| | |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
| 2 | DISTRICT OF DELAWARE |

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
| ZOHAR III CORP., *et al.*, | . | Case No. 18-10512 (KBO) |
|  | . |  |
| _____ Debtors. | . |  |
| BLANK ROME LLP, FFP (CAYMAN) | . |  |
| LIMITED, MAPLES AND CALDER | . |  |
| MAPLESFS LIMITED, MORRIS, | . |  |
| NICHOLS, ARSHT & TUNNELL LLP, | . |  |
| GARY NEEMS, AND QUINN EMANUEL | . |  |
| URQUHART & SULLIVAN LLP, | . |  |
|  | . |  |
| Plaintiffs. | . |  |
|  | . |  |
| v. | . | Adv. Proc. No. 19-50273 |
|  | . |  |
| ZOHAR CDO 2003-1 CORP. AND | . |  |
| ZOHAR CDO 2003-1 LIMITED | . |  |
| ZOHAR CDO 2003-1, LIMITED; | . |  |
| ZOHARII 2005-1, LIMITED; AND | . |  |
| ZOHAR III, LIMITED, | . |  |
|  | . |  |
| Plaintiffs. | . |  |
|  | . |  |
| v. | . | Adv. Proc. No. 20-50534 |
|  | . |  |
| PATRIARCH PARTNERS, LLC; | . |  |
| PATRIARCH PARTNERS VIII, LLC; | . |  |
| PARTRIARCH PARTNERS XIV, LLC; | . |  |
| PATRIARCH PARTNERS XV, LLC; | . |  |
| PHOENIX VIII, LLC; OCTALUNA LLC; | . |  |
| OCTALUNA II LLC; OCTALUNA III, | . |  |
| LLC; ARK II CLO 2001-1, LLC; | . |  |
| ARK INVESTMENT PARTNERS II, LP; | . |  |
| ARK ANGELS VII, LLC; PATRIARCH | . |  |
| PARTNERS MANAGEMENT GROUP, LLC; | . | Courtroom No. 1 |
| PATRIARCH PARTNERS AGENCY | . | 824 North Market Street |
| SERVICES, LLC; AND LYNN TILTON, | . | Wilmington, Delaware 19801 |
|  | . |  |
| Defendants. | . | April 21, 2020 |
| . . . . . . . . . . . . . . . . . . | | 1:30 P.M. |

```
 1                  TRANSCRIPT OF TELEPHONIC HEARING
                BEFORE THE HONORABLE KAREN B. OWENS
 2                 UNITED STATES BANKRUPTCY JUDGE

 3

     TELEPHONIC APPEARANCES:
 4

 5   For the Debtors:         Michael Nestor, Esquire
                              Drew Magaziner, Esquire
 6                            Ryan Bartley, Esquire
                              Robert Brady, Esquire
 7                            Joseph Barry, Esquire
                              James Patton, Esquire
 8                            Shane Reil, Esquire
                              YOUNG CONAWAY STARGATT & TAYLOR LLP
 9                            Rodney Square
                              1000 North King Street
10                            Wilmington, Delaware 19801
     Audio Operator:          Al Lugano
11
     Transcription Company:   Reliable
12                            1007 N. Orange Street
                              Wilmington, Delaware 19801
13                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
14

15   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
16

17   TELEPHONIC APPEARANCES (Continued):

18
     For Patriarch:           Monica Loseman, Esquire
19                            Mary Beth Maloney, Esquire
                              Robert Klyman, Esquire
20                            GIBSON DUNN
                              333 South Grand Avenue
21                            Los Angeles, California 90071

22   For Mr. Farnan:          Christopher Shore, Esquire
                              WHITE & CASE
23                            1221 Avenue of the Americas
                              New York, New York 10020
24

25
```

1 | MATTERS GOING FORWARD:

2 | **#12)**  Patriarch Stakeholders' Motion to Amend the Court's
3 | March 30, 2020 Order [(SEALED) D.I. 1553; 4/2/20; (REDACTED)
   | D.I. 1579; 4/15/20]

4 | **Ruling:  18**

5 |

6 | **#10)**  Debtors' and Independent Director's Joint Emergency
   | Motion for Entry of an Order Declaring that the Debtors
7 | Control the Portfolio Companies and Granting Related Relief
   | [(SEALED) D.I. 1505; 3/23/20; (REDACTED) D.I. 1599; 4/16/20]

8 |

9 | **Ruling:  Adjourned**

1      (Telephonic proceedings commence at 1:31 p.m.)

2          THE COURT:  Counsel, this is Judge Owens.  Thank

3  you very much for appearing telephonically today.  I

4  understand we have two substantive motions to address today.

5          So, why don't I turn it over for counsel for the

6  debtors to take us through the agenda today.  I'm sorry, is

7  counsel for the debtors on the line?

8          MR. BARRY:  He may have gotten disconnected.  I

9  think we had this issue in the past.  I will -- if I could

10  ask the court for a moment I will try and reach him.

11          THE COURT:  Okay.  Is this Mr. Barry?

12          MR. BARRY:  Its Joe Barry, Your Honor, for the

13  record.

14          MR. NESTOR:  Can you guys hear me?

15          THE COURT:  Mr. Nestor, yes.  This is Judge Owens.

16          MR. NESTOR:  Can you hear me?

17          THE COURT:  I can hear you.  This is Judge Owens.

18  Can you hear me?

19          MR. NESTOR:  Yeah, I can.  Sorry about that.  I

20  actually picked up the phone to talk so it would be clearer.

21  I put it back on the box.  It seems like there must be a

22  problem with my phone.  I apologize.

23          THE COURT:  Not a problem.  I thought maybe I was

24  not connected to the line.  So, that's the explanation of why

25  it was silent for so long.

1    Thank you for joining.  Why don't you take us

2  through the agenda today.

3    MR. NESTOR:  Thank you, Your Honor.

4    I wanted to give you two points and a suggestion

5  with respect to this hearing.  First, did you get the number

6  identification that I had emailed to your Chambers for the

7  five portfolio companies?

8    THE COURT:  Yes.

9    MR. NESTOR:  Okay.  I wanted to let you know, just

10 as an update, with respect to number two; the debtors had

11 noticed up a shareholder meeting with respect to filling the

12 sole director of that company.  Ms. Tilton has also noticed

13 up a shareholder meeting for the same purpose.  But I wanted

14 to let you know that the meeting did occur, the votes were

15 tallied, and the debtors candidate was selected as the sole

16 member -- as the sole director of number two.

17    Again, preliminarily, and this is just the debtors

18 perspective, there have been allegations of false

19 emergencies, rushing to court, et cetera, and we want to be

20 clear with Your Honor that we don't view anything that we do

21 before the court lightly.  We certainly don't come to you on

22 what we would call false.  The debtors bring issues to Your

23 Honor based upon our judgment regarding the needs that are

24 required and when we need your judgment on an issue.

25    So, fortunately the relief that we're seeking

1  today is not emergency relief because it was sent out and

2  filed on regular notice.  We just wanted you to know from our

3  perspective that we don't take lightly coming to Your Honor

4  for decisions and if we do so on an emergency fashion it's

5  because we believe that that's what's required.

6         There are two motions that are pending, two

7  pleadings pending before the court.  The first is the debtors

8  -- it was the debtors underlying emergency motion that was

9  filed the week of March 23rd.  You denied that without

10  prejudice, and so we filed a second supplement to seek very

11  narrow relief with respect to one portfolio company.  That is

12  Item No. 10 on the agenda.

13         Item No. 12 on the agenda is Patriarch's motion to

14  amend Your Honor's order of March 30th.  And I will defer,

15  obviously, to you and Ms. Loseman, if she's arguing this.  It

16  may make sense to start with that motion because it may

17  address some of the issues that we will be discussing in the

18  context of Item No. 10.  So, my recommendation would be to,

19  at least, start with that motion and then come back to Item

20  No. 10.

21         THE COURT:  Okay.  This is Judge Owens.  I was

22  actually thinking the same thing.  I would like to take the

23  motion to amend, which after reading the pleadings, appears

24  that the relief sought has been very narrowly focused.

25         So, Ms. Loseman or counsel for Patriarch, why

1  don't we address that matter first and I'll allow you to

2  present it in the first instance.

3          MS. LOSEMAN:  Thank you, Your Honor.  This is

4  Monica Loseman on behalf of Ms. Tilton and the Patriarch

5  stakeholders.  That order certainly makes good sense to us.

6          So, as to the motion to amend, Your Honor, we are

7  before you on what we believe is a fairly simple limited

8  motion to clarify the March 30th order entered by this court.

9  Debtors take the position that the court's entry of its order

10 on March 30th constitutes a finding, an implicit finding,

11 that the rescissions on March 26th are ineffective and that

12 the five companies were without a director or manager through

13 a transition period.

14          The debtors take this position despite the fact it

15 was debtors that asked for help, seemingly asked for help,

16 complaining that those companies needed transitional

17 leadership and were left without governance until the parties

18 could elect replacements.  They take this position despite

19 the fact that Ms. Tilton has continued to provide leadership

20 to those companies, with no compensation, in order to address

21 debtors' concerns that the business, in fact, needed that

22 transitional leadership.  She has provided that leadership

23 and the companies have continued to operate in the normal

24 course and continue to prepare for the sales processes

25 consistent with this court's order on the timeline motions.

1          The debtors, unfortunately, take this position

2    despite the fact that Mr. Katzenstein continues to meet with

3    Ms. Tilton to discuss and work towards a transition and that

4    Mr. Katzenstein receives updates on the company's operations

5    and their activities to prepare for a sales process

6    consistent with the timeline ordered by this court.  The

7    debtors' counsel take this position despite the fact that the

8    rescissions were clearly effective only until such time as

9    replacements would be appointed.  Ms. Tilton, unfortunately,

10   it seems, can do no right in debtors' view.

11          So, why is there a need for clarity that this

12   court did not implicitly rule on the effectiveness of the

13   rescissions.  Let's the series of events in the transfer of

14   leadership at Portfolio Company 2 as an example.

15          As Mr. Nestor noted, the company held a special

16   meeting where the debtors' director was elected just

17   yesterday.  The company had actually noticed an annual

18   meeting of shareholders for May 15th at which time the

19   director would be elected.  The debtors, however, wanted a

20   meeting sooner and they sent a notice of special meeting for

21   April 21st; however, debtors notice and special meeting was

22   sent pursuant to a provision of the bylaws applicable only

23   where there is a director absent.

24          On behalf of the Ark and any IP entities that hold

25   approximately 42 percent of the equity in that company we ask

1  debtors to simply revise their notice of special meeting and

2  include a reference to a different provision of the bylaws

3  applicable to a replacement of a seated director.  The

4  debtors refused.  There were actions taken by the company and

5  approved by Ms. Tilton during this transitional period,

6  actions that Ms. Tilton discussed with Mr. Katzenstein and

7  with which he concurred in her role as director during that

8  transition.

9      Debtors' insistence that this court has ruled on

10  the effectiveness of the rescissions could leave questions as

11  to the validity of those actions.  Rather than waste

12  resources, by the way, litigating the issue, Ms. Tilton

13  caused the Patriarch stakeholders that own equity in that

14  company to also request a special meeting for the same date

15  and time for the purpose of electing a replacement director.

16  That is how the special meeting that occurred yesterday came

17  about. And debtors' candidate was elected.

18      Now we hope for the same relatively smooth

19  transition to a new director or manager of leadership as to

20  the other companies as well.  There should be no ambiguity

21  about leadership during the transitional period.

22      Let me address the procedural issue raised in the

23  briefing briefly.  We do not seek to modify or seek any

24  reconsideration of the court's March 30th order.  We seek

25  only a clarification that this court did not rule, did not

1   even receive briefing or hear argument on the effectiveness

2   of the rescission.  And the mechanism for clarifying the

3   order is Rule 9023.  The standard is not so high, as debtors

4   suggest, for this court merely to clarify its prior order.

5   This court can use Rule 9023 to do so without reaching the

6   standards debtors suggest.  And there is clear precedent we

7   have sited including the Nortel case where Judge Gross

8   invoked this very rule to clarify an order.

9           Now let me address, briefly, debtor's view

10  regarding the motivation for the motion to amend.  That

11  conspiracy theory, frankly, is out of left field.  Debtors

12  have developed this theory that the purpose, the secret

13  purpose of this very limited motion to amend is to allow Ms.

14  Tilton to replace her personal role with that of an

15  independent person with industry experience all in an effort

16  to somehow delay the sales process.  Debtors once again make

17  radical factual allegations without a scintilla of support.

18          If Ms. Tilton and Mr. Katzenstein were to testify

19  we believe the court would find no support whatsoever for

20  this conspiracy theory.  And even setting aside the utter

21  absence of any factual support for that theory the debtors'

22  theory is illogical.  If debtors' true concern is adhering to

23  this court's timeline order then granting the motion to amend

24  is actually in debtors' stated interest.  It merely maintains

25  a status quo and the companies continue to prepare for the

1   monetization process consistent with the court's order.

2           According to debtors read of the settlement

3   agreement Ms. Tilton will continue to be bound by its terms

4   so long as she continues to fulfill the manager/director role

5   at these companies through the transitional period.  And

6   setting aside interpretations of the settlement agreement or

7   legal arguments on that point we agree it is preferable that

8   Ms. Tilton remain in these roles during the transition

9   process so that the companies can continue to make progress

10  with the monetization process.

11          In the short few weeks Ms. Tilton has continued to

12  provide transitional leadership.  And as Mr. Katzenstein

13  would have to admit she has moved the companies forward in

14  the marketing process, utterly cognizant of the deadlines

15  imposed by the court.  And once new leadership is elected the

16  expectation is that they will simply pick-up that process and

17  continue to move it forward.

18          Debtors want to create this sense of an emergency

19  in the hopes that doing so will persuade this court to

20  foreclose the Patriarch stakeholders from exercising their

21  equity and lender rights in the portfolio companies.  They

22  insist, for example, that the five companies are without

23  governance in order to complain about the absence of

24  leadership, hoping to persuade the court an emergency exists

25  that justifies wholly foreclosing the Patriarch stakeholders

1  voting rights.  I will address that more with respect to the

2  second supplement and in response to debtors opening remarks

3  on that matter, but it's not really relevant to the motion to

4  amend.

5        Permitting debtors to imply to third-parties that

6  the court implicitly ruled that the rescissions were

7  ineffective only leaves the five or now four companies

8  without leadership through the transition period.  What we

9  seek through the motion to amend should be a shared goal of

10 the parties; maintaining a status quo as to governance only

11 until such time as replacements are dually elected for the

12 four remaining companies.  That is all we ask of the court; a

13 clarification that the March 30th order did not constitute a

14 ruling on the rescission question.

15       That question was not at issue at the March 26th

16 argument, it was not briefed, it was not argued and the only

17 reason the rescissions even came about was debtors' complaint

18 that certain companies might be left without transitional

19 leadership.  Ms. Tilton answered their concern by,

20 essentially, agreeing to maintain the status quo; continue as

21 director and manager, pushing the monetization process

22 forward only until such time as replacements are dually

23 elected.  She has and will continue to do so.  We simply ask

24 the court to amend its order to make clear it did not somehow

25 implicitly rule the limited rescissions were ineffective.

1    Thank you, Your Honor.

2    THE COURT:  Thank you.

3    Mr. Nestor?

4    MR. NESTOR:  Thank you, Your Honor.  Can you hear

5  me?

6    THE COURT:  I can.

7    MR. NESTOR:  Thank you.

8    Your Honor, a couple things at the outset.  One,

9  the debtors never asked Ms. Tilton to rescind her

10  resignations.  Ms. Tilton apparently did not understand the

11  implication of her decision.  So, when we filed the

12  supplement with the court we noted that as a basis for the

13  debtors needing to take control, not for Ms. Tilton to then

14  rescind her resignation at those companies.  They were

15  without leadership because of her unilateral action and the

16  debtors took action immediately to fix that.  And it's

17  uncontroverted in the record, Judge.

18    The Monday after Ms. Tilton gave her notice the

19  debtors sent a consent that said please provide us with the

20  control, the leadership, and the stability that you committed

21  to give us under your letter. She said no.  So, we were left

22  with no alternative but to file the motion.

23    With respect to the compensation issue, Judge, Ms.

24  Tilton does get $100,000 dollars a month and each of these

25  portfolio companies is either paid or accrued, but the

1  services being provided aren't free.  And despite counsel's

2  attempts to testify from the phone regarding facts that

3  aren't relevant to this proceeding the debtors took action,

4  Judge, consistent with the letter that was filed, and we'll

5  get to that, that she sent to the debtors on March 21st and

6  was filed with the court.

7          The order that was entered, Judge, was the result

8  of a hearing that was conducted before Your Honor.  We had a

9  hearing on March 26th and Your Honor instructed the parties

10  to submit Ms. Tilton's order and to add a provision that

11  required her reasonable and good faith in terms of delivering

12  ownership and control of the portfolios to the debtors

13  consistent with the representations in her letter.

14          Now, with respect to the relief that's requested,

15  Judge, this very easily have been disposed of on or before

16  March 30th.  We sent the order.  We had a dispute with

17  Patriarch regarding the order.  And this is something that

18  likely and should have been done then because the same issues

19  were at play at that time.

20          From our perspective, Judge, the resignations with

21  respect to these five companies, now four companies, was

22  effective immediately pursuant to Ms. Tilton's own letter and

23  her own letters referenced to applicable law and the

24  applicable agreements.  Once she resigned she lacked the

25  ability to rescind and Patriarch sites no case in support of

1  that proposition.  There is nothing in the agreements which

2  were filed with the court and there's nothing under

3  applicable law that supports that position.  In short, Your

4  Honor, there's (indiscernible).  You don't get to resign,

5  send everyone notice of your resignation, make clear that

6  it's automatic upon receipt and then change your mind five

7  days later.

8          THE COURT:  Well, listen, Mr. Nestor, I know that

9  that is your argument on the substantive issue.  Presumably,

10 you know, we're going to get to it, depending on how I rule

11 on this motion, of course, we're going to get to it in the

12 next motion.

13         MR. NESTOR:  Yes.

14         THE COURT:  With respect to the motion to amend, I

15 mean, to you agree that I did not make a decision with

16 respect to the rescissions on March 30th?

17         MR. NESTOR:  Well, Your Honor --

18         THE COURT:  I mean, let's just save one issue out

19 of time.  I'm not saying I made a decision.  I'm  just saying

20 do you agree that we didn't discuss or it or I didn't make a

21 ruling and there needs to be some sort of ruling or do you

22 disagree because that is really the focused issue that we're

23 talking about momentarily in the motion to amend.

24         MR. NESTOR:  Correct, Your Honor.  So, a couple of

25 things.

1         So, the motion that was filed by Patriarch started

2    off under 59(e) and then they flipped to 60(b) in their

3    reply.  And I think we have to -- so, one, all of these facts

4    were in the record on March 26th.  Ms. Tilton filed a

5    pleading with the court stating that she rescinded her

6    resignation with respect to these five companies prior to the

7    hearing. I think it was an hour before the hearing, and it

8    was addressed at the hearing on the call with Your Honor.

9         So, everything that we're talking about now, all

10   of these facts were in the record, both the docket and the

11   transcript, at the hearing that was conducted by Your Honor

12   on March 26th.  And at the conclusion of that hearing we did

13   exactly what you asked us to do.  You said take Ms. Tilton's

14   order and add this paragraph.  That is what we did.

15        Our position was, in fact, that she had resigned

16   and that she's incapable of un-resigning under the applicable

17   documents.  We both, respectively, briefed this issue.  It's

18   before you today.  We think you can decide that on the

19   merits, but our position is under Rule 59(e) they haven't

20   made their case.  What they do is they site the rule and site

21   some facts, but they never connect the dots on tying the

22   facts to the rule.  And what it requires, what cases have

23   said is you need an intervening change of law, we don't have

24   that.  We have availability of new evidence, we don't have

25   that.  And we have the need to correct clear error of law or

1  manifest injustice.  The debtors don't have that, it hasn't

2  been alleged.

3      With respect to Rule 60(b) same sort of issues

4  except, you know, most of them don't apply.  Mistaken

5  inadvertence, or excusable neglect, first, second, newly

6  discovered evidence, third fraud, fourth is the judgment

7  void, fifth has the judgment been satisfied, and sixth any

8  other reason that justifies the relief.  I assume that is

9  what they are relying on, but it is unclear from their

10 papers.

11     From the debtors' perspective we were at the

12 hearing on the 26th.  They actually filed a pleading noting

13 that Ms. Tilton had rescinded her resignations.  We had the

14 hearing and Your Honor instructed us to file an order, you

15 know, that we filed ultimately and that Your Honor,

16 ultimately, entered.  So, we would suggest that, in fact, the

17 order did address this issue, the effectiveness of the

18 resignations, that was the heart of the ruling which was

19 important from the debtors' perspective.

20     And we don't think -- we think either you did so

21 understanding the issues that were being discussed or that it

22 should not be an issue as a matter of law because Ms. Tilton

23 is incapable under the applicable documents of rescinding her

24 resignation and reinserting herself back after she has

25 resigned effective immediately upon delivery.

1      THE COURT:  Okay.  Well, listen, I'm just going to

2  cut right to the issues.  I don't want to waste time on this.

3  The motion to amend is very narrow.  I am prepared to make

4  the clarification.

5      I think that my order was very clear and that

6  there was no ruling on the rescissions.  I did not make any

7  such ruling on the record or in the order.  And I did not

8  intend to do so.  So, I am prepared to make that

9  clarification.  But to be clear I made no determination as to

10 the effectiveness or ineffectiveness of Ms. Tilton's letters

11 rescinding her resignation.

12      So, that is an open issue.  And you teed up one

13 motion to address it at Company One.  That is the next

14 matter.  So, let's just go ahead and deal with it now.

15      MR. NESTOR:  Thank you, Your Honor.  I appreciate

16 that.

17      So, Your Honor, we're at Item Number 10 on the

18 agenda, the debtor's motion through a second supplement to

19 insert itself and have you compel Ms. Tilton to insert

20 herself -- to insert the debtors as the managing member of

21 Portfolio Company No. 1.

22      Your Honor, we've been through this before, Ms.

23 Tilton's resignation on March 21st was the day after you

24 ruled on the monetization procedures and guidelines.  And she

25 purports to say that that had nothing to do with it.  At that

1  time she resigned from all positions at all of the Group A

2  and Group B portfolio companies. And we will get to those

3  statements in that letter shortly.

4          It's important to note, Your Honor, that this was

5  done without any notice to anyone including Your Honor.  If

6  we turn back to -- again, this is the, you know, sworn

7  testimony of Ms. Tilton in connection with that trial.  She

8  testified over two days and never indicated to anyone that

9  she intended to resign.  In fact, it was the opposite, Your

10  Honor.

11          I would like to talk about a few of these

12  statements.  Page 91, Lines 15 through 20 she states that,

13          "In the end it's important to me to maximize value

14  for all constituencies to find the right buyer that will take

15  care of my people and the customers and vendors, and all the

16  people that we have built relationships with, and to make

17  certain that that process is successful."

18          Page 150, Lines 23 through Page 151, Line 4,

19          "I expect that I will be deeply involved with the

20  management meetings of potential buyers since I'm the only

21  one with the history and much of the management is new trying

22  to maximize value for this company."

23          Page 208, Lines 20 to 23,

24          "My intention is to do everything possible to

25  market this company properly, and maximize value and get a

1  robust price that I can sell at."

2           Page 211, Lines 6 through 20,

3           "It's important to me to be deeply involved in the

4  process and the managment meetings, I mean this company.

5  Everybody will be new and just hired.  So, I will be the only

6  one who can sit in management meetings with the history of

7  operations to market the company."

8           Last, Your Honor, Page 339, Lines 4 through 6,

9           "But I will work, as I have since the start of

10 this process, tirelessly and with my full attention."

11          So, Judge, she resigned without any notice

12 contrary to her statements before Your Honor, sworn

13 testimony, a month before.  On March 23rd the debtors

14 immediately sent Ms. Tilton, and, again, uncontroverted in

15 the record, a consent that would have fulfilled her

16 commitments under her resignation letter and delivered

17 ownership, control and leadership to the debtors.  It was

18 rejected that day and we were forced to file the motion with

19 Your Honor.

20          Having resigned, effectively, as of March 21st Ms.

21 Tilton then, on the 26th, the day of the hearing, purported

22 to rescind it apparently after reading the debtors' pleading

23 and then understanding the ramifications of her decision, but

24 she only did that with respect to the five companies where

25 she has an economic interest in the form of debt and/or

1  equity.

2        So, Your Honor, we had the hearing on the 26th.

3  You granted in part and denied in part the relief that was

4  requested by the debtors, but it's important to look at

5  exactly what you said.  You said,

6        "I do feel it appropriate to add a provision to

7  Ms. Tilton's proposed order that requires Ms. Tilton and the

8  other Patriarch stakeholders shall work reasonably and in

9  good faith with the debtors to transition ownership and

10  control of the portfolio companies as set forth in the

11  resignation letter."

12        Then, you noted further that,

13        "I do believe her representations are genuine and

14  I will give her the chance to accomplish and live up to that

15  statement."

16        THE COURT:  Mr. Nestor, I'm going to interrupt you

17  because I know what I said.  Everybody, both sides, loves to

18  quote me, loves to fill their motions with things that I

19  said.  I know what I said, I remember what I said.  What's

20  important is that at the time that we had that hearing there

21  was -- Patriarch made it clear or Ms. Tilton's counsel made

22  it clear that she was not transferring ownership or control

23  rights that she had due to her personal investments.  So,

24  that is really the issue here, at least I think that the

25  issue here.

1      So, why don't we talk about that?  Why in some way

2  is that not the correct framing of this issue and why aren't

3  we focusing on that?

4      MR. NESTOR:  Thank you, Your Honor.  I will focus

5  on that.  I appreciate that.

6      So, in that regard, Your Honor, so let's then look

7  at what Ms. Tilton said to us, to you and to all the

8  portfolio companies.

9      Her resignation letter is not -- well, first of

10  all, our position is that at this portfolio company, and this

11  issue is teed up in the context of this motion, that Ms.

12  Tilton has, in fact, resigned at this company and her

13  position has not been filled.  If you look at she tendered

14  her resignation to the debtors, to the company and it set

15  forth that it was effective immediately upon receipt.

16      If you look at Section 5.9 of the LLC agreement it

17  states resignation by the manager will take effect at the

18  time specified in the resignation or if no time specified at

19  the time of its receipt by any common member.  So, the

20  debtors received that on March 21st.  We believe it was

21  effective as of the 21st.  And the documents speak to absent

22  an order of this court how that spot gets filled.

23      It's important, Judge, this wasn't just a

24  resignation letter, a one liner that says I resign and move

25  on.  The letter went into extreme detail in terms of her

1  commitments, the basis, the clarity and the implications of

2  her resignation.  She stated,

3      "I know that I can no longer effectively lead the

4  companies forward into the future."

5      She stated,

6      "As the Zohar's control the future of these

7  companies I feel I can no longer continue my roles."

8      She stated again that it was effective immediately

9  and under the express terms of the LLC agreements and the

10  shareholders agreements,

11      "Such resignation is deemed accepted upon

12  receipt."

13      She stated that she believed her resignations are

14  in the best interest of all constituencies.

15      She stated that,

16      "It's only more important to the portfolio

17  companies are not caught in the middle of constituency

18  conflict."

19      She stated that the portfolio companies will need,

20      "Unilateral support, relief, capital and attention

21  presumably from the debtors."

22      And in closing she said,

23      "I will, of course, reasonably cooperate with your

24  new leadership to accomplish this transition."

25      So, Judge, from the debtors' perspective Ms.

1   Tilton promised -- she resigned effective immediately,

2   vacating all those positions at dozens of portfolio

3   companies.  At this company in particular, the one we're

4   talking about today, she is incapable of rescinding it.

5   Under applicable law Patriarch provides no support for the

6   ability to rescind that resignation.  It's effective upon

7   receipt and its effective consistent with the applicable LLC

8   agreement.

9           The debtors, in response, offered themselves as

10  the Zohar III Corp, as proposed managing member, Judge.  A

11  debtor in these cases who is subject to the oversight and

12  jurisdiction of this court.  Ms. Tilton has objected to that

13  stating that she is still the manager.  She stated that you

14  need industry experience and that she needs an additional

15  four to six weeks, not from the date of resignation, from the

16  filing of her pleading, to find an acceptable candidate,

17  imposing necessarily a month long delay into this process.

18          THE COURT:  Well, let me interrupt you because I

19  want to be clear.  I want to make sure that I understand.  My

20  understanding is, and please correct me if I'm wrong, Mr.

21  Nestor, and Ms. Loseman can chime in when it's here time, but

22  she -- I believe that the papers reveal that she objected to

23  the appointment of Zohar III not because she is the manager,

24  but because she holds common shares, through an affiliate,

25  and she has the right to consent under the LLC agreements.

1        MR. NESTOR:  It's both, Your Honor.

2        THE COURT:  So, even if the manager is empty she

3  still has the ability as a common member to vote on the

4  replacement.  Is that my understanding wrong?

5        MR. NESTOR:  Can you hear me, Your Honor?

6        THE COURT:  Yes.

7        MR. NESTOR:  I think she has taken both positions

8  that she is the manager and there is no need to replace her,

9  and that she has the right -- you know, essentially, you need

10  unanimity to elect it and she doesn't consent.

11       THE COURT:  Okay.  Let's focus on the unanimous

12  vote.  I understand your position with respect to whether Ms.

13  Tilton, effectively, reinstated herself as manager.  I

14  certainly understand that, but let's put that aside.  Explain

15  a little bit more into your position as to why the parties do

16  not need to have unanimous consent.

17       MR. NESTOR:  Well, I mean the fact of the matter

18  is, Judge, we don't -- the argument is that it requires

19  unanimous consent and that requires unanimity which requires

20  all common holders to consent.  And Ms. Tilton does not

21  consent to the debtor's representatives.  So, at this point

22  we don't have -- we're in a deadlock in terms of next steps.

23  In connection with -- by the way, we just keep coming back to

24  either her letter that was tendered to the debtors and given

25  to the court has some meaning or it doesn't.

1        From the debtors' perspective what Ms. Tilton has

2   done is pulled the carpet out from everybody, resigned at all

3   these companies, and now purported to rescind which we think,

4   as I said and its set forth in our papers, is incapable of

5   being done under the underlying LLC agreements and applicable

6   law.

7        From the debtors' perspective her decision and the

8   refusal of the Ark entities to consent to the debtors in

9   these cases, whose job is to sell and realize value for their

10  assets, directly impacts the settlement agreement which

11  requires a joint process.  There is no joint process in

12  connection with Ms. Tilton's resignation at all of these

13  portfolio companies.  It actually directly impacts that

14  process.

15       Second, the monetization procedures order which,

16  again, requires a joint process and court imposed deadlines

17  to get things done specific to this company.  Finally, Judge,

18  the transition order which deals with the transition of

19  ownership and control to the debtors consistent with the

20  resignation letter that she filed.

21       So, from the debtors' perspective, Judge, you have

22  jurisdiction over Ms. Tilton and the Ark entities.  They are

23  Patriarch stakeholders under the settlement agreement.  We

24  went -- you decided that on February 6th.  You have authority

25  to enforce your orders.  We are now one month removed from

1  Ms. Tilton's resignation, two months removed from the trial

2  that we had with you in February and Ms. Tilton is telling

3  you she needs a couple of more months to make a decision,

4  just to make a recommendation with respect to a manager.

5          The debtors respectfully request that you exercise

6  jurisdiction over Ms. Tilton and the Ark entities, that you

7  have the authority to do that under three orders of this

8  court regarding the settlement agreement, the monetization

9  procedures order and the transition order.  The debtors are

10  prepared to lead the process with respect to this company,

11  but you required, and there is no contest with respect to

12  Paragraph 6 of the transition order that you entered on the

13  30th, you required Ms. Tilton to act in good faith and

14  reasonableness in connection with the transition of ownership

15  and control.

16          What we have, Your Honor, is we're a month removed

17  from this process.  The debtors immediately made

18  recommendations with respect to the portfolio companies.  She

19  immediately -- they did it on March 23rd before they filed

20  their motion, they did it on March 31st the day after you

21  ruled.  And Ms. Tilton was a month removed from the hearing

22  and from Ms. Tilton's resignation.  And we still don't even

23  have a candidate, Judge.  And we have no commitment to get

24  one in the short term.

25          We think that Paragraph 6 drives Your Honor's

1  ruling.  We think that you have jurisdiction, as I said, with

2  respect to these entities.  They're all controlled by Ms.

3  Tilton anyway, but the good news is they're covered as

4  Patriarch stakeholders in the settlement agreement.  The

5  orders that you enter have to have integrity and they have to

6  have meaning.

7           From the debtors' perspective you have the right,

8  you have the authority and you have the basis to, one,

9  determine that Ms. Tilton has, in fact, resigned this company

10  and not reinserted herself or, you know, taken back her

11  resignation, but more importantly, Judge, that the debtors

12  are the right party to lead the process forward with that

13  company when the clock is ticking on the timeline that you

14  set in the monetization procedures order.

15           I have nothing further, Your Honor, unless you

16  want to beat me up some more.

17           THE COURT:  I just struggle because you filed your

18  adversary proceeding seeking, in part, exactly the relief

19  that you obtained through the resignation letters as we sit

20  here today.  So, what did you expect was going to happen if

21  you obtain that relief in connection with the joint

22  monetization process --

23           MR. NESTOR:  Your Honor --

24           THE COURT:  -- because I'm struggling -- let me

25  back up, I want to continue my thought which is because I'm

1  struggling with the idea that this relief is necessary to

2  enforce my order when I have not concluded that Ms. Tilton

3  has resigned solely to thwart my orders unless I should hold

4  her in contempt or should enforce the terms of those orders.

5  And you provided me no other clarity under Delaware state law

6  as to why I can force or somehow resolve this deadlock.

7           I will be honest with you because there was law

8  sited I did the dangerous thing and went on Westlaw and I

9  found that this is not necessarily the remedy the Delaware

10 Courts impose when there is a deadlock, okay, because

11 judicial dissolution is the remedy.

12          MR. NESTOR:  Either that or -- there are other

13 remedies as well, Judge, but from the -- again, this is a

14 court of equity and we are operating under orders of this

15 court.  At this point I'm not sure we care why it happened.

16 It doesn't have -- there are facts in the record,

17 uncontroverted, that we think drive the result we're seeking.

18          One, Ms. Tilton resigns at all companies.  Made

19 the representation to us, to you and to the portfolio

20 companies that she was resigning at all of these portfolio

21 companies.

22          Second, there is a vacancy here at this company.

23 And there is a deadline that's been prescribed by Your Honor

24 in connection with a process, again, the record is clear,

25 that has been going on for more than a year, but there is a

1 deadline that has to be achieved with respect to that

2 portfolio company.

3        Third, the debtor -- this is a debtor in a Chapter

4 11 case pending before the court who recommend itself, its

5 professionals, its principals, as the parties to lead that

6 process.  Over the next couple of months there's not much

7 time left.

8        I understand where you are coming from, Judge.

9 And I would say that if Ms. Tilton is willing to stipulate to

10 judgment on all of the relief set forth in the complaint that

11 we filed that would resolve, actually, some of the issues

12 with the other portfolio companies because she purported to

13 give herself, you know, the sole exclusive right.  She

14 contracted with herself to give her those remedies.

15        So, if she is prepared to consent to all of the

16 relief we've sought in that adversary proceeding we're happy

17 to document that, but with respect to this company, Judge,

18 from the debtors' perspective we have a settlement agreement

19 which requires a joint process.  She acted unilaterally to --

20 again, I'm not saying that was the intent, but it effectively

21 kept significant doubt and delay over that process.  The same

22 goes for the monetization procedures order. It reaffirmed the

23 joint process and set deadlines.  The unilateral, without

24 notice, resignation necessarily imposes uncertainty and delay

25 in connection with that process.

1          Third, the transition order.  I guess the question

2  is you ordered Ms. Tilton to work reasonably and in good

3  faith to transition ownership and control of the portfolio

4  companies to the Zohar's.  In this case the Zohar's have

5  suggested themselves as the party who will take ownership,

6  leadership, control and responsibility for this entity.  And

7  Ms. Tilton, without detailing why that is not a proffer has

8  objected.  She hasn't come forward in the last 30 days with a

9  replacement candidate for this company.  Instead, she told

10 you, us and everyone else that she needs another four to six

11 weeks from last week to be able to make that decision.

12         So, from the debtors' perspective we don't believe

13 that the negotiation on this company is in good faith.  We

14 don't believe that it's reasonable and we think that you have

15 the authority, you have the jurisdiction to enter an order

16 directing her to do this, just as you would if you were

17 directing a sale of the portfolio company. It's the same

18 issues we dealt with on February 6th.  If Ms. Tilton was not

19 doing something that you thought needed to be done you said

20 you have the authority over her objection to take action to

21 make her do the right thing.

22         In this case, Judge, with respect to this company

23 we're going to be caught in limbo for an indefinite period of

24 time and we're going to be having this same argument two

25 months from now.

1           THE COURT:  Okay.  Thank you.

2           MR. SHORE:  Your Honor, this is Chris Shore.  May

3  I be heard very briefly on behalf of Mr. Farnan?

4           THE COURT:  Yes.

5           MR. SHORE:  For the past, I'd say, nine months now

6  the court has been moving on a very deliberate series of

7  steps to get a solution to the problem we had last August

8  which is companies that were -- debtors in bankruptcy whose

9  interests in companies were not getting better with age and

10  no visible path to getting to closure.

11          The debtors invested a great deal of money in

12  litigation and the court invested a great deal of time in

13  coming up with a solution.  The solution was to use the

14  settlement agreement to obtain jurisdiction over Ms. Tilton

15  and the portfolio companies that would extend until all the

16  assets are sold or the parties were paid in full and the

17  court found, in a contested hearing, that it had jurisdiction

18  over Ms. Tilton and the Patriarch parties to compel the sale

19  of the portfolio companies including the portfolio companies

20  in which the Patriarch entities, like Ark, held a minority in

21  stockholding interest.  That is the whole company could be

22  sold and we then had a discussion about how we might have to

23  drag in third-parties through the drag provisions in the

24  shareholders agreement so that we could get to a sale.

25          I'm not going to repeat the argument.  Once

1  resigned a director or officer can't reappointment

2  themselves, it has to be done through valid corporate action.

3  The question here, with respect to this portfolio company, is

4  what do we do about a new manager.  As it is right now the

5  status quo is that the court has been divested of

6  jurisdiction to compel anybody to sell this portfolio

7  company.  That is if the court is going to conclude that it

8  does not have jurisdiction to compel the minority shareholder

9  here to elect a director.

10          It will be a, from Mr. Farnan's perspective, giant

11  loophole in the monetization order and the process that led

12  up to it.  That is on the day before she resigned the court

13  could compel, as Mr. Nestor said, the actual sale of those

14  interests.  And to that would be could compel the minority

15  shareholder to take the actions necessary to cause the sale

16  if it required a shareholder consent, it required a

17  shareholder meeting.  None of that could be done.

18          Its Mr. Farnan's perspective that both he and Ms.

19  Tilton are personally obligated under that monetization order

20  to take certain actions and proceed in a certain way.  It's

21  Mr. Farnan's position that Ms. Tilton did not remove herself

22  from the jurisdiction of the court to compel moving forward

23  with the monetization process.  While we accept that

24  commitments have been made about when things are going to get

25  done it needs to be very clear that as part of the

1  monetization process, if Ms. Tilton is going to resign, she

2  needs to get a replacement manager in there.  It cannot be a

3  veto by delay and it cannot be an unreasonable veto because

4  the monetization or the transition order requires good faith

5  cooperation.

6         As it stands right now Ms. Tilton, in her papers,

7  has not articulated any reason why Z-III can't be the

8  replacement manager here. And just as if the court could

9  compel the Ark entities to vote their shares in favor of a

10  transaction the court has the power, under the existing

11  monetization order to compel or to put a manager in place who

12  can effectuate the monetization process or, as I said, this

13  just ended up being a unfortunate waste of the debtors'

14  scarce resources and the court's scarce resources in working

15  up to this.  I do not believe that the court built into its

16  order that kind of loophole, but if it is we're going to have

17  to do something to fix it because we are, from Mr. Farnan's

18  perspective, dead in the water on the monetization unless and

19  until we get a manager in there.

20         THE COURT:  Well, Mr. Shore, I certainly

21  everyone's frustration and I certainly understand the

22  concerns you have just articulated about the inability of the

23  parties to move forward with respect to the monetization of

24  this specific portfolio company and perhaps others.

25         And assuming I have jurisdiction, I guess the

1  question that I have and that I did not articulate properly

2  is what is the standard by which I compel Ark to execute the

3  written consent, given that the LLC agreement requires

4  unanimous consent under Delaware State law?  Because there

5  was no case law cited to me in any of the briefing as to the

6  standard and Mr. Nestor highlighted that there could be other

7  remedies under Delaware State law, rather than general

8  dissolution, but no one cited the standard.

9            This is a similar are issue that I asked the

10  parties when we were going to compel the sell because there

11  were two sort of hoops there we had to jump through --

12  jurisdiction, but then in addition, what would be the

13  standard by which, We, we compel a sale, and of course we

14  never got there.

15            So, what is the standard by which I would compel

16  Ark to execute the written consent?

17            MR. SHORE:  Well, I think there are a couple of

18  standards that are out there.  The first thing that has to be

19  found, I think, in the emanation of the Court's jurisdiction

20  comes from the fact that the monetization order personally

21  required Ms. Tilton to take certain actions.  That she is

22  incapable of taking them and she's incapable of taking them

23  because she made herself incapable of taking them.

24            Not a question of knowing or willful.  Knowing or

25  willful goes to the extent of the remedy, but Ms. Tilton has

1  placed herself in contempt of the order and the Supreme Court

2  has clarified, it doesn't need -- you don't need to have a

3  subjective belief that you're violating the order.  She has

4  made herself incapable of carrying out the monetization

5  processes because in order to do that, she needs to be a

6  manager.

7         So, that gives the Court wide range in

8  jurisdiction to fashion a remedy and it is up to the Court's

9  equitable jurisdiction to do that.  And in this instance, the

10 fix for Ms. Tilton removing herself from the managerial

11 position to carrying out the monetization order, which is not

12 permitted in the monetization order, and I can assure you

13 that if Mr. Farnan were to resign, he would come to the Court

14 before doing so and ask to modify the monetization order and

15 address this ahead of time, rather than taking a precipitous

16 action the day after the Court entered the order.

17        But that gives the jurisdiction to the Court to

18 fix it.  If Ms. Tilton wants to remain in contempt by failing

19 to executed Ark consent, then the Court has a number of other

20 remedies on which it can rely to compel that action.  But as

21 it stands right now, we're not talking about the economics of

22 her interest, the economics of her interest or Ark's interest

23 in the entity are going to be protected by the manager put in

24 place, who will be charged with getting the right price under

25 the circumstances.

1           What we're talking about the is governance piece;

2   the piece which is, there needs to be somebody in place and

3   the shareholders have the right to pick that person.

4           All you would be doing by ordering --

5           THE COURT:  So, my question --

6           MR. SHORE:  -- by ordering Ark to or Ms. Tilton to

7   execute the Ark consent would be, quote, depriving her of the

8   opportunity to pick her manager of choice.

9           And as I started, and I'll finish here --

10          THE COURT:  (Indiscernible) interrupt you.

11          MR. SHORE:  Sure.

12          THE COURT:  Okay.  Go ahead.

13          I'm sorry.  No, complete your thought.

14          MR. SHORE:  Where I started was, if there was some

15  articulation from Ms. Tilton as to why Z-III was not an

16  appropriate manager to carry out the acts that are required

17  under the order, which is putting that portfolio company up

18  for sale and closing the sale, that might be a basis for

19  saying the remedy that you would require me to execute this

20  consent would be inappropriate or unfair or unjust or

21  inequitable.  But the only argument that we've received to

22  date as to why Z-III is not appropriate is that Z-III can't

23  run the business of this portfolio company over time, but

24  that's not an appropriate purpose.

25          So, the interest that is trying to be protected

1  here is not a legitimate one, such that it is within the

2  Court's equitable power to get Ms. Tilton to sign the Ark

3  consent.

4        THE COURT:  And under Delaware State law, the

5  Delaware Courts justify their decision to break a deadlock in

6  favor of one party over the other under that standard.

7        MR. SHORE:  Right.  But the issue --

8        THE COURT:  What is the standard by which the

9  Delaware Courts breaks the deadlock?

10       MR. SHORE:  I don't know the answer to that.  I

11 would did he have to my Delaware corporate brethren.

12       But my issue or my point is that the Court has the

13 point to enforce its orders.  If the Court ordered somebody

14 to deliver or to sell the company and Ms. Tilton didn't sell

15 the company, right, this violation of the order once entered,

16 then it's not a point to say you can't do that under State

17 law.  Your time to raise that issue was before the order was

18 entered.

19       This order was entered requiring her to take

20 certain actions.  She has taken herself out of the box on it,

21 right; she's made herself incapable of carrying out Your

22 Honor's order.  So, Your Honor is authorized to enter an

23 order which requires Ms. Tilton not to benefit -- and that's

24 what we're really talking about here -- benefit from the fact

25 that she is in violation of Your Honor's order.

1          THE COURT:  Well, I want to tease that out a

2    little bit because even assuming that the replacement

3    manager, let's just assume for purposes of this discussion,

4    that the replacement manager of company one is someone who

5    does not want to sell the companies don't I have the

6    authority over Zohar III and Ark II under the settlement

7    agreement to force you to comply with my joint monetization

8    order?

9          In other words, don't I have jurisdiction over

10    Ms. Tilton and Ark, based on their agreements or based on

11    their holding of the equity?

12          MR. SHORE:  Okay.  So, one way this could play out

13    and it would be a very difficult way, right, is the

14    monetization -- a new manager comes, in carrying out your

15    example, who doesn't want to sell.  Ms. Tilton shops the

16    items for a director who has never sold the company and

17    decides that's who I want.  And we go forward in the process

18    and offers come in and Mr. Farnan says, Yes, and replacement

19    manager says, No.

20          We could then go through a process of dragging Ark

21    in to have Ark and Zohar III issue proxy statements at that

22    point, right, either removing that manager or a shareholder

23    consent, which overrides that manager's decision to sell.

24    And that would work and that would be messy and it would take

25    a lot of time and probably can't be done within the time

1  frames that we were talking about now months ago, which is

2  holding an APA open while that happens.  That's probably not

3  workable.

4        But more difficult to deal with in the process is,

5  what are we doing while that manager is in place who is

6  dealing with the portfolio companies, dealing with the

7  investment bankers, holding these meetings, are we now

8  modifying?  I guess we modify the order, the monetization

9  order to make that person have to attend the status

10  conferences and make periodic things and we make those

11  issues, right?

12        But all during that time, the Court has no

13  jurisdiction over that manager.  The jurisdiction, which the

14  Court -- going back to the beginning -- started with, was the

15  jurisdiction under the settlement agreement.  That's how we

16  got to the monetization order.  A manager who comes in, the

17  Court -- I don't know, maybe, but it would have to be clear

18  at the outset -- but I don't know how the Court writes an

19  order that says, Manager, you didn't show up at the status

20  conference.  You've got to show up at the status conference.

21  Manager, you didn't deal with the investment banks and that

22  you've got to deal with the investment banks.

23        What the debtors are trying to do here is address

24  that issue up front and, again, the problem that's been

25  created is of Ms. Tilton's making.  She is the one who

1  stepped out and under the appropriate State Court law or

2  State law is required to have the shareholders' meeting and

3  the directors of all the shareholders reappointing herself

4  before she gets re-appointed.  So, we're not doing any of

5  that.

6          So, I guess the looking four or five steps down

7  the line, it's critical to let's just get Ms. Tilton out,

8  let's get new people in, and the Court, I would just say, the

9  Court has the jurisdiction to protect its jurisdiction.  It

10 has jurisdiction to enforce a process and that jurisdiction

11 is being subverted by the resignations.

12         THE COURT:  Okay.  Thank you very much.  I

13 appreciate the clarification of your point.

14         MR. SHORE:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         Okay.  Why don't I hear from the Patriarch

17 parties.

18         MS. LOSEMAN:  Thank you, Your Honor.  For the

19 record, it's Ms. Loseman again.

20         Frankly, Your Honor, we're confounded.  I mean,

21 Ms. Tilton gave the debtors what we thought they wanted:  a

22 concession that the Zohars own the equity recorded in their

23 name and whatever rights come with that equity.  And she can

24 still do no right.

25         If anything, Ms. Tilton is going out of her way to

1  cooperate in the transition out of respect for the Court's

2  orders here.  There's no record whatsoever that she's

3  obstructing the sales process or even operation of the

4  company and that's because she is not and the debtors'

5  business professionals know it.  She was performing as

6  manager of portfolio company one and that performance was

7  apparently unobjectionable up to the date of her resignation.

8          And now she's doing the same thing since her

9  resignation was rescinded, performing as manager.  But now,

10  suddenly, that's objectionable.

11          Where is the violation of any order?

12          There is no violation.  There is no support for

13  any suggestion that Ms. Tilton has violated any of this

14  Court's orders.

15          This isn't, in fact, about Ms. Tilton as

16  continuing to perform as manager through a transition period.

17  This isn't even about obstructing a sale.  The Zohars and the

18  Patriarch stakeholders' financial interests in this company

19  are aligned:  find a sale at the highest value possible so

20  that everyone can collect on their interests in the company.

21  This, instead, is about invalidating the Patriarch

22  stakeholders' equity interests in voting in a new replacement

23  manager.

24          Let me just address, briefly, the rescission

25  point.  We believe that the rescission is effective.  The

1  rescission was delivered to the company, itself.  That

2  rescission was acknowledged and accepted by the chief

3  executive officer.  The company, Ms. Tilton, Mr. Katzenstein,

4  all have continued to operate consistent with the

5  effectiveness of the rescission and relied on the company's

6  acceptance of that rescission.  We think it's a mixed

7  question of law and fact, but we believe that there's ample

8  support for a ruling that the rescission was effective.

9          But let me get right to the heart of it.  I think

10 Your Honor is correct, the debtors are conflating the

11 rescission issue and the voting rights issue.  Ms. Tilton did

12 not object to Zohar III in her role as transitional manager

13 at the company.  She objected as an equity earner.

14          Counsel, I think, at the beginning of this

15 argument said it pretty clearly:  The basis for debtors'

16 complaint on March 26th, which Ms. Tilton took it as an

17 expression, a genuine expression of concern for the companies

18 and a need for leadership through a transitional period.  In

19 fact, Ms. Tilton, (indiscernible) her read of that -- of

20 debtors' complaint on March 26th was perhaps wrong because

21 debtors' could believe made it pretty clear, that complaint

22 was not an invitation for Ms. Tilton to help; instead, that

23 was a complaint that there was a need, there was some

24 justification for the debtors to take control of the company

25 without giving any effect to the minority equity interests.

1    Whether Ms. Tilton remains as manager or not

2    during its transition period, the voting rights in portfolio

3    company one and the applicability of the relevant provisions

4    in the LLC agreement are what they are, regardless of whether

5    Ms. Tilton remains the company's manager or not through

6    transition, a vote needs to take place, consistent with the

7    terms of the LLC agreement to elect a new manager.  And let

8    me be clear, Ms. Tilton wants a new manager.  She is not

9    seeking to elect herself to the position permanently.

10    Debtors, here, make no mistake about it, ask for

11    extraordinary relief.  They asked this Court to render

12    invalid the voting rights associated with Ms. Tilton's

13    approximately 17 percent equity interests in portfolio

14    company one so that they may unilaterally appoint Zohar III

15    as the manager.  They asked this Court to ignore the

16    governing LLC agreement.  They asked this Court to ignore

17    applicable Delaware State law and consequently ignore the

18    Patriarch stakeholders' rights.

19    And it's not as if Ms. Tilton asks much here.  She

20    merely asks that the debtors propose an independent

21    candidate, ideally with industry experience and that she

22    would do the same.  She's in that process.  There's a lot, of

23    course, going on in the world right now.  She is working to

24    identify appropriate candidates as quickly as she possibly

25    can, but she also asked and expected the debtors would do the

1  same in the hopes that they could continue working together

2  and negotiating to find an appropriate replacement manager.

3          The debtors haven't even done that.  Instead, they

4  came immediately to the Court asking it to ignore the LLC

5  agreement, ignore Delaware law, ignore Chancery Court

6  authority, and simply appoint Zohar III as the manager,

7  claiming that Ms. Tilton agreed to abdicate her rights by

8  writing very generally in her resignation letter that she

9  would cooperate in the transition process.  The debtors'

10 arguments are without any legal justification or factual

11 support.

12          Let me address, first, the other absence of any

13 legal justification for the extraordinary relief debtors

14 request.  The debtors who pointed to no legal justification

15 for what they ask this Court to do and that's because there

16 is none.  We certainly have not seen it and the Court has

17 noted there are remedies under State law if, in fact, the

18 equity holders have reached a deadlock, but those remedies do

19 not include this Court invalidating the Patriarch

20 stakeholders' right to participate in the election of a new

21 manager under the terms of a new LLC agreement.

22          They do not point to any provision in the

23 settlement agreement where Ms. Tilton abdicated the Patriarch

24 stakeholders' rights as equity owners and lenders to the

25 portfolio companies and they do not cite any such provision

1  because it does not exist.  Ms. Tilton never agreed to give

2  up the Patriarch stakeholders' equity and best interests in

3  the companies.

4         And the Court's order implementing the settlement

5  agreement did not, of course, purport to resolve ownership or

6  control over the portfolio companies; in fact, it purposely

7  avoided that question and preserved the then, *status quo*.  It

8  was only Ms. Tilton's resignation and agreement that the

9  Zohars owned the equity recorded in their name and whatever

10  rights go with that, that led us here.

11         The order implementing the settlement agreement

12  did not require Ms. Tilton to forego her personal voting

13  interest.  She is not, for example, blocking a sale of the

14  company.  There is nothing in the orders to support

15  Mr. Shore's newly articulated theory of this Court's

16  authority for imposing the radical relief they request here.

17         The selection of an independent manager does not

18  impact the monetization of this company and there's no record

19  upon which the Court could find anything remotely approaching

20  supposed contempt of any order whatsoever.  Not agreeing to

21  allow Zohar III to ride roughshod over the Patriarch

22  stakeholders' interests is not contempt.  This Court's

23  equitable jurisdiction simply does not reach so far,

24  particularly where there's no factual record to suggest any

25  of this is impacting the sale process in any way whatsoever.

1          They do not, of course, point to Delaware law for

2    legal support, nor could they, for the reasons I noted and

3    they can't point to any statement in her resignation letter

4    where she agreed to abdicate her rights.  Again, that is

5    because it simply does not exist.

6          Ms. Tilton only gave control over that which the

7    Zohars now own, the equity recorded in the Zohar's name.

8    Ms. Tilton did not express any intent to abdicate the

9    Patriarch stakeholders' equity and debt interests in her

10   resignation letter; instead, the debtors in their papers

11   point to a general remark in the resignation letter that the

12   Zohars control the future of the portfolio companies and that

13   she would reasonably cooperate with new leadership, your new

14   leadership to accomplish the transition.

15         The debtors are stretching this language beyond

16   all sense and reason.  With regard to the vast majority of

17   the portfolio companies, for example, where debtors now own

18   100 percent of the equity, because 100 percent of the equity

19   is recorded in the Zohar's name or where they own majority

20   rights, given the Zohar equity, with simple majority voting

21   provisions, the future of the companies, most of the

22   companies are now in the Zohars' hands and, indeed,

23   Ms. Tilton has cooperated with the debtors to accomplish a

24   smooth transition, including, even with respect to the

25   largest portfolio company.  But those general remarks in her

1 resignation letter cannot be converted into an abdication of

2 the Patriarch stakeholders' rights.  There's simply no legal

3 support for such an argument.

4        Now, let me address the purported factual

5 justification.  Debtors suggest an emergency exists and I

6 quote from the second supplement:

7        "Portfolio company one and its officers are

8 without direction and unable to enact the mandate under the

9 final monetization order to effectively proceed with the

10 ongoing sale process, despite active and ongoing bidder

11 discussions, so that the company has been left rudderless

12 when informed, decisive actions important or that absent a

13 manager, portfolio company one has somehow been hampered in

14 executing the Court's final monetization order."

15        These are quite the statements to be made without

16 any every other support whatsoever.  Debtors submitted no

17 declarations, nothing from Mr. Katzenstein or even the

18 company's management team in support of those statements; in

19 fact, Ms. Tilton has testified to the contrary, that since

20 her limited rescission, it has been business as usual or as

21 usual can be under the circumstances of the COVID-19 crisis,

22 and that that company is not left rudderless.  It is actively

23 and successfully negotiating a difficult period.

24        Once more there, is no sales -- no yields to be

25 done right now.  While we believe prior bidders remain

1  interested, there are unfortunately no active or ongoing

2  bidder discussions, no LOI has been submitted, and it is

3  unlikely one is immediately forthcoming, given the

4  circumstances of the broader economic environment.  But

5  that's not because of the absence of an independent manager

6  to replace Ms. Tilton.  We believe Mr. Katzenstein, if

7  permitted to be cross-examined, would have to agree with

8  these points.  That's why we believe that the relief

9  requested by debtors' second supplement cannot be ordered

10  without an opportunity to present this testimony and cross-

11  examine Mr. Katzenstein.

12          So, what is this issue really about?  What is the

13  second supplement really about in the fight over Zohar III as

14  the manager?

15          The debtors want their nominee Zohar III and they

16  refuse to negotiate.  They infer, without evidence, that

17  Ms. Tilton is holding out a vote in favor of Zohar III as

18  manager in order to somehow obstruct the process, that she

19  has no legitimate interest in voting her shares in favor of

20  an independent manager; again, quite the claim to be made

21  with no evidentiary support whatsoever.

22          But let's be clear, the Patriarch stakeholders

23  have debt and equity interests in portfolio company one.

24  Upon the consummation of a sales transaction, Ms. Tilton

25  expects those stakeholders to be retained and receive what

1  other interests they are due.  She is concerned that Zohar

2  III's manager will obstruct payments rightfully due to the

3  Patriarch stakeholders and she has a right to be concerned.

4          The ABL lender at the portfolio company, Bardin

5  Hill, is also the controlling noteholder in Zohar III.  They

6  have taken steps with respect to the ABL to shut out the

7  Patriarch stakeholders from collecting --

8          MR. NESTOR:  Your Honor, objection.  This is

9  testimony.  This is testimony.  This is not -- this is a non-

10  evidentiary hearing.  There's no evidence of this.

11          MS. LOSEMAN:  Your Honor, if I may?

12          THE COURT:  Yes.

13          MS. LOSEMAN:  This is a proffer of what the

14  evidence would show were we permitted to call Ms. Tilton on

15  the stand and permitted to cross-examine Mr. Katzenstein.

16          THE COURT:  I understand, but this is not an

17  evidentiary and to the extent that I feel like I can't make a

18  decision at the end of this, then I will allow an evidentiary

19  hearing to go forward.  So, I understand your position that

20  evidence is necessary, but I don't think we need to go any

21  further.

22          MS. LOSEMAN:  All right.  Suffice it to say, Ms.

23  Tilton has a right to be concerned as Zohar III as a manager

24  of the company.  Her withholding of the Patriarch

25  stakeholders' consent to Zohar III as a manager of the

1  company is not without foundation or without basis, which we

2  would present if we were permitted an opportunity to do so.

3          In light of this backdrop, Ms. Tilton feels it's

4  prudent that an independent manager be appointed and she,

5  therefore, exercised her voting rights, consistent with that

6  belief.  Instead of even attempting to engage with Ms. Tilton

7  and identify an independent candidate, the debtors just run

8  to court; this should not be the countenance.

9          Now, I hope that the equity holders in the

10  portfolio company are not deadlocked.  If they are, there are

11  applicable State law remedies and the parties will seek what

12  remedies they feel we need to seek.  But there is no factual

13  support, there's not even logical support for the outlandish

14  conspiracy theory now concocted by debtors that Ms. Tilton

15  somehow seeks to install an independent manager for the

16  purpose of avoiding the Court's timeline order and deadline

17  to sell the company; again, that's quite the theory to set

18  forth without any evidence.

19          But let's be clear, Ms. Tilton is not attempting

20  to delay the sales process.  She has no intention of delaying

21  the sales process and she did not believe that the sales

22  process needed to be delayed by the appointment of an

23  independent manager.

24          The theory is also illogical, given the Patriarch

25  stakeholders' financial interests in the company.  The

1  Patriarch stakeholders' financial interests are entirely

2  aligned with the debtors; let's get this company sold so that

3  the Patriarch stakeholders can recoup their investment, as

4  well.

5          In any event, it is entirely unclear to me how any

6  delay could be accomplished with an order requiring the sale

7  of the company by a date certain in place.  The Court has

8  ordered what it has ordered and Ms. Tilton remains committed

9  to accomplishing a sale by that deadline; Ms. Tilton, of

10 course, would testify to the same.

11         The election of an independent manager to shepherd

12 the company through its sales process, someone who will call

13 balls and strikes, with respect to the various stakeholders'

14 interest in that company is all Ms. Tilton has denied, and

15 allowing the negotiating process to play out over the next

16 one to two months would leave the company with a new manager,

17 at most, approximately two months prior to the Court-ordered

18 sell-by date.

19         There's no record, there's no logical inference

20 that can be drawn that a new independent manager with

21 industry experience could not oversee the completion of the

22 sales process in that time; in short, there's simply no

23 justification for the extraordinary relief debtors request

24 here.  They have not pointed to a single thing the debtors

25 prefer the company do that it cannot, given Ms. Tilton's

1  reasonable request that the parties attempt to agree on an

2  independent manager.

3            The relief debtors seek is consistent with their

4  pattern of prematurely and unnecessarily seeking Court

5  intervention on an incomplete and even misleading factual

6  record.  While we recognize the Court cannot order the

7  debtors to stop wasting estate resources with these ill-

8  developed allegations and conspiracy theories, we ask that

9  debtors' allegations lodged at Ms. Tilton be limited to those

10 that can be supported by sworn declaration or documentary

11 evidence.

12           As I suggested to the Court in February, the

13 lawyers need to get out of the way so that these sales

14 processes can move forward.  Debtors' counsel's continual

15 attacks against Ms. Tilton unfortunately have the effect of

16 requiring Ms. Tilton to respond through her counsel and

17 filings with the Court, unnecessarily taking up everyone's

18 time and distracting the parties and taking away resources

19 from the work that has been ordered by the Court:  Sell the

20 companies.

21           The Court should follow its instinct here and let

22 the process play out in terms of the election of a new

23 manager under applicable State law and the governing

24 documents.  Thank you, Your Honor.

25           THE COURT:  Thank you.

1          MR. NESTOR:  Your Honor, it's Mike Nestor.  Might
2   I be heard briefly with respect to three points?

3          THE COURT:  Yes.

4          MR. NESTOR:  First of all, I heard no legal basis
5   regarding the rescission argument; it's contrary to the
6   documents and there's no basis for the alleged rescission.
7   Ms. Loseman can't rely on the LLC when it suits her and then
8   not rely on it when it doesn't.

9          From our perspective, the resignation letter and
10  Your Honor's order of March 30th has to have some meaning.
11  The reason that we're not limited by State Court is because
12  we're in bankruptcy and in bankruptcy, you have equitable
13  powers that exceed those that are available outside of your
14  courtroom.  And to look solely to what remedies would have
15  been available in State Court would limit the ability of Your
16  Honor to enforce your orders.

17         And so, the resignation letter and the Court order
18  have to mean something and if we look at what happened,
19  putting all the -- I mean, I don't even want to say
20  "conspiracy theories" because we don't have any -- we're
21  just -- we're looking at the uncontested facts here.  Is
22  there a gap in the management at the company?  We would
23  submit there is.

24         Is the debtors' choice of itself reasonable?  This
25  is an entity and representative's that are accountable to

1  Your Honor.

2        Third, is Ms. Tilton's rejection of the debtor and

3  refusal to submit a candidate 30 days after her resignation

4  reasonable?  And not only that, not expressly saying she

5  doesn't intend to do it for a couple more months.

6        And does the resignation, the refusal to consent

7  to the debtors' representative, and the refusal to even

8  submit a candidate a month after her resignation violate

9  Paragraph 6 of your order, Judge?

10        We come back to the transition order where you

11  requested -- you ordered good faith transition of ownership

12  and control.  So, from the debtors' perspective, your orders

13  have to mean something.  Ms. Tilton's commitments, I went

14  through each of them, have to mean something.  She said --

15  that letter was sent to you.  It was in the pleadings.  It's

16  got to mean something.

17        So, from the debtors' perspective, you have the

18  authority.  You have -- and both -- in fact, I looked them.

19  Both sides cite the exact case law in terms of you have

20  jurisdiction to interpret and enforce settlement agreements

21  and accompanying orders approving settlements.  You have the

22  authority to do that.

23        We have a settlement agreement that was the

24  culmination of litigation in this case.  We have your

25  determination that you have jurisdiction over Ms. Tilton and

1  these very Ark entities as Patriarch stakeholders, under the

2  settlement agreement.  You have the monetization procedures

3  order which set forth a timeline and required joint process

4  going forward, which is imperiled by the resignation without

5  notice and the failure for a month to provide a candidate to

6  take ownership of the company, to take leadership of the

7  company with the deadline fast approaching.  And we have your

8  transition order which states that Ms. Tilton has to

9  negotiate in good faith and reasonableness regarding the

10 transition of ownership and control.

11         So, from the debtors' perspective, again, the

12 orders have to mean something.  Ms. Tilton's letter, which

13 forms a basis of this entire dispute, her representations to

14 Your Honor have to mean something and we can't be limited by

15 State Court because we're not there; we're in Bankruptcy

16 Court.  You have broad equitable power and you have the

17 ability to fashion remedies that are focused on enforcement

18 of your orders.

19         So, again, from our perspective, there is a gap.

20 The debtors' choice is completely reasonable since we're

21 accountable to you.  Ms. Tilton has rejected that and failed

22 to put another candidate in and has refused to do that for at

23 least a couple more months and that, necessarily, will impact

24 the sale process.

25         So, we think that you have more than enough

1 authority under your orders with respect to this one company

2 to compel Ms. Tilton to do that, which we think needs to

3 happen just to comply with your order.

4         And I would say you have done this before.  You

5 have determined you have jurisdiction to compel a sale.  You

6 have determined that you can determine the timing of the sale

7 and the guidelines to the sale.  So, we're asking you to

8 continue to enforce your orders, exercise your judgment, and

9 keep these processes on track, specifically, with respect to

10 company number one.

11         THE COURT:  Okay.  Thank you, Mr. Nestor.

12         MR. SHORE:  Your Honor this, is Mr. Shore.  May I

13 be heard on that?

14         THE COURT:  Yes, Mr. Shore.  Go ahead.  Sorry to

15 cut you off.

16         MR. SHORE:  Let me make one macro comment here

17 because it keeps coming up at these hearings.  There's a

18 little bit of gaslighting going on here where the debtors

19 come forward and explain the problem and the response on the

20 other side is, You're seeing ghosts, you are overreacting,

21 you're coming up with wild hypotheticals.

22         I'm just going to remind the Court that on one

23 side, there is Ms. Tilton who has, for a decade, held out on

24 the sale of these companies to great effect in many courts,

25 and on the other side you have a raft of professionals who

1  have been in your court and other courts, you have an

2  independent director, and you have a CRO, who you know,

3  you've heard him testify.  At some point, the Court is either

4  going to have to accept that the reality perceived by those

5  people is wrong and they are hysterical or what is going on

6  here is a process, which we believe of making provocative

7  statements, doing provocative things, walking them back

8  before a hearing, or doing things just before a hearing and

9  then coming in and proclaiming that the protagonist in the

10  fight is hysterical.

11          I don't know what to do about that, but from Mr.

12  Farnan's perspective, we talked about it, it's not

13  appropriate in our view to take the independent director and

14  the CRO and accuse them of seeing ghosts.  They both came in

15  here long after these loans were made, long after the

16  litigation played out, and they have formed a view about what

17  needs get done, to get the job done that they were both put

18  in place to do and which Mr. Farnan has been ordered to do.

19          Second, the only thing that needs to be addressed

20  right now is the extent to which the Court has jurisdiction

21  to compel Ark to put a director in place.  The Court has

22  already found it has jurisdiction to direct Ark to sell the

23  entire company.  I'd leave aside, evidentiary or not, the

24  wrong time to be giving your explanation as to why you don't

25  want Z-III as a director is after all the pleadings have been

1  filed and for the first time, make a "proffer" on the record.

2          There was an opportunity for Ms. Tilton, up to

3  today, to come up with an explanation as to why Z-III was not

4  appropriate and under existing rules, quite frankly, she's

5  waived the arguments that there is some other legitimate

6  reason, other than "she wants somebody who can run the

7  company with expertise over the next two months."

8          So, the Court is going to have to decide one way

9  or the other and from Mr. Farnan's perspective, he is very

10 concerned that if the Court finds it doesn't have

11 jurisdiction to compel Ark to execute the consent, it's going

12 to undermine the entire process that was set up to get these

13 companies out of bankruptcy, because we're going to find

14 ourselves in a situation where if you don't have jurisdiction

15 to control that process, the process by which Ark, the party

16 to the settlement agreement, controls the disposition of the

17 asset by saying, essentially, there's an intervening

18 jurisdictional cut that occurs by the appointment of an

19 independent, we're going to be in a morass.

20          Is it certain to have them?  No.

21          Is Mr. Farnan or Mr. Katzenstein seeing ghosts

22 when they have concerns about that happening?  No.

23          We certainly didn't expect, for example, that

24 someone would take the position after two years in bankruptcy

25 that the Court had no jurisdiction to do anything.  It

1 happened.  It played out.

2           And so, the time to address the jurisdiction is

3 now.  It's not a question of what the State law process is;

4 it's a question of what the settlement agreement and the

5 orders that this Court say about the Court's ability to

6 direct the parties to the settlement agreement to effectuate

7 the purposes of the settlement agreement.

8           Unless Your Honor has any questions, I have

9 nothing further.

10           THE COURT:  Thank you, Mr. Shore.

11           MS. LOSEMAN:  Your Honor this, is Ms. Loseman.

12 May I briefly respond?

13           THE COURT:  Yes.

14           MS. LOSEMAN:  Thank you, Your Honor.

15           Let me address, first, Mr. Shore's suggestion that

16 we are somehow gaslighting the Court.  That allegation is,

17 frankly, beyond the pale.  Remember, this all started with

18 extraordinary allegations regarding Ms. Tilton's provocative

19 statements made in brief that were later disproved by us with

20 evidence and then debtors continue to resist the need for an

21 evidentiary hearing.  They even suggested evidence wasn't

22 necessary for this hearing regarding the second supplement

23 and they continue to resist the presentation of evidence

24 while, with the same breath, claiming that Ms. Tilton is

25 somehow trying to delay the sale of this company.

1    From our perspective, it's not appropriate to make

2  outlandish allegations regarding Ms. Tilton without evidence

3  or without giving her an opportunity to defend herself in

4  sworn testimony.

5    Let me just make a few brief points regarding

6  comments by Mr. Nestor.  The companies, let's remember, are

7  not in bankruptcy and there's not dispute on this.  This is

8  made clear, even in the settlement agreement.  The internal

9  affairs and the affairs of management of the portfolio

10  companies are not before this Court.

11    The sale of the companies, the ability to transact

12  with a third party and interest into a sales agreement,

13  that's clearly what this Court has jurisdiction over, but

14  there is no record to conclude here that this internal

15  control matter, how a new manager is to be elected by the

16  existing equity holders in portfolio company one, there is no

17  record to conclude that this Court has authority to

18  essentially override existing LLC agreements and applicable

19  State law on that question, especially where there is no

20  record to suggest the election of a new manager puts in

21  peril, the sales process or the Court's order, with respect

22  to the sale of portfolio company one.

23    I want to emphasize, we agree, your orders do mean

24  something, but your orders do not mean that debtors get their

25  way whenever they want it without having to live by the terms

1 of an LLC agreement, to which they are now a party.  Thank

2 you.

3         THE COURT:  Okay.  Thank you very much.

4         And I appreciate all the thorough presentation, so

5 why don't I give you a few observations that have evolved

6 while listening to you all.

7         With respect to the last set of comments regarding

8 gaslighting, listen, everyone here has their narratives.  I

9 get it.  It understand it.  And I've been living with them

10 since the case has been reassigned and I take them for what

11 they're worth.

12         With respect to the relief requested in the second

13 supplement of the debtors', I find that I do have

14 jurisdiction (indiscernible) the relief sought directly

15 affects property of the estate; mainly, the debtors'

16 interests holdings in the company, company one; the rights

17 and value related to those holdings; and the rights and value

18 related to their outstanding holdings under the outstanding

19 term loan facility.

20         Also, I believe it's appropriate that I consider

21 the issues, rather than sending the parties to another court,

22 perhaps a Delaware Chancery Court would be another logical

23 forum, but given my history with these cases and the further

24 delay that would be caused if the disputes are restarted in

25 Chancery Court, I do think it's appropriate that I hear and

1 decide the issues.

2        With respect to the first form of relief requested

3 by the debtors that I -- the request that find Ms. Tilton's

4 rescission of her earlier resignation as sole manager of

5 company one to ineffective, I will -- I would be prepared to

6 grant this relief, as the resignations were deemed accepted

7 upon the receipt, as acknowledged by all the parties, most

8 effective at the time, pursuant to the applicable LLC

9 agreement and there's been no case law or provision of the

10 applicable LLC agreement cited to the contrary.  And so, as

11 such, portfolio company one currently has no manager.

12        To fill the position, the debtors, through their

13 second form of relief, have requested or asked me to direct

14 Ms. Tilton to execute a written consent on behalf of Ark II,

15 appointing Zohar III as the sole manager of company one.  And

16 there's no dispute that to appoint the manager, the LLC

17 agreement of company one requires the unanimous consent of

18 its common members, that's Zohar III and Ark II, and the

19 debtors want Zohar III to be manager and Ms. Tilton has said

20 no and requested potential appointees with relevant industry

21 knowledge who are independent.

22        It's clear unanimous consent has not been reached,

23 but the problem is debtors have provided no legal

24 justification under applicable State law for the relief they

25 seek, which is not readily apparent to me and they say that I

1    can fashion a remedy to enforce my monetization order because

2    of the deadlock reached between the parties; however, a

3    deadlock is not yet here because no attempt to reach a

4    consensus has been made to date so, so far, Zohar III is the

5    only suggested appointee; however, it is clear that

6    Ms. Tilton doesn't agree.  That was clear to me before this

7    hearing and it's clear in the papers what she wanted, but it

8    should not take four to six weeks for the parties to be able

9    to find a replacement and, quite frankly, I question the need

10   for an industry expert when there's so many qualified and

11   independent professionals who can serve as manager.

12          So, therefore, I'm going to hold the motion in

13   abeyance for one week and I want the parties to suggest their

14   replacements and try to reach a consensus and you can report

15   back to me through my courtroom deputy as to whether a

16   replacement manager has been selected and if not, I'll decide

17   what the next steps will be.

18          But before we move on to the next matter we're

19   going to discuss today, I want to give a word of caution.  I

20   have not made a determination as to the reasons underlying

21   Ms. Tilton's resignation from her position.  Based on my

22   observations of Ms. Tilton during the course of the February

23   trial, I have no reason to disbelieve her claim that the

24   resignations were motivated by a desire to preserve the value

25   of the portfolio companies for the benefit of the customers,

1 vendors, and employees.

2          However, I acknowledge that that may not be her

3 only motivation or an argument could be made that that may

4 not be her only motivation and the timing of the resignation

5 gives me great concern and has given me great pause as to

6 whether Ms. Tilton's resignation will be used to further

7 delay or avoid the monetization process.  And to me, actions

8 always speak louder than words, so I'm sure I will have a

9 better understanding of why the resignation occurred as we

10 move forward with the monetization schedule.

11          I expect a replacement manager for the company to

12 be selected and the parties to focus on moving the

13 monetization process forward, in light of the new landscape

14 of control and the ownership that has sprung forth as a

15 result of Ms. Tilton's resignation letter.  I expect you to

16 act with the understanding that the monetization process is

17 and will continue and that, sadly, any further dilatory

18 actions of the parties in this proceeding may not only

19 destroy value to the debtors' stakeholders, but also will

20 most definitely harm the thousands of portfolio company

21 employees vendors and customers who are so very reliant on

22 the portfolio companies now and into the future in light of

23 the unprecedented economic crisis we are currently

24 experiencing and will continue to experience for an unknown

25 period.

1          I implore you not to lose sight of the many who

2   are dependent on the portfolio companies for their

3   livelihoods, as well as my belief that Ms. Tilton's

4   resignations do not alter the obligations in the settlement

5   agreement to monetize the portfolio companies.

6          And with that, I will adjourn the motion for one

7   week and I expect to hear from you through any courtroom

8   deputy and I will go ahead and enter an order on the motion

9   to amend and make that clarification.

10          And with that, I understand there's a few more

11  non-substantive matters that are on the agenda, with respect

12  to motions to seal.  I don't think objections have been

13  raised, so do you need me to rule on those today or can you

14  submit the orders under certification of counsel or

15  certificates of no objection.

16          MR. NESTOR:  Your Honor, it's Mike Nestor.

17          Why don't we just end the call and I'll submit

18  them under certification of counsel if that works for you?

19          THE COURT:  Unless there are parties that want to

20  be heard on the motions today, that's satisfactory to me.

21      (No verbal response)

22          THE COURT:  Okay.  Hearing nothing, then let's

23  adjourn this hearing and I'll wait to hear from you in

24  exactly one week.  Thank you.

25          MR. NESTOR:  Thank you, Your Honor.

1          MS. LOSEMAN:   Thank you, Your Honor.

2      (Proceedings concluded at 3:04 p.m.)

3

4

5                          CERTIFICATE

6

7      I certify that the foregoing is a correct transcript

8  from the electronic sound recording of the proceedings in the

9  above-entitled matter.

10
   /s/Mary Zajaczkowski                    April 23, 2020
11 Mary Zajaczkowski, CET**D-531

12

13

14

15

16

17

18

19

20

21

22

23

24

25