# **EXHIBIT A**

Redacted Public Version of Sealed Declaration [D.I. 45]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>        Debtors.<br><br>---<br><br>ZOHAR CDO 2003-1, LIMITED; ZOHAR II 2005-1, LIMITED; and ZOHAR III, LIMITED,<br><br>        Plaintiffs,<br><br>        -against-<br><br>PATRIARCH PARTNERS, LLC; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC; PHOENIX VIII, LLC; OCTALUNA LLC; OCTALUNA II LLC; OCTALUNA III LLC; ARK II CLO 2001-1, LLC; ARK INVESTMENT PARTNERS II, LP; ARK ANGELS VII, LLC; PATRIARCH PARTNERS MANAGEMENT GROUP, LLC; PATRIARCH PARTNERS AGENCY SERVICES, LLC; and LYNN TILTON,<br><br>        Defendants. | Chapter 11<br><br>Case No. 18-10512 (KBO)<br><br>Jointly Administered<br><br><br>Adversary No. 20-50534 (KBO) |

## DECLARATION OF THERESA TRZASKOMA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

---

[1] The "Debtors," and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited ("Zohar III") (9261), Zohar II 2005-1, Limited ("Zohar II") (8297), and Zohar CDO 2003-1, Limited (together with Zohar II and Zohar III, the "Zohar Funds") (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

I, Theresa Trzaskoma, declare under penalty of perjury that:

1.      I am a partner at the law firm Sher Tremonte LLP, counsel to the above-captioned Defendants.[2] I submit this declaration in support of Defendants' Motion to Dismiss the Complaint.

2.      I have knowledge of the issues described herein.

### *Subscription Agreement*

3.      Attached hereto as Exhibit 1 is a true and correct copy of the Subscription Agreement between Octaluna II and Zohar II, dated January 12, 2005.

### *The Credit Agreements*

4.      Attached hereto as Exhibit 2 is a true and correct copy of the Credit Agreement between Rand Acquisition (as borrower), the Zohar Funds (as lenders), and PPAS (as agent), dated December 6, 2007.

5.      Attached hereto as Exhibit 3 is a true and correct copy of Amendment No. 14 to the Credit Agreement between Rand Acquisition (as borrower), the Zohar Funds (as lenders), and PPAS (as agent), dated November 19, 2015.

### *Agreements Governing the Portfolio Companies*

6.      Attached hereto as Exhibit 4 is a true and correct copy of the Amended and Restated Limited Liability Company Agreement of ██, dated March 9, 2013.

7.      Attached hereto as Exhibit 5 is a true and correct copy of the Limited Liability Company Agreement of ██, dated April 17, 2009.

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Complaint, D.I. 2, and the Brief in Support of Defendants' Motion to Dismiss the Complaint (filed concurrently herewith).

8.      Attached hereto as Exhibit 6 is a true and correct copy of the November 2017 Written Consent of ▮, dated November 13, 2017.

9.      Attached hereto as Exhibit 7 is a true and correct copy of the November 2017 Written Consent of ▮, dated November 13, 2017.

10.     Attached hereto as Exhibit 8 is a true and correct copy of the ▮ Stockholders Agreement, dated July 7, 2005.

11.     Attached hereto as Exhibit 9 is a true and correct copy of the First Amendment to Stockholders Agreement of ▮, dated December 30, 2005.

12.     Attached hereto as Exhibit 10 is a true and correct copy of the Phantom Equity Agreement between Lynn Tilton and ▮, dated March 10, 2018.

13.     Attached hereto as Exhibit 11 is a true and correct copy of the Phantom Equity Agreement between Lynn Tilton and ▮, dated March 11, 2018.

14.     Attached hereto as Exhibit 12 is a true and correct copy of the Phantom Equity Agreement between Lynn Tilton and ▮, dated March 11, 2018.

### *PPMG Agreements*

15.     Attached hereto as Exhibit 13 is a true and correct copy of the PPMG Agreement between PPMG and ▮, dated January 1, 2010, as amended August 25, 2015.

16.     Attached hereto as Exhibit 14 is a true and correct copy of the PPMG Agreement between PPMG and ▮ dated November 20, 2010, as amended August 25, 2015.

### *Other Documents*

17.     Attached hereto as Exhibit 15 is a true and correct copy of the monthly report of Zohar I trustee US Bank, dated January 29, 2010.

18.      Attached hereto as Exhibit 16 is a true and correct copy of the Order Instituting Administrative and Cease-and-Desist Proceedings, and Notice of Hearing, dated March 30, 2015, filed in *In the Matter of Lynn Tilton, et al.*, SEC Admin. Proc. File No. 3-16462 (2015).

19.      Attached hereto as Exhibit 17 is a true and correct copy of the Division of Enforcement's Pre-Hearing Brief, dated October 17, 2016, filed in *In the Matter of Lynn Tilton, et al.*, SEC Admin. Proc. File No. 3-16462 (2015).

20.      Attached hereto as Exhibit 18 is a true and correct copy of the Division of Enforcement's Post-Hearing Brief, dated December 16, 2016, filed in *In the Matter of Lynn Tilton, et al.*, SEC Admin. Proc. File No. 3-16462 (2015).

21.      Attached hereto as Exhibit 19 is a true and correct copy of Respondents' Post-Hearing Brief, dated December 16, 2016, filed in *In the Matter of Lynn Tilton, et al.*, SEC Admin. Proc. File No. 3-16462 (2015).

22.      Attached hereto as Exhibit 20 is a true and correct copy of the Initial Decision, Initial Decision Release No. 1182, dated September 27, 2017, filed in *In the Matter of Lynn Tilton, et al.*, SEC Admin. Proc. File No. 3-16462 (2015).

23.      Attached hereto as Exhibit 21 is a true and correct copy of the Final SEC Order, dated November 28, 2017, filed in *In the Matter of Lynn Tilton, et al.*, SEC Admin. Proc. File No. 3-16462 (2015).

24.      Attached hereto as Exhibit 22 is a true and correct copy of excerpts from the deposition of Lynn Tilton, dated April 14, 2018, taken in the matter *In re Zohar III Corp.*, No. 18-10512 (Bankr. D. Del. 2018).

25.      Attached hereto as Exhibit 23 is a true and correct copy of the letter dated March 21, 2020 of Lynn Tilton to Joseph Farnan, Independent Director of the Zohar Funds, and Mike

4

Katzenstein, Chief Restructuring Officer of the Zohar Funds, regarding her resignation from certain of her roles at several Portfolio Companies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 21, 2020
      New York, New York

                                    Theresa Trzaskoma

# Exhibit 1

Octaluna II & Zohar II Subscription Agreement

EXECUTION COPY

**U.S.$30,000,000 Preference Shares**
**ZOHAR II 2005-1, LIMITED**

## SUBSCRIPTION AGREEMENT

Zohar II 2005-1, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

      1.    Subscription. The Issuer hereby sells, and the undersigned (the "Investor") hereby purchases Preference Shares ("Preference Shares") of Zohar II 2005-1, Limited, a newly formed exempted company incorporated under the laws of the Cayman Islands (the "Issuer"), in the aggregate amount set forth opposite the Investor's name on the signature page hereto, and for an aggregate purchase price, equal to U.S.$30,000,000. Capitalized terms used herein and in the attached Investor Questionnaire, but not otherwise defined herein or therein, shall have the respective meanings given to them in the Indenture, dated as of the date hereof (the "Indenture"), among the Issuer, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, as Credit Enhancer, IXIS Financial Products Inc., as Class A-1 Note Agent and Class A-3 Note Agent, and LaSalle Bank National Association, as trustee.

      The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to delivery by the Issuer of the Preference Shares.

      2.    Representations and Warranties. To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor purchases Preference Shares pursuant to Paragraph 1 above):

      (a)    Accredited Investor Status; Investment Intent. The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the "Securities Act") (an "Accredited Investor") and is acquiring the Preference Shares for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws. The Investor understands that the Preference Shares have not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any other governmental authority or agency of any jurisdiction.

(b)     Investor Sophistication; Non-Reliance; Suitability; Access to Information. The Investor (i) has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Preference Shares, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer or any of its Affiliates (or any representative of the Issuer) and (iv) has determined that an investment in the Preference Shares is suitable and appropriate for it. The Investor has received, and has had an adequate opportunity to review the contents of, the Issuer Charter, the Preference Share Paying Agency Agreement and the other Transaction Documents. The Investor has had access to such financial and other information concerning the Issuer and the Preference Shares as it has deemed necessary to make its own independent decision to purchase the Preference Shares, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Preference Shares.

(c)     Certification Upon Transfer. The Investor will, prior to any sale, pledge or other transfer by it of any Preference Share (or any interest therein), obtain from the transferee and deliver to the Issuer and the Preference Share Paying Agent a duly executed transferee certificate in the form of Exhibit B attached to the Preference Share Paying Agency Agreement and such other certificates and other information as the Issuer or the Preference Share Paying Agent may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in the Preference Share Paying Agency Agreement.

(d)     Minimum Denominations. The Investor agrees that no Preference Shares (or any interest therein) may be sold, pledged or otherwise transferred in less than the applicable minimum number of Preference Shares set forth in the Preference Share Paying Agency Agreement.

(e)     Securities Law Limitations on Resale. The Investor understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, have not been and will not be registered under the Securities Act, and may be re-offered, resold, pledged, or otherwise transferred only to a person whom the Investor reasonably believes is (i) a Qualified Institutional Buyer purchasing for its own account or for the account of another Qualified Institutional Buyer to whom notice is given, in each case, that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A or (ii) an Accredited Investor, in each case, subject to the transfer restrictions set forth in the Preference Share Paying Agency Agreement. The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Preference Shares.

(f)     Limited Liquidity. The Investor understands that there is no market for the Preference Shares and that no assurance can be given as to the liquidity of any trading

market for the Preference Shares and that it is unlikely that a trading market for the Preference Shares will develop.

(g) <u>Investment Company Act</u>. The Investor is a "qualified purchaser" (a "<u>Qualified Purchaser</u>") as defined in the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "<u>Knowledgeable Employee</u>") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer. The Investor agrees that no sale, pledge or other transfer of a Preference Share (or any portion thereof) may be made (i) unless such transfer is made to a transferee who is a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser, or (ii) if such transfer would have the effect of requiring the Issuer or its assets to register as an investment company under the Investment Company Act. The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

(h) <u>ERISA</u>. The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan pursuant to 29 C.F.R. Section 2510.3-101 (the "<u>Plan Asset Regulation</u>") or otherwise (each, a "<u>Plan</u>") and (b) whether it is a "benefit plan investor", as defined in the Plan Asset Regulation, and/or a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or is an Affiliate of any such person (each such person, a "<u>controlling person</u>"). If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that, assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise, its purchase, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. The Investor (i) agrees that no sale, pledge or other transfer of such Preference Share (or any interest therein) may be made if, immediately after giving effect to such transfer, 25% or more, as determined under the Plan Asset Regulation, of the value of any class of the Preference Shares or any other equity interest of the Issuer would be held by "benefit plan investors" or a "controlling person", (ii) agrees to inform the Issuer and the Preference Share Paying Agent immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor", (iii) agrees to promptly dispose of its interests in the

3

Preference Shares if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Preference Shares would result in 25% or more, as determined under the Plan Asset Regulation, of the value of any class of the Issuer's Preference Shares or any other equity interest of the Issuer being held by "benefit plan investors" and (iv) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Preference Shares and as requested thereafter will be utilized to determine whether benefit plan investors own less than 25% of the value of any class of the Preference Shares or any equity interest in the Issuer, both upon the original issuance of Preference Shares and upon any subsequent transfer of the Preference Shares or any other equity interest in the Issuer.

(i)    Certain Tax Matters.  The Investor (i) represents that: (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30); (b) it is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2) and (c) it is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Preference Shares or cause the Preference Shares to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not sell, pledge or otherwise transfer a Preference Share (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) if it would cause there to be more than 99 beneficial owners of the Preference Shares and any other equity interests of the Issuer or otherwise cause the Issuer to be treated as a publicly traded partnership for such purposes, (b) it will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

(j)    Limitations on Flow-Through Status.  The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Preference Shares does not exceed 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the Investor; (ii) no Person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such Person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Preference Shares. For this purpose, a "Qualifying Investment Vehicle" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to

4

which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Preference Share Paying Agent each of the representations set forth herein and in the Preference Share Paying Agency Agreement required to be made upon transfer of any of the Preference Shares (with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Preference Shares) and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "excepted investment company"): (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("pre-amendment beneficial owners"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

(k)    Certain Transfers Void.  The Investor agrees that (i) any sale, pledge or other transfer of a Preference Share (or any portion thereof) made in violation of the transfer restrictions contained in the Preference Share Paying Agency Agreement, or made based upon any false or inaccurate representation made by the Investor or a transferee to the Issuer, will be void ab initio and of no force or effect and (ii) none of the Issuer, the Preference Share Paying Agent or the Share Registrar has any obligation to recognize any sale, pledge or other transfer of a Preference Share (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(l)    Reliance on Representations, etc.  The Investor acknowledges that the Issuer, the Preference Share Paying Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Preference Shares are no longer accurate, the Investor will promptly notify the Issuer and Preference Share Paying Agent.

(m)    Cayman Islands.  The Investor is not a member of the public of the Cayman Islands.

(n)    Subscription Agreement.  The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Preference Shares, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the Person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by

the Investor in connection with this subscription for Preference Shares. Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor or its property is bound. This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(o)     Investor Location. If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Preference Shares in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that state governs the Investor's subscription for the Preference Shares.

3.     Tax Information. The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof). The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer. The Investor further agrees to inform promptly the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.     Further Advice and Assurances. All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue. The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

5.     Indemnity. The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase Preference Shares. The Investor agrees to indemnify and hold harmless the Issuer, the Preference Share Paying Agent and each of their respective Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares.

Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

6.  <u>Payment of Subscription Price; Delivery of Preference Shares</u>. Simultaneously with the delivery hereof, the Investor shall deliver the purchase price for its Preference Shares hereunder (which shall be paid by a cash payment of U.S.$30,000,000 by wire transfer to an account designated by the Issuer and the Issuer shall cause the Preference Shares to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Share Registrar under the Preference Share Paying Agency Agreement, and have delivered to the Investor its Preference Shares.

7.  <u>Binding Effect</u>. Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and permitted transferees.

8.  <u>Benefit of Agreement</u>. The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares is made for the benefit of the Issuer and its Affiliates and the other Holders of Preference Shares issued by the Issuer and also for the benefit of the Preference Share Paying Agent under the Preference Share Paying Agency Agreement and Holders from time to time of the Preference Shares issued thereunder.

9.  <u>Miscellaneous</u>. This Subscription Agreement is not assignable by the Investor without the consent of the Issuer. The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer. The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein. This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.  <u>Waiver of Jury Trial</u>. **THE INVESTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT, THE PREFERENCE SHARES, THE PREFERENCE SHARE PAYING AGENCY AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

11.  <u>Notices</u>. Notices shall be given hereunder as specified in, and with the effect provided for by, Section 8.4 of the Preference Share Paying Agency Agreement.

12.  <u>No Recourse</u>. Notwithstanding anything to the contrary contained herein, the Investor hereby acknowledges and agrees that the Issuer's obligations hereunder will be solely the corporate obligations of the Issuer, and the Investor will not have any recourse to any

of the directors, officers, shareholders, incorporators, partners, agents, members or Affiliates of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby. Recourse in respect of any obligations of the Issuer hereunder will be limited to the Collateral and on the exhaustion thereof all claims against the Issuer arising from this subscription or any transactions contemplated hereby shall be extinguished and shall not thereafter revive.

13.    Certain Transactions.  Notwithstanding anything else contained herein or in any other Transaction Document, the Investor hereby acknowledges and agrees that (i) the Issuer has purchased the assets designated as the "Zohar I Assets" set forth in Schedule A-1 of the Indenture from Zohar CDO 2003-1, Limited (an Affiliate of Patriarch Partners) with proceeds of Warehouse Advances, and the Investor hereby consents to such acquisitions at such prices and waives any and all conflicts of interest relating thereto, and (ii) the Issuer and/or the Zohar Subsidiary shall purchase the assets (on or about the Funding Date) set forth in Schedule A-2 of the Indenture from Ark CLO 2000-1, Limited and/or Ark CLO 2000-1, LLC (each an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2 of the Indenture), and the Investor hereby consents to such acquisitions at such prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2 of the Indenture) and waives any and all conflicts of interest relating thereto.  The above described purchases and sales have been or will be, as applicable, made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in Schedule A-1 of the Indenture and Schedule A-2 of the Indenture, as applicable.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth below.

Date:  January __, 2005

**Aggregate Number of Preference Shares subscribed for:**

OCTALUNA II, LLC:

By:  Patriarch Partners XIV, LLC,
    its Managing Member

By:_____
    Name:  Lynn Tilton
    Title:  Manager


_____
                (Print Name)


By:_____
                (Signature)


_____Lynn Tilton, Manager_____
            (Print Name and Title)

The Issuer hereby accepts the above application
for subscription for Preference Shares.

ZOHAR II 2005-1, LIMITED


By:_____

   Name:    **Chris Watler**

   Title:     **Director**

Date:_____

# INVESTOR QUESTIONNAIRE

Reference is made to the Indenture, dated as of January 12, 2005 (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Zohar II 2005-1, Limited , Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc. and LaSalle Bank National Association, as trustee.  Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

## A.    General Information

1.    Print Full Name of Investor:    _____

2.    Name in which Preference
       Shares should be registered:    _____

3.    Address and Contact Person
       for Notices:    _____
                        _____
                        _____
       Attention: _____

4.    Telephone Number:    _____

5.    Telecopier Number:    _____

6.    Permanent Address:
       (if different from above)    _____
                                     _____
                                     _____

7.    U.S. Taxpayer
       Identification or Social
       Security Number (if any)    _____

8.    Payment Instructions:    _____
                                _____
                                _____

9.    Instructions for delivery
       of Preference Shares:    _____
                                _____
                                _____

## B.    Accredited Investor

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor") and has checked the box or boxes below which are next to the categories under which the Transferee so qualifies as an Accredited Investor:

☐　　　(A)　　It is an entity, including a grantor trust, in which all of the equity owners are Accredited Investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐　　　(B)　　It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐　　　(C)　　It is an insurance company as defined in Section 2(13) of the Securities Act.

☐　　　(D)　　It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐　　　(E)　　It is an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐　　　(F)　　It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐　　　(G)　　It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐　　　(H)　　It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐　　　(I)　　It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Preference Shares, with total assets in excess of U.S.$5,000,000.

☐　　　(J)　　It is a trust with total assets in excess of U.S.$5,000,000 not formed for the specific purpose of acquiring Preference Shares, whose purchase is directed by a

person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Preference Shares.

## C.    Qualified Purchaser Status

1.    The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "Qualified Purchaser") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a Qualified Purchaser:

☐        (A)    It is a company that (1) owns not less than U.S.$5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐        (B)    It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settler or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐        (C)    It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than U.S.$25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

NY3:#7347785v6

☐      (D)    It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; <u>provided</u>:

        (1)   that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of the dealer; and

        (2)   that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☐      (E)    It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

Alternatively, the Purchaser represents and warrants that the Purchaser is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "<u>Knowledgeable Employee</u>") or a company owned exclusively by Knowledgeable Employees.

<div align="center">☐ Yes      ☐ No</div>

2.    If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "<u>excepted investment company</u>"):

     (i)     all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "<u>pre-amendment beneficial owners</u>"); and

     (ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Investor, have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

D.      **Supplemental Data**

1.    Legal form of entity (corporation, partnership, trust, etc.): _____

Jurisdiction of organization: _____

2.    The Investor certifies that it is not a Flow-Through Investment Vehicle (as defined in the Indenture) other than a Qualifying Investment Vehicle (as defined in the Preference Share Paying Agency Agreement).

☐ Yes      ☐ No

3.    (a)    Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "Plan"), whether or not such Plan is subject to ERISA, and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "Benefit Plan Investor") pursuant to 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise.

☐ Yes      ☐ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA, and a Keogh plan covering no common law employees and an individual retirement account, which are also not subject to ERISA, are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

(b)    Is the Investor, or is the Investor acting on behalf of, a "Benefit Plan Investor" which is subject to ERISA or Section 4975 of the Code:

☐ Yes      ☐ No

(c)(1)    Is the investor a life insurance company?

☐ Yes      ☐ No

(c)(2)    If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Preference Shares being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3)  If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Preference Shares, please complete the following:

_____% of such general account assets used to acquire Preference Shares represent "plan assets" within the meaning of the Plan Asset Regulation

(d)    Is the Investor a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or an affiliate of any such person (each, a "Controlling Person").

☐ Yes      ☐ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person.  "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)    The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of any class of the Issuer's Preference Shares, both upon the original issuance of Preference Shares and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Preference Shares, for any reason.  Accordingly, the Investor undertakes:

(i)    to inform the Issuer and the Preference Share Paying Agent immediately of any change in the information provided in this paragraph,

(ii)    to provide to the Issuer and the Preference Share Paying Agent such information as the Issuer or the Preference Share Paying Agent may reasonably request from time to time to enable the Preference Share Paying Agent to make a determination with respect to the portion of the Preference Shares of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii)    to inform the Issuer and the Preference Share Paying Agent immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv)    to promptly dispose of its interests in the Preference Shares if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Preference Shares would result in 25% or more, as determined under the

Plan Asset Regulation, of the value of any class of the Preference Shares of the Issuer being held by Benefit Plan Investors.

(f)     If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise, its purchase, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, any similar federal, state or local law) for which an exemption is not applicable.   In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E.   **Certain Tax Matters**

1.   The Investor understands that no purchase or transfer of a Preference Share (or any interest therein) may be made (and the Preference Share Paying Agent will not recognize any such purchase or transfer) if it would cause there to be more than 99 beneficial owners of Preference Shares and any other equity interests in the Issuer for U.S. federal income tax purposes or otherwise cause the Issuer to become a publicly traded partnership treated as a corporation for such purposes.

2.   The Investor represents to <u>each of</u> (A), (B)  (C) and (D) below as follows:

(A)   <u>Either</u>

☐        (1)     It will at all times be a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code, <u>or</u>

☐        (2)     It will at all times be a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code.

(B)   <u>Either</u>

☐        (1)     It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, <u>or</u>

Subscription Agreement (Preference Shares)

☐     (2)     It was not formed for the purpose of holding Preference Shares or any other equity interests in the Issuer and not more than 50% of the value of the interest of any of the Investor's beneficial owners will be attributable to Preference Shares or any other equity interests of the Issuer, <u>or</u>

☐     (3)     It will provide an opinion of a nationally recognized tax counsel that its purchase will not cause the Issuer to be treated as a publicly traded partnership and such other representations and information as the Preference Share Paying Agent in its sole discretion may request, in form and substance satisfactory to the Preference Share Paying Agent, <u>or</u>

☐     (4)     It is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2).

☐   (C)     The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) or cause any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

The Investor understands and agrees that:

    (1)     Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Preference Shares of the Issuer will constitute partners of the Issuer,

    (2)     It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

    (3)     It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

    (4)     It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payments in respect of investments without

any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

F.    **Related Parties**

1.    To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

☐ Yes        ☐ No

2.    Will any other person or persons have a beneficial interest in the Preference Shares to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

☐ Yes        ☐ No

If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

G.    **Cayman Islands**

1.    The Investor certifies that it is not a member of the public in the Cayman Islands.

☐ Yes        ☐ No

Subscription Agreement (Preference Shares)

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Class B Notes of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Class B Notes of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Class B Notes in the name of the Investor in the Note Register. The Investor agrees to indemnify and hold harmless the Issuer and its Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

OCTALUNA II, LLC:

By: Patriarch Partners XIV, LLC,
       its Managing Member

By:_____
    (Signature)

____Lynn Tilton, Manager_____
     (Print Name and Title)


Date:_____

Subscription Agreement (Class B Notes)

# Exhibit 2

Rand Acquisition Credit Agreement

[REDACTED]

# Exhibit 3

Amendment No. 14 to Rand Acquisition Credit Agreement

[REDACTED]

# Exhibit 4

 LLC Agreement

[REDACTED]

# Exhibit 5

 LLC Agreement

[REDACTED]

# Exhibit 6

█████ November 2017 Written Consent

[REDACTED]

# Exhibit 7

███ November 2017 Written Consent

[REDACTED]

# Exhibit 8

████████████ Stockholders Agreement

[REDACTED]

# Exhibit 9

First Amendment to ██████████
Stockholders Agreement

[REDACTED]

# Exhibit 10

███ Phantom Equity Agreement

[REDACTED]

# Exhibit 11

█████ Phantom Equity Agreement

[REDACTED]

# Exhibit 12

██████████ Phantom Equity Agreement

[REDACTED]

# Exhibit 13

███ PPMG Agreement

[REDACTED]

# Exhibit 14

███████████ PPMG Agreement

[REDACTED]

# Exhibit 15

January 29, 2010 Zohar I Trustee Report



# ZOHAR CLO 2003-1 LIMITED

## Monthly Report

## As of January 29, 2010

Becky Ng
Account Officer
(704) 335-4660
Becky.Ng@usbank.com


Craig Healy
Analyst
(617) 603-6696
Craig.Healy@usbank.com



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**
**Zohar CLO 2003-1 Limited**

**Table of Contents**

| Report Name | Page Number |
|---|---|

***Class A Coverage Tests***

Class A Overcollateralization Ratio…………………………………………………………………………………………1
Class A Interest Coverage Ratio…………………………………………………………………………………………2
Collateral Value Ratio………………………………………………………………………………………………3
Funding Availability Report……………………...…………………………………………………………… 4

***Test Summaries & Assets***

Monthly Accounting Summary -Pursuant to Section 10.13………………………………………………… 5
Eligibility Criteria - Pursuant to Section 12.1…………………………………………………………………15
Eligible Investment Detail Report…………………………………………………………………………………21
Collateral Debt Obligation Report…………………………………………………………………………………22

***Collateral Quality Tests***

Diversity Test Report…………………………………………………………………………………………………27
Moody's Weighted Average Rating Factor Test…………………………………………...…………………… 29
Moody's Average Recovery Rate Report………………………………………………………………………33
S&P Average Recovery Rate Report……………………………………………………………………………37
Weighted Average Life Report……………………………………………………………………………………41
Weighted Average Spread Detail Report…………………………………………………………………………45

***Supporting Reports***

Bankruptcy / Insolvency Information……………………………………………………………………………49
Collateral Sold Report………………………………………………………………………………………………50
Commitment Shortfall………………………………………………………………………………………………51
Defaulted Collateral Detail Report………………………………………………………………………………52
Equities / Capitalized Interest Report…………………………………… ……...……………………………… 53
Issuer Concentration Report………………………………………………………………………………………55
Industry Classification & Rating Report …………………………………………………………………………57
Ineligible Collateral Securities Report……………………………………………………………………………61
Junior Rollover Exchange Securities Report ……………………………...……………………………………62
Moody's Industry Concentration Report …………………………………………………………………………63
Non-Current Obligation Report …………………………………………………………………………………68
Non-Performing Obligation Report ………………………………………………………………………………69
Participation Detail Report …………………...……………………………………………………………………70
Restructured / Refinance Detail Report……………………………………………………………………………71
S&P Industry Concentration Report………………………………………………………………………………72
Unrestricted Collateral Detail Report……………………………………………………………………………78
Workout Detail Report………………………………………………………………………………………………79



Portfolio Tests Pursuant to the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

## Class A Overcollateralization Ratio

| | |
|---|---:|
| Category 1 and 2 Collateral Debt Obligations : | 33,105,430.05 |
| plus Category 3 and 4 Collateral Debt Obligations : | 564,669,481.51 |
| plus Workout Securities : | 3,062,318.44 |
| **Adjusted Collateral Balance :** | **600,837,230.00** |
| plus Funding Availability : | 664,021.55 |
| plus Unrestricted Collateral Balance : | 25,334,496.68 |
| **Class A Overcollateralization Numerator :** | **626,835,748.23** |
| | |
| Aggregate Outstanding Amount of Class A Notes : | 521,895,972.35 |
| Aggregate Undrawn Amount of Class A Notes : | 0.00 |
| **Class A Overcollateralization Denominator :** | **521,895,972.35** |
| | |
| **Resulting Class A Overcollateralization Ratio :** | **120.11%** |
| **Class A Overcollateralization Ratio >= 105%:** | **Pass** |



Portfolio Tests Pursuant to the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

|  | Ratio3 | Trigger | Result |
|---|---|---|---|
| **Interest Coverage Ratio [A / B]** | **133.47%** | **110.00%** | **Pass** |

| | | |
|---|---|---|
| (i) The Scheduled Distributions of Interest | | 5,040,765.27 |
| plus (ii) The Scheduled Distributions of Interest on Eligible Investments | | 0.00 |
| plus (iii) The Scheduled Distributions of Commitment Fees | | 0.00 |
| plus (iv) Any other amounts actually received by the Issuer and/or the Zohar Subsidiary during such Due Period that constitute Interest Proceeds | | 0.00 |
| plus (v) If the Issuer has entered into a Hedge Agreement, the amount, if any, payable to the Issuer by the Hedge Counterparty under such Hedge Agreement on the Payment Date relating to such Due Period | | 0.00 |
| less (vi) The Sum of all Payments pursuant to paragraphs (A) through (E) of Section 11.1(a)(i) on the Payment Date immediately following such Due Period; by | | |
| A  Payment of Taxes, Registration, and Filing Fees owing by the Zohar Obligors | | 0.00 |
| B1  Accrued & Unpaid Supplemental Credit Enhancement Liabilities to the Credit Enhancer5,759,551.54 | | 0.00 |
| B2  Trustee Expenses | | 72,530.77 |
| C  Replenish Expense Account / Administrative Fees | | 12,500.00 |
| D  Senior Collateral Management Fee / Professional Fee Transfer | | 2,283,724.00 |
| E  Hedge Counterparty Payment | | 0.00 |

| | | |
|---|---|---|
| **Interest Coverage Numerator :** | **2,672,010.50** | **[A]** |

| | | |
|---|---|---|
| Class A Interest Distribution Amount | | |
| Class A-1 Note | | 333,917.12 |
| Class A-2 Note | | 71,235.65 |
| Class A-3a Note | | 1,115,675.40 |
| Class A-3b Note | | 201,383.64 |
| Class A-1 Commitment Fee Amount | | 0.00 |
| Class A-2 Commitment Fee Amount | | 0.00 |
| Class A-3a Commitment Fee Amount | | 0.00 |
| Class A-3b Commitment Fee Amount | | 0.00 |
| Senior Class A-1 Additional Amount | | 0.00 |
| Credit Enhancement Premium | | 279,717.93 |

| | | |
|---|---|---|
| **Interest Coverage Denominator** | **2,001,929.74** | **[B]** |



Portfolio Tests Pursuant to the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

## Collateral Value Ratio

| | |
|---|---|
| Category 1 Collateral Debt Obligations : | 33,105,430.05 |
| Plus Principal Balance of Collateral Debt Obligations : | 564,669,481.51 |
| plus Workout Securities : | 3,062,318.44 |
| **Net Portfolio Collateral Balance :** | **600,837,230.00** |
| plus Funding Availability : | 664,021.55 |
| plus Unrestricted Collateral Balance : | 25,334,496.68 |
| **Collateral Value Numerator :** | **626,835,748.23** |
| Aggregate Outstanding Amount of Class A Notes : | 521,895,972.35 |
| Aggregate Undrawn Amount of Class A Notes : | 0.00 |
| **Collateral Value Denominator :** | **521,895,972.35** |
| **Resulting Collateral Value Ratio :** | **120.11%** |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date: 02/01/2010 3:11 PM
As of Date: 01/29/2010
Page [4]

**Funding Availability Report**

**ZOHAR CDO 2003-1 Limited**

| | |
|---|---|
| Principal Proceeds Account Balance : | 73,346,405.10 |
| Subsidiary Principal Collection Account : | 0.00 |
| Aggregate of Undrawn Amounts of the Class A Notes : | 0.00 |
| Unfunded Revolver Discount Account : | 0.00 |
| **Total of Funding Source Amount :** | **73,346,405.10** |

**Less**

| | |
|---|---|
| **Unfunded Revolver and Delayed Term Loan Amount :** | **40,523,308.46** |
| **Cost of Unsettled Commitments :** | **32,159,075.00** |
| **Resulting Funding Availability :** | **664,021.55** |



Test Date:    02/01/2010 12:07 PM
As of Date:   01/29/2010

Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

| | |
|---|---|
| **Maximum Investment Amount** | **607,616,941.89** |

Page 5

**10.13 (a)(1)**

**The Aggregate Principal Balance of all Collateral Debt Obligations, Equity**
**Securities and Unrestricted Collateral Debt Obligations;**

| | |
|---|---|
| **Aggregate Principal Balance of CDOs:** | **606,952,920.34** |
| **Unrestricted Collateral Obligations:** | **13,144,410.27** |

For additional information, please see the Equities / Capitalized Interest Report

**10.13 (a)(2)**

**The Balance of all Eligible Investments and Cash in each of the Issuer Interest**
**Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Principal**
**Collection Account, the Zohar Subsidiary Interest Collection Account, the Cash Collateral**
**Account, the Payment Account, the Expense Account, the Closing Expense Account, the**
**Holdback Account, the Professional Fee Account, the Unrestricted Collateral Account, the Class**
**A Holder Collateral Account, the Unfunded Revolver Discount Account, the Rollover Proceeds**
**Account, the Class A-3 Proceeds Account (including the Class A-3 Interest Proceeds Sub-**
**Account and the Class A-3 Principal Proceeds Sub-Account) and the Cash Reserve Account;**

| | |
|---|---|
| **Issuer Interest Collection Account Balance:** | **2,738,102.37** |
| **Issuer Principal Collection Account Balance:** | **73,346,405.01** |
| **Zohar Subsidiary Principal Collection Account Balance:** | **0.00** |
| **Zohar Subsidiary Interest Collection Account Balance:** | **0.00** |
| **Payment Account Balance:** | **0.00** |
| **Cash Collateral Account Balance:** | **0.00** |
| **Expense Account Balance:** | **400,000.00** |
| **Closing Expense Account Balance:** | **0.00** |
| **Holdback Account Balance:** | **1,500,000.00** |
| **Professional Fee Account Balance:** | **1,154,175.68** |
| **Unrestricted Collateral Account Balance:** | **855,541.66** |



Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

**Page 6**

| | |
|---|---|
| **Class A Holder Account Balance:** | 0.00 |
| **Unfunded Revolver Discount Account Balance:** | 0.00 |
| **Rollover Proceeds Account Balance:** | 0.00 |
| **Class A-3 Proceeds Account Balance:** | 0.00 |
| Cash Reserve Account Balance: | 13,054,544.75 |

**10.13 (a)(3)**

**The nature, source and amount of any proceeds in the Collection Accounts,**
**including Uninvested Proceeds, Interest Proceeds, Principal Proceeds and Sale Proceeds, received**
**since the Preceding Monthly Reporting Date (including for each Collateral Debt Obligation the**
**allocation of Distributions received in respect thereof among principal, interest, fees and other**
**amounts);**
For additional information, please see the Transaction Data File, available on the
USBank Investor Reporting website.

**10.13 (a)(4)**

**The nature, source and amount of any proceeds in the Unrestricted Collateral**
**Account received since the Preceding Monthly Reporting Date (including for each Unrestricted**
**Collateral Debt Obligation the allocation of Distributions received in respect thereof among**
**principal, interest, fees and other amounts);**

| | |
|---|---|
| **Unrestricted Collateral Account Proceeds Balance:** | 0.00 |



Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

**Page 7**

**10.13 (a)(5)**

**(a) The Principal Balance, annual interest rate, Stated Maturity, issuer, the
Moody's Rating and the Standard & Poor's Rating of each Collateral Debt Obligation, Eligible
Investment, the Commitment Amount and the Funded Amount of each Collateral Debt Obligation
that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation,
the aggregate Funded Amount of all Collateral Debt Obligations that are Revolving Collateral
Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment
Amounts under all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or
Delayed Funding Collateral Debt Obligations; and (b) the Principal Balance, annual interest rate,
Stated Maturity and issuer of each Unrestricted Collateral Debt Obligation, the Commitment
Amount and the Funded Amount of each Unrestricted Collateral Debt Obligation that is a
Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the
aggregate Funded Amount of all Unrestricted Collateral Debt Obligations that are Revolving
Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate
Commitment Amounts under all Unrestricted Collateral Debt Obligations that are Revolving
Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations;**

For additional information, please see the Collateral Debt Obligation, Industry Classification &
Rating Reports, and Collateral Holding File available on the USBank Investor Reporting website.

**10.13 (a)(6)**

**The amount of funds withdrawn from the Issuer Principal Collection Account or
the Zohar Subsidiary Principal Collection Account pursuant to Section 9.7 to fund commitments
under Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed
Funding Collateral Debt Obligations since the Preceding Monthly Reporting Date;**

| | |
|---|---:|
| **Issuer Principal Collection Account Withdrawal:** | **6,675,964.82** |
| **ZOHAR Subsidiary Principal Collection Account Withdrawal:** | **0.00** |

**10.13 (a)(7)**

**The identity of each Collateral Debt Obligation which became a Defaulted
Obligation, Workout Obligation, Non-Current Obligation or Non-Performing Obligation since the
Preceding Monthly Reporting Date;**

For additional information, please see the Defaulted Collateral Detail and Workout Detail Reports .



Test Date:    02/01/2010 12:07 PM
As of Date:    01/29/2010

Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

Page 8

**10.13 (a)(8)**

**Identify and provide the Principal Balance of each (and provide the Aggregate**
**Principal Balance of all) Defaulted Obligation, Workout Obligation, Collateral Debt Obligation**
**that became a Post-Insolvency Collateral Debt Obligation since the Preceding Monthly Reporting**
**Date, Collateral Debt Obligation that became a Non-Current Obligation since the Preceding**
**Monthly Reporting Date, Collateral Debt Obligation that became a Non-Performing Obligation**
**since the Preceding Monthly Reporting Date, and Collateral Debt Obligation that became a**
**Performing Collateral Debt Obligation since the Preceding Monthly Reporting Date;**

For additional information, please see the Defaulted Collateral and Workout Detail Reports.

**10.13 (a)(9)**

**The Aggregate Principal Balance, number and identity of any Collateral Debt**
**Obligations that were released for sale or other disposition (indicating the sale price thereof**
**and whether such Collateral Debt Obligation was a Defaulted Obligation or Non-Performing**
**Obligation (in each case, as reported in writing to the Issuer by the Collateral Manager))**
**since the Preceding Monthly Reporting Date;**

For additional information, please see the Collateral Sold Report.

**10.13 (a)(10)**

**The Aggregate Principal Balance of all Collateral Debt Obligations that are Senior**
**Secured Collateral Debt Obligations;**

| | |
|---|---|
| 583,825,045.33 | 96.08% |

For additional information, please see the Collateral Debt Obligation Report.

**10.13 (a)(11)**

**The Aggregate Principal Balance of all Junior Rollover Exchanged Securities;**

| **Junior Rollover Exchanged Securities:** | 0.00 | 0.00% |
|---|---|---|

For additional information, please see the Junior Rollover Exchange Securities Report.

**10.13 (a)(12)**

**The Aggregate Principal Balance of all Collateral Debt Obligations providing for**
**payments of interest less frequently than quarterly;**

| | |
|---|---|
| 48,826,886.05 | 8.04% |

For additional information, please see the Collateral Debt Obligation Report.



Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

| 10.13 (a)(13) | | Page 9 |
|---|---|---|

**The Aggregate Principal Balance of all Collateral Debt Obligations convertible or
exchangeable into Equity Securities;**

| 31,000,000.00 | 5.10% |
|---|---|

| 10.13 (a)(14) |
|---|

**A description in reasonable detail of the terms of each Equity Security (including
whether or not such Equity Security constitutes Margin Stock);**

For additional information, please see the Equities / Capitalized Interest Report

| 10.13 (a)(15) |
|---|

**A description in reasonable detail of the terms of any Pledged Obligation that is
not a Collateral Debt Obligation, an Unrestricted Collateral Debt Obligation, an Equity Security
or an Eligible Investment;**

For additional information, please see the Ineligible Collateral Securities Report

| 10.13 (a)(16) |
|---|

**The Aggregate Principal Balance of all Fixed Rate Obligations;**

| 8,363,198.95 | 1.38% |
|---|---|

For additional information, please see the Collateral Debt Obligation Report

| 10.13 (a)(17) |
|---|

**The Aggregate Principal Balance of all Floating Rate Obligations;**

| 598,589,721.39 | 98.51% |
|---|---|

For additional information, please see the Collateral Debt Obligation Report

| 10.13 (a)(18) |
|---|

**The Aggregate Principal Balance of all Floating Rate Obligations for which the
calculation of the relevant floating rate of interest may not be determined by reference to the
LIBO Rate;**

| 19,510,909.52 | 3.21% |
|---|---|

| 10.13 (a)(19) |
|---|

**The Aggregate Principal Balance of all Collateral Debt Obligations (x) held by the
Issuer and (y) held by the Zohar Subsidiary;**

| 0.00 | 0.00% |
|---|---|

| 10.13 (a)(20) |
|---|

**The Aggregate Principal Balance of all Collateral Debt Obligations that are
designated as Category 1;**

| 33,528,603.97 | 5.52% |
|---|---|



Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

### 10.13 (a)(21)

**The Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 2;**

| | |
|---|---|
| 0.00 | 0.00% |

### 10.13 (a)(22)

**The Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 3;**

| | |
|---|---|
| 0.00 | 0.00% |

### 10.13 (a)(23)

**The Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 4;**

| | |
|---|---|
| 564,669,481.51 | 92.93% |

### 10.13 (a)(23)(A)

**The Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Workout Obligations;**

| | |
|---|---|
| 8,754,834.83 | 1.44% |

For additional information, please see the Workout Detail Report .

### 10.13 (a)(24)

**The Aggregate Principal Balance of all Collateral Debt Obligations issued by each Issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);**

For additional information, please see the Issuer Concentration Report.

### 10.13 (a)(25)

**For each Collateral Debt Obligation that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests acquired from such Selling Institution;**

For additional information, please see the Participation Detail Report.

### 10.13 (a)(26)

**The Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests;**

| | |
|---|---|
| 0.00 | 0.00% |

For additional information, please see the Participation Detail Report.

Test Date:    02/01/2010 12:07 PM
As of Date:   01/29/2010



Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

<div style="text-align:right">Page 11</div>

| 10.13 (a)(27) |
|:---:|

**The Commitment Shortfall, if any;**                    **0.00**

For additional information, please see the Commitment Shortfall  Report.

| 10.13 (a)(28) |
|:---:|

**For each Collateral Debt Obligation (as applicable):**

**(A) the last date on which interest was paid thereunder since the Preceding
Monthly Reporting Date;**
For additional information, please see the Transaction Data File

**(B) the date of the occurrence of any default or event of default thereunder
since the Preceding Monthly Reporting Date;**
For additional information, please see the Defaulted Collateral Detail Report

**(C) the date of the occurrence of any event of bankruptcy or insolvency in
respect of the obligor thereon since the Preceding Monthly Reporting Date;**
For additional information, please see the the Bankruptcy / Insolvency Detail Report

**(D) the date of emergence of the obligor thereon from any bankruptcy or
insolvency proceeding since the Preceding Monthly Reporting Date;**
For additional information, please see the the Bankruptcy / Insolvency Detail Report

**(E) the amount and type of Distributions received by the issuer thereunder
since the Preceding Monthly Reporting Date in connection with any restructuring
of the terms of such Collateral Debt Obligation;**
For additional information, please see the Transaction Data File

**(F) the date on which all or any portion of such Collateral Debt Obligation
was refinanced since the Preceding Monthly Reporting Date and the amount of
any such refinancing;**
For additional information, please see the Weighted Average Purchase Price Report

Test Date:    02/01/2010 12:07 PM
As of Date:   01/29/2010

Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

Page 12

### 10.13 (a)(28) : Continued

**(G) if such Collateral Debt Obligation is an Exchanged Security or if the Issuer
thereof has otherwise changed since the date such Collateral Debt Obligation
was Granted to the Trustee, the name of the original issuer of such Collateral
Debt Obligation (or any predecessor Collateral Debt Obligation); and**
For additional information, please see the Restructured Collateral Report

**(H) for any Insolvency Collateral Debt Obligation, a specification of each
instance since the Preceding Monthly Reporting Date in which the Issuer
received interest in Cash;**
For additional information, please see the the Bankruptcy / Insolvency Detail Report

### 10.13 (a)(29)

**The Aggregate Principal Balance of all Collateral Debt Obligations that fall
within each Standard & Poor's Industry Classification Group;**
For additional information, please see the Standard & Poor's Industry Classification

### 10.13 (a)(30)

**The Aggregate Principal Balance of all Collateral Debt Obligations that fall
within each Moody's Industry Classification Group;**
For additional information, please see the Moody's Industry Classification



Test Date:    02/01/2010 12:07 PM
As of Date:    01/29/2010

Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

---

| **10.13 (a)(31)** | | | | | **Page 13** |

**A calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Debt Obligations on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;**

| | | | |
|---|---|---|---|
| **Diversity Score / Test** | >= 22 | 22 | Pass |
| **Moody's Weighted Average Rating Factor Test** | 2,800 | 2,869 | Fail |
| **Minimum Average Recovery Rate Test** | | | |
| Standard & Poor's Average Recovery Rate Test | >= 58.0% | 60.0% | Pass |
| Moody's Average Recovery Rate Test | >= 43% | 49.0% | Pass |
| **Weighted Average Life Report** | <= 5.0 Years | 3.10 | Pass |
| **Weighted Average Spread Test Report** | 6.75% | 8.650% | Pass |
| **Weighted Average Purchase Price Report** | N/A | N/A | Pass |

---

| **10.13 (a)(32)** |

**The Class A Break-Even Loss Rate, the Class A Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;**

For additional information, please see the Standard & Poor's CDO Monitoring Report

---

| **10.13 (a)(33)** |

**With respect to each Collateral Debt Obligation that is a Senior Secured Collateral Debt Obligation, the rating assigned by Moody's to such Senior Secured Collateral Debt Obligation and the senior implied rating assigned by Moody's to the issuer of such Senior Secured Collateral Debt Obligation;**

For additional information, please see the Industry Classification & Rating Report



Portfolio Tests Pursuant to  the Indenture between ZOHAR CDO 2003-1 Limited,
(Issuer) and U.S. Bank National Association (Trustee)

**10.13 (a)(34)**

**For each Collateral Debt Obligation sold or extinguished since the Preceding**
**Monthly Reporting Date, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net**
**distributions received on a Collateral Debt Obligation that was so extinguished) received by the**
**Issuer in connection with such sale (or in exchange for the extinguishment of such obligation)**
**was greater than or less than the price at which the Issuer purchased such Collateral Debt**
**Obligation (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds**
**received and, in the case of any Collateral Debt Obligation that is a Revolving Collateral Debt**
**Obligation or Delayed Funding Collateral Debt Obligation, fundings in respect of such Collateral**
**Debt Obligation), and the Dollar amount by which, after giving effect to such sale, the aggregate**
**Sale Proceeds received by the Issuer in connection with all sales of Collateral Debt Obligations**
**after the Closing Date was greater than or less than the aggregate amount of the prices at which**
**the Issuer purchased such Collateral Debt Obligations; and**

Please see the Collateral Sold Report and the Transaction Data File available on the U.S.Bank Investor Reporting Website

**10.13 (a)(35)**

**A calculation in reasonable detail necessary to determine compliance with each of the**
**Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the**
**Collateral Value Ratio**

| | | | |
|---|---|---|---|
| **Class A Overcollateralization Ratio** | >= 105% | 120.11% | Pass |
| **Class A Interest Coverage Ratio** | >= 110% | 133.47% | Pass |
| **Collateral Value Ratio** | | 120.11% | |



Portfolio Tests Pursuant to Section 12.1 of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

## Section 12.1 Eligibility Criteria

**Maximum Investment Amount**

| | | Result | Total Loan Commitment | Actual % | Limit |
|---|---|---|---|---|---|
| | **607,616,941.89** | | | | |
| (1) | such obligation or security is a Collateral Debt Obligation (including an attached Equity Kicker) or Originated Special Loan/Preferred Security; | Pass | 0.00 | 0.00% | 0.00% |
| (2) | such Collateral Debt Obligation provides for a fixed amount of principal payable in Cash no later than its Stated Maturity; | Pass | 583,825,045.33 | 96.08% | 100.00% |
| (3) | such Collateral Debt Obligation is not payable or denominated in, or convertible into an obligation or security denominated in, a currency other than U.S. Dollars; | Pass | 0.00 | 0.00% | 0.00% |
| (4) | not more than 10% of the Maximum Investment Amount may consist of Collateral Debt Obligations that bear interest at a rate that increases or decreases solely as a function of the passage of time; | Pass | 0.00 | 0.00% | 0.00% |
| (5) | such Collateral Debt Obligation provides for periodic payments of interest in Cash at least semi-annually; | Pass | 0.00 | 0.00% | 0.00% |
| (6) | such Collateral Debt Obligation is not a PIK Loan; | Pass | 0.00 | 0.00% | 0.00% |
| (7) | such Collateral Debt Obligation is Registered; | Pass | 0.00 | 0.00% | 0.00% |
| (8) | such Collateral Debt Obligation is a loan of a U.S. private issuer, payable only in the United States and governed by the laws of a state of the United States, provided however, that up to 10% (in the aggregate) of the Maximum Investment Amount may consist of obligations issued organized under the laws of Canada, the United Kingdom, Germany, The Netherlands, and/or France so long as such applicable country(x) does not impose foreign exchange controls and (y) has a sovereign credit rating of at least AA by Standard & Poor's; | Pass | 0.00 | 0.00% | 10.00% |
| (9) | such Collateral Debt Obligation is not (A) an Equity Security (other than an attached Equity Kicker or an Equity Workout Security) or (B) convertible or exchangeable into any Equity Security (other than at the sole option of the holder thereof); | Pass | 0.00 | 0.00% | 0.00% |



Portfolio Tests Pursuant to Section 12.1 of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

___

**Section 12.1 Eligibility Criteria (continued)**

**Maximum Investment Amount**                          607,616,941.89

(10) unless such Collateral Debt Obligation is a Revolving Collateral Debt Obligation or a Delayed
     Funding Collateral Debt Obligation, such Collateral Debt Obligation does not require the
     Issuer to make future advances to (or on behalf of) the obligor or issuer under the related
     Underlying Instruments (other than the customary expense reimbursements and indemnifications
     contained in the Underlying Instruments);                    Pass      0.00   0.00%   0.00%

(11) such Collateral Debt Obligation is not an Asset-backed Security;       Pass      0.00   0.00%   0.00%

(12) such Collateral Debt Obligation is not an obligation to pay rent or other amounts under any lease
     of (or other arrangement conveying the right to use) real or personal property, or a combination
     thereof;                                                     Pass      0.00   0.00%   0.00%

(13) such Collateral Debt Obligation is not a loan (other than a DIP Loan) incurred in connection
     with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a
     Person or similar transaction which obligation by its terms is required to be repaid within the year
     of the incurrence thereof with proceeds from additional borrowings or other refinancing;    Pass      0.00   0.00%   0.00%

(14) such Collateral Debt Obligation is not a loan which is a swap, option, forward, trust certificate,
     credit-linked note or other derivative contract;             Pass      0.00   0.00%   0.00%

(15) (x) such Collateral Debt Obligation is not a security whose repayment is subject to material non-
     credit related risk (for example, a Collateral Debt Obligation the payment of which is expressly
     contingent upon the non-occurrence of a catastrophe), as determined in the sole judgment of the
     Collateral Manager, exercised in accordance with the standard of care set forth in the Management
     Agreement; and (y) no rating assigned by Standard & Poor's to such Collateral Debt Obligation
     includes the subscript "r" or "t";                           Pass      0.00   0.00%   0.00%



Portfolio Tests Pursuant  to Section 12.1 of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

---

**Section 12.1 Eligibility Criteria (continued)**

**Maximum Investment Amount**                     607,616,941.89

(16)  if such Collateral Debt Obligation is in the form of a Participation Interest, the Selling Institution
is at the time of the purchase of such Participation Interest a financial institution (including a
securities broker or an Affiliate thereof) or other institutional lender with long-term unsecured debt
parent of which has ratings) of at least "A2" from Moody's and "A" from Standard & Poor's and      Pass      0.00    0.00%    0.00%
the conditions in clause (34) below are satisfied;

(17)  such Collateral Debt Obligation is not an asset that, pursuant to the Plan Asset Regulation, (A)
would be treated as an equity interest in an entity; and (B) if held by an ERISA Plan, would
cause such ERISA Plan to be treated as owning an undivided interest in each of the underlying
assets of such entity for purposes of ERISA;      Pass      0.00    0.00%    0.00%

(18)  the acquisition of such Collateral Debt Obligation will not cause the Issuer or the pool of Collateral
to be required to register as an investment company under the Investment Company Act and if the
issuer of such Collateral Debt Obligation is excepted from the definition of an "investment company"
solely by reason of Section 3(c)(1) of the Investment Company Act, then either (x) such Collateral
Debt Obligation does not constitute a "voting security" for purposes of the Investment Company Act
or (y) the aggregate amount of such Collateral Debt Obligation held by the Issuer and/or the Zohar
10% of the entire issue of such security;      Pass      0.00    0.00%    0.00%

(19)  on or after the Ramp Up End Date (A) the Class A Interest Coverage Ratio Test is satisfied (or,
if the Class A Interest Coverage Ratio Test is not satisfied, compliance with the Class A Interest
Coverage Ratio Test is improved) and (B) the Class A Overcollateralization Ratio Test is satisfied
(or if not satisfied, is satisfied after giving effect to such acquisition);      Pass      0.00    0.00%    0.00%



Portfolio Tests Pursuant to Section 12.1 of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

## Section 12.1 Eligibility Criteria (continued)

**Maximum Investment Amount**     607,616,941.89

(20) on or after the Ramp Up End Date (A) each of the Collateral Quality Tests (other than the Standard
& Poor's CDO Monitor Test) is satisfied with respect to the portfolio of Collateral Debt Obligations
or, if immediately prior to such investment (or immediately prior to the sale of the Collateral Debt
Obligation the proceeds of which are used to purchase such Collateral Debt Obligation) one or more
such Collateral Quality Tests was not satisfied with respect to the portfolio of Collateral Debt Obligations,
(1) the extent of compliance with at least one such non-complying Collateral Quality Test must be
improved, (2) no Collateral Quality Test which has previously failed to be satisfied shall be made worse
and (3) no Collateral Quality Test which has previously been satisfied shall fail to be satisfied after giving
effect to such acquisition and (B) the Standard & Poor's CDO Monitor Test is satisfied (as
determined by the Trustee) or, if immediately prior to such investment the Standard & Poor's CDO
Monitor Test was not satisfied,                                    Pass    0.00   0.00%   0.00%

(21) no Commitment Shortfall would exist;                          Pass    0.00   0.00%   0.00%

(22) such Collateral Debt Obligation is not the subject of an all Cash Offer for all of the outstanding
loans under the related Underlying Instruments;                    Pass    0.00   0.00%   0.00%

(23) such Collateral Debt Obligation matures on or prior to the earlier of (A) the date 7 years after the
date of such investment and (B) the Stated Maturity of the Class A Notes;   Pass    0.00   0.00%   0.00%

(24) such Collateral Debt Obligation is not a loan secured primarily by a mortgage, deed of trust or
similar lien on real property;                                     Pass    0.00   0.00%   0.00%

(25) such Collateral Debt Obligation is not a security issued by a collateralized debt obligation vehicle;   Pass    0.00   0.00%   0.00%

(26) the Issuer or the Zohar Subsidiary is an eligible assignee with respect to such Collateral Debt
Obligation under the related Underlying Instruments, and the pledge of such Collateral Debt
Obligation under this Indenture is permitted under such Underlying Instrument;   Pass    0.00   0.00%   0.00%



Test Date:    02/01/10 05:28 PM
As of Date:    01/29/10

Portfolio Tests Pursuant to Section 12.1 of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

## Section 12.1 Eligibility Criteria

**Maximum Investment Amount**            607,616,941.89

| | Total Loan Commitment | Actual % | Limit | Result |
|---|---|---|---|---|
| (27) not more than 3.0% of the Maximum Investment Amount may consist of obligations issued by any single issuer or any of its Affiliates; provided, that up to four issuers may constitute up to 5.0% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 7.0% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 8.5% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 9.0% of the Maximum Investment Amount (in each case including any Unfunded Amounts in respect thereof); | 56,492,001.29 | 9.30% | 9.00% | Fail |
| | 53,386,597.13 | 8.79% | 8.50% | Fail |
| | 43,982,013.57 | 7.24% | 7.00% | Fail |
| | 31,403,880.40 | 5.17% | 5.00% | Fail |
| | 18,842,328.00 | 3.10% | 3.00% | Fail |
| (28) not more than 5% of the Maximum Investment Amount may consist of Collateral Loans that are Defaulted Obligations; | 33,528,603.97 | 5.52% | 5.00% | Fail |
| (29) not more than 50% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are Revolving Collateral Debt Obligations (including any Unfunded Amounts in respect thereof) and Delayed Funding Collateral Debt Obligations (but only with respect to the Unfunded Amounts in respect thereof); | 98,688,867.05 | 16.24% | 50.00% | Pass |
| (30) not more than 20% of Maximum Investment Amount may consist of Fixed Rate Obligations; | 5,605,471.69 | 0.92% | 20.00% | Pass |
| (31) not more than 5% of the Maximum Investment Amount may consist of Collateral Debt Obligations that (i) are Floating Rate Obligations and (ii) do not have an interest option based on either a LIBO Rate or the "prime rate" (excluding any Non-Current Obligations); | 0.00 | 0.00% | 5.00% | Pass |
| (32) not more than 20% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are Floating Rate Obligations with an interest option based on the "prime rate" or "alternate base rate", where the spread on any LIBO Rate interest option is more than 1.50% above the spread on such "prime rate" interest option or "alternate base rate" option, as applicable (excluding any Non-Current Obligations); | 0.00 | 0.00% | 20.00% | Pass |
| (33) not more than 15% of the Maximum Investment Amount may consist of obligations that pay interest less frequently than quarterly (excluding any Non-Current Obligations); | 34,305,786.58 | 5.65% | 15.00% | Pass |



Portfolio Tests Pursuant to Section 12.1 of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S. Bank National Association (Trustee)

## Section 12.2 Eligibility Criteria (continued)

**Maximum Investment Amount**          607,616,941.89

(34) not more than 20% of the Maximum Investment Amount may consist of Participation Interests,     0.00   0.00%   20.00%   Pass
not more than 10% of the Maximum Investment Amount may consist of Participation
Interests with any single Selling Institution, and not more than 10% of the Maximum     0.00   0.00%   10.00%   Pass
Investment Amount may consist of Participation Interests with Selling Institutions rated
less than Aa2 by Moody's or AA by Standard & Poor's;     0.00   0.00%   10.00%   Pass

(35) not more than 5% of the Maximum Investment Amount may consist of Collateral Debt
Obligations that are convertible or exchangeable into Equity Securities;     31,000,000.00   5.10%   5.00%   Fail

(36) not more than 12% of the Maximum Investment Amount may consist of Collateral Debt
Obligations issued by obligors that fall within the same Moody's Industry Classification Group     99,345,857.79   16.35%   16.00%   Fail
(provided that up to 3 Industry Classification Groups may each constitute up to 16% of
the Maximum Investment Amount);

(37) not more than 12% of the Maximum Investment Amount may consist of Collateral Debt
Obligations issued by obligors that fall within the same Standard & Poor's Industry Classification     99,345,857.79   16.35%   16.00%   Fail
Group (provided that up to 3 Industry Classification Groups may each constitute up to 16%
of the Maximum Investment Amount);

(38) not more than 5% of the Maximum Investment Amount may consist of Collateral Debt
Obligations in Category 1;     33,528,603.97   5.52%   5.00%   Fail

(39) not more than 10% of the Maximum Investment Amount may consist of Collateral Debt
Obligations in Category 1 or Category 2;     33,528,603.97   5.52%   10.00%   Pass

(40) not more than 20% of the Maximum Investment Amount may consist of Collateral Debt
Obligations in Category 1, Category 2 or Category 3;     33,528,603.97   5.52%   20.00%   Pass



<div align="center">

**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

</div>

<div align="center">

**Eligible Investment Detail Report**

**ZOHAR CDO 2003-1 Limited**

</div>

| Account Type | Issuer Name | Principal Balance | Interest Rate | Moody's / S&P Rating | Maturity Date |
|---|---|---|---|---|---|
| ESCROW | US Bank CP | 1,555,008.34 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For ESCROW :** | | **1,555,008.34** | | | |
| Expense Account | US BANK CP | 400,000.00 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Expense Account :** | | **400,000.00** | | | |
| Holdback Account | US BANK CP | 1,500,000.00 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Holdback Account :** | | **1,500,000.00** | | | |
| Interest Collection Account | US BANK CP | 2,738,102.37 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Interest Collection Account :** | | **2,738,102.37** | | | |
| Interest Reserve Account | US BANK CP | 13,054,544.75 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Interest Reserve Account :** | | **13,054,544.75** | | | |
| Principal Collection Account | US BANK CP | 73,346,405.01 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Principal Collection Account :** | | **73,346,405.01** | | | |
| Professional Fee | US BANK CP | 1,154,175.68 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Professional Fee :** | | **1,154,175.68** | | | |
| Unrestricted Collateral Account | US BANK CP | 855,541.66 | 0.50000 | Aaa | 02/01/2010 |
| **Total Holdings For Unrestricted Collateral Account :** | | **855,541.66** | | | |
| **Total Holdings For All Accounts :** | | **94,603,777.81** | | | |
| **Eligible Investments :** | | **94,603,777.81** | | | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 12:37 PM
As of Date: 01/29/2010
Page [22]

### Collateral Debt Obligation Report

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Total Loan Commitment | Annual Int. Rate | Sprd./ Cpn. | Cat. | Fixed/ Variable | Stated Maturity | Index | Pay. Freq. | Conv./ Exch. | Sen. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 180's, LLC | Tranche A Revolver | 9,600,000.00 | 10.0000 | 8.0000 | 4 | V | 06/30/13 | LIBOR | M | | SS |
| 180's, LLC | Tranche A Revolver | 7,000,000.00 | 0.5000 | 0.5000 | 4 | V | 06/30/13 | Unfunded | M | | SS |
| 180's, LLC | Delayed Draw Term Loan B | 2,240,328.00 | 10.0000 | 8.0000 | 4 | V | 06/30/13 | LIBOR | M | | SS |
| 180's, LLC | Delayed Draw Term Loan B | 2,000.00 | 0.5000 | 0.5000 | 4 | V | 06/30/13 | Unfunded | M | | SS |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | 0.0000 | 8.0000 | 4 | V | 12/31/12 | Committed | M | | SS |
| American LaFrance | Revolver | 558,910.58 | 10.0000 | 8.0000 | 4 | V | 06/30/13 | LIBOR | M | | SS |
| American LaFrance | Revolver | 951.89 | 0.5000 | 0.5000 | 4 | V | 06/30/13 | Unfunded | M | | SS |
| American LaFrance | Term Loan 2 | 52,313,856.66 | 10.0000 | 8.0000 | 4 | V | 06/30/13 | LIBOR | M | | SS |
| American LaFrance | Term Loan 1 | 512,878.00 | 10.0000 | 8.0000 | 4 | V | 06/30/13 | LIBOR | M | | SS |
| Amweld International | Term Loan B | 16,164,108.84 | 6.0000 | 4.0000 | 4 | V | 01/21/14 | LIBOR | M | | SS |
| Arc One, LLC | Restructured Term Lo | 30,653,808.29 | 10.0000 | 8.0000 | 1 | V | 06/03/13 | LIBOR | M | | SS |
| Arc One, LLC | Fully Funded Term Lo | 700,000.00 | 10.0000 | 8.0000 | 1 | V | 06/03/13 | LIBOR | M | | SS |
| Best Textiles Acquisition, LLC | Revolver | 2,001,110.44 | 1.5000 | 0.5000 | 4 | V | 08/28/13 | Unfunded | M | | SS |
| Best Textiles Acquisition, LLC | Revolver | 2,998,889.56 | 10.0000 | 8.0000 | 4 | V | 08/28/13 | LIBOR | M | | SS |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | 3.2309 | 3.0000 | 4 | V | 06/30/10 | LIBOR | M | | SS |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | 3.2309 | 3.0000 | 4 | V | 06/30/10 | LIBOR | Q | | SS |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | 13.2312 | 3.0000 | 4 | V | 06/30/10 | LIBOR | M | | SS |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | 8.2500 | 5.0000 | 4 | V | 11/06/13 | PRIME | Q | | SS |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | 0.5000 | 0.5000 | 4 | V | 11/06/13 | Unfunded | Q | | SS |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | 0.0000 | 5.0000 | 4 | V | 11/06/13 | Committed | Q | | SS |
| Croscil Home | Revolver | 10,000,000.00 | 1.5000 | 0.5000 | 4 | V | 11/07/13 | Unfunded | M | | SS |
| Doors Acquisition, LLC | Fully Funded Term Lo | 2,905,786.58 | 8.0000 | 6.0000 | | V | 09/18/13 | LIBOR | S | | SS |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | 9.0000 | 7.0000 | 4 | V | 06/03/13 | LIBOR | M | | SS |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | 9.0000 | 7.0000 | 4 | V | 06/03/13 | LIBOR | M | | SS |
| Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | 9.0000 | 7.0000 | 4 | V | 06/03/13 | LIBOR | M | | SS |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | 0.0000 | 8.0000 | 4 | V | 06/03/13 | Committed | M | | SS |
| Electro Source, LLC | Term Loan | 2,916,666.67 | 10.0000 | 8.0000 | 4 | V | 04/30/13 | LIBOR | M | | SS |
| Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | 10.0000 | 8.0000 | 4 | V | 04/30/13 | LIBOR | M | | SS |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | 7.2309 | 7.0000 | 4 | V | 03/19/13 | LIBOR | M | | SS |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | 8.2309 | 8.0000 | 4 | V | 06/16/10 | LIBOR | M | | SS |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | 10.0000 | 10.0000 | 4 | F | 06/15/50 | FIXED | Q | Y | PS |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | S | | SS |
| Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | S | | SS |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date: 02/01/2010 12:37 PM
As of Date: 01/29/2010
Page [23]

### Collateral Debt Obligation Report

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Total Loan Commitment | Annual Int. Rate | Sprd./ Cpn. | Cat. | Fixed/ Variable | Stated Maturity | Index | Pay. Freq. | Conv./ Exch. | Sen. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | S | | SS |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | S | | SS |
| Glenoit LLC | Term Loan | 4,526,721.00 | 7.2309 | 7.0000 | 4 | V | 09/30/12 | LIBOR | M | | SS |
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | 10.0000 | 8.0000 | 4 | V | 05/31/13 | LIBOR | Q | | SS |
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | 10.0000 | 8.0000 | 4 | V | 05/31/13 | LIBOR | Q | | SS |
| Global Automotive Systems, LLC | Term B | 576,025.00 | 0.0000 | 8.0000 | 4 | V | 05/31/13 | Committed | Q | | SS |
| Hartwell Industries, Inc. | New Revolver | 1,919,123.22 | 8.2309 | 8.0000 | 4 | V | 03/23/13 | LIBOR | M | | SS |
| Hartwell Industries, Inc. | New Revolver | 8,516.74 | 0.3750 | 0.3750 | 4 | V | 03/23/13 | Unfunded | M | | SS |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | 13.2506 | 8.0000 | 4 | V | 03/23/13 | LIBOR | M | | SS |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | 8.2309 | 8.0000 | 4 | V | 03/23/13 | LIBOR | M | | SS |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 423,547.10 | 8.2309 | 8.0000 | 4 | V | 03/23/13 | LIBOR | M | | SS |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 1,076,452.90 | 0.0000 | 0.0000 | 4 | V | 03/23/13 | Unfunded | M | | SS |
| Heritage Aviation | Term Loan | 1,000,000.00 | 10.0000 | 8.0000 | 4 | V | 12/31/13 | LIBOR | M | | SS |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | 0.0000 | 8.0000 | 4 | V | 12/31/13 | Committed | M | | SS |
| Heritage Aviation | Delayed Draw Term Lo | 9,000,000.00 | 8.2309 | 8.0000 | 4 | V | 12/31/13 | LIBOR | M | | SS |
| Heritage Aviation | Delayed Draw Term Lo | 1,000,000.00 | 0.5000 | 0.5000 | 4 | V | 12/31/13 | Unfunded | M | | SS |
| IMG Holdings, Inc | Term C | 2,000,000.00 | 8.2309 | 8.0000 | 4 | V | 05/25/12 | LIBOR | M | | SS |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | 8.2309 | 8.0000 | 4 | V | 05/25/12 | LIBOR | M | | SS |
| IMG Holdings, Inc | Term E | 144,640.00 | 8.2309 | 8.0000 | 4 | V | 05/25/12 | LIBOR | M | | SS |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | 0.5000 | 0.5000 | 4 | V | 05/25/12 | Unfunded | M | | SS |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | 8.2309 | 8.0000 | 4 | V | 05/25/12 | LIBOR | M | | SS |
| IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | 8.2309 | 8.0000 | 1 | V | 05/25/12 | LIBOR | M | | SS |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | 8.2309 | 8.0000 | 4 | V | 05/25/12 | LIBOR | M | | SS |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | 0.0000 | 8.0000 | 4 | V | 03/31/12 | Committed | Q | | SS |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | 6.0000 | 4.0000 | 4 | V | 03/31/12 | LIBOR | Q | | SS |
| Intera Group, Inc. | Exchanged Security | 5,849,048.28 | 2.0000 | 0.0000 | | V | 12/31/16 | LIBOR | Q | Y | PS |
| Intera Group, Inc. | Term Loan C | 160,000.00 | 10.0000 | 8.0000 | 4 | V | 03/31/12 | LIBOR | M | | SS |
| Intera Group, Inc. | Fully Funded Term C | 1,150,000.00 | 10.0000 | 8.0000 | 4 | V | 03/31/12 | LIBOR | M | | SS |
| Intera Group, Inc. | Fully Funded Term C | 200,000.00 | 2.0000 | 0.0000 | 4 | V | 03/31/12 | Unfunded | M | | SS |
| Intrepid USA | Revolver | 7,907,031.53 | 8.0000 | 6.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| Intrepid USA | Revolver | 1,372,968.47 | 1.5000 | 1.5000 | 4 | V | 01/31/13 | Unfunded | M | | SS |
| Intrepid USA | Term Loan B | 3,860,066.01 | 8.0000 | 6.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | 10.0000 | 8.0000 | 4 | V | 06/01/14 | LIBOR | M | | SS |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date: 02/01/2010 12:37 PM
As of Date: 01/29/2010
Page [24]

## Collateral Debt Obligation Report

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Total Loan Commitment | Annual Int. Rate | Sprd./ Cpn. | Cat. | Fixed/ Variable | Stated Maturity | Index | Pay. Freq. | Conv./ Exch. | Sen. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | 7.5000 | 5.5000 | 4 | V | 06/03/13 | LIBOR | Q | | SS |
| MD Helicopters, Inc | Term A | 12,873,602.92 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | Q | | SS |
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | Q | | SS |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | Q | | SS |
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | 10.0000 | 8.0000 | 4 | V | 06/03/13 | LIBOR | Q | | SS |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | 0.0000 | 8.0000 | 4 | V | 06/03/13 | Committed | Q | | SS |
| Natura Water | Fully Funded Term B | 1,500,000.00 | 10.0000 | 8.0000 | 4 | V | 03/03/13 | LIBOR | M | | SS |
| Natura Water | Fully Funded Term C | 2,200,000.00 | 10.0000 | 8.0000 | 4 | V | 03/03/13 | LIBOR | M | | SS |
| Natura Water | Fully Funded Term Lo | 300,000.00 | 10.0000 | 8.0000 | 4 | V | 03/03/13 | LIBOR | M | | SS |
| NetVersant Acquisition, LLC | Restructured Revolve | 277,257.23 | 10.0000 | 8.0000 | 4 | V | 01/07/13 | LIBOR | M | | SS |
| NetVersant Acquisition, LLC | Restructured Revolve | 16,814.27 | 0.5000 | 0.5000 | 4 | V | 01/07/13 | Unfunded | M | | SS |
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | 10.0000 | 8.0000 | 4 | V | 01/07/13 | LIBOR | M | | SS |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | 10.0000 | 8.0000 | 4 | V | 01/07/13 | LIBOR | M | | SS |
| Petry Media Corporation | Priming Revolver | 11,928,254.70 | 10.0000 | 8.0000 | 4 | V | 12/31/10 | LIBOR | M | | SS |
| Petry Media Corporation | Priming Revolver | 0.08 | 0.5000 | 0.5000 | 4 | V | 12/31/10 | Unfunded | M | | SS |
| Petry Media Corporation | Term Loan | 3,750,050.00 | 0.0000 | 8.0000 | 4 | V | 12/31/10 | Committed | M | | SS |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | 10.0000 | 8.0000 | 4 | V | 12/31/10 | LIBOR | M | | SS |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | 10.0000 | 8.0000 | 4 | V | 12/31/10 | LIBOR | M | | SS |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | 12.0000 | 6.0000 | 4 | F | 01/31/13 | FIXED | M | | SS |
| Rapid Rack Industries, Inc | Revolver | 450,000.00 | 10.0000 | 8.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| Rapid Rack Industries, Inc | Revolver | 3,855,324.10 | 10.0000 | 8.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| Rapid Rack Industries, Inc | Revolver | 1,694,675.90 | 0.5000 | 1.5000 | 4 | V | 01/31/13 | Unfunded | M | | SS |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | 0.0000 | 8.0000 | 4 | V | 11/03/13 | Committed | M | | SS |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | 0.5000 | 0.5000 | 4 | V | 11/03/13 | Unfunded | M | | SS |
| Red Shield Acquisition, LLC | Term Loan | 5,650,182.22 | 10.0000 | 8.0000 | 4 | V | 11/03/13 | LIBOR | M | | SS |
| Red Shield Acquisition, LLC | Term Loan | 2,349,817.78 | 0.5000 | 0.0000 | 4 | V | 11/03/13 | Unfunded | M | | SS |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | 10.0000 | 8.0000 | 4 | V | 03/31/13 | LIBOR | M | | SS |
| Remco Maintenance, LLC | Revolver | 1,700,000.00 | 10.0000 | 8.0000 | 4 | V | 03/31/13 | LIBOR | M | | SS |
| Remco Maintenance, LLC | Revolver | 800,000.00 | 0.5000 | 0.5000 | 4 | V | 03/31/13 | Unfunded | M | | SS |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | 6.3300 | 4.3300 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | 0.2309 | 0.0000 | 4 | V | 04/29/13 | LIBOR | S | Y | PS |
| RM Acquisition, LLC | Revolver | 2,205,882.35 | 10.0000 | 8.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| ServiceMaster Company | Closing Date Term Lo | 359,696.06 | 2.7600 | 2.5000 | 4 | V | 07/24/14 | LIBOR | Q | | SS |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 12:37 PM
As of Date: 01/29/2010
Page [25]

**Collateral Debt Obligation Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Total Loan Commitment | Annual Int. Rate | Sprd./ Cpn. | Cat. | Fixed/ Variable | Stated Maturity | Index | Pay. Freq. | Conv./ Exch. | Sen. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ServiceMaster Company | Closing Date Term Lo | 661,660.90 | 2.7400 | 2.5000 | 4 | V | 07/24/14 | LIBOR | M | | SS |
| ServiceMaster Company | Closing Date Term Lo | 669,034.67 | 2.7400 | 2.5000 | 4 | V | 07/24/14 | LIBOR | M | | SS |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | 2.7400 | 2.5000 | 4 | V | 07/24/14 | LIBOR | M | | SS |
| ServiceMaster Company | LOC #1 | 107,908.82 | 0.2506 | 0.0000 | 4 | V | 07/24/14 | LIBOR | Q | | SS |
| Snelling Medical Staffing | Term Loan | 223,000.00 | 9.0000 | 7.0000 | 4 | V | 12/31/12 | LIBOR | M | | SS |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | 10.0000 | 8.0000 | 4 | V | 08/05/13 | LIBOR | M | | SS |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | 10.0000 | 8.0000 | 4 | V | 08/05/13 | LIBOR | M | | SS |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | 10.0000 | 8.0000 | 4 | V | 01/19/12 | LIBOR | M | | SS |
| Swift Transportation | Term Loan 1 | 3,649,652.96 | 6.2500 | 6.0000 | 4 | V | 05/06/14 | LIBOR | Q | | SS |
| Swift Transportation | Term Loan 1 | 6,293,768.10 | 6.2500 | 6.0000 | 4 | V | 05/06/14 | LIBOR | Q | | SS |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | 4.7500 | 1.5000 | 4 | V | 01/31/13 | PRIME | M | | SS |
| Trim Trends | Term Loan A | 6,555,380.26 | 10.0000 | 8.0000 | 4 | V | 05/31/13 | LIBOR | Q | | SS |
| Trim Trends | Term Loan | 8,000,000.00 | 0.0000 | 8.0000 | 4 | V | 05/31/13 | Committed | Q | | SS |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | 0.0000 | 8.0000 | 4 | V | 08/31/13 | Committed | M | | SS |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | 9.0000 | 7.0000 | 4 | V | 10/21/12 | LIBOR | M | | SS |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | 8.2500 | 5.0000 | 4 | V | 01/31/13 | PRIME | M | | SS |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | 4.2306 | 4.0000 | 4 | V | 07/27/12 | LIBOR | S | Y | PS |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | 2.0000 | 0.0000 | 4 | V | 07/27/12 | LIBOR | S | Y | PS |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 500,000.00 | 8.2309 | 8.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 1,200,000.00 | 8.2309 | 8.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 300,000.00 | 8.2309 | 8.0000 | 4 | V | 01/31/13 | LIBOR | M | | SS |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | 9.0000 | 7.0000 | 4 | V | 06/01/12 | LIBOR | M | | SS |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Collateral Debt Obligation Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Total Loan Commitment | Annual Int. Rate | Sprd./ Cpn. | Cat. | Fixed/ Variable | Stated Maturity | Index | Pay. Freq. | Conv./ Exch. | Sen. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | 2.0000 | 0.0000 | 4 | V | 09/15/12 | LIBOR | S | Y | PS |

| | | | |
|---|---|---|---|
| **Aggregate Principal Balance :** | **606,952,920.34** | | |
| **Principal Balance of Collateral Loans :** | **566,429,611.88** | **93.32%** | |
| **Unfunded Amounts of Collateral Loans :** | **40,523,308.46** | **6.68%** | |
| Aggregate Principal Balance of Category 1 : | 33,528,603.97 | | |
| Aggregate Principal Balance of Category 2 : | 0.00 | | |
| Aggregate Principal Balance of Category 3 : | 0.00 | | |
| Aggregate Principal Balance of Category 4 : | 564,669,481.51 | | |
| Aggregate Principal Balance of Senior Secured : | 583,825,045.33 | | |
| Aggregate Principal Balance of Senior Unsecured : | 0.00 | | |
| Aggregate Principal Balance of Fixed Rate Obligations : | 8,363,198.95 | | |
| Aggregate Principal Balance of Floating Rate Obligations : | 598,589,721.39 | | |

\* Balance adjusted for Capitalized Interest.

Report excludes Equities.



# U.S. Bank Corporate Trust Services
## CDO Administration Unit

### Diversity Test Report

### ZOHAR CDO 2003-1 Limited

| Issuer | Industry | Industry Par Amount | Issuer Par Amount | Issuer Score | Sum of Issuers Scores | Industry Diversity Score |
|---|---|---|---|---|---|---|
| Heritage Aviation | Aerospace and Defense | 69,492,001.29 | 13,000,000.00 | 0.9439 | 1.9439 | 1.4500 |
| MD Helicopters, Inc | Aerospace and Defense | 69,492,001.29 | 56,492,001.29 | 1.0000 | 1.9439 | 1.4500 |
| American LaFrance | Automobile | 99,345,857.79 | 53,386,597.13 | 1.0000 | 3.0000 | 2.0000 |
| Global Automotive Systems, LLC | Automobile | 99,345,857.79 | 31,403,880.40 | 1.0000 | 3.0000 | 2.0000 |
| Trim Trends | Automobile | 99,345,857.79 | 14,555,380.26 | 1.0000 | 3.0000 | 2.0000 |
| Natura Water | Beverage, Food and Tobacco | 4,000,000.00 | 4,000,000.00 | 0.2904 | 0.2904 | 0.3000 |
| Petry Media Corporation | Broadcasting & Entertainment | 48,928,254.78 | 17,928,254.78 | 1.0000 | 2.0000 | 1.5000 |
| Xinhua Sports & Entertainment Ltd. | Broadcasting & Entertainment | 48,928,254.78 | 31,000,000.00 | 1.0000 | 2.0000 | 1.5000 |
| Swift Transportation | Cargo Transport | 9,943,421.06 | 9,943,421.06 | 0.7219 | 0.7219 | 0.7000 |
| Amweld International | Diversified/Cong. Mfg | 25,468,102.17 | 16,164,108.84 | 1.0000 | 1.6755 | 1.3500 |
| Arc One, LLC | Diversified/Cong. Mfg | 25,468,102.17 | 0.00 | 0.0000 | 1.6755 | 1.3500 |
| Doors Acquisition, LLC | Diversified/Cong. Mfg | 25,468,102.17 | 0.00 | 0.0000 | 1.6755 | 1.3500 |
| LVD Acquisition, LLC | Diversified/Cong. Mfg | 25,468,102.17 | 9,303,993.33 | 0.6755 | 1.6755 | 1.3500 |
| Remco Maintenance, LLC | Diversified/Cong. Service | 12,674,417.37 | 5,862,670.50 | 0.4256 | 0.9201 | 0.9000 |
| XPIENT Solutions, LLC | Diversified/Cong. Service | 12,674,417.37 | 6,811,746.87 | 0.4945 | 0.9201 | 0.9000 |
| Red Shield Acquisition, LLC | Diversified/Resources, Metals and Minera | 17,000,000.00 | 17,000,000.00 | 1.0000 | 1.0000 | 1.0000 |
| CBA Group Vs Holding Company | Electronics | 22,066,614.63 | 14,610,909.52 | 1.0000 | 1.5412 | 1.2500 |
| Electro Source, LLC | Electronics | 22,066,614.63 | 3,393,205.11 | 0.2463 | 1.5412 | 1.2500 |
| EMAG Solutions, LLC | Electronics | 22,066,614.63 | 4,062,500.00 | 0.2949 | 1.5412 | 1.2500 |
| Intrepid USA | Healthcare, Education and Childcare | 13,140,066.01 | 13,140,066.01 | 0.9540 | 0.9540 | 1.0000 |
| ACME INTERNATIONAL ENTERPRISES, INC. | Home and Office Furnishing, Housewares | 42,199,471.07 | 1,000,000.00 | 0.0726 | 2.8978 | 1.9500 |
| Bomar Industries International Inc | Home and Office Furnishing, Housewares | 42,199,471.07 | 16,059,173.26 | 1.0000 | 2.8978 | 1.9500 |
| Croscil Home | Home and Office Furnishing, Housewares | 42,199,471.07 | 10,000,000.00 | 0.7260 | 2.8978 | 1.9500 |
| Fetco Home Decor, Inc | Home and Office Furnishing, Housewares | 42,199,471.07 | 10,613,576.81 | 0.7706 | 2.8978 | 1.9500 |
| Glenoit LLC | Home and Office Furnishing, Housewares | 42,199,471.07 | 4,526,721.00 | 0.3286 | 2.8978 | 1.9500 |
| 180's, LLC | Leisure, Amusement, Entertainment | 18,842,328.00 | 18,842,328.00 | 1.0000 | 1.0000 | 1.0000 |
| Rapid Rack Industries, Inc | Machinery: Non-agric, Non-constr, Non-electr | 13,605,471.69 | 11,605,471.69 | 0.8426 | 0.9878 | 1.0000 |
| VULCAN ENGINEERING CO. | Machinery: Non-agric, Non-constr, Non-electr | 13,605,471.69 | 2,000,000.00 | 0.1452 | 0.9878 | 1.0000 |
| IMG Holdings, Inc | Personal & Non Durable Consumer Products | 9,004,585.76 | 9,004,585.76 | 0.6538 | 0.6538 | 0.7000 |
| Transcare Corporation | Personal Transportation | 3,500,000.00 | 3,500,000.00 | 0.2541 | 0.2541 | 0.3000 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:20 PM
As of Date: 01/29/2010
Page [28]

**Diversity Test Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Industry | Industry Par Amount | Issuer Par Amount | Issuer Score | Sum of Issuers Scores | Industry Diversity Score |
|--------|----------|--------------------:|------------------:|-------------:|----------------------:|-------------------------:|
| ServiceMaster Company | Personal, Food & Miscellaneous | 13,191,240.79 | 1,966,638.19 | 0.1427 | 0.9576 | 1.0000 |
| Snelling Medical Staffing | Personal, Food & Miscellaneous | 13,191,240.79 | 223,000.00 | 0.0161 | 0.9576 | 1.0000 |
| Zohar SS Acquisition, LLC | Personal, Food & Miscellaneous | 13,191,240.79 | 11,001,602.60 | 0.7988 | 0.9576 | 1.0000 |
| RM Acquisition, LLC | Printing and Publishing | 21,424,661.76 | 16,574,661.76 | 1.0000 | 1.3521 | 1.2000 |
| SO Acquisition, LLC | Printing and Publishing | 21,424,661.76 | 4,850,000.00 | 0.3521 | 1.3521 | 1.2000 |
| NetVersant Acquisition, LLC | Telecommunications | 43,982,013.57 | 43,982,013.57 | 1.0000 | 1.0000 | 1.0000 |
| Best Textiles Acquisition, LLC | Textiles and Leather | 68,483,726.88 | 5,000,000.00 | 0.3630 | 3.3244 | 2.1000 |
| Duro Textiles LLC | Textiles and Leather | 68,483,726.88 | 18,842,259.65 | 1.0000 | 3.3244 | 2.1000 |
| Galey & Lord, LLC | Textiles and Leather | 68,483,726.88 | 31,400,000.00 | 1.0000 | 3.3244 | 2.1000 |
| Hartwell Industries, Inc. | Textiles and Leather | 68,483,726.88 | 13,241,467.23 | 0.9614 | 3.3244 | 2.1000 |
| Intera Group, Inc. | Utilities | 8,377,246.89 | 8,377,246.89 | 0.6082 | 0.6082 | 0.6000 |

| | |
|---|---:|
| **Average Par Amount:** | **13,772,426.38** |
| Number of Issuers: | 41 |
| Total Industry Par Amount: | 564,669,481.51 |
| Total Issuer Par Amount: | 564,669,481.51 |
| Total Issuers Scores: | 27.0828 |
| Total Sum of Issuers Scores: | 27.0828 |
| **Total Diversity Score:** | **22** |
| **Total Diversity Score >= 22** | **Pass** |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Moodys Weighted Average Rating Factor Test**

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Balance | Moody's Rating | Rating Factor | Weighted Factor |
|--------|-------------|--------:|:------:|:------:|:------:|
| 180's, LLC | Tranche A Revolver | 16,600,000.00 | * | * | * |
| 180's, LLC | Fully Funded Term B | 2,242,328.00 | * | * | * |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | * | * | * |
| American LaFrance | Revolver | 559,862.47 | * | * | * |
| American LaFrance | Term Loan 2 | 52,313,856.66 | * | * | * |
| American LaFrance | Term Loan 1 | 512,878.00 | * | * | * |
| Amweld International | Term Loan B | 16,164,108.84 | * | * | * |
| Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | * | * | * |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | * | * | * |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | * | * | * |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | * | * | * |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | * | * | * |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | * | * | * |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | * | * | * |
| Croscil Home | Revolver | 10,000,000.00 | * | * | * |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | * | * | * |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | * | * | * |
| Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | * | * | * |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | * | * | * |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | * | * | * |
| Electro Source, LLC | Term Loan | 2,916,666.67 | * | * | * |
| Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | * | * | * |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | * | * | * |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | * | * | * |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | * | * | * |
| Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | * | * | * |
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | * | * | * |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | * | * | * |
| Glenoit LLC | Term Loan | 4,526,721.00 | * | * | * |
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | * | * | * |
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | * | * | * |
| Global Automotive Systems, LLC | Term B | 576,025.00 | * | * | * |
| Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | * | * | * |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | * | * | * |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | * | * | * |



## U.S. Bank Corporate Trust Services
### CDO Administration Unit

### Moodys Weighted Average Rating Factor Test

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Balance | Moody's Rating | Rating Factor | Weighted Factor |
|---|---|---|---|---|---|
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 1,500,000.00 | * | * | * |
| Heritage Aviation | Term Loan | 1,000,000.00 | * | * | * |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | * | * | * |
| Heritage Aviation | Delayed Draw Term Lo | 10,000,000.00 | * | * | * |
| IMG Holdings, Inc | Term C | 2,000,000.00 | * | * | * |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | * | * | * |
| IMG Holdings, Inc | Term E | 144,640.00 | * | * | * |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | * | * | * |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | * | * | * |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | * | * | * |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | * | * | * |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | * | * | * |
| Intera Group, Inc. | Term Loan C | 160,000.00 | * | * | * |
| Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | * | * | * |
| Intrepid USA | Revolver | 9,280,000.00 | * | * | * |
| Intrepid USA | Term Loan B | 3,860,066.01 | * | * | * |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | * | * | * |
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | * | * | * |
| MD Helicopters, Inc | Term A | 12,873,602.92 | * | * | * |
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | * | * | * |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | * | * | * |
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | * | * | * |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | * | * | * |
| Natura Water | Fully Funded Term B | 1,500,000.00 | * | * | * |
| Natura Water | Fully Funded Term C | 2,200,000.00 | * | * | * |
| Natura Water | Fully Funded Term Lo | 300,000.00 | * | * | * |
| NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | * | * | * |
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | * | * | * |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | * | * | * |
| Petry Media Corporation | Priming Revolver | 11,928,254.78 | * | * | * |
| Petry Media Corporation | Term Loan | 3,750,050.00 | * | * | * |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | * | * | * |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | * | * | * |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | * | * | * |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | * | * | * |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Moodys Weighted Average Rating Factor Test**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Balance | Moody's Rating | Rating Factor | Weighted Factor |
|---|---|---|---|---|---|
| RM Acquisition, LLC | Revolver | 2,205,882.35 | * | * | * |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | * | * | * |
| Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | * | * | * |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | * | * | * |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | * | * | * |
| Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | * | * | * |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | * | * | * |
| Remco Maintenance, LLC | Revolver | 2,500,000.00 | * | * | * |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | * | * | * |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | * | * | * |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | * | * | * |
| ServiceMaster Company | Closing Date Term Lo | 1,690,391.62 | B2 | 2720 | 4,597,865,206.40 |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | B2 | 2720 | 457,878,677.01 |
| ServiceMaster Company | LOC #1 | 107,908.82 | B2 | 2720 | 293,511,990.40 |
| Snelling Medical Staffing | Term Loan | 223,000.00 | * | * | * |
| Swift Transportation | Term Loan 1 | 9,943,421.06 | Caa1 | 4770 | 47,430,118,448.57 |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | * | * | * |
| Trim Trends | Term Loan A | 6,555,380.26 | * | * | * |
| Trim Trends | Term Loan | 8,000,000.00 | * | * | * |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | * | * | * |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | * | * | * |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | * | * | * |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | * | * | * |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 500,000.00 | * | * | * |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 1,200,000.00 | * | * | * |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 300,000.00 | * | * | * |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | * | * | * |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | * | * | * |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 1:16 PM
As of Date: 01/29/2010
Page [32]

**Moodys Weighted Average Rating Factor Test**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Balance | Moody's Rating | Rating Factor | Weighted Factor |
|--------|-------------|---------|----------------|---------------|-----------------|
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | * | * | * |
| | **Aggregate Principal Balance :** | **564,669,481.51** | | | **1,620,347,952,338.42** |
| | **Resulting Weighted Average Rating :** | **2,869.55** | | | |
| | **Weighted Average Rating <= 2,800 :** | **Fail** | | | |

Excludes Defaulted Securities.

* The ratings for the above securities have been obtained through confidential credit rating estimates. These ratings are not available for disclosure.



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date: 02/01/2010 1:21 PM
As of Date: 01/29/2010
Page [33]

**Moodys Average Recovery Rate Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | Type | Moody's Recovery Rate | Moody's Recovery Amount |
|---|---|---|---|---|---|
| 180's, LLC | Fully Funded Term B | 2,242,328.00 | Loan | 50% | 1,121,164.00 |
| 180's, LLC | Tranche A Revolver | 16,600,000.00 | Loan | 50% | 8,300,000.00 |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | Loan | 50% | 500,000.00 |
| American LaFrance | Revolver | 559,862.47 | Loan | 50% | 279,931.24 |
| American LaFrance | Term Loan 1 | 512,878.00 | Loan | 50% | 256,439.00 |
| American LaFrance | Term Loan 2 | 52,313,856.66 | Loan | 50% | 26,156,928.33 |
| Amweld International | Term Loan B | 16,164,108.84 | Loan | 50% | 8,082,054.42 |
| Arc One, LLC | Fully Funded Term Lo | 700,000.00 | Loan | 50% | 350,000.00 |
| Arc One, LLC | Restructured Term Lo | 30,653,808.29 | Loan | 50% | 15,326,904.15 |
| Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | Loan | 50% | 2,500,000.00 |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | Loan | 50% | 1,600,000.00 |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | Loan | 50% | 5,000,000.00 |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | Loan | 50% | 1,429,586.63 |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | Loan | 50% | 2,000,000.00 |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | Loan | 50% | 4,055,454.76 |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | Loan | 50% | 1,250,000.00 |
| Croscil Home | Revolver | 10,000,000.00 | Loan | 50% | 5,000,000.00 |
| Doors Acquisition, LLC | Fully Funded Term Lo | 2,905,786.58 | Loan | 50% | 1,452,893.29 |
| Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | Loan | 50% | 524,629.83 |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | Loan | 50% | 3,750,000.00 |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | Loan | 50% | 4,000,000.00 |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | Loan | 50% | 1,146,500.00 |
| Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | Loan | 50% | 238,269.22 |
| Electro Source, LLC | Term Loan | 2,916,666.67 | Loan | 50% | 1,458,333.34 |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | Loan | 50% | 2,031,250.00 |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | Loan | 30% | 827,318.18 |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | Loan | 50% | 3,927,924.78 |
| Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | Loan | 50% | 1,500,000.00 |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | Loan | 50% | 13,000,000.00 |
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | Loan | 50% | 800,000.00 |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | Loan | 50% | 400,000.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Moodys Average Recovery Rate Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | Type | Moody's Recovery Rate | Moody's Recovery Amount |
|--------|-------------|-------------------|------|----------------------|-------------------------|
| Glenoit LLC | Term Loan | 4,526,721.00 | Loan | 50% | 2,263,360.50 |
| Global Automotive Systems, LLC | Term B | 576,025.00 | Loan | 50% | 288,012.50 |
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | Loan | 50% | 4,550,000.00 |
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | Loan | 50% | 10,863,927.70 |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 1,500,000.00 | Loan | 50% | 750,000.00 |
| Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | Loan | 50% | 963,819.98 |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | Loan | 50% | 4,656,913.64 |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | Loan | 50% | 250,000.00 |
| Heritage Aviation | Delayed Draw Term Lo | 10,000,000.00 | Loan | 50% | 5,000,000.00 |
| Heritage Aviation | Term Loan | 1,000,000.00 | Loan | 50% | 500,000.00 |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | Loan | 50% | 1,000,000.00 |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | Loan | 50% | 277,680.00 |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | Loan | 50% | 2,000,000.00 |
| IMG Holdings, Inc | Term C | 2,000,000.00 | Loan | 50% | 1,000,000.00 |
| IMG Holdings, Inc | Term E | 144,640.00 | Loan | 50% | 72,320.00 |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | Loan | 50% | 1,002,292.88 |
| IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | Loan | 50% | 1,087,397.84 |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | Loan | 50% | 150,000.00 |
| Intera Group, Inc. | Exchanged Security | 5,849,048.28 | Loan | 30% | 1,754,714.48 |
| Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | Loan | 50% | 675,000.00 |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | Loan | 50% | 438,623.45 |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | Loan | 50% | 2,995,000.00 |
| Intera Group, Inc. | Term Loan C | 160,000.00 | Loan | 50% | 80,000.00 |
| Intrepid USA | Revolver | 9,280,000.00 | Loan | 50% | 4,640,000.00 |
| Intrepid USA | Term Loan B | 3,860,066.01 | Loan | 50% | 1,930,033.01 |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | Loan | 50% | 4,651,996.67 |
| MD Helicopters, Inc | Term A | 12,873,602.92 | Loan | 50% | 6,436,801.46 |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | Loan | 50% | 12,775,862.07 |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | Loan | 50% | 25,000.00 |
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | Loan | 50% | 8,058,337.12 |
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | Loan | 50% | 350,000.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:21 PM
As of Date: 01/29/2010
Page [35]

**Moodys Average Recovery Rate Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | Type | Moody's Recovery Rate | Moody's Recovery Amount |
|--------|-------------|-------------------|------|----------------------|------------------------|
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | Loan | 50% | 600,000.00 |
| Natura Water | Fully Funded Term B | 1,500,000.00 | Loan | 50% | 750,000.00 |
| Natura Water | Fully Funded Term C | 2,200,000.00 | Loan | 50% | 1,100,000.00 |
| Natura Water | Fully Funded Term Lo | 300,000.00 | Loan | 50% | 150,000.00 |
| NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | Loan | 50% | 147,035.75 |
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | Loan | 50% | 1,051,192.66 |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | Loan | 50% | 20,792,778.38 |
| Petry Media Corporation | Priming Revolver | 11,928,254.78 | Loan | 50% | 5,964,127.39 |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | Loan | 50% | 228,475.00 |
| Petry Media Corporation | Term Loan | 3,750,050.00 | Loan | 50% | 1,875,025.00 |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | Loan | 50% | 896,500.00 |
| Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | Loan | 50% | 3,000,000.00 |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | Loan | 50% | 2,802,735.85 |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | Loan | 50% | 2,000,000.00 |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | Loan | 50% | 2,500,000.00 |
| Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | Loan | 50% | 4,000,000.00 |
| Remco Maintenance, LLC | Revolver | 2,500,000.00 | Loan | 50% | 1,250,000.00 |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | Loan | 50% | 1,681,335.25 |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | Loan | 30% | 2,563,575.00 |
| RM Acquisition, LLC | Revolver | 2,205,882.35 | Loan | 50% | 1,102,941.18 |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | Loan | 50% | 2,911,764.71 |
| ServiceMaster Company | Closing Date Term Lo | 1,690,391.62 | Loan | 50% | 845,195.81 |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | Loan | 45% | 75,751.99 |
| ServiceMaster Company | LOC #1 | 107,908.82 | Loan | 50% | 53,954.41 |
| Snelling Medical Staffing | Term Loan | 223,000.00 | Loan | 50% | 111,500.00 |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | Loan | 50% | 1,250,000.00 |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | Loan | 50% | 175,000.00 |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | Loan | 50% | 1,000,000.00 |
| Swift Transportation | Term Loan 1 | 9,943,421.06 | Loan | 50% | 4,971,710.53 |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | Loan | 50% | 1,750,000.00 |
| Trim Trends | Term Loan | 8,000,000.00 | Loan | 50% | 4,000,000.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:21 PM
As of Date: 01/29/2010
Page [36]

**Moodys Average Recovery Rate Report**

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Principal Balance | Type | Moody's Recovery Rate | Moody's Recovery Amount |
|---|---|---|---|---|---|
| Trim Trends | Term Loan A | 6,555,380.26 | Loan | 50% | 3,277,690.13 |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | Loan | 50% | 1,000,000.00 |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | Loan | 45% | 13,950,000.00 |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | Loan | 30% | 175,961.98 |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | Loan | 30% | 847,562.09 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 500,000.00 | Loan | 50% | 250,000.00 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 1,200,000.00 | Loan | 50% | 600,000.00 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 300,000.00 | Loan | 50% | 150,000.00 |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | Loan | 50% | 700,000.00 |
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | Loan | 30% | 769,230.78 |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | Loan | 50% | 4,218,750.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Aggregate Principal Balance :** | | **606,952,920.33 [B]** | | | **297,292,468.36 [A]** |
| **Moody's Minimum Average Recovery Rate (A/B ) :** | | **49.0%** | | | |
| **Moody's Minimum Average Recovery Rate >= 43% :** | | **Pass** | | | |

| Moody's Priority Category Recovery Rate | Aggregate Principal Balance |
|---|---|
| 50% | 552,656,707.58 |
| 60% | 0.00 |
| 45% | 31,168,337.75 |
| 40% | 0.00 |
| 30% | 23,127,875.01 |
| 50% (DIP) | 0.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:24 PM
As of Date: 01/29/2010
Page [37]

**Standard & Poors Average Recovery Rate Test Report**
**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | S&P Recovery Category | Category Type | S&P Recovery Rate | S&P Recovery Rate Amount |
|---|---|---|---|---|---|---|
| 180's, LLC | Fully Funded Term B | 2,242,328.00 | Senior Secured | 4 | 60 | 1,345,396.80 |
| 180's, LLC | Tranche A Revolver | 16,600,000.00 | Senior Secured | 4 | 60 | 9,960,000.00 |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | Senior Secured | 4 | 60 | 600,000.00 |
| American LaFrance | Revolver | 559,862.47 | Senior Secured | 4 | 60 | 335,917.48 |
| American LaFrance | Term Loan 1 | 512,878.00 | Senior Secured | 4 | 60 | 307,726.80 |
| American LaFrance | Term Loan 2 | 52,313,856.66 | Senior Secured | 4 | 60 | 31,388,314.00 |
| Amweld International | Term Loan B | 16,164,108.84 | Senior Secured | 4 | 60 | 9,698,465.30 |
| Arc One, LLC | Fully Funded Term Lo | 700,000.00 | Senior Secured | 1 | 60 | 420,000.00 |
| Arc One, LLC | Restructured Term Lo | 30,653,808.29 | Senior Secured | 1 | 60 | 18,392,284.97 |
| Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | Senior Secured | 4 | 60 | 3,000,000.00 |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | Senior Secured | 4 | 60 | 1,920,000.00 |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | Senior Secured | 4 | 60 | 6,000,000.00 |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | Senior Secured | 4 | 60 | 1,715,503.96 |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | Senior Secured | 4 | 60 | 2,400,000.00 |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | Senior Secured | 4 | 60 | 4,866,545.71 |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | Senior Secured | 4 | 60 | 1,500,000.00 |
| Croscil Home | Revolver | 10,000,000.00 | Senior Secured | 4 | 60 | 6,000,000.00 |
| Doors Acquisition, LLC | Fully Funded Term Lo | 2,905,786.58 | Senior Secured | | 60 | 1,743,471.95 |
| Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | Senior Secured | 4 | 60 | 629,555.79 |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | Senior Secured | 4 | 60 | 4,500,000.00 |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | Senior Secured | 4 | 60 | 4,800,000.00 |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | Senior Secured | 4 | 60 | 1,375,800.00 |
| Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | Senior Secured | 4 | 60 | 285,923.06 |
| Electro Source, LLC | Term Loan | 2,916,666.67 | Senior Secured | 4 | 60 | 1,750,000.00 |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | Senior Secured | 4 | 60 | 2,437,500.00 |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | Senior Secured | 4 | 60 | 1,654,636.36 |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | Senior Secured | 4 | 60 | 4,713,509.73 |
| Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | Senior Secured | 4 | 60 | 1,800,000.00 |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | Senior Secured | 4 | 60 | 15,600,000.00 |
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | Senior Secured | 4 | 60 | 960,000.00 |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | Senior Secured | 4 | 60 | 480,000.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:24 PM
As of Date: 01/29/2010
Page [38]

**Standard & Poors Average Recovery Rate Test**
**Report**
**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | S&P Recovery Category | Category Type | S&P Recovery Rate | S&P Recovery Rate Amount |
|---|---|---|---|---|---|---|
| Glenoit LLC | Term Loan | 4,526,721.00 | Senior Secured | 4 | 60 | 2,716,032.60 |
| Global Automotive Systems, LLC | Term B | 576,025.00 | Senior Secured | 4 | 60 | 345,615.00 |
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | Senior Secured | 4 | 60 | 5,460,000.00 |
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | Senior Secured | 4 | 60 | 13,036,713.24 |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 1,500,000.00 | Senior Secured | 4 | 60 | 900,000.00 |
| Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | Senior Secured | 4 | 60 | 1,156,583.98 |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | Senior Secured | 4 | 60 | 5,588,296.36 |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | Senior Secured | 4 | 60 | 300,000.00 |
| Heritage Aviation | Delayed Draw Term Lo | 10,000,000.00 | Senior Secured | 4 | 60 | 6,000,000.00 |
| Heritage Aviation | Term Loan | 1,000,000.00 | Senior Secured | 4 | 60 | 600,000.00 |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | Senior Secured | 4 | 60 | 1,200,000.00 |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | Senior Secured | 4 | 60 | 333,216.00 |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | Senior Secured | 4 | 60 | 2,400,000.00 |
| IMG Holdings, Inc | Term C | 2,000,000.00 | Senior Secured | 4 | 60 | 1,200,000.00 |
| IMG Holdings, Inc | Term E | 144,640.00 | Senior Secured | 4 | 60 | 86,784.00 |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | Senior Secured | 4 | 60 | 1,202,751.46 |
| IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | Senior Secured | 1 | 60 | 1,304,877.41 |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | Senior Secured | 4 | 60 | 180,000.00 |
| Intera Group, Inc. | Exchanged Security | 5,849,048.28 | Senior Secured | | 60 | 3,509,428.97 |
| Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | Senior Secured | 4 | 60 | 810,000.00 |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | Senior Secured | 4 | 60 | 526,348.13 |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | Senior Secured | 4 | 60 | 3,594,000.00 |
| Intera Group, Inc. | Term Loan C | 160,000.00 | Senior Secured | 4 | 60 | 96,000.00 |
| Intrepid USA | Revolver | 9,280,000.00 | Senior Secured | 4 | 60 | 5,568,000.00 |
| Intrepid USA | Term Loan B | 3,860,066.01 | Senior Secured | 4 | 60 | 2,316,039.61 |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | Senior Secured | 4 | 60 | 5,582,396.00 |
| MD Helicopters, Inc | Term A | 12,873,602.92 | Senior Secured | 4 | 60 | 7,724,161.75 |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | Senior Secured | 4 | 60 | 15,331,034.48 |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | Senior Secured | 4 | 60 | 30,000.00 |
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | Senior Secured | 4 | 60 | 9,670,004.54 |
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | Senior Secured | 4 | 60 | 420,000.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Standard & Poors Average Recovery Rate Test**
**Report**
**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | S&P Recovery Category | Category Type | S&P Recovery Rate | S&P Recovery Rate Amount |
|---|---|---|---|---|---|---|
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | Senior Secured | 4 | 60 | 720,000.00 |
| Natura Water | Fully Funded Term B | 1,500,000.00 | Senior Secured | 4 | 60 | 900,000.00 |
| Natura Water | Fully Funded Term C | 2,200,000.00 | Senior Secured | 4 | 60 | 1,320,000.00 |
| Natura Water | Fully Funded Term Lo | 300,000.00 | Senior Secured | 4 | 60 | 180,000.00 |
| NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | Senior Secured | 4 | 60 | 176,442.90 |
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | Senior Secured | 4 | 60 | 1,261,431.19 |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | Senior Secured | 4 | 60 | 24,951,334.06 |
| Petry Media Corporation | Priming Revolver | 11,928,254.78 | Senior Secured | 4 | 60 | 7,156,952.87 |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | Senior Secured | 4 | 60 | 274,170.00 |
| Petry Media Corporation | Term Loan | 3,750,050.00 | Senior Secured | 4 | 60 | 2,250,030.00 |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | Senior Secured | 4 | 60 | 1,075,800.00 |
| Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | Senior Secured | 4 | 60 | 3,600,000.00 |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | Senior Secured | 4 | 60 | 3,363,283.01 |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | Senior Secured | 4 | 60 | 2,400,000.00 |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | Senior Secured | 4 | 60 | 3,000,000.00 |
| Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | Senior Secured | 4 | 60 | 4,800,000.00 |
| Remco Maintenance, LLC | Revolver | 2,500,000.00 | Senior Secured | 4 | 60 | 1,500,000.00 |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | Senior Secured | 4 | 60 | 2,017,602.30 |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | Senior Secured | 4 | 60 | 5,127,150.00 |
| RM Acquisition, LLC | Revolver | 2,205,882.35 | Senior Secured | 4 | 60 | 1,323,529.41 |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | Senior Secured | 4 | 60 | 3,494,117.65 |
| ServiceMaster Company | Closing Date Term Lo | 1,690,391.62 | Senior Secured | 4 | 60 | 1,014,234.97 |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | Senior Secured | 4 | 60 | 101,002.65 |
| ServiceMaster Company | LOC #1 | 107,908.82 | Senior Secured | 4 | 60 | 64,745.29 |
| Snelling Medical Staffing | Term Loan | 223,000.00 | Senior Secured | 4 | 60 | 133,800.00 |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | Senior Secured | 4 | 60 | 1,500,000.00 |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | Senior Secured | 4 | 60 | 210,000.00 |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | Senior Secured | 4 | 60 | 1,200,000.00 |
| Swift Transportation | Term Loan 1 | 9,943,421.06 | Senior Secured | 4 | 60 | 5,966,052.64 |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | Senior Secured | 4 | 60 | 2,100,000.00 |
| Trim Trends | Term Loan | 8,000,000.00 | Senior Secured | 4 | 60 | 4,800,000.00 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:24 PM
As of Date: 01/29/2010
Page [40]

**Standard & Poors Average Recovery Rate Test**
**Report**
**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | S&P Recovery Category | Category Type | S&P Recovery Rate | S&P Recovery Rate Amount |
|---|---|---|---|---|---|---|
| Trim Trends | Term Loan A | 6,555,380.26 | Senior Secured | 4 | 60 | 3,933,228.16 |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | Senior Secured | 4 | 60 | 1,200,000.00 |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | Senior Secured | 4 | 60 | 18,600,000.00 |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | Senior Secured | 4 | 60 | 351,923.95 |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | Senior Secured | 4 | 60 | 1,695,124.17 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 500,000.00 | Senior Secured | 4 | 60 | 300,000.00 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 1,200,000.00 | Senior Secured | 4 | 60 | 720,000.00 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 300,000.00 | Senior Secured | 4 | 60 | 180,000.00 |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | Senior Secured | 4 | 60 | 840,000.00 |
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | Senior Secured | 4 | 60 | 1,538,461.56 |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | Senior Secured | 4 | 60 | 5,062,500.00 |

| | | | |
|---|---|---|---|
| **Aggregate Principal Balance :** | **606,952,920.34** | | **364,171,752.22** |
| **S&P Average Recovery Rate :** | **60.0%** | | |
| **S&P Average Recovery Rate > 58% :** | **Pass** | | |
| **Maximum Investment Amount (M.I.A.) :** | **607,616,941.89** | | |

| S&P Priority Category | S&P Priority Category Recovery Rate | Aggregate Principal Balance | % of M.I.A. |
|---|---|---|---|
| Category 3 or 4 Senior Secured | 60% | 606,952,920.34 | 99.89% |
| Category 3 or 4 Senior Unsecured and Second Lien Collateral Debt Obligation (up to maximum amount equal to 10% of M.I.A. | 50% | 0.00 | 0.00% |
| Category 3 or 4 Senior Subordinated | 28% | 0.00 | 0.00% |
| Category 1 or 2 CDOs and Workout Securities | As determined by S&P | 0.00 | 0.00% |
| Second Lien Collateral | 50% | 0.00 | 0.00% |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date: 02/01/2010 1:26 PM
As of Date: 01/29/2010
Page [41]

**Weighted Average Life Report**

**ZOHAR CDO 2003-1 Limited**

| Obligor | Description | Scheduled Principal | Average Years to Maturity | WAL Calculation Factor |
|---|---|---|---|---|
| 180's, LLC | Fully Funded Term B | 2,242,328.00 | 3.42 | 7,668,761.76 |
| 180's, LLC | Tranche A Revolver | 16,600,000.00 | 3.42 | 56,772,000.00 |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | 2.92 | 2,920,000.00 |
| American LaFrance | Revolver | 559,862.47 | 3.42 | 1,914,729.64 |
| American LaFrance | Term Loan 1 | 512,878.00 | 3.42 | 1,754,042.76 |
| American LaFrance | Term Loan 2 | 52,313,856.66 | 3.42 | 178,913,389.78 |
| Amweld International | Term Loan B | 16,164,108.84 | 3.98 | 64,333,153.18 |
| Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | 3.58 | 17,900,000.00 |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | 0.42 | 1,344,000.00 |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | 0.42 | 4,200,000.00 |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | 0.42 | 1,200,852.77 |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | 3.77 | 15,080,000.00 |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | 3.77 | 30,578,128.89 |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | 3.77 | 9,425,000.00 |
| Croscil Home | Revolver | 10,000,000.00 | 3.77 | 37,700,000.00 |
| Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | 3.34 | 3,504,527.23 |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | 3.34 | 25,050,000.00 |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | 3.34 | 26,720,000.00 |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | 3.34 | 7,658,620.00 |
| Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | 3.25 | 1,548,749.93 |
| Electro Source, LLC | Term Loan | 2,916,666.67 | 3.25 | 9,479,166.68 |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | 3.13 | 12,715,625.00 |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | 5.81 | 16,022,395.38 |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | 0.38 | 2,985,222.83 |
| Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | 3.34 | 10,020,000.00 |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | 3.34 | 86,840,000.00 |
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | 3.34 | 5,344,000.00 |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | 3.34 | 2,672,000.00 |
| Glenoit LLC | Term Loan | 4,526,721.00 | 2.67 | 12,086,345.07 |
| Global Automotive Systems, LLC | Term B | 576,025.00 | 3.33 | 1,918,163.25 |
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | 3.33 | 30,303,000.00 |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date: 02/01/2010 1:26 PM
As of Date: 01/29/2010
Page [42]

**Weighted Average Life Report**

**ZOHAR CDO 2003-1 Limited**

| Obligor | Description | Scheduled Principal | Average Years to Maturity | WAL Calculation Factor |
|---|---|---|---|---|
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | 3.33 | 72,353,758.48 |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 1,500,000.00 | 3.15 | 4,725,000.01 |
| Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | 3.15 | 6,072,065.88 |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | 3.15 | 29,338,555.90 |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | 3.15 | 1,575,000.00 |
| Heritage Aviation | Delayed Draw Term Lo | 10,000,000.00 | 3.92 | 39,200,000.00 |
| Heritage Aviation | Term Loan | 1,000,000.00 | 3.92 | 3,920,000.00 |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | 3.92 | 7,840,000.00 |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | 2.32 | 1,288,435.21 |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | 2.32 | 9,280,000.00 |
| IMG Holdings, Inc | Term C | 2,000,000.00 | 2.32 | 4,640,000.00 |
| IMG Holdings, Inc | Term E | 144,640.00 | 2.32 | 335,564.80 |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | 2.32 | 4,650,638.96 |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | 2.32 | 696,000.00 |
| Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | 2.17 | 2,929,500.00 |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | 2.17 | 1,903,625.75 |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | 2.17 | 12,998,300.00 |
| Intera Group, Inc. | Term Loan C | 160,000.00 | 2.17 | 347,200.00 |
| Intrepid USA | Revolver | 9,280,000.00 | 3.01 | 27,932,800.00 |
| Intrepid USA | Term Loan B | 3,860,066.01 | 3.01 | 11,618,798.69 |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | 4.34 | 40,379,331.05 |
| MD Helicopters, Inc | Term A | 12,873,602.92 | 3.34 | 42,997,833.75 |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | 3.34 | 85,342,758.63 |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | 3.34 | 167,000.00 |
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | 3.34 | 53,829,691.93 |
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | 3.34 | 2,338,000.00 |
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | 3.34 | 4,008,000.00 |
| Natura Water | Fully Funded Term B | 1,500,000.00 | 3.09 | 4,635,000.00 |
| Natura Water | Fully Funded Term C | 2,200,000.00 | 3.09 | 6,798,000.00 |
| Natura Water | Fully Funded Term Lo | 300,000.00 | 3.09 | 927,000.00 |
| NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | 2.94 | 864,570.21 |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 1:26 PM
As of Date: 01/29/2010
Page [43]

**Weighted Average Life Report**

**ZOHAR CDO 2003-1 Limited**

| Obligor | Description | Scheduled Principal | Average Years to Maturity | WAL Calculation Factor |
|---|---|---|---|---|
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | 2.94 | 6,181,012.81 |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | 2.94 | 122,261,536.87 |
| Petry Media Corporation | Priming Revolver | 11,928,254.78 | 0.92 | 10,973,994.39 |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | 0.92 | 420,394.00 |
| Petry Media Corporation | Term Loan | 3,750,050.00 | 0.92 | 3,450,046.00 |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | 0.92 | 1,649,560.00 |
| Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | 3.01 | 18,060,000.00 |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | 3.01 | 16,872,469.79 |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | 3.76 | 15,040,000.00 |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | 3.76 | 18,800,000.00 |
| Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | 3.76 | 30,080,000.00 |
| Remco Maintenance, LLC | Revolver | 2,500,000.00 | 3.17 | 7,925,000.00 |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | 3.17 | 10,659,665.49 |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | 3.25 | 27,772,062.50 |
| RM Acquisition, LLC | Revolver | 2,205,882.35 | 3.01 | 6,639,705.86 |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | 3.01 | 17,528,823.52 |
| ServiceMaster Company | Closing Date Term Lo | 1,690,391.62 | 4.48 | 7,572,954.46 |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | 4.48 | 754,153.12 |
| ServiceMaster Company | LOC #1 | 107,908.82 | 4.48 | 483,431.51 |
| Snelling Medical Staffing | Term Loan | 223,000.00 | 2.92 | 651,160.00 |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | 3.52 | 8,800,000.00 |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | 1.97 | 689,500.00 |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | 3.52 | 7,040,000.00 |
| Swift Transportation | Term Loan 1 | 9,943,421.06 | 4.28 | 42,557,842.13 |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | 3.01 | 10,535,000.00 |
| Trim Trends | Term Loan | 8,000,000.00 | 3.33 | 26,640,000.00 |
| Trim Trends | Term Loan A | 6,555,380.26 | 3.33 | 21,829,416.27 |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | 3.59 | 7,180,000.00 |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | 2.73 | 84,630,000.00 |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | 2.49 | 1,460,484.40 |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | 2.49 | 7,034,765.31 |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 1:26 PM
As of Date: 01/29/2010
Page [44]

**Weighted Average Life Report**

**ZOHAR CDO 2003-1 Limited**

| Obligor | Description | Scheduled Principal | Average Years to Maturity | WAL Calculation Factor |
|---------|-------------|--------------------:|--------------------------:|-----------------------:|
| XPIENT Solutions, LLC | Fully Funded Term Lo | 500,000.00 | 3.01 | 1,505,000.00 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 1,200,000.00 | 3.01 | 3,612,000.00 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 300,000.00 | 3.01 | 903,000.00 |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | 3.01 | 4,214,000.00 |
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | 2.63 | 6,743,589.84 |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | 2.34 | 19,743,750.00 |
| | **Aggregate Principal Balance:** | **564,669,481.51** | | **1,751,398,621.67** |

**Weighted Average Life of Scheduled Payments :**  **3.10**

**Weighted Average Life of Scheduled Payments <= 5.0 years :**  **Pass**



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/09/2010 12:38 PM
As of Date: 01/29/2010
Page [45]

**Weighted Average Spread Detail Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Balance | Type | Spread | Product | Current Rate |
|---|---|---|---|---|---|---|
| 180's, LLC | Fully Funded Term B | 2,240,328.00 | LIBOR | 9.7691 | 21,885,988.26 | 10.0000 |
| 180's, LLC | Fully Funded Term B | 2,000.00 | UNFND | 9.7691 | 19,538.20 | 0.5000 |
| 180's, LLC | Tranche A Revolver | 9,600,000.00 | LIBOR | 9.7691 | 93,783,360.00 | 10.0000 |
| 180's, LLC | Tranche A Revolver | 7,000,000.00 | UNFND | 9.7691 | 68,383,700.00 | 3.1194 |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | UNSET | 9.7691 | 9,769,100.00 | |
| American LaFrance | Revolver | 558,910.58 | LIBOR | 9.7691 | 5,460,053.35 | 10.0000 |
| American LaFrance | Revolver | 951.89 | UNFND | 9.7691 | 9,299.11 | 0.5000 |
| American LaFrance | Term Loan 1 | 512,878.00 | LIBOR | 9.7691 | 5,010,356.47 | 10.0000 |
| American LaFrance | Term Loan 2 | 52,313,856.66 | LIBOR | 9.7691 | 511,059,297.10 | 10.0000 |
| Amweld International | Term Loan B | 16,164,108.84 | LIBOR | 5.7691 | 93,252,360.31 | 6.0000 |
| Best Textiles Acquisition, LLC | Revolver | 2,006,590.76 | UNFND | 9.7691 | 19,602,585.79 | 1.5000 |
| Best Textiles Acquisition, LLC | Revolver | 2,993,409.24 | LIBOR | 9.7691 | 29,242,914.21 | 10.0000 |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | LIBOR | 3.0000 | 9,600,000.00 | |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | LIBOR | 3.0000 | 30,000,000.00 | |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | LIBOR | 3.0000 | 8,577,519.78 | 13.2312 |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | UNFND | 8.0191 | 32,076,400.00 | 0.5000 |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | PRIME | 8.0191 | 65,042,194.53 | 8.2500 |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | UNSET | 8.0191 | 20,047,750.00 | |
| Croscil Home | Revolver | 10,000,000.00 | UNFND | 9.7691 | 97,691,000.00 | 1.5000 |
| Doors Acquisition, LLC | Fully Funded Term Lo | 2,905,786.58 | LIBOR | 7.7691 | 22,575,346.52 | 8.0000 |
| Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | LIBOR | 8.7691 | 9,201,062.80 | 9.0000 |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | LIBOR | 8.7691 | 65,768,250.00 | 9.0000 |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | LIBOR | 8.7691 | 70,152,800.00 | 9.0000 |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | UNSET | 9.7691 | 22,400,546.30 | |
| Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | LIBOR | 9.7691 | 4,655,351.67 | 10.0000 |
| Electro Source, LLC | Term Loan | 2,916,666.67 | LIBOR | 9.7691 | 28,493,208.37 | 10.0000 |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | LIBOR | 7.0000 | 28,437,500.00 | 7.2309 |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | FIXED | 9.7691 | 26,940,513.38 | 10.0000 |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | LIBOR | 8.0000 | 62,846,796.40 | |
| Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | LIBOR | 9.7691 | 29,307,300.00 | 10.0000 |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | LIBOR | 9.7691 | 253,996,600.00 | 10.0000 |
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | LIBOR | 9.7691 | 15,630,560.00 | 10.0000 |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | LIBOR | 9.7691 | 7,815,280.00 | 10.0000 |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/09/2010 12:38 PM
As of Date: 01/29/2010
Page [46]

### Weighted Average Spread Detail Report

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Balance | Type | Spread | Product | Current Rate |
|---|---|---|---|---|---|---|
| Glenoit LLC | Term Loan | 4,526,721.00 | LIBOR | 7.0000 | 31,687,047.00 | 7.2309 |
| Global Automotive Systems, LLC | Term B | 576,025.00 | UNSET | 9.7691 | 5,627,245.83 | |
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | LIBOR | 9.7691 | 88,898,810.00 | 10.0000 |
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | LIBOR | 9.7691 | 212,261,592.19 | 10.0000 |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 1,076,452.90 | UNFND | 8.0000 | 8,611,623.20 | 0.7309 |
| Hartwell Industries, Inc. | DELAYED DRAW TERM LO | 423,547.10 | LIBOR | 8.0000 | 3,388,376.80 | 8.2309 |
| Hartwell Industries, Inc. | New Revolver | 3,036.42 | UNFND | 8.0000 | 24,291.36 | |
| Hartwell Industries, Inc. | New Revolver | 1,924,603.54 | LIBOR | 8.0000 | 15,396,828.32 | |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | LIBOR | 8.0000 | 74,510,618.16 | |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | LIBOR | 8.0000 | 4,000,000.00 | |
| Heritage Aviation | Delayed Draw Term Lo | 1,000,000.00 | UNFND | 9.7691 | 9,769,100.00 | 0.5000 |
| Heritage Aviation | Delayed Draw Term Lo | 9,000,000.00 | LIBOR | 9.7691 | 87,921,900.00 | 8.2309 |
| Heritage Aviation | Term Loan | 1,000,000.00 | LIBOR | 9.7691 | 9,769,100.00 | 10.0000 |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | UNSET | 9.7691 | 19,538,200.00 | |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | LIBOR | 8.0000 | 4,442,880.00 | |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | UNFND | 8.0000 | 32,000,000.00 | 0.5000 |
| IMG Holdings, Inc | Term C | 2,000,000.00 | LIBOR | 8.0000 | 16,000,000.00 | 8.2309 |
| IMG Holdings, Inc | Term E | 144,640.00 | LIBOR | 8.0000 | 1,157,120.00 | |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | LIBOR | 8.0000 | 16,036,686.08 | |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | LIBOR | 8.0000 | 2,400,000.00 | |
| Intera Group, Inc. | Fully Funded Term C | 1,150,000.00 | LIBOR | 9.7691 | 11,234,465.00 | 10.0000 |
| Intera Group, Inc. | Fully Funded Term C | 200,000.00 | UNFND | 9.7691 | 1,953,820.00 | 2.0000 |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | LIBOR | 5.7691 | 5,060,925.03 | 6.0000 |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | UNSET | 9.7691 | 58,516,909.00 | |
| Intera Group, Inc. | Term Loan C | 160,000.00 | LIBOR | 9.7691 | 1,563,056.00 | 10.0000 |
| Intrepid USA | Revolver | 7,907,031.53 | LIBOR | 7.7691 | 61,430,518.66 | 8.0000 |
| Intrepid USA | Revolver | 1,372,968.47 | UNFND | 7.7691 | 10,666,729.34 | 1.5000 |
| Intrepid USA | Term Loan B | 3,860,066.01 | LIBOR | 7.7691 | 29,989,238.84 | 8.0000 |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | LIBOR | 9.7691 | 90,891,641.24 | 10.0000 |
| MD Helicopters, Inc | Term A | 12,873,602.92 | LIBOR | 9.7691 | 125,763,514.29 | 10.0000 |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | LIBOR | 9.7691 | 249,617,348.30 | 10.0000 |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | UNSET | 9.7691 | 488,455.00 | |
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | LIBOR | 7.2691 | 117,153,716.65 | 7.5000 |



U.S. Bank Corporate Trust Services
CDO Administration Unit

**Weighted Average Spread Detail Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Balance | Type | Spread | Product | Current Rate |
|---|---|---|---|---|---|---|
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | LIBOR | 9.7691 | 6,838,370.00 | 10.0000 |
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | LIBOR | 9.7691 | 11,722,920.00 | 10.0000 |
| Natura Water | Fully Funded Term B | 1,500,000.00 | LIBOR | 9.7691 | 14,653,650.00 | 10.0000 |
| Natura Water | Fully Funded Term C | 2,200,000.00 | LIBOR | 9.7691 | 21,492,020.00 | 10.0000 |
| Natura Water | Fully Funded Term Lo | 300,000.00 | LIBOR | 9.7691 | 2,930,730.00 | 10.0000 |
| NetVersant Acquisition, LLC | Restructured Revolve | 277,257.23 | LIBOR | 9.7691 | 2,708,553.61 | 10.0000 |
| NetVersant Acquisition, LLC | Restructured Revolve | 16,814.27 | UNFND | 9.7691 | 164,260.29 | 0.5000 |
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | LIBOR | 9.7691 | 20,538,412.33 | 10.0000 |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | LIBOR | 9.7691 | 406,253,462.54 | 10.0000 |
| Petry Media Corporation | Priming Revolver | 11,928,254.70 | LIBOR | 9.7691 | 116,528,312.99 | 10.0000 |
| Petry Media Corporation | Priming Revolver | 0.08 | UNFND | 9.7691 | 0.78 | 0.5000 |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | LIBOR | 9.7691 | 4,463,990.25 | 10.0000 |
| Petry Media Corporation | Term Loan | 3,750,050.00 | UNSET | 9.7691 | 36,634,613.46 | |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | LIBOR | 9.7691 | 17,515,996.30 | 10.0000 |
| Rapid Rack Industries, Inc | Revolver | 450,000.00 | LIBOR | 9.7691 | 4,396,095.00 | 10.0000 |
| Rapid Rack Industries, Inc | Revolver | 3,855,324.10 | LIBOR | 9.7691 | 37,663,046.67 | 10.0000 |
| Rapid Rack Industries, Inc | Revolver | 1,694,675.90 | UNFND | 9.7691 | 16,555,458.33 | 0.5000 |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | FIXED | 5.7691 | 32,338,526.73 | 12.0000 |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | UNSET | 9.7691 | 39,076,400.00 | |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | UNFND | 9.7691 | 48,845,500.00 | 0.5000 |
| Red Shield Acquisition, LLC | Term Loan | 5,650,182.22 | LIBOR | 9.7691 | 55,197,195.13 | 10.0000 |
| Red Shield Acquisition, LLC | Term Loan | 2,349,817.78 | UNFND | 9.7691 | 22,955,604.87 | 0.5000 |
| Remco Maintenance, LLC | Revolver | 1,700,000.00 | LIBOR | 9.7691 | 16,607,470.00 | 10.0000 |
| Remco Maintenance, LLC | Revolver | 800,000.00 | UNFND | 9.7691 | 7,815,280.00 | 0.5000 |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | LIBOR | 9.7691 | 32,850,264.38 | 10.0000 |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | LIBOR | 0.0000 | 0.00 | |
| RM Acquisition, LLC | Revolver | 2,205,882.35 | LIBOR | 9.7691 | 21,549,485.27 | 10.0000 |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | LIBOR | 6.0991 | 35,518,288.22 | 6.3300 |
| ServiceMaster Company | Closing Date Term Lo | 669,034.67 | LIBOR | 2.5000 | 1,672,586.68 | |
| ServiceMaster Company | Closing Date Term Lo | 661,660.90 | LIBOR | 2.5000 | 1,654,152.25 | |
| ServiceMaster Company | Closing Date Term Lo | 359,696.06 | LIBOR | 2.5000 | 899,240.15 | |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | LIBOR | 2.5000 | 420,844.38 | |
| ServiceMaster Company | LOC #1 | 107,908.82 | LIBOR | 0.0000 | 0.00 | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/09/2010 12:38 PM
As of Date: 01/29/2010
Page [48]

**Weighted Average Spread Detail Report**

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Balance | Type | Spread | Product | Current Rate |
|---|---|---|---|---|---|---|
| Snelling Medical Staffing | Term Loan | 223,000.00 | LIBOR | 8.7691 | 1,955,509.30 | 9.0000 |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | LIBOR | 9.7691 | 24,422,750.00 | 10.0000 |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | LIBOR | 9.7691 | 3,419,185.00 | 10.0000 |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | LIBOR | 9.7691 | 19,538,200.00 | 10.0000 |
| Swift Transportation | Term Loan 1 | 6,293,768.10 | LIBOR | 8.0191 | 50,470,355.77 | 6.2500 |
| Swift Transportation | Term Loan 1 | 3,649,652.96 | LIBOR | 8.0191 | 29,266,932.05 | 6.2500 |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | PRIME | 4.5191 | 15,816,850.00 | 4.7500 |
| Trim Trends | Term Loan | 8,000,000.00 | UNSET | 9.7691 | 78,152,800.00 | |
| Trim Trends | Term Loan A | 6,555,380.26 | LIBOR | 9.7691 | 64,040,165.30 | 10.0000 |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | UNSET | 9.7691 | 19,538,200.00 | |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | LIBOR | 8.7691 | 271,842,100.00 | 9.0000 |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | LIBOR | 0.0000 | 0.00 | |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | LIBOR | 4.0000 | 11,300,827.80 | |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 500,000.00 | LIBOR | 8.0000 | 4,000,000.00 | 8.2309 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 1,200,000.00 | LIBOR | 8.0000 | 9,600,000.00 | 8.2309 |
| XPIENT Solutions, LLC | Fully Funded Term Lo | 300,000.00 | LIBOR | 8.0000 | 2,400,000.00 | |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | PRIME | 8.0191 | 11,226,740.00 | 8.2500 |
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | LIBOR | 1.7691 | 4,536,153.91 | 2.0000 |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | LIBOR | 8.7691 | 73,989,281.25 | 9.0000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Aggregate Principal Balance : | 567,575,268.10 (A) | | | (B) | 4,910,483,069.83 | |
| Weighted Average Spread (B/A) : | 8.650 | | | | | |
| Weighted Average Spread >= 6.75 : | Pass | | | | | |

\* Report excludes PIK Loans and Equities.



U.S. Bank Corporate Trust Services
CDO Administration Unit

Bankruptcy / Insolvency Information

**ZOHAR CDO 2003-1 Limited**

Date:  02/01/2010 3:11 PM
As of Date: 01/29/2010
Page [49]

| Type / Issuer | Description | % of M.I.A. | Principal Balance | Last Date of Int. Payment | Date of Occurance |
|---|---|---|---|---|---|

Currently, there are no securities that match the criteria of this report.



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 3:12 PM
As of Date: 01/29/2010
Page [50]

**Collateral Sold Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Face Amount | Date of Sales | Interest Sold | Prin. Coll. Sales Amount | Sale Price | Reason For Sale |
|--------|-------------|-------------|---------------|---------------|--------------------------|------------|-----------------|

Currently, there are no securities that match the criteria of this report.



Portfolio Tests Pursuant to Section 10.13(a) of the Indenture of ZOHAR CDO 2003-1 Ltd.
(Issuer) and U.S.Bank National Association (Trustee)

## Commitment Shortfall

| | |
|---|---|
| Unfunded Portfolio Amount : | 40,523,308.46 |
| Cost of Commitments : | 32,159,075.00 |
| **Total (A) :** | **72,682,383.46** |
| | |
| plus Principal Proceeds : | 73,346,405.01 |
| plus Uninvested Proceeds : | 0.00 |
| plus Zohar Subsidiary Principal Collection Account : | 0.00 |
| plus Aggregate Undrawn Amounts of the Class A Notes : | 0.00 |
| plus URDA Available Amount : | 0.00 |
| plus Rollover Proceeds Account : | 0.00 |
| **Total (B) :** | **73,346,405.01** |
| | |
| **Resulting Commitment Shortfall Amount (A - B) :** | **0.00** |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Defaulted Collateral Detail Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Total Loan Commitment | Effective Date | % of Maximum Investment Amount |
|--------|-------------|----------------------|----------------|--------------------------------|
| **Prior Month Default** | | | | |
| Arc One, LLC | Restructured Term Lo | 30,653,808.29 | August 29, 2008 | 5.04% |
| Arc One, LLC | Fully Funded Term Lo | 700,000.00 | August 29, 2008 | 0.12% |
| IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | May 26, 2009 | 0.36% |
| Intera Group, Inc. | Exchanged Security | 5,849,048.28 | July 10, 2007 | 0.96% |
| | **Total for Prior Month Default :** | **39,377,652.25** | | |
| | **Total for Report :** | **39,377,652.25** | | |
| | **Maximum Investment Amount :** | **607,616,941.89** | | |
| | **Current Month Defaulted Obligations :** | **0.00** | | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:02/09/2010 1:19 PM
As of Date: 01/29/2010
Page [53]

**Equities / Capitalized Interest Report**

**ZOHAR CDO 2003-1 Limited**

| Collateral Type / Issuer | Description | # of Shares | Margin Stock (Yes / No) |
|---|---|---|---|
| **Equity Shares** | | | |
| AUTOMATED DUCTWORK MANUFACTURING CO | Common | 100.00 | No |
| FETCO HOME DECOR, INC | Common 315619ZA7 | 76,263.00 | No |
| FETCO HOME DECOR, INC | Common 315619ZC3 | 60,000.00 | No |
| FETCO HOME DECOR, INC | Pref 315619ZB5 | 27,578.00 | No |
| FETCO INTERNATIONAL | Common | 9,997.00 | No |
| GALEY & LORD, LLC | Common Stock | 687,547.00 | No |
| GALEY & LORD, LLC | Series A Preferred I | 39,010,000.00 | No |
| GLENOIT UNIVERSAL LTD | Common CL B | 3,527.00 | No |
| GLENOIT UNIVERSAL LTD | Common Stock Class B | 12,967.00 | No |
| HARTWELL INDUSTRIES, INC. | Common Class A | 116,594.00 | No |
| IMG HOLDINGS, INC | WARRANT EX 5/26/2015 | 18.00 | No |
| INTERA GROUP, INC. | Common | 839.09 | No |
| MD HELICOPTERS, INC | Common | 206.00 | No |
| METALFORMING TECHNOLOGIES INC | Common Stock | 175,889.00 | No |
| OPENING SPECIALTIES AND SUPPLY INC | Common | 2,267.00 | No |
| PHC HOLDING CORP | Class A Common Stock | 83,460.13 | No |
| PHC HOLDING CORP | Class B Common Stock | 112,047.09 | No |
| PHC HOLDING CORP | Class C Common Stock | 85,880.75 | No |
| PHC HOLDING CORP | Common | 100.00 | No |
| PHC HOLDING CORP | Preferred Stock | 114,178.19 | No |
| PLEASANTS HARWARE CO | Common CL B | 1,000.00 | No |
| TEXTILE HOLDING, INC. | Common | 400,000.00 | No |
| UF HOLDINGS INC | Common | 196,020.00 | No |
| UF HOLDINGS INC | Preferred Stock | 53,810.00 | No |
| W.W. HOLDINGS LLC | Common Stock | 4,787.00 | No |
| WESTERN FOREST PRODUCTS, INC. | Common | 45,327.00 | No |
| WW VERSAT AQUISITION CORP | Common Stock | 100.00 | No |

**Total of Equity Shares :**    **41,280,502.25**



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date: 02/09/2010 1:19 PM
As of Date: 01/29/2010
Page [54]

**Equities / Capitalized Interest Report**

**ZOHAR CDO 2003-1 Limited**

| Collateral Type / Issuer | Description | | | |
|---|---|---|---|---|

| Capitalized Interest | | CDO Balance | Capitalized Interest | Adjusted CDO Balance |
|---|---|---|---|---|
| BOMAR INDUSTRIES INTERNATIONAL INC | Tranche B Term Loan | 3,499,896.39 | 1,499,896.39 | 2,000,000.00 |
| HARTWELL INDUSTRIES, INC. | New Term Loan 2 | 11,246,048.35 | 2,271,860.77 | 8,974,187.58 |
| INTERA GROUP, INC. | Exchanged Security | 6,374,815.26 | 525,766.98 | 5,849,048.28 |
| RAPID RACK INDUSTRIES, INC | Term Loan | 5,986,914.13 | 1,322,914.13 | 4,664,000.00 |
| XPIENT SOLUTIONS, LLC | Exch. Security | 598,493.96 | 23,700.91 | 574,793.05 |
| | **Total CDO Balance :** | **27,706,168.06** | | |
| | **Total of Capitalized Interest :** | | **5,644,139.18** | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Issuer Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Principal Balance | % of M.I.A. | Largest Issuer <= 9% | 2nd Largest Issuer <= 8.5% | 3rd Largest Issuer <= 7% | 4th - 7th largest Issuers <= 5% each | 8th & lower Issuers <= 3% each |
|---|---|---|---|---|---|---|---|
| 180's, LLC | 18,842,328.00 | 3.1010% | | | | | Fail |
| ACME INTERNATIONAL ENTERPRISES, INC. | 1,000,000.00 | 0.1646% | | | | | Pass |
| American LaFrance | 53,386,597.13 | 8.7862% | | Fail | | | |
| Amweld International | 16,164,108.84 | 2.6602% | | | | | Pass |
| Arc One, LLC | 31,353,808.29 | 5.1601% | | | | Fail | |
| Best Textiles Acquisition, LLC | 5,000,000.00 | 0.8229% | | | | | Pass |
| Bomar Industries International Inc | 16,059,173.26 | 2.6430% | | | | | Pass |
| CBA Group Vs Holding Company | 14,610,909.52 | 2.4046% | | | | | Pass |
| Croscil Home | 10,000,000.00 | 1.6458% | | | | | Pass |
| Doors Acquisition, LLC | 2,905,786.58 | 0.4782% | | | | | Pass |
| Duro Textiles LLC | 18,842,259.65 | 3.1010% | | | | | Fail |
| Electro Source, LLC | 3,393,205.11 | 0.5584% | | | | | Pass |
| EMAG Solutions, LLC | 4,062,500.00 | 0.6686% | | | | | Pass |
| Fetco Home Decor, Inc | 7,855,849.55 | 1.2929% | | | | | Pass |
| Galey & Lord, LLC | 31,400,000.00 | 5.1677% | | | | Fail | |
| Glenoit LLC | 4,526,721.00 | 0.7450% | | | | | Pass |
| Global Automotive Systems, LLC | 31,403,880.40 | 5.1684% | | | | Fail | |
| Hartwell Industries, Inc. | 13,241,467.23 | 2.1792% | | | | | Pass |
| Heritage Aviation | 13,000,000.00 | 2.1395% | | | | | Pass |
| IMG Holdings, Inc | 11,179,381.44 | 1.8399% | | | | | Pass |
| Intera Group, Inc. | 8,377,246.89 | 1.3787% | | | | | Pass |
| Intrepid USA | 13,140,066.01 | 2.1626% | | | | | Pass |
| LVD Acquisition, LLC | 9,303,993.33 | 1.5312% | | | | | Pass |
| MD Helicopters, Inc | 56,492,001.29 | 9.2973% | Fail | | | | |
| Natura Water | 4,000,000.00 | 0.6583% | | | | | Pass |
| NetVersant Acquisition, LLC | 43,982,013.57 | 7.2384% | | | Fail | | |
| Petry Media Corporation | 17,928,254.78 | 2.9506% | | | | | Pass |
| Rapid Rack Industries, Inc | 11,605,471.69 | 1.9100% | | | | | Pass |
| Red Shield Acquisition, LLC | 17,000,000.00 | 2.7978% | | | | | Pass |
| Remco Maintenance, LLC | 5,862,670.50 | 0.9649% | | | | | Pass |
| RM Acquisition, LLC | 8,029,411.76 | 1.3215% | | | | | Pass |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Issuer Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Principal Balance | % of M.I.A. | Largest Issuer <= 9% | 2nd Largest Issuer <= 8.5% | 3rd Largest Issuer <= 7% | 4th - 7th largest Issuers <= 5% each | 8th & lower Issuers <= 3% each |
|---|---|---|---|---|---|---|---|
| ServiceMaster Company | 1,966,638.19 | 0.3237% | | | | | Pass |
| Snelling Medical Staffing | 223,000.00 | 0.0367% | | | | | Pass |
| SO Acquisition, LLC | 4,850,000.00 | 0.7982% | | | | | Pass |
| Swift Transportation | 9,943,421.06 | 1.6365% | | | | | Pass |
| Transcare Corporation | 3,500,000.00 | 0.5760% | | | | | Pass |
| Trim Trends | 14,555,380.26 | 2.3955% | | | | | Pass |
| VULCAN ENGINEERING CO. | 2,000,000.00 | 0.3292% | | | | | Pass |
| Xinhua Sports & Entertainment Ltd. | 31,000,000.00 | 5.1019% | | | | Fail | |
| XPIENT Solutions, LLC | 3,400,000.00 | 0.5596% | | | | | Pass |
| Zohar SS Acquisition, LLC | 8,437,500.00 | 1.3886% | | | | | Pass |

| | |
|---|---|
| **Maximum Principal Balance :** | **583,825,045.33** |
| **Number of Issuers :** | **41** |
| **Maximum Investment Amount :** | **607,616,941.89** |

| | | |
|---|---|---|
| Largest Issuer : MD Helicopters, Inc | 56,492,001.29 | 9.30% |
| 2nd Largest Issuer : American LaFrance | 53,386,597.13 | 8.79% |
| 3rd Largest Issuer : NetVersant Acquisition, LLC | 43,982,013.57 | 7.24% |
| 4th Largest Issuer : Global Automotive Systems, LLC | 31,403,880.40 | 5.17% |
| 5th Largest Issuer : Galey & Lord, LLC | 31,400,000.00 | 5.17% |
| 6th Largest Issuer : Arc One, LLC | 31,353,808.29 | 5.16% |
| 7th Largest Issuer : Xinhua Sports & Entertainment Ltd. | 31,000,000.00 | 5.10% |
| 8th Largest Issuer : 180's, LLC | 18,842,328.00 | 3.10% |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Industry Classification & Rating Report**

Date:  02/01/2010 3:35 PM
As of Date: 01/29/2010
Page [57]

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Total Loan Commitment | Moody Industry | Moody Rating | S&P Industry | S&P Rating |
|---|---|---|---|---|---|---|
| 180's, LLC | Tranche A Revolver | 16,600,000.00 | Leisure, Amusement, Entertainment | * | Leisure Goods/ Activities/ Movies | * |
| 180's, LLC | Fully Funded Term B | 2,242,328.00 | Leisure, Amusement, Entertainment | * | Leisure Goods/ Activities/ Movies | * |
| ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| American LaFrance | Revolver | 559,862.47 | Automobile | * | Automotive | * |
| American LaFrance | Term Loan 2 | 52,313,856.66 | Automobile | * | Automotive | * |
| American LaFrance | Term Loan 1 | 512,878.00 | Automobile | * | Automotive | * |
| Amweld International | Term Loan B | 16,164,108.84 | Diversified/Cong. Mfg | * | Building and Development | * |
| Arc One, LLC | Restructured Term Lc | 30,653,808.29 | Diversified/Cong. Mfg | * | Building and Development | * |
| Arc One, LLC | Fully Funded Term Lc | 700,000.00 | Diversified/Cong. Mfg | * | Building and Development | * |
| Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | Electronics | * | Electronics/ Electric | * |
| CBA Group Vs Holding Company | Revolver | 4,000,000.00 | Electronics | * | Electronics/ Electric | * |
| CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | Electronics | * | Electronics/ Electric | * |
| Croscil Home | Revolver | 10,000,000.00 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| Doors Acquisition, LLC | Fully Funded Term Lc | 2,905,786.58 | Diversified/Cong. Mfg | * | Building and Development | * |
| Duro Textiles LLC | Term B Loan | 7,500,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Duro Textiles LLC | Term Loan | 8,000,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Duro Textiles LLC | Fully Funded Term Lc | 1,049,259.65 | Textiles and Leather | * | Clothing/ Textiles | * |
| Duro Textiles LLC | Term loan 2 | 2,293,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Electro Source, LLC | Term Loan | 2,916,666.67 | Electronics | * | Electronics/ Electric | * |
| Electro Source, LLC | Fully Funded Term Lc | 476,538.44 | Electronics | * | Electronics/ Electric | * |
| EMAG Solutions, LLC | Revolver | 4,062,500.00 | Electronics | * | Electronics/ Electric | * |
| Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| Fetco Home Decor, Inc | Exchanged Security | 2,757,727.26 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| Galey & Lord, LLC | Term Loan | 26,000,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Galey & Lord, LLC | Fully Funded Term Lc | 3,000,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Galey & Lord, LLC | Term Loan E | 1,600,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Galey & Lord, LLC | Term Loan M | 800,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Glenoit LLC | Term Loan | 4,526,721.00 | Home and Office Furnishing, Housewares | * | Home Furnishings | * |
| Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | Automobile | * | Automotive | * |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Industry Classification & Rating Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Total Loan Commitment | Moody Industry | Moody Rating | S&P Industry | S&P Rating |
|---|---|---|---|---|---|---|
| Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | Automobile | * | Automotive | * |
| Global Automotive Systems, LLC | Term B | 576,025.00 | Automobile | * | Automotive | * |
| Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | Textiles and Leather | * | Clothing/ Textiles | * |
| Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | Textiles and Leather | * | Clothing/ Textiles | * |
| Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Hartwell Industries, Inc. | DELAYED DRAW TE | 1,500,000.00 | Textiles and Leather | * | Clothing/ Textiles | * |
| Heritage Aviation | Term Loan | 1,000,000.00 | Aerospace and Defense | * | Aerospace and Defense | * |
| Heritage Aviation | Term loan 2 | 2,000,000.00 | Aerospace and Defense | * | Aerospace and Defense | * |
| Heritage Aviation | Delayed Draw Term L | 10,000,000.00 | Aerospace and Defense | * | Aerospace and Defense | * |
| IMG Holdings, Inc | Term C | 2,000,000.00 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| IMG Holdings, Inc | Term Loan D | 300,000.00 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| IMG Holdings, Inc | Term E | 144,640.00 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| IMG Holdings, Inc | Revolver A | 4,000,000.00 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| IMG Holdings, Inc | Fully Funded Term Lo | 555,360.00 | Personal & Non Durable Consumer Product | * | Cosmetics/ Toiletries | * |
| Intera Group, Inc. | Term Loan | 5,990,000.00 | Utilities | * | Utilities | * |
| Intera Group, Inc. | Restructured Term Lo | 877,246.89 | Utilities | * | Utilities | * |
| Intera Group, Inc. | Exchanged Security | 5,849,048.28 | Utilities | * | Utilities | * |
| Intera Group, Inc. | Term Loan C | 160,000.00 | Utilities | * | Utilities | * |
| Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | Utilities | * | Utilities | * |
| Intrepid USA | Revolver | 9,280,000.00 | Healthcare, Education and Childcare | * | Health Care | * |
| Intrepid USA | Term Loan B | 3,860,066.01 | Healthcare, Education and Childcare | * | Health Care | * |
| LVD Acquisition, LLC | Term Loan | 9,303,993.33 | Diversified/Cong. Mfg | * | Ecological Services and Equipment | * |
| MD Helicopters, Inc | Term Loan B | 16,116,674.23 | Aerospace and Defense | * | Aerospace and Defense | * |
| MD Helicopters, Inc | Term A | 12,873,602.92 | Aerospace and Defense | * | Aerospace and Defense | * |
| MD Helicopters, Inc | Tranche A-3 | 700,000.00 | Aerospace and Defense | * | Aerospace and Defense | * |
| MD Helicopters, Inc | Term Loan | 25,551,724.14 | Aerospace and Defense | * | Aerospace and Defense | * |
| MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | Aerospace and Defense | * | Aerospace and Defense | * |
| MD Helicopters, Inc | Term Loan 1 | 50,000.00 | Aerospace and Defense | * | Aerospace and Defense | * |
| Natura Water | Fully Funded Term B | 1,500,000.00 | Beverage, Food and Tobacco | * | Beverage and Tobacco | * |
| Natura Water | Fully Funded Term C | 2,200,000.00 | Beverage, Food and Tobacco | * | Beverage and Tobacco | * |
| Natura Water | Fully Funded Term Lo | 300,000.00 | Beverage, Food and Tobacco | * | Beverage and Tobacco | * |



# U.S. Bank Corporate Trust Services
## CDO Administration Unit

### Industry Classification & Rating Report

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Total Loan Commitment | Moody Industry | Moody Rating | S&P Industry | S&P Rating |
|---|---|---|---|---|---|---|
| NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | Telecommunications | * | Telecommunications/ Cellular | * |
| NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | Telecommunications | * | Telecommunications/ Cellular | * |
| NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | Telecommunications | * | Telecommunications/ Cellular | * |
| Petry Media Corporation | Priming Revolver | 11,928,254.78 | Broadcasting & Entertainment | * | Broadcast Radio and Television | * |
| Petry Media Corporation | Term Loan | 3,750,050.00 | Broadcasting & Entertainment | * | Broadcast Radio and Television | * |
| Petry Media Corporation | Priming Term Loan | 456,950.00 | Broadcasting & Entertainment | * | Broadcast Radio and Television | * |
| Petry Media Corporation | Term Loan C | 1,793,000.00 | Broadcasting & Entertainment | * | Broadcast Radio and Television | * |
| Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | Machinery: Non-agric, Non-constr, Non-elec | * | Industrial Equipment | * |
| Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | Machinery: Non-agric, Non-constr, Non-elec | * | Industrial Equipment | * |
| Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | Diversified/Resources, Metals and Minera | * | Forest Products | * |
| Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | Diversified/Resources, Metals and Minera | * | Forest Products | * |
| Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | Diversified/Resources, Metals and Minera | * | Forest Products | * |
| Remco Maintenance, LLC | Term Loan | 3,362,670.50 | Diversified/Cong. Service | * | Ecological Services and Equipment | * |
| Remco Maintenance, LLC | Revolver | 2,500,000.00 | Diversified/Cong. Service | * | Ecological Services and Equipment | * |
| RM Acquisition, LLC | Term Loan | 5,823,529.41 | Printing and Publishing | * | Publishing | * |
| RM Acquisition, LLC | Preferred Security | 8,545,250.00 | Printing and Publishing | * | Publishing | * |
| RM Acquisition, LLC | Revolver | 2,205,882.35 | Printing and Publishing | * | Publishing | * |
| ServiceMaster Company | Closing Date Term Lo | 1,690,391.62 | Personal, Food & Miscellaneous | B2 | Business Equipment and Services | B |
| ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | Personal, Food & Miscellaneous | B2 | Business Equipment and Services | B |
| ServiceMaster Company | LOC #1 | 107,908.82 | Personal, Food & Miscellaneous | B2 | Business Equipment and Services | B |
| Snelling Medical Staffing | Term Loan | 223,000.00 | Personal, Food & Miscellaneous | * | Business Equipment and Services | * |
| SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | Printing and Publishing | * | Electronics/ Electric | * |
| SO Acquisition, LLC | Term Loan A | 2,000,000.00 | Printing and Publishing | * | Electronics/ Electric | * |
| SO Acquisition, LLC | Fully Funded Term Lo | 350,000.00 | Printing and Publishing | * | Electronics/ Electric | * |
| Swift Transportation | Term Loan 1 | 9,943,421.06 | Cargo Transport | Caa1 | Surface Transport | B- |
| Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | Personal Transportation | * | Surface Transport | * |
| Trim Trends | Term Loan A | 6,555,380.26 | Automobile | * | Automotive | * |
| Trim Trends | Term Loan | 8,000,000.00 | Automobile | * | Automotive | * |
| VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | Machinery: Non-agric, Non-constr, Non-elec | * | Industrial Equipment | * |
| Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | Broadcasting & Entertainment | * | Broadcast Radio and Television | * |
| XPIENT Solutions, LLC | Revolver | 1,400,000.00 | Diversified/Cong. Service | * | Electronics/ Electric | * |
| XPIENT Solutions, LLC | Exchanged Security | 2,825,206.95 | Diversified/Cong. Service | * | Electronics/ Electric | * |
| XPIENT Solutions, LLC | Exch. Security | 586,539.92 | Diversified/Cong. Service | * | Electronics/ Electric | * |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Industry Classification & Rating Report**

Date:  02/01/2010 3:35 PM
As of Date: 01/29/2010
Page [60]

### ZOHAR CDO 2003-1 Limited

| Issuer | Description | Total Loan Commitment | Moody Industry | Moody Rating | S&P Industry | S&P Rating |
|---|---|---|---|---|---|---|
| XPIENT Solutions, LLC | Fully Funded Term Lc | 500,000.00 | Diversified/Cong. Service | * | Electronics/ Electric | * |
| XPIENT Solutions, LLC | Fully Funded Term Lc | 1,200,000.00 | Diversified/Cong. Service | * | Electronics/ Electric | * |
| XPIENT Solutions, LLC | Fully Funded Term Lc | 300,000.00 | Diversified/Cong. Service | * | Electronics/ Electric | * |
| Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | Personal, Food & Miscellaneous | * | Business Equipment and Services | * |
| Zohar SS Acquisition, LLC | Exchanged Security | 2,564,102.60 | Personal, Food & Miscellaneous | * | Business Equipment and Services | * |

|  |  |  |
|---|---|---|
| **Aggregate Principal Balance :** | **606,952,920.34** | |
| **Maximum Investment Amount (M.I.A.) :** | **607,616,941.89** | |
| Largest Moody Industry : Automobile | 99,345,857.79 | 16.35% |
| Largest S&P Industry : Automotive | 99,345,857.79 | 16.35% |

**\* The ratings for the above securities have been obtained through confidential credit rating estimates. These ratings are not available for disclosure.**



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 3:38 PM
As of Date: 01/29/2010
Page [61]

**Ineligible Collateral Securities Report**

**ZOHAR CDO 2003-1 Limited**

| Type | Obligor | Description | Balance | Maturity Date | Issue Date | Sale Date | Payment Terms |
|------|---------|-------------|---------|---------------|------------|-----------|---------------|

Currently, there are no securities that match the criteria of this report.



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 3:39 PM
As of Date: 01/29/2010
Page [62]

**Junior Rollover Exchange Securities Report**

**ZOHAR CDO 2003-1 Limited**

| Exchange Date | Issuer | Description | Type | Balance | % of Maximum Principal Balance |
|---|---|---|---|---|---|

Currently, there are no securities that match the criteria of this report.



<div align="center">

**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Moodys Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

</div>

Date:  02/01/2010 3:56 PM
As of Date: 01/29/2010
Page [63]

| Moody<br>Industry | Issuer | Description | Total Loan<br>Commitment | % of<br>M.I.A. | % of M.I.A.<br>< 12% | % of M.I.A.<br>< 16% |
|---|---|---|---|---|---|---|
| **Aerospace and Defense** | | | | | | |
| | Heritage Aviation | Delayed Draw Term L | 10,000,000.00 | 1.65% | | |
| | Heritage Aviation | Term Loan | 1,000,000.00 | 0.16% | | |
| | Heritage Aviation | Term loan 2 | 2,000,000.00 | 0.33% | | |
| | MD Helicopters, Inc | Term A | 12,873,602.92 | 2.12% | | |
| | MD Helicopters, Inc | Term Loan | 25,551,724.14 | 4.21% | | |
| | MD Helicopters, Inc | Term Loan 1 | 50,000.00 | 0.01% | | |
| | MD Helicopters, Inc | Term Loan B | 16,116,674.23 | 2.65% | | |
| | MD Helicopters, Inc | Tranche A-3 | 700,000.00 | 0.12% | | |
| | MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | 0.20% | | |
| | | **Total for Aerospace and Defense :** | **69,492,001.29** | **11.44%** | | **Pass** |
| **Automobile** | | | | | | |
| | American LaFrance | Revolver | 559,862.47 | 0.09% | | |
| | American LaFrance | Term Loan 1 | 512,878.00 | 0.08% | | |
| | American LaFrance | Term Loan 2 | 52,313,856.66 | 8.61% | | |
| | Global Automotive Systems, LLC | Term B | 576,025.00 | 0.09% | | |
| | Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | 1.50% | | |
| | Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | 3.58% | | |
| | Trim Trends | Term Loan | 8,000,000.00 | 1.32% | | |
| | Trim Trends | Term Loan A | 6,555,380.26 | 1.08% | | |
| | | **Total for Automobile :** | **99,345,857.79** | **16.35%** | | **Fail** |
| **Beverage, Food and Tobacco** | | | | | | |
| | Natura Water | Fully Funded Term B | 1,500,000.00 | 0.25% | | |
| | Natura Water | Fully Funded Term C | 2,200,000.00 | 0.36% | | |
| | Natura Water | Fully Funded Term L | 300,000.00 | 0.05% | | |
| | | **Total for Beverage, Food and Tobacco :** | **4,000,000.00** | **0.66%** | | **Pass** |
| **Broadcasting & Entertainment** | | | | | | |
| | Petry Media Corporation | Priming Revolver | 11,928,254.78 | 1.96% | | |
| | Petry Media Corporation | Priming Term Loan | 456,950.00 | 0.08% | | |
| | Petry Media Corporation | Term Loan | 3,750,050.00 | 0.62% | | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 3:56 PM
As of Date: 01/29/2010
Page [64]

**Moodys Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| Moody Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Broadcasting & Entertainment** | | | | | | |
| | Petry Media Corporation | Term Loan C | 1,793,000.00 | 0.30% | | |
| | Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lc | 31,000,000.00 | 5.10% | | |
| | **Total for Broadcasting & Entertainment :** | | **48,928,254.78** | **8.05%** | **Pass** | |
| **Cargo Transport** | | | | | | |
| | Swift Transportation | Term Loan 1 | 9,943,421.06 | 1.64% | | |
| | **Total for Cargo Transport :** | | **9,943,421.06** | **1.64%** | **Pass** | |
| **Diversified/Cong. Mfg** | | | | | | |
| | Amweld International | Term Loan B | 16,164,108.84 | 2.66% | | |
| | Arc One, LLC | Fully Funded Term Lc | 700,000.00 | 0.12% | | |
| | Arc One, LLC | Restructured Term Lc | 30,653,808.29 | 5.04% | | |
| | Doors Acquisition, LLC | Fully Funded Term Lc | 2,905,786.58 | 0.48% | | |
| | LVD Acquisition, LLC | Term Loan | 9,303,993.33 | 1.53% | | |
| | **Total for Diversified/Cong. Mfg :** | | **59,727,697.04** | **9.83%** | **Pass** | |
| **Diversified/Cong. Service** | | | | | | |
| | Remco Maintenance, LLC | Revolver | 2,500,000.00 | 0.41% | | |
| | Remco Maintenance, LLC | Term Loan | 3,362,670.50 | 0.55% | | |
| | XPIENT Solutions, LLC | Fully Funded Term Lc | 500,000.00 | 0.08% | | |
| | XPIENT Solutions, LLC | Fully Funded Term Lc | 1,200,000.00 | 0.20% | | |
| | XPIENT Solutions, LLC | Fully Funded Term Lc | 300,000.00 | 0.05% | | |
| | XPIENT Solutions, LLC | Revolver | 1,400,000.00 | 0.23% | | |
| | **Total for Diversified/Cong. Service :** | | **9,262,670.50** | **1.52%** | **Pass** | |
| **Diversified/Resources, Metals and Minera** | | | | | | |
| | Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | 0.66% | | |
| | Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | 0.82% | | |
| | Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | 1.32% | | |
| | **Total for Diversified/Resources, Metals and Minera :** | | **17,000,000.00** | **2.80%** | **Pass** | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 3:56 PM
As of Date: 01/29/2010
Page [65]

**Moodys Industry Concentration Report**

### ZOHAR CDO 2003-1 Limited

| Moody Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Electronics** | | | | | | |
| | CBA Group Vs Holding Company | Revolver | 4,000,000.00 | 0.66% | | |
| | CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | 1.33% | | |
| | CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | 0.41% | | |
| | Electro Source, LLC | Fully Funded Term Lo | 476,538.44 | 0.08% | | |
| | Electro Source, LLC | Term Loan | 2,916,666.67 | 0.48% | | |
| | EMAG Solutions, LLC | Revolver | 4,062,500.00 | 0.67% | | |
| | | **Total for Electronics :** | **22,066,614.63** | **3.63%** | **Pass** | |
| **Healthcare, Education and Childcare** | | | | | | |
| | Intrepid USA | Revolver | 9,280,000.00 | 1.53% | | |
| | Intrepid USA | Term Loan B | 3,860,066.01 | 0.64% | | |
| | | **Total for Healthcare, Education and Childcare :** | **13,140,066.01** | **2.16%** | **Pass** | |
| **Home and Office Furnishing, Housewares** | | | | | | |
| | ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | 0.16% | | |
| | Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | 0.53% | | |
| | Bomar Industries International Inc | Tranche A Term Loar | 10,000,000.00 | 1.65% | | |
| | Bomar Industries International Inc | Tranche B Term Loar | 2,859,173.26 | 0.47% | | |
| | Croscil Home | Revolver | 10,000,000.00 | 1.65% | | |
| | Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | 1.29% | | |
| | Glenoit LLC | Term Loan | 4,526,721.00 | 0.74% | | |
| | | **Total for Home and Office Furnishing, Housewares :** | **39,441,743.81** | **6.49%** | **Pass** | |
| **Leisure, Amusement, Entertainment** | | | | | | |
| | 180's, LLC | Fully Funded Term B | 2,242,328.00 | 0.37% | | |
| | 180's, LLC | Tranche A Revolver | 16,600,000.00 | 2.73% | | |
| | | **Total for Leisure, Amusement, Entertainment :** | **18,842,328.00** | **3.10%** | **Pass** | |
| **Machinery: Non-agric, Non-constr, Non-electr** | | | | | | |
| | Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | 0.99% | | |
| | Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | 0.92% | | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 3:56 PM
As of Date: 01/29/2010
Page [66]

**Moodys Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| Moody Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Machinery: Non-agric, Non-constr, Non-electr** | | | | | | |
| | VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | 0.33% | | |
| | Total for Machinery: Non-agric, Non-constr, Non-electr : | | **13,605,471.69** | **2.24%** | **Pass** | |
| | | | | | | |
| **Personal & Non Durable Consumer Products** | | | | | | |
| | IMG Holdings, Inc | Fully Funded Term Lc | 555,360.00 | 0.09% | | |
| | IMG Holdings, Inc | Revolver A | 4,000,000.00 | 0.66% | | |
| | IMG Holdings, Inc | Term C | 2,000,000.00 | 0.33% | | |
| | IMG Holdings, Inc | Term E | 144,640.00 | 0.02% | | |
| | IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | 0.33% | | |
| | IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | 0.36% | | |
| | IMG Holdings, Inc | Term Loan D | 300,000.00 | 0.05% | | |
| | Total for Personal & Non Durable Consumer Products : | | **11,179,381.44** | **1.84%** | **Pass** | |
| | | | | | | |
| **Personal Transportation** | | | | | | |
| | Transcare Corporation | Tranche B Term Loar | 3,500,000.00 | 0.58% | | |
| | Total for Personal Transportation : | | **3,500,000.00** | **0.58%** | **Pass** | |
| | | | | | | |
| **Personal, Food & Miscellaneous** | | | | | | |
| | ServiceMaster Company | Closing Date Term Lc | 1,690,391.62 | 0.28% | | |
| | ServiceMaster Company | Fully Funded Term Lc | 168,337.75 | 0.03% | | |
| | ServiceMaster Company | LOC #1 | 107,908.82 | 0.02% | | |
| | Snelling Medical Staffing | Term Loan | 223,000.00 | 0.04% | | |
| | Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | 1.39% | | |
| | Total for Personal, Food & Miscellaneous : | | **10,627,138.19** | **1.75%** | **Pass** | |
| | | | | | | |
| **Printing and Publishing** | | | | | | |
| | RM Acquisition, LLC | Revolver | 2,205,882.35 | 0.36% | | |
| | RM Acquisition, LLC | Term Loan | 5,823,529.41 | 0.96% | | |
| | SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | 0.41% | | |
| | SO Acquisition, LLC | Fully Funded Term Lc | 350,000.00 | 0.06% | | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date: 02/01/2010 3:56 PM
As of Date: 01/29/2010


## Moodys Industry Concentration Report

## ZOHAR CDO 2003-1 Limited

| Moody Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Printing and Publishing** | | | | | | |
| | SO Acquisition, LLC | Term Loan A | 2,000,000.00 | 0.33% | | |
| | | **Total for Printing and Publishing :** | **12,879,411.76** | **2.12%** | **Pass** | |
| **Telecommunications** | | | | | | |
| | NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | 0.05% | | |
| | NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | 0.35% | | |
| | NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | 6.84% | | |
| | | **Total for Telecommunications :** | **43,982,013.57** | **7.24%** | **Pass** | |
| **Textiles and Leather** | | | | | | |
| | Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | 0.82% | | |
| | Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | 0.17% | | |
| | Duro Textiles LLC | Term B Loan | 7,500,000.00 | 1.23% | | |
| | Duro Textiles LLC | Term Loan | 8,000,000.00 | 1.32% | | |
| | Duro Textiles LLC | Term loan 2 | 2,293,000.00 | 0.38% | | |
| | Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | 0.49% | | |
| | Galey & Lord, LLC | Term Loan | 26,000,000.00 | 4.28% | | |
| | Galey & Lord, LLC | Term Loan E | 1,600,000.00 | 0.26% | | |
| | Galey & Lord, LLC | Term Loan M | 800,000.00 | 0.13% | | |
| | Hartwell Industries, Inc. | DELAYED DRAW TE | 1,500,000.00 | 0.25% | | |
| | Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | 0.32% | | |
| | Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | 1.53% | | |
| | Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | 0.08% | | |
| | | **Total for Textiles and Leather :** | **68,483,726.88** | **11.27%** | | **Pass** |
| **Utilities** | | | | | | |
| | Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | 0.22% | | |
| | Intera Group, Inc. | Restructured Term Lo | 877,246.89 | 0.14% | | |
| | Intera Group, Inc. | Term Loan | 5,990,000.00 | 0.99% | | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 3:56 PM
As of Date: 01/29/2010
Page [68]

**Moodys Industry Concentration Report**

### ZOHAR CDO 2003-1 Limited

| Moody Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Utilities** | | | | | | |
| | Intera Group, Inc. | Term Loan C | 160,000.00 | 0.03% | | |
| | | **Total for Utilities :** | **8,377,246.89** | **1.38%** | **Pass** | |
| | | **Aggregate Principal Balance :** | **583,825,045.33** | | | |
| | | **Maximum Investment Amount (M.I.A.) :** | **607,616,941.89** | | | |
| | | Largest Moody's Industry : Automobile | | | 99,345,857.79 | 16.35% |
| | | 2nd Largest Moody's Industry : Aerospace and Defense | | | 69,492,001.29 | 11.44% |
| | | 3rd Largest Moody's Industry : Textiles and Leather | | | 68,483,726.88 | 11.27% |

Note : Aggregate Principal Balance excludes Exchanged Securities.



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 3:57 PM
As of Date: 01/29/2010
Page [69]

**Non-Current Obligations Report**

**ZOHAR CDO 2003-1 Limited**

| Type / Issuer | Description | % of M.I.A. | Principal Balance | Non-Current Date |
|---|---|---|---|---|

Currently, there are no securities that match the criteria of this report.



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Non-Performing Obligation Report**

**ZOHAR CDO 2003-1 Limited**

Date: 02/01/2010 4:01 PM
As of Date: 01/29/2010
Page [70]

| Type / Issuer | Description | Principal Balance | Non-Performing Date | Non-Performing End Date |
|---|---|---|---|---|

Currently, there are no securities that match the criteria of this report.



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Participation Detail Report**

Date: 02/01/2010 4:02 PM
As of Date: 01/29/2010
Page [71]

**ZOHAR CDO 2003-1 Limited**

| Obligor | Description | Participation Counterparty | Participation Moody's Counterparty Rating | Participation S&P Counterparty Rating | Principal Balance |
|---|---|---|---|---|---|

Currently, there are no securities that match the criteria of this report.



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 3:33 PM
As of Date: 01/29/2010
Page [72]

**Restructure / Refinance Detail Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | % of M.I.A. | Principal Balance | Date of Restructure | Default Date | Date of Refinance | Exchange | Refinance | Restructure |
|---|---|---|---|---|---|---|---|---|---|
| American LaFrance | Revolver | 0.09% | 559,862.47 | 07/17/08 | | | | | X |
| American LaFrance | Term Loan 2 | 8.61% | 52,313,856.66 | 07/17/08 | | | | | X |
| Amweld International | Term Loan B | 2.66% | 16,164,108.84 | 01/10/09 | | | | | X |
| Arc One, LLC | Restructured Term Lo | 5.04% | 30,653,808.29 | 06/28/06 | 08/29/08 | | | | X |
| Bomar Industries International Inc | Revolver 2 | 0.53% | 3,200,000.00 | 06/18/04 | | | | | X |
| Bomar Industries International Inc | Tranche A Term Loan | 1.65% | 10,000,000.00 | 06/18/04 | | | | | X |
| Bomar Industries International Inc | Tranche B Term Loan | 0.30% | 1,800,335.90 | 06/18/04 | | | | | X |
| Fetco Home Decor, Inc | Exchanged Security | 0.45% | 2,757,727.26 | 06/15/07 | | | X | | X |
| Fetco Home Decor, Inc | Term Loan | 1.29% | 7,855,849.55 | 06/15/07 | | | | | X |
| Hartwell Industries, Inc. | New Revolver | 0.32% | 1,927,639.96 | 01/30/04 | | | | | X |
| Hartwell Industries, Inc. | New Term Loan 2 | 1.53% | 9,313,827.27 | 03/23/05 | | | | | X |
| Intera Group, Inc. | Exchanged Security | 0.96% | 5,849,048.28 | 12/01/06 | 07/10/07 | | X | | |
| Intera Group, Inc. | Restructured Term Lo | 0.14% | 877,246.89 | 12/01/06 | | | | | X |
| LVD ACQUISITION, LLC | Term Loan | 1.53% | 9,303,993.33 | 06/01/09 | | | | | X |
| NetVersant Acquisition, LLC | Restructured Revolve | 0.05% | 294,071.50 | 01/06/09 | | | | | X |
| NetVersant Acquisition, LLC | Restructured Revolve | 0.35% | 2,102,385.31 | 01/06/09 | | | | | X |
| NetVersant Acquisition, LLC | Restructured Term Lo | 6.84% | 41,585,556.76 | 01/06/09 | | | | | X |
| Rapid Rack Industries, Inc | Revolver | 0.99% | 6,000,000.00 | 11/21/05 | | | | | X |
| Rapid Rack Industries, Inc | Term Loan | 0.92% | 5,605,471.69 | 11/21/05 | | | | | X |
| SO Acquisition, LLC | Term Loan A | 0.33% | 2,000,000.00 | 08/05/05 | | | | | X |
| XPIENT Solutions, LLC | Revolver | 0.23% | 1,400,000.00 | 08/19/04 | | | | | X |

**Totals from above : 211,564,789.99**

**Maximum Investment Amount (M.I.A.) : 607,616,941.89**



U.S. Bank Corporate Trust Services
CDO Administration Unit

**S&P Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| S&P Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Aerospace and Defense** | | | | | | |
| | Heritage Aviation | Delayed Draw Term L | 10,000,000.00 | 1.65% | | |
| | Heritage Aviation | Term Loan | 1,000,000.00 | 0.16% | | |
| | Heritage Aviation | Term loan 2 | 2,000,000.00 | 0.33% | | |
| | MD Helicopters, Inc | Term A | 12,873,602.92 | 2.12% | | |
| | MD Helicopters, Inc | Term Loan | 25,551,724.14 | 4.21% | | |
| | MD Helicopters, Inc | Term Loan 1 | 50,000.00 | 0.01% | | |
| | MD Helicopters, Inc | Term Loan B | 16,116,674.23 | 2.65% | | |
| | MD Helicopters, Inc | Tranche A-3 | 700,000.00 | 0.12% | | |
| | MD Helicopters, Inc | Tranche A-7 | 1,200,000.00 | 0.20% | | |
| | | **Total for Aerospace and Defense :** | **69,492,001.29** | **11.44%** | | **Pass** |
| **Automotive** | | | | | | |
| | American LaFrance | Revolver | 559,862.47 | 0.09% | | |
| | American LaFrance | Term Loan 1 | 512,878.00 | 0.08% | | |
| | American LaFrance | Term Loan 2 | 52,313,856.66 | 8.61% | | |
| | Global Automotive Systems, LLC | Term B | 576,025.00 | 0.09% | | |
| | Global Automotive Systems, LLC | Term Loan | 9,100,000.00 | 1.50% | | |
| | Global Automotive Systems, LLC | Term Loan A | 21,727,855.40 | 3.58% | | |
| | Trim Trends | Term Loan | 8,000,000.00 | 1.32% | | |
| | Trim Trends | Term Loan A | 6,555,380.26 | 1.08% | | |
| | | **Total for Automotive :** | **99,345,857.79** | **16.35%** | | **Fail** |
| **Beverage and Tobacco** | | | | | | |
| | Natura Water | Fully Funded Term B | 1,500,000.00 | 0.25% | | |
| | Natura Water | Fully Funded Term C | 2,200,000.00 | 0.36% | | |
| | Natura Water | Fully Funded Term L | 300,000.00 | 0.05% | | |
| | | **Total for Beverage and Tobacco :** | **4,000,000.00** | **0.66%** | **Pass** | |
| **Broadcast Radio and Television** | | | | | | |
| | Petry Media Corporation | Priming Revolver | 11,928,254.78 | 1.96% | | |
| | Petry Media Corporation | Priming Term Loan | 456,950.00 | 0.08% | | |



<div align="center">

**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**S&P Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

</div>

Date:  02/01/2010 4:20 PM
As of Date: 01/29/2010
Page [74]

| S&P Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Broadcast Radio and Television** | | | | | | |
| | Petry Media Corporation | Term Loan | 3,750,050.00 | 0.62% | | |
| | Petry Media Corporation | Term Loan C | 1,793,000.00 | 0.30% | | |
| | Xinhua Sports & Entertainment Ltd. | Fully Funded Term Lo | 31,000,000.00 | 5.10% | | |
| | Total for Broadcast Radio and Television : | | 48,928,254.78 | 8.05% | Pass | |
| **Building and Development** | | | | | | |
| | Amweld International | Term Loan B | 16,164,108.84 | 2.66% | | |
| | Arc One, LLC | Fully Funded Term Lo | 700,000.00 | 0.12% | | |
| | Arc One, LLC | Restructured Term Lo | 30,653,808.29 | 5.04% | | |
| | Doors Acquisition, LLC | Fully Funded Term Lo | 2,905,786.58 | 0.48% | | |
| | Total for Building and Development : | | 50,423,703.71 | 8.30% | Pass | |
| **Business Equipment and Services** | | | | | | |
| | ServiceMaster Company | Closing Date Term Lo | 1,690,391.62 | 0.28% | | |
| | ServiceMaster Company | Fully Funded Term Lo | 168,337.75 | 0.03% | | |
| | ServiceMaster Company | LOC #1 | 107,908.82 | 0.02% | | |
| | Snelling Medical Staffing | Term Loan | 223,000.00 | 0.04% | | |
| | Zohar SS Acquisition, LLC | Term Loan | 8,437,500.00 | 1.39% | | |
| | Total for Business Equipment and Services : | | 10,627,138.19 | 1.75% | Pass | |
| **Clothing/ Textiles** | | | | | | |
| | Best Textiles Acquisition, LLC | Revolver | 5,000,000.00 | 0.82% | | |
| | Duro Textiles LLC | Fully Funded Term Lo | 1,049,259.65 | 0.17% | | |
| | Duro Textiles LLC | Term B Loan | 7,500,000.00 | 1.23% | | |
| | Duro Textiles LLC | Term Loan | 8,000,000.00 | 1.32% | | |
| | Duro Textiles LLC | Term loan 2 | 2,293,000.00 | 0.38% | | |
| | Galey & Lord, LLC | Fully Funded Term Lo | 3,000,000.00 | 0.49% | | |
| | Galey & Lord, LLC | Term Loan | 26,000,000.00 | 4.28% | | |
| | Galey & Lord, LLC | Term Loan E | 1,600,000.00 | 0.26% | | |
| | Galey & Lord, LLC | Term Loan M | 800,000.00 | 0.13% | | |
| | Hartwell Industries, Inc. | DELAYED DRAW TE | 1,500,000.00 | 0.25% | | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 4:20 PM
As of Date: 01/29/2010
Page [75]

**S&P Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| S&P Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Clothing/ Textiles** | | | | | | |
| | Hartwell Industries, Inc. | New Revolver | 1,927,639.96 | 0.32% | | |
| | Hartwell Industries, Inc. | New Term Loan 2 | 9,313,827.27 | 1.53% | | |
| | Hartwell Industries, Inc. | Term Loan A-1 | 500,000.00 | 0.08% | | |
| | | **Total for Clothing/ Textiles :** | **68,483,726.88** | **11.27%** | | **Pass** |
| | | | | | | |
| **Cosmetics/ Toiletries** | | | | | | |
| | IMG Holdings, Inc | Fully Funded Term Lc | 555,360.00 | 0.09% | | |
| | IMG Holdings, Inc | Revolver A | 4,000,000.00 | 0.66% | | |
| | IMG Holdings, Inc | Term C | 2,000,000.00 | 0.33% | | |
| | IMG Holdings, Inc | Term E | 144,640.00 | 0.02% | | |
| | IMG Holdings, Inc | Term Loan 1A | 2,004,585.76 | 0.33% | | |
| | IMG Holdings, Inc | Term Loan 1B | 2,174,795.68 | 0.36% | | |
| | IMG Holdings, Inc | Term Loan D | 300,000.00 | 0.05% | | |
| | | **Total for Cosmetics/ Toiletries :** | **11,179,381.44** | **1.84%** | **Pass** | |
| | | | | | | |
| **Ecological Services and Equipment** | | | | | | |
| | LVD Acquisition, LLC | Term Loan | 9,303,993.33 | 1.53% | | |
| | Remco Maintenance, LLC | Revolver | 2,500,000.00 | 0.41% | | |
| | Remco Maintenance, LLC | Term Loan | 3,362,670.50 | 0.55% | | |
| | | **Total for Ecological Services and Equipment :** | **15,166,663.83** | **2.50%** | **Pass** | |
| | | | | | | |
| **Electronics/ Electric** | | | | | | |
| | CBA Group Vs Holding Company | Revolver | 4,000,000.00 | 0.66% | | |
| | CBA Group Vs Holding Company | Term Loan | 8,110,909.52 | 1.33% | | |
| | CBA Group Vs Holding Company | Term Loan 1 | 2,500,000.00 | 0.41% | | |
| | Electro Source, LLC | Fully Funded Term Lc | 476,538.44 | 0.08% | | |
| | Electro Source, LLC | Term Loan | 2,916,666.67 | 0.48% | | |
| | EMAG Solutions, LLC | Revolver | 4,062,500.00 | 0.67% | | |
| | SO Acquisition, LLC | Fully Funded Term A | 2,500,000.00 | 0.41% | | |
| | SO Acquisition, LLC | Fully Funded Term Lc | 350,000.00 | 0.06% | | |
| | SO Acquisition, LLC | Term Loan A | 2,000,000.00 | 0.33% | | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 4:20 PM
As of Date: 01/29/2010
Page [76]

### S&P Industry Concentration Report

### ZOHAR CDO 2003-1 Limited

| S&P Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Electronics/ Electric** | | | | | | |
| | XPIENT Solutions, LLC | Fully Funded Term Lc | 500,000.00 | 0.08% | | |
| | XPIENT Solutions, LLC | Fully Funded Term Lc | 1,200,000.00 | 0.20% | | |
| | XPIENT Solutions, LLC | Fully Funded Term Lc | 300,000.00 | 0.05% | | |
| | XPIENT Solutions, LLC | Revolver | 1,400,000.00 | 0.23% | | |
| | | **Total for Electronics/ Electric :** | **30,316,614.63** | **4.99%** | **Pass** | |
| **Forest Products** | | | | | | |
| | Red Shield Acquisition, LLC | Revolver | 4,000,000.00 | 0.66% | | |
| | Red Shield Acquisition, LLC | Revolver 2 | 5,000,000.00 | 0.82% | | |
| | Red Shield Acquisition, LLC | Term Loan | 8,000,000.00 | 1.32% | | |
| | | **Total for Forest Products :** | **17,000,000.00** | **2.80%** | **Pass** | |
| **Health Care** | | | | | | |
| | Intrepid USA | Revolver | 9,280,000.00 | 1.53% | | |
| | Intrepid USA | Term Loan B | 3,860,066.01 | 0.64% | | |
| | | **Total for Health Care :** | **13,140,066.01** | **2.16%** | **Pass** | |
| **Home Furnishings** | | | | | | |
| | ACME INTERNATIONAL ENTERPRISES, INC. | Term Loan | 1,000,000.00 | 0.16% | | |
| | Bomar Industries International Inc | Revolver 2 | 3,200,000.00 | 0.53% | | |
| | Bomar Industries International Inc | Tranche A Term Loan | 10,000,000.00 | 1.65% | | |
| | Bomar Industries International Inc | Tranche B Term Loan | 2,859,173.26 | 0.47% | | |
| | Croscil Home | Revolver | 10,000,000.00 | 1.65% | | |
| | Fetco Home Decor, Inc | Term Loan | 7,855,849.55 | 1.29% | | |
| | Glenoit LLC | Term Loan | 4,526,721.00 | 0.74% | | |
| | | **Total for Home Furnishings :** | **39,441,743.81** | **6.49%** | **Pass** | |
| **Industrial Equipment** | | | | | | |
| | Rapid Rack Industries, Inc | Revolver | 6,000,000.00 | 0.99% | | |
| | Rapid Rack Industries, Inc | Term Loan | 5,605,471.69 | 0.92% | | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

Date:  02/01/2010 4:20 PM
As of Date: 01/29/2010
Page [77]

**S&P Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| S&P Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Industrial Equipment** | | | | | | |
| | VULCAN ENGINEERING CO. | Term Loan | 2,000,000.00 | 0.33% | | |
| | | **Total for Industrial Equipment :** | **13,605,471.69** | **2.24%** | **Pass** | |
| **Leisure Goods/ Activities/ Movies** | | | | | | |
| | 180's, LLC | Fully Funded Term B | 2,242,328.00 | 0.37% | | |
| | 180's, LLC | Tranche A Revolver | 16,600,000.00 | 2.73% | | |
| | | **Total for Leisure Goods/ Activities/ Movies :** | **18,842,328.00** | **3.10%** | **Pass** | |
| **Publishing** | | | | | | |
| | RM Acquisition, LLC | Revolver | 2,205,882.35 | 0.36% | | |
| | RM Acquisition, LLC | Term Loan | 5,823,529.41 | 0.96% | | |
| | | **Total for Publishing :** | **8,029,411.76** | **1.32%** | **Pass** | |
| **Surface Transport** | | | | | | |
| | Swift Transportation | Term Loan 1 | 9,943,421.06 | 1.64% | | |
| | Transcare Corporation | Tranche B Term Loan | 3,500,000.00 | 0.58% | | |
| | | **Total for Surface Transport :** | **13,443,421.06** | **2.21%** | **Pass** | |
| **Telecommunications/ Cellular** | | | | | | |
| | NetVersant Acquisition, LLC | Restructured Revolve | 294,071.50 | 0.05% | | |
| | NetVersant Acquisition, LLC | Restructured Revolve | 2,102,385.31 | 0.35% | | |
| | NetVersant Acquisition, LLC | Restructured Term Lo | 41,585,556.76 | 6.84% | | |
| | | **Total for Telecommunications/ Cellular :** | **43,982,013.57** | **7.24%** | **Pass** | |
| **Utilities** | | | | | | |
| | Intera Group, Inc. | Fully Funded Term C | 1,350,000.00 | 0.22% | | |
| | Intera Group, Inc. | Restructured Term Lo | 877,246.89 | 0.14% | | |
| | Intera Group, Inc. | Term Loan | 5,990,000.00 | 0.99% | | |



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**S&P Industry Concentration Report**

**ZOHAR CDO 2003-1 Limited**

| S&P Industry | Issuer | Description | Total Loan Commitment | % of M.I.A. | % of M.I.A. < 12% | % of M.I.A. < 16% |
|---|---|---|---|---|---|---|
| **Utilities** | | | | | | |
| | Intera Group, Inc. | Term Loan C | 160,000.00 | 0.03% | | |
| | | **Total for Utilities :** | **8,377,246.89** | **1.38%** | **Pass** | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **Aggregate Principal Balance :** | 583,825,045.33 | | | |
| | | **Maximum Investment Amount (M.I.A.) :** | 607,616,941.89 | | | |
| | Largest S&P Industry : Automotive | | 99,345,857.79 | 16.35% | | |
| | 2nd Largest S&P Industry : Aerospace and Defense | | 69,492,001.29 | 11.44% | | |
| | 3rd Largest S&P Industry : Clothing/ Textiles | | 68,483,726.88 | 11.27% | | |



U.S. Bank Corporate Trust Services
CDO Administration Unit

Date:  02/01/2010 4:23 PM
As of Date: 01/29/2010
Page [79]

Unrestricted Collateral Detail Report

ZOHAR CDO 2003-1 Limited

| Deal / Issuer | Description | Total Loan Commitment | Annual Int. Rate | Sprd./ Cpn. | Category | Index | Value | Funded Amount |
|---|---|---|---|---|---|---|---|---|
| American LaFrance | Fully Funded DD Ter | 2,210,000.00 | 10.0000 | 8.0000 | 4 | LIBOR | 2,210,000.00 | 2,210,000.00 |
| Arc One, LLC | Fully Funded Term Lo | 4,300,000.00 | 10.0000 | 8.0000 | 1 | LIBOR | 2,580,000.00 | 4,300,000.00 |
| Galey & Lord, LLC | Term Loan F | 1,578,000.00 | 10.0000 | 8.0000 | 4 | LIBOR | 1,578,000.00 | 1,578,000.00 |
| Galey & Lord, LLC | Term Loan K | 1,000,000.00 | 10.0000 | 8.0000 | 4 | LIBOR | 1,000,000.00 | 1,000,000.00 |
| MD Helicopters, Inc | Term Loan 2 | 3,800,000.00 | 10.0000 | 8.0000 | 4 | LIBOR | 3,800,000.00 | 3,800,000.00 |
| Zohar SS Acquisition, LLC | Preferred Stock | 256,410.27 | 10.0000 | 7.0000 | 4 | FIXED | 256,410.27 | 256,410.27 |

**Loan Commitment Balance :    13,144,410.27**                                                                                      **11,424,410.27    13,144,410.27**

**Unrestricted Collateral Account :    855,541.66**

**Interest Reserve Account :    13,054,544.75**

**Unrestricted Collateral Balance :    25,334,496.68**



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**

**Workout Detail Report**

**ZOHAR CDO 2003-1 Limited**

| Issuer | Description | Principal Balance | Maturity Date | Moody's Rating | S&P Rating |
|---|---|---|---|---|---|
| Intera Group, Inc. | Exchanged Security | 5,849,048.28 | 12/31/2016 | * | * |
| Doors Acquisition, LLC | Fully Funded Term Lo | 2,905,786.58 | 09/18/2013 | * | * |
| | **Total of Workout Collateral :** | **8,754,834.86** | | | |

# Exhibit 16

Order Instituting Cease-and-Desist Proceedings

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 4053 / March 30, 2015**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 31539 / March 30, 2015**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 3644 / March 30, 2015**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-16462**

|  |  |
|---|---|
| In the Matter of<br><br>    LYNN TILTON;<br><br>    PATRIARCH PARTNERS, LLC;<br><br>    PATRIARCH PARTNERS VIII, LLC;<br><br>    PATRIARCH PARTNERS XIV, LLC; AND<br><br>    PATRIARCH PARTNERS XV, LLC,<br><br>Respondents. | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, AND NOTICE OF HEARING** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Lynn Tilton ("Tilton"); Patriarch Partners, LLC ("Patriarch"); Patriarch Partners VIII, LLC ("Patriarch VIII"); Patriarch Partners XIV, LLC ("Patriarch XIV"); and Patriarch Partners XV, LLC ("Patriarch XV") (collectively, "Respondents").

<div align="center">

**II.**

</div>

After an investigation, the Division of Enforcement alleges that:

**A.    <u>SUMMARY</u>**

1.        Since 2003, Respondents have defrauded three Collateralized Loan Obligation ("CLO") funds they manage and these funds' investors by providing false and misleading information, and engaging in a deceptive scheme, practice and course of business, relating to the values they reported for these funds' assets.  Lynn Tilton, who controls and makes relevant decisions on behalf of each of the Respondents, is responsible for all of these violations.

2.        The three CLO funds, collectively known as the "Zohar Funds," raised more than $2.5 billion from investors and used these investments to make loans to distressed companies.  These loans to distressed companies are the primary assets of the Zohar Funds.  However, many of the distressed companies have performed poorly and have not made interest payments, or have made only partial payments, to the Funds over several years.

3.        As required under the relevant deal documents, through the trustee, Tilton's entities regularly provide information to the Funds and their investors about the performance of the Funds.  This information includes valuation categorizations of the Funds' assets and financial statements purportedly reflecting the financial position of each Fund.

4.        Despite the poor performance of many of the Funds' assets, Tilton has intentionally and consistently directed that nearly all valuations of these assets be reported as unchanged from their valuations at the time the assets were originated.

5.        These actions are inconsistent with the categorization methodology set forth in documents governing the Funds.  This methodology turns on, among other factors, whether a distressed company has timely made interest payments to the Funds.  Instead of applying this methodology, Tilton instead substitutes her own, independent discretion when categorizing the Funds' investments.  At Tilton's direction, Respondents will not assign a lower valuation category to an asset unless and until Tilton subjectively decides to stop "supporting" the distressed company.

6.        If Respondents had applied the categorization methodology set forth in the documents, certain valuation ratio tests derived from the categorizations would have failed by at least 2009.  As a result, based on other provisions in the documents, management fees and other payments to Tilton and her entities would have been reduced by almost $200 million, and investors would have gained more control over the Funds' activities, among other consequences.  By applying her own discretion rather than the valuation methodology set forth in the governing documents, Tilton has avoided these consequences and taken

<div align="center">

2

</div>

excessive fees from the Funds.  As a result, Respondents' practices were inconsistent with disclosures and created a clear conflict of interest.

7.      Respondents also prepare quarterly financial statements for the Funds, which are provided to investors.  These financial statements include disclosures about the Funds' loan impairment policy and portfolio fair value.  Tilton certifies these financial statements and represents that they are prepared in conformity with generally accepted accounting principles ("GAAP").

8.      However, contrary to these statements, Respondents do not prepare the financial statements in conformity with GAAP.  Significantly, rather than applying a GAAP-compliant impairment methodology, Respondents impair assets only when Tilton decides to withdraw support for a distressed company.  This approach mirrors the discretionary approach Tilton uses to categorize assets and does not conform with GAAP. It is also inconsistent with other disclosures in the financial statements that falsely indicate that Respondents assess and consider impairment issues and the fair value of the Funds' loan assets.

9.      Respondents have never disclosed Tilton's discretionary valuation approaches to the Funds or their investors, much less the conflict of interest these approaches created.  As a result, Respondents also breached their fiduciary duties and their contractual standard for managing the Zohar Funds as set forth in the relevant deal documents.

## B.    **RESPONDENTS**

10.     **Lynn Tilton**, age 55, is a resident of Rumson, New Jersey and Highland Beach, Florida.  Tilton manages each of the Patriarch entities described below.  She also controls their decisions.

11.     **Patriarch Partners, LLC** is a Delaware limited liability company with a principal place of business in New York, New York.  Patriarch's employees, including Tilton, run the businesses of Patriarch VIII, Patriarch XIV, and Patriarch XV (collectively, the "Patriarch Collateral Managers").  Patriarch is indirectly owned 100% by Tilton.

12.     **Patriarch Partners VIII, LLC** is a Delaware limited liability company with a principal place of business in New York, New York.  Patriarch VIII has been registered as a relying investment adviser with the Commission since March 2012 and is the collateral manager for Zohar CDO 2003-1, Limited ("Zohar I").  Patriarch VIII is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

13.     **Patriarch Partners XIV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York.  Patriarch XIV has been registered as a relying investment adviser with the Commission since March 2012 and is the collateral manager for Zohar II 2005-1, Limited ("Zohar II").  Patriarch XIV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

14.     **Patriarch Partners XV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York.  Patriarch XV has been registered as an investment adviser with the Commission since March 2012 and is the collateral manager for Zohar III, Limited ("Zohar III").  Patriarch XV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

## C.     FACTS

Structure, Strategy, and Performance of the Zohar Funds

15.     Tilton structured the Zohar Funds as CLO funds.  A CLO fund is a securitization vehicle in which a special purpose entity, the issuer, raises capital through the issuance of secured notes and uses the proceeds to purchase a portfolio of commercial loans.  A collateral manager, typically an investment adviser, determines what loans to purchase or originate on behalf of the CLO fund.  Cash flows and other proceeds from the collateral are used to repay the investor noteholders in the CLO fund.

16.     The Zohar Funds' investors invested in the Zohar CLO Funds in return for the promise of regular interest payments and the repayment of their principal on a specified maturity date.  The three Zohar CLO deals have the following details:

| Name of Deal | Date of Issuance | Approximate Principal Amount of Notes | Maturity Date |
|---|---|---|---|
| Zohar I | 2003 | $532 million | November 2015 |
| Zohar II | 2005 | $1 billion | January 2017 |
| Zohar III | 2007 | $1 billion | April 2019 |

17.     Each Zohar deal is governed by various deal documents, including the indenture and the collateral management agreement ("CMA").   Tilton signed each indenture and each CMA as Manager of the collateral manager.

18.     The indenture describes the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments.  The indenture also describes the rights of the parties and responsibilities of the collateral manager.

19.     The CMA, a contract between the issuer and the respective Patriarch Collateral Manager, engages Patriarch VIII, XIV, or XV as the collateral manager for the deal and describes that entity's obligations and compensation.

20.     The CMA for each deal allows the Patriarch Collateral Manager to select and manage the collateral to be held by the fund.  Through the Patriarch Collateral Managers, Tilton used the funds raised from investors to buy or make loans to primarily private, mid-sized distressed companies (the "Portfolio Companies").  Tilton typically directed more than one of the Zohar Funds to extend loans to the same Portfolio Company.

Every quarter, the investors receive an interest payment, generated from the collective interest payments made by the Portfolio Companies.

21.     In connection with the loans made to distressed companies, the Zohar Funds obtained equity in the Portfolio Companies.  Tilton also obtained equity in many of the Portfolio Companies through other entities she owned.

22.     Tilton's management strategy for the Zohar Funds is and has been to improve the operations of the distressed Portfolio Companies so that the companies can pay off their debt, increase in value, and eventually be sold for additional profit.  However, the Portfolio Companies as a whole have performed worse than expected.

23.     As a result, Tilton has now informed the investors in Zohar I that, without an extension on the maturity date, they will suffer significant losses when their notes in the CLO fund mature in November 2015.  Because of the tremendous overlap in the investments across the three deals, any default in Zohar I would have significant ramifications for Zohar II and Zohar III as well.

<u>Tilton's Management and Control of the Zohar Funds and the Portfolio Companies</u>

24.     Tilton is the chief executive officer ("CEO") and sole principal of Patriarch Partners, LLC, which employs individuals in various roles to support the Zohar Funds.

25.     Tilton and entities under her control own all of the Patriarch Collateral Managers.  The Patriarch Collateral Managers have no employees of their own, but instead rely on the employees of Patriarch to conduct business.  Tilton makes all significant decisions relating to management of the collateral.  She also signs all transaction documents on behalf of the Patriarch Collateral Managers.

26.     The Patriarch Collateral Managers are entitled to a Senior Collateral Management Fee of 1% of the amount of assets in the deal, paid quarterly, and a Subordinated Collateral Management Fee (the "Subordinated Fee") of 1% of the amount of assets in the deal, also paid or accrued quarterly.  As discussed below, payment or accrual of the Subordinated Fee is dependent on the performance of a valuation test.

27.     Entities controlled by Tilton hold preference shares in the Zohar Funds.  Distributions on those preference shares are also contingent on the outcome of the valuation test.

28.     Tilton actively manages the business of the Portfolio Companies.  She hires and fires their senior employees and provides input on their major operating decisions.  Tilton requires that the companies report regularly to her regarding their financial condition and business prospects.  Tilton is the CEO of some of the Portfolio Companies.  In other instances, Tilton is the sole manager of the Portfolio Companies that are LLCs.

**Tilton Is Improperly Valuing Fund Assets and Improperly Collecting the Subordinated Fee and Other Payments.**

The Purpose, Calculation, and Publication of the OC Ratio Test

29.    The indenture for each of the Zohar CLOs contains certain numeric tests that must be met on a monthly basis.  If those tests are not met, the indenture outlines certain consequences, which include increased rights by the investors to control the fund and/or remove the collateral manager, and elimination of the Funds' obligations to pay the Subordinated Fee.  Failure of these tests also changes the waterfall distribution for each Fund, such that investors receive earlier repayments on their principal.

30.    One of those tests is the Overcollateralization Ratio (the "OC Ratio") test. The OC Ratio is a numeric formula that, in this case, divides the total value of the loans the relevant Zohar Fund has made to Portfolio Companies by the outstanding principal balance of the notes due to the Fund's investors.

$$\text{OC Ratio} = \frac{\text{Value of Funds' Loan Assets}}{\text{CLO Investors' Principal}}$$

31.    The higher the OC Ratio, the greater the cushion between the value of the Fund's collateral and the principal amount of investors' notes.  As the numerator and denominator in the OC Ratio approach the same level, the chance of an investor suffering losses in its principal grows.

32.    The OC Ratio test is satisfied if the resulting percentage is at least equal to the threshold percentage defined in the indenture.  For the three Zohar Funds, that percentage varies, ranging from 105% to 112%.  If the OC Ratio falls below these levels, then the consequences outlined in the indenture would be triggered.  Patriarch consistently monitors the OC Ratio test percentage.  However, based on Tilton's inputs, the OC Ratio test has never failed, despite the substantial decline in value of the Zohar Funds' assets.

33.    Under the terms of the indentures, the trustee for each of the Zohar Funds is required to prepare and distribute a monthly report to noteholders that contains various information about the fund and its assets, including the outstanding balance of the notes, interest received, a description of the loans in the portfolio, and the outcome of tests relating to the collateral, including the OC Ratio test.

34.    The indenture for each Zohar CLO also requires the collateral manager to categorize each loan that the fund makes or acquires.  The category of each asset, which is published in the trustee reports, determines its value for calculating the numerator of the OC Ratio.  Therefore, a change in categorization of an asset results in a change to the ratio.

35.    In the case of Zohar I and Zohar II, asset categories are numbered 1 through 4.  Category 4 assets are the strongest and are typically valued at the principal amount

6

outstanding on the loan to the Portfolio Company. Category 1 assets are the weakest and are valued at a lower amount.

36.    For Zohar III, the numeric category designations were replaced with just two categories: "Defaulted Investment" and "Collateral Investment." These are equivalent to Categories 1 and 4, respectively.

### Tilton's Control Over Improper Asset Categorizations

37.    Each indenture contains a very specific definition for each asset category. Under the Zohar I and II indentures, an asset may be categorized as a Category 4 only if it meets specific criteria, most notably that the asset is "Current." A loan is "Current" when it is not "Non-Current." A "Non-Current" loan is a "Defaulted Obligation" which has "previously deferred and/or capitalized as principal any interest due." A "Defaulted Obligation" is a loan "with respect to which a default as to the payment of principal and/or interest has occurred (without regard to any applicable grace period or any waiver of such default) but only so long as such default has not been cured."

38.    The Zohar III indenture approaches categorization slightly differently, but the result is the same. Under the Zohar III indenture, a loan is a "Defaulted Investment" when "a default as to the payment of principal and/or interest has occurred, but only so long as the default has not been cured."

39.    Based on these contractual definitions, the assets in the Zohar Funds should be reclassified as Category 1 or Defaulted Investments when they are no longer Current, i.e., when the Portfolio Company has failed to make interest payments and has not cured these non-payments.

40.    However, instead of following the definitions set forth in the indentures, Tilton has consistently and intentionally used her own discretion to determine how an asset should be categorized. Respondents do not lower an asset's valuation category unless and until Tilton decides that she will no longer "support" the Portfolio Company. By "support," Tilton means that she will continue to provide financial and managerial support to the Portfolio Company.

41.    Loans originated or acquired by the Zohar Funds were generally initially assigned the highest valuation category -- a Category 4 or Collateral Investment. Over the life of the Funds, Respondents have recategorized a Portfolio Company's loans as a Category 1 or Defaulted Asset only if and when Tilton decided she would no longer "support" the Portfolio Company.

42.    As a result of Tilton's discretionary approach to the categorization of the collateral, she has classified very few Portfolio Companies as a Category 1 or Defaulted Asset at any point. For example, as of January 2014, out of 122 loans in the Zohar II portfolio, only 16 were classified as Category 1. The same pattern exists over the life of all three Zohar Funds.

Consequences of Tilton's Improper Categorization

43.    Had Tilton followed the methodology for categorization set out in the indenture, the number of Category 1 or Defaulted Investments reported in the monthly trustee reports would have looked very different.  In fact, many Portfolio Companies had large sums of unpaid interest, beginning by at least 2008.  Certain Portfolio Companies have failed to pay as much as 90% of the interest that they owe to the Zohar Funds, yet remain classified as a Category 4 or a Collateral Investment.

44.    Had Respondents appropriately classified the Zohar Funds' assets, Zohar II and Zohar III would have failed the OC Ratio test by at least the summer of 2009.  Tilton's approach allowed Respondents to collect or accrue almost $200 million in Subordinated Fees and preference share distributions to which she was not entitled.

45.    Moreover, investors were not informed about the decline in value of the Funds' assets, regardless of whether the changes caused the OC Ratio test to fail.

Tilton's Control Over Interest Payments By Portfolio Companies

46.    Tilton has been aware of the interest payments made by the Portfolio Companies and their financial condition since the Funds' inceptions.  Tilton regularly receives a quarterly interest projection, in which she is notified of the amount of interest on loans a company expects to pay that quarter.

47.    Numerous emails show Tilton directing the amount of interest that a Portfolio Company should pay, which may or may not equal the amount that the company wishes to pay.  For example, in a 2011 email chain, a Patriarch employee asked Tilton for guidance on interest payments from several different companies.  In response, Tilton directed that one company should pay $50,000, one company should pay $142,000, and one should pay $12,800.  None of these amounts matched the amount of interest due on the loans to these Portfolio Companies.

48.    Tilton makes the ultimate decision on when to accept less than the contractual rate of interest from the Portfolio Companies.

Investors Do Not Know About Tilton's Approach

49.    Respondents have not at any time disclosed Tilton's discretionary approach to categorization to the Funds or their investors.  They have not disclosed that they fail to consider past due interest when conducting categorization analyses and performing the OC Ratio test.  Investors have not been told that the OC Ratio test would have failed at various points if Tilton had performed the categorization analyses in the method anticipated by the indentures.

50.    Other parties to the transaction were similarly unaware of Tilton's approach.  For example, an email from an employee at the trustee to a Patriarch employee questions why there are "multiple uncollected interest payments for Zohar II and III for assets we

have flagged as Performing." Similarly, a rating agency employee emailed in 2010, inquiring why certain Portfolio Companies were not considered defaulted in light of unpaid interest. At the time the investments were structured, the insurer for certain of the Fund investments described its understanding of the meaning of Category 4 as "[c]ompanies will pay current interest and most will have an amortization schedule. . . ." Respondents also have not provided information to any of these parties about Tilton's actual, discretionary categorization approach.

51.    Respondents' approach to categorization, and the resulting impact on the OC Ratio test, were important to investors and rendered statements about asset categories and OC Ratio test results false or misleading. Respondents' discretionary approach to categorization, which was contrary to disclosures made, also represents a fraudulent and deceptive scheme, practice, and course of business.

**Tilton and the Patriarch Entities Breached Their Fiduciary Duties and Failed to Meet Their Contractual Standard of Conduct in Disclosing Their Conflict of Interest**

The Patriarch Collateral Managers Are Fiduciaries and Have Agreed to a Contractual Standard of Conduct

52.    Patriarch, the Patriarch Collateral Managers and Lynn Tilton all acted as investment advisers to the Zohar Funds they managed. As such, they owed fiduciary duties to these Funds.

53.    In addition, the CMA defines a contractual standard of conduct required by the collateral manager. Specifically, the CMA requires that the relevant Patriarch Collateral Manger, "in rendering its services as Collateral Manager use reasonable care and the same degree of skill and attention . . . exercised by institutional investment managers of national standing generally in respect to assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions."

Tilton and Her Entities Have Not Disclosed The Facts Giving Rise To A Conflict Of Interest

54.    Tilton's undisclosed approach to categorization creates a significant conflict of interest. Respondents are making decisions in a way that allows Respondents to collect more money from the Funds and retain absolute control over their management, regardless of the performance of the Funds' assets.

55.    As noted above, Tilton decides when to accept less than the full interest due from Portfolio Companies. Tilton also determines the categories for portfolio assets. As long as Tilton follows her self-designed approach to categorization, which gives her absolute discretion, Respondents can keep classifying assets in the highest valuation categories and prevent triggering the consequences for failure of the OC Ratio test. In light of these consequences, Tilton's conflict of interest is and has at all times been material.

56.     In breach of their fiduciary duties and contractual standard of conduct, Patriarch, Tilton, and the Patriarch Collateral Managers have not disclosed Tilton's actual method of categorization or the conflict of interest that arose from use of that method. They also have not given the Funds or investors a choice as to whether to consent to this conflict.

## The Zohar Funds' Financial Statements Are Also False and Misleading.

### Preparation of the Financial Statements

57.     Each of the Zohar Funds is required under the terms of the indenture to provide GAAP-compliant financial statements on a quarterly basis.  These financial statements are prepared by Patriarch's accounting department, approved by Tilton on behalf of the Patriarch Collateral Managers, and then provided to the trustee, which makes them available to investors.  Information in the financial statements about the value of the Funds' assets was important to investors.

58.     Each financial statement contains a cover page and certification, signed by Tilton.  The certification provides, in part, that the balance sheet and income statements provided are prepared in accordance with U.S. GAAP.  Tilton also certifies that she has reviewed the balance sheet and income statements and that those documents fairly present the financial position of the relevant Zohar Fund in all material respects.

59.     Since the inception of the Zohar Funds, Tilton has signed about fifty of these certifications on behalf of the relevant Patriarch Collateral Manager, each time attesting to the GAAP compliance and fair presentation of the financial statements.

60.      However, the financial statements are not GAAP-compliant, nor do they present a fair picture of the Zohar Funds' financial conditions.

### Misleading Information Relating to Asset Value and Impairment

61.     Loans to Portfolio Companies are recorded on the Zohar Funds' financial statements at cost and make up the vast majority of assets on the balance sheet, with a corresponding payable to investors in the Zohar Funds.

62.     Under GAAP, a loan is impaired, and must be measured for impairment when, based on all available information, it is probable that the creditor will be unable to collect all amounts due for interest and principal based on the contract with the debtor.

63.     Patriarch did not analyze the Zohar Funds' loan assets for impairment in accordance with GAAP or follow this required impairment methodology.

64.     At Tilton's direction, Patriarch does not write down loans for impairment purposes but, instead, writes them off if and when Tilton determines that she will no longer support a Portfolio Company.

65.     The impairment decision is driven by Tilton's categorization—when she decides to change the category of an asset from a 4 to a 1, that asset will be impaired in the financial statements.

66.     Even though Patriarch does not conduct an impairment analysis that complies with GAAP, Respondents tell investors that it does.  For example, under the heading "Carrying Value of Collateral Debt Obligations" in the footnotes to the Zohar II financial statements, the financial statements disclose:

> In the event the Company's expected realization of principal under a [loan asset] is impaired, such that the anticipated future collections are determined to be less than the carrying value of the loan, the Company will record an impairment loss equal to the amount of the anticipated shortfall and will thereafter carry the loan at the reduced amount.[1]

67.     However, Patriarch has no procedures in place to analyze future collections and no such analysis occurred.

68.     This disclosure is misleading because it tells investors that assets would be analyzed for impairment, including an assessment of anticipated collections.  Further, all loans that were modified to provide a concession to a Portfolio Company that was under financial duress should have been identified and measured as impaired in the Zohar Funds' financial statements.  Instead, as with categorization, Tilton decided when an asset was impaired using her own discretion and did not communicate this approach to investors.

<u>Misleading Disclosures Regarding Fair Value of Loans</u>

69.     The footnotes to the Zohar Funds' financial statements also were and are misleading in their disclosure of how loan assets are valued.

70.     These footnotes have consistently stated that the fair value of the loans in the portfolio is approximately equal to their carrying value on the balance sheet.  This statement is unsupportable and misleading.

71.     The footnotes have also consistently and misleadingly disclosed that, "[f]or substantially all of the" loans, "fair values are based on estimates using present value of anticipated future collections or other valuation techniques."

72.     In reality, there was never any analysis of present value of anticipated future collections, and no analysis at all was conducted to determine fair value.  Instead, at Tilton's direction, Patriarch at all times carried these assets at cost unless and until Tilton decided to stop supporting the relevant Portfolio Company.

73.     Because Patriarch did not conduct fair value analyses, there was never any basis for the affirmative assertion that cost and fair value were the same.  Moreover, these

---

[1] The financial statements for Zohar I and Zohar III contain similar disclosures.

disclosures indicate that Patriarch does conduct an analysis of the reported fair values, which is not true.

E.   UNDERLINE(VIOLATIONS)

74.    As a result of the conduct described above, Respondents willfully violated Sections 206(1), 206(2), and 206(4) of the Advisers Act, which prohibit fraudulent conduct by an investment adviser.

75.    As a result of the conduct described above, Respondents willfully violated Advisers Act Rule 206(4)-8, which prohibits fraudulent conduct by advisers to "pooled investment vehicles" with respect to investors or prospective investors in those pools.

76.    As a result of the conduct described above, Patriarch alternatively willfully aided and abetted and caused violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder, by Tilton and the Patriarch Collateral Managers.

## III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A.    Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B.    What, if any, remedial action is appropriate in the public interest against Respondents pursuant to Sections 203(e) and 203(f) of the Advisers Act including, but not limited to, disgorgement and civil penalties pursuant to Section 203 of the Advisers Act;

C.    What, if any, remedial action is appropriate and in the public interest against Respondents pursuant to Section 9(b) of the Investment Company Act including, but not limited to, disgorgement and civil penalties pursuant to Section 9 of the Investment Company Act; and

D.    Whether, pursuant to Section 203(k) of the Advisers Act Respondents should be ordered to cease and desist from committing or causing violations of and any future violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder, whether Respondents should be ordered to pay a civil penalty pursuant to Section 203(i) of the Advisers Act and Section 9(d) of the Investment Company Act, and whether Respondents should be ordered to pay disgorgement pursuant to Section 203(j) and 203(k)(5) of the Advisers Act and Section 9(e) of the Investment Company Act.

**IV.**

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondents as provided for in the Commission's Rules of Practice.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.


Brent J. Fields
Secretary

# Exhibit 17

Division of Enforcement's Pre-Hearing Brief

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-16462

In the Matter of

    LYNN TILTON;
    PATRIARCH PARTNERS, LLC;
    PATRIARCH PARTNERS VIII, LLC;
    PATRIARCH PARTNERS XIV, LLC;
    AND
    PATRIARCH PARTNERS XV, LLC,

Respondents.

DIVISION OF ENFORCEMENT'S PRE-HEARING BRIEF

## Table of Contents

I.    PRELIMINARY STATEMENT ............................................................................2

II.   RESPONDENTS ...........................................................................................4

III.  FACTS ........................................................................................................5

      A.    Background on the Zohar Funds.......................................................5

      B.    Respondents Were Investment Advisors and Owed Fiduciary Duties......................9

      C.    The Zohar Indentures Prescribed Important, Objective Requirements to
            Value and Categorize Fund Assets, Which Protected the Funds and
            the Funds' Investors ...................................................................10

      D.    Respondents Ignored These Objective Requirements and Instead
            Categorized Fund Assets Based on Tilton's Subjective Belief in the
            Prospects of the Portfolio Companies..........................................13

      E.    Respondents' Subjective Belief Approach Resulted in Respondents
            Improperly Retaining $200 Million in Fees and Preference Share Distributions,
            as Well as Control over the Funds ..............................................15

      F.    Investors Were Not Aware of Respondents' Subjective Belief Approach
            or the Conflict of Interest it Created ...........................................18

      G.    Respondents Caused the Zohar Funds' Financial Statements to be False and
            Misleading. .............................................................................19

      H.    Current Status of the Zohar Funds and Respondents ....................22

IV.   ARGUMENT...............................................................................................22

      A.    Section 206 of the Investment Advisers Act Imposes Fiduciary
            Duties on Advisers ...................................................................22

      B.    Respondents Are Investment Advisers, the Zohar Funds are Their Clients,
            and the Investors in the Zohar Funds are Investors in Pooled
            Investment Vehicles ..................................................................25

      C.    Respondents Made False and Misleading Statements, Engaged in
            Fraudulent and Deceptive Valuation Practices and Courses of Business, and
            Breached Fiduciary Duties .........................................................26

1.    False and Misleading Categorizations and OC Ratio Test Results in Trustee Reports ...........................................................................27

2.    Failure to Disclose Facts Creating Conflict of Interest................................28

3.    False and Misleading Financial Statements ...................................30

D.    The Misstatements Were Material ....................................................30

E.    Respondents' Conduct Was Knowing, Intentional, Reckless, or at a Minimum Negligent ...........................................................................31

F.    As a Result of This Conduct, Respondents Violated, Aided and Abetted, and/or Caused Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder .............................32

G.    Respondents' Anticipated Defenses Do Not – and Cannot – Excuse Their Conduct..................................................................................33

V.    RELIEF REQUESTED .........................................................................36

## I.    PRELIMINARY STATEMENT

Investment advisers have fiduciary duties to act with the utmost good faith and in the best interest of their clients – indeed, to put their clients' interests above their own. In addition, the Investment Advisers' Act prohibits fraudulent practices and schemes. Respondents in this case breached those solemn duties, misled their clients, and put their own interests first. In so doing, Respondents kept more than $200 million that properly belonged to their clients and deprived investors of the chance to exercise control over the investment funds. These breaches of fundamental obligations under the Investment Advisers Act warrant serious sanctions.

Respondent Lynn Tilton and the Patriarch entities she controlled were investment advisers. Respondents managed three pooled investment vehicles structured as collateralized loan obligation ("CLO") funds – the Zohar funds. The Zohar funds raised money from investors through the issuance of notes, which are securities, and used those funds to make loans to distressed companies, which would in turn make interest and principal payments back to the Zohar funds. Based upon the disclosures made to them, investors expected regular cash flows and ultimately the return of their principal from their investments.

Tilton represented to investors that she would monitor the value of the Zohar funds' assets (*i.e.*, loans to distressed companies) and categorize those assets according to an objective framework set out in the governing documents. This objective categorization of the Zohar funds' assets was designed to protect both the Zohar funds and the funds' investors, as it afforded certain rights to investors if the funds' assets were not performing well. These rights – triggered by the Zohar funds' assets performing below a certain benchmark – included redirecting payments from Respondents to the Zohar funds and the funds' investors and ultimately giving investors the option to remove Tilton from control of the funds.

As will be demonstrated through documentary and testimonial evidence, Tilton flouted her obligations and consistently and regulatory breached her fiduciary duties. Instead of objectively categorizing the funds' assets as promised, Tilton manipulated their value by categorizing the assets according to her own subjective, personal belief in whether a distressed company would be able to repay the loan sometime in the future. This manipulation was not only undisclosed to investors, it also eviscerated the protections that had been promised in the offering documents. Although many of the Zohar funds' assets were performing poorly and missing substantial interest payments, Tilton concealed these facts by keeping the assets in the highest-performing category based on subjectively "believing" in the company. The Zohar funds' financial statements were similarly false and misleading, as they affirmatively represented Respondents were complying with U.S. GAAP, were performing an impairment analysis on the loans, and that the fair value of the loans was approximately equal to their carrying value. These statements were not true, as no U.S. GAAP-compliant analyses were performed.

Through the manipulation of the disclosed asset valuations, Respondents were able to keep control of the Zohar funds, and continue to reap certain management fees and equity distributions that should have gone to the funds and ultimately to investors – over $200 million since 2009. The Division's case will detail Respondents' false statements and omissions, fraudulent scheme, and breaches of fiduciary duties. The Division will prove that Respondents hid the truth from investors, and in doing so, violated the securities laws, breached their fiduciary duties and standards of care, and took over $200 million that should have gone to investors. The Division will request, and Your Honor should order, appropriate remedial relief, including that Respondents disgorge these monies, pay civil penalties, and be barred from the securities industry so that they can no longer harm investors.

## II.    RESPONDENTS

**Lynn Tilton** is a resident of Highland Beach, Florida. Tilton manages each of the Patriarch entities described below and controls their decisions. Tilton is also heavily involved in the management of the companies to which the Zohar CLO funds at issue in this case have made loans.

**Patriarch Partners, LLC** ("Patriarch") is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch's employees, including Tilton, run the businesses of Patriarch VIII, Patriarch XIV, and Patriarch XV (collectively, the "Patriarch Collateral Managers"). Patriarch is indirectly owned 100% by Tilton.

**Patriarch Partners VIII, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch VIII was registered as a relying investment adviser[1] with the Commission from March 2012 until March 2016, and was the collateral manager for Zohar CDO 2003-1, Limited during the relevant time period. Patriarch VIII is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

**Patriarch Partners XIV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch XIV was registered as a relying investment adviser with the Commission from March 2012 until March 2016, and was the collateral manager for Zohar II 2005-1, Limited during the relevant time period. Patriarch XIV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

---

[1] A relying investment adviser is an investment adviser controlled by, or under common control with, an adviser that is registered with the Commission and that together "conduct a single advisory business." *See* American Bar Association, Business Law Section, SEC No-Action Letter (Jan 18, 2012), *available at* https://www.sec.gov/divisions/investment/noaction/2012/aba011812.htm.

**Patriarch Partners XV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. Patriarch XV was registered as an investment adviser with the Commission from March 2012 until March 2016 and was the collateral manager for Zohar III, Limited during the relevant time period. Patriarch XV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.

## III.    FACTS

### A.    Background on the Zohar Funds

This case involves structured finance vehicles called Collateralized Loan Obligation funds. As the name implies, a CLO fund raises money from investors to invest in loans. More specifically, a CLO fund is a securitization vehicle in which a special purpose entity – the issuer – raises capital through the issuance of secured notes to investors and uses the proceeds to purchase or originate a portfolio of commercial loans. A CLO fund has a collateral manager – who is typically an investment adviser – and that collateral manager determines what loans to purchase or originate on behalf of the CLO fund. Cash flows and other proceeds from those loans are used to repay the investor noteholders in the CLO fund. CLOs are securities and carry with them the obligations – including fiduciary duties – that come with managing securities and being an investment adviser.

There are three Zohar CLO funds at issue in this case: the first, referred to as "Zohar I," was launched in 2003; the second, referred to as "Zohar II," was launched in 2005, and the third, referred to as "Zohar III," was launched in 2007. Tilton structured each of the three Zohar funds as CLO funds. The issuer in each case is a corporate entity: Zohar CDO 2003-1, Limited is the issuer for Zohar I ; Zohar II 2005-I, Limited is the issuer for Zohar II; and Zohar III, Limited is the issuer

for Zohar III.[2] These issuer entities, which are all Cayman Island companies, each have their own Board of Directors.

As described above, the Patriarch Collateral Managers (Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; and Patriarch Partners XV, LLC) are the collateral managers for their respective Zohar funds. The Patriarch Collateral Managers are owned and controlled by Tilton and entities under her control. The Patriarch Collateral Managers have no employees of their own; rather, Patriarch Partners, LLC – for which Tilton is the CEO and sole principal – employs individuals in various roles to help her manage the Zohar funds. Tilton makes all significant decisions relating to the management of the collateral of the Zohar funds. Put simply, in the words of Tilton herself: "I'm the collateral manager, I am the ultimate decision-maker on many things."

Each Zohar deal is governed by various documents. Two critical governing documents are the indenture and the collateral management agreement ("CMA"). The indenture describes the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments. The indenture also describes the rights of the parties and responsibilities of the collateral manager. The indenture further identifies the Patriarch Collateral Managers as the collateral managers for the funds. As one of the Division's experts, Ira Wagner, has explained in his report and will explain at the hearing, investors in CLOs expect collateral managers to follow the indenture to the letter.

The CMA is also an important document. The CMA, which is a contract between the issuer and the respective Patriarch Collateral Manager, describes the collateral manager's duties and compensation. Tilton signed each CMA as the manager of the respective Patriarch Collateral Manager.

---

[2] Each fund also had co-issuers and subsidiaries that were also corporate entities.



The Patriarch Collateral Managers – which, as can be seen in the above illustration, are owned by Tilton and entities under her control[3] – earn fees based on the assets in the Zohar deals. Specifically, the Patriarch Collateral Managers receive a Senior Collateral Management Fee, paid quarterly, which is equal to 1% of the fund's assets. The Patriarch Collateral Managers may also receive an additional Subordinated Collateral Management Fee, which is also equal to 1% of the fund's assets. In addition, certain entities controlled by Tilton hold preference shares in the Zohar funds. As more fully described below, both payment of the Subordinated Collateral Management Fee and distributions on preference shares are dependent on the Zohar funds passing certain valuation tests, and thus those valuation tests were of critical importance to both Respondents and investors. These provisions meant that if the funds were performing well, Tilton would benefit financially as collateral manager, while if the funds were performing poorly, the Subordinated Collateral Management Fee and distributions on preference shares would be diverted from Respondents to the funds, and ultimately investors, to protect their investment.

---

[3] This illustration relates to the Zohar II CLO. The other Zohar funds have similar structures.

Each of the Zohar funds raised a significant amount of money from institutional investors. Zohar I raised approximately $532 million; Zohar II and Zohar III each raised approximately $1 billion. Tilton – through the Patriarch Collateral Managers – used these funds to buy or make loans to primarily private, mid-sized companies that were in distress (the "Portfolio Companies"). Tilton often directed more than one of the Zohar funds to extend loans to the same Portfolio Company.

Repayment of these loans by the Portfolio Companies was and is critical to the investors in the Zohar funds. The Zohar funds are so-called "cash flow" CLOs: repayment of the loans by the Portfolio Companies is the means by which the investors in the Zohar funds are to recover their investments. Every quarter, the investors receive an interest payment, generated from the collective interest payments made by the Portfolio Companies. Although they receive interest payments quarterly, investors are generally not entitled to be repaid their principal until the maturity date of their notes from the Zohar funds. Each of the deals has a 12 year maturity, meaning that investments in Zohar I (launched in 2003) matured last year (but, as noted below, Zohar I defaulted and was unable to repay investors' principal), investments in Zohar II (launched in 2005) will mature in early 2017 (as noted below, Zohar II is also expected to default), and investments in Zohar III (launched in 2007) will mature in 2019.

In addition to directing the Zohar funds to make loans to the Portfolio Companies, Tilton actively manages the business of the Portfolio Companies. Tilton is the CEO or sole manager of many of the Portfolio Companies. She hires and fires their senior employees, provides input on their major operating decisions, and requires that the companies report regularly to her regarding their financial condition and business prospects. In addition to Tilton's management of the Portfolio Companies, Tilton and the Zohar funds obtained equity in the Portfolio Companies.

Tilton's ostensible management strategy for the Zohar funds was to improve the operations of the distressed Portfolio Companies so that the companies could pay off their debt (including their loans from the Zohar funds), increase in value, and eventually be sold for additional profit. Tilton failed in this strategy. In November 2015, Zohar I defaulted on its obligation to repay noteholders their principal investment. In addition, Respondents have represented that Zohar II is likely to default when it matures in early 2017.

**B.    Respondents Were Investment Advisors and Owed Fiduciary Duties.**

Each of the Respondents was an investment adviser to the Zohar funds during the relevant time period. More specifically, as noted above, each of the Patriarch Collateral Managers was registered as an investment adviser with the Commission and received fees in exchange for providing investment advice to the respective Zohar funds.[4] Tilton is an investment adviser as well: she owns and controls the Patriarch Collateral Managers and provided and was compensated for investment advice to the Zohar funds. And Patriarch Partners, LLC employs individuals in various roles to help Tilton and the Patriarch Collateral Managers manage the Zohar funds, making that entity an investment adviser also.

As investment advisers, Respondents owed fiduciary duties to their clients. *See* Section IV.A, *infra*. Indeed, Patriarch Partners, LLC's compliance manual recognizes that investment advisers

> are in a position of trust and confidence with respect to their Clients and have a fiduciary duty to place their Clients' interests before the Firm's and its Employees' interests. This includes an obligation to avoid or minimize both conflicts of interest and the appearance of any conflicts of interest.

---

[4] As noted above, Patriarch Partners XV, LLC (the collateral manager entity for Zohar III) was registered as an investment adviser. Patriarch Partners VIII, LLC (the collateral manager entity for Zohar I) and Patriarch Partners XIV, LLC (the collateral manager entity for Zohar II) were registered as relying investment advisers.

In addition, the CMA for each Zohar deal provides a standard of care for the collateral manager, requiring the collateral manager to "use reasonable care and the same degree of skill and attention … exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral [that is being managed] and for clients having similar investment objectives and restrictions." The CMA also outlines the collateral manager's obligations, including the obligation to not take any action that the collateral manager knows or should know would "cause the [issuer] to violate the terms of the Indenture" or "adversely affect the interests of" the Zohar investors.

C.     **The Zohar Indentures Prescribed Important, Objective Requirements to Value and Categorize Fund Assets, Which Protected the Funds and the Funds' Investors.**

The Zohar funds' controlling documents made clear that investors would receive regular interest payments and the repayment of their principal on a specified maturity date. As a safeguard for investors, the indenture for each of the Zohar funds contains certain tests that must be met over time and that relate to the performance of the fund's loans to the Portfolio Companies. The indentures also prescribe consequences for failing these tests. The results of these tests were communicated to investors each month through reports distributed by the Zohar funds' trustee.

One key test is the Overcollateralization Ratio ("OC Ratio") test. In its simplest terms, the OC Ratio compares the assets of a CLO (*i.e.* the loans the CLO owns) to the liabilities of a CLO (*i.e.* the notes the CLO owes to investors). It is somewhat analogous to a loan-to-value ratio. The higher the OC Ratio, the greater the cushion between the value of the Zohar fund's assets and the amount the fund owes to its investors. As one of the Division's experts, Ira Wagner, has explained in his report and will explain at the hearing, OC Ratios and related tests are significant to investors in CLOs. Mr. Wagner's opinions will be corroborated by various investor witnesses. As those

investor witnesses will explain at the hearing, the OC Ratio is key: it is one of the first things they look at on each month's trustee report to assess the performance of the investment.

In addition to providing information on the performance of the funds' assets, declines in the OC Ratio trigger important protections for investors. Mr. Wagner has outlined those protections in his reports. In brief, as the OC Ratio falls, meaning the value of the Zohar fund's assets declines and comes closer to the amount the fund owes its investors, the chance of an investor suffering losses in its principal grows. For that reason, as the OC Ratio breaches certain test levels, the indentures spell out a number of consequences to insulate investors from further loss. For example, if the OC Ratio falls below an initial prescribed level,[5] cash flow is re-directed *away from* Respondents (in the form of subordinated management fees payable to the collateral manager and preference share distributions to entities Tilton controls) and *toward* the investors (in the form of accelerated payments on their notes). If the OC Ratio falls even further, the indentures provide investors with additional rights, including the option of terminating the collateral manager. Thus, the results of the OC test directly impacted Respondents' ability to obtain management fees as well as to keep control of the Zohar funds.

The indentures require that the OC Ratio be calculated using objective measures. The Zohar funds' assets – the loans to the Portfolio Companies – are required to be categorized by the collateral manager, and that category determines the value of the asset for purposes of the OC ratio. For Zohar I and II, the asset categories range from a "1" to a "4." Category 4 assets are the

---

[5] That level varies depending on the Zohar fund. The level was set at 105% for Zohar I, 112% for Zohar II, and 112.7% for Zohar III.

strongest; Category 1 assets are the weakest.[6] In the case of Zohar III, the numerical designations were replaced with two categories: "Defaulted Investment" and "Collateral Investment." These are equivalent to Categories 1 and 4, respectively. In either case, loans that are Category 4/Collateral Investments are essentially valued at 100 cents on the dollar for purposes of calculating the OC Ratio; loans that are Category 1/Defaulted Investments are haircut by some amount.[7] This means that, as loans are moved from a Category 4/Collateral Investment to a Category 1/Defaulted Investment, the OC Ratio falls.

Each indenture contains specific, objective definitions for each asset category that turn, in large part, on whether the Portfolio Company is current on its loan interest payments to the Zohar funds. For Zohar I and II, a loan to a Portfolio Company may not be categorized higher than a Category 1 unless, among other things, it is "Current." A loan is not "Current" if it is a "Defaulted Obligation," which is a loan "*with respect to which a default as to the payment of* principal and/or *interest has occurred* (without regard to any applicable grace period or waiver of such default), but only so long as such default has not been cured." Thus, for Zohar I and II, a loan that has failed to make interest payments when due must be classified as a Category 1 asset.[8]

---

[6] As a practical matter, Categories 2 and 3 were rarely used; categorization was binary as either a 1 or a 4.

[7] In Zohar I, the value of a Category 1 loan is determined by using the loan's Original Purchase Price Percentage, meaning the percentage of the outstanding principal on the loan that the CLO paid to acquire the loan. In Zohar II, the value of a Category 1 loan is determined by using either the Moody's or Standard & Poor's recovery rates, which were typically between 40% and 60%. A Defaulted Investment in Zohar III is valued the same way, *i.e.*, by reference to the Moody's or Standard & Poor's recovery rates.

[8] More precisely, for Zohar I and II, a loan is "Current" if it is not "Non-Current." A "Non-Current" loan is a "Defaulted Obligation" which has "previously deferred and/or capitalized as principal any interest due." Thus, a loan must be placed in Category 1 if the borrower has not been current on its interest payments for two consecutive periods: the first missed payment

Zohar III has similar, objective criteria. A "Defaulted Investment" – the equivalent of a Category 1 loan in Zohar I and II – includes a loan "*with respect to which a default as to the payment of* principal and/or *interest has occurred*, but only so long as such default has not been cured." Like Zohar I and II, under the objective definitions in the indenture, a loan that has failed to make interest payments when due must be categorized as a Defaulted Investment.[9]

In sum, the indentures set out specific, objective measures for categorizing loan assets and haircutting the value of loans that are not paying any or all interest. As the Division's expert Ira Wagner has explained in his report and will explain in the hearing, these measures – haircutting assets that are not performing – are common features to CLOs and structured finance transactions generally, which protect investors.

## D.    Respondents Ignored These Objective Requirements and Instead Categorized Fund Assets Based on Tilton's Subjective Belief in the Prospects of the Portfolio Companies.

Rather than follow the objective definitions required by the indentures, Respondents have categorized assets based on Tilton's subjective, personal belief in whether the underlying Portfolio Company would ultimately be successful. Over the life of the Zohar funds, many Portfolio Companies have repeatedly defaulted on their periodic interest payments: in some cases, they have only paid a fraction of the interest due in a given period, in other cases they have paid no interest at all in a given period. Respondents are well aware of the interest payments Portfolio Companies

---

creates a "Defaulted Obligation" by virtue of the "default as to the payment of … interest," and the second consecutive missed payment creates a "Non-Current" loan since it is then a Defaulted Obligation that, because of the missed interest payment in the prior period, "previously deferred … any interest due."

[9] Zohar III does not have the same terms as Zohar I and II, which require that the loan fail to make full interest payments for two consecutive periods. Thus, the first missed interest payment requires a loan in Zohar III to be categorized as a "Defaulted Investment."

make on their loans – indeed, Tilton herself made the ultimate decision to accept less interest than the amount that is due. However, in direct contravention of the indentures, Respondents have not categorized the loans based on whether they are current or have defaulted on their interest payments. Tilton could not have been clearer about this in her investigative testimony, admitting that she substitutes her subjective, personal belief in the long-term prospects of a Portfolio Company for the objective requirements of the indentures. Indeed, she went so far as to claim that the failure to pay interest does not affect a loan's categorization:

> A.    . . .*[C]ategorizations are based on the belief in the future recovery and the reorganization, not based on how much interest is collected. The categorizations are based on the belief in the ultimate reasonableness of the recovery and the future.*

> Q.    And where was that – that concept of the ultimate reasonableness of recovery, how is that reflected in the indenture?

> A.    I'd have to review the indenture, but there – *the categories, we have discretion over choosing the categories*; and for us in control situations, the categories are binary. *A Category 1 is either – it's a formal restructure of bankruptcy, or we believe that despite efforts in additional funding, that the value or the performance of the company will still decline in time. And a Category 4 is that we have reasonable belief to conclude that with additional funding and additional effort, that the performance of the company will improve with time*.

As a result of this subjective, personal belief assessment, Respondents have classified very few loans lower than Category 4/Collateral Investment. For example, as of January 2014, more than one hundred loans in the Zohar II portfolio were classified as Category 4 while only 16 loans were categorized as Category 1. Moreover, as of the time of the institution of these proceedings, all of the Zohar funds reported OC Ratios that were passing the prescribed test levels.

Respondents were acutely aware of the OC Ratio, and were interested in keeping it high. For example, in early July 2009, Tilton communicated with another Patriarch employee about the restructuring of a particular Portfolio Company. Tilton pressed the employee to explain what that

14

restructure "mean[s] in OC pickup." When the employee responded that other events would cause the OC Ratio to fall, Tilton scolded the employee to "get to me in advance if OC will retreat so radically. I need to know this before the end of the month so I can see if there is anything I want to do to change things. We need to be proactive before the month closes."[10] Similarly, in late 2008, in a communication with a different Patriarch employee, Tilton wrote, "I[']ll take any OC where I can get it."[11]

As discussed below, Respondents' subjective, personal belief categorization approach – which was not disclosed to the Zohar funds' investors – allowed Respondents to "be proactive" in manipulating the OC Ratio and resulted in materially higher OC Ratios than the ratios that should have been reported had Respondents followed the objective, disclosed terms of the indentures.

### E.    Respondents' Subjective Belief Approach Resulted in Respondents Improperly Retaining $200 Million in Fees and Preference Share Distributions, as Well as Control over the Funds.

Had Respondents followed the objective categorization methodology required by the indentures – rather than categorizing assets based on Tilton's subjective, personal belief in the Portfolio Companies – the number of loans categorized as Category 1/Defaulted Investment, as well as the OC Ratio, would have looked very different. One of the Division's experts, Michael G. Mayer, calculated what the OC Ratio should have been each quarter had Respondents been properly categorizing the loans based on whether the Portfolio Companies were current on their interest payments on the loans from the Zohar funds. Mr. Mayer's analysis shows that the OC Ratio was materially misstated in numerous periods, that the OC Ratio fell below the level that should have re-directed cash flows away from Respondents (in the form of subordinated

---

[10] Division Ex. 147.

[11] Division Ex. 138.

management fees and preference share distributions) and toward investors (in the form of additional payments on their notes), and that in the case of Zohar II, the OC Ratio fell even further, to the level where investors would have had the option to terminate the collateral manager.

For Zohar II, Mr. Mayer's analysis shows that by the middle of 2009, the properly-calculated OC Ratio (denoted as "CRA Adjusted" in the chart below) diverged significantly from the OC Ratio that was reported to the funds and the funds' investors and that was based on Respondents' subjective, personal belief in the Portfolio Companies (denoted as "Original" in the chart below):[12]

### Zohar II OC Ratio Test Results by Quarter

| Year | Quarter Ending | Original | CRA Adjusted | Minimum | Pass/Fail |
|------|----------------|----------|--------------|---------|-----------|
| 2005 | Jul-05 | 118.38% | 118.38% | 112.00% | Pass |
|      | Oct-05 | 113.95% | 113.95% | 112.00% | Pass |
| 2006 | Jan-06 | 118.49% | 118.36% | 112.00% | Pass |
|      | Apr-06 | 122.53% | 122.41% | 112.00% | Pass |
|      | Jul-06 | 122.39% | 122.27% | 112.00% | Pass |
|      | Oct-06 | 123.86% | 123.74% | 112.00% | Pass |
| 2007 | Jan-07 | 123.12% | 122.78% | 112.00% | Pass |
|      | Apr-07 | 123.36% | 123.02% | 112.00% | Pass |
|      | Jul-07 | 120.50% | 119.40% | 112.00% | Pass |
|      | Oct-07 | 122.97% | 122.59% | 112.00% | Pass |
| 2008 | Jan-08 | 122.06% | 121.47% | 112.00% | Pass |
|      | Apr-08 | 121.45% | 121.00% | 112.00% | Pass |
|      | Jul-08 | 123.57% | 120.85% | 112.00% | Pass |
|      | Oct-08 | 121.97% | 119.15% | 112.00% | Pass |
| 2009 | Jan-09 | 125.93% | 121.93% | 112.00% | Pass |
|      | Apr-09 | 124.38% | 120.35% | 112.00% | Pass |
|      | Jul-09 | 121.19% | 111.65% | 112.00% | Fail |
|      | Oct-09 | 121.88% | 107.82% | 112.00% | Fail |
| 2010 | Jan-10 | 121.66% | 105.59% | 112.00% | Fail |
|      | Apr-10 | 120.45% | 103.69% | 112.00% | Fail |
|      | Jul-10 | 120.07% | 101.80% | 112.00% | Fail |
|      | Oct-10 | 120.35% | 101.77% | 112.00% | Fail |
| 2011 | Jan-11 | 119.44% | 100.73% | 112.00% | Fail |
|      | Apr-11 | 120.29% | 101.11% | 112.00% | Fail |
|      | Jul-11 | 120.26% | 100.47% | 112.00% | Fail |
|      | Oct-11 | 120.41% | 100.94% | 112.00% | Fail |
| 2012 | Jan-12 | 119.72% | 99.91% | 112.00% | Fail |
|      | Apr-12 | 120.23% | 100.02% | 112.00% | Fail |
|      | Jul-12 | 120.56% | 100.07% | 112.00% | Fail |
|      | Oct-12 | 118.23% | 98.52% | 112.00% | Fail |
| 2013 | Jan-13 | 118.03% | 98.26% | 112.00% | Fail |
|      | Apr-13 | 115.26% | 95.40% | 112.00% | Fail |
|      | Jul-13 | 115.35% | 95.35% | 112.00% | Fail |
|      | Oct-13 | 115.45% | 95.30% | 112.00% | Fail |
| 2014 | Jan-14 | 115.54% | 95.51% | 112.00% | Fail |
|      | Apr-14 | 115.29% | 97.78% | 112.00% | Fail |
|      | Jul-14 | 115.60% | 97.64% | 112.00% | Fail |
|      | Oct-14 | 114.79% | 97.76% | 212.00% | Fail |

In addition to the OC Ratio being materially misstated, starting in July 2009, the OC Ratio fell below the specified level – 112% – that should have re-directed cash flows away from Respondents and toward investors. And starting in July 2010, the OC Ratio fell below 102%, which is the level that triggers an "Event of Default" and gives the Zohar II investors the right to terminate the collateral manager.

---

[12] This chart is from Mr. Mayer's expert report (Div. Ex. 117) at page 56.

Mr. Mayer's analysis shows similar results for Zohar III. For Zohar III, the properly-calculated OC Ratio (again denoted as "CRA Adjusted" in the chart below) began diverging significantly from the OC Ratio Respondents were reporting (again denoted as "Original" in the chart below) in early 2009:[13]

**Zohar III OC Ratio Test Results by Quarter**

| Year | Quarter Ending | Original | CRA Adjusted | Minimum | Pass/Fail |
|------|----------------|----------|--------------|---------|-----------|
| 2007 | Dec-07 | 110.33% | 1...% | 112.70% | N/A |
| 2008 | Mar-08 | 107.58% | 106.74% | 112.70% | N/A |
|      | Jun-08 | 127.36% | 126.77% | 112.70% | Pass |
|      | Sep-08 | 122.78% | 116.06% | 112.70% | Pass |
|      | Dec-08 | 127.31% | 122.53% | 112.70% | Pass |
| 2009 | Mar-09 | 127.04% | 115.00% | 112.70% | Pass |
|      | Jun-09 | 122.75% | 110.31% | 112.70% | Fail |
|      | Sep-09 | 123.99% | 109.17% | 112.70% | Fail |
|      | Dec-09 | 125.19% | 110.19% | 112.70% | Fail |
| 2010 | Mar-10 | 125.06% | 109.77% | 112.70% | Fail |
|      | Jun-10 | 125.26% | 109.21% | 112.70% | Fail |
|      | Sep-10 | 125.27% | 109.04% | 112.70% | Fail |
|      | Dec-10 | 125.26% | 109.06% | 112.70% | Fail |
| 2011 | Mar-11 | 126.12% | 109.51% | 112.70% | Fail |
|      | Jun-11 | 123.18% | 107.55% | 112.70% | Fail |
|      | Sep-11 | 124.44% | 108.43% | 112.70% | Fail |
|      | Dec-11 | 124.41% | 109.18% | 112.70% | Fail |
| 2012 | Mar-12 | 124.32% | 108.99% | 112.70% | Fail |
|      | Jun-12 | 120.97% | 107.36% | 112.70% | Fail |
|      | Sep-12 | 121.50% | 107.44% | 112.70% | Fail |
|      | Dec-12 | 121.46% | 107.47% | 112.70% | Fail |
| 2013 | Mar-13 | 119.62% | 105.42% | 112.70% | Fail |
|      | Jun-13 | 120.05% | 105.37% | 112.70% | Fail |
|      | Sep-13 | 120.39% | 105.31% | 112.70% | Fail |
|      | Dec-13 | 120.63% | 105.21% | 112.70% | Fail |
| 2014 | Mar-14 | 116.79% | 105.67% | 112.70% | Fail |
|      | Jun-14 | 118.74% | 107.28% | 112.70% | Fail |
|      | Sep-14 | 117.83% | 105.71% | 112.70% | Fail |
|      | Dec-14 | 118.13% | 105.82% | 112.70% | Fail |

As with Zohar II, beginning in June 2009 the OC Ratio fell below the specified level – 112.7% – that should have re-directed cash flows away from Respondents and toward investors.[14]

As a result of Tilton's improper subjective, personal belief categorization approach, Respondents retained significant sums that should have been re-directed to the Zohar funds and those funds' investors. As. Mr. Mayer demonstrates through his analysis, Respondents were paid

---

[13] This chart is from Mr. Mayer's expert report (Div. Ex. 117) at page 57.

[14] While many of the Zohar I loans to Portfolio Companies were not current on their interest payments, because the "haircut" made to the value of such loans was minimal under the terms of the Zohar I indenture, *see supra* n. 7, Zohar I would not have failed the OC Ratio test even if the collateral had been categorized correctly.

more than *$200 million* in subordinated management fees and preference share distributions to which they were not entitled:[15]

**Preference Share Distributions and Subordinated Collateral Management Fees Paid During the Period in which Zohar II and Zohar III Failed their OC Ratio Tests**

| CLO | OC Ratio Test Fail Period | Preference Share Distributions | Subordinated Collateral Manager Fees | Total |
|---|---|---|---|---|
| Zohar II | Jul 2009 - Dec 2014 | $0 | $76,012,349 | $76,012,349 |
| Zohar III | Jun 2009 - Dec 2014 | $41,000,000 | $91,403,522 | $132,403,522 |
| Total | | $41,000,000 | $167,415,871 | $208,415,871 |

**F.    Investors Were Not Aware of Respondents' Subjective Belief Approach or the Conflict of Interest it Created.**

Respondents did not disclose Tilton's subjective, personal belief categorization approach. As investor witnesses will explain at the hearing, they expected Respondents to follow the objective terms of the indenture to categorize assets for purposes of the OC Ratio. They were not aware that Respondents were categorizing loans based on, in Tilton's words, "the belief in the ultimate reasonableness of the recovery and the future." Moreover, the investor witnesses will explain that this information – knowing that Respondents were categorizing loans based on Tilton's subjective, personal belief in the Portfolio Company's ultimate success rather than following the objective terms of the indentures – would have been important to their investment decision.

In addition to concealing Tilton's subjective, personal belief approach, this approach to categorization created a significant conflict of interest. Respondents made decisions in a way that allowed them to collect money from the funds and retain absolute control over their management, despite the poor performance of the funds' assets. More specifically, Tilton controlled the Portfolio

---

[15] This chart is from Mr. Mayer's expert report (Div. Ex. 117) at page 63.

Companies, controlled the decision whether to allow those Portfolio Companies to pay less interest than was due, and (based on Tilton's undisclosed, subjective, personal belief in the underlying Portfolio Company) controlled the decision whether to move a loan from a Category 4/Collateral Investment to a Category 1/Defaulted Investment for purposes of the OC Ratio, regardless of whether or not the loan was paying its interest. This approach gave Respondents absolute discretion to keep loans that were not making full interest payments from being downgraded, thereby artificially keeping the OC Ratio above the point where the investor protections were triggered. Put simply, Respondents' approach to categorization eviscerated the investor protections afforded by the OC Ratio tests while directing more than $200 million to Respondents that should have been re-directed to the funds and their investors. Despite this, Respondents did not disclose this subjective, personal belief approach that they employed to categorize assets and the glaring conflict of interest that arose from this approach.

**G.    Respondents Caused the Zohar Funds' Financial Statements to be False and Misleading.**

In addition to prescribing objective standards for categorizing assets for the OC Ratio, the indenture for each of the Zohar funds also required that the respective funds provide quarterly financial statements prepared in accordance with U.S. GAAP. Relatedly, in each of the funds' financial statements, Respondents represented that the fair value of the loans to Portfolio Companies was approximately equal to their carrying value. However, the financial statements were not U.S. GAAP compliant, and the representations about fair value were false and misleading because Respondents had no basis to make any such disclosure.

Each of the Zohar fund's indenture required the publication of quarterly financial statements in accordance with U.S. GAAP. The financial statements were prepared by Patriarch's accounting department, approved by Tilton, and then provided to the trustee, which in turn made

19

them available to investors. Each financial statement contained a cover page and certification signed by Tilton. The certification (also required under the terms of the indentures) provided, in part, that the balance sheet and income statement were prepared in accordance with U.S. GAAP, and that Tilton had reviewed the balance sheet and income statements and that those documents fairly presented the financial position of the relevant Zohar fund in all material respects.[16]

Contrary to the indenture and Tilton's certifications, the balance sheet and income statements were not prepared in accordance with U.S. GAAP. Specifically, Patriarch did not perform U.S. GAAP-compliant impairment analyses, but represented that it did. U.S. GAAP requires certain affirmative steps to account for loan impairment, which Respondents did not follow. Here, loans to Portfolio Companies were recorded on the Zohar funds' financial statements at cost. These loans make up the vast majority of the assets on the balance sheet, and have a corresponding payable to investors in the Zohar funds. Consistent with U.S. GAAP, and as required by the indentures, Patriarch was required to perform an impairment analysis. Under U.S. GAAP, a creditor is required to record a loss when it is probable that a loan is impaired as of the date of the financial statement. A loan is impaired, and must be measured for the amount of impairment loss, when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contract with the debtor.

Respondents did not follow these requirements, and did not impair loans, but instead would only write them off if and when Tilton determined that she would no longer support a

---

[16] Although Patriarch did hire an outside accounting firm – Anchin, Block & Anchin, LLP ("Anchin") – Patriarch did not employ Anchin to ensure the financial statements were prepared in accordance with U.S. GAAP. In fact, the engagement letter makes explicit that Anchin would "take no responsibility regarding the accuracy or completeness of such statements, computation or data or whether such statement or data comply with generally accepted accounting principles."

Portfolio Company. Indeed, Tilton explicitly directed that loan values were not to be written down, but rather that loans were only to be written off after she so directed, and only after there was debt forgiveness or extinguishment. As Tilton bluntly put it in an email to Patriarch's controller: "[W]e do not write up or write down – we write off."[17] Thus, while Tilton continued to represent to investors that the fund's financial statements were compliant with U.S. GAAP, they were not. Instead, consistent with her improper subjective, personal belief approach to categorizing loans for purposes of the OC Ratio, Tilton would not write down impaired loans until she subjectively gave up on a company, an approach that was inconsistent with the indenture, her quarterly certifications, and U.S. GAAP.

Moreover, even though Respondents did not conduct a U.S. GAAP-compliant impairment analysis, they told investors that they did. For example, Respondents disclosed in the footnotes to their financial statements that where "the anticipated future collections are determined to be less than the carrying value of the loan, the Company will record an impairment loss . . ." However, Respondents did not analyze future collections, but instead relied on Tilton's subjective judgment to determine when an asset was impaired.

In addition, Respondents misrepresented that the fair value of the loans was approximately equal to their carrying value. The notes to the Zohar funds' financial statements represent that "[f]or substantially all of the Collateral Debt Obligations, [ ], fair values are based on estimates using present value of anticipated future collection or other valuation techniques." However, Tilton did not direct, and the accounting department did not engage in, any analysis of present value of anticipated future collections. Nor was there any other valuation technique applied to determine the

---

[17] Division Ex. 162.

fair value of the loans. Instead, Respondents made assertions to investors about the fair value of loans without any substantiation or basis for doing so.

Notably, after the Division initiated this action, the Zohar funds' financial disclosures changed significantly. The references to U.S. GAAP were removed and the "fair value" and "anticipated future collection" language was changed to disclose that the loans were simply carried at cost. As one of the Division's experts, Steven Henning, has explained in his report and will explain at the hearing, the fact that the financial disclosures eliminated these references to U.S. GAAP compliance – without changes in the underlying accounting methodologies – is an acknowledgement by the Respondents that the prior reporting departed from U.S. GAAP.

**H.    Current Status of the Zohar Funds and Respondents**

As noted above, the Zohar funds have not performed well. In November 2015, Zohar I defaulted on its obligation to repay noteholders their principal investment.[18] In addition, Respondents have represented that Zohar II is likely to default when it matures in early 2017. In early 2016, Respondents resigned as collateral manager for the various Zohar funds. The replacement collateral manager has sued Respondents, alleging that Respondents will not provide them "critical documents and information needed to assess the state of the Zohar Funds' investments and to manage those investments to obtain maximum value for investors."[19]

**IV.    ARGUMENT**

**A.    Section 206 of the Investment Advisers Act**

Respondents are charged with violations of Section 206 of the Investment Advisers Act. Generally speaking, Section 206 establishes a federal fiduciary standard for investment advisers,

---

[18] Many, if not all, of the investors in Zohar I and II had their positions insured.

[19] Verified Complaint, *Zohar CDO 2003-1, LLC et al. v. Patriarch Partners, LLC et al.*, Civ. Action No. 12247-VCS (Del. Ch. Apr. 22, 2016).

which includes the obligations to exercise the utmost good faith in dealing with their clients, to disclose to their clients all material facts, and to employ reasonable care to avoid misleading their clients. *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963). Given the "delicate fiduciary nature of . . . [the] investment advisory relationship," Section 206 places "an affirmative duty" of "utmost good faith" on all investment advisers, part of which requires "full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading." *Id.* Investment advisers have a duty "to eliminate, or at least expose, all conflicts of interest which might incline [them] – consciously or unconsciously – to render advice which was not disinterested." *Id.*

Specifically, Respondents are charged with violating Sections 206(1), (2), and (4), along with Rule 206(4)-8. Section 206(1) of the Advisers Act prohibits an investment adviser from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client[,]" and Section 206(2) prohibits an investment adviser from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]" Section 206(4) prohibits a registered investment adviser from engaging "in any act, practice, or course of business which is fraudulent, deceptive, or manipulative[,]" including those defined by the Commission.

Scienter is required for a violation of Section 206(1), but negligent conduct is actionable under Sections 206(2) and 206(4).[20] *See, e.g., SEC v. Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006); *SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir. 1977). Recklessness satisfies the scienter standard under Section 206(1) and is established where there

---

[20] *See* Order, Admin. Proc. Rel. No. 4245, dated Oct. 12, 2016 (noting that the OIP alleged violations of each of these sections and that the Division could proceed with evidence of intentional, reckless, and/or negligent conduct).

has been an "extreme departure from the standards of ordinary care." *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992) (citation omitted); *see also Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003) (investment adviser violated Section 206(1) because "investment advisers are knowledgeable enough to recognize [when] an arrangement . . . creates potential conflicts of interest"). Moreover, violations of the antifraud provisions of Section 206 do not require a showing of actual injury to any client. *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 195 (1963).

The standard for materiality under the Advisers Act is whether there is a substantial likelihood that a reasonable investor would have considered the information important. Amendments to Form ADV, Advisers Act Rel. No. 3060 (2010) n. 35 (*citing Steadman*, 967 F.2d at 643); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Generally speaking, the existence of a conflict of interest is a fact that an investment adviser, as a fiduciary, must disclose. *Vernazza*, 327 F.3d at 859. In addition, the value of the collateral in an investment is a material fact that an investor would consider important. *See, e.g., SEC v. Mannion*, 789 F.Supp.2d 1321, 1334 (N.D. Georgia 2011) (inflation of net asset value by investment adviser could support materiality requirement under federal securities laws).

Section 206 protects both the fund and the fund's investors. The "client" to whom Sections 206(1) and 206(2) refer is the fund, rather than the fund's investors. *See Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006). By contrast, Section 206(4) and Rule 206(4)-8 apply to misconduct against investors in a fund. *Id.* at n.6. Rule 206(4)-8 specifically prohibits an investment adviser from making false or misleading statements, and from engaging in "any act, practice, or course of business that is fraudulent, deceptive, or manipulative[,]" with respect to investors in pooled investment vehicles.

**B.      Respondents Are Investment Advisers, the Zohar Funds are Their Clients, and the Investors in the Zohar Funds are Investors in Pooled Investment Vehicles.**

The Advisors Act contains a "broad definition" of an investment adviser. *See, e.g.*, *In the Matter of Donald L. Koch et.al.*, S.E.C. Rel. No. 3836, 2014 WL 1998524, *18 (Comm. Op. 2014). Specifically, Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Each of the Respondents falls within this broad definition.

The Patriarch Collateral Managers acted as the funds' investment advisers by selecting and managing collateral, among other obligations, for compensation from the funds' inception until they resigned in March 2016. Indeed, the Patriarch Collateral Managers were registered as investment advisers with the Commission from March 2012 until March 2016. In addition, because Tilton owns and controls the Patriarch Collateral Managers and provided and was compensated for investment advice to the Zohar funds, she is also an investment adviser. *See, e.g.*, *SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001) (finding that present and sole shareholder of investment adviser entity who "effectively controlled [the investment adviser] and its decision making" was "properly labeled an investment adviser within the meaning of the Advisers Act"). And finally, since Patriarch Partners, LLC's employees performed all relevant investment advisory services for the Patriarch Collateral Managers, Patriarch also meets the statutory definition of an investment adviser. *See, e.g.*, *In the Matter of John J. Kenny, et al.*, SEC Rel. No. IA-2128, n. 54 (May 14, 2003) (Comm. Op.) (an individual associated with an investment adviser entity "may be charged as a primary violator under Section 206 where the activities of the associated person cause him or her to meet the broad definition of 'investment adviser.'").

Further, each of the Zohar funds is the client of the Patriarch Collateral Manager designated as its collateral manager. *See, e.g., Goldstein*, 451 F.3d at 881-82. Each fund is also a client of Tilton and Patriarch, since they are also investment advisers and advised each fund. Finally, each of the Zohar funds is a "pooled investment vehicle" under Rule 206(4)-8(b).[21] As a result, each of the fund's investors are protected under Advisers Act Section 206(4) and Rule 206(4)-8.

**C.     Respondents Made False and Misleading Statements, Engaged in Fraudulent and Deceptive Valuation Practices and Courses of Business, and Breached Fiduciary Duties.**

Respondents violated Section 206 of the Advisers Act by misleading the Zohar funds and the funds' investors regarding core information concerning the value of the funds' assets. Respondents' fraudulent conduct took three related forms. First, Respondents disregarded the objective standards for categorizing assets that they agreed to in the indenture, and instead categorized assets based on Tilton's subjective, personal belief in the future of the underlying Portfolio Company. This approach was not disclosed, and resulted in artificial – and material – inflation of the OC Ratios. In addition, it allowed Respondents to keep control over the funds and over $200 million in fees and distributions that should have flowed to the funds and the funds' investors. Second, Respondents breached their fiduciary duties by failing to disclose the significant conflict of interest that resulted from Respondents' undisclosed, subjective, personal belief approach. That is, Respondents' approach allowed them to keep control over the funds and tens of millions of dollars that otherwise would have flowed to the funds and the funds' investors. And

---

[21] Each of the Zohar funds is a pooled investment vehicle because it would be an investment company but for its reliance on an exclusion from the definition of investment company provided by Sections 3(c)(1) and (7) of the Investment Company Act. These sections provide exclusions for investment company issuers – like the Zohar funds – that do not make a public offer and have fewer than 100 security holders or whose outstanding shares are owned exclusively by qualified purchasers.

third, Respondents misled investors by stating that the funds' financial statements were U.S. GAAP compliant when, for example, no U.S. GAAP-compliant impairment analyses were performed and, instead, Respondents were simply impairing loans when they subjectively and personally decided to no longer support the Portfolio Companies.

1.    False and Misleading Categorizations and OC Ratio Test Results in Trustee Reports.

For years, Respondents failed to properly categorize the assets of the Zohar funds. Every month, Respondents provided information to the trustee, which prepared a report that was disseminated to investors. In that report, each of the Zohar fund's assets were ostensibly categorized according to the requirements of the indenture.

However, as noted above, Respondents did not follow the indenture when categorizing the investments. Instead of applying the objective criteria relating to failure to make interest payments, Respondents categorized assets based on Tilton's subjective, personal belief in the prospects of the underlying Portfolio Company. This approach was never disclosed to investors, and was wholly inconsistent with disclosures that were made. Moreover, as a result of this approach, the asset categories for a number of Portfolio Companies – and the resulting OC Ratios – were materially misstated to the Zohar funds and their investors. These misstatements and omissions allowed Respondents to avoid the consequences of failing the OC Ratio test, and thereby to continue to receive tens of millions of dollars of fees and distributions as well as to maintain control over the funds. Since Respondents regularly followed the same undisclosed approach when categorizing assets each period, these actions represent a fraudulent and deceptive scheme, practice, and course of business toward the Zohar funds and the funds' investors.

2.    <u>Failure to Disclose Facts Creating Conflict of Interest.</u>

As set forth above, as investment advisors, Respondents owed fiduciary duties to the Zohar funds. Moreover, pursuant to the CMAs, respondents had the obligation to "use reasonable care and the same degree of skill and attention . . . exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions."

Respondents repeatedly breached their duties by failing to disclose to the Zohar funds and their investors the facts that led to a conflict of interest inherent in Respondents' undisclosed approach to categorization. Specifically, so long as Respondents used Tilton's undisclosed, subjective, personal belief to categorize enough assets as Category 4/Collateral Investments, Respondents were able to impermissibly collect the subordinated fee and preference share payments that would have otherwise been redirected to the funds and their investors, and to improperly retain absolute control over the funds. Respondents' method of categorization was clearly inconsistent with the objective approach communicated to the funds and their investors through the indenture, and therefore rendered the indenture test materially misleading. Moreover, Respondents' approach to categorization eviscerated the important OC Ratio test, which is designed to protect investors when investors' principal becomes at risk.

Respondents have never disclosed the facts that create this conflict of interest, much less provided an opportunity for their clients to independently consider whether to consent to it. Because the conflict of interest involved Tilton's own interests, Tilton never had the authority to consent to it on behalf of the Zohar funds.[22]

---

[22] The Division anticipates Respondents will argue – as they did in their motion for summary disposition – that because Tilton is or was the ultimate owner of Patriarch and the Zohar funds, she

Furthermore, Tilton's knowledge of her approach cannot be imputed to the Zohar funds or their investors, especially since Tilton was not acting in their interest. Generally, as a matter of law, knowledge of an action by an agent is imputed to the principal. However,

> [t]here is . . . a well-established exception to this general rule, where the conduct of the agent is such as to raise a clear presumption that [s]he would not communicate to the principal the facts in controversy, as where an agent is in reality acting in [her] own business or for [her] own personal interest and adversely to the principal.

*Ruberoid Co. v. Roy, et al.*, 240 F. Supp. 7,9 (E.D. La. 1965) (citations omitted). This is often referred to as the common law agency doctrine of the "adverse interest exception," which generally precludes the imputation of the agent's knowledge to its principal whenever "an agent acts adversely to its principal." *Bank of China v. NBM LLC,* 359 F.3d 171, 179 (2d Cir. 2004) (applying New York law). Indeed, the Second Circuit has held that a conflicted fiduciary cannot give him or herself consent. *See SEC v. DiBella,* 587 F.3d 553, 563 (2d Cir. 2009) ("[t]hird party disclosure to an agent is not imputed to the principal when the agent is acting adversely to the principal's interest and the third party has notice of this" (citing *Arlinghaus v. Ritenour,* 622 F.2d 629, 636 (2d Cir. 1980))).[23]

As a result, Respondents failed to comply with their fiduciary duties and the contractual standard outlined in the CMAs. A fiduciary investment adviser, and a similarly situated

---

could not have defrauded them. However, the Zohar funds are distinct legal entities that have their own Boards of Directors. In fact, those directors opposed an involuntary bankruptcy petition filed by Tilton (as a creditor of Zohar I) after the fund defaulted on its obligation to repay investor principal in November 2015 and while Tilton was still collateral manager. *See* Answer and Motion of Alleged Debtors for an Order Dismissing Involuntary Chapter 11 Petitions or, In the Alternative, Abstaining Pursuant to 11 U.S.C. § 305, *In re Zohar CDO 2003-1, Corp.*, Case No. 15-23681 (Bankr. S.D.N.Y. December 14, 2015).

[23] In any event, Respondents' misstatements and omissions to the funds' investors – which are undoubtedly separate from Respondents – are actionable under Section 206(4) and Rule 206(4)-8.

collateral manager of national standing, would not act as Respondents did, in a manner that put their own interests above those of the funds and their investors, and would not fail to disclose the conflict inherent in Respondents' subjective, personal belief approach to categorizing the collateral.

      3.     <u>False and Misleading Financial Statements.</u>

Finally, as discussed above, the Zohar funds' financial statements were false and misleading and furthered the fraudulent scheme and course of business, because Patriarch failed to perform any impairment analyses of loans to the Portfolio Companies while falsely representing that the financial statements conformed with U.S. GAAP, and Patriarch disclosed that reported loan assets approximated fair value while failing to perform any valuation analyses of the loan assets. Through Tilton and accounting employees, Patriarch prepared the financial statements for the Zohar funds on behalf of the Patriarch Collateral Managers and provided them to the trustee for distribution to the noteholders. Tilton signed a certification for each fund's quarterly financial statements, on behalf of the relevant Patriarch Collateral Manager, confirming that they conformed with U.S. GAAP and fairly presented the financial position of the Zohar funds. These statements were false and misleading,

**D.    The Misstatements Were Material.**

Rule 206(8) prohibits investment advisers from making materially false or misleading statements to investors. *See* 17 C.F.R. 275 § 206(4)-8 ("It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) … for any investment adviser to a pooled investment vehicle to … [m]ake any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading …."). The Respondents' false

30

and misleading statements regarding how assets were being categorized and valued, and the resulting false and misleading statements related to the OC Ratio and financial statements, were material. Each of these items provided information relating to the value of the funds' investments, and, in the case of the OC Ratio, the likelihood that investors' principal would be repaid. Respondents' conflict of interest in using the undisclosed, subjective, personal belief approach to asset categorization was also critical information since it allowed Respondents to put their own interests ahead of the funds' and the funds' investors. *See, e.g.*, *Vernazza v. SEC*, 327 F.3d at 859 (existence of a conflict of interest is a material fact that an investment adviser, as a fiduciary, must disclose); *SEC v. Mannion*, 789 F.Supp.2d 1321, 1334 (N.D. Georgia 2011) (inflation of net asset value by investment adviser could support materiality requirement under federal securities laws).

**E.  Respondents' Conduct Was Knowing, Intentional, Reckless, or at a Minimum Negligent.**

Respondents have at all times been aware of the indentures' categorization requirements, the OC Ratio test and its consequences, and the actual interest payments by the Portfolio Companies. Instead of following the criteria for categorization set forth in the indentures, however, Respondents categorized assets based on Tilton's subjective, personal belief in the future of the Porfolio Companies.[24] In addition, although Respondents clearly knew how they were categorizing assets, and knew – or at a minimum should have known – that this approach was undisclosed, was contrary to the terms of the indenture, and created a significant conflict of interest, Respondents did nothing to adequately disclose this approach to the funds or their investors, or to seek their consent for the conflict.

---

[24] Because Tilton controls Patriarch and the Patriarch Collateral Managers, her scienter is imputed to those entities.

Tilton also certified the Zohar funds' financial statements every quarter during the relevant period. Despite her knowledge of the financial condition of the Portfolio Companies and Patriarch's actual accounting practices, she allowed the financial statements to be published without conducting impairment analyses and while including false or misleading disclosures relating to the valuation of assets. She certified the financial statements, knowing that she applied her own standards for impairment without regard to standards prescribed by U.S. GAAP.

Adding to the evidence of Respondents' scienter is evidence the Division expects will be adduced from investor witnesses. Certain of these investor witnesses will explain the difficulty they had obtaining information from Respondents. For example, Jaime Aldama of Barclays is expected to testify that, when he attempted to obtain additional information from Respondents regarding the underlying Portfolio Companies, Respondents insisted that Barclays sign not only a non-disclosure agreement, but a litigation waiver that would prevent Barclays from suing Respondents based on any information that was provided. Such conduct corroborates Respondents' scienter: it strongly suggests that Respondents knew the disclosure of their conduct would result in litigation and therefore sought to coerce investors into abstaining from litigation in exchange for honest disclosure.

Respondents' knowledge and conduct demonstrates that they acted intentionally, recklessly, or at a minimum negligently with respect to their false and misleading statements fraudulent or deceptive practices, and course of business.

**F.      As a Result of This Conduct, Respondents Violated, Aided and Abetted, and/or Caused Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder.**

By failing to disclose that Respondents were not following the objective terms of the indenture, but rather were categorizing assets based on Tilton's subjective, personal belief in the future of the Portfolio Companies, by collecting fees to which Respondents were not entitled, by

failing to disclose the facts underlying their conflict of interest, and by making false and

misleading statements regarding the asset categorization approach, the OC Ratio, and the financial

statements, Respondents violated Sections 206(1) and 206(2) of the Advisers Act by defrauding

the three Zohar funds, and violated Section 206(4) and Rule 206(4)-8 thereunder by defrauding the

investors in the Funds.[25]

## G.    Respondents' Anticipated Defenses Do Not – and Cannot – Excuse Their Conduct.

In the face of overwhelming evidence that Respondents, contrary to the objective

requirements of the indentures, categorized assets based on Tilton's subjective, personal belief in

the future of the Portfolio Companies and performed no U.S. GAAP-compliant impairment or

valuation analyses of the loans to Portfolio Companies, the Division anticipates Respondents will

attempt to mount a defense based on distractions and hypotheticals. For example, based on

Respondents' amended witness list, it appears that Respondents intend to present numerous

witnesses from the Portfolio Companies themselves. While the relevance of these witnesses is not

---

[25] Alternatively, to the extent Your Honor disagrees that the evidence shows that Patriarch Partners, LLC is itself an investment adviser, Patriarch aided and abetted and/or caused these violations. To establish aiding and abetting liability, the Division must show: (1) "that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator, and (3) that the aider and abettor had the necessary 'scienter'-*i.e.* that she rendered such assistance knowingly or recklessly." *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000). Negligence is sufficient to establish liability for causing a violation when a person is alleged to have caused a primary violation that does not require scienter. *In re KPMG Peat Marwick*, Exchange Act Rel. No. 43862 (Jan. 19, 2001), *aff'd, KPMG v. SEC*, 289 F.3d 109 (D.C. Cir. 2002). In an administrative proceeding, a finding that a respondent aided and abetted a primary violation necessarily makes that respondent a "cause" of those violations. *See In the Matter of Clarke T. Blizzard, et al.*, Advisers Act Rel. No. 2253, 2004 SEC LEXIS 1298, at *16 n.10 (June 23, 2004) (Comm. Op.). Patriarch aided and abetted and/or caused the other Respondents' violations by providing substantial assistance to Tilton and the other entities. For example, Patriarch's employees provided all information to the trustee, including the misleading information relating to categorization of the assets and the false financial statements.

immediately clear – as distinct from the Division's investor witnesses – the Division expects Respondents may attempt to put on evidence about their efforts to turn those Portfolio Companies around and to "save American jobs." But whether Respondents were attempting to – or successful in – saving jobs at the Portfolio Companies provides no defense. This case is about Respondents' conduct with respect to the Zohar funds and those funds' investors. Your Honor should not be distracted from the proper focus of this case: Respondents' breaches of obligations imposed by the indentures and duties owed to the Zohar funds and the funds' investors, subjects as to which the Division's witnesses will directly testify.

The Division also anticipates that Respondents will focus heavily on their numerous expert witnesses. However, Respondents' experts opinions are not based on what Respondents actually did – *e.g.*, their failure to follow the requirements of the indentures and their categorization of assets based on the subjective, personal belief in the underlying Portfolio Companies – but on hypotheticals of what Respondents could have done. Again, this case is properly focused on what actually occurred: Respondents flouted the objective categorization standards of the indenture, categorized assets based on Tilton's subjective, personal belief in the future of the Portfolio Companies, and failed to perform GAAP-complaint impairment and valuation analyses.

The Division further anticipates that Respondents will argue that they had unlimited discretion to amend loan terms under a particular and ostensibly unique provision of the Zohar indentures – Section 7.7(a).[26] But this argument is a red herring. While Section 7.7(a) does give

---

[26] Section 7.7(a) provides:

The Zohar Obligors (or the Collateral Manager on behalf of such Person) may, without the consent of the Holders of any Notes or the Credit Enhancer, enter into any amendment, forbearance or waiver of or supplement to any Underlying Instrument included in the Collateral, so long as such amendment, forbearance, waiver or supplement does not contravene the

respondents flexibility to amend loans, the evidence will show that Respondents were not amending loans when Portfolio Companies failed to pay or paid less than required interest. Rather, Tilton has admitted that Respondents were simply allowing the Portfolio Companies to not pay the interest required, and then categorizing those loans based on her subjective, personal belief in the underlying company. Moreover, as one of the Division's experts, Ira Wagner, has explained in his report and will explain at the hearing, Section 7.7(a) is not unique in the *discretion* it gave Respondents, as collateral managers, to modify loans – that sort of discretion is common in structured transactions. Rather, what is unique about Section 7.7(a) is that it allows the Zohar funds to acquire and hold certain securities that otherwise would not satisfy the indenture requirements. Thus, Respondents argument that the discretion outlined in Section 7.7(a) was so unique to the Zohar deals that it trumped all other provisions of the indentures is, simply, wrong. In any event, Section 7.7(a) says nothing about *categorization* of loans for purposes of the OC Ratio, nor does it grant Respondents the authority to categorize assets based on a subjective, personal belief or to thoroughly disregard their fiduciary duties. And Section 7.7(a) certainly cannot be read to disclose what actually occurred: Tilton's improper subjective, personal belief categorization approach to categorizing the Zohar funds' loans.

---

provisions of any Transaction Document or contravene any applicable law or regulation. For the avoidance of doubt and notwithstanding anything else contained herein, the parties hereto acknowledge and agree that the Collateral Debt Obligations will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or the other negotiations and, as a consequence thereof, the Issuer or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral Debt Obligations, Equity Kickers, Equity Workout Securities and/or the relevant Underlying Instruments (i) interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Debt Obligation" and/or the Eligibility Criteria and/or (ii) Equity Workout Securities.

Finally, the Division expects Respondents to argue that investors could have uncovered their scheme because investors could easily have figured out, from the trustee reports, that certain loans were not current on their interest payments and thus could have figured out the OC Ratio was inflated. As a threshold matter, investors would have needed to analyze substantial amounts of data on a monthly basis to replicate the OC Ratio calculations – something that investors in cash-flow bonds would have no reason to do. But even if an investor could have figured out that Respondents were not properly following the objective requirements of the indenture, they could not have figured out what Respondents were actually doing: categorizing assets based on Tilton's subjective, personal belief in the future of the Portfolio Companies, which allowed them to retain more than $200 million in fees and distributions and control of the Zohar funds. And in any event, arguing that investors could have determined that they were being lied to by their investment adviser is a curious – and failing – defense to these charges.

## V.    RELIEF REQUESTED

The Division requests remedial action consistent with Section 203 of the Advisers Act and the Section 9 of the Investment Company Act. Such remedial action may include, without limitation, disgorgement and prejudgment interest, civil penalties, cease-and-desist orders, and industry and collateral bars. The Division will recommend specific remedial action in its post-trial briefing or at the hearing if requested by the law judge.

Dated: October 17, 2016

Respectfully Submitted,

Dugan Bliss, Esq.
Nicholas Heinke, Esq.
Amy Sumner, Esq.
Mark L. Williams, Esq.
Division of Enforcement
Securities and Exchange Commission
Denver Regional Office
1961 Stout Street, Ste. 1700
Denver, CO 80294

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the **DIVISION OF ENFORCEMENT'S PREHEARING BRIEF** was served on the following on this 17th day of October, 2016, in the manner indicated below:

Securities and Exchange Commission
Brent Fields, Secretary
100 F Street, N.E.
Mail Stop 1090
Washington, D.C. 20549
(By Facsimile and original and three copies by UPS)

Hon. Judge Carol Fox Foelak
100 F Street, N.E.
Mail Stop 2557
Washington, D.C. 20549
(By Email)

Randy M. Mastro, Esq.
Lawrence J. Zweifach, Esq.
Barry Goldsmith, Esq.
Caitlin J. Halligan, Esq.
Reed Brodsky, Esq.
Monica K. Loseman, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
(By email pursuant to the parties' agreement)

Susan E. Brune, Esq.
Brune Law PC
450 Park Avenue
New York, NY 10022
(By email pursuant to the parties' agreement)

Martin J. Auerbach
Law Firm of Martin J. Auerbach, Esq.
1330 Avenue of the Americas
Ste. 1100
New York, NY 10019
(By email pursuant to the parties' agreement)

# Exhibit 18

Division of Enforcement's Post-Hearing Brief

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-16462

In the Matter of

   LYNN TILTON;
   PATRIARCH PARTNERS, LLC;
   PATRIARCH PARTNERS VIII, LLC;
   PATRIARCH PARTNERS XIV, LLC;
   AND
   PATRIARCH PARTNERS XV, LLC,

Respondents.

**DIVISION OF ENFORCEMENT'S
POST-HEARING BRIEF**

Table of Contents

I.      PRELIMINARY STATEMENT ............................................................................2

II.     RESPONDENTS ...........................................................................................4

III.    FACTS ...........................................................................................................6

        A.      Background on the Zohar Funds ..................................................................6

        B.      Respondents Were Investment Advisors and Owed Fiduciary Duties.....................10

        C.      The Zohar Indentures Prescribed Important, Objective Requirements to
                Value and Categorize Fund Assets, Which Protected the Funds and
                the Funds' Investors ...............................................................................12

        D.      Respondents Ignored These Objective Requirements and Instead
                Categorized Fund Assets Based on Tilton's Subjective Belief in the
                Prospects of the Portfolio Companies...........................................................15

        E.      Respondents' Subjective Belief Approach Resulted in Respondents Improperly
                Obtaining $200 Million in Fees and Preference Share Distributions, as Well as
                Retaining Control over the Funds ................................................................18

        F.      Investors Were Not Aware of Respondents' Subjective Belief Approach or
                the Conflict of Interest it Created ...............................................................21

        G.      The Zohar Funds' Financial Statements Were False and Misleading .....................22

        H.      Respondents' Post-Hoc Arguments are Inconsistent with their Conduct.................26

        I.      Current Status of the Zohar Funds ..............................................................30

IV.     ARGUMENT ...............................................................................................30

        A.      Section 206 of the Advisors Act .................................................................30

        B.      Respondents Are Investment Advisers, the Zohar Funds are Their Clients,
                and the Investors in the Zohar Funds are Investors in Pooled
                Investment Vehicles .................................................................................33

        C.      Respondents Made False and Misleading Statements and Engaged in
                Fraudulent and Deceptive Practices and Courses of Business...............................35

                1.      Categorization of Fund Assets and Reporting of the OC Ratio Test
                        Results ....................................................................................35

i

        2.      Failure to Disclose Circumstances Giving Rise to a Conflict of Interest ................................................................................................36

        3.      False and Misleading Financial Statements ....................................38

    D.      Respondents' Misstatements Were Material ..............................................39

    E.      Respondents' Conduct was Intentional, Reckless, or at Least Negligent................40

    F.      Respondents Violated Section 206 of the Advisers Act or Aided and Abetted and/or Caused a Violation .............................................................................45

    G.      Respondents' Defenses Have No Merit......................................................46

        1.      Respondents Did Not Disclose Their Categorization Method ....................46

        2.      Tilton Was Not Amending the Loans............................................48

        3.      At the Very Least, Respondents' Conduct Was Misleading ........................49

        4.      Respondents Do Not Have a Reliance Defense ............................50

        5.      The Division's Claims Properly Consider the Purpose of the Zohar CLOs............................................................................53

V.      REMEDIES ..............................................................................................54

    A.      A Cease and Desist Order Should Issue ....................................................55

    B.      Respondents Should Disgorge Certain Advisory Fees ...............................56

    C.      Third-Tier Penalties Should Be Assessed...................................................57

    D.      Associational Bars Are Appropriate ..........................................................59

VI.    CONCLUSION..........................................................................................61

Table of Authority

**Cases**

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................................ 31

*Don Warner Reinhard*, Exch. Act Rel. No. 3139, 2011 WL 121451 (Jan. 14, 2011) ................ 58

*Gary M. Kornman*, Exch. Act Rel. No. 59403, 2009 WL 367635 (Feb. 13, 2009) ................ 59

*Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) ................................................. 32, 33

*Hector Gallardo*, Exch. Act Rel. No. 65422, 2011 WL 4495006 (Sept. 28, 2011) ................ 56

*IMS/CPAs & Assocs.*, Exch. Act Rel. No. 45109 , 2001 WL 1359521 (November 5, 2001) ........ 32

*In re Clarke T. Blizzard, et al.*, Advisers Act Rel. No. 2253, No. 1298,

    2004 SEC LEXIS 1298 (June 23, 2004) ........................................................ 44

*In re Refco Capital Mkts.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469

    (S.D.N.Y. Sept. 13, 2007) ................................................................ 31

*In the Matter of ZPR Investment Management, Inc. et al* , 2016 WL 3194778 (June 9, 2016) ...... 31

*In the Matter of Donald L. Koch et.al.*, S.E.C. Rel. No. 3836,

    2014 WL 1998524 (May 16, 2014) ........................................................ 32

*Kennedy v. Tallant*, 710 F.2d 711 (11th Cir. 1983) ............................................ 46

*KPMG, L.L.P. v. SEC*, 289 F.3d 109 (D.C. Cir. 2002) ......................................... 44

*James C. Dawson*, Advisers Act Rel. No. 3057, 2010 WL 2886183 (July 23, 2010) ................ 58

*JS Oliver Capital Mgmt*, SEC Rel. No. 4431, 2016 WL 3361166 (Mar. 7, 2016) ................ 59

*Kevin H Goldstein*, Initial Dec. Rel. No. 243, 2004 WL 69156 (Jan. 16, 2004) ................ 58

*KPMG Peat Marwick L.L.P.*, Exch. Act Rel. No. 1374, 2001 WL 223378 (Mar. 8, 2001) ........ 54

*Mark Feathers*, Initial Dec. Rel. No. 605, 2014 WL 2418472 (May 30, 2014) ................ 54

*Mark S. Parnass*, Exch. Act Rel. No. 65261, 2011 WL 4101087 (Sept. 2, 2011) ............. 58-59

*Marshall E. Melton*, Advisers Act Rel. No. 2151, 2003 WL 21729839 (July 25, 2003) ........... 54

*Markowski v. SEC*, 34 F.3d 99 (2d Cir. 1994) ................................................. 50

*Robert G. Weeks*, Initial Dec. Rel. No. 199, 2002 WL 169185 (Feb. 4, 2002) ................ 57

*SEC v. Berger*, 244 F. Supp. 2d 180 (S.D.N.Y. 2001) ......................................... 33

*SEC v. C.R. Richmond & Co.* , 565 F.2d 1101 (9th Cir. 1977) ................................ 31

*SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180 (1963) ........................... 31

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ......................... 30, 36

*SEC v. Caserta*, 75 F. Supp. 2d 79 (E.D.N.Y. 1999) ....................................... 49, 50, 52

*SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014) ............................................ 55

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) ............................. 55

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ........................................... 56

*SEC v. Lorin,* 76 F.3d 458 (2d Cir. 1996) ................................................................ 55

*SEC v. Mannion*, 789 F. Supp. 2d 1321 (N.D. Ga. 2011) ............................................. 32, 35

*SEC v. Nutmeg Group*, 162 F. Supp. 3d 754 (N.D. Ill. 2016) ....................................... 30, 46

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ........................................................ 31

*SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) .............................................. 31

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979) ..................................................... 54, 58

*Steven E. Muth*, Initial Dec. Rel. No. 262, 2004 WL 2270299 (Oct. 8, 2004) ............... 54, 57-58

*Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11 (1979) ............................................ 30

*Vernazza v. SEC*, 327 F.3d 851 (9th Cir. 2003) ........................................................ 31, 32

*Voss v. SEC*, 222 F.3d 994 (D.C. Cir. 2000) ............................................................... 44

*ZPR Inv. Mgmt.*, SEC Rel. No. 4249, 2015 WL 6575683 (Oct. 20, 2015) ....................... 56, 59

**Federal Statutes**

15 U.S.C. § 9(b) ................................................................................................ 58

15 U.S.C. § 9(d) ................................................................................................ 56

15 U.S.C. § 9(e) ................................................................................................ 55

15 U.S.C. § 80a-9(b) (2012) ................................................................................. 58

15 U.S.C. § 80a-9(d) (2012) ................................................................................. 56

15 U.S.C. § 80a-9(e) (2012) ................................................................................. 55

15 U.S.C. § 80b-3(e), (f) (2012) ............................................................................ 58

15 U.S.C. § 80b-3(i)(2) (2012) .............................................................................. 57

15 U.S.C. § 80b-3(i)(3) (2012) .............................................................................. 56

15 U.S.C. § 203(e), (f) ........................................................................................ 58

15 U.S.C. § 203(i) .............................................................................................. 56

15 U.S.C. §§ 80b-3(j), 80b-3(k)(5) (2012) ............................................................... 55

17 C.F.R. § 201.1003 .......................................................................................... 57

## I.    PRELIMINARY STATEMENT

Investment advisers have fiduciary duties to act with the utmost good faith and in the best interest of their clients – indeed, to put their clients' interests above their own. In addition, the Investment Advisers' Act prohibits fraudulent acts, practices, or schemes directed toward an adviser's clients or investors. The evidence in this case showed that Respondents breached those solemn duties, misled investors, and put their own interests first. In so doing, Respondents kept more than $200 million that properly belonged to their clients and investors and deprived investors of the chance to exercise control over the investment funds. These breaches of fundamental obligations under the Investment Advisers Act warrant serious sanctions.

Respondent Lynn Tilton and the Patriarch entities she controlled were investment advisers. Respondents managed three pooled investment vehicles structured as collateralized loan obligation ("CLO") funds – the Zohar funds. The Zohar funds raised money from investors through the issuance of notes, which are securities, and used those funds to make loans to distressed companies, which would in turn make interest and principal payments back to the Zohar funds. Based upon the disclosures made to them, investors expected regular cash flows and ultimately the return of their principal from their investments.

Tilton represented to investors that she would monitor the value of the Zohar funds' assets (*i.e.*, loans to distressed companies) and categorize those assets according to an objective framework set out in the governing documents. This objective categorization of the Zohar funds' assets was designed to protect both the Zohar funds and the funds' investors, as it afforded certain rights to investors if the funds' assets were not performing well. These rights – triggered by the Zohar funds' assets performing below a certain benchmark – included redirecting payments from

Respondents to the Zohar funds and the funds' investors and ultimately giving investors the option to remove Tilton from control of the funds.

As was demonstrated through documentary and testimonial evidence, Tilton flouted her obligations and consistently and regularly breached her fiduciary duties and her responsibilities to investors. Instead of objectively categorizing the funds' loan assets as promised, Tilton manipulated their value by categorizing the assets according to her own subjective, personal belief in whether a distressed company would be able to repay the loan at some indeterminate time in the future. This manipulation was not only undisclosed to investors, it also eviscerated the protections that had been promised in the offering documents. Although many of the Zohar funds' assets were performing poorly and not making substantial interest payments that remained due and owing (which even Patriarch admitted were unlikely to be collected), Tilton concealed these facts by keeping the assets in the highest-performing category based on subjectively "believing" in the distressed company borrower. The Zohar funds' financial statements were similarly false and misleading, as they affirmatively misrepresented that the financial statements were prepared in accordance with U.S. GAAP, were performing a U.S. GAAP-compliant loan impairment analysis and were performing a U.S. GAAP-compliant fair value analysis of the loans. These statements were not true, as no such analyses were performed, much less U.S. GAAP-compliant analyses. Indeed, by failing to perform the disclosed fair value analysis and impairment on the loan assets, and by continually changing the methodology for accruing interest on the Zohar funds' balance sheet, Patriarch similarly concealed that portfolio companies were not paying interest, and were not expected to be able to pay their past due interest, but were categorized as current for purposes of the OC Ratio.

Respondents' defense is essentially that they disclosed enough piecemeal bits of information, in various locations, that sophisticated investors should have figured out what Tilton was doing. But this in no way satisfied Respondents' fiduciary obligations or constituted full and fair disclosure. An investment adviser's clients and investors are not expected to ferret out information from their investment advisers. The law does not require investors to seek out disclosures; rather, the obligation to provide disclosure is placed on people who solicit and manage investors' money.

Through the manipulation of the disclosed asset valuations, Respondents were able to keep control of the Zohar funds, and continue to reap certain management fees and equity distributions that should have gone to the funds and ultimately to investors – over $200 million since 2009. The evidence put on by the Division detailed Respondents' false statements and misleading omissions, fraudulent acts and scheme, and breaches of fiduciary duties. The Division proved that Respondents hid the truth from investors (tellingly, Respondents did not call a single investor witness to support their case), and in doing so, violated the securities laws, breached their fiduciary duties and standards of care, and took over $200 million that should have gone to investors. The Division requests, and Your Honor should order, appropriate remedial relief, including that Respondents disgorge these monies, pay civil penalties, and be barred from the securities industry so that they can no longer harm investors.

## II.    RESPONDENTS

**Lynn Tilton** is a resident of Highland Beach, Florida. (Answer ¶ 20.) Tilton manages each of the Patriarch entities described below and controls their decisions. (FOF ¶ 270.) Tilton is also heavily involved in the management of the companies to which the Zohar CLO funds at issue in this case have made loans. (FOF ¶ 271.)

**Patriarch Partners, LLC** ("Patriarch Partners") is a Delaware limited liability company with a principal place of business in New York, New York. (FOF ¶ 254; Answer ¶ 11.) Tilton and Patriarch Partners' employees ran the business of Patriarch VIII, Patriarch XIV, and Patriarch XV, when those entities (the "Patriarch Collateral Managers") were collateral managers of the Zohar funds. The Patriarch Collateral Managers have not had employees of their own, but were operated by Tilton with the assistance of Patriarch Partners employees. (FOF ¶ 255.) Tilton owns, controls, and acts on behalf of Patriarch Partners. (FOF ¶ 256.) Tilton founded Patriarch in 2000, originally with a partner, but has run the company herself since 2002. (*Id.*) Tilton refers to Patriarch Partners as a distressed private equity firm. (*Id.*)

**Patriarch Partners VIII, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. (FOF ¶ 257; Answer ¶ 12.) Patriarch VIII was registered as a relying investment adviser[1] with the Commission from March 2012 until March 2016, and was the collateral manager for Zohar CDO 2003-1, Limited during the relevant time period. (*Id.*) Patriarch VIII is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter. (*Id.*)

**Patriarch Partners XIV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York. (FOF ¶ 259; Answer ¶ 13.) Patriarch XIV was registered as a relying investment adviser with the Commission from March 2012 until March 2016, and was the collateral manager for Zohar II 2005-1, Limited during the relevant time period.

---

[1] A relying investment adviser is an investment adviser controlled by, or under common control with, an adviser that is registered with the Commission and that together "conduct a single advisory business." *See* American Bar Association, Business Law Section, SEC No-Action Letter (Jan 18, 2012), *available at* https://www.sec.gov/divisions/investment/noaction/2012/aba011812.htm.

(*Id.*)  Patriarch XIV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.  (*Id.*)

**Patriarch Partners XV, LLC** is a Delaware limited liability company with a principal place of business in New York, New York.  (FOF ¶ 261; Answer ¶ 14.)  Patriarch XV was registered as an investment adviser with the Commission from March 2012 until March 2016 and was the collateral manager for Zohar III, Limited during the relevant time period.  (*Id.*)  Patriarch XV is indirectly owned 100% by Tilton and a trust for the benefit of Tilton's daughter.  (*Id.*)

### III.    FACTS

#### A.    Background on the Zohar Funds

This case involves structured finance vehicles called Collateralized Loan Obligation funds.  (FOF ¶ 263.)  A CLO fund raises money from investors to invest in loans.  (*Id.*)  More specifically, a CLO fund is a securitization vehicle in which a special purpose entity – the issuer – raises capital through the issuance of secured notes to investors and uses the proceeds to purchase or originate a portfolio of commercial loans.  (Answer ¶ 15.)  A CLO fund has a collateral manager – who is typically an investment adviser – and that collateral manager determines what loans to purchase or originate on behalf of the CLO fund.  (*Id.*)  Cash flows and other proceeds from those loans are used to repay the investor noteholders in the CLO fund.  (*Id.*)  CLOs issue securities and CLO managers carry with them the obligations – including fiduciary duties – that come with being investment advisers.  (FOF ¶¶ 274-75.)

There are three Zohar CLO funds at issue in this case: the first, referred to as "Zohar I," was launched in 2003; the second, referred to as "Zohar II," was launched in 2005, and the third, referred to as "Zohar III," was launched in 2007.  (FOF ¶¶ 257, 259, 261.)  Tilton structured each of the three Zohar funds as CLO funds.  (FOF ¶ 263.)  The issuer in each case is a corporate entity:

Zohar CDO 2003-1, Limited is the issuer for Zohar I ; Zohar II 2005-I, Limited is the issuer for Zohar II; and Zohar III, Limited is the issuer for Zohar III.[2]  (FOF ¶¶ 257, 259, 261.)  These issuer entities, which are all Cayman Island companies, each has its own Board of Directors.  (DX 44-46.)

As described above, the Patriarch Collateral Managers (Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; and Patriarch Partners XV, LLC) are the collateral managers for their respective Zohar funds.  (FOF ¶¶ 257, 259, 261.)  The Patriarch Collateral Managers are owned and controlled by Tilton and entities under her control.  (FOF ¶¶ 257, 259, 261.)  The Patriarch Collateral Managers have no employees of their own; rather, Patriarch Partners, LLC – for which Tilton is the CEO and sole principal – employs individuals in various roles to help her manage the Zohar funds.  (FOF ¶ 255.)  Tilton makes all significant decisions relating to the management of the collateral of the Zohar funds.  (FOF ¶¶ 270, 281.)  Put simply, in the words of Tilton herself: "I'm the collateral manager, I am the ultimate decision-maker on many things. . . ." (DX 219 at 83 (Tilton Testimony Day 2 at 27:19-20).)

Each Zohar deal is governed by various documents.  (FOF ¶ 266; Answer ¶ 17.)  Two critical governing documents are the indenture and the collateral management agreement ("CMA").  (*Id.*)  The indenture describes the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments.  (FOF ¶ 267; Answer ¶ 18; DX 1-3.)  The indenture also describes the rights of the parties and responsibilities of the collateral manager.  (*Id.*)  The indenture further identifies the Patriarch Collateral Managers as the collateral managers for the funds.  (*Id.*)  As one of the Division's experts, Ira Wagner, has explained, investors in CLOs expect collateral managers to follow the indenture to the letter.  (FOF ¶ 331.)

---

[2] Each fund also had co-issuers and subsidiaries that were also corporate entities.

And, indeed, the Zohar Funds' investors testified that they also expected that the collateral manager would follow the indenture. (FOF ¶¶ 15, 78, 242.)

The CMA is also an important document. (FOF ¶¶ 266, 268; Answer ¶¶ 19-20.) The CMA, which is a contract between the issuer and the respective Patriarch Collateral Manager, describes the collateral manager's duties and compensation. (*Id.*) Tilton signed each CMA as the manager of the respective Patriarch Collateral Manager. (*Id.*)

The Patriarch Collateral Managers – which, as can be seen in the below illustration, are owned by Tilton and entities under her control[3] – earn fees based on the assets in the Zohar deals.



(FOF ¶¶ 255, 270.) Specifically, the Patriarch Collateral Managers receive a Senior Collateral Management Fee, paid quarterly, which is equal to 1% of the funds' assets. (FOF ¶ 270.) The Patriarch Collateral Managers may also receive an additional Subordinated Collateral Management Fee, which is also equal to 1% of the funds' assets. (*Id.*) In addition, certain entities controlled by Tilton hold preference shares in the Zohar funds. (FOF ¶ 271; Answer ¶ 27.) As more fully

---

[3] This illustration relates to the Zohar II CLO. The other Zohar funds have similar structures.

described below, both payment of the Subordinated Collateral Management Fee and distributions on preference shares are dependent on the Zohar funds passing certain valuation tests, and thus those valuation tests were of critical importance to both Respondents and investors. (FOF ¶ 271.) These valuation tests meant that if the funds were performing well, Tilton would benefit financially as collateral manager, while if the funds were performing poorly, the Subordinated Collateral Management Fee and distributions on preference shares would be diverted from Respondents to the funds, and ultimately investors, to protect their investments. (*Id.*)

Each of the Zohar funds raised a significant amount of money from institutional investors. Zohar I raised approximately $532 million; Zohar II and Zohar III each raised approximately $1 billion. (FOF ¶¶ 258, 260, 262.) Tilton – through the Patriarch Collateral Managers – used these funds to buy or make loans to primarily private, mid-sized companies that were in distress (the "Portfolio Companies"). (FOF ¶ 263; Answer ¶ 20.) Tilton often directed more than one of the Zohar funds to extend loans to the same Portfolio Company. (Answer ¶ 20.)

Repayment of these loans by the Portfolio Companies was and is critical to the investors in the Zohar funds. (FOF ¶ 71.) The Zohar funds are so-called "cash flow" CLOs: repayment of the loans by the Portfolio Companies is the means by which the investors in the Zohar funds are to recover their investments. (FOF ¶¶ 264, 324-26.) Every quarter, the investors were to receive an interest payment, generated from the collective interest payments made by the Portfolio Companies. (*Id.*) Although they received interest payments quarterly, investors were generally not entitled to be repaid their principal until the maturity date of their notes from the Zohar funds. (*Id.*) Each of the deals has a 12 year maturity, meaning that investments in Zohar I (launched in 2003) matured last year (but, as noted below, Zohar I defaulted and was unable to repay investors' principal), investments in Zohar II (launched in 2005) will mature in early 2017 (as noted below,

Zohar II is also expected to default), and investments in Zohar III (launched in 2007) will mature in 2019.  (FOF ¶ 265; Answer ¶ 16.)

In addition to directing the Zohar funds to make loans to the Portfolio Companies, Tilton actively controlled (and still manages) the business of Portfolio Companies.  (FOF ¶ 272.)  Tilton is and was the CEO or sole manager of many of the Portfolio Companies. She is and was involved with hiring and firing of employees, making major operating decisions, and requiring that the companies regularly report their financial condition and business prospects; she was aware of the extent to which interest payments were or were not being made to the Zohar funds by the Portfolio Companies.  (*Id.*)  In addition to Tilton's management of the Portfolio Companies, Tilton obtained equity in the Portfolio Companies.  (FOF ¶ 269.)

Tilton's ostensible management strategy for the Zohar funds was to improve the operations of the distressed Portfolio Companies so that the companies could pay off their debt (including their loans from the Zohar funds), increase in value, and eventually be sold for additional profit. (Answer ¶ 22.)  Tilton failed in this strategy: In November 2015, Zohar I defaulted on its obligation to repay noteholders their principal investments. In addition, Respondents have represented that Zohar II is likely to default when it matures in early 2017.  (FOF ¶ 265.)

B.      **Respondents Were Investment Advisors and Owed Fiduciary Duties.**

Each of the Respondents was an investment adviser to the Zohar funds during the relevant time period.  (FOF ¶¶ 255, 256, 257, 259, 261, 270; Answer ¶¶ 12-14.)  More specifically, as noted above, each of the Patriarch Collateral Managers was registered as an investment adviser with the Commission and received fees in exchange for providing investment advice to the respective Zohar

funds.[4]  (*Id.*)  Tilton is an investment adviser as well: she owns and controls the Patriarch Collateral Managers and provided and was compensated for investment advice to the Zohar funds.  (*Id.*)  And Patriarch Partners, LLC employs individuals in various roles to help Tilton and the Patriarch Collateral Managers manage the Zohar funds, making that entity an investment adviser also.  (FOF ¶ 255.)

As investment advisers, Respondents owed fiduciary duties to their clients. *See* Section IV.A, *infra*. Indeed, Patriarch Partners, LLC's compliance manual recognizes that investment advisers

> are in a position of trust and confidence with respect to their Clients and have a fiduciary duty to place their Clients' interests before the Firm's and its Employees' interests. This includes an obligation to avoid or minimize both conflicts of interest and the appearance of any conflicts of interest.

(DX 37, 39, 41 at p. 20 § 5B.)

In addition, the CMA for each Zohar deal provides a standard of care for the collateral manager, requiring the collateral manager to "use reasonable care and the same degree of skill and attention … exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral [that is being managed] and for clients having similar investment objectives and restrictions."  (DX 13, 14, 15 § 2.4.)  The CMA also outlines the collateral manager's obligations, including the obligation to not take any action that the collateral manager knows or should know would "cause the [issuer] to violate the terms of the Indenture" or "adversely affect the interests of" the Zohar investors.  (*Id.* at § 2.6.)

---

[4] As noted above, Patriarch Partners XV, LLC (the collateral manager entity for Zohar III) was registered as an investment adviser. Patriarch Partners VIII, LLC (the collateral manager entity for Zohar I) and Patriarch Partners XIV, LLC (the collateral manager entity for Zohar II) were registered as relying investment advisers.  (FOF ¶¶ 255, 256, 257, 259, 261, 270; Answer ¶¶ 12-14.)

C.    **The Zohar Indentures Prescribed Important, Objective Requirements to Value and Categorize Fund Assets, Which Protected the Funds and the Funds' Investors.**

The Zohar funds' controlling documents made clear that investors would receive regular interest payments and the repayment of their principal on a specified maturity date. (FOF ¶ 264.) As a safeguard for investors, the indenture for each of the Zohar funds contains certain objective tests that must be met over time and that relate to the performance of the fund's assets – the loans to the Portfolio Companies. (FOF ¶¶ 271, 284, 293.) The indentures also prescribe consequences for failing these tests. (FOF ¶¶ 271, 337, 339, 348, 357.) The results of these tests were communicated to investors each month through reports distributed by the Zohar funds' trustee. (FOF ¶ 334.)

One key test is the Overcollateralization Ratio ("OC Ratio") test. (FOF ¶¶ 271, 293, 334, 335, 339.) In its simplest terms, the OC Ratio compares the assets of a CLO (*i.e.* the loans the CLO owns) to the liabilities of a CLO (*i.e.* the notes the CLO owes to investors). (FOF ¶ 338.) The higher the OC Ratio, the greater the cushion between the value of the Zohar fund's assets and the amount the fund owes to its investors. (FOF ¶¶ 271, 334, 337, 339, 348, 357.) As one of the Division's experts, Ira Wagner, explained in his report and at the hearing, OC Ratios and related tests are significant to investors in CLOs. (*Id.*) Wagner's opinions were corroborated by all of the Division's investor witnesses. As those investor witnesses explained, the OC Ratio is important: it is one of the first things they review on each month's trustee report to assess the performance of the investment. (FOF ¶¶ 17, 74, 231.)

In addition to providing information on the performance of the funds' assets, declines in the OC Ratio trigger important protections for investors. (FOF ¶¶ 271, 337, 339, 349.) Wagner outlined those protections in his reports. (FOF ¶¶ 337, 339, 349.) In brief, as the OC Ratio falls,

meaning the value of the Zohar fund's loan assets declines and comes closer to the amount the fund owes to its investors, the chance of an investor suffering losses in its principal grows. (*Id.*) For that reason, as the OC Ratio breaches certain test levels, the indentures impose a number of consequences to insulate investors from further loss. (*Id.*)  For example, if the OC Ratio falls below an initial prescribed level,[5] cash flow is re-directed *away from* Respondents (by restricting subordinated management fees payable to the collateral manager and preference share distributions to entities Tilton controls) and *toward* the investors (in the form of accelerated payments on their notes). (*Id.*)  If the OC Ratio falls even further, the indentures provide investors with additional rights, which for Zohar I and II include the option of terminating the collateral manager. (*Id.*) Thus, the results of the OC test directly impacted Respondents' ability to obtain management fees as well as to maintain a position of control over the Zohar funds. (*Id.*; *accord* FOF ¶ 271.)  In total, Tilton collected about $600 million in collateral management fees and preference share distributions from the Zohar funds. (FOF ¶ 271.)

The indentures require that the OC Ratio be calculated using objective measures. (FOF ¶¶ 29, 75, 236, 284, 293, 343, 344; DX 1 at 13; DX 2 at 11-12; DX 3 at 9-10.)  The Zohar funds' assets – the loans to the Portfolio Companies – are required to be categorized by the collateral manager, and that category determines the value of the asset for purposes of the OC ratio. (FOF ¶¶ 281, 284, 343-346.)  For Zohar I and II, the asset categories range from a "1" to a "4." (FOF ¶ 284.)  Category 4 assets are the strongest; Category 1 assets are the weakest.[6]  (*Id.*)  In the case of

---

[5] That level varies depending on the Zohar fund. The level was set at 105% for Zohar I, 112% for Zohar II, and 112.7% for Zohar III.

[6] As a practical matter, Categories 2 and 3 were rarely used; categorization was binary as either a 1 or a 4.

Zohar III, the numerical designations were replaced with two categories: "Defaulted Investment" and "Collateral Investment." (*Compare* DX 1 & 2 definitions with DX 3 definitions.) These are equivalent to Categories 1 and 4, respectively. (*Id.*) In either case, loans that are Category 4/Collateral Investments are essentially valued at 100 cents on the dollar for purposes of calculating the OC Ratio; loans that are Category 1/Defaulted Investments are haircut by some amount.[7] (FOF ¶¶ 340-343, 346, 347.) This means that, as loans are moved from a Category 4/Collateral Investment to a Category 1/Defaulted Investment, the OC Ratio falls. (*Id.*; FOF ¶¶ 63, 64, 319.)

Each indenture contains specific, objective definitions for each asset category that turn, in large part, on whether the Portfolio Company is current on its loan interest payments to the Zohar funds. (FOF ¶ 284, 293; DX 1-3.) For Zohar I and II, a loan to a Portfolio Company may not be categorized higher than a Category 1 unless, among other things, it is "Current." (DX 1 at 10, 23-24, 38; DX 2 at 8-9, 22-23, 44.) A loan is not "Current" if it is a "Defaulted Obligation," which is a loan "***with respect to which a default as to the payment of*** principal and/or ***interest has occurred*** (without regard to any applicable grace period or waiver of such default), but only so long as such default has not been cured." (*Id.* (emphasis added).) Thus, for Zohar I and II, a loan that has failed to make interest payments when due must be classified as a Category 1 asset.[8] (*Id.*)

---

[7] In Zohar I, the value of a Category 1 loan is determined by using the loan's Original Purchase Price Percentage, meaning the percentage of the outstanding principal on the loan that the CLO paid to acquire the loan. In Zohar II, the value of a Category 1 loan is determined by using either the Moody's or Standard & Poor's recovery rates, which were typically between 40% and 60%. A Defaulted Investment in Zohar III is valued the same way, *i.e.*, by reference to the Moody's or Standard & Poor's recovery rates.

[8] More precisely, for Zohar I and II, a loan is "Current" if it is not "Non-Current." A "Non-Current" loan is a "Defaulted Obligation" which has "previously deferred and/or capitalized as principal any interest due." Thus, a loan must be placed in Category 1 if the borrower has not

14

Zohar III has similar, objective criteria. A "Defaulted Investment" – the equivalent of a Category 1 loan in Zohar I and II – includes a loan "*with respect to which a default as to the payment of* principal and/or *interest has occurred*, but only so long as such default has not been cured." (DX 3 at 20, 21, 41 (emphasis added).) Thus, like Zohar I and II, under the objective definitions in the indenture, a loan that has failed to make interest payments when due must be categorized as a Defaulted Investment.[9]  (*Id.*)  As investor witnesses explained at the hearing, they expected Respondents to follow the objective terms of the indenture to categorize assets for purposes of the OC Ratio.  (FOF ¶¶ 29, 75, 240.)

In sum, the indentures set out specific, objective measures for categorizing loan assets and haircutting the value of loans that are not paying any or all interest. As the Division's expert Ira Wagner explained in his report and at the hearing, these measures – haircutting the value of assets that are not performing to redirect payments to investors – are common features of CLOs and structured finance transactions generally and provide critical investor protection.  (FOF ¶¶ 271, 334, 337, 339, 348, 357.)

**D.  Respondents Ignored These Objective Requirements and Instead Categorized Fund Assets Based on Tilton's Subjective Belief in the Prospects of the Portfolio Companies.**

Rather than follow the objective definitions required by the indentures, Respondents have categorized assets based on Tilton's subjective, personal belief in whether the underlying Portfolio

---

been current on its interest payments for two consecutive periods: the first missed payment creates a "Defaulted Obligation" by virtue of the "default as to the payment of … interest," and the second consecutive missed payment creates a "Non-Current" loan since it is then a Defaulted Obligation that, because of the missed interest payment in the prior period, "previously deferred … any interest due."

[9] Zohar III does not have the same terms as Zohar I and II, which require that the borrower fail to make full interest payments for two consecutive periods. Thus, the first missed interest payment requires a loan in Zohar III to be categorized as a "Defaulted Investment."

Company would ultimately be successful. (FOF ¶¶ 296, 297, 305, 321.) Over the life of the Zohar funds, many Portfolio Companies have repeatedly defaulted on their periodic interest payments: in some cases, they have paid only a fraction of the interest due in a given period, in other cases they have paid no interest at all in a given period. (FOF ¶ 313.) Respondents were well aware of the piecemeal and often minimal interest payments Portfolio Companies made on their loans – indeed, Tilton herself made the ultimate decision to accept less interest than the amount that was due, and would do so only after the respective portfolio company's management travelled to New York to meet with Tilton, explained why the company could not make its interest payments, and presented a 12-month business plan. (FOF ¶¶ 273, 397.) However, despite Tilton's plain awareness that the portfolio company was incapable of satisfying its contractual obligations, in direct contravention of the indentures, Respondents did not categorize the loans based on whether interest payments were current or defaulted. (FOF ¶¶ 296, 321.) Tilton could not have been clearer about this in her testimony, repeatedly admitting that she substituted her subjective, personal belief in the long-term prospects of a Portfolio Company for the objective requirements of the indentures. Indeed, she went so far as to claim that the failure to pay interest does not affect a loan's categorization:

> A.   . . .*[C]ategorizations are based on the belief in the future recovery and the reorganization, not based on how much interest is collected. The categorizations are based on the belief in the ultimate reasonableness of the recovery and the future.*
>
> Q.     And where was that – that concept of the ultimate reasonableness of recovery, how is that reflected in the indenture?
>
> A.     I'd have to review the indenture, but there – *the categories, we have discretion over choosing the categories*; and for us in control situations, the categories are binary. *A Category 1 is either – it's a formal restructure of bankruptcy, or we believe that despite efforts in additional funding, that the value or the performance of the company will still decline in time. And a Category 4 is that we have reasonable belief to conclude that with additional funding and additional effort, that the performance of the company will improve with time.*

(DX 219 at Tilton Testimony Day 2 at 88:14-89:10; *accord* FOF ¶¶ 296, 321.)

> Q    Can you tell me how that practice -- how did that practice get established?
>
> A    I can't tell you exactly when it got established, but basically if we're supporting a company and we are effectuating a turnaround, they are usually paying some form of interest, and *in those instances where* they are paying interest, and *we are continuing our support with a reasonable belief of recovery, we keep it a Category 4. At what time we don't, it becomes a Category 1.*

(DX 219 at Tilton Testimony Day 1 at 182:17-183:1.)

> Q    Okay. So you said when you are active in a turnaround, you are putting money and effort in it, and there's time, and so *what changes would cause you to go from saying there's a reasonable chance of recovery to no reasonable chance?*
>
> A    That we're no longer going to provide the capital it needs, that we have given up on the turnaround, that we're not putting our efforts anymore, we're not hiring management teams, we are not on the ground, you know, making certain that they have the operational expertise. We basically said, you know, this takes a deep concentrated effort and *we believe that the capital it will take and the effort it will take is not worth the journey and the winding road to get there.* And there are times when, given what's going on in the portfolio, we take that stance.
>
> Q    *And who makes that decision?*
>
> A    *Ultimately I do* because I make the decisions on additional funding.

(DX 219 at Tilton Testimony Day 1 at 177:6-24.)  (emphasis added to all)

As a result of Tilton's subjective, personal belief assessment approach, Respondents classified very few loans lower than Category 4/Collateral Investment, regardless of the poor performance of the funds.  (DX 7, 8, and 9 (Zohar I, II, and III Trustee Reports).)  For example, as of January 2014, more than one hundred loans in the Zohar II portfolio were classified as Category 4 while only 16 loans were categorized as Category 1.  (*Id.*; Answer ¶42.)  Moreover, as of the time of the institution of these proceedings, all of the Zohar funds reported OC Ratios that were passing the prescribed test levels.  (DX 7, 8, and 9.)

Respondents were acutely aware of the OC Ratio, were interested in keeping it high, and proactively managed it. (FOF ¶¶ 273, 292; DX 138, 147.) For example, in early July 2009, Tilton communicated with another Patriarch employee about the restructuring of a particular Portfolio Company. Tilton pressed the employee to explain what that restructure "mean[t] in OC pickup." (*Id.*) When the employee responded that other events would cause the OC Ratio to fall, Tilton scolded the employee to "get to me in advance if OC will retreat so radically. I need to know this before the end of the month so I can see if there is anything I want to do to change things. We need to be proactive before the month closes." (*Id.*) Similarly, in late 2008, in a communication with a different Patriarch employee, Tilton wrote, "I[']ll take any OC where I can get it." (*Id.*)

As discussed below, Respondents' subjective, personal belief categorization approach – which was not disclosed to the Zohar funds' investors – allowed Respondents to "be proactive" in manipulating the OC Ratio and to report materially higher OC Ratios than the actual ratios under the objective, disclosed terms of the indentures.

### E.    Respondents' Subjective Belief Approach Resulted in Respondents Improperly Obtaining $200 Million in Fees and Preference Share Distributions, as Well as Retaining Control over the Funds.

Had Respondents followed the objective categorization methodology required by the indentures – rather than categorizing assets based on Tilton's subjective, personal belief in the Portfolio Companies – the number of loans categorized as Category 1/Defaulted Investment, as well as the OC Ratio, would have looked very different. One of the Division's experts, Michael G. Mayer, calculated what the OC Ratio should have been each quarter had Respondents properly categorized the loans based on whether the Portfolio Companies were current in their interest payments. (FOF ¶¶ 63-64.) Mayer's analysis shows that the OC Ratio was materially misstated in numerous periods, that the OC Ratio fell below the level that should have re-directed cash flows

away from Respondents (by restricting subordinated management fees and preference share distributions) and toward investors (in the form of additional payments on their notes), and that in the case of Zohar II, the OC Ratio fell to the level where investors should have had the option to terminate the collateral manager.  (*Id.*)

For Zohar II, Mayer's analysis shows that by the middle of 2009, the properly-calculated OC Ratio (denoted as "CRA Adjusted" in the chart below) diverged significantly from the reported OC Ratio that was based on Tilton's subjective, personal belief in the Portfolio Companies (denoted as "Original" in the chart below):

### Zohar II OC Ratio Test Results by Quarter

| Year | Quarter Ending | Original | CRA Adjusted | Minimum | Pass/Fail | Year | Quarter Ending | Original | CRA Adjusted | Minimum | Pass/Fail |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | Jul-05 | 118.38% | 118.16% | 112.00% | Pass | 2010 | Jan-10 | 121.65% | 103.59% | 112.00% | Fail |
| | Oct-05 | 113.95% | 113.95% | 112.00% | Pass | | Apr-10 | 120.45% | 103.69% | 112.00% | Fail |
| 2006 | Jan-06 | 118.49% | 118.36% | 112.00% | Pass | | Jul-10 | 120.07% | 101.80% | 112.00% | Fail |
| | Apr-06 | 122.53% | 122.41% | 112.00% | Pass | | Oct-10 | 120.35% | 101.77% | 112.00% | Fail |
| | Jul-06 | 122.39% | 122.27% | 112.00% | Pass | 2011 | Jan-11 | 119.44% | 100.73% | 112.00% | Fail |
| | Oct-06 | 123.86% | 123.74% | 112.00% | Pass | | Apr-11 | 120.29% | 101.11% | 112.00% | Fail |
| 2007 | Jan-07 | 123.12% | 122.78% | 112.00% | Pass | | Jul-11 | 120.26% | 100.47% | 112.00% | Fail |
| | Apr-07 | 123.36% | 123.02% | 112.00% | Pass | | Oct-11 | 120.41% | 100.94% | 112.00% | Fail |
| | Jul-07 | 120.50% | 119.40% | 112.00% | Pass | 2012 | Jan-12 | 119.72% | 99.91% | 112.00% | Fail |
| | Oct-07 | 122.97% | 122.59% | 112.00% | Pass | | Apr-12 | 120.23% | 100.02% | 112.00% | Fail |
| 2008 | Jan-08 | 122.06% | 121.47% | 112.00% | Pass | | Jul-12 | 120.56% | 100.07% | 112.00% | Fail |
| | Apr-08 | 121.45% | 121.00% | 112.00% | Pass | | Oct-12 | 118.23% | 98.52% | 112.00% | Fail |
| | Jul-08 | 123.57% | 120.85% | 112.00% | Pass | 2013 | Jan-13 | 118.03% | 98.26% | 112.00% | Fail |
| | Oct-08 | 121.97% | 119.15% | 112.00% | Pass | | Apr-13 | 115.26% | 95.40% | 112.00% | Fail |
| 2009 | Jan-09 | 125.93% | 121.93% | 112.00% | Pass | | Jul-13 | 115.35% | 95.35% | 112.00% | Fail |
| | Apr-09 | 124.38% | 120.35% | 112.00% | Pass | | Oct-13 | 115.45% | 95.30% | 112.00% | Fail |
| | Jul-09 | 121.19% | 111.65% | 112.00% | Fail | 2014 | Jan-14 | 115.54% | 95.51% | 112.00% | Fail |
| | Oct-09 | 121.88% | 107.82% | 112.00% | Fail | | Apr-14 | 115.29% | 97.78% | 112.00% | Fail |
| | | | | | | | Jul-14 | 115.60% | 97.64% | 112.00% | Fail |
| | | | | | | | Oct-14 | 114.79% | 97.76% | 212.00% | Fail |

(FOF ¶¶ 63-64; DX 17 at 56.)  In addition to the OC Ratio being materially misstated, starting in July 2009, the OC Ratio fell below the specified level – 112% – that should have re-directed cash flows away from Respondents and toward investors.  (*Id.*)  And starting in July 2010, the OC Ratio fell below 102%, which is the level that triggers an "Event of Default" and gives the Zohar II investors the right to terminate the collateral manager.  (*Id.*)

Mayer's analysis shows similar results for Zohar III. For Zohar III, the properly-calculated OC Ratio (again denoted as "CRA Adjusted" in the chart below) began diverging significantly from the OC Ratio Respondents were reporting (again denoted as "Original" in the chart below) in early 2009:

Zohar III OC Ratio Test Results by Quarter

| Year | Quarter Ending | Original | CRA Adjusted | Minimum | Pass/Fail |
|---|---|---|---|---|---|
| 2007 | Dec-07 | 110.33% | 109.46% | 112.70% | N/A |
| 2008 | Mar-08 | 107.58% | 106.74% | 112.70% | N/A |
| | Jun-08 | 127.36% | 126.77% | 112.70% | Pass |
| | Sep-08 | 122.78% | 118.08% | 112.70% | Pass |
| | Dec-08 | 127.31% | 122.53% | 112.70% | Pass |
| 2009 | Mar-09 | 127.04% | 115.00% | 112.70% | Pass |
| | Jun-09 | 122.75% | 110.31% | 112.70% | Fail |
| | Sep-09 | 123.99% | 109.17% | 112.70% | Fail |
| | Dec-09 | 125.19% | 110.19% | 112.70% | Fail |
| 2010 | Mar-10 | 125.06% | 109.77% | 112.70% | Fail |
| | Jun-10 | 125.28% | 109.21% | 112.70% | Fail |
| | Sep-10 | 125.27% | 109.04% | 112.70% | Fail |
| | Dec-10 | 125.28% | 109.08% | 112.70% | Fail |
| 2011 | Mar-11 | 125.12% | 109.11% | 112.70% | Fail |
| | Jun-11 | 123.18% | 107.56% | 112.70% | Fail |
| | Sep-11 | 124.44% | 108.43% | 112.70% | Fail |
| | Dec-11 | 124.41% | 109.18% | 112.70% | Fail |
| 2012 | Mar-12 | 124.32% | 108.99% | 112.70% | Fail |
| | Jun-12 | 120.97% | 107.38% | 112.70% | Fail |
| | Sep-12 | 121.50% | 107.44% | 112.70% | Fail |
| | Dec-12 | 121.46% | 107.47% | 112.70% | Fail |
| 2013 | Mar-13 | 119.62% | 105.42% | 112.70% | Fail |
| | Jun-13 | 120.05% | 105.37% | 112.70% | Fail |
| | Sep-13 | 120.39% | 105.31% | 112.70% | Fail |
| | Dec-13 | 120.63% | 105.21% | 112.70% | Fail |
| 2014 | Mar-14 | 116.79% | 105.67% | 112.70% | Fail |
| | Jun-14 | 118.74% | 107.28% | 112.70% | Fail |
| | Sep-14 | 117.83% | 105.71% | 112.70% | Fail |
| | Dec-14 | 118.13% | 105.62% | 112.70% | Fail |

(FOF ¶¶ 63-64; DX 17 at 57.)  As with Zohar II, beginning in June 2009 the OC Ratio fell below the specified level – 112.7% – that should have re-directed cash flows away from Respondents and toward investors.[10]  (*Id.*)

As a result of Tilton's improper subjective, personal belief categorization approach, Respondents retained significant sums that should have been re-directed to the Zohar funds and those funds' investors.  (FOF ¶ 66.)  As Mayer demonstrates through his analysis, Respondents

---

[10] While many of the Zohar I loans to Portfolio Companies were not current on their interest payments, because the "haircut" made to the value of such loans was minimal under the terms of the Zohar I indenture, *see supra* n. 7, Zohar I would not have failed the OC Ratio test even if the collateral had been categorized correctly. Still, the improper categorization of assets in Zohar 1 misled investors about their performance.

were paid more than *$200 million* in subordinated management fees and preference share

distributions to which they were not entitled:

**Preference Share Distributions and Subordinated Collateral Management Fees Paid**

**During the Period in which Zohar II and Zohar III Failed their OC Ratio Tests**

| CLO | OC Ratio Test Fail Period | Preference Share Distributions | Subordinated Collateral Manager Fees | Total |
|---|---|---|---|---|
| Zohar II | Jul 2009 - Dec 2014 | $0 | $76,012,349 | $76,012,349 |
| Zohar III | Jun 2009 - Dec 2014 | $41,000,000 | $91,403,522 | $132,403,522 |
| Total | | $41,000,000 | $167,415,871 | $208,415,871 |

(FOF ¶ 66; DX 17 at 63.)

> **F.    Investors Were Not Aware of Respondents' Subjective Belief Approach or the Conflict of Interest it Created.**

Respondents did not disclose Tilton's subjective, personal belief categorization approach,

and came nowhere near meeting the exacting standards imposed upon fiduciaries. (FOF ¶¶ 29, 76,

238.) As investor witnesses explained at the hearing, they expected Respondents to follow the

objective terms of the indenture to categorize assets for purposes of the OC Ratio. (FOF ¶¶ 29, 75,

240.) They were not aware that Respondents were categorizing loans based on, in Tilton's words,

"the belief in the ultimate reasonableness of the recovery and the future." (FOF ¶¶ 29, 76, 238.)

Moreover, the investor witnesses explained that this information – knowing that Respondents were

categorizing loans based on Tilton's subjective, personal belief in the Portfolio Company's

ultimate success rather than following the objective terms of the indentures – would have been

important to their investment decision. (FOF ¶¶ 32, 76, 239.)

In addition to concealing the actual performance of the Zohar funds' assets, Tilton's

subjective, personal belief approach to categorization created a significant conflict of interest.

Respondents made decisions in a way that allowed them to collect money from the funds and

retain absolute control over their management, despite the poor performance of the funds' assets. More specifically, Tilton controlled the Portfolio Companies, controlled the decision whether to allow those Portfolio Companies to pay less interest than was due, and (based on Tilton's undisclosed, subjective, personal belief in the underlying Portfolio Company) controlled the decision of whether to move a loan from a Category 4/Collateral Investment to a Category 1/Defaulted Investment for purposes of the OC Ratio, regardless of whether the borrower was paying interest due. (FOF ¶¶ 270-273, 281, 309.) This approach gave Respondents absolute discretion to prevent downgrades of loans that were not making full interest payments, thereby artificially inflating the OC Ratio above the point where the investor protections were triggered. (*Id.*) Put simply, Respondents' approach to categorization eviscerated the investor protections afforded by the OC Ratio tests, directing more than $200 million to Respondents that should have flowed to the funds and their investors. (FOF ¶¶ 295; 350.) Despite this impact, Respondents did not disclose Tilton's subjective, personal belief approach that they employed to categorize assets and the glaring conflict of interest it created. (FOF ¶¶ 29, 76, 238.)

G.    **The Zohar Funds' Financial Statements Were False and Misleading.**

In addition to prescribing objective standards for categorizing assets for the OC Ratio, the indenture for each of the Zohar funds also required that the respective funds provide quarterly financial statements prepared in accordance with U.S. GAAP. (FOF ¶ 134.) Also, in each of the funds' financial statements, Respondents represented that the fair value of the loans to Portfolio Companies was approximately equal to their carrying value. (FOF ¶ 147.) However, the financial statements were not U.S. GAAP compliant, and the representations about fair value were false and misleading because Respondents had no basis to make any such disclosure. (FOF ¶¶ 183-190.)

Each of the Zohar fund's indenture required the publication of quarterly financial statements prepared in accordance with U.S. GAAP. (FOF ¶ 134.) The financial statements were prepared by Patriarch's accounting department, approved by Tilton, and then provided to the trustee, which in turn made them available to investors. (FOF ¶ 131, 135, 298.) Each financial statement contained a cover page and certification signed by Tilton. (FOF ¶ 298.) The certification (also required under the terms of the indentures) provided, in part, that the balance sheet and income statement were prepared in accordance with U.S. GAAP, that Tilton had reviewed the balance sheet and income statements, and that those documents fairly presented the financial position of the relevant Zohar fund in all material respects.[11] (DX 10-12.)

Contrary to the indenture and Tilton's certifications, the balance sheet and income statements were not prepared in accordance with U.S. GAAP. (FOF ¶¶ 183-190.) Specifically, Patriarch did not perform U.S. GAAP-compliant impairment analyses, but represented that it did. (FOF ¶¶ 183-190.) U.S. GAAP requires certain affirmative steps to account for loan impairment, which Respondents did not follow. (FOF ¶¶ 183-190.) Here, loans to Portfolio Companies were recorded on the Zohar funds' financial statements at cost. (FOF ¶ 148.) These loans made up the vast majority of the assets on the balance sheet, which also included a corresponding payable to investors in the Zohar funds. (DX 10-12.) To conform with U.S. GAAP, as required by the indentures, Patriarch was required to perform an impairment analysis. (FOF ¶ 178, 179.) Under

---

[11] Although Patriarch did hire an outside accounting firm – Anchin, Block & Anchin, LLP ("Anchin") – Patriarch did not employ Anchin to ensure the financial statements were prepared in accordance with U.S. GAAP. (FOF ¶¶ 99, 137-140, 299.) In fact, the engagement letter makes explicit that Anchin's "[f]inancial statements services shall consist of reading and commenting on financial statements, computations or other financial data compiled by Patriarch employees" and the Anchin firm would "take no responsibility regarding the accuracy or completeness of such statements, computation or data or whether such statement or data comply with generally accepted accounting principles." (FOF ¶¶ 94, 95, 301; DX 34.)

U.S. GAAP, a creditor is required to record a loss when it is probable that a loan is impaired as of the date of the financial statement. (FOF ¶ 178.) A loan is impaired, and must be measured for the amount of impairment loss, when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contract with the debtor. (*Id.*)

Respondents did not follow these requirements, and did not impair loans, but instead only wrote the loan (or a portion of the loan) off if and when Tilton determined that she would no longer support a Portfolio Company. (FOF ¶ 144, 145, 302; DX 162.) Indeed, Tilton explicitly directed that loan values were not to be written down, but rather that loans were only to be written off after she so directed, and only after debt forgiveness or extinguishment. (*Id.*) As Tilton bluntly put it in an email to Patriarch's controller: "[W]e do not write up or write down – we write off." (*Id.*) Thus, while Tilton continued to represent to investors that the funds' financial statements were compliant with U.S. GAAP, they were not. (FOF ¶¶ 183-190.) Instead, consistent with her improper subjective, personal belief approach to categorizing loans for purposes of the OC Ratio, Tilton would not write down impaired loans until she subjectively gave up on a company, an approach that contradicted the indentures, her quarterly certifications, and U.S. GAAP. (*Id.*)

Notably, after the Division provided a Wells notice to Respondents, the Zohar funds' financial statement disclosures and the related certifications signed by Tilton changed significantly. (FOF ¶¶ 112-116; 142-143; 191-195). The references to U.S. GAAP were removed and the notes to the Zohar funds' financials were changed to include disclosures that the loan assets would not be impaired until, in the judgment of the collateral manager, principal losses could be conclusively determined. As one of the Division's experts, Steven Henning, explained in his report and at the hearing, the fact that the financial disclosures eliminated these references to U.S. GAAP compliance – without changes in the underlying accounting methodologies – is an

24

acknowledgement by the Respondents that the prior reporting departed from U.S. GAAP. (FOF ¶¶ 191-195). Regardless, the "conclusively determined" standard does not comport with U.S. GAAP, which requires a creditor to record a loss when it is *probable* that a loan is impaired as of the date of the financial statements. (FOF ¶ 178.)

Moreover, even though Respondents did not conduct a U.S. GAAP-compliant impairment analysis, they told investors that they did. (DX 10-12.) For example, Respondents disclosed in the footnotes to their financial statements that where "the anticipated future collections are determined to be less than the carrying value of the loan, the Company will record an impairment loss . . ." (*Id.*) However, Respondents did not use any analysis of future collections for this purpose, but instead relied on Tilton's subjective judgment to determine when an asset was impaired. (FOF ¶¶ 133, 141-146.)

Respondents' abandonment of their obligation to perform U.S. GAAP-compliant impairment analyses informs their conduct with respect to the manipulation of the OC Ratio. As noted herein, the portfolio companies began missing large amounts of interest payments, especially during and after the Financial Crisis. (FOF ¶ 165.) A U.S. GAAP-compliant impairment analyses would have forced Tilton and Patriarch to impair loan assets because numerous portfolio companies were not making their interest payments. Such a disclosure, combined with the representation that the OC Ratio was passing, may have alerted investors that the OC Ratio was being manipulated, that the Zohar funds were not performing well, or both. To avoid such a disclosure, and to conceal these facts, Patriarch performed no U.S. GAAP-compliant impairment analyses, but represented that it did.

In addition, Respondents misrepresented that the fair value of the loans was approximately equal to their carrying value, which was the cost to purchase or the dollar amount of the loan to the

portfolio company. (FOF ¶¶ 147-150; 187-190.) The notes to the Zohar funds' financial statements represented that "[f]or substantially all of the Collateral Debt Obligations, [ ], fair values are based on estimates using present value of anticipated future collection or other valuation techniques." (DX 10-12.) However, Tilton did not direct, and the accounting department did not engage in, any analysis of the present value of anticipated future collections. (FOF ¶¶ 105, 147-150, 152, 188-190, 306.) Nor did they apply any other valuation technique to determine the fair value of the loans. (*Id.*) Instead, Respondents made assertions to investors about the fair value of loans without any substantiation or basis for doing so. (FOF ¶¶ 147-150; 187-190.) To the extent that Respondents claim that their valuations were based on cost, this misses the point because "fair value" and "cost" are not the same thing. (FOF ¶¶ 150, 410, 413.)

As noted above, after the Division initiated this action, the Zohar funds' financial statement disclosures changed significantly. (FOF ¶¶ 112-116; 191-195). The references to U.S. GAAP were removed and the "fair value" and "anticipated future collection" language was changed to disclose that the loans were simply carried at cost. (Id.) As Dr. Henning explained in his report and at the hearing, the fact that the financial statement disclosures eliminated these references to U.S. GAAP compliance – without changes in the underlying accounting methodologies – is an acknowledgement by the Respondents that the prior reporting departed from U.S. GAAP. (FOF ¶¶ 191-195). Regardless, as acknowledged by Respondents' expert, if an entity represents that its financial statements present the results of a legitimate U.S. GAAP-compliant fair value analysis, the entity should actually conduct a fair value analysis. (FOF ¶ 413.)

### H.    Respondents' Post-Hoc Arguments are Inconsistent with their Conduct.

At trial, Respondents' relied on a post-hoc, ever-shifting series of arguments that their conduct was both proper and disclosed. However, their arguments in support of their defenses are

inconsistent with their prior conduct. Perhaps most indicative of these inconsistences – with respect to both the manipulation of the OC Ratio and their purposeful misrepresentations on loan impairment and fair value – is demonstrated by their treatment of accrued interest on the Zohar funds' financial statements. Patriarch's treatment of accrued interest, viewed in conjunction with their post-hoc arguments, demonstrates inherent inconsistency in Respondents' arguments that loans were "amended," that the portfolio companies were current, and that Respondents believed they would obtain the interest due on the loans. Put another way, Respondents' treatment of accrued interest directly rebuts Respondents' claims that they were not manipulating the OC Ratio.

Accrued interest is interest that was owed to the Zohar funds, but not collected (*i.e.* interest the portfolio companies owed but could not pay). (FOF ¶ 153.) The Zohar funds' balance sheet contained a line item for accrued interest, along with a "net of an allowance for uncollectible items." (FOF ¶ 154.) At one time the Zohar funds' financial statements disclosed the entirety of accrued interest (*i.e.* the total amount of interest owed to the respective Zohar fund but not collected). (FOF ¶ 155.) However, by 2010, this practice – and the transparency it afforded to investors – had ceased at the direction of Tilton. (FOF ¶¶ 156, 159.) Instead, because the accrued interest figure was not a number that was "meaningful to investors," Patriarch changed its policy to omit the total accrued interest figure and only disclose on the balance sheet what Patriarch "actually expected to collect." (FOF ¶¶ 158, 159, 164.)

In 2010 there was an "uptick" in portfolio companies that could not pay their owed interest and there was a reduction in what Patriarch expected to collect. Thus, the accrued interest figure began to grow. (FOF ¶ 165.) Patriarch's Controller, Carlos Mercado, therefore sought guidance from Tilton on changing the methodology as to how Patriarch calculated accrued interest. (FOF ¶ 166.) Tilton directed that the methodology be changed after Mercado sent an email explaining that

under the current methodology the accrued interest figure would increase by more than $4 million from the previous quarter. As outlined in Mercado's email, the methodology change would "maintain a more consistent accrual level" that "results in accrual that is in line with the prior period," and then broke out how the new figure would be similar to the prior quarters. (DX 218; FOF ¶¶ 167, 169.) According to Mercado, this methodology change was allegedly made for the benefit of investors. (FOF ¶ 169.)

Respondents' conduct with respect to accrued interest rebuts Respondents' proffered defenses in this case, and shows the inherent inconsistencies in their arguments. First, Respondents' treatment of accrued interest is at odds with their argument that loans were being amended (i.e. they were no longer technically due so there was no technical default), and that Patriarch ultimately believed it would obtain the funds from the portfolio companies, thereby justifying the "current" status for the OC Ratio. As Respondents explicitly recognized in their own internal accounting, this interest was due, this interest was not paid, and this interest was so unlikely to ever be paid that it warranted near complete omission of the interest from the Zohar funds' balance sheet. Indeed, as even acknowledged by Respondents' own expert, "because there's so much uncertainty as to collection, you really don't have a collectible," and therefore the accrued interest did not belong on the balance sheet. (FOF ¶¶ 416, 417.) Inexplicably, the very same companies missing interest payments that were not expected be collected continued to be classified as "current" with respect to the OC Ratio.

Second, Respondents' treatment of accrued interest is at odds with their arguments that they were not concealing missed interest payments from investors. Indeed, an internal email between Tilton and Patriarch's controller (DX 218) makes explicit that the accrued interest methodology was changed for the specific purpose of creating an "accrual that is in line with the

28

prior period." As the email makes crystal clear, this methodology change was made in order to actively conceal the "uptick" in portfolio companies missing interest payments in 2010, which would have resulted in a more than $4 million increase in the accrued interest line item on the balance sheet. (DX 218; FOF ¶¶ 165, 166.) Such conduct is inconsistent with Respondents' arguments that they were freely disclosing that portfolio companies were missing interest payments but were still treated as current for purposes of the OC Ratio. Indeed, if Respondents did not in fact fear disclosing missed interest payments alongside a Portfolio Company's categorization as current for purposes of the OC ratio, there would have been no need to change the accrued interest methodology to "result[] in accrual that is in line with the prior period. (DX 218; FOF ¶¶ 167, 169.) As Patriarch's controller conceded, the goal of a financial statement is to accurately reflect the entity at that point in time, not to have the statement be consistent with past statement. (FOF ¶ 168.)

Third, Respondents' treatment of accrued interest is at odds with their arguments that Respondents' believed that their not engaging in impairment or a fair value analyses was proper. It is not a coincidence that Patriarch *did* impair accrued interest by recognizing it was unlikely to be collected and not to be considered an asset. This practice, which removed the bulk of uncollectible accrued interest figures from the balance sheet, was inconsistent with the practice of not impairing the principal of loans. Indeed, it is telling that impairing the interest, and not impairing the principal, had the same effect: concealing that portfolio companies were not making their loan payments. It is therefore not surprising that Tilton told Patriarch's controller that discussing Patriarch's lack of loan impairment was "not an email discussion." (FOF ¶ 145; DX 162.) Again, Respondents' conduct with respect to accrued interest makes clear that the allegations herein were not simple oversights, but rather a calculated effort to conceal from investors that portfolio

companies were not making interest payments, but were continued to be classified as current with respect to the OC Ratio. Respondents' failure to engage in any analyses for impairment of loan principal or fair value simply corroborate that Respondents' conduct of concealing missed interest payments, and their manipulation of the OC ratio, was no accident.

**I.      Current Status of the Zohar Funds**

As noted above, the Zohar funds have failed. In November 2015, Zohar I defaulted on its obligation to repay noteholders their principal investment.[12] (FOF ¶ 265; Answer ¶ 16.)  In addition, Respondents have represented that Zohar II is likely to default when it matures in early 2017.  (*Id.*)  In early 2016, Respondents resigned as collateral manager for the various Zohar funds. (FOF ¶¶ 255, 257, 159, 261.)  The replacement collateral manager has sued Respondents, alleging that Respondents will not provide them "critical documents and information needed to assess the state of the Zohar Funds' investments and to manage those investments to obtain maximum value for investors."[13]

**IV. ARGUMENT**

**A.      Section 206 of the Advisers Act**

Respondents are charged with violating Advisers Act Sections 206(1), (2), and (4), and Rule 206(4)-8. Section 206(1) of the Advisers Act prohibits an investment adviser from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client[,]" and Section 206(2) prohibits an investment adviser from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]"

---

[12] Many, if not all, of the investors in Zohar I and II had their positions insured by MBIA.

[13] Verified Complaint, *Zohar CDO 2003-1, LLC et al. v. Patriarch Partners, LLC et al.*, Civ. Action No. 12247-VCS (Del. Ch. Apr. 22, 2016).

Section 206(4) prohibits a registered investment adviser from engaging "in any act, practice, or course of business which is fraudulent, deceptive, or manipulative[,]" including those defined by the Commission.

"The purpose of the Advisers Act and its rules is to protect investors, not investment advisers." *SEC v. Nutmeg Group LLC*, 162 F. Supp. 3d 754, 777 (N.D. Ill. 2016) (citing *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009)). Section 206 of the Advisers Act "establishes 'federal fiduciary standards' to govern the conduct of investment advisers." *Transamerican Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979). In recognition of the "delicate fiduciary nature of an investment advisory relationship," Section 206 places an "affirmative duty" on advisers of "utmost good faith, and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191, 194 (1963) (internal quotation marks omitted). A "fundamental purpose of [the Advisers Act is] to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *In the Matter of The Robare Group, Ltd.* et al., Adv. Act Rel. No. 4566 at 7 (Nov. 7, 2016) (quoting *Capital Gains* 375 U.S. at 186). In addition, the provisions of the Advisers Act exist to "'eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.'" *SEC v. Nutmeg Group LLC*, 162 F. Supp. 3d at 772 (quoting *SEC v. DiBella*, 587 F.3d at 567).

To commit fraud, a fiduciary need not make an affirmative misstatement; fraud can also be:

conduct that is deceptive because it is inconsistent with a fiduciary duty. In claims of this kind, the fiduciary duty serves as a sort of standing false representation by the fraudster, who deceives the victim by violating the commitment associated with her fiduciary duty. Acceptance of a fiduciary duty creates an understanding that the fiduciary will behave in certain ways; if the fiduciary allows this understanding to continue while acting inconsistently with her obligations, she has deceived the victim.

31

*In re Refco Capital Markets Ltd. Brokerage Customer Secs*. Litig., 2007 WL 2694469 at *7

(S.D.N.Y. Sept. 13, 2007) (citing *SEC v. Zandford,* 535 U.S. 813, 821 (2002)).

Moreover, an investment adviser's clients and investors are not expected to ferret out

information from their investment advisers. "'[T]he law does not put the onus on investors to

seek out disclosures; it puts the obligation to provide disclosures on people who solicit and

manage investors' money.'" *In the Matter of ZPR Investment Management, Inc. et al.*, 2016 WL

3194778 (Comm. Order Denying Mot. for Reconsideration, June 9, 2016) (quoting *SEC v.*

*Nutmeg Group LLC*, 162 F. Supp. 3d at 780). In addition, violations of the antifraud provisions

of Section 206 do not require a showing of actual injury to any client. *SEC v. Capital Gains*

*Research Bureau Inc.*, 375 U.S. 180, 195 (1963).

Scienter is required for a violation of Section 206(1), but negligent conduct is sufficient

under Sections 206(2) and 206(4). *See, e.g., SEC v. Treadway*, 430 F. Supp. 2d 293, 338

(S.D.N.Y. 2006); *SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir. 1977).

Recklessness satisfies the scienter standard under Section 206(1) and is established where there

has been an "extreme departure from the standards of ordinary care." *SEC v. Steadman*, 967 F.2d

636, 641 (D.C. Cir. 1992) (citation omitted); *see also Vernazza v. SEC*, 327 F.3d 851, 860 (9th

Cir. 2003) (investment adviser violated Section 206(1) because "investment advisers are

knowledgeable enough to recognize [when] an arrangement . . . creates potential conflicts of

interest").

The standard for materiality under the Advisers Act is whether there is a substantial

likelihood that a reasonable investor would have considered the information important.

Amendments to Form ADV, Advisers Act Rel. No. 3060 (2010) n. 35 (*citing Steadman*, 967

F.2d at 643); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Generally speaking,

the existence of a conflict of interest is a fact that an investment adviser, as a fiduciary, must disclose. *Vernazza*, 327 F.3d at 859; *Robare Group et al.,* Advisers Act Rel. No. 4566 at 8 (November 7, 2016) (citing *IMS/CPAs & Assocs.*, Exchange Act Rel. No. 45109, 2001 WL 1359521 at *8) (Economic conflicts of interest are material facts that must be disclosed by investment advisers.). In addition, the value of the collateral for an investment is a material fact that an investor would consider important. *See, e.g., SEC v. Mannion*, 789 F.Supp.2d 1321, 1334 (N.D. Georgia 2011) (inflation of net asset value by investment adviser could support materiality requirement under federal securities laws).

Section 206 protects both the fund and the fund's investors. The "client" to whom Sections 206(1) and 206(2) refer is the fund, rather than the fund's investors. *See Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006). By contrast, Section 206(4) and Rule 206(4)-8 also apply to misconduct against investors in a fund. *Id.* at n.6. Rule 206(4)-8 specifically prohibits an investment adviser from making false or misleading statements, and from engaging in "any act, practice, or course of business that is fraudulent, deceptive, or manipulative[,]" with respect to investors in pooled investment vehicles.

B.    **Respondents Are Investment Advisers, the Zohar Funds are Their Clients, and the Investors in the Zohar Funds are Investors in Pooled Investment Vehicles.**

The Advisers Act contains a "broad definition" of an investment adviser. *See, e.g., In the Matter of Donald L. Koch et.al.*, S.E.C. Rel. No. 3836, 2014 WL 1998524, *18 (Comm. Op. 2014). Specifically, Section 202(a)(11) of the Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Each of the Respondents falls within this broad definition.

The Patriarch Collateral Managers acted as the funds' investment advisers by selecting and managing collateral, among other obligations, for compensation from the time of the funds' inception until they resigned in March 2016. Indeed, the Patriarch Collateral Managers were registered as investment advisers with the Commission from March 2012 until March 2016. In addition, because Tilton owns and controls the Patriarch Collateral Managers and was compensated for investment advice to the Zohar funds, she is also an investment adviser. *See, e.g.*, *SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001) (finding that present and sole shareholder of investment adviser entity who "effectively controlled [the investment adviser] and its decision making" was "properly labeled an investment adviser within the meaning of the Advisers Act"). And finally, since Patriarch Partners' employees performed all relevant investment advisory services for the Patriarch Collateral Managers, Patriarch Partners also meets the statutory definition of an investment adviser. *See, e.g.*, *In the Matter of John J. Kenny, et al.*, SEC Rel. No. IA-2128, n. 54 (May 14, 2003) (Comm. Op.) (an individual associated with an investment adviser entity "may be charged as a primary violator under Section 206 where the activities of the associated person cause him or her to meet the broad definition of 'investment adviser.'").

Further, each of the Zohar funds is the client of the Patriarch Collateral Manager designated as its collateral manager. *See, e.g.*, *Goldstein*, 451 F.3d at 881-82. Each fund is also a client of Tilton and Patriarch Partners, since they are also investment advisers and advised each fund. Finally, each of the Zohar funds is a "pooled investment vehicle" under Rule 206(4)-8(b).[14] As a

---

[14] Each of the Zohar funds is a pooled investment vehicle because it would be an investment company but for its reliance on an exclusion from the definition of investment company provided by Sections 3(c)(1) and (7) of the Investment Company Act. These sections provide exclusions for investment company issuers – like the Zohar funds – that do not make a public offer and have fewer than 100 security holders or whose outstanding shares are owned exclusively by qualified purchasers.

result, each of the fund's investors is protected under Advisers Act Section 206(4) and Rule 206(4)-8.

### C.   Respondents Made False and Misleading Statements and Engaged in Fraudulent and Deceptive Practices and Courses of Business.

1.   Categorization of Fund Assets and Reporting of the OC Ratio Test Results

Pursuant to the documents governing the Zohar deals, Respondents were required to categorize the fund assets. The indentures clearly spelled out the criteria for each category. Rather than follow the objective definitions required by the indentures, Respondents categorized assets based on Tilton's subjective, personal belief in whether the underlying Portfolio Company borrower would ultimately be successful. (FOF ¶¶ 296, 297, 305, 321.) This is not consistent with the practice disclosed to investors.

Investors were promised an objective categorization method—that a loan would be classified as a Category 4 or Collateral Investment only when it was "Current." Correspondingly, they were also promised that a loan would be categorized as a Category 1 or a Defaulted Obligation when a "default as to the payment of principal and/or interest has occurred." Instead of following the indenture, Tilton admits that she made the ultimate decision as to whether to accept less than the full amount of interest owed and, if she did so, the loan would not be considered defaulted. (FOF ¶¶ 273, 321.)

As a result of the improper and undisclosed categorization method, Respondents made numerous misstatements to the funds and their investors regarding the categorization of the funds' collateral. First, Respondents' statements in the indentures and other governing documents about asset categorization were false and misleading since Respondents were not engaging in the objective categorization methodology disclosed in those documents. Further, in each monthly trustee report, the category of each loan is separately reported. By improperly reporting the

categories for the funds' collateral, Respondents made misstatements month after month. In addition, due to the false categorizations, Respondents improperly reported the funds' OC Ratios, which were derived from the categorization of the collateral.

Moreover, the failure of Respondents to appropriately categorize the loans obscured the financial condition of the Zohar funds from investors. For example, investor David Aniloff testified that the OC Ratio measures the value of the loans held in a CLO relative to the amount invested, and a change to the OC Ratio would provide a reflection of how the underlying collateral is performing. (FOF ¶¶ 16, 19.) Because of Respondents' improper approach to the categorization, investors did not get this important information.

These acts — consistently categorizing loans in a way that was contrary to the Zohar governing documents and was undisclosed to investors – also represent a fraudulent, misleading, and deceptive scheme, practice, and course of business toward the Zohar funds and their investors. *See SEC v. Mannion,* 789 F.Supp.2d at 1339 (recognizing that overvaluation of fund assets can constitute a scheme under Section 206 of the Advisers Act).

2.    Failure to Disclose Circumstances Giving Rise to a Conflict of Interest

Tilton's approach to categorization gave rise to an unambiguous, significant conflict of interest: she was incentivized to keep loans categorized as a 4 even when borrowers were not paying current interest in order to keep the OC Ratio test passing, to continue to receive subordinated management fees, and to retain control of the funds—categorizations that were not in the best interest of the funds. Respondents improperly failed to disclose this conflict and the facts giving rise to it.

The law could not be more clear on this point: investment advisers who stand to benefit financially from their advisory activities must fully and completely disclose the circumstances

surrounding their advisory services. Indeed, as the Supreme Court has explained, a conflict exists where a relationship "might incline a[n] investment adviser—*consciously or unconsciously*—to render advice which was not disinterested." *Capital Gains,* 375 U.S. at 191-92 (emphasis added).

For example, the Commission recently found that an adviser violated Section 206 of the Advisers Act by failing to disclose to its clients that it would receive compensation when it made certain investment decisions on behalf of its clients. *Robare Group et al.,* Advisers Act Rel. No. 4566 (November 7, 2016). Similarly, where payments "obtained from client funds" were "used to benefit an investment adviser," the Commission found that such an arrangement must be disclosed pursuant to Section 206. *JS Oliver Capital Management*, Rel. No. 4431 at 7, 21016 WL 3361166 at *8 (June 17, 2016).

The evidence is clear that Respondents stood to gain financially from Tilton's categorization practice but did not disclose that practice.[15] The investors who testified had no understanding that Tilton would continue to categorize assets as a Category 4 or Collateral Investment even where contractual interest payments had not been made. In fact, investors testified to precisely the opposite—that they expected a loan to be considered defaulted where it had not paid contractually agreed-upon interest. (FOF ¶¶ 23, 75, 234.) Likewise, the investors had no understanding that Tilton would categorize assets based on her subjective belief in the company's future prospects. (FOF ¶¶ 29, 76, 238.) However, as described above, Tilton was handsomely compensated through this practice—she alone decided when an asset would be categorized as Category 1 or a Defaulted, and entities she controlled received subordinated

---

[15] Although the governing documents did disclose some conflicts of interest inherent in the funds' structure, the specific conflict alleged by the Division—Tilton's approach to categorization—was not disclosed. "A fiduciary cannot avoid its obligation of full disclosure by disclosing a different conflict of interest." *Edgar R. Page and Page One Financial, Inc.*, SEC Rel. No. 4400 at 5, 2016 WL 3030845 at *7 (May 27, 2016).

management fees and preference share distributions because of her categorization method. The law requires disclosure of such a glaring conflict of interest.

    3.    <u>False and Misleading Financial Statements</u>

Respondents also prepared and distributed false and misleading financial statements, which further obscured the poor performance of the collateral underlying the Zohar funds. Pursuant to a requirement in the indentures, Tilton signed a certification that the financial statements prepared by the Funds complied with U.S. GAAP. As described above, Respondents, under Tilton's direction, failed to perform a U.S. GAAP-compliant impairment analysis and also failed to conduct the type of impairment analysis that it disclosed it had done. Instead of reviewing assets for impairment when indicators of impairment were present, Respondents waited until a definitive event occurred indicating the certainty of a loss and then wrote off that loan, or a portion of that loan. (FOF ¶¶ 183, 184.) Respondents' practice of waiting until a loss was certain is inconsistent with U.S. GAAP. (FOF ¶ 185.) Moreover, Respondents disclosed that they would perform a U.S. GAAP-compliant impairment analysis based on a cash flow analysis of anticipated future collections, which they did not. (FOF ¶ 183, 203).

Respondents also failed to conduct a fair value analysis of the loans to Portfolio Companies, despite disclosing that it had done so. Instead, Respondents merely represented that the fair value of the loans approximated the cost of the loans, which was the reported amount on the balance sheet. Investors, however, were told that Respondents conducted a fair value analysis. Curiously, at trial, Respondents claimed that a fair value analysis was conducted, but the controller—Patriarch's senior accounting officer—testified that he had never participated in any such analysis over the course of many years, nor had external accountant Peter Berlant. (FOF ¶ 152.) Indeed, there is not a single shred of evidence in the record that Patriarch's external or

internal accountants were involved in Patriarch's phantom U.S. GAAP-compliant fair value analyses. Regardless of Respondents' post-hoc arguments at trial, Respondents' amended financial statement disclosures made clear that the loan assets were "recorded at cost and the company's equity interests in portfolio companies are not recorded on the consolidated balance sheet[,]" after all references to any disclosed fair value were removed. (Div. Ex. 18 at 24-25.)

### D.    Respondents' Misstatements Were Material.

Respondents' false and misleading statements and omissions regarding how assets were categorized and valued, the resulting false and misleading statements and omissions related to the OC Ratio, and the false and misleading statements and omissions in the financial statements, were all obviously material.

Investor testimony supports a finding of materiality. First, investors testified that it was important for the collateral manager to follow the requirements of the indentures, including properly and objectively categorizing the portfolio company loans for OC Ratio purposes. (FOF ¶¶ 14, 15, 20, 75, 78, 240, 242.). Indeed, investors all testified that the OC Ratio was very important to their investment decisions, and as one investor, David Aniloff, described it, the OC Ratio was "the most important ratio in a CLO, by far." (FOF ¶¶ 17, 18, 28, 74, 77, 231.) Had investors known that Tilton would categorize loans based on her personal belief in the portfolio companies rather than using the method disclosed in the indentures, that would have been important information to them, and likely would have changed their investment decisions. (FOF ¶¶ 29, 31, 35, 76, 77, 239.) Second, several investors also testified that the disclosures in the financial statements were important to them, including the disclosures regarding fair value and U.S. GAAP compliance. (FOF ¶¶ 50, 83.)

Furthermore, it is apparent that there is a substantial likelihood that a reasonable investor would have considered these misrepresentations and omissions important given their subject matter.  The OC Ratio compares the assets of a CLO to its liabilities: it provides a snapshot of the financial health of the CLO.  (FOF ¶¶ 74, 338.)  Additionally, declines in the OC Ratio beyond a certain level would trigger investor protections, including funds being directed away from Respondents to the investors, and in certain instances, the ability to remove the collateral manager.  (FOF ¶¶ 271, 337, 339, 349.)  Disclosures related to the financial health of an investment and investor protections are plainly material to investors.  Additionally, Respondents' manipulation of the OC Ratio to inflate it and avoid redirecting funds to investors is a significant conflict of interest that would necessarily be material to investors.

With respect to the financial statements, Respondents disclosed that the fair values of the loans to the portfolio companies, taken as a whole, were approximately equal to the carrying value presented on the balance sheet, when in fact no such calculation was done.  (FOF ¶¶ 180-190.)  And Respondents claimed to use a U.S. GAAP-compliant impairment methodology, when they did not.  (*Id.*)  A reasonable investor would consider it material that a CLO fund – whose ability to repay principal rests on the financial condition of the underlying loans – had not actually engaged in a fair value calculation of the loans that it claimed to have done, and had not used a U.S. GAAP-compliant impairment methodology that it claimed to have used.  Respondents' false and misleading disclosures on these topics in the financial statements were also therefore material.

**E.      Respondents' Conduct was Intentional, Reckless, or at Least Negligent.**

Respondents acted intentionally, recklessly, or at least negligently.  Respondents knew (or at least had information showing) what the indentures required with respect to categorization,

that hundreds of millions of dollars of interest was unpaid, that the collection of this interest was "doubtful." Yet they continued to categorize these loans in the highest category. Remarkably, Respondents also claimed that they were fully "transparent" with investors even though the evidence plainly belies such a claim. Particularly in the context of an investment adviser with fiduciary duties and obligations of candor, the record evidence shows that Respondents acted with scienter or, at a minimum, negligently.

Tilton and Respondents have at all relevant times controlled the Zohar funds and known of the indentures' categorization requirements, the OC Ratio test and its consequences, and the actual interest payments by the portfolio companies. (FOF ¶¶ 255, 256, 270-273.) And Tilton and the other Respondents were well aware of their fiduciary obligations and standard of care. (FOF ¶¶ 274-276.) But instead of following the criteria for categorization set forth in the indentures, Respondents categorized assets based on Tilton's subjective, personal belief in the future of the portfolio companies.[16] (FOF ¶ 296; DX 219.) In addition, although Respondents clearly knew how they were categorizing assets, and knew – or at a minimum should have known – that this approach was undisclosed, was contrary to the terms of the indenture, and created a significant conflict of interest, Respondents did nothing to adequately disclose this approach to the funds or their investors. They also failed to disclose or seek any consent to their significant conflict of interest.

Respondents' undisclosed, subjective categorization approach manifested its investor-harming consequences during the Financial Crisis, when the Zohar funds' portfolio companies lost 30 to 35 percent of their revenues and did not pay their interest due, yet Tilton still kept the

---

[16] Because Tilton controls Patriarch and the Patriarch Collateral Managers, her scienter is imputed to those entities.

loans to these portfolio companies categorized as a 4 or current.  (FOF ¶ 316.)  Indeed, Tilton

allowed hundreds of millions dollars of unpaid interest to accrue.  (FOF ¶ 313.)  Moreover,

Respondents acknowledged that the collection of this unpaid interest was "doubtful," and yet

they continued to categorize the loans as a 4 or current.  (FOF ¶ 312.)  This conduct – keeping

myriad loans with millions of dollars in unpaid, "doubtful" interest in the highest-performing

category – further evidences that Respondents acted with scienter or, at a minimum, negligently.

Tilton had significant motivation to keep the OC Ratios artificially inflated.  By

improperly categorizing the loans, she was able to keep the OC Ratio for each fund passing, thus

avoiding the consequences of OC Ratio failure, including the increased rights to control the fund

assets afforded the insurer or the noteholders in the event of an OC Ratio failure.  To the extent

that these other parties gained control of the funds and could potentially force asset sales, Tilton

stood to lose the enormous potential equity upside that she held in the portfolio companies.  (FOF

¶ 269.)

As for the financial statements, Tilton personally signed the officer's certificate verifying

the accuracy of the financial statements for the Zohar Funds.  Patriarch took responsibility for the

financial statements.  (FOF ¶¶ 298, 301.)  But Tilton and Respondents did not analyze fair value

or impairment as they claimed in the financial statements.  (FOF ¶¶ 302, 304, 305, 306.)  At one

point, as accrued interest grew, Tilton and Respondents even changed the numbers in the

financial statements so they looked the same, despite the significantly larger amount of unpaid

interest.  (FOF ¶ 311.)  Despite her knowledge of the financial condition of the Portfolio

Companies and Patriarch's actual accounting practices, Tilton allowed the financial statements to

be published without anyone conducting impairment analyses and while including false or

misleading disclosures relating to the valuation of assets.  She certified the financial statements,

knowing that she applied her own subjective standards for impairment without regard to standards prescribed by U.S. GAAP. These intentional and deceptive acts are strong evidence of Respondents' scienter.

Rather than helping Respondents, Tilton's specious claims that she did, in fact, "transparently" disclose what she was doing in the categorization process further underscores that Respondents were purposefully acting to keep information from investors. Tilton's defense boils down to her false claim that "Category 4 just meant that it wasn't defaulted. And if I agreed to accept less interest than the stated amount on the credit agreement, I had amended and it wasn't defaulted." (FOF ¶ 321.) This bizarre approach was not disclosed in the indentures, nor was her subjective method to categorize loans based on her personal belief in the portfolio companies. (*Id.*)

Instead of simply disclosing her actual practice in straightforward terms, Tilton merely disclosed – in different portions of the trustee report and ratings agency reports – certain information about cash flows, which she calls "transparency." (*Id.*) Tilton's "transparency" included stating in an investor call that "things could be done to elongate the time needed to be able to create the most amount of value to pay off the loans." (*Id.*) And she now claims that that was a disclosure of her purported practice of amending by course of performance, which she claims "everyone knew, everyone saw it, everyone understood." (*Id.*) In fact, no evidence was presented that Tilton disclosed her subjective categorization method to any investor, which falls manifestly short of the high standard imposed under the Advisers Act. Rather, investors testified that they did not know about Tilton's subjective method. Perhaps most damningly, Tilton did not call a single investor to back up her false claim that she disclosed her deceptive practice. (*Id.*) She instead relied on a post-hoc, ever-shifting series of arguments at trial that investors should have spent untold hours piecing together fragments of information to divine her true practices.

43

Respondents hid the truth from investors, and this is the strongest evidence of scienter. Tilton knew that allowing companies to pay less than interest due without re-categorizing the loans was contrary to the indentures, but she never disclosed to investors that she was doing this. Rather, she kept the loans categorized as 4s or current, kept her money coming in, and stayed in control of the funds. Her only defense is a *post hoc* lawyer-created argument that because she disclosed some incomplete information about cash flows, investors should have figured out that she was not following the indentures.[17] (FOF ¶ 309, 310.) But she had countless opportunities to disclose her actual subjective categorization practice, and never did, which evidences her true intent.

In addition, Respondents' conduct was reckless or at a minimum negligent since it was inconsistent with the actions that a reasonable investment adviser would take. Through the Zohar governing documents, Respondents told investors that loans would be categorized based on whether they were making their interest payments. Investors testified that they understood – as is common in the industry – that if a loan did not pay its interest, and specifically if a loan did not pay its stated coupon rate, it should be categorized as defaulted. (*See, e.g.*, FOF ¶¶ 23-25, 234-236, 251.) Even so, Respondents kept loans with tens of millions of dollars in unpaid interest categorized as Category 4/ Collateral Investments, because of Tilton's subjective belief that, ultimately, these Portfolio Companies would turn around. Moreover, Respondents did not fully and candidly disclose to investors what they were doing; indeed, every investor who testified explained that they did not understand what Respondents were doing. In addition, a reasonable investment adviser would not certify that financial statements were prepared in accordance with U.S. GAAP when they were not, and would not obfuscate the value of the fund assets on the financial

---

[17] In all of her testimony that Tilton gave in 2013, her first testimony in this case, she did not say that she was amending by course of performance. (DX 219.)

statements. No reasonable investment adviser would have acted this way, and violated their standard of care. (FOF ¶¶ 276, 360.) Thus, in addition to Respondents' actions being done with scienter, their actions were negligent.

Respondents' conduct demonstrates that they acted intentionally, recklessly, or at a minimum negligently with respect to their false and misleading statements, fraudulent or deceptive practices, and course of business.

**F. Respondents Violated Section 206 of the Advisers Act or Aided and Abetted and/or Caused a Violation.**

By failing to disclose that Respondents were not following the objective terms of the indenture, but rather were categorizing assets based on Tilton's subjective, personal belief in the future of the Portfolio Companies, by collecting fees to which Respondents were not entitled, by failing to disclose the facts underlying their conflict of interest, and by making false and misleading statements regarding the asset categorization approach, the OC Ratio, and the financial statements, Respondents violated Sections 206(1) and 206(2) of the Advisers Act by defrauding the three Zohar funds, and violated Section 206(4) and Rule 206(4)-8 thereunder by defrauding the investors in the Funds.[18]

---

[18] Alternatively, to the extent Your Honor disagrees that the evidence shows that Patriarch Partners, LLC is itself an investment adviser, Patriarch aided and abetted and/or caused these violations. To establish aiding and abetting liability, the Division must show: (1) "that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator, and (3) that the aider and abettor had the necessary 'scienter'-*i.e.* that she rendered such assistance knowingly or recklessly." *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000). Negligence is sufficient to establish liability for causing a violation when a person is alleged to have caused a primary violation that does not require scienter. *In re KPMG Peat Marwick*, Exchange Act Rel. No. 43862 (Jan. 19, 2001), *aff'd, KPMG v. SEC*, 289 F.3d 109 (D.C. Cir. 2002). In an administrative proceeding, a finding that a respondent aided and abetted a primary violation necessarily makes that respondent a "cause" of those violations. *See In the Matter of Clarke T. Blizzard, et al.*, Advisers Act Rel. No. 2253, 2004 SEC LEXIS 1298, at *16 n.10 (June 23, 2004) (Comm. Op.). Patriarch aided and abetted and/or caused the other Respondents' violations by providing substantial assistance to Tilton and the other entities. For

G.     **Respondents' Defenses Have No Merit.**

1.     Respondents Did Not Disclose Their Categorization Method.

Tilton testified extensively that investors understood what she was doing with respect to categorization. She further argues that her categorization method was accurately disclosed because investors could determine that companies were not paying full interest if they reviewed the trustee reports. This defense is without merit.

As a threshold matter, the trustee reports did not disclose Tilton's subjective categorization approach. Indeed, they did not even explicitly disclose that companies categorized as a 4 or current were not making interest payments at the stated rates. Rather, to come to this conclusion, an investor would be required to undertake a multi-step analysis for each loan, on a monthly basis, requiring them to: 1) review the principal balance on a particular loan; 2) review the contractual rate of interest on that loan; 3) review the amount actually paid for the period; and 4) review the category assigned to that loan.[19] (FOF, ¶ 282.) Although investors in Zohar II and III may have been able to determine from the trustee reports that loans were not paying their contractual rate of interest at times, investors could not determine the method that Tilton was using to categorize the loans (which was different from the disclosed method) or easily determine what the actual OC Ratio was (which was different from the reported ratio).

In addition – and critically – investors did not expect that they would need to recalculate the reported categories or OC Ratio. (FOF ¶¶ 43, 81.) And, as discussed above, the law does not require them to do so. "[T]he law does not put the onus on investors to seek out disclosures; it puts

---

example, Patriarch's employees provided all information to the trustee, including the misleading information relating to categorization of the assets and the false financial statements.
[19] Each Zohar Fund issued a report monthly. Each report covered about 90 loans in the case of Zohar I and about 150 loans in the case of Zohar II and III. *See* DX 7-9. The Zohar I cash flows do not appear in the trustee reports.

the obligation to provide disclosures on people who solicit and manage investors' money." *In the Matter of ZPR Investment Management, Inc., and Max E. Zavanelli*, SEC Rel. No. 4417 at 6 (June 9, 2016) (quoting *SEC v. Nutmeg Group, LLC*, 162 F. Supp. 3d 754, 780 (N.D. Ill. 2016)). The disclosure that Respondents claim was provided, was simply not sufficient. "Full and fair disclosure cannot be achieved through piecemeal release of subsidiary facts which if stated together might provide a sufficient statement of the ultimate fact." *Kennedy v. Tallant*, 710 F.2d 711, 720 (1983).

Tilton further argues that her method was "disclos[ed]" because on an investor call in 2011, she stated that "things could be done to elongate the time needed to be able to create the most amount of value to pay off the loans." (FOF ¶ 321.) But this statement is not even remotely a candid and transparent disclosure of Tilton's categorization approach.

Respondents make the same claims about disclosure as the Defendants did in *SEC v. Nutmeg Group*, 162 F. Supp. 3d 754 (N.D. Ill. 2016), which were rejected by the court. In that case, Defendants claimed that where investors wrote checks to and received distributions from the investment advisory firm rather than the specific fund in which they invested, they were properly on notice that their assets would be commingled with assets of the firm and/or assets of other funds. The Court disagreed, noting that this argument "reflect[s] a basic misunderstanding of what constitutes meaningful disclosure to investors." *Id.* at 780. In addition, the Defendants in *Nutmeg Group* also claimed that the investors knew what they were doing, but, as here, failed to offer any evidence other than their own testimony that this was the case. *Id.* Finally, as here, Defendants in *Nutmeg Group* claim that they would have answered questions had they been asked. However, appropriately, the Court noted that "a willingness to disclose is a poor substitute for actual disclosure." *Id.* at 779-80.

2.    Tilton Was Not Amending the Loans.

The primary justification asserted by Tilton for retaining loans as Category 4 or Collateral Investments when the borrowers were not paying current contractual interest is that those loans were "amended by course of performance" whenever she did not collect the full interest due from the borrower. These "amendments" are not documented through any written agreement and, puzzlingly, do not even amend the underlying loans. Tilton's explanation is simply preposterous. Tilton was not actually amending the loans when she accepted less than full interest—she was just accepting less than full interest and failing to properly recategorize the loans.[20] The unpaid interest remained due and owing, but was omitted from the Zohar funds' financial statements because the collection of the funds was claimed to be doubtful.

As an initial matter, Tilton's claim is that accepting less than full interest was an amendment by course of performance simply does not make sense. When these purported "amendments" occurred, the loan terms did not change. (FOF ¶¶ 309, 366.) The credit agreement was not amended. (FOF ¶, 309, Tr. 2524: 1-6.) And the interest rate disclosed in the trustee reports remained the same. (FOF ¶ 366). Tilton attempted to explain this type of "amendment," stating that "[i]t was a different type of amendment, but it was still an amendment. But we didn't amend the actual credit agreement, because we were keeping the contractual materials the same, and then making that decision on a monthly basis on whether to amend and defer until a later date." (Tr. 2523:20-2524:8.) This explanation simply defies credulity: one cannot amend a loan without amending the contractual credit agreement. As the Division's expert witness Ira Wagner explained, "an amendment but not an amendment to the credit agreement just really doesn't make any sense." (Tr. 2978:20-2979:7.)

---

[20] There were many documented amendments to loans to portfolio companies. However, the acceptance of less than the contractually-owed interest by Tilton was generally not documented. (FOF ¶366(a).)

Further, the indentures specify certain actions that must be taken by the collateral manager when a loan is amended. Specifically, the indenture dictates that the collateral manager will notify the trustee when "any term or condition" of a loan has "been amended or waived, and the effect of such amendment or waiver was to change the interest rate. . . " (DX 2 at PP050451.) Likewise, the indenture required Respondents to notify rating agencies of amendments, and submit an amended loan for re-rating. Respondents did not do any of these things, significantly undercutting the claim that Tilton's actions were "amendments." (FOF ¶ 366.) Respondents did provide written amendments to both the rating agencies and the trustees. What they did not do is provide notice of the unwritten "amendments" – that is, the purported agreements not to collect interest due – to those parties. The reason for this is clear: these were not actual amendments, but instead are a post-hoc legal fiction created to justify Tilton's approach to categorization. Tilton herself struggled to explain why certain amendments were provided to the rating agencies, but others were not.

Lastly, Tilton's amendment argument is at odds with Patriarch's own internal accounting records on accrued interest, which makes clear that interest payments were missed, remained due and owning, but were not included as an asset on the Zohar funds' balance sheet because the interest was so unlikely to be collected. It is nonsensical that Tilton amended the loan so the amount was no longer due and owing, but at the same time the amount was considered due and owing for accounting purposes, but unlikely to be collected.

   3.    At the Very Least, Respondents' Conduct Was Misleading.

Even if Your Honor determines to credit Tilton's argument that she was amending loans by course of performance, her conduct rendered the statements Respondents made incredibly misleading to investors. As described above, Respondents continually failed to disclose the true

condition of the Zohar funds' collateral to investors through the misstatements of the categories of collateral, the improperly-reported OC Ratio, and the false and misleading financial statements. In addition, despite clear language in the Zohar governing documents that loans would be categorized as Category 1s or Defaulted Investments if borrowers defaulted on a payment of interest, Tilton allowed Portfolio Companies to miss tens of millions of dollars in unpaid interest – interest she herself said was "doubtful" to be collected – and yet continued to categorize those loans as Category 4s or Collateral Investments. Put simply, investors could not tell what was happening with their investments or what Tilton was doing.

At Tilton's direction, loans with tens of millions of dollars in unpaid interest were reported as current on the trustee reports. Respondents' practice of simply reporting loans as current and the OC Ratio as passing, provided investors with the false comfort that the principal on their investments would ultimately be recoverable. However, as noted above, Zohar I has already defaulted on that obligation and Zohar II is expected to default in January 2017. At Tilton's direction, loans were not being analyzed for impairment. Again, had loans been appropriately impaired, investors would have had some indication that repayment of their principal was in danger. At Tilton's direction, the method for reporting interest accrual was changed so that investors could not see a large amount of unpaid interest.

4.    Respondents Do Not Have a Reliance Defense

Respondents' arguments that they "relied" on external accountant Peter Berlant are meritless. "Good faith reliance on the advice of an accountant or an attorney has been recognized as a viable defense to scienter in securities fraud cases." *SEC. v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (citing cases). "To establish the defense, the defendant should show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct,

received advice that the conduct was appropriate, and relied on that advice in good faith." *Id.* (citing cases). In such cases, "good faith reliance" is "not a complete defense, but only one factor for consideration." *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir.1994).

As an initial matter, as acknowledged by Patriarch's controller, Berlant was not reviewing or opining on whether the Zohar funds' financial statements complied with U.S. GAAP, and was not testing whether the Zohar funds' financial statements complied with U.S. GAAP. Rather, Berlant was providing instruction as to whether or not there was an issue that Patriarch needed to incorporate into the financial statements, or "consider to be included into the financial statements." (FOF ¶ 139.) This was corroborated by Berlant who testified that he had no knowledge of whether the Zohar funds' financial statements were prepared in accordance with U.S. GAAP because he was never asked to interpret, or given an opportunity to research and consider, whether the Zohar funds' financials were U.S. GAAP-compliant. (FOF ¶ 99.)

This was further corroborated by Anchin's engagement letter, signed by both Tilton and Berlant, which defined what Anchin would and would not do, and where Anchin's responsibilities lie and where Patriarch's responsibilities lie: "Financial statements services shall consist of reading and commenting on financial statements, computations or other financial data compiled by Patriarch employees." (DX 34; FOF ¶¶ 94, 95, 301.) The Engagement Letter made explicit that Anchin and Berlant would "take no responsibility regarding the accuracy or completeness of such statements, computations or data, or whether such statements or data comply with generally accepted accounting principles or any other specified basis of accounting." (*Id.*)

The amount of time Berlant had with the financial statements, and his practice of picking up the phone and calling a Patriarch employee with any comments, further corroborates that he could not have been performing any meaningful tasks outside the scope of his engagement letter.

51

As explained by Patriarch's controller, Berlant typically had about two days to look at and comment on the draft financials, and this time frame would not have allowed him to perform an audit, review or compilation of the Zohar funds' financial statements. (FOF ¶¶ 136, 299.) Rather, according to Mercado, Berlant merely checked the "accuracy" (meaning "what was in the [Patriarch] work papers was being reflected on the financial statement document") of Patriarch's work papers and the financial statements and provided any commentary with respect to accounting issue that he felt were relevant to the Zohar funds' financial statements. (FOF ¶¶ 136-138).

This was corroborated by Berlant who similarly testified that he received draft financial statements and an electronic set of work papers (all prepared by Patriarch) and would spend approximately one or two hours making sure dates were updated correctly, numbers added up correctly, and that the financial statements had been updated and were internally consistent. He would then typically make a phone call to the controller or CFO at Patriarch and provide comments, which were typically due within 24 to 48 hours after he received the financials. (FOF ¶¶ 96, 97). Thus, it was not possible for Berlant to perform the type of services that would sustain a reliance defense with respect to the challenged conduct.

Furthermore, Respondents' alleged reliance defenses appear to be little more than a post-hoc attorney created defense. When Patriarch made changes to the Zohar funds' financials by removing references to U.S. GAAP and inserting new disclosures, Berlant was not asked to opine on whether this language should be removed, and was never told that he was doing a poor job, that he missed things in past financial statements, that changes were made because of his work, or that anybody at Patriarch was unsatisfied with his work. Rather, Patriarch continued to send the Zohar funds' financial statements to Berlant and pay him for his services after the changes in disclosures. (FOF ¶¶ 116-119).

Lastly, it strains credulity that Tilton – who had been a financial analyst for years looking at financial statements, understanding them, deciphering them, breaking them apart, and interpreting them – was confused on whether Patriarch needed to comply with U.S. GAAP and their own representations of engaging in a fair value analysis. Her recent attempt to blame the external accountant – who spent a few hours each month looking at draft financial statements – is meritless. (FOF ¶¶ 119-120). Berlant was not hired to test or opine on whether Patriarch's internal procedures complied with their representations to investors, and Tilton has enough experience with financials to know that Berlant could not have been testing or opining because of the engagement letter that she signed, and because Berlant spent merely a few hours per month looking over draft financials. Simply put, there can be no credible dispute that Berlant did not perform the services necessary to support a reliance defense.

Respondents did not (and cannot) show that they made complete disclosure about their lack of impairment and fair value analyses to Berlant, that they every sought advice from Berlant on representing they were engaging in the analyses but were failing to actually perform them, that Berlant advised such conduct was appropriate, and that Respondents relied on such advice. *See SEC. v. Caserta*, 75 F. Supp. 2d at 94. Put simply, Respondents did (and cannot) show they meet any of the elements for reliance, much less all of them.

5. The Division's Claims Properly Consider the Purpose of the Zohar CLOs.

Respondents argue that the Division's approach fundamentally misconstrues the purpose of the Zohar funds. But this argument also fails.

At the outset, it is uncontroverted that investors did expect companies to pay current interest. (FOF ¶ 72.) Moreover, the portfolio companies understood that they were expected to pay their interest. Specifically, according to portfolio company witness Jean Luc Pelissier, interest

"must be paid," is a "critical item that each of the company must comply to," and that paying less than full interest is "[a]lways a difficult process to justify and be in front of Lynn Tilton and explain why a company has failed or why a company is not always in position of not being able to do those interest payment." (Tr. 3082:11-3083:9.). Similarly, portfolio company witness John Harrington testified that the priority on a portfolio's company cash was payroll, payroll taxes, and payment of interest. Portfolio companies did 13 week cash flow projections; if the cash flow indicated those three things could not be paid, the company's management would need to put together a 12 month business plan, go to New York to meet with Tilton, and present the plan. These meetings were brutal and long, sometimes lasting days. (Tr. 3533:1-3535:6; 3535:23-3536:7; 3557:17-3559:9)]

 If the portfolio companies were not paying current interest, investors expected that their loans would be categorized correctly. (FOF ¶ 24, 30.) Investors bargained for this protection. Indeed, portfolio companies largely paid their interest until the financial crisis hit. (FOF ¶ 278.)

 Finally, investors' expectation that Tilton would follow the terms of the indenture did not mean that Tilton would be unable to manage the funds or the portfolio companies. Respondents could still exercise remedies as a lender, and could also originate new loans to the same portfolio company. (FOF ¶¶ 371, 372, 376.) There is no automatic outcome when a loan is made a Category 1 or a Defaulted Obligation. (FOF ¶¶ 371-377). Thus, Respondents' assertion is wholly speculative and without merit.

## V. REMEDIES

 In determining whether the public interest requires sanctions, the following factors are to be considered: the egregiousness of the actions; the isolated or recurrent nature of the infractions; the degree of scienter involved; the sincerity of a respondent's assurances against future violations; a

respondent's recognition of the wrongful nature of his or her conduct; and the likelihood that a respondent's occupation will present opportunities for future violations. *See Steadman v. SEC,* 603 F.2d 1126, 1140 (5th Cir. 1979); *see also ZPR Opinion of Commission at* \*27. Other factors include the age of the violations and the degree of harm to investors and the marketplace, *see Marshall E. Melton,* Advisers Act Rel. No. 2151, 2003 WL 21729839, at \*2 (July 25, 2003), as well as the extent to which a sanction will have a deterrent effect and the likelihood of future violations. *Mark Feathers,* Initial Dec. Rel. No. 605, 2014 WL 2418472, at \*3 (May 30, 2014), *affd* SEC Release No. 7634, 2014 WL 6449870 (Nov. 18, 2014) (citing *Schield Mgmt. Co.,* Exchange Act Rel. No. 53253, 2006 WL 231642, at \*8 & n.46 (Jan. 31, 2006)).

### A.    A Cease and Desist Order Should Issue.

In determining whether a cease-and-desist order is appropriate and in the public interest, in addition to the *Steadman* factors listed above, the Commission further considers: "whether there is a risk of future violations, whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceedings." *Steven E. Muth,* Initial Dec. Rel. No. 262, 2004 WL 2270299, at \*39 (Oct. 8, 2004) (citing *KPMG Peat Marwick LLP,* Exchange Act Rel. No. 1360, 2001 WL 47245 (Jan. 19, 2001)). In applying these factors, the Commission has held that "although some risk of future violation is necessary, it need not be very great to warrant issuing a cease-and-desist order and . . . in the ordinary case and absent evidence to the contrary, a finding of past violation raises a sufficient risk of future violation." *KPMG Peat Marwick LLP,* Exchange Act Rel. No. 1374, 2001 WL 223378, at \*6 (Mar. 8, 2001) (internal quotation marks and citation omitted).

A cease-and-desist order is appropriate in this proceeding. Respondents' violations of their statutory duties were serious, repeated, and committed with the requisite scienter. There is no assurance against future misconduct, as Tilton has never acknowledged that her approach to managing the Zohar funds was inappropriate in any way. Instead, she has created post hoc justifications for her improper actions and blamed investors for failing to uncover her fraud. Moreover, Tilton will continue to have opportunities to commit future violations given her age and long career in the securities industry. Although the Patriarch Collateral Managers have withdrawn their registration as investment advisers, Tilton has given no assurances that she will not enter the securities industry again. Indeed, given her role as the top executive at many private companies, it seems likely that she will again attempt to avail herself of funding opportunities provided by the financial markets that are regulated by the Commission.

> **B.    Respondents Should Disgorge Certain Advisory Fees.**

Sections 203(j) and 203(k)(5) of the Advisers Act authorize an order to disgorge ill-gotten gains. 15 U.S.C. §§ 80b-3(j), 80b-3(k)(5).[21] "[D]isgorgement's underlying purpose is to make lawbreaking unprofitable for the law-breaker[.]" *SEC v. Contorinis,* 743 F.3d 296, 301 (2d Cir. 2014). To determine the appropriate amount of disgorgement, the Division need only offer a reasonable approximation of the profits from the violative conduct. *See SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989). The burden then shifts to the respondent to show that the approximation is inaccurate. *Id.* at 1232. All doubts concerning the determination of the disgorgement figure are to be construed against Respondents. *E.g., SEC v. Lorin,* 76 F.3d 458, 462 (2d Cir. 2006).

---

[21] Authority for a disgorgement order here also stems from Section 9(e) of the Investment Company Act of 1940 ("Company Act"), 15 U.S.C. § 80a-9(e). *See* OIP at III (C).

The Division has presented evidence that Respondents profited substantially as a result of their violative conduct.    Specifically, the Division's expert Michael Mayer calculated that if Tilton had appropriately categorized Zohar fund assets, the OC Ratio Test would have failed for Zohar II by July 2009 and Zohar III by June 2009. As a result, Respondents received over $208 million in subordinated management fees and preference share distributions that they otherwise should not have received.  (FOF ¶ 66.)  Respondents have put forward no competing calculation.

Finally, the disgorgement order should be joint and several as to the Patriarch entities and Tilton in light of Tilton's ownership of all of them and her role as the responsible individual for the misconduct.  *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475-76 (2d Cir. 1996).

### C.  Third-Tier Penalties Should Be Assessed.

Under Section 203(i) of the Advisers Act, the Commission may impose a civil money penalty on a respondent who willfully violated (or aided and abetted a violation of) the Advisers Act, if the penalty is in the public interest.[22]  A violation is willful if the respondent "intentionally commit[ed] the act which constitutes the violations." *ZPR Investment Mgmt.*, 2015 WL 6575683 at *27 (quoting *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000)).  There is no requirement that the respondent "also be aware" that he or she "violat[ed] the of the Rules or Acts." *Id.*  Public interest is assessed with respect to these statutory factors: (1) deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; (2) harm to others; (3) unjust enrichment; (4) prior violations; (5) the need for deterrence; and (6) such other matters as justice may require. 15 U.S.C. § 80b-3(i)(3); *see also Hector Gallardo,* Exchange Act Rel. No. 65422, 2011 WL 4495006, at *10 (Sept. 28, 2011). "Not all factors may be relevant in a given case, and the factors need not all carry

---

[22] Penalty authority here also derives from Section 9(d) of the Investment Company Act, 15 U.S.C. § 80a-9(d).

equal weight." *Robert G. Weeks,* Initial Dec. Rel. No. 199, 2002 WL 169185, at *58 (Feb. 4, 2002).

A three-tier system establishes the maximum per-violation penalty. 15 U.S.C. § 80b-3(i)(2). Second-tier penalties are imposed in cases involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. *Id.* Third-tier penalties are imposed in cases where such state of mind is present *and* where the conduct directly or indirectly (i) resulted in substantial losses, *or* (ii) created a significant risk of substantial losses to other persons, *or* (iii) resulted in substantial pecuniary gain to the violator. *Id.* During the lengthy period at issue, the third tier penalties for each violation for a natural person range from a maximum of $120,000 for the earliest part of the misconduct to $178,156 for violations occurring after November 2, 2015. For an entity, the range is from $600,000 to $890,780. See 17 C.F.R.§ 201.1003 & Pt. 201, Subpart E, Table III; "Adjustments to Civil Monetary Penalty Amounts" Sec. Act. Rel. No. 33-10104 (June 27, 206) at 14-15.

The conduct here should be subject to third-tier penalties given the level of scienter and the tremendous pecuniary gains to Respondents, as described above. In addition, Tilton's callous disregard for her advisory obligations created a very significant risk of harm to others. Due to Tilton's actions in managing the Zohar funds, the funds and their investors were deprived of significant fees and distributions that should have flowed to them.

There are many ways to count violations, and Respondents' potential exposure here is enormous. The Court could impose a penalty on Respondents for each misrepresentation of the category of an asset in each trustee report. Likewise, the court could impose a penalty for each improperly represented OC Ratio. In addition, the Court could impose a penalty for each financial statement misrepresentation. *See, e.g., Muth,* 2004 WL 2270299, at *41 ("each fraudulent

misrepresentation to each investor constitutes a separate act or omission" since the "statutory maximum is not an overall limitation, but a limitation per violation."); *Kevin H Goldstein,* Initial Dec. Rel. No. 243, 2004 WL 69156, at * 19 (Jan. 16, 2004) (in fraudulent offering of securities, each fraudulent misrepresentation to each investor counted as a separate act or omission);

No matter how the penalty is computed, it should consider the need for a strong deterrent message to ensure that investment advisers deal truthfully and honestly with their clients and investors and disclose all conflicts of interest, regardless of the context.

D.      **Associational Bars Are Appropriate.**

Sections 203(e) and (f) of the Advisers Act authorize the Commission to revoke the registration of a registered investment adviser, and to bar a person from association with an investment adviser, for willfully violating (or aiding and abetting a violation of) the federal securities laws. 15 U.S.C. § 80b-3(e), (f).   The selection of an appropriate sanction includes an assessment of the deterrent effect it may have in upholding and enforcing standards of conduct in the securities business.   An industry bar is particularly important in this case given the importance to the investment adviser industry of maintaining honest fiduciary relationships. *See Steadman,* 603 F.2d at 1142 (in determining appropriate sanction, Commission entitled to consider "violations occurring in the context of a fiduciary relationship to be more serious than they otherwise might be"); *James C. Dawson,* Advisers Act Rel. No. 3057, 2010 WL 2886183, at *4 (July 23, 2010) ("We have consistently viewed misconduct involving a breach of fiduciary duty or dishonest conduct on the part of a fiduciary ... as egregious.").[23] *See Don Warner Reinhard,* Exchange Act Rel. No. 3139, 2011 WL 121451, at *8 (Jan. 14, 2011); *Mark S. Parnass,* Exchange Act Rel. No. 65261,2011 WL 4101087, at *3 (Sept. 2, 2011) ("the function of a bar order is not limited to

---

[23] Company Act Section 9(b), 15 U.S.C. § 80a-9(b), also authorizes bars relating to registered investment companies.

merely preventing future identical violations, but is more broadly designed to achieve the goals of deterrence, both specific and general, to address the risks of allowing a respondent to remain in the industry"); *see also Gary M Kornman,* Exchange Act Rel. No. 59403, 2009 WL 367635 at *7 (Feb. 13, 2009) ("The securities industry presents continual opportunities for dishonesty and abuse and depends heavily on the integrity of its participants and on investors' confidence.").

Permanent bars are appropriate here and have been ordered in analogous cases. For example, the Commission upheld the imposition of a bar where an investment adviser failed to act in its clients' best interest by allocating profitable trades to its own account rather than that of its clients, in violation of its fiduciary duties. *JS Oliver Capital Mgmt,* SEC Rel. No. 4431, 2016 WL 3361166 at *10 (March 7, 2016). Likewise, in *ZPR Investment Management,* the Commission upheld an industry bar against an associated person of an investment adviser who misled clients by misrepresenting that the adviser had complied with national standards for advertising guidelines failed to acknowledge the wrongfulness his conduct, but instead argued that investors "could have found" the relevant disclosures "elsewhere." *ZPR Investment Management*, SEC Rel. No. 4249, 2015 WL 6575683 (October 20, 2015).

In this case, Respondents, through Tilton, elevated their own interests over those of their clients and investors rather than following the requirements of the funds' governing documents or disclosing their actual approach to the OC Ratio. Moreover, Respondents failed to comply with both the standard of care applicable to similarly-situated investment advisers and with U.S. GAAP, all the while claiming that investors could figure out what Tilton was doing if they took the time to piece bits of information together. Permanent bars will provide investors with much better protection from these Respondents in the future.

## VI.    CONCLUSION

The Division requests that Your Honor rule in its favor and granted the relief requested.

Dated: December 16, 2016

Respectfully Submitted,

Dugan Bliss, Esq.
Nicholas Heinke, Esq.
Amy Sumner, Esq.
Mark L. Williams, Esq.
Division of Enforcement
Securities and Exchange Commission
Denver Regional Office
1961 Stout Street, Ste. 1700
Denver, CO 80294

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the **DIVISION OF ENFORCEMENT'S POST-HEARING BRIEF** was served on the following on this 16th day of December, 2016, in the manner indicated below:

Securities and Exchange Commission
Brent Fields, Secretary
100 F Street, N.E.
Mail Stop 1090
Washington, D.C. 20549
(By Facsimile and original and three copies by UPS)

Hon. Judge Carol Fox Foelak
100 F Street, N.E.
Mail Stop 2557
Washington, D.C. 20549
(By Email)

Randy M. Mastro, Esq.
Lawrence J. Zweifach, Esq.
Barry Goldsmith, Esq.
Caitlin J. Halligan, Esq.
Reed Brodsky, Esq.
Monica K. Loseman, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
(By email pursuant to the parties' agreement)

Susan E. Brune, Esq.
Brune Law PC
450 Park Avenue
New York, NY 10022
(By email pursuant to the parties' agreement)

Martin J. Auerbach
Law Firm of Martin J. Auerbach, Esq.
1330 Avenue of the Americas
Ste. 1100
New York, NY 10019
(By email pursuant to the parties' agreement)

# Exhibit 19

Respondents' Post-Hearing Brief

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In the Matter of                                    :
                                                    :
LYNN TILTON,                                         :
PATRIARCH PARTNERS, LLC,                             :   Administrative Proceeding
PATRIARCH PARTNERS VIII, LLC,                        :   File No. 3-16462
PATRIARCH PARTNERS XIV, LLC and                     :
PATRIARCH PARTNERS XV, LLC                           :   Judge Carol Fox Foelak
                                                    :
                 Respondents.                       :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**RESPONDENTS' POST-HEARING BRIEF**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Fax: 212.351.4035

BRUNE LAW P.C.
450 Park Avenue
New York, NY 10022
Telephone: 212.668.1900
Fax: 212.668.0315

*Counsel for Respondents*

December 16, 2016

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................. 1

THE EVIDENCE .............................................................................. 11

I.   Ms. Tilton Designed The Zohars To Originate Loans To Deeply Distressed Companies
     And Implement A Long-Term Turnaround Strategy To Create Value. ......................... 11

     A.   Ms. Tilton Created The Innovative Zohars To Provide A Solution To
          Financial Institutions Seeking To Invest In Distressed Assets. ..................... 11

     B.   The Zohars Were Private Transactions Among Sophisticated Parties Who
          Understood The Investment Strategy And Its Risks. ................................. 12

     C.   The Unique Zohar Investment Strategy Involved Originating High-Interest
          Loans To Distressed Portfolio Companies, Gaining Control, And
          Rehabilitating The Companies To Maximize The Zohars' Return On
          Investment. ...................................................................... 14

II.  The Obligations Set Forth In The Governing Documents Reflected The Unique Zohar
     Investment Strategy. .................................................................. 17

     A.   The Governing Documents Expressly Granted Respondents Unilateral
          Discretion to Amend Loan Terms. .................................................. 17

     B.   The IC And OC Ratios Reflected Respondents' Exercise Of Discretion
          Pursuant To The Zohar Strategy. .................................................. 17

     C.   The Indentures Permitted Respondents To Use Their Business Judgment To
          Amend Loans And Categorize Them According To Their Amended Terms. ................. 19

III. Respondents' Approach To Loan Amendment And Categorization Was Fully
     Disclosed. ........................................................................... 22

     A.   Monthly And Quarterly Trustee Reports Disclosed Respondents'
          Categorization Approach. ......................................................... 22

     B.   Investor Calls And Emails Provided Even More Detail On Respondents'
          Categorization Approach. ......................................................... 23

     C.   The Trustee Received And Reviewed Detailed Information Regarding Each
          Loan, And Never Objected To Respondents' Management Of The Zohars. ................ 24

IV.  Patriarch Prepared GAAP-Compliant Financial Statements For The Zohars With The
     Advice And Approval Of Internal And External Accountants. ............................. 25

PROCEDURAL HISTORY AND TRIAL ................................................................ 28

I.  After A Nearly Six-Year Investigation By The Division, The Commission—On A Split Vote—Authorized Narrow Charges Against Respondents. ................................. 28

II.  At Trial, The Division Did Not Satisfy Its Burden To Prove The Allegations. ............. 29

    A.  The Witnesses Called In The Division's Case Decimated Its Allegations Against Respondents. .............................................................................. 30

        1.  The Division's Own Witnesses Eviscerated Its Categorization Claim.... 31

        2.  The Division's Witnesses Undermined Its Financial Statements Claim. 35

    B.  The Testimony From Respondents' Witnesses Confirmed That The Division's Allegations Are Baseless. .................................................................. 37

III.  The Investigation And Trial Were Marked By Serious Constitutional And Procedural Deficiencies. ........................................................................................ 45

LEGAL STANDARDS ........................................................................................ 47

ARGUMENT .................................................................................................... 49

I.  The Division Failed To Prove That Respondents' Loan Categorization Methodology Was Improper Or Undisclosed. ............................................................................ 49

    A.  The Evidence At Trial Established Respondents' Approach To Loan Categorization Was Proper And Fully Disclosed. ............................................ 49

        1.  Respondents' Loan Amendments And Categorization Approach Were Permitted By The Zohars' Governing Documents And Necessitated By Their Design. ............................................................................ 50

        2.  Respondents' Categorization Practices Were Fully Disclosed In Trustee Reports, Investor Calls, And Other Communications. ............... 61

        3.  The Categorization Claims Are Based On A Breach Of Contract Theory, Which Cannot Give Rise To Advisers Act Liability. ................. 67

    B.  Respondents Performed Their Fiduciary Duties Appropriately. ........................ 68

        1.  Any Conflicts Of Interest Were Disclosed And Expressly Waived. ....... 70

        2.  The Fiduciary Duty Claim Should Be Dismissed Because It Is Merely A Dressed-Up Breach Of Contract Claim, Based On Conduct Towards Noteholders To Whom No Fiduciary Duty Was Owed. .......................... 72

3.      Respondents At All Times Prioritized The Interests Of the Zohars And The Noteholders, Working Tirelessly On Their Behalf And Investing Hundreds Of Millions Of Dollars For Their Benefit. .............................. 74

C.      Any Inaccuracies, Nondisclosures, Or Fiduciary Breach Relating To Categorization Were Not Material. ...................................................... 77

D.      Any Inaccuracies, Nondisclosures, Or Fiduciary Breach Relating To Categorization Could Not Have Been Intentional Or Negligent, Given Respondents' Good-Faith, Reasonable Interpretation Of The Indentures. .......... 80

II.      The Division's Case With Respect To The Financial Statements Has No Merit. .......... 83

A.      Respondents' Financial Statements Were Accurate And GAAP Compliant. ...... 86

1.      Respondents Analyzed And Reported Fair Value In Accordance With GAAP. ................................................................................... 86

2.      Respondents' Loan Impairment Policies And Practices Complied With GAAP. ................................................................................... 89

3.      Patriarch Recorded Accrued Interest In Accordance With GAAP. ......... 93

B.      Respondents Relied On The Advice Of External And Internal Accountants In Preparing The Financial Statements, Which Were The Product Of A Reasonable, Good Faith Accounting Process. .................................... 95

1.      Respondents Hired Berlant At The Inception Of The Business, Relying On Him To Provide Accounting Guidance, Create Respondents' Financial Statements, And Develop A Manual of GAAP-Compliant Accounting Policies. .............................................................. 96

2.      Ms. Tilton Relied On Berlant To Provide Guidance On GAAP And Other Substantive Accounting Issues, And To Review And Approve The Zohars' Financial Statements. ......................................... 98

3.      The Division Failed To Rebut Respondents' Advice-Of-Experts Defense. ................................................................................ 103

C.      The Division Did Not Satisfy Its Burden Of Proving Scienter Or Negligence With Respect To The Zohar Financial Statements. ............................. 104

D.      The Challenged Certifications Were Immaterial To Noteholders. .................... 106

III.      The Unconstitutionality Of These Proceedings And The Division's Litigation Misconduct Each Present Independent Reasons To Dismiss The Charges. .................. 109

A.      The Denial Of Respondents' Constitutional Rights Presents An Independent Basis To Dismiss...............................................................................................109

B.      Division's Litigation Misconduct Presents An Independent Basis To Dismiss.110

IV.    If Respondents Were To Be Found Liable, Any Significant Sanctions Would Not Be Appropriate. ...........................................................................................................112

A.      A Permanent Bar On Ms. Tilton's Involvement In The Securities Industry Would Be Inequitable And Ill Serve The Public Interest. ..................................113

B.      Any Monetary Sanction—And Certainly A Significant One—Would Disserve The Public Interest. ........................................................................................115

C.      The Division's Disgorgement Figure Is Based On Inaccurate Calculations And Is Offset Entirely By Respondents' Substantial Transfers To The Zohars.115

CONCLUSION.....................................................................................................121

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Addington v. Comm'r of Internal Revenue,*
205 F.3d 54 (2d Cir. 2000)................................................................95

*In re Am. Int'l Grp. Inc.,*
2013 WL 1787567 (S.D.N.Y. Apr. 26, 2013).........................................85

*Amitie One Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.,*
2008 WL 2973097 (M.D. Pa. Aug. 4, 2008) ..........................................80

*Apollo Fuel Oil v. United States,*
195 F.3d 74 (2d Cir. 1999)...........................................................65, 67

*In re Atlas Mining Co. Sec. Litig.,*
670 F. Supp. 2d 1128 (D. Idaho 2009) .........................................106, 108

*Bank of Am. v. Bear Stearns Asset Mgmt.,*
969 F. Supp. 2d 339 (S.D.N.Y. 2013)..................................................70

*Bank of China, N.Y. Branch v. NBM LLC,*
359 F.3d 171 (2d Cir. 2004)...............................................................66

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)..........................................................8, 78, 108

*Belmont v. MB Inv. Partners, Inc.,*
708 F.3d 470 (3d Cir. 2013)...............................................................77

*Brandt, Kelly & Simmons, LLC,*
Initial Decision Release No. 289, 2005 WL 1584978 (June 30, 2005) ..................... passim

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,*
98 F.3d 13 (2d Cir. 1996)..................................................................68

*Carroll v. Bear, Stearns & Co.,*
416 F. Supp. 998 (S.D.N.Y. 1976) ......................................................68

*Chill v. Gen. Elec. Co.,*
101 F.3d 263 (2d Cir. 1996)...............................................................84

*City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.,*
129 F. Supp. 3d 48, 73 (S.D.N.Y. 2015) ..............................................89

*Clarke T. Blizzard,*
Advisers Act Release No. 2409, 2005 WL 1802401 (Comm'n July 29, 2005) ....................77

*In re Dauo Sys.*,
  411 F.3d 1006 (9th Cir. 2005) ........................................................................... 106

*David F. Bandimere*,
  Initial Decision Release No. 507, 2013 WL 5553898 (ALJ Oct. 8, 2013) ............ 119

*David J. Montanino*,
  Initial Decision Release No. 773, 2015 WL 1732106 (ALJ Apr. 16, 2015) ............ 84

*Dempsey v. Vieau*,
  130 F. Supp. 3d 809 (S.D.N.Y. 2015) ..................................................................... 84

*In re Digi Int'l, Inc., Sec. Litig.*,
  14 F. App'x 714 (8th Cir. 2001) ............................................................................ 103

*EBC I, Inc. v. Goldman Sachs & Co.*,
  832 N.E.2d 26 (N.Y. 2005) ...................................................................................... 50

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F. 3d 187 (2d Cir. 2009) ................................................................................. 108

*Ellington v. EMI Mills Music, Inc.*,
  21 N.E.3d 1000 (N.Y. 2014) .................................................................................... 50

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ............................................................................. 85, 86

*Fine v. Am. Solar King Corp.*,
  919 F.2d 290 (5th Cir. 1990) .................................................................................. 85

*Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*,
  524 F.2d 275 (2d Cir. 1975) .................................................................................... 62

*F.X.C. Inv'rs Corp.*,
  Admin. Proc. Rulings Release No. 218, 2002 WL 31741561
  (ALJ Dec. 9, 2002) ............................................................................................... 112

*Gabelli v. SEC*,
  133 S. Ct. 1216 (2013) .......................................................................................... 119

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
  720 F.3d 84 (2d Cir. 2013) ...................................................................................... 60

*Gen. Ins. Co. of Am. v. K. Capolino Constr. Corp.*,
  983 F. Supp. 403 (S.D.N.Y. 1997) ...................................................................... 9, 80

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ...................................................................... 68, 72, 73

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................................108

*Hirsch v. DuPont*,
  553 F.2d 750 (2d Cir. 1977)......................................................................79, 80

*Hoemke v. N.Y. Blood Ctr.*,
  912 F.2d 550 (2d Cir. 1990)..............................................................................82

*Howard v. SEC*,
  376 F.3d 1136 (D.C. Cir. 2004) ..................................................................48, 80

*In re Hyperion Sec. Litig.*,
  1995 WL 422480 (S.D.N.Y. July 14, 1995) ................................................78, 79

*Ieradi v. Mylan Labs., Inc.*,
  230 F.3d 594 (3d Cir. 2000)..............................................................................78

*Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*,
  2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013)....................................................116

*Int'l S'holders Servs. Corp.*,
  Exchange Act Release No. 12389A, 1976 WL 182458 (Comm'n June 8,
  1976) .............................................................................................................2, 93

*Kirschner v. KPMG LLP*,
  938 N.E.2d 941 (N.Y. 2010)..............................................................................65

*Koplin v. Labe Fed'l Sav. & Loan Ass'n*,
  748 F. Supp. 1336 (N.D. Ill. 1990) ..................................................................62

*Krys v. Butt*,
  486 F. App'x 153 (2d Cir. 2012) .......................................................................50

*Lawrence M. Labine*,
  Initial Decision Release No. 973, 2016 WL 824588 (ALJ Mar. 2, 2016) .................47, 48, 80

*Lincolnshire Mgmt., Inc.*,
  Advisers Act Release No. 3927, 2014 WL 4678600 (Comm'n Sept. 22, 2014)....................80

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
  2004 WL 376442 (S.D.N.Y. Feb. 27, 2004)........................................................81

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  2011 WL 536437 (S.D.N.Y. Feb. 9, 2011)....................................................79, 81

*Michael A. Horowitz*,
  Initial Decision Release No. 733, 2015 WL 77529 (ALJ Jan. 7, 2015) ................................115

*Miguel A. Ferrer*,
    Admin. Proc. Rulings Release No. 730, 2012 WL 8751437
    (ALJ Nov. 2, 2012) .........................................................................................47

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................84

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*,
    135 S. Ct. 1318 (2015)..................................................................................88

*Optionsxpress, Inc.*,
    Securities Act Release No. 10125, 2016 WL 4413227
    (Comm'n Aug. 18, 2016)..............................................................................48

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ............................................................84, 86, 89

*Pierce v. SEC*,
    786 F.3d 1027 (D.C. Cir. 2015) ..............................................................65, 93

*Puma Indus. Consulting, Inc. v. Daal Assocs., Inc.*,
    808 F.2d 982 (2d Cir. 1987).........................................................................60

*Rodman v. Grant Found.*,
    608 F.2d 64 (2d Cir. 1979)...........................................................................70

*Rogen v. Scheer*,
    1991 WL 33294 (S.D.N.Y. Feb. 22, 1991).................................................68

*Russell W. Stein*,
    Initial Decision Release No. 150, 1999 WL 756083 (ALJ Sept. 27, 1999)................8, 77, 107

*SEC v. AmeriFirst Funding, Inc.*,
    2008 WL 1959843 (N.D. Tex. May 5, 2008) .....................................................119

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963)................................................................................72, 73

*SEC v. Contorinis*,
    743 F.3d 296 (2d Cir. 2014).......................................................................115

*SEC v. Goldsworthy*,
    2008 WL 8901272 (D. Mass. June 11, 2008) ............................................95

*SEC v. Graham*,
    823 F.3d 1357 (11th Cir. 2016) .................................................................119

*SEC v. Jensen,*
   2013 WL 6499699 (C.D. Cal. Dec. 10, 2013) ...................................................102

*SEC v. Kokesh,*
   834 F.3d 1158 (10th Cir. 2016) ...................................................................119

*SEC v. Lowry,*
   396 F. Supp. 2d 225 (E.D.N.Y. 2003) ...........................................................47

*SEC v. Mannion,*
   28 F. Supp. 3d 1304 (N.D. Ga. 2014) ...........................................................115

*SEC v. Mapp,*
   2016 WL 5870576 (E.D. Tex. Oct. 7, 2016) ...................................................62

*SEC v. McCaskey,*
   2002 WL 850001 (S.D.N.Y. Mar. 26, 2002) ...................................................116

*SEC v. Moran,*
   922 F. Supp. 867 (S.D.N.Y. 1996) ............................................................65, 73

*SEC v. Nutmeg Grp. LLC,*
   162 F. Supp. 3d 754 (N.D. Ill. 2016) ...........................................................79

*SEC v. Snyder,*
   292 F. App'x 391 (5th Cir. 2008) ...........................................................85, 108

*SEC v. Spongetech Delivery Sys. Inc.,*
   2015 WL 5793303 (E.D.N.Y. Sept. 30, 2015) ...............................................115

*SEC v. Steadman,*
   967 F.2d 636 (D.C. Cir. 1992) ................................................................48, 80

*SEC v. Tourre,*
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...........................................................46

*In re Seidman,*
   37 F.3d 911 (3d Cir. 1994) ........................................................................70

*SportsChannel Assocs. v. Sterling Mets, L.P.,*
   25 A.D.3d 314 (N.Y. 1st Dep't 2006) ........................................................51, 57

*Staten Is. Emergency Physicians, P.C. v. Staten Is. Univ. Hosp.,*
   57 A.D.3d 650 (N.Y. 2d Dep't 2008) ...........................................................61

*Steadman v. SEC,*
   450 U.S. 91 (1981) ..................................................................................47

*Steadman v. SEC*,
603 F.2d 1126 (5th Cir. 1979) ........................................................................112

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004)..................................................61, 79

*Terry T. Steen*,
Initial Decision Release No. 107, 1997 WL 104603 (ALJ Mar. 7, 1997) ............115

*Timbervest, LLC*,
Initial Decision Release No. 658, 2014 WL 4090371 (ALJ Aug. 20, 2014)........115

*Todi Exports v. Amrav Sportswear Inc.*,
1997 WL 61063 (S.D.N.Y. Feb. 13, 1997).............................................................68

*United States v. Boyle*,
469 U.S. 241 (1985).................................................................................................95

*United States v. Chapman*,
524 F.3d 1073 (9th Cir. 2008) .....................................................................10, 110

*United States v. Dobruna*,
146 F. Supp. 3d 458 (E.D.N.Y. 2015) ..................................................................116

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015)....................................................................................79

*United States v. Lyons*,
352 F. Supp. 2d 1231 (M.D. Fla. 2004)................................................................112

*United States v. Schwimmer*,
968 F.2d 1570 (2d Cir. 1993)..................................................................................61

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)...............................................................................................78

*Valicenti Advisory Servs., Inc.*,
Initial Decision Release No. 111, 1997 WL 362000 (ALJ July 2, 1997) .............113

*Vosgerichian v. Commodore Int'l*,
862 F. Supp. 1371 (E.D. Pa. 1994) .......................................................................108

*Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*,
67 A.D.2d 339 (N.Y. 1st Dep't 1979).....................................................................60

## Statutes

Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (2015) .................... passim

28 U.S.C. § 2462 ..................................................................................................118, 119

## Regulations

17 C.F.R. § 275.206(4)-8 (2007) ........................................................................ passim

Final Rule, Amendments to the Commission's Rules of Practice, 81 Fed. Reg.
50,212 (July 29, 2016) (to be codified at 17 C.F.R. Pt. 201)...................................96

Definition of "Client" of Investment Adviser for Certain Purposes Relating to
Limited Partnerships, 50 Fed. Reg. 8740 (proposed Mar. 5, 1985).........................73

Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, Advisers
Act Release No. 2628, 2007 WL 2239114 (Aug. 3, 2007) (final rule) ......................47, 48, 73

## Other Authorities

Black's Law Dictionary (10th ed. 2014)........................................................................68

*Heitman Capital Mgmt. LLC*,
SEC No-Action Letter, 2007 WL 789073 (Feb. 12, 2007)......................................70

*Mary Jo White Explains the New SEC Rules*,
Wall St. J., Nov. 24, 2015, *available at* http://www.wsj.com/articles/mary-jo-
white-explains-the-new-sec-rules-1448302777 ........................................................46

Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011)....................116

SEC, Final Commissioner Votes (Mar. 2015),
*available at* https://www.sec.gov/foia/docs/votes/2015-03.pdf................................28

## **PRELIMINARY STATEMENT**

After a six-year investigation and a 3-2 Commission vote to bring any charges, the Division proceeded to trial against Respondents. The trial proved only this: that the Commission grossly overreached in charging Respondents, because the Division's case was nothing more than a contract dispute outside the Commission's regulatory authority. The trial record overwhelmingly confirms what the transaction documents, disclosures, and exculpatory materials belatedly wrung from the Division had already established—that Respondents' practices were fully authorized by the deal Indentures, disclosed to investors, and in the best interests of the Zohar Funds ("Zohars") and their noteholders ("Noteholders"). Faced with this evidence, the Division tried to switch course during the trial itself. But its late-breaking, newfound theories of liability nowhere to be found in its charging document—including that the financial statements did not appropriately disclose accrued interest, or that Respondents did not take the steps necessary to amend loan terms—are, as discussed below, as meritless as the original theories and barred as outside the scope of the Order Instituting Proceedings ("OIP").

Indeed, this case has been flawed from day one. In March 2015, the Commission by split vote authorized the Division to institute proceedings against Respondents based on narrow allegations set forth in the OIP. The OIP makes three claims, each of them meritless. *First*, it alleges that Respondents categorized loans made to Portfolio Companies in a manner "inconsistent with the categorization method set forth in [the governing] documents," OIP ¶ 5, and "never disclosed Tilton's discretionary valuation approaches to the Funds or their investors," *id.* ¶ 9. *Second*, it alleges that Respondents breached their statutory fiduciary duties to the Zohars by failing to disclose the purported conflict of interest that arose from their categorization method. *See id.* ¶¶ 9, 52-56. *Third*, it alleges that the financial statements Respondents prepared for the Zohars misrepresented GAAP compliance with respect to impairment, and misstated fair

value methodology.  *Id.* ¶¶ 7-8, 57-73.  The Division failed to prove a single one of these claims at trial, and notably has conceded that it is not alleging "Respondents' subjective judgments relating to the portfolio companies were incorrect."  Div. Opp. to Mot. for a More Definite Statement 4 (Apr. 29, 2015).

As to the charges about categorization, Respondents proved, and Division fact and expert witnesses conceded, that the Indentures themselves permitted Ms. Tilton to amend loan terms and defer interest payments in her business judgment, and that when she amended the terms to defer payment that did not trigger an interest payment default necessitating re-categorization.  *See infra* pp. 51-57.  The Division's first three investor witnesses so roundly undermined the Division's claim on this point that it dropped its remaining investor witnesses.

By summation, the Division had retreated to claiming that Ms. Tilton had not actually amended the loans made by the Portfolio Companies.  *See, e.g.*, Tr. 3673:2-3.  This argument appears nowhere in the OIP, and thus has no place in this case.  *Int'l S'holders Servs. Corp.*, Exchange Act Release No. 12389A, 1976 WL 182458, at *4 n.19 (June 8, 1976).  It is also incorrect.  As the Division's own expert, Ira Wagner, admitted, and as New York law makes clear, amendments to a contract need not be in writing.  Tr. 2963:2-8 (Wagner).  And as Ms. Tilton testified and both Portfolio Company witnesses confirmed, Respondents engaged in a rigorous process whenever a Portfolio Company sought to pay less than full stated interest, and did so by agreeing to amend the loan terms and defer interest until the company could pay it.  *See infra* pp. 57-61.[1]

---

[1]  The Division's extensive misrepresentations of the record in summation are presented and rebutted in Appendix A.

Likewise, while the OIP alleged that Ms. Tilton did not disclose that she exercised discretion in loan categorization, at trial, Respondents proved—and all three of the Division's investor witnesses admitted—that, in fact, the transaction documents, including the Indentures and Collateral Management Agreements ("CMAs"),[2] disclosed and permitted Respondents' use of discretion and "business judgment" in amending and categorizing loans. FOF ¶¶ 93-96. The Trustee Reports disclosed, month after month, the interest rate, interest payments, and categorization of the loans, as well as the interest coverage ratio, all of which made plain that many loans were not paying full interest, and yet remained in Category 4—as the Noteholder witnesses admitted. FOF ¶¶ 53-55, 125-50, 157-59; Tr. 321:4-41 (Aniloff), 612:9-613:21 (Mach), 1674:13-18 (Aldama). The same transaction documents also made plain Respondents' strategy of investing in deeply distressed companies that no one expected would necessarily pay full interest from day one, as numerous witnesses explained. Ms. Tilton and others at Patriarch forthrightly, uniformly, and unambiguously explained their amendment, deferral, and

---

[2]   Each Zohar transaction was governed by an Indenture, a Collateral Management Agreement ("CMA"), and a Collateral Administration Agreement ("CAA") (together the "governing documents"). Respondents' Proposed Findings of Fact ("FOF") ¶ 16. The Indenture is a comprehensive agreement that specifies, among other things, the types of collateral the relevant Zohar Fund may purchase, the priority of payments to the Zohar Noteholders, and the various coverage and quality tests (the Zohar I, II, and III Indentures collectively referred to herein as the "Indenture" or "Indentures," and cited to as "Indenture § __," unless a specific Indenture is cited, *e.g.* "Zohar III Indenture § __"). FOF ¶ 17; RX 21 (Froeba Rep.) at ¶ 40. The CMA is an agreement between the relevant Zohar Fund and Patriarch as collateral manager that sets forth Patriarch's duties and standard of care (the Zohar I, II, and III CMAs collectively referred to herein as the "CMA," and cited to as "CMA § __," unless a specific CMA is cited, *e.g.*, "Zohar III CMA § __"). FOF ¶ 18. The CAA is an agreement between the relevant Zohar, Patriarch as collateral manager, and the Collateral Administrator/Trustee for that Zohar, which, in connection with the Indentures, establishes the Trustee's duties and responsibilities, including to prepare monthly and quarterly Trustee Reports, to monitor payments to and from the Portfolio Companies and Noteholders, and to effectuate such payments (the Zohar I, II, and III CAAs collectively referred to herein as the "CAA," and cited to as "CAA ¶ __," unless a specific CAA is cited, *e.g.*, "Zohar III CAA § __"). FOF ¶ 19.

categorization practices.  FOF ¶¶ 151-56.  Even the Division's own witness, David Aniloff of SEI Investments Company, testified that Respondents' "categorization approach [was] disclosed to [him] as an investor in the Zohar bonds" "in the offering memorandum and indenture."  Tr. 146:16-19.

Having entirely failed to prove their allegations about categorization, the Division tried to shift gears, arguing in summation that "even if you credit Ms. Tilton's claim that there were amendments by course of performance" under Section 7.7(a), that "doesn't save her" because the "amendments were not expressly disclosed" to investors and others.  Tr. 3674:22-3675:11.  But the evidence showed that they were:  Not only did the Indentures and CMAs expressly disclose that Respondents anticipated entering into "extensive amendments" to effectuate the "turnaround" of "distressed" companies, *see* Indenture § 7.7(a), but Jaime Aldama of Barclays also admitted that he "met with Ms. Tilton, and she told [him] that she was, in fact amending the loan agreements," Tr. 1676:21-1678:6, when in her judgment it was in the best interests of the Noteholders to do so.  And Respondents sent monthly and quarterly reports providing all of the relevant information regarding interest payments and categorization; through this data—the language of Wall Street—these reports conveyed as directly as any words could that Respondents were regularly amending loan terms to accept less than full stated interest while maintaining loan categorization.

Indeed, Respondents' authority to amend loan terms was the critical means of implementing Respondents' disclosed strategy of investing in distressed companies that had been "left for dead," Tr. 1838:5-7 (Tilton), and turning them around by providing them with liquidity through new loans and loan repayment flexibility.  As Ms. Tilton testified, only by deferring interest and amending loans could she hope to steer the Zohars through the financial crisis and

obtain "a couple of billion dollars of value that would not be here" otherwise, enough to cover in full the amounts owed to investors.  Tr. 2727:5-7.  And the testimony of the Division's own witnesses confirms this point.  *See* Tr. 742:10-743:3, 746:17-23 (Mach); Tr. 1728:23-1729:9 (Aldama).

The Division also alleged that Respondents' categorization practices were designed to maintain a high Overcollateralization Ratio ("OC Ratio") to allow Ms. Tilton to collect fees and preference share distributions "to which she was not entitled."  *See* OIP ¶¶ 44-45.  But the trial revealed that the OC Ratio was in fact appropriately calculated under the Indentures and was in any case of limited utility as it did not factor in the value of equity interests gifted by Ms. Tilton to the Zohars.  *See* FOF ¶¶ 41, 57; Tr. 3588:7-11 (Hubbard); RX 24 (Hubbard Rep.) at ¶ 25 n.47.  The evidence also showed that another metric—the Interest Coverage Ratio ("IC Ratio")—was of far greater significance because it disclosed the ratio of interest payments received from Portfolio Companies to the total interest owed to the Noteholders.  *See* FOF ¶ 53.

In sum, the Division's purported fraud case failed miserably.  There is hardly even a live dispute as to the interpretation of the Indentures.  The only remaining question is whether the amendments Ms. Tilton believed she was executing under Section 7.7(a) orally or by course of performance had legal effect under New York state contract law.  There is no sensible reason for the Division to have devoted its enforcement resources to this question.  The Division should not be in the business of policing the performance of contracts, especially ones among sophisticated parties.  Notwithstanding this fact, the answer to the question is clear—the amendments did have legal effect under New York law.

The Division's theory of fiduciary breach similarly collapsed at trial.  The only fiduciary breach alleged in the OIP, the Division's pretrial brief, and its opening, was a purported

undisclosed conflict of interest based on Respondents' categorization approach.  Not only did the documentary and testimonial evidence show that this approach was both authorized and disclosed, the Division's theory also ignored the express conflicts of interest disclosure and waiver in the CMAs.  The Division has now changed course, asserting that Ms. Tilton was not acting in the best interests of the Zohars and of the Noteholders more generally.  Tr. 3645:17-23, 3649:19-24 (Div. summation).  That is an inappropriate expansion of the charges, and is in any case meritless.  The evidence confirmed that Ms. Tilton put the Zohars' and Noteholders' interests ahead of her own (even though she had no fiduciary duty to the Noteholders, *see infra* pp. 71-74).  She reinvested hundreds of millions of dollars of her own money into the Zohars and the Portfolio Companies, Tr. 2548:5-18 (Tilton)—a sum more than double the $200 million in collateral management fees and distributions the Division now seeks from Ms. Tilton as disgorgement.  And the Division now concedes that Ms. Tilton "chose to gift" the equity upside to the Zohars.  Tr. 3681:16-3682:2 (Div. summation).  Ms. Tilton also elected to defer tens of millions of dollars in subordinated management fees and preference share dividends during the financial crisis, Tr. 2487:24-2488:22 (Tilton), and subordinated her interests behind others, for the benefit of the Noteholders and the Zohars, Tr. 2070:24-2071:2, 2260:8-21, 2422:14-25, 2687:7-11 (Tilton).  She even offered to resign as collateral manager if that would help facilitate a restructuring and save the Zohars.  FOF ¶ 190.  In short, Ms. Tilton behaved admirably, conducting herself at all times as someone committed to putting the interests of the Zohars and the Noteholders before her own, belying any allegation of fiduciary breach.

The Division likewise failed to adduce credible proof of its claim that the financial statements were misleading.  The Division called Peter Berlant, who was Ms. Tilton's outside accountant.  Berlant advised the Zohars since their inception, and was Ms. Tilton's outside

accountant for predecessor funds Ark I and Ark II.  Berlant's testimony—particularly his insistence under oath that all he ever did for 15 years was to look for "clerical errors" in Patriarch's financial statements—was patently false, as contemporaneous documents conclusively established.  *See* Tr. 775:23-776:1, 838:3-17, 936:5-25, 937:1-6.  His attempt to minimize his relationship to Ms. Tilton was similarly false, as his own emails proved.  *See* Tr. 1040:9-1041:11 (Berlant); RX 1195.

The Division's other witnesses offered no support for the financial statement allegation.  The Division called Patriarch's controller, Carlos Mercado, who testified that Berlant had reviewed and approved the financial statements, and explained in detail Respondents' impairment and fair value processes.  *See* Tr. 1181:5-20, 1280:13-21, 1300:14-1301:10, 1318:15-1319:7.  And the Division's purported accounting expert witness, Steven Henning, admitted that many of his opinions were not based on accounting principles at all, FOF ¶¶ 311, 313; Tr. 1424:7-14, that he had failed to review documents detailing Patriarch's processes, FOF ¶ 310, and that the Division had not communicated to him fundamental facts about the case that undermined his conclusions, Tr. 1425:6-1427:11.

As with its other claims, the Division sought to retool its financial statements case, trotting out the new, uncharged theory that the financial statements did not adequately disclose accrued interest.  Mercado and Respondents' expert Charles Lundelius definitively refuted that assertion, and also explained that the accounting approach recommended by Division lawyers— that Patriarch reported on its financial statements as accrued interest amounts that it did not expect to collect—would have been "misleading" and inconsistent with GAAP.  *See* Tr. 1221:2-18, 1222:16-25, 1235:3-7.  Tellingly, the Division did not ask its own accounting expert,

Henning—who testified after Mercado—a single question on the topic and, indeed, presented no expert testimony at all to buttress its new theory.

The witnesses the Division did not call are equally revealing.  It failed to present a single witness—other than Ms. Tilton—who was present at the inception of the Zohars, any witness from the Zohar Trustee, any witness from the Rating Agencies, or any of the Zohars' independent directors.  Moreover, even though the Division interviewed many dozens of investor witnesses and as late as opening statements had indicated that it would call five investor witnesses, it called only three—pulling the remaining investor witnesses as its case collapsed.

Even if the Indentures had not authorized Respondents' practices—which they did—the Division failed to prove the materiality of any alleged misrepresentations, omissions, or deceptive conduct.  The Division made no showing—let alone a "substantial likelihood"—that the "disclosure of the [purportedly] omitted fact" (namely, that Respondents used their discretion to amend loans in a way that affected categorization) "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Russell W. Stein*, Initial Decision Release No. 150, 1999 WL 756083, at *11 (ALJ Sept. 27, 1999) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  *See infra* pp. 77-78.  Additional disclosures could not have altered the total mix of information with respect to Respondents' categorization methodology, because all of the information needed to grasp the so-called "omitted fact" was available to these sophisticated investors.  *See infra* pp. 79-80.  Multiple investor witnesses testified to the immateriality of the financial statements allegations, and one admitted that he had not even bothered to avail himself of the information that was available to him.  *See infra* pp. 62-64.

Nor can the Division prove that Respondents engaged in intentional misconduct or acted negligently. *See infra* pp. 80-83. Quite the opposite: Respondents' actions were wholly inconsistent with bad faith. In the monthly Trustee Reports, Respondents provided Noteholders and the Zohars with the very information that they were purportedly withholding, including that full interest was not being collected on loans classified as Category 4. Nor has the Division shown recklessness or negligence in Respondents' categorization of loans, because their conduct was based on a reasonable interpretation of the governing contracts. *See Gen. Ins. Co. of Am. v. K. Capolino Constr. Corp.*, 983 F. Supp. 403, 437 n.63 (S.D.N.Y. 1997). Indeed, the Division has conceded that it does not allege that "Respondents' subjective judgments relating to the portfolio companies were incorrect[.]" Div. Opp. to Mot. for a More Definite Statement 4 (Apr. 29, 2015).

The same is true for the Division's charges relating to the financial statements. Both Mercado and Ms. Tilton consistently testified that they relied reasonably and in good faith on Berlant to provide GAAP advice and to review and approve the financial statements, and the evidentiary record includes two dozen examples of Berlant being asked to "review and approve" or of Patriarch employees referring internally to the fact that Berlant would need to "review and approve" financial statements. The documentary evidence showed that Berlant in fact did so. Respondents had formal systems and processes in place for the preparation and review of the financial statements for accuracy and GAAP compliance. And both Mercado and Ms. Tilton consistently testified that they understood that the financial statements were GAAP-compliant and appropriate in all respects. These facts establish the defense of good faith reliance on the advice of accountants—a complete defense to the financial statements charge—and, in any case, make it impossible for the Division to meet its burden of proving scienter or negligence.

More fundamentally, this case should be terminated for reasons of basic fairness.  Ms. Tilton and Patriarch have been denied most of the procedural rights they would have been afforded in a federal district court—starting with a jury and extending even to the right to serve subpoenas—and have been treated dramatically differently than others similarly situated.  And in their zeal to target Ms. Tilton, Division lawyers have engaged in troubling conduct unbefitting a government enforcement agency, and the manner in which the Division's lawyers have prosecuted this case simply does not comport with due process and fundamental fairness.  Both before and at trial, Division lawyers repeatedly failed to honor their most basic disclosure obligations and misled Respondents and Your Honor as to the nature of their relationship with multiple witnesses.  Under similar circumstances, federal courts have dismissed the charges for prosecutorial misconduct, *see, e.g.*, *United States v. Chapman*, 524 F.3d 1073, 1078-80 (9th Cir. 2008), and the same remedy is warranted here.  *See infra* pp. 110-12.

In no event should this Court take seriously the Division's request for an astonishing $208 million in disgorgement and a permanent bar of Ms. Tilton from the securities industry.  These sanctions would be completely inappropriate on the evidence adduced here.  *See infra* pp. 112-20.  Now that a fuller picture has been revealed through the crucible of trial, the only just and proper outcome is to dismiss these charges in their entirety.

## THE EVIDENCE

Respondents' Proposed Findings of Fact contain a full statement of relevant facts and supporting evidence.  An overview of the key points established at trial is below.

## I.  Ms. Tilton Designed The Zohars To Originate Loans To Deeply Distressed Companies And Implement A Long-Term Turnaround Strategy To Create Value.

### A.  Ms. Tilton Created The Innovative Zohars To Provide A Solution To Financial Institutions Seeking To Invest In Distressed Assets.

Ms. Tilton founded Patriarch in 2000, after nineteen years of experience on Wall Street, to develop and market innovative solutions for financial institutions carrying portfolios of distressed and defaulted loans.  FOF ¶ 1; *see also* RX 72.  To that end, Ms. Tilton created two collateralized loan obligations ("CLOs") in 2000 and 2001, respectively called Ark I and Ark II (collectively, the "Arks").  FOF ¶ 2.  Through the Arks, Patriarch purchased and took over the management of portfolios of distressed and defaulted loans from two major banks, thereby allowing the banks to remove those failing assets from their balance sheets.  FOF ¶ 2.  The Arks were the first CLOs invested exclusively in distressed debt to receive an investment-grade rating, FOF ¶ 3, and were widely heralded as successful transactions, FOF ¶ 4.  The ratings on the Notes in these CLOs were upgraded during the life of the transactions, and Noteholders were repaid earlier than expected.  FOF ¶¶ 5-6.  Respondents were praised for their "hands-on management style," RX 70 (Introduction to Patriarch Partners Pitchbook, dated Sept. 15, 2003) at 77 (quoting from a July 30, 2003 Wall Street Journal Article, *In Hard Luck Industries, Patriarch Seeks Revival Funds*), and developed a reputation as "superior manager[s] of distressed loans," RX 551 (Internal MBIA email attaching Feb. 22, 2006 write-up on Patriarch from MBIA's Credit Analytics Group) at 4; *see also* FOF ¶ 4.

Ms. Tilton's success with the Arks prompted insurer MBIA, which faced insurance liability for a potential shortfall of $200-300 million on a set of unrelated CDOs, to seek Ms.

Tilton's help in creating a transaction designed to reduce that liability. FOF ¶¶ 7-8. In response, she created Zohar I. FOF ¶ 7. MBIA insured the Zohar I senior Notes, Ms. Tilton took over as collateral manager of MBIA's seven failing CDOs, and MBIA was granted a potential interest in a set of junior Zohar I Notes. FOF ¶¶ 9-10. Like the Arks, Zohar I was originally set up to invest in distressed corporate loans by purchasing them on the secondary market at a steep discount to their face value ("par value") and improve the prospects for success. FOF ¶ 11. After Zohar I closed, however, the market for distressed debt changed and prices for distressed loans increased, making this strategy less feasible. FOF ¶ 12.

To avoid unwinding the Zohar I deal, Ms. Tilton proposed a revised strategy: Zohar I would continue to purchase distressed loans on the secondary market at a discount when possible, but the primary strategy (the "Zohar Strategy") would be to originate loans to distressed companies (the "Portfolio Companies") at or near par value, gain control over them, and implement a long-term turnaround strategy to create value. FOF ¶¶ 13, 15. Shortly after the parties decided on the new strategy, Zohar II and Zohar III were created to invest side-by-side with Zohar I, thereby providing sufficient investment power to gain controlling interests in the distressed companies. FOF ¶ 14.

### B. The Zohars Were Private Transactions Among Sophisticated Parties Who Understood The Investment Strategy And Its Risks.

The Zohars were private transactions involving only sophisticated parties. The parties to the governing documents included the Zohars, the "Credit Enhancer," the "Note Agent," the Trustee/Collateral Administrator, the collateral manager, the Rating Agencies, and a small group of sophisticated institutional investors. FOF ¶ 21. The "Credit Enhancer," MBIA, provided a financial guaranty insurance policy on the Zohar Notes that would pay the Noteholders if the

Zohars were unable to meet their principle repayment obligations.  FOF ¶ 22.[3]  The "Note Agent" (otherwise known as the investment bank), Natixis Financial Products Inc. ("Natixis"), participated in structuring the transactions, worked with the Rating Agencies to obtain ratings on the Notes, and marketed and placed the Notes and preference shares with investors.  FOF ¶ 23.  LaSalle Bank (later U.S. Bank and others) served as Trustee and Collateral Administrator for the Zohars, and had many responsibilities in those capacities, including maintaining a database documenting each of the Zohar loans, compiling and distributing monthly and quarterly Trustee Reports, and collecting and disbursing funds.  FOF ¶ 24.

As collateral manager to the Zohars, Patriarch made all decisions regarding the management of the Zohars and their collateral, including regarding the purchase of loans from the secondary market, the origination of loans to the Portfolio Companies, and the restructuring of the loans and rehabilitation of the Portfolio Companies.  FOF ¶ 25.  Patriarch is owned and controlled by Ms. Tilton, who acted on behalf of Patriarch as collateral manager.  FOF ¶ 26.  Ms. Tilton typically owned equity in the Portfolio Companies, often served as CEO and as a board member of the Portfolio Companies, and actively fought for their rehabilitation.  FOF ¶ 97.

The Rating Agencies (Standard and Poor's and Moody's) reviewed and analyzed the terms of the transactions in order to issue ratings on the Notes issued by the Zohars, reflecting their view of the risk associated with investment.  FOF ¶ 28.  The Rating Agencies also conducted ongoing monitoring of the transactions in order to adjust their ratings if the risk changed.  FOF ¶¶ 182-84.  The Zohar Noteholders—all sophisticated institutional investors, including MBIA, Goldman Sachs, Barclays, and Natixis—invested capital into the Zohars by

---

[3]  There was no Credit Enhancer for the Zohar III transaction.  *See* RX 12 (Zohar III Indenture).

purchasing Notes, and were, in exchange, entitled to interest payments over time in addition to return of their principal at the maturity date.  FOF ¶ 29.[4]

Together, these parties heavily negotiated the governing documents, including the supplemental indentures that were negotiated to address the change in investment strategy.  FOF ¶ 30.  They also specifically negotiated what disclosures would be provided by the Zohars, including the content of the Trustee Reports and financial statements.  FOF ¶¶ 20, 31.

### C. The Unique Zohar Investment Strategy Involved Originating High-Interest Loans To Distressed Portfolio Companies, Gaining Control, And Rehabilitating The Companies To Maximize The Zohars' Return On Investment.

Although the Zohars shared some characteristics with typical CLOs, they were unique in several respects.  Like typical CLOs, the Zohars raised capital by issuing Notes to Noteholders who were, in exchange, entitled to interest payments over time, plus return of their principal at the maturity date, and the Zohars also paid collateral management fees to Patriarch for managing the portfolio.  FOF ¶¶ 27, 34.[5]  But the fundamental investment strategy and value proposition of

---

[4]   Some Zohar Notes were sold on the secondary market exclusively to other sophisticated institutional investors, including SEI Investments and Värde Partners.  FOF ¶ 32.  Those investors were given the Indentures and other governing documents, as well as marketing materials that detailed the Zohar Strategy, prior to investing in the Zohars.  FOF ¶ 33; *see also* RX 72 (Introduction to Patriarch Partners Pitchbook, dated Nov. 11, 2004) at 3-4 (executive summary of Respondents, the Zohars, and the Zohar Strategy); RX 15 (Zohar III Offering Memorandum) at 56-57 (discussing the "[i]nherent [i]lliquidity and [v]olatility" of the Zohar loans).

[5]   Payments of fees and interest were made according to a payment "waterfall" established in the Indenture, which directed payment based on the seniority of the Notes.  *See* Indenture § 11.1(a); *see also* FOF 59.  The Zohar waterfall provided that interest payments from the Portfolio Companies would first go toward the Zohars' operational and administrative costs, then to Patriarch's senior collateral management fee, then to pay interest to the Class A Noteholders.  Indenture § 11.1(a).  If funds remained, cash flowed to an account for preference shares, then to Patriarch's subordinated collateral management fee, then to pay principal to all Noteholders in order of priority, and finally to the equity and preference shareholders.  Indenture § 11.1(a).

the Zohars differed markedly from traditional CLOs, FOF ¶ 35, and as detailed below, *see infra*

Pt. II,[6] the governing documents were drafted to reflect that unique strategy.

The Zohar Strategy was built upon the premise that Ms. Tilton would be the catalyst for the success of the Portfolio Companies.  An investment in Zohar Notes was really an investment in Ms. Tilton's judgment.  The structure of the transaction reflects this fact at every step.  Thus, the Zohar Strategy gave Respondents broad authority and discretion to control the repayment terms of the loans the Zohars originated to the Portfolio Companies.  FOF ¶¶ 36-40, 48-51. Because the Portfolio Companies were deeply distressed, typically had no positive cash-flow prior to the Zohars' investment, were sometimes purchased out of bankruptcy, and often were not operating, they were generally unable to obtain funding from any source other than Respondents and the Zohars.  FOF ¶ 37.  As the representative of the sole lenders to highly distressed Portfolio Companies, Patriarch, as collateral manager, could control the terms of the loans without having to address the competing interests of other lenders.  FOF ¶ 36.  Ms. Tilton and her affiliates often owned all or almost all of the equity in the companies, which she typically purchased with personal funds.  FOF ¶ 40.  In connection with that equity ownership, Ms. Tilton was actively involved in the management of the Portfolio Companies, often acting as CEO and as a board member or manager of the companies (in most cases, the sole board member or manager).  FOF ¶¶ 97-98.  Ms. Tilton's active involvement enabled her to direct the rehabilitation of the companies, which, given her prior successes, was a key selling point for Noteholders.  FOF ¶¶ 38-39.

---

[6] Cross-references in this brief to "*infra* Pt. __," or "*supra* Pt. __," refer to the numbered Part falling within the same major heading as the reference (*i.e.*, "The Evidence," "Procedural History and Trial," "Legal Standards," or "Argument").

Ms. Tilton generally directed "equity upside" of the Portfolio Companies to inure to the benefit of the Zohars and Noteholders before herself.  FOF ¶ 41.  If that "equity upside" was realized upon a sale, those funds would be used to make principal and interest payments on the loans before any profits flowed to Ms. Tilton.  FOF ¶ 41; *see also* FOF ¶¶ 35, 94.[7]  The Indentures also allowed the Zohars to benefit from "Equity Kickers" and "Equity Workout Securities," including warrants, preferred second lien loans, prepayment penalties, and cash bonuses at maturity, which were arrangements pursuant to which a Portfolio Company would pay the Zohars more than 100% of the principal they owed on a loan.  FOF ¶ 42.

The large spread between the high interest rate that the Zohars, as lenders of last and only resort, charged the highly distressed Portfolio Companies (typically LIBOR plus 8 percent), and the interest rate paid to Zohar Noteholders (LIBOR plus 0.38 percent to LIBOR plus 1.4 percent) reflected the parties' expectation that—consistent with the Zohars' disclosed business strategy of investing in highly distressed companies—not all Portfolio Companies would always make timely, full interest and principal payments on their loans.  FOF ¶¶ 43, 46-47.  But if some of the Portfolio Companies succeeded and could pay the high interest on their loans, plus yield additional returns through potential equity upside and equity kickers, the Zohars would meet their financial obligations to Noteholders and create additional value besides.  FOF ¶ 44.

---

[7]  For example, the Zohars benefitted from the equity upside from the sale of a company called Xpient in 2014, when it was sold for a $17 million profit.  Tr. 2312:6-14 (Tilton).  The principal on the loan to Xpient, originated by the Zohars, was paid off first, followed by the payment of an equity kicker in the form of a preferred second lien loan, and then the Zohars were paid a portion of the remaining equity upside.  *Id.*

## II. The Obligations Set Forth In The Governing Documents Reflected The Unique Zohar Investment Strategy.

### A. The Governing Documents Expressly Granted Respondents Unilateral Discretion to Amend Loan Terms.

Because the value of the Zohars depended on the successful turnaround of the Portfolio Companies, the Indentures were drafted to give Respondents significant discretion in managing cash flows from the Portfolio Companies—including broad, unilateral discretion to amend the terms of the loans originated and purchased by the Zohars. *See* FOF ¶¶ 37-38, 48-49, 51, 87-92; Indenture § 7.7(a).[8]

### B. The IC And OC Ratios Reflected Respondents' Exercise Of Discretion Pursuant To The Zohar Strategy.

The Indentures required the calculation of both an IC Ratio and an OC Ratio. FOF ¶ 52. The IC Ratio measured the interest payments received from Portfolio Companies as against the interest owed to the Noteholders, and indicated whether the portfolio was generating sufficient interest income, on an aggregate cash basis, to satisfy interest payment obligations to Noteholders. FOF ¶ 53. The Indentures established a minimum IC Ratio of 110 percent (the "IC Ratio Test"), meaning the Zohars needed to collect only 10 percent more in interest from the Portfolio Companies than they owed to Noteholders in order to "pass." FOF ¶ 54. Because the interest rates on loans to the Portfolio Companies were significantly higher than the interest rates on the Notes, if every Portfolio Company paid the full stated interest, the IC Ratio would far surpass (by *multiples* of) the threshold. FOF ¶ 55. Thus, in the context of the very high interest rates charged to the failing or failed companies, setting the IC Ratio at 110 percent reflected the

---

[8]   The Collateral Management Agreements contained substantially the same language.  FOF ¶ 50; RX 6 § 2.2(c) at 7-8; RX 10 § 2.2(c) at 7-8; RX 16 § 2.2(c) at 8.

unambiguous understanding and expectation that not all loans would pay the full stated interest at all times. FOF ¶ 55.

The OC Ratio, by comparison, reflected the "carrying value" of the loans, plus cash, divided by the remaining principal owed to the Noteholders. FOF ¶ 56. Because the OC Ratio did not take into account the value of the equity upside that would benefit the Zohars and Noteholders when a Portfolio Company was successfully rehabilitated, it did not give a full picture of the value available to make payments to Noteholders and was of limited utility. FOF ¶ 57.[9]

If either the IC or OC Ratio Tests fell below the thresholds set forth in the Indentures, the payment waterfall re-directed cash flows to reduce the principal balance owed to the Noteholders, at the expense of paying Patriarch's subordinated management fees. FOF ¶ 60; RX 24 (Hubbard Rep.) at ¶ 37. If the OC Ratio decreased further, to an even lower threshold, it would trigger an "Event of Default." FOF ¶ 61. An "Event of Default" would empower the "Controlling Party"[10] to liquidate the CLO. FOF ¶ 62. As collateral manager, Ms. Tilton properly could "manage to the tests" by deferring management fees, forgoing preference share distributions, or buying new loans at a discount on the secondary market, to ensure that the OC and IC Ratios did not fail and that the Zohars would generate sufficient value to pay Noteholders. FOF ¶ 63.

---

[9]  The minimum OC Ratio was 105 percent, 112 percent, and 112.7 percent for Zohar I, II, and III, respectively (the "OC Ratio Test"). *See* FOF ¶ 58.

[10]  The "Controlling Party" (known as "Controlling Class" in Zohar III) was a Noteholder or group of Noteholders as determined according to a complex rubric in the Indentures. FOF ¶ 62; Indenture § 1.1 (definition of "Controlling Party" or "Controlling Class"). MBIA was the Controlling Party of Zohar I. FOF ¶ 62; Tr. 2181:3-10 (Tilton).

**C.    The Indentures Permitted Respondents To Use Their Business Judgment To Amend Loans And Categorize Them According To Their Amended Terms.**

To calculate the OC Ratio, Respondents were required to assign each loan to one of four numeric categories: Categories 1, 2, 3 or 4.[11]  FOF ¶ 64.  In practice, the categorization was essentially binary: a loan was either a Category 1, "Defaulted Obligation," or a Category 4, a current obligation.  FOF ¶¶ 66-67.  The "carrying value" of the loans, which served as the numerator of the OC Ratio, was determined according to these categories.  FOF ¶¶ 69-73.[12]  Assignment of a loan to either Category 1 or Category 4 turned, in part, on whether a payment "default" had occurred under the current loan terms.  FOF ¶¶ 74-84.

The Indentures expressly required Respondents to make a number of subjective determinations regarding the anticipated future performance of the Portfolio Companies in determining whether to maintain loans in Category 4 or move them to Category 1.  Regardless of whether a Portfolio Company was meeting its payment obligations, Respondents had the authority to put a loan into Category 1 if, "in the reasonable judgment of the Collateral Manager,

---

[11]    The four-category approach was tailored to the initial strategy of buying distressed loans on the secondary market and consolidating control over the companies in bankruptcy.  FOF ¶ 65.  By the time Zohar III was created, the four categories had been eliminated, and loans were designated as either "Defaulted Investments" (roughly analogous to Category 1 loans) or "Collateral Investments" that were not Defaulted Investments (roughly analogous to Category 4).  FOF ¶¶ 66-68.  The Division made no claim that investments categorized should have been categorized as a "2" or "3" instead.

[12]    Category 4 loans were carried at the principal amount outstanding on the loan for purposes of calculating the OC Ratio.  FOF ¶ 70.  For Zohar I, the carrying value of a Category 1 loan was measured by the lower of the purchase price or the market price (if there was one).  FOF ¶ 72.  The loans originated by Zohar I would typically be held at par value even in Category 1 since there was typically no market value and the loans were originated (*i.e.*, purchased) at 100 cents on the dollar.  FOF ¶ 72.  In Zohars II and III, the carrying value for Category 1 loans was typically measured by the Moody's recovery rate, "which would have been anywhere between 50 and 60 percent of par."  Tr. 2418:17-2419:2 (Tilton); *see also* FOF ¶ 73.

[there was] a significant risk of declining in credit quality or, with the passage of time, becoming Category 1." Indenture § 1.1 (definition of "Defaulted Obligation" at (a)(ii) stating the collateral manager can move a loan out of Category 4 if in its "sole judgment" the loan "will likely result in a default as to the payment of principal and/or interest," even if no such payment default has yet occurred); *see also* FOF ¶ 79.[13]

Conversely, if Respondents had confidence that a Portfolio Company would likely provide long-term value to the Zohars and their Noteholders, Respondents could exercise their discretion under Section 7.7(a) of the Indentures to "enter into any amendment, forbearance or waiver of or supplement to any Underlying Instrument," thereby avoiding a default and permitting the loan to remain in Category 4. Indenture § 7.7(a); FOF ¶ 80. Ms. Tilton exercised her discretion "not to default something but to amend and defer if [she had the] reasonable belief or reasonable judgment or good-faith business judgment that by doing so [she would] maximize the cash flows of principal, interest and equity over a longer period of time." Tr. 1831:7-12; *see also* FOF ¶¶ 80, 107.

Under the Indentures, "a payment default [was] measured by the loan's current terms after giving effect to all of the amendments." RX 21 (Froeba Rep.) at ¶ 63. Thus, if Respondents amended the terms of a loan to extend the due date for interest payment, default was measured pursuant to the amended deadline, not the superseded deadline, and did not need

---

[13] While the categorization terminology changed in the Zohar III Indenture, as noted above, the definition of "Defaulted Investment" in the Zohar III Indenture carried over the same "sole judgment" provision. *See* Zohar III Indenture § 1.1 (definition of "Defaulted Investment").

to be put into Category 1 because there was no default of principal or interest.  FOF ¶¶ 80-83.[14] On the other hand, if payment was not timely made according to the amended terms of the loan, Respondents would have to—and did—place the loan in Category 1.  FOF ¶ 84.

The Indentures also included "Eligibility Criteria" for loans held by the Zohars, including that no more than 5 percent of the Zohars' loans could be "Defaulted Obligations" (Zohar I and II) or "Defaulted Investments" (Zohar III).  FOF ¶ 89.[15]  If the 5 percent limit was exceeded, the Zohars could not acquire or originate any loans that would increase the percentage.  FOF ¶ 90. Because the Eligibility Criteria discouraged the Zohars' exposure to "Defaulted Obligations" or "Defaulted Investments" by setting a limit, while the disclosed Zohar Strategy was to invest in loans that would be subject to "extensive amendment," a reading of the Indentures that required amended loans to be reclassified as "Defaulted Obligations" or "Defaulted Investments" would be inconsistent with the "Eligibility Criteria."  Moreover, if the 5 percent threshold were exceeded, the Zohars would be prohibited from making further loans to those Portfolio Companies when they were at their most vulnerable.  FOF ¶¶ 89-90.  If Portfolio Companies could not obtain funding in times of distress, it would almost certainly force fire sales of the

---

[14]    Unlike other CLO indentures, which provided that a loan would still be considered to be defaulted if it "would be so delinquent but for any amendment or modification to such loan," the Indentures had no such language barring categorization by reference to the amended terms of a loan.  FOF ¶ 83.  To the contrary, while the Zohar I and II Indentures specified that a loan would be considered in default "without regard to . . . any waiver of such default," they did not contain parallel language regarding amendments, despite expressly authorizing amendments in Section 7.7(a) of the Indentures.  *See* Indenture § 1.1 (definition of "Defaulted Obligation").

[15]    Under the Indentures, if one loan to a Portfolio Company was a Category 1, all other loans to that company were also reclassified to Category 1, meaning that if Respondents did not have the ability to amend and defer interest, the 5 percent threshold would have been quickly exceeded.  FOF ¶ 78.

distressed and illiquid Portfolio Companies and lead to rapid and precipitous losses for

noteholders.

## III.  Respondents' Approach To Loan Amendment And Categorization Was Fully Disclosed.

### A.  Monthly And Quarterly Trustee Reports Disclosed Respondents' Categorization Approach.

The Indentures required that the Zohars' Trustee distribute a "Monthly Report" and a

quarterly "Note Valuation Report" (together, the "Trustee Reports") to Noteholders and other

interested parties, including the Rating Agencies.  FOF ¶ 125.  As required by the Indentures, the

Trustee Reports contained detailed information on their face about the Zohar loans, including the

principal balance, the interest rate, amount of interest collected during that period, and the

numeric category to which Respondents had assigned each loan for purposes of calculating the

OC Ratio, as well as the IC and OC Ratios for each Zohar for the given period.  FOF ¶¶ 127-

30.[16]  The Trustee also posted on its website data files containing detailed loan-level information,

which Noteholders and other interested parties regularly downloaded and analyzed alongside the

Trustee Reports.  FOF ¶ 126.  The Trustee Reports and associated data files regularly disclosed

on their face that some of the loans held by the Zohars did not pay the full amounts of stated

interest and were categorized as Category 4 loans.  FOF ¶¶ 128, 139-50.

---

[16]  For example, the July 2009 quarterly Trustee Report disclosed that loan 0855_11 (corresponding to American LaFrance) did not pay the full stated interest for the relevant period, and was a Category 4 loan.  The Report stated that loan had a total principal balance of approximately $45 million, and an interest rate of 10 percent.  Simply by multiplying $45 million by 10 percent, it was evident that the stated interest on the loan was around $4.5 million per year, or just over $1 million per quarter, but the July 2009 Report showed that American LaFrance paid only $200,000 in interest for the quarter, and that the loan was classified as Category 4. FOF ¶¶ 131-34; *see also* FOF ¶¶ 135-38 (September 2007 monthly Trustee Report disclosures for loan 865_02).

**B. Investor Calls And Emails Provided Even More Detail On Respondents'
Categorization Approach.**

Not only did the governing documents, marketing materials, and Trustee Reports make

clear Respondents' investment strategy and concomitant approach to loan amendment and

categorization, but also Ms. Tilton was transparent in explaining and clarifying Respondents'

approach on investor calls and in emails.  On a December 2011 conference call for Zohar I

Noteholders, Ms. Tilton told Noteholders, "[T]hese deals were constructed such that . . .

maturities could be extended, that interest rates could be changed, . . . that things could be done

to elongate the time needed to be able to create the most amount of value to pay off the loans,"

RX 48A at 4:2-6; *see also* FOF ¶ 154,  namely by "deferring and amending and using the cash

flow that the company can use to create value rather than paying interest and going into

liquidation."  Tr. 2711:22-2712:5 (Tilton).

Similarly, on a Zohar II investor call, Ms. Tilton told Noteholders that the Zohar strategy

involved gaining control over companies in their "deepest and darkest moments, at low prices,"

and "tak[ing] the long journey of rebuilding these companies and ultimately selling them for

value.  And the deals were actually structured with the knowledge that that would be what we

were doing, which is why they look very different than other CDOs in terms of the ability to

change maturities, adjust interest rates, extend, restructure."  RX 49A at 2:12-23; *see also*

FOF ¶ 155.  On a Zohar III investor call, Ms. Tilton told Noteholders, "[T]iming is everything.

Selling things at their worst moment is the worst that you could do. . . .  The automotive

company that we owned prior to 2009, Global Automotive Systems, in 2009 it lost fifty percent

of its revenues when Chrysler and GM went into bankruptcy. . . .  Had I not been here to hold it

steady, change its interest rate, move the maturity out, we too would have gone that way. Yet this

year it'll probably do $27 million of EBITDA."  RX 50A at 15:25-16:17; FOF ¶ 156.  Ms. Tilton

did not receive a single follow-up inquiry after any of these investor calls.  Tr. 2557:7-11.

Respondents were equally open in email communications with Noteholders.  FOF

¶¶ 151-52.  For instance, in responding to an inquiry from a Barclays analyst about the difference

between the interest stated and the interest actually paid on a certain loan, Respondents explained

that "[t]he Indenture allows Patriarch Partners, as Collateral Manager, to restructure [a]

company's debt . . . [w]e have recently amended many of the credit agreements to lower interest

rates to allow them to pay full interest or defer current due interest."  RX 117 (June 23, 2011

email from Frank Li to Anand Sankaranarayanan, Barclays) at 1-2.  Barclays did not ask any

follow-up questions.  *See also, e.g.*, RX 118 (Patriarch employee email to Noteholder Natixis

explaining that some "loans have been amended").  Similarly, when analysts at the Rating

Agencies noted that certain loans that were not paying the full stated interest were carried as

Category 4 loans—precisely the information the Division wrongly alleges was not disclosed—

Respondents openly explained their amendment and deferral practices.  FOF ¶¶ 185-86.

## C.  The Trustee Received And Reviewed Detailed Information Regarding Each Loan, And Never Objected To Respondents' Management Of The Zohars.

As agent and fiduciary to the Zohars, the Trustee was responsible for monitoring all

aspects of the Zohars' transactions and preparing the monthly and quarterly Trustee Reports,

which entailed a thorough review of the principal amounts on the loans, the interest rates on the

loans, and the interest payments made by the Portfolio Companies.  FOF ¶¶ 173-175.  The

Trustee also independently calculated the OC Ratio based on Respondents' loan categorizations,

and included it in the Trustee Report.  FOF ¶ 176.  Additionally, the Trustee was tasked with

calculating, collecting, and distributing all funds on behalf of the Zohars, including the amounts

loaned to the Portfolio Companies, as well as the principal and interest payments made by the

Portfolio Companies and fees paid to Patriarch, and tracking the interest rates and maturity dates on the loans.  FOF ¶¶ 177, 180.  The Trustee was also obligated to identify any defaulted, non-current, or non-performing loan, and the date on which it became defaulted.  FOF ¶ 178.  If the Trustee did not receive a principal and interest payment when due, it was required to send written notice to the Zohars and Patriarch and request payment from the Portfolio Company within three days.  FOF ¶ 179.  The Trustee never did so, and never objected to Respondents' management of the Zohars.  FOF ¶¶ 179, 181.

## IV.  Patriarch Prepared GAAP-Compliant Financial Statements For The Zohars With The Advice And Approval Of Internal And External Accountants.

In addition to the Trustee Reports, Noteholders received the Zohars' quarterly financial statements, as required by Section 7.9(a) of the Indenture.  FOF ¶ 219.  Section 7.9(a) prescribed the content of the financial statements, and they provided significantly less detail than the Trustee Reports: a one-page balance sheet, a one-page income statement, notes about the Zohars' accounting processes, and a one-page certification that the balance sheet and income statements were "prepared . . . in accordance with [GAAP] and certified by the Issuer as presenting fairly, in all material respects, the financial position of the Issuer and its consolidated subsidiaries."  FOF ¶ 220; Indenture § 7.9(a).

In preparing the Zohars' financial statements, Respondents relied on the advice and approval of its long-time outside accountant, Peter Berlant of Anchin, Block & Anchin ("Anchin").  FOF ¶¶ 247-270.  By the time the Zohars were formed, Berlant was deeply familiar with Patriarch and its business operations, because he had served as Patriarch's accountant since "the inception of [the] business" in 2001, created the Arks' financial statements, and participated in negotiating the Zohar I governing documents (including the Zohar I Indenture, the Collateral Management Agreement, and the Collateral Administration Agreement).  Tr. 1956:5-25 (Tilton);

FOF ¶¶ 247, 249-52, 254-56. Berlant helped to develop the form and content of the Zohars' financial statements; indeed, he revised the fair value and impairment notes of the very first statement to include language that was incorporated in all of the subsequent statements. FOF ¶¶ 249-50.[17]

Over the next 15 years, Berlant routinely reviewed and approved the Zohars' financial statements and provided accounting advice to Respondents, including with respect to GAAP. FOF ¶¶ 255, 257-60, 269-70. He advised Respondents on fair value disclosures, impairment policy, and how certain disclosures should be revised in light of new GAAP guidelines that arose from time to time. FOF ¶¶ 250-52, 257-60. In accordance with the processes Berlant helped create, Respondents regularly conducted impairment and fair value analyses.[18] FOF ¶¶ 223-28, 232-40. Patriarch analyzed the performance and future prospects of the Portfolio Companies through "credit templates" that applied a discounted cash flow analysis to estimate the value of future collections, and conducted an "event-driven" impairment analysis, writing down loans when underperforming assets needed to be restructured and writing off loans upon liquidation,

---

[17] Further, Anchin worked with Patriarch to develop a manual of accounting policies, which included advice from Berlant on how to conduct GAAP-compliant impairment analyses. FOF ¶¶ 251-53.

[18] Respondents created detailed models that "la[id] out [Portfolio Company] cash flows credit-by-credit and as a whole," and "discount[ed] those cash flows back to create a fair value number." Tr. 2297:8-2298:5 (Tilton); *see also* FOF ¶¶ 223-24. Patriarch then compared the discounted cash flow numbers from the valuation models to the "carrying cost on the financial statements as well as to the holding value in the trustee reports," and reported "the lowest number" as the fair value in the financial statements. Tr. 2281:15-25 (Tilton); *see also* FOF ¶ 224.

all in accordance with Berlant's advice.  FOF ¶¶ 232-33, 250-52, 255, 257.  These analyses were plainly disclosed in the financial statements.[19]

Anchin and Respondents also established formal procedures for preparing the financial statements, as set forth in Patriarch's "Fund Accounting Manuals," and adhered to those procedures every month for 15 years (with respect not only to the Zohars, but also the Ark I and Ark II funds, which preceded Zohar I).  FOF ¶¶ 247, 250-52; DX 127 (Fund Accounting Manual for Zohar I).  Patriarch's Finance & Accounting ("F&A") Department completed workpapers and generated draft financial statements using information provided by the Trustee.  FOF ¶¶ 256, 264.  Specifically, Patriarch's F&A Department, "ensure[d that] the financial statements were prepared in accordance with US GAAP."  Tr. 1144:10-13 (Mercado); FOF ¶¶ 264-65.  The workpapers and financial statements were sent for review and comment to Berlant, who would inform Patriarch's internal accountants of any proposed changes or state that he "approv[ed]" the financial statements.  *See, e.g.*, RX 1761;  FOF ¶¶ 264-65, 269.  Only after Patriarch's accounting department satisfied themselves that the statements were GAAP compliant and "incorporate[d] comments from" Berlant could the papers be "submitted to Ms. Tilton . . . for approval."  DX 127 (Fund Accounting Manual for Zohar I) at 4; FOF ¶ 268.  Both by policy and in practice, Ms. Tilton, who has no formal accounting training, would not sign the financial

---

[19]    As to fair value, the Zohar financial statements disclosed that the estimated "fair value of the Collateral Debt Obligations/Collateral Investments, taken as a whole, is approximately equal to the [] carrying value presented on the Balance Sheet" and "[t]he Collateral Debt Obligations/Collateral Investments are recorded at cost upon acquisition or origination."  FOF ¶ 221.  The Zohar financial statements further disclosed that "fair value estimates are generally subjective in nature," and may be based upon "valuation techniques" that "involve uncertainties."  FOF ¶ 222.  As to impairment, the Zohar financial statements also disclosed that an impairment loss would be recorded "[i]n the event . . . that the anticipated future collections are determined to be less than the carrying value of the loan," FOF ¶ 229, and that Patriarch "employs the cost-recovery basis of accounting for the recognition of capital gain or loss" due to the "uncertainty with regard to future collection[s]," FOF ¶ 230-31.

statements unless and until she was assured by her internal accountants that Berlant had reviewed and approved the documents.  FOF ¶¶ 263, 265, 268; DX 127 at 4.

## **PROCEDURAL HISTORY AND TRIAL**

I.    **After A Nearly Six-Year Investigation By The Division, The Commission—On A Split Vote—Authorized Narrow Charges Against Respondents.**

In 2009, the Division commenced an investigation of Respondents that spanned nearly six years.  During that time, the Division interviewed dozens of witnesses and gathered millions of pages of documents dating back to 2000.  The Division's record is nonetheless startlingly incomplete, precisely as the Division wished it to be.  Several of the Division's trial witnesses are not mentioned at all in the investigative record, the vast majority of its witness interviews were conducted off the record, and the Division resisted production of any notes from post-OIP interviews.  FOF ¶ 348.

In March 2015, by a 3-2 vote, the Commission authorized the Division to institute proceedings against Respondents based on the narrow allegations set forth in the OIP.  *See Lynn Tilton*, Investment Advisers Act Release No. 4053 (Mar. 30, 2015).  Commissioners Daniel M. Gallagher and Michael S. Piwowar disapproved of any charges being filed.  SEC, Final Commissioner Votes, at 849 (Mar. 2015), https://www.sec.gov/foia/docs/votes/2015-03.pdf. The charges rest on a single core allegation: that Respondents had failed to disclose their use of "subjective" methods for categorizing loans, rather than the purportedly objective standards set forth in the Indentures.  *See* OIP ¶¶ 3-6, 29-51.  This allegation animates the Division's various legal theories: the OIP characterizes it as a purported material misrepresentation or actionable omission in communications with Noteholders made via the Trustee Reports; as a purported breach of Respondents' fiduciary duties to the Zohars, by failing to disclose the actual method of categorization or an alleged conflict of interest linked to that method; and as an inaccuracy in the

financial statements.  *See* OIP ¶¶ 7-9, 52-73.[20]  The Division, however, has no complaint about how Respondents ran their business: "[t]he Division does not make any allegation that Respondents' subjective judgments relating to the portfolio companies were incorrect."  Div. Opp. to Mot. for a More Definite Statement 4.

## II.    At Trial, The Division Did Not Satisfy Its Burden To Prove The Allegations.

The Division's evidence at trial was threadbare.  Despite the extraordinary scope of its investigation—including interviews of fifty-nine individuals—the Division listed only a handful of them as "may call" witnesses, and ultimately called only three Noteholder witnesses at trial, two of whom had never been contacted prior to the OIP.  The Division's own witnesses—three Noteholders and two experts—did not actually support, and in some cases clearly rejected, the claim that Ms. Tilton hid her amendment and categorization strategy from Noteholders.  The Division's key fact witness regarding the GAAP claims, Peter Berlant, gave absurd testimony that was flatly contradicted by contemporaneous documents.  And the Division's expert witness on this point, Henning, admitted that the Division had failed to provide him with critical facts relevant to his analysis.

The Division's case was especially notable for the witnesses who were not called.  The Division opted not to call a single witness from MBIA.  That choice was unsurprising in light of the SEC's prior secret and inappropriate dealings with MBIA.  In the course of its investigation, the SEC supplied MBIA with confidential, nonpublic documents and other information that Ms. Tilton had provided to the SEC, explicitly authorizing MBIA to use those documents against Ms.

---

[20]  These theories form the basis for the charges against Respondents under §§ 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (2015) ("Advisers Act" or "IAA"), and Rule 206(4)-8 promulgated thereunder, *see* 17 C.F.R. § 275.206(4)-8 (2007), as well as the aiding and abetting charges against Patriarch.  OIP ¶¶ 74-76.

Tilton in civil litigation so long as MBIA did not "cite or attach any of the documents." FOF ¶ 352; RX 515 (Dec. 17-18, 2013 email chain). For its part, MBIA blocked a potential restructuring of the Zohars that it had initially supported and that would have greatly benefitted Noteholders— but surely would have hampered the Division's investigation by signaling the Noteholders' approval of Ms. Tilton's management of the Zohars. *See* FOF ¶¶ 199-210. MBIA even admitted to Division staff that it wanted to "own Zohar I," RX 540 at 1, and dupe Ms. Tilton into "go[ing] all in" before the Division sued her company, RX 501 at 9; *see also* Tr. 2612:1-2616:17 (Tilton).[21]

The Division also failed to call a single witness (other than Ms. Tilton) who was present at the inception of the Zohars, any witness from the Zohar Trustee, any witness from the Rating Agencies, or any of the Zohars' independent directors. The only inference to be drawn is that the Division knew that no one in any of these categories of witnesses would support its charges.

A.    **The Witnesses Called In The Division's Case Decimated Its Allegations Against Respondents.**

The Division called three Noteholder witnesses and two experts regarding its categorization claim, and an outside accountant and one expert for its GAAP claim. Not only did their testimony fail to establish even the narrow allegations set out in the OIP, it confirmed the testimony provided by Ms. Tilton and Mercado, who were also called in the Division's case.

---

[21]    The SEC also blocked another restructuring attempt that would have mooted the Division's case by making all Noteholders whole. In the fall of 2013, Ms. Tilton hired the investment bank Moelis & Company to help with an alternative restructuring plan: Ms. Tilton would spend $300 million of her own funds, along with additional money raised from a third party or parties, to repurchase all of the Zohar Notes from Noteholders, and once the Noteholders were fully repaid, Patriarch would withdraw as an investment adviser and operate instead as a family office, focusing on the Portfolio Companies. RX 543 (draft terms and conditions for alternative restructuring plan); Tr. 2581:4-2585:17 (Tilton). Even after Moelis had raised $1.1 billion for the deal, the SEC nonetheless issued a Wells Notice in October 2014, and the deal (of which the SEC was aware) fell through. FOF ¶¶ 203-207; Tr. 2588:13-20, 2596:23-25 (Tilton).

## 1.    The Division's Own Witnesses Eviscerated Its Categorization Claim.

The Division called only three Noteholder witnesses to testify about its categorization claim against Respondents:  David Aniloff from SEI Investments, Matthew Mach from Värde Partners, and Jaime Aldama from Barclays.  None of these Noteholders was present when the Zohars were created, and none of them participated in negotiating the governing documents. FOF ¶ 160.  Despite their substantial incentives to testify against Respondents, FOF ¶¶ 165-72, all three admitted at trial that Ms. Tilton had the unilateral discretion to amend loans and that her approach to loan categorization was disclosed in the governing documents or Trustee Reports, FOF ¶¶ 93-96, 157-59.  Their testimony thus defeated the Division's claim that Respondents had deceived the investors and breached their fiduciary duty to the Zohars by not disclosing Ms. Tilton's approach to categorizing loans.

The Division's first Noteholder witness, David Aniloff, is a portfolio manager at SEI Investments, a secondary investor in the Zohars.  Tr. 90:25-91:10.  Aniloff, who testified to reviewing and analyzing the Zohar governing documents before investing, Tr. 108:5-23; *see also* FOF ¶ 33, conceded that Section 7.7(a) of the Indenture granted Ms. Tilton "the ability to amend the terms of a loan," Tr. 150:22-25; *see also* FOF ¶ 93.  He also readily admitted that he understood from the offering memorandum and Indenture that Ms. Tilton categorized loans based on her "belief in the future recovery and the reorganization [of the Portfolio Companies], not based on how much interest is collected."  Tr. 146:7-147:2; FOF ¶ 157.  Aniloff testified that he reviewed the Trustee Reports each month, Tr. 118:17-119:20; FOF ¶ 127, conceded that he could have determined from the Trustee Reports that certain Category 4 loans were not paying full stated interest, FOF ¶ 157; Tr. 321:17-24, and admitted that when he analyzed the Trustee Reports "sometime in the last few years," he noted that "the amount that was actually collected did not tie out to the spread that was listed in the trustee report," Tr. 129:21-130:4; FOF ¶ 157.

The Division's next noteholder witness was Matthew Mach, managing director at Värde Partners, also a secondary investor in the Zohars. Tr. 587:10-16. Mach admitted that he reviewed and analyzed the Zohar governing documents before investing in the Zohars, *see* Tr. 592:4-9, 594:19-25; FOF ¶ 33, and, in doing so, took note of the discretion that Section 7.7(a) conferred on Patriarch to amend loans, FOF ¶ 94. He also testified to his understanding that, pursuant to the Indentures, the distressed loans in the Zohar portfolio would be subject to extensive amendment. FOF ¶ 94. Mach further testified that he "look[ed] at the trustee reports as they would come out," Tr. 610:1-7; FOF ¶ 127, and conceded that it took only "basic math" to determine from the Trustee Reports that the "actual cash flows that were reported and coming off [of the loans to the Portfolio Companies] . . . were inconsistent and very often well below the stated interest rate," Tr. 612:9-15, 613:14-21; *see also* FOF ¶ 158.

The Division's third Noteholder witness was Jaime Aldama, managing director at Barclays. Tr. 1496:8-11. Although Barclays was an original Zohar Noteholder, Aldama did not become involved with the investment until 2010—seven years after the Zohars were established—and he testified that he had never communicated with any Barclays employee who had participated in negotiating the structure and operation of the Zohar transactions. FOF ¶ 164. Aldama did review the Zohar governing documents when he began monitoring the investment, Tr. 1573:14-1574:22; FOF ¶ 33, and like Aniloff and Mach, admitted that he understood Indenture Section 7.7(a) as giving Respondents unilateral authority to amend the Zohar loans. FOF ¶ 95. Aldama further admitted that Ms. Tilton explained to him in a meeting that she amended the Portfolio Company loan agreements pursuant to the Zohar Strategy when, in her judgment, it was in the best interests of the Noteholders to do so, because without amending in those instances, the Portfolio Companies would not have had enough cash to continue operating.

FOF ¶ 153.  Aldama also testified that he regularly reviewed the Trustee Reports, Tr. 1648:11-1;

FOF ¶ 127, and conceded that he could determine from the Trustee Reports that some Category 4

loans were not paying the full stated interest, FOF ¶ 159; Tr. 1649:13-1650:1.  Aldama further

admitted that he was able to tell that "not all of the loans were paying the full amount of interest"

from the face of the Trustee Reports because "[t]he weighted average spread and the interest

collected was not the same."  Tr. 1651:6-13; FOF ¶ 159.[22]

The Division's own experts also undermined the categorization claims.  Ira Wagner, the

Division's purported "expert in the structure and function of CLO[s]," Tr. 2834:6-12 (Div.),

admitted that:  (1) Ms. Tilton had "the authority to amend and make changes to the loan[s]," Tr.

2948:8-12; FOF ¶ 51; (2) if a loan were amended, it would need to be reclassified as Category 1

only "if it didn't make the payment according to its current"—that is, post-amendment—

"contractual terms," Tr. 2932:23-2933:3; *see also* FOF ¶ 82; and (3) loan amendments did not

need to be in writing, Tr. 2963:2-8; FOF ¶ 82.  Far from helping the Division's case, Wagner's

testimony supported Respondents' loan amendment and categorization practices.

The Division also called Michael Mayer, a purported "disgorgement expert."  He claimed

to have analyzed when it was that the OC Ratio Test should have failed had the Division's

categorization theory been correct.  Mayer's analysis was flawed as a matter of logic, economics,

and arithmetic.  FOF ¶¶ 328-31.  Indeed, Mayer did not consider the consequences of an OC

Ratio Test failure—the very hypothetical he had assumed.  FOF ¶ 329.  Mayer, moreover, first

---

[22]    To the extent the Noteholder witnesses testified that they were not aware of Ms. Tilton's
approach to categorization, that testimony is not credible, FOF ¶¶ 160-72, particularly in light of
the fact that, as several witnesses confirmed, the face of the Trustee Reports revealed that loans
that did not pay full interest were nonetheless categorized as a "4," FOF ¶¶ 128, 139-50, 157-59.

asserted that certain data was unavailable to investors, but then conceded that he had no way of knowing whether the data was contemporaneously available or not.  FOF ¶ 324.

These experts not only failed to further the Division's case but also proffered improper legal opinions, engaged in improper fact-finding, and gave otherwise unreliable testimony.  FOF ¶¶ 302-43.  Your Honor should therefore not accord their testimony any weight.

The Division called Ms. Tilton, who testified about the creation of the Zohars, the governing documents, the Zohar Strategy, the financial statements, and the extensive disclosures made by Respondents to Noteholders and other parties to the transactions.  Ms. Tilton explained that the structure of the Zohars, including the high interest rates on the loans to the Portfolio Companies, reflected the parties' expectation that Respondents would collect as much interest as possible from each Portfolio Company without unnecessarily exacerbating a liquidity crisis (and all of them had liquidity crises at the time of purchase), which would lead to a fire sale. Tr. 2006:10-16; *e.g.* FOF ¶¶ 38, 44, 55, 87-92.  Accordingly, Ms. Tilton explained that her ability under Indenture Section 7.7(a) to "defer[] interest as an amendment" was the strategy for which the "noteholders negotiated and bargained."  Tr. 1871:25-1872:15; FOF ¶ 87.  She testified that, in line with this strategy, she had chosen "not to default something but to amend and defer" only if she had the "good-faith business judgment that by doing so [she would] maximize the cash flows of principal, interest and equity over a longer period of time."  FOF ¶¶ 86, 92, 98, 107; *see also* Tr. 2743:1-12.[23]  She "never categorize[d] something as a 1 or 4 if

---

[23]    For example, Ms. Tilton testified at length about using her discretion to amend to defer interest payments for two Portfolio Companies, MD Helicopters and Global Automotive Services ("GAS"), both of which later successfully turned around and provided value to the Zohars.  FOF ¶¶ 114-24.

[she] believed it should be a 1 just to keep the OC ratio higher."  Tr. 1930:7-9; *see also* Tr.

1930:17-21; FOF ¶ 84.  There was no evidence to the contrary.

Ms. Tilton also testified that she had elected to defer preference share dividends (over a

two-year period) and over $32 million in subordinated management fees (for more than three

years) during the financial crisis.  Tr. 2487:24-2488:22; FOF ¶ 196.  She reinvested into the

Zohars and Portfolio Companies hundreds of millions of dollars of her own money, Tr. 2548:5-

18; FOF ¶¶ 212-18—a sum far greater than the collateral management fees the Division now

seeks from Ms. Tilton as disgorgement—reinforcing not only how closely her own interests were

aligned with those of the Noteholders, but also her adherence to the highest standards of care.

FOF ¶¶ 63, 193-98.

### 2.        The Division's Witnesses Undermined Its Financial Statements Claim.

Berlant, the Division's key witness regarding the Zohars' financial statements, was Ms.

Tilton's outside accountant for the Zohars since their inception, as well as for predecessor funds

(Ark I and Ark II).  FOF ¶ 247-49.  On direct examination, the Division elicited the extremely

implausible testimony from Berlant, a Certified Public Accountant and partner at the accounting

firm Anchin, Block & Anchin, that even after 15 years of receiving financial statements starting

with Ark I, he did not know why the Zohars generated financial statements at all, or even

whether the statements went to Noteholders, *see* Tr. 775:23-776:1, 838:3-17, 936:5-25, 937:1-6,

and for the entire 15 years of receiving the Zohar financial statements to review and approve, his

review was limited to checking for "clerical accuracies," *see* Tr. 928:13-20; FOF ¶¶ 261-62.

Impeached with contemporaneous documents on cross-examination, Berlant conceded that he

had helped create the Zohar financial statements, had reviewed them for substantive accuracy for

over 15 years, and had provided accounting advice, including on GAAP issues, completely

undermining the Division's attempt to show that Respondents were not relying on Berlant in preparing their financial statements.

The Division's only other fact witness who testified about the financial statements was Mercado, a Certified Public Accountant who has worked in Patriarch's accounting department since 2008 and currently serves as controller.  Tr. 1099:14-18, 1102:2-6, 1103:11-13 (Mercado). Mercado detailed Patriarch's process for preparing the Zohars' financial statements, and explained why those statements were GAAP-compliant.  *E.g.* FOF ¶¶ 226, 232, 236, 241, 244. He also testified to Berlant's role in advising on GAAP and other accounting issues, Tr. 1131:23-1132:1, 1135:21-1136:2; *see also* FOF ¶ 269; Berlant's review and approval of every financial statement, Tr. 1126:17-20, 1292:10-15; FOF ¶¶ 256, 264; and Ms. Tilton's insistence that both Mercado and Berlant sign off before she would sign a financial statement certification, Tr. 1292:5-7; FOF ¶¶ 264-65, 268.

The Division's accounting expert, Henning, did not advance the Division's claims. Henning admitted that many of his opinions were not based on accounting principles at all, FOF ¶ 304, and his opinion that Patriarch did no impairment or fair value analyses simply ignored Respondents' processes and corresponding disclosures, as he conceded on cross-examination, *see* FOF ¶ 310; Tr. 1429:14-1430:8 (Henning).  Henning also admitted that the Division had failed to tell him fundamental facts about the case that undermined his opinions, FOF ¶ 305; Tr. 1426:2-1427:14, and he took the incredible position that his confidence in his opinions would be unchanged even if Berlant—on whom he relied heavily—had lied on the stand, FOF ¶ 314.[24]

---

[24]    Because the testimony from the Division's witnesses failed to make out even a *prima facie* case for the allegations in the OIP, Respondents moved for summary disposition at the close of the Division's case.  Noting that the Commission disfavors rulings on such motions before the presentation of the Respondents' case, Your Honor deferred a decision.  Respondents hereby renew that motion and request dismissal of the Division's claims in their entirety.

### B.    The Testimony From Respondents' Witnesses Confirmed That The Division's Allegations Are Baseless.

Respondents' case at trial included three fact witnesses from the Portfolio Companies and six expert witnesses, each of whom further rebutted the Division's theories.

Respondents first called Thomas Lys, a professor emeritus at Northwestern University. Tr. 2997:1-18. Lys' summary testimony illustrated that Respondents' loan amendment and categorization approach was disclosed in the Trustee Reports. Lys prepared summaries of the data in 111 quarterly Trustee Reports, FOF ¶ 139, which confirmed that in most quarters beginning in the very first years and continuing throughout the relevant period, the aggregate interest collected on the Zohar loans was less than the aggregate interest due, FOF ¶¶ 140-41, 146 (the very same rough calculation actually done by the Barclays analyst in RX 117 (June 22-23, 2011 email chain)), 151, and that Noteholders could readily identify whether the full stated interest on a loan to a Portfolio Company had been paid during that quarter, Tr. 2998:7-3002:10, 3013:24-3030:7, 3015:5-11 (Lys); RX 573 (Trustee Report summary exhibit); *see also* FOF ¶¶ 143-45, 147-50.[25] Lys testified that such a comparison could be conducted in "only a few minutes." Tr. 3015:12-23; FOF ¶ 142.

---

[25] For example, Lys demonstrated that loan number beginning with 851 could be readily matched to the name of the Portfolio Company—MD Helicopters. Tr. 3019:12-17 (Lys). As shown in Lys's summary, the December 8, 2010 Zohar III Quarterly Trustee Report disclosed on its face that the MD Helicopter loan, 851_03, was held at a Category 4 even though it had not paid almost $173,000 of stated interest due. RX 20.073 (Zohar III Trustee Report) at 22, 34; *see also* RX 573 (Trustee Report Summary Exhibit) at 8. According to the Trustee Report, again on its face, the funded balance was almost $8,000,000 and the interest rate was 10 percent due quarterly, which equaled a quarterly interest payment of about $197,000. RX 20.073 (Zohar III Trustee Report) at 34; *see also* RX 573 (Trustee Report Summary Exhibit) at 8. However, the face of the Trustee Report disclosed that MD Helicopter only paid $25,000. RX 20.073 (Zohar III Trustee Report) at 22; *see also* RX 573 (Trustee Report Summary Exhibit) at 8.

As to Ms. Tilton's personal investments, Lys calculated that Respondents have invested over $500 million into the Zohars and Portfolio Companies, FOF ¶ 217, including $441 million that Ms. Tilton personally invested, FOF ¶¶ 212-13, and approximately $70 million in deferred fees, FOF ¶¶ 214-16.[26]  That amount far exceeds what the Division now seeks in disgorgement.

Two Portfolio Company CEOs—Jean-Luc Pelissier, the CEO of Portfolio Company Universal Instruments, Tr. 3061:22-3062:13, and John Harrington, the CEO of Portfolio Company Hussey Copper, Tr. 3517:14-3519:24—also testified.  Pelissier and Harrington are both "Platform Leaders" for Patriarch, and as such, are responsible for helping other Portfolio Companies, in consultation with Ms. Tilton, create and implement operating plans to effectuate their turnaround.  FOF ¶ 99; Tr. 3072:11-3073:15 (Pelissier); Tr. 3518:18-3519:7 (Harrington).  Through their involvement with the Portfolio Companies, Pelissier and Harrington each witnessed firsthand the close watch that Ms. Tilton kept on the Portfolio Companies' financial statuses and her decisions to amend loans in order to defer interest payments for Portfolio Companies experiencing periods of distress.  Both corroborated Ms. Tilton's testimony that she amended loans to Portfolio Companies when doing so would provide greater value to the Zohars over the long term.

Both Pelissier and Harrington testified that Ms. Tilton took the timely payment of interest seriously, and understood that, to Ms. Tilton, making the full stated interest payments was

---

[26]  Ms. Tilton has invested over $223 million of her own personal funds into the Portfolio Companies through entities that she owned, including ARK II, AIP, and ARK Angels, to benefit the Zohars and the Noteholders.  FOF ¶ 212.  She also invested over $218 million into Zohar I, II, and III through preference share and Series A (Zohar I) Notes investments.  FOF ¶ 213.  Ms. Tilton and the Patriarch entities have also deferred, and are therefore owed, approximately $35 million in management and secondment services, approximately $7.5 million in agency and amendment fees, and approximately $26.4 million in collateral management fees.  FOF ¶¶ 214-16.

"critical and absolutely need[ed] to be addressed timely." Tr. 3082:11-21 (Pelissier).  Harrington

explained that the Portfolio Companies understood that they had "an obligation . . . to pay

interest" and doing so "was a very high priority" because the Zohars "had investors" and Ms.

Tilton "had to report to them."  Tr. 3537:24-3538:14; *see also* Tr. 3542:5-8 ("I regarded [paying

interest] as very important, because Lynn has instilled that into me.").

Pelissier and Harrington also testified to the processes and procedures Ms. Tilton

followed in monitoring the financial state of the Portfolio Companies.  FOF ¶¶ 97-104.  They

explained that Patriarch had a "very sophisticated reporting [system]" that kept Ms. Tilton

informed of each Portfolio Company's performance: each of the CEOs reported to Ms. Tilton on

a weekly basis directly, Tr. 3081:17-3082:5, 3119:10-3121:10, 3131:14-3134:15 (Pelissier); RX

409 (weekly report for NetVersant, dated Dec. 7, 2013), a Patriarch credit officer and a Platform

Leader responsible for overseeing each Portfolio Company reported to Ms. Tilton on a weekly

basis, Tr. 3081:17-3082:5, 3119:10-3125:1 (Pelissier); Tr. 3540:20-3543:23 (Harrington); RX

453 (weekly platform update on Scan Optics, dated Nov. 20, 2011), Patriarch's credit officers

were constantly monitoring each Portfolio Company's 13-week cash flow projections, which

were also provided to Ms. Tilton, Tr. 3120:7-12, 3125:2-3129:7 (Pelissier); Tr. 3544:22-3545:20

(Harrington); RX 453 (board packet from Scan Optics, dated Aug. 7, 2012), and Ms. Tilton held

annual budget meetings for each Portfolio Company, Tr. 3545:21-3546:14 (Harrington).

Pelissier and Harrington likewise testified about the process Ms. Tilton followed when

determining whether to amend a loan to accept less than full stated interest or to provide

additional funding to a Portfolio Company.  FOF ¶¶ 105-12.  Harrington testified that a Portfolio

Company facing an inability to make payroll or an interest payment would, only after

"explor[ing] every other option of keeping the cash flow of that business going," have a lengthy

in-person meeting with Ms. Tilton to seek approval of a business plan.  Tr. 3533:1-3535:14.  Pelissier testified that as part of this process, Ms. Tilton would "dig into the data in order to provide guidance," and would typically "demand a meeting in which the company is going to explain the root cause of the problem."  Tr. 3083:3-3084:15; *see also* Tr. 3083:3-9 (Pelissier); Tr. 3135:3-16 (Harrington).  Pelissier made clear that when Ms. Tilton ultimately agreed to defer interest, she did so before the interest was due.  Tr. 3117:25-3118:4, 3134:7-10.  If Ms. Tilton did provide additional funding, it was typically "doled out day by day," and the Portfolio Company had to "itemize where that money was going."  Tr. 3536:6-3537:9 (Harrington).  When the Portfolio Companies faced a cash flow emergency or as otherwise needed, Ms. Tilton would sometimes loan her personal funds to the Portfolio Companies and defer and forgive fees owed her.  Tr. 3128:18-3129:7, 3138:11-20 (Pelissier); Tr. 3528:23-3529:1, 3529:4-3530:23, 3531:20-3532:10, 3546:15-3547:17 (Harrington); RX 437 (board packet from Scan Optics, dated Aug. 7, 2012).

Respondents' expert witnesses explained why the Division's theory that Ms. Tilton hid her amendment and categorization approach from investors was totally without merit.  Mark Froeba was accepted without objection by the Division as an expert on the interpretation of indentures and on the Zohar deals.  He had rated and monitored hundreds of CLOs (including the Zohars) for Moody's.  Froeba—the only witness in the case accepted as an expert on the Zohars—testified that the Indentures were specifically designed to allow Respondents to amend the terms of the loans and categorize them according to the amended terms.  Tr. 3327:13-23, 3332:8-3333:23; RX 21 (Froeba Rep.) at ¶¶ 21-23 & n.5; *see also* FOF ¶¶ 81, 285-89.  He testified that the Indentures were unique in providing the collateral manager "broad discretion to amend, to forbear, to defer, to supplement" the underlying loans, and explained that the

Indentures did not require a writing for any of these.  Tr. 3334:11-23, 3418:1-3419:14; *see also* FOF ¶¶ 35, 48.  The Division's theory that Respondents' amendment and categorization practices eliminated protections for Noteholders was incorrect, he testified, because Section 7.7(a) protected Noteholders by "making sure that [Ms. Tilton] could . . . execute her . . . unique and successful investment strategy in these series of deals."  Tr. 3416:13-25.  Without this discretion, Noteholders would be harmed, because the "stressed and distressed loans" in which the Zohars were investing would quickly default, causing Noteholders to lose money.  Tr. 3350:11-3351:4, 3351:22-3352:9 (Froeba).

Froeba also described how the flexibility vested in the collateral manager is evidenced by both the OC Ratio Test—which is "very different from a standard CLO" because "it was designed to be a test that would not impair the manager's management strategy and, therefore, be difficult to fail," Tr. 3430:22-24, 3428:22-24; FOF ¶ 71—and the IC Ratio Test—which featured an unusually large cushion "to permit for the management of a unique, a new, a different asset type," Tr. 3415:7-19; FOF ¶ 55.  Froeba further testified to the Trustee's significant role in a structure like the Zohars, including the responsibility "to not just receive and pass along the data, but to process it, evaluate it and give it their own stamp of approval."  Tr. 3389:7-3390:2, 3387:25-3389:6; FOF ¶ 173.

Peter Vinella, an expert with over 30 years' experience in financial services, including as CEO and President of a trustee/collateral administration firm, Tr. 3439:22-3440:1, testified about the critical role of the collateral administrator and trustee.  FOF ¶¶ 292-93.  Vinella's testimony was entirely unrebutted: the Division did not respond to Vinella's statement, RX 25 (Vinella Statement), nor did the Division cross-examine Vinella at trial.  Vinella explained, based on industry custom and practice, that when the Trustee was managing the cash accounts, approving

and effectuating payments, and perfecting security interests in the collateral, Tr. 3446:14-3448:20, not to mention calculating the OC Ratio and preparing the periodic reports, the Trustee would have to do so with an "understand[ing]" of the "economic objective of the deal," Tr. 3446:20-25; *see also* Tr. 3444:6-3445:4; FOF ¶ 174. In other words, the Trustee would have understood Respondents' loan categorization practices, and yet there was no evidence presented that the Trustee ever objected. FOF ¶ 181.

John H. Dolan, an expert in CLOs and structured financial products, Tr. 3484:7-11; RX 23 (Dolan Rep.) at ¶ 3, directly refuted the notion that Patriarch's loan categorization process was concealed from Noteholders. FOF ¶¶ 290-91. He testified that Noteholders had extensive information available to them regarding the performance of their investments in the Zohars. Most notably, he testified that Noteholders could plainly see from the face of the Trustee Reports that certain Category 4 loans were not paying full stated interest, Tr. 3471:7-11, 3473:24-3476:21, 3480:23-25, 3483:18-3484:5; *see also, e.g.*, FOF ¶¶ 128-30—the very information that the Division asserted was not disclosed. Dolan also testified to the voluminous additional information about the underlying loans available to Noteholders, Tr. 3472:7-3473:18, and identified the myriad ways in addition to the Trustee Reports that Noteholders could obtain information about the performance of their investments. RX 23 (Dolan Rep.) at ¶¶ 20-55. Dolan also refuted Mayer's assertions that data were missing from the Trustee's data files, explaining that the Trustee Reports referenced supplementary data, which Mayer apparently did not even attempt to access. Tr. 3483:1-17.

Professor Steven L. Schwarcz, an expert in workout of distressed companies and structured finance, Tr. 3505:10-21, 3507:18-3508:6; FOF ¶¶ 294-96, testified that the execution of the Zohars' disclosed business strategy required flexibility in managing Portfolio Company

investments, including amending the loans to allow for less than full interest payments to assist in the Portfolio Companies' turnaround. He explained that because the Notes in the Zohars were long-term, the Noteholders "would lose the benefit of their bargain" if the Notes were liquidated. Tr. 3511:20-3512:2; FOF ¶ 91. For the Zohars to realize their contemplated returns from their investment in stressed and distressed companies, it was essential for the collateral manager to "work closely with the loans to modify them as needed." Tr. 3512:3-7 (Schwarcz); *see also* Tr. 3510:22-3511:11 (Schwarcz) ("[C]ompanies that are financially stressed, in trouble or in bankruptcy, they need to continue operating as companies . . . if they are going to turnaround, so to speak. And that means that they must be able to pay their operating expenses."); FOF ¶ 88. Schwarcz's testimony about the need for flexibility in turning around troubled companies supported Pelissier's and Harrington's testimony. And, just as with Vinella, the Division neither challenged Schwarcz's written statement nor cross-examined him at trial.

Glenn Hubbard, dean of the Graduate School of Business of Columbia University, Tr. 3560:13-3561:24; *see also* FOF ¶¶ 297-301, testified that the business strategy of the Zohars was fully disclosed to investors, Tr. 3566:2-19; *see also* FOF ¶ 45, and that the Division's theory of loan classification was wholly inconsistent, from an economic perspective, with that disclosed business strategy. He described the unique nature of the Zohars, and explained what distinguishes them "from traditional CLOs," Tr. 3564:20-23: the unusual business strategy, Tr. 3564:21-23; the "very active management involvement of Ms. Tilton," Tr. 3567:8-16; the "importance of . . . equity upside for the Funds," *id.*; the "nature of the Funds' collateral," RX 24 (Hubbard Rep.) at ¶ 24; and "the Funds' expected sources and timing of cash flows from their collateral," *id.*; *see also* FOF ¶ 35. He elaborated on the critical role of the "equity upside," which would flow initially through the waterfall to benefit Noteholders; although this upside was

not reflected in the OC Ratio, it was critical "for the structure to be profitable." Tr. 3567:13-16, 3587:6-11, 3588:7-11; RX 24 (Hubbard Rep.) at ¶ 25 (explaining that the equity upside, in the form of "cash when portfolio companies . . . . are sold" is part of the "significant value to the Funds"); *see also* FOF ¶¶ 41, 57.

Like Schwarcz, Hubbard testified that the Zohar Strategy depended on flexibility, such that some companies would not pay the full stated interest, Tr. 3569:7-3570:1—a strategy made "abundantly clear" in marketing materials and investor conference calls, Tr. 3566:15-19; *see also* Tr. 3587:12-3588:6; FOF ¶¶ 43, 45. He also explained how that strategy was implemented: "Patriarch would modify the terms of its debt collateral and the corresponding stated Collateral Interest payments when it felt that doing so would enhance the long-term value of the portfolio companies and, thus, enhance the long-term value of the Zohar Funds." RX 24 (Hubbard Rep.) at ¶ 27; *see also* FOF ¶¶ 87, 107. A contrary policy of forced re-categorization of loans to Category 1 or Defaulted upon remitting less than full stated interest, he testified, would be totally inconsistent with the Zohars' 5 percent maximum for Category 1 or Defaulted Investments set forth in the Indentures' Eligibility Criteria, and would "make little sense as a matter of economics, because it would almost doom the strategy." Tr. 3571:1-3572:13; RX 24 (Hubbard) at ¶ 23; *see also* FOF ¶ 90.[27]

---

[27] Separately, Hubbard explained why Mayer's analysis of the OC Ratio Test was flawed: If the OC Ratio Test ever failed, "incoming money would be diverted to principal repayments," Tr. 3576:1-5, and those repayments would decrease the denominator of the OC Ratio in the next period, rendering the OC Ratio Test less likely to fail going forward, Tr. 3577:8-21; RX 24 (Hubbard Rep.) at ¶ 35; *see also* ¶¶ 328-30. Hubbard recalculated Mayer's analysis with only one change—namely, accounting for the principal repayments—and found a minimum of $61 million less in preference share distributions and collateral management fees. Tr. 3579:14-3581:21; RX 24 (Hubbard Rep.) at ¶ 43; FOF ¶ 330. Hubbard also pointed out that a hypothetical failure of the OC Ratio Test might have had other effects (for example, Ms. Tilton

With respect to Patriarch's GAAP compliance, Lundelius, a Certified Public Accountant with 30 years of accounting experience, RX27A (Lundelius curriculum vitae) at 1-2; Tr. 3276:15-17; *see also* FOF ¶¶ 280-84, confirmed that Patriarch's financial statements were GAAP compliant and that it conducted appropriate loan impairment and fair value analyses, consistent with the Zohars' financial statement disclosures.  Tr. 3181:14-21, 3199:24-3200:5, 3161:25-3162:8, 3304:25-3305:3, 3311:9-12; *see also* FOF ¶¶ 226, 236-40, 315.  Lundelius also debunked the Division's uncharged theory that the Zohars' financial statements did not properly account for interest accruals.  Tr. 3162:10-3164:1.

## III.    The Investigation And Trial Were Marked By Serious Constitutional And Procedural Deficiencies.

Throughout this investigation and trial, the Division's actions have fallen far short of what is required by the Constitution and by fundamental fairness.  Respondents have contested in federal actions the validity of this proceeding under the Appointments Clause, as well as the Due Process and Equal Protection Clauses of the U.S. Constitution.[28]  Those claims have not yet been adjudicated on the merits, but remain a substantial hurdle to any final decision that might be issued in the Division's favor.

In addition, Respondents moved to strike the Division's expert witnesses, who were unqualified, employed unreliable methodologies, and whose expert reports (and subsequent

---

might have responded in a way that would have affected subsequent periods), and that Mayer's failure to consider the possibility of this and other effects was an "economic logic error," Tr. 3574:22-3575:8, which rendered his analysis "incomplete and therefore unreliable," RX 24 (Hubbard Rep.) at ¶ 34; *see also* FOF ¶ 328.

[28]    *See, e.g.*, Compl., *Tilton v. SEC*, No. 15 Civ. 02472 (S.D.N.Y. Apr. 1, 2015); Pet. To Comm'n, Tilton, Admin. Proc. File No. 3-16462 (July 25, 2016); Applic. Stay Pending Filing & Disp. Pet. Writ Cert., *Tilton v. SEC*, No. 16A242 (U.S. Sept. 2, 2016).  Respondents incorporate by reference and reiterate the claims raised in these filings, as well as all of Respondents' objections that were improperly rejected in this proceeding.  *See* App'x B.

testimony at trial) were replete with improper, unreliable statements and conclusions.  *See* Resp. Br. in Supp. of Mots. in Lim. to Strike (Aug. 26, 2016); Resp. Br. in Supp. of Mot. in Lim. to Exclude Henning (Aug. 31, 2016); Resp. Br. in Supp. of Resp. Mots. in Lim. to Exclude Expert Test. of Mayer/Wagner (Aug. 31, 2016); *see also SEC v. Tourre*, 950 F. Supp. 2d 666, 681 (S.D.N.Y. 2013) (admonishing Division for proffering written expert testimony from one of the experts in this proceeding, Wagner, and finding his testimony "problematic and not admissible" because he purported to "find[] facts that [we]re in contention," and opined on "legal conclusion[s]" that were "not proper expert testimony").

Respondents also moved for application of the Amended SEC Rules of Practice, which were adopted to "modernize [the SEC's] administrative proceedings." *Mary Jo White Explains the New SEC Rules*, Wall St. J., Nov. 24, 2015, *available at* http://www.wsj.com/articles/mary-jo-white-explains-the-new-sec-rules-1448302777.  Respondents further moved under Amended SEC Rule of Practice 320 to preclude the Division from introducing irrelevant, unreliable, immaterial, and unduly repetitious evidence, and repeatedly renewed their objections to the admission of that evidence at trial.  Your Honor denied the motions but indicated that Respondents could "argue against [the] weight" of inappropriately admitted evidence in their post-hearing briefs, and Respondents urge Your Honor now not to give weight to such evidence, as detailed below.  *E.g.*, *Lynn Tilton*, Admin. Proc. Rulings Release No. 4245, at 4 (ALJ Oct. 12, 2016).  Respondents also challenged the unfair timing of the trial, moved to permit the filing of three new reports for expert witnesses who testified in place of previously designated experts, and filed a motion for summary disposition.  These motions were likewise denied.  Respondents incorporate by reference and reiterate all of the motions Respondents made throughout this proceeding that have been denied in whole or in part.

Finally, the Division failed to meet its obligations to produce exculpatory and impeachment materials, as Respondents' motions outlined.[29]  Despite the Division's repeated representations that it was complying with its *Brady* obligations, Respondents subsequently uncovered, and the Division belatedly disclosed, additional exculpatory evidence that had been wrongfully withheld.  *See* FOF ¶¶ 344-45.

## LEGAL STANDARDS

"The Division has the burden of showing that the allegations in the OIP are true by a preponderance of the evidence."  *Miguel A. Ferrer*, Admin. Proc. Rulings Release No. 730, 2012 WL 8751437, at *4 (ALJ Nov. 2, 2012) (citing *Steadman v. SEC*, 450 U.S. 91, 101-02 (1981)). The Division must establish "each of the elements" of an allegation in order to prove it true. *SEC v. Lowry*, 396 F. Supp. 2d 225, 240 (E.D.N.Y. 2003).  *See generally* Respondents' Proposed Conclusions of Law ("COL") ¶¶ 2-7.

To prove any of its allegations under Section 206(1), 206(2), or 206(4) of the Advisers Act, or under Advisers Act Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 ("Rule 206(4)-8"), the Division must establish: (a) that Respondents made false representations or actionable omissions, or engaged in deceptive conduct; (b) that the misrepresentations, omissions, or deceptive conduct were material, *see, e.g.*, *Lawrence M. Labine*, Initial Decision Release No. 973, 2016 WL 824588, at *28, *30-31 (ALJ Mar. 2, 2016) (applying to Section 206(1) and (2)); Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, Advisers Act Release No. 2628, 2007 WL 2239114, at *9 (Aug. 3, 2007) (final rule) (materiality required for Section 206(4) and Rule

---

[29]  *See* Mem. of Law in Supp. Resp. Mot. to Compel Production of Brady Materials (Aug. 31, 2016); Mem. of Law in Supp. Resp. Mot. to Compel. Production of Brady Material and Jencks Act Witness Statements (Oct. 12, 2016); Mem. of Law in Supp. Resp. Mot. to Stay Proceedings and Compel Div. to Make Further Disclosures Regarding Two Witnesses (Oct. 16, 2016).

206(4)-8); and (c) under Section 206(1), that Respondents acted with scienter—that is, actual

intent to defraud or extreme recklessness, *see Labine*, 2016 WL 824588, at *28, *31, or under

the other provisions, that Respondents acted with scienter or negligence (pursuant to Your

Honor's ruling denying Respondents' motion to require the Division to prove intentional

misconduct for all charges, which Respondents reassert here, but recognize as the law of the case

for purposes of their post-hearing submissions), *see, e.g.*, *Steadman*, 967 F.2d at 643 n.5, 647

(scienter or negligence required for Section 206(2) and (4)); *see also* Advisers Act Release No.

2628, 2007 WL 2239114, at *5 (scienter or negligence required for Rule 206(4)-8).  Rule 206(4)-

8 is invalid, and Respondents accordingly ask that the Rule 206(4)-8 charge be dismissed on that

basis, *see* COL ¶ 8, but Respondents' post-hearing submissions otherwise assume the Rule's

validity.

In addition, to prove a violation of Section 206(1) or 206(2), the Division must prove that

misrepresentations, omissions, or deceptive conduct were directed to the adviser's client (here,

the Zohars); for Section 206(4) or Rule 206(4)-8, the Division must prove that

misrepresentations, omissions, or deceptive conduct were directed to investors (here, the

Noteholders).  *See* Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles,

Advisers Act Release No. 2628, 2007 WL 2239114, at *1 (Aug. 3, 2007) (final rule).[30]

---

[30]  In addition to the primary violations, the Division has also alleged that the Patriarch entities (but not Ms. Tilton) aided and abetted those violations.  To prevail on the claim of aiding and abetting, the Division must prove: "(1) the principal, or primary wrongdoer, has violated the securities laws; (2) the aider and abettor provided substantial assistance to the primary violator; and (3) such assistance was rendered with knowledge of, or extreme recklessness regarding, the securities law violation."  *Optionsxpress, Inc.*, Securities Act Release No. 10125, 2016 WL 4413227, at *47 n.185 (Comm'n Aug. 18, 2016) (citing *Howard*, 376 F.3d at 1143).  As explained herein, the Division has not met its burden of proof with respect to any primary violation, and it therefore has plainly failed to prove that any Respondent aided and abetted a

# ARGUMENT

I. **The Division Failed To Prove That Respondents' Loan Categorization Methodology Was Improper Or Undisclosed.**

A. **The Evidence At Trial Established Respondents' Approach To Loan Categorization Was Proper And Fully Disclosed.**

The gravamen of the OIP is that Respondents categorized loans in a "discretionary" manner inconsistent with the methodology set out in the Zohars' Indentures and failed to disclose that they were doing so. *See, e.g.*, OIP ¶¶ 9, 49. Under the Division's interpretation of the Indentures, distressed companies that remitted less than the full interest payments stated on the face of the loan agreements should have been immediately categorized as "Category 1" or "Defaulted Investment," even when the loans had been amended to defer interest payments. But the trial proved just the opposite: Respondents' conduct was entirely consistent with the Indentures, *see infra* Pt. I.A.1; and Respondents fully disclosed the categorizations and interest payments to the Zohars and Noteholders, *see infra* Pt. I.A.2.

The theory articulated in the OIP is no more. Indeed, even the testimony of the Division's own witnesses established that the Indentures gave Respondents broad discretion to amend loans to defer interest and maintain categorization—and that Respondents fully disclosed that reality. By the time of summations, the Division retreated, instead claiming that Respondents had not in fact amended the loans. *See* Tr. 3671:23 (Div. summation). While the amendments Ms. Tilton was executing under Section 7.7(a), either orally or by course of performance, clearly had legal effect under New York contract law, *see infra* pp. 60-61, the

---

violation. *See id.* at \*47 ("Because the record in this case does not support a finding that [the alleged principal] committed fraud, there is no primary violation and thus no basis for aiding and abetting."); *see also* COL ¶¶ 91-93.

Division never should have tarred Respondents with fraud charges that reduce to a disagreement over the performance of contracts among sophisticated parties, *see infra* Pt. I.A.3.

> **1.    Respondents' Loan Amendments And Categorization Approach Were Permitted By The Zohars' Governing Documents And Necessitated By Their Design.**

Because the Division failed to prove that Respondents engaged in any misrepresentation, omission, or deception related to the categorization of loans, Respondents' categorization methodology cannot violate the Advisers Act.  The evidence at trial confirmed that Respondents' conduct was consistent with the express provisions of the Zohars' governing documents.  The Indentures granted Respondents discretion to amend loans, and Respondents exercised that discretion in amending loans to permit payment of less than full stated interest, and concurrently, to defer the remaining stated interest to a later due date.  FOF ¶¶ 48-51, 97-113.  Respondents categorized all loans in strict compliance with the Indentures:  a current loan—one that satisfied the operative terms of the credit agreement, including any amendments, at the time of the categorization—would retain its Category 4 designation, and a defaulted loan would be placed into Category 1.  FOF ¶¶ 74-86.  The Indentures' authorization of this approach fully answers the Division's allegations on this point.  *See Ellington v. EMI Mills Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) ("Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole."); *see also Krys v. Butt*, 486 F. App'x 153, 155 (2d Cir. 2012) ("Generally, where parties have entered into a contract, courts look to that agreement to discover the nexus of the parties' relationship." (quoting *EBC I, Inc. v.*

*Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005)); COL ¶¶ 9-23.[31]  Any contrary reading is

foreclosed because it would have destroyed Respondents' ability to protect the value of the

Zohars' investments and thereby "produce a result that is absurd, commercially unreasonable

[and] contrary to the reasonable expectations of the parties." *SportsChannel Assocs. v. Sterling*

*Mets, L.P.*, 25 A.D.3d 314, 314 (N.Y. 1st Dep't 2006) (internal quotation marks omitted).

> **a)    The Evidence At Trial Confirmed Respondents' Broad
> Discretion To Amend Loans To Defer Interest And Avoid
> Default.**

As proven at trial, the Zohar governing documents give Respondents discretion to amend

loans and defer interest payments; in fact, that authority is the cornerstone of the Zohar strategy.

FOF ¶¶ 48-51, 87-91.  Each Indenture provides in Section 7.7(a) that "the Collateral Manager . . .

may, without the consent of the Holders of any Notes or the Credit Enhancer, enter into any

amendment, forbearance or waiver of or supplement to any Underlying Instrument included in

the Collateral."  The same provision underscores that this discretion will be used broadly: "For

the avoidance of doubt and notwithstanding anything else contained" in the Indenture, "the

parties hereto acknowledge and agree that the [CDOs] will consist of stressed and distressed

loans that may be the subject of extensive amendment . . . ."  Indenture § 7.7(a).[32]  The Division

---

[31]    New York law governs interpretation of these contracts.  *See, e.g.*, Indenture § 18.9; Zohar
III Indenture § 17.9; CMA § 7.5; Zohar III CMA § 7.4 at 30.

[32]    The CMAs contain the parallel provision that "the Collateral Manager may, . . . without the
consent of the holders of any Notes or any Person, enter into any amendment, modification or
waiver of, or supplement to, any term or condition of any Collateral, Collateral Debt Obligation,
Unrestricted Collateral Debt Obligation and/or Equity Security . . . ."  CMA § 2.2(c).  Like the
Indentures, the CMAs emphasize the risky nature of the investments and the necessity of the
collateral manager's "extensive amendment" and flexible administration of the collateral.  Zohar
I CMA § 2.2(p); Zohar II CMA § 2.2(c); Zohar III CMA § 2.2(m) ("For the avoidance of doubt
and notwithstanding anything else contained herein, the [parties] acknowledge and agree that the
[collateral] will consist of stressed an distressed loans that may be the subject of extensive
amendment, workout, restructuring and/or other negotiations . . . .").

has conceded that "Section 7.7(a) does provide discretion to amend," Tr. 28:1-2 (Div. opening), and this discretion was confirmed by numerous witnesses at trial—including the Division's purported expert on the interpretation of indentures, Wagner, *see* Tr. 2948:8-12 (Wagner); *see also* FOF ¶¶ 48, 51, 93-96.

The discretion vested in Respondents plainly includes authority to amend a loan's interest payment requirements, as even Wagner conceded. *See* Tr. 2949:17-21 ("a given interest payment that was due could be deferred"). When Respondents exercise this discretion to defer all or part of a given interest payment, the interest is paid pursuant to the amended schedule, the payment complies with the amended loan terms, and there is no default. FOF ¶¶ 80-86.

The absence of a default, in turn, is what allows the loan to remain in Category 4. A default is the operative distinction between Category 1 and Category 4 loans, as well as between "Defaulted Investments" and "Collateral Investments,"[33] as Wagner (the Division's putative expert) and Aldama (the Division's Noteholder witness) confirmed. *See* DX 16 (Wagner Rep.) at ¶ 96 (quoting Aldama Testimony) (the key feature that moves a loan from Category 4 into Category 1 is "[i]f the company doesn't pay interest that is due and payable under the terms of the facility."); *see also* FOF ¶ 74-76. The provisions of the Indenture spell this out: a Category 4

---

[33]    In the Zohar III Indenture, the categories "Defaulted Investment" and "Collateral Investment" are used in a manner analogous to the Zohar I and Zohar II Indentures' usage of Category 1 and Category 4, respectively. Accordingly, the parties in this proceeding have treated the categories as equivalent, *see, e.g.*, OIP ¶ 36 ("'Defaulted Investment' and 'Collateral Investment . . . are equivalent to Categories 1 and 4, respectively."), and this brief uses "Category 1" and "Category 4" to refer to the analogs across the Zohars unless otherwise indicated.

loan is defined in part as "Current Collateral Debt Obligation," Indenture § 1.1;[34] "Current

Collateral Debt Obligation" is defined as "[a]ny [CDO] that is neither a Non-Current Obligation

nor a Workout Obligation," Indenture § 1.1; a "Non-Current Obligation" is defined as "Any

Defaulted Obligation . . . ," Indenture § 1.1; and a "Defaulted Obligation" (or, in the case of

Zohar III, "Defaulted Obligation") is defined as "[a]ny [CDO] . . . with respect to which a default

as to the payment of principal and/or interest has occurred (without regard to any applicable

grace period or waiver of such default), but only so long as such default has not been cured,"

Indenture § 1.1.  Category 1 is defined simply as a CDO that does not fall into any of the other

defined categories, and the other categories (2 and 3) are irrelevant here because they apply only

to Portfolio Companies in bankruptcy.  Indenture § 1.1.

     Critically, a default occurs—and re-categorization may be required—only when an

interest payment is due under the loan's terms as amended.  FOF ¶¶ 80-86.  Indeed, it would

make no sense to measure a default when no payment is actually due, because the terms were

---

[34] The Indentures set forth five characteristics of a Category 4 loan.  The Division has put only
one element ("Current Collateral Debt Obligation") at issue in this proceeding; it does not
contend that any of the other elements were not satisfied for loans designated by Respondents as
Category 4.  A Category 4 loan is defined as:

> A [CDO] . . . that (i) is a Current Collateral Debt Obligation, (ii) is not an
> Insolvency Collateral Debt Obligation, (iii) with respect to any Underlying
> Instruments related to such Collateral Debt Obligation, there shall not have
> occurred any "event of default" or any "default" by the Obligor thereon with
> respect to any covenant, representation or warranty contained therein, . . . which
> has not been waived, (iv) with respect to the Obligor thereon, there are no
> negotiations, at the time of measurement, to restructure . . . the financial
> obligations . . . and (v) is not a [CDO] that has, in the reasonable judgment of the
> Collateral Manager, a significant risk of declining in credit quality or, with the
> passage of time, becoming Category 1, Category 2 or Category 3.

Indenture § 1.1.

amended.  As the Division's own expert stressed, it is the "current" terms of a loan that are relevant to analyzing categorization and default.  FOF ¶ 82.  Indeed, Wagner himself testified that after a loan was amended, "the loan would have the contractual features reflecting the amendment, and if it met those contractual features . . . it would not have to be placed in Category 1."  Tr. 2949:22-2950:6 (Wagner).[35]  Given this admission by the Division's purported expert on indenture interpretation, there can be no live dispute as to Respondents' authority under the Indenture to amend a loan, defer interest, avoid a default, and maintain the categorization of that loan in Category 4.

Several structural features of the Zohars make plain the importance of this authority to amend a loan and defer interest without re-categorizing it.  First, interest payments to Noteholders were small relative to the stated interest due from Portfolio Companies, and thus, the Zohars could make full payments to Noteholders even if they collected only a fraction of stated Collateral Interest.  FOF ¶¶ 43-44.  Because all parties expected that many Portfolio Companies would not, in fact, pay full stated interest, but would nonetheless remain part of the Zohar portfolio and continue to be supported by Ms. Tilton, a "very large cushion" was built into the IC Ratio Test.  Tr. 3570:12-22 (Hubbard).  An interpretation of the Indentures that required Respondents to default a loan and move it to Category 1 when a loan was amended to defer payment of full stated interest would be irreconcilable with an IC Ratio Test that was designed on the assumption that the loans in the portfolio would pay a relatively small portion of stated interest in any given period.  The IC Ratio Test is thus "evidence that the transaction was

---

[35]  To the extent Wagner attempted to limit his testimony to written amendments, that caveat is legally meaningless: under New York law, a written amendment has no greater legal force than an amendment made orally or by course of performance.  *See infra* pp. 60-61 & n.40.

deliberately designed to facilitate [the] investment strategy." Tr. 3381:14-3382:1 (Froeba); *see also* FOF ¶¶ 53-55; Tr. 3570:2-22 (Hubbard).

Additionally, the Zohars' "Eligibility Criteria" for collateral specified that if more than 5 percent of loans consisted of "Defaulted Obligations" (Zohar I and II) or "Defaulted Investments" (Zohar III), the Zohars would be restricted from making new investments if such investments would increase the percentage of loans that were "Defaulted Obligations." Indenture §§ 12.1(a)(28), 12.1(b); *see also* FOF ¶¶ 89-90. A loan would be considered a "Defaulted Obligation" (or, in the case of Zohar III, "Defaulted Investment") if it missed interest payments, *or* if another loan to that same Portfolio Company was a "Defaulted Obligation." Indenture § 1.1. FOF ¶ 78.

If merely missing one or two interest payments meant that the loan was a "Defaulted Obligation," the Zohars would quickly exceed the 5 percent threshold, particularly because at the inception of the relationship with the Portfolio Companies, those companies typically had negative cash flow, or no cash flow, were not even operational, or were in bankruptcy. When Respondents' summary witness, Lys, analyzed the Trustee Reports' disclosures of instances in which Category 4 loans paid less than full stated interest, he found that the very first reports for Zohar I, Zohar II, and Zohar III revealed such instances,[36] *see* FOF ¶¶ 141, 148 —meaning that under the Division's theory of an "automatic" default, loans would have begun defaulting almost immediately upon inception of each Zohar. *See also* Tr. 3571:23-3572:13 (Hubbard); RX 24 (Hubbard Rep.) at ¶¶ 7.B, 21-23. In addition, the Division's interpretation effectively would prevent the Zohars from lending to distressed companies in their time of greatest need. If a

---

[36] As to each of Zohar I, Zohar II, and Zohar III, Lys never found a single quarter in which the Trustee Report did not show loans categorized as either Category 4 or Collateral Investments that had not paid full stated interest. Tr. 3030:1-7; *see also* FOF ¶ 150.

Portfolio Company had a loan that was a "Defaulted Obligation"—and many would under the Division's incorrect interpretation—the Zohars could not extend any further loans to that company once the 5 percent limit had been breached (which would happen very quickly, as noted). That is because any further loan would by definition be a "Defaulted Obligation" and, contrary to the Indentures, increase the total percentage of "Defaulted Obligations."[37]

The Indentures' plain language, which allows for and anticipates that Respondents will exercise discretion extensively to amend loan agreements, defer interest, and thereby avoid default, is the only interpretation of the Indentures that would be consistent with the design and objective of the agreements. By design, the success of the Zohars depends on Respondents' ability to exercise discretion to continue supporting Portfolio Companies, even when those companies could not pay full stated interest in any given month. Ms. Tilton explained this design point: "[T]he design of the deal is a reflection of the expectation that we would do our best to put high interest rates on distressed companies, to collect as much interest as due without impairing the liquidity and forcing a crisis, in order to maximize the cash flows over the time until that company was rebuilt and of value," Tr. 2006:10-16, and as a result "[t]he deals were

---

[37]    Wagner asserts that the 5 percent limit was not meaningful because it was not an outright prohibition on further investment: under Wagner's theory, even after the Zohars would have quickly exceeded the 5 percent limit, they could still make other investments that did not cause the percentage of "Defaulted Obligations" to increase. RX 19A (Wagner Rebuttal) at ¶ 90. But Wagner's position disregards the Zohars' business strategy, which focused on supporting Portfolio Companies while they were in distress in order to create opportunities to turn them around.

Wagner's flawed analysis in this regard is but one example of his generally unreliable testimony, to which Your Honor should assign no weight. Your Honor declined to exclude Wagner's testimony upon Respondents' motions *in limine* and objections, but the same reasons laid out in those motions and objections are now reasons not to credit Wagner's testimony. *See Lynn Tilton*, Admin. Proc. Rulings Release No. 4245, at 3 (ALJ Oct. 12, 2016) (noting that Respondents may "argue against [the] weight" of admitted evidence).

designed with the ability and with the expectation that partial interest would get paid," Tr. 2016:13-2017:02*; see also* FOF ¶¶ 34-44, 87.  This design was what made the Zohar deals possible.  After all, the "business niche that [Ms. Tilton] plays in is she buys very distressed companies and endeavors to turn them around," Tr. 3518:4-7 (Harrington); see also FOF ¶¶ 45-47—a strategy fundamentally irreconcilable with an indenture that would require Respondents to default a loan and stop supporting it if it could not pay full stated interest in a given month.

The Division nonetheless contends that distressed companies that remitted less than full stated interest payments were required to be categorized as "Category 1" or "Defaulted Investments," which would have caused the OC Ratio Test to fail very quickly.  In fact, the OC Ratio may have fallen to such a low level that it would have triggered an "Event of Default," which in turn would have allowed a Noteholder or a group of Noteholders to liquidate the entire Zohar Fund.  *See* FOF ¶¶ 60-62.  Under the Division's interpretation, the "Defaulted Obligations" or "Defaulted Investments" would also have quickly exceeded 5 percent of each portfolio, thus forcing a fire sale under the Indenture, Indenture § 12.1(b); FOF ¶ 90, and in turn stripping the Zohar of any potential return on investment.  That reading of the Indentures would "make little sense as a matter of economics, because it would almost doom the strategy" from inception.  Tr. 3571:18-3572:23 (Hubbard); *see also* FOF ¶ 106.  That interpretation is surely "commercially unreasonable," and must be rejected under bedrock principles of New York law. *SportsChannel Assocs*, 807 N.Y.S.2d at 61.

> **b)**  **Respondents Did Exactly What The Indentures Provided, Amending Loans In Their Discretion To Defer Interest And Avoid Default.**

As it became clear throughout the course of trial that Respondents' interpretation of the Indentures was virtually undisputed, the Division took a different tack in summation:  Instead of disputing Respondents' ability to amend loan terms and defer interest, it disputed whether the

loan terms had actually been amended.  Tr. 3671:23 (Div. summation) ("These were not amendments."); Tr. 3672:10-3673:21 (Div. summation).  Not only did the Division fail to meet any burden of proof on this point—which is in any case outside the scope of the OIP—but the evidence showed that Respondents in fact amended loans orally and by course of performance.

Ms. Tilton gave the question of whether to amend and defer intense scrutiny.  FOF ¶ 106. Ms. Tilton decided methodically, and based on meticulous collection of data and inputs, whether to accept less than full stated interest from a Portfolio Company, based on whether amendment and deferral "w[ould] maximize the cash flows of principal, interest and equity over a longer period of time."  Tr. 1830:20-1831:12 (Tilton); *see also* Tr. 3083:12-3084:1 (Pelissier) (weekly cash flow forecasts); Tr. 3539:19-1340:1 (Harrington) (same); Tr. 3080:6-10 (Pelissier) (quarterly meetings, observed "religiously," to review performance); Tr. 1250:13-23 (Mercado) (credit analysts' statistical reports); Tr. 1246:2-9, 1251:2-8 (Mercado) (these many inputs shared with Ms. Tilton personally, who considered them in her decisions); *see also* FOF ¶¶ 97-113. She amended only as a last resort.[38]

Although the Division has attempted to relabel these transactions as something other than amendments—and has contended that they are a post hoc rationalization for Respondents' categorization practices—this ignores that the Indentures themselves disclose and authorize "extensive amendments."  Indenture § 7.7(a).  It is also inconsistent with the testimony from the Division's own witness, Aldama, that he "met with Ms. Tilton, and she told [him] that she was,

---

[38]  Both CEOs testified at length to this point.  *See, e.g.*, Tr. 3082:11-21 (Pelissier) (describing Ms. Tilton's message that "[i]nterest must be paid" as arising "in every meeting" and "prevalent in every communication"); Tr. 3533:4-7 (Harrington); Tr. 3083:3-9 (Pelissier) ("Always a difficult process to justify and be in front of Lynn Tilton and explain."); Tr. 3084:2-15 (Pelissier); Tr. 3533:23-3535:7 (Harrington) ("Those meetings were brutal.  Brutal. . . . They were long meetings.  Could go days.  I've been thrown out within minutes.").

in fact amending the loan agreements," Tr. 1676:21-1678:6 (Aldama), as well as

contemporaneous emails from Patriarch employees discussing such amendments, *see* RX 118

(email chain Sept. 1-2, 2011); FOF ¶¶ 151-53.  And even if Respondents had not used the word

amendment at that time, this would signify nothing more than that they were "saying the same

thing in different words," Tr. 1943:1-2, as Your Honor has correctly recognized.

If Ms. Tilton agreed to amend a loan, she first required that (prior to any deferral) the

Portfolio Company pay the maximum amount of interest that would not threaten the Portfolio

Company's prospects for an effective turnaround.  FOF ¶ 110.  After the amendment, the

Portfolio Company "continued to have the obligation to pay the outstanding interest," albeit on a

deferred timetable.  Tr. 3128:14-17 (Pelissier); *see, e.g.*, Tr. 1832:15-22 (Tilton); Tr. 3118:5-15

(Pelissier); Tr. 3539:15-18 (Harrington) (testifying that Respondents never waived any interest

payment for Harrington's Portfolio Companies, but changed only the timing of the required

payment); Tr. 2727:8-10 (Tilton) ("[M]uch of that deferment actually got paid back as these

companies came back."); *see also* FOF ¶ 111.  And if she declined to amend and full stated

interest payments were not timely made, Respondents would re-categorize the loan as "a

Category 1 and . . . default and liquidate the company."  Tr. 2466:2-9 (Tilton); *see also* FOF

¶ 84.

The Division accused Ms. Tilton of having provided inconsistent testimony on this point,

Tr. 1942:15-20, but as Your Honor rightly noted, the two snippets of testimony the Division

referenced "seem[] to be saying the same thing in different words," Tr. 1943:1-2—that

Ms. Tilton has consistently viewed her oral agreements and course of performance as amending

the loan terms to defer interest payments.  The Division also argued that if Respondents did not

submit a loan amendment to the Rating Agencies, the amendment must have been fabricated post

hoc. Tr. 3671:13-3672:11 (Div. summation). This argument misreads the Indentures (as explained by Froeba, *see* Tr. 3344:6-3345:6), which require Respondents to report to the Rating Agencies only those amendments that "change the interest rate or the date of the payment of any principal," Indenture § 10.13(b)(52); *see also* Indenture § 1.1 (requiring re-submission for re-rating upon "a change in, or waiver of, the interest rate"). That requirement did not cover a deferral of interest payments. FOF ¶ 341.[39]

The Division also questioned Ms. Tilton's explanation that she used written amendments to alter essential terms that were specified in writing in the "credit agreements" (such as "the rate of interest"), and used oral agreements and course of performance to amend other terms (such as the date a given interest payment would be due). Tr. 2531:13-24 (Tilton). *See, e.g.*, Tr. 3673:22-3674:9 (Div. summation). Ms. Tilton's approach was reasonable, as the evidence showed, and was entirely consistent with the Indentures and New York contract law.

Under New York law, "any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90-91 (2d Cir. 2013) (internal quotation marks omitted). Specifically, a course of performance that involves accepting a smaller fee than memorialized in the written contract is sufficient, without any writing, to amend the written contract to reduce the fee. *See Puma Indus. Consulting, Inc. v.*

---

[39] Even if a report to a Rating Agency were required, that obligation would not alter the legal effect of an oral or course-of-performance amendment. Tr. 3344:17-3345:13 (Froeba). But in any event, Rating Agencies review Indentures before providing ratings. The Division could have provided a Rating Agency witness to testify to the Agencies' understanding of what information the Agency would receive. But the Division failed to call a Rating Agency witness, although it had such a witness on its witness list.

*Daal Assocs., Inc.*, 808 F.2d 982, 983 (2d Cir. 1987); *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*, 67 A.D.2d 339 (N.Y. 1st Dep't 1979). Oral amendments to written contracts are equally valid. *See, e.g.*, *United States v. Schwimmer*, 968 F.2d 1570, 1575 (2d Cir. 1993); *Staten Is. Emergency Physicians, P.C. v. Staten Is. Univ. Hosp.*, 57 A.D.3d 650, 651 (N.Y. 2d Dep't 2008).[40] And the uncontroverted evidence at trial established both oral agreements to amend and course-of-performance amendments. *See* FOF ¶ 108.

### 2. Respondents' Categorization Practices Were Fully Disclosed In Trustee Reports, Investor Calls, And Other Communications.

Even if Respondents' interest deferral and loan categorization practices had been inconsistent with the Indentures—and they were not—the Division still failed to prove liability under the Advisers Act and Rule 206(4)-8 because the approach was fully disclosed. *See, e.g.*, *Brandt, Kelly & Simmons, LLC*, Initial Decision Release No. 289, 2005 WL 1584978, at *8 (Foelak, J.) ("Assuming, *arguendo*, that BKS was required to disclose the payment . . . , its failure to do so was mitigated by its subsequent amendment to disclose the payment when the Commission staff considered that it should be disclosed"); *Steed Fin. LDC v. Nomura Sec. Int'l*,

---

[40] In *Schwimmer*, a recently convicted criminal defendant signed a written contract with prosecutors, forfeiting $4.5 million, and setting aside certain amounts of the forfeiture, such as a certain amount for his trial attorneys' fees. *See* 968 F.2d at 1572. When the criminal case proceeded to appeal, the defendant and his new appellate attorneys met with the federal prosecutors, and "an oral agreement was reached" to expand the carve-out for attorneys' fees in order to pay the appellate attorneys. *Id.* The defendant's victim sought to block payment to the appellate attorneys from the forfeited account, based on the contract's provision stating that any amendments must be in writing. *Id.* The Second Circuit noted that "[u]nder New York law, a contractual prohibition against oral modification may be waived by a course of conduct," and that "[t]his is particularly true where there has been performance in reliance on the oral modification." *Id.* at 1575. Like in *Schwimmer*, the present case features contracting parties who agree that they amended their agreements, and it is a third party that is disputing the validity of the oral amendments.

*Inc.*, 2004 WL 2072536, at *7 (S.D.N.Y. Sept. 14, 2004), *aff'd*, 148 F. App'x 66 (2d Cir. 2005)

("all relevant information was sufficiently disclosed," so "there were no misrepresentations by

defendants"); *see also Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.

1975); *Koplin v. Labe Fed'l Sav. & Loan Ass'n*, 748 F. Supp. 1336, 1342 (N.D. Ill. 1990); COL

¶¶ 24-33.

> **a)      Noteholders Had Full And Accurate Knowledge Of Respondents' Approach.**

As detailed above, not only do the Indentures lay out Respondents' discretion to amend

loans and the methodology for categorizing loans, but Respondents disclosed their categorization

approach to Noteholders in other important ways, including offering memoranda and other deal

documents, Trustee Reports, investor calls, and emails in response to questions.  *See supra*

pp. 22-25.  They did so even though Respondents had no duty under Section 206 to disclose

*anything* to Noteholders, for whom Respondents were not fiduciaries.  *Cf. SEC v. Mapp*, 2016

WL 5870576, at *6, 14 (E.D. Tex. Oct. 7, 2016).

All three of the Division's Noteholder witnesses agreed that the Trustee Reports gave

them adequate information to determine that Category 4 included loans that did not make full

stated interest payments.  *See supra* pp. 31-33.  In addition to the Trustee Reports, the Trustee

released accompanying data files, containing additional detailed loan-level data, which were

regularly downloaded, used, and analyzed by Noteholders.  RX 23 (Dolan Rep.) at ¶¶ 16, 56, 61;

FOF ¶ 126.  The Division's Noteholder witnesses testified that they would regularly "review

trustee reports and download [loan-level] information and feed it into [their] proprietary

models," Tr. 655:1-4 (Mach); *see also* Tr. 1694:24-1695:12 (Aldama), and they used the analysis

"to actually gauge what cash flow [they] expect[ed] to come off of the underlying loans,"

Tr. 604:16-23 (Mach).  *See* FOF ¶ 126.  Even the Division's expert, Mayer, testified that when

the data from the Trustee Report was available, "[a]nyone with access who understood math and had the energy to go through the process would be able" to calculate the actual interest payments on loans that were in Category 4.  Tr. 479:22-24 (Mayer).  And as Mayer admitted, "people who buy these kinds of securities" generally "have those kinds of capabilities."  Tr. 480:10-17 (Mayer).[41]

Mayer's concession understates how simple it was to determine that some Category 4 companies were not paying full stated interest.  The witnesses explained just how simple it was for a recipient of the Trustee Reports to determine the interest payments and categorization of each loan.  Respondents' summary witness, Lys, testified that after taking some initial time to understand the Trustee Reports, it took his team only "a few minutes" and "a sorting function on Excel" to calculate loans' unpaid interest.  Tr. 3015:12-19, 3048:9-12 (Lys); FOF ¶ 142.  Dolan opined that "from the face of the trustee report, a noteholder can tell both that a loan isn't paying stated interest and that the loan is listed as Category 4," Tr. 3471:7-11 (Dolan), and that this level of diligence is part of "the normal course of business for people in the investment business to

---

[41]   Mayer's assertion that data were missing for "whole periods" of time, Tr. 473:5-10; DX 17 (Mayer Rep.) at 57-60, makes no sense.  At most, Mayer attempted to access the data files on a single (undisclosed) day, years after the data were posted.  Tr. 473:22-474:4; 475:5-476:8; 476:20-477:12; 477:17-478:17 (Mayer).  The fact that Mayer could not find the data today says nothing about whether they were available years ago when posted.  Indeed, some of the data files Mayer claims were missing were expressly listed on the face of the Trustee Reports.  RX 23 (Dolan Rep.) at ¶¶ 72-76; Tr. 3482:20-3483:7 (Dolan).  Unsurprisingly, Mayer conceded at trial that he "[didn't] know for sure whether or not [the data] was there at some previous point in time."  Tr. 475:5-18 (Mayer).  Dolan explained why this concession is critical:  "On some of the dates that Mayer suggests that the data files were not available, the trustee reports in fact have on the cover page the data files listed."  Tr. 3483:1-7 (Dolan).  Therefore, as Dolan explained, there is every reason to believe that the data files were in fact available to Noteholders contemporaneous with the Trustee Reports' publication.  Tr. 3483:6-7 (Dolan).  Mayer's credibility on this point is further undermined by the fact that Mayer never claimed to have even attempted to log on to the Trustee's web site to access the data himself.  *See* Tr. 3483:14-17 (Dolan).

perform," Tr. 3480:23-25 (Dolan); *see also* RX 24 (Hubbard Rep.) at ¶ 45.  Documents produced

by the Zohar Noteholders show that the Noteholders indeed used the information contained in

the Trustee Reports independently to assess the performance of the Zohar Notes.  *See, e.g.*, RX

23 (Dolan Rep.) at ¶¶ 75, 85, 91, 104, 108 (discussing monitoring and independent evaluations

done by Natixis, Rabobank, Goldman, and Barclays).

      In response to Division questioning, Ms. Tilton also explained how one could easily

determine from the Trustee Reports that Category 4 loans were not paying full stated interest:

First, she located a particular loan in the June 2010 Trustee Report for Zohar III, Tr. 2013:17-18;

DX 9-A; then she noted its principal, or funded balance, Tr. 2013:18; she then noted its interest

rate, or coupon, Tr. 2013:21-22; finally, she multiplied the principal by the interest rate, Tr.

2013:21-23, and divided by four to find the stated quarterly interest payment, Tr. 2014:7, before

identifying the actual interest paid, Tr. 2014:12-16.  Having thus calculated stated quarterly

interest of $375,000, and interest actually paid of $254,000, Ms. Tilton noted the difference and

concluded, "so we would have deferred approximately $120,000."  Tr. 2014:15-16.  She also

showed from the face of the Trustee Report that the loan was listed "as not defaulted" and thus

was categorized as a "collateral investment," the Zohar III equivalent of Category 4.

Tr. 2014:17-2015:5.  Ms. Tilton conducted this analysis accurately, on the fly, without any

assistance of computers or calculators, and certainly without the assistance of the vast analytical

apparatus available to an institutional investor like Barclays or Värde or SEI.

      In his expert testimony, Dolan went through a similar exercise and showed how a reader

of the Trustee Report need only look at three different pages to discern that some Category 4

loans were not paying full stated interest.  Tr. 3473:24-3476:21.  He explained, moreover, that

Noteholders could contact the Trustee, or access the Trustee's web site for the data files, if they

sought even more information than they could find on the face of the Trustee Reports.  Tr.

3472:7-3473:18.  Finally, he described how routine and simple this level of diligence is for

professional investors.  Tr. 3483:18-3484:5.  In fact, Dolan estimated that it took his team

approximately 50 to 80 hours of work to analyze 10 years of quarterly Trustee Reports and

backup data for all three Zohars.  Tr. 3500:16-3501:6.[42]

### b) The Zohars Had Full And Accurate Knowledge Of Respondents' Approach.

Any claim that the Zohars lacked knowledge of Respondents' categorization approach

also fails because as a matter of law, Respondents' knowledge is imputed to the Zohars.[43]  As the

managers and owners of the Zohars, Respondents were also the agent of the Zohars—a fact that

the Division does not dispute.  *See* Div. Opp. to Summ. Disposition 18 (June 26, 2015).  Nor

does the Division dispute that, under principal-agent law, Respondents' knowledge is imputed to

the Zohars unless a narrow "adverse interest" exception applies.  *Id.*; *see also, e.g.*, *Apollo Fuel*

*Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999).  This "most narrow of exceptions" is

reserved for extreme situations in which "the agent . . . ha[s] *totally abandoned* his principal's

interests and . . . cannot be invoked merely because he has a conflict of interest or because he is

---

[42]  For the first time in summation, the Division suggested that Respondents' interest accrual procedures were evidence of deception, arguing that the interest accrual figures "omitt[ed] from the financial statements the amount of interest not being paid."  Tr. 3663:24-3664:3 (Div. summation).  This theory is nowhere to be found in the OIP, briefing on summary disposition, or prehearing briefing, or even in the trial testimony, and the Division cannot pursue it now.  *Pierce v. SEC*, 786 F.3d 1027, 1036 (D.C. Cir. 2015); *see infra* Pt. II.A.3.  In any event, as Mercado and Lundelius' testimony demonstrates, Respondents' interest accrual policies were GAAP-compliant and the alternative accounting approach (which the Division insists was required) would in fact have been "misleading" and inconsistent with GAAP.  Tr. 1221:12-18, 1222:16-25, 1235:3-7 (Mercado); Tr. 3163:6-7, 3163:19-22, 3296:4-8 (Lundelius); *see infra* Pt. II.A.3.

[43]  The only freestanding duty to disclose created by Advisers Act § 206 is limited to disclosure of conflicts of interest, which is part of the adviser's fiduciary duty to the client.  *See SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996); *see also infra* Pt. I.B.

not acting primarily for his principal." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010) (emphasis in original).

The Division has not even asserted that there was a "total abandon[ment]." The Division did not call a single witness or present a single document from any "victim" purporting to show Respondents' abandonment, even though each of the Zohars has independent directors, *see* FOF ¶ 188, and even though the Division spent years collecting documents in the course of its investigation. In fact, the Division has all but conceded that the allegations amount to "merely . . . a conflict of interest or . . . not acting primarily for [the] principal," rather than an abandonment of the principal's interests. *See* Div. Opp. to Mot. for a More Definite Statement 4 ("The Division argues that Respondents' undisclosed approach to categorization of the fund assets created a conflict of interest," but "does not make any allegation that Respondents' subjective judgments relating to the portfolio companies were incorrect.").

In any event, the record is clear that this exception does not apply, and Respondents' knowledge must be imputed to the Zohars.[44] The trial transcript is brimming with evidence that Respondents pursued the Zohars' interests fully in good faith, including providing hundreds of millions of dollars of investments, equity upside, and foregone fees. *See infra* Pt. I.B.3.

Not only is Respondents' knowledge imputed to the Zohars, but the Zohars had the same knowledge independently by imputation from the Trustee. The Trustee is an agent of the Zohars, *see* CAA § 2(a) (providing, that "The Collateral Administrator shall act as the . . . agent for the

---

[44]   When Respondents moved for summary disposition on this point, Your Honor determined that there was a triable issue as to whether Respondents had "exhibit[ed] a 'total abandonment'" of the Zohars' interests, such that the adverse interest exception might apply. *Lynn Tilton*, Admin. Proc. Rulings Release No. 4157, at 2 (ALJ Sept. 16, 2016) (quoting *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004) (internal quotation marks and alterations omitted)).

Issuer"); *see also* FOF ¶ 173, and the Division has not accused the Trustee of any wrongdoing or conflict of interest. The Trustee's knowledge is therefore imputed to the Zohars. *See, e.g.*, *Apollo*, 195 F.3d at 76. While this would be true whether or not the Zohars actually received information from the Trustee, this is no mere legal fiction here: the Trustee actually agreed to maintain a "Collateral database" of detailed payment information, and make that database available to the Zohars. CAA § 2(b); *see also* FOF ¶ 177. The Trustee was also required to identify defaulted, non-current, or non-performing loans, Zohar II CAA § 2(c)(vii); *see also* Zohar III CAA § 2(c)(vi) at 3; FOF ¶ 178, and if the Trustee did not receive a principal and interest payment when due, it was required to give the Zohars written notice. Indenture § 6.14. *See* FOF ¶ 179. It never did so. The Division cannot now claim that the Zohars were shielded from the information to which they had access as a matter of fact and as a matter of law.

The bottom line is this: through the myriad deal documents and communications from Respondents and the Trustee Reports; from the array of Respondents' and the Trustee's knowledge that must be imputed to the Zohars; Respondents' discretion to amend loans, defer interest payments, and maintain such loans in Category 4 was fully disclosed. The Division has failed to prove any misrepresentation or omission and its claims based on categorization must be dismissed.

> **3.    The Categorization Claims Are Based On A Breach Of Contract Theory, Which Cannot Give Rise To Advisers Act Liability.**

At trial, the Division's case collapsed into a claim that Respondents breached their contracts with the Noteholders. During summation, Division counsel admitted as much: "Ms. Tilton and Respondents didn't give investors what they were promised." Tr. 3654:3-4 (Div. summation); *see also, e.g.*, Tr. 3678:2-4 (Div. summation) ("[T]he investors didn't get what they were promised."); Tr. 3754:3-5 (Div. summation) ("It is about promises made and promises

broken to investors.  That is what's at the heart of this case.").  Thus, as the Division acknowledged, "[t]his is a case about . . . failures to keep . . . promises," not fraud.  Tr. 3690:5-10 (Div. summation); *cf.* Black's Law Dictionary (10th ed. 2014) (defining "breach of contract" as "[v]iolation of a contractual obligation by failing to perform one's own promise").  Respondents' conduct was in fact entirely consistent with the Indentures, *see supra* Pt. I.A.1, but even if it had not been, the Advisers Act does not empower the Division to police compliance with the Indentures.  *See* COL ¶¶ 49-52.

The claims against Respondents thus fail for the simple reason that there is no liability for breach of contract under Advisers Act § 206 and Rule 206(4)-8.  *See Carroll v. Bear, Stearns & Co.*, 416 F. Supp. 998, 1002 (S.D.N.Y. 1976) (holding that allegations of breach of contractual obligations "fail to state a claim for fraud or deceit" under Advisers Act § 206).  A "breach of contract claim cannot be 'dressed up' as a fraud claim," *Todi Exports v. Amrav Sportswear Inc.*, 1997 WL 61063, at *3 (S.D.N.Y. Feb. 13, 1997), because fraud is something more than the mere failure to abide by a contractual promise.  In the "absence of additional allegations of wrongdoing," the Division's fraud claim cannot stand.  *See, e.g.*, *Rogen v. Scheer*, 1991 WL 33294, at *8 (S.D.N.Y. Feb. 22, 1991); *cf. Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (vacating common-law fraud liability "premised upon an alleged breach of contractual duties").  Accordingly, all of the claims against Respondents related to amendment, deferral, and categorization of loans must be dismissed.

### B.    Respondents Performed Their Fiduciary Duties Appropriately.

As investment advisers to the Zohars, Respondents owed the Zohars "a fiduciary duty of loyalty."  *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006).  The OIP's sole theory of fiduciary breach is that Respondents labored under "An Undisclosed Conflict of Interest."  OIP ¶ 9.  The Division's prehearing brief likewise alleged only one theory of fiduciary breach:

"Failure to Disclose Facts Creating Conflict of Interest."  Div. Prehearing Br. 28 (Oct. 17, 2016).

And in its opening statement, the Division again explained that the alleged fiduciary breach

concerns an undisclosed conflict of interest—namely, that Respondents' discretion to amend

loans would have supposedly allowed Ms. Tilton to profit at Noteholders' expense.  *See* Tr.

29:24-30:1 (Div. opening).  The Division's allegation of fiduciary breach fails because, as just

laid out, that alleged conflict of interest was the subject of express disclosure and waiver.  *Infra*

Pt. I.B.1.

Perhaps recognizing that the evidence at trial overwhelmingly established disclosure, the

Division attempted to switch theories mid-trial, contending for the first time that the manner in

which Respondents exercised their discretion concerning categorizations was not in the

Noteholders' interests.  This theory of fiduciary breach is not only outside the scope of the OIP

(and therefore cannot serve as the basis for any liability), but it is also meritless.  First, as with

the OIP's theory of fiduciary breach, it is based on flawed legal premises (*e.g.*, that a fiduciary

duty was owed to the Noteholders), and thus fails as a matter of law.  *Infra* Pt. I.B.2.  And

second, it is based on a factual premise that bears no resemblance to what was conclusively

demonstrated at trial—namely, the premise that Respondents did not act in the Zohars' interests.

*Infra* Pt. I.B.3.  To the contrary, Respondents' performance of their fiduciary duties is undeniable

in light of the evidence adduced at trial.  Ms. Tilton described her unyielding efforts to build

value on behalf of the Zohars, and the Portfolio Company witnesses testified that Ms. Tilton has

"dedicated her life, almost every waking hour, that I know of, in the last 10 years to improving

these businesses and getting them . . . cash flow."  Tr. 3548:18-3549:6 (Harrington); *see also* Tr.

3137:14-22 (Pelissier) ("[S]he work[s] tirelessly.  And she's 100 percent focused on the future of

her companies.");  FOF ¶ 98.  Meanwhile, the Division has conceded that it has never challenged

"Respondents' subjective judgments relating to the portfolio companies."  Div. Opp. to Mot. for a More Definite Statement 4.

### 1.        Any Conflicts Of Interest Were Disclosed And Expressly Waived.

Even if there had been no evidence of disclosure, the OIP's allegations of an undisclosed conflict of interest would be baseless because conflicts of this type were expressly waived in the CMAs.  Where a collateral management agreement "waiv[es] any conflict of interest that might otherwise exist," a conflicts-based fiduciary duty claim is invalid "as a matter of law."  *Bank of Am. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 356-57 (S.D.N.Y. 2013); *see* COL ¶¶ 34-40.  This principle applies with particular force in this case, given the Zohars' (and other actors') extraordinary level of sophistication—a factor courts routinely take into account in upholding waivers as valid in the face of fiduciary breach claims.  *See, e.g.*, *Heitman Capital Mgmt. LLC*, SEC No-Action Letter, 2007 WL 789073 (Feb. 12, 2007).

The Zohars explicitly acknowledged and waived conflicts of interest between themselves and Respondents.  Each CMA contains a section titled "Conflicts of Interest; Acknowledgement of the Company," which provides as follows:  "Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of [Respondents] . . . and their respective clients . . . ."  CMA § 6.2(a); *see also* FOF ¶¶ 18, 194.  The same section continues:  "The Company and the Zohar Subsidiary hereby . . . consent to and waive the various potential and actual conflicts of interest that may exist from time to time with respect to

[Respondents] as generally described in Section 6.2(a) above."  CMA § 6.2(b).  The OIP's sole theory of fiduciary breach is foreclosed by these clear, explicit disclosures and waivers.[45]

The Division's fiduciary breach claim also fails for the same reasons that defeat the fraud claims: Respondents' approach to categorization was fully disclosed.  *See supra* Pt. I.A.  The OIP is explicit about the complete overlap of conduct alleged in the fraud and fiduciary breach claims.  After alleging that Respondents' categorization of loans was misleading, the OIP again recites the allegations of nondisclosure as the basis for a fiduciary duty claim.  *See* OIP ¶ 9.  In the more detailed discussion of the fiduciary duty allegations (which occupies just five short paragraphs of the 76-paragraph-long OIP), the only facts alleged to give rise to a conflict of interest are the "approach to categorization" and the "deci[sion] when to accept less than the full interest due from the Portfolio Companies."  OIP ¶¶ 54-55.

The evidence showed just the opposite.  It was well-disclosed that Ms. Tilton used good-faith business judgment to categorize loans while earning collateral management fees and owning and operating Portfolio Companies.  *See generally* FOF ¶¶ 125-59.  This strategy was necessitated by the design of the Zohars (as any reasonable investor would, and did know), and it was evident on the face of the Zohars' governing documents and Trustee Reports, in addition to being disclosed via investor calls and other communications.  *See supra* Pt. I.A.

---

[45]  In addition, for the same reasons explained in Part I.B.2 *infra*, all the knowledge of Respondents and the Trustee is also imputed to the Zohars.  *See Rodman v. Grant Found.*, 608 F.2d 64, 72-73 (2d Cir. 1979) (upholding dismissal of fiduciary breach claim predicated on failure to disclose, because "full and fair disclosure was made"); *In re Seidman*, 37 F.3d 911, 933-36 (3d Cir. 1994) (no breach of fiduciary duty where the fiduciary's interest—purportedly in conflict with the principal's interest—was disclosed).  Given the Zohars' knowledge of everything Respondents knew (and the Zohars' knowledge of all the information in the Trustee Reports and all underlying financial data by way of the Trustee), Respondents lacked the legal capacity to keep any conflict undisclosed from the Zohars.

2.    **The Fiduciary Duty Claim Should Be Dismissed Because It Is Merely A Dressed-Up Breach Of Contract Claim, Based On Conduct Towards Noteholders To Whom No Fiduciary Duty Was Owed.**

Even aside from the trial evidence of Respondents' allegiance to the Zohars and the Noteholders, the Division's fiduciary breach claim suffers from two flaws that independently preclude any finding of liability against Respondents.  First, these claims are nothing more than dressed-up (and meritless) breach of contract claims.  As with the fraud claims, the fiduciary duty claims are based on allegations that Respondents did not keep their contractual promises. That is exactly how the Division alleged its fiduciary duty claims, albeit with stray references to fiduciary duties scattered throughout its opening and closing arguments.  Tr. 3679:22-24 (Div. summation) ("[T]hat's the protection investors bargained for.  And a fiduciary investment adviser has to honor the promises made."); Tr. 36:14-20 (Div. opening) ("This case is . . . about Ms. Tilton's breaches of her core promises made and duties owed to her investors and about Ms. Tilton's disregard of those promises and duties for her own personal benefit.").  Substituting "contractual duties" for "fiduciary duties" gets the Division no closer to making out an Advisers Act violation.

Moreover, the Division's arguments about what "investors bargained for" and Ms. Tilton's "duties owed to her investors," Tr. 3679:22-24 (Div. summation); Tr. 36:14-20 (Div. opening), would transmute the fiduciary duty imposed by the Advisers Act from an obligation owed to a client (the Zohars) into one owed to a client's investors (the Noteholders).  The duty flows exclusively from the adviser to the client.  *See Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (discussing the "fiduciary duty of loyalty between an adviser and his client"); *see also SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 201 (1963) (noting the Advisers Act's "recognition of the adviser's fiduciary relationship to his clients").  For advisers to pooled investment vehicles, "[t]his type of direct relationship exists between the adviser and

the fund, but not between the adviser and the investors in the fund." *Goldstein*, 451 F.3d at

880.[46]  In fact, the fiduciary duty must be owed exclusively to the fund, because "[i]f the

investors are owed a fiduciary duty and the entity is also owed a fiduciary duty, then the adviser

will inevitably face conflicts of interest." *Id.* at 881; *see also* COL ¶¶ 41-45.

The OIP appears to recognize that Respondents owed fiduciary duties exclusively to the

Zohars.  *See* OIP ¶ 52 (characterizing the Zohars as Respondents' clients and stating that

Respondents "owed fiduciary duties to these funds," but making no similar allegations as to

Noteholders).  And the Division made effectively the same concession in its Opposition to

Summary Disposition.  Div. Opp. to Summ. Disposition 18 ("The Division does not dispute that

under Sections 206(1) and (2) of the Advisers Act, Respondents' 'clients' are the Funds

themselves, rather than the Funds' investors.") (citing *Goldstein*, 451 F.3d at 881-82).[47]

---

[46]  *See also, e.g.*, *Capital Gains Research Bureau*, 375 U.S. at 194 (describing fiduciary duty as "an affirmative obligation to . . . [the advisor's] clients"); *Moran*, 922 F. Supp. at 895-96 ("Section 206 of the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients."); Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, Advisers Act Release No. 2628, 2007 WL 2239114, at *1 (Aug. 3, 2007) (Final Rule 206(4)-8) (describing courts' "view that, for purposes of sections 206(1) and (2) of the Advisers Act, the 'client' of an investment adviser managing a pool is the pool itself, not an investor in the pool" and therefore expressing skepticism about "whether the Commission could continue to rely on sections 206(1) and (2) of the Advisers Act to bring enforcement actions in certain cases where investors in a pool are defrauded by an investment adviser to that pool"); Definition of "Client" of Investment Adviser for Certain Purposes Relating to Limited Partnerships, 50 Fed. Reg. 8740, 8741 (proposed Mar. 5, 1985) ("[I]t appears appropriate to view the pool—rather than each participant—as a client of the adviser.").

[47]  During trial, the Division appeared to suggest that the Patriarch's compliance manuals were evidence of a fiduciary duty to Noteholders.  But the compliance manuals made clear that the fiduciary duty was owed to the funds, and not the Noteholders.  The manuals explained:

> The clients of the Investment Advisers are the collateralized loan obligation funds
> whose investment portfolios we manage (each a "Client" and collectively, the

Whatever position the Division now takes, the law provides no support for such liability, and the

OIP's breach of fiduciary duty allegations should be dismissed as a matter of law.

> **3.     Respondents At All Times Prioritized The Interests Of the Zohars
> And The Noteholders, Working Tirelessly On Their Behalf And
> Investing Hundreds Of Millions Of Dollars For Their Benefit.**

The Division's contention that Respondents disserved the Zohars and Noteholders by

amending loans and deferring interest in order to keep the Portfolio Companies afloat and collect

fees is nonsensical.  The evidence showed that, in a fully disclosed strategy, Respondents

amended loans and deferred interest to create and maintain value for the Portfolio Companies.

But according to the Division, the only proper course of conduct would have been for

Respondents to cease supporting Portfolio Companies—all of which were highly distressed and

the ability of which to repay stated interest was non-existent—a course that would have

destroyed the value of the collateral and pushed the Zohars to failure.  This position is

preposterous and ignores the basic investment strategy: to draw upon Respondents' expertise and

business judgment as collateral manager, and thereby gain value through loans issued to stressed

and distressed companies that could be turned around.  *See, e.g.*, Tr. 1838:15-22, 1839:3-22

(Tilton); Tr. 3511:13-3512:07 (Schwarcz); Tr. 3566:4-11 (Hubbard); FOF ¶¶ 13, 98.  This bid to

equate Respondents' exercise of business judgment on behalf of the Zohars with a breach of

fiduciary duty is even more bizarre in light of the Division's explicit choice to "not make any

---

"Clients"). . . . As registered investment advisers, the Investment Advisers are in a
position of trust and confidence with respect to their Clients and have a fiduciary
duty to place their Clients' interests before the Firm's and its Employees'
interests.

DX 39 (Patriarch Partners Compliance Manual) at PP130557.  In light of this definition,
the compliance manuals' references to Patriarch's clients are plainly references to the
Zohars, and the compliance manuals' references to Patriarch's fiduciary duties are plainly
references to duties owed to the Zohars.

allegation that Respondents' subjective judgments relating to the portfolio companies were incorrect."  Div. Opp. to Mot. for a More Definite Statement 4.

In fact, the evidence showed that Respondents went far beyond their fiduciary duty in serving the interests of the Zohars. *Cf. Brandt, Kelly & Simmons, LLC*, 2005 WL 1584978, at *8 (no liability for breach of fiduciary duty under Advisers Act where respondents "worked diligently" for clients); COL ¶¶ 46-48.  Respondents were not required to, but chose to, dedicate staggering amounts of their own capital to the Zohars and directly to Portfolio Companies, and structured their investments so that they would not get paid until after Noteholders were paid, with the specific purpose of advancing the interests of the Zohars and the Noteholders, and avoiding any conflict of interest.  Respondents have (through Ms. Tilton's investment vehicles) invested over $218 million of their own money in Zohar I, Zohar II, and Zohar III directly, Tr. 3038:18-3040:23, 3060:1-5 (Lys); RX 132 (Summary of Preference Share and Class A 3A/3B Investments in the Zohar Funds), and they have invested over $223 million of their own money in the Portfolio Companies, Tr. 3031:8-3038:15 (Lys); RX 129 (Summary of Investments in Portfolio Companies made by ARK II, AIP, and ARK Angels through Aug. 31, 2016) at 1; FOF ¶¶ 212-18.  Because the investments were structured such that upon sale of a Portfolio Company, the equity upside would "flow through the waterfall and pay the noteholders" and only pay Respondents last, they aligned Respondents' interests squarely with the Zohars' and Noteholders' interests.  Tr. 2755:23-2756:5 (Tilton); *see also* Tr. 1800:9-11, 2113:23-2114:21 (Tilton) (describing "last-out equity," which "gets paid after the notes"); Tr. 3567:22-3568:8 (Hubbard) (only after investors are paid, "[t]o the extent those returns are very handsome, Ms. Tilton and Patriarch would also be rewarded"); FOF ¶ 41.

Respondents have proved their loyalty in other ways as well, as evidenced by the over $68.4 million in fees that have been accrued and have not been paid to Respondents. RX 134 (Summary of Fee Accruals and Payments) at 1 ($34,026,603 in unpaid management fees, and $1,014,299 in unpaid secondment fees); *id.* at 2 ($7,456,287 in unpaid agency fees); *id.* at 3 ($26,461,341 in unpaid collateral management fees); FOF ¶¶ 214-16. Ms. Tilton took no pay for 41 months during the financial crisis, Tr. 1841:6-11; deferred fees to provide extra liquidity to the Zohars, Tr. 1906:12-15; took no fees while Portfolio Companies were in bankruptcy, Tr. 1906:24-1907:6; and generally volunteered to "for[go] subordinated collateral management fees and preference share dividends to make sure that the noteholders had a deal that was performing well," Tr. 1908:17-24; *see also* FOF ¶ 196. She also attempted on multiple occasions to implement restructuring plans that would have made Noteholders whole, and offered to resign as collateral manager if it would help persuade MBIA to accept such a deal. Tr. 2577:2-2579:5 (Tilton); RX 498 (Mar. 15, 2013 email from Ms. Tilton to McKiernan) (attaching term sheet for the proposed Zohar I restructure); RX 48A, 48B (Dec. 12, 2011 Zohar I Investor Call) at 13:5-10; RX 497 (Mar. 14, 2013 email from Ms. Tilton to McKiernan); FOF ¶¶ 190, 199-211.[48]

Notably, Respondents continued to act as collateral manager for the Zohars until they voluntarily resigned in March 2016, almost six years after the Division began its investigation

---

[48] In view of Respondents' loyal work in service of the Zohars, there could be no breach of the standard of care memorialized in the CMAs. Respondents and the Zohars were parties to the CMAs (further evidence that the fiduciary duty flows exclusively to the Zohars), which imposed a specific standard of care on Respondents: "reasonable care," which the contract defined in part as "the same degree of skill and attention . . . that the Collateral Manager [*i.e.*, Respondents] . . . exercises with respect to comparable assets that it manages for itself and its Affiliates." RX 10 (Zohar II CMA) § 2.4 at 11; *see also* RX 6 (Zohar I CMA) § 2.4 at 11; RX 16 (Zohar III CMA) § 2.4 at 11; FOF ¶ 198. Respondents invested heavily in the Zohars' Portfolio Companies, so by definition, they managed the Portfolio Companies the way they would (and did) manage companies in which they invested. *See* FOF ¶ 213.

and almost one year after the Division filed the OIP.  *See* FOF ¶¶ 190-91.  Each of the Zohars'

independent directors held several meetings during this interval.  *See* FOF ¶¶ 188-89.  This

continued relationship "suggests that [the independent directors], at least, did not think that

[Respondents] had acted in bad faith or under a conflict of interest in connection with their . . .

investments."  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 506 n.43 (3d Cir. 2013); *see also*

*Stein*, 1999 WL 756083, at *11 (noting that the Advisers Act duty to disclose conflicts exists "so

that the client [can] make an informed decision" as to whether to "continue an advisory

relationship" or "take some action to protect himself against the specific conflict of interests

involved" (internal quotation marks and citation omitted)).  And the Division failed to call even

one independent director to testify.  It is absurd that the Division purports to assert claims on

behalf of the Zohars when the directors of the Zohars themselves have never said a word

indicating they believed the Zohars were in fact wronged.

### C.    Any Inaccuracies, Nondisclosures, Or Fiduciary Breach Relating To Categorization Were Not Material.

There can be no liability under the antifraud provisions of the Advisers Act unless the

Division proves materiality.  *Stein*, 1999 WL 756083, at *11; *see also Clarke T. Blizzard*,

Advisers Act Release No. 2409, 2005 WL 1802401, at *4 (Comm'n July 29, 2005) (requiring

materiality for breach of fiduciary duty under Advisers Act § 206); COL ¶¶ 53-57.  To prevail

here, the Division must prove that the alleged omission—namely, a more explicit description of

Respondents' categorization approach—would have "substantially altered the total mix of

information," given the information that Respondents did in fact disclose.  *Stein*, 1999 WL

756083, at *11 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).[49]  The Division's

proof fell far short of that burden, particularly in light of the evidence that Respondents

accurately disclosed their categorization approach.  *See supra* Pt. I.A.2.

The Division responded to this gap in its proof by claiming that these disclosures required

too much effort from the reader of the Trustee Reports.  Almost laughably, the Division asserts

that the disclosures in the Trustee Reports communicate no useful information because they

require the reader to "look at page 1 . . . and then . . . flip and look at another page."  Tr.

3684:10-23 (Div. summation).  But as Respondents' expert Dolan showed, a reader could easily

determine "from the face of the Trustee Report . . . both that a loan isn't paying stated interest

and that the loan is listed as Category 4."  Tr. 3471:7-11; *see also, e.g.*, Tr. 3476:17-21 (Dolan)

(a reader need only look at three pages of the Trustee Report to determine that a given loan is in

Category 4 and did not pay full stated interest); Tr. 3015:15-19 (Lys) (after becoming familiar

with the organization of the Trustee Reports, Lys spent "a few minutes" to analyze each report

for Category 4 loans paying less than full stated interest); RX 24 (Hubbard Rep.) at ¶ 45; FOF

¶ 142.

---

[49]    The Division cannot meet its burden if "the risk of real deception drops to nil" in light of the
truthful facts included in the total mix of information.  *See, e.g.*, *Va. Bankshares, Inc. v.
Sandberg*, 501 U.S. 1083, 1097 (1991) ("publishing accurate facts in a proxy statement can
render a misleading proposition too unimportant to ground liability" due to the materiality
requirement); *cf. Brandt, Kelly & Simmons, LLC*, 2005 WL 1584978, at *8 (finding "no material
misrepresentations or omissions, and no violation of Sections 206(1) or 206(2) of the Advisers
Act," in part because respondents "disclosed to each client individually the benefits and costs"
related to the alleged violation); *see also Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir.
2000) (affirming the "conclusion that [defendant's] failure to disclose . . . was immaterial"
because "public disclosure was more than sufficient to put potential investors . . . on notice" of
the allegedly omitted fact); *In re Hyperion Sec. Litig.*, 1995 WL 422480, at *7 (S.D.N.Y. July
14, 1995), *aff'd*, 98 F.3d 2 (2d Cir. 1996) ("Because [alleged misrepresentations] in the
prospectus . . . appeared amidst abundant factual disclosures . . . the alleged misrepresentations
do not rise to the requisite level of materiality").

Even if the Division were correct that the Trustee Reports required inference or interpretation by the reader—and, of course, that is entirely untrue—this would not render the disclosure inadequate.  The disclosures were directed to sophisticated investors who had ample capacity to process complex information, *see* FOF ¶¶ 29, 32-33; Tr. 480:10-17 (Mayer) (admitting that "people who buy these kinds of securities" generally "have those kinds of capabilities" necessary to analyze this information), and in fact analyzed the information in the Trustee Reports and associated data files, FOF ¶¶ 125-27.  To the extent any of them purportedly "fail[ed] to pursue this line of investigation," that reveals that, "despite appearances, the knowledge [they] would have discovered was immaterial." *Hirsch v. DuPont*, 553 F.2d 750, 763 (2d Cir. 1977); *see id.* at 762-63 (in analyzing adequacy of disclosures, the key question is whether a "reasonable investor of [the purported victims'] level of sophistication would have made a further inquiry").[50]  The law on this point is clear, and directly contradicts the Division's argument that a disclosure defeats materiality only if it requires no diligence at all on the part of the recipient.[51]  To the contrary:  "The securities laws were not enacted to protect sophisticated

---

[50]  *See also United States v. Litvak*, 808 F.3d 160, 185 (2d Cir. 2015) ("[T]he sophistication of the investor is relevant . . . to the adequacy of the defendant's disclosure." (internal alterations omitted)); *In re Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 536437 (S.D.N.Y. Feb. 9, 2011) (finding no misrepresentation because the investor, "armed with the information [in the disclosure], was on notice of that information and all information that a diligent inquiry would have disclosed"); *Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, 2004 WL 2072536, at *6 (S.D.N.Y. Sept. 14, 2004) ("[T]he more sophisticated the investor and the more resources available to the investor, the greater the burden on the investor to act to protect itself." (internal quotations and citations omitted)); *cf. In re Hyperion Sec. Litig.*, 1995 WL 422480, at *6 ("[T]he securities laws were not meant to shelter those who deliberately disregard disclosed risks.").

[51]  The Division cited only one legal authority in its entire summation:  an opinion by a Magistrate Judge in the Northern District of Illinois, partially granting and partially denying a motion for summary judgment, which the Division quoted for the uncontroversial proposition that "willingness to disclose is a poor substitute for actual disclosure." *SEC v. Nutmeg Grp.*

businessmen from their own errors in judgment.  Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information." *Id.* at 763.

**D.      Any Inaccuracies, Nondisclosures, Or Fiduciary Breach Relating To Categorization Could Not Have Been Intentional Or Negligent, Given Respondents' Good-Faith, Reasonable Interpretation Of The Indentures.**

For Respondents to be found liable, the Division bears the burden of proving their scienter, or, for charges other than § 206(1), their negligence.  *See supra* p. 48; *Labine*, 2016 WL 824588, at *28, *31; *Steadman*, 967 F.2d at 643 n.5, 647; *cf. Lincolnshire Mgmt., Inc.*, Advisers Act Release No. 3927, 2014 WL 4678600, at *5 (Comm'n Sept. 22, 2014) (applying the same state-of-mind requirement for claim of breach of fiduciary duty).  The Division cannot meet that burden.  The Division fell far short of proving intentional fraud; all the usual trappings of such a prosecution are conspicuously absent from the record.  And the evidence at a minimum demonstrates that Respondents acted out of a "good faith" belief that their conduct was appropriate, and with "due care," *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004), in the face of which the charges should be dismissed, *see* COL ¶¶ 58-70.

When conduct is based on a reasonable—even if ultimately erroneous—interpretation of a contract, the conduct is not negligent, because it was based on an objectively reasonable attempt to comply with the contract.  *See Gen. Ins. Co. of Am. v. K. Capolino Constr. Corp.*, 983 F. Supp. 403, 437 n.63 (S.D.N.Y. 1997); *see also Amitie One Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.*, 2008 WL 2973097, at *4 (M.D. Pa. Aug. 4, 2008) ("reasonable but incorrect interpretation" of a contract does not "give rise to bad faith").  Even if Your Honor were to

---

*LLC*, 162 F. Supp. 3d 754, 779-80 (N.D. Ill. 2016).  The entire case is, however, inapposite given the contrast between the *Nutmeg* defendants, who contended only that they "were willing to answer questions," *see id.* at 779, with the robust actual disclosures made by Respondents here.

disagree with Respondents' reading of the Zohars' governing documents, Ms. Tilton's testimony established that Respondents' conduct was nonetheless motivated by a firm belief in that interpretation. *See, e.g.*, Tr. 1798:24-1799:7 (Tilton) (testifying that Respondents believed they "worked in accordance with those indentures" and that they "implemented practices and procedures to make sure that Patriarch complied with those indentures for the Zohar deals"). Indeed, that is the only possible explanation here—nobody who is proceeding in bad faith or with negligence spends a decade or longer refining, memorializing, and publishing the details of the challenged behavior, including through open discussions of what the contract means.[52] FOF ¶¶ 45-47, 125-59.

Likewise, Respondents' disclosures confirm their good-faith state of mind. No fraudster would openly announce deceptive conduct on a public investor call, or respond in writing to questions from an alleged victim by telling that person exactly what they were doing, as Respondents did here. FOF ¶¶ 151-56. Fraudsters do the opposite: they conceal wrongful conduct when confronted. *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *14 (S.D.N.Y. Feb. 27, 2004) ("[I]n the context of the consistent disclosures by the defendants, there is no basis to infer from this alleged omission that the defendants acted with scienter."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 536437, at *9 (disclosures are probative of defendant's compliance with "standards of ordinary care" (citation omitted)). And

---

[52]  *See, e.g.*, RX 118 (Sept. 2, 2011 email from Karen Wu at Patriarch to Daniel Strong at Natixis) ("[W]e have amended agreements to align with payments rather than issuing waivers or forgiving interest. You are well aware that the ability to waive, amend, or change interest rates to meet the current conditions of a company is a[n] integral part of the business model."); RX 117 (June 23, 2011 email from Frank Li at Patriarch to Anand Sankaranarayanan at Barclays, responding to a question about interest payments below stated interest) ("Interest may have been deferred for some of the borrowers. Different from other CLO managers, Patriarch Partners' business model is a unique vertically integrated model.").

tellingly, the Division presented no evidence, nor any reason to believe, that Respondents ever attempted to interfere with the Trustee Reports, attempted to alter or hinder the presentation of information in the Trustee Reports, or failed to cooperate with the Trustee in any way.

Ms. Tilton's rigorous process for deciding when to amend loans is also inconsistent with intentional or reckless deception, and it unequivocally establishes that Ms. Tilton was not negligent. *See, e.g.*, *Hoemke v. N.Y. Blood Ctr.*, 912 F.2d 550, 552 (2d Cir. 1990) (negligence defeated by "procedures that reasonable prudence would dictate be instituted"). On an ongoing basis, Ms. Tilton was intensively involved in supervising the financial performance of the Portfolio Companies; she required (among other things) weekly financial reports, quarterly meetings, regular calls with Patriarch's workout officers to discuss "hot issues," and ongoing analysis by Patriarch's credit analysts. FOF ¶¶ 97-104. When considering whether to amend a loan to defer interest, Ms. Tilton heightened her scrutiny: she met with credit analysts, considered interest projections, and compared the expected value of letting the loan default with the long-term value of continuing efforts to turn around the Portfolio Company. FOF ¶¶ 105-08. She exerted substantial pressure on the Portfolio Companies to pay full stated interest if they could possibly do so. FOF ¶¶ 106, 111; *see supra* pp. 38-40. The Platform Leaders who testified at trial described the final stage before a loan amendment as a "brutal" series of meetings (which could last days), in which the Platform Leader would advocate for a deferral of interest. Tr. 3533:1-3535:6 (Harrington); *see also* Tr. 3083:3-13 (Pelissier); FOF ¶ 106. If the Portfolio Company could not pay full stated interest, Ms. Tilton sought to maximize the value of the collateral by either amending to defer an interest payment "in order to hold securities that would be worth much more later on," or refusing to amend and moving the loan to Category 1. Tr. 2090:23-2091:7 (Tilton); *see also* FOF ¶¶ 107-11. This approach to interest deferral was an

exercise in diligence—not negligence—with the intent of increasing value to the Zohars and the Noteholders.

Finally, the Division has argued that Respondents' categorization methodology was designed to allow Ms. Tilton to collect greater fees and distribution. *See, e.g.*, Tr. 18:11-15, 20:18-24 (Div. opening); Tr. 3657:15-19 (Div. summation).  Not only does the evidence of Ms. Tilton's unflagging loyalty to the Zohars—and the lack of any evidence that Respondents misrepresented their amendment, deferral, and categorization strategy—disprove this theory, but it makes no economic sense.  The relevant fees and distributions pale in comparison to Ms. Tilton's stake in the success of the Zohars and the Portfolio Companies, and her hundreds of millions of dollars in investments.  FOF ¶¶ 202-18.  Her financial interests were tightly aligned with those of the Zohars and the Noteholders, and she had every reason to want them to succeed.

The trial record makes clear the fierce loyalty and dedication that Respondents showed to the Zohars and Noteholders.  Their willingness to sacrifice for the Zohars is especially clear from Ms. Tilton's repeatedly volunteering to resign as collateral manager, her decision not to take fees for 41 months during the financial crisis, and her massive investments of her own capital in the Zohars and the Portfolio Companies.  *See infra* part I.B.3; FOF ¶¶ 202-18.  Accordingly, none of the categorization-based claims (including the fiduciary duty claims) can give rise to a finding of scienter or negligence.

## II.    The Division's Case With Respect To The Financial Statements Has No Merit.

Each Zohar Indenture requires Respondents to deliver "an Officer's certificate attaching (i) a consolidated balance sheet . . . and (ii) a consolidated income statement . . .  prepared in each case in accordance with U.S. generally accepted accounting principles and certified by the Issuer as presenting fairly, in all material respects, the financial position of the Issuer and its consolidated subsidiaries."  Indenture § 7.9(a); *see also* FOF ¶¶ 219-220.  The OIP alleged that

"Respondents do not prepare the financial statements in conformity with GAAP," contrary to the certifications signed by Ms. Tilton, and that the "disclosures in the financial statements . . . falsely indicate that Respondents assess and consider impairment issues and the fair value of the Funds' loan assets." OIP ¶ 8.[53]

Courts have consistently held that "[a]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Dempsey v. Vieau*, 130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).[54]  Instead, to establish a claim of misrepresentation based on alleged GAAP violations or accounting irregularities, the Division must prove:  (1) that the financial statements contained false or misleading representations, *see Brandt, Kelly & Simmons, LLC*, Initial Decision Release No. 289, 2005 WL 1584978, at *8 (June 30, 2005); (2) the materiality to investors of the purportedly false statements, *see id.*; *David J. Montanino*, Initial Decision Release No. 773, 2015 WL 1732106, at *33 (ALJ Apr. 16, 2015); and (3) "that [the respondent] acted with scienter with regard to both the truth and the materiality of the allegedly misleading

---

[53]  As a preliminary matter, the Indentures did not require the Zohars to produce GAAP-compliant "financial statements"—only GAAP-compliant balance sheets and income statements. *See* Indenture § 7.9(a).  The financial statements themselves made clear on their face that they were "special purpose" financial statements prepared in accordance with the "specific reporting requirements set forth under Section 7.9(a) of the Indenture," and "should not be regarded as a complete presentation of GAAP financial statements," RX 30.009 (Dec. 8, 2009 Zohar III Financial Statements) § 2.1 at 4, and the officer's certificate certified GAAP-compliance only as to the "Balance Sheet[s]" and "Income Statement[s]," *id*. at 1.  Accordingly, as used in this brief, references to GAAP-compliant financial statements serve as a shorthand for the GAAP-compliance of the balance sheets and income statements contained in the financial statements.

[54]  *See also, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions . . . are not sufficient to state a securities fraud claim."); *Owens v. Jastrow*, 789 F.3d 529, 543-44 (5th Cir. 2015) (dismissing complaint because the fact that "the reported figures are alleged to have violated GAAP is not, by itself, actionable").

statements," *SEC v. Snyder*, 292 F. App'x 391, 399-400 (5th Cir. 2008) (citing *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)).[55]  Finally, reliance on the review and approval of the challenged financial statements by professional accountants is a complete defense to both intent and negligence-based accounting charges.  *See infra* Pt. II.B; COL ¶¶ 71-73.

Here, the Division failed to prove any of the elements of the charge, and Respondents easily proved the advice-of-experts defense.  Respondents introduced uncontroverted evidence, corroborated by expert testimony, of their robust process for evaluating impairment and fair value of the Zohars' loans, as well as evidence that their practices were GAAP-compliant.  *See infra* Pt. II.A.  The evidence also established that Respondents relied in good faith on their external accountant, Berlant of Anchin, to create their accounting policies and financial statement disclosures, and then to review and approve their financial statement disclosures on a monthly basis for over 15 years.  *See infra* Pt. II.B.  Respondents' accounting policies were, moreover, never challenged or questioned by the Noteholders, and the Division's Noteholder witnesses admitted that the financial statement disclosures were not material to their investment decisions.  *See infra* Pt. II.D.  And far from acting with scienter, Respondents and their internal accountant testified to their reasonable, good faith continuing belief that the financial statements and the process for evaluating impairment and fair value complied with GAAP.  *See infra* Pt. II.C.

---

[55]  Because the GAAP certification is a statement of opinion, the Division must prove that Respondents subjectively did not believe the challenged statements.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011) (holding that complaint was deficient where it "[did] not . . . plausibly allege that defendants did not believe the statements . . . at the time they made them"); *see also In re Am. Int'l Grp. Inc.*, 2013 WL 1787567, at *3-4 (S.D.N.Y. Apr. 26, 2013) (dismissing claim based on GAAP noncompliance where plaintiff failed to "plead subjective falsity").

A.    **Respondents' Financial Statements Were Accurate And GAAP Compliant.**

The OIP alleges GAAP non-compliance only as to fair value and recognition of impairments. Both the measurement of fair value and the recognition of impairments are subjective assessments for which GAAP permits a range of acceptable outcomes, depending on the "particular methodology and assumptions used." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111-12 (2d Cir. 2011); *see also Owens*, 789 F.3d at 544. Here, the evidence at trial established that Respondents' treatment of fair value and recognition of impairments in financial statements fell within the range of acceptable outcomes that GAAP permits, and that Respondents assessed and considered both impairment issues and the fair value of the Zohars' loan assets. COL ¶¶ 74-80.

1.    **Respondents Analyzed And Reported Fair Value In Accordance With GAAP.**

The Zohar financial statements disclosed that the "fair value of the Collateral Debt Obligations . . . is approximately equal to the . . . carrying value presented on the Balance Sheet" and that "fair value estimates are generally subjective in nature," and may be based upon "valuation techniques" that "involve uncertainties." *See, e.g.*, RX 28.022 (Nov. 17, 2008 Zohar I Financial Statements) at 6; *see also* FOF ¶¶ 221-22. The OIP contended that these disclosures were misleading because "no analysis at all was conducted to determine fair value," OIP ¶ 72, but this allegation is false. As Respondents established at trial, detailed and accurate valuation analyses of the Collateral Debt Obligations were regularly performed by Ms. Tilton and Patriarch's credit and structured finance groups. FOF ¶¶ 223-24; *see also* Tr. 1977:19-22 (Tilton) ("Q. Who conducted this fair value analysis . . . ? A. I did, along with the structured finance team and the credit officers."). Respondents conducted their fair value analyses with detailed models that "la[id] out [Portfolio Company] cash flows credit-by-credit and as a whole,"

and then Ms. Tilton and Patriarch's credit and structured finance groups "discount[ed] those cash flows back to create a fair value number." Tr. 2297:8-2298:5 (Tilton); *see also* FOF ¶ 224. Respondents introduced several examples of these valuation models at trial, which the Division at best failed to understand, or worse, simply disregarded in their rush to charge Respondents with accounting fraud. *See, e.g.*, FOF ¶ 223; RX 487.001 (Spreadsheet of Portfolio Company performance history and projected performance); RX 1832 (Compilation of Equity Analysis Spreadsheets); RX 557 (Patriarch's model into which the credit templates fed to create cash flow analyses). Indeed, the Division's own accounting expert did not consider a single one of the detailed spreadsheets that lay out this analysis. *See* FOF ¶ 228.

These analyses were part of the process by which Patriarch confirmed that the estimated fair value of the Collateral Debt Obligations reported in the Zohar financial statements was accurate. FOF ¶ 224. Ms. Tilton, "along with the structured finance team and the credit officers," compared the discounted cash flow numbers from the valuation models to the "carrying cost on the financial statements as well as to the holding value in the trustee reports. And then [they] chose the most conservative or the lowest number that was usually, if not always, carrying at . . . cost." Tr. 1977:19-22, 2281:15-25 (Tilton). Far from misleading Noteholders with inflated valuations, Ms. Tilton reported only "the most conservative [valuation], which was the cost of the collateral, plus borrowings, less paydowns, minus impairment." Tr. 2297:8-2298:5 (Tilton). Respondents' fair value analyses always ensured that the financial statements "present[ed] a fair picture of the Zohar Funds' financial conditions," OIP ¶ 60, by confirming that the fair value of the Collateral Debt Obligations was at least equal to the carrying value presented on the balance sheet of the financial statements. FOF ¶ 225. Indeed,

even the Division's accounting expert, Henning, did not conclude that any fair value figure reported in a Zohars' financial statements was inaccurate, materially or otherwise.  FOF ¶ 227.

Respondents' estimation of Collateral Debt Obligations' fair value as approximately equal to their carrying value complied with GAAP.  FOF ¶ 226.  Respondents' expert witness, Lundelius, found that Patriarch regularly prepared valuation analyses, which is "what the guidelines require.  The guidelines then suggest that you use methods such as some multiple of earnings.  That's exactly what Patriarch did . . .  [a]nd Patriarch was following the guidelines almost to the letter."  Tr. 3161:25-3162:8 (Lundelius).  Contrary to the OIP's insinuation that Patriarch blindly followed "[Ms.] Tilton's direction" to "carr[y] these assets at cost unless and until Tilton decided to stop supporting the relevant Portfolio Company," OIP ¶ 72, Mercado, Patriarch's Controller, testified that "the accounting and finance group consulted with Ms. Tilton.  And based upon [their] understanding of GAAP rules and based upon the asset class[] being . . . all distressed assets and . . . subject to highly subjective assumptions, . . . [they] determine[d] that cost was the most effective way of determining the aggregate value of the assets on the balance sheet," Tr. 1181:5-16 (Mercado).  As such, Respondents' CPA witnesses, Lundelius and Mercado, both testified that "that Patriarch was presenting fair value in accordance with GAAP."  Tr. 3311:9-12 (Lundelius); *see* Tr. 1181:17-20 (Mercado) ("Q. So you're telling this court that a current valuation technique of cost is compliant with GAAP in your opinion?  A. Yes.").  Moreover, each statement that forms the basis of the Division's charges is "a statement of opinion," which, because it was sincerely held, "is not an untrue statement of material fact" regardless whether it is correct or incorrect, *Omnicare, Inc. v.*

*Laborers Dist. Council Constr. Indus.*, 135 S. Ct. 1318, 1327 (2015), and therefore cannot give rise to liability.[56]

### 2.    Respondents' Loan Impairment Policies And Practices Complied With GAAP.

The Zohar financial statements disclosed that an impairment loss would be recorded "[i]n the event . . . that the anticipated future collections are determined to be less than the carrying value of the loan." *See, e.g.*, RX 28.022 (Zohar I Financial Statements) at 5; *see also* FOF ¶ 229. The OIP alleges this disclosure was misleading because Patriarch did "not conduct an impairment analysis that complies with GAAP" and had "no procedures in place to analyze future collections." OIP ¶¶ 66-67. This allegation, too, is false. As Respondents established at trial, Patriarch regularly analyzed the performance and future prospects of the Portfolio Companies through "credit templates" that applied a discounted cash flow analysis to estimate the value of future collections. FOF ¶ 232. Ms. Tilton and her team used the credit templates to make decisions regarding Portfolio Companies, including decisions to restructure or liquidate an asset. FOF ¶ 233; *see also* Tr. 2279:4-6 (Tilton). Patriarch would then conduct an "event-driven" impairment analysis to determine whether to write off a loan upon the occurrence of events, such as bankruptcies, restructurings, and liquidations. *See* Tr. 1959:21-1960:2 (Tilton). As with the valuation models, Respondents introduced an example of these credit templates at

---

[56] Because "[a]pplying GAAP often involves subjective determinations," *Owens*, 789 F.3d at 543, courts have held statements regarding GAAP compliance non-actionable under the securities laws absent proof that the person issuing the statement "did not actually believe" the statement when made, *City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 129 F. Supp. 3d 48, 73 (S.D.N.Y. 2015). Respondents' GAAP certifications provided opinions as to inherently subjective matters, and the Division has not undermined the sincerity of Respondents' belief in that accuracy. Similarly, the evidence shows that Respondents' purported misrepresentations regarding categorization involved their sincere belief in the appropriateness of their discretionary exercise of good faith business judgment to amend the terms of the loans under the Indentures.

trial, *see* RX 561 (ALF Credit Template), which put the lie to the Division's claim that Patriarch had "no procedures in place to analyze future collections," OIP ¶ 67.  Again, in its rush to judgment, the Division failed to confirm the veracity of the allegations that formed the basis of its charges.

The Division's expert, Henning, conceded that he ignored the credit templates used by Patriarch's credit team when he concluded Patriarch did not conduct an impairment analysis. *See* Tr. 1429:14-1430:8 (Henning); FOF ¶ 240.  Lundelius, who had no difficulty understanding the importance of the credit templates in Patriarch's impairment analyses, testified that "it seemed like the only evidence [Henning] would consider is something that says 'impairment calculation' or 'impairment process' at the top of the page," and Lundelius could not "understand why [Henning] was coming to [the] conclusion" that there was no evidence of an impairment analysis.  Tr. 3247:8-17 (Lundelius).  In fact, as detailed in Dietrich's report, and explained by Lundelius, Patriarch analyzed loan impairment.  *See* FOF ¶ 236; RX 22 (Dietrich Rep.) at ¶¶ 39-42; Tr. 3256:22-3258:19 (Lundelius).  Lundelius "found . . . contemporaneous evidence that . . . showed the enterprise value was being assessed at least annually if not more frequently.  And that given enterprise values, significantly above the loan levels, that an impairment analysis was, in fact, being done."  Tr. 3199:24-3200:5 (Lundelius).

The Division also falsely alleged that "Patriarch does not write down loans for impairment purposes but, instead, writes them off if and when Tilton determines that she will no longer support a Portfolio Company."  OIP ¶ 64.  The slender reed on which the Division bases the entirety of this allegation is a single email, in which Ms. Tilton stated, "we do not write up or write down—we write off," DX 162 (Aug. 13, 2010 email from Ms. Tilton to Mercado) at PP2_00580148, and claimed that this showed "[Ms.] Tilton explicitly directed that loan values

were not to be written down," Div. Prehearing Br. 21.  The Division, however, "read[s] [too] much into an email string . . . . [when] there was actual evidence of both actual write-downs and write-offs."  Tr. 3248:25-3249:5 (Lundelius); *see also* Tr. 1263:16-23 (Mercado) ("Q. Did you take Ms. Tilton's email [DX 162], the one about write off and write down, to mean that we wait, we don't record the . . . loss until we write off the whole amount of the . . . loan?  A. No. Q. And, in fact, you recognize the loss upon the event of restructuring; is that right?  A. That's correct.").

The evidence adduced at trial established that under its impairment policy, Patriarch both wrote down loans when underperforming assets needed to be restructured and wrote off loans upon liquidation.  FOF ¶ 235.  Respondents introduced a sample workpaper (a spreadsheet employed to populate the financial statements) from the Division's exhibit list to showcase how easy it was to see what Patriarch's write-down practices were.  *See* Tr. 1258:3-4 (Mercado) (addressing DX 57 (Sept. 7, 2011 Zohar III Workpapers)).  Each workpaper contains a "payoffs" tab, which "reflects quarter by quarter any gains and losses . . . on the income statement since the inception of the fund."  Tr. 1258:20-1259:1 (Mercado).  During his testimony, Mercado highlighted examples on the payoffs tab where Patriarch restructured a loan and wrote down "the amount that is not included in the restructure."  Tr. 1259:5-1262:3 (Mercado).  Berlant testified during cross-examination that he reviewed the workpapers each month and that he was aware the payoffs tab showed "that losses were reported when restructurings occurred."  Tr. 1027:15-17 (Berlant).  The Division tellingly failed to ask a single witness about the contents of the payoffs tab, including their own witness Berlant.  Much like the valuation models and credit templates, the Division either failed to understand the information on the payoffs tab, or simply elected to ignore any evidence that directly undermined its allegation.

In any event, Respondents' process of regularly reviewing the loan portfolio and impairing assets upon the occurrence of certain events complied with GAAP. FOF ¶¶ 236-39. Analyzing future collections is "what GAAP requires you to do. And that's what [Patriarch's] policy requires you to do, future anticipated collections." Tr. 3181:15-17 (Lundelius); *see also* FOF ¶ 236. Lundelius found Patriarch "look[ed] to the future and look[ed] at what [a portfolio] company will be worth, and then assess[ed] whether or not at that point in time it will have enough value to pay all of its debts." Tr. 3181:18-21 (Lundelius). This approach to impairment complied with GAAP, because "what you're looking for is just enough [enterprise value] to cover the debt. That's all that GAAP would require, and that's all that the investors in the Zohar funds would need." Tr. 3183:22-25 (Lundelius). Lundelius testified that as such, he "did not find that there was . . . anything incorrect in terms of the application to GAAP for the financial statements for loan impairment." Tr. 3304:25-3305:3 (Lundelius). In addition, during cross-examination, Mercado remained firm in his conviction that Patriarch's impairment process complied with GAAP. Tr. 1118:6-8 (Mercado) ("Q. As a CPA here in the state of New York, can you tell the judge, is that [impairment policy] GAAP compliant? A. I believe it is, yes.").

The Division's expert, Henning, was neither reliable nor persuasive in his opinions about GAAP compliance.[57] He simply ignored Respondents' processes and corresponding disclosures, and then asserted that no analysis was done. Nor did Henning show that the financial statements were false or misleading; he simply testified that he preferred a different process (based on the

---

[57] Although Your Honor declined to exclude Henning's testimony on the basis of Respondents' motions *in limine* and objections, all of the reasons why Henning should have been excluded are also reasons why Your Honor should assign no weight to his testimony. *See Lynn Tilton*, Admin. Proc. Rulings Release No. 4245, at 4 (ALJ Oct. 12, 2016) (noting that "Respondents may argue against [the] weight" of admitted evidence); Tr. 396:22-397:1 (Div.) (arguing against an evidentiary objection on that ground that it "goes to the weight").

same flawed misperception of the Zohars' business model that underlies the allegations regarding loan categorization). Consequently, the Division did not carry its burden to prove the "disclosures in the financial statements . . . falsely indicate that Respondents assess and consider impairment issues and the fair value of the Funds' loan assets." OIP ¶ 8.

### 3. Patriarch Recorded Accrued Interest In Accordance With GAAP.

With its case unravelling, the Division sought to change its case by advancing a previously undisclosed theory that appears nowhere in the OIP—that Patriarch had incorrectly recorded "accrued interest" in its financial statements. The Division's new, uncharged allegation is not only without merit, but also it violates the bedrock principle that the Division cannot pursue at trial any alleged wrongdoing that was not charged in the OIP.

An ALJ "may only admit 'new matters of fact or law that are within the scope of the original order instituting proceedings.'" *Pierce v. SEC*, 786 F.3d 1027, 1036 (D.C. Cir. 2015), *cert. denied*, 136 S.Ct. 1713 (2016) (citation omitted). Facts that are "wholly outside the framework of the order for proceedings," such as those pertaining to accrued interest, have no place in the record. *Int'l S'holders Servs. Corp.*, Exchange Act Release No. 12389A, 1976 WL 182458, at *4 n.19 (June 8, 1976); *see also Brandt, Kelly & Simmons, LLC*, 2005 WL 1584978, at *7 (rejecting Division's evidence that respondent distributed funds according to inappropriate criteria because the allegations in the OIP concerned misappropriation of separate funds). The Division was well aware of Respondents' interest accrual procedures prior to filing the OIP and chose not to include allegations related to that issue. As the Commission has recognized: "If the staff thought that it had a case in these areas, it should have touched on them in its pleading. Or, having failed to do so the first time around, it should have amended that pleading to raise [the issues that were not alleged]." *Int'l S'holders Servs. Corp.*, 1976 WL 182458, at *4 n.19.

In any event, Respondents' treatment of accrued interest complied with GAAP, as the unrebutted testimony confirmed.  According to the Division's newly-invented theory, the Zohars should have recorded all unpaid interest as an asset—even if it was not likely to be collected in that reporting period—and then taken an allowance against that asset in the same amount.  But Respondents recorded as accrued interest on the Zohar financial statements only the unpaid interest that the Zohars reasonably expected to collect from the Portfolio Companies.  FOF ¶ 241.  "Rather than inflat[ing] . . . revenue," Respondents' internal accountants believed that "it was a more accurate description and more meaningful number to show the investors what [they could] expect to collect as opposed to grossing up the revenue number by this huge amount of interest that [they] did not expect to collect."  Tr. 1189:2-8 (Mercado).  Respondents also recorded a percentage allowance, or "haircut," to account for the fact that there was some uncertainty surrounding the possibility of collecting all of the interest that it otherwise reasonably expected to collect from the Portfolio Companies.  FOF ¶¶ 241-42.

Respondents' policy of recording only the accrued interest that the Zohars reasonably expected to collect from the Portfolio Companies, and taking a haircut from that number, was consistent with GAAP.  FOF ¶ 243.  Lundelius confirmed this point, explaining that "if there is a point where you cannot make a reasonable estimate of what is uncollectible, then you can't go over and accrue the income related to it as well."  Tr. 3163:6-7, 3296:4-8.  In fact, it would have been inconsistent with GAAP, and "misleading" to record interest that the Zohars were owed by the Portfolio Companies, but that Respondents did not reasonably expect to collect.  FOF ¶ 244; *see also* Tr. 1222:21-25 (Mercado) ("Q. And would it be wrong under GAAP to accrue for interest that Patriarch does not expect to receive in that quarter?  A. It would be misleading to

reflect an amount that you don't expect to collect.").[58]   The Division never even asked its own

expert to opine that the accounting was incorrect.   In the face of the unrebutted evidence, the

Division's arguments regarding Respondents' reporting of accrued interest are not only outside

the scope of the OIP, they are in no way relevant or supportive of the allegation that Respondents

were attempting to hide non-payment of interest.

> **B.     Respondents Relied On The Advice Of External And Internal Accountants In Preparing The Financial Statements, Which Were The Product Of A Reasonable, Good Faith Accounting Process.**

The evidence adduced at trial showed that Respondents established a reasonable, good

faith accounting process, with the input and advice of both internal and external accountants.   It

further showed that Respondents carried out that process month after month and year after year,

and relied in good faith on internal and external accountants to review the financial statements

and ensure they complied with GAAP.

To show good faith reliance on the advice of a professional, a defendant "should show

that [she] [1] made a complete disclosure, [2] sought the advice as to the appropriateness of the

challenged conduct, [3] received advice that the conduct was appropriate, and [4] relied on that

advice in good faith."   *SEC v. Goldsworthy*, 2008 WL 8901272, at *4 (D. Mass. June 11, 2008);

*see also United States v. Boyle*, 469 U.S. 241, 251 (1985) (reliance on a professional's advice is

reasonable when the advice falls within the professional's area of expertise).   This is a complete

defense that defeats both intent and negligence-based charges.   *See, e.g.*, *Addington v. Comm'r of*

---

[58]   Contrary to the Division's insinuations, Respondents did not change their interest accrual policy in March 2010.   Rather, they modified the interest accrual methodology so that the financial statements would continue to reflect only the interest that the Zohars reasonably expected to collect, based upon the status of restructurings and amendments in process with the Portfolio Companies.   FOF ¶ 245.

*Internal Revenue*, 205 F.3d 54, 58 (2d Cir. 2000) ("Good faith reliance on professional advice is a defense to negligence penalties.").[59]  That standard was more than satisfied here.  *See* COL ¶¶ 89-91.

##### 1.    Respondents Hired Berlant At The Inception Of The Business, Relying On Him To Provide Accounting Guidance, Create Respondents' Financial Statements, And Develop A Manual of GAAP-Compliant Accounting Policies.

Respondents hired Anchin, a prominent national accounting firm, "right after [Patriarch closed its] first deal," "to help [Patriarch] formulate what the financial statements . . . would look like; the basis for the accounting; the notes to the financial statements; and to make certain that [Respondents] were following the terms of the [I]ndenture and issuing financial statements that were in accordance with GAAP."  Tr. 1954:25, 2135:8-14 (Tilton); *see also* FOF ¶¶ 247-49. Respondents "trusted in Anchin" and worked with Anchin for the next 15 years, paying the firm more than $17 million for its professional services.  Tr. 1954:24-1955:1, 1958:4-5 (Tilton). Patriarch's relationship partner at Anchin from the inception of the relationship, Berlant, was a highly qualified accountant.  Berlant is "one of the senior leaders" of Anchin's fund accounting practice, "supervis[ing] 40 professionals" and serving on the governing council of the American Institute of Certified Public Accountants.  Tr. 909:18-916:8 (Berlant); *see also* FOF ¶ 248.  And Anchin itself is designated in the Indentures as a "firm of Independent or certified public accountants of recognized national reputation."  *See, e.g.*, Indenture § 1.1.

---

[59]  Respondents asserted reliance on advice of experts as an affirmative defense.  *See* Answer 11 (Apr. 22, 2015).  The Commission, in its revisions to the Rules of Practice, acknowledged that this is an available and appropriate affirmative defense.  *See* Final Rule, Amendments to the Commission's Rules of Practice, 81 Fed. Reg. 50,212, 50,220 (July 29, 2016) (to be codified at 17 C.F.R. Pt. 201) (specifically referencing "the advice of . . . accountants"); *see also id.* at 50,234.

Berlant "was involved from the inception of [Patriarch's] business. . . . [H]e and his tax partners put together the manual and the process that [Patriarch] would follow" for the next 15 years. Tr. 1956:5-8 (Tilton); *see also* FOF ¶ 249. Berlant helped develop the form and content of Patriarch's fund financial statements and "taught [Patriarch] how to do the accounting" for its distressed "asset class in accordance with GAAP." Tr. 2137:16-2138:3 (Tilton). Berlant revised the fair value and impairment notes in the first financial statements issued by Patriarch and drafted the impairment policy disclosure at issue in this litigation. FOF ¶ 250. The impairment language included in the first Patriarch financial statements by Berlant remained in place "for the next 14 years." Tr. 957:2-7 (Berlant); *compare* RX 1740.001 (Aug. 30, 2001 Ark I Financial Statements) at 5 *with* RX 28.022 (Nov. 6, 2008 Zohar I Financial Statements) at 5.

Anchin also worked with Patriarch to develop a manual of accounting policies, which included advice from Berlant on how to conduct GAAP-compliant impairment analyses. FOF ¶ 251. Patriarch employed no internal CPAs and "had no [external] accountants" other than Anchin at the time the template and policies were created. Tr. 956:10-12 (Berlant); *see also* FOF ¶ 253. As Ms. Tilton testified, Patriarch followed the accounting advice provided in the policy manual, including as to impairment. Tr. 2147:12-18 (Tilton); *see also* FOF ¶ 252.[60]

---

[60]  *Compare* RX 1766.001 (Oct. 10, 2001 Ark CLO 2000-1 Ltd. Accounting/Tax Manual) at 63 ("If the modification [to the terms of a loan] results in a material diminution of anticipated collections versus Loan Carrying Value, this situation may call for an Impairment Charge. However, since most of the modifications will be engineered to enhance the borrower's ability to service its debt, we expect that a modification will rarely, if ever, necessitate an Impairment Charge.") *with* Tr. 2146:2-12 (Tilton) ("That is . . . the advice that was given to us on when you impair; when there is an event and an estimated principal loss that you can see based on the restructure or the bankruptcy. And that estimated principal amount would then be written off or written down . . . at that time of that event. That's where we get, 'Don't write up, don't write down, write off.'").

2.    **Ms. Tilton Relied On Berlant To Provide Guidance On GAAP And Other Substantive Accounting Issues, And To Review And Approve The Zohars' Financial Statements.**

Berlant was deeply involved in Respondents' business throughout the years. Respondents regularly sought and received GAAP guidance and accounting advice from him. Berlant served on Patriarch's "deal team in connection with the creation of Zohar I," where Respondents relied on him to review and comment on drafts of the Zohar I Indenture, CMA, and CAA.  FOF ¶ 254; Tr. 2136:12-14 (Tilton) (Berlant "and the Anchin firm had guided [Patriarch] on [its] financial and tax accounting, and what [Patriarch] had to put together for [its] first reporting period.").  After the Zohar I deal closed, Respondents relied on Berlant to review the first Zohar financial statements and workpapers, which were based on the Ark financial statements formulated by Berlant in 2001.  FOF ¶ 255.

Every month for many years, the financial statements for all three Zohar Funds were prepared by Respondents' internal accountants, utilizing information provided by the Trustee, and were reviewed and approved by Berlant.  FOF ¶¶ 255-56, 264-67.  The trial evidence established the pattern.  In accordance with Patriarch's accounting manuals, the F&A Department was responsible for preparing the certificate to be "signed by Ms. Lynn Tilton," as well as the "consolidated balance sheet" and "consolidated income statement" for each period, which were to be "prepared in each case in accordance with U.S. generally accepted accounting principles and certified by the Issuer as presenting fairly, in all material respects, the financial position of the Issuer and its consolidated subsidiaries."  DX 127 (Zohar I Patriarch Fund Accounting Manual) at PP122679; *see also* FOF ¶ 264.  The accounting manuals specifically instructed that "Workpapers and Financial Statements are first sent to Peter Berlant at Anchin Block & Anchin (ABA) for comments."  DX 127 at 122680; *see also* Tr. 1292:10-15 (Mercado) ("When we submit the financial statements to [Anchin] on a monthly basis, they provide a

review of the financial statements.  And our expectation is that they would provide any guidance with respect to accounting issues that they feel need to be addressed in the financial statements.").  Respondents also provided Berlant with all of the relevant data relating to the financial statements.  FOF ¶ 256.  Berlant was "very familiar with the work papers and how they flowed," as he "ha[d] been reviewing them since the inception of every fund."  Tr. 1126:17-20 (Mercado); *see also* Tr. 1027:4-5 (Berlant) ("I regularly received the work papers and I read the financial statements.").  Only after Patriarch's F&A Department incorporated Berlant's comments were the papers submitted to Ms. Tilton for approval.  DX 127 at PP122680.

Ms. Tilton, who is not a CPA, FOF ¶ 263, reasonably relied on her internal and external accountants to review the financial statements and ensure they complied with GAAP.  FOF ¶¶ 264-69; *see also* Tr. 1144:10-13 (Mercado) ("Q. Did you take any steps, Mr. Mercado, to ensure the financial statements were prepared in accordance with US GAAP?  A.  Yes, that's part of my responsibility."); Tr. 1955:5-17 (Tilton) ("I would believe that if [Anchin] didn't think that these financial statements were in accordance with GAAP, then they would have advised me").  Indeed, Respondents introduced at least 25 emails, many of which were addressed to or copied Berlant himself, into evidence showing that, over a period of years, Ms. Tilton was repeatedly informed that Berlant "reviewed and approved," "signed off" on, or "blessed" the Zohar financial statements.  RX 1768 (compilation of 19 emails between Patriarch's F&A Department and Ms. Tilton); *see also* FOF ¶¶ 266-67.

Berlant affirmatively told Patriarch that he "approv[ed]" the financial statements, and never "corrected" Patriarch's stated understanding that he was reviewing and approving the financial statements. FOF ¶ 267; *see, e.g.*, RX 1761 (Oct. 13, 2008 emails between Richard Buckley and Berlant) at 1-2 (Buckley asking Berlant, "does that constitute an approval from you

on the overall financial statements?" Berlant replies to Buckley, "As long as the few changes were made . . . the answer is yes."); Tr. 979:19-22 (Berlant) ("Q. And that line, where she asks you to review it, you don't write back and say, Kim, I'm not doing the kind of review you're talking about.  A. That's correct.").

The evidence also showed that Ms. Tilton would not sign the financial statements unless and until Berlant had reviewed and approved them.  FOF ¶ 268; *see also* Tr. 1074:12-16 (Berlant) ("Q. And what needs to happen before the financials go to the trustee, to the best of your knowledge?  A. I read them, I comment on them.  Then whomever at Patriarch goes through their process, ultimately to Lynn, who then goes through her process before signing."); Tr. 1292:5-7 (Mercado) ("Q. And has Ms. Tilton ever signed that officer certificate without Mr. Berlant's review?  A. Not to my knowledge.").  Ms. Tilton testified, "I don't believe I ever agreed to sign without his approval," because "I'm not a CPA.  I wasn't building the financial statements myself.  I expected Peter [Berlant] and his expertise, along with my people, to make certain that when I sign this, that it was in accordance with my responsibilities and my standard of care."  Tr. 2269:18-2270:2.  To Ms. Tilton, Berlant's review "was that extra layer that I expected after my people had done their work to make certain that everything was as it should be before I affixed my signature."  Tr. 2270:3-6. [61]

Berlant routinely provided GAAP advice to Respondents on other issues, such as the interpretation of accounting standards promulgated by the Financial Accounting Standards Board

---

[61]  In addition, Ms. Tilton's longstanding personal relationship with Berlant gave her every indication that he was worthy of trust and confidence.  FOF ¶ 272.  For example, Berlant was an advisor to Ms. Tilton on the establishment of a trust for her daughter, meeting one-on-one with Ms. Tilton's daughter and telling Ms. Tilton that he "truly care[d]" for Ms. Tilton's family.  1036:18-1038:22.  Berlant was also Ms. Tilton's expert witness in a malpractice suit against her prior accountant.  Tr. 1033:14-1034:7 (Berlant).

("FASB"). FOF ¶ 257; *see also, e.g.*, RX 60 (Feb. 16, 2009 email from Berlant to Chris Denune) (addressing FAS 157 and FIN 48); RX 64 (Nov. 17, 2009 email chain between Berlant and Chris Denune) (addressing FAS 165); RX 1256 (Feb. 28. 2006 email from Kimberly Sturkey to Ms. Tilton) (addressing FAS 150). When Berlant proposed "[a]dditional language [be] added to the [financial statement] fair value disclosures . . . pursuant to FAS 157," RX 61 (Feb. 16, 2009 email from Chris Denune to Ms. Tilton), Respondents relied on his advice in good faith and added the language, *see* Tr. 1296:11-12 (Mercado) ("Q. And did Patriarch rely on his advice? A. Yes, we did."); Tr. 2491:2-4 (Tilton) ("Q. Did you follow the advice that Mr. Berlant gave on this point? A. Yes."). Respondents also sought and received accounting advice from Berlant on GAAP issues relevant to the Zohar financial statements, including interest accruals, carrying value, tax, and accounting for preferred stock conversion. FOF ¶¶ 258-60; *see also, e.g.*, RX 1260 (Dec. 15, 2008 email from Chris Denune to Berlant); RX 1263 (Dec. 14, 2009 email from Mercado to Berlant) (addressing carrying value); RX 1271 (May 13, 2002 email from Berlant to Ms. Tilton); RX 1741 (Jan. 23, 2004 email from Kimberly Sturkey to Berlant, copying Ms. Tilton) (addressing tax); RX 1776 (Mar. 15, 2010 email chain between Berlant and Mercado) (addressing interest accruals); RX 1777 (Mar. 31, 2010 email chain between Chris Denune and Berlant, copying Mercado) (addressing preferred stock conversion).

The Division attempted to question Respondents' reliance on Berlant, pointing to a single paragraph of standard disclaimer language in a 2007 engagement letter between Berlant and Ms. Tilton. That document was signed six years into the relationship—six years after the inception of the relationship and for which time the Division produced no engagement letter—where course of performance was already well-established; it stated that Anchin would "take no responsibility regarding the accuracy or completeness of such statements, computation or data or

whether such statement or data comply with generally accepted accounting principles." Div. Prehearing Br. 20 n.16 (quoting DX 34 (July 1, 2007 Engagement Letter) at ABA-000009). It is ludicrous to claim that standard disclaimer language in an engagement letter signed years after the inception of the parties' relationship means that Respondents could not reasonably rely on the GAAP advice embodied in the very financial statements that Berlant has created and reviewed for years. The Division's attack also conveniently ignored the very next paragraph of the letter, which states that Anchin "shall provide such Business and Finance Advice as [Patriarch] may specifically request," and that "[s]uch advice may include . . . advice relating to the interpretation of accounting issues." DX 34 at ABA-000010. The course of conduct that existed before, during, and after the time this engagement letter was signed, whereby Berlant repeatedly reviewed and approved the Zohar financial statements and provided GAAP guidance and substantive accounting advice to Respondents, is consistent with the latter paragraph and was likewise ignored by the Division. *See* FOF ¶ 270.

All these facts provide the clearest possible evidence that Ms. Tilton and the other Respondents did rely on Berlant, and over the course of a 15-year close relationship, had every reason to do so. *SEC v. Jensen* confirms that this evidence of Ms. Tilton's reliance on professional advice precludes a finding of negligence. 2013 WL 6499699 (C.D. Cal. Dec. 10, 2013), *vacated on other grounds*, 2016 WL 4537377 (9th Cir. Aug. 31, 2016). In that case, the Division brought several federal securities claims, including under Sections 17(a)(2) and (3), which include negligence standards. *Id.* at *27-29. The Division argued that "scienter [was] present because Defendants recognized revenue in ways that were either in contravention of GAAP and/or misleading . . . ." *Id.* at *28. The court found that:

> Defendants did not act negligently. They had in place several levels of internal and external review, and thoroughly vetted all the transactions at issue in this case

before deciding to record revenue on those transactions.  The evidence shows that
[the CFO] personally worked diligently on ensuring that he got the accounting right.
This included his reasonable reliance on the advice of the numerous professionals
working both inside and outside [the company].

*Id*. at *29.[62]  The same is true here.

### 3.    The Division Failed To Rebut Respondents' Advice-Of-Experts Defense.

The Division failed to introduce any credible evidence to rebut Respondents' advice-of-

experts defense.  Berlant falsely testified that for 15 years he had only a "very administerial"

role, reviewed the financial statements only for "silly mistakes" and "clerical errors," and

charged Patriarch $600 per hour to serve merely as an "expensive clerk."  Tr. 775:23, 759:20-21,

849:18, 935:6-14 (Berlant); *see also* FOF ¶ 261.  He also claimed that he did not know

Patriarch's accounting policies (which he had helped draft), never considered the purpose of the

financial statements or whether they complied with GAAP, did not know the financial statements

were sent to Noteholders, did not even know why the financial statements were generated at all,

and proposed language for inclusion in financial statements without "satisfy[ing] [himself] that

[the] statement was true."  Tr. 893:24-894:3, 936:5-10, 937:22-24, 1005:13-19, 1081:12-22.  The

contemporaneous documentary evidence proved the falsity of that testimony.  *See, e.g.*, FOF

¶¶ 257-60; 266-67.  Berlant in fact regularly provided substantive GAAP and accounting advice,

and he had extensive and longstanding involvement in Patriarch's accounting practices.[63]  If the

---

[62]   Other cases have reached the same result on facts similar to those established here at trial.
*See, e.g.*, *In re Digi Int'l, Inc., Sec. Litig.*, 14 F. App'x 714, 717 (8th Cir. 2001) ("no reasonable
jury could find the necessary element of scienter even if the accounting treatment was improper"
in light of advice given by defendants' independent accountant and lawyers).

[63]   Berlant also falsely testified that it "did not cross [his] mind" that he could be a target of the
SEC, even though he brought three attorneys when he testified before the SEC in 2014, and
conceded that Anchin had notified its malpractice carrier about the SEC investigation.  FOF
¶ 271.

stakes were not so high for Respondents, Berlant's transparently false testimony would be laughable.

### C.    The Division Did Not Satisfy Its Burden Of Proving Scienter Or Negligence With Respect To The Zohar Financial Statements.

Even if Respondents had not established reasonable reliance on the advice of professionals, the Division did not satisfy its own burden of proving scienter (or even negligence).  *See* COL ¶¶ 81-83.  The Division's claim that Ms. Tilton "certified the financial statements, knowing that she applied her own standards for impairment without regard to standards prescribed by U.S. GAAP," Div. Prehearing Br. 32, was roundly refuted at trial.  Ms. Tilton consistently and credibly testified that Respondents "believed that these [financial statements] were [prepared] in accordance with GAAP" and "still believe they're in accordance with GAAP."  Tr. 2737:24-2738:1 (Tilton); *see* FOF ¶¶ 273-76.  Mercado also testified that the financial statements prepared by his F&A Department complied with GAAP.  FOF ¶ 274; *see* Tr. 1356:17-18 (Mercado) ("Q. In your opinion, they do comply with GAAP?  A. That's correct.").  And the Division failed to introduce any evidence that *any* Patriarch employee or advisor did not believe that the financial statements complied with GAAP, or was in any way negligent as to the preparation of the financial statements.

This should come as no surprise, because Respondents reasonably relied on their external accountants at Anchin to provide GAAP guidance and to review and approve the financial statements on a monthly basis for over 15 years.  *See supra* Pt. II.B.  Respondents' trust and confidence in their external accountants is rooted in their deep and longstanding relationship with Anchin and Berlant.  It was eminently reasonable for Ms. Tilton to "certainly expect[] that [Anchin] would guide [her] properly, as they did at the beginning along the way, if anything changed."  Tr. 1956:23-25 (Tilton).

In an improper "gotcha" gambit, the Division alleged that Patriarch's removal of certain GAAP-related language from the Zohar financial statements in early 2015 was an admission that the statements had not been prepared in accordance with GAAP.  Div. Prehearing Br. 22.  The Division, however, omitted the crucial context in which these changes to the financial statements were made:  As Ms. Tilton testified, Patriarch removed the financial statements' references to GAAP in 2015 "out of respect" for the SEC, in response to the SEC's suggestion that it would like her to do so.  FOF ¶ 276.  Respondents, however, "didn't change how [they prepared] the financial statements.  [Respondents] believed that [they] had done them correctly, and that they actually gave the most accurate performance of the fund.  [They] still believed they were in accordance with GAAP."  Tr. 2597:22-2598:2 (Tilton).

The Division promised that its expert, Henning, would "explain at the hearing, the fact that the financial disclosures eliminated these references to U.S. GAAP compliance . . . is an acknowledgement by the Respondents that the prior reporting departed from U.S. GAAP."  Div. Prehearing Br. 22.  During cross-examination, though, Henning conceded that his conclusion that the financial statement modifications were an admission of error was not an accounting-based opinion but, rather, based on his own purported "belief as to what the change represents."  Tr. 1393:9-10 (Henning); *see also* FOF ¶¶ 304-05.  Moreover, as he acknowledged, Henning's "belief" was dependent on the Division's failure to apprise him of the relevant facts:  He testified that he was never made "aware of the fact that in December 2014 . . . the Enforcement staff said that, in their view, the current form of the financial statements constituted ongoing violations, and . . . needed to be addressed if the matter could ever be resolved."  Tr. 1426:20-1427:8 (Henning).  With Henning's "expert" opinion on the modifications to the financial statements completely discredited, the Division was unable to proffer any evidence of scienter.  A

company's good faith efforts to appease a regulator are generally called cooperation; here, the Division seeks to miscast such good faith efforts as scienter. This is simply wrong, and should not be countenanced.

### D. The Challenged Certifications Were Immaterial To Noteholders.

Even if the financial statements did not comply with GAAP (they do), and even if there were no advice-of-experts defense (there is), the financial statements charge should be dismissed for the independent reason that the Division failed to carry its burden of demonstrating the materiality of the challenged certifications. *See* COL ¶¶ 84-88. "In assessing the magnitude of alleged GAAP violations, one needs to look to see if the violations were 'minor or technical in nature' or 'material in light of the company's overall financial condition.'" *In re Atlas Mining Co. Sec. Litig.*, 670 F. Supp. 2d 1128, 1141 (D. Idaho 2009) (magistrate judge's order adopted by the district court) (quoting *In re Dauo Sys.*, 411 F.3d 1006, 1017-18 (9th Cir. 2005)); *see also Brandt, Kelly & Simmons, LLC*, 2005 WL 1584978, at *8 (Division bears burden of proving materiality). Here, the purported GAAP violations were technical in nature and did not change the total mix of information available to Noteholders, as the Division's Noteholder witnesses themselves testified.

The financial statements were immaterial as a whole. The evidence established that Noteholders looked at the Trustee Reports, not the financial statements, to evaluate the performance of the Zohars. Noteholder witness Aldama agreed that he "had never once looked at the financial statements" and "had never discussed [them] with anyone" in the years prior to his investigative testimony. Tr. 1547:15-25 (Aldama); *see also* FOF ¶ 278. And Ms. Tilton testified without contradiction that she "never got one question by anyone over 15 years on these financial statements . . . not the trustee, not the Rating Agency, not the noteholders." Tr. 1981:2-8 (Tilton); *see also* FOF ¶ 279. The financial statements were simply not important sources of

information in light of the Trustee Reports, which contained significantly more detailed information.[64]

Nor did the Division introduce any evidence that the specific GAAP certifications and notes at issue were material. To the contrary, Noteholder witness Aniloff, for example, agreed that "the representations that financial statements were GAAP compliant were not important" to him. Tr. 375:9-12; *see also* FOF ¶ 278. It is thus unsurprising that neither Aniloff, nor any other Noteholders (nor the Rating Agencies, nor the Trustee) asked any questions or raised any objections when, in a show of respect for the SEC, Respondents removed the GAAP certifications from their financial statements. Tr. 2598:6-18 (Tilton); FOF ¶ 279. None of the Noteholders altered their behavior in response to the presence or absence of a GAAP certification in the financial statements, nor did any Noteholder testify that it would have made different investment decisions had there been no GAAP certifications all along.

Although two of the Division's three Noteholder witnesses acknowledged that the financial disclosures, and the GAAP certifications within them, were not important in light of the more detailed Trustee Reports, the Division did manage to find one Noteholder, Mach, who claimed to have held a different view. Tr. 618:3-621:9. But Mach's testimony was absurd and hardly a reliable indicator of whether the "reasonable investor" would have found the alleged GAAP improprieties altered the "'total mix' of information available to investors." *Stein*, 1999

---

[64] The Indentures set forth dozens of detailed categories of information that were required to be, and were, included in the Trustee Reports. *See, e.g.*, Indenture § 10.13(a) & (b) (detailing 90 specific required categories); FOF ¶ 277. Yet the Indentures included *no* specific requirements on the contents of the financial statements or even a requirement that the financial statements be audited. Trustee Reports, as a result, were approximately 50 pages long, with voluminous data on every page, and they were released both monthly and quarterly. In contrast, the financial statements contained two pages of information (a one-page balance sheet and a one-page income statement), plus a certification and notes. *See* FOF ¶ 277.

WL 756083, at *11 (quoting *Basic Inc.*, 485 U.S. at 231-32).  Mach admitted to having never

even bothered to look at the interest payment cash flows in the Trustee Reports—the disclosures

that were key to following the progress of the investments—and instead supposedly preferred to

rely on the far less detailed information in the financial statements and his own understanding of

GAAP.  *See, e.g.*, Tr. 618:3-621:9, 692:02-693:01 (Mach).  Mach's self-interested testimony was

entirely unreasonable and does not support any inference about relevant issues.  In short, the

Division failed to carry its burden of proving that the absence of GAAP-compliance certification,

or revisions to the impairment and fair value notes, would have made any difference in the

behavior of any Noteholder, given the information actually presented in the financial statements,

Trustee Reports, Indentures, and Noteholder communications.[65]

Finally, the Division failed to demonstrate that Ms. Tilton possessed the requisite scienter

as to materiality—in other words, that Ms. Tilton believed that Noteholders considered the

GAAP certifications important, or was at least grossly reckless as to whether Noteholders

considered them important.  *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan

Chase Co.*, 553 F. 3d 187, 202-203 (2d Cir. 2009); *Snyder*, 292 F. App'x at 399-400 (5th Cir.

2008) (citing *Fine*, 919 F.2d at 297).  Ms. Tilton, along with Mercado and Respondents' expert

Lundelius, not only believed and continue to believe in good faith that the financial statements

---

[65]  *See Vosgerichian v. Commodore Int'l*, 862 F. Supp. 1371, 1374, 1377 (E.D. Pa. 1994)
(dismissing fraud claims because reporting errors did not materially "alter the total mix of
information available" to investors where information regarding the relevant transactions was
generally disclosed in defendant company's financial statements) (internal quotation marks
omitted); *In re Atlas Mining Co. Sec. Litig.*, 670 F. Supp. 2d at 1131, 1133 (dismissing fraud
claims brought against auditor, where even though the financial statements at issue did not
comply with GAAP, "the violations [we]re not material").  The Division also cannot meet its
burden of proving materiality because it has "fail[ed] to quantify the financial impact of . . . the
alleged GAAP violations."  *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161
(C.D. Cal. 2007) (dismissing Exchange Act allegations arising from purported GAAP
violations).

comply with GAAP, but also that the Noteholders, who never once asked a question about the financial statements over the course of 15 years, did not deem the financial statements important in light of the total mix of information available to them. *See* Tr. 1981:2-8 (Tilton); Tr. 1356:14-18 (Mercado); FOF ¶¶ 226, 236, 273-76.

## III.    The Unconstitutionality Of These Proceedings And The Division's Litigation Misconduct Each Present Independent Reasons To Dismiss The Charges.

### A.    The Denial Of Respondents' Constitutional Rights Presents An Independent Basis To Dismiss.

Respondents have previously argued, and continue to assert, that this proceeding violates their constitutional rights in several critical respects. *See* COL ¶¶ 110-127; FOF ¶¶ 344-55.

- The SEC's internal administrative tribunals, including this one, are facially unconstitutional under the Appointments Clause of Article II of the U.S. Constitution.[66]

- This forum violates Respondents' due process rights by, *inter alia*, requiring enforcement cases to be tried to an initial decision in an unduly limited timeframe regardless of their complexity; insisting that the SEC need not specify salient factual allegations in the OIP; denying Respondents a meaningful opportunity to gather information from key witnesses; interpreting in overly narrow terms the Division's obligation to turn over exculpatory materials; approving the Division's improper use of experts to introduce legal conclusions; and admitting hearsay and other forms of unreliable evidence.[67] *See* FOF ¶¶ 302-03, 306, 327, 335, 344-55, App'x B.

- To the extent recent amendments to the Commission's Rules of Practice were not deemed applicable to Respondents in this proceeding, the Commission's failure to apply all of the amended Rules to Respondents and those similarly situated violates Respondents' equal protection rights.[68]

---

[66]    *See, e.g.*, Complaint for Declaratory and Injunctive Relief and Demand for Jury Trial, *Tilton v. SEC*, No. 15 Civ. 02472 (S.D.N.Y. Apr. 1, 2015); Pet. To Comm'n, *Tilton*, Admin. Proc. File No. 3-16462 (July 25, 2016); Complaint for Declaratory and Injunctive Relief and Demand for Jury Trial, *Tilton v. SEC*, No. 16 Civ. 07048 (S.D.N.Y. Sept. 9, 2016).

[67]    *See* sources cited *supra* n.66.

[68]    *See* sources cited *supra* n.66.

Numerous erroneous rulings in this particular proceeding manifest the lack of due process characteristic of this forum.  *See* COL ¶¶ 92-95, 113-24.  Respondents incorporate by reference and reiterate all of the written and oral motions they have made throughout this proceeding that have been denied in whole or in part.  These erroneous rulings, which are listed more fully in Appendix B, include:

- Admission of testimony elicited by the Division concerning the legal conclusions of its unqualified "experts."  App'x B at 4-6; FOF ¶¶ 302-03, 306, 327, 335.

- Admission of irrelevant testimony concerning "accrued interest" allegations not contained in the OIP.  App'x B at 8; *see also, e.g.*, FOF ¶ 354.

- Failure to timely conduct *in camera* review of documents improperly withheld by the SEC's Office of Litigation and Administrative Practice.  App'x B at 2.

- Failure to compel production of improperly withheld documents, on the ground that witnesses to whom the documents relate had already testified.  *Id.* at 3.

- Denial of the request to dismiss the charges based on the Division's litigation misconduct, on the ground that an ALJ does not have such authority.  *Id.* at 3.

The lack of due process manifested in these and other erroneous rulings addressed in Appendix B presents an independent basis for dismissal.

### B.  Division's Litigation Misconduct Presents An Independent Basis To Dismiss.

The Division has engaged in significant misconduct throughout its investigation of Respondents and this proceeding.  Such misconduct should provide grounds to dismiss the charges against Respondents pursuant to Rule 111, just as a "district court may dismiss an indictment on the ground of outrageous government conduct" under its "supervisory powers" even "[i]f the conduct does not rise to the level of a due process violation."  *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (affirming dismissal for misconduct) (citation omitted); *see* COL ¶¶ 99-109.  Respondents accordingly incorporate by reference and reiterate

their written and oral motions to dismiss for prosecutorial misconduct, for all of the reasons

explained therein, including:

- *Untimely and deceptive partial disclosure of engagement of Anchin in another SEC enforcement action.*  Four days after Respondents' external accountant, Berlant, testified, the Division disclosed that Berlant's accounting firm, Anchin, has been working for the Division in another matter since May 2016, for a fee of $366,000.  In making this belated disclosure, Division counsel failed to disclose that the other matter is *their* prosecution, which made their initial failure to disclose difficult to justify as an oversight.  The Respondent in the other case was advised of Anchin's involvement—weeks earlier.  FOF ¶ 350; Letter from Respondents to ALJ Foelak (Oct. 31, 2016); Tr. 1443:24-1491:8.

- *Failure to disclose Anchin emails.*  The Division produced to Respondents only two Anchin emails, in response to a subpoena seeking seven years of Zohar-related emails, despite Berlant's testimony on cross-examination that he had reviewed responsive documents in his files, he had withheld nothing for privilege, and that "likely, yes," he had provided more than that to the Division.  FOF ¶ 353; Tr. 924:25-925:15, 927:25-928:3 (Berlant); RX 1275 (Apr. 22, 2014 Division subpoena to Anchin).

- *Improper collusion with MBIA.*  The Division provided MBIA confidential, non-public information produced by Respondents during the Division's investigation, in exchange for MBIA's cooperation with this investigation, on the condition that MBIA not reveal that it received the information from the Division.  *See* FOF ¶ 352; RX 515 (Dec. 18, 2013 email from Amy Sumner to Susan DiCicco).

- *The Division's unwillingness to create and provide investigative record.*  Several of the Division's trial witnesses are not mentioned anywhere in the investigative record, and the Division conducted the vast majority of its witness interviews off-the-record.  Even where interview notes were taken, the Division's lawyers refused to produce them. *See, e.g.*, FOF ¶ 348; Tr. 901:12-22 (Berlant).

- *Undisclosed role of allegedly independent expert witnesses in developing the Division's theory.*  The Division presented Mayer as an independent expert witness, but on cross-examination, Respondents elicited that Mayer had assisted the Division during the investigation in developing its theory of the case.  *See* Tr. 438:25-439:6.  Division experts Wagner and Henning were likewise retained pre-OIP yet presented as independent experts.  *See* Tr. 2822:16-2823:7 (Wagner); Tr. 1393:11-20 (Henning); FOF ¶¶ 307-08, 323, 346, 351.

The Division's misconduct in this proceeding has been the result, "at best, [of their]

sloppy investigative work or, at worst, [of] their knowing failure to meet constitutional duties,"

*United States v. Lyons*, 352 F. Supp. 2d 1231, 1252 (M.D. Fla. 2004) (dismissing charges), and easily warrants dismissal of the charges against Respondents.

## IV.    If Respondents Were To Be Found Liable, Any Significant Sanctions Would Not Be Appropriate.

The Division has failed to satisfy its burden of proof on any of its charges.  Although Respondents fervently believe there is no valid basis to rule otherwise, if Your Honor does, the Division has vastly overreached in asking for some of the most severe sanctions in SEC history: a permanent bar on Ms. Tilton and Patriarch from the securities industry and over $200 million in disgorgement.  These sanctions, or sanctions of any severity, are simply inappropriate on the evidence adduced here.  *See* COL ¶¶ 128-54.

The determination of appropriate sanctions turns in part on "[t]he public interest analysis," *F.X.C. Inv'rs Corp.*, Admin. Proc. Rulings Release No. 218, 2002 WL 31741561, at *14 (ALJ Dec. 9, 2002), based on the factors set forth in *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd*, 450 U.S. 91 (1981).  Those factors include:

> (1) the egregiousness of the respondents' actions; (2) the isolated or recurrent nature of the infractions; (3) the degree of scienter involved; (4) the sincerity of the respondents' assurances against future violations; (5) the respondents' recognition of the wrongful nature of their conduct; and (6) the likelihood that the respondents' occupation will present opportunities for future violations.

*F.X.C. Inv'rs Corp.*, 2002 WL 31741561, at *14 (quoting *Steadman*, 603 F.2d at 1140).  The Division "has a greater burden to show with particularity the facts and policies that support th[e] sanctions [it seeks] and why less severe action would not serve to protect investors."  *Steadman*, 603 F.2d at 1137.  The severe sanctions the Division seeks here are wholly unjustified in light of these factors, and each would disserve the public interest.

### A.   A Permanent Bar On Ms. Tilton's Involvement In The Securities Industry Would Be Inequitable And Ill Serve The Public Interest.

In seeking to bar Respondents from the securities industry, the Division has asked Your Honor to impose one of "the most drastic remedies at [the Commission's] disposal." *Steadman*, 603 F.2d at 1137.  An industry bar is simply not appropriate where, as here, there is no scienter. *See, e.g.*, *Valicenti Advisory Servs., Inc.*, Initial Decision Release No. 111, 1997 WL 362000, at *19 (ALJ July 2, 1997) (Foelak, J.) ("revocation and suspension" sanctions are "excessively harsh" where respondents acted without scienter), *rev'd on other grounds by* Advisers Act Release No. 1774, 1998 WL 798699 (Comm'n Nov. 18, 1998), *aff'd*, 198 F.3d 62, 63 (2d Cir. 1999); *see also Steadman*, 603 F.2d at 1141 ("It would be a gross abuse of discretion to bar an investment adviser from the industry on the basis of isolated negligent violations."). Respondents believed that their categorization strategy was permitted (indeed mandated) by the Indentures, and it was disclosed and known to all.  *See supra* Pts. I.A-B, I.D.  They believed that their financial statements were accurate, and issued them in reliance on a well-respected outside accountant.  *See supra* Pts. II.A-C.  Even if Your Honor finds a violation of the Advisers Act, the complete absence of any evidence of ill motive is dispositive of the request for any bar, let alone a permanent bar.

The other *Steadman* factors also weigh heavily against an industry bar.  Respondents' unflagging efforts to increase value to the Zohars and the Noteholders—even putting hundreds of millions of dollars of their own money into the Zohars and the Portfolio Companies— demonstrates that their conduct was anything but egregious.  *See* FOF ¶¶ 193-96, 206, 208, 211-18.  And given that Respondents are charged with a single categorization error (albeit one that played out over the course of several years), there are no recurrent infractions.  Moreover, Respondents are sincere in their assurances against future violations.  *See* Tr. 3139:5-13

(Pelissier) (describing Ms. Tilton as "unwavering in regards to [the] law" and "unwavering [in her] compliance"); Tr. 3548:18-3549:6 (Harrington) (describing Ms. Tilton as "a very ethical person"); FOF ¶ 98. Finally, there would be no opportunity for future violations, because Respondents are no longer acting as investment advisers or as collateral managers for the Zohars. *See* Div. Prehearing Br. 22, 25; FOF ¶ 191.

The public interest also weighs heavily against any bar. Respondents' participation in the securities industry has provided significant financial benefits to many investors, and enormous societal benefits given that Respondents have saved hundreds of thousands of jobs through their investments and management. Their strategy is value-creating—"buying companies left for dead, and . . . taking the time to rebuild these companies," Tr. 1838:5-7 (Tilton)—and they continue to be deeply involved in running the Portfolio Companies, *see* FOF ¶¶ 92, 97-106, 113-24, 191. As the *Wall Street Journal* reported, Respondents have pursued a strategy "to turn around troubled companies, many in the manufacturing sector," with a "'focus on saving the company in its most appropriate form to survive long into the future, salvaging as many jobs as is possible and viable.'" RX 72 at 60 (*In Hard Luck Industries, Patriarch Seeks Revival Funds*, Wall St. J. (quoting Ms. Tilton)). In the process, they have created value for Noteholders as well, proved by the billions of dollars in value currently locked in the Portfolio Companies. FOF ¶ 92; Tr. 2727:4-7 (Tilton).

Moreover, a lifetime bar would harm the public interest far more than a temporary bar. It would send the message that there is no principled limitation on the availability of this grave sanction. If a lifetime bar can be imposed for what is essentially a breach of contract case, there would be nothing left to the proposition that a bar is appropriate only under limited circumstances of extreme wrongdoing.

### B.  Any Monetary Sanction—And Certainly A Significant One—Would Disserve The Public Interest.

The Division's requested disgorgement figure of more than $200 million plus civil penalties is outlandishly large and incommensurate with the charges against Respondents. Disgorgement is "an equitable remedy," *SEC v. Spongetech Delivery Sys. Inc.*, 2015 WL 5793303, at *5 (E.D.N.Y. Sept. 30, 2015), and it would be manifestly inequitable to award a significant monetary penalty on the facts adduced here.

As with the permanent bar, a "lack of scienter" is a mitigating factor that can render inappropriate a "significant money penalty." *Terry T. Steen*, Initial Decision Release No. 107, 1997 WL 104603, at *11-12 (ALJ Mar. 7, 1997) (Foelak, J.); *see also SEC v. Mannion*, 28 F. Supp. 3d 1304, 1311 n.8 (N.D. Ga. 2014) (good faith "is an independent factor the Court must consider in determining remedies" in a Section 206 case).  Similarly, the *Steadman* public interest factors apply to all monetary penalties sought by the Division.  *See, e.g.*, *Timbervest, LLC*, Initial Decision Release No. 658, 2014 WL 4090371, at *64 (ALJ Aug. 20, 2014) (considering whether "the *Steadman* factors weigh in favor of ordering disgorgement"); *Michael A. Horowitz*, Initial Decision Release No. 733, 2015 WL 77529, at *31 (ALJ Jan. 7, 2015) (same); *Terry T. Steen*, 1997 WL 104603, at *11-12 (applying *Steadman* factors to civil penalties analysis).  For the same reasons that an industry bar is unwarranted here, *see supra* Pt. IV.A, the monetary remedies sought by the Division are completely inappropriate.

### C.  The Division's Disgorgement Figure Is Based On Inaccurate Calculations And Is Offset Entirely By Respondents' Substantial Transfers To The Zohars.

The standards governing a disgorgement amount are well-established.  "Because disgorgement does not serve a punitive function, the disgorgement amount may not exceed the amount obtained through the wrongdoing."  *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir.

2014).  Accordingly, a disgorgement award may not exceed actual net profits.  *See, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 51(4), comment (e) (2011) ("The profit for which the wrongdoer is liable by [disgorgement] is *the net increase in the assets* of the wrongdoer." (emphasis added)).  Your Honor has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."  *SEC v. McCaskey*, 2002 WL 850001, at *4 (S.D.N.Y. Mar. 26, 2002).  The Division bears the burden of proving a disgorgement amount no greater than net profits, and it must provide a "measurement of a [respondent's] gains—the proceeds subject to disgorgement—[that] is not . . . speculative."  *United States v. Dobruna*, 146 F. Supp. 3d 458, 460 (E.D.N.Y. 2015); *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *14 (S.D.N.Y. Apr. 25, 2013) ("preclud[ing] . . . [plaintiff's] disgorgement argument as overly speculative").

Here, the Division seeks over $200 million in so-called "disgorgement," based solely on the unreliable and erroneous calculation of its expert, Mayer.  *See* OIP ¶¶ 6, 44; *see also* DX 17 (Mayer Rep.) at 63; FOF ¶¶ 320-21, 324-25, 328-31.  Mayer claimed that under the Division's theory of categorization, Zohar II and Zohar III "failed their monthly OC Ratio tests starting in July 2009 and June 2009 respectively."  DX 17 (Mayer Rep.) at 3.  He then calculated $208 million in preference share distributions and subordinated collateral management fees that Respondents purportedly "improperly received" from Zohar II and Zohar III during that period.  *Id.* at 63.  Mayer's calculation is, however, unreliable because he failed to consider that an OC Ratio Test failure in one period decreases the likelihood of an OC Ratio Test failure in subsequent periods, due to the additional repayment of principal mandated by the Zohar Indentures—a mechanical redirection of proceeds that the Division, Wagner, and Hubbard *all*

agree must occur when the OC Ratio Test fails.  *See* OIP ¶ 29; DX 16 (Wagner Rep.) at ¶ 27; Tr. 2922:8-2923:6 (Wagner), RX 24 (Hubbard Rep.) at ¶ 35; FOF ¶¶ 328-31.[69]

If the OC Ratio Test fails in a given period, the mandatory principal paydown will affect the OC Ratio in every subsequent period.  Tr. 3577:6-3580:19 (Hubbard); RX 24 (Hubbard Rep.) at ¶ 35; FOF ¶¶ 328-30.  Mayer's failure to account for this mandatory principal paydown results in an erroneous calculation of the OC Ratio for every period after the first one in which he claims the OC Ratio Test should have failed.  RX 24 (Hubbard Rep.) at ¶ 35; Tr. 3577:8-21 (Hubbard); FOF ¶¶ 328-30.  As the Division's own expert, Wagner, explained, "[b]y making additional payments of principal to senior Notes, the denominator of the OC Ratio test will decline; . . . the OC Ratio will then be higher."  DX 16 (Wagner Rep.) at ¶ 27; *see also* RX 24 (Hubbard Rep.) at ¶¶ 35, 37; FOF ¶ 331.  Mayer purported to calculate an adjusted numerator for his adjusted OC Ratio, DX 17 at 50-53 (referring to "Adjusted OC Ratio Numerator"), but failed to reduce the OC Ratio's denominator to reflect the required additional principal payments, Tr. 549:12-23 (Mayer); FOF ¶ 329.  When Mayer's error is corrected, the OC Ratio Test passes in many periods Mayer says it should have failed, even under the Division's theory.  RX 24 (Hubbard Rep.) at ¶¶ 38, 42; Tr. 3577:8-21 (Hubbard); FOF ¶ 330.  After correcting Mayer's error, Hubbard determined that of the $208 million that Mayer characterized as "improperly received" by Patriarch, $61 million would have been properly distributed to Patriarch under the Division's

---

[69]  As with Wagner's and Henning's testimony, Mayer's testimony is deeply flawed, unreliable, and improper expert testimony for the reasons set forth in Respondents' motions *in limine* and objections.  Although Your Honor did not exclude Mayer's testimony, the same arguments made there mean that little, if any, weight should be given to Mayer's testimony.  *See Lynn Tilton*, Admin. Proc. Rulings Release No. 4245, at 3 (ALJ Oct. 12, 2016) (noting that Respondents may "argue against [the] weight" of admitted evidence); Tr. 396:25 (Division) (arguing against an evidentiary objection on that ground that it "goes to the weight").

own theory of categorization for Zohar III alone, had Mayer accounted for principal paydown. RX 24 (Hubbard Rep.) at ¶¶ 38-44; FOF ¶¶ 329-30.  Because Mayer makes such a basic arithmetic error, his calculations are entirely unreliable.[70]

Mayer's report suffers from a more fundamental fallacy of economic logic:  He ignores the various potential consequences of an OC Ratio Test failure in a given period, including options for the collateral manager to bring the test back into compliance in future periods.  *See* Tr. 3574:23-3575:11 (Hubbard) ("Mr. Mayer can't possibly know" the strategic choices Ms. Tilton could employ in the event of an OC Ratio failure, "[s]o the experiment is flawed from the beginning."); *see also* RX 24 (Hubbard Rep.) at ¶¶ 33-34; FOF ¶ 328.  The repayment of principal is the first and most obvious consequence of Mayer's error, but it is not the only one. Especially in an actively managed fund, Tr. 3566:4-8 (Hubbard); RX 24 (Hubbard Rep.) at ¶ 10; FOF ¶¶ 35, 38-39, 46, 48, 97, it is implausible to think that the collateral manager would have exercised *none* of the options available to her under the Indenture in the event of an OC Ratio Test failure.  Mayer's failure to consider these possibilities renders his $208 million "disgorgement" calculation and his methodology inaccurate and entirely unreliable.

Even if all aspects of Mayer's inaccurate calculations were accepted, the disgorgement figure must be reduced as a matter of law to exclude any fees or distributions based on conduct more than five years before the issuance of the OIP.  A five-year statute of limitations applies to "any action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture," 28 U.S.C. § 2462, and several of the time periods to which the Division attributes its disgorgement

---

[70]   Mayer does not even purport to consider Respondents' massive transfers to the Zohars and the Portfolio Companies, discussed below.  *See infra* pp. 119-20.  This failure to even consider half of the equation for net profits (*i.e.*, looking at receipts but refusing to look at payments) underscores the inaccuracy and unreliability of Mayer's calculations altogether.

amount fall outside the five-year limitations period, *compare* OIP at p. 1 (issued Mar. 30, 2015), *with* DX 17 (Mayer Rep.) at 63 fig.58 (arriving at Division's disgorgement figure of $208,415,871 million by adding fees and distributions from as early as June 2009).  The best interpretation of the statute is that "§ 2462's statute of limitations applies to disgorgement," *SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016),[71] in addition to applying to civil penalties on its face, so the time periods prior to March 30, 2010, must be excluded.

Not only that, the Division's disgorgement calculation simply ignores that Respondents have repaid to the Zohars and the Portfolio Companies (and thus to the Noteholders), directly and indirectly, far more capital than they are accused of taking.  Given that disgorgement may not exceed net profits, these payments should reduce any disgorgement to nil.  *See SEC v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *3 (N.D. Tex. May 5, 2008) (ill-gotten gains that were afterward invested so as to be "within reach of the investors (*i.e.*, money the investors will eventually obtain) should reduce a defendant's disgorgement liability"); *David F. Bandimere*, Initial Decision Release No. 507, 2013 WL 5553898, at *82 (ALJ Oct. 8, 2013) ("[I]t is appropriate to reduce the disgorgement amount by the amount [the respondent] returned to investors.").  As Lys testified at trial, Respondents have transferred to the Zohars more than $500 million in value from their own coffers, including $441 million that Ms. Tilton personally invested and approximately $70 million in uncollected fees that Respondents are owed.  FOF

---

[71]  While not every court has agreed with this proposition, *see, e.g.*, *SEC v. Kokesh*, 834 F.3d 1158, 1166 (10th Cir. 2016), *cert. filed*, No. 16-529 (Oct. 18, 2016), the Supreme Court has made clear that § 2462 should be construed broadly to avoid "leav[ing] defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future," *Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013) (rejecting SEC argument that a discovery rule should apply to § 2462).  In any event, there can be no dispute that § 2462 applies to civil penalties; if Your Honor imposes civil penalties, none can be imposed for conduct prior to March 30, 2010.

¶¶ 212-17.  This massive figure, already two and a half times the amount the Division seeks in disgorgement, is in addition to other offsetting value that Ms. Tilton has given to the Zohars, namely the "equity upside" that she has "gifted to the funds" to the extent the cash from a collateral sale does not make Noteholders whole.  Tr. 1934:7-11 (Tilton); *see also* FOF ¶¶ 193, 195; Tr. 2261:19-21 (Tilton).  And all of these offsets are in addition to the costs Ms. Tilton has paid to run her business, pay its employees, and keep the lights on.  *See* FOF ¶ 218.  The amounts of Respondents' investments must be deducted in the calculation of disgorgement, offsetting entirely any disgorgement sought by the Division.

## CONCLUSION

For the foregoing reasons, the Division has failed to meet its burden of proving the

charges set forth in the OIP, and Your Honor should issue an initial decision finding

Respondents not liable.

Dated:  New York, New York
        December 16, 2016             GIBSON, DUNN & CRUTCHER LLP

                                By: _____

                                Randy M. Mastro
                                Reed Brodsky
                                Caitlin J. Halligan
                                Mark A. Kirsch
                                Monica Loseman
                                Lawrence J. Zweifach
                                Barry Goldsmith
                                Lisa H. Rubin

                                200 Park Avenue
                                New York, NY 10166-0193
                                Telephone: 212.351.4000
                                Fax: 212.351.4035

                                Susan E. Brune
                                BRUNE LAW P.C.
                                450 Park Avenue
                                New York, NY 10022
                                Telephone: 212.668.1900
                                Fax: 212.668.0315

                                *Counsel for Respondents*

# Exhibit 20

Initial SEC Decision

INITIAL DECISION RELEASE NO. 1182
ADMINISTRATIVE PROCEEDING
FILE NO. 3-16462

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

In the Matter of

:

LYNN TILTON;                                    :          INITIAL DECISION
PATRIARCH PARTNERS, LLC;              :          September 27, 2017
PATRIARCH PARTNERS VIII, LLC;         :
PATRIARCH PARTNERS XIV, LLC; and    :
PATRIARCH PARTNERS XV, LLC             :

APPEARANCES:     Dugan Bliss, Nicholas Heinke, Amy Sumner, and Mark L. Williams
                 for the Division of Enforcement, Securities and Exchange Commission

                 Randy M. Mastro, Lawrence J. Zweifach, Barry Goldsmith, Caitlin J.
                 Halligan, Reed Brodsky, Monica K. Loseman, Mark A. Kirsch, and Lisa
                 H. Rubin of Gibson, Dunn & Crutcher LLP; and Susan E. Brune of Brune
                 Law PC[1]
                 for Respondents Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners
                 VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC

BEFORE:          Carol Fox Foelak, Administrative Law Judge

## SUMMARY

This Initial Decision dismisses charges concerning Respondents' operation of three collateral loan obligation funds, known as the Zohar Funds.

## I. INTRODUCTION

### A. **Procedural Background**

The Commission instituted this proceeding with an Order Instituting Proceedings (OIP) on March 30, 2015, pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisers

---

[1] These attorneys appeared for Respondents on the post-hearing briefs. Additional attorneys appeared for Respondents in other phases of the proceeding.

Act of 1940 and Section 9(b) of the Investment Company Act of 1940. The proceeding was stayed by order of the U.S. Court of Appeals for the Second Circuit between September 17, 2015, and June 2016, followed by a brief continuance of the stay until July 6, 2016, to permit Tilton to file a stay motion with the Supreme Court. *See Tilton v. SEC*, 824 F.3d 276, 291 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2187 (2017); *Tilton v. SEC*, No. 15-2103 (2d Cir.), ECF Nos. 76, 125. The undersigned held a fourteen-day hearing in New York City from October 24 through November 10, 2016. The Division of Enforcement called nine witnesses, including three expert witnesses, from whom evidence was taken, and Respondents called nine witnesses, including six expert witnesses. Respondent Tilton testified for three and one half days. Numerous exhibits were admitted into evidence.[2]

The findings and conclusions in this Initial Decision are based on the record and public official records of which official notice has been taken, pursuant to 17 C.F.R. § 201.323. Preponderance of the evidence was applied as the standard of proof. *See Steadman v. SEC*, 450 U.S. 91, 96-104 (1981). Pursuant to the Administrative Procedure Act, 5 U.S.C. § 557(c), the parties' post-hearing December 16, 2016, filings and January 13, 2017, replies were considered. All arguments and proposed findings and conclusions that are inconsistent with this Initial Decision were considered and rejected.

## B. Allegations and Arguments of the Parties

This proceeding concerns Respondents' operation of three collateral loan obligation funds, known as the Zohar Funds. The OIP alleges that Respondents violated the antifraud provisions of the Investment Advisers Act of 1940 – Sections 206(1), 206(2), and 206(4); and Rule 206(4)-8 – by reporting misleading values for the assets held by the Funds and thus collecting unearned management fees and other payments; generally breaching fiduciary duties by failing to disclose a conflict of interest arising from Lynn Tilton's undisclosed approach to categorization of assets; and issuing false and misleading financial statements that purport to comply with GAAP but do not, in that they contain misleading information relating to impairment and fair valuing of assets. The Division is seeking a cease-and-desist order, bars, disgorgement, and civil penalties. Respondents argue that this proceeding is constitutionally and otherwise infirm, that there were no violations, and that, in any event, sanctions are inappropriate.

## C. Procedural Issues

Respondents argue that the proceeding is unconstitutional because: the Commission appoints administrative law judges in a manner that is inconsistent with the Appointments Clause of the United States Constitution; it otherwise lacks due process; and Respondents' equal protection rights were violated. Resp. Concl. at 24-28; Resp. Br. at 45-47, 109-10. Respondents incorporate by reference and reiterate forty-one erroneous rulings on these and other topics. Resp. Br. at 46, 110, App. B.

---

[2] Citations to the hearing transcript will be noted as "Tr. __." Citations to exhibits offered by the Division and Respondents will be noted as "Div. Ex. __" and "Resp. Ex. __," respectively.

## 1. Appointments Clause

The Commission has rejected the Appointments Clause argument and adhered to its position, despite the contrary view of the Tenth Circuit in *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016), *pet. for reh'g en banc denied*, 855 F.3d 1128 (10th Cir. 2017). *See Harding Advisory LLC*, Securities Act of 1933 Release No. 10277, 2017 SEC LEXIS 86, at \*67-69 & nn.82, 90 (Jan. 6, 2017), *pet. for review pending*, No. 17-1070 (D.C. Cir.); *Raymond J. Lucia Cos.*, Securities Exchange Act of 1934 Release No. 75837, 2015 SEC LEXIS 3628, at \*76-89 (Sept. 3, 2015), *pet. for review denied by an equally divided court*, No. 15-1345, 2017 WL 2727019 (D.C. Cir. June 26, 2017), *pet. for cert. filed*, No. 17-130 (U.S. July 21, 2017); *Timbervest, LLC*, Advisers Act Release No. 4197, 2015 SEC LEXIS 3854, at \*89-103 (Sept. 17, 2015), *pet. for review pending*, No. 15-1416 (D.C. Cir.). Moreover, the Commission has denied Respondents' motion to stay this proceeding pending the resolution by the federal courts – and, possibly, the Supreme Court – of the Appointments Clause question. *See Lynn Tilton*, Advisers Act Release No. 4735, 2017 SEC LEXIS 2296 (July 28, 2017).

## 2. Due Process

Respondents argue that the Commission's administrative proceedings are inherently unfair and violate the Due Process Clause in that: salient factual allegations are not required to be specified in the OIP, and evidence relating to charges not specified in the OIP was admitted at the hearing; Respondents were constrained to a short timeline, with limited discovery that does not include depositions and without a meaningful opportunity to gather information from key witnesses; the Commission, essentially, has no rules of evidence, resulting in a record that includes hearsay and improper legal conclusions of expert witnesses; and the Commission forum requires enforcement cases to be tried in an unduly limited timeframe regardless of their complexity. Resp. Concl. at 25-28; Resp. Br. at 45-47, 109-10.

Respondents cite no authority to show that the procedures of the Commission's administrative proceedings violate the Due Process Clause. Indeed, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Jonathan Feins*, Exchange Act Release No. 41943, 1999 SEC LEXIS 2039, at \*25-26 (Sept. 29, 1999) ("Administrative due process is satisfied where the party against whom the proceeding is brought understands the issues and is afforded a full opportunity to meet the charges during the course of the proceeding."). In determining whether due process is satisfied, "the question . . . is not the adequacy of the [OIP] but is the fairness of the whole procedure." *Timbervest, LLC*, 2015 SEC LEXIS 3854, at \*78 (alteration brackets in original). Here, Respondents received a Wells notice and the OIP; had at least nine months to prepare for the hearing (not counting the period in which this case was stayed), during which the parties exchanged expert reports and other evidence and notified each side of proposed witnesses, and filed and obtained rulings on numerous prehearing motions; had a fourteen-day hearing and the opportunity to call witnesses and cross-examine the Division's witnesses; and had the opportunity to present argument at the hearing and in post-hearing filings.

Respondents' contentions regarding the adequacy of the OIP are unpersuasive. In Commission administrative proceedings, the OIP must state: the nature of the hearing; the legal authority for holding the hearing; "the factual and legal basis alleged . . . in such detail as will permit a specific response" where, as here, the OIP directs an answer; and the nature of any relief sought. 17 C.F.R. § 201.200(b). But the OIP need not allege all of the evidence on which the Division intends to rely. *See Rita J. McConville*, Exchange Act Release No. 51950, 2005 SEC LEXIS 1538, at \*51 (June 30, 2005) ("The OIP must inform the respondent of the charges in enough detail to allow the respondent to prepare a defense, but it need not disclose to the respondent the evidence upon which the Division intends to rely."), *pet. denied*, 465 F.3d 780 (7th Cir. 2006); *Morris J. Reiter*, Exchange Act Release No. 6108, 1959 SEC LEXIS 588, at \*5 (Nov. 2, 1959) (a respondent "is not entitled to a disclosure of evidence" such as "the names of the persons to whom the alleged false and misleading statements were made"); *see also Clawson v. SEC*, No. 03-73199, 2005 WL 2174637, at \*1 (9th Cir. Sept. 8, 2005) (finding notice sufficient where the facts ultimately found were "consistent with" or "subsumed in" the theory alleged in the OIP). Here, the OIP included seventy-three paragraphs of the Division's allegations, together with the asserted legal bases for this proceeding, the alleged violations, and the sanctions sought. Respondents' arguments throughout the course of this proceeding make plain that they "understood the issue[s] and [were] afforded full opportunity to justify [their] conduct during the course of the litigation." *Wendy McNeeley, CPA*, Exchange Act Release No. 68431, 2012 SEC LEXIS 3880, at \*28-29 (Dec. 13, 2012) (internal quotation marks omitted).

Although the procedures of administrative proceedings may differ in some respects from those in district court, Respondents have not shown that they violate the Due Process Clause. The Commission and courts have rejected broad attacks on administrative process. *See Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1107-08 (D.C. Cir. 1988); *Harding Advisory LLC*, 2017 SEC LEXIS 86, at \*56. "Administrative proceedings have long been a key feature of the scheme of securities regulation established by Congress." *Timbervest, LLC*, 2015 SEC LEXIS 3854, at \*90. Contrary to Respondents' claim, the availability of different discovery mechanisms in federal district court does not violate due process. *See John J. Aesoph, CPA*, Exchange Act Release No. 78490, 2016 SEC LEXIS 2730, at \*72-73 (Aug. 5, 2016); *cf. Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery . . . ."); *McClelland v. Andrus*, 606 F.2d 1278, 1285 (D.C. Cir. 1979) ("The extent of discovery that a party engaged in an administrative hearing is entitled to is primarily determined by the particular agency . . . .").

Also unpersuasive are Respondents' due process objections to the admission of certain evidence that would not be admissible in a federal jury trial. "[T]he fact that the Federal Rules of Civil Procedure and the Federal Rules of Evidence do not apply in administrative proceedings is not a violation of due process." *Charles L. Hill, Jr.*, Exchange Act Release No. 79459, 2016 SEC LEXIS 4491, at \*12-13 (Dec. 2, 2016). Rather, "'[c]ourts have consistently held that agencies need not observe all the rules and formalities applicable to courtroom proceedings,' and that 'agencies should be free to fashion their own rules of procedure.'" *Id.* at \*13 (quoting *McClelland*, 606 F.2d at 1285, and *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543-44 (1978)); *see also Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div. of Dep't of Labor*, 312 U.S. 126, 155 (1941) ("[I]t has long been settled that the technical rules for the exclusion of evidence applicable in jury trials do not apply to proceedings before federal

administrative agencies in the absence of a statutory requirement that such rules are to be observed.").

The threshold for the admissibility of evidence in Commission proceedings is quite low. *See* 5 U.S.C. § 556(d); 17 C.F.R. § 201.320; *Herbert Moskowitz*, Exchange Act Release No. 45609, 2002 SEC LEXIS 693, at *46 n.68 (Mar. 21, 2002); *City of Anaheim*, Exchange Act Release No. 42140, 1999 SEC LEXIS 2421, at *4 & n.7 (Nov. 16, 1999). For example, "hearsay evidence is admissible in [Commission] administrative proceedings and, in an appropriate case, may even form the sole basis for findings of fact." *Edgar B. Alacan*, Securities Act Release No. 8436, 2004 SEC LEXIS 1422, at *23 (July 6, 2004) (internal quotation marks omitted); *see also Echostar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002) ("[A]dministrative agencies may consider hearsay evidence as long as it bears satisfactory indicia of reliability, and hearsay can constitute substantial evidence if it is reliable and trustworthy." (internal quotation marks, citations, and alteration brackets omitted)). Also, as the undersigned has observed, "[s]ince this proceeding is not a jury trial, the fact that [certain experts] arguably are providing legal opinions is not *per se* objectionable, even under [Federal Rule of Evidence] 702." *Lynn Tilton*, Admin. Proc. Rulings Release No. 4118, 2016 SEC LEXIS 3217, at *2 (A.L.J. Sept. 1, 2016) (collecting cases). To the extent Respondents believe the record contains unreliable evidence, they have been free to argue that it should be given little to no weight. *Cf. City of Anaheim*, 1999 SEC LEXIS 2421, at *4 ("Administrative agencies such as the Commission are more expert fact-finders, less prone to undue prejudice, and better able to weigh complex and potentially misleading evidence than are juries.").

Respondents have not shown a due process violation based on the Commission's procedural timelines and their allegation that their counsel did not have an adequate opportunity to prepare for the hearing. The Commission has rejected a facial due process attack on the procedural timelines set forth in 17 C.F.R. § 201.360. *Gregory M. Dearlove, CPA*, Exchange Act Release No. 57244, 2008 SEC LEXIS 223, at *142-44 (Jan. 31, 2008), *pet. denied*, 573 F.3d 801 (D.C. Cir. 2009).

More recently, in rejecting Respondents' petition for interlocutory review, the Commission stated:

> Respondents argue that interlocutory review is appropriate because the present hearing schedule denies them 'the opportunity to fully and fairly litigate their defense' and violates their 'right to counsel of [their] choice by effectively punishing Respondents for changing counsel recently.' But the Supreme Court has made clear that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." This is not a case in which there are 'extraordinary circumstances' warranting postponement, such as when respondents are left without assistance of counsel at or near the hearing date through no fault of their own. Although Respondents recently replaced some of their attorneys, they have been represented by other attorneys from Brune Law P.C. throughout this proceeding.

Nor are we persuaded by Respondents' claim that their new counsel will have insufficient time to review what they describe as a voluminous and complex record. When the court of appeals initially stayed this proceeding, the hearing was set to begin in three weeks and, as the Division notes, many phases of the proceeding had been completed, including the exchange of witness and exhibit lists and expert reports. Once the court of appeals lifted that stay on July 6, the law judge essentially granted the parties an additional 13 weeks in which to prepare by rescheduling the hearing for October 24.

*Lynn Tilton*, Advisers Act Release No. 4495, 2016 SEC LEXIS 2973, at *12-14 (Aug. 24, 2016). Although the Commission did not explicitly address Respondents' claim about their alleged inability to prepare adequately, *id.* at *14, counsel's conduct at the hearing and arguments made before, during, and after the hearing show that counsel understood the complexities of the case and was, in fact, adequately prepared.

### 3. Equal Protection

Respondents argue that their equal protection rights were violated in that the Commission denied them and similarly situated respondents the benefits of its amended procedural rules that it adopted to correct procedural and discovery deficiencies in administrative proceedings.

In August 2016, the Commission denied Respondents' request for an order applying certain amendments to its rules of practice to this proceeding. *Lynn Tilton*, 2016 SEC LEXIS 2973, at *16-18. The Commission explained that it had already specified how the amended rules would apply to pending proceedings in its July 2016 release adopting the amendments. *Id.* at *16-17; *see also* Amendments to the Commission's Rules of Practice, Exchange Act Release No. 78319, 81 Fed. Reg. 50,212, 50,229-30 (July 29, 2016). It reasoned: "Respondents provide no compelling reasons why we should treat their case uniquely from all the other pending cases in our administrative tribunals, and deviate from our decision that the availability of the Amended Rules for litigants in pending proceedings should depend on the stage of their proceeding." *Lynn Tilton*, 2016 SEC LEXIS 2973, at *18.

Respondents do not claim, let alone establish, that the Commission's regulatory classification "jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Nor do they base their claim on a class-of-one theory. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Rather, they claim to be part of a class of respondents "deliberately targeted" by the Commission. Resp. Concl. at 28. Respondents' post-hearing brief references a district court complaint in which they defined this class as "certain individuals who brought Appointments Clause challenges in federal district court and whose administrative proceedings were stayed pending a decision by the federal courts." Complaint at 5, *Tilton v. SEC*, 16-cv-7048 (Sept. 9, 2016), ECF No. 1; *see* Resp. Br. at 109 & nn.66, 68. As this purported class is not a suspect one, Respondents would have to show that the Commission's regulatory classification has no rational basis to establish a violation of the Equal Protection Clause. *See Heller v. Doe*, 509 U.S. 312, 319-20 (1993); *cf. Romer v. Evans*, 517 U.S. 620, 632 (1996) (rational basis not met where a law or regulation is "inexplicable by anything but animus toward the class it affects").

Respondents' claim is better suited for appeal to the Commission or a federal court of appeals, as the undersigned does not sit in review of Commission rules or regulations. In any event, Respondents have not offered anything other than speculation to support their claim.

**4.        Alleged Erroneous Rulings**

Respondents maintain that "[n]umerous erroneous rulings in this particular proceeding manifest the lack of due process characteristic of this forum." Resp. Br. at 110. Many of these claims "are cast in due process terms but are in substance challenges to the [undersigned]'s evidentiary rulings" and denial of various prehearing motions. *Harding Advisory LLC*, 2017 SEC LEXIS 86, at *63. Insofar as Respondents seek reconsideration of forty-one "Key Erroneous Rulings" on their motions that they incorporate by reference and reiterate in their post-hearing briefing, reconsideration is denied.

Moreover, "[the Commission's] review is de novo and plenary as to evidentiary rulings, as well as to factual findings and legal conclusions." *Id.* Thus, the Commission is "not bound" by the undersigned's decisions. *Id.* Alleged procedural or evidentiary errors may be cured by the Commission on appeal. *See Heath v. SEC*, 586 F.3d 122, 142 (2d Cir. 2009); *Ronald S. Bloomfield*, Exchange Act Release No. 71632, 2014 SEC LEXIS 698, at *38-39 (Feb. 27, 2014), *pet. denied*, 649 F. App'x 546 (9th Cir. 2016).

## II.  FINDINGS OF FACT

### A.  Relevant Individuals and Entities

**1. Lynn Tilton**

Lynn Tilton manages the Patriarch Respondents, with the input of other employees. Answer ¶ 10.[3] The CEO, sole principal, and 100% indirect owner, she controls Respondent Patriarch Partners, LLC. *Id.* ¶¶ 11, 24; Tr. 1785. She started the firm in 2000 after a number of years of experience in the financial industry. Tr. 2076-80. Her business is distressed private equity. Tr. 1802. A relatively small number of firms specialize in this kind of investment. Tr. 1828-30.

**2. Patriarch Entities**

Patriarch Partners, LLC, is a Delaware limited liability company with a principal place of business in New York City. Answer ¶ 11. Its employees, including Tilton, run the businesses of

---

[3] Paragraph numbers in the Answer correspond to the paragraph numbers in the OIP and are cited as to allegations in the OIP paragraphs that the Answer admits.

Respondents Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC, which have no employees of their own.[4]  *Id.* ¶¶ 11, 25.

Patriarch Partners VIII, Patriarch Partners XIV, and Patriarch Partners XV were, until March 2016, the collateral managers for Zohar CDO 2003-1, Limited (Zohar I), Zohar II 2005-1, Limited (Zohar II), and Zohar III, Limited (Zohar III), respectively.  *Id.* ¶¶ 12-14; Tr. 1784. They are indirectly owned 100% by Tilton and a trust for her daughter.  Answer ¶¶ 12-14.  They were registered with the Commission from March 2012 to March 2016 – Patriarch XV as an investment adviser, and Patriarch VIII and Patriarch XIV as relying investment advisers.  *Id.*; official notice.[5]

### 3.  Zohar Funds

Zohar I, Zohar II, and Zohar III (Zohar Funds or Funds) are collateralized loan obligation (CLO) funds.  Answer ¶ 15.  A CLO fund is a securitization vehicle in which a special purpose entity, the issuer, raises capital through the issuance of secured notes and uses the proceeds to acquire a portfolio of commercial loans.  *Id.*  A collateral manager determines what loans to purchase or originate on behalf of the CLO fund.  *Id.*  Cash flows and other proceeds from the collateral are used to repay the investors in the CLO fund.  *Id.*

Investors invested in the Zohar Funds in return for the promise of regular interest payments and the repayment of their principal on a specified maturity date.  *Id.* ¶ 16.  Every quarter, investors in a Fund receive an interest payment, generated from the collective interest payments made by the borrowers in the Fund's loan portfolio.  *Id.* ¶ 20.  As Tilton saw it, the Zohar noteholders were investing in "the maximization of cash flows that would originate from multiple interest, principal and equity upside, and the expertise and standard of care that [she] would provide in order to maximize that value and those cash flows."  Tr. 1792.

The three Zohar deals have the following details:

| Name of Deal | Date of Issuance | Approximate Principal Amount of Notes | Maturity Date |
|---|---|---|---|
| Zohar I | 2003 | $532 million | November 2015 |
| Zohar II | 2005 | $1 billion | January 2017 |
| Zohar III | 2007 | $1 billion | April 2019 |

---

[4] "Patriarch," as used in testimony, may be a shorthand reference to any Patriarch entity.  *See, e.g.*, Tr. 1798.

[5] Patriarch XV's registration was terminated as of March 30, 2016, following its filing Form ADV-W.  *See* https://goo.gl/Aad5k4 (last visited Sept. 1, 2017), in the public official records of the Commission, of which official notice is taken, pursuant to 17 C.F.R. § 201.323.  According to Patriarch XV's March 31, 2015, Form ADV, it had $4.9 billion in assets under management, including Zohar I, II, and III.  *See* Form ADV Items 5.F, 7.B & Schedule D, https://goo.gl/VgUwGg (last visited Sept. 1, 2017).

Answer ¶ 16.  Each Zohar deal is governed by deal documents that include the indenture[6] and the collateral management agreement (CMA).  *Id.* ¶ 17.  The indenture describes the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments, as well as the rights of the parties and responsibilities of the collateral manager.  *Id.* ¶ 18.  The CMA, a contract between the issuer and collateral manager, engages the collateral manager and describes its obligations and compensation.  *Id.* ¶ 19.  The CMA allows the collateral manager to select and manage the collateral to be held by the Fund.  *Id.* ¶ 20.

Through the collateral managers, Tilton used the monies raised from investors to buy or make loans to primarily private, mid-sized distressed companies (Portfolio Companies).  *Id.* ¶ 20.  At times, Tilton directed more than one of the Zohar Funds to extend loans to the same Portfolio Company.  *Id.*  In connection with the loans, the Zohar Funds obtained equity in the Portfolio Companies.  *Id.* ¶ 21.  Tilton also obtained equity in some of the Portfolio Companies through other entities she owned.  *Id.*

Tilton's management strategy for the Zohar Funds included improving the operations of the distressed Portfolio Companies, paying off their debt and increasing their value, and selling them.  *Id.* ¶ 22.  She actively managed the Portfolio Companies.  *Id.* ¶ 28.  She hired and fired their senior employees and provided input on their major operating decisions.  *Id.*  She required that the companies report regularly to her regarding their financial condition and business prospects.  *Id.*  Tilton was CEO of some of the Portfolio Companies.  *Id.*  In other instances, Tilton was the sole manager of the Portfolio Companies that are LLCs.  *Id.*  Tilton was a hands-on, demanding taskmaster in managing Portfolio Companies, in some instances resulting in a successful turnaround.  Tr. 3061-63, 3069-88, 3108-39, 3516-59.

## 4.  Investors

Zohar noteholders were sophisticated, institutional investors.  *See, e.g.*, Tr. 91, 95-96, 98-100, 588-93, 634, 1492, 1498-99, 1672, 2379, 2415.  There is no evidence in the record that any retail investors invested in the Zohar Funds.  The terms of the Zohar indentures and accompanying note forms and certificates show that the notes were primarily intended for Qualified Institutional Buyers and Qualified Purchasers, and include strict restrictions on the transfer of the notes.[7]  *See, e.g.*, Resp. Ex. 1 (Zohar I indenture) at 51, 73, 77-79 (of 303 .pdf

---

[6]  The indentures for Zohar I, II, and III are in evidence as Division Exhibits 1, 2, and 3, respectively, and also as Respondents Exhibits 1, 8, and 12 (supplemented, for completeness, with additional schedules/exhibits on May 30, 2017, as 12A), respectively.

[7]  "Qualified Institutional Buyer" is defined in Securities Act Rule 144A and includes specified institutions that, in the aggregate, own and invest on a discretionary basis at least $100 million in securities of issuers that are not affiliated with such institutions.  17 C.F.R. § 230.144A(a)(1).  "Qualified Purchaser" is defined in Section 2(a)(51) of the Investment Company Act of 1940 and includes (i) any natural person who owns not less than $5 million in investments, (ii) a family-owned company that owns not less than $5 million in investments, (iii)

pages) & Exhibits A-1 through B-3; Resp. Ex. 8 (Zohar II indenture) at 58-59, 78-79, 83-89, 96, 97, 154 (of 447 .pdf pages) & Exhibits A-1 through B-9, I-1, I-2; Resp. Ex. 12A (Zohar III indenture) at 54, 74, 79-85, 92, 93, 146-47 (of 398 .pdf pages) & Exhibits A-1 through B-9, H-1, H-2.

The record includes evidence of the following investors:

### a. Barclays Bank

Barclays Bank is a bank. Tr. 1513. Zohar I raised $532 million in notes – $350 million from Barclays and the balance from Natixis Global Asset Management[8] and MBIA Insurance Corp. Tr. 1554-55, 2207, 2258-59. MBIA (described *infra*) insured Barclays's notes through a separate contract outside of the deal. Tr. 1559, 2209, 2260. In 2010, Barclays had a position of about $300 million in Zohar I after some paydowns on its original $350 million investment. Tr. 1498. Jaime Aldama, a managing director at Barclays, began to analyze the bank's Zohar I position in 2010 and first contacted Tilton in 2011. Tr. 1496-97, 1502-03. Eventually, the Zohar investment had become unrated, triggering a requirement for Barclays to have a large amount of capital, equal to its investment, reserved against the position. Tr. 1506-14. Barclays sold its position to a Patriarch entity in 2015 for $100 million, an approximate $200 million loss to Barclays. Tr. 1522.[9] Barclays also received a payment, of undisclosed amount, from MBIA resulting from its insurance of the Barclays notes. Tr. 1723-27.

### b. SEI Investments

SEI Investments Company is a global financial services NASDAQ-listed (symbol, "SEIC") company. SEI's 2016 Form 10-K at Part I, Item 1.[10] SEI purchased interests in Zohar III in the secondary market in 2010 to 2013. Tr. 95-96. Natixis was the underwriter for Zohar III. Tr. 266. The purchases, made at about $0.45, totaled $100 million face value of the A-2 tranche, and $50 million face value of the A-3 tranche. Tr. 96-99. SEI's David Aniloff

---

[8] certain trusts, and (iv) any other person that owns and invests on a discretionary basis not less than $25 million in investments. 15 U.S.C. § 80a-2(a)(51)(A).

[8] Tilton described Natixis (also referred to by a pre-merger name, CDC IXIS) as Respondents' banker. Tr. 2200, 2257, 2379, 2445, 2539.

[9] *See also* Tr. 3039-40 (testimony of Respondents' summary witness Thomas Lys that his review of Patriarch documents included confirmations from Barclays for the purchase of notes for $103,388,450); Resp. Ex. 132 (Lys's summary chart showing the March 25, 2015, purchase by Patriarch of two Zohar I notes with a face value of $350 million for $103,388,450).

[10] The Form 10-K is found in the Commission's EDGAR database, of which official notice is taken pursuant to 17 C.F.R. § 201.323. In 2016, SEI managed over $750 billion in assets, had revenues of over $1.4 billion, and had total assets of over $1.6 billion. SEI's 2016 Form 10-K at Part I, Items 1 & 6.

conducted the analysis and made the decisions to purchase.  Tr. 94-95.  Aniloff, whose duties included reviewing the Fund's monthly and quarterly trustee reports, did not tie the interest rate on each individual loan to interest that actually was collected on the loan – information as to both was available in the trustee reports in separate places.  Tr. 119, 313-21.  He acknowledged that, although Zohar III invested in distressed debt, only five loans appeared on the list of defaulted noncurrent and nonperforming loans in the June 8, 2010, note valuation report.  Tr. 314-15, 321; Div. Ex. 9A at 38.

### c. Värde Partners

Värde Partners is "an alternative investment manager with a focus on opportunistic credit and special situations investing."  Tr. 588.   That is, Värde focuses on distressed debt.  Tr. 588-90, 623-24.   Its co-located affiliate, Värde Management, L.P., with which it shares employees, is a Commission-registered investment adviser with more than $11 billion in assets under management.   Official notice;[11]  Tr. 606, 625.   Värde's clients are large institutional investors. Tr. 634.   Värde uses proprietary analytic models and judgment to look for and buy assets that appear cheap and eventually to profit through an exit strategy at the right time.  Tr. 634-42.  In 2013, Värde invested in Zohar III, purchasing $110 million face value of the A-1 tranche and $38 million face value of the A-2 tranche.  Tr. 593.   Matthew Mach, now a managing director of Värde Partners, was the trader who analyzed and recommended that Värde purchase the Zohar position.   Tr. 587, 591, 606.   Värde declined to disclose the prices it paid for the notes[12] or received on selling the notes.   Tr. 644-45, 703-09, 720-21, 741.   It also declined to disclose its valuation of the notes when it owned them and had access to all the reports on the trustee's website.   Tr. 726-27; Resp. Ex. 1107.   However, it was not a large investment for Värde.  Tr. 721-22.   Värde still holds $31 million face value of the A-2 notes.  Tr. 617-18.  Värde's due diligence prior to making the investment included studying Tilton's business successes.  Tr. 661-62, 666-69.

### d. MBIA[13]

MBIA Insurance Corporation is a stock insurance company incorporated under the laws of the State of New York.  Resp. Ex. 1 at 8 (of 303 .pdf pages); Resp. Ex. 8 at 8 (of 447 .pdf pages).  MBIA has had a relationship with Patriarch since 2001, as it "wrapped" a predecessor to

---

[11]  *See* Värde Management, L.P., Mar. 30, 2016, Brochure at 1-2, https://goo.gl/qubMPt (last visited Sept. 1, 2017).  Värde Partners, Inc., is the general partner of Värde Partners, L.P., which is the general partner of private investment funds for which Värde Management, L.P., is the investment adviser.  *Id.* at 7, 44.  Värde Partners, Inc., is privately owned.  *Id.* at 1.

[12]  In calculating the price at which it would consider purchasing the notes, Värde's due diligence indicated a recovery rate "no worse than 40%."  Resp. Ex. 1099; Tr. 705.

[13]  In this section, official notice is taken of related litigation and decisions and filings therein, MBIA's public filings with the Commission, a public release of the State of New York Insurance Department, and a news article regarding the Zohar I auction.  *See* 17 C.F.R. § 201.323.

the Zohar Funds, the Ark II transaction.[14]   Resp. Ex. 551 at 2 (of 7 .pdf pages); Tr. 2148, 2152-56.   MBIA approached Tilton in early 2002 and sought a solution for its shortfall in loss reserves in seven collateralized debt obligations (CDOs) that it had insured; Zohar I was then formed, in part, to raise a separate pool of capital to cover MBIA's shortfall, and Patriarch replaced MBIA as the collateral manager of the troubled CDOs.   Tr. 1913, 2175-77, 2180-85; Resp. Ex. 551 at 3, 5 (of 7 .pdf pages).

In addition to being one of the original noteholders in Zohar I, MBIA was also the credit enhancer of, or "wrapped," Zohar I and II.   Resp. Ex. 1 at 1, 28-30 (of 303 .pdf pages); Resp. Ex. 8 at 1, 28-29 (of 447 .pdf pages) (both at Title Page & Section 1.1 "Credit Enhancement" through "Credit Enhancer"); Tr. 343, 2258-59.   As the credit enhancer, MBIA provided a financial guaranty that it would pay certain senior classes of noteholders if the Zohar I and II Funds were unable to meet their repayment obligations.   Resp. Ex. 1 at 28-30, 39 (of 303 .pdf pages); Resp. Ex. 8 at 28-29, 40 (of 447 .pdf pages) (both at Section 1.1 "Credit Enhancement" through "Credit Enhancer" & "Insured Payments"); Resp. Ex. 21 at 15 (of 64 .pdf pages).   This enhanced the deals' credit ratings.   MBIA wrapped the Zohar I deal exclusive of the Barclays notes; it wrapped the Barclays notes separately.   Tr. 1559-64, 2186, 2209, 2260.

The relationship between MBIA and Respondents, however, began to unravel by 2006. Tr. 2412.   MBIA backed out as the credit enhancer of Zohar III after Tilton refused MBIA's proposal that she raise new investor capital to partly pay off MBIA's interest in Zohar I.   Tr. 2412-15.   Then, in 2009, MBIA sued Patriarch in federal district court, alleging breach of contract and other claims on the purported basis that Patriarch – in contravention of a master agreement and/or the Zohar I indenture – refused to obtain ratings for, and transfer a portion of, certain Class B notes, then held by a Patriarch affiliate, to some of the troubled CDOs insured by MBIA.   *See* Complaint, *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09-cv-3255 (S.D.N.Y. Apr. 3, 2009), ECF No. 16 (unsealed version attached).   Following a bench trial, the lawsuit ended in Patriarch's favor.   *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013).

Meanwhile, Tilton offered Patriarch's resignation as collateral manager on several occasions, but MBIA – the controlling party of Zohar I and II – did not act on her offers at the time.   Tr. 2181, 2224-25, 2576-77; Resp. Ex. 48A at 13; Resp. Ex. 49A at 17; Resp. Ex. 497; *see also* Resp. Ex. 1 at 27-28 (of 303 .pdf pages); Resp. Ex. 8 at 27 (of 447 .pdf pages) (both at Section 1.1 "Controlling Party").   Also, MBIA did not agree to Tilton's proposed restructuring plans for Zohar I.   Tr. 1724-25, 2074, 2580; Resp. Exs. 498, 1803.   After Zohar I defaulted upon maturity in late 2015, Tilton, as Patriarch's representative, filed involuntary bankruptcy petitions against Zohar I.   *See* Involuntary Petitions, *In re Zohar CDO 2003-1, Ltd.*, No. 15-23680 (Bankr. S.D.N.Y. Nov. 22, 2015); *In re Zohar CDO 2003-1, Corp.*, No. 15-23681 (Bankr. S.D.N.Y. Nov. 22, 2015); *In re Zohar CDO 2003-1, LLC*, No. 15-23682 (Bankr. S.D.N.Y. Nov. 22, 2015) (collectively, Zohar Bankr. Actions), all at ECF No. 1; Tr. 2074, 2608.   Also as a result of the

---

[14]   A "wrap" is a form of financial guaranty insurance in which the insurer pledges to make interest and principal payments to noteholders or bondholders in the event the issuer defaults; in turn, the wrap enhances the quality of the issuer's credit rating, if any.   *See* State of N.Y. Ins. Dep't, Circular Letter No. 19 at 2 (2008), http://goo.gl/P7NiVL; Tr. 2104-05, 2186.

default, MBIA directed Zohar I's trustee to commence an auction of the Zohar I assets, which occurred in 2016; MBIA ultimately acquired beneficial ownership of the assets. *See* MBIA Inc. (CIK No. 0000814585), Mar. 31, 2017, Form 10-Q (filed May 10, 2017) at 13, 62; Tiffany Kary & Matt Scully, *Lynn Tilton's Patriarch Faces Off With MBIA in Zohar Auction*, Bloomberg (Dec. 21, 2016), http://goo.gl/dTr7Aa. In addition to MBIA's 2009 lawsuit and the bankruptcy proceedings, Respondents and MBIA have been engaged in other litigations arising from the Zohar deals.[15]

Patriarch resigned as collateral manager of all three Zohar Funds in March 2016, as part of a bankruptcy settlement, and the bankruptcy proceedings were dismissed. Tr. 1784, 2610-11; *see* Order Dismissing the Involuntary Chapter 11 Petitions, Zohar Bankr. Actions (Bankr. S.D.N.Y. Mar. 28, 2016), filed as ECF No. 53 in No. 15-23680. MBIA selected a new collateral manager of the Zohar Funds, which has resulted in litigation between the Zohar Funds and Patriarch in various forums. Tr. 2616; *see, e.g.*, *Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. 12247-VCS, 2016 WL 6248461 (Del. Ch. Oct. 26, 2016), *am. order & judgment*, 2016 WL 6561058 (Del. Ch. Nov. 3, 2016), *aff'd*, No. 5492016, 2017 WL 2643972 (Del. June 19, 2017); *Zohar CDO 2003-1, Ltd., v. Patriarch Partners, LLC*, No. 17-cv-307 (S.D.N.Y.) (pending).

To date, MBIA has paid nearly $1 billion in aggregate claims for insured Zohar I and II notes. MBIA Inc. (CIK No. 0000814585), Dec. 31, 2016, Form 10-K (filed Mar. 1, 2017) at 26.

## 5. Anchin

Anchin, Block & Anchin LLP has been Respondents' one and only accounting firm since the inception of Patriarch. Tr. 2149-50. Peter Berlant, CPA, an Anchin partner, was Respondents' accountant at all relevant times. Tr. 753-1097; Div. Exs. 28, 29, 30, 34. While others at Anchin performed tax services for Respondents, only Berlant performed services concerning Respondents' financial statements. Tr. 846-47, 1118.

## B. Deal Documents – Terms of the Zohar Fund Deals

The indentures for the Funds specified Patriarch as the collateral manager. Div. Exs. 1-3 [all at] Section 1.1."Collateral Manager". As discussed below, the deal documents disclosed an inherent conflict of interest in that Respondents valued the Funds' assets and determined the

---

[15] *See, e.g.*, *Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n*, No. 16-cv-7128 (S.D.N.Y) (lawsuit by Patriarch and affiliate Octaluna against U.S. Bank National Association and MBIA to prevent them from "rigging" the sale of Zohar I assets; the parties stipulated to dismissal in January 2017); *Patriarch Partners XIV, LLC v. MBIA Ins. Corp.*, 934 N.Y.S.2d 35 (N.Y. Sup. Ct., N.Y. Cty. 2011) (lawsuit by Patriarch against MBIA seeking a declaratory judgment that Patriarch is in compliance with the Zohar II collateral management agreement; the court largely resolved the matter in Patriarch's favor); *Tilton v. MBIA Inc.*, No. 68880/2015 (N.Y. Sup. Ct., Westchester Cty.) (pending lawsuit by Tilton and Patriarch against MBIA alleging breach of contract, promissory estoppel, and fraud based on MBIA's "scheme" to induce them to buy out a third-party noteholder in negotiations to extend Zohar I's maturity date).

status however defined – performing or non-performing, defaulted or current – of the Portfolio Companies' loans and could amend the terms of the loans as well. The documents warned that the assets would consist of distressed loans and granted the collateral manager considerable flexibility in valuing and categorizing the assets. The fees that the collateral manager was to receive depended on the valuation of the assets, and a low valuation benchmark gave noteholders the right to liquidate the assets. As discussed below, during the time that Patriarch was the collateral manager for the Funds, Patriarch – with Tilton as the ultimate decision-maker – selected the collateral and valued the collateral, which as illiquid debt of distressed companies was inherently a Level 3 valuation.[16]

The deal documents also disclosed a potential conflict of interest in that Respondents might own equity in Portfolio Companies. *See also* Tr. 259-60 (testimony of David Aniloff of SEI, which invested in Zohar III in the secondary market, that he knew the collateral manager also owned the equity of the underlying companies and that this was unique), 622-23 (testimony of Matthew Mach of Värde Partners, which considered investing in Zohar II, and invested in Zohar III, in the secondary market, describing this feature as "brilliant" for Patriarch).

The indenture and CMA documents were available to noteholders prior to investing in a Zohar Fund. *See, e.g.*, Tr. 102, 158-60 (testimony of David Aniloff of SEI); 592, 594 (testimony of Matthew Mach of Värde Partners); 1500, 1526, 1534-36 (testimony of Jaime Aldama of Barclays, original noteholder in Zohar I).[17] Aniloff and Mach also had trustee reports before recommending that SEI and Värde Partners, respectively, invest in Zohar III in the secondary market.[18] Tr. 272, 592, 594; Resp. Ex. 1335 at 1, 4-52; Resp. Exs. 1336, 1336.002; Resp. Exs. 1097, 1097.006. Likewise, Aldama had trustee reports when evaluating Barclays's holdings in Zohar I and considering different strategies to deal with the holdings, including selling. Tr. 1500-02, 1523, 1597-98, 1646-49.

---

[16] The Financial Accounting Standards Board (FASB) establishes financial accounting and reporting standards for public and private companies that follow Generally Accepted Accounting Principles (GAAP). Financial Accounting Standard (FAS) No. 157 prioritizes the inputs used to measure fair value into three Levels: (1) Level 1 – observable, quoted prices for identical assets or liabilities in active markets; (2) Level 2 – quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; and inputs other than quoted prices such as interest rates and yield curves; (3) Level 3 – unobservable inputs for the asset or liability based on the best information available.

[17] Insofar as Aldama testified that he did not have immediate access to the documents, his involvement began several years after Zohar I was formed in a club deal that included Barclays.

[18] Neither compared the amounts of interest borrowers actually paid with the amounts due according to interest rates on their loans. Tr. 319-21, 647-51.

## 1. Indentures

### a. Fees

The collateral manager was entitled to a Senior Collateral Management Fee of 1% of the amount of assets in the deal, paid or accrued quarterly, and a Subordinated Collateral Management Fee of 1% of assets in the deal, also paid quarterly. Answer ¶ 26. Payment or accrual of the Subordinated Fee was dependent on the performance of a test. *Id.* Entities controlled by Tilton held preference shares in the Zohar Funds. *Id.* ¶ 27. Distributions on those preference shares were also contingent on the outcome of the test. *Id.* The CMAs also disclosed the fee arrangement, *i.e.*, that the collateral manager was entitled to receive a Senior Collateral Management Fee and Subordinated Collateral Management Fee, subject to the conditions set forth in the indentures and in accordance with the priority of payments (discussed *infra*). Resp. Exs. 6, 10, 16 [all at] Section 4.1(a)-(c); Tr. 2226.

Zohar II and III paid Respondents a total of $208,415,871 in Subordinated Collateral Management Fees and Preference Share Distributions during a period starting in 2009 when the Division alleges that those Funds failed one of the tests, the Overcollateralization Ratio Test. Div. Ex. 17 at 790-97 (of 797 .pdf pages).[19]  This figure breaks down as follows: (1) Zohar II (a) Subordinated Collateral Management Fees: through the quarter ended April 2010[20] - $19,768,433; thereafter - $56,243,915; (b) Preference Share Distributions - $0; (2) Zohar III (a) Subordinated Collateral Management Fees:  September 2010 and thereafter - $91,403,522; (b) Preference Share Distributions: through the quarter ended March 2010 - $29,366,529; thereafter - $11,633,471.  *Id.* at 793-94, 796-97.

### b. Overcollateralization Ratio and Interest Coverage Ratio Tests

The indentures refer to the Overcollateralization (OC) Ratio and Interest Coverage (IC) Ratio Tests, collectively, as "Class A Coverage Tests." Div. Exs. 1-3 [all at] Section 1.1."Class A Coverage Tests".   The IC Ratio is, essentially, at the measurement date, the amount of interest the Fund collected less expenses, including the Senior Collateral Management Fee, divided by the amount owed to noteholders.  *Id.* Section 1.1."Class A Interest Coverage Ratio"; Section 11.1(a)(i)(A)-(E); *see, e.g.*, Div. Ex. 7A at 4 (showing calculation of numerator and of

---

[19]  Division Exhibit 17 is the Expert Report of Michael G. Mayer, the Division's expert witness. The Division adduced his evidence in support of its argument that Respondents should disgorge $208 million in ill-gotten gains.  Respondents argue that Mayer's methodology is faulty or that they are entitled to an offset, but they do not dispute that $208,415,871 was actually paid. Resp. Br. at 115-20; Resp. Opp. Br. at 52-55.

[20]  Insofar as these payments are subject to the possibility of disgorgement, the five-year statute of limitations provided by 28 U.S.C. § 2462 is applicable to disgorgement and runs from the date of the OIP, March 30, 2015.  *Kokesh v. SEC*, 137 S. Ct. 1635, 1644 (2017).  In a letter dated June 9, 2017, the Division reduced its requested disgorgement amount by $45,447,417 in light of the U.S. Supreme Court's June 5 decision in *Kokesh*.

denominator of IC Ratio).  The passing grade for the IC Ratio Test was 110% for all three Zohar Funds.  Div. Exs. 1-3 [all at] Section 1.1.“Class A Interest Coverage Ratio Test”.

An individual OC Ratio for Zohar I, II, and III is specified in each Fund's indenture. Resp. Ex. 1 at 20 (of 303 .pdf pages); Resp. Ex. 8 at 18 (of 447 .pdf pages); Resp. Ex. 12A at 15-16 (of 398 .pdf pages) (all at Section 1.1.  “Class A Overcollateralization Ratio”).  The denominator is the outstanding principal balance of the notes due to the Fund's investors.  Id.; Answer ¶ 30.  The numerator is essentially the collateral balance or “carrying value” plus cash. See Resp. Ex. 1 at 13, 20, 68 (Section 1.1.  “Adjusted Collateral Balance”; “Class A Overcollateralization Ratio”; “Unrestricted Collateral Balance”); Resp. Ex. 8 at 18, 50-51, 73 (Section 1.1.  “Class A Overcollateralization Ratio”; “Net Portfolio Collateral Balance”; “Unrestricted Collateral Balance”); Resp. Ex. 12A at 15-16, 46-47 (Section 1.1. “Class A Overcollateralization Ratio”; “Net Portfolio Collateral Balance”); Tr. 1890-91, 2234-35, 2251, 2370.[21]  The carrying value can be affected by how assets are categorized.  For Category 3 and 4 loans in Zohar I and II and for Collateral Investments in Zohar III, the entire principal outstanding is included in the numerator calculation; for Category 1 and 2 loans in Zohar I and II and for Defaulted Investments in Zohar III, only a portion of the principal outstanding is included based on certain metrics, as specified in each indenture.  See Resp. Ex. 1 at 13, 20, 68; Resp. Ex. 8 at 18, 50-51, 73; Resp. Ex. 12A at 15-16, 46-47.  Although these metrics call for using market values in certain situations, there generally were no obtainable market values.  Tr. 2245-46.  Thus, for Zohar I, the carrying value was typically: par, for a Category 3 or 4 loan (i.e., $1.00, even if the loan were purchased at $0.30); the purchase price, for a Category 1 or 2 loan. See Resp. Ex. 1 at 13; Tr. 1891-92, 2234-36, 2246, 2330.  For Zohar II and III, the carrying value was typically: par, for a Category 3 or 4 loan/Collateral Investment; a reduced portion of the principal using a recovery rate based on data from rating agencies, for a Category 1 or 2 loan/Defaulted Investment.  See Resp. Ex. 8 at 50-51; Resp. Ex. 12A at 46-47; Tr. 1896-98, 2370, 2418-19.

Respondents argue that although the numerator is based on an understanding of the “carrying value” of the loans under the definitions set forth in the indentures, the OC Ratio does not reflect a valuation of the loan assets.  See, e.g., Answer ¶ 30; Tr. 1891-92; Resp. Ex. 24 at 13 n.47.  Nonetheless, Tilton acknowledged that on the whole, in Zohar II and III, recategorizing an asset from a Category 4 loan/Collateral Investment to a Category 1 loan/Defaulted Investment would lower the carrying value and, in turn, could negatively impact the OC Ratio.  Tr. 1897-98.

Passing grades for the OC Ratio Test were:  105% for Zohar I; from 112% to 117% for Zohar II; and 112.7% for Zohar III.   Div. Ex. 1 Section 1.1.“Class A Overcollateralization Ratio

---

[21] The term “carrying value” in this context refers primarily to the main input of the numerator – the adjusted collateral balance or net portfolio collateral balance.  For Zohar I and II, another input called the unrestricted collateral balance – the principal balance of unrestricted collateral debt obligations, carried at 60% for Category 1 and 2 loans – represented a small portion of the numerator relative to the input for the adjusted collateral balance or net portfolio collateral balance.  See Resp. Ex. 1 at 68; Resp. Ex. 8 at 73; see, e.g., Resp. Ex. 18.076 (Zohar I Trustee Report as of Mar. 31, 2014) at 4; Resp. Ex. 19.071 (Zohar II Trustee Report as of Mar. 31, 2014) at 12.

Test"; Div. Ex. 2 Section 1.1."Class A Overcollateralization Ratio Test", "Ratings Matrix"; Div. Ex. 3 Section 1.1."Class A Overcollateralization Ratio Test Level".

Respondents argue that the IC Ratio is more significant than the OC Ratio because it compared available cash with current interest payments owed to noteholders. Resp. Br. at 5. The OIP does not allege any violations or errors in calculating the IC Ratio or of misrepresenting the amount of interest actually collected, included in the numerator.

### c. Priority of Payments (Waterfall)

The priority of payments – referred to as the waterfall – derived from the Portfolio Companies' interest payments, to be made by the trustee on the payment dates is set forth in the indentures. Div. Exs. 1-3 [all at] Sections 1.1."Priority of Payments", Sections 11.1(a)(i) and (ii); Div. Exs. 1-2 [both at] Section 11.2(a). The trustee was to pay available monies in the following order: (1) for the Fund's operational and administrative costs; (2) to Patriarch for its Senior Collateral Management Fee; (3) interest payments to the Class A noteholders; (4) payments to a preference share account up to a certain amount; (5) to Patriarch for its Subordinated Collateral Management Fee; (6) to an account to purchase or originate more loans during the reinvestment period; and (7) after the reinvestment period,[22] principal payments to all noteholders in order of priority, and then any remainder to equity and preference shareholders. *Id.* As relevant here, if a Fund failed its OC Ratio Test (or its IC Ratio Test), the trustee was to use available monies to pay down principal, starting with the highest Class A noteholders. *Id.* The Subordinated Collateral Management Fee and preference shareholders would not be paid.

### d. Event of Default by Zohar Funds

An Event of Default would be triggered if, *inter alia*, the Collateral Value Ratio fell under 102% for Zohar I, the OC Ratio fell under a certain percentage (ranging between 102% and 107%) for Zohar II, and the OC Ratio fell under 105% for Zohar III. Div. Exs. 1, 2 [both at] Section 5.1(k); Div. Ex. 2 Section 1.1 "Adjusted Event of Default Overcollateralization Ratio"; Div. Ex. 3 Section 5.1(j). It would also be triggered upon the "default in the payment of" interest on certain notes or principal on any note "when the same becomes due and payable." Div. Exs. 1-3 [all at] Section 1.1."Event of Default" and Section 5.1(a), (b). An Event of Default would empower the controlling party to liquidate the Fund's assets. Div. Exs. 1, 2 [both at] Section 1.1."Controlling Party" and Section 5.2(a); Div. Ex. 3 Section 1.1."Controlling Class" and Section 5.2(a).

### e. Defaults by Portfolio Companies to which the Funds Made Loans

As relevant to the Division's claims, a Defaulted Obligation (Zohar I and II) or Defaulted Investment (Zohar III) is one in which "a default as to the payment of principal and/or interest has occurred" and not been cured. Div. Exs. 1, 2 [both at] Section 1.1."Defaulted Obligation";

---

[22] Each Fund had a five-year reinvestment period. Div. Exs. 1-3 [all at] "Reinvestment Period"; "Scheduled Reinvestment Period Termination Date"; Tr. 2187-88.

Div. Ex. 3 Section 1.1."Defaulted Investment". A Non-Performing Obligation (Zohar I and II) or Non-Performing Collateral Investment (Zohar III) is one in which "a default as to the payment of interest has occurred and is continuing . . . during a specified period." Div. Exs. 1, 2 [both at] Section 1.1."Non-Performing Obligation"; Div. Ex. 3 Section 1.1."Non-Performing Collateral Investment". The indentures do not define the specific facts, *e.g.*, number of overdue payments or period of delinquency, that constitute a borrower's "default" (lower case). A Non-Current Obligation (Zohar I and II) or a Non-Current Collateral Investment (Zohar III) is a Defaulted Obligation or Investment in which the issuer of, or obligor on, "has previously deferred and/or capitalized as principal any interest due thereon (unless [such] interest . . . has subsequently been paid in full . . .)." Div. Exs. 1, 2 [both at] Section 1.1."Non-Current Obligation"; Div. Ex. 3 Section 1.1."Non-Current Collateral Investment". A Current Collateral Debt Obligation is defined as "[not] a Non-Current Obligation" (Zohar I and II), and a Current Collateral Investment, as "not a Non-Current Collateral Investment" (Zohar III). Div. Exs. 1, 2 [both at] Section 1.1."Current Collateral Debt Obligation"; Div. Ex. 3 Section 1.1."Current Collateral Investment".

Where the Zohars were the sole lender or Patriarch otherwise had the ability to control the decision as to whether to consider a borrower in default, Tilton was the decision-maker, after consultation with people at Patriarch and at the Portfolio Company. Tr. 1853-54. In determining whether to continue her support for a company, she required the credit team each day to provide answers to four questions concerning the company's performance and borrowings before allowing it to draw money under a revolving credit agreement. Tr. 2474-75; Resp. Ex. 208; *see also* Resp. Ex. 210 (an October 2008 weekly update from Portfolio Company GAS regarding its sales, staff reductions, and efforts to obtain new business). The loan agreements between the Funds and their borrowers are not in evidence. The undersigned assumes, with minimal evidence, that each loan agreement would specify the facts that constitute a borrower's default or event of default, as well as the actions that the lender could take against the borrower. *See* Div. Ex. 126 (a July 1, 2008, letter from Tilton to a borrower referencing its loan agreement, as amended, and agreeing to defer interest for the coming quarter, subject to terms and conditions). Division Exhibit 126 is the only approximation to a loan agreement that is in evidence. As Tilton pointed out, the performance of the Portfolio Companies deteriorated during the financial crisis, which would have been the worst possible time to default the loans and sell the companies and/or their assets. Tr. 2462-64, 2478-80.

### f. Asset Categories

For Zohar I and II, asset categories are numbered 1 through 4; Category 4 is the strongest. Div. Exs. 1, 2 [both at] Section 1.1."Category 1", "Category 2", "Category 3", "Category 4". As relevant here, a Category 4 Collateral Debt Obligation "(i) is a Current Collateral Debt Obligation, . . . (iii) with respect to [which] . . . there shall not have occurred any 'event of default' or any 'default' . . . which has not been waived . . . *and* (v) is not a Collateral Debt Obligation that has, *in the reasonable judgment of the Collateral Manager*, a significant risk of declining in credit quality or, with the passage, of time, becoming a Category 1, . . . 2 or . . . 3." *Id.* at "Category 4" (emphasis added). In practice, the assets were categorized as either 1 or 4.[23]

---

[23] Tilton explained:

*See, e.g.*, Div. Ex. 7A at 9-10, 26, 37-40 (Zohar I report as of January 29, 2010, showing aggregate principal balances for all Category 1 and 4 loans, but no existing aggregate principal balance for either Category 2 or 3 loans; and categorizing loans as only Category 1 or 4 in a recovery rate test report); Div. Ex. 8, 2010.pdf at 7 (Zohar II report as of January 7, 2010, showing 119 Category 4 loans, eleven Category 1 loans, and no Category 2 or 3 loans); Tr. 2330-31, 2417-18.   Category 4 assets are carried at the principal amount outstanding on the loan to the Portfolio Company.   Answer ¶ 35.   For Zohar III, the categories are binary:[24]   Collateral Investment or Defaulted Investment.   Div. Ex. 3 Section 1.1.<u>"Collateral Investment"</u>, "<u>Defaulted Investment</u>".

The collateral manager categorized each loan the Fund made or acquired, and the category of each asset might affect the carrying value of the asset for calculating the numerator of the OC Ratio.   Answer ¶¶ 34, 55.   Tilton was aware of the interest payments made by the Portfolio Companies and their financial condition.   Answer ¶ 46.   Tilton regularly received a quarterly interest projection, in which she was notified of the amount of interest on loans that a company expected to pay that quarter.   *Id.*

### g. Section 7.7(a) – Distressed Loans – Amendment, Forbearance, Waiver, or Supplement

Each of the indentures provided at Section 7.7(a):

The Zohar Obligors (or the Collateral Manager on behalf of such Person) may, without the consent of the Holders of any Notes or the Credit Enhancer, enter into any amendment, forbearance or waiver of or supplement to any Underlying Instrument included in the Collateral, so long as such amendment, forbearance,

---

[I]f we were working up the company, we would hold it as a Category 4, amend and restructure as we saw fit to create value.   If it were in a free-fall bankruptcy without a prepackaged plan, we would hold it as a Category 1.   Or if it came to a point that we didn't believe by putting more money in that we could create more value than where we were today, or it was going to take too much time, too much money and too much effort, then we would hold it as a Category 1.

Tr. 2330-31 (re Zohar I); *see also* Tr. 2370-72 (applying the same reasoning to Zohar II). "Category 4 just meant that it wasn't defaulted.   And if I agreed to accept less interest than the stated amount on the credit agreement, I had amended and it wasn't defaulted."   Tr. 2332. "[T]he analysis [is] . . . if I'm putting [new money] in, will I get back [that sum] plus more than the liquidation value if I liquidate today? . . . [If the new] money and time is . . . just not going to make a difference[,] that's when we would decide that this should be a Category 1."   Tr. 2372; *see also* Tr. 2464-68, 2477-81, 2716-21, 2727-28.

---

[24] This recognized that Categories 2 and 3 were rarely, if ever, used in Zohars I and II.   Tr. 2418. Tilton stated that Zohar III's Collateral Investment "is equivalent to a Category 4."   Tr. 2418.

waiver or supplement does not contravene the provisions of any Transaction Document or contravene any applicable law or regulation. For the avoidance of doubt and notwithstanding anything else contained herein, the parties hereto acknowledge and agree that the Collateral Debt Obligations will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as a consequence thereof, the Issuer or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral Debt Obligations, Equity Kickers, Equity Workout Securities and/or the relevant Underlying Instruments (i) interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Debt Obligation" and/or the Eligibility Criteria and/or (ii) Equity Workout Securities.

Div. Exs. 1, 2, 3;[25, 26, 27] *see also* Tr. 2210-14.

The April 4, 2007, Zohar III offering memorandum warned that the collateral "is expected to include a material amount of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and other negotiations" and, as a result, the Fund "may . . . receive interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of 'Collateral Investment' and the Eligibility Criteria referred to

---

[25] The segment quoted is from Zohar I's indenture. There are minor differences in wording in the same segment in Zohar II's and III's indentures: In both, "Collateral Debt Obligations" is replaced with "Collateral." In Zohar III's indenture, "Equity Workout Securities" is replaced with "Exchanged Securities," "Collateral Debt Obligation" is replaced with "Collateral Investment," and the numerals "(i)" and "(ii)" in the last sentence are omitted.

[26] Section 7.7(a) was not changed by supplemental indentures: (1) Zohar I: Resp. Ex. 2 (First Supplemental Indenture, dated Aug. 10, 2004); Div. Ex. 5 (Second Supplemental Indenture, dated Oct. 29, 2004); Resp. Ex. 4 (Third Supplemental Indenture, undated); Resp. Ex. 5 (Fourth Supplemental Indenture, dated Mar. 21, 2007); (2) Zohar II: Resp. Ex. 9 (First Supplemental Indenture, dated Oct. 31, 2007); (3) Zohar III: Resp. Ex. 13 (First Supplemental Indenture, dated Mar. 27, 2008); Resp. Ex. 14 (Second Supplemental Indenture, dated Apr. 4, 2008).

[27] The following additional language appears at the end of Section 7.7(a) in the Zohar II and III indentures:

> The Issuer (or the Collateral Manager on its behalf) shall notify each Rating Agency of any amendment, waiver or supplement to any Underlying Instrument included in the Collateral that is in the Collateral Manager's reasonable determination a material amendment, waiver or supplement of the related Pledged Obligation.

Div. Exs. 2, 3.

herein." Resp. Ex. 15[28] at 57, 134-35, 153-58 (of 248 .pdf pages). It further warned that the Fund "may originate or purchase loans . . . of . . . companies that are experiencing significant financial or business difficulties, including . . . bankruptcy." *Id*. at 60. Such investments "involve a substantial degree of risk. Any one or all of [them] . . . may be unsuccessful or not show any return for a considerable period of time . . . [and the Fund] may lose its entire investment." *Id*. SEI and Värde Partners had the Zohar III offering memorandum at the time they invested in the Fund in the secondary market. Resp. Exs. 1097, 1097.002, 1336, 1336.001.

Respondents referred openly to amendments in their communications with investors. Tr. 1676-78 (Tilton told Barclays's Aldama that she was amending the loan agreements); Resp. Exs. 117 (June 2011 email string in which Patriarch told Barclays: "We have recently amended many of the credit agreements to lower interest rates to allow them to pay full interest or defer current due interest"); 118 (September 2011 email string in which Natixis asks for Zohar II and III loans "that have recently changed coupon rates," and Patriarch's reply observes, "You are well aware that the ability to waive, amend or change interest rates to meet the current conditions of a company is an integral part of the business model" and advises that the reductions are temporary and will be re-evaluated within a year); 48A at 4 (transcript of December 2011 investor call in which Tilton tells Barclays, MBIA, and Natixis that the deals were constructed to provide for amendments "to be able to create the most amount of value to pay off the loans"); 48B (recording of same); 49A at 2 (December 2011 investor call with Zohar II noteholders in which Tilton says the deals look "very different than other CDOs in terms of the ability to change maturities, adjust interest rates, . . . extend, restructure"); 49B (recording of same); 50A at 15-16 (Zohar III 2011 investor call in which Tilton states that Global Automotive Systems was able to recover due to her ability to change the interest rate and maturity); 50B (recording of same).

Tilton made the ultimate decision on when to accept less than the contractual rate of interest due from the Portfolio Companies. Answer ¶¶ 48, 55; Tr. 1809. In most such instances she "deferred and accrued" interest. Tr. 1831-32, 1849.[29] Indications of "amendment by course of performance" by deferring and accruing (agreeing to accept less than the contractual rate of interest and deferring the remaining interest to a later date) appear in the trustee reports, as discussed *infra*. As Tilton aptly emphasized, "You want to collect as much as you can without throwing a company into foreclosure or liquidation. . . . Everyone knew what we were buying, and everyone knew what the strategy was." Tr. 1839. A deferral is an amendment to the loan or credit agreement under the terms of the applicable Zohar indenture. Tr. 1842. By contrast to a deferral, a permanent change of interest or maturity, for example, would be incorporated in a signed document. Tr. 1850. Tilton was the ultimate decision-maker on whether a loan would be considered as defaulted, through Section 7.7(a). Tr. 1853-54. Tilton considered that she could

---

[28] The Zohar III offering memorandum is also in evidence as Div. Ex. 6 and Resp. Exs. 1097.002, 1336.001.

[29] Tilton explained: "It was rare that we waived or forgave interest." Tr. 1849. By deferring and accruing unpaid interest, "if a company turned around . . . we could provide that interest to the loans . . . also . . . [if] we needed to take a company through bankruptcy, having that large accrued interest helped us keep the equity, because it became the unsecured class." *Id*.

categorize a 1 as a 4, if appropriate, using reasonable, good faith business judgment and discretion. Tr. 1863-64. As Tilton understood, categorization of a loan could have an impact on the OC Ratio. Tr. 1896-99.

When Tilton deferred interest payments, payments were deferred until she asked for payment, which could be any point in the future or never. Tr. 1836-37.

### h. Financial Statements

Each Zohar Fund was required under the terms of its indenture to provide quarterly financial statements prepared in accordance with GAAP to the trustee and each noteholder, as well as to "the Preference Share Paying Agent, the Credit Enhancer,[30] [and] each Rating Agency." Answer ¶ 57; Tr. 1119; Div. Exs. 1-3 [all at] Section 7.9(a). The indentures did not require the financial statements to be audited. Div. Exs. 1-3 [all at] Section 7.9(a). The financial statements were prepared by Patriarch's accounting department, provided to Berlant, and then ultimately approved by Tilton; the statements were then provided to the trustee, which made them available to noteholders by posting them on a secure website to which they had access. Answer ¶ 57; Tr. 151-52, 1118.

### i. Trustee Reports

Under the terms of the indentures, the trustee for each of the Funds was required to prepare and distribute a monthly report to noteholders containing various information about the Fund and its assets, including the outstanding balance of the notes, interest received, a description of loans in the portfolio, and the outcome of tests relating to the collateral, including the OC Ratio test. Answer ¶ 33; Div. Ex. 1 Section 10.12, Div. Ex. 2 Section 10.12, Div. Ex. 3 Section 10.09. The information in the reports was provided by the Funds. Specifically, the indentures required the issuer each month to provide monthly reports and quarterly note valuation reports "to each Rating Agency, the Trustee, the Preference Share Paying Agent, . . . the Collateral Manager, . . . and the Holders of Notes." Div. Ex. 1 Section 10.13, Div. Ex. 2 Section 10.13, Div. Ex. 3 Section 10.10. The trustee made the reports available to the noteholders on a secure website. Tr. 104, 311; Resp. Ex. 1656. The reports were confidential and not to be shared by the recipients with other parties. Tr. 274-76.

The indentures absolved the trustee of any responsibility to verify the accuracy of information it received from Respondents. Div. Ex. 1, 2, 3 [all at] Section 6.3(k).

---

[30] In Zohar I and II only; Zohar III did not have a Credit Enhancer. Div. Exs. 1-3 [all at] Section 7.9(a).

## 2. Collateral Management Agreements

### a. Termination for Cause

The CMAs for each Zohar Fund required Tilton to be a principal and own a minimum percentage of the equity of the respective Patriarch collateral manager (with a provision for an approved replacement).  Resp. Exs. 6, 10, 16[31] [all at] Section 1.1."Cause" (vi) and Section 5.3; Tr. 2224-25.  The holder of the controlling interest in each Fund could remove the collateral manager for specified causes.  Resp. Exs. 6, 10, 16 [all at] Section 1.1."Cause" and Section 5.3. In Zohar I and II, that party could then select a successor; in Zohar III, Patriarch XV could then select a successor, subject to the consent of the controlling class.  Resp. Exs. 6, 10 [both at] Section 5.5; Resp. Ex. 16 Section 5.4.

### b. Workouts and Restructurings

Each of the CMAs contained language that tracked the warning in Section 7.7(a) of the indentures about the assets to be held in the CLOs:

> Workouts and Restructurings.  For the avoidance of doubt and notwithstanding anything else contained herein, the Company, the Zohar Subsidiary and the Collateral Manager acknowledge and agree that the Collateral Debt Obligations [and/or] Unrestricted Collateral Debt Obligations will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as of consequence thereof, the Company and/or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral Debt Obligations, Equity Kickers, Equity Workout Securities[,] and/or the relevant Underlying Instruments (A) interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Debt Obligation" and/or the Eligibility Criteria and/or (B) Equity Workout Securities.

Div. Ex. 13 Section 2.2(p); Div. Ex. 14 Section 2.2(p); Div. Ex. 15 Section 2.2(m) (CMAs for Zohar I, II, and III, respectively);[32] *see also* Tr. 2219-21.  The CMAs also tracked Section 7.7(a)'s disclosure regarding the collateral manager's authority to amend, modify, waive, or supplement any term or condition of any loan or investment, without the noteholders' consent. Div. Exs. 13, 14, 15 [all at] Section 2.2(c).

---

[31] Resp. Exs. 6, 10, and 16 are the same as Div. Exs. 13, 14, and 15, respectively.

[32] The segment quoted is from the CMA for Zohar I.  There are minor differences in punctuation and wording in the same segment among the CMAs.  In particular, in the CMA for Zohar III "Collateral Debt Obligations" and "Collateral Debt Obligations [and/or] Unrestricted Collateral Debt Obligations" are replaced with "Collateral Investments," and the first instance of "Equity Workout Securities" is replaced with "Exchanged Securities."

### c. Conflicts of Interest

In addition to the conflict inherent in the collateral manager's authority to categorize collateral, which in turn affected the fees it would receive, the CMAs contained a provision regarding conflicts of interest arising from the collateral manager's or its affiliates' investments in or services to other firms. Tr. 2227-28; Resp. Exs. 6, 10, 16 [all at] Section 6.2. Section 6.2 dealt with conflicts. More generally, obligations of the collateral manager provided in Section 2.6 include: "[T]he Collateral Manager shall not take any action which it knows or should be reasonably expected to know in accordance with prevailing market practices would . . . adversely affect the interest of the [noteholders] . . . in any material respect (other than as contemplated hereunder or under the Indenture," with the proviso that "the Collateral Manager does not guarantee the performance of the Collateral or any payment obligation under the Indenture)." Resp. Exs. 6, 10, 16 [all at] Section 2.6.

## C. Respondents Operate the Zohars

Having become interested in distressed assets, Tilton developed a method of evaluating distressed loans – analyzing the potential cash flows and other factors; and determining on that basis whether to purchase, and an appropriate price for, each loan to make up a portfolio of varied loans that would generate sufficient cash flows to pay expenses, including interest and principal to investors in a vehicle that would hold the portfolio. Tr. 2080-98. A portion of the pool had to have a high likelihood of paying interest on a consistent basis, in order to pay investors; as Tilton explained, if all the loans were non-performing at the start, there would be no interest coming in to pay investors, while if all were higher quality, there would not be enough potential for profit because she would have to pay too much for them. Tr. 2085. In November 2003, Tilton was granted a business method patent, Patent No. US 6,654,727 B2 (Method of Securitizing a Portfolio of at Least 30% Distressed Commercial Loans), for her method. Tr. 2173-75; Resp. Ex. 65. Tilton obtained equity and became active in management of the Portfolio Companies. Tr. 2164. Since some of the Portfolio Companies were bound to fail, it was necessary for some to succeed in order to mitigate the risk of loss. Tr. 2165.

Tilton referred to her investment in, or interest in, the Zohar Funds or Portfolio Companies in general terms, but the record does not contain specifics concerning dollar amounts, her rights or obligations, or other specific details. For example, Tilton testified, "I believe I put up 5 million" for "last-out preference shares" in Zohar I. Tr. 2208; *see also* Tr. 2114. Zohar II "had $78 million of equity contribution. . . . Most of it was from me . . . part of it was from one of the funds that I wrapped." Tr. 1788. For Zohar III, "I put up $60 million of the equity." Tr. 1789.[33] For Zohar II and III and the later years of Zohar I, "much of what we had acquired was exercising our distressed private equity expertise into buying companies and loaning to [them] and giving equity upside to the fund." Tr. 1790. Tilton used the term "equity upside" some

---

[33] The dollar amounts in Tilton's testimony as to her investments in Zohar I, II, and III are approximately consistent with the evidence of Respondents' summary witness Thomas Lys concerning her entities' investments in the Funds' preference shares, based on his review of Patriarch documents. Tr. 3038-40, 3054; Resp. Ex. 132 (Lys's summary chart).

forty-eight times, and "upside equity" six times, in her testimony.[34]  Tilton confirmed that the "equity upside" is not in the trustee reports.  Tr. 2757.  She testified that she allocated the upside equity to the Funds to run through the waterfall upon a sale of the companies to pay the noteholders before she would receive the rest.  Tr. 1800-01.  She testified that she "gifted" the equity upside to the Funds.  Tr. 1934, 2261, 2596, 2687, 2756.  However, there are no deeds of gift or other documents in evidence effectuating such gifts.  Thus, it is found that, for the purpose of this administrative proceeding, the Zohar Funds, beyond their right to receive interest and principal payments on loans or other assets listed in the Trustee Reports,[35] had no express equity ownership or beneficial rights in the Portfolio Companies.

Tilton used her patented method in setting up Zohar I.  Tr. 2175-76, 2179.  The deal had a twelve-year maturity and a five-year period during which principal could be reinvested.  Tr. 2187-88.  It was a club deal.  Tr. 2207.  The three investors in the notes, totaling approximately $532 million, were Natixis, Tilton's banker; MBIA; and Barclays, which MBIA brought into the deal.  Tr. 2204-05, 2207; Answer ¶ 16.  Tilton herself invested in Zohar I preference shares.  Tr. 2208.

Starting in 2012, Tilton had tried to restructure Zohar I, at the least, to extend its maturity from November 2015 to match the maturity of Zohar II in January 2017.  Tr. 1515-21, 1695-96, 1712-19, 2561-95, 2599-611, 2701-05.  In exchange, Tilton would give up any subordinated fees and dividends that would have come to her and her affiliates.  Tr. 2572.  Barclays and MBIA did not agree to Tilton's proposal and the restructuring did not occur.  Tr. 1517-21, 1696, 2571, 2580, 2705-06.  Zohar I matured in November 2015 and defaulted.  Tr. 1796.

At the time of the hearing, Zohar II and III were still extant.

The allegations of wrongdoing relate to disclosures in the trustee reports – alleged miscategorization of loans and consequent effect on the OC Ratio Test – and in the financial statements.  The allegations directly related to the trustee reports are discussed first.

---

[34] *See, e.g.*, Tr. 2754-55 (Tilton testifying "there are multiple types of equity upside.  Some are collateral to the funds, like the special lien preferreds . . . or equity kickers . . . or equity workout securities.  But the common equity upside that I paid for lives in Octaluna where the preference shares and . . . the B notes also are held."); *see also* Resp. Exs. 125, 126A.  Adding to the indefiniteness concerning the ownership of benefits and rights in the portfolio companies is the role of the blocker corporation (Octaluna).  Tr. 2754-57, 2261 (Tilton testifying that the Zohars could not hold anything that was a U.S. taxpayer; such interests were placed in a blocker corporation).  *See also* Tr. 2118, 2170 (explaining her use of a blocker corporation in connection with a previous investment vehicle).

[35] *See, e.g.*, Div. Ex. 7A at 53 (listing equity holdings of Zohar I in several companies as of Jan. 29, 2010); Div. Ex. 9A at 39 (listing an equity holding of Zohar III in one company as of June 8, 2010); Resp. Ex. 19.100 at 19 (listing an equity holding of Zohar II in one company as of Jan. 7, 2011).

## 1. Trustee Reports

The trustee reports provided far more information than the financial statements. *See, e.g.*, Resp. Ex. 18.108 & Div. Ex. 10A (Zohar I Aug. 10, 2010, quarterly trustee report [68 pp.] & financial statements [9 pp.]); Resp. Ex. 19.098 & Div. Ex. 11A (Zohar II Jul. 8, 2010, quarterly trustee report [48 pp.] & financial statements [10 pp.]); Resp. Ex. 20.070 & Div. Ex. 12D (Zohar III Mar. 8, 2010, quarterly trustee report [51 pp.] & financial statements [10 pp.]). Of a financial statement's nine or ten pages, two pages contained dollar values – a one-page balance sheet and a one-page income statement; the remaining pages were Tilton's certificate and the notes to the financial statements. *See, e.g.*, Div. Exs. 10A, 11A, 12D. Except for a table of contents or title page, the trustee reports were comprised largely of dollar values and several financial metrics ascribed to loans, payments, and various compilations. *See, e.g.*, Resp. Exs. 18.108, 19.098, 20.070. There is no evidence in the record that any of these dollar values were inaccurate.

The trustee reports for Zohar II and III listed, in separate places, the interest rate (and balance) of each individual loan and the interest that actually was collected on the loan.[36] For example, the Zohar III report as of June 8, 2010, showed the interest rate and the intra-period interest actually collected as to loan 855_11; the interest collected was far less than the interest due according to the interest rate. Div. Ex. 9A at 19, 31; Tr. 315-21. The report includes a list of defaulted noncurrent and nonperforming loans; loan 855_11 does not appear. Div. Ex. 9A at 38; Tr. 315-16, 321. The OC Ratio was reported as passing at 125.28%. Div. Ex. 9A at 16. Further, the Zohar II report as of January 7, 2010, showed no intra-period interest collected on loan 855_11, which had a 10% interest rate and a balance of $44,949,848.59, and showed the loan as Category 4. Div. Ex. 8, 2010.pdf at 28, 36. The OC Ratio was reported as passing at 121.66%. *Id.* at 15.

The reports for Zohar I show the total interest collected and the interest rate and balance of each loan. An example is the Zohar I report as of January 29, 2010, which showed that total interest collected was far less than interest due.[37] Div. Ex. 7A at 2, 45-48. The OC Ratio was reported as passing at 120.11%. *Id.* at 3.

---

[36] Zohar III investor Värde compared the interest rate and actual interest payments reported in the trustee reports only after the institution of this proceeding. Tr. 612-14, 646-51, 675-79, 690-96, 725-26. An analyst entered the data in Excel; Mach admitted that it took just "basic math to look at the actual interest rate that had been paid." Tr. 613.

[37] Zohar I investor Barclays ascertained that a Category 4 rating did not mean that the borrower was paying full interest at the original rate. Tr. 1656-61, 1678-79, 1683, 1710-11; Resp. Ex. 1079. Barclays also discerned that there was a gap between actual interest payments and interest calculations based on the weighted average spread stated in the trustee reports. Tr. 1665-68, 1674, 1701; Resp. Ex. 117.

Zohar I trustee reports do not show loan-by-loan data on interest collected.[38]  *See, e.g.*, Div. Ex. 7A; *see also* Tr. 1596, 1647-48, 1738-39.  They show most of the loans as Category 4. *See, e.g.*, Div. Ex. 7A; *see also* Tr. 1651.  They also show Category 4 loans with interest rates declining and maturity dates extending over time.  *See, e.g.*, Div. Ex. 7, 2004.pdf at 21 (Sept. 30, 2004, Trustee Report showing Bomar Industries International Inc. Tranche A Term Loan of $10 million with an interest rate of 7.75% and maturity on June 30, 2008, as Category 4); Div. Ex. 7A at 22 (Jan. 29, 2010, Trustee Report showing the same loan with an interest rate of 3.2309% and maturity on June 30, 2010, as Category 4).  They also show total interest received.  *See, e.g.*, Div. Ex. 7A at 2 (showing "Scheduled Distributions of Interest" as part of calculation of the numerator of the IC Ratio).

The Zohar II and III trustee reports also disclosed the Senior and Subordinated Collateral Management Fees paid.  *See, e.g.*, Div. Ex. 8, 2010.pdf at 9; Div. Ex. 9A at 9.  The Zohar I trustee reports disclosed the Senior Collateral Management Fee, and the income statements disclosed the total Collateral Management Fees.  *See, e.g.*, Resp. Ex. 18.108 at 2 & Div. Ex. 10A at 3 (Zohar I Aug. 10, 2010, quarterly trustee report showing $1,799,826.45 Senior Collateral Management Fee & financial statements showing $3,599,653 Collateral Management Fees).

The trustee reports do not contain underlying financial information on the Portfolio Companies; Tilton considered that disclosing such information would reduce the Portfolio Companies' chances of being able to turn around.[39]  Tr. 2230-32; *see also* Tr. 1502-06, 1509-12, 1517-21, 1534, 1622, 1669-70, 1707 (testimony of Jaime Aldama of Barclays regarding his unsuccessful attempt to obtain underlying financial information on Zohar I Portfolio Companies in which he acknowledges that Barclays had no right to the information), 2783-84; Div. Ex. 189 at 4.

## 2.  Financial Statements

As found *supra*, the financial statements provided far less information than the trustee reports.[40]  Over the entire time that Patriarch was the Funds' collateral manager, Tilton never

---

[38] There was some loan-by-loan information that noteholders could download from the trustee's website.  Tr. 1695, 1759-62; *see* Resp. Exs. 18.001A, B (data associated with Resp. Ex. 18.001, Sept. 30, 2004, monthly report), 18.002A, B (data associated with Resp. Ex. 18.002, Oct. 29, 2004, monthly report), etc.

[39] Nor were the noteholders entitled to the credit agreements between the borrowers and the Funds.  Tr. 2784.

[40] Indeed, after approximately February 2015, when the financial statements' disclosure regarding impairment was revised and reference to GAAP and fair value was removed, the revisions included the following addition to Note 1:  "It is important that the financial statements be read in conjunction with the monthly and quarterly trustee reports, which include detailed information regarding the Collateral Debt Obligations, along with other information not included in the financial statements."  *See, e.g.*, Div. Exs. 10B, 11C, 12C [all at] 4.

was asked a question about a Fund's financial statements by noteholders, rating agencies, or anyone else. Tr. 1981-82. Barclay's Aldama, who analyzed the bank's position in Zohar I, starting in 2010, never looked at the Fund's financial statements. Tr. 1496-97, 1499-1501, 1547. The representation that Zohar III's financial statements were GAAP compliant was not important to SEI's Aniloff, who conducted the analysis and made the decision to purchase interests in the Fund during 2010 to 2013 and monitored the holdings. Tr. 375. His interest in the financial statements focused on the fair value of the collateral. Tr. 152, 154-55, 345-52. Värde's Matthew Mach, who analyzed and recommended that Värde purchase the Zohar position, focused on the fair value of the collateral and the representation that the fair valuation was conducted in accordance with GAAP. Tr. 618-20.

Tilton executed the certificates as to the financial statements of the Funds. Div. Exs. 10-12, *passim*. Through 2014, the certificates stated that the financial statements complied with GAAP.[41] *Id.* After approximately February 2015, the statement of compliance with GAAP does not appear, and this statement appears: "These financial statements have been prepared under a basis of accounting in which the Company's investment in Collateral Debt Obligations ("CDOs") are recorded at cost and the company's equity interests in portfolio companies are not recorded on the consolidated balance sheet." *Compare* Div. Exs. 10A, 11A, 11B, 12A, 12B, 12D [all at] 1 *with* Div. Exs. 10B, 11C, 12C [all at] 1.[42] Respondents made this change to reduce their risk going forward when they understood that the Commission was about to issue an OIP alleging that their financial statements did not comply with GAAP.[43] Tr. 2597-98, 2738.

Respondents' outside accountant, Peter Berlant, CPA, was not consulted about the language changes concerning compliance with GAAP (or concerning impairment and fair value, referenced *infra*) and does not know who drafted the revised language. Tr. 817-27, 883. Berlant had provided the language concerning FAS 157 that had appeared in Note 3. Tr. 1008-13; Resp. Exs. 60, 60.002.

---

[41] Specifically, the certificates as to the financial statements through November 6, 2014, for Zohar I; January 7, 2015, for Zohar II; and December 8, 2014, for Zohar III stated that they complied with GAAP. Div. Ex. 10 (Zohar I Financials) at 293-95 (of 322 .pdf pages); Div. Ex. 11 (Zohar II Financials) at 260-62 (of 280 .pdf pages); Div. Ex. 12 (Zohar III Financials) at 266-68 (of 293 .pdf pages).

[42] The change occurs starting with the financial statements for Zohar I on February 6, 2015; for Zohar II, April 8, 2015; and for Zohar III, March 6, 2015. Div. Exs. 10B, 11C, 12C.

[43] The Division argues that the change is an acknowledgement that the prior reporting did not comply with GAAP. Div. Br. at 24-26. This argument is rejected and Respondents' common-sense explanation is accepted. There is no evidence in the record that any noteholder or other interested party asked for an explanation of the change.

### 3. Disclosure of Impairment and Fair Value Policies

The notes to the Zohar financial statements contained certain disclosures regarding Patriarch's accounting policies related to impairment, fair value, and interest accrual, as discussed further below. Tr. 1111-13. The policies concerning impairment and interest accrual also relate to Respondents' categorization of loans as disclosed in the trustee reports. The policies, however, were not written down in any manual specific to the Zohar Funds. Tr. 1114, 2138-39, 2749-51; *see also* Div. Exs. 127, 128; Resp. Ex. 1766.001. Respondents' current controller, Carlos Mercado, CPA, understood the policies from discussions with the former controller and understood that Respondents had a process by which the credit team monitored the borrowers on a day-to-day basis. Tr. 1099, 1102, 1117, 1172.

### a. Impairment

The notes to the Zohar financial statements disclosed:

### NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

. . .

4. Carrying Value of Collateral Debt Obligations/Collateral Investments

. . . In the event the Company's expected realization of principal . . . is impaired, such that the anticipated future collections are determined to be less than the carrying value of the loan, the Company will record an impairment loss equal to the amount of the anticipated shortfall and will thereafter carry the loan at the reduced amount.[44]

---

[44] After approximately February 2015, Note 4 was changed, adding language indicated by underscoring as follows:

In the event the Company's expected realization of principal . . . is impaired on a permanent basis, such that the anticipated future collections are determined to be less than the carrying value of the loan, the Company will record an impairment loss equal to the amount of the anticipated shortfall and will thereafter carry the loan at the reduced amount. A Collateral Debt Obligation is not considered impaired and the carrying value of the loans is not reduced until either an event or sale occur such and to the extent that, in the judgment of the Collateral Manager, principal losses can be conclusively determined. Pursuant to Section 7.7(a) of the Indenture, the Company, through the Collateral Manager, may defer, waive, or forgive interest otherwise payable. Accordingly, a Collateral Debt Obligation is not considered impaired on the basis that interest payments are less than the amounts that would otherwise be due.

*Compare* Div. Exs. 10A, 11A, 11B, 12A, 12B, 12D [all at] 5 *with* Div. Exs. 10B, 11C, 12C [all at] 5.

5.  Revenue Recognition

. . .

> *Gains and Losses on the Settlement of Collateral Debt Obligations* – The
> Company expects that a portion of the underlying obligors of the Collateral Debt
> Obligations/Collateral Investments will be unable to repay the full principal
> outstanding under their respective credit agreements.    Given such element of
> uncertainty with regard to future collection, the Company employs the cost-
> recovery basis of accounting for the recognition of capital gain or loss.  To this
> end, the Company does not recognize gain on Collateral Debt Obligations/
> Collateral Investments until the principal collected exceeds the carrying value of a
> respective Collateral Debt Obligation/Collateral Investment . . . .

Div. Ex. 10 at 5; Div. Ex. 11 at 5; Div. Ex. 12 at 5.[45]

According to Mercado, impairment occurs when it is expected that the full amount of
principal and interest on a loan will not be collected.  Tr. 1148.  Respondents' policy since the
inception of the Zohar Funds is that the Collateral Debt Obligations/Collateral Investments are
not considered impaired unless an event or sale occurs from which a principal loss can be
conclusively determined.     Tr.  1117-18, 1149, 1175, 1256-57, 1973.    Events leading to
impairment include bankruptcy, liquidation, and restructuring of a company's debt.    Tr. 1151,
1154; *see, e.g.*, Tr. 1258-62, 1267-68 (concerning recording a write-off of a portion of a
borrower's loan on restructuring).  If there were no "event," there would be no impairment.  Tr.
1149, 1153, 1948, 1964, 1975-76.   Mercado considered this to be GAAP-compliant.  Tr. 1118,
1175.

Patriarch applied the impairment process to Category 1 loans; for the most part, Category
4 loans were held at cost and not impaired, unless there was a restructuring, because
Respondents "believed in the future recovery"; in Tilton's words, "until you know, you don't
know."   Tr. 1975-76.   Deferring interest in itself did not necessarily trigger an impairment
analysis.  Tr. 1334-35.

The Zohar accounting workpapers show losses were recognized upon impairment events.
*See, e.g.*, Tr. 1258-59; *see also* Resp. Ex. 31, Payoffs 2-7-14 Tab at Column I; Resp. Ex. 32,
Payoffs 4-8-14 Tab at Column H; Resp. Ex. 33, Payoffs 3-6-14 Tab at Column H.  When the
workpapers yielded a net loss for a given period, a corresponding loss would be recorded on the
income statement under "Gain or (Loss) on Settlement of Collateral Debt Obligations" (for
Zohar I and II) or "Gain or (Loss) on Settlement of Collateral Investments" (for Zohar III),
would be reported in the notes to the Zohar financial statements, and would reduce the loan's
carrying value – which, in turn, may affect the value of assets presented on the balance sheet.  Tr.
1256-57, 1271-72, 1148-49; *see, e.g.*, Div. Ex. 10 at 74-75, 77-78 (Zohar I, Feb. 9, 2009,

---

[45] The quoted language is modified to reflect that, in Zohar III, the term Collateral Investments is
used instead of Collateral Debt Obligations.

Financial Statement) ($2,216,388 loss tied to Resp. Ex. 31, Payoffs 2-7-14 Tab at Column I, Period Ended 2/9/09); Div. Ex. 11 at 83-84, 86-87 (Zohar II, July 8, 2009, Financial Statement) ($17,805,637 loss tied to Resp. Ex. 32, Payoffs 4-8-14 Tab at Column H, Period Ended 7/8/09); Div. Ex. 12 at 157-58, 160-61 (Zohar III, Dec. 7, 2011, Financial Statement) ($4,044,852 loss tied to Resp. Ex. 33, Payoffs 3-6-14 Tab at Column H, Period from 9/8/11 thru 12/8/11).

As Mercado testified and as Tilton expressed in an August 2010 email to Mercado, Patriarch's policy was to write off loans, not to write down. Tr. 1159-61, 1174-75, 1265; Div. Ex. 162. This policy, however, did not mean that Respondents would record an impairment loss only when writing off the entire amount of a loan; rather, it reflected Respondents' event-driven impairment policy, and losses short of a full write off were recognized in the event of loan restructuring. Tr. 1263, 1265, 1964, 2146. Indeed, the Zohar workpapers show partial write offs or write downs when Patriarch restructured loans, in which a portion of the borrower's loan that was not included in the restructuring was written off, as it was determined to be the uncollectible principal loss. Tr. 1027, 1151, 1258-62, 1267-68; *see, e.g.*, Resp. Ex. 33, Payoffs 3-6-14 Tab at Column H, Period from 12/8/08 thru 3/6/09 (reflecting a $3.7 million loss upon restructuring of an Ark II Manufacturing loan), Period from 3/6/09 thru 6/8/09 (reflecting a $1.7 million loss upon restructuring of a Zohar Waterworks loan).

Respondents' policy was consistent with a 2001 Patriarch document titled "Ark CLO 2000-1, Limited – Accounting/Tax Manual."[46] Resp. Ex. 1766.001. That manual provided:

> Under GAAP, a mere modification in terms of a loan – such as a change of interest rate, extension of maturity, release of collateral, or reduction of principal – does not, by itself, require accounting entries.

> If the modification results a material diminution of anticipated collections versus Loan Carrying Value, this situation may call for an Impairment Charge. However, since most of the modifications will be engineered to enhance the borrower's ability to service its debt, we expect that a modification will rarely, if ever, necessitate an Impairment Charge.

*Id*. at 63.[47] According to Tilton, Berlant developed the GAAP reporting portion of the manual in conjunction with a Patriarch associate and provided advice embodied in the quoted language. Tr.

---

[46] Respondents urge that the manual was in use in 2008, citing Respondents Exhibit 1766, a March 26, 2008, email to Patriarch accountants Chris Denune and William Plon, which forwarded a 2005 email from then-CFO Kimberly Sturkey. Tr. 2138, 2143, 2267. The subject line reads "FW: Helpful Tax Information and Guidance.zip," and the attachment is identified as "Helpful Tax Information and Guidance.zip." Resp. Ex. 1766. This identification might – or might not – contain the 2001 Patriarch document titled "Ark CLO 2000-1, Limited – Accounting/Tax Manual." Most of the sixty-five page manual was devoted to tax issues, but eight pages were devoted to GAAP reporting. Resp. Ex. 1766.001 at 58-65.

[47] The manual also provided, as to "GAAP Reporting of Loan Restructurings": "If assets received bear a material diminution of anticipated collections versus their respective Carrying

2143, 2145-46. Berlant, however, testified that he did not recall drafting the language or ever seeing the manual or the language prior to being questioned on it. Tr. 963. There is no additional evidence in the record on this, and no finding can be made as to whether Berlant drafted, reviewed, or commented on the language, based on the brief testimony of Tilton and Berlant.[48]

Patriarch's loan review process involved a team of six or more credit officers – also referred to as portfolio managers – who monitored borrowers day to day, including telephoning companies daily for financial information; the team provided monthly updates to Tilton, and she used the information in the impairment analysis. Tr. 1244-46, 1250-51, 1254-56, 2353. As an example of the type of information prepared by the credit team, Respondents introduced a credit template for American LaFrance, which included detailed financial information and analyses of the company and its loans, including a pricing sheet to predict future cash flows. Resp. Ex. 561; Tr. 1246, 1250-51, 2277-78. The final decision on impairment of a loan was Tilton's. Tr. 1152, 1164, 1171-72; *see, e.g.*, Div. Ex. 162.

### b. Fair Value

The notes disclosed that the fair value of the Collateral Debt Obligations/Collateral Investments, "taken as a whole, is approximately equal to the . . . carrying value presented on the Balance Sheet";[49] the dollar amount for carrying value is included both in this fair value disclosure and as the first reported figure under assets on the balance sheet. *See, e.g.*, Div. Ex. 10 at 2, 6; Div. Ex. 11 at 2, 6; Div. Ex. 12 at 2, 6. Regarding Respondents' policy on carrying

---

Values, the situation may call for an Impairment Charge. However, since most of the Restructurings will be engineered to increase the borrower's ability to service its debts, we expect such Impairments to be rare." Resp. Ex. 1766.001 at 64.

[48] The record is unclear as to whether Mercado knew of the manual. Tr. 1114 (as to accounting policies and procedures that govern loan impairments and fair value analysis of the loan assets "[t]here is no manual where that specific language is included"), 1278-79 (Denune showed him how to prepare the financial statements, and "[w]e also had an accounting manual that outlines . . . how to use the work papers in the preparation of the financial statements"); *see also* Div. Exs. 127, 128 (accounting manuals for the Zohars, which do not contain the guidance referenced in the Ark manual).

[49] After approximately February 2015, all references to fair value were removed from the financial statements. Note 3 had included a section titled "Disclosure of Fair Value of Financial Instruments" that described the GAAP framework for measuring fair value and stated that the Fund's CDOs were valued using Level 3 inputs; this section was removed from Note 3. *Compare* Div. Exs. 10A, 11A, 11B, 12A, 12B, 12D [all at] 6-7 *with* Div. Exs. 10B, 11C, 12C [all at] 6. The fair value section that was removed included the statements on fair value as quoted in the main text. A "Fair Value" column in Note 6, a chart depicting notes payable, was also removed. *Compare* Div. Exs. 10A, 11A, 11B, 12A, 12B, 12D [all at] 8 *with* Div. Exs. 10B, 11C, 12C [all at] 8.

value, the notes disclosed that: the Collateral Debt Obligations/Collateral Investments are recorded "at cost" upon acquisition or origination, which is equal to the amount of cash paid to acquire or originate them; the carrying value of the respective loan assets is reduced by principal payments received from borrowers and increased by advances to borrowers pursuant to revolving credit agreements; and loans are carried at reduced amounts when losses are recognized under Respondents' impairment policy. *See, e.g.*, Div. Ex. 10 at 5-6; Div. Ex. 11 at 5-6; Div. Ex. 12 at 5-6.

Further, the notes disclosed:

Fair value estimates are generally subjective in nature, and are made as of a specific point in time based on the characteristics of the financial instruments and relevant market information. Where available, quoted market prices are taken into account in the determination of fair value. For substantially all of the [Collateral Debt Obligations/Collateral Investments], however, fair values are based on estimates using present value of anticipated future collections or other valuation techniques. These techniques involve uncertainties and are significantly affected by the assumptions used and judgments made regarding risk characteristics of various financial instruments, discount rates, estimates of future cash flows, future expected loss experience and other factors. Changes in assumptions could significantly affect these estimates and the resulting fair values. Derived fair value estimates cannot necessarily be substantiated by comparison to independent markets and, in many cases, could not be realized in an immediate sale of the instrument. Accordingly, the aggregate fair value amounts determined by the Company do not purport to represent, and should not be considered representative of, the underlying enterprise value of the Company. In addition, because of differences in methodologies and assumptions used to estimate fair values, the Company's estimate of fair values should not be compared to those of other financial institutions.

*See, e.g.*, Div. Ex. 10 at 6; Div. Ex. 11 at 6; Div. Ex. 12 at 6.

Mercado believed that the notes to the Zohar financial statements gave sufficient notice of Patriarch's fair value valuation technique. Tr. 1176-83. Mercado, however, was not involved in the process of fair valuing loans. Tr. 1326, 1331. Nor was Berlant. Tr. 1081, 1331. Rather, Tilton conducted the fair value analysis along with the structured finance team and the credit officers. Tr. 1977.

Although acknowledging that cost and fair value are not necessarily the same, Mercado explained that the accounting and finance group and Tilton determined that carrying the assets at cost was the most effective way of determining the aggregate value of the assets because they are all distressed assets subject to highly subjective assumptions; Mercado considered this valuation technique to be GAAP-compliant. Tr. 1181-82.

Patriarch calculated fair value of the Collateral Debt Obligations/Collateral Investments as cost (cash paid for loans) minus or plus gains or losses recognized − in effect carrying cost.

Tr. 1177-83, 1273; *see also* Resp. Exs. 31, 32, 33 (Zohar workpapers) all at WTB tabs (reflecting calculation of the value of Collateral Debt Obligations/Collateral Investments each period, corresponding to this method). There could be a potentially different value for any particular loan, Tr. 1273, but Patriarch's fair value estimation process never arrived at a number different from the cost basis reported in the financial statements. Tr. 1275.

Tilton considered detailed financial data and cash-flow analyses about each Fund's overall performance and the Portfolio Companies to confirm that the carrying value, or cost, of the Collateral Debt Obligations/Collateral Investments was an accurate estimate of their fair value. Tr. 1273-74, 1978-79, 2280-83, 2297-98; *see, e.g.*, Resp. Exs. 487.001, 557, 1832 (compilation exhibit). Tilton explained:

> If when we conducted the fair value analysis, it came to a lower number than cost, then we would have lowered that number; but we used cost as the most conservative when we compared it to the carrying value on the trustee report and to our fair market value analysis, which also included equity upside which is not included in our holding value or carrying value here.
>
> So it always came up higher, so we chose to use the carrying value as the most conservative basis to hold the assets.

Tr. 1978.

Tilton acknowledged that, for the most part, Category 4 loans were held at cost and not impaired. Tr. 1975-76. She considered this to be the most conservative approach as it was "event-driven," rather than "a market value of subjective inputs." Tr. 1962-64. The subjective inputs included "when [Tilton] thought debt would pay down; when [she] thought there might be a sale of the company; what [she] thought would be the equity upside; what [she] thought the [earnings before interest, tax, depreciation and amortization (EBITDA)] might be at the time of the sale of the company." Tr. 1978-79.

**4. Accrued Interest**

Respondents' strategy of amending loans by course of performance and deferring and accruing unpaid interest might not seem entirely consistent with their treatment of accrued interest on the financial statements. However, contrary to the Division's argument, Respondents' treatment of accrued interest does not demonstrate an "inherent inconsistency" with their strategy of amending loans.

The consolidated balance sheet of each financial statement included under assets an item for "Accrued Interest and Fees Receivable," which is net of an "allowance for uncollectables." *See* Div. Exs. 10, 11, 12. Generally, accrued interest is interest that is earned but not collected at a specific point in time. Tr. 1183-84. Patriarch accrued interest based on the terms of the credit agreements of the underlying loans. Tr. 1183. Respondents' policy was to report on the balance sheet of each Zohar Fund's financial statements the amount of accrued interest that Patriarch reasonably expected to be collected in the next period, based on the amount of interest it agreed

to receive from the Portfolio Companies, taking into account any amendments or restructures. Tr. 1199-1201, 1221-22, 2023-24. The "allowance for uncollectables" was a "haircut" applied to the amount of interest that Patriarch expected to collect, as a general provision for unforeseen collection difficulties. Tr. 1185-87, 1233, 1337-38.

There was a time, before Patriarch's controller Mercado joined Patriarch in 2008, when Patriarch fully expected to collect the amounts of actual interest owed, and as a result, those were reflected on the balance sheet. Tr. 1103, 1203-05. In March 2010, Patriarch modified its methodology as to how it arrived at the accrued interest figure reported on the balance sheet. Tr. 1200. Before Zohar III's March 2010 financials were finalized, Mercado emailed Tilton and said that a 50% reduction would be applied to the unpaid current period interest of certain companies with past-due balances, whereas, in the prior three periods, the total accumulated and unpaid interest for all prior periods was reduced by specific exclusions to arrive at the accrual. Div. Ex. 218 at 1 (of 6 .pdf pages). Attached to the email are a financial statement variance analysis and an interest accrual analysis; the latter shows total accrued interest of $47.2 million and current period unpaid interest of $12.5 million. *Id*. at 2-6; Tr. 1224-25. In response to Mercado's email, Tilton said that she would prefer to discuss in person and: "We need to do this borrower by borrower based on the restructures and amendments that are in process . . . . It is more than a formula." Resp. Ex. 1775. Ultimately though, Tilton had no changes to the interest accrual. Resp. Ex. 1776.

In implementing the modified methodology, Zohar III's March 2010 balance sheet showed "Accrued Interest and Fees Receivable (net of $0.9 million allowance for uncollectables)" of $6,907,911. Div. Ex. 12D at 2; Tr. 1233-35. That is the amount Patriarch agreed to collect from the Portfolio Companies and for which it had a reasonable expectation of collectability. Tr. 1359. Under the prior methodology, the accrual would have shown a $4.1 million increase from the prior period. Div. Ex. 218 at 1; Tr. 1352. As a result of the change, Zohar III's March 2010 balance sheet showed an amount of accrued interest that was relatively consistent with the amounts reported in 2009. Tr. 1354-55; Div. Ex. 218 at 3; *compare* Div. Ex. 12D at 2 *with* Div. Ex. 12 at 47, 57, 67, 77 (of 293 .pdf pages) (March, June, September, and December 2009 balance sheets showing accrued interest of $6.31 million, $6.35 million, $6.57 million, and $6.91 million, respectively).

The goal behind the methodology change was to consistently show the amount that Patriarch expected to collect. Tr. 1355. Mercado testified that the accounting and finance group discussed the methodology change with Tilton: "The objective was not so much to keep things in line, but to be able to reflect what we expected to collect on a consistent basis."[50] Tr. 1201-02. Although the amount of interest that Patriarch expected to collect did not change, there was an "uptick" in the amount of unpaid interest, and more interest payments were being deferred in the post-financial crisis era. Tr. 1201, 1203, 1350-51, 2025. Tilton would defer and accrue interest

---

[50] Mercado also discussed Zohar III's draft March 2010 financial statements with Berlant, but the evidence does not establish whether or not their discussion addressed the methodology change. Tr. 1236; Resp. Ex. 1776.

for the purpose of keeping Portfolio Companies alive; she did not, however, consider such interest "due and owing." Tr. 2047-49, 2056.

The total accrued interest of $47.2 million was not shown on Zohar III's March 2010 balance sheet because, according to Mercado and Tilton, Patriarch did not want to overestimate or inflate the amount it expected to collect. Tr. 1189-91, 1197, 1359, 2023-24; *compare* Div. Ex. 218 at 5-6 *with* Div. Ex. 12D. The Patriarch team considered the amount of accrued interest that Patriarch expected to collect as "more meaningful" for investors to see on the balance sheet, as opposed to the total accrued interest. Tr. 1187-91, 1207, 1221, 1347-48, 1357. Tilton made the final decision on what to show on the financial statements. Tr. 1207. As Mercado testified, the total accrued interest of $47.2 million could have been ascertained from the trustee's quarterly note valuation report reflecting the cash activity, loan by loan, for principal and interest. Tr. 1340-41, 1348, 1357-60. However, the report does not express total accrued interest in a single-sum figure. Tr. 1355-56; *see* Resp. Ex. 20.070 (Zohar III, March 8, 2010, note valuation report).

Despite Respondents' methodology change in 2010, the policy disclosure in the notes to the financial statements did not change as to interest and fee income; the disclosure stated that such income would be recognized "on an accrual basis with respect to assets for which there exists reasonable certainty that such accrued interest and fee income will be collected in the future," and "doubtful" amounts are recognized when received.[51] Div. Exs. 10, 11, 12 [all at] Note 2(5) – Revenue Recognition, Interest and Fee Income; Tr. 1238-39. The methodology change, however, does not necessarily conflict with the stated policy.

The financial statements could have been presented differently to show the total accrued interest and/or the amount of accrued interest not expected to be collected while still reporting under assets the lower amount of accrued interest that Patriarch expected to collect in a given period; and it would have been easier for investors to ascertain the total accrued interest had it been reported on the balance sheet (with an allowance for the amount of accrued interest that Patriarch did not expect to collect). Tr. 1205-07, 1344-46, 1355-56. Nonetheless, the Division's argument that Respondents' accrued interest methodology was part of an effort to "actively conceal" an increase in missed interest payments is unpersuasive. As discussed elsewhere, the sophisticated, institutional investors that owned the Zohar notes could have reviewed the trustee reports and understood the actual cash activity of the distressed loans. Moreover, uncertainty regarding the collection of accrued interest at a specific point in time does not necessarily mean

---

[51] In 2015, the following language was added:

> For this reason, the Accrued Interest and Fees Receivable on the Balance Sheet presents accrued interest for which collection at the date of accrual is considered reasonably certain. The Collateral Manager and the Trustee maintain historical data relating to interest accruals, including interest accruals that the Company has considered uncertain.

Div. Ex. 10 at 307 (of 322 .pdf pages) (Zohar I, Feb. 6, 2015, Financial Statement); Div. Ex. 11 at 264 (of 280 .pdf pages) (Zohar II, Jan. 7, 2015, Financial Statement); Div. Ex. 12 at 280 (of 293 .pdf pages) (Zohar III, Mar. 6, 2015, Financial Statement).

that a loan must be deemed impaired under GAAP, and does not necessarily mean that a loan is in default or non-current for purposes of calculating the OC Ratio.

## 5. Accounting

The Zohar indentures represented that financial statements were to be prepared in accordance with GAAP. Tr. 1119; Div. Exs. 1-3 [all at] Section 7.9(a). Mercado testified that, when Patriarch personnel prepared the financial statements, "We've always relied on Peter Berlant . . . to provide us with some guidance [on GAAP]." Tr. 1280. Berlant did provide advice. Tr. 1292-1309 (*passim*); Div. Ex. 151; Resp. Exs. 61, 64, 107, 1777.

### a. Patriarch Prepared Financial Statements

Mercado, now controller, joined Patriarch in October 2008 as assistant controller. Tr. 1102-06, 1278. In those capacities, he prepared the Zohar Funds' quarterly financial statements from workpapers. Tr. 1106-11, 1278-80. Mercado considered that the financial statements complied with GAAP. Tr. 1144, 1356. The workpapers were Excel spreadsheets that had various tabs and had the information necessary to roll up to financial statements. Tr. 1108; *see also* Resp. Exs. 31-33. The workpapers were populated from the following sources: cash sheets that the trustee submitted to Patriarch; a daily extract, which was an Excel spreadsheet showing all the loans outstanding on the trustee's records; information from Patriarch's loan administration group as to all outstanding interest due on the CDO balances; and input from the structured finance group confirming the par value of the outstanding CDO balances. Tr. 1290. Typically there were about ten tabs in each workpaper for every quarter, and each tab had a certain amount of information that ultimately flowed up to the eventual financial statement – balance sheet and income statement – being prepared. Tr. 1110. All the tabs led up to the working trial balance tab which was compared to the general ledger for the various accounts that were on the financial statements. Tr. 1290-91. That flowed into a balance sheet and an income statement, and these were transferred into a Word document that reflected the full financial statements with notes included. Tr. 1291. The Word document and workpapers were then sent to Berlant. Tr. 1291-92. After Berlant's feedback, Tilton signed the officer certificate for the financial statements. Tr. 1107, 1292; Div. Exs. 10-12 (*passim*); Resp. Exs. 28.022 at 1, 29.004 at 1, 30.009 at 1, 30.013 at 1. Each Fund had a payment date (specified in the indenture). Tr. 1121; Div. Exs. 1-3 [all at] Section 1.1. "Payment Date". The cutoff date for the financial statements was eight business days before the payment date; and the financial statements had to be submitted to the trustee three days before the payment date. Tr. 1121; Div. Exs. 1-3 [all at] Section 1.1. "Determination Date", "Due Period"; Section 7.9(a). The financial statements were sent to Berlant within those five days. Tr. 1121.

### b. Berlant provided agreed-upon procedures only

As discussed below, Berlant did not provide "audit," "review," or "compilation" services with respect to the Zohar Funds. He provided "agreed-upon procedures" that included looking over and commenting on each Fund's quarterly financial statements. These comments included guidance on GAAP.

Berlant performed "agreed-upon procedures" for Respondents with respect to the Zohar Funds from 2003 to January 2016.  Tr. 757-60, 765, 889; Div. Ex. 34.[52]  He started performing these services in regard to Tilton's previous investment vehicles, the Ark funds and, starting in 2003, in regard to the Zohar Funds.  Tr. 757-59.  He did not provide "audit," "review," or "compilation" services for them.  Tr. 761-65, 1125.  Nor did he draft Zohar financial statements.  Tr. 762.  He spent an hour or two each quarter reading, footing, and commenting on Zohar financial statements.  Tr. 757, 759-62, 775-76, 778-82, 846, 928.  Berlant summarized the services that he performed as "reading of the quarterly financial statements, commenting on the clerical accuracies, the ministerial agreed-upon procedures on an annual basis for each [Zohar Fund], and response to the occasional question."  Tr. 928.  Typically, he had twenty-four to forty-eight hours from the time he received the financial statements to do this and telephone his contact at Patriarch to convey his comments.  Tr. 780-82, 932-34, 1121.

The word "review" appears in the hearing testimony and exhibits that are emails among Zohar-related participants;[53] in those instances "review" was used as a colloquial term to mean "look over," not to indicate review services as defined in accounting literature.  Mercado, Respondents' controller, confirmed that Berlant did not provide "review" services as defined in accounting literature.  Tr. 1124-26.  Rather, he was checking that the financial statements were consistent with the workpapers and providing any comments he felt necessary, including, to some degree, guidance concerning GAAP.  Tr. 1128-37.

Respondents paid Anchin approximately $17 million over fifteen years.  Tr. 1958.  More was for tax services than for Berlant's services.  Tr. 846, 897, 1959.  There is no evidence in the record as to the specific amounts paid for Berlant's services.  *See* Tr. 2150.

### c.  Berlant's Role

Berlant's role is addressed in detail because:  (1) part of Respondents' defense to the charge that the financial statements did not comply with GAAP is that they relied on him to

---

[52] Division Exhibit 34 is an engagement letter dated July 1, 2007, signed by Berlant and Tilton, describing the scope of services to be provided by Anchin.  There is no other general engagement letter in the record.  *See also* Tr. 770-71.  However, there are a number of engagement letters, between Berlant on behalf of Anchin and Tilton on behalf of Zohar, describing specific "agreed-upon procedures" services to be performed in specified periods for Zohar I, II, and III.  Resp. Exs. 52.001-.005, .007-.011.  The copies of the letters that are in the record all have signature blocks for Berlant and Tilton; some also have their signatures.  Div. Ex. 34; Resp. Exs. 52.001-005, .007-011.  The earliest date on any of the engagement letters in the record is January 1, 2006.  Div. Ex. 34; Resp. Exs. 52.001-005, .007-011.  However, all are consistent with Berlant's testimony that he performed such limited agreed-upon procedures for the Zohar Funds from 2003 onward.  Tr. 757-62, 769, 928.

[53] *See, e.g.*, Tr. 976-92; Resp. Exs. 34, 1257, 1258, 1753.  Berlant himself used "review" in the non-technical sense.  *See, e.g.*, Tr. 941; *but see* Tr. 946-47 (Berlant objecting to such use by counsel of "review," saying he "read" materials).

interpret GAAP; and (2) the Division failed to disclose timely Anchin's concurrent engagement by the Commission in a case pending in U.S. District Court, discussed *infra*. Berlant described his role as mostly clerical and ministerial. Tr. 758-62, 778-80. These tasks would take "[a]n hour, maybe two." Tr. 780. Then he would call the person who had sent him the draft – the controller or CFO – and provide his comments; the calls would last fifteen minutes or perhaps longer. Tr. 780-81.

Berlant denied ever discussing loan impairment or the need to reduce – write-down – the carrying value of loan assets under GAAP with anyone at Patriarch or telling anyone at Patriarch that he was evaluating Zohar loan assets for impairment. Tr. 787-95. He also denied discussing fair valuation of the assets with Tilton or anyone at Patriarch or telling her or anyone else at Patriarch that he was evaluating the fair value of the assets. Tr. 796-98. He also denied being asked to opine on compliance with FAS 157. Tr. 798-801. He also denied being asked to opine on language changes that removed reference to GAAP in the financial statements. Tr. 802-27. He conceded that there were isolated requests for advice relating to the interpretation of accounting issues. Tr. 893. He denied ever being asked to consider whether the financial statements complied with GAAP. Tr. 894. Mercado confirmed that Patriarch's expectation was that Berlant was checking accuracy – that what was in the workpapers was reflected in financial statements – and providing any commentary with respect to accounting issues that he felt were relevant to the financial statements. Tr. 1125-26. He also confirmed that, with reference to GAAP, Berlant was to advise whether there was an issue that Patriarch should consider to be included in the financial statements. Tr. 1128-29, 1131-32. Mercado confirmed that Berlant conveyed his comments, usually, in a telephone call and sometimes in an email. Tr. 1136.

Insofar as the foregoing suggests that Berlant's role was limited to clerical and ministerial activities, that is not entirely consistent with other record evidence of his providing accounting guidance. Tr. 1002-1013; Resp. Exs. 60, 60.001, 60.002 (February 16, 2009, email enclosing draft financial statement Notes concerning newly applicable accounting standards that Patriarch included in its financial statements; Berlant claims the draft Notes were Anchin stock language that he provided for Patriarch's determination as to whether to include them); Tr. 1013-15; Resp. Ex. 64 (November 17, 2009, email from Berlant providing language for a Note based on FAS 165 that "I recommend . . . be added to the Zohar report (and all reports that you issue from here on out)"); Tr. 1016-19; Resp. Ex. 1741 (January 23, 2004, email string in which Patriarch poses various accounting questions concerning Zohar workpapers; Berlant proposes to "look at this over the weekend" unless "an answer [is  needed] sooner"); Tr. 1019-21; Resp. Ex. 1263 (December 14, 2009, email asking Berlant for "guidance" on an accounting issue presented by the financial statements); Tr. 1022-24; Resp. Ex. 1260 (December 15, 2008, email notifying Berlant of a change in interest accruals in the draft financial statements "in the event you had any questions"); *see also* Tr. 1131-32 (Mercado:  Berlant "would make comments whether or not we needed to include something that he felt was GAAP appropriate, such as adjustments to the notes to the financial statements"), 1135-36 (Mercado: Patriarch expected Berlant would advise Patriarch of "any GAAP information that he felt should be included in the footnotes [and] [h]e, in fact, provided . . . guidance on the footnotes").

Berlant conceded that if there were a change in the standards that might have affected the financial statements, he would have advised Patriarch to take a look at it. Tr. 959. When Zohar I

was created, Berlant conceded that he "read sections of" the key transaction documents before they were finalized and "may have had comments on them." Tr. 969. In fact, the evidence shows that he *did* read and comment substantively on them. Tr. 971-74; Resp. Exs. 1196, 1259.

Several emails to which Berlant was a party refer to Berlant's approval of financial statements. Tr. 975-94; Resp. Exs. 1257, 1258, 1753, 1760, 1761. Berlant confirmed that he performed the same work from 2001 onward. Tr. 994-95.

Numerous emails in 2005-2008 from Patriarch employees forwarding Zohar I, II, or III financial statements to Tilton for her approval stated "Peter has reviewed and approved the Zohar Financials" or similar phraseology. Resp. Exs. 40, 41, 1257, 1768. This included an instance where Berlant was temporarily unavailable and it was feared that, as a result, Patriarch would miss a deadline for producing Zohar III's financial statements. Resp. Ex. 1768 at 20-26. *See also* Resp. Ex. 42 (forwarding Zohar I financial statements to Tilton for approval, noting that Berlant "has reviewed and approved the financials with only one question," and stating that the balance in an account had been adjusted in line with Berlant's explanation); Div. Ex. 136 (informed that Berlant "will review Zohar III this afternoon," Tilton replied that she "will just need to review his chnages (sic)").

Berlant testified about his February 16, 2009, email to Chris Denune[54] at Patriarch attaching draft notes concerning Financial Interpretation (FIN) No. 48 (regarding uncertainty in income taxes) and FAS No. 157 (regarding fair value measurements). Tr. 1002-13; Resp. Ex. 60. He testified that he advised Denune to consider including the language in the Zohar financial statements, but that it was up to Denune/Patriarch whether to include the language; he further testified that the FIN 48 language was a generic draft authored by Anchin's quality control or technical department but conceded that he slightly edited the FAS 157 language provided by Anchin's quality control or technical people. Tr. 1002-13. The evidence of record contains additional examples of Berlant's providing, or Patriarch's soliciting from him, advice concerning accounting issues. Tr. 1013-23; Resp. Exs. 64 (regarding FAS 165), 1256 (regarding FAS 150), 1741 at 2 (regarding accrual of a fee), 1263 (regarding accounting treatment of credit and debit entries for a cash account), 1260 (regarding accrual of interest). To the extent that Berlant's testimony could be construed as evidence that he never provided advice to Patriarch, such a construction is not entirely consistent with the other evidence in the record, including the referenced emails. Berlant never advised Respondents that he could not advise them and that they should engage another accounting firm for advice on accounting issues. Tr. 1023-26.

## D. Expert Testimony[55]

**Michael G. Mayer, CFA, CFE**, testified for the Division. Div. Exs. 17, 20. He is a vice president of Charles River Associates, a global consulting firm, and has extensive experience as an expert witness or consultant in securities disputes, including matters involving structured

---

[54] Denune was Patriarch's controller at the time. Tr. 1105.

[55] To the extent that the expert's evidence does not lead to findings of fact, it will be summarized here and referred to as appropriate in the Conclusions of Law section of this Initial Decision.

products and CDOs. Div. Ex. 17 at 3 & Ex. 1; Tr. 389-90. He was accepted as an expert in the topics on which he opined. Tr. 423-24. He opined that Zohar II and III: (1) failed their monthly OC Ratio Tests starting in July 2009 and June 2009, respectively; and (2) as a result, improperly paid $208 million in Subordinated Collateral Management Fees and preference share distributions to Respondents during the periods in which Zohar II and III failed their OC Ratio Tests – as those monies should have been paid as additional principal to investors under the "priority of payments" or "waterfall" per the Zohar governing documents. Div. Ex. 17 at 3-4, 8-9, 16-19, 62-72; Div. Ex. 20 at 2-4; Tr. 391-94. He further opined that investors could not replicate the OC Ratio Tests solely by using data available in the trustee reports but rather would have to maintain, update, and analyze over a thousand pieces of data each month to replicate the tests. Div. Ex. 17 at 4, 57; Tr. 392.

**Ira Wagner** testified for the Division. Div. Exs. 16, 19A. He is an independent consultant; has extensive experience in structured finance, including CDOs of all asset classes; and previously served as the head of the CDO group at Bear, Stearns & Co. Tr. 2839-41; Div. Ex. 16 at 7-9 & App. 2. He was accepted as an expert in the structure and operation of CLOs, including categorizations of assets within CLOs and the duties and responsibilities of CLO collateral managers. Tr. 2834, 2837-38, 2850, 2863. In general, Wagner opined that Tilton's approach to categorizing assets of the Zohar Funds was inconsistent with the methodology required by the governing documents of each Fund, and her purported failure to properly categorize assets was adverse to the interests of the Funds and investors – but beneficial to Tilton. Div. Ex. 16 at 2, 4-5. He also opined that investors were harmed by Tilton's approach because payments that should have been paid as principal to Zohar investors when the OC Ratio Tests failed were instead improperly paid to Respondents in Subordinated Collateral Management Fees and equity distributions, investors were denied information they regularly utilize to analyze investment performance, and Respondents breached standards of care and fiduciary duties. Div. Ex. 16 at 5-6, 43-50.

Wagner further opined that – contrary to Tilton's approach – a loan that has not made its current, required interest payment must be categorized as a defaulted asset (i.e., placed in Category 1 for Zohar I and II or categorized as a Default Investment for Zohar III) under the governing documents, and Tilton had no discretion to treat a loan that had not paid its contractual payments as anything other than a defaulted asset. Div. Ex. 16 at 27, 30-34, 36, 38; Div. Ex. 19A at 8. Responding to Tilton's defense theory, Wagner opined that Tilton was not "amending" the loans when accepting less than the contractual amount of interest due. Div. Ex. 19A at 3, 10-34; Tr. 2842-47.

**Steven L. Henning, Ph.D., CPA**, testified for the Division. Div. Exs. 18, 21. He is a partner at Marks Paneth LLP, a public accounting and business consulting firm, and has an extensive background in accounting and teaching the subject. Div. Ex. 18 at 2-3 & Ex. A; Tr. 1404-06. He was accepted as an expert in the topics on which he opined, namely GAAP and financial reporting. Tr. 1407, 1412-13; Div. Ex. 18 at 4. He opined that the financial statements of the Zohar Funds departed from GAAP and were false and misleading because, contrary to certain representations in the statements, GAAP-compliant impairment and fair-value analyses were not performed by Respondents. Div. Ex. 18 at 2, 4, 13-19, 22-24; Div. Ex. 21 at 2; Tr. 1407-11. He further opined that the fact that the Funds' financial statements and accompanying

certifications eliminated references to GAAP compliance in 2015 was an acknowledgement by Respondents that their prior reporting departed from GAAP.  Div. Ex. 18 at 4, 24-26; Div. Ex. 21 at 2; Tr. 1411.

**Charles R. Lundelius, Jr., CPA, CFF**, testified for Respondents and adopted the report of J. Richard Dietrich, Ph.D., who did not testify at the hearing.  Resp. Exs. 22, 27, 27A; Tr. 3145-46, 3164.  He is the managing director of the Capital Markets Group at Berkeley Research Group, LLC, and has extensive experience in public and forensic accounting.  Resp. Ex. 27A; Tr. 3276-78.  He was accepted as an expert in the topics on which he opined, which included responding to certain opinions of Division expert Henning.  Tr. 3143-44, 3147.  In general, he opined that Henning did not consider certain accounting guidance in reaching his conclusions, and Respondents' policies as to impairment and fair value were consistent with GAAP.  Resp. Ex. 27; *see, e.g.*, Tr. 3151-52, 3311.  He also opined that, contrary to the Division's theory, Respondents' policy as to accrued interest was consistent with GAAP.  Tr. 3150, 3162-63.

**Mark Froeba** testified for Respondents.  Resp. Ex. 21.  He is an independent consultant in CDOs; he previously worked in private law practice and then at Moody's Derivatives Group, where he focused exclusively on the analysis and ratings of all types of CDOs, including CLOs, and was the legal analyst on the Zohar II and Zohar III deals.  Resp. Ex. 21 at 9-12 (of 64 .pdf pages); Tr. 3326-28.  He was accepted as an expert on interpreting indentures in general and in interpreting the Zohar indentures in particular, and he responded to related issues raised by Division experts Wagner and Mayer.  Tr. 3331-32; Resp. Ex. 21 at 4 (of 64 .pdf pages).  He opined that the Zohar indentures categorize loans based upon their current terms, giving effect to all amendments, even those intended to avoid payment default; thus, a loan amended to avoid default is not a defaulted security.  Resp. Ex. 21 at 4-8, 20 (of 64 .pdf pages); Tr. 3332-33.  He further opined that the Zohar indentures reflect an investment strategy that gives Respondents broad discretion, such as the capacity to negotiate amendments to a loan that avoids a default. Resp. Ex. 21 at 8-9, 37 (of 64 .pdf pages); Tr. 3333-34.

**Peter U. Vinella** testified for Respondents and adopted certain opinions of Marti P. Murray, who did not testify at the hearing.  Resp. Exs. 25, 25A.  He is the managing director of PVA Toucan International LLC, a financial consulting firm; has extensive financial-industry experience; and previously served the CEO and president of an entity that provided trustee and collateral administration services.  Resp. Ex. 25A; Tr. 3439-40.  He was accepted as an expert in the topics on which he opined, which included responding to certain opinions of Division expert Wagner.  Tr. 3440-42; Resp. Ex. 25.  He opined that the Zohar governing documents gave Patriarch broad authority over the management and disposition of the underlying loans, including, without limitation, the ability to modify loans for any reason at its sole discretion. Resp. Ex. 25; Tr. 3443.  He also opined that Patriarch's approach should be evaluated from the perspective of what a manager of a distressed debt turnaround strategy would have reasonably done operating within a CLO that provides the same level of constraints and discretion as the Zohar Funds under the circumstances that Patriarch faced – rather than the benchmark of a typical CLO manager.  Resp. Ex. 25; Tr. 3445-46.

**John H. Dolan** testified for Respondents.  Resp. Ex. 23.  He is an independent consultant in risk management and other subjects; has extensive prior experience trading in, investing in,

and valuing structured products, including CDOs; and has held executive and senior-level positions at large portfolio managers and investment banks. Resp. Ex. 23 at 3-5, 75-76 (of 99 .pdf pages); Tr. 3463-67. He was accepted as an expert in the topics on which he opined, which included responding to the Division's allegation that Zohar investors were not informed about the decline in value of the Zohar Funds' assets and to certain opinions of Division experts Mayer and Wagner. Tr. 3468; Resp. Ex. 23 at 6 (of 99 .pdf pages). He opined that the OC Ratio is but one of many metrics available to investors to analyze the risks of their Zohar investments and any decline in value; such metrics include publicly available economic indicators and credit ratings, disclosures regarding the underlying debt collateral, and detailed information on individual loans from the trustee reports and accompanying electronic data files. Resp. Ex. 23 at 7-9 (of 99 .pdf pages); *see, e.g.*, Tr. 3469-71. He also opined that some investors developed independent valuation models of the Zohar notes, confirming that ongoing surveillance of the Zohar notes was within the capabilities of investors. Resp. Ex. 23 at 30 (of 99 .pdf pages).

**Steven L. Schwarcz** testified for Respondents and adopted a specific opinion of Murray. Resp. Exs. 26, 26A; Tr. 3506. He is a law professor at Duke University School of Law, where his teaching and research concentrates in structured finance, securitization, bankruptcies, and workouts; and he previously was a corporate partner at major law firms. Tr. 3505; Resp. Ex. 26A. He was accepted as an expert in the workout of distressed companies and the area of structured finance. Tr. 3507-08. He noted that Murray had opined that the Zohar governing documents provided Patriarch with the ability to modify loans to avert default, and he opined that successful execution of the Zohar Funds' investment strategy in distressed companies required flexibility in managing the investments; for example, he noted that Patriarch might choose to allow a Portfolio Company to delay payment of interest or principal on its debt, enabling the company to use the cash for other purposes that could assist with its successful turnaround. Resp. Ex. 26; Tr. 3509-10.

**Robert Glenn Hubbard, Ph.D.**, testified for Respondents. Resp. Ex. 24. He is a professor at and dean of the Columbia University Graduate School of Business, is an adviser to the president of the Federal Reserve Bank of New York, and has an extensive background in economics and finance, including a term as chairman of the President's Council of Economic Advisers. Tr. 3560-63; Resp. Ex. 24 at 3-4, 31-33 (of 58 .pdf pages). He was accepted as an expert in the topics on which he opined, which included responding to certain opinions of Division experts Wagner and Mayer. Tr. 3564; Resp. Ex. 24 at 4 (of 58 .pdf pages). He rendered four principal opinions: (1) the economic characteristics of the Zohar Funds are not similar to those of typical CLOs, but follow Tilton's distinct business strategy; (2) from an economic perspective, Tilton's approach was consistent with the Funds' disclosed strategy; (3) Mayer's calculations are incomplete and therefore unreliable, as they do not take into account how purported OC Ratio Test failures would change waterfall distributions in subsequent periods or impact subsequent investment decisions, operating decisions, or cash flows; and (4) contrary to Mayer's opinion, adjusted OC Ratios may be approximated with simple calculations based on the Funds' quarterly note valuation reports. Tr. 3564-65; Resp. Ex. 24 at 4-6, 14, 17, 19, 25 (of 58 .pdf pages).

### III.  THE DIVISION'S DISCLOSURE OBLIGATIONS AND ALLEGED MISCONDUCT

Respondents allege that the undersigned has interpreted in overly narrow terms the Division's obligation to turn over exculpatory and impeachment materials as required by the *Brady* doctrine, the Jencks Act, and 17 C.F.R. §§ 201.230, .231.  Resp. Concl. at 26-27; Resp. Br. at 47, 109-10.  Respondents also contend that the Division engaged in misconduct that warrants dismissal of this proceeding.  Resp. Concl. at 22-24; Resp. Br. at 110-12.

### A.  Rule 230/Brady

Pursuant to 17 C.F.R. § 201.230 (Rule 230), the Division "shall make available for inspection and copying by any party documents obtained by the Division prior to the institution of proceedings, in connection with the investigation leading to the Division's recommendation to institute proceedings."  Rule 230(b) describes documents that may be withheld and provides: "Nothing in this paragraph (b) authorizes the Division of Enforcement in connection with an enforcement or disciplinary proceeding to withhold, contrary to the doctrine of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), documents that contain material exculpatory evidence."  Rule 230(b)(2).[56]  Neither the Commission nor the courts have interpreted *Brady* expansively.  *See, e.g.*, *Weatherford*, 429 U.S. at 559; *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987); *Orlando Joseph Jett*, Admin. Proc. Rulings Release No. 514, 1996 SEC LEXIS 1683 (June 17, 1996).  Insofar as Respondents seek to reargue their *Brady* motions, they are again denied.  *See, e.g.*, *Lynn Tilton*, Admin. Proc. Rulings Release No. 4162, 2016 SEC LEXIS 3487 (A.L.J. Sept. 16, 2016); Oct. 19, 2016, Prehr'g Tr. 32-33; Tr. 447, 455, 1366-70, 1467-68, 1481-82, 1990, 1992.

Two of Respondents' *Brady* claims warrant further discussion.  First, Respondents argue that the Division improperly withheld information relating to the pre-OIP roles of its three experts.  Resp. Br. at 111; Resp. Concl. at 23.  On cross-examination, the experts testified that they were retained by the Division before the institution of this proceeding; one expert, Michael G. Mayer, CFA, testified that he had assisted the Division in developing its theory; another expert, Ira Wagner, testified that he had provided his views to the Division about certain evidence.  Tr. 438-40, 1393-98, 2822-26.  Respondents cite *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999), in which the court held that "if a witness has been extensively involved in a criminal investigation against a defendant, and is presented at trial as a neutral, detached expert against that defendant, then the witness's previous involvement qualifies as 'bias,' and the defendant is entitled to expose such bias."  Unlike *Schledwitz*, however, the Division's experts did not take part in the formal investigation of gathering evidence or conducting interviews.  *See id.* at 1014 (government expert "had been actively and intimately involved in the investigation against" the defendant, "was present during the FBI's interview with" one witness, and "himself conducted the interviews with" two other witnesses).  Rather, they evaluated the evidence and the Division's potential theories.  Also unlike *Schledwitz*, this is

---

[56] Under the Commission's 2016 amendments to its rules of practice, this disclosure requirement is now codified under Rule 230(b)(3).  *See* Amendments to the Commission's Rules of Practice, Exchange Act Release No. 78319, 81 Fed. Reg. 50,212, 50,235 (July 29, 2016) (codified at 17 C.F.R. § 201.230).

not the case where a jury could be easily misled. The undersigned has taken into consideration the experts' potential biases, including the fact that they were paid. Tr. 460, 464-65.

Second, Respondents argue that the Division improperly failed to disclose prior to Berlant's testimony its concurrent engagement with Anchin in another matter. Resp. Br. at 111; Resp. Concl. at 23. Berlant testified as a witness in the Division's case on October 26 and 27, 2016. Tr. 753-1097. On October 30, 2016, Division counsel advised Respondents' counsel that they had previously engaged the Anchin firm in a matter pending in the U.S. District Court for the District of Connecticut and paid $366,000 for forensic accounting services performed by individuals other than Berlant.[57]    Tr. 1444-91; Division's Oct. 30, 2016, Letter to the undersigned and Respondents' counsel (Oct. 30 letter). The Division also represented that: Berlant had performed no work related to that Connecticut matter and would not receive direct compensation for his firm's work on that matter; Anchin expected less than $100,000 in profits from the engagement; and, as an Anchin partner, Berlant might indirectly receive a portion of that sum derived from the Connecticut matter.[58]    Oct. 30 letter. In response, Respondents' counsel stated that it had independently identified the Connecticut matter in question (the name and case number were not disclosed by the Division) and discovered that two of the Division attorneys in the present matter were representing the Commission in the Connecticut matter. Respondents' Oct. 31, 2016, Letter to the undersigned. Respondents' counsel also discovered that – in an October 4, 2016, witness disclosure – the two Division attorneys had disclosed to the defendant in the Connecticut matter that certain individuals from Anchin may be used to support the Commission's claims. Id. at 4 & Ex. A.

Respondents urged the undersigned to dismiss the proceeding based on prosecutorial misconduct or, at least, to strike Berlant's testimony. Tr. 1443-67. The undersigned denied the request.[59]  Tr. 1467-68, 1481. However, the undersigned issued a subpoena *duces tecum*, as requested by Respondents, directed to Anchin concerning its involvement since 2006 with the Division, including, but not limited to the Connecticut matter; on November 9, 2016, Respondents reported that they had received a document response from Anchin that they believed could have been used for cross-examination of Berlant, but that they had decided not to recall him only for that purpose. Tr. 1482-86, 3625. In light of the foregoing, even though the Division made a belated disclosure, no prejudice has been shown, and no further remedial action is warranted.

---

[57] Official notice pursuant to 17 C.F.R. § 201.323 is taken of the fact that two of the attorneys who represent the Division in this proceeding are among the attorneys who represent the Commission in *SEC v. Ahmed*, No. 3:15-cv-675 (D. Conn.) (pending).

[58] Division counsel apologized at the hearing for the belated disclosure. Tr. 1456-59.

[59] The denial was one of the forty-one Key Erroneous Rulings on Respondents' motions that Respondents incorporated by reference and reiterated in their post-hearing briefing. *See* Resp. Br. at 46, 110 & App. B at 3-4.

## B. <u>Rule 231/Jencks</u>

Pursuant to 17 C.F.R. § 201.231(a), a respondent may move that the Division "produce for inspection and copying any statement of any person called or to be called as a witness by [the Division] that pertains, or is expected to pertain, to his or her direct testimony and that would be required to be produced pursuant to the Jencks Act, 18 U.S.C. 3500." The term "statement" is defined under the Jencks Act as:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). Only those statements which can properly be called the witness's own words are required to be produced. *Palermo v. United States*, 360 U.S. 343, 352-53 (1959); *see also United States v. Sasso*, 59 F.3d 341, 351 (2d Cir. 1995) ("The statute does not . . . require the government to divulge even verbatim statements by the witness if the writer 'merely select[ed] portions, albeit accurately, from a lengthy oral recital.'" (quoting *Palermo*, 360 U.S. at 352) (alteration in original)).

Respondents maintain that the Division has improperly withheld "interview notes from its interviews with witnesses reflecting those witnesses' statements and bearing on their likely direct testimony." Resp. Concl. at 24; *see* Resp. Br. at 111. Essentially, Respondents seek to reargue their Jencks motions, which are again denied. *See, e.g.*, *Lynn Tilton*, Admin. Proc. Rulings Release No. 4137, 2016 SEC LEXIS 3366 (A.L.J. Sept. 8, 2016); Oct. 19, 2016, Prehr'g Tr. at 32-33; Tr. 300-01, 534, 901-06. Respondents' attempted analogy to *Goldberg v. United States*, 425 U.S. 94 (1976), is misplaced. Unlike *Goldberg*, none of the witnesses suggested that they had "adopted or approved" anything written in interview notes. Mere speculation that the Division's interview notes might contain Jencks material does not suffice to require the Division to produce the notes or to submit them for *in camera* review. Respondents have not shown that their requests are anything other than a fishing expedition, which the Commission and the courts frown upon. *See, e.g.*, *United States v. Delgado*, 56 F.3d 1357, 1364 (11th Cir. 1995); *United States v. Boyd*, 53 F.3d 631, 634-35 (4th Cir. 1995); *United States v. Nickell*, 552 F.2d 684, 689-90 (6th Cir. 1977); *United States v. Graves*, 428 F.2d 196, 199 (5th Cir. 1970); *Orlando Joseph Jett*, 1996 SEC LEXIS 1683, at *1-2 (frowning on "fishing expeditions" in the context of *Brady* material).

Respondents also maintain that the Division improperly conducted interviews with certain witnesses off-the-record and has been "unwilling[] to create and provide [an] investigative record" of those interviews. Resp. Br. at 111. But the Division does not have a

general duty to create potential Jencks material by recording witness interviews or taking notes during such interviews. *See United States v. Houlihan*, 92 F.3d 1271, 1288-89 (1st Cir. 1996) (collecting case law).

## C. Anchin Emails

Respondents aver that the Division failed to disclose Anchin emails it had received as a result of an investigative subpoena. Respondents' counsel represents that the Division produced only two Anchin emails to Respondents, whereas the Division subpoena sought seven years of Zohar-related emails and Berlant testified that "likely, yes" he had provided more than just two emails. Resp. Br. at 111. Even accepting that representation as true, there has been no showing that any purported failure by the Division was not harmless error. *See* 17 C.F.R. § 201.230(h); *James. S. Tagliaferri*, Securities Act Release No. 10308, 2017 SEC LEXIS 481, at *38 (Feb. 15, 2017). At the hearing, Respondents offered into evidence numerous exhibits reflecting Berlant's emails sent or related to Respondents. Resp. Exs. 60, 1191, 1194, 1195, 1196, 1247, 1271, 1776, 1777.

## D. Alleged Collusion with MBIA

Throughout this proceeding, Respondents have claimed that the Division improperly colluded with MBIA by providing MBIA confidential information produced by Respondents to the Division during the investigation and allowing MBIA to use such information in civil proceedings against Tilton. *See, e.g.*, Resp. Br. at 29-30, 111. It appears that the Division agreed to share certain documents with MBIA in December 2013, Resp. Ex. 515, but the exact nature of those documents is unclear. Even if the Division's information sharing breached "'legal or ethical rules governing [Commission] investigations' [it is] 'not, without more, a defense to the SEC's suit.'" *Kevin Hall, CPA*, Exchange Act Release No. 61662, 2009 SEC LEXIS 4165, at *86 n.115 (Dec. 14, 2009) (quoting *Buntrock v. SEC*, 347 F.3d 995, 998 (7th Cir. 2003)) (first alteration in original); *see also Mabry v. Johnson*, 467 U.S. 504, 511 (1984) ("The Due Process Clause is not a code of ethics for prosecutors.").

## IV. CONCLUSIONS OF LAW

The OIP charges that Respondents willfully violated Advisers Act Sections 206(1), 206(2), and 206(4) and Rule 206(4)-8 thereunder, or, alternatively, that Patriarch Partners, LLC, willfully aided and abetted and caused violations of those provisions by the other Respondents. The OIP charges that these violations were committed in that: (1) Tilton improperly categorized and overvalued loans, such that Zohar II and III never failed their OC Ratio Tests, enabling Respondents to collect Subordinated Collateral Management Fees and other payments; and that these alleged departures from the provisions of the indentures were not disclosed to investors;[60]

---

[60] The OIP also charged that Respondents failed to disclose their conflict of interest. To the extent that this is not covered in item (1), as found above, the deal documents disclosed an inherent conflict of interest in that Respondents valued the Funds' assets, categorized the loans, could amend the terms of the loans, and were to receive fees dependent on their own valuation of the assets.

and (2) the Funds' financial statements were false and misleading and did not comply with GAAP, in respect to impairment and fair valuing of assets.

As discussed below, it is concluded that the violations are unproven.

## A. Antifraud Provisions

Advisers Act Sections 206(1), 206(2), and 206(4) make it unlawful for any investment adviser, by jurisdictional means, respectively:

> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; . . . or
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative [as defined by Commission rule].

Rule 206(4)-8 applies specifically to "any investment adviser to a pooled investment vehicle":

> It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of [Advisers Act Section 206(4)] for any investment adviser to a pooled investment vehicle to:
> (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or
> (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

## 1. Materiality

The standard of materiality is whether or not a reasonable investor or prospective investor would have considered the information important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 240 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32 (quoting *TSC Indus., Inc.*, 426 U.S. at 449); *accord Matrixx Initiatives., Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992).

Investor sophistication may influence whether an allegedly misleading or omitted fact would have assumed actual significance in the deliberations of the reasonable investor. *See McGonigle v. Combs*, 968 F.2d 810, 817 (9th Cir. 1992). Moreover, investor sophistication is a relevant consideration in assessing the adequacy of a defendant's disclosure. *United States v. Litvak*, 808 F.3d 160, 185 (2d Cir. 2015).

## 2. Scienter

Scienter is required to establish violations of Advisers Act Section 206(1). *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980); *SEC v. Steadman*, 967 F.2d at 641 & n.3. It is "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron*, 446 U.S. at 686 n.5; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *SEC v. Steadman*, 967 F.2d at 641. Recklessness can satisfy the scienter requirement. *See SEC v. Steadman*, 967 F.2d at 641-42; *David Disner*, Exchange Act Release No. 38234, 1997 SEC LEXIS 258, at *15 & n.20 (Feb. 4, 1997). Reckless conduct is "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)).

Scienter is not required to establish a violation of Advisers Act Section 206(2) or 206(4) and Rule 206(4)-8 thereunder; a showing of negligence is adequate. *See SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195 (1963); *SEC v. Steadman*, 967 F.2d at 643 & n.5; *Steadman v. SEC*, 603 F.2d 1126, 1132-34 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981). Negligence is the failure to exercise reasonable care. *IFG Network Secs., Inc.*, Exchange Act Release No. 54127, 2006 SEC LEXIS 1600, at *37 (July 11, 2006).

The Patriarch entities are responsible for the actions of their responsible principal, Tilton. *See C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1435 (10th Cir. 1988) (citing *A.J. White & Co. v. SEC*, 556 F.2d 619, 624 (1st Cir. 1977)). A company's scienter is imputed from that of the individuals controlling it. *See SEC v. Blinder, Robinson & Co.*, 542 F. Supp. 468, 476 n.3 (D. Colo. 1982) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096-97 nn. 16-18 (2d Cir. 1972)), *aff'd*, No. 82-1954, 1983 WL 20181 (10th Cir. Sept. 19, 1983).

## 3. Willfulness

Respondents are charged with *willful* primary or secondary violations of Advisers Act Sections 206(1), 206(2), and 206(4) and Rule 206(4)-8. A finding of willfulness does not require an intent to violate the law, but merely an intent to do the act which constitutes a violation. *See Steadman v. SEC*, 603 F.2d at 1135; *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965).

## 4. Fiduciary Standard

Patriarch Partners VIII, XIV, and XV were registered investment advisers during part of the time at issue. As owners of, and the parties who controlled, those entities, Tilton and Patriarch Partners, LLC, were associated persons of an investment adviser. *See* Advisers Act Sections 202(a)(17), 203(f). All Respondents were also investment advisers within the meaning of Advisers Act Section 202(11) in that they "for compensation, engage[d] in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Investment advisers and their associated persons are fiduciaries. *Fundamental Portfolio Advisors, Inc.*, Advisers Act Release No. 2146, 2003 SEC LEXIS 1654, at *54 (July 15, 2003), *pet. denied sub nom. Brofman v. SEC*, 167 F. App'x 836

(2d Cir. 2006); *see Capital Gains Research Bureau*, 375 U.S. at 191-92, 194, 201; *see also Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979). An investment adviser owes a duty to act "in a manner consistent with the best interest of [her] client and . . . not subrogate client interests to [her] own." *James C. Dawson*, Advisers Act Release No. 3057, 2010 SEC LEXIS 2561, at *8 (July 23, 2010).

The Zohar Funds (not the noteholders) were Respondents' clients within the meaning of Advisers Act Sections 206(1) and 206(2), and, thus, Respondents' fiduciary duty was owed to the Funds. *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006). Advisers Act Section 206(4) prohibits fraud by an investment adviser without reference to "any client or prospective client," and Rule 206(4)-8(a) thereunder specifically prohibits fraud by an investment adviser to a pooled investment vehicle as to "any investor or prospective investor." *See id.* at 881 n.6. The Funds were pooled investment vehicles. *See* Rule 206(4)-8(b).

## 5. Primary Liability

An associated person may be charged as a primary violator where the investment adviser is an alter ego of the associated person. *John J. Kenny*, Securities Act Release No. 8234, 2003 SEC LEXIS 1170, at *63 n.54 (May 14, 2003), *pet. denied*, 87 F. App'x 608 (8th Cir. 2004). Accordingly, since, as found above, Tilton was the decision-maker in the events at issue as well as the direct or indirect owner of the other Respondents, including Patriarch Partners, LLC, it is unnecessary to address its secondary liability for any violations.

## 6. Reliance on Accountants

Respondents raise an affirmative defense of reliance on accountants. Resp. Br. at 95-104. To the extent that Respondents argue that the involvement of Berlant or Mercado and other Patriarch accountants in the preparation of the financial statements is a defense, it fails. In considering whether to credit a claim of reliance on advice of counsel or other professional, the Commission considers four elements: "that the person made complete disclosure to counsel, sought advice on the legality of the intended conduct, received advice that the intended conduct was legal, and relied in good faith on counsel's advice." *Howard Brett Berger*, Exchange Act Release No. 58950, 2008 SEC LEXIS 3141, at *38 (Nov. 14, 2008), *pet. denied*, 347 F. App'x 692 (2d Cir. 2009); *see also SEC. v. Caserta*, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999) (articulating similar standard for reliance on accountants defense). The professional must also be independent. *C.E. Carlson, Inc.*, 859 F.2d at 1436; *Arthur Lipper Corp.*, 547 F.2d 171, 181-82 (2d Cir. 1976). There is no evidence in the record that Berlant was asked by anyone associated with Respondents whether Tilton's impairment procedures or fair value procedures complied with GAAP. Rather, the record shows that he responded to specific accounting questions on various topics and looked over the draft financial statements, raising questions that occurred to him related to GAAP compliance as well as checking administrative errors.

Likewise, Mercado denied involvement in Respondents' impairment and fair value policies. There is no evidence in the record that shows that Mercado was asked to opine on these questions; rather, he followed Respondents' historic accounting practices, learned from other

employees, and was not involved in impairing or fair valuing loans. In addition, as a Patriarch employee, he is not independent of Respondents.

Although any reliance on the advice of accountants defense fails, the fact that Tilton employed accountants and engaged an outside accountant is relevant to Respondents' degree of culpability for any violations. Berlant was given the opportunity – albeit within a short time period of about two days – to raise questions about the Funds' financial statements. There is no indication in the record that Respondents affirmatively rejected any particular advice from Berlant (or from Mercado) concerning the compliance of any course of action with GAAP.

## B. Alleged Violations

In applying the law to the facts of the instant case, it must be emphasized that the trustee reports and financial statements were not publicly available, unlike financial statements of a public issuer in the issuer's periodic reports published on the Commission's website. Rather, pursuant to the Funds' indentures, they were made available to the noteholders, the trustee, and a limited group of entities. The investors and potential investors in the Funds were Qualified Institutional Buyers and Qualified Purchasers, such as Barclays, SEI Investments, Värde Partners, and MBIA; not, in the words of Commission Chairman Jay Clayton, "Mr. and Ms. 401(k)."[61] While there may have been an information asymmetry between Tilton and the noteholders, there was not a power asymmetry.[62] While Respondents did not maximize the ease of finding it, they also did not conceal – omit to state – material information such as the amount of interest actually being paid and the interest rate and principal on the Portfolio Companies' loans. This material information underlies the alleged miscategorization of loans and consequent OC Ratio Test in the trustee reports and is related to the alleged improper valuation of assets in the financial statements.

## 1. Categorization of Assets and OC Ratio Test

The Division argues that Tilton improperly categorized the Funds' loan assets in the strongest category when many, if not most, of the loans should have been Category 1 (Zohar I and II) or Defaulted Investments (Zohar III), and that, as a result of the improper categorization, Zohar II and III never failed their OC Ratio Tests, enabling Respondents to collect Subordinated Collateral Management Fees and other payments; and that these alleged departures from the provisions of the indentures were material and not disclosed to investors. The Division does not allege that Zohar I ever "failed the OC Ratio test even if the collateral had been categorized correctly." Div. Br. at 20 n.10. It does argue that Respondents' categorization of the assets misled investors about their performance. However, it is concluded that Respondents' approach

---

[61]  *See* Commission Chairman Jay Clayton, Remarks at the Economic Club of New York (July 12, 2017).

[62]  Zohar I was a club deal; the original noteholders actually participated in negotiating the deal documents.

was disclosed in the trustee reports, which disclosed adequate information to determine that Category 4/Collateral Investment included loans that did not make full stated interest payments.

There is no dispute that many borrowers paid less interest than the original coupon rate on their loans. Tilton presented evidence that she amended loan agreements, as permitted by the indentures, by "course of performance" to allow interest payments to be deferred and accrued or otherwise to change the terms – interest rates and maturities – of loans.[63] There is no affirmative evidence that she did not amend the loan agreements. In light of the Division's burden of proof and the undisputed fact that she did accept the lesser payments or nonpayments on loans, it must be concluded that she did "amend" the loan agreements. Section 7.7(a) of the indentures effectively gave Respondents wide discretion to amend the terms of the underlying instruments. Further, as found above, the evidence does not establish the specific facts that would constitute a borrower's "default." However, assuming *arguendo* that asset categorizations and consequent OC Ratio computations were not in accord with the provisions of the indentures, this disparity was disclosed to the investors.

The investors knew that the Funds' business model was to lend to a number of distressed companies with the idea that, while some would succeed, enabling the Funds' investors to be paid, others would fail. Thus, it would be unreasonable to expect that all the borrowers would make 100% of their interest payments. Indeed, an assumption that borrowers' not making 100% of their interest payments would trigger a Fund's Event of Default – due to a failed OC Ratio Test – could result in returning the investors' funds to them soon after they invested, thus defeating the purpose of investing. The trustee reports disclosed that the interest payments received from the Portfolio Companies were far below the amounts due based on the loans' stated interest rates, yet almost no loans were Category 1 or Defaulted Investments. Noting that investors had to glean these facts from different pages of the trustee reports, the Division points to *ZPR Investment Management, Inc.*, Advisers Act Release No. 4417, 2016 SEC LEXIS 2074 (June 9, 2016),[64] in which an investment adviser distributed to the public advertisements and promotional materials containing misrepresentations concerning the adviser's past performance, and *SEC v. Nutmeg Group, LLC*, 162 F. Supp. 3d 754 (N.D. Ill. 2016), *recon. denied*, 2016 U.S. Dist. LEXIS 68176 (N.D. Ill. May 24, 2016),[65] in which an investment adviser inappropriately commingled retail investors' funds and reported this in a misleading way on account statements. These cases are inapplicable to the instant case, in which there was no affirmative misrepresentation of the interest payments collected and in which the investors – large financial institutions – could ascertain the difference between the total interest payable based on the

---

[63] Under New York law, "any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90-91 (2d Cir. 2013) (quoting *Harold J. Rosen Tr. v. Rosen*, 386 N.Y.S.2d 491, 499 (N.Y. App. Div. 1976), *aff'd*, 371 N.E.2d 828 (N.Y. 1977)).

[64] *Pet. granted in part on other grounds and denied in part*, 861 F.3d 1239 (11th Cir. 2017).

[65] A two-week jury trial in this long-running case is currently set for January 16, 2018. Order, *SEC v. Nutmeg Grp., LLC*, No. 09-cv-1775 (N.D. Ill. May 15, 2017), ECF No. 883.

interest rates of the loans and the total actually collected by comparing information disclosed in the same document.[66]  Not only were these large financial institutions able to obtain the information from the trustee reports, it would have been unreasonable for them to expect all of the companies to pay all of their interest according to the interest rates on their loans, given the business model of loaning to distressed companies.

The Subordinated Collateral Management Fee payments to Respondents resulting from the Funds' passing the OC Ratio Test are disclosed in the Zohar II and III trustee reports, and the Division does not allege that Zohar I ever failed the OC Ratio Test.[67]  Whether or not Tilton "amended" the loan agreements, the amount of interest actually collected is disclosed in the trustee reports.  The total mix of information available to the investors was such that there was no omission to state a material fact or misrepresentation of a material fact.

## 2. Financial Statements

As found above, each Fund's indenture required it to provide quarterly financial statements prepared in accordance with GAAP to its trustee and noteholders.  GAAP "are the conventions, rules, and procedures that define accepted accounting practices."  *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n.7 (1984).  GAAP include a hierarchy of statements published by the Financial Accounting Standards Board (FASB) and other sources.[68]  *Wendy McNeeley, CPA*, Exchange Act Release No. 68431, 2012 SEC LEXIS 3880, at *49 n.42 (Dec. 13, 2012).  FASB's Accounting Standards Codification (ASC) has been considered the authoritative source of GAAP for nongovernmental entities since 2009.  *Id.*; ASC 105-10-05-1.  "[F]ar from being a canonical set of rules," however, GAAP "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."  *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979).

### a. Impairment

As a general concept, FASB's guidance provides:

---

[66]  Division expert witness Mayer opined that such research and calculation would be burdensome.  However, the burden must be viewed in light of the noteholders' resources.

[67]  The Senior Collateral Management Fees are disclosed in Zohar I's trustee reports and can be compared with the total Collateral Management Fees disclosed in the financial statements; the Subordinated Collateral Management Fee, paid only if the Fund passes the OC Ratio Test, is the difference between the two.

[68]  The American Institute of Certified Public Accountants (AICPA), a private professional association, designated FASB as the body primarily responsible for setting accounting standards.  The Commission treats FASB's standards as authoritative.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000); Statement of Policy on the Establishment and Improvement of Accounting Principles and Standards, Accounting Series Release No. 150, 1973 SEC LEXIS 2259 (Dec. 20, 1973).

It is usually difficult, even with hindsight, to identify any single event that made a particular loan uncollectible. However, the concept in GAAP is that impairment of receivables shall be recognized when, based on all available information, it is probable that a loss has been incurred based on past events and conditions existing at the date of the financial statements.

ASC 310-10-35-4(a). FASB's "guidance does not specify how a creditor should identify loans that are to be evaluated for collectability," but rather states that "[a] creditor shall apply its normal loan review procedures in making that judgment" and lists "[s]ources of information useful in identifying loans for evaluation." ASC 310-10-35-14.

An entity shall disclose, as of the date of each statement of financial position presented, its recorded investment in impaired loans. ASC 310-10-50-15(a)(3). "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due [of both principal and interest payments] according to the contractual terms of the loan agreement." ASC 310-10-35-16. Probable means "[t]he future event or events are likely to occur." ASC 310-10-35-18. It "does not mean virtually certain." ASC 310-10-35-19.

FASB's guidance "does not specify how a creditor should determine that it is probable that it will be unable to collect all amounts due according to the contractual terms of a loan." ASC 310-10-35-17. Instead,

[a] creditor shall apply its normal loan review procedures in making that judgment. An insignificant delay or insignificant shortfall in amount of payments does not require application of this guidance. A loan is not impaired during a period of delay in payment if the creditor expects to collect all amounts due including interest accrued at the contractual interest rate for the period of delay.

ASC 310-10-35-17.

ASC 310-10-35-16 references subtopic 310-40 for specific application of its guidance to loans restructured in a troubled debt restructuring. Generally, "[a] restructuring of a debt constitutes a troubled debt restructuring if the creditor for economic or legal reasons related to the debtor's financial difficulties grants a concession to the debtor that it would not otherwise consider." ASC 310-40-20. "A loan restructured in a troubled debt restructuring is an impaired loan."[69] ASC 310-40-35-10. "For a loan that has been restructured in a troubled debt

---

[69] "Usually, a loan whose terms are modified in a troubled debt restructuring already will be identified as impaired. However, if the creditor has written down a loan and the measure of the restructured loan is equal to or greater than the recorded investment, no impairment would be recognized . . . ." ASC 310-40-50-4. In this circumstance, "[t]he creditor is required to disclose the amount of the write-down and the recorded investment in the year of the write-down but is not required to disclose the recorded investment in that loan in later years if . . . two criteria . . . are met": (1) "[t]he restructuring agreement specifies an interest rate equal to or greater than the rate that the creditor was willing to accept at the time of the restructuring for a new loan with

restructuring, the contractual terms of the loan agreement [for purposes of ASC 310-10-35-16] refers to the contractual terms specified by the original loan agreement, not the contractual terms specified by the restructuring agreement." ASC 310-40-35-8. However, a debt restructuring is not a troubled debt restructuring if "[t]he fair value of cash, other assets, or an equity interest accepted by a creditor from a debtor in full satisfaction of its receivable at least equals the creditor's recorded investment in the receivable." ASC 310-40-15-12(a).

Patriarch employed its normal loan review procedures – credit officers monitored the borrowers on a daily basis and reported to Tilton, who used the information in her impairment analysis. According to ASC 310-40, some of the amended loans were loans restructured in a troubled debt restructuring – Tilton "for economic or legal reasons related to the debtor's financial difficulties grant[ed] a concession to the debtor that [she] would not otherwise consider" – and impaired with reference to the "contractual terms [of] the original loan agreement." ASC 310-40-20, -35-10, -35-8. The impairment loss of Zohar restructured loans appeared on the "Gain or (Loss) on Settlement of Collateral Debt Obligations" (for Zohar I and II) or "Gain or (Loss) on Settlement of Collateral Investments" (for Zohar III) line in the income statements and was reflected in the asset value on the balance sheet. Tilton's "event-driven" impairment process was an attempt to introduce a degree of objectivity into impairment.

Loans were typically held at cost and not impaired unless there was a triggering event, such as a restructuring, because Respondents continued to support the future recovery of the underlying Portfolio Companies. That Tilton's support for the Portfolio Companies played an important, if not decisive, role in their future recovery was not a hidden fact. Given the distressed nature of the loans and unique context of Tilton's business model, determining probability of loss might not have been practical without reference to events from which losses could be conclusively determined. An alternative process to recognizing impairment losses may have involved amorphous tests – or impairing many loans simply due to the nonpayment of full interest, which would have been nonsensical in this context. The notion that impairment losses should have been recognized in a manner inconsistent with Tilton's business model is unproven.

**b. Fair Value**

"A reporting entity shall disclose . . . [,] [e]ither in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value."[70] ASC 825-10-50-10(a). Fair value is "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants

---

comparable risk"; and (2) "[t]he loan is not impaired based on the terms specified by the restructuring agreement." ASC 310-40-50-2, -4.

[70] A reporting entity is "[a]n entity or group whose financial statements are being referred to." FASB, Master Glossary. "[P]racticable means that an estimate of fair value can be made without incurring excessive costs. It is a dynamic concept: what is practicable for one entity might not be for another; what is not practicable in one year might be in another." ASC 825-10-50-17.

at the measurement date."[71]    ASC 825-10-20.  An orderly transaction is "[a] transaction that assumes exposure to the market for a period before the measurement date to allow for marketing activities that are usual and customary for transactions involving such assets or liabilities; it is not a forced transaction (for example, a forced liquidation or distress sale)."  FASB, Master Glossary; FAS 157-8.

FASB's standard FAS 157 prioritizes the inputs used to measure fair value into three Levels:  (1) Level 1 – observable, quoted prices for identical assets or liabilities in active markets; (2) Level 2 – quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; and inputs other than quoted prices such as interest rates and yield curves; (3) Level 3 – unobservable inputs for the asset or liability  based on the best information  available.

As illiquid debt of distressed companies, the loans were inherently Level 3 assets.  As found above, the notes to the financial statements disclosed that the fair value estimates were subjective and that "fair values are based on estimates using present value of anticipated future collections or other valuation techniques . . . [that] involve uncertainties and are significantly affected by the assumptions used and judgments made regarding risk characteristics of various financial instruments, discount rates, estimates of future cash flows, future expected loss experience and other factors."  Tilton's testimony that such estimates fell below the carrying value of the loans was not disproved.  The financial statements disclosed the subjective and uncertain nature of the fair valuation techniques, and in light of the Division's burden of proof, it is concluded that violation  of GAAP is unproven with reference to fair value.

### c.  Noncompliance with GAAP is Insufficient to Prove Fraud

Even if the financial statements did not comply with GAAP, "a violation of GAAP provisions . . . without corresponding fraudulent intent [is] not sufficient to state a securities fraud claim."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *accord Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999).  In the instant case, evidence of scienter or reckless conduct is lacking, and, accordingly, it is concluded that, even if their treatment of impairment or fair value on the financial statements did not comply with GAAP, Respondents did not violate Advisers Act Section 206(1).    Further, assuming that their treatment of impairment or fair value on the financial statements did not comply with GAAP, this did not alter the total mix of information available to Zohar investors in light of the more comprehensive information in the trustee reports, so that the misrepresentation or omission was not material and

---

[71]  Before 2007, FASB's guidance stated: "Quoted market prices, if available, are the best evidence of the fair value of financial instruments. If quoted market prices are not available, management's best estimate of fair value may be based on the quoted market price of a financial instrument with similar characteristics or on valuation techniques."    Statement of Financial Accounting Standards No. (FAS) 107 ¶ 11 (FASB 1991).  FAS 157 deleted this guidance, effective November 15, 2007.  *See* FAS 157-1, -4, -68 (FASB 2006).  Under FAS 157, "a fair value measurement should be determined based on the assumptions that market participants would use in pricing  the asset or liability."  FAS 157-3.

Respondents did not violate any of the charged Advisers Act provisions – Sections 206(1), 206(2), and 206(4) and Rule 206(4)-8.

## V.  ULTIMATE CONCLUSIONS

It is concluded that the violations alleged in the OIP are unproven.  Thus, this proceeding will be dismissed.

## VI.  RECORD CERTIFICATION

Pursuant to Rule 351(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.351(b), it is certified that the record includes the items set forth in the revised record index issued by the Secretary of the Commission on September 27, 2017.[72]

## VII.  ORDER

IT IS ORDERED that this administrative proceeding IS DISMISSED.

IT IS FURTHER ORDERED THAT reconsideration of the forty-one "Key Erroneous Rulings" on Respondents' motions that Respondents incorporated by reference and reiterated in their post-hearing briefing IS DENIED.

This Initial Decision shall become effective in accordance with and subject to the provisions of Rule 360 of the Commission's Rules of Practice, 17 C.F.R. § 201.360.  Pursuant to that Rule, a party may file a petition for review of this Initial Decision within twenty-one days after service of the Initial Decision.  A party may also file a motion to correct a manifest error of fact within ten days of the Initial Decision, pursuant to Rule 111 of the Commission's Rules of Practice, 17 C.F.R. § 201.111.  If a motion to correct a manifest error of fact is filed by a party, then a party shall have twenty-one days to file a petition for review from the date of the undersigned's order resolving such motion to correct a manifest error of fact.  The Initial Decision will not become final until the Commission enters an order of finality.  The Commission will enter an order of finality unless a party files a petition for review or motion to correct a manifest error of fact or the Commission determines on its own initiative to review the Initial Decision as to a party.  If any of these events occur, the Initial Decision shall not become final as to that party.

_____
Carol Fox Foelak
Administrative Law Judge

---

[72] The revised record index implements changes ordered on September 26, 2017.  *See Lynn Tilton*, Admin. Proc. Rulings Release No. 5096, 2017 SEC LEXIS 3018 (A.L.J. September 26, 2017).  Additionally, Respondents' Exhibit 12, the Zohar III indenture, was supplemented, for completeness, by Respondents' May 30, 2017, submission of Exhibit 12A, which has additional exhibits included within the indenture.  Exhibit 12A is admitted into evidence.

# Exhibit 21

Final SEC Order

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION


INVESTMENT ADVISERS ACT OF 1940
Release No. 4815 / November 28, 2017

INVESTMENT COMPANY ACT OF 1940
Release No. 32926 / November 28, 2017

Admin. Proc. File No. 3-16462

LYNN TILTON;
PATRIARCH PARTNERS, LLC;
PATRIARCH PARTNERS VIII, LLC;
PATRIARCH PARTNERS XIV, LLC; and
PATRIARCH PARTNERS XV, LLC


NOTICE THAT INITIAL DECISION HAS BECOME FINAL


The time for filing a petition for review of the initial decision in this proceeding has expired.  No such petition has been filed by the Division of Enforcement and the Commission has not chosen to review the decision on its own initiative.

Accordingly, notice is hereby given, pursuant to Rule 360(d) of the Commission's Rules of Practice,[1] that the initial decision of the administrative law judge has become the final decision of the Commission with respect to Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC.[2]  The order contained in that decision is hereby declared effective.  The initial decision ordered that this administrative proceeding is dismissed.

For the Commission, by the Office of the General Counsel, pursuant to delegated authority.



Brent J. Fields
Secretary



---

[1]    17 C.F.R. § 201.360(d).

[2]    *Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC*, Initial Decision Release No. 1182 (Sept. 27, 2017), 117 SEC Docket 14, 2017 WL 4297256.

# Exhibit 22

Excerpts of April 14, 2018 Deposition of Lynn Tilton

[REDACTED]

# Exhibit 23

Resignation Letter



# PATRIARCH PARTNERS

One Liberty Plaza, 35th Floor
New York, NY 10006
(212) 825-0550

Via Electronic Mail

March 21, 2020

Joseph Farnan, Independent Director, Zohar Funds
Mike Katzenstein, Chief Restructuring Officer, Zohar Funds

      Re:  Resignation

Dear Joe and Mike,

As you know, the Zohars very recently filed an adversary proceeding in the pending bankruptcy, seeking, among other things, a declaration that they are the beneficial owners of all of the Group A and Group B portfolio companies, and that all proxies and LLC amendments executed in connection with those companies are null and void.  As you also know, the Zohars previously sought similar declarations of beneficial ownership and invalidity for the proxies and LLC amendments, and even executed consents purporting to replace me as the Board or managing member for many of the portfolio companies[1].  While the Zohars never sought to recommence the stayed litigation addressing the ownership and control disputes, the declaratory relief the Zohars now seek would permit the Zohars to replace me as Manager or Board of the Group A and Group B portfolio companies as they have attempted to do since November 2016.

Because of actions taken by the Zohars, including last week's mediation failure where the Zohars chose not to negotiate and continued to refuse to extend the term loan maturity dates, and the filing of an adversary action that continues the Zohars' smear campaign against me in court, I know that I can no longer effectively lead the companies forward into the future.  At present, the Portfolio Companies who owe funds to the Zohars continue to operate in default, and the risk of imminent foreclosure creates overwhelming obstacles that cannot be

---

[1] The Zohars previously executed consents purporting to replace me as the Board or Managing Member for Glenoit Universal, Ltd., FSAR Holdings, Inc. CBA/Universal Instruments, Inc., Stila Styles, LLC, Croscill, LLC, Jewel of Jane, LLC, IMG Holdings, Inc., Snelling Holdings, LLC, Gorham Tissue and Paper, LLC, Dura Buyer, LLC, Global Automotive Systems, LLC, and RM Acquisition, LLC.



# PATRIARCH PARTNERS

One Liberty Plaza, 35th Floor
New York, NY 10006
(212) 825-0550

overcome.  The Portfolio Companies are unable to secure the capital necessary to pay for equipment, retain employees, invest in value-creating research and development, or otherwise operate in normal course.  The relentless risk of foreclosure by Debtors has inspired a potentially fatal loss of confidence among employees, customers, suppliers, and other business partners, depressing the Companies' values.  By continuing to force the Portfolio Companies to operate in default, Debtors force upon the Portfolio Companies an unwarranted appearance of financial distress and a perception among potential buyers that these Companies are substantially less valuable than they actually are, slowing any efforts to monetize the Companies and reducing the value of any ultimate monetization event. The fate of Dura and the actions taken by the Zohars and the DIP lender with respect to that company and its operations have served as a cautionary tale to much of the leadership of other Portfolio Companies, resulting in resignations of key leaders.

Moreover, your actions have placed me in the untenable position of making commitments to customers, vendors and employees with no assurance that I can meet such commitments due to imminent potential foreclosure.  This raises ethical issues that render it impossible for me to continue in my roles, running the companies in the ordinary course when, indeed nothing is ordinary.  Due to the Zohars' actions, I am no longer able to live to commitments made to these customers, vendors and employees.  As the Zohars control the future of these companies, I feel I can no longer continue in my roles.

As I can no longer effectively serve in my positions as Manager, Director and/or CEO of the Group A and Group B Portfolio Companies, this letter shall serve as notice of my immediate resignation from all such positions, including as CEO of GAS, MDHI, and Stila.[2] Under the express terms of the LLC Agreements and Shareholder agreements, such resignation is deemed accepted upon receipt.

In addition, the Patriarch Stakeholders and I withdraw our objection (i) to the prior consents executed by the Zohars purporting to remove and replace me in my director and manager roles, and (ii) the Zohars' allegations that they are the

---

[2] This letter does not address my position as Zohar Tax Director. And, as set forth below, I am not resigning my positions at Dura.



One Liberty Plaza, 35th Floor
New York, NY 10006
(212) 825-0550

beneficial owners of the Portfolio Company equity and membership interests. While we continue to believe that the Zohars' positions as to the validity of the proxies, the LLC amendments and the beneficial ownership issues are incorrect, we will no longer litigate these issues. To that end, all of the benefits and burdens of ownership belong to the Zohars.

While I am deeply saddened and disappointed that we could never achieve a mutually agreeable resolution to this case or a path forward to preserve value at the companies during the sales process, the actions set forth herein are consistent with the relief the Zohars seek in their March 10 complaint, and I believe my resignations are in the best interest of all constituencies. In the current environment, it is only more important that the Portfolio Companies are not caught in the middle of constituency conflict and personal battles. They will need unilateral support, relief, capital and attention. It is my deepest hope that you give your full attention to, and take care of, the companies and their loyal and devoted employees, allowing the companies to reach their full potential and maximize value for all Zohar stakeholders. I will of course reasonably cooperate with your new leadership to accomplish the transition. Please note that I am not resigning from Dura at this time due to the crisis the company and employees face absent a buyer and sufficient cash to continue as a going concern.

Sincerely,

Lynn Tilton