## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ——————————————— | ) | |
| | ) | |
| ZOHAR CDO 2003-1, LIMITED; ZOHAR | ) | |
| II 2005-1, LIMITED; and ZOHAR III, | ) | |
| LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No. 20-50534 (KBO) |
| v. | ) | |
| | ) | |
| PATRIARCH PARTNERS, LLC; | ) | |
| PATRIARCH PARTNERS VIII, LLC; | ) | |
| PATRIARCH PARTNERS XIV, LLC; | ) | |
| PATRIARCH PARTNERS XV, LLC; | ) | |
| PHOENIX VIII, LLC; OCTALUNA LLC; | ) | |
| OCTALUNA II LLC; OCTALUNA III, | ) | |
| LLC; ARK II CLO 2001-1, LLC; ARK | ) | |
| INVESTMENT PARTNERS II, LP; ARK | ) | |
| ANGELS VII, LLC; PATRIARCH | ) | |
| PARTNERS MANAGEMENT GROUP, | ) | |
| LLC; PATRIARCH PARTNERS AGENCY | ) | |
| SERVICES, LLC; and LYNN TILTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

**TABLE OF CONTENTS**

I.    **SUMMARY OF THE ALLEGED FACTS** ........................................................ 1

    A.    The Parties ........................................................................................... 1

    B.    Tilton's Alleged Misuse of the Funds and Portfolio Companies .......................... 3

        1.    Overcollateralization Test ........................................................... 4

        2.    Voting/Control Actions ............................................................... 5

        3.    PPMG Agreements and Phantom Equity Agreements .............................. 6

        4.    Ownership of Equity ................................................................... 7

II.    **APPLICABLE LEGAL STANDARD** ......................................................... 7

III.    **LEGAL DISCUSSION** ......................................................................... 8

    A.    Statute of Limitations ............................................................................. 9

        1.    Counts 4 and 28 ..................................................................... 10

        2.    Counts 9, 10, 31, and 32 .......................................................... 12

    B.    Preclusion of the OC Test Claims ............................................................. 14

    C.    Viability of the Tortious Interference Claims in Light of Defendants' Positions and Interests ........................................................................... 17

        1.    Tortious Interference by a Director or Officer (Counts 5, 16, 17, and 28) .................................................................................. 17

        2.    The Economic Interest Doctrine (Counts 5, 16, 17, 26, 27, and 28) ........ 20

    D.    Failure to Plead Fraudulent Transfer Claims ................................................ 21

        1.    Failure to Adequately Allege the Transactions Sought to be Avoided (Counts 9, 10, 31, and 32) ......................................................... 23

            (a)    Counts 9 and 10 ........................................................ 23

            (b)    Counts 31 and 32 ...................................................... 25

        2.    Failure to Adequately Allege Insolvency (Counts 10, 12, 20, 22, and 32) ............................................................................... 26

        3.    Failure to Adequately Allege Badges of Fraud (Counts 9, 11, 19, 21, and 31) ........................................................................... 27

        4.    Failure to Allege Creditor Status (Counts 31 and 32) ........................... 28

    E.    Duplicative Tort and Quasi-Tort Claims ..................................................... 29

        1.    The Unjust Enrichment Claims (Counts 13, 14, 24, and 33) ................... 30

        2.    Breach of Fiduciary Duty Claims (Counts 6 and 7) ............................. 32

    F.    Viability of Claims Arising From the "Check the Box" Election ...................... 33

i

|   | 1. | Lack of Standing (Counts 15, 16, 17, 19, 20, 21, 22, and 23) .................. 34 |
|---|---|---|
|   | 2. | Octaluna Entities Were Permitted to Act (Counts 15, 16, 17, 19, 20, 21, 22, and 23) ........................................................................ 35 |
|   | 3. | CTB Election Did Not Result in a Transfer of the Funds' Property That May be Avoided (Counts 19, 20, 21, and 22)................................. 37 |

| G. | | Mootness of Counts 9 and 10................................................................ 39 |
|---|---|---|
|   | 1. | The September 2015 Transfers ................................................... 39 |
|   | 2. | Voting/Control Transfers Related to Dura Automotive Systems, LLC and Its Affiliated Debtors........................................................... 40 |

| H. | | Remaining Individual Claim Issues ...................................................... 41 |
|---|---|---|
|   | 1. | Count 1 – Declaratory Judgment of Equity Ownership........................... 41 |
|   | 2. | Count 2 – Declaratory Judgment That Voting/Control Actions Were Ineffective ................................................................................ 41 |
|   | 3. | Count 3 – Declaratory Judgment (PPMG Agreements) .......................... 41 |
|   | 4. | Count 4 – Breach of CMAs and Indentures........................................... 44 |
|   |   | (a)  Voting/Control Actions.................................................. 45 |
|   |   | (b)  November 2017 Written Consents.................................. 46 |
|   |   | (c)  Section 2.2(f)(iv)......................................................... 46 |
|   | 5. | Count 8 – Conversion of Zohar Funds' Property...................................... 47 |
|   | 6. | Count 17 – Tortious Interference with Indentures Based on the CTB Election ...................................................................................... 50 |
|   | 7. | Count 18 – Conversion of Tax Dividends ............................................... 50 |
|   | 8. | Count 23 – Permanent Injunction ....................................................... 51 |
|   | 9. | Counts 25 and 27 – Breach of the Portfolio Company LLC Agreements and Tortious Interference........................................... 52 |
|   |   | (a)  Standing ....................................................................... 53 |
|   |   | (b)  Breach of the LLC Agreements .................................... 56 |
|   | 10. | Counts 29 and 30 – Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty........................................... 58 |

| I. | | Patriarch Partners ............................................................................. 59 |
|---|---|---|
| **IV.** | | **CONCLUSION** .......................................................................... 59 |

This adversary proceeding relates to the bankruptcy cases of the above-captioned debtors and Plaintiffs, Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II"), and Zohar III, Limited ("Zohar III" and together with Zohar I and Zohar II, the "Funds"). The Funds' cases were commenced under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on May 11, 2018 (the "Petition Date"). On March 9, 2020 (the "Commencement Date"), shortly less than two years after the Petition Date, the Complaint was filed. As the Court will discuss more thoroughly herein, the Complaint contains thirty-three counts alleging a variety of claims against the Defendants. On September 21, 2020, the Defendants moved to dismiss (the "Motion to Dismiss") the Complaint in its entirety and with prejudice pursuant to Rule 12(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Briefing on the Motion to Dismiss was completed on December 18, 2020.[2] The Complaint and all briefing related to the Motion to Dismiss was under seal until March 2021, when the parties filed redacted versions after revisiting confidentiality given the progression of the bankruptcy cases. Argument on the Motion to Dismiss was held on April 21, 2021, and the matter is ripe for adjudication.[3]

## I.    SUMMARY OF THE ALLEGED FACTS

### A.    The Parties

The Funds are a series of collateralized loan obligation funds formed in the mid-2000s by Lynn Tilton ("Tilton").[4] Each Fund was created to raise capital through the issuance of secured notes, primarily for the purpose of acquiring or originating loans from and to a portfolio of various distressed companies (collectively, the "Portfolio Companies").[5] In connection with making or restructuring the loans to the Portfolio Companies, the Funds received equity in the Portfolio Companies.[6] Over $1.5 billion was raised by the Funds from third-party investors through the issuance of notes, which was invested in approximately 40 Portfolio Companies.[7]

The investment thesis for the Funds was that through active management, Tilton and her

---

[2] See Adv. D.I. 43, 44, 45, 59 & 95.

[3] This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 157(a). Certain counts of the Complaint are core proceedings while others are non-core. The Funds consent to the entry of a final order or judgment by this Court. The Defendants do not. Nonetheless, the Court has the authority to hear and enter an order on the Motion to Dismiss. See, e.g., Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.), No. 13-51215, 2014 WL 1320145, *2 (Bankr. D. Del. Apr. 2, 2014) ("After Stern v. Marshall, the ability of bankruptcy judges to enter interlocutory orders in proceedings . . . has been reaffirmed . . . ."); Boyd v. King Par, LLC, No. 11-CV-1106, 2011 WL 5509873, at *2 (W.D. Mich. Nov. 10, 2011) ("[U]ncertainty regarding the bankruptcy court's ability to enter a final judgment . . . does not deprive the bankruptcy court of the power to entertain all pretrial proceedings . . . .").

[4] Compl. ¶ 1.

[5] Id. ¶¶ 1, 11, 41, 73 & 74.

[6] Id. ¶¶ 52 & 73.

[7] Id. ¶¶ 52 & 73, Annex A.

affiliates could rehabilitate the underlying Portfolio Companies.[8]  To do so, Tilton used the Funds' controlling equity positions and was installed as director, officer, and/or manager of the Portfolio Companies.[9]  Moreover, several of her affiliates contracted with the Funds and the Portfolio Companies to provide services.[10]  While not all Portfolio Companies could be successfully turned around, the hope was that the value generated from those that were a success would repay the Funds' noteholders either through repayment of the loans or returns on the equity.[11]  Until that time, the noteholders were to receive quarterly interest payments generated from payments the Portfolio Companies made on account of the Funds' loans and equity.[12]

Defendant Patriarch Partners VIII, LLC ("Patriarch VIII"), Patriarch Partners XIV, LLC ("Patriarch XIV"), and Patriarch Partners XV, LLC ("Patriarch XV") (collectively, the "Patriarch Managers") each served until March 3, 2016 as a collateral manager for a Fund.[13]  Among other things, they acted for and on behalf of the Funds in deciding the investments to make and in managing, effectuating, and disposing of those investments and other assets of the Funds.[14]  Defendants Octaluna LLC ("Octaluna I"), Octaluna II, LLC ("Octaluna II"), and Octaluna III LLC ("Octaluna III" and, together with Octaluna I and Octaluna II, the "Octaluna Entities") each own the preferred stock of a single corresponding Fund[15] and certain notes issued by the Funds.[16]  Defendant Patriarch Partners Agency Services, LLC ("PPAS") served as the Funds' agent under the various loan agreements with the Portfolio Companies (the "Credit Agreements").[17]  Defendant Patriarch Partners Management Group, LLC ("PPMG") purportedly provided management and consulting services for the Portfolio Companies since as early as 2006 pursuant to various agreements (collectively, the "PPMG Agreements").[18]  Patriarch Partners, LLC ("Patriarch Partners") contracted with the Patriarch Managers to provide employees, office space, and other operating expenses.[19]  Tilton entirely owned, managed, and controlled these entities.[20]

Each Fund is governed by a set of documents that includes an indenture (each an

---

[8] *Id.* ¶ 41.

[9] *Id.* ¶¶ 41 & 53.

[10] *Id.* ¶ 55.

[11] *Id.* ¶¶ 41-42.

[12] *Id.* ¶¶ 44 & 83.

[13] *Id.* ¶¶ 1-23.  Patriarch VIII was the collateral manager for Zohar I.  Patriarch XIV was the collateral manager for Zohar II.  Patriarch XV was the collateral manager for Zohar III.  *Id.* ¶¶ 21-23.

[14] *Id.* ¶¶ 40, 62 & 63.

[15] *Id.* ¶¶ 24-28.  Octaluna I holds all of the preference shares of Zohar I.  Octaluna II holds all of the preference shares of Zohar II.  Octaluna III holds all of the preference shares of Zohar III.  *Id.* ¶¶ 26-28.

[16] *Id.* ¶¶ 24-28

[17] *Id.* ¶ 56.

[18] *Id.* ¶¶ 57 & 121.

[19] *Id.* ¶ 51.

[20] *Id.* ¶¶ 20, 25, 30, 35, 36, 54, 57 & 84.

"Indenture" and, collectively, the "Indentures"), a collateral management agreement (each a "CMA" and, collectively, the "CMAs"), and a collateral administration agreement.[21]  Each set of documents is substantially identical.[22]  The Indentures set forth, among other things, the rights of the Funds' noteholders, the obligations of the Funds to the noteholders, and the responsibilities of the Patriarch Managers as collateral managers.[23]  The CMAs were entered into between the applicable Patriarch Manager and Fund.  They set forth the roles and obligations of the Patriarch Managers as collateral managers, which Tilton performed through her control.[24]  The CMAs also set forth the standards that would govern the Patriarch Managers' actions for the Funds.[25]

As a result of the foregoing structure, Tilton, herself or through the web of her affiliated entities, entirely controlled and managed the affairs and operations of Funds (including their capital raises and investments) and the Portfolio Companies (including their corporate activities and business strategies).[26]  Moreover, Tilton and her affiliates received collateral management fees, management fees, and distributions on the preference shares held by the Octaluna Entities.[27]  In addition, Tilton, as the ultimate owner of the Funds, received valuable tax attributes generated by certain Portfolio Companies' substantial operating losses that could be used to offset the income she and her affiliates earned in connection with the Funds and their investment activities.[28]  These attributes flowed to her because the Funds were intended to be, and originally were structured, as disregarded entities for tax purposes and because the Portfolio Companies that were structured as limited liability companies (the "LLC Portfolio Companies") elected to be treated as partnerships or disregarded entities for tax purposes.[29]

### B.    Tilton's Alleged Misuse of the Funds and Portfolio Companies

The Funds allege that Tilton and her affiliates used the Funds and the Portfolio Companies for their own personal gain and wrongfully took valuable rights and assets without giving any consideration in exchange.[30]  While this behavior is alleged to have occurred since the Funds' inception, it significantly worsened beginning in 2015 when Tilton's management came under scrutiny and Zohar I faced a looming default on its note obligations.[31]  Faced with the likely possibility that the noteholders would replace the Patriarch Managers as collateral managers, it is

---

[21] *Id.* ¶ 45.

[22] *Id.* ¶ 61 n.5.

[23] *Id.* ¶ 46.

[24] *Id.* ¶¶ 49, 62 & 65.

[25] *Id.* ¶¶ 66-71.

[26] *Id.* ¶¶ 1, 17, 20, 25, 35, 36, 54, 57, 84.

[27] *Id.* ¶ 83.

[28] *Id.* ¶ 85.

[29] *Id.*

[30] *Id.* ¶ 8.

[31] *Id.* ¶ 2.

alleged that Tilton took a series of steps designed to keep control over the Portfolio Companies and to maintain (and even increase) the fees and other income generated to her enterprise from the Funds and Portfolio Companies.[32]  Given Tilton's control, the self-dealing was concealed from all parties associated with the Funds other than Tilton and her affiliates until sometime after the Patriarch Managers were replaced as collateral managers in 2016.[33]

The Funds challenge numerous actions of Tilton and her affiliates.  However, for purposes of this summary, the Court will focus on the most significant.

### 1.    Overcollateralization Test

The Indentures required the Patriarch Managers to classify the Funds' loans to the Portfolio Companies into categories based on their demonstrated or reasonably ascertained likelihood to perform.[34]  Using these categories, an Overcollateralization Test (the "OC Test") was then calculated quarterly to measure whether the Funds' noteholders were over- or under-collateralized.[35]  If the notes were sufficiently overcollateralized, then fees to the Patriarch Managers and distributions to the Octaluna Entities, as the Funds' preference shareholders, could be made.[36]  If the notes were sufficiently undercollateralized, then the fees were decreased, distributions prohibited, and an event of default could have been triggered under the Indentures that permitted the removal of the Patriarch Managers as the collateral managers.[37]

The Funds allege that Tilton miscategorized the Funds' assets to ensure a passing OC Test result.[38]  She managed the cash of the Portfolio Companies to ensure that interest payments were made or amended the obligations so that payments were reduced or subject to forbearance.[39]  Moreover, she failed to disclose other appropriate information pertinent to creditworthiness.[40]  She also substituted her subjective view as to the health of the Portfolio Companies and used this view for the OC Test.[41]  As a result, the actual health of the Portfolio Companies and their ability to repay their loan obligations could not be measured.[42]  This manipulation allowed the Octaluna Entities to obtain preference-share payments and the Patriarch Managers to collect collateral

---

[32] *Id.* ¶ 2.

[33] *Id.* ¶¶ 7, 148-53.

[34] *Id.* ¶ 88.

[35] *Id.*

[36] *Id.*

[37] *Id.* ¶ 89.

[38] *Id.* ¶ 91.

[39] *Id.* ¶¶ 91 & 94.

[40] *Id.* ¶ 91.

[41] *Id.*

[42] *Id.* ¶¶ 91-93.

management fees to which they were not entitled.[43]  Additionally, the challenged actions allowed Tilton, the Patriarch Managers, and other affiliated entities to retain their positions and control over the Funds longer than they otherwise would have.[44]

### 2.    Voting/Control Actions

In addition to the OC Test manipulations, Tilton, through the Patriarch Managers, caused the Funds to transfer their voting rights in the Portfolio Companies to Tilton's affiliated entities.[45] Moreover, Tilton restructured the Funds' loans to the Portfolio Companies to remove from the Funds and give to PPAS ultimate authority.[46]  These actions are collectively referred to as the "Voting/Control Actions".

First, in September 2015, Tilton caused the Funds to execute amendments to the LLC Portfolio Company limited liability company agreements (the "LLC Agreements").  These amendments (the "September 2015 Amendments") transferred to the Tilton affiliates known as the "Class B Parties"[47] key control rights held by the Funds as members of the LLC Portfolio Companies.[48]  These included the right to remove Tilton as manager and to amend the LLC Agreements without the consent of the Class B Parties.[49]  Additionally, Tilton caused the Funds as shareholders of the corporate Portfolio Companies (the "Corporate Portfolio Companies") to grant irrevocable proxies (the "September 2015 Proxies") to the Tilton affiliates known as the "Proxy Grantees."[50]  Like the September 2015 Amendments, the September 2015 Proxies transferred to the Proxy Grantees the Funds' ability to remove management or otherwise control the Corporate Portfolio Companies through their stockholder voting rights.[51]

Then, in November 2015, Tilton, on behalf of the Funds, amended the applicable Credit Agreements governing the Funds' loans to the Portfolio Companies (the "Credit Agreement Amendments").  The amendments, among other things, prevented the Funds' ability to declare event of defaults, granted PPAS sole discretion to waive certain events of default, and required PPAS's consent for amendment, modification, termination, or waiver of any provision of the Credit Agreements.[52]  Certain Credit Agreement Amendments also irrevocably appointed PPAS

---

[43] *Id.* ¶ 97.

[44] *Id.*

[45] *Id.* ¶ 100.

[46] *Id.* ¶ 101.

[47] The Class B Parties are the Class B Members of the Octaluna Entities or Patriarch VIII, Patriarch XIV, Ark II CLO 2001-1, LLC ("Ark II"), Patriarch Partners XV, and Phoenix VIII, LLC ("Phoenix VIII").  *Id.* ¶ 105 n.14.

[48] *Id.* ¶¶ 104-08.

[49] *Id.* ¶¶ 105 & 108.

[50] *Id.* ¶ 110.  The Proxy Grantees are Patriarch VIII, Patriarch XIV, and Ark II.  *Id.*

[51] *Id.*

[52] *Id.* ¶¶ 101, 113-19.

as agent[53] and subordinated loans and securities interests of the Funds to those held by the Tilton affiliates referred to as the "Ark Entities."[54]

Finally, in November 2017, Tilton, as manager, executed written consents (the "November 2017 Written Consents")[55] for three valuable Portfolio Companies - Global Automotive Systems, LLC ("GAS"), Stila Styles, LLC ("Stila"), and Dura Buyer, LLC ("Dura Buyer").[56]   The November 2017 Written Consents created and issued to the Octaluna Entities new preference interests (the "Class A Interests").[57]   As holders of these interests, the Octaluna Entities were given the sole right to remove or replace Tilton as manager of GAS, Stila, and Dura Buyer and to amend the companies' LLC Agreements.[58]   The Octaluna Entities received a preference payout five times the amount they invested into GAS, Stila, and Dura Buyer for the Class A Interests.[59]

### 3.    PPMG Agreements and Phantom Equity Agreements

In August and September 2015, Tilton caused many of the Portfolio Companies to amend their PPMG Agreements to drastically increase the management fees (the "PPMG Amendments").[60]   Due to the September 2015 Amendments and September 2015 Proxies, the Funds were unable to terminate the PPMG Agreements thereafter.[61]

In March 2018, concurrently with the Petition Date, Tilton caused three Portfolio Companies – GAS, Stila, and MD Helicopters, Inc. ("MD Helicopters") – to enter into so-called "phantom equity" agreements (the "Phantom Equity Agreements").[62]   Upon a change in control, these agreements entitled Tilton to receive cash payments from the subject Portfolio Companies of up to 4% of any equity appreciation that occurred since she began serving as CEO or manager

---

[53] *Id.*

[54] The Ark Entities are Ark II, Ark Angels VIII, LLC ("Ark VIII"), and Ark Investment Partners II, L.P. ("AIP").  *Id.* ¶ 33.

[55] In addition to the September 2015 Amendments, the September 2015 Proxies, the Credit Agreement Amendments, and the November 2017 Written Consents, the Voting/Control Actions also include amendments made to certain LLC Agreements (the "May 2011 Amendments") that replaced the majority voting requirement to remove and replace an LLC Portfolio Company manager with a unanimous voting requirement.  *Id.* ¶ 104 n.13.

[56] *Id.* ¶¶ 135-36.

[57] *Id.* ¶ 136.

[58] *Id.*

[59] *Id.* ¶¶ 138-40.

[60] *Id.* ¶¶ 120-25.

[61] *Id.* ¶ 126.

[62] *Id.* ¶ 143.

of such company.[63]  The Funds allege that the Portfolio Companies subject to the Phantom Equity Agreements were three of the most valuable and most likely to be monetized.[64]

### 4.    Ownership of Equity

Finally, notwithstanding that the Funds were issued the equity in the Portfolio Companies on account of their investments and that such issuance is reflected in various documents, including stock certificates and LLC Agreements, Tilton asserted that the Octaluna Entities were the beneficial owners.[65]  Tilton and certain of her affiliates exercised control over the equity and received substantial value on account thereof.[66]

The Funds allege that these and other actions caused repeated breaches of contractual and fiduciary duties and stripped away their ability to repay their noteholders.[67]  The Funds commenced this proceeding to seek, among other things, damages and the avoidance of the improper transfers and obligations to repay.[68]

## II.    APPLICABLE LEGAL STANDARD

Federal Rule 8(a)(2), made applicable to this proceeding by Bankruptcy Rule 7008, provides that to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"[69]  When reviewing a motion to dismiss under Federal Rule 12(b)(6) challenging the sufficiency of a plaintiff's statement of claim, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[70]  This is a plausibility standard – it requires more than a sheer possibility that a defendant acted unlawfully but is not akin to the probability standard.[71]  Rather, a plaintiff must allege sufficient facts to nudge the claims "across the line from conceivable to plausible[.]"[72]

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

---

[63] *Id.* ¶ 144.

[64] *Id.* ¶ 145.

[65] *Id.* ¶ 86.

[66] *Id.* ¶¶ 86-87.

[67] *Id.* ¶ 9.

[68] *Id.*

[69] FED. R. CIV. P. 8(a).

[70] *Crystallex Int'l Corp. v Petroleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018) (quoting *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015)).

[71] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007).

[72] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

will not do[.]"[73]   Therefore, "the tenet that a court must accept as true all factual allegations contained in a complaint is inapplicable to legal conclusions."[74]   Thus, a plaintiff's threadbare recitals of a cause of action that are only supported by conclusory statements will not suffice.[75]

The United States Court of Appeals for the Third Circuit in *Burtch v. Milberg Factors, Inc.* prescribed a three-step process for courts to determine the sufficiency of a complaint - first, note the elements of the claim; second, identify the allegations that are conclusory and thus not entitled to an assumption of truth; and third, assume the veracity of well-pleaded factual allegations and determine the plausibility of the plaintiff's entitlement to relief.[76]

While a court may draw from "judicial experience and common sense" in considering a motion to dismiss,[77] it must only consider alleged facts that are within the scope of the court's review.[78]   The scope of what is reviewable includes the complaint, public record, and documents that are "integral to or explicitly relied upon" by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based.[79]

## III.   LEGAL DISCUSSION

The Defendants seek dismissal of each count of the Complaint, and most, for multiple reasons.   Moreover, some of the bases supporting dismissal overlap counts.   For efficiency and organization, the Court will first address the Defendants' arguments that apply to multiple counts of the Complaint.   Then, it will address any remaining arguments for each count.[80]

---

[73] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (internal citation omitted).

[74] *Iqbal*, 556 U.S. at 678.

[75] *Id.*

[76] 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

[77] *Iqbal*, 556 U.S. at 679.

[78] *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *S. Cross Overseas Agencies, Inc. v. Wah Kong Shipping Grp., Ltd.*, 181 F.3d 410, 429 (3d Cir. 1999).

[79] *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018); *see also McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009); *Davis*, 824 F.3d at 341.

[80]   As will become clear, the Plaintiffs raise many complex claims in the Complaint.   Moreover, the Defendants submit many arguments for the Court's consideration in an effort to dismiss the entirety of the Complaint.   Because of the sheer number of issues raised, the parties' briefing was often less than helpful. Nonetheless, the Court attempted to take all arguments into account when reaching its conclusions.   It addresses herein only those arguments that raise significant concern and rejects all others.

## A.    Statute of Limitations

The Defendants argue that claims arising from the May 2011 Amendments and the original entry into the PPMG Agreements beginning in 2006[81] are untimely.  The following counts are implicated:

| COUNT | CLAIM | BASIS | DEFENDANT(S) |
|---|---|---|---|
| IV | Breach of Contract | CMAs and Indentures | Patriarch Managers |
| IX | Actual Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | Voting/Control Transfers | Patriarch Managers Class B Parties Octaluna Entities PPAS Ark II |
| X | Constructive Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | Voting/Control Transfers | Patriarch Managers Class B Parties Octaluna Entities Ark II |
| XXVIII | Tortious Interference | MD Helicopters, Inc. Stockholders Agreement (PPMG Agreement and Phantom Equity Agreement) | Tilton PPMG |
| XXXI | Actual Fraudulent Transfer under New York and Delaware law | PPMG Agreements | PPMG |
| XXXII[82] | Constructive Fraudulent Transfer under New York and Delaware law | PPMG Agreements | PPMG |

The Petition Date was May 11, 2018, and the Commencement Date was March 9, 2020. Accordingly, pursuant to sections 108(a)[83] and 546(a)(1)[84] of the Bankruptcy Code, the Funds'

[81] The Defendants have not moved to dismiss as untimely any claims based on the 2015 PPMG Amendments.

[82] Claims in Counts 25, 27, 29, and 30 related to the PPMG Agreements are also implicated by the Defendants' statute of limitation arguments.  However, the Court dismisses these claims for the reasons discussed in Sections III.H.9-10 and, therefore, excludes these counts from this section.

[83] 11 U.S.C. § 108(a) provides, in relevant part, that "[i]f applicable non-bankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the filing of the petition, the trustee may commence such action only before the later of – (1) the end of such period . . .; two years after the order for relief."

[84] 11 U.S.C. § 546(a) specifies the time by which a section 544(b)(1) claim must be brought, providing in pertinent part that:

An action or proceeding under section 544 . . . may not be commenced after the earlier of – (1) the later of – (A) 2 years after the entry of the order for relief; . . . or (2) the time the case is closed or dismissed.

claims will be timely so long as the applicable statute of limitations for each claim did not expire prior to the Petition Date.

### 1.    Counts 4 and 28

Count 4 alleges that the Patriarch Managers breached the CMAs and Indentures by, *inter alia*, taking or purporting to take the May 2011 Amendments.  Count 28 alleges against PPMG and Tilton tortious interference with the MD Helicopters, Inc. Stockholders Agreement as a result of, *inter alia*, MD Helicopter's entry into its PPMG Agreement.

Under applicable New York law,[85] the statute of limitations for a breach of contract claim is six years.[86]  The statute of limitations for a tortious interference claim is three years.[87]  The Petition Date was approximately 7 years after the May 2011 Amendments and approximately 12 years after the date of the earliest PPMG Agreement alleged in the Complaint.  Accordingly, the claims appear barred by time.  However, to avoid this result, the Funds argue that the doctrine of equitable tolling applies.  They assert that they were unable to reasonably discover the Defendants' misconduct until the Patriarch Managers were removed from their positions of control in March 2016, approximately two years before the Petition Date.

New York law recognizes the doctrine of equitable estoppel (not equitable tolling),[88] which "'preclude[s] a defendant from using the statute of limitations as a defense where it is the defendant's affirmative wrongdoing which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.'"[89]  It applies "where a plaintiff was induced by fraud, misrepresentation, or deception to refrain from timely commencing an action."[90]  "The doctrine requires proof that the defendant made an actual misrepresentation or, if a fiduciary, concealed facts which he was required to disclose, that the plaintiff relied on the misrepresentation and that the reliance caused plaintiff to delay bringing timely action."[91]  "A plaintiff seeking to

---

[85] The parties do not dispute that New York law applies to these claims.

[86] *See* NY CPLR § 213(2).

[87] *See id.* § 214(4); *see e.g.*, *Ullmannglass v. Oneida, Ltd.*, 927 N.Y.S.2d 702, 704 (N.Y. App. Div. 2011) ("[A] claim for tortious interference with a contract is governed by a three-year statute of limitations").

[88] *See Dowe v. Leeds Brown Law, P.C.*, 419 F. Supp. 3d 748, 761 n.6 (S.D.N.Y. 2019) (explaining that while the federal doctrine of "equitable tolling" does not apply to New York causes of action, state law "'appears to use 'equitable estoppel' to cover both the circumstances where the defendant conceals from the plaintiff the fact that he has a cause of action and where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired.'" (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002)).  The Funds rely upon the former circumstance in this proceeding.

[89] *Dowe*, 419 F. Supp. 3d at 761 (quoting *Putter v. N. Shore Univ. Hosp.*, 858 N.E.2d 1140, 1142 (N.Y. 2006)); *Gen. Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 170 (N.Y. 1966) ("The principle that a wrongdoer should not be able to take refuge behind the shield of his own wrong is a truism.").

[90] *Gleason v. Spota*, 599 N.Y.S.2d 297, 298-99 (N.Y. App. Div. 1993); *Dowe*, 419 F. Supp. 3d at 761.

[91] *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 167 (N.Y. App. Div. 2003); *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006); *Dowe*, 419 F. Supp. 3d at 762.

apply the doctrine of equitable estoppel must establish that subsequent and specific actions by defendants somehow kept him or her from timely bringing suit."[92]  It will not apply if a plaintiff possesses "timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations."[93]

The Court finds it premature at this stage of the proceeding to determine whether the Funds have established the applicability of the aforementioned fact-intensive doctrine.[94]  Rather, the Court must decide only whether the Complaint includes "'sufficient factual matter'" for it to infer that discovery may show that they could keep the claims alive.[95]

The Complaint alleges that the Patriarch Managers served as the Funds' agent and attorney in fact until March 3, 2016 when they were replaced by an unaffiliated third party, Alvarez & Marsal Zohar Management, LLC.[96]  Until then, the Funds claim that they "were unable to meaningfully evaluate Tilton and her affiliates' compliance with their duties and obligations . . . particularly the Patriarch Managers" because Tilton and her affiliates controlled the flow of information about their activities and concealed them.[97]  The Complaint further details the difficulties Alvarez & Marsal Zohar Management, LLC faced even after it took over as collateral managers to gain possession of relevant books and records.[98]

Assuming the facts in the Complaint to be true, the Complaint sufficiently pleads the equitable estoppel doctrine under New York law,[99] and that the Funds were not in a position to discover their alleged injuries until March 3, 2016 at the earliest.  However, given the alleged delayed document turnover, it is reasonable to infer that discovery may not have occurred until later.  The Defendants argue that the Funds had full knowledge of the PPMG Agreements and consented to the May 2011 Amendments, but that is an issue for the Court to decide after discovery.  Moreover, the Defendants argue that the Funds admit in the Complaint that the

---

[92] *Putter*, 858 N.E.2d at 1142 (internal quotations omitted); *Gleason*, 599 N.Y.S.2d at 298.

[93] *Gleason*, 599 N.Y.S.2d at 299 (internal quotations omitted).

[94] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (explaining that while generally a defendant pleads "an affirmative defense, like the statute of limitations defense, in the answer, not on a motion to dismiss[,]" a movant may raise a timeliness defense "by a Rule 12(b)(6) motion . . . if the time alleged in the statement of a claim shows that the cause of action has not been brought within" the statutory period).

[95] *Aversano v. Santander Bank, N.A.*, 828 F. App'x 109, 112 (3d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).

[96] *See, e.g.*, Compl. ¶¶ 7, 148, 153.

[97] *Id.* ¶¶ 7, 148.

[98] *See id.* ¶¶ 149-53.

[99] *See, e.g.*, *North Coast Outfitters, Ltd. v. Darling III*, 24 N.Y.S.3d 92, 94 (N.Y. App. Div. 2015) (finding triable issue of fact on the applicability of the doctrine of equitable estoppel in action of corporation against its majority shareholder and former president); *In re Watson*, 778 N.Y.S.2d 658, 659–60 (N.Y. App. Div. 2004) (refusing to dismiss a minority shareholder's claim as time-barred where a fiduciary relationship existed and there were colorable allegations of concealment); *Gen. Stencils, Inc.*, 219 N.E.2d at 170-71 (allowing equitable estoppel litigation where former employer sued former employee for conversion).

noteholders knew of the PPMG Agreements in 2015.[100]  The Funds make no such admission.  Thus, at this stage, the claims are not time barred, and the Court will deny dismissal on this basis.

### 2.    Counts 9, 10, 31, and 32

Counts 9 and 10 relate to the Voting/Control Actions and allege against multiple Defendants claims for actual and constructive fraudulent transfer under section 544(b) of the Bankruptcy Code and applicable state law, including that of New York and Delaware.  Count 9 alleges claims for actual fraudulent transfer whereas Count 10 alleges ones for constructive fraudulent transfer.  The Defendants argue that the Funds' claims alleged in these counts arising from the May 2011 Amendments are not timely.

Section 544(b)(1)[101] serves as a "vehicle" through which the Funds may, among other things, recover their fraudulently transferred assets under a state's fraudulent conveyance laws.[102]  It provides that:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of [the Bankruptcy Code] or that is not allowable under section 502(e) of [the Bankruptcy Code].[103]

This strong-arm provision permits a debtor-in-possession to step into the shoes of its unsecured creditors holding state law avoidance claims and pursue such claims "on behalf of the bankruptcy estate . . . for the benefit of the creditors."[104]  If there exists no such creditor, a debtor-in-possession may not act under section 544(b)(1).  Moreover, "section 544(b)(1) confers . . . no greater rights of avoidance than the creditor would have if the creditor were asserting invalidity on its own behalf.  Consequently, if the creditor is . . . barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the [debtor] is likewise . . . barred."[105]   Accordingly, the Funds' fraudulent transfer claims of Counts 9 and 10 will be timely so long as one of their creditors was entitled as of the Petition Date to assert a claim against the Defendants under the fraudulent transfer laws of Delaware and New York.

Under Delaware's Uniform Fraudulent Transfer Act (the "<u>DUFTA</u>"),[106] an actual fraudulent transfer claim must be brought "within 4 years after the transfer was made or the

---

[100] *See* Compl. ¶ 122.

[101] Unless otherwise indicated, all statutory references are to the Bankruptcy Code.

[102] *In re Truong*, 285 Fed. Appx. 837, 839 (3d Cir. 2008).

[103] 11 U.S.C. § 544(b)(1).

[104] *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-44 (3d Cir. 2000).

[105] 5 COLLIER ON BANKRUPTCY ¶ 544.06[3].

[106] 6 DEL. C. §§ 1301-1311.

obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant[.]"[107]  Constructive fraudulent transfer claims, however, cannot be tolled and must be brought "within 4 years after the transfer was made or the obligation was incurred[.]"[108]   Under the applicable Article 10 of the New York Debtor and Creditor Law (the "NY DCL"),[109] claims for actual fraudulent transfers are "governed by a limitations period of six years from the date of the alleged fraud or two years from the date of discovery, whichever is later."[110]   Similar to the DUFTA, claims for constructive fraudulent transfer are subject to a strict statute of limitations of six years.[111]

The claims alleged by the Funds in Counts 31 and 32 are also subject to the same statute of limitations.  As lenders to various Portfolio Companies or subsidiaries thereof, the Funds allege in these counts direct claims against PPMG for actual (Count 31) and constructive (Count 32) fraudulent transfer under Delaware and New York law for the original PPMG Agreements, the PPMG Amendments, and the payment of certain fees paid to PPMG thereunder.  The Defendants argue that the Funds' claims alleged in these counts arising from the original entry into the PPMG Agreements are not timely.

Similar to their arguments in opposition to the dismissal of Counts 4 and 28, the Funds argue that dismissal of the challenged fraudulent transfer claims is not appropriate due to the discovery rule.  For the reasons already set forth, the Court finds that the Complaint contains facts suggesting that the discovery rule may apply to the Funds' actual fraudulent transfer claims in Count 9 related to the May 2011 Amendments and Count 31 related to the original PPMG Agreements.  Accordingly, dismissal of these is premature.  However, the Funds' constructive fraudulent transfer claims of Count 10 related to the May 2011 Amendments and Count 32 related to the original PPMG Agreements are time barred under the strict four and six-year statute of limitations of Delaware and New York as the subject transfers occurred more than four and six years before the Petition Date.  Accordingly, these claims must be dismissed.[112]

---

[107] *Id.* § 1309(1).

[108] *Id.* § 1309(2)-(3); *see generally Burkhart v. Genworth Fin., Inc.*, No. 2018-0691-JRS, 2020 WL 507938 (Del. Ch. Jan 31, 2020) (explaining the application of laches and equitable tolling to the statute of limitations for actual and constructive fraudulent transfers under DUFTA).

[109] Effective April 4, 2020, the original Article 10 of New York's Debtor & Creditor Law, which was enacted in 1925 and based on the Uniform Fraudulent Conveyance Act, was superseded by a newly revised Article 10 based on the Uniform Voidable Transactions Act.  The revised Article 10, which applies to transfers made and obligations incurred on or after the April 4, 2020 effective date, materially modifies the statute of limitations governing actual and fraudulent transfers brought under the original Article 10.  *See* N.Y. DEBT. & CRED. LAW § Ch. 12, art. 10, Refs & Annos (Introductory Note by James Gadsden and Alan Kolod).

[110] *Lippe v. Bairnco Corp.*, 225 B.R. 846, 853 (S.D.N.Y. 1998), on reargument in part, 229 B.R. 598 (S.D.N.Y. 1999), *aff''d*, 99 F. App'x 274 (2d Cir. 2004) (citing NY CPLR §§ 213(8) & 203(g)).

[111] *Id.* (citing NY CPLR § 213(1)); *accord Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993).

[112] *See, e.g.*, *Forman v. Kelly Cap. (In re Nat'l Serv. Indus., Inc.)*, No. 14-50377, 2015 WL 3827003, at **7-8 (Bankr. D. Del. 2015) (dismissing certain constructive fraudulent transfer claims when complaint on its face indicated that they were barred by the applicable statute of limitations).

### B.    Preclusion of the OC Test Claims

The Defendants argue that the Funds' claims premised on their alleged manipulation of the OC Test or failure to provide accurate information concerning the Portfolio Companies (the "OC Test Claims") should be dismissed as precluded by a final order (the "Final SEC Order") entered in a 2015 administrative action (the "Action") brought by the Securities and Exchange Commission ("SEC") against Tilton and the Patriarch Managers.[113]  That proceeding was premised on the Investment Advisers Act of 1940 and Investment Company Act of 1940 and was ultimately resolved in favor of Tilton and the Patriarch Managers.[114]  The counts implicated are:

| COUNT | CLAIM | BASIS | DEFENDANT(S) |
|---|---|---|---|
| IV | Breach of Contract | CMAs and Indentures | Patriarch Managers |
| V | Tortious Interference | Count IV Breaches of CMAs and Indentures | Tilton |
| VI | Breach of Fiduciary Duty | CMAs | Patriarch Managers Tilton |
| VII | Aiding and Abetting Breach of Fiduciary Duty | Count VI Breaches of Fiduciary Duty | Tilton |
| XIV | Unjust Enrichment | OC Test Manipulation | Patriarch Managers Tilton Octaluna Entities |
| XXXIII | Unjust Enrichment | OC Test Manipulation | Octaluna Entities PPMG |

In Count 4, the Funds argue that the Patriarch Managers breached the CMAs and Indentures by miscategorizing the Funds' assets to ensure a passing OC Test result.  Count 5 alleges that Tilton tortiously interfered with the relationship between the Funds, their noteholders, and the Patriarch Managers by causing the Patriarch Managers to manipulate the OC Test.  Count 6 alleges that Tilton and the Patriarch Managers breached fiduciary duties they owed to the Funds by manipulating the OC Test to continue to collect fees and retain control, thereby self-dealing and exploiting positions of power.  Count 7 is pled in the alternative and alleges that, if Tilton did not owe the Funds fiduciary duties, then she aided and abetted the Patriarch Managers' breach of their fiduciary duties.  Count 14 alleges that Tilton, the Patriarch Managers, and the Octaluna Entities were unjustly enriched by the manipulation of the OC Test.  Finally, Count 33 is pled in the alternative and alleges that the Octaluna Entities and PPMG were unjustly enriched by, among other things, the breaches of the CMAs and Indentures.

The Defendants argue that the Court should dismiss the OC Test Claims because they and the issues presented thereby were raised by the SEC in the Action and considered and rejected in the Final SEC Order.  Specially, they assert that the SEC pursued the exact same theories of wrongdoing that the Funds currently pursue and contend that they were resoundingly rejected.  The Funds disagree, but also oppose dismissal because they were not a party to the Action.  While the

---

[113] Adv. D.I. 45, Ex. 21.

[114] *Id.*

Defendants acknowledge that the Funds were a nonparty, they contend that the Funds were adequately represented and thus subject to the doctrine of preclusion.

Federal common law determines the preclusive effect of a federal-court judgment.[115]  The federal common law doctrines of issue preclusion and claim preclusion, collectively referred to as res judicata, define a judgement's preclusive effect.[116]  Issue preclusion "bars repetitive litigation of the same issue between the same parties:  if two parties actually litigated an issue in a prior case, and a court necessarily decided the issue pursuant to entry of a final judgment, then the losing party" is unable to later relitigate the issue against the winning party in a different case.[117]  In contrast, under the doctrine of claim preclusion, if a later case advances the same claim as a prior case between the same parties, the prior case's judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues" as the prior case.[118]

Applying issue and claim preclusion to nonparties collides with the "deep-rooted historic tradition that everyone should have his own day in court."[119]  A nonparty "generally has not had a full and fair opportunity to litigate the claims and issues settled in" a suit to which it was not a party.  However, courts have recognized that nonparty preclusion may be appropriate in some instances.[120]  Notably, "a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit."[121]  "The 'adequate representation' exception to nonparty preclusion, in order to comport with due process, requires either special procedures in the first suit to protect nonparties' interests, or an understanding by concerned parties in the first suit that it was brought in a representative capacity."[122]  Additionally, the interest of the non-party and the representative must be aligned and notice to the non-party of the original suit may be required.[123]

Accordingly, to determine as a threshold matter whether the non-party Funds are precluded from asserting the OC Test Claims because of the Final Order, the Court must determine at a minimum that the SEC implemented special procedures to protect the Funds' interests in the Action or that the SEC and the Funds understood the SEC to be acting in a representative capacity during the Action.  The Court cannot make either determination from the presented record.

---

[115] *Taylor v. Sturgell,* 553 U.S. 880, 891 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507-08 (2001)).

[116] *Id*. at 892.

[117] *Amos v. PPG Indus., Inc.*, 699 F.3d 448, 451 (6th Cir. 2012) (citing *Sturgell*, 553 U.S. at 892).

[118] *New Hampshire v. Maine,* 532 U.S. 742, 748 (2001).

[119] *Sturgell,* 553 U.S. at 892-93 (quoting *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 798 (1996)).

[120] *Id.* at 893.

[121] *Id.* (quoting *Richards*, 517 U.S. at 798).

[122] 46 AM. JUR. 2D JUDGMENTS § 568 (quoting *Sturgell*, 553 U.S. at 880); *see also Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 313 (3d Cir. 2009).

[123] *Sturgell,* 553 U.S. at 900.

For the latter element, which is the element upon which the parties focus, courts have generally looked to express allegations of the party in the first suit that reflect an intention to represent the interests of the non-party in the second suit.[124] Here, the Defendants have not pointed to any allegations of the SEC that indicate its intention to represent the Funds and their interests in the Action. Rather, they focus on the SEC's advocacy on behalf of the Funds' noteholders and emphasize certain noteholders' participation in the SEC's investigation and appearance as witnesses. However, quite obviously, the Funds are not the same parties as their noteholders. Their relationship is limited to debtors and creditors. Furthermore, although their interests may be aligned now, Tilton and the Patriarch Managers controlled the Funds at the time of the Action and therefore, based upon the Complaint's allegations, it is reasonable to conclude that the Funds were, at best, misaligned with the noteholders and the SEC at the time of the Action and, at worse, adverse to them. Therefore, even assuming, *in arguendo*, that the noteholders, as non-parties to the Action, are bound by the Final Order, the Court does not find that the circumstances sufficiently warrant a determination that the noteholders somehow bound the Funds.[125] That would be a stretch too far. The Defendants have cited no cases supportive of this indirect preclusion argument and critically, the United States Supreme Court has directed that the doctrine of non-party preclusion should be applied with scrutiny given the significant due process concerns at play.[126] The Defendants describe the concerns as "overwrought," but the Court emphatically disagrees.[127] Therefore, the Court will deny the Defendants' request to dismiss Counts 4 through 7, 14 and 33 on the basis of preclusion.

---

[124] *See Midwest Disability Initiative v. JANS Enters., Inc.*, No. 17-CV-4401, 2017 WL 6389685, at *4 (D. Minn. Dec. 13, 2017), *aff'd*, 929 F.3d 603 (8th Cir. 2019) (finding that MDI understood itself to be acting in a representative capacity for its members when the original complaint alleged injury to all disabled individuals beyond the member-co-plaintiff and sought remedies designed to benefit all injured individuals rather than ones that would only address the member-co-plaintiff's specific disability); *see also Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 533 F.3d 634, 641 (8th Cir. 2008) (finding that the Sioux Tribe understood and intended to represent its individual members when it stated in its original complaint that it brought the "complaint on its own behalf and on behalf of its individual members for whose health, safety and welfare the Tribe is responsible.") (internal quotation marks omitted); *see also Comm'r of Dep't of Planning & Nat. Res. v. Century Alumina Co., LLC*, No. CIV.A. 05-62, 2011 WL 6010009, at *5 (D.V.I. Nov. 30, 2011) (explaining that one indication that the DPNR understood itself to be acting in a representative capacity was that its original complaint stated that the suit was brought "on behalf of the Government of the United States Virgin Islands.").

[125] *See Sturgell*, 553 U.S. at 894-95 (noting class actions and suits brought by trustees, guardians, and other fiduciaries as examples of adequate representation); *see also Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 835 (S.D. Iowa 2015) (determining, based on the factual circumstances, that a party sued in a representative capacity on behalf of a non-party where the parties had a parent-subsidiary relationship, party sold stock to non-party to serve as a basis for its later claims, both were represented by the same counsel, and both sued as co-plaintiffs in a different case based on the same challenged actions).

[126] *Sturgell*, 553 U.S. at 884 ("We disapprove the doctrine of preclusion by 'virtual representation' . . . .").

[127] *Id.* at 884-904 (discussing the importance of a limited application of nonparty preclusion).

### C.    Viability of the Tortious Interference Claims in Light of Defendants' Positions and Interests

Counts 5, 16, 17, 26, 27, and 28 are the Funds' tortious interference claims:

| COUNT | CLAIM | BASIS | DEFENDANT(S) |
|---|---|---|---|
| V | Tortious Interference | Breach of CMAs and Indentures by the Patriarch Managers | Tilton |
| XVI | Tortious Interference | Breach of Subscription Agreements by the Octaluna Entities | Tilton |
| XVII | Tortious Interference | Breach of the Indentures by the Funds | Octaluna Entities Tilton |
| XXVI | Tortious Interference | Breach of the LLC Agreements by Tilton (November 2017 Written Consents) | Octaluna Entities |
| XXVII | Tortious Interference | Breach of the LLC Agreements by Tilton (PPMG Agreements) | PPMG |
| XXVIII | Tortious Interference | Breach of the MD Helicopters, Inc. Stockholders Agreement by MD Helicopters (PPMG Agreement and Phantom Equity Agreement) | Tilton PPMG |

The four elements to a tortious interference claim under New York law[128] are the existence of a contract between the plaintiff and a third party, the defendant's knowledge of that contract, the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and damages to the plaintiff.[129]

In support of the dismissal of these claims, the Defendants raise two primary arguments. First, they contend that the tortious interference claims against Tilton (Counts 5, 16, 17, and 28) fail because she was an officer or director of the alleged breaching parties and the Funds do not properly plead that she acted with malice to impair the Funds' business. Second, they argue that all of the tortious interference claims must be dismissed because the Defendants have economic stakes in the breaching parties' businesses and acted in furtherance of those interests.

### 1.    Tortious Interference by a Director or Officer (Counts 5, 16, 17, and 28)

Generally, a corporate director, officer, or employee who acts on behalf of a corporation and within the scope of his or her authority may not be liable for tortiously interfering with the

---

[128] *See supra* note 85.

[129] *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993).

corporation's contract with another because such individual is considered a party to the contract.[130] "[T]o hold otherwise would be a dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations."[131] Nonetheless, New York courts find exception to the general rule when an individual acts outside the scope of authority, commits a separate tort, or pursues a personal, rather than corporate, interest.[132]

The Funds acknowledge that Tilton served as manager, director, or officer of the alleged breaching corporate entities.[133] However, they submit that when Tilton took the challenged actions, she acted outside the scope of her authority to benefit herself personally.[134] In urging this Court to dismiss the tortious interference claims against her, Tilton argues that she owned the Funds and had no motive to harm them or their business. However, the Court cannot consider this argument on a motion to dismiss. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."[135]

Tilton further argues that the Funds are required to plead more than that she acted for her own personal interests. She asserts that the Funds are required and do not allege under New York's "enhanced pleading standard" that she acted with malice. In support of the malice requirement, Tilton cites to *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, which states that "a pleading must allege that the acts complained of, whether or not beyond the scope of the defendant's corporate authority, were performed with malice and were calculated to impair the

---

[130] *DiNardo v. L&W Indus. Park of Buffalo, Inc.*, 425 N.Y.S.2d 704, 705 (N.Y. App. Div. 1980; *Rothschild v. World-Wide Autos. Corp.*, 264 N.Y.S.2d 705, 706 (N.Y. App. Div. 1965).

[131] *Application of Brookside Mills*, 94 N.Y.S.2d 509, 518 (N.Y. App. Div. 1950); *accord Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (N.Y. App. Div. 2003).

[132] *DiNardo*, 425 N.Y.S.2d at 705 ("Generally when an officer or director acts on behalf of his corporation, he may not be liable for inducing his corporation to violate its contractual obligations unless his activity involves separate tortious conduct or results in personal profit."); *accord Rothschild*, 264 N.Y.S.2d at 706 ("The general principle is that when an officer or director acts on behalf of a corporation and within the scope of his authority, such director or officer 'may not be held liable where his corporation has been allegedly induced by him to violate its contractual obligation' unless his activity involves separate tortious acts." (quoting *Greyhound Corp. v. Comm. Cas Ins. Co.*, 19 N.Y.S.2d 239, 241 (N.Y. App. Div. 1940), *aff'd by* 18 N.Y.2d 982 (N.Y. 1966)); *Murtha v. Yonkers Child Care Ass'n, Inc.*, 383 N.E.2d 865, 915 (N.Y. 1978) ("A corporate officer who is charged with inducing the breach of contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer . . . (and did not commit) independent torts or predatory acts directed at another." (citing *Buckley v. 112 Cent. Park South*, 136 N.Y.S.2d 233, 236 (N.Y. App. Div. 1954)); *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 534 (N.Y. App. Div. 1998) ("To establish a corporate officer's liability for inducing a breach of contract between the corporation and a third party, the complaint must allege that the . . . acts were taken outside the scope of their employment and that they personally profited from their acts." (internal quotations omitted)).

[133] Compl. ¶¶ 20 (Patriarch Managers), 25 (Octaluna Entities), 414 (MD Helicopters).

[134] Compl. *passim.*

[135] *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 494 (Bankr. D. Del. 2010) (quoting *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F.Supp.2d 404, 407 (D. Del. 2007)).

plaintiff's business for the personal profit of the defendant."[136] Tilton also cites to *Schiff v. ZM Equity Partners, LLC*, which cites and applies *Hansen* for the same principle.[137]

The Court finds that the Funds have satisfied their pleading requirements under New York law. The court in *Hansen* makes clear that when an officer or director intentionally acts to harm the corporation in order to personally profit, they are liable:

> It has been observed that, "where the pleading has been sustained . . . the complaint has contained allegations that the acts of the corporate officers were done with the motive for personal gain as distinguished from gain to their corporations" . . . . The general rule, as we have stated, is that an "officer or director is liable when he acts for his personal, rather than the corporate interests."[138]

In other words, it is not enough that a corporate officer or director simply receives a personal gain as a result of his or her actions, the individual must act intentionally to obtain such gain:

> The essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability . . . even if it has the unintended effect of deterring the third person from dealing with the other. It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result.[139]

This is consistent with a finding of malice. "Malice does not necessarily mean hatred. It may be inferred from unjustifiable conduct. In a legal sense, it means a wrongful act, done intentionally, without just cause of excuse."[140]

---

[136] 744 N.Y.S.2d 384, 390-91 (N.Y. App. Div. 2002) (dismissing tortious interference claim where, *inter alia*, there was no allegation that the defendants sought to obtain a personal benefit).

[137] No. 19-4735, 2020 WL 5077712, at *9 (S.D.N.Y. Aug. 27, 2020) (finding a failure to allege tortious interference where allegations were unclear whether the defendants' "own selfish" actions were outside the scope of his employment and performed with malice against the plaintiff).

[138] 744 N.Y.S.2d at 390-91.

[139] *Navarro v. Fiorita*, 62 N.Y.S.2d 730, 734 (N.Y. App. Div. 1946) (quoting 4 RESTATEMENT OF TORTS § 766 (cmt. d)), *aff'd*, 71 N.E.2d 468; *see also Petkanas*, 759 N.Y.S.2d at 2 ("Generally we have construed such a standard to require a particularized pleading of allegations that the acts of the defendant corporate officers which resulted in the tortious interference with contract either were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation. We have construed personal gain in terms that the challenged acts were undertaken 'with malice and were calculated to impair the plaintiff's business for the personal profit of the [individual] defendant.'" (quoting *Hansen*, 744 N.Y.S.2d at 384)).

[140] *Romanych v. Liverpool & London & Globe Ins. Co.*, 167 N.Y.S.2d 398, 401 (N.Y. Sup. Ct. 1957) (defining malice for purposes of an insurance coverage dispute). Although the Defendants disagree with this definition of malice, courts applying New York law appear to have adopted it for a wide variety of

The Complaint advances an overall theory of motive that Tilton, either herself or through her affiliated entities, intentionally and in violation of the law took a series of actions to keep and maintain complete control over the Funds and the Portfolio Companies and to extract as much value as possible to the detriment of, among others, the Funds.[141]  This is sufficient to satisfy any pleading requirement of malice.  As such, the Court will not dismiss the claims on this basis.[142]

## 2.    The Economic Interest Doctrine (Counts 5, 16, 17, 26, 27, and 28)

To defend against a claim of tortious interference, New York law permits a party to argue "that it acted to protect its own legal or financial stake in the breaching party's business."[143]  This is called the "economic interest doctrine."[144]  For courts considering tortious interference claims, the doctrine is part of a balance required to be struck "between two valued interests:  protection of enforceable contracts, which lends stability and predictability to parties' dealings, and promotion of free and robust competition in the marketplace."[145]

Courts applying the economic interest doctrine to free a stakeholder-defendant from tortious interference liability have determined the defendant justified or excused in procuring a breach of contract when it was done in furtherance of a right equally important to the protection of enforceable contracts – *i.e.* the protection of the breaching party and by extension the defendant's own economic interest therein.[146]  Critically, a court must determine the purpose of the stakeholder-defendant's actions.  If they are taken maliciously towards the plaintiff or to protect

---

claims requiring a finding of malice.  *See, e.g.*, *Constellation Brands, Inc. v. Keste, LLC*, No. 14-6272, 2014 WL 6065776, at *5 (W.D.N.Y. Nov. 13, 2014) (breach of contract); *Caminito v. City of N.Y.*, 256 N.Y.S.2d 670, 681 (N.Y. Sup. Ct. 1965) (malicious prosecution); *Navarro*, 62 N.Y.S.2d at 733 (tortious interference); *Beardsley v. Soper*, 171 N.Y.S. 1043, 1045 (N.Y. App. Div. 1918) (false imprisonment).  *See also Tinker v. Colwell*, 193 U.S. 473, 508 (1904) ("'Malice, is common acceptation, means ill will against a person; but in its legal sense it means a wrongful act, done intentionally, without just cause or excuse.'" (quoting *Bromage v. Prosser*, 4 Barn. & Cress. 247, 255)).

[141] Compl. *passim*.

[142] *Compare e.g.*, *Navarro*, 62 NY.S.2d at 65-66 (denying dismissal of tortious interference claim where it was alleged that officer purposely converted corporate assets so that corporation could not fulfill orders and prevent plaintiff from earning commissions under employment contract), *with Scuderi v. Springer*, No. 03-2098, 2004 WL 2711048, at *2 (S.D.N.Y. Nov. 29, 2004) (dismissing tortious interference claim against corporate officials with conclusory allegations that the defendants acted outside the scope of their authority and received a benefit); *Petkanas*, 759 N.Y.S.2d at 2 (reversing lower court's decision denying motion to dismiss tortious interference claim, observing that the complaint "fails to allege that defendants personally benefitted from the[ challenged] actions and that such was their motivating intent.").

[143] *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).

[144] *Id.*

[145] *Id.*

[146] *Felsen v. Sol Café Mfg. Corp.*, 249 N.E.2d 459, 461 (N.Y. 1969).

the defendant's direct interests, then the doctrine will not apply.[147]  It will also not apply if the stakeholder-defendant employs fraudulent or illegal means to protect its interests.[148]

Like the analysis set forth above with respect to the tortious interference claims against Tilton, the Court finds that the Funds sufficiently allege enough facts for their tortious interference claims to survive dismissal even if relevant Defendants have economic stakes in the alleged breaching parties.  The Fund theorize that Tilton and her affiliated entities designed and pursued the challenged activities to strip control rights and other assets away from the Funds to harm them and their stakeholders and to advance Tilton's interests.  These allegations are in stark contrast to the circumstances of tortious interference courts have found economically justified – namely, those where the stakeholder-defendants acted with reasonable business justification to defend the business of the breaching-party and protect their interests therein.[149]  Accordingly, the Court will not dismiss the tortious interference claims based on the economic justification doctrine.

## D.    Failure to Plead Fraudulent Transfer Claims

The Defendants argue that the Funds' fraudulent transfer allegations are insufficient under the applicable pleading requirements of Federal Rules 8 and 9(b) and must be dismissed without leave to amend.  The following counts are implicated:

| COUNT | CLAIM | BASIS | DEFENDANT(S) |
|-------|-------|-------|--------------|
| IX | Actual Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | Voting/Control Transfers | Patriarch Managers Class B Parties Octaluna Entities PPAS Ark II |
| X | Constructive Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | Voting/Control Transfers | Patriarch Managers Class B Parties Octaluna Entities Ark II |
| XI | Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) | November 2017 Transfers | Octaluna Entities |
| XII | Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) | November 2017 Transfers | Octaluna Entities |

---

[147] *Felsen*, 249 N.E.2d at 461; *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F.Supp.2d 459, 484 (E.D.N.Y. 2012).

[148] *Felsen*, 249 N.E.2d at 461; *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996).

[149] *See, e.g.*, *Felsen*, 249 N.E.2d at 613-14 (justification found where the interference was to protect the breaching-corporation from the plaintiff's mismanagement); *Foster*, 665 N.E.2d at 157 (justification found when actions were taken to avoid the payment of money to protect the breaching-company on the brink of insolvency); *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988) (justification found when actions were taken to terminate a contract that was causing the breaching-corporation to lose money), *cert. denied* 488 U.S. 852 (1988); *WMW Mach. Co. v. Koerber AG*, 658 N.Y.S.2d 385, 401 (N.Y. App. Div. 1997) (justification found when actions were taken to end an exclusive sales contract that never yielded a sale for the breaching corporation).

| XIX | Actual Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | CTB Election | Octaluna Entities |
| XX | Constructive Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | CTB Election | Octaluna Entities |
| XXI | Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) | CTB Election | Octaluna Entities |
| XXII | Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) | CTB Election | Octaluna Entities |
| XXXI | Actual Fraudulent Transfer under New York and Delaware law | PPMG Agreements | PPMG |
| XXXII | Constructive Fraudulent Transfer under New York and Delaware law | PPMG Agreements | PPMG |

Federal Rule 8(a)(2), made applicable to this proceeding pursuant to Bankruptcy Rule 7008, applies to constructive fraudulent transfer claims.[150] It requires that pleadings contain a short and plain statement of a claim showing that the pleader is entitled to relief.[151] While generally the factual statements alleged in a pleading are not required to be detailed,[152] a pleading "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[153] "The complaint 'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory.'"[154] Thus, a complaint that tenders "naked assertions devoid of further factual enhancement[,] . . . labels and conclusions, or formulaic recitations of the elements of a cause of action will not do."[155] However, "[a] plaintiff need not set out in detail the facts upon which he bases his claim, so long as he gives the defendant(s) fair notice of what the claim is and the grounds upon which it rests."[156]

For an actual fraudulent transfer claim, Federal Rule 9(b), made applicable to this proceeding pursuant to Bankruptcy Rule 7009, imposes a heightened pleading requirement. Specifically, it mandates that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud[.]"[157] However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[158]

---

[150] *See, e.g.*, *Mervyn's*, 426 B.R. at 495 (collecting cases).

[151] FED. R. CIV. P. 8(a)(2).

[152] *Twombly*, 550 U.S. at 555.

[153] *Iqbal*, 556 U.S. at 678.

[154] *Mervyn's*, 426 B.R. at 494.

[155] *Iqbal*, 556 U.S. at 678 (internal citations omitted); *Twombly*, 550 U.S. at 555.

[156] *Mervyn's*, 426 B.R. at 495.

[157] FED. R. CIV. P. 9(b).

[158] *Id.*

The Defendants rely on three primary arguments to support their theory that the Funds' fraudulent transfer claims are insufficiently pled.  First, the Funds fail to adequately allege the transactions that they seek to avoid in Counts 9, 10, 31, and 32.  Second, the Funds fail to adequately allege insolvency for purposes of the constructive fraudulent transfer claims in Counts 10, 12, 20, 22, and 32.  Third, the Funds fail to adequately allege badges of fraud for purposes of the actual fraudulent transfer claims in Counts 9, 11, 14, 21, and 31.

### 1.    Failure to Adequately Allege the Transactions Sought to be Avoided (Counts 9, 10, 31, and 32)

#### (a)    Counts 9 and 10

Counts 9 and 10 allege claims for actual and constructive fraudulent transfer under section 544(b) of the Bankruptcy Code and the NY DCL and DUFTA for the Voting/Control Transfers (as defined herein).  The Defendants allege that these counts should be dismissed because the Funds fail to provide each of them with adequate notice of the claims against them.  More specifically, they contend that the Funds fail to identify each individual transfer, the corresponding transferee, and the Portfolio Company.  They take issue with the Funds' use of categories to set forth these items.

To adequately plead an actual fraudulent transfer claim against multiple defendants, Federal Rule 9(b) requires that a complaint provide notice to each defendant of "the circumstances surrounding the fraudulent conduct with which he is individually charged"[159] sufficient "to allow each defendant to prepare an effective answer or defense."[160]  Similarly, while Rule 8(a)(2) applies a less stringent pleading standard, a defendant must still receive enough notice to permit it to understand the claims against it and the alleged legal bases therefor.[161]  In general, a fraudulent transfer claim will withstand dismissal if it alleges, *inter alia*, the transferor, the transferee, the amount of the transfer, and relevant date.[162]

The Complaint describes four categories of transfers, their timing, and the type of documents effectuating them – *i.e.* the "transfer of interests in the Zohar Funds' property (namely, critical governance and control rights in the equity of the Portfolio Companies) and the incurrence of governance and control obligations)" resulting from the May 2011 Amendments (the "May 2011 Transfers"), the September 2015 Amendments and the September 2015 Proxies (the "September 2015 Transfers"), and the November 2017 Written Consents (the "November 2017 Transfers" and, together with the May 2011 Transfers and the September 2015 Transfers, the

---

[159] *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998).

[160] *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 93 (Bankr. S.D.N.Y. 2010) (internal quotations omitted).

[161] *See generally id.* at 102; *Argus Mgmt. Grp. v. Rider (In re CVEO Corp.)*, No. 03-50377, 2004 WL 2049316, at *3 (Bankr. D. Del. Sept. 13, 2004).

[162] *See, e.g.*, *JLL Consultants, Inc. v. Gothner (In re AgFeed USA, LLC)*, 546 B.R. 318, 337 (Bankr. D. Del. 2016).

"Voting/Control Transfers").[163]   Moreover, the Complaint details what rights were lost by each category of transfer and at times, provides specific quotes from the relevant documents.   For instance, the Funds allege that the September 2015 Amendments and September 2015 Proxies stripped away the Funds' rights as members or shareholders of the Portfolio Companies to remove Tilton from positions of control and transferred them to Tilton's affiliated entities.[164]

With respect to the transferees, the Complaint identifies for the September 2015 Transfers and the November 2017 Transfers, the particular groups of relevant transferee-Defendants and the particular groups of involved Portfolio Companies.   Transferees of the September 2015 Amendments are the Class B Parties.[165]   The Proxy Grantees received the September 2015 Proxies.[166]   The Octaluna Entities are the subject transferees of the November 2017 Transfers.[167] The Complaint alleges that the LLC Portfolio Companies were the subject of the September 2015 Amendments[168] and that the Corporate Portfolio Companies were the subject of the September 2015 Proxies.[169]   The name of each Portfolio Company is listed on Annex A to the Complaint along with a business description and ownership detail.   With respect to the November 2017 Transfers, three Portfolio Companies are identified.[170]   When read as a whole, this information sufficiently apprises each Defendant of most claims against it so that answers and defenses may be formulated.

The exceptions are the Funds' claims in Count 9 against PPAS and the claims in Counts 9 and 10 with respect to the May 2011 Transfers.   No information is provided regarding the transfers received by PPAS.   Moreover, the Complaint provides no information regarding the transferee-Defendants of the May 2011 Transfers.[171]   It only generally alleges that certain of the LLC Portfolio Companies' LLC Agreements were the subject of the May 2011 Amendments but fails to identify the subject LLC Portfolio Companies save perhaps two.[172]   More specificity is required for these claims so that the particular Defendants are given fair notice.   With respect to the remainder of the fraudulent transfer claims, the Court is confident based on its experience in overseeing the Funds' bankruptcy cases and adjudicating the multitude of disputes between the parties stemming from their pre- and post-petition relationships that the Defendants fully understand the claims despite the use of categories to appropriately organize the complex claims involving a web of affiliated Defendants, 40 Portfolio Companies, and a significant scope of

---

[163] *See* Compl. ¶ 241; *see also id.* ¶¶ 241-43.

[164] *See id.* ¶¶ 104-12.

[165] *See id.* ¶¶ 105, 242, & n.14.

[166] *See id.* ¶¶ 110, 242.

[167] *See id.* ¶¶ 24, 136-40.

[168] *See id.* ¶ 104.

[169] *See id.* ¶ 110.

[170] *See id.* ¶¶ 136-40.

[171] *See id.* ¶¶ 241 & n.13. While the Funds allege in the Complaint that all Voting/Control Transfers were ultimately to and for the benefit of Tilton, *see id.* ¶¶ 244, 252, she is not a Defendant for Counts 9 and 10.

[172] *Id.*

contracts and other documents, which often mimic one another across Portfolio Companies. Requiring the Defendants to amend the Complaint to list every individual Voting/Control Transfer (*i.e.* the particular amendment, proxy, or consent, the corresponding Portfolio Company, and relevant Defendant) would be a pointless and inefficient endeavor.

While the Court will grant the Motion to Dismiss with respect to the claims in Count 9 against PPAS and the claims in Count 9 related to the May 2011 Transfers on the grounds that they are insufficiently pled, it will grant the Funds leave to amend the Complaint to provide further detail.[173]  Under Federal Rule 15(a)(2), made applicable to these proceedings by Bankruptcy Rule 7015, the Funds may amend with the Court's permission.  As directed by that rule, "the court should freely give leave when justice so requires."[174]  Factors courts consider when deciding whether amendment is inappropriate are "(1) whether the amendment has been unduly delayed; (2) whether the amendment would unfairly prejudice the non-moving party; (3) whether the amendment is brought for some improper purpose; and (4) whether the amendment is futile."[175] There are no circumstances presented preventing the Court from granting leave to amend.

### (b)    Counts 31 and 32

Counts 31 and 32 allege against PPMG claims for actual and constructive fraudulent transfer under the NY DCL and DUFTA for, among other things, fees paid to PPMG by various Portfolio Companies under the PPMG Agreements (the "PPMG Fees").[176]  Annex B sets forth the PPMG Fees known to the Funds and the relevant transferor Portfolio Company.[177]  However, the Funds reserve the right to add additional payments made to PPMG once identified (the "Unidentified Transfers").[178]  PPMG moves to dismiss the Complaint with respect to the Unidentified Transfers as insufficiently pled.  The Court will deny this relief as moot.  The Funds acknowledge that the Unidentified Transfers are not currently the subject of Counts 31 and 32. Rather, they reserve the right to seek to amend the Complaint following the completion of discovery to add the Unidentified Transfers to Counts 31 and 32.[179]

---

[173] Although the Court has found that the Funds' claims in Count 10 related to the May 2011 Transfers are also insufficiently pled, it need not dismiss these claims on this basis given that the Court has already dismissed the claims as time barred.  *See* Section III A.2.

[174] FED. R. CIV. P. 15(a)(2).

[175] *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, No. 11-54-SLR, 2013 WL 571801, at *1 (D. Del. Feb. 13, 2013) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[176] Compl. ¶ 456.

[177] *Id.* ¶ 456 n.23.

[178] *Id.*

[179] *See* Adv. D.I. 59 ¶ 41 n.41.

## 2.    Failure to Adequately Allege Insolvency (Counts 10, 12, 20, 22, and 32)

Counts 10, 12, 20, 22, and 32 are the Funds' constructive fraudulent transfer claims under either section 548(a)(1)(B) (Counts 12 and 22) or section 544(b) and the NY DCL and DUFTA (Counts 10, 20, and 32).  Insolvency is a required element for these claims.[180]

In support of dismissal under Federal Rule 8(a)(2), the Defendants argue that the Funds merely recite the conclusory statutory definition of insolvency and fail to provide sufficient facts to support such a legal conclusion given that the transfers the Funds seek to avoid stretch back a decade and span dozens of Portfolio Companies.  The Court cannot agree.  While the Complaint includes conclusory allegations that the avoidable transfers were made either when the Funds or, as relevant to Count 32, the Portfolio Companies were insolvent, had unreasonably small capital, or incurred debts beyond their ability to pay,[181] the Funds also allege sufficient facts in support.

Specifically, the Funds allege that the Portfolio Companies were distressed businesses from the inception of the Funds' involvement.[182]  As may be inferred from the Funds' allegations, the solvency of the Funds is dependent on the performance or financial wherewithal of the Portfolio Companies and their ability to satisfy their debt obligations to the Funds and to (hopefully) create future equity value when rehabilitated.[183]  While the Funds admit that an unspecified number of Portfolio Companies were able to be stabilized, they allege that a number of them were unable to be turned-around, having to declare bankruptcy or simply shutter.[184]  Moreover, they describe the failure of many Portfolio Companies to pay the Funds stated interest amounts.[185]  They also describe their eventual defaults in 2019.[186]  Indeed, multiple claims of the Funds rest on allegations that Tilton manipulated the OC Test to hide the failing financial performance, creditworthiness, and health of the Portfolio Companies throughout her tenure of control.[187]  Ultimately, the Complaint describes as illustrative examples numerous Portfolio Companies that were unable to

---

[180] *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III); 6 Del C. § 1304(a)(2); N.Y. DEBT. & CRED. LAW § 273(a)(2).

[181] Compl. ¶¶ 255, 268, 341; *see also id.* ¶ 326 (alleging that the CTB Election was made either when the Funds were insolvent, so as to render the Funds insolvent, so as to leave the Funds with unreasonably small capital, or when the Funds had incurred debts beyond their ability to pay); *id.* ¶ 467 (alleging with respect to Count 32 that "each of the Portfolio Companies has been in a precarious financial condition at all relevant times.  At the time that the PPMG Agreements were executed in 2010 and 2011 and at the time of the amendments in 2015, the Portfolio Companies had incurred debts beyond their ability to pay, as evidenced by the ultimate defaults to the Zohar Funds in 2019, were insolvent at the time of entry into the PPMG Agreements, and had unreasonably small capital for the businesses that they were engaged in.").

[182] *Id.* ¶¶ 41, 52, 70, 74, 91.

[183] *Id.* ¶¶ 40-44, 47, 52, 73.

[184] *Id.* ¶¶ 90, 92, 93.

[185] *Id.* ¶ 94.

[186] *Id.* ¶ 467.

[187] *Id.* ¶¶ 88-98

satisfy their obligations to the Funds,[188] and the Funds' default on their own repayment obligations.[189]   Moreover, the Court is able to take judicial notice of the monetizations of the Portfolio Companies it has overseen during the Funds' bankruptcy proceedings, many of which did not yield sufficient amounts to repay the Funds' loans.

Taken as a whole, the Funds allege sufficient facts to demonstrate the insolvency criteria for all relevant timeframes for purposes of pleading.   Insolvency is a fact-intensive inquiry and precise calculations are not needed for this stage.[190]   Discovery will yield more answers on this topic.   Accordingly, the Court will deny the Defendants' request to dismiss Counts 10, 12, 20, 22, and 32 on the basis that the Funds did not adequately pled insolvency.

### 3.        Failure to Adequately Allege Badges of Fraud (Counts 9, 11, 19, 21, and 31)

Counts 9, 11, 19, 21, and 31 are the Funds' actual fraudulent transfer claims under either section 548(a)(1)(A) (Counts 11 and 21) or section 544(b) and the NY DCL and DUFTA (Counts 9, 19, and 31).   As already explained, Rule 9(b) mandates heightened pleading.   "Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent."[191]   That evidence, referred to as "badges of fraud", includes:

> (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction.[192]

The Court is not limited to examining only these factors but may impute fraudulent intent where more than one of them is present.   As observed by the court in *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*:

> [t]he presence or absence of any single badge of fraud is not conclusive. "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.   Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction

---

[188] *Id.* ¶¶ 76, 79, 81, 92, 93.

[189] *Id.* ¶¶ 59, 99, 100, 113, 120, 246, 261.

[190] *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 349 (Bankr. D. Del. 2011).

[191] *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),* 405 B.R. 527, 545 (Bankr. D. Del.2009).

[192] *Id.*

generally provides conclusive evidence of an actual intent to defraud."[193]

There is no dispute that the Funds allege numerous badges of fraud throughout the Complaint. They include an insider relationship between all relevant parties, retention of control of transferred property, either insufficient or no consideration for the challenged transfers, and insolvency.[194] Moreover, the Complaint's allegations advance an overall theory of motive that Tilton, either herself or through her affiliated entities, took a series of actions to keep and maintain complete control over the Funds and the Portfolio Companies and to extract as much value as possible from the Portfolio Companies for herself and affiliates to the detriment of the Funds and their noteholders.[195] These allegations are sufficient to withstand dismissal.[196]

Notwithstanding, the Defendants move to dismiss because they assert that the Funds' "view of the facts defies economic reason and does not yield a reasonable inference of fraudulent intent."[197] More specifically, the Defendants argue that "[g]iven the circumstances . . ., it is far more likely that Ms. Tilton's actions were entirely consistent with a strategy of protecting the Portfolio Companies, preventing disastrous fire sales that would have harmed the Zohar Funds, and maintaining a strategy that would benefit all stakeholders . . . ."[198] The Defendants then point the Court to contracts and other facts and theories that they contend support their theory and erode any inferences of fraudulent intent the Court could make from the Funds' alleged badges of fraud.[199] However, consideration of these arguments at this initial stage is not appropriate given the strong inferences created by the Complaint's allegations.[200] Accordingly, the Court will not dismiss Counts 9, 11, 19, 21, and 31 on the ground that badges of fraud were insufficiently pled.

### 4.    Failure to Allege Creditor Status (Counts 31 and 32)

As noted, Counts 31 and 32 allege against PPMG claims for actual and constructive fraudulent transfer under the NY DCL and DUFTA on account of PPMG Fees made by the Portfolio Companies.[201] Annex B sets forth the known transferred PPMG Fees and the relevant

---

[193] *Id.* (quoting *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 199 (Bankr. D. Del. 2006)).

[194] Compl. *passim*.

[195] *Id.*

[196] *Tronox*, 329 B.R. at 95 ("The existence of several badges of fraud can constitute clear and convincing evidence of actual intent." (internal quotations omitted)). *Compare Fedders*, 405 B.R. at 545 (determining plaintiff failed to state a claim after alleging a single badge of fraud), *with Forman*, No. 14-50377, 2015 WL 3827003, at *5 (refusing to dismiss complaint when trustee alleged three badges of fraud).

[197] Adv. D.I. 44 ¶ 124.

[198] Adv. D.I. 95 ¶ 37.

[199] *See, e.g.*, Adv. D.I. 44 ¶¶ 125-26; Adv. D.I. 95 ¶¶ 38-52.

[200] *See supra* note 135 and accompanying text.

[201] Compl. ¶ 456.

transferor Portfolio Company.[202]   Included therein are multiple PPMG Fees by Stila.   The Defendants move to dismiss any claims of the Funds based upon these transfers.

Although the Funds bring Counts 31 and 32 as creditors of the relevant Portfolio Companies and, in particular, as a creditor of Stila resulting from revolving credit and term loans,[203] the Defendants highlight that the Funds admit in the Complaint that "[b]y January 2016, Stila had fully repaid its term loan . . . and terminated its revolving credit commitment from the Zohar Funds[.]"[204]   The Complaint is clear that "full realization has yet to occur on the Zohar Funds' interests in Stila" but there are no allegations that the Funds are creditors of Stila.[205]   The Funds offer no opposition or further explanation on this issue and, accordingly, the Court will grant dismissal of the claims in Counts 31 and 32, with permission to amend the Complaint as appropriate, to the extent that they seek to challenge any PPMG Fees made by Stila.[206]

### E.      Duplicative Tort and Quasi-Tort Claims

The Defendants argue that the Funds' unjust enrichment and breach of fiduciary duty claims must be dismissed because there are valid and enforceable contracts governing the parties' relationships serving as the basis for breach of contract claims arising from the same challenged actions.   The following counts are implicated:

| COUNT | CLAIM | BASIS | DEFENDANT(S) |
|-------|-------|-------|--------------|
| VI | Breach of Fiduciary Duties Owed in Collateral Management | Voting/Control Actions, OC Test Manipulation | Patriarch Managers Tilton |
| VII | Aiding and Abetting Breach of Fiduciary Duty | Voting/Control Actions, OC Test Manipulation | Tilton |
| XIII | Unjust Enrichment | Voting/Control Actions | Ark Entities Octaluna Entities PPAS PPMG Tilton |
| XIV | Unjust Enrichment | OC Test Manipulation | Patriarch Managers Octaluna Entities Tilton |

---

[202] *Id.* ¶ 456 n. 23.

[203] *Id.* ¶ 81.

[204] *Id*.

[205] *Id.*; *see also id.* ¶ 453, 463 (listing the Portfolio Companies to which the Funds are lenders and failing to include Stila).

[206] *See, e.g.*, *ADM Assocs., Inc. v. Grease 'N Go, Inc.*, 905 F. Supp. 79, 90 (E.D.N.Y. 1995) ("[U]nder New York law, to recover under the DCL and attack a transaction as being fraudulent, plaintiffs must first establish that they occupy the status of creditor."); *In re Wickes Tr.*, No. 2515-VCS, 2008 WL 4698477, at *7 (Del. Ch. Oct. 16, 2008) ("Thus, in order to have a fraudulent transfer claim, one must first have a valid claim against the person . . . alleged to have fraudulently made the transfer.").

| XXIV | Unjust Enrichment | Tax Dividends | Octaluna Entities Tilton |
| XXXIII | Unjust Enrichment | November 2017 Written Consents, PPMG Agreements, Phantom Equity Agreements | Octaluna Entities PPMG |

Counts 4 and 25 are two of the Funds' breach of contract counts.  Count 4 seeks a finding that the Patriarch Managers breached express or implied terms of the CMAs and Indentures as a result of the Voting/Control Actions, manipulations of the OC Tests, and concealment of the financial condition of the Portfolio Companies.  Count 25 seeks a finding that Tilton breached the LLC Agreements of the LLC Portfolio Companies as a result of the November 2017 Written Consents, the PPMG Agreements, and the Phantom Equity Agreements.

The Court will separately address each set of alleged duplicative claims.

### 1.    The Unjust Enrichment Claims (Counts 13, 14, 24, and 33)

The Defendants argue that the Funds' unjust enrichment claims in Counts 13, 14, 24, and 33 are duplicative of the breach of contract claims in both Counts 4 and 25.  The parties contend that either New York or Delaware law apply to the unjust enrichment claims.  Under New York law, a claim for unjust enrichment is a claim "sounding in quasi contract[.]"[207] "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[208]  Where there is a valid, written agreement and its scope clearly covers the dispute between the parties, a plaintiff is limited to recovery of damages on the contract and may not pursue those based on an alleged quasi contract.[209]  Delaware law mirrors that of New York.  Indeed, Delaware courts "routinely" dismiss unjust enrichment claims if "premised on an 'express, enforceable contract that controls the parties' relationship' because damages [are] an available remedy at law for breach of contract."[210]  If "there is doubt surrounding the enforceability or the existence of the contract[,]" then dismissal is not appropriate.[211]

---

[207] *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987).

[208] *Id.*

[209] *Id.*; *see also Bettan v. GEICO Gen. Ins. Co.*, 745 N.Y.S.2d 545, 546 (N.Y. App. Div. 2002) (dismissing unjust enrichment claim as duplicative of breach of contract claim "because both causes of action [sought] damages for events arising from the same subject matter that is governed by an enforceable contract.").

[210] *Stone & Paper Invs., LLC v. Blanch*, No. 2018-0394, 2020 WL 3496694, at *12 (Del. Ch. June 29, 2020) (quoting *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014)); *see also Albert v. Alex. Brown Mgmt. Servs., Inc.*, Nos. 762-N & 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) ("Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.").

[211] *Albert*, Nos. 762-N & 763-N, 2005 WL 2130607, at *8; *see also iBio, Inc. v. Fraunhofer USA Inc.*, No. 10256-VCF, 2020 WL 5745541, at *11 (Del. Ch. Sept. 25, 2020) ("Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract.").

As an initial matter, Count 24 is an unjust enrichment claim against Tilton and the Octaluna Entities premised on their receipt of tax dividends that allegedly should have been paid to the Funds. Neither Count 4 nor Count 25 is premised on this action, and accordingly, the Court will not dismiss Count 24 as duplicative.

The remaining unjust enrichment claims are premised on the same conduct as Counts 4 and 25. Counts 13 and 14 are premised on the Voting/Control Actions and alleged manipulation of the OC Tests challenged in Count 4. Count 33 is premised on the November 2017 Written Consents, the PPMG Agreements and the Phantom Equity Agreements challenged in Count 25. However, as indicated by the previous chart, but for the unjust enrichment claim alleged in Count 13 against Tilton related to the November 2017 Written Consents and the unjust enrichment claim alleged in Count 14 against the Patriarch Managers, the remaining claims in Counts 13, 14, and 33 are alleged against Defendants different than those of Counts 4 and 25. Accordingly, these claims are not duplicative and will not be dismissed.[212]

The unjust enrichment claim alleged in Count 14 against the Patriarch Managers rests upon the same allegations of OC Test manipulation asserted in Count 4.[213] Moreover, it alleges that the Patriarch Managers' actions violated the Indentures,[214] just like the allegations of Count 4, which allege that their actions violated the Indentures (and the CMAs).[215] Despite the Funds' argument to the contrary, the Patriarch Managers do not contest that the CMAs and Indentures are valid and enforceable agreements governing the relationship between themselves and the Funds.[216] Therefore, because the Funds have pursued a remedy against the Patriarch Managers under the Indentures and CMAs in Count 4 for the same conduct complained of in Count 14 and have not identified any other independent basis for such claim, it must be dismissed.

The remaining unjust enrichment claim alleged in Count 13 against Tilton relates to the Patriarch Managers' breach of the CMAs and Indentures as a result of the November 2017 Written Consents. Tilton is accused in Count 25 of breaching the Portfolio Companies' LLC Agreements as a result of same written consents. Count 13 is not duplicative given the different contracts at issue and alleged breaching party. Accordingly, the Court will not dismiss the claim.[217]

---

[212] If the Funds ultimately prevail in obtaining a judgment against one or more of the Defendants on their breach of contract and unjust enrichment claims, the scope of remedies may ultimately need to be tailored to avoid an excessive recovery.

[213] *Compare* Compl. ¶ 201 ("The Patriarch Managers knowingly and intentionally breached the CMAs by incorrectly categorizing the Zohar Funds' assets using higher quality categorizations than were warranted, resulting in inflated principal balances being used as part of the OC Test in violation of the Indentures."), *with id.* ¶ 279 ("Tilton and the Patriarch Managers manipulated the OC Test by incorrectly categorizing the Zohar Funds' assets and inflating the principal balances used in the OC Test in violation of the Indentures.").

[214] *Id.* ¶ 279.

[215] *Id.* ¶¶ 197-202.

[216] *See* Adv. D.I. 95 ¶ 91.

[217] *See supra* note 212.

### 2.    Breach of Fiduciary Duty Claims (Counts 6 and 7)

The Defendants argue that the Funds' breach of fiduciary duty claims in Counts 6 and 7 are duplicative of the breach of contract claims in Count 4.  Count 6 alleges breach of fiduciary duty against the Patriarch Managers and Tilton for manipulating the OC Test, wrongfully consenting on behalf of the Funds to the Voting/Control Actions, and permitting or authorizing the distribution or transfer of valuable rights and interests, and the proceeds of debt and equity, held or owned by the Funds to the Defendants and their affiliates.  Count 7 is alleged against Tilton for aiding and abetting these breaches of fiduciary duty to the extent that the Court does not ultimately find Tilton owed fiduciary duties under Count 6.

Both parties rely upon Delaware law for their positions on dismissal of these claims as duplicative.  The Funds argue that dismissal is not appropriate because they are permitted to plead claims in the alternative.  Generally, "[u]nder Delaware law, if the contract claim addresses the alleged wrongdoing . . . , 'any fiduciary duty claim arising out of the same conduct is superfluous.'"[218]  This policy is in place to protect "the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations."[219]  There is a narrow exception, however, that allows fiduciary duty claims to survive if "'there is an independent basis for the fiduciary duty claims apart from the contractual claims, even if both are related to the same or similar conduct.'"[220]  To determine whether there is an independent basis for fiduciary claims arising from the same general events, the Court inquires whether the fiduciary duty claims "'depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy.'"[221]

With respect to the claims in Counts 6 and 7 alleged against Tilton, the Court disagrees that they are duplicative of the claims in Count 4 because, among other thing, the claims in Count 4 are alleged solely against the Patriarch Managers.  With respect to the claims in Count 6 alleged against the Patriarch Managers, the Court agrees that they are duplicative of those alleged in Count 4 to the extent that they rely upon duties set forth in the Indentures and CMAs.  However, the Funds also allege that the Patriarch Managers, as investment advisers, owed fiduciary duties of care and loyalty to the Funds that arose from common law and statute.[222]  To the extent that claims in Count 6 rely upon this theory, they are not duplicative of Count 4 and will not be dismissed.

---

[218] *Grayson v. Imagination Station, Inc.*, No. 5051-CC, 2010 WL 3221951, at *6 (Del. Ch. Aug. 16, 2010) (quoting *Gale v. Bershad*, No. 15714, 1998 WL 118022, at *5 (Del. Ch. Mar.4, 1998)).

[219] *Id.*

[220] *Id.* (quoting *PT China LLC v. PT Korea LLC*, No. 4456–VCN, 2010 WL 761145, at *7 (Del. Ch. Feb.26, 2010)).

[221] *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, No. 7668, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) (quoting *AM Gen. Holdings. LLC v. Renco Grp., Inc.*, No. 7639, 2013 WL 5863010, at *10 (Del. Ch. Oct. 31, 2013)).

[222] *See, e.g.*, Compl. ¶¶ 69, 218.

## F.    Viability of Claims Arising From the "Check the Box" Election

The Funds allege in the Complaint that prior to 2016, they were structured for United States income tax purposes as disregarded entities or partnerships.[223]  As a result, their income ultimately flowed up to Tilton through several pass-through or disregarded entities owned and directed by her.[224]  The Funds were not taxed on any interest, dividends, or distributions received on account of their investments in the Portfolio Companies.[225]  Nor were they taxed when the Companies were sold.  According to the Funds, this disregarded status was central to their structure and credit ratings and critical to their investors.[226]

The Funds status changed in 2016 when Tilton (through the Octaluna Entities) made an election, commonly known as "check the box", for the Funds to be taxed as corporations (the "CTB Election").[227]  The CTB Election caused the Funds to be responsible for tax on their income and on any gains realized from a Portfolio Company sale or loan repayment.[228]  Moreover, as a result of the CTB Election, the Funds allege that they are not entitled to offset any gains from losses that were generated pre-CTB Election by the Portfolio Companies or the Funds and that were collected by Tilton as the ultimate taxpayer pre-CTB Election.[229]

The CTB Election serves as the foundation for eight counts of the Complaint:

| COUNT | CLAIM | BASIS | DEFENDANT(S) |
|---|---|---|---|
| XV | Breach of the Subscription Agreements | CTB Election | Octaluna Entities |
| XVI | Tortious Interference | CTB Election (Subscription Agreement) | Tilton |
| XVII | Tortious Interference | CTB Election (Indenture) | Octaluna Entities Tilton |
| XIX | Actual Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | CTB Election | Octaluna Entities |
| XX | Constructive Fraudulent Transfer under 11 U.S.C. § 544 and New York and Delaware law | CTB Election | Octaluna Entities |
| XXI | Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) | CTB Election | Octaluna Entities |

---

[223] *Id.* ¶ 128.

[224] *Id.*

[225] *Id.* ¶ 129.

[226] *Id.* ¶¶ 128-31.

[227] *Id.* ¶¶ 131, 292.

[228] *Id.* ¶ 132.

[229] *Id.* ¶¶ 129 & 133.

| XXII | Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) | CTB Election | Octaluna Entities |
| XXIII | Permanent Injunction | CTB Election | Octaluna Entities Tilton |

The Defendants move to dismiss each of these counts for various reasons, most overlapping.  The Court will discuss the common bases in this section of the Opinion and the remainder in the section addressing individual claim issues.

### 1.     Lack of Standing (Counts 15, 16, 17, 19, 20, 21, 22, and 23)

The Defendants seek dismissal of all claims arising from the CTB Election because they contend that the Funds fail to allege an injury as a result of the CTB Election that is not speculative.  More specifically, the Defendants claim that the Funds do not allege that they suffered an actual incurrence of tax liabilities as a result of the CTB Election but rather a future, possible incurrence when the Portfolio Companies are sold.  Accordingly, they seek this Court's dismissal of the claims as unripe.  The Funds oppose dismissal, arguing that they allege a suffered harm as a result of the Defendants' conduct.  Specifically, the Funds are now taxable entities for United States tax purposes.  The Court agrees with the Funds.

To establish Article III standing,[230] the Funds must "have suffered an 'injury in fact', that is "fairly traceable to the challenged conduct of the [D]efendant[s]", and that is likely to "be redressed by a favorable judicial decision."[231]  An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) 'actual or imminent, not 'conjectural' or 'hypothetical'"'[.]"[232]  "At the pleading stage, general factual allegations of injury resulting from the defendants' conduct may suffice, for . . . [the Court must] presume that general allegations embrace those specific facts that are necessary to support the claim."[233]

The Funds identify in the Complaint the particular injury that they have suffered due to the CTB Election – *i.e.* they are no longer disregarded entities and now subject to tax liability.  Moreover, the Funds allege that they suffered damages as a result[234] and will continue to suffer damages as interest on their loans is collected, loans are repaid, and their equity interests are sold.[235]  This allegation of future harm is not "too speculative for Article III purposes[.]"[236]  Indeed,

---

[230] U.S. CONST., ART. III, § 2 (limiting the jurisdiction of federal courts to "Cases" and "Controversies").

[231] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted).

[232] *Id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

[233] *Id.* at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

[234] Compl. ¶¶ 294, 302, 308, 315, 323, 331, & 338.  Moreover, the Court can take judicial notice of the Funds' need to obtain tax compliance and consulting services as a result of the CTB Election and their payment of fees and expenses in connection therewith.  *See, e.g.*, Case No. 18-10512, D.I. 1958, 2017, 2141, 2172, 2264, 2364, 2374, 2384, 2438, 2455, 2485, 2563, 2600.

[235] *See, e.g.*, *id.* ¶ 132.

[236] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013).

the Funds are not "require[d] to demonstrate that it is literally certain that the harms they identify will come about."[237]  Rather, a "'substantial risk' that the harm will occur" is sufficient.[238]  Such risk exists here given, among other things, the ongoing monetization process of the Portfolio Companies and the requirements of such companies to satisfy their ongoing interest obligations.

The Defendants cite cases in support of the proposition that "the mere possibility of future tax liability, or any associated penalties imposed by the IRS, is insufficient to establish standing to sue in federal court."[239]  However, the cases cited and those upon which they rely are distinguishable on their facts.[240]  The question here is not *if* the Funds will incur tax liabilities but rather, *when* and *how* much.  Moreover, to the extent that the Funds prevail on their claims and seek an award of damages that includes future tax liabilities, the parties can address issues that may arise from such a request then.

### 2.    Octaluna Entities Were Permitted to Act (Counts 15, 16, 17, 19, 20, 21, 22, and 23)

The Defendants also seek dismissal of claims arising from the CTB Election because they contend that relevant tax law expressly permitted the Octaluna Entities to make the CTB Election. The Funds do not dispute this[241] but argue that the Octaluna Entities agreed not to make the CTB Election in the Subscription Agreement and incorporated Investor Questionnaire and therefore, breached their promises when they made the election.  The Defendants do not agree and contend that the Subscription Agreements impose no such obligation on the Octaluna Entities and that even if they do, the obligation did not apply when they made the CTB Election given the circumstances.

There is no dispute that each Fund and its corresponding Octaluna Entity entered into a Subscription Agreement when the Funds sold and the Octaluna Entities purchased their preference

---

[237] *Id.* at 414 n.5.

[238] *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010)).

[239] *Coon v. Wood*, 160 F. Supp. 3d 246, 251 (D.D.C. 2016).

[240] *See, e.g.*, *id.* at 250-51 (finding at the summary judgment stage that the plaintiff's potential tax liability was dependent on two speculative future events resting on a third party – an audit (which the plaintiff did not prove was imminent or likely) and the determination following the audit that additional taxes were owed); *Barker v. Gottlieb*, 23 F. Supp. 3d 1152, 1159 (D. Haw. 2014) (granting plaintiff leave to amend his complaint to allege that "he faces actual or imminent tax liabilities or penalties" as a result of defendants' conduct rather than simply "potential tax liabilities and penalties"); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 527-28 (E.D.N.Y. 2013) (finding no standing where, among other things, the plaintiff's tax status had not yet been re-classified as a result of the defendants' conduct but noting that if the status was reclassified, plaintiff would then have standing); *Local No. 773 of the Intern. Ass'n of Firefighters v. City of Bristol*, No. 3:11-1657, 2013 WL 1442453, at **4-5 (D. Conn. Apr. 9, 2013) (finding no standing where plaintiffs alleged pecuniary harm was dependent on their retirement plan no longer being considered a qualified defined benefit pension plan); *Scanlan v. Kodak Ret. Income Plan*, 678 F. Supp. 2d 110, 114 (W.D.N.Y. 2010) (same).

[241] *See* D.I. 59 ¶ 111 n.121.

shares.[242]  Moreover, there is no dispute that the terms of the Investor Questionnaire attached to each Subscription Agreement were incorporated by reference therein.[243]

Section E of the Investor Questionnaire, entitled "Certain Tax Matters", provides, in pertinent part, that:

> The Investor *understands and agrees* that:
>
> (1)  Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Preference Shares of the Issuer will constitute partners of the Issuer[.][244]

According to the Defendants, this language did not create any affirmative obligation on the part of the Octaluna Entities to maintain the Funds' disregarded tax status and was merely a general aspirational statement.  They argue that their only affirmative obligation regarding the Funds' status is set forth in the "Further Advice and Assurances" clause of the Subscription Agreement, which simply imposes upon them a notice requirement:

> All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including the attached Investor Questionnaire, becomes untrue.  The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may by subject.[245]

---

[242] The Defendants provided the Court with a copy of the Subscription Agreement entered into between Zohar II and Octaluna II.  *See* Adv. D.I., 45, Ex. 1.  The Subscription Agreements entered into between Zohar I and Octaluna I and Zohar III and Octaluna III have not been provided to the Court.  Nonetheless, the parties do not dispute that such agreements exist and that their terms mirror those of the Zohar II Subscription Agreement, including the language relevant to this dispute.

[243] *See id.* ¶ 9 ("The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein.").

[244] *Id.* (Investor Questionnaire at 8).

[245] *Id.* ¶ 4.

The Court disagrees with the Defendants. The plain language of Section E of the Investor Questionnaire provides that the Octaluna Entities "agree" that the Funds would be treated as a disregarded entity. This is not general or aspirational language; it served as a basis for the Octaluna Entities' eligibility to purchase the preference shares.[246] This is understandable because control of the Funds' tax status lies with the owners of the Funds, which the Octaluna Entities became by virtue of their purchase of the preference shares. Furthermore, the Investor Questionnaire is clear that the Octaluna Entities made agreements therein as it concludes with the agreement of the Octaluna Entities to "indemnify and hold harmless the [Funds] . . . from and against all loss, damage or liability due to or arising out of a breach of *any . . . agreement*" they made therein.[247] For these reasons, any argument that the Octaluna Entities did not have the obligation pursuant to the Subscription Agreements to maintain the disregarded status of the Funds is unavailing.

The Defendants also argue that even if the Investor Questionnaire imposed an affirmative obligation on the Octaluna Entities to maintain the Funds' tax status, the Octaluna Entities complied with such obligation. According to the Octaluna Entities, they had more than one beneficial owner as of 2016 and therefore each Fund had more than a single beneficial owner at the time of the CTB Election. However, the Complaint does not include any information regarding the beneficial owners of the Octaluna Entities as of the CTB Election and the Defendants do not offer any.[248] Accordingly, the Court will not dismiss the claims for this reason.

### 3.    CTB Election Did Not Result in a Transfer of the Funds' Property That May be Avoided (Counts 19, 20, 21, and 22)

Finally, the Defendants argue that the Funds' fraudulent transfer claims based upon the CTB Election must be dismissed because the Funds do not have a property interest in their tax status that can be subject to an avoidance action under the Bankruptcy Code. They also argue that, even if they do, the Court may not be permitted under the Internal Revenue Service ("IRS") Treasury Regulations to avoid the CTB Election or cause its reversal because the decision to allow for a change in classification lies with the IRS Commissioner.

With respect to the latter issue, the Funds did not respond. However, a review of the IRS Treasury Regulation cited by the Defendants in support reveals its inapplicability to this proceeding. More specifically, 26 C.F.R. § 301.7701-3(c)(iv) provides in pertinent part that:

> If an eligible entity makes an election under paragraph (c)(1)(i) of this section to change its classification . . ., the entity cannot change its classification by election again *during the sixty months succeeding the effective date of the election*. *However, the Commissioner may permit the entity to change its classification by election within the sixty months if* more than fifty percent of the

---

[246] *Id.* ¶ 5.

[247] *Id.* (Investor Questionnaire at 10 (emphasis added)).

[248] *See, e.g.*, *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.").

ownership interests in the entity as of the effective date of the subsequent election are owned by persons that did not own any interests in the entity on the filing date or on the effective date of the entity's prior election.[249]

The CTB Election was alleged to have been made in 2016.  This proceeding is in its infancy and will not likely be ripe for adjudication this year.  Accordingly, more than 60 months will have elapsed before the Court is in a position to contemplate, let alone order, the avoidance the CTB Election.   Putting aside any other issues that may be implicated by the Defendants' argument that this Court's authority to avoid the CTB Election is preempted or otherwise limited by the IRS Treasury Regulations, there does not appear a basis for such an argument in section 301.7701-3(c)(iv) and therefore, the request to dismiss Counts 19 through 22 on this basis is denied.

With respect to the former issue raised, the Defendants rely primarily on the decision of the United States Court of Appeals for the Third Circuit in *Majestic Star Casino, LLC v. Barden Development, Inc. (In re Majestic Star Casino, LLC)*.[250]  Specifically, the court in *Majestic* held that a debtor's tax classification status as a qualified subchapter S subsidiary shielding it from federal taxation was not property of the estate pursuant to section 541(a)(1) of the Bankruptcy Code given, among other things, it was a "tax classification over which [the] debtor has no control and that is not alienable or assignable."[251]   In response, the Funds acknowledge the precedential effect of the Third Circuit's decision in *Majestic* on their fraudulent transfer claims arising from the CTB Election.  Although they do not directly concede that their claims should be dismissed to the extent that they rest on a purported transfer of estate property, the Funds expressly reserve such issue for appeal.[252]  Given the foregoing, and to avoid any later confusion if this matter is ultimately appealed, the Court will dismiss Counts 19 through 22 to the extent the Funds seek to avoid the CTB Election as a transfer of estate property.

Notwithstanding, the Funds state that Counts 19 through 22 are still viable.  Specifically, they argue that the CTB Election caused them to incur tax liabilities.[253]  In their reply briefing, the Defendants argue that the court in *Majestic* considered and foreclosed this argument, but the Court does not agree.  The issue there was whether a parent's decision to abandon its tax classification - and thus forfeit the pass-through tax benefits that it and its debtor-subsidiary enjoyed - was, among other things, avoidable under sections 549 and 550 of the Bankruptcy Code as a postpetition

---

[249] 26 CFR § 301.7701-3(c)(iv) (emphasis added).

[250] 716 F.3d 736 (3d Cir. 2013).

[251] 716 F.3d at 759.

[252] *See* Adv. D.I. 59 ¶ 41 n.40.

[253] *See* Compl. ¶ 315 ("The CTB Election resulted in the Zohar Funds' incurrence of tax obligations that had previously been the tax obligation of Tilton and the Octaluna Entities."); *accord id.* ¶¶ 316, 319, 323-24, 327, 331-32, 338-39; *see also* 11 U.S.C. § 548(a)(1) ("The Trustee may avoid any . . . obligation . . . incurred by the debtor, that was . . . incurred on or within 2 years before the date of the filing of the petition . . . ."); 6 DEL. C. § 1304(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . ."); N.Y. DEBT. & CRED. LAW §§ 273(a) & 274(a) (same).

transfer of property of the estate.[254]   The question as to whether the resulting incurrence of tax liability by the debtor was avoidable as a fraudulent transfer was not before the court.   Whether the findings and conclusions of *Majestic* can be extrapolated to the legal and factual issues that will be presented to the Court in connection with Counts 19 through 22 is unclear at this time, making briefing on this issue beyond the one paragraph submitted by the Defendants in their reply necessary.[255]   Accordingly, the Court will not dismiss the relevant counts on this basis.

### G.   Mootness of Counts 9 and 10

The Defendants seek dismissal of the Funds' fraudulent transfer claims in Counts 9 and 10 as moot to the extent that the Funds assert claims on account of the September 2015 Transfers or any Voting/Control Transfer related to Dura Automotive Systems, LLC and its affiliated debtors.

### 1.   The September 2015 Transfers

The Defendants argue that the fraudulent transfer claims related to the September 2015 Transfers are moot because of the Court's prior *Order Granting in Part Debtors' and Independent Director's Joint Emergency Motion for an Order Declaring That the Debtors Control the Portfolio Companies and Granting Related Relief* (the "Equity Order"), which restored the September 2015 Transfers to the Funds.[256]   The Equity Order was entered on March 30, 2020 after the filing of the Complaint and provides:

> 3.  Effective immediately upon entry of this Order, the Debtors are hereby declared to be the legal and beneficial owners of the equity or membership interests issued or otherwise recorded in the Debtors' names.
> 4.  Effective, immediately upon entry of this Order, the September 2015 Amendments and the September 2015 Proxies are hereby terminated in all respects."[257]

The Funds do not disagree that they have already recovered the September 2015 Transfers but assert that the claims in Counts 9 and 10 related to these transfers are not moot because the Funds also seek the value lost as a result of those transfers.

Section 550(a) of the Bankruptcy Code provides in pertinent part that "[t]o the extent that a transfer is avoided under section 544 . . ., the trustee may recover for the benefit of the estate,

---

[254] *Majestic*, 716 F.3d at 741, 745, 747.

[255] *See, e.g.*, *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017) (noting the common rule that the court will not consider arguments raised for the first time in a reply brief); 5B FED. PRAC. & PROC. CIV. § 1349 (3d ed.) (noting that motions to dismiss under Rule 12(b) "should be granted sparingly and with caution to make certain that the plaintiff is not improperly denied a right to have his claim adjudicated on the merits.").

[256] Case No. 18-10512, D.I. 1542 (Mar. 30, 2020).

[257] *Id.* ¶ 3-4.

the property transferred, or, if the court so orders, the value of such property."[258]    When determining the scope of recovery under this provision, the goal is to restore a debtor and its estate to the position that it would have enjoyed if the transfer had not occurred.[259]    Accordingly, as the Funds have correctly observed, courts have acknowledged money judgments to be an appropriate remedy following the avoidance and return of estate property fraudulently transferred so that an estate may recapture lost value.[260]    While the Defendants argue that the Funds have not pled enough to seek this relief, the Court disagrees given the Funds' request for compensatory damages.[261]    Accordingly, the Court will deny dismissal of the claims in Counts 9 and 10 related to the September 2015 Transfers on this basis.

## 2.    Voting/Control Transfers Related to Dura Automotive Systems, LLC and Its Affiliated Debtors

On October 17, 2019, Dura Automotive Systems, LLC and affiliated entities (collectively, "Dura") filed for chapter 11 protection in the United States Bankruptcy Court for the Middle District of Tennessee.    The cases were transferred to this Court and converted to ones under chapter 7.[262]    The Defendants have moved to dismiss Counts 9 and 10 as moot to the extent that the claims are based on the transfer of governance rights in Dura because of the bankruptcy proceedings. They offer no further explanation.    The Funds did not respond to this argument except to note during argument that certain Voting/Control Actions relate to non-debtor Dura Buyer and not Dura.    The Court will deny dismissal.    Even if the Court is unable to restore to the Funds' estates any Voting/Control Transfers related to Dura, the Court is still able to award the Funds' monetary damages on account of the value of such property.    Accordingly, the claims are not moot.

---

[258] 11 U.S.C. § 550(a).

[259] See, e.g., Giuliano v. Schnabel (In re DSI Renal Holdings, LLC), 617 B.R. 496, 503 (Bankr. D. Del. 2020); EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.), 380 B.R. 348, 362 (Bankr. D. Del. 2008).

[260] See, e.g., Feltman v. Warmus (In re Am. Way Serv. Corp.), 229 B.R. 496, 531-32 (Bankr. S.D. Fla. 1999) (holding that the plain language of section 550(a) as well as public policy allow for a court to order the return of property and award a money judgment to account for appreciation or depreciation of such property following its transfer); D.A.N. Joint Venture III, L.P. v. Touris, 597 B.R. 411, 417 (N.D. Ill. 2019) (same).

[261] The Defendants also challenge the Funds' measure of value purportedly lost and able to be recovered under section 550 as a result of the September 2015 Transfers. Specifically, the Funds argue that they are entitled to recover the value of loans and equity in the Portfolio Companies that was lost as a result of the September 2015 Transfers. The Defendants disagree, arguing that the relevant value to be examined in any future section 550 analysis is that of the governance and control rights transferred as a result of the September 2015 Transfers and not the loans and equity in the Portfolio Companies. A decision on the issues presented in connection with these arguments is not appropriate for the motion to dismiss stage and best left for more advanced stages of this proceeding when the parties' theories and support therefore have been fully developed and presented to the Court.

[262] See generally Case No. 19-12378, D.I. 252 & 1279.

### H.      Remaining Individual Claim Issues

#### 1.      Count 1 – Declaratory Judgment of Equity Ownership

Count 1 is the Funds' claim for a declaratory judgment that they ***are*** the legal and beneficial owners of the equity interests issued or otherwise created in their names for 35 Portfolio Companies and that no other party, including the Octaluna Entities, Tilton, or Tilton's affiliates, have any ownership interest in them.  The Defendants argue that this claim is moot because of the Equity Order.  The Funds do not disagree that they are now the legal and beneficial owners of the equity.  However, they argue that they now seek a declaration that they ***were always*** the legal and beneficial owners of the subject equity interests.  The Court agrees that the count should be re-pled as there is currently no live controversy[263] and will grant the Funds leave to do so.

#### 2.      Count 2 – Declaratory Judgment That Voting/Control Actions Were Ineffective

Count 2 is the Funds' claim for a declaratory judgment that the Voting/Control Actions were void *ab initio* and unenforceable.  The Defendants move to dismiss this claim as duplicative of the Funds' breach of contract claims in Counts 4 and 25, which seek damages for and recession of the Voting/Control Actions.  In response, the Funds argue that it is too premature to determine whether the claims are duplicative and that, if duplicative, they are entitled to bring a claim for declaratory judgment while also seeking coercive relief.  As noted by the Defendants, the Court has discretion to dismiss declaratory claims that overlap with other claims.  Given the initial stage of these proceedings and the complexity of the circumstances presented and relief sought, the Court declines to exercise its discretion to dismiss Count 2.[264]

#### 3.      Count 3 – Declaratory Judgment (PPMG Agreements)

Count 3 is the Funds' claim for a declaratory judgment that the PPMG Agreements have terminated at all but one Portfolio Company.  The Defendants contend that the Funds do not have prudential standing to pursue this claim because they are not parties to the PPMG Agreements or third-party beneficiaries.

As explained by the United States Supreme Court in *Warth v. Seldin*, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."[265]   "[E]ven when the plaintiff has alleged injury sufficient to meet [Article III's] 'case or controversy' requirement, . . . the plaintiff generally

---

[263] U.S. CONST., ART. III, § 2 (limiting the jurisdiction of federal courts to "Cases" and "Controversies").

[264] *Aluminum Co. Am. v. Beazer E., Inc.*, 124 F.3d 551, 560 (3d Cir. 1997) ("Although a court has discretion to decline to adjudicate a declaratory judgment action over which it has jurisdiction, a court should only exercise such discretion if it determines that issuing a declaratory judgment would serve no useful purpose.").

[265] 422 U.S. 490, 498 (1975).

41

must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[266]  This rule is a form of judicial gatekeeping to ensure that courts are adjudicating matters necessary to protect individual rights and limiting their role in resolving public disputes.[267]  "[T]he limits of prudential standing are used to ensure that those parties who can best pursue a particular claim will gain access to the courts."[268]

Prudential standing requires three elements.  The Funds must assert their own legal rights rather than those of a third party, the grievance must "not be so abstract as to amount to a generalized grievance", and the Funds' interests must be within the "zone of interests" protected by the statute, rule, or constitutional provision on which the claim is based.[269]  While the Funds admit that they are not a party to the PPMG Agreements,[270] they assert that they are third-party beneficiaries if the agreements benefitted anyone beyond Tilton and PPMG.[271]  However, the Complaint contains no allegations demonstrating that the Funds are third-party beneficiaries.[272]  Indeed, such a contention is antithetical to the Funds' argument that the PPMG Agreements were unnecessary, excessive, and designed to "siphon[] off value" that should otherwise go to the Funds as the holders of equity and/or debt of the Portfolio Companies.[273]

Nonetheless, the Court will not dismiss the Funds' claim.  Third-party standing, or *jus tertii* standing, is permitted, and "the principles animating . . . prudential [standing] concerns are not subverted[,] if a third party is hindered from asserting its own rights and shares an identity of interests with the plaintiff."[274]  A court must balance three factors to determine if third-party standing is warranted.  These are whether the plaintiff has suffered injury, whether the plaintiff

---

[266] *Id.* at 499.

[267] *Id.* at 499-500.

[268] *Mariana v. Fisher*, 338 F.3d 189, 204 (3d Cir. 2003); *see also Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 (3d Cir. 2002) ("This principle is based on the assumption that 'third parties themselves usually will be the best proponents of their own rights,' *Singleton v. Wulff*, 428 U.S. 106, 114, (1976), which serves to foster judicial restraint and ensure the clear presentation of issues.").

[269] *Id.* at 205; *Lewis v. Alexander*, 685 F.3d 325, 340 (3d Cir. 2012).

[270] Compl. ¶ 121.

[271] *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) ("terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract[.]").

[272] *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[I]t is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' 'clearly to allege facts demonstrating that he is the proper party to invoke judicial resolution of the dispute.'" (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) and *Warth*, 422 U.S. at 518)).  A third party may be a beneficiary of a private contract "by establishing (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [the third party's] benefit and (3) that the benefit to [the third party] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit is lost."  *Burns Jackson Miller Summit & Spitzer v. Linder*, 451 N.E.2d 459, 469 (N.Y. 1983).

[273] *See, e.g.*, Compl. ¶¶ 3, 7, 120-27.

[274] *Pa. Psychiatric Soc'y*, 280 F.3d at 288.

and the third party have a "close relationship", and whether the third party faces obstacles that prevent it from pursuing its own claims.[275]  Here, given the unique facts and circumstances of the Funds' bankruptcy cases, the Court determines that these criteria are satisfied.

More specifically, the Court is overseeing the monetization process of the Portfolio Companies pursuant to which their assets or the equity interests therein are being sold and the liens, claims, and interests of the Funds and the Defendants against the Portfolio Companies are being satisfied from the proceeds and released.[276]  Payments to PPMG on account of claims arising from the PPMG Agreements are included in the types of claims that are payable in the event of a monetization transaction and serve to reduce proceeds available to the Funds to satisfy their interests in the Portfolio Companies.[277]  Accordingly, the Funds and their estates suffer harm as a result of claims that arise from the PPMG Agreements.

As a result of the monetization process and the need to determine the validity and amount of the Defendants' claims against the Portfolio Companies, the parties have already called upon this Court to determine whether the Defendants held valid claims arising under one of the PPMG Agreements (with no involvement of the relevant Portfolio Company).[278]  Moreover, they anticipate similar disputes, including those based on the allegations made in Count 3, to arise in the future as the Portfolio Companies are monetized.[279]  In the adjudication of these claim disputes, the interests of the Funds were and will be fully aligned with those of the Portfolio Companies.[280]  Moreover, the Portfolio Companies have little to no incentive to bring challenges to the PPMG Agreements or the claims PPMG may assert thereunder in light of the structure of the monetization process and claim dispute mechanics already in place, and it is difficult to imagine them doing so given the adverse consequences those suits could have on their monetization efforts and resources.[281]  As such, adjudicating the claims alleged in Count 3 does not inappropriately expand the scope of the parties' proceedings already before this Court and does not serve to undermine

---

[275] *Id.* at 288-89.

[276] *See* Case No. 18-10512, D.I. 266 (the "Settlement Order") & D.I. 545.

[277] Settlement Order, Ex. 1 ¶ 18.

[278] *See Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction*, Case No. 18-10512, D.I. 2019 (Oct. 15, 2020).

[279] *See Pa. Psychiatric Soc'y*, 280 F.3d at 289 (explaining that, for third-party standing purposes, a sufficiently "close relationship" exists between a plaintiff and a third-party if the relationship permits the plaintiff "to effectively advance" the third-party's claims such that the plaintiff is operating "fully, or very nearly, as effective a proponent" of the third-party's rights as the third-party itself.  (quoting *Powers v. Ohio*, 499 U.S. 400, 413 (1991)).

[280] Indeed, Tilton and her affiliated entities commenced state court actions against over a dozen Portfolio Companies in the summer of 2020 in an attempt to collect various monies due to them under various agreements, and this Court stayed those actions for several reasons, including that the suits were wasteful and duplicative in light of the Settlement Order and a harmful distraction to the monetization processes. *See* Case No. 18-10512, D.I. 2081 (transcript ruling) & 2082 (related order).

[281] *See Pa. Psychiatric Soc'y*, 280 F.3d at 290 (noting that the third criterion of third-party standing "does not require an absolute bar from suit, but 'some hindrance to the third party's ability to protect his or her own interests.'" (quoting *Powers*, 499 U.S. at 411)).

the policies animating the doctrine of prudential standing.  The Defendants' request to dismiss Count 3 on this basis is therefore denied.

### 4.     Count 4 – Breach of CMAs and Indentures

Count 4 is the Funds' claim that the Patriarch Managers breached the CMAs and Indentures as a result of, *inter alia*, the Voting/Control Actions and concealment of the financial condition of the Portfolio Companies.   Specifically, the Funds allege that the Voting/Control Actions transferred value from the Funds to Tilton and her affiliates in a manner that was not entirely fair and inconsistent with arms-length business practices.[282]  As a result, the Funds contend that the Patriarch Managers violated the Indentures and multiple provisions of the CMAs, including sections 2.2 and 2.4 and the implied covenant of good faith and fair dealing.[283]

The Funds also assert that the Patriarch Managers failed to report the financial deterioration of the Portfolio Companies as required under section 2.2(f)(iv) of the CMAs.[284]  They allege that "the cash flows generated by many of the Portfolio Companies deviated from the expected cash flows for a substantial period of time without the Patriarch Managers alerting the Trustee"[285] and that this failure concealed the state of the Portfolio Companies and prolonged the Defendants' control over the Funds' assets to the Funds' detriment.[286]  In addition to section 2.2(f)(iv), the Funds contend that the concealment breached the implied covenant of good faith and fair dealing.[287]

The Defendants assert that the Funds have no claims for these actions because the terms of the relevant agreements foreclose any liability.  They assert that the CMAs gave the Patriarch Managers broad authority to manage the Funds' assets and amend the Credit Agreements on the Funds' behalf and that they took the Voting/Control Actions pursuant to this authority. Accordingly, the Defendants argue that the Funds cannot recover any damages because the Funds themselves are at fault.  Moreover, they assert that there can be no claim against the Patriarch Managers for the November 2017 Written Consents because the Patriarch Managers were no longer collateral managers for the Funds at the time[288] and because the consents were unrelated to their prior role or actions as collateral managers.  Finally, the Defendants argue that section 2.2(f)(iv) forecloses any contention that the Patriarch Managers were required to disclose the financial performance of each individual Portfolio Company as it imposed only a duty to report cash flows for the entire portfolio of Portfolio Companies.

---

[282] Compl. ¶¶ 193-96.

[283] *Id.*

[284] *Id.* ¶¶ 204-06.

[285] *Id.* ¶ 204.

[286] *Id.* ¶¶ 205-06.

[287] *Id.* ¶ 205.

[288] *See id.* ¶ 149.

(a)     **Voting/Control Actions**

To sufficiently state a claim for breach of contract under New York law,[289] the Funds must allege "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."[290]  The Funds have done so as outlined above with respect to their claims arising from the Voting/Control Actions with the exception of those related to November 2017 Written Consents.

Although not explicit, the Defendants appear to seek dismissal under the doctrine of *in pari delicto* when asserting that the Patriarch Managers acted on behalf of the Funds to execute the Voting/Control Actions.  The *in pari delicto* doctrine "is an affirmative defense available in situations where it is proven that the plaintiff and the defendant were equally at fault for the wrongdoing alleged by the plaintiff."[291]  "The doctrine prohibits one party from suing another where the plaintiff was 'an active, voluntary participant in the unlawful activity that is the subject of the suit.'"[292]

As explained by the New York Court of Appeals in *Kirschner v. KPMG LLP*, "[t]raditional agency principles play an important role in an in pari delicto analysis."[293]  Because a corporation is not a natural person, they act solely through their duly authorized agents even if the particular acts were unauthorized.[294]  "[W]here conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principals."[295]  Similar to the policy considerations underlying the *in pari delicto* doctrine, this imputation serves to "foster[] an incentive for a principal to select honest agents and delegate duties with care."[296]

There exists an "adverse interest" exception to imputation, which may be invoked if an agent "*totally abandoned* his principal's interests and [acted] entirely for his own or another's purposes."[297]  It does not apply if the agent simply has a conflict of interest or fails to act primarily for the principal.[298]  Rather, it may be invoked if the agent's "misconduct benefits only himself or a third party[.]"[299]  It is a narrow exception and applies "where the corporation is actually the

---

[289] *See supra* note 85.

[290] *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011).

[291] *In re E. End Dev., LLC*, 555 B.R. 138, 147 (Bankr. E.D.N.Y. 2016).

[292] *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 57 F. Supp. 3d 206, 209 (S.D.N.Y. 2014) (quoting *Pinter v. Dahl*, 486 U.S. 622, 636 (1988)).

[293] 938 N.E.2d 941, 950 (N.Y. 2010).

[294] *Id.* at 950-51.

[295] *Id.* at 951.

[296] *Id.* at 951-52.

[297] *Id.* at 952 (emphasis in original).

[298] *Id.*

[299] *Id.*

45

victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (i.e., 'adverse') to the corporation's own interests."[300]

Dismissal of a claim under the doctrine of *in pari delicto* at this stage requires its application to be "'plain on the face of the pleadings.'"[301]  Here it is not.  Notably, as the Court has already highlighted, the overarching theory the Funds advance is that the challenged actions were entirely for Tilton's benefit at the expense of, among others, the Funds.  Accordingly, the Court will not dismiss the claims in Count 4 related to the Voting/Control Actions on this basis.

### (b)    November 2017 Written Consents

With respect to the November 2017 Written Consents (a subset of the Voting/Control Actions), there is no dispute that the Patriarch Managers were no longer the collateral managers for the Funds at the time of their execution.  Notwithstanding, the Funds argue that the claim should survive dismissal because the November 2017 Written Consents were a direct result of the prior Voting/Control Actions.  But for those prior Voting/Control Actions, the Funds contend that they would have removed Tilton from control of the Funds and prevented the November 2017 Written Consents.  The Defendants disagree with these contentions, arguing that the consents are disconnected from Patriarch Managers' actions as collateral managers.

The Court agrees that dismissal is appropriate of any breach of contract claim against the Patriarch Managers arising from the November 2017 Written Consents given their prior resignations as collateral managers.  Nonetheless, the Funds may still recover damages on account of the November 2017 Written Consents if they are, among other things, "'the natural and probable consequences of the breach[es]'" that allegedly occurred prior.[302]

### (c)    Section 2.2(f)(iv)[303]

Section 2 of the CMAs describes the general duties of the Funds' collateral manager.  In section 2.2(f)(iv) or (v), as applicable, entitled "Monitoring of Collateral", the collateral manager must "monitor from time to time the cash flows generated by the portfolio of Collateral

---

[300] *Id.*

[301] *MF Global*, 57 F. Supp. 3d at 209 (quoting *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 65 (2d Cir. 2013)).

[302] *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008) ("It is well settled that in breach of contract actions 'the nonbreaching party may recover general damages which are the natural and probable consequence of the breach.' Special, or consequential damages, which 'do not so directly flow from the breach,' are also recoverable in limited circumstances." (quoting *Kenford Co. v. Cnty. of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989) & *Am. List Corp. v. U.S. News & World Report*, 549 N.E.2d 1161, 1164)) (N.Y. 1989)).

[303] The relevant provision at issue is found at section 2.2(f)(iv) of the Zohar III CMA but section 2.2(f)(v) of the Zohar I and II CMAs.  *See* Compl., Ex. 4 § 2.2(f)(v) (Zohar I CMA); Ex. 5 § 2.2(f)(v) (Zohar II CMA); Ex. 6 § 2.2(f)(iv) (Zohar III CMA).  However, the Defendants do not take issue with the Funds' Complaint and its sole reliance on section 2.2(f)(iv).

46

Investments [or Collateral Debt Obligations] and notify the Trustee when such cash flows materially deviate from the expected cash flows in respect of such portfolio[.]"[304]

The Defendants argue that the Funds' claim that the Patriarch Managers were obligated and failed to monitor the cash flows of each *individual* Portfolio Company and report when they materially deviated from expectation is at odds with the plain language of the foregoing section because it requires the monitoring of cash flows generated by the *portfolio* of Collateral Investments or Collateral Debt Obligations.  It is the Defendants' position that the Patriarch Managers were only obligated to monitor and report material deviations in the *aggregate* cash flow of all the Collateral Investment and Collateral Debt Obligations.

The Funds argue that this interpretation is absurd as it would not require notifications until the entire portfolio was in collapse and would avoid notifications in a circumstance when a Portfolio Company ceased all payments and defaulted on its obligations to the Funds.  The Defendants disagree, arguing that a reporting of cash flows on a company-by-company basis would ignore the strategy of the Funds, which was to rely on the Portfolio Companies' aggregate cash flows to enable repayment of the Funds' noteholders.

Both the Funds and the Defendants "have advanced two equally plausible and reasonable interpretations of the [agreement] provision in question, thereby evidencing an ambiguity[.]"[305] As such, the Court must deny the dismissal of the claim so that further evidence of the parties' intent may be gathered and presented.[306]

### 5.    Count 8 – Conversion of Zohar Funds' Property

Count 8 is the Funds' conversion claim through which the Funds allege that certain Defendants intentionally interfered with the Funds' property rights and deprived their use of property by (a) asserting beneficial ownership of the equity interests in the Portfolio Companies owed by the Funds and, by extension, related sale proceeds, dividends, other distributions on account of such interests and (b) taking the Voting/Control Actions, including the Credit Agreement Amendments, which stripped the Funds of valuable voting and control rights in the

---

[304] *Id.*  The terms "Collateral Investments" and "Collateral Debt Obligations" are undefined in the CMAs. Therefore, pursuant to the terms of the CMAs, the Court must look to the relevant Indenture for their meaning.  *See* Compl., Ex. 4 § 1.1 (Zohar I CMA); Ex. 5 § 1.1 (Zohar II CMA); Ex. 6 § 1.1 (Zohar III CMA).  "Collateral Investment" is a defined collection of assets of Zohar III or non-debtor Zohar III, LLC, including certain loans and other obligations, participation interests therein, and certain securities. *See id.*, Ex. 6 § 1.1.  "Collateral Debt Obligation" is a similar defined pool of assets of either Zohar I (and non-debtor Zohar I CDO 2003-1, LLC) or Zohar II (and non-debtor Zohar II 2005-1, LLC). *See id.*, Ex. 4 § 1.1; *id.*, Ex. 5 § 1.1.

[305] *Vectron Intern., Inc. v. Corning Oak Holding, Inc.*, 964 N.Y.S.2d 724, 726 (N.Y. App. Div. 2013); *see also Pozament Corp. v. Aes Westover, LLC*, 812 N.Y.S.2d 154, 156 (N.Y. App. Div. 2006) ("A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion."  (internal citations omitted)).

[306] *Vectron*, 964 N.Y.S.2d at 726.

Portfolio Companies and under the various Credit Agreements and transferred them to the Defendants.

The Defendants argue that the Funds have no viable claim for conversion based upon any alleged wrongful action related to the Portfolio Company equity interests or the rights affected by the Voting/Control Actions because such interests and rights are intangible property not subject to conversion under New York law. The Funds do not disagree that the interests and rights are intangible but argue that such property may be subject to a conversion claim if represented by a tangible manifestation. To that end, the Funds assert that the property at issue is memorialized in the form of stock certificates, proxy agreements, amended liability company agreements, and other electronic and paper records.

Under New York law,[307] conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."[308] To establish a claim for conversion under New York Law, a plaintiff must show "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the [property], to the alteration of its condition or to the exclusion of the plaintiff's rights." [309] Notably, New York does not generally recognize a conversion claim for "the withholding of indefinite, intangible, and incorporeal species of property."[310] However, under the merger doctrine, New York has extended the tort of conversion to intangible property rights "that are 'merged in, or identified with, some document.'"[311] In that regard, courts have identified stocks and bonds as intangible property subject to a cause of action for conversion when represented by stock certificates or other documents.[312] Additionally, "items that bear a substantial similarity to

---

[307] The parties appear in agreement that New York law applies to the conversion claim in Count 8.

[308] *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 660 N.E.2d 1121, 1126 (N.Y. 1995)).

[309] *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (citation and internal quotation marks omitted).

[310] *Phansalkar v. Andersen Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001) (quoting *Matzan v. Eastman Kodak Co.,* 521 N.Y.S.2d 917, 918 (N.Y. App. Div. 1987)) (internal quotation marks omitted).

[311] *Phansalkar*, 175 F. Supp. at 639-40 (quoting *In re Chateaugay Corp.,* 156 B.R. 391, 400 n.10 (S.D.N.Y. 1993)).

[312] *Phansalkar*, 175 F. Supp. 2d at 643 (finding that stocks are intangible property subject to conversion even when the document memorializing the shares is not a stock certificate and even when there is no allegation that the document itself has been converted); *see also Thyroff*, 460 F.3d at 405 (opining that "although shares of stock are intangible property, they merge with the stock certificates, so that conversion of the certificate may be treated as conversion of the shares that the certificate represents."); *Nelly de Vuyst, USA, Inc. v. Eur. Cosmetiques, Inc.*, 2012 WL 246673, at *8 (S.D.N.Y. Jan. 6, 2012) ("*Thyroff* stands for the proposition that intangible property interests may be subject to conversion when they are represented by something that is subject to conversion - e.g., physical or electronic documents.")

tangible property, like electronically stored data and other information" are subject to a claim for conversion but interests such as business expectancies are not.[313]

The Funds properly plead a cause of action for conversion as it relates to the allegedly converted equity interests.  In that regard, the subject property is a specific identifiable thing - namely, the equity interests in the Portfolio Companies evidenced by various documents, including stock certificates and operating agreements, showing that the Funds were issued equity in the Portfolio Companies.[314]  As to the second and third elements, the Funds assert that they owned the interests before the Defendants exercised dominion and control over them to the Funds' exclusion.[315]  Nonetheless, the Defendants argue that the Funds' claim for conversion of the equity interests must fail because the Funds have made no allegation that the Defendants pilfered or took possession of the underlying documents evincing the equity interests.  However, at least one court has recognized that "under New York law, a claim for conversion of intangible interests embodied in a tangible document need not allege conversion of the document itself."[316]  Moreover, given Tilton's alleged dominance over the Funds and Portfolio Companies, it is reasonable to conclude that an actual taking of the tangible embodiment of the equity interests was unnecessary to deprive the Funds of their alleged property and the fruits thereof.[317]

Notwithstanding the survivability of the Funds' conversion claim relating to the Portfolio Company equity interests, the Court will dismiss the claim as it relates to the Voting/Control Actions.  In this regard, the Funds argue that the Defendants caused them to transfer to the Defendants their voting and control rights as interest holders, and their authority and rights as lenders.  As a threshold matter, any conversion claim against the Patriarch Managers resting on the Voting/Control Actions will be dismissed as duplicative of Count 4, which will ultimately determine whether the Patriarch Managers were permitted under the CMAs and Indentures to take such actions.[318]  As to the remainder of the Defendants, dismissal is also appropriate.  Like the allegedly converted equity interests, the Funds argue that their voting and control rights that were allegedly converted as a result of the Voting/Control Actions are memorialized in tangible records for conversion purposes.[319]  However, the Voting/Control Actions stripped away rights granted to the Funds by virtue of contract as a result of their equity and loan ownership.  Under New York law, "a right to the benefits under a contract" is not the type of intangible property interest protected

[313] *See In re Tashlitsky*, 492 B.R. 640, 649 (Bankr. E.D.N.Y. 2013).

[314] Compl. ¶ 86.

[315] *Id.*

[316] *Phansalkar*, 175 F. Supp. 2d at 642.

[317] *See* RESTATEMENT [SECOND] OF TORTS § 242 ("One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted.").

[318] *See, e.g.*, *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 456 (S.D.N.Y. 2014) ("Whereas courts in this Circuit allow for alternative pleading of unjust enrichment and contract claims, conversion claims are routinely dismissed on Rule 12(b)(6) motions where duplicative of breach of contract claims.").

[319] The Funds fail to make any arguments as to why Count 8 should not be dismissed as to their allegedly converted rights as lenders under the Credit Agreements.

by the law of conversion.[320]    If, alternatively, the Funds wish to assert that the Voting/Control Actions converted their equity interests, rather than their contractual rights, they may amend the Complaint to clarify.[321]

Accordingly, the Court will deny the Defendants' request to dismiss Count 8 as it relates to allegedly converted equity interests but grant the request as it relates to the Voting/Control Actions, subject to the Funds right to amend as necessary.[322]

### 6.    Count 17 – Tortious Interference with Indentures Based on the CTB Election

In Count 17, the Funds assert that in making the CTB Election, Tilton and the Octaluna Entities tortiously interfered with the Indentures by wrongfully and intentionally interfering with the requirement therein for each Fund to be treated as a disregarded entity.[323]    The Defendants argue that the Indentures' obligation to maintain the Funds as disregarded entities belongs to the Funds, and that dismissal is appropriate because a claim for tortious interference cannot be based on the Funds' own breach of contract.[324]    This argument was raised for the first time in the Defendants' reply briefing and therefore, the Court need not consider it.[325]    Moreover, it is not readily apparent from the Court's independent research that a tortious interference claim cannot be maintained under New York law where it is the plaintiff, as opposed to a third-party, who breaches the contract.[326]    The Court will therefore not dismiss Count 17.

### 7.    Count 18 – Conversion of Tax Dividends

In Count 18, the Funds contend that the Octaluna Entities and Tilton, as the ultimate taxpayer for the Octaluna Entities, converted the Funds' tax dividends from the Portfolio

---

[320] *See, e.g.*, *Nelly de Vuyst, USA, Inc.*, 2012 WL 246673, at *8; *accord In re Chateaugay Corp.*, 136 B.R. 79, 86 n.8 (Bankr. S.D.N.Y. 1992) ("[N]o cause of action may lie for conversion of a contractual right.").

[321] The Funds advanced this theory during argument.

[322] As a practical matter, the Funds are not harmed by the dismissal of this claim as they still may maintain their breach of contract claim against the Patriarch Managers (Count 4) related to the Voting/Control Actions and their unjust enrichment claim (Count 13) against the remainder of the Count 8 Defendants.

[323] Compl. ¶¶ 303-08.

[324] The Defendants also argue that the Complaint fails to sufficiently allege an actual breach of the Indentures and that the Defendants' conduct intentionally or improperly interfered with the Indenture. The Court disagrees. *See id.*

[325] *See supra* note 255.

[326] *See, e.g.*, *Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN 120950, LRNNN 122950, LRNN 123580, MSLNV 254064*, 485 F. Supp. 2d 187, 203 (E.D.N.Y. 2007) (citing cases and stating that "those few New York state courts to have considered the issue have held that causing a plaintiff to breach a contract by preventing the plaintiff's performance constitutes tortious interference with a contract, provided that the other elements of the tort are satisfied.").

Companies.  The Defendants make several arguments in support of dismissal, none of which the Court accepts.

First, the Defendants argue that the allegations are vague and do not provide them notice of the specific dividends at issue.  This contention, however, is belied by the Defendants' own admission that the Octaluna Entities ever received from the Portfolio Companies.[327]  Second, they argue that the Complaint fails to allege that the dividends at issue ever belonged to the Funds (a predicate for a conversion claim) but instead acknowledges that the Portfolio Companies paid the dividends at issue.  Like the prior argument, this is without merit as the crux of the Funds' claim is that the Defendants diverted and exercised dominion and control over tax dividends that should have been paid to them.[328]  This is a black letter claim for conversion under New York law, which the parties cite as the appliable law.[329]  Third and finally, the Defendants argue that, under a variety of theories, they were lawfully entitled to receive the dividends.  The exploration of these defenses, however, is more appropriate after full development and presentation of the evidentiary record.

### 8.    Count 23 – Permanent Injunction

Count 23 is the Funds' claim for a permanent injunction against Tilton and the Octaluna Entities.  Specifically, the Funds ask that, in the event that the Court avoids the CTB Election, it also enjoin Tilton and the Octaluna Entities from taking any action or series of actions that would result in the Funds again becoming or being deemed taxable entities.

There are four elements that a plaintiff must demonstrate to obtain a permanent injunction:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[330]

The Defendants argue that the Funds fail to properly plead the first and second elements.  First, they assert that any harm is speculative and premature because the Court has yet to avoid the CTB Election and there is no reason to believe that the Defendants would interfere with the Court's decision to do so.  Second, they contend that an award of monetary damages to compensate the

---

[327] Adv. D.I. 44 ¶ 178.

[328] Compl. ¶¶ 310-12.

[329] *In re Harvard Knitwear, Inc.*, 153 B.R. 617, 624 (Bankr. E.D.N.Y. 1993) ("To properly plead a cause of action for conversion, a complaint must allege that, i) plaintiff had title to the property in question or had a right to its possession; ii) the defendant converted a specifically identified property; iii) the defendant exercised unauthorized dominion over the identified property; and iv) the plaintiff was damaged by reason of the alleged conversion.").

[330] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Funds for any tax liabilities they incur as a result of a future CTB Election would be a sufficient and available remedy in lieu of an injunction.

The Funds oppose dismissal, arguing that Count 23 is "in effect" a request to direct the Octaluna Entities to specifically perform the tax status covenant in the Subscription Agreement and Investor Questionnaire. They contend that such relief may be appropriate if they are unable to determine the appropriate amount of damages caused by the CTB Election due to the uncertain nature of the Funds' future income and gains.[331] However, that is not the relief the Complaint seeks. Count 23 seeks an injunction in the event the Court avoids the CTB Election as a fraudulent transfer. The new relief articulated by the Funds relates to their breach of contract claims in Count 15 and is more appropriate as a remedy sought in connection therewith.[332] The Funds may amend their Complaint to address their specific performance request as and if necessary.

More in support of the relief sought in Count 23, the Funds argue that the Court should not dismiss their request for a permanent injunction because there is nothing preventing the Defendants from making a future election should this Court avoid the CTB Election as a fraudulent transfer. They contend that there is reason to believe the Defendants would, in fact, make a further election because they already reneged on their past promise to keep the Funds as disregarded entities. The Defendants stress to the Court that there is no support for the Funds' alleged fears.[333]

The Court agrees. Count 23 is premature. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"[334] While the Funds "need not await the consummation of threatened injury to obtain preventive relief[,]" the injury must be "certainly impending[.]"[335] Here, the Court has not yet avoided the CTB Election but, assuming it does, the Funds allege no facts independent of the initial CTB Election to support the threat of a reoccurring election. Count 23 is dismissed.

### 9.    Counts 25 and 27 – Breach of the Portfolio Company LLC Agreements and Tortious Interference

Count 25 is the Funds' claim against Tilton for breach of the LLC Agreements arising from the November 2017 Written Consents, the Phantom Equity Agreements, and the PPMG Agreements. Count 27 alleges that PPMG tortiously interfered with the LLC Agreements by assisting Tilton's breaches of those agreements by entering into and amending the PPMG

---

[331] Adv. D.I. 59 ¶ 121.

[332] *Maestro W. Chelsea SPE LLC v. Pradera Realty Inc.*, 954 N.Y.S.2d 819, 828 (N.Y. Sup. Ct. 2012) (dismissing claim for specific performance and noting that "'specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action.'" (quoting *Cho v. 401–403 57th Street Realty Corp.*, 300 A.D.2d 174, 175 (N.Y. App. Div. 2002)).

[333] Adv. D.I. 95 ¶ 100.

[334] *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81 (1985)).

[335] *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

Agreements. The Funds bring the counts in their capacity as members of the LLC Portfolio Companies and seek monetary damages and/or recission of the challenged transactions.

With respect to the November 2017 Written Consents, the Funds argue that, while the LLC Agreements for Dura Buyer, GAS, and Stila permitted Tilton as manager to authorize and direct the creation and issuance of classes of membership interests, Tilton's discretion was required to be exercised in good faith.[336] They contend it was not.[337] Moreover, the Funds allege that the November 2017 Written Consents and the PPMG Agreements were related-party transactions that were not entirely fair and that, as required by the applicable LLC Agreements, failed to be on terms that were no less favorable than those the applicable LLC Portfolio Companies could reasonably be expected to be obtained from unrelated third parties.[338]

According to the Funds, the November 2017 Consents stripped away their control rights and allowed the Octaluna Entities to receive Class A Interests with preference payouts five times their initial investment.[339] Furthermore, the Funds allege that the services PPMG provided under the PPMG Agreements were duplicative of those performed by the Patriarch Managers under the CMAs and that the amounts charged were unreasonable.[340] It is the Funds' contention that the PPMG Agreements were procured with no market test and were inconsistent with arms' length terms.[341] Finally, the Funds allege that the Phantom Equity Agreements were self-interested transactions that were not entirely fair and given for no consideration.[342]

The Defendants assert that dismissal of Count 25 is appropriate because the Funds lack standing to bring the claims. Moreover, they contend that none of the alleged conduct constituted a breach of any obligation under the LLC Agreements.

### (a)    Standing

The Defendants argue that Count 25 alleges harm to the LLC Portfolio Companies as a result of Tilton's actions as manager, thus requiring the Funds to bring the claims derivatively rather than directly as individual members of the companies. The Funds, however, assert that, as non-controlling interest holders, applicable Delaware law[343] permits them to bring claims directly against Tilton as controlling interest holder because the challenged actions breached Tilton's duty of loyalty and harmed the Funds uniquely and primarily by reducing and shifting their economic

---

[336] Compl. ¶¶ 362-65.

[337] Id.

[338] Id. ¶¶ 366-71, 376-77.

[339] Id. ¶¶ 362-65.

[340] Id. ¶¶ 378-82.

[341] Id.

[342] Id. ¶¶ 373-75.

[343] Both parties apply Delaware law to Count 25 and the applicable issues raised in connection with the Motion to Dismiss.

value and voting power in the LLC Portfolio Companies to Tilton and her affiliates. In support, the Funds primarily rely on the Supreme Court of Delaware's decision in *Gentile v. Rosette*.[344]

In *Gentile*, the Delaware Supreme Court reversed a decision of the trial court that granted summary judgment in favor of defendant-directors and a chief-executive officer/controlling shareholder in a breach of fiduciary action commenced by former minority shareholders.[345] The minority shareholders brought the action against the defendants after they approved a self-dealing transaction. Specifically, the CEO/controlling shareholder forgave the corporation's debt to himself in exchange for stock whose value allegedly exceeded the value of the forgiven debt.[346] The minority shareholders claimed that the transaction wrongfully reduced the cash-value and the voting power of their shareholder-interests while concurrently increasing that of the controller's majority interest.[347] The issue decided by the court in *Gentile* was whether the former minority shareholders could bring a direct claim against the defendants as fiduciaries for the debt conversion transaction or whether the claim was exclusively derivative.[348] The trial court determined the claim to be exclusively derivative and thus dismissed it.[349] However, the Delaware Supreme Court disagreed, finding the claim both direct and derivative.[350]

In so ruling, the court explained at the outset that "whether a claim is derivative or direct depends solely upon two questions: '(1) who suffered the alleged harm (the corporation or the using stockholders individually); and (2) who would receive the benefit of the recovery or other remedy (the corporation or the stockholders, individually)?'"[351] Then, it acknowledged that the debt conversion transaction brought by the minority shareholders caused two separate and independent harms.[352] First, the corporation was harmed because it was caused to overpay for the forgiveness of the CEO/controlling shareholder's debt.[353] Second, the minority shareholders were harmed because the transaction extracted or expropriated their economic value and voting power and redistributed them to the CEO/controlling shareholder.[354] As a result, the "shareholders [were] harmed, "uniquely and individually, to the same extent that the controlling shareholder [was] (correspondingly) benefited."[355] As a remedy, the court in *Gentile* determined that the

---

[344] 906 A.2d 91 (Del. 2006).

[345] *Id.* at 103.

[346] *Id.* at 93.

[347] *Id.*

[348] *Id.*

[349] *Id.* at 97.

[350] *Id.* at 99.

[351] *Id.* at 97 (quoting *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.3d 1031, 1033 (Del. 2004)).

[352] *Id.* at 99.

[353] *Id.*

[354] *Id.* at 99-102.

[355] *Id.* at 100.

shareholders could directly recover the value represented by the overpayment without regard to any claim of the corporation.[356]

Accordingly, the Court in *Gentile* articulated "a narrow exception" to the general rule that shareholder dilution claims are derivative.[357]    In sum, a shareholder dilution claim is both derivative and direct (or "dual-natured") when:

> (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[358]

Later, the Delaware Supreme Court in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*[359] clarified that these dilution claims "are only dual-natured when there is some expropriation of control, in addition to economic value, from minority stockholders."[360]    While the continued application and viability of the holdings in *Gentile* have been questioned, they have not been overruled.[361]    Regardless, they should be applied cautiously and narrowly.[362]

The Funds' breach of contract claim arising from the November 2017 Written Consents fits within the aforementioned paradigm and therefore, the Court will not dismiss it as derivative. Similar to the allegations in *Gentile*, Tilton, as controller, is alleged to have caused Dura Buyer, Stila, and GAS to establish and overpay for the Class A Interests that stripped the Funds of their control rights (in particular, their ability to remove Tilton as manager) and reduce the Funds' recovery on account of their common interests in the companies.[363]    This is a dual-natured claim as articulated by the court in *Gentile*.

The same, however, cannot be said for the Funds' breach of contract claims related to the PPMG Agreements and the Phantom Equity Agreements.    As the Defendants highlight, the Funds do not explain in their briefing on the Motion to Dismiss why these claims are direct.    Rather, they focus the Court's attention solely on the November 2017 Written Consents.    Accordingly, the Court is left alone with the Complaint's allegations.    To that end, the Funds allege that the LLC Portfolio Companies overpaid (or agreed to overpay) Tilton or her affiliates for services by way

---

[356] *Id.*

[357] *Hindlin v. Gottwald*, No. 2019-0586-JRS, 2020 WL 4206570, at *7 (Del. Ch. Jul. 22, 2020).

[358] *Gentile*, 906 A.2d at 101.

[359] 152 A.3d 1248 (Del. 2016).

[360] *Hindlin*, No. 2019-0586-JRS, 2020 WL 4206570, at *7 (quoting *El Paso*, 152 A.3d at 1264).

[361] *Almond v. Glenhill Advisors LLC*, No. 10477-CB, 2018 WL 3954733, at *24 (Del. Ch. Aug. 17, 2018).

[362] *Id.*

[363] *See, e.g.*, Compl. ¶¶ 136-42; 364, 369.

of these agreements. Such cash overpayments were incurred either monthly or upon a sale or change of control.[364]

Unlike the November 2017 Written Consents, these transactions fit within "the typical corporate overpayment case" described by the court in *Gentile* as giving rise to an exclusively derivative claim against the corporation's fiduciaries.[365] In such circumstances, the claim to be brought belongs to the corporation because:

> any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In the eyes of the law, such equal 'injury' to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually.[366]

Accordingly, the Court will dismiss Count 25 as it relates to the PPMG Agreements and the Phantom Equity Agreements. For similar reasons, it will also dismiss Count 27. It will, however, grant the Funds leave to amend the Complaint and re-plead the claims as derivative.[367]

### (b)   Breach of the LLC Agreements

The Defendants urge this Court to dismiss the remaining claim of Count 25 related to the November 2017 Written Consents because they contend that the LLC Agreements for Dura Buyer, GAS, and Stila expressly gave Tilton the sole discretion to authorize and direct the creation and issuance of the Class A Interests on terms Tilton determined to be appropriate. However, as noted above, the Funds assert in the Complaint that the creation and issuance of the Class A Interests to entities controlled by Tilton were required to be on terms no less favorable than those the Portfolio Company could reasonably be expected to obtain from unrelated third parties, and that the creation and issuances reflected in the November 2017 Written Consents were not.[368]

Despite the foregoing, Tilton argues that the Funds fail to adequately allege sufficient facts to support the Funds' conclusory statement that the terms were less favorable than those that could have been garnered from unrelated third parties, particularly given that the Complaint alleges that

---

[364] *See, e.g.*, *id.* ¶¶ 122, 124, 144, 382.

[365] *Gentile*, 906 A.2d at 99.

[366] *Id.*

[367] In amending the Complaint, the Court expects that the Plaintiffs will identify and address any other claims that might be derivative claims but were not challenged as such by the Defendants in the dismissal briefing. Moreover, in their briefing, the Funds assert that there was a breach of the LLC Agreements because Tilton amended them without the Funds' approval. However, this claim is not currently included in the Complaint and should be addressed in any amendment.

[368] *See supra* notes 338 & 339 and accompanying text; *see also* Adv. D.I. 45, Ex. 4 (GAS LLC Agreement § 5.14) & Ex. 5 (Stila LLC Agreement § 5.15). No party has submitted the LLC Agreement of Dura Buyer.

consideration was given for the Class A Interest and fails to allege that the Portfolio Companies did not need the invested funds. The Court does not agree. The Complaint alleges that the Class A Interests stripped from the Funds control rights and entitled the Octaluna Entities a payout five times the value of their investment. When read in light of the Complaint's thesis that Tilton used her positions of control to divert as much value as possible to herself at the expense of the Funds and Portfolio Companies, the Funds allegations sufficiently support an inference that the terms of the November 2017 Written Consents were more favorable than those that could reasonably be expected to be obtained from unrelated third parties and thus in breach of the LLC Agreements. Accordingly, the Court will not dismiss Count 25 as it relates to this theory.

The Funds additionally allege that, even if Tilton did not breach an express term of the LLC Agreements, she did not exercise her discretion to create and issue the Class A Interests in good faith and thus, breached the covenant of good faith and fair dealing.[369] The Defendants have moved to dismiss, arguing that the Funds cannot rely upon the implied covenant given that the parties anticipated and specifically delineated Tilton's grant of authority as manager of the Portfolio Companies with respect to related-party transactions.

"The implied covenant of good faith and fair dealing inheres in every contract and 'requires 'a party in a contractual relationships to refrain from arbitrary or unreasonable conduct which has the effects of preventing the other party to the contract from receiving the fruits' of the bargain.'"[370] However, it should be invoked cautiously and rarely to ensure that parties' reasonable expectations are fulfilled.[371] It "'is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[372] "Existing contract terms control"[373] so a court should not employ the implied covenant to re-write an agreement or rebalance economic interests after events that could have been anticipated, but were not, later adversely affect a party.[374] "It may only be invoked 'when the contract is truly silent concerning the matter at hand.' And, even when a contract is indeed 'truly silent' on a matter, the court should still 'be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[375] "The doctrine . . . operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer. In the Venn diagram of contract cases, the area of overlap is quite small."[376]

---

[369] Compl. ¶¶ 359-60, 365.

[370] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

[371] *Id.* (quoting *Dunlap*, 878 A.2d at 442).

[372] *Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Dunlap*, 878 A.2d at 441)).

[373] *Dunlap*, 878 A.2d at 441.

[374] *Oxbow,* 202 A.3d at 507.

[375] *Hindlin*, No. 2019-0586-JRS, 2020 WL 4206570, at *5 (quoting *Oxbow*, 202 A.3d at 507)).

[376] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

Here, the Funds fail to "allege a specific implied contractual obligation and . . . how the violation of that obligation denied [them] the fruits of the contract."[377]   Rather, the Complaint makes only a general allegation of a lack of good faith, which is insufficient to state a cognizable claim of breach of the implied covenant of good faith and fair dealing.[378]   Without a more refined legal theory, the Court cannot analyze whether there is a colorable claim.  Accordingly, the Court will dismiss the claim with leave to re-plead.

### 10.    Counts 29 and 30 – Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

Count 29 is the Funds' claim against Tilton as shareholders of the Corporate Portfolio Companies for breach of fiduciary duty.  The Funds allege that Tilton, as a director of each Corporate Portfolio Company and with actual control over each board, breached her duties of care and loyalty by approving the PPMG Agreements and the MD Helicopter Phantom Equity Agreement.  The Funds allege that these agreements were self-interested transactions that were not entirely fair to the Corporate Portfolio Companies.  Count 30 is the Funds' claim against PPMG for aiding and abetting Tilton's breaches of fiduciary duty related to the PPMG Agreements.

The Defendants move to dismiss Counts 29 and 30 for, among other things, lack of standing.  They allege that the claims are derivative and that the Funds cannot bring the claims in their direct capacity as shareholders of the Corporate Portfolio Companies.  The Funds do not address this argument in their briefing.  For the reasons discussed with respect to Counts 25 and 27 in Section III.H.9(a), the Court will dismiss Counts 29 and 30 for lack of standing but will grant the Funds leave to amend the Complaint and re-plead the claims as derivative claims.[379]

---

[377] *Kuroda*, 971 A.2d at 888 (emphasis in original).

[378] *Id.*; *accord Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850, at **13-14 (Del. Ch. Feb. 24, 2010); *Lonergan v. EPE Holdings LLC*, 5 A.3d 1008, 1022 (Del. Ch. 2010).

[379] *See, e.g.*, *Feldman v. Cutaia*, 956 A.2d 644, 660-62 (Del. Ch. 2007) (dismissing breach of fiduciary duty claim and related aiding and abetting claim as derivative), *aff'd* 951 A.2d 727; *Stallworth v. AmSouth Bank of Ala.*, 709 So. 2d 458, 467 (Ala. 1997) ("The lost value of a minority shareholder's stock resulting from director self-dealing or mismanagement could certainly be characterized as "unfair" to the minority stockholder in some sense, but this is a quintessential derivative injury, merely incidental to one's status as a stockholder . . . .  A minority shareholder has a remedy for such an injury, but that remedy is a derivative action brought on behalf of the corporation."); *Stocke v. Berryman*, 632 N.W.2d 242, 247 (Minn. Ct. App. 2001) ("Where the injury is to the corporation, and only indirectly harms the shareholder, the claim must be pursued as a derivative claim.  To be entitled to bring a direct action, a shareholder or member must be able to allege some injury or harm that is separate and distinct from the injury or harm to the corporation and that is not dependent on the harm to the corporation." (internal quotations and citations omitted)); *Albers v. Edelson Tech. Partners, L.P.*, 31 P.3d 821, 826 (Ariz. Ct. App. 2001) ("Generally, a stockholder may not bring an action individually for wrongs done to a corporation on the theory that the acts devalued the corporation's stock.  Such an action is derivative rather than direct if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets." (internal quotations and citations omitted)).  The parties do not appear to dispute that Delaware, Alabama, Arizona, and Minnesota law apply to these claims.

I.    **Patriarch Partners**

During argument on the Motion to Dismiss, the Defendants correctly noted that the Funds do not allege any claim against the Patriarch Partners despite it being named as a Defendant. Accordingly, the Defendants request dismissal of the Complaint as it relates to that entity.  The Court will grant the dismissal but allow the Funds to amend the Complaint to specify which, if any, claims are alleged against Patriarch Partners.

## IV.    **CONCLUSION**

Accordingly, for the foregoing reasons, the Court will grant in part and deny in part the relief requested in the Motion to Dismiss.  In summary, the Court will dismiss the following claims or counts with leave to re-plead:

- The declaratory judgment claim in Count 1;
- The conversion claim in Count 8 against all relevant Defendants except for the Patriarch Managers as it relates to the Voting/Control Actions;
- Claims for actual fraudulent transfer in Count 9 against PPAS;
- Claims for actual fraudulent transfer in Count 9 related to the May 2011 Transfers;
- Claims for breach of the LLC Portfolio Companies' LLC Agreements in Count 25 related to the PPMG Agreements and Phantom Equity Agreements;
- Claims for breach of implied covenant of good faith and fair dealing in Count 25 related to the November 2017 Written Consents;
- Claims for tortious interference in Count 27;
- Claims for breach of fiduciary duty in Count 29;
- Claims for aiding and abetting breach of fiduciary duty in Count 30;
- Claims for actual and constructive fraudulent transfer in Counts 31 and 32 related to the PPMG Fees made by Stila; and
- Any claims against the Patriarch Partners.

The following claims or counts are dismissed without leave to re-plead:

- The breach of contract claim in Count 4 against the Patriarch Managers arising from the November 2017 Written Consents;
- The breach of fiduciary duty claims in Count 6 against the Patriarch Managers to the extent that they rely upon duties set forth in the Indentures and CMAs;
- The claim for conversion in Count 8 against the Patriarch Managers relating to the Voting/Control Actions;
- The constructive fraudulent transfer claims of Count 10 related to the May 2011 Amendments;
- The unjust enrichment claim in Count 14 against the Patriarch Managers;
- The fraudulent transfer claims in Counts 19-22 to the extent that the Funds seek to avoid the CTB Election as a transfer of estate property;
- The permanent injunction claim in Count 23; and

59

- The constructive fraudulent transfer claims of Count 32 related to the original PPMG Agreements.

All other relief requested in the Motion to Dismiss is denied.  An appropriate order will follow.

Dated:  June 18, 2021

_____
Karen B. Owens
United States Bankruptcy Judge