(E)   in the case of the Class A Pro Rata Adjustment Advance, solely to repay Outstanding principal of the Class A-2 Notes and Class A-3 Notes as provided in paragraph (e) below.

Amounts may be borrowed by the Issuer (at the direction of the Collateral Manager, a copy of which direction shall simultaneously be given to the Trustee by the Collateral Manager) under the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes (a "Borrowing"); provided that:

(i)   each applicable condition to such Borrowing specified in the applicable Note Purchase Agreements is satisfied on the date of such Borrowing (a "Borrowing Date");

(ii)   in no event may (A) the aggregate principal amount of Borrowings outstanding under the Class A-1 Notes exceed the aggregate amount of Class A-1 Commitments (utilized and unutilized); (B) the aggregate principal amount of Borrowings outstanding under the Class A-2 Notes exceed the aggregate amount of Class A-2 Commitments (utilized and unutilized) or (C) the aggregate principal amount of Borrowings outstanding under the Class A-3 Notes exceed the aggregate amount of Class A-3 Commitments (utilized and unutilized);

(iii)   with respect to the Class A-2 Notes and the Class A-3 Notes, the Issuer shall not be permitted to reborrow any amount previously repaid thereon;

(iv)   the Issuer shall not borrow under the Class A-2 Notes until the Issuer has borrowed the full amount available under the Class A-3 Notes, and the Issuer shall not borrow under the Class A-1 Notes until the Issuer has borrowed the full amount available under the Class A-2 Notes and Class A-3 Notes;

(v)   the Issuer shall borrow under the Class A-3 Notes as follows:

(1)   the Issuer shall borrow not less than U.S.$100,000,000 under the Class A-3 Notes on the Closing Date;

(2)   the Issuer shall borrow not less than 50% of the initial Class A-3 Commitments on or prior to February 12, 2004 (or, if such day is not a Business Day, the immediately preceding Business Day);

(3)   the Issuer shall borrow the remaining amount of the initial Class A-3 Commitments on or prior to May 12, 2004 (or, if such day is not a Business Day, the immediately preceding Business Day); and

(4)   without limiting the foregoing, the Issuer shall borrow the Aggregate Undrawn Amount of the Class A-3 Notes in the circumstances described in Section 7.5(e)(2),

provided that no Borrowing under the Class A-3 Notes referred to in clauses (1), (2) or (3) above may be made during the last three Business Days of any calendar month or during the last five Business Days of December, 2003 or March, 2004; and

(vi)   the Issuer shall borrow the full amount of the initial Class A-2 Commitments on May 12, 2004 (or, if such day is not a Business Day, the immediately preceding Business Day),

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050079

NY3:#7320262

- 144 -

or such earlier date as the Collateral Manager and the Holders of the Class A-2 Notes otherwise agree in writing.

(b)  Notice of any Borrowing under the Class A-1 Notes pursuant to Section 9.6(a) shall be given by the Issuer (or the Collateral Manager on its behalf) to the Class A-1 Note Agent and the Trustee, and the Class A-1 Note Agent shall promptly give notice of such Borrowing to each Holder of Class A-1 Notes and the Credit Enhancer, as provided in the applicable Note Purchase Agreements. Notwithstanding anything in the Class A-1 Note Purchase Agreement, all Borrowings thereunder shall be accompanied by a Notice of Borrowing as specified in the Class A-1 Note Purchase Agreement. Notice of any Borrowing under the Class A-2 Notes or the Class A-3 Notes pursuant to Section 9.6(a) shall be given by the Issuer (or the Collateral Manager on its behalf) to the Trustee, and the Trustee shall promptly give notice of such Borrowing to each Holder of Class A-2 Notes or Class A-3 Notes, as provided in the Class A-2 Note Purchase Agreement or the Class A-3 Note Purchase Agreement, as applicable.

(c)  Except as provided herein with respect to Short Settlement Borrowings under the Class A-1 Notes:

(1)  the aggregate principal amount of any Borrowing under this Section 9.6 in respect of the Class A-1 Notes (taken as a whole) shall be an integral multiple of U.S.$500,000 and at least U.S.$5,000,000;

(2)  the aggregate principal amount of the Borrowing under this Section 9.6 in respect of the Class A-2 Notes (taken as a whole) shall be in an aggregate amount equal to the aggregate Class A-2 Commitments on the Closing Date; and

(3)  the aggregate principal amount of any Borrowing under this Section 9.6 in respect of the Class A-3 Notes shall be an integral multiple of U.S.$500,000 and at least U.S.$25,000,000 (except that the final Borrowing under the Class A-3 Notes shall be in the remaining undrawn amount of such Notes).

(d)  Except as provided herein with respect to Short Settlement Borrowings:

(1)  all Borrowings under the Class A-1 Notes shall be made pro rata according to the Aggregate Undrawn Amounts of the Class A-1 Commitments;

(2)  all Borrowings under the Class A-2 Notes shall be made pro rata according to the Aggregate Undrawn Amounts of the Class A-2 Commitments; and

(3)  all Borrowings under the Class A-3 Notes shall be made pro rata according to the Aggregate Undrawn Amounts of the Class A-3 Commitments (and, for the avoidance of doubt, pro rata according to the Aggregate Undrawn Amounts of the Class A-3a Notes and Class A-3b Notes).

(e)  Without limiting the foregoing provisions of this Section 9.6, and in any event subject to all applicable conditions to Borrowing set forth herein and in the Class A-1 Note Purchase Agreement, on the Payment Date on which the Reinvestment Period ends (or, if the Reinvestment Period ends on a day that is not a Payment Date, on the next succeeding Payment Date), the Issuer shall (at the direction of the Collateral Manager) borrow an advance ("Class A Pro Rata Adjustment Advance") under the Class A-1 Notes in an aggregate principal amount equal to the Term Sharing Percentage of the Class A-1 Available Amount, whereupon the proceeds of such Borrowing shall be applied to repay the outstanding principal of the Class A-2 Notes and Class A-3 Notes ratably in accordance with the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                               PP050080
ON BEHALF OF PATRIARCH PARTNERS LLC

Aggregate Outstanding Amounts of the Class A-2 Notes and Class A-3 Notes, respectively (it being understood that amounts applied to repay the Class A-3 Notes under this Section 9.6(e) shall be deposited in the Class A-3 Principal Proceeds Sub-Account for application in accordance with Section 11.7). Notwithstanding anything in this Indenture to the contrary, the proceeds of the Class A Pro Rata Adjustment Advance will not constitute "Principal Proceeds" or "Uninvested Proceeds" and will not be applied under the Priority of Payments but instead will be applied as stated above. Upon the making of the Class A Pro Rata Adjustment Advance, the Class A-1 Commitments will be reduced to an amount equal to the Aggregate Outstanding Amount of the Class A-1 Notes (determined immediately after giving effect to such advance) plus the Class A-1 Adjusted Exposure. As used above:

"Class A-1 Adjusted Exposure" means an amount (not less than zero) equal to (a) the Unfunded Portfolio Amount as of the date on which the Class A Pro Rata Adjustment Advance is made minus (b) the aggregate amount of Principal Proceeds then on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A Pro Rata Adjustment Advance) minus (c) the Balance on deposit in the Unfunded Revolver Discount Account as of such date.

"Class A-1 Available Amount" means an amount equal to the excess (if any) of:

(a)     the Aggregate Undrawn Amount of the Class A-1 Notes as of the date on which the Class A Pro Rata Adjustment Advance is made (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A Pro Rata Adjustment Advance); over

(b)     the Class A-1 Adjusted Exposure as of such date.

"Term Sharing Percentage" means the ratio (expressed as a percentage) of:

(a)     the Aggregate Outstanding Amount of the Class A-2 Notes and Class A-3 Notes as of the date on which the Class A Pro Rata Adjustment Advance is made (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A Pro Rata Adjustment Advance); to

(b)     the Aggregate Outstanding Amount of the Class A Notes as of such date (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of the Class A Pro Rata Adjustment Advance) plus the Aggregate Undrawn Amount of the Class A-1 Notes (as so determined) as of such date.

Section 9.7.    Application of Amounts to Purchase and Fund Collateral Debt Obligations

On any Business Day during or (to the extent permitted by this Indenture) after the Reinvestment Period, the Issuer or the Zohar Subsidiary may direct the Trustee, by Issuer Order, to acquire any Collateral Debt Obligation (subject to the requirements of Section 12.1) or to extend credit in respect of the Unfunded Amount under any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation by application of amounts in the following manner and order of priority:

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                                    PP050081
ON BEHALF OF PATRIARCH PARTNERS LLC

(a)    In the case of any such extension of credit in respect of an Unfunded Amount under a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation that is an Unutilized Commitment, such credit will be extended by the Issuer or the Zohar Subsidiary thereunder:

(i)    first, by application of amounts on deposit in the Unfunded Revolver Discount Account (to the extent of the pro rata portion of the Discount Amount in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, determined by reference to the ratio of such Unutilized Commitment being funded to the original Unutilized Commitment in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation);

(ii)    second, by application of amounts on deposit in the Issuer Principal Collection Account and/or on deposit in the Zohar Subsidiary Principal Collection Account, (in any case to the extent available); and

(iii)    third, by a Borrowing under the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes pursuant to and at the times set forth in Section 9.6.

(b)    In the case of the funding of any acquisition of a Collateral Debt Obligation or any extension of credit in respect of an Unfunded Amount under a Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation that is a Utilized Commitment, the purchase price of such acquisition will be funded or such credit will be extended by the Issuer or the Zohar Subsidiary thereunder:

(i)    first, by application of amounts on deposit in the Issuer Principal Collection Account and/or on deposit in the Zohar Subsidiary Principal Collection Account (in any case to the extent available); and

(ii)    second, by a Borrowing under the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes pursuant to and at the times set forth in Section 9.6.

Notwithstanding the foregoing, if the Issuer requests a Borrowing under Section 9.6 in an amount required by clause (a)(iii) or (b)(ii) above to acquire any Collateral Debt Obligation or to fund the Unfunded Amount under any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation and the proceeds of such Borrowing are insufficient to fund such acquisition or commitment due to the failure of any Holder of a Class A Note to make such proceeds available on the date requested therefor, the Issuer or the Zohar Subsidiary, as applicable, shall first apply amounts on deposit in the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account and second, apply amounts on deposit in the Unfunded Revolver Discount Account.

(c)    Notwithstanding the terms of Section 9.6, 9.7(a) or 9.7(b), on any Business Day (other than the last two Business Days during any Due Period) the Issuer or the Zohar Subsidiary may direct the Trustee, by Issuer Order, to acquire any Collateral Debt Obligations or to extend credit in respect of the Unfunded Amount under any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation by application of amounts on deposit in the Unfunded Revolver Discount Account, the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account in such manner and order of priority as may be specified in such Issuer Order; provided that, in the event that, pursuant to this Section 9.7(c), amounts shall be applied on any date from the Unfunded Revolver Discount Account, the Issuer Principal Collection

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050082

- 147 -

Account and/or the Zohar Subsidiary Principal Collection Account in an order of priority other than that specified in Section 9.7(a) or 9.7(b), on the Business Day immediately preceding the last day of the then-current Due Period (the "True-Up Date") the Trustee shall transfer amounts between the Unfunded Revolver Discount Account and the Issuer Principal Collection Account in such amounts as may be necessary to cause the Balances of such Accounts on the True-Up Date to equal what such Balances would have been on the True-Up Date had credit been extended from such Accounts on each applicable date during such Due Period in accordance with the funding procedures set forth in Section 9.7(a) or 9.7(b), as applicable (and, to the extent that the Balances on deposit in the Issuer Principal Collection Account or Zohar Subsidiary Principal Collection Account are insufficient to fund the transfers to the Unfunded Revolver Discount Account on such date, the Collateral Manager may direct the Issuer to draw upon the Class A Notes pursuant to and at the times set forth in Section 9.6 in an amount equal to such shortfall, the proceeds of which to be deposited into the Unfunded Revolver Discount Account).

(d)    The Issuer or the Zohar Subsidiary may extend credit in respect of the Unfunded Amount under any Unrestricted Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation to the extent provided in Section 11.5(a).

ARTICLE 10

ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.   Collection of Money

(a)    Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms and conditions of such Pledged Obligations. The Trustee shall segregate and hold all such Money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.

(b)    Each of the parties hereto hereby agrees that (i) each Account shall be deemed to be a "Securities Account" and (ii) except as otherwise expressly provided herein, the Trustee will be exclusively entitled to exercise the rights that comprise each Financial Asset held in each Account. Each of the parties hereto hereby agrees to cause the Custodian or any other Securities Intermediary that holds any Money or other property for any Zohar Obligor in an Account to agree with the parties hereto that (a) the Cash and other property is to be treated as a Financial Asset under Article 8 of the UCC and (b) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially indorsed to, the Issuer unless such Financial Asset has also been indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account. Each Account shall be held and maintained at an office located in the United States of America.

Section 10.2.   Principal Collection Accounts; Interest Collection Accounts; Custodial Account

(a)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Issuer Interest Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds received by the Issuer from the disposition of any

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050083

Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested in Collateral Debt Obligations or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), (ii) all other Interest Proceeds received by the Issuer (other than interest and other income from Eligible Investments held in the Class A Holder Collateral Account and the Hedge Counterparty Collateral Account) and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(b)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Issuer Principal Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all Uninvested Proceeds received from the issuance of the Notes and Preference Shares (to the extent not deposited into the Expense Account, the Closing Expense Account, the Professional Fee Account, the Holdback Account, the Unrestricted Collateral Account, the Unfunded Revolver Discount Account or the Cash Reserve Account or used to pay any amount payable out of the Uninvested Proceeds on the Closing Date), (ii) all proceeds received by the Issuer from the disposition of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in Collateral Debt Obligations or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), (iii) all other Principal Proceeds received by the Issuer and (iv) all other amounts (including any Cash Retention Amount) required by the terms of this Indenture to be deposited therein.

(c)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Zohar Subsidiary Interest Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds received by the Zohar Subsidiary from the disposition of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested in Eligible Investments), (ii) all other Interest Proceeds received by the Zohar Subsidiary and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(d)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Zohar Subsidiary Principal Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds received by the Zohar Subsidiary from the disposition of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in Eligible Investments), (ii) all other Principal Proceeds received by the Zohar Subsidiary and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(e)    In addition to depositing or causing to be deposited from time to time such Monies in the Collection Accounts as required from time to time in accordance with the terms hereof, the Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such other Monies in a Collection Account as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Monies are to be treated as Principal Proceeds or Interest Proceeds hereunder to be credited to the applicable Collection Account at its discretion. All Monies deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Collection Accounts shall remain at all times with a financial institution organized under the laws of the United States of America or any political subdivision thereof and having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(f)    All Distributions, any deposit required pursuant to Section 10.2(e) and any net proceeds from the sale or disposition of a Collateral Debt Obligation, Eligible Investment or Equity

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050084

Security received by the Trustee (other than any Distribution the proceeds of which are required under Section 10.9 to be deposited in the Unrestricted Collateral Account or under Section 10.10 to be deposited in the Rollover Proceeds Account) shall be immediately deposited into the Issuer Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Interest Collection Account or the Zohar Subsidiary Principal Collection Account (unless in any case simultaneously reinvested in accordance with the terms of the Indenture in Collateral Debt Obligations or Eligible Investments), as the case may be. Subject to Sections 10.2(h) and 10.2(i), all amounts deposited in the Collection Accounts, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection Accounts as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2. By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall (except as provided in Section 10.2(g)), invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Collection Accounts, as so directed in Eligible Investments having Stated Maturities no later than the Business Day immediately preceding the next Payment Date. The Trustee, within one Business Day after receipt of any Distribution or other proceeds which are not Cash, shall so notify the Issuer and the Issuer or the Zohar Subsidiary, as applicable, shall, within 60 days of receipt of such notice from the Trustee, sell such Distribution or other proceeds for Cash in an arm's-length transaction to a Person which is not an Affiliate of the Issuer or the Collateral Manager and deposit the proceeds thereof in the applicable Collection Account, for investment pursuant to this Section 10.2; provided that neither the Issuer nor the Zohar Subsidiary need sell such Distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such Distributions or other proceeds constitute Collateral Debt Obligations, Unrestricted Collateral Debt Obligations, Eligible Investments or Equity Securities.

(g)    If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(f), the Trustee shall seek instructions from the Collateral Manager within three Business Days after transfer of such funds to a Collection Account. If the Trustee does not thereupon receive written instructions from the Issuer within five Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (d) of the definition thereof in Section 1.1 maturing no later than the Business Day immediately preceding the next Payment Date (provided that the Trustee shall make such investments and reinvestments in such amounts (but only to the extent of available funds) as may be necessary to ensure that on each date there shall be on deposit in or credited to the Issuer Principal Collection Account Eligible Investments having a Stated Maturity of the Business Day immediately following the date of investment with an Aggregate Principal Balance equal to or greater than the Unfunded Portfolio Amount minus the amounts referred to in clauses (b), (c) and (d) of the definition of "Funding Source Amount" as of such date). After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Monies in Eligible Investments specified by the Controlling Party or, in the absence of such direction, as fully as practicable in Eligible Investments of the type described in clause (d) of the definition thereof in Section 1.1 maturing not later than the earlier of (i) 30 days after the date of such investment or (ii) the Business Day immediately preceding the next Payment Date (subject to the proviso in the preceding sentence). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account or the Zohar Subsidiary Interest Collection Account (to the extent such interest and other income constitutes Interest Proceeds) or the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account (to the extent such interest and other income constitutes Principal Proceeds), any gain realized from such investments shall be credited to such Collection Account, and any loss resulting from such investments shall be charged to such Collection Account. Any gain or loss with respect to an Eligible Investment shall be allocated in such a manner as to increase or

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050085

decrease, respectively, Principal Proceeds and/or Interest Proceeds in the proportion which the amount of Principal Proceeds and/or Interest Proceeds used to acquire such Eligible Investment bears to the purchase price thereof. The Trustee shall not in any way be held liable by reason of any insufficiency of such Collection Account resulting from any loss relating to any such investment.

(h)    The Trustee shall, upon receipt of an Issuer Order specified in Section 9.7(a) or 9.7(b) or as otherwise required by Section 9.7(c), apply amounts on deposit in the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account as permitted under and in accordance with the requirements of Section 9.7 and such Issuer Order. The Trustee shall, upon receipt of an Issuer Order and with the prior written consent of the Controlling Party, apply amounts on deposit in the Issuer Principal Collection Account as permitted under and in accordance with the requirements of Section 15.1(b) and such Issuer Order.

(i)    On the Business Day next succeeding the date on which any Interest Proceeds are received in the Zohar Subsidiary Interest Collection Account, the Trustee shall transfer such Interest Proceeds to the Issuer Interest Collection Account; and on the Business Day next succeeding the date on which any Principal Proceeds are received in the Zohar Subsidiary Principal Collection Account, the Trustee shall transfer such Principal Proceeds to the Issuer Principal Collection Account. On the Business Day prior to each Payment Date, the Trustee shall transfer any amounts then held in the Issuer Interest Collection Account and the amount of any Principal Proceeds then held in the Issuer Principal Collection Account (other than in each case proceeds received after the end of the Due Period with respect to such Payment Date) to the Payment Account for application pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b).

(j)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Custodial Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties and into which the Trustee shall from time to time deposit Collateral. All Collateral deposited from time to time in the Custodial Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Trustee agrees to give the Issuer and the Controlling Party notice as promptly as reasonably possible if the Custodial Account or any funds on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.

Section 10.3.    Payment Account

The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Payment Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Sections 11.1 and 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts and make deposits specified in the Priority of Payments, each in accordance with the Priority of Payments (including in connection with any redemption of the Notes pursuant to Section 9.1 on any Payment Date). The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Payment Account or any funds on deposit therein, or otherwise to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                              PP050086
ON BEHALF OF PATRIARCH PARTNERS LLC

The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments. The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

Section 10.4.    Cash Collateral Account

(a)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Cash Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Cash Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Cash Collateral Account shall be to pay amounts specified in Section 11.2 (including in connection with any redemption of the Notes pursuant to Section 9.1 on any Payment Date). The Trustee shall transfer to the Cash Collateral Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b) and such other amounts as required hereunder.

(b)    The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Cash Collateral Account or any funds on deposit therein, or otherwise to the credit of the Cash Collateral Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Cash Collateral Account other than in accordance with the Priority of Payments. The Cash Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Cash Collateral Account during a Due Period, and amounts received in prior Due Periods and retained in the Cash Collateral Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately preceding the next Payment Date). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Cash Collateral Account and any loss resulting from such investments shall be charged to the Cash Collateral Account.

Section 10.5.    Class A Holder Collateral Accounts

(a)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account, which shall be designated as the "Class A Holder Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Issuer and the Secured Parties (and, as to any Holder of Class A-1 Notes as to which a Holder Subaccount is created as provided below, any related External Support Provider) and in which no other Person shall have any legal or beneficial interest. If any Holder of a Class A-1 Note or Class A-2 Note shall at any time be required to post collateral to the Class A Holder Collateral Account pursuant to the terms of the Note Purchase Agreement to which such Holder is a party, then (1) the Trustee shall create a segregated subaccount of the Class A

- 152 -

Holder Collateral Account with respect to such Holder (the "Holder Subaccount" of such Holder) and (2) the Trustee shall deposit all collateral received from such Holder into such Holder Subaccount. The only permitted withdrawal from or application of funds credited to a Holder Subaccount shall be as specified in this Section 10.5.

(b)    The posting of collateral to a Holder Subaccount by any Holder of a Class A Note shall not constitute a Borrowing by the Issuer and shall not constitute a utilization of the Class A-1 Commitment or Class A-2 Commitment (as applicable) of such Holder, and the funds posted as collateral shall not constitute principal outstanding under such Class A Note. However, from and after the establishment of a Holder Subaccount with respect to any Holder of Class A Notes until otherwise provided in this Section 10.5, the obligation of such Holder to advance funds under its Class A Notes as part of any Borrowing under this Indenture and the related Note Purchase Agreement shall be satisfied by the Trustee withdrawing funds from such Holder Subaccount in the amount of such Holder's pro rata share of such Borrowing, and all payments of principal with respect to advances made by such Holder under its Class A Notes (whether or not originally funded from such Holder Subaccount) shall be made by depositing the related funds into such Holder Subaccount. The Trustee shall have full power and authority to withdraw funds from each such Holder Subaccount at the time of, and in connection with, the making of any such Borrowing and to deposit funds into each such Holder Subaccount, all in accordance with the terms of and for the purposes set forth in this Agreement and the related Note Purchase Agreement.

(c)    If on any Payment Date (or on any other Business Day upon three Business Days' prior written request from such Holder and the Issuer) the amount of funds on deposit in the Holder Subaccount relating to any Holder of Class A Notes (exclusive of interest earnings subject to clause (e) below) exceeds the Aggregate Undrawn Amount of the Class A-1 Note or Class A-2 Note of such Holder (as applicable) (whether due to a reduction in the Class A-1 Commitment or Class A-2 Commitment (as applicable) or otherwise), then the Trustee shall remit to such Holder a portion of the funds then held in the related Holder Subaccount in an amount equal to such excess.

(d)    If at any time a Holder of Class A Notes demonstrates to the Issuer and the Trustee that it is no longer required to post or maintain collateral in the Class A Holder Collateral Account pursuant to the terms of the Note Purchase Agreement to which such Holder is a party, then all funds then held in the relevant Holder Subaccount (after giving effect to any Borrowings in respect of such Class A Notes are to be made on such date) shall be withdrawn from such Holder Subaccount and remitted to such Holder, and thereafter all payments of principal with respect to advances made by such Holder shall be paid directly to such Holder in accordance with the terms of this Indenture and the relevant Note Purchase Agreement.

(e)    For so long as any amounts are on deposit in any Holder Subaccount, the Trustee shall invest and reinvest such funds in Eligible Investments as directed by the related Holder (which direction may be in the form of standing instructions) (or, if such Holder does not so direct, in Eligible Investments of the type referred to in clause (d) of the definition of such term in Section 1.1), in each case having a Stated Maturity on the day following the date of acquisition thereof. Interest received on such Eligible Investments shall be remitted to such Holder on each Payment Date (and, pending such remittance, shall be retained in such account and invested and reinvested as aforesaid). Any gain realized from such investments shall be credited to such Holder Subaccount and any loss resulting from such investments shall be charged to such Holder Subaccount.

(f)    If the Class A Holder Collateral Account, any Holder Subaccount or any funds on deposit therein, or otherwise to the credit of any Holder Subaccount, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process, the Trustee shall give the Co-

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050088

- 153 -

Issuers, the Collateral Manager, the related Holder and the Controlling Party immediate notice thereof. The Class A Holder Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

Section 10.6.     Expense Account; Professional Fee Account; Closing Expense Account

(a)      The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Expense Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Expense Account shall be to pay (on any day other than a Payment Date) accrued and unpaid Administrative Expenses (other than (i) fees and expenses described in Section 11.1a(i)(B) (except to the extent such fees and expenses remain unpaid on any Payment Date after application of the Priority of Payments on such Payment Date), (ii) the Collateral Management Fee, but including other amounts payable by the Issuer to the Collateral Manager under the Management Agreement or the Indenture, (iii) Credit Enhancement Premium and Credit Enhancement Reimbursement Amounts, but including, so long as no Credit Enhancement Event has occurred and is continuing, other Credit Enhancement Liabilities, as applicable, and (iv) fees and expenses payable from the Professional Fee Account). On the Closing Date, the Trustee shall deposit into the Expense Account an amount equal to U.S.$400,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Thereafter, the Trustee shall transfer to the Expense Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and 11.2(a) and in accordance with the calculations and the instructions contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b). On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Expense Account to the Cash Collateral Account for application pursuant to Section 11.2 on the immediately succeeding Payment Date.

(b)      The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Professional Fee Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Professional Fee Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Professional Fee Account shall be (i) to pay (or reimburse for) costs of enforcement of the Issuer's obligations under Section 7.18, (ii) to pay accrued and unpaid Professional Fees (on any day other than a Payment Date) owing to first, legal advisors and, second, other professionals hired by the Collateral Manager in connection with its duties under the Management Agreement and (iii) on any Payment Date on which there are no Professional Fees due and owing (after application of any amounts from the Priority of Payments to the payment thereof), to reimburse the Collateral Manager for any Senior Collateral Management Fee paid to the Professional Fee Account pursuant to Section 11.1(a)(i)(D) on any prior Payment Date; provided that no amounts may be withdrawn from the Professional Fee Account under clauses (i), (ii) and (iii) above in excess of U.S.$500,000 until after the Phase I Effective Date. On the Closing Date, the Trustee shall deposit into the Professional Fee Account an amount equal to U.S.$2,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Thereafter, the Trustee shall transfer to the Professional Fee Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and 11.2(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050089

prepared by the Issuer pursuant to Section 10.13(b). On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Professional Fee Account to the Cash Collateral Account for application pursuant to Section 11.2 on the immediately succeeding Payment Date.

(c)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Closing Expense Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Closing Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Closing Expense Account shall be to pay accrued and unpaid fees and expenses payable by or on behalf of the Zohar Obligors, the Collateral Manager, the Credit Enhancer, the Placement Agent and their respective Affiliates in connection with the issuance of the Notes and Preference Shares, the acquisition of the Warehouse Collateral Debt Obligations and any amounts payable under or in connection with the Warehouse Agreement or the transactions contemplated thereby and the negotiation, preparation and delivery of the Transaction Documents and other documents related thereto (collectively, "Closing Expenses"). On the Closing Date, the Trustee shall deposit into the Closing Expense Account an amount equal to U.S.$16,350,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. On the Business Day preceding the Payment Date in November, 2004, the Trustee shall transfer all amounts on deposit in the Closing Expense Account to the Cash Collateral Account for application pursuant to Section 11.2 on such Payment Date.

(d)    The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Expense Account, the Professional Fee Account, or the Closing Expense Account or any funds on deposit therein, or otherwise to the credit of any such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Expense Account, the Professional Fee Account and the Closing Expense Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(e)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Expense Account, the Professional Fee Account and the Closing Expense Account during a Due Period, and amounts received in prior Due Periods and retained in the Expense Account, the Professional Fee Account and the Closing Expense Account, as so directed in Eligible Investments having Stated Maturities no later than the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day next succeeding the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be, and any loss resulting from such investments shall be charged to the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be.

Section 10.6A.  Holdback Account

(a)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Holdback Account", which shall be held

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                                    PP050090
ON BEHALF OF PATRIARCH PARTNERS LLC

- 155 -

in the name of the Trustee in trust for the benefit of the Holders of the Class A Notes and the Deferred Payees. Any and all funds at any time on deposit in, or otherwise to the credit of, the Holdback Account shall be held in trust by the Trustee for the benefit of such Persons. On the Closing Date, the Trustee shall deposit into the Holdback Account an amount equal to U.S.$4,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Holdback Account shall be (1) prior to the Phase I Effective Date, for application as provided in clause (X) below; and (2) after the Phase I Effective Date, for application as provided in clauses (Y) and (Z) below:

(X)    Application of Funds if the Phase I Effective Date does not occur.

(1)    If on any Payment Date (I) the Phase I Effective Date has not occurred, (II) the Ramp Up Liquidation Date has not occurred and (III) there would otherwise be insufficient funds available for application pursuant to the Priority of Payments to pay the amounts payable under Sections 11.1(a)(i)(F)(i) through (v) on such Payment Date (in each case, after application on such Payment Date of Interest Proceeds and Principal Proceeds on deposit in the Collection Account, amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments and application of amounts on deposit in the Cash Reserve Account as provided in Section 10.7, but without giving effect to the Credit Enhancement and Supplemental Credit Enhancement), then on such Payment Date:

(A)    the Trustee shall transfer funds from the Holdback Account to the Payment Account in an aggregate amount equal to such insufficiency for application under the Priority of Payments on such Payment Date; and

(B)    to the extent any funds remain in the Holdback Account after the transfer to the Payment Account made pursuant to clause (A) above, the remainder shall be held in the Holdback Account for application on succeeding Payment Dates in accordance with this Section 10.6A.

(2)    If on the Ramp Up Liquidation Date there would otherwise be insufficient funds available for application pursuant to the Priority of Payments to repay the outstanding principal of the Class A Notes in full together with interest (other than Class A Additional Interest or Additional Class A-3 Adjustment Amounts) thereon and Class A-1 Commitment Fee, Class A-2 Commitment Fee and the Class A-3 Commitment Fee in respect thereof (in each case, after application on such Payment Date of the proceeds of the sale or liquidation of all of the Collateral (including the amounts on deposits in the Accounts pursuant to Article 10 but other than funds on deposit in the Holdback Account), but without giving effect to the Credit Enhancement and Supplemental Credit Enhancement), then on such Payment Date:

(A)    the Trustee shall transfer funds from the Holdback Account to the Payment Account in an aggregate amount equal to such insufficiency for application under the Priority of Payments on such Payment Date;

(B)    to the extent any funds remain in the Holdback Account after the transfer to the Payment Account made pursuant to clause (A) above, the Trustee shall apply amounts on deposit in the Holdback Account to the payment of the Deferred Closing Expenses (other than Deferred Class B Structuring Fees), to be applied ratably in accordance with the respective amounts of such Deferred Closing Expenses owing to the Deferred Payees thereof; and

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7370267

PP050091

(C)     to the extent any funds remain in the Holdback Account after the transfer to the Payment Account made pursuant to clause (A) above and the payment in full of the Deferred Closing Expenses payable pursuant to clause (B) above, the Trustee shall transfer such funds to the Cash Collateral Account for application pursuant to Section 11.2.

(Y)     Application of Funds if the Phase I Effective Date occurs. If the Phase I Effective Date occurs, then, on the first Business Day following the Phase I Effective Date:

(A)     the Trustee shall apply amounts on deposit in the Holdback Account to the payment of the Deferred Closing Expenses (other than Deferred Class B Structuring Fees), to be applied ratably in accordance with the respective amounts of such Deferred Closing Expenses owing to the Deferred Payees thereof; provided that an amount equal to the Deferred Class B Structuring Fee Reserve Amount will be retained in the Holdback Account for application as provided in clause (Z) below;

(B)     to the extent any funds remain in the Holdback Account after payment in full of the Deferred Closing Expenses under clause (A) above and retention of the Deferred Class B Structuring Fee Reserve Amount therein, the Collateral Manager, by Issuer Order, may direct the Trustee to, and thereupon the Trustee shall, transfer funds from the Holdback Account to the Expense Account, the Professional Fee Account and/or the Closing Expense Account in an aggregate amount not exceeding U.S.$1,000,000 (in each case without regard to any limitations on the aggregate amount of funds that can be deposited in any such Account pursuant to the Priority of Payments, and the transfers to such Accounts made pursuant to this sentence will be disregarded when determining the amounts that may be deposited in such Accounts pursuant to the Priority of Payments); and

(C)     to the extent any funds remain in the Holdback Account after the payment of Deferred Closing Expenses in full and retention of the Deferred Class B Structuring Fee Reserve Amount therein under clause (A) above and the transfers to the Expense Account, the Professional Fee Account and/or the Closing Expense Account under clause (B) above, the Trustee shall transfer such funds to the Cash Collateral Account for application pursuant to Section 11.2.

(Z)     Deferred Class B Structuring Fees. Amounts retained in the Holdback Account pursuant to the proviso to clause (Y)(A) above will be applied on and after the later to occur of (I) the Phase I Effective Date and (II) the date on which the Class B Rating Condition is satisfied, as follows:

(A)     on the first Business Day (if any) following the date on which the Trustee receives a written notice (provided that if such notice is received after noon (New York time) on any Business Day it will be deemed to be received on the next succeeding Business Day) that all or a portion of the Class B Notes issued on the Closing Date are first rated at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's, and on each Additional Class B Note Issuance Date (if any), the Trustee shall disburse to the Placement Agent, in payment of accrued Deferred Class B Structuring Fees, an amount equal to 1% of the face amount of the Class B Notes that are so rated; provided that the aggregate amount disbursed to the Placement Agent pursuant to this clause (A) shall not exceed U.S.$1,500,000; and

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050092
ON BEHALF OF PATRIARCH PARTNERS LLC

- 157 -

(B)    on the Payment Date in November, 2006, all amounts not disbursed to the Placement Agent pursuant to clause (A) above shall be transferred to the Cash Collateral Account for application under Section 11.2.

(b)    The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Holdback Account or any funds on deposit therein, or otherwise to the credit of such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Holdback Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Holdback Account during a Due Period, and amounts received in prior Due Periods and retained in the Holdback Account, as so directed in Eligible Investments having Stated Maturities no later than the Business Day prior to the Payment Date next succeeding the date of such investment.  All interest and other income from such investments shall be deposited in the Holdback Account.  Any gain realized from such investments shall be credited to the Holdback Account, and any loss resulting from such investments, shall be charged to the Holdback Account.

Section 10.7.    Cash Reserve Account

(a)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Cash Reserve Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Cash Reserve Account shall be held in trust by the Trustee for the benefit of the Secured Parties.

(b)    On the Closing Date, the Trustee shall deposit into the Cash Reserve Account an amount equal to U.S.$42,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares.  In addition, any amounts received by the Trustee from the Hedge Counterparty under any Hedge Agreement (other than Hedge Termination Amounts) shall be deposited into the Cash Reserve Account.  Except as provided in Section 11.8, the only permitted withdrawal from or applications of funds on deposit in, or otherwise to the credit of, the Cash Reserve Account shall be as provided in Section 10.7(c).

(c)    If on any Determination Date the Collateral Manager certifies to the Trustee that the Collateral Manager has determined, based on its reasonable belief, that on the next succeeding Payment Date there will be in the aggregate insufficient Interest Proceeds and Principal Proceeds on deposit in the Collection Accounts and amounts on deposit in the Cash Collateral Account to pay all Senior Expense Amounts due and owing on such Payment Date in accordance with the Priority of Payments, the Trustee shall (at the written direction of the Collateral Manager) withdraw from the Cash Reserve Account and deposit into the Payment Account on or prior to the Business Day prior to such Payment Date for application on such Payment Date as Interest Proceeds an amount equal to such insufficiency (to the extent of funds on deposit in the Cash Reserve Account and after application on such Payment Date of Interest Proceeds and Principal Proceeds on deposit in the Collection Account and amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments) (and, if no such direction is provided, then no such withdrawals shall be made from the Cash Reserve Account).  If on any Payment Date, after giving effect to any withdrawal referred to in the preceding sentence, the Balance in the Cash Reserve Account shall exceed the Required Reserve Amount, the Trustee shall

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050093

withdraw from the Cash Reserve Account an amount equal to such excess and deposit such amounts into the Cash Collateral Account; provided that no amounts may be withdrawn from the Cash Reserve Account pursuant to this sentence until after the Phase I Effective Date.

On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Cash Reserve Account to the Issuer Principal Collection Account for application as provided in Section 10.2 or, if no Class A Notes are Outstanding and all Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero and all Credit Enhancement Liabilities and Credit Enhancement Premium have been paid in full, to the Cash Collateral Account for application pursuant to Section 11.2 on the immediately succeeding Payment Date.

(d)    The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Cash Reserve Account or any funds on deposit therein, or otherwise to the credit of the Cash Reserve Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Cash Reserve Account other than in accordance with the Priority of Payments. The Cash Reserve Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(e)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Cash Reserve Account as so directed in Eligible Investments having a Stated Maturity no later than the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately preceding the next Payment Date). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Cash Reserve Account and any loss resulting from such investments shall be charged to the Cash Reserve Account.

Section 10.8.    Unfunded Revolver Discount Account

(a)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Unfunded Revolver Discount Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Unfunded Revolver Discount Account shall be held in trust by the Trustee for the benefit of the Secured Parties. On the Closing Date, the Trustee shall deposit into the Unfunded Revolver Discount Account, from the initial issuance of the Notes and the Preference Shares, an amount equal to U.S.$15,000,000. In addition, upon the acquisition of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation on or after the Closing Date, the proceeds of any Discount Amount paid (or deemed paid) by the seller thereof to the Issuer shall be deposited into the Unfunded Revolver Discount Account. In addition, to the extent that the Issuer has withdrawn amounts on deposit in the Unfunded Revolver Discount Account pursuant to the last paragraph of Section 9.7(b) to acquire any Collateral Debt Obligations or to fund the Unfunded Amount under any Collateral Debt Obligations that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation and on any subsequent date the Issuer receives proceeds of a Borrowing that was to have been applied pursuant to Section 9.7(b) to such acquisition or Unfunded Amount, the Issuer will deposit a portion of the proceeds of such Borrowing

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050094

- 159 -

equal to such previously withdrawn amounts into the Unfunded Revolver Discount Account. Except as provided in Section 11.8, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Unfunded Revolver Discount Account shall be (i) upon receipt by the Trustee of an Issuer Order to acquire any Collateral Debt Obligation or to make extensions of credit in respect of the Unutilized Commitment of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation as permitted under and in accordance with the requirements of Section 9.7(a) and such Issuer Order, (ii) to acquire any Collateral Debt Obligation or to make extensions of credit in respect of the Utilized Commitment of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation as permitted under and in accordance with the requirements of Section 9.7(b) and such Issuer Order and (iii) as specified in Section 11.4. On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of or, if earlier, on the Business Day next preceding any Payment Date that is a Redemption Date (so long as the conditions to the redemption of the Notes on such Redemption Date specified in Section 9.1(b)(i) or (ii) have been satisfied), the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Unfunded Revolver Discount Account to the Cash Collateral Account for application pursuant to Section 11.2 on the immediately succeeding Payment Date.

(b)     The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Unfunded Revolver Discount Account or any funds on deposit therein, or otherwise to the credit of the Unfunded Revolver Discount Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Unfunded Revolver Discount Account other than in accordance with the Priority of Payments. The Unfunded Revolver Discount Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)     By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Unfunded Revolver Discount Account during a Due Period, and amounts received in prior Due Periods and retained in the Unfunded Revolver Discount Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Unfunded Revolver Discount Account and any loss resulting from such investments shall be charged to the Unfunded Revolver Discount Account.

Section 10.9.    <u>Unrestricted Collateral Account</u>

(a) The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Unrestricted Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Unrestricted Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. On the Closing Date, the Trustee shall deposit into the Unrestricted Collateral Account, from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares, an amount equal to U.S.$30,000,000. In addition, all payments of principal, actual cash discounts received in connection with the acquisition of such

NYX3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP050095

Unrestricted Collateral Debt Obligation (if applicable) or Distributions on Equity Securities (except as described in clause (e) of the definition of "Interest Proceeds") acquired with proceeds from the Unrestricted Collateral Account received in Cash by the Issuer or the Zohar Subsidiary on any Unrestricted Collateral Debt Obligation shall be immediately deposited by the Trustee upon receipt thereof in the Unrestricted Collateral Account. Except as provided in Section 11.8, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Unrestricted Collateral Account shall be made as specified in Section 11.5; provided that no amounts may be withdrawn from the Unrestricted Collateral Account pursuant to this paragraph until after the Phase 1 Effective Date except as provided in Section 11.5(a).

On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of or, if earlier, on the Business Day next preceding any Payment Date that is a Redemption Date (so long as the conditions to the redemption of the Notes on such Redemption Date specified in Section 9.1(b)(i) or (ii) have been satisfied), the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Unrestricted Collateral Account to the Cash Collateral Account for application pursuant to Section 11.2 on the immediately succeeding Payment Date.

(b) The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Unrestricted Collateral Account or any funds on deposit therein, or otherwise to the credit of, the Unrestricted Collateral Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Unrestricted Collateral Account other than in accordance with the Priority of Payments. The Unrestricted Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c) By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Unrestricted Collateral Account during a Due Period, and amounts received in prior Due Periods and retained in the Unrestricted Collateral Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Unrestricted Collateral Account and any loss resulting from such investments shall be charged to the Unrestricted Collateral Account.

Section 10.10.    Rollover Proceeds Account

(a) The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Rollover Proceeds Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Rollover Proceeds Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Upon the receipt by the Issuer or the Zohar Subsidiary of Cash Distributions on any Collateral Debt Obligation or Equity Security in connection with the reorganization, restructuring or liquidation of any obligor thereon (or its Affiliates) or such obligor's (or Affiliates') line(s) of business or the refinancing of or amendment of such Collateral Debt Obligation or Equity Security, the Collateral Manager may, on behalf of the Issuer or the Zohar Subsidiary (as applicable), direct the Trustee in writing to deposit such Cash Distributions into the Rollover Proceeds

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7120262                                                                                      PP050096

Account (absent such direction such payments will be deposited in the applicable Collection Account). Except as provided in Section 11.8, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Rollover Proceeds Account shall be made as specified in Section 11.6. On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Rollover Proceeds Account to the Cash Collateral Account for application pursuant to Section 11.2 on the immediately succeeding Payment Date.

(b) The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Rollover Proceeds Account or any funds on deposit therein, or otherwise to the credit of, the Rollover Proceeds Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Rollover Proceeds Account other than in accordance with the Priority of Payments. The Rollover Proceeds Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c) By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Rollover Proceeds Account during a Due Period, and amounts received in prior Due Periods and retained in the Rollover Proceeds Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Rollover Proceeds Account and any loss resulting from such investments shall be charged to the Rollover Proceeds Account.

Section 10.11. Class A-3 Proceeds Account

(a)      The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Class A-3 Proceeds Account", which (i) shall include a sub-account designated as the "Class A-3 Interest Proceeds Sub-Account" and (ii) shall include a sub-account designated as the "Class A-3 Principal Proceeds Sub-Account" and which shall be held in the name of the Trustee in trust solely for the benefit of the Holders of Class A-3 Notes. Any and all funds at any time on deposit in, or otherwise to the credit of, the Class A-3 Proceeds Account shall be held in trust by the Trustee for the benefit of the Holders of Class A-3 Notes. Any reference in this Indenture or the other Transaction Documents to the "Class A-3 Proceeds Account" shall, unless otherwise expressly provided, include a reference to the Class A-3 Interest Proceeds Sub-Account and the Class A-3 Principal Proceeds Sub-Account. The Trustee shall transfer to the Class A-3 Interest Proceeds Sub-Account from the Payment Account, in accordance with Sections 11.1(a)(i)(F), 11.1(a)(i)(K), 11.1(a)(ii)(B), 11.1(a)(ii)(H), 11.2(a)(ii) and 11.2(a)(ix), (i) the Class A-3 Interest Distribution Amount, (ii) the Class A-3 Commitment Fee and (iii) any Class A Additional Interest, Additional Class A-3 Adjusted Amounts and Defaulted Interest in respect thereof and interest thereon. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Class A-3 Interest Proceeds Sub-Account shall be to pay the Senior Class A-3 Distribution and the Subordinated Class A-3 Distribution payable in respect of the Class A-3 Notes, in accordance with the priority of payments set forth in Section 11.7. The Trustee shall transfer to the Class A-3 Principal Proceeds Sub-Account from the Payment Account, in accordance with Sections 11.1(a)(i)(H)(3), 11.1(a)(ii)(C)(3), 11.1(a)(ii)(G)(3)

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050097

- 162 -

and 11.2(a)(vi)(3), the payment of principal of the Class A-3 Notes. Notwithstanding anything to the contrary in this Indenture, in any of the other Transaction Documents or in any Issuer Order, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Class A-3 Principal Proceeds Sub-Account shall be to pay the Senior Class A-3 Distribution and the Subordinated Class A-3 Distribution payable in respect of the Class A-3 Notes, in accordance with the priority of payments set forth in Section 11.7.

(b)     The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Class A-3 Proceeds Account (including the Class A-3 Interest Proceeds Sub-Account and the Class A-3 Principal Proceeds Sub-Account) or any funds on deposit therein, or otherwise to the credit of the Class A-3 Proceeds Account (including the Class A-3 Interest Proceeds Sub-Account and the Class A-3 Principal Proceeds Sub-Account), shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Class A-3 Proceeds Account (including the Class A-3 Interest Proceeds Sub-Account and the Class A-3 Principal Proceeds Sub-Account). The Class A-3 Proceeds Account (including the Class A-3 Interest Proceeds Sub-Account and the Class A-3 Principal Proceeds Sub-Account) shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

Section 10.12.   <u>Reports by Trustee</u>

Upon request, the Trustee shall supply in a timely fashion to the Issuer, the Collateral Manager, the Class A-1 Note Agent and the Preference Share Paying Agent any information regularly maintained by the Trustee (i) that the Issuer, the Collateral Manager, the Class A-1 Note Agent or the Preference Share Paying Agent may from time to time request with respect to the Pledged Obligations or any Account, (ii) reasonably needed to complete the Note Valuation Report, (iii) reasonably available to the Trustee by reason of its acting as Trustee hereunder, (iv) to permit the Collateral Manager to perform its obligations under the Management Agreement, (v) to permit the Class A-1 Note Agent to perform its obligations under the applicable Note Purchase Agreements and (vi) to permit the Preference Share Paying Agent to perform its obligations under the Preference Share Paying Agency Agreement. The Trustee shall forward to the Collateral Manager, to the Class A-1 Note Agent, to the Controlling Party, to the Preference Share Paying Agent and to any Holder of a Note shown on the Note Register upon written request therefor, copies of notices and other writings received by it from the issuer of any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation or from any Clearing Agency with respect to any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation advising the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer. Nothing in this Section 10.12 shall be construed to impose on the Trustee any duty to prepare any report or statement which the Issuer (or the Collateral Manager on behalf of the Issuer) is required to prepare or provide under Section 10.13 or to calculate or recalculate any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer or the Collateral Manager. Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations which it reasonably considers to be confidential in nature.

The Trustee shall promptly notify the Class A-1 Note Agent (which shall thereupon notify the Holders of the Class A-1 Notes promptly), the Holders of the Class A-2 Notes and the Holders of the Class A-3 Notes if at any time the balance in the Issuer Principal Collection Account exceeds U.S.$20,000,000. In addition, by the close of business on the fifth Business Day prior to each Payment Date, the Trustee shall prepare and deliver to the Class A-1 Note Agent a report setting forth the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050098

estimated Balances on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account as of close of business on the last day of the Due Period related to such Payment Date, together with the estimated Unfunded Portfolio Amount as of the last day of such Due Period.

Section 10.13.  Accountings

(a)     Monthly Accountings.  Not later than the eighth Business Day after the last day of each calendar month (commencing with the last day of the first calendar month ending after the Initial Payment Date, and excluding any month as to which a Note Valuation Report is rendered), the Issuer shall compile and provide to each Rating Agency, the Trustee, the Preference Share Paying Agent, the Collateral Manager, each Hedge Counterparty, the Credit Enhancer and the Holders of Notes, a monthly report (the "Monthly Report").  The Monthly Report shall contain the following information and instructions with respect to the Pledged Obligations included in the Collateral, determined as of the last day of the applicable calendar month (and, for such purposes, the "Preceding Monthly Reporting Date" means, as to any applicable calendar month, the last day of the immediately preceding calendar month):

(1)     the Aggregate Principal Balance of all Collateral Debt Obligations, Equity Securities and Unrestricted Collateral Debt Obligations;

(2)     the Balance of all Eligible Investments and Cash in each of the Issuer Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Principal Collection Account, the Zohar Subsidiary Interest Collection Account, the Cash Collateral Account, the Payment Account, the Expense Account, the Closing Expense Account, the Holdback Account, the Professional Fee Account, the Unrestricted Collateral Account, the Class A Holder Collateral Account, the Unfunded Revolver Discount Account, the Rollover Proceeds Account, the Class A-3 Proceeds Account (including the Class A-3 Interest Proceeds Sub-Account and the Class A-3 Principal Proceeds Sub-Account) and the Cash Reserve Account;

(3)     the nature, source and amount of any proceeds in the Collection Accounts, including Uninvested Proceeds, Interest Proceeds, Principal Proceeds and Sale Proceeds, received since the Preceding Monthly Reporting Date (including for each Collateral Debt Obligation the allocation of Distributions received in respect thereof among principal, interest, fees and other amounts);

(4)     the nature, source and amount of any proceeds in the Unrestricted Collateral Account received since the Preceding Monthly Reporting Date (including for each Unrestricted Collateral Debt Obligation the allocation of Distributions received in respect thereof among principal, interest, fees and other amounts);

(5)     (a) the Principal Balance, annual interest rate, Stated Maturity, issuer, the Moody's Rating and the Standard & Poor's Rating of each Collateral Debt Obligation, Eligible Investment, the Commitment Amount and the Funded Amount of each Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations; and (b) the Principal Balance, annual interest rate, Stated Maturity and issuer of each Unrestricted Collateral Debt Obligation, the Commitment Amount and the Funded Amount of each Unrestricted Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320767

PP050099

- 164 -

aggregate Funded Amount of all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations;

(6)    the amount of funds withdrawn from the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account pursuant to Section 9.7 to fund commitments under Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations since the Preceding Monthly Reporting Date;

(7)    the identity of each Collateral Debt Obligation which became a Defaulted Obligation, Workout Obligation, Non-Current Obligation or Non-Performing Obligation since the Preceding Monthly Reporting Date;

(8)    identify and provide the Principal Balance of each (and provide the Aggregate Principal Balance of all) Defaulted Obligation, Workout Obligation, Collateral Debt Obligation that became a Post-Insolvency Collateral Debt Obligation since the Preceding Monthly Reporting Date, Collateral Debt Obligation that became a Non-Current Obligation since the Preceding Monthly Reporting Date, Collateral Debt Obligation that became a Non-Performing Obligation since the Preceding Monthly Reporting Date, and Collateral Debt Obligation that became a Performing Collateral Debt Obligation since the Preceding Monthly Reporting Date;

(9)    the Aggregate Principal Balance, number and identity of any Collateral Debt Obligations that were released for sale or other disposition (indicating the sale price thereof and whether such Collateral Debt Obligation was a Defaulted Obligation or Non-Performing Obligation (in each case, as reported in writing to the Issuer by the Collateral Manager)) since the Preceding Monthly Reporting Date;

(10)    the Aggregate Principal Balance of all Collateral Debt Obligations that are Senior Secured Collateral Debt Obligations;

(11)    the Aggregate Principal Balance of all Junior Rollover Exchanged Securities;

(12)    the Aggregate Principal Balance of all Collateral Debt Obligations providing for payments of interest less frequently than quarterly;

(13)    the Aggregate Principal Balance of all Collateral Debt Obligations convertible or exchangeable into Equity Securities;

(14)    a description in reasonable detail of the terms of each Equity Security (including whether or not such Equity Security constitutes Margin Stock);

(15)    a description in reasonable detail of the terms of any Pledged Obligation that is not a Collateral Debt Obligation, an Unrestricted Collateral Debt Obligation, an Equity Security or an Eligible Investment;

(16)    the Aggregate Principal Balance of all Fixed Rate Obligations;

(17)    the Aggregate Principal Balance of all Floating Rate Obligations;

NY3:#7339267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050100

(18)    the Aggregate Principal Balance of all Floating Rate Obligations for which the calculation of the relevant floating rate of interest may not be determined by reference to the LIBO Rate;

(19)    the Aggregate Principal Balance of all Collateral Debt Obligations (x) held by the Issuer and (y) held by the Zohar Subsidiary;

(20)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 1;

(21)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 2;

(22)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 3;

(23)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 4;

(23A)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Workout Obligations;

(24)    the Aggregate Principal Balance of all Collateral Debt Obligations issued by each issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);

(25)    for each Collateral Debt Obligation that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests acquired from such Selling Institution;

(26)    the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests;

(27)    the Commitment Shortfall, if any;

(28)    for each Collateral Debt Obligation (as applicable):

(A)    the last date on which interest was paid thereunder since the Preceding Monthly Reporting Date;

(B)    the date of the occurrence of any default or event of default thereunder since the Preceding Monthly Reporting Date;

(C)    the date of the occurrence of any event of bankruptcy or insolvency in respect of the obligor thereon since the Preceding Monthly Reporting Date;

(D)    the date of emergence of the obligor thereon from any bankruptcy or insolvency proceeding since the Preceding Monthly Reporting Date;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050101
ON BEHALF OF PATRIARCH PARTNERS LLC

(E)    the amount and type of Distributions received by the issuer thereunder since the Preceding Monthly Reporting Date in connection with any restructuring of the terms of such Collateral Debt Obligation;

(F)    the date on which all or any portion of such Collateral Debt Obligation was refinanced since the Preceding Monthly Reporting Date and the amount of any such refinancing;

(G)    if such Collateral Debt Obligation is an Exchanged Security or if the issuer thereof has otherwise changed since the date such Collateral Debt Obligation was Granted to the Trustee, the name of the original issuer of such Collateral Debt Obligation (or any predecessor Collateral Debt Obligation); and

(H)    for any Insolvency Collateral Debt Obligation, a specification of each instance since the Preceding Monthly Reporting Date in which the Issuer received interest in Cash;

(29)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Standard & Poor's Industry Classification Group;

(30)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Moody's Industry Classification Group;

(31)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Debt Obligations on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;

(32)    the Class A Break-Even Loss Rate, the Class A Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;

(33)    with respect to each Collateral Debt Obligation that is a Senior Secured Collateral Debt Obligation, the rating assigned by Moody's to such Senior Secured Collateral Debt Obligation and the senior implied rating assigned by Moody's to the issuer of such Senior Secured Collateral Debt Obligation;

(34)    for each Collateral Debt Obligation sold or extinguished since the Preceding Monthly Reporting Date, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net distributions received on a Collateral Debt Obligation that was so extinguished) received by the Issuer in connection with such sale (or in exchange for the extinguishment of such obligation) was greater than or less than the price at which the Issuer purchased such Collateral Debt Obligation (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds received and, in the case of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, fundings in respect of such Collateral Debt Obligation), and the Dollar amount by which, after giving effect to such sale, the aggregate Sale Proceeds received by the Issuer in connection with all sales of Collateral Debt Obligations after the Closing Date was greater than or less than the aggregate amount of the prices at which the Issuer purchased such Collateral Debt Obligations; and

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050102

- 167 -

(35)    a calculation in reasonable detail necessary to determine compliance with each of the Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the Collateral Value Ratio.

The Issuer shall report the following information with respect to the Pledged Collateral Debt Obligations from the Standard & Poor's CDO Monitor: (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure.

In addition, the Issuer shall also indicate in each such Monthly Report the percentage of the Aggregate Principal Balance of all Collateral Debt Obligations and the Maximum Investment Amount for each aggregate amount referred to in clauses (8) through (26) above (inclusive).

Upon receipt of each Monthly Report, the Trustee shall compare the information contained therein to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer and the Collateral Manager if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral. In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.15 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

(b)    Payment Date Accountings. The Issuer shall render an accounting (the "Note Valuation Report") determined as of each Determination Date, and delivered to each Rating Agency, the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Credit Enhancer and the Holders of Notes, not later than the second Business Day preceding the related Payment Date. The Note Valuation Report shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date):

(1)    the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the next Payment Date, the aggregate amount of the Class A-1 Commitments, the aggregate amount of Class A-2 Commitments, the aggregate amount of Class A-3 Commitments and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on the next Payment Date;

(2)    the Interest Distribution Amount, the Class A-1 Commitment Fee, the Class A-2 Commitment Fee, the Class A-3 Commitment Fee, the Class A Additional Interest (if any), the Class A-1 Additional Amounts (if any) and the Additional Class A-3 Adjusted Amounts (if any) payable to the Holders of the Class A Notes (in the aggregate and by Class), for such Payment Date;

(3)    the Administrative Expenses payable on the next Payment Date on an itemized basis;

(4)    for the Issuer Interest Collection Account:

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050103

- 168 -

(A)    the Balance on deposit in the Issuer Interest Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Issuer Interest Collection Account (by way of the Payment Account) pursuant to paragraphs (A) through (M) of Section 11.1(a)(i) on the next Payment Date; and

(C)    the Balance remaining in the Issuer Interest Collection Account immediately after all payments and deposits to be made on such Payment Date;

(5)    for the Issuer Principal Collection Account:

(A)    the Balance on deposit in the Issuer Principal Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Issuer Principal Collection Account (by way of the Payment Account) pursuant to paragraphs (A) through (J) of Section 11.1(a)(ii) on the next Payment Date; and

(C)    the Balance remaining in the Issuer Principal Collection Account immediately after all payments and deposits to be made on such Payment Date;

(6)    for the Cash Collateral Account:

(A)    the Balance on deposit in the Cash Collateral Account at the end of the related Due Period;

(B)    the amounts payable from the Cash Collateral Account pursuant to paragraphs (i) through (xi) of Section 11.2(a) on the next Payment Date; and

(C)    the Balance remaining in the Cash Collateral Account immediately after all payments and deposits to be made on such Payment Date;

(7)    the Balance on deposit in the Zohar Subsidiary Interest Collection Account at the end of the related Due Period;

(8)    the Balance on deposit in the Zohar Subsidiary Principal Collection Account at the end of the related Due Period;

(9)    the Balance on deposit in the Cash Reserve Account at the end of the related Due Period;

(10)    the Balance on deposit in the Rollover Proceeds Account at the end of the related Due Period;

(11)    [reserved];

(12)    [reserved];

(13)    the Balance on deposit in the Unfunded Revolver Discount Account at the end of the related Due Period;

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050104

(14)    the Balance on deposit in the Unrestricted Collateral Account at the end of the related Due Period;

(15)    the Balance on deposit in the Expense Account at the end of the related Due Period;

(16)    the Balance on deposit in the Professional Fee Account at the end of the related Due Period;

(17)    the Balance on deposit in the Closing Expense Account at the end of the related Due Period;

(18)    for the Class A-3 Proceeds Account:

(A)    the Balance on deposit in the Class A-3 Interest Proceeds Sub-Account at the end of the related Due Period;

(B)    the Balance remaining in the Class A-3 Principal Proceeds Sub-Account at the end of the related Due Period; and

(19)    such other information as the Trustee, the Collateral Manager or the Controlling Party shall reasonably request.

The Issuer shall report the following information with respect to the Pledged Collateral Debt Obligations from the Standard & Poor's CDO Monitor: (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure.

Each Note Valuation Report shall contain instructions to the Trustee to withdraw on the related Payment Date from the Payment Account, the Cash Collateral Account and the Class A-3 Proceeds Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established, in Sections 11.1(a), 11.2(a) and 11.7.

(c)    Noteholder Report.  The Issuer shall render an accounting (the "Noteholder Report"), determined as of each Determination Date and delivered to each of the Trustee and the Preference Share Paying Agent not later than the Business Day preceding the related Payment Date.  The Trustee shall deliver to each Noteholder (or its designee) at the address shown on the Note Register, to the Credit Enhancer and to each Rating Agency a copy of the Noteholder Report promptly after receipt thereof by the Trustee and no later than the tenth day after each Payment Date.  The Noteholder Report shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date):

(1)    the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the related Payment Date, the aggregate amount of the Class A-1 Commitments, the aggregate amount of Class A-2 Commitments, the aggregate amount of the Class A-3 Commitments and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on such Payment Date;

NY1:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050105

(2)     the Interest Distribution Amount, the Class A-1 Commitment Fee, the Class A-2 Commitment Fee, the Class A-3 Commitment Fee, the Class A Additional Interest (if any) and the Additional Class A-3 Adjusted Amounts (if any) payable to the Holders of the Class A Notes (in the aggregate and by Class), for the related Payment Date;

(3)     the amounts payable pursuant to paragraphs (A) through (M) of Section 11.1(a)(i), paragraphs (A) through (J) of Section 11.1(a)(ii), and paragraphs (i) through (xi) of Section 11.2(a) on the related Payment Date;

(4)     the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for the Interest Period preceding the next Payment Date;

(5)     the amounts expected to be distributed from the Preference Share Distribution Account to the Holders of the Preference Shares as a dividend assuming the solvency of the Issuer under Cayman Islands law;

(6)     the number and identity of each Collateral Debt Obligation and Unrestricted Collateral Debt Obligation held by the Issuer and the Zohar Subsidiary on the last day of the Due Period most recently ended and indicating, in the case of each Collateral Debt Obligation, whether such Collateral Debt Obligation is a Defaulted Obligation or was a Non-Performing Obligation during the related Due Period (in each case, as reported in writing to the Trustee by the Collateral Manager);

(7)     the identity of each Collateral Debt Obligation that was sold or disposed of pursuant to Section 12.2 since the date of determination of the most recent Noteholder Report and on or prior to the last day of the Due Period most recently ended;

(8)     the identity of each Unrestricted Collateral Debt Obligation that was Granted to the Trustee since the date of the most recent Noteholder Report and on or prior to the last day of the Due Period most recently ended;

(9)     identify and provide the Principal Balance of each (and provide the Aggregate Principal Balance of all) Defaulted Obligation, Workout Obligation, Collateral Debt Obligation that became a Post-Insolvency Collateral Debt Obligation during the related Due Period, Collateral Debt Obligation that became a Non-Current Obligation during the related Due Period, Collateral Debt Obligation that became a Non-Performing Obligation during the related Due Period, and Collateral Debt Obligation that became a Performing Collateral Debt Obligation during the related Due Period;

(10)     the Aggregate Principal Balance of all Collateral Debt Obligations that are Senior Secured Collateral Debt Obligations;

(11)     the Aggregate Principal Balance of all Junior Rollover Exchanged Securities;

(12)     the Aggregate Principal Balance of all Collateral Debt Obligations providing for payments of interest less frequently than quarterly;

(13)     the Aggregate Principal Balance of all Collateral Debt Obligations convertible or exchangeable into Equity Securities;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050106

(14)    a description in reasonable detail of the terms of each Equity Security (including whether or not such Equity Security constitutes Margin Stock);

(15)    a description in reasonable detail of the terms of any Pledged Obligation that is not a Collateral Debt Obligation, an Unrestricted Collateral Debt Obligation, an Equity Security or an Eligible Investment;

(16)    the Aggregate Principal Balance of all Fixed Rate Obligations;

(17)    the Aggregate Principal Balance of all Floating Rate Obligations;

(18)    (a) the Principal Balance, annual interest rate, Stated Maturity, issuer, the Moody's Rating and the Standard & Poor's Rating of each Collateral Debt Obligation, Eligible Investment, the Commitment Amount and the Funded Amount of each Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations; and (b) the Principal Balance, annual interest rate, Stated Maturity and issuer of each Unrestricted Collateral Debt Obligation, the Commitment Amount and the Funded Amount of each Unrestricted Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations;

(19)    the Aggregate Principal Balance of all Floating Rate Obligations for which the calculation of the relevant floating rate of interest may not be determined by reference to the LIBO Rate;

(20)    the Aggregate Principal Balance of all Collateral Debt Obligations (x) held by the Issuer and (y) held by the Zohar Subsidiary;

(21)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 1;

(22)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 2;

(23)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 3;

(24)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 4;

(24A)   the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Workout Obligations;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050107

- 172 -

(25)    the Aggregate Principal Balance of all Collateral Debt Obligations issued by each issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);

(26)    for each Collateral Debt Obligation that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests acquired from such Selling Institution;

(27)    the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests;

(28)    the Commitment Shortfall, if any;

(29)    for each Collateral Debt Obligation (as applicable):

(A)    the last date on which interest was paid thereunder during the related Due Period;

(B)    the date of the occurrence of any default or event of default thereunder during the related Due Period;

(C)    the date of the occurrence of any event of bankruptcy or insolvency in respect of the obligor thereon during the related Due Period;

(D)    the date of emergence of the obligor thereon from any bankruptcy or insolvency proceeding during the related Due Period;

(E)    the amount and type of Distributions received by the issuer thereunder during the related Due Period in connection with any restructuring of the terms of such Collateral Debt Obligation;

(F)    the date on which all or any portion of such Collateral Debt Obligation was refinanced during the related Due Period and the amount of any such refinancing;

(G)    if such Collateral Debt Obligation is an Exchanged Security or if the issuer thereof has otherwise changed since the date such Collateral Debt Obligation was Granted to the Trustee, the name of the original issuer of such Collateral Debt Obligation (or any predecessor Collateral Debt Obligation); and

(H)    for any Insolvency Collateral Debt Obligation, a specification of each instance during such Due Period in which the Issuer received interest in Cash;

(30)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Standard & Poor's Industry Classification Group;

(31)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Moody's Industry Classification Group;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050108

- 173 -

(32)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Debt Obligations on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;

(33)    the Class A Break-Even Loss Rate, the Class A Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;

(34)    with respect to each Collateral Debt Obligation that is a Senior Secured Collateral Debt Obligation, the rating assigned by Moody's to such Senior Secured Collateral Debt Obligation and the senior implied rating assigned by Moody's to the issuer of such Senior Secured Collateral Debt Obligation;

(35)    for each Collateral Debt Obligation sold or extinguished during the related Due Period, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net distributions received on a Collateral Debt Obligation that was so extinguished) received by the Issuer in connection with such sale (or in exchange for the extinguishment of such obligation) was greater than or less than the price at which the Issuer purchased such Collateral Debt Obligation (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds received and, in the case of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, fundings in respect of such Collateral Debt Obligation), and the Dollar amount by which, after giving effect to such sale, the aggregate Sale Proceeds received by the Issuer in connection with all sales of Collateral Debt Obligations after the Closing Date was greater than or less than the aggregate amount of the prices at which the Issuer purchased such Collateral Debt Obligations; and

(36)    written notice received by the Collateral Manager or any Zohar Obligor of any challenge of the validity of any Collateral Debt Obligation or of the validity or priority of any Underlying Instrument or any related collateral security during such Due Period;

(37)    if since the date of determination of the last Noteholder Report any term or condition of any Collateral Debt Obligation has (to the best knowledge of the Issuer or the Collateral Manager) been amended or waived, and the effect of such amendment or waiver was to change the interest rate or the date for the payment of any principal or to release any collateral security thereunder, a description of such amendment or waiver in reasonable detail; and

(38)    a calculation in reasonable detail necessary to determine compliance with the Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the Collateral Value Ratio.

The Issuer shall report the following information with respect to the Pledged Collateral Debt Obligations from the Standard & Poor's CDO Monitor: (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure.

(d)    Redemption Date Instructions.  No later than five Business Days after receiving an Issuer Request requesting information regarding a redemption of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer, and the Issuer shall compute the following

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050109

- 174 -

information and provide such information in a statement (the "<u>Redemption Date Statement</u>") delivered to the Trustee:

(i)      the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii)     the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date; and

(iii)    the amount in the Redemption Accounts available for application to the redemption of such Notes.

(e)     If the Trustee shall not have received any accounting provided for in this Section 10.13 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.13 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

Section 10.14.  <u>Release of Collateral</u>

(a)     If no Event of Default has occurred and is continuing and subject to Article 12, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager delivered to the Trustee, certifying that the conditions set forth in Section 12.2 are satisfied, direct the Trustee to release such Collateral from the lien of this Indenture against receipt of payment therefor.

(b)     Subject to Article 12 (and, if an Event of Default has occurred and is continuing, subject to Article 5), the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager, delivered to the Trustee, certifying that such Collateral is being redeemed or paid in full, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Collateral, if in physical form, duly endorsed, or, if such Collateral is a Clearing Corporation Security, to cause it to be presented, to the appropriate paying agent therefor on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof. If an Event of Default has occurred and is continuing at the time of such direction, the Trustee may and, if so directed by the Controlling Party, shall, disregard such direction provided that, in exercising its discretion, the Trustee shall be entitled to rely on the advice of the Collateral Manager.

(c)     Subject to Article 12 (and, if an Event of Default has occurred and is continuing, subject to Article 5), the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager, delivered to the Trustee, certifying that such Collateral is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Collateral, if in physical form, duly endorsed, or, if such Collateral is a Clearing Corporation Security, to cause it to be delivered, in accordance with such Issuer Order, in each case against receipt of payment therefor. If an Event of Default has occurred and is continuing at the time of such direction, the Trustee may and, if so directed by the Controlling Party, shall, disregard such direction provided that, in exercising its discretion, the Trustee shall be entitled to rely on the advice of the Collateral Manager.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050110

(d)    The Trustee shall deposit any proceeds received by it from the disposition of any Collateral (other than amounts required to be deposited in the Unrestricted Collateral Account or the Rollover Proceeds Account) in the Issuer Interest Collection Account, Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account (unless simultaneously reinvested in Collateral Debt Obligations or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), as the case may be.

(e)    The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

Section 10.15.    Reports by Independent Accountants

(a)    Promptly after the Closing Date the Issuer shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture.  Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee, the Credit Enhancer and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation reasonably acceptable to the Controlling Party.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee and the Credit Enhancer of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation reasonably acceptable to the Controlling Party.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer or by the Trustee as provided in Sections 11.1 and 11.2.

(b)    On or before January 10 of each year (commencing January 10, 2005), the Issuer shall cause to be delivered to the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Credit Enhancer and each Rating Agency an Accountants' Report specifying the procedures applied and their associated findings with respect to (i) the Note Valuation Reports delivered during the one-year period ending on such date, (ii) the Redemption Date Statements, if any, delivered during such one-year period, (iii) the Aggregate Principal Balance of the Collateral Debt Obligations securing the Notes as of the Determination Date immediately preceding such date, (iv) the remaining Scheduled Distributions on the Pledged Collateral Debt Obligations, (v) the amount of principal of, and interest on, each Note estimated to be paid on each subsequent Payment Date, (vi) the amount of any Hedge Termination Amount that would have been payable to the Issuer on the Determination Date immediately preceding such date and (vii) whether each Hedge Counterparty (if any) is in compliance with any collateralization obligations under the Hedge Agreements.

(c)    Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee upon written request therefor by a Holder of a Note shown on the Note Register, to such Holder (or its designee).

Section 10.16.    Reports to Rating Agencies, Etc.

In addition to the information and reports specifically required to be provided to the Rating Agencies pursuant to the terms of this Indenture, the Issuer (or the Collateral Manager on behalf of the Issuer) shall provide or procure to provide the Rating Agencies with (a) all information or reports delivered to the Trustee hereunder, (b) such additional information as the Rating Agencies may from time

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050111

- 176 -

to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense, (c) notice of any waiver given pursuant to Section 5.14.

The Issuer shall promptly notify the Trustee, the Credit Enhancer and the Collateral Manager if the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.

## ARTICLE 11

## APPLICATION OF MONIES

Section 11.1.    Disbursements of Monies from Payment Account

(a)    Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Sections 9.5 and 13.1, on each Payment Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(i) as follows and for application by the Trustee in accordance with the following priorities:

(i)    On each Payment Date, Interest Proceeds with respect to the related Due Period shall be applied as follows:

(A)    to the payment of Administrative Expenses constituting taxes, registration fees and filing fees owing by the Zohar Obligors (as certified by an Authorized Officer of the applicable Zohar Obligor or of the Collateral Manager to the Trustee); provided that the aggregate amount of funds paid under this clause (A) in any calendar year shall not exceed U.S.$50,000;

(B)    (1) first, to the payment of all accrued and unpaid Supplemental Credit Enhancement Liabilities to the Credit Enhancer; and (2) second, to the payment or reimbursement of accrued and unpaid Administrative Expenses constituting the Trustee Fee and other fees or unpaid expenses of the Trustee, of the Collateral Administrator under the Collateral Administration Agreement, of the Administrator under the Administration Agreement and of the Preference Share Paying Agent and of the Preference Share Registrar under the Preference Share Paying Agency Agreement; provided that payments pursuant to this subclause (B)(2) shall be limited to an amount not to exceed (x) on the Initial Payment Date, the aggregate amount of Trustee's Fees payable on such Payment Date plus the aggregate amount of Administrative Expenses of the Administrator under the Administration Agreement and (y) on any Payment Date thereafter, 0.0125% of the Quarterly Asset Amount with respect to such Payment Date;

(C)    if the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b), to the pro rata payment of (1) prior to the date on which amounts on deposit in the Expense Account are transferred to the Cash Collateral Account pursuant to Section 10.6, if the Balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$400,000 for deposit into the Expense Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Expense Account, immediately after such deposit, to equal U.S.$400,000; provided that the amount so deposited on any Payment Date shall not exceed U.S.$100,000; and (2) the accrued and unpaid Administrative Expenses constituting the ongoing surveillance fees

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050112

- 177 -

and expenses of the Credit Enhancer (subject to the limit in clause (g) of the definition of "Administrative Expenses" in Section 1.1);

(D)     if the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b) and such Payment Date is after the Initial Payment Date, to the pro rata payment of (i) the Senior Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date (provided that to the extent that on such Payment Date Professional Fees are due and owing after application of any amounts available for the payment thereof in the Professional Fee Account an amount of Senior Collateral Management Fee otherwise payable to the Collateral Manager equal to the lesser of (A) the amount of such Senior Collateral Management Fee otherwise available to be paid pursuant to this paragraph (D) minus U.S.$1,500,000 and (B) the amount of such unpaid Professional Fees shall be remitted to the Professional Fee Account) and (ii) prior to the date on which amounts on deposit in the Professional Fee Account are transferred to the Cash Collateral Account pursuant to Section 10.6, if the balance in the Professional Fee Account is less than U.S.$2,000,000, for deposit into the Professional Fee Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Professional Fee Account, immediately after such deposit, to equal U.S.$2,000,000 (provided that the amount so deposited on any Payment Date shall not exceed the greater of (x) U.S.$250,000 and (y) 0.075% of the Aggregate Principal Balance of all Pledged Collateral Debt Obligations on such Determination Date);

(E)     if (1) the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b) and (2) the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Closing Date, to the payment of such amounts (exclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party);

(F)     to the pro rata payment of (i) the Class A Interest Distribution Amount for such Payment Date (excluding any interest on the Class A Notes constituting Class A Additional Interest and any Defaulted Interest in respect of Class A Additional Interest and interest thereon), (ii) the Class A-1 Commitment Fee Amount for such Payment Date, (iii) the Class A-2 Commitment Fee Amount for such Payment Date, (iv) the Class A-3 Commitment Fee Amount for such Payment Date, (v) accrued and unpaid Senior Class A-1 Additional Amounts, (vi) if the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b) accrued and unpaid Supplemental Credit Enhancement Premium and (vii) if the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b) and such Payment Date is after the Initial Payment Date, accrued and unpaid Credit Enhancement Premium;

(F1)     on the Initial Payment Date and each Payment Date thereafter, (1) first to the payment of the Senior Collateral Management Fee due on such Payment Date and not paid above and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date and (2) second to the payment of accrued and unpaid Supplemental Credit Enhancement Premium and Credit Enhancement Premium; provided that no payment may be made under this clause (F1) on any Payment Date to the extent the inclusion of such payment in clause (A)(vi) of

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                         PP050113
ON BEHALF OF PATRIARCH PARTNERS LLC

the definition of "Class A Interest Coverage Ratio Test" would cause the Class A Interest Coverage Ratio Test not to be satisfied (calculated on a pro forma basis as of such Determination Date after giving effect to such application);

(F2)    on each Payment Date after the Rate Adjustment Date, pro rata to the payment in full of (x) all accrued and unpaid Additional Class A-3 Adjusted Amounts and (y) all accrued and unpaid Additional Premium Adjusted Amounts; provided that (I) no payment may be made under this clause (F2) on any Payment Date if any Class A Coverage Test was not satisfied on the related Determination Date and (II) no payment may be made under this clause (F2) on any Payment Date to the extent the inclusion of such payment and the payments under clause (F1) above in clause (A)(vi) of the definition of "Class A Interest Coverage Ratio Test" would cause the Class A Interest Coverage Ratio Test not to be satisfied (calculated on a pro forma basis as of such Determination Date after giving effect to such application);

(G)    to the payment of all accrued and unpaid Credit Enhancement Liabilities to the Credit Enhancer; provided that, so long as (x) no Event of Default shall have occurred and be continuing as of the related Determination Date or (y) the Class A Overcollateralization Ratio as of the related Determination Date is not less than 105%, the amounts to be paid to the Credit Enhancer under this clause (G) on account of any "Accrued Insurance Liabilities" (as defined in the Credit Enhancement Agreement) arising pursuant to clauses (ii), (iii)(A), (C), (D) and (E) and (iv) of the definition thereof (but excluding, for the avoidance of doubt, any Credit Enhancement Premium and/or any amounts payable pursuant to clause (g) of the definition of "Administrative Expenses" in Section 1.1) shall not exceed the Credit Enhancement Liabilities Threshold Amount as then in effect;

(H)    if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Class A Note Reduction Amount" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a pro forma basis as of such Determination Date after giving effect to such application) and, in the case of a Rating Confirmation Failure, to the extent specified in the related Post-Ramp Up Plan, will be applied as follows:

(1)  an amount equal to the Class A-1 Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)  an amount equal to the Class A-2 Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)  an amount equal to the Class A-3 Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP050114

provided that if the amount of funds available to be distributed under this clause (H) is less than the Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(I)     if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of the Minimum Total Credit Enhancement Premium Amount to the Credit Enhancer, but only to the extent not previously paid in full after the applications on such Payment Date and any prior Payment Dates pursuant to the Priority of Payments;

(J)     to the payment first of any amounts described in paragraph (A) above to the extent not paid thereunder as a result of the dollar limitation set forth in such paragraph, second of any amounts described in paragraph (B) above to the extent not paid thereunder as a result of the dollar limitation set forth in such paragraph, third of any amounts described in paragraph (G) above to the extent not paid thereunder as a result of the dollar limitation set forth in such paragraph and fourth of any other accrued and unpaid reasonable fees and expenses of the Zohar Obligors permitted under this Indenture and the other Transaction Documents (to the extent not paid in full by application of amounts from the Expense Account, the Closing Expense Account or the Professional Fee Account on such Payment Date) (provided that the aggregate amount applied pursuant to this paragraph (J) on any Payment Date shall not exceed U.S.$200,000);

(K)     to the pro rata payment of (x) accrued and unpaid Class A Additional Interest and Defaulted Interest in respect thereof and interest thereon and (y) accrued and unpaid Second Priority Class A-1 Additional Amounts (ratably in accordance with the respective amounts thereof then due and owing);

(L)     to the payment of the Class A-1 Note Agent Fee due on such Payment Date and to the payment of any accrued and unpaid Class A-1 Note Agent Fee owed on any prior Payment Date; and

(M)     any remaining Interest Proceeds to the Cash Collateral Account.

(ii)     On each Payment Date, Principal Proceeds transferred to the Payment Account with respect to such Payment Date shall be distributed in the following order of priority (immediately following the applications of Interest Proceeds referred to in the foregoing clause (i)):

(A)     to a deposit in the Issuer Principal Collection Account in an amount equal to the excess (if any) of (1) the Unfunded Portfolio Amount as of the related Determination Date over (2) the sum of (x) the Aggregate Undrawn Amount of the Class A-1 Notes as of such date as reported by the Class A-1 Note Agent to the Trustee (determined immediately after giving effect to any reductions in the Class A-1 Commitments to occur on such date pursuant to Sections 9.5 and 9.6) plus (y) the Balance on deposit in the Unfunded Revolver Discount Account on such date plus (z) the Balance on deposit in the Rollover Proceeds Account on such date (to be retained in the Issuer Principal Collection Account for application to fund Unfunded Portfolio Amounts

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP050115

- 180 -

or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date);

(B)      to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i);

(C)      if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Remaining Class A Note Reduction Amount" for such Payment Date) equal to the Class A Note Reduction Amount for such Payment Date minus the aggregate amount of funds applied under Section 11.1(a)(i)(H) on such Payment Date will be applied as follows:

(1)      an amount equal to the Class A-1 Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)      an amount equal to the Class A-2 Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)      an amount equal to the Class A-3 Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (C) is less than the Remaining Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(D)      [reserved];

(E)      if any Class A Notes are Outstanding or any Class A-1 Commitments, Class A-2 Commitments or Class A-3 Commitments have not expired, terminated, or been reduced to zero, to a deposit to the Issuer Principal Collection Account in an amount sufficient to cause the aggregate amount on deposit therein to equal the Cash Retention Amount for such Payment Date;

(F)      during the Reinvestment Period, to a deposit to the Issuer Principal Collection Account (for application to acquire Collateral Debt Obligations in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein as Eligible Investments or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date); provided that (1) the Collateral Manager may, if

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050116

- 181 -

in its sole discretion it elects to do so, direct the Trustee (which notice must be in writing and be given to the Trustee prior to the related Determination Date) to, and if so notified the Trustee shall, deposit, from such funds, not more than U.S.$3,000,000 into the Cash Collateral Account for application on such Payment Date under Section 11.2(a)(iv) and (2) no such deposit under clause (1) above will be permitted unless each of the following conditions is satisfied: (I) both prior to and after giving effect to such deposit the Class A Overcollateralization Ratio is not less than 135%; (II) both prior to and after giving effect to such deposit the Class A Interest Coverage Test is satisfied; (III) prior to such Determination Date, Class B Notes (including any Additional Class B Notes) having an aggregate Outstanding face amount of not less than U.S.$100,000,000 have at any time been rated at least "Baa3" by Moody's and "BBB-" by Standard & Poor's; (IV) the Additional Class A-3 Adjusted Amount and Additional Premium Adjusted Amount shall have been paid in full; (V) such Payment Date is after the Specified Equity Payment Date; (VI) not more than U.S.$3,000,000 may be deposited in the Cash Collateral Account pursuant to clause (1) above on any one Payment Date; (VII) not more than U.S.$15,000,000 in the aggregate may be deposited in the Cash Collateral Account pursuant to clause (1) on all Payment Dates; and (VIII) each Rating Agency has confirmed that such deposit will not cause the downgrade or withdrawal of its then-current rating of any Class of Notes (in each case determined without regard to the Credit Enhancement);

(G)    after the Reinvestment Period, an amount equal to the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes will be applied as follows:

(1) an amount equal to the Class A-1 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2) an amount equal to the Class A-2 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3) an amount equal to the Class A-3 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (G) is less than the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(H)    after the Reinvestment Period, to the payment of the amounts referred to in paragraphs (I) through (L) of Section 11.1(a)(i) (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11(a)(i);

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050117
ON BEHALF OF PATRIARCH PARTNERS LLC

- 182 -

(I)     after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of outstanding principal of the Class B Notes until the principal of the Class B Notes has been paid in full; and

(J)     after the Reinvestment Period, any remaining Principal Proceeds (other than the Excluded Property) to the Cash Collateral Account.

(b)     Except as otherwise expressly provided in Section 11.1(a), if on any Payment Date, the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by any alphabetized paragraph of the Priority of Payments specified therein to different Persons, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

(c)     Notwithstanding the foregoing provisions of Section 11.1(a)(i), on the Initial Payment Date the amount that shall be disbursed by the Trustee pursuant to subclauses (B), (C) and (D) of Section 11.1(a)(i) (to the extent funds are available therefor) shall be adjusted to reflect the different number of days in the initial Due Period (as compared to the number of days in subsequent Due Periods).

(d)     Notwithstanding the foregoing provisions of Section 11.1(a), the amounts distributed to the Holders of the Class A-3 Notes will be paid to such Holders from the Class A-3 Proceeds Account pursuant to Section 11.7 to the extent of available funds therein.

Section 11.2.    Disbursements of Monies from Cash Collateral Account

(a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Section 13.1, on each Payment Date, the Trustee shall disburse amounts on deposit in the Cash Collateral Account (immediately after application of Interest Proceeds and Principal Proceeds on such Payment Date in accordance with the priority of payments specified in Section 11.1) as follows and for application by the Trustee in accordance with the following order of priority:

(i)     prior to the date on which amounts on deposit in the Cash Reserve Account are transferred to the Cash Collateral Account for application as described in the last sentence of Section 10.7(c), if the balance in the Cash Reserve Account is less than the Required Reserve Amount, to deposit into the Cash Reserve Account an amount as shall cause the balance therein to equal the Required Reserve Amount, provided that the amount so deposited on any Payment Date shall not exceed U.S.$500,000;

(ii)     to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the applications on such Payment Date provided for in Section 11.1(a);

(iii)     if the Class A Coverage Tests are satisfied as of the related Determination Date, no Rating Confirmation Failure with respect to the Class A Notes has occurred and is continuing and no Event of Default has occurred and is continuing, to a deposit in the Preference Share Distribution Account, provided that (1) the aggregate amount deposited in the Preference Share Distribution Account pursuant to this clause (iii) on all Payment Dates from the Closing Date through and including such Payment Date shall not exceed an amount equal to U.S.$3,750,000

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267                                                                                                              PP050118

multiplied by (x) the number of such Payment Dates (including such Payment Date) plus (y) two; and (2) the aggregate amount deposited in the Preference Share Distribution Account for all Payment Dates pursuant to this clause (iii) shall not in any event exceed U.S.$30,000,000;

(iiiA)    if such Payment Date is after the Rate Adjustment Date and the Class A Coverage Tests are satisfied as of the related Determination Date, pro rata to the payment in full of (x) all accrued and unpaid Additional Class A-3 Adjusted Amounts and (y) all accrued and unpaid Additional Premium Adjusted Amounts;

(iv)    if the Class A Coverage Tests are satisfied as of the related Determination Date and no Event of Default has occurred and is continuing, pro rata to (a) the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date; and (b) the Arranger Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Arranger Fee owed on any prior Payment Date;

(v)    during the Reinvestment Period, to a deposit to the Issuer Principal Collection Account in the amount (if any) specified by the Collateral Manager (for application to acquire Collateral Debt Obligations in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein and invested in Eligible Investments in accordance with the terms of this Indenture or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date); and, to the extent not so specified, to be retained in the Cash Collateral Account for application on subsequent Payment Dates;

(vi)    after the Reinvestment Period, an amount equal to the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes will be applied as follows:

(1)    an amount equal to the Class A-1 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)    an amount equal to the Class A-2 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)    an amount equal to the Class A-3 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (vi) is less than the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(vii)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of the Minimum Total Credit

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050119

- 184 -

Enhancement Premium Amount to the Credit Enhancer, but only to the extent not previously paid in full after the applications on or prior to such Payment Date pursuant to the Priority of Payments;

(viii)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, first to the payment of principal of the Class B Notes until the principal of each such Note has been paid in full and then to the payment of principal of the Class C Notes until the principal of each such Note has been paid in full;

(ix)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero and the principal of the Class B Notes and Class C Notes has been paid in full, first to the payment of any amounts payable to the Credit Enhancer with respect to Credit Enhancement Liabilities that were not paid under Section 11.1(a) as a result of the limitations on the amounts set forth therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii)); and second to the payment of the amounts referred to in paragraphs (J) through (L) of Section 11(a)(i), in the same order of priority but without regard to any Dollar limitation specified therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii));

(x)    after the Reinvestment Period, if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Closing Date, to the payment of such amounts (inclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party and any other amount owing in respect of such Hedge Agreement and not paid under Section 11.1(a)(i)(E)); and

(xi)    after the Reinvestment Period, on the earliest of (A) the Stated Maturity of the Class C Notes, (B) the Payment Date on or after the first date on which substantially all of the Issuer's assets have been sold or otherwise disposed of (so long as the principal of and interest on the Class A Notes, the principal of the Class B Notes and the principal of the Class C Notes has been paid in full on such date) and (C) any date specified by the Collateral Manager if the Class A Notes and all interest thereon has been paid in full, the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, the Class B Notes have been paid in full and the Class C Notes have been paid in full, the remainder (other than the Excluded Property) to a deposit to the Preference Share Distribution Account.

(b)    Except as otherwise expressly provided in Section 11.2(a), if on any Payment Date, the amount available in the Cash Collateral Account is insufficient to make the full amount of the disbursements required by any numeric paragraph of the Priority of Payments specified therein to different Persons, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050120

Section 11.3.    [Reserved]

Section 11.4.    Disbursements of Monies from Unfunded Revolver Discount Account

(a)    The Trustee shall apply amounts on deposit in the Unfunded Revolver Discount Account to extend credit in respect of Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations to the extent specified in Section 9.7.

(b)    Except as otherwise provided in Section 11.4(c), if on any Determination Date after the Phase I Effective Date the Balance on deposit in the Unfunded Revolver Discount Account exceeds the sum of the Discount Amounts remaining with respect to the Unutilized Commitments as of such date, then the Collateral Manager, by Issuer Order, may direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Unfunded Revolver Discount Account to the Cash Collateral Account in an aggregate amount equal to such excess (or such lesser amount as the Collateral Manager may specify in such Issuer Order), provided that after giving effect to such transfer no Commitment Shortfall would exist. For purposes of this Section 11.4, the Discount Amount for any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation will be deemed reduced (but in no event to an amount less than zero) by amounts (without duplication) equal to the portion of the Unutilized Commitment of such Collateral Debt Obligation that has been funded in accordance with Section 9.7(a)(i) and the aggregate amount of Commitment Reductions that have been applied in respect of such Collateral Debt Obligation.

(c)    If on any date there shall occur a Commitment Reduction in respect of the Unutilized Commitment under a Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation and concurrently with such Commitment Reduction any Cash Distribution in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation is deposited in the Rollover Proceeds Account pursuant to Section 10.10(a), any amount then held in the Unfunded Revolver Discount Account and representing a Discount Amount in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation that would otherwise be deposited in the Cash Collateral Account in accordance with Section 11.4(b) in connection with such Commitment Reduction shall instead be held in the Unfunded Revolver Discount Account until such time as the proceeds of such Cash Distribution are withdrawn from the Rollover Proceeds Account pursuant to Section 11.6, whereupon:

(i)    if such proceeds are applied from the Rollover Proceeds Account pursuant to Section 11.6(a) to acquire an Exchanged Security, such Discount Amount may, at the written direction of the Collateral Manager, be (x) retained in the Unfunded Revolver Discount Account (to the extent that the applicable Exchanged Security is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation with an Unutilized Commitment corresponding to such Discount Amount), (y) applied to acquire such Exchanged Security or (z) deposited into the Cash Collateral Account; and

(ii)    if such payments are applied from the Rollover Proceeds Account pursuant to Section 11.6(b), such Discount Amount shall be deposited into the Cash Collateral Account;

provided that no such funds shall be withdrawn from the Unfunded Revolver Discount Account pursuant to this paragraph (i)(z) or (ii) above (1) prior to the Phase I Effective Date or (2) if, after giving effect to such withdrawal, a Commitment Shortfall would exist.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050121

- 186 -

Section 11.5.    Disbursements of Monies from Unrestricted Collateral Account

(a)    Upon receipt of an Issuer Order pursuant to Section 12.1, the Trustee shall apply amounts on deposit in the Unrestricted Collateral Account to (i) make extensions of credit in respect of, or to acquire, Unrestricted Collateral Debt Obligations (including extending credit under Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations) or (ii) acquire Equity Securities, in each case on behalf of the Issuer or the Zohar Subsidiary and subject to the terms of Section 12.1(c) and Section 7.8(a)(v); provided that no amounts may be withdrawn from the Unrestricted Collateral Account pursuant to this paragraph in excess of U.S.$10,000,000 until after the Phase I Effective Date.

(b)    If on any Payment Date (after giving effect to any withdrawals made pursuant to Section 11.5(a) on such date) the Balance in the Unrestricted Collateral Account shall exceed U.S.$40,000,000, the Trustee shall withdraw from the Unrestricted Collateral Account an amount equal to such excess and shall deposit such amount in the Issuer Principal Collection Account (prior to giving effect to distributions from the Issuer Principal Collection Account to be made on such date), provided that after giving effect to any such deposit to the Issuer Principal Collection Account, there are sufficient amounts on deposit in the Unrestricted Collateral Account to fund the Unfunded Amounts under any Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations.

(c)    On any Payment Date, the Collateral Manager may direct that all or any portion of the funds on deposit in the Unrestricted Collateral Account may be deposited in the Issuer Principal Collection Account (prior to giving effect to distributions from the Issuer Principal Collection Account to be made on such date), provided that the Collateral Manager has confirmed to the Trustee that after giving effect to any such deposit to the Issuer Principal Collection Account, there are sufficient amounts on deposit in the Unrestricted Collateral Account to fund the Unfunded Amounts under any Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations.

Section 11.6.    Disbursements of Monies from Rollover Proceeds Account

(a)    Upon receipt of an Issuer Order pursuant to Section 12.1, the Trustee shall apply amounts on deposit in the Rollover Proceeds Account to acquire Exchanged Securities on behalf of the Issuer or the Zohar Subsidiary and subject to the terms of Section 12.1(d), provided that amounts may not be applied from the Rollover Proceeds Account to acquire any Junior Rollover Exchanged Security if, after giving effect to such acquisition, the Aggregate Principal Balance of all Junior Rollover Exchanged Securities then held by the Trustee would exceed 10% of the Aggregate Principal Balance of all Pledged Collateral Debt Obligations.

(b)    The Collateral Manager shall calculate the amount of funds deposited into and withdrawn from the Rollover Proceeds Account on a "first-in/first-out" basis, and shall notify the Trustee promptly of the amount of any funds that are (based on such calculations) held in or credited to the Rollover Proceeds Account for a period in excess of 60 days. Promptly upon receipt of such notice, the Trustee shall withdraw from the Rollover Proceeds Account the amount of any funds that have been held in the Rollover Proceeds Account for a period in excess of 60 days and shall deposit such amount in the Issuer Principal Collection Account, subject to Section 11.4(c)(ii).

(c)    Without limiting clause (a) above, the Collateral Manager may in its discretion, by Issuer Order, direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Rollover Proceeds Account to the Issuer Principal Collection Account from time to time to fund

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050122

- 187 -

Unfunded Amounts in respect of Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations.

Section 11.7.    Disbursements of Monies from Class A-3 Proceeds Account

On each Payment Date, the Trustee shall disburse amounts transferred to the Class A-3 Proceeds Account from the Payment Account or from the proceeds of the Class A Pro Rata Adjustment Advance pursuant to Sections 9.6(e), 10.11(a), 11.1(a) and 11.2(a) as follows and for application by the Trustee in accordance with the following priorities:

(a)    On each Payment Date, the amounts on deposit in the Class A-3 Interest Proceeds Sub-Account shall be applied as follows:

(i)    to the payment of the Senior Class A-3 Distribution due on such Payment Date in respect of the Class A-3a Notes; and

(ii)    any remaining amounts to the payment of the Subordinated Class A-3 Distribution due on such Payment Date in respect of the Class A-3b Notes.

(b)    On each Payment Date, the amounts on deposit in the Class A-3 Principal Proceeds Sub-Account shall be applied as follows:

(i)    to the payment of the Senior Class A-3 Distribution due on such Payment Date in respect of the Class A-3a Notes; and

(ii)    any remaining amounts to the payment of the Subordinated Class A-3 Distribution due on such Payment Date in respect of the Class A-3b Notes.

Section 11.8.    Trust Accounts

All Monies held by, or deposited with, the Trustee in any Account pursuant to the provisions of this Indenture, and not invested in Collateral Debt Obligations or Eligible Investments as herein provided, shall be deposited in one or more segregated trust accounts, maintained at a financial institution whose long-term rating is at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's, to be held in trust for the benefit of the Secured Parties. To the extent Monies deposited in a trust account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States of America, such excess shall be invested in Eligible Investments.

ARTICLE 12

ACQUISITION AND SALE OF COLLATERAL DEBT
OBLIGATIONS AND EQUITY SECURITIES

Section 12.1.    Acquisition of Collateral Debt Obligations and Equity Securities;
Eligibility Criteria

(a)    Subject to Sections 12.1(b) and 12.3, during the Reinvestment Period, an obligation or security to be Granted to the Trustee (including, without limitation, on the Closing Date),

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050123

- 188 -

shall be eligible for inclusion in the Collateral as a Pledged Collateral Debt Obligation (and the Issuer will be entitled to enter into a commitment to acquire such obligation or security in order to be Granted to the Trustee for inclusion in the Collateral as a Pledged Collateral Debt Obligation) by application of amounts referred to in Section 9.7 only if, (x) the Controlling Party consents in writing to such acquisition and notice thereof has been provided to each Rating Agency in writing or (y) as evidenced by an officer's certificate of an Authorized Officer of the Issuer or the Collateral Manager delivered to the Trustee and the Credit Enhancer, the following conditions (the "Eligibility Criteria") are satisfied at the time such commitment to purchase such Collateral Debt Obligation is made and after giving effect thereto (and, if applicable, treating all other Collateral Debt Obligations that the Issuer or the Zohar Subsidiary has committed to purchase at such time as being owned by the Issuer or the Zohar Subsidiary, as applicable, it being understood however that the Eligibility Criteria shall be determined on a commitment-by-commitment basis without aggregating block trades of Collateral Debt Obligations):

    (1)    such obligation or security is a Collateral Debt Obligation (including an attached Equity Kicker);

    (2)    such Collateral Debt Obligation provides for a fixed amount of principal payable in Cash no later than its Stated Maturity;

    (3)    such Collateral Debt Obligation is not payable or denominated in, or convertible into an obligation or security denominated in, a currency other than U.S. Dollars;

    (4)    such Collateral Debt Obligation bears interest at a rate that does not increase or decrease solely as a function of the passage of time;

    (5)    such Collateral Debt Obligation provides for periodic payments of interest in Cash at least semi-annually;

    (6)    such Collateral Debt Obligation is not a PIK Loan;

    (7)    such Collateral Debt Obligation is Registered;

    (8)    such Collateral Debt Obligation is a loan of a U.S. private issuer, payable only in the United States and governed by the laws of a state of the United States;

    (9)    such Collateral Debt Obligation is not (A) an Equity Security (other than an attached Equity Kicker or an Equity Workout Security) or (B) convertible or exchangeable into any Equity Security (other than at the sole option of the holder thereof);

    (10)    unless such Collateral Debt Obligation is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation, such Collateral Debt Obligation does not require the Issuer to make future advances to (or on behalf of) the obligor or issuer under the related Underlying Instruments (other than the customary expense reimbursements and indemnifications contained in the Underlying Instruments);

    (11)    such Collateral Debt Obligation is not an Asset-backed Security;

    (12)    such Collateral Debt Obligation is not an obligation to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050124

- 189 -

(13)     such Collateral Debt Obligation is not a loan (other than a DIP Loan) incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a Person or similar transaction which obligation by its terms is required to be repaid within the year of the incurrence thereof with proceeds from additional borrowings or other refinancing;

(14)     such Collateral Debt Obligation is not a loan which is a swap, option, forward, trust certificate, credit-linked note or other derivative contract;

(15)     (x) such Collateral Debt Obligation is not a security whose repayment is subject to material non-credit related risk (for example, a Collateral Debt Obligation the payment of which is expressly contingent upon the non-occurrence of a catastrophe), as determined in the sole judgment of the Collateral Manager, exercised in accordance with the standard of care set forth in the Management Agreement; and (y) no rating assigned by Standard & Poor's to such Collateral Debt Obligation includes the subscript "r" or "t";

(16)     if such Collateral Debt Obligation is in the form of a Participation Interest, the Selling Institution is at the time of the purchase of such Participation Interest a financial institution (including a securities broker or an Affiliate thereof) or other institutional lender with long-term unsecured debt ratings (or the parent of which has ratings) of at least "A2" from Moody's and "A" from Standard & Poor's and the conditions in clause (34) below are satisfied;

(17)     such Collateral Debt Obligation is not an asset that, pursuant to the Plan Asset Regulation, (A) would be treated as an equity interest in an entity; and (B) if held by an ERISA Plan, would cause such ERISA Plan to be treated as owning an undivided interest in each of the underlying assets of such entity for purposes of ERISA;

(18)     the acquisition of such Collateral Debt Obligation will not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act and if the issuer of such Collateral Debt Obligation is excepted from the definition of an "investment company" solely by reason of Section 3(c)(1) of the Investment Company Act, then either (x) such Collateral Debt Obligation does not constitute a "voting security" for purposes of the Investment Company Act or (y) the aggregate amount of such Collateral Debt Obligation held by the Issuer and/or the Zohar Subsidiary is less than 10% of the entire issue of such security;

(19)     on or after the Ramp Up End Date (A) the Class A Interest Coverage Ratio Test is satisfied (or, if the Class A Interest Coverage Ratio Test is not satisfied, compliance with the Class A Interest Coverage Ratio Test is improved) and (B) the Class A Overcollateralization Ratio Test is satisfied (or if not satisfied, is satisfied after giving effect to such acquisition);

(20)     on or after the Ramp Up End Date (A) each of the Collateral Quality Tests (other than the Standard & Poor's CDO Monitor Test) is satisfied with respect to the portfolio of Collateral Debt Obligations or, if immediately prior to such investment (or immediately prior to the sale of the Collateral Debt Obligation the proceeds of which are used to purchase such Collateral Debt Obligation) one or more such Collateral Quality Tests was not satisfied with respect to the portfolio of Collateral Debt Obligations, (1) the extent of compliance with at least one such non-complying Collateral Quality Test must be improved, (2) no Collateral Quality Test which has previously failed to be satisfied shall be made worse and (3) no Collateral Quality Test which has previously been satisfied shall fail to be satisfied after giving effect to such acquisition and (B) the Standard & Poor's CDO Monitor Test is satisfied (as determined by the Trustee) or, if immediately prior to such investment the Standard & Poor's CDO Monitor Test was not satisfied,

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050125
ON BEHALF OF PATRIARCH PARTNERS LLC

the extent of compliance with the Standard & Poor's CDO Monitor Test must be maintained or improved;

(21)    no Commitment Shortfall would exist;

(22)    such Collateral Debt Obligation is not the subject of an all Cash Offer for all of the outstanding loans under the related Underlying Instruments;

(23)    such Collateral Debt Obligation matures on or prior to the earlier of (A) the date 7 years after the date of such investment and (B) the Stated Maturity of the Class A Notes;

(24)    such Collateral Debt Obligation is not a loan secured primarily by a mortgage, deed of trust or similar lien on real property;

(25)    such Collateral Debt Obligation is not a security issued by a collateralized debt obligation vehicle;

(26)    the Issuer or the Zohar Subsidiary is an eligible assignee with respect to such Collateral Debt Obligation under the related Underlying Instruments, and the pledge of such Collateral Debt Obligation under this Indenture is permitted under such Underlying Instrument;

(27)    not more than 2.5% of the Maximum Investment Amount may consist of obligations issued by any single issuer or any of its Affiliates; provided that two issuers may each constitute up to 3.0% of the Maximum Investment Amount and (without duplication) three issuers may each constitute up to 4.5% of the Maximum Investment Amount (in each case, including any Unfunded Amounts in respect thereof);

(28)    not more than 20% of the Maximum Investment Amount may consist of Collateral Loans that are Defaulted Obligations;

(29)    not more than 50% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are Revolving Collateral Debt Obligations (including any Unfunded Amounts in respect thereof) and Delayed Funding Collateral Debt Obligations (but only with respect to the Unfunded Amounts in respect thereof);

(30)    not more than 10% of Maximum Investment Amount may consist of Fixed Rate Obligations;

(31)    not more than 5% of the Maximum Investment Amount may consist of Collateral Debt Obligations that (i) are Floating Rate Obligations and (ii) do not have an interest option based on either a LIBO Rate or the "prime rate" (excluding any Non-Current Obligations);

(32)    not more than 20% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are Floating Rate Obligations with an interest option based on the "prime rate" or "alternate base rate", where the spread on any LIBO Rate interest option is more than 1.50% above the spread on such "prime rate" interest option or "alternate base rate" option, as applicable (excluding any Non-Current Obligations).

(33)    not more than 15% of the Maximum Investment Amount may consist of obligations that pay interest less frequently than quarterly (excluding any Non-Current Obligations);

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050126
ON BEHALF OF PATRIARCH PARTNERS LLC

(34)    not more than 20% of the Maximum Investment Amount may consist of Participation Interests, not more than 10% of the Maximum Investment Amount may consist of Participation Interests with any single Selling Institution, and not more than 10% of the Maximum Investment Amount may consist of Participation Interests with Selling Institutions rated less than "Aa2" by Moody's or "AA" by Standard & Poor's;

(35)    not more than 5% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are convertible or exchangeable into Equity Securities;

(36)    not more than 12% of the Maximum Investment Amount may consist of Collateral Debt Obligations issued by obligors that fall within the same Moody's Industry Classification Group (provided that up to 3 Industry Classification Groups may each constitute up to 16% of the Maximum Investment Amount);

(37)    not more than 12% of the Maximum Investment Amount may consist of Collateral Debt Obligations issued by obligors that fall within the same Standard & Poor's Industry Classification Group (provided that up to 3 Industry Classification Groups may each constitute up to 16% of the Maximum Investment Amount);

(38)    not more than 20% of the Maximum Investment Amount may consist of Collateral Debt Obligations in Category 1;

(39)    not more than 40% of the Maximum Investment Amount may consist of Collateral Debt Obligations in Category 1 or Category 2;

(40)    not more than 70% of the Maximum Investment Amount may consist of Collateral Debt Obligations in Category 1, Category 2 or Category 3; and

(41)    such Collateral Debt Obligation has a Moody's Rating and an Standard & Poor's Rating.

(b)    On or after the Closing Date, if the Issuer (or the Collateral Manager on the Issuer's behalf) has previously entered into a commitment to acquire an obligation or security for inclusion in the Collateral as a Pledged Collateral Debt Obligation, then the Issuer need not comply with any of the Eligibility Criteria on the date of such Grant if the Issuer complied with each of the Eligibility Criteria on the date on which the Issuer (or the Collateral Manager on the Issuer's behalf) entered into such commitment (as if the date of such Grant referred to above were the date of such commitment), so long as the settlement period does not exceed 90 days. For purposes of determining satisfaction of the Eligibility Criteria, each Class A Coverage Test and each Collateral Quality Test, (i) any Collateral Debt Obligation with respect to which the Issuer (or the Collateral Manager on the Issuer's behalf) has previously entered into a commitment to acquire shall be treated as being owned by the Issuer, so long as the settlement period does not exceed 90 days and (ii) Unrestricted Collateral Debt Obligations and Exchanged Securities shall be deemed not to constitute Pledged Collateral Debt Obligations or otherwise part of the Issuer's (or Zohar subsidiary's) portfolio of Collateral Debt Obligations. The provisions of Section 12.1(a) shall not apply to the purchase of any Unrestricted Collateral Debt Obligation or Exchanged Security. The Trustee and the Issuer shall be entitled to rely conclusively and in good faith upon any certification made by the Collateral Manager pursuant to this Section 12.1.

Upon the acquisition of each Collateral Debt Obligation by the Issuer, the Collateral Manager shall designate (in a writing delivered to the Trustee and the Credit Enhancer) each such

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050127

- 192 -

Collateral Debt Obligation as falling within Category 1, Category 2, Category 3 or Category 4. After the acquisition of each Collateral Debt Obligation by the Issuer and/or the Zohar Subsidiary, to the extent that the characterization of such Collateral Debt Obligation shall change, the Collateral Manager shall re-designate (in a writing delivered to the Trustee and the Credit Enhancer) each such Collateral Debt Obligation as falling within Category 1, Category 2, Category 3 or Category 4 or as a Workout Obligation.

Notwithstanding the provisions of Section 12.1(a), (A) to the extent Cash on deposit in the Collection Accounts may be used to acquire Collateral Debt Obligations in accordance with terms of this Indenture, such Cash may be invested in Eligible Investments, pending acquisition of Collateral Debt Obligations, (B) if an Event of Default shall have occurred and be continuing, no Collateral Debt Obligation may be acquired unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such Event of Default or with the prior written consent of the Controlling Party, (C) if the Collateral Manager shall have received notice that an event constituting "Cause" (as defined in the Management Agreement) shall have occurred and be continuing, no Collateral Debt Obligation may be acquired or sold unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such event constituting "Cause" or with the prior written consent of the Controlling Party, (D) to the extent that any one or more of the Eligibility Criteria in any of clauses (29) through (37) above are not met, the Issuer and/or the Zohar Subsidiary shall continue to be able to acquire Collateral Debt Obligations to the extent any such unsatisfied Eligibility Criteria shall not be made worse (and any such Eligibility Criteria which has previously been satisfied shall not fail to be satisfied) after giving effect to such reinvestment and (E) to the extent that any one or more of the Eligibility Criteria in any of clauses (28), (38), (39) and (40) above are not met, the Issuer and/or the Zohar Subsidiary shall continue to be able to acquire Collateral Debt Obligations to the extent any such unsatisfied Eligibility Criteria shall be improved (and any such Eligibility Criteria which has previously been satisfied shall not fail to be satisfied) after giving effect to such reinvestment.

(c)    The Issuer may, by Issuer Order, direct the Trustee to apply amounts on deposit in the Unrestricted Collateral Account to acquire any Unrestricted Collateral Debt Obligation or Equity Security (subject to the terms of this Section 12.1(c) and Section 7.8(a)(v)), provided that the Collateral Manager delivers to the Trustee a certificate stating that the following conditions are satisfied:

(i)    immediately prior to such acquisition, there are sufficient amounts on deposit in the Unrestricted Collateral Account to pay the funding or purchase price in respect of such Unrestricted Collateral Debt Obligation or Equity Security, and after giving effect to such acquisition, there would be sufficient amounts on deposit in the Unrestricted Collateral Account to fund the Unfunded Amounts under all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations then held by the Issuer or the Zohar Subsidiary;

(ii)    such Unrestricted Collateral Debt Obligation or Equity Security (if denominated in any currency) is denominated in Dollars (and not any other currency);

(iii)    the issuer of such Unrestricted Collateral Debt Obligation or Equity Security is organized under the laws of the United States of America or any State or other political subdivision thereof, and either:

(x)    such issuer is at such time (or was immediately prior to such time) also an issuer of a Pledged Collateral Debt Obligation (an "Existing Obligor") or an Affiliate of such Existing Obligor; or

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050128

- 193 -

(y)    the acquisition of such Unrestricted Collateral Debt Obligation or Equity Security is made in connection with any refinancing, restructuring or reorganization of an Existing Obligor (or an Affiliate of such Existing Obligor) or any line(s) of business of an Existing Obligor (or an Affiliate of such Existing Obligor);

(iv)    if any Class A Notes are Outstanding, after giving effect to such acquisition:

(x)    the sum of (A) the aggregate amount of funds applied from the Unrestricted Collateral Account (subject to Section 7.8(a)(v), to acquire Unrestricted Collateral Debt Obligations from lenders in existing credit facilities plus (B) the Unfunded Amount of all such Unrestricted Collateral Debt Obligations, would not exceed U.S.$15,000,000; and

(y)    the sum of (A) the aggregate amount of funds applied from the Unrestricted Collateral Account to acquire Unrestricted Collateral Debt Obligations or Equity Securities issued by the same obligor or any Affiliate thereof plus (B) the Unfunded Amount of all such Unrestricted Collateral Debt Obligations, would not exceed U.S.$5,000,000;

(v)    the Issuer has complied (or will comply) with the procedures set forth in Section 3.3(b) relating to the perfection of the Trustee's security interest in such Unrestricted Collateral Debt Obligation or Equity Security.

(d)    The Issuer or the Zohar Subsidiary may (x) apply amounts on deposit in the Rollover Proceeds Account to acquire a loan, debt security, letter of credit, lease or equity or other security (as provided in Section 11.6) or (y) otherwise exchange any Collateral Debt Obligation or Equity Security held by it for a loan, debt security, letter of credit, lease or equity or other security (any such new loan, debt security, letter of credit, lease or equity or other security referred to in the foregoing clause (x) or (y), an "Exchanged Security"), provided that the Collateral Manager delivers to the Trustee a certificate on or prior to the date of acquisition of such Exchanged Security stating that the following conditions are satisfied:

(i)    the Collateral Manager shall have determined (in its reasonable judgment) that the fair market value of such Exchanged Security equals or exceeds (A) in the case of clause (d)(x) above, the amount of funds applied from the Rollover Proceeds Account or (B) in the case of clause (d)(y) above, the fair market value of the predecessor Collateral Debt Obligation or Equity Security, in each case as of the date of acquisition of such Exchanged Security;

(ii)    to the extent that the Exchanged Security is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation, after giving effect to such acquisition no Commitment Shortfall would exist;

(iii)    such Exchanged Security is denominated in Dollars (and not any other currency) (to the extent, in the case of any Equity Security, such Equity Security is denominated in any currency);

(iv)    the obligor in respect of such Exchanged Security is organized under the laws of the United States of America or any State or other political subdivision thereof; and

NY1:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050129

- 194 -

(v)     the Issuer has complied (or will comply) with the procedures set forth in Section 3.3(b) relating to the perfection of the Trustee's security interest in such Exchanged Security.

Section 12.2.     Sale of Collateral Debt Obligations and Equity Securities

(a)     Except as otherwise expressly permitted or required by this Indenture, neither the Issuer nor the Zohar Subsidiary will sell or otherwise dispose of any Collateral Debt Obligation or Equity Security; provided that, subject to satisfaction of any applicable conditions in Section 10.14, so long as (i) no Event of Default has occurred and is continuing and (ii) on or prior to the trade date for such sale the Collateral Manager has certified to the Trustee and the Credit Enhancer in writing that the conditions applicable to such sale set forth below have been satisfied, the Issuer or the Zohar Subsidiary (or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary, as applicable, acting pursuant to the Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing:

(i)     any Unrestricted Collateral Debt Obligation or Equity Security; and

(ii)     any Collateral Debt Obligation, so long as the conditions specified in any one or more of the following clauses (A), (B), (C), (D) or (E) are satisfied:

(A)     (x) none of the initial ratings of the Class A Notes have been reduced or withdrawn by Moody's or Standard & Poor's (in each case without giving effect to the Credit Enhancement) and (y) the Aggregate Principal Balance of all such sales of Collateral Debt Obligations for a given calendar year effected pursuant to this clause (A) does not exceed 15% of the Aggregate Principal Balance of all Pledged Collateral Debt Obligations as of the beginning of such year; provided that, with respect to the period from the Closing Date to and including December 31, 2004, the Issuer and the Zohar Subsidiary may sell Collateral Debt Obligations having an Aggregate Principal Balance not exceeding $90,000,000;

(B)     the Collateral Manager shall provide the Trustee, the Credit Enhancer (so long as no Credit Enhancement Event shall have occurred and be continuing), the Class A-1 Note Agent and the Preference Share Paying Agent written notice of such sale at least five Business Days' prior to the proposed date thereof, together with either (x) a description of two bona fide bids for such Collateral Debt Obligation or (y) a certification of the proposed sale price and a report of an Independent bond and/or loan pricing service (which certification may be in the form of a firm bid) confirming such sale price, and the Controlling Party shall consent in writing to such sale at least one Business Day prior to the proposed date thereof, provided that such consent may be withheld only if the Controlling Party determines, in its sole discretion, that there is a reasonable basis to do so (based on the judgment of the Controlling Party, which judgment shall not be called into question as a result of subsequent events);

(C)     (x) the Issuer or the Zohar Subsidiary shall hold title to such Collateral Debt Obligation or, in the case of the sale of a Collateral Debt Obligation that is a Participation Interest, the Selling Institution shall hold title to the underlying loan, as part of a syndicated credit facility comprised of at least two lenders other than the Issuer, the Zohar Subsidiary or any investment fund managed by the Collateral Manager or any of their respective Affiliates; and

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                     PP050130

- 195 -

(y) one or more of such lenders (other than the Issuer, the Zohar Subsidiary or any investment fund managed by the Collateral Manager or any of their respective Affiliates) holding in excess of 50% of the principal amount of loans under such credit facility approve the sale price of such Collateral Debt Obligation or such underlying loan (and, in the case of a sale of such underlying loan, upon such sale the entire net proceeds thereof attributable to the Participation Interest shall be remitted to the Issuer or the Zohar Subsidiary, as applicable, as the purchase price for the sale of such Participation Interest);

(D) such Collateral Debt Obligation (or any portion thereof) is sold for a price equal to at least 85% of the par or face amount thereof (before giving effect to the amount of any reasonable and customary transfer fees and any customary discounts given in connection with the sale of an unfunded revolving loan commitment, the amount of such fees and discounts to be certified by the Collateral Manager to the Trustee) and, so long as the Credit Enhancer is the Controlling Party, concurrently with such sale the Collateral Manager provides notice of such sale to the Credit Enhancer; or

(E) the Controlling Party consents to such sale.

Notwithstanding the foregoing, neither the Issuer nor the Zohar Subsidiary will sell or otherwise dispose of any Collateral Debt Obligation to the Collateral Manager or any Holder of the Preference Shares (or any of their respective Affiliates) without the prior written consent of the Controlling Party.

(b) The Issuer and the Zohar Subsidiary will sell any Equity Security within six years after the Issuer's or the Zohar Subsidiary's acquisition thereof (or within six years after such later date as such security may first be sold in accordance with its terms and to the extent permitted by applicable law).

(c) After the Issuer has notified the Trustee of an optional redemption in accordance with Section 9.2, the Issuer (or the Collateral Manager on behalf of the Issuer, pursuant to the Management Agreement) may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Collateral Debt Obligation or Equity Security without regard to the foregoing limitations in Section 12.2(a); provided that:

(i) the Sale Proceeds therefrom are used to pay certain expenses and redeem all of the Notes in whole but not in part pursuant to Sections 9.1(a) and (b), and upon any such sale the Trustee shall release such Collateral Debt Obligation pursuant to Section 10.14;

(ii) the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) a Collateral Debt Obligation pursuant to this Section 12.2(c) unless:

(A) the Collateral Manager certifies to the Trustee and the Credit Enhancer that (x) in its sole judgment based on calculations included in the certification (which shall include the sales prices of the Collateral Debt Obligations), the Sale Proceeds from the sale of one or more of the Collateral Debt Obligations (based on the criteria set forth in Section 9.1(b)(i) or (ii)) will be sufficient to pay the Redemption Price with respect to all the Notes pursuant to Section 9.1(a) and (y) an Independent bond and/or loan pricing service (which shall be one or more "P-1" rated broker-dealers selected by the Collateral Manager that make a market in the applicable Collateral Debt Obligations) has confirmed

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050131

- 196 -

(which confirmation may be in the form of a firm bid) the sales prices contained in the certification in clause (x) above (and attaching a copy of such confirmation); and

(B)      the Independent accountants appointed by the Issuer pursuant to Section 10.15 shall confirm the calculations made in clause (A)(x) above;

(iii)      all the Collateral Debt Obligations to be sold pursuant to this Section 12.2(c) will be sold in accordance with the requirements set forth in Section 9.1(b)(i) or (ii), as applicable; and

(iv)      the Collateral Manager shall sell any Collateral Debt Obligation pursuant to this Section 12.2(c) only at a price that in its sole judgment is commercially reasonable.

(d)      After the payment in full of the Notes (in connection with an optional redemption of the Notes or otherwise and without giving effect to any payment under the Credit Enhancement) and payment of, or establishment of a reasonable reserve (as determined by the Collateral Manager in its sole discretion) for, all other amounts payable under the Priority of Payments prior to the payment of any final distribution on the Preference Shares, the Issuer (or the Collateral Manager on behalf of the Issuer, pursuant to the Management Agreement) may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Collateral Debt Obligation or Equity Security without regard to the foregoing limitations in Section 12.2(a) or Section 12.2(c), provided that the Collateral Manager shall sell any Collateral Debt Obligation pursuant to this Section 12.2(d) only at a price that in its sole judgment is commercially reasonable.

(e)      Promptly following the Payment Date falling in May, 2015, the Issuer and the Zohar Subsidiary, as applicable (or the Collateral Manager on behalf of the Issuer and the Zohar Subsidiary, pursuant to the Management Agreement), shall direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, all Collateral Debt Obligations without regard to the foregoing limitations in Section 12.2(a) or Section 12.2(c); provided that:

(i)   ·   the Issuer, the Zohar Subsidiary and the Collateral Manager shall not be required to direct the Trustee to sell any Collateral Debt Obligation that has a stated final maturity occurring prior to the Stated Maturity of the Class A Notes if the Collateral Manager reasonably believes that such Collateral Debt Obligation will be repaid on or prior to the maturity thereof for an aggregate price of not less than par; and

(ii)      the Collateral Manager shall sell any Collateral Debt Obligation pursuant to this Section 12.2(e) only at a price that in its sole judgment is commercially reasonable.

(f)      Neither the Issuer nor the Zohar Subsidiary will sell any Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation unless, concurrently with such sale, (i) the transferee agrees with the Issuer or the Zohar Subsidiary, as applicable (for the express benefit of the Issuer or the Zohar Subsidiary and the obligors on such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, as the case may be) that the transferee will, from and after the consummation of such sale, perform all of the obligations of the Issuer or the Zohar Subsidiary, as applicable, as a bank or lender or counterparty under the Underlying Instruments in respect of Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, as the case may be, sold by the Issuer or the Zohar Subsidiary and (ii) by reason of the express terms of the relevant Underlying Instruments or by reason of the agreement of the Obligors on such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation (or their duly authorized representative), the Issuer or the Zohar Subsidiary, as applicable, shall be released from such obligations.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050132

Section 12.3.    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Article or under Section 10.14 shall be conducted on an arm's-length basis for fair market value and in accordance with the requirements of the Management Agreement and applicable law, and, if effected with the Collateral Manager, the Issuer, the Zohar Subsidiary, or the Trustee, or any Affiliate of any of the foregoing shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so Affiliated; provided that if any disposition of a Collateral Debt Obligation is made to an Affiliate of the Issuer or the Zohar Subsidiary or to the Collateral Manager or any of their Affiliates, then such disposition shall be made only with the prior written approval of (A) the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares) and (B) the Controlling Party and (z) for a price not less than (aa) the average of the bona fide bids for such Collateral Debt Obligation obtained by the Collateral Manager at the time of such disposition from any two Independent qualified dealers chosen by the Collateral Manager or (bb) if two such bids are not able to be obtained, an amount equal to the greater of (I) the fair market value thereof as determined by the Collateral Manager and (II) (a) the original Purchase Price paid by the Issuer or the Zohar Subsidiary therefor, plus (b) any additional advances made by the Issuer or the Zohar Subsidiary in respect thereof, minus (c) any repayments of principal received by the Issuer or the Zohar Subsidiary with respect thereto.

The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)    Upon any Grant pursuant to this Article, all of the Issuer's or the Zohar Subsidiary's right, title and interest to the applicable Pledged Obligation or Securities shall be Granted to the Trustee pursuant to this Indenture and, if applicable, the Trustee shall receive such Pledged Obligation or Securities. The Trustee shall also receive, not later than the date of delivery of any Collateral Debt Obligation delivered after the Closing Date, (i) an Officer's certificate of the Collateral Manager certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is permitted by this Article, including, without limitation, the Eligibility Criteria, and (ii) an Officer's certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)    Notwithstanding anything contained in this Article to the contrary, the Issuer and the Zohar Subsidiary shall have the right to effect any transaction which has been consented to by Holders of Notes evidencing 100% of the Aggregate Outstanding Amount of each Class of Notes and (so long as no Credit Enhancement Event has occurred and is continuing) the Credit Enhancer and of which each Rating Agency has been notified.

ARTICLE 13

NOTEHOLDERS' RELATIONS

Section 13.1.    Subordination

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and the Credit Enhancer that the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A Notes, all Credit Enhancement Liabilities, all Supplemental Credit Enhancement Liabilities, all Credit Enhancement Premium and all Supplemental Credit Enhancement Premium (the

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP050133

"Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A Notes shall be paid in full in Cash or, to the extent a Majority of the Class A Notes consents, other than in Cash (without giving effect to the Credit Enhancement), before any further payment or distribution is made on account of the Subordinate Interests. The Holders of Class B Notes, the Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A Notes and the Credit Enhancer, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or the Class C Notes, as applicable, or hereunder in respect of any such Class of Notes until the payment in full of the Class A Notes and all Credit Enhancement Liabilities and Credit Enhancement Premium and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder in respect of any such Class of Notes until the payment in full of the Class B Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(c)     In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until the applicable Senior Interests shall have been paid in full in Cash or (with regard to clause (a) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class A Notes or the Credit Enhancer, as the case may be, consents, other than in Cash (without giving effect to the Credit Enhancement) or (with regard to clause (b) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class B Notes consents, other than in Cash) in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the holders of the applicable Senior Interests in accordance with this Indenture; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including, without limitation, this Section 13.1.

(d)     Each Holder of Subordinate Interests agrees with the holders of the applicable Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including, without limitation, this Section 13.1; provided that (i) after the Class A Notes and all Credit Enhancement Liabilities and all Credit Enhancement Premium have been paid in full, the Holders

NY3:#7320262
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050134

- 199 -

of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A Notes and (ii) after the Class B Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class B Notes. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2.    Standard of Conduct

(a)    In exercising any of the Credit Enhancer's or (without duplication) the Controlling Party's voting rights, rights to direct and consent or any other rights as a Secured Party, as the Credit Enhancer or as the Controlling Party under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 and so long as no Credit Enhancement Event has occurred, the Credit Enhancer shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

(b)    In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

Section 13.3.    Controlling Party

No party dealing with the Controlling Party in connection with the exercise by the Controlling Party of its rights hereunder shall have any obligation to determine the right, power and authority of the Controlling Party to exercise such rights or the compliance of such exercise with the provisions hereof, and each and every such party may conclusively rely on the existence of such right, power, authority and compliance.

Section 13.4.    Non-Petition

The Holders of Notes agree not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Holders of Class A Notes (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency proceeding filed or commenced against such Zohar Obligor by a Person other than the Holders of Class A Notes, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050135

- 200 -

## ARTICLE 14

### ASSIGNMENT OF MANAGEMENT AGREEMENT AND COLLATERAL ADMINISTRATION AGREEMENT, ETC.

Section 14.1.    Assignment

Each of the Issuer and the Zohar Subsidiary, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Noteholders hereunder and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's and the Zohar Subsidiary's estate, right, title and interest in, to and under the Management Agreement and (in the case of the Issuer) the Collateral Administration Agreement, including, without limitation, (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Manager or the Collateral Administrator, as applicable, thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer or the Zohar Subsidiary, as applicable, is or may be entitled to do thereunder; provided that the Trustee hereby grants to the Issuer and the Zohar Subsidiary a license to exercise all of the Issuer's and the Zohar Subsidiary's applicable rights pursuant to the Management Agreement and the Collateral Administration Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in Section 14.4), which license shall be and is hereby deemed to be automatically revoked (i) upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived, (ii) in the case of the Management Agreement, upon the occurrence of an event specified therein pursuant to which the Issuer is entitled to remove the Collateral Manager pursuant to Section 5.3 thereof or (iii) in the case of the Management Agreement, upon a default in the performance, or breach, of any covenant, representation, warranty or other agreement of the Collateral Manager thereunder or in any certificate or writing delivered pursuant thereto if Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of any Class give notice of such default or breach to the Trustee, the Credit Enhancer and the Collateral Manager and such default or breach (if remediable) continues for a period of 30 days.

Section 14.2.    No Impairment

The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer or the Zohar Subsidiary under the provisions of the Management Agreement or (in the case of the Issuer) the Collateral Administration Agreement, nor shall any of the obligations contained in the Management Agreement or the Collateral Administration Agreement be imposed on the Trustee.

Section 14.3.    Termination, Etc.

Upon the redemption and cancellation of the Notes and the release of the Collateral from the lien of this Indenture, the collateral assignments described in this Article 14 and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Management Agreement and the Collateral Administration Agreement shall revert to the Issuer and (in the case of the Management Agreement) the Zohar Subsidiary and no further instrument or act shall be necessary to evidence such termination and reversion.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050136

Section 14.4.    Assignment of Collateral Management Agreement and Collateral
Administration Agreement

Each of the Issuer and the Zohar Subsidiary represents that it has not executed any other assignment of the Management Agreement. Each of the Issuer and the Zohar Subsidiary agrees that the collateral assignments described in this Article 14 are irrevocable, and that it will not take any action which is inconsistent with such assignments or make any other assignment inconsistent herewith. Each of the Issuer and the Zohar Subsidiary will, from time to time upon the request of the Trustee (at the direction of the Controlling Party) or the Credit Enhancer, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee (at the direction of the Controlling Party) or the Credit Enhancer may reasonably specify. Each of the Issuer, the Zohar Subsidiary and the Collateral Manager hereby agrees to the following:

(a)    the Collateral Manager consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to the Collateral Manager;

(b)    the Collateral Manager acknowledges that the Issuer and the Zohar Subsidiary are assigning all of their respective right, title and interest in, to and under the Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Management Agreement are also for the benefit of the Trustee and the Secured Parties;

(c)    the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Management Agreement;

(d)    neither the Issuer nor the Collateral Manager will enter into any agreement amending, modifying or terminating the Management Agreement or selecting or consenting to a successor Collateral Manager, or objecting to prospective Approved Replacements under the Management Agreement, (i) without 10 days' prior notice to each Rating Agency and the Credit Enhancer, (ii) without 10 days' prior notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder), (iii) without the prior written confirmation of each Rating Agency that such amendment, modification or termination will not cause its then-current rating of any Class of Notes to be reduced or withdrawn, (iv) without the prior written consent of the Controlling Party and (v) if either (a) a Majority of each Class of Notes or (b) the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares) shall, by notice to the Issuer and the Trustee within 30 days after the date of the related notice to the Trustee given as provided in clause (ii) above, object to such amendment, modification or termination, object to such successor Collateral Manager or direct that the Issuer object to such Approved Replacement;

(e)    except as otherwise set forth herein and therein (including, without limitation, pursuant to Article V of the Management Agreement), the Collateral Manager shall continue to serve as Collateral Manager under the Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Management Agreement because sufficient funds were not then available hereunder to pay such amounts. The Collateral Manager agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050137

- 202 -

payment in full of all Notes issued under the Indenture; <u>provided</u> that nothing in this clause shall preclude, or be deemed to stop, the Collateral Manager (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by any Zohar Obligor, as the case may be, or (b) any involuntary insolvency proceeding filed or commenced against any Zohar Obligor by a Person other than the Collateral Manager, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding;

(f)    if the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the Class A Noteholders and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment advisor that relates to any action to be taken with respect to any Pledged Obligation, then the Collateral Manager will perform its obligations with respect to any such conflict in accordance with Section 12.3(a) and with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict (<u>provided</u> that, to the extent that any provision of the Management Agreement specifically addresses the treatment of any conflict referred to in this clause (f), such conflict shall not be subject to this clause (f));

(g)    the Collateral Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Manager irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Collateral Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Collateral Manager irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager in New York, New York or, if no such office is then maintained, at the office of U.S. Bank National Association, having an address at One Federal Street, Third Floor, Boston, Massachusetts, 02110, Attention: CDO Department, Ref: Zohar CDO 2003-1, Limited. The Collateral Manager agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.5.    <u>Issuer and Collateral Administrator Agreements, Etc.</u>

The Issuer represents that it has not executed any other assignment of the Collateral Administration Agreement. The Issuer agrees that the assignment of the Collateral Administration Agreement under this Article 14 is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee (at the direction of the Controlling Party) or the Credit Enhancer, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee (at the direction of the Controlling Party) or the Credit Enhancer may reasonably specify. Each of the Issuer and the Collateral Administrator hereby agrees to the following:

(a)    the Collateral Administrator consents to the provisions of this assignment and agrees to perform the provisions of the Collateral Administration Agreement applicable to the Collateral Administrator;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050138

- 203 -

(b)     the Collateral Administrator acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Administration Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Administrator agrees that all of the representations, covenants and agreements made by the Collateral Administrator in the Collateral Administration Agreement are also for the benefit of the Trustee and the Secured Parties;

(c)     the Collateral Administrator shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Administration Agreement;

(d)     the Collateral Administrator agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Collateral Administrator (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency proceeding filed or commenced against such Zohar Obligor by a Person other than the Collateral Administrator, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding; and

(e)     the Collateral Administrator irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Administrator irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Collateral Administrator irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Collateral Administrator irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Administrator in New York, New York or, if no such office is then maintained, at the office of U.S. Bank National Association, having an address at One Federal Street, Third Floor, Boston, Massachusetts, 02110, Attention: CDO Department, Ref: Zohar CDO 2003-1, Limited. The Collateral Administrator agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

ARTICLE 15

HEDGE AGREEMENTS

Section 15.1.    Hedge Agreements

(a)     On any date which the Issuer enters into a Hedge Agreement, the Issuer shall assign it to the Trustee pursuant to this Indenture and a Collateral Assignment of Hedge Agreement. The Issuer shall not enter into any Hedge Agreement after the Closing Date unless it has obtained and delivered to the Trustee (i) the written confirmation of each Rating Agency that the entry by the Issuer

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NYL#7320267

PP050139

- 204 -

into such Hedge Agreement will not cause such Rating Agency's then-current rating, if any, of any Class of Notes to be reduced or withdrawn and (ii) the prior written consent of the Controlling Party.  The Issuer shall not enter into a Hedge Agreement the payments from which are subject to withholding tax.

Each Hedge Agreement shall be governed by the laws of the State of New York.

(b)    Any amounts payable by the relevant Hedge Counterparty under any Hedge Agreement shall be paid or deposited into the Cash Reserve Account.  Any amounts payable by the Issuer to the relevant Hedge Counterparty under any Hedge Agreement upon entry into such Hedge Agreement by the Issuer on any date other than a Payment Date may, with the written consent of the Controlling Party, be paid by the Issuer to such Hedge Counterparty by payment of amounts on deposit in the Issuer Principal Collection Account pursuant to Section 10.2.

(c)    The Trustee shall consent to any reduction in the notional amount of any Hedge Agreement requested by the Issuer at the direction of the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares), subject to the prior written consent of the Controlling Party; provided that, if any Notes are then Outstanding, the Issuer shall have requested and the Trustee shall first have received written confirmation from each Rating Agency that such reduction will not cause its then-current rating, if any, of any Class of Notes to be reduced or withdrawn.  Upon any such reduction, any amount paid to the Issuer by the relevant Hedge Counterparty pursuant to such Hedge Agreement shall constitute "Principal Proceeds."

(d)    Each Hedge Agreement will provide for termination on or prior to the Stated Maturity of the Class A Notes, and shall also be subject to termination, whether or not the Notes have been paid in full prior to such termination, upon the earliest to occur of (i) certain events of bankruptcy, insolvency, conservatorship, receivership or reorganization of the Issuer or the Hedge Counterparty party thereto, (ii) failure on the part of the Issuer or such Hedge Counterparty to make any payment or delivery under such Hedge Agreement within the applicable grace period, (iii) the failure of the relevant Hedge Counterparty to agree to provide Hedge Counterparty Credit Support within ten Business Days after the failure of such Hedge Counterparty (or any Person that shall have absolutely and unconditionally guaranteed the obligations of such Hedge Counterparty under the relevant Hedge Agreement) to have a long-term debt rating or issuer rating of at least "Aa2" by Moody's or at least "AA-" by Standard & Poor's or a short-term debt rating of "A-1" by Standard & Poor's, (iv) the failure of such Hedge Counterparty to transfer, at its own expense, all of its rights and obligations under the Hedge Agreement to a third party satisfying the rating requirements described herein and in the Hedge Agreement within 30 days after the failure of such Hedge Counterparty (or any Person that has absolutely and unconditionally guaranteed the obligations of such Hedge Counterparty under the relevant Hedge Agreement) to have a long-term debt rating or issuer rating at least "Aa2" by Moody's or at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's and (v) a change in law making it illegal for either the Issuer or such Hedge Counterparty to be a party to, or perform an obligation under, the Hedge Agreement. The Issuer will give prompt written notice to each Rating Agency, the Trustee and the Credit Enhancer of any such termination or agreement to provide Hedge Counterparty Credit Support. The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated securities account, which shall be designated as the "Hedge Counterparty Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties (other than the Hedge Counterparty pledging such Collateral) and in which no Person other than the Secured Parties shall have any legal or beneficial interest. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement in the Hedge Counterparty Collateral Account. Any and all funds at any time on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging such Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050140

- 205 -

Hedge Counterparty Collateral Account shall be (a) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (b) to return collateral to the relevant Hedge Counterparty when and as required by a Hedge Agreement.

(e)     If the Trustee has actual knowledge that a Hedge Counterparty has defaulted in the payment when due of its obligations to the Issuer under a Hedge Agreement, the Trustee shall make a demand on the Hedge Counterparty and/or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date (or by such time on the next succeeding Business Day if such knowledge is obtained after 11:30 a.m., New York time). The Trustee shall give notice to the Noteholders and the Credit Enhancer upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on the Hedge Counterparty.

(f)     If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer and the Trustee (acting at the direction of the Collateral Manager) shall take such actions (following the expiration of any applicable grace period and after the expiration of the two Business Day period referred to in Section 15.1(e)) to enforce the rights of the Issuer and the Trustee thereunder and under the Collateral Assignment of Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and shall apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty) to enter into a replacement Hedge Agreement (within 30 Business Days of the termination of such existing Hedge Agreement) on substantially identical terms or on such other terms as are consented to by the Controlling Party and as each Rating Agency may confirm in writing would not cause such Rating Agency's then-current rating, if any, of any Class of Notes to be reduced or withdrawn. Any costs of the Issuer attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of the terminated Hedge Agreement shall be borne solely by the Issuer and shall constitute expenses payable from the Expense Account (provided that the foregoing will not limit the responsibility of any Hedge Counterparty to pay costs and expenses associated with any transfer of a Hedge Agreement in order to avoid the termination thereof). In determining the amount payable under a terminated Hedge Agreement, the Issuer will seek quotations from reference market-makers who satisfy the definition of "Hedge Counterparty" in Section 1.1. In addition, the Issuer will use its best efforts to cause the termination of a Hedge Agreement to become effective simultaneously with the entry into a replacement Hedge Agreement described as aforesaid.

(g)     Each Hedge Counterparty is an express third-party beneficiary of this Indenture. Each of the Issuer and the Trustee agrees that it will not, without the prior written agreement of the affected Hedge Counterparty, consent to any amendment, waiver, supplement, termination or other modification of this Indenture if the effect thereof is to diminish or impair the rights, interests or benefits of such Hedge Counterparty under or in respect of this Indenture or the Collateral.

## ARTICLE 16

## THE CREDIT ENHANCEMENT

Section 16.1.    Certain Rights of the Credit Enhancer

(a)     So long as no Credit Enhancement Event shall have occurred and be continuing, the Trustee shall provide to the Credit Enhancer copies of any report, notice, Opinion of Counsel,

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050141

Officer's Certificate, request for consent or request for amendment to any document related hereto (including any Transaction Document) promptly upon the Trustee's production or receipt thereof (in each case, to the extent that such documents are not expressly required to be provided directly to such Credit Enhancer pursuant to the terms hereof).

(b)    Notwithstanding any other provision of this Indenture, so long as the Credit Enhancer is the Controlling Party, whenever any request, demand, authorization, direction, notice, consent, waiver, vote or other action of the Holders of the Class A Notes is required or permitted under this Indenture, the Credit Enhancer shall be deemed to be the sole Holder of each Class A Note for the purposes of taking or giving such request, demand, authorization, direction, notice, consent, waiver, vote or other action with respect to the Class A Notes, provided that (x) with respect to requests, demands, authorizations, directions, notices, consents, waivers, votes or other actions (i) under Article 17 by a Holder of a Class A-1 Note, (ii) under Section 16.2 by a Majority of the Class A-1 and Class A-2 Notes, (iii) under Section 7.13(b)(1) or (2), Section 7.18 or Section 10.6 by a Majority of the Class A Notes or (iv) expressly required to be taken by each Holder of a Class A-1 Note, Class A-2 Note or Class A-3 Note, as applicable, under Section 8.1 or 8.2, each such Holder shall have consented to the request, demand, authorization, direction, notice, consent, waiver, or other action taken or given by the Credit Enhancer, (y) nothing in this Section 16.1(b) shall limit the express right of any Holder of Class A Notes to receive any information to be provided to such Holder under the terms of this Indenture or to communicate directly with the provider of such information or to receive payment of principal of and interest on any Class A Note and all other amounts owing to such Holder pursuant to the terms of this Indenture and (z) nothing in this Section 16.1(b) shall limit the right of any Holder of a Class A-1 Note or Class A-2 Note to direct, in accordance with the provisions of this Indenture (including Section 16.3(c)), the Trustee to take any action to request or demand payment of any amount under the Credit Enhancement, to enforce any amounts payable under the Credit Enhancement or to amend, modify or waive any provision of the Credit Enhancement.

(c)    The Credit Enhancer may disclaim any of its rights and power under this Indenture (but not its duties and obligations under the Credit Enhancement) upon delivery of written notice to the Trustee and the Collateral Manager. The Credit Enhancer may give or withhold any consent hereunder in its sole and absolute discretion (unless otherwise provided herein). From and after the date on which the Credit Enhancement expires in accordance with its terms and all Credit Enhancement Liabilities and Credit Enhancement Premium have been irrevocably paid in full, the Credit Enhancer shall have no rights or benefits hereunder, and all references in this Indenture to the Credit Enhancer shall be disregarded.

Section 16.2.    Modification or Termination of Credit Enhancement and Credit Enhancement Agreement

(a) The Trustee shall not agree to any termination of or any modification, alteration, amendment or endorsement of the terms of the Credit Enhancement, or the assignment or transfer of the Credit Enhancement, without in each case the prior consent of each Holder of the Class A-1 Notes and each Holder of the Class A-2 Notes, and written confirmation from each Rating Agency that its then-current rating of such Notes (after giving effect to the Credit Enhancement) will not be reduced or withdrawn.

(b) The Issuer shall not agree to any amendment or other modification of the terms or conditions of the Credit Enhancement Agreement without the prior consent of a Majority of the Class A-1 Notes and the Class A-2 Notes, and written notice to each Rating Agency.

NY3:#7320767
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050142

Section 16.3.   <u>Drawings under the Credit Enhancement</u>

(a)     If by 4:00 p.m. in the city in which the Corporate Trust Office is located on the Business Day next succeeding the last day of any Due Period (or, in the case of the Due Period ending on the day preceding the Stated Maturity of the Class A-1 Notes or the Class A-2 Notes, on the date five Business Days prior to the last day of such Due Period) the amounts then on deposit (or scheduled to be on deposit and available for distribution on the related Payment Date) in the Collection Accounts and the Cash Collateral Account are insufficient to pay the Insured Payments in respect of the Class A-1 Notes and the Class A-2 Notes (the amount of such deficiency, the "<u>Deficiency Amount</u>"), the Trustee shall:

(i)     no later than 12:00 p.m., New York City time, on the third Business Day prior to the Payment Date next succeeding such Due Period, give written notice (in strict compliance with the terms of the Credit Enhancement) to the Credit Enhancer, specifying therein the Deficiency Amount; and

(ii)     on the date on which the Trustee receives payment under the Credit Enhancement (but not earlier than the applicable Payment Date) in respect of such Deficiency Amount, pay over to each Holder of Class A-1 Notes and each Holder of Class A-2 Notes, for application by such Holder to amounts due in respect of such Holder's Notes due on the related Payment Date, such Holder's ratable share of the amounts so received by the Trustee.

Any payment by the Credit Enhancer under the Credit Enhancement in respect of amounts due on the Class A-1 Notes and Class A-2 Notes shall be applied solely to the payment of such amounts due on such Notes and shall not discharge the Issuer's obligations to make such payments as provided in Section 16.5(b).

(b)     The Trustee agrees to furnish to the Credit Enhancer upon its reasonable request copies of the Trustee's records evidencing the payment of amounts due on the Class A-1 Notes and the Class A-2 Notes that have been made by the Trustee and subsequently recovered from Holders of such Notes and the dates on which such payments were made.

(c)     The Trustee shall be entitled to enforce, on behalf of the Holders of the Class A-1 Notes and the Class A-2 Notes, the obligations of the Credit Enhancer under the Credit Enhancement. Notwithstanding any other provision of this Indenture, the Holders of the Class A-1 Notes and the Class A-2 Notes are not entitled to make any claims under the Credit Enhancement or institute proceedings directly against the Credit Enhancer.

Section 16.4.   <u>Preference Claims and Insolvency Proceedings</u>

(a)     In the event the Trustee receives a certified copy of an order of the appropriate court that an amount due on a Class A-1 Note and/or a Class A-2 Note has been avoided in whole or in part as a preference payment under applicable bankruptcy law, the Trustee shall so notify the Credit Enhancer, shall comply with the provisions of the Credit Enhancement to obtain payment by the Credit Enhancer of such avoided payment, and shall, at the time it provides notice to the Credit Enhancer, notify the Holders of the Class A-1 Notes and/or the Class A-2 Notes, as applicable, in accordance with Section 16.3 that, in the event that any such Holder's payment is so recoverable, such Holder will be entitled to payment pursuant to the terms of the Credit Enhancement. The Trustee shall furnish to the Credit Enhancer copies of its records evidencing the payment of amounts due on the Class A-1 Notes and/or the Class A-2 Notes, if any, that have been made by the Trustee and subsequently recovered from Holders of such Notes, and the dates on which such payments were made. Pursuant to the terms of the Credit Enhancement, the Credit Enhancer will make such payment on behalf of such Holders to the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                         PP050143

- 208 -

receiver or trustee in bankruptcy named in the Order (as defined in the Credit Enhancement) and not to the Trustee or any such Holder directly unless any such Holder provides certification or other evidence reasonably satisfactory to the Credit Enhancer that such Holder has returned principal or interest paid on the Class A-1 Notes and/or Class A-2 Notes to the receiver or trustee in bankruptcy, in which case the Credit Enhancer will make such payment to the Trustee for distribution to such Holder upon proof of such payment reasonably satisfactory to the Credit Enhancer).

(b)    The Trustee shall promptly notify the Credit Enhancer of either of the following as to which it has actual knowledge: (i) the commencement of any insolvency proceeding by or against the Co-Issuers under the Bankruptcy Code or any other applicable insolvency, receivership, rehabilitation or similar law in any jurisdiction (an "Insolvency Proceeding") and (ii) the making of any claim in connection with any Insolvency Proceeding by or against the Co-Issuers seeking the avoidance as a preferential transfer of any payment of principal of, or interest on, the Notes (in any case, a "Preference Claim"). Each Holder of a Class A-1 Note or a Class A-2 Note, by its purchase of such Note, and the Trustee hereby agree that, so long as no Credit Enhancement Event shall have occurred and be continuing, the Credit Enhancer may at any time during the continuation of any proceeding relating solely to a Preference Claim in respect of the Class A-1 Notes and/or the Class A-2 Notes direct all matters relating to such Preference Claim or Insolvency Proceeding including, without limitation, (a) the direction of any appeal of any order relating solely to any such Preference Claim and (b) the posting of a surety, supersedeas or performance bond pending any such appeal relating solely to such Preference Claim. In addition, and without limitation of the foregoing, as set forth in Section 16.5, the Credit Enhancer shall be subrogated to, and each Holder of Class A-1 Notes, each Holder of Class A-2 Notes and the Trustee hereby delegates and assigns, to the fullest extent permitted by law, the rights of the Trustee and such Holder in the conduct of any proceeding with respect to such a Preference Claim related to the Class A-1 Notes and the Class A-2 Notes, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Preference Claim or Insolvency Proceeding.

Section 16.5.    Subrogation

(a)    The Co-Issuers, the Trustee, each Holder of a Class A-1 Note and each Holder of a Class A-2 Note, by its acceptance of such Class A-1 Note or Class A-2 Note, as applicable, hereby acknowledge and agree for the benefit of the Credit Enhancer that, without the need for any further action on the part of the Credit Enhancer, the Co-Issuers, the Trustee or any other Person (i) to the extent the Credit Enhancer makes payments, directly or indirectly, on account of principal of or interest on the Class A-1 Notes, the Class A-2 Notes, Class A-1 Commitment Fee or Class A-2 Commitment Fee to the Holders of the Class A-1 Notes or the Class A-2 Notes, as applicable, the Credit Enhancer will be fully subrogated to the rights of such Holders to receive such principal, interest, Class A-1 Commitment Fee and/or Class A-2 Commitment Fee from the Issuer and (ii) the Credit Enhancer shall be paid such principal, interest, Class A-1 Commitment Fee and/or Class A-2 Commitment Fee in its capacity as a Holder of the Class A-1 Notes or the Class A-2 Notes, as applicable, but only from the sources and in the manner provided herein for the payment of such principal, interest, Class A-1 Commitment Fee and/or Class A-2 Commitment Fee in accordance with the Priorities of Payment, in each case only after the Holders of the Class A-1 Notes or the Class A-2 Notes, as applicable, have received payment of all principal, interest, Class A-1 Commitment Fee and/or Class A-2 Commitment Fee due thereon. The Trustee shall give effect to any such subrogation by distributing to the Credit Enhancer, as subrogee of the Holders of the Class A-1 Notes and the Class A-2 Notes, reimbursement for any payments by the Credit Enhancer under the Credit Enhancement in accordance with the Priority of Payments.

(b)    Anything in this Indenture, the Class A-1 Notes or the Class A-2 Notes to the contrary notwithstanding (but subject to Section 2.6(i)), any payment with respect to amounts due in

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050144

- 209 -

respect of the Class A-1 Notes or the Class A-2 Notes that is made with monies received pursuant to the terms of the Credit Enhancement shall not be considered payment on such Notes by the Co-Issuers, shall not discharge any obligations of the Co-Issuers to make such payment and shall not result in the payment of (or the provision for the payment of) any amounts due in respect of such Notes for purposes of Section 4.1. To the extent provided in the Credit Enhancement Agreement, the Credit Enhancer may require transfer of any Class A-1 Note (or a portion thereof) or any Class A-2 Note (or a portion thereof) in each case from the Holder thereof to the Credit Enhancer to reflect payment of Insured Payments on such Note by the Credit Enhancer under the Credit Enhancement (subject to the terms and conditions of Section 2.4).

Section 16.6.   Credit Enhancement Payment Account

The Trustee shall, prior to the Closing Date, establish a single, segregated trust account which shall be designated as the "Credit Enhancement Payment Account", which shall be held in trust for the benefit of the Holders of the Class A-1 Notes and the Class A-2 Notes, over which the Trustee shall have exclusive control and the sole right of withdrawal, and in which none of the Issuer, the Holders of the Notes (except the Holders of the Class A-1 Notes and the Class A-2 Notes) or any other Person shall have any legal or beneficial interest. The Trustee shall deposit all amounts received by the Trustee from the Credit Enhancer under the Credit Enhancement, in the Credit Enhancement Payment Account. Any and all funds at any time on deposit in, or otherwise to the credit of, the Credit Enhancement Payment Account shall be held in trust by the Trustee solely for the benefit of the Holders of the Class A-1 Notes and the Class A-2 Notes. Amounts held in the Credit Enhancement Payment Account shall not be invested. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Credit Enhancement Payment Account shall be to make payment of the amounts due in respect of the Class A-1 Notes and/or the Class A-2 Notes on the related Payment Date in respect of which such funds are paid by the Credit Enhancer, to the extent such amounts are not paid pursuant to the Priority of Payments (and such funds may not be applied to pay any other amounts payable by the Co-Issuers under any Transaction Document). Any Monies held in the Credit Enhancement Payment Account after the distributions made pursuant to this Article 16 on any Payment Date shall promptly be remitted to the Credit Enhancer.

Section 16.7.   Certain Remedies

With respect to the Credit Enhancement, without limiting the provisions of Article 5 or 6 or the rights or interest of the Holders of the Class A-1 Notes or the Class A-2 Notes as otherwise set forth herein so long as (i) any of the Class A-1 Notes or the Class A-2 Notes shall be Outstanding and (ii) the Credit Enhancement shall not have been duly cancelled or terminated, and no Credit Enhancement Event shall have occurred and be continuing, the Trustee shall cooperate in all respects with any reasonable request by the Credit Enhancer for action to preserve or enforce the Credit Enhancer's rights or interests under this Indenture and the Credit Enhancement Agreement, including, without limitation, upon the occurrence and continuance of an Event of Default, a request to take any one or more of the following actions, subject to the provisions of Article 5:

(A)   institute proceedings for collection of all amounts then owing to the Credit Enhancer in respect of the Credit Enhancement Liabilities or Credit Enhancement Premium or under this Indenture in respect of the Class A-1 Notes or the Class A-2 Notes, enforce any judgment obtained and collect from the Issuer Monies adjudged due;

(B)   institute proceedings from time to time for the complete or partial foreclosure of this Indenture; and

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7328262

PP050145

- 210 -

(C)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Credit Enhancer and the other Secured Parties hereunder.

Section 16.8.    Miscellaneous

(a)    The Trustee shall keep a complete and accurate record of all funds deposited by the Credit Enhancer into the Credit Enhancement Payment Account and the allocation of such funds to payment of amounts paid in respect of any Class A-1 Note or any Class A-2 Note. The Credit Enhancer shall have the right to inspect such records during normal business hours upon three Business Day's prior written notice to the Trustee.

(b)    Upon the expiration of the Credit Enhancement in accordance with the terms thereof, the Trustee shall surrender the same to the Credit Enhancer for cancellation in accordance with the terms thereof.

(c)    The Zohar Obligors and the Collateral Manager shall permit representatives of the Credit Enhancer, at the expense of the Zohar Obligors and upon reasonable prior notice to the Zohar Obligors and the Collateral Manager, to visit the principal office of the Collateral Manager for the purpose of inspecting the records of the Zohar Obligors relating to Professional Fees paid from the Professional Fee Account, at such reasonable times and as often as may be reasonably requested in writing.

(d)    The Collateral Administrator shall permit representatives of the Credit Enhancer, at the expense of the Zohar Obligors and upon at least three Business Days prior written notice to the Collateral Administrator and the Collateral Manager, to visit the principal office of the Collateral Administrator during normal business hours for the purpose of inspecting records of the Collateral Administrator with respect to the reports to be prepared by the Collateral Administrator under this Indenture, at such reasonable times and as often as may be reasonably requested in writing.

Section 16.9.    No Proceedings

(a)    Each of the Credit Enhancer, the Co-Issuers and the Trustee hereby agrees that it will not institute against any CP Conduit (as defined in the applicable Note Purchase Agreements), or join, cooperate with or encourage any other Person in instituting against any CP Conduit, any bankruptcy, insolvency, reorganization, receivership or similar proceeding so long as any CP Notes (as so defined) issued by such CP Conduit shall be outstanding and there shall not have elapsed one year plus one day since the last day on which any such CP Notes shall have been outstanding.

(b)    Nothing in the foregoing clause (a) shall limit the right of the Credit Enhancer, the Co-Issuers or the Trustee to (i) file any claim in or otherwise take any action with respect to any insolvency proceeding of the type described in clause (a) above that was (A) instituted against any CP Conduit by any Person other than the Credit Enhancer, the Co-Issuers or the Trustee, as applicable (other than the joining in, cooperating with or encouraging the institution of such proceeding) or (B) voluntarily commenced or filed by the CP Conduit or (ii) commence against the CP Conduit or any of its properties any legal action that is not a proceeding of the type described in clause (a) above.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                            PP050146

- 211 -

## ARTICLE 16A

## THE SUPPLEMENTAL CREDIT ENHANCEMENT

Section 16A.1.  Certain Rights of the Credit Enhancer

(a)     So long as no Credit Enhancement Event shall have occurred and be continuing, the Trustee shall provide to the Credit Enhancer copies of any report, notice, Opinion of Counsel, Officer's Certificate, request for consent or request for amendment to any document related hereto (including any Transaction Document) promptly upon the Trustee's production or receipt thereof (in each case, to the extent that such documents are not expressly required to be provided directly to such Credit Enhancer pursuant to the terms hereof).

(b)     Notwithstanding any other provision of this Indenture, so long as the Credit Enhancer is the Controlling Party and the Supplemental Credit Enhancement is outstanding, whenever any request, demand, authorization, direction, notice, consent, waiver, vote or other action of the Holders of the Class A Notes is required or permitted under this Indenture, the Credit Enhancer shall be deemed to be the sole Holder of each Class A Note for the purposes of taking or giving such request, demand, authorization, direction, notice, consent, waiver, vote or other action with respect to the Class A Notes, provided that (x) with respect to requests, demands, authorizations, directions, notices, consents, waivers, votes or other actions (i) under Article 17 by a Holder of a Class A-1 Note, (ii) under Section 7.13(b)(1) or (2), Section 7.18, Section 10.6(b) or Section 16A.2 by a Majority of the Class A Notes or (iii) expressly required to be taken by each Holder of a Class A-1 Note, Class A-2 Note or Class A-3 Note, as applicable, under Section 8.1 or 8.2, each such Holder shall have consented to the request, demand, authorization, direction, notice, consent, waiver, or other action taken or given by the Credit Enhancer, (y) nothing in this Section 16A.1(b) shall limit the express right of any Holder of Class A Notes to receive any information to be provided to such Holder under the terms of this Indenture or to communicate directly with the provider of such information or to receive payment of principal of and interest on any Class A Note and all other amounts owing to such Holder pursuant to the terms of this Indenture and (z) nothing in this Section 16A.1(b) shall limit the right of any Holder of a Class A Note to direct, in accordance with the provisions of this Indenture (including Section 16A.3(c)), the Trustee to take any action to request or demand payment of any amount under the Supplemental Credit Enhancement, to enforce any amounts payable under the Supplemental Credit Enhancement or to amend, modify or waive any provision of the Supplemental Credit Enhancement.

(c)     The Credit Enhancer may disclaim any of its rights and power under this Indenture (but not its duties and obligations under the Supplemental Credit Enhancement) upon delivery of written notice to the Trustee and the Collateral Manager.  The Credit Enhancer may give or withhold any consent hereunder in its sole and absolute discretion (unless otherwise provided herein).  From and after the date on which the Supplemental Credit Enhancement expires in accordance with its terms and all Supplemental Credit Enhancement Liabilities and Supplemental Credit Enhancement Premium have been irrevocably paid in full, the Credit Enhancer shall have no rights or benefits hereunder in respect of the Supplemental Credit Enhancement only, and all references in this Indenture to the Supplemental Credit Enhancement shall be disregarded.  For the avoidance of doubt, nothing in this Section 16A.1(c) shall limit or alter the rights of the Credit Enhancer pursuant to Article 16.

Section 16A.2.  Modification or Termination of Supplemental Credit Enhancement and Credit Enhancement Agreement

(a)  The Trustee shall not agree to any termination of or any modification, alteration, amendment or endorsement of the terms of the Supplemental Credit Enhancement, or the assignment or

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050147

TX1:#730367

- 212 -

transfer of the Supplemental Credit Enhancement, without in each case the prior consent of each Holder of the Class A Notes, and written confirmation from each Rating Agency that its then-current rating of such Notes (after giving effect to the Supplemental Credit Enhancement) will not be reduced or withdrawn.

(b)     The Issuer shall not agree to any amendment or other modification of the terms or conditions of the Credit Enhancement Agreement without the prior consent of a Majority of the Class A Notes, and written notice to each Rating Agency.

Section 16A.3.   Drawings under the Supplemental Credit Enhancement

(a)     Drawings Prior to Ramp Up Liquidation Date. If by 4:00 p.m. in the city in which the Corporate Trust Office is located on the Business Day next succeeding the last day of any Due Period (or, in the case of the Due Period ending on the day preceding the Stated Maturity of the Class A Notes, on the date five Business Days prior to the last day of such Due Period), (1) the Ramp Up Liquidation Date has not occurred and (2) there would otherwise be insufficient funds available for application pursuant to the Priority of Payments to pay the amounts payable under Sections 11.1(a)(i)(F)(i) through (iv) on such Payment Date (in each case, after application on such Payment Date of Interest Proceeds and Principal Proceeds on deposit in the Collection Account, amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments, application of amounts on deposit in the Cash Reserve Account as provided in Section 10.7 and application of amounts on deposit in the Accounts pursuant to Article 10, but without giving effect to the Credit Enhancement and Supplemental Credit Enhancement) (the amount of such deficiency, a "Supplemental Deficiency Amount"), then the Trustee shall:

(i)     no later than 12:00 p.m., New York City time, on the third Business Day prior to the Payment Date next succeeding such Due Period, give written notice (in strict compliance with the terms of the Supplemental Credit Enhancement) to the Credit Enhancer, specifying therein such Supplemental Deficiency Amount; and

(ii)     on the date on which the Trustee receives payment under the Supplemental Credit Enhancement (but not earlier than the applicable Payment Date) in respect of such Supplemental Deficiency Amount, pay over to each Holder of Class A Notes, for application by such Holder to amounts due in respect of such Holder's Notes due on the related Payment Date, such Holder's ratable share of the amounts so received by the Trustee.

(b)     Drawings On Ramp Up Liquidation Date. If by 4:00 p.m. in the city in which the Corporate Trust Office is located on the Ramp Up Liquidation Date there would otherwise be insufficient funds available for application pursuant to the Priority of Payments to repay the outstanding principal of the Class A Notes in full together with interest (other than Class A Additional Interest) thereon and Class A-1 Commitment Fee, Class A-2 Commitment Fee and the Class A-3 Commitment Fee in respect thereof (in each case, after application on such Payment Date of the proceeds of the sale or liquidation of all of the Collateral, including funds on deposit in the Holdback Account but without giving effect to the Credit Enhancement and Supplemental Credit Enhancement) (the amount of such deficiency, a "Supplemental Deficiency Amount"), then the Trustee shall:

(i)     no later than 12:00 p.m., New York City time, on the third Business Day after the Ramp Up Liquidation Date, give written notice (in strict compliance with the terms of the Supplemental Credit Enhancement) to the Credit Enhancer, specifying therein such Supplemental Deficiency Amount; and

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050148

- 213 -

(ii)     on the date on which the Trustee receives payment under the Supplemental Credit Enhancement in respect of such Supplemental Deficiency Amount, pay over to each Holder of Class A Notes, for application by such Holder to amounts due in respect of such Holder's Notes then due, such Holder's ratable share of the amounts so received by the Trustee.

Any payment by the Credit Enhancer under the Supplemental Credit Enhancement in respect of amounts due on the Class A Notes shall be applied solely to the payment of such amounts due on such Notes and shall not discharge the Issuer's obligations to make such payments as provided in Section 16A.5(b).

(c)     The Trustee agrees to furnish to the Credit Enhancer upon its reasonable request copies of the Trustee's records evidencing the payment of amounts due on the Class A Notes that have been made by the Trustee and subsequently recovered from Holders of such Notes and the dates on which such payments were made.

(d)     The Trustee shall be entitled to enforce, on behalf of the Holders of the Class A Notes, the obligations of the Credit Enhancer under the Supplemental Credit Enhancement. Notwithstanding any other provision of this Indenture, the Holders of the Class A Notes are not entitled to make any claims under the Supplemental Credit Enhancement or institute proceedings directly against the Credit Enhancer.

Section 16A.4.    [Reserved]

Section 16A.5.    Subrogation

(a)     The Co-Issuers, the Trustee and each Holder of a Class A Note, by its acceptance of such Class A Note, as applicable, hereby acknowledge and agree for the benefit of the Credit Enhancer that, without the need for any further action on the part of the Credit Enhancer, the Co-Issuers, the Trustee or any other Person (i) to the extent the Credit Enhancer makes payments, directly or indirectly, on account of principal of or interest on the Class A Notes, Class A-1 Commitment Fee, Class A-2 Commitment Fee or Class A-3 Commitment Fee to the Holders of the applicable Class A Notes, the Credit Enhancer will be fully subrogated to the rights of such Holders to receive such principal, interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee and/or Class A-3 Commitment Fee from the Issuer and (ii) the Credit Enhancer shall be paid such principal, interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee and/or Class A-3 Commitment Fee in its capacity as a Holder of the applicable Class A Notes, but only from the sources and in the manner provided herein for the payment of such principal, interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee and/or Class A-3 Commitment Fee in accordance with the Priorities of Payment, but, in the case of principal, only after the Holders of the applicable Class A Notes have received payment in full of all principal on such Notes and, in the case of interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee and/or Class A-3 Commitment Fee, only after the Holders of the applicable Class A Notes have received payment in full of all interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee and/or Class A-3 Commitment Fee on such Notes. The Trustee shall give effect to any such subrogation by distributing to the Credit Enhancer, as subrogee of the Holders of the Class A Notes, reimbursement for any payments by the Credit Enhancer under the Supplemental Credit Enhancement in accordance with the Priority of Payments.

(b)     Anything in this Indenture or the Class A Notes to the contrary notwithstanding (but subject to Section 2.6(i)), any payment with respect to amounts due in respect of the Class A Notes that is made with monies received pursuant to the terms of the Supplemental Credit Enhancement shall not be considered payment on such Notes by the Co-Issuers, shall not discharge any obligations of the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050149

- 214 -

Co-Issuers to make such payment and shall not result in the payment of (or the provision for the payment of) any amounts due in respect of such Notes for purposes of Section 4.1. To the extent provided in the Credit Enhancement Agreement, the Credit Enhancer may require transfer of any Class A-1 Note (or a portion thereof), any Class A-2 Note (or a portion thereof) or any Class A-3 Note (or a portion thereof) in each case from the Holder thereof to the Credit Enhancer to reflect payment of Supplemental Insured Payments on such Note by the Credit Enhancer under the Supplemental Credit Enhancement (subject to the terms and conditions of Section 2.4).

Section 16A.6.  Supplemental Credit Enhancement Payment Account

The Trustee shall, prior to the Closing Date, establish a single, segregated trust account which shall be designated as the "Supplemental Credit Enhancement Payment Account", which shall be held in trust for the benefit of the Holders of the Class A Notes, over which the Trustee shall have exclusive control and the sole right of withdrawal, and in which none of the Issuer, the Holders of the Notes (except the Holders of the Class A Notes) or any other Person shall have any legal or beneficial interest. The Trustee shall deposit all amounts received by the Trustee from the Credit Enhancer under the Supplemental Credit Enhancement in the Supplemental Credit Enhancement Payment Account. Any and all funds at any time on deposit in, or otherwise to the credit of, the Supplemental Credit Enhancement Payment Account shall be held in trust by the Trustee solely for the benefit of the Holders of the Class A Notes. Amounts held in the Supplemental Credit Enhancement Payment Account shall not be invested. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Supplemental Credit Enhancement Payment Account shall be to make payment of the amounts due in respect of the Class A Notes on the related Payment Date in respect of which such funds are paid by the Credit Enhancer, to the extent such amounts are not paid pursuant to the Priority of Payments (and such funds may not be applied to pay any other amounts payable by the Co-Issuers under any Transaction Document). Any Monies held in the Supplemental Credit Enhancement Payment Account after the distributions made pursuant to this Article 16A on any Payment Date shall promptly be remitted to the Credit Enhancer.

Section 16A.7.  Certain Remedies

With respect to the Supplemental Credit Enhancement, without limiting the provisions of Article 5 or 6 or the rights or interest of the Holders of the Class A Notes as otherwise set forth herein so long as (i) any of the Class A Notes shall be Outstanding and (ii) the Supplemental Credit Enhancement shall not have been duly cancelled or terminated, and no Credit Enhancement Event shall have occurred and be continuing, the Trustee shall cooperate in all respects with any reasonable request by the Credit Enhancer for action to preserve or enforce the Credit Enhancer's rights or interests under this Indenture and the Credit Enhancement Agreement, including, without limitation, upon the occurrence and continuance of an Event of Default, a request to take any one or more of the following actions, subject to the provisions of Article 5:

(A)    institute proceedings for collection of all amounts then owing to the Credit Enhancer in respect of the Supplemental Credit Enhancement Liabilities or Supplemental Credit Enhancement Premium or under this Indenture in respect of the Class A Notes, enforce any judgment obtained and collect from the Issuer Monies adjudged due;

(B)    institute proceedings from time to time for the complete or partial foreclosure of this Indenture; and

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050150

- 215 -

(C)     exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Credit Enhancer and the other Secured Parties hereunder.

Section 16A.8.  Miscellaneous

(a)     The Trustee shall keep a complete and accurate record of all funds deposited by the Credit Enhancer into the Supplemental Credit Enhancement Payment Account and the allocation of such funds to payment of amounts paid in respect of any Class A Note.  The Credit Enhancer shall have the right to inspect such records during normal business hours upon three Business Days' prior written notice to the Trustee.

(b)     Upon the expiration of the Supplemental Credit Enhancement in accordance with the terms thereof, the Trustee shall surrender the same to the Credit Enhancer for cancellation in accordance with the terms thereof.

Section 16A.9.  [Reserved]

Section 16A.10. Interpretive Adjustments

Except as expressly provided in the Priority of Payments, in Section 10.6A, in Articles 16 and 16A and in determining the rating on the Class A Notes, all references in this Indenture to "Credit Enhancement", "Credit Enhancement Agreement", "Credit Enhancement Event", "Credit Enhancement Liabilities", "Credit Enhancement Payment Account", "Credit Enhancement Premium", "Credit Enhancement Premium Letter", "Credit Enhancement Reimbursement Amount" and "Credit Enhancer" and similar terms shall be deemed to include references (unless the context otherwise requires) to the analogous definitions set forth herein with respect to the Supplemental Credit Enhancement.

ARTICLE 17

CLASS A-1 NOTE AGENT

Section 17.1.    Appointment of Class A-1 Note Agent

Each Holder of a Class A-1 Note, by its acceptance thereof, irrevocably appoints the Class A-1 Note Agent as its agent and authorizes the Class A-1 Note Agent to take such actions on its behalf and to exercise such powers as are delegated to the Class A-1 Note Agent by the terms of this Indenture, together with such actions and powers as are reasonably incidental thereto.

Section 17.2.    Certain Duties and Responsibilities

(a)     The Class A-1 Note Agent undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and the applicable Note Purchase Agreements (including without limitation to give and receive notices expressly provided therein to be given and received by it).

(b)     In the absence of bad faith on its part, the Class A-1 Note Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates and other notices furnished to the Class A-1 Note Agent and conforming to the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050151

requirements of this Indenture; provided that, in the case of any such certificates which by any provision hereof are specifically required to be furnished to the Class A-1 Note Agent, the Class A-1 Note Agent shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not conform. If a corrected form shall not have been delivered to the Class A-1 Note Agent within 15 days after such notice from the Class A-1 Note Agent, the Class A-1 Note Agent shall so notify the Holders of the Class A-1 Notes.

(c)    No provision of this Indenture shall be construed to relieve the Class A-1 Note Agent from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of subsections (a) and (b) of this Section;

(ii)    the Class A-1 Note Agent shall not be liable for any error of judgment made in good faith by an Officer, unless it shall be proven that the Class A-1 Note Agent was negligent in ascertaining the pertinent facts; and

(iii)    no provision of this Indenture shall require the Class A-1 Note Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it unless such risk or liability relates to performance of its ordinary services under this Indenture.

(d)    For all purposes under this Indenture, the Class A-1 Note Agent shall not be deemed to have notice or knowledge of any Event of Default unless an Officer of the Class A-1 Note Agent has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Class A-1 Note Agent.

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Class A-1 Note Agent shall be subject to the provisions of this Section.

Section 17.3.    Compensation

(a)    The Issuer agrees:

(i)    to pay the Class A-1 Note Agent on each Payment Date, so long as the Class A-1 Notes are Outstanding or the Class A-1 Commitments shall not have not expired, terminated or been reduced to zero, and subject to the Priority of Payments, the Class A-1 Note Agent Fee together with interest on any overdue amounts thereof at the Federal Funds Rate (which fee, once paid, shall be non-refundable); and

(ii)    to indemnify the Class A-1 Note Agent and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of the duties specified herein, including the costs and expenses of

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050152

defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder.

(b)    The Class A-1 Note Agent shall, subject to the Priority of Payments, receive amounts pursuant to this Section 17.3 and Sections 11.1(a)(i) and (ii) and Section 11.2(a) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Class A-1 Note Agent will not, by itself, constitute an Event of Default. The Class A-1 Note Agent agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Class A-1 Note Agent (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency proceeding filed or commenced against such Zohar Obligor by a Person other than the Class A-1 Note Agent, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

Section 17.4.    Resignation and Removal; Appointment of a Successor

(a)    No resignation or removal of the Class A-1 Note Agent and no appointment of a successor Class A-1 Note Agent pursuant to this Article shall become effective until the acceptance of appointment by the successor Class A-1 Note Agent under Section 17.5.

(b)    The Class A-1 Note Agent may resign at any time by giving written notice thereof to the Co-Issuers, the Holders of the Class A-1 Notes, the Credit Enhancer, the Trustee, the Collateral Manager and each Rating Agency. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor Class A-1 Note Agent by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Class A-1 Note Agent so resigning and one copy to the successor Class A-1 Note Agent, together with a copy to each such Holder and the Credit Enhancer; provided that such successor Class A-1 Note Agent shall be appointed only upon the written consent of the Majority of the Class A-1 Notes and the Collateral Manager. If no successor Class A-1 Note Agent shall have been appointed and an instrument of acceptance by a successor Class A-1 Note Agent shall not have been delivered to the Class A-1 Note Agent within 30 days after the giving of such notice of resignation, the resigning Class A-1 Note Agent or any Holder of a Class A-1 Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Class A-1 Note Agent.

(c)    The Class A-1 Note Agent may be removed at any time by Act of a Majority of the Class A-1 Notes, delivered to the Class A-1 Note Agent, the Trustee, the Credit Enhancer, the Co-Issuers and the Collateral Manager.

(d)    If at any time the Class A-1 Note Agent shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Class A-1 Note Agent or of its property shall be appointed or any public officer shall take charge or control of the Class A-1 Note Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case (subject to Section 17.4(a)), (i) the Co-Issuers, by Issuer Order, may remove the Class A-1 Note Agent, or (ii) any Holder of a Class A-1 Note may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Class A-1 Note Agent and the appointment of a successor Class A-1 Note Agent.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP050153

- 218 -

(e)    If the Class A-1 Note Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Class A-1 Note Agent for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Class A-1 Note Agent. If the Co-Issuers shall fail to appoint a successor Class A-1 Note Agent within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Class A-1 Note Agent may be appointed by Act of the Holders of a Majority of the Class A-1 Notes delivered to the Issuer and the retiring Class A-1 Note Agent. The successor Class A-1 Note Agent so appointed shall, forthwith upon its acceptance of such appointment, become the successor Class A-1 Note Agent and supersede any successor Class A-1 Note Agent proposed by the Co-Issuers. If no successor Class A-1 Note Agent shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Class A-1 Note Agent.

(f)    The Co-Issuers shall give prompt notice of each resignation and each removal of the Class A-1 Note Agent and each appointment of a successor Class A-1 Note Agent by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, the Credit Enhancer, the Trustee, each Rating Agency and to the Holders of the Class A-1 Notes as their names and addresses appear in the Class A-1 Note Register. Each notice shall include the name and address of the successor Class A-1 Note Agent. If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Class A-1 Note Agent, the successor Class A-1 Note Agent shall cause such notice to be given at the expense of the Co-Issuers.

Section 17.5.    Acceptance of Appointment of a Successor

Every successor Class A-1 Note Agent appointed hereunder shall be reasonably acceptable to the Trustee and the Collateral Manager and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Class A-1 Note Agent an instrument accepting such appointment. No successor Class A-1 Note Agent may be appointed hereunder unless such Class A-1 Note Agent or an Affiliate shall then be the Holder of one or more Class A-1 Notes. Upon delivery of the required instruments, the resignation or removal of the retiring Class A-1 Note Agent shall become effective and such successor Class A-1 Note Agent, without any other act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of the retiring Class A-1 Note Agent; but, on request of the Co-Issuers or a Majority of the Class A-1 Notes or the successor Class A-1 Note Agent, such retiring Class A-1 Note Agent shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Class A-1 Note Agent all the rights, powers and trusts of the retiring Class A-1 Note Agent.

ARTICLE 18

MISCELLANEOUS

Section 18.1.    Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050154

Any certificate or opinion of an Authorized Officer of any Zohar Obligor or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of any Zohar Obligor or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of any Zohar Obligor, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the any Zohar Obligor, the Collateral Manager or such other Person, unless such Authorized Officer of any Zohar Obligor or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of any Zohar Obligor, stating that the information with respect to such matters is in the possession of such Zohar Obligor, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of any Zohar Obligor, then notwithstanding that the satisfaction of such condition is a condition precedent to any Zohar Obligors' rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in Section 6.1(d).

Section 18.2.    Acts of Noteholders

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders or "Acts of Noteholders" signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 18.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050155

- 220 -

every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 18.3.   <u>Notices, etc., to Trustee, the Preference Share Paying Agent, the Zohar Obligors, the Collateral Manager, the Credit Enhancer, the Rating Agencies and the Hedge Counterparty</u>

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee by any Noteholder or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Trustee addressed to it at its Corporate Trust Office, Attention:  CDO Department, Ref: Zohar CDO 2003-1, Limited, telephone number (617) 603-6531, or at any other address previously furnished in writing to the Co-Issuers or Noteholder by the Trustee;

(b)    the Preference Share Paying Agent by the Trustee or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Preference Share Paying Agent addressed to it at One Federal Street, Third Floor, Boston, Massachusetts, 02110, Attention:  CDO Department, Ref: Zohar CDO 2003-1, Limited, telephone number (617) 603-6531, or at any other address previously furnished in writing to the Co-Issuers or Trustee by the Preference Share Paying Agent;

(c)    the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention:  The Directors, telecopy no. (345) 945-7100, or at any other address previously furnished in writing to the Trustee by the Issuer;

(d)    the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Co-Issuer addressed to it at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention:  Donald Puglisi, Esq., telecopy no. (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(e)    the Zohar Subsidiary by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Co-Issuer addressed to it at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention:  Donald Puglisi, Esq., telecopy no. (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                         PP050156
ON BEHALF OF PATRIARCH PARTNERS LLC

- 221 -

(f)    the Collateral Manager by any Zohar Obligor or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Collateral Manager addressed to Patriarch Partners VIII, LLC, c/o Patriarch Partners, LLC, 112 South Tryon Street, Suite 700, Charlotte, NC 28284, Attention:  Lynn Tilton, telecopy no. (704) 375-0358, or at any other address previously furnished in writing to the Co-Issuers or the Trustee by the Collateral Manager;

(g)    the Rating Agencies by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, addressed to Moody's Investors Service, 99 Church Street, New York, New York 10007, telecopy no. (212) 553-0355, Attention:  CBO/CLO Monitoring and to Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041, telecopy no. 212-438-2664, Attention: Structured Finance Ratings, Asset-Backed Securities - CBO/CLO Surveillance, or via electronic mail to CDOsurveillance@standardandpoors.com;

(h)    the Credit Enhancer by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form, addressed to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504, Telephone:  (914) 765-3068, Facsimile: (914) 765-3555, Attention: Insured Portfolio Management-Attn: CDO Group;

(i)    any Hedge Counterparty by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to such Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by such Hedge Counterparty.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective:  (i) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (ii) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); and (iii) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

Section 18.4.    <u>Notices and Reports to Noteholders; Waiver</u>

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Notes of any event,

(a)    such report or notice shall be sufficiently given to Holders of Notes if (i) in writing and mailed, first class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, or (ii) in the case of Monthly Reports, Note Valuation Reports and Noteholder Reports, posted to the Trustee's website, in each

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050157

- 222 -

case not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice; and

(b)    such report or notice shall be in the English language.

Such reports and notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Credit Enhancer and the Holder of any Note shown on the Note Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note or to the Credit Enhancer shall affect the sufficiency of such notice with respect to other Holders of Notes or the Credit Enhancer, as the case may be.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 18.5.    Effect of Headings and Table of Contents

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 18.6.    Successors and Assigns

All covenants and agreements in this Indenture by the Zohar Obligors shall bind their respective successors and assigns, whether so expressed or not.

Section 18.7.    Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 18.8.    Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Noteholders and each Hedge Counterparty, any benefit or any legal or equitable right, remedy or claim under this Indenture.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050158

- 223 -

Section 18.9.    Governing Law

THIS INDENTURE AND EACH NOTE AND ALL MATTERS ARISING OUT OF
OR RELATING TO THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN
ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 18.10.    Submission to Jurisdiction

The Zohar Obligors/Co-Issuers hereby irrevocably submit to the non-exclusive
jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of
New York in any action or proceeding arising out of or relating to the Notes or this Indenture, and the
Zohar Obligors hereby irrevocably agree that all claims in respect of such action or proceeding may be
heard and determined in such New York State or Federal court. The Zohar Obligors hereby irrevocably
waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the
maintenance of such action or proceeding. The Zohar Obligors irrevocably consent to the service of any
and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the
office of the Zohar Obligors' agent set forth in Section 7.2. The Zohar Obligors agree that a final
judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions
by suit on the judgment or in any other manner provided by law.

Section 18.11.    Waiver of Jury Trial

EACH OF THE ZOHAR OBLIGORS HEREBY IRREVOCABLY WAIVES ANY AND
ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 18.12.    Counterparts

This instrument may be executed in any number of counterparts, each of which so
executed shall be deemed to be an original, but all such counterparts shall together constitute but one and
the same instrument.

Section 18.13.    Judgment Currency

This is an international financing transaction in which the specification of Dollars (the
"Specified Currency"), and the specification of the place of payment, as the case may be (the "Specified
Place"), is of the essence, and the Specified Currency shall be the currency of account in all events
relating to payments of or on the Notes. The payment obligations of the Co-Issuers under this Indenture,
the Credit Enhancement Agreement and the Notes shall not be discharged by an amount paid in another
currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount
so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking
procedures does not yield the amount of the Specified Currency at the Specified Place. If for the purpose
of obtaining judgment in any court it is necessary to convert a sum due hereunder or under the Note
Purchase Agreements in the Specified Currency into another currency (the "Second Currency"), the rate
of exchange which shall be applied shall be that at which in accordance with normal banking procedures
the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next
preceding that on which such judgment is rendered. The obligation of the Co-Issuers in respect of any
such sum due from the Co-Issuers hereunder shall, notwithstanding the rate of exchange actually applied
in rendering such judgment, be discharged only to the extent that on the Business Day following receipt
by the Trustee of any sum adjudged to be due hereunder or under the Note Purchase Agreements or the
Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                                    PP050159
ON BEHALF OF PATRIARCH PARTNERS LLC

- 224 -

and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Co-Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class of Notes constituted additional principal owing in respect of such Class of Notes), agree to indemnify the Trustee, the Credit Enhancer and each Noteholder against, and to pay the Trustee or such Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee, the Credit Enhancer or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050160

**IN WITNESS WHEREOF**, we have set our hands as of the _13th_ day of November, 2003.

ZOHAR CDO 2003-1, LIMITED,
as Issuer

By: _____

Name:    **Chris Watler**

Title:    Director

NY3:#7320267                              Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                              PP050161

ZOHAR CDO 2003-1, CORP.,
as Co-Issuer

By: _____
Name:  **Donald J. Puglisi**
Title:  **President**

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY\1589267
Indenture

PP050162

ZOHAR CDO 2003-1, LLC,
as Zohar Subsidiary

By:  ZOHAR CDO 2003-1, LIMITED
as Managing Member

By: _____

Name:  **Chris Watler**
Title:  Director

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050163
ON BEHALF OF PATRIARCH PARTNERS LLC

MBIA INSURANCE CORPORATION,
as Credit Enhancer

By:
Name:   Adam M. Carta
Title:   Assistant Secretary

NY3:#7320267                                        Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP050164

CDC FINANCIAL PRODUCTS INC.

as Class A-1 Note Agent

By: _____
Name: Ralph J. Inglese
Title: Managing Director


By: _____
Name:    Kathy Lynch
Title:    Director

NY3:#7320267

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050165

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By: _____
Name:
Title:

SCHEDULE A

## SCHEDULE OF COLLATERAL DEBT OBLIGATIONS

1.   $1,915,728.16 Term Loan A of Metalforming Technologies, Inc. governed by Third Amended and Restated Credit Agreement dated as of October 31, 2003, as amended.

2.   $656,821.08 Term Loan B of Metalforming Technologies, Inc. governed by Third Amended and Restated Credit Agreement  dated as of October 31, 2003, as amended.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050167

INDEX

SCHEDULE B

## LIBOR FORMULA

With respect to any Interest Period commencing on the Closing Date, "LIBOR" for purposes of calculating the interest rate in respect of the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for such Interest Period will be a rate per annum equal to 1.41276%.

With respect to each Interest Period commencing after the Closing Date, "LIBOR" for purposes of calculating the interest rate in respect of the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for such Interest Period will be determined by the Calculation Agent in accordance with the following provisions:

(i)    LIBOR for any Interest Period shall equal the offered rate, as determined by the Calculation Agent, for U.S. Dollar deposits in the term of such Interest Period which appears on Telerate Page 3750 (or such other page as may replace such Telerate 3750 for the purpose of displaying comparable rates) as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date. "LIBOR Determination Date" means, with respect to any Interest Period, the second London Banking Day prior to the first day of such Interest Period.

(ii)    If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Eurodollar deposits in the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Issuer) are quoting on the relevant LIBOR Determination Date for U.S. Dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), to the principal London offices of leading banks in the London interbank market.

(iii)    If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

For purposes of clause (i) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clauses (ii) and (iii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

- 2 -

As used herein:

"Base Rate" means a fluctuating rate of interest determined by the Calculation Agent as being the higher of (i) the Federal Funds Rate and (ii) the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for U.S. Dollar loans. Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"Base Rate Reference Bank" means Citibank, N.A., or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"Business Day" means a day on which commercial banks and foreign exchange markets settle payments in New York City, the Cayman Islands (or such other jurisdiction in which the Issuer may be incorporated as permitted by the Indenture) and any other city in which the principal corporate trust office of the Trustee is located and, in the case of the final payment of principal of any Note or redemption of any Preference Share, the place of presentation of such Note or Preference Share.

"LIBOR Business Day" means a day on which commercial banks and foreign exchange markets settle payments in Dollars in New York and London.

"London Banking Day" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent.

The determination of the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

In respect of any Interest Period that commences after the Closing Date and on any day that is not a Payment Date, LIBOR shall be determined through the use of a straight-line interpolation by reference to two rates calculated in accordance with paragraphs (i) and (ii) above, one of which rates shall be determined as if the maturity of the applicable deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which rates shall be determined as if the maturity of the applicable deposits referred to therein were the period of time for which rates are available next longer than the Interest Period.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050169

INDEX

SCHEDULE C-1

MOODY'S INDUSTRY CLASSIFICATION GROUP LIST

1.  Aerospace and Defense
2.  Automobile
3.  Banking
4.  Beverage, Food and Tobacco
5.  Buildings and Real Estate
6.  Chemicals, Plastics and Rubber
7.  Containers, Packaging and Glass
8.  Personal and Non-Durable Consumer Products (Manufacturing Only)
9.  Diversified/Conglomerate Manufacturing
10. Diversified/Conglomerate Service
11. Diversified Natural Resources, Precious Metals and Minerals
12. Ecological
13. Electronics
14. Finance
15. Farming and Agriculture
16. Grocery
17. Healthcare, Education and Childcare
18. Home and Office Furnishings, Housewares and Durable Consumer Products
19. Hotels, Motels, Inns and Gaming
20. Insurance
21. Leisure and Amusement
22. Machinery (Non-Agriculture, Non-Construction and Non-Electronic)
23. Mining, Steel, Iron and Non-Precious Metals
24. Oil and Gas
25. Personal, Food and Miscellaneous Services
26. Printing and Publishing
27. Cargo Transport
28. Retail Store
29. Telecommunications
30. Textiles and Leather
31. Personal Transportation

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050170

INDEX

- 2 -

32.    Utilities

33.    Broadcasting and Entertainment

34.    Structured Finance Obligations

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050171

SCHEDULE C-2

## STANDARD & POOR'S INDUSTRY CLASSIFICATION GROUP LIST

1. Aerospace and defense
   Aircraft manufacturer/components
   Arms and ammunition
2. Air transport
3. Automotive
   Manufacturers
   Parts and equipment
   Tire and rubber
4. Beverage and tobacco
5. Broadcast radio and television
6. Brokerages/securities dealers/investment houses
7. Building and development
   Builders
   Land development/real estate
   Mobile homes
   REITs
8. Business equipment and services
   Graphic arts
   Office equipment/computers
   Data processing service bureaus
   Computer software
9. Cable television
10. Chemical/plastics
    Coatings/paints/varnishes
11. Clothing/textiles
12. Conglomerates
13. Containers and glass products
14. Cosmetics/toiletries
15. Drugs
16. Ecological services and equipment
    Waste disposal services and equipment

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

17.   Electronics/electric
      Equipment
      Component
18.   Equipment leasing
      Auto leasing/rentals
      Equipment leasing
      Data processing equipment
      Service/leasing
19.   Farming/agriculture
      Agricultural products and equipment
      Fertilizers
20.   Financial intermediaries
      Banking
      Finance companies
21.   Food/drug retailers
22.   Food products
23.   Food service
      Food service/restaurants
      Vending
24.   Forest products
      Building materials
      Paper products and containers
25.   Health care
      Medical equipment/supply
      Hospital management
26.   Home furnishings
      Appliances
      Furniture, fixtures
      Housewares
27.   Hotels/motels/inns and casinos
28.   Industrial equipment
      Machinery
      Manufacturing/industrial
      Specialty instruments
29.   Insurance

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050173

INDEX

30.  Leisure
     Leisure goods
     Leisure activities/motion pictures
31.  Nonferrous metals/minerals
     Aluminum producers
     Other metal/mineral producers
     Mining (including coal)
32.  Oil and gas
     Producers/refiners
     Gas pipelines
33.  Publishing
34.  Rail industries
     Railroads
     Rail equipment
35.  Retailers (other than food/drug)
36.  Steel
37.  Surface transport
     Shipping/shipbuilding
     Trucking
38.  Telecommunications/cellular communications
39.  Utilities
     Electric
     Local gas
     Water
40.  Structured Finance Obligations

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050174

INDEX

## DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |

NY3:#7320267

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050175

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |

NY3:#7320267

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050176

EXHIBIT A-1

[FORM OF CLASS A NOTE]

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") THAT IS (I) A "QUALIFIED PURCHASER" AS DEFINED IN SECTION 2(a)51 OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), (II) A "KNOWLEDGEABLE EMPLOYEE" WITH RESPECT TO THE ISSUER WITHIN THE MEANING OF RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT OR (III) A COMPANY BENEFICIALLY OWNED EXCLUSIVELY BY ONE OR MORE "QUALIFIED PURCHASERS" AND/OR "KNOWLEDGEABLE EMPLOYEES" WITH RESPECT TO THE ISSUER (ANY PERSON IN (I), (II) OR (III) A "QUALIFIED PURCHASER"), PURCHASING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF ANOTHER QUALIFIED INSTITUTIONAL BUYER, TO WHOM NOTICE IS GIVEN, IN EACH CASE, THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY RULE 144A, OR (2) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a) UNDER THE SECURITIES ACT THAT IS ALSO A QUALIFIED PURCHASER, (B) IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND (C) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. NEITHER OF THE CO-ISSUERS HAS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER) IF SUCH TRANSFER (A) WOULD BE MADE TO A TRANSFEREE WHO IS A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) THAT IS NOT A QUALIFIED PURCHASER THAT IS A NATURAL PERSON OR A COMPANY EACH OF WHOSE BENEFICIAL OWNERS IS A QUALIFIED PURCHASER (AS SUCH TERMS ARE DEFINED IN OR UNDER THE INVESTMENT COMPANY ACT), (B) WOULD HAVE THE EFFECT OF REQUIRING EITHER OF THE CO-ISSUERS OR THE COLLATERAL TO REGISTER AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT, (C) WOULD BE MADE TO A TRANSFEREE WHO IS A U.S. RESIDENT THAT IS A FLOW-THROUGH INVESTMENT VEHICLE OTHER THAN A QUALIFYING INVESTMENT VEHICLE, OR (D) WOULD BE MADE TO A PERSON WHO IS OTHERWISE UNABLE TO MAKE THE ACKNOWLEDGEMENTS, REPRESENTATIONS AND AGREEMENTS REQUIRED BY THE APPLICABLE TRANSFER CERTIFICATE ATTACHED AS AN EXHIBIT TO THE INDENTURE REFERRED TO HEREIN. ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050177

INDEX

## ZOHAR CDO 2003-1, LIMITED
## ZOHAR CDO 2003-1, CORP.

[CLASS A-1 FLOATING RATE SENIOR SECURED REVOLVING NOTE DUE 2015]
[CLASS A-2 FLOATING RATE SENIOR SECURED DELAYED DRAWDOWN NOTE DUE 2015]
[CLASS A-3a FLOATING RATE SENIOR SECURED DELAYED DRAWDOWN NOTE DUE 2015]
[CLASS A-3b FLOATING RATE SENIOR SECURED DELAYED DRAWDOWN NOTE DUE 2015]

CUSIP # [_____]¹ [_____]² [_____]³ [_____]⁴                November 13, 2003

Certificate No. [A-1]/[_____]                             U.S. $[_____]

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), and ZOHAR CDO 2003-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Note) on the Payment Date in November, 2015 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of

[Class A-1 Floating Rate Senior Secured Revolving Notes due 2015 (the "Class A-1 Notes")]
[Class A-2 Floating Rate Senior Secured Delayed Drawdown Notes due 2015 (the "Class A-2 Notes")]
[Class A-3a Floating Rate Senior Secured Delayed Drawdown Notes due 2015 (the "Class A-3a Notes")]
[Class A-3b Floating Rate Senior Secured Delayed Drawdown Notes due 2015 (the "Class A-3b Notes")]

issued and to be issued under an Indenture dated as of November 13, 2003 (as supplemented and otherwise modified and in effect from time to time, the "Indenture"), among the Issuer, the Co-Issuer, Zohar CDO 2003-1, LLC (the "Zohar Subsidiary"), MBIA Insurance Company (the "Credit Enhancer"), CDC Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent"), and U.S. Bank National Association, as trustee (together with any successor trustee as permitted under the Indenture, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein (including, without limitation, the Note Purchase Agreement related hereto) for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

The Co-Issuers promise to pay interest on the principal amount of this Note outstanding from time to time, from the Closing Date to but excluding the Stated Maturity, in arrears on each Payment Date

---

¹ Insert for Class A-1 Note.
² Insert for Class A-2 Note.
³ Insert for Class A-3a Note.
⁴ Insert for Class A-3b Note.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP        PP050178
ON BEHALF OF PATRIARCH PARTNERS LLC

at a rate per annum equal to the applicable [Class A-1] [Class A-2] [Class A-3a][Class A-3b][5] Note Interest Rate as set forth in the Indenture, promise to pay [Class A-1 Commitment Fee] [Class A-2 Commitment Fee] [Class A-3 Commitment Fee][6] ("Commitment Fee") on the Aggregate Undrawn Amount of this Note on each Payment Date at a rate per annum equal to the [Class A-1 Commitment Fee Rate][Class A-2 Commitment Fee Rate][Class A-3 Commitment Fee Rate] as set forth in the Indenture, and promise to pay the other amounts stated to be payable by them pursuant to the applicable Note Purchase Agreement, all in accordance with the Priority of Payments and the other terms set forth in the Indenture. Interest and Commitment Fees accrued with respect to each Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the outstanding principal amount of this Note at the beginning of such Interest Period and (in the case of interest) the Note Interest Rate for such Interest Period; provided that, in the case of the Interest Periods ending prior to the Initial Payment Date, interest accrued with respect to each such Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the increase in the outstanding principal amount of this Note at the beginning of such Interest Period and the Note Interest Rate for such Interest Period (it being understood that on the Closing Date, such increase is equal to the outstanding principal amount of this Note as of the close of business on such day).

This Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture. Amounts may be borrowed, from time to time, under this Note on and after the Closing Date, in the manner and with the effect provided in the Indenture and the Note Purchase Agreement. [In addition, prepayments of principal of this Class A-1 Note may be made in the manner and with the effect provided in Section 9.5 of the Indenture.][7][Amounts borrowed under this Note, once repaid, cannot be reborrowed.][8]

The principal of and interest and Commitment Fee and other amounts payable in respect of this Note pursuant to the Note Purchase Agreement which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date. Any such interest and Commitment Fee not so punctually paid shall forthwith cease to be payable to the Holder on such Record Date, and will instead be payable to the Person in whose name this Note is registered at the close of business on a subsequent Record Date.

Interest will cease to accrue on this Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless Default is otherwise made with respect to such payments. To the extent lawful and enforceable, interest on any Defaulted Interest shall accrue hereon to the extent provided in Section 2.6 of the Indenture.

[Payments of principal of and interest on this Note and the Class A-3 Commitment Fee with respect to this Note are subordinated to the payments on each Payment Date of principal of, interest on and Class A-3 Commitment Fee in respect of the Class A-3a Notes in accordance with Section 11.7 of the Indenture.][9]

---

[5] Insert as appropriate.
[6] Insert as appropriate.
[7] Insert for Class A-1 Notes
[8] Insert for all Class A Notes (other than Class A-1 Note)
[9] Insert for Class A-3b Notes.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050179
ON BEHALF OF PATRIARCH PARTNERS LLC

The obligations of the Co-Issuers under this Note, the Note Purchase Agreement and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Collateral. The payments of principal of and interest on this Note and Commitment Fee and all other amounts due on this Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

[The Notes are entitled to the benefits of a financial guaranty insurance policy (the "Policy") issued by the Credit Enhancer, pursuant to which the Credit Enhancer has unconditionally guaranteed payments of Insured Payments (as defined in the Policy) on each Payment Date, all as more fully set forth in the Indenture and subject to the terms of the Policy.][10]   The Notes are entitled to the benefits of a supplemental financial guaranty insurance policy (the "Supplemental Policy") issued by the Credit Enhancer, pursuant to which the Credit Enhancer has unconditionally guaranteed payments of Insured Payments (as defined in the Supplemental Policy) on each Payment Date, all as more fully set forth in the Indenture and subject to the terms of the Supplemental Policy.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. It is also further understood that the foregoing shall not limit the rights of the Trustee and the Holder of this Note [or the obligations of the Credit Enhancer under the Credit Enhancement][11] or the obligations of the Credit Enhancer under the Supplemental Credit Enhancement.

All reductions in the principal amount of this (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Note issued upon the registration of transfer of this Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Note.

[To the extent that this Note has been paid with proceeds of the Credit Enhancement, this Note shall continue to remain Outstanding for purposes of the Indenture until the Credit Enhancer has been paid as subrogee thereunder or reimbursed under the Credit Enhancement Agreement, and the Credit Enhancer shall be deemed the Holder hereof, to the extent of any payments hereon made by the Credit Enhancer, in accordance with the Indenture (including, without limitation, Section 16.3 thereof).][12]   To the extent that this Note has been paid with proceeds of the Supplemental Credit Enhancement, this Note shall continue to remain Outstanding for purposes of the Indenture until the Credit Enhancer has been paid as subrogee thereunder or reimbursed under the Supplemental Credit Enhancement Agreement, and the Credit Enhancer shall be deemed the Holder hereof, to the extent of any payments hereon made by the Credit Enhancer, in accordance with the Indenture (including, without limitation, Section 16A.3 thereof).

For the avoidance of doubt, all funds advanced by the Holder pursuant to a Notice of Borrowing (delivered pursuant to, and as defined in, the Note Purchase Agreement) received from the Trustee shall

---

[10] Insert for Class A-1 Notes and Class A-2 Notes.
[11] Insert for Class A-1 Notes and Class A-2 Notes.
[12] Insert for Class A-1 Notes and Class A-2 Notes.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050180

be deemed to be outstanding under this Note, regardless of whether the conditions to the related Borrowing set forth in the Note Purchase Agreement or in the Indenture were in fact satisfied, until repaid in accordance with the terms of the Indenture and this Note.

This Note is a registered Note pursuant to Section 2.4 of the Indenture and is subject to certain transfer restrictions and conditions as provided therein. Title to this Note shall pass solely by registration in the Note Register kept by the Note Registrar. The Co-Issuers, the Trustee, the Collateral Manager, the Class A-1 Note Agent, the Credit Enhancer and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and Commitment Fee and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall (subject to the subrogation rights of the Credit Enhancer in connection with the Credit Enhancement and in connection with the Supplemental Credit Enhancement) be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed.

ZOHAR CDO 2003-1, LIMITED

By:_____
    Name:
    Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050181

ZOHAR CDO 2003-1, CORP.

By:_____
   Name:
   Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050182

CERTIFICATE OF AUTHENTICATION

     This is one of the [Class A-1 Floating Rate Senior Secured Revolving Notes] [Class A-2 Floating Rate Senior Secured Delayed Drawdown Notes] [Class A-3a Floating Rate Senior Secured Delayed Drawdown Notes] [Class A-3b Floating Rate Senior Secured Delayed Drawdown Notes][13] referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
Authorized Signatory

---

[13] Insert as appropriate.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050183

ASSIGNMENT FORM

For value received_____

hereby sells, assigns and transfers unto

_____

_____
Please insert social security or
other identifying number of assignee

Please print or type name and address,
including zip code, of assignee:

_____

_____

_____

_____

the within Note and does hereby irrevocably constitute and appoint _____ Attorney to transfer the
Note on the books of the Co-Issuers with full power of substitution in the premises.

Date:_____        Your Signature:_____
                                                (Sign exactly as your name
                                                appears on the Note)

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

EXHIBIT A-2

## [FORM OF CLASS B NOTE]

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR CDO 2003-1, LIMITED

### CLASS B ZERO COUPON SECOND PRIORITY SECURED NOTE DUE 2018

CUSIP # [_____]                                                         November 13, 2003
Certificate No. B/[___]                                                      U.S.$[_____]

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promise to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class B Note on the Payment Date in November, 2018 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class B Zero Coupon Second Priority Secured Notes due 2018 (the "Class B Notes") issued and to be issued under an Indenture dated as of November 13, 2003, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar CDO 2003-1, Corp. (the "Co-Issuer"), Zohar CDO 2003-1, LLC, MBIA Insurance Company (the "Credit Enhancer"), CDC Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent"), and U.S. Bank National Association, as trustee (together with any successor trustee as permitted under the Indenture, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein (including, without limitation, the Note Purchase Agreement related hereto) for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Credit Enhancer, the Class A-1 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class B Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

A portion of the principal amount of this Class B Note may be reduced in the circumstances and to the extent provided in the Indenture.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050185

The principal of this Class B Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The payments of principal of this Class B Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class B Note (or one or more predecessor Class B Notes) effected pursuant to Section 7.13 of the Indenture or by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class B Note issued upon the registration of transfer of this Class B Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class B Note.

This Class B Note is a registered Note pursuant to Section 2.4 of the Indenture and neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050186

or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050187

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR CDO 2003-1, LIMITED.

By:_____
    Name:
    Title:

CERTIFICATE OF AUTHENTICATION

This is one of the Class B Zero Coupon Second Priority Secured Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
    Authorized Signatory

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050188

ASSIGNMENT FORM

For value received_____

hereby sells, assigns and transfers unto

_____

_____
Please insert social security or
other identifying number of assignee

Please print or type name and address,
including zip code, of assignee:

_____

_____

_____

_____

the within Note and does hereby irrevocably constitute and appoint _____ Attorney to transfer the
Note on the books of the Issuer with full power of substitution in the premises.

Date:_____        Your Signature:_____
                              (Sign exactly as your name
                              appears on the Note)

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050189

**INDEX**

EXHIBIT A-3

## [FORM OF CLASS C NOTE]

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR CDO 2003-1, LIMITED

### CLASS C ZERO COUPON THIRD PRIORITY SECURED NOTE DUE 2018

CUSIP # [_____]                                      [_____], 20[___]
Certificate No. C/[___]                                  U.S.$[_____]

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promise to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class C Note on the Payment Date in November, 2018 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class C Zero Coupon Third Priority Secured Notes due 2018 (the "Class C Notes") issued and to be issued under an Indenture dated as of November 13, 2003, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar CDO 2003-1, Corp. (the "Co-Issuer"), Zohar CDO 2003-1, LLC, MBIA Insurance Company (the "Credit Enhancer"), CDC Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent"), and U.S. Bank National Association, as trustee (together with any successor trustee as permitted under the Indenture, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein (including, without limitation, the Note Purchase Agreement related hereto) for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Credit Enhancer, the Class A-1 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class C Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

The principal of this Class C Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Class C Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050190

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The payments of principal of this Class C Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class C Note (or one or more predecessor Class C Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class C Note issued upon the registration of transfer of this Class C Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class C Note.

This Class C Note is a registered Note pursuant to Section 2.4 of the Indenture, neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050191

charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class C Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050192

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR CDO 2003-1, LIMITED.

By:_____
   Name:
   Title:

CERTIFICATE OF AUTHENTICATION

This is one of the Class C Zero Coupon Third Priority Secured Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
       Authorized Signatory

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050193

ASSIGNMENT FORM

For value received_____

hereby sells, assigns and transfers unto

_____

_____
Please insert social security or
other identifying number of assignee

Please print or type name and address,
including zip code, of assignee:

_____

_____

_____

_____

the within Note and does hereby irrevocably constitute and appoint _____ Attorney to transfer the
Note on the books of the Issuer with full power of substitution in the premises.

Date:_____        Your Signature:_____
                                              (Sign exactly as your name
                                              appears on the Note)

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

EXHIBIT B-1

FORM OF CLASS A NOTE CERTIFICATE

ZOHAR CDO 2003-1, Limited
ZOHAR CDO 2003-1, Corp.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town
Grand Cayman, Cayman Islands

U.S. Bank National Association,
as Trustee
One Federal Street
Third Floor
Boston, MA 02110

Re:   [Class A-1 Floating Rate Senior Secured Revolving Notes due 2015] [Class A-2 Floating Rate Senior Secured Delayed Drawdown Notes due 2015] [Class A-3a Floating Rate Senior Secured Delayed Drawdown Notes due 2015] [Class A-3b Floating Rate Senior Secured Delayed Drawdown Notes due 2015] (the "Notes")

Reference is hereby made to the Indenture dated as of November 13, 2003 (the "Indenture") among ZOHAR CDO 2003-1, Limited, ZOHAR CDO 2003-1, Corp., ZOHAR CDO 2003-1, LLC, MBIA Insurance Company, CDC Financial Products Inc. and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of [Class A-1 Notes] [Class A-2 Notes] [Class A-3a Notes] [Class A-3b Notes] registered in the name of [insert name of transferor] (the "Transferor"). The Transferor has requested a transfer of such Class A Notes for Class A Notes registered in the name of [insert name of transferee] (the "Transferee"). Delivered herewith is a Transferee Certification completed by the Transferee.

In connection with such request, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and the Notes and (ii) (I) under Rule 144A ("Rule 144A") of the U.S. Securities Act of 1933, as amended (the "Securities Act") to a Transferee that the Transferor reasonably believes is a "qualified institutional buyer" (within the meaning of Rule 144A) (a "Qualified Institutional Buyer") that is acquiring such Notes for its own account or for the account of another Qualified Institutional Buyer to whom notice has been given that the transfer is being made in reliance on Rule 144A, or (II) to an "accredited investor" within the meaning of Rule 501(a) under the Securities Act, or (III) pursuant to another available exemption from the requirements of the Securities Act, provided that the Co-Issuers or the Trustee may require the delivery of an opinion of counsel, certification and/or other information satisfactory to them as to any transfer pursuant to this clause (III), and in the case of (I), (II) or (III) to (x) a "Qualified Purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050195

Company Act"), (y) a "Knowledgeable Employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (z) a company beneficially owned exclusively by one or more "Qualified Purchasers" and/or "Knowledgeable Employees" with respect to the Issuer (any person in (x), (y) or (z), a "Qualified Purchaser") and (iii) any applicable securities laws of any state of the United States or any other jurisdiction.

This certificate and the statements contained herein are made for your benefit.

[INSERT NAME OF TRANSFEROR]

By:_____
    Name:
    Title:

Dated: _____, _____

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050196

FORM OF TRANSFEREE CERTIFICATION


ZOHAR CDO 2003-1, Limited
ZOHAR CDO 2003-1, Corp.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town
Grand Cayman, Cayman Islands

U.S. Bank National Association,
as Trustee
One Federal Street
Third Floor
Boston, MA  02110

       The undersigned (the "Transferee") intends to purchase U.S.$_____ principal amount of [Class A-1 Notes] [Class A-2 Notes] [Class A-3a Notes] [Class A-3b Notes] (the "Notes") issued by ZOHAR CDO 2003-1, Limited (the "Issuer") and ZOHAR CDO 2003-1, Corp. (the "Co–Issuer" and, together with the Issuer, the "Co–Issuers") from the Transferor named in the Transfer Certificate to which this Transferee Certification is attached.  In connection with the registration of the transfer of such Notes, the Transferee hereby executes and delivers to each of you this "Transferee Certification" in which the Transferee certifies to each of you the information set forth herein.

A.    **General Information**

1.    Print Full Name of Transferee:    _____

2.    Name in which Notes should
    be registered:    _____

3.    Address and Contact Person
    for Notices:    _____
    _____
    _____
    _____
    _____

4.    Telephone Number:    _____

5.    Telecopier Number:    _____

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050197

6.  Permanent Address (if
    different than above):      _____
                               _____
                               _____
                               _____
                               _____

7.  U.S. Taxpayer
    Identification or Social
    Security Number (if any):   _____

8.  Payment Instructions:       _____
                               _____
                               _____
                               _____
                               _____

9.  Instructions for delivery
    of Notes:                   _____
                               _____
                               _____
                               _____
                               _____

B.  **Status**

1.  The Transferee is (i) a "qualified institutional buyer" (within the meaning of Rule 144A ("Rule 144A") under the U.S. Securities Act of 1933, as amended (the "Securities Act")) (a "Qualified Institutional Buyer") and is acquiring such Notes for its own account or for the account of another Qualified Institutional Buyer to whom notice has been given that the transfer is being made in reliance on Rule 144A, or (ii) an "accredited investor" within the meaning of Rule 501(a) under the Securities Act and, in the case of (i) or (ii), is (I) a "Qualified Purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), (II) a "Knowledgeable Employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (III) a company beneficially owned exclusively by one or more "Qualified Purchasers" and/or "Knowledgeable Employees" with respect to the Issuer (any person in (I), (II) or (III), a "Qualified Purchaser").

2.  The Transferee agrees that, prior to any sale or other transfer by it of any of the Notes, it will obtain from the subsequent transferee and deliver to the Note Registrar a duly executed transferee certificate substantially in the form attached as an exhibit to the Indenture and such other certificates and other information as the Co-Issuers, the Collateral Manager or the Trustee may reasonably require to confirm that the proposed transfer complies with the restrictions in the legend placed on such Notes and in the Indenture.

3.  The Transferee understands that the Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act, and, if in the future the Transferee decides to offer,

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050198

resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged, or otherwise transferred only (i) in accordance with the transfer restrictions set forth in the Indenture and the Notes and (ii) (I) under Rule 144A ("Rule 144A") of the U.S. Securities Act of 1933, as amended (the "Securities Act") to a Transferee that the Transferor reasonably believes is a "qualified institutional buyer" (within the meaning of Rule 144A) (a "Qualified Institutional Buyer") that is acquiring such Notes for its own account or for the account of another Qualified Institutional Buyer to whom notice has been given that the transfer is being made in reliance on Rule 144A or (II) to an "accredited investor" within the meaning of Rule 501(a) under the Securities Act, or (III) pursuant to another available exemption from the requirements of the Securities Act, provided that the Co-Issuers or the Trustee may require the delivery of an opinion of counsel, certification and/or other information satisfactory to them as to any transfer pursuant to this clause (III), and in the case of (I), (II) or (III) to (x) a "Qualified Purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), (y) a "Knowledgeable Employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (z) a company beneficially owned exclusively by one or more "Qualified Purchasers" and/or "Knowledgeable Employees" with respect to the Issuer (any person in (x), (y) or (z), a "Qualified Purchaser") and (iii) any applicable securities laws of any state of the United States or any other jurisdiction.

4.     The Transferee understands that no transfer of a Note (or any interest therein) may be made (and the Trustee or Note Registrar will not recognize any such transfer) if such transfer (a) would be made to a transferee that is not a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser, (b) would have the effect of requiring either of the Co-Issuers or the Collateral to register as an investment company under the Investment Company Act or (c) would be made to a transferee that (i) would be an investment company but for the exception in Section 3(c)(1) or 3(c)(7) of the Investment Company Act and the amount of such transferee's investment in the Notes exceeds 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the transferee; (ii) is an entity that was organized or reorganized for the specific purpose of acquiring such Note or (iii) is a transferee as to which any person owning any equity or similar interest in the transferee exercises control, on an investment-by-investment basis, over the amount of such person's contribution to any investment made by the transferee (any transferee described in this clause (c), a "Flow-Through Investment Vehicle") other than a Qualifying Investment Vehicle. The Transferee further understands and agrees that any transfer in violation of the applicable provisions of the Indenture will be void. A "Qualifying Investment Vehicle" is a Flow-Through Investment Vehicle as to which (i) all of the beneficial owners of any securities issued by the Flow-Through Investment Vehicle have made, and as to which (in accordance with the document pursuant to which the Flow-Through Investment Vehicle was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Trustee each of the representations set forth herein (with appropriate modifications satisfactory to the Collateral Manager and to the Co-Issuers to reflect the indirect nature of their interests in the Notes) and (ii) if such entity is an "excepted investment company" as provided in Item 5 below, such entity meets the requirements set out in Item 5.

5.     The Transferee is Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser and the Transferee has checked the box or boxes below which are next to the categories under which the Transferee so qualifies:

☐     (A)     It is a company that (1) owns not less than $5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050199

incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Notes of the Co-Issuers unless each beneficial owner of the Transferee's securities is a Qualified Purchaser.

☐     (B)     It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐     (C)     It is a person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Notes of the Co-Issuers unless each beneficial owner of the Transferee's securities is a Qualified Purchaser.

☐     (D)     It is a Qualified Institutional Buyer acting for its own account, the account of another Qualified Institutional Buyer or the account of a Qualified Purchaser; provided:

       (1) that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25 million in securities of Issuers that are not affiliated persons of the dealer; and

       (2) that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☐     (E)     It is an entity in which each beneficial owner of the Transferee's securities is a Qualified Purchaser.

6.     If the Transferee is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050200

(i) all of the beneficial owners of outstanding securities (other than short-term paper) of the Transferee (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Transferee,

have consented to the Transferee's treatment as a Qualified Purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

7. Either (i) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan described in Section 4975(e)(1) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or an entity which is deemed to hold the assets of any such employee benefit plan or plan pursuant to 29 CFR §2510.3-101 or otherwise (each, a "Plan"), or (ii) the Transferee's acquisition, ownership and disposition of such Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any substantially similar federal, state or local law) for which an exemption is not applicable. In addition, if the Transferee is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

8. The Transferee understands and agrees that no Note may be sold, pledged or otherwise transferred in a denomination of less than the applicable minimum denomination set forth in the Indenture.

9. The Transferee agrees to inform each Transferee to which it transfers the Notes (or any interests therein) of the transfer restrictions (including certification, if any, and other requirements) in the Indenture.

10. The Transferee understands and agrees that a legend substantially to the foregoing effect must be placed on each Note.

11. If the Transferee is not a United States Person (as defined in the Indenture), it represents to either (A), (B) or (C) as follows:

☐ (A) It has attached an executed and duly completed Form W-8BEN and a statement that the beneficial owner of such Note is not a bank within the meaning of Code section 881(c)(3)(A), a 10% shareholder within the meaning of section 881(c)(3)(B) or a controlled foreign corporation within the meaning of section 881(c)(3)(C);

☐ (B) It has attached an executed and duly completed Form W-8ECI; or

☐ (C) It has attached an executed and duly completed Form W-8BEN entitling such purchaser to a complete exemption from withholding tax on interest and principal

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050201

payments in respect of such Note under an applicable tax treaty with the United States.

12. The Transferee is not a member of the public in the Cayman Islands.

13. The Transferee acknowledges that to the extent the Note is being transferred prior to the date upon which the [Class A-1 Commitment] [Class A-2 Commitment] [Class A-3 Commitment] in respect of such Note has expired, terminated or been reduced to zero, the Transferee has entered into a Note Purchase Agreement in respect of such Note.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050202

The Transferee understands that the foregoing acknowledgments, representations and agreements will be relied upon by the Trustee, the Collateral Manager, and the Co-Issuers for the purpose determining the eligibility of the Transferee to purchase Notes of the Co-Issuers.  The Transferee agrees to provide, if requested, any additional information that may be required to substantiate the Transferee's status as a Qualified Institutional Buyer or as a Qualified Purchaser or as an institutional "accredited investor" or to otherwise determine the eligibility of the Transferee to purchase Notes of the Co-Issuers.

Signatures:

_____
(Name of Entity)

By: _____
(Signature)

_____
(Print Name and Title)

Date: _____

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050203

EXHIBIT B-2

## FORM OF CLASS B NOTE CERTIFICATE

ZOHAR CDO 2003-1, Limited
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town
Grand Cayman, Cayman Islands

U.S. Bank National Association,
as Trustee
One Federal Street
Third Floor
Boston, MA  02110

Re:    Class B Zero Coupon Second Priority Secured Notes due 2018 (the "Notes")

Reference is hereby made to the Indenture dated as of November 13, 2003 (the "Indenture") among ZOHAR CDO 2003-1, Limited, ZOHAR CDO 2003-1, Corp., ZOHAR CDO 2003-1, LLC, MBIA Insurance Company, CDC Financial Products Inc. and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In accordance with the terms of the Indenture, the undersigned (the "Proposed Class B Holder") is required to deliver to you this Class B Note Certificate relating to the U.S.$_____ principal amount of Class B Notes to be registered in its name.

The Proposed Class B Holder hereby executes and delivers to each of you this Certificate in which it certifies to each of you the information set forth herein.

A.    **General Information**

1.    Print Full Name of Proposed
      Class B Holder:                     _____

2.    Name in which Notes should
      be registered:                      _____

3.    Address and Contact Person
      for Notices:                        _____
                                          _____
                                          _____
                                          _____
                                          _____

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050204

4.     Telephone Number: _____

5.     Telecopier Number: _____

6.     Permanent Address (if
different than above):
_____
_____
_____
_____
_____

7.     U.S. Taxpayer
Identification or Social
Security Number (if any): _____

8.     Payment Instructions:
_____
_____
_____
_____
_____

9.     Instructions for delivery
of Notes:
_____
_____
_____
_____
_____

**B.     Status**

1.     The Proposed Class B Holder is (i) a "qualified institutional buyer" (within the meaning of Rule 144A ("Rule 144A") under the U.S. Securities Act of 1933, as amended (the "Securities Act")) (a "Qualified Institutional Buyer") and is acquiring such Notes for its own account or for the account of another Qualified Institutional Buyer to whom notice has been given that the transfer is being made in reliance on Rule 144A, or (ii) an "accredited investor" within the meaning of Rule 501(a) under the Securities Act and, in the case of (i) or (ii), is (I) a "Qualified Purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), (II) a "Knowledgeable Employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (III) a company beneficially owned exclusively by one or more "Qualified Purchasers" and/or "Knowledgeable Employees" with respect to the Issuer (any person in (I), (II) or (III), a "Qualified Purchaser").

2.     [reserved]

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050205

3. The Proposed Class B Holder understands that (1) the Class B Notes have not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), the securities laws of any state of the United States or any other jurisdiction, and the Issuer has not been registered under the Investment Company Act and (2) no transfer or pledge of a Class B Note (or any interest herein) may be made (and the Trustee and the Note Registrar will not recognize any such transfer or pledge). Accordingly, an investor in the Class B Notes must be prepared to bear the economic risk of the investment for an indefinite period of time.

4. The Proposed Class B Holder represents to <u>each of</u> (A), (B), (C) and (D) below as follows:

☐  (A)  It is acting for its own account and not for the benefit of any other person or entity.

(B)  <u>Either</u>

☐  (1)  It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, <u>or</u>

☐  (2)  It was not formed for the purpose of holding Notes, Preference Shares or other equity interests of the Issuer and not more than 50% of the value of the interest of any of the Proposed Class B Holder's beneficial owners will be attributable to Notes, Preference Shares or other equity interests of the Issuer, <u>or</u>

☐  (3)  It will provide an opinion of a nationally recognized tax counsel to the effect that its acquisition of Notes will not cause the Issuer to be treated as a publicly traded partnership for U.S. federal income tax purposes and will provide such other representations and information as the Trustee in its sole discretion may request, in form and substance satisfactory to the Trustee.

☐  (C)  The Proposed Class B Holder is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of Notes to a derivative or swap counterparty) or cause any Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of Notes to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

☐  (D)  The Proposed Class B Holder is a United States Person (as defined in the Indenture).

5. [reserved]

6. The Proposed Class B Holder is a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser and the Proposed Class B Holder has checked the

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050206

box or boxes below which are next to the categories under which the Proposed Class B Holder so qualifies:

☐    (A)    It is a company that (1) owns not less than $5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Notes of the Issuer unless each beneficial owner of the Proposed Class B Holder's securities is a Qualified Purchaser.

☐    (B)    It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐    (C)    It is a person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Notes of the Issuer unless each beneficial owner of the Proposed Class B Holder's securities is a Qualified Purchaser.

☐    (D)    It is a Qualified Institutional Buyer acting for its own account, the account of another Qualified Institutional Buyer or the account of a Qualified Purchaser; provided:

(1) that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25 million in securities of Issuers that are not affiliated persons of the dealer; and

(2) that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**                                      PP050207

☐    (E)    It is an entity in which each beneficial owner of the Proposed Class B Holder's securities is a Qualified Purchaser.

7.    If the Proposed Class B Holder is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

    (i)    all of the beneficial owners of outstanding securities (other than short-term paper) of the Transferee (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

    (ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Proposed Class B Holder,

have consented to the Proposed Class B Holder's treatment as a Qualified Purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

8.    (a)    Is the Proposed Class B Holder, or is the Proposed Class B Holder acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a *"Plan"*), whether or not such Plan is subject to ERISA, and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a *"Benefit Plan Investor"*) pursuant to 29 C.F.R. §2510.3-101 (the *"Plan Asset Regulation"*) or otherwise.

    ☐ Yes ☐ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, are employee benefit plans within the meaning of Section 3(3) of ERISA even though they are generally are not subject to ERISA, and a Keogh plan covering no common law employees and an individual retirement account are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person) is held by Benefit Plan Investors (including an entity which is deemed to hold the assets of any such plan), would be deemed to hold the assets of one or more pursuant to the Plan Asset Regulation.

    (b)    Is the Proposed Class B Holder, or is the Proposed Class B Holder acting on behalf of, a "benefit plan investor" as defined in U.S. Department of Labor Regulations Section 2510.3-101 (a *"Benefit Plan Investor"*):

    ☐ Yes ☐ No

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050208

(c)    (1)   Is the Proposed Class B Holder a life insurance company?

☐ Yes  ☐ No

(c)    (2)   If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Proposed Class B Holder's interest in the Notes being acquired with the assets of the Proposed Class B Holder's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)    (3)   If the Proposed Class B Holder indicated to the question in (c)(2) above that general account assets are being used to acquire the Proposed Class B Holder's interest in the Notes, please complete the following:

_____% of such general account assets used to acquire Notes represent "plan assets" within the meaning of the Plan Asset Regulation

(d)    Is the Proposed Class B Holder a person who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, or an affiliate of any such person (each, a "***Controlling Person***").

☐ Yes  ☐ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)    The Proposed Class B Holder understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Preference Shares of the Issuer, both upon the original issuance of the Preference Shares and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Notes (if the Notes were treated as equity interests in the Issuer) or the Preference Shares for any reason.  Accordingly, the Proposed Class B Holder undertakes:

(i)    to inform the Issuer and the Trustee immediately of any change in the information provided in this paragraph,

(ii)    to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Trustee to make a determination with respect to the portion of the Notes of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii)    agrees to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the status of the Proposed Class B Holder

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050209

which results in the Proposed Class B Holder's becoming a "benefit plan investor" or a Controlling Person and

    (iv)    agrees to promptly dispose of its interests in the Notes if its becoming a "benefit plan investor" or a Controlling Person and its ownership of the Notes would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Notes being held by "benefit plan investors."

    (f)    If the Proposed Class B Holder is, or is acting on behalf of, a Plan, the Proposed Class B Holder represents and warrants that its acquisition, ownership and disposition of the Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any substantially similar federal, state or local law) for which an exemption is not applicable. In addition, if the Proposed Class B Holder is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares and/or Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

9.    The Proposed Class B Holder understands and agrees that the a portion of the principal amount of its Class B Notes may be reduced in the circumstances and to the extent provided in the Indenture.

10.    The Proposed Class B Holder understands and agrees that a legend summarizing certain of the foregoing matters will be placed on each Class B Note.

11.    The Proposed Class B Holder is not a member of the public in the Cayman Islands.

12.    The Proposed Class B Holder understands and agrees that the obligations of the Issuer under the Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The Proposed Class B Holder understands and agrees that no recourse shall be had for the payment of any amount owing in respect of the Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under the Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050210

13.  The Proposed Class B Holder understands and agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Proposed Class B Holder (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency proceeding filed or commenced against such Zohar Obligor by a Person other than the Proposed Class B Holder, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

The Proposed Class B Holder understands that the foregoing acknowledgments, representations and agreements will be relied upon by the Trustee and the Issuer for the purpose determining the eligibility of the Proposed Class B Holder to acquire Class B Notes of the Issuer. The Proposed Class B Holder agrees to provide, if requested, any additional information that may be required to substantiate the Proposed Class B Holder's status as a Qualified Institutional Buyer or as a Qualified Purchaser or Knowledgeable Employee or as an "accredited investor" or to otherwise determine the eligibility of the Proposed Class B Holder to hold Class B Notes of the Issuer.

Signatures:

_____
(Name of Entity)

By: _____
(Signature)

_____
(Print Name and Title)

Date:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050211

EXHIBIT B-3

## FORM OF CLASS C NOTE CERTIFICATE

ZOHAR CDO 2003-1, Limited
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town
Grand Cayman, Cayman Islands

U.S. Bank National Association,
as Trustee
One Federal Street
Third Floor
Boston, MA  02110

Re:   Class C Zero Coupon Third Priority Secured Notes due 2018 (the "Notes")

Reference is hereby made to the Indenture dated as of November 13, 2003 (the "Indenture") among ZOHAR CDO 2003-1, Limited, ZOHAR CDO 2003-1, Corp., ZOHAR CDO 2003-1, LLC, MBIA Insurance Company, CDC Financial Products Inc. and U.S. Bank National Association, as Trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In accordance with the terms of the Indenture, the undersigned (the "Proposed Class C Holder") is required to deliver to you this Class C Note Certificate relating to the U.S.$_____ principal amount of Class C Notes to be registered in its name.

The Proposed Class C Holder hereby executes and delivers to each of you this Certificate in which it certifies to each of you the information set forth herein.

A.   **General Information**

1.   Print Full Name of Proposed
     Class C Holder:                         _____


2.   Name in which Notes should
     be registered:                          _____

3.   Address and Contact Person
     for Notices:                            _____
                                             _____
                                             _____
                                             _____
                                             _____

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050212

INDEX

4.    Telephone Number: _____

5.    Telecopier Number: _____

6.    Permanent Address (if
different than above): _____
_____
_____
_____

7.    U.S. Taxpayer
Identification or Social
Security Number (if any): _____

8.    Payment Instructions: _____
_____
_____
_____
_____

9.    Instructions for delivery
of Notes: _____
_____
_____
_____

**B.**    **Status**

1.    The Proposed Class C Holder is (i) a "qualified institutional buyer" (within the meaning of Rule 144A ("Rule 144A") under the U.S. Securities Act of 1933, as amended (the "Securities Act")) (a "Qualified Institutional Buyer") and is acquiring such Notes for its own account or for the account of another Qualified Institutional Buyer to whom notice has been given that the transfer is being made in reliance on Rule 144A, or (ii) an "accredited investor" within the meaning of Rule 501(a) under the Securities Act and, in the case of (i) or (ii), is (I) a "Qualified Purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), (II) a "Knowledgeable Employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (III) a company beneficially owned exclusively by one or more "Qualified Purchasers" and/or "Knowledgeable Employees" with respect to the Issuer (any person in (I), (II) or (III), a "Qualified Purchaser").

2.    [reserved]

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050213

3.   The Proposed Class C Holder understands that (1) the Class C Notes have not been and will
not be registered under the Securities Act of 1933, as amended (the "Securities Act"), the
securities laws of any state of the United States or any other jurisdiction, and the Issuer has
not been registered under the Investment Company Act and (2) no transfer or pledge of a
Class C Note (or any interest herein) may be made (and the Trustee and the Note Registrar
will not recognize any such transfer or pledge).  Accordingly, an investor in the Class C
Notes must be prepared to bear the economic risk of the investment for an indefinite period
of time.

4.   The Proposed Class C Holder represents to each of (A), (B), (C) and (D) below as follows:

☐   (A)   It is acting for its own account and not for the benefit of any other person or
entity.

    (B)   Either

    ☐   (1)   It is not for U.S. federal income tax purposes a partnership, grantor trust
or S corporation, or

    ☐   (2)   It was not formed for the purpose of holding Notes, Preference Shares or
other equity interests of the Issuer and not more than 50% of the value of
the interest of any of the Proposed Class C Holder's beneficial owners
will be attributable to Notes, Preference Shares or other equity interests
of the Issuer, or

    ☐   (3)   It will provide an opinion of a nationally recognized tax counsel to the
effect that its acquisition of Notes will not cause the Issuer to be treated
as a publicly traded partnership for U.S. federal income tax purposes and
will provide such other representations and information as the Trustee in
its sole discretion may request, in form and substance satisfactory to the
Trustee.

☐   (C)   The Proposed Class C Holder is not acquiring and will not sell, transfer, assign,
participate, pledge or otherwise dispose of any Notes (or any interest therein,
including through any derivative or swap arrangement that transfers all or
substantially all of the economic benefits of ownership of Notes to a derivative or
swap counterparty) or cause any Notes (or any interest therein, including through
any derivative or swap arrangement that transfers all or substantially all of the
economic benefits of ownership of Notes to a derivative or swap counterparty) to
be marketed on or through an "established securities market" within the meaning
of Section 7704(b)(1) of the Code, including, without limitation, an interdealer
quotation system that regularly disseminates firm buy or sell quotations.

☐   (D)   The Proposed Class C Holder is a United States Person (as defined in the
Indenture).

5.   [reserved]

6.   The Proposed Class C Holder is a Qualified Purchaser or a company each of whose
beneficial owners is a Qualified Purchaser and the Proposed Class C Holder has checked the

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050214

box or boxes below which are next to the categories under which the Proposed Class C Holder so qualifies:

☐     (A)     It is a company that (1) owns not less than $5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Notes of the Issuer unless each beneficial owner of the Proposed Class C Holder's securities is a Qualified Purchaser.

☐     (B)     It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐     (C)     It is a person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Notes of the Issuer unless each beneficial owner of the Proposed Class C Holder's securities is a Qualified Purchaser.

☐     (D)     It is a Qualified Institutional Buyer acting for its own account, the account of another Qualified Institutional Buyer or the account of a Qualified Purchaser; provided:

            (1) that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25 million in securities of Issuers that are not affiliated persons of the dealer; and

            (2) that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050215

☐    (E)    It is an entity in which each beneficial owner of the Proposed Class C Holder's securities is a Qualified Purchaser.

7.    If the Proposed Class C Holder is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

(i)    all of the beneficial owners of outstanding securities (other than short-term paper) of the Transferee (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Proposed Class C Holder,

have consented to the Proposed Class C Holder's treatment as a Qualified Purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

8.    (a)    Is the Proposed Class C Holder, or is the Proposed Class C Holder acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "*Plan*"), whether or not such Plan is subject to ERISA, and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "*Benefit Plan Investor*") pursuant to 29 C.F.R. §2510.3-101 (the "*Plan Asset Regulation*") or otherwise.

☐ Yes ☐ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, are employee benefit plans within the meaning of Section 3(3) of ERISA even though they are generally are not subject to ERISA, and a Keogh plan covering no common law employees and an individual retirement account are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person) is held by Benefit Plan Investors (including an entity which is deemed to hold the assets of any such plan), would be deemed to hold the assets of one or more pursuant to the Plan Asset Regulation.

(b)    Is the Proposed Class C Holder, or is the Proposed Class C Holder acting on behalf of, a "benefit plan investor" as defined in U.S. Department of Labor Regulations Section 2510.3-101 (a "*Benefit Plan Investor*"):

☐ Yes ☐ No

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050216

(c)　(1) Is the Proposed Class C Holder a life insurance company?

　　☐ Yes  ☐ No

(c)　(2)　If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Proposed Class C Holder's interest in the Notes being acquired with the assets of the Proposed Class C Holder's general account and separate accounts:

　　_____% is being acquired with the assets of the general account.

　　_____% is being acquired with the assets of one or more separate accounts.

(c)　(3)　If the Proposed Class C Holder indicated to the question in (c)(2) above that general account assets are being used to acquire the Proposed Class C Holder's interest in the Notes, please complete the following:

　　_____% of such general account assets used to acquire Notes represent "plan assets" within the meaning of the Plan Asset Regulation

(d)　Is the Proposed Class C Holder a person who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, or an affiliate of any such person (each, a "**_Controlling Person_**").

　　☐ Yes  ☐ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)　The Proposed Class C Holder understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Preference Shares of the Issuer, both upon the original issuance of the Preference Shares and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Notes (if the Notes were treated as equity interests in the Issuer) or the Preference Shares for any reason. Accordingly, the Proposed Class C Holder undertakes:

　　(i)　to inform the Issuer and the Trustee immediately of any change in the information provided in this paragraph,

　　(ii)　to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Trustee to make a determination with respect to the portion of the Notes of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

　　(iii)　agrees to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the status of the Proposed Class C Holder

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050217

which results in the Proposed Class C Holder's becoming a "benefit plan investor" or a Controlling Person and

(iv)    agrees to promptly dispose of its interests in the Notes if its becoming a "benefit plan investor" or a Controlling Person and its ownership of the Notes would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Notes being held by "benefit plan investors."

(f)    If the Proposed Class C Holder is, or is acting on behalf of, a Plan, the Proposed Class C Holder represents and warrants that its acquisition, ownership and disposition of the Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any substantially similar federal, state or local law) for which an exemption is not applicable. In addition, if the Proposed Class B Holder is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares and/or Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

9.    The Proposed Class C Holder understands and agrees that a legend summarizing certain of the foregoing matters will be placed on each Class C Note.

10.    The Proposed Class C Holder is not a member of the public in the Cayman Islands.

11.    The Proposed Class C Holder understands and agrees that the obligations of the Issuer under the Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The Proposed Class C Holder understands and agrees that no recourse shall be had for the payment of any amount owing in respect of the Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under the Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

12.    The Proposed Class C Holder understands and agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050218

Notes issued under the Indenture; <u>provided</u> that nothing in this clause shall preclude, or be deemed to stop, the Proposed Class C Holder (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency proceeding filed or commenced against such Zohar Obligor by a Person other than the Proposed Class C Holder, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

The Proposed Class C Holder understands that the foregoing acknowledgments, representations and agreements will be relied upon by the Trustee and the Issuer for the purpose determining the eligibility of the Proposed Class C Holder to acquire Class C Notes of the Issuer. The Proposed Class C Holder agrees to provide, if requested, any additional information that may be required to substantiate the Proposed Class C Holder's status as a Qualified Institutional Buyer or as a Qualified Purchaser or Knowledgeable Employee or as an "accredited investor" or to otherwise determine the eligibility of the Proposed Class C Holder to hold Class C Notes of the Issuer.

Signatures:

_____
(Name of Entity)

By: _____
(Signature)

_____
(Print Name and Title)

Date:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050219

EXHIBIT C

FORM OF OPINION OF MILBANK, TWEED, HADLEY & MCCLOY LLP

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050220

# Please refer to tabbed item # 44 to view this document

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050221

INDEX

EXHIBIT D

FORM OF OPINION OF MAPLES AND CALDER

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050222

# Please refer to tabbed item # 45 to view this document

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050223

INDEX

EXHIBIT E

FORM OF OPINION OF COUNSEL TO THE TRUSTEE

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

# Please refer to tabbed item # 46 to view this document

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050225

INDEX

EXHIBIT F

FORM OF OPINION OF RICHARDS SPEARS KIBBE & ORBE LLP

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050226

# Please refer to tabbed item # 48 to view this document

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050227

INDEX

EXHIBIT G

FORM OF OPINION OF IN-HOUSE COUNSEL TO THE CREDIT ENHANCER

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050228

# Please refer to tabbed item # 47 to view this document

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050229

INDEX

EXHIBIT H

FORM OF FUNDING CERTIFICATE

Funding Certificate–Section 3.2(e)

Reference is made to the Indenture dated as of November 13, 2003 (the "Indenture") among ZOHAR CDO 2003-1, Limited (the "Issuer"), ZOHAR CDO 2003-1, Corp. (the "Co-Issuer"), ZOHAR CDO 2003-1, LLC, MBIA Insurance Corporation, as credit enhancer, CDC Financial Products Inc., as agent for the Holders of the Class A-1 Notes, and U.S. Bank National Association, as trustee (in such capacity, together with its successors in such capacity, the "Trustee"). Terms used but not defined herein have the respective meanings given to such terms in the Indenture.

Pursuant to Section 3.2(e) of the Indenture, this Funding Certificate is being delivered by the Issuer to the Trustee.

On the date hereof, in accordance with the Indenture and the Placement Agreement, the Issuer expects to receive

(i)    proceeds from the issuance of the Class A-1 Notes in an amount equal to U.S.$ 0,
(ii)   proceeds from the issuance of the Class A-2 Notes in an amount equal to U.S.$ 0,
(iii)  proceeds from the issuance of the Class A-3 Notes in an amount equal to U.S.$ 107,000,000 and
(iv)   proceeds from the issuance of the Class B Notes in an amount equal to U.S.$ 0.

The Issuer hereby directs you, upon your receipt of all of such net proceeds, to apply such proceeds on the Issuer's behalf pursuant to its instructions with respect thereto.

Please acknowledge your receipt of this Funding Certificate by signing on the line provided below.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

IN WITNESS WHEREOF, this Certificate is delivered on behalf of the Issuer, in the undersigned's capacity as _____, this ____ day of November, 2003.

ZOHAR CDO 2003-1, LIMITED,
as Issuer

By:_____
       Name:
       Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050231

RECEIPT ACKNOWLEDGED:

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee


By_____
     Title:

NY3:#7322368
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050232

INDEX

Respondents' Exhibit 1   pg. 303 of 303

EXECUTION COPY

FIRST SUPPLEMENTAL INDENTURE

DATED AS OF AUGUST 10, 2004

to the

INDENTURE

among

ZOHAR CDO 2003-1, LIMITED,

ZOHAR CDO 2003-1, CORP.,

ZOHAR CDO 2003-1, LLC,

MBIA INSURANCE CORPORATION,
as Credit Enhancer,

CDC FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent, and

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

Dated as of November 13, 2003

NY266319.2/1939-17978

**RESPONDENTS'
EXHIBIT
2
AP No. 16462**

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050233

**FIRST SUPPLEMENTAL INDENTURE** dated as of August 10, 2004 (this "First Supplemental Indenture") among:

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR CDO 2003-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR CDO 2003-1, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors"); and

U.S. BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of The United States of America, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "Trustee").

PRELIMINARY STATEMENTS

The Issuer, the Co-Issuer, the Zohar Subsidiary, the Credit Enhancer (as defined below), the Class A-1 Note Agent (as defined below) and the Trustee are parties to an Indenture dated as of November 13, 2003 (the "Indenture") providing for the issuance of Class A Notes, Class B Notes and Class C Notes (each as defined below).

The Zohar Obligors desire to amend the Indenture on the terms and conditions herein provided pursuant to Section 8.2 of the Indenture.  The Trustee and the Zohar Subsidiary may (subject to said Section 8.2) enter into one or more supplemental indentures to change in any manner the provisions of the Indenture.

As contemplated by Section 8.2 of the Indenture, the Trustee has delivered a copy of this First Supplemental Indenture to the Noteholders, the Preference Share Paying Agent, the Credit Enhancer, the Collateral Manager, Moody's and Standard & Poor's.  Moody's and Standard & Poor's have each confirmed in writing to the Trustee and the Co-Issuers that the amendments to the Indenture contemplated hereby will not cause the rating assigned by it to the Notes to be reduced or withdrawn and such other consents as required by Section 8.2 have been obtained and such other conditions required thereby have been met or waived.

Accordingly, in consideration of the premises and the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.  Defined Terms.  Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture.

Section 2.  Amendments and Agreements.  Subject to the receipt by the Trustee of this First Supplemental Indenture, duly executed and delivered by the parties hereto, but with effect as of date hereof:

NY266319.2/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050234**

- 2 -

(a)     the Indenture is amended to replace the words "The Payment Date falling in August, 2004" in the definition of "Ramp-Up End Date" with "October 29, 2004";

(b)     any amounts that may be due and payable to the Preference Share Distribution Account on the Payment Date in August, 2004 pursuant to Section 11.2 of the Indenture shall not paid on such Payment Date; and

(c)     any amounts that may be due and payable pursuant to Section 11.2 of the Indenture as Subordinated Collateral Management Fee on the Payment Date in August, 2004 shall be deferred and not paid on such Payment Date.

Section 3.  Miscellaneous.

(a)  GOVERNING LAW.  THIS FIRST SUPPLEMENTAL INDENTURE, AND ALL MATTERS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER HEREOF, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

(b)  Counterparts.  This First Supplemental Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one of the same instrument.  Delivery of an executed counterpart of a signature page of this First Supplemental Indenture by telecopy shall be effective as delivery of a manually executed counterpart of this First Supplemental Indenture.

(c)  Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction hereof.

(d)  Complete Agreement.  This First Supplemental Indenture sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto.

(e)  Documents Otherwise Unchanged.  Except as herein provided, the Indenture and the other Transaction Documents shall remain unchanged and in full force and effect, and each reference to the Indenture and words of similar import in the Indenture and other Transaction Documents shall be a reference to the Indenture as amended hereby and as the same may be further amended, supplemented and otherwise modified and in effect from time to time.

[remainder of page intentionally blank]

- 3 -

**IN WITNESS WHEREOF**, the parties have caused this First Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR CDO 2003-1, LIMITED

By:_____
    Name:
    Title:

ZOHAR CDO 2003-1, CORP.

By:_____
    Name:
    Title:

ZOHAR CDO 2003-1, LLC

By:  Zohar CDO 2003-1, Limited
    as Managing Member

By:_____
    Name:
    Title:

MBIA INSURANCE CORPORATION

By:_____
    Name:
    Title:

NY266319.2/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050236

- 4 -


CDC FINANCIAL PRODUCTS INC.
As Class A-1 Note Agent


By:_____
    Name:
    Title:



U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
    Name:
    Title:

NY266319.2/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050237**

**[EXECUTION COPY]**

SECOND SUPPLEMENTAL INDENTURE

DATED AS OF [_____], 2004

to the

INDENTURE

among

ZOHAR CDO 2003-1, LIMITED,

ZOHAR CDO 2003-1, CORP.,

ZOHAR CDO 2003-1, LLC,

MBIA INSURANCE CORPORATION,
as Credit Enhancer,

CDC FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent, and

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

Dated as of November 13, 2003

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

RESPONDENTS'
EXHIBIT
3
AP No. 16462

PP050238

**SECOND SUPPLEMENTAL INDENTURE** (this "<u>Second Supplemental Indenture</u>") dated as of [        ], 2004 (the "<u>Second Supplemental Indenture Date</u>") among:

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "<u>Issuer</u>");

ZOHAR CDO 2003-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "<u>Co-Issuer</u>", and together with the Issuer, the "<u>Co-Issuers</u>");

ZOHAR CDO 2003-1, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "<u>Zohar Subsidiary</u>", and together with the Co-Issuers, the "<u>Zohar Obligors</u>"); and

U.S. BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of The United States of America, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "<u>Trustee</u>").

## PRELIMINARY STATEMENTS

The Issuer, the Co-Issuer, the Zohar Subsidiary, the Credit Enhancer (as defined below), the Class A-1 Note Agent (as defined below) and the Trustee are parties to an Indenture dated as of November 13, 2003 (the "<u>Original Indenture</u>") providing for the issuance of Class A Notes, Class B Notes and Class C Notes (each as defined below), as amended by that certain First Supplemental Indenture dated as of August 10, 2004 (the "<u>First Supplemental Indenture</u>"; and together with the Original Indenture, the "<u>Indenture</u>"), among the Zohar Obligors and the Trustee.

The Zohar Obligors desire to amend the Indenture on the terms and conditions herein provided pursuant to Section 8.2 of the Indenture.  The Trustee and the Zohar Subsidiary may (subject to said Section 8.2) enter into one or more supplemental indentures to change in any manner the provisions of the Indenture.

As contemplated by Section 8.2 of the Indenture, the Trustee has delivered a copy of this Second Supplemental Indenture to the Noteholders, the Preference Share Paying Agent, the Credit Enhancer, the Collateral Manager, Moody's and Standard & Poor's.  Each of Moody's and Standard & Poor's has confirmed in writing to the Trustee and the Co-Issuers that the amendments to the Indenture contemplated hereby will not cause the rating assigned by it to the Notes to be reduced or withdrawn and such other consents as required by Section 8.2 have been obtained and such other conditions required thereby have been met or waived.

Accordingly, in consideration of the premises and the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.  <u>Defined Terms</u>.  Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture.

NY274058.19/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050239**

Section 2.  <u>Amendments and Agreements</u>.  Subject to the receipt by the Trustee of this Second Supplemental Indenture, duly executed and delivered by the parties hereto, the Indenture is amended as follows:

(a)    The last sentence of the definition of "Adjusted Collateral Balance" in Section 1.1 of the Indenture is hereby amended and restated to read in its entirety as follows:

"For the avoidance of doubt, (1) references above to Collateral Debt Obligations shall include all Collateral Debt Obligations that the Issuer and/or the Zohar Subsidiary has committed to purchase (but which purchases have not yet settled) and (2) for purposes of calculating the Class A Overcollateralization Ratio, all Originated Special Loan/Preferred Securities (but not Preferred Securities) shall be treated as Collateral Debt Obligations."

(b)    The definition of "Class A Interest Coverage Ratio" in Section 1.1 of the Indenture is hereby amended by adding as a new paragraph at the end of such definition the following:

"For purposes of calculating clause (a) above, Scheduled Distributions in the case of Collateral Debt Obligations that bear interest at a rate that decreases solely as a function of the passage of time shall be calculated assuming the lowest rate of interest that such Collateral Debt Obligations may now or in the future bear interest at."

(c)    Clause (a) of the definition of "Collateral Debt Obligation" in Section 1.1 of the Indenture is hereby amended and restated to read in its entirety as follows:

"(a)    An outstanding Dollar-denominated loan or obligation that on the date of initial acquisition thereof by the Issuer or the Zohar Subsidiary is either a Senior Secured Collateral Debt Obligation or a Second Lien Collateral Debt Obligation (including in each case term loans, Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations, including, without limitation, DIP Loans),"

(d)    The definition of "Diversity Test" in Section 1.1 of the Indenture is hereby amended by replacing the number "25" in such definition with "22."

(e)    The definition of "Maximum Investment Amount" in Section 1.1 of the Indenture is hereby amended by replacing the amount "$750,000,000" in such definition with "$650,000,000."

(f)    The definition of "Measurement Date" in Section 1.1 of the Indenture is hereby amended by deleting the last sentence of such defined term.

(g)    The definition of "Minimum Average Recovery Rate Test" in Section 1.1 of the Indenture is hereby amended by replacing the percentage "60%" in such definition with "58%" and replacing the percentage "45%" in such definition with "43%."

- 2 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050240

(h)    The definition of "Moody's Average Recovery Rate" in Section 1.1 of the Indenture is hereby amended by amending and restating the second sentence in such definition to read in its entirety as follows:

"For purposes of determining the Moody's Average Recovery Rate, (x) the Principal Balance of each Defaulted Obligation and Workout Obligation will be deemed to be equal to its outstanding principal amount and (y) all Originated Special Loan/Preferred Securities (but not Preferred Securities) shall be treated as Collateral Debt Obligations."

(i)    The definition of "Moody's Weighted Average Rating Factor Test" in Section 1.1 of the Indenture is hereby amended by replacing the number "3,500" in such definition with the following:

"(x) 2,300, (y) 2,550, so long as the Moody's Average Recovery Rate on such Measurement Date equals or exceeds 45%, or (z) 2,800, so long as the Moody's Average Recovery Rate on such Measurement Date equals or exceeds 47%, as applicable"

(j)    Section 1.1 of the Indenture is hereby amended by adding the following definition to such section:

""Originated Special Loan/Preferred Security":  Any loan or other debt obligation or Preferred Security that (i) was acquired by the Issuer and/or the Zohar Subsidiary in connection with the origination of a new Collateral Debt Obligation, (ii) does not otherwise meet the definition of Collateral Debt Obligation at the time of such origination, and (iii) in the case of such Preferred Security has a face or stated amount and a fixed maturity or redemption date.  Where the context requires, the Principal Balance of such Preferred Security shall be its face or stated amount."

(k)    The definition of "PIK Loan" in Section 1.1 of the Indenture is hereby amended and restated to read in its entirety as follows:

""PIK Loan":  Any loan or other obligation with respect to which the issuer thereof or Obligor thereon has (at such time) the right under the related Underlying Instrument to defer or capitalize interest due on such loan or obligation as principal; provided, however, that a loan or other obligation that is required to pay at least a portion of its interest as a cash coupon due on each payment date or distribution date pursuant to its Underlying Instruments without the ability to defer or capitalize such portion of interest shall not be considered a PIK Loan."

(l)    Section 1.1 of the Indenture is hereby amended by adding the following definition to such section:

""Preferred Security":  Any equity security that is a preferred stock, preferred share or other form of preferred equity interest."

- 3 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050241

(m)    The definition of "Principal Balance" in Section 1.1 of the Indenture is hereby amended by amending and restating clause (c) of such definition to read in its entirety as follows:

"(c) the Principal Balance of any Collateral Debt Obligation will not include any principal amount of such Collateral Debt Obligation representing previously deferred or capitalized interest unless such Collateral Debt Obligation (1) has a Standard & Poor's Rating of "B" or higher and (2) is in compliance with all "EBITDA", senior debt to "EBITDA" and "EBITDA" to interest expense covenants, as applicable, set forth in the Underlying Instruments of such Collateral Debt Obligation."

(n)    The definition of "Principal Proceeds" in Section 1.1 of the Indenture is hereby amended by replacing the words "and (g)" with the following:

"(g)  all Cash Distributions on and Cash Sale Proceeds with respect to any PIK Loan (and, in the case of loan or other obligation that defers or capitalizes a portion of its interest, all Cash Distributions and Cash Proceeds relating to such portion of deferred or capitalized interest); and (h)"

(o)    The definition of "Quarterly Asset Amount" in Section 1.1 of the Indenture is hereby amended and restated to read in its entirety as follows:

""Quarterly Asset Amount":  With respect to any Payment Date, an amount equal to the Aggregate Principal Balance of all Pledged Obligations on the preceding Payment Date; provided that the Quarterly Asset Amount in respect of the Initial Payment Date shall equal the weighted average of the Aggregate Principal Balance of all Pledged Obligations on each of the Closing Date, February 20, 2004, and May 20, 2004."

(p)    Section 1.1 of the Indenture is hereby amended by deleting the following defined terms:  "Ramp Up Measurement Dates", "Ramp Up Amount Targets", "Ramp Up Calculation", "Proposed Moody's Plan" and "Moody's Plan".

(q)    Proviso (Y) in the first paragraph of Clause (I)(iv) of the definition of "Rating" in Section 1.1 of the Indenture is hereby amended by (i) deleting the text "(C)(l)," therein and (ii) adding at the end of such proviso (Y) the following:

"and the Aggregate Principal Balance of Collateral Debt Obligations that may be given a Moody's Rating as provided in subclause (C)(l) below may not exceed 25% of the Maximum Investment Amount (or such higher percentage as Moody's may specify in writing to the Issuer, the Collateral Manager and the Trustee) on such date"

(r)    Provisos (1) and (2) in Clause (I)(iv)(C) of the definition of "Rating" in Section 1.1 of the Indenture are hereby amended by amending and restating such provisos to read in their entirety as follows:

"(1) pending receipt from Moody's of such an estimated rating factor, the Moody's Rating of such Collateral Debt Obligation shall be (x) three subcategories below the rating

- 4 -

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050242

generated by the Moody's Riscalc Model or (y) at the option of the Issuer (or the Collateral Manager on behalf of the Issuer), equal to the rating generated by such alternative Moody's rating model that is mutually acceptable to Moody's and the Issuer; provided however that the Moody's Rating derived in clauses (l)(x) and (1)(y) above shall not exceed "B1"; (2) [reserved];"

(s)    Clause (II)(ii)(x) of the definition of "Rating" in Section 1.1 of the Indenture is hereby amended by (i) replacing the words "three subcategories below" in such subsection with "equal to", (ii) deleting the clause "(but in any event not below "B-")" therefrom and  (iii) replacing the words "; or" at the end of such subsection with the following:

"provided; that (1) unless the applicable industry and country of such borrower are covered by the Standard & Poor's Credit Model and such borrower has at least $50 million of annual revenues, such Collateral Debt Obligation shall have a Standard & Poor's rating of "B-" until Standard & Poor's provides a credit estimate (which Standard & Poor's shall provide within 14 days after application is made therefor and if Standard & Poor's does not provide such credit estimate within  such 14 day period then the Issuer (or the Collateral Manager on behalf of the Issuer) shall have the option of assigning such Collateral Debt Obligation a Standard & Poor's Rating equal to the credit score that would be generated by the Standard & Poor's Credit Model for such Collateral Debt Obligation until Standard & Poor's provides a credit estimate (and upon Standard & Poor's providing such credit estimate the Standard & Poor's Rating shall equal such credit estimate)) and (2) if within 14 days after acquiring such Collateral Debt Obligation the Issuer (or the Collateral Manager on behalf of the Issuer) has either (x) failed to apply to Standard & Poor's for such credit estimate or (y) failed to provide Standard & Poor's with copies of the material Underlying Instruments for such Collateral Debt Obligation to conduct a credit estimate then such Collateral Debt Obligation shall have a Standard & Poor's Rating of "CCC-" until the earlier of  the date that (a) Standard & Poor's provides such credit estimate and (b) such application is made and/or documentation is provided, as applicable, to Standard & Poor's; or"

(t)    Clause (II)(ii)(y) of the definition of "Rating" in Section 1.1 of the Indenture is hereby amended by (i) replacing each of the two uses of the words "three subcategories below" in such subsection with "equal to", (ii) deleting both uses of the clause "(but in any event not below "B-")" therefrom, (iii) adding the words "and copies of other material Underlying Instruments for such Collateral Debt Obligations" to the end of proviso (1) of clause (II)(ii)(y) and (iv) inserting at the end of clause (II)(ii)(y) the following:

"and (3) the Standard & Poor's Credit Model may only be used for purposes of this clause (ii)(y) if the industry and country of such borrower are covered by such model and such borrower has at least $50 million of annual revenues and, in the event the Standard & Poor's Credit Model does not cover such industry and country or such borrower does not have such revenues, the Issuer (or the Collateral Manager on behalf of the Issuer) shall apply to Standard & Poor's for a corporate credit estimate pursuant to clause (ii)(x) above and (4) if within 14 days after acquiring such Collateral Debt Obligation the Issuer (or the Collateral Manager on behalf of the Issuer) has either (x) failed to provide Standard &

- 5 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP050243

Poor's with the inputs for the Standard & Poor's Credit Model for such Collateral Debt Obligation or (y) failed to provide Standard & Poor's with copies of the material Underlying Instruments for such Collateral Debt Obligation then such Collateral Debt Obligation shall have a Standard & Poor's Rating of "CCC- " until such information is provided to Standard & Poor's";

(u)     Clause (II)(ii) of the definition of "Rating" in Section 1.1 of the Indenture is hereby amended by adding after clause (II)(ii)(y) the following as a new paragraph:

"To the extent that any Rating of a Collateral Debt Obligation is then being derived pursuant to this clause (II)(ii) based on the Standard & Poor's Credit Model, the Issuer, or the Collateral Manager on behalf of the Issuer, shall (so long as such Rating is so derived) recalculate such Rating using the Standard & Poor's Credit Model at least quarterly and such recalculated Rating shall be promptly provided to Standard & Poor's by the Issuer."

(v)     The definition of "Required Reserve Amount" in Section 1.1 of the Indenture is hereby amended by replacing (i) the percentage "7.5%" in such definition with "2.5%" and (ii) each of the two uses of the amount "$10,000,000" in such definition with "$5,000,000."

(w)     The definition of "Senior Collateral Management Fee" in Section 1.1 of the Indenture is hereby amended by adding after the last sentence of such definition the following:

"For purposes of this definition of Senior Collateral Management Fee, the Quarterly Asset Amount shall include (without duplication) the Principal Balance of each Originated Special Loan/Preferred Security."

(x)     Section 1.1 of the Indenture is hereby amended by adding the following definition to such section:

""Second Lien Collateral Debt Obligation": A Dollar-denominated loan or obligation that on the date of initial acquisition thereof by the Issuer or the Zohar Subsidiary pursuant to Section 12.1(a) hereof is secured by second priority liens (and is secured by no first priority liens) on assets of the obligor(s) thereon or its Affiliates."

(y)     The definition of "Senior Secured Collateral Debt Obligation" in Section 1.1 of the Indenture is hereby amended by deleting the words "made to a borrower incorporated or organized under the laws of the United States of America or any state thereof," in such defined term.

(z)     The definition of "Standard & Poor's Average Recovery Rate" in Section 1.1 of the Indenture is being amended by amending and restating the second sentence in such definition to read in its entirety as follows:

"For purposes of determining the Standard & Poor's Average Recovery Rate, (x) the Principal Balance of each Defaulted Obligation and Workout Obligation will be deemed to be equal to its outstanding principal amount and (y) all Originated

- 6 -

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050244

Special Loan/Preferred Securities (but not Preferred Securities) shall be treated as Collateral Debt Obligations."

(aa)    The definition of "Standard & Poor's Average Recovery Rate" in Section 1.1 of the Indenture is hereby further amended by (i) inserting after the words "Category 3 or 4 senior unsecured loans" in the table of such definition the words "; and Second Lien Collateral Debt Obligations up to a maximum amount equal to 10% of the Maximum Investment Amount" and (ii) inserting after the words "Category 3 or 4 subordinated loans" in the table of such definition the words "; and Second Lien Collateral Debt Obligations in excess of 10% of the Maximum Investment Amount".

(bb)    The definition of "Subordinated Collateral Management Fee" in Section 1.1 of the Indenture is hereby amended by adding after the last sentence of such definition the following:

"For purposes of this definition of Subordinated Collateral Management Fee, the Quarterly Asset Amount shall include (without duplication) the Principal Balance of each Originated Special Loan/Preferred Security."

(cc)    The definition of "Weighted Average Purchase Price" in Section 1.1 of the Indenture is hereby amended by adding as a new paragraph at the end of such definition the following:

"For purposes of this definition of Weighted Average Purchase Price, each Originated Special Loan/Preferred Security shall be deemed to be a "Collateral Debt Obligation.""

(dd)    The definition of "Weighted Average Purchase Price Test" in Section 1.1 of the Indenture is hereby amended and restated to read in its entirety as follows:

""<u>Weighted Average Purchase Price Test</u>":  A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if: (1) the Weighted Average Purchase Price of all Collateral Debt Obligations on such Measurement Date is not less than 25%; and (2) the Weighted Average Purchase Price of those Collateral Debt Obligations acquired after the Aggregate Principal Balance of all Collateral Debt Obligations exceeds the Target Amount specified in the table below is not greater than the corresponding Percentage specified in the table below:

| Target Amount (Aggregate Principal Balance of all Collateral Debt Obligations) | Percentage |
|---|---|
| $650,000,000 | 74.50% |
| $675,000,000 | 76.75% |
| $700,000,000 | 79.00% |
| $725,000,000 | 81.25% |
| $750,000,000 | 83.00% |
| $775,000,000 | 85.25% |

- 7 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050245

| Target Amount (Aggregate Principal Balance of all Collateral Debt Obligations) | Percentage |
| --- | --- |
| $800,000,000 | 87.50% |

Upon the Issuer's and/or the Zohar Subsidiary's acquisition of Collateral Debt Obligations with an Aggregate Principal Balance of 95% or more of any of the above noted Target Amounts, the Issuer shall at each such time request from Standard & Poor's an updated Standard & Poor's CDO Monitor."

(ee)    The definition of "Weighted Average Spread" in Section 1.1 of the Indenture is hereby amended by (i) inserting after the words "principal only" on the fifth line of such defined term the following "but, for the avoidance of doubt, including the current pay portion of a Collateral Debt Obligation that has both a current pay Cash interest component and an interest component that can be deferred or capitalized by the Obligor thereon" and (ii) inserting before the period at the end of the last sentence of such definition the following "and (iii) with respect to Collateral Debt Obligations that bear interest at a rate that decreases solely as a function of the passage of time the applicable interest rate shall be the lowest rate of interest that such Collateral Debt Obligation may now or in the future bear interest at".

(ff)    The definition of "Weighted Average Spread Test" in Section 1.1 of the Indenture is hereby amended by replacing the words "exceeds 3.25%" with the following:

"exceeds (x) 6.75% or (y) so long as the Aggregate Principal Balance of all Collateral Debt Obligations exceeds $750,000,000, 6.5%."

(gg)    Section 1.2(b)(i) of the Indenture is hereby amended by inserting at the end of such subsection the following:

"(for the avoidance of doubt the current pay portion of a Collateral Debt Obligation that has both a current pay Cash interest component and a interest component that can be deferred or capitalized by the Obligor thereon shall be included for the purposes of calculating any Class A Interest Coverage Ratio)"

(hh)    Section 5.1(n) of the Indenture is hereby amended by replacing the amount "U.S.$4,000,000" therein with "U.S.$2,000,000."

(ii)    Section 7.13(a) of the Indenture is hereby amended by replacing the amount "U.S.$750,000,000" in the first paragraph of such section with "U.S.$543,000,000".

(jj)    Section 7.13(a) of the Indenture is hereby further amended by deleting the second paragraph thereof and deleting the table following such second paragraph.

(kk)    Section 10.7(c) of the Indenture is hereby amended by inserting after the end of the last sentence of such section the following:

- 8 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050246

"On the Second Supplemental Indenture Date, the Trustee shall transfer from the Cash Reserve Account to the Issuer Principal Collection Account (for application as provided in Section 10.2) an amount equal to (x) the Balance in the Cash Reserve Account on such date minus (y) U.S.$15,000,000."

(ll)     Section 10.9(a) of the Indenture is hereby amended by inserting at the end of the last sentence of the first paragraph of such section the following:

"; provided further, that on the Second Supplemental Indenture Date, the Trustee shall transfer from the Unrestricted Collateral Account to the Issuer Principal Collection Account (for application as provided in Section 10.2) an amount equal to (x) the Balance in the Unrestricted Collateral Account on such date minus (y) U.S.$15,000,000"

(mm)    Section 10.13 (a)(16) of the Indenture is hereby amended by adding the following to the end of such section:

"and the Aggregate Principal Balance of Fixed Rate Obligations designated as each of Non-Performing Obligations, Non-Current Obligations and Collateral Debt Obligations with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only"

(nn)    Section 10.13 (c)(16) of the Indenture is hereby amended by adding the following to the end of such section:

"and the Aggregate Principal Balance of Fixed Rate Obligations designated as each of Non-Performing Obligations, Non-Current Obligations and Collateral Debt Obligations with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only"

(oo)    Section 11.2(a)(iii) of the Indenture is hereby amended by inserting at the end of such subsection the following:

"and (3) for purposes of calculating the Class A Overcollateralization Ratio Test for this Section 11.2(a)(iii) only, the Principal Balance of a Collateral Debt Obligation shall not include any principal amount representing previously deferred or capitalized interest;"

(pp)    Section 12.1(a)(l) of the Indenture is hereby amended by adding after the words "Equity Kicker" the words "or Originated Special Loan/Preferred Security".

(qq)    Section 12.1(a)(4) of the Indenture is hereby amended and restated to read in its entirety as follows:

"(4)  not more than 10% of the Maximum Investment Amount may consist of Collateral Debt Obligations that bear interest at a rate that increases or decreases solely as a function of the passage of time;"

- 9 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050247

(rr)    Section 12.1(a)(8) of the Indenture is hereby amended by inserting the following at the end of such subsection:

", provided however, that up to 10% (in the aggregate) of the Maximum Investment Amount may consist of obligations issued by obligors organized under the laws of Canada, the United Kingdom, Germany, The Netherlands and/or France so long as such applicable country (x) does not impose foreign exchange controls and (y) has a sovereign credit rating of at least AA by Standard & Poor's"

(ss)    Section 12.1(a)(22) of the Indenture is hereby amended by inserting the following at the end of such subsection:

", provided, however, that this requirement shall not apply to acquisitions effected pursuant to an active strategy of the Issuer and/or the Zohar Subsidiary (or the Collateral Manager on behalf of the Issuer and/or the Zohar Subsidiary) involving the acquisition of Collateral Debt Obligations to gain or maintain control of a bank group (or similar constituency)"

(tt)    Section 12.1(a)(27) of the Indenture is hereby amended and restated to read in its entirety as follows:

"(27)  not more than 3.0% of the Maximum Investment Amount may consist of obligations issued by any single issuer or any of its Affiliates; provided, that up to four issuers may each constitute up to 5.0% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 7.0% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 8.5% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 9.0% of the Maximum Investment Amount (in each case, including any Unfunded Amounts in respect thereof);"

(uu)    Section 12.1(a)(28) of the Indenture is hereby amended and restated to read in its entirety as follows:

"(28)  not more than 5% of the Maximum Investment Amount may consist of Collateral Loans that are Defaulted Obligations;"

(vv)    Section 12.1(a)(30) of the Indenture is hereby amended and restated to read in its entirety as follows:

"(30)  not more than 20% of the Maximum Investment Amount may consist of Fixed Rate Obligations (excluding for purposes of this Section 12.1(a)(30) Fixed Rate Obligations that are Non-Performing Obligations, Non-Current Obligations and Collateral Debt Obligations with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only);"

(ww)    Section 12.1(a)(38) of the Indenture is hereby amended by replacing the percentage "20%" therein with "5%."

- 10 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP050248

(xx)    Section 12.1(a)(39) of the Indenture is herby amended by replacing the percentage "40%" therein with "10%."

(yy)    Section 12.1(a)(40) of the Indenture is herby amended by replacing the percentage "70%" therein with "20%."

(zz)    Section 12.1(a)(41) is hereby amended by replacing the period at the end of such subsection with "; and".

(aaa)    Section 12.1(a) is hereby amended by adding after Section 12.1(a)(41) the following:

"(42)    not more than 10% of the Maximum Investment Amount may consist of Second Lien Collateral Debt Obligations; and

(43)    such Collateral Debt Obligation has a Moody's Rating of "B3" or better if the Principal Balance of such Collateral Debt Obligation is greater than 3.5% of the Maximum Investment Amount."

(bbb)    The third paragraph of Section 12.1(b) of the Indenture is hereby amended by (i) inserting" (8) and" before the number "(29)" therein and (ii) replacing the number "(37)" therein with "(37), and (42)".

(ccc)    Section 12.1(c)(iii) of the Indenture is hereby amended by inserting the following after the word "thereof" in the third line of such subsection:

"or organized under the laws of Canada, the United Kingdom, Germany, The Netherlands and/or France"

(ddd)    Section 12.1(d)(iv) of the Indenture is hereby amended by inserting after the word "thereof" in such subsection the following:

; or under the laws of Canada, the United Kingdom, Germany, The Netherlands and/or France"

Section 3.    Miscellaneous.

(a)    GOVERNING LAW.  THIS SECOND SUPPLEMENTAL INDENTURE, AND ALL MATTERS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER HEREOF, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

(b)    Counterparts.  This Second Supplemental Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page of this Second Supplemental Indenture by telecopy

- 11 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                                          PP050249
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 3   pg. 12 of 15

shall be effective as delivery of a manually executed counterpart of this Second Supplemental Indenture.

       (c)    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction hereof.

       (d)    <u>Complete Agreement</u>.  This Second Supplemental Indenture and the contemporaneous conforming amendment of the Management Agreement set forth the entire understanding of the parties relating to the subject matter hereof and supersede and cancel any prior communications, understandings and agreements between the parties hereto.  The parties also agree that the reporting sections of the Collateral Administration Agreement are hereby amended mutatis mutandis to conform to Sections 2(bb) and 2(cc) above and to the extent that there are any inconsistencies between the Indenture (as amended by this Second Supplemental Indenture) and any other Transaction Document then the provisions of the Indenture (as amended by this Second Supplemental Indenture) shall control.

       (e)    <u>Documents Otherwise Unchanged</u>.  Except as herein provided (and in the contemporaneous amendment of the Management Agreement), the Indenture and the other Transaction Documents shall remain unchanged and in full force and effect, and each reference to the Indenture and words of similar import in the Indenture and other Transaction Documents shall be a reference to the Indenture as amended hereby and as the same may be further amended, supplemented and otherwise modified and in effect from time to time.

**[remainder of page intentionally blank]**

NY274058.19/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050250**

**IN WITNESS WHEREOF**, the parties have caused this Second Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR CDO 2003-1, LIMITED


By:_____
      Name:
      Title:

ZOHAR CDO 2003-1, CORP.


By:_____
      Name:
      Title:

ZOHAR CDO 2003-1, LLC
By:    Zohar CDO 2003-1, Limited
       as Managing Member


By:_____
      Name:
      Title:

MBIA INSURANCE CORPORATION,
as Credit Enhancer and Controlling Party



By:_____
      Name:
      Title:

CDC IXIS CAPITAL MARKETS
 NORTH AMERICA INC.


By:_____
      Name:
      Title:

- 13 -

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050251

CDC SECURITIES


By:_____
   Name:
   Title:


CDC FINANCIAL PRODUCTS INC.
as Class A-1 Note Agent


By:_____
   Name:
   Title:


U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
   Name:
   Title:

- 14 -

NY274058.19/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050252

**[EXECUTION COPY]**

THIRD SUPPLEMENTAL INDENTURE

DATED AS OF [_____], 2004

to the

INDENTURE

among

ZOHAR CDO 2003-1, LIMITED,

ZOHAR CDO 2003-1, CORP.,

ZOHAR CDO 2003-1, LLC,

MBIA INSURANCE CORPORATION,
as Credit Enhancer,

CDC FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent, and

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

Dated as of November 13, 2003

NY274061.4/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC



PP050253

RESPONDENTS'
EXHIBIT
4
AP No. 16462

**THIRD SUPPLEMENTAL INDENTURE** (this "Third Supplemental Indenture") dated as of [_____], 2004 among:

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR CDO 2003-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR CDO 2003-1, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors"); and

U.S. BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of The United States of America, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "Trustee").

## PRELIMINARY STATEMENTS

The Issuer, the Co-Issuer, the Zohar Subsidiary, the Credit Enhancer (as defined below), the Class A-1 Note Agent (as defined below) and the Trustee are parties to an Indenture dated as of November 13, 2003 (the "Original Indenture") providing for the issuance of Class A Notes, Class B Notes and Class C Notes (each as defined below), as amended by that certain First Supplemental Indenture dated as of August 10, 2004 (the "First Supplemental Indenture") and that certain Second Supplemental Indenture dated as of [___], 2004 (the "Second Supplemental Indenture"; and together with the First Supplemental Indenture and the Original Indenture, the "Indenture"), among the Zohar Obligors and the Trustee.

The Zohar Obligors desire to amend the Indenture on the terms and conditions herein provided pursuant to Section 8.2 of the Indenture. The Trustee and the Zohar Subsidiary may (subject to said Section 8.2) enter into one or more supplemental indentures to change in any manner the provisions of the Indenture.

As contemplated by Section 8.2 of the Indenture, the Trustee has delivered a copy of this Third Supplemental Indenture to the Noteholders, the Preference Share Paying Agent, the Credit Enhancer, the Collateral Manager, Moody's and Standard & Poor's. Each of Moody's and Standard & Poor's has confirmed in writing to the Trustee and the Co-Issuers that the amendments to the Indenture contemplated hereby will not cause the rating assigned by it to the Notes to be reduced or withdrawn and such other consents as required by Section 8.2 have been obtained and such other conditions required thereby have been met or waived.

Accordingly, in consideration of the premises and the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture.

NY274061.4/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050254

Section 2.  <u>Amendments and Agreements</u>.  Subject to the receipt by the Trustee of this Third Supplemental Indenture, duly executed and delivered by the parties hereto, the Indenture is amended as follows:

(a)  Section 7.13(b)(1) of the Indenture is hereby amended and restated to read in its entirety as follows:

"(1)  The confirmation of the initial ratings on the Class A Notes by Moody's and Standard & Poor's (the "<u>Rating Confirmation</u>") has been obtained and accordingly no "<u>Rating Confirmation Failure</u>" with respect to the Class A Notes has occurred or will occur.  Within thirty (30) days following the date that the Aggregate Principal Balance of the Collateral Debt Obligations exceeds $750,000,000 (or such earlier date as the Collateral Manager may determine), the Issuer (or the Collateral Manager on behalf of the Issuer) shall (with the assistance of the Arranger) request that each of Moody's and Standard and Poor's provide an initial rating of the Class B Notes of at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's (an "<u>Acceptable Class B Rating</u>"), within thirty (30) days after the date of such request (it being understood that such initial rating of the Class B Notes would address the ultimate payment in full of the principal of the Class B Notes); <u>provided</u> that such request to Standard & Poor's will result in a separate rating process that may or may not result in the issuance of a rating on the Class B Notes.  Any failure by Moody's or Standard & Poor's to provide an Acceptable Class B Rating within such thirty (30) day period is herein referred to as a "<u>Rating Failure</u>" with respect to the Class B Notes."

Section 3.  <u>Miscellaneous</u>.

(a)  <u>GOVERNING LAW</u>.  THIS THIRD SUPPLEMENTAL INDENTURE, AND ALL MATTERS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER HEREOF, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

(b)  <u>Counterparts</u>.  This Third Supplemental Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page of this Third Supplemental Indenture by telecopy shall be effective as delivery of a manually executed counterpart of this Third Supplemental Indenture.

(c)  <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction hereof.

(d)  <u>Complete Agreement</u>.  This Third Supplemental Indenture sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto.

(e)  <u>Documents Otherwise Unchanged</u>.  Except as herein provided, the Indenture and the other Transaction Documents shall remain unchanged and in full force and effect, and each

- 2 -

NY274061.4/1939-17978
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP050255

reference to the Indenture and words of similar import in the Indenture and other Transaction Documents shall be a reference to the Indenture as amended hereby and as the same may be further amended, supplemented and otherwise modified and in effect from time to time.

**[remainder of page intentionally blank]**

- 3 -

NY274061.4/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050256**

**IN WITNESS WHEREOF**, the parties have caused this Third Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR CDO 2003-1, LIMITED

By:_____
     Name:
     Title:

ZOHAR CDO 2003-1, CORP.

By:_____
     Name:
     Title:

ZOHAR CDO 2003-1, LLC
By:    Zohar CDO 2003-1, Limited
     as Managing Member

By:_____
     Name:
     Title:

MBIA INSURANCE CORPORATION

By:_____
     Name:
     Title:

CDC IXIS CAPITAL MARKETS
 NORTH AMERICA INC.

By:_____
     Name:
     Title:

- 4 -

NY274061.4/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050257**

CDC FINANCIAL PRODUCTS INC.
as Class A-1 Note Agent


By:_____
       Name:
       Title:


U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
       Name:
       Title:

- 5 -

NY274061.4/1939-17978
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050258**



**MBIA Insurance Corporation**
113 King Street, Armonk, NY 10504
Tel 914-273-4545
www.mbia.com

Capital Strength. Triple-A Performance.

EXECUTION VERSION

---

FOURTH SUPPLEMENTAL INDENTURE

DATED AS OF MARCH 21, 2007

to the

INDENTURE

among

ZOHAR CDO 2003-1, LIMITED,

ZOHAR CDO 2003-1, CORP.,

ZOHAR CDO 2003-1, LLC,

MBIA INSURANCE CORPORATION,
as Credit Enhancer,

IXIS FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent, and

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

Dated as of November 13, 2003

---

NY3:#7400911v5

RESPONDENTS'
EXHIBIT
**5**
AP No. 16462

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000638



Capital Strength. Triple-A Performance.

**FOURTH SUPPLEMENTAL INDENTURE** dated as of March 21, 2007 (this "Supplemental Indenture") among:

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR CDO 2003-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR CDO 2003-1, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors"); and

U.S. BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of The United States of America, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "Trustee").

PRELIMINARY STATEMENTS

The Issuer, the Co-Issuer, the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent and the Trustee are parties to an Indenture dated as of November 13, 2003 (as heretofore amended by the First, Second and Third Supplemental Indentures thereto, the "Indenture") providing for the issuance of Class A Notes, Class B Notes and Class C Notes.

The Zohar Obligors desire to amend the Indenture on the terms and conditions herein provided, and certain of such amendments require Noteholder and Preference Share Paying Agent consent pursuant to Section 8.2 of the Indenture. The Trustee and the Zohar Subsidiary may (subject to said Section 8.2) enter into one or more supplemental indentures to change in any manner certain provisions of the Indenture.

As contemplated by Section 8.2 of the Indenture, the Trustee has delivered a copy of this Supplemental Indenture to the Noteholders, the Preference Share Paying Agent, the Credit Enhancer, Moody's and Standard & Poor's. Moody's and Standard & Poor's have each confirmed in writing to the Trustee and the Co-Issuers that the amendments to the Indenture contemplated hereby will not cause the rating assigned by it to the Notes to be reduced or withdrawn.

Accordingly, in consideration of the premises and the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture.

Section 2. Amendments. Subject to the receipt by the Trustee of this Supplemental Indenture, duly executed and delivered by each of the parties hereto, but with effect as of date hereof, the Indenture is hereby amended as follows:

A. Definitions. The definition of "Arranger Fee Payment Dates" in Section 1.1 of the Indenture is hereby amended to read as follows:

NY3:#7400911v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000639



Capital Strength. Triple-A Performance.

"Arranger Fee Payment Dates": Each Payment Date commencing on the Payment Date in November, 2006, in each case so long as no Arranger Default shall have occurred and be continuing as of the related Determination Date.

B. Deferred Class B Structuring Fees. Section 10.6A(a)(Z) is hereby amended to read as follows:

"(Z)    Deferred Class B Structuring Fees.    Amounts retained in the Holdback Account pursuant to the proviso to clause (Y)(A) above will be applied on and after the later to occur of (I) the Phase I Effective Date and (II) the date on which the Class B Rating Condition is satisfied, as follows:

(A)    on the first Business Day (if any) following the date on which the Trustee receives a written notice (provided that if such notice is received after noon (New York time) on any Business Day it will be deemed to be received on the next succeeding Business Day) that all or a portion of the Class B Notes issued on the Closing Date are first rated at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's, and on each Additional Class B Note Issuance Date (if any), the Trustee shall disburse to the Placement Agent, in payment of accrued Deferred Class B Structuring Fees, an amount equal to 1% of the face amount of the Class B Notes that are so rated; provided that the aggregate amount disbursed to the Placement Agent pursuant to this clause (A) shall not exceed U.S.$1,500,000; and

(B)    on the final Payment Date, all amounts not disbursed to the Placement Agent pursuant to clause (A) above shall be transferred to the Cash Collateral Account for application under Section 11.2."

C.  Cash Collateral Account Waterfall.  Section 11.2(a)(iv) is hereby amended to read as follows:

"(iv)    if the Class A Coverage Tests are satisfied as of the related Determination Date and no Event of Default has occurred and is continuing, pro rata to (a) the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date; and (b) the Arranger Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Arranger Fee owed on any prior Payment Date; provided that (1) the aggregate amount payable under clause (b) of this Section 11.2(a)(iv) on any Payment Date shall not exceed U.S.$1,500,000; and (2) for purposes of calculating the Class A Overcollateralization Ratio Test for this Section 11.2(a)(iv) only, the Principal Balance of a Collateral Debt Obligation shall not include any principal amount representing previously deferred or capitalized interest;".

Section 3.  Waiver.  The parties hereto hereby waive the requirement in Section 8.2 of the Indenture that 15 Business Days' prior notice of this Supplemental Indenture be given as would otherwise be required under said Section 8.2.

NY3:#7400911v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000640



Capital Strength. Triple-A Performance.

Section 4.  Miscellaneous.

(a)  GOVERNING LAW.  THIS SUPPLEMENTAL INDENTURE, AND ALL MATTERS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER HEREOF, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

(b)  Counterparts.  This Supplemental Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one of the same instrument.  Delivery of an executed counterpart of a signature page of this Supplemental Indenture by telecopy shall be effective as delivery of a manually executed counterpart of this Supplemental Indenture.

(c)  Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction hereof.

(d)  Complete Agreement.  This Supplemental Indenture sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto.

(e)  Documents Otherwise Unchanged.  Except as herein provided, the Indenture and the other Transaction Documents shall remain unchanged and in full force and effect, and each reference to the Indenture and words of similar import in the Indenture and other Transaction Documents shall be a reference to the Indenture as amended hereby and as the same may be further amended, supplemented and otherwise modified and in effect from time to time.

[remainder of page intentionally blank]

NY3:#7400911v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000641



Capital Strength. Triple-A Performance.

**IN WITNESS WHEREOF**, the parties have caused this Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR CDO 2003-1, LIMITED

By:_____   _____
    Name:
    Title:

ZOHAR CDO 2003-1, CORP.

By:_____   _____
    Name:
    Title:

ZOHAR CDO 2003-1, LLC

By:_____   _____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Name:
    Title:

CONSENTED TO AND AGREED:

MBIA INSURANCE CORPORATION,
as Credit Enhancer

By:_____
    Name:
    Title: Michael Murtagh
        Director
        MBIA Insurance Corporation

NY3:#7400911v5

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

PP000642



Capital Strength. Triple-A Performance.

PATRIARCH PARTNERS VIII, LLC,
as Collateral Manager

By
  Name: Lynn Tilton
  Title: Manager

U.S. BANK NATIONAL ASSOCIATION,
as Preference Share Paying Agent

By
  Name:
  Title:

NY3 #7400911v5

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP000643**