# **EXHIBIT 2**

**Zohar II Indenture**

EXECUTION COPY

# INDENTURE

among

## ZOHAR II 2005-1, LIMITED

## ZOHAR II 2005-1, CORP.

## ZOHAR II 2005-1, LLC

## MBIA INSURANCE CORPORATION,
as Credit Enhancer

## IXIS FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent and Class A-3 Note Agent

and

## LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

**Dated as of January 12, 2005**

RESPONDENTS'
EXHIBIT

**8**

AP No. 16462

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050259

# CONTENTS

| Section | | Page |
|---|---|---|
| ARTICLE 1  DEFINITIONS | | 4 |
| Section 1.1. | Definitions | 4 |
| Section 1.2. | Assumptions as to Collateral Debt Obligations, Etc. | 69 |
| | | |
| ARTICLE 2  THE NOTES | | 71 |
| Section 2.1. | Forms Generally | 71 |
| Section 2.2. | Authorized Amount; Note Interest Rate; Stated Maturity; Denominations | 73 |
| Section 2.3. | Execution, Authentication, Delivery and Dating | 74 |
| Section 2.4. | Registration, Transfer and Exchange of Notes | 75 |
| Section 2.5. | Mutilated, Defaced, Destroyed, Lost or Stolen Notes | 84 |
| Section 2.6. | Payment of Interest, Principal and Commitment Fees; Rights Preserved | 85 |
| Section 2.7. | Persons Deemed Owners | 88 |
| Section 2.8. | Cancellation | 88 |
| Section 2.9. | Debt Treatment | 88 |
| Section 2.10. | Issuance of Additional Class B Notes | 88 |
| Section 2.11 | Depository Unable or Unwilling to Perform | 90 |
| Section 2.12. | Notes Beneficially Owned by Persons Not Qualified Purchasers | 90 |
| | | |
| ARTICLE 3  CONDITIONS PRECEDENT | | 91 |
| Section 3.1. | General Provisions | 91 |
| Section 3.2. | Security for Notes | 94 |
| Section 3.3. | Custodianship; Transfer of Collateral Debt Obligations and Eligible Investments | 96 |
| Section 3.4. | Representations as to Collateral | 98 |
| Section 3.5. | Representations and Warranties of the Co-Issuers | 101 |
| | | |
| ARTICLE 4  SATISFACTION AND DISCHARGE | | 102 |
| Section 4.1. | Satisfaction and Discharge of Indenture | 102 |
| Section 4.2. | Application of Trust Money | 103 |
| Section 4.3. | Repayment of Monies Held by Paying Agent | 104 |
| | | |
| ARTICLE 5  EVENTS OF DEFAULT; REMEDIES | | 104 |
| Section 5.1. | Events of Default | 104 |
| Section 5.2. | Acceleration of Maturity; Rescission and Annulment | 106 |
| Section 5.3. | Collection of Indebtedness and Suits for Enforcement by Trustee | 108 |
| Section 5.4. | Remedies | 110 |
| Section 5.5. | Preservation of Collateral | 112 |
| Section 5.6. | Trustee May Enforce Claims Without Possession of Notes | 113 |
| Section 5.7 | Application of Money Collected | 113 |
| Section 5.8. | Limitation on Suits | 113 |
| Section 5.9. | Unconditional Rights of Noteholders to Receive Principal, Interest, Class A-1 Commitment Fee, Class A-3 Commitment Fee and Certain Other Amounts | 114 |
| Section 5.10. | Restoration of Rights and Remedies | 114 |
| Section 5.11. | Rights and Remedies Cumulative | 115 |
| Section 5.12. | Delay or Omission Not Waiver | 115 |
| Section 5.13. | Control by Controlling Party | 115 |
| Section 5.14. | Waiver of Past Defaults | 115 |

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050260

Section 5.15.   Undertaking for Costs ............................................................................ 116
Section 5.16.   Waiver of Stay or Extension Laws .......................................................... 116
Section 5.17.   Sale of Collateral .................................................................................... 116
Section 5.18.   Action on the Notes ................................................................................ 117

ARTICLE 6  THE TRUSTEE ...................................................................................... 117
Section 6.1.    Certain Duties and Responsibilities ........................................................ 117
Section 6.2.    Notice of Default .................................................................................... 119
Section 6.3.    Certain Rights of Trustee ....................................................................... 119
Section 6.4.    Authenticating Agents ............................................................................ 121
Section 6.5.    Not Responsible for Recitals or Issuance of Notes ................................. 122
Section 6.6.    May Hold Notes ..................................................................................... 122
Section 6.7.    Money Held in Trust ............................................................................... 122
Section 6.8.    Compensation and Reimbursement ........................................................ 122
Section 6.9.    Corporate Trustee Required; Eligibility ................................................. 123
Section 6.10.   Resignation and Removal; Appointment of Successor ............................ 124
Section 6.11.   Acceptance of Appointment by Successor .............................................. 125
Section 6.12.   Merger, Conversion, Consolidation or Succession to Business of Trustee ................ 125
Section 6.13.   Co-Trustees ............................................................................................ 125
Section 6.14.   Certain Duties Related to Delayed Payment of Proceeds ........................ 127
Section 6.15.   Representations and Warranties of the Bank ........................................... 127
Section 6.16.   Exchange Offers ..................................................................................... 128
Section 6.17.   Fiduciary for Noteholders Only; Agent for the Credit Enhancer and Collateral
               Manager ................................................................................................. 128
Section 6.18.   Duties and Responsibilities of Trustee Following Payment in Full of the Notes ........ 128

ARTICLE 7  COVENANTS ......................................................................................... 128
Section 7.1.    Payment of Principal and Interest and Revolving Commitment Fees ........ 128
Section 7.2.    Maintenance of Office or Agency ........................................................... 129
Section 7.3.    Money for Note Payments to be Held in Trust ........................................ 129
Section 7.4.    Existence of Zohar Obligors ................................................................... 131
Section 7.5.    Protection of Collateral ........................................................................... 132
Section 7.6.    Opinions as to Collateral ........................................................................ 134
Section 7.7.    Performance of Obligations .................................................................... 134
Section 7.8.    Negative Covenants ................................................................................ 134
Section 7.9.    Certain Statements ................................................................................. 136
Section 7.10.   Co-Issuers May Consolidate, etc., Only on Certain Terms ...................... 137
Section 7.11.   Successor Substituted ............................................................................. 141
Section 7.12.   No Other Business .................................................................................. 141
Section 7.13.   Ramp Up; Rating Confirmation; Annual Rating Review; Etc. ................. 142
Section 7.14.   Calculation Agent ................................................................................... 144
Section 7.15.   Amendment of Certain Documents ......................................................... 146
Section 7.16.   Reporting ............................................................................................... 146
Section 7.17.   Special Procedures for Certain Obligations ............................................. 146
Section 7.18    Delivery of Appropriate Tax Forms ....................................................... 147
Section 7.19    Section 3(c)(7) Procedures .................................................................... 147

ii

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050261

ARTICLE 8 SUPPLEMENTAL INDENTURES ..................................................................... 148
  Section 8.1.   Supplemental Indentures Without Consent of Noteholders ......................... 148
  Section 8.2.   Supplemental Indentures with Consent of Noteholders ............................. 151
  Section 8.3.   Execution of Supplemental Indentures ...................................................... 153
  Section 8.4.   Effect of Supplemental Indentures ............................................................ 153
  Section 8.5.   Reference in Notes to Supplemental Indentures ........................................ 153
  Section 8.6.   Rights of the Credit Enhancer .................................................................... 154

ARTICLE 9 REDEMPTION AND REPAYMENT OF NOTES, ETC. ..................................... 154
  Section 9.1.   Redemption of all Notes ............................................................................ 154
  Section 9.2.   Notice to Trustee of Optional Redemption ................................................ 156
  Section 9.3.   Notice of Optional Redemption or Maturity by the Co-Issuers .................. 156
  Section 9.4.   Notes Payable on Redemption Date ........................................................... 157
  Section 9.5.   Certain Prepayments; Reduction of Commitments ..................................... 157
  Section 9.6.   Borrowings; Class A Pro Rata Adjustment Advances .................................. 158
  Section 9.7.   Application of Amounts to Purchase and Fund Collateral Debt Obligations ............. 161

ARTICLE 10 ACCOUNTS, ACCOUNTINGS AND RELEASES ............................................. 162
  Section 10.1.  Collection of Money .................................................................................. 162
  Section 10.2.  Principal Collection Accounts; Interest Collection Accounts; Custodial
                Account ....................................................................................................... 163
  Section 10.3.  Payment Account ....................................................................................... 166
  Section 10.4.  Cash Collateral Account ............................................................................ 166
  Section 10.5.  Class A Holder Collateral Accounts ........................................................... 167
  Section 10.6.  Expense Account; Professional Fee Account; Closing Expense Account ............... 169
  Section 10.7.  Cash Reserve Account ............................................................................... 171
  Section 10.8.  Unfunded Revolver Discount Account ....................................................... 172
  Section 10.9.  Unrestricted Collateral Account ............................................................... 173
  Section 10.10. Rollover Proceeds Account ....................................................................... 174
  Section 10.11. [Reserved] .................................................................................................. 175
  Section 10.12. Reports by Trustee .................................................................................... 175
  Section 10.13. Accountings .............................................................................................. 176
  Section 10.14. Release of Collateral ................................................................................ 187
  Section 10.15. Reports by Independent Accountants ........................................................ 188
  Section 10.16. Reports to Rating Agencies, Etc. .............................................................. 189

ARTICLE 11 APPLICATION OF MONIES ............................................................................ 189
  Section 11.1.  Disbursements of Monies from Payment Account ..................................... 189
  Section 11.2.  Disbursements of Monies from Cash Collateral Account .......................... 195
  Section 11.3.  [Reserved] .................................................................................................. 197
  Section 11.4.  Disbursements of Monies from Unfunded Revolver Discount Account .............. 197
  Section 11.5.  Disbursements of Monies from Unrestricted Collateral Account ............... 198
  Section 11.6.  Disbursements of Monies from Rollover Proceeds Account ...................... 199
  Section 11.7.  [Reserved] .................................................................................................. 199
  Section 11.8.  Trust Accounts .......................................................................................... 199

iii

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050262

ARTICLE 12  ACQUISITION AND SALE OF COLLATERAL DEBT OBLIGATIONS AND
EQUITY SECURITIES .................................................................................................. 200
    Section 12.1.  Acquisition of Collateral Debt Obligations and Equity Securities; Eligibility
               Criteria .............................................................................................................. 200
    Section 12.2.  Sale of Collateral ............................................................................................... 208
    Section 12.3.  Conditions Applicable to all Transactions Involving Sale or Grant ............................ 211

ARTICLE 13  NOTEHOLDERS' RELATIONS .......................................................................... 211
    Section 13.1.  Subordination ...................................................................................................... 211
    Section 13.2.  Standard of Conduct ........................................................................................... 213
    Section 13.3.  Controlling Party ................................................................................................ 213
    Section 13.4.  Non-Petition ....................................................................................................... 213

ARTICLE 14  ASSIGNMENT OF MANAGEMENT AGREEMENT AND COLLATERAL
ADMINISTRATION AGREEMENT, ETC. ............................................................................. 214
    Section 14.1.  Assignment ......................................................................................................... 214
    Section 14.2.  No Impairment .................................................................................................... 214
    Section 14.3.  Termination, Etc. ................................................................................................ 214
    Section 14.4.  Assignment of Collateral Management Agreement and Collateral
               Administration Agreement .................................................................................. 215
    Section 14.5.  Issuer and Collateral Administrator Agreements, Etc. ............................................ 216

ARTICLE 15  HEDGE AGREEMENTS ...................................................................................... 217
    Section 15.1.  Hedge Agreements .............................................................................................. 217

ARTICLE 16  THE CREDIT ENHANCEMENT ........................................................................ 219
    Section 16.1.  Certain Rights of the Credit Enhancer ................................................................ 219
    Section 16.2.  Modification or Termination of Credit Enhancement and Credit Enhancement
               Agreement .......................................................................................................... 220
    Section 16.3.  Drawings under the Credit Enhancement ........................................................... 220
    Section 16.4.  Preference Claims and Insolvency Proceedings .................................................. 221
    Section 16.5.  Subrogation ........................................................................................................ 222
    Section 16.6.  Credit Enhancement Payment Account ............................................................... 223
    Section 16.7.  Certain Remedies .............................................................................................. 223
    Section 16.8.  Miscellaneous .................................................................................................... 224
    Section 16.9.  No Proceedings .................................................................................................. 224

ARTICLE 17  CLASS A-1 NOTE AGENT AND CLASS A-3 NOTE AGENT .......................... 225
    Section 17.1.  Appointment of Class A-1 Note Agent ............................................................... 225
    Section 17.2.  Certain Duties and Responsibilities .................................................................... 225
    Section 17.3.  Compensation ..................................................................................................... 226
    Section 17.4.  Resignation and Removal; Appointment of a Successor ..................................... 226
    Section 17.5.  Acceptance of Appointment of a Successor ........................................................ 227
    Section 17.6.  Appointment of Class A-3 Note Agent ............................................................... 228

ARTICLE 18  MISCELLANEOUS ............................................................................................. 228
    Section 18.1.  Form of Documents Delivered to Trustee ........................................................... 228
    Section 18.2.  Acts of Noteholders ............................................................................................ 229

iv

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050263

Section 18.3.   Notices, etc., to Trustee, the Preference Share Paying Agent, the Zohar
                Obligors, the Collateral Manager, the Credit Enhancer, the Rating Agencies
                and the Hedge Counterparty ............................................................................... 229
Section 18.4.   Notices and Reports to Noteholders; Waiver ................................................... 231
Section 18.5.   Effect of Headings and Table of Contents....................................................... 232
Section 18.6.   Successors and Assigns .................................................................................... 232
Section 18.7.   Severability......................................................................................................... 232
Section 18.8.   Benefits of Indenture ......................................................................................... 232
Section 18.9.   Governing Law .................................................................................................. 232
Section 18.10.  Submission to Jurisdiction ................................................................................ 233
Section 18.11.  Waiver of Jury Trial .......................................................................................... 233
Section 18.12.  Counterparts ...................................................................................................... 233
Section 18.13.  Judgment Currency ........................................................................................... 233
Section 18.14.  Confidentiality ................................................................................................... 234

## SCHEDULES

Schedule A-1    Collateral Debt Obligations Owned by the Issuer or the Zohar Subsidiary on the
                Funding Date
Schedule A-2    Collateral Debt Obligations to Be Acquired from Ark CLO 2000-1, Limited
Schedule B      LIBOR Formula
Schedule C-1    Moody's Industry Classification Group List
Schedule C-2    Standard & Poor's Industry Classification Group List
Schedule D      Diversity Score Table
Schedule E      Approved Loan Pricing Services

## EXHIBITS

Exhibit A-1     Form of Certificated Notes (Class A Notes)
Exhibit A-2     Form of Temporary Regulation S Global Note (Class A-2 Notes and Class A-3 Notes)
Exhibit A-3     Form of Rule 144A Global Note (Class A-2 Notes and Class A-3 Notes)
Exhibit A-4     Form of Regulation S Global (Class A-2 Notes and Class A-3 Notes)
Exhibit A-5     Form of Class B Note
Exhibit A-6     Form of Class C Note
Exhibit B-1     Form of Class A Note Certificate
Exhibit B-2     Form of Certificate for Transfer or Exchange of Rule 144A Global Note to Temporary
                Regulation S Global Note or Regulation S Global Note
Exhibit B-3     Form of Certificate for Transfer or Exchange of Temporary Regulation S Global Note
                or Regulation S Global Note to Rule 144A Global Note
Exhibit B-4     Form of QIB/QP Certification
Exhibit B-5     Form of Regulation S Transferee Certification
Exhibit B-6     Form of Certificate for Transfer or Exchange of Certificated Note to Temporary
                Regulation S Global Note or Regulation S Global Note
Exhibit B-7     Form of Certificate for Transfer or Exchange of Certificated Note to Rule 144A Global

v

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050264

|  | Note |
| Exhibit B-8 | Form of Class B Note Certificate |
| Exhibit B-9 | Form of Class C Note Certificate |
| Exhibit C | Form of Opinion of Milbank, Tweed, Hadley & McCloy LLP |
| Exhibit D | Form of Opinion of Maples and Calder |
| Exhibit E-1 | Form of Opinion of Kennedy Covington Lobdell & Hickman LLP |
| Exhibit E-2 | Form of Opinion of Seyfarth Shaw LLP |
| Exhibit E-3 | Form of Opinion of In-House Counsel to Trustee |
| Exhibit F | Form of Opinion of Richards Spears Kibbe & Orbe LLP |
| Exhibit G | Form of Opinion of In-House Counsel to Credit Enhancer |
| Exhibit H | Form of Funding Certificate |
| Exhibit I-1 | Form of Section 3(c)(7) Reminder Notice |
| Exhibit I-2 | Form of Important Section 3(c)(7) Reminder Notice |
| Exhibit J | Form of Confidentiality Agreement |

vi

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050265

**INDENTURE** dated as of January 12, 2005, among:

ZOHAR II 2005-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR II 2005-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR II 2005-1, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors");

MBIA INSURANCE CORPORATION, a stock insurance company incorporated under the laws of the State of New York ("MBIA" or the "Credit Enhancer");

IXIS FINANCIAL PRODUCTS INC., a corporation organized and existing under the laws of the State of Delaware, as agent for the holders of the Class A-1 Notes and Class A-3 Notes referred to below (in such capacities, together with its successors in such capacities, the "Class A-1 Note Agent" and "Class A-3 Note Agent", respectively); and

LASALLE BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "Trustee").

## PRELIMINARY STATEMENTS

The Zohar Obligors are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Zohar Obligors herein are for the benefit and security of the Noteholders, the Credit Enhancer, the Hedge Counterparties, the Collateral Manager, the Collateral Administrator and the Trustee (collectively, the "Secured Parties"). The Zohar Obligors are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Zohar Obligors in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, a continuing security interest in, and lien on, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, instruments, deposit accounts, investment property (each, as defined in the UCC), and any and all other property of any type or nature owned by it (other than Excluded Property), including but not limited to (a) the Collateral Debt Obligations, the Unrestricted Collateral Debt Obligations and any Equity Securities and other securities or obligations owned or acquired by the Issuer on the Funding Date, which the Issuer (or the Collateral Manager on the Issuer's behalf) causes to be delivered to the Trustee (directly or through a Securities Intermediary or bailee), all payments thereon or with respect thereto and all Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and Equity Securities and other securities or

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

obligations owned or acquired from time to time by the Issuer (including, without limitation, Exchanged Securities) that are delivered to the Trustee (directly or through a Securities Intermediary or bailee) after the Funding Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Custodial Account, the Payment Account, the Issuer Principal Collection Account, the Issuer Interest Collection Account, the Cash Collateral Account, the Unrestricted Collateral Account, the Class A Holder Collateral Account, the Expense Account, the Closing Expense Account, the Professional Fee Account, the Cash Reserve Account, the Unfunded Revolver Discount Account, the Rollover Proceeds Account and Eligible Investments purchased with funds on deposit in said accounts and all income from the investment of funds therein, (c) the Hedge Agreements (if any) and all payments thereunder or with respect thereto and each Hedge Counterparty Collateral Account, (d) the Management Agreement, the Collateral Administration Agreement, the Purchase Documents, the Class A-1 Note Purchase Agreements, the Note Subscription Agreements and the Preference Share Subscription Agreements, (e) all Cash and Money delivered to the Trustee (directly or through a Securities Intermediary or bailee) (other than Cash or Money on deposit in the Credit Enhancement Payment Account), (f) the membership interests in the Zohar Subsidiary and (g) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (but excluding the Preference Share Distribution Account, Eligible Investments purchased with funds on deposit therein and all funds deposited therein and financial assets and investment property credited thereto and income from the investment of funds therein and any part thereof that consists of general intangibles or investment property (each as defined in the UCC) relating thereto).

The Zohar Subsidiary hereby Grants to the Trustee, for the benefit and security of the Secured Parties, a continuing security interest in, and lien on, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, instruments, deposit accounts, investment property (each, as defined in the UCC), and any and all other property of any type or nature owned by it, including but not limited to (a) the Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and any Equity Securities and other securities or obligations owned or acquired by the Zohar Subsidiary on the Funding Date, which the Zohar Subsidiary (or the Collateral Manager on the Zohar Subsidiary's behalf) causes to be delivered to the Trustee (directly or through a Securities Intermediary or bailee), all payments thereon or with respect thereto and all Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and Equity Securities and other securities or obligations owned or acquired from time to time by the Zohar Subsidiary (including, without limitation, Exchanged Securities) that are delivered to the Trustee (directly or through a Securities Intermediary or bailee) after the Funding Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Custodial Account, the Zohar Subsidiary Principal Collection Account and the Zohar Subsidiary Interest Collection Account and Eligible Investments purchased with funds on deposit in said accounts and all income from the investment of funds therein, (c) the Management Agreement, (d) all Cash and Money delivered to the Trustee (directly or through a Securities Intermediary or bailee) (other than Cash or Money on deposit in the Credit Enhancement Payment Account) and (e) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Zohar Subsidiary described in the preceding clauses.

Such Grants by the Issuer and the Zohar Subsidiary are made, however, to the Trustee to hold in trust, to secure (i) the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, (ii) the payment of all amounts due on the Notes in accordance with their terms, (iii) the payment by the Issuer of all amounts due under the Credit Enhancement Agreement, (iv) the payment by the Issuer of all amounts payable under the Hedge Agreements, (v) the payment of all

2

Indenture<br>PP050267

NY3:#7347151v22<br>CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP<br>ON BEHALF OF PATRIARCH PARTNERS LLC

other amounts payable under this Indenture, and (vi) compliance by each of the Zohar Obligors with the provisions of this Indenture, the Credit Enhancement Agreement, the Management Agreement, the Collateral Administration Agreement and the Hedge Agreements, all as provided in this Indenture, the Credit Enhancement Agreement, the Management Agreement, the Collateral Administration Agreement and the Hedge Agreements (collectively, the "Secured Obligations"). Except to the extent otherwise provided in this Indenture, the Issuer and the Zohar Subsidiary do hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer and the Zohar Subsidiary, respectively, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer and the Zohar Subsidiary with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all Monies and claims for Monies due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any Proceedings which the Trustee may deem to be necessary or advisable in the premises. The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power. This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

Each Secured Party hereby acknowledges and agrees that its rights as a Secured Party under this Indenture shall be subject to and in accordance with the Priority of Payments.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer and the Zohar Subsidiary shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer or the Zohar Subsidiary under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein to the best of its ability such that the interests of the Secured Parties may be adequately and effectively protected.

3

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050268

Respondents' Exhibit 8   pg. 10 of 447

# ARTICLE I

## DEFINITIONS

Section 1.1.    Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

"Acceptable Class B Rating": The meaning specified in Section 7.13(b)(1).

"Account": Any of the Payment Account, the Issuer Interest Collection Account, the Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Principal Collection Account, the Credit Enhancement Payment Account, the Cash Collateral Account, the Unrestricted Collateral Account, the Class A Holder Collateral Account, the Expense Account, the Closing Expense Account, the Professional Fee Account, the Cash Reserve Account, the Unfunded Revolver Discount Account, the Custodial Account, the Rollover Proceeds Account and any Hedge Counterparty Collateral Account.

"Accountants' Report": A report of Anchin, Block & Anchin LLP or another firm of Independent certified public accountants of recognized national reputation appointed by the Issuer pursuant to Section 10.15(a), which may be the firm of independent accountants that reviews or performs procedures with respect to the financial reports prepared by the Issuer or the Collateral Manager.

"Act" and "Acts of Noteholders": The meanings specified in Section 18.2.

"Additional Class B Note Issuance Date": The meaning specified in Section 2.10.

"Additional Class B Notes": The meaning specified in Section 2.10.

"Adequate Market Value Collateral Debt Obligation": The meaning specified in Section 9.1(b)(ii)(C).

"Adjusted Event of Default Overcollateralization Ratio": As of (i) the Funding Date, 102% and (ii) thereafter, the number (expressed as a percentage) calculated by subtracting 28 from the Class A Overcollateralization Ratio (determined as of the most recent to occur of the Ramp Up End Date and each annual anniversary thereof); provided that (i) if such number is smaller than 102%, the Adjusted Event of Default Overcollateralization Ratio shall be deemed to be 102% and (ii) if such number is greater than 107%, the Adjusted Event of Default Overcollateralization Ratio shall be deemed to be 107%.

"Adjusted Priority of Payments Overcollateralization Ratio": As of (i) the Funding Date, 105% and (ii) thereafter, the number (expressed as a percentage) calculated by adding 3 to the Adjusted Event of Default Overcollateralization Ratio (determined as of the most recent to occur of the Ramp Up End Date and each annual anniversary thereof).

4

Indenture
PP050269

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Administration Agreement": The Amended and Restated Administration Agreement dated January 11, 2005, between the Administrator and the Issuer, as modified and supplemented and in effect from time to time.

"Administrative Expenses": Amounts (including indemnities) due or accrued with respect to any Payment Date and payable by any Zohar Obligor to (a) the Trustee pursuant to Section 6.8 or any co-trustee appointed pursuant to Section 6.13; (b) the Collateral Administrator under the Collateral Administration Agreement; (c) the Administrator under the Administration Agreement; (d) the Preference Share Paying Agent and the Preference Share Registrar under the Preference Share Paying Agency Agreement, (e) the Independent accountants, agents and counsel of any Zohar Obligor for fees and expenses; (f) the Rating Agencies for fees and expenses in connection with any rating of the Notes, including fees and expenses due or accrued in connection with any rating of the Collateral Debt Obligations and any ongoing surveillance fees, credit estimates and expenses; (g) the Credit Enhancer in respect of ongoing surveillance fees and expenses in an amount equal to U.S.$50,000 per annum (which amount will be prorated for each Payment Date); (h) the Collateral Manager under this Indenture and/or the Management Agreement (including, without limitation, amounts payable pursuant to Section 4.2 of the Management Agreement); (i) any other Person for fees and expenses in connection with any loan pricing services provided to the Issuer and/or the Zohar Subsidiary by such Person, (j) any other Person in respect of any governmental filing or registration fee, charge or tax in relation to any Zohar Obligor (including, in the case of the Zohar Subsidiary, any U.S. federal income taxes due and owing as of such Payment Date or reasonably determined by the Collateral Manager to become due and owing during the Due Period in which such Payment Date falls); and (k) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture and the Notes; provided that Administrative Expenses shall not include (i) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date or Funding Date, (ii) the Collateral Management Fee, (iii) any principal of or interest on any Notes or any Class A-1 Commitment Fee, (iv) any amount owing under any Hedge Agreement or (v) any Credit Enhancement Premium or Credit Enhancement Reimbursement Amounts.

"Administrator": Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands, and any successor thereto.

"Affiliate" or "Affiliated": With respect to a Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, Officer, employee, member or general partner of (i) such Person or (ii) any such other Person described in clause (a) above, provided that (A) any Holder of a Preference Share or Note, (B) the Credit Enhancer or (C) any company to which the Administrator acts as share trustee or administrator or provides directors or other services shall not in any such case be an Affiliate of the Issuer solely by reason of such Person holding a Preference Share or Note, acting as the Credit Enhancer, or having the Administrator act as share trustee or administrator or provide directors or other services for such Person. For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent Members": Members of, or participants in, the Depository.

"Aggregate Industry Equivalent Unit Score": With respect to each Moody's Industry Classification Group, the sum of the Equivalent Unit Scores for each issuer of a Collateral Debt

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050270

Obligation in such Moody's Industry Classification Group. For purposes of calculating the Aggregate Industry Equivalent Unit Score, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Aggregate Outstanding Amount": When used with respect to any of the Notes at any time, the aggregate principal amount of such Notes Outstanding at such time (in each case excluding any unutilized commitments).

"Aggregate Principal Balance": When used with respect to any Pledged Obligations, the sum of the Principal Balances of all such Pledged Obligations.

"Aggregate Undrawn Amount": At any time:

(a)    with respect to the Class A-1 Notes, the excess (if any) of (i) the aggregate amount of the Class A-1 Commitments (whether or not utilized) over (ii) the Aggregate Outstanding Amount at such time of the Class A-1 Notes; and

(b)    with respect to the Class A-3 Notes, the excess (if any) of (i) the aggregate amount of the Class A-3 Commitments (whether or not utilized) over (ii) the Aggregate Outstanding Amount at such time of the Class A-3 Notes.

"Approved Loan Pricing Service": Any: (a) Person set forth on Schedule E; or (b) dealer in the relevant market Independent of the Collateral Manager and approved by Standard & Poor's (provided that the Collateral Manager shall notify Moody's and the Credit Enhancer of any such dealer approved by Standard & Poor's).

"Approved Replacement": Any replacement for an individual who is (a) a director, officer or management-level employee of the Collateral Manager and (b) actively involved in the management of the Collateral Debt Obligations.

"Arranger": IXIS Capital Markets North America Inc.

"Asset-backed Security": A security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the security holders.

"Assigned Moody's Rating": The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"Assumed Reinvestment Rate": With respect to any Account or fund securing the Notes, as at any date, a rate per annum equal to (a) LIBOR (calculated according to Schedule B for a three-month Interest Period and assuming such date is a LIBOR Determination Date) minus (b) 1.00%.

"Authenticating Agent": With respect to the Notes or any Class of the Notes, the Person designated by the Trustee, if any, to authenticate such Notes on behalf of the Trustee pursuant to Section 6.4.

6

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Authorized Officer": With respect to any Zohar Obligor, any Officer who is authorized to act for such Zohar Obligor in matters relating to, and binding upon, such Zohar Obligor. With respect to the Collateral Manager, any Officer, employee, manager or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect and such Person may be considered to be an "Authorized Officer" until receipt by such other party of written notice to the contrary.

"Average Par Amount": At any time, the sum of the Issuer Par Amounts at such time of the Collateral Debt Obligations divided by the sum of the number of issuers of the Collateral Debt Obligations; provided that, (a) for purposes of calculating the number of issuers of the Collateral Debt Obligations, any issuers Affiliated with one another will be considered one issuer and (b) for purposes of calculating the Average Par Amount, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Balance": At any time, with respect to Cash or Eligible Investments in any Account at such time, the aggregate of the (a) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (b) principal amount of interest-bearing corporate and government securities, money market accounts, repurchase obligations and Reinvestment Agreements; and (c) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank": LaSalle Bank National Association, a national banking association organized and existing under the laws of the United States, in its individual capacity and not as Trustee or Preference Share Paying Agent.

"Bankruptcy Code": The United States Bankruptcy Code, Title 11 of the United States Code, as amended.

"Base Rate": The meaning specified in Schedule B.

"Base Rate Reference Bank": The meaning specified in Schedule B.

"Bearer Form": When used with respect to a Certificated Security, a form in which the Security is payable to the bearer of the Security Certificate according to its terms but not by reason of an Indorsement.

"Board of Directors": With respect to the Issuer, the directors of the Issuer duly appointed in accordance with the Issuer Charter; with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the shareholders of the Co-Issuer; and with respect to the Zohar Subsidiary, the sole member of the Zohar Subsidiary specified in the Zohar Subsidiary Operating Agreement.

"Board Resolution": With respect to any Zohar Obligor, a resolution of the Board of Directors of such Zohar Obligor, as the case may be.

"Bond": A debt security (that is not a loan) that is issued by a corporation, limited liability company, partnership, trust or other legal entity.

7

Indenture
PP050272

NY3:#734715lv22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Borrowing": The meaning specified in Section 9.6(a).

"Borrowing Date": The meaning specified in Section 9.6(a).

"Business Day": A day on which commercial banks and foreign exchange markets settle payments in each of (a) New York City, (b) Chicago, Illinois, (c) any other city in which the Corporate Trust Office is located, (d) in the case of the final payment of principal of any Note, the place of presentation of such Note and (e) in any case where action is required on the part of the Issuer, the Cayman Islands.

"Calculation Agent": The meaning specified in Section 7.14(a).

"Cash": Such coin or currency of the United States as at the time shall be legal tender for payment of all public and private debts.

"Cash Collateral Account": The trust account designated the "Cash Collateral Account" and established in the name of the Trustee pursuant to Section 10.4(a).

"Cash Reserve Account": The trust account designated the "Cash Reserve Account" and established in the name of the Trustee pursuant to Section 10.7(a).

"Cash Retention Amount": For any Payment Date, an amount specified by the Collateral Manager by Issuer Order delivered on or before the related Determination Date to the Trustee to be maintained in the Issuer Principal Collection Account, not in excess of U.S.$5,000,000; provided that (i) on any Payment Date following the date upon which an Event of Default (and the acceleration of the Notes as a result thereof) has occurred and is continuing, (ii) on any Payment Date relating to the Stated Maturity of any Note or (iii) on any Redemption Date, the Cash Retention Amount shall be zero.

"Category 1": A Collateral Debt Obligation (other than (i) a Workout Obligation or (ii) an Originated Special Loan/Preferred Security that is a Preferred Security) that does not satisfy the criteria of any of Category 2, Category 3 or Category 4.

"Category 1 Ratio": The percentage specified in the Currently Applicable Row of the Ratings Matrix.

"Category 1-2 Ratio": The percentage specified in the Currently Applicable Row of the Ratings Matrix.

"Category 2": A Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security) that (i) does not satisfy the criteria of Category 3 or Category 4 and (ii) is a Current Collateral Debt Obligation.

"Category 3": A Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security) that (i) does not satisfy the criteria of Category 4 and (ii) (a) is a Current Collateral Debt Obligation and (b)(1) is an Insolvency Collateral Debt Obligation for which a plan of reorganization has been filed with the court primarily responsible for administering such case, at least 10 days have elapsed after the date on which such plan was so filed and confirmation of such plan has not been rejected by such court or (2) the Obligor thereon has agreed to an out of court restructuring of its financial obligations and the material terms of such restructuring have been agreed to

8

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050273

by all creditors whose debts will be adversely affected by such restructuring; provided that a Collateral Debt Obligation shall not be Category 3 for more than six consecutive months.

"Category 4": A Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security) that (i) is a Current Collateral Debt Obligation, (ii) is not an Insolvency Collateral Debt Obligation, (iii) with respect to any Underlying Instruments related to such Collateral Debt Obligation, there shall not have occurred any "event of default" or any "default" by the Obligor thereon with respect to any covenant, representation or warranty contained therein, or any other "event of default" or "default" thereunder, in each case which has not been waived, (iv) with respect to the Obligor thereon, there are no negotiations, at the time of measurement, to restructure (either in or outside of a bankruptcy or reorganization Proceeding) the financial obligations of such Obligor and (v) is not a Collateral Debt Obligation that has, in the reasonable judgment of the Collateral Manager, a significant risk of declining in credit quality or, with the passage of time, becoming Category 1, Category 2 or Category 3.

"Certificate of Authentication": The meaning specified in Section 2.3(f).

"Certificated Note": A Note in certificated form.

"Certificated Security": A Security that is represented by a certificate.

"Chattel Paper": The meaning specified in Section 9-102(a)(11) of the UCC.

"Class": Any of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes (provided that, unless the context otherwise expressly requires, the Class A Notes shall be deemed to constitute a single Class of Notes for all purposes of this Indenture).

"Class A Additional Interest": With respect to any Class A-1 Note, Class A-2 Note or Class A-3 Note during any Interest Period, any incremental interest accruing during such Interest Period (based on the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate or the Class A-3 Note Interest Rate, as applicable) at a rate per annum in excess of the sum of LIBOR for such Interest Period plus 0.50%.

"Class A Applicable Margin": With respect to any Class A-1 Notes, Class A-2 Notes or Class A-3 Notes and any Interest Period:

        (a)    if on the LIBOR Determination Date in respect of such Interest Period the rating of such Notes most recently assigned or confirmed by Moody's is equal to or greater than "A2" and the rating of such Notes most recently assigned or confirmed by Standard & Poor's is equal to or greater than "A+" (in each case, after giving effect to the Credit Enhancement or any other credit enhancement of such Notes), 0.50%; and

        (b)    if on the LIBOR Determination Date in respect of such Interest Period the rating of such Notes most recently assigned or confirmed by Moody's is less than "A2" or the rating of such Notes most recently assigned or confirmed by Standard & Poor's is less than "A+" (in each case, after giving effect to the Credit Enhancement or any other credit enhancement of such Notes), 0.70%.

"Class A Break-Even Loss Rate": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined through

9

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050274

Respondents' Exhibit 8   pg. 16 of 447

application of the Standard & Poor's CDO Monitor, which, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, shall result in sufficient funds remaining for the payment of the Class A Notes in full by their Stated Maturity and the timely payment of interest (other than Class A Additional Interest), the Class A-1 Commitment Fee and the Class A-3 Commitment Fee (in each case, without giving effect to the Credit Enhancement, as applicable).

"Class A Coverage Tests": Collectively, the Class A Overcollateralization Ratio Test and the Class A Interest Coverage Ratio Test.

"Class A Holder Collateral Account": A trust account designated a "Class A Holder Collateral Account" and established in the name of the Trustee pursuant to Section 10.5(a).

"Class A Interest Coverage Ratio": As of any Measurement Date, the ratio (expressed as a percentage) calculated by dividing:

(a)    the sum (not less than zero) (without duplication) of (i) the Scheduled Distributions of interest (determined assuming that LIBOR, or such other rate basis applicable to the relevant Collateral Debt Obligation and Unrestricted Collateral Debt Obligations, remains constant throughout such Due Period, but exclusive of (A) interest accrued on Collateral Debt Obligations to the date of acquisition thereof by the Issuer and/or the Zohar Subsidiary and purchased with Principal Proceeds or Uninvested Proceeds, (B) interest accrued on Unrestricted Collateral Debt Obligations to the date of acquisition thereof by the Issuer and/or the Zohar Subsidiary and purchased with amounts on deposit in the Unrestricted Collateral Account, (C) amounts accrued and unpaid in respect of Non-Performing Obligations and Non-Current Obligations (without duplication) and (D) the amount of any payments that the Collateral Manager believes with reasonable certainty (which belief shall be communicated to the Trustee in writing prior to such Measurement Date) will not be made in Cash in the Due Period in which such Measurement Date occurs) (regardless of whether the due date for any such interest payment has yet occurred) to be received by the Issuer and/or the Zohar Subsidiary in the Due Period in which such Measurement Date occurs on the Collateral Debt Obligations and Unrestricted Collateral Debt Obligations; plus (ii) the Scheduled Distributions of interest on Eligible Investments held in the Accounts (other than the Class A Holder Collateral Account and the Hedge Counterparty Collateral Account) that constitute Interest Proceeds to be received by the Issuer and/or the Zohar Subsidiary during such Due Period; plus (iii) the Scheduled Distributions of commitment fees and other fees to be received by the Issuer and/or the Zohar Subsidiary during such Due Period in respect of Collateral Debt Obligations and Unrestricted Collateral Debt Obligations that constitute Interest Proceeds; plus (iv) any other amounts actually received by the Issuer and/or the Zohar Subsidiary during such Due Period that constitute Interest Proceeds; plus (v) if the Issuer has entered into a Hedge Agreement, the amount, if any, payable to the Issuer by the Hedge Counterparty under such Hedge Agreement on the Payment Date relating to such Due Period (other than any Hedge Termination Amount); plus (vi) regularly scheduled dividends on Preferred Securities (provided that (A) the Collateral Manager believes with reasonable certainty that such regularly scheduled dividend will be paid and (B) the most recent regularly scheduled dividend was paid), minus (vii) the sum of all amounts payable pursuant to paragraphs (A) through (E) of Section 11.1(a)(i) on the Payment Date immediately following such Due Period; by

(b)    the sum of the scheduled (i) Class A Interest Distribution Amount (excluding any Class A Additional Interest and any Defaulted Interest with respect thereto and interest thereon); plus (ii) Class A-1 Commitment Fee Amount; plus (iii) Class A-3 Commitment Fee Amount; plus

10

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050275

(iv) Senior Class A-1 Additional Amounts; plus (v) Credit Enhancement Premium, in each case for the Payment Date relating to such Due Period.

For purposes of calculating clause (a) above, Scheduled Distributions in the case of Collateral Debt Obligations that bear interest at a rate that decreases solely as a function of the passage of time shall be calculated assuming the lowest rate of interest that such Collateral Debt Obligations may now or in the future bear interest at, and for purposes of calculating the Class A Interest Coverage Ratio (except for purposes of clause (a)(vi) of the definition thereof), any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Class A Interest Coverage Ratio Test": For so long as any Class A Notes are Outstanding or the Class A-1 Commitments or the Class A-3 Commitments shall not have expired, terminated or been reduced to zero, a test satisfied on any Measurement Date if the Class A Interest Coverage Ratio on such Measurement Date is equal to or greater than 110%; provided that compliance with the Class A Interest Coverage Ratio Test shall only be required on any Measurement Date on or after the Ramp Up End Date.

"Class A Interest Distribution Amount": Collectively, the Class A-1 Interest Distribution Amount, the Class A-2 Interest Distribution Amount and the Class A-3 Interest Distribution Amount.

"Class A Loss Differential": At any time, the rate calculated by subtracting the Class A Scenario Loss Rate at such time from the Class A Break-Even Loss Rate at such time.

"Class A Note Certificate": A certificate substantially in the form of Exhibit B-1.

"Class A Note Reduction Amount": The meaning specified in Section 11.1(a)(i)(H).

"Class A Notes": Collectively, the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes.

"Class A Overcollateralization Ratio": As of any Measurement Date, the number (expressed as a percentage) calculated by dividing:

(a)    the sum of (1) the Net Portfolio Collateral Balance as of such Measurement Date; plus (2) the Unrestricted Collateral Balance as of such Measurement Date; plus (3) the aggregate amount of Principal Proceeds and Uninvested Proceeds on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account on such Measurement Date; plus (4) the Balance on deposit in the Rollover Proceeds Account on such Measurement Date; by

(b)    the sum of (1) the Aggregate Outstanding Amount of the Class A Notes as of such Measurement Date; plus (2) the Net Aggregate Exposure Amount as of such Measurement Date;

provided that, for the avoidance of doubt, any amounts that (i) are on deposit in the Issuer Principal Collection Account, the Zohar Subsidiary Principal Collection Account or the Rollover Proceeds Account as of such Measurement Date and (ii) will be applied to purchase any Collateral Debt Obligation that the Issuer and/or Zohar Subsidiary have committed to purchase (but which purchases have not yet settled) as of such Measurement Date, shall be excluded in determining the Class A Overcollateralization Ratio.

11

Indenture
PP050276

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Class A Overcollateralization Ratio Test": For so long as any Class A Notes are Outstanding or the Class A-1 Commitments or the Class A-3 Commitments shall not have expired, terminated or been reduced to zero, a test satisfied on any Measurement Date if the Class A Overcollateralization Ratio on such Measurement Date is equal to or greater than the percentage specified in the Currently Applicable Row of the Ratings Matrix; provided that compliance with the Class A Overcollateralization Ratio Test shall only be required on any Measurement Date on or after the Ramp Up End Date.

"Class A Payoff Date": The first date on which (a) the Class A Notes have been repaid in full (without giving effect to payments under the Credit Enhancement) and (b) the Class A-1 Commitments and the Class A-3 Commitments shall have expired, terminated or been reduced to zero.

"Class A Pro Rata Adjustment Advance": The meaning specified in Section 9.6(e).

"Class A Scenario Loss Rate": As of any Measurement Date, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AA" rating of the Class A Notes by Standard & Poor's, determined by the Issuer through application of the Standard & Poor's CDO Monitor at such time.

"Class A-1 Additional Amounts": The meaning specified in the applicable Class A-1 Note Purchase Agreement.

"Class A-1 Adjusted Exposure": The meaning specified in Section 9.6(e).

"Class A-1 Available Amount": The meaning specified in Section 9.6(e).

"Class A-1 Commitment": At any time in respect of any Class A-1 Note, the maximum aggregate outstanding principal amount of advances (whether at the time funded or unfunded) that the Issuer may from time to time request be made by the Holder of such Class A-1 Note under the applicable Class A-1 Note Purchase Agreement.

"Class A-1 Commitment Fee": With respect to the Class A-1 Notes, a commitment fee calculated by the Class A-1 Note Agent in accordance with Section 2.2(c)(ii).

"Class A-1 Commitment Fee Amount": With respect to the Class A-1 Notes for each Due Period, the Class A-1 Commitment Fee (as calculated by the Class A-1 Note Agent pursuant to the applicable Class A-1 Note Purchase Agreement) accrued for each day from and including the first day of such Due Period to and including the last day of such Due Period.

"Class A-1 Commitment Fee Rate": A rate per annum equal to 0.25%.

"Class A-1 Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for each Interest Period with respect to the Class A-1 Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-1 Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-1 Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-1 Notes and accrued interest thereon at the Class A-1 Note Interest Rate; plus (c) any Class A-1 Redemption Break Funding Costs.

12

NY3:#734715t v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Class A-1 Note Agent": IXIS Financial Products Inc., solely in its capacity as agent for the Holders of the Class A-1 Notes hereunder, unless a successor Person shall have become the Class A-1 Note Agent pursuant to the applicable provisions of this Indenture, and thereafter "Class A-1 Note Agent" shall mean such successor Person.

"Class A-1 Note Agent Fee": The fee payable to the Class A-1 Note Agent on each Payment Date (so long as the Class A-1 Notes are Outstanding or the Class A-1 Commitments shall not have not expired, terminated or been reduced to zero) pursuant to Section 17.3(a)(i), in an aggregate amount equal to U.S.$15,000; provided that the Class A-1 Note Agent Fee will be payable on each Payment Date only to the extent that funds are available for such purpose in accordance with the Priority of Payments.

"Class A-1 Note Interest Rate":

(a)   with respect to any interest in a Class A-1 Note held by a CP Funding Holder, the CP Funding Rate, provided that, if and to the extent that such CP Funding Holder has funded all or any portion of its interest in the Class A-1 Notes for any period with funds derived from an External Support Provider or Committed Note Purchaser referred to in the applicable Class A-1 Note Purchase Agreement, then the rate payable with respect to such CP Funding Holder's interest in the Class A-1 Note so funded shall be equal to the rate specified in clause (c) below applicable to such period;

(b)   with respect to any Short Settlement Borrowing under a Class A-1 Note (for the period from and including the date of such Borrowing to but excluding the date three Business Days thereafter), the Base Rate; and

(c)   with respect to any other interest in a Class A-1 Note, a rate per annum equal to LIBOR plus the Class A Applicable Margin;

provided that:

(1)   except as provided in clause (2) below, with respect to any assignment of a Class A-1 Note during any Interest Period between a CP Funding Holder and any other Holder, the Class A-1 Note Interest Rate on such Class A-1 Note will be (x) the CP Funding Rate for the portion of such Interest Period during which such Class A-1 Note is held by such CP Funding Holder and (y) the rate per annum equal to LIBOR plus the Class A Applicable Margin for the portion of such Interest Period during which such Class A-1 Note is not held by such CP Funding Holder; and

(2)   with respect to any assignment of any interest in a Borrowing under a Class A-1 Note by an Uncommitted Note Purchaser to a Committed Note Purchaser or External Support Provider pursuant to a Class A-1 Note Purchase Agreement, the Class A-1 Note Interest Rate for the period from and including the first day of the related Interest Period to but excluding the date three Business Days after the first day of such Interest Period shall be the Base Rate.

"Class A-1 Note Purchase Agreements": Each Note Purchase Agreement dated as of January 12, 2005 entered into among the Issuer, the Co-Issuer, the Class A-1 Note Agent, the Collateral Manager, the Trustee and certain other parties, and the beneficial owners from time to time of the Class A-1 Notes, as modified and supplemented and in effect from time to time.

13

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Class A-1 Note Register": The meaning specified in Section 2.4(j).

"Class A-1 Notes": The floating rate senior secured revolving Notes designated as "Class A-1 Notes" and having the Class A-1 Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-1 Principal Sharing Percentage": At any time, the ratio (expressed as a percentage) of:

      (a)    the Aggregate Outstanding Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1 Notes at such time; to

      (b)    the Aggregate Outstanding Amount of the Class A Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-3 Notes at such time.

"Class A Redemption Break Funding Costs": The Class A-1 Redemption Break Funding Costs, Class A-2 Redemption Break Funding Costs and Class A-3 Redemption Break Funding Costs.

"Class A-1 Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-1 Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by an Uncommitted Note Purchaser from investing the Aggregate Outstanding Amount of such Class A-1 Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-1 Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class A-2 Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for each Interest Period with respect to the Class A-2 Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-2 Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-2 Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-2 Notes and accrued interest thereon at the Class A-2 Note Interest Rate; plus (c) any Class A-2 Redemption Break Funding Costs.

"Class A-2 Note Interest Rate": For any Interest Period with respect to the Class A-2 Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A Applicable Margin.

"Class A-2 Notes": The floating rate senior secured term Notes designated as "Class A-2 Notes" and having the Class A-2 Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-2 Principal Sharing Percentage": At any time, the ratio (expressed as a percentage) of:

      (a)    the Aggregate Outstanding Amount of the Class A-2 Notes at such time; to

      (b)    the Aggregate Outstanding Amount of the Class A Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-3 Notes at such time.

14

Indenture
PP050279

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Class A-2 Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-2 Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-2 Note from investing the Aggregate Outstanding Amount of such Class A-2 Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-1 Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class A-3 Commitment": At any time in respect of any Class A-3 Note, the maximum aggregate outstanding principal amount of advances (whether at the time funded or unfunded) that the Issuer may from time to time request be made by the Holder of such Class A-3 Note under the applicable Class A-3 Note Purchase Agreement.

"Class A-3 Commitment Fee": With respect to the Class A-3 Notes, a commitment fee calculated by the Class A-3 Note Agent in accordance with Section 2.2(c)(iv).

"Class A-3 Commitment Fee Amount": With respect to the Class A-3 Notes for each Due Period, the Class A-3 Commitment Fee (as calculated by the Class A-3 Note Agent) accrued for each day from and including the first day of such Due Period to and including the last day of such Due Period.

"Class A-3 Commitment Fee Rate": A rate per annum equal to 0.25%.

"Class A-3 Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for each Interest Period with respect to the Class A-3 Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-3 Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-3 Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-3 Notes and accrued interest thereon at the Class A-3 Note Interest Rate; plus (c) any Class A-3 Redemption Break Funding Costs.

"Class A-3 Note Agent": IXIS Financial Products Inc., solely in its capacity as agent for the Holders of the Class A-3 Notes hereunder, unless a successor Person shall have become the Class A-3 Note Agent pursuant to the applicable provisions of this Indenture, and thereafter "Class A-3 Note Agent" shall mean such successor Person.

"Class A-3 Note Interest Rate": For any Interest Period with respect to the Class A-3 Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A Applicable Margin.

"Class A-3 Note Purchase Agreement": The Note Purchase Agreement dated as of January 12, 2005 entered into among the Issuer, the Co-Issuer, the Collateral Manager, the Class A-3 Note Agent, the Trustee and certain other parties, and the beneficial owners from time to time of the Class A-3 Notes, as modified and supplemented and in effect from time to time.

"Class A-3 Note Register": The meaning specified in Section 2.4(k).

"Class A-3 Notes": The floating rate senior secured delayed drawdown Notes designated as "Class A-3 Notes" and having the Class A-3 Note Interest Rate and the Stated Maturity set forth in Section 2.2.

15

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8    pg. 22 of 447

"Class A-3 Principal Sharing Percentage": At any time, the ratio (expressed as a percentage) of:

    (a)    the Aggregate Outstanding Amount of the Class A-3 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-3 Notes at such time; to

    (b)    the Aggregate Outstanding Amount of the Class A Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-3 Notes at such time.

"Class A-3 Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-3 Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-3 Note from investing the Aggregate Outstanding Amount of such Class A-3 Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-3 Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class B Break-Even Loss Rate": At any time after the Class B Rating Date, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined through application of the Standard & Poor's CDO Monitor, which after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, shall result in sufficient funds remaining for the ultimate payment in full of the principal of the Class B Notes by their Stated Maturity.

"Class B Loss Differential": At any time after the Class B Rating Date, the rate calculated by subtracting the Class B Scenario Loss Rate at such time from the Class B Break-Even Loss Rate at such time.

"Class B Note Certificate": A certificate substantially in the form of Exhibit B-8.

"Class B Notes": The zero coupon second priority secured Notes designated as "Class B Notes" and having the principal amount and Stated Maturity set forth in Section 2.2, together with the additional Class B Notes (if any) issued from time to time after the Funding Date in accordance with Section 2.10 of this Indenture. Notwithstanding anything to the contrary contained in this Indenture or the other Transaction Documents, the Issuer shall be the sole obligor on or in respect of the Class B Notes, and the Co-Issuer shall not have any obligations in respect thereof. In the event of a Rating Failure in respect of the Class B Notes as provided in Section 7.13(b), all or any portion the Class B Notes may be converted into Class C Notes in the manner and to the extent provided therein.

"Class B Rating Date": The date (if any) that the Class B Notes receive an Acceptable Class B Rating pursuant to Section 7.13(b).

"Class B Reduction Amount": The meaning specified in Section 7.13(b)(4)(A).

"Class B Scenario Loss Rate": As of any Measurement Date after the Class B Rating Date, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with an "BBB-" rating of the Class B Notes by Standard & Poor's, determined by the Issuer through application of the Standard & Poor's CDO Monitor at such time.

16

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Class C Note Certificate": A certificate substantially in the form of Exhibit B-9.

"Class C Notes": The zero coupon third priority secured Notes designated as "Class C Notes" and having the Stated Maturity set forth in Section 2.2. Notwithstanding anything to the contrary contained in this Indenture or the other Transaction Documents, the Issuer shall be the sole obligor on or in respect of the Class C Notes, and the Co-Issuer shall not have any obligations in respect thereof.

"Clearing Agency": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation": The meaning specified in Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security": A Security that is a Financial Asset that is (a) in bearer form or endorsed in blank or (b) registered in the name of a Clearing Corporation or the nominee of such Clearing Corporation and, if a Certificated Security, is held in the custody of such Clearing Corporation.

"Clearstream": Clearstream International *société anonyme*, a corporation organized under the laws of the Grand Duchy of Luxembourg, or any of its applicable subsidiaries.

"Closing Date": January 12, 2005.

"Closing Expense Account": The trust account designated the "Closing Expense Account" and established in the name of the Trustee pursuant to Section 10.6(c).

"Closing Expenses": The meaning specified in Section 10.6(c).

"Code": The U.S. Internal Revenue Code of 1986, as amended.

"Co-Issuer": Zohar II 2005-1, Corp., a corporation organized under the laws of the State of Delaware, unless a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers": The Issuer and the Co-Issuer.

"Collateral": All Money, instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts, investment property and other property and rights subject or intended to be subject to the lien of this Indenture for the benefit of the Secured Parties as of any particular time pursuant to the Granting Clauses of this Indenture.

"Collateral Administration Agreement": The Collateral Administration Agreement dated as of January 12, 2005 by and among the Issuer, the Collateral Manager and the Collateral Administrator relating to certain functions performed by the Collateral Administrator for the Issuer and the Collateral Manager with respect to this Indenture and the Collateral, as amended from time to time.

"Collateral Administrator": The Bank, solely in its capacity as collateral administrator under the Collateral Administration Agreement, unless a successor Person shall have become the Collateral Administrator pursuant to the applicable provisions thereof, and thereafter "Collateral Administrator" shall mean such successor Person.

17

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Collateral Assignment of Hedge Agreement": Each Collateral Assignment of Hedge Agreement, dated the date that the Issuer enters into any Hedge Agreement, among the Issuer, the Trustee and the relevant Hedge Counterparty.

"Collateral Debt Obligation": (a) An outstanding loan or obligation that on the date of initial acquisition thereof by the Issuer or the Zohar Subsidiary is either a Senior Secured Collateral Debt Obligation or a Second Lien Collateral Debt Obligation (including in each case term loans, Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations, including, without limitation, DIP Loans), (b) the loans and other obligations owned by the Issuer or the Zohar Subsidiary on the Funding Date and set forth on Schedule A-1 attached hereto and the loans and other obligations acquired by the Issuer that are set forth on Schedule A-2 attached hereto, (c) any loan, debt security, letter of credit or lease (other than any Equity Security) received by the Issuer or the Zohar Subsidiary after the Funding Date in exchange for (or upon the transfer of) any Collateral Debt Obligation pursuant to an Offer or otherwise in connection with (i) any reorganization of the issuer of such Collateral Debt Obligation (or any Affiliate of such issuer) or such issuer's (or such Affiliate's) line(s) of business or (ii) any amendment, modification or supplement of such Collateral Debt Obligation, (d) any Exchanged Security (excluding any Equity Security) acquired by the Issuer or the Zohar Subsidiary after the Funding Date by application of amounts on deposit in the Rollover Proceeds Account to the extent that such amounts represented the proceeds of a Collateral Debt Obligation when originally deposited in the Rollover Proceeds Account and (e) any Participation Interest in any of the foregoing, in each case as the same may be amended, modified, supplemented and in effect from time to time; provided that each item described in clauses (a) thorough (e) above shall be Dollar denominated. For the avoidance of doubt, (i) an Unrestricted Collateral Debt Obligation is not a Collateral Debt Obligation; and (ii) the Issuer and/or the Zohar Subsidiary may be an original lender on a Collateral Debt Obligation or be a closing date participant (pursuant to clause (e) of this definition) in such loan or obligation. Collateral Debt Obligations also include (i) other loans and debt obligations received in connection with any workout, restructuring or refinancing of a Collateral Debt Obligation and (ii) Originated Special Loan/Preferred Securities.

"Collateral Face Amount Ratio": The ratio (expressed as a percentage and not less than zero) equal to (a) the Principal Balance of all the Pledged Obligations that are not Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations plus the Funded Amount of all Revolving Collateral Debt Obligation and Delayed Funding Collateral Debt Obligations plus the aggregate amount of Principal Proceeds and Uninvested Proceeds on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account plus the Balance on deposit in the Rollover Proceeds Account divided by (b) the Aggregate Outstanding Amount of the Class A Notes.

"Collateral Hedge Event": With respect to any Hedge Agreement, the failure of the relevant Hedge Counterparty (or any Person that shall have absolutely and unconditionally guaranteed the obligations of such Hedge Counterparty under such Hedge Agreement) to have a long-term debt rating or issuer rating of at least "Aa2" by Moody's or at least "AA-" by Standard & Poor's or a short-term debt rating of "A-1" by Standard & Poor's and the failure of such Hedge Counterparty at its own expense:

(a)     within 30 days of such ratings downgrade, to transfer all of its rights and obligations under such Hedge Agreement to a third party that has (i) a long-term debt rating or issuer rating at least "Aa2" by Moody's and (ii) a long-term debt rating or issuer rating at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's;

(b)     within 30 days of such ratings downgrade, to cause a Person that has (i) a long-term debt rating or issuer rating at least "Aa2" by Moody's and (ii) a long-term debt rating or

18

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

issuer rating at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's, to guarantee absolutely and unconditionally the obligations of such Hedge Counterparty under such Hedge Agreement; or

(c)    within 10 days of such ratings downgrade, to provide Hedge Counterparty Credit Support which:

(i)    requires collateral to be delivered in an amount sufficient to maintain the then current ratings on the Class A Notes and (if then rated) the Class B Notes;

(ii)    requires such Hedge Counterparty to mark-to-market on a weekly basis and post additional collateral as necessary;

(iii)    requires all costs relating to the posting of additional collateral and implementing the mark-to-market procedures to be borne by such Hedge Counterparty; and

(iv)    is accompanied by an enforceability opinion, reasonably acceptable to the Controlling Party, regarding the pledge of the collateral under the Hedge Counterparty Credit Support.

"Collateral Management Fee": Collectively, the Senior Collateral Management Fee and the Subordinated Collateral Management Fee.

"Collateral Manager": Patriarch Partners, unless another successor Person shall have become the collateral manager pursuant to the provisions of the Management Agreement, and thereafter "Collateral Manager" shall mean such successor Person.

"Collateral Quality Tests: Collectively, the Diversity Test, the Moody's Weighted Average Rating Factor Test, the Minimum Average Recovery Rate Test, the Standard & Poor's CDO Monitor Test, the Weighted Average Life Test, the Weighted Average Spread Test and the Purchase-to-Improve Ratio Test.

"Collateral Ramp Up Event of Default": An Event of Default under Section 5.1(o).

"Collection Accounts": Collectively, the Issuer Interest Collection Account, the Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account.

"Commitment Amount": With respect to any Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the maximum aggregate outstanding principal amount (whether at the time funded or unfunded) of advances or other extensions of credit at any one time outstanding that the Issuer or the Zohar Subsidiary, as applicable, could be required to make to the borrower under the Underlying Instruments relating thereto.

"Commitment Limit": The meaning specified in the applicable Class A-1 Note Purchase Agreement.

19

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050284

"Commitment Reduction": With respect to any Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, a permanent reduction (whether scheduled, mandatory, optional or otherwise) in the related Commitment Amount.

"Commitment Shortfall": As of any date, the amount (not less than zero) by which (a) the Unfunded Portfolio Amount on such date exceeds (b) the Funding Source Amount on such date.

"Committed Note Purchasers": The meaning specified in the Class A-1 Note Purchase Agreements.

"Comparison Date": With respect to the determination on any date of the Priority Category Recovery Rate applicable to a Senior Secured Collateral Debt Obligation for the purpose of calculating the Moody's Weighted Average Recovery Rate, the latest to occur of (a) the date on which the Issuer acquired such Senior Secured Collateral Debt Obligation, (b) the date on which Moody's first provides a senior implied rating of the issuer of such Senior Secured Collateral Debt Obligation and (c) the most recent date on which there has occurred, in the sole judgment of the Collateral Manager, a material change in the collateral security for such Senior Secured Collateral Debt Obligation.

"Competitor": Any Person who engages in a primary business activity of, or a significant business activity of which includes, corporate, real estate, tranche b and/or asset-based lending and/or the purchase or sale of bank debt.

"Controlling Party": (a) So long as the Class A Notes are Outstanding or the Class A-1 Commitments or the Class A-3 Commitments have not expired, terminated or been reduced to zero or any amounts remain due and payable to the Credit Enhancer under or in respect of the Credit Enhancement Agreement, (x) if no Credit Enhancement Event has occurred and is continuing, the Credit Enhancer or (y) otherwise, a Majority of the Class A Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class A Notes) (excluding the aggregate principal amount of any Class A Notes held by the Collateral Manager and its Affiliates in making such calculation); (b) thereafter, so long as the Class B Notes are Outstanding, a Majority of the Class B Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class B Notes); (c) thereafter, so long as the Class C Notes are Outstanding, a Majority of the Class C Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class C Notes); and (d) thereafter, a Majority of the Preference Shares.

"Corporate Trust Office": The corporate trust office of the Trustee at which this Indenture is administered, currently having an address of 135 South LaSalle Street, Suite 1625, Chicago, IL 60603, or such other address as the Trustee may designate from time to time by notice to the Noteholders, the Collateral Manager, the Credit Enhancer and the Issuer or the principal corporate trust office of any successor Trustee.

"CP Funding Holder": At any time, any Holder of a Class A-1 Note that (a) is a special purpose receivables company and (b) funds the acquisition and ownership of such Note through the issuance of commercial paper or through borrowings from an issuer of commercial paper (including, without limitation, an Uncommitted Note Purchaser under a Class A-1 Note Purchase Agreement) or through borrowings from, or sales of interests in the Class A-1 Notes to, External Support Providers.

"CP Funding Rate": With respect to any Class A-1 Note held by an Uncommitted Note Purchaser for all or part of each Interest Period, the per annum rate (calculated by such Uncommitted Note Purchaser or its administrator) equal to the lesser of (a) the sum of (i) the Weighted Average CP

20

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Cost of Funds for such Uncommitted Note Purchaser for such Interest Period (or portions thereof) plus (ii) the Class A Applicable Margin and (b) the sum of (i) LIBOR for such Interest Period (or portions thereof) plus (ii) 0.70%.

"Credit Enhancement": The financial guaranty insurance policy No. 45557 issued to the Trustee for the benefit of the Holders of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes pursuant to the Credit Enhancement Agreement.

"Credit Enhancement Agreement": Collectively (i) the Insurance and Indemnity Agreement and (ii) the Credit Enhancement Premium Letter, in each case as amended from time to time.

"Credit Enhancement Event": The occurrence and continuance of any one of the following events:

      (a)    the Credit Enhancer fails to make a payment required under the Credit Enhancement in accordance with its terms and such failure remains unremedied for three Business Days;

      (b)    the Credit Enhancer (i) files any petition or commences any case or Proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (ii) makes a general assignment for the benefit of its creditors, or (iii) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or

      (c)    a court of competent jurisdiction, the New York Department of Insurance or other competent regulatory authority enters a final and nonappealable order, judgment or decree (i) appointing a custodian, trustee, agent or receiver for the Credit Enhancer or for all or any material portion of its property or (ii) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Credit Enhancer (or the taking of possession of all or any material portion of the property of the Credit Enhancer).

"Credit Enhancement Liabilities": With respect to any Payment Date, an amount equal to all accrued and unpaid amounts owing by the Issuer to the Credit Enhancer pursuant to the Credit Enhancement Agreement as of the related Determination Date in respect of the Credit Enhancement or otherwise, including any related Credit Enhancement Reimbursement Amounts (excluding (1) any accrued and unpaid Credit Enhancement Premium and (2) amounts owing to the Credit Enhancer in respect of ongoing surveillance fees and expenses pursuant to clause (g) of the definition of "Administrative Expenses"), as shall be confirmed to the Issuer, the Collateral Manager and the Collateral Administrator by the Credit Enhancer on or prior to the related Determination Date.

"Credit Enhancement Liabilities Threshold Amount":

      (a)    with respect to the period from the Funding Date until the first anniversary thereof, an amount equal to U.S.$325,000; and

      (b)    with respect to each successive twelve month period thereafter, the sum of (i) U.S.$325,000 per annum and (ii) any unused portion of the amounts allocable to the Credit Enhancement Liabilities Threshold Amount in the preceding period (after giving effect to all

21

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 28 of 447

payments in respect of "Accrued Insurance Liabilities" (as defined in the Credit Enhancement Agreement) in such preceding period), determined on a cumulative basis;

provided that (1) on any Payment Date such Credit Enhancement Liabilities Threshold Amount shall in no event exceed U.S.$650,000; and (2) such Credit Enhancement Liabilities Threshold Amount, on a cumulative basis for the entire life of the transaction, shall in no event exceed U.S.$3,600,000.

"Credit Enhancement Payment Account": The meaning specified in Section 16.6.

"Credit Enhancement Premium": With respect to any Payment Date, an amount equal to the sum of (a) the accrued and unpaid premium payable to the Credit Enhancer pursuant to the Credit Enhancement Agreement (including any premium supplement) in respect of the Credit Enhancement as of the related Determination Date plus (b) the aggregate amount of interest accrued at a rate per annum equal to the rate specified in the Credit Enhancement Agreement for each applicable Interest Period on any overdue installments of premium payable to the Credit Enhancer pursuant to the Credit Enhancement Agreement as of the related Determination Date (as may be confirmed to the Issuer, the Collateral Manager and the Collateral Administrator by the Credit Enhancer).

"Credit Enhancement Premium Letter": The letter agreement dated as of January 12, 2005 between the Credit Enhancer and the Issuer relating to the premium payable by the Issuer in respect of the Credit Enhancement, as amended and in effect from time to time.

"Credit Enhancement Reimbursement Amount": With respect to any Payment Date, an amount equal to the sum of (a) all amounts paid by the Credit Enhancer under the Credit Enhancement as of the related Determination Date to the extent not reimbursed to the Credit Enhancer as of the related Determination Date plus (b) the aggregate amount of interest accrued at a rate per annum equal to the rate specified in the Credit Enhancement Agreement on the amounts paid by the Credit Enhancer under the Credit Enhancement from and including the date paid by the Credit Enhancer to but excluding the date reimbursed to the Credit Enhancer (in each case as shall be confirmed to the Issuer, the Collateral Manager and the Collateral Administrator by the Credit Enhancer on or prior to the related Determination Date).

"Credit Enhancer": MBIA, unless a successor Person shall have become the Credit Enhancer pursuant to the applicable provisions of the Credit Enhancement Agreement and the Credit Enhancement, and thereafter "Credit Enhancer" shall mean such successor Person.

"Current Collateral Debt Obligation": Any Collateral Debt Obligation that is neither a Non-Current Obligation nor a Workout Obligation; provided that an Insolvency Collateral Debt Obligation will constitute a Current Collateral Debt Obligation only if the related bankruptcy court shall have authorized the payment of interest due and payable on such Insolvency Collateral Debt Obligation. For purposes of this definition, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be a Current Collateral Debt Obligation.

"Current Portfolio": The portfolio (measured by Principal Balance) of the Collateral Debt Obligations (excluding Collateral Debt Obligations in Category 1 and Category 2) and Funding Availability existing immediately prior to the sale, maturity or other disposition of a Collateral Debt Obligation or immediately prior to the acquisition of a Collateral Debt Obligation, as the case may be. For purposes of the definition of "Current Portfolio", any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

22

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Currently Applicable Row": The meaning specified in the definition of "Ratings Matrix".

"Custodial Account": A custodial account at the Custodian, established in the name of the Trustee pursuant to Section 10.2(j).

"Custodian": The meaning specified in Section 3.3(a).

"Default": Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Interest": Any interest due and payable in respect of any Class A Note that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity and which remains unpaid.

"Defaulted Obligation": Any Collateral Debt Obligation (other than any Originated Special Loan/Preferred Security that is a Preferred Security) included in the Collateral:

(a)     (i) with respect to which a default as to the payment of principal and/or interest has occurred (without regard to any applicable grace period or any waiver of such default), but only so long as such default has not been cured; (ii) with respect to which the Collateral Manager has received written notice stating, or as to which the Collateral Manager believes, that (A) a default has occurred and is continuing with respect to such Collateral Debt Obligation that in the sole judgment of the Collateral Manager will likely result in a default as to the payment of principal and/or interest on such Collateral Debt Obligation, (B) a default (beyond any applicable grace period) has occurred and is continuing with respect to such Collateral Debt Obligation that, under the related Underlying Instruments, entitles all or a specified percentage of the holders of such Collateral Debt Obligation to accelerate the maturity thereof (but only if no forbearance or waiver has been granted by such holders) or (C) a default as to the payment of principal and/or interest (beyond any applicable grace period) has occurred and is continuing on another obligation of the same issuer that is senior or pari passu in right of payment to such Collateral Debt Obligation (but in each case only so long as such default has not been cured or waived);

(b)     that is an Insolvency Collateral Debt Obligation;

(c)     that at one time was a Workout Obligation, was subsequently re-designated as Category 2, Category 3 or Category 4 and that has subsequently been re-designated as a Workout Obligation;

(d)     that is a Defaulted Participation Obligation;

(e)     that is a Selling Institution Defaulted Participation;

(f)     that is rated "D" or "SD" by Standard & Poor's; or

(g)     that is rated "C" by Moody's.

"Defaulted Participation Obligation": A Participation Interest in a loan or other debt security that would, if such loan or other debt security were a Collateral Debt Obligation, constitute a "Defaulted Obligation" under paragraph (a) of the definition of such term.

23

NY3:#7747151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 30 of 447

"Deficiency Amount": The meaning specified in Section 16.3(a).

"Delayed Funding Collateral Debt Obligation": A Collateral Debt Obligation or Unrestricted Collateral Debt Obligation that is a loan pursuant to which one or more future advances may or will be required to be made to (or for the account of) the Obligor thereunder but which, once all such advances have been made, may not be reborrowed once repaid by the Obligor; provided that such loan shall only be considered to be a Delayed Funding Collateral Debt Obligations to the extent that any future funding obligations remain in effect.

"Depository" or "DTC": The Depository Trust Company, its nominees, and their respective successors.

"Determination Date": The last day of a Due Period.

"DIP Loan": Any interest in a loan or financing facility (a) which is an obligation of a debtor-in-possession pursuant to Section 364 of the Bankruptcy Code, (b) the terms of which have been approved by an order (including any interim order) of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code and (d) which, if such loan or financing facility by its terms provides for Cash interest to be paid on a current basis or provides for scheduled payments of principal, has paid its most recent interest and principal payments (if any) and the Collateral Manager reasonably expects that the loan or financing facility will continue to pay interest and principal.

"Discount Amount": (i) For each Revolving Collateral Debt Obligation and Delayed Funding Collateral Debt Obligation held by the Issuer or the Zohar Subsidiary as of the Funding Date and set forth on Schedule A-1, the amount specified as such in a schedule provided to the Trustee by the Collateral Manager on the Funding Date and (ii) for any other Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation acquired by the Issuer or the Zohar Subsidiary, the amount specified as such in a notice provided to the Trustee by the Collateral Manager on or prior to the date of settlement which amount, in each case, is calculated as follows: the Unfunded Amount of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation on the date that the acquisition of such Collateral Debt Obligation is settled upon multiplied by (a) one minus (b) the Original Purchase Price Percentage for such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation.

"Discounted Loan": Any Collateral Debt Obligation (other than any Originated Special Loan/Preferred Security) in respect of which the aggregate amount of consideration paid and/or payable to originate such obligation by the Issuer and/or Zohar Subsidiary is less than 95% of the outstanding principal amount of such obligation on such origination date.

"Distribution": Any payment of principal, interest or fee or any dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"Diversity Score": With respect to the Collateral Debt Obligations, the sum of each of the Industry Diversity Scores. For purposes of determining the Diversity Score, the Principal Balance of each Non-Performing Obligation shall be deemed to be zero. In determining the Diversity Score with respect to the Collateral Debt Obligations as of any date, including the date the Issuer or the Zohar Subsidiary entered into a commitment to purchase any such Collateral Debt Obligation, at the written direction of the Collateral Manager there may be included all Collateral Debt Obligations with respect to

24

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY2-#7347151v22

Indenture
PP050289

which the Issuer or the Zohar Subsidiary (or the Collateral Manager on such Person's behalf) has entered into such a commitment as though such Collateral Debt Obligations were subject to the lien of this Indenture as of such date. For purposes of calculating the Diversity Score, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Diversity Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Diversity Score on such Measurement Date equals or exceeds 29.

"Dollar" or "U.S.$" or "$": A dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for all debts, public and private.

"DTC Participant": A broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"Due Date": Each date on which a Distribution is due on a Pledged Obligation.

"Due Period": With respect to any Payment Date, the period commencing immediately following the eighth Business Day prior to the preceding Payment Date (or on the Funding Date, in the case of the Due Period relating to the Initial Payment Date) and ending on (and including) the eighth Business Day prior to such Payment Date (or, in the case of a Due Period that is applicable to the Payment Date relating to the Stated Maturity of any Note, or the Maturity of all Outstanding Notes, ending on the day preceding such Payment Date); provided that, for purposes of this definition, each Payment Date will be determined without regard to the last sentence of the definition of "Payment Date".

"Eligibility Criteria": The meaning specified in Section 12.1.

"Eligible Assignee": The meaning specified in the applicable Class A-1 Note Purchase Agreement.

"Eligible Holder": Any Holder (or beneficial owner of a Note) with respect to which the Collateral Manager has provided written consent (not to be unreasonably withheld) to such Person and the Trustee for such Person to receive a copy of the Supplemental Noteholder Information; provided that the Collateral Manager may withhold such consent in respect of any Person that is, in the sole discretion of the Collateral Manager, a Competitor.

"Eligible Investments": Any Dollar-denominated investment that, at the time it is Granted to the Trustee (directly or through a Securities Intermediary or bailee), is one or more of the following:

(a)    Cash;

(b)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States;

(c)    demand and time deposits in, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by, any depository institution

25

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

or trust company incorporated under the laws of the United States (including the Bank) or any state thereof and subject to supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's, in the case of long-term debt obligations, or "P-1" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "A-1" by Standard & Poor's, in the case of commercial paper and short-term debt obligations; provided that in the case of commercial paper and short-term obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

(d)       unleveraged repurchase obligations with respect to (i) any security described in clause (b) above or (ii) any other Registered security issued or guaranteed by an agency or instrumentality of the United States (in each case without regard to the Stated Maturity of such security), in either case entered into with a United States federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term rating is not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's or whose short-term credit rating is "P-1" by Moody's and "A-1" by Standard & Poor's, at the time of such investment; provided that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

(e)       Registered debt securities (other than mortgage-backed securities) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that have a credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's at the time of such investment or contractual commitment providing for such investment;

(f)        commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of "P-1" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "A-1" by Standard & Poor's; provided that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

(g)       a Reinvestment Agreement (so long as payments under any such Reinvestment Agreement are not subject to withholding taxes) issued by any bank (if treated as a deposit by such bank), or a Registered Reinvestment Agreement issued by any insurance company or other corporation or entity organized under the laws of the United States or any state thereof, that has a credit rating of not less than "P-1" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "A-1+" by Standard & Poor's; provided that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term

26

NY3:#7247151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

      (h)     any money market fund or similar investment vehicle having at the time of investment therein a credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's; and/or

      (i)     an interest in a pool(s) consisting of any or all of the obligations set forth in clauses (a) through (h) above;

and, in each case, with a Stated Maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs; provided that Eligible Investments may not include any interest-only security, any security purchased at a price in excess of 100% of the par value thereof, any security whose repayment is subject to material non-credit related risk as determined in the sole judgment of the Collateral Manager, any security whose rating assigned by Standard & Poor's includes the subscript "r", "t", "p", "pi" or "q" or any mortgage-backed security. Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and that otherwise fall within the foregoing provisions of this definition.

      "Entitlement Holder": A Person identified in the records of a Securities Intermediary as the Person having a Security Entitlement against the Securities Intermediary.

      "Entitlement Order": A notification communicated to a Securities Intermediary directing transfer or redemption of a Financial Asset to which the Entitlement Holder has a Security Entitlement.

      "Equity Kicker": Any Equity Security or any other security that is not eligible for purchase by the Issuer but is received with respect to a Collateral Debt Obligation or purchased as part of a "unit" with a Collateral Debt Obligation.

      "Equity Security": (a) Any Equity Kicker, (b) any Equity Workout Security, (c) any equity security (including any equity security attached to an Unrestricted Collateral Debt Obligation) purchased with funds on deposit in the Unrestricted Collateral Account and (d) any other security that does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal, including those received by the Issuer or the Zohar Subsidiary, as applicable, as a result of the exercise or conversion of an Equity Kicker or other convertible or exchangeable Collateral Debt Obligation or Unrestricted Collateral Debt Obligation. No Equity Security other than an Equity Kicker or an Originated Special Loan/Preferred Security that is a Preferred Security may be purchased by the Issuer or the Zohar Subsidiary (other than (i) in connection with a workout or restructuring of an Obligor, its Affiliates, or the lines of business of the Obligor, or its Affiliates, or, subject to Section 7.8(a)(v), any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation or (ii) subject to Section 7.8(a)(v), with proceeds from the Unrestricted Collateral Account). For the avoidance of doubt, a PIK Loan is not an Equity Security.

      "Equity Workout Security": Any security received in exchange for or in connection with a Collateral Debt Obligation or Unrestricted Collateral Debt Obligation, which security does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal.

      "Equivalent Unit Score": With respect to each issuer of Collateral Debt Obligations (other than any Originated Special Loan/Preferred Security that is a Preferred Security), the lesser of

27

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7247151v22

Indenture
PP050292

(a) one and (b) the Issuer Par Amount for such issuer divided by the Average Par Amount. For purposes of calculating the Equivalent Unit Score, any issuers Affiliated with one another will be considered one issuer.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Plan": An "employee benefit plan" (as defined in Section 3(3) of ERISA) which is subject to the provisions of Title I of ERISA.

"Euroclear": Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"Event of Default": The meaning specified in Section 5.1.

"Excel Default Model Input File": An electronic spreadsheet file to be provided to Standard & Poor's, which file shall include the following information (to the extent such information is not confidential) with respect to each Collateral Debt Obligation: (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Collateral Debt Obligation, (c) the par value (including the Unfunded Amount) of such Collateral Debt Obligation, (d) the Funded Amount of such Collateral Debt Obligation, (e) the Unfunded Amount of such Collateral Debt Obligation, (f) the type of issue (including, by way of example, whether such Collateral Debt Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (g) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (h) the coupon (in the case of a Collateral Debt Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Obligation which bears interest at a floating rate), (i) the Standard & Poor's Industry Classification Group for such Collateral Debt Obligation, (j) the stated maturity date of such Collateral Debt Obligation, (k) the Standard & Poor's Rating of such Collateral Debt Obligation or the issuer thereof, as applicable, (l) the priority category assigned by Standard & Poor's to such Collateral Debt Obligation, if available, and (m) such other information as the Trustee may determine to include in such file.

"Exchange Act": The U.S. Securities Exchange Act of 1934, as amended.

"Exchange Date": The 40th day after the Funding Date or (if not a Business Day) the first Business Day thereafter.

"Exchanged Security": The meaning specified in Section 12.1(d).

"Excluded Property": Collectively, (i) U.S.$250 of capital contributed by the owners of the Issuer's common shares, (ii) U.S.$1,000 of capital contributed by the owners of the Issuer's preference shares and (iii) U.S.$250 representing a transaction fee payable to the Issuer.

"Existing Obligor": The meaning specified in Section 12.1(c)(iii)(x).

"Expense Account": The trust account designated the "Expense Account" and established in the name of the Trustee pursuant to Section 10.6(a).

28

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"External Support Provider": The meaning specified in the Class A-1 Note Purchase Agreements.

"Federal Funds Rate" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Trustee from three federal funds brokers of recognized standing selected by it.

"Financial Asset": Except as otherwise provided in Section 8-103 of the UCC: (a) a Security; (b) an obligation of a Person or a share, participation or other interest in a Person or in property or an enterprise of a Person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or (c) any property that is held by a Securities Intermediary for another Person in a Securities Account if the Securities Intermediary has expressly agreed with the other Person that the property is to be treated as a financial asset under Article 8 of the UCC.

"Financing Statements": Financing statements relating to the Collateral naming the Issuer or the Zohar Subsidiary, as applicable, as debtor and the Trustee on behalf of the Secured Parties as secured party.

"Fixed Rate Obligations": All Collateral Debt Obligations other than Floating Rate Obligations.

"Floating Rate Obligations": All Pledged Collateral Debt Obligations that bear interest based on a floating rate index.

"Flow-Through Investment Vehicle": A Person that (i) would be an investment company but for the exception in Section 3(c)(1) or 3(c)(7) of the Investment Company Act and the amount of such Person's investment in the Notes exceeds 40% of the total assets (determined on a consolidated basis with its subsidiaries) of such Person; (ii) is an entity that was organized or reorganized for the specific purpose of acquiring any Note; or (iii) is an entity as to which any Person owning any equity or similar interest in such entity exercises control, on an investment-by-investment basis, over the amount of such entities' contribution to any investment made by such entity.

"Funded Amount": With respect to any Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation at any time, the aggregate principal amount of advances or other extensions of credit made thereunder (by the Issuer or the Zohar Subsidiary or any predecessor lender) that are outstanding at such time.

"Funding Availability": As of any date, an amount equal to (a) the Funding Source Amount as of such date minus (b) the Unfunded Portfolio Amount on such date.

"Funding Certificate": The meaning specified in Section 3.2(e).

"Funding Date": January 14, 2005.

29

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Funding Source Amount": As of any date, the sum of (a) the aggregate amount of Principal Proceeds and Uninvested Proceeds on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account on such date; plus (b) the Aggregate Undrawn Amounts of the Class A Notes on such date; plus (c) the Balance on deposit in the Unfunded Revolver Discount Account on such date; plus (d) the Balance on deposit in the Rollover Proceeds Account on such date.

"Global Notes": Any Temporary Regulation S Global Notes, Regulation S Global Notes or Rule 144A Global Notes.

"Grant": To bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and pledge a security interest in and right of set-off against, deposit, set over and confirm. A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the pledging party thereunder, including without limitation the immediate continuing right to claim for, collect, receive and receipt for principal, interest and fee payments in respect of the Pledged Obligations or such other instruments, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the pledging party or otherwise, and generally to do and receive anything that the pledging party is or may be entitled to do or receive thereunder or with respect thereto.

"Hedge Agreement": An interest rate protection agreement (if any) to be entered into between the Issuer and any Hedge Counterparty for the sole purpose of hedging interest rate risk between the portfolio of Collateral Debt Obligations and the Notes, as amended from time to time and any replacement hedge agreement entered into pursuant to Section 15.1.

"Hedge Counterparty": A counterparty having, on the date on which it enters into a Hedge Agreement, a long-term senior unsecured debt rating or issuer rating of at least "Aa2" by Moody's and at least "AA-" by Standard & Poor's and the rating of the short-term debt obligations of such Hedge Counterparty is at least "A-1" by Standard & Poor's (or, with respect to any counterparty not so rated but whose obligations in respect of such Hedge Agreement entered into with the Issuer are absolutely and unconditionally guaranteed by an Affiliate of such counterparty, so long as such Affiliate's long-term debt obligations are so rated) or any permitted assignee or successor under such Hedge Agreement (subject to the prior written approval of the Controlling Party) which each Rating Agency has confirmed will not cause the downgrade or withdrawal of its then current rating of any Class of Notes.

"Hedge Counterparty Collateral Account": The meaning specified in Section 15.1(d).

"Hedge Counterparty Credit Support": Without limiting any additional collateral delivery obligations to which a Hedge Counterparty may agree, the agreement by a Hedge Counterparty, in the event that and so long as the rating of the long-term senior unsecured debt obligations or the issuer rating of such Hedge Counterparty or of any Affiliate of such Hedge Counterparty that has absolutely and unconditionally guaranteed the obligations of such Hedge Counterparty under a Hedge Agreement is below "Aa2" by Moody's or below "AA-" by Standard & Poor's or the rating of the short-term debt obligations of such Hedge Counterparty or of such Affiliate is below "A-1" by Standard & Poor's, to deliver collateral on a mark to market basis pursuant to a 1994 ISDA Credit Support Annex (New York law) substantially in the form of the 1994 ISDA Credit Support Annex (New York law) entered into by the Issuer on or prior to the Funding Date with the initial Hedge Counterparty.

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050295

"Hedge Termination Amount": With respect to any Hedge Agreement, the amount of any early termination or liquidation payment, if any, payable to or by the Issuer under such Hedge Agreement.

"Holder":

(a)    With respect to any Note (other than a Class A-1 Note) the Person in whose name such Note is registered in the Note Register.

(b)    With respect to any Class A-1 Note, each of the following Persons (as the context may require): (i) the Person in whose name such Note is registered in the Note Register (including any collateral trustee or agent holding such Class A-1 Note under a Class A-1 Note Purchase Agreement) and (ii) any Person party to a Class A-1 Note Purchase Agreement that is required or that has the option to fund advances under a Class A-1 Note registered in the name of an agent or collateral trustee appointed under or in accordance with such Class A-1 Note Purchase Agreement (including without limitation any Committed Note Purchaser or External Support Provider); provided that, subject to Section 10.5 and Section 16.1(b), the "Holder" of any Class A-1 Note for the purpose of taking or giving any request, demand, authorization, direction, notice, consent, waiver, or other action under this Indenture or receiving any payment under this Indenture shall be the Person in whose name such Class A-1 Note is registered in the Note Register.

(c)    With respect to any Preference Share, the Person in whose name such Preference Share is registered in the share register maintained by the Preference Share Registrar pursuant to the Preference Share Paying Agency Agreement.

"Holder Subaccount": The meaning specified in Section 10.5(a).

"Important Section 3(c)(7) Reminder Notice": A notice substantially in the form of Exhibit J-2 hereto.

"Indenture": This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended. All references in this instrument to designated "Articles", "Sections", "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed. The words "herein", "hereof", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, Subsection or other subdivision.

"Independent": As to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (a) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (b) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

31

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee or the Credit Enhancer, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Indorsement": The meaning specified in Section 8-102(a)(11) of the UCC.

"Industry Classification Group": When used herein and preceded by the term "Moody's", any of the Moody's classification groups set forth in Schedule C-1, and any such classification groups that may be subsequently established by Moody's and provided by the Collateral Manager or Moody's to the Trustee. When used herein and preceded by the term "Standard & Poor's", any of the Standard & Poor's classification groups set forth in Schedule C-2, and any such classification groups that may be subsequently established by Standard & Poor's and provided by the Collateral Manager or Standard & Poor's to the Trustee. For the purposes of determining the composition of any Industry Classification Group, any Originated Special Loan/Preferred Security that is a Preferred Security shall be disregarded.

"Industry Diversity Score": With respect to the Collateral Debt Obligations, the number established by reference to the Diversity Score Table set forth in Schedule D for the related Aggregate Industry Equivalent Unit Score; provided that if the Aggregate Industry Equivalent Unit Score falls between any two such scores shown in the Diversity Score Table in Schedule D, the Industry Diversity Score shall equal the lesser of the two such scores. For purposes of calculating the Industry Diversity Score, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Initial Payment Date": The Payment Date in July, 2005.

"Insolvency Collateral Debt Obligation": A Collateral Debt Obligation as to which any of the following shall have occurred or be continuing after the Funding Date with respect to the issuer thereof:

      (a)     an involuntary Proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of such issuer or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such issuer or for a substantial part of its assets, and, in any such case, such Proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or

      (b)     such issuer shall (i) voluntarily commence any Proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any Proceeding or petition described in clause (a) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such issuer or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such Proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

For the avoidance of doubt, (i) a Post-Insolvency Collateral Debt Obligation is not an Insolvency Collateral Debt Obligation and (ii) any Originated Special Loan/Preferred Security that is a Preferred Security shall not be an Insolvency Collateral Debt Obligation.

32

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050297

"Insolvency Proceeding": The meaning specified in Section 16.4(b).

"Instruction": The meaning specified in Section 8-102(a)(12) of the UCC.

"Instrument": The meaning specified in Section 9-102(a)(47) of the UCC.

"Insurance and Indemnity Agreement": The Insurance and Indemnity Agreement, dated as of January 12, 2005, among the Issuer, the Co-Issuer, the Zohar Subsidiary, and the Credit Enhancer.

"Insured Payments":

(a)    With respect to the Class A-1 Notes, the scheduled payments of principal of and interest on such Notes and the Class A-1 Commitment Fee (but excluding any Class A-1 Additional Amounts and any Class A Additional Interest) insured by the Credit Enhancer, as specified in the Credit Enhancement.

(b)    With respect to the Class A-2 Notes, the scheduled payments of principal of and interest on such Notes (but excluding any Class A Additional Interest) insured by the Credit Enhancer, as specified in the Credit Enhancement.

(c)    With respect to the Class A-3 Notes, the scheduled payments of principal of and interest on such Notes (but excluding any Class A Additional Interest) and the Class A-3 Commitment Fee insured by the Credit Enhancer, as specified in the Credit Enhancement.

For the avoidance of doubt, "Insured Payments" shall not include Class A-1 Redemption Break Funding Costs, Class A-2 Redemption Break Funding Costs or Class A-3 Redemption Break Funding Costs.

"Interest Period": With respect to any Borrowing made under the Class A Notes:

(a)    in the case of the initial Interest Period with respect to any such Borrowing, the period from, and including, the date of such Borrowing to, but excluding, the Payment Date following the Due Period in which such Borrowing occurs; and

(b)    in the case of any other Interest Period, the period from, and including, the first day after the end of the immediately preceding Interest Period to, but excluding, the next succeeding Payment Date (or in the case of the final Interest Period, the Stated Maturity);

provided that, upon any assignment of any interest in a Borrowing under a Class A-1 Note by an Uncommitted Note Purchaser to a Committed Note Purchaser pursuant to a Class A-1 Note Purchase Agreement, the Interest Period in effect with respect to such Borrowing shall terminate on the date of such assignment and a new Interest Period with respect to such Borrowing shall commence on the date immediately succeeding the date of such assignment and shall end on the date immediately prior to the next succeeding Payment Date.

"Interest Proceeds": With respect to any Due Period, the sum (without duplication) of (a) all payments of interest received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and Eligible Investments (other than (i) Past Due Interest, (ii) payments of interest on Eligible Investments credited to the Class A Holder Collateral Account and the Hedge Counterparty Collateral Account and (iii) payments of interest

33

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7347151v22

Indenture
PP050298

referred to in clause (c) of the definition of "Principal Proceeds"); (b) all Sale Proceeds received in Cash by the Issuer or the Zohar Subsidiary during such Due Period to the extent such Sale Proceeds constitute proceeds from the sale of accrued interest on Collateral Debt Obligations and Unrestricted Collateral Debt Obligations (other than Past Due Interest and interest accrued on Collateral Debt Obligations and Unrestricted Collateral Debt Obligations to the date of acquisition thereof by the Issuer or the Zohar Subsidiary and purchased with Principal Proceeds or Uninvested Proceeds or amounts on deposit in the Unrestricted Collateral Account); (c) all payments of principal received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on Eligible Investments to the extent such Eligible Investments were acquired with Interest Proceeds; (d) all call, redemption and prepayment premiums received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and Eligible Investments; (e) all scheduled dividend payments actually received by the Issuer or the Zohar Subsidiary during such Due Period on or in respect of any Equity Securities that are Preferred Securities owned by the Issuer or the Zohar Subsidiary and (f) all commitment fees, facility fees, letter of credit fees, amendment, restructuring and waiver fees, all late payment fees and all other fees and commissions received (other than syndication fees) in Cash by the Issuer or the Zohar Subsidiary during the related Due Period in connection with the Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and Eligible Investments.

"Investment Company Act": The U.S. Investment Company Act of 1940, as amended, and the rules thereunder.

"Investor Agent": IXIS Financial Products Inc., in its capacity as Investor Agent for the investors under the Warehouse Agreement, and its successors in such capacity.

"Issuer": Zohar II 2005-1, Limited, an exempted company organized under the laws of the Cayman Islands, unless a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Charter": The Amended and Restated Memorandum of Association and Articles of Association of the Issuer, filed under *The Companies Law* (2004 Revision) of the Cayman Islands, as amended and restated and as otherwise modified and supplemented and in effect from time to time.

"Issuer Interest Collection Account": The trust account designated the "Issuer Interest Collection Account" and established in the name of the Trustee pursuant to Section 10.2(a).

"Issuer Order" and "Issuer Request": A written order or request (which may be in the form of standing instructions) dated and signed in the name of the Issuer by an Authorized Officer of the Issuer and (if appropriate) the Zohar Subsidiary and/or the Co-Issuer, or by an Authorized Officer of the Collateral Manager where permitted pursuant to this Indenture or the Management Agreement, as the context may require or permit.

"Issuer Par Amount": With respect to each issuer of Collateral Debt Obligations, the sum of the par amounts of all Collateral Debt Obligations issued by such issuer or any Affiliate of such issuer that remain outstanding. For purposes of calculating the Issuer Par Amount, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Issuer Principal Collection Account": The trust account designated the "Issuer Principal Collection Account" and established in the name of the Trustee pursuant to Section 10.2(b).

34

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Junior Rollover Exchanged Security":  Any Exchanged Security that (i) is acquired by application of amounts on deposit in the Rollover Proceeds Account and (ii) is not a Senior Secured Collateral Debt Obligation, a Second Lien Collateral Debt Obligation, or an Originated Special Loan/Preferred Security.

"Knowledgeable Employee":  The meaning specified in Rule 3c-5 promulgated under the Investment Company Act.

"LIBO Rate":  A rate of interest determined on the basis of the rates at which deposits in Dollars are offered to prime banks in the London interbank market.

"LIBOR":  The meaning specified in Schedule B.

"LIBOR Business Day":  The meaning specified in Schedule B.

"LIBOR Determination Date":  The meaning specified in Schedule B.

"LIFO/Priming Facility":  A loan or credit facility, or an amendment or supplement to an existing loan or credit facility, that is entered into by an Obligor and/or its Affiliates that (i) by its terms is senior to or must be paid before other indebtedness of such Obligor and (ii) is commonly known as a "LIFO Facility" or is another facility substantially equivalent to a "LIFO Facility".

"London Banking Day":  The meaning specified in Schedule B.

"Majority":  With respect to (i) any Class or Classes of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class or Classes of Notes, as the case may be and (ii) the Preference Shares, the holders of more than 50% of the Preference Shares Outstanding.

"Management Agreement":  The Collateral Management Agreement, dated as of January 12, 2005 among the Issuer, the Zohar Subsidiary and the Collateral Manager, as amended from time to time in accordance with the terms thereof.

"Margin Stock":  "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System.

"Market Value":  On any date of determination, the market value of any Collateral Debt Obligation based upon the average of the quotations for the purchase of such Collateral Debt Obligation obtained by the Collateral Manager from three Approved Loan Pricing Services; or if the Collateral Manager is able to obtain quotations from only two Approved Loan Pricing Services after reasonable efforts, the lower of such two quotations; or if the Collateral Manager is able to obtain only one quotation from an Approved Loan Pricing Service or no such quotation after reasonable efforts, based on a report of Mark-it Partners Ltd. or an Independent bond and/or loan pricing service approved by the Controlling Party (which report may be in the form of a firm bid) confirming such value.

"Maturity":  With respect to any Note, the date on which all outstanding unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, redemption or otherwise.

NY3:#7347151v27
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050300

"Maximum Investment Amount": On any date, an amount equal to the sum (without duplication) of:

(a)    the Aggregate Principal Balance on such date of all Collateral Debt Obligations (which, for the avoidance of doubt, shall include all Collateral Debt Obligations that the Issuer and/or the Zohar Subsidiary has committed to purchase (but which purchases have not yet settled)), and in each case excluding, in the case of any such Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations, the aggregate Unfunded Amounts thereunder; plus

(b)    the Funding Source Amount on such date; minus

(c)    the aggregate amounts owing by the Issuer and/or the Zohar Subsidiary to sellers of Collateral Debt Obligations that the Issuer and/or the Zohar Subsidiary has committed to purchase (but which purchases have not yet settled) on such date;

provided that, at all times prior to the Ramp Up End Date, the Maximum Investment Amount shall be deemed to be not less than U.S.$1,000,000,000.

"MBIA": MBIA Insurance Corporation, a stock insurance company incorporated under the laws of the State of New York, and any successor thereto.

"Measurement Date": Any of the following dates on or after the Ramp Up End Date: (i) any date on which the Issuer or the Zohar Subsidiary commits to acquire or dispose of any Collateral Debt Obligation, (ii) any date on which a Collateral Debt Obligation becomes a Non-Performing Obligation, (iii) each Determination Date, (iv) each date as of which a Monthly Report is prepared; (v) any date on which a request for a Borrowing is given under any Class A-1 Note Purchase Agreement in respect of the Class A-1 Notes or under any Class A-3 Note Purchase Agreement in respect of the Class A-3 Notes, (vi) the Ramp Up End Date and (vii) with reasonable notice to the Zohar Obligors, the Collateral Manager and the Trustee, any other Business Day that either Rating Agency requests or the Controlling Party requests be a Measurement Date; provided that if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date shall be the next succeeding day that is a Business Day. In addition, the Ramp Up Measurement Dates will constitute "Measurement Dates" solely for purposes of computing each Ramp Up Calculation pursuant to Section 7.13(a).

"Minimum Average Recovery Rate Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if (i) the Standard & Poor's Average Recovery Rate on such Measurement Date equals or exceeds 58% and (ii) the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 45%.

"Minimum Total Credit Enhancement Premium Amount": On any Payment Date, the amount, if any, by which (a) U.S.$12,500,000 exceeds (b) the aggregate amount (without duplication) of Credit Enhancement Premium paid to or on behalf of the Credit Enhancer in respect of the Credit Enhancement through the Class A Payoff Date plus the amount of any additional premium in respect of the Credit Enhancement paid to the Credit Enhancer by the Issuer or any other Person on or prior to such Payment Date (including any such premium previously paid as Minimum Total Credit Enhancement Premium Amount pursuant to the Priority of Payments)), as reported to the Collateral Administrator by the Credit Enhancer on or prior to the related Determination Date.

"Money": The meaning specified in Section 1-201(24) of the UCC.

NY3-#7147151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050301

"Monthly Report": The meaning specified in Section 10.13(a).

"Moody's": Moody's Investors Service, Inc. and any successor or successors thereto.

"Moody's Default Probability Rating": With respect to any Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security), as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    with respect to a Senior Secured Collateral Debt Obligation:

(i)    if the issuer thereof has a senior implied rating from Moody's, such senior implied rating;

(ii)    if the preceding clause does not apply, the Assigned Moody's Rating of such loan; and

(iii)    if the preceding clauses do not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating;

(b)    with respect to a Second Lien Collateral Debt Obligation or Collateral Debt Obligation (other than a DIP Loan), the Moody's Equivalent Senior Unsecured Rating of such Second Lien Collateral Debt Obligation or Collateral Debt Obligation; and

(c)    with respect to a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"Moody's Equivalent Senior Unsecured Rating": With respect to any Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security) and the issuer thereof as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    if such issuer has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)    if the preceding clause does not apply, the Moody's "issuer rating" for such issuer;

(c)    if the preceding clauses do not apply, but such issuer has a subordinated obligation with an Assigned Moody's Rating, then

(i)    if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

37

Indenture
PP050302

NY3:#7247151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(ii)    if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d)    if the preceding clauses do not apply, but such issuer has a senior secured obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)    if the preceding clauses do not apply, but such issuer has a senior implied rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such senior implied rating;

(f)    if the preceding clauses do not apply, but such issuer has a senior unsecured obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB−" or higher, or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower;

(g)    if the preceding clauses do not apply, but such issuer has a subordinated obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB−" or higher; or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower,

and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above;

(h)    if the preceding clauses do not apply, but such issuer has a senior secured obligation with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB−" or higher; or

38

Indenture
PP050303

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower,

and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above;

(i)    if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(i)    neither such issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

(ii)    no debt securities or obligations of such issuer are in default,

(iii)    neither such issuer nor any of its Affiliates has defaulted on any debt during the preceding two years,

(iv)    such issuer has been in existence for the preceding five years,

(v)    such issuer is current on any cumulative dividends,

(vi)    the fixed-charge ratio for such issuer exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

(vii)    such issuer had a net profit before tax in the past fiscal year and the most recent quarter, and

(viii)    the annual financial statements of such issuer are unqualified and certified by a firm of Independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j)    if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(i)    neither such issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii)    no debt security or obligation of such issuer has been in default during the past two years; and

(k)    if the preceding clauses do not apply and a debt security or obligation of such issuer has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, no more than 7.5% of the Collateral Debt Obligations, by Aggregate Principal Balance, may be given a Moody's Equivalent Senior Unsecured Rating based on a rating given by Standard & Poor's as provided in clauses (f), (g) and (h) above.

"Moody's Obligation Rating": With respect to any Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security), as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

39

NY3:#7347151v23
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(a)    with respect to a Senior Secured Collateral Debt Obligation:

(i)    if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)    if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b)    with respect to a Second Lien Collateral Debt Obligation or other Collateral Debt Obligation (other than a DIP Loan):

(i)    if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)    if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c)    with respect to a DIP Loan, the Assigned Moody's Rating thereof.

"Moody's Plan": The meaning specified in Section 7.13(a).

"Moody's Rating": With respect to any Collateral Debt Obligation (other than an Originated Special Loan/Preferred Security that is a Preferred Security), the Moody's Default Probability Rating; provided that, if such Collateral Debt Obligation is not rated by Moody's and no other security or obligation of the issuer is rated by Moody's, then the Issuer, or the Collateral Manager on behalf of the Issuer, shall present such Collateral Debt Obligation to Moody's for an estimate of such Collateral Debt Obligation's rating factor from which its corresponding Moody's rating may be determined, which shall be its Moody's Rating and (1) pending receipt from Moody's of such an estimated rating, the Moody's Rating of such Collateral Debt Obligation shall be (x) three subcategories below the rating generated by the Moody's Riscalc Model or (y) at the option of the Issuer (or the Collateral Manager on behalf of the Issuer), equal to the rating derived from such alternative Moody's rating model that is mutually acceptable to Moody's and the Issuer (provided that the Moody's Rating derived in the foregoing clauses (1)(x) and (1)(y) above shall not exceed "B1"); and (2) for each Collateral Debt Obligation whose Moody's Rating is determined by this proviso, the Collateral Manager shall redetermine such Moody's Rating annually (or, in the alternative, determine such Moody's Rating by another method permitted in this definition) and, in such connection, furnish to Moody's such updated financial information relating to the obligor on such Collateral Debt Obligation as Moody's may reasonably request. At no time shall more than 25% of the Maximum Investment Amount be comprised of Collateral Debt Obligations whose ratings, for purposes of this Indenture, are generated by the Moody's Riscalc Model; provided that, at the option of the Issuer (or the Collateral Manager on behalf of the Issuer), and upon written notice to Moody's, such 25% limitation shall not apply to any Collateral Debt Obligation in respect of which (x) the Issuer shall have made a request to Moody's for a credit estimate pursuant to the first sentence of this definition (to which Moody's shall promptly acknowledge whether the materials in connection with such credit estimate application are complete) and (y) Moody's shall not have provided such credit estimate within 30 days of such acknowledgement. With respect to the Pledged Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Issuer (with written notice to the Trustee), as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used. The Issuer (or the Collateral Manager on behalf of the Issuer) shall promptly apply to Moody's for a new Moody's Rating in respect of any Collateral Debt Obligation that does not have a monitored publicly available rating from Moody's and as to which any one or more of the following events occurs, is agreed between the issuer thereof (or a

40

Indenture
PP050305

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

governmental authority) and a sufficient number of holders of such Collateral Debt Obligation that is binding on all holders thereof or is announced (or otherwise decreed) by such issuer (or governmental authority) in a form that is binding upon all such holders, and such event is not expressly provided for under the terms of the Underlying Instruments of such Collateral Debt Obligation in effect immediately prior to such event: (i) a postponement by more than 6 months of the date on which principal is payable at final maturity; (ii) a reduction by more than 3.00% per annum in the rate of interest payable (whether calculated based on a spread above a floating reference rate or a fixed rate); (iii) a reduction by more than 25% in the aggregate amount of principal payable on any one or more scheduled amortization or other redemption dates within any 12-month period; (iv) an increase of more than 10% in any advance rate or other borrowing base formula utilized in connection with such Collateral Debt Obligation; or (v) a change in, or waiver of, the interest rate resulting in a deferral or capitalization of interest by more than 3.00% per annum (based on the Principal Balance of such Collateral Debt Obligation) or any deferral or capitalization that would cause such Collateral Debt Obligation to become a PIK Loan.

"Moody's Rating Factor": For purposes of computing the Moody's Weighted Average Rating Distribution, the number assigned below to the Moody's Rating applicable to each Collateral Debt Obligation (other than any Originated Special Loan/Preferred Security that is a Preferred Security).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,780 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

"Moody's Recovery Rate": With respect to any loan or Bond, as of any date of determination, the recovery rate determined in accordance with the following, in the following order of priority:

(a)     if such loan or Bond has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate;

(b)     if the preceding clause does not apply to such loan or Bond, and such loan is a Senior Secured Collateral Debt Obligation or a Second Lien Collateral Debt Obligation, the rate determined pursuant to the table below based on the number of rating subcategories difference between such loan's or such Bond's Moody's Obligation Rating and its Moody's Default Probability Rating (for the avoidance of doubt, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories' difference will be positive and if it is lower, negative):

41

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture
PP050306

| Number of Moody's Ratings Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Senior Secured Collateral Debt Obligation | Second Lien Collateral Debt Obligation | Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

or if no recovery rate has been specifically assigned with respect to a loan pursuant to clause (a) above, and such loan is a DIP Loan, 50%.

"Moody's Riscalc Model": The model developed by Moody's and used to estimate the Rating to be given by Moody's to a Collateral Debt Obligation (other than any Originated Special Loan/Preferred Security that is a Preferred Security) that does not have a Moody's rating and is provided to the Collateral Manager on the Funding Date for purposes of determining such Rating.

"Moody's Weighted Average Rating Distribution": On any Measurement Date, the number obtained by dividing (a) the summation of the series of products obtained by multiplying the Principal Balance of each Collateral Debt Obligation that is not a Non-Performing Obligation by its respective Moody's Rating Factor by (b) the sum of the Aggregate Principal Balances of all Collateral Debt Obligations that are not Non-Performing Obligations and rounding the result up to the nearest whole number. For purposes of calculating the Moody's Weighted Average Rating Distribution, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Moody's Weighted Average Rating Factor Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Moody's Weighted Average Rating Distribution is not more than the number specified in the Currently Applicable Row of the Ratings Matrix plus:

(i)     if the Currently Applicable Row of the Ratings Matrix is row 1 thereof:

(a)     100 if the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 47%; plus

(b)     an additional 100 if the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 49%;

(ii)     if the Currently Applicable Row of the Ratings Matrix is row 2 thereof:

(a)     125 if the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 47%; plus

(b)     an additional 125 if the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 49%; and

42

Indenture
PP050307
NY3:#7347151v22

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(iii)    if the Currently Applicable Row of the Ratings Matrix is row 3 thereof:

(a)    150 if the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 47%; plus

(b)    an additional 150 if the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds 49%.

"Moody's Weighted Average Recovery Rate": As of any Measurement Date, the rate expressed as a percentage obtained by (i) summing the products obtained by multiplying the Principal Balance of each Pledged Collateral Debt Obligation that is not a Non-Performing Obligation by its applicable Moody's Recovery Rate, (ii) dividing such sum by the Aggregate Principal Balance of all such Pledged Collateral Debt Obligations that are not a Non-Performing Obligations and (iii) rounding up to the first decimal place. For purposes of determining the Moody's Weighted Average Recovery Rate, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Net Aggregate Exposure Amount": As of any Measurement Date, an amount (not less than zero) equal to (a) the Unfunded Portfolio Amount as of such Measurement Date minus (b) the Balance on deposit in the Unfunded Revolver Discount Account on such Measurement Date.

"Net Portfolio Collateral Balance": As of any Measurement Date, an amount equal to the sum of:

(a)    for each Collateral Debt Obligation that is designated as Category 1 or Category 2:

(i)    with respect to any Collateral Debt Obligation that is (x) in Category 1 or Category 2 and was previously in Category 3 or Category 4 or (y) in Category 1 and was previously in Category 2, the Market Value of such Collateral Debt Obligation (determined taking into account both the Funded Amounts and Unfunded Amounts in respect thereof as applicable); provided that if such Market Value has not been obtained, then the lowest of (A) an amount equal to the Original Purchase Price Percentage of such Collateral Debt Obligation multiplied by the Principal Balance thereof, (B) an amount equal to the Moody's Recovery Rate of such Collateral Debt Obligation multiplied by the Principal Balance thereof and (C) an amount equal to the Priority Category Recovery Rate of such Collateral Debt Obligation determined by reference to the table set forth in the definition of "Standard & Poor's Average Recovery Rate" multiplied by the Principal Balance thereof; and

(ii)    otherwise, (A) if the value of such Collateral Debt Obligation is obtainable through the relevant market, an amount equal to the lower of (1) the Market Value of such Collateral Debt Obligation (determined taking into account both the Funded Amounts and Unfunded Amounts in respect thereof as applicable) and (2) an amount equal to the Original Purchase Price Percentage of such Collateral Debt Obligation multiplied by the Principal Balance thereof or (B) if the value of such Collateral Debt Obligation is not obtainable through the relevant market, an amount equal to the Original Purchase Price Percentage of such Collateral Debt Obligation multiplied by the Principal Balance thereof;

43

Indenture
PP050308

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(b)    for each Collateral Debt Obligation that is designated as Category 3 or Category 4, an amount equal to the Principal Balance thereof; and

(c)    for each Workout Obligation, (i) if such Workout Obligation is a senior secured obligation, 45% of the Principal Balance of such Workout Obligation or (ii) otherwise, 30% of the Principal Balance of such Workout Obligation.

For the avoidance of doubt, (1) references above to Collateral Debt Obligations shall include all Collateral Debt Obligations that the Issuer and/or the Zohar Subsidiary have committed to purchase (but which purchases have not yet settled) and (2) for purposes of calculating the Net Portfolio Collateral Balance, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Non-Current Obligation": (a) Any Defaulted Obligation the issuer of, or Obligor on, which has previously deferred and/or capitalized as principal any interest due thereon (unless any interest so deferred and capitalized has subsequently been paid in full in Cash to the Issuer or the Zohar Subsidiary, as applicable); and (b) any PIK Loan. For purposes of this definition, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be a Non-Current Obligation.

"Non-Extending Holder": The meaning specified in the applicable Class A-1 Note Purchase Agreement.

"Non-Performing Obligation": Any Collateral Debt Obligation with respect to which a default as to the payment of interest has occurred and is continuing (after giving effect to any applicable grace period) during a specified period. For purposes of this definition, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be a Non-Performing Obligation.

"Non-Permitted Holder": The meaning specified in Section 2.12(b).

"Noteholder": A Holder of a Note.

"Note Interest Rate": With respect to the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes, the annual rate at which interest accrues on the Notes of such Class, being the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate or the Class A-3 Note Interest Rate, as applicable.

"Note Purchase Agreement": The Class A-1 Note Purchase Agreements and the Class A-3 Note Purchase Agreement, collectively.

"Note Register" and "Note Registrar": The respective meanings specified in Section 2.4(a).

"Note Subscription Agreements": The several Note Subscription Agreements, each dated on or about January 12, 2005, between the Issuer and the initial purchaser of the Class B Notes named on the signature page thereof, as modified and supplemented and in effect from time to time.

"Note Valuation Report": The meaning specified in Section 10.13(b).

"Notes": The Class A Notes, the Class B Notes and the Class C Notes authorized by, and authenticated and delivered under, this Indenture.

44

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050309

"Obligor": With respect to a Collateral Debt Obligation, the Person who is obligated to repay such Collateral Debt Obligation (including, if applicable, a guarantor thereof), and whose assets were principally relied upon by the Issuer or the Zohar Subsidiary at the time such Collateral Debt Obligation was purchased by the Issuer or the Zohar Subsidiary, as applicable, as the source of repayment of such Collateral Debt Obligation.

"Offer": With respect to any security or obligation, (a) any offer by the issuer of such security or obligation or by any other Person made to some or all of the holders of such security or obligation to purchase or otherwise acquire such security or obligation (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security or obligation into or for Cash, securities or any other type of consideration or (b) any solicitation by the issuer of such security or obligation or any other Person to amend, modify or waive any provision of such security or obligation or any related Underlying Instrument.

"Officer": With respect to any Zohar Obligor and any corporation and/or limited liability company, the Chairman of the Board of Directors (or any director, with respect to the Issuer), the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer or equivalent of such entity; with respect to any partnership, any general partner thereof; and with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"Offshore Transaction": The meaning specified in Regulation S.

"Opinion of Counsel": A written opinion addressed to the Trustee, the Credit Enhancer, each Noteholder and each Rating Agency (each, a "Recipient"), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice (or law firm with one or more partners admitted to practice) in any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for any Zohar Obligor, as the case may be, and which attorney (or law firm) shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"Original Purchase Price Percentage": With respect to any Collateral Debt Obligation, the ratio (expressed as a percentage) of:

(a)    the Purchase Price of such Collateral Debt Obligation (not taking into account transfer fees) plus the Unfunded Amount with respect thereto (if any) as of the date on which the Issuer or the Zohar Subsidiary settles the acquisition thereof; to

(b)    the Principal Balance of such Collateral Debt Obligation as of the date on which the Issuer or the Zohar Subsidiary settles the acquisition thereof.

"Originated Special Loan/Preferred Security": Any loan or other debt obligation or Preferred Security that (i) was acquired by the Issuer and/or the Zohar Subsidiary in connection with the origination of a new Collateral Debt Obligation, (ii) does not otherwise satisfy clause (a) of the definition of "Collateral Debt Obligation" at the time of such origination and (iii) in the case of a Preferred Security, has a face or stated amount and a fixed maturity or redemption date. Where the context requires, the

45

Indenture
PP050310

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Principal Balance of each such Preferred Security shall be its face or stated amount. For the avoidance of doubt, the term "Originated Special Loan/Preferred Security" includes other loans or other debt obligations or Preferred Securities, as applicable, received in connection with any exchange, workout, restructuring or refinancing of an Originated Special Loan/Preferred Security.

"Outstanding": With respect to (i) the Notes, as of any date of determination, all of such Class of Notes or the Notes, as the case may be, theretofore authenticated and delivered under this Indenture and (ii) the Preference Shares, all of such Preference Shares issued and allocated under the Issuer Charter, except in any case:

(a)    Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

(b)    Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; provided that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(c)    Notes in exchange for, or in lieu of, other Notes which have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course;

(d)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.5; and

(e)    Preference Shares redeemed or repurchased in accordance with the Issuer Charter;

provided that:

(1)    to the extent that the Class A-1 Notes or the Class A-2 Notes have been paid with proceeds of the Credit Enhancement (including payments made as a result of Preference Claims), such Notes shall continue to remain Outstanding for purposes of this Indenture until the Credit Enhancer has been paid as subrogee hereunder (and (without duplication) has been paid all outstanding Credit Enhancement Premium and all outstanding Credit Enhancement Liabilities), and the Credit Enhancer shall be deemed the Holder thereof, to the extent of any payments thereon made by the Credit Enhancer; and

(2)    in determining whether the Holders of the requisite Aggregate Outstanding Amount of Notes, or the Holders of the requisite Outstanding Preference Shares, have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (A) Notes beneficially owned by any Zohar Obligor or any other obligor upon the Notes or any Affiliate of any of them (excluding the Collateral Manager or any of its Affiliates) shall be disregarded and deemed not to be Outstanding and (B) Class A Notes beneficially owned by the Collateral Manager or any Affiliate of the Collateral Manager shall be disregarded and deemed not to be Outstanding in relation to any amendment or other modification of, or assignment or termination of, any of the express rights or obligations of the Collateral Manager under the Management Agreement or this Indenture (including the exercise of any rights to remove the Collateral Manager or terminate the Management Agreement or approve or object to a replacement

46

Indenture
PP050311

NY3;#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Collateral Manager), except in any case that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Trustee knows to be beneficially owned in the manner indicated above shall be so disregarded.

Notes owned in the manner indicated in paragraph (2) above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not any Zohar Obligor or any other obligor upon the Notes or any Affiliate of any Zohar Obligor or such other obligor (excluding, with respect to the Class B Notes or Class C Notes, the Collateral Manager or any of its Affiliates).

"Participation Interest": An undivided participation interest in a Collateral Debt Obligation or Unrestricted Collateral Debt Obligation, as applicable.

"Past Due Interest": With respect to any Collateral Debt Obligation, all accrued and unpaid interest thereon to the extent that any portion of such interest is more than 90 days overdue when received by the Issuer (taking into account any applicable grace period specified in the Underlying Instrument up to but not exceeding five days) (as determined by the Collateral Manager in reasonable good faith and judgment by reference to the terms of the applicable Underlying Instruments). For the avoidance of doubt, distributions on any Originated Special Loan/Preferred Security that is a Preferred Security shall not constitute Past Due Interest.

"Patriarch Partners": Patriarch Partners XIV, LLC, a Delaware limited liability company.

"Paying Agent": Any Person authorized by the Issuer to pay the principal of any Notes on behalf of the Issuer as specified in Section 7.2.

"Payment Account": The trust account designated the "Payment Account" and established in the name of the Trustee pursuant to Section 10.3.

"Payment Date": January 20, April 20, July 20 and October 20 of each year; provided that (a) the first Payment Date will be the Initial Payment Date and (b) the final Payment Date will be January 20, 2020. Notwithstanding the foregoing, if any such date is not a Business Day, the related Payment Date will be the immediately following Business Day.

"Performing Collateral Debt Obligation": Any Collateral Debt Obligation that is not a Non-Performing Obligation. For purposes of this definition, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be a Performing Collateral Debt Obligation.

"Person": An individual, corporation (including a business trust), company, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association, government or any agency or political subdivision thereof or any other legal entity.

"PIK Loan": Any loan or other obligation with respect to which the issuer thereof or Obligor thereon has (at such time) the right under the related Underlying Instrument to defer or capitalize interest due on such loan or obligation as principal; provided that, a loan or other obligation shall not be considered a PIK Loan if (i) such loan or obligation is required to pay at least a portion of its interest as a cash coupon due on each payment date or distribution date pursuant to its Underlying Instruments without

47

NY3:#7347)51v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

the ability to defer or capitalize such portion of interest and (ii) the cash coupon portion of such loan or obligation is calculated at a rate per annum greater than or equal to LIBOR.

"Placement Agent": IXIS Securities, in its capacity as Placement Agent under the Placement Agreement.

"Placement Agreement": An agreement dated January 12, 2005 among the Co-Issuers, and the Placement Agent, relating to the offer and sale of the Class A Notes, as amended from time to time.

"Plan": An ERISA Plan and any other "plan" (as defined in Section 4975(e)(1) of the Code) which is subject to the provisions of Section 4975 of the Code, and any entity whose underlying assets include the assets of any such ERISA Plan or plan.

"Plan Asset Regulation": The regulation issued by the United States Department of Labor at 29 C.F.R. Section 2510.3-101 as in effect from time to time.

"Pledged Collateral Debt Obligation": As of any date of determination, any Collateral Debt Obligation that has been Granted to the Trustee and has not been released from the lien of this Indenture pursuant to Section 10.14.

"Pledged Obligations": On any date of determination, (a) the Collateral Debt Obligations, the Unrestricted Collateral Debt Obligations and the Eligible Investments that have been Granted to the Trustee and any Equity Security which forms part of the Collateral and (b) all non-Cash proceeds thereof.

"Post-Insolvency Collateral Debt Obligation": As of any date, any Collateral Debt Obligation that on such date is not an Insolvency Collateral Debt Obligation, but prior to such date (but on or after the Funding Date) was an Insolvency Collateral Debt Obligation, and on such date is a Collateral Debt Obligation of an obligor that has emerged from bankruptcy, insolvency, reorganization or similar proceeding pursuant to a plan of reorganization confirmed or approved by a final order of a court of competent jurisdiction.

"Post-Ramp Up Plan": The meaning specified in Section 7.13(b).

"Preceding Monthly Reporting Date": The meaning specified in Section 10.13(a).

"Preference Claim": The meaning specified in Section 16.4(b).

"Preference Share Distribution Account": The meaning specified in the Preference Share Paying Agency Agreement.

"Preference Share Paying Agency Agreement": The Preference Share Paying Agency Agreement dated as of January 12, 2005 between the Issuer and the Preference Share Paying Agent, as modified and supplemented and in effect from time to time.

"Preference Share Paying Agent": The Bank, solely in its capacity as paying agent under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the paying agent pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter "Preference Share Paying Agent" shall mean such successor Person.

48

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Preference Share Registrar": The Issuer, solely in its capacity as registrar under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the registrar pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter "Preference Share Registrar" shall mean such successor Person.

"Preference Share Subscription Agreements": The several Preference Share Subscription Agreements, each dated on or about January 12, 2005, between the Issuer and the respective initial purchaser(s) of the Preference Shares, as modified and supplemented and in effect from time to time.

"Preference Shares": The preference shares of the Issuer, par value U.S.$0.01 per share.

"Preferred Security": Any equity security that is a preferred stock, preferred share or other form of preferred equity interest.

"Prepayment": The meaning specified in Section 9.5(a)(ii).

"Prepayment Date": The meaning specified in Section 9.5(a)(ii).

"Principal Balance" or "par": With respect to any Pledged Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation; provided that:

(a)    for all purposes (except as provided in the definition of Originated Special Loan/Preferred Security), the Principal Balance of any Equity Security shall be deemed to be zero;

(b)    except as otherwise expressly specified herein, the Principal Balance of a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation shall include any Unfunded Amount of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation (regardless of the nature of the contingency relating to the Issuer's obligation to fund such Unfunded Amount);

(c)    the Principal Balance of any Collateral Debt Obligation will not include any principal amount of such Collateral Debt Obligation representing previously deferred or capitalized interest unless (1) such Collateral Debt Obligation has a Standard & Poor's Rating of "B" or higher, (2) such Collateral Debt Obligation is in compliance with all "EBITDA", senior debt to "EBITDA" and "EBITDA" to interest expense covenants, as applicable, set forth in the Underlying Instruments of such Collateral Debt Obligation and (3) the Collateral Manager believes with reasonable certainty that the obligor under such Collateral Debt Obligation has the financial ability to pay, as of such date of determination, such amount of deferred or capitalized interest in accordance with the terms of its Underlying Instrument; and

(d)    with respect to any Discounted Loan, the Principal Balance of such Discounted Loan shall be deemed to equal the outstanding principal amount thereof (including, for the avoidance of doubt, the discounted portion thereof) plus any unfunded commitment of the Issuer and/or the Zohar Subsidiary to make further advances pursuant to such Discounted Loan; provided that (1) such Discounted Loan has a Standard & Poor's Rating of "B" or higher, (2) such Discounted Loan is in compliance with all "EBITDA", senior debt to "EBITDA" and "EBITDA" to interest expense covenants, as applicable, set forth in the Underlying Instruments of such Discounted Loan and (3) the Collateral Manager believes with reasonable certainty that the

49

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050314

discounted portion will be paid as and when due; provided further that, for purposes of the foregoing portion of this clause (d), the aggregate Principal Balance of all such Discounted Loans that satisfy the foregoing clauses (1), (2) and (3) shall not exceed 10% of the Maximum Investment Amount); otherwise, the Principal Balance of such Discounted Loan shall be deemed to equal the outstanding principal amount thereof (excluding the discounted portion thereof) plus any unfunded commitment of the Issuer and/or the Zohar Subsidiary to make further advances pursuant to such Discounted Loan.

"Principal Proceeds": With respect to any Due Period, the sum (without duplication, and in any event excluding the Excluded Property) of: (a) all payments of principal received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Debt Obligations and Eligible Investments (other than (i) Uninvested Proceeds, (ii) amounts defined as "Interest Proceeds" pursuant to clause (c) of the definition thereof, (iii) payments of principal on any Unrestricted Collateral Debt Obligations to be deposited in the Unrestricted Collateral Account pursuant to Section 10.9 and (iv) payments to be held in the Rollover Proceeds Account pursuant to Section 10.10); (b) all Sale Proceeds received by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Debt Obligations, including without limitation amounts received in respect of original issue or market discount or Past Due Interest, but excluding accrued interest constituting "Interest Proceeds" under clauses (a) or (b) of the definition of "Interest Proceeds" and excluding call, redemption and prepayment premiums and fees and commissions of the type referred to in clause (d) or (e) of the definition of "Interest Proceeds"; (c) all payments of interest received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Debt Obligations and Eligible Investments to the extent such payments constitute proceeds from accrued interest purchased with Principal Proceeds or Uninvested Proceeds; (d) all payments of Past Due Interest received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Debt Obligations; (e) with respect to the Due Period during which the last day of the Reinvestment Period occurs, any Uninvested Proceeds on deposit in the Issuer Principal Collection Account on the close of the last day of the Reinvestment Period (other than Uninvested Proceeds that will be used to acquire Collateral Debt Obligations that the Issuer or the Zohar Subsidiary has committed to purchase (but have not yet settled) on such date and Uninvested Proceeds that are to be deposited in the Unfunded Revolver Discount Account with respect thereto); (f) all Hedge Termination Amounts received by the Issuer during such Due Period; (g) all Cash Distributions on and Cash Sale Proceeds with respect to any PIK Loan (and, in the case of loan or other obligation that defers or capitalizes a portion of its interest, all Cash Distributions and Cash Proceeds relating to such portion of deferred or capitalized interest); and (h) all other amounts received by the Issuer or the Zohar Subsidiary during such Due Period which are not included in the definition of "Interest Proceeds" (other than (i) amounts payable by any Hedge Counterparty to the Issuer and required to be deposited into the Cash Reserve Account, (ii) payments of interest and principal on Eligible Investments credited to the Class A Holder Collateral Account and the Hedge Counterparty Collateral Account and (iii) distributions on Equity Securities (other than those described in clause (e) of the definition of "Interest Proceeds") acquired, directly or indirectly, with amounts on deposit in the Unrestricted Collateral Account (which distributions shall be deposited in the Unrestricted Collateral Account)). Any determination of the aggregate amount of Principal Proceeds with respect to any day during a Due Period will include all Principal Proceeds received by the Issuer or the Zohar Subsidiary from and including the first day of such Due Period to and including such date of determination.

"Priority Category Recovery Rate": With respect to any Collateral Debt Obligation, the recovery rates applicable thereto, determined by reference to the table set forth in the definition of "Moody's Recovery Rate" or by reference to the table set forth in the definition of "Standard & Poor's Average Recovery Rate", as the case may be.

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050315

"Priority of Payments": The priority of payments specified in Section 11.1(a)(i) and (ii) and in Section 11.2(a).

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Professional Fee Account": The trust account designated the "Professional Fee Account" and established in the name of the Trustee pursuant to Section 10.6(b).

"Professional Fees": Fees and expenses of professionals hired by the Collateral Manager in connection with its duties under the Management Agreement (other than (a) fees and expenses described in Section 11.1(a)(i)(B) and (b) fees and expenses payable from the Expense Account or the Closing Expense Account).

"Proposed Moody's Plan": The meaning specified in Section 7.13(a).

"Proposed Portfolio": The portfolio (measured by Principal Balance) of the Collateral Debt Obligations (excluding Collateral Debt Obligations in Category 1 and Category 2) and Funding Availability resulting from the sale, maturity or other disposition of a Collateral Debt Obligation or a proposed purchase of a Collateral Debt Obligation, as the case may be. For purposes of the definition of "Proposed Portfolio", any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Proposed Post-Ramp Up Plan": The meaning specified in Section 7.13(b).

"Purchase Documents": The assignment agreements, purchase and sale agreements, participation agreements and/or other agreements by which the Issuer and/or the Zohar Subsidiary acquires any interest, direct or indirect, in the Collateral.

"Purchase Price": With respect to the purchase of a Collateral Debt Obligation, the net price paid by or to the Issuer for such Collateral Debt Obligation (which, in the case of a Purchase Price paid to the Issuer by the seller of such Collateral Debt Obligation, will be stated as a negative number), after taking into account all transfer fees paid by or paid to the Issuer in connection with such purchase and all payments and discounts made or granted by the seller of such Collateral Debt Obligation to the Issuer in consideration of such purchase.

"Purchase-to-Improve Ratio": The percentage specified in the Currently Applicable Row of the Ratings Matrix.

"Purchase-to-Improve Ratio Test": A test that is satisfied as of any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period, if the Class A Overcollateralization Ratio as of such date equals or exceeds the Purchase-to-Improve Ratio as of such date.

"QIB/QP": A Qualified Institutional Buyer (other than (a) a dealer described in paragraph (a)(1)(ii) of Rule 144A that owns and invests on a discretionary basis less than U.S.$25,000,000 in securities of issuers that are not affiliated Persons of such dealer; or (b) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, where investment decisions with respect to such plan are made by the beneficiaries of such plan) that is a Qualified Purchaser.

51

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Qualified Institutional Buyer": A "qualified institutional buyer" as defined in Rule 144A.

"Qualified Purchaser": (a) A "qualified purchaser" as defined in Section 2(a)(51) of the Investment Company Act, (b) a Knowledgeable Employee with respect to the Issuer or (c) a company beneficially owned exclusively by one or more "qualified purchasers" and/or Knowledgeable Employees with respect to the Issuer.

"Qualified Securitization Pledge": With respect to any Uncommitted Note Purchaser, a bona fide pledge by such Uncommitted Note Purchaser of its right, title and interest in and to any Class A Note pursuant to its program collateral or security agreement with a collateral agent to secure obligations owing by such Uncommitted Note Purchaser to such Uncommitted Note Purchaser's liquidity providers, debt holders or other creditors, but only:

(1)     if such pledge would not (in the reasonable judgment of the Uncommitted Note Purchaser and for so long as the Issuer does not reasonably object) (A) have the effect of requiring the Issuer, the Co-Issuer or the pool of Collateral to register as an investment company under the Investment Company Act; (B) adversely affect the Issuer's ability to use the exception provided for by Section 3(c)(7) of the Investment Company Act; (C) subject the Issuer or the Notes to the registration requirements of the Securities Act; (D) result in a non-exempt prohibited transaction for purposes of ERISA; or (E) cause the Issuer to be a publicly traded partnership or otherwise be taxable as a corporation for U.S. federal income tax purposes; and

(2)     if such Uncommitted Note Purchaser from time to time delivers to the Issuer such information concerning such Uncommitted Note Purchaser, such collateral agent and such liquidity providers, debt holders or other creditors as the Issuer may reasonably request in order for the Issuer to make appropriate determinations with respect to the matters referred to in clause (1) above;

provided that, upon any foreclosure action in respect of any such pledge and any related purported transfer of legal or beneficial ownership of such Class A Note or any right, title or interest therein, any such purported transfer will be considered to be a "transfer" of such Note (or such right, title or interest) for all purposes of this Indenture (including for purposes of Section 2.4).

"Qualifying Investment Vehicle": An entity (a) with only one class of securities outstanding and (b) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer or the Co-Issuers, as the case may be, and the Note Registrar each of the representations set forth herein and required to be made upon transfer of any of the relevant Class of Notes (with modifications to such representations satisfactory to the Collateral Manager, the Issuer and the Controlling Party to reflect the indirect nature of the interests of such beneficial owners in such Notes, including any modification permitting the beneficial owners of the securities issued by such entity to represent that they are accredited investors as defined in Rule 501(a) under the Securities Act).

"Quarterly Asset Amount": With respect to any Payment Date, an amount equal to the Aggregate Principal Balance of all Pledged Obligations (including, for the avoidance of doubt, the amount of any Cash, to the extent not already invested in Eligible Investments) on the preceding Payment

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050317

Date; provided that the Quarterly Asset Amount in respect of the Initial Payment Date shall equal the weighted average of the Aggregate Principal Balance of all Pledged Obligations (including, for the avoidance of doubt, the amount of any Cash, to the extent not already invested in Eligible Investments) on each of the Funding Date, April 20, 2005, and June 20, 2005.

"Ramp Up Calculation": The meaning specified in Section 7.13(a).

"Ramp Up End Date": January 20, 2006 or such earlier date as may be specified by the Collateral Manager by notice to the Trustee, the Controlling Party and the Rating Agencies.

"Ramp Up Liquidation Date": The date specified by the Credit Enhancer in a written notice to the Trustee (in any event not less than five Business Days after the date on which the Trustee receives such notice) as the "Ramp Up Liquidation Date" following (i) the occurrence of a Collateral Ramp Up Event of Default, (ii) the acceleration of the Class A Notes by the Credit Enhancer pursuant to Section 5.2(a) and (iii) the completion of the sale or liquidation of all of the Collateral at the direction of the Credit Enhancer pursuant to Section 5.5.

"Ramp Up Measurement Dates": The meaning specified in Section 7.13(a).

"Rating": (I) With respect to Moody's, the Moody's Rating as of any date of determination.

(II)    With respect to any Collateral Debt Obligation, for determining the Standard & Poor's Rating as of any date of determination:

(i)    if there is an issuer credit rating by Standard & Poor's of the borrower of such Collateral Debt Obligation, or the guarantor who unconditionally and irrevocably guarantees such Collateral Debt Obligation, then the Standard & Poor's Rating shall be the lower of (x) such rating and (y) the published rating (if any) by Standard & Poor's on such Collateral Debt Obligation;

(ii)    if no other security or obligation of the borrower is rated by Standard & Poor's, then the Issuer, or the Collateral Manager on behalf of the Issuer, may either:

(x)    apply to Standard & Poor's for a corporate credit estimate, which shall be its Standard & Poor's Rating (provided that any corporate credit estimate given by Standard & Poor's shall be valid for the purpose of determining the Standard & Poor's Rating of a Collateral Debt Obligation for only one year from the date such corporate credit estimate is given by Standard & Poor's) (and pending receipt from Standard & Poor's of such estimate, such Collateral Debt Obligation shall have a Standard & Poor's Rating equal to the credit model score generated by the Standard & Poor's Credit Model); provided that (1) unless the applicable industry and country of such borrower are covered by the Standard & Poor's Credit Model and such borrower has at least U.S.$50,000,000 of annual revenues, such Collateral Debt Obligation shall have a Standard & Poor's rating of "B-" until Standard & Poor's provides a credit estimate (which Standard & Poor's shall provide within 14 days after application is made therefor and if Standard & Poor's does not provide such credit estimate within such 14 day period then the Issuer (or the Collateral Manager on behalf of the Issuer) shall have the option of assigning such Collateral Debt Obligation a Standard & Poor's Rating equal to the credit score that

53

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3;#7347151v22

Indenture
PP050318

would be generated by the Standard & Poor's Credit Model for such Collateral Debt Obligation until Standard & Poor's provides a credit estimate (and upon Standard & Poor's providing such credit estimate the Standard & Poor's Rating shall equal such credit estimate)) and (2) if within 14 days after acquiring such Collateral Debt Obligation the Issuer (or the Collateral Manager on behalf of the Issuer) has either (x) failed to apply to Standard & Poor's for such credit estimate or (y) failed to provide Standard & Poor's with copies of the material Underlying Instruments for such Collateral Debt Obligation to conduct a credit estimate then such Collateral Debt Obligation shall have a Standard & Poor's Rating of "CCC " until the earlier of the date that (a) Standard & Poor's provides such credit estimate and (b) such application is made and/or documentation is provided, as applicable, to Standard & Poor's; or

(y)      notify the Trustee and Standard & Poor's that such Collateral Debt Obligation shall have a Standard & Poor's Rating equal to the credit model score generated by the Standard & Poor's Credit Model; provided that (1) the Collateral Manager shall, within 14 days of such notification, submit to Standard & Poor's the inputs to the Standard & Poor's Credit Model used by the Collateral Manager for such Collateral Debt Obligation and copies of other material Underlying Instruments for such Collateral Debt Obligations; (2) if Standard & Poor's notifies the Collateral Manager in writing that Standard & Poor's has generated a different credit model score under the Standard & Poor's Credit Model for such Collateral Debt Obligation, then the Standard & Poor's Rating of such Collateral Debt Obligation shall be equal to the credit model score so generated by Standard & Poor's unless the Collateral Manager elects to determine such Standard & Poor's Rating by another method permitted in this definition; (3) the Standard & Poor's Credit Model may only be used for purposes of this clause (ii)(y) if the industry and country of such borrower are covered by such model and such borrower has at least U.S.$50,000,000 of annual revenues and, in the event the Standard & Poor's Credit Model does not cover such industry and country or such borrower does not have such revenues, the Issuer (or the Collateral Manager on behalf of the Issuer) shall apply to Standard & Poor's for a corporate credit estimate pursuant to clause (ii)(x) above and (4) if within 14 days after acquiring such Collateral Debt Obligation the Issuer (or the Collateral Manager on behalf of the Issuer) has either (x) failed to provide Standard & Poor's with the inputs for the Standard & Poor's Credit Model for such Collateral Debt Obligation or (y) failed to provide Standard & Poor's with copies of the material Underlying Instruments for such Collateral Debt Obligation then such Collateral Debt Obligation shall have a Standard & Poor's Rating of "CCC-" until such information is provided to Standard & Poor's.

To the extent that any Rating of a Collateral Debt Obligation is then being derived pursuant to this clause (II)(ii) based on (x) the Standard & Poor's Credit Model, the Issuer, or the Collateral Manager on behalf of the Issuer, shall (so long as such Rating is so derived) recalculate such Rating using the Standard & Poor's Credit Model at least quarterly and such recalculated Rating shall be promptly provided to Standard & Poor's by the Issuer or (y) a Standard & Poor's corporate credit estimate or the Standard & Poor's Credit Model on such Collateral Debt Obligation and such obligation is restructured or refinanced and such restructuring or refinancing has not been factored into such estimate or such model then the Issuer, or the Collateral Manager on behalf of the Issuer, shall promptly reapply to Standard & Poor's for a new corporate credit estimate and, if applicable, recalculate the Standard & Poor's Credit Model score for such Collateral Debt Obligation upon becoming aware of such event.

54

Indenture
PP050319

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

The Issuer (or the Collateral Manager on behalf of the Issuer) shall promptly apply to Standard & Poor's for a new rating in respect of any Collateral Debt Obligation that does not have a monitored publicly available rating from Standard & Poor's and as to which any one or more of the following events occurs, is agreed between the issuer thereof (or a governmental authority) and a sufficient number of holders of such Collateral Debt Obligation that is binding on all holders thereof or is announced (or otherwise decreed) by such issuer (or governmental authority) in a form that is binding upon all such holders, and such event is not expressly provided for under the terms of the Underlying Instruments of such Collateral Debt Obligation in effect immediately prior to such event: (i) a postponement by more than 6 months of the date on which principal is payable at final maturity; (ii) a reduction by more than 3.00% per annum in the rate of interest payable (whether calculated based on a spread above a floating reference rate or a fixed rate); (iii) a reduction by more than 25% in the aggregate amount of principal payable on any one or more scheduled amortization or other redemption dates within any 12-month period; (iv) an increase of more than 10% in any advance rate or other borrowing base formula utilized in connection with such Collateral Debt Obligation; or (v) a change in, or waiver of, the interest rate resulting in a deferral or capitalization of interest by more than 3.00% per annum (based on the Principal Balance of such Collateral Debt Obligation) or any deferral or capitalization that would cause such Collateral Debt Obligation to become a PIK Loan.

      (iii)    if such Collateral Debt Obligation is not rated by Standard & Poor's, but another security or obligation of the borrower is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains a Standard & Poor's Rating for such Collateral Debt Obligation pursuant to subclause (ii) above, then the Standard & Poor's Rating of such Collateral Debt Obligation shall be the issuer credit rating or shall be determined as follows: (a) if there is a rating on a senior secured obligation of the borrower, then the Standard & Poor's Rating of such Collateral Debt Obligation shall be one (1) subcategory below such rating if such Collateral Debt Obligation is a senior secured or senior unsecured obligation of the borrower; (b) if there is a rating on a senior unsecured obligation of the borrower, then the Standard & Poor's Rating of such Collateral Debt Obligation shall equal such rating if such Collateral Debt Obligation is a senior secured or senior unsecured obligation of the borrower; and (c) if there is a rating on a subordinated obligation of the borrower, and if such Collateral Debt Obligation is a senior secured or senior unsecured obligation of the borrower, then the Standard & Poor's Rating of such Collateral Debt Obligation shall be one (1) subcategory above such rating;

      (iv)    if there is no issuer credit rating published by Standard & Poor's and such Collateral Debt Obligation is not rated by Standard & Poor's, and no other security or obligation of the borrower is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains a Standard & Poor's Rating for such Collateral Debt Obligation pursuant to subclause (ii) above, then the Standard & Poor's Rating of such Collateral Debt Obligation shall be determined as follows if (x) neither the borrower nor any of its affiliates (except that, for this purpose, affiliation will not result from the common ownership by a common financial sponsor) is subject to reorganization or bankruptcy Proceedings and (y) no debt security or obligation of the borrower has been in default during the past two years, the Standard & Poor's Rating of such Collateral Debt Obligation will be "CCC-";

provided that the Standard & Poor's Rating for any Collateral Debt Obligation that is (x) on credit watch positive for possible upgrade by Standard & Poor's shall be deemed to be the Standard & Poor's Rating

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050320

one notch above the Standard & Poor's Rating of such Collateral Debt Obligation that would otherwise be applicable as determined pursuant to clauses (i) through (iv) above and (y) on credit watch negative for possible downgrade by Standard & Poor's shall be deemed to be the Standard & Poor's Rating one notch below the Standard & Poor's Rating of such Collateral Debt Obligation that would otherwise be applicable as determined pursuant to clauses (i) through (iv) above.

For purposes of the definition of "Rating", any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Rating Agency": Each of Moody's, for so long as any of the Outstanding Notes are rated by Moody's, and Standard & Poor's, for so long as any of the Outstanding Notes are rated by Standard & Poor's, or with respect to Pledged Obligations generally, if at any time Moody's or Standard & Poor's ceases to provide rating services with respect to high yield debt securities, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to the Credit Enhancer and a Majority of each Class. If at any time Moody's or Standard & Poor's ceases to be a Rating Agency, references to rating categories of Moody's or Standard & Poor's, as the case may be, in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's or Standard & Poor's published ratings for the type of security in respect of which such alternative rating agency is used.

"Rating Confirmation": The meaning specified in Section 7.13(b)(1).

"Rating Confirmation Failure": The meaning specified in Section 7.13(b)(1).

"Rating Criteria": Criteria satisfied on any date:

(i)      with respect to any Holder of a Class A-1 Note:

(1)      if such Holder is a Committed Note Purchaser, such Committed Note Purchaser meets the Class A-1 Rating Test; and

(2)      if such Holder is not a Committed Note Purchaser, then either (A) such Holder is then entitled to require one or more Committed Note Purchasers to purchase Class A-1 Notes (or interests therein) held by such Holder and all such Committed Note Purchasers meet the Class A-1 Rating Test or (B) the Issuer is then entitled to require one or more Committed Note Purchasers to fund Borrowings (or is entitled to fund such Borrowings from the Holder Subaccounts of one or more Committed Note Purchasers that are Non-Extending Holders) under the Class A-1 Note Purchase Agreement relating to the Class A-1 Notes of such Holder and all such Committed Note Purchasers meet the Class A-1 Rating Test; and

(ii)     with respect to any Holder of a Class A-3 Note, if (x) the short-term debt, deposit or similar obligations of such Holder are on such date rated at least "P-1" by Moody's and at least "A-1" by Standard & Poor's or (y) the long-term debt, deposit or similar obligations of such Holder are on such date rated at least "Aa2" by Moody's and at least "AA" by Standard & Poor's.

As used above, "Class A-1 Rating Test" means a test that is satisfied, for any Committed Note Purchaser at any time, if (1) the short-term debt, deposit or similar obligations of such Committed Note Purchaser are on such date rated "P-1" by Moody's and "A-1" by Standard & Poor's, (2) such Committed Note Purchaser satisfies the requirements for being an Eligible Assignee or (3) a Class A Holder Collateral

56

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Account with respect to such Committed Note Purchaser has been established and funded in accordance with the applicable Class A-1 Note Purchase Agreement and this Indenture.

"Rating Failure": The meaning specified in Section 7.13(b)(1).

"Ratings Hedge Event": With respect to any Hedge Agreement, the failure of the Hedge Counterparty thereunder (or any Person that shall have absolutely and unconditionally guaranteed the obligations of such Hedge Counterparty under such Hedge Agreement) to have a long-term debt rating or issuer rating at least "A3" by Moody's and at least "BBB-" by Standard & Poor's and the failure of such Hedge Counterparty with 10 days of such ratings downgrade, at its own expense, to transfer all of its rights and obligations under such Hedge Agreement to (or obtain an absolute and unconditional guaranty by) a third party that has (i) a long-term debt rating or issuer rating at least "Aa2" by Moody's and (ii) a long-term debt rating or issuer rating of at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's.

"Ratings Matrix": The row of the table below, which row (the "Currently Applicable Row") shall be: (a) as of the Ramp Up End Date, row 1 in such table; and (b) thereafter, any row as selected by the Collateral Manager from time to time on 10 Business Days' prior written notice to the Trustee (provided that, at the time of such selection, the Collateral Face Amount Ratio shall equal or exceed the percentage set forth in such newly selected row).

| Ratings Matrix Row | Moody's Weighted Average Rating Factor Test | Class A Over-collateralization Ratio Test | Purchase-to-Improve Ratio | Weighted Average Spread Test | Category 1 Ratio | Category 1-2 Ratio | Collateral Face Amount Ratio |
|---|---|---|---|---|---|---|---|
| 1 | 2850 | 112% | 118% | 5.5% | 5% | 10% | 131% |
| 2 | 3050 | 115% | 121% | 5.0% | 10% | 20% | 143% |
| 3 | 3250 | 117% | 124% | 5.0% | 10% | 25% | 148% |

"Record Date": The date on which the Holders of Notes entitled to receive a payment in respect of principal of or interest on the succeeding Payment Date are determined, such date as to any Payment Date being the 15th day (whether or not a Business Day) prior to the applicable Payment Date.

"Redemption Accounts": All Accounts other than the Class A Holder Collateral Account and the Hedge Counterparty Collateral Account.

"Redemption Date": Any date specified for a redemption of Notes pursuant to Section 9.1.

"Redemption Date Statement": The meaning specified in Section 10.13(d).

57

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050322

"Redemption Price": When used with respect to:

(a)    any Class A-1 Note to be redeemed pursuant to Section 9.1, an amount equal to the Aggregate Outstanding Amount of such Class A-1 Note to be redeemed; plus accrued interest (including Class A Additional Interest and Defaulted Interest and accrued interest thereon) thereon; plus accrued Class A-1 Commitment Fee owing to the Holder of such Note; plus accrued and unpaid Class A-1 Additional Amounts owing to the Holder of such Note; plus any Class A-1 Redemption Break Funding Costs;

(b)    any Class A-2 Note to be redeemed pursuant to Section 9.1, an amount equal to the Aggregate Outstanding Amount of such Class A-2 Note to be redeemed; plus accrued interest (including Class A Additional Interest and Defaulted Interest and accrued interest thereon) thereon; plus any Class A-2 Redemption Break Funding Costs;

(c)    any Class A-3 Note to be redeemed pursuant to Section 9.1, an amount equal to the Aggregate Outstanding Amount of such Class A-3 Note to be redeemed; plus accrued interest (including Class A Additional Interest and Defaulted Interest and accrued interest thereon) thereon; plus accrued Class A-3 Commitment Fee owing to the Holder of such Note; plus any Class A-3 Redemption Break Funding Costs;

(d)    any Class B Note to be redeemed pursuant to Section 9.1, an amount equal to the Outstanding principal amount of such Class B Note on the applicable Redemption Date; and

(e)    any Class C Note to be redeemed pursuant to Section 9.1, an amount equal to the Outstanding principal amount of such Class C Note on the applicable Redemption Date.

"Reference Banks": The meaning specified in Schedule B.

"Registered": With respect to a loan or other debt obligation, either (a) it is in registered form as such term is used in Section 163(f) of the Code, (b) it is held through an arrangement that satisfies the requirements of Treasury Regulation section 1.165-12(c)(3) or (c) it is not a registration required obligation within the meaning of Treasury Regulation section 1.165-12(a).

"Registered Form": When used with respect to a Certificated Security, means a form in which: (a) the Security Certificate specifies a Person entitled to the Security; and (b) a transfer of the Security may be registered upon books maintained for that purpose by or on behalf of the issuer of such Security, or the Security Certificate so states.

"Regulation S": Regulation S under the Securities Act.

"Regulation S Global Note": The meaning specified in Section 2.1(a).

"Regulation U": Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221, as amended, or any successor regulation.

"Reinvestment Agreement": A guaranteed reinvestment agreement, funding agreement, investment contract or similar obligation from a bank, insurance company or other corporation or entity; provided that such agreement provides that it is terminable by the purchaser, without premium or penalty, if the rating assigned to such agreement by any Rating Agency is at any time lower than the rating

58

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

"Reinvestment Period": The period from the Funding Date to the first to occur of (i) the Scheduled Reinvestment Period Termination Date; (ii) the Payment Date immediately following the date that the Collateral Manager (in its sole and absolute discretion) notifies the Trustee and the Controlling Party that, in light of the composition of the Collateral Debt Obligations, general market conditions and other pertinent factors, investments in additional Collateral Debt Obligations within the foreseeable future would either be impractical or not beneficial; (iii) the first Measurement Date after the Ramp Up End Date on which (A) the Class A Overcollateralization Ratio is less than the Adjusted Priority of Payments Overcollateralization Ratio or (B) the Class A Interest Coverage Ratio is less than the Adjusted Event of Default Overcollateralization Ratio; and (iv) the date on which the Reinvestment Period is terminated pursuant to Article 5 hereof.

"Relevant Persons": The meaning specified in Section 2.7.

"Remaining Class A Note Reduction Amount": The meaning specified in Section 11.1(a)(ii)(C).

"Required Reserve Amount": As of any date, an amount equal to the lesser of (i) U.S.$15,000,000 and (ii) 2.0% of the sum of (a) the Aggregate Outstanding Amount of the Class A Notes; plus (b) the sum of the Aggregate Undrawn Amounts of the Class A-1 Notes and the Class A-3 Notes; provided that if, at any time prior to such date, the Balance on deposit in the Cash Reserve Account shall have been reduced below U.S.$5,000,000, then the Required Reserve Amount as of such date shall be equal to U.S.$5,000,000.

"Revolving Collateral Debt Obligation": A Collateral Debt Obligation or Unrestricted Collateral Debt Obligation that provides the issuer thereunder with a revolving credit facility from which one or more borrowings may be made up to the stated principal amount of such revolving credit facility and which provides that borrowed amounts may be repaid and reborrowed from time to time. In the case of any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation that consists of a combination of a Revolving Collateral Debt Obligation and a term loan, only that portion of the loan which consists of a Revolving Collateral Debt Obligation will be treated as a Revolving Collateral Debt Obligation.

"Rollover Proceeds Account": The trust account designated the "Rollover Proceeds Account" and established in the name of the Trustee pursuant to Section 10.10(a).

"Rule 144A": Rule 144A under the Securities Act.

"Rule 144A Information": Such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"Rule 144A Global Note": The meaning specified in Section 2.1(a).

"Sale": The meaning specified in Section 5.17.

"Sale Proceeds": All proceeds received as a result of sales of Pledged Obligations pursuant to Section 12.2(a), 12.2(b) or 12.2(c), net of any out-of-pocket expenses of the Issuer, the Zohar Subsidiary, the Collateral Manager or the Trustee reasonably incurred in connection with any such sale.

NY3:#7347151v23
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050324

"Scheduled Distribution": With respect to any Pledged Obligation, for each Due Date, the scheduled payment of principal and/or interest and/or fees due on such Due Date with respect to such Pledged Obligation, determined in accordance with the assumptions specified in Section 1.2.

"Scheduled Reinvestment Period Termination Date": The Payment Date in January, 2010.

"Second Currency": The meaning specified in Section 18.13.

"Second Lien Collateral Debt Obligation": A Dollar denominated loan or obligation that on the date of initial acquisition thereof by the Issuer or the Zohar Subsidiary pursuant to Section 12.1(a) hereof is secured by second priority liens (and is secured by no first priority liens) on assets of the obligor(s) thereon or its Affiliates.

"Second Priority Class A-1 Additional Amounts": With respect to any Payment Date on which Class A-1 Additional Amounts are due and owing to any Holder of a Class A-1 Note, the lesser of:

    (a)    the Class A-1 Additional Amounts due and owing to such Holder as of the immediately prior Determination Date (less any such Class A-1 Additional Amounts paid to such Holder on such Payment Date pursuant to Section 11.1(a)(i)(F)); and

    (b)    the excess of (i) the amount of interest that would accrue on the Aggregate Outstanding Amount of Class A-1 Notes held by such Holder for the Interest Period ending on such Payment Date at a rate per annum equal to LIBOR for such Interest Period plus 0.70% over (ii) the amount of interest that does in fact accrue on the Aggregate Outstanding Amount of Class A-1 Notes held by such Holder for such Interest Period at the applicable Class A-1 Note Interest Rate then in effect.

"Section 3(c)(7)": Section 3(c)(7) of the 1940 Act.

"Section 3(c)(7) Reminder Notice": A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.13(a) and (b)) substantially in the form of Exhibit I-1 hereto.

"Secured Obligations": The meaning specified in the Granting Clauses of this Indenture.

"Secured Parties": The meaning specified in the Preliminary Statements of this Indenture.

"Securities Account": An account to which a Financial Asset is or may be credited in accordance with an agreement under which the Person maintaining the account undertakes to treat the Person for whom the account is maintained as entitled to exercise the rights that comprise the Financial Asset.

"Securities Act": The U.S. Securities Act of 1933, as amended.

"Securities Entitlement": Is acquired by a Person if a Securities Intermediary: (a) indicates by book entry that a Financial Asset has been credited to the Person's Securities Account; (b) receives a Financial Asset from the Person or acquires a Financial Asset for the Person and, in either case, accepts it for credit to the Person's Securities Account; or (c) becomes obligated under other law, regulation or rule to credit a Financial Asset to the Person's Securities Account; provided that if a

60

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050325

Securities Intermediary holds a Financial Asset for another Person, and the Financial Asset is registered in the name of, payable to the order of, or specially Indorsed to the other Person, and has not been indorsed to the Securities Intermediary or in blank, the other Person is treated as holding the Financial Asset directly rather than as having a Securities Entitlement with respect to the Financial Asset.

"Securities Intermediary": (a) A Clearing Corporation; or (b) a Person, including a bank or broker, that in the ordinary course of its business maintains Securities Accounts for others and is acting in that capacity.

"Security": Except as otherwise provided in Section 8-103 of the UCC, means an obligation of an issuer or a share, participation or other interest in an issuer or in property or an enterprise of an issuer: (a) which is represented by a Security Certificate in Bearer Form or Registered Form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (b) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations; and (c) which either (i) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (ii) is a medium for investment and by its terms expressly provides that it is a security governed by Article 8 of the UCC.

"Security Certificate": A certificate representing a Security.

"Selling Institution": An entity from which the Issuer or the Zohar Subsidiary, as applicable, acquires a Participation Interest in a loan, debt instrument or other obligation.

"Selling Institution Defaulted Participation": A Participation Interest (other than a Defaulted Participation Obligation) with respect to which:

(a)     the long-term debt or deposit obligations of the Selling Institution (other than Ark CLO 2000-1, Limited) are not at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's or any such debt or deposit obligations of such participation granting entity shall cease to be rated; or

(b)     the Selling Institution has defaulted in the performance of any of its payment obligations under the related participation agreement.

"Senior Class A-1 Additional Amounts": With respect to any Payment Date on which Class A-1 Additional Amounts are due and owing to any Holder of a Class A-1 Note, the lesser of:

(a)     the Class A-1 Additional Amounts due and owing to such Holder as of the immediately prior Determination Date; and

(b)     the excess of (i) the amount of interest that would accrue on the Aggregate Outstanding Amount of Class A-1 Notes held by such Holder for the Interest Period ending on such Payment Date at a rate per annum equal to LIBOR for such Interest Period plus 0.50% over (ii) the amount of interest that does in fact accrue on the Aggregate Outstanding Amount of Class A-1 Notes held by such Holder for such Interest Period at the Class A-1 Note Interest Rate then in effect.

"Senior Collateral Management Fee": The fee accrued and payable to the Collateral Manager (or, to the extent provided in the Management Agreement, to any Person that was the Collateral Manager when such fee was earned) in arrears on each Payment Date pursuant to Section 4.1(b) of the

61

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Management Agreement and Sections 11.1 and 11.2, in an amount (as certified by the Collateral Manager in writing to the Trustee) equal to the greater of (x) 1.00% per annum on the Quarterly Asset Amount and (y) U.S.$1,500,000 (adjusted in the case of the first Payment Date on which such fees are paid to reflect the different number of days in such period). The Senior Collateral Management Fee will accrue if unpaid or deferred in accordance with the Management Agreement and be payable on the next Payment Date(s) on which funds are available therefor in accordance with the Priority of Payments. For the avoidance of doubt, for purposes of this definition of Senior Collateral Management Fee, the Quarterly Asset Amount shall include (without duplication) the Principal Balance of each Originated Special Loan/Preferred Security.

"Senior Expense Amounts": As of any Payment Date, all amounts specified in paragraphs (A) through (G), inclusive, of Section 11.1(a)(i).

"Senior Interests": The meanings specified in Section 13.1(a) and (b).

"Senior Secured Collateral Debt Obligation": An outstanding Registered senior secured loan made by a bank or other financing entity or financial institution (including insurance companies) (that on the date a commitment was entered into with respect to the initial acquisition thereof by the Issuer or the Zohar Subsidiary is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases or other similar obligations but which may (i) be subordinated to any DIP Loans or LIFO/Priming Facilities of such obligor or its Affiliates or (ii) in accordance with typical senior secured loan documentation, contain carve-outs or acknowledgments of certain statutory and other liens against the obligor that are or may be superior to the liens granted in connection with such senior loan), or a Participation Interest therein.

"Short Settlement Borrowing": A Borrowing which the Issuer requests to be made on less than three Business Days' notice to the Class A-1 Note Agent.

"Specified Currency": The meaning specified in Section 18.13.

"Specified Equity Payment Date": The Payment Date as of which not less than U.S.$60,000,000 in the aggregate for all Payment Dates has been deposited in the Preference Share Distribution Account pursuant to Section 11.2(a)(iii).

"Specified Person": The meaning specified in Section 2.5(a).

"Specified Place": The meaning specified in Section 18.13.

"Standard & Poor's": Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"Standard & Poor's Average Recovery Rate": As of any Measurement Date, the percentage obtained by (i) summing the products obtained by multiplying the Principal Balance of each Pledged Collateral Debt Obligation by its applicable Priority Category Recovery Rate as set forth in the table below, (ii) dividing such sum by the Aggregate Principal Balance of all such Pledged Collateral Debt Obligations, and (iii) rounding up to the first decimal place. For purposes of determining the Standard & Poor's Average Recovery Rate, (x) the Principal Balance of each Defaulted Obligation and Workout Obligation will be deemed to be equal to its outstanding principal amount and (y) any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

62

Indenture
PP050327

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

| Priority Category | Priority Category Recovery Rate |
|---|---|
| Category 3 or 4 senior secured loans | 60% |
| Category 3 or 4 senior unsecured loans; and Second Lien Collateral Debt Obligations up to a maximum amount equal to 10% of the Maximum Investment Amount | 50% |
| Category 3 or 4 subordinated loans; and Second Lien Collateral Debt Obligations in excess of 10% of the Maximum Investment Amount | 28% |
| Category 1 or Category 2 Collateral Debt Obligations or Workout Obligations | As determined in accordance with the Standard & Poor's Recovery Rate Formula |

"Standard & Poor's CDO Monitor": The dynamic, analytical computer model developed by Standard & Poor's and used to estimate the default risk of the Collateral Debt Obligations (other than any Originated Special Loan/Preferred Security that is a Preferred Security) and provided to the Collateral Manager and the Trustee (along with the assumptions and instructions to use in connection therewith), as it may be modified by Standard & Poor's in connection with its confirmation of the ratings of the Class A Notes (without giving effect to the Credit Enhancement relating to the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes) and the Class B Notes following the issuance, if requested, of an Acceptable Class B Rating (and as so modified, if applicable).

"Standard & Poor's CDO Monitor Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if after giving effect to the sale of a Collateral Debt Obligation or the purchase of a Collateral Debt Obligation (or both) (i) (x) the Class A Loss Differential of the Proposed Portfolio is positive or (y) the Class A Loss Differential of the Proposed Portfolio is greater than or equal to the Class A Loss Differential of the Current Portfolio and (ii) if the Class B Notes are then rated by Standard & Poor's, (x) the Class B Loss Differential of the Proposed Portfolio is positive or (y) the Class B Loss Differential of the Proposed Portfolio is greater than or equal to the Class B Loss Differential of the Current Portfolio. For purposes of the definition of "Standard & Poor's CDO Monitor Test", any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Standard & Poor's Credit Model": The model developed by Standard & Poor's and used to generate credit model scores that are used to determine the Standard & Poor's Ratings of Collateral Debt Obligations (other than any Originated Special Loan/Preferred Security that is a Preferred Security) that do not have published Standard & Poor's ratings, which model is provided to the Collateral Manager on the Funding Date for purposes of determining such Standard & Poor's Rating.

"Standard & Poor's Rating": With respect to any Collateral Debt Obligation, the Rating thereof determined in accordance with Part II of the definition of "Rating".

"Standard & Poor's Recovery Rate Formula": The recovery rate formula delivered by Standard & Poor's to the Issuer, the Collateral Manager, the Credit Enhancer and the Trustee on the Funding Date.

"Stated Maturity": With respect to any security, the date specified in such security, with respect to any repurchase obligation, the repurchase date thereunder, and with respect to any Note, the

63

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050328

date specified in such Note and in Section 2.2, as the fixed date on which the final payment of principal of such security, repurchase obligation or Note, as the case may be, is due and payable, or, if such date is not a Business Day, the next following Business Day.

"Subordinate Interests": The meanings specified in Section 13.1(a) and (b).

"Subordinated Collateral Management Fee": The fee accrued and payable to the Collateral Manager (or, to the extent provided in the Collateral Management Agreement, to any Person that was the Collateral Manager when such fee was earned) in arrears on each applicable Payment Date pursuant to Section 4.1(c) of the Management Agreement and Section 11.2 hereof, in an amount (as certified by the Collateral Manager to the Trustee) equal to 1.00% per annum of the Quarterly Asset Amount. Notwithstanding the foregoing, the Subordinated Collateral Management Fee will accrue if unpaid or deferred in accordance with the Management Agreement and be payable on the next Payment Date(s) on which funds are available therefor in accordance with the Priority of Payments. For the avoidance of doubt, for purposes of this definition of Subordinated Collateral Management Fee, the Quarterly Asset Amount shall include (without duplication) the Principal Balance of each Originated Special Loan/Preferred Security.

"Supplemental Noteholder Information": The meaning specified in Section 10.13(c).

"Tax": Any present or future tax, levy, impost, duty, charge, assessment, deduction, withholding or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority other than a stamp, registration, documentation or similar tax.

"Temporary Regulation S Global Note": The meaning specified in Section 2.1(a).

"Term Sharing Percentage": The meaning specified in Section 9.6(e).

"Total Redemption Amount": The meaning specified in Section 9.1(b)(i).

"Transaction Documents": This Indenture, the Notes, the Management Agreement, the Collateral Administration Agreement, the Credit Enhancement Agreement, the Administration Agreement, the Hedge Agreements, the Placement Agreement, the Preference Share Paying Agency Agreement, the Note Subscription Agreements, the Note Purchase Agreements, the Preference Share Subscription Agreements, the Issuer Charter, the Trustee Fee Letter and each other agreement executed and delivered by any Zohar Obligor in connection with the foregoing agreements and the transactions contemplated thereby.

"Transfer Agent": The Person or Persons, which may include the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"True-Up Date": The meaning specified in Section 9.7(c).

"Trustee": The Bank, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee Letter": The fee letter agreement dated October 29, 2004 entered into by the Issuer (or the Collateral Manager on its behalf) and the Trustee.

64

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Trust Officer": When used with respect to the Trustee, any Officer within the CDO Trust Services Group of the Corporate Trust Office (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other Officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust office because of such Person's knowledge of and familiarity with the particular subject.

"UCC": The Uniform Commercial Code as in effect in the State of New York.

"Uncertificated Security": A Security that is not represented by a certificate.

"Uncommitted Note Purchaser": The meaning specified in the Class A-1 Note Purchase Agreements.

"Underlying Instruments": The loan or credit agreement, indenture or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of, guarantees the payment of, or secures the obligations represented by such Pledged Obligation or of which the holders of such Pledged Obligation are the beneficiaries.

"Unfunded Amount": With respect to any Revolving Collateral Debt Obligation or any Delayed Funding Collateral Debt Obligation at any time, an amount equal to the excess of (a) the Commitment Amount of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation at such time over (b) the Funded Amount of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation at such time.

"Unfunded Portfolio Amount": As of any date, an amount (not less than zero) equal to:

(a)    the aggregate Unfunded Amount of all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations; plus

(b)    the aggregate amounts owing by the Issuer and/or the Zohar Subsidiary to sellers of Collateral Debt Obligations that the Issuer and/or the Zohar Subsidiary has committed to purchase (but which purchases have not yet settled) on such date and Unfunded Amounts thereon.

"Unfunded Revolver Discount Account": The trust account designated the "Unfunded Revolver Discount Account" and established in the name of the Trustee pursuant to Section 10.8(a).

"Uninvested Proceeds": At any time, the net proceeds received by the Issuer on the Funding Date from the initial issuance of the Notes and the Preference Shares, or on any Borrowing Date occurring after the Funding Date from any Borrowing under the Class A Notes, to the extent such proceeds have not theretofore been invested in Collateral Debt Obligations or Equity Kickers, have not previously become Principal Proceeds in accordance with the terms of this Indenture and have not previously been deposited in the Expense Account, the Closing Expense Account, the Professional Fee Account, the Unrestricted Collateral Account, the Unfunded Revolver Discount Account or the Cash Reserve Account.

"United States" and "U.S.": The United States of America, including the states thereof and the District of Columbia.

65

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"United States Person": Either (i) a United States person within the meaning of Section 7701(a)(30) of the Code or (ii) a person whose separate existence is disregarded pursuant to Treasury Regulation section 301.7701-3 for U.S. federal income tax purposes and all of whose equity is owned by a single person that is a United States person within the meaning of Section 7701(a)(30) of the Code.

"Unregistered Securities": The meaning specified in Section 5.17(c).

"Unrestricted Collateral Account": The trust account designated the "Unrestricted Collateral Account" and established in the name of the Trustee pursuant to Section 10.9(a).

"Unrestricted Collateral Balance": As of any Measurement Date, an amount equal to the sum of:

(a)    for each Unrestricted Collateral Debt Obligation that satisfies the criteria for Category 1 or Category 2, 60% of the Principal Balance thereof;

(b)    for each Unrestricted Collateral Debt Obligation that satisfies the criteria for Category 3 or Category 4, the Principal Balance thereof;

(c)    for each Unrestricted Collateral Debt Obligation that satisfies the criteria for a Workout Obligation, (i) if such Unrestricted Collateral Debt Obligation is a senior secured obligation, 45% of the Principal Balance thereof or (ii) otherwise, 30% of the Principal Balance thereof;

(d)    for each other Unrestricted Collateral Debt Obligation, zero; and

(e)    the Balance then on deposit in the Unrestricted Collateral Account and the Cash Reserve Account.

"Unrestricted Collateral Debt Obligations": Collectively, (a) the loans, debt securities, letters of credit and leases (excluding any Equity Security) acquired by the Issuer or the Zohar Subsidiary after the Funding Date by application of amounts on deposit in the Unrestricted Collateral Account, (b) any loan, debt security, letter of credit or lease (excluding any Equity Security) received by the Issuer or the Zohar Subsidiary after the Funding Date in exchange for (or upon the transfer of) any Unrestricted Collateral Debt Obligation, pursuant to an Offer or otherwise in connection with (i) any restructuring or reorganization of the issuer of an Unrestricted Collateral Debt Obligation (or any Affiliate of such issuer) or such issuer's (or such Affiliate's) line(s) of business or (ii) any amendment, modification or supplement of an Unrestricted Collateral Debt Obligation and (c) any Participation Interest in any of the foregoing, in each case as the same may be amended, modified, supplemented and in effect from time to time.

"Unutilized Commitment": With respect to any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation at any time, the portion (if any) of the Issuer's or the Zohar Subsidiary's funding commitment thereunder that has not theretofore been funded by the Issuer or the Zohar Subsidiary, as applicable, at such time.

"U.S. Person": The meaning specified in Regulation S.

"Utilized Commitment": With respect to any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation at any time, the

66

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

portion (if any) of the Issuer's or the Zohar Subsidiary's funding commitment thereunder that is not an Unutilized Commitment.

"Warehouse Advances": The advances made by the investors party to the Warehouse Agreement to the Issuer for purposes of acquiring certain Collateral Debt Obligations prior to the Funding Date.

"Warehouse Agreement": The Note Purchase Agreement dated as of November 3, 2004, among the Issuer, IXIS Financial Products Inc., as investor agent, and the investors party thereto.

"Warehouse Collateral Debt Obligations": The Collateral Debt Obligations purchased by the Issuer prior to the Funding Date with Warehouse Advances pursuant to the Warehouse Agreement.

"Weighted Average CP Cost of Funds": For any Uncommitted Note Purchaser for any Payment Date, the weighted average cost (as determined by such Uncommitted Note Purchaser or its administrator and notified to the Class A-1 Note Agent, the Trustee, the Controlling Party and the Collateral Manager pursuant to the applicable Class A-1 Note Purchase Agreements, and which shall include commissions of placement agents and dealers, incremental carrying costs incurred with respect to commercial paper issued by or with respect to such Uncommitted Note Purchaser maturing on dates other than those on which corresponding funds are received by such Uncommitted Note Purchaser and any other costs associated with the issuance of such commercial paper, estimates of commercial paper rates for the period from the end of a Due Period through the related Payment Date and good faith increases and decreases of cost of funds to reflect overestimation or underestimation of commercial paper rates for prior periods) of or related to the issuance of commercial paper issued by or with respect to such Uncommitted Note Purchaser and other borrowings by such Uncommitted Note Purchaser (including, without limitation, sales of interests in a Class A-1 Note by Uncommitted Note Purchasers to their respective liquidity or credit support providers) that are allocated, in whole or in part, by such Uncommitted Note Purchaser or its administrator to fund or maintain any portion of the Class A-1 Notes (and which may be also allocated in part to the funding of other assets of such Uncommitted Note Purchaser); provided that if any component of such rate is a discount rate, in calculating the "CP Funding Rate" for any portion of the Class A-1 Notes for such Interest Period, such Uncommitted Note Purchaser shall for such component use the rate resulting from converting such discount rate to an interest bearing equivalent rate per annum.

"Weighted Average Life": As of any Measurement Date, the number obtained by (a) for each Collateral Debt Obligation (other than any Non-Performing Obligations), multiplying the amount of each scheduled distribution of principal to be paid after such Measurement Date by the number of years (rounded to the nearest hundredth) from such date until such scheduled distribution of principal is due (b) summing all of the products calculated pursuant to clause (a) and (c) dividing the sum calculated pursuant to clause (b) by the sum of all scheduled distributions of principal due on all the Collateral Debt Obligations (other than Non-Performing Obligations) as of such Measurement Date. For purposes of calculating the Weighted Average Life, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"Weighted Average Life Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Weighted Average Life as of such Measurement Date is equal to or less than 5.0 years.

"Weighted Average Spread": As of any Measurement Date, a fraction (expressed as a percentage and rounded up to the next 0.001%) equal to the sum of the weighted average spread on all

67

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Collateral Debt Obligations (excluding, without duplication, Non-Current Obligations, Non-Performing Obligations but, for the avoidance of doubt, including the current pay portion of a Collateral Debt Obligation that has both a current pay Cash interest component and an interest component that can be deferred or capitalized by the Obligor thereon), determined by (a) multiplying the Principal Balance of each such Collateral Debt Obligation by the per annum spread over the applicable LIBO Rate and (b) summing the amounts determined pursuant to clause (a) for all such Collateral Debt Obligations, and (c) dividing such sum by the Aggregate Principal Balance of all such Collateral Debt Obligations. For purposes of the foregoing calculation, (i) with respect to Floating Rate Obligations that do not bear interest based upon such LIBO Rate, such spread shall be deemed to be the current rate of interest <u>minus</u> the applicable LIBO Rate and (ii) with respect to Fixed Rate Obligations, such spread shall be deemed to be the current coupon rate <u>minus</u> the applicable three-month LIBOR rate then in effect and (iii) with respect to Collateral Debt Obligations that bear interest at a rate that decreases solely as a function of the passage of time the applicable interest rate shall be the lowest rate of interest that such Collateral Debt Obligation may now or in the future bear interest at and (iv) with respect to Collateral Debt Obligations, the interest payments of which are subject to any tax withholding under applicable law but are not entitled to receive (pursuant to the Underlying Instruments) any gross-up for such tax withholdings, the applicable interest rate shall be the effective rate at which such Collateral Debt Obligations bear interest after taking into account such tax withholdings. For purposes of calculating the Weighted Average Spread, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be treated as a Collateral Debt Obligation.

"<u>Weighted Average Spread Test</u>": A test that is satisfied as of any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Weighted Average Spread as of such Measurement Date equals or exceeds the percentage specified in the Currently Applicable Row of the Ratings Matrix.

"<u>Workout Obligation</u>": The portion of a Non-Performing Obligation that was most recently designated as Category 2, Category 3 or Category 4, but has been restructured, modified or otherwise exchanged for or into an obligation or security that no longer qualifies as Category 2, Category 3 or Category 4, respectively; and such Non-Performing Obligation will remain a Workout Obligation until such time as the Collateral Manager designates such obligation or security as Category 2, Category 3 or Category 4, respectively. For purposes of this definition, any Originated Special Loan/Preferred Security that is a Preferred Security shall not be a Workout Obligation.

"<u>Zohar Obligors</u>": The Co-Issuers and the Zohar Subsidiary.

"<u>Zohar Subsidiary</u>": Zohar II 2005-1, LLC, a limited liability company organized under the laws of the State of Delaware, unless a successor Person shall have become the Zohar Subsidiary pursuant to the applicable provisions of this Indenture, and thereafter "<u>Zohar Subsidiary</u>" shall mean such successor Person.

"<u>Zohar Subsidiary Interest Collection Account</u>": The trust account designated the "Zohar Subsidiary Interest Collection Account" and established in the name of the Trustee pursuant to Section 10.2(c).

"<u>Zohar Subsidiary Operating Agreement</u>": The Limited Liability Company Agreement of the Zohar Subsidiary dated as of January 12, 2005, as amended and in effect from time to time.

68

Indenture
PP050333

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

"Zohar Subsidiary Principal Collection Account": The trust account designated the "Zohar Subsidiary Principal Collection Account" and established in the name of the Trustee pursuant to Section 10.2(d).

Section 1.2.    Assumptions as to Collateral Debt Obligations, Etc.

In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Obligation, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Obligations and on any other amounts that may be received for deposit in the Collection Accounts, the provisions set forth in this Section 1.2 shall be applied.

(a)    All calculations with respect to Scheduled Distributions on the Pledged Obligations shall be made on the basis of information as to the terms of each such Pledged Obligation and upon report of payments, if any, received on such Pledged Obligation that are furnished by or on behalf of the issuer of such Pledged Obligation and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)    For purposes of calculating any Class A Interest Coverage Ratio, on the date such ratio is calculated:

(i)    all accrued and unpaid payments of interest on or principal of, or commitment or facility fees with respect to, Non-Performing Obligations and Non-Current Obligations (without duplication) shall be excluded (and, solely for such purposes, references to Collateral Debt Obligations in the definitions of "Non-Performing Obligation" and "Non-Current Obligation" shall be deemed to include references to Unrestricted Collateral Debt Obligations) (for the avoidance of doubt the current pay portion of a Collateral Debt Obligation that has both a current pay Cash interest component and a interest component that can be deferred or capitalized by the issuer thereof or the Obligor thereon shall be included for the purposes of calculating any Class A Interest Coverage Ratio);

(ii)    the expected interest income on Floating Rate Obligations and Eligible Investments and under the Hedge Agreements (if any) and the expected interest payable on the Class A Notes shall be calculated using the interest rates applicable thereto on the applicable date of determination;

(iii)    the expected payments of commitment and facility fees in respect of Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations shall be calculated using the applicable commitment fee or facility fee rate, and the Unfunded Amount of the Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations, as the case may be, on the applicable date of determination; and

(iv)    it shall be assumed that no principal payments are made on the Notes, that no Borrowings are made under the Class A Notes, that the duration of any outstanding Borrowing is at least three months, that the Funded Amounts of Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations shall remain constant, that no interest or dividend payments are made on any Equity Securities

69

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(other than scheduled dividend payments on or with respect to any preference shares owned by the Issuer and/or the Zohar Subsidiary), and that no principal repayments received as a result of redemptions, optional redemptions, prepayments, Offers or other unscheduled payments or prepayments and unscheduled sinking fund payments shall be received on the Collateral Debt Obligations and Unrestricted Collateral Debt Obligations, during the applicable periods.

(c)  For each Due Period, the Scheduled Distribution on any Pledged Obligation (other than a Defaulted Obligation, Non-Current Obligation, Workout Obligation or Equity Security, which, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero except for any amounts actually received) shall be the sum of (i) the total amount of payments and collections in respect of such Pledged Obligation (including the Sale Proceeds with respect to such Pledged Obligation received during the Due Period) that, if paid as scheduled (less any amounts that the Collateral Manager believes with reasonable certainty will not be received in such Due Period), will be available for payment on the Notes and of certain expenses of the Zohar Obligors in the Collection Accounts at the end of the Due Period and (ii) any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

(d)  Each Scheduled Distribution receivable with respect to a Pledged Obligation shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the applicable Collection Account, and, except as otherwise specified herein, to earn interest at the Assumed Reinvestment Rate. All such funds, unless earlier withdrawn in connection with the purchase of Collateral Debt Obligations, shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Accounts for transfer to the Payment Account and application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.

(e)  Any reference in the definitions of "Senior Collateral Management Fee" or "Subordinated Collateral Management Fee" to an amount calculated with respect to a period at per annum rate shall be computed on the basis of the actual number of days elapsed during such period and a year of 360 days.

(f)  The Trustee's fees pursuant to the Trustee Fee Letter, the fees of the Preference Share Paying Agent under the Preference Share Agreement and the fees of the Collateral Administrator under the Collateral Administration Agreement shall be computed on the basis of the actual number of days elapsed during such period and a year of 360 days and the Principal Balance with respect to any Pledged Obligation shall be deemed to be the outstanding principal amount of such Pledged Obligation.

(g)  Whenever any action taken or to be taken hereunder after the Funding Date is subject to a condition relating to the rating of the Class A-1 Notes or the Class A-2 Notes (including any confirmation by either Rating Agency that any action will not cause a reduction or withdrawal of its then current rating, if any, of such Notes) any reference to a required rating with respect to such Notes shall be to the rating of such Notes without giving effect to the Credit Enhancement (both before and after giving effect to such action).

(h)  For the purposes of determining any payment to be made on any Payment Date pursuant to any applicable paragraph of Section 11.1(a) or 11.2, the Class A Coverage Tests

70

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050335

referred to in such paragraph shall be calculated as of the relevant Determination Date after giving effect to all payments to be made on such Payment Date prior to such payment in accordance with Section 11.1(a) or 11.2, as applicable.

(i)      With respect to any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation as to which any interest or other payment thereon is subject to withholding tax, each Scheduled Distribution thereon shall, for purposes of the Class A Coverage Tests and the Collateral Quality Tests, be deemed to be payable net of such withholding tax unless the issuer thereof or the Obligor thereon is required to make additional payments sufficient on an after tax basis to cover any withholding tax imposed on payments to the issuer with respect thereto. On any date of determination, the amount of any Scheduled Distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(j)      Unless otherwise specified, test calculations that evaluate to a percentage will be rounded to the nearest ten-thousandth, and test calculations that evaluate to a number or decimal will be rounded to the nearest one hundredth.

ARTICLE 2

THE NOTES

Section 2.1.     Forms Generally

(a)      Each Class A Note (unless the Person purchasing such Note elects to hold such Note in global form consistent with the terms hereof; provided, however, that any Class A-1 Note shall be issued solely in certificated form) shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-1, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Each Class A-2 Note and each Class A-3 Note (unless the Person purchasing such Note elects, or is required, to hold such Note in certificated form consistent with the terms hereof) shall either be (i) in the case of such Class A Note being sold to a non-U.S. Person in an Offshore Transaction in reliance on Regulation S, initially represented by one or more temporary global notes in definitive, fully registered form without interest coupons substantially in the form of Exhibit A-2 hereto (each, a "Temporary Regulation S Global Note") or (ii) in the case of such Class A Note being sold to a U.S. Person that is a QIB/QP, initially issued in the form of one permanent global note in definitive, fully registered form without interest coupons substantially in the form of Exhibit A-3 hereto (each, a "Rule 144A Global Note"), which shall be deposited on behalf of the subscribers for such Class A Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Each Class B Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-5, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Each Class C Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-6, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter

71

Indenture
PP050336

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

provided. On the Funding Date, each Holder of a Class A Note (and each beneficial owner of an interest therein) shall be deemed to make to the Issuer and the Trustee each of the representations and warranties set forth in Part B of the form of Transferee Certificate attached to the form of Class A Note Certificate; and each Holder of a Class B Note (and each beneficial owner of an interest therein) shall be deemed to make to the Issuer and the Trustee each of the representations and warranties set forth in Part B of the form of Transferee Certificate attached to the form of Class B Note Certificate. No Person may acquire a Class A Note (other than in case of transfers of interests in Global Notes in accordance with the terms of the Indenture and such Global Notes), Class B Note or Class C Note (or any beneficial interest therein) after the Funding Date except for a Holder who acquires legal and beneficial ownership of such interest upon provision to the Issuer and the Trustee of an applicable Class A Note Certificate, Class B Note Certificate or Class C Note Certificate, as applicable.

(b)    The Co-Issuers in issuing the Notes will obtain "CUSIP" or "private placement" numbers (if then generally in use), and the Trustee will indicate the "CUSIP" or "private placement" numbers (as applicable) of the Notes in notices of redemption and related materials as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and related materials. "CUSIP" numbers for the Rule 144A Global Notes must meet the requirements set forth in Section 7.19(d).

(c)    On or after the Exchange Date, interests in a Temporary Regulation S Global Note shall be exchangeable for interests in permanent Regulation S Global Notes of the same Class in definitive, fully registered form without interest coupons upon certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons. Such global notes shall have the applicable legends set forth in Exhibit A-4 hereto added to the form of such Notes (each, a "Regulation S Global Note"), and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Any such Regulation S Global Note shall be so issued and delivered in exchange for only that portion of the Temporary Regulation S Global Note in respect of which there shall have been presented to the Depository by Euroclear or Clearstream a certification to the effect that it has received from or in respect of a Person entitled to an interest (as shown by its records) therein a certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons.

(d)    The aggregate principal amount of the Regulation S Global Notes and Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(e)    This Section 2.1(e) shall apply only to Global Notes deposited with or on behalf of the Depository.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Temporary Regulation S Global Notes and the Regulation S Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the

72

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050337

Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

Section 2.2.    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations

(a)    The aggregate principal amount of Class A Notes which may be issued under this Indenture may not exceed U.S.$1,000,000,000, excluding Class A Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Class A Notes pursuant to Section 2.4, 2.5 or 8.5.

(b)    The Notes shall be divided into five Classes having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

| Designation | Principal Amount | Note Interest Rate | Note Stated Maturity |
| --- | --- | --- | --- |
| Class A-1 Notes | U.S.$250,000,000 | LIBOR + Class A Applicable Margin (or CP Funding Rate) | January 20, 2017 |
| Class A-2 Notes | U.S.$550,000,000 | LIBOR + Class A Applicable Margin | January 20, 2017 |
| Class A-3 Notes | U.S.$200,000,000 | LIBOR + Class A Applicable Margin | January 20, 2017 |
| Class B Notes | U.S.$200,000,000 | N/A | January 20, 2020 |
| Class C Notes | N/A | N/A | January 20, 2020 |

The Class A Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class B Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class C Notes are not subject to a minimum denomination in connection with the initial issuance thereof. After issuance any Note may fail to be in such required minimum denominations or integral multiples due to repayment of principal thereof in accordance with the Priority of Payments or, with respect to the Class A Notes, due to Borrowings with respect thereto or, with respect to the Class B Notes, due to reductions of the Outstanding face amount thereof pursuant to Section 7.13(b).

(c)(i)    Interest shall accrue on the Outstanding principal amount of the Class A Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date or the date of any Borrowing and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A Notes and interest on Defaulted Interest in respect of the Class A Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(ii)    Class A-1 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1 Notes for each day from and including the Funding Date to but excluding the date the Class A-1 Commitments terminate, expire or are reduced to zero,

73

Indenture
PP050338

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

at a rate per annum equal to the Class A-1 Commitment Fee Rate. Accrued Class A-1 Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus 0.50%, which interest will constitute "Class A-1 Commitment Fee" for purposes of the Priority of Payments. Class A-1 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(iii)  [reserved]

(iv)  Class A-3 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-3 Notes for each day from and including the Funding Date to but excluding the date the Class A-3 Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-3 Commitment Fee Rate. Accrued Class A-3 Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus 0.50%, which interest will constitute "Class A-3 Commitment Fee" for purposes of the Priority of Payments. Class A-3 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(v)  The Class B Notes will not bear a stated rate of interest.

(vi)  The Class C Notes will not bear a stated rate of interest.

(d)  The Notes shall be redeemable as provided in Articles 9 and 12.

(e)  The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

Section 2.3.  Execution, Authentication, Delivery and Dating

(a)  The Class A Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers, and the Class B Notes and (subject to Section 7.13(b)) Class C Notes shall be executed on behalf of the Issuer by an Authorized Officer thereof. The signatures of any such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

(b)  Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)  At any time and from time to time after the execution and delivery of this Indenture, the applicable Co-Issuers may deliver Notes executed by the applicable Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)  Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Funding Date shall be dated as of the Funding Date. All other Notes that are authenticated after the Funding Date for any other purpose under this Indenture shall be dated the date of their authentication.

74

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(e)    Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced. If any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

(f)    No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "Certificate of Authentication"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual or facsimile signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.4.    Registration, Transfer and Exchange of Notes

(a)    Registration of Notes. The Trustee is hereby appointed, as the agent of the Co-Issuers, as the registrar hereunder (the "Note Registrar") and as Transfer Agent with respect to the Notes. The Note Registrar shall keep a register (the "Note Register") at the Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and the registration of transfers of Notes. No transfer of any Notes (or any rights therein) shall be effective unless such transfer is reflected in the Note Register. Upon any resignation or removal of the Note Registrar, the Issuer shall provide notice thereof to the Controlling Party, the Collateral Manager and each Noteholder and promptly appoint a successor or, in the absence of such appointment, assume the duties of Note Registrar.

Subject to this Section 2.4, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2, the applicable Co-Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like original aggregate principal amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate original principal amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the applicable Co-Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the applicable Co-Issuers evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the applicable Co-Issuers and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

75

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Noteholder but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith and expenses of delivery (if any) not made by regular mail. Registration of the transfer of a Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Co-Issuers.

(b)    Transfers and Exchanges of Class A Notes. Transfers or exchanges of Class A Notes (other than transfers of interests in a Class A-1 Note from any Uncommitted Note Purchaser to any Committed Note Purchaser pursuant to the terms of any applicable Class A-1 Note Purchase Agreement or to any External Support Provider) may only be made in accordance with the following:

(i)    Transfers and Exchanges of Certificated Notes.

(A)    With respect to a Class A Note of any Class that is a Certificated Note, the Trustee as Note Registrar shall register the exchange or transfer of such Note for, or to a transferee receiving, a Certificated Note or Certificated Notes of the same Class, upon provision, in the case of a transfer, to the Trustee and the Issuer of duly completed written certifications from the transferor and transferee substantially in the form of the Class A Note Certificate. Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Notes, the Holder of any Class A Note that is a Certificated Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any authorized greater amount) by surrendering such Note at the Corporate Trust Office or at the office of any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment and transfer and a Class A Note Certificate, duly completed and executed by the transferor and the transferee (and accompanied by an opinion of legal counsel, if contemplated by such Class A Note Certificate), and (y) in the case of any exchange, a written request for exchange. Additional certification to the effect that such transfer is in compliance with the restrictions contained in the applicable legend on such Notes may be required. Following a proper request for transfer or exchange, the Trustee shall cancel the surrendered Class A Note and shall (provided it has available in its possession an inventory of Notes), within five Business Days of such request if made at such Corporate Trust Office, or within 10 Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to the transferee (in the case of transfer) or Holder (in the case of exchange) or send by first class mail (at the risk of the transferee in the case of transfer or Holder in the case of exchange) to such address as the transferee or Holder, as applicable, may request, a Class A Note or Notes, as the case may require, in certificated form for a like original aggregate principal amount and in such authorized denomination or denominations as may be requested. In the event of any exchange or transfer pursuant to this clause (A) of less than the entire principal amount of a Class A Note of any Holder, the Trustee shall (provided it has available in its possession an inventory of Notes), within five Business Days of the applicable request if made at such Corporate Trust Office, or within 10 Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to such Holder, or send by first class mail (at the risk of such Holder) to such address as such Holder may request, a Class A Note or Notes, as the case may require, in certificated form for an aggregate principal amount equal to the principal amount retained

76

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

by such Holder and in such authorized denomination or denominations as may be requested.

(B)　　The presentation for transfer or exchange of any Class A Note that is a Certificated Note shall not be valid unless made at the Corporate Trust Office or at the office of a Transfer Agent by the registered Noteholder in person, or by a duly authorized attorney-in-fact.

(ii)　Restrictions on Transfers of Class A Notes. Notwithstanding Section 2.4(b)(i), no transfer of a Class A Note (or any interest therein) may be made, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer, if:

(A)　　such transfer is not exempt from the registration requirements of the Securities Act and/or is not exempt from the registration requirements under applicable state securities laws;

(B)　　with respect to any Temporary Regulation S Global Note, such transfer is made (1) prior to the Exchange Date and (2) within the United States or to, or for the benefit of, a U.S. Person, except in accordance with Rule 144A or another available exemption from the registration requirements of the Securities Act;

(C)　　such transfer would be made to a transferee who is a Person that is not a Qualified Purchaser or a non-U.S. Person;

(D)　　such transfer would have the effect of requiring either of the Co-Issuers or the Collateral to register as an investment company under the Investment Company Act;

(E)　　if such transferee is a non-U.S. Person, such transfer would be made to a transferee that is a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle; or

(F)　　such transfer would be made to a Person who is otherwise unable to make the acknowledgements, representations and agreements required by the applicable Class A Note Certificate, if required by this Indenture.

The exchange or transfer of a Class A-1 Note or a Class A-3 Note is subject to the further condition that (unless the obligations to advance funds to the Issuer thereunder have theretofore expired, been cancelled or reduced to zero) the transferee of such Class A-1 Note or such Class A-3 Note, respectively, be party to an existing Note Purchase Agreement in respect thereof or shall, simultaneously with such exchange or transfer, enter into a new Note Purchase Agreement with (inter alia) the Issuer on substantially the same terms as applied to such Class A Note immediately prior to such exchange or transfer. The exchange or transfer of any Class A Note shall also be subject to the conditions set forth in such Class A Note.

(iii)　Restrictions on Transfers and Exchanges of Global Notes. No transfer or exchange of a Global Note (or any interest therein) may be made, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or exchange, if such transfer or exchange is not made in accordance with clauses (A), (B), (C) or (D) below, as applicable.

Indenture
PP050342
NY3:#7347151v22

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(A)    <u>Rule 144A Global Note to Temporary Regulation S Global Note or Regulation S Global Note</u>.  If a Holder of a beneficial interest in a Rule 144A Global Note deposited with the Depository wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, such Holder, <u>provided</u> such Holder or, in the case of a transfer, the transferee is not a U.S. Person, may, subject to the rules and procedures of the Depository, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note. Upon receipt by the Note Registrar of (1) instructions given in accordance with the Depository's procedures from an Agent Member directing the Note Registrar to credit or cause to be credited a beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, (2) a written order given in accordance with the Depository's procedures containing information regarding the participant account of the Depository and the Euroclear or Clearstream account to be credited with such increase, (3) a certificate in the form of Exhibit B-2 hereto given by the Holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the Holder or the transferee, as applicable, is not a U.S. Person, and that such transfer has been made pursuant to and in accordance with Regulation S and (4) in the case of a transfer, a certificate in the form of Exhibit B-5 hereto given by the proposed transferee stating that it is not a U.S. Person, then the Note Registrar shall approve the instructions at the Depository to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Temporary Regulation S Global Note or Regulation S Global Note, as the case may be, by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be transferred or exchanged, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note.  Notwithstanding anything else in this clause (A), prior to the Exchange Date, a Rule 144A Global Note may only be exchanged or transferred pursuant to Regulation S for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note.

(B)    <u>Temporary Regulation S Global Note or Regulation S Global Note to Rule 144A Global Note</u>.  If a Holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note deposited with the Depository wishes at any time to exchange its interest in such Temporary Regulation S Global Note or Regulation S Global Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in such Temporary Regulation S Global Note or Regulation S Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such Holder may, subject to the rules and procedures of Euroclear, Clearstream and/or the Depository, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note.  Upon receipt by the

78

Indenture
PP050343

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Note Registrar of (1) instructions from Euroclear, Clearstream and/or the Depository, as the case may be, directing the Note Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Temporary Regulation S Global Note or Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Notes, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depository to be credited with such increase, (2) a certificate in the form of Exhibit B-3 hereto given by the Holder of such beneficial interest and stating that, in the case of an exchange, the Holder is a Qualified Institutional Buyer and is also a Qualified Purchaser or, in the case of a transfer, the Person transferring such interest in such Temporary Regulation S Global Note or Regulation S Global Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser and (3) a certificate in the form of Exhibit B-4 hereto given by the proposed transferee stating that it is a QIB/QP, then the Note Registrar shall approve the instructions at the Depository to reduce, or cause to be reduced, the Temporary Regulation S Global Note or Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note to be transferred or exchanged and the Note Registrar shall approve the instructions at the Depository, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Temporary Regulation S Global Note or Regulation S Global Note.

(C)    Global Note to Certificated Note.  If a Holder of a beneficial interest in a Global Note wishes at any time to transfer its interest in such Global Note to a Person who wishes to take delivery thereof in the form of a Certificated Note of the same Class, such Holder may, subject to the rules and procedures of Euroclear, Clearstream and/or the Depository, as the case may be, transfer or cause the transfer of such interest for an equivalent beneficial interest in one or more such Certificated Notes of the same Class as described below.  Upon receipt by the Note Registrar of (1) instructions given in accordance with the Depository's procedures from an Agent Member, or instructions from Euroclear, Clearstream and/or the Depository, as the case may be, directing the Trustee to deliver one or more such Certificated Notes, designating the registered name or names, address, payment instructions, the Class and the number and principal amounts of the Certificated Notes to be executed and delivered (the Class and the aggregate principal amounts of such Certificated Notes being the same as the beneficial interest in the Global Note to be transferred), in authorized denominations, (2) a Class A Note Certificate given by the transferee of such beneficial interest and (3) if such certificate does not include a certification that the transferee is a Qualified Institutional Buyer or a non-U.S. Person, an opinion of counsel acceptable to the Note Registrar that such transfer may be made pursuant to an exemption from registration under the Securities Act, then the Note Registrar shall approve the instructions at the Depository to reduce, or cause to be reduced, the applicable Global Note by the aggregate principal amount of the beneficial interest in such Global Note to be transferred and the Note Registrar shall record the transfer in the Note Register in accordance with Section 2.4(a) and authenticate and deliver one or more Certificated Notes of the appropriate Class registered in the names specified in the certificate described in clause (2) above in

79

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050344

principal amounts designated by the transferee (the aggregate of such amounts being equal to the beneficial interest in the Global Notes to be transferred) and in the minimum denominations and integral multiples in excess thereof as specified in Section 2.2(b).

If a Holder of a beneficial interest in a Global Note wishes at any time to exchange such interest in a Global Note for one or more Certificated Notes of the applicable Class, such Holder may exchange or cause the exchange of such interest for an equivalent beneficial interest in one or more such Certificated Notes as provided below. Upon receipt by the Note Registrar of (1) instructions given in accordance with the Depository's procedures from an Agent Member, or instructions from Euroclear, Clearstream and/or the Depository, as the case may be, directing the Trustee to deliver one or more Certificated Notes and (2) written instructions from such Holder designating the registered name or names, address and payment instructions of such Holder and the Class and the number and principal amounts of the applicable Certificated Notes to be executed and delivered to such Holder (the Class and the aggregate principal amounts of such Certificated Notes being the same as the beneficial interest in the Global Note to be exchanged), then the Note Registrar shall approve the instructions at the Depository to reduce the Global Note by the aggregate principal amount of the beneficial interest in the Global Note to be exchanged, shall record the exchange in the Note Register in accordance with Section 2.4(a) and authenticate and deliver one or more Certificated Notes of the appropriate Class registered as specified in the instructions described in clause (1) above, in authorized denominations.

(D)    Other Exchanges. In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.11, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers and comply with Rule 144A or are to non-U.S. Persons, or otherwise comply with Regulation S, as the case may be), and as may be from time to time adopted by the Issuer and the Trustee.

(iv)    Restrictions on Transfers and Exchanges of Certificated Notes. No transfer or exchange of a Class A-2 Note or a Class A-3 Note (or any interest therein) represented by a Certificated Note may be made, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or exchange, if such transfer or exchange is not made in accordance with clauses (A) or (B) below, as applicable.

(A)    Certificated Note to Temporary Regulation S Global Note or Regulation S Global Note. If a Holder of a Class A-2 Note or a Class A-3 Note represented by a Certificated Note wishes at any time to exchange such Certificated Note for an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, or to transfer such Certificated Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, such Holder may exchange or transfer, or cause the exchange or transfer of, such Note for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, provided that such proposed transferee or the Person requesting such exchange, as applicable, is not a U.S. Person. Upon receipt by the Note Registrar of (1) such Certificated Note properly endorsed for such transfer, and written instructions from such Holder directing the Note Registrar to cause to be credited a beneficial interest in the

80

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Temporary Regulation S Global Note or Regulation S Global Note of the same Class in an amount equal to the principal amount of such Certificated Note, (2) a written order containing information regarding the Euroclear or Clearstream account to be credited with such increase, (3) a certificate in the form of Exhibit B-6 hereto, given by the Holder of such Certificated Note stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Temporary Regulation S Global Note or Regulation S Global Note, including that the proposed transferee or the Person requesting such exchange, as the case may be, is not a U.S. Person and that the proposed transfer is being made pursuant to and in accordance with Regulation S and (4) in the case of a transfer, a certificate in the form of Exhibit B-5 hereto given by the proposed transferee stating that it is not a U.S. Person, the Note Registrar shall cancel such Certificated Note in accordance with Section 2.8, record the transfer in the Note Register in accordance with Section 2.4(a) and approve the instructions at the Depository to increase the principal amount of the Temporary Regulation S Global Note or Regulation S Global Note by the aggregate principal amount of the Certificated Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note of the same Class equal to the amount specified in the instructions received pursuant to clause (1) above. Notwithstanding anything else in this clause (A), prior to the Exchange Date, a Certificated Note may only be exchanged or transferred pursuant to Regulation S for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note.

(B)    Certificated Note to Rule 144A Global Note. If a Holder of a Class A-2 Note or a Class A-3 Note represented by a Certificated Note wishes at any time to exchange its interest in such Certificated Note for an interest in the corresponding Rule 144A Global Note, or to transfer its interest in such Certificated Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such Holder may exchange or transfer, or cause the exchange or transfer of, such Note for an equivalent beneficial interest in the corresponding Rule 144A Global Note, provided such proposed transferee or the Person requesting such exchange, as applicable, is a QIB/QP. Upon receipt by the Note Registrar of (1) such Certificated Note properly endorsed for such transfer and written instructions from such Holder directing the Note Registrar to cause to be credited a beneficial interest in the Rule 144A Global Note of the same Class in an amount equal to the principal amount of such Certificated Note, such instructions to contain information regarding the participant account with the Depository to be credited with such increase, (2) a certificate in the form of Exhibit B-7 hereto given by the Holder of such Certificated Note and stating that, in the case of an exchange, the Holder is a QIB/QP or, in the case of a transfer, such Holder reasonably believes that the Person acquiring such interest in the applicable Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and is also a Qualified Purchaser or that, in the case of an exchange, the Holder is a QIB/QP and (C) a certificate in the form of Exhibit B-4 hereto given by the proposed transferee stating that it is a QIB/QP, then the Note Registrar shall cancel such Certificated Note in accordance with Section 2.8, record the transfer in the Note Registrar in accordance with Section 2.4(a) and instruct or approve the instructions to the Depository to credit or cause to be credited to the securities account of the Person specified in such instructions a

81

Indenture
PP050346

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

beneficial interest in the Rule 144A Global Note of the same Class equal to the amount specified in the instructions received pursuant to clause (1) above.

(v)    Noncompliant Transfers Void.  Any purported sale, pledge or other transfer of a Class A Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture or in such Class A Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class A Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(vi)    Pledges of Notes.  For purposes of this Section 2.4, each pledge of a Class A Note or an interest therein (other than a Qualified Securitization Pledge) will be considered to be a "transfer" of such Class A Note (or such interest), and each Person for whose benefit a Class A Note (or an interest therein) is so pledged will be considered a "transferee."

(vii)    Certain Deemed Representations.  Each transferor of an interest in a Global Note shall be deemed to make to the Issuer and the Trustee, as of the date of such transfer, each of the certifications of a "Transferor" set forth in the form of Class A Note Certificate; and each transferee of an interest in a Global Note shall be deemed to make to the Issuer and the Trustee, as of the date of such transfer, each of the representations and warranties of a "Transferee" set forth in Part B of the form of Transferee Certificate attached to the form of Class A Note Certificate.

(c)    No Transfers of Class B Notes, Etc.  No Class B Note (or any interest therein) may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge.  Any purported sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture or in such Class B Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(d)    No Transfers of Class C Notes, Etc.  No Class C Note (or any interest therein) may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge.  Any purported sale, pledge or other transfer of a Class C Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture or in such Class C Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class C Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(e)    Authorized Denominations.  No Person may hold a beneficial interest in any Class A Note or Class B Note except in a denomination authorized for such Notes under Section 2.2(b).

(f)    Legends.  Any Class A Note issued upon the transfer, exchange or replacement of Class A Notes shall bear such applicable legend set forth in the applicable portion of Exhibit A hereto.

82

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050347

Any Class B Note issued upon the exchange or replacement of Class B Notes shall bear such applicable legend set forth in Exhibit A-2 hereto.  Any Class C Note issued upon the exchange or replacement of Class C Notes shall bear such applicable legend set forth in Exhibit A-3 hereto.

      (g)    <u>Surrender Upon Final Payment</u>.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent.

      (h)    <u>No Purchase, Etc.</u>  The Co-Issuers will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes except upon the prepayment or redemption of the Notes in accordance with the terms of this Indenture and the Notes.  The Co-Issuers will promptly cancel all Notes acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Notes pursuant to any provision of this Indenture, and no Notes may be issued in substitution or exchange for any such Notes.

      (i)    <u>Limitations on Trustee Responsibility, Etc.</u>  Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, ERISA (or, in the case of a governmental plan or a church plan (as described in ERISA Sections 3(32) and 3(33), respectively) any substantially similar federal, state or local law), the Code or the Investment Company Act; <u>provided</u> that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to a Trustee by a purchaser or transferee of a Note, the Trustee shall be under a duty to receive and examine the same to determine whether on its face it conforms to the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms.

      (j)    <u>Class A-1 Register</u>.  The Class A-1 Note Agent shall keep a register (the "<u>Class A-1 Note Register</u>") at the office of the Class A-1 Note Agent and in which the Class A-1 Note Agent shall maintain the Class A-1 Commitment applicable to each Holder of Class A-1 Notes and the aggregate principal amount of advances from time to time outstanding in respect of such Class A-1 Notes. On the second Business Day next succeeding each Determination Date, and at any time promptly following a request therefor by the Trustee, the Collateral Manager, the Collateral Administrator or the Controlling Party, the Class A-1 Note Agent shall provide the Trustee, the Collateral Manager, the Collateral Administrator and the Controlling Party, as applicable, with a report specifying the aggregate principal amount of advances outstanding in respect of each Class A-1 Note, the Class A-1 Commitment applicable thereto (as of such Record Date or such time, as the case may be), the Class A-1 Note Interest Rate and the Class A-1 Interest Distribution Amount (for any Payment Date), the Class A-1 Commitment Fee, the Class A-1 Commitment Fee Amount (for any Payment Date), the Commitment Limits, notice of the termination, expiration or reduction to zero of the Class A-1 Commitments, all payments of principal of the Class A-1 Notes, any Class A-1 Additional Amounts, any Class A Additional Interest and applicable payment instructions.  Except as otherwise provided herein, promptly upon receipt by the Class A-1 Note Agent of any notice or report provided under this Indenture, the Class A-1 Note Agent shall deliver copies of such notice or report to each Holder of Class A-1 Notes under the applicable Class A-1 Note Purchase Agreement or to an agent on behalf of such Holder (unless such notice or report has concurrently been provided to such Holder or agent and the Controlling Party).

      (k)    <u>Class A-3 Register</u>.  The Class A-3 Note Agent shall keep a register (the "<u>Class A-3 Note Register</u>") at the office of the Class A-3 Note Agent and in which the Class A-3 Note Agent shall maintain the Class A-3 Commitment applicable to each Holder of Class A-3 Notes and the aggregate principal amount of advances from time to time outstanding in respect of such Class A-3 Notes.

83

Indenture<br>PP050348

NY3:#7347151v22<br>CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP<br>ON BEHALF OF PATRIARCH PARTNERS LLC

On the second Business Day next succeeding each Determination Date, and at any time promptly following a request therefor by the Trustee, the Collateral Manager, the Collateral Administrator or the Controlling Party, the Class A-3 Note Agent shall provide the Trustee, the Collateral Manager, the Collateral Administrator and the Controlling Party, as applicable, with a report specifying the aggregate principal amount of advances outstanding in respect of each Class A-3 Note, the Class A-3 Commitment applicable thereto (as of such Record Date or such time, as the case may be), the Class A-3 Note Interest Rate and the Class A-3 Interest Distribution Amount (for any Payment Date), the Class A-3 Commitment Fee, the Class A-3 Commitment Fee Amount (for any Payment Date), the Commitment Limits, notice of the termination, expiration or reduction to zero of the Class A-3 Commitments, all payments of principal of the Class A-3 Notes, any Class A Additional Interest and applicable payment instructions. Except as otherwise provided herein, promptly upon receipt by the Class A-3 Note Agent of any notice or report provided under this Indenture, the Class A-3 Note Agent shall deliver copies of such notice or report to each Holder of Class A-3 Notes under the applicable Class A-3 Note Purchase Agreement or to an agent on behalf of such Holder (unless such notice or report has concurrently been provided to such Holder or agent and the Controlling Party).

Section 2.5.    Mutilated, Defaced, Destroyed, Lost or Stolen Notes.

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers, the Trustee and the Transfer Agent (each, a "Specified Person") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless (and in the case of any Holder that is, or is a nominee for, a Qualified Institutional Buyer with a minimum net worth of at least U.S.$100,000,000, such Holder's own unsecured agreement of indemnity shall be deemed to be satisfactory) then, in the absence of notice to the Specified Persons that such Note has been acquired by a protected purchaser, the Co-Issuers shall execute and, upon Issuer Request, the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Note, of like tenor (including the same date of issuance) and equal original principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Specified Persons shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Specified Persons in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Co-Issuers in their discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.5, the Co-Issuers, the Trustee or any Transfer Agent may require the payment by the registered holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.5 in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Co-

84

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.5, to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same class duly issued hereunder.

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.6.    Payment of Interest, Principal and Commitment Fees; Rights Preserved.

(a)    Each Class of Class A Notes shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate specified in Section 2.2. Interest on each such Class of Notes shall be due and payable on each Payment Date immediately following the related Interest Period; provided that payments of interest on all Notes are subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

The Class A-1 Notes shall accrue the Class A-1 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-1 Commitment Fee shall be due and payable on each Payment Date; provided that payment of Class A-1 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments. The Class A-3 Notes shall accrue the Class A-3 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-3 Commitment Fee shall be due and payable on each Payment Date; provided that payment of the Class A-3 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

Subject to the next succeeding paragraph of this Section 2.6(a), interest will cease to accrue on each Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, for so long as the Class A Notes are outstanding, interest shall accrue on any Defaulted Interest on any Class A Note at the applicable Note Interest Rate until paid as provided herein.

So long as any Class A Notes are Outstanding (or until all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero), any Class A Additional Interest and Class A-1 Additional Amounts due in respect of the Class A Notes that is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1 until the Payment Date on which such Class A Additional Interest or Class A-1 Additional Amounts, as applicable, are available to be paid in accordance with the Priority of Payments.

(b)    The principal of each Class of Notes shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by operation of the Priority of Payments, by declaration of acceleration, by redemption or otherwise; provided that (1) so long as any Class A Notes are Outstanding or until all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class B Notes (A) may only occur after principal of the Class A Notes has been paid in full (without giving effect to the payment of any Insured Payments paid with proceeds from the Credit Enhancement) and all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on

85

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050350

the Class A Notes, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, any Credit Enhancement Premium, any Credit Enhancement Liabilities, any Class A-1 Additional Amounts and other amounts due in accordance with the Priority of Payments and (2) so long as any Class A Notes or Class B Notes are Outstanding or until all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class C Notes (A) may only occur after principal of the Class A Notes has been paid in full (without giving effect to the payment of any Insured Payments paid with proceeds from the Credit Enhancement) and all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero and principal of the Class B Notes has been paid in full and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, any Credit Enhancement Premium, any Credit Enhancement Liabilities, any Class A-1 Additional Amounts, the principal of the Class B Notes and other amounts due in accordance with the Priority of Payments. Any payment of principal of the Class B Notes and Class C Notes that is not paid, in accordance with the Priority of Payments, on any Payment Date shall not be considered "due and payable" for purposes of Section 5.1(b) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments.

        (c)    So long as the Class A Coverage Tests are met, principal shall not be payable on any Class of Notes prior to the end of the Reinvestment Period except upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5. If any of the Class A Coverage Tests is not satisfied, or after the Reinvestment Period, principal shall not be payable on any Class of Notes except (i) upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5 and (ii) on each Payment Date from Principal Proceeds, Interest Proceeds and amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments.

        (d)    As a condition to the payment of any principal of or interest on any Note, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee or any Class A-1 Additional Amounts, as applicable, without the imposition of withholding tax, any Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

        (e)    Payments in respect of principal of and interest on the Notes and in respect of any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts and any Class A Redemption Break Funding Costs, as applicable, shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Noteholders in accordance with written wire transfer instructions received by any Paying Agent on or before the Record Date or, if no such wire transfer instructions are received by a Paying Agent, by a Dollar-denominated check drawn on a bank in the U.S.

        (f)    The principal of and interest on any Note, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts and any Class A Redemption Break Funding Costs, as applicable, that are payable in accordance with the Priority of Payments on such Payment Date and are punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the Record Date for such payment. All such payments that are mailed or wired

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050351

and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2.

Except as otherwise expressly provided herein with respect to the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the Note Register in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)    Payment of any Defaulted Interest in respect of the Class A Notes may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)    All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)    Notwithstanding anything contained herein to the contrary, the obligations of each Co-Issuer under the Notes and this Indenture and under each other Transaction Document to which it is a party are limited recourse obligations of the Co-Issuers payable solely from the Collateral and, in the case of Insured Payments with respect to the Class A-1 Notes and Class A-2 Notes, the Credit Enhancement, and following realization of the Collateral, any claims of the Noteholders, the Credit Enhancer, the Collateral Manager, the Administrator, the Collateral Administrator, the Placement Agent and each other counterparty to any Zohar Obligor under the Transaction Documents (subject to the terms of the Issuer Charter) shall be extinguished, and shall not thereafter revive. No recourse shall be had for the payment of any amount owing under or in respect of the Notes or any other Transaction Document against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns. It is understood that the foregoing provisions of this Section 2.6(i) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, (ii) limit the rights of the Trustee, the Credit Enhancer and the Holders of the Notes or the obligations of the Credit Enhancer under the Credit Enhancement or (iii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this Section 2.6(i) shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(j)    Subject to the foregoing provisions of this Section 2.6 and the provisions of Sections 2.4 and 2.5, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest, Class A-1 Commitment Fees, Class A-3 Commitment Fees, Class A-1 Additional Amounts and any Class A Redemption Break Funding Costs, if applicable, and principal that were carried by such other Note.

87

Indenture
PP050352

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 2.7.    Persons Deemed Owners

The Co-Issuers, the Trustee, the Note Registrar, the Collateral Manager, the Class A-1 Note Agent, the Class A-3 Note Agent, the Controlling Party and any agent of any of them (collectively, the "Relevant Persons") may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts, any Class A Redemption Break Funding Costs and, subject to Section 16.1(b), on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

Section 2.8.    Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it. Any Notes purchased by either of the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

Section 2.9.    Debt Treatment

. The Co-Issuers and each Holder (and each beneficial owner of a Note), by acceptance of its Note (or its interest therein, as the case may be) shall be deemed to have agreed to treat, and shall treat, the Class A Notes as unconditional debt of the Issuer for tax, accounting and financial reporting purposes. The Issuer and the Holders of the Class B and Class C Notes agree to treat such Notes as equity for tax purposes unless, in the case of the Class B Notes, the Trustee has received an Opinion of Counsel that such Class B Notes will be treated as debt for U.S. federal income tax purposes.

Section 2.10.    Issuance of Additional Class B Notes

At the direction of the Credit Enhancer, the Holders of all of the Class B Notes, the Holders of all Class C Notes (if any) and the Holders of all of the Preference Shares, the Issuer shall issue (and, upon Issuer Order, the Trustee shall authenticate) additional Class B Notes ("Additional Class B Notes") to the Collateral Manager or its designees (without payment of any amounts by the Collateral Manager or such designees to the Issuer or any other Zohar Obligor) on one or more Business Days (each, an "Additional Class B Note Issuance Date"); provided that the following conditions are met:

(a)    the party requesting the issuance of such Additional Class B Notes shall have given not less than 10 Business Days' written notice thereof to the Collateral Manager, the Trustee, the Issuer, the Credit Enhancer, each Noteholder, each Holder of Preference Shares and each Rating Agency;

(b)    except for issuance date, the terms of the Additional Class B Notes are identical to the terms of the other Class B Notes then Outstanding;

(c)    no Default or Event of Default shall have occurred and be continuing, and the Class A Coverage Tests shall be satisfied, as of such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes);

88

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050353

(d)     each Holder of Additional Class B Notes shall be (1) a Qualified Institutional Buyer or an accredited investor as defined in Rule 501(a) under the Securities Act and (2) a Qualified Purchaser, shall meet all of the other conditions of ownership of the Class B Notes and shall have delivered to the Issuer and the Trustee a Class B Note Certificate duly executed by such Holder;

(e)     the Trustee shall have received an Opinion of Counsel to the effect that it is not necessary in connection with the issuance of such Additional Class B Notes to register the Notes (including the Additional Class B Notes) under the Securities Act or to qualify this Indenture under the Trust Indenture Act of 1939, as amended, or the rules and regulations of the Securities and Exchange Commission applicable to an indenture which is qualified thereunder;

(f)     the Trustee shall have received an Officer's certificate of the Issuer:

(1)     attaching a letter signed by Moody's and confirming that, after giving effect to the issuance of such Additional Class B Notes, the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes are rated "Aaa" by Moody's after giving effect to the Credit Enhancement and at least "Aa2" by Moody's without giving effect to the Credit Enhancement; and the Class B Notes (including such Additional Class B Notes) are rated at least "Baa3" by Moody's;

(2)     attaching a letter signed by Standard & Poor's and confirming that, after giving effect to the issuance of such Additional Class B Notes, the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes are rated "AAA" by Standard & Poor's after giving effect to the Credit Enhancement and at least "AA" by Standard & Poor's without giving effect to the Credit Enhancement; and the Class B Notes (including such Additional Class B Notes) are rated at least "BBB-" by Standard & Poor's; and

(3)     stating that each such rating is in full force and effect on such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes), and

(g)     the issuance date is at least 10 Business Days prior to the next succeeding Payment Date,

(h)     either (1) the Trustee shall have received an Opinion of Counsel that such Additional Class B Notes will be treated as debt for U.S. federal income tax purposes, or (2) the Issuer has delivered an Officer's Certificate to the Trustee certifying that following the issuance of such Additional Class B Notes, there are and would at all times be no more than 98 "partners" in the Issuer for purposes of Treasury Regulation section 1.7704-1(h) (counting as equity of the Issuer for this purpose the Preference Shares, Class C Notes and any Class B Notes and assuming compliance with any documentary restrictions on transfer),

it being understood that (x) each of the above ratings by Standard & Poor's on the Class A Notes will address the timely payment in full of the principal of and interest (other than Class A Additional Interest) on the Class A Notes and commitment fees on the Class A-1 Notes and Class A-3 Notes, (y) each of the above ratings by Moody's on the Class A Notes will address the ultimate payment in full of the principal of and interest (other than Class A Additional Interest) on the Class A Notes and (z) each of the above

89

Indenture
PP050354

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

ratings on the Class B Notes will address the ultimate payment in full of the principal of the Class B Notes.

Section 2.11    Depository Unable or Unwilling to Perform

(a)    A Global Note deposited with the Depository pursuant to Section 2.1 shall be transferred in the form of a Certificated Note to the beneficial owners thereof only if such transfer complies with Section 2.4 and either (i) the Depository notifies the Issuer that it is unwilling or unable to continue as Depository for such Global Note or (ii) if at any time such Depository ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Issuer within 90 days after such notice.

(b)    Any Global Note that is transferable in the form of a Certificated Note to the beneficial owners thereof pursuant to this Section 2.11 shall be surrendered by the Depository to the Trustee's office located in the City of Chicago, Illinois (or such other office as may be designated by the Trustee) to be so transferred, in whole or from time to time in part, without charge, and the Issuer shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Certificated Notes (pursuant to the instructions of the Depository) in authorized denominations. Any Certificated Note delivered in exchange for an interest in a Global Note, as applicable, shall bear the legends set forth in the applicable portion of Exhibit A hereto and shall be subject to the transfer restrictions referred to in such legends.

(c)    The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes, as applicable.

(d)    In the event of the occurrence of either of the events specified in subclauses (i) and (ii) of subsection (a) of this Section 2.11, the Issuer shall promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

Section 2.12.    Notes Beneficially Owned by Persons Not Qualified Purchasers

(a)    Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a Note or a beneficial interest in any Rule 144A Global Note to a U.S. Person that is not a QIB/QP or a Certificated Note to a U.S. person that is not a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act shall be null and void ab initio and any such purported transfer of which the Issuer or the Trustee shall have notice may be disregarded by the Issuer and the Trustee for all purposes.

(b)    If any U.S. Person that is not a QIB/QP shall become a beneficial owner of an interest in any Rule 144A Global Note or any U.S. Person that is not a Qualified Purchaser or that does not have an exemption available under the Securities Act shall become the Holder or beneficial owner of an interest in any Certificated Note (any such Person, a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such Person is a Non-Permitted Holder by the Issuer or the Trustee (and notice by the Trustee if it makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its Note or interest to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice. If such Non-Permitted Holder fails to so transfer its Note or interest in such Note, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Note or interest in such Note to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other

90

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

market professionals that regularly deal in securities similar to the Notes, and selling such Notes or interest in such Notes to the highest such bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the beneficial owner of each interest in a Note, the Non-Permitted Holder and each other Person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any Person having Notes or an interest in the Notes sold as a result of any such sale (including the net proceeds received thereby) or the exercise of such discretion.

## ARTICLE 3

### CONDITIONS PRECEDENT

Section 3.1.    General Provisions

The Notes to be issued on the Funding Date may be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee (or an Authenticating Agent on its behalf) upon Issuer Request, upon receipt by the Trustee of the following:

(a)    (i) a certificate of the Issuer (a) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Collateral Administration Agreement, the Note Purchase Agreements, the Note Subscription Agreements, the Preference Share Subscription Agreements, the Management Agreement, the Administration Agreement, the Credit Enhancement Agreement, the Preference Share Paying Agency Agreement, the Collateral Assignment of Hedge Agreement, the Trustee Fee Letter and the Hedge Agreements (if any) entered into on the Closing Date and the execution, authentication and delivery of the Notes and specifying the Stated Maturity, the principal amount and Classes of Notes to be authenticated and delivered, and (b) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(ii)    a certificate of the Co-Issuer (a) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Note Purchase Agreements, the Note Subscription Agreements and the Credit Enhancement Agreement and the execution, authentication and delivery of the Class A Notes and Class B Notes and specifying the Stated Maturity, the principal amount and Classes of Class A Notes and Class B Notes to be authenticated and delivered, and (b) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon; and

(iii)    a certificate of the Zohar Subsidiary (a) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Insurance and Indemnity Agreement and the Management Agreement and (b) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been

91

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050356

rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    (i) either (a) a certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee and the Credit Enhancer, as applicable, that the Trustee and the Credit Enhancer, as applicable, are entitled to rely thereon to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares, or (b) an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee and the Credit Enhancer, as applicable, to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares except as may have been given;

(ii)    either (a) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Co-Issuer satisfactory in form and substance to the Trustee and the Credit Enhancer, as applicable, that the Trustee and the Credit Enhancer, as applicable, are entitled to rely thereon to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Class A Notes, or (b) an Opinion of Counsel of the Co-Issuer satisfactory in form and substance to the Trustee and the Credit Enhancer, as applicable, that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Class A Notes except as may have been given; and

(iii)    either (a) a certificate of the Zohar Subsidiary or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Zohar Subsidiary satisfactory in form and substance to the Trustee and the Credit Enhancer, as applicable, that the Trustee and the Credit Enhancer, as applicable, are entitled to rely thereon to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (b) an Opinion of Counsel of the Zohar Subsidiary satisfactory in form and substance to the Trustee and the Credit Enhancer, as applicable, that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes except as may have been given;

(c)    (i) an opinion of Milbank, Tweed, Hadley & McCloy LLP, special counsel to the Zohar Obligors, dated the Funding Date, substantially in the form of Exhibit C, (ii) an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Funding Date, substantially in the form of Exhibit D, (iii) opinions of each of (A) Kennedy Covington Lobdell & Hickman LLP, special counsel to the Trustee, (B) Seyfarth Shaw LLP, Illinois counsel to Trustee, and (C) the in-house counsel to the Trustee, each dated the Funding Date, substantially in the forms of Exhibit E-1, Exhibit E-2, and Exhibit E-3, respectively, (iv) an opinion of Richards Spears Kibbe & Orbe LLP, special counsel to the Collateral Manager, dated the Funding Date, substantially in the form of Exhibit F, and (v) an opinion of in-house counsel to the Credit Enhancer, dated the Funding Date, substantially in the form of Exhibit G;

(d)    a certificate of the Issuer stating that the Issuer is not in Default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Issuer Charter, any indenture or

92

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

other agreement or instrument to which the Issuer is a party or by which it or its property is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it or its property may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties of the Issuer contained herein are true and correct as of the Funding Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes (including in Section 3.2) and all conditions precedent in the Issuer Charter relating to the issuance of the Preference Shares have been complied with; and that all expenses due or accrued with respect to the offering of the Notes or relating to actions taken on or in connection with the Funding Date have been paid;

(e)    a certificate of the Co-Issuer stating that the Co-Issuer is not in Default under this Indenture and that the issuance of the Notes applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the certificate of incorporation or by-laws of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or to which it or its property is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it or its property may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties of the Co-Issuer contained herein are true and correct as of the Funding Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with; and that all expenses due or accrued with respect to the offering of the Notes or relating to actions taken on or in connection with the Funding Date have been paid;

(f)    a certificate of the Zohar Subsidiary stating that the Zohar Subsidiary is not in Default under this Indenture; that no Event of Default shall have occurred and be continuing; and that all of the representations and warranties of the Zohar Subsidiary contained herein are true and correct as of the Funding Date;

(g)    an Accountants' Report (along with an electronic data file containing the information supporting the conclusions therein) delivered to the Issuer (with copies to the Trustee, the Rating Agencies and the Class A-1 Note Agent) specifying the procedures applied by the certified public accountants preparing such Accountants' Report and such accountants' associated findings comparing the information provided in the Accountants' Report with respect to each Collateral Debt Obligation (as set forth in Schedule A-1 as provided by the Issuer);

(h)    fully executed counterparts of the Note Subscription Agreements, the Preference Share Subscription Agreements, the Note Purchase Agreements, the Collateral Administration Agreement, the Administration Agreement, the Trustee Fee Letter and the Management Agreement;

(i)    fully executed counterparts of each Hedge Agreement (if any) entered into on or before the Funding Date and an executed copy of each Collateral Assignment of Hedge Agreement with respect thereto (and all acknowledgments thereto);

(j)    the Credit Enhancement, duly executed and delivered by the Credit Enhancer, and fully executed counterparts of the Credit Enhancement Agreement;

(k)    executed Financing Statements for filing in the following filing offices (x) against the Issuer: Secretary of State, State of Delaware, Secretary of State, State of Illinois and the Recorder of Deeds of the District of Columbia, Washington, DC and (y) against the Zohar Subsidiary: Secretary of State, State of Delaware and Secretary of State, State of Illinois;

93

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(l)    UCC-3 financing statements executed and filed against the Issuer with the Secretary of State, State of Delaware, Secretary of State, State of Illinois and the Recorder of Deeds of the District of Columbia, Washington, DC relating to the termination of the security interest granted in connection with the Warehouse Agreement and the transactions contemplated thereby;

(m)    an acknowledgment from the Issuer, the Investor Agent, Patriarch Partners XIV, LLC, MMP-5 Funding, LLC, and LaSalle Bank National Association under the Warehouse Agreement that the Warehouse Advances and any other amounts payable under or in connection with the Warehouse Agreement or the transactions contemplated thereby have been paid in full;

(n)    evidence of the registration of a charge in the Issuer's books in the Cayman Islands;

(o)    evidence that the Preference Shares have been, or contemporaneously with the issuance of the Notes will be, issued;

(p)    if required by the Note Purchaser, the Trustee shall have received fully executed forms FRG-3 of each of the Issuer and the Zohar Subsidiary (one each with the Uncommitted Note Purchaser, as lender, and one each with each Committed Note Purchaser, as lender) to the effect that no part of the proceeds of the issuance of any Notes or any Borrowing will be used to purchase or carry Margin Stock; and

(q)    such other documents as the Trustee may reasonably require (provided that nothing herein shall imply or impose a duty on the Trustee to request other documents).

Section 3.2.    Security for Notes

Prior to the issuance of the Notes on the Funding Date, the Issuer shall cause the following conditions to be satisfied and shall certify that the following conditions are satisfied:

(a)    Pledge of Collateral Debt Obligations. The Grant pursuant to the Granting clauses of this Indenture of all of the Issuer's and the Zohar Subsidiary's respective right, title and interest in and to the Collateral Debt Obligations and Eligible Investments purchased or owned by the Issuer or the Zohar Subsidiary on the Funding Date (in the case of such Collateral Debt Obligations, as set forth in Schedule A-1), and the transfer of all such Collateral Debt Obligations and Eligible Investments to the Trustee in the manner provided in Section 3.3(b).

(b)    Certificate of the Issuer. The delivery to the Trustee of a certificate of the Issuer, dated as of the Funding Date, to the effect that, in the case of each Collateral Debt Obligation listed on Schedule A-1, each Eligible Investment and each other item or Collateral pledged to the Trustee for inclusion in the Collateral on the Funding Date (whether pledged by the Issuer or the Zohar Subsidiary) and immediately prior to the delivery thereof on the Funding Date:

(i)    the Issuer or the Zohar Subsidiary, as applicable, is the owner of such Collateral Debt Obligation listed on Schedule A-1, Eligible Investment or other item of Collateral free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Funding Date and except for those Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Collateral Debt Obligation or

94

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture
PP050359

Eligible Investment prior to the first payment date and owed by the Issuer to the seller of such Collateral Debt Obligation or Eligible Investment;

(ii)    the Issuer or the Zohar Subsidiary, as applicable, has acquired its ownership in such Collateral Debt Obligation or Eligible Investment in good faith without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC), except as described in paragraph (i) above;

(iii)    neither the Issuer nor the Zohar Subsidiary has assigned, pledged or otherwise encumbered any interest in such Collateral Debt Obligation or Eligible Investment or other item of Collateral (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released or will be released on the Funding Date) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer or the Zohar Subsidiary, as applicable, has full right to Grant to the Trustee a security interest in and assign and pledge all of its right, title and interest in such Collateral Debt Obligation, Eligible Investment or other item of Collateral;

(v)    the information set forth with respect to such Collateral Debt Obligation in Schedule A-1 is correct;

(vi)    the Collateral Debt Obligations set forth on Schedule A-1 and the requirements of the definition of "Collateral Debt Obligations" and are transferred to the Trustee as required by Section 3.3(a); and

(vii)    upon Grant by the Issuer or the Zohar Subsidiary, as applicable, the Trustee has a first priority perfected security interest in the Collateral (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Pledge of Collateral takes the actions required of it under Section 3.3(b) for perfection of that interest).

(c)    Rating Letters.  The delivery to the Trustee of a certificate of the Issuer to the effect that attached thereto is a true and correct copy of: (i) a letter signed by Moody's and confirming that the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes have been rated "Aaa" by Moody's after giving effect to the Credit Enhancement and at least "Aa2" by Moody's without giving effect to the Credit Enhancement, which ratings shall be in full force and effect on the Funding Date and shall address the ultimate payment in full of the principal of and interest (other than Class A Additional Interest) on the Class A Notes; and (ii) a letter signed by Standard & Poor's and confirming that the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes have been rated "AAA" by Standard & Poor's after giving effect to the Credit Enhancement and at least "AA" by Standard & Poor's without giving effect to the Credit Enhancement, which ratings shall be in full force and effect on the Funding Date and shall address the timely payment in full of the principal of and interest (other than Class A Additional Interest) on the Class A Notes and commitment fees on the Class A-1 Notes and the Class A-3 Notes.

The parties hereto acknowledge that neither Moody's nor Standard & Poor's has rated, and neither has agreed to rate, the Class B Notes, and that if any Rating Agency is asked to rate the Class B Notes after the Funding Date, such rating agency will undertake a separate rating

95

Indenture
PP050360

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

process which may or may not result in the Class B Notes being rated by such Rating Agency at the rating level requested.

(d)  Accounts. The delivery by the Trustee of evidence of the establishment of the Payment Account, the Collection Accounts, the Cash Collateral Account, the Custodial Account, the Credit Enhancement Payment Account, the Expense Account, the Closing Expense Account, the Cash Reserve Account, the Unrestricted Collateral Account, the Class A Holder Collateral Account, the Professional Fee Account, the Rollover Proceeds Account, the Hedge Counterparty Collateral Account and the Unfunded Revolver Discount Account.

(e)  Funding Certificate. The delivery to the Trustee of a funding certificate, duly executed by an Authorized Officer of the Issuer, relating to, among other things, the disposition of the proceeds of the issuance of the Notes, dated the Funding Date, substantially in the form of Exhibit H hereto (the "Funding Certificate").

(f)  Purchases. The delivery to the Trustee of evidence (which may be a certificate of the Issuer) that the Issuer or the Zohar Subsidiary, as applicable, shall have acquired or owns the Collateral Debt Obligations specified on Schedule A-1.

Section 3.3.    Custodianship; Transfer of Collateral Debt Obligations and Eligible Investments

(a)  The Trustee shall hold all Certificated Securities and Instruments in physical form at the office of a custodian appointed by it in the State of Illinois (the "Custodian"). Initially, such Custodian shall be the Bank, located at the Corporate Trust Office. Any successor custodian shall be a state or national bank or trust company which is not an Affiliate of any Zohar Obligor and has capital and surplus of at least U.S.$200,000,000.

(b)  Each time that the Issuer or the Zohar Subsidiary, or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary, shall direct or cause the acquisition of any Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security or Eligible Investment, the Collateral Manager (on behalf of the Issuer or the Zohar Subsidiary) shall, if such Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security or Eligible Investment has not already been transferred to the Custodial Account, cause the transfer of such Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security or Eligible Investment to the Custodian to be held in the Custodial Account for the benefit of the Trustee in accordance with the terms of this Indenture. The security interest of the Trustee in the funds and other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security or Eligible Investment so acquired, including all rights of the Issuer or the Zohar Subsidiary, as applicable, in and to any Money, Instruments, payment intangibles, general intangibles, Chattel Paper, electronic chattel paper, letter-of-credit rights and investment property related to and proceeds of such Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security or Eligible Investment. The Collateral Manager shall cause all Collateral Debt Obligations, Unrestricted Collateral Debt Obligations, Equity Securities and Eligible Investments acquired by or on behalf of the Issuer or the Zohar Subsidiary, as applicable, to be transferred to the Custodian for the benefit of the Trustee by one of the following means (and shall take any and all other actions necessary to create and maintain in favor of the Trustee a valid, perfected, first-priority security interest in each Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity

96

NY3:#7347151v22

Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050361

Respondents' Exhibit 8   pg. 103 of 447

Security and Eligible Investment Granted to the Trustee under laws and regulations (including without limitation Articles 8 and 9 of the UCC) in effect at the time of such Grant):

(i)    in the case of an Instrument, Chattel Paper or a Certificated Security represented by a Security Certificate in Registered Form, by (a) delivering such Instrument, Chattel Paper or Security Certificate to the Custodian in the State of Illinois specially indorsed to the Trustee by an effective Indorsement and (b) causing the Custodian to maintain (on behalf of the Trustee) continuous possession of such Instrument, Chattel Paper or Security Certificate in the State of Illinois;

(ii)    in the case of an Uncertificated Security (other than an Uncertificated Security covered by clause (iii) below), by (a) causing the Trustee to become the registered owner of such Uncertificated Security and (b) taking reasonable steps to direct the issuer of such Uncertificated Security to cause such registration to remain effective;

(iii)    in the case of an Uncertificated Security registered in the name of the Issuer or the Zohar Subsidiary, as applicable, by (a) taking reasonable steps to cause the issuer of such Uncertificated Security to agree that it will comply with Instructions originated by the Trustee without further consent by the Issuer or Zohar Subsidiary and (b) taking reasonable steps to direct the issuer of such Uncertificated Security to cause such agreement to remain in effect;

(iv)    in the case of a Securities Entitlement held through a Securities Intermediary and as to which the Entitlement Holder is the Issuer or the Zohar Subsidiary, as applicable, by (a) causing such Securities Intermediary to agree that it will comply with Entitlement Orders originated by the Trustee without further consent of the Issuer or the Zohar Subsidiary and (b) causing such agreement to remain in effect;

(v)    in the case of any Security Entitlement (other than a Security Entitlement covered by clause (iv) above), by taking reasonable steps to cause the Trustee to become the Entitlement Holder of such Security or Security Entitlement;

(vi)    in the case of general intangibles and payment intangibles (including any Participation Interest in which neither such Participation Interest nor the underlying debt are represented by Instruments) by (a) causing the filing of a Financing Statement against the Issuer in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, (b) causing the filing of a Financing Statement against the Zohar Subsidiary in the office of the Secretary of State of the State of Delaware and (c) causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands; and

(vii)    in the case of Participation Interests in which the underlying debt is represented by an Instrument or Instruments by (a) (X) causing the delivery of each such Instrument to the Custodian in the State of Illinois specially indorsed to the Trustee by an effective Indorsement and (Y) causing the Custodian to maintain (on behalf of the Trustee) continuous possession of such Instrument in the State of Illinois or (b) notifying the institution which sold the Participation Interest that it holds such Instruments for the account of the Trustee.

Without limiting the foregoing, the Custodian acknowledges that the Custodian will hold all "instruments" (as defined in each applicable Uniform Commercial Code) and "certificated securities" (as so defined) that constitute or evidence the Collateral solely on behalf and for the benefit of the Trustee.

97

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050362

(c)     If and to the extent the Bank shall act as Custodian or Securities Intermediary hereunder, it shall be entitled to and shall enjoy the protections, benefits, immunities and indemnities applicable to the Trustee set forth in Section 6.3 and Section 6.8(a)(iii) (in each case as fully as if such Section made express reference to the Custodian or Securities Intermediary). If and to the extent any Person other than the Bank shall act as Custodian or Securities Intermediary, the Trustee shall have no liability for the actions or omissions of any such Custodian or Securities Intermediary.

(d)     Notwithstanding any term herein or in the UCC to the contrary, the Custodian, Securities Intermediary and the Trustee shall not be under any obligation or duty with respect to any Collateral in the form of an Instrument or Chattel Paper, or any other document or writing, evidencing or purporting to evidence a participation or other interest in a loan, other than to receive and hold possession of such Instrument or Chattel Paper or other document or writing as is delivered or caused to be delivered to the Custodian pursuant to Section 3.3(b). Without limiting the generality of the foregoing, the Custodian, Securities Intermediary and the Trustee shall not be under any obligation to examine the terms of any related underlying instrument in order to determine the applicability of or compliance with any conditions or restriction upon transfer (including without limitation any requirement for consent or approval of any agent bank or borrower) or otherwise to determine the genuineness, completeness, validity, title, transferability or marketability thereof.

(e)     In connection with the delivery of any Unrestricted Collateral Debt Obligation, the Issuer, the Zohar Subsidiary or the Collateral Manager shall send to the Trustee and the Controlling Party a trade ticket or transmittal letter (in form and content mutually acceptable to them), which shall, at a minimum (i) specify the Purchase Price for such Unrestricted Collateral Debt Obligation, (ii) identify such Unrestricted Collateral Debt Obligation and its amount and material payment and interest rate terms, (iii) identify whether the Issuer's or the Zohar Subsidiary's interest in such Unrestricted Collateral Debt Obligation is evidenced by a promissory note, participation certificate or other instrument (and, if so, identification thereof), or (if not) description of the assignment agreement being delivered with respect to such Unrestricted Collateral Debt Obligation, and (iv) specifically list each of the instruments, agreements, documents and other items being delivered to the Trustee (its Custodian or the Security Intermediary) in connection with the delivery of such Unrestricted Collateral Debt Obligation. Each of the Trustee, the Custodian, and the Securities Intermediary shall be entitled to assume the genuineness, validity and enforceability of each such note, certificate, instrument and agreement delivered to it in connection with the delivery of an Unrestricted Collateral Debt Obligation, and to assume that each is what it purports on its face to be, and to assume the genuineness and due authority of all signatures appearing thereon.

Section 3.4.     Representations as to Collateral

(a)     The Issuer hereby represents and warrants to the Secured Parties on the Funding Date as follows (which representations (x) shall be deemed to be made as of each date of which the Issuer or the Zohar Subsidiary, as applicable, shall acquire any Collateral, (y) shall survive the execution of this Indenture and (z) shall not be waived unless the Trustee shall have received consent of the Credit Enhancer and confirmation from each Rating Agency that its then current ratings issued with respect to the Notes will not be reduced or withdrawn as a result of such waiver):

(i)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages and other

98

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050363

encumbrances, and is enforceable as such as against creditors of and purchasers from the Issuer or the Zohar Subsidiary, as applicable.

(ii)      The Issuer or the Zohar Subsidiary, as applicable, is the owner of and has good title to each item of Collateral free and clear of any liens, claims or encumbrances of any nature whatsoever except for liens (x) that are being released on the Funding Date, (y) granted pursuant to this Indenture and (z) securing judgments, but only (A) to the extent, for an amount and for a period not resulting in an Event of Default under Section 5.1(h), (B) if such liens attach after the Funding Date and after the date on which the Issuer or the Zohar Subsidiary, as applicable, acquired such Collateral and (C) if the Issuer or the Zohar Subsidiary, as applicable, has given notice of such liens to the Trustee, each Rating Agency and the Controlling Party.

(iii)      The Issuer or the Zohar Subsidiary, as applicable, has not assigned, pledged, sold, granted a security interest in or otherwise encumbered any interest in the Collateral (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released prior to the Funding Date or is being released on the Funding Date) other than interests granted pursuant to this Indenture.

(iv)      The Issuer or the Zohar Subsidiary, as applicable, has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral to the Trustee.

(v)      All Collateral has been and will have been credited to one of the Accounts (other than any such Collateral consisting of "instruments" or "general intangibles" within the meaning of the applicable Uniform Commercial Code or any such Collateral referred to in Section 3.4(b)). The securities intermediary for each Account has agreed to treat all assets credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vi)      The Issuer or the Zohar Subsidiary, as applicable, has pledged to the Trustee all of such Person's right, title and interest in and to each Collateral Debt Obligation included in the Collateral pursuant to the Granting Clause of this Indenture and has delivered each such Collateral Debt Obligation (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.3(b).

(vii)      The Collateral constitutes "general intangibles", "certificated securities", "uncertificated securities", "instruments", "securities entitlements", each within the meaning of the applicable Uniform Commercial Code, and/or such other category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under Section 3.4(b).

(viii)      The Issuer or the Zohar Subsidiary, as applicable, has caused (or will have caused within 10 days following the Funding Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law in order to perfect the security interest in the portion of the Collateral pledged to the Trustee hereunder that may be perfected by the filing of financing statements. All Financing Statements filed in connection herewith describing the Collateral contain a statement to the following effect: "A security interest in any collateral described in this financing statement will violate the rights of the secured party named herein."

99

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 106 of 447

(ix)    The Issuer or the Zohar Subsidiary, as applicable, has not authorized the filing of and is not aware of any financing statements against the Issuer or the Zohar Subsidiary, as applicable, that include a description of collateral covering the Collateral other than any financing statement (x) relating to the security interest granted to the Trustee hereunder or (y) that has been terminated on or prior to the Funding Date. As of the Funding Date, neither the Issuer nor the Zohar Subsidiary is aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against either Person.

(x)    The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer or the Zohar Subsidiary, as applicable.

(xi)    All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that constitutes or evidences the Collateral have been delivered to the Custodian, to the extent received by the Issuer or the Zohar Subsidiary, as applicable. The Issuer has received a written acknowledgment from the Custodian that the Custodian is holding all such instruments that constitute or evidence the Collateral solely on behalf and for the benefit of the Trustee. None of such instruments that constitute or evidence the Collateral has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed by the Issuer or the Zohar Subsidiary, as applicable, to any Person other than the Trustee.

(xii)    All "certificated securities" (as defined in each applicable Uniform Commercial Code) that constitute or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer or the Zohar Subsidiary, as applicable, registered in the name of the Custodian or indorsed to the Custodian. The Issuer has received a written acknowledgment from the Custodian that the Custodian is holding all such certificated securities that constitute or evidence the Collateral solely on behalf and for the benefit of the Trustee.

(xiii)    The Issuer or the Zohar Subsidiary, as applicable, has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that constitute or evidence the Collateral to be registered in the name of the Custodian.

(xiv)    The Accounts are not in the name of any Person other than the Issuer, the Zohar Subsidiary or the Trustee. Neither the Issuer nor the Zohar Subsidiary has consented to the securities intermediary of any Account to comply with instructions of any Person other than the Trustee.

(xv)    Upon Grant by the Issuer or the Zohar Subsidiary, as applicable, the Trustee has a first priority perfected security interest in the Collateral.

(b)    Without limiting the obligations of the Issuer under Section 10.2(f), if the Issuer or the Zohar Subsidiary acquires Collateral that is not "general intangibles", "certificated securities", "uncertificated securities", "instruments", or "securities entitlements", each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer or the Zohar Subsidiary, as applicable, has complied with its obligations under this Section 3.4(b), then on or prior to the date on which the Issuer or the Zohar Subsidiary, as applicable, acquires such Collateral, the Issuer or the Zohar Subsidiary, as applicable (or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary) shall notify Standard & Poor's and the Trustee (for the benefit of the Secured Parties) of its acquisition or intended acquisition of such

100

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Collateral and the Issuer or the Zohar Subsidiary, as applicable, shall represent to Standard & Poor's and the Secured Parties as to the category of such Collateral under the applicable Uniform Commercial Code and shall make such further representations as to the perfection and priority of the security interest in such Collateral Granted hereunder as shall be acceptable to Standard & Poor's and the Controlling Party. Notwithstanding anything contained herein to the contrary, the parties acknowledge that the Collateral pledged hereunder may consist of assets that are subordinated to the interests of other parties.

Section 3.5.    <u>Representations and Warranties of the Co-Issuers</u>

The Issuer and the Co-Issuer represent and warrant, each in respect of itself only, to each Noteholder on the date hereof and/or on the Funding Date, as applicable, as follows:

(a)    <u>Organization</u>. The Issuer is an exempted company with limited liability duly organized and validly existing and in good standing under the laws of the Cayman Islands, and the Co-Issuer is a corporation duly organized and validly existing and in good standing under the laws of the State of Delaware.

(b)    <u>Authorization</u>. Each of the Issuer and the Co-Issuer has the power to execute and deliver this Indenture and the other Transaction Documents to which it is a party and to perform its obligations under this Indenture and the other Transaction Documents to which it is a party and has taken all necessary action to authorize such execution, delivery and performance.

(c)    <u>No Conflict</u>. The execution, delivery and performance of this Indenture and the other Transaction Documents to which the Issuer or the Co-Issuer is a party by the Issuer and the Co-Issuer, respectively, do not violate or conflict with any law, rule or regulation applicable to the Issuer or the Co-Issuer, any provision of the organizational documents of the Issuer or the Co-Issuer, any order or judgment of any court or other governmental authority applicable to the Issuer or the Co-Issuer, any of the Issuer's or the Co-Issuer's assets or any contractual restriction binding on or affecting the Issuer or the Co-Issuer or any of such assets.

(d)    <u>Consents</u>. All governmental and other third-party consents that are required to have been obtained by the Issuer or the Co-Issuer with respect to the execution, delivery and performance of this Indenture and the other Transaction Documents to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)    <u>Enforceability</u>. This Indenture and the other Transaction Documents to which it is a party constitute the legal, valid and binding obligations of the Issuer and the Co-Issuer, enforceable against the Issuer and the Co-Issuer in accordance with their respective terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a Proceeding in equity or at law).

(f)    <u>Use of Proceeds; Margin Regulations</u>. All proceeds of the advances will be used by the Issuer only in accordance with the provisions of this Indenture and the other Transaction Documents to which it is a party (including, without limitation, Section 7.8(a)(v)). No part of the proceeds of any advance will be used, directly or indirectly, (i) to extend "purpose credit" within the meaning given to such term in Regulation U or (ii) to purchase, carry or otherwise acquire, or refinance any indebtedness incurred to purchase, carry or otherwise acquire, any Margin Stock (it being understood that nothing in this clause (f) shall prohibit the Issuer or the Zohar Subsidiary

101

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050366

from exchanging any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation or Equity Security for Margin Stock in connection with a workout or enforcement of such obligation or Equity Security if such exchange does not violate Regulation U (and, if any such exchange in fact violates Regulation U, then the Collateral Manager shall cause the Issuer to sell such Margin Stock within 90 days of the date on which the Collateral Manager first becomes aware of such violation)).

(g)     Investment Company Act. Assuming the accuracy of the Noteholder's representations set forth in the Transaction Documents to which it is a party (or otherwise deemed made pursuant to the Transaction Documents), none of the Issuer, the Co-Issuer or the Zohar Subsidiary is an investment company required to be registered under the Investment Company Act.

(h)     Securities Act. Assuming the accuracy of the Note Purchasers' representations set forth in the Transaction Documents to which it is a party (or otherwise deemed made pursuant to the Transaction Documents), no offer or sale of any of the Notes or the Preference Shares of the Issuer or the Co-Issuer made in accordance with the Transaction Documents is subject to the registration requirements of the Securities Act.

(i)     Zohar Subsidiary. The Issuer has been formed for purposes of acquiring Collateral Debt Obligations and for the other purposes contemplated by the Transaction Documents, and has not been formed primarily for the purpose of owning the Zohar Subsidiary.

## ARTICLE 4

## SATISFACTION AND DISCHARGE

Section 4.1.     Satisfaction and Discharge of Indenture

This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Notes and the Credit Enhancement except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A Additional Interest, any Class A-1 Additional Amounts, any Class A Redemption Break Funding Costs and rights of the Credit Enhancer to receive payments of Credit Enhancement Liabilities and Credit Enhancement Premium, in each case as provided herein (including, without limitation, as provided in the Priority of Payments and Article 13), (iv) the rights, obligations and immunities of the Trustee hereunder, (v) the rights and immunities of the Collateral Manager hereunder and under the Management Agreement and (vi) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them; and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered (other than (a) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.5 and (b) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3) have been delivered to the Trustee for cancellation; or

102

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050367

(ii)     all Notes not theretofore delivered to the Trustee for cancellation (a) have become due and payable, or (b) will become due and payable at their Stated Maturity within one year, or (c) are to be called for redemption pursuant to Section 9.1 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Co-Issuers pursuant to Section 9.3 and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or noncallable direct obligations of the United States in an amount sufficient, as verified by a firm of nationally recognized Independent certified public accountants, to pay and discharge the entire indebtedness on all Notes not theretofore delivered to the Trustee for cancellation, including all principal, interest (including Defaulted Interest and interest thereon) and Class A-1 Commitment Fees, Class A-3 Commitment Fees, Class A-1 Additional Amounts and Class A Additional Interest accrued to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or the Redemption Date, as the case may be, and any outstanding Credit Enhancement Liabilities or Credit Enhancement Premium; provided that (x) such obligations are entitled to the full faith and credit of the United States and (y) this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

(b)     the Issuer has paid or caused to be paid all other sums payable hereunder (including all Class A-1 Additional Amounts, Class A Additional Interest and all amounts due and owing under each Hedge Agreement, each Note Purchase Agreement, the Collateral Administration Agreement, the Administration Agreement, the Credit Enhancement Agreement and the Management Agreement) and no other amounts will become due and payable by the Co-Issuers; and

(c)     the Co-Issuers have delivered to the Trustee and the Credit Enhancer an Officer's certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

The foregoing provisions of this Section 4.1 notwithstanding, amounts owing in respect of Notes that shall have been paid, or for which provision shall have been made, by a payment from the Credit Enhancer pursuant to the Credit Enhancement Agreement shall continue to be Outstanding under this Indenture, and the conditions set forth in this Section 4.1 shall not be satisfied and the Credit Enhancer shall become the Holder of the Class A-1 Notes and the Class A-2 Notes for all purposes of this Indenture; provided that if the Issuer shall make payment to the Credit Enhancer in reimbursement of any payments of principal of and interest on the Class A-1 Notes, the Class A-2 Notes and any outstanding Credit Enhancement Liabilities and Credit Enhancement Premium, the obligation of the Co-Issuers with respect to payment of such Notes shall cease to the extent of such reimbursement, and if such reimbursement shall be sufficient to pay the principal of and interest on such Notes and any outstanding Credit Enhancement Liabilities and Credit Enhancement Premium, such Notes shall no longer be deemed Outstanding for purposes of this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Collateral Manager, the Credit Enhancer and, if applicable, the Noteholders, as the case may be, under Sections 2.6, 4.2, 5.9, 5.18, 6.7, 6.8, 7.1 and 7.3 shall survive.

Section 4.2.     Application of Trust Money

All Monies deposited with the Trustee pursuant to Section 4.1 for the payment of principal of and interest on the Notes, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee

103

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture
PP050368

and amounts payable pursuant to this Indenture, each Note Purchase Agreement, the Credit Enhancement Agreement, each Hedge Agreement, the Collateral Administration Agreement, the Administration Agreement and the Management Agreement shall be held in a segregated account in trust and applied by it in accordance with the provisions of this Indenture, including, without limitation, the Priority of Payments, for the payment either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the respective amounts in respect of which such Money has been deposited with the Trustee.

Section 4.3.    Repayment of Monies Held by Paying Agent

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

ARTICLE 5

EVENTS OF DEFAULT; REMEDIES

Section 5.1.    Events of Default

"Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    default in the payment of (i) any Credit Enhancement Premium, (ii) any interest on any Class A-1 Note (excluding any such interest constituting Class A Additional Interest or Class A-1 Additional Amounts, but including any such interest constituting Senior Class A-1 Additional Amounts) or any Class A-1 Commitment Fee, (iii) any interest on any Class A-2 Note (excluding any such interest constituting Class A Additional Interest) or (iv) any interest on any Class A-3 Note (excluding any such interest constituting Class A Additional Interest) or any Class A-3 Commitment Fee, when the same becomes due and payable (and in the case of clauses (ii), (iii) and (iv), determined without giving effect to any such payments made with proceeds of drawings under the Credit Enhancement), which default in each case shall continue for a period of three Business Days;

(b)    default in the payment of principal of any Note (determined without giving effect to any payments in respect of principal made with proceeds of drawings under the Credit Enhancement) when the same becomes due and payable, at its Stated Maturity or Redemption Date;

(c)    failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and continuation of such failure for a period of two Business Days;

(d)    either of the Co-Issuers or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

104

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050369

(e)      default in the performance, or breach, of any covenant or agreement of any Zohar Obligor in this Indenture (other than the covenant to satisfy any of the Collateral Quality Tests, any of the Class A Coverage Tests, or the failure of any Zohar Obligor to comply with any other covenant or agreement for which another remedy or consequence is provided by this Section 5.1) or in any Note Purchase Agreement, or the failure of any representation or warranty of any Zohar Obligor made in this Indenture, in any Note Purchase Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith or therewith to be correct in any material respect when made, and the continuation of such default, breach or failure for a period of 30 days after any of the Issuer, the Co-Issuer, the Zohar Subsidiary or the Collateral Manager have actual knowledge thereof or after notice thereof shall have been given by registered or certified mail or overnight courier, to the Zohar Obligors and the Collateral Manager by the Trustee or to the Co-Issuers, the Collateral Manager and the Trustee by the Controlling Party, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; provided, however, that such 30 day period shall (with the consent of the Controlling Party (such consent not to be unreasonably withheld or delayed)) be increased to 60 days if such Zohar Obligor is using commercially reasonable good faith efforts to cure such default, breach or failure;

(f)      an involuntary Proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Zohar Obligor or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Zohar Obligor or for a substantial part of its assets, and, in any such case, such Proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or the Issuer or its assets shall become subject to any event that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(g)      any Zohar Obligor shall (i) voluntarily commence any Proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership, liquidation or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any Proceeding or petition described in Section 5.1(f), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, liquidator, sequestrator, conservator or similar official for such Zohar Obligor or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such Proceeding, (v) make a general assignment for the benefit of creditors, (vi) fail generally, or admit in writing such Zohar Obligor's inability to pay, its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing; or the Issuer or its assets shall cause or become subject to any event with respect to the Issuer that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(h)      the rendering of one or more final judgments against any Zohar Obligor which exceed, in the aggregate, U.S.$5,000,000 and which remain unstayed, undischarged and unsatisfied for 30 days after such judgment(s) becomes nonappealable, unless adequate funds have been reserved or set aside for the payment thereof, and unless the Controlling Party shall otherwise consent in writing to the amount of funds so reserved or set aside;

(i)      other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security, Eligible Investment or any Hedge Agreement, the imposition of

105

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050370

taxes, fees, assessments or other similar charges on any Zohar Obligor in an aggregate amount in any twelve-month period in excess of U.S.$1,000,000, unless the Controlling Party shall otherwise consent in writing;

(j)    [reserved];

(k)    on any Measurement Date, on or after the Ramp Up End Date, the Class A Overcollateralization Ratio shall be less than the Adjusted Event of Default Overcollateralization Ratio;

(l)    the occurrence of an "event of default" under (and as defined in) the Credit Enhancement Agreement and written notification of such occurrence by the Credit Enhancer to the Trustee;

(m)    more than 10% of the Collateral securing all of the Notes ceases to be subject to the lien of this Indenture;

(n)    the balance of the Cash Reserve Account shall be less than U.S.$3,000,000; or

(o)    no Rating Confirmation with respect to the Class A Notes has been obtained on or prior to the 30th day after the second Payment Date.

If either of the Co-Issuers obtains knowledge, or has reason to believe, that an Event of Default shall have occurred and is continuing, such of the Co-Issuers shall, within three Business Days, notify the Trustee, the Collateral Manager, the Noteholders, each Hedge Counterparty, the Credit Enhancer and each Rating Agency in writing.

Section 5.2.    Acceleration of Maturity; Rescission and Annulment

(a)    If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(f) or 5.1(g)), (i) the Trustee (at the direction of the Controlling Party) by notice to the Co-Issuers shall or (ii) the Controlling Party, by notice to the Co-Issuers and the Trustee, may (A) declare the Outstanding principal of all the Notes to be immediately due and payable, and upon any such declaration such Outstanding principal, together with all accrued and unpaid interest thereon, all accrued and unpaid Class A-1 Commitment Fees, all accrued and unpaid Class A-3 Commitment Fees, all accrued and unpaid Class A-1 Additional Amounts, all accrued and unpaid Class A Additional Interest, all accrued and unpaid Class A Redemption Break Funding Costs and all other amounts payable hereunder and under the Credit Enhancement Agreement and each Note Purchase Agreement, shall become immediately due and payable and/or (B) terminate the Reinvestment Period. The acceleration of the Notes pursuant to this Section 5.2(a) shall not accelerate the obligations of the Credit Enhancer under the Credit Enhancement. If an Event of Default specified in Section 5.1(b) occurs and is continuing solely with respect to a default in the payment of any principal of any Class B Note at a time when the Class B Notes are not the most senior Class of Notes Outstanding, neither the Trustee nor the Holders of the Class B Notes shall have the right to exercise any remedies with respect thereto under this Indenture or otherwise, including without limitation the right to declare such principal and other amounts to be immediately due and payable. If an Event of Default specified in Section 5.1(b) occurs and is continuing solely with respect to a default in the payment of any principal of any Class C Note at a time when the Class C Notes are not the most senior Class of Notes Outstanding, neither the Trustee nor the Holders of the Class C Notes shall have the right to exercise any remedies with respect thereto under this Indenture or otherwise, including without limitation the right to declare such principal and other amounts to be

106

NY3:#7347151v22<br>CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP<br>ON BEHALF OF PATRIARCH PARTNERS LLC

immediately due and payable. If an Event of Default specified in Section 5.1(f) or (g) occurs, all unpaid principal of the Notes, together with all accrued and unpaid interest thereon, all accrued and unpaid Class A-1 Commitment Fees, all accrued and unpaid Class A-3 Commitment Fees, all accrued and unpaid Class A-1 Additional Amounts, all accrued and unpaid Class A Additional Interest and all other amounts payable hereunder and under the Credit Enhancement Agreement and each Note Purchase Agreement, shall automatically become due and payable without any declaration or other act on the part of the Trustee, the Controlling Party or any Noteholder and the Reinvestment Period shall automatically terminate. The Holders of the Preference Shares shall not have any creditors' rights against the Issuer and shall not have the right to determine the remedies to be exercised under this Indenture.

(b)    At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as hereinafter provided in this Article 5, the Controlling Party, by written notice to the Co-Issuers and the Trustee, may (and the Trustee, at the direction of the Controlling Party, shall) rescind and annul such declaration and its consequences if:

(i)    the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay (in accordance with the Priority of Payments):

(A)    all overdue installments of principal of and interest on the Class A Notes (including Defaulted Interest and any interest thereon but excluding any such interest constituting Class A Additional Interest) and all overdue Class A-1 Commitment Fees, Class A-3 Commitment Fees, Senior Class A-1 Additional Amounts or Class A Redemption Break Funding Costs; or, after the Class A Notes have been paid in full (without giving effect to the payment of applicable Insured Payments paid with proceeds from the Credit Enhancement), all overdue installments of principal of the Class B Notes; or, after the Class B Notes have been paid in full, all overdue installments of principal of the Class C Notes;

(B)    interest upon Defaulted Interest at the applicable Note Interest Rates (in the case of the Class A Notes) (to the extent that the payment thereof is lawful);

(C)    all Credit Enhancement Liabilities and Credit Enhancement Premium; and

(D)    all unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(ii)    the Trustee has determined that all Events of Default, other than the nonpayment of the principal of or interest on the Notes, Class A-1 Commitment Fees or Class A-3 Commitment Fees that have become due solely by such acceleration, have been cured and the Controlling Party by written notice to the Trustee has agreed with such determination or waived such requirement as provided in Section 5.14.

Any Hedge Agreement in place at the time of any declaration of an acceleration shall remain in place until such declaration is no longer capable of being rescinded or annulled and liquidation of the Collateral has commenced.

107

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050372

At any such time as the Trustee shall rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5; provided that, if such preservation of the Collateral is rescinded pursuant to Section 5.5, the Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this Section 5.2(b). No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3.    Collection of Indebtedness and Suits for Enforcement by Trustee

The Co-Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest on any Class A Note, Class A-1 Commitment Fee, Class A-3 Commitment Fee, Class A Additional Interest, Class A-1 Additional Amounts, Class A Redemption Break Funding Costs, the payment of principal of any Class B Note or the payment of principal of any Class C Note, the applicable Co-Issuers will, upon demand of the Trustee or any affected Noteholder, pay to the Trustee, for the benefit of such Noteholder, the whole amount, if any, then due and payable on such Note for principal, interest, Class A-1 Commitment Fee, Class A-3 Commitment Fee, Class A Additional Interest and Class A-1 Additional Amounts, Class A Redemption Break Funding Costs, as applicable, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, Class A-1 Commitment Fee, Class A-3 Commitment Fee, Class A Additional Interest, Class A-1 Additional Amounts, Class A Redemption Break Funding Costs and all other amounts owing to the Holders of the Notes and the Credit Enhancer under this Indenture, under the Credit Enhancement Agreement and under the Note Purchase Agreements (each as specified in the Priority of Payments), at the applicable Note Interest Rate and all other amounts due under this Indenture and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, the Credit Enhancer and such Noteholder and their respective agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may (with the consent of the Controlling Party) institute a Proceeding for the collection of the sums so due and unpaid, and shall, upon the direction by the Controlling Party, prosecute such Proceeding to judgment or final decree, and shall, upon the direction by the Controlling Party, enforce the same against the Co-Issuers or any other obligor upon the Notes and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may (with the consent of the Controlling Party) proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings as the Trustee shall deem most effectual (if no direction by the Controlling Party is received by the Trustee) or as the Trustee may be directed by the Controlling Party, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power pledged herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to any Zohar Obligor or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer, the Zohar Subsidiary or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer, the Zohar Subsidiary or other

108

Indenture
PP050373

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

obligor upon the Notes, or the creditors or property of the Issuer, the Co-Issuer, the Zohar Subsidiary or such other obligor, the Trustee, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)    to file and prove a claim or claims for the whole amount of principal, interest, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, Class A Additional Interest, Class A-1 Additional Amounts and Class A Redemption Break Funding Costs owing and unpaid in respect of the Notes and all other amounts owing to the Holders of the Notes hereunder and under the Note Purchase Agreements and the Credit Enhancement Agreement upon direction by the Controlling Party or a Majority of each Class of Notes, and to file such other papers or documents and take such other actions (such as sitting on a committee of creditors) as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of the Noteholders allowed in any Proceedings relative to the Issuer, the Co-Issuer, the Zohar Subsidiary or other obligor upon the Notes or to the creditors or property of the Issuer, the Co-Issuer, the Zohar Subsidiary or such other obligor;

(b)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes (in the case of the Class A-1 Notes and the Class A-2 Notes, subject to the consent of the Credit Enhancer, so long as no Credit Enhancement Event has occurred and is continuing), upon the direction of such Holders, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(c)    to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on behalf of the Secured Parties in accordance with the Priority of Payments; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Secured Party, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any action or Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements and compensation of the Trustee, each

109

Indenture
PP050374

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

predecessor trustee and their respective agents and attorneys and counsel, shall be for the ratable benefit of the Secured Parties payable to the Secured Parties in accordance with the Priority of Payments.

Without prejudice to its rights hereunder, when the Trustee incurs expenses or renders services after an Event of Default specified in Section 5.1(f) or (g) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy law.

In any Proceedings brought by the Trustee on behalf of the Secured Parties, the Trustee shall be held to represent all the Secured Parties to which amounts are owing by the Issuer or the Co-Issuer under this Indenture, provided it shall not have any fiduciary obligations to any Secured Parties other than a Noteholder.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Sections 5.4 and 5.5(a).

Section 5.4.    Remedies

(a)    If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may after notice to the Noteholders (and with the consent of the Controlling Party), and shall, upon direction by the Controlling Party (and upon offer of reasonable indemnity against costs, expenses and liabilities to be incurred in connection with such direction), to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, the Credit Enhancement or the Note Purchase Agreements, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral Monies adjudged due;

(ii)    sell all or any portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Sections 5.5 and 5.17;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)    exercise any other rights and remedies that may be available at law or in equity;

provided that:

(A)    in the event that the Controlling Party is the Credit Enhancer and the Controlling Party elects to direct any sale described in clause (a)(ii) above, the Controlling Party shall provide at least five Business Days' prior notice of such sale to the Trustee and to each Holder of a Class B Note and each Holder of a Class C Note (describing the Collateral to be sold and the sale price therefor in reasonable detail), and any Holder of a Class B Note or Class C Note may

110

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7347151v22

Indenture
PP050375

arrange for a Person to purchase such Collateral, within three Business Days of such notice, at a price equal to or more favorable to the Issuer than the price described in such notice; and

(B)    the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

To the extent that, subject to the terms of this Article 5, the Trustee is acting other than at the direction of the Controlling Party, the Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest on the Notes and the Class A-1 Commitment Fee and the Class A-3 Commitment Fee, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in Section 5.1(e) shall have occurred and be continuing, the Trustee may (with the consent of the Controlling Party), and at the request of the Controlling Party shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such Proceeding.

(c)    Upon any sale, whether made under the power of sale hereby given or by virtue of Proceedings, any Noteholder or Noteholders or other Secured Party may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale hereby given or by virtue of Proceedings, the receipt of the Trustee, or of the Officer making a sale under Proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase Money, and such purchaser or purchasers shall not be obliged to confirm the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of Proceedings, shall bind the Zohar Obligors, the Trustee, the Noteholders and the other Secured Parties, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or the Zohar Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under federal or state bankruptcy or similar laws. Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or the Zohar Subsidiary or (b) any involuntary insolvency Proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer, the Co-Issuer or the Zohar Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar Proceeding.

111

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050376

Section 5.5.    Preservation of Collateral

(a)    If an Event of Default shall have occurred and be continuing, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of Articles 10, 12 and 13 unless either:

(i)    the Trustee determines in consultation with the Collateral Manager that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation including costs of its agents and advisors) would be sufficient to discharge in full (in accordance with the Priority of Payments) the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and interest thereon in respect of the Class A Notes), the Class A-1 Commitment Fee, the Class A-3 Commitment Fee and all other amounts owing to the Holders under this Indenture and under the Note Purchase Agreements (as specified in the Priority of Payments), due and unpaid Administrative Expenses, all amounts owing by the Issuer to the Credit Enhancer under the Credit Enhancement Agreement and the Controlling Party agrees with such determination; or

(ii)    the Controlling Party directs the sale and liquidation of the Collateral (or any portion thereof).

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer and the Controlling Party. So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral securing the Notes if prohibited by applicable law.

(c)    For the purposes of making the determinations required pursuant to Section 5.5(a)(i), the Trustee may rely on the advice of nationally recognized accountants, investment bankers or other Persons specified in Section 6.3(c) and shall apply the standards set forth in Section 9.1(b) (assuming for this purpose that the Total Redemption Amount referred to in said Section 9.1(b) is the required amount specified in Section 5.5(a)(i)). In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Pledged Obligations and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, the Controlling Party, the Collateral Manager and the Co-Issuers a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than 10 days after making such determination but in any case prior to such sale. The Trustee shall make the determinations required by Section 5.5(a)(i) as soon as reasonably practicable but in any event within 45 days after an Event of Default and at the request of the Controlling Party at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i). In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture (and shall upon receipt thereof provide a copy to the Controlling Party). In determining whether the Holders of the requisite Aggregate

112

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050377

Outstanding Amount of the Class A Notes, the Class B Notes or the Class C Notes have given any direction or notice, any Holder of a Class of Notes who is also a Holder of another Class of Notes or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

Section 5.6.    Trustee May Enforce Claims Without Possession of Notes

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7.

Section 5.7    Application of Money Collected

Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may upon such collection then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied, subject to Section 13.1 and in accordance with the provisions of Sections 11.1 and 11.2, at the date or dates fixed by the Trustee.

Section 5.8.    Limitation on Suits

Subject to the proviso in Section 5.4(a), no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    either (i) such Holder has previously given to the Trustee written notice of an Event of Default and such Holder has obtained the prior consent of the Controlling Party to the institution of such Proceeding; or (ii) except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the then most senior Class of Notes shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(b)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(c)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Controlling Party;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more Persons that could constitute the Controlling Party, each singly not constituting the Controlling Party, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

113

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050378

Section 5.9.    Unconditional Rights of Noteholders to Receive Principal, Interest, Class A-1 Commitment Fee, Class A-3 Commitment Fee and Certain Other Amounts

(a)    Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i) and the Priority of Payments), the Holder of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class A Note, the Class A-1 Commitment Fee or the Class A-3 Commitment Fee, Class A-1 Additional Amounts, Class A Additional Interest and Class A Redemption Break Funding Costs, each as applicable, as the same become due and payable in accordance with the Priority of Payments and, subject to the provisions of Section 5.8, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Holders of Class A-1 Notes shall have no right to institute Proceedings for the enforcement of any such payment of amounts constituting Class A-1 Additional Amounts (other than Senior Class A-1 Additional Amounts) until such time as no Class A Notes remain Outstanding (other than with respect to such Class A-1 Additional Amounts or Class A Additional Interest) and all Class A-1 Commitments and all Class A-3 Commitments have expired, terminated or been reduced to zero and the Credit Enhancement Premium and the Credit Enhancement Liabilities have been irrevocably paid in full, which right to institute Proceedings shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder and the Credit Enhancer (so long as no Credit Enhancement Event has occurred and is continuing).

(b)    Notwithstanding any other provision in this Indenture (but subject to Sections 2.6(i) and 7.13(b)), the Holder of any Class B Note shall have the right, which is absolute and unconditional, to receive payment of the principal of such Class B Note as such principal becomes due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class B Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding and the Credit Enhancer has been irrevocably paid in full all outstanding Credit Enhancement Liabilities and Credit Enhancement Premium (and all Class A-1 Commitments and Class A-3 Commitments shall have expired, terminated or been reduced to zero), which right to institute Proceedings shall be subject to the provisions of Section 5.8 and this Section 5.9, and shall not be impaired without the consent of any such Holder.

(c)    Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i)), the Holder of any Class C Note shall have the right, which is absolute and unconditional, to receive payment of the principal of such Class C Note as such principal becomes due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class C Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding and the Credit Enhancer has been irrevocably paid in full all outstanding Credit Enhancement Liabilities and Credit Enhancement Premium (and all Class A-1 Commitments and Class A-3 Commitments shall have expired, terminated or been reduced to zero) and no Class B Note remains Outstanding, which right to institute Proceedings shall be subject to the provisions of Section 5.8 and this Section 5.9, and shall not be impaired without the consent of any such Holder.

Section 5.10.    Restoration of Rights and Remedies

If the Trustee, the Credit Enhancer or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee, the Credit Enhancer or to such Noteholder, then and in every such case the Zohar Obligors, the Credit Enhancer, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively

114

NY3:#7347151v22<br>CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP<br>ON BEHALF OF PATRIARCH PARTNERS LLC

to their former positions hereunder, and thereafter all rights and remedies of the Trustee, the Credit Enhancer and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.11.    Rights and Remedies Cumulative

Except as expressly set forth in this Indenture, no right or remedy herein conferred upon or reserved to the Trustee, to the Noteholders or to the Credit Enhancer is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise, and the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12.    Delay or Omission Not Waiver

No delay or omission of the Trustee, of any Noteholder or of the Credit Enhancer to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article 5 or by law to the Trustee, to the Noteholders or to the Credit Enhancer may be exercised from time to time, and as often as may be deemed expedient, by the Trustee, by the Noteholders or by the Credit Enhancer, as the case may be.

Section 5.13.    Control by Controlling Party

Notwithstanding any other provision of this Indenture, the Controlling Party shall have the right to cause the institution of (or, subject to the proviso to Section 5.4(a), cause the discontinuance of the institution of) and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee; provided that:

(a)    such direction shall not conflict with any rule of applicable law;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; provided that, subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received reasonably satisfactory indemnity against such liability as set forth below);

(c)    the Trustee shall have been provided with indemnity reasonably satisfactory to the Trustee; and

(d)    any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5.

Section 5.14.    Waiver of Past Defaults

Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article 5, the Controlling Party (subject to the proviso to Section 5.4(a)) may on behalf of the Secured Parties waive any past Default and its consequences, except a Default:

(a)    in the payment of the principal of any Note or in the payment of interest on any Class A Note (including Defaulted Interest and any interest thereon but excluding any such

115

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

interest constituting Class A Additional Interest), the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, Senior Class A-1 Additional Amounts and Class A Redemption Break Funding Costs; or

(b)    in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected thereby; or

(c)    arising under Section 5.1(f) or 5.1(g).

In the case of any such waiver, the Zohar Obligors, the Trustee, the Credit Enhancer and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15.    Undertaking for Costs

All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Trustee, to any suit instituted by the Controlling Party, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% of the Aggregate Outstanding Amount of the then most senior Class of Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16.    Waiver of Stay or Extension Laws

The Zohar Obligors covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Zohar Obligors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein pledged to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17.    Sale of Collateral

(a)    The power to effect any sale (a "Sale") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid. The Trustee shall, upon direction of the

116

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Controlling Party and upon notice to the Noteholders, from time to time postpone any Sale by announcement made at the time and place of such Sale; provided that, if the Sale is rescheduled for a date more than five Business Days (in the case of a determination applying the standards set forth in Section 9.1(b)(ii)(A)) or 10 Business Days (in the case of a determination applying the standards set forth in Section 9.1(b)(ii)(B)) after the date of the determination by the Trustee pursuant to Section 5.5(a)(i), such Sale shall not occur unless and until the Trustee has again made the determination required by Section 5.5(a)(i). The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; provided that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)    The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7. The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral consists of securities not registered under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of the Controlling Party, seek a no-action position from the United States Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities.

(d)    The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer and the Zohar Subsidiary to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18.    Action on the Notes

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of any Zohar Obligor.

ARTICLE 6

THE TRUSTEE

Section 6.1.    Certain Duties and Responsibilities

(a)    Except during the continuance of an Event of Default:

117

NY3:#7347151v22

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050382

Respondents' Exhibit 8    pg. 124 of 447

(i)      the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not conform. If a corrected form shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders and the Controlling Party.

(b)      In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Controlling Party, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(c)      No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)      this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(ii)      the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)      the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of any Zohar Obligor or the Collateral Manager in accordance with this Indenture and/or the Controlling Party relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)      no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it (if the amount of such funds or risk or liability does not exceed the amount payable to the Trustee pursuant to Section 11.1(a)(i)(B) net of the amounts specified in Section 6.8(a)(i), the Trustee shall be deemed to be reasonably assured of such repayment) unless such risk or liability relates to performance of its ordinary services, including ordinary services under Article 5, under this Indenture.

118

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050383

(d)     For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1(d), 5.1(f), 5.1(g), 5.1(j) or 5.1(m) or any Default described in Section 5.1(e), 5.1(h) or 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the Corporate Trust Office. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section.

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

(f)     The Trustee shall, upon reasonable (but no less than three Business Days') prior written notice to the Trustee, permit any representative of a Holder of a Note or of the Credit Enhancer, during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee relating to the Notes, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder or the Credit Enhancer) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Notes.

Section 6.2.     Notice of Default

Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall fax (where a fax number has been provided to the Trustee) and mail to the Credit Enhancer, the Collateral Manager, each Rating Agency (for so long as any Class of Notes is Outstanding), the Preference Share Paying Agent and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

Section 6.3.     Certain Rights of Trustee

Except as otherwise provided in Sections 6.1, 8.1 and 8.2:

(a)     the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, email, request, direction, consent, order, note or other paper or document reasonably believed by it to be genuine and to have been signed, sent or presented by the proper party or parties;

(b)     any request or direction of any Zohar Obligor mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cashflows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other

119

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050384

Persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders or the Credit Enhancer pursuant to this Indenture, unless such Noteholders or the Credit Enhancer shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, email, request, direction, consent, order, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of any Class or of either Rating Agency or of the Credit Enhancer, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Collateral Manager, to examine the books and records of the Co-Issuers and the Collateral Manager relating to the Notes and the Collateral, personally or by agent or attorney at a time acceptable to the Co-Issuers or the Collateral Manager in their reasonable judgment during normal business hours; provided that the Trustee shall, and shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law by any regulatory authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; provided that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Trustee) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)    the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of an Event of Default, subject to Section 6.1(b), prudently believes to be authorized or within its rights or powers hereunder;

(i)    the Trustee shall not be responsible for the accuracy of the books or records of, or for any acts or omissions of, the depository, any Transfer Agent (other than the Bank acting in such capacity), any Securities Intermediary (other than the Bank acting in such capacity) any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Bank acting in such capacity);

(j)    in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account (and, if otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder);

(k)    the Trustee shall not be liable for the actions or omissions of the Collateral Manager, and without limiting the foregoing, the Trustee shall not (except to the extent, if at all,

120

NY3:#7347151.v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050385

otherwise expressly stated in this Indenture) be under any obligation to monitor, evaluate or verify compliance by the Collateral Manager with the terms of this Indenture or the Management Agreement, or to verify or independently determine the accuracy of information received by it from the Collateral Manager (or from any selling institution, agent bank, trustee or similar source) with respect to the Collateral;

(l)      subject to Section 6.1(d), the Trustee shall not be deemed to have notice or knowledge of any matter unless a Trustee Officer assigned to and working in the Trustee's corporate trust division has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer or this Indenture (and whenever reference is made in this Indenture to a Default or an Event of Default, such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph);

(m)      notwithstanding anything herein to the contrary, the Trustee shall not be deemed to be acting as a fiduciary for the benefit of any Hedge Counterparty or the Credit Enhancer; and

(n)      the Trustee shall not be under any obligation or duty to become a party to, or to review or evaluate the terms of (or have responsibility for the sufficiency of), any Hedge Agreement or the eligibility of any Hedge Counterparty.

Section 6.4.    Authenticating Agents

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5, and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.4 shall be deemed to be the authentication of Notes "by the Trustee."

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving 30 days' prior written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers. Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto and the Trustee shall be entitled to be reimbursed for such payments, subject to Section 6.8. The provisions of Sections 2.8, 6.5 and 6.6 shall be applicable to any Authenticating Agent.

121

Indenture
PP050386

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 6.5.    Not Responsible for Recitals or Issuance of Notes

The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Co-Issuers, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of the proceeds of the Notes or any Money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.6.    May Hold Notes

The Trustee, any Paying Agent, the Note Registrar, the Class A-1 Note Agent, the Class A-3 Note Agent or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and, may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, Note Registrar, Class A-1 Note Agent, Class A-3 Note Agent or such other agent.

Section 6.7.    Money Held in Trust

Money held by the Trustee hereunder shall be held in trust in segregated accounts. The Trustee shall be under no liability for interest on any Money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

Section 6.8.    Compensation and Reimbursement

(a)    The Issuer agrees (subject to the Priority of Payments):

(i)    to pay the Trustee on each Payment Date the Trustee's fees pursuant to the Trustee Fee Letter as compensation for the Trustee's ordinary services, including custodial services, rendered by it hereunder (which compensation shall not be limited by any mandatory provision of law in regard to the compensation of a trustee of an express trust);

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 6.3(c), 10.13 or 10.15, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) but only to the extent any such securities transaction charges have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Collateral Manager;

(iii)    to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance

122

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050387

or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder; and

      (iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.14.

      (b)    The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from Moneys on deposit in the Payment Account for the Notes pursuant to Section 11.1.

      (c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against any Zohar Obligor for the non-payment to the Trustee of any amounts provided by this Section 6.8, this Indenture or the other Transaction Documents until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.

      (d)    The Trustee shall have a lien ranking senior to that of the Noteholders upon all property and funds held or collected as part of the Collateral to secure payment of amounts payable to the Trustee under this Section 6.8 not to exceed such amount with respect to any Payment Date; provided that (a) the Trustee shall not institute any Proceeding for enforcement of such lien except in connection with an action pursuant to Section 5.3 or 5.4 for the enforcement of the lien of this Indenture for the benefit of the Secured Parties and (b) the Trustee may only enforce such a lien in conjunction with the enforcement of the rights of the Secured Parties in the manner set forth in Section 5.4.

      The indemnification provided to the Trustee hereunder shall survive the removal or resignation of the Trustee hereunder and the termination of the Indenture.

      The Trustee shall, subject to the Priority of Payments, receive amounts pursuant to this Section 6.8 and Sections 11.1(a)(i) and (ii) and Section 11.2(a) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default. Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder. No direction by the Controlling Party shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

Section 6.9.    <u>Corporate Trustee Required; Eligibility</u>

      There shall at all times be a Trustee hereunder which shall be a corporation, banking association or trust company organized and doing business under the laws of the United States, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state banking authority, having a rating of at least "Baa1" by Moody's and "BBB+" by Standard & Poor's and having an office within the United States. If such entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in Section 6.10.

123

NY3:#7347151v22<br>CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP<br>ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture<br>PP050388

Section 6.10.    Resignation and Removal; Appointment of Successor

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11.

(b)    The Trustee may resign at any time by giving written notice thereof to the Co-Issuers, the Noteholders, the Collateral Manager, the Credit Enhancer and each Rating Agency. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor Trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, together with a copy to each Noteholder, the Collateral Manager and the Credit Enhancer; provided that such successor Trustee shall be appointed only upon the written consent of the Controlling Party. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, any Holder of a Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    The Trustee may be removed at any time by Act of a Majority of any Class or, if an Event of Default shall have occurred and be continuing or when a successor Trustee has been appointed pursuant to Section 6.11, by Act of the Controlling Party, delivered to the Trustee and to the Co-Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.9 and shall fail to resign after written request therefor by the Co-Issuers, the Credit Enhancer or by any Holder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.10(a)), (a) the Co-Issuers, by Issuer Order, may remove the Trustee, or (b) subject to Section 5.15, the Credit Enhancer or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee with the consent of the Controlling Party. If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by Act of the Controlling Party delivered to the Issuer and the retiring Trustee. The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers. If no successor Trustee shall have been so appointed by the Co-Issuers or the Controlling Party and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15, the Credit Enhancer or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

124

Indenture
PP050389

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, each Rating Agency, the Credit Enhancer, the Preference Share Paying Agent and to the Holders as their names and addresses appear in the Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.11.    Acceptance of Appointment by Successor

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers, the Credit Enhancer and the retiring Trustee an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.8(d). Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments to vest in and confirm to such successor Trustee all such rights, powers and trusts more fully or certainly.

No successor Trustee shall accept its appointment unless at the time of such acceptance (a) each Rating Agency confirms in writing that appointment will not adversely affect its then current ratings on any Class of Notes (without giving effect to the Credit Enhancement) and (b) such successor shall (i) have long term debt rated within the four highest rating categories by each Rating Agency and (ii) be qualified and eligible under this Article 6. No appointment of a successor Trustee shall become effective if the Controlling Party objects to such appointment; and no appointment of a successor shall become effective until the date 10 days after notice of such appointment has been given to each Noteholder.

Section 6.12.    Merger, Conversion, Consolidation or Succession to Business of Trustee

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; provided that such Person shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.13.    Co-Trustees

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint (with the consent of the Controlling Party) one or more Persons to act as co-

125

NY3:#7347151v23
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050390

trustee, jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.6 and to make such claims and enforce such rights of action on behalf of the Secured Parties subject to the other provisions of this Section. The co-trustee shall meet the eligibility criteria set out under Section 6.9.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have the power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers. The Co-Issuers agree to pay (subject to the Priority of Payments) for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)    the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly, as shall be provided in the instrument appointing such co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(c)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

(d)    no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other co-trustee hereunder;

(e)    the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)    any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

126

Indenture
PP050391

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 6.14.    Certain Duties Related to Delayed Payment of Proceeds

In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Obligation on its Due Date (unless otherwise directed by the Collateral Manager in connection with any Pledged Obligation with respect to which there was a default in payment during the preceding Due Period as to which the Collateral Manager is taking action under the Management Agreement), (a) the Trustee shall promptly notify the Issuer and the Collateral Manager in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice (i) such payment shall have been received by the Trustee, or (ii) the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(c)), shall have made provision for such payment satisfactory to the Trustee and the Controlling Party in accordance with Section 10.2(c), the Trustee shall request the issuer of such Pledged Obligation, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. If such payment is not made within such time period, the Trustee, subject to the provisions of Section 6.1(c)(iv), shall take such action as the Collateral Manager shall reasonably direct in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. If the Issuer or the Collateral Manager requests a release of a Pledged Obligation in connection with any such action under the Management Agreement, such release shall be subject to Section 10.14 and Article 12 of this Indenture, as the case may be. Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee and the Controlling Party in accordance with Section 10.2(c) and this Section 6.14 and such payment shall not be deemed part of the Collateral.

Section 6.15.    Representations and Warranties of the Bank

(a)    Organization. The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)    Authorization; Binding Obligations. The Bank has the corporate power and authority to perform the duties and obligations of Trustee under this Indenture. The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto. Upon execution and delivery by the Co-Issuers, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)    Eligibility. The Bank is eligible under Section 6.9 to serve as Trustee hereunder and satisfies the trustee eligibility requirements set forth in Rule 3a-7(a)(4)(i) under the Investment Company Act.

(d)    No Conflict. Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

127

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050392

(e)    No Proceedings. There are no Proceedings pending or, to the best knowledge of the Bank, threatened against the Bank before any federal, provincial or other governmental agency, authority, administrator or regulatory body, arbitrator, court or other tribunal, foreign or domestic, that could have a material adverse effect on the Collateral or any action taken or to be taken by the Bank under this Indenture.

Section 6.16.    Exchange Offers

The Collateral Manager may, on behalf of the Issuer, instruct the Trustee pursuant to an Issuer Order to, and the Trustee shall, take any of the following actions with respect to a Collateral Debt Obligation, Unrestricted Collateral Debt Obligation or Equity Security as to which an exchange offer has been made: (i) exchange such obligation or instrument for other securities or a mixture of securities and other consideration pursuant to such exchange offer; and (ii) give consent, pledge waiver, vote, take any action or exercise any or all other rights or remedies with respect to any such Collateral Debt Obligation, Unrestricted Collateral Debt Obligation or Equity Security.

Section 6.17.    Fiduciary for Noteholders Only; Agent for the Credit Enhancer and Collateral Manager

With respect to the security interests created hereunder, the Grant of any item of Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties hereunder. In furtherance of the foregoing, the possession by the Trustee of any item of Collateral (including without limitation as Entitlement Holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the other Secured Parties.

Section 6.18.    Duties and Responsibilities of Trustee Following Payment in Full of the Notes

Following the payment in full of the Notes, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral in accordance with the Priority of Payments and the other provisions of this Indenture and in return therefor will continue to receive its fees and reimbursement of its expenses as Trustee and have all its rights provided for hereunder until the liquidation of the Collateral and the final distribution of the proceeds of such liquidation in accordance with the Priority of Payments and an Issuer Order.

ARTICLE 7

COVENANTS

Section 7.1.    Payment of Principal and Interest and Revolving Commitment Fees

(a)    The Co-Issuers will duly and punctually pay all principal, interest (including Class A Additional Interest, Defaulted Interest and interest thereon in respect of the Class A Notes), Class A-1 Commitment Fees, Class A-3 Commitment Fees, Class A-1 Additional Amounts, Class A Redemption Break Funding Costs, Credit Enhancement Premium and Credit Enhancement Liabilities, each as applicable, in accordance with the terms of the Notes, this Indenture, the Note Purchase Agreements and the Credit Enhancement Agreement. Upon the Maturity of the Notes of each Class, the

128

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050393

Issuer will give notice thereof to each Rating Agency (unless otherwise notified thereof pursuant to the terms of this Indenture).

(b)   Subject to the terms of the Note Purchase Agreements, amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder of principal, interest, Class A-1 Commitment Fee, Class A-3 Commitment Fee or other amounts shall be considered as having been paid by the Co-Issuers to such Noteholder for all purposes of this Indenture. The Trustee hereby provides notice to each Noteholder that the failure of such Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to such Noteholder under this Indenture (provided that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Co-Issuers as provided above).

Section 7.2.   Maintenance of Office or Agency

The Co-Issuers hereby appoint the Trustee as Paying Agent for the payment of principal and interest in respect of the Notes, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, the Class A-1 Additional Amounts, the Class A Additional Interest and Class A Redemption Break Funding Costs payable under this Indenture and under the Note Purchase Agreements. The Co-Issuers hereby appoint CT Corporation, 111 Eighth Avenue, 13th Floor, New York, New York 10011, as the Co-Issuers' agent where notices and demands to or upon either of the Co-Issuers in respect of the Notes or this Indenture may be served. Notes may be surrendered for registration of transfer or exchange at the Corporate Trust Office of the Trustee.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; provided that (a) the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of the Notes and this Indenture may be served and (b) no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax. The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency, the Credit Enhancer and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment, at the office of the Paying Agent (and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands).

Section 7.3.   Money for Note Payments to be Held in Trust

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Co-Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

129

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050394

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any Moneys deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article 10.

The initial Paying Agent shall be appointed as set forth in Section 7.2. Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee and the Credit Enhancer; provided that so long as any Class of Notes are rated by the Rating Agencies and with respect to any additional or successor Paying Agent for the Notes, either (a) the Paying Agent for the Notes has a rating of not less than "Aa2" and not less than "P-1" by Moody's and a rating of not less than "AA-" and not less than "A-1+" by Standard & Poor's or (b) each Rating Agency confirms in writing that employing such Paying Agent will not adversely affect its then current ratings on any Class of Notes (without giving effect to the Credit Enhancement). In the event that such successor Paying Agent ceases to have a rating of at least "Aa2" and at least "P-1" by Moody's and a rating of at least "AA-" and of "A-1+" by Standard & Poor's and the then current ratings on the Notes have not been confirmed in writing, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3, that such Paying Agent will:

(i)     allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the instructions set forth in the applicable Note Valuation Report or Redemption Date Statement, in each case to the extent permitted by applicable law;

(ii)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(iii)     if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(iv)     if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer (or any other Obligor upon the Notes) in the making of any payment required to be made;

130

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050395

(v)    if such Paying Agent is not the Trustee at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent; and

(vi)    not, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or the Zohar Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under federal or state bankruptcy or similar laws. Nothing in this clause (vi) shall preclude, or be deemed to stop, such Paying Agent (x) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or the Zohar Subsidiary or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than such Paying Agent, or (y) from commencing against the Issuer, the Co-Issuer or the Zohar Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar Proceeding.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Money.

Except as otherwise required by applicable law, any Money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-Issuers on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Money (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.4.    Existence of Zohar Obligors

(a) (i) The Issuer shall maintain in full force and effect its existence and rights as an exempted company organized under the laws of the Cayman Islands, (ii) the Co-Issuer shall maintain in full force and effect its existence and rights as a corporation incorporated under the laws of the State of Delaware and (iii) the Zohar Subsidiary shall maintain in full force and effect its existence and rights as a limited liability company organized under the laws of the State of Delaware. Each Zohar Obligor shall obtain and preserve their qualification to do business in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes and any of the Collateral.

131

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050396

(b)    Each Zohar Obligor shall ensure that all corporate or other formalities regarding its existences (including holding any required regular board of directors' and shareholders', or other similar, meetings) are followed. No Zohar Obligor shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency Proceeding. Without limiting the foregoing, each Zohar Obligor shall not (i) have any employees, (ii) hire any professional advisors other than the Collateral Manager and legal counsel to the extent expressly provided for in this Indenture (it being understood that the Collateral Manager may hire professional advisors on behalf of the Issuer and the Zohar Subsidiary to the extent provided in the Management Agreement), (iii) engage in any transaction with any shareholder that would constitute a conflict of interest (other than any transactions contemplated by the Management Agreement to the extent that the Collateral Manager is a Holder of Preference Shares or any transactions contemplated hereunder), (iv) pay dividends other than in accordance with the terms of this Indenture, the Issuer Charter and the Zohar Subsidiary Operating Agreement or (v) conduct business other than in its own name. Except as otherwise consented to by the Controlling Party, no Zohar Obligor shall, without at least 30 days prior written notice to the Trustee and the Controlling Party, (i) change its location (within the meaning of Section 9-307 of the UCC) or jurisdiction of organization, (ii) change its corporate name, or the name under which it does business, from the name shown on the signature pages hereto or (iii) change its identity or corporate structure.

(c)    The Issuer will elect to be treated as a partnership (or for so long as there is a single owner of its equity, as a disregarded entity) for U.S. federal income tax purposes and will not take any action inconsistent with such characterization.

Section 7.5.    Protection of Collateral

(a)    Each of the Issuer, the Zohar Subsidiary and the Collateral Manager (subject to the terms of the Management Agreement) shall from time to time execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable (or as may be directed by the Controlling Party) to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    Grant more effectively all or any portion of the Collateral;

(ii)    maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)    enforce any of the Pledged Obligations or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Trustee on behalf of the Secured Parties against the claims of all Persons and parties; or

(vi)    pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Collateral.

132

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Each of the Issuer and the Zohar Subsidiary hereby designates the Trustee its agent and attorney-in-fact to execute any Financing Statement, continuation statement or other instrument required pursuant to this Section 7.5 (provided that such designation shall not obligate the Trustee to perform the Issuer's or Zohar Subsidiary's obligations hereunder). Each of the Issuer and the Zohar Subsidiary further authorizes the Trustee to file without the Issuer's or the Zohar Subsidiary's signature a Financing Statement that names the Issuer and the Zohar Subsidiary as debtor and the Trustee as secured party and that describes "all assets of the Debtor whether now owned or hereafter acquired and wherever located, and all proceeds thereof" as the assets in which the Trustee has a security interest.

(b)     The Trustee shall not (i) except in accordance with Section 10.14(a), (b), (c) or (e), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (a) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Funding Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.6) or (b) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (a) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (b) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)     Each of the Issuer and the Zohar Subsidiary shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Obligations that secure the Notes.

(d)     The Issuer will duly and punctually perform each of its obligations under the Note Purchase Agreements. The Issuer shall enforce all of its material rights and remedies under each Note Purchase Agreement, each Note Subscription Agreement, each Preference Share Subscription Agreement, the Management Agreement, the Administration Agreement, the Collateral Administration Agreement and each Hedge Agreement. The Zohar Subsidiary shall enforce all of its material rights and remedies under the Management Agreement.

(e)     If the Issuer or the Collateral Manager receives notice, or shall become aware, that any Holder of Class A-1 Notes or any Holder of Class A-3 Notes shall, at any time prior to the date on which the Class A-1 Commitment or the Class A-1 Commitment of such Holder expires or is terminated or reduced to zero, fail to satisfy the Rating Criteria, then, subject to the terms of the applicable Note Purchase Agreement:

(1)     in the case of the Class A-1 Notes, the Collateral Manager shall cause the Issuer to enforce its rights under each applicable Class A-1 Note Purchase Agreement to cause such Holder to transfer its rights and obligations in respect of its Class A-1 Notes to a Person that satisfies the Rating Criteria or to cause such Holder (including any related Committed Note Purchaser) to deposit in the Class A Holder Collateral Account, in accordance with Section 10.5 and the applicable Class A-1 Note Purchase Agreement, an amount equal to the then Aggregate Undrawn Amount of such Holder's Class A-1 Commitment; and

133

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(2)        in the case of the Class A-3 Notes, the Collateral Manager shall cause the Issuer to borrow the Aggregate Undrawn Amount of the Class A-3 Notes promptly and in any event within three Business Days after the date that the Collateral Manager receives notice, or becomes aware, that such Holder fails to satisfy the applicable Rating Criteria.

Section 7.6.        Opinions as to Collateral

On or before January 1 in each calendar year, commencing in 2006 the Issuer shall furnish to the Trustee, the Credit Enhancer, the Collateral Manager, each Noteholder and each Rating Agency an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and stating that no further action is required during the ensuing calendar year to maintain the effectiveness of such lien (other than as stated in such opinion).

Section 7.7.        Performance of Obligations

(a)        The Zohar Obligors (or the Collateral Manager on behalf of such Person) may, without the consent of the Holders of any Notes or the Credit Enhancer, enter into any amendment, forbearance or waiver of or supplement to any Underlying Instrument included in the Collateral, so long as such amendment, forbearance, waiver or supplement does not contravene the provisions of any Transaction Document or contravene any applicable law or regulation. For the avoidance of doubt and notwithstanding anything else contained herein, the parties hereto acknowledge and agree that the Collateral will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as a consequence thereof, the Issuer or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral, Equity Kickers, Equity Workout Securities and/or the relevant Underlying Instruments (i) interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Debt Obligation" and/or the Eligibility Criteria and/or (ii) Equity Workout Securities. The Issuer (or the Collateral Manager on its behalf) shall notify each Rating Agency of any amendment, waiver or supplement to any Underlying Instrument included in the Collateral that is in the Collateral Manager's reasonable determination a material amendment, waiver or supplement of the related Pledged Obligation.

(b)        The Zohar Obligors may, with the prior written consent of the Controlling Party and the Preference Share Paying Agent (acting at the direction of a Majority of the Preference Shares) (except in the case of the Management Agreement as initially executed), contract with other Persons, including the Collateral Manager, for the performance of actions and obligations to be performed by the Zohar Obligors hereunder by such Persons and the performance of the actions and other obligations with respect to the Collateral of the nature set forth in the Management Agreement by the Collateral Manager. Notwithstanding any such arrangement, the Zohar Obligors shall remain liable for all such actions and obligations. In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Zohar Obligors; and the Zohar Obligors will punctually perform, and use their best efforts to cause the Collateral Manager or such other Person to perform, all of their obligations and agreements contained in the Management Agreement or such other agreement.

Section 7.8.        Negative Covenants

(a)        The Issuer and the Zohar Subsidiary will not and, with respect to clauses (ii), (iii), (iv), (viii) and (xi), the Co-Issuer will not:

134

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050399

(i)        sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(ii)       claim any credit on, make any deduction from, or dispute the enforceability of, the payment of the principal or interest payable (or any other amount) in respect of the Notes (other than amounts required to be paid, deducted or withheld in accordance with any applicable law or regulation of any governmental authority) or assert any claim against any present or future Noteholder or the Credit Enhancer, by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)      (x) incur or assume or guarantee any indebtedness, other than the Notes and under this Indenture, the Underlying Instruments or any other Transaction Document; (y) issue any additional class of securities, except as provided herein; or (z) issue any additional shares of stock other than ordinary shares issued pursuant to the Issuer Charter and the Preference Shares issued or outstanding on the Funding Date and any ordinary shares and Preference Shares issued in substitution therefor or as provided in Section 7.17 (it being understood that, notwithstanding anything to the contrary herein or in any other Transaction Document, the Issuer shall issue Preference Shares to Ark CLO 2000-1, Limited and/or its nominee as contemplated herein and by the other Transaction Documents);

(iv)      (x) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (y) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof (except as may be expressly permitted hereby), or (z) take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

(v)       use any of the proceeds of the Notes issued hereunder, directly or indirectly, (x) to extend "purpose credit" within the meaning given to such term in Regulation U or (y) to purchase, carry or otherwise acquire, or refinance any indebtedness incurred to purchase, carry or otherwise acquire, any Margin Stock (it being understood that nothing in this clause (v) shall prohibit the Issuer or the Zohar Subsidiary from exchanging any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation or Equity Security for Margin Stock in connection with a workout or enforcement of such obligation or Equity Security if such exchange does not violate Regulation U (and, if any such exchange in fact violates Regulation U, then the Collateral Manager shall cause the Issuer to sell such Margin Stock within 90 days of the date on which the Collateral Manager first becomes aware of such violation);

(vi)      [reserved];

(vii)     amend the Management Agreement except pursuant to Article 14;

(viii)    dissolve or liquidate in whole or in part, except as permitted hereunder;

(ix)      obtain the listing of the Class B Notes, the Class C Notes or the Preference Shares on any stock exchange;

135

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050400

(x)     change the last day of its fiscal year from December 31 of each calendar year; or

(xi)    enter into any agreement with any Secured Party that does not contain limited recourse language and non-petition provisions similar to those specified in Sections 2.6(c), 6.8(c), 13.4, and 17.3(b) and will not amend such provisions unless the Trustee shall have received confirmation from each Rating Agency that its then current ratings issued with respect to the Notes will not be reduced or withdrawn as a result of such agreement or amendment.

(b)     None of the Issuer, the Zohar Subsidiary or the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted by this Indenture and the Management Agreement.

(c)     The Co-Issuer will not invest any of its assets in "securities" (as such term is defined in the Investment Company Act), and will keep all of its assets in Cash (and to the extent it receives any Cash it shall promptly remit such Cash to the Issuer for application as provided in this Indenture).

(d)     For so long as any of the Notes are Outstanding (i) the Co-Issuer shall not transfer, and the Issuer shall not permit the Co-Issuer to issue, any capital stock of the Co-Issuer to any Person other than the Issuer and (ii) the Zohar Subsidiary shall not transfer, and the Issuer shall not permit the Zohar Subsidiary to issue, any equity interests of the Zohar Subsidiary to any Person other than the Issuer.

Section 7.9.    Certain Statements

(a)     No later than the third Business Day prior to each Payment Date, the Issuer shall deliver to the Trustee, the Preference Share Paying Agent, the Credit Enhancer, each Rating Agency and each Noteholder, an Officer's certificate attaching (i) a consolidated balance sheet of the Issuer and its subsidiaries as of the Determination Date preceding such Payment Date (specifying (x) the amount of the share capital of the Preference Shares as of such Determination Date, (y) the Issuer's consolidated total capitalization as of such Determination Date and (z) the Issuer's consolidated total capitalization as of the Funding Date) and (ii) a consolidated income statement of the Issuer and its subsidiaries for the Due Period ending on such Determination Date, prepared in each case in accordance with U.S. generally accepted accounting principles and certified by the Issuer as presenting fairly, in all material respects, the financial position of the Issuer and its consolidated subsidiaries.

(b) On or before January 20, in each calendar year commencing in 2006, or immediately if there has been a Default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee, the Preference Share Paying Agent, the Credit Enhancer, each Rating Agency and each Noteholder, an Officer's certificate stating, as to each signer thereof, that:

(i)     a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the twelve-month period ending on December 31, of such year (or from the Funding Date until December 31, 2005, in the case of the first such Officer's certificate) has been made under such Officer's supervision; and

(ii)    to the best of such Officer's knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout the period, or, if there has been a

136

Indenture
PP050401

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Default in the fulfillment of any such obligation, specifying each such Default known to such Officer and the nature and status thereof, including actions undertaken to remedy the same.

Section 7.10.    Co-Issuers May Consolidate, etc., Only on Certain Terms

(a)     The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law and unless:

(i)     the Issuer shall be the surviving entity or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred shall be an exempted company organized under the laws of the Cayman Islands (or another jurisdiction acceptable to the Collateral Manager and the Controlling Party); provided that if the Issuer is not the surviving entity, such transaction shall be undertaken solely to effect a change in jurisdiction of organization and the surviving entity shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the Credit Enhancer and each Noteholder, the due and punctual payment of the principal of and interest on all Notes, all Class A-1 Commitment Fees, all Class A-3 Commitment Fees and all other amounts owing by the Issuer under this Indenture and under the other Transaction Documents and the performance of every covenant of this Indenture and under the other Transaction Documents on the part of the Issuer to be performed or observed, all as provided herein;

(ii)     the Credit Enhancer, the Trustee, and each Rating Agency shall have been notified of such consolidation, merger, transfer or conveyance and the Trustee shall have received (x) confirmation from each Rating Agency that its then current ratings issued with respect to the Notes will not be reduced or withdrawn as a result of the consummation of such transaction and (y) the prior written consent of the Controlling Party to such consolidation, merger, transfer or conveyance;

(iii)     if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred shall have agreed with the Trustee (by a supplemental indenture hereto or otherwise) (a) to observe the same legal requirements for the recognition of such formed or surviving entity as a legal entity separate and apart from any of its Affiliates as are applicable to the Issuer with respect to its Affiliates and (b) not to consolidate or merge with or into any other Person or transfer or convey the Collateral or all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(iv)     if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred shall have delivered to the Trustee, the Credit Enhancer, the Preference Share Paying Agent and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (a)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject

137

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050402

only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Issuer, (a) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral; and (b) the Trustee continues to have a valid perfected first priority security interest in the Collateral securing all of the Notes; and such other matters as the Trustee, the Credit Enhancer or any Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)    the Issuer shall have delivered to the Trustee, the Credit Enhancer and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article 7, that all conditions precedent in this Article 7 provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer or any Holder of the Notes; and

(vii)    the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, none of the Zohar Obligors will be required to register as an investment company under the Investment Company Act.

(b)    The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless:

(i)    the Co-Issuer shall be the surviving corporation, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on the Notes, all Class A-1 Commitment Fees, all Class A-3 Commitment Fees and all other amounts owing under this Indenture and under the Note Purchase Agreements and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii)    the Credit Enhancer, the Trustee and each Rating Agency shall have been notified of such consolidation, merger, transfer or conveyance and the Trustee shall have received (x) confirmation from each Rating Agency that its then current ratings issued with respect to the Notes will not be reduced or withdrawn as a result of the consummation of such transaction and (y) the prior written consent of the Controlling Party to such consolidation, merger, transfer or conveyance;

(iii)    if the Co-Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred shall have agreed with the Trustee (by a supplemental indenture hereto or otherwise) (a) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Co-Issuer with respect to its Affiliates and (b) not to consolidate or merge

138

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

with or into any other Person or transfer or convey all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(iv)    if the Co-Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred shall have delivered to the Trustee, the Credit Enhancer, the Preference Share Paying Agent and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (b)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law); and such other matters as the Trustee, the Credit Enhancer or any Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)    the Co-Issuer shall have delivered to the Trustee, the Credit Enhancer and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer or to any Holder of the Notes;

(vii)    after giving effect to such transaction, none of the Zohar Obligors will be required to register as an investment company under the Investment Company Act; and

(viii)    after giving effect to such transaction, the outstanding stock of the Co-Issuer will not be beneficially owned by any Person other than the Issuer.

(c)    The Zohar Subsidiary shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person unless:

(i)    the Zohar Subsidiary shall be the surviving entity, or the Person (if other than the Zohar Subsidiary) formed by such consolidation or into which the Zohar Subsidiary is merged or to which all or substantially all of the assets of the Zohar Subsidiary are transferred shall be an entity formed with limited liability under the laws of the State of Delaware (or any other state which the Collateral Manager determines will not subject the Zohar Subsidiary to material net income or franchise taxes) and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the performance of every covenant of this Indenture on the part of the Zohar Subsidiary to be performed or observed, all as provided herein;

(ii)    the Credit Enhancer, the Trustee and each Rating Agency shall have been notified of such consolidation, merger, transfer or conveyance and the Trustee shall have received

139

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050404

(x) confirmation from each Rating Agency that its then current ratings issued with respect to the Notes will not be reduced or withdrawn as a result of the consummation of such transaction and (y) the prior written consent of the Controlling Party to such consolidation, merger, transfer or conveyance;

(iii)     if the Zohar Subsidiary is not the surviving entity, the Person formed by such consolidation or into which the Zohar Subsidiary is merged or to which all or substantially all of the assets of the Zohar Subsidiary are transferred shall have agreed with the Trustee (by a supplemental indenture hereto or otherwise) (a) to observe the same legal requirements for the recognition of such formed or surviving entity as a legal entity separate and apart from any of its Affiliates as are applicable to the Zohar Subsidiary with respect to its Affiliates and (b) not to consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(iv)     if the Zohar Subsidiary is not the surviving entity, the Person formed by such consolidation or into which the Zohar Subsidiary is merged or to which all or substantially all of the assets of the Zohar Subsidiary are transferred shall have delivered to the Trustee, the Credit Enhancer and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (c)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Zohar Subsidiary, (a) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral; and (b) the Trustee continues to have a valid perfected first priority security interest in the Collateral securing all of the Notes; and such other matters as the Trustee, the Credit Enhancer or any Noteholder may reasonably require;

(v)     immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)     the Zohar Subsidiary shall have delivered to the Trustee, the Credit Enhancer, the Preference Share Paying Agent and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer, the Co-Issuer, the Zohar Subsidiary, the Credit Enhancer or any Holder of the Notes;

(vii)     after giving effect to such transaction, none of the Zohar Obligors will be required to register as an investment company under the Investment Company Act; and

140

Indenture
PP050405

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(viii)    after giving effect to such transaction, the outstanding membership interests of the Zohar Subsidiary will not be beneficially owned by any Person other than the Issuer.

Section 7.11.    Successor Substituted

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the applicable Zohar Obligor in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than such Zohar Obligor), or, the Person to which such consolidation, merger, transfer or conveyance is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each obligation or covenant of, the applicable Zohar Obligor under this Indenture with the same effect as if such Person had been named as such Zohar Obligor herein.

In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer", the "Co-Issuer" or the "Zohar Subsidiary" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article 7 may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture to the extent such liabilities and obligations are assumed by the Person referred to in the immediate preceding paragraph.

Section 7.12.    No Other Business

The Issuer shall not engage in any business or activity other than (a) acquiring, managing and disposing of, and investing in, Collateral Debt Obligations, Unrestricted Collateral Debt Obligations, Equity Securities and Eligible Investments, (b) entering into and performing its obligations under documents relating to the Hedge Agreements, the Note Purchase Agreements, the Management Agreement, the Placement Agreement, the Purchase Documents, the Underlying Instruments, the Note Subscription Agreements, the Preference Share Subscription Agreements, the Collateral Administration Agreement, the Credit Enhancement Agreement, the Preference Share Paying Agency Agreement and the Administration Agreement, (c) issuing and selling the Notes pursuant to this Indenture, the Note Purchase Agreements and the Note Subscription Agreements, (d) issuing and selling the Preference Shares pursuant to the Issuer Charter and the Preference Share Subscription Agreements, (e) pledging the Collateral as security for its obligations to Secured Parties under this Indenture, the Notes, the Credit Enhancement Agreement, the Hedge Agreements and the other Transaction Documents, (f) owning equity interests of the Co-Issuer and the Zohar Subsidiary and (g) such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The Co-Issuer shall not engage in any business or activity other than (i) issuing and selling the Notes pursuant to this Indenture and such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith and (ii) entering into and performing its obligations under the Credit Enhancement Agreement. The Zohar Subsidiary shall not engage in any business or activity other than (i) acquiring, managing and disposing of, and investing in, Collateral Debt Obligations, Unrestricted Collateral Debt Obligations, Equity Securities and Eligible Investments, (ii) entering into and performing its obligations under the Management Agreement, the Purchase Documents, the Underlying Instruments and the Credit Enhancement Agreement, (iii) pledging the Collateral as security for its obligations to Secured Parties under this Indenture, the Notes, the Credit Enhancement Agreement, the Hedge Agreements and the other Transaction Documents and (iv) such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The Issuer will not amend the Issuer Charter, the Co-Issuer will not amend its certificate of incorporation or by-laws, and the Zohar Subsidiary will not amend the Zohar Subsidiary Operating Agreement, unless in any case (x) each Rating Agency has confirmed that such

141

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

amendment would not result in its then current rating of any Class of the Notes being reduced or withdrawn and (y) the Controlling Party has consented thereto in writing.

Section 7.13.    Ramp Up; Rating Confirmation; Annual Rating Review; Etc.

(a)    Ramp Up Targets. The Issuer and/or the Zohar Subsidiary shall use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Debt Obligations having an Aggregate Principal Balance at least equal to U.S.$1,315,000,000 by no later than the Ramp Up End Date. The Issuer agrees to provide written notice to the Rating Agencies, the Credit Enhancer and the Trustee within five Business Days following the Ramp Up End Date if such target has not been reached.

In addition, within 10 Business Days following each of July 12, 2005 and October 12, 2005 (each a "Ramp Up Measurement Date" and, collectively, the "Ramp Up Measurement Dates"), the Issuer shall deliver to Moody's and the Credit Enhancer (with a copy to the Trustee) a notice in writing setting forth the Diversity Score, the Class A Overcollateralization Ratio and Moody's Weighted Average Rating Distribution (each, a "Ramp Up Calculation") as of such Ramp Up Measurement Date, and the Issuer shall deliver to Standard & Poor's the Excel Default Model Input File with information as of such Ramp Up Measurement Date. If any one or more of the Ramp Up Calculations does not satisfy the requirement set forth in the table below as of the applicable Ramp Up Measurement Date, then (1) the Issuer (or the Collateral Manager on its behalf) shall prepare and deliver to Moody's, the Credit Enhancer and the Trustee a reasonable plan (a "Proposed Moody's Plan") addressing the steps that the Issuer proposes to take to satisfy such requirements on all subsequent Ramp Up Measurement Dates and to meet the Collateral Quality Tests as of the Ramp Up End Date and (2) until such Proposed Moody's Plan has been approved in writing by Moody's and the Credit Enhancer the Issuer shall not, without the consent of Moody's, acquire additional Collateral Debt Obligations or Unrestricted Collateral Debt Obligations (but may settle on previous commitments to acquire such Collateral). The terms and conditions of any Proposed Moody's Plan, as proposed by the Issuer (or the Collateral Manager on behalf of the Issuer), in respect of which the Credit Enhancer and Moody's has provided its consent and confirmation as described above (a "Moody's Plan"), will be set forth in a supplemental indenture to be entered into by and among the Zohar Obligors, the Trustee, the Arranger, the Class A-1 Note Agent, the Class A-3 Note Agent and the Credit Enhancer in accordance with Section 8.1.

**Ramp Up Targets**

| Ramp Up Calculation | Satisfied if | Ramp Up Measurement Date | |
|---|---|---|---|
| | | July 12, 2005 | October 12, 2005 |
| Diversity Score | Equals or exceeds | 22 | 26 |
| Class A Overcollateralization Ratio | Equals or exceeds | 115% | 124% |
| Moody's Weighted Average Rating Distribution | Less than or equal to | 3000 | 2950 |

(b)    Rating Confirmation Provisions, Etc.

(1)    On or prior to the Ramp Up End Date, the Issuer (or the Collateral Administrator on behalf of the Issuer) shall deliver or cause to be delivered to the Trustee and to Standard & Poor's the Excel Default Model Input File. Within 30 days following the Ramp Up End Date, the

142

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture

PP050407