Issuer (or the Collateral Manager on behalf of the Issuer) shall deliver or cause to be delivered to the Trustee and each Rating Agency a written certificate setting forth in reasonable detail results of computations of each of the Collateral Quality Tests and Class A Coverage Tests on the Ramp Up End Date, and shall, with the assistance of the Arranger, request that each of Moody's and Standard & Poor's confirm in writing its initial rating (determined without giving effect to the Credit Enhancement) of the Class A Notes (a "Rating Confirmation" with respect to the Class A Notes) within 30 days after the Ramp Up End Date. Any failure by Moody's or Standard & Poor's to confirm their respective initial ratings of the Class A Notes (determined without giving effect to the Credit Enhancement) within such 30-day period is herein referred to as a "Rating Confirmation Failure" with respect to the Class A Notes.

In addition, at any time after the Ramp Up End Date, the Holders of a Majority of the Class B Notes may (with the consent of the Collateral Manager and notice to the Credit Enhancer) request that each of Moody's and Standard & Poor's provide an initial rating of the Class B Notes of at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's (an "Acceptable Class B Rating") (it being understood that such initial rating of the Class B Notes would address the ultimate payment in full of the principal of the Class B Notes); provided that such request to Standard & Poor's will result in a separate rating process that may or may not result in the issuance of a rating on the Class B Notes. Any failure by Moody's or Standard & Poor's to provide an Acceptable Class B Rating is herein referred to as a "Rating Failure" with respect to the Class B Notes.

(2)     In the event of a Rating Confirmation Failure with respect to the Class A Notes, then (x) the Issuer (or the Collateral Manager on its behalf) shall within 10 Business Days after such Rating Confirmation Failure prepare and deliver to the Rating Agencies, the Credit Enhancer and the Trustee a reasonable plan (a "Proposed Post-Ramp Up Plan") addressing the steps that the Issuer proposes to take to obtain a Rating Confirmation with respect to the Class A Notes and (y) until such Proposed Post-Ramp Up Plan has been approved by Standard & Poor's and the Credit Enhancer, and until Moody's has acknowledged that such plan, if implemented, will allow Moody's to provide a rating confirmation, the Issuer shall not, without the consent of each Rating Agency, acquire additional Collateral Debt Obligations or Unrestricted Collateral Debt Obligations (but may settle on previous commitments to acquire such Collateral). The terms and conditions of any Proposed Post-Ramp Up Plan, as proposed by the Issuer (or the Collateral Manager on behalf of the Issuer), in respect of which the Credit Enhancer and each Rating Agency has provided its consent and confirmation as described above (a "Post-Ramp Up Plan"), will be set forth in a supplemental indenture to be entered into by and among the Zohar Obligors, the Trustee, the Class A-1 Note Agent, the Class A-3 Note Agent and the Credit Enhancer in accordance with Section 8.1.

(3)     As provided in the Priority of Payments, in the event of a Rating Confirmation Failure with respect to the Class A Notes (except as otherwise provided in a Post-Ramp Up Plan approved and acknowledged in accordance with paragraph (2) above), Interest Proceeds and Principal Proceeds will be applied to the Class A Notes on each Payment Date in accordance with the Priority of Payments until the Aggregate Outstanding Amount of the Class A Notes and the Class A-1 Commitments have been reduced by an amount sufficient to obtain a Rating Confirmation of the Class A Notes (as specified by Moody's and/or Standard & Poor's, as applicable, in writing). In connection therewith, the Issuer shall, within 10 Business Days after each successive Payment Date request such Rating Confirmation of the Class A Notes and thereafter deliver any information required by Moody's and/or Standard & Poor's related to such Rating Confirmation, until such Rating Confirmation shall be so received.

143

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(4)    In the event of a Rating Failure with respect to the Class B Notes, then, if (and only if) requested by the Holders of a Majority of the Class B Notes (with the consent of the Collateral Manager and notice to the Credit Enhancer) (but without any other action on behalf of any other Person, except as expressly set forth in this clause (4)):

(A)    the Outstanding face amount of the Class B Notes will be reduced in an aggregate amount (the "Class B Reduction Amount") equal to the greater of (1) the amount (if any) specified by Moody's in writing as sufficient to obtain an Acceptable Class B Rating with respect to the Class B Notes from Moody's and (2) the amount (if any) specified in writing by Standard & Poor's sufficient to obtain an Acceptable Class B Rating with respect to the Class B Notes from Standard & Poor's, with the Class B Reduction Amount to be allocated ratably to each Outstanding Class B Note according to the Outstanding principal amount thereof immediately prior to such reduction;

(B)    the Issuer shall issue to each Holder of Class B Notes, and upon Issuer Order the Trustee shall authenticate, a new Class C Note, registered in the name of such Holder in an original face amount equal to such Holder's ratable share of the Class B Reduction Amount and shall deliver such Class C Note to the applicable Class B Noteholder upon such Holder's surrender of the Class B Note as provided in clause (D) below;

(C)    the Trustee shall direct the Note Registrar to reflect such reduction and issuance; and

(D)    each Holder of Class B Notes shall, at the expense of the Issuer, deliver its Class B Notes to the Trustee for notation of such reduction on the face of such Class B Note or, at the option of the Issuer, for the exchange of such Class B Notes for new Class B Notes issued in the new, reduced principal amount (it being understood that failure to deliver such Class B Notes to the Issuer shall not affect the reduction effected pursuant to clause (A) above).

(c)    Annual Rating Review.  On or before January 1 in each year commencing in 2006, the Co-Issuers shall obtain and pay for an annual review of the rating from each of Moody's and Standard & Poor's of each Class of Notes then rated by it (and in the case of the Class A Notes, without giving effect to the Credit Enhancement).

(d)    Notification.  The Co-Issuers shall promptly notify the Trustee, the Collateral Manager, the Credit Enhancer and the Noteholders in writing if at any time the rating of any such Class of Notes has been, or is known will be, changed or withdrawn (and in the case of the Class A Notes, without giving effect to the Credit Enhancement).

Section 7.14.    Calculation Agent

(a)    The Co-Issuers hereby agree that for so long as any of the Class A Notes remain Outstanding there will at all times be one or more agents (each, a "Calculation Agent") appointed to calculate (i) LIBOR in respect of each Interest Period in accordance with the terms of Schedule B, (ii) the CP Funding Rate, to the extent that any Class A-1 Note bears interest at the CP Funding Rate and (iii) the Base Rate, to the extent that any Note bears interest at the Base Rate for any period. The Co-Issuers have initially appointed (i) the Class A-1 Note Agent as a Calculation Agent for purposes of determining

144

NY3:#7347151y22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(A) LIBOR in respect of the Class A-1 Notes for each Interest Period, (B) and the CP Funding Rate, to the extent that any Class A-1 Note bears interest at the CP Funding Rate and (C) the Base Rate, to the extent that any Class A-1 Note bears interest at the Base Rate and (ii) the Trustee as a Calculation Agent for purposes of determining (A) LIBOR in respect of the Class A-2 Notes and the Class A-3 Notes for each Interest Period and (B) the Base Rate, to the extent that any Class A-2 Note or Class A-3 Note bears interest at the Base Rate. The Class A-1 Note Agent and the Trustee each hereby acknowledges and agrees to such appointment. Any Calculation Agent may be removed by the Co-Issuers at any time. If a Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, the Co-Issuers will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in Dollar deposits in Europe and which does not control and is not controlled by or under common control with the Co-Issuers or any of their Affiliates. A Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)     Each Calculation Agent shall, as soon as possible after 11:00 a.m. (London time) on each applicable LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following such LIBOR Determination Date, calculate the Class A-1 Note Interest Rate (in the case of the Class A-1 Note Agent) or the Class A-2 Note Interest Rate or the Class A-3 Note Interest Rate (in the case of the Trustee) for the related Interest Period and the amount of interest for such Interest Period payable in respect of each U.S.$1,000 in principal amount of the applicable Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will (as applicable) communicate such rates and amounts to the Co-Issuers, the Trustee, the Class A-1 Note Agent, the Class A-3 Note Agent, and each Paying Agent. Each Calculation Agent will also specify to the Co-Issuers the quotations upon which the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate, as applicable, are based, and in any event each Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on each applicable LIBOR Determination Date if it has not determined and is not in the process of determining the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate, as applicable, together with its reasons therefor.

(c)     Promptly upon receiving notice of the CP Funding Rate for any Uncommitted Note Purchaser under any Class A-1 Note Purchase Agreement, the Class A-1 Note Agent will communicate such CP Funding Rate to the Co-Issuers, the Trustee and each Paying Agent.

(d)     On or prior to the Determination Date relating to each Payment Date, the Class A-1 Note Agent shall calculate (i) the daily average principal balance of the Aggregate Outstanding Amount and the Aggregate Undrawn Amount of the Class A-1 Notes with respect to each Interest Period ending immediately prior to such Payment Date and (ii) the number of days in each such Interest Period, and shall on such Business Day provide such calculations to the Credit Enhancer and the Trustee. In addition, the Trustee shall notify the Class A-1 Note Agent in writing on the first Payment Date on which the Class A-1 Notes shall have become due and payable prior to the Stated Maturity thereof pursuant to Section 5.2; and the Class A-1 Note Agent shall notify the Trustee in writing on the first Payment Date on which the Class A-1 Commitments shall have expired, terminated or been reduced to zero. On or prior to the Business Day immediately preceding each Payment Date, the Trustee shall calculate (i) the daily average principal balance of the Aggregate Outstanding Amount of the Class A-2 Notes, the Aggregate Outstanding Amount of the Class A-3 Notes and the Aggregate Undrawn Amount of the Class A-3 Notes, in each case, with respect to each Interest Period ending immediately prior to such Payment Date and (ii) the number of days in each such Interest Period. In addition, the Trustee shall determine the first Payment Date on which either (x) the Class A-2 Notes or the Class A-3 Notes shall have become due and payable prior to the Stated Maturity thereof pursuant to Section 5.2 or (y) the Class A-3 Commitments shall have expired, terminated or been reduced to zero.

145

Indenture
PP050410

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 7.15.    Amendment of Certain Documents

Prior to entering into any agreement amending, modifying, terminating or waiving its rights under the Collateral Administration Agreement, any Note Subscription Agreement, any Preference Share Subscription Agreement, the Note Purchase Agreements, or any Hedge Agreement (other than any such amendment to correct an ambiguity, mistake or defect), the Issuer shall (a) provide at least 10 days' prior notice thereof to each Rating Agency and to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder and the Credit Enhancer) and (b) obtain (i) the written confirmation of each Rating Agency that the entry by the Issuer into such amendment, modification, termination or waiver will not cause the then current ratings, if any, of any Class of Notes to be reduced or withdrawn and (ii) the prior written consent of the Controlling Party. Notwithstanding the foregoing, no such notice, consent or confirmation shall be required for the Issuer to amend, with the consent of the Holder of any Class A-1 Note, the applicable Note Purchase Agreement so long as such amendment relates solely to the manner in which outstanding Borrowings are assigned or otherwise transferred by Uncommitted Note Purchasers to Committed Note Purchasers and does not otherwise diminish in any way the ability of the Issuer to effect Borrowings from such Uncommitted Note Purchasers and such Committed Note Purchasers. Prior to entering into any agreement amending, modifying, terminating or waiving its rights under the Management Agreement, the Issuer shall comply with the applicable requirements of Section 14.4(d).

Section 7.16.    Reporting

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder of a Class A Note, the Co-Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder, to a prospective purchaser of such Note (or a beneficial interest therein) designated by such Holder or to the Trustee for delivery to such Holder or a prospective purchaser designated by such Holder, as the case may be, in order to permit compliance by such Holder with Rule 144A in connection with the resale of such Note (or a beneficial interest therein) by such Holder.

Section 7.17.    Special Procedures for Certain Obligations

(a)    Transfer of Obligations. If the Collateral Manager determines that the holding of title to any Pledged Obligation by the Issuer would impose material tax, regulatory, procedural or other burdens on the Issuer that would be mitigated by the transfer of such Pledged Obligation to the Zohar Subsidiary, then the Collateral Manager may cause the Issuer to assign such Pledged Obligation to the Zohar Subsidiary, provided that the Collateral Manager shall have given not less than five Business Days' prior written notice of such assignment to each Rating Agency. Consideration given by the Zohar Subsidiary for any such assignment may be in the form of Cash or in the form of membership interests of the Zohar Subsidiary.

(b)    Re-Transfer of Obligations. If subsequent to the assignment of any Pledged Obligation to the Zohar Subsidiary the Collateral Manager determines that the holding of title to such Pledged Obligation by the Issuer would no longer impose material tax, regulatory, procedural or other burdens on the Issuer, then the Collateral Manager shall use all commercially reasonable efforts to cause the Zohar Subsidiary to re-assign such Pledged Obligation to the Issuer as promptly as practicable.

146

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 7.18    Delivery of Appropriate Tax Forms

The Issuer shall deliver, and shall take all such reasonable actions as shall permit it to deliver, to each issuer (or appropriate paying agent) of an income producing asset acquired by the Issuer, as and when required to exempt payments with respect to such asset from U.S. federal withholding tax, (i) if the Issuer has a single U.S. equity owner for U.S. federal income tax purposes and is disregarded under Treasury Regulation section 301.7701-3, a duly completed Internal Revenue Service Form W-9 (or successor form) of its equity owner, (ii) otherwise, either (A) a duly completed Internal Revenue Service Form W-8ECI (or successor form) or (B) a duly completed Internal Revenue Service W-8IMY (or successor form) and all necessary supporting documentation from any Person treated as an equity owner of the Issuer for U.S. federal income tax purposes certifying that such Person is a United States Person or (iii) such other appropriate forms evidencing the Issuer's ability to receive such payments without withholding of U.S. federal withholding tax. If and to the extent directed by a Majority of the Class A Notes, the Trustee shall enforce the Issuer's obligations under this Section 7.18.

Section 7.19    Section 3(c)(7) Procedures

(a)    Section 3(c)(7) Reminder Notices. The Issuer shall send to the Noteholders a Section 3(c)(7) Reminder Notice at the times required under Sections 10.13(a) and 10.13(b). Without limiting the foregoing, the Issuer shall send a copy of each report referred to in Section 10.13(b) to DTC, with a request that DTC forward each such report to the relevant DTC Participants for further delivery to Beneficial Owners of interests in the Global Notes.

(b)    DTC Actions. The Issuer shall direct DTC to take the following steps in connection with the Rule 144A Global Notes:

(i)    The Issuer shall direct DTC to include the "3c7" marker in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes of each Class in order to indicate that sales are limited to QIB/QPs.

(ii)    The Issuer shall direct DTC to cause each physical DTC deliver order ticket delivered by DTC to purchasers to contain the DTC 20-character security descriptor; and shall direct DTC to cause each DTC deliver order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" indicator and a related user manual for participants, which shall contain a description of the relevant restrictions.

(iii)    The Issuer shall instruct DTC to send an Important Section 3(c)(7) Notice to all DTC Participants in connection with the offering of the Rule 144A Global Notes.

(iv)    The Issuer shall advise DTC that it is a Section 3(c)(7) issuer and shall request DTC to include the Rule 144A Global Notes in DTC's "Reference Directory" of Section 3(c)(7) offerings.

(v)    The Issuer shall from time to time (upon the request of the Trustee, the Note Registrar or the Portfolio Manager) request DTC to deliver to the Issuer a list of all DTC Participants holding an interest in the Rule 144A Global Notes.

(c)    Bloomberg Screens, Etc. The Issuer shall from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) restrictions on the Rule 144A Global Notes. Without limiting the foregoing, the

147

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050412

Issuer shall request Bloomberg, L.P. to include the following on each Bloomberg screen containing information about the Rule 144A Global Notes:

(i)      The "Note Box" on bottom of "Security Display" page describing the Rule 144A Global Notes should state: "Iss'd Under 144A/3c7".

(ii)      The "Note Box" on bottom of "Security Display" page describing the Regulation S Global Notes should state: "Iss'd Under Regulation S/3c7".

(iii)      The "Security Display Page" should have flashing red indicator "See Other Available Information".

(iv)      The Indicator for the Rule 144A Global Notes should link to the "Additional Security Information" page, which should state that the Rule 144A Global Notes "are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act to persons who are both (a) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (b) qualified purchasers (as defined under Section 3(c)(7) of the Investment Company Act of 1940)".

(v)      The Indicator for the Regulation S Global Notes should link to the "Additional Security Information" page, which should state that the Regulation S Global Notes "are being offered in reliance on the exemption from registration under Regulation S of the Securities Act in offshore transactions to non-U.S. persons".

(vi)      The "Disclaimer" page for the Global Notes should state that the Global Notes "shall not be and have not been registered under the Securities Act of 1933, as amended, and the Issuer has not been registered under the Investment Company Act of 1940, as amended, and these securities may not be offered or sold in the United States, or to U.S. Persons absent an applicable exemption from registration requirements and any such offer or sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act of 1940, as amended; each purchaser of these securities (or any interest therein) will be deemed to make to the Issuer and the Trustee all of the representations required pursuant to the Indenture under which such securities are issued".

(d)      CUSIP. The Issuer shall cause each "CUSIP" number obtained for the Rule 144A Global Notes to have an attached "fixed field" that contains "3c7" and "144A" indicators.


ARTICLE 8

SUPPLEMENTAL INDENTURES

Section 8.1.      Supplemental Indentures Without Consent of Noteholders

With the consent of the Controlling Party and the Collateral Manager (but without the consent of the Holders of any Notes or the Holders of any Preference Shares, unless such Holders of any such Notes or Preference Shares are within the definition of "Controlling Party"), the Zohar Obligors and the Trustee, at any time and from time to time subject to the requirement provided below in this Section 8.1 with respect to the ratings of the Notes, may enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Trustee, for any of the following purposes:

148

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050413

(a)      to evidence the succession of another Person to any Zohar Obligor and the assumption by any such successor Person of the covenants of such Zohar Obligor herein and, in the case of the Co-Issuers, in the Notes pursuant to Section 7.10 or 7.11;

(b)      to add to the covenants of the Zohar Obligors or the Trustee for the benefit of all the Secured Parties (or for the benefit of all Holders of the Notes in a manner not adverse to the interests of any other Secured Party) or to surrender any right or power herein conferred upon the Zohar Obligors;

(c)      to convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(d)      to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.11, 6.12 and 6.13;

(e)      to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(f)      to modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(g)      to correct any inconsistency, defect or ambiguity in this Indenture;

(h)      to accommodate the issuance of the Class A Notes in book-entry form through the facilities of DTC or otherwise, or to permit any Class A Notes to be listed on the Irish Stock Exchange, the Luxembourg Stock Exchange or any other exchange within the European Union (so long as the costs associated with obtaining and maintaining such listing are comparable to the costs of obtaining and maintaining such listing on the Irish Stock Exchange or the Luxembourg Stock Exchange);

(i)      to effect any one or more of the following (in each case subject to the delivery to the Co-Issuers, the Trustee, the Credit Enhancer, the Rating Agencies, the Noteholders and the Placement Agent an opinion of nationally-recognized tax counsel, subject only to customary qualifications, to the effect that after giving effect to the modifications of the Indenture and the other Transaction Documents in connection therewith that the Class B Notes (or Class C Notes) will be treated as debt of the Issuer for U.S. federal income tax purposes):

(1)      to modify the restrictions on the transfer and exchange of the Class B Notes (or Class C Notes, as applicable) to be substantially similar to the restrictions on the transfer and exchange of the Class A Notes as then in effect;

149

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture
PP050414

(2)    to fix the accreted value of the Class B Notes (or Class C Notes, as applicable) as of any date;

(3)    in the case of the Class B Notes, to change the maturity date thereof so long as any such change does not result in the maturity date of the Class B Notes being prior to the maturity date of the Class A Notes (and, in the case of the Class C Notes, to change the maturity date thereof so long as any such change does not result in the maturity date of the Class C Notes being prior to the maturity date of the Class B Notes); or

(4)    to modify the treatment of the Class B Notes (or the Class C Notes, as applicable) for U.S. federal income tax purposes; or

(j)    to effect any changes required by a Moody's Plan or a Post-Ramp Up Plan pursuant to Section 7.13.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

The Trustee shall not enter into any such supplemental indenture pursuant to this Section 8.1 if, as a result of such supplemental indenture, the interests of any Holder would be adversely affected thereby (unless such Holder shall have consented to such supplemental indenture). Unless notified by a Majority of any Class of Notes that such Class will be adversely affected or by the Preference Share Paying Agent acting on behalf of the Holders of a Majority of the Preference Shares Outstanding that the Holders of the Preference Shares will be adversely affected, the Trustee shall be entitled to rely upon an Opinion of Counsel as to whether the interests of any such Holder would be adversely affected by any such supplemental indenture (after giving notice of such change to the Holders), which Opinion of Counsel may rely (as applicable) (x) as to the effect of any supplemental indenture on the economic interests of the Holders of the Notes, on written confirmation from each Rating Agency that the supplemental indenture will not cause a reduction or withdrawal of its rating, if any, of any Class A Notes rated by it (without giving effect to the Credit Enhancement) and (y) as to the effect of any supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares, on written certification from the Collateral Manager as to the effect of the supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares. At the cost of the Co-Issuers, the Trustee shall provide to the Noteholders and the Preference Share Paying Agent a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee and a copy of the executed supplemental indenture after its execution. At the cost of the Co-Issuers, the Trustee shall provide to the Credit Enhancer (for so long as the Credit Enhancement has not been cancelled or terminated in accordance with its terms), to Moody's and to Standard & Poor's, a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee, and, for so long as such Notes are Outstanding, request written confirmation that each Rating Agency will not, as a result of such supplemental indenture, cause the then current rating of any such Class of Notes (without giving effect to the Credit Enhancement) to be reduced or withdrawn, and, as soon as practicable after the execution by the Trustee and the Zohar Obligors of any such supplemental indenture, provide to each Rating Agency a copy of the executed supplemental indenture. The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the then current rating of any Outstanding Class of Notes would be reduced or

150

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7347151v22

Indenture
PP050415

withdrawn by either Rating Agency, as evidenced by a written instrument or instruments signed by each Rating Agency, unless the Trustee shall have obtained the consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class and the Credit Enhancer, so long as no Credit Enhancement Event has occurred and is continuing.

Section 8.2.    Supplemental Indentures with Consent of Noteholders

With the consent of (x) the Controlling Party and (y) the Collateral Manager, delivered to the Trustee and the Zohar Obligors, the Trustee and Zohar Obligors may enter into one or more indentures supplemental hereto to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes or the Holders of the Preference Shares under this Indenture; provided that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of the Credit Enhancer (unless a Credit Enhancement Event has occurred and is continuing, in which case the consent of the Credit Enhancer shall be required only if the Credit Enhancer would be adversely effected by such supplemental indenture), each Holder of each Outstanding Note of each Class adversely affected thereby (or, in the case of Class A-1 Additional Amounts, each Holder of Class A-1 Notes adversely affected thereby) and the Preference Share Paying Agent acting at the direction of the Holders of each of the Preference Shares outstanding (if the Holders of the Preference Shares will be adversely affected thereby):

(a)    change the Stated Maturity of the principal of or the due date or amount of any installment of interest on any Note, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee or any Class A-1 Additional Amounts, reduce the principal amount thereof or the Note Interest Rate thereon or Class A-1 Commitment Fee thereon, or Class A-3 Commitment Fee thereon, or the Redemption Price with respect to any Note or Preference Share, or change the earliest date on which any Note or Preference Share may be redeemed, or change the date on which any dividend or final distribution on the Preference Shares is payable or change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes or any Class A-1 Commitment Fee, any Class A-3 Commitment Fee or any Class A-1 Additional Amounts or the deposit of the proceeds of any Collateral in the Preference Share Distribution Account, or change any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon or any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts, any Class A Redemption Break Funding Costs or, with respect to the Preference Shares, any dividend or final distribution thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or the percentage in aggregate number of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with the provisions of this Indenture or any Default hereunder or their consequences provided for in this Indenture;

(c)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate such lien on any property at any time subject hereto (other than in connection with the sale thereof in accordance with this Indenture) or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

151

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050416

(d)      reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to preserve the Collateral or rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(e)      modify any of the provisions of Article 8, except to increase any such percentage referred to in Section 8.2(d) above or to provide that other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note or Preference Share adversely affected thereby (in the case of any Preference Share, as evidenced by the consent of the Preference Share Paying Agent acting at the direction of the Holder of such Preference Share);

(f)      modify the definition of "Outstanding", the Priority of Payments set forth in Section 11.1(a) or Section 11.2(a), or Section 13.1;

(g)      increase the permitted minimum denominations of any Class of Notes; or

(h)      modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of interest on or principal of any Note or any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts, any Class A Redemption Break Funding Costs or the payment of dividends or any final distribution on any Preference Shares on any Payment Date or to affect the rights of the Holders of Notes or Preference Shares to the benefit of any provisions for the redemption of such Notes or Preference Shares contained herein.

In addition, (A) each supplemental indenture referred to in this Section 8.2 shall require the consent of each Holder of a Class A Note if the changes to the Indenture effected pursuant to such supplemental indenture would modify Section 9.5 or 9.6, (B) each supplemental indenture referred to in this Section 8.2 shall require the consent of the Arranger or the Placement Agent if the changes to the Indenture effected pursuant to such supplemental indenture would reduce the rights or increase the obligations of the Arranger or the Placement Agent and (C) each supplemental indenture referred to in this Section 8.2 shall require the consent of a CP Conduit or Committed Note Purchaser if the changes to the Indenture or the other Transaction Documents effected pursuant to such supplemental indenture would modify the definition of "Rating Criteria" or modify the obligation of such CP Conduit or Committed Note Purchaser to post collateral to a Class A Holder Collateral Account or modify any rights, obligations or other provisions with respect to such Class A Holder Collateral Account.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers shall mail to the Noteholders, the Preference Share Paying Agent, the Credit Enhancer (for so long as the Credit Enhancement has not been cancelled or terminated in accordance with its terms), to Moody's and to Standard & Poor's a copy of such supplemental indenture (or a description of the substance thereof) and shall request Moody's and Standard & Poor's, to determine and inform the Trustee and the Co-Issuers whether, as a result of such supplemental indenture, such Rating Agency would cause the then current rating of any Class of Notes to be reduced or withdrawn (without giving effect to the Credit Enhancement). The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the then current rating of any such Class of Notes would be reduced or withdrawn (without giving effect to the Credit Enhancement), as evidenced by a written instrument or instruments signed by each Rating Agency, unless each Holder of Notes of each Class whose rating will be reduced or withdrawn has, after notice that the proposed supplemental indenture would result in such

152

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050417

reduction or withdrawal of the then current rating of the Class of Notes held by such Holder, consented to such supplemental indenture. Unless notified by a Majority of any Class of Notes that such Class will be adversely affected or by the Preference Share Paying Agent acting at the direction of the Holders of a Majority of the Preference Shares that such Holders will be adversely affected (in each case in the manner set forth in clauses (a) through (h) above), the Trustee may, consistent with the written advice of counsel, determine whether or not such Class of Notes or Preference Shares would be so adversely affected by such change (after giving notice of such change to the Holders of the Notes and the Preference Shares), which Opinion of Counsel may rely (as applicable) (x) as to the effect of any supplemental indenture on the economic interests of the Holders of the Notes, on written confirmation from each Rating Agency that the supplemental indenture will not cause a reduction or withdrawal of its rating, if any, of any Class of Notes rated by it (without giving effect to the Credit Enhancement) and (y) as to the effect of any supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares, on written certification from the Collateral Manager as to the effect of the supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares. Such determination shall be conclusive and binding on all present and future Holders and present and future Holders of the Preference Shares. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3.

It shall not be necessary for any Act of Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Zohar Obligors and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes, the Collateral Manager, the Preference Share Paying Agent, the Credit Enhancer (for so long as the Class A-1 Notes or the Class A-2 Notes shall remain Outstanding), Moody's and Standard & Poor's a copy thereof. Any failure of the Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.3.    Execution of Supplemental Indentures

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying in good faith upon an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise.

Section 8.4.    Effect of Supplemental Indentures

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.    Reference in Notes to Supplemental Indentures

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notation in form approved by

153

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

the Trustee as to any matter provided for in such supplemental indenture. If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Co-Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

Section 8.6.    Rights of the Credit Enhancer

The rights of the Holders of the Notes to vote in respect of any supplemental indenture pursuant to Section 8.1 or Section 8.2 shall be subject to the rights of the Credit Enhancer set forth in Section 16.1(b).

## ARTICLE 9

## REDEMPTION AND REPAYMENT OF NOTES, ETC.

Section 9.1.    Redemption of all Notes

(a)    On any date occurring on or after the Payment Date in January, 2010, at the option of the Issuer (which option the Issuer agrees to exercise only at the written direction of the Collateral Manager and the Preference Share Paying Agent acting at the written direction of the Majority of the Preference Shares), the Notes shall be redeemable, from Sale Proceeds and all other funds in the Redemption Accounts, in whole but not in part, at the applicable Redemption Price (exclusive of installments of principal and interest due on or prior to such date if payment of such installments of principal and interest shall have been made or duly provided for, to the Holders of the Notes as provided in this Indenture); provided that (i) the Sale Proceeds therefrom and all other funds subject to this Indenture in the Redemption Accounts will be at least sufficient to redeem the Notes simultaneously, and to pay the other amounts payable, in accordance with the procedures described in Section 9.1(b), (ii) such Sale Proceeds and other funds are used to make such a redemption and (iii) after giving effect to such a redemption no Commitment Shortfall would exist.

(b)    The Notes shall not be redeemed pursuant to Section 9.1(a) unless either:

(i)    at least five Business Days before the scheduled Redemption Date, the Collateral Manager shall have furnished to the Trustee evidence in form reasonably satisfactory to the Trustee, that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial institution or institutions (or a guarantor or guarantors of the obligations thereof) (x) whose long-term unsecured debt obligations (other than such obligations whose rating is based on the credit of a Person other than such institution) have a credit rating from each Rating Agency of at least equal to the highest rating of any Notes then Outstanding or whose short-term unsecured debt obligations have a credit rating of "P-1" by Moody's and "A-1+" by Standard & Poor's (unless waived by the Controlling Party) or (y) whose obligations under such binding agreements are supported by a letter of credit or other agreement acceptable to the Trustee and issued by a financial institution (or a guarantor or guarantors of the obligations thereof) satisfying the requirements of the foregoing clause (x) to purchase, not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds all or part of the Collateral Debt Obligations and Unrestricted Collateral Debt Obligations at a sale price (including in such sale price the accrued interest on such Collateral) at least equal to an amount sufficient, together with (a) all funds on deposit in the Redemption Accounts, (b) the proceeds from all Eligible Investments and other Collateral maturing prior to the scheduled Redemption Date and (c) (without duplication) the aggregate amount of the expected

154

Indenture

NY3:#7347151v22
PP050419
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8    pg. 161 of 447

proceeds from the sale of Collateral and/or Eligible Investments not later than the Business Day immediately preceding the scheduled Redemption Date with respect to which the Collateral Manager has provided the certification to the Trustee described in Section 9.1(b)(ii), to pay all Administrative Expenses, all Credit Enhancement Liabilities, all Credit Enhancement Premium and all amounts payable under the Priority of Payments prior to the payment of the Notes (including fees and expenses incurred by the Trustee and the Collateral Manager in connection with such sale of such Collateral), to pay any Hedge Termination Amounts payable by the Issuer and to redeem the Notes on the scheduled Redemption Date at the applicable Redemption Prices, together with all accrued interest to the date of redemption (including any Defaulted Interest and interest thereon in respect of the Class A Notes) and all other amounts payable under the Note Purchase Agreements (the aggregate amount required to make all such payments and to effect such redemption, the "Total Redemption Amount"); provided that all such payments shall be made in accordance with the Priority Payments and that for the purposes of this Section 9.1(b)(i), such date of redemption shall be deemed to be a Payment Date, or

(ii)    prior to selling any Collateral Debt Obligations, Unrestricted Collateral Debt Obligations and/or Eligible Investments, the Collateral Manager shall certify to the Trustee, each Rating Agency and the Controlling Party that (in the Collateral Manager's sole judgment) the sum (without duplication) of:

(A)    100% of all Eligible Investments maturing on or prior to the scheduled Redemption Date and all Cash held in or credited to the Redemption Accounts;

(B)    100% of the purchase prices of any Collateral Debt Obligations and Unrestricted Collateral Debt Obligations as to which the Collateral Manager has entered into one or more binding agreements with financial institutions meeting the requirements of Section 9.1(b)(i)(x) or (y);

(C)    65% of the Market Value of any Current Collateral Debt Obligation that has a Market Value of at least 90% of the Aggregate Principal Balance thereof (an "Adequate Market Value Collateral Debt Obligation") that the Collateral Manager certifies is expected to be sold within two Business Days of such certification;

(D)    63% of the Market Value of any Adequate Market Value Collateral Debt Obligation that the Collateral Manager certifies is expected to be sold within three to five Business Days of such certification;

(E)    55% of the Market Value of any Adequate Market Value Collateral Debt Obligation that the Collateral Manager certifies is expected to be sold within six to 15 Business Days of such certification;

(F)    45% of the Market Value of any Collateral that is not an Adequate Market Value Collateral Debt Obligation and that the Collateral Manager certifies is expected to be sold within two Business Days of such certification;

(G)    43% of the Market Value of any Collateral that is not an Adequate Market Value Collateral Debt Obligation and that the Collateral Manager

155

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7347151v22

Respondents' Exhibit 8   pg. 162 of 447

certifies is expected to be sold within three to five Business Days of such certification; and

> (H)    20% of the Market Value of any Collateral that is not an Adequate Market Value Collateral Debt Obligation and which the Collateral Manager certifies is expected to be sold within six to 15 Business Days of such certification;

equals or exceeds the Total Redemption Amount, subject to the requirement that no such certification may be given more than 15 Business Days prior to the scheduled Redemption Date.

Section 9.2.    Notice to Trustee of Optional Redemption

In the event of any redemption pursuant to Section 9.1, the Issuer shall, at least 30 days (but not more than 90 days) prior to the Redemption Date (unless the Controlling Party and the Trustee shall agree to a shorter notice period), notify the Trustee, the Controlling Party and each Rating Agency in writing of such Redemption Date, the applicable record date (which shall be 15 Business Days before the Redemption Date), the principal amount of Notes to be redeemed on such Redemption Date and the Redemption Price of such Notes in accordance with Section 9.1.

Section 9.3.    Notice of Optional Redemption or Maturity by the Co-Issuers

Notice of redemption pursuant to Section 9.1 or the Maturity of any Class of Notes shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the applicable Redemption Date or Maturity to each Rating Agency and each Holder of Notes to be redeemed pursuant to Section 9.1, at such Holder's address in the Note Register and to the Controlling Party.

All notices of redemption shall state: (a) the applicable Redemption Date; (b) the applicable record date therefor; (c) the Redemption Price; (d) the principal amount of each Class of Notes to be redeemed and that interest on such principal amount of Notes shall cease to accrue on the Redemption Date specified in the notice; (e) that the Class A-1 Commitments and/or the Class A-3 Commitments shall terminate on the Redemption Date specified in the notice; and (f) the place or places where such Notes to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Paying Agent or the Issuer to be maintained as provided in Section 7.2.

The Issuer shall have the option to withdraw the notice of redemption up to the fourth Business Day prior to the scheduled Redemption Date by written notice to the Trustee, the Controlling Party and the Collateral Manager only if (i) the Collateral Manager is unable to deliver the sale agreement or agreements or certifications referred to in Section 9.1, as the case may be, in form satisfactory to the Trustee or (ii) the Issuer receives written direction from the Preference Share Paying Agent (acting at the direction of the same requisite percentage of Holders of Preference Shares that originally directed such redemption) (and the Issuer agrees for the benefit of Holders of the Preference Shares to withdraw such notice of redemption if it receives such written direction). Notice of any such withdrawal will be given by the Trustee to each Holder of Notes that was to be redeemed at such Holder's address in the Note Register maintained by the Note Registrar under the Indenture by overnight courier guaranteeing next day delivery (if such Holder's address is proper for such delivery; otherwise by first class mail) and by fax (where a fax number has been provided to the Trustee), sent not later than the third Business Day prior to the scheduled Redemption Date.

156

NY3:#7347151v23
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

Section 9.4.    Notes Payable on Redemption Date

Notice of redemption having been given in accordance with Section 9.3, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) any such Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date. Installments of interest on Notes of a Class so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.6(e).

If any Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding. All amounts paid hereunder in connection with the redemption of any Notes, including Sales Proceeds in excess of the Total Redemption Amount, shall be distributed in accordance with the Priority of Payments.

Section 9.5.    Certain Prepayments; Reduction of Commitments

(a)    Principal Payments; Class A-1 Note Prepayments.

(i)    The Issuer will make principal payments on the Notes as provided in Article 11.

(ii)    In addition to the principal payments required on the Class A-1 Notes referred to in clause (a)(i) above, the Class A-1 Notes may be prepaid at the option of the Issuer at the written direction of the Collateral Manager (each, a "Prepayment"; each date of a Prepayment being a "Prepayment Date") on any Payment Date to the extent funds are available for such application under Sections 11.1(a)(ii)(A), 11.1(a)(ii)(F) and 11.2(a)(v), provided that (1) the Issuer has delivered a written notice of Prepayment to the Class A-1 Note Agent and the Trustee not less than five Business Days before the proposed Prepayment Date and (2) the aggregate principal amount of any partial Prepayment of the Class A-1 Notes (taken as a whole) shall be an integral multiple of U.S.$100,000 and at least U.S.$1,000,000.

(iii)    Except as otherwise expressly provided in this Indenture, a Prepayment of the Class A-1 Notes will not result in a reduction in the Class A-1 Commitments.

(b)    Commitment Reductions.

(i)    On each Payment Date, the Class A-1 Commitments will be reduced by an amount equal to the aggregate amounts applied under Sections 11.1(a)(i)(H)(1), 11.1(a)(ii)(C)(1), 11.1(a)(ii)(G)(1) and 11.2(a)(vi)(1) on such Payment Date (including the amounts deposited in the Issuer Principal Collection Account pursuant thereto); and on the Payment Date on which the Class A Pro Rata Adjustment Advance is made under Section 9.6(e), the Class A-1 Commitments will be reduced as provided therein.

157

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050422

(ii)    Each reduction of the Class A-1 Commitments referred to in clause (b)(i) above will be applied to the Class A-1 Commitments pro rata according to the respective amounts thereof. In addition, contemporaneously with each such reduction the respective Commitment Limits of the Committed Note Purchasers under the applicable Class A-1 Note Purchase Agreements shall be proportionally reduced.

(iii)    Unless earlier reduced to zero or terminated:

(1)    the Class A-1 Commitments will expire at the close of business on the Stated Maturity of the Class A Notes; and

(2)    the Class A-3 Commitments will expire at the close of business on the Payment Date falling in October, 2005.

(c)    Reductions, etc., Irrevocable. Class A-1 Commitments and Class A-3 Commitments, once reduced, terminated or expired, cannot be reinstated.

Section 9.6.    Borrowings; Class A Pro Rata Adjustment Advances

(a)    Pursuant to the Note Purchase Agreements and subject to compliance with the conditions set forth herein and therein, the Issuer (at the direction of the Collateral Manager) may request (and the Holders of the Class A-1 Notes and the Holders of the Class A-3 Notes shall be obligated to make) advances under the Class A-1 Notes and the Class A-3 Notes until the earlier of (1) the date on which the Class A-1 Commitments or the Class A-3 Commitments (as the case may be) have terminated, expired or been reduced to zero and (2) the Maturity of such Notes. Proceeds of the advances made under the Class A Notes may be used only for the following purposes:

(A)    during the Reinvestment Period, to fund the purchase of Collateral Debt Obligations subject to Section 12.1;

(B)    on any Business Day, to fund the purchase of Collateral Debt Obligations for which the commitment to purchase was entered into prior to the end of the Reinvestment Period, subject to Section 12.1;

(C)    on any Business Day to make extensions of credit in respect of Collateral Debt Obligations that constitute Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations owned by the Issuer or the Zohar Subsidiary;

(D)    with respect to each Class of the Class A Notes, to satisfy the minimum Borrowing requirements set forth herein and in the applicable Note Purchase Agreement with respect to such Class; and

(E)    in the case of the Class A Pro Rata Adjustment Advance, solely to repay Outstanding principal of the Class A-2 Notes and the Class A-3 Notes as provided in paragraph (e) below.

Amounts may be borrowed by the Issuer (at the direction of the Collateral Manager, a copy of which direction shall simultaneously be given to the Trustee by the Collateral Manager) under the Class A-1 Notes or the Class A-3 Notes (a "Borrowing"); provided that:

158

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050423

(i)    each applicable condition to such Borrowing specified in the applicable Note Purchase Agreements is satisfied on the date of such Borrowing (a "Borrowing Date");

(ii)    in no event may (A) the aggregate principal amount of Borrowings outstanding under the Class A-1 Notes exceed the aggregate amount of Class A-1 Commitments (utilized and unutilized) or (B) the aggregate principal amount of Borrowings outstanding under the Class A-3 Notes exceed the aggregate amount of Class A-3 Commitments (utilized and unutilized);

(iii)    with respect to the Class A-3 Notes, the Issuer shall not be permitted to reborrow any amount previously repaid thereon;

(iv)    the Issuer shall not borrow under the Class A-1 Notes until the Issuer has borrowed the full amount available under the Class A-2 Notes and Class A-3 Notes;

(v)    the Issuer shall borrow the remaining amount of the initial Class A-3 Commitments on or prior to October 20, 2005 (or if such day is not a Business Day, the immediately preceding Business Day); and

(vi)    the Issuer shall borrow the Aggregate Undrawn Amount of the Class A-3 Notes in the circumstances described in Section 7.5(e)(2).

(b)    Notice of any Borrowing under the Class A-1 Notes pursuant to Section 9.6(a) shall be given by the Issuer (or the Collateral Manager on its behalf) to the Class A-1 Note Agent and the Trustee, and the Class A-1 Note Agent shall promptly give notice of such Borrowing to each Holder of Class A-1 Notes and the Credit Enhancer, as provided in the applicable Class A-1 Note Purchase Agreements. Notwithstanding anything in the Class A-1 Note Purchase Agreement, all Borrowings thereunder shall be accompanied by a Notice of Borrowing as specified in the Class A-1 Note Purchase Agreement. Notice of any Borrowing under the Class A-3 Notes pursuant to Section 9.6(a) shall be given by the Issuer (or the Collateral Manager on its behalf) to the Class A-3 Note Agent and the Trustee, and the Class A-3 Note Agent shall promptly give notice of such Borrowing to each Holder of Class A-3 Notes, as provided in the applicable Class A-3 Note Purchase Agreement.

(c)    Except as provided herein with respect to Short Settlement Borrowings under the Class A-1 Notes:

(1)    the aggregate principal amount of any Borrowing under this Section 9.6 in respect of the Class A-1 Notes (taken as a whole) shall be an integral multiple of U.S.$500,000 and at least U.S.$5,000,000;

(2)    the aggregate principal amount of any Borrowing under this Section 9.6 in respect of the Class A-3 Notes shall be an integral multiple of U.S.$5,000,000 and at least U.S.$25,000,000 (except that the final Borrowing under the Class A-3 Notes may be in the remaining undrawn amount of such Notes).

(d)    Except as provided herein with respect to Short Settlement Borrowings:

(1)    all Borrowings under the Class A-1 Notes shall be made pro rata according to the Aggregate Undrawn Amounts of the Class A-1 Commitments; and

159

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(2)    all Borrowings under the Class A-3 Notes shall be made <u>pro rata</u> according to the Aggregate Undrawn Amounts of the Class A-3 Commitments.

(e)    Without limiting the foregoing provisions of this Section 9.6, and in any event subject to all applicable conditions to Borrowing set forth herein and in the Class A-1 Note Purchase Agreements, on the Payment Date on which the Reinvestment Period ends (or, if the Reinvestment Period ends on a day that is not a Payment Date, on the next succeeding Payment Date), the Issuer shall (at the direction of the Collateral Manager) borrow an advance ("<u>Class A Pro Rata Adjustment Advance</u>") under the Class A-1 Notes in an aggregate principal amount equal to the Term Sharing Percentage of the Class A-1 Available Amount, whereupon the proceeds of such Borrowing shall be applied to repay the outstanding principal of the Class A-2 Notes and Class A-3 Notes ratably in accordance with the Aggregate Outstanding Amounts of the Class A-2 Notes and Class A-3 Notes, respectively. Notwithstanding anything in this Indenture to the contrary, the proceeds of the Class A Pro Rata Adjustment Advance will not constitute "Principal Proceeds" or "Uninvested Proceeds" and will not be applied under the Priority of Payments but instead will be applied as stated above. Upon the making of the Class A Pro Rata Adjustment Advance, the Class A-1 Commitments will be reduced to an amount equal to the Aggregate Outstanding Amount of the Class A-1 Notes (determined immediately after giving effect to such advance) <u>plus</u> the Class A-1 Adjusted Exposure. As used above:

"<u>Class A-1 Adjusted Exposure</u>" means an amount (not less than zero) equal to (a) the Unfunded Portfolio Amount as of the date on which the Class A Pro Rata Adjustment Advance is made <u>minus</u> (b) the aggregate amount of Principal Proceeds then on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A Pro Rata Adjustment Advance) <u>minus</u> (c) the Balance on deposit in the Unfunded Revolver Discount Account as of such date.

"<u>Class A-1 Available Amount</u>" means an amount equal to the excess (if any) of:

(a)    the Aggregate Undrawn Amount of the Class A-1 Notes as of the date on which the Class A Pro Rata Adjustment Advance is made (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A Pro Rata Adjustment Advance); <u>over</u>

(b)    the Class A-1 Adjusted Exposure as of such date.

"<u>Term Sharing Percentage</u>" means the ratio (expressed as a percentage) of:

(a)    the Aggregate Outstanding Amount of the Class A-2 Notes and the Class A-3 Notes as of the date on which the Class A Pro Rata Adjustment Advance is made (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A Pro Rata Adjustment Advance); <u>to</u>

(b)    the Aggregate Outstanding Amount of the Class A Notes as of such date (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of the Class A Pro Rata Adjustment Advance) <u>plus</u> the Aggregate Undrawn Amount of the Class A-1 Notes (as so determined) as of such date.

160

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050425

(f)    The Trustee is hereby directed by the Issuer to execute and deliver the Note Purchase Agreements.

Section 9.7.    Application of Amounts to Purchase and Fund Collateral Debt Obligations

On any Business Day during or (to the extent permitted by this Indenture) after the Reinvestment Period, the Issuer or the Zohar Subsidiary may direct the Trustee, by Issuer Order, to acquire any Collateral Debt Obligation (subject to the requirements of Section 12.1) or to extend credit in respect of the Unfunded Amount under any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation by application of amounts in the following manner and order of priority:

(a)    In the case of any such extension of credit in respect of an Unfunded Amount under a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation that is an Unutilized Commitment, such credit will be extended by the Issuer or the Zohar Subsidiary thereunder:

(i)    first, by application of amounts on deposit in the Unfunded Revolver Discount Account (to the extent of the pro rata portion of the Discount Amount in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, determined by reference to the ratio of such Unutilized Commitment being funded to the original Unutilized Commitment in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation);

(ii)    second, by application of amounts on deposit in the Issuer Principal Collection Account and/or on deposit in the Zohar Subsidiary Principal Collection Account (in any case to the extent available); and

(iii)    third, by a Borrowing under the Class A-1 Notes or the Class A-3 Notes pursuant to and at the times set forth in Section 9.6.

(b)    In the case of the funding of any acquisition of a Collateral Debt Obligation or any extension of credit in respect of an Unfunded Amount under a Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation that is a Utilized Commitment, the purchase price of such acquisition will be funded or such credit will be extended by the Issuer or the Zohar Subsidiary thereunder:

(i)    first, by application of amounts on deposit in the Issuer Principal Collection Account and/or on deposit in the Zohar Subsidiary Principal Collection Account (in any case to the extent available); and

(ii)    second, by a Borrowing under the Class A-1 Notes or the Class A-3 Notes pursuant to and at the times set forth in Section 9.6.

Notwithstanding the foregoing, if the Issuer requests a Borrowing under Section 9.6 in an amount required by clause (a)(iii) or (b)(ii) above to acquire any Collateral Debt Obligation or to fund the Unfunded Amount under any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation and the proceeds of such Borrowing are insufficient to fund such acquisition or commitment due to the failure of any Holder of a Class A Note to make such

161

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050426

Respondents' Exhibit 8   pg. 168 of 447

proceeds available on the date requested therefor, the Issuer or the Zohar Subsidiary, as applicable, shall <u>first</u> apply amounts on deposit in the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account and <u>second</u>, apply amounts on deposit in the Unfunded Revolver Discount Account.

(c)    Notwithstanding the terms of Section 9.6, 9.7(a) or 9.7(b), on any Business Day (other than the last two Business Days during any Due Period) the Issuer or the Zohar Subsidiary may direct the Trustee, by Issuer Order, to acquire any Collateral Debt Obligations or to extend credit in respect of the Unfunded Amount under any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation by application of amounts on deposit in the Unfunded Revolver Discount Account, the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account in such manner and order of priority as may be specified in such Issuer Order; <u>provided</u> that, in the event that, pursuant to this Section 9.7(c), amounts shall be applied on any date from the Unfunded Revolver Discount Account, the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account in an order of priority other than that specified in Section 9.7(a) or 9.7(b), on the Business Day immediately preceding the last day of the then current Due Period (the "<u>True-Up Date</u>") the Trustee shall transfer amounts between the Unfunded Revolver Discount Account and the Issuer Principal Collection Account in such amounts as may be necessary to cause the Balances of such Accounts on the True-Up Date to equal what such Balances would have been on the True-Up Date had credit been extended from such Accounts on each applicable date during such Due Period in accordance with the funding procedures set forth in Section 9.7(a) or 9.7(b), as applicable (and, to the extent that the Balances on deposit in the Issuer Principal Collection Account or Zohar Subsidiary Principal Collection Account are insufficient to fund the transfers to the Unfunded Revolver Discount Account on such date, the Collateral Manager may direct the Issuer to draw upon the Class A-1 Notes or Class A-3 Notes (as applicable) pursuant to and at the times set forth in Section 9.6 in an amount equal to such shortfall, the proceeds of which to be deposited into the Unfunded Revolver Discount Account).

(d)    The Issuer or the Zohar Subsidiary may extend credit in respect of the Unfunded Amount under any Unrestricted Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation to the extent provided in Section 11.5(a).

ARTICLE 10

ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.    <u>Collection of Money</u>

(a)    Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms and conditions of such Pledged Obligations. The Trustee shall segregate and hold all such Money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.

(b)    Each of the parties hereto hereby agrees that (i) each Account shall be deemed to be a "Securities Account" and (ii) except as otherwise expressly provided herein, the Trustee will be exclusively entitled to exercise the rights that comprise each Financial Asset held in each Account. Each of the parties hereto hereby agrees to cause the Custodian or any other Securities Intermediary that holds any Money or other property for any Zohar Obligor in an Account to agree with the parties hereto that

162

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(a) the Cash and other property is to be treated as a Financial Asset under Article 8 of the UCC and (b) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially indorsed to, the Issuer unless such Financial Asset has also been indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account. Each Account shall be held and maintained at an office located in the United States.

Section 10.2.    Principal Collection Accounts; Interest Collection Accounts; Custodial Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Issuer Interest Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds received by the Issuer from the disposition of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested in Collateral Debt Obligations or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), (ii) all other Interest Proceeds received by the Issuer (other than interest and other income from Eligible Investments held in the Class A Holder Collateral Account and the Hedge Counterparty Collateral Account) and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(b)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Issuer Principal Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all Uninvested Proceeds received from the issuance of the Notes and Preference Shares (to the extent not deposited into the Expense Account, the Closing Expense Account, the Professional Fee Account, the Unrestricted Collateral Account, the Unfunded Revolver Discount Account or the Cash Reserve Account or used to pay any amount payable out of the Uninvested Proceeds on the Funding Date), (ii) all proceeds received by the Issuer from the disposition of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in Collateral Debt Obligations or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), (iii) all other Principal Proceeds received by the Issuer and (iv) all other amounts (including any Cash Retention Amount) required by the terms of this Indenture to be deposited therein.

(c)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account (which may be a sub-account of the Issuer Interest Collection Account) which shall be designated as the "Zohar Subsidiary Interest Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary from the disposition of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested in Eligible Investments), (ii) all other Interest Proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(d)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account (which may be a sub-account of the Issuer Principal Collection Account) which shall be designated as the "Zohar Subsidiary Principal Collection Account", which shall be held in

163

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050428

the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary from the disposition of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in Eligible Investments), (ii) all other Principal Proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(e)    In addition to depositing or causing to be deposited from time to time such Monies in the Collection Accounts as required from time to time in accordance with the terms hereof, the Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such other Monies in a Collection Account as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Monies are to be treated as Principal Proceeds or Interest Proceeds hereunder to be credited to the applicable Collection Account at its discretion. All Monies deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied for the purposes herein provided. The Collection Accounts shall remain at all times with a financial institution organized under the laws of the United States or any political subdivision thereof and having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(f)    All Distributions, any deposit required pursuant to Section 10.2(e) and any net proceeds from the sale or disposition of a Collateral Debt Obligation, Eligible Investment or Equity Security received by the Trustee (other than any Distribution the proceeds of which are required under Section 10.9 to be deposited in the Unrestricted Collateral Account or under Section 10.10 to be deposited in the Rollover Proceeds Account) shall be immediately deposited into the Issuer Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Interest Collection Account or the Zohar Subsidiary Principal Collection Account (unless in any case simultaneously reinvested in accordance with the terms of the Indenture in Collateral Debt Obligations or Eligible Investments), as the case may be. Subject to Sections 10.2(h) and 10.2(i), all amounts deposited in the Collection Accounts, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection Accounts as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2. By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall (except as provided in Section 10.2(g)), invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Collection Accounts, as so directed in Eligible Investments having Stated Maturities no later than the Business Day immediately preceding the next Payment Date. The Trustee, within one Business Day after receipt of any Distribution or other proceeds which are not Cash, shall so notify the Issuer and the Issuer or the Zohar Subsidiary, and shall, within 60 days of receipt of such notice from the Trustee, sell such Distribution or other proceeds for Cash in an arm's-length transaction to a Person which is not an Affiliate of the Issuer or the Collateral Manager and deposit the proceeds thereof in the applicable Collection Account, for investment pursuant to this Section 10.2; provided that neither the Issuer nor the Zohar Subsidiary need sell such Distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such Distributions or other proceeds constitute Collateral Debt Obligations, Unrestricted Collateral Debt Obligations, Eligible Investments or Equity Securities.

(g)    If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(f), the Trustee shall seek instructions from the

164

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Collateral Manager within three Business Days after transfer of such funds to a Collection Account. If the Trustee does not thereupon receive written instructions from the Issuer within five Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition thereof maturing no later than the Business Day immediately preceding the next Payment Date (provided that the Trustee shall make such investments and reinvestments in such amounts (but only to the extent of available funds) as may be necessary to ensure that on each date there shall be on deposit in or credited to the Issuer Principal Collection Account Eligible Investments having a Stated Maturity of the Business Day immediately following the date of investment with an Aggregate Principal Balance equal to or greater than the Unfunded Portfolio Amount minus the amounts referred to in clauses (b), (c) and (d) of the definition of "Funding Source Amount" as of such date). After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Monies in Eligible Investments specified by the Controlling Party or, in the absence of such direction, as fully as practicable in Eligible Investments of the type described in clause (c) of the definition thereof maturing not later than the earlier of (i) 30 days after the date of such investment or (ii) the Business Day immediately preceding the next Payment Date (subject to the proviso in the preceding sentence). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account or the Zohar Subsidiary Interest Collection Account (to the extent such interest and other income constitutes Interest Proceeds) or the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account (to the extent such interest and other income constitutes Principal Proceeds), any gain realized from such investments shall be credited to such Collection Account, and any loss resulting from such investments shall be charged to such Collection Account. Any gain or loss with respect to an Eligible Investment shall be allocated in such a manner as to increase or decrease, respectively, Principal Proceeds and/or Interest Proceeds in the proportion which the amount of Principal Proceeds and/or Interest Proceeds used to acquire such Eligible Investment bears to the purchase price thereof. The Trustee shall not in any way be held liable by reason of any insufficiency of such Collection Account resulting from any loss relating to any such investment.

(h)    The Trustee shall, upon receipt of an Issuer Order specified in Section 9.7(a) or 9.7(b) or as otherwise required by Section 9.7(c), apply amounts on deposit in the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account as permitted under and in accordance with the requirements of Section 9.7 and such Issuer Order. The Trustee shall, upon receipt of an Issuer Order and with the prior written consent of the Controlling Party, apply amounts on deposit in the Issuer Principal Collection Account as permitted under and in accordance with the requirements of Section 15.1(b) and such Issuer Order.

(i)    On the Business Day next succeeding the date on which any Interest Proceeds are received in the Zohar Subsidiary Interest Collection Account, the Trustee shall transfer such Interest Proceeds to the Issuer Interest Collection Account; and on the Business Day next succeeding the date on which any Principal Proceeds are received in the Zohar Subsidiary Principal Collection Account, the Trustee shall transfer such Principal Proceeds to the Issuer Principal Collection Account. On the Business Day prior to each Payment Date, the Trustee shall transfer any amounts then held in the Issuer Interest Collection Account and the amount of any Principal Proceeds then held in the Issuer Principal Collection Account (other than in each case proceeds received after the end of the Due Period with respect to such Payment Date) to the Payment Account for application pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b).

(j)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Custodial Account", which shall be held

165

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

in the name of the Trustee in trust for the benefit of the Secured Parties and into which the Trustee shall from time to time deposit Collateral. All Collateral deposited from time to time in the Custodial Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Trustee agrees to give the Issuer and the Controlling Party notice as promptly as reasonably possible if the Custodial Account or any funds on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.

Section 10.3.    <u>Payment Account</u>

The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Payment Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Sections 11.1 and 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes in accordance with their terms and the provisions of this Indenture and, upon direction of the Issuer or in accordance with the Note Valuation Report, to pay Administrative Expenses and other amounts and make deposits specified in the Priority of Payments, each in accordance with the Priority of Payments (including in connection with any redemption of the Notes pursuant to Section 9.1 on any Payment Date). The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Payment Account or any funds on deposit therein, or otherwise to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments. The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

Section 10.4.    <u>Cash Collateral Account</u>

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Cash Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Cash Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Cash Collateral Account shall be to pay amounts specified in Section 11.2 (including in connection with any redemption of the Notes pursuant to Section 9.1 on any Payment Date). The Trustee shall transfer to the Cash Collateral Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b) and such other amounts as required hereunder.

(b)    The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Cash Collateral Account or any funds on deposit therein, or otherwise to the credit of the Cash Collateral Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Cash Collateral Account other than in accordance with the Priority of Payments. The Cash Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

166

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(c)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Cash Collateral Account during a Due Period, and amounts received in prior Due Periods and retained in the Cash Collateral Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately preceding the next Payment Date). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Cash Collateral Account and any loss resulting from such investments shall be charged to the Cash Collateral Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Cash Collateral Account resulting from any loss relating to any such investment.

Section 10.5.    Class A Holder Collateral Accounts

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account, which shall be designated as the "Class A Holder Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Issuer and any Holder of Class A-1 Notes (and, as to any Holder of Class A-1 Notes as to which a Holder Subaccount is created as provided below, any related External Support Provider) and in which no other Person shall have any legal or beneficial interest. If any Holder of a Class A-1 Note shall at any time be required to post collateral to the Class A Holder Collateral Account pursuant to the terms of the Class A-1 Note Purchase Agreement to which such Holder is a party, then (1) the Trustee shall create a segregated subaccount of the Class A Holder Collateral Account with respect to such Holder (the "Holder Subaccount" of such Holder) and (2) the Trustee shall deposit all collateral received from such Holder into such Holder Subaccount. The only permitted withdrawal from or application of funds credited to a Holder Subaccount shall be as specified in this Section 10.5.

(b)    With respect to any Holder, except as otherwise provided in any Class A-1 Note Purchase Agreement to which such Holder is a party, the posting of collateral to a Holder Subaccount or in a Class A-1 Collateral Arrangement by such Holder of a Class A-1 Note shall not constitute a Borrowing by the Issuer and shall not constitute a utilization of the Class A-1 Commitment of such Holder, and the funds posted as collateral shall not constitute principal outstanding under such Class A-1 Note. However, from and after the establishment of a Holder Subaccount or in a Class A-1 Collateral Arrangement with respect to any Holder of Class A-1 Notes until otherwise provided in this Section 10.5, the obligation of such Holder to advance funds under its Class A-1 Notes as part of any Borrowing under this Indenture and the related Note Purchase Agreement shall be satisfied by the Trustee withdrawing funds from such Holder Subaccount or obtaining funds from the Class A-1 Collateral Arrangement pursuant to the terms thereof, as the case may be, at the direction of the Class A-1 Note Agent, in the amount of such Holder's pro rata share of such Borrowing, and all payments of principal with respect to advances made by such Holder under its Class A-1 Notes (whether or not originally funded from such Holder Subaccount) shall be made by depositing the related funds into such Holder Subaccount. The Trustee shall have full power and authority to withdraw funds from each such Holder Subaccount at the time of, and in connection with, the making of any such Borrowing and to deposit funds into each such Holder Subaccount or a Class A-1 Collateral Arrangement, as the case may be, all in accordance with the terms of and for the purposes set forth in this Agreement and the related Note Purchase Agreement.

167

Indenture
PP050432

NY3:#7247151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(c)    If on any Payment Date (or on any other Business Day upon three Business Days' prior written request from such Holder and the Issuer) the sum of (i) the amount of funds on deposit in the Holder Subaccount and (ii) the value of collateral in the Class A-1 Collateral Arrangement (as determined pursuant to the terms thereof) relating to any Holder of Class A-1 Notes (exclusive of interest earnings subject to clause (e) below) exceeds such Holder's pro rata portion of the Aggregate Undrawn Amount of the Class A-1 Note of such Holder (whether due to a reduction in the Class A-1 Commitment or otherwise), then the Trustee shall, at the direction of the Class A-1 Note Agent, remit to such Holder a portion of the funds then held in the related Holder Subaccount and/or any cash or other collateral held pursuant to the Class A-1 Collateral Arrangment in an aggregate amount equal to such excess. If at any time the Issuer would otherwise be required to repay or prepay principal of any Borrowing to a Holder that is a Non-Extending Holder, then the Issuer shall repay or prepay such Borrowing by making a deposit in the Holder Subaccount of such Holder on such repayment or prepayment date in the payment or repayment amount, whereupon the principal amount of such Borrowing funded or deemed funded by such Holder shall be reduced by such amount. The Issuer shall repay the principal portion of any Borrowing funded or deemed funded by a Holder that is a Non-Extending Holder, and such Holder shall only be entitled to receive such amount (a) from time to time to the extent that the sum of the amount on deposit in the Holder Subaccount of such Holder plus the outstanding principal amount of all Borrowings funded or deemed funded by such Holder exceeds such Holder's Commitment Limit (as defined in the Class A-1 Note Purchase Agreement to which such Holder is a party) and (b) in full upon the Maturity of the Note. Amounts in the Holder Subaccount of any Holder shall also be applied as otherwise provided in the Note Purchase Agreement to which such Holder is a party.

(d)    If at any time a Holder of Class A-1 Notes demonstrates to the Issuer and the Class A-1 Note Agent that it is no longer required to post or maintain collateral in the Class A Holder Collateral Account pursuant to the terms of the Note Purchase Agreement to which such Holder is a party (including, without limitation, in the event that a Holder satisfies the Rating Criteria), then all funds then held in the relevant Holder Subaccount (after giving effect to any Borrowings in respect of such Class A-1 Notes are to be made on such date) shall be withdrawn from such Holder Subaccount, at the direction of the Class A-1 Note Agent, and remitted to such Holder, and thereafter all payments of principal with respect to advances made by such Holder shall be paid directly to such Holder in accordance with the terms of this Indenture and the relevant Class A-1 Note Purchase Agreement.

(e)    Except as otherwise provided in any Note Purchase Agreement, for so long as any amounts are on deposit in any Holder Subaccount, the Trustee shall invest and reinvest such funds in Eligible Investments as directed by the related Holder (which direction may be in the form of standing instructions) (or, if such Holder does not so direct, in Eligible Investments of the type referred to in clause (c) of the definition of such term), in each case having a Stated Maturity on the day following the date of acquisition thereof. Interest received on such Eligible Investments shall be remitted to such Holder on each Payment Date (and, pending such remittance, shall be retained in such account and invested and reinvested as aforesaid). Any gain realized from such investments shall be credited to such Holder Subaccount and any loss resulting from such investments shall be charged to such Holder Subaccount. The Trustee shall not in any way be held liable by reason of any insufficiency of such Holder Subaccount resulting from any loss relating to any such investment.

(f)    If the Class A Holder Collateral Account, any Holder Subaccount or any funds on deposit therein, or otherwise to the credit of any Holder Subaccount, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process, the Trustee shall give the Co-Issuers, the Collateral Manager, the related Holder and the Controlling Party immediate notice thereof. The Class A Holder Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

168

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050433

Section 10.6.    Expense Account; Professional Fee Account; Closing Expense Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Expense Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Expense Account shall be to pay (on any day other than a Payment Date) accrued and unpaid Administrative Expenses (other than (i) fees and expenses described in Section 11.1(a)(i)(B) (except to the extent such fees and expenses remain unpaid on any Payment Date after application of the Priority of Payments on such Payment Date), (ii) the Collateral Management Fee, but including other amounts payable by the Issuer to the Collateral Manager under the Management Agreement or the Indenture, (iii) Credit Enhancement Premium and Credit Enhancement Reimbursement Amounts, but including, so long as no Credit Enhancement Event has occurred and is continuing, other Credit Enhancement Liabilities, as applicable, and (iv) fees and expenses payable from the Professional Fee Account). On the Funding Date, the Trustee shall deposit into the Expense Account an amount equal to U.S.$500,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Thereafter, the Trustee shall transfer to the Expense Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and 11.2(a) and in accordance with the calculations and the instructions contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b). On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Expense Account to the Cash Collateral Account.

(b)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Professional Fee Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Professional Fee Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Professional Fee Account shall be (i) to pay (or reimburse for) costs of enforcement of the Issuer's obligations under Section 7.18, (ii) to pay accrued and unpaid Professional Fees (on any day other than a Payment Date) owing to first, legal advisors and, second, other professionals hired by the Collateral Manager in connection with its duties under the Management Agreement and (iii) on any Payment Date on which there are no Professional Fees due and owing (after application of any amounts from the Priority of Payments to the payment thereof), to reimburse the Collateral Manager for any Senior Collateral Management Fee paid to the Professional Fee Account pursuant to Section 11.1(a)(i)(D) on any prior Payment Date; provided that, in each case, such payments and/or reimbursements shall be made at the direction of the Collateral Manager. On the Funding Date, the Trustee shall deposit into the Professional Fee Account an amount equal to U.S.$2,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Thereafter, the Trustee shall transfer to the Professional Fee Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and 11.2(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.13(b). On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and,

169

Indenture
PP050434

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Professional Fee Account to the Cash Collateral Account.

(c)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Closing Expense Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Closing Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.8, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Closing Expense Account shall be to pay accrued and unpaid fees and expenses payable by or on behalf of the Zohar Obligors, the Collateral Manager, the Credit Enhancer, the Placement Agent and their respective Affiliates in connection with the issuance of the Notes and Preference Shares, the acquisition of the Warehouse Collateral Debt Obligations and any amounts payable under or in connection with the Warehouse Agreement or the transactions contemplated thereby and the negotiation, preparation and delivery of the Transaction Documents and other documents related thereto (collectively, "Closing Expenses"). On the Funding Date, the Trustee shall deposit into the Closing Expense Account an amount equal to U.S.$15,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. On the Business Day preceding the Payment Date in January, 2006, the Trustee shall transfer all amounts on deposit in the Closing Expense Account to the Cash Collateral Account.

(d)    The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Expense Account, the Professional Fee Account, or the Closing Expense Account or any funds on deposit therein, or otherwise to the credit of any such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Expense Account, the Professional Fee Account and the Closing Expense Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(e)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Expense Account, the Professional Fee Account and the Closing Expense Account during a Due Period, and amounts received in prior Due Periods and retained in the Expense Account, the Professional Fee Account and the Closing Expense Account, as so directed in Eligible Investments having Stated Maturities no later than the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day next succeeding the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be, and any loss resulting from such investments shall be charged to the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be. The Trustee shall not in any way be held liable by reason of any insufficiency of the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be, resulting from any loss relating to any such investment.

170

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050435

Section 10.7.    Cash Reserve Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Cash Reserve Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Cash Reserve Account shall be held in trust by the Trustee for the benefit of the Secured Parties.

(b)    On the Funding Date, the Trustee shall deposit into the Cash Reserve Account an amount equal to U.S.$15,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. In addition, any amounts received by the Trustee from the Hedge Counterparty under any Hedge Agreement (other than Hedge Termination Amounts) shall be deposited into the Cash Reserve Account. Except as provided in Section 11.8, the only permitted withdrawal from or applications of funds on deposit in, or otherwise to the credit of, the Cash Reserve Account shall be as provided in Section 10.7(c).

(c)    If on any Determination Date the Collateral Manager certifies to the Trustee that the Collateral Manager has determined, based on its reasonable belief, that on the next succeeding Payment Date there will be in the aggregate insufficient Interest Proceeds and Principal Proceeds on deposit in the Collection Accounts and amounts on deposit in the Cash Collateral Account to pay all Senior Expense Amounts due and owing on such Payment Date in accordance with the Priority of Payments, the Trustee shall (at the written direction of the Collateral Manager) withdraw from the Cash Reserve Account and deposit into the Payment Account on or prior to the Business Day prior to such Payment Date for application on such Payment Date as Interest Proceeds an amount equal to such insufficiency (to the extent of funds on deposit in the Cash Reserve Account and after application on such Payment Date of Interest Proceeds and Principal Proceeds on deposit in the Collection Account and amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments) (and, if no such direction is provided, then no such withdrawals shall be made from the Cash Reserve Account). If on any Payment Date, after giving effect to any withdrawal referred to in the preceding sentence, the Balance in the Cash Reserve Account shall exceed the Required Reserve Amount, the Trustee shall withdraw from the Cash Reserve Account an amount equal to such excess and deposit such amounts into the Cash Collateral Account.

On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Cash Reserve Account to the Issuer Principal Collection Account for application as provided in Section 10.2 or, if no Class A Notes are Outstanding and all Class A-1 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero and all Credit Enhancement Liabilities and Credit Enhancement Premium have been paid in full, to the Cash Collateral Account.

(d)    The Trustee agrees to give the Co-Issuers and the Controlling Party notice as promptly as reasonably possible if the Cash Reserve Account or any funds on deposit therein, or otherwise to the credit of the Cash Reserve Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Cash Reserve Account other than in accordance with the Priority of Payments. The Cash Reserve Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

171

Indenture
PP050436

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(e)      By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Cash Reserve Account as so directed in Eligible Investments having a Stated Maturity no later than the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately preceding the next Payment Date).  All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account.  Any gain realized from such investments shall be credited to the Cash Reserve Account and any loss resulting from such investments shall be charged to the Cash Reserve Account.  The Trustee shall not in any way be held liable by reason of any insufficiency of the Cash Reserve Account resulting from any loss relating to any such investment.

Section 10.8.    Unfunded Revolver Discount Account

(a)      The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Unfunded Revolver Discount Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Unfunded Revolver Discount Account shall be held in trust by the Trustee for the benefit of the Secured Parties.  On the Funding Date, the Trustee shall deposit into the Unfunded Revolver Discount Account, from the initial issuance of the Notes and the Preference Shares, an amount equal to U.S.$15,000,000.  In addition, upon the acquisition of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation on or after the Funding Date, the proceeds of any Discount Amount paid (or deemed paid) by the seller thereof to the Issuer shall be deposited into the Unfunded Revolver Discount Account.  In addition, to the extent that the Issuer has withdrawn amounts on deposit in the Unfunded Revolver Discount Account pursuant to the last paragraph of Section 9.7(b) to acquire any Collateral Debt Obligations or to fund the Unfunded Amount under any Collateral Debt Obligations that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation and on any subsequent date the Issuer receives proceeds of a Borrowing that was to have been applied pursuant to Section 9.7(b) to such acquisition or Unfunded Amount, the Issuer will deposit a portion of the proceeds of such Borrowing equal to such previously withdrawn amounts into the Unfunded Revolver Discount Account.  Except as provided in Section 11.8, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Unfunded Revolver Discount Account shall be (i) upon receipt by the Trustee of an Issuer Order to acquire any Collateral Debt Obligation or to make extensions of credit in respect of the Unutilized Commitment of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation as permitted under and in accordance with the requirements of Section 9.7(a) and such Issuer Order, (ii) to acquire any Collateral Debt Obligation or to make extensions of credit in respect of the Utilized Commitment of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation as permitted under and in accordance with the requirements of Section 9.7(b) and such Issuer Order and (iii) as specified in Section 11.4.  On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of or, if earlier, on the Business Day next preceding any date that is a Redemption Date (so long as the conditions to the redemption of the Notes on such Redemption Date specified in Section 9.1(b)(i) or (ii) have been satisfied), the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Unfunded Revolver Discount Account to the Cash Collateral Account.

172

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050437

(b)    The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Unfunded Revolver Discount Account or any funds on deposit therein, or otherwise to the credit of the Unfunded Revolver Discount Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Unfunded Revolver Discount Account other than in accordance with the Priority of Payments. The Unfunded Revolver Discount Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Unfunded Revolver Discount Account during a Due Period, and amounts received in prior Due Periods and retained in the Unfunded Revolver Discount Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Unfunded Revolver Discount Account and any loss resulting from such investments shall be charged to the Unfunded Revolver Discount Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Unfunded Revolver Discount Account resulting from any loss relating to any such investment.

Section 10.9.    Unrestricted Collateral Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Unrestricted Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Unrestricted Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. On the Funding Date, the Trustee shall deposit into the Unrestricted Collateral Account, from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares, an amount equal to U.S.$10,000,000. In addition, all payments of principal, actual cash discounts received in connection with the acquisition of such Unrestricted Collateral Debt Obligation (if applicable) or Distributions on Equity Securities (except as described in clause (e) of the definition of "Interest Proceeds") acquired with proceeds from the Unrestricted Collateral Account received in Cash by the Issuer or the Zohar Subsidiary on any Unrestricted Collateral Debt Obligation shall be immediately deposited by the Trustee upon receipt thereof in the Unrestricted Collateral Account. Except as provided in Section 11.8, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Unrestricted Collateral Account shall be made as specified in Section 11.5.

On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of or, if earlier, on the Business Day next preceding any date that is a Redemption Date (so long as the conditions to the redemption of the Notes on such Redemption Date specified in Section 9.1(b)(i) or (ii) have been satisfied), the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Unrestricted Collateral Account to the Cash Collateral Account.

Indenture
PP050438

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(b)      The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Unrestricted Collateral Account or any funds on deposit therein, or otherwise to the credit of the Unrestricted Collateral Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Unrestricted Collateral Account other than in accordance with the Priority of Payments. The Unrestricted Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)      By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Unrestricted Collateral Account during a Due Period, and amounts received in prior Due Periods and retained in the Unrestricted Collateral Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Unrestricted Collateral Account and any loss resulting from such investments shall be charged to the Unrestricted Collateral Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Unrestricted Collateral Account resulting from any loss relating to any such investment.

Section 10.10.    Rollover Proceeds Account

(a)      The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Rollover Proceeds Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Rollover Proceeds Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Upon the receipt by the Issuer or the Zohar Subsidiary of Cash Distributions on any Collateral Debt Obligation or Equity Security in connection with the reorganization, restructuring or liquidation of any obligor thereon (or its Affiliates) or such obligor's (or Affiliates') line(s) of business or the refinancing of or amendment of such Collateral Debt Obligation or Equity Security, the Collateral Manager may, on behalf of the Issuer or the Zohar Subsidiary (as applicable), direct the Trustee in writing to deposit such Cash Distributions into the Rollover Proceeds Account (absent such direction such payments will be deposited in the applicable Collection Account). Except as provided in Section 11.8, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Rollover Proceeds Account shall be made as specified in Section 11.6. On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Rollover Proceeds Account to the Cash Collateral Account.

(b)      The Trustee agrees to give the Co-Issuers and the Controlling Party immediate notice if the Rollover Proceeds Account or any funds on deposit therein, or otherwise to the credit of the Rollover Proceeds Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Rollover Proceeds Account other than in accordance with the Priority of Payments. The Rollover Proceeds Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

174

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050439

(c)     By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Rollover Proceeds Account during a Due Period, and amounts received in prior Due Periods and retained in the Rollover Proceeds Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Party, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Party having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Rollover Proceeds Account and any loss resulting from such investments shall be charged to the Rollover Proceeds Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Rollover Proceeds Account resulting from any loss relating to any such investment.

Section 10.11.  [Reserved]

Section 10.12.  Reports by Trustee

Upon request, the Trustee shall supply in a timely fashion to the Issuer, the Collateral Manager, the Class A-1 Note Agent, the Class A-3 Note Agent and the Preference Share Paying Agent any information regularly maintained by the Trustee (i) that the Issuer, the Collateral Manager, the Class A-1 Note Agent, the Class A-3 Note Agent or the Preference Share Paying Agent may from time to time request with respect to the Pledged Obligations or any Account, (ii) reasonably needed to complete the Note Valuation Report, (iii) reasonably available to the Trustee by reason of its acting as Trustee hereunder, (iv) to permit the Collateral Manager to perform its obligations under the Management Agreement, (v) to permit the Class A-1 Note Agent to perform its obligations under the Class A-1 Note Purchase Agreements, and to permit the Class A-3 Note Agent to perform its obligations under the Class A-3 Note Purchase Agreements and (vi) to permit the Preference Share Paying Agent to perform its obligations under the Preference Share Paying Agency Agreement. The Trustee shall forward to the Collateral Manager, to the Class A-1 Note Agent, to the Class A-3 Note Agent, to the Controlling Party, to the Preference Share Paying Agent and to any Holder of a Note shown on the Note Register upon written request therefor, copies of notices and other writings received by it from the issuer of any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation or from any Clearing Agency with respect to any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation advising the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer. Nothing in this Section 10.12 shall be construed to impose on the Trustee any duty to prepare any report or statement which the Issuer (or the Collateral Manager on behalf of the Issuer) is required to prepare or provide under Section 10.13 or to calculate or recalculate any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer or the Collateral Manager. Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations which it reasonably considers to be confidential in nature.

The Trustee shall promptly notify the Class A-1 Note Agent (which shall thereupon promptly notify the Holders of the Class A-1 Notes, the Holders of the Class A-2 Notes and the Holders of the Class A-3 Notes) if at any time the balance in the Issuer Principal Collection Account exceeds U.S.$20,000,000.

175

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050440

Section 10.13.  Accountings

(a)    Monthly Accountings.  Not later than the tenth Business Day after the last day of each calendar month (commencing with the calendar month in which the Initial Payment Date falls, and excluding any month as to which a Note Valuation Report is rendered), the Issuer shall compile and provide to each Rating Agency, the Trustee, the Preference Share Paying Agent, the Class A-1 Note Agent, the Class A-3 Note Agent, the Collateral Manager, each Hedge Counterparty, the Credit Enhancer and the Holders of Notes (and any beneficial owner thereof to the extent it has certified to the Trustee that it is such a holder), a monthly report (the "Monthly Report").  Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice.  The Monthly Report shall contain the following information and instructions with respect to the Pledged Obligations included in the Collateral, determined as of the last day of the applicable calendar month (and, for such purposes, the "Preceding Monthly Reporting Date" means, as to any applicable calendar month, the last day of the immediately preceding calendar month; it being understood that, for the purposes of this Section 10.13(a) and Section 2(c) of the Collateral Administration Agreement, the "Preceding Monthly Reporting Date" with respect to the first Monthly Report shall be deemed to refer to the last day of the calendar month preceding the Initial Payment Date):

(1)    the Aggregate Principal Balance of all Collateral Debt Obligations, Equity Securities and Unrestricted Collateral Debt Obligations;

(2)    the Balance of all Eligible Investments and Cash in each of the Issuer Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Principal Collection Account, the Zohar Subsidiary Interest Collection Account, the Cash Collateral Account, the Payment Account, the Expense Account, the Closing Expense Account, the Professional Fee Account, the Unrestricted Collateral Account, the Class A Holder Collateral Account, the Unfunded Revolver Discount Account, the Rollover Proceeds Account and the Cash Reserve Account;

(3)    the nature, source and amount of any proceeds in the Collection Accounts, including Uninvested Proceeds, Interest Proceeds, Principal Proceeds and Sale Proceeds, received since the Preceding Monthly Reporting Date (including, for each Collateral Debt Obligation, the allocation of Distributions received in respect thereof among principal, interest, fees and other amounts);

(4)    the nature, source and amount of any proceeds in the Unrestricted Collateral Account received since the Preceding Monthly Reporting Date (including, for each Unrestricted Collateral Debt Obligation, the allocation of Distributions received in respect thereof among principal, interest, fees and other amounts);

(5)    (a) the Principal Balance, annual interest rate, Stated Maturity, the Moody's Rating and the Standard & Poor's Rating of each Collateral Debt Obligation (but, in each case, only to the extent such ratings are not confidential), Eligible Investment, the Commitment Amount and the Funded Amount of each Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations; and (b) the Principal Balance, annual interest rate and Stated Maturity of each Unrestricted Collateral Debt Obligation, the Commitment Amount and the Funded Amount of each Unrestricted Collateral Debt Obligation that is a Revolving Collateral

176

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050441

Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations (for the avoidance of doubt, the information provided pursuant to this clause shall not contain the name of the issuer of any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation);

(6)      the amount of funds withdrawn from the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account pursuant to Section 9.7 to fund commitments under Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations since the Preceding Monthly Reporting Date;

(7)      the identity of each Collateral Debt Obligation which became a Defaulted Obligation, Workout Obligation, Non-Current Obligation or Non-Performing Obligation since the Preceding Monthly Reporting Date;

(8)      the identity and the Principal Balance of each (and the Aggregate Principal Balance of all) Defaulted Obligation, Workout Obligation, Collateral Debt Obligation that became a Post-Insolvency Collateral Debt Obligation since the Preceding Monthly Reporting Date, Collateral Debt Obligation that became a Non-Current Obligation since the Preceding Monthly Reporting Date, Collateral Debt Obligation that became a Non-Performing Obligation since the Preceding Monthly Reporting Date, and Collateral Debt Obligation that became a Performing Collateral Debt Obligation since the Preceding Monthly Reporting Date;

(9)      the Aggregate Principal Balance, number and identity of any Collateral Debt Obligations that were released for sale or other disposition (indicating the sale price thereof and whether such Collateral Debt Obligation was a Defaulted Obligation or Non-Performing Obligation (in each case, as reported in writing to the Issuer by the Collateral Manager)) since the Preceding Monthly Reporting Date;

(10)     the Aggregate Principal Balance of all Collateral Debt Obligations that are Senior Secured Collateral Debt Obligations;

(11)     the Aggregate Principal Balance of all Junior Rollover Exchanged Securities;

(12)     the Aggregate Principal Balance of all Collateral Debt Obligations providing for payments of interest less frequently than quarterly;

(13)     the Aggregate Principal Balance of all Collateral Debt Obligations convertible or exchangeable into Equity Securities;

(14)     a description in reasonable detail of the terms of each Equity Security (including whether or not such Equity Security constitutes Margin Stock);

(15)     a description in reasonable detail of the terms of any Pledged Obligation that is not a Collateral Debt Obligation, an Unrestricted Collateral Debt Obligation, an Equity Security or an Eligible Investment;

(16)     the Aggregate Principal Balance of all Fixed Rate Obligations and the Aggregate Principal Balance of Fixed Rate Obligations designated as each of Non-Performing Obligations,

177

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050442

Non-Current Obligations and Collateral Debt Obligations with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only;

(17)     the Aggregate Principal Balance of all Floating Rate Obligations;

(18)     the Aggregate Principal Balance of all Floating Rate Obligations for which the calculation of the relevant floating rate of interest may not be determined by reference to the LIBO Rate;

(19)     the Aggregate Principal Balance of all Collateral Debt Obligations (x) held by the Issuer and (y) held by the Zohar Subsidiary;

(20)     the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 1;

(21)     the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 2;

(22)     the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 3;

(23)     the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 4;

(23A)   the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Workout Obligations;

(24)     the Aggregate Principal Balance of all Collateral Debt Obligations issued by each issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);

(25)     for each Collateral Debt Obligation that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests acquired from such Selling Institution;

(26)     the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests;

(27)     the Commitment Shortfall, if any;

(28)     for each Collateral Debt Obligation (as applicable):

(A)     the last date on which interest was paid thereunder since the Preceding Monthly Reporting Date;

(B)     the date of the occurrence of any default or event of default thereunder since the Preceding Monthly Reporting Date;

178

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture

PP050443

(C)    the date of the occurrence of any event of bankruptcy or insolvency in respect of the obligor thereon since the Preceding Monthly Reporting Date;

(D)    the date of emergence of the obligor thereon from any bankruptcy or insolvency Proceeding since the Preceding Monthly Reporting Date;

(E)    the amount and type of Distributions received by the issuer thereunder since the Preceding Monthly Reporting Date in connection with any restructuring of the terms of such Collateral Debt Obligation;

(F)    the date on which all or any portion of such Collateral Debt Obligation was refinanced since the Preceding Monthly Reporting Date and the amount of any such refinancing;

(G)    [reserved]; and

(H)    for any Insolvency Collateral Debt Obligation, a specification of each instance since the Preceding Monthly Reporting Date in which the Issuer received interest in Cash;

(29)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Standard & Poor's Industry Classification Group;

(30)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Moody's Industry Classification Group;

(31)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Debt Obligations on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;

(32)    the Class A Break-Even Loss Rate, the Class A Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;

(33)    with respect to each Collateral Debt Obligation that is a Senior Secured Collateral Debt Obligation, the rating assigned by Moody's to such Senior Secured Collateral Debt Obligation (to the extent such information is not confidential) and the senior implied rating assigned by Moody's to the issuer of such Senior Secured Collateral Debt Obligation (to the extent such information is not confidential);

(34)    for each Collateral Debt Obligation sold or extinguished since the Preceding Monthly Reporting Date, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net distributions received on a Collateral Debt Obligation that was so extinguished) received by the Issuer in connection with such sale (or in exchange for the extinguishment of such obligation) was greater than or less than the price at which the Issuer purchased such Collateral Debt Obligation (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds received and, in the case of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, fundings in respect of such Collateral Debt Obligation), and the Dollar amount by which, after giving effect to such sale, the aggregate

179

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Sale Proceeds received by the Issuer in connection with all sales of Collateral Debt Obligations after the Funding Date was greater than or less than the aggregate amount of the prices at which the Issuer purchased such Collateral Debt Obligations;

(35)    a calculation in reasonable detail necessary to determine compliance with each of the Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the Class A Overcollateralization Ratio; and

(36)    the row of the Ratings Matrix most recently selected by the Collateral Manager and whether such row is different from the row reported in the preceding Monthly Report.

The Issuer shall report the following information with respect to the Pledged Collateral Debt Obligations from the Standard & Poor's CDO Monitor:  (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure.

In addition, the Issuer shall also indicate in each such Monthly Report the percentage of the Aggregate Principal Balance of all Collateral Debt Obligations and the Maximum Investment Amount for each aggregate amount referred to in clauses (8) through (26) above (inclusive).

Upon receipt of each Monthly Report, the Collateral Manager shall compare the information contained therein to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer and the Trustee if the information contained in the Monthly Report does not conform to the information maintained by the Collateral Manager with respect to the Collateral.  In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.15 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

In addition, not later than the tenth Business Day after the last day of each calendar month (commencing with the calendar month after the month in which the Ramp Up End Date falls), the Issuer shall compile and provide to Standard & Poor's the Excel Default Model Input File.

(b)    Payment Date Accountings.  The Issuer shall render an accounting (the "Note Valuation Report") determined as of each Determination Date, and made available to each Rating Agency, the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Class A-1 Note Agent, the Class A-3 Note Agent, the Credit Enhancer and the Holders of Notes (and any beneficial owner thereof to the extent it has certified to the Trustee that it is such a holder), not later than the Business Day preceding the related Payment Date; provided that each such report shall be delivered electronically to the Credit Enhancer and to any other such party who so requests in writing.  Each Note Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice.  The Note Valuation Report shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date):

(1)    the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the next Payment Date, the aggregate amount of the Class A-1

180

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050445

Commitments, the aggregate amount of the Class A-3 Commitments and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on the next Payment Date;

(2)    the Interest Distribution Amount, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, the Class A Additional Interest (if any) and the Class A-1 Additional Amounts (if any) payable to the Holders of the Class A Notes (in the aggregate and by Class), for such Payment Date;

(3)    the Administrative Expenses payable on the next Payment Date on an itemized basis;

(4)    for the Issuer Interest Collection Account:

(A)    the Balance on deposit in the Issuer Interest Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Issuer Interest Collection Account (by way of the Payment Account) pursuant to paragraphs (A) through (M) of Section 11.1(a)(i) on the next Payment Date; and

(C)    the Balance remaining in the Issuer Interest Collection Account immediately after all payments and deposits to be made on such Payment Date;

(5)    for the Issuer Principal Collection Account:

(A)    the Balance on deposit in the Issuer Principal Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Issuer Principal Collection Account (by way of the Payment Account) pursuant to paragraphs (A) through (J) of Section 11.1(a)(ii) on the next Payment Date; and

(C)    the Balance remaining in the Issuer Principal Collection Account immediately after all payments and deposits to be made on such Payment Date;

(6)    for the Cash Collateral Account:

(A)    the Balance on deposit in the Cash Collateral Account at the end of the related Due Period;

(B)    the amounts payable from the Cash Collateral Account pursuant to paragraphs (i) through (xi) of Section 11.2(a) on the next Payment Date; and

(C)    the Balance remaining in the Cash Collateral Account immediately after all payments and deposits to be made on such Payment Date;

(7)    the Balance on deposit in the Zohar Subsidiary Interest Collection Account at the end of the related Due Period;

181

Indenture

PP050446

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(8)     the Balance on deposit in the Zohar Subsidiary Principal Collection Account at the end of the related Due Period;

(9)     the Balance on deposit in the Cash Reserve Account at the end of the related Due Period;

(10)     the Balance on deposit in the Rollover Proceeds Account at the end of the related Due Period;

(11)     [reserved];

(12)     [reserved];

(13)     the Balance on deposit in the Unfunded Revolver Discount Account at the end of the related Due Period;

(14)     the Balance on deposit in the Unrestricted Collateral Account at the end of the related Due Period;

(15)     the Balance on deposit in the Expense Account at the end of the related Due Period;

(16)     the Balance on deposit in the Professional Fee Account at the end of the related Due Period;

(17)     the Balance on deposit in the Closing Expense Account at the end of the related Due Period;

(18)     the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for the Interest Period preceding the next Payment Date;

(19)     the amounts expected to be distributed from the Preference Share Distribution Account to the Holders of the Preference Shares as a dividend assuming the solvency of the Issuer under Cayman Islands law;

(20)     the number and identity of each Collateral Debt Obligation and Unrestricted Collateral Debt Obligation held by the Issuer and the Zohar Subsidiary on the last day of the Due Period most recently ended and indicating, in the case of each Collateral Debt Obligation, whether such Collateral Debt Obligation is a Defaulted Obligation or was a Non-Performing Obligation during the related Due Period (in each case, as reported in writing to the Trustee by the Collateral Manager);

(21)     the identity of each Collateral Debt Obligation that was sold or disposed of pursuant to Section 12.2 since the date of determination of the most recent Note Valuation Report and on or prior to the last day of the Due Period most recently ended;

(22)     the identity of each Unrestricted Collateral Debt Obligation that was Granted to the Trustee since the date of the most recent Note Valuation Report and on or prior to the last day of the Due Period most recently ended;

182

Indenture

PP050447

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(23)    the identity and the Principal Balance of each (and the Aggregate Principal Balance of all) Defaulted Obligation, Workout Obligation, Collateral Debt Obligation that became a Post-Insolvency Collateral Debt Obligation during the related Due Period, Collateral Debt Obligation that became a Non-Current Obligation during the related Due Period, Collateral Debt Obligation that became a Non-Performing Obligation during the related Due Period, and Collateral Debt Obligation that became a Performing Collateral Debt Obligation during the related Due Period;

(24)    the Aggregate Principal Balance of all Collateral Debt Obligations that are Senior Secured Collateral Debt Obligations;

(25)    the Aggregate Principal Balance of all Junior Rollover Exchanged Securities;

(26)    the Aggregate Principal Balance of all Collateral Debt Obligations providing for payments of interest less frequently than quarterly;

(27)    the Aggregate Principal Balance of all Collateral Debt Obligations convertible or exchangeable into Equity Securities;

(28)    a description in reasonable detail of the terms of each Equity Security (including whether or not such Equity Security constitutes Margin Stock);

(29)    a description in reasonable detail of the terms of any Pledged Obligation that is not a Collateral Debt Obligation, an Unrestricted Collateral Debt Obligation, an Equity Security or an Eligible Investment;

(30)    the Aggregate Principal Balance of all Fixed Rate Obligations and the Aggregate Principal Balance of Fixed Rate Obligations designated as each of Non-Performing Obligations, Non-Current Obligations and Collateral Debt Obligations with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only;

(31)    the Aggregate Principal Balance of all Floating Rate Obligations;

(32)    (a) the Principal Balance, annual interest rate, Stated Maturity, the Moody's Rating and the Standard & Poor's Rating of each Collateral Debt Obligation, Eligible Investment, the Commitment Amount and the Funded Amount of each Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations; and (b) the Principal Balance, annual interest rate and Stated Maturity of each Unrestricted Collateral Debt Obligation, the Commitment Amount and the Funded Amount of each Unrestricted Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, the aggregate Funded Amount of all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations and the aggregate Commitment Amounts under all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations (for the avoidance of doubt, the information provided pursuant to this clause shall not contain the name of the issuer of any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation);

183

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050448

(33)    the Aggregate Principal Balance of all Floating Rate Obligations for which the calculation of the relevant floating rate of interest may not be determined by reference to the LIBO Rate;

(34)    the Aggregate Principal Balance of all Collateral Debt Obligations (x) held by the Issuer and (y) held by the Zohar Subsidiary;

(35)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 1;

(36)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 2;

(37)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 3;

(38)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Category 4;

(39)    the Aggregate Principal Balance of all Collateral Debt Obligations that are designated as Workout Obligations;

(40)    the Aggregate Principal Balance of all Collateral Debt Obligations issued by each issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);

(41)    for each Collateral Debt Obligation that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests acquired from such Selling Institution;

(42)    the Aggregate Principal Balance of all Collateral Debt Obligations that are Participation Interests;

(43)    the Commitment Shortfall, if any;

(44)    for each Collateral Debt Obligation (as applicable):

(A)    the last date on which interest was paid thereunder during the related Due Period;

(B)    the date of the occurrence of any default or event of default thereunder during the related Due Period;    .

(C)    the date of the occurrence of any event of bankruptcy or insolvency in respect of the obligor thereon during the related Due Period;

(D)    the date of emergence of the obligor thereon from any bankruptcy or insolvency Proceeding during the related Due Period;

184

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050449

(E)    the amount and type of Distributions received by the issuer thereunder during the related Due Period in connection with any restructuring of the terms of such Collateral Debt Obligation;

(F)    the date on which all or any portion of such Collateral Debt Obligation was refinanced during the related Due Period and the amount of any such refinancing;

(G)    [reserved]; and

(H)    for any Insolvency Collateral Debt Obligation, a specification of each instance during such Due Period in which the Issuer received interest in Cash;

(45)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Standard & Poor's Industry Classification Group;

(46)    the Aggregate Principal Balance of all Collateral Debt Obligations that fall within each Moody's Industry Classification Group;

(47)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Debt Obligations on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;

(48)    the Class A Break-Even Loss Rate, the Class A Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;

(49)    with respect to each Collateral Debt Obligation that is a Senior Secured Collateral Debt Obligation, the rating assigned by Moody's to such Senior Secured Collateral Debt Obligation and the senior implied rating assigned by Moody's to the issuer of such Senior Secured Collateral Debt Obligation;

(50)    for each Collateral Debt Obligation sold or extinguished during the related Due Period, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net distributions received on a Collateral Debt Obligation that was so extinguished) received by the Issuer in connection with such sale (or in exchange for the extinguishment of such obligation) was greater than or less than the price at which the Issuer purchased such Collateral Debt Obligation (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds received and, in the case of any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, fundings in respect of such Collateral Debt Obligation), and the Dollar amount by which, after giving effect to such sale, the aggregate Sale Proceeds received by the Issuer in connection with all sales of Collateral Debt Obligations after the Funding Date was greater than or less than the aggregate amount of the prices at which the Issuer purchased such Collateral Debt Obligations;

(51)    written notice received by the Collateral Manager or any Zohar Obligor of any challenge of the validity of any Collateral Debt Obligation or of the validity or priority of any Underlying Instrument or any related collateral security during such Due Period;

185

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050450

(52)    if since the date of determination of the last Note Valuation Report any term or condition of any Collateral Debt Obligation has (to the best knowledge of the Issuer or the Collateral Manager) been amended or waived, and the effect of such amendment or waiver was to change the interest rate or the date for the payment of any principal or to release any collateral security thereunder, a description of such amendment or waiver in reasonable detail;

(53)    a calculation in reasonable detail necessary to determine compliance with the Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the Class A Overcollateralization Ratio; and

(54)    such other information as the Controlling Party shall reasonably request.

The Issuer shall report the following information with respect to the Pledged Collateral Debt Obligations from the Standard & Poor's CDO Monitor: (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure.

Each Note Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and the Cash Collateral Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established, in Sections 11.1(a) and 11.2(a).

(c)    Supplemental Noteholder Information.  Concurrently with the delivery of each Monthly Report and each Note Valuation Report, the Issuer shall provide to the Trustee and to the Credit Enhancer (i) the names and identities of the obligors and/or issuers of the Collateral Debt Obligations and Unrestricted Collateral Debt Obligations owned by the Issuer and the Zohar Subsidiary and (ii) the name of the original issuer of any Collateral Debt Obligation (or any predecessor Collateral Debt Obligation) which is an Exchanged Security or a Collateral Debt Obligation for which the issuer thereof has otherwise changed since the date such Collateral Debt Obligation was Granted to the Trustee (the information in clauses (i) and (ii), collectively, the "Supplemental Noteholder Information").  The Trustee shall maintain the Supplemental Noteholder Information pursuant to the terms of this Section 10.13(c).  Upon and after receiving the written consent of the Collateral Manager to any Holder's receipt of the Supplemental Noteholder Information, the Trustee shall provide to such Eligible Holder the Supplemental Noteholder Information concurrently with the delivery of any Monthly Report or Note Valuation Report furnished to such Holder.  Each Eligible Holder that receives the Supplemental Noteholder Information and/or any other information relating to the names or identities of the issuers of and/or obligors on the Collateral Debt Obligations, the Unrestricted Collateral Debt Obligations and/or Equity Securities held by the Zohar Obligors, shall hold in confidence all such information, except (i) to the extent disclosure may be required by law by any regulatory authority and (ii) each Eligible Holder may disclose the Supplemental Noteholder Information to its accountants and attorneys (provided that such Eligible Holder advises such Persons of the confidential nature of the information being disclosed).  No assignee or transferee (or proposed assignee or transferee) of an Eligible Holder shall be deemed an Eligible Holder unless the Collateral Manager has consented to the designation of such assignee or transferee as an Eligible Holder in accordance with the definition thereof.  For the avoidance of doubt and notwithstanding anything else to the contrary contained herein or in any other Transaction Document, no Holder (or beneficial owner thereof), assignee or transferee (or proposed Holder (or beneficial owner thereof), assignee or transferee) (other than an Eligible Holder) shall receive, and none of the Zohar Obligors, the Collateral Manager, the Trustee, the Collateral Administrator or any other Person shall provide to such Person, the names or identities of any obligor on and/or issuer of any Collateral Debt Obligation, Unrestricted Collateral Debt Obligation or Equity Security held or owned by the Zohar Obligors.

186

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050451

(d)    Redemption Date Instructions. No later than five Business Days after receiving an Issuer Request requesting information regarding a redemption of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer, and the Issuer shall compute the following information and provide such information in a statement (the "Redemption Date Statement") delivered to the Trustee:

(i)    the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii)    the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date; and

(iii)    the amount in the Redemption Accounts available for application to the redemption of such Notes.

(e)    If the Trustee shall not have received any accounting provided for in this Section 10.13 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.13 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

Section 10.14.    Release of Collateral

(a)    If no Event of Default has occurred and is continuing and subject to Article 12, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager delivered to the Trustee, certifying that the conditions set forth in Section 12.2 are satisfied, direct the Trustee to release such Collateral from the lien of this Indenture against receipt of payment therefor.

(b)    Subject to Article 12 (and, if an Event of Default has occurred and is continuing, subject to Article 5), the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager, delivered to the Trustee, certifying that such Collateral is being redeemed or paid in full, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Collateral, if in physical form, duly endorsed, or, if such Collateral is a Clearing Corporation Security, to cause it to be presented, to the appropriate paying agent therefor on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof. If an Event of Default has occurred and is continuing at the time of such direction, the Trustee may and, if so directed by the Controlling Party, shall, disregard such direction; provided that, in the absence of such direction by the Controlling Party, the Trustee shall be entitled to rely and act on the advice of the Collateral Manager.

(c)    Subject to Article 12 (and, if an Event of Default has occurred and is continuing, subject to Article 5), the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager, delivered to the Trustee, certifying that such Collateral is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Collateral, if in physical form, duly endorsed, or, if such Collateral is a Clearing Corporation Security, to cause it to be delivered, in accordance with such Issuer Order, in each case against receipt of payment therefor. If an Event of Default has occurred and is

187

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050452

continuing at the time of such direction, the Trustee may and, if so directed by the Controlling Party, shall, disregard such direction; provided that, in the absence of such direction by the Controlling Party, the Trustee shall be entitled to rely and act on the advice of the Collateral Manager.

(d)    The Trustee shall deposit any proceeds received by it from the disposition of any Collateral (other than amounts required to be deposited in the Unrestricted Collateral Account or the Rollover Proceeds Account) in the Issuer Interest Collection Account, Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account (unless simultaneously reinvested in Collateral Debt Obligations or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), as the case may be.

(e)    The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

Section 10.15.    Reports by Independent Accountants

(a)    Promptly after the Funding Date the Issuer shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the Accountants' Reports required under this Section 10.15. Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee, the Credit Enhancer and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation reasonably acceptable to the Controlling Party. If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee and the Credit Enhancer of such failure in writing. If the Issuer shall not have appointed a successor within 10 days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation reasonably acceptable to the Controlling Party. The fees of such Independent certified public accountants and its successor shall be payable by the Issuer or by the Trustee as provided in Sections 11.1 and 11.2.

(b)    On or before January 6 of each year (commencing January 6, 2006), the Issuer shall cause to be delivered to the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Credit Enhancer and each Rating Agency an Accountants' Report specifying the procedures applied and their associated findings with respect to (i) the Note Valuation Reports delivered during the one-year period ending on such date, (ii) the Redemption Date Statements, if any, delivered during such one-year period, (iii) the Aggregate Principal Balance of the Collateral Debt Obligations securing the Notes as of the Determination Date immediately preceding such date, (iv) the remaining Scheduled Distributions on the Pledged Collateral Debt Obligations during the next Due Period, (v) the amount of principal of, and interest on, each Note estimated to be paid on the next Payment Date, (vi) the amount of any Hedge Termination Amount that would have been payable to the Issuer on the Determination Date immediately preceding such date and (vii) whether each Hedge Counterparty (if any) is in compliance with any collateralization obligations under the Hedge Agreements.

(c)    Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee upon written request therefor by a Holder of a Note shown on the Note Register, to such Holder (or its designee).

188

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050453

Section 10.16.  Reports to Rating Agencies, Etc.

In addition to the information and reports specifically required to be provided to the Rating Agencies pursuant to the terms of this Indenture, the Issuer (or the Collateral Manager on behalf of the Issuer) shall provide or procure to provide the Rating Agencies with (a) all information or reports delivered to the Trustee hereunder, (b) such additional information as the Rating Agencies may from time to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense, (c) notice of any waiver given pursuant to Section 5.14.

The Issuer shall promptly notify the Trustee, the Credit Enhancer and the Collateral Manager if the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.

ARTICLE 11

APPLICATION OF MONIES

Section 11.1.  Disbursements of Monies from Payment Account

(a)  Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Sections 9.5 and 13.1, on each Payment Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(i) as follows and for application by the Trustee in accordance with the following priorities:

(i)  On each Payment Date, Interest Proceeds with respect to the related Due Period shall be applied as follows:

(A)  to the payment of Administrative Expenses constituting taxes, registration fees and filing fees owing by the Zohar Obligors (as certified by an Authorized Officer of the applicable Zohar Obligor or of the Collateral Manager to the Trustee);

(B)  (1) first, to the payment or reimbursement of accrued and unpaid Administrative Expenses constituting the Trustee's fees pursuant to the Trustee Fee Letter; and (2) second, to the payment or reimbursement of other accrued and unpaid Administrative Expenses constituting fees, unpaid expenses or indemnities of the Trustee under this Indenture, of the Collateral Administrator under the Collateral Administration Agreement, of the Administrator under the Administration Agreement and of the Preference Share Paying Agent and of the Preference Share Registrar under the Preference Share Paying Agency Agreement; provided that payments pursuant to this subclause (B)(2) shall be limited to an amount not to exceed 0.0125% of the Quarterly Asset Amount with respect to such Payment Date; provided, further, that the aggregate amount applied pursuant to this subclause (B)(2) shall not exceed U.S.$125,000;

(C)  if the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b), to the pro rata payment of (1) prior to the date on which amounts on deposit in the Expense Account are transferred to the Cash Collateral Account pursuant to Section 10.6, if the Balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$500,000 for deposit into the Expense Account of an amount equal to such

189

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7347151v22

Indenture
PP050454

amount as would have caused the Balance of all Eligible Investments and Cash in the Expense Account, immediately after such deposit, to equal U.S.$500,000; <u>provided</u> that the amount so deposited on any Payment Date shall not exceed U.S.$125,000; and (2) the accrued and unpaid Administrative Expenses constituting the ongoing surveillance fees and expenses of the Credit Enhancer (subject to the limit in clause (g) of the definition of "Administrative Expenses");

(D)     to the <u>pro rata</u> payment of (i) the Senior Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date (<u>provided</u> that, if such Payment Date is on or prior to the Ramp Up End Date, no payment may be made under this clause (D)(i) to the extent the inclusion of such payment would cause the amounts payable in clauses (E), (F), (F1)(2), and (G) not to be paid in full) and (ii) prior to the date on which amounts on deposit in the Professional Fee Account are transferred to the Cash Collateral Account pursuant to Section 10.6, if the balance in the Professional Fee Account is less than U.S.$2,000,000, for deposit into the Professional Fee Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Professional Fee Account, immediately after such deposit, to equal U.S.$2,000,000 (<u>provided</u> that the amount so deposited on any Payment Date shall not exceed the greater of (x) U.S.$300,000 and (y) 0.075% of the Aggregate Principal Balance of all Pledged Collateral Debt Obligations on such Determination Date);

(E)     if (1) the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b) and (2) the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (exclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party);

(F)     to the <u>pro rata</u> payment of (i) the Class A Interest Distribution Amount for such Payment Date (excluding any interest on the Class A Notes constituting Class A Additional Interest and any Defaulted Interest in respect of Class A Additional Interest and interest thereon), (ii) the Class A-1 Commitment Fee Amount for such Payment Date, (iii) the Class A-3 Commitment Fee Amount for such Payment Date, (iv) accrued and unpaid Senior Class A-1 Additional Amounts and (v) if the Rating Confirmation with respect to the Class A Notes has theretofore been obtained in accordance with Section 7.13(b) and such Payment Date is after the Initial Payment Date, accrued and unpaid Credit Enhancement Premium;

(F1)     on the Initial Payment Date and each Payment Date thereafter, (1) <u>first</u> to the payment of the Senior Collateral Management Fee due on such Payment Date and not paid above and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date (<u>provided</u> that if such Payment Date is on or prior to the Ramp Up End Date, no payment may be made under this clause (F1)(1) to the extent the inclusion of such payment would cause the amounts payable in clauses (F1)(2) and (G) not to be paid in full; <u>provided further</u>, <u>however</u>, that no payment may be made under this clause (F1)(1) on any Payment Date to the extent the inclusion of such payment would cause the Class A Interest Coverage Ratio Test not to be satisfied (calculated on a <u>pro forma</u> basis as of such Determination Date

190

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

after giving effect to such application)); and (2) <u>second</u> to the payment of accrued and unpaid Credit Enhancement Premium;

(G)  to the payment of all accrued and unpaid Credit Enhancement Liabilities to the Credit Enhancer; <u>provided</u> that, so long as (x) no Event of Default shall have occurred and be continuing as of the related Determination Date or (y) the Class A Overcollateralization Ratio as of the related Determination Date is not less than the Adjusted Priority of Payments Overcollateralization Ratio, the amounts to be paid to the Credit Enhancer under this clause (G) on account of any "Accrued Insurance Liabilities" (as defined in the Credit Enhancement Agreement) arising pursuant to clauses (ii), (iii)(A), (C), (D) and (E) and (iv) of the definition thereof (but excluding, for the avoidance of doubt, any Credit Enhancement Premium and/or any amounts payable pursuant to clause (g) of the definition of "Administrative Expenses") shall not exceed the Credit Enhancement Liabilities Threshold Amount as then in effect;

(G1)  on each Payment Date on or prior to the Ramp Up End Date, to the payment of the Senior Collateral Management Fee due on such Payment Date and not paid above and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date;

(H)  if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "<u>Class A Note Reduction Amount</u>" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a <u>pro forma</u> basis as of such Determination Date after giving effect to such application) and, in the case of a Rating Confirmation Failure, to the extent specified in the related Post-Ramp Up Plan, will be applied as follows:

(1)  an amount equal to the Class A-1 Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)  an amount equal to the Class A-2 Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)  an amount equal to the Class A-3 Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

<u>provided</u> that if the amount of funds available to be distributed under this clause (H) is less than the Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

191

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 198 of 447

(I)  if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of the Minimum Total Credit Enhancement Premium Amount to the Credit Enhancer, but only to the extent not previously paid in full after the applications on such Payment Date and any prior Payment Dates pursuant to the Priority of Payments;

(J)  to the payment first of any amounts described in paragraph (B) above to the extent not paid thereunder as a result of the dollar limitation set forth in such paragraph, second of any amounts described in paragraph (G) above to the extent not paid thereunder as a result of the dollar limitation set forth in such paragraph and third of any other accrued and unpaid reasonable fees and expenses of the Zohar Obligors permitted under this Indenture and the other Transaction Documents (to the extent not paid in full by application of amounts from the Expense Account, the Closing Expense Account or the Professional Fee Account on such Payment Date) (provided that the aggregate amount applied pursuant to this paragraph (J) on any Payment Date shall not exceed U.S.$200,000);

(K)  to the pro rata payment of (x) accrued and unpaid Class A Additional Interest and Defaulted Interest in respect thereof and interest thereon and (y) accrued and unpaid Second Priority Class A-1 Additional Amounts (ratably in accordance with the respective amounts thereof then due and owing);

(L)  to the payment of the Class A-1 Note Agent Fee due on such Payment Date and to the payment of any accrued and unpaid Class A-1 Note Agent Fee owed on any prior Payment Date; and

(M)  any remaining Interest Proceeds to the Cash Collateral Account.

(ii)  On each Payment Date, Principal Proceeds transferred to the Payment Account with respect to such Payment Date shall be distributed in the following order of priority (immediately following the applications of Interest Proceeds referred to in the foregoing clause (i)):

(A)  to a deposit in the Issuer Principal Collection Account in an amount equal to the excess (if any) of (1) the Unfunded Portfolio Amount as of the related Determination Date over (2) the sum of (w) the Aggregate Undrawn Amount of the Class A-1 Notes as of such date as reported by the Class A-1 Note Agent to the Trustee (determined immediately after giving effect to any reductions in the Class A-1 Commitments to occur on such date pursuant to Sections 9.5 and 9.6); plus (x) the Aggregate Undrawn Amount of the Class A-3 Notes as of such date as reported by the Class A-3 Note Agent to the Trustee (determined after giving effect to the expiration of the Class A-3 Commitments on or prior to such date pursuant to Section 9.5); plus (y) the Balance on deposit in the Unfunded Revolver Discount Account on such date; plus (z) the Balance on deposit in the Rollover Proceeds Account on such date (to be retained in the Issuer Principal Collection Account for application to fund Unfunded Portfolio Amounts or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date);

192

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050457

(B)    to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i);

(C)    if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Remaining Class A Note Reduction Amount" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a pro forma basis as of such Determination Date after giving effect to such application and any application of funds under Section 11.1(a)(i)(H) on such Payment Date) and, in the case of a Rating Confirmation Failure, to the extent specified in the related Post-Ramp Up Plan, will be applied as follows:

(1)    an amount equal to the Class A-1 Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)    an amount equal to the Class A-2 Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)    an amount equal to the Class A-3 Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (C) is less than the Remaining Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(D)    [reserved];

(E)    if any Class A Notes are Outstanding or any Class A-1 Commitments or any Class A-3 Commitments have not expired, terminated, or been reduced to zero, to a deposit to the Issuer Principal Collection Account in an amount sufficient to cause the aggregate amount on deposit therein to equal the Cash Retention Amount for such Payment Date;

(F)    during the Reinvestment Period, to a deposit to the Issuer Principal Collection Account (for application to acquire Collateral Debt Obligations in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein as Eligible Investments or, at the discretion of the Collateral Manager, to repay principal of the

193

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050458

Class A-1 Notes on such Payment Date); provided that (1) the Collateral Manager may, if in its sole discretion it elects to do so, direct the Trustee (which notice must be in writing and be given to the Trustee prior to the related Determination Date) to, and if so notified the Trustee shall, deposit, from such funds, not more than the lesser of (x) U.S.$3,000,000 and (y) the sum of the Subordinated Collateral Management Fee due on such Payment Date plus any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date, into the Cash Collateral Account for application on such Payment Date under Section 11.2(a)(iv) and (2) no such deposit under clause (1) above will be permitted unless each of the following conditions is satisfied: (I) both prior to and after giving effect to such deposit the Class A Overcollateralization Ratio is not less than 135%; (II) both prior to and after giving effect to such deposit the Class A Interest Coverage Test is satisfied; (III) prior to such Determination Date, Class B Notes (including any Additional Class B Notes) having an aggregate Outstanding face amount of not less than U.S.$100,000,000 have at any time been rated at least "Baa3" by Moody's and "BBB-" by Standard & Poor's; (IV) both prior to and after giving effect to such deposit the Standard & Poor's CDO Monitor Test is satisfied; (V) such Payment Date is after the Specified Equity Payment Date; (VI) not more than U.S.$3,000,000 may be deposited in the Cash Collateral Account pursuant to clause (1) above on any one Payment Date; (VII) not more than U.S.$15,000,000 in the aggregate may be deposited in the Cash Collateral Account pursuant to clause (1) on all Payment Dates; and (VIII) each Rating Agency has confirmed that such deposit will not cause the downgrade or withdrawal of its then current rating of any Class of Notes (in each case determined without regard to the Credit Enhancement);

(G) after the Reinvestment Period, an amount equal to the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes will be applied as follows:

(1) an amount equal to the Class A-1 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2) an amount equal to the Class A-2 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3) an amount equal to the Class A-3 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (G) is less than the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(H) after the Reinvestment Period, to the payment of the amounts referred to in paragraphs (I) through (L) of Section 11.1(a)(i) (and in the same manner, subject to the

·194·

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7347151v22

Indenture

PP050459

same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11(a)(i);

(I)     after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of outstanding principal of the Class B Notes until the principal of the Class B Notes has been paid in full; and

(J)     after the Reinvestment Period, any remaining Principal Proceeds (other than the Excluded Property) to the Cash Collateral Account.

(b)     Except as otherwise expressly provided in Section 11.1(a), if on any Payment Date, the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by any paragraph of the Priority of Payments specified therein, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 11.2.   Disbursements of Monies from Cash Collateral Account

(a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Section 13.1, on each Payment Date, the Trustee shall disburse amounts on deposit in the Cash Collateral Account (immediately after application of Interest Proceeds and Principal Proceeds on such Payment Date in accordance with the Priority of Payments specified in Section 11.1) as follows and for application by the Trustee in accordance with the following order of priority:

(i)     prior to the date on which amounts on deposit in the Cash Reserve Account are transferred to the Cash Collateral Account for application as described in the last sentence of Section 10.7(c), if the balance in the Cash Reserve Account is less than the Required Reserve Amount, to deposit into the Cash Reserve Account an amount as shall cause the balance therein to equal the Required Reserve Amount, provided that the amount so deposited on any Payment Date shall not exceed U.S.$500,000;

(ii)     to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the applications on such Payment Date provided for in Section 11.1(a);

(iii)     if the Class A Coverage Tests are satisfied as of the related Determination Date, no Rating Confirmation Failure with respect to the Class A Notes has occurred and is continuing and no Event of Default has occurred and is continuing, to a deposit in the Preference Share Distribution Account, provided that (1) the aggregate amount deposited in the Preference Share Distribution Account pursuant to this clause (iii) on all Payment Dates from the Funding Date through and including such Payment Date shall not exceed an amount equal to U.S.$7,500,000 multiplied by (x) the number of such Payment Dates (including such Payment Date) plus (y) one; and (2) the aggregate amount deposited in the Preference Share Distribution Account for all Payment Dates pursuant to this clause (iii) shall not in any event exceed U.S.$60,000,000 and (3) for purposes of calculating the Class A Overcollateralization Ratio Test for this Section 11.2(a)(iii) only, the Principal Balance of a Collateral Debt Obligation shall not include any principal amount representing previously deferred or capitalized interest;

195

Indenture<br>PP050460

NY3:#7347151v22<br>CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP<br>ON BEHALF OF PATRIARCH PARTNERS LLC

(iv)    if the Class A Coverage Tests are satisfied as of the related Determination Date and no Event of Default has occurred and is continuing and U.S.$60,000,000 has been deposited in the Preference Share Distribution Account pursuant to Section 11.2(a)(iii), pro rata to the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date; provided that for purposes of calculating the Class A Overcollateralization Ratio Test for this Section 11.2(a)(iv) only, the Principal Balance of a Collateral Debt Obligation shall not include any principal amount representing previously deferred or capitalized interest;

(v)    during the Reinvestment Period, to a deposit to the Issuer Principal Collection Account in the amount (if any) specified by the Collateral Manager (for application to acquire Collateral Debt Obligations in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein and invested in Eligible Investments in accordance with the terms of this Indenture or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date); and, to the extent not so specified, to be retained in the Cash Collateral Account for application on subsequent Payment Dates, provided that if U.S.$60,000,000 has been deposited in the Preference Share Distribution Account pursuant to Section 11.2(a)(iii), then the amount to be retained in the Cash Collateral Account shall be as specified by the Collateral Manager but no more than U.S.$5,000,000;

(vi)    after the Reinvestment Period, an amount equal to the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes will be applied as follows:

(1)    an amount equal to the Class A-1 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)    an amount equal to the Class A-2 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)    an amount equal to the Class A-3 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (vi) is less than the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(vii)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of the Minimum Total Credit Enhancement Premium Amount to the Credit Enhancer, but only to the extent not previously paid in full after the applications on or prior to such Payment Date pursuant to the Priority of Payments;

196

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050461

(viii)     after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, <u>first</u> to the payment of principal of the Class B Notes until the principal of each such Note has been paid in full and <u>then</u> to the payment of principal of the Class C Notes until the principal of each such Note has been paid in full;

(ix)     after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero and the principal of the Class B Notes and Class C Notes has been paid in full, <u>first</u> to the payment of any amounts payable to the Credit Enhancer with respect to Credit Enhancement Liabilities that were not paid under Section 11.1(a) as a result of the limitations on the amounts set forth therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii)); and <u>second</u> to the payment of the amounts referred to in paragraphs (J) through (L) of Section 11(a)(i), in the same order of priority but without regard to any Dollar limitation specified therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii));

(x)     after the Reinvestment Period, if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (inclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party and any other amount owing in respect of such Hedge Agreement and not paid under Section 11.1(a)(i)(E)); and

(xi)     after the Reinvestment Period, on the earliest of (A) the Stated Maturity of the Class C Notes, (B) the Payment Date on or after the first date on which substantially all of the Issuer's assets have been sold or otherwise disposed of (so long as the principal of and interest on the Class A Notes, the principal of the Class B Notes and the principal of the Class C Notes has been paid in full on such date) and (C) any date specified by the Collateral Manager if the Class A Notes and all interest thereon has been paid in full, the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, the Class B Notes have been paid in full and the Class C Notes have been paid in full, the remainder (other than the Excluded Property) to a deposit to the Preference Share Distribution Account.

(b)     Except as otherwise expressly provided in Section 11.2(a), if on any Payment Date, the amount available in the Cash Collateral Account is insufficient to make the full amount of the disbursements required by any paragraph of the Priority of Payments specified therein, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 11.3.     [Reserved]

Section 11.4.     <u>Disbursements of Monies from Unfunded Revolver Discount Account</u>

(a)     The Trustee shall apply amounts on deposit in the Unfunded Revolver Discount Account to extend credit in respect of Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations to the extent specified in Section 9.7.

(b)     Except as otherwise provided in Section 11.4(c), if on any Determination Date the Balance on deposit in the Unfunded Revolver Discount Account exceeds the sum of the Discount Amounts remaining with respect to the Unutilized Commitments as of such date, then the Collateral

197

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050462

Manager, by Issuer Order, may direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Unfunded Revolver Discount Account to the Cash Collateral Account in an aggregate amount equal to such excess (or such lesser amount as the Collateral Manager may specify in such Issuer Order), provided that after giving effect to such transfer no Commitment Shortfall would exist. For purposes of this Section 11.4, the Discount Amount for any Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation will be deemed reduced (but in no event to an amount less than zero) by amounts (without duplication) equal to the portion of the Unutilized Commitment of such Collateral Debt Obligation that has been funded in accordance with Section 9.7(a)(i) and the aggregate amount of Commitment Reductions that have been applied in respect of such Collateral Debt Obligation.

(c)     If on any date there shall occur a Commitment Reduction in respect of the Unutilized Commitment under a Collateral Debt Obligation that is a Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation and concurrently with such Commitment Reduction any Cash Distribution in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation is deposited in the Rollover Proceeds Account pursuant to Section 10.10(a), any amount then held in the Unfunded Revolver Discount Account and representing a Discount Amount in respect of such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation that would otherwise be deposited in the Cash Collateral Account in accordance with Section 11.4(b) in connection with such Commitment Reduction shall instead be held in the Unfunded Revolver Discount Account until such time as the proceeds of such Cash Distribution are withdrawn from the Rollover Proceeds Account pursuant to Section 11.6, whereupon:

(i)     if such proceeds are applied from the Rollover Proceeds Account pursuant to Section 11.6(a) to acquire an Exchanged Security, such Discount Amount may, at the written direction of the Collateral Manager, be (x) retained in the Unfunded Revolver Discount Account (to the extent that the applicable Exchanged Security is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation with an Unutilized Commitment corresponding to such Discount Amount), (y) applied to acquire such Exchanged Security or (z) deposited into the Cash Collateral Account; and

(ii)     if such payments are applied from the Rollover Proceeds Account pursuant to Section 11.6(b), such Discount Amount shall be deposited into the Cash Collateral Account,

provided that no such funds shall be withdrawn from the Unfunded Revolver Discount Account pursuant to paragraph (c)(i)(z) or (ii) above if, after giving effect to such withdrawal, a Commitment Shortfall would exist.

Section 11.5.     Disbursements of Monies from Unrestricted Collateral Account

(a)     Upon receipt of an Issuer Order pursuant to Section 12.1, the Trustee shall apply amounts on deposit in the Unrestricted Collateral Account to (i) make extensions of credit in respect of, or to acquire, Unrestricted Collateral Debt Obligations (including extending credit under Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations) or (ii) acquire Equity Securities, in each case on behalf of the Issuer or the Zohar Subsidiary and subject to the terms of Section 12.1(c) and Section 7.8(a)(v).

(b)     If on any Payment Date (after giving effect to any withdrawals made pursuant to Section 11.5(a) on such date) the Balance in the Unrestricted Collateral Account shall exceed U.S.$35,000,000, the Trustee shall withdraw from the Unrestricted Collateral Account an amount equal to

198

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

such excess and shall deposit such amount in the Issuer Principal Collection Account (prior to giving effect to distributions from the Issuer Principal Collection Account to be made on such date), provided that after giving effect to any such deposit to the Issuer Principal Collection Account, there are sufficient amounts on deposit in the Unrestricted Collateral Account to fund the Unfunded Amounts under any Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations.

(c)    With respect to any Payment Date, the Collateral Manager may, on or before the last day of the related Due Period, direct that all or any portion of the funds on deposit in the Unrestricted Collateral Account be deposited in the Issuer Principal Collection Account (prior to giving effect to distributions from the Issuer Principal Collection Account to be made on such date), provided that the Collateral Manager has confirmed to the Trustee that after giving effect to any such deposit to the Issuer Principal Collection Account, there are sufficient amounts on deposit in the Unrestricted Collateral Account to fund the Unfunded Amounts under any Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations.

Section 11.6.    Disbursements of Monies from Rollover Proceeds Account

(a)    Upon receipt of an Issuer Order pursuant to Section 12.1, the Trustee shall apply amounts on deposit in the Rollover Proceeds Account to acquire Exchanged Securities and/or Originated Special Loans/Preferred Securities on behalf of the Issuer or the Zohar Subsidiary and subject to the terms of Section 12.1(d), provided that amounts may not be applied from the Rollover Proceeds Account to acquire any Junior Rollover Exchanged Security if, after giving effect to such acquisition, the Aggregate Principal Balance of all Junior Rollover Exchanged Securities then held by the Trustee would exceed 10% of the Maximum Investment Amount.

(b)    The Collateral Manager shall calculate the amount of funds deposited into and withdrawn from the Rollover Proceeds Account on a "first-in/first-out" basis, and shall notify the Trustee promptly of the amount of any funds that are (based on such calculations) held in or credited to the Rollover Proceeds Account for a period in excess of 60 days. Promptly upon receipt of such notice, the Trustee shall withdraw from the Rollover Proceeds Account the amount of any funds that have been held in the Rollover Proceeds Account for a period in excess of 60 days and shall deposit such amount in the Issuer Principal Collection Account, subject to Section 11.4(c)(ii).

(c)    Without limiting clause (a) above, the Collateral Manager may in its discretion, by Issuer Order, direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Rollover Proceeds Account to the Issuer Principal Collection Account from time to time to fund Unfunded Amounts in respect of Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations.

Section 11.7.    [Reserved]

Section 11.8.    Trust Accounts

All Monies held by, or deposited with, the Trustee in any Account pursuant to the provisions of this Indenture, and not invested in Collateral Debt Obligations or Eligible Investments as herein provided, shall be deposited in one or more segregated trust accounts, maintained at a financial institution whose long-term rating is at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's, to be held in trust for the benefit of the Secured Parties. Except with respect to amounts on deposit in the Payment Account, to the extent Monies deposited in a trust account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit

199

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States, such excess shall be invested in Eligible Investments.

## ARTICLE 12

## ACQUISITION AND SALE OF COLLATERAL DEBT
## OBLIGATIONS AND EQUITY SECURITIES

Section 12.1.    Acquisition of Collateral Debt Obligations and Equity Securities; Eligibility Criteria

(a)    Subject to Sections 12.1(b) and 12.3, during the Reinvestment Period, an obligation or security to be Granted to the Trustee (including, without limitation, on the Funding Date), shall be eligible for inclusion in the Collateral as a Pledged Collateral Debt Obligation (and the Issuer will be entitled to enter into a commitment to acquire such obligation or security in order to be Granted to the Trustee for inclusion in the Collateral as a Pledged Collateral Debt Obligation) by application of amounts referred to in Section 9.7 only if, (x) the Controlling Party consents in writing to such acquisition and notice thereof has been provided to each Rating Agency in writing or (y) as evidenced by an officer's certificate of an Authorized Officer of the Issuer or the Collateral Manager delivered to the Trustee and the Credit Enhancer, the following conditions (the "Eligibility Criteria") are satisfied at the time such commitment to purchase such Collateral Debt Obligation is made and after giving effect thereto (and, if applicable, treating all other Collateral Debt Obligations that the Issuer or the Zohar Subsidiary has committed to purchase at such time as being owned by the Issuer or the Zohar Subsidiary, as applicable, it being understood however that the Eligibility Criteria shall be determined on a commitment-by-commitment basis without aggregating block trades of Collateral Debt Obligations):

(1)    such obligation or security is a Collateral Debt Obligation (including an attached Equity Kicker or Originated Special Loan/Preferred Security);

(2)    such Collateral Debt Obligation provides for a fixed amount of principal payable in Cash no later than its Stated Maturity;

(3)    such Collateral Debt Obligation is not payable or denominated in, or convertible into an obligation or security denominated in, a currency other than U.S. Dollars;

(4)    (A) such Collateral Debt Obligation is not an inverse floater; and (B) not more than 10% of the Maximum Investment Amount may consist of Collateral Debt Obligations that bear interest at a rate that increases or decreases solely as a function of the passage of time;

(5)    such Collateral Debt Obligation provides for periodic payments of interest in Cash at least semi-annually;

(6)    such Collateral Debt Obligation is not a PIK Loan;

(7)    such Collateral Debt Obligation, if debt, is Registered;

(8)    such Collateral Debt Obligation is a loan of a U.S. private issuer, payable only in the United States and governed by the laws of a state of the United States, provided, however, that up to 10% (in the aggregate) of the Maximum Investment Amount may consist of obligations

200

NY3:#734715|v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

issued by obligors organized under, and such Collateral Debt Obligations may be governed by, the laws of Canada, the United Kingdom, Germany, The Netherlands and/or France so long as such applicable country (x) does not impose foreign exchange controls and (y) has a sovereign credit rating of at least "AA" by Standard & Poor's;

(9)      such Collateral Debt Obligation is not (A) an Equity Security (other than an attached Equity Kicker, Originated Special Loan/Preferred Security or an Equity Workout Security) or (B) convertible or exchangeable into any Equity Security (other than at the sole option of the holder thereof);

(10)     unless such Collateral Debt Obligation is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation, such Collateral Debt Obligation does not require the Issuer to make future advances to (or on behalf of) the obligor or issuer under the related Underlying Instruments (other than the customary expense reimbursements and indemnifications contained in the Underlying Instruments);

(11)     such Collateral Debt Obligation is not an Asset-backed Security;

(12)     such Collateral Debt Obligation is not an obligation to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof;

(13)     such Collateral Debt Obligation is not a loan (other than a DIP Loan) incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a Person or similar transaction which obligation by its terms is required to be repaid within the year of the incurrence thereof with proceeds from additional borrowings or other refinancing;

(14)     such Collateral Debt Obligation is not a loan which is a swap, option, forward, trust certificate, credit-linked note or other derivative contract;

(15)     (x) such Collateral Debt Obligation is not a security whose repayment is subject to material non-credit related risk (for example, a Collateral Debt Obligation the payment of which is expressly contingent upon the non-occurrence of a catastrophe), as determined in the sole judgment of the Collateral Manager, exercised in accordance with the standard of care set forth in the Management Agreement; and (y) no rating assigned by Standard & Poor's to such Collateral Debt Obligation includes the subscript "r", "t", "p", "pi" or "q";

(16)     if such Collateral Debt Obligation is in the form of a Participation Interest, (x) the Selling Institution is at the time of the purchase of such Participation Interest a financial institution (including a securities broker or an Affiliate thereof) or other institutional lender with long-term unsecured debt ratings (or the parent of which has ratings) of at least "A2" from Moody's and "A" from Standard & Poor's or (y) the Selling Institution is Ark CLO 2000-1, Limited or Ark CLO 2000-1, LLC and, in either case (x) or (y), the conditions in clause (34) below are satisfied;

(17)     [reserved];

(18)     the acquisition of such Collateral Debt Obligation will not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act and if the issuer of such Collateral Debt Obligation is excepted from the definition

201

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

of an "investment company" solely by reason of Section 3(c)(1) of the Investment Company Act, then either (x) such Collateral Debt Obligation does not constitute a "voting security" for purposes of the Investment Company Act or (y) the aggregate amount of such Collateral Debt Obligation held by the Issuer and/or the Zohar Subsidiary is less than 10% of the entire issue of such security;

(19)    on or after the Ramp Up End Date (A) the Class A Interest Coverage Ratio Test is satisfied (or, if the Class A Interest Coverage Ratio Test is not satisfied, compliance with the Class A Interest Coverage Ratio Test is improved), (B) the Class A Overcollateralization Ratio Test is satisfied (determined immediately before and after giving effect to such acquisition) and (C) the Class A Overcollateralization Ratio (determined immediately after giving effect to such acquisition) is greater than or equal to the Purchase-to-Improve Ratio;

(20)    on or after the Ramp Up End Date (A) each of the Collateral Quality Tests (other than the Standard & Poor's CDO Monitor Test) is satisfied with respect to the portfolio of Collateral Debt Obligations or, if immediately prior to such investment (or immediately prior to the sale of the Collateral Debt Obligation the proceeds of which are used to purchase such Collateral Debt Obligation) one or more such Collateral Quality Tests was not satisfied with respect to the portfolio of Collateral Debt Obligations, (1) the extent of compliance with at least one such non-complying Collateral Quality Test must be improved, (2) no Collateral Quality Test which has previously failed to be satisfied shall be made worse and (3) no Collateral Quality Test which has previously been satisfied shall fail to be satisfied after giving effect to such acquisition and (B) the Standard & Poor's CDO Monitor Test is satisfied (as determined by the Trustee) or, if immediately prior to such investment the Standard & Poor's CDO Monitor Test was not satisfied, the extent of compliance with the Standard & Poor's CDO Monitor Test must be maintained or improved;

(21)    no Commitment Shortfall would exist;

(22)    such Collateral Debt Obligation is not the subject of an all Cash Offer for all of the outstanding loans under the related Underlying Instruments, provided, however, that this requirement shall not apply to acquisitions effected pursuant to an active strategy of the Issuer and/or the Zohar Subsidiary (or the Collateral Manager on behalf of the Issuer and/or the Zohar Subsidiary) involving the acquisition of Collateral Debt Obligations to gain or maintain control of a bank group (or similar constituency);

(23)    such Collateral Debt Obligation matures on or prior to the earlier of (A) the date 7 years after the date of such investment and (B) the Stated Maturity of the Class A Notes;

(24)    such Collateral Debt Obligation is not a loan secured primarily by a mortgage, deed of trust or similar lien on real property;

(25)    such Collateral Debt Obligation is not a security issued by a collateralized debt obligation vehicle;

(26)    the Issuer or the Zohar Subsidiary is an eligible assignee with respect to such Collateral Debt Obligation under the related Underlying Instruments, and the pledge of such Collateral Debt Obligation under this Indenture is permitted under such Underlying Instrument;

202

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050467

(27)    not more than 3.0% of the Maximum Investment Amount may consist of obligations issued by any single issuer or any of its Affiliates; provided that up to five issuers may each constitute up to 5.0% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 7.5% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 9.0% of the Maximum Investment Amount (in each case, including any Unfunded Amounts in respect thereof);

(28)    not more than 5% of the Maximum Investment Amount may consist of Collateral Loans that are Defaulted Obligations (for the avoidance of doubt, the value of each Defaulted Obligation shall be the Principal Balance of such Defaulted Obligation);

(29)    not more than 30% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are Revolving Collateral Debt Obligations (including any Unfunded Amounts in respect thereof) and Delayed Funding Collateral Debt Obligations (but only with respect to the Unfunded Amounts in respect thereof);

(30)    not more than 20% of the Maximum Investment Amount may consist of Fixed Rate Obligations (excluding for purposes of this Section 12.1(a)(30) Fixed Rate Obligations that are Non-Performing Obligations, Non-Current Obligations and Collateral Debt Obligations with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only);

(31)    not more than 5% of the Maximum Investment Amount may consist of Collateral Debt Obligations that (i) are Floating Rate Obligations and (ii) do not have an interest option based on either a LIBO Rate or the "prime rate" (excluding any Non-Current Obligations);

(32)    not more than 20% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are Floating Rate Obligations with an interest option based on the "prime rate" or "alternate base rate", where the spread on any LIBO Rate interest option is more than 1.50% above the spread on such "prime rate" interest option or "alternate base rate" option, as applicable (excluding any Non-Current Obligations).

(33)    not more than 15% of the Maximum Investment Amount may consist of obligations that pay interest less frequently than quarterly (excluding any Non-Current Obligations);

(34)    (A) Participation Interests may not comprise more than the following percentages of the Maximum Investment Amount: (I) from the Funding Date until and including the 30th day thereafter, 29%; (II) thereafter until and including the 60th day after the Funding Date, 28%; (III) thereafter until and including the 90th day after the Funding Date, 27%; (IV) thereafter until and including the 120th day after the Funding Date, 26%; provided that, notwithstanding the foregoing clauses (I) through (IV), if at any time during the period from the Funding Date until and including the 120th date thereafter, Participation Interests comprise 20% or less of the Maximum Investment Amount, then from and after such date, Participation Interests may not comprise more than 20% of the Maximum Investment Amount; and (V) after the 120th day following the Funding Date, Participation Interests may not comprise more than 20% of the Maximum Investment Amount; (B) not more than 10% of the Maximum Investment Amount may consist of Participation Interests with any single Selling Institution (other than Ark CLO 2000-1, Limited or Ark CLO 2000-1, LLC); and (C) not more than 10% of the Maximum Investment Amount may consist of Participation Interests with Selling Institutions rated less than "Aa2" by Moody's or "AA" by Standard & Poor's (other than Ark CLO 2000-1, Limited or Ark CLO 2000-1, LLC);

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050468

(35)     not more than 5% of the Maximum Investment Amount may consist of Collateral Debt Obligations that are convertible or exchangeable into Equity Securities;

(36)     not more than 12% of the Maximum Investment Amount may consist of Collateral Debt Obligations issued by obligors that fall within the same Moody's Industry Classification Group (provided that up to 3 Industry Classification Groups may each constitute up to 16% of the Maximum Investment Amount);

(37)     not more than 12% of the Maximum Investment Amount may consist of Collateral Debt Obligations issued by obligors that fall within the same Standard & Poor's Industry Classification Group (provided that up to 3 Industry Classification Groups may each constitute up to 16% of the Maximum Investment Amount);

(38)     the percentage of the Maximum Investment Amount consisting of Collateral Debt Obligations in Category 1 may not exceed the Category 1 Ratio;

(39)     the percentage of the Maximum Investment Amount consisting of Collateral Debt Obligations in Category 1 or Category 2 may not exceed the Category 1-2 Ratio;

(40)     the Purchase Price of such Collateral Debt Obligation does not exceed the Outstanding Principal Balance thereof plus accrued and unpaid interest thereon;

(41)     such Collateral Debt Obligation has a Moody's Rating and a Standard & Poor's Rating;

(42)     not more than 10% of the Maximum Investment Amount may consist of Second Lien Collateral Debt Obligations;

(43)     none of the Collateral Debt Obligations, when initially acquired by the Issuer or the Zohar Subsidiary, may consist of subordinated loans (other than Senior Secured Collateral Debt Obligations, Second Lien Collateral Debt Obligations and Originated Special Loans/Preferred Securities);

(44)     such Collateral Debt Obligation has a Moody's Rating of "B3" or better if the Principal Balance of such Collateral Debt Obligation is greater than 3.5% of the Maximum Investment Amount;

(45)     not more than 40% of the Maximum Investment Amount may consist of Collateral Debt Obligations rated "Caa1" or less by Moody's or "CCC+" or less by Standard & Poor's; and not more than 20% of the Maximum Investment Amount may consist of Collateral Debt Obligations rated "Caa3" or less by Moody's or "CCC-" or less by Standard & Poor's

(46)     not more than 10% of the Maximum Investment Amount may consist of Discounted Loans;

(47)     not more than 3% of the Maximum Investment Amount may consist of Collateral Debt Obligations the Stated Maturity of which, as a result of amendment or restructuring, is after the Stated Maturity of the Class A Notes; and

204

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050469

(48)    the assets owned or held by the Zohar Subsidiary do not exceed 40% of the total assets (determined on a consolidated basis) owned or held by the Co-Issuers and the Zohar Subsidiary.

(b)    On or after the Funding Date, if the Issuer (or the Collateral Manager on the Issuer's behalf) has previously entered into a commitment to acquire an obligation or security for inclusion in the Collateral as a Pledged Collateral Debt Obligation, then the Issuer need not comply with any of the Eligibility Criteria on the date of such Grant if the Issuer complied with each of the Eligibility Criteria on the date on which the Issuer (or the Collateral Manager on the Issuer's behalf) entered into such commitment (as if the date of such Grant referred to above were the date of such commitment), so long as the settlement period does not exceed 90 days. For purposes of determining satisfaction of the Eligibility Criteria, each Class A Coverage Test and each Collateral Quality Test, (i) any Collateral Debt Obligation with respect to which the Issuer (or the Collateral Manager on the Issuer's behalf) has previously entered into a commitment to acquire shall be treated as being owned by the Issuer, so long as the settlement period does not exceed 90 days and (ii) Unrestricted Collateral Debt Obligations and Exchanged Securities shall be deemed not to constitute Pledged Collateral Debt Obligations or otherwise part of the Issuer's (or Zohar subsidiary's) portfolio of Collateral Debt Obligations. The conditions of Section 12.1(a) shall not apply to the purchase or acquisition of any Unrestricted Collateral Debt Obligation, any Exchanged Security or any Originated Special Loan/Preferred Security. The Trustee and the Issuer shall be entitled to rely conclusively and in good faith upon any certification made by the Collateral Manager pursuant to this Section 12.1.

Upon the acquisition of each Collateral Debt Obligation by the Issuer, the Collateral Manager shall designate (in a writing delivered to the Trustee and the Credit Enhancer) each such Collateral Debt Obligation as falling within Category 1, Category 2, Category 3 or Category 4. After the acquisition of each Collateral Debt Obligation by the Issuer and/or the Zohar Subsidiary, to the extent that the characterization of such Collateral Debt Obligation shall change, the Collateral Manager shall re-designate (in a writing delivered to the Trustee and the Credit Enhancer) each such Collateral Debt Obligation as falling within Category 1, Category 2, Category 3 or Category 4 or as a Workout Obligation.

Notwithstanding the provisions of Section 12.1(a), (A) to the extent Cash on deposit in the Collection Accounts may be used to acquire Collateral Debt Obligations in accordance with terms of this Indenture, such Cash may be invested in Eligible Investments, pending acquisition of Collateral Debt Obligations, (B) if an Event of Default shall have occurred and be continuing, no Collateral Debt Obligation may be acquired unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such Event of Default or with the prior written consent of the Controlling Party, (C) if the Collateral Manager shall have received notice that an event constituting "Cause" (as defined in the Management Agreement) shall have occurred and be continuing, no Collateral Debt Obligation may be acquired or sold unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such event constituting "Cause" or with the prior written consent of the Controlling Party, (D) to the extent that any one or more of the Eligibility Criteria in any of clauses (4)(B), (8), (19)(C) and (29) through (37), and (42) through (46) above are not met, the Issuer and/or the Zohar Subsidiary shall continue to be able to acquire Collateral Debt Obligations to the extent any such unsatisfied Eligibility Criteria shall not be made worse (and any such Eligibility Criteria which has previously been satisfied shall not fail to be satisfied) after giving effect to such reinvestment and (E) to the extent that any one or more of the Eligibility Criteria in any of clauses (28), (38), (39) and (40) above are not met, the Issuer and/or the Zohar Subsidiary shall continue to be able to acquire Collateral Debt Obligations to the extent any such unsatisfied Eligibility Criteria shall be improved (and any such Eligibility Criteria which has previously been satisfied shall not fail to be satisfied) after giving effect to such reinvestment.

205

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050470

(c)    The Issuer may, by Issuer Order, direct the Trustee to apply amounts on deposit in the Unrestricted Collateral Account to acquire any Unrestricted Collateral Debt Obligation or Equity Security (subject to the terms of this Section 12.1(c) and Section 7.8(a)(v)), provided that the Collateral Manager delivers to the Trustee a certificate stating that the following conditions are satisfied:

(i)    immediately prior to such acquisition, there are sufficient amounts on deposit in the Unrestricted Collateral Account to pay the funding or purchase price in respect of such Unrestricted Collateral Debt Obligation or Equity Security, and after giving effect to such acquisition, there would be sufficient amounts on deposit in the Unrestricted Collateral Account to fund the Unfunded Amounts under all Unrestricted Collateral Debt Obligations that are Revolving Collateral Debt Obligations or Delayed Funding Collateral Debt Obligations then held by the Issuer or the Zohar Subsidiary;

(ii)    such Unrestricted Collateral Debt Obligation or Equity Security (if denominated in any currency) is denominated in Dollars (and not any other currency);

(iii)    the issuer of such Unrestricted Collateral Debt Obligation or Equity Security is organized under the laws of the United States or any State or other political subdivision thereof or organized under the laws of Canada, the United Kingdom, Germany, The Netherlands and/or France, and either:

(x)    such issuer is at such time (or was immediately prior to such time) also an issuer of a Pledged Obligation (an "Existing Obligor") or an Affiliate of such Existing Obligor; or

(y)    the acquisition of such Unrestricted Collateral Debt Obligation or Equity Security is made in connection with any refinancing, restructuring or reorganization of an Existing Obligor (or an Affiliate of such Existing Obligor) or any line(s) of business of an Existing Obligor (or an Affiliate of such Existing Obligor);

(iv)    if any Class A Notes are Outstanding, after giving effect to such acquisition:

(x)    the sum of (A) the aggregate amount of funds applied from the Unrestricted Collateral Account (subject to Section 7.8(a)(v)), to acquire Unrestricted Collateral Debt Obligations from lenders in existing credit facilities plus (B) the Unfunded Amount of all such Unrestricted Collateral Debt Obligations, would not exceed U.S.$15,000,000; and

(y)    the sum of (A) the aggregate amount of funds applied from the Unrestricted Collateral Account to acquire Unrestricted Collateral Debt Obligations or Equity Securities issued by the same obligor or any Affiliate thereof plus (B) the Unfunded Amount of all such Unrestricted Collateral Debt Obligations, would not exceed U.S.$5,000,000;

(v)    the Issuer has complied (or will comply) with the procedures set forth in Section 3.3(b) relating to the perfection of the Trustee's security interest in such Unrestricted Collateral Debt Obligation or Equity Security.

(d)    The Issuer or the Zohar Subsidiary may (x) apply amounts on deposit in the Rollover Proceeds Account to acquire a loan, debt security, letter of credit, lease or equity or other

206

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050471

Respondents' Exhibit 8    pg. 213 of 447

security (as provided in Section 11.6) or (y) otherwise exchange any Collateral Debt Obligation or Equity Security held by it for a loan, debt security, letter of credit, lease or equity or other security (any such new loan, debt security, letter of credit, lease or equity or other security referred to in the foregoing clause (x) or (y), an "Exchanged Security"), provided that the Collateral Manager delivers to the Trustee a certificate on or prior to the date of acquisition of such Exchanged Security stating that the following conditions are satisfied:

(i)    the Collateral Manager shall have determined (in its reasonable judgment) that the fair market value of such Exchanged Security equals or exceeds (A) in the case of clause (d)(x) above, the amount of funds applied from the Rollover Proceeds Account or (B) in the case of clause (d)(y) above, the fair market value of the predecessor Collateral Debt Obligation or Equity Security, in each case as of the date of acquisition of such Exchanged Security;

(ii)    to the extent that the Exchanged Security is a Revolving Collateral Debt Obligation or a Delayed Funding Collateral Debt Obligation, after giving effect to such acquisition no Commitment Shortfall would exist;

(iii)    such Exchanged Security is denominated in Dollars (and not any other currency) (to the extent, in the case of any Equity Security, such Equity Security is denominated in any currency);

(iv)    the obligor in respect of such Exchanged Security is organized under the laws of the United States or any State or other political subdivision thereof or under the laws of Canada, the United Kingdom, Germany, The Netherlands and/or France; and

(v)    the Issuer has complied (or will comply) with the procedures set forth in Section 3.3(b) relating to the perfection of the Trustee's security interest in such Exchanged Security.

(e)    Notwithstanding anything else contained herein or in any other Transaction Document, the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents hereby acknowledge and agree that (i) the Issuer has purchased the assets designated as the "Zohar I Assets" set forth in Schedule A-1 from Zohar CDO 2003-1, Limited (an Affiliate of Patriarch Partners) with proceeds of Warehouse Advances, and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents hereby consent to such acquisitions at such prices and waive any and all conflicts of interest relating thereto, and (ii) the Issuer and/or the Zohar Subsidiary shall (on or about the Funding Date) purchase the assets set forth in Schedule A-2 from Ark CLO 2000-1, Limited and/or Ark CLO 2000-1, LLC (each an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2), and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents hereby consent to such acquisitions at such prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2) and waive any and all conflicts of interest relating thereto. The above described purchases and sales have been made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in Schedule A-1 and Schedule A-2, as applicable.

207

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 214 of 447

Section 12.2.    Sale of Collateral

(a)      Except as otherwise expressly permitted or required by this Indenture, neither the Issuer nor the Zohar Subsidiary will sell or otherwise dispose of any Collateral Debt Obligation or Equity Security; provided that, subject to satisfaction of any applicable conditions in Section 10.14, so long as (i) no Event of Default has occurred and is continuing and (ii) on or prior to the trade date for such sale the Collateral Manager has certified to the Trustee and the Credit Enhancer in writing that the conditions applicable to such sale set forth below have been satisfied, the Issuer or the Zohar Subsidiary (or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary, as applicable, acting pursuant to the Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing:

(i)      any Unrestricted Collateral Debt Obligation, Originated Special Loan/Preferred Security or Equity Security; and

(ii)     any Collateral Debt Obligation, so long as the conditions specified in any one or more of the following clauses (A), (B), (C), (D) or (E) are satisfied:

(A)      (x) none of the initial ratings of the Class A Notes have been reduced or withdrawn by Moody's or Standard & Poor's (in each case without giving effect to the Credit Enhancement) and (y) the Aggregate Principal Balance of all such sales of Collateral Debt Obligations for a given calendar year effected pursuant to this clause (A) does not exceed 15% of the Aggregate Principal Balance of all Pledged Collateral Debt Obligations as of the beginning of such year; provided that, with respect to the period from the Funding Date to and including December 31, 2005, the Issuer and the Zohar Subsidiary may sell Collateral Debt Obligations having an Aggregate Principal Balance not exceeding U.S.$90,000,000;

(B)      the Collateral Manager shall provide the Trustee, the Credit Enhancer (so long as no Credit Enhancement Event shall have occurred and be continuing), the Class A-1 Note Agent and the Preference Share Paying Agent written notice of such sale at least five Business Days' prior to the proposed date thereof, together with either (x) a description of two bona fide bids for such Collateral Debt Obligation or (y) a certification of the proposed sale price and a report of an Independent bond and/or loan pricing service (which certification may be in the form of a firm bid) confirming such sale price, and the Controlling Party shall consent in writing to such sale at least one Business Day prior to the proposed date thereof, provided that such consent may be withheld only if the Controlling Party determines, in its sole discretion, that there is a reasonable basis to do so (based on the judgment of the Controlling Party, which judgment shall not be called into question as a result of subsequent events);

(C)      (x) the Issuer or the Zohar Subsidiary shall hold title to such Collateral Debt Obligation or, in the case of the sale of a Collateral Debt Obligation that is a Participation Interest, the Selling Institution shall hold title to the underlying loan, as part of a syndicated credit facility comprised of at least two lenders other than the Issuer, the Zohar Subsidiary or any investment fund managed by the Collateral Manager or any of their respective Affiliates; and

(y) one or more of such lenders (other than the Issuer, the Zohar Subsidiary or any investment fund managed by the Collateral Manager or any of their respective Affiliates) holding in excess of 50% of the principal amount of

208

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

loans under such credit facility approve the sale price of such Collateral Debt Obligation or such underlying loan (and, in the case of a sale of such underlying loan, upon such sale the entire net proceeds thereof attributable to the Participation Interest shall be remitted to the Issuer or the Zohar Subsidiary, as applicable, as the purchase price for the sale of such Participation Interest);

(D)    such Collateral Debt Obligation (or any portion thereof) is sold for a price equal to at least 85% of the par or face amount thereof (before giving effect to the amount of any reasonable and customary transfer fees and any customary discounts given in connection with the sale of an unfunded revolving loan commitment, the amount of such fees and discounts to be certified by the Collateral Manager to the Trustee) and, so long as the Credit Enhancer is the Controlling Party, concurrently with such sale the Collateral Manager provides notice of such sale to the Credit Enhancer; or

(E)    the Controlling Party consents to such sale.

Notwithstanding the foregoing, neither the Issuer nor the Zohar Subsidiary will sell or otherwise dispose of any Collateral Debt Obligation to the Collateral Manager or any Holder of the Preference Shares (or any of their respective Affiliates) without the prior written consent of the Controlling Party.

(b)    The Issuer and the Zohar Subsidiary will sell any Equity Security within six years after the Issuer's or the Zohar Subsidiary's acquisition thereof (or within six years after such later date as such security may first be sold in accordance with its terms and to the extent permitted by applicable law).

(c)    After the Issuer has notified the Trustee of an optional redemption in accordance with Section 9.2, the Issuer (or the Collateral Manager on behalf of the Issuer, pursuant to the Management Agreement) may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, Equity Security or other Collateral without regard to the foregoing limitations in Section 12.2(a); provided that:

(i)    the Sale Proceeds therefrom are used to pay certain expenses and redeem all of the Notes in whole but not in part pursuant to Sections 9.1(a) and (b), and upon any such sale the Trustee shall release such Collateral pursuant to Section 10.14;

(ii)    the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) such Collateral pursuant to this Section 12.2(c) unless:

(A)    the Collateral Manager certifies to the Trustee and the Credit Enhancer that (x) in its sole judgment based on calculations included in the certification (which shall include the sales prices of the Collateral), the Sale Proceeds from the sale of one or more of the Collateral (based on the criteria set forth in Section 9.1(b)(i) or (ii)) will be sufficient to pay the Redemption Price with respect to all the Notes pursuant to Section 9.1(a) and (y) an Independent bond and/or loan pricing service has confirmed (which confirmation may be in the form of a firm bid) the sales prices contained in the certification in clause (x) above (and attaching a copy of such confirmation); and

209

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(B)     the Independent accountants appointed by the Issuer pursuant to Section 10.15 shall confirm the calculations made in clause (A)(x) above;

(iii)    all the Collateral to be sold pursuant to this Section 12.2(c) will be sold in accordance with the requirements set forth in Section 9.1(b)(i) or (ii), as applicable; and

(iv)    the Collateral Manager shall sell any Collateral pursuant to this Section 12.2(c) only at a price that in its sole judgment is commercially reasonable.

(d)     After the payment in full of the Notes (in connection with an optional redemption of the Notes or otherwise and without giving effect to any payment under the Credit Enhancement) and payment of, or establishment of a reasonable reserve (as determined by the Collateral Manager in its sole discretion) for, all other amounts payable under the Priority of Payments prior to the payment of any final distribution on the Preference Shares, the Issuer (or the Collateral Manager on behalf of the Issuer, pursuant to the Management Agreement) may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Collateral or Equity Security without regard to the foregoing limitations in Section 12.2(a) or Section 12.2(c), provided that the Collateral Manager shall sell any Collateral pursuant to this Section 12.2(d) only at a price that in its sole judgment is commercially reasonable.

(e)     Promptly following the Payment Date falling in September, 2016, the Issuer and the Zohar Subsidiary, as applicable (or the Collateral Manager on behalf of the Issuer and the Zohar Subsidiary, pursuant to the Management Agreement), shall direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, all Collateral without regard to the foregoing limitations in Section 12.2(a) or Section 12.2(c); provided that:

(i)    the Issuer, the Zohar Subsidiary and the Collateral Manager shall not be required to direct the Trustee to sell any Collateral that has a stated final maturity occurring prior to the Stated Maturity of the Class A Notes if the Collateral Manager believes with reasonable certainty that such Collateral will be repaid on or prior to the maturity thereof for an aggregate price of not less than 90% of par; and

(ii)    the Collateral Manager shall sell any Collateral pursuant to this Section 12.2(e) only at a price that in its sole judgment is commercially reasonable.

(f)     Neither the Issuer nor the Zohar Subsidiary will sell any Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation unless, concurrently with such sale, (i) the transferee agrees with the Issuer or the Zohar Subsidiary, as applicable (for the express benefit of the Issuer or the Zohar Subsidiary and the obligors on such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, as the case may be) that the transferee will, from and after the consummation of such sale, perform all of the obligations of the Issuer or the Zohar Subsidiary, as applicable, as a bank or lender or counterparty under the Underlying Instruments in respect of Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation, as the case may be, sold by the Issuer or the Zohar Subsidiary and (ii) by reason of the express terms of the relevant Underlying Instruments or by reason of the agreement of the Obligors on such Revolving Collateral Debt Obligation or Delayed Funding Collateral Debt Obligation (or their duly authorized representative), the Issuer or the Zohar Subsidiary, as applicable, shall be released from such obligations.

210

Indenture
PP050475

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 12.3.    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Article or under Section 10.14 shall be conducted on an arm's-length basis for fair market value and in accordance with the requirements of the Management Agreement and applicable law, and, if effected with the Collateral Manager, the Issuer, the Zohar Subsidiary, or the Trustee, or any Affiliate of any of the foregoing shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so Affiliated; provided that if any disposition of a Collateral Debt Obligation is made to an Affiliate of the Issuer or the Zohar Subsidiary or to the Collateral Manager or any of their Affiliates, then such disposition shall be made only (x) with the prior written approval of (A) the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares) and (B) the Controlling Party and (y) for a price not less than (aa) the average of the bona fide bids for such Collateral Debt Obligation obtained by the Collateral Manager at the time of such disposition from any two Independent qualified dealers chosen by the Collateral Manager or (bb) if two such bids are not able to be obtained, an amount equal to the greater of (I) the fair market value thereof as determined by the Collateral Manager and (II) (a) the original Purchase Price paid by the Issuer or the Zohar Subsidiary therefor; plus (b) any additional advances made by the Issuer or the Zohar Subsidiary in respect thereof; minus (c) any repayments of principal received by the Issuer or the Zohar Subsidiary with respect thereto. Notwithstanding anything herein to the contrary, the Issuer and/or the Zohar Subsidiary may (solely with the written consent of the Controlling Party) acquire from the Collateral Manager or any Affiliate of the Collateral Manager for nominal consideration any equity security issued by an obligor on or an issuer of any Collateral Debt Obligation (or any Affiliate of such obligor or issuer) then held by the Issuer and/or the Zohar Subsidiary.

The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)    Upon any Grant pursuant to this Article, all of the Issuer's or the Zohar Subsidiary's right, title and interest in the applicable Pledged Obligation or Securities shall be Granted to the Trustee pursuant to this Indenture and, if applicable, the Trustee shall receive such Pledged Obligation or Securities. The Trustee shall also receive, not later than the date of delivery of any Collateral Debt Obligation delivered after the Funding Date, (i) an Officer's certificate of the Collateral Manager certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is permitted by this Article, including, without limitation, the Eligibility Criteria, and (ii) an Officer's certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)    Notwithstanding anything contained in this Article to the contrary, the Issuer and the Zohar Subsidiary shall have the right to effect any transaction which has been consented to by the Controlling Party and of which each Rating Agency has been notified.

ARTICLE 13

NOTEHOLDERS' RELATIONS

Section 13.1.    Subordination

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and the Credit Enhancer that the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and

211

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050476

junior to the Class A Notes, all Credit Enhancement Liabilities and all Credit Enhancement Premium (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A Notes shall be paid in full in Cash or, to the extent a Majority of the Class A Notes consents, other than in Cash (without giving effect to the Credit Enhancement), before any further payment or distribution is made on account of the Subordinate Interests. The Holders of Class B Notes, the Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A Notes and the Credit Enhancer, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or the Class C Notes, as applicable, or hereunder in respect of any such Class of Notes until the payment in full of the Class A Notes and all Credit Enhancement Liabilities and Credit Enhancement Premium and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

      (b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder in respect of any such Class of Notes until the payment in full of the Class B Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

      (c)     In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until the applicable Senior Interests shall have been paid in full in Cash or (with regard to clause (a) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class A Notes or the Credit Enhancer, as the case may be, consents, other than in Cash (without giving effect to the Credit Enhancement) or (with regard to clause (b) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class B Notes consents, other than in Cash) in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the holders of the applicable Senior Interests in accordance with this Indenture; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including, without limitation, this Section 13.1.

      (d)     Each Holder of Subordinate Interests agrees with the holders of the applicable Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this

212

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture including, without limitation, this Section 13.1; provided that (i) after the Class A Notes and all Credit Enhancement Liabilities and all Credit Enhancement Premium have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A Notes and (ii) after the Class B Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class B Notes. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2.    Standard of Conduct

(a)    In exercising any of the Credit Enhancer's or (without duplication) the Controlling Party's voting rights, rights to direct and consent or any other rights as a Secured Party, as the Credit Enhancer or as the Controlling Party under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 and so long as no Credit Enhancement Event has occurred, the Credit Enhancer shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

(b)    In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

Section 13.3.    Controlling Party

No party dealing with the Controlling Party in connection with the exercise by the Controlling Party of its rights hereunder shall have any obligation to determine the right, power and authority of the Controlling Party to exercise such rights or the compliance of such exercise with the provisions hereof, and each and every such party may conclusively rely on the existence of such right, power, authority and compliance.

Section 13.4.    Non-Petition

The Holders of Notes agree not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Holders of Class A Notes (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Holders of Class A Notes, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding,

213

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

ARTICLE 14

ASSIGNMENT OF MANAGEMENT AGREEMENT AND
COLLATERAL ADMINISTRATION AGREEMENT, ETC.

Section 14.1.     Assignment

Each of the Issuer and the Zohar Subsidiary, in furtherance of the covenants of this
Indenture and as security for the Notes and amounts payable to the Noteholders hereunder and the
performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to
the Trustee, for the benefit of the Secured Parties, all of the Issuer's and the Zohar Subsidiary's estate,
right, title and interest in, to and under the Management Agreement and (in the case of the Issuer) the
Collateral Administration Agreement, including, without limitation, (i) the right to give all notices,
consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal
action upon the breach of an obligation of the Collateral Manager or the Collateral Administrator, as
applicable, thereunder, including the commencement, conduct and consummation of Proceedings at law
or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder
and (iv) the right to do any and all other things whatsoever that the Issuer or the Zohar Subsidiary, as
applicable, is or may be entitled to do thereunder; provided that the Trustee hereby grants to the Issuer
and the Zohar Subsidiary a license to exercise all of the Issuer's and the Zohar Subsidiary's applicable
rights pursuant to the Management Agreement and the Collateral Administration Agreement without
notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture,
including, without limitation, as set forth in Section 14.4), which license shall be and is hereby deemed to
be automatically revoked (i) upon the occurrence of an Event of Default hereunder until such time, if any,
as such Event of Default is cured or waived, (ii) in the case of the Management Agreement, upon the
occurrence of an event specified therein pursuant to which the Issuer is entitled to remove the Collateral
Manager pursuant to Section 5.3 thereof or (iii) in the case of the Management Agreement, upon a default
in the performance, or breach, of any covenant, representation, warranty or other agreement of the
Collateral Manager thereunder or in any certificate or writing delivered pursuant thereto if Holders of at
least 25% of the Aggregate Outstanding Amount of the Notes of any Class give notice of such default or
breach to the Trustee, the Credit Enhancer and the Collateral Manager and such default or breach (if
remediable) continues for a period of 30 days.

Section 14.2.     No Impairment

The assignment made hereby is executed as collateral security, and the execution and
delivery hereby shall not in any way impair or diminish the obligations of the Issuer or the Zohar
Subsidiary under the provisions of the Management Agreement or (in the case of the Issuer) the Collateral
Administration Agreement, nor shall any of the obligations contained in the Management Agreement or
the Collateral Administration Agreement be imposed on the Trustee.

Section 14.3.     Termination, Etc.

Upon the redemption and cancellation of the Notes and the release of the Collateral from
the lien of this Indenture, the collateral assignments described in this Article 14 and all rights herein
assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate,
right, title and interest of the Trustee in, to and under the Management Agreement and the Collateral
Administration Agreement shall revert to the Issuer and (in the case of the Management Agreement) the
Zohar Subsidiary and no further instrument or act shall be necessary to evidence such termination and
reversion.

Indenture
PP050479

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Section 14.4.    Assignment of Collateral Management Agreement and Collateral Administration Agreement

Each of the Issuer and the Zohar Subsidiary represents that it has not executed any other assignment of the Management Agreement. Each of the Issuer and the Zohar Subsidiary agrees that the collateral assignments described in this Article 14 are irrevocable, and that it will not take any action which is inconsistent with such assignments or make any other assignment inconsistent herewith. Each of the Issuer and the Zohar Subsidiary will, from time to time upon the request of the Trustee (at the direction of the Controlling Party) or the Credit Enhancer, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee (at the direction of the Controlling Party) or the Credit Enhancer may reasonably specify. Each of the Issuer, the Zohar Subsidiary and the Collateral Manager hereby agrees to the following:

(a)    the Collateral Manager consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to the Collateral Manager;

(b)    the Collateral Manager acknowledges that the Issuer and the Zohar Subsidiary are assigning all of their respective right, title and interest in, to and under the Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Management Agreement are also for the benefit of the Trustee and the Secured Parties;

(c)    the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Management Agreement;

(d)    neither the Issuer nor the Collateral Manager will enter into any agreement amending, modifying or terminating the Management Agreement or selecting or consenting to a successor Collateral Manager, or objecting to prospective Approved Replacements under the Management Agreement, (i) without 10 days' prior notice to each Rating Agency and the Credit Enhancer, (ii) without 10 days' prior notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder), (iii) without the prior written confirmation of each Rating Agency that such amendment, modification or termination will not cause its then current rating of any Class of Notes to be reduced or withdrawn, (iv) without the prior written consent of the Controlling Party and (v) if either (a) a Majority of each Class of Notes or (b) the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares) shall, by notice to the Issuer and the Trustee within 30 days after the date of the related notice to the Trustee given as provided in clause (ii) above, object to such amendment, modification or termination, object to such successor Collateral Manager or direct that the Issuer object to such Approved Replacement;

(e)    except as otherwise set forth herein and therein (including, without limitation, pursuant to Article V of the Management Agreement), the Collateral Manager shall continue to serve as Collateral Manager under the Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Management Agreement because sufficient funds were not then available hereunder to pay such amounts. The Collateral Manager agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least

215

Indenture
PP050480

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Collateral Manager (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by any Zohar Obligor, as the case may be, or (b) any involuntary insolvency Proceeding filed or commenced against any Zohar Obligor by a Person other than the Collateral Manager, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding;

(f)    if the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the Class A Noteholders and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment advisor that relates to any action to be taken with respect to any Pledged Obligation, then the Collateral Manager will perform its obligations with respect to any such conflict in accordance with Section 12.3(a) and with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict (provided that, to the extent that any provision of the Management Agreement specifically addresses the treatment of any conflict referred to in this clause (f), such conflict shall not be subject to this clause (f));

(g)    the Collateral Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Manager irrevocably agrees that all claims in respect of such action or Proceeding may be heard and determined in such New York State or federal court. The Collateral Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding. The Collateral Manager irrevocably consents to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager in Charlotte, North Carolina (so long as Patriarch Partners is the Collateral Manager). The Collateral Manager agrees that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.5.    Issuer and Collateral Administrator Agreements, Etc.

The Issuer represents that it has not executed any other assignment of the Collateral Administration Agreement. The Issuer agrees that the assignment of the Collateral Administration Agreement under this Article 14 is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee (at the direction of the Controlling Party) or the Credit Enhancer, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee (at the direction of the Controlling Party) or the Credit Enhancer may reasonably specify. Each of the Issuer and the Collateral Administrator hereby agrees to the following:

(a)    the Collateral Administrator consents to the provisions of this assignment and agrees to perform the provisions of the Collateral Administration Agreement applicable to the Collateral Administrator;

216

Indenture
PP050481

NY3:#7247151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(b)    the Collateral Administrator acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Administration Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Administrator agrees that all of the representations, covenants and agreements made by the Collateral Administrator in the Collateral Administration Agreement are also for the benefit of the Trustee and the Secured Parties;

(c)    the Collateral Administrator shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Administration Agreement;

(d)    the Collateral Administrator agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Collateral Administrator (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Collateral Administrator, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding; and

(e)    the Collateral Administrator irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Administrator irrevocably agrees that all claims in respect of such action or Proceeding may be heard and determined in such New York State or federal court. The Collateral Administrator irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding. The Collateral Administrator irrevocably consents to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Administrator at LaSalle Bank National Association, having an address at 135 South LaSalle Street, Suite 1625, Chicago, IL 60603, Attention: CDO Trust Services Group – Zohar II 2005-1, Limited. The Collateral Administrator agrees that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

ARTICLE 15

HEDGE AGREEMENTS

Section 15.1.    Hedge Agreements

(a)    On any date which the Issuer enters into a Hedge Agreement, the Issuer shall assign it to the Trustee pursuant to this Indenture and a Collateral Assignment of Hedge Agreement. The Issuer shall not enter into any Hedge Agreement after the Funding Date unless it has obtained and delivered to the Trustee (i) the written confirmation of each Rating Agency that the entry by the Issuer into such Hedge Agreement will not cause such Rating Agency's then current rating, if any, of any

217

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8    pg. 224 of 447

Class of Notes to be reduced or withdrawn and (ii) the prior written consent of the Controlling Party. The Issuer shall not enter into a Hedge Agreement the payments under which are subject to withholding tax.

Each Hedge Agreement shall be governed by the laws of the State of New York.

(b)    Any amounts payable by the relevant Hedge Counterparty under any Hedge Agreement shall be paid or deposited into the Cash Reserve Account. Any amounts payable by the Issuer to the relevant Hedge Counterparty under any Hedge Agreement upon entry into such Hedge Agreement by the Issuer on any date other than a Payment Date may, with the written consent of the Controlling Party, be paid by the Issuer to such Hedge Counterparty by payment of amounts on deposit in the Issuer Principal Collection Account pursuant to Section 10.2.

(c)    The Trustee shall consent to any reduction in the notional amount of any Hedge Agreement requested by the Issuer at the direction of the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares), subject to the prior written consent of the Controlling Party; provided that, if any Notes are then Outstanding, the Issuer shall have requested and the Trustee shall first have received written confirmation from each Rating Agency that such reduction will not cause its then current rating, if any, of any Class of Notes to be reduced or withdrawn. Upon any such reduction, any amount paid to the Issuer by the relevant Hedge Counterparty pursuant to such Hedge Agreement shall constitute "Principal Proceeds."

(d)    Each Hedge Agreement will provide for termination on or prior to the Stated Maturity of the Class A Notes, and shall also be subject to termination, whether or not the Notes have been paid in full prior to such termination, upon the earliest to occur of (i) certain events of bankruptcy, insolvency, conservatorship, receivership or reorganization of the Issuer or the Hedge Counterparty party thereto, (ii) the failure on the part of the Issuer or such Hedge Counterparty to make any payment or delivery under such Hedge Agreement within the applicable grace period, (iii) a Collateral Hedge Event, (iv) a Ratings Hedge Event and (v) a change in law the result of which is that it becomes illegal for either the Issuer or such Hedge Counterparty to be a party to, or perform its obligations under, the Hedge Agreement. The Issuer will give prompt written notice to each Rating Agency, the Trustee and the Credit Enhancer of any such termination or agreement to provide Hedge Counterparty Credit Support, as applicable. The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account, which shall be designated as the "Hedge Counterparty Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties (other than the Hedge Counterparty pledging such Collateral) and in which no Person other than the Secured Parties shall have any legal or beneficial interest. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement in the Hedge Counterparty Collateral Account. Any and all funds at any time on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging such Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be (a) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (b) to return collateral to the relevant Hedge Counterparty when and as required by a Hedge Agreement.

(e)    If the Trustee has actual knowledge that a Hedge Counterparty has defaulted in the payment when due of its obligations to the Issuer under a Hedge Agreement, the Trustee shall make a demand on the Hedge Counterparty and/or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date (or by such time on the next succeeding Business Day if such knowledge is obtained after 11:30 a.m., New York time). The Trustee shall give notice to the

218

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Noteholders and the Credit Enhancer upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on the Hedge Counterparty.

(f)    If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer and the Trustee (acting at the direction of the Collateral Manager) shall take such actions (following the expiration of any applicable grace period and after the expiration of the two Business Day period referred to in Section 15.1(e)) to enforce the rights of the Issuer and the Trustee thereunder and under the Collateral Assignment of Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and shall apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty) to enter into a replacement Hedge Agreement (within 30 Business Days of the termination of such existing Hedge Agreement) on substantially identical terms or on such other terms as are consented to by the Controlling Party and as each Rating Agency may confirm in writing would not cause such Rating Agency's then current rating, if any, of any Class of Notes to be reduced or withdrawn. Any costs of the Issuer attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of the terminated Hedge Agreement shall be borne solely by the Issuer and shall constitute expenses payable from the Expense Account (provided that the foregoing will not limit the responsibility of any Hedge Counterparty to pay costs and expenses associated with any transfer of a Hedge Agreement in order to avoid the termination thereof). In determining the amount payable under a terminated Hedge Agreement, the Issuer will seek quotations from reference market-makers who satisfy the definition of "Hedge Counterparty". In addition, the Issuer will use its best efforts to cause the termination of a Hedge Agreement to become effective simultaneously with the entry into a replacement Hedge Agreement described as aforesaid.

(g)    Each Hedge Counterparty is an express third-party beneficiary of this Indenture. Each of the Issuer and the Trustee agrees that it will not, without the prior written agreement of the affected Hedge Counterparty, consent to any amendment, waiver, supplement, termination or other modification of this Indenture if the effect thereof is to diminish or impair the rights, interests or benefits of such Hedge Counterparty under or in respect of this Indenture or the Collateral.

## ARTICLE 16

### THE CREDIT ENHANCEMENT

Section 16.1.    Certain Rights of the Credit Enhancer

(a)    So long as no Credit Enhancement Event shall have occurred and be continuing, the Trustee shall provide to the Credit Enhancer copies of any report, notice, Opinion of Counsel, Officer's Certificate, request for consent or request for amendment to any document related hereto (including any Transaction Document) promptly upon the Trustee's production or receipt thereof (in each case, to the extent that such documents are not expressly required to be provided directly to such Credit Enhancer pursuant to the terms hereof).

(b)    Notwithstanding any other provision of this Indenture, so long as the Credit Enhancer is the Controlling Party, whenever any request, demand, authorization, direction, notice, consent, waiver, vote or other action of the Holders of the Class A Notes is required or permitted under this Indenture, the Credit Enhancer shall be deemed to be the sole Holder of each Class A Note for the purposes of taking or giving such request, demand, authorization, direction, notice, consent, waiver, vote

219

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

or other action with respect to the Class A Notes, provided that (x) with respect to requests, demands, authorizations, directions, notices, consents, waivers, votes or other actions (i) under Article 17 by a Holder of a Class A-1 Note, (ii) under Section 16.2 by a Majority of each of the Class A-1 Notes, Class A-2 Notes and Class A-3 Notes, (iii) under Section 7.13(b)(1) or (2), Section 7.18 or Section 10.6 by a Majority of the Class A Notes or (iv) expressly required to be taken by each Holder of a Class A-1 Note, Class A-2 Note or Class A-3 Note, as applicable, under Section 8.1 or 8.2, each such Holder shall have consented to the request, demand, authorization, direction, notice, consent, waiver, or other action taken or given by the Credit Enhancer, (y) nothing in this Section 16.1(b) shall limit the express right of any Holder of Class A Notes to receive any information to be provided to such Holder under the terms of this Indenture or to communicate directly with the provider of such information or to receive payment of principal of and interest on any Class A Note and all other amounts owing to such Holder pursuant to the terms of this Indenture and (z) nothing in this Section 16.1(b) shall limit the right of any Holder of a Class A-1 Note, Class A-2 Note or Class A-3 Note to direct, in accordance with the provisions of this Indenture (including Section 16.3(c)), the Trustee to take any action to request or demand payment of any amount under the Credit Enhancement, to enforce any amounts payable under the Credit Enhancement or to amend, modify or waive any provision of the Credit Enhancement.

(c)    The Credit Enhancer may disclaim any of its rights and power under this Indenture (but not its duties and obligations under the Credit Enhancement) upon delivery of written notice to the Trustee and the Collateral Manager. The Credit Enhancer may give or withhold any consent hereunder in its sole and absolute discretion (unless otherwise provided herein). From and after the date on which the Credit Enhancement expires in accordance with its terms and all Credit Enhancement Liabilities and Credit Enhancement Premium have been irrevocably paid in full, the Credit Enhancer shall have no rights or benefits hereunder, and all references in this Indenture to the Credit Enhancer shall be disregarded.

Section 16.2.    Modification or Termination of Credit Enhancement and Credit Enhancement Agreement

(a)  The Trustee shall not agree to any termination of or any modification, alteration, amendment or endorsement of the terms of the Credit Enhancement, or the assignment or transfer of the Credit Enhancement, without in each case the prior consent of each Holder of the Class A-1 Notes, each Holder of the Class A-2 Notes and each Holder of the Class A-3 Notes, and written confirmation from each Rating Agency that its then current rating of such Notes (after giving effect to the Credit Enhancement) will not be reduced or withdrawn.

(b) The Issuer shall not agree to any amendment or other modification of the terms or conditions of the Credit Enhancement Agreement without the prior consent of a Majority of each of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, and written notice to each Rating Agency.

Section 16.3.    Drawings under the Credit Enhancement

(a)    If by 4:00 p.m. in the city in which the Corporate Trust Office is located on the Business Day next succeeding the last day of any Due Period (or, in the case of the Due Period ending on the day preceding the Stated Maturity of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes, on the date five Business Days prior to the last day of such Due Period) the amounts then on deposit (or scheduled to be on deposit and available for distribution on the related Payment Date) in the Collection Accounts and the Cash Collateral Account are insufficient to pay the Insured Payments in respect of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes (the amount of such deficiency, the "Deficiency Amount"), the Trustee shall:

220

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(i)      no later than 12:00 p.m., New York City time, on the third Business Day prior to the Payment Date next succeeding such Due Period, give written notice (in strict compliance with the terms of the Credit Enhancement) to the Credit Enhancer, specifying therein the Deficiency Amount; and

(ii)     on the date on which the Trustee receives payment under the Credit Enhancement (but not earlier than the applicable Payment Date) in respect of such Deficiency Amount, pay over to each Holder of Class A-1 Notes, each Holder of Class A-2 Notes and each Holder of Class A-3 Notes, for application by such Holder to amounts due in respect of such Holder's Notes due on the related Payment Date, such Holder's ratable share of the amounts so received by the Trustee.

Any payment by the Credit Enhancer under the Credit Enhancement in respect of amounts due on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes shall be applied solely to the payment of such amounts due on such Notes and shall not discharge the Issuer's obligations to make such payments as provided in Section 16.5(b).

(b)      The Trustee agrees to furnish to the Credit Enhancer upon its reasonable request copies of the Trustee's records evidencing the payment of amounts due on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes that have been made by the Trustee and subsequently recovered from Holders of such Notes and the dates on which such payments were made.

(c)      The Trustee shall be entitled to enforce, on behalf of the Holders of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, the obligations of the Credit Enhancer under the Credit Enhancement. Notwithstanding any other provision of this Indenture, the Holders of the Class A-1 Notes, the Holders of the Class A-2 Notes and the Holders of the Class A-3 Notes are not entitled to make any claims under the Credit Enhancement or institute Proceedings directly against the Credit Enhancer.

Section 16.4.    Preference Claims and Insolvency Proceedings

(a)      In the event the Trustee receives a certified copy of an order of the appropriate court that an amount due on a Class A-1 Note, a Class A-2 Note and/or a Class A-3 Note has been avoided in whole or in part as a preference payment under applicable bankruptcy law, the Trustee shall so notify the Credit Enhancer, shall comply with the provisions of the Credit Enhancement to obtain payment by the Credit Enhancer of such avoided payment, and shall, at the time it provides notice to the Credit Enhancer, notify the Holders of the Class A-1 Notes, the Holders of the Class A-2 Notes and/or the Holders of the Class A-3 Notes, as applicable, in accordance with Section 16.3 that, in the event that any such Holder's payment is so recoverable, such Holder will be entitled to payment pursuant to the terms of the Credit Enhancement. The Trustee shall furnish to the Credit Enhancer copies of its records evidencing the payment of amounts due on the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes, if any, that have been made by the Trustee and subsequently recovered from Holders of such Notes, and the dates on which such payments were made. Pursuant to the terms of the Credit Enhancement, the Credit Enhancer will make such payment on behalf of such Holders to the receiver or trustee in bankruptcy named in the Order (as defined in the Credit Enhancement) and not to the Trustee or any such Holder directly unless any such Holder provides certification or other evidence reasonably satisfactory to the Credit Enhancer that such Holder has returned principal or interest paid on the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes to the receiver or trustee in bankruptcy, in which case the Credit Enhancer will make such payment to the Trustee for distribution to such Holder upon proof of such payment reasonably satisfactory to the Credit Enhancer).

221

NY3:#7342151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050486

(b)    The Trustee shall promptly notify the Credit Enhancer of either of the following as to which it has actual knowledge: (i) the commencement of any insolvency Proceeding by or against the Co-Issuers under the Bankruptcy Code or any other applicable insolvency, receivership, rehabilitation or similar law in any jurisdiction (an "Insolvency Proceeding") and (ii) the making of any claim in connection with any Insolvency Proceeding by or against the Co-Issuers seeking the avoidance as a preferential transfer of any payment of principal of, or interest on, the Notes (in any case, a "Preference Claim"). Each Holder of a Class A-1 Note, a Class A-2 Note or a Class A-3 Note, by its purchase of such Note, and the Trustee hereby agrees that, so long as no Credit Enhancement Event shall have occurred and be continuing, the Credit Enhancer may at any time during the continuation of any Proceeding relating solely to a Preference Claim in respect of the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes direct all matters relating to such Preference Claim or Insolvency Proceeding including, without limitation, (a) the direction of any appeal of any order relating solely to any such Preference Claim and (b) the posting of a surety, supersedeas or performance bond pending any such appeal relating solely to such Preference Claim. In addition, and without limitation of the foregoing, as set forth in Section 16.5, the Credit Enhancer shall be subrogated to, and each Holder of Class A-1 Notes, each Holder of Class A-2 Notes, each Holder of Class A-3 Notes and the Trustee hereby delegate and assign, to the fullest extent permitted by law, the rights of the Trustee and such Holder in the conduct of any Proceeding with respect to such a Preference Claim related to the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes, including, without limitation, all rights of any party to an adversary Proceeding action with respect to any court order issued in connection with any such Preference Claim or Insolvency Proceeding.

Section 16.5.    Subrogation

(a)    The Co-Issuers, the Trustee, each Holder of a Class A-1 Note, each Holder of a Class A-2 Note and each Holder of a Class A-3 Note, by its acceptance of such Class A-1 Note, Class A-2 Note or Class A-3 Note, as applicable, hereby acknowledge and agree for the benefit of the Credit Enhancer that, without the need for any further action on the part of the Credit Enhancer, the Co-Issuers, the Trustee or any other Person (i) to the extent the Credit Enhancer makes payments, directly or indirectly, on account of principal of or interest on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, or Class A-1 Commitment Fee to the Holders of the Class A-1 Notes or Class A-3 Commitment Fee to the Holders of the Class A-3 Notes, as applicable, the Credit Enhancer will be fully subrogated to the rights of such Holders to receive such principal, interest, Class A-1 Commitment Fee and/or Class A-3 Commitment Fee from the Issuer and (ii) the Credit Enhancer shall be paid such principal, interest, Class A-1 Commitment Fee and/or Class A-3 Commitment Fee in its capacity as a Holder of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes, as applicable, but only from the sources and in the manner provided herein for the payment of such principal, interest, Class A-1 Commitment Fee and/or Class A-3 Commitment Fee in accordance with the Priorities of Payment, in each case only after the Holders of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes, as applicable, have received payment of all principal, interest, Class A-1 Commitment Fee and/or Class A-3 Commitment Fee due thereon. The Trustee shall give effect to any such subrogation by distributing to the Credit Enhancer, as subrogee of the Holders of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, reimbursement for any payments by the Credit Enhancer under the Credit Enhancement in accordance with the Priority of Payments.

(b)    Anything in this Indenture, the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes to the contrary notwithstanding (but subject to Section 2.6(i)), any payment with respect to amounts due in respect of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes that is made with Monies received pursuant to the terms of the Credit Enhancement shall not be considered payment on such Notes by the Co-Issuers, shall not discharge any obligations of the Co-Issuers to make

222

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

such payment and shall not result in the payment of (or the provision for the payment of) any amounts due in respect of such Notes for purposes of Section 4.1. To the extent provided in the Credit Enhancement Agreement, the Credit Enhancer may require transfer of any Class A-1 Note (or a portion thereof) or any Class A-2 Note (or a portion thereof) or any Class A-3 Note (or a portion thereof), in each case, from the Holder thereof to the Credit Enhancer to reflect payment of Insured Payments on such Note by the Credit Enhancer under the Credit Enhancement (subject to the terms and conditions of Section 2.4).

Section 16.6.   Credit Enhancement Payment Account

The Trustee shall, prior to the Funding Date, establish a single, segregated trust account which shall be designated as the "Credit Enhancement Payment Account", which shall be held in trust for the benefit of the Holders of the Class A-1 Notes, the Holders of the Class A-2 Notes and the Holders of the Class A-3 Notes, over which the Trustee shall have exclusive control and the sole right of withdrawal, and in which none of the Issuer, the Holders of the Notes (except the Holders of the Class A-1 Notes, the Holders of the Class A-2 Notes and the Holders of the Class A-3 Notes) or any other Person shall have any legal or beneficial interest. The Trustee shall deposit all amounts received by the Trustee from the Credit Enhancer under the Credit Enhancement, in the Credit Enhancement Payment Account. Any and all funds at any time on deposit in, or otherwise to the credit of, the Credit Enhancement Payment Account shall be held in trust by the Trustee solely for the benefit of the Holders of the Class A-1 Notes, the Holders of the Class A-2 Notes and the Holders of the Class A-3 Notes. Amounts held in the Credit Enhancement Payment Account shall not be invested. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Credit Enhancement Payment Account shall be to make payment of the amounts due in respect of the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes on the related Payment Date in respect of which such funds are paid by the Credit Enhancer, to the extent such amounts are not paid pursuant to the Priority of Payments (and such funds may not be applied to pay any other amounts payable by the Co-Issuers under any Transaction Document). Any Monies held in the Credit Enhancement Payment Account after the distributions made pursuant to this Article 16 on any Payment Date shall promptly be remitted to the Credit Enhancer.

Section 16.7.   Certain Remedies

With respect to the Credit Enhancement, without limiting the provisions of Article 5 or 6 or the rights or interest of the Holders of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes as otherwise set forth herein so long as (i) any of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes shall be Outstanding and (ii) the Credit Enhancement shall not have been duly cancelled or terminated, and no Credit Enhancement Event shall have occurred and be continuing, the Trustee shall cooperate in all respects with any reasonable request by the Credit Enhancer for action to preserve or enforce the Credit Enhancer's rights or interests under this Indenture and the Credit Enhancement Agreement, including, without limitation, upon the occurrence and continuance of an Event of Default, a request to take any one or more of the following actions, subject to the provisions of Article 5:

(A)     institute Proceedings for collection of all amounts then owing to the Credit Enhancer in respect of the Credit Enhancement Liabilities or Credit Enhancement Premium or under this Indenture in respect of the Class A-1 Notes, the Class A-2 Notes or the Class A-3 Notes, enforce any judgment obtained and collect from the Issuer Monies adjudged due;

(B)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture; and

223

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050488

(C)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Credit Enhancer and the other Secured Parties hereunder.

Section 16.8.    Miscellaneous

(a)    The Trustee shall keep a complete and accurate record of all funds deposited by the Credit Enhancer into the Credit Enhancement Payment Account and the allocation of such funds to payment of amounts paid in respect of any Class A-1 Note, any Class A-2 Note or any Class A-3 Note. The Credit Enhancer shall have the right to inspect such records during normal business hours upon three Business Day's prior written notice to the Trustee.

(b)    Upon the expiration of the Credit Enhancement in accordance with the terms thereof, the Trustee shall surrender the same to the Credit Enhancer for cancellation in accordance with the terms thereof.

(c)    The Zohar Obligors and the Collateral Manager shall permit representatives of the Credit Enhancer, at the expense of the Zohar Obligors and upon reasonable prior notice to the Zohar Obligors and the Collateral Manager, to visit the principal office of the Collateral Manager for the purpose of inspecting the records of the Zohar Obligors relating to Professional Fees paid from the Professional Fee Account, at such reasonable times and as often as may be reasonably requested in writing.

(d)    The Collateral Administrator shall permit representatives of the Credit Enhancer, at the expense of the Zohar Obligors and upon at least three Business Days prior written notice to the Collateral Administrator and the Collateral Manager, to visit the principal office of the Collateral Administrator during normal business hours for the purpose of inspecting records of the Collateral Administrator with respect to the reports to be prepared by the Collateral Administrator under this Indenture, at such reasonable times and as often as may be reasonably requested in writing.

Section 16.9.    No Proceedings

(a)    Each of the Credit Enhancer, the Co-Issuers and the Trustee hereby agrees that it will not institute against any CP Conduit (as defined in the applicable Class A-1 Note Purchase Agreements), or join, cooperate with or encourage any other Person in instituting against any CP Conduit, any bankruptcy, insolvency, reorganization, receivership or similar Proceeding so long as any CP Notes (as so defined) issued by such CP Conduit shall be outstanding and there shall not have elapsed one year plus one day since the last day on which any such CP Notes shall have been outstanding.

(b)    Nothing in the foregoing clause (a) shall limit the right of the Credit Enhancer, the Co-Issuers or the Trustee to (i) file any claim in or otherwise take any action with respect to any insolvency Proceeding of the type described in clause (a) above that was (A) instituted against any CP Conduit by any Person other than the Credit Enhancer, the Co-Issuers or the Trustee, as applicable (other than the joining in, cooperating with or encouraging the institution of such Proceeding) or (B) voluntarily commenced or filed by the CP Conduit or (ii) commence against the CP Conduit or any of its properties any legal action that is not a Proceeding of the type described in clause (a) above.

224

Indenture

NY3:#734715lv22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050489

ARTICLE 17

CLASS A-1 NOTE AGENT AND CLASS A-3 NOTE AGENT

Section 17.1.    Appointment of Class A-1 Note Agent

Each Holder of a Class A-1 Note, by its acceptance thereof, irrevocably appoints the Class A-1 Note Agent as its agent and authorizes the Class A-1 Note Agent to take such actions on its behalf and to exercise such powers as are delegated to the Class A-1 Note Agent by the terms of this Indenture, together with such actions and powers as are reasonably incidental thereto.

Section 17.2.    Certain Duties and Responsibilities

(a)    The Class A-1 Note Agent undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and the applicable Class A-1 Note Purchase Agreements (including without limitation to give and receive notices expressly provided therein to be given and received by it).

(b)    In the absence of bad faith on its part, the Class A-1 Note Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates and other notices furnished to the Class A-1 Note Agent and conforming to the requirements of this Indenture; provided that, in the case of any such certificates which by any provision hereof are specifically required to be furnished to the Class A-1 Note Agent, the Class A-1 Note Agent shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not conform.  If a corrected form shall not have been delivered to the Class A-1 Note Agent within 15 days after such notice from the Class A-1 Note Agent, the Class A-1 Note Agent shall so notify the Holders of the Class A-1 Notes.

(c)    No provision of this Indenture shall be construed to relieve the Class A-1 Note Agent from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of subsections (a) and (b) of this Section;

(ii)    the Class A-1 Note Agent shall not be liable for any error of judgment made in good faith by an Officer, unless it shall be proven that the Class A-1 Note Agent was negligent in ascertaining the pertinent facts; and

(iii)    no provision of this Indenture shall require the Class A-1 Note Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it unless such risk or liability relates to performance of its ordinary services under this Indenture.

(d)    For all purposes under this Indenture, the Class A-1 Note Agent shall not be deemed to have notice or knowledge of any Event of Default unless an Officer of the Class A-1 Note

225

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Agent has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Class A-1 Note Agent.

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Class A-1 Note Agent shall be subject to the provisions of this Section.

Section 17.3.     Compensation

(a)     The Issuer agrees:

(i)     to pay the Class A-1 Note Agent on each Payment Date, so long as the Class A-1 Notes are Outstanding or the Class A-1 Commitments shall not have not expired, terminated or been reduced to zero, and subject to the Priority of Payments, the Class A-1 Note Agent Fee together with interest on any overdue amounts thereof at the Federal Funds Rate (which fee, once paid, shall be non-refundable); and

(ii)     to indemnify the Class A-1 Note Agent and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of the duties specified herein, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder.

(b)     The Class A-1 Note Agent shall, subject to the Priority of Payments, receive amounts pursuant to this Section 17.3 and Sections 11.1(a)(i) and (ii) and Section 11.2(a) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Class A-1 Note Agent will not, by itself, constitute an Event of Default. The Class A-1 Note Agent agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Class A-1 Note Agent (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Class A-1 Note Agent, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

Section 17.4.     Resignation and Removal; Appointment of a Successor

(a)     No resignation or removal of the Class A-1 Note Agent and no appointment of a successor Class A-1 Note Agent pursuant to this Article shall become effective until the acceptance of appointment by the successor Class A-1 Note Agent under Section 17.5.

(b)     The Class A-1 Note Agent may resign at any time by giving written notice thereof to the Co-Issuers, the Holders of the Class A-1 Notes, the Credit Enhancer, the Trustee, the Collateral Manager and each Rating Agency. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor Class A-1 Note Agent by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall

226

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050491

be delivered to the Class A-1 Note Agent so resigning and one copy to the successor Class A-1 Note Agent, together with a copy to each such Holder and the Credit Enhancer; provided that such successor Class A-1 Note Agent shall be appointed only upon the written consent of the Majority of the Class A-1 Notes and the Collateral Manager. If no successor Class A-1 Note Agent shall have been appointed and an instrument of acceptance by a successor Class A-1 Note Agent shall not have been delivered to the Class A-1 Note Agent within 30 days after the giving of such notice of resignation, the resigning Class A-1 Note Agent or any Holder of a Class A-1 Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Class A-1 Note Agent.

(c)     The Class A-1 Note Agent may be removed at any time by Act of a Majority of the Class A-1 Notes, delivered to the Class A-1 Note Agent, the Trustee, the Credit Enhancer, the Co-Issuers and the Collateral Manager.

(d)     If at any time the Class A-1 Note Agent shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Class A-1 Note Agent or of its property shall be appointed or any public officer shall take charge or control of the Class A-1 Note Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case (subject to Section 17.4(a)), (i) the Co-Issuers, by Issuer Order, may remove the Class A-1 Note Agent, or (ii) any Holder of a Class A-1 Note may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Class A-1 Note Agent and the appointment of a successor Class A-1 Note Agent.

(e)     If the Class A-1 Note Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Class A-1 Note Agent for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Class A-1 Note Agent. If the Co-Issuers shall fail to appoint a successor Class A-1 Note Agent within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Class A-1 Note Agent may be appointed by Act of the Holders of a Majority of the Class A-1 Notes delivered to the Issuer and the retiring Class A-1 Note Agent. The successor Class A-1 Note Agent so appointed shall, forthwith upon its acceptance of such appointment, become the successor Class A-1 Note Agent and supersede any successor Class A-1 Note Agent proposed by the Co-Issuers. If no successor Class A-1 Note Agent shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Class A-1 Note Agent.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Class A-1 Note Agent and each appointment of a successor Class A-1 Note Agent by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, the Credit Enhancer, the Trustee, each Rating Agency and to the Holders of the Class A-1 Notes as their names and addresses appear in the Class A-1 Note Register. Each notice shall include the name and address of the successor Class A-1 Note Agent. If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Class A-1 Note Agent, the successor Class A-1 Note Agent shall cause such notice to be given at the expense of the Co-Issuers.

Section 17.5.    Acceptance of Appointment of a Successor

Every successor Class A-1 Note Agent appointed hereunder shall be reasonably acceptable to the Trustee and the Collateral Manager and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Class A-1 Note Agent an instrument accepting such appointment. No successor Class A-1 Note Agent may be appointed hereunder unless such Class A-1 Note Agent or an

227

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050492

Affiliate shall then be the Holder of one or more Class A-1 Notes. Upon delivery of the required instruments, the resignation or removal of the retiring Class A-1 Note Agent shall become effective and such successor Class A-1 Note Agent, without any other act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of the retiring Class A-1 Note Agent; but, on request of the Co-Issuers or a Majority of the Class A-1 Notes or the successor Class A-1 Note Agent, such retiring Class A-1 Note Agent shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Class A-1 Note Agent all the rights, powers and trusts of the retiring Class A-1 Note Agent.

Section 17.6.    Appointment of Class A-3 Note Agent

Each Holder of a Class A-3 Note, by its acceptance thereof, irrevocably appoints the Class A-3 Note Agent as its agent and authorizes the Class A-3 Note Agent to take such actions on its behalf and to exercise such powers as are delegated to the Class A-3 Note Agent by the terms of this Indenture, together with such actions and powers as are reasonably incidental thereto.

ARTICLE 18

MISCELLANEOUS

Section 18.1.    Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of any Zohar Obligor or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of any Zohar Obligor or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of any Zohar Obligor, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the any Zohar Obligor, the Collateral Manager or such other Person, unless such Authorized Officer of any Zohar Obligor or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of any Zohar Obligor, stating that the information with respect to such matters is in the possession of such Zohar Obligor, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

228

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8    pg. 235 of 447

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of any Zohar Obligor, then notwithstanding that the satisfaction of such condition is a condition precedent to any Zohar Obligors' rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in Section 6.1(d).

Section 18.2.    Acts of Noteholders

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders or "Acts of Noteholders" signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 18.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 18.3.    Notices, etc., to Trustee, the Preference Share Paying Agent, the Zohar Obligors, the Collateral Manager, the Credit Enhancer, the Rating Agencies and the Hedge Counterparty

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee by any Noteholder or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Trustee addressed to it at its Corporate Trust Office, Attention: CDO Trust Services Group, Ref: Zohar II 2005-1, Limited, telephone number (312) 904-0283, or at any other address previously furnished in writing to the Co-Issuers or Noteholder by the Trustee;

229

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

(b)    the Preference Share Paying Agent by the Trustee or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Preference Share Paying Agent addressed to it at 135 South LaSalle Street, Suite 1625, Chicago, IL 60603, Attention: CDO Trust Services Group, Ref: Zohar II 2005-1, Limited, telephone number (312) 904-0283, or at any other address previously furnished in writing to the Co-Issuers or Trustee by the Preference Share Paying Agent;

(c)    the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: The Directors, telecopy no. (345) 945-7100, or at any other address previously furnished in writing to the Trustee by the Issuer;

(d)    the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Co-Issuer addressed to it at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopy no. (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(e)    the Zohar Subsidiary by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Co-Issuer addressed to it at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopy no. (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(f)    the Collateral Manager by any Zohar Obligor or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Collateral Manager addressed to Patriarch Partners XIV, LLC, c/o Patriarch Partners, LLC, 112 South Tryon Street, Suite 700, Charlotte, NC 28284, Attention: Lynn Tilton, telecopy no. (704) 375-0358, or at any other address previously furnished in writing to the Co-Issuers or the Trustee by the Collateral Manager;

(g)    the Rating Agencies by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, addressed to Moody's Investors Service, 99 Church Street, New York, New York 10007, telecopy no. (212) 553-0355, Attention: CBO/CLO Monitoring and to Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041, telecopy no. 212-438-2664, Attention: Structured Finance Ratings, Asset-Backed Securities - CBO/CLO Surveillance, or via electronic mail to CDO_surveillance@standardandpoors.com (provided that each Monthly Report and Note Valuation Report delivered to Standard & Poor's shall be delivered to it via electronic email);

230

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050495

(h)    the Credit Enhancer by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form, addressed to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504, Telephone: (914) 765-3068, Facsimile: (914) 765-3555, Attention: Insured Portfolio Management-Attn: CDO Group;

(i)    any Hedge Counterparty by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to such Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by such Hedge Counterparty; and

(j)    the Class A-1 Note Agent and the Class A-3 Note Agent by any Holder of a Class A-1 Note or Class A-3 Note, as applicable, or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Class A-1 Note Agent or the Class A-3 Note Agent, as the case may be, addressed to it at IXIS Financial Products Inc., 9 West 57th Street, New York, NY 10019, Facsimile: 646-282-2361, Attention: Primary contact: Yazmin Vasconez; Secondary contact: Evelyn Clarke, E-mail: agent_group@ixiscm.com, or at any other address previously furnished in writing to the Co-Issuers or the applicable Noteholders by the Class A-1 Note Agent or the Class A-3 Note Agent, as the case may be.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective: (i) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (ii) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); (iii) if sent by email, on the date that confirmation of receipt by the addressees thereof is obtained, and (iv) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

Section 18.4.    Notices and Reports to Noteholders; Waiver

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Notes of any event,

(a)    such report or notice shall be sufficiently given to Holders of Notes if (i) in writing and mailed, first class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, or (ii) in the case of Monthly Reports and Note Valuation Reports, posted to the Trustee's website, in each case not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice; and

(b)    such report or notice shall be in the English language.

231

Indenture
PP050496

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Such reports and notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Credit Enhancer and the Holder of any Note shown on the Note Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note or to the Credit Enhancer shall affect the sufficiency of such notice with respect to other Holders of Notes or the Credit Enhancer, as the case may be.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 18.5.    Effect of Headings and Table of Contents

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 18.6.    Successors and Assigns

All covenants and agreements in this Indenture by the Zohar Obligors shall bind their respective successors and permitted assigns, whether so expressed or not.

Section 18.7.    Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 18.8.    Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Noteholders and each Hedge Counterparty, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 18.9.    Governing Law

THIS INDENTURE AND EACH NOTE AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

232

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050497

Section 18.10.  Submission to Jurisdiction

The Zohar Obligors/Co-Issuers hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Notes or this Indenture, and the Zohar Obligors hereby irrevocably agree that all claims in respect of such action or Proceeding may be heard and determined in such New York State or federal court. The Zohar Obligors hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding. The Zohar Obligors irrevocably consent to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Zohar Obligors' agent set forth in Section 7.2. The Zohar Obligors agree that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 18.11.  Waiver of Jury Trial

EACH OF THE ZOHAR OBLIGORS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 18.12.  Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 18.13.  Judgment Currency

This is an international financing transaction in which the specification of Dollars (the "Specified Currency"), and the specification of the place of payment, as the case may be (the "Specified Place"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Notes. The payment obligations of the Co-Issuers under this Indenture, the Credit Enhancement Agreement and the Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place. If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or under the Note Purchase Agreements in the Specified Currency into another currency (the "Second Currency"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered. The obligation of the Co-Issuers in respect of any such sum due from the Co-Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Note Purchase Agreements or the Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Co-Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class of Notes constituted additional principal owing in respect of such Class of Notes), agree to indemnify the Trustee, the Credit Enhancer and each Noteholder against, and to pay the Trustee or such Noteholder, as

233

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee, the Credit Enhancer or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

Section 18.14.  Confidentiality

Each of the Secured Parties (other than the Collateral Manager and the Credit Enhancer) and the Class A-1 Note Agent shall, and shall cause its Affiliates to, keep confidential information obtained in connection with this Indenture and the other Transaction Documents (including, without limitation, information relating to the structure of this transaction, financial models and/or other information in or related to the Indenture and/or the Transaction Documents) and shall not disclose any such information (excluding Exhibit J hereto) to non-affiliated third parties except (i) with the prior written consent of the Company (or, with respect to confidential information of or pertaining to the Zohar Subsidiary or the activities of the Collateral Manager on behalf of the Zohar Subsidiary, the Zohar Subsidiary), (ii) as required by law, regulation, court order or the rules or regulations of any self-regulating organization, body or official having jurisdiction over such Secured Party or Class A-1 Note Agent (as applicable), (iii) such information as shall have been publicly disclosed other than in violation of this Indenture, (iv) to the extent any such information is expressly required to be disclosed in accordance with the terms of this Indenture or (v) to any Person who has executed and delivered to the Collateral Manager an agreement with or in favor of the Collateral Manager either (x) in substantially the form of Exhibit J hereto or (y) in such other form as the Collateral Manager may reasonably agree.  For purposes of this Section 18.14, all parties to the Transaction Documents and any of their professional advisors shall in no event be considered "non-affiliated third parties".  For the avoidance of doubt, (a) the Collateral Manager shall be subject to the confidentiality provisions set forth in the Management Agreement and (b) the Credit Enhancer shall be subject to the confidentiality provisions set forth in any confidentiality agreements to which it is a party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050499

**IN WITNESS WHEREOF,** we have set our hands as of the _____ day of January, 2005.

ZOHAR II 2005-1, LIMITED,
as Issuer

By: _____

  Name:   **Chris Watler**
  Title:    **Director**

ZOHAR II 2005-1, CORP.,
as Co-Issuer

By: _____

  Name:
  Title:

ZOHAR II 2005-1, LLC,
as Zohar Subsidiary

By: _____

  Name: Zohar II 2005-1, LIMITED
  Title: MANAGING MEMBER

MBIA INSURANCE CORPORATION,
as Credit Enhancer

By: _____

  Name:
  Title:

IXIS FINANCIAL PRODUCTS INC.
as Class A-1 Note Agent and Class A-3 Note Agent

By: _____

  Name:
  Title:

Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050500

IN WITNESS WHEREOF, we have set our hands as of the ____ day of January, 2005.

ZOHAR II 2005-1, LIMITED,
as Issuer

By:_____
　Name:
　Title:

ZOHAR II 2005-1, CORP.,
as Co-Issuer

By: _____
　Name:　Donald J. Puglisi
　Title:　President

ZOHAR II 2005-1, LLC,
as Zohar Subsidiary

By:_____
　Name:
　Title:

MBIA INSURANCE CORPORATION,
as Credit Enhancer

By:_____
　Name:
　Title:

IXIS FINANCIAL PRODUCTS INC.
as Class A-1 Note Agent and Class A-3 Note Agent

By:_____
　Name:
　Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

IndentuppP050501

**IN WITNESS WHEREOF**, we have set our hands as of the _____ day of January, 2005.

ZOHAR II 2005-1, LIMITED,
  as Issuer


By:_____
  Name:
  Title:


ZOHAR II 2005-1, CORP.,
  as Co-Issuer


By:_____
  Name:
  Title:


ZOHAR II 2005-1, LLC,
  as Zohar Subsidiary


By:_____
  Name:
  Title:


MBIA INSURANCE CORPORATION,
  as Credit Enhancer


By:_____
  Name:  Adam M. Carta
  Title:  Assistant Secretary


IXIS FINANCIAL PRODUCTS INC.
  as Class A-1 Note Agent and Class A-3 Note Agent


By:_____
  Name:
  Title:

Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050502

**IN WITNESS WHEREOF,** we have set our hands as of the ____ day of January, 2005.

ZOHAR II 2005-1, LIMITED,
    as Issuer


By:_____
  Name:
  Title:


ZOHAR II 2005-1, CORP.,
    as Co-Issuer


By:_____
  Name:
  Title:


ZOHAR II 2005-1, LLC,
    as Zohar Subsidiary


By:_____
  Name:
  Title:


MBIA INSURANCE CORPORATION,
    as Credit Enhancer


By:_____
  Name:
  Title:


IXIS FINANCIAL PRODUCTS INC.
    as Class A-1 Note Agent and Class A-3 Note Agent

By:_____
  Name:
  Title: Ralph J. Inglese          Christopher Hayden
        Managing Director          Managing Director

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture
PP050503

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

By: _____

Name: _____

Title:    KOREN SUMSER
          FIRST VICE PRESIDENT

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

# Schedule A-1

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

SCHEDULE A-1

SCHEDULE OF COLLATERAL DEBT OBLIGATIONS
OWNED BY THE ISSUER OR THE ZOHAR SUBSIDIARY
ON THE FUNDING DATE

(Commitment and Funded Amounts are as of the close of business January 12, 2005) [1]

| Borrower | Exposure | Commitment | Funded | Purchase Price Paid by the Issuer |
|---|---|---|---|---|
| A1* | Term Loan | $25,000,000.00 | $25,000,000.00[2] | 100.00% |
| A2* | Term Loan | $25,000,000.00 | $25,000,000.00 | 100.00% |
| A3* | Term Loan | $15,000,000.00 | $15,000,000.00 | 71.07% |
| A4* | Term B Loan | $380,000.00 | $380,000.00 | 74.50% |
| A5* | Term B Loan | $1,704,544.32 | $1,704,544.32[3] | 71.37% |
| A4* | Term B Loan | $480,087.00 | $480,087.00 | 74.50% |
| A6 | Term Loan | $5,000,000.00 | $5,000,000.00 | 100.00% |
| A7 | Term Loan | $20,000,000.00 | $20,000,000.00[4] | 100.00% |
| A8 | Term Loan | $17,000,000.00 | $17,000,000.00 | 100.00% |
| A8 | Preferred | $25,474,000.00 | $25,474,000.00 | 0% |
| A9 | Term A Loan | $3,045,770.00 | $3,045,770.00 | 94.84% |
| A9 | Term B Loan | $1,044,264.75 | $1,044,264.75[5] | 0% |
| A9 | Revolver | $1,000,000.00 | $412,500.00 | 100% |

**Zohar I Assets.*

[1]    Commitment and Funded amounts set forth as above will be adjusted as of the close of business on January 13, 2005 to reflect any repayments of principal received on January 13, 2005.

[2]    Does not include $55,902.78 of capitalized interest.

[3]    Does not include $18,250.75 of capitalized interest.

[4]    Does not include $36,855.25 of capitalized interest.

[5]    Does not include $97,778.67 of capitalized interest.

1    Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050506

Background of Purchases

On November 8, 2004, Zohar CDO 2003-1, Limited ("Zohar I") sold the loans issued by borrowers A1, A2 and A3 above to the Issuer, and on November 9, 2004, Zohar I sold the loans issued by borrowers A4 and A5 above to the Issuer.

Relationship between Zohar I/Patriarch Partners VIII, LLC and the Issuer/Patriarch Partners XIV, LLC

Zohar I is a structured finance vehicle managed by Patriarch Partners VIII, LLC ("Patriarch VIII"). Ms. Lynn Tilton is the manager of Patriarch VIII and Patriarch VIII is owned by Zohar Holding, LLC ("Holding"). Ms. Tilton owns substantially all of the equity of Holding. All of the equity interests of Zohar I are held by Octaluna, LLC, and Patriarch VIII is both a member and the managing member of Octaluna, LLC. Patriarch VIII initially directed Zohar I to purchase the "Zohar I Assets" and Patriarch VIII directed Zohar I to sell the Zohar I Assets to the Issuer. Patriarch VIII receives management fees from Zohar I for providing collateral management services to Zohar I.

Holding is also the owner of Patriarch Partners XIV, LLC ("Patriarch XIV"), the collateral manager of the Issuer. Ms. Tilton is the manager of Patriarch XIV and Patriarch XIV directed the Issuer to acquire the Zohar I Assets from Zohar I with Warehouse Advances. Immediately prior to the Funding Date, Patriarch XIV was the sole owner of the Issuer and, effective as of the Funding Date, Patriarch XIV and certain other investors will indirectly own all of the equity interests of the Issuer. The Issuer will pay Patriarch XIV management fees for providing collateral management services to the Issuer.

Pricing

The price paid by the Issuer to Zohar I for each Zohar I Asset is set forth above in this Schedule A-1.

Pricing Methodology

Each Zohar I Asset was recently originated or acquired by Zohar I and each such asset was transferred to the Issuer at Zohar I's origination or purchase price, as applicable.

2

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050507

INDEX

# Schedule A-2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050508

Respondents' Exhibit 8   pg. 250 of 447

SCHEDULE A-2

COLLATERAL DEBT OBLIGATIONS
TO BE ACQUIRED FROM ARK CLO 2000-1, LIMITED

(Commitment and Funded Amounts are as of the close of business January 12, 2005) [14]

| Borrower [1] | Credit | Commitment (in $) [13] | Funded (in $) [13] | Purchase Price [4] (%) | Interest Rate [2] | PIK | Maturity | RiskCalc Computer Model plus 3 notches (Moody's) | Credit Model (S&P) |
|---|---|---|---|---|---|---|---|---|---|
| B1 | Revolver | 1,764,705.00 | 1,764,705.00 | 101.00 | L+375 | | 12/31/2006 | B2 | B- |
| B1 | Term Loan | 3,488,017.06 | 3,488,017.06 | 101.00 | L+375 | | 12/31/2006 | B2 | B- |
| B2* [11] | Loan 1-Tranche A | 5,648,651.65 | 5,648,651.65 | 101.00 | 10.000 [7] | | 12/31/2007 | Caa3 | CCC- |
| B2* [11] | Loan 2 | 1,662,652.79 | 1,662,652.79 | 101.00 | 10.000 [7] | | 12/31/2007 | Caa3 | CCC- |
| B2* [11] | Loan 1-Tranche B | 2,738,876.91 | 2,738,876.91 | 101.00 | 10.000 [7] | | 12/31/2007 | Caa3 | CCC- |
| B3 [12] | Revolver | 8,919,881.50 | 8,919,881.50 | 100.99 | L+450 | | 12/31/2007 | Caa3 | CCC- |
| B4 | Overadvance | 2,500,000.00 | 2,400,000.00 | 101.00 | P+500 | | 10/18/2006 | B1 | B+ |
| B4 | Term Loan | 6,589,282.50 | 6,589,282.50 | 101.00 | P+200 | | 10/18/2006 | B1 | B+ |
| B5 | Term Loan | 4,699,834.80 | 4,699,834.80 | 98.16 | L+200 | | 10/18/2006 | B1 | B+ |
| B6 | New Revolver | 11,210,000.00 | 7,723,188.97 | 101.00 | P+200 | | 6/30/2005 | B2 | B+ |
| B6 | New Term | 14,868,000.00 | 14,868,000.00 | 100.60 | P+200 | | 6/30/2005 | B2 | B+ |
| B7 | Overadvance | 336,949.00 | 336,949.00 | 101.00 | 8.500% | | 6/30/2006 | B2 | B+ |
| B7 | Overadvance | 300,000.00 | 300,000.00 | 101.00 | 8.500% | | 11/15/2007 | B2 | B+ |
| B7 | New Term Loan | 5,000,002.00 | 5,000,002.00 | 101.50 | 8.500% | | 6/30/2006 | B2 | B+ |

PP050509

| Borrower [1] | Credit | Commitment (in $) [13] | Funded (in $) [13] | Purchase Price [4] (%) | Interest Rate [2] | PIK | Maturity | RiskCalc Computer Model plus 3 notches (Moody's) | Credit Model (S&P) |
|---|---|---|---|---|---|---|---|---|---|
| B8 | Term Loan | 1,308,006.00 | 1,308,006.00 | 101.50 | 8.000% | | 7/1/2008 | B2 | B+ |
| B9 | Revolver | 7,500,000.00 | 6,372,285.71 | 101.00 | P+250 | | 6/30/2008 | B2 | CCC+ |
| B9 | Term Loan | 2,187,500.03 | 2,187,500.03 | 101.00 | P+250 | | 6/30/2008 | B2 | CCC+ |
| B10* | Term Loan A | 6,536,618.82 | 6,536,618.82 | 35.00[10] | 10.000% | | 6/5/2009 | Ba3 | B+ |
| B11 | Term Loan | 2,000,000.00 | 2,000,000.00 | 101.00 | L+800 | | 10/8/2007[18] | Ba3 | B+ |
| B11 | Preferred [5] | 3,000,000.00 | 3,000,000.00 | 50.00[10] | L+0 | | 11/8/2009 | Ba3 | B+ |
| B12 | Term Loan | 5,878,066.95 | 5,878,066.95 | 95.00[9] | L+400 | | 10/31/2006 | B1 | B |
| B13 | Revolver | 22,000,000.00 | 2,233,846.14 | 96.75[6] | L+300 | | 8/8/2009 | B2 | B+ |
| B13 | Term C | 32,953,140.82 | 32,953,140.82 | 101.50[6] | L+250 | | 8/8/2010 | B2[5] | B+[5] |
| B14 | New Revolver | 1,469,850.00 | 746,483.22 | 101.00 | P+100 | | 1/30/2007 | B2 | B |
| B14 | New Term | 398,648.66 | 398,648.66 | 101.00 | 13.000% | | 10/1/2006 | B2 | B |
| B15 | Term A | 5,450,466.68 | 5,450,466.68 | 101.00 | 10.000% | | 12/31/2005 | B2 | B+ |
| B15 | Term B | 2,332,388.85 | 2,332,388.85 | 101.50 | 12.000% | | 12/31/2005 | B2 | B+ |
| B15 | Term C | 4,596,293.60 | 4,596,293.60 | 101.50 | 14.000% | | 12/31/2005 | B2 | B+ |
| B16 | Revolver | 2,080,000.00 | 2,080,000.00 | 101.00 | P+200 | | 6/30/2008 | B1 | B- |
| B17 | Term | 7,180,033.93 | 7,180,033.93 | 100.91 | P+175 | | 1/31/2007 | B2 | B+ |
| B17 | Term | 3,029,126.99 | 3,029,126.99 | 101.27 | P+175 | | 12/30/2010 | B2 | B+ |
| B18 | Overadvance | 2,625,000.00 | 2,625,000.00 | 101.00 | P+200 | | 5/31/2007 | Ba3 | B+ |
| B18 | Term B | 2,230,200.00 | 2,230,200.00 | 100.95 | P+200 | | 5/31/2007 | Ba3 | B+ |
| B18 | Preferred [5] | 3,230,148.31 | 3,230,148.31 | 101.50 | P+200[19] | | 5/31/2007 | Ba3 | B+ |
| B19 | New Term Loan | 8,302,147.86 | 8,302,147.86 | 101.00 | L+350[20] | | 12/31/2006 | B1 | B+ |
| B19 | New Revolver | 3,000,000.00 | 0.00 | 101.00 | L+350[21] | | 12/31/2005 | B1 | B+ |
| B20* | Term | 2,500,000.00[8] | 2,500,000.00[8] | 98.56 | L+200 | | 12/31/2007 | Caa3 | CCC- |
| B21 | Revolver | 1,000,000.00 | 240,562.47 | 97.00[6] | P+175 | | 12/24/2007 | B1 | BB- |

Indenture

2

| Borrower [1] | Credit | Commitment (in $)[13] | Funded (in $)[13] | Purchase Price [4] (%) | Interest Rate [2] | PIK | Maturity | RiskCalc Computer Model plus 3 notches (Moody's) | Credit Model (S&P) |
|---|---|---|---|---|---|---|---|---|---|
| B21 | Term | 1,740,261.99 | 1,740,261.99 | 104.88[6] | 12.000%[22] | | 12/24/2008 | B1 | BB- |
| B21 | Term-LC | 500,000.00 | 500,000.00 | 102.00[6] | L+950 | | 12/24/2007 | B1 | BB- |
| B21 | Term | 554,499.21 | 554,499.21 | 101.00 | L+1750[23] | | 12/24/2007 | B1 | BB- |
| B22 | Term Loan | 3,262,402.51 | 3,262,402.51 | 101.00 | L+800 | | 6/30/2007 | B2 | B |
| B23 | Revolver | 2,500,000.00 | 1,000,000.00 | 101.00 | P+200 | | 3/30/2007[24] | B1 | B+ |
| B23 | Term Loan | 9,000,000.00 | 9,000,000.00 | 100.82 | P+200 | | 3/30/2007[24] | B1 | B+ |
| B24 | Discretionary Line | 2,500,000.00 | 0.00 | 101.50 | P+200 | | 5/1/2006 | B2 | B |
| B24 | Term | 13,483,576.00 | 13,483,576.00 | 101.00 | P+200 | | 5/1/2006 | B2 | B |
| B24 | Interest Note | 3,037,921.00 | 3,037,921.00 | 101.50 | P+200 | | 5/1/2006 | B2 | B |
| B25 | Revolver | 10,000,000.00 | 8,282,459.68 | 100.68 | P+200[25] | | 8/1/2005 | B2 | B+ |
| B25 | Term Loan | 5,271,826.48 | 5,271,826.48 | 101.00 | 10.000% | | 8/1/2005 | B2 | B+ |
| B25 | Term Loan B | 14,254,085.86 | 14,254,085.86 | 101.00 | 10.000% | | 8/1/2005 | B2 | B+ |
| B25 | Overadvance Term Loan | 916,666.65 | 916,666.65 | 101.50 | 25.500% | | 6/8/2009 | B2 | B+ |
| B26 | Revolver | 1,401,865.00 | 473,481.60 | 99.92 | P+150[15] | | 12/29/2008[26] | Ba2 | B+ |
| B26 | Term A | 4,555,557.81 | 4,555,557.81 | 101.00 | P+250[16] | | 12/29/2008[26] | Ba2 | B+ |
| B26 | Preferred[5] | 1,429,572.78 | 1,429,572.78 | 100.74 | 10.000%[17] | | 12/29/2014[27] | Ba2 | B+ |
| B27 | Preferred[5] | 1,869,913.26 | 1,869,913.26 | 101.50 | L+200 | | 1/12/2010[28] | B1 | B- |
| B27 | Tranche B TL | 3,100,000.00 | 3,100,000.00 | 101.00 | P+200 | | 8/19/2008 | B1 | B- |
| | | 281,892,639.25 | 246,283,232.04 | 98.46% | | | | | |

3

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 253 of 447

PP050511

[1]   Except for those borrowers noted with an asterisk, Ark I owns equity interests in each such borrower, which equity interests (other than those of borrowers B10 and B23 above) are also being transferred to the Issuer.

[2]   "L" indicates LIBOR rate and "P" indicates prime rate.

[3]   These ratings are based on public ratings and not on the Riscalc Computer Model (Moody's) or Credit Model (S&P).

[4]   All Pricing from Mark-it Partners Loan Model as of 1/6/2005, except where otherwise noted.  Preferred equity is modeled as "TLB" option.

[5]   Asset represents preferred equity.

[6]   Price given by Mark-it Partners broker quote.

[7]   Prices were calculated on the basis of a more conservative interest rate (L+450 vs. 10% fixed).

[8]   Consists of a pool of medical receivables and payments related thereto; commitment and funded amounts presented at a significantly lower amount to reflect anticipated collections.

[9]   Based upon two bona fide bids.

[10]  Asset priced near par by Mark-it Partners Loan Price Model, presented at significantly lower price here due to subordination considerations.

[11]  Consists of a claim to proceeds from a pool of leases and receivables and equipment related thereto.

[12]  Consists of a right to receive proceeds for certain equipment lease payments on account of leases held by this borrower.

[13]  Does not include the obligation of one borrower that the Issuer planned to purchase from Ark I, which obligation was repaid in full.

[14]  Commitment and Funded amounts will be adjusted as of the close of business on January 13, 2005 to reflect advances made by Ark CLO 2000-1, Limited ("Ark I") on January 13, 2005 in connection with any revolver loan facilities, any repayments of outstanding amounts received by Ark I on January 13, 2005 under such revolver loan facilities as well as any repayments of principal received by Ark I in connection with any term loan facility on January 13, 2005.  For each of the above assets, the purchase price paid to Ark I will be adjusted to reflect any such variation by increasing the purchase price (at par) for every dollar advanced by Ark I on January 13, 2005 and reducing the purchase price (at par) for every dollar of repayments of principal received by Ark I on January 13, 2005.

4

Indenture

NY3#734715v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8    pg. 254 of 447

PP050512

[15]    Mark-it Partners priced at interest rate of P+385; current interest rate is P+150.

[16]    Mark-it Partners priced at interest rate of P+385; current interest rate is P+250.

[17]    Mark-it Partners priced at interest rate of P+435; current interest rate is 10%.

[18]    Mark-it Partners priced at maturity of 11/8/2007; current maturity is 10/8/2007.

[19]    Mark-it Partners priced at interest rate of L+200; current interest rate is P+200.

[20]    Mark-it Partners priced at interest rate of L+325; current interest rate is L+350.

[21]    Mark-it Partners priced at interest rate of L+325; current interest rate is L+350.

[22]    Mark-it Partners priced at interest rate of L+750; current interest rate is 12%.

[23]    Mark-it Partners priced at interest rate of L+750; current interest rate is L+1750.

[24]    Mark-it Partners priced at maturity of 6/1/2005; current maturity is 3/30/2007.

[25]    Mark-it Partners priced at interest rate of P+250; current interest rate is P+200.

[26]    Mark-it Partners priced at maturity of 5/31/2005; current maturity is 12/29/2008.

[27]    Mark-it Partners priced at maturity of 2/28/2005; current maturity is 12/29/2014.

[28]    Mark-it Partners priced at maturity of 8/19/2008; current maturity is 1/12/2010.

5

NY3:#734715lv22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 255 of 447

Indenture

PP050513

Background for Proposed Purchases

Ark CLO 2000-1, Limited ("Ark I") will sell all of the above listed loans and other assets to the Issuer and/or the Zohar Subsidiary. It is expected that the sales proceeds received by Ark I from such sales will be used, together with other cash and cash equivalents held by Ark I, to repay all of the debt obligations issued by Ark I and, consequently, various restrictions imposed on Ark I pursuant to the document governing the debt issued by Ark I will be released shortly thereafter.

Relationships between Ark I/Patriarch Partners, LLC and the Issuer/Patriarch Partners XIV, LLC

Ark I is a structured finance vehicle managed by Patriarch Partners, LLC ("Patriarch I"). Ms. Lynn Tilton is the manager of Patriarch I. Ms. Tilton indirectly owns all of the interests of Patriarch I, which in turn owns all of the equity of Ark Holdings 2000-1, LLC, which owns all of the equity of Ark I. Patriarch I initially directed Ark I to acquire the assets set forth in Schedule A-2, Patriarch I has managed such assets on behalf of Ark I and Patriarch I has directed Ark I to sell all of the assets listed in Schedule A-2 to the Issuer. Ark I initially purchased the assets listed on Schedule A-2 at less than par.

Ms. Tilton owns substantially all of the equity of Zohar Holding, LLC ("Holding") and Holding owns all of the equity of Patriarch Partners XIV, LLC ("Patriarch XIV"), the collateral manager of the Issuer. Ms. Tilton is the manager of Patriarch XIV and Patriarch XIV has directed the Issuer to purchase the assets listed on Schedule A-2 from Ark I. Immediately prior to the Funding Date, Patriarch XIV was the sole owner of the Issuer and, effective as of the Funding Date, Patriarch XIV and certain other investors will indirectly own all of the equity interests of the Issuer. The Issuer will pay Patriarch XIV management fees for providing collateral management services to the Issuer.

Pricing

The price to be paid by the Issuer to Ark I for each asset purchased by the Issuer is set forth in Schedule A-2. Transfer fees relating to such purchases shall be borne by the Issuer. In addition to the purchase price, all accrued and unpaid interest up to the transfer and settlement date shall be for the account of Ark I. The purchase price for the above-referenced loans will be paid in cash and the Preference Shares of the Issuer. The cash portion of the purchase price will not be less than $210,000,000 (subject to adjustment pursuant to the foregoing footnote 14). Zohar II will also issue 38,236.83 Preference Shares to Ark I as part of the purchase price.

Pricing Methodology

Because a liquid market for such loans/obligations does not exist, Patriarch I and Patriarch XIV have determined the price of the loans and other assets as follows: Patriarch I and Patriarch XIV completed credit analyses consistent with the purchase and loan origination standards of Zohar I and II, respectively. A new credit template has been written and rating agency computer credit models have been completed with credit ratings that will be reviewed by both Rating Agencies on a quarterly basis. In comparing other loan obligations and other assets issued by obligors with similar credit ratings on the credit statistics of debt to EBITDA, EBITDA to senior interest as well as ensuring that the rate of interest is consistent with other loans with similar ratings, Patriarch I and Patriarch XIV believe that the ultimate recovery will be par. This

1

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7347151v22

Indenture
PP050514

conclusion is based upon, among other things, the experience of Patriarch I and Patriarch XIV with the loans and other instruments that are subject to the transfer from Ark I to the Issuer, the underlying obligors party to such loans and other instruments, and the experience of Patriarch I and Patriarch XIV in similar situations. In certain cases the loans and other assets include equity interests in the underlying obligors (and/or their affiliates), which equity interests Patriarch I and Patriarch XIV believe may be of additional value in realizing par recoveries. There can, however, be no assurance that any of the loans or other assets transferred will ultimately yield a par recovery.

In addition, Patriarch I and Patriarch XIV have retained Mark-it Partners to value the transferred loans. Mark-it Partners, which has not reviewed this Indenture or the other Transaction Documents, is an independent provider of valuation services that has developed a proprietary model for deriving values for illiquid loan facilities that are not priced by the dealer community. Mark-it Partners (www.loanx.com), working in conjunction with 70 loan traders worldwide, has built a database containing over 1 million historical loan prices. By collecting actual dealer prices for liquid loans and analyzing the relationship between, among other things, the credit rating of the issuer of the loan, the industry classification, the interest rate of the loan and its maturity, the Mark-it Partners model provides the possibility of comparing illiquid loans to a database containing information on more liquid facilities that have actual dealer quotes. There can be no assurance that any of the loans to be transferred to the Issuer will ultimately perform similarly to the liquid loans relied upon in the Mark-it Partners model. The Mark-it Partners model is designed for secured and certain other loans, and there can be no guaranty that the assets set forth in Schedule A-2 conform to the asset class that such model is designed to analyze.

In the course of performing such an analysis, the Mark-it Partners model relies on information related to the loans provided by Patriarch I and, in the course of performing the analysis, simplifying assumptions are made. With respect to the information used by Patriarch I to analyze the loans, and in turn provided by Patriarch I to Mark-it Partners, Patriarch I has relied upon information provided to it by the underlying obligors of the loans and other instruments and other Persons, and there can be no assurance that such information is accurate. Patriarch has also relied upon the Ark I trustee to provide accurate information related to outstanding balances and amounts. In addition, the Mark-it Partners model relies upon credit ratings for the underlying obligors that were obtained by Patriarch I using proprietary credit rating models provided by the Rating Agencies. Those models require Patriarch I to assemble and input information about the underlying obligor in order to obtain a credit rating, and the majority of such information is ultimately obtained from the obligor. The analysis performed by Mark-it Partners relies upon the credit ratings generated by Patriarch I using the Rating Agencies' models.

NY2:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

# Schedule B

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050516

INDEX

SCHEDULE B

## LIBOR FORMULA

With respect to any Interest Period commencing on the Funding Date, "LIBOR" for purposes of calculating the interest rate in respect of the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for such Interest Period will be a rate per annum equal to 2.88266%.

With respect to each Interest Period commencing after the Funding Date, "LIBOR" for purposes of calculating the interest rate in respect of the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for such Interest Period will be determined by the Calculation Agent in accordance with the following provisions:

(i)    LIBOR for any Interest Period shall equal the offered rate, as determined by the Calculation Agent, for U.S. Dollar deposits in the term of such Interest Period which appears on Telerate Page 3750 (or such other page as may replace such Telerate 3750 for the purpose of displaying comparable rates) as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date. "LIBOR Determination Date" means, with respect to any Interest Period, the second London Banking Day prior to the first day of such Interest Period.

(ii)    If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Eurodollar deposits in the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Issuer) are quoting on the relevant LIBOR Determination Date for U.S. Dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), to the principal London offices of leading banks in the London interbank market.

(iii)    If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

For purposes of clause (i) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clauses (ii) and (iii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

1

Indenture
PP050517

NY3:#734715\v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

As used herein:

"Base Rate" means a fluctuating rate of interest determined by the Calculation Agent as being the higher of (i) the Federal Funds Rate and (ii) the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for U.S. Dollar loans. Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"Base Rate Reference Bank" means Citibank, N.A., or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"Business Day" means a day on which commercial banks and foreign exchange markets settle payments in each of (a) New York City, (b) Chicago, Illinois, (c) any other city in which the Corporate Trust Office is located, (d) in the case of the final payment of principal of any Note, the place of presentation of such Note and (e) in any case where action is required on the part of the Issuer, the Cayman Islands.

"LIBOR Business Day" means a day on which commercial banks and foreign exchange markets settle payments in Dollars in New York and London.

"London Banking Day" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent.

The determination of the Class A-1 Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

In respect of any Interest Period that commences after the Funding Date and on any day that is not a Payment Date, LIBOR shall be determined through the use of a straight-line interpolation by reference to two rates calculated in accordance with paragraphs (i) and (ii) above, one of which rates shall be determined as if the maturity of the applicable deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which rates shall be determined as if the maturity of the applicable deposits referred to therein were the period of time for which rates are available next longer than the Interest Period.

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050518

INDEX

# Schedule C-1

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050519

SCHEDULE C-1

## MOODY'S INDUSTRY CLASSIFICATION GROUP LIST

1.  Aerospace and Defense
2.  Automobile
3.  Banking
4.  Beverage, Food and Tobacco
5.  Buildings and Real Estate
6.  Chemicals, Plastics and Rubber
7.  Containers, Packaging and Glass
8.  Personal and Non-Durable Consumer Products (Manufacturing Only)
9.  Diversified/Conglomerate Manufacturing
10. Diversified/Conglomerate Service
11. Diversified Natural Resources, Precious Metals and Minerals
12. Ecological
13. Electronics
14. Finance
15. Farming and Agriculture
16. Grocery
17. Healthcare, Education and Childcare
18. Home and Office Furnishings, Housewares and Durable Consumer Products
19. Hotels, Motels, Inns and Gaming
20. Insurance
21. Leisure and Amusement
22. Machinery (Non-Agriculture, Non-Construction and Non-Electronic)
23. Mining, Steel, Iron and Non-Precious Metals
24. Oil and Gas
25. Personal, Food and Miscellaneous Services
26. Printing and Publishing
27. Cargo Transport
28. Retail Store
29. Telecommunications
30. Textiles and Leather
31. Personal Transportation

1

Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050520

32.    Utilities

33.    Broadcasting and Entertainment

34.    Structured Finance Obligations

2

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

# Schedule C-2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050522

SCHEDULE C-2

STANDARD & POOR'S INDUSTRY CLASSIFICATION GROUP LIST

1. Aerospace and defense
   Aircraft manufacturer/components
   Arms and ammunition
2. Air transport
3. Automotive
   Manufacturers
   Parts and equipment
   Tire and rubber
4. Beverage and tobacco
5. Broadcast radio and television
6. Brokerages/securities dealers/investment houses
7. Building and development
   Builders
   Land development/real estate
   Mobile homes
   REITs
8. Business equipment and services
   Graphic arts
   Office equipment/computers
   Data processing service bureaus
   Computer software
9. Cable television
10. Chemical/plastics
    Coatings/paints/varnishes
11. Clothing/textiles
12. Conglomerates
13. Containers and glass products
14. Cosmetics/toiletries
15. Drugs
16. Ecological services and equipment
    Waste disposal services and equipment

1

Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050523

17. Electronics/electric
    Equipment
    Component
18. Equipment leasing
    Auto leasing/rentals
    Equipment leasing
    Data processing equipment
    Service/leasing
19. Farming/agriculture
    Agricultural products and equipment
    Fertilizers
20. Financial intermediaries
    Banking
    Finance companies
21. Food/drug retailers
22. Food products
23. Food service
    Food service/restaurants
    Vending
24. Forest products
    Building materials
    Paper products and containers
25. Health care
    Medical equipment/supply
    Hospital management
26. Home furnishings
    Appliances
    Furniture, fixtures
    Housewares
27. Hotels/motels/inns and casinos
28. Industrial equipment
    Machinery
    Manufacturing/industrial
    Specialty instruments
29. Insurance

2

Indenture

30.  Leisure
     Leisure goods
     Leisure activities/motion pictures
31.  Nonferrous metals/minerals
     Aluminum producers
     Other metal/mineral producers
     Mining (including coal)
32.  Oil and gas
     Producers/refiners
     Gas pipelines
33.  Publishing
34.  Rail industries
     Railroads
     Rail equipment
35.  Retailers (other than food/drug)
36.  Steel
37.  Surface transport
     Shipping/shipbuilding
     Trucking
38.  Telecommunications/cellular communications
39.  Utilities
     Electric
     Local gas
     Water
40.  Structured Finance Obligations

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050525

# Schedule D

SCHEDULE D

## DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |

1

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
PP050527

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050528

Respondents' Exhibit 8   pg. 270 of 447

# Schedule E

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

SCHEDULE E

APPROVED LOAN PRICING SERVICES

Mark-it Partners Ltd
Loan Pricing Corporation
Standard & Poor's
Houlihan Lokey Howard & Zukin

1

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050530

INDEX

Respondents' Exhibit 8   pg. 272 of 447

# Exhibit A-1

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050531

EXHIBIT A-1

[FORM OF CLASS A CERTIFICATED NOTE]

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND MAY BE RESOLD, PLEDGED (OTHER THAN PURSUANT TO A QUALIFIED SECURITIZATION PLEDGE) OR OTHERWISE TRANSFERRED ONLY (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A IN ACCORDANCE WITH RULE 144A IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, PURCHASING FOR ITS OWN ACCOUNT OR (A)(2) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A) UNDER THE SECURITIES ACT, AND WHO, IN THE CASE OF (A)(1) OR (A)(2), IS A "QUALIFIED PURCHASER" AS DEFINED IN SECTION 2(A)51 OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") (A "QUALIFIED PURCHASER") OR (A)(3) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT AND WHO IS NOT A U.S. RESIDENT WITHIN THE MEANING OF THE 1940 ACT, (B) IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND (C) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. NEITHER OF THE CO-ISSUERS HAS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER) IF SUCH TRANSFER (A) WOULD BE MADE TO A TRANSFEREE WHO IS A U.S. RESIDENT (WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT) THAT IS NOT A QUALIFIED PURCHASER, (B) WOULD HAVE THE EFFECT OF REQUIRING EITHER OF THE CO-ISSUERS OR THE COLLATERAL TO REGISTER AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT, (C) WOULD BE MADE TO A TRANSFEREE WHO IS A U.S. RESIDENT THAT IS A FLOW-THROUGH INVESTMENT VEHICLE OTHER THAN A QUALIFYING INVESTMENT VEHICLE, OR (D) WOULD BE MADE TO A PERSON WHO IS OTHERWISE UNABLE TO MAKE THE ACKNOWLEDGEMENTS, REPRESENTATIONS AND AGREEMENTS REQUIRED BY THE APPLICABLE TRANSFER CERTIFICATE ATTACHED AS AN EXHIBIT TO THE INDENTURE REFERRED TO HEREIN. ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

NY3:#7350442v5

Exhibit A-1 – Form of Class A Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050532

**ZOHAR II 2005-1, LIMITED**
**ZOHAR II 2005-1, CORP.**

[CLASS A-1 FLOATING RATE SENIOR SECURED REVOLVING NOTE DUE 2017]
[CLASS A-2 FLOATING RATE SENIOR SECURED TERM NOTE DUE 2017]
[CLASS A-3 FLOATING RATE SENIOR SECURED DELAYED DRAWDOWN NOTE DUE 2017][1]

CUSIP # [98977EAA0] [98977EAA0][98977EAC6][2]                                                    [Date]

Certificate No. [____]/[____]                                                    Up to U.S.$[_____]

ZOHAR II 2005-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), and ZOHAR II 2005-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to _____ or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of _____ United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Note) on the Payment Date in January, 2017 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of [Class A-1 floating rate senior secured revolving notes due 2017 (the "Class A-1 Notes")] [Class A-2 floating rate senior secured term notes due 2017 (the "Class A-2 Notes")] [Class A-3 floating rate senior secured delayed drawdown notes due 2017 (the "Class A-3 Notes")][3] issued under an Indenture dated as of January 12, 2005 (as supplemented and otherwise modified and in effect from time to time, the "Indenture"), among the Issuer, the Co-Issuer, Zohar II 2005-1, LLC (the "Zohar Subsidiary"), MBIA Insurance Company (the "Credit Enhancer"), IXIS Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent") and as agent for the Holders of the Class A-3 Notes (together with any successors in such capacity, the "Class A-3 Note Agent"), and LaSalle Bank National Association, as trustee (in such capacity, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein [(including, without limitation, the Class A-1 Note Purchase Agreement related hereto, the "Note Purchase Agreement")][4] [(including, without limitation, the Class A-3 Note Purchase Agreement related hereto, the "Note Purchase Agreement")][5] for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent, the Class A-3 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

The Co-Issuers promise to pay interest on the principal amount of this Note outstanding from time to time, from the Closing Date to but excluding the Stated Maturity, in arrears on each Payment Date

---

[1] Insert as appropriate.
[2] Insert as appropriate.
[3] Insert as appropriate.
[4] Insert for Class A-1 Notes.
[5] Insert for Class A-3 Notes.

NY3:#7350442v5

Exhibit A-1 – Form of Class A Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050533

at a rate per annum equal to the applicable [Class A-1] [Class A-2] [Class A-3][6] Note Interest Rate as set forth in the Indenture[, promise to pay the Class A-1 Commitment Fee ("Commitment Fee") on the Aggregate Undrawn Amount of this Note on each Payment Date at a rate per annum equal to the Class A-1 Commitment Fee Rate as set forth in the Indenture, and promise to pay the other amounts stated to be payable by them pursuant to the Note Purchase Agreement, all][7] [, promise to pay the Class A-3 Commitment Fee ("Commitment Fee") on the Aggregate Undrawn Amount of this Note on each Payment Date at a rate per annum equal to the Class A-3 Commitment Fee Rate as set forth in the Indenture, and promise to pay the other amounts stated to be payable by them pursuant to the Note Purchase Agreement, all][8] in accordance with the Priority of Payments and the other terms set forth in the Indenture. Interest [and Commitment Fees][9] accrued with respect to each Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the outstanding principal amount of such Interest Period and [(in the case of interest)][10] the Note Interest Rate for such Interest Period; provided that, in the case of the Interest Periods ending prior to the Initial Payment Date, interest accrued with respect to each such Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the increase in the outstanding principal amount of this Note at the beginning of such Interest Period and the Note Interest Rate for such Interest Period (it being understood that on the Closing Date, such increase is equal to the outstanding principal amount of this Note as of the close of business on such day).

This Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture. [Amounts may be borrowed, from time to time, under this Note on and after the Closing Date, in the manner and with the effect provided in the Indenture and the Note Purchase Agreement. In addition, prepayments of principal of this Class A-1 Note may be made in the manner and with the effect provided in Section 9.5 of the Indenture.][11] [Amounts borrowed under this Note, once repaid, cannot be reborrowed.][12]

The principal of and interest [and Commitment Fee and other amounts payable in respect of this Note pursuant to the Note Purchase Agreement][13] which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date. Any such interest [and Commitment Fee][14] not so punctually paid shall forthwith cease to be payable to the Holder on such Record Date, and will instead be payable to the Person in whose name this Note is registered at the close of business on the next Record Date.

Interest will cease to accrue on this Note, or in the case of a partial repayment, on such part, from the date of repayment unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, interest on any Defaulted Interest shall accrue hereon to the extent provided in Section 2.6 of the Indenture.

---

[6] Insert as appropriate.
[7] Insert for Class A-1 Notes.
[8] Insert for Class A-3 Notes.
[9] Insert for Class A-1 Notes and Class A-3 Notes.
[10] Insert for Class A-1 Notes and Class A-3 Notes.
[11] Insert for Class A-1 Notes.
[12] Insert for Class A-2 Notes and Class A-3 Notes.
[13] Insert for Class A-1 Notes and Class A-3 Notes.
[14] Insert for Class A-1 Notes and Class A-3 Notes.

Exhibit A-1 – Form of Class A Note

NY3:#7350442v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050534

The obligations of the Co-Issuers under this Note[, the Note Purchase Agreement][15] and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Collateral. The payments of principal of and interest on this Note [and Commitment Fee][16] and all other amounts due on this Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

The Notes are entitled to the benefits of a financial guaranty insurance policy (the "Policy") issued by the Credit Enhancer, pursuant to which the Credit Enhancer has unconditionally guaranteed payments of Insured Payments (as defined in the Policy) on each Payment Date, all as more fully set forth in the Indenture and subject to the terms of the Policy.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. It is also further understood that the foregoing shall not limit the rights of the Trustee and the Holder of this Note or the obligations of the Credit Enhancer under the Credit Enhancement.

All reductions in the principal amount of this (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Note issued upon the registration of transfer of this Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Note.

To the extent that this Note has been paid with proceeds of the Credit Enhancement, this Note shall continue to remain Outstanding for purposes of the Indenture until the Credit Enhancer has been paid as subrogee thereunder or reimbursed under the Credit Enhancement Agreement, and the Credit Enhancer shall be deemed the Holder hereof, to the extent of any payments hereon made by the Credit Enhancer, in accordance with the Indenture (including, without limitation, Section 16.3 thereof).

This Note is a registered Note pursuant to Section 2.4 of the Indenture and is subject to certain transfer restrictions and conditions as provided therein. Title to this Note shall pass solely by registration in the Note Register kept by the Note Registrar. The Co-Issuers, the Trustee, the Collateral Manager, the Class A-1 Note Agent, the Credit Enhancer and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note [and Commitment Fee][17] and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

---

[15] Insert for Class A-1 Notes and Class A-3 Notes.
[16] Insert for Class A-1 Notes and Class A-3 Notes.
[17] Insert for Class A-1 Notes and Class A-3 Notes.

NY3:#7350442v5

Exhibit A-1 – Form of Class A Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050535

Amounts payable hereunder shall (subject to the subrogation rights of the Credit Enhancer in connection with the Credit Enhancement) be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

Exhibit A-1 – Form of Class A Note

NY3:#7350442v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050536

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed.

ZOHAR II 2005-1, LIMITED

By:_____
   Name:
   Title:


ZOHAR II 2005-1, CORP.


By:_____
   Name:
   Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050537

INDEX

# Exhibit A-2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

EXHIBIT A-2

FORM OF TEMPORARY REGULATION S GLOBAL NOTE
(CLASS A-2 AND A-3 NOTES)

THIS NOTE IS A TEMPORARY GLOBAL NOTE FOR PURPOSES OF REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") WHICH IS EXCHANGEABLE FOR A PERMANENT GLOBAL NOTE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH HEREIN AND IN THE INDENTURE REFERRED TO HEREIN.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE CO-ISSUERS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT). THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED (OTHER THAN PURSUANT TO A QUALIFIED SECURITIZATION PLEDGE) OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A IN ACCORDANCE WITH RULE 144A IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, PURCHASING FOR ITS OWN ACCOUNT, AND WHO IS ALSO A QUALIFIED PURCHASER (FOR PURPOSES OF THE 1940 ACT), SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, AND WHICH MAY BE IN EITHER CASE EFFECTED WITHOUT LOSS OF ANY APPLICABLE 1940 ACT EXCEPTION OR (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT AND WHO IS NOT A U.S. RESIDENT WITHIN THE MEANING OF THE 1940 ACT AND, IN THE CASE OF CLAUSES (1) AND (2), IN A MINIMUM DENOMINATION OF U.S.$1,000,000 AND INTEGRAL MULTIPLES OF U.S.$50,000 IN EXCESS THEREOF, AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH PURCHASER OF THIS NOTE WILL BE REQUIRED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE CLASS A NOTE CERTIFICATE, WHICH IS ATTACHED TO THE INDENTURE REFERRED TO BELOW AS EXHIBIT B-1 (OTHER THAN A TRANSFEREE OF A NOTE REPRESENTED BY A GLOBAL NOTE, OR OF ANY INTEREST THEREIN, WHICH SHALL BE DEEMED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN SUCH CERTIFICATE). ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

TRANSFER OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO NOMINEES OF DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF INTERESTS IN THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN SECTION 2.4 OF THE INDENTURE REFERRED TO HEREIN.

Exhibit A-2 – Form of Temporary Regulation S Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050539

EACH PURCHASER OF A NOTE, AND EACH TRANSFEREE OF A NOTE, OR OF ANY INTEREST THEREIN, WILL BE REQUIRED TO ACKNOWLEDGE, REPRESENT AND AGREE IN WRITING (AND EACH TRANSFEREE OF A BENEFICIAL INTEREST IN THIS NOTE, SHALL BE DEEMED TO HAVE ACKNOWLEDGED, REPRESENTED AND AGREED), EITHER THAT (A) IT IS NOT, AND IT WILL NOT BE, AN "EMPLOYEE BENEFIT PLAN" SUBJECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN DESCRIBED IN SECTION 4975(e)(1) OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE PLAN ASSETS BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR OTHERWISE, OR A GOVERNMENTAL OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) ITS PURCHASE, HOLDING AND DISPOSITION OF THE NOTE, OR OF ANY INTEREST THEREIN, WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA AND/OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A GOVERNMENTAL OR OTHER PLAN, A VIOLATION OF ANY SUBSTANTIALLY SIMILAR FEDERAL, STATE OR LOCAL LAW) BY REASON OF AN APPLICABLE STATUTORY OR ADMINISTRATIVE EXEMPTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY HOLDER OR OWNER OF A BENEFICIAL INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND IS NOT A QUALIFIED INSTITUTIONAL BUYER OR A U.S. PERSON THAT IS NOT A QUALIFIED PURCHASER OR THAT DOES NOT HAVE AN EXEMPTION AVAILABLE UNDER THE SECURITIES ACT TO SELL THIS NOTE OR ITS INTEREST IN THIS NOTE, OR MAY SELL SUCH NOTE OR INTEREST ON BEHALF OF SUCH PERSON.

PRINCIPAL OF THIS NOTE IS PAYABLE IN INSTALLMENTS FROM TIME TO TIME AS SET FORTH IN THE INDENTURE REFERRED TO HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE ORIGINAL PRINCIPAL AMOUNT OF THIS NOTE SET FORTH BELOW.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE OR ITS AGENTS FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050540

ZOHAR II 2005-1, LIMITED
ZOHAR II 2005-1, CORP.

TEMPORARY REGULATION S GLOBAL NOTE
representing
[CLASS A-2 FLOATING RATE SENIOR SECURED TERM NOTE DUE 2017]
[CLASS A-3 FLOATING RATE SENIOR SECURED DELAYED DRAWDOWN NOTE DUE 2017][1]

Certificate No.:    [A-2-S-[●]] [A-3-S-[●]][2]                                    [Date]
Common Code:   [_____]                           Up to U.S.$[_____]
ISIN No.:         [USG98917AA89][3] [USG98917AB62][4]
CUSIP No.:        [G98917 AA 8][5]  [G98917 AB 6][6]

ZOHAR II 2005-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), and ZOHAR II 2005-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of _____ United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Note) on the Payment Date in January, 2020 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of [Class A-2 floating rate senior secured term notes due 2020 (the "Class A-2 Notes")] [Class A-3 floating rate senior secured delayed drawdown notes due 2020 (the "Class A-3 Notes")][7] issued under an Indenture dated as of January 12, 2005 (as supplemented and otherwise modified and in effect from time to time, the "Indenture"), among the Issuer, the Co-Issuer, Zohar II 2005-1, LLC (the "Zohar Subsidiary"), MBIA Insurance Company (the "Credit Enhancer"), IXIS Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent") and as agent for the Holders of the Class A-3 Notes (together with any successors in such capacity, the "Class A-3 Note Agent"), and LaSalle Bank National Association, as trustee (in such capacity, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent, the Class A-3 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

The Co-Issuers promise to pay interest on the principal amount of this Note outstanding from time to time, from the Closing Date to but excluding the Stated Maturity, in arrears on each Payment Date

_____

[1] Insert as appropriate.
[2] Insert as appropriate.
[3] Insert for Class A-2 Notes.
[4] Insert for Class A-3 Notes.
[5] Insert for Class A-2 Notes.
[6] Insert for Class A-3 Notes.
[7] Insert as appropriate.

NY3:#7350183v3

Exhibit A-2 – Form of Temporary Regulation S Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050541
ON BEHALF OF PATRIARCH PARTNERS LLC

at a rate per annum equal to the applicable [Class A-2] [Class A-3][8] Note Interest Rate as set forth in the Indenture in accordance with the Priority of Payments and the other terms set forth in the Indenture. Interest accrued with respect to each Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the outstanding principal amount of this Note at the beginning of such Interest Period and [(in the case of interest)][9] the Note Interest Rate for such Interest Period; provided that, in the case of the Interest Periods ending prior to the Initial Payment Date, interest accrued with respect to each such Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the increase in the outstanding principal amount of this Note at the beginning of such Interest Period and the Note Interest Rate for such Interest Period (it being understood that on the Closing Date, such increase is equal to the outstanding principal amount of this Note as of the close of business on such day).

This Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture. Amounts borrowed under this Note, once repaid, cannot be reborrowed.

The principal of and interest which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date. Any such interest not so punctually paid shall forthwith cease to be payable to the Holder on such Record Date, and will instead be payable to the Person in whose name this Note is registered at the close of business on the next Record Date.

Interest will cease to accrue on this Note, or in the case of a partial repayment, on such part, from the date of repayment unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, interest on any Defaulted Interest shall accrue hereon to the extent provided in Section 2.6 of the Indenture.

The obligations of the Co-Issuers under this Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Collateral. The payments of principal of and interest on this Note and all other amounts due on this Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

The Notes are entitled to the benefits of a financial guaranty insurance policy (the "Policy") issued by the Credit Enhancer, pursuant to which the Credit Enhancer has unconditionally guaranteed payments of Insured Payments (as defined in the Policy) on each Payment Date, all as more fully set forth in the Indenture and subject to the terms of the Policy.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the

---

[8] Insert as appropriate.
[9] Insert for Class A-3 Notes.

NY3:#7350183v3

Exhibit A-2 – Form of Temporary Regulation S Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050542

nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. It is also further understood that the foregoing shall not limit the rights of the Trustee and the Holder of this Note or the obligations of the Credit Enhancer under the Credit Enhancement.

All reductions in the principal amount of this (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Note issued upon the registration of transfer of this Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Note.

To the extent that this Note has been paid with proceeds of the Credit Enhancement, this Note shall continue to remain Outstanding for purposes of the Indenture until the Credit Enhancer has been paid as subrogee thereunder or reimbursed under the Credit Enhancement Agreement, and the Credit Enhancer shall be deemed the Holder hereof, to the extent of any payments hereon made by the Credit Enhancer, in accordance with the Indenture (including, without limitation, Section 16.3 thereof).

This Note is a registered Note pursuant to Section 2.4 of the Indenture and is subject to certain transfer restrictions and conditions as provided therein. Title to this Note shall pass solely by registration in the Note Register kept by the Note Registrar. The Co-Issuers, the Trustee, the Collateral Manager, the Class A-1 Note Agent, the Credit Enhancer and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall (subject to the subrogation rights of the Credit Enhancer in connection with the Credit Enhancement) be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

On or after the 40th day after the later of the Closing Date and the commencement of the offering of the Notes, interests in this Temporary Regulation S Global Note may be exchanged (free of charge) for interests in a permanent Regulation S Global Note of the same Class in the form attached as an exhibit to the Indenture. The permanent Regulation S Global Note shall be so issued and delivered in exchange for only that portion of this Temporary Regulation S Global Note in respect of which there shall have been presented to the Depository by Euroclear or Clearstream a certification to the effect that it has received from or in respect of a person entitled to an interest (as shown by its records) a certification that the beneficial interests in such Temporary Regulation S Global Note are owned by persons who are not U.S. persons.

NY3:#7350183v3

Exhibit A-2 – Form of Temporary Regulation S Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050543

On an exchange of the whole of this Temporary Regulation S Global Note, this Temporary Regulation S Global Note shall be surrendered to the Depository at its office. On an exchange of only part of this Temporary Regulation S Global Note, details of such exchange shall be entered by or on behalf of the Issuer in Schedule A hereto. If, following the issue of a permanent Regulation S Global Note in exchange for some of the Notes represented by this Temporary Regulation S Global Note, further Notes are to be exchanged pursuant to this paragraph, such exchange may be effected, without the issue of a new permanent Regulation S Global Note, by the Issuer or the Depository endorsing Schedule A of the permanent Regulation S Global Note previously issued to reflect an increase in the aggregate principal amount of such permanent Regulation S Global Note by an amount equal to the aggregate principal amount of the additional Notes to be exchanged.

Interests in this Temporary Regulation S Global Note may be exchanged for Certificated Notes or an interest in the corresponding Rule 144A Global Note, in each case subject to the restrictions as set forth in the Indenture. This Temporary Regulation S Global Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Notes may become or be declared immediately due and payable in the manner and with the effect provided in the Indenture.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

Exhibit A-2 – Form of Temporary Regulation S Global Note

NY3:#7350183v3

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050544

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed.

ZOHAR II 2005-1, LIMITED

By:_____
    Name:
    Title:

ZOHAR II 2005-1, CORP.

By:_____
    Name:
    Title:

Exhibit A-2 – Form of Temporary Regulation S Global Note

NY3:#7350183V3

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050545

## CERTIFICATE OF AUTHENTICATION

This is one of the [Class A-2 floating rate senior secured term notes] [Class A-3 floating rate senior secured delayed drawdown note][10] referred to in the within-mentioned Indenture.

LASALLE BANK NATIONAL
ASSOCIATION, as Trustee

By:_____
Authorized Signatory

---

[10] Insert as appropriate.

NY3:#7350191v3

Exhibit A-2 – Form of Temporary Regulation S Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050546

SCHEDULE A

This Note was initially made in the amount of U.S.$[_____].

The following exchanges of a part of this Temporary Regulation S Global Note for Notes represented by a permanent Regulation S Global Note have been made:

| Date exchange/redemption/ increase made | Original principal amount of this Temporary Regulation S Global Note | Part of principal amount of this Temporary Regulation S Global Note exchanged/redeemed/ increased | Remaining principal amount of this Temporary Regulation S Global Note following such exchange/redemption/ increase | Notation made by or on behalf of the Co-Issuers |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit A-2 – Form of Temporary Regulation S Global Note

NY3:#7350191v3

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050547

# Exhibit A-3

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050548

INDEX

EXHIBIT A-3

## FORM OF RULE 144A GLOBAL NOTE
### (CLASS A-2 AND A-3 NOTES)

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE CO-ISSUERS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT). THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED (OTHER THAN PURSUANT TO A QUALIFIED SECURITIZATION PLEDGE) OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A IN ACCORDANCE WITH RULE 144A IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, PURCHASING FOR ITS OWN ACCOUNT, AND WHO IS ALSO A QUALIFIED PURCHASER (FOR PURPOSES OF THE 1940 ACT), SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, AND WHICH MAY BE IN EITHER CASE EFFECTED WITHOUT LOSS OF ANY APPLICABLE 1940 ACT EXCEPTION OR (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT AND WHO IS NOT A U.S. RESIDENT WITHIN THE MEANING OF THE 1940 ACT AND, IN THE CASE OF CLAUSES (1) AND (2), IN A MINIMUM DENOMINATION OF U.S.$1,000,000 AND INTEGRAL MULTIPLES OF U.S.$50,000 IN EXCESS THEREOF, AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.    EACH PURCHASER OF THIS NOTE WILL BE REQUIRED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE CLASS A NOTE CERTIFICATE, WHICH IS ATTACHED TO THE INDENTURE REFERRED TO BELOW AS EXHIBIT B-1 (OTHER THAN A TRANSFEREE OF A NOTE REPRESENTED BY A GLOBAL NOTE, OR OF ANY INTEREST THEREIN, WHICH SHALL BE DEEMED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN SUCH CERTIFICATE). ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

TRANSFER OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO NOMINEES OF DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF INTERESTS IN THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE

NY3:#7350186v5

Exhibit A-3 – Form of Rule 144A Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050549

RESTRICTIONS SET FORTH IN SECTION 2.4 OF THE INDENTURE REFERRED TO HEREIN.

EACH PURCHASER OF A NOTE, AND EACH TRANSFEREE OF A NOTE, OR OF ANY INTEREST THEREIN, WILL BE REQUIRED TO ACKNOWLEDGE, REPRESENT AND AGREE IN WRITING (AND EACH TRANSFEREE OF A BENEFICIAL INTEREST IN THIS NOTE, SHALL BE DEEMED TO HAVE ACKNOWLEDGED, REPRESENTED AND AGREED), EITHER THAT (A) IT IS NOT, AND IT WILL NOT BE, AN "EMPLOYEE BENEFIT PLAN" SUBJECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN DESCRIBED IN SECTION 4975(e)(1) OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE PLAN ASSETS BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY OR OTHERWISE, OR A GOVERNMENTAL OR OTHER PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) ITS PURCHASE, HOLDING AND DISPOSITION OF THE NOTE, OR OF ANY INTEREST THEREIN, WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA AND/OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A GOVERNMENTAL OR OTHER PLAN, A VIOLATION OF ANY SUBSTANTIALLY SIMILAR FEDERAL, STATE OR LOCAL LAW) BY REASON OF AN APPLICABLE STATUTORY OR ADMINISTRATIVE EXEMPTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY HOLDER OR OWNER OF A BENEFICIAL INTEREST IN THIS NOTE THAT IS A U.S. PERSON AND IS NOT A QUALIFIED INSTITUTIONAL BUYER OR A U.S. PERSON THAT IS NOT A QUALIFIED PURCHASER OR THAT DOES NOT HAVE AN EXEMPTION AVAILABLE UNDER THE SECURITIES ACT TO SELL THIS NOTE OR ITS INTEREST IN THIS NOTE, OR MAY SELL SUCH NOTE OR INTEREST ON BEHALF OF SUCH PERSON.

PRINCIPAL OF THIS NOTE IS PAYABLE IN INSTALLMENTS FROM TIME TO TIME AS SET FORTH IN THE INDENTURE REFERRED TO HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE ORIGINAL PRINCIPAL AMOUNT OF THIS NOTE SET FORTH BELOW.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE OR ITS AGENTS FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050550

ZOHAR II 2005-1, LIMITED
ZOHAR II 2005-1, CORP.

FORM OF RULE 144A GLOBAL NOTE
representing
[CLASS A-2 FLOATING RATE SENIOR SECURED TERM NOTE DUE 2017]
[CLASS A-3 FLOATING RATE SENIOR SECURED DELAYED DRAWDOWN NOTE DUE 2017][1]

Certificate No.: [A-2-R-[●]] [A-3-R-[●]][2]                                    [Date]
Common Code: [_____]                          Up to U.S.$[_____]
ISIN No.:        [US98977EAB83] [US98977EAC66][3]
CUSIP No.:      [98977EAB8] [98977EAC6][4]

ZOHAR II 2005-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), and ZOHAR II 2005-1, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of _____ United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Note) on the Payment Date in January, 2017 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of [Class A-2 floating rate senior secured term notes due 2017 (the "Class A-2 Notes")] [Class A-3 floating rate senior secured delayed drawdown notes due 2017 (the "Class A-3 Notes")][5] issued under an Indenture dated as of January 12, 2005 (as supplemented and otherwise modified and in effect from time to time, the "Indenture"), among the Issuer, the Co-Issuer, Zohar II 2005-1, LLC (the "Zohar Subsidiary"), MBIA Insurance Company (the "Credit Enhancer"), IXIS Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent") and as agent for the Holders of the Class A-3 Notes (together with any successors in such capacity, the "Class A-3 Note Agent"), and LaSalle Bank National Association, as trustee (in such capacity, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent, the Class A-3 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

---

[1] Insert as appropriate.
[2] Insert as appropriate.
[3] Insert as appropriate.
[4] Insert as appropriate.
[5] Insert as appropriate.

NY3:#7350186v5

Exhibit A-3 – Form of Rule 144A Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                     PP050551
ON BEHALF OF PATRIARCH PARTNERS LLC

The Co-Issuers promise to pay interest on the principal amount of this Note outstanding from time to time, from the Closing Date to but excluding the Stated Maturity, in arrears on each Payment Date at a rate per annum equal to the applicable [Class A-2] [Class A-3][6] Note Interest Rate as set forth in the Indenture in accordance with the Priority of Payments and the other terms set forth in the Indenture. Interest accrued with respect to each Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the outstanding principal amount of this Note at the beginning of such Interest Period and [(in the case of interest)][7] the Note Interest Rate for such Interest Period; provided that, in the case of the Interest Periods ending prior to the Initial Payment Date, interest accrued with respect to each such Interest Period shall be computed on the basis of a 360-day year and the actual number of days elapsed in such Interest Period, and shall be determined for such Interest Period based on the increase in the outstanding principal amount of this Note at the beginning of such Interest Period and the Note Interest Rate for such Interest Period (it being understood that on the Closing Date, such increase is equal to the outstanding principal amount of this Note as of the close of business on such day).

This Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture. Amounts borrowed under this Note, once repaid, cannot be reborrowed.

The principal of and interest which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date. Any such interest not so punctually paid shall forthwith cease to be payable to the Holder on such Record Date, and will instead be payable to the Person in whose name this Note is registered at the close of business on the next Record Date.

Interest will cease to accrue on this Note, or in the case of a partial repayment, on such part, from the date of repayment unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, interest on any Defaulted Interest shall accrue hereon to the extent provided in Section 2.6 of the Indenture.

The obligations of the Co-Issuers under this Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Collateral. The payments of principal of and interest on this Note and all other amounts due on this Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

The Notes are entitled to the benefits of a financial guaranty insurance policy (the "Policy") issued by the Credit Enhancer, pursuant to which the Credit Enhancer has unconditionally guaranteed payments of Insured Payments (as defined in the Policy) on each Payment Date, all as more fully set forth in the Indenture and subject to the terms of the Policy.

---

[6] Insert as appropriate.
[7] Insert for Class A-3 Notes.

NY3:#7350186v5

Exhibit A-3 - Form of Rule 144A Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050552

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. It is also further understood that the foregoing shall not limit the rights of the Trustee and the Holder of this Note or the obligations of the Credit Enhancer under the Credit Enhancement.

All reductions in the principal amount of this (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Note issued upon the registration of transfer of this Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Note.

To the extent that this Note has been paid with proceeds of the Credit Enhancement, this Note shall continue to remain Outstanding for purposes of the Indenture until the Credit Enhancer has been paid as subrogee thereunder or reimbursed under the Credit Enhancement Agreement, and the Credit Enhancer shall be deemed the Holder hereof, to the extent of any payments hereon made by the Credit Enhancer, in accordance with the Indenture (including, without limitation, Section 16.3 thereof).

This Note is a registered Note pursuant to Section 2.4 of the Indenture and is subject to certain transfer restrictions and conditions as provided therein. Title to this Note shall pass solely by registration in the Note Register kept by the Note Registrar. The Co-Issuers, the Trustee, the Collateral Manager, the Class A-1 Note Agent, the Credit Enhancer and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall (subject to the subrogation rights of the Credit Enhancer in connection with the Credit Enhancement) be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

NY3:#7350186v5

Exhibit A-3 – Form of Rule 144A Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050553

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Transfers of this Rule 144A Global Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the Depository to a successor of the Depository or such successor's nominee.

Interests in this Rule 144A Global Note will be transferable in accordance with the Depository's rules and procedures in use at such time.

Interests in this Rule 144A Global Note may be exchanged for Certificated Notes or an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, in each case subject to the restrictions as set forth in the Indenture. This Rule 144A Global Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this Rule 144A Global Note, this Global Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Notes may become or be declared immediately due and payable in the manner and with the effect provided in the Indenture.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

NY3:#7350186v5

Exhibit A-3 – Form of Rule 144A Global Note

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050554

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed.

ZOHAR II 2005-1, LIMITED

By:_____
  Name:
  Title:

ZOHAR II 2005-1, CORP.

By:_____
  Name:
  Title:

Exhibit A-3 – Form of Rule 144A Global Note

NY3:#7350186v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050555

CERTIFICATE OF AUTHENTICATION

This is one of the [Class A-2 floating rate senior secured term notes] [Class A-3 floating rate senior secured delayed drawdown notes][8] referred to in the within-mentioned Indenture.

LASALLE BANK NATIONAL
ASSOCIATION, as Trustee

By:_____
Authorized Signatory

---

[8] Insert as appropriate.

Exhibit A-3 – Form of Rule 144A Global Note

NY3:#7350186v5
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050556

## SCHEDULE A

### SCHEDULE OF EXCHANGES OR REDEMPTIONS

This Note was initially made in the amount of U.S.$[____].

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this Rule 144A Global Note have been made:

| Date exchange/redemption/increase made | Original principal amount of this Rule 144A Global Note | Part of principal amount of this Rule 144A Global Note exchanged/redeemed/increased | Remaining principal amount of this Rule 144A Global Note following such exchange/redemption/increase | Notation made by or on behalf of the Co-Issuers |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit A-3 – Form of Rule 144A Global Note

NY3:#7150186v5
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050557