# EXHIBIT 3

## Zohar III Indenture

26135740.1

EXECUTION COPY

INDENTURE

among

**ZOHAR III, LIMITED**

**ZOHAR III, CORP.**

**ZOHAR III, LLC**

**NATIXIS FINANCIAL PRODUCTS INC.,**
as Class A-1R Note Agent and Class A-1D Note Agent

and

**LASALLE BANK NATIONAL ASSOCIATION,**
as Trustee

**Dated as of April 6, 2007**

NY3:#7377192v32

RESPONDENTS'
EXHIBIT
**12**
AP No. 16462

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001748

# CONTENTS

| Section | | Page |
|---|---|---|

ARTICLE 1  DEFINITIONS ...... 4
Section 1.1.    Definitions ...... 4
Section 1.2.    Assumptions as to Collateral Investments, Etc. ...... 65

ARTICLE 2  THE NOTES ...... 68
Section 2.1.    Forms Generally ...... 68
Section 2.2.    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations ...... 69
Section 2.3.    Execution, Authentication, Delivery and Dating ...... 71
Section 2.4.    Registration, Transfer and Exchange of Notes ...... 72
Section 2.5.    Mutilated, Defaced, Destroyed, Lost or Stolen Notes ...... 81
Section 2.6.    Payment of Interest, Principal and Commitment Fees; Rights Preserved ...... 82
Section 2.7.    Persons Deemed Owners ...... 85
Section 2.8.    Cancellation ...... 85
Section 2.9.    Debt Treatment ...... 85
Section 2.10.   Issuance of Additional Class B Notes ...... 85
Section 2.11    Depository Unable or Unwilling to Perform ...... 87
Section 2.12.   Notes Beneficially Owned by Persons Not Qualified Purchasers ...... 87

ARTICLE 3  CONDITIONS PRECEDENT ...... 88
Section 3.1.    General Provisions ...... 88
Section 3.2.    Security for Notes ...... 91
Section 3.3.    Custodianship; Transfer of Collateral Investments and Eligible Investments ...... 93
Section 3.4.    Representations as to Collateral ...... 95
Section 3.5.    Representations and Warranties of the Co-Issuers ...... 97

ARTICLE 4  SATISFACTION AND DISCHARGE ...... 98
Section 4.1.    Satisfaction and Discharge of Indenture ...... 98
Section 4.2.    Application of Trust Money ...... 99
Section 4.3.    Repayment of Monies Held by Paying Agent ...... 100

ARTICLE 5  EVENTS OF DEFAULT; REMEDIES ...... 100
Section 5.1.    Events of Default ...... 100
Section 5.2.    Acceleration of Maturity; Rescission and Annulment ...... 102
Section 5.3.    Collection of Indebtedness and Suits for Enforcement by Trustee ...... 103
Section 5.4.    Remedies ...... 105
Section 5.5.    Preservation of Collateral ...... 106
Section 5.6.    Trustee May Enforce Claims Without Possession of Notes ...... 107
Section 5.7    Application of Money Collected ...... 108
Section 5.8.    Limitation on Suits ...... 108
Section 5.9.    Unconditional Rights of Noteholders to Receive Principal, Interest, Class A-1R Commitment Fee, Class A-1D Commitment Fee and Certain Other Amounts ...... 108
Section 5.10.   Restoration of Rights and Remedies ...... 109
Section 5.11.   Rights and Remedies Cumulative ...... 109
Section 5.12.   Delay or Omission Not Waiver ...... 109
Section 5.13.   Control by Controlling Class ...... 110
Section 5.14.   Waiver of Past Defaults ...... 110
Section 5.15.   Undertaking for Costs ...... 110

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP001749

| | | |
|---|---|---|
| Section 5.16. | Waiver of Stay or Extension Laws | 111 |
| Section 5.17. | Sale of Collateral | 111 |
| Section 5.18. | Action on the Notes | 112 |

**ARTICLE 6  THE TRUSTEE** ........... 112

| | | |
|---|---|---|
| Section 6.1. | Certain Duties and Responsibilities | 112 |
| Section 6.2. | Notice of Default | 114 |
| Section 6.3. | Certain Rights of Trustee | 114 |
| Section 6.4. | Authenticating Agents | 116 |
| Section 6.5. | Not Responsible for Recitals or Issuance of Notes | 116 |
| Section 6.6. | May Hold Notes | 116 |
| Section 6.7. | Money Held in Trust | 116 |
| Section 6.8. | Compensation and Reimbursement | 117 |
| Section 6.9. | Corporate Trustee Required; Eligibility | 118 |
| Section 6.10. | Resignation and Removal; Appointment of Successor | 118 |
| Section 6.11. | Acceptance of Appointment by Successor | 119 |
| Section 6.12. | Merger, Conversion, Consolidation or Succession to Business of Trustee | 119 |
| Section 6.13. | Co-Trustees | 120 |
| Section 6.14. | Certain Duties Related to Delayed Payment of Proceeds | 121 |
| Section 6.15. | Representations and Warranties of the Bank | 121 |
| Section 6.16. | Exchange Offers | 122 |
| Section 6.17. | Fiduciary for Noteholders Only; Agent for the Collateral Manager | 122 |
| Section 6.18. | Duties and Responsibilities of Trustee Following Payment in Full of the Notes | 122 |

**ARTICLE 7  COVENANTS** ........... 123

| | | |
|---|---|---|
| Section 7.1. | Payment of Principal and Interest and Commitment Fees | 123 |
| Section 7.2. | Maintenance of Office or Agency | 123 |
| Section 7.3. | Money for Note Payments to be Held in Trust | 124 |
| Section 7.4. | Existence of Zohar Obligors | 125 |
| Section 7.5. | Protection of Collateral | 126 |
| Section 7.6. | Opinions as to Collateral | 128 |
| Section 7.7. | Performance of Obligations | 128 |
| Section 7.8. | Negative Covenants | 129 |
| Section 7.9. | Certain Statements | 130 |
| Section 7.10. | Co-Issuers May Consolidate, etc., Only on Certain Terms | 131 |
| Section 7.11. | Successor Substituted | 134 |
| Section 7.12. | No Other Business | 135 |
| Section 7.13. | Ramp Up; Rating Confirmation; Annual Rating Review; Etc. | 135 |
| Section 7.14. | Calculation Agent | 138 |
| Section 7.15. | Amendment of Certain Documents | 139 |
| Section 7.16. | Reporting | 139 |
| Section 7.17. | Special Procedures for Certain Obligations | 139 |
| Section 7.18 | Delivery of Appropriate Tax Forms | 140 |
| Section 7.19 | Section 3(c)(7) Procedures | 140 |

**ARTICLE 8  SUPPLEMENTAL INDENTURES** ........... 142

| | | |
|---|---|---|
| Section 8.1. | Supplemental Indentures Without Consent of Noteholders | 142 |
| Section 8.2. | Supplemental Indentures with Consent of Noteholders | 144 |
| Section 8.3. | Execution of Supplemental Indentures | 146 |
| Section 8.4. | Effect of Supplemental Indentures | 146 |
| Section 8.5. | Reference in Notes to Supplemental Indentures | 147 |

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001750

ARTICLE 9  REDEMPTION AND REPAYMENT OF NOTES, ETC. .................................................. 147
Section 9.1.    Redemption of all Notes .................................................................................. 147
Section 9.2.    Notice to Trustee of Optional Redemption .............................................. 149
Section 9.3.    Notice of Optional Redemption or Maturity by the Co-Issuers ...................... 149
Section 9.4.    Notes Payable on Redemption Date ........................................................... 149
Section 9.5.    Certain Prepayments; Reduction of Commitments ..................................... 150
Section 9.6.    Borrowings; Class A-1 Pro Rata Adjustment Advances .............................. 151
Section 9.7.    Application of Amounts to Acquire, Originate and Fund Collateral Investments ...... 153

ARTICLE 10  ACCOUNTS, ACCOUNTINGS AND RELEASES ............................................. 155
Section 10.1.    Collection of Money .................................................................................. 155
Section 10.2.    Principal Collection Accounts; Interest Collection Accounts; Custodial
                 Account ...................................................................................................... 155
Section 10.3.    Payment Account ....................................................................................... 158
Section 10.4.    Class A-1R Future Funding Reserve Account ............................................ 159
Section 10.5.    Class A-1R Holder Collateral Accounts ..................................................... 160
Section 10.6.    Expense Account; Professional Fee Account; Closing Expense Account ................ 161
Section 10.7.    Unfunded Revolver Discount Account ........................................................ 163
Section 10.8.    Rollover Proceeds Account ........................................................................ 164
Section 10.09.   Reports by Trustee .................................................................................... 165
Section 10.10.   Accountings .............................................................................................. 166
Section 10.11.   Release of Collateral ................................................................................. 176
Section 10.12.   Reports by Independent Accountants .......................................................... 177
Section 10.13.   Reports to Rating Agencies, Etc. .............................................................. 177

ARTICLE 11  APPLICATION OF MONIES ..................................................................... 178
Section 11.1.    Disbursements of Monies from Payment Account ...................................... 178
Section 11.2.    Disbursements of Monies from Rollover Proceeds Account ........................ 185
Section 11.3.    Disbursements of Monies from Unfunded Revolver Discount Account .......... 186
Section 11.4.    Disbursements of Monies from Class A-1R Future Funding Reserve Account .......... 186
Section 11.5.    Trust Accounts .......................................................................................... 186

ARTICLE 12  ACQUISITION, ORIGINATION AND SALE OF COLLATERAL
INVESTMENTS AND EQUITY SECURITIES ...................................................................... 187
Section 12.1.    Acquisition and Origination of Collateral Investments and Equity Securities;
                 Eligibility Criteria ...................................................................................... 187
Section 12.2.    Sale of Collateral ....................................................................................... 193
Section 12.3.    Conditions Applicable to all Transactions Involving Sale or Grant ............... 195
Section 12.4.    Foreign Currency Provisions ...................................................................... 196
Section 12.5.    Unrestricted Collateral Investments. ........................................................... 196

ARTICLE 13  NOTEHOLDERS' RELATIONS ................................................................... 197
Section 13.1.    Subordination ............................................................................................ 197
Section 13.2.    Standard of Conduct .................................................................................. 199
Section 13.3.    Non-Petition ............................................................................................. 200

ARTICLE 14  ASSIGNMENT OF MANAGEMENT AGREEMENT AND COLLATERAL
ADMINISTRATION AGREEMENT, ETC. ......................................................................... 200
Section 14.1.    Assignment ............................................................................................... 200
Section 14.2.    No Impairment ........................................................................................... 201
Section 14.3.    Termination, Etc. ....................................................................................... 201

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001751

Section 14.4.   Assignment of Collateral Management Agreement and Collateral
                Administration Agreement ....................................................................... 201
Section 14.5.   Issuer and Collateral Administrator Agreements, Etc. ........................... 203

ARTICLE 15  HEDGE AGREEMENTS ............................................................................. 204
Section 15.1.   Hedge Agreements .................................................................................. 204

ARTICLE 16  CLASS A-1R NOTE AGENT AND CLASS A-1D NOTE AGENT ............... 206
Section 16.1.   Appointment of Class A-1R Note Agent .................................................. 206
Section 16.2.   Certain Duties and Responsibilities ......................................................... 206
Section 16.3.   Compensation ......................................................................................... 207
Section 16.4.   Resignation and Removal; Appointment of a Successor ........................ 208
Section 16.5.   Acceptance of Appointment of a Successor .............................................. 209
Section 16.6.   Appointment of Class A-1D Note Agent ................................................. 209

ARTICLE 17  MISCELLANEOUS ................................................................................... 209
Section 17.1.   Form of Documents Delivered to Trustee ................................................ 209
Section 17.2.   Acts of Noteholders ................................................................................. 210
Section 17.3.   Notices, etc., to Trustee, the Preference Share Paying Agent, the Zohar
                Obligors, the Collateral Manager, the Rating Agencies and the Hedge
                Counterparty ......................................................................................... 210
Section 17.4.   Notices and Reports to Noteholders; Waiver ............................................ 212
Section 17.5.   Effect of Headings and Table of Contents ................................................ 213
Section 17.6.   Successors and Assigns .......................................................................... 213
Section 17.7.   Severability ............................................................................................. 213
Section 17.8.   Benefits of Indenture .............................................................................. 213
Section 17.9.   Governing Law ....................................................................................... 213
Section 17.10.  Submission to Jurisdiction ..................................................................... 214
Section 17.11.  Waiver of Jury Trial ............................................................................... 214
Section 17.12.  Counterparts ........................................................................................... 214
Section 17.13.  Judgment Currency ................................................................................ 214
Section 17.14.  Confidentiality ....................................................................................... 215

## SCHEDULES

Schedule A-1    Collateral Investments Owned by the Issuer or the Zohar Subsidiary on the Funding
                Date
Schedule A-2    Collateral Investments to Be Acquired from Ark II CLO 2001-1, Limited and
                Ark II CLO 2001-1, LLC
Schedule B      LIBOR Formula
Schedule C-1    Moody's Industry Classification Group List
Schedule C-2    Standard & Poor's Industry Classification Group List
Schedule D      Diversity Score Table
Schedule E      Approved Loan Pricing Services

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001752

- v -

## EXHIBITS

Exhibit A-1    Form of Certificated Notes (Class A-1 Notes)
Exhibit A-2    Form of Temporary Regulation S Global Note (Class A-1T Notes, Class A-1D Notes, Class A-2 Notes and Class A-3 Notes)
Exhibit A-3    Form of Rule 144A Global Note (Class A-1T Notes, Class A-1D Notes, Class A-2 Notes and Class A-3 Notes)
Exhibit A-4    Form of Regulation S Global (Class A-1T Notes, Class A-1D Notes, Class A-2 Notes and Class A-3 Notes)
Exhibit A-5    Form of Class B Note
Exhibit A-6    Form of Class C Note
Exhibit B-1    Form of Class A Note Certificate
Exhibit B-2    Form of Certificate for Transfer or Exchange of Rule 144A Global Note to Temporary Regulation S Global Note or Regulation S Global Note
Exhibit B-3    Form of Certificate for Transfer or Exchange of Temporary Regulation S Global Note or Regulation S Global Note to Rule 144A Global Note
Exhibit B-4    Form of QIB/QP Certification
Exhibit B-5    Form of Regulation S Transferee Certification
Exhibit B-6    Form of Certificate for Transfer or Exchange of Certificated Note to Temporary Regulation S Global Note or Regulation S Global Note
Exhibit B-7    Form of Certificate for Transfer or Exchange of Certificated Note to Rule 144A Global Note
Exhibit B-8    Form of Class B Note Certificate
Exhibit B-9    Form of Class C Note Certificate
Exhibit C      Form of Opinion of Milbank, Tweed, Hadley & McCloy LLP
Exhibit D      Form of Opinion of Maples and Calder
Exhibit E-1    Form of Opinion of Kennedy Covington Lobdell & Hickman LLP
Exhibit E-2    Form of Opinion of Seyfarth Shaw LLP
Exhibit E-3    Form of Opinion of In-House Counsel to Trustee
Exhibit F      Form of Opinion of Purrington Moody Weil LLP
Exhibit G      Form of Funding Certificate
Exhibit H-1    Form of Section 3(c)(7) Reminder Notice
Exhibit H-2    Form of Important Section 3(c)(7) Reminder Notice

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001753

**INDENTURE** dated as of April 6, 2007, among:

ZOHAR III, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR III, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR III, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors");

NATIXIS FINANCIAL PRODUCTS INC., a corporation organized and existing under the laws of the State of Delaware, as agent for the Holders of the Class A-1R Notes and Class A-1D Notes referred to below (in such capacities, together with its successors in such capacities, the "Class A-1R Note Agent" and "Class A-1D Note Agent", respectively); and

LASALLE BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "Trustee").

## PRELIMINARY STATEMENTS

The Zohar Obligors are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Zohar Obligors herein are for the benefit and security of the Noteholders, the Hedge Counterparties, the Swingline Lender, the Collateral Manager, the Collateral Administrator, the Preference Share Paying Agent and the Trustee (collectively, the "Secured Parties"). The Zohar Obligors are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Zohar Obligors in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, a continuing security interest in, and lien on, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, instruments, deposit accounts, investment property (each, as defined in the UCC), and any and all other property of any type or nature owned by it (other than Excluded Property), including but not limited to (a) the Collateral Investments and any Equity Securities and other securities or obligations owned, acquired or originated by the Issuer on the Funding Date, which the Issuer (or the Collateral Manager on the Issuer's behalf) causes to be delivered to the Trustee (directly or through a Securities Intermediary or bailee), all payments thereon or with respect thereto and all Collateral Investments and Equity Securities and other securities or obligations owned, acquired or originated from time to time by the Issuer (including, without limitation, Exchanged Securities) that are delivered to the Trustee (directly or through a Securities Intermediary or bailee) after the Funding Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Custodial Account, the Payment Account, the Issuer Principal Collection

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001754

Account, the Issuer Interest Collection Account, the Class A-1R Holder Collateral Account, the Expense Account, the Closing Expense Account, the Professional Fee Account, the Unfunded Revolver Discount Account, the Class A-1R Future Funding Reserve Account, the Rollover Proceeds Account, each Foreign Currency Account and Eligible Investments purchased with funds on deposit in said accounts and all income from the investment of funds therein, (c) the Hedge Agreements (if any) and all payments thereunder or with respect thereto and each Hedge Counterparty Collateral Account, (d) the Management Agreement, the Collateral Administration Agreement, the Purchase Documents, the Class A-1R Note Purchase Agreement, the Class A-1D Note Purchase Agreement, the Note Subscription Agreements and the Preference Share Subscription Agreements, (e) all Cash and Money delivered to the Trustee (directly or through a Securities Intermediary or bailee), (f) the membership interests in the Zohar Subsidiary and (g) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (but excluding the Preference Share Distribution Account, Eligible Investments purchased with funds on deposit therein and all funds deposited therein and financial assets and investment property credited thereto and income from the investment of funds therein and any part thereof that consists of general intangibles or investment property (each as defined in the UCC) relating thereto).

The Zohar Subsidiary hereby Grants to the Trustee, for the benefit and security of the Secured Parties, a continuing security interest in, and lien on, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, instruments, deposit accounts, investment property (each, as defined in the UCC), and any and all other property of any type or nature owned by it, including but not limited to (a) the Collateral Investments and any Equity Securities and other securities or obligations owned or acquired by the Zohar Subsidiary on the Funding Date, which the Zohar Subsidiary (or the Collateral Manager on the Zohar Subsidiary's behalf) causes to be delivered to the Trustee (directly or through a Securities Intermediary or bailee), all payments thereon or with respect thereto and all Collateral Investments and Equity Securities and other securities or obligations owned or acquired from time to time by the Zohar Subsidiary (including, without limitation, Exchanged Securities) that are delivered to the Trustee (directly or through a Securities Intermediary or bailee) after the Funding Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Custodial Account, the Zohar Subsidiary Principal Collection Account, the Zohar Subsidiary Interest Collection Account and Eligible Investments purchased with funds on deposit in said accounts and all income from the investment of funds therein, (c) the Management Agreement, (d) all Cash and Money delivered to the Trustee (directly or through a Securities Intermediary or bailee) and (e) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Zohar Subsidiary described in the preceding clauses.

Such Grants by the Issuer and the Zohar Subsidiary are made, however, to the Trustee to hold in trust, to secure (i) the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, (ii) the payment of all amounts due on the Notes in accordance with their terms, (iii) the payment by the Issuer of all amounts payable under the Hedge Agreements, (iv) the payment of all other amounts payable under this Indenture, and (v) compliance by each of the Zohar Obligors with the provisions of this Indenture, the Management Agreement, the Collateral Administration Agreement and the Hedge Agreements, all as provided in this Indenture, the Management Agreement, the Collateral Administration Agreement and the Hedge Agreements (collectively, the "Secured Obligations"). Except to the extent otherwise provided in this Indenture, the Issuer and the Zohar Subsidiary do hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer and the Zohar Subsidiary, respectively, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer and the Zohar Subsidiary with respect to the Collateral held for the benefit

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001755

- 3 -

and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all Monies and claims for Monies due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any Proceedings which the Trustee may deem to be necessary or advisable in the premises. The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power. This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

Each Secured Party hereby acknowledges and agrees that its rights as a Secured Party under this Indenture shall be subject to and in accordance with the Priority of Payments.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer and the Zohar Subsidiary shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer or the Zohar Subsidiary under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein to the best of its ability such that the interests of the Secured Parties may be adequately and effectively protected.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001756

- 4 -

## ARTICLE 1

### DEFINITIONS

Section 1.1.    Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

"Acceptable Class B Rating": The meaning specified in Section 7.13(b)(1).

"Account": Any of the Payment Account, the Issuer Interest Collection Account, the Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Principal Collection Account, the Class A-1R Holder Collateral Account, the Expense Account, the Closing Expense Account, the Professional Fee Account, the Unfunded Revolver Discount Account, the Class A-1R Future Funding Reserve Account, the Rollover Proceeds Account, the Custodial Account, any Hedge Counterparty Collateral Account and any Foreign Currency Account.

"Accountants' Report": A report of Anchin, Block & Anchin LLP or another firm of Independent certified public accountants of recognized national reputation appointed by the Issuer pursuant to Section 10.12(a), which may be the firm of independent accountants that reviews or performs procedures with respect to the financial reports prepared by the Issuer or the Collateral Manager.

"Act" and "Acts of Noteholders": The meanings specified in Section 17.2.

"Additional Amounts": The meaning specified in the Class A-1R Note Purchase Agreement.

"Additional Class B Note Issuance Date": The meaning specified in Section 2.10.

"Additional Class B Notes": The meaning specified in Section 2.10.

"Adequate Market Value Collateral Investment": The meaning specified in Section 9.1(b)(ii)(C).

"Administration Agreement": The Administration Agreement dated September 16, 2005 between the Administrator and the Issuer, as modified and supplemented and in effect from time to time.

"Administrative Expenses": Amounts (including indemnities) due or accrued with respect to any Payment Date and payable by any Zohar Obligor to (a) the Trustee pursuant to Section 6.8 or any co-trustee appointed pursuant to Section 6.13; (b) the Collateral Administrator under the Collateral Administration Agreement; (c) the Administrator under the Administration Agreement; (d) the Preference Share Paying Agent and the Preference Share Registrar under the Preference Share Paying Agency Agreement, (e) the Independent accountants, agents and counsel of any Zohar Obligor for fees and expenses; (f) the Rating Agencies for fees and expenses in connection with any rating of the Notes, including fees and expenses due or accrued in connection with any rating of the Collateral Investments

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001757

and any ongoing surveillance fees, credit estimates and expenses; (g) the Collateral Manager under this Indenture and/or the Management Agreement (including, without limitation, amounts payable pursuant to Section 4.2 of the Management Agreement); (h) any other Person for fees and expenses in connection with any loan pricing services provided to the Issuer and/or the Zohar Subsidiary by such Person, (i) any other Person in respect of any governmental filing or registration fee, charge or tax in relation to any Zohar Obligor; and (j) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture and the Notes; provided that Administrative Expenses shall not include (i) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date or Funding Date, (ii) the Collateral Management Fee, (iii) any principal of or interest on any Notes or any Class A-1R Commitment Fee or Class A-1D Commitment Fee or (iv) any amount owing under any Hedge Agreement.

"Administrator": Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands, and any successor thereto.

"Affiliate" or "Affiliated": With respect to a Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, Officer, employee, member or general partner of (i) such Person or (ii) any such other Person described in clause (a) above, provided that:

(1) (A) any Holder of a Preference Share or Note or (B) any company to which the Administrator acts as share trustee or administrator or provides directors or other services shall not in any such case be an Affiliate of the Issuer solely by reason of such Person holding a Preference Share or Note or having the Administrator act as share trustee or administrator or provide directors or other services for such Person; and

(2) no Obligor shall be deemed to be an Affiliate of any other Obligor solely by reason of Patriarch Partners' (or one or more of its Affiliates') ownership, whether directly or indirectly, of any voting securities of any such Obligor or Obligors.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent Members": Members of, or participants in, the Depository.

"Aggregate Industry Equivalent Unit Score": With respect to each Moody's Industry Classification Group, the sum of the Equivalent Unit Scores for each issuer of a Collateral Investment in such Moody's Industry Classification Group.

"Aggregate Outstanding Amount": When used with respect to any of the Notes at any time, the aggregate principal amount of such Notes Outstanding at such time (in each case excluding any unutilized commitments).

"Aggregate Participation Exposure" The Principal Balance of all Collateral Investments that are in the form of Participation Interests.

"Aggregate Principal Balance": When used with respect to any Pledged Obligations, the sum of the Principal Balances of all such Pledged Obligations.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                   PP001758

"Aggregate Undrawn Amount": At any time:

(a)    with respect to the Class A-1R Notes, the excess (if any) of (i) the aggregate amount of the Class A-1R Commitments (whether or not utilized) at such time over (ii) the Aggregate Outstanding Amount of the Class A-1R Notes at such time; and

(b)    with respect to the Class A-1D Notes, the excess (if any) of (i) the aggregate amount of the Class A-1D Commitments (whether or not utilized) at such time over (ii) the Aggregate Outstanding Amount of the Class A-1D Notes at such time.

"Approved Loan Pricing Service": Any: (a) Person set forth on Schedule E; or (b) dealer in the relevant market Independent of the Collateral Manager and approved by Standard & Poor's and Moody's.

"Approved Replacement": Any replacement for an individual who is (a) a director, officer or management-level employee of the Collateral Manager and (b) actively involved in the management of the Collateral Investments.

"Ark Seller": Ark II CLO 2001-1, Limited.

"Arranger": IXIS Capital Markets North America Inc.

"Asset-backed Security": A security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into Cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the security holders; provided that a security primarily serviced by the cash flows of a discrete pool of receivables or other financial assets of a single operating company and its Affiliates shall not constitute an "Asset-backed Security" hereunder.

"Assigned Moody's Rating": The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"Assumed Reinvestment Rate": With respect to any Account or fund securing the Notes, as at any date, a rate per annum equal to (a) LIBOR (calculated according to Schedule B for a three-month Interest Period and assuming such date is a LIBOR Determination Date) minus (b) 1.00%.

"Authenticating Agent": With respect to the Notes or any Class of the Notes, the Person designated by the Trustee, if any, to authenticate such Notes on behalf of the Trustee pursuant to Section 6.4.

"Authorized Officer": With respect to any Zohar Obligor, any Officer who is authorized to act for such Zohar Obligor in matters relating to, and binding upon, such Zohar Obligor. With respect to the Collateral Manager, any Officer, employee, manager or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect and such Person may be considered to be an "Authorized Officer" until receipt by such other party of written notice to the contrary.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                            PP001759

"Average Par Amount":  At any time, the sum of the Issuer Par Amounts at such time of the Collateral Investments divided by the sum of the number of issuers of the Collateral Investments; provided that, for purposes of calculating the number of issuers of the Collateral Investments, any issuers Affiliated with one another will be considered one issuer.

"Balance":  At any time, with respect to Cash or Eligible Investments in any Account at such time, the aggregate of the (a) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (b) principal amount of interest-bearing corporate and government securities, money market accounts, repurchase obligations and Reinvestment Agreements; and (c) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank":  LaSalle Bank National Association, a national banking association organized and existing under the laws of the United States, in its individual capacity and not as Trustee or Preference Share Paying Agent.

"Bankruptcy Code":  The United States Bankruptcy Code, Title 11 of the United States Code, as amended.

"Base Rate":  The meaning specified in Schedule B.

"Base Rate Reference Bank":  The meaning specified in Schedule B.

"Bearer Form":  When used with respect to a Certificated Security, a form in which the Security is payable to the bearer of the Security Certificate according to its terms but not by reason of an Indorsement.

"Board of Directors":  With respect to the Issuer, the directors of the Issuer duly appointed in accordance with the Issuer Charter; with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the shareholders of the Co-Issuer; and with respect to the Zohar Subsidiary, the sole member of the Zohar Subsidiary specified in the Zohar Subsidiary Operating Agreement.

"Board Resolution":  With respect to any Zohar Obligor, a resolution of the Board of Directors of such Zohar Obligor, as the case may be.

"Bond":  A debt security (that is not a loan) that is issued by a corporation, limited liability company, partnership, trust or other legal entity.

"Borrowing":  The meaning specified in Section 9.6(a).

"Borrowing Date":  The meaning specified in Section 9.6(a).

"Business Day":  A day on which commercial banks and foreign exchange markets settle payments in each of (a) New York City, (b) Chicago, Illinois, (c) any other city in which the Corporate Trust Office is located, (d) in the case of the final payment of principal of any Note, the place of presentation of such Note and (e) in any case where action is required on the part of the Issuer, the Cayman Islands.

"Calculation Agent":  The meaning specified in Section 7.14(a).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001760

- 8 -

"Case": The meaning specified in Section 7.13(a).

"Cash": Such coin or currency of the United States as at the time shall be legal tender for payment of all public and private debts.

"Cash Retention Amount": For any Payment Date, an amount specified by the Collateral Manager by Issuer Order delivered on or before the related Determination Date to the Trustee to be maintained in the Issuer Principal Collection Account, not in excess of U.S.$5,000,000; provided that (i) on any Payment Date following the date upon which an Event of Default (and the acceleration of the Notes as a result thereof) has occurred and is continuing, (ii) on any Payment Date relating to the Stated Maturity of any Note or (iii) on any Redemption Date, the Cash Retention Amount shall be zero.

"Certificate of Authentication": The meaning specified in Section 2.3(f).

"Certificated Note": A Note in certificated form.

"Certificated Security": A Security that is represented by a certificate.

"Chattel Paper": The meaning specified in Section 9-102(a)(11) of the UCC.

"Class": Any of the Class A-1R Notes, the Class A-1T Notes, the Class A-1D Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes (provided that, unless the context otherwise expressly requires, the Class A-1 Notes shall be deemed to constitute a single Class of Notes for all purposes of this Indenture).

"Class A Coverage Tests": Collectively, the Class A Overcollateralization Ratio Test and the Class A Interest Coverage Ratio Test.

"Class A Interest Coverage Ratio": As of any Measurement Date, the ratio (expressed as a percentage) calculated by dividing:

(a)    the sum (not less than zero) (without duplication) of:

(i)    the Scheduled Distributions of interest to be received by the Issuer and/or the Zohar Subsidiary on the Collateral Investments in the Due Period in which such Measurement Date occurs, regardless of whether the due date for any such interest payment has yet occurred (determined assuming that LIBOR, or such other rate basis applicable to the relevant Collateral Investment, remains constant throughout such Due Period, but exclusive of (A) interest accrued on Collateral Investments to the date of acquisition thereof by the Issuer and/or the Zohar Subsidiary and purchased with Principal Proceeds or Uninvested Proceeds, (B) amounts accrued and unpaid in respect of Non-Performing Collateral Investments and Non-Current Collateral Investments (without duplication) and (C) the amount of any payments that the Collateral Manager believes with reasonable certainty (which belief shall be communicated to the Trustee in writing prior to such Measurement Date) will not be made in Cash in the Due Period in which such Measurement Date occurs); plus

(ii)    the Scheduled Distributions of interest on Eligible Investments held in the Accounts (other than the Class A-1R Holder Collateral Account and the Hedge Counterparty Collateral Account) that constitute Interest Proceeds to be received by the Issuer and/or the Zohar Subsidiary during such Due Period; plus

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                              PP001761

(iii)    the Scheduled Distributions of commitment fees and other fees to be received by the Issuer and/or the Zohar Subsidiary during such Due Period in respect of Collateral Investments that constitute Interest Proceeds; plus

(iv)    if the Issuer has entered into a Hedge Agreement, the amount, if any, payable to the Issuer by the Hedge Counterparty under such Hedge Agreement on the Payment Date relating to such Due Period (other than any Hedge Termination Amount); plus

(v)    any other amounts actually received by the Issuer and/or the Zohar Subsidiary during such Due Period that constitute Interest Proceeds; minus

(vi)    the sum of all amounts payable pursuant to paragraphs (A) through (E) of Section 11.1(a)(i) on the Payment Date immediately following such Due Period (other than any Hedge Termination Amount); by

(b)    the sum of the scheduled (i) Class A-1 Interest Distribution Amount (excluding any Defaulted Interest with respect thereto and interest thereon); plus (ii) Class A-1R Commitment Fee Amount; plus (iii) Class A-1D Commitment Fee Amount; plus (iv) Class A-2 Interest Distribution Amount, plus (v) Class A-3 Interest Distribution Amount, in each case for the Payment Date relating to such Due Period.

For purposes of calculating clause (a) above, Scheduled Distributions in the case of Collateral Investments that bear interest at a rate that decreases solely as a function of the passage of time shall be calculated assuming the lowest rate of interest that such Collateral Investments may now or in the future bear interest at.

"Class A Interest Coverage Ratio Test":  For so long as any Class A Notes are Outstanding or the Class A-1R Commitments or the Class A-1D Commitments shall not have expired, terminated or been reduced to zero, a test satisfied on any Measurement Date if the Class A Interest Coverage Ratio on such Measurement Date is equal to or greater than 110%; provided that compliance with the Class A Interest Coverage Ratio Test shall only be required on any Measurement Date on or after the Ramp Up End Date.

"Class A Note Certificate":  A certificate substantially in the form of Exhibit B-1.

"Class A Note Reduction Amount":  The meaning specified in Section 11.1(a)(i)(H).

"Class A Notes":  Collectively, the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes.

"Class A Overcollateralization Ratio":  As of any Measurement Date, the number (expressed as a percentage) calculated by dividing:

(a)    the sum of (1) the Net Portfolio Collateral Balance as of such Measurement Date plus (2) the Balance on deposit in the Rollover Proceeds Account on such Measurement Date; by

(b)    the sum of (1) the Aggregate Outstanding Amount of the Class A Notes as of such Measurement Date; plus (2) the Net Aggregate Exposure Amount as of such Measurement Date;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001762

provided that, for the avoidance of doubt, any amounts that (i) are on deposit in the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account as of such Measurement Date and (ii) will be applied to purchase or originate any Collateral Investment that the Issuer and/or Zohar Subsidiary have committed to purchase or originate (but which purchases or originations have not yet settled) as of such Measurement Date, shall be excluded in determining the Class A Overcollateralization Ratio.

"Class A Overcollateralization Ratio Test":  For so long as any Class A Notes are Outstanding or the Class A-1R Commitments or the Class A-1D Commitments shall not have expired, terminated or been reduced to zero, a test satisfied on any Measurement Date if the Class A Overcollateralization Ratio on such Measurement Date is equal to or greater than the Class A Overcollateralization Ratio Test Level; provided that compliance with the Class A Overcollateralization Ratio Test shall only be required on any Measurement Date on or after the Ramp Up End Date.

"Class A Overcollateralization Ratio Test Level":  112.7%.

"Class A Redemption Break Funding Costs":  The Class A-1R Redemption Break Funding Costs, Class A-1T Redemption Break Funding Costs, Class A-1D Redemption Break Funding Costs, Class A-2 Redemption Break Funding Costs and Class A-3 Redemption Break Funding Costs.

"Class A-1 Break-Even Loss Rate":  At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined through application of the Standard & Poor's CDO Monitor, which, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, shall result in sufficient funds remaining for the payment of the Class A-1 Notes in full by their Stated Maturity and the timely payment of interest, the Class A-1R Commitment Fee and the Class A-1D Commitment Fee.

"Class A-1 Interest Distribution Amount":  Collectively, the Class A-1R Interest Distribution Amount, the Class A-1T Interest Distribution Amount and the Class A-1D Interest Distribution Amount.

"Class A-1 Loss Differential":  At any time, the rate calculated by subtracting the Class A-1 Scenario Loss Rate at such time from the Class A-1 Break-Even Loss Rate at such time.

"Class A-1 Notes":  Collectively, the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes.

"Class A-1 Pro Rata Adjustment Advance":  The meaning specified in Section 9.6(e).

"Class A-1 Scenario Loss Rate":  As of any Measurement Date, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class A-1 Notes by Standard & Poor's, determined by the Issuer through application of the Standard & Poor's CDO Monitor at such time.

"Class A-1D Applicable Margin":  0.38%.

"Class A-1D Commitment":  At any time in respect of any Class A-1D Note, the maximum aggregate outstanding principal amount of advances (whether at the time funded or unfunded) that the Issuer may from time to time request be made by the Holder of such Class A-1D Note under the Class A-1D Note Purchase Agreement.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001763

"Class A-1D Commitment Fee": With respect to the Class A-1D Notes, a commitment fee calculated by the Class A-1D Note Agent in accordance with Section 2.2(c)(iii).

"Class A-1D Commitment Fee Amount": With respect to the Class A-1D Notes for each Due Period, the Class A-1D Commitment Fee (as calculated by the Class A-1D Note Agent) accrued for each day from and including the first day of such Due Period to and including the last day of such Due Period.

"Class A-1D Commitment Fee Rate": A rate per annum equal to 0.25%.

"Class A-1D Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for each Interest Period with respect to the Class A-1D Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-1D Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-1D Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-1D Notes and accrued interest thereon at the Class A-1D Note Interest Rate; plus (c) any Class A-1D Redemption Break Funding Costs.

"Class A-1D Note Agent": Natixis Financial Products Inc., solely in its capacity as agent for the Holders of the Class A-1D Notes hereunder, unless a successor Person shall have become the Class A-1D Note Agent pursuant to the applicable provisions of this Indenture, and thereafter "Class A-1D Note Agent" shall mean such successor Person.

"Class A-1D Note Interest Rate": For any Interest Period with respect to the Class A-1D Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A-1D Applicable Margin.

"Class A-1D Note Purchase Agreement": The Note Purchase Agreement dated as of the Closing Date entered into among the Issuer, the Co-Issuer, the Collateral Manager, the Class A-1D Note Agent, the Trustee and certain other parties, and the beneficial owners from time to time of the Class A-1D Notes, as modified and supplemented and in effect from time to time.

"Class A-1D Note Register": The meaning specified in Section 2.4(k).

"Class A-1D Notes": The floating rate senior secured delayed drawdown Notes designated as "Class A-1D Notes" and having the Class A-1D Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-1D Principal Sharing Percentage": At any time, the ratio (expressed as a percentage) of:

(a) the Aggregate Outstanding Amount of the Class A-1D Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1D Notes at such time; to

(b) the Aggregate Outstanding Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1R Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1D Notes at such time.

"Class A-1D Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-1D Note during the remainder of such Interest Period if such

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001764

redemption had not occurred <u>over</u> (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-1D Note from investing the Aggregate Outstanding Amount of such Class A-1D Note to be redeemed <u>plus</u> the accrued interest on the Aggregate Outstanding Amount of such Class A-1D Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"<u>Class A-1R Adjusted Exposure</u>": The meaning specified in Section 9.6(e).

"<u>Class A-1R Applicable Margin</u>": 0.40%.

"<u>Class A-1R Available Amount</u>": The meaning specified in Section 9.6(e).

"<u>Class A-1R Collateral Arrangement</u>": The meaning specified in the Class A-1 R Note Purchase Agreements.

"<u>Class A-1R Commitment</u>": At any time in respect of any Class A-1R Note, the maximum aggregate outstanding principal amount of advances (whether at the time funded or unfunded) that the Issuer may from time to time request be made by the Holder of such Class A-1R Note under the Class A-1R Note Purchase Agreement.

"<u>Class A-1R Commitment Fee</u>": With respect to the Class A-1R Notes, a commitment fee calculated by the Class A-1R Note Agent in accordance with Section 2.2(c)(ii).

"<u>Class A-1R Commitment Fee Amount</u>": With respect to the Class A-1R Notes for each Due Period, the Class A-1R Commitment Fee (as calculated by the Class A-1R Note Agent pursuant to the Class A-1R Note Purchase Agreement) accrued for each day from and including the first day of such Due Period to and including the last day of such Due Period.

"<u>Class A-1R Commitment Fee Rate</u>": A rate per annum equal to 0.25%.

"<u>Class A-1R Final Advance</u>": The meaning specified in Section 9.6(e).

"<u>Class A-1R Future Funding Reserve Account</u>": The trust account designated the "Class A-1R Future Funding Reserve Account" and established in the name of the Trustee pursuant to Section 10.4(a).

"<u>Class A-1R Holder Collateral Account</u>": A trust account designated a "Class A-1R Holder Collateral Account" and established in the name of the Trustee pursuant to Section 10.5(a).

"<u>Class A-1R Holder Collateral Account Permitted Investments</u>": Eligible Investments meeting the criteria in clause (a), (b) or (c) of the definition thereof having a Stated Maturity on the day following the date of acquisition thereof.

"<u>Class A-1R Interest Distribution Amount</u>": With respect to any Payment Date, the sum of (a) for each Interest Period with respect to the Class A-1R Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-1R Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-1R Notes having such Interest Period; <u>plus</u> (b) any accrued Defaulted Interest in respect of the Class A-1R Notes and accrued interest thereon at the Class A-1R Note Interest Rate; <u>plus</u> (c) any Class A-1R Redemption Break Funding Costs.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001765

"Class A-1R Note Agent": Natixis Financial Products Inc., solely in its capacity as agent for the Holders of the Class A-1R Notes hereunder, unless a successor Person shall have become the Class A-1R Note Agent pursuant to the applicable provisions of this Indenture, and thereafter "Class A-1R Note Agent" shall mean such successor Person.

"Class A-1R Note Agent Fee": The fee payable to the Class A-1R Note Agent on each Payment Date (so long as the Class A-1R Notes are Outstanding or the Class A-1R Commitments shall not have not expired, terminated or been reduced to zero) pursuant to Section 16.3(a)(i), in an aggregate amount equal to U.S.$15,000; provided that the Class A-1R Note Agent Fee will be payable on each Payment Date only to the extent that funds are available for such purpose in accordance with the Priority of Payments.

"Class A-1R Note Interest Rate": For any Interest Period with respect to the Class A-1R Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A-1R Applicable Margin, provided that, with respect to any Short Settlement Borrowing under a Class A-1R Note, the Class A-1R Note Interest Rate will, for the period from and including the date of such Borrowing to but excluding the date three Business Days thereafter, be equal to the Base Rate.

"Class A-1R Note Purchase Agreement": The Note Purchase Agreement dated as of the Closing Date entered into among the Issuer, the Co-Issuer, the Class A-1R Note Agent, the Collateral Manager, the Trustee, the Swingline Lender and certain other parties, and the beneficial owners from time to time of the Class A-1R Notes, as modified and supplemented and in effect from time to time.

"Class A-1R Note Register": The meaning specified in Section 2.4(j).

"Class A-1R Notes": The floating rate senior secured revolving Notes designated as "Class A-1R Notes" and having the Class A-1R Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-1R Principal Sharing Percentage": At any time, the ratio (expressed as a percentage) of:

(a) the Aggregate Outstanding Amount of the Class A-1R Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1R Notes at such time; to

(b) the Aggregate Outstanding Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1R Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1D Notes at such time.

"Class A-1R Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-1R Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-1R Note from investing the Aggregate Outstanding Amount of such Class A-1R Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-1R Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class A-1T Applicable Margin": 0.38%.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001766

"Class A-1T Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for each Interest Period with respect to the Class A-1T Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-1T Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-1T Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-1T Notes and accrued interest thereon at the Class A-1T Note Interest Rate; plus (c) any Class A-1T Redemption Break Funding Costs.

"Class A-1T Note Interest Rate": For any Interest Period with respect to the Class A-1T Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A-1T Applicable Margin.

"Class A-1T Notes": The floating rate senior secured term Notes designated as "Class A-1T Notes" and having the Class A-1T Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-1T Principal Sharing Percentage": At any time, the ratio (expressed as a percentage) of:

(a) the Aggregate Outstanding Amount of the Class A-1T Notes at such time; to

(b) the Aggregate Outstanding Amount of the Class A-1 Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1R Notes at such time, plus the Aggregate Undrawn Amount of the Class A-1D Notes at such time.

"Class A-1T Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-1T Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-1T Note from investing the Aggregate Outstanding Amount of such Class A-1T Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-1T Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class A-2 Applicable Margin": 0.55%.

"Class A-2 Break-Even Loss Rate": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined through application of the Standard & Poor's CDO Monitor, which, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, shall result in sufficient funds remaining for the payment of the Class A-2 Notes in full by their Stated Maturity and the timely payment of interest.

"Class A-2 Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for the Interest Period with respect to the Class A-2 Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-2 Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-2 Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-2 Notes and accrued interest thereon at the Class A-2 Note Interest Rate; plus (c) any Class A-2 Redemption Break Funding Costs.

"Class A-2 Loss Differential": At any time, the rate calculated by subtracting the Class A-2 Scenario Loss Rate at such time from the Class A-2 Break-Even Loss Rate at such time.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001767

"Class A-2 Note Interest Rate": For any Interest Period with respect to the Class A-2 Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A-2 Applicable Margin.

"Class A-2 Notes": The floating rate second priority senior secured term Notes designated as "Class A-2 Notes" and having the Class A-2 Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-2 Scenario Loss Rate": As of any Measurement Date, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class A-2 Notes by Standard & Poor's, determined by the Issuer through application of the Standard & Poor's CDO Monitor at such time.

"Class A-2 Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-2 Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-2 Note from investing the Aggregate Outstanding Amount of such Class A-2 Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-2 Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class A-3 Applicable Margin": 0.75%.

"Class A-3 Break-Even Loss Rate": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined through application of the Standard & Poor's CDO Monitor, which, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, shall result in sufficient funds remaining for the payment of the Class A-3 Notes in full by their Stated Maturity and the timely payment of interest.

"Class A-3 Interest Distribution Amount": With respect to any Payment Date, the sum of (a) for the Interest Period with respect to the Class A-3 Notes ending on the day immediately preceding such Payment Date, the aggregate amount of interest accrued at the Class A-3 Note Interest Rate for such Interest Period on the Aggregate Outstanding Amount of the Class A-3 Notes having such Interest Period; plus (b) any accrued Defaulted Interest in respect of the Class A-3 Notes and accrued interest thereon at the Class A-3 Note Interest Rate; plus (c) any Class A-3 Redemption Break Funding Costs.

"Class A-3 Loss Differential": At any time, the rate calculated by subtracting the Class A-3 Scenario Loss Rate at such time from the Class A-3 Break-Even Loss Rate at such time.

"Class A-3 Note Interest Rate": For any Interest Period with respect to the Class A-3 Notes, a rate per annum equal to LIBOR for such Interest Period plus the Class A-3 Applicable Margin.

"Class A-3 Notes": The floating rate third priority senior secured term Notes designated as "Class A-3 Notes" and having the Class A-3 Note Interest Rate and the Stated Maturity set forth in Section 2.2.

"Class A-3 Scenario Loss Rate": As of any Measurement Date, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AA" rating of the Class A-3 Notes by Standard & Poor's, determined by the Issuer through application of the Standard & Poor's CDO Monitor at such time.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001768

"Class A-3 Redemption Break Funding Costs": In connection with a redemption of the Notes pursuant to Section 9.1 on a date other than a Payment Date, the excess, if any, of (a) the interest that would have accrued on the Class A-3 Note during the remainder of such Interest Period if such redemption had not occurred over (b) the sum of the income, if any, scheduled to be received by a Holder of a Class A-3 Note from investing the Aggregate Outstanding Amount of such Class A-3 Note to be redeemed plus the accrued interest on the Aggregate Outstanding Amount of such Class A-3 Note to be redeemed during the remainder of such Interest Period if such amounts were invested in Eligible Investments described in clause (c) of the definition thereof.

"Class B Break-Even Loss Rate": At any time after the Class B Rating Date, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined through application of the Standard & Poor's CDO Monitor, which after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, shall result in sufficient funds remaining for the ultimate payment in full of the principal of the Class B Notes by their Stated Maturity.

"Class B Loss Differential": At any time after the Class B Rating Date, the rate calculated by subtracting the Class B Scenario Loss Rate at such time from the Class B Break-Even Loss Rate at such time.

"Class B Note Certificate": A certificate substantially in the form of Exhibit B-8.

"Class B Notes": The zero coupon fourth priority secured Notes designated as "Class B Notes" and having the principal amount and Stated Maturity set forth in Section 2.2, together with the additional Class B Notes (if any) issued from time to time after the Funding Date in accordance with Section 2.10 of this Indenture. Notwithstanding anything to the contrary contained in this Indenture or the other Transaction Documents, the Issuer shall be the sole obligor on or in respect of the Class B Notes, and the Co-Issuer shall not have any obligations in respect thereof. In the event of a Rating Failure in respect of the Class B Notes as provided in Section 7.13(b), all or any portion the Class B Notes may be converted into Class C Notes in the manner and to the extent provided therein.

"Class B Rating Date": The date (if any) that the Class B Notes receive an Acceptable Class B Rating pursuant to Section 7.13(b).

"Class B Reduction Amount": The meaning specified in Section 7.13(b)(4)(A).

"Class B Scenario Loss Rate": As of any Measurement Date after the Class B Rating Date, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with an "BBB-" rating of the Class B Notes by Standard & Poor's, determined by the Issuer through application of the Standard & Poor's CDO Monitor at such time.

"Class C Note Certificate": A certificate substantially in the form of Exhibit B-9.

"Class C Notes": The zero coupon fifth priority secured Notes designated as "Class C Notes" and having the Stated Maturity set forth in Section 2.2. Notwithstanding anything to the contrary contained in this Indenture or the other Transaction Documents, the Issuer shall be the sole obligor on or in respect of the Class C Notes, and the Co-Issuer shall not have any obligations in respect thereof.

"Clearing Agency": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001769

"Clearing Corporation": The meaning specified in Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security": A Security that is a Financial Asset that is (a) in bearer form or endorsed in blank or (b) registered in the name of a Clearing Corporation or the nominee of such Clearing Corporation and, if a Certificated Security, is held in the custody of such Clearing Corporation.

"Clearstream": Clearstream International *société anonyme*, a corporation organized under the laws of the Grand Duchy of Luxembourg, or any of its applicable subsidiaries.

"Closing Date": April 6, 2007.

"Closing Expense Account": The trust account designated the "Closing Expense Account" and established in the name of the Trustee pursuant to Section 10.6(c).

"Closing Expenses": The meaning specified in Section 10.6(c).

"Code": The U.S. Internal Revenue Code of 1986, as amended.

"Co-Issuer": Zohar III, Corp., a corporation organized under the laws of the State of Delaware, unless a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers": The Issuer and the Co-Issuer.

"Collateral": All Money, instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts, investment property and other property and rights subject or intended to be subject to the lien of this Indenture for the benefit of the Secured Parties as of any particular time pursuant to the Granting Clauses of this Indenture.

"Collateral Administration Agreement": The Collateral Administration Agreement dated as of the Closing Date by and among the Issuer, the Collateral Manager and the Collateral Administrator relating to certain functions performed by the Collateral Administrator for the Issuer and the Collateral Manager with respect to this Indenture and the Collateral, as amended from time to time.

"Collateral Administrator": The Bank, solely in its capacity as collateral administrator under the Collateral Administration Agreement, unless a successor Person shall have become the Collateral Administrator pursuant to the applicable provisions thereof, and thereafter "Collateral Administrator" shall mean such successor Person.

"Collateral Assignment of Hedge Agreement": Each Collateral Assignment of Hedge Agreement, dated the date that the Issuer enters into any Hedge Agreement, among the Issuer, the Trustee and the relevant Hedge Counterparty.

"Collateral Hedge Event": With respect to any Hedge Agreement, the failure of the relevant Hedge Counterparty (or any Person that shall have absolutely and unconditionally guaranteed the obligations of such Hedge Counterparty under such Hedge Agreement) to have a long-term debt rating or issuer rating of at least "Aa2" by Moody's or at least "AA-" by Standard & Poor's or a short-term debt rating of "A-1" by Standard & Poor's and the failure of such Hedge Counterparty at its own expense:

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001770

(a)    within 30 days of such ratings downgrade, to transfer all of its rights and obligations under such Hedge Agreement to a third party that has (i) a long-term debt rating or issuer rating at least "Aa2" by Moody's and (ii) a long-term debt rating or issuer rating at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's;

(b)    within 30 days of such ratings downgrade, to cause a Person that has (i) a long-term debt rating or issuer rating at least "Aa2" by Moody's and (ii) a long-term debt rating or issuer rating at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's, to guarantee absolutely and unconditionally the obligations of such Hedge Counterparty under such Hedge Agreement; or

(c)    within 10 days of such ratings downgrade, to provide Hedge Counterparty Credit Support which:

(i)    requires collateral to be delivered in an amount sufficient to maintain the ratings given to the Class A Notes and (if then rated) the Class B Notes on the Funding Date;

(ii)    requires such Hedge Counterparty to mark-to-market on a weekly basis and post additional collateral as necessary;

(iii)    requires all costs relating to the posting of additional collateral and implementing the mark-to-market procedures to be borne by such Hedge Counterparty; and

(iv)    is accompanied by an enforceability opinion regarding the pledge of the collateral under the Hedge Counterparty Credit Support, including an opinion regarding the enforceability of such pledge in the event of such Hedge Counterparty's bankruptcy.

"Collateral Investment": The following:

(a)    an outstanding loan or obligation that on the date of initial acquisition or origination thereof by the Issuer or the Zohar Subsidiary is either a Senior Secured Collateral Investment or a Second Lien Collateral Investment (including in each case term loans, Revolving Collateral Investments or Delayed Funding Collateral Investments and including, without limitation, DIP Loans);

(b)    the loans and other obligations owned by the Issuer or the Zohar Subsidiary on the Funding Date and set forth on Schedule A-1 attached hereto and the loans and other obligations acquired by the Issuer that are set forth on Schedule A-2 attached hereto;

(c)    any Participation Interest in any of the foregoing; and

(d)    Exchanged Securities received for any Collateral Investment (in an aggregate par amount up to but not exceeding the par amount of such Collateral Investment) or by application of amounts on deposit in the Rollover Proceeds Account to the extent that such amounts represented the proceeds of a Collateral Investment when originally deposited in the Rollover Proceeds Account,

in each case as the same may be amended, modified, supplemented and in effect from time to time. For the avoidance of doubt, the Issuer and/or the Zohar Subsidiary may be an original lender on a Collateral

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001771

Investment or be a closing date participant (pursuant to clause (c) of this definition) in such loan or security.

"Collateral Management Fee":  Collectively, the Senior Collateral Management Fee and the Subordinated Collateral Management Fee.

"Collateral Manager":  Patriarch Partners, unless another successor Person shall have become the collateral manager pursuant to the provisions of the Management Agreement, and thereafter "Collateral Manager" shall mean such successor Person.

"Collateral Quality Tests:  Collectively, the Diversity Test, the Moody's Weighted Average Rating Factor Test, the Minimum Average Recovery Rate Test, the Standard & Poor's CDO Monitor Test, the Weighted Average Life Test and the Weighted Average Spread Test.

"Collection Accounts":  Collectively, the Issuer Interest Collection Account, the Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account.

"Commitment Amount":  With respect to any Revolving Collateral Investment or Delayed Funding Collateral Investment, the maximum aggregate outstanding principal amount (whether at the time funded or unfunded) of advances or other extensions of credit at any one time outstanding that the Issuer or the Zohar Subsidiary, as applicable, could be required to make to the borrower under the Underlying Instruments relating thereto.

"Commitment Limit":  The meaning specified in the applicable Note Purchase Agreement.

"Commitment Reduction":  With respect to any Revolving Collateral Investment or Delayed Funding Collateral Investment, a permanent reduction (whether scheduled, mandatory, optional or otherwise) in the related Commitment Amount.

"Commitment Shortfall":  As of any date, the amount (not less than zero) by which (a) the Unfunded Portfolio Amount on such date exceeds (b) the Funding Source Amount on such date.

"Competitor":  Any Person who engages in a primary business activity of, or a significant business activity of which includes, corporate, real estate, tranche b and/or asset-based lending and/or the purchase or sale of bank debt.

"Controlling Class":  (a) So long as the Class A-1 Notes are Outstanding or the Class A-1R Commitments or the Class A-1D Commitments have not expired, terminated or been reduced to zero, a Majority of the Class A-1 Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class A-1 Notes) (excluding the aggregate principal amount of any Class A-1 Notes held by the Collateral Manager and its Affiliates in making such calculation); (b) thereafter, so long as the Class A-2 Notes are Outstanding, a Majority of the Class A-2 Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class A-2 Notes) (excluding the aggregate principal amount of any Class A-2 Notes held by the Collateral Manager and its Affiliates in making such calculation); (c) thereafter, so long as the Class A-3 Notes are Outstanding, a Majority of the Class A-3 Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class A-3 Notes) (excluding the aggregate principal amount of any Class A-3 Notes held by the Collateral Manager and its Affiliates in making such calculation); (d) thereafter, so long as the Class B Notes are Outstanding, a Majority of the Class B Notes (or, in the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001772

case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class B Notes); (e) thereafter, so long as the Class C Notes are Outstanding, a Majority of the Class C Notes (or, in the case of Section 5.1(e), Holders of at least 25% of the Aggregate Outstanding Amount of the Class C Notes); and (f) thereafter, a Majority of the Preference Shares.

"Corporate Trust Office": The corporate trust office of the Trustee at which this Indenture is administered, currently having an address of 181 West Madison Street, 32nd Floor, Chicago, IL 60602, or such other address as the Trustee may designate from time to time by notice to the Noteholders, the Collateral Manager and the Issuer or the principal corporate trust office of any successor Trustee.

"Currency Hedge Agreement": A hedge agreement entered into between the Issuer and any Hedge Counterparty, as amended from time to time, in respect of a Collateral Investment denominated in Euros, under which the Issuer pays amounts in Euros and receives Dollars, as amended from time to time and any replacement hedge agreement entered into pursuant to Section 15.1. Each Currency Hedge Agreement shall fully cover the principal component of the related Euro-denominated Collateral Investment, the interest component thereof and the basis risk between such interest rate index and LIBOR. The interest component and basis risk shall be cancelable by the Issuer without cost at any time, and the principal component, the interest component and the basis risk shall be cancelled or reduced by the Issuer without cost upon such Collateral Investment becoming a Defaulted Investment.

"Current Collateral Investment": Any Collateral Investment that is not a Non-Current Collateral Investment.

"Current Pay Investment": (1) A Collateral Investment as to which (a) a bankruptcy, insolvency or receivership proceeding has been instituted with respect to the issuer or obligor thereof, (b) all interest and principal payments due (other than any principal payments due solely as a result of the commencement of a bankruptcy, insolvency, receivership or other analogous proceeding) were paid in Cash and the Collateral Manager reasonably expects that the remaining scheduled interest and principal payments due will be paid in Cash when due, (c) the Moody's Obligation Rating of such Collateral Investment is at least "Caa2" and such Collateral Investment is not on a watch list for possible downgrade, (d) the Market Value of such Collateral Investment is at least 85% of par, and (e) a bankruptcy court has authorized the payment of interest due and payable on such Collateral Investment; or (2) a Defaulted Investment that would not constitute a Defaulted Investment except for the provisions of clause (d) or (c) of the definition of such term and that satisfies the requirements of clauses (1)(b) and (1)(d) above; provided that to the extent that more than 10% of the Maximum Investment Amount would otherwise constitute Current Pay Investments, one or more Collateral Investments designated by the Issuer having an Aggregate Principal Balance at least equal to such excess shall be deemed not to constitute Current Pay Investments (and shall therefore constitute Defaulted Investments).

"Current Portfolio": The portfolio (measured by Principal Balance) of the Collateral Investments and Funding Availability existing immediately prior to the sale, maturity or other disposition of a Collateral Investment or immediately prior to the acquisition or origination of a Collateral Investment, as the case may be.

"Currently Applicable Row": The meaning specified in the definition of "Ratings Matrix".

"Custodial Account": A custodial account at the Custodian, established in the name of the Trustee pursuant to Section 10.2(j).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                         PP001773

"<u>Custodian</u>": The meaning specified in Section 3.3(a).

"<u>Default</u>": Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"<u>Defaulted Interest</u>": Any interest due and payable in respect of any Class A Note that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity and which remains unpaid.

"<u>Defaulted Investment</u>": Any Collateral Investment included in the Collateral (other than a Current Pay Investment):

(a)    (i) with respect to which a default as to the payment of principal and/or interest has occurred, but only so long as such default has not been cured, (ii) with respect to which the Collateral Manager has received written notice stating, or as to which the Collateral Manager believes, that (A) a default has occurred and is continuing with respect to such Collateral Investment that in the sole judgment of the Collateral Manager will likely result in a default as to the payment of principal and/or interest on such Collateral Investment or (B) a default as to the payment of principal and/or interest (beyond any applicable grace period) has occurred and is continuing on another obligation of the same issuer that is senior or <u>pari passu</u> in right of payment to such Collateral Investment (but in each case only so long as such default has not been cured or waived) or (iii) with respect to which the issuer thereof is the subject of a bankruptcy, insolvency, receivership or other analogous proceeding and such proceeding has not been stayed or dismissed;

(b)    that is a Defaulted Participation Obligation;

(c)    that is a Selling Institution Defaulted Participation;

(d)    that is rated "D" or "SD" by Standard & Poor's or had such rating before it was withdrawn and is not currently rated by Standard & Poor's;

(e)    that is rated "C" by Moody's; or

(f)    that is a PIK Loan.

"<u>Defaulted Participation Obligation</u>": A Participation Interest in a loan or other debt security that would, if such loan or other debt security were a Collateral Investment, constitute a "Defaulted Investment" under the definition of such term.

"<u>Delayed Funding Collateral Investment</u>": A Collateral Investment that is a loan pursuant to which one or more future advances may or will be required to be made to (or for the account of) the Obligor thereunder but which, once all such advances have been made, may not be reborrowed once repaid by such Obligor; <u>provided</u> that such loan shall only be considered to be a Delayed Funding Collateral Investments to the extent that the commitment of the Obligor thereunder has not terminated or irrevocably been reduced to zero.

"<u>Depository</u>" or "<u>DTC</u>": The Depository Trust Company, its nominees, and their respective successors.

"<u>Determination Date</u>": The last day of a Due Period.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001774

- 22 -

"DIP Loan":  Any interest in a loan or financing facility (a) which is an obligation of a debtor-in-possession pursuant to Section 364 of the Bankruptcy Code, (b) the terms of which have been approved by an order (including any interim order) of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code, (d) which, if such loan or financing facility by its terms provides for Cash interest to be paid on a current basis or provides for scheduled payments of principal, has paid its most recent interest and principal payments (if any) and the Collateral Manager reasonably expects that the loan or financing facility will continue to pay interest and principal and (e) which has a Standard & Poor's Rating that is not generated by the Standard & Poor's CreditModel.

"Discount Amount":  (i) For each Revolving Collateral Investment and Delayed Funding Collateral Investment held by the Issuer or the Zohar Subsidiary as of the Funding Date and set forth on Schedule A-1, the amount specified as such in a schedule provided to the Trustee by the Collateral Manager on the Funding Date and (ii) for any other Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment acquired or originated by the Issuer or the Zohar Subsidiary, as applicable, the amount specified as such in a notice provided to the Trustee by the Collateral Manager on or prior to the date of settlement which amount, in each case, is calculated as follows:  the Unfunded Amount of such Revolving Collateral Investment or Delayed Funding Collateral Investment on the date that the acquisition or origination of such Collateral Investment is settled upon multiplied by (a) one minus (b) the Original Purchase Price Percentage for such Revolving Collateral Investment or Delayed Funding Collateral Investment.

"Distribution":  Any payment of principal, interest or fee or any dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"Diversity Score":  With respect to the Collateral Investments, the sum of each of the Industry Diversity Scores.  For purposes of determining the Diversity Score, the Principal Balance of each Non-Performing Collateral Investment shall be deemed to be zero.  In determining the Diversity Score with respect to the Collateral Investments as of any date, including the date the Issuer or the Zohar Subsidiary entered into a commitment to purchase or originate any such Collateral Investment, at the written direction of the Collateral Manager there may be included all Collateral Investments with respect to which the Issuer or the Zohar Subsidiary (or the Collateral Manager on such Person's behalf) has entered into such a commitment as though such Collateral Investments were subject to the lien of this Indenture as of such date.

"Diversity Test":  A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Diversity Score on such Measurement Date equals or exceeds the number specified in the applicable column of the "Effective Targets Table" set forth in Section 7.13(a).

"Dollar" or "U.S.$" or "$":  A dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for all debts, public and private.

"Dollar-Equivalent Amount":  At any time in respect of payments received (or to be received) by the Issuer in a Non-Dollar Currency in respect of a Collateral Investment denominated in such currency, (a) if such payment is then covered by a Currency Hedge Agreement, an amount (expressed in U.S. Dollars) equal to the aggregate amount of U.S. Dollars to be received by the Issuer or the Zohar Subsidiary under such Currency Hedge Agreement against payment by the Issuer of such Non-Dollar Currency thereunder; and (b) if such payment is not then covered by a Currency Hedge Agreement, an amount (expressed in U.S. Dollars) equal to the aggregate amount of U.S. Dollars that the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001775

Issuer or the Zohar Subsidiary, as applicable, would receive in exchange therefor at the Applicable Spot Market Exchange Rate. As used herein, "Applicable Spot Market Exchange Rate" means (1) with respect to any date on which a currency equivalence calculation is made in accordance with the terms of this Indenture, the spot market currency exchange rate, quoted as the number of U.S. Dollars per unit of the applicable Non-Dollar Currency, quoted on the Bloomberg page relating to foreign currency exchange at noon (New York City time) on the date of such calculation; and (2) with respect to any date on which the Collateral Manager on behalf of the Issuer directs the Trustee to convert amounts from one currency to another in accordance with the terms of this Indenture, the firm bid quotation spot currency exchange rate, quoted as the number of U.S. Dollars per unit of Non-Dollar Currency at which the Trustee actually effects such currency conversion.

"Domicile" or "Domiciled": With respect to any issuer of, or obligor with respect to, a Collateral Investment, (a) the country in which its principal place of business is located, (b) its country of organization, or (c) the country in which a substantial portion of its operations are located or from which a substantial portion of its revenue is derived, in each case directly or through subsidiaries.

"DTC Participant": A broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"Due Date": Each date on which a Distribution is due on a Pledged Obligation.

"Due Period": With respect to any Payment Date, the period commencing immediately following the eighth Business Day prior to the preceding Payment Date (or on the Funding Date, in the case of the Due Period relating to the Initial Payment Date) and ending on (and including) the eighth Business Day prior to such Payment Date (or, in the case of a Due Period that is applicable to the Payment Date relating to the Stated Maturity of any Note, or the Maturity of all Outstanding Notes, ending on the day preceding such Payment Date); provided that, for purposes of this definition, each Payment Date will be determined without regard to the last sentence of the definition of "Payment Date".

"Effective Target Date": The meaning specified in Section 7.13(a).

"Eligibility Criteria": The meaning specified in Section 12.1.

"Eligible Assignee": The meaning specified in the applicable Note Purchase Agreement.

"Eligible Holder": Any Holder (or beneficial owner of a Note) with respect to which the Collateral Manager has provided written consent (not to be unreasonably withheld) to such Person and the Trustee for such Person to receive a copy of the Supplemental Noteholder Information; provided that the Collateral Manager may withhold such consent in respect of any Person that is, in the sole discretion of the Collateral Manager, a Competitor.

"Eligible Investments": Any Dollar-denominated investment that, at the time it is Granted to the Trustee (directly or through a Securities Intermediary or bailee), is one or more of the following:

(a)    Cash (which, notwithstanding anything to the contrary in this definition, may be held in Euros and Canadian dollars);

(b)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001776

agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States;

(c)     demand and time deposits in, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by, any depository institution or trust company incorporated under the laws of the United States (including the Bank) or any state thereof and subject to supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's, in the case of long-term debt obligations, or "P-1" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "A-1+" by Standard & Poor's, in the case of commercial paper and short-term debt obligations (other than overnight deposits issued or sold by or maintained with LaSalle Bank National Association so long as it is the Trustee under this Indenture and has a short-term credit rating of no less than "A-1" by Standard & Poor's); provided that, in the case of commercial paper and short-term obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

(d)     unleveraged repurchase obligations with respect to (i) any security described in clause (b) above or (ii) any other Registered security issued or guaranteed by an agency or instrumentality of the United States (in each case without regard to the Stated Maturity of such security), in either case entered into with a United States federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term rating is not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's or whose short-term credit rating is "P-1" by Moody's and "A-1+" by Standard & Poor's, at the time of such investment; provided that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

(e)     Registered debt securities (other than mortgage-backed securities) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that have a credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's at the time of such investment or contractual commitment providing for such investment;

(f)     commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of "P-1" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "A-1+" by Standard & Poor's; provided that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

(g)     a Reinvestment Agreement (so long as payments under any such Reinvestment Agreement are not subject to withholding taxes) issued by any bank (if treated as a deposit by

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001777

such bank), or a Registered Reinvestment Agreement issued by any insurance company or other corporation or entity organized under the laws of the United States or any state thereof, that has a credit rating of not less than "P-1" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "A-1+" by Standard & Poor's; provided that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AA-" by Standard & Poor's;

       (h)      any money market fund or similar investment vehicle having at the time of investment therein a credit rating of not less than "Aa2" by Moody's and (if at such time any Notes are rated by Standard & Poor's) "AAAm" or "AAAm-G" by Standard & Poor's; and/or

       (i)      an interest in a pool(s) consisting of any or all of the obligations set forth in clauses (a) through (h) above;

and, in each case, with a Stated Maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs; provided that Eligible Investments may not include (1) any interest-only security, (2) any security purchased at a price in excess of 100% of the par value thereof, (3) any security whose repayment is subject to material non-credit related risk as determined in the sole judgment of the Collateral Manager, (4) any security whose rating assigned by Standard & Poor's includes the subscript "r", "t", "p", "pi" or "q" or any mortgage-backed security, (5) any security subject to withholding tax (unless the issuer thereof is required under the Underlying Instruments thereof to make gross-up payments to the Issuer or the Zohar Subsidiary, as the case may be, covering the full amount of such withholding tax) or (6) any security subject to an Offer. Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and that otherwise fall within the foregoing provisions of this definition.

       "Entitlement Holder": A Person identified in the records of a Securities Intermediary as the Person having a Security Entitlement against the Securities Intermediary.

       "Entitlement Order": A notification communicated to a Securities Intermediary directing transfer or redemption of a Financial Asset to which the Entitlement Holder has a Security Entitlement.

       "Equity Kicker": Any Equity Security or any other security that is not eligible for purchase by the Issuer but is received with respect to a Collateral Investment or purchased as part of a "unit" with a Collateral Investment, subject to Section 7.8(a)(v).

       "Equity Security": (a) Any Equity Kicker and (b) any other security that does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal, including those received by the Issuer or the Zohar Subsidiary, as applicable, as a result of the exercise or conversion of an Equity Kicker or other convertible or exchangeable Collateral Investment. No Equity Security (other than an Equity Kicker) may be purchased by the Issuer or the Zohar Subsidiary (other than in connection with a workout or restructuring of an Obligor, its Affiliates, or the lines of business of the Obligor, or its Affiliates). For the avoidance of doubt, PIK Loans shall not constitute "Equity Securities" hereunder.

       "Equivalent Unit Score": With respect to each issuer of Collateral Investments, the lesser of (a) one and (b) the Issuer Par Amount for such issuer divided by the Average Par Amount. For purposes of calculating the Equivalent Unit Score, any issuers Affiliated with one another will be considered one issuer.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                 PP001778

"ERISA":  The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Plan":  An "employee benefit plan" (as defined in Section 3(3) of ERISA) which is subject to the fiduciary responsibility requirements of the provisions of Title I of ERISA.

"Euro":  The single currency of participating member states of the European Union, as contemplated by the treaty establishing the European Community, as amended.

"Euroclear":  Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"Event of Default":  The meaning specified in Section 5.1.

"Excel Default Model Input File":  An electronic spreadsheet file to be provided to Standard & Poor's, which file shall include the following information (to the extent such information is not confidential) with respect to each Collateral Investment:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Collateral Investment, (c) the par value (including the Unfunded Amount) of such Collateral Investment, (d) the Funded Amount of such Collateral Investment, (e) the Unfunded Amount of such Collateral Investment, (f) the type of issue (including, by way of example, whether such Collateral Investment is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (g) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Investment is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (h) the coupon (in the case of a Collateral Investment which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Investment which bears interest at a floating rate), (i) the Standard & Poor's Industry Classification Group for such Collateral Investment, (j) the stated maturity date of such Collateral Investment, (k) the Standard & Poor's Rating of such Collateral Investment or the issuer thereof, as applicable, (l) the priority category assigned by Standard & Poor's to such Collateral Investment, if available, (m) the principal balance in Cash and Eligible Investments of each Account and (n) such other information as the Trustee may determine to include in such file.

"Exchange Act":  The U.S. Securities Exchange Act of 1934, as amended.

"Exchange Date":  The 40th day after the Funding Date or (if not a Business Day) the first Business Day thereafter.

"Exchanged Security":  A loan, debt security, letter of credit, lease or equity or other security received by the Issuer or the Zohar Subsidiary in exchange for any Collateral Investment or Equity Security held by it or by application of amounts on deposit in the Rollover Proceeds Account.

"Excluded Property":  Collectively, (i) U.S.$250 of capital contributed by the owners of the Issuer's common shares, (ii) U.S.$1,000 of capital contributed by the owners of the Issuer's preference shares and (iii) U.S.$250 representing a transaction fee payable to the Issuer.

"Expense Account":  The trust account designated the "Expense Account" and established in the name of the Trustee pursuant to Section 10.6(a).

"Federal Funds Rate" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001779

the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Trustee from three federal funds brokers of recognized standing selected by it.

"Financial Asset":  Except as otherwise provided in Section 8-103 of the UCC: (a) a Security; (b) an obligation of a Person or a share, participation or other interest in a Person or in property or an enterprise of a Person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or (c) any property that is held by a Securities Intermediary for another Person in a Securities Account if the Securities Intermediary has expressly agreed with the other Person that the property is to be treated as a financial asset under Article 8 of the UCC.

"Financing Statements":  Financing statements relating to the Collateral naming the Issuer or the Zohar Subsidiary, as applicable, as debtor and the Trustee on behalf of the Secured Parties as secured party.

"Fixed Rate Obligations":  All Collateral Investments that bear interest at a fixed rate.

"Floating Rate Obligations":  All Collateral Investments that bear interest based on a LIBO Rate, bank prime or (subject to satisfaction of the Rating Condition with respect to each Rating Agency) any other floating rate index and obligations in respect of which an Interest Hedge Agreement has been entered into under which the Issuer receives payments based on any such rate.

"Flow-Through Investment Vehicle":  A Person that (i) would be an investment company but for the exception in Section 3(c)(1) or 3(c)(7) of the Investment Company Act and the amount of such Person's investment in the Notes exceeds 40% of the total assets (determined on a consolidated basis with its subsidiaries) of such Person; (ii) is an entity that was organized or reorganized for the specific purpose of acquiring any Note; or (iii) is an entity as to which any Person owning any equity or similar interest in such entity exercises control, on an investment-by-investment basis, over the amount of such entities' contribution to any investment made by such entity.

"Foreign Currency Account":  The meaning specified in Section 12.4.

"Funded Amount":  With respect to any Revolving Collateral Investment or Delayed Funding Collateral Investment at any time, the aggregate principal amount of advances or other extensions of credit made thereunder (by the Issuer or the Zohar Subsidiary or any predecessor lender) that are outstanding at such time.

"Funding Availability":  As of any date, an amount equal to (a) the Funding Source Amount as of such date minus (b) the Unfunded Portfolio Amount on such date.

"Funding Certificate":  The meaning specified in Section 3.2(e).

"Funding Date":  April 11, 2007.

"Funding Source Amount":  As of any date, the sum of (a) the aggregate amount of Principal Proceeds and Uninvested Proceeds on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account on such date; plus (b) the Aggregate Undrawn Amounts of the Class A-1 Notes on such date; plus (c) the Balance on deposit in the Unfunded Revolver Discount

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001780

- 28 -

Account on such date; plus (d) the Balance on deposit in the Class A-1R Future Funding Reserve Account on such date; plus (e) the Balance on deposit in the Rollover Proceeds Account on such date.

"Global Notes": Any Temporary Regulation S Global Notes, Regulation S Global Notes or Rule 144A Global Notes.

"Grant": To bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and pledge a security interest in and right of set-off against, deposit, set over and confirm. A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the pledging party thereunder, including without limitation the immediate continuing right to claim for, collect, receive and receipt for principal, interest and fee payments in respect of the Pledged Obligations or such other instruments, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the pledging party or otherwise, and generally to do and receive anything that the pledging party is or may be entitled to do or receive thereunder or with respect thereto.

"Hedge Agreement": An Interest Hedge Agreement and a Currency Hedge Agreement.

"Hedge Counterparty": A counterparty having, on the date on which it enters into a Hedge Agreement, a long-term senior unsecured debt rating or issuer rating of at least "Aa2" by Moody's and at least "A+" (or, in the case of a Currency Hedge Agreement, "AA-") by Standard & Poor's and the rating of the short-term debt obligations of such Hedge Counterparty is at least "A-1" (or, in the case of a Currency Hedge Agreement, "A-1+") by Standard & Poor's (or, with respect to any counterparty not so rated but whose obligations in respect of such Hedge Agreement entered into with the Issuer are absolutely and unconditionally guaranteed (with such form of guarantee meeting Standard & Poor's then current publicly available criteria on guarantees) by an Affiliate of such counterparty, so long as such Affiliate's long-term debt obligations are so rated) or any permitted assignee or successor under such Hedge Agreement which each Rating Agency has confirmed will not cause the downgrade or withdrawal of its then rating of any Class of Notes below its rating on the Funding Date.

"Hedge Counterparty Collateral Account": The meaning specified in Section 15.1(d).

"Hedge Counterparty Credit Support": Without limiting any additional collateral delivery obligations to which a Hedge Counterparty may agree, the agreement by a Hedge Counterparty, in the event that and so long as the rating of the long-term senior unsecured debt obligations or the issuer rating of such Hedge Counterparty or of any Affiliate of such Hedge Counterparty that has absolutely and unconditionally guaranteed (with such form of guarantee meeting Standard & Poor's then current publicly available criteria on guarantees) the obligations of such Hedge Counterparty under a Hedge Agreement is below "Aa2" by Moody's or below "A+" (or, in the case of a Currency Hedge Agreement, "AA-") by Standard & Poor's or the rating of the short-term debt obligations of such Hedge Counterparty or of such Affiliate is below "A-1" (or, in the case of a Currency Hedge Agreement, "A-1+") by Standard & Poor's, to deliver collateral on a mark to market basis pursuant to a 1994 ISDA Credit Support Annex (New York law) in the form of the 1994 ISDA Credit Support Annex (New York law), and (a) the form of such 1994 ISDA Credit Support Annex (New York law) and (b) the aggregate amount of such collateral delivered as Hedge Counterparty Credit Support permit the Issuer to satisfy the Rating Condition with respect to Standard & Poor's.

"Hedge Termination Amount": With respect to any Hedge Agreement, the amount of any early termination or liquidation payment, if any, payable to or by the Issuer under such Hedge Agreement.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001781

- 29 -

"Holder":

(a)    With respect to any Note (other than a Class A-1R Note) the Person in whose name such Note is registered in the Note Register.

(b)    With respect to any Class A-1R Note, each of the following Persons (as the context may require): (i) the Person in whose name such Note is registered in the Note Register (including any collateral trustee or agent holding such Class A-1R Note under the Class A-1R Note Purchase Agreement) and (ii) any Person party to the Class A-1R Note Purchase Agreement that is required or that has the option to fund advances under a Class A-1R Note registered in the name of an agent or collateral trustee appointed under or in accordance with the Class A-1R Note Purchase Agreement; provided that, subject to Section 10.5, the "Holder" of any Class A-1R Note for the purpose of taking or giving any request, demand, authorization, direction, notice, consent, waiver, or other action under this Indenture or receiving any payment under this Indenture shall be the Person in whose name such Class A-1R Note is registered in the Note Register.

(c)    With respect to any Preference Share, the Person in whose name such Preference Share is registered in the share register maintained by the Preference Share Registrar pursuant to the Preference Share Paying Agency Agreement.

"Holder Subaccount": The meaning specified in Section 10.5(a).

"Important Section 3(c)(7) Reminder Notice": A notice substantially in the form of Exhibit H-2 hereto.

"Indenture": This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended. All references in this instrument to designated "Articles", "Sections", "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed. The words "herein", "hereof", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, Subsection or other subdivision.

"Independent": As to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (a) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (b) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Indorsement": The meaning specified in Section 8-102(a)(11) of the UCC.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP001782

"Industry Classification Group": When used herein and preceded by the term "Moody's", any of the Moody's classification groups set forth in Schedule C-1, and any such classification groups that may be subsequently established by Moody's and provided by the Collateral Manager or Moody's to the Trustee. When used herein and preceded by the term "Standard & Poor's", any of the Standard & Poor's classification groups set forth in Schedule C-2, and any such classification groups that may be subsequently established by Standard & Poor's and provided by the Collateral Manager or Standard & Poor's to the Trustee.

"Industry Diversity Score": With respect to the Collateral Investments, the number established by reference to the Diversity Score Table set forth in Schedule D for the related Aggregate Industry Equivalent Unit Score; provided that if the Aggregate Industry Equivalent Unit Score falls between any two such scores shown in the Diversity Score Table in Schedule D, the Industry Diversity Score shall equal the lesser of the two such scores.

"Initial Payment Date": The Payment Date in September, 2007.

"Instruction": The meaning specified in Section 8-102(a)(12) of the UCC.

"Instrument": The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Hedge Agreement": An interest rate protection agreement (if any) to be entered into between the Issuer and any Hedge Counterparty for the sole purpose of hedging interest rate risk between the portfolio of Collateral Investments and the Notes, as amended from time to time and any replacement hedge agreement entered into pursuant to Section 15.1. Each Interest Hedge Agreement shall be documented as one or more confirmations under a 1992 or 2002 ISDA Master Agreement (as such form may be updated from time to time).

"Interest Period":

(a)    With respect to any Borrowing made under the Class A-1R Notes and the Class A-1D Notes:

(1)    in the case of the initial Interest Period with respect to any such Borrowing, the period from, and including, the date of such Borrowing to, but excluding, the Payment Date following the Due Period in which such Borrowing occurs; and

(2)    in the case of any other Interest Period, the period from, and including, the first day after the end of the immediately preceding Interest Period to, but excluding, the next succeeding Payment Date (or in the case of the final Interest Period, the Stated Maturity); and

(b)    with respect to the Class A-1T Notes, the Class A-2 Notes and Class A-3 Notes, in the case of the initial Interest Period, the period from, and including, the Funding Date to, but excluding, the first Payment Date, and thereafter, the period from, and including, the first day after the end of the immediately preceding Interest Period to, but excluding, the next succeeding Payment Date (or, in the case of the final Interest Period, the Stated Maturity).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001783

"Interest Proceeds": With respect to any Due Period, the sum (without duplication) of:

(a)     all payments of interest received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Investments and Eligible Investments (other than (i) payments of interest on Eligible Investments credited to the Class A-1R Holder Collateral Account and the Hedge Counterparty Collateral Account and (ii) payments of interest referred to in clause (c) of the definition of "Principal Proceeds");

(b)     all Sale Proceeds received in Cash by the Issuer or the Zohar Subsidiary during such Due Period to the extent such Sale Proceeds constitute proceeds from the sale of accrued interest on Collateral Investments;

(c)     all payments of principal received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on Eligible Investments to the extent such Eligible Investments were acquired with Interest Proceeds;

(d)     all call, redemption and prepayment premiums received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Investments and Eligible Investments;

(e)     all scheduled dividend payments actually received by the Issuer or the Zohar Subsidiary during such Due Period on or in respect of any Equity Securities owned by the Issuer or the Zohar Subsidiary; provided that, if such Equity Security has been received in exchange for any Defaulted Investment, then scheduled dividends on such Equity Security will constitute Interest Proceeds only to the extent that the aggregate of all collections in respect of such Defaulted Investment (and any Exchanged Securities and Equity Securities received in exchange therefor) since it became a Defaulted Investment equals the outstanding Principal Balance of such Collateral Investment immediately prior to it becoming a Defaulted Investment;

(f)     all commitment fees, facility fees, letter of credit fees, amendment, restructuring and waiver fees, all late payment fees and all other fees and commissions received in Cash by the Issuer or the Zohar Subsidiary during the related Due Period in connection with the Collateral Investments and Eligible Investments;

(g)     all amounts received by the Issuer from the Hedge Counterparties under all Interest Hedge Agreements on the Payment Date relating to such Due Period (other than any Hedge Termination Amount); and

(i)     the Specified Realized Gain Amounts for all Collateral Investments sold or paid in full during such Due Period,

provided that any amounts received in respect of any Defaulted Investment (and any Exchanged Securities and Equity Securities received in exchange therefor) will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Defaulted Investment (and such Exchanged Securities and Equity Securities) since it became a Defaulted Investment equals the outstanding Principal Balance of such Collateral Investment when it became a Defaulted Investment. Amounts received in U.S. Dollars under Currency Hedge Agreements in respect of Interest Proceeds received in Non-Dollar Currencies shall constitute Interest Proceeds.

"Investment Company Act": The U.S. Investment Company Act of 1940, as amended, and the rules thereunder.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001784

"Information Package": With respect to obtaining a Rating on any Collateral Investment, a set of information pertaining to the issuer of such Collateral Investment containing: (i) the most recent interim financial statements; (ii) up to three years of historical annual financial statements to the extent received by the Issuer, or the Collateral Manager on behalf of the Issuer; (iii) a credit memorandum prepared by the Issuer, or the Collateral Manager on behalf of the Issuer; (iv) the most recent financial covenant compliance report; (v) a debt maturity schedule; (vi) if applicable, the inputs used to derive the Standard & Poor's Rating generated by Standard & Poor's CreditModel and (vii) if the (a) Issuer has owned the Collateral Investment for more than one year and (b) the Principal Balance (or Commitment Amount with respect to any Revolving Collateral Investment or Delayed Funding Collateral Investment) is greater than $20,000,000, then the most recent annual audited financial statements.

"Investment Weighted Average Life": For any Collateral Investment, the number obtained by (a) multiplying the amount of each scheduled distribution of principal on such Collateral Investment to be paid after the date on which it is acquired or originated by the Issuer or the Zohar Subsidiary, as applicable, by the number of years (rounded to the nearest hundredth) from such date until such scheduled distribution of principal is due, (b) summing all of the products calculated pursuant to clause (a) and (c) dividing the sum calculated pursuant to clause (b) by the sum of all such scheduled distributions of principal due on such Collateral Investment.

"Investor Agent": Natixis Financial Products Inc., in its capacity as Investor Agent for the investors under the Warehouse Agreement, and its successors in such capacity.

"Issuer": Zohar III, Limited, an exempted company organized under the laws of the Cayman Islands, unless a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Charter": The Amended and Restated Memorandum of Association and Articles of Association of the Issuer, filed under *The Companies Law* (2004 Revision) of the Cayman Islands, as amended and restated and as otherwise modified and supplemented and in effect from time to time.

"Issuer Interest Collection Account": The trust account designated the "Issuer Interest Collection Account" and established in the name of the Trustee pursuant to Section 10.2(a).

"Issuer Order" and "Issuer Request": A written order or request (which may be in the form of standing instructions) dated and signed in the name of the Issuer by an Authorized Officer of the Issuer and (if appropriate) the Zohar Subsidiary and/or the Co-Issuer, or by an Authorized Officer of the Collateral Manager where permitted pursuant to this Indenture or the Management Agreement, as the context may require or permit.

"Issuer Par Amount": With respect to each issuer of Collateral Investments, the sum of the par amounts of all Collateral Investments issued by such issuer or any Affiliate of such issuer that remain outstanding.

"Issuer Principal Collection Account": The trust account designated the "Issuer Principal Collection Account" and established in the name of the Trustee pursuant to Section 10.2(b).

"Knowledgeable Employee": The meaning specified in Rule 3c-5 promulgated under the Investment Company Act.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001785

"LIBO Rate": A rate of interest determined on the basis of the rates at which deposits in Dollars are offered to prime banks in the London interbank market.

"LIBOR": The meaning specified in Schedule B.

"LIBOR Business Day": The meaning specified in Schedule B.

"LIBOR Determination Date": The meaning specified in Schedule B.

"London Banking Day": The meaning specified in Schedule B.

"Majority": With respect to (i) any Class or Classes of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class or Classes of Notes, as the case may be and (ii) the Preference Shares, the Holders of more than 50% of the Preference Shares Outstanding.

"Management Agreement": The Collateral Management Agreement, dated as of the Closing Date among the Issuer, the Zohar Subsidiary and the Collateral Manager, as amended from time to time in accordance with the terms thereof.

"Margin Stock": "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System.

"Market Value": On any date of determination, the market value of any Collateral Investment based upon the average of the quotations for the purchase of such Collateral Investment obtained by the Collateral Manager from three Approved Loan Pricing Services; or if the Collateral Manager is able to obtain quotations from only two Approved Loan Pricing Services after reasonable efforts, the lower of such two quotations; or if the Collateral Manager is unable within 30 days of such date of determination to obtain quotations from two Approved Loan Pricing Services after using reasonable efforts to locate other dealers in the relevant market Independent of the Collateral Manager and approved by Standard & Poor's and Moody's, zero.

"Maturity": With respect to any Note, the date on which all outstanding unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, redemption or otherwise.

"Maximum Investment Amount": On any date, an amount equal to the sum (without duplication) of:

    (a)    the Aggregate Principal Balance on such date of all Collateral Investments (which, for the avoidance of doubt, shall include all Collateral Investments that the Issuer and/or the Zohar Subsidiary has committed to purchase or originate (but which purchases or originations have not yet settled)), and in each case excluding, in the case of any such Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments, the aggregate Unfunded Amounts thereunder; plus

    (b)    the Funding Source Amount on such date; minus

    (c)    the aggregate amounts owing by the Issuer and/or the Zohar Subsidiary to sellers of Collateral Investments that the Issuer and/or the Zohar Subsidiary has committed to purchase or originate (but which purchases or originations have not yet settled) on such date;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001786

provided that, at all times prior to the Ramp Up End Date, the Maximum Investment Amount shall be deemed to be not less than U.S.$1,000,000,000.

"Measurement Date": Any of the following dates on or after the Ramp Up End Date: (i) any date on which the Issuer or the Zohar Subsidiary commits to acquire, originate or dispose of any Collateral Investment, (ii) any date on which a Collateral Investment becomes a Non-Performing Collateral Investment or a Defaulted Investment, (iii) each Determination Date, (iv) each date as of which a Monthly Report is prepared; (v) any date on which a request for a Borrowing is given under the Class A-1R Note Purchase Agreement in respect of the Class A-1R Notes or under the Class A-1D Note Purchase Agreement in respect of the Class A-1D Notes, (vi) the Ramp Up End Date and (vii) with reasonable notice to the Zohar Obligors, the Collateral Manager and the Trustee, any other Business Day that either Rating Agency requests be a Measurement Date; provided that if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date shall be the next succeeding day that is a Business Day. In addition, the Effective Target Date will constitute a "Measurement Date" solely for purposes of making the calculations required on such date pursuant to Section 7.13(a).

"Mezzanine Notes" means, collectively, the two promissory notes issued by the Issuer dated September 19, 2005 providing, subject to the terms and conditions thereof, for subordinated indebtedness of the Issuer (i) in favor of Phoenix VIII, LLC in an original aggregate principal amount of $10,000,000 and (ii) in favor of Ark Investment Partners II L.P., in an original aggregate principal amount of $10,000,000.

"Minimum Average Recovery Rate Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if (i) both of the Standard & Poor's Average Recovery Rates for the "Class A-2 level" and the "Class A-3 level" on such Measurement Date equals or exceeds the percentages specified in the Currently Applicable Row of the Ratings Matrix (it being understood that each of the "Class A-2 level" and "Class A-3 level" will have separate and distinct calculations) and (ii) the Moody's Weighted Average Recovery Rate on such Measurement Date equals or exceeds the percentage specified in the Currently Applicable Row of the Ratings Matrix.

"Money": The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report": The meaning specified in Section 10.10(a).

"Moody's": Moody's Investors Service, Inc. and any successor or successors thereto.

"Moody's Default Probability Rating": With respect to any Collateral Investment as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    with respect to a Senior Secured Collateral Investment:

(i)    if the issuer thereof has a corporate family rating from Moody's, such corporate family rating;

(ii)    if the preceding clause does not apply, the Assigned Moody's Rating of such loan; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001787

(iii)    if the preceding clauses do not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating;

(b)    with respect to a Second Lien Collateral Investment or Collateral Investment (other than a DIP Loan), the Moody's Equivalent Senior Unsecured Rating of such Second Lien Collateral Investment or Collateral Investment; and

(c)    with respect to a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"Moody's Equivalent Senior Unsecured Rating": With respect to any Collateral Investment and the issuer thereof as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    if such issuer has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)    if the preceding clause does not apply, the Moody's "issuer rating" for such issuer;

(c)    if the preceding clauses do not apply, but such issuer has a subordinated obligation with an Assigned Moody's Rating, then

(i)    if such Assigned Moody's Rating is at least "B3" (and, if rated "B3", not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d)    if the preceding clauses do not apply, but such issuer has a senior secured obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3", not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)    if the preceding clauses do not apply, but such issuer has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001788

(f)    if the preceding clauses do not apply, but such issuer has a senior unsecured obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB–" or higher, or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower;

(g)    if the preceding clauses do not apply, but such issuer has a subordinated obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB–" or higher; or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower,

and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above;

(h)    if the preceding clauses do not apply, but such issuer has a senior secured obligation with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB–" or higher; or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower,

and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above;

(i)    if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(i)    neither such issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

(ii)    no debt securities or obligations of such issuer are in default,

(iii)    neither such issuer nor any of its Affiliates has defaulted on any debt during the preceding two years,

(iv)    such issuer has been in existence for the preceding five years,

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001789

(v)      such issuer is current on any cumulative dividends,

(vi)      the fixed-charge ratio for such issuer exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

(vii)      such issuer had a net profit before tax in the past fiscal year and the most recent quarter, and

(viii)      the annual financial statements of such issuer are unqualified and certified by a firm of Independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j)      if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(i)      neither such issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii)      no debt security or obligation of such issuer has been in default during the past two years; and

(k)      if the preceding clauses do not apply and a debt security or obligation of such issuer has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca".

Notwithstanding the foregoing, no more than 7.5% of the Collateral Investments, by Aggregate Principal Balance, may be given a Moody's Equivalent Senior Unsecured Rating based on a rating given by Standard & Poor's as provided in clauses (f), (g) and (h) above.

"Moody's Obligation Rating": With respect to any Collateral Investment as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)      with respect to a Senior Secured Collateral Investment:

(i)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)      if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b)      with respect to a Second Lien Collateral Investment or other Collateral Investment (other than a DIP Loan):

(i)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)      if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c)      with respect to a DIP Loan, the Assigned Moody's Rating thereof.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP001790

- 38 -

"Moody's Rating": With respect to any Collateral Investment, the Moody's Default Probability Rating; provided that, if such Collateral Investment is not rated by Moody's and no other security or obligation of the issuer is rated by Moody's, then the Issuer, or the Collateral Manager on behalf of the Issuer, shall present such Collateral Investment to Moody's for an estimate of such Collateral Investment's rating factor from which its corresponding Moody's rating may be determined, which shall be its Moody's Rating and:

      (1)    pending receipt from Moody's of such an estimated rating, the Moody's Rating of such Collateral Investment shall be (x) one subcategory below the rating generated by the Moody's Riscale Model or (y) at the option of the Issuer (or the Collateral Manager on behalf of the Issuer), equal to the rating derived from such alternative Moody's rating model that is mutually acceptable to Moody's and the Issuer (provided that the Moody's Rating derived in the foregoing clauses (1)(x) and (1)(y) above shall not exceed "B1"); and

      (2)    for each Collateral Investment whose Moody's Rating is determined by this proviso, the Collateral Manager shall redetermine such Moody's Rating semi-annually (or, in the alternative, determine such Moody's Rating by another method permitted in this definition) and, in such connection, furnish to Moody's such updated financial information relating to the obligor on such Collateral Investment as Moody's may reasonably request.

      At no time shall more than 25% of the Maximum Investment Amount be comprised of Collateral Investments whose ratings, for purposes of this Indenture, are generated by the Moody's Riscale Model; provided that, at the option of the Issuer (or the Collateral Manager on behalf of the Issuer), and upon written notice to Moody's, such 25% limitation shall not apply to any Collateral Investment in respect of which:

      (x)    the Issuer shall have made a request to Moody's for a credit estimate pursuant to the first sentence of this definition (to which Moody's shall promptly acknowledge whether the materials in connection with such credit estimate application are complete) and

      (y)    Moody's shall not have provided such credit estimate within 30 days of such acknowledgement.

      With respect to the Pledged Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Issuer (with written notice to the Trustee), as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

      The Issuer (or the Collateral Manager on behalf of the Issuer) shall promptly apply to Moody's for a new Moody's Rating in respect of any Collateral Investment that does not have a monitored publicly available rating from Moody's and as to which any one or more of the following events occurs, is agreed between the issuer thereof (or a governmental authority) and a sufficient number of holders of such Collateral Investment that is binding on all holders thereof or is announced (or otherwise decreed) by such issuer (or governmental authority) in a form that is binding upon all such holders, and such event is not expressly provided for under the terms of the Underlying Instruments of such Collateral Investment in effect immediately prior to such event:

      (i)    a postponement by more than 6 months of the date on which principal is payable at final maturity;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC      PP001791

(ii)    a reduction by more than 3.00% per annum in the rate of interest payable (whether calculated based on a spread above a floating reference rate or a fixed rate);

(iii)    a reduction by more than 25% in the aggregate amount of principal payable on any one or more scheduled amortization or other redemption dates within any 12-month period;

(iv)    an increase of more than 10% in any advance rate or other borrowing base formula utilized in connection with such Collateral Investment; or

(v)    a change in, or waiver of, the interest rate resulting in a deferral or capitalization of interest by more than 3.00% per annum (based on the Principal Balance of such Collateral Investment) or any deferral or capitalization that would cause such Collateral Investment to become a PIK Loan.

"Moody's Rating Factor": For purposes of computing the Moody's Weighted Average Rating Distribution, the number assigned below to the Moody's Rating applicable to each Collateral Investment.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

"Moody's Recovery Rate": With respect to any loan or Bond, as of any date of determination, the recovery rate determined in accordance with the following, in the following order of priority:

(a)    if such loan or Bond has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate;

(b)    if the preceding clause does not apply to such loan or Bond, the rate determined pursuant to the table below based on the number of rating subcategories difference between such loan's or such Bond's Moody's Obligation Rating and its Moody's Default Probability Rating (for the avoidance of doubt, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories' difference will be positive and if it is lower, negative):

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001792

| Number of Moody's Ratings Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Senior Secured Collateral Debt Obligation | Second Lien Collateral Debt Obligation | Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

or if no recovery rate has been specifically assigned with respect to a loan pursuant to clause (a) above, and such loan is a DIP Loan, 50%.

For each loan and Bond issued by an obligor not Domiciled in the United States, the Issuer (or the Collateral Manager on its behalf) shall request Moody's to assign a recovery rate to such loan or Bond, which recovery rate shall be its "Moody's Recovery Rate".

"Moody's Riscale Model": The model developed by Moody's and used to estimate the Rating to be given by Moody's to a Collateral Investment that does not have a Moody's rating and is provided to the Collateral Manager on the Funding Date for purposes of determining such Rating.

"Moody's Weighted Average Rating Distribution": On any Measurement Date, the number obtained by dividing the summation of the series of products obtained by multiplying the Principal Balance of each Collateral Investment that is not a Non-Performing Collateral Investment by its respective Moody's Rating Factor by (b) the sum of the Aggregate Principal Balances of all Collateral Investments that are not Non-Performing Collateral Investments and rounding the result up to the nearest whole number.

"Moody's Weighted Average Rating Factor Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Moody's Weighted Average Rating Distribution is not more than the number specified in the Currently Applicable Row of the Ratings Matrix.

"Moody's Weighted Average Recovery Rate": As of any Measurement Date, the rate expressed as a percentage obtained by (i) summing the products obtained by multiplying the Principal Balance of each Pledged Collateral Investment that is not a Non-Performing Collateral Investment by its applicable Moody's Recovery Rate, (ii) dividing such sum by the Aggregate Principal Balance of all such Pledged Collateral Investments that are not a Non-Performing Collateral Investments and (iii) rounding up to the first decimal place.

"Net Aggregate Exposure Amount": As of any Measurement Date, an amount (not less than zero) equal to (a) the Unfunded Portfolio Amount as of such Measurement Date minus (b) the Balance on deposit in the Unfunded Revolver Discount Account on such Measurement Date minus (c) the Balance on deposit in the Class A-1R Future Funding Reserve Account on such Measurement Date.

"Net Portfolio Collateral Balance": On any Measurement Date, without duplication, an amount equal to (a) the aggregate Principal Balance on such Measurement Date of all Collateral Investments (other than Defaulted Investments, Exchanged Securities and Unrestricted Collateral

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001793

- 41 -

Investments), determined excluding the Unfunded Amounts of Revolving Collateral Investments and Delayed Funding Collateral Investments; plus (b) the Adjusted Principal Balance on such Measurement Date of all Defaulted Investments and Exchanged Securities; plus (c) the Net Aggregate Exposure Amount of all Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments (other than Defaulted Investments and Exchanged Securities); plus (d) the aggregate amount of Principal Proceeds and Uninvested Proceeds on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account on such Measurement Date; plus (e) the Balance on deposit in the Unfunded Revolver Discount Account on such Measurement Date; plus (f) the Balance on deposit in the Class A-1R Future Funding Reserve Account on such Measurement Date. For the avoidance of doubt, references above to Collateral Investments shall include all Collateral Investments that the Issuer and/or the Zohar Subsidiary have committed to purchase or originate (but which purchases or originations have not yet settled).

As used above, the "Adjusted Principal Balance" of any Defaulted Investment or Exchanged Security on any Measurement Date is equal to:

(A)     if such Market Value thereof is obtainable through the relevant market, the lowest of (1) an amount equal to the Moody's Recovery Rate of such Collateral Investment multiplied by the Principal Balance thereof, (2) an amount equal to the Priority Category Recovery Rate of such Collateral Investment determined by reference to the table set forth in the definition of "Standard & Poor's Average Recovery Rate" multiplied by the Principal Balance thereof and (3) the Market Value of such Collateral Investment (determined taking into account both the Funded Amounts and Unfunded Amounts in respect thereof as applicable); and

(B)     if the Market Value thereof is not obtainable through the relevant market, then the lowest of (1) an amount equal to the Original Purchase Price Percentage of such Collateral Investment multiplied by the Principal Balance thereof, (2) an amount equal to the Moody's Recovery Rate of such Collateral Investment multiplied by the Principal Balance thereof and (3) an amount equal to the Priority Category Recovery Rate of such Collateral Investment determined by reference to the table set forth in the definition of "Standard & Poor's Average Recovery Rate" multiplied by the Principal Balance thereof. For purposes of this paragraph (B), the Principal Balance of any Exchanged Security shall be deemed to be equal to (i) the Principal Balance of the related Defaulted Investment so long as (a) such Exchanged Security's seniority with respect to right of payment is the same or higher than that of the related Defaulted Investment immediately prior to such Collateral Investment becoming a Defaulted Investment, (b) none of the collateral securing such Defaulted Investment immediately prior to such Collateral Investment becoming a Defaulted Investment has been released and such collateral secures the Exchanged Security and (c) if the issuer of such Defaulted Investment is in bankruptcy proceedings, court approval has been obtained with respect to the exchange of such Exchanged Security for such Defaulted Investment and the collateral arrangement relating thereto or (ii) in all other cases, the Principal Balance of such Defaulted Investment multiplied by its applicable Priority Category Recovery Rate.

"Non-Consenting Holder": The meaning specified in Section 8.2.

"Non-Current Collateral Investment": (a) Any Defaulted Investment the issuer of, or Obligor on, which has previously deferred and/or capitalized as principal any interest due thereon (unless any interest so deferred and capitalized has subsequently been paid in full in Cash to the Issuer or the Zohar Subsidiary, as applicable); and (b) any PIK Loan.

"Non-Dollar Currency": Any currency other than U.S. Dollars.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP001794

"Non-Performing Collateral Investment": Any Collateral Investment with respect to which a default as to the payment of interest has occurred and is continuing (after giving effect to any applicable grace period) during a specified period.

"Non-Permitted Holder": The meaning specified in Section 2.12(b).

"Noteholder": A Holder of a Note.

"Note Interest Rate": With respect to the Class A-1R Notes, the Class A-1T Notes, the Class A-1D Notes, the Class A-2 Notes or the Class A-3 Notes, the annual rate at which interest accrues on the Notes of such Class, being the Class A-1R Note Interest Rate, the Class A-1T Note Interest Rate, the Class A-1D Note Interest Rate, the Class A-2 Note Interest Rate or the Class A-3 Note Interest Rate, as applicable.

"Note Purchase Agreements": The Class A-1R Note Purchase Agreement and the Class A-1D Note Purchase Agreement, collectively.

"Note Register" and "Note Registrar": The respective meanings specified in Section 2.4(a).

"Note Subscription Agreements": The several Note Subscription Agreements, each dated as of the Closing Date, between the Issuer and the initial purchaser of the Class B Notes named on the signature page thereof, as modified and supplemented and in effect from time to time.

"Note Valuation Report": The meaning specified in Section 10.10(b).

"Notes": The Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes authorized by, and authenticated and delivered under, this Indenture.

"Obligor": With respect to a Collateral Investment, the Person who is obligated to repay such Collateral Investment (including, if applicable, a guarantor thereof), and whose assets were principally relied upon by the Issuer or the Zohar Subsidiary at the time such Collateral Investment was purchased or originated by the Issuer or the Zohar Subsidiary, as applicable, as the source of repayment of such Collateral Investment.

"Offer": With respect to any security or obligation, (a) any offer by the issuer of such security or obligation or by any other Person made to some or all of the holders of such security or obligation to purchase or otherwise acquire such security or obligation (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security or obligation into or for Cash, securities or any other type of consideration or (b) any solicitation by the issuer of such security or obligation or any other Person to amend, modify or waive any provision of such security or obligation or any related Underlying Instrument.

"Officer": With respect to any Zohar Obligor and any corporation and/or limited liability company, the Chairman of the Board of Directors (or any director, with respect to the Issuer), the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer or equivalent of such entity; with respect to any partnership, any general partner thereof; and with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001795

"Offshore Transaction": The meaning specified in Regulation S.

"Opinion of Counsel": A written opinion addressed to the Trustee, each Noteholder and each Rating Agency (each, a "Recipient"), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice (or law firm with one or more partners admitted to practice) in any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for any Zohar Obligor, as the case may be, and which attorney (or law firm) shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"Original Purchase Price Percentage": With respect to any Collateral Investment, the ratio (expressed as a percentage) of:

> (a)     the Purchase Price of such Collateral Investment (not taking into account transfer fees) plus the Unfunded Amount with respect thereto (if any) as of the date on which the Issuer or the Zohar Subsidiary settles the acquisition or origination thereof; to

> (b)     the Principal Balance of such Collateral Investment as of the date on which the Issuer or the Zohar Subsidiary settles the acquisition or origination thereof.

"Outstanding": With respect to (i) the Notes, as of any date of determination, all of such Class of Notes or the Notes, as the case may be, theretofore authenticated and delivered under this Indenture and (ii) the Preference Shares, all of such Preference Shares issued and allocated under the Issuer Charter, except in any case:

> (a)     Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

> (b)     Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; provided that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

> (c)     Notes in exchange for, or in lieu of, other Notes which have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course;

> (d)     Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.5; and

> (e)     Preference Shares redeemed or repurchased in accordance with the Issuer Charter;

provided that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of Notes, or the Holders of the requisite Outstanding Preference Shares, have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (A) Notes beneficially owned by any Zohar

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001796

Obligor or any other obligor upon the Notes or any Affiliate of any of them (excluding the Collateral Manager or any of its Affiliates) shall be disregarded and deemed not to be Outstanding and (B) Notes beneficially owned by the Collateral Manager or any Affiliate of the Collateral Manager shall be disregarded and deemed not to be Outstanding in relation to any amendment or other modification of, or assignment or termination of, any of the express rights or obligations of the Collateral Manager under the Management Agreement or this Indenture (including the exercise of any rights to remove the Collateral Manager or terminate the Management Agreement), except in any case that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Trustee knows to be beneficially owned in the manner indicated above shall be so disregarded.

Notes owned in the manner indicated in the proviso above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not any Zohar Obligor or any other obligor upon the Notes or any Affiliate of any Zohar Obligor or such other obligor (excluding, with respect to the Class B Notes or Class C Notes, the Collateral Manager or any of its Affiliates).

"Participation Interest":  An undivided participation interest in a Collateral Investment.

"Patriarch Partners":  Patriarch Partners XV, LLC, a Delaware limited liability company.

"Paying Agent":  Any Person authorized by the Issuer to pay the principal of any Notes on behalf of the Issuer as specified in Section 7.2.

"Payment Account":  The trust account designated the "Payment Account" and established in the name of the Trustee pursuant to Section 10.3.

"Payment Date":  The 18th day of each March, June, September and December in each calendar year; provided that (a) the first Payment Date will be the Initial Payment Date and (b) the final Payment Date will be April 15, 2019. Notwithstanding the foregoing, if any such date is not a Business Day, the related Payment Date will be the immediately following Business Day.

"Performing Collateral Investment":  Any Collateral Investment that is not a Non-Performing Collateral Investment.

"Person":  An individual, corporation (including a business trust), company, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association, government or any agency or political subdivision thereof or any other legal entity.

"PIK Loan":  Any loan or other obligation with respect to which the issuer thereof or Obligor thereon has (at such time) the right under the related Underlying Instrument to defer or capitalize interest due on such loan or obligation as principal; provided that, a loan or other obligation shall not be considered a PIK Loan if (i) such loan or obligation is required to pay at least a portion of its interest as a cash coupon due on each payment date or distribution date pursuant to its Underlying Instruments without the ability to defer or capitalize such portion of interest and (ii) the cash coupon portion of such loan or obligation is calculated at a rate per annum greater than or equal to LIBOR.

"Placement Agent":  Each of IXIS Securities North America Inc. and IXIS Corporate & Investment Bank, in its capacity as a Placement Agent under the Placement Agreement.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001797

"Placement Agreement": An agreement dated April 6, 2007 among the Co-Issuers and the Placement Agents, relating to the offer and sale of the Class A Notes, as amended from time to time.

"Plan": An ERISA Plan and any other "plan" (as defined in Section 4975(e)(1) of the Code) which is subject to the provisions of Section 4975 of the Code, and any entity whose underlying assets include the assets of any such ERISA Plan or plan.

"Plan Asset Regulation": The regulation issued by the United States Department of Labor at 29 C.F.R. Section 2510.3-101 as in effect from time to time.

"Pledged Collateral Investment": As of any date of determination, any Collateral Investment that has been Granted to the Trustee and has not been released from the lien of this Indenture pursuant to Section 10.11.

"Pledged Obligations": On any date of determination, (a) the Collateral Investments, the Eligible Investments and any Equity Security that have been Granted to the Trustee and which have not been released from the lien of this Indenture pursuant to Section 10.11 and form part of the Collateral and (b) all non-Cash proceeds thereof.

"Post-Ramp Up Plan": The meaning specified in Section 7.13(b).

"Preceding Monthly Reporting Date": The meaning specified in Section 10.10(a).

"Preference Share Distribution Account": The meaning specified in the Preference Share Paying Agency Agreement.

"Preference Share Paying Agency Agreement": The Preference Share Paying Agency Agreement dated as of the Closing Date between the Issuer and the Preference Share Paying Agent, as modified and supplemented and in effect from time to time.

"Preference Share Paying Agent": The Bank, solely in its capacity as paying agent under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the paying agent pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter "Preference Share Paying Agent" shall mean such successor Person.

"Preference Share Registrar": The Issuer, solely in its capacity as registrar under the Preference Share Paying Agency Agreement, unless a successor Person shall have become the registrar pursuant to the applicable provisions of the Preference Share Paying Agency Agreement, and thereafter "Preference Share Registrar" shall mean such successor Person.

"Preference Share Subscription Agreements": The several Preference Share Subscription Agreements, each dated as of the Closing Date, between the Issuer and the respective initial purchaser(s) of the Preference Shares, as modified and supplemented and in effect from time to time.

"Preference Shares": The preference shares of the Issuer, par value U.S.$0.01 per share.

"Prepayment": The meaning specified in Section 9.5(a)(ii).

"Prepayment Date": The meaning specified in Section 9.5(a)(ii).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001798

"Principal Balance" or "par": With respect to any Pledged Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation; provided that:

(a)    the Principal Balance of any Equity Security shall be deemed to be zero;

(b)    except as otherwise expressly specified herein, the Principal Balance of a Revolving Collateral Investment or a Delayed Funding Collateral Investment shall include any Unfunded Amount of such Revolving Collateral Investment or Delayed Funding Collateral Investment (regardless of the nature of the contingency relating to the Issuer's obligation to fund such Unfunded Amount); and

(c)    the Principal Balance of any Collateral Investment will not include any principal amount of such Collateral Investment representing previously deferred or capitalized interest unless (1) such Collateral Investment has a Standard & Poor's Rating of "B" or higher (such Rating will include only ratings assigned by Standard & Poor's or Standard & Poor's CreditModel) and such Standard & Poor's Rating addresses the previously deferred or capitalized interest, (2) such Collateral Investment is in compliance with all "EBITDA", senior debt to "EBITDA" and "EBITDA" to interest expense covenants, as applicable, set forth in the Underlying Instruments of such Collateral Investment and (3) the Collateral Manager believes with reasonable certainty that the obligor under such Collateral Investment has the financial ability to pay, as of such date of determination, such amount of deferred or capitalized interest in accordance with the terms of its Underlying Instrument.

"Principal Proceeds": With respect to any Due Period, the sum (without duplication, and in any event excluding the Excluded Property) of:

(a)    all payments of principal received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Investments and Eligible Investments (other than (i) Uninvested Proceeds, (ii) amounts defined as "Interest Proceeds" pursuant to clause (c) of the definition thereof and (iii) payments to be held in the Rollover Proceeds Account pursuant to Section 10.8);

(b)    all Sale Proceeds received by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Investments, including without limitation amounts received in respect of original issue or market discount, but excluding accrued interest constituting "Interest Proceeds" under clauses (a) or (b) of the definition of "Interest Proceeds" and excluding call, redemption and prepayment premiums and fees and commissions of the type referred to in clause (d) or (f) of the definition of "Interest Proceeds";

(c)    all payments of interest received in Cash by the Issuer or the Zohar Subsidiary during such Due Period on the Collateral Investments and Eligible Investments to the extent such payments constitute proceeds from accrued interest purchased with Principal Proceeds or Uninvested Proceeds;

(d)    with respect to the Due Period during which the last day of the Reinvestment Period occurs, any Uninvested Proceeds on deposit in the Issuer Principal Collection Account on the close of the last day of the Reinvestment Period (other than Uninvested Proceeds that will be used to acquire or originate Collateral Investments that the Issuer or the Zohar Subsidiary has committed to purchase or originate (but have not yet settled) on such date and Uninvested Proceeds that are to be deposited in the Unfunded Revolver Discount Account with respect thereto);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001799

(e)    all Hedge Termination Amounts received by the Issuer during such Due Period;

(f)    all Distributions in Cash on and Cash Sale Proceeds with respect to any PIK Loan (and, in the case of loan or other obligation that defers or capitalizes a portion of its interest, all Distributions in Cash and Cash Proceeds relating to such portion of deferred or capitalized interest); and

(g)    all other amounts received by the Issuer or the Zohar Subsidiary during such Due Period which are not included in the definition of "Interest Proceeds" (other than payments of interest and principal on Eligible Investments credited to the Class A-1R Holder Collateral Account and the Hedge Counterparty Collateral Account),

provided that the Specified Realized Gain Amount for any Collateral Investment shall not constitute Principal Proceeds.

Any determination of the aggregate amount of Principal Proceeds with respect to any day during a Due Period will include all Principal Proceeds received by the Issuer or the Zohar Subsidiary from and including the first day of such Due Period to and including such date of determination.

Amounts received in U.S. Dollars under Currency Hedge Agreements in respect of Principal Proceeds received in Non-Dollar Currencies shall constitute Principal Proceeds.

"Principally Secured Asset": Any Collateral Investment (i) that is, or is an interest in, an obligation substantially all of the proceeds of which were used to acquire, improve or protect an interest in real property that, at the origination date of such obligation, is the only security for such obligation (other than Cash and investment securities held pending use of such funds), (ii) that is secured by interests in real property the fair market value of which, in aggregate, is at least 80% of the issue price of such obligation on the issue date therefor, (iii) is an interest in a real estate mortgage investment conduit under Section 860D of the Code, (iv) is a stripped bond or stripped coupon described in Treasury Regulation Section 301.7701(i) 1(d)(1)(iii), or (v) is an interest in any of (i) through (iv) above.

"Priority Category Recovery Rate": With respect to any Collateral Investment, the recovery rates applicable thereto, determined as set forth in the definition of "Moody's Recovery Rate" or as set forth in the definition of "Standard & Poor's Average Recovery Rate", as the case may be.

"Priority of Payments": The priority of payments specified in Sections 11.1(a)(i) and (ii).

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Professional Fee Account": The trust account designated the "Professional Fee Account" and established in the name of the Trustee pursuant to Section 10.6(b).

"Professional Fees": Fees and expenses of professionals hired by the Collateral Manager in connection with its duties under the Management Agreement (other than (a) fees and expenses described in Section 11.1(a)(i)(B) and (b) fees and expenses payable from the Expense Account or the Closing Expense Account).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001800

- 48 -

"Proposed Portfolio": The portfolio (measured by Principal Balance) of the Collateral Investments and Funding Availability resulting from the sale, maturity or other disposition of a Collateral Investment or a proposed purchase or origination of a Collateral Investment, as the case may be.

"Proposed Post-Ramp Up Plan": The meaning specified in Section 7.13(b).

"Purchase Documents": The assignment agreements, purchase and sale agreements, participation agreements and/or other agreements by which the Issuer and/or the Zohar Subsidiary acquires any interest, direct or indirect, in the Collateral.

"Purchase Price": With respect to the purchase of a Collateral Investment, the net price paid by or to the Issuer or the Zohar Subsidiary for such Collateral Investment (which, in the case of a Purchase Price paid to the Issuer or the Zohar Subsidiary by the seller of such Collateral Investment, will be stated as a negative number), after taking into account all transfer fees paid by or paid to the Issuer or the Zohar Subsidiary in connection with such purchase and all payments and discounts made or granted by the seller of such Collateral Investment to the Issuer in consideration of such purchase.

"QIB/QP": A Qualified Institutional Buyer (other than (a) a dealer described in paragraph (a)(1)(ii) of Rule 144A that owns and invests on a discretionary basis less than U.S.$25,000,000 in securities of issuers that are not affiliated Persons of such dealer; or (b) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, where investment decisions with respect to such plan are made by the beneficiaries of such plan) that is a Qualified Purchaser.

"Qualified Institutional Buyer": A "qualified institutional buyer" as defined in Rule 144A.

"Qualified Purchaser ": (a) A "qualified purchaser" as defined in Section 2(a)(51) of the Investment Company Act. (b) a Knowledgeable Employee with respect to Issuer or (c) a company beneficially owned exclusively by one or more "qualified purchasers" and/or Knowledgeable Employees with respect to the Issuer.

"Qualified Securitization Pledge": With respect to any Holder of Class A-1 Notes, a bona fide pledge by Holder of its right, title and interest in and to any Class A-1 Note pursuant to its program collateral or security agreement with a collateral agent to secure obligations owing by such Holder to such Holder's liquidity providers, debt holders or other creditors, but only:

    (1)    if such pledge would not (in the reasonable judgment of such Holder and for so long as the Issuer does not reasonably object) (A) have the effect of requiring the Issuer, the Co-Issuer, the Zohar Subsidiary or the pool of Collateral to register as an investment company under the Investment Company Act; (B) adversely affect the Issuer's ability to use the exception provided for by Section 3(c)(7) of the Investment Company Act; (C) subject the Issuer or the Notes to the registration requirements of the Securities Act; (D) result in a non-exempt prohibited transaction for purposes of ERISA; or (E) cause the Issuer to be a publicly traded partnership or otherwise be taxable as a corporation for U.S. federal income tax purposes; and

    (2)    if such Holder from time to time delivers to the Issuer such information concerning such Holder, such collateral agent and such liquidity providers, debt holders or other creditors as the Issuer may reasonably request in order for the Issuer to make appropriate determinations with respect to the matters referred to in clause (1) above;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                 PP001801

provided that, upon any foreclosure action in respect of any such pledge and any related purported transfer of legal or beneficial ownership of such Class A-1 Note or any right, title or interest therein, any such purported transfer will be considered to be a "transfer" of such Note (or such right, title or interest) for all purposes of this Indenture (including for purposes of Section 2.4).

"Qualifying Investment Vehicle": An entity (a) with only one class of securities outstanding and (b) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer or the Co-Issuers, as the case may be, and the Note Registrar each of the representations set forth herein and required to be made upon transfer of any of the relevant Class of Notes (with modifications to such representations satisfactory to the Collateral Manager and the Issuer to reflect the indirect nature of the interests of such beneficial owners in such Notes, including any modification permitting the beneficial owners of the securities issued by such entity to represent that they are accredited investors as defined in Rule 501(a) under the Securities Act).

"Quarterly Asset Amount": With respect to any Payment Date, an amount equal to the Aggregate Principal Balance of all Pledged Obligations (including, for the avoidance of doubt, the amount of any Cash, to the extent not already invested in Eligible Investments) on the preceding Payment Date; provided that the Quarterly Asset Amount in respect of the Initial Payment Date shall equal the average of the Aggregate Principal Balance of all Pledged Obligations (including, for the avoidance of doubt, the amount of any Cash, to the extent not already invested in Eligible Investments) on the Funding Date, August 11, 2007 and September 2, 2007.

"Ramp Up Calculation": The meaning specified in Section 7.13(a).

"Ramp Up End Date": April 11, 2008 or such earlier date as may be specified by the Collateral Manager by notice to the Trustee and the Rating Agencies delivered in connection with the Effective Target Date, if any.

"Rating": (I) With respect to Moody's, the Moody's Rating as of any date of determination.

(II)     With respect to any Collateral Investment, for determining the Standard & Poor's Rating as of any date of determination:

(i)     if there is an issuer credit rating by Standard & Poor's of the borrower of such Collateral Investment, or the guarantor who unconditionally and irrevocably guarantees the payment of such Collateral Investment, then the Standard & Poor's Rating shall be the lower of (x) such rating and (y) the published rating (if any) by Standard & Poor's on such Collateral Investment;

(ii)     if no other security or obligation of the borrower is rated by Standard & Poor's, then the Issuer, or the Collateral Manager on behalf of the Issuer, may either:

(x)     apply to Standard & Poor's for a corporate credit estimate, which shall be its Standard & Poor's Rating (and pending receipt from Standard & Poor's of such estimate, such Collateral Investment shall have a Standard & Poor's Rating equal to the credit model score generated by the Standard & Poor's CreditModel); provided that (1) unless the applicable industry and country of such borrower are covered by the Standard & Poor's CreditModel and such borrower has at least U.S.$50,000,000 of annual

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001802

revenues, such Collateral Investment shall have a Standard & Poor's rating of "B" until Standard & Poor's provides a credit estimate and (2) if within 14 days after acquiring or originating such Collateral Investment the Issuer (or the Collateral Manager on behalf of the Issuer) has failed to provide Standard & Poor's with the Information Package for such Collateral Investment to conduct a credit estimate then such Collateral Investment shall have a Standard & Poor's Rating of "CCC-" until the earlier of the date that (a) Standard & Poor's provides such credit estimate and (b) such Information Package is provided to Standard & Poor's at which time such Collateral Investment will be assigned a Standard & Poor's rating according to this clause II(ii)(x); or

(y)    notify the Trustee and Standard & Poor's that such Collateral Investment shall have a Standard & Poor's Rating equal to the credit model score generated by the Standard & Poor's CreditModel; *provided* that (1) the Collateral Manager shall, within 14 days of such notification, submit to Standard & Poor's the Information Package for such Collateral Investments; (2) if Standard & Poor's notifies the Collateral Manager in writing that Standard & Poor's has generated a different credit model score under the Standard & Poor's CreditModel for such Collateral Investment, then the Standard & Poor's Rating of such Collateral Investment shall be equal to the credit model score so generated by Standard & Poor's unless the Collateral Manager elects to determine such Standard & Poor's Rating by another method permitted in this definition; (3) the Standard & Poor's CreditModel may only be used for purposes of this clause (ii)(y) if the industry and country of such borrower are covered by such model and such borrower has at least U.S.$50,000,000 of annual revenues and, in the event the Standard & Poor's CreditModel does not cover such industry and country or such borrower does not have such revenues, the Issuer (or the Collateral Manager on behalf of the Issuer) shall apply to Standard & Poor's for a corporate credit estimate pursuant to clause (ii)(x) above and (4) if within 14 days after acquiring or originating such Collateral Investment the Issuer (or the Collateral Manager on behalf of the Issuer) has failed to provide Standard & Poor's with the Information Package for such Collateral Investment then such Collateral Investment shall have a Standard & Poor's Rating of "CCC-" until such information is provided to Standard & Poor's at which time such Collateral Investment will be assigned a Standard & Poor's rating according to this clause II(ii)(y).

To the extent that any Rating of a Collateral Investment is then being derived pursuant to this clause (II)(ii) based on a Standard & Poor's corporate credit estimate or the Standard & Poor's CreditModel, the Issuer, or the Collateral Manager on behalf of the Issuer shall provide to Standard & Poor's the most recent annual or quarterly financials, as applicable, with respect to the issuer of such Collateral Investment on or before the last day of April and October of each calendar year, beginning in October, 2007. If the financials of any Collateral Investment are not delivered according to the preceding sentence, such Collateral Investment shall have a Standard & Poor's rating of "CCC-".

The Issuer (or the Collateral Manager on behalf of the Issuer) shall promptly apply to Standard & Poor's for a new rating (including providing an Information Package) in respect of any Collateral Investment that does not have a monitored publicly available rating from Standard & Poor's and as to which any one or more of the following events occurs, is agreed between the issuer thereof (or a governmental authority) and a sufficient number of holders of such Collateral Investment that is binding on all holders thereof or is announced (or otherwise decreed) by such issuer (or governmental authority) in a form that is binding upon all such holders, and such event is not expressly provided for under the terms of the Underlying Instruments of such Collateral Investment in effect

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                             PP001803

immediately prior to such event: (i) a postponement by more than 6 months of the date on which principal is payable at final maturity; (ii) a reduction by more than 3.00% per annum in the rate of interest payable (whether calculated based on a spread above a floating reference rate or a fixed rate); (iii) a reduction by more than 25% in the aggregate amount of principal payable on any one or more scheduled amortization or other redemption dates within any 12-month period; (iv) an increase of more than 10% in any advance rate or other borrowing base formula utilized in connection with such Collateral Investment; (v) a change in, or waiver of, the interest rate resulting in a deferral or capitalization of interest by more than 3.00% per annum (based on the Principal Balance of such Collateral Investment) or any deferral or capitalization that would cause such Collateral Investment to become a PIK Loan; (vi) upon a restructuring of any loan that has a Standard & Poor's Rating evidenced by a corporate credit estimate whereby the restructuring materially modifies the economic terms on which the most recent corporate credit estimate was based (Upon the occurrence of a restructuring, the Collateral Investment will be ineligible for deriving the Standard & Poor's Rating using the Standard & Poor's CreditModel and the Issuer, or the Collateral Manager on behalf of the Issuer, must apply to Standard & Poor's for a corporate credit estimate 14 days prior to the restructuring taking effect. If the new rating obtained by the procedures in the prior sentence is equivalent to the rating prior to the restructuring, then, if applicable, the asset will be eligible for deriving the Standard & Poor's Rating using the Standard & Poor's CreditModel); or (vii) the Issuer, or the Collateral Manager on behalf of the Issuer, becomes aware that the financial condition of an issuer of a Collateral Investment has materially changed since the last time the Information Package was provided to Standard & Poor's.

(iii)     if such Collateral Investment is not rated by Standard & Poor's, but another security or obligation of the borrower is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains a Standard & Poor's Rating for such Collateral Investment pursuant to subclause (ii) above, then the Standard & Poor's Rating of such Collateral Investment shall be the issuer credit rating or shall be determined as follows: (a) if there is a rating on a senior secured obligation of the borrower, then the Standard & Poor's Rating of such Collateral Investment shall be one (1) subcategory below such rating if such Collateral Investment is a senior secured or senior unsecured obligation of the borrower; (b) if there is a rating on a senior unsecured obligation of the borrower, then the Standard & Poor's Rating of such Collateral Investment shall equal such rating if such Collateral Investment is a senior secured or senior unsecured obligation of the borrower; and (c) if there is a rating on a subordinated obligation of the borrower, and if such Collateral Investment is a senior secured or senior unsecured obligation of the borrower, then the Standard & Poor's Rating of such Collateral Investment shall be one (1) subcategory above such rating;

(iv)     if there is no issuer credit rating published by Standard & Poor's and such Collateral Investment is not rated by Standard & Poor's, and no other security or obligation of the borrower is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains a Standard & Poor's Rating for such Collateral Investment pursuant to subclause (ii) above, then the Standard & Poor's Rating of such Collateral Investment shall be determined as follows if (x) neither the borrower nor any of its affiliates (except that, for this purpose, affiliation will not result from the common ownership by a common financial sponsor) is subject to reorganization or bankruptcy Proceedings and (y) no debt security or obligation of the borrower has been in default during the past two years, the Standard & Poor's Rating of such Collateral Investment will be "CCC-";

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001804

provided that the Standard & Poor's Rating for any Collateral Investment that is (x) on credit watch positive for possible upgrade by Standard & Poor's shall be deemed to be the Standard & Poor's Rating one notch above the Standard & Poor's Rating of such Collateral Investment that would otherwise be applicable as determined pursuant to clauses (i) through (iv) above, (y) on credit watch negative for possible downgrade by Standard & Poor's shall be deemed to be the Standard & Poor's Rating one notch below the Standard & Poor's Rating of such Collateral Investment that would otherwise be applicable as determined pursuant to clauses (i) through (iv) above and (z) a Current Pay Investment shall be deemed to be "CCC-" for purposes of the Standard & Poor's CDO Monitor Test.

"Rating Agency": Each of Moody's, for so long as any of the Outstanding Notes are rated by Moody's, and Standard & Poor's, for so long as any of the Outstanding Notes are rated by Standard & Poor's, or with respect to Pledged Obligations generally, if at any time Moody's or Standard & Poor's ceases to provide rating services with respect to high yield debt securities, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory a Majority of each Class. If at any time Moody's or Standard & Poor's ceases to be a Rating Agency, references to rating categories of Moody's or Standard & Poor's, as the case may be, in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's or Standard & Poor's published ratings for the type of security in respect of which such alternative rating agency is used.

"Rating Condition": With respect to any action taken or to be taken by or on behalf of the Issuer and a Rating Agency, a condition that is satisfied if such Rating Agency has confirmed in writing to the Issuer, the Trustee and the Collateral Manager that no immediate withdrawal or reduction with respect to its then-current rating by such Rating Agency of any Class of Notes will occur as a result of such action; provided that the Rating Condition will be deemed to be satisfied with respect to a Rating Agency if no Class of Notes Outstanding is rated by such Rating Agency.

"Rating Confirmation": The meaning specified in Section 7.13(b)(1).

"Rating Confirmation Failure": The meaning specified in Section 7.13(b)(1).

"Rating Criteria": Criteria satisfied on any date with respect to any Holder of a Class A-1R Note or Class A-1D Note if (x) the short term debt, deposit or similar obligations of such Holder are on such date rated at least "P-1" by Moody's or the long-term debt, deposit or similar obligations of such Holder are on such date rated at least "Aa2" by Moody's and (y) the short term debt, deposit or similar obligations of such Holder are on such date rated at least "A-1" by Standard & Poor's.

"Rating Failure": The meaning specified in Section 7.13(b)(1).

"Ratings Hedge Event": With respect to any Hedge Agreement, the failure of the Hedge Counterparty thereunder (or any Person that shall have absolutely and unconditionally guaranteed (with such form of guarantee meeting Standard & Poor's then current publicly available criteria on guarantees) the obligations of such Hedge Counterparty under such Hedge Agreement) to have a long-term debt rating or issuer rating at least "A3" by Moody's and at least "BBB-" by Standard & Poor's and the failure of such Hedge Counterparty with 10 days of such ratings downgrade, at its own expense, to transfer all of its rights and obligations under such Hedge Agreement to (or obtain an absolute and unconditional guaranty (with such form of guarantee meeting Standard & Poor's then current publicly available criteria on guarantees) by) a third party that has (i) a long-term debt rating or issuer rating at least "Aa2" by Moody's and (ii) a long-term debt rating or issuer rating of at least "AA-" by Standard & Poor's or a short-term debt rating at least "A-1" by Standard & Poor's.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001805

"Ratings Matrix": The row of the table below, which row (the "Currently Applicable Row") shall be as of the Ramp Up End Date: (a) if the criteria for Case I, II or III in the "Effective Targets Table" are then in effect, row 8 in such table (disregarding for this purpose the column under the heading "Moody's Weighted Average Rating Factor Test") and (b) if the criteria in Case IV in the "Effective Targets Table" are in effect, any row as selected by the Collateral Manager from time to time on 10 Business Days' prior written notice to the Trustee.

| | | | | Minimum Average Recovery Rate Test | | |
|---|---|---|---|---|---|---|
| Ratings Matrix Row | Moody's Weighted Average Rating Factor Test | Weighted Average Spread Test | Weighted Average Coupon Test | Moody's Recovery Rate | Standard & Poor's Average Recovery Rate (Class A-2 level) | Standard & Poor's Average Recovery Rate (Class A-3 level) |
| 1 | 2870 | 5.50% | 10.00% | 50.00% | 52.00% | 55.50% |
| 2 | 2960 | 5.75% | 10.00% | 50.00% | 52.00% | 55.50% |
| 3 | 3010 | 6.00% | 10.00% | 50.00% | 52.00% | 55.50% |
| 4 | 3070 | 6.25% | 10.00% | 50.00% | 52.00% | 55.50% |
| 5 | 3110 | 6.50% | 10.00% | 50.00% | 52.00% | 55.50% |
| 6 | 3260 | 6.75% | 10.00% | 50.00% | 52.00% | 55.50% |
| 7 | 3110 | 5.50% | 10.00% | 53.00% | 52.80% | 56.40% |
| 8 | 3270 | 5.75% | 10.00% | 53.00% | 52.80% | 56.40% |
| 9 | 3300 | 6.00% | 10.00% | 53.00% | 52.80% | 56.40% |
| 10 | 3390 | 6.25% | 10.00% | 53.00% | 52.80% | 56.40% |
| 11 | 3440 | 6.50% | 10.00% | 53.00% | 52.80% | 56.40% |
| 12 | 3510 | 6.75% | 10.00% | 53.00% | 52.80% | 56.40% |
| 13 | 3410 | 5.50% | 10.00% | 56.00% | 54.00% | 57.80% |
| 14 | 3490 | 5.75% | 10.00% | 56.00% | 54.00% | 57.80% |
| 15 | 3510 | 6.00% | 10.00% | 56.00% | 54.00% | 57.80% |
| 16 | 3660 | 6.25% | 10.00% | 56.00% | 54.00% | 57.80% |
| 17 | 3740 | 6.50% | 10.00% | 56.00% | 54.00% | 57.80% |
| 18 | 3810 | 6.75% | 10.00% | 56.00% | 54.00% | 57.80% |
| 19 | 3860 | 5.50% | 10.00% | 60.00% | 56.00% | 60.00% |
| 20 | 3960 | 5.75% | 10.00% | 60.00% | 56.00% | 60.00% |
| 21 | 4050 | 6.00% | 10.00% | 60.00% | 56.00% | 60.00% |
| 22 | 4160 | 6.25% | 10.00% | 60.00% | 56.00% | 60.00% |
| 23 | 4240 | 6.50% | 10.00% | 60.00% | 56.00% | 60.00% |
| 24 | 4310 | 6.75% | 10.00% | 60.00% | 56.00% | 60.00% |

"Record Date": The date on which the Holders of Notes entitled to receive a payment in respect of principal of or interest on the succeeding Payment Date are determined, such date as to any Payment Date being the 15th day (whether or not a Business Day) prior to the applicable Payment Date.

"Redemption Accounts": All Accounts other than the Class A-1R Holder Collateral Account and the Hedge Counterparty Collateral Account.

"Redemption Date": Any date specified for a redemption of Notes pursuant to Section 9.1.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001806

"Redemption Date Statement": The meaning specified in Section 10.10(d).

"Redemption Price": When used with respect to:

(a)        any Class A-1R Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class A-1R Note; plus accrued interest (including Defaulted Interest and accrued interest thereon) thereon; plus accrued Class A-1R Commitment Fee owing to the Holder of such Note; plus such Class A-1R Note's pro rata share of any Class A-1R Redemption Break Funding Costs;

(b)        any Class A-1T Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class A-1T Note; plus accrued interest (including Defaulted Interest and accrued interest thereon) thereon; plus such Class A-1T Note's pro rata share of any Class A-1T Redemption Break Funding Costs;

(c)        any Class A-1D Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class A-1D Note; plus accrued interest (including Defaulted Interest and accrued interest thereon) thereon; plus accrued Class A-1D Commitment Fee owing to the Holder of such Note; plus such Class A-1D Note's pro rata share of any Class A-1D Redemption Break Funding Costs;

(d)        any Class A-2 Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class A-2 Note; plus accrued interest (including Defaulted Interest and accrued interest thereon) thereon; plus such Class A-2 Note's pro rata share of any Class A-2 Redemption Break Funding Costs;

(e)        any Class A-3 Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class A-3 Note; plus accrued interest (including Defaulted Interest and accrued interest thereon) thereon; plus such Class A-2 Note's pro rata share of any Class A-3 Redemption Break Funding Costs;

(f)        any Class B Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class B Note; and

(g)        any Class C Note to be redeemed, an amount equal to the Aggregate Outstanding Amount of such Class C Note.

"Reference Banks": The meaning specified in Schedule B.

"Registered": With respect to a loan or other debt obligation, either (a) it is in registered form as such term is used in Section 163(f) of the Code, (b) it is held through an arrangement that satisfies the requirements of Treasury Regulation section 1.165-12(c)(3) or (c) it is not a registration required obligation within the meaning of Treasury Regulation section 1.165-12(a).

"Registered Form": When used with respect to a Certificated Security, means a form in which: (a) the Security Certificate specifies a Person entitled to the Security; and (b) a transfer of the Security may be registered upon books maintained for that purpose by or on behalf of the issuer of such Security, or the Security Certificate so states.

"Regulation S": Regulation S under the Securities Act.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                           PP001807

"Regulation S Global Note": The meaning specified in Section 2.1(a).

"Regulation U": Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221, as amended, or any successor regulation.

"Reinvestment Agreement": A guaranteed reinvestment agreement, funding agreement, investment contract or similar obligation from a bank, insurance company or other corporation or entity; provided that such agreement provides that it is terminable by the purchaser, without premium or penalty, if the rating assigned to such agreement by any Rating Agency is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

"Reinvestment Period": The period from the Funding Date to the first to occur of (i) the Scheduled Reinvestment Period Termination Date; (ii) the Payment Date immediately following the date that the Collateral Manager (in its sole and absolute discretion) notifies the Trustee that, in light of the composition of the Collateral Investments, general market conditions and other pertinent factors, investments in additional Collateral Investments within the foreseeable future would either be impractical or not beneficial; and (iii) the date on which the Reinvestment Period is terminated pursuant to Article 5 hereof.

"Relevant Persons": The meaning specified in Section 2.7.

"Remaining Class A Note Reduction Amount": The meaning specified in Section 11.1(a)(ii)(C).

"Revolving Collateral Investment": A Collateral Investment that provides the issuer thereunder with a revolving credit facility from which one or more borrowings may be made up to the stated principal amount of such revolving credit facility and which provides that borrowed amounts may be repaid and reborrowed from time to time; provided that such loan shall only be considered to be a Revolving Collateral Investment to the extent that the commitment of the Obligor thereunder has not terminated or irrevocably been reduced to zero. In the case of any Collateral Investment that consists of a combination of a Revolving Collateral Investment and a term loan, only that portion of the loan which consists of a Revolving Collateral Investment will be treated as a Revolving Collateral Investment.

"Rollover Proceeds Account": The trust account designated the "Rollover Proceeds Account" and established in the name of the Trustee pursuant to Section 10.8(a).

"Rule 144A": Rule 144A under the Securities Act.

"Rule 144A Information": Such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"Rule 144A Global Note": The meaning specified in Section 2.1(a).

"Sale": The meaning specified in Section 5.17.

"Sale Proceeds": All proceeds received as a result of sales of Pledged Obligations pursuant to Section 12.2(a), 12.2(b) or 12.2(c), net of any out-of-pocket expenses of the Issuer, the Zohar Subsidiary, the Collateral Manager or the Trustee reasonably incurred in connection with any such sale.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001808

"Scheduled Distribution": With respect to any Pledged Obligation, for each Due Date, the scheduled payment of principal and/or interest and/or fees due on such Due Date with respect to such Pledged Obligation, determined in accordance with the assumptions specified in Section 1.2.

"Scheduled Reinvestment Period Termination Date": The Payment Date in March, 2012.

"Second Currency": The meaning specified in Section 17.13.

"Second Lien Collateral Investment": A Dollar or Non-Dollar Currency-denominated loan or obligation that (i) on the date of initial acquisition or origination thereof by the Issuer or the Zohar Subsidiary pursuant to Section 12.1(a) hereof is secured by a valid second priority perfected security interest (and is secured by no first priority liens) on assets of the obligor(s) thereon or its Affiliates; (ii) is secured by collateral having a value (determined as set forth below) not less than the outstanding principal balance of such loan or obligation plus the aggregate outstanding principal balances of all other loans or obligations of equal or higher seniority secured by a first or second lien or security interest in the same collateral and (iii) is not by its terms (and is not expressly permitted by its terms to become) subordinate in right of payment to any other obligation for borrowed money of the obligor of such loan with respect to the liquidation of such obligor or such collateral, other than Senior Secured Collateral Investments and other loans or obligations permitted in the definition thereof to be of equal or higher seniority to such Senior Secured Collateral Investments. The determination as to whether condition (ii) of this definition is satisfied shall be based on (a) an appraisal, cashflow/enterprise valuation or other valuation performed on or about the date of acquisition or origination of the loan or obligation or (b) the Collateral Manager's judgment (exercised in accordance with the standards set forth in the Management Agreement) at the time the loan or obligation is acquired or originated by the Issuer.

"Section 3(c)(7)": Section 3(c)(7) of the 1940 Act.

"Section 3(c)(7) Reminder Notice": A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.10(a) and (b)) substantially in the form of Exhibit H-1 hereto.

"Secured Obligations": The meaning specified in the Granting Clauses of this Indenture.

"Secured Parties": The meaning specified in the Preliminary Statements of this Indenture.

"Securities Account": An account to which a Financial Asset is or may be credited in accordance with an agreement under which the Person maintaining the account undertakes to treat the Person for whom the account is maintained as entitled to exercise the rights that comprise the Financial Asset.

"Securities Act": The U.S. Securities Act of 1933, as amended.

"Securities Entitlement": Is acquired by a Person if a Securities Intermediary: (a) indicates by book entry that a Financial Asset has been credited to the Person's Securities Account; (b) receives a Financial Asset from the Person or acquires a Financial Asset for the Person and, in either case, accepts it for credit to the Person's Securities Account; or (c) becomes obligated under other law, regulation or rule to credit a Financial Asset to the Person's Securities Account; provided that if a Securities Intermediary holds a Financial Asset for another Person, and the Financial Asset is registered in the name of, payable to the order of, or specially Indorsed to the other Person, and has not been indorsed to the Securities Intermediary or in blank, the other Person is treated as holding the Financial Asset directly rather than as having a Securities Entitlement with respect to the Financial Asset.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001809

"Securities Intermediary": (a) A Clearing Corporation; or (b) a Person, including a bank or broker, that in the ordinary course of its business maintains Securities Accounts for others and is acting in that capacity.

"Security": Except as otherwise provided in Section 8-103 of the UCC, means an obligation of an issuer or a share, participation or other interest in an issuer or in property or an enterprise of an issuer: (a) which is represented by a Security Certificate in Bearer Form or Registered Form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (b) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations; and (c) which either (i) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (ii) is a medium for investment and by its terms expressly provides that it is a security governed by Article 8 of the UCC.

"Security Certificate": A certificate representing a Security.

"Selling Institution": An entity from which the Issuer or the Zohar Subsidiary, as applicable, acquires a Participation Interest in a loan, debt instrument or other obligation.

"Selling Institution Defaulted Participation": A Participation Interest (other than a Defaulted Participation Obligation) with respect to which:

      (a)      the long-term debt or deposit obligations of the Selling Institution (other than the Ark Seller) are not at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's or any such debt or deposit obligations of such participation granting entity shall cease to be rated; or

      (b)      the Selling Institution has defaulted in the performance of any of its payment obligations under the related participation agreement.

"Senior Collateral Management Fee": The fee accrued and payable to the Collateral Manager (or, to the extent provided in the Management Agreement, to any Person that was the Collateral Manager when such fee was earned) in arrears on each Payment Date pursuant to Section 4.1(b) of the Management Agreement and Section 11.1, in an amount (as certified by the Collateral Manager in writing to the Trustee) equal to 1.00% per annum on the Quarterly Asset Amount (adjusted in the case of the first Payment Date on which such fees are paid to reflect the different number of days in such period). The Senior Collateral Management Fee will accrue if unpaid or deferred in accordance with the Management Agreement and be payable on the next Payment Date(s) on which funds are available therefor in accordance with the Priority of Payments.

"Senior Expense Amounts": As of any Payment Date, all amounts specified in paragraphs (A) through (G), inclusive, of Section 11.1(a)(i).

"Senior Interests": The meanings specified in Section 13.1(a) and (b).

"Senior Secured Collateral Investment": An outstanding Registered senior secured loan made by a bank or other financing entity or financial institution (including insurance companies) that (i) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under such loan (whether or not the Issuer and any other lenders are also granted a security interest of lower priority in additional collateral), (ii) is secured by a valid first priority security interest or lien in, to or on collateral (including intangible assets) having a value (determined as set forth below) not less than the outstanding principal balance of such loan plus the aggregate outstanding

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                 PP001810

principal balances of all other loans or obligations of equal seniority secured by a first lien or security interest in the same collateral and (iii) on the date a commitment was entered into with respect to the initial acquisition or origination thereof by the Issuer or the Zohar Subsidiary is not subordinated (except with respect to liquidation preferences relating to pledged collateral) by its terms in right of payment to indebtedness of the borrower for borrowed money, trade claims, capitalized leases or other similar obligations but which may (a) be subordinated to any DIP Loans of such obligor or its Affiliates or (b) in accordance with typical senior secured loan documentation, contain carve-outs or acknowledgments of certain statutory and other customarily permitted liens, such as but not limited to, tax liens against the obligor that are or may be superior to the liens granted in connection with such senior loan or a Participation Interest in such a senior secured loan. The determination as to whether condition (ii) of this definition is satisfied shall be based on (a) an appraisal, cashflow/enterprise valuation or other valuation performed on or about the date of acquisition or origination of the loan or obligation or (b) the Collateral Manager's judgment (exercised in accordance with the standards set forth in the Management Agreement) at the time the loan or obligation is acquired or originated by the Issuer.

"Short Settlement Borrowing": A Borrowing which the Issuer requests to be made on less than three Business Days' notice to the Class A-1R Note Agent.

"Specified Country": (a) Australia, Belgium, Canada, Denmark, France, Germany, Greece, Ireland, Italy, Luxembourg, The Netherlands, New Zealand, Sweden, Switzerland and the United Kingdom, (b) each Tax Jurisdiction and (c) each other country identified by the Issuer from time to time for which the Issuer either (i) has satisfied the Rating Condition with respect to the inclusion of such country or (ii) (x) has requested that the Rating Agencies confirm in writing that the inclusion of such country satisfies the Rating Condition, (y) has not received a response from either Rating Agency for a period of more than 30 days from the date of such request and (z) after such 30 day period, has notified Moody's and Standard & Poor's that such country has been designated a "Specified Country" (unless either such Rating Agency has notified the Issuer that treatment of such other country as a "Specified Country" hereunder will cause the ratings on any Class of Notes to be reduced or withdrawn by such Rating Agency).

"Specified Currency": The meaning specified in Section 17.13.

"Specified Person": The meaning specified in Section 2.5(a).

"Specified Place": The meaning specified in Section 17.13.

"Specified Realized Gain Amount": For any Collateral Investment sold or paid in full after the second anniversary of the Closing Date:

(a)    if the Class A Overcollateralization Ratio (determined immediately prior to such sale or payment in full) is greater than or equal to 140% but less than 150%, an amount equal to 50% of the Realized Gain Amount for such Collateral Investment; and

(b)    if the Class A Overcollateralization Ratio (determined immediately prior to such sale or payment in full) is greater than or equal to 150%, an amount equal to 75% of the Realized Gain Amount for such Collateral Investment;

provided that the Specified Realized Gain Amount for any Collateral Investment so sold or paid in full shall be equal to zero unless, at the time of such sale or payment, (1) the ratings on each Class of the Class A Notes by Moody's and Standard & Poor's have not been withdrawn by such Rating Agency, reduced by such Rating Agency below the ratings on such Class of Notes on the Closing Date by such

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001811

Rating Agency or be on negative credit watch by such Rating Agency, (2) each of the Class A Coverage Tests is satisfied before and after giving effect to the inclusion of such Specified Realized Gain Amount as Interest Proceeds, (3) if such sale or payment occurs during the Reinvestment Period, each of the Collateral Quality Tests is satisfied, and (4) if such sale or payment occurs after the Reinvestment Period, the Moody's Weighted Average Rating Factor Test is satisfied.

As used herein:

"Realized Gain Amount" means, for any Collateral Investment sold or paid in full, the excess (if any) of (a) the amount of Sale Proceeds received in such sale or payments received thereon, as applicable; *over* (b) the sum of (i) the Overcollateralization Credit for such Collateral Investment *plus* (ii) the aggregate amount of accrued and unpaid Cash interest thereon, in each case as of the date on which such Collateral Investment is sold or paid in full.

"Overcollateralization Credit" means, for any Collateral Investment sold or paid in full, the portion (in U.S. Dollars) of the Net Portfolio Collateral Balance represented by such Collateral Investment at the time of such sale or payment.

"Standard & Poor's":  Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"Standard & Poor's Average Recovery Rate":  As of any Measurement Date, the percentage obtained by (i) summing the products obtained by multiplying the Principal Balance of each Pledged Collateral Investment by its applicable Priority Category Recovery Rate (which shall be, if such Pledged Collateral Investment has been specifically assigned a recovery rate by Standard & Poor's for the "Class A-2 level" and the "Class A-3 level", such recovery rates and, otherwise, the Priority Category Recovery Rates as set forth in the table below), (ii) dividing such sum by the Aggregate Principal Balance of all such Pledged Collateral Investments, and (iii) rounding up to the first decimal place.  For purposes of determining the Standard & Poor's Average Recovery Rate, the Principal Balance of each Defaulted Investment will be deemed to be equal to its outstanding principal amount.

| Priority Category | Priority Category Recovery Rate (Class A-2 level) | Priority Category Recovery Rate (Class A-3 level) |
|---|---|---|
| Senior secured loans | 56% | 60% |
| Senior unsecured loans; and Second Lien Collateral Investments up to a maximum amount equal to 10% of the Maximum Investment Amount | 40% | 42% |
| Subordinated loans and Second Lien Collateral Investments in excess of 10% of the Maximum Investment Amount | 22% | 22% |

For each Pledged Collateral Investment issued by an obligor not Domiciled in the United States or Canada, the Issuer (or the Collateral Manager on its behalf) shall request Standard & Poor's to assign a Priority Category Recovery Rate to such Pledged Collateral Investment, which recovery rate shall be its applicable "Priority Category Recovery Rate".

"Standard & Poor's Bivariate Risk Table":  As follows:

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001812

| Standard & Poor's Credit Rating of Selling Institution/Counterparty (at or below) | Individual Selling Institution/Counterparty Limit (as a percentage of Total Capitalization) | Aggregate Selling Institution/Counterparty Limit (as a percentage of Total Capitalization) |
|---|---|---|
| AAA | 20% | 20.0% |
| AA+ | 10% | 20.0% |
| AA | 10% | 20.0% |
| AA- | 10% | 20.0% |
| A+ | 5% | 20.0% |
| A | 5% | 20.0% |

"Standard & Poor's CDO Monitor":  The dynamic, analytical computer model developed by Standard & Poor's and used to estimate the default risk of the Collateral Investments and provided to the Collateral Manager and the Trustee (along with the assumptions and instructions to use in connection therewith), as it may be modified by Standard & Poor's in connection with its confirmation of the ratings of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes following the issuance, if requested, of an Acceptable Class B Rating (and as so modified, if applicable).

"Standard & Poor's CDO Monitor Test":  A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if, after giving effect to the sale of a Collateral Investment or the purchase/origination of a Collateral Investment (or both), for each Class of Notes then rated by Standard & Poor's, (x) the Loss Differential of the Proposed Portfolio for such Class of Notes is positive or (y) the Loss Differential of the Proposed Portfolio for such Class of Notes is greater than or equal to the Loss Differential of the Current Portfolio for such Class of Notes.  For the avoidance of doubt, the Standard & Poor's CDO Monitor Test will not apply prior to the date on which an effective Standard & Poor's CDO Monitor is delivered to the Collateral Manager and Trustee.

As used herein, "Loss Differential" means, for the Class A-1 Notes, the Class A-1 Loss Differential; for the Class A-2 Notes, the Class A-2 Loss Differential; for the Class A-3 Notes, the Class A-3 Loss Differential; and for the Class B Notes (if the Class B Notes are then rated by Standard & Poor's), the Class B Loss Differential.

"Standard & Poor's CreditModel":  The model developed by Standard & Poor's and used to generate credit model scores that are used to determine the Standard & Poor's Ratings of Collateral Investments that do not have published Standard & Poor's ratings, which model is provided to the Collateral Manager on the Funding Date for purposes of determining such Standard & Poor's Rating.

"Standard & Poor's Rating":  With respect to any Collateral Investment, the Rating thereof determined in accordance with Part II of the definition of "Rating".

"Stated Maturity":  With respect to any security, the date specified in such security, with respect to any repurchase obligation, the repurchase date thereunder, and with respect to any Note, the date specified in such Note and in Section 2.2, as the fixed date on which the final payment of principal of such security, repurchase obligation or Note, as the case may be, is due and payable, or, if such date is not a Business Day, the next following Business Day.

"Subordinate Interests":  The meanings specified in Section 13.1(a) and (b).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001813

"Subordinated Collateral Management Fee": The fee accrued and payable to the Collateral Manager (or, to the extent provided in the Collateral Management Agreement, to any Person that was the Collateral Manager when such fee was earned) in arrears on each applicable Payment Date pursuant to Section 4.1(c) of the Management Agreement and Section 11.1 hereof, in an amount (as certified by the Collateral Manager to the Trustee) equal to the sum of (a) 1.00% per annum of the Quarterly Asset Amount and (b) the excess of U.S.$1,500,000 over the amount of the Senior Collateral Management Fee on such Payment Date. The Subordinated Collateral Management Fee will accrue if unpaid or deferred in accordance with the Management Agreement and be payable on the next Payment Date(s) on which funds are available therefor in accordance with the Priority of Payments.

"Supplemental Noteholder Information": The meaning specified in Section 10.10(c).

"Swap Rate": With respect to any Class A Notes to be redeemed, the per annum rate, determined by the Trustee or an Affiliate thereof (or any other Person selected by the Trustee and approved by the Issuer), equal to the prevailing swap rate (as quoted by Bloomberg, L.P. at approximately 10:00 A.M., New York City time on page USSW) on the third Business Day prior to the Redemption Date for a period of time closest in duration to the period from the Redemption Date to the Payment Date in March, 2012.

"Swingline Lender": Versailles Assets LLC, in its capacity as swingline lender under the Class A-1R Note Purchase Agreement.

"Swingline Note": The Promissory Note executed by the Co-Issuers and delivered to the Swingline Lender pursuant to the Class A-1R Note Purchase Agreement.

"Tax Jurisdiction": The Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands, the Channel Islands or the Netherlands Antilles (or any other tax-advantaged jurisdiction as the Collateral Manager may notify the Rating Agencies and the Trustee from time to time and with respect to which the Rating Condition has been satisfied).

"Temporary Regulation S Global Note": The meaning specified in Section 2.1(a).

"Term Sharing Percentage": The meaning specified in Section 9.6(e).

"Total Redemption Amount": The meaning specified in Section 9.1(b)(i).

"Transaction Documents": This Indenture, the Notes, the Management Agreement, the Collateral Administration Agreement, the Administration Agreement, the Hedge Agreements, the Placement Agreement, the Preference Share Paying Agency Agreement, the Note Subscription Agreements, the Note Purchase Agreements, the Preference Share Subscription Agreements, the Issuer Charter, the Trustee Fee Letter, the Swingline Note and each other agreement executed and delivered by any Zohar Obligor in connection with the foregoing agreements and the transactions contemplated thereby.

"Transfer Agent": The Person or Persons, which may include the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"True-Up Date": The meaning specified in Section 9.7(c).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                         PP001814

"Trustee": The Bank, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee Letter": The fee letter agreement dated August 15, 2005 entered into by the Issuer (or the Collateral Manager on its behalf) and the Trustee.

"Trust Officer": When used with respect to the Trustee, any Officer within the CDO Trust Services Group of the Corporate Trust Office (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other Officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office because of such Person's knowledge of and familiarity with the particular subject.

"UCC": The Uniform Commercial Code as in effect in the State of New York.

"Uncertificated Security": A Security that is not represented by a certificate.

"Underlying Instruments": The loan or credit agreement, indenture or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of, guarantees the payment of, or secures the obligations represented by such Pledged Obligation or of which the holders of such Pledged Obligation are the beneficiaries.

"Unfunded Amount": With respect to any Revolving Collateral Investment or any Delayed Funding Collateral Investment at any time, an amount equal to the excess of (a) the Commitment Amount of such Revolving Collateral Investment or Delayed Funding Collateral Investment at such time over (b) the Funded Amount of such Revolving Collateral Investment or Delayed Funding Collateral Investment at such time.

"Unfunded Portfolio Amount": As of any date, an amount (not less than zero) equal to:

(a)    the aggregate Unfunded Amount of all Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments; plus

(b)    the aggregate amounts owing by the Issuer and/or the Zohar Subsidiary to sellers of Collateral Investments that the Issuer and/or the Zohar Subsidiary has committed to purchase or originate (but which purchases or originations have not yet settled) on such date and Unfunded Amounts thereon.

"Unfunded Revolver Discount Account": The trust account designated the "Unfunded Revolver Discount Account" and established in the name of the Trustee pursuant to Section 10.7(a).

"Uninvested Proceeds": At any time, the net proceeds received by the Issuer on the Funding Date from the initial issuance of the Notes and the Preference Shares, or on any Borrowing Date occurring after the Funding Date from any Borrowing under the Class A-1 Notes, to the extent such proceeds have not theretofore been invested in Collateral Investments or Equity Kickers, have not previously become Principal Proceeds in accordance with the terms of this Indenture and have not previously been deposited in the Expense Account, the Closing Expense Account, the Professional Fee Account, the Unfunded Revolver Discount Account or the Class A-1R Future Funding Reserve Account.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001815

"United States" and "U.S".:  The United States of America, including the states thereof and the District of Columbia.

"United States Person":  Either (i) a United States person within the meaning of Section 7701(a)(30) of the Code or (ii) a person whose separate existence is disregarded pursuant to Treasury Regulation section 301.7701-3 for U.S. federal income tax purposes and all of whose equity is owned by a single person that is a United States person within the meaning of Section 7701(a)(30) of the Code.

"Unregistered Securities":  The meaning specified in Section 5.17(c).

"Unrestricted Collateral Investment":  Any Collateral Investment (other than a Delayed Funding Collateral Investment or Revolving Collateral Investment) designated by the Collateral Manager as an "Unrestricted Collateral Investment" in accordance with Section 12.5(a), in each case unless the designation of such Collateral Investment as an Unrestricted Collateral Investment has been removed by the Collateral Manager in accordance with Section 12.5(b).

"Unutilized Commitment":  With respect to any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment at any time, the portion (if any) of the Issuer's or the Zohar Subsidiary's funding commitment thereunder that has not theretofore been funded by the Issuer or the Zohar Subsidiary, as applicable, at such time.

"U.S. Person":  The meaning specified in Regulation S.

"Utilized Commitment":  With respect to any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment at any time, the portion (if any) of the Issuer's or the Zohar Subsidiary's funding commitment thereunder that is not an Unutilized Commitment.

"Warehouse Advances":  The advances made by the investors party to the Warehouse Agreement to the Issuer for purposes of acquiring or originating certain Collateral Investments prior to the Funding Date.

"Warehouse Agreement":  The Note Purchase Agreement dated as of September 19, 2005, among the Issuer, Natixis Financial Products Inc., as investor agent, and the investors party thereto.

"Warehouse Collateral Investments":  The Collateral Investments purchased or originated by the Issuer prior to the Funding Date with Warehouse Advances pursuant to the Warehouse Agreement.

"Weighted Average Coupon":  As of any Measurement Date, a fraction (expressed as a percentage and rounded up to the next 0.001%) equal to the sum of the weighted average coupon on all Fixed Rate Obligations (excluding, without duplication, Non-Current Collateral Investments, Non-Performing Collateral Investments but, for the avoidance of doubt, including the current pay portion of a Collateral Investment that has both a current pay fixed rate Cash interest component and an interest component that can be deferred or capitalized by the Obligor thereon), determined by (a) multiplying the Principal Balance of each such Collateral Investment by its interest rate per annum and (b) summing the amounts determined pursuant to clause (a) for all such Collateral Investments, and (c) dividing such sum by the Aggregate Principal Balance of all such Collateral Investments; provided that, if the Weighted Average Coupon Test is not satisfied as of such Measurement Date, then all or a portion of the Weighted Average Coupon Adjustment, if any, as of such Measurement Date, up to the amount of such shortfall, shall be added to such sum.  For purposes of the foregoing calculation, (i) with respect to Collateral Investments that bear interest at a fixed rate that decreases solely as a function of the passage of time the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001816

applicable interest rate shall be the lowest rate of interest that such Collateral Investment may now or in the future bear interest at and (ii) with respect to Collateral Investments, the interest payments of which are subject to tax withholding under applicable law but are not entitled to receive (pursuant to the Underlying Instruments) gross-up for the full amount of such tax withholdings, the applicable interest rate shall be the effective rate at which such Collateral Investments bear interest after taking into account such tax withholdings.

"Weighted Average Coupon Adjustment": As of any Measurement Date, a fraction (expressed as a percentage), the numerator of which is equal to the product of (a) the excess, if any, of the Weighted Average Spread for such Measurement Date over the percentage specified for the Weighted Average Spread Test in the Currently Applicable Row of the Ratings Matrix for such Measurement Date, and (b) the aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of such Measurement Date (other than Defaulted Investments and Unrestricted Collateral Investments), and the denominator of which is the aggregate Principal Balance of all Fixed Rate Obligations held by the Issuer as of such Measurement Date (other than Defaulted Investments and Unrestricted Collateral Investments). In computing the Weighted Average Coupon Adjustment on any Measurement Date, the Weighted Average Spread for such Measurement Date shall be computed as if the Weighted Average Spread Adjustment was equal to zero.

"Weighted Average Coupon Test": A test that is satisfied as of any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Weighted Average Coupon as of such Measurement Date equals or exceeds the percentage specified in the Currently Applicable Row of the Ratings Matrix.

"Weighted Average Life": As of any Measurement Date, the number obtained by (a) for each Collateral Investment (other than any Non-Performing Collateral Investments), multiplying the amount of each scheduled distribution of principal to be paid after such Measurement Date by the number of years (rounded to the nearest hundredth) from such date until such scheduled distribution of principal is due (b) summing all of the products calculated pursuant to clause (a) and (c) dividing the sum calculated pursuant to clause (b) by the sum of all scheduled distributions of principal due on all the Collateral Investments (other than Non-Performing Collateral Investments) as of such Measurement Date.

"Weighted Average Life Test": A test satisfied on any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Weighted Average Life as of such Measurement Date is equal to or less than 6.0 years.

"Weighted Average Spread": As of any Measurement Date, a fraction (expressed as a percentage and rounded up to the next 0.001%) equal to the sum of the weighted average spread on all Collateral Investments that are Floating Rate Obligations (excluding, without duplication, Non-Current Collateral Investments, Non-Performing Collateral Investments but, for the avoidance of doubt, including the current pay portion of a Collateral Investment that has both a current pay Cash interest component and an interest component that can be deferred or capitalized by the Obligor thereon), determined by (a) multiplying the Principal Balance of each such Collateral Investment by the per annum spread over the applicable LIBO Rate and (b) summing the amounts determined pursuant to clause (a) for all such Collateral Investments, and (c) dividing such sum by the Aggregate Principal Balance of all such Collateral Investments; provided that, if the Weighted Average Spread Test is not satisfied for such Measurement Date, then all or a portion of the Weighted Average Spread Adjustment, if any, as of such Measurement Date, to the extent not exceeding such shortfall, shall be added to such sum. For purposes of the foregoing calculation, (i) with respect to Floating Rate Obligations that do not bear interest based upon such LIBO Rate, such spread shall be deemed to be the current rate of interest minus the applicable LIBO Rate, (ii) with respect to Collateral Investments that bear interest at a rate that decreases solely as a

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001817

- 65 -

function of the passage of time the applicable interest rate shall be the lowest rate of interest that such Collateral Investment may now or in the future bear interest at and (iii) with respect to Collateral Investments, the interest payments of which are subject to tax withholding under applicable law but are not entitled to receive (pursuant to the Underlying Instruments) gross-up for the full amount of such tax withholdings, the applicable interest rate shall be the effective rate at which such Collateral Investments bear interest after taking into account such tax withholdings.

"Weighted Average Spread Adjustment": As of any Measurement Date, a fraction (expressed as a percentage), the numerator of which is equal to the product of (a) the excess, if any, of the Weighted Average Coupon for such Measurement Date over the percentage specified for the Weighted Average Coupon Test in the Currently Applicable Row of the Ratings Matrix for such Measurement Date, and (b) the aggregate Principal Balance of all Fixed Rate Obligations held by the Issuer as of such Measurement Date (other than Defaulted Loans and Unrestricted Collateral Investments), and the denominator of which is the aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of such Measurement Date (other than Defaulted Investments and Unrestricted Collateral Investments). In computing the Weighted Average Spread Adjustment on any Measurement Date, the Weighted Average Coupon for such Measurement Date shall be computed as if the Weighted Average Coupon Adjustment was equal to zero.

"Weighted Average Spread Test": A test that is satisfied as of any Measurement Date on and after the Ramp Up End Date and prior to the expiration of the Reinvestment Period if the Weighted Average Spread as of such Measurement Date equals or exceeds the percentage specified in the Currently Applicable Row of the Ratings Matrix.

"Zohar Obligors": The Co-Issuers and the Zohar Subsidiary.

"Zohar Subsidiary": Zohar III, LLC, a limited liability company organized under the laws of the State of Delaware, unless a successor Person shall have become the Zohar Subsidiary pursuant to the applicable provisions of this Indenture, and thereafter "Zohar Subsidiary" shall mean such successor Person.

"Zohar Subsidiary Interest Collection Account": The trust account designated the "Zohar Subsidiary Interest Collection Account" and established in the name of the Trustee pursuant to Section 10.2(c).

"Zohar Subsidiary Operating Agreement": The Limited Liability Company Agreement of the Zohar Subsidiary dated as of April 6, 2007, as amended and in effect from time to time.

"Zohar Subsidiary Principal Collection Account": The trust account designated the "Zohar Subsidiary Principal Collection Account" and established in the name of the Trustee pursuant to Section 10.2(d).

Section 1.2.    Assumptions as to Collateral Investments, Etc.

In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Obligation, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Obligations and on any other amounts that may be received for deposit in the Collection Accounts, the provisions set forth in this Section 1.2 shall be applied.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001818

(a)      All calculations with respect to Scheduled Distributions on the Pledged Obligations shall be made on the basis of information as to the terms of each such Pledged Obligation and upon report of payments, if any, received on such Pledged Obligation that are furnished by or on behalf of the issuer of such Pledged Obligation and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)      For purposes of calculating any Class A Interest Coverage Ratio, on the date such ratio is calculated:

(i)      all accrued and unpaid payments of interest on or principal of, or commitment or facility fees with respect to, Non-Performing Collateral Investments and Non-Current Collateral Investments (without duplication) shall be excluded (for the avoidance of doubt the current pay portion of a Collateral Investment that has both a current pay Cash interest component and a interest component that can be deferred or capitalized by the issuer thereof or the Obligor thereon shall be included for the purposes of calculating any Class A Interest Coverage Ratio);

(ii)      the expected interest income on Floating Rate Obligations and Eligible Investments and under the Hedge Agreements (if any) and the expected interest payable on the Class A Notes shall be calculated using the interest rates applicable thereto on the applicable date of determination;

(iii)      the expected payments of commitment and facility fees in respect of Revolving Collateral Investments and Delayed Funding Collateral Investments shall be calculated using the applicable commitment fee or facility fee rate, and the Unfunded Amount of the Revolving Collateral Investments or Delayed Funding Collateral Investments, as the case may be, on the applicable date of determination; and

(iv)      it shall be assumed that no principal payments are made on the Notes, that no Borrowings are made under the Class A-1 Notes, that the duration of any outstanding Borrowing is at least three months, that the Funded Amounts of Revolving Collateral Investments and Delayed Funding Collateral Investments shall remain constant, that no interest or dividend payments are made on any Equity Securities, and that no principal repayments received as a result of redemptions, optional redemptions, prepayments, Offers or other unscheduled payments or prepayments and unscheduled sinking fund payments shall be received on the Collateral Investments, during the applicable periods.

(c)      For each Due Period, the Scheduled Distribution on any Pledged Obligation (other than a Defaulted Investment, Non-Current Collateral Investment, Unrestricted Collateral Investment or Equity Security, which, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero except for any amounts actually received) shall be the sum of (i) the total amount of payments and collections in respect of such Pledged Obligation (including the Sale Proceeds with respect to such Pledged Obligation received during the Due Period) that, if paid as scheduled (less any amounts that the Collateral Manager believes with reasonable certainty will not be received in such Due Period), will be available for payment on the Notes and of certain expenses of the Zohar Obligors in the Collection Accounts at the end of the Due Period and (ii) any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001819

(d)    Each Scheduled Distribution receivable with respect to a Pledged Obligation shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the applicable Collection Account, and, except as otherwise specified herein, to earn interest at the Assumed Reinvestment Rate. All such funds, unless earlier withdrawn in connection with the purchase or origination of Collateral Investments, shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Accounts for transfer to the Payment Account and application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.

(e)    Any reference in the definition of "Senior Collateral Management Fee" or "Subordinated Collateral Management Fee" to an amount calculated with respect to a period at per annum rate shall be computed on the basis of the actual number of days elapsed during such period and a year of 360 days.

(f)    The Trustee's fees pursuant to the Trustee Fee Letter, the fees of the Preference Share Paying Agent under the Preference Share Agreement and the fees of the Collateral Administrator under the Collateral Administration Agreement shall be computed on the basis of the actual number of days elapsed during such period and a year of 360 days and the Principal Balance with respect to any Pledged Obligation shall be deemed to be the outstanding principal amount of such Pledged Obligation.

(g)    For the purposes of determining any payment to be made on any Payment Date pursuant to any applicable paragraph of Section 11.1(a), the Class A Coverage Tests referred to in such paragraph shall be calculated as of the relevant Determination Date after giving effect to all payments to be made on such Payment Date prior to such payment in accordance with Section 11.1(a).

(h)    With respect to any Collateral Investment as to which any interest or other payment thereon is subject to withholding tax, each Scheduled Distribution thereon shall, for purposes of the Class A Coverage Tests and the Collateral Quality Tests, be deemed to be payable net of such withholding tax unless the issuer thereof or the Obligor thereon is required to make additional payments sufficient on an after tax basis to cover any withholding tax imposed on payments to the issuer with respect thereto. On any date of determination, the amount of any Scheduled Distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(i)    Unless otherwise specified, test calculations that evaluate to a percentage will be rounded to the nearest ten-thousandth, and test calculations that evaluate to a number or decimal will be rounded to the nearest one hundredth.

(j)    All calculations required to be made and all reports which are to be prepared pursuant to the Transaction Documents, with respect to the Collateral, shall be made on the basis of the date on which the Issuer or the Zohar Subsidiary, as the case may be, enters into a commitment to purchase, originate or sell an asset, and not the settlement date.

(k)    Unrestricted Collateral Investments will not be included in determining compliance with the Collateral Quality Tests and the Eligibility Criteria (other than as expressly stated in Article 12) and will be treated as having a Principal Balance equal to zero for purposes of the Class A Coverage Tests. For purposes of the Class A Interest Coverage Ratio Test,

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001820

- 68 -

scheduled interest payments due on the Unrestricted Collateral Investments will be ignored until actually received.

## ARTICLE 2

## THE NOTES

Section 2.1.     Forms Generally

(a)     Each Class A-1R Note shall be issued solely in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-1, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Each Class A-1T Note, Class A-1D Note, Class A-2 Note and Class A-3 Note (unless the Person purchasing such Note elects, or is required, to hold such Note in certificated form consistent with the terms hereof) shall either be (i) in the case of such Class A Note being sold to a non-U.S. Person in an Offshore Transaction in reliance on Regulation S, initially represented by one or more temporary global notes in definitive, fully registered form without interest coupons substantially in the form of Exhibit A-2 hereto (each, a "Temporary Regulation S Global Note") or (ii) in the case of such Class A Note being sold to a U.S. Person that is a QIB/QP, initially issued in the form of one permanent global note in definitive, fully registered form without interest coupons substantially in the form of Exhibit A-3 hereto (each, a "Rule 144A Global Note"), which shall be deposited on behalf of the subscribers for such Class A Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Each Class B Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-5, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Each Class C Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-6, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. On the Funding Date, each Holder of a Class A Note (and each beneficial owner of an interest therein) shall be deemed to make to the Issuer and the Trustee each of the representations and warranties set forth in Part B of the form of Transferee Certificate attached to the form of Class A Note Certificate; and each Holder of a Class B Note (and each beneficial owner of an interest therein) shall be deemed to make to the Issuer and the Trustee each of the representations and warranties set forth in Part B of the form of Transferee Certificate attached to the form of Class B Note Certificate. No Person may acquire a Class A Note (other than in case of transfers of interests in Global Notes in accordance with the terms of the Indenture and such Global Notes), Class B Note or Class C Note (or any beneficial interest therein) after the Funding Date except for a Holder who acquires legal and beneficial ownership of such interest upon provision to the Issuer and the Trustee of an applicable Class A Note Certificate, Class B Note Certificate or Class C Note Certificate, as applicable.

(b)     The Co-Issuers in issuing the Notes may use "CUSIP" numbers, and, if so, the Trustee will indicate the "CUSIP" numbers of the Notes in notices of redemption and related materials as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001821

- 69 -

and related materials. The Co-Issuers may use different "CUSIP" numbers for different Borrowings made with respect to the Class A-1D Notes. In connection therewith, the Trustee shall, on any Business Day after the earlier of (1) the date on which the Class A-1D Commitments have terminated, expired or been irrevocably reduced to zero and (2) the Payment Date falling in December, 2007, direct DTC to exchange such "CUSIP" numbers for a single "CUSIP" number in respect of the Aggregate Outstanding Amount of the Class A-1D Notes (which single "CUSIP" number may be the "CUSIP" number assigned in respect of the Borrowing made on the Class A-1D Notes on the Funding Date). "CUSIP" numbers for the Rule 144A Global Notes must meet the requirements set forth in Section 7.19(d).

(c)     On or after the Exchange Date, interests in a Temporary Regulation S Global Note shall be exchangeable for interests in permanent Regulation S Global Notes of the same Class in definitive, fully registered form without interest coupons upon certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons. Such global notes shall have the applicable legends set forth in Exhibit A-4 hereto added to the form of such Notes (each, a "Regulation S Global Note"), and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Any such Regulation S Global Note shall be so issued and delivered in exchange for only that portion of the Temporary Regulation S Global Note in respect of which there shall have been presented to the Depository by Euroclear or Clearstream a certification to the effect that it has received from or in respect of a Person entitled to an interest (as shown by its records) therein a certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons.

(d)     The aggregate principal amount of the Regulation S Global Notes and Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(e)     This Section 2.1(e) shall apply only to Global Notes deposited with or on behalf of the Depository.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Temporary Regulation S Global Notes and the Regulation S Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

Section 2.2.     Authorized Amount; Note Interest Rate; Stated Maturity; Denominations

(a)     The aggregate principal amount of Class A Notes which may be issued under this Indenture may not exceed U.S.$1,016,000,000, excluding Class A Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Class A Notes pursuant to Section 2.4, 2.5 or 8.5.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001822

(b)    The Notes shall be divided into six Classes having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

| Designation | Principal Amount | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1R Notes | U.S.$200,000,000 | LIBOR + Class A-1R Applicable Margin | April 15, 2019 |
| Class A-1T Notes | U.S.$150,000,000 | LIBOR + Class A-1T Applicable Margin | April 15, 2019 |
| Class A-1D Notes | U.S.$350,000,000 | LIBOR + Class A-1D Applicable Margin | April 15, 2019 |
| Class A-2 Notes | U.S.$200,000,000 | LIBOR + Class A-2 Applicable Margin | April 15, 2019 |
| Class A-3 Notes | U.S.$116,000,000 | LIBOR + Class A-3 Applicable Margin | April 15, 2019 |
| Class B Notes | U.S.$196,000,000 | N/A | April 15, 2019 |
| Class C Notes | N/A | N/A | April 15, 2019 |

The Class A Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class B Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class C Notes are not subject to a minimum denomination in connection with the initial issuance thereof. After issuance any Note may fail to be in such required minimum denominations or integral multiples due to repayment of principal thereof in accordance with the Priority of Payments or, with respect to the Class A-1 Notes, due to Borrowings or Prepayments with respect thereto or in connection with the Class A-1R Final Advance or, with respect to the Class B Notes, due to reductions of the Outstanding face amount thereof pursuant to Section 7.13(b).

(c)(i)    Interest shall accrue on the Outstanding principal amount of the Class A-1 Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date or the date of any Borrowing and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A-1 Notes and interest on Defaulted Interest in respect of the Class A-1 Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(ii)    Class A-1R Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1R Notes for each day from and including the Funding Date to but excluding the date the Class A-1R Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-1R Commitment Fee Rate. Accrued Class A-1R Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus the Class A-1R Applicable Margin, which interest will constitute "Class A-1R Commitment Fee" for purposes of the Priority of Payments. Class A-1R Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001823

(iii)    Class A-1D Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1D Notes for each day from and including the Funding Date to but excluding the date the Class A-1D Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-1D Commitment Fee Rate. Accrued Class A-1D Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus the Class A-1D Applicable Margin, which interest will constitute "Class A-1D Commitment Fee" for purposes of the Priority of Payments. Class A-1D Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(iv)    Interest shall accrue on the Outstanding principal amount of the Class A-2 Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A-2 Notes and interest in respect of Defaulted Interest in respect of the Class A-2 Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(v)    Interest shall accrue on the Outstanding principal amount of the Class A-3 Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A-3 Notes and interest on Defaulted Interest in respect of the Class A-3 Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(vi)    The Class B Notes will not bear a stated rate of interest.

(vii)    The Class C Notes will not bear a stated rate of interest.

(d)    The Notes shall be redeemable as provided in Articles 9 and 12.

(e)    The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

Section 2.3.    Execution, Authentication, Delivery and Dating.

(a)    The Class A Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers, and the Class B Notes and (subject to Section 7.13(b)) Class C Notes shall be executed on behalf of the Issuer by an Authorized Officer thereof. The signatures of any such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

(b)    Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the applicable Co-Issuers may deliver Notes executed by the applicable Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001824

(d)     Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Funding Date shall be dated as of the Funding Date.  All other Notes that are authenticated after the Funding Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)     Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced.  If any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

(f)     No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "Certificate of Authentication"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual or facsimile signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.4.     Registration, Transfer and Exchange of Notes

(a)     Registration of Notes.  The Trustee is hereby appointed, as the agent of the Co-Issuers, as the registrar hereunder (the "Note Registrar") and as Transfer Agent with respect to the Notes.  The Note Registrar shall keep a register (the "Note Register") at the Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and the registration of transfers of Notes.  No transfer of any Notes (or any rights therein) shall be effective unless such transfer is reflected in the Note Register.  Upon any resignation or removal of the Note Registrar, the Issuer shall provide notice thereof to the Collateral Manager and each Noteholder and promptly appoint a successor or, in the absence of such appointment, assume the duties of Note Registrar.

Subject to this Section 2.4, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2, the applicable Co-Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like original aggregate principal amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate original principal amount, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Note is surrendered for exchange, the applicable Co-Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the applicable Co-Issuers evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the applicable Co-

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001825

Issuers and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Noteholder but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith and expenses of delivery (if any) not made by regular mail. Registration of the transfer of a Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Co-Issuers.

(b)    Transfers and Exchanges of Class A Notes. Transfers or exchanges of Class A Notes may only be made in accordance with the following:

(i)    Transfers and Exchanges of Certificated Notes.

(A)    With respect to a Class A Note of any Class that is a Certificated Note, the Trustee as Note Registrar shall register the exchange or transfer of such Note for, or to a transferee receiving, a Certificated Note or Certificated Notes of the same Class, upon provision, in the case of a transfer, to the Trustee and the Issuer of duly completed written certifications from the transferor and transferee substantially in the form of the Class A Note Certificate. Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Notes, the Holder of any Class A Note that is a Certificated Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any authorized greater amount) by surrendering such Note at the Corporate Trust Office or at the office of any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment and transfer and a Class A Note Certificate, duly completed and executed by the transferor and the transferee (and accompanied by an opinion of legal counsel, if contemplated by such Class A Note Certificate), and (y) in the case of any exchange, a written request for exchange. Additional certification to the effect that such transfer is in compliance with the restrictions contained in the applicable legend on such Notes may be required. Following a proper request for transfer or exchange, the Trustee shall cancel the surrendered Class A Note and shall (provided it has available in its possession an inventory of Notes), within five Business Days of such request if made at such Corporate Trust Office, or within 10 Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to the transferee (in the case of transfer) or Holder (in the case of exchange) or send by first class mail (at the risk of the transferee in the case of transfer or Holder in the case of exchange) to such address as the transferee or Holder, as applicable, may request, a Class A Note or Notes, as the case may require, in certificated form for a like Class, original aggregate principal amount and in such authorized denomination or denominations as may be requested. In the event of any exchange or transfer pursuant to this clause (A) of less than the entire principal amount of a Class A Note of any Holder, the Trustee shall (provided it has available in its possession an inventory of Notes), within five Business Days of the applicable request if made at such Corporate Trust Office, or within 10 Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to such Holder, or send by first class mail (at the risk of such Holder) to such address as such Holder may request, a Class A Note or Notes, as the case may require, in certificated form for an aggregate principal amount equal to the principal amount retained

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001826

by such Holder and in such authorized denomination or denominations as may be requested.

(B)     The presentation for transfer or exchange of any Class A Note that is a Certificated Note shall not be valid unless made at the Corporate Trust Office or at the office of a Transfer Agent by the registered Noteholder in person, or by a duly authorized attorney-in-fact.

(ii)     Restrictions on Transfers of Class A Notes.  Notwithstanding Section 2.4(b)(i), no transfer of a Class A Note (or any interest therein) may be made, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer, if:

(A)     such transfer is not exempt from the registration requirements of the Securities Act and/or is not exempt from the registration requirements under applicable state securities laws;

(B)     with respect to any Temporary Regulation S Global Note, such transfer is made (1) prior to the Exchange Date and (2) within the United States or to, or for the benefit of, a U.S. Person, except in accordance with Rule 144A or another available exemption from the registration requirements of the Securities Act;

(C)     such transfer would be made to a transferee who is a Person that is not a Qualified Purchaser or a non-U.S. Person;

(D)     such transfer would have the effect of requiring either the Issuer or the pool of Collateral to register as an investment company under the Investment Company Act;

(E)     if such transferee is a non-U.S. Person, such transfer would be made to a transferee that is a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle; or

(F)     such transfer would be made to a Person who is otherwise unable to make the acknowledgements, representations and agreements required by the applicable Class A Note Certificate, if required by this Indenture.

The exchange or transfer of a Class A-1R Note or a Class A-1D Note is subject to the further condition that (unless the obligations to advance funds to the Issuer thereunder have theretofore expired, been cancelled or reduced to zero) the transferee of such Class A-1R Note or such Class A-1D Note, respectively, be party to an existing Note Purchase Agreement in respect thereof or shall, simultaneously with such exchange or transfer, enter into a new Note Purchase Agreement with (inter alia) the Issuer on substantially the same terms as applied to such Class A-1 Note immediately prior to such exchange or transfer.  The exchange or transfer of any Class A Note shall also be subject to the conditions set forth in such Class A Note.

(iii)     Restrictions on Transfers and Exchanges of Global Notes.  No transfer or exchange of a Global Note (or any interest therein) may be made, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or exchange, if such transfer or exchange is not made in accordance with clauses (A), (B), (C) or (D) below, as applicable.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP001827

(A)     Rule 144A Global Note to Temporary Regulation S Global Note or Regulation S Global Note. If a Holder of a beneficial interest in a Rule 144A Global Note deposited with the Depository wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, such Holder, provided such Holder or, in the case of a transfer, the transferee is not a U.S. Person, may, subject to the rules and procedures of the Depository, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note. Upon receipt by the Note Registrar of (1) instructions given in accordance with the Depository's procedures from an Agent Member directing the Note Registrar to credit or cause to be credited a beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, (2) a written order given in accordance with the Depository's procedures containing information regarding the participant account of the Depository and the Euroclear or Clearstream account to be credited with such increase, (3) a certificate in the form of Exhibit B-2 hereto given by the Holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the Holder or the transferee, as applicable, is not a U.S. Person, and that such transfer has been made pursuant to and in accordance with Regulation S and (4) in the case of a transfer, a certificate in the form of Exhibit B-5 hereto given by the proposed transferee stating that it is not a U.S. Person, then the Note Registrar shall approve the instructions at the Depository to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Temporary Regulation S Global Note or Regulation S Global Note, as the case may be, by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be transferred or exchanged, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note. Notwithstanding anything else in this clause (A), prior to the Exchange Date, a Rule 144A Global Note may only be exchanged or transferred pursuant to Regulation S for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note.

(B)     Temporary Regulation S Global Note or Regulation S Global Note to Rule 144A Global Note. If a Holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note deposited with the Depository wishes at any time to exchange its interest in such Temporary Regulation S Global Note or Regulation S Global Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in such Temporary Regulation S Global Note or Regulation S Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such Holder may, subject to the rules and procedures of Euroclear, Clearstream and/or the Depository, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note. Upon receipt by the Note Registrar of (1) instructions from Euroclear, Clearstream and/or the Depository, as the case may be, directing the Note Registrar to cause to be credited a beneficial interest

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001828

in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Temporary Regulation S Global Note or Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Notes, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depository to be credited with such increase, (2) a certificate in the form of Exhibit B-3 hereto given by the Holder of such beneficial interest and stating that, in the case of an exchange, the Holder is a Qualified Institutional Buyer and is also a Qualified Purchaser or, in the case of a transfer, the Person transferring such interest in such Temporary Regulation S Global Note or Regulation S Global Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser and (3) a certificate in the form of Exhibit B-4 hereto given by the proposed transferee stating that it is a QIB/QP, then the Note Registrar shall approve the instructions at the Depository to reduce, or cause to be reduced, the Temporary Regulation S Global Note or Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note to be transferred or exchanged and the Note Registrar shall approve the instructions at the Depository, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Temporary Regulation S Global Note or Regulation S Global Note.

(C)     Global Note to Certificated Note. If a Holder of a beneficial interest in a Global Note wishes at any time to transfer its interest in such Global Note to a Person who wishes to take delivery thereof in the form of a Certificated Note of the same Class, such Holder may, subject to the rules and procedures of Euroclear, Clearstream and/or the Depository, as the case may be, transfer or cause the transfer of such interest for an equivalent beneficial interest in one or more such Certificated Notes of the same Class as described below. Upon receipt by the Note Registrar of (1) instructions given in accordance with the Depository's procedures from an Agent Member, or instructions from Euroclear, Clearstream and/or the Depository, as the case may be, directing the Trustee to deliver one or more such Certificated Notes, designating the registered name or names, address, payment instructions, the Class and the number and principal amounts of the Certificated Notes to be executed and delivered (the Class and the aggregate principal amounts of such Certificated Notes being the same as the beneficial interest in the Global Note to be transferred), in authorized denominations, (2) a Class A Note Certificate given by the transferee of such beneficial interest and (3) if such certificate does not include a certification that the transferee is a Qualified Institutional Buyer or a non-U.S. Person, an opinion of counsel acceptable to the Note Registrar that such transfer may be made pursuant to an exemption from registration under the Securities Act, then the Note Registrar shall approve the instructions at the Depository to reduce, or cause to be reduced, the applicable Global Note by the aggregate principal amount of the beneficial interest in such Global Note to be transferred and the Note Registrar shall record the transfer in the Note Register in accordance with Section 2.4(a) and authenticate and deliver one or more Certificated Notes of the appropriate Class registered in the names specified in the certificate described in clause (2) above in principal amounts designated by the transferee (the aggregate of such amounts being equal to the beneficial interest in the Global Notes to be transferred) and in the minimum denominations and integral multiples in excess thereof as specified in Section 2.2(b).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001829

If a Holder of a beneficial interest in a Global Note wishes at any time to exchange such interest in a Global Note for one or more Certificated Notes of the applicable Class, such Holder may exchange or cause the exchange of such interest for an equivalent beneficial interest in one or more such Certificated Notes as provided below. Upon receipt by the Note Registrar of (1) instructions given in accordance with the Depository's procedures from an Agent Member, or instructions from Euroclear, Clearstream and/or the Depository, as the case may be, directing the Trustee to deliver one or more Certificated Notes and (2) written instructions from such Holder designating the registered name or names, address and payment instructions of such Holder and the Class and the number and principal amounts of the applicable Certificated Notes to be executed and delivered to such Holder (the Class and the aggregate principal amounts of such Certificated Notes being the same as the beneficial interest in the Global Note to be exchanged), then the Note Registrar shall approve the instructions at the Depository to reduce the Global Note by the aggregate principal amount of the beneficial interest in the Global Note to be exchanged, shall record the exchange in the Note Register in accordance with Section 2.4(a) and authenticate and deliver one or more Certificated Notes of the appropriate Class registered as specified in the instructions described in clause (1) above, in authorized denominations.

(D)    <u>Other Exchanges</u>.  In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.11, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers and comply with Rule 144A or are to non-U.S. Persons, or otherwise comply with Regulation S, as the case may be), and as may be from time to time adopted by the Issuer and the Trustee.

(iv)    <u>Restrictions on Transfers and Exchanges of Certificated Notes</u>.  No transfer or exchange of a Class A-1T Note, a Class A-1D Note, Class A-2 Note or a Class A-3 Note (or any interest therein) represented by a Certificated Note may be made, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or exchange, if such transfer or exchange is not made in accordance with clauses (A) or (B) below, as applicable.

(A)    <u>Certificated Note to Temporary Regulation S Global Note or Regulation S Global Note</u>.  If a Holder of a Class A-1T Note, a Class A-1D Note, Class A-2 Note or a Class A-3 Note represented by a Certificated Note wishes at any time to exchange such Certificated Note for an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, or to transfer such Certificated Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, such Holder may exchange or transfer, or cause the exchange or transfer of, such Note for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note, <u>provided</u> that such proposed transferee or the Person requesting such exchange, as applicable, is not a U.S. Person.  Upon receipt by the Note Registrar of (1) such Certificated Note properly endorsed for such transfer, and written instructions from such Holder directing the Note Registrar to cause to be credited a beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note of the same Class in an amount equal to the principal amount of such Certificated

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001830

Note, (2) a written order containing information regarding the Euroclear or Clearstream account to be credited with such increase, (3) a certificate in the form of Exhibit B-6 hereto, given by the Holder of such Certificated Note stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Temporary Regulation S Global Note or Regulation S Global Note, including that the proposed transferee or the Person requesting such exchange, as the case may be, is not a U.S. Person and that the proposed transfer is being made pursuant to and in accordance with Regulation S and (4) in the case of a transfer, a certificate in the form of Exhibit B-5 hereto given by the proposed transferee stating that it is not a U.S. Person, the Note Registrar shall cancel such Certificated Note in accordance with Section 2.8, record the transfer in the Note Register in accordance with Section 2.4(a) and approve the instructions at the Depository to increase the principal amount of the Temporary Regulation S Global Note or Regulation S Global Note by the aggregate principal amount of the Certificated Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note of the same Class equal to the amount specified in the instructions received pursuant to clause (1) above. Notwithstanding anything else in this clause (A), prior to the Exchange Date, a Certificated Note may only be exchanged or transferred pursuant to Regulation S for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Note.

(B)    Certificated Note to Rule 144A Global Note. If a Holder of a Class A-1T Note, a Class A-1D Note, Class A-2 Note or a Class A-3 Note represented by a Certificated Note wishes at any time to exchange its interest in such Certificated Note for an interest in the corresponding Rule 144A Global Note, or to transfer its interest in such Certificated Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such Holder may exchange or transfer, or cause the exchange or transfer of, such Note for an equivalent beneficial interest in the corresponding Rule 144A Global Note, provided such proposed transferee or the Person requesting such exchange, as applicable, is a QIB/QP. Upon receipt by the Note Registrar of (1) such Certificated Note properly endorsed for such transfer and written instructions from such Holder directing the Note Registrar to cause to be credited a beneficial interest in the Rule 144A Global Note of the same Class in an amount equal to the principal amount of such Certificated Note, such instructions to contain information regarding the participant account with the Depository to be credited with such increase, (2) a certificate in the form of Exhibit B-7 hereto given by the Holder of such Certificated Note and stating that, in the case of an exchange, the Holder is a QIB/QP or, in the case of a transfer, such Holder reasonably believes that the Person acquiring such interest in the applicable Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and is also a Qualified Purchaser or that, in the case of an exchange, the Holder is a QIB/QP and (C) a certificate in the form of Exhibit B-4 hereto given by the proposed transferee stating that it is a QIB/QP, then the Note Registrar shall cancel such Certificated Note in accordance with Section 2.8, record the transfer in the Note Registrar in accordance with Section 2.4(a) and instruct or approve the instructions to the Depository to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Rule 144A Global Note of the same Class equal to the amount specified in the instructions received pursuant to clause (1) above.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001831

(v)    <u>Noncompliant Transfers Void</u>. Any purported sale, pledge or other transfer of a Class A Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture or in such Class A Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void <u>ab</u> <u>initio</u> and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class A Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(vi)    <u>Pledges of Notes</u>. For purposes of this Section 2.4, each pledge of a Class A Note or an interest therein (other than a Qualified Securitization Pledge) will be considered to be a "transfer" of such Class A Note (or such interest), and each Person for whose benefit a Class A Note (or an interest therein) is so pledged will be considered a "transferee".

(vii)    <u>Certain Deemed Representations</u>. Each transferor of an interest in a Global Note shall be deemed to make to the Issuer and the Trustee, as of the date of such transfer, each of the certifications of a "Transferor" set forth in the form of Class A Note Certificate; and each transferee of an interest in a Global Note shall be deemed to make to the Issuer and the Trustee, as of the date of such transfer, each of the representations and warranties of a "Transferee" set forth in Part B of the form of Transferee Certificate attached to the form of Class A Note Certificate.

(c)    <u>No Transfers of Class B Notes, Etc.</u> No Class B Note (or any interest therein) may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture or in such Class B Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void <u>ab</u> <u>initio</u> and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation. Until such time as an opinion of counsel is received by the Issuer that the Class B Notes constitutes indebtedness for U.S. federal income tax purposes, the Class B Notes may not be held (or beneficially owned) by or transferred to any Person other than a United States Person as defined in Section 7701(a)(30) of the Code.

(d)    <u>No Transfers of Class C Notes, Etc.</u> No Class C Note (or any interest therein) may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of a Class C Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture or in such Class C Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void <u>ab</u> <u>initio</u> and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class C Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation. Until such time as an opinion of counsel is received by the Issuer that the Class C Notes constitutes indebtedness for U.S. federal income tax purposes, the Class C Notes may not be held (or beneficially owned) by or transferred to any Person other than a United States Person as defined in Section 7701(a)(30) of the Code.

(e)    <u>Authorized Denominations</u>. No Person may hold a beneficial interest in any Note except in a denomination authorized for such Notes under Section 2.2(b).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                              PP001832

- 80 -

    (f)    <u>Legends</u>. Any Class A Note issued upon the transfer, exchange or replacement of Class A Notes shall bear such applicable legend set forth in the applicable portion of Exhibit A hereto. Any Class B Note issued upon the exchange or replacement of Class B Notes shall bear such applicable legend set forth in Exhibit A-2 hereto. Any Class C Note issued upon the exchange or replacement of Class C Notes shall bear such applicable legend set forth in Exhibit A-3 hereto.

    (g)    <u>Surrender Upon Final Payment</u>. Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent.

    (h)    <u>No Purchase, Etc</u>. The Co-Issuers will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes except upon the prepayment or redemption of the Notes in accordance with the terms of this Indenture and the Notes. The Co-Issuers will promptly cancel all Notes acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Notes pursuant to any provision of this Indenture, and no Notes may be issued in substitution or exchange for any such Notes.

    (i)    <u>Limitations on Trustee Responsibility, Etc</u>. Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, ERISA (or, in the case of a governmental plan or a church plan (as described in ERISA Sections 3(32) and 3(33), respectively) any substantially similar federal, state or local law), the Code or the Investment Company Act; <u>provided</u> that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to a Trustee by a purchaser or transferee of a Note, the Trustee shall be under a duty to receive and examine the same to determine whether on its face it conforms to the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms.

    (j)    <u>Class A-1R Register</u>. The Class A-1R Note Agent shall keep a register (the "<u>Class A-1R Note Register</u>") at the office of the Class A-1R Note Agent and in which the Class A-1R Note Agent shall maintain the Class A-1R Commitment applicable to each Holder of Class A-1R Notes and the aggregate principal amount of advances from time to time outstanding in respect of such Class A-1R Notes. On the second Business Day next succeeding each Determination Date, and at any time promptly following a request therefor by the Trustee, the Collateral Manager or the Collateral Administrator, the Class A-1R Note Agent shall provide the Trustee, the Collateral Manager and the Collateral Administrator, as applicable, with a report specifying the aggregate principal amount of advances outstanding in respect of each Class A-1R Note, the Class A-1R Commitment applicable thereto (as of such Record Date or such time, as the case may be), the Class A-1R Note Interest Rate and the Class A-1R Interest Distribution Amount (for any Payment Date), the Class A-1R Commitment Fee, the Class A-1R Commitment Fee Amount (for any Payment Date), the Commitment Limits, notice of the termination, expiration or reduction to zero of the Class A-1R Commitments, all payments of principal of the Class A-1R Notes and applicable payment instructions. Except as otherwise provided herein, promptly upon receipt by the Class A-1R Note Agent of any notice or report provided under this Indenture, the Class A-1R Note Agent shall deliver copies of such notice or report to each Holder of Class A-1R Notes under the Class A-1R Note Purchase Agreement or to an agent on behalf of such Holder (unless such notice or report has concurrently been provided to such Holder or agent).

    (k)    <u>Class A-1D Register</u>. The Class A-1D Note Agent shall keep a register (the "<u>Class A-1D Note Register</u>") at the office of the Class A-1D Note Agent and in which the Class A-1D Note Agent shall maintain the Class A-1D Commitment applicable to each Holder of Class A-1D Notes and the aggregate principal amount of advances from time to time outstanding in respect of such Class A-

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC    PP001833

1D Notes. On the second Business Day next succeeding each Determination Date, and at any time promptly following a request therefor by the Trustee, the Collateral Manager or the Collateral Administrator, the Class A-1D Note Agent shall provide the Trustee, the Collateral Manager and the Collateral Administrator, as applicable, with a report specifying the aggregate principal amount of advances outstanding in respect of each Class A-1D Note, the Class A-1D Commitment applicable thereto (as of such Record Date or such time, as the case may be), the Class A-1D Note Interest Rate and the Class A-1D Interest Distribution Amount (for any Payment Date), the Class A-1D Commitment Fee, the Class A-1D Commitment Fee Amount (for any Payment Date), the Commitment Limits, notice of the termination, expiration or reduction to zero of the Class A-1D Commitments, all payments of principal of the Class A-1D Notes and applicable payment instructions. Except as otherwise provided herein, promptly upon receipt by the Class A-1D Note Agent of any notice or report provided under this Indenture, the Class A-1D Note Agent shall deliver copies of such notice or report to each Holder of Class A-1D Notes under the Class A-1D Note Purchase Agreement or to an agent on behalf of such Holder (unless such notice or report has concurrently been provided to such Holder or agent).

Section 2.5.    Mutilated, Defaced, Destroyed, Lost or Stolen Notes

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers, the Trustee and the Transfer Agent (each, a "Specified Person") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless (and in the case of any Holder that is, or is a nominee for, a Qualified Institutional Buyer with a minimum net worth of at least U.S.$100,000,000, such Holder's own unsecured agreement of indemnity shall be deemed to be satisfactory) then, in the absence of notice to the Specified Persons that such Note has been acquired by a protected purchaser, the Co-Issuers shall execute and, upon Issuer Request, the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Note, of like tenor (including the same date of issuance) and equal original principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Specified Persons shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Specified Persons in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Co-Issuers in their discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.5, the Co-Issuers, the Trustee or any Transfer Agent may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.5 in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Co-Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.5, to all the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001834

benefits of this Indenture equally and proportionately with any and all other Notes of the same class duly issued hereunder.

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.6.    Payment of Interest, Principal and Commitment Fees; Rights Preserved

(a)    Each Class of Class A Notes shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate specified in Section 2.2. Interest on each such Class of Notes shall be due and payable on each Payment Date immediately following the related Interest Period; provided that payments of interest on all Notes are subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

The Class A-1R Notes shall accrue the Class A-1R Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-1R Commitment Fee shall be due and payable on each Payment Date; provided that payment of Class A-1R Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments. The Class A-1D Notes shall accrue the Class A-1D Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-1D Commitment Fee shall be due and payable on each Payment Date; provided that payment of the Class A-1D Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

Subject to the next succeeding paragraph of this Section 2.6(a), interest will cease to accrue on each Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, for so long as the Class A Notes are outstanding, interest shall accrue on any Defaulted Interest on any Class A Note at the applicable Note Interest Rate until paid as provided herein.

(b)    The principal of each Class of Notes shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by operation of the Priority of Payments, by declaration of acceleration, by redemption or otherwise; provided that:

(1)    so long as any Class A-1 Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class A-2 Notes (A) may only occur after principal of the Class A-1 Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and other amounts due in accordance with the Priority of Payments;

(2)    so long as any Class A-1 Notes or Class A-2 Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class A-3 Notes (A) may only occur after principal of the Class A-1 Notes and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001835

Class A-2 Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes and the Class A-2 Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and other amounts due in accordance with the Priority of Payments;

(3)    so long as any Class A Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class B Notes (A) may only occur after principal of the Class A Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and other amounts due in accordance with the Priority of Payments; and

(4)    so long as any Class A Notes or Class B Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class C Notes (A) may only occur after principal of the Class A Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and principal of the Class B Notes has been paid in full and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee, the principal of the Class B Notes and other amounts due in accordance with the Priority of Payments.

Any payment of principal of the Class B Notes and Class C Notes that is not paid, in accordance with the Priority of Payments, on any Payment Date shall not be considered "due and payable" for purposes of Section 5.1(b) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments.

(c)    So long as the Class A Coverage Tests are met, principal shall not be payable on any Class of Notes prior to the end of the Reinvestment Period except upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5. If any of the Class A Coverage Tests is not satisfied, or after the Reinvestment Period, principal shall not be payable on any Class of Notes except (i) upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5 and (ii) on each Payment Date from Principal Proceeds and Interest Proceeds in accordance with the Priority of Payments.

(d)    As a condition to the payment of any principal of or interest on any Note, any Class A-1R Commitment Fee or any Class A-1D Commitment Fee, as applicable, without the imposition of withholding tax, any Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)    Payments in respect of principal of and interest on the Notes and in respect of any Class A-1R Commitment Fee, any Class A-1D Commitment Fee and any Class A Redemption Break Funding Costs, as applicable, shall be payable by wire transfer in immediately available funds to a Dollar

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001836

- 84 -

account maintained by the Noteholders in accordance with written wire transfer instructions received by any Paying Agent on or before the Record Date or, if no such wire transfer instructions are received by a Paying Agent, by a Dollar-denominated check drawn on a bank in the U.S.

(f)     The principal of and interest on any Note, any Class A-1R Commitment Fee, any Class A-1D Commitment Fee and any Class A Redemption Break Funding Costs, as applicable, that are payable in accordance with the Priority of Payments on such Payment Date and are punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the Record Date for such payment. All such payments that are mailed or wired and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2.

Except as otherwise expressly provided herein with respect to the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes, payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the Note Register in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)     Payment of any Defaulted Interest in respect of the Class A Notes may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding anything contained herein to the contrary, the obligations of each Co-Issuer under the Notes and this Indenture and under each other Transaction Document to which it is a party are limited recourse obligations of the Co-Issuers payable solely from the Collateral and, following realization of the Collateral, any claims of the Noteholders, the Collateral Manager, the Administrator, the Collateral Administrator, the Placement Agent and each other counterparty to any Zohar Obligor under the Transaction Documents (subject to the terms of the Issuer Charter) shall be extinguished, and shall not thereafter revive. No recourse shall be had for the payment of any amount owing under or in respect of the Notes or any other Transaction Document against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns. It is understood that the foregoing provisions of this Section 2.6(i) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, (ii) limit the rights of the Trustee and the Holders of the Notes or (iii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this Section 2.6(i) shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                  PP001837

(j)        Subject to the foregoing provisions of this Section 2.6 and the provisions of Sections 2.4 and 2.5, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest, Class A-1R Commitment Fees, Class A-1D Commitment Fees and any Class A Redemption Break Funding Costs, if applicable, and principal that were carried by such other Note.

Section 2.7.        Persons Deemed Owners

The Co-Issuers, the Trustee, the Note Registrar, the Collateral Manager, the Class A-1R Note Agent, the Class A-1D Note Agent and any agent of any of them (collectively, the "Relevant Persons") may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest, any Class A-1R Commitment Fee, any Class A-1D Commitment Fee and any Class A Redemption Break Funding Costs and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

Section 2.8.        Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it. Any Notes purchased by either of the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

Section 2.9.        Debt Treatment

The Co-Issuers and each Holder (and each beneficial owner of a Note), by acceptance of its Note (or its interest therein, as the case may be) shall be deemed to have agreed to treat, and shall treat, the Class A Notes as unconditional debt of the Issuer for tax, accounting and financial reporting purposes. The Issuer and the Holders of the Class B and Class C Notes agree to treat such Notes as equity for tax purposes unless, in the case of the Class B Notes, the Trustee has received an Opinion of Counsel that such Class B Notes will be treated as debt for U.S. federal income tax purposes.

Section 2.10.        Issuance of Additional Class B Notes

At the direction of the Holders of all of the Class B Notes, the Holders of all Class C Notes (if any) and the Holders of all of the Preference Shares, the Issuer shall issue (and, upon Issuer Order, the Trustee shall authenticate) additional Class B Notes ("Additional Class B Notes") to the Collateral Manager or its designees (without payment of any amounts by the Collateral Manager or such designees to the Issuer or any other Zohar Obligor) on one or more Business Days (each, an "Additional Class B Note Issuance Date"); provided that the following conditions are met, as certified by an Officer's certificate of the Issuer:

(a)        the party requesting the issuance of such Additional Class B Notes shall have given not less than 10 Business Days' written notice thereof to the Collateral Manager, the Trustee, the Issuer, each Noteholder, each Holder of Preference Shares and each Rating Agency;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                         PP001838

(b)    except for issuance date, the terms of the Additional Class B Notes are identical to the terms of the other Class B Notes then Outstanding;

(c)    no Default or Event of Default shall have occurred and be continuing, and the Class A Coverage Tests shall be satisfied, as of such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes);

(d)    each Holder of Additional Class B Notes shall be (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, shall meet all of the other conditions of ownership of the Class B Notes and shall have delivered to the Issuer and the Trustee a Class B Note Certificate duly executed by such Holder;

(e)    the Trustee shall have received an Opinion of Counsel to the effect that it is not necessary in connection with the issuance of such Additional Class B Notes to register the Notes (including the Additional Class B Notes) under the Securities Act or to qualify this Indenture under the Trust Indenture Act of 1939, as amended, or the rules and regulations of the Securities and Exchange Commission applicable to an indenture which is qualified thereunder;

(f)    the Trustee shall have received an Officer's certificate of the Issuer:

(1)    attaching a letter signed by Moody's and confirming that, after giving effect to the issuance of such Additional Class B Notes, the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes are rated "Aaa" by Moody's; the Class A-2 Notes are rated "Aaa" by Moody's; the Class A-3 Notes are rated at least "Aa2" by Moody's; and the Class B Notes (including such Additional Class B Notes) are rated at least "Baa3" by Moody's;

(2)    attaching a letter signed by Standard & Poor's and confirming that, after giving effect to the issuance of such Additional Class B Notes, the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes are rated "AAA" by Standard & Poor's; the Class A-2 Notes are rated "AAA" by Standard & Poor's; the Class A-3 Notes are rated at least "AA" by Standard & Poor's; and the Class B Notes (including such Additional Class B Notes) are rated at least "BBB-" by Standard & Poor's; and

(3)    stating that each such rating is in full force and effect on such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes), and

(g)    the issuance date is at least 10 Business Days prior to the next succeeding Payment Date,

(h)    either (1) the Trustee shall have received an Opinion of Counsel that such Additional Class B Notes will be treated as debt for U.S. federal income tax purposes, or (2) the Issuer has delivered an Officer's Certificate to the Trustee certifying that following the issuance of such Additional Class B Notes, there are and would at all times be no more than 98 "partners" in the Issuer for purposes of Treasury Regulation section 1.7704-1(h) (counting as equity of the Issuer for this purpose the Preference Shares, Class C Notes and any Class B Notes and assuming compliance with any documentary restrictions on transfer),

it being understood that (x) each of the above ratings by Standard & Poor's on the Class A Notes will address the timely payment in full of the principal of and interest on the Class A Notes and commitment

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001839

fees on the Class A-1R Notes and Class A-1D Notes, (y) each of the above ratings by Moody's on the Class A Notes will address the ultimate payment in full of the principal of and interest on the Class A-1 Notes and (z) each of the above ratings on the Class B Notes will address the ultimate payment in full of the principal of the Class B Notes.

Section 2.11    Depository Unable or Unwilling to Perform

(a)    A Global Note deposited with the Depository pursuant to Section 2.1 shall be transferred in the form of a Certificated Note to the beneficial owners thereof only if such transfer complies with Section 2.4 and either (i) the Depository notifies the Issuer that it is unwilling or unable to continue as Depository for such Global Note or (ii) if at any time such Depository ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Issuer within 90 days after such notice.

(b)    Any Global Note that is transferable in the form of a Certificated Note to the beneficial owners thereof pursuant to this Section 2.11 shall be surrendered by the Depository to the Trustee's office located in the City of Chicago, Illinois (or such other office as may be designated by the Trustee) to be so transferred, in whole or from time to time in part, without charge, and the Issuer shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Certificated Notes (pursuant to the instructions of the Depository) in authorized denominations. Any Certificated Note delivered in exchange for an interest in a Global Note, as applicable, shall bear the legends set forth in the applicable portion of Exhibit A hereto and shall be subject to the transfer restrictions referred to in such legends.

(c)    The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes, as applicable.

(d)    In the event of the occurrence of either of the events specified in subclauses (i) and (ii) of subsection (a) of this Section 2.11, the Issuer shall promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

Section 2.12.    Notes Beneficially Owned by Persons Not Qualified Purchasers

(a)    Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a Note or a beneficial interest in any Rule 144A Global Note to a U.S. Person that is not a QIB/QP or a Certificated Note to a U.S. person that is not a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act shall be null and void ab initio and any such purported transfer of which the Issuer or the Trustee shall have notice may be disregarded by the Issuer and the Trustee for all purposes.

(b)    If any U.S. Person that is not a QIB/QP shall become a beneficial owner of an interest in any Rule 144A Global Note or any U.S. Person that is not a Qualified Purchaser or that does not have an exemption available under the Securities Act shall become the Holder or beneficial owner of an interest in any Certificated Note (any such Person, a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such Person is a Non-Permitted Holder by the Issuer or the Trustee (and notice by the Trustee if it makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its Note or interest to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice. If such Non-Permitted Holder fails to so transfer its Note or interest in such Note, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Note or interest in such Note to a purchaser selected by the Issuer that is not a Non-

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001840

Permitted Holder on such terms as the Issuer may choose. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes or interest in such Notes to the highest such bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the beneficial owner of each interest in a Note, the Non-Permitted Holder and each other Person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any Person having Notes or an interest in the Notes sold as a result of any such sale (including the net proceeds received thereby) or the exercise of such discretion.

## ARTICLE 3

## CONDITIONS PRECEDENT

Section 3.1.    General Provisions

The Notes to be issued on the Funding Date may be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee (or an Authenticating Agent on its behalf) upon Issuer Request, upon receipt by the Trustee of the following by the Funding Date:

(a)    (i) a certificate of the Issuer (a) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Collateral Administration Agreement, the Note Purchase Agreements, the Note Subscription Agreements, the Preference Share Subscription Agreements, the Management Agreement, the Administration Agreement, the Preference Share Paying Agency Agreement, the Collateral Assignment of Hedge Agreement, the Trustee Fee Letter and the Hedge Agreements (if any) entered into on the Closing Date and the execution, authentication and delivery of the Notes and specifying the Stated Maturity, the principal amount and Classes of Notes to be authenticated and delivered, and (b) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(ii)    a certificate of the Co-Issuer (a) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Note Purchase Agreements and the Note Subscription Agreements and the execution, authentication and delivery of the Class A Notes and Class B Notes and specifying the Stated Maturity, the principal amount and Classes of Class A Notes and Class B Notes to be authenticated and delivered, and (b) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon; and

(iii)    a certificate of the Zohar Subsidiary (a) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture and the Management Agreement and (b) certifying that (1) the attached copy of such Board Resolution is a true and complete copy

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001841

thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    (i) either (a) a certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee that the Trustee is entitled to rely thereon to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares, or (b) an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares except as may have been given;

(ii)    either (a) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Co-Issuer satisfactory in form and substance to the Trustee that the Trustee is entitled to rely thereon to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Class A Notes, or (b) an Opinion of Counsel of the Co-Issuer satisfactory in form and substance to the Trustee that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Class A Notes except as may have been given; and

(iii)    either (a) a certificate of the Zohar Subsidiary or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Zohar Subsidiary satisfactory in form and substance to the Trustee that the Trustee is entitled to rely thereon to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (b) an Opinion of Counsel of the Zohar Subsidiary satisfactory in form and substance to the Trustee that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes except as may have been given;

(c)    (i) an opinion of Milbank, Tweed, Hadley & McCloy LLP, special counsel to the Zohar Obligors, dated the Funding Date, substantially in the form of Exhibit C, (ii) an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Funding Date, substantially in the form of Exhibit D, (iii) opinions of each of (A) Kennedy Covington Lobdell & Hickman LLP, special counsel to the Trustee and (B) Seyfarth Shaw LLP, Illinois counsel to Trustee, each dated the Funding Date, substantially in the forms of Exhibit E-1 and Exhibit E-2, respectively, and (iv) an opinion of Purrington Moody Weil LLP, special counsel to the Collateral Manager, dated the Funding Date, substantially in the form of Exhibit F;

(d)    a certificate of the Issuer stating that the Issuer is not in Default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it or its property is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it or its property may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties of the Issuer contained herein are true and correct as of the Funding Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes (including in Section 3.2) and all conditions precedent in the Issuer Charter relating to the issuance of the Preference Shares have been complied with;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                           PP001842

and that all expenses due or accrued with respect to the offering of the Notes or relating to actions taken on or in connection with the Funding Date have been paid;

(e)     a certificate of the Co-Issuer stating that the Co-Issuer is not in Default under this Indenture and that the issuance of the Notes applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the certificate of incorporation or by-laws of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it or its property is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it or its property may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties of the Co-Issuer contained herein are true and correct as of the Funding Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with; and that all expenses due or accrued with respect to the offering of the Notes or relating to actions taken on or in connection with the Funding Date have been paid;

(f)     a certificate of the Zohar Subsidiary stating that the Zohar Subsidiary is not in Default under this Indenture; that no Event of Default shall have occurred and be continuing; and that all of the representations and warranties of the Zohar Subsidiary contained herein are true and correct as of the Funding Date;

(g)     an Accountants' Report (along with an electronic data file containing the information supporting the findings therein) delivered to the Issuer (with copies to the Trustee, the Rating Agencies and the Class A-1R Note Agent) specifying the procedures applied by the certified public accountants preparing such Accountants' Report and such accountants' associated findings comparing the information provided in the Accountants' Report with respect to each Collateral Investment (as set forth in Schedule A-1 as provided by the Issuer);

(h)     fully executed counterparts of the Note Subscription Agreements, the Preference Share Subscription Agreements, the Note Purchase Agreements, the Collateral Administration Agreement, the Administration Agreement, the Trustee Fee Letter and the Management Agreement;

(i)     fully executed counterparts of each Hedge Agreement (if any) entered into on or before the Funding Date and an executed copy of each Collateral Assignment of Hedge Agreement with respect thereto (and all acknowledgments thereto);

(j)     executed Financing Statements for filing in the following filing offices (x) against the Issuer:  Secretary of State, State of Delaware, Secretary of State, State of Illinois and the Recorder of Deeds of the District of Columbia, Washington, DC and (y) against the Zohar Subsidiary: Secretary of State, State of Delaware and Secretary of State, State of Illinois;

(k)     UCC-3 financing statements executed and filed against the Issuer with the Secretary of State, State of Delaware, Secretary of State, State of Illinois and the Recorder of Deeds of the District of Columbia, Washington, DC relating to the termination of the security interest granted in connection with the Warehouse Agreement, the Mezzanine Notes and the transactions contemplated thereby;

(l)     an acknowledgment from the Issuer, the Investor Agent, Patriarch Partners XV, LLC, MMP-5 Funding, LLC, Ark Investment Partners II, L.P., Phoenix VIII, LLC, Ark II CLO 2001-1, Limited, Branch Banking and Trust Company and LaSalle Bank National Association under the Warehouse Agreement that the Warehouse Advances and any other amounts payable under or in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001843

connection with the Warehouse Agreement or the transactions contemplated thereby (including the Mezzanine Notes) have been paid in full;

(m)    evidence of the registration of a charge in the Issuer's books in the Cayman Islands;

(n)    evidence that the Preference Shares have been, or contemporaneously with the issuance of the Notes will be, issued;

(o)    if required by the Note Purchaser, the Trustee shall have received fully executed forms FRG-3 of each of the Issuer and the Zohar Subsidiary to the effect that no part of the proceeds of the issuance of any Notes or any Borrowing will be used to purchase or carry Margin Stock; and

(p)    such other documents as the Trustee may reasonably require (provided that nothing herein shall imply or impose a duty on the Trustee to request other documents).

Section 3.2.    Security for Notes

Prior to the issuance of the Notes on the Funding Date, the Issuer shall cause the following conditions to be satisfied and shall certify that the following conditions are satisfied:

(a)    Pledge of Collateral Investments.  The Grant pursuant to the Granting clauses of this Indenture of all of the Issuer's and the Zohar Subsidiary's respective right, title and interest in and to the Collateral Investments and Eligible Investments purchased or owned by the Issuer or the Zohar Subsidiary on the Funding Date (in the case of such Collateral Investments, as set forth in Schedule A-1), and the transfer of all such Collateral Investments and Eligible Investments to the Trustee in the manner provided in Section 3.3(b).

(b)    Certificate of the Issuer.  The delivery to the Trustee of a certificate of the Issuer, dated as of the Funding Date, to the effect that, in the case of each Collateral Investment listed on Schedule A-1, each Eligible Investment and each other item or Collateral pledged to the Trustee for inclusion in the Collateral on the Funding Date (whether pledged by the Issuer or the Zohar Subsidiary) and immediately prior to the delivery thereof on the Funding Date:

(i)    the Issuer or the Zohar Subsidiary, as applicable, is the owner of such Collateral Investment listed on Schedule A-1, Eligible Investment or other item of Collateral free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Funding Date and except for those Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Collateral Investment or Eligible Investment prior to the first payment date and owed by the Issuer to the seller of such Collateral Investment or Eligible Investment;

(ii)    the Issuer or the Zohar Subsidiary, as applicable, has acquired its ownership in such Collateral Investment or Eligible Investment in good faith without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC), except as described in paragraph (i) above;

(iii)    neither the Issuer nor the Zohar Subsidiary has assigned, pledged or otherwise encumbered any interest in such Collateral Investment or Eligible Investment or other item of Collateral (or, if any such interest has been assigned, pledged or

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001844

otherwise encumbered, it has been released or will be released on the Funding Date) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer or the Zohar Subsidiary, as applicable, has full right to Grant to the Trustee a security interest in and assign and pledge all of its right, title and interest in such Collateral Investment, Eligible Investment or other item of Collateral;

(v)    the information set forth with respect to such Collateral Investment in Schedule A-1 is correct;

(vi)    the Collateral Investments set forth on Schedule A-1 and the requirements of the definition of "Collateral Investments" and are transferred to the Trustee as required by Section 3.3(a); and

(vii)    upon Grant by the Issuer or the Zohar Subsidiary, as applicable, the Trustee has a first priority perfected security interest in the Collateral (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it under Section 3.3(b) for perfection of that interest).

(c)    Rating Letters.  The delivery to the Trustee of a certificate of the Issuer to the effect that attached thereto is a true and correct copy of:  (i) a letter signed by Moody's and confirming that the Class A-1R Notes, the Class A-1T Notes, the Class A-1D Notes and the Class A-2 Notes have been rated "Aaa" by Moody's and that the Class A-3 Notes have been rated at least "Aa2" by Moody's, which ratings shall be in full force and effect on the Funding Date and shall address the ultimate payment in full of the principal of and interest on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, respectively; and (ii) a letter signed by Standard & Poor's and confirming that the Class A-1R Notes, the Class A-1T Notes, the Class A-1D Notes and the Class A-2 Notes have been rated "AAA" by Standard & Poor's and that the Class A-3 Notes have been rated at least "AA" by Standard & Poor's, which ratings shall be in full force and effect on the Funding Date and shall address the timely payment in full of the principal of and interest on the Class A-1 Notes, Class A-2 Notes and Class A-3 Notes, respectively, and commitment fees on the Class A-1R Notes and the Class A-1D Notes.

The parties hereto acknowledge that neither Moody's nor Standard & Poor's has rated, and neither has agreed to rate, the Class B Notes, and that if any Rating Agency is asked to rate the Class B Notes after the Funding Date, such rating Agency will undertake a separate rating process which may or may not result in the Class B Notes being rated by such Rating Agency at the rating level requested.

(d)    Accounts.  The delivery by the Trustee of evidence of the establishment of the Payment Account, the Collection Accounts, the Custodial Account, the Expense Account, the Closing Expense Account, the Class A-1R Holder Collateral Account, the Professional Fee Account, the Hedge Counterparty Collateral Account, the Unfunded Revolver Discount Account, the Class A-1R Future Funding Reserve Account and the Rollover Proceeds Account.

(e)    Funding Certificate.  The delivery to the Trustee of a funding certificate, duly executed by an Authorized Officer of the Issuer, relating to, among other things, the disposition of the proceeds of the issuance of the Notes, dated the Funding Date, substantially in the form of Exhibit G hereto (the "Funding Certificate").

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001845

(f)    Purchases. The delivery to the Trustee of evidence (which may be a certificate of the Issuer) that the Issuer or the Zohar Subsidiary, as applicable, shall have acquired or originated or owns the Collateral Investments specified on Schedule A-1.

Section 3.3.    Custodianship; Transfer of Collateral Investments and Eligible Investments

(a)    The Trustee shall hold all Certificated Securities and Instruments in physical form at the office of a custodian appointed by it in the State of Illinois (the "Custodian"). Initially, such Custodian shall be the Bank, located at the Corporate Trust Office. Any successor custodian shall be a state or national bank or trust company which is not an Affiliate of any Zohar Obligor and has capital and surplus of at least U.S.$200,000,000.

(b)    Each time that the Issuer or the Zohar Subsidiary, or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary, shall direct or cause the acquisition or origination of any Collateral Investment, Equity Security or Eligible Investment, the Collateral Manager (on behalf of the Issuer or the Zohar Subsidiary) shall, if such Collateral Investment, Equity Security or Eligible Investment has not already been transferred to the Custodial Account, cause the transfer of such Collateral Investment, Equity Security or Eligible Investment to the Custodian to be held in the Custodial Account for the benefit of the Trustee in accordance with the terms of this Indenture. The security interest of the Trustee in the funds and other property utilized in connection with such acquisition or origination shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Investment, Equity Security or Eligible Investment so acquired or originated, including all rights of the Issuer or the Zohar Subsidiary, as applicable, in and to any Money, Instruments, payment intangibles, general intangibles, Chattel Paper, electronic chattel paper, letter-of-credit rights and investment property related to and proceeds of such Collateral Investment, Equity Security or Eligible Investment. The Collateral Manager shall cause all Collateral Investments, Equity Securities and Eligible Investments acquired or originated by or on behalf of the Issuer or the Zohar Subsidiary, as applicable, to be transferred to the Custodian for the benefit of the Trustee by one of the following means (and shall take any and all other actions necessary to create and maintain in favor of the Trustee a valid, perfected, first-priority security interest in each Collateral Investment, Equity Security and Eligible Investment Granted to the Trustee under laws and regulations (including without limitation Articles 8 and 9 of the UCC) in effect at the time of such Grant):

(i)    in the case of an Instrument, Chattel Paper or a Certificated Security represented by a Security Certificate in Registered Form, by (a) delivering such Instrument, Chattel Paper or Security Certificate to the Custodian in the State of Illinois specially indorsed to the Trustee by an effective Indorsement and (b) causing the Custodian to maintain (on behalf of the Trustee) continuous possession of such Instrument, Chattel Paper or Security Certificate in the State of Illinois;

(ii)    in the case of an Uncertificated Security (other than an Uncertificated Security covered by clause (iii) below), by (a) causing the Trustee to become the registered owner of such Uncertificated Security and (b) taking reasonable steps to direct the issuer of such Uncertificated Security to cause such registration to remain effective;

(iii)    in the case of an Uncertificated Security registered in the name of the Issuer or the Zohar Subsidiary, as applicable, by (a) taking reasonable steps to cause the issuer of such Uncertificated Security to agree that it will comply with Instructions originated by the Trustee without further consent by the Issuer or Zohar Subsidiary and (b) taking reasonable steps to direct the issuer of such Uncertificated Security to cause such agreement to remain in effect;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001846

        (iv)    in the case of a Securities Entitlement held through a Securities Intermediary and as to which the Entitlement Holder is the Issuer or the Zohar Subsidiary, as applicable, by (a) causing such Securities Intermediary to agree that it will comply with Entitlement Orders originated by the Trustee without further consent of the Issuer or the Zohar Subsidiary and (b) causing such agreement to remain in effect;

        (v)    in the case of any Security Entitlement (other than a Security Entitlement covered by clause (iv) above), by taking reasonable steps to cause the Trustee to become the Entitlement Holder of such Security or Security Entitlement;

        (vi)    in the case of general intangibles and payment intangibles (including any Participation Interest in which neither such Participation Interest nor the underlying debt are represented by Instruments) by (a) causing the filing of a Financing Statement against the Issuer in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, (b) causing the filing of a Financing Statement against the Zohar Subsidiary in the office of the Secretary of State of the State of Delaware and (c) causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands; and

        (vii)    in the case of Participation Interests in which the underlying debt is represented by an Instrument or Instruments by (a) (X) causing the delivery of each such Instrument to the Custodian in the State of Illinois specially indorsed to the Trustee by an effective Indorsement and (Y) causing the Custodian to maintain (on behalf of the Trustee) continuous possession of such Instrument in the State of Illinois or (b) notifying the institution which sold the Participation Interest that it holds such Instruments for the account of the Trustee.

        Without limiting the foregoing, the Custodian acknowledges that the Custodian will hold all "instruments" (as defined in each applicable Uniform Commercial Code) and "certificated securities" (as so defined) that constitute or evidence the Collateral solely on behalf and for the benefit of the Trustee.

        (c)    If and to the extent the Bank shall act as Custodian or Securities Intermediary hereunder, it shall be entitled to and shall enjoy the protections, benefits, immunities and indemnities applicable to the Trustee set forth in Section 6.3 and Section 6.8(a)(iii) (in each case as fully as if such Section made express reference to the Custodian or Securities Intermediary). If and to the extent any Person other than the Bank shall act as Custodian or Securities Intermediary, the Trustee shall have no liability for the actions or omissions of any such Custodian or Securities Intermediary.

        (d)    Notwithstanding any term herein or in the UCC to the contrary, the Custodian, Securities Intermediary and the Trustee shall not be under any obligation or duty with respect to any Collateral in the form of an Instrument or Chattel Paper, or any other document or writing, evidencing or purporting to evidence a participation or other interest in a loan, other than to receive and hold possession of such Instrument or Chattel Paper or other document or writing as is delivered or caused to be delivered to the Custodian pursuant to Section 3.3(b). Without limiting the generality of the foregoing, the Custodian, Securities Intermediary and the Trustee shall not be under any obligation to examine the terms of any related underlying instrument in order to determine the applicability of or compliance with any conditions or restriction upon transfer (including without limitation any requirement for consent or approval of any agent bank or borrower) or otherwise to determine the genuineness, completeness, validity, title, transferability or marketability thereof.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                      PP001847

Section 3.4.        Representations as to Collateral

(a)        The Issuer hereby represents and warrants to the Secured Parties on the Funding Date as follows (which representations (x) shall be deemed to be made as of each date of which the Issuer or the Zohar Subsidiary, as applicable, shall acquire or originate any Collateral, (y) shall survive the execution of this Indenture and (z) shall not be waived unless the Trustee shall have received confirmation from each Rating Agency that its ratings issued with respect to the Notes will not be withdrawn or reduced below the rating effective on the Funding Date as a result of such waiver):

(i)        This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages and other encumbrances, and is enforceable as such as against creditors of and purchasers from the Issuer or the Zohar Subsidiary, as applicable.

(ii)        The Issuer or the Zohar Subsidiary, as applicable, is the owner of and has good title to each item of Collateral free and clear of any liens, claims or encumbrances of any nature whatsoever except for liens (x) that are being released on the Funding Date, (y) granted pursuant to this Indenture and (z) securing judgments, but only (A) to the extent, for an amount and for a period not resulting in an Event of Default under Section 5.1(h), (B) if such liens attach after the Funding Date after the date on which the Issuer or the Zohar Subsidiary, as applicable, acquired or originated such Collateral and after the Delivery of such item of Collateral to the Trustee and (C) if the Issuer or the Zohar Subsidiary, as applicable, has given notice of such liens to the Trustee and each Rating Agency.

(iii)        The Issuer or the Zohar Subsidiary, as applicable, has not assigned, pledged, sold, granted a security interest in or otherwise encumbered any interest in the Collateral (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released prior to the Funding Date or is being released on the Funding Date) other than interests granted pursuant to this Indenture.

(iv)        The Issuer or the Zohar Subsidiary, as applicable, has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral to the Trustee.

(v)        All Collateral has been and will have been credited to one of the Accounts (other than any such Collateral consisting of "instruments" or "general intangibles" within the meaning of the applicable Uniform Commercial Code or any such Collateral referred to in Section 3.4(b)). The securities intermediary for each Account has agreed to treat all assets credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vi)        The Issuer or the Zohar Subsidiary, as applicable, has pledged to the Trustee all of such Person's right, title and interest in and to each Collateral Investment included in the Collateral pursuant to the Granting Clause of this Indenture and has delivered each such Collateral Investment (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.3(b).

(vii)        The Collateral constitutes "general intangibles", "certificated securities", "uncertificated securities", "instruments", "securities entitlements", each within the meaning of the applicable Uniform Commercial Code, and/or such other category of collateral under the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001848

- 96 -

applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under Section 3.4(b).

(viii)    The Issuer or the Zohar Subsidiary, as applicable, has caused (or will have caused within 10 days following the Funding Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law in order to perfect the security interest in the portion of the Collateral pledged to the Trustee hereunder that may be perfected by the filing of financing statements. All Financing Statements filed in connection herewith describing the Collateral contain a statement to the following effect: "A security interest in any collateral described in this financing statement will violate the rights of the secured party named herein".

(ix)    The Issuer or the Zohar Subsidiary, as applicable, has not authorized the filing of and is not aware of any financing statements against the Issuer or the Zohar Subsidiary, as applicable, that include a description of collateral covering the Collateral other than any financing statement (x) relating to the security interest granted to the Trustee hereunder or (y) that has been terminated on or prior to the Funding Date. As of the Funding Date, neither the Issuer nor the Zohar Subsidiary is aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against either Person.

(x)    The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer or the Zohar Subsidiary, as applicable.

(xi)    All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that constitutes or evidences the Collateral have been delivered to the Custodian, to the extent received by the Issuer or the Zohar Subsidiary, as applicable. The Issuer has received a written acknowledgment from the Custodian that the Custodian is holding all such instruments that constitute or evidence the Collateral solely on behalf and for the benefit of the Trustee. None of such instruments that constitute or evidence the Collateral has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed by the Issuer or the Zohar Subsidiary, as applicable, to any Person other than the Trustee.

(xii)    All "certificated securities" (as defined in each applicable Uniform Commercial Code) that constitute or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer or the Zohar Subsidiary, as applicable, registered in the name of the Custodian or indorsed to the Custodian. The Issuer has received a written acknowledgment from the Custodian that the Custodian is holding all such certificated securities that constitute or evidence the Collateral solely on behalf and for the benefit of the Trustee.

(xiii)    The Issuer or the Zohar Subsidiary, as applicable, has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that constitute or evidence the Collateral to be registered in the name of the Custodian.

(xiv)    The Accounts are not in the name of any Person other than the Issuer, the Zohar Subsidiary or the Trustee. Neither the Issuer nor the Zohar Subsidiary has consented to the securities intermediary of any Account to comply with instructions of any Person other than the Trustee.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001849

(xv)    Upon Grant by the Issuer or the Zohar Subsidiary, as applicable, the Trustee has a first priority perfected security interest in the Collateral.

(b)    Without limiting the obligations of the Issuer under Section 10.2(f), if the Issuer or the Zohar Subsidiary acquires Collateral that is not "general intangibles", "certificated securities", "uncertificated securities", "instruments", or "securities entitlements", each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer or the Zohar Subsidiary, as applicable, has complied with its obligations under this Section 3.4(b), then on or prior to the date on which the Issuer or the Zohar Subsidiary, as applicable, acquires such Collateral, the Issuer or the Zohar Subsidiary, as applicable (or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary) shall notify Standard & Poor's and the Trustee (for the benefit of the Secured Parties) of its acquisition or intended acquisition of such Collateral and the Issuer or the Zohar Subsidiary, as applicable, shall represent to Standard & Poor's and the Secured Parties as to the category of such Collateral under the applicable Uniform Commercial Code and shall make such further representations as to the perfection and priority of the security interest in such Collateral Granted hereunder as shall be acceptable to Standard & Poor's.

Section 3.5.    Representations and Warranties of the Co-Issuers

The Issuer and the Co-Issuer represent and warrant, each in respect of itself only, to each Noteholder on the date hereof and/or on the Funding Date, as applicable, as follows:

(a)    Organization.  The Issuer is an exempted company with limited liability duly organized and validly existing and in good standing under the laws of the Cayman Islands, and the Co-Issuer is a corporation duly organized and validly existing and in good standing under the laws of the State of Delaware.

(b)    Authorization.  Each of the Issuer and the Co-Issuer has the power to execute and deliver this Indenture and the other Transaction Documents to which it is a party and to perform its obligations under this Indenture and the other Transaction Documents to which it is a party and has taken all necessary action to authorize such execution, delivery and performance.

(c)    No Conflict.  The execution, delivery and performance of this Indenture and the other Transaction Documents to which the Issuer or the Co-Issuer is a party by the Issuer and the Co-Issuer, respectively, do not violate or conflict with any law, rule or regulation applicable to the Issuer or the Co-Issuer, any provision of the organizational documents of the Issuer or the Co-Issuer, any order or judgment of any court or other governmental authority applicable to the Issuer or the Co-Issuer, any of the Issuer's or the Co-Issuer's assets or any contractual restriction binding on or affecting the Issuer or the Co-Issuer or any of such assets.

(d)    Consents.  All governmental and other third-party consents that are required to have been obtained by the Issuer or the Co-Issuer with respect to the execution, delivery and performance of this Indenture and the other Transaction Documents to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)    Enforceability.  This Indenture and the other Transaction Documents to which it is a party constitute the legal, valid and binding obligations of the Issuer and the Co-Issuer, enforceable against the Issuer and the Co-Issuer in accordance with their respective terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001850

- 98 -

creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a Proceeding in equity or at law).

(f)    Use of Proceeds; Margin Regulations.  All proceeds of the advances will be used by the Issuer only in accordance with the provisions of this Indenture and the other Transaction Documents to which it is a party (including, without limitation, Section 7.8(a)(v)).  No part of the proceeds of any advance will be used, directly or indirectly, (i) to extend "purpose credit" within the meaning given to such term in Regulation U or (ii) to purchase, carry or otherwise acquire, or refinance any indebtedness incurred to purchase, carry or otherwise acquire, any Margin Stock (it being understood that nothing in this clause (f) shall prohibit the Issuer or the Zohar Subsidiary from exchanging any Collateral Investment or Equity Security for Margin Stock in connection with a workout or enforcement of such obligation or Equity Security if such exchange does not violate Regulation U (and, if any such exchange in fact violates Regulation U, then the Collateral Manager shall cause the Issuer to sell such Margin Stock within 90 days of the date on which the Collateral Manager first becomes aware of such violation)).

(g)    Investment Company Act.  Assuming the accuracy of the Noteholder's representations set forth in the Transaction Documents to which it is a party (or otherwise deemed made pursuant to the Transaction Documents), none of the Issuer, the Co-Issuer or the Zohar Subsidiary is an investment company required to be registered under the Investment Company Act.

(h)    Securities Act.  Assuming the accuracy of the Note Purchasers' representations set forth in the Transaction Documents to which it is a party (or otherwise deemed made pursuant to the Transaction Documents), no offer or sale of any of the Notes or the Preference Shares of the Issuer or the Co-Issuer made in accordance with the Transaction Documents is subject to the registration requirements of the Securities Act.

(i)    Zohar Subsidiary.  The Issuer has been formed for purposes of acquiring Collateral Investments and for the other purposes contemplated by the Transaction Documents, and has not been formed primarily for the purpose of owning the Zohar Subsidiary.


ARTICLE 4

SATISFACTION AND DISCHARGE

Section 4.1.    Satisfaction and Discharge of Indenture

This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, any Class A-1R Commitment Fee, any Class A-1D Commitment Fee, any Class A Redemption Break Funding Costs, in each case as provided herein (including, without limitation, as provided in the Priority of Payments and Article 13), (iv) the rights, obligations and immunities of the Trustee hereunder, (v) the rights and immunities of the Collateral Manager hereunder and under the Management Agreement and (vi) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them; and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                            PP001851

- 99 -

(a)    either:

(i)    all Notes theretofore authenticated and delivered (other than (a) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.5 and (b) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3) have been delivered to the Trustee for cancellation; or

(ii)    all Notes not theretofore delivered to the Trustee for cancellation (a) have become due and payable, or (b) will become due and payable at their Stated Maturity within one year, or (c) are to be called for redemption pursuant to Section 9.1 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Co-Issuers pursuant to Section 9.3 and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or non-callable direct obligations of the United States in an amount sufficient, as verified by a firm of nationally recognized Independent certified public accountants, to pay and discharge the entire indebtedness on all Notes not theretofore delivered to the Trustee for cancellation, including all principal, interest (including Defaulted Interest and interest thereon) and Class A-1R Commitment Fees and Class A-1D Commitment Fees accrued to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or the Redemption Date, as the case may be; provided that (x) such obligations are entitled to the full faith and credit of the United States and (y) this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

(b)    the Issuer has paid or caused to be paid all other sums payable hereunder (including all amounts due and owing under each Hedge Agreement, each Note Purchase Agreement, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement, the Administration Agreement and the Management Agreement) and no other amounts will become due and payable by the Co-Issuers; and

(c)    the Co-Issuers have delivered to the Trustee an Officer's certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Collateral Manager and, if applicable, the Noteholders, as the case may be, under Sections 2.6, 4.2, 5.9, 5.18, 6.7, 6.8, 7.1 and 7.3 shall survive.

Section 4.2.    <u>Application of Trust Money</u>

All Monies deposited with the Trustee pursuant to Section 4.1 for the payment of principal of and interest on the Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and amounts payable pursuant to this Indenture, each Note Purchase Agreement, each Hedge Agreement, the Collateral Administration Agreement, the Administration Agreement and the Management Agreement shall be held in a segregated account in trust and applied by it in accordance with the provisions of this Indenture, including, without limitation, the Priority of Payments, for the payment either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the respective amounts in respect of which such Money has been deposited with the Trustee.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC    PP001852

- 100 -

Section 4.3.    Repayment of Monies Held by Paying Agent

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

ARTICLE 5

EVENTS OF DEFAULT; REMEDIES

Section 5.1.    Events of Default

"Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    default in the payment of (i) any interest on any Class A-1R Note or any Class A-1R Commitment Fee, (ii) any interest on any Class A-1T Note, (iii) any interest on any Class A-1D Note or any Class A-1D Commitment Fee, (iv) any interest on any Class A-2 Note or (v) any interest on any Class A-3 Note, when the same becomes due and payable, which default in each case shall continue for a period of three Business Days;

(b)    default in the payment of principal of any Note when the same becomes due and payable, at its Stated Maturity or Redemption Date;

(c)    failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and continuation of such failure for a period of two Business Days;

(d)    any of the Zohar Obligors or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(e)    default in the performance, or breach, of any covenant or agreement of any Zohar Obligor in this Indenture (other than the covenant to satisfy any of the Collateral Quality Tests, any of the Class A Coverage Tests, or the failure of any Zohar Obligor to comply with any other covenant or agreement for which another remedy or consequence is provided by this Section 5.1) or in any Note Purchase Agreement, or the failure of any representation or warranty of any Zohar Obligor made in this Indenture, in any Note Purchase Agreement or in any certificate or other writing delivered pursuant hereto or thereto in connection herewith or therewith to be correct in any material respect when made, and the continuation of such default, breach or failure for a period of 30 days after any of the Issuer, the Co-Issuer, the Zohar Subsidiary or the Collateral Manager have actual knowledge thereof or after notice thereof shall have been given by registered or certified mail or overnight courier, to the Zohar Obligors and the Collateral Manager by the Trustee or to the Co-Issuers, the Collateral Manager and the Trustee by the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; provided that such 30 day period shall be

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001853

increased to 60 days if such Zohar Obligor is using commercially reasonable good faith efforts to cure such default, breach or failure;

(f)    an involuntary Proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Zohar Obligor or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Zohar Obligor or for a substantial part of its assets, and, in any such case, such Proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or the Issuer or its assets shall become subject to any event that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(g)    any Zohar Obligor shall (i) voluntarily commence any Proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership, liquidation or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any Proceeding or petition described in Section 5.1(f), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, liquidator, sequestrator, conservator or similar official for such Zohar Obligor or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such Proceeding, (v) make a general assignment for the benefit of creditors, (vi) fail generally, or admit in writing such Zohar Obligor's inability to pay, its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing; or the Issuer or its assets shall cause or become subject to any event with respect to the Issuer that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(h)    the rendering of one or more final judgments against any Zohar Obligor which exceed, in the aggregate, U.S.$5,000,000 and which remain unstayed, undischarged and unsatisfied for 30 days after such judgment(s) becomes nonappealable, unless adequate funds have been reserved or set aside for the payment thereof;

(i)    other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any Collateral Investment, Equity Security, Eligible Investment or any Hedge Agreement, the imposition of taxes, fees, assessments or other similar charges on any Zohar Obligor in an aggregate amount in any twelve-month period in excess of U.S.$1,000,000;

(j)    on any Measurement Date, on or after the Ramp Up End Date, the Class A Overcollateralization Ratio shall be less than 105%; or

(k)    more than 10% of the Collateral securing all of the Notes ceases to be subject to the lien of this Indenture.

If either of the Co-Issuers obtains knowledge, or has reason to believe, that an Event of Default shall have occurred and is continuing, such of the Co-Issuers shall, within three Business Days, notify the Trustee, the Collateral Manager, the Noteholders, each Hedge Counterparty and each Rating Agency in writing.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001854

Section 5.2.     Acceleration of Maturity; Rescission and Annulment

(a)     If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(f) or 5.1(g)), (i) the Trustee (at the direction of the Controlling Class) by notice to the Co-Issuers shall or (ii) the Controlling Class, by notice to the Co-Issuers and the Trustee, may (A) declare the Outstanding principal of all the Notes to be immediately due and payable, and upon any such declaration such Outstanding principal, together with all accrued and unpaid interest thereon, all accrued and unpaid Class A-1R Commitment Fees, all accrued and unpaid Class A-1D Commitment Fees, all accrued and unpaid Class A Redemption Break Funding Costs and all other amounts payable hereunder and under each Note Purchase Agreement, shall become immediately due and payable and/or (B) terminate the Reinvestment Period. If an Event of Default specified in Section 5.1(b) occurs and is continuing solely with respect to a default in the payment of any principal of any Class B Note at a time when the Class B Notes are not the most senior Class of Notes Outstanding, neither the Trustee nor the Holders of the Class B Notes shall have the right to exercise any remedies with respect thereto under this Indenture or otherwise, including without limitation the right to declare such principal and other amounts to be immediately due and payable. If an Event of Default specified in Section 5.1(b) occurs and is continuing solely with respect to a default in the payment of any principal of any Class C Note at a time when the Class C Notes are not the most senior Class of Notes Outstanding, neither the Trustee nor the Holders of the Class C Notes shall have the right to exercise any remedies with respect thereto under this Indenture or otherwise, including without limitation the right to declare such principal and other amounts to be immediately due and payable. If an Event of Default specified in Section 5.1(f) or (g) occurs, all unpaid principal of the Notes, together with all accrued and unpaid interest thereon, all accrued and unpaid Class A-1R Commitment Fees, all accrued and unpaid Class A-1D Commitment Fees and all other amounts payable hereunder and under each Note Purchase Agreement, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder and the Reinvestment Period shall automatically terminate. The Holders of the Preference Shares shall not have any creditors' rights against the Issuer and shall not have the right to determine the remedies to be exercised under this Indenture.

(b)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as hereinafter provided in this Article 5, the Controlling Class, by written notice to the Co-Issuers and the Trustee, may (and the Trustee, at the direction of the Controlling Class, shall) rescind and annul such declaration and its consequences if:

(i)     the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay (in accordance with the Priority of Payments):

(A)     all overdue installments of principal of and interest on the Class A Notes (including Defaulted Interest and any interest thereon) and all overdue Class A-1R Commitment Fees, Class A-1D Commitment Fees or Class A Redemption Break Funding Costs; or, after the Class A Notes have been paid in full, all overdue installments of principal of the Class B Notes; or, after the Class B Notes have been paid in full, all overdue installments of principal of the Class C Notes;

(B)     interest upon Defaulted Interest at the applicable Note Interest Rates (in the case of the Class A Notes) (to the extent that the payment thereof is lawful); and

(C)     all unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001855

(ii)    the Trustee has determined that all Events of Default, other than the nonpayment of the principal of or interest on the Notes, Class A-1R Commitment Fees or Class A-1D Commitment Fees that have become due solely by such acceleration, have been cured and the Controlling Class by written notice to the Trustee has agreed with such determination or waived such requirement as provided in Section 5.14.

Any Hedge Agreement in place at the time of any declaration of an acceleration shall remain in place until such declaration is no longer capable of being rescinded or annulled and liquidation of the Collateral has commenced.

At any such time as the Trustee shall rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5; provided that, if such preservation of the Collateral is rescinded pursuant to Section 5.5, the Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this Section 5.2(b).  No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3.    Collection of Indebtedness and Suits for Enforcement by Trustee

The Co-Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest on any Class A-1 Note, Class A-1R Commitment Fee, Class A-1D Commitment Fee, Class A Redemption Break Funding Costs, the payment of principal of any Class B Note or the payment of principal of any Class C Note, the applicable Co-Issuers will, upon demand of the Trustee or any affected Noteholder, pay to the Trustee, for the benefit of such Noteholder, the whole amount, if any, then due and payable on such Note for principal, interest, Class A-1R Commitment Fee, Class A-1D Commitment Fee and Class A Redemption Break Funding Costs, as applicable, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, Class A-1R Commitment Fee, Class A-1D Commitment Fee, Class A Redemption Break Funding Costs and all other amounts owing to the Holders of the Notes under this Indenture and under the Note Purchase Agreements (each as specified in the Priority of Payments), at the applicable Note Interest Rate and all other amounts due under this Indenture and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Noteholder and their respective agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and shall, upon the direction by the Controlling Class, prosecute such Proceeding to judgment or final decree, and shall, upon the direction by the Controlling Class, enforce the same against the Co-Issuers or any other obligor upon the Notes and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings as the Trustee shall deem most effectual (if no direction by the Controlling Class is received by the Trustee) or as the Trustee may be directed by the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power pledged herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001856

- 104 -

In case there shall be pending Proceedings relative to any Zohar Obligor or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer, the Zohar Subsidiary or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer, the Zohar Subsidiary or other obligor upon the Notes, or the creditors or property of the Issuer, the Co-Issuer, the Zohar Subsidiary or such other obligor, the Trustee, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)    to file and prove a claim or claims for the whole amount of principal, interest, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and Class A Redemption Break Funding Costs owing and unpaid in respect of the Notes and all other amounts owing to the Holders of the Notes hereunder and under the Note Purchase Agreements upon direction by a Majority of each Class of Notes, and to file such other papers or documents and take such other actions (such as sitting on a committee of creditors) as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of the Noteholders allowed in any Proceedings relative to the Issuer, the Co-Issuer, the Zohar Subsidiary or other obligor upon the Notes or to the creditors or property of the Issuer, the Co-Issuer, the Zohar Subsidiary or such other obligor;

(b)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes, upon the direction of such Holders, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(c)    to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on behalf of the Secured Parties in accordance with the Priority of Payments; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Secured Party, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any action or Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment,

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                 PP001857

subject to the payment of the reasonable expenses, disbursements and compensation of the Trustee, each predecessor trustee and their respective agents and attorneys and counsel, shall be for the ratable benefit of the Secured Parties payable to the Secured Parties in accordance with the Priority of Payments.

Without prejudice to its rights hereunder, when the Trustee incurs expenses or renders services after an Event of Default specified in Section 5.1(f) or (g) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy law.

In any Proceedings brought by the Trustee on behalf of the Secured Parties, the Trustee shall be held to represent all the Secured Parties to which amounts are owing by the Issuer or the Co-Issuer under this Indenture, provided it shall not have any fiduciary obligations to any Secured Parties other than a Noteholder.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Sections 5.4 and 5.5(a).

Section 5.4.    Remedies

(a)    If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may after notice to the Noteholders (and with the consent of the Controlling Class), and shall, upon direction by the Controlling Class (and upon offer of reasonable indemnity against costs, expenses and liabilities to be incurred in connection with such direction), to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture or the Note Purchase Agreements, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral Monies adjudged due;

(ii)    sell all or any portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Sections 5.5 and 5.17;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)    exercise any other rights and remedies that may be available at law or in equity;

provided that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

To the extent that, subject to the terms of this Article 5, the Trustee is acting other than at the direction of the Controlling Class, the Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001858

to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest on the Notes and the Class A-1R Commitment Fee and the Class A-1D Commitment Fee, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)     If an Event of Default as described in Section 5.1(e) shall have occurred and be continuing, the Trustee may (with the consent of the Controlling Class), and at the request of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such Proceeding.

(c)     Upon any sale, whether made under the power of sale hereby given or by virtue of Proceedings, any Noteholder or Noteholders or other Secured Party may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale hereby given or by virtue of Proceedings, the receipt of the Trustee, or of the Officer making a sale under Proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase Money, and such purchaser or purchasers shall not be obliged to confirm the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of Proceedings, shall bind the Zohar Obligors, the Trustee, the Noteholders and the other Secured Parties, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)     Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or the Zohar Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under federal or state bankruptcy or similar laws. Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or the Zohar Subsidiary or (b) any involuntary insolvency Proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer, the Co-Issuer or the Zohar Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar Proceeding.

Section 5.5.     Preservation of Collateral

(a)     If an Event of Default shall have occurred and be continuing, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of Articles 10, 12 and 13 unless either:

(i)     the Trustee determines in consultation with the Collateral Manager that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation including costs of its agents and advisors) would be sufficient

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001859

to discharge in full (in accordance with the Priority of Payments) the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and interest thereon in respect of the Class A-1 Notes), the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and all other amounts owing to the Holders under this Indenture and under the Note Purchase Agreements (as specified in the Priority of Payments) and due and unpaid Administrative Expenses, and the Controlling Class agrees with such determination; or

(ii)    the Controlling Class directs the sale and liquidation of the Collateral (or any portion thereof) and, if any Class A Notes are Outstanding, a Majority of each Class of Class A Notes that is not then the Controlling Class has consented to such sale and liquidation.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer. So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral securing the Notes if prohibited by applicable law.

(c)    For the purposes of making the determinations required pursuant to Section 5.5(a)(i), the Trustee may rely on the advice of nationally recognized accountants, investment bankers or other Persons specified in Section 6.3(c) and shall apply the standards set forth in Section 9.1(b) (assuming for this purpose that the Total Redemption Amount referred to in said Section 9.1(b) is the required amount specified in Section 5.5(a)(i)). In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Pledged Obligations and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, the Collateral Manager and the Co-Issuers a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than 10 days after making such determination but in any case prior to such sale. The Trustee shall make the determinations required by Section 5.5(a)(i) as soon as reasonably practicable but in any event within 45 days after an Event of Default and at the request of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i). In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture (and shall upon receipt thereof provide a copy to the Controlling Class). In determining whether the Holders of the requisite Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes have given any direction or notice, any Holder of a Class of Notes who is also a Holder of another Class of Notes or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

Section 5.6.    Trustee May Enforce Claims Without Possession of Notes

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001860

- 108 -

Section 5.7     Application of Money Collected

Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may upon such collection then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied, subject to Section 13.1 and in accordance with the provisions of Section 11.1, at the date or dates fixed by the Trustee.

Section 5.8.     Limitation on Suits

Subject to the proviso in Section 5.4(a), no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)     either (i) such Holder has previously given to the Trustee written notice of an Event of Default and such Holder has obtained the prior consent of the Controlling Class to the institution of such Proceeding; or (ii) except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the then most senior Class of Notes shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(b)     the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(c)     no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more Persons that could constitute the Controlling Class, each singly not constituting the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the applicable Class of Notes, notwithstanding any other provisions of this Indenture.

Section 5.9.     Unconditional Rights of Noteholders to Receive Principal, Interest, Class A-1R Commitment Fee, Class A-1D Commitment Fee and Certain Other Amounts

(a)     Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i) and the Priority of Payments), the Holder of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class A Note, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and the Class A Redemption Break Funding Costs, each as applicable, as the same become due and payable in accordance with the Priority of Payments and, subject to the provisions of Section 5.8, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC          PP001861

(b)        Notwithstanding any other provision in this Indenture (but subject to Sections 2.6(i) and 7.13(b)), the Holder of any Class B Note shall have the right, which is absolute and unconditional, to receive payment of the principal of such Class B Note as such principal becomes due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class B Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding (and all Class A-1R Commitments and Class A-1D Commitments shall have expired, terminated or been reduced to zero), which right to institute Proceedings shall be subject to the provisions of Section 5.8 and this Section 5.9, and shall not be impaired without the consent of any such Holder.

(c)        Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i)), the Holder of any Class C Note shall have the right, which is absolute and unconditional, to receive payment of the principal of such Class C Note as such principal becomes due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class C Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding (and all Class A-1R Commitments and Class A-1D Commitments shall have expired, terminated or been reduced to zero) and no Class B Note remains Outstanding, which right to institute Proceedings shall be subject to the provisions of Section 5.8 and this Section 5.9, and shall not be impaired without the consent of any such Holder.

Section 5.10.    Restoration of Rights and Remedies

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case the Zohar Obligors, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.11.    Rights and Remedies Cumulative

Except as expressly set forth in this Indenture, no right or remedy herein conferred upon or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise, and the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12.    Delay or Omission Not Waiver

No delay or omission of the Trustee or of any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article 5 or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001862

Section 5.13.    Control by Controlling Class

Notwithstanding any other provision of this Indenture, the Controlling Class shall have the right to cause the institution of (or, subject to the proviso to Section 5.4(a), cause the discontinuance of the institution of) and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee; provided that:

    (a)    such direction shall not conflict with any rule of applicable law;

    (b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; provided that, subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received reasonably satisfactory indemnity against such liability as set forth below);

    (c)    the Trustee shall have been provided with indemnity reasonably satisfactory to the Trustee; and

    (d)    any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5.

Section 5.14.    Waiver of Past Defaults

Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article 5, the Controlling Class (subject to the proviso to Section 5.4(a)) may on behalf of the Secured Parties waive any past Default and its consequences, except a Default:

    (a)    in the payment of the principal of any Note or in the payment of interest on any Class A Note (including Defaulted Interest and any interest thereon), the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and Class A Redemption Break Funding Costs; or

    (b)    in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected thereby; or

    (c)    arising under Section 5.1(f) or 5.1(g).

In the case of any such waiver, the Zohar Obligors, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15.    Undertaking for Costs

All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001863

- 111 -

enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Trustee, to any suit instituted by the Controlling Class, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% of the Aggregate Outstanding Amount of the then most senior Class of Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16.    Waiver of Stay or Extension Laws

The Zohar Obligors covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Zohar Obligors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein pledged to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17.    Sale of Collateral

(a)    The power to effect any sale (a "Sale") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid. The Trustee shall, upon direction of the Controlling Class and upon notice to the Noteholders, from time to time postpone any Sale by announcement made at the time and place of such Sale; provided that, if the Sale is rescheduled for a date more than five Business Days (in the case of a determination applying the standards set forth in Section 9.1(b)(ii)(A)) or 10 Business Days (in the case of a determination applying the standards set forth in Section 9.1(b)(ii)(B)) after the date of the determination by the Trustee pursuant to Section 5.5(a)(i), such Sale shall not occur unless and until the Trustee has again made the determination required by Section 5.5(a)(i). The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; provided that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)    The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7. The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral consists of securities not registered under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained, seek a no-action position from the United States Securities and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001864

Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities.

(d)    The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer and the Zohar Subsidiary to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18.    Action on the Notes

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of any Zohar Obligor.

ARTICLE 6

THE TRUSTEE

Section 6.1.    Certain Duties and Responsibilities

(a)    Except during the continuance of an Event of Default:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not conform. If a corrected form shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b)    In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001865

- 113 -

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of any Zohar Obligor or the Collateral Manager in accordance with this Indenture, the Controlling Class and/or any Holder of any Note relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it (if the amount of such funds or risk or liability does not exceed the amount payable to the Trustee pursuant to Section 11.1(a)(i)(B) net of the amounts specified in Section 6.8(a)(i), the Trustee shall be deemed to be reasonably assured of such repayment) unless such risk or liability relates to performance of its ordinary services, including ordinary services under Article 5, under this Indenture.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1(d), 5.1(f), 5.1(g) or 5.1(k) or any Default described in Section 5.1(e), 5.1(h) or 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the Corporate Trust Office. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section.

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

(f)    The Trustee shall, upon reasonable (but no less than three Business Days') prior written notice to the Trustee, permit any representative of a Holder of a Note, during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee relating to the Notes, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Notes.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001866

Section 6.2.    Notice of Default

Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall fax (where a fax number has been provided to the Trustee) and mail to the Collateral Manager, each Rating Agency (for so long as any Class of Notes is Outstanding), the Preference Share Paying Agent and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

Section 6.3.    Certain Rights of Trustee

Except as otherwise provided in Sections 6.1, 8.1 and 8.2:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, email, request, direction, consent, order, note or other paper or document reasonably believed by it to be genuine and to have been signed, sent or presented by the proper party or parties;

(b)    any request or direction of any Zohar Obligor mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cashflows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other Persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, email, request, direction, consent, order, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of any Class or of either Rating Agency, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Collateral Manager, to examine the books and records of the Co-Issuers and the Collateral Manager relating to the Notes and the Collateral, personally or by agent or attorney at a time acceptable to the Co-Issuers or the Collateral Manager in their reasonable judgment during normal business hours; provided that the Trustee shall, and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001867

shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law by any regulatory authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; provided that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Trustee) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)    the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of an Event of Default, subject to Section 6.1(b), prudently believes to be authorized or within its rights or powers hereunder;

(i)    the Trustee shall not be responsible for the accuracy of the books or records of, or for any acts or omissions of, the depository, any Transfer Agent (other than the Bank acting in such capacity), any Securities Intermediary (other than the Bank acting in such capacity) any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Bank acting in such capacity);

(j)    in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account (and, if otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder);

(k)    the Trustee shall not be liable for the actions or omissions of the Collateral Manager, and without limiting the foregoing, the Trustee shall not (except to the extent, if at all, otherwise expressly stated in this Indenture) be under any obligation to monitor, evaluate or verify compliance by the Collateral Manager with the terms of this Indenture or the Management Agreement, or to verify or independently determine the accuracy of information received by it from the Collateral Manager (or from any selling institution, agent bank, trustee or similar source) with respect to the Collateral;

(l)    subject to Section 6.1(d), the Trustee shall not be deemed to have notice or knowledge of any matter unless a Trustee Officer assigned to and working in the Trustee's corporate trust division has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer or this Indenture (and whenever reference is made in this Indenture to a Default or an Event of Default, such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph);

(m)    notwithstanding anything herein to the contrary, the Trustee shall not be deemed to be acting as a fiduciary for the benefit of any Hedge Counterparty; and

(n)    the Trustee shall not be under any obligation or duty to become a party to, or to review or evaluate the terms of (or have responsibility for the sufficiency of), any Hedge Agreement or the eligibility of any Hedge Counterparty.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001868

Section 6.4.    Authenticating Agents

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5, and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.4 shall be deemed to be the authentication of Notes "by the Trustee".

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving 30 days' prior written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers. Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto and the Trustee shall be entitled to be reimbursed for such payments, subject to Section 6.8. The provisions of Sections 2.8, 6.5 and 6.6 shall be applicable to any Authenticating Agent.

Section 6.5.    Not Responsible for Recitals or Issuance of Notes

The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Co-Issuers, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of the proceeds of the Notes or any Money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.6.    May Hold Notes

The Trustee, any Paying Agent, the Note Registrar, the Class A-1R Note Agent, the Class A-1D Note Agent or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and, may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, Note Registrar, Class A-1R Note Agent, Class A-1D Note Agent or such other agent.

Section 6.7.    Money Held in Trust

Money held by the Trustee hereunder shall be held in trust in segregated accounts. The Trustee shall be under no liability for interest on any Money received by it hereunder except as otherwise

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001869

agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

    Section 6.8.   Compensation and Reimbursement

    (a)   The Issuer agrees (subject to the Priority of Payments):

      (i)   to pay the Trustee on each Payment Date the Trustee's fees pursuant to the Trustee Fee Letter as compensation for the Trustee's ordinary services, including custodial services, rendered by it hereunder (which compensation shall not be limited by any mandatory provision of law in regard to the compensation of a trustee of an express trust);

      (ii)   except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 6.3(c), 10.10 or 10.10, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) but only to the extent any such securities transaction charges have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Collateral Manager;

      (iii)   to indemnify the Bank, the Trustee and their Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder; and

      (iv)   to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.14.

    (b)   The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from Moneys on deposit in the Payment Account for the Notes pursuant to Section 11.1.

    (c)   The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against any Zohar Obligor for the non-payment to the Trustee of any amounts provided by this Section 6.8, this Indenture or the other Transaction Documents until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.

    The indemnification provided to the Trustee hereunder shall survive the removal or resignation of the Trustee hereunder and the termination of the Indenture.

    The Trustee shall, subject to the Priority of Payments, receive amounts pursuant to this Section 6.8 and Sections 11.1(a)(i) and (ii) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC          PP001870

- 118 -

of Default. Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder. No direction by the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

Section 6.9.    Corporate Trustee Required; Eligibility

There shall at all times be a Trustee hereunder which shall be a corporation, banking association or trust company organized and doing business under the laws of the United States, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state banking authority, having a rating of at least "Baa1" by Moody's and "BBB+" by Standard & Poor's and having an office within the United States. If such entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in Section 6.10.

Section 6.10.    Resignation and Removal; Appointment of Successor

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11.

(b)     The Trustee may resign at any time by giving written notice thereof to the Co-Issuers, the Noteholders, the Collateral Manager and each Rating Agency. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor Trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, together with a copy to each Noteholder and the Collateral Manager; provided that such successor Trustee shall be appointed only upon the written consent of the Controlling Class. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, any Holder of a Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)     The Trustee may be removed at any time by Act of a 66⅔% of any Class or, if an Event of Default shall have occurred and be continuing or when a successor Trustee has been appointed pursuant to Section 6.11, by Act of the Controlling Class, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee shall cease to be eligible under Section 6.9 and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)     the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001871

then, in any such case (subject to Section 6.10(a)), (a) the Co-Issuers, by Issuer Order, may remove the Trustee, or (b) subject to Section 5.15, or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee with the consent of the Controlling Class. If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by Act of the Controlling Class delivered to the Issuer and the retiring Trustee. The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers. If no successor Trustee shall have been so appointed by the Co-Issuers or the Controlling Class and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, each Rating Agency, the Preference Share Paying Agent and to the Holders as their names and addresses appear in the Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.11.    Acceptance of Appointment by Successor

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.8(d). Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments to vest in and confirm to such successor Trustee all such rights, powers and trusts more fully or certainly.

No successor Trustee shall accept its appointment unless at the time of such acceptance (a) each Rating Agency confirms in writing that appointment will not adversely affect its the ratings on any Class of Notes on the Funding Date and (b) such successor shall (i) have long term debt rated within the four highest rating categories by each Rating Agency and (ii) be qualified and eligible under this Article 6. No appointment of a successor shall become effective until the date 10 days after notice of such appointment has been given to each Noteholder.

Section 6.12.    Merger, Conversion, Consolidation or Succession to Business of Trustee

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001872

shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; provided that such Person shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.13.    Co-Trustees

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee, jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.6 and to make such claims and enforce such rights of action on behalf of the Secured Parties subject to the other provisions of this Section. The co-trustee shall meet the eligibility criteria set out under Section 6.9.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have the power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers. The Co-Issuers agree to pay (subject to the Priority of Payments) for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)      the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)      the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly, as shall be provided in the instrument appointing such co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(c)      the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001873

(d)    no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other co-trustee hereunder;

(e)    the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)    any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.14.    Certain Duties Related to Delayed Payment of Proceeds

In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Obligation on its Due Date (unless otherwise directed by the Collateral Manager in connection with any Pledged Obligation with respect to which there was a default in payment during the preceding Due Period as to which the Collateral Manager is taking action under the Management Agreement), (a) the Trustee shall promptly notify the Issuer and the Collateral Manager in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice (i) such payment shall have been received by the Trustee, or (ii) the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(c)), shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(c), the Trustee shall request the issuer of such Pledged Obligation, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. If such payment is not made within such time period, the Trustee, subject to the provisions of Section 6.1(c)(iv), shall take such action as the Collateral Manager shall reasonably direct in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. If the Issuer or the Collateral Manager requests a release of a Pledged Obligation in connection with any such action under the Management Agreement, such release shall be subject to Section 10.11 and Article 12 of this Indenture, as the case may be. Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with Section 10.2(c) and this Section 6.14 and such payment shall not be deemed part of the Collateral.

Section 6.15.    Representations and Warranties of the Bank

(a)    Organization.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)    Authorization; Binding Obligations.  The Bank has the corporate power and authority to perform the duties and obligations of Trustee under this Indenture. The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto. Upon execution and delivery by the Co-Issuers, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)    Eligibility.  The Bank is eligible under Section 6.9 to serve as Trustee hereunder and satisfies the trustee eligibility requirements set forth in Rule 3a-7(a)(4)(i) under the Investment Company Act.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                           PP001874

(d)  No Conflict.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

(e)  No Proceedings.  There are no Proceedings pending or, to the best knowledge of the Bank, threatened against the Bank before any federal, provincial or other governmental agency, authority, administrator or regulatory body, arbitrator, court or other tribunal, foreign or domestic, that could have a material adverse effect on the Collateral or any action taken or to be taken by the Bank under this Indenture.

Section 6.16.    Exchange Offers

The Collateral Manager may, on behalf of the Issuer, instruct the Trustee pursuant to an Issuer Order to, and the Trustee shall, take any of the following actions with respect to a Collateral Investment or Equity Security as to which an exchange offer has been made:  (i) exchange such obligation or instrument for other securities or a mixture of securities and other consideration pursuant to such exchange offer; and (ii) give consent, pledge waiver, vote, take any action or exercise any or all other rights or remedies with respect to any such Collateral Investment or Equity Security.

Section 6.17.    Fiduciary for Noteholders Only; Agent for the Collateral Manager

With respect to the security interests created hereunder, the Grant of any item of Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties hereunder.  In furtherance of the foregoing, the possession by the Trustee of any item of Collateral (including without limitation as Entitlement Holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the other Secured Parties.

Section 6.18.    Duties and Responsibilities of Trustee Following Payment in Full of the Notes

Following the payment in full of the Notes, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral in accordance with the Priority of Payments and the other provisions of this Indenture and in return therefor will continue to receive its fees and reimbursement of its expenses as Trustee and have all its rights provided for hereunder until the liquidation of the Collateral and the final distribution of the proceeds of such liquidation in accordance with the Priority of Payments and an Issuer Order.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001875

- 123 -

## ARTICLE 7

## COVENANTS

Section 7.1.    Payment of Principal and Interest and Commitment Fees

(a)    The Co-Issuers will duly and punctually pay all principal, interest (including Defaulted Interest and interest thereon in respect of the Class A Notes), Class A-1R Commitment Fees, Class A-1D Commitment Fees, Class A Redemption Break Funding Costs, each as applicable, in accordance with the terms of the Notes, this Indenture and the Note Purchase Agreements. Upon the Maturity of the Notes of each Class, the Issuer will give notice thereof to each Rating Agency (unless otherwise notified thereof pursuant to the terms of this Indenture).

(b)    Subject to the terms of the Note Purchase Agreements, amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder of principal, interest, Class A-1R Commitment Fee, Class A-1D Commitment Fee or other amounts shall be considered as having been paid by the Co-Issuers to such Noteholder for all purposes of this Indenture. The Trustee hereby provides notice to each Noteholder that the failure of such Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to such Noteholder under this Indenture (provided that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Co-Issuers as provided above).

Section 7.2.    Maintenance of Office or Agency

The Co-Issuers hereby appoint the Trustee as Paying Agent for the payment of principal and interest in respect of the Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and Class A Redemption Break Funding Costs payable under this Indenture and under the Note Purchase Agreements. The Co-Issuers hereby appoint CT Corporation, 111 Eighth Avenue, 13th Floor, New York, New York 10011, as the Co-Issuers' agent where notices and demands to or upon either of the Co-Issuers in respect of the Notes or this Indenture may be served. Notes may be surrendered for registration of transfer or exchange at the Corporate Trust Office of the Trustee.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; provided that (a) the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of the Notes and this Indenture may be served and (b) no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax. The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment, at the office of the Paying Agent (and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands).

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001876

- 124 -

Section 7.3.    Money for Note Payments to be Held in Trust

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Co-Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any Moneys deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article 10.

The initial Paying Agent shall be appointed as set forth in Section 7.2. Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; provided that so long as any Class of Notes are rated by the Rating Agencies and with respect to any additional or successor Paying Agent for the Notes, either (a) the Paying Agent for the Notes has a rating of not less than "Aa2" and not less than "P-1" by Moody's and a rating of not less than "AA-" and not less than "A-1+" by Standard & Poor's or (b) each Rating Agency confirms in writing that employing such Paying Agent will not adversely affect its ratings on any Class of Notes given on the Funding Date. In the event that such successor Paying Agent ceases to have a rating of at least "Aa2" and at least "P-1" by Moody's and a rating of at least "AA-" and of "A-1+" by Standard & Poor's and the ratings on the Notes given on the Funding Date have not been confirmed in writing, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3, that such Paying Agent will:

(i)    allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the instructions set forth in the applicable Note Valuation Report or Redemption Date Statement, in each case to the extent permitted by applicable law;

(ii)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001877

   (iii) if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

   (iv) if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer (or any other Obligor upon the Notes) in the making of any payment required to be made;

   (v) if such Paying Agent is not the Trustee at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent; and

   (vi) not, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or the Zohar Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under federal or state bankruptcy or similar laws. Nothing in this clause (vi) shall preclude, or be deemed to stop, such Paying Agent (x) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or the Zohar Subsidiary or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than such Paying Agent, or (y) from commencing against the Issuer, the Co-Issuer or the Zohar Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar Proceeding.

   The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Money.

   Except as otherwise required by applicable law, any Money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-Issuers on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Money (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

   Section 7.4.  Existence of Zohar Obligors

   (a) (i) The Issuer shall maintain in full force and effect its existence and rights as an exempted company organized under the laws of the Cayman Islands, (ii) the Co-Issuer shall maintain in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC          PP001878

full force and effect its existence and rights as a corporation incorporated under the laws of the State of Delaware and (iii) the Zohar Subsidiary shall maintain in full force and effect its existence and rights as a limited liability company organized under the laws of the State of Delaware. Each Zohar Obligor shall obtain and preserve their qualification to do business in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes and any of the Collateral.

(b)  Each Zohar Obligor shall ensure that all corporate or other formalities regarding its existences (including holding any required regular board of directors' and shareholders', or other similar, meetings) are followed. No Zohar Obligor shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency Proceeding. Without limiting the foregoing, each Zohar Obligor shall not (i) have any employees, (ii) hire any professional advisors other than the Collateral Manager and legal counsel to the extent expressly provided for in this Indenture (it being understood that the Collateral Manager may hire professional advisors on behalf of the Issuer and the Zohar Subsidiary to the extent provided in the Management Agreement), (iii) engage in any transaction with any shareholder that would constitute a conflict of interest (other than any transactions contemplated by the Management Agreement to the extent that the Collateral Manager is a Holder of Preference Shares or any transactions contemplated hereunder), (iv) pay dividends other than in accordance with the terms of this Indenture, the Issuer Charter and the Zohar Subsidiary Operating Agreement or (v) conduct business other than in its own name. No Zohar Obligor shall, without at least 30 days prior written notice to the Trustee, (i) change its location (within the meaning of Section 9-307 of the UCC) or jurisdiction of organization, (ii) change its corporate name, or the name under which it does business, from the name shown on the signature pages hereto or (iii) change its identity or corporate structure.

(c)  The Issuer will elect to be treated as a partnership (or for so long as there is a single owner of its equity, as a disregarded entity) for U.S. federal income tax purposes and will not take any action inconsistent with such characterization, including revoking any election. The Zohar Subsidiary will elect to be treated as other than a corporation for U.S. federal income tax purposes, and neither the Zohar Subsidiary nor the Issuer will take any action inconsistent with such characterization, including revoking such election.

Section 7.5.    Protection of Collateral

(a)  Each of the Issuer, the Zohar Subsidiary and the Collateral Manager on behalf of the Issuer (subject to the terms of the Management Agreement) shall from time to time execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable (or as may be directed by the Controlling Class) to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    Grant more effectively all or any portion of the Collateral;

(ii)    maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                     PP001879

(iv)    enforce any of the Pledged Obligations or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Trustee on behalf of the Secured Parties against the claims of all Persons and parties; or

(vi)    pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Collateral.

Each of the Issuer and the Zohar Subsidiary hereby designates the Trustee its agent and attorney-in-fact to execute any Financing Statement, continuation statement or other instrument required pursuant to this Section 7.5 (provided that such designation shall not obligate the Trustee to perform the Issuer's or Zohar Subsidiary's obligations hereunder). Each of the Issuer and the Zohar Subsidiary further authorizes the Trustee to file without the Issuer's or the Zohar Subsidiary's signature a Financing Statement that names the Issuer and the Zohar Subsidiary as debtor and the Trustee as secured party and that describes "all assets of the Debtor whether now owned or hereafter acquired and wherever located, and all proceeds thereof" as the assets in which the Trustee has a security interest.

(b)    The Trustee shall not (i) except in accordance with Section 10.11(a), (b), (c) or (e), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (a) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Funding Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.6) or (b) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (a) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (b) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)    Each of the Issuer and the Zohar Subsidiary shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Obligations that secure the Notes.

(d)    The Issuer will duly and punctually perform each of its obligations under the Note Purchase Agreements. The Issuer shall enforce all of its material rights and remedies under each Note Purchase Agreement, each Note Subscription Agreement, each Preference Share Subscription Agreement, the Management Agreement, the Administration Agreement, the Collateral Administration Agreement and each Hedge Agreement. The Zohar Subsidiary shall enforce all of its material rights and remedies under the Management Agreement.

(e)    If the Issuer or the Collateral Manager receives notice, or shall become aware, that any Holder of Class A-1R Notes or any Holder of Class A-1D Notes shall, at any time prior to the date on which the Class A-1R Commitment or the Class A-1R Commitment of such Holder expires or is terminated or reduced to zero, fail to satisfy the Rating Criteria, then, subject to the terms of the applicable Note Purchase Agreement:

(1)    in the case of the Class A-1R Notes, the Collateral Manager shall cause the Issuer to enforce its rights under the Class A-1R Note Purchase Agreement to cause

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001880

such Holder to transfer its rights and obligations in respect of its Class A-1R Notes to a Person that satisfies the Rating Criteria or to cause such Holder to deposit in the Class A-1R Holder Collateral Account, in accordance with Section 10.5 and the Class A-1R Note Purchase Agreement, an amount equal to the then Aggregate Undrawn Amount of such Holder's Class A-1R Commitment; and

(2)  in the case of the Class A-1D Notes, the Collateral Manager shall cause the Issuer to borrow the Aggregate Undrawn Amount of the Class A-1D Notes promptly and in any event within three Business Days after the date that the Collateral Manager receives notice, or becomes aware, that such Holder fails to satisfy the applicable Rating Criteria.

Section 7.6.    Opinions as to Collateral

On or before January 1 in each calendar year, commencing in 2008 the Issuer shall furnish to the Trustee, the Collateral Manager, each Noteholder and each Rating Agency an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and stating that no further action is required during the ensuing calendar year to maintain the effectiveness of such lien (other than as stated in such opinion).

Section 7.7.    Performance of Obligations

(a)  The Zohar Obligors (or the Collateral Manager on behalf of such Person) may, without the consent of the Holders of any Notes, enter into any amendment, forbearance or waiver of or supplement to any Underlying Instrument included in the Collateral, so long as such amendment, forbearance, waiver or supplement does not contravene the provisions of any Transaction Document or contravene any applicable law or regulation. For the avoidance of doubt and notwithstanding anything else contained herein, the parties hereto acknowledge and agree that the Collateral will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as a consequence thereof, the Issuer or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral, Equity Kickers, Exchanged Securities and/or the relevant Underlying Instruments interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Investment" and/or the Eligibility Criteria. The Issuer (or the Collateral Manager on its behalf) shall notify each Rating Agency of any amendment, waiver or supplement to any Underlying Instrument included in the Collateral that is in the Collateral Manager's reasonable determination a material amendment, waiver or supplement of the related Pledged Obligation.

(b)  The Zohar Obligors may, with the prior written consent of the Controlling Class and the Preference Share Paying Agent (acting at the direction of a Majority of the Preference Shares) (except in the case of the Management Agreement as initially executed), contract with other Persons, including the Collateral Manager, for the performance of actions and obligations to be performed by the Zohar Obligors hereunder by such Persons and the performance of the actions and other obligations with respect to the Collateral of the nature set forth in the Management Agreement by the Collateral Manager. Notwithstanding any such arrangement, the Zohar Obligors shall remain liable for all such actions and obligations. In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Zohar Obligors; and the Zohar Obligors will punctually perform, and use their best efforts to cause the Collateral Manager or such other Person to perform, all of their obligations and agreements contained in the Management Agreement or such other agreement.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001881

- 129 -

Section 7.8.    Negative Covenants

(a)    The Issuer and the Zohar Subsidiary will not and, with respect to clauses (ii), (iii), (iv), (vii) and (x), the Co-Issuer will not:

(i)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(ii)    claim any credit on, make any deduction from, or dispute the enforceability of, the payment of the principal or interest payable (or any other amount) in respect of the Notes (other than amounts required to be paid, deducted or withheld in accordance with any applicable law or regulation of any governmental authority) or assert any claim against any present or future Noteholder, by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)    (x) incur or assume or guarantee any indebtedness, other than the Notes and under this Indenture, the Underlying Instruments or any other Transaction Document; (y) issue any additional class of securities, except as provided herein; or (z) issue any additional shares of stock other than ordinary shares issued pursuant to the Issuer Charter and the Preference Shares issued or outstanding on the Funding Date and any ordinary shares and Preference Shares issued in substitution therefor or as provided in Section 7.17 (it being understood that, notwithstanding anything to the contrary herein or in any other Transaction Document, the Issuer shall issue Preference Shares to Ark II CLO 2001-1, Limited, Patriarch Partners XV, LLC, Phoenix VIII, LLC and/or their respective nominees as contemplated herein and by the other Transaction Documents);

(iv)    (x) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (y) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof (except as may be expressly permitted hereby), or (z) take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

(v)    use any of the proceeds of the Notes issued hereunder, directly or indirectly, (x) to extend "purpose credit" within the meaning given to such term in Regulation U or (y) to purchase, carry or otherwise acquire, or refinance any indebtedness incurred to purchase, carry or otherwise acquire, any Margin Stock (it being understood that nothing in this clause (v) shall prohibit the Issuer or the Zohar Subsidiary from exchanging any Collateral Investment or Equity Security for Margin Stock in connection with a workout or enforcement of such obligation or Equity Security if such exchange does not violate Regulation U (and, if any such exchange in fact violates Regulation U, then the Collateral Manager shall cause the Issuer to sell such Margin Stock within 90 days of the date on which the Collateral Manager first becomes aware of such violation));

(vi)    amend the Management Agreement except pursuant to Article 14;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001882

- 130 -

(vii)    dissolve or liquidate in whole or in part, except as permitted hereunder;

(viii)   obtain the listing of the Class B Notes, the Class C Notes or the Preference Shares on any stock exchange;

(ix)    change the last day of its fiscal year from December 31 of each calendar year; or

(xi)    enter into any agreement with any Secured Party that does not contain limited recourse language and non-petition provisions similar to those specified in Sections 2.6(i), 6.8(c), 13.4, and 16.3(b) and will not amend such provisions unless the Trustee shall have received confirmation from each Rating Agency that its ratings issued with respect to the Notes will not be withdrawn or reduced below the rating effective on the Funding Date as a result of such agreement or amendment.

(b)    None of the Issuer, the Zohar Subsidiary or the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted by this Indenture and the Management Agreement.

(c)    The Co-Issuer will not invest any of its assets in "securities" (as such term is defined in the Investment Company Act), and will keep all of its assets in Cash (and to the extent it receives any Cash it shall promptly remit such Cash to the Issuer for application as provided in this Indenture).

(d)    For so long as any of the Notes are Outstanding (i) the Co-Issuer shall not transfer, and the Issuer shall not permit the Co-Issuer to issue, any capital stock of the Co-Issuer to any Person other than the Issuer and (ii) the Zohar Subsidiary shall not transfer, and the Issuer shall not permit the Zohar Subsidiary to issue, any equity interests of the Zohar Subsidiary to any Person other than the Issuer.

Section 7.9.    Certain Statements

(a)    No later than the third Business Day prior to each Payment Date, the Issuer shall deliver to the Trustee, the Preference Share Paying Agent, each Rating Agency and each Noteholder, an Officer's certificate attaching (i) a consolidated balance sheet of the Issuer and its subsidiaries as of the Determination Date preceding such Payment Date (specifying (x) the amount of the share capital of the Preference Shares as of such Determination Date, (y) the Issuer's consolidated total capitalization as of such Determination Date and (z) the Issuer's consolidated total capitalization as of the Funding Date) and (ii) a consolidated income statement of the Issuer and its subsidiaries for the Due Period ending on such Determination Date, prepared in each case in accordance with U.S. generally accepted accounting principles and certified by the Issuer as presenting fairly, in all material respects, the financial position of the Issuer and its consolidated subsidiaries.

(b) On or before April 11, in each calendar year commencing in 2008, or immediately if there has been a Default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee, the Preference Share Paying Agent, each Rating Agency and each Noteholder, an Officer's certificate stating, as to each signer thereof, that:

(i)    a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the twelve-month period ending on December 31, of such year (or from the Funding Date until December 31, 2007, in the case of the first such Officer's certificate) has been made under such Officer's supervision; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001883

(ii)    to the best of such Officer's knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout the period, or, if there has been a Default in the fulfillment of any such obligation, specifying each such Default known to such Officer and the nature and status thereof, including actions undertaken to remedy the same.

Section 7.10.    <u>Co-Issuers May Consolidate, etc., Only on Certain Terms</u>

(a)    The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law and unless:

(i)    the Issuer shall be the surviving entity or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred shall be an exempted company organized under the laws of the Cayman Islands (or another jurisdiction acceptable to the Collateral Manager and the Controlling Class), <u>provided</u> that if the Issuer is not the surviving entity, such transaction shall be undertaken solely to effect a change in jurisdiction of organization and the surviving entity shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Noteholder, the due and punctual payment of the principal of and interest on all Notes, all Class A-1R Commitment Fees, all Class A-1D Commitment Fees and all other amounts owing by the Issuer under this Indenture and under the other Transaction Documents and the performance of every covenant of this Indenture and under the other Transaction Documents on the part of the Issuer to be performed or observed, all as provided herein;

(ii)    the Trustee, and each Rating Agency shall have been notified of such consolidation, merger, transfer or conveyance and the Trustee shall have received confirmation from each Rating Agency that its ratings issued with respect to the Notes will not be withdrawn or reduced below the rating effective on the Funding Date as a result of the consummation of such transaction;

(iii)    if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred shall have agreed with the Trustee (by a supplemental indenture hereto or otherwise) (a) to observe the same legal requirements for the recognition of such formed or surviving entity as a legal entity separate and apart from any of its Affiliates as are applicable to the Issuer with respect to its Affiliates and (b) not to consolidate or merge with or into any other Person or transfer or convey the Collateral or all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(iv)    if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred shall have delivered to the Trustee, the Preference Share Paying Agent and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (a)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                        PP001884

bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Issuer, (a) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral; and (b) the Trustee continues to have a valid perfected first priority security interest in the Collateral securing all of the Notes; and such other matters as the Trustee or any Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)    the Issuer shall have delivered to the Trustee and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article 7, that all conditions precedent in this Article 7 provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer or any Holder of the Notes; and

(vii)    the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither the Issuer nor the pool of Collateral will be required to register as an investment company under the Investment Company Act.

(b)    The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless:

(i)    the Co-Issuer shall be the surviving corporation, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on the Notes, all Class A-1R Commitment Fees, all Class A-1D Commitment Fees and all other amounts owing under this Indenture and under the Note Purchase Agreements and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii)    the Trustee and each Rating Agency shall have been notified of such consolidation, merger, transfer or conveyance and the Trustee shall have received confirmation from each Rating Agency that its ratings issued with respect to the Notes will not be withdrawn or reduced below the rating effective on the Funding Date as a result of the consummation of such transaction;

(iii)    if the Co-Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred shall have agreed with the Trustee (by a supplemental indenture hereto or otherwise) (a) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Co-Issuer with respect to its Affiliates and (b) not to consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                               PP001885

- 133 -

(iv)    if the Co-Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred shall have delivered to the Trustee, the Preference Share Paying Agent and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (b)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law); and such other matters as the Trustee  or any Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)    the Co-Issuer shall have delivered to the Trustee and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer or to any Holder of the Notes;

(vii)    after giving effect to such transaction, neither the Issuer nor the pool of Collateral will be required to register as an investment company under the Investment Company Act; and

(viii)    after giving effect to such transaction, the outstanding stock of the Co-Issuer will not be beneficially owned by any Person other than the Issuer.

(c)    The Zohar Subsidiary shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person unless:

(i)    the Zohar Subsidiary shall be the surviving entity, or the Person (if other than the Zohar Subsidiary) formed by such consolidation or into which the Zohar Subsidiary is merged or to which all or substantially all of the assets of the Zohar Subsidiary are transferred shall be an entity formed with limited liability under the laws of the State of Delaware (or any other state which the Collateral Manager determines will not subject the Zohar Subsidiary to material net income or franchise taxes) and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the performance of every covenant of this Indenture on the part of the Zohar Subsidiary to be performed or observed, all as provided herein;

(ii)    the Trustee and each Rating Agency shall have been notified of such consolidation, merger, transfer or conveyance and the Trustee shall have received confirmation from each Rating Agency that its ratings issued with respect to the Notes will not be withdrawn or reduced below the rating effective on the Funding Date as a result of the consummation of such transaction;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001886

- 134 -

(iii)    if the Zohar Subsidiary is not the surviving entity, the Person formed by such consolidation or into which the Zohar Subsidiary is merged or to which all or substantially all of the assets of the Zohar Subsidiary are transferred shall have agreed with the Trustee (by a supplemental indenture hereto or otherwise) (a) to observe the same legal requirements for the recognition of such formed or surviving entity as a legal entity separate and apart from any of its Affiliates as are applicable to the Zohar Subsidiary with respect to its Affiliates and (b) not to consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(iv)    if the Zohar Subsidiary is not the surviving entity, the Person formed by such consolidation or into which the Zohar Subsidiary is merged or to which all or substantially all of the assets of the Zohar Subsidiary are transferred shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (c)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Zohar Subsidiary, (a) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral; and (b) the Trustee continues to have a valid perfected first priority security interest in the Collateral securing all of the Notes; and such other matters as the Trustee or any Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)    the Zohar Subsidiary shall have delivered to the Trustee, the Preference Share Paying Agent and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer, the Co-Issuer, the Zohar Subsidiary or any Holder of the Notes;

(vii)    after giving effect to such transaction, neither the Issuer nor the pool of Collateral will be required to register as an investment company under the Investment Company Act; and

(viii)    after giving effect to such transaction, the outstanding membership interests of the Zohar Subsidiary will not be beneficially owned by any Person other than the Issuer.

Section 7.11.    Successor Substituted

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the applicable Zohar Obligor in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than such Zohar Obligor), or, the Person to which such consolidation, merger, transfer or conveyance is made, shall succeed to, and be substituted for, and may

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001887

- 135 -

exercise every right and power of, and shall be bound by each obligation or covenant of, the applicable Zohar Obligor under this Indenture with the same effect as if such Person had been named as such Zohar Obligor herein.

In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer", the "Co-Issuer" or the "Zohar Subsidiary" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article 7 may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture to the extent such liabilities and obligations are assumed by the Person referred to in the immediate preceding paragraph.

Section 7.12.    No Other Business

The Issuer shall not engage in any business or activity other than (a) acquiring, originating, managing and disposing of, and investing in, Collateral Investments, Equity Securities and Eligible Investments, (b) entering into and performing its obligations under documents relating to the Hedge Agreements, the Note Purchase Agreements, the Management Agreement, the Placement Agreement, the Purchase Documents, the Underlying Instruments, the Note Subscription Agreements, the Preference Share Subscription Agreements, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement and the Administration Agreement, (c) issuing and selling the Notes pursuant to this Indenture, the Note Purchase Agreements and the Note Subscription Agreements, (d) issuing and selling the Preference Shares pursuant to the Issuer Charter and the Preference Share Subscription Agreements, (e) pledging the Collateral as security for its obligations to Secured Parties under this Indenture, the Notes, the Hedge Agreements and the other Transaction Documents, (f) owning equity interests of the Co-Issuer and the Zohar Subsidiary and (g) such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.  The Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.  The Zohar Subsidiary shall not engage in any business or activity other than (i) acquiring, managing and disposing of, and investing in, Collateral Investments, Equity Securities and Eligible Investments, (ii) entering into and performing its obligations under the Management Agreement, the Purchase Documents and the Underlying Instruments, (iii) pledging the Collateral as security for its obligations to Secured Parties under this Indenture, the Notes, the Hedge Agreements and the other Transaction Documents and (iv) such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.  The Issuer will not amend the Issuer Charter, the Co-Issuer will not amend its certificate of incorporation or by-laws, and the Zohar Subsidiary will not amend the Zohar Subsidiary Operating Agreement, unless in any case each Rating Agency has confirmed that such amendment would not result in its rating of any Class of the Notes being withdrawn or reduced below the rating effective on the Funding Date.

Section 7.13.    Ramp Up; Rating Confirmation; Annual Rating Review; Etc.

(a)    Ramp Up Targets.  The Issuer and/or the Zohar Subsidiary shall use commercially reasonable efforts to purchase or originate, or to enter into binding agreements to purchase or originate, Collateral Investments in order to achieve an Effective Target Date by no later than April 11, 2008.  The Issuer agrees to provide written notice to the Rating Agencies and the Trustee within five Business Days following such date if such target has not been reached.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001888

- 136 -

On or prior to April 11, 2008, the Issuer (or the Collateral Manager on behalf of the Issuer) may deliver or cause to be delivered to the Trustee and each Rating Agency a written certificate setting forth in reasonable detail calculations made as of the date of such certificate (such date the "Effective Target Date") of each of the Collateral Quality Tests and the Class A Coverage Tests as well as calculations demonstrating the satisfaction of each of the criteria specified for any one of the "Cases" (each, a "Case") in the "Effective Targets Table" set forth below. Contemporaneously with the delivery of such certificate, the Issuer (or the Collateral Manager on behalf of the Issuer) shall deliver or cause to be delivered to the Trustee and to Standard & Poor's the Excel Default Model Input File with information as of the Effective Target Date. In addition, the Issuer shall, with the assistance of the Collateral Manager, request that each of Moody's and Standard & Poor's confirm in writing its initial rating of the Class A Notes (a "Rating Confirmation" with respect to the Class A Notes) within 30 days of its receipt of such certificate.

| Effective Targets Table | | | | | |
|---|---|---|---|---|---|
| Case | | I | II | III | IV |
| *Ramp Up Calculation* | *Satisfied if* | *Effective Targets* | | | |
| Aggregate Principal Balance of Collateral Investments | Equals or exceeds | $704,000,000 | $890,000,000 | $1,070,000,000 | $1,270,000,000 |
| Class A Overcollateralization Ratio | Equals or exceeds | 128% | 127% | 126% | 125% |
| Moody's Weighted Average Rating Distribution | Less than or equal to | 3050 | 3100 | 3270 | The number specified in the "Currently Applicable Row" of the Ratings Matrix |
| Diversity Score | Equals or exceeds | 17 | 19 | 23 | 27 |

    (b)    Rating Confirmation Provisions, Etc.

    (1)    Within 30 days following the Ramp Up End Date, if a Rating Confirmation has not been obtained in accordance with Section 7.13(a) above, the Issuer (or the Collateral Manager on behalf of the Issuer) shall deliver or cause to be delivered to the Trustee and each Rating Agency a written certificate setting forth in reasonable detail results of computations of each of the Collateral Quality Tests and Class A Coverage Tests on the Ramp Up End Date, and shall, with the assistance of the Arranger, request a Rating Confirmation with respect to the Class A Notes within 30 days of its receipt of such notice. Any failure by Moody's or Standard & Poor's to confirm their respective initial ratings of the Class A Notes within such 30-day period is herein referred to as a "Rating Confirmation Failure" with respect to the Class A Notes.

In addition, at any time after the Ramp Up End Date, the Holders of a Majority of the Class B Notes may (with the consent of the Collateral Manager) request that each of Moody's and Standard & Poor's provide an initial rating of the Class B Notes of at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's (an "Acceptable Class B Rating") (it being understood that such initial rating of the Class B Notes would address the ultimate payment in full

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC    PP001889

of the principal of the Class B Notes); provided that such request to Standard & Poor's will result in a separate rating process that may or may not result in the issuance of a rating on the Class B Notes. Any failure by Moody's or Standard & Poor's to provide an Acceptable Class B Rating is herein referred to as a "Rating Failure" with respect to the Class B Notes.

(2)     In the event of a Rating Confirmation Failure with respect to the Class A Notes, then (x) the Issuer (or the Collateral Manager on its behalf) shall within 10 Business Days after such Rating Confirmation Failure prepare and deliver to the Rating Agencies and the Trustee a reasonable plan (a "Proposed Post-Ramp Up Plan") addressing the steps that the Issuer proposes to take to obtain a Rating Confirmation with respect to the Class A Notes and (y) until such Proposed Post-Ramp Up Plan has been approved by Standard & Poor's, and until Moody's has acknowledged in writing that such plan, if implemented, will allow Moody's to provide a rating confirmation, the Issuer shall not, without the consent of each Rating Agency, acquire or originate additional Collateral Investments (but may settle on previous commitments to acquire or originate such Collateral). The terms and conditions of any Proposed Post-Ramp Up Plan, as proposed by the Issuer (or the Collateral Manager on behalf of the Issuer), in respect of which each Rating Agency has provided its consent and confirmation as described above (a "Post-Ramp Up Plan"), will be set forth in a supplemental indenture to be entered into by and among the Zohar Obligors, the Trustee, the Class A-1R Note Agent and the Class A-1D Note Agent in accordance with Section 8.1.

(3)     As provided in the Priority of Payments, in the event of a Rating Confirmation Failure with respect to the Class A Notes (except as otherwise provided in a Post-Ramp Up Plan approved and acknowledged in accordance with paragraph (2) above), Interest Proceeds and Principal Proceeds will be applied to the Class A Notes on each Payment Date in accordance with the Priority of Payments until the Aggregate Outstanding Amount of the Class A Notes and the Class A-1R Commitments have been reduced by an amount sufficient to obtain a Rating Confirmation of the Class A Notes (as specified by Moody's and/or Standard & Poor's, as applicable, in writing). In connection therewith, the Issuer shall, within 10 Business Days after each successive Payment Date request such Rating Confirmation of the Class A Notes and thereafter deliver any information required by Moody's and/or Standard & Poor's related to such Rating Confirmation, until such Rating Confirmation shall be so received.

(4)     In the event of a Rating Failure with respect to the Class B Notes, then, if (and only if) requested by the Holders of a Majority of the Class B Notes (with the consent of the Collateral Manager) (but without any other action on behalf of any other Person, except as expressly set forth in this clause (4)):

(A)     the Outstanding face amount of the Class B Notes will be reduced in an aggregate amount (the "Class B Reduction Amount") equal to the greater of (1) the amount (if any) specified by Moody's in writing as sufficient to obtain an Acceptable Class B Rating with respect to the Class B Notes from Moody's and (2) the amount (if any) specified in writing by Standard & Poor's sufficient to obtain an Acceptable Class B Rating with respect to the Class B Notes from Standard & Poor's, with the Class B Reduction Amount to be allocated ratably to each Outstanding Class B Note according to the Outstanding principal amount thereof immediately prior to such reduction;

(B)     the Issuer shall issue to each Holder of Class B Notes, and upon Issuer Order the Trustee shall authenticate, a new Class C Note, registered in the name of such Holder in an original face amount equal to such Holder's ratable share of the Class B Reduction Amount and shall deliver such Class C Note to the applicable Class B

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                               PP001890

- 138 -

Noteholder upon such Holder's surrender of the Class B Note as provided in clause (D) below;

(C)     the Trustee shall direct the Note Registrar to reflect such reduction and issuance; and

(D)     each Holder of Class B Notes shall, at the expense of the Issuer, deliver its Class B Notes to the Trustee for notation of such reduction on the face of such Class B Note or, at the option of the Issuer, for the exchange of such Class B Notes for new Class B Notes issued in the new, reduced principal amount (it being understood that failure to deliver such Class B Notes to the Issuer shall not affect the reduction effected pursuant to clause (A) above).

(c)     Annual Rating Review. On or before January 1 in each year commencing in 2008, the Co-Issuers shall obtain and pay for an annual review of the rating from each of Moody's and Standard & Poor's of each Class of Notes then rated by it.

(d)     Notification. The Co-Issuers shall promptly notify the Trustee, the Collateral Manager and the Noteholders in writing if at any time the rating of any such Class of Notes has been, or is known will be, changed or withdrawn.

Section 7.14.    Calculation Agent

(a)     The Co-Issuers hereby agree that for so long as any of the Class A Notes remain Outstanding there will at all times be one or more agents (each, a "Calculation Agent") appointed to calculate (i) LIBOR in respect of each Interest Period in accordance with the terms of Schedule B and (ii) the Base Rate, to the extent that any Note bears interest at the Base Rate for any period. The Co-Issuers have initially appointed the Trustee as a Calculation Agent for purposes of determining LIBOR in respect of the Class A Notes for each Interest Period and for the Base Rate (to the extent that any Class A-1R Note bears interest at the Base Rate). The Trustee hereby acknowledges and agrees to such appointment. Any Calculation Agent may be removed by the Co-Issuers at any time. If a Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, the Co-Issuers will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in Dollar deposits in Europe and which does not control and is not controlled by or under common control with the Co-Issuers or any of their Affiliates. A Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)     Each Calculation Agent shall, as soon as possible after 11:00 a.m. (London time) on each applicable LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following such LIBOR Determination Date, calculate the Note Interest Rates required to be calculated by it for the related Interest Period and the amount of interest for such Interest Period payable in respect of each U.S.$1,000 in principal amount of the applicable Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will (as applicable) communicate such rates and amounts to the Co-Issuers, the Trustee, the Class A-1R Note Agent, the Class A-1D Note Agent, and each Paying Agent. Each Calculation Agent will also specify to the Co-Issuers the quotations upon which such Note Interest Rates are based, and in any event each Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (New York time) on each applicable LIBOR Determination Date if it has not determined and is not in the process of determining the applicable Note Interest Rates, together with its reasons therefor.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001891

- 139 -

(c)    On or prior to the Determination Date relating to each Payment Date, the Class A-1R Note Agent shall calculate (i) the daily average principal balance of the Aggregate Outstanding Amount and the Aggregate Undrawn Amount of the Class A-1R Notes with respect to each Interest Period ending immediately prior to such Payment Date and (ii) the number of days in each such Interest Period, and shall on such Business Day provide such calculations to the Trustee.  In addition, the Trustee shall notify the Class A-1R Note Agent in writing on the first Payment Date on which the Class A-1R Notes shall have become due and payable prior to the Stated Maturity thereof pursuant to Section 5.2; and the Class A-1R Note Agent shall notify the Trustee in writing on the first Payment Date on which the Class A-1R Commitments shall have expired, terminated or been reduced to zero.  On or prior to the Business Day immediately preceding each Payment Date, the Trustee shall calculate (i) the daily average principal balance of the Aggregate Outstanding Amount of the Class A-1T Notes, the Aggregate Outstanding Amount of the Class A-1D Notes, the Aggregate Undrawn Amount of the Class A-1D Notes, and the Aggregate Outstanding Amount of the Class A-2 Notes and the Aggregate Outstanding Amount of the Class A-3 Notes, in each case, with respect to each Interest Period ending immediately prior to such Payment Date and (ii) the number of days in each such Interest Period.  In addition, the Trustee shall determine the first Payment Date on which either (x) the Class A-1T Notes, the Class A-1D Notes, the Class A-2 Notes or the Class A-3 Notes shall have become due and payable prior to the Stated Maturity thereof pursuant to Section 5.2 or (y) the Class A-1D Commitments shall have expired, terminated or been reduced to zero.

Section 7.15.    Amendment of Certain Documents

Prior to entering into any agreement amending, modifying, terminating or waiving its rights under the Collateral Administration Agreement, any Note Subscription Agreement, any Preference Share Subscription Agreement, the Note Purchase Agreements, or any Hedge Agreement (other than any such amendment to correct an ambiguity, mistake or defect), the Issuer shall (a) provide at least 10 days' prior notice thereof to each Rating Agency and to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder) and (b) obtain the written confirmation of each Rating Agency that the entry by the Issuer into such amendment, modification, termination or waiver will not cause the ratings, if any, of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date.  Prior to entering into any agreement amending, modifying, terminating or waiving its rights under the Management Agreement, the Issuer shall comply with the applicable requirements of Section 14.4(d).

Section 7.16.    Reporting

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder of a Class A Note, the Co-Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder, to a prospective purchaser of such Note (or a beneficial interest therein) designated by such Holder or to the Trustee for delivery to such Holder or a prospective purchaser designated by such Holder, as the case may be, in order to permit compliance by such Holder with Rule 144A in connection with the resale of such Note (or a beneficial interest therein) by such Holder.

Section 7.17.    Special Procedures for Certain Obligations

(a)    Transfer of Obligations.  If the Collateral Manager determines that the holding of title to any Pledged Obligation by the Issuer would impose material tax, regulatory, procedural or other burdens on the Issuer that would be mitigated by the transfer of such Pledged Obligation to the Zohar Subsidiary, then the Collateral Manager may cause the Issuer to assign such Pledged Obligation to the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                    PP001892

- 140 -

Zohar Subsidiary, provided that the Collateral Manager shall have given not less than five Business Days' prior written notice of such assignment to each Rating Agency. Consideration given by the Zohar Subsidiary for any such assignment may be in the form of Cash or in the form of membership interests of the Zohar Subsidiary.

(b)    Re-Transfer of Obligations. If subsequent to the assignment of any Pledged Obligation to the Zohar Subsidiary the Collateral Manager determines that the holding of title to such Pledged Obligation by the Issuer would no longer impose material tax, regulatory, procedural or other burdens on the Issuer, then the Collateral Manager shall use all commercially reasonable efforts to cause the Zohar Subsidiary to re-assign such Pledged Obligation to the Issuer as promptly as practicable.

Section 7.18    Delivery of Appropriate Tax Forms

The Issuer shall deliver, and shall take all such reasonable actions as shall permit it to deliver, to each issuer (or appropriate paying agent) of an income producing asset acquired or originated by the Issuer, as and when required to exempt payments with respect to such asset from U.S. federal withholding tax, (i) if the Issuer has a single U.S. equity owner for U.S. federal income tax purposes and is disregarded under Treasury Regulation section 301.7701-3, a duly completed Internal Revenue Service Form W-9 (or successor form) of its equity owner, (ii) otherwise, either (A) a duly completed Internal Revenue Service Form W-8ECI (or successor form) or (B) a duly completed Internal Revenue Service W-8IMY (or successor form) and all necessary supporting documentation from any Person treated as an equity owner of the Issuer for U.S. federal income tax purposes certifying that such Person is a United States Person or (iii) such other appropriate forms evidencing the Issuer's ability to receive such payments without withholding of U.S. federal withholding tax. If and to the extent directed by a Majority of the Class A-1 Notes, the Trustee shall enforce the Issuer's obligations under this Section 7.18.

Section 7.19    Section 3(c)(7) Procedures

(a)    Section 3(c)(7) Reminder Notices. The Issuer shall send to the Noteholders a Section 3(c)(7) Reminder Notice at the times required under Sections 10.10(a) and 10.10(b). Without limiting the foregoing, the Issuer shall send a copy of each report referred to in Section 10.10(b) to DTC, with a request that DTC forward each such report to the relevant DTC Participants for further delivery to Beneficial Owners of interests in the Global Notes.

(b)    DTC Actions. The Issuer shall direct DTC to take the following steps in connection with the Rule 144A Global Notes:

(i)    The Issuer shall direct DTC to include the "3c7" marker in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes of each Class in order to indicate that sales are limited to QIB/QPs.

(ii)    The Issuer shall direct DTC to cause each physical DTC deliver order ticket delivered by DTC to purchasers to contain the DTC 20-character security descriptor; and shall direct DTC to cause each DTC deliver order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" indicator and a related user manual for participants, which shall contain a description of the relevant restrictions.

(iii)    The Issuer shall instruct DTC to send an Important Section 3(c)(7) Notice to all DTC Participants in connection with the offering of the Rule 144A Global Notes.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                           PP001893

    (iv)    The Issuer shall advise DTC that it is a Section 3(c)(7) issuer and shall request DTC to include the Rule 144A Global Notes in DTC's "Reference Directory" of Section 3(c)(7) offerings.

    (v)    The Issuer shall from time to time (upon the request of the Trustee, the Note Registrar or the Portfolio Manager) request DTC to deliver to the Issuer a list of all DTC Participants holding an interest in the Rule 144A Global Notes.

    (c)    <u>Bloomberg Screens, Etc</u>.  The Issuer shall from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) restrictions on the Rule 144A Global Notes.  Without limiting the foregoing, the Issuer shall request Bloomberg, L.P. to include the following on each Bloomberg screen containing information about the Rule 144A Global Notes:

    (i)    The "Note Box" on bottom of "Security Display" page describing the Rule 144A Global Notes should state:  "Iss'd Under 144A/3c7".

    (ii)    The "Note Box" on bottom of "Security Display" page describing the Regulation S Global Notes should state:  "Iss'd Under Regulation S/3c7".

    (iii)    The "Security Display Page" should have flashing red indicator "See Other Available Information".

    (iv)    The Indicator for the Rule 144A Global Notes should link to the "Additional Security Information" page, which should state that the Rule 144A Global Notes "are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act to persons who are both (a) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (b) qualified purchasers (as defined under Section 3(c)(7) of the Investment Company Act of 1940)".

    (v)    The Indicator for the Regulation S Global Notes should link to the "Additional Security Information" page, which should state that the Regulation S Global Notes "are being offered in reliance on the exemption from registration under Regulation S of the Securities Act in offshore transactions to non-U.S. persons".

    (vi)    The "Disclaimer" page for the Global Notes should state that the Global Notes "shall not be and have not been registered under the Securities Act of 1933, as amended, and the Issuer has not been registered under the Investment Company Act of 1940, as amended, and these securities may not be offered or sold in the United States, or to U.S. Persons absent an applicable exemption from registration requirements and any such offer or sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act of 1940, as amended; each purchaser of these securities (or any interest therein) will be deemed to make to the Issuer and the Trustee all of the representations required pursuant to the Indenture under which such securities are issued".

    (d)    <u>CUSIP</u>.  The Issuer shall cause each "CUSIP" number obtained for the Rule 144A Global Notes to have an attached "fixed field" that contains "3c7" and "144A" indicators.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC        PP001894

- 142 -

## ARTICLE 8

## SUPPLEMENTAL INDENTURES

Section 8.1.    <u>Supplemental Indentures Without Consent of Noteholders</u>

With the consent of the Collateral Manager (but without the consent of the Holders of any Notes or the Holders of any Preference Shares), the Zohar Obligors and the Trustee, at any time and from time to time subject to the requirement provided below in this Section 8.1 with respect to the ratings of the Notes, may enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Trustee, for any of the following purposes:

(a)    to evidence the succession of another Person to any Zohar Obligor and the assumption by any such successor Person of the covenants of such Zohar Obligor herein and, in the case of the Co-Issuers, in the Notes pursuant to Section 7.10 or 7.11;

(b)    to add to the covenants of the Zohar Obligors or the Trustee for the benefit of all the Secured Parties (or for the benefit of all Holders of the Notes in a manner not adverse to the interests of any other Secured Party) or to surrender any right or power herein conferred upon the Zohar Obligors;

(c)    to convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(d)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.11, 6.12 and 6.13;

(e)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(f)    to modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(g)    to correct any inconsistency, defect or ambiguity in this Indenture;

(h)    to accommodate the issuance of the Class A Notes in book-entry form through the facilities of DTC or otherwise, or to permit any Class A Notes to be listed on the Irish Stock Exchange, the Luxembourg Stock Exchange or any other exchange within the European Union (so long as the costs associated with obtaining and maintaining such listing are comparable to the costs of obtaining and maintaining such listing on the Irish Stock Exchange or the Luxembourg Stock Exchange);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001895

(i)      to effect any one or more of the following (in each case subject to the delivery to the Co-Issuers, the Trustee, the Rating Agencies, the Noteholders and the Placement Agent an opinion of nationally-recognized tax counsel, subject only to customary qualifications, to the effect that after giving effect to the modifications of the Indenture and the other Transaction Documents in connection therewith that the Class B Notes (or Class C Notes) will be treated as debt of the Issuer for U.S. federal income tax purposes):

(1)      to modify the restrictions on the transfer and exchange of the Class B Notes (or Class C Notes, as applicable) to be substantially similar to the restrictions on the transfer and exchange of the Class A Notes as then in effect;

(2)      to fix the accreted value of the Class B Notes (or Class C Notes, as applicable) as of any date;

(3)      in the case of the Class B Notes, to change the maturity date thereof so long as any such change does not result in the maturity date of the Class B Notes being prior to the maturity date of the Class A Notes (and, in the case of the Class C Notes, to change the maturity date thereof so long as any such change does not result in the maturity date of the Class C Notes being prior to the maturity date of the Class B Notes); or

(4)      to modify the treatment of the Class B Notes (or the Class C Notes, as applicable) for U.S. federal income tax purposes; or

(j)      to effect any changes required by a Post-Ramp Up Plan pursuant to Section 7.13.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

The Trustee shall not enter into any such supplemental indenture pursuant to this Section 8.1 if, as a result of such supplemental indenture, the interests of any Holder would be adversely affected thereby (unless such Holder shall have consented to such supplemental indenture). Unless notified by a Majority of any Class of Notes that such Class will be adversely affected or by the Preference Share Paying Agent acting on behalf of the Holders of a Majority of the Preference Shares Outstanding that the Holders of the Preference Shares will be adversely affected, the Trustee shall be entitled to rely upon an Opinion of Counsel as to whether the interests of any such Holder would be adversely affected by any such supplemental indenture (after giving notice of such change to the Holders), which Opinion of Counsel may rely (as applicable) as to the effect of any supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares, on written certification from the Collateral Manager as to the effect of the supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares. At the cost of the Co-Issuers, the Trustee shall provide to the Noteholders and the Preference Share Paying Agent a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee and a copy of the executed supplemental indenture after its execution. At the cost of the Co-Issuers, the Trustee shall provide to Moody's and to Standard & Poor's, a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee, and, for so long as such Notes are Outstanding, request written confirmation that each Rating Agency will not, as a result of such supplemental indenture, cause the rating of any such Class of Notes to be withdrawn or reduced below the rating effective on the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001896

- 144 -

Funding Date. and, as soon as practicable after the execution by the Trustee and the Zohar Obligors of any such supplemental indenture, provide to each Rating Agency a copy of the executed supplemental indenture. The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the rating of any Outstanding Class of Notes would be withdrawn or reduced below the rating effective on the Funding Date by either Rating Agency, as evidenced by a written instrument or instruments signed by each Rating Agency, unless the Trustee shall have obtained the consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class.

Section 8.2.    Supplemental Indentures with Consent of Noteholders

With the consent of a Majority of each Class of Notes adversely affected thereby and the Collateral Manager, delivered to the Trustee and the Zohar Obligors, the Trustee and Zohar Obligors may enter into one or more indentures supplemental hereto to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes or the Holders of the Preference Shares under this Indenture; provided that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of each Holder of each Outstanding Note of each Class adversely affected thereby and the Preference Share Paying Agent acting at the direction of the Holders of each of the Preference Shares outstanding (if the Holders of the Preference Shares will be adversely affected thereby):

(a)    change the Stated Maturity of the principal of or the due date or amount of any installment of interest on any Note, any Class A-1R Commitment Fee or any Class A-1D Commitment Fee, reduce the principal amount thereof or the Note Interest Rate thereon or Class A-1R Commitment Fee thereon, or Class A-1D Commitment Fee thereon, or the Redemption Price with respect to any Note or Preference Share, or change the earliest date on which any Note or Preference Share may be redeemed, or change the date on which any dividend or final distribution on the Preference Shares is payable or change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes or any Class A-1R Commitment Fee or any Class A-1D Commitment Fee or the deposit of the proceeds of any Collateral in the Preference Share Distribution Account, or change any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon or any Class A-1R Commitment Fee, any Class A-1D Commitment Fee, any Class A Redemption Break Funding Costs or, with respect to the Preference Shares, any dividend or final distribution thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or the percentage in aggregate number of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with the provisions of this Indenture or any Default hereunder or their consequences provided for in this Indenture;

(c)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate such lien on any property at any time subject hereto (other than in connection with the sale thereof in accordance with this Indenture) or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

(d)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to preserve the Collateral or

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001897

rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(e) modify any of the provisions of Article 8, except to increase any such percentage referred to in Section 8.2(d) above or to provide that other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note or Preference Share adversely affected thereby (in the case of any Preference Share, as evidenced by the consent of the Preference Share Paying Agent acting at the direction of the Holder of such Preference Share);

(f) modify the definition of "Outstanding", the Priority of Payments set forth in Section 11.1(a), or Section 13.1;

(g) increase the permitted minimum denominations of any Class of Notes; or

(h) modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of interest on or principal of any Note or any Class A-1R Commitment Fee, any Class A-1D Commitment Fee, any Class A Redemption Break Funding Costs or the payment of dividends or any final distribution on any Preference Shares on any Payment Date or to affect the rights of the Holders of Notes or Preference Shares to the benefit of any provisions for the redemption of such Notes or Preference Shares contained herein.

In addition, (A) each supplemental indenture referred to in this Section 8.2 shall require the consent of each Holder of a Class A-1 Note if the changes to the Indenture effected pursuant to such supplemental indenture would modify Section 9.5 or 9.6, (B) each supplemental indenture referred to in this Section 8.2 shall require the consent of the Arranger or the Placement Agent if the changes to the Indenture effected pursuant to such supplemental indenture would reduce the rights or increase the obligations of the Arranger or the Placement Agent and (C) each supplemental indenture referred to in this Section 8.2 shall require the consent of each Holder of a Class A-1 Note if the changes to this Indenture or the other Transaction Documents effected pursuant to such supplemental indenture would modify the definition of "Rating Criteria" or modify the obligation of such Holder to post collateral to a Class A-1R Holder Collateral Account or modify any rights, obligations or other provisions with respect to such Class A-1R Holder Collateral Account.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers shall mail to the Noteholders, to the Preference Share Paying Agent, to Moody's and to Standard & Poor's a copy of such supplemental indenture (or a description of the substance thereof) and shall request Moody's and Standard & Poor's, to determine and inform the Trustee and the Co-Issuers whether, as a result of such supplemental indenture, such Rating Agency would cause the rating of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date. The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the rating of any such Class of Notes would be withdrawn or reduced below the rating effective on the Funding Date, as evidenced by a written instrument or instruments signed by each Rating Agency, unless each Holder of Notes of each Class whose rating will be reduced or withdrawn has, after notice that the proposed supplemental indenture would result in such reduction or withdrawal of the rating of the Class of Notes held by such Holder, consented to such supplemental indenture. Unless notified by a Majority of any Class of Notes that such Class will be adversely affected or by the Preference Share Paying Agent acting at the direction of the Holders of a Majority of the Preference Shares that such Holders will be adversely affected (in each case in the manner set forth in clauses (a) through (h) above), the Trustee may, consistent with the written advice of counsel, determine whether or not such Class of Notes or Preference

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001898

- 146 -

Shares would be so adversely affected by such change (after giving notice of such change to the Holders of the Notes and the Preference Shares), which Opinion of Counsel may rely (as applicable) as to the effect of any supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares, on written certification from the Collateral Manager as to the effect of the supplemental indenture on the economic interests of the Holders of the Notes or the Holders of the Preference Shares. Such determination shall be conclusive and binding on all present and future Holders and present and future Holders of the Preference Shares. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3.

If any Holder of Class A Notes is a Non-Consenting Holder with respect to any supplemental indenture under this Section 8.2, the Issuer may, upon not less than five Business Days' notice, require such Holder to transfer all of its rights and obligations in respect of all Notes held by it to an eligible transferee, provided that no Non-Consenting Holder shall be required to transfer any Note under this paragraph unless the price obtained by such Non-Consenting Holder is at least equal to the outstanding principal amount thereof plus accrued interest and any other amounts owing with respect thereto. As used herein, "Non-Consenting Holder" means, with respect to any supplemental indenture that requires the consent of one or more Holders of Notes, any Holder or, in the case of Notes represented by Global Notes, any beneficial owner, of Class A Notes that in each case either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) does not consent to such supplemental indenture during the period of 15 Business Days from (but excluding) the date on which the Trustee provided notice of such supplemental indenture pursuant to Section 8.2 to the Holders of the Notes.

It shall not be necessary for any Act of Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Zohar Obligors and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes, the Collateral Manager, the Preference Share Paying Agent, Moody's and Standard & Poor's a copy thereof. Any failure of the Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.3.    Execution of Supplemental Indentures

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying in good faith upon an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise.

Section 8.4.    Effect of Supplemental Indentures

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001899

Section 8.5.    Reference in Notes to Supplemental Indentures

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Co-Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

ARTICLE 9

REDEMPTION AND REPAYMENT OF NOTES, ETC.

Section 9.1.    Redemption of all Notes

(a)    On any date occurring on or after April 11, 2012, at the option of the Issuer (which option the Issuer agrees to exercise only at the written direction of the Collateral Manager and the Preference Share Paying Agent acting at the written direction of the Majority of the Preference Shares), the Notes shall be redeemable, from Sale Proceeds and all other funds in the Redemption Accounts, in whole but not in part, at the applicable Redemption Price (exclusive of installments of principal and interest due on or prior to such date if payment of such installments of principal and interest shall have been made or duly provided for, to the Holders of the Notes as provided in this Indenture); provided that (i) the Sale Proceeds therefrom and all other funds subject to this Indenture in the Redemption Accounts will be at least sufficient to redeem the Notes simultaneously, and to pay the other amounts payable, in accordance with the procedures described in Section 9.1(b), (ii) such Sale Proceeds and other funds are used to make such a redemption and (iii) after giving effect to such a redemption no Commitment Shortfall would exist.

(b)    The Notes shall not be redeemed pursuant to Section 9.1(a) unless either:

(i)    at least five Business Days before the scheduled Redemption Date, the Collateral Manager shall have furnished to the Trustee evidence in form reasonably satisfactory to the Trustee, that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial institution or institutions (or a guarantor or guarantors of the obligations thereof) (x) whose long-term unsecured debt obligations (other than such obligations whose rating is based on the credit of a Person other than such institution) have a credit rating from each Rating Agency of at least equal to the highest rating of any Notes then Outstanding or whose short-term unsecured debt obligations have a credit rating of "P-1" by Moody's and "A-1+" by Standard & Poor's or (y) whose obligations under such binding agreements are supported by a letter of credit or other agreement acceptable to the Trustee and issued by a financial institution (or a guarantor or guarantors of the obligations thereof) satisfying the requirements of the foregoing clause (x) to purchase, not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds all or part of the Collateral Investments at a sale price (including in such sale price the accrued interest on such Collateral) at least equal to an amount sufficient, together with (a) all funds on deposit in the Redemption Accounts, (b) the proceeds from all Eligible Investments and other Collateral maturing prior to the scheduled Redemption Date and (c) (without duplication) the aggregate amount of the expected proceeds from the sale of Collateral and/or Eligible Investments not later than the Business Day immediately preceding the scheduled Redemption Date with respect to which the Collateral Manager has provided the certification to the Trustee described in Section 9.1(b)(ii), to

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001900

pay all Administrative Expenses and all amounts payable under the Priority of Payments prior to the payment of the Notes (including fees and expenses incurred by the Trustee and the Collateral Manager in connection with such sale of such Collateral), to pay any Hedge Termination Amounts payable by the Issuer and to redeem the Notes on the scheduled Redemption Date at the applicable Redemption Prices, together with all accrued interest to the date of redemption (including any Defaulted Interest and interest thereon in respect of the Class A Notes) and all other amounts payable under the Note Purchase Agreements (the aggregate amount required to make all such payments and to effect such redemption, the "Total Redemption Amount"); provided that all such payments shall be made in accordance with the Priority Payments and that for the purposes of this Section 9.1(b)(i), such date of redemption shall be deemed to be a Payment Date, or

(ii)    prior to selling any Collateral Investments and/or Eligible Investments, the Collateral Manager shall certify to the Trustee and each Rating Agency that (in the Collateral Manager's sole judgment) the sum (without duplication) of:

(A)    100% of all Eligible Investments maturing on or prior to the scheduled Redemption Date and all Cash held in or credited to the Redemption Accounts;

(B)    100% of the purchase prices of any Collateral Investments as to which the Collateral Manager has entered into one or more binding agreements with financial institutions meeting the requirements of Section 9.1(b)(i)(x) or (y);

(C)    65% of the Market Value of any Current Collateral Investment that has a Market Value of at least 90% of the Aggregate Principal Balance thereof (an "Adequate Market Value Collateral Investment") that the Collateral Manager certifies is expected to be sold within two Business Days of such certification;

(D)    63% of the Market Value of any Adequate Market Value Collateral Investment that the Collateral Manager certifies is expected to be sold within three to five Business Days of such certification;

(E)    55% of the Market Value of any Adequate Market Value Collateral Investment that the Collateral Manager certifies is expected to be sold within six to 15 Business Days of such certification;

(F)    45% of the Market Value of any Collateral that is not an Adequate Market Value Collateral Investment and that the Collateral Manager certifies is expected to be sold within two Business Days of such certification;

(G)    43% of the Market Value of any Collateral that is not an Adequate Market Value Collateral Investment and that the Collateral Manager certifies is expected to be sold within three to five Business Days of such certification; and

(H)    20% of the Market Value of any Collateral that is not an Adequate Market Value Collateral Investment and which the Collateral Manager certifies is expected to be sold within six to 15 Business Days of such certification;

equals or exceeds the Total Redemption Amount, subject to the requirement that no such certification may be given more than 15 Business Days prior to the scheduled Redemption Date.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001901

Section 9.2.    Notice to Trustee of Optional Redemption

In the event of any redemption pursuant to Section 9.1, the Issuer shall, at least 30 days (but not more than 90 days) prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee and each Rating Agency in writing of such Redemption Date, the applicable record date (which shall be 15 Business Days before the Redemption Date), the principal amount of Notes to be redeemed on such Redemption Date and the Redemption Price of such Notes in accordance with Section 9.1.

Section 9.3.    Notice of Optional Redemption or Maturity by the Co-Issuers

Notice of redemption pursuant to Section 9.1 or the Maturity of any Class of Notes shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the applicable Redemption Date or Maturity to each Rating Agency and each Holder of Notes to be redeemed pursuant to Section 9.1, at such Holder's address in the Note Register.

All notices of redemption shall state:  (a) the applicable Redemption Date; (b) the applicable record date therefor; (c) the Redemption Price; (d) the principal amount of each Class of Notes to be redeemed and that interest on such principal amount of Notes shall cease to accrue on the Redemption Date specified in the notice; (e) that the Class A-1R Commitments and/or the Class A-1D Commitments shall terminate on the Redemption Date specified in the notice; and (f) the place or places where such Notes to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Paying Agent or the Issuer to be maintained as provided in Section 7.2.

The Issuer shall have the option to withdraw the notice of redemption up to the fourth Business Day prior to the scheduled Redemption Date by written notice to the Trustee and the Collateral Manager only if (i) the Collateral Manager is unable to deliver the sale agreement or agreements or certifications referred to in Section 9.1, as the case may be, in form satisfactory to the Trustee or (ii) the Issuer receives written direction from the Preference Share Paying Agent (acting at the direction of the same requisite percentage of Holders of Preference Shares that originally directed such redemption) (and the Issuer agrees for the benefit of Holders of the Preference Shares to withdraw such notice of redemption if it receives such written direction).  Notice of any such withdrawal will be given by the Trustee to each Holder of Notes that was to be redeemed at such Holder's address in the Note Register maintained by the Note Registrar under the Indenture by overnight courier guaranteeing next day delivery (if such Holder's address is proper for such delivery; otherwise by first class mail) and by fax (where a fax number has been provided to the Trustee), sent not later than the third Business Day prior to the scheduled Redemption Date.

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

Section 9.4.    Notes Payable on Redemption Date

Notice of redemption having been given in accordance with Section 9.3, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) any such Notes shall cease to bear interest on the Redemption

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001902

- 150 -

Date. Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date. Installments of interest on Notes of a Class so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.6(e).

If any Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding. All amounts paid hereunder in connection with the redemption of any Notes, including Sales Proceeds in excess of the Total Redemption Amount, shall be distributed in accordance with the Priority of Payments.

Section 9.5.    Certain Prepayments; Reduction of Commitments

(a)    Principal Payments; Class A-1R Note Prepayments.

(i)    The Issuer will make principal payments on the Notes as provided in Article 11.

(ii)    In addition to the principal payments required on the Class A-1R Notes referred to in clause (a)(i) above, the Class A-1R Notes may be prepaid at the option of the Issuer at the written direction of the Collateral Manager (each, a "Prepayment"; each date of a Prepayment being a "Prepayment Date") on any Payment Date to the extent funds are available for such application under Sections 11.1(a)(i)(M), 11.1(a)(ii)(A) and 11.1(a)(ii)(E), provided that (1) the Issuer has delivered a written notice of Prepayment to the Class A-1R Note Agent and the Trustee not less than five Business Days before the proposed Prepayment Date and (2) the aggregate principal amount of any partial Prepayment of the Class A-1R Notes (taken as a whole) shall be an integral multiple of U.S.$100,000 and at least U.S.$1,000,000.

(iii)    Except as otherwise expressly provided in this Indenture, a Prepayment of the Class A-1R Notes will not result in a reduction in the Class A-1R Commitments.

(b)    Commitment Reductions.

(i)    On each Payment Date, the Class A-1R Commitments will be reduced by an amount equal to the aggregate amounts applied under Sections 11.1(a)(i)(H)(1), 11.1(a)(i)(M)(1), 11.1(a)(ii)(C)(1) and 11.1(a)(ii)(F)(1) on such Payment Date (including the amounts deposited in the Issuer Principal Collection Account pursuant thereto); and on the Payment Date on which the Class A-1 Pro Rata Adjustment Advance is made under Section 9.6(e), the Class A-1R Commitments will be reduced as provided therein.

(ii)    Each reduction of the Class A-1R Commitments referred to in clause (b)(i) above will be applied to the Class A-1R Commitments pro rata according to the respective amounts thereof.

(iii)    Unless earlier reduced to zero or terminated:

(1)    the Class A-1R Commitments will expire at the close of business on the Stated Maturity of the Class A-1 Notes; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001903

(2)    the Class A-1D Commitments will expire at the close of business on the Payment Date falling in December, 2007.

(c)    <u>Reductions, etc., Irrevocable.</u>  Class A-1R Commitments and Class A-1D Commitments, once reduced, terminated or expired, cannot be reinstated.

Section 9.6.    <u>Borrowings; Class A-1 Pro Rata Adjustment Advances</u>

(a)    Pursuant to the Note Purchase Agreements and subject to compliance with the conditions set forth herein and therein, the Issuer (at the direction of the Collateral Manager) may request (and the Holders of the Class A-1R Notes and the Holders of the Class A-1D Notes shall be obligated to make) advances under the Class A-1R Notes and the Class A-1D Notes until the earlier of (1) the date on which the Class A-1R Commitments or the Class A-1D Commitments (as the case may be) have terminated, expired or been irrevocably reduced to zero and (2) the Maturity of such Notes.  Proceeds of the advances made under the Class A-1 Notes may be used only for the following purposes:

(A)    during the Reinvestment Period, to fund the purchase and originations of Collateral Investments subject to Section 12.1;

(B)    on any Business Day, to fund the purchase and origination of Collateral Investments for which the commitment to purchase or originate was entered into prior to the end of the Reinvestment Period, subject to Section 12.1;

(C)    on any Business Day to make extensions of credit in respect of Collateral Investments that constitute Revolving Collateral Investments and Delayed Funding Collateral Investments owned by the Issuer or the Zohar Subsidiary;

(D)    with respect to each Class of the Class A-1 Notes, to satisfy the minimum Borrowing requirements set forth herein and in the applicable Note Purchase Agreement with respect to such Class; and

(E)    in the case of the Class A-1 Pro Rata Adjustment Advance, solely to repay Outstanding principal of the Class A-1T Notes and the Class A-1D Notes as provided in paragraph (e) below.

Amounts may be borrowed by the Issuer (at the direction of the Collateral Manager, a copy of which direction shall simultaneously be given to the Trustee by the Collateral Manager) under the Class A-1R Notes or the Class A-1D Notes (a "<u>Borrowing</u>"); <u>provided</u> that:

(i)    each applicable condition to such Borrowing specified in the applicable Note Purchase Agreements is satisfied on the date of such Borrowing (a "<u>Borrowing Date</u>");

(ii)    in no event may (A) the aggregate principal amount of Borrowings outstanding under the Class A-1R Notes exceed the aggregate amount of Class A-1R Commitments (utilized and unutilized) or (B) the aggregate principal amount of Borrowings outstanding under the Class A-1D Notes exceed the aggregate amount of Class A-1D Commitments (utilized and unutilized);

(iii)    with respect to the Class A-1D Notes, the Issuer shall not be permitted to reborrow any amount previously repaid thereon;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001904

(iv)    the Issuer shall not borrow under the Class A-1R Notes until the Issuer has borrowed the full amount available under the Class A-1D Notes;

(v)    the Issuer shall borrow the remaining amount of the initial Class A-1D Commitments on or prior to the Payment Date falling in December, 2007; and

(vi)    the Issuer shall borrow the Aggregate Undrawn Amount of the Class A-1D Notes in the circumstances described in Section 7.5(e)(2).

(b)    Notice of any Borrowing under the Class A-1R Notes pursuant to Section 9.6(a) shall be given by the Issuer (or the Collateral Manager on its behalf) to the Class A-1R Note Agent and the Trustee, and the Class A-1R Note Agent shall promptly give notice of such Borrowing to each Class A-1R Noteholder as provided in the Class A-1R Note Purchase Agreement. Notwithstanding anything in the Class A-1R Note Purchase Agreement, all Borrowings thereunder shall be accompanied by a Notice of Borrowing as specified in the Class A-1R Note Purchase Agreement. Notice of any Borrowing under the Class A-1D Notes pursuant to Section 9.6(a) shall be given by the Issuer (or the Collateral Manager on its behalf) to the Class A-1D Note Agent and the Trustee, and the Class A-1D Note Agent shall promptly give notice of such Borrowing to each Class A-1D Noteholder, as provided in the Class A-1D Note Purchase Agreement.

(c)    Except as provided herein with respect to Short Settlement Borrowings under the Class A-1R Notes:

(1)    the aggregate principal amount of any Borrowing under this Section 9.6 in respect of the Class A-1R Notes (taken as a whole) shall be an integral multiple of U.S.$500,000 and at least U.S.$5,000,000 (other than the Class A-1 Pro Rata Adjustment Advance); and

(2)    the aggregate principal amount of any Borrowing under this Section 9.6 in respect of the Class A-1D Notes shall be an integral multiple of U.S.$5,000,000 and at least U.S.$25,000,000 (except that the final Borrowing under the Class A-1D Notes may be in the remaining undrawn amount of such Notes).

(d)    Except as provided herein with respect to Short Settlement Borrowings:

(1)    all Borrowings under the Class A-1R Notes shall be made pro rata according to the Aggregate Undrawn Amounts of the Class A-1R Commitments; and

(2)    all Borrowings under the Class A-1D Notes shall be made pro rata according to the Aggregate Undrawn Amounts of the Class A-1D Commitments.

(e)    Without limiting the foregoing provisions of this Section 9.6, and in any event subject to all applicable conditions to Borrowing set forth herein and in the Class A-1R Note Purchase Agreement, on the Payment Date on which the Reinvestment Period ends (or, if the Reinvestment Period ends on a day that is not a Payment Date, on the next succeeding Payment Date), the Issuer shall (at the direction of the Collateral Manager) borrow an advance (the "Class A-1R Final Advance") under the Class A-1R Notes in an aggregate principal amount equal to (1) the Net Aggregate Exposure Amount on such date, whereupon such portion of the proceeds of such Borrowing shall be applied for deposit in the Class A-1R Future Funding Reserve Account plus (2) the Term Sharing Percentage of the Class A-1R Available Amount (the portion of such advance made pursuant to this clause (2), a "Class A-1 Pro Rata Adjustment Advance"), whereupon such portion of the proceeds of such Borrowing shall be applied to

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001905

- 153 -

repay the outstanding principal of the Class A-1T Notes and Class A-1D Notes ratably in accordance with the Aggregate Outstanding Amounts of the Class A-1T Notes and Class A-1D Notes, respectively. Notwithstanding anything in this Indenture to the contrary, the proceeds of such an advance will not constitute "Principal Proceeds" or "Uninvested Proceeds" and will not be applied under the Priority of Payments but instead will be applied as stated above. Upon the making of the deposit in the Class A-1R Future Funding Reserve Account and the Class A-1 Pro Rata Adjustment Advance, the Class A-1R Commitments will be reduced to zero. As used above:

"Class A-1R Adjusted Exposure" means an amount (not less than zero) equal to (a) the Unfunded Portfolio Amount as of the date on which the Class A-1 Pro Rata Adjustment Advance is made minus (b) the aggregate amount of Principal Proceeds then on deposit in the Issuer Principal Collection Account and the Zohar Subsidiary Principal Collection Account (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A-1 Pro Rata Adjustment Advance) minus (c) the Balance on deposit in the Unfunded Revolver Discount Account as of such date minus (d) the Balance on deposit in the Class A-1R Future Funding Reserve Account as of such date.

"Class A-1R Available Amount" means an amount equal to the excess (if any) of:

     (a)    the Aggregate Undrawn Amount of the Class A-1R Notes as of the date on which the Class A-1 Pro Rata Adjustment Advance is made (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A-1 Pro Rata Adjustment Advance); over

     (b)    the Class A-1R Adjusted Exposure as of such date.

"Term Sharing Percentage" means the ratio (expressed as a percentage) of:

     (a)    the Aggregate Outstanding Amount of the Class A-1T Notes and the Class A-1D Notes as of the date on which the Class A-1 Pro Rata Adjustment Advance is made (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of such Class A-1 Pro Rata Adjustment Advance); to

     (b)    the Aggregate Outstanding Amount of the Class A-1 Notes as of such date (determined immediately after giving effect to the application of the Priority of Payments on such date but prior to the making of the Class A-1 Pro Rata Adjustment Advance) plus the Aggregate Undrawn Amount of the Class A-1R Notes (as so determined) as of such date.

     (f)    The Trustee is hereby directed by the Issuer to execute and deliver the Note Purchase Agreements.

     Section 9.7.    Application of Amounts to Acquire, Originate and Fund Collateral Investments

On any Business Day during or (to the extent permitted by this Indenture) after the Reinvestment Period, the Issuer or the Zohar Subsidiary may direct the Trustee, by Issuer Order, to acquire any Collateral Investment (subject to the requirements of Section 12.1) or to extend credit in respect of any Collateral Investment originated by the Issuer (subject to the requirements of Section 12.1) or the Unfunded Amount under any Collateral Investment that is a Revolving Collateral Investment or

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                 PP001906

- 154 -

Delayed Funding Collateral Investment by application of amounts in the following manner and order of priority:

(a)    In the case of any such extension of credit in respect of an Unfunded Amount under a Revolving Collateral Investment or a Delayed Funding Collateral Investment that is an Unutilized Commitment, such credit will be extended by the Issuer or the Zohar Subsidiary thereunder:

(i)    first, by application of amounts on deposit in the Unfunded Revolver Discount Account (to the extent of the pro rata portion of the Discount Amount in respect of such Revolving Collateral Investment or Delayed Funding Collateral Investment, determined by reference to the ratio of such Unutilized Commitment being funded to the original Unutilized Commitment in respect of such Revolving Collateral Investment or Delayed Funding Collateral Investment);

(ii)    second, by application of amounts on deposit in the Issuer Principal Collection Account and/or on deposit in the Zohar Subsidiary Principal Collection Account (in any case to the extent available); and

(iii)    third, by a Borrowing under the Class A-1R Notes or the Class A-1D Notes  pursuant to and at the times set forth in Section 9.6.

(b)    In the case of the funding of any acquisition or origination of a Collateral Investment or any extension of credit in respect of any Collateral Investment originated by the Issuer or an Unfunded Amount under a Collateral Investment that is a Revolving Collateral Investment or a Delayed Funding Collateral Investment that is a Utilized Commitment, the purchase price of such acquisition or origination will be funded or such credit will be extended by the Issuer or the Zohar Subsidiary thereunder:

(i)    first, by application of amounts on deposit in the Issuer Principal Collection Account and/or on deposit in the Zohar Subsidiary Principal Collection Account (in any case to the extent available); and

(ii)    second, by a Borrowing under the Class A-1R Notes or the Class A-1D Notes pursuant to and at the times set forth in Section 9.6.

Notwithstanding the foregoing, if the Issuer requests a Borrowing under Section 9.6 in an amount required by clause (a)(iii) or (b)(ii) above to acquire or originate any Collateral Investment or to fund the Unfunded Amount under any Collateral Investment that is a Revolving Collateral Investment or a Delayed Funding Collateral Investment and the proceeds of such Borrowing are insufficient to fund such acquisition, origination or commitment due to the failure of any Holder of a Class A-1 Note to make such proceeds available on the date requested therefor, the Issuer or the Zohar Subsidiary, as applicable, shall first apply amounts on deposit in the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account and second, apply amounts on deposit in the Unfunded Revolver Discount Account.

(c)    Notwithstanding the terms of Section 9.6, 9.7(a) or 9.7(b), on any Business Day (other than the last two Business Days during any Due Period) the Issuer or the Zohar Subsidiary may direct the Trustee, by Issuer Order, to acquire any Collateral Investments or to extend credit in respect of any Collateral Investment originated by the Issuer or the Unfunded Amount under any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment by

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001907

- 155 -

application of amounts on deposit in the Unfunded Revolver Discount Account, the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account in such a manner and order of priority as may be specified in such Issuer Order; provided that, in the event that, pursuant to this Section 9.7(c), amounts shall be applied on any date from the Unfunded Revolver Discount Account, the Issuer Principal Collection Account and/or the Zohar Subsidiary Principal Collection Account in an order of priority other than that specified in Section 9.7(a) or 9.7(b), on the Business Day immediately preceding the last day of the then current Due Period (the "True-Up Date") the Trustee shall transfer amounts between the Unfunded Revolver Discount Account and the Issuer Principal Collection Account in such amounts as may be necessary to cause the Balances of such Accounts on the True-Up Date to equal what such Balances would have been on the True-Up Date had credit been extended from such Accounts on each applicable date during such Due Period in accordance with the funding procedures set forth in Section 9.7(a) or 9.7(b), as applicable (and, to the extent that the Balances on deposit in the Issuer Principal Collection Account or Zohar Subsidiary Principal Collection Account are insufficient to fund the transfers to the Unfunded Revolver Discount Account on such date, the Collateral Manager may direct the Issuer to draw upon the Class A-1R Notes or Class A-1D Notes (as applicable) pursuant to and at the times set forth in Section 9.6 in an amount equal to such shortfall, the proceeds of which to be deposited into the Unfunded Revolver Discount Account).

## ARTICLE 10

## ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.    Collection of Money

(a)    Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms and conditions of such Pledged Obligations. The Trustee shall segregate and hold all such Money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.

(b)    Each of the parties hereto hereby agrees that (i) each Account shall be deemed to be a "Securities Account" and (ii) except as otherwise expressly provided herein, the Trustee will be exclusively entitled to exercise the rights that comprise each Financial Asset held in each Account. Each of the parties hereto hereby agrees to cause the Custodian or any other Securities Intermediary that holds any Money or other property for any Zohar Obligor in an Account to agree with the parties hereto that (a) the Cash and other property is to be treated as a Financial Asset under Article 8 of the UCC and (b) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially indorsed to, the Issuer unless such Financial Asset has also been indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account. Each Account shall be held and maintained at an office located in the United States.

Section 10.2.    Principal Collection Accounts; Interest Collection Accounts; Custodial Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Issuer Interest Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001908

Trustee shall from time to time deposit (i) all proceeds received by the Issuer from the disposition of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested in Collateral Investments or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), (ii) all other Interest Proceeds received by the Issuer (other than interest and other income from Eligible Investments held in the Class A-1R Holder Collateral Account and the Hedge Counterparty Collateral Account) and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(b)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Issuer Principal Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all Uninvested Proceeds received from the issuance of the Notes and Preference Shares (to the extent not deposited into the Expense Account, the Closing Expense Account, the Professional Fee Account or the Unfunded Revolver Discount Account or used to pay any amount payable out of the Uninvested Proceeds on the Funding Date), (ii) all proceeds received by the Issuer from the disposition of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in Collateral Investments or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), (iii) all other Principal Proceeds received by the Issuer and (iv) all other amounts (including any Cash Retention Amount) required by the terms of this Indenture to be deposited therein.

(c)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account (which may be a sub-account of the Issuer Interest Collection Account) which shall be designated as the "Zohar Subsidiary Interest Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary from the disposition of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested in Eligible Investments), (ii) all other Interest Proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(d)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account (which may be a sub-account of the Issuer Principal Collection Account) which shall be designated as the "Zohar Subsidiary Principal Collection Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit (i) all proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary from the disposition of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in Eligible Investments), (ii) all other Principal Proceeds identified to the Trustee by the Collateral Manager as having been received by the Zohar Subsidiary and (iii) all other amounts required by the terms of this Indenture to be deposited therein.

(e)    All Monies deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied for the purposes herein provided. The Collection Accounts shall remain at all times with a financial institution organized under the laws of the United States or any political subdivision thereof and having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(f)    All Distributions, any deposit required pursuant to Section 10.2(e) and any net proceeds from the sale or disposition of a Collateral Investment, Eligible Investment or Equity Security

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001909

received by the Trustee (other than any Distribution the proceeds of which are required under Section 10.8 to be deposited in the Rollover Proceeds Account) shall be immediately deposited into the Issuer Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Interest Collection Account or the Zohar Subsidiary Principal Collection Account (unless in any case simultaneously reinvested in accordance with the terms of the Indenture in Collateral Investments or Eligible Investments), as the case may be. Subject to Sections 10.2(h) and 10.2(i), all amounts deposited in the Collection Accounts, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection Accounts as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2. By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall (except as provided in Section 10.2(g)), invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Collection Accounts, as so directed in Eligible Investments having Stated Maturities no later than the Business Day immediately preceding the next Payment Date. The Trustee, within one Business Day after receipt of any Distribution or other proceeds which are not Cash, shall so notify the Issuer and the Issuer or the Zohar Subsidiary, as applicable, shall, within 60 days of receipt of such notice from the Trustee, sell such Distribution or other proceeds for Cash in an arm's-length transaction to a Person which is not an Affiliate of the Issuer or the Collateral Manager and deposit the proceeds thereof in the applicable Collection Account, for investment pursuant to this Section 10.2; provided that neither the Issuer nor the Zohar Subsidiary need sell such Distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such Distributions or other proceeds constitute Collateral Investments, Eligible Investments or Equity Securities.

(g)    If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(f), the Trustee shall seek instructions from the Collateral Manager within three Business Days after transfer of such funds to a Collection Account. If the Trustee does not thereupon receive written instructions from the Issuer within five Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition thereof maturing no later than the Business Day immediately preceding the next Payment Date (provided that the Trustee shall make such investments and reinvestments in such amounts (but only to the extent of available funds) as may be necessary to ensure that on each date there shall be on deposit in or credited to the Issuer Principal Collection Account Eligible Investments having a Stated Maturity of the Business Day immediately following the date of investment with an Aggregate Principal Balance equal to or greater than the Unfunded Portfolio Amount minus the amounts referred to in clauses (b), (c), (d) and (e) of the definition of "Funding Source Amount" as of such date). After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Monies in Eligible Investments specified by the Controlling Class or, in the absence of such direction, as fully as practicable in Eligible Investments of the type described in clause (c) of the definition thereof maturing not later than the earlier of (i) 30 days after the date of such investment or (ii) the Business Day immediately preceding the next Payment Date (subject to the proviso in the preceding sentence). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account or the Zohar Subsidiary Interest Collection Account (to the extent such interest and other income constitutes Interest Proceeds) or the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account (to the extent such interest and other income constitutes Principal Proceeds), any gain realized from such investments shall be credited to such Collection Account, and any loss resulting from such investments shall be charged to such Collection Account. Any gain or loss with respect to an Eligible Investment shall be allocated in such a manner as to increase or decrease, respectively, Principal Proceeds and/or Interest Proceeds in the proportion which the amount of

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001910

- 158 -

Principal Proceeds and/or Interest Proceeds used to acquire such Eligible Investment bears to the purchase price thereof. The Trustee shall not in any way be held liable by reason of any insufficiency of such Collection Account resulting from any loss relating to any such investment.

(h)     The Trustee shall, upon receipt of an Issuer Order specified in Section 9.7(a) or 9.7(b) or as otherwise required by Section 9.7(c), apply amounts on deposit in the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account as permitted under and in accordance with the requirements of Section 9.7 and such Issuer Order. The Trustee shall, upon receipt of an Issuer Order, apply amounts on deposit in the Issuer Principal Collection Account as permitted under and in accordance with the requirements of Section 15.1(b) and such Issuer Order.

(i)     On the Business Day next succeeding the date on which any Interest Proceeds are received in the Zohar Subsidiary Interest Collection Account, the Trustee shall transfer such Interest Proceeds to the Issuer Interest Collection Account; and on the Business Day next succeeding the date on which any Principal Proceeds are received in the Zohar Subsidiary Principal Collection Account, the Trustee shall transfer such Principal Proceeds to the Issuer Principal Collection Account. On the Business Day prior to each Payment Date, the Trustee shall transfer any amounts then held in the Issuer Interest Collection Account and the amount of any Principal Proceeds then held in the Issuer Principal Collection Account (other than in each case proceeds received after the end of the Due Period with respect to such Payment Date) to the Payment Account for application pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.10(b).

(j)     The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Custodial Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties and into which the Trustee shall from time to time deposit Collateral. All Collateral deposited from time to time in the Custodial Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Trustee agrees to give the Issuer notice as promptly as reasonably possible if the Custodial Account or any funds on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.

Section 10.3.    Payment Account

The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Payment Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Sections 11.1 and 11.5, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes in accordance with their terms and the provisions of this Indenture and, upon direction of the Issuer or in accordance with the Note Valuation Report, to pay Administrative Expenses and other amounts and make deposits specified in the Priority of Payments, each in accordance with the Priority of Payments (including in connection with any redemption of the Notes pursuant to Section 9.1 on any Payment Date). The Trustee agrees to give the Co-Issuers notice as promptly as reasonably possible if the Payment Account or any funds on deposit therein, or otherwise to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001911

- 159 -

Payments. The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

Section 10.4.    Class A-1R Future Funding Reserve Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Class A-1R Future Funding Reserve Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Class A-1R Future Funding Reserve Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Sections 11.4 and 11.5, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Class A-1R Future Funding Reserve Account shall be upon receipt by the Trustee of an Issuer Order (i) to make extensions of credit in respect of the Unutilized Commitment of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment as permitted under and in accordance with the requirements of Section 9.7(a) and such Issuer Order, (ii) to make extensions of credit in respect of the Utilized Commitment of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment as permitted under and in accordance with the requirements of Section 9.7(b) and such Issuer Order and (iii) as specified in Section 11.3. On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of or, if earlier, on the Business Day next preceding any date that is a Redemption Date (so long as the conditions to the redemption of the Notes on such Redemption Date specified in Section 9.1(b)(i) or (ii) have been satisfied), the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Class A-1R Future Funding Reserve Account to the Issuer Principal Collection Account.

(b)    The Trustee agrees to give the Co-Issuers immediate notice if the Class A-1R Future Funding Reserve Account or any funds on deposit therein, or otherwise to the credit of the Class A-1R Future Funding Reserve Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Class A-1R Future Funding Reserve Account other than in accordance with the Priority of Payments. The Class A-1R Future Funding Reserve Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Class A-1R Future Funding Reserve Account during a Due Period, and amounts received in prior Due Periods and retained in the Class A-1R Future Funding Reserve Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Class, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Class having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Class A-1R Future Funding Reserve Account and any loss resulting from such investments shall be charged to the Class A-1R Future Funding Reserve Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Class A-1R Future Funding Reserve Account resulting from any loss relating to any such investment.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001912

Section 10.5.    Class A-1R Holder Collateral Accounts

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account, which shall be designated as the "Class A-1R Holder Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Issuer and any Holder of Class A-1R Notes and in which no other Person shall have any legal or beneficial interest. If any Holder of a Class A-1R Note shall at any time be required to post collateral to the Class A-1R Holder Collateral Account pursuant to the terms of the Class A-1R Note Purchase Agreement, then (1) the Trustee shall create a segregated subaccount of the Class A-1R Holder Collateral Account with respect to such Holder (the "Holder Subaccount" of such Holder) and (2) the Trustee shall deposit all collateral received from such Holder into such Holder Subaccount. The only permitted withdrawal from or application of funds credited to a Holder Subaccount shall be as specified in this Section 10.5.

(b)    With respect to any Holder, except as otherwise provided in the Class A-1R Note Purchase Agreement, the posting of collateral to a Holder Subaccount or in a Class A-1R Collateral Arrangement by such Holder of a Class A-1R Note shall not constitute a Borrowing by the Issuer and shall not constitute a utilization of the Class A-1R Commitment of such Holder, and the funds posted as collateral shall not constitute principal outstanding under such Class A-1R Note. However, from and after the establishment of a Holder Subaccount or in a Class A-1R Collateral Arrangement with respect to any Holder of Class A-1R Notes until otherwise provided in this Section 10.5, the obligation of such Holder to advance funds under its Class A-1R Notes as part of any Borrowing under this Indenture and the related Note Purchase Agreement shall be satisfied by the Trustee withdrawing funds from such Holder Subaccount or obtaining funds from the Class A-1R Collateral Arrangement pursuant to the terms thereof, as the case may be, at the direction of the Class A-1R Note Agent, in the amount of such Holder's pro rata share of such Borrowing, and all payments of principal with respect to advances made by such Holder under its Class A-1R Notes (whether or not originally funded from such Holder Subaccount) shall be made by depositing the related funds into such Holder Subaccount. The Trustee shall have full power and authority to withdraw funds from each such Holder Subaccount at the time of, and in connection with, the making of any such Borrowing and to deposit funds into each such Holder Subaccount or a Class A-1R Collateral Arrangement, as the case may be, all in accordance with the terms of and for the purposes set forth in this Agreement and the related Note Purchase Agreement.

(c)    If on any Payment Date (or on any other Business Day upon three Business Days' prior written request from such Holder and the Issuer) the sum of (i) the amount of funds on deposit in the Holder Subaccount and (ii) the value of collateral in the Class A-1R Collateral Arrangement (as determined pursuant to the terms thereof) relating to any Holder of Class A-1R Notes (exclusive of interest earnings subject to clause (e) below) exceeds such Holder's pro rata portion of the Aggregate Undrawn Amount of the Class A-1R Note of such Holder (whether due to a reduction in the Class A-1R Commitment or otherwise), then the Trustee shall, at the direction of the Class A-1R Note Agent, remit to such Holder a portion of the funds then held in the related Holder Subaccount and/or any Cash or other collateral held pursuant to the Class A-1R Collateral Arrangement in an aggregate amount equal to such excess. Amounts in the Holder Subaccount of any Holder shall also be applied as otherwise provided in the Note Purchase Agreement to which such Holder is a party.

(d)    If at any time a Holder of Class A-1R Notes demonstrates to the Issuer and the Class A-1R Note Agent that it is no longer required to post or maintain collateral in the Class A-1R Holder Collateral Account pursuant to the terms of the Note Purchase Agreement to which such Holder is a party (including, without limitation, in the event that a Holder satisfies the Rating Criteria), then all funds then held in the relevant Holder Subaccount (after giving effect to any Borrowings in respect of such Class A-1R Notes are to be made on such date) shall be withdrawn from such Holder Subaccount, at the direction of the Class A-1R Note Agent, and remitted to such Holder, and thereafter all payments of

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001913

principal with respect to advances made by such Holder shall be paid directly to such Holder in accordance with the terms of this Indenture and the Class A-1R Note Purchase Agreement.

(e)    Except as otherwise provided in any Class A-1R Note Purchase Agreement, for so long as any amounts are on deposit in any Holder Subaccount, the Trustee shall invest and reinvest such funds in Class A-1R Holder Collateral Account Permitted Investments as directed by the related Holder (which direction may be in the form of standing instructions) (or, if such Holder does not so direct, in Eligible Investments of the type referred to in clause (a) of the definition of such term), in each case having a Stated Maturity on the day following the date of acquisition thereof. Interest received on such Class A-1R Holder Collateral Account Permitted Investments shall be remitted to such Holder on each Payment Date (and, pending such remittance, shall be retained in such account and invested and reinvested as aforesaid). Any gain realized from such investments shall be credited to such Holder Subaccount and any loss resulting from such investments shall be charged to such Holder Subaccount. The Trustee shall not in any way be held liable by reason of any insufficiency of such Holder Subaccount resulting from any loss relating to any such investment.

(f)    If the Class A-1R Holder Collateral Account, any Holder Subaccount or any funds on deposit therein, or otherwise to the credit of any Holder Subaccount, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process, the Trustee shall give the Co-Issuers, the Collateral Manager and the related Holder immediate notice thereof. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Class A-1R Holder Collateral Account other than in accordance with the Priority of Payments. The Class A-1R Holder Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

Section 10.6.    Expense Account; Professional Fee Account; Closing Expense Account

(a)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Expense Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.5, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Expense Account shall be to pay (on any day other than a Payment Date) accrued and unpaid Administrative Expenses (other than (i) fees and expenses described in Section 11.1(a)(i)(B) (except to the extent such fees and expenses remain unpaid on any Payment Date after application of the Priority of Payments on such Payment Date), (ii) the Collateral Management Fee, but including other amounts payable by the Issuer to the Collateral Manager under the Management Agreement or the Indenture and (iii) fees and expenses payable from the Professional Fee Account. On the Funding Date, the Trustee shall deposit into the Expense Account an amount equal to U.S.$400,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Thereafter, the Trustee shall transfer to the Expense Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and in accordance with the calculations and the instructions contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.10(b). On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Expense Account to the Issuer Principal Collection Account.

(b)    The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Professional Fee Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                               PP001914

- 162 -

time on deposit in, or otherwise to the credit of, the Professional Fee Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.5, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Professional Fee Account shall be (i) to pay (or reimburse for) costs of enforcement of the Issuer's obligations under Section 7.18, (ii) to pay accrued and unpaid Professional Fees (on any day other than a Payment Date) owing to first, legal advisors and, second, other professionals hired by the Collateral Manager in connection with its duties under the Management Agreement and (iii) on any Payment Date on which there are no Professional Fees due and owing (after application of any amounts from the Priority of Payments to the payment thereof), to reimburse the Collateral Manager for any Senior Collateral Management Fee paid to the Professional Fee Account pursuant to Section 11.1(a)(i)(D) on any prior Payment Date; provided that, in each case, such payments and/or reimbursements shall be made at the direction of the Collateral Manager. On the Funding Date, the Trustee shall deposit into the Professional Fee Account an amount equal to U.S.$1,500,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. Thereafter, the Trustee shall transfer to the Professional Fee Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.10(b). On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Professional Fee Account to the Issuer Principal Collection Account.

(c)     The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Closing Expense Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Closing Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.5, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Closing Expense Account shall be to pay accrued and unpaid fees and expenses payable by or on behalf of the Zohar Obligors, the Collateral Manager, the Placement Agent and their respective Affiliates in connection with the issuance of the Notes and Preference Shares, the acquisition of the Warehouse Collateral Investments and any amounts payable under or in connection with the Warehouse Agreement or the transactions contemplated thereby and the negotiation, preparation and delivery of the Transaction Documents and other documents related thereto (collectively, "Closing Expenses"). On the Funding Date, the Trustee shall deposit into the Closing Expense Account an amount equal to U.S.$31,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and Preference Shares. On any Business Day preceding the Payment Date in March, 2008, the Trustee shall, at the direction of the Collateral Manager, transfer any amounts (or portion thereof) on deposit in the Closing Expense Account to the Issuer Principal Collection Account. On the Business Day preceding the Payment Date in March, 2008, the Trustee shall transfer any remaining amounts on deposit in the Closing Expense Account to the Issuer Principal Collection Account.

(d)     The Trustee agrees to give the Co-Issuers notice as promptly as reasonably possible if the Expense Account, the Professional Fee Account, or the Closing Expense Account or any funds on deposit therein, or otherwise to the credit of any such Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Expense Account, the Professional Fee Account and the Closing Expense Account other than in accordance with the Priority of Payments. The Expense Account, the Professional Fee Account and the Closing Expense Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                 PP001915

(e)        By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Expense Account, the Professional Fee Account and the Closing Expense Account during a Due Period, and amounts received in prior Due Periods and retained in the Expense Account, the Professional Fee Account and the Closing Expense Account, as so directed in Eligible Investments having Stated Maturities no later than the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Class, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Class having a Stated Maturity of the Business Day next succeeding the date of such investment).  All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account.  Any gain realized from such investments shall be credited to the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be, and any loss resulting from such investments shall be charged to the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be.  The Trustee shall not in any way be held liable by reason of any insufficiency of the Expense Account, the Professional Fee Account or the Closing Expense Account, as the case may be, resulting from any loss relating to any such investment.

Section 10.7.    Unfunded Revolver Discount Account

(a)        The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Unfunded Revolver Discount Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Unfunded Revolver Discount Account shall be held in trust by the Trustee for the benefit of the Secured Parties.  In addition, upon the acquisition of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment on or after the Funding Date, the proceeds of any Discount Amount paid (or deemed paid) by the seller thereof to the Issuer shall be deposited into the Unfunded Revolver Discount Account.  In addition, to the extent that the Issuer has withdrawn amounts on deposit in the Unfunded Revolver Discount Account pursuant to the last paragraph of Section 9.7(b) to acquire or originate any Collateral Investments or to fund the Unfunded Amount under any Collateral Investments that is a Revolving Collateral Investment or Delayed Funding Collateral Investment and on any subsequent date the Issuer receives proceeds of a Borrowing that was to have been applied pursuant to Section 9.7(b) to such acquisition or origination or Unfunded Amount, the Issuer will deposit a portion of the proceeds of such Borrowing equal to such previously withdrawn amounts into the Unfunded Revolver Discount Account.  Except as provided in Sections 11.3 and 11.5, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Unfunded Revolver Discount Account shall be (i) upon receipt by the Trustee of an Issuer Order to acquire any Collateral Investment or to make extensions of credit in respect of any Collateral Investment originated by the Issuer or the Unutilized Commitment of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment as permitted under and in accordance with the requirements of Section 9.7(a) and such Issuer Order, (ii) to acquire any Collateral Investment or to make extensions of credit in respect of any Collateral Investment originated by the Issuer or the Utilized Commitment of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment as permitted under and in accordance with the requirements of Section 9.7(b) and such Issuer Order and (iii) as specified in Section 11.3.  On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of or, if earlier, on the Business Day next preceding any date that is a Redemption Date (so long as the conditions to the redemption of the Notes on such Redemption Date specified in Section 9.1(b)(i) or (ii) have been satisfied), the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP001916

Order, the Trustee shall, transfer all amounts on deposit in the Unfunded Revolver Discount Account to the Issuer Principal Collection Account.

(b)     The Trustee agrees to give the Co-Issuers immediate notice if the Unfunded Revolver Discount Account or any funds on deposit therein, or otherwise to the credit of the Unfunded Revolver Discount Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Unfunded Revolver Discount Account other than in accordance with the Priority of Payments. The Unfunded Revolver Discount Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)     By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Unfunded Revolver Discount Account during a Due Period, and amounts received in prior Due Periods and retained in the Unfunded Revolver Discount Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Class, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Class having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Unfunded Revolver Discount Account and any loss resulting from such investments shall be charged to the Unfunded Revolver Discount Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Unfunded Revolver Discount Account resulting from any loss relating to any such investment.

Section 10.8.   Rollover Proceeds Account

(a)     The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account which shall be designated as the "Rollover Proceeds Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Rollover Proceeds Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Upon the receipt by the Issuer or the Zohar Subsidiary of Distributions in Cash on any Collateral Investment or Equity Security in connection with the reorganization, restructuring or liquidation of any obligor thereon (or its Affiliates) or such obligor's (or Affiliates') line(s) of business or the refinancing of or amendment of such Collateral Investment or Equity Security, the Collateral Manager may, on behalf of the Issuer or the Zohar Subsidiary (as applicable), direct the Trustee in writing to deposit such Distributions in Cash into the Rollover Proceeds Account (absent such direction such payments will be deposited in the applicable Collection Account). Except as provided in Section 11.5, the only permitted withdrawals from or applications of funds on deposit in, or otherwise to the credit of, the Rollover Proceeds Account shall be made as specified in Section 11.2. On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of, the Issuer by Issuer Order executed by an Authorized Officer of the Collateral Manager shall direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, transfer all amounts on deposit in the Rollover Proceeds Account to the Issuer Principal Collection Account.

(b)     The Trustee agrees to give the Co-Issuers and the Controlling Class immediate notice if the Rollover Proceeds Account or any funds on deposit therein, or otherwise to the credit of the Rollover Proceeds Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001917

- 165 -

the Rollover Proceeds Account other than in accordance with the Priority of Payments. The Rollover Proceeds Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's.

(c)    By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Rollover Proceeds Account during a Due Period, and amounts received in prior Due Periods and retained in the Rollover Proceeds Account, as so directed in Eligible Investments having a Stated Maturity of the Business Day immediately preceding the next Payment Date (provided that during the continuance of an Event of Default, if so directed by the Controlling Class, the Trustee shall invest all such funds in Eligible Investments specified by the Controlling Class having a Stated Maturity of the Business Day immediately following the date of such investment). All interest and other income from such investments shall be deposited in the Issuer Interest Collection Account. Any gain realized from such investments shall be credited to the Rollover Proceeds Account and any loss resulting from such investments shall be charged to the Rollover Proceeds Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Rollover Proceeds Account resulting from any loss relating to any such investment.

Section 10.9.    Reports by Trustee

Upon request, the Trustee shall supply in a timely fashion to the Issuer, the Collateral Manager, the Class A-1R Note Agent, the Class A-1D Note Agent and the Preference Share Paying Agent any information regularly maintained by the Trustee (i) that the Issuer, the Collateral Manager, the Class A-1R Note Agent, the Class A-1D Note Agent or the Preference Share Paying Agent may from time to time request with respect to the Pledged Obligations or any Account, (ii) reasonably needed to complete the Note Valuation Report, (iii) reasonably available to the Trustee by reason of its acting as Trustee hereunder, (iv) to permit the Collateral Manager to perform its obligations under the Management Agreement, (v) to permit the Class A-1R Note Agent to perform its obligations under the Class A-1R Note Purchase Agreement, and to permit the Class A-1D Note Agent to perform its obligations under the Class A-1D Note Purchase Agreement and (vi) to permit the Preference Share Paying Agent to perform its obligations under the Preference Share Paying Agency Agreement. The Trustee shall forward to the Collateral Manager, to the Class A-1R Note Agent, to the Class A-1D Note Agent, to the Preference Share Paying Agent and to any Holder of a Note shown on the Note Register upon written request therefor, copies of notices and other writings received by it from the issuer of any Collateral Investment or from any Clearing Agency with respect to any Collateral Investment advising the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer. Nothing in this Section 10.09 shall be construed to impose on the Trustee any duty to prepare any report or statement which the Issuer (or the Collateral Manager on behalf of the Issuer) is required to prepare or provide under Section 10.10 or to calculate or recalculate any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer or the Collateral Manager. Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations which it reasonably considers to be confidential in nature. In addition, notwithstanding anything to the contrary herein, to the extent a Noteholder wishes to receive any confidential information regarding the identity of the underlying borrowers with respect to Collateral Investments from the Issuer or the Trustee, such Noteholder shall be required to execute confidentiality agreements, in form and substance reasonably satisfactory to the Collateral Manger, before being provided with such information.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001918

- 166 -

The Trustee shall promptly notify the Class A-1R Note Agent (which shall thereupon promptly notify the Holders of the Class A-1R Notes, the Holders of the Class A-1T Notes and the Holders of the Class A-1D Notes) if at any time the balance in the Issuer Principal Collection Account exceeds U.S.$20,000,000.

Section 10.10.    Accountings

(a)    Monthly Accountings.  Not later than the tenth Business Day after the last day of each calendar month (commencing with the calendar month in which the Initial Payment Date falls, and excluding any month as to which a Note Valuation Report is rendered), the Issuer shall compile and provide or make available to each Rating Agency, the Trustee, the Preference Share Paying Agent, the Class A-1R Note Agent, the Class A-1D Note Agent, the Collateral Manager, each Hedge Counterparty and the Holders of Notes (and any beneficial owner thereof to the extent it has certified to the Trustee that it is such a beneficial owner), a monthly report (the "Monthly Report"). Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Monthly Report shall contain the following information and instructions with respect to the Pledged Obligations included in the Collateral (provided that disclosure of the identity of the underlying borrowers with respect to Collateral Investments shall be subject to Section 10.9), determined as of the last day of the applicable calendar month (and, for such purposes, the "Preceding Monthly Reporting Date" means, as to any applicable calendar month, the last day of the immediately preceding calendar month; it being understood that, for the purposes of this Section 10.10(a) and Section 2(c) of the Collateral Administration Agreement, the "Preceding Monthly Reporting Date" with respect to the first Monthly Report shall be deemed to refer to the last day of the calendar month preceding the Initial Payment Date):

(1)    the Aggregate Principal Balance of all Collateral Investments and Equity Securities;

(2)    the Balance of all Eligible Investments and Cash in each of the Issuer Interest Collection Account, the Issuer Principal Collection Account, the Zohar Subsidiary Principal Collection Account, the Zohar Subsidiary Interest Collection Account, the Payment Account, the Expense Account, the Closing Expense Account, the Professional Fee Account, the Class A-1R Holder Collateral Account, the Unfunded Revolver Discount Account, the Class A-1R Future Funding Reserve Account, the Rollover Proceeds Account and any Foreign Currency Account;

(3)    the nature, source and amount of any proceeds in the Collection Accounts, including Uninvested Proceeds, Interest Proceeds, Principal Proceeds and Sale Proceeds, received since the Preceding Monthly Reporting Date (including, for each Collateral Investment, the allocation of Distributions received in respect thereof among principal, interest, fees and other amounts);

(4)    the Principal Balance, annual interest rate, Stated Maturity, the Moody's Rating and the Standard & Poor's Rating of each Collateral Investment (but, in each case, only to the extent such ratings are not confidential), Eligible Investment, the Commitment Amount and the Funded Amount of each Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment, the aggregate Funded Amount of all Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments and the aggregate Commitment Amounts under all Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments (for the avoidance of doubt, the information provided pursuant to this clause shall not contain the name of the issuer of any Collateral Investment);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                    PP001919

(5)     the amount of funds withdrawn from the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account pursuant to Section 9.7 to fund commitments under Collateral Investments that are Revolving Collateral Investments and Delayed Funding Collateral Investments since the Preceding Monthly Reporting Date;

(6)     the identity of each Collateral Investment which became a Defaulted Investment, Non-Current Collateral Investment or Non-Performing Collateral Investment since the Preceding Monthly Reporting Date; and the identity of each Unrestricted Collateral Investment;

(7)     the identity and the Principal Balance of each (and the Aggregate Principal Balance of all) Defaulted Investment, Collateral Investment that became a Non-Current Collateral Investment since the Preceding Monthly Reporting Date, Collateral Investment that became a Non-Performing Collateral Investment since the Preceding Monthly Reporting Date, and Collateral Investment that became a Performing Collateral Investment since the Preceding Monthly Reporting Date;

(8)     the Aggregate Principal Balance, number and identity of any Collateral Investments that were released for sale or other disposition (indicating the sale price thereof and whether such Collateral Investment was a Defaulted Investment or Non-Performing Collateral Investment (in each case, as reported in writing to the Issuer by the Collateral Manager)) since the Preceding Monthly Reporting Date;

(9)     the Aggregate Principal Balance of all Collateral Investments that are Senior Secured Collateral Investments;

(10)     the Aggregate Principal Balance of all Collateral Investments providing for payments of interest less frequently than quarterly;

(11)     the Aggregate Principal Balance of all Collateral Investments convertible or exchangeable into Equity Securities;

(12)     a description in reasonable detail of the terms of each Equity Security (including whether or not such Equity Security constitutes Margin Stock);

(13)     a description in reasonable detail of the terms of any Pledged Obligation that is not a Collateral Investment, an Equity Security or an Eligible Investment;

(14)     the Aggregate Principal Balance of all Fixed Rate Obligations and the Aggregate Principal Balance of Fixed Rate Obligations designated as each of Non-Performing Collateral Investments, Non-Current Collateral Investments and Collateral Investments with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only;

(15)     the Aggregate Principal Balance of all Floating Rate Obligations;

(16)     the Aggregate Principal Balance of all Floating Rate Obligations for which the calculation of the relevant floating rate of interest may not be determined by reference to the LIBO Rate;

(17)     the Aggregate Principal Balance of all Collateral Investments (x) held by the Issuer and (y) held by the Zohar Subsidiary;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001920

- 168 -

(18)    the Aggregate Principal Balance of all Collateral Investments issued by each issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);

(19)    for each Collateral Investment that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Investments that are Participation Interests acquired from such Selling Institution;

(20)    the Aggregate Principal Balance of all Collateral Investments that are Participation Interests;

(21)    the Commitment Shortfall, if any;

(22)    for each Collateral Investment (as applicable):

(A)    the last date on which interest was paid thereunder since the Preceding Monthly Reporting Date;

(B)    the date of the occurrence of any default or event of default thereunder since the Preceding Monthly Reporting Date;

(C)    the date of the occurrence of any event of bankruptcy or insolvency in respect of the obligor thereon since the Preceding Monthly Reporting Date;

(D)    the date of emergence of the obligor thereon from any bankruptcy or insolvency Proceeding since the Preceding Monthly Reporting Date;

(E)    the amount and type of Distributions received by the issuer thereunder since the Preceding Monthly Reporting Date in connection with any restructuring of the terms of such Collateral Investment; and

(F)    the date on which all or any portion of such Collateral Investment was refinanced since the Preceding Monthly Reporting Date and the amount of any such refinancing;

(23)    the Aggregate Principal Balance of all Collateral Investments that fall within each Standard & Poor's Industry Classification Group;

(24)    the Aggregate Principal Balance of all Collateral Investments that fall within each Moody's Industry Classification Group;

(25)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Investments on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;

(26)    the Class A-1 Break-Even Loss Rate, the Class A-1 Scenario Loss Rate, the Class A-2 Break-Even Loss Rate, the Class A-2 Scenario Loss Rate, the Class A-3 Break-Even

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP001921

Loss Rate, the Class A-3 Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;

(27)    with respect to each Collateral Investment that is a Senior Secured Collateral Investment, the rating assigned by Moody's to such Senior Secured Collateral Investment (to the extent such information is not confidential) and the corporate family rating assigned by Moody's to the issuer of such Senior Secured Collateral Investment (to the extent such information is not confidential);

(28)    for each Collateral Investment sold or extinguished since the Preceding Monthly Reporting Date, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net distributions received on a Collateral Investment that was so extinguished) received by the Issuer in connection with such sale (or in exchange for the extinguishment of such obligation) was greater than or less than the price at which the Issuer purchased or originated such Collateral Investment (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds received and, in the case of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment, fundings in respect of such Collateral Investment), and the Dollar amount by which, after giving effect to such sale, the aggregate Sale Proceeds received by the Issuer in connection with all sales of Collateral Investments after the Funding Date was greater than or less than the aggregate amount of the prices at which the Issuer purchased or originated such Collateral Investments;

(29)    a calculation in reasonable detail necessary to determine compliance with each of the Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the Class A Overcollateralization Ratio; and

(30)    the row of the Ratings Matrix most recently selected by the Collateral Manager and whether such row is different from the row reported in the preceding Monthly Report.

The Issuer shall report the following information with respect to the Pledged Collateral Investments from the Standard & Poor's CDO Monitor: (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure, and the Collateral Manager will confirm, based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Investments, whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied.

In addition, the Issuer shall also indicate in each such Monthly Report the percentage of the Aggregate Principal Balance of all Collateral Investments and the Maximum Investment Amount for each aggregate amount referred to in clauses (8) through (20) above (inclusive).

Upon receipt of each Monthly Report, the Collateral Manager shall compare the information contained therein to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer and the Trustee if the information contained in the Monthly Report does not conform to the information maintained by the Collateral Manager with respect to the Collateral. In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.12 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001922

- 170 -

revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

Each Monthly Report shall be made available to the Persons entitled to such reports via the Trustee's internet website. The Trustee's internet website shall initially be located at "www.cdostrustee.net." Assistance in using the website can be obtained by calling the Trustee's customer service desk at telephone no. (312) 904-0283. Persons who are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the Trustee's customer service desk. The Trustee shall have the right to change the method such reports are distributed in order to make such distribution more convenient and/or more accessible to the Persons entitled to such reports, and the Trustee shall provide timely notification (in any event, not less than 30 days) to all such Persons.

In addition, not later than the tenth Business Day after the last day of each calendar month (commencing with the calendar month after the month in which the Ramp Up End Date falls), the Issuer shall compile and provide to Standard & Poor's the Excel Default Model Input File.

(b)    Payment Date Accountings. The Issuer shall render an accounting (the "Note Valuation Report") determined as of each Determination Date, and made available to each Rating Agency, the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Class A-1R Note Agent, the Class A-1D Note Agent and the Holders of Notes (and any beneficial owner thereof to the extent it has certified to the Trustee that it is such a beneficial owner), not later than the related Payment Date; provided that each such report shall be delivered electronically to any such party who so requests in writing. Each Note Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Note Valuation Report shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date); provided that disclosure of the identity of the underlying borrowers with respect to Collateral Investments shall be subject to Section 10.9:

(1)    the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the next Payment Date, the aggregate amount of the Class A-1R Commitments, the aggregate amount of the Class A-1D Commitments and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on the next Payment Date;

(2)    the Interest Distribution Amount, the Class A-1R Commitment Fee and the Class A-1D Commitment Fee (if any) payable to the Holders of the Class A-1 Notes (in the aggregate and by Class), for such Payment Date;

(3)    the Administrative Expenses payable on the next Payment Date on an itemized basis;

(4)    for the Issuer Interest Collection Account:

(A)    the Balance on deposit in the Issuer Interest Collection Account at the end of the related Due Period;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001923

- 171 -

(B)    the amounts payable from the Issuer Interest Collection Account (by way of the Payment Account) pursuant to paragraphs (A) through (Q) of Section 11.1(a)(i) on the next Payment Date; and

(C)    the Balance remaining in the Issuer Interest Collection Account immediately after all payments and deposits to be made on such Payment Date;

(5)    for the Issuer Principal Collection Account:

(A)    the Balance on deposit in the Issuer Principal Collection Account at the end of the related Due Period;

(B)    the amounts payable from the Issuer Principal Collection Account (by way of the Payment Account) pursuant to paragraphs (A) through (I) of Section 11.1(a)(ii) on the next Payment Date; and

(C)    the Balance remaining in the Issuer Principal Collection Account immediately after all payments and deposits to be made on such Payment Date;

(6)    the Balance on deposit in the Rollover Proceeds Account at the end of the related Due Period;

(7)    the Balance on deposit in the Zohar Subsidiary Interest Collection Account at the end of the related Due Period;

(8)    the Balance on deposit in the Zohar Subsidiary Principal Collection Account at the end of the related Due Period;

(9)    the Balance on deposit in the Class A-1R Future Funding Reserve Account at the end of the related Due Period;

(10)    the Balance on deposit in the Unfunded Revolver Discount Account at the end of the related Due Period;

(11)    the Balance on deposit in any Foreign Currency Account at the end of the related Due Period

(12)    the Balance on deposit in the Expense Account at the end of the related Due Period;

(13)    the Balance on deposit in the Professional Fee Account at the end of the related Due Period;

(14)    the Balance on deposit in the Closing Expense Account at the end of the related Due Period;

(15)    the Class A-1R Note Interest Rate, the Class A-1T Note Interest Rate, the Class A-1D Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for the Interest Period preceding the next Payment Date;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001924

(16)    the amounts expected to be distributed from the Preference Share Distribution Account to the Holders of the Preference Shares as a dividend assuming the solvency of the Issuer under Cayman Islands law;

(17)    the number and identity of each Collateral Investment held by the Issuer and the Zohar Subsidiary on the last day of the Due Period most recently ended and indicating, in the case of each Collateral Investment, whether such Collateral Investment is a Defaulted Investment or was a Non-Performing Collateral Investment during the related Due Period (in each case, as reported in writing to the Trustee by the Collateral Manager);

(18)    the identity of each Collateral Investment that was sold or disposed of pursuant to Section 12.2 since the date of determination of the most recent Note Valuation Report and on or prior to the last day of the Due Period most recently ended;

(19)    the identity and the Principal Balance of each (and the Aggregate Principal Balance of all) Defaulted Investment, Collateral Investment that became a Non-Current Collateral Investment during the related Due Period, Collateral Investment that became a Non-Performing Collateral Investment during the related Due Period, and Collateral Investment that became a Performing Collateral Investment during the related Due Period;

(20)    the Aggregate Principal Balance of all Collateral Investments that are Senior Secured Collateral Investments;

(21)    the Aggregate Principal Balance of all Collateral Investments providing for payments of interest less frequently than quarterly;

(22)    the Aggregate Principal Balance of all Collateral Investments convertible or exchangeable into Equity Securities;

(23)    a description in reasonable detail of the terms of each Equity Security (including whether or not such Equity Security constitutes Margin Stock);

(24)    a description in reasonable detail of the terms of any Pledged Obligation that is not a Collateral Investment, an Equity Security or an Eligible Investment;

(25)    the Aggregate Principal Balance of all Fixed Rate Obligations and the Aggregate Principal Balance of Fixed Rate Obligations designated as each of Non-Performing Collateral Investments, Non-Current Collateral Investments and Collateral Investments with a Moody's Rating or a Standard & Poor's Rating which addresses return of principal only;

(26)    the Aggregate Principal Balance of all Floating Rate Obligations;

(27)    the Principal Balance, annual interest rate, Stated Maturity, the Moody's Rating and the Standard & Poor's Rating of each Collateral Investment (if such ratings are not confidential), Eligible Investment, the Commitment Amount and the Funded Amount of each Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment, the aggregate Funded Amount of all Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments and the aggregate Commitment Amounts under all Collateral Investments that are Revolving Collateral Investments or Delayed Funding Collateral Investments (for the avoidance of doubt, the information provided pursuant to this clause shall not contain the name of the issuer of any Collateral Investment);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001925

(28)    the Aggregate Principal Balance of all Floating Rate Obligations for which the calculation of the relevant floating rate of interest may not be determined by reference to the LIBO Rate;

(29)    the Aggregate Principal Balance of all Collateral Investments (x) held by the Issuer and (y) held by the Zohar Subsidiary;

(30)    the Aggregate Principal Balance of all Collateral Investments issued by each issuer thereof (and for the purposes of this clause, any issuers Affiliated with one another will be considered one issuer);

(31)    for each Collateral Investment that is a Participation Interest, (A) the Principal Balance thereof, (B) the Moody's or Standard & Poor's rating of the long-term and short-term debt obligations of the related Selling Institution and (C) the Aggregate Principal Balance of all Collateral Investments that are Participation Interests acquired from such Selling Institution;

(32)    the Aggregate Principal Balance of all Collateral Investments that are Participation Interests;

(33)    the Commitment Shortfall, if any;

(34)    for each Collateral Investment (as applicable):

    (A)    the last date on which interest was paid thereunder during the related Due Period;

    (B)    the date of the occurrence of any default or event of default thereunder during the related Due Period;

    (C)    the date of the occurrence of any event of bankruptcy or insolvency in respect of the obligor thereon during the related Due Period;

    (D)    the date of emergence of the obligor thereon from any bankruptcy or insolvency Proceeding during the related Due Period;

    (E)    the amount and type of Distributions received by the issuer thereunder during the related Due Period in connection with any restructuring of the terms of such Collateral Investment; and

    (F)    the date on which all or any portion of such Collateral Investment was refinanced during the related Due Period and the amount of any such refinancing;

(35)    the Aggregate Principal Balance of all Collateral Investments that fall within each Standard & Poor's Industry Classification Group;

(36)    the Aggregate Principal Balance of all Collateral Investments that fall within each Moody's Industry Classification Group;

(37)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Test) and a statement

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001926

(confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Investments on the date of determination) of whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied;

(38)    the Class A-1 Break-Even Loss Rate, the Class A-1 Scenario Loss Rate, the Class A-2 Break-Even Loss Rate, the Class A-2 Scenario Loss Rate, the Class A-3 Break-Even Loss Rate, the Class A-3 Scenario Loss Rate, the Class B Break-Even Loss Rate and the Class B Scenario Loss Rate;

(39)    with respect to each Collateral Investment that is a Senior Secured Collateral Investment, the rating assigned by Moody's to such Senior Secured Collateral Investment and the corporate family rating assigned by Moody's to the issuer of such Senior Secured Collateral Investment (if such ratings are not confidential);

(40)    for each Collateral Investment sold or extinguished during the related Due Period, the Dollar amount, if any, by which the Sale Proceeds (or aggregate net distributions received on a Collateral Investment that was so extinguished) received by the Issuer in connection with such sale (or in exchange for the extinguishment of such obligation) was greater than or less than the price at which the Issuer purchased or originated such Collateral Investment (such Dollar amount being adjusted for Distributions in respect of Principal Proceeds received and, in the case of any Collateral Investment that is a Revolving Collateral Investment or Delayed Funding Collateral Investment, fundings in respect of such Collateral Investment), and the Dollar amount by which, after giving effect to such sale, the aggregate Sale Proceeds received by the Issuer in connection with all sales of Collateral Investments after the Funding Date was greater than or less than the aggregate amount of the prices at which the Issuer purchased or originated such Collateral Investments;

(41)    written notice received by the Collateral Manager or any Zohar Obligor of any challenge of the validity of any Collateral Investment or of the validity or priority of any Underlying Instrument or any related collateral security during such Due Period;

(42)    if since the date of determination of the last Note Valuation Report any term or condition of any Collateral Investment has (to the best knowledge of the Issuer or the Collateral Manager) been amended or waived, and the effect of such amendment or waiver was to change the interest rate or the date for the payment of any principal or to release any collateral security thereunder, a description of such amendment or waiver in reasonable detail; and

(43)    a calculation in reasonable detail necessary to determine compliance with the Class A Coverage Tests, and a calculation in reasonable detail necessary to determine the Class A Overcollateralization Ratio.

The Issuer shall report the following information with respect to the Pledged Collateral Investments from the Standard & Poor's CDO Monitor:  (1) weighted average maturity, (2) weighted average rating, (3) default measure, (4) correlation measure and (5) variability measure, and the Collateral Manager will confirm, based on its independent application of the Standard & Poor's CDO Monitor Test to the Collateral Investments, whether the Standard & Poor's CDO Monitor Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Test was not satisfied.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001927

Each Note Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established, in Section 11.1(a).

Each Note Valuation Report shall be made available to the Persons entitled to such reports via the Trustee's internet website. The Trustee's internet website shall initially be located at "www.cdostrustee.net." Assistance in using the website can be obtained by calling the Trustee's customer service desk at telephone no. (312) 904-0283. Persons who are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the Trustee's customer service desk. The Trustee shall have the right to change the method such reports are distributed in order to make such distribution more convenient and/or more accessible to the Persons entitled to such reports, and the Trustee shall provide timely notification (in any event, not less than 30 days) to all such Persons.

In addition to the Note Valuation Report, upon the written request of any Noteholder shown on the Note Register that has entered into a confidentiality agreement with the Collateral Manager in accordance with Section 10.9, the Issuer shall deliver to such Noteholder, a report containing the number and identity of each obligor under a Collateral Investment held by the Issuer or the Zohar Subsidiary on the last day of the Due Period most recently ended.

(c)    Supplemental Noteholder Information. Concurrently with the delivery of each Monthly Report and each Note Valuation Report, the Issuer shall provide to the Trustee (i) the names and identities of the obligors and/or issuers of the Collateral Investments owned by the Issuer and the Zohar Subsidiary and (ii) the name of the original issuer of any Collateral Investment (or any predecessor Collateral Investment) which is an Exchanged Security or a Collateral Investment for which the issuer thereof has otherwise changed since the date such Collateral Investment was Granted to the Trustee (the information in clauses (i) and (ii), collectively, the "Supplemental Noteholder Information"). The Trustee shall maintain the Supplemental Noteholder Information pursuant to the terms of this Section 10.10(c). Upon and after receiving the written consent of the Collateral Manager to any Holder's receipt of the Supplemental Noteholder Information, the Trustee shall provide to such Eligible Holder the Supplemental Noteholder Information concurrently with the delivery of any Monthly Report or Note Valuation Report furnished to such Holder. Each Eligible Holder that receives the Supplemental Noteholder Information and/or any other information relating to the names or identities of the issuers of and/or obligors on the Collateral Investments and/or Equity Securities held by the Zohar Obligors, shall hold in confidence all such information, except (i) to the extent disclosure may be required by law by any regulatory authority and (ii) each Eligible Holder may disclose the Supplemental Noteholder Information to its accountants and attorneys (provided that such Eligible Holder advises such Persons of the confidential nature of the information being disclosed). No assignee or transferee (or proposed assignee or transferee) of an Eligible Holder shall be deemed an Eligible Holder unless the Collateral Manager has consented to the designation of such assignee or transferee as an Eligible Holder in accordance with the definition thereof. For the avoidance of doubt and notwithstanding anything else to the contrary contained herein or in any other Transaction Document, no Holder (or beneficial owner thereof), assignee or transferee (or proposed Holder (or beneficial owner thereof), assignee or transferee) (other than an Eligible Holder) shall receive, and none of the Zohar Obligors, the Collateral Manager, the Trustee, the Collateral Administrator or any other Person shall provide to such Person, the names or identities of any obligor on and/or issuer of any Collateral Investment or Equity Security held or owned by the Zohar Obligors.

(d)    Redemption Date Instructions. No later than five Business Days after receiving an Issuer Request requesting information regarding a redemption of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer, and the Issuer shall compute the following

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001928

- 176 -

information and provide such information in a statement (the "Redemption Date Statement") delivered to the Trustee:

(i)    the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii)    the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date; and

(iii)    the amount in the Redemption Accounts available for application to the redemption of such Notes.

(e)    If the Trustee shall not have received any accounting provided for in this Section 10.10 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.10 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

Section 10.11.    Release of Collateral

(a)    If no Event of Default has occurred and is continuing and subject to Article 12, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager delivered to the Trustee, certifying that the conditions set forth in Section 12.2 are satisfied, direct the Trustee to release such Collateral from the lien of this Indenture against receipt of payment therefor.

(b)    Subject to Article 12 (and, if an Event of Default has occurred and is continuing, subject to Article 5), the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager, delivered to the Trustee, certifying that such Collateral is being redeemed or paid in full, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Collateral, if in physical form, duly endorsed, or, if such Collateral is a Clearing Corporation Security, to cause it to be presented, to the appropriate paying agent therefor on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof. If an Event of Default has occurred and is continuing at the time of such direction, the Trustee may and, if so directed by the Controlling Class, shall, disregard such direction; provided that, in the absence of such direction by the Controlling Class, the Trustee shall be entitled to rely and act on the advice of the Collateral Manager.

(c)    Subject to Article 12 (and, if an Event of Default has occurred and is continuing, subject to Article 5), the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager, delivered to the Trustee, certifying that such Collateral is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Collateral, if in physical form, duly endorsed, or, if such Collateral is a Clearing Corporation Security, to cause it to be delivered, in accordance with such Issuer Order, in each case against receipt of payment therefor. If an Event of Default has occurred and is continuing at the time of such direction, the Trustee may and, if so directed by the Controlling Class, shall, disregard such direction; provided that, in the absence of such direction by the Controlling Class, the Trustee shall be entitled to rely and act on the advice of the Collateral Manager.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001929

(d)      The Trustee shall deposit any proceeds received by it from the disposition of any Collateral in the Issuer Interest Collection Account, Zohar Subsidiary Interest Collection Account, the Issuer Principal Collection Account or the Zohar Subsidiary Principal Collection Account (unless simultaneously reinvested in Collateral Investments or Eligible Investments as permitted under and in accordance with the requirements of Article 12 and this Article 10), as the case may be.

(e)      The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

Section 10.12.    Reports by Independent Accountants

(a)      Promptly after the Funding Date the Issuer shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the Accountants' Reports required under this Section 10.12. Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation. If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing. If the Issuer shall not have appointed a successor within 10 days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation. The fees of such Independent certified public accountants and its successor shall be payable by the Issuer or by the Trustee as provided in Sections 11.1.

(b)      On or before March 15 of each year (commencing in 2008), the Issuer shall cause to be delivered to the Trustee, the Preference Share Paying Agent, the Collateral Manager and each Rating Agency an Accountants' Report specifying the procedures applied and their associated findings with respect to (i) the Note Valuation Reports delivered during the one-year period ending on such date, (ii) the Redemption Date Statements, if any, delivered during such one-year period, (iii) the Aggregate Principal Balance of the Collateral Investments securing the Notes as of the Determination Date immediately preceding such date, (iv) the remaining Scheduled Distributions on the Pledged Collateral Investments during the next Due Period, (v) the amount of principal of, and interest on, each Note estimated to be paid on the next Payment Date, (vi) the amount of any Hedge Termination Amount that would have been payable to the Issuer on the Determination Date immediately preceding such date and (vii) whether each Hedge Counterparty (if any) is in compliance with any collateralization obligations under the Hedge Agreements.

(c)      Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee upon written request therefor by a Holder of a Note shown on the Note Register, to such Holder (or its designee).

Section 10.13.    Reports to Rating Agencies, Etc.

In addition to the information and reports specifically required to be provided to the Rating Agencies pursuant to the terms of this Indenture, the Issuer (or the Collateral Manager on behalf of the Issuer) shall provide or procure to provide the Rating Agencies with (a) all information or reports delivered to the Trustee hereunder, (b) such additional information as the Rating Agencies may from time to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense, (c) notice of any waiver given pursuant to Section 5.14, (d) notice of any amendment or termination of any Transaction Document to which it is a party and (e) notice of any material breach by the Issuer under the Management Agreement, the Collateral

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001930

- 178 -

Administration Agreement, the Hedge Agreements or the Note Purchase Agreements (provided that, in the case of notices required to be provided by the Collateral Manager under this clause (e), the Collateral Manager has actual knowledge of such material breach).

        The Issuer shall promptly notify the Trustee and the Collateral Manager if the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.

## ARTICLE 11

## APPLICATION OF MONIES

    Section 11.1.   Disbursements of Monies from Payment Account

       (a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Sections 9.5 and 13.1, on each Payment Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(i) as follows and for application by the Trustee in accordance with the following priorities:

         (i)     On each Payment Date, Interest Proceeds with respect to the related Due Period shall be applied as follows:

           (A)     to the payment of Administrative Expenses constituting taxes, registration fees and filing fees owing by the Zohar Obligors (as certified by an Authorized Officer of the applicable Zohar Obligor or of the Collateral Manager to the Trustee);

           (B)     (1) first, to the payment or reimbursement of accrued and unpaid Administrative Expenses constituting the Trustee's fees pursuant to the Trustee Fee Letter; and (2) second, to the payment or reimbursement of other accrued and unpaid Administrative Expenses (in the following order) constituting fees, unpaid expenses or indemnities of the Trustee under this Indenture, of the Collateral Administrator under the Collateral Administration Agreement, of the Administrator under the Administration Agreement, of the Preference Share Paying Agent, of the Preference Share Registrar under the Preference Share Paying Agency Agreement and of the Rating Agencies; provided that payments pursuant to clause (1) above shall be limited to an amount not to exceed the sum of 0.01% of the Quarterly Asset Amount with respect to such Payment Date plus U.S.$7,500 and payments pursuant to clause (2) above shall be limited to an amount not to exceed U.S.$117,500;

           (C)     if such date is prior to the date on which amounts on deposit in the Expense Account are transferred to the Issuer Principal Collection Account pursuant to Section 10.6 and if the Balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$400,000, for deposit into the Expense Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Expense Account, immediately after such deposit, to equal U.S.$400,000; provided that the amount so deposited on any Payment Date shall not exceed U.S.$200,000;

           (D)     to the pro rata payment of (i) the Senior Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC          PP001931

Senior Collateral Management Fee owed with respect to any prior Payment Date (provided that, if such Payment Date is on or prior to the Ramp Up End Date, no payment may be made under this clause (D)(i) to the extent the inclusion of such payment would cause the amounts payable in clauses (E) and (F) not to be paid in full) and (ii) prior to the date on which amounts on deposit in the Professional Fee Account are transferred to the Issuer Principal Collection Account pursuant to Section 10.6 and if the balance in the Professional Fee Account is less than U.S.$1,500,000, for deposit into the Professional Fee Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Professional Fee Account, immediately after such deposit, to equal U.S.$1,500,000; provided that the amount so deposited on any Payment Date shall not exceed 0.0375% of the Aggregate Principal Balance of all Pledged Collateral Investments on such Determination Date;

(E)     if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (exclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party);

(F)     first, to the pro rata payment of (i) the Class A-1 Interest Distribution Amount for such Payment Date, (ii) the Class A-1R Commitment Fee Amount for such Payment Date and (iii) the Class A-1D Commitment Fee Amount for such Payment Date, second, to the payment of the Class A-2 Interest Distribution Amount and, third, to the payment of the Class A-3 Interest Distribution Amount;

(G)     on the Initial Payment Date and each Payment Date thereafter, to the payment of the Senior Collateral Management Fee due on such Payment Date and not paid above and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date (provided that no payment may be made under this clause (G) on any Payment Date to the extent the inclusion of such payment would cause the Class A Interest Coverage Ratio Test not to be satisfied (calculated on a pro forma basis as of such Determination Date after giving effect to such application));

(H)     if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Class A Note Reduction Amount" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a pro forma basis as of such Determination Date after giving effect to such application) and, in the case of a Rating Confirmation Failure will be applied as follows (provided that if there is a Post-Ramp Up Plan, only to the extent specified therein):

(1)     first, to the Class A-1 Notes as follows:

(x)     an amount equal to the Class A-1R Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001932

- 180 -

(y)    an amount equal to the Class A-1T Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)    an amount equal to the Class A-1D Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (H)(1) is less than the Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (x), (y) and (z) above ratably in accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)    second, any remaining portion of the Class A Note Reduction Amount will be applied to repay the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full;

(3)    third, any remaining portion of the Class A Note Reduction Amount will be applied to repay the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(I)    to the payment, first, of any amounts described in clause (B) above in the same order of priority to the extent not paid thereunder as a result of the dollar limitation set forth in such clause and, second, of any Administrative Expenses (to the extent not paid in full by application of amounts from the Expense Account, the Closing Expense Account or the Professional Fee Account on such Payment Date); provided that the aggregate amount applied pursuant to this clause (I) on any Payment Date shall not exceed U.S.$200,000;

(J)    to the payment of the Class A-1R Note Agent Fee due on such Payment Date and to the payment of any accrued and unpaid Class A-1R Note Agent Fee owed on any prior Payment Date;

(K)    for application as follows:

(1)    first, for deposit in the Preference Share Distribution Account in an aggregate amount equal to the sum of the Specified Realized Gain Amounts received during such Due Period; and

(2)    second, if the Class A Coverage Tests are satisfied as of the related Determination Date, no Rating Confirmation Failure with respect to the Class A Notes has occurred and is continuing and no Event of Default has occurred and is continuing:

(I)    first, for deposit in the Preference Share Distribution Account; provided that (x) the aggregate amount deposited in the Preference Share Distribution Account pursuant to this clause (I) on all Payment Dates from the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001933

- 181 -

Funding Date through and including such Payment Date shall not exceed an amount equal to U.S.$5,625,000 multiplied by (A) the number of such Payment Dates (including such Payment Date) plus (B) one; and (y) the aggregate amount deposited in the Preference Share Distribution Account for all Payment Dates pursuant to this clause (I) shall not in any event exceed U.S.$45,000,000; and

(II)    second, if U.S.$45,000,000 has been deposited in the Preference Share Distribution Account pursuant to clause (I) above, pro rata to the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date;

provided that for purposes of calculating the Class A Overcollateralization Ratio Test for this clause (K)(2) only, the Principal Balance of a Collateral Investment shall not include any principal amount representing previously deferred or capitalized interest;

(L)    during the Reinvestment Period, for deposit to the Issuer Principal Collection Account in the amount (if any) specified by the Collateral Manager for application to acquire or originate Collateral Investments in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein as Eligible Investments or, at the discretion of the Collateral Manager, to repay principal of the Class A-1R Notes on such Payment Date);

(M)    after the Reinvestment Period:

(1)    first, an amount equal to the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes will be applied as follows:

(x)    an amount equal to the Class A-1R Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(y)    an amount equal to the Class A-1T Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)    an amount equal to the Class A-1D Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (M)(1) is less than the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes, then the funds available will be applied under clauses (x), (y) and (z) above ratably in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001934

accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)      second, to be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)      third, to be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(N)      after the Reinvestment Period, first, to the payment of principal of the Class B Notes until the principal of each such Note has been paid in full and, second, to the payment of principal of the Class C Notes until the principal of each such Note has been paid in full;

(O)      after the Reinvestment Period, to the payment of the amounts referred to in clause (I) above and in same order of priority (without regard to any Dollar limitation specified therein, but only to the extent not previously paid in full);

(P)      after the Reinvestment Period, if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (inclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party and any other amount owing in respect of such Hedge Agreement and not paid under clause (E) above); and

(Q)      after the Reinvestment Period, the remainder (other than the Excluded Property) for deposit to the Preference Share Distribution Account.

(ii)      On each Payment Date, Principal Proceeds transferred to the Payment Account with respect to such Payment Date shall be distributed in the following order of priority (immediately following the applications of Interest Proceeds referred to in the foregoing clause (i)):

(A)      first, after the Reinvestment Period, for deposit in the Class A-1R Future Funding Reserve Account in an amount equal to the Net Aggregate Exposure Amount (if any) on such Payment Date and, second, for deposit in the Issuer Principal Collection Account in an amount equal to the excess (if any) of (1) the Unfunded Portfolio Amount as of the related Determination Date over (2) the sum of (w) the Aggregate Undrawn Amount of the Class A-1R Notes as of such date as reported by the Class A-1R Note Agent to the Trustee (determined immediately after giving effect to any reductions in the Class A-1R Commitments to occur on such date pursuant to Sections 9.5 and 9.6); plus (x) the Aggregate Undrawn Amount of the Class A-1D Notes as of such date as reported by the Class A-1D Note Agent to the Trustee (determined after giving effect to the expiration of the Class A-1D Commitments on or prior to such date pursuant to Section 9.5); plus (y) the Balance on deposit in the Unfunded Revolver Discount Account on such date; plus (z) the Balance on deposit in the Class A-1R Future Funding Reserve Account (to be retained in the Issuer Principal Collection Account for application to fund

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001935

Unfunded Portfolio Amounts or, at the discretion of the Collateral Manager, to repay principal of the Class A-1R Notes on such Payment Date);

(B)    to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i);

(C)    if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Remaining Class A Note Reduction Amount" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a pro forma basis as of such Determination Date after giving effect to such application and any application of funds under Section 11.1(a)(i)(H) on such Payment Date) and, in the case of a Rating Confirmation Failure, to the extent specified in the related Post-Ramp Up Plan, will be applied as follows:

(1)    first, to the Class A-1 Notes as follows:

(x)    an amount equal to the Class A-1R Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(y)    an amount equal to the Class A-1T Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)    an amount equal to the Class A-1D Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (C)(1) is less than the Remaining Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (x), (y) and (z) above ratably in accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)    second, any remaining portion of the Remaining Class A Note Reduction Amount will be applied to repay the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001936

(3)      third, any remaining portion of the Remaining Class A Note Reduction Amount will be applied to repay the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(D)      if any Class A Notes are Outstanding or any Class A-1R Commitments or any Class A-1D Commitments have not expired, terminated, or been reduced to zero, for deposit to the Issuer Principal Collection Account in an amount sufficient to cause the aggregate amount on deposit therein to equal the Cash Retention Amount for such Payment Date;

(E)      during the Reinvestment Period, for deposit to the Issuer Principal Collection Account (for application to acquire or originate Collateral Investments in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein as Eligible Investments or, at the discretion of the Collateral Manager, to repay principal of the Class A-1R Notes on such Payment Date);

(F)      after the Reinvestment Period:

(1)      first, an amount equal to the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes will be applied as follows:

(x)      an amount equal to the Class A-1R Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(y)      an amount equal to the Class A-1T Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)      an amount equal to the Class A-1D Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (F)(1) is less than the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes, then the funds available will be applied under clauses (x), (y) and (z) above ratably in accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)      second, to be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001937

(3)    third, to be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(G)    after the Reinvestment Period, to the payment of the amounts referred to in clauses (I) through (J) of Section 11.1(a)(i) (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i);

(H)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1R Commitments and the Class A-1D Commitments have expired, terminated or been reduced to zero, first, to the payment of outstanding principal of the Class B Notes until the principal of the Class B Notes has been paid in full and, second, to the payment of outstanding principal of the Class C Notes until the principal of the Class C Notes has been paid in full and, third, to the payment of accrued and unpaid Additional Amounts; and

(I)    after the Reinvestment Period, any remaining Principal Proceeds (other than the Excluded Property) to the payment of the amounts referred to in clauses (O), (P) and (Q) of Section 11.1(a)(i) (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i).

(b)    Except as otherwise expressly provided in Section 11.1(a), if on any Payment Date, the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by any clause of the Priority of Payments specified therein, the Trustee will make the disbursements called for by such clause ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 11.2.    Disbursements of Monies from Rollover Proceeds Account

(a)    Upon receipt of an Issuer Order pursuant to Section 12.1, the Trustee shall apply amounts on deposit in the Rollover Proceeds Account to acquire Exchanged Securities on behalf of the Issuer or the Zohar Subsidiary and subject to the terms of Section 12.1(c).

(b)    The Collateral Manager shall calculate the amount of funds deposited into and withdrawn from the Rollover Proceeds Account on a "first-in/first-out" basis, and shall notify the Trustee promptly of the amount of any funds that are (based on such calculations) held in or credited to the Rollover Proceeds Account for a period in excess of 60 days. Promptly upon receipt of such notice, the Trustee shall withdraw from the Rollover Proceeds Account the amount of any funds that have been held in the Rollover Proceeds Account for a period in excess of 60 days and shall deposit such amount in the Issuer Principal Collection Account.

(c)    Without limiting clause (a) above, the Collateral Manager may in its discretion, by Issuer Order, direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Rollover Proceeds Account to the Issuer Principal Collection Account from time to time to fund Unfunded Amounts in respect of Collateral Investments that are Revolving Collateral Investments and Delayed Funding Collateral Investments.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001938

- 186 -

Section 11.3.    Disbursements of Monies from Unfunded Revolver Discount Account

(a)    The Trustee shall apply amounts on deposit in the Unfunded Revolver Discount Account to extend credit in respect of Collateral Investments that are Revolving Collateral Investments and Delayed Funding Collateral Investments to the extent specified in Section 9.7.

(b)    If on any Determination Date the Balance on deposit in the Unfunded Revolver Discount Account exceeds the sum of the Discount Amounts remaining with respect to the Unutilized Commitments as of such date, then the Collateral Manager, by Issuer Order, may direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Unfunded Revolver Discount Account to the Issuer Principal Collection Account in an aggregate amount equal to such excess (or such lesser amount as the Collateral Manager may specify in such Issuer Order), provided that after giving effect to such transfer no Commitment Shortfall would exist.  For purposes of this Section 11.3, the Discount Amount for any Collateral Investment that is a Revolving Collateral Investment or a Delayed Funding Collateral Investment will be deemed reduced (but in no event to an amount less than zero) by amounts (without duplication) equal to the portion of the Unutilized Commitment of such Collateral Investment that has been funded in accordance with Section 9.7(a)(i) and the aggregate amount of Commitment Reductions that have been applied in respect of such Collateral Investment.

Section 11.4.    Disbursements of Monies from Class A-1R Future Funding Reserve Account

(a)    The Trustee shall apply amounts on deposit in the Class A-1R Future Funding Reserve Account to extend credit in respect of Collateral Investments that are Revolving Collateral Investments and Delayed Funding Collateral Investments to the extent specified in Section 9.7.

(b)    If on any Determination Date the Balance on deposit in the Class A-1R Future Funding Reserve Account exceeds the sum of the Discount Amounts remaining with respect to the Unutilized Commitments as of such date, then the Collateral Manager, by Issuer Order, may direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Class A-1R Future Funding Reserve Account to the Issuer Principal Collection Account in an aggregate amount equal to such excess (or such lesser amount as the Collateral Manager may specify in such Issuer Order), provided that after giving effect to such transfer no Commitment Shortfall would exist.

Section 11.5.    Trust Accounts

All Monies held by, or deposited with, the Trustee in any Account pursuant to the provisions of this Indenture, and not invested in Collateral Investments or Eligible Investments as herein provided, shall be deposited in one or more segregated trust accounts, maintained at a financial institution whose long-term rating is at least "Baa1" by Moody's and at least "BBB+" by Standard & Poor's and has capital and surplus of at least U.S.$200,000,000, to be held in trust for the benefit of the Secured Parties. Except with respect to amounts on deposit in the Payment Account, to the extent Monies deposited in a trust account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States, such excess shall be invested in Eligible Investments.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001939

### ARTICLE 12

### ACQUISITION, ORIGINATION AND SALE OF COLLATERAL INVESTMENTS AND EQUITY SECURITIES

Section 12.1.    Acquisition and Origination of Collateral Investments and Equity Securities; Eligibility Criteria

(a)    Subject to Sections 12.1(b) and 12.3, during the Reinvestment Period, an obligation or security to be Granted to the Trustee (including, without limitation, on the Funding Date), shall be eligible for inclusion in the Collateral as a Pledged Collateral Investment (and the Issuer will be entitled to enter into a commitment to acquire or originate such obligation or security in order to be Granted to the Trustee for inclusion in the Collateral as a Pledged Collateral Investment) by application of amounts referred to in Section 9.7 only if, as evidenced by an officer's certificate of an Authorized Officer of the Issuer or the Collateral Manager delivered to the Trustee, the following conditions (the "Eligibility Criteria") are satisfied at the time such commitment to purchase or originate such Collateral Investment is made and after giving effect thereto (and, if applicable, treating all other Collateral Investments that the Issuer or the Zohar Subsidiary has committed to purchase or originate at such time as being owned by the Issuer or the Zohar Subsidiary, as applicable, it being understood however that the Eligibility Criteria shall be determined on a commitment-by-commitment basis without aggregating block trades of Collateral Investments):

(1)    such obligation or security is a Collateral Investment (including an attached Equity Kicker);

(2)    such Collateral Investment provides for a fixed amount of principal payable in Cash no later than its Stated Maturity;

(3)    such Collateral Investment is not payable or denominated in, or convertible into an obligation or security denominated in, a currency other than U.S. Dollars or a Non-Dollar Currency;

(4)    (A) such Collateral Investment is not an inverse floater; and (B) not more than 10% of the Maximum Investment Amount may consist of Collateral Investments that bear interest at a rate that increases or decreases solely as a function of the passage of time;

(5)    such Collateral Investment provides for periodic payments of interest in Cash at least semi-annually;

(6)    on or after the Effective Target Date, the criteria specified for the highest numerical Case where all such criteria are satisfied immediately prior to such investment must remain satisfied (or, if there is no Case where all of the criteria specified therefor are satisfied immediately prior to such investment, the extent of compliance with each of the criteria specified for Case I must be maintained or improved);

(7)    such Collateral Investment, if debt, is Registered;

(8)    such Collateral Investment is a loan of a U.S. private issuer, payable only in the United States and governed by the laws of a state of the United States, provided, however, that up to 30% (in the aggregate) of the Maximum Investment Amount may consist of obligations issued by obligors Domiciled in, and such Collateral Investments may be governed by the laws of, any

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001940

- 188 -

of the Specified Countries so long as such applicable country (x) does not impose foreign exchange controls and (y) has a sovereign credit rating of at least "Aa2" by Moody's and at least "AA" by Standard & Poor's (subject to clause (34) below);

(9)    (x) such Collateral Investment is not an Equity Security (other than an attached Equity Kicker); (y) such Collateral Investment is not convertible or exchangeable into any Equity Security (other than at the sole option of the holder thereof); and (z) not more than 10.0% of the Maximum Investment Amount may consist of Collateral Investments that are convertible or exchangeable into Equity Securities at the sole option of the holder thereof;

(10)    unless such Collateral Investment is a Revolving Collateral Investment or a Delayed Funding Collateral Investment, such Collateral Investment does not require the Issuer to make future advances to (or on behalf of) the obligor or issuer under the related Underlying Instruments (other than the customary expense reimbursements and indemnifications contained in the Underlying Instruments);

(11)    such Collateral Investment is not an Asset-backed Security;

(12)    such Collateral Investment is not an obligation to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof;

(13)    not more than 30% of the Maximum Investment Amount may consist of Collateral Investments denominated in Euros and not more than 5.0% of the Maximum Investment Amount may consist of Collateral Investments denominated in Canadian dollars; provided that (A) Revolving Collateral Investments and Delayed Funding Collateral Investments must be denominated in U.S. Dollars and (B) as a condition to the purchase or origination of any Collateral Investment denominated in Euros, the Issuer or the Zohar Subsidiary, as applicable, will be required to enter into a Currency Hedge Agreement;

(14)    such Collateral Investment is not a loan which is a swap, option, forward, credit-linked note or other derivative contract;

(15)    (x) such Collateral Investment is not a security whose repayment is not primarily subject to material non-credit related risk (for example, a Collateral Investment the payment of which is expressly contingent upon the non-occurrence of a catastrophe), as determined in the sole judgment of the Collateral Manager, exercised in accordance with the standard of care set forth in the Management Agreement; and (y) no rating assigned by Standard & Poor's to such Collateral Investment includes the subscript "r", "t", "p", "pi" or "q";

(16)    if such Collateral Investment is in the form of a Participation Interest, (x) the Selling Institution is at the time of the purchase of such Participation Interest a financial institution (including a securities broker or an Affiliate thereof) or other institutional lender with long-term unsecured debt ratings (or the parent of which has ratings) of at least "A2" from Moody's and "A" from Standard & Poor's or (y) the Selling Institution is an Ark Seller and, in either case (x) or (y), the conditions in clause (33) below are satisfied;

(17)    the acquisition or origination of such Collateral Investment will not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act and if the issuer of such Collateral Investment is excepted from the definition of an "investment company" solely by reason of Section 3(c)(1) of the Investment

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001941

Company Act, then either (x) such Collateral Investment does not constitute a "voting security" for purposes of the Investment Company Act or (y) the aggregate amount of such Collateral Investment held by the Issuer and/or the Zohar Subsidiary is less than 10% of the entire issue of such security;

(18)     on or after the Ramp Up End Date, the Class A Coverage Tests are satisfied (or, if any Class A Coverage Test is not satisfied, compliance with such Class A Coverage Test is maintained or improved);

(19)     on or after the Ramp Up End Date, each of the Collateral Quality Tests is satisfied or, if immediately prior to such investment any such Collateral Quality Test was not satisfied, the extent of compliance with such Collateral Quality Test must be maintained or improved;

(20)     no Commitment Shortfall would exist;

(21)     such Collateral Investment is not the subject of an all Cash Offer for all of the outstanding loans under the related Underlying Instruments, provided, however, that this requirement shall not apply to acquisitions effected pursuant to an active strategy of the Issuer and/or the Zohar Subsidiary (or the Collateral Manager on behalf of the Issuer and/or the Zohar Subsidiary) involving the acquisition of Collateral Investments to gain or maintain control of a bank group (or similar constituency);

(22)     such Collateral Investment matures on or prior to the earlier of (A) the date 7 years after the date of such investment and (B) the Stated Maturity of the Class A Notes;

(23)     (A) the obligor on such Collateral Investment is not principally engaged in real estate development or related activities; and (B) not more than 50% of the Maximum Investment Amount may consist of Collateral Investments that are Principally Secured Assets;

(24)     such Collateral Investment is not a security issued by a collateralized debt obligation vehicle;

(25)     the Issuer or the Zohar Subsidiary is an eligible assignee with respect to such Collateral Investment under the related Underlying Instruments, and the pledge of such Collateral Investment under this Indenture is permitted under such Underlying Instrument;

(26)     not more than 3.0% of the Maximum Investment Amount may consist of obligations issued by any single issuer or any of its Affiliates; provided that up to five issuers may each constitute up to 5.0% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 7.5% of the Maximum Investment Amount and (without duplication) one issuer may constitute up to 9.0% of the Maximum Investment Amount (in each case, including any Unfunded Amounts in respect thereof);

(27)     not more than 5.0% of the Maximum Investment Amount may consist of Collateral Investments that are Defaulted Investments (for the avoidance of doubt, the value of each Defaulted Investment for purposes of this clause (27) shall be the Principal Balance of such Defaulted Investment);

(28)     not more than 30% of the Maximum Investment Amount may consist of Collateral Investments that are Revolving Collateral Investments (including any Unfunded

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001942

- 190 -

Amounts in respect thereof) and Delayed Funding Collateral Investments (but only with respect to the Unfunded Amounts in respect thereof);

(29)    not more than 10% of the Maximum Investment Amount may consist of Fixed Rate Obligations;

(30)    not more than 5.0% of the Maximum Investment Amount may consist of Collateral Investments that (i) are Floating Rate Obligations and (ii) do not have an interest option based on either a LIBO Rate or the "prime rate" (excluding any Non-Current Collateral Investments);

(31)    [reserved];

(32)    not more than 15% of the Maximum Investment Amount may consist of obligations that pay interest less frequently than quarterly (excluding any Non-Current Collateral Investments);

(33)    [reserved];

(34)    not more than 20% of the Maximum Investment Amount may consist in the aggregate of (a) Collateral Investments issued by obligors Domiciled in, or governed by the laws of, any Specified Country that has a sovereign credit rating less than "Aa2" by Moody's or a sovereign credit rating less than "AA" by Standard & Poor's and (b) Participation Interests;

(35)    not more than 12% of the Maximum Investment Amount may consist of Collateral Investments issued by obligors that fall within the same Moody's Industry Classification Group (provided that up to 3 Industry Classification Groups may each constitute up to 16% of the Maximum Investment Amount);

(36)    not more than 12% of the Maximum Investment Amount may consist of Collateral Investments issued by obligors that fall within the same Standard & Poor's Industry Classification Group (provided that up to 3 Industry Classification Groups may each constitute up to 16% of the Maximum Investment Amount);

(37)    such Collateral Investment has an Investment Weighted Average Life of less than or equal to 6.0 years;

(38)    [reserved];

(39)    the Purchase Price of such Collateral Investment does not exceed the Outstanding Principal Balance thereof plus accrued and unpaid interest thereon;

(40)    such Collateral Investment has a Moody's Rating and a Standard & Poor's Rating;

(41)    not more than 10% of the Maximum Investment Amount may consist of Second Lien Collateral Investments;

(42)    none of the Collateral Investments, when initially acquired or originated by the Issuer or the Zohar Subsidiary, may consist of subordinated loans or interests (other than Senior

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                           PP001943

Secured Collateral Investments and Second Lien Collateral Investments, but only to the extent permitted in the definitions thereof);

      (43)    [reserved];

      (44)    not more than 40% of the Maximum Investment Amount may consist of Collateral Investments rated "Caa1" or less by Moody's or "CCC+" or less by Standard & Poor's; and not more than 20% of the Maximum Investment Amount may consist of Collateral Investments rated "Caa3" or less by Moody's or "CCC-" or less by Standard & Poor's

      (45)    [reserved];

      (46)    the assets owned or held by the Zohar Subsidiary do not exceed 40% of the total assets (determined on a consolidated basis) owned or held by the Co-Issuers and the Zohar Subsidiary;

      (47)    the Aggregate Participation Exposure of Collateral Investments entered into with, or issued by (a) a single Selling Institution (or its Affiliates) may not exceed (as a percentage of Total Capitalization) the "Individual Selling Institution/Counterparty Limit" opposite the rating of such Selling Institution as set forth in the definition of "Standard & Poor's Bivariate Risk Table" and (b) Selling Institutions (or their respective Affiliates) having the same credit rating may not exceed (as a percentage of Total Capitalization) the "Aggregate Selling Institution/Counterparty Limit" opposite such rating as set forth in the definition of "Standard & Poor's Bivariate Risk Table"; and

      (48)    not more than 10% of the Maximum Investment Amount may consist of Current Pay Investments.

      (b)    On or after the Funding Date, if the Issuer (or the Collateral Manager on the Issuer's behalf) has previously entered into a commitment to acquire or originate an obligation or security for inclusion in the Collateral as a Pledged Collateral Investment, then the Issuer need not comply with any of the Eligibility Criteria on the date of such Grant if (i) such obligation or security complied with each of the Eligibility Criteria on the date on which the Issuer (or the Collateral Manager on the Issuer's behalf) entered into such commitment (as if the date of such Grant referred to above were the date of such commitment) and (ii) the Collateral Manager reasonably believed at the time such commitment was entered into that such obligation or security would comply with each of the Eligibility Criteria at the time of settlement. For purposes of determining satisfaction of the Eligibility Criteria, each Class A Coverage Test and each Collateral Quality Test, any Collateral Investment with respect to which the Issuer (or the Collateral Manager on the Issuer's behalf) has previously entered into a commitment to acquire or originate shall be treated as being owned by the Issuer, so long as the settlement period does not exceed 90 days.

      The Trustee and the Issuer shall be entitled to rely conclusively and in good faith upon any certification made by the Collateral Manager pursuant to this Section 12.1.

      Notwithstanding the provisions of Section 12.1(a), (A) to the extent Cash on deposit in the Collection Accounts may be used to acquire or originate Collateral Investments in accordance with terms of this Indenture, such Cash may be invested in Eligible Investments at the direction of the Collateral Manager, pending acquisition or origination of Collateral Investments, (B) if an Event of Default shall have occurred and be continuing, no Collateral Investment may be acquired or originated unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such Event

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                        PP001944

- 192 -

of Default, (C) if the Collateral Manager shall have received notice that an event constituting "Cause" (as defined in the Management Agreement) shall have occurred and be continuing, no Collateral Investment may be acquired, originated or sold unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such event constituting "Cause", (D) to the extent that any one or more of the Eligibility Criteria in any of clauses (4)(B), (8), (9)(z), (13), (18), (23)(B), (26) through (36), (41) through (45) above are not met, the Issuer and/or the Zohar Subsidiary shall continue to be able to acquire or originate Collateral Investments to the extent any such unsatisfied Eligibility Criteria shall not be made worse (and any such Eligibility Criteria which has previously been satisfied shall not fail to be satisfied) after giving effect to such reinvestment and (E) Unrestricted Collateral Investments may be purchased or originated after the Issuer has obtained a Rating Confirmation following the Effective Target Date in compliance with Section 12.5 but without regard to the restrictions set forth in this Section 12.1, other than clauses (7), (17), 8(18), (19), (20), (23), (25) and (46) of Section 12.1(a) above, and Unrestricted Collateral Investments shall be ignored in determining compliance with percentage limits specified in the other clauses of Section 12.1(a).

(c)     The Issuer or the Zohar Subsidiary may (x) apply amounts on deposit in the Rollover Proceeds Account to an Exchanged Security (as provided in Section 11.2) or (y) exchange any Collateral Investment or Equity Security held by it for an Exchanged Security, provided that the Collateral Manager delivers to the Trustee a certificate on or prior to the date of acquisition or origination of such Exchanged Security stating that the following conditions are satisfied:

(i)     the Collateral Manager shall have determined (in its reasonable judgment) that the fair market value of such Exchanged Security equals or exceeds (A) in the case of clause (c)(x) above, the amount of funds applied from the Rollover Proceeds Account or (B) in the case of clause (c)(y) above, the fair market value of the predecessor Collateral Investment or Equity Security, in each case as of the date of acquisition or origination of such Exchanged Security;

(ii)     to the extent that the Exchanged Security is a Revolving Collateral Investment or a Delayed Funding Collateral Investment, after giving effect to such acquisition or origination no Commitment Shortfall would exist;

(iii)     the issuer in respect of such Exchanged Security is Domiciled in the United States or any State or other political subdivision thereof or in a Specified Country, and such Exchanged Security is denominated in the same currency as the predecessor Collateral Investment or Equity Security; and

(iv)     the Issuer has complied (or will comply) with the procedures set forth in Section 3.3(b) relating to the perfection of the Trustee's security interest in such Exchanged Security.

Notwithstanding anything herein to the contrary, the conditions of Sections 12.1(a) and (b) shall not apply to the acquisition or origination of any Exchanged Security.

(d)     Notwithstanding anything else contained herein or in any other Transaction Document, the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents hereby acknowledge and agree that (i) the Issuer has purchased the assets designated as the "Zohar I Assets" and the "Zohar II Assets" set forth in Schedule A-1 from Zohar CDO 2003-1, Limited and/or Zohar II CDO 2005-1, Limited (each an Affiliate of Patriarch Partners) with proceeds of Warehouse Advances, and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents hereby consent to such acquisitions at such prices and waive any and all conflicts of interest

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001945

relating thereto, and (ii) the Issuer and/or the Zohar Subsidiary shall (on or about the Funding Date) purchase the assets set forth in Schedule A-2 from the Ark Seller (an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2), and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents hereby consent to such acquisitions at such prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2) and waive any and all conflicts of interest relating thereto. The above described purchases and sales have been made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in Schedule A-1 and Schedule A-2, as applicable.

Section 12.2.    Sale of Collateral

(a)        Except as otherwise expressly permitted or required by this Indenture, neither the Issuer nor the Zohar Subsidiary will sell or otherwise dispose of any Collateral Investment or Equity Security; provided that, subject to satisfaction of any applicable conditions in Section 10.11, so long as (i) no Event of Default has occurred and is continuing and (ii) on or prior to the trade date for such sale the Collateral Manager has certified to the Trustee in writing that the conditions applicable to such sale set forth below has been satisfied, the Issuer or the Zohar Subsidiary (or the Collateral Manager on behalf of the Issuer or the Zohar Subsidiary, as applicable, acting pursuant to the Management Agreement) may direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing:

(i)        any Equity Security and Unrestricted Collateral Investment; and

(ii)        any Collateral Investment, so long as the conditions specified in any one or more of the following clauses (A), (B), (C), (D) or (E) are satisfied:

(A)        (x) none of the initial ratings of the Class A Notes have been reduced or withdrawn by Moody's or Standard & Poor's and (y) the Aggregate Principal Balance of all such sales of Collateral Investments for a given calendar year effected pursuant to this clause (A) does not exceed 15% of the Aggregate Principal Balance of all Pledged Collateral Investments as of the beginning of such year;

(B)        the Collateral Manager shall provide the Trustee, the Class A-1R Note Agent and the Preference Share Paying Agent written notice of such sale at least five Business Days' prior to the proposed date thereof, together with either (x) a description of two bona fide bids for such Collateral Investment or (y) a certification of the proposed sale price and a report of an Independent bond and/or loan pricing service (which certification may be in the form of a firm bid) confirming such sale price;

(C)        (x) the Issuer or the Zohar Subsidiary shall hold title to such Collateral Investment or, in the case of the sale of a Collateral Investment that is a Participation Interest, the Selling Institution shall hold title to the underlying loan, as part of a syndicated credit facility comprised of at least two lenders other than the Issuer, the Zohar Subsidiary or any investment fund managed by the Collateral Manager or any of their respective Affiliates; and

(y) one or more of such lenders (other than the Issuer, the Zohar Subsidiary or any investment fund managed by the Collateral Manager or any of their respective Affiliates) holding in excess of 50% of the principal amount of

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001946

loans under such credit facility approve the sale price of such Collateral Investment or such underlying loan (and, in the case of a sale of such underlying loan, upon such sale the entire net proceeds thereof attributable to the Participation Interest shall be remitted to the Issuer or the Zohar Subsidiary, as applicable, as the purchase price for the sale of such Participation Interest);

(D)    such Collateral Investment (or any portion thereof) is sold for a price equal to at least 85% of the par or face amount thereof (before giving effect to the amount of any reasonable and customary transfer fees and any customary discounts given in connection with the sale of an unfunded revolving loan commitment, the amount of such fees and discounts to be certified by the Collateral Manager to the Trustee); or

(E)    the Controlling Class consents to such sale.

(b)    After the Issuer has notified the Trustee of an optional redemption in accordance with Section 9.2, the Issuer (or the Collateral Manager on behalf of the Issuer, pursuant to the Management Agreement) may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, any Collateral Investment, Equity Security or other Collateral without regard to the foregoing limitations in Section 12.2(a); provided that:

(i)    the Sale Proceeds therefrom are used to pay certain expenses and redeem all of the Notes in whole but not in part pursuant to Sections 9.1(a) and (b), and upon any such sale the Trustee shall release such Collateral pursuant to Section 10.11;

(ii)    the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) such Collateral pursuant to this Section 12.2(b) unless:

(A)    the Collateral Manager certifies to the Trustee that (x) in its sole judgment based on calculations included in the certification (which shall include the sales prices of the Collateral), the Sale Proceeds from the sale of one or more of the Collateral (based on the criteria set forth in Section 9.1(b)(i) or (ii)) will be sufficient to pay the Redemption Price with respect to all the Notes pursuant to Section 9.1(a) and (y) an Independent bond and/or loan pricing service has confirmed (which confirmation may be in the form of a firm bid) the sales prices contained in the certification in clause (x) above (and attaching a copy of such confirmation); and

(B)    the Independent accountants appointed by the Issuer pursuant to Section 10.12 shall confirm the calculations made in clause (A)(x) above;

(iii)    all the Collateral to be sold pursuant to this Section 12.2(b) will be sold in accordance with the requirements set forth in Section 9.1(b)(i) or (ii), as applicable; and

(iv)    the Collateral Manager shall sell any Collateral pursuant to this Section 12.2(b) only at a price that in its sole judgment is commercially reasonable.

(c)    After the payment in full of the Notes (in connection with an optional redemption of the Notes or otherwise) and payment of, or establishment of a reasonable reserve (as determined by the Collateral Manager in its sole discretion) for, all other amounts payable under the Priority of Payments prior to the payment of any final distribution on the Preference Shares, the Issuer (or the Collateral Manager on behalf of the Issuer, pursuant to the Management Agreement) may at any time direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001947

- 195 -

writing, any Collateral Investment or Equity Security without regard to the foregoing limitations in Section 12.2(a) or Section 12.2(b), provided that the Collateral Manager shall sell any Collateral pursuant to this Section 12.2(c) only at a price that in its sole judgment is commercially reasonable.

(d)    Promptly following the Payment Date falling in March 2019, the Issuer and the Zohar Subsidiary, as applicable (or the Collateral Manager on behalf of the Issuer and the Zohar Subsidiary, pursuant to the Management Agreement), shall direct the Trustee in writing to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, all Collateral without regard to the foregoing limitations in Section 12.2(a) or Section 12.2(b); provided that:

(i)    the Issuer, the Zohar Subsidiary and the Collateral Manager shall not be required to direct the Trustee to sell any Collateral that has a stated final maturity occurring prior to the Stated Maturity of the Class A Notes if the Collateral Manager believes with reasonable certainty that such Collateral will be repaid on or prior to the maturity thereof for an aggregate price of not less than 90% of par; and

(ii)    the Collateral Manager shall sell any Collateral pursuant to this Section 12.2(d) only at a price that in its sole judgment is commercially reasonable.

(e)    Neither the Issuer nor the Zohar Subsidiary will sell any Revolving Collateral Investment or Delayed Funding Collateral Investment unless, concurrently with such sale, (i) the transferee agrees with the Issuer or the Zohar Subsidiary, as applicable (for the express benefit of the Issuer or the Zohar Subsidiary and the obligors on such Revolving Collateral Investment or Delayed Funding Collateral Investment, as the case may be) that the transferee will, from and after the consummation of such sale, perform all of the obligations of the Issuer or the Zohar Subsidiary, as applicable, as a bank or lender or counterparty under the Underlying Instruments in respect of Revolving Collateral Investment or Delayed Funding Collateral Investment, as the case may be, sold by the Issuer or the Zohar Subsidiary and (ii) by reason of the express terms of the relevant Underlying Instruments or by reason of the agreement of the Obligors on such Revolving Collateral Investment or Delayed Funding Collateral Investment (or their duly authorized representative), the Issuer or the Zohar Subsidiary, as applicable, shall be released from such obligations.

Section 12.3.    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Article or under Section 10.11 shall be conducted on an arm's-length basis for fair market value and in accordance with the requirements of the Management Agreement and applicable law, and, if effected with the Collateral Manager, the Issuer, the Zohar Subsidiary, or the Trustee, or any Affiliate of any of the foregoing shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so Affiliated. Notwithstanding anything herein to the contrary, the Issuer and/or the Zohar Subsidiary may acquire from the Collateral Manager or any Affiliate of the Collateral Manager for nominal consideration any Equity Security issued by an obligor on or an issuer of any Collateral Investment (or any Affiliate of such obligor or issuer) then held by the Issuer and/or the Zohar Subsidiary. By its purchase of any Note, each Noteholder shall be deemed to consent to all cross-transactions effected in accordance with this Section 12.3. Any principal transactions shall require the consent of a majority of the Board of Directors of the Issuer.

The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)    Upon any Grant pursuant to this Article, all of the Issuer's or the Zohar Subsidiary's right, title and interest to the applicable Pledged Obligation or Securities shall be Granted to

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001948

the Trustee pursuant to this Indenture and, if applicable, the Trustee shall receive such Pledged Obligation or Securities. The Trustee shall also receive, not later than the date of delivery of any Collateral Investment delivered after the Funding Date, (i) an Officer's certificate of the Collateral Manager certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is permitted by this Article, including, without limitation, the Eligibility Criteria, and (ii) an Officer's certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)       Notwithstanding anything contained in this Section 12.3 to the contrary, the Issuer and the Zohar Subsidiary shall have the right to effect any transaction made in accordance with the other provisions of this Indenture so long as such transaction has been consented to by a Majority of the Class A-1 Notes, a Majority of the Class A-2 Notes, a Majority of Class A-3 Notes and, if the Class B Notes are then rated by Standard & Poor's, a Majority of the Class B Notes, and of which each Rating Agency has been notified.

Section 12.4.       Foreign Currency Provisions.

(a)       As a condition to the purchase or origination of any Collateral Investment denominated in Euros, the Issuer or the Zohar Subsidiary, as applicable, will be required to enter into a Currency Hedge Agreement. At the direction of the Collateral Manager, the Trustee will from time to time establish such foreign currency accounts on behalf of the Issuer or the Zohar Subsidiary (each, a "Foreign Currency Account"), at the cost of the Zohar Obligors, as may be necessary or desirable to accommodate the payments to be made and received by the Issuer under the Non-Dollar Currency-denominated Collateral Investments and Currency Hedge Agreements.

(b)       For purposes of calculations under this Indenture (including determinations of the Collateral Quality Tests and the Coverage Tests), amounts denominated in a Non-Dollar Currency will be deemed to be equal to the relevant Dollar-Equivalent Amount as of the date of determination.

(c)       Amounts received in U.S. Dollars under Currency Hedge Agreements in respect of Interest Proceeds received in Euros shall constitute Interest Proceeds.

(d)       Amounts received in U.S. Dollars under Currency Hedge Agreements in respect of Principal Proceeds received in Euros shall constitute Principal Proceeds.

(e)       Payments under Currency Hedge Agreements shall only be made on Payment Dates, and all payments to be made by the Issuer thereunder shall be made only in accordance with the Priority of Payments. If at any time the Issuer is required to pay amounts under a Currency Hedge Agreement in Euros, but the Issuer has insufficient funds in such currency to make such payment, then, at the direction of the Collateral Manager, the Trustee shall (out of amounts available to be used for such purpose under the Priority of Payments) convert U.S. Dollars into Euros and remit such Euro payment to the Person or Persons entitled thereto.

(f)       The Trustee shall convert amounts received in any Non-Dollar Currency to U.S. Dollars upon receipt in accordance with its usual practice and deposit the proceeds of such conversion into the appropriate Account for application as provided herein, unless otherwise directed by the Issuer.

Section 12.5.       Unrestricted Collateral Investments.

(a)       After the Issuer has obtained a Rating Confirmation following the Effective Target Date, the Collateral Manager, on behalf of the Issuer, may, at the time any Collateral Investment (other than a Delayed Funding Collateral Investment or Revolving Collateral Investment) is acquired or

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001949

originated or committed to be acquired or originated by the Issuer, designate such Collateral Investment as an "Unrestricted Collateral Investment" by giving notice of such designation to the Issuer, the Trustee and each Rating Agency, provided that (1) after giving effect to such designation and the payment of the purchase price therefor, each of the Collateral Quality Tests and the Class A Coverage Tests are satisfied, the Class A Overcollateralization Ratio is greater than or equal to 125%, and the ratings on each Class of the Class A Notes by Moody's and Standard & Poor's shall be at or above the ratings on such Class on the Closing Date by such Rating Agency; and (2) Collateral Investments with an Aggregate Principal Balance of not more than 10% of the Maximum Investment Amount may at any time constitute Unrestricted Collateral Investments.

(b)     The Collateral Manager may, at any time, by written notice to the Issuer, the Trustee and the Rating Agencies, remove the "Unrestricted Collateral Investment" designation from any Unrestricted Collateral Investment, provided that no such redesignation shall occur if such redesignation would cause any Class A Coverage Test or Collateral Quality Test to fail to be in compliance immediately after giving effect thereto (or, if any such test is not so in compliance, the level of compliance with such tests are maintained or improved).

(c)     Unrestricted Collateral Investments will not be included in determining compliance with the Collateral Quality Tests or the Eligibility Criteria (other than as expressly stated in Article 12) and will be treated as having a Principal Balance equal to zero for purposes of the Class A Coverage Tests. For purposes of the Class A Interest Coverage Ratio Test, scheduled interest payments due on the Unrestricted Collateral Investments will be ignored until actually received (and net of taxes, if any).

ARTICLE 13

NOTEHOLDERS' RELATIONS

Section 13.1.     Subordination

(a)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class A-2 Notes, the Holders of the Class A-3 Notes, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A-1 Notes that the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A-1 Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-1 Notes shall be paid in full in Cash or, to the extent a Majority of the Class A-1 Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-1 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class A-1 Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class A-3 Notes, the Holders of the Class B Notes and the Holders of the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001950

- 198 -

Class C Notes agree for the benefit of the Holders of the Class A-2 Notes that the Class A-3 Notes, the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A-2 Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-2 Notes shall be paid in full in Cash or, to the extent a Majority of the Class A-2 Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-2 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class A-2 Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(c)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A-3 Notes that the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A-3 Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-3 Notes shall be paid in full in Cash or, to the extent a Majority of the Class A-3 Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-3 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class A-3 Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(d)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class B Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(e)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class C Notes that the Issuer's rights in and to the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                         PP001951

Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class C Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class C Notes shall be paid in full in Cash or, to the extent a Majority of the Class C Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class C Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(f)     In the event that, notwithstanding the provisions of this Indenture, any Holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until each Class of Senior Interests with respect thereto shall have been paid in full in Cash or, to the extent a Majority of such Class of Senior Interests consents, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Class of Senior Interests in accordance with this Indenture; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(g)     Each Holder of Subordinate Interests agrees with the Holders of the applicable Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including, without limitation, this Section 13.1; provided that (i) after the Class A-1 Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A-1 Notes, (ii) after the Class A-2 Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A-2 Notes, (iii) after the Class A-3 Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A-3 Notes and (iv) after the Class B Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class B Notes. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2.     Standard of Conduct

In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Issuer, or any other Person.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                            PP001952

- 200 -

Section 13.3.    Non-Petition

The Holders of Notes agree not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Holders of Class A Notes  (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Holders of Class A Notes, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

ARTICLE 14

ASSIGNMENT OF MANAGEMENT AGREEMENT AND
COLLATERAL ADMINISTRATION AGREEMENT, ETC.

Section 14.1.    Assignment

Each of the Issuer and the Zohar Subsidiary, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Noteholders hereunder and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's and the Zohar Subsidiary's estate, right, title and interest in, to and under the Management Agreement and (in the case of the Issuer) the Collateral Administration Agreement, including, without limitation, (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Manager or the Collateral Administrator, as applicable, thereunder, including the commencement, conduct and consummation of Proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer or the Zohar Subsidiary, as applicable, is or may be entitled to do thereunder; provided that the Trustee hereby grants to the Issuer and the Zohar Subsidiary a license to exercise all of the Issuer's and the Zohar Subsidiary's applicable rights pursuant to the Management Agreement and the Collateral Administration Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in Section 14.4), which license shall be and is hereby deemed to be automatically revoked (i) upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived, (ii) in the case of the Management Agreement, upon the occurrence of an event specified therein pursuant to which the Issuer is entitled to remove the Collateral Manager pursuant to Section 5.3 thereof or (iii) in the case of the Management Agreement, upon a default in the performance, or breach, of any covenant, representation, warranty or other agreement of the Collateral Manager thereunder or in any certificate or writing delivered pursuant thereto if Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of any Class give notice of such default or breach to the Trustee and the Collateral Manager and such default or breach (if remediable) continues for a period of 30 days.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                              PP001953

Section 14.2.    No Impairment

The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer or the Zohar Subsidiary under the provisions of the Management Agreement or (in the case of the Issuer) the Collateral Administration Agreement, nor shall any of the obligations contained in the Management Agreement or the Collateral Administration Agreement be imposed on the Trustee.

Section 14.3.    Termination, Etc.

Upon the redemption and cancellation of the Notes and the release of the Collateral from the lien of this Indenture, the collateral assignments described in this Article 14 and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Management Agreement and the Collateral Administration Agreement shall revert to the Issuer and (in the case of the Management Agreement) the Zohar Subsidiary and no further instrument or act shall be necessary to evidence such termination and reversion.

Section 14.4.    Assignment of Collateral Management Agreement and Collateral Administration Agreement

Each of the Issuer and the Zohar Subsidiary represents that it has not executed any other assignment of the Management Agreement. Each of the Issuer and the Zohar Subsidiary agrees that the collateral assignments described in this Article 14 are irrevocable, and that it will not take any action which is inconsistent with such assignments or make any other assignment inconsistent herewith. Each of the Issuer and the Zohar Subsidiary will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify. Each of the Issuer, the Zohar Subsidiary and the Collateral Manager hereby agrees to the following:

(a)    the Collateral Manager consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to the Collateral Manager;

(b)    the Collateral Manager acknowledges that the Issuer and the Zohar Subsidiary are assigning all of their respective right, title and interest in, to and under the Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Management Agreement are also for the benefit of the Trustee and the Secured Parties;

(c)    the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Management Agreement;

(d)    neither the Issuer nor the Collateral Manager will enter into any agreement amending, modifying or terminating the Management Agreement or selecting or consenting to a successor Collateral Manager, or objecting to prospective Approved Replacements under the Management Agreement, (i) without 10 days' prior notice to each Rating Agency, (ii) without 10 days' prior notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder), (iii) without the prior written confirmation of each Rating Agency that such amendment, modification or termination will not cause its rating of any Class of Notes to be

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001954

- 202 -

withdrawn or reduced below the rating effective on the Funding Date and (iv) if either (a) a Majority of each Class of Notes or (b) the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares) shall, by notice to the Issuer and the Trustee within 30 days after the date of the related notice to the Trustee given as provided in clause (ii) above, object to such amendment, modification or termination, object to such successor Collateral Manager or direct that the Issuer object to such Approved Replacement;

(e)      except as otherwise set forth herein and therein (including, without limitation, pursuant to Article V of the Management Agreement), the Collateral Manager shall continue to serve as Collateral Manager under the Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Management Agreement because sufficient funds were not then available hereunder to pay such amounts. The Collateral Manager agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Collateral Manager (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by any Zohar Obligor, as the case may be, or (b) any involuntary insolvency Proceeding filed or commenced against any Zohar Obligor by a Person other than the Collateral Manager, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding;

(f)      if the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the Noteholders and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment advisor that relates to any action to be taken with respect to any Pledged Obligation, then the Collateral Manager will perform its obligations with respect to any such conflict in accordance with Section 12.3(a) and with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict (provided that, to the extent that any provision of the Management Agreement specifically addresses the treatment of any conflict referred to in this clause (f), such conflict shall not be subject to this clause (f));

(g)      the Collateral Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Manager irrevocably agrees that all claims in respect of such action or Proceeding may be heard and determined in such New York State or federal court. The Collateral Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding. The Collateral Manager irrevocably consents to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager in Charlotte, North Carolina (so long as Patriarch Partners is the Collateral Manager). The Collateral Manager agrees that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001955

Section 14.5.    <u>Issuer and Collateral Administrator Agreements, Etc.</u>

The Issuer represents that it has not executed any other assignment of the Collateral Administration Agreement. The Issuer agrees that the assignment of the Collateral Administration Agreement under this Article 14 is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify. Each of the Issuer and the Collateral Administrator hereby agrees to the following:

(a)     the Collateral Administrator consents to the provisions of this assignment and agrees to perform the provisions of the Collateral Administration Agreement applicable to the Collateral Administrator;

(b)     the Collateral Administrator acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Administration Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Administrator agrees that all of the representations, covenants and agreements made by the Collateral Administrator in the Collateral Administration Agreement are also for the benefit of the Trustee and the Secured Parties;

(c)     the Collateral Administrator shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Administration Agreement;

(d)     the Collateral Administrator agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; <u>provided</u> that nothing in this clause shall preclude, or be deemed to stop, the Collateral Administrator (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Collateral Administrator, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding; and

(e)     the Collateral Administrator irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Administrator irrevocably agrees that all claims in respect of such action or Proceeding may be heard and determined in such New York State or federal court. The Collateral Administrator irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding. The Collateral Administrator irrevocably consents to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Administrator at LaSalle Bank National Association, having an address at 181 West Madison Street, 32nd Floor, Chicago, IL 60602, Attention: CDO Trust Services Group – Zohar III, Limited. The Collateral Administrator agrees that a final judgment in any such action or

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001956

Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

ARTICLE 15

HEDGE AGREEMENTS

Section 15.1.    Hedge Agreements

(a)    On any date which the Issuer enters into a Hedge Agreement, the Issuer shall assign it to the Trustee pursuant to this Indenture and a Collateral Assignment of Hedge Agreement. The Issuer shall not enter into any Hedge Agreement after the Funding Date unless it has obtained and delivered to the Trustee the written confirmation of each Rating Agency that the entry by the Issuer into such Hedge Agreement will not cause such Rating Agency's rating, if any, of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date. The Issuer shall not enter into a Hedge Agreement the payments under which are subject to withholding tax.

Each Hedge Agreement shall be governed by the laws of the State of New York.

(b)    Any amounts payable by the relevant Hedge Counterparty under any Interest Hedge Agreement shall be paid or deposited into the Issuer Interest Collection Account. Any amounts payable by the Issuer to the relevant Hedge Counterparty under any Interest Hedge Agreement upon entry into such Hedge Agreement by the Issuer on any date other than a Payment Date may be paid by the Issuer to such Hedge Counterparty by payment of amounts on deposit in the Issuer Principal Collection Account pursuant to Section 10.2.

Any amounts payable by the relevant Hedge Counterparty under any Currency Hedge Agreement shall be paid or deposited into the Issuer Interest Collection Account (to the extent of payments thereunder corresponding to the interest component of the related Euro-denominated Collateral Investment) and into the Issuer Principal Collection Account (to the extent of payments thereunder corresponding to the principal component of the related Euro-denominated Collateral Investment). Any amounts payable by the Issuer to the relevant Hedge Counterparty under any Currency Hedge Agreement upon entry into such Hedge Agreement by the Issuer on any date other than a Payment Date may be paid by the Issuer to such Hedge Counterparty by payment of amounts on deposit in the Issuer Principal Collection Account pursuant to Section 10.2.

(c)    The Trustee shall consent to any reduction in the notional amount of any Hedge Agreement requested by the Issuer at the direction of the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares); provided that, if any Notes are then Outstanding, the Issuer shall have requested and the Trustee shall first have received written confirmation from each Rating Agency that such reduction will not cause its rating, if any, of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date. Upon any such reduction, any amount paid to the Issuer by the relevant Hedge Counterparty pursuant to such Hedge Agreement shall constitute "Principal Proceeds".

(d)    Each Hedge Agreement will provide for termination on or prior to the Stated Maturity of the Class A Notes, and shall also be subject to termination, whether or not the Notes have been paid in full prior to such termination, upon the earliest to occur of (i) certain events of bankruptcy, insolvency, conservatorship, receivership or reorganization of the Issuer or the Hedge Counterparty party thereto, (ii) the failure on the part of the Issuer or such Hedge Counterparty to make any payment or

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001957

delivery under such Hedge Agreement within the applicable grace period, (iii) a Collateral Hedge Event, (iv) a Ratings Hedge Event and (v) a change in law the result of which is that it becomes illegal for either the Issuer or such Hedge Counterparty to be a party to, or perform its obligations under, the Hedge Agreement. The Issuer will give prompt written notice to each Rating Agency and the Trustee of any such termination or agreement to provide Hedge Counterparty Credit Support, as applicable. The Trustee shall, prior to the Funding Date, cause the Custodian to establish a segregated securities account, which shall be designated as the "Hedge Counterparty Collateral Account", which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties (other than the Hedge Counterparty pledging such Collateral) and in which no Person other than the Secured Parties shall have any legal or beneficial interest. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement in the Hedge Counterparty Collateral Account. Any and all funds at any time on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging such Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be (a) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (b) to return collateral to the relevant Hedge Counterparty when and as required by a Hedge Agreement.

(e)    If the Trustee has actual knowledge that a Hedge Counterparty has defaulted in the payment when due of its obligations to the Issuer under a Hedge Agreement, the Trustee shall make a demand on the Hedge Counterparty and/or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date (or by such time on the next succeeding Business Day if such knowledge is obtained after 11:30 a.m., New York time). The Trustee shall give notice to the Noteholders upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on the Hedge Counterparty.

(f)    If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer and the Trustee (acting at the direction of the Collateral Manager) shall take such actions (following the expiration of any applicable grace period and after the expiration of the two Business Day period referred to in Section 15.1(e)) to enforce the rights of the Issuer and the Trustee thereunder and under the Collateral Assignment of Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and the Issuer shall apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty) to enter into a replacement Hedge Agreement (upon termination of such existing Hedge Agreement or as soon as practicable thereafter, but in any event within 30 Business Days of the termination of such existing Hedge Agreement) on such terms as each Rating Agency may confirm in writing would not cause such Rating Agency's rating, if any, of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date. Any costs of the Issuer attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of the terminated Hedge Agreement shall be borne solely by the Issuer and shall constitute expenses payable from the Expense Account (provided that the foregoing will not limit the responsibility of any Hedge Counterparty to pay costs and expenses associated with any transfer of a Hedge Agreement in order to avoid the termination thereof). In determining the amount payable under a terminated Hedge Agreement, the Issuer will seek quotations from reference market-makers who satisfy the definition of "Hedge Counterparty". In addition, the Issuer will use its best efforts to cause the termination of a Hedge Agreement to become effective simultaneously with the entry into a replacement Hedge Agreement described as aforesaid.

(g)    Each Hedge Agreement shall provide that recourse in respect of any obligations of the Issuer under such Hedge Agreement shall be limited to the Collateral with payments applied in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001958

accordance with the Priority of Payments and on the exhaustion thereof all claims against the Issuer thereunder or any transactions contemplated thereby shall be extinguished.

(h)     Each Hedge Counterparty is an express third-party beneficiary of this Indenture. Each of the Issuer and the Trustee agrees that it will not, without the prior written agreement of the affected Hedge Counterparty, consent to any amendment, waiver, supplement, termination or other modification of this Indenture if the effect thereof is to diminish or impair the rights, interests or benefits of such Hedge Counterparty under or in respect of this Indenture or the Collateral.

## ARTICLE 16

## CLASS A-1R NOTE AGENT AND CLASS A-1D NOTE AGENT

Section 16.1.    Appointment of Class A-1R Note Agent

Each Holder of a Class A-1R Note, by its acceptance thereof, irrevocably appoints the Class A-1R Note Agent as its agent and authorizes the Class A-1R Note Agent to take such actions on its behalf and to exercise such powers as are delegated to the Class A-1R Note Agent by the terms of this Indenture, together with such actions and powers as are reasonably incidental thereto.

Section 16.2.    Certain Duties and Responsibilities

(a)     The Class A-1R Note Agent undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and the Class A-1R Note Purchase Agreement (including without limitation to give and receive notices expressly provided therein to be given and received by it).

(b)     In the absence of bad faith on its part, the Class A-1R Note Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates and other notices furnished to the Class A-1R Note Agent and conforming to the requirements of this Indenture; provided that, in the case of any such certificates which by any provision hereof are specifically required to be furnished to the Class A-1R Note Agent, the Class A-1R Note Agent shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not conform. If a corrected form shall not have been delivered to the Class A-1R Note Agent within 15 days after such notice from the Class A-1R Note Agent, the Class A-1R Note Agent shall so notify the Holders of the Class A-1R Notes.

(c)     No provision of this Indenture shall be construed to relieve the Class A-1R Note Agent from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this subsection shall not be construed to limit the effect of subsections (a) and (b) of this Section;

(ii)     the Class A-1R Note Agent shall not be liable for any error of judgment made in good faith by an Officer, unless it shall be proven that the Class A-1R Note Agent was negligent in ascertaining the pertinent facts; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001959

- 207 -

(iii)　no provision of this Indenture shall require the Class A-1R Note Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it unless such risk or liability relates to performance of its ordinary services under this Indenture.

(d)　For all purposes under this Indenture, the Class A-1R Note Agent shall not be deemed to have notice or knowledge of any Event of Default unless an Officer of the Class A-1R Note Agent has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Class A-1R Note Agent.

(e)　Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Class A-1R Note Agent shall be subject to the provisions of this Section.

Section 16.3.　　Compensation

(a)　The Issuer agrees:

(i)　to pay the Class A-1R Note Agent on each Payment Date, so long as the Class A-1R Notes are Outstanding or the Class A-1R Commitments shall not have not expired, terminated or been reduced to zero, and subject to the Priority of Payments, the Class A-1R Note Agent Fee together with interest on any overdue amounts thereof at the Federal Funds Rate (which fee, once paid, shall be non-refundable); and

(ii)　to indemnify the Class A-1R Note Agent and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of the duties of hereunder, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder.

(b)　The Class A-1R Note Agent shall, subject to the Priority of Payments, receive amounts pursuant to this Section 16.3 and Sections 11.1(a)(i) and (ii) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Class A-1R Note Agent will not, by itself, constitute an Event of Default. The Class A-1R Note Agent agrees not to institute against, or join any other Person in instituting against, any Zohar Obligor in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Class A-1R Note Agent (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Class A-1R Note Agent, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001960

- 208 -

Section 16.4.    Resignation and Removal; Appointment of a Successor

(a)    No resignation or removal of the Class A-1R Note Agent and no appointment of a successor Class A-1R Note Agent pursuant to this Article shall become effective until the acceptance of appointment by the successor Class A-1R Note Agent under Section 16.5.

(b)    The Class A-1R Note Agent may resign at any time by giving written notice thereof to the Co-Issuers, the Holders of the Class A-1R Notes, the Trustee, the Collateral Manager and each Rating Agency. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor Class A-1R Note Agent by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Class A-1R Note Agent so resigning and one copy to the successor Class A-1R Note Agent, together with a copy to each such Holder; provided that such successor Class A-1R Note Agent shall be appointed only upon the written consent of the Majority of the Class A-1R Notes and the Collateral Manager. If no successor Class A-1R Note Agent shall have been appointed and an instrument of acceptance by a successor Class A-1R Note Agent shall not have been delivered to the Class A-1R Note Agent within 30 days after the giving of such notice of resignation, the resigning Class A-1R Note Agent or any Holder of a Class A-1R Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Class A-1R Note Agent.

(c)    The Class A-1R Note Agent may be removed at any time by Act of a Majority of the Class A-1R Notes, delivered to the Class A-1R Note Agent, the Trustee, the Co-Issuers and the Collateral Manager.

(d)    If at any time the Class A-1R Note Agent shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Class A-1R Note Agent or of its property shall be appointed or any public officer shall take charge or control of the Class A-1R Note Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case (subject to Section 16.4(a)), (i) the Co-Issuers, by Issuer Order, may remove the Class A-1R Note Agent, or (ii) any Holder of a Class A-1R Note may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Class A-1R Note Agent and the appointment of a successor Class A-1R Note Agent.

(e)    If the Class A-1R Note Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Class A-1R Note Agent for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Class A-1R Note Agent. If the Co-Issuers shall fail to appoint a successor Class A-1R Note Agent within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Class A-1R Note Agent may be appointed by Act of the Holders of a Majority of the Class A-1R Notes delivered to the Issuer and the retiring Class A-1R Note Agent. The successor Class A-1R Note Agent so appointed shall, forthwith upon its acceptance of such appointment, become the successor Class A-1R Note Agent and supersede any successor Class A-1R Note Agent proposed by the Co-Issuers. If no successor Class A-1R Note Agent shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Class A-1R Note Agent.

(f)    The Co-Issuers shall give prompt notice of each resignation and each removal of the Class A-1R Note Agent and each appointment of a successor Class A-1R Note Agent by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, the Trustee, each Rating Agency and to the Holders of the Class A-1R Notes as their names and addresses appear in the Class A-1R Note Register. Each notice shall include the name and address of the successor Class A-

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP001961

1R Note Agent. If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Class A-1R Note Agent, the successor Class A-1R Note Agent shall cause such notice to be given at the expense of the Co-Issuers.

Section 16.5.    Acceptance of Appointment of a Successor

Every successor Class A-1R Note Agent appointed hereunder shall be reasonably acceptable to the Trustee and the Collateral Manager and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Class A-1R Note Agent an instrument accepting such appointment. No successor Class A-1R Note Agent may be appointed hereunder unless such Class A-1R Note Agent or an Affiliate shall then be the Holder of one or more Class A-1R Notes. Upon delivery of the required instruments, the resignation or removal of the retiring Class A-1R Note Agent shall become effective and such successor Class A-1R Note Agent, without any other act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of the retiring Class A-1R Note Agent; but, on request of the Co-Issuers or a Majority of the Class A-1R Notes or the successor Class A-1R Note Agent, such retiring Class A-1R Note Agent shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Class A-1R Note Agent all the rights, powers and trusts of the retiring Class A-1R Note Agent.

Section 16.6.    Appointment of Class A-1D Note Agent

Each Holder of a Class A-1D Note, by its acceptance thereof, irrevocably appoints the Class A-1D Note Agent as its agent and authorizes the Class A-1D Note Agent to take such actions on its behalf and to exercise such powers as are delegated to the Class A-1D Note Agent by the terms of this Indenture, together with such actions and powers as are reasonably incidental thereto.


ARTICLE 17

MISCELLANEOUS

Section 17.1.    Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of any Zohar Obligor or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of any Zohar Obligor or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of any Zohar Obligor, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the any Zohar Obligor, the Collateral Manager or such other Person, unless such Authorized Officer of any Zohar Obligor or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001962

- 210 -

of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of any Zohar Obligor, stating that the information with respect to such matters is in the possession of such Zohar Obligor, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of any Zohar Obligor, then notwithstanding that the satisfaction of such condition is a condition precedent to any Zohar Obligors' rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in Section 6.1(d).

Section 17.2.    Acts of Noteholders

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders or "Acts of Noteholders" signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 17.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 17.3.    Notices, etc., to Trustee, the Preference Share Paying Agent, the Zohar Obligors, the Collateral Manager, the Rating Agencies and the Hedge Counterparty

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001963

- 211 -

(a)     the Trustee by any Noteholder or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Trustee addressed to it at its Corporate Trust Office, Attention: CDO Trust Services Group, Ref: Zohar III, Limited, telephone number (312) 904-0283, or at any other address previously furnished in writing to the Co-Issuers or Noteholder by the Trustee;

(b)     the Preference Share Paying Agent by the Trustee or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Preference Share Paying Agent addressed to it at 181 West Madison Street, 32nd Floor, Chicago, IL 60602, Attention: CDO Trust Services Group, Ref: Zohar III, Limited, telephone number (312) 904-0283, or at any other address previously furnished in writing to the Co-Issuers or Trustee by the Preference Share Paying Agent;

(c)     the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: The Directors, telecopy no. (345) 945-7100, or at any other address previously furnished in writing to the Trustee by the Issuer;

(d)     the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Co-Issuer addressed to it at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopy no. (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(e)     the Zohar Subsidiary by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Zohar Subsidiary addressed to it at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopy no. (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(f)     the Collateral Manager by any Zohar Obligor or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Collateral Manager addressed to Patriarch Partners XV, LLC, c/o Patriarch Partners, LLC, 227 West Trade Street, Suite 1400, Charlotte, NC 28202, Attention: Lynn Tilton, telecopy no. (704) 375-0358, or at any other address previously furnished in writing to the Co-Issuers or the Trustee by the Collateral Manager;

(g)     the Rating Agencies by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, addressed to Moody's Investors Service, 99 Church Street, New

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001964

York, New York 10007, telecopy no. (212) 553-0355, Attention: CBO/CLO Monitoring and to Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041, telecopy no. 212-438-2664, Attention: Structured Finance Ratings, Asset-Backed Securities - CBO/CLO Surveillance, or via electronic mail to CDO_surveillance@standardandpoors.com (provided that each Monthly Report and Note Valuation Report and the Excel Default Model Input file to be delivered to Standard & Poor's shall be delivered to it via electronic email);

(h)    any Hedge Counterparty by any Zohar Obligor, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to such Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by such Hedge Counterparty; and

(i)    the Class A-1R Note Agent and the Class A-1D Note Agent by any Holder of a Class A-1R Note or Class A-1D Note, as applicable, or by any Zohar Obligor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Class A-1R Note Agent or the Class A-1D Note Agent, as the case may be, addressed to it at Natixis Financial Products Inc., 9 West 57th Street, New York, NY 10019, Facsimile: 646-282-2361, Attention: Primary contact: Yazmin Vasconez; Secondary contact: Evelyn Clarke, E-mail: agent_group@ixiscm.com, or at any other address previously furnished in writing to the Co-Issuers or the applicable Noteholders by the Class A-1R Note Agent or the Class A-1D Note Agent, as the case may be.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective: (i) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (ii) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); (iii) if sent by email, on the date that confirmation of receipt by the addressees thereof is obtained; and (iv) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

Section 17.4.    Notices and Reports to Noteholders; Waiver

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Notes of any event,

(a)    such report or notice shall be sufficiently given to Holders of Notes if (i) in writing and mailed, first class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, or (ii) in the case of Monthly Reports and Note Valuation Reports, posted to the Trustee's website, in each case not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice; and

(b)    such report or notice shall be in the English language.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001965

Such reports and notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Holder of any Note shown on the Note Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note shall affect the sufficiency of such notice with respect to other Holders of Notes.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 17.5.    Effect of Headings and Table of Contents

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 17.6.    Successors and Assigns

All covenants and agreements in this Indenture by the Zohar Obligors shall bind their respective successors and permitted assigns, whether so expressed or not.

Section 17.7.    Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 17.8.    Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Noteholders and each Hedge Counterparty, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 17.9.    Governing Law

THIS INDENTURE AND EACH NOTE AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001966

- 214 -

Section 17.10.   Submission to Jurisdiction

The Zohar Obligors/Co-Issuers hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Notes or this Indenture, and the Zohar Obligors hereby irrevocably agree that all claims in respect of such action or Proceeding may be heard and determined in such New York State or federal court.  The Zohar Obligors hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding.  The Zohar Obligors irrevocably consent to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Zohar Obligors' agent set forth in Section 7.2.  The Zohar Obligors agree that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 17.11.   Waiver of Jury Trial

THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 17.12.   Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.  Delivery of an executed counterpart by facsimile shall be effective as delivery of a manually delivered counterpart.

Section 17.13.   Judgment Currency

This is an international financing transaction in which the specification of Dollars (the "Specified Currency"), and the specification of the place of payment, as the case may be (the "Specified Place"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Notes.  The payment obligations of the Co-Issuers under this Indenture and the Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place.  If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or under the Note Purchase Agreements in the Specified Currency into another currency (the "Second Currency"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered.  The obligation of the Co-Issuers in respect of any such sum due from the Co-

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP001967

Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Note Purchase Agreements or the Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Co-Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class of Notes constituted additional principal owing in respect of such Class of Notes), agree to indemnify the Trustee and each Noteholder against, and to pay the Trustee or such Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

Section 17.14.  Confidentiality

Each of the Secured Parties (other than the Collateral Manager) and the Class A-1R Note Agent shall, and shall cause its Affiliates to, keep confidential information obtained in connection with this Indenture and the other Transaction Documents (including, without limitation, information relating to the structure of this transaction, financial models and/or other information in or related to the Indenture and/or the Transaction Documents) and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Company (or, with respect to confidential information of or pertaining to the Zohar Subsidiary or the activities of the Collateral Manager on behalf of the Zohar Subsidiary, the Zohar Subsidiary), (ii) as required by law, regulation, court order or the rules or regulations of any self-regulating organization, body or official having jurisdiction over such Secured Party or Class A-1R Note Agent (as applicable), (iii) such information as shall have been publicly disclosed other than in violation of this Indenture, (iv) to the extent any such information is expressly required to be disclosed in accordance with the terms of this Indenture or (v) to any Person who has executed and delivered to the Collateral Manager an agreement with or in favor of the Collateral Manager in a form reasonably acceptable by the Collateral Manager.  For purposes of this Section 17.14, all parties to the Transaction Documents and any of their professional advisors shall in no event be considered "non-affiliated third parties".  For the avoidance of doubt, the Collateral Manager shall be subject to the confidentiality provisions set forth in the Management Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                           PP001968

**IN WITNESS WHEREOF**, we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
as Issuer

By: _____
Name:  Chris Watler
Title:  Director


ZOHAR III, CORP.,
as Co-Issuer


By: _____
Name:
Title:


ZOHAR III, LLC,
as Zohar Subsidiary

By: _____
Name:  Chris Watler
Title:  Director

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent


By: _____
Name:
Title:

By: _____
Name:
Title:


LASALLE BANK NATIONAL ASSOCIATION,
as Trustee


By: _____
Name:
Title:

Indenture

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001969

**IN WITNESS WHEREOF,** we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
as Issuer

By: _____
    Name:
    Title:

ZOHAR III, CORP.,
as Co-Issuer

By: _____
    Name:  Gregory F. Lavelle
    Title:  Attorney-In-Fact

ZOHAR III, LLC,
as Zohar Subsidiary

By: _____
    Name:
    Title:

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
    Name:
    Title:

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001970

**IN WITNESS WHEREOF,** we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
   as Issuer

By:_____
   Name:
   Title:

ZOHAR III, CORP.,
   as Co-Issuer

By:_____
   Name:
   Title:

ZOHAR III, LLC,
   as Zohar Subsidiary

By:_____
   Name:
   Title:

NATIXIS FINANCIAL PRODUCTS INC.,
   as Class A-1R Note Agent and Class A-1D Note Agent

By:_____
   Name: Ralph J. Inglese
   Title: Managing Director

By:_____
   Name: Todd Luyster
   Title: Director

LASALLE BANK NATIONAL ASSOCIATION,
   as Trustee

By:_____
   Name:
   Title:

Indenture

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001971

**IN WITNESS WHEREOF**, we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
   as Issuer


By:_____
      Name:
      Title:


ZOHAR III, CORP.,
   as Co-Issuer


By:_____
      Name:
      Title:


ZOHAR III, LLC,
   as Zohar Subsidiary


By:_____
      Name:
      Title:

NATIXIS FINANCIAL PRODUCTS INC.,
   as Class A-1R Note Agent and Class A-1D Note Agent


By:_____
      Name:
      Title:


By:_____
      Name:
      Title:


LASALLE BANK NATIONAL ASSOCIATION,
   as Trustee


By:_____
      Name:          Suzanne Smith
      Title:          First Vice President

Indenture

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001972

SCHEDULE A-1

SCHEDULE OF COLLATERAL DEBT OBLIGATIONS
OWNED BY THE ISSUER OR THE ZOHAR SUBSIDIARY
ON THE FUNDING DATE

(Commitment and Funded Amounts are as of the close of business March 30, 2007)[1]

| Borrower | Exposure | Commitment | Funded | Purchase Price Paid by the Issuer |
|----------|----------|------------|--------|-----------------------------------|
| A1 | Term Loan B | $15,000,000.00 | $15,000,000.00 | 100.00% |
| A2 | Term Loan | $9,250,000.00 | $9,250,000.00 | 100.00% |
| A2 | Revolver | $1,500,000.00 | $1,500,000.00 | 100.00% |
| A2 | New Preferred Stock (Series A) | $1,000,000.00 | $1,000,000.00[2] | 100.00% |
| A2 | Term Loan | $3,000,000.00 | $3,000,000.00 | 100.00% |
| A3 | Term Loan | $2,947,871.32 | $2,947,871.32 | 100.00% |
| A3 | Delayed Draw TL | $8,865,903.94 | $8,865,903.94 | 100.00% |
| A4 | Delayed Draw TL D | $10,000,000.00 | $5,000,000.00 | 100.00% |
| A4 | Term Loan A | $4,148,012.22 | $4,148,012.22 | 100.00% |
| A5 | Term Loan C | $6,000,000.00 | $6,000,000.00 | 100.00% |
| A5 | Revolver | $5,000,000.00 | $5,000,000.00 | 100.00% |
| A6 | Term Loan B | $6,057,692.31 | $6,057,692.31 | 100.00% |
| A7 | Term Loan B | $5,000,000.00 | $5,000,000.00 | 100.00% |
| A7 | Term Loan C | $12,000,000.00 | $12,000,000.00 | 100.00% |
| A7 | DF T/L D | $6,500,000.00 | $6,481,056.33 | 100.00% |
| A8 | Term Loan A -1 | $17,000,000.00 | $17,000,000.00 | 100.00% |
| A9 | Delayed Draw Term Loan | $4,000,000.00 | $3,000,000.00 | 100.00% |
| A10 | Revolver | $5,000,000.00 | $4,000,000.00 | 100.00% |
| A11 | Term Loan | $10,981,645.60 | $10,981,645.60 | 91.06% |
| A12 | Term Loan A-1 | $4,140,000.00 | $4,140,000.00 | 100.00% |
| A13 | Term Loan Tranche A-4 | $15,004,802.63 | $15,004,802.63 | 100.00% |
| A14 | Term Loan A-1 | $8,402,397.15 | $8,402,397.15 | 100.00% |
| A15 | Delayed Draw Term Loan | $4,000,000.00 | $4,000,000.00 | 100.00% |

[1]    Commitment and Funded amounts set forth as above will be adjusted as of the close of business
on April 10, 2007 to reflect any repayments of principal received after March 30, 2007.

[2]    Does not include $63,829.34 of capitalized interest.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001973

SCHEDULE A-2

## COLLATERAL DEBT OBLIGATIONS
## TO BE ACQUIRED FROM ARK SELLER

(Commitment and Funded Amounts are as of the close of business March 30, 2007)

| Borrower | Credit | Commitment (in $) | Funded (in $) | Purchase Price [1] (%) | Interest Rate [2] | PIK | Maturity |
|----------|--------|-------------------|---------------|------------------------|-------------------|-----|----------|
| B1 | Term Loan | 1,000,000.00 | 1,000,000.00 | 100.998 | L+800 | | 1/30/2010 |
| B2 | Term Loan | 10,461,614.61 | 10,461,614.61 | 101 | 12.00% | | 12/31/2008 |
| B2 | TERM LOAN OVERADVANCE | 5,122,516.14 | 5,122,516.14 | 101 | 12.00% | | 12/31/2008 |
| B3 | Term Loan | 1,331,020.88 | 1,331,020.88 | 96.147 | 6.00% | 6.00% | 11/16/2010 |
| B3 | Revolver | 1,000,000.00 | 500,000.00 | 101 | L+800 | | 11/16/2010 |
| B4 | Term Loan A | 7,879,314.60 | 7,879,314.60 | 100.998 | L+800 | | 7/8/2009 |
| B4 | Term Loan B | 8,705,533.77 | 8,705,533.77 | 101.5 | L+550 | | 7/8/2009 |
| | | 35,500,000.00 | 35,000,000.00 | 100.94 | | | |

[1]    All Pricing from Mark-it Partners Loan Model as of 4/4/2007.

[2]    "L" indicates LIBOR rate.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001974

## COLLATERAL DEBT OBLIGATIONS
### TO BE ACQUIRED FROM ZOHAR CDO 2003-1, LIMITED AND ZOHAR II CDO 2005-1, LIMITED

(Commitment and Funded Amounts are as of the close of business March 30, 2007)

| Borrower | Credit | Commitment (in $) | Funded (in $) | Purchase Price (%) | Interest Rate [1] | PIK | Maturity |
|---|---|---|---|---|---|---|---|
| B5 | Term Loan | 8,200,000.00 | 8,200,000.00 | 100.00 | 11.52% | 7.50% | 6/29/2010 |
| B6 | Term Loan | 11,000,000.00 | 11,000,000.00 | 100.00 | L+900 | | 6/27/2011 |
| B7 | Term Loan | 10,000,000.00 | 10,000,000.00 | 100.00 | L+800 | | 12/14/2010 |
| B7 | Term Loan | 10,000,000.00 | 10,000,000.00 | 100.00 | L+800 | | 2/19/2008 |
| B8 | Term Loan | 2,000,000.00 | 2,000,000.00 | 100.00 | L+1000 | | 1/11/2011 |
| | | **41,200,000.00** | **41,200,000.00** | **100.00%** | | | |

[1]     "L" indicates LIBOR rate.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                           PP001975

SCHEDULE B

## LIBOR FORMULA

With respect to any Interest Period commencing on the Funding Date, "LIBOR" for purposes of calculating the interest rate in respect of the Class A-1R Note Interest Rate, the Class A-1T Note Interest Rate, the Class A-1D Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for such Interest Period will be a rate per annum equal to 5.33818%.

With respect to each Interest Period commencing after the Funding Date, "LIBOR" for purposes of calculating the interest rate in respect of the Class A-1R Note Interest Rate, the Class A-1T Note Interest Rate, the Class A-1D Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate for such Interest Period will be determined by the Calculation Agent in accordance with the following provisions:

(i)    LIBOR for any Interest Period shall equal the offered rate, as determined by the Calculation Agent, for U.S. Dollar deposits in the term of such Interest Period which appears on Telerate Page 3750 (as defined in the 2000 ISDA Definitions and as reported by Bloomberg Financial Markets Commodities News) or such other page (including the Reuters LIBOR01 screen page) as may replace such Page 3750 as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date. "LIBOR Determination Date" means, with respect to any Interest Period, the second London Banking Day prior to the first day of such Interest Period.

(ii)    If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Eurodollar deposits in the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Issuer) are quoting on the relevant LIBOR Determination Date for U.S. Dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a LIBOR Business Day, for the relevant term commencing on the next following LIBOR Business Day), to the principal London offices of leading banks in the London interbank market.

(iii)    If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the Base Rate for each day during such Interest Period.

For purposes of clause (i) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clauses (ii) and (iii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001976

As used herein:

"Base Rate" means a fluctuating rate of interest determined by the Calculation Agent as being the higher of (i) the Federal Funds Rate and (ii) the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for U.S. Dollar loans. Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"Base Rate Reference Bank" means Citibank, N.A., or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"Business Day" means a day on which commercial banks and foreign exchange markets settle payments in each of (a) New York City, (b) Chicago, Illinois, (c) any other city in which the Corporate Trust Office is located, (d) in the case of the final payment of principal of any Note, the place of presentation of such Note and (e) in any case where action is required on the part of the Issuer, the Cayman Islands.

"LIBOR Business Day" means a day on which commercial banks and foreign exchange markets settle payments in Dollars in New York and London.

"London Banking Day" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent.

The determination of the Class A-1R Note Interest Rate, the Class A-1T Note Interest Rate, the Class A-1D Note Interest Rate, the Class A-2 Note Interest Rate and the Class A-3 Note Interest Rate by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

In respect of any Interest Period that commences after the Funding Date and on any day that is not a Payment Date, LIBOR shall be determined through the use of a straight-line interpolation by reference to two rates calculated in accordance with paragraphs (i) and (ii) above, one of which rates shall be determined as if the maturity of the applicable deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which rates shall be determined as if the maturity of the applicable deposits referred to therein were the period of time for which rates are available next longer than the Interest Period.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001977

SCHEDULE C-1

## MOODY'S INDUSTRY CLASSIFICATION GROUP LIST

1.    Aerospace and Defense

2.    Automobile

3.    Banking

4.    Beverage, Food and Tobacco

5.    Buildings and Real Estate

6.    Chemicals, Plastics and Rubber

7.    Containers, Packaging and Glass

8.    Personal and Non-Durable Consumer Products (Manufacturing Only)

9.    Diversified/Conglomerate Manufacturing

10.   Diversified/Conglomerate Service

11.   Diversified Natural Resources, Precious Metals and Minerals

12.   Ecological

13.   Electronics

14.   Finance

15.   Farming and Agriculture

16.   Grocery

17.   Healthcare, Education and Childcare

18.   Home and Office Furnishings, Housewares and Durable Consumer Products

19.   Hotels, Motels, Inns and Gaming

20.   Insurance

21.   Leisure and Amusement

22.   Machinery (Non-Agriculture, Non-Construction and Non-Electronic)

23.   Mining, Steel, Iron and Non-Precious Metals

24.   Oil and Gas

25.   Personal, Food and Miscellaneous Services

26.   Printing and Publishing

27.   Cargo Transport

28.   Retail Store

29.   Telecommunications

30.   Textiles and Leather

31.   Personal Transportation

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001978

32.    Utilities

33.    Broadcasting and Entertainment

34.    Structured Finance Obligations

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001979

SCHEDULE C-2

**STANDARD & POOR'S INDUSTRY CLASSIFICATION GROUP LIST**

| | |
|---|---|
| 1. | Zero Default Risk |
| 2. | Aerospace & Defense |
| 3. | Air transport |
| 4. | Automotive |
| 5. | Beverage & Tobacco |
| 6. | Radio & Television |
| 7. | Brokers, Dealers & Investment houses |
| 8. | Building & Development |
| 9. | Business equipment & services |
| 10. | Cable & satellite television |
| 11. | Chemicals & plastics |
| 12. | Clothing/textiles |
| 13. | Conglomerates |
| 14. | Containers & glass products |
| 15. | Cosmetics/toiletries |
| 16. | Drugs |
| 17. | Ecological services & equipment |
| 18. | Electronics/electrical |
| 19. | Equipment leasing |
| 20. | Farming/agriculture |
| 21. | Financial intermediaries |
| 22. | Food/drug retailers |
| 23. | Food products |
| 24. | Food service |
| 25. | Forest products |
| 26. | Health care |
| 27. | Home furnishings |
| 28. | Lodging & casinos |
| 29. | Industrial equipment |
| 30. | Insurance |
| 31. | Leisure goods/activities/movies |
| 32. | Nonferrous metals/minerals |
| 33. | Oil & gas |
| 34. | Publishing |
| 35. | Rail industries |
| 36. | Retailers (except food & drug) |
| 37. | Steel |
| 38. | Surface transport |
| 39. | Telecommunications |
| 40. | Utilities |
| 41. | CDOs |
| 42. | ABS Consumer |
| 43. | ABS Commercial |
| 44. | CMBS Diversified (Conduit and CTL) |

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001980

| 45. | CMBS (Large Loan, Single Borrower, and |
|-----|------------------------------------------|
| 46. | Single Property) |
| 47. | REITs and REOCs |
| 48. | RMBS A |
| 49. | RMBS B&C, HELs, HELOCs, and Tax Lien |
| 50. | Manufactured Housing |
| 51. | U.S. Agency (Explicitly Guaranteed) |
| 52. | Monoline/FER Guaranteed |
| 53. | Non-FER Company Guaranteed |
| 54. | FFELP Student Loans (Over 70% FFELP) |
| 55. | CLO of SME's |

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001981

SCHEDULE D

## DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001982

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001983

SCHEDULE E

APPROVED LOAN PRICING SERVICES

Mark-it Partners Ltd
Loan Pricing Corporation
Standard & Poor's
Houlihan Lokey Howard & Zukin

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001984

FIRST SUPPLEMENTAL INDENTURE

DATED AS OF March 27, 2008

to the

INDENTURE

among

ZOHAR III, LIMITED

ZOHAR III, CORP.

ZOHAR III, LLC

and

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

Dated as of April 6, 2007

RESPONDENTS'
EXHIBIT
**13**
AP No. 16462

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050717

**PP Ex. 13**

**FIRST SUPPLEMENTAL INDENTURE** dated as of March 27, 2008 (this "Supplemental Indenture") among:

ZOHAR III, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR III, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR III, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors"); and

LASALLE BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States, as trustee (together with its permitted successors in the trusts under the Indenture, the "Trustee").

PRELIMINARY STATEMENTS

The Zohar Obligors and the Trustee are parties to an Indenture dated as of April 6, 2007 (the "Indenture").

As and to the extent provided in Section 8.1(g) of the Indenture, with the consent of the Collateral Manager the Trustee and the Zohar Obligors may enter into one or more supplemental indentures to correct any inconsistency, defect or ambiguity of the Indenture. As contemplated by the Indenture, not later than 10 days prior to the execution hereof, the Trustee has delivered a notice to the Noteholders, Preference Share Paying Agent, Moody's and Standard & Poor's describing the substance of this Supplemental Indenture. On or prior to the execution hereof, each Rating Agency has confirmed in writing that this Supplemental Indenture will not cause the then current rating of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date.

Accordingly, in consideration of the premises and the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture.

Section 2. Amendments. Subject to the receipt by the Trustee of this Supplemental Indenture, duly executed and delivered by each of the parties hereto, but effective as of March 27, 2008, the Indenture is hereby amended as follows:

A. Certain Prepayments; Reduction of Commitments. Section 9.5(b)(iii)(2) of the Indenture is deleted in its entirety and replaced with the following:

"(2)    the Class A-1D Commitments will expire on May 26, 2008."

B. Borrowings; Class A-1 Pro-Rata Adjustment Advances. Section 9.6(a)(v) of the Indenture is deleted in its entirety and replaced with the following:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050718
ON BEHALF OF PATRIARCH PARTNERS LLC

"(v)    the Issuer shall borrow the remaining amount of the initial Class A-1D Commitments on or prior to May 26, 2008; and"

Section 3.  Miscellaneous.

(A) GOVERNING LAW.  THIS SUPPLEMENTAL INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(B) Counterparts.  This Supplemental Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page of this Supplemental Indenture by telecopy shall be effective as delivery of a manually executed counterpart of this Supplemental Indenture.

(C) Effect of Headings; Complete Agreement.  The Section headings herein are for convenience only and shall not affect the construction hereof.  This Supplemental Indenture sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto.

(D) Documents Otherwise Unchanged.  Except as herein provided, the Indenture shall remain unchanged and in full force and effect, and each reference to each such document, and words of similar import, therein and in other documents shall be a reference to the Indenture as amended hereby and as the same may be further amended, supplemented and otherwise modified and in effect from time to time.

[remainder of page intentionally blank]

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050719

**IN WITNESS WHEREOF,** the parties have caused this Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By: _____
    Name:    Chris Watler
    Title:    Director

ZOHAR III, CORP., as Co-Issuer

By: _____
    Name:
    Title:

ZOHAR III, LLC
By:    ZOHAR III, LIMITED,
       its Managing Member

By: _____
    Name:
    Title:    Chris Watler
              Director

LASALLE BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely as Trustee

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED:

PATRIARCH PARTNERS XV, LLC

By: _____
    Name:  Lynn Tilton
    Title:  Manager

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050720

**IN WITNESS WHEREOF**, the parties have caused this Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By:_____
   Name:
   Title:

ZOHAR III, CORP., as Co-Issuer

By:_____
   Name:  Donald P. Pughsi
   Title:   President

ZOHAR III, LLC
By:    ZOHAR III, LIMITED,
      its Managing Member

By:_____
   Name:
   Title:

LASALLE BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely as Trustee

By:_____
   Name:
   Title:

ACKNOWLEDGED AND AGREED:

PATRIARCH PARTNERS XV, LLC

By:_____
   Name:  Lynn Tilton
   Title:  Manager

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050721

**IN WITNESS WHEREOF,** the parties have caused this Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By:_____
  Name:
  Title:

ZOHAR III, CORP., as Co-Issuer

By:_____
  Name:
  Title:

ZOHAR III, LLC
By:    ZOHAR III, LIMITED,
      its Managing Member

By:_____
  Name:
  Title:

LASALLE BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely as Trustee

By: _____
  Name: Suzanne Smith
  Title: FVP

ACKNOWLEDGED AND AGREED:

PATRIARCH PARTNERS XV, LLC

By:_____
  Name: Lynn Tilton
  Title: Manager

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050722

**IN WITNESS WHEREOF**, the parties have caused this Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By:_____
   Name:
   Title:

ZOHAR III, CORP., as Co-Issuer

By:_____
   Name:
   Title:

ZOHAR III, LLC
By:   ZOHAR III, LIMITED,
      its Managing Member

By:_____
   Name:
   Title:

LASALLE BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely as Trustee

By:_____
   Name:
   Title:

ACKNOWLEDGED AND AGREED:

PATRIARCH PARTNERS XV, LLC

By:_____
   Name: Lynn Tilton
   Title: Manager

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050723

EXECUTION COPY

SECOND SUPPLEMENTAL INDENTURE

DATED AS OF August 4, 2008

to the

INDENTURE

among

ZOHAR III, LIMITED

ZOHAR III, CORP.

ZOHAR III, LLC

NATIXIS FINANCIAL PRODUCTS INC.
as Class A-1R Note Agent and Class A-1D Note Agent

and

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

Dated as of April 6, 2007

**SECOND SUPPLEMENTAL INDENTURE** dated as of August 4, 2008 (this "Second Supplemental Indenture") among:

ZOHAR III, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer");

ZOHAR III, CORP., a corporation organized and existing under the laws of the State of Delaware (the "Co-Issuer", and together with the Issuer, the "Co-Issuers");

ZOHAR III, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Zohar Subsidiary", and together with the Co-Issuers, the "Zohar Obligors");

NATIXIS FINANCIAL PRODUCTS INC., a corporation organized and existing under the laws of the State of Delaware, as agent for the Holders of the Class A-1R Notes and Class A-1D Notes (in such capacities, together with its successors in such capacities, the "Class A-1R Note Agent" and "Class A-1D Note Agent", respectively); and

LASALLE BANK NATIONAL ASSOCIATION, a national banking association organized and existing under the laws of the United States, as trustee (together with its permitted successors in the trusts under the Indenture, the "Trustee").

### PRELIMINARY STATEMENTS

The Zohar Obligors, the Class A-1R Note Agent, the Class A-1D Note Agent and the Trustee are parties to an Indenture dated as of April 6, 2007 (the "Indenture").

As and to the extent provided in Section 8.1(j) of the Indenture, with the consent of the Collateral Manager the Trustee and the Zohar Obligors may enter into one or more supplemental indentures to effect any changes required by a Post-Ramp Up Plan pursuant to Section 7.13 of the Indenture. As contemplated by the Indenture, not later than 10 days prior to the execution hereof, the Trustee has delivered a notice to the Noteholders, Preference Share Paying Agent, Moody's and Standard & Poor's describing the substance of this Second Supplemental Indenture. On or prior to the execution hereof, each Rating Agency has confirmed in writing that this Second Supplemental Indenture will not cause the then current rating of any Class of Notes to be withdrawn or reduced below the rating effective on the Funding Date.

Accordingly, in consideration of the premises and the mutual agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture.

Section 2. Amendment. Subject to the receipt by the Trustee of this Second Supplemental Indenture, duly executed and delivered by each of the parties hereto, but effective as of August 4, 2008, the Indenture is hereby amended as follows:

A. Ramp Up End Date. The definition of "Ramp Up End Date" set forth in Section 1.1 of the Indenture is deleted in its entirety and replaced with the following:

"Ramp Up End Date": December 18, 2008, or such earlier date as may be specified by the Collateral Manager by notice to the Trustee and the Rating Agencies delivered in connection with the Effective Target Date, if any."

B. Ramp Up; Rating Confirmation; Annual Rating Review; Etc.

(1) The first sentence of the first paragraph of Section 7.13(a) is deleted in its entirety and replaced with the following:

"(a)    Ramp Up Targets. The Issuer and/or the Zohar Subsidiary shall use commercially reasonable efforts to purchase or originate, or to enter into binding agreements to purchase or originate, Collateral Investments in order to achieve an Effective Target Date by no later than December 18, 2008."

(2) The first sentence of the second paragraph of Section 7.13(a) is deleted in its entirety and replaced with the following:

"On or prior to December 18, 2008, the Issuer (or the Collateral Manager on behalf of the Issuer) may deliver or cause to be delivered to the Trustee and each Rating Agency a written certificate setting forth in reasonable detail calculations made as of the date of such certificate (such date the "Effective Target Date") of each of the Collateral Quality Tests and the Class A Coverage Tests as well as calculations demonstrating the satisfaction of each of the criteria specified for any one of the "Cases" (each a "Case") in the "Effective Targets Table" set forth below."

Section 3.  Notice.  Pursuant to Section 7.13(b)(2) of the Indenture, the Collateral Manager on behalf of the Issuer has prepared and delivered to the Rating Agencies and the Trustee a Proposed Post-Ramp Up Plan addressing the steps that the Issuer proposes to take to obtain a Rating Confirmation with respect to the Class A Notes. A copy of such Proposed Post Ramp Up Plan is attached hereto as Exhibit A.

Section 4.  Miscellaneous.

(A) GOVERNING LAW. THIS SECOND SUPPLEMENTAL INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(B) Counterparts. This Second Supplemental Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Second Supplemental Indenture by telecopy shall be effective as delivery of a manually executed counterpart of this Second Supplemental Indenture.

(C) Effect of Headings; Complete Agreement. The Section headings herein are for convenience only and shall not affect the construction hereof. This Second Supplemental Indenture sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto.

(D) Documents Unchanged. The Indenture shall remain unchanged and in full force and effect, and each reference to each such document, and words of similar import, therein and in other

documents shall be a reference to the Indenture, as the same may be amended, supplemented and otherwise modified and in effect from time to time.

[remainder of page intentionally blank]

PP-DEL2-000026791

**Exhibit A**

**Zohar III Proposed Post Ramp -Up Plan**

- The Collateral Manager will focus upon the expeditious settlement of commitments based upon the capital committed prior to the end of the investment period defined in Section 7.13(b)(1) of the Indenture.
- The Collateral Manager will continue to acquire collateral, as additional collateral investments or as replacement collateral for any committed investments that fail to settle, in order to comply with collateral quality tests and eligibility criteria in accordance with Section 12.1 of the Indenture.
- In accordance with the voluntary practice of the Collateral Manager since the inception of Zohar III, no cash shall leave the transaction in the form of Preference Share dividend distributions or Subordinated Collateral Management fees, as specified in Section 11.1(a)(i)(K) of the Indenture, until such time as a Rating Confirmation has been achieved.
- The Collateral Manager will submit the Zohar III portfolio of settled assets to the Rating Agencies no later than the December Payment Date in order to achieve a Rating Confirmation in accordance with the procedures defined in Section 7.13 of the Indenture.

PP-DEL2-000026792

**IN WITNESS WHEREOF**, the parties have caused this Second Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By: _____
    Name: Chris Watler
    Title: Director

ZOHAR III, CORP., as Co-Issuer

By: _____
    Name:
    Title:

ZOHAR III, LLC

By:     ZOHAR III, LIMITED,
        its Managing Member

By: _____
    Name: Chris Watler
    Title: Director

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

LASALLE BANK NATIONAL ASSOCIATION, not in
its individual capacity, but solely as Trustee

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the parties have caused this Second Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By:_____
   Name:
   Title:

ZOHAR III, CORP., as Co-Issuer

By:_____
   Name: Donald J. Puglisi
   Title:   President

ZOHAR III, LLC

By:    ZOHAR III, LIMITED,
       its Managing Member

By:_____
   Name:
   Title:

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

LASALLE BANK NATIONAL ASSOCIATION, not in
its individual capacity, but solely as Trustee

By:_____
   Name:
   Title:

**IN WITNESS WHEREOF**, the parties have caused this Second Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer


By:_____
    Name:
    Title:


ZOHAR III, CORP., as Co-Issuer


By:_____
    Name:
    Title:


ZOHAR III, LLC

By:    ZOHAR III, LIMITED,
       its Managing Member


By:_____
    Name:
    Title:


NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent


By:_____
    Name: Ralph W. Anglese
    Title: Managing Director

By:_____
    Name:
    Title: **Todd Luyster**
           **Director**

LASALLE BANK NATIONAL ASSOCIATION, not in
its individual capacity, but solely as Trustee


By:_____
    Name:
    Title:

**IN WITNESS WHEREOF,** the parties have caused this Second Supplemental Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

ZOHAR III, LIMITED, as Issuer

By:_____
  Name:
  Title:


ZOHAR III, CORP., as Co-Issuer

By:_____
  Name:
  Title:


ZOHAR III, LLC

By:    ZOHAR III, LIMITED,
       its Managing Member

By:_____
  Name:
  Title:


NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent

By:_____
  Name:
  Title:

By:_____
  Name:
  Title:

LASALLE BANK NATIONAL ASSOCIATION, not in
its individual capacity, but solely as Trustee

By:_____
  Name: ROBERT KRUSE
  Title: AVP

ACKNOWLEDGED AND AGREED:

PATRIARCH PARTNERS XV, LLC

By: _____
Name: Lynn Tilton
Title: Manager

PP-DEL2-000026797

The McGraw Hill Companies

# STANDARD &POOR'S

**Ratings Services**

55 Water Street, 41st. Floor
New York, NY 10041-0003
212 438 2000 Tel
212 438 2650 Fax

August 4, 2008

Zohar III, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT
Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands

Zohar III, Corp.
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

### Re: Zohar III, Limited/Zohar III, Corp.

Dear Sir or Madam:

Standard & Poor's Ratings Services hereby confirms its ratings for the above-referenced obligations. This letter is being provided in connection with the (Second Supplemental Indenture dated as of August 4, 2008 among Zohar III, Limited, Zohar III, Corp., and Zohar III, LLC ("Second Supplemental Indenture"). Please be advised that the Second Supplemental Indenture will not in and of itself result in a downgrade, withdrawal, or other adverse action with respect to any of the ratings assigned to the above-referenced obligations.

Standard & Poor's confirmation of the rating contained in this letter only addresses the effect of the proposed change on the last rating assigned by Standard & Poor's to the above-referenced obligations. Rating confirmation does not address the effect of such change on the rights or interests of holders of the obligations under the documents or whether such change is permitted by the terms of the documents. This letter does not constitute an Effective Target Date or a Ramp Up End Date Rating Confirmation under the Indenture among Zohar III, Limited, Zohar III, Corp, Zohar III, LLC, Natixis Financial Products, Inc., and LaSalle Bank National Association dated as of April 6, 2007.

The rating is not investment, financial, or other advice and you should not and cannot rely upon the rating as such. The rating is based on information supplied to us by you or by your agents but does not represent an audit. We undertake no duty of due diligence or independent verification of any information. The assignment of a rating does not create a

www.standardandpoors.com

Page 2
August 4, 2008

fiduciary relationship between us and you or between us and other recipients of the rating. We have not consented to and will not consent to being named an "expert" under the applicable securities laws, including without limitation, Section 7 of the U.S. Securities Act of 1933. The rating is not a "market rating" nor is it a recommendation to buy, hold, or sell the obligations.

Standard & Poor's is pleased to have the opportunity to be of service to you. For more information please visit our website at www.standardandpoors.com. If we can be of help in any other way, please contact us. Thank you for choosing Standard & Poor's and we look forward to working with you again.

Very truly yours,

Standard & Poor's Ratings Services,
a division of The McGraw-Hill Companies, Inc.

Analytical Contact:    Robert Radziul
                       212-438-1051



**Moody's Investors Service**

7 WTC
New York, New York 10007

August 4th, 2008

Zohar III, Limited (the "Issuer")                    Zohar III, Corp. and Zohar III, LLC (the "Co-Issuers")
c/o Maples Finance Limited                           Puglisi & Associates
P.O. Box 1093 GT                                     850 Library Avenue, Suite 204
Queensgate House, South Church Street                Newark, Delaware 19711
George Town, Grand Cayman, Cayman Islands

LaSalle Bank National Association (the "Trustee")
181 West Madison Street, 32nd Floor
Chicago, Illinois 60602

**Re: Zohar III, Limited**
U.S. $200,000,000 Class A-1R Notes due 2019 ("Class A-1R Notes")
U.S. $150,000,000 Class A-1T Notes due 2019 ("Class A-1T Notes")
U.S. $350,000,000 Class A-1D Notes due 2019 ("Class A-1D Notes")
U.S. $200,000,000 Class A-2 Notes due 2019 ("Class A-2 Notes")
U.S. $116,000,000 Class A-3 Notes due 2019 ("Class A-3 Notes")
        (collectively, the "Notes")

Ladies and Gentlemen:

At your request, we have reviewed the Second Supplemental Indenture to the Indenture dated as of April 6, 2007 (the "Indenture") among Zohar III, Limited, as Issuer, Zohar III, Corp. and Zohar III, LLC, as Co-Issuers, Natixis Financial Products Inc. and LaSalle Bank National Association, as Trustee. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

Pursuant to Section 8.1(i) of the Indenture, we hereby confirm that the Second Supplement Indenture dated as of August 4th, 2008 will not result in a withdrawal or reduction of the Moody's ratings assigned to the above-referenced Notes. After the implementation of the Post-Ramp Up Plan described in the Second Supplemental Indenture, the Issuer shall be required to request a Rating Confirmation of the Class A Notes in accordance with Section 7.13(b)(3) of the Indenture.

Thank you for your continued interest in our services.

Rodrigo Araya
Senior Vice President

PP-DEL2-000026800

# EXHIBIT 4

**Zohar I CMA**

[EXECUTION COPY]

COLLATERAL MANAGEMENT AGREEMENT

among

ZOHAR CDO 2003-1, LIMITED,

ZOHAR CDO 2003-1, LLC,

and

PATRIARCH PARTNERS VIII, LLC,

as Collateral Manager

Dated as of November 13, 2003

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC



PP000644

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................1

    Section 1.1   Definitions. ...............................................................................1

ARTICLE II GENERAL DUTIES OF THE COLLATERAL MANAGER....................................4

    Section 2.1   Appointment of the Collateral Manager.......................................4
    Section 2.2   Management Services.................................................................4
    Section 2.3   Delivery of Collateral...............................................................8
    Section 2.4   Standard of Care.......................................................................8
    Section 2.5   Action on Behalf of the Company and the Zohar Subsidiary. .........9
    Section 2.6   Obligations of the Collateral Manager........................................9
    Section 2.7   Brokerage. ...............................................................................9
    Section 2.8   Allocation of Aggregate Executions. .........................................10
    Section 2.9   The Collateral Manager's Practices. ...........................................10

ARTICLE III REPRESENTATIONS AND WARRANTIES.......................................................10

    Section 3.1   Representations and Warranties of the Company and the Zohar Subsidiary.10
    Section 3.2   Representations and Warranties of the Collateral Manager. .....................12

ARTICLE IV COMPENSATION; EXPENSE; DELEGATION;  LIABILITY AND
INDEMNIFICATION............................................................................................13

    Section 4.1   Compensation..........................................................................13
    Section 4.2   Expenses. ...............................................................................15
    Section 4.3   Delegation. .............................................................................15
    Section 4.4   Liability of the Collateral Manager. ...........................................15
    Section 4.5   Indemnification. ......................................................................16

ARTICLE V TERM AND TERMINATION; REMOVAL OF THE COLLATERAL
MANAGER ..........................................................................................................19

    Section 5.1   Term. .....................................................................................19
    Section 5.2   Automatic Termination. ............................................................19
    Section 5.3   Termination For Cause. .............................................................19
    Section 5.4   Post-Termination Approvals. .....................................................19
    Section 5.5   Appointment of Successor.........................................................19
    Section 5.6   Survival. ................................................................................20
    Section 5.7   Action Upon Termination. ........................................................20
    Section 5.8   Trustee Termination Rights.......................................................21

ARTICLE VI ADDITIONAL AGREEMENTS OF THE COLLATERAL MANAGER ............21

    Section 6.1   Non-Exclusivity......................................................................21
    Section 6.2   Conflicts of Interest; Acknowledgment of the Company...........................21
    Section 6.3   Records. .................................................................................23

i

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000645

Section 6.4   Confidentiality. ...................................................................................24
Section 6.5   Non-Petition. .......................................................................................24

ARTICLE VII MISCELLANEOUS.............................................................................25
Section 7.1   No Partnership or Joint Venture. .........................................................25
Section 7.2   Notices. ...............................................................................................25
Section 7.3   Succession; No Assignment, Submission to Jurisdiction, Etc. ...................25
Section 7.4   Third-Party Beneficiary. .....................................................................26
Section 7.5   Governing Law; Waiver Of Jury Trial. ...............................................26
Section 7.6   Counterparts. .......................................................................................26
Section 7.7   Headings Descriptive. .........................................................................26
Section 7.8   Severability. .........................................................................................26
Section 7.9   Entire Agreement. ...............................................................................26
Section 7.10  Amendments. .......................................................................................27
Section 7.11  Indulgences Not Waivers. ...................................................................27
Section 7.12  Collateral Manager Obligations Under the Indenture. .............................27
Section 7.13  Limitations on Recourse. .....................................................................27
Section 7.14  Conflict with Indenture. ......................................................................28

ii

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000646

COLLATERAL MANAGEMENT AGREEMENT

COLLATERAL MANAGEMENT AGREEMENT, dated as of November 13, 2003 (as the same may be amended or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), among ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Company"), ZOHAR CDO 2003-1, LLC, a limited liability company organized under the laws of the State of Delaware (the "Zohar Subsidiary"), and PATRIARCH PARTNERS VIII, LLC, a limited liability company organized under the laws of the State of Delaware ("Patriarch VIII" or the "Collateral Manager").

**RECITAL**

A.    The Company and the Zohar Subsidiary desire to engage the Collateral Manager to provide the services described herein and the Collateral Manager desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the parties hereto hereby agree as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.1    Definitions.  Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings ascribed thereto in the Indenture (defined below).  In addition, as used herein, the following terms shall have the following respective meanings:

"Approved Percentage" shall mean 50% or such lesser percentage (greater than 25%) as shall have been approved in writing by the Controlling Party (such approval not to be unreasonably withheld).

"Approved Replacement" shall mean any replacement for an individual who is (a) a manager, director or management-level employee of the Collateral Manager and (b) actively involved in the management of the Collateral Debt Obligations.

"Cause" shall mean:

(i)    the Collateral Manager willfully breaches, or takes any action that it knows violates, any provision of this Agreement or any term of the Indenture applicable to it;

(ii)    except as provided in (i) above, the Collateral Manager breaches in any material respect any provision of this Agreement or any term of the Indenture applicable to it and fails to cure such breach within thirty (30) days of becoming aware of, or receiving notice from the Trustee or the Controlling Party of, such breach;

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP000647

-2-

(iii)    the failure of any representation, warranty, certification or statement made or delivered by the Collateral Manager in or pursuant to this Agreement or the Indenture to be correct in any material respect when made and such failure (i) has an adverse effect on the Noteholders or the Credit Enhancer and (ii) no correction is made for a period of thirty (30) days after the Collateral Manager becomes aware of or receives notice from the Trustee or the Controlling Party of such failure;

(iv)    an Event of Bankruptcy occurs;

(v)    the occurrence of an act by (i) the Collateral Manager, (ii) Patriarch Partners, LLC or Patriarch Partners II, LLC, (iii) any company that controls, is controlled by or is under common control with the Collateral Manager (a "Controlled Entity"), (iv) any holder of equity interests in the Collateral Manager, Patriarch Partners, LLC, Patriarch Partners II, LLC or any Controlled Entity that is also a senior officer of such entity or (v) (without duplication) Lynn Tilton (or any Approved Replacement therefor) that constitutes fraud (as determined in an adjudication) in the performance of its obligations under this Agreement or in the performance of investment advisory services comparable to those provided under this Agreement, or any such person or entity being indicted for a criminal offense materially related to the performance of its obligations under this Agreement or in the performance of investment advisory services comparable to those provided under this Agreement (it being understood that, for the purposes of the definition of "Controlled Entity", control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise);

(vi)    (a) Lynn Tilton (or any Approved Replacement therefor) shall fail, for any reason, to be a principal, managing director or management-level employee of Patriarch VIII who is actively involved in the management of the Collateral Debt Obligations or (b) Lynn Tilton shall fail directly or indirectly to own at least the Approved Percentage of the equity interests in Patriarch VIII, unless in the case of the foregoing clause (a) an Approved Replacement shall (x) have been proposed within forty-five (45) days of such failure and (y) have been approved in writing by the Controlling Party within thirty (30) days after notice is sent of such proposed replacement; or

(vii)    an Event of Default under the Indenture has occurred and is continuing.

"CMA Termination Date" shall have the meaning specified in Section 5.1.

"Debt Issuer" shall mean the issuer of any Collateral Debt Obligation.

"Event of Bankruptcy" shall mean:

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP000648

-3-

(A)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Collateral Manager or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Collateral Manager or for a substantial part of its assets and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days; or an order or decree approving or ordering any of the foregoing shall be entered; or

(B)    the Collateral Manager shall (i) be wound up or dissolved, (ii) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (iii) apply for or consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (A) of this definition, (iv) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Collateral Manager or for a substantial part of its assets, (v) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (vi) cease to be able to, or admit in writing its inability to, pay its debts as they become due and payable, or make a general assignment for the benefit of creditors or (vii) take any action for the purpose of effecting any of the foregoing.

"First CM Payment Date" shall have the meaning specified in Section 4.1(b).

"Indemnified Party" shall have the meaning specified in Section 4.5(a) and (c).

"Indemnifying Party" shall have the meaning specified in Section 4.5(a) and (c).

"Indenture" shall mean the Indenture, dated as of November 13, 2003, among the Company, Zohar CDO 2003-1, Corp., the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent and the Trustee, as modified and supplemented and in effect from time to time in accordance with the terms thereof.

"Purchase Documents" shall mean the assignment agreements, purchase and sale agreements, participation agreements and/or other agreements by which the Company and/or the Zohar Subsidiary acquires any interest, direct or indirect, in the Collateral.

"Quarterly Asset Amount" shall mean, with respect to any Payment Date, an amount equal to the Aggregate Principal Balance of all Pledged Obligations on the preceding Payment Date; provided, that the Quarterly Asset Amount in respect of the Initial Payment Date shall be an amount equal to the Aggregate Principal Balance of all Pledged Obligations on the Closing Date.

"Related Parties" shall have the meaning specified in Section 6.2.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000649

-4-

"Securities" shall mean, for the purposes of this Agreement only, the Notes and the Preference Shares.

"Senior Collateral Management Fee" shall have the meaning specified in Section 4.1(b).

"Subordinated Collateral Management Fee" shall have the meaning specified in Section 4.1(c).

## ARTICLE II

## GENERAL DUTIES OF THE COLLATERAL MANAGER

Section 2.1    Appointment of the Collateral Manager. The Collateral Manager is hereby appointed as collateral manager of each of the Company and the Zohar Subsidiary for the purpose of performing certain investment management functions as specified herein, and the Collateral Manager hereby accepts such appointment.

Section 2.2    Management Services. The Collateral Manager will provide each of the Company and the Zohar Subsidiary with the following services, in each case subject to and in accordance with the terms of the Indenture and this Agreement:

(a)    Collateral. The Collateral Manager shall determine, in accordance with the criteria set forth in the Indenture relating to the acquisition, restructuring, exchange, holding and disposition of the Collateral, the specific Collateral to be purchased, restructured, exchanged, held or disposed of by the Company and/or the Zohar Subsidiary (including without limitation (x) the entry into, and the reduction in the notional amount or termination of, Hedge Agreements and (y) whether or not to acquire (by extending credit or otherwise) additional Collateral Debt Obligations pursuant to Section 12.1 of the Indenture, to acquire (by extending credit or otherwise) Unrestricted Collateral Debt Obligations or to apply amounts on deposit in the Rollover Proceeds Account), and shall effect purchases, restructurings, exchanges and dispositions of Collateral) on behalf of the Company and/or the Zohar Subsidiary from time to time as it shall determine, taking into consideration the payment obligations of and financing available to the Company under the Indenture and the other Transaction Documents and the Principal Proceeds and other amounts held by the Company; provided, however, that notwithstanding anything to the contrary contained in this Agreement, no duty or obligation of the Collateral Manager described hereunder shall be deemed to imply a guaranty of, and the Collateral Manager does not hereby guarantee, the performance of or economic returns to be realized by such Collateral or whether the economic returns on such Collateral will be sufficient to repay the amounts owed by the Company under the Indenture or otherwise.

(b)    Effectuation of Trades. Subject to any restrictions in the Indenture, the Collateral Manager shall effectuate the purchase, restructuring, exchange or disposition of Collateral on behalf of the Company and the Zohar Subsidiary, as applicable.

(c)    Exercise of the Rights by the Company and the Zohar Subsidiary. The Collateral Manager shall make determinations with respect to the exercise or enforcement

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                     PP000650

-5-

of any and all rights by the Company and/or the Zohar Subsidiary (including but not limited to any such rights under the Hedge Agreements and voting rights and rights arising in connection with the bankruptcy or insolvency of a Debt Issuer or the consensual or non-judicial restructuring of the debt or equity of a Debt Issuer) or remedies in connection with the Collateral and participating in the committees (official or otherwise) or other groups formed by creditors of a Debt Issuer; provided, however, that the Collateral Manager shall not cause the Company or the Zohar Subsidiary to exercise any such rights or remedies in a manner prohibited by the Indenture. Without limiting the foregoing, the Collateral Manager may, on behalf of the Company and/or the Zohar Subsidiary and without the consent of the holders of any Notes or any other Person, enter into any amendment, modification or waiver of, or supplement to, any term or condition of any Collateral, Collateral Debt Obligation, Unrestricted Collateral Debt Obligation or Equity Security (including, without limitation and subject to the terms of the Indenture, exchanges thereof for other loans, equity or other securities), so long as such amendment, modification, waiver or supplement does not contravene the provisions of the Indenture or this Agreement or contravene any applicable law or regulation. The Collateral Manager shall make determinations with respect to the exercise or enforcement of any rights and remedies of the Company and the Zohar Subsidiary, as applicable, under the Purchase Documents on behalf of the Company and the Zohar Subsidiary, subject to the terms and conditions thereof.

(d)   Negotiations. The Collateral Manager shall negotiate on behalf of the Company and the Zohar Subsidiary with prospective purchasers of the Collateral, with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor (or any of its Affiliates) thereon (or such obligor's (or any of its Affiliates') line(s) of business) or exchange of Collateral and/or with prospective sellers of Collateral as to the terms relating to the purchase, sale, exchange and/or disposition of such Collateral, subject in each case to any restrictions contained in the Indenture.

(e)   Rating Agencies, Trustee and Credit Enhancer. (i) The Collateral Manager shall on behalf of the Company and/or the Zohar Subsidiary consult with each Rating Agency, the Trustee and the Credit Enhancer at such times as may be reasonably requested by such Rating Agency, the Trustee or the Credit Enhancer and provide the Rating Agencies, the Trustee and the Credit Enhancer with any information reasonably requested by such Person in connection with each Rating Agency's, the Trustee's or the Credit Enhancer's monitoring of the acquisition, management and disposition of Collateral. (ii) The Collateral Manager shall be, and hereby is, authorized to execute on behalf of any Zohar Obligor(s) any and all agreements to be entered into between such Zohar Obligor(s) and a Rating Agency.

(f)   Monitoring of Collateral. The Collateral Manager shall (i) monitor the Collateral on an ongoing basis, (ii) prepare and deliver such information, reports, schedules and other data that is required to be prepared and/or delivered by the Collateral Manager under the Indenture and Section 2 of the Collateral Administration Agreement, as applicable, (iii) notify the Credit Enhancer, the Trustee, and the Company in writing of the occurrence of an Event of Default under the Indenture to the extent the Collateral Manager has actual knowledge of the occurrence thereof, (iv) determine whether any

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000651

-6-

Unrestricted Collateral Debt Obligation is a Revolving Collateral Debt Obligation, Delayed Funding Collateral Debt Obligation or term loan, (v) monitor from time to time the cash flows generated by the portfolio of Collateral Debt Obligations and notify the Trustee when such cash flows materially deviate from the expected cash flows in respect of such portfolio and (vi) determine whether any Collateral Debt Obligation is (A) a Revolving Collateral Debt Obligation, Delayed Funding Collateral Debt Obligation or term loan; (B) a Category 1, Category 2, Category 3 or Category 4 loan or a Workout Obligation; or (C) a Defaulted Collateral Debt Obligation..

(g)    <u>Supervision of the Collateral</u>.  The Collateral Manager shall manage the Company's and the Zohar Subsidiary's investments within the parameters set forth in the Indenture.

(h)    <u>Hiring of Specialists</u>.  The Collateral Manager shall, to the extent required or desirable in connection with the performance of its duties under this Agreement, hire and manage specialists and pay the fees and expenses with respect thereto (with reimbursement from the Company to the extent provided in Section 4.2 hereof and as provided in the Priority of Payments), <u>provided</u> that no delegation by the Collateral Manager of any of its duties hereunder to any third party shall relieve the Collateral Manager of any of its duties hereunder or relieve the Collateral Manager of any liability with respect to the performance of such duties.

(i)    <u>Optional Redemption</u>.  The Collateral Manager shall take commercially reasonable action on behalf of the Company in connection with effectuating any optional redemption of the Notes in accordance with Section 9.1 of the Indenture or any optional redemption of the Preference Shares in accordance with the Preference Share Paying Agency Agreement.

(j)    <u>Payments from Interest Reserve Accounts</u>.  The Collateral Manager shall determine on each Determination Date whether to cause the Company on the related Payment Date to apply amounts in the Interest Reserve Account in the manner set forth in Section 10.7 of the Indenture.

(k)    <u>Other Matters</u>.  The Collateral Manager shall comply with such other duties and responsibilities as may be expressly required of the Collateral Manager by the provisions of the Indenture and Section 2 of the Collateral Administration Agreement and shall use commercially reasonable efforts to assist the Company in complying with its duties and responsibilities under the Indenture, the Note Purchase Agreements and the Purchase Documents.

(l)    The Collateral Manager shall not without the prior consent of the Credit Enhancer:

(i)    arrange for the Company and/or the Zohar Subsidiary to acquire any Collateral Debt Obligation if at the time of such initial acquisition the Collateral Manager has actual knowledge that (A) such Collateral Debt Obligation is not investment grade and has no material negative covenants but, when

<u>Collateral Management Agreement</u>

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                              PP000652

-7-

originally issued, was investment grade, (B) such Collateral Debt Obligation is secured primarily by the stock of subsidiaries of the obligor on such Collateral Debt Obligation or (C) the obligor of such Collateral Debt Obligation (or such obligor's business) is the subject of (1) protracted litigation, (2) material accounting irregularities or (3) significant environmental problems; or

(ii)    arrange for the Company and/or the Zohar Subsidiary to acquire any Collateral Debt Obligation or any other item included in the Collateral from or sell any Collateral Debt Obligation to the Collateral Manager, any of its Affiliates or any fund or account for which the Collateral Manager or any of its Affiliates acts as investment manager or advisor (if the Credit Enhancer consents to any purchase or sale described in this clause (ii) then the Collateral Manager shall provide written notice of such purchase or sale to the original holder of the Class A-3 Note (so long as it remains a holder of such note)).

(m)    The Collateral Manager shall cause the Company and/or the Zohar Subsidiary to acquire each Collateral Debt Obligation pursuant to a purchase, assignment or participation agreement containing terms and conditions not materially less favorable to the Company and/or the Zohar Subsidiary than the terms and conditions of the comparable standard-form document of the Loan Syndications and Trading Association ("LSTA") (which in the case of any Collateral Debt Obligation acquired by way of assignment for a price of less than 95% of par shall be deemed to be the applicable LSTA "Distressed Trade" form document) (for the avoidance of doubt, such documentation described in this clause (m) shall not be required in the case of any Collateral Debt Obligation that consists of a direct extension of credit by the Company and/or the Zohar Subsidiary to the obligor under such Collateral Debt Obligation).

(n)    The Collateral Manager shall not, on behalf of the Company and/or the Zohar Subsidiary, direct or effect the acquisition or disposition of the Collateral Debt Obligations or any other item included in the Collateral except in accordance with the requirements of the Indenture.

(o)    The Collateral Manager shall consult with the Credit Enhancer at such times as may be reasonably requested by the Credit Enhancer and provide the Credit Enhancer with any information reasonably requested by it in connection with the Credit Enhancer's duties and responsibilities in its capacity as the Credit Enhancer under the Indenture and each of the other Transaction Documents.

(p)    Workouts and Restructurings.  For the avoidance of doubt and notwithstanding anything else contained herein, the Company, the Zohar Subsidiary and the Collateral Manager acknowledge and agree that the Collateral Debt Obligations and Unrestricted Collateral Debt Obligations will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as of consequence thereof, the Company and/or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral Debt Obligations, Equity Kickers, Equity Workout Securities and/or the relevant Underlying Instruments (A) interests in loans, debt securities, letters of credit or

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP000653

-8-

leases that do not satisfy the provisions of the definition of "Collateral Debt Obligation" and/or the Eligibility Criteria and/or (B) Equity Workout Securities.

(q)    Borrowings.  The Collateral Manager shall (subject to the terms of the Indenture) take such action on behalf of the Company and the Zohar Subsidiary as the Collateral Manager determines appropriate to cause the Company to make Borrowings under the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes at such times and in such amounts (subject to Section 9.6 of the Indenture) as may be required to meet the obligations of the Company and the Zohar Subsidiary.

(r)    Eligible Investments.  The Collateral Manager shall manage, in accordance with the terms of the Indenture, the Eligible Investments, including, without limitation, determining the Stated Maturity (after giving effect to any applicable grace period) of each Eligible Investment purchased or held by the Issuer, which Stated Maturity shall be no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the investment was made, taking into consideration the scheduled and expected funding and payment obligations of the Company and/or the Zohar Subsidiary.

Section 2.3    Delivery of Collateral.  The Collateral Manager shall cause the Company and/or the Zohar Subsidiary (as applicable to) deliver the Collateral as provided in Section 3.3 of the Indenture.  Should any part of the Collateral come into the possession or otherwise be acquired by the Collateral Manager, the Collateral Manager shall promptly cause such property to be delivered to the Trustee (or to the Custodian for the benefit of the Trustee), as provided in Section 3.3 of the Indenture.

Section 2.4    Standard of Care.  The Collateral Manager shall, in rendering its services as Collateral Manager, use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture. Subject to the immediately preceding sentence, the Collateral Manager shall follow its customary standards, policies and procedures in performing its duties under the Indenture and Section 2 of the Collateral Administration Agreement and its duties hereunder.  The Collateral Manager shall comply with all the terms and conditions of the Indenture and Section 2 of the Collateral Administration Agreement affecting the duties and functions that have been delegated to it thereunder.  The Collateral Manager will be bound to follow any supplement or other modification to the Indenture and any other applicable Transaction Document of which it has received written notice from the time it has received a copy of such supplement or other modification from the Company or the Trustee, so long as such supplement or other modification is in effect and has been entered into in accordance with the terms of Article 8 of the Indenture. The Collateral Manager shall not be bound by any amendment, supplement or other modification to the Indenture, any Transaction Document and/or any other agreement that reduces the rights or increases the obligations of the Collateral Manager unless the Collateral Manager shall have consented thereto in writing.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP000654

-9-

Section 2.5    <u>Action on Behalf of the Company and the Zohar Subsidiary</u>. To the extent necessary or appropriate to perform all of the duties to be performed by it hereunder and under the provisions of the Indenture applicable to it, each of the Company and the Zohar Subsidiary hereby confers upon the Collateral Manager the power to execute and deliver all necessary, desirable and appropriate documents and/or instruments in the name and on behalf of the Company or the Zohar Subsidiary, as the case may be, as its attorney-in-fact with respect thereto.

Section 2.6    <u>Obligations of the Collateral Manager</u>. Unless otherwise required by any provision of the Indenture or this Agreement or by applicable law, the Collateral Manager shall not take any action which it knows or should be reasonably expected to know in accordance with prevailing market practices would (i) cause the Company or the Zohar Subsidiary to violate the terms of the Indenture, (ii) adversely affect the interests of the Holders of the Securities, (without, in the case of the Notes, giving effect to the Credit Enhancement, if applicable) in any material respect (other than as contemplated hereunder or under the Indenture, it being understood and acknowledged that the Collateral Manager does not guarantee the performance of the Collateral or any payment obligation under the Indenture), (iii) not be permitted under the governing instruments of the Company, the Co-Issuer, or the Zohar Subsidiary, (iv) violate any United States federal or state law (including Delaware corporate and limited liability company law), Cayman Islands law or any other law (including, without limitation, any related rule or regulation of any governmental body or agency having jurisdiction over the Company, the Co-Issuer or the Zohar Subsidiary) known to the Collateral Manager, or as advised by the Administrator, counsel to the Administrator or counsel to the Collateral Manager, to be applicable to the Company, the Zohar Subsidiary or the Co-Issuer the violation of which would have a material adverse effect on the Company, the Zohar Subsidiary, the Co-Issuer, any of the Collateral or on the ability of the Collateral Manager to perform its obligations hereunder or (v) require registration of the Company, the Co-Issuer, the Zohar Subsidiary, or the pool of Collateral as an "investment company" under the Investment Company Act; it being understood that in connection with the foregoing the Collateral Manager will not be required to make any independent investigation of any facts or laws not otherwise known to it in connection with its obligations under this Agreement and the Indenture or the conduct of its business generally. The Collateral Manager covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement or the Indenture, the Collateral Manager shall not intentionally take any action that it knows would cause an Event of Default under the Indenture.

Section 2.7    <u>Brokerage</u>. The Collateral Manager shall use commercially reasonable efforts to obtain, in accordance with applicable laws, the best prices and execution for all orders placed with respect to purchases and sales of the Collateral. Subject to the objective of obtaining best execution, the Collateral Manager may take into consideration research and other brokerage services furnished to the Collateral Manager or its Affiliates by brokers and dealers which are not Affiliates of the Collateral Manager. Such services may be used by the Collateral Manager in connection with its other advisory activities or investment operations. Subject to Section 6.2, the Collateral Manager may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts managed by the Collateral Manager and the Affiliates of the Collateral Manager, <u>provided</u> that the Collateral Manager and its Affiliates may only so aggregate purchases and sales if at the time of such

<u>Collateral Management Agreement</u>

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                     PP000655

-10-

purchases and sales the agreements governing the management of such other accounts contain a provision permitting such aggregation substantially similar to the provision contained herein. In accounting for such aggregated order price, commissions and other expenses shall be apportioned on an equitable basis (in the sole judgment of the Collateral Manager).

Section 2.8    Allocation of Aggregate Executions. When any aggregate sales or purchase orders occur, the objective of the Collateral Manager shall be to allocate the executions among the accounts in an equitable manner over time, consistent with its practices with respect to other accounts it manages, the status of the portfolio of investments and the requirements in the Indenture.

Section 2.9    The Collateral Manager's Practices. Without limiting the obligations of the Collateral Manager set forth herein and in the Indenture, all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company and/or the Zohar Subsidiary shall be in accordance with reasonable and customary business practices of the relevant market and in compliance with applicable laws and all purchases and sales of the Collateral will be effected on arm's-length terms (including without limitation any sales or purchases of Collateral Debt Obligations to or from CDC Financial Products Inc. and/or its Affiliates). Each of the Company and the Zohar Subsidiary acknowledges that all or a significant portion of the Collateral Debt Obligations and Unrestricted Collateral Debt Obligations, if sold, will likely be sold in the distressed debt market and that the Collateral Manager will be required to cause the Company and the Zohar Subsidiary, as applicable, to make extensive representations and warranties regarding such Collateral and the management of such Collateral by the Company, the Zohar Subsidiary and the Collateral Manager. In connection with the foregoing, to the extent that the seller of such Collateral Debt Obligations and Unrestricted Collateral Debt Obligations (and/or such seller's predecessors-in-title) did not make customary representations and warranties at the time of the applicable transfer of such Collateral, the Company and/or the Zohar Subsidiary may each make such representations and warranties on its own account.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of the Company and the Zohar Subsidiary. Each of the Company and the Zohar Subsidiary (each, a "Representing Entity") represents and warrants (as to itself only) to the Collateral Manager that:

(a)    Organization, Power and Authority, Etc. Such Representing Entity has been duly organized and is validly existing under the laws of the Cayman Islands (in the case of the Company) or the State of Delaware (in the case of the Zohar Subsidiary) and has the full power and authority (i) to execute, deliver and perform each of the Transaction Documents to which it is a party and all obligations required thereunder and (ii) to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP000656

-11-

the conduct of its business requires, or the performance of its obligations under the Transaction Documents to which it is a party would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of such Representing Entity.

(b)    This Agreement.  This Agreement has been duly authorized, executed and delivered by such Representing Entity and constitutes its valid and binding obligation, enforceable against it in accordance with its terms except that the enforceability thereof may be subject to (i) bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(c)    Consents, Approvals, Etc.  No consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person is required for the performance by such Representing Entity of its duties hereunder, except such as have been duly made or obtained.

(d)    No Conflicts.  Neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of or constitutes a default under (i) the organizational documents of such Representing Entity, (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which such Representing Entity is a party or is bound, (iii) any statute applicable to such Representing Entity, or (iv) any law, decree, order, rule or regulation applicable to such Representing Entity of any court or regulatory, administrative or governmental agency, body or authority or arbitrator having or asserting jurisdiction over such Representing Entity or its properties, and, in the case of each preceding clause, which would have a material adverse effect upon the performance by it of its duties under this Agreement or any other Transaction Document.

(e)    No Violations.  Such Representing Entity is not in violation of any U.S. federal or state securities law or regulation promulgated thereunder and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best of its knowledge, threatened that would have a material adverse effect upon the performance by it of its duties under or the validity or enforceability of this Agreement.

(f)    True and Complete Documentation.  True and complete copies of the Transaction Documents to which it is a party and all other documents contemplated therein, and the organizational documents of such Representing Entity, as in effect as of the date of this Agreement, have been delivered to the Collateral Manager and such Representing Entity agrees to deliver a true and complete copy of each amendment to the documents referred to in this paragraph (f) to the Collateral Manager, as promptly as practicable after its adoption or execution.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP000657

-12-

(g)    <u>Investment Company Act</u>. Such Representing Entity is not an "investment company" that is required to be registered under the Investment Company Act.

Section 3.2    <u>Representations and Warranties of the Collateral Manager</u>. The Collateral Manager represents and warrants to the Company, the Zohar Subsidiary, the Credit Enhancer and the Noteholders that:

(a)    <u>Organization, Power and Authority, Etc</u>. The Collateral Manager is duly organized, is validly existing and in good standing under the laws of the State of Delaware and has full power and authority (i) to execute and deliver this Agreement and to perform all of its obligations hereunder and under the provisions of the Indenture and Collateral Administration Agreement applicable to it, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the Indenture and Collateral Administration Agreement applicable to it and (ii) to transact the business in which it is presently engaged and is duly qualified and in good standing under the laws of each jurisdiction where the performance of its obligations under this Agreement and the provisions of the Indenture and Collateral Administration Agreement applicable to it would require such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the financial condition or the ability of the Collateral Manager to perform its obligations under, or on the validity or enforceability of, this Agreement and the applicable provisions of the Indenture and Collateral Administration Agreement.

(b)    <u>This Agreement</u>. This Agreement and each instrument or document of the Collateral Manager required hereunder or under the terms of the Indenture and Collateral Administration Agreement has been duly authorized, executed and delivered by the Collateral Manager and constitutes a valid and binding agreement of the Collateral Manager, enforceable against it in accordance with its terms, except that the enforceability thereof may be subject to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(c)    <u>No Securities Laws Violations, No Proceedings</u>. The Collateral Manager is not in violation of any federal or state securities law or regulation promulgated thereunder related to the conduct of its asset management business, and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best knowledge of the Collateral Manager, threatened, that in either case would have a material adverse effect upon the performance by the Collateral Manager of its duties under this Agreement and the Collateral Administration Agreement or on the validity or enforceability of this Agreement and the Collateral Administration Agreement or the provisions of the Indenture and the Collateral Administration Agreement applicable to the Collateral Manager.

(d)    <u>No Conflicts</u>. Neither the execution and delivery of this Agreement or the Collateral Administration Agreement, nor the performance of the terms hereof or the

<u>Collateral Management Agreement</u>

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000658

-13-

provisions of the Indenture and the Collateral Administration Agreement applicable to the Collateral Manager, conflicts with or results in a breach or violation of the organizational documents of the Collateral Manager or conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) the terms of any indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other agreement, obligation, condition, covenant or instrument to which the Collateral Manager is a party or is bound, (ii) any statute applicable to the Collateral Manager or (iii) any law, decree, order, rule or regulation applicable to the Collateral Manager of any court or regulatory, administrative or governmental agency, body or authority or asserting jurisdiction over the Collateral Manager or its properties, and which would, in the case of the foregoing clauses (i), (ii) and (iii), have a material adverse effect upon the performance by the Collateral Manager of its duties under this Agreement or the provisions of the Indenture and the Collateral Administration Agreement applicable to it.

(e)    <u>No Consents, Approvals, Etc</u>. No consent, approval, registration, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other Person is required for the performance by the Collateral Manager of its duties hereunder and under the terms of the Indenture and the Collateral Administration Agreement applicable to it, except such as have been duly made or obtained.

## ARTICLE IV

### COMPENSATION; EXPENSE; DELEGATION; LIABILITY AND INDEMNIFICATION

Section 4.1    <u>Compensation</u>.

(a)    <u>Generally</u>. In consideration of the performance of the obligations of the Collateral Manager hereunder and under the Indenture, the Collateral Manager shall be entitled to receive, at the times set forth in the Indenture and subject to the conditions set forth in the Indenture and in accordance with the Priority of Payments, to the extent funds are available therefor, the fees set forth in clauses (b) and (c) below. The Senior Collateral Management Fee and the Subordinated Collateral Management Fee shall be computed on the basis of a year of 360 days and the actual number of days elapsed.

(b)    <u>Senior Collateral Management Fee</u>. The Collateral Manager shall be entitled to receive a fee (the "<u>Senior Collateral Management Fee</u>") which will accrue from the Closing Date at the greater of (x) a rate of 1.0% per annum on the Quarterly Asset Amount and (y) $1,500,000 on each Payment Date (adjusted in the case of the first Payment Date on which such fees are paid to reflect the different number of days in such period), payable in arrears on each Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments. The Senior Collateral Management Fee will accrue if unpaid and shall be payable on the next Payment Date on which funds are available therefor in accordance with the Priority

<u>Collateral Management Agreement</u>

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP000659

-14-

of Payments. Notwithstanding the foregoing, the Collateral Manager, in its sole and absolute discretion, shall be entitled to defer to a later Payment Date all or any portion of the Senior Collateral Management Fee payable on any Payment Date upon written direction by the Collateral Manager to the Trustee. Any such deferred Senior Collateral Management Fee shall be payable, at the Collateral Manager's sole and absolute discretion, on the subsequent Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments. Notwithstanding anything herein to the contrary, the Senior Collateral Management Fees will accrue from the Closing Date but will not be payable until the first Payment Date on or following the Ramp Up End Date (the "First CM Payment Date").

(c)    Subordinated Collateral Management Fee. The Collateral Manager shall also be entitled to receive a fee (the "Subordinated Collateral Management Fee") which will accrue from the Closing Date at a rate of 1.0% per annum on the Quarterly Asset Amount and shall be payable in arrears on each Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments. The Subordinated Collateral Management Fee will accrue if unpaid and shall be payable on the next Payment Date on which funds are available therefor in accordance with the Priority of Payments. Notwithstanding the foregoing, the Collateral Manager, in its sole and absolute discretion, shall be entitled to defer to a later Payment Date all or any portion of the Subordinated Collateral Management Fee payable on any Payment Date upon written direction by the Collateral Manager to the Trustee. Any such deferred Subordinated Collateral Management Fee shall be payable, at the Collateral Manager's sole and absolute discretion, on the subsequent Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments. Notwithstanding anything herein to the contrary, the Subordinated Collateral Management Fees will accrue from the Closing Date but will not be payable until the First CM Payment Date.

(d)    Post-Termination Payments. If this Agreement is terminated for any reason or Patriarch VIII is removed, then (i) the fees calculated as provided in this Section 4.1 and payable to Patriarch VIII shall be prorated for any partial period to, but excluding, the effective date of such termination or removal, and (ii) the fees calculated as provided in this Section 4.1 and payable to the successor collateral manager shall be prorated for any partial period beginning on the effective date of such appointment. The prorated fees, together with any accrued and unpaid fees and any unpaid expense reimbursements, due to Patriarch VIII hereunder shall rank pari passu to the fees and any unpaid expense reimbursements due to the successor collateral manager, and such fees and expense reimbursements due to Patriarch VIII and the successor collateral manager shall be paid pro rata to the extent funds are available therefor in accordance with the Priority of Payments; provided, however, that if Patriarch VIII is removed as Collateral Manager pursuant to clauses (i), (v) or (vi) of the definition of "Cause", then such amounts due to Patriarch VIII shall be paid after fees and expenses (of comparable priority under the Priority of Payments) due to the successor collateral manager are paid in full.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP000660

-15-

(e)    Subordination of Payments. The Collateral Manager agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be subordinated to the extent set forth in, and limited to the amounts available under, the Priority of Payments, described in the Indenture and the Collateral Manager agrees to be bound by the Priority of Payments as if the Collateral Manager were a party to the Indenture.

(f)    Collateral Manager as Holder of Notes and Preference Shares. The Company and the Zohar Subsidiary acknowledge and agree that the Collateral Manager may from time to time acquire, hold and dispose of Notes and Preference Shares, subject in each case to the terms and conditions of the Indenture.

Section 4.2    Expenses. The Collateral Manager shall pay all expenses and costs incurred by it in connection with its services under this Agreement; provided, however, that the Company shall reimburse the Collateral Manager, at the times set forth in the Indenture and subject to the conditions set forth therein and the Priority of Payments, to the extent funds are available therefor, for (i) extraordinary costs and expenses incurred in the performance of the Collateral Manager's obligations under this Agreement and the Indenture, (ii) reasonable fees and expenses (not otherwise paid with funds from the Professional Fee Account) incurred by the Collateral Manager to employ outside lawyers, accountants, consultants or other outside specialists or professionals, asset pricing and asset rating services, and accounting, programming and data entry services that are retained by the Company, the Zohar Subsidiary or by the Collateral Manager on behalf of the Company or the Zohar Subsidiary and (iii) brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction-related expenses and fees arising out of transactions effected for the Company's or the Zohar Subsidiary's account. Expenses and costs payable to the Collateral Manager under this Section 4.2 shall constitute either Administrative Expenses or professional fees and shall be payable by application of amounts on deposit in the Professional Fee Account or the Expense Account, as applicable, subject to the terms of the Indenture and in accordance with the Priority of Payments (in each case to the extent funds are available therefor).

Section 4.3    Delegation. With the consent of the Controlling Party, the Collateral Manager may delegate to any agent any or all of the duties and obligations assigned to the Collateral Manager hereunder; provided that no delegation by the Collateral Manager of any of its duties hereunder shall relieve the Collateral Manager of any of its duties hereunder nor relieve the Collateral Manager of any liability with respect to the performance of such duties.

Section 4.4    Liability of the Collateral Manager. The Collateral Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it in good faith and, subject to the standard of conduct described in the next succeeding sentence, shall not be responsible for any action or omission of the Company, the Co-Issuer, the Zohar Subsidiary or the Controlling Party or any other Person(s) in following or declining to follow any advice, recommendation or direction of the Collateral Manager or for any action of the Company, the Co-Issuer, the Trustee or the Zohar Subsidiary in following any direction of the Controlling Party, the Trustee or any Holder of the Notes or of the Securities. The Collateral Manager, its members, managers, directors, officers, stockholders, partners, employees, advisors and agents, shall not be liable to (a) the Company,

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                   PP000661

-16-

the Co-Issuer, the Zohar Subsidiary, the Trustee, the Holders of the Securities, the Credit Enhancer or any other Person for any losses, claims, damages, judgments, assessments, interests, judgments, costs, fines, amounts paid in settlement, attorneys' fees and expenses or other liabilities of any nature whatsoever incurred by the Company, the Co-Issuer, the Zohar Subsidiary, the Trustee, the Holders of the Securities, the Credit Enhancer or any other Person that arise out of or in connection with the performance by the Collateral Manager (or such other Persons) of the Collateral Manager's duties under this Agreement and/or the other Transaction Documents, or (b) the Holders of the Securities, the Co-Issuers, the Zohar Subsidiary, the Trustee, the Credit Enhancer, the creditors of the Co-Issuers, the Zohar Subsidiary or any other Person for any error of judgment, mistake of law, or for any loss arising out of any investment, for any other act or omission in the performance of its obligations to the Zohar Obligors except, in the case of both clauses (a) and (b), by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party.

Section 4.5    Indemnification.

(a)    The Company and the Zohar Subsidiary (in such case, the "Indemnifying Party") shall reimburse, indemnify, defend and hold harmless the Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees and any Affiliate of the Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees (in such case, an "Indemnified Party") from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees and expenses), as are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Transaction Documents and/or any acts or omissions of the Collateral Manager, or its managers, directors, officers, stockholders, members, agents, advisors, partners and employees made in good faith and in the performance of the duties of the Collateral Manager under the Transaction Documents except to the extent resulting from the Indemnified Party's acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party.

(b)    The Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees may consult with counsel and accountants with respect to the Collateral or the affairs of the Zohar Obligors and shall be fully protected and justified, to the extent allowed by law, in acting, or failing to act, if such action or failure to act is taken or made in good faith and is in accordance with the advice or opinion of such counsel or accountants. Notwithstanding anything contained herein to the contrary, the obligations of the Company under this Section 4.5 constitute Administrative Expenses and shall be payable in accordance with the Priority of Payments described in the Indenture.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP000662

-17-

(c)    The Collateral Manager (in such case, the "Indemnifying Party") shall reimburse, indemnify, defend and hold harmless the Company, the Zohar Subsidiary, and each of their respective directors, stockholders, managers, officers, members, agents, partners and employees (in such case, an "Indemnified Party") from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees and expenses) in respect of or arising out of any acts or omissions of the Collateral Manager, its directors, stockholders, managers, officers, members, agents, partners and employees constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party (except to the extent resulting from the Indemnified Party's bad faith, willful misconduct or gross negligence in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party).

(d)    With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 4.5, such Indemnified Party shall (or with respect to Indemnified Parties that are Affiliates, managers, directors, officers, stockholders, members, agents, advisors, partners or employees of the Collateral Manager, the Company or the Zohar Subsidiary (as applicable), the Collateral Manager, the Company or the Zohar Subsidiary (as applicable) shall cause such Indemnified Party to):

(i)    give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 4.5 unless the Indemnifying Party is materially prejudiced or otherwise forfeits substantial rights or defenses by reason of such failure;

(ii)    at the Indemnifying Party's expense, provide the Indemnifying Party with such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)    at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP000663

-18-

Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)     neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgement in respect thereof, in each case, without the prior written consent of the Indemnifying Party, unless the Indemnifying Party contests indemnification;

(vi)     subject to the Indemnifying Party's giving of reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

(vii)     the Indemnifying Party shall not settle any such claim without the prior written consent of the Indemnified Party, which consent (x) shall not be unreasonably withheld or delayed in the case of a settlement for monetary damages only and (y) may be withheld in the Indemnified Party's sole discretion if the Indemnified Party must perform any act or make any admission in connection with such settlement.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 4.5 is held to be unavailable or insufficient to hold harmless any Indemnified Party, although applicable in accordance with the terms of this Section 4.5, the Company, the Zohar Subsidiary or the Collateral Manager (as applicable) shall contribute to the aggregate costs incurred by the Indemnified Party in connection with any claim covered by this Section 4.5 in the proportion of the respective economic interests of the Company, the Zohar Subsidiary or the Collateral Manager. The respective economic interests shall be calculated by reference to the aggregate amounts (other than the proceeds from the issuance of the Notes) received by Company and the Zohar Subsidiary from the interest, fees, gains or other amounts received in connection with the Collateral and the aggregate Senior Collateral Management Fees and Subordinated Collateral Management Fees paid to the Collateral Manager hereunder.

<u>Collateral Management Agreement</u>

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP000664

-19-

## ARTICLE V

## TERM AND TERMINATION;
## REMOVAL OF THE COLLATERAL MANAGER

Section 5.1    Term.  This Agreement shall become effective on the date hereof and shall continue in force and effect until the first of the following occurs (the "CMA Termination Date"):  (i) the payment in full of the Notes and redemption of the Preference Shares and the termination of the Indenture and the Preference Share Paying Agency Agreement in accordance with their respective terms, (ii) the liquidation of the Collateral and the final distribution of the proceeds in accordance with the Priority of Payments and (iii) the termination of this Agreement in accordance with this Article V.

Section 5.2    Automatic Termination.  This Agreement shall automatically terminate upon the Company's good-faith determination that the Company, the Co-Issuer, the Zohar Subsidiary, or the pool of Collateral has become required to be registered as an "investment company" under the Investment Company Act, and the Company notifies the Collateral Manager thereof.

Section 5.3    Termination For Cause.

(a)    The Collateral Manager may be removed for Cause upon 10 Business Days' prior written notice by the Company to the Collateral Manager (which notice may be waived by the Collateral Manager) at the direction of the Controlling Party.

(b)    If any event constituting Cause occurs, the Collateral Manager shall give prompt written notice thereof to the Company, the Zohar Subsidiary, the Trustee, the Preference Share Paying Agent and the Credit Enhancer promptly upon the Collateral Manager's becoming aware of the occurrence of such event.

Section 5.4    Post-Termination Approvals.  In the event that the Collateral Manager has received notification of its removal pursuant to this Article V, until a successor collateral manager has been appointed and has accepted such appointment in accordance with the terms hereof, all purchases and sales of any item included in the Collateral (other than Eligible Investments) must be approved by the Controlling Party (except for the settlement of purchases and/or sales committed to prior to the Collateral Manager's receipt of such notification).

Section 5.5    Appointment of Successor.  (a)  Upon the removal of the Collateral Manager pursuant to this Article V, the Controlling Party shall appoint a successor collateral manager.  Notwithstanding any other provision herein to the contrary, Patriarch VIII shall not be liable for any acts, omissions or obligations of any successor collateral manager.  Any termination of this Agreement and the termination of Patriarch VIII as the Collateral Manager hereunder shall become effective as provided herein once a successor collateral manager shall have been appointed.

(b)    No removal of the Collateral Manager shall be effective unless (i) a successor collateral manager has agreed in writing to assume all of the Collateral Manager's duties and obligations pursuant to this Agreement, (ii) the successor collateral manager has been

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                 PP000665

-20-

approved in writing by the Controlling Party and (iii) the outgoing Collateral Manager has received written notice (a) from the Controlling Party or, if applicable, a Majority of the Preference Shares that it has approved of such successor collateral manager and (b) from such successor collateral manager that it has agreed to assume the outgoing collateral manager's duties.

(c)    No removal of the Collateral Manager shall be effective until the appointment by the Controlling Party of, and acceptance of such appointment in writing by, a successor collateral manager that in the opinion of the Controlling Party or a Majority of the Preference Shares (as applicable) (i) is an established institution that has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Collateral Manager under this Agreement and the other Transaction Documents and with a substantially similar (or better) level of expertise, (ii) is legally qualified and has the capacity to act as collateral manager under this Agreement and the other Transaction Documents and as successor to the Collateral Manager hereunder in the assumption of all the responsibilities, duties and obligations of the Collateral Manager hereunder and the other Transaction Documents, (iii) will not cause any Zohar Obligor or the pool of Collateral to become required to register under the provisions of the Investment Company Act and (iv) so long as any Notes are rated, each Rating Agency has confirmed in writing that the appointment of such successor collateral manager will not cause its then current rating (without giving effect to the Credit Enhancement, if applicable) of any Note to be reduced or withdrawn.

(d)    If no successor collateral manager is in place within ninety (90) days after the giving of such notice of termination, the Collateral Manager or the Trustee (or, after the Notes are paid in full, the Preferences Share Paying Agent acting at the direction of a majority of the Preference Shares) may petition any court of competent jurisdiction for the appointment of a successor collateral manager.

Section 5.6    Survival. Upon any termination or assignment of this Agreement, the provisions of Sections 3.1, 3.2, 4.1, 4.2, 4.4, 4.5, 5.7, 6.3, 6.4 and 6.5 shall survive such termination or assignment and remain operative and in full force and effect.

Section 5.7    Action Upon Termination.

(a)    From and after the effective date of the termination of the Collateral Manager's duties and obligations pursuant to this Agreement or removal of the Collateral Manager hereunder, the Collateral Manager shall not be entitled to compensation for services hereunder after the effective date of such termination or removal but shall be paid all compensation accrued through the date of termination (subject to the Priority of Payments), as provided in Section 4.1 hereof, and shall be entitled to receive any amounts owing under Sections 4.2 and 4.5 hereof. Upon such termination or removal, the Collateral Manager shall as soon as practicable:

(i)    deliver to the Company or (at the direction of the Company) any successor collateral manager that is appointed all property and documents of the Trustee, the Company, the Co-Issuer, or the Zohar Subsidiary, as the case may be,

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP000666

-21-

relating to the Collateral then in the custody of the Collateral Manager, including, without limitation, files in electronic form; and

(ii)    deliver to the Trustee an accounting with respect to the books and records delivered to the Company or the successor collateral manager, as applicable.

(b)    Notwithstanding such termination or removal, the Collateral Manager shall remain liable to the extent set forth herein (but subject to Section 4.4 hereof) for its acts or omissions hereunder arising prior to termination or removal and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Collateral Manager in Section 3.2 hereof or from any failure of the Collateral Manager to comply with the provisions of this Section 5.7 or as otherwise provided in Section 4.5(c) hereof.

(c)    The Collateral Manager agrees that, notwithstanding such termination or removal it shall cooperate with the Company in any Proceeding arising in connection with this Agreement, the Indenture, the Collateral Administration Agreement or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Collateral Manager or any Related Party of the Collateral Manager) upon receipt of appropriate indemnification and expense reimbursement. Notwithstanding anything else to the contrary contained in this Agreement or any other Transaction Documents, if Patriarch VIII ceases to be the Collateral Manager hereunder, the rights of Patriarch VIII and/or its Affiliates as a holder of any Securities shall not be affected.

Section 5.8    Trustee Termination Rights.  The Company, the Zohar Subsidiary and the Collateral Manager acknowledge the right of the Trustee to terminate this Agreement under certain circumstances set forth in Section 14.1 of the Indenture.

## ARTICLE VI

## ADDITIONAL AGREEMENTS OF THE COLLATERAL MANAGER

Section 6.1    Non-Exclusivity.  The services of the Collateral Manager to the Company and the Zohar Subsidiary are not to be deemed exclusive and the Collateral Manager shall be free to render collateral management or other services of any kind to others (including without limitation Affiliates, other investment companies and clients having objectives substantially identical to those of the Company). It is understood and agreed that the members, directors, stockholders, partners, employees, officers and managers of the Collateral Manager may engage in any other business activity or render services to any other Person or serve as partners, owners, officers, directors, consultants and advisers or managers of any other firm or company.

Section 6.2    Conflicts of Interest; Acknowledgment of the Company.

(a)    Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of the Collateral Manager, and its Affiliates, managers, directors, officers, stockholders, members, agents, advisors, partners and employees

NY216332.12/1939-17978

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000667

-22-

(collectively, "Related Parties") and their respective clients, including but not limited to the matters described in this Section 6.2. The Collateral Manager and its Related Parties may invest for their own accounts or on behalf of other clients (including clients with business objectives and structures and loans identical to the Company and/or the Zohar Subsidiary) in securities, obligations, loans or other assets that would be appropriate as investments for the Company and/or the Zohar Subsidiary. Such investments may be different (including with respect to issuer, price or terms) from those made on behalf of the Company and/or the Zohar Subsidiary. The Collateral Manager and its Related Parties may have, or advise clients with, ongoing relationships with companies whose securities, obligations or loans are pledged to support the Company's repayment obligations under the Indenture and such Persons may own equity or debt securities issued by issuers of, and other obligors on, Collateral Debt Obligations. Subject to Section 2.2(l)(ii), the Collateral Manager and its Related Parties may serve as collateral manager or advisor for, invest in, or be affiliated with, the Persons from which the Company and/or the Zohar Subsidiary may acquire Collateral, Affiliates of such Persons and other entities organized to issue collateralized debt obligations, including those identical to the Securities and those secured by high yield securities, distressed loans, or emerging market bonds and loans, including those issued by companies that are issuers of, and other obligors on, the Collateral. The Collateral Manager and its Related Parties may at certain times be simultaneously seeking to purchase and/or sell investments for the Company, the Zohar Subsidiary and/or other entities (or for some but not all of such Persons) for which it serves as collateral manager or advisor now or in the future, or for its other clients and its managers, directors, officers, stockholders, members, agents, advisors, partners, employees and Affiliates or for its own account. Due to the illiquid nature of the market for certain investments, the Collateral Manager and its Related Parties and clients may be unable to obtain identical execution of similar buy or sell decisions. The Collateral Manager, and its Related Parties may at certain times acquire, hold and dispose of Notes and Preference Shares. Notwithstanding any other provision herein to the contrary, the Collateral Manager and its Affiliates may act as a consultant to any issuer of or obligor on any Collateral or an agent for lenders under any loan facility (or hold any other similar role) in which the Company and/or the Zohar Subsidiary holds an interest that comprises part of the Collateral, subject to such consulting agreement or loan facility (or similar documents) containing customary and reasonable provisions for the indemnification and/or compensation of the Collateral Manager or its Affiliates, as the case may be.

      (b)    The Company and the Zohar Subsidiary hereby acknowledge that the Collateral Manager and its Related Parties may actively manage their own accounts and the accounts of other clients with investments similar, and in some cases identical, to the Collateral, including those issued by companies that are issuers of, and other obligors on, the Collateral, and consent to and waive the various potential and actual conflicts of interest that may exist from time to time with respect to the Collateral Manager and its Related Parties as generally described in Section 6.2(a) above; provided, however, that nothing in this Section 6.2 shall be construed as altering the duties of the Collateral Manager as set forth in this Agreement or the Indenture nor the requirements of any law, rule, or regulation applicable to the Collateral Manager.

      (c)    If the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the holders of the Notes and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment advisor that relates to any action to be taken with respect to any Collateral Debt Obligation, then the

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000668

-23-

Collateral Manager will (i) perform its obligations with respect to any such conflict in accordance with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict (provided that, to the extent that any provision of this Agreement specifically addresses the treatment of any conflict referred to in this clause (c), such conflict shall not be subject to this clause (c)) and (ii) provide notice to the original holder of the Class A-3 Note (so long as it remains a holder of such Note) of such conflict and the action taken by the Collateral Manager.

Section 6.3    Records.

(a)    The Collateral Manager, with the assistance of the Collateral Administrator, shall maintain appropriate books of account and records relating to services performed hereunder and relating to the Collateral including invoices for professional fees, and such books of account and records shall be accessible for inspection by a representative of the Company, the Zohar Subsidiary, the Trustee, the Credit Enhancer, the Preference Share Paying Agent, the Holders of the Notes and the independent accountants appointed by the Company pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior written notice ;provided, however, that following the Collateral Manager's receipt of a notice of its removal pursuant to Section 5.3 hereof, the Collateral Manager shall at the request of the Controlling Party use its commercially reasonable efforts to promptly provide to the prospective successor collateral manager copies of the books and records of the Zohar Obligors and copies of Underlying Instruments (in each case in the possession of the Collateral Manager) (for the avoidance of doubt, such books and records and other information shall not include the credit templates or other proprietary information of the Collateral Manager); provided further that the Collateral Manager shall be required to provide the information described in the immediately preceding proviso if (i) the prospective successor collateral manager executes a confidentiality agreement reasonably acceptable to the Collateral Manager and (ii) the release of such information is permitted under the Transaction Documents and the Underlying Instruments. Upon the termination of its obligations hereunder in accordance with this Agreement and the Indenture, the Collateral Manager agrees to either (i) maintain or cause the Collateral Administrator to maintain, such books and records as provided above for a period of three years (or such longer period required by applicable law) from such termination or (ii) deliver, or cause the Collateral Administrator to deliver, all such books and records (or copies thereof) to the Trustee promptly following such termination.

(b)    Upon the reasonable request of the Credit Enhancer, the Collateral Manager shall provide the Credit Enhancer with any calculations, and copies of documents and other relevant data and information in the possession of the Collateral Manager that the Collateral Manager utilizes for purposes of preparing any report or performing any calculation hereunder, under the Indenture or under the Collateral Administration Agreement.

(c)    Following the acquisition by the Company or the Zohar Subsidiary of any Collateral Debt Obligation or any Unrestricted Collateral Debt Obligation, the Collateral Manager shall provide to the Credit Enhancer a copy of the credit template prepared by the Collateral Manager with respect to such Collateral Debt Obligation or such Unrestricted Collateral Debt Obligation, as the case may be.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000669

-24-

Section 6.4    Confidentiality. The Collateral Manager shall, and shall endeavor to cause its Affiliates to, keep confidential information obtained in connection with this Agreement and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Company (or, with respect to confidential information of or pertaining to the Zohar Subsidiary or the activities of the Collateral Manager on behalf of the Zohar Subsidiary, the Zohar Subsidiary), (ii) such information as the Rating Agencies shall request, (iii) as required by law, regulation, court order or the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Collateral Manager (including securities offerings for additional collateralized debt obligation funds or investment vehicles for which the Collateral Manager or any of its Affiliates will serve as the collateral manager, advisor or replacement collateral manager), (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Collateral Manager (A) on a non-confidential basis or (B) for avoidance of doubt, other than in connection with the services rendered hereunder; provided that for the purposes of this clause (vi)(A) the Collateral Manager does not know of any breach by such source of any confidentiality obligations with respect thereto. Notwithstanding anything herein to the contrary, any party subject to confidentiality obligations hereunder or under any other related document (and any employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment of the U.S. federal income tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided it relating to such tax treatment and tax structure. For purposes of this Section 6.4, the Holders of Securities, the prospective Holders of Securities, the Credit Enhancer, all parties to the Transaction Documents, and any of their Related Parties or professional advisors or agents shall in no event be considered "non-affiliated third parties".

Section 6.5    Non-Petition. The Collateral Manager shall continue to serve as Collateral Manager under this Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under this Agreement because sufficient funds were not then available under the Indenture to pay such amounts in accordance with the Priority of Payments. The Collateral Manager covenants and agrees that it shall not institute against, or join any other Person in instituting against, any Zohar Obligor or any of their directors, officers, shareholders or incorporators (in their capacity as such) for any reason whatsoever (including, without limitation, the non-payment to the Collateral Manager of any amount payable by the Company hereunder) any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this sentence shall preclude, or be deemed to estop, the Collateral Manager (A) from taking any action prior to the expiration of the aforementioned one year and one day period (or such longer applicable preference period then in effect) in (x) any case or proceeding voluntarily filed or commenced by the Company, the Zohar Subsidiary or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Company, the Zohar Subsidiary or the Co-Issuer, as the case may be, by a Person other than the Collateral Manager or its respective Affiliates, or (B) from commencing against the Company, the Zohar Subsidiary or the Co-Issuer or any properties of the Company, the Zohar Subsidiary or the Co-Issuer any legal action that is

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP000670

-25-

not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    No Partnership or Joint Venture. The Company, the Zohar Subsidiary and the Collateral Manager are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Collateral Manager's relationship to the Company and the Zohar Subsidiary shall be deemed to be that of an independent contractor.

Section 7.2    Notices. Any notice under this Agreement shall be in writing and sent by facsimile or addressed and delivered or mailed postage paid to the other parties at such address as such other parties may designate for the receipt of such notice. Notice shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of facsimile notice, when received in legible form, addressed as set forth below. Until further notice to the other party, it is agreed that the address of the Company for this purpose shall be Zohar CDO 2003-1, Limited, c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Directors, telephone (345) 945-7099, facsimile (345) 945-7100; the address of the Zohar Subsidiary for this purpose shall be Zohar CDO 2003-1, LLC, c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopier number: (302) 738-7210; the address of the Collateral Manager for this purpose shall be Patriarch Partners VIII, LLC, c/o Patriarch Partners, LLC, 112 South Tryon Street, Suite 700, Charlotte, North Carolina 28284, Attention: Greg Murphy, telephone: (704) 227-1204, telecopier: (704) 375-0358; the address of the Trustee for this purpose shall be U.S. Bank National Association, One Federal Street, Third Floor, Boston, Massachusetts 02110, Attention: CDO Group-Ref: Zohar CDO 2003-1, Ltd., telephone: (617) 603-6531, telecopier: (503) 258-5859; the address of Standard & Poor's for this purpose shall be Standard & Poor's Ratings Group, 55 Water Street, New York, New York, 10041, telephone: (212) 438-2000, facsimile (212) 438-2664, Attention: Structured Finance Ratings, Asset Backed Securities CBO/CLO Surveillance and that of Moody's for this purpose shall be Moody's Investors Service, Inc., 99 Church St., New York, New York 10007, telephone: (212) 553-0300, telecopier: (212) 553-0355, Attention: CBO/CLO Monitoring; and the address of the Credit Enhancer for this purpose shall be MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504, telephone: (914) 765-3068, telecopier: (914) 765-3555, Attention: Insured Portfolio Management – Attention: CDO Group.

Section 7.3    Succession; No Assignment, Submission to Jurisdiction, Etc.

(a)    This Agreement shall inure to the benefit of and be binding upon the successors to the parties hereto. This Agreement may not be assigned by any party hereto, except (i) in the case of the assignment by the Company to the Trustee as contemplated by the Granting Clause of the Indenture, (ii) in the case of any assignment to a successor collateral manager pursuant to Section 5.5 hereof and (iii) in the case of any assignment by Patriarch VIII to a Controlled Entity with the prior written consent of the Controlling Party.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP000671

-26-

(b)    Each of the Company, the Zohar Subsidiary and the Collateral Manager irrevocably (i) submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to this Agreement or the Indenture, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court, (iii) waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, (iv) consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the address specified for it in Section 7.2 and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 7.4    Third-Party Beneficiary.  The Credit Enhancer is an express third-party beneficiary of this Agreement with the full power to enforce this Agreement as if the Credit Enhancer were a party hereto.

Section 7.5    Governing Law; Waiver Of Jury Trial.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 7.6    Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Section 7.7    Headings Descriptive.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 7.8    Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 7.9    Entire Agreement.  This Agreement and other documents referred to herein or delivered pursuant hereto, collectively contain the entire understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior agreements and understandings, oral and written, with respect thereto.

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP000672

-27-

Section 7.10    Amendments.  This Agreement may not be amended or modified or any provision hereof waived except (i) by an instrument in writing signed by the parties hereto, (ii) in accordance with Section 14.4(d) of the Indenture and (iii) with the written consent of the Controlling Party.  For the avoidance of doubt, prior to entering any agreement amending, modifying, terminating or waiving its rights under this Agreement, the Collateral Manager shall comply with the applicable requirements of Section 14.4(d) of the Indenture; provided however, that notwithstanding anything else contained herein, any amendment that (i) is necessary in order for this Agreement to comply with any applicable law or regulation, including without limitation the Investment Advisers Act of 1940, and (ii) does not materially and adversely affect the holders of the Notes shall not require the consent of any Person (other than the Controlling Party (so long as the Notes are Outstanding, the Class A-1 Commitments, the Class A-2 Commitments and the Class A-3 Commitments have not expired, terminated or been reduced to zero, or there remain any accrued and unpaid Credit Enhancement Liabilities) which consent shall not be unreasonably withheld or delayed) and may be evidenced by a supplement prepared by the Collateral Manager.

Section 7.11    Indulgences Not Waivers.  Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

Section 7.12    Collateral Manager Obligations Under the Indenture.  The Collateral Manager (i) consents to the assignment of this Agreement to the Trustee for the benefit of the Secured Parties pursuant to the terms of the Indenture, (ii) acknowledges that each of the Company and the Zohar Subsidiary has collaterally assigned all of its right, title and interest in, to and under this Agreement to the Trustee for the benefit of such Secured Parties, (iii) makes each of the agreements and covenants set forth in Section 14.4 of the Indenture and (iv) acknowledges that, under the terms of the Indenture, the Credit Enhancer will act as the Controlling Party under certain circumstances described therein.

Section 7.13    Limitations on Recourse.

(a)    The Collateral Manager shall have recourse solely to the Collateral described in the Indenture for the payment and performance of all of the obligations of the Company under this Agreement.  Upon final realization of such Collateral, any outstanding obligations of the Company hereunder shall be extinguished and shall not thereafter revive, and the Collateral Manager shall not be entitled to take any further steps against the Company or any of its directors, officers, shareholders or incorporators, to recover any sums due from the Company but still unpaid.

(b)    The Collateral Manager shall have no recourse to any shareholder, manager, member, director or officer of the Company or the Zohar Subsidiary, or to any

Collateral Management Agreement

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP000673

-28-

of the respective assets of such shareholder, manager, member, director or officer of the Company or the Zohar Subsidiary.

      (c)    Neither the Company nor the Zohar Subsidiary shall have any recourse to any shareholder, manager, member, director or officer of the Collateral Manager, or to any of the respective assets of such shareholder, manager, member, director or officer of the Collateral Manager.

      Section 7.14   <u>Conflict with Indenture</u>.  Subject to Article II, in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

<u>Collateral Management Agreement</u>

NY216332.12/1939-17978

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000674

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR CDO 2003-1, LIMITED

By: _____
Name: **Chris Watler**
Title: **Director**

ZOHAR CDO 2003-1, LLC
    By: ZOHAR CDO 2003-1, LIMITED,
        as Managing Member

By: _____
Name:
Title:

PATRIARCH PARTNERS VIII, LLC

By: _____
Name: Lynn Tilton
Title: Manager

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000675

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR CDO 2003-1, LIMITED

By: _____
Name:
Title:


ZOHAR CDO 2003-1, LLC
    By: ZOHAR CDO 2003-1, LIMITED,
        as Managing Member

By: _____
Name:    **Chris Watler**
Title:    Director


PATRIARCH PARTNERS VIII, LLC

By: _____
Name: Lynn Tilton
Title:   Manager


Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                      PP000676

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR CDO 2003-1, LIMITED

By: _____
Name:
Title:

ZOHAR CDO 2003-1, LLC
   By:  ZOHAR CDO 2003-1, LIMITED,
        as Managing Member

By: _____
Name:
Title:

PATRIARCH PARTNERS VIII, LLC

By: _____
Name:  Lynn Tilton
Title:   Manager

Collateral Management Agreement

**INDEX**

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000677

# **EXHIBIT 5**

**Zohar II CMA**

COLLATERAL MANAGEMENT AGREEMENT

among

ZOHAR II 2005-1, LIMITED,

ZOHAR II 2005-1, LLC,

and

PATRIARCH PARTNERS XIV, LLC,

as Collateral Manager

Dated as of January 12, 2005

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

INDEX

RESPONDENTS'
EXHIBIT
**10**
AP No. 16462

PP000949

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................1

    Section 1.2. Definitions.................................................................................................1

ARTICLE II GENERAL DUTIES OF THE COLLATERAL MANAGER...................................4

    Section 2.1. Appointment of the Collateral Manager. ......................................................4
    Section 2.2. Management Services. .................................................................................4
    Section 2.3. Delivery of Collateral. ................................................................................8
    Section 2.4. Standard of Care. .......................................................................................8
    Section 2.5. Action on Behalf of the Company and the Zohar Subsidiary.........................8
    Section 2.6. Obligations of the Collateral Manager.........................................................8
    Section 2.7. Brokerage.................................................................................................9
    Section 2.8. Allocation of Aggregate Executions............................................................9
    Section 2.9. The Collateral Manager's Practices............................................................10

ARTICLE III REPRESENTATIONS AND WARRANTIES.....................................................10

    Section 3.1. Representations and Warranties of the Company and the Zohar Subsidiary.10
    Section 3.2. Representations and Warranties of the Collateral Manager. .........................11

ARTICLE IV COMPENSATION; EXPENSE; DELEGATION;  LIABILITY AND
INDEMNIFICATION.......................................................................................................13

    Section 4.1. Compensation. .........................................................................................13
    Section 4.2. Expenses. ................................................................................................14
    Section 4.3. Delegation. ..............................................................................................15
    Section 4.4. Liability of the Collateral Manager.............................................................15
    Section 4.5. Indemnification. .......................................................................................15

ARTICLE V TERM AND TERMINATION; REMOVAL OF THE COLLATERAL
MANAGER ....................................................................................................................18

    Section 5.1. Term........................................................................................................18
    Section 5.2. Automatic Termination..............................................................................18
    Section 5.3. Termination For Cause. .............................................................................18
    Section 5.4. Post-Termination Approvals.......................................................................19
    Section 5.5. Appointment of Successor. ........................................................................19
    Section 5.6. Survival....................................................................................................20
    Section 5.7. Action Upon Termination...........................................................................20
    Section 5.8. Trustee Termination Rights. ......................................................................20

ARTICLE VI ADDITIONAL AGREEMENTS OF THE COLLATERAL MANAGER ...........21

    Section 6.1. Non-Exclusivity. ......................................................................................21
    Section 6.2. Conflicts of Interest; Acknowledgment of the Company. ..............................21
    Section 6.3. Records. ..................................................................................................22
    Section 6.4. Confidentiality. .........................................................................................23

i

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000950

Section 6.5. Non-Petition.............................................................................................23

ARTICLE VII MISCELLANEOUS.................................................................................24
    Section 7.1. No Partnership or Joint Venture. ...........................................................24
    Section 7.2. Notices. ..................................................................................................24
    Section 7.3. Succession; No Assignment, Submission to Jurisdiction, Etc. ..............25
    Section 7.4. Third-Party Beneficiary. .......................................................................25
    Section 7.5. Governing Law; Waiver Of Jury Trial....................................................25
    Section 7.6. Counterparts...........................................................................................25
    Section 7.7. Headings Descriptive. ............................................................................26
    Section 7.8. Severability. ...........................................................................................26
    Section 7.9. Entire Agreement. ..................................................................................26
    Section 7.10. Amendments. .......................................................................................26
    Section 7.11. Indulgences Not Waivers......................................................................26
    Section 7.12. Collateral Manager Obligations Under the Indenture...........................26
    Section 7.13. Limitations on Recourse. ......................................................................27
    Section 7.14. Conflict with Indenture.........................................................................27

ii

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000951

## COLLATERAL MANAGEMENT AGREEMENT

COLLATERAL MANAGEMENT AGREEMENT, dated as of January 12, 2005 (as the same may be amended or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), among ZOHAR II 2005-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Company"), ZOHAR II 2005-1, LLC, a limited liability company organized under the laws of the State of Delaware (the "Zohar Subsidiary"), and PATRIARCH PARTNERS XIV, LLC, a limited liability company organized under the laws of the State of Delaware ("Patriarch XIV" or the "Collateral Manager").

### RECITAL

The Company and the Zohar Subsidiary desire to engage the Collateral Manager to provide the **services** described herein and the Collateral Manager desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the parties hereto hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1. Definitions. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings ascribed thereto in the Indenture (defined below).  In addition, as used herein, the following terms shall have the following respective meanings:

"Approved Percentage" shall mean 50% or such lesser percentage (greater than 25%) as shall have been approved in writing by the Controlling Party (such approval not to be unreasonably withheld).

"Approved Replacement" shall mean any replacement for an individual who is (a) a manager, director or management-level employee of the Collateral Manager and (b) actively involved in the management of the Collateral Debt Obligations.

"Cause" shall mean:

(i)      the Collateral Manager willfully breaches, or takes any action that it knows violates, any provision of this Agreement or any term of the Indenture applicable to it;

(ii)      except as provided in (i) above, the Collateral Manager breaches in any material respect any provision of this Agreement or any term of the Indenture applicable to it and fails to cure such breach within thirty (30) days of becoming aware of, or receiving notice from the Trustee or the Controlling Party of, such breach provided however, that such 30 day period shall (with the consent of the Controlling Party (such consent not to be unreasonably withheld or delayed)) be increased to 60 days if the

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000952

-2-

Collateral Manager is using commercially reasonable good faith efforts to cure such breach;

(iii)    the failure of any representation, warranty, certification or statement made or delivered by the Collateral Manager in or pursuant to this Agreement or the Indenture to be correct in any material respect when made and such failure (i) has an adverse effect on the Noteholders or the Credit Enhancer and (ii) no correction is made for a period of thirty (30) days after the Collateral Manager becomes aware of or receives notice from the Trustee or the Controlling Party of such failure; provided however, that such 30 day period shall (with the consent of the Controlling Party (such consent not to be unreasonably withheld or delayed)) be increased to 60 days if the Collateral Manager is using commercially reasonable good faith efforts to cure such failure;

(iv)    an Event of Bankruptcy occurs;

(v)    the occurrence of an act by (i) the Collateral Manager, (ii) Patriarch Partners VIII, LLC, (iii) any company that controls, is controlled by or is under common control with the Collateral Manager (a "Controlled Entity"), (iv) any holder of equity interests in the Collateral Manager, Patriarch Partners VIII, LLC or any Controlled Entity that is also a senior officer of such entity or (v) (without duplication) Lynn Tilton (or any Approved Replacement therefor) that constitutes fraud (as determined in an adjudication) in the performance of its obligations under this Agreement or in the performance of investment advisory services comparable to those provided under this Agreement, or any such person or entity being indicted for a criminal offense materially related to the performance of its obligations under this Agreement or in the performance of investment advisory services comparable to those provided under this Agreement (it being understood that, for the purposes of the definition of "Controlled Entity", control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise);

(vi)    (a) Lynn Tilton (or any Approved Replacement therefor) shall fail, for any reason, to be a principal, managing director or management-level employee of Patriarch XIV who is actively involved in the management of the Collateral Debt Obligations or (b) Lynn Tilton shall fail directly or indirectly to own at least the Approved Percentage of the equity interests in Patriarch XIV, unless in the case of the foregoing clause (a) an Approved Replacement shall (x) have been proposed within forty-five (45) days of such failure and (y) have been approved in writing by the Controlling Party within thirty (30) days after notice is sent of such proposed replacement; or

(vii)    an Event of Default under the Indenture has occurred and is continuing.

"CMA Termination Date" shall have the meaning specified in Section 5.1.

"Debt Issuer" shall mean the issuer of any Collateral Debt Obligation.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000953

-3-

"Event of Bankruptcy" shall mean:

(A)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Collateral Manager or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Collateral Manager or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days; or an order or decree approving or ordering any of the foregoing shall be entered; or

(B)     the Collateral Manager shall (i) be wound up or dissolved, (ii) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (iii) apply for or consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (A) of this definition, (iv) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Collateral Manager or for a substantial part of its assets, (v) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (vi) cease to be able to, or admit in writing its inability to, pay its debts as they become due and payable, or make a general assignment for the benefit of creditors or (vii) take any action for the purpose of effecting any of the foregoing.

"Indemnified Party" shall have the meanings specified in Section 4.5(a) and (c).

"Indemnifying Party" shall have the meanings specified in Section 4.5(a) and (c).

"Indenture" shall mean the Indenture, dated as of January 12, 2005, among the Company, Zohar II 2005-1, Corp., the Zohar Subsidiary, the Credit Enhancer, the Class A-1 Note Agent, the Class A-3 Note Agent and the Trustee, as modified and supplemented and in effect from time to time in accordance with the terms thereof.

"Purchase Documents" shall mean the assignment agreements, purchase and sale agreements, participation agreements and/or other agreements by which the Company and/or the Zohar Subsidiary acquires any interest, direct or indirect, in the Collateral.

"Related Parties" shall have the meaning specified in Section 6.2.

"Securities" shall mean, for the purposes of this Agreement only, the Notes and the Preference Shares.

"Senior Collateral Management Fee" shall have the meaning specified in Section 4.1(b).

"Subordinated Collateral Management Fee" shall have the meaning specified in Section 4.1(c).

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC          PP000954

-4-

## ARTICLE II

## GENERAL DUTIES OF THE COLLATERAL MANAGER

Section 2.1. <u>Appointment of the Collateral Manager</u>. The Collateral Manager is hereby appointed as collateral manager of each of the Company and the Zohar Subsidiary for the purpose of performing certain investment management functions as specified herein, and the Collateral Manager hereby accepts such appointment.

Section 2.2. <u>Management Services</u>. The Collateral Manager will provide each of the Company and the Zohar Subsidiary with the following services, in each case subject to and in accordance with the terms of the Indenture and this Agreement:

(a)    <u>Collateral</u>. The Collateral Manager shall determine, in accordance with the criteria set forth in the Indenture relating to the acquisition, origination, restructuring, exchange, holding and disposition of the Collateral, the specific Collateral to be acquired, originated, restructured, exchanged, held or disposed of by the Company and/or the Zohar Subsidiary (including without limitation (x) the entry into, and the reduction in the notional amount or termination of, Hedge Agreements (if any) and (y) whether or not to acquire (by extending credit or otherwise) additional Collateral Debt Obligations pursuant to Section 12.1 of the Indenture, to acquire (by extending credit or otherwise) Unrestricted Collateral Debt Obligations or to apply amounts on deposit in the Rollover Proceeds Account), and shall effect acquisitions, originations, restructurings, exchanges and dispositions of Collateral on behalf of the Company and/or the Zohar Subsidiary from time to time as it shall determine, taking into consideration the payment obligations of and financing available to the Company under the Indenture and the other Transaction Documents and the Principal Proceeds and other amounts held by the Company; <u>provided, however</u>, that notwithstanding anything to the contrary contained in this Agreement, no duty or obligation of the Collateral Manager described hereunder shall be deemed to imply a guaranty of, and the Collateral Manager does not hereby guarantee, the performance of or economic returns to be realized by such Collateral or whether the economic returns on such Collateral will be sufficient to repay the amounts owed by the Company under the Indenture or otherwise.

(b)    <u>Effectuation of Trades</u>. Subject to any restrictions in the Indenture, the Collateral Manager shall effectuate the acquisition, origination, restructuring, exchange or disposition of Collateral on behalf of the Company and/or the Zohar Subsidiary, as applicable.

(c)    <u>Exercise of the Rights by the Company and the Zohar Subsidiary</u>. The Collateral Manager shall make determinations with respect to the exercise or enforcement of any and all rights by the Company and/or the Zohar Subsidiary (including but not limited to any such rights under the Hedge Agreements (if any) and voting rights and rights arising in connection with the bankruptcy or insolvency of a Debt Issuer or the consensual or non-judicial restructuring of the debt or equity of a Debt Issuer) or rights or remedies in connection with the Collateral and participating in the committees (official or otherwise) or other groups formed by creditors of a Debt Issuer; <u>provided, however</u>, that the Collateral Manager shall not cause the Company or the Zohar Subsidiary to exercise any such rights or remedies in a manner prohibited by the Indenture. Without limiting the foregoing, the Collateral Manager may, on behalf of the

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000955

-5-

Company and/or the Zohar Subsidiary and without the consent of the holders of any Notes or any other Person, enter into any amendment, modification or waiver of, or supplement to, any term or condition of any Collateral, Collateral Debt Obligation, Unrestricted Collateral Debt Obligation, and/or Equity Security (including, without limitation and subject to the terms of the Indenture, exchanges thereof for other loans, equity or other securities), so long as such amendment, modification, waiver or supplement does not contravene the provisions of the Indenture or this Agreement or contravene any applicable law or regulation. The Collateral Manager shall make determinations with respect to the exercise or enforcement of any rights and remedies of the Company and the Zohar Subsidiary, as applicable, under the Purchase Documents on behalf of the Company and the Zohar Subsidiary, subject to the terms and conditions thereof.

(d)    Negotiations. The Collateral Manager shall negotiate on behalf of the Company and the Zohar Subsidiary with prospective purchasers of the Collateral, with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor (or any of its Affiliates) thereon (or such obligor's (or any of its Affiliates') line(s) of business) or exchange of Collateral and/or with prospective sellers or issuers of Collateral as to the terms relating to the issuance, purchase, sale, exchange and/or disposition of such Collateral, subject in each case to any restrictions contained in the Indenture.

(e)    Rating Agencies, Trustee and Credit Enhancer. (i) The Collateral Manager shall on behalf of the Company and/or the Zohar Subsidiary consult with each Rating Agency, the Trustee and the Credit Enhancer at such times as may be reasonably requested by such Rating Agency, the Trustee or the Credit Enhancer and provide the Rating Agencies, the Trustee and the Credit Enhancer with any information reasonably requested by such Person in connection with each Rating Agency's, the Trustee's or the Credit Enhancer's monitoring of the acquisition, management and disposition of Collateral. (ii) The Collateral Manager shall be, and hereby is, authorized to execute on behalf of any Zohar Obligor(s) any and all agreements to be entered into between such Zohar Obligor(s) and a Rating Agency.

(f)    Monitoring of Collateral. The Collateral Manager shall (i) monitor the Collateral on an ongoing basis, (ii) prepare and deliver such information, reports, schedules and other data that is required to be prepared and/or delivered by the Collateral Manager under the Indenture and Section 2 of the Collateral Administration Agreement, as applicable, (iii) notify the Credit Enhancer, the Trustee, and the Company in writing of the occurrence of an Event of Default under the Indenture to the extent the Collateral Manager has actual knowledge of the occurrence thereof, (iv) determine whether any Unrestricted Collateral Debt Obligation is a Revolving Collateral Debt Obligation, Delayed Funding Collateral Debt Obligation or term loan, (v) monitor from time to time the cash flows generated by the portfolio of Collateral Debt Obligations and notify the Trustee when such cash flows materially deviate from the expected cash flows in respect of such portfolio and (vi) determine whether any Collateral Debt Obligation is (A) a Revolving Collateral Debt Obligation, Delayed Funding Collateral Debt Obligation or term loan; (B) a Category 1, Category 2, Category 3 or Category 4 loan or a Workout Obligation; or (C) a Defaulted Collateral Debt Obligation.

NY281027.5/2047-00003

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000956

Case 20-50534-KBO    Doc 179-6    Filed 04/13/22    Page 303 of 362

-6-

(g)    Supervision of the Collateral. The Collateral Manager shall manage the Company's and the Zohar Subsidiary's investments within the parameters set forth in the Indenture.

(h)    Hiring of Specialists. The Collateral Manager shall, to the extent required or desirable in connection with the performance of its duties under this Agreement, hire and manage specialists and pay the fees and expenses with respect thereto (with reimbursement from the Company to the extent provided in Section 4.2 hereof and as provided in the Priority of Payments), provided that no delegation by the Collateral Manager of any of its duties hereunder to any third party shall relieve the Collateral Manager of any of its duties hereunder or relieve the Collateral Manager of any liability with respect to the performance of such duties.

(i)    Optional Redemption. The Collateral Manager shall take commercially reasonable action on behalf of the Company in connection with effectuating any optional redemption of the Notes in accordance with Section 9.1 of the Indenture or any optional redemption of the Preference Shares in accordance with the Preference Share Paying Agency Agreement.

(j)    Payments from Cash Reserve Account. The Collateral Manager shall determine on each Determination Date whether to cause the Company on the related Payment Date to apply amounts in the Cash Reserve Account in the manner set forth in Section 10.7 of the Indenture.

(k)    Other Matters. The Collateral Manager shall comply with such other duties and responsibilities as may be expressly required of the Collateral Manager by the provisions of the Indenture and Section 2 of the Collateral Administration Agreement and shall use commercially reasonable efforts to assist the Company in complying with its duties and responsibilities under the Indenture, the Note Purchase Agreements and the Purchase Documents.

(l)    So long as the Class A Notes are outstanding, the Class A-1 Commitments and the Class A-3 Commitments have not expired, terminated or been reduced to zero or any amounts remain due and payable to the Credit Enhancer under the Credit Enhancement Agreement, the Collateral Manager shall not without the prior consent of the Credit Enhancer:

(i)    arrange for the Company and/or the Zohar Subsidiary to acquire any Collateral Debt Obligation if at the time of such initial acquisition the Collateral Manager has actual knowledge that (A) such Collateral Debt Obligation is not investment grade and has no material negative covenants but, when originally issued, was investment grade, (B) such Collateral Debt Obligation is secured primarily by the stock of subsidiaries of the obligor on such Collateral Debt Obligation or (C) the obligor of such Collateral Debt Obligation (or such obligor's business) is the subject of (1) protracted litigation, (2) material accounting irregularities or (3) significant environmental problems; or

(ii)    arrange for the Company and/or the Zohar Subsidiary to acquire any Collateral Debt Obligation or any other item included in the Collateral from or sell any Collateral Debt Obligation to the Collateral Manager, any of its

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000957

Respondents' Exhibit 10   pg. 9 of 32

-7-

Affiliates or any fund or account for which the Collateral Manager or any of its Affiliates acts as investment manager or advisor, except as provided in the Indenture or the other Transaction Documents (including without limitation the Company's purchase(s) from Zohar CDO 2003-1, Limited and/or Ark CLO 2000-1, Limited of the assets and at the price(s) listed in Schedule A-1 and Schedule A-2, respectively, of the Indenture).

(m)     The Collateral Manager shall cause the Company and/or the Zohar Subsidiary to acquire each Collateral Debt Obligation pursuant to a purchase, assignment or participation agreement containing terms and conditions not materially less favorable to the Company and/or the Zohar Subsidiary than the terms and conditions of the comparable standard-form document of the Loan Syndications and Trading Association ("LSTA") (which in the case of any Collateral Debt Obligation acquired by way of assignment for a price of less than 80% of par shall be deemed to be the applicable LSTA "Distressed Trade" form document) (for the avoidance of doubt, such documentation described in this clause (m) shall not be required in the case of any Collateral Debt Obligation that consists of a direct extension of credit by the Company and/or the Zohar Subsidiary to the obligor under such Collateral Debt Obligation).

(n)     The Collateral Manager shall not, on behalf of the Company and/or the Zohar Subsidiary, direct or effect the acquisition or disposition of the Collateral Debt Obligations or any other item included in the Collateral except in accordance with the requirements of the Indenture.

(o)     The Collateral Manager shall consult with the Credit Enhancer at such times as may be reasonably requested by the Credit Enhancer and provide the Credit Enhancer with any information reasonably requested by it in connection with the Credit Enhancer's duties and responsibilities in its capacity as the Credit Enhancer under the Indenture and each of the other Transaction Documents.

(p)     Workouts and Restructurings. For the avoidance of doubt and notwithstanding anything else contained herein, the Company, the Zohar Subsidiary and the Collateral Manager acknowledge and agree that the Collateral Debt Obligations, and/or Unrestricted Collateral Debt Obligations will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as of consequence thereof, the Company and/or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral Debt Obligations, Equity Kickers, Equity Workout Securities, and/or the relevant Underlying Instruments (A) interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Debt Obligation" and/or the Eligibility Criteria and/or (B) Equity Workout Securities.

(q)     Borrowings. The Collateral Manager shall (subject to the terms of the Indenture) take such action on behalf of the Company and the Zohar Subsidiary as the Collateral Manager determines appropriate to cause the Company to make Borrowings under the Class A-1 Notes, the Class A-2 Notes and/or the Class A-3 Notes at such times and in such amounts (subject to Section 9.6 of the Indenture) as may be required to meet the obligations of the Company and the Zohar Subsidiary.

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000958

-8-

(r)    Eligible Investments. The Collateral Manager shall manage, in accordance with the terms of the Indenture, the Eligible Investments, including, without limitation, determining the Stated Maturity (after giving effect to any applicable grace period) of each Eligible Investment purchased or held by the Issuer, which Stated Maturity shall be no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the investment was made, taking into consideration the scheduled and expected funding and payment obligations of the Company and/or the Zohar Subsidiary.

Section 2.3.  Delivery of Collateral. The Collateral Manager shall cause the Company and/or the Zohar Subsidiary (as applicable to) deliver the Collateral as provided in Section 3.3 of the Indenture.  Should any part of the Collateral come into the possession or otherwise be acquired by the Collateral Manager, the Collateral Manager shall promptly cause such property to be delivered to the Trustee (or to the Custodian for the benefit of the Trustee), as provided in Section 3.3 of the Indenture.

Section 2.4.  Standard of Care. The Collateral Manager shall, in rendering its services as Collateral Manager, use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture. Subject to the immediately preceding sentence, the Collateral Manager shall follow its customary standards, policies and procedures in performing its duties under the Indenture and Section 2 of the Collateral Administration Agreement and its duties hereunder.  The Collateral Manager shall comply with all the terms and conditions of the Indenture and Section 2 of the Collateral Administration Agreement affecting the duties and functions that have been delegated to it thereunder.  The Collateral Manager will be bound to follow any supplement or other modification to the Indenture and any other applicable Transaction Document of which it has received written notice from the time it has received a copy of such supplement or other modification from the Company or the Trustee, so long as such supplement or other modification is in effect and has been entered into in accordance with the terms of Article 8 of the Indenture. The Collateral Manager shall not be bound by any amendment, supplement or other modification to the Indenture, any Transaction Document and/or any other agreement that reduces the rights or increases the obligations of the Collateral Manager unless the Collateral Manager shall have consented thereto in writing.

Section 2.5.  Action on Behalf of the Company and the Zohar Subsidiary. To the extent necessary or appropriate to perform all of the duties to be performed by it hereunder and under the provisions of the Indenture applicable to it, each of the Company and the Zohar Subsidiary hereby confers upon the Collateral Manager the power to execute and deliver all necessary, desirable and appropriate documents and/or instruments in the name and on behalf of the Company or the Zohar Subsidiary, as the case may be, as its attorney-in-fact with respect thereto.

Section 2.6.  Obligations of the Collateral Manager. Unless otherwise required by any provision of the Indenture or this Agreement or by applicable law, the Collateral Manager shall not take any action which it knows or should be reasonably expected to know in accordance with

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000959

-9-

prevailing market practices would (i) cause the Company or the Zohar Subsidiary to violate the terms of the Indenture, (ii) adversely affect the interests of the Holders of the Securities (without, in the case of the Notes, giving effect to the Credit Enhancement, if applicable) in any material respect (other than as contemplated hereunder or under the Indenture, it being understood and acknowledged that the Collateral Manager does not guarantee the performance of the Collateral or any payment obligation under the Indenture), (iii) not be permitted under the governing instruments of the Company, the Co-Issuer or the Zohar Subsidiary, (iv) violate any United States federal or state law (including Delaware corporate and limited liability company law), Cayman Islands law or any other law (including, without limitation, any related rule or regulation of any governmental body or agency having jurisdiction over the Company, the Co-Issuer or the Zohar Subsidiary) known to the Collateral Manager, or as advised by the Administrator, counsel to the Administrator or counsel to the Collateral Manager, to be applicable to the Company, the Zohar Subsidiary or the Co-Issuer, the violation of which would have a material adverse effect on the Company, the Zohar Subsidiary, the Co-Issuer, any of the Collateral or on the ability of the Collateral Manager to perform its obligations hereunder or (v) require registration of the Company, the Co-Issuer, the Zohar Subsidiary, or the pool of Collateral as an "investment company" under the Investment Company Act; it being understood that in connection with the foregoing the Collateral Manager will not be required to make any independent investigation of any facts or laws not otherwise known to it in connection with its obligations under this Agreement and the Indenture or the conduct of its business generally. The Collateral Manager covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement or the Indenture, the Collateral Manager shall not intentionally take any action that it knows would cause an Event of Default under the Indenture.

Section 2.7. <u>Brokerage</u>. The Collateral Manager shall use commercially reasonable efforts to obtain, in accordance with applicable laws, the best prices and execution for all orders placed with respect to purchases and sales of the Collateral. Subject to the objective of obtaining best execution, the Collateral Manager may take into consideration research and other brokerage services furnished to the Collateral Manager or its Affiliates by brokers and dealers which are not Affiliates of the Collateral Manager. Such services may be used by the Collateral Manager in connection with its other advisory activities or investment operations. Subject to Section 6.2, the Collateral Manager may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts managed by the Collateral Manager and the Affiliates of the Collateral Manager, <u>provided</u> that the Collateral Manager and its Affiliates may only so aggregate purchases and sales if at the time of such purchases and sales the agreements governing the management of such other accounts contain a provision permitting such aggregation substantially similar to the provision contained herein. In accounting for such aggregated order price, commissions and other expenses shall be apportioned on an equitable basis (in the sole judgment of the Collateral Manager).

Section 2.8. <u>Allocation of Aggregate Executions</u>. When any aggregate sales or purchase orders occur, the objective of the Collateral Manager shall be to allocate the executions among the accounts in an equitable manner over time, consistent with its practices with respect to other accounts it manages, the status of the portfolio of investments and the requirements in the Indenture.

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000960

-10-

Section 2.9. <u>The Collateral Manager's Practices</u>. Without limiting the obligations of the Collateral Manager set forth herein and in the Indenture, all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company and/or the Zohar Subsidiary shall be in accordance with reasonable and customary business practices of the relevant market and in compliance with applicable laws and all purchases and sales of the Collateral will be effected on arm's-length terms (including without limitation any sales or purchases of Collateral Debt Obligations to or from IXIS Financial Products Inc. and/or its Affiliates). Each of the Company and the Zohar Subsidiary acknowledges that all or a significant portion of the Collateral Debt Obligations, and/or Unrestricted Collateral Debt Obligations, if sold, will likely be sold in the distressed debt market and that the Collateral Manager will be required to cause the Company and the Zohar Subsidiary, as applicable, to make extensive representations and warranties regarding such Collateral and the management of such Collateral by the Company, the Zohar Subsidiary and the Collateral Manager. In connection with the foregoing, to the extent that the seller of such Collateral Debt Obligations, and/or Unrestricted Collateral Debt Obligations (and/or such seller's predecessors-in-title) did not make customary representations and warranties at the time of the applicable transfer of such Collateral, the Company and/or the Zohar Subsidiary may each make such representations and warranties on its own account.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1. <u>Representations and Warranties of the Company and the Zohar Subsidiary</u>. Each of the Company and the Zohar Subsidiary (each, a "<u>Representing Entity</u>") represents and warrants (as to itself only) to the Collateral Manager that:

(a)     <u>Organization, Power and Authority, Etc.</u> Such Representing Entity has been duly organized and is validly existing under the laws of the Cayman Islands (in the case of the Company) or the State of Delaware (in the case of the Zohar Subsidiary) and has the full power and authority (i) to execute, deliver and perform each of the Transaction Documents to which it is a party and all obligations required thereunder and (ii) to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under the Transaction Documents to which it is a party would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of such Representing Entity.

(b)     <u>This Agreement</u>. This Agreement has been duly authorized, executed and delivered by such Representing Entity and constitutes its valid and binding obligation, enforceable against it in accordance with its terms except that the enforceability thereof may be subject to (i) bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                            PP000961

-11-

(c)    <u>Consents, Approvals, Etc</u>.  No consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person is required for the performance by such Representing Entity of its duties hereunder, except such as have been duly made or obtained.

(d)    <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement nor the performance of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of or constitutes a default under (i) the organizational documents of such Representing Entity, (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which such Representing Entity is a party or such Representing Entity or its property is bound, (iii) any statute applicable to such Representing Entity, or (iv) any law, decree, order, rule or regulation applicable to such Representing Entity of any court or regulatory, administrative or governmental agency, body or authority or arbitrator having or asserting jurisdiction over such Representing Entity or its properties, and, in the case of each preceding clause, which would have a material adverse effect upon the performance by it of its duties under this Agreement or any other Transaction Document.

(e)    <u>No Violations</u>.  Such Representing Entity is not in violation of any U.S. federal or state securities law or regulation promulgated thereunder and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best of its knowledge, threatened that would have a material adverse effect upon the performance by it of its duties under or the validity or enforceability of this Agreement.

(f)    <u>True and Complete Documentation</u>.  True and complete copies of the Transaction Documents to which it is a party and all other documents contemplated therein, and the organizational documents of such Representing Entity, as in effect as of the date of this Agreement, have been delivered to the Collateral Manager and such Representing Entity agrees to deliver a true and complete copy of each amendment to the documents referred to in this paragraph (f) to the Collateral Manager, as promptly as practicable after its adoption or execution.

(g)    <u>Investment Company Act</u>.  Such Representing Entity is not an "investment company" that is required to be registered under the Investment Company Act.

Section 3.2.  <u>Representations and Warranties of the Collateral Manager</u>.  The Collateral Manager represents and warrants to the Company, the Zohar Subsidiary, the Credit Enhancer and the Noteholders that:

(a)    <u>Organization, Power and Authority, Etc</u>.  The Collateral Manager is duly organized, is validly existing and in good standing under the laws of the State of Delaware and has full power and authority (i) to execute and deliver this Agreement and to perform all of its obligations hereunder and under the provisions of the Indenture and Collateral Administration Agreement applicable to it, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the Indenture and Collateral Administration Agreement applicable to it and (ii) to transact the business in which it is presently engaged and is duly qualified and in good standing

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000962

-12-

under the laws of each jurisdiction where the performance of its obligations under this Agreement and the provisions of the Indenture and Collateral Administration Agreement applicable to it would require such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the financial condition or the ability of the Collateral Manager to perform its obligations under, or on the validity or enforceability of, this Agreement and the applicable provisions of the Indenture and Collateral Administration Agreement.

(b)    This Agreement. This Agreement and each instrument or document of the Collateral Manager required hereunder or under the terms of the Indenture and Collateral Administration Agreement has been duly authorized, executed and delivered by the Collateral Manager and constitutes a valid and binding agreement of the Collateral Manager, enforceable against it in accordance with its terms, except that the enforceability thereof may be subject to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(c)    No Securities Laws Violations, No Proceedings. The Collateral Manager is not in violation of any federal or state securities law or regulation promulgated thereunder related to the conduct of its asset management business, and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best knowledge of the Collateral Manager, threatened, that in either case would have a material adverse effect upon the performance by the Collateral Manager of its duties under this Agreement and the Collateral Administration Agreement or on the validity or enforceability of this Agreement and the Collateral Administration Agreement or the provisions of the Indenture and the Collateral Administration Agreement applicable to the Collateral Manager.

(d)    No Conflicts. Neither the execution and delivery of this Agreement or the Collateral Administration Agreement, nor the performance of the terms hereof or the provisions of the Indenture and the Collateral Administration Agreement applicable to the Collateral Manager, conflicts with or results in a breach or violation of the organizational documents of the Collateral Manager or conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) the terms of any indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other agreement, obligation, condition, covenant or instrument to which the Collateral Manager is a party or the Collateral Manager or its property is bound, (ii) any statute applicable to the Collateral Manager or (iii) any law, decree, order, rule or regulation applicable to the Collateral Manager of any court or regulatory, administrative or governmental agency, body or authority or arbitrator having or asserting jurisdiction over the Collateral Manager or its properties, and which would, in the case of the foregoing clauses (i), (ii) and (iii), have a material adverse effect upon the performance by the Collateral Manager of its duties under this Agreement or the provisions of the Indenture and the Collateral Administration Agreement applicable to it.

(e)    No Consents, Approvals, Etc. No consent, approval, registration, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other Person is required for the performance by the Collateral Manager of its duties

NY281027.5/2047-00003

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP000963

-13-

hereunder and under the terms of the Indenture and the Collateral Administration Agreement applicable to it, except such as have been duly made or obtained.

## ARTICLE IV

## COMPENSATION; EXPENSE; DELEGATION; LIABILITY AND INDEMNIFICATION

Section 4.1. Compensation.

(a)    Generally.  In consideration of the performance of the obligations of the Collateral Manager hereunder and under the Indenture, the Collateral Manager shall be entitled to receive, at the times set forth in the Indenture and subject to the conditions set forth in the Indenture and in accordance with the Priority of Payments, to the extent funds are available therefor, the fees set forth in clauses (b) and (c) below.  The Senior Collateral Management Fee and the Subordinated Collateral Management Fee shall be computed on the basis of a year of 360 days and the actual number of days elapsed.

(b)    Senior Collateral Management Fee.  The Collateral Manager shall be entitled to receive a fee (the "Senior Collateral Management Fee") which will accrue from the Closing Date at the greater of (x) a rate of 1.0% per annum on the Quarterly Asset Amount and (y) $1,500,000 on each Payment Date (adjusted in the case of the first Payment Date on which such fees are paid to reflect the different number of days in such period), payable in arrears on each Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments.  For the avoidance of doubt, for purposes of calculating the Senior Collateral Management Fee, the Quarterly Asset Amount shall include (without duplication) the Principal Balance of each Originated Special Loan/Preferred Security.  The Senior Collateral Management Fee will accrue if unpaid and shall be payable on the next Payment Date on which funds are available therefor in accordance with the Priority of Payments.  Notwithstanding the foregoing, the Collateral Manager, in its sole and absolute discretion, shall be entitled to defer to a later Payment Date and/or have paid at a less senior or other applicable position in the Priority of Payments all or any portion of the Senior Collateral Management Fee payable on any Payment Date upon written direction by the Collateral Manager to the Trustee.  Any such deferred Senior Collateral Management Fee shall be payable, at the Collateral Manager's sole and absolute discretion, at such less senior or other applicable position in the Priority of Payments on such Payment Date and/or on the subsequent Payment Date (including for the avoidance of doubt at a less senior or other applicable position in the Priority of Payments) in each case to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments.

(c)    Subordinated Collateral Management Fee.  The Collateral Manager shall also be entitled to receive a fee (the "Subordinated Collateral Management Fee") which will accrue from the Closing Date at a rate of 1.0% per annum on the Quarterly Asset Amount and shall be payable in arrears on each Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments.  For the avoidance of doubt, for purposes of calculating the Subordinated Collateral Management Fee, the Quarterly Asset Amount shall include (without duplication) the Principal Balance of each

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                             PP000964

-14-

Originated Special Loan/Preferred Security. The Subordinated Collateral Management Fee will accrue if unpaid and shall be payable on the next Payment Date on which funds are available therefor in accordance with the Priority of Payments. Notwithstanding the foregoing, the Collateral Manager, in its sole and absolute discretion, shall be entitled to defer to a later Payment Date and/or have paid at a less senior or other applicable position in the Priority of Payments all or any portion of the Subordinated Collateral Management Fee payable on any Payment Date upon written direction by the Collateral Manager to the Trustee. Any such deferred Subordinated Collateral Management Fee shall be payable, at the Collateral Manager's sole and absolute discretion, at such less senior or other applicable position in the Priority of Payments on such Payment Date and/or on the subsequent Payment Date (including for the avoidance of doubt at a less senior or other applicable position in the Priority of Payments) in each case to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments.

(d)     Post-Termination Payments.  If this Agreement is terminated for any reason or Patriarch XIV is removed, then (i) the fees calculated as provided in this Section 4.1 and payable to Patriarch XIV shall be prorated for any partial period to, but excluding, the effective date of such termination or removal, and (ii) the fees calculated as provided in this Section 4.1 and payable to the successor collateral manager shall be prorated for any partial period beginning on the effective date of such appointment.  The prorated fees, together with any accrued and unpaid fees and any unpaid expense reimbursements, due to Patriarch XIV hereunder shall rank pari passu to the fees and any unpaid expense reimbursements due to the successor collateral manager, and such fees and expense reimbursements due to Patriarch XIV and the successor collateral manager shall be paid pro rata to the extent funds are available therefor in accordance with the Priority of Payments; provided, however, that if Patriarch XIV is removed as Collateral Manager pursuant to clauses (i), (v) or (vi) of the definition of "Cause", then such amounts due to Patriarch XIV shall be paid after fees and expenses (of comparable priority under the Priority of Payments) due to the successor collateral manager are paid in full.

(e)     Subordination of Payments. The Collateral Manager agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be subordinated to the extent set forth in, and limited to the amounts available under, the Priority of Payments, described in the Indenture and the Collateral Manager agrees to be bound by the Priority of Payments as if the Collateral Manager were a party to the Indenture.

(f)     Collateral Manager as Holder of Notes and Preference Shares.  The Company and the Zohar Subsidiary acknowledge and agree that the Collateral Manager may from time to time acquire, hold and dispose of Notes and Preference Shares, subject in each case to the terms and conditions of the Indenture.

Section 4.2.  Expenses.  The Collateral Manager shall pay all expenses and costs incurred by it in connection with its services under this Agreement; provided, however, that the Company shall reimburse the Collateral Manager, at the times set forth in the Indenture and subject to the conditions set forth therein and the Priority of Payments, to the extent funds are available therefor, for (i) extraordinary costs and expenses incurred in the performance of the Collateral Manager's obligations under this Agreement and the Indenture, (ii) reasonable fees and expenses (not otherwise paid with funds from the Professional Fee Account) incurred by the Collateral

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000965

-15-

Manager to employ outside lawyers, accountants, consultants or other outside specialists or professionals, asset pricing and asset rating services, and accounting, programming and data entry services that are retained by the Company, the Zohar Subsidiary or by the Collateral Manager on behalf of the Company or the Zohar Subsidiary and (iii) brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction-related expenses and fees arising out of transactions effected for the Company's or the Zohar Subsidiary's account. Expenses and costs payable to the Collateral Manager under this Section 4.2 shall constitute either Administrative Expenses or professional fees and shall be payable by application of amounts on deposit in the Professional Fee Account or the Expense Account, as applicable, subject to the terms of the Indenture and in accordance with the Priority of Payments (in each case to the extent funds are available therefor).

Section 4.3. Delegation. With the consent of the Controlling Party, the Collateral Manager may delegate to any agent any or all of the duties and obligations assigned to the Collateral Manager hereunder; provided that no delegation by the Collateral Manager of any of its duties hereunder shall relieve the Collateral Manager of any of its duties hereunder nor relieve the Collateral Manager of any liability with respect to the performance of such duties.

Section 4.4. Liability of the Collateral Manager. The Collateral Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it in good faith and, subject to the standard of conduct described in the next succeeding sentence, shall not be responsible for any action or omission of the Company, the Co-Issuer, the Zohar Subsidiary or the Controlling Party or any other Person(s) in following or declining to follow any advice, recommendation or direction of the Collateral Manager or for any action of the Company, the Co-Issuer, the Trustee or the Zohar Subsidiary in following any direction of the Controlling Party, the Trustee or any Holder of the Notes or of the Securities. The Collateral Manager, its members, managers, directors, officers, stockholders, partners, employees, advisors and agents, shall not be liable to (a) the Company, the Co-Issuer, the Zohar Subsidiary, the Trustee, the Holders of the Securities, the Credit Enhancer or any other Person for any losses, claims, damages, judgments, assessments, interests, judgments, costs, fines, amounts paid in settlement, attorneys' fees and expenses or other liabilities of any nature whatsoever incurred by the Company, the Co-Issuer, the Zohar Subsidiary, the Trustee, the Holders of the Securities, the Credit Enhancer or any other Person that arise out of or in connection with the performance by the Collateral Manager (or such other Persons) of the Collateral Manager's duties under this Agreement and/or the other Transaction Documents, or (b) the Holders of the Securities, the Co-Issuers, the Zohar Subsidiary, the Trustee, the Credit Enhancer, the creditors of the Co-Issuers, the Zohar Subsidiary or any other Person for any error of judgment, mistake of law, or for any loss arising out of any investment, for any other act or omission in the performance of its obligations to the Zohar Obligors except, in the case of both clauses (a) and (b), by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party.

Section 4.5. Indemnification.

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000966

-16-

(a)      The Company and the Zohar Subsidiary (in such case, the "Indemnifying Party") shall reimburse, indemnify, defend and hold harmless the Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees and any Affiliate of the Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees (in such case, an "Indemnified Party") from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees and expenses), as are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Transaction Documents and/or any acts or omissions of the Collateral Manager, or its managers, directors, officers, stockholders, members, agents, advisors, partners and employees made in good faith and in the performance of the duties of the Collateral Manager under the Transaction Documents except to the extent resulting from the Indemnified Party's acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party.

(b)      The Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees may consult with counsel and accountants with respect to the Collateral or the affairs of the Zohar Obligors and shall be fully protected and justified, to the extent allowed by law, in acting, or failing to act, if such action or failure to act is taken or made in good faith and is in accordance with the advice or opinion of such counsel or accountants.  Notwithstanding anything contained herein to the contrary, the obligations of the Company under this Section 4.5 constitute Administrative Expenses and shall be payable in accordance with the Priority of Payments described in the Indenture.

(c)      The Collateral Manager (in such case, the "Indemnifying Party") shall reimburse, indemnify, defend and hold harmless the Company, the Zohar Subsidiary, and each of their respective directors, stockholders, managers, officers, members, agents, partners and employees (in such case, an "Indemnified Party") from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees and expenses) in respect of or arising out of any acts or omissions of the Collateral Manager, its directors, stockholders, managers, officers, members, agents, partners and employees constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party (except to the extent resulting from the Indemnified Party's bad faith, willful misconduct or gross negligence in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party).

(d)      With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 4.5, such Indemnified Party shall (or with respect to Indemnified Parties that are Affiliates, managers, directors, officers, stockholders, members, agents, advisors, partners or employees of the Collateral Manager, the Company or the Zohar Subsidiary (as applicable), the Collateral Manager, the Company or the Zohar Subsidiary (as applicable) shall cause such Indemnified Party to):

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP000967

-17-

(i)      give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 4.5 unless the Indemnifying Party is materially prejudiced or otherwise forfeits substantial rights or defenses by reason of such failure;

(ii)      at the Indemnifying Party's expense, provide the Indemnifying Party with such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)      at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)      in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)      neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case, without the prior written consent of the Indemnifying Party, unless the Indemnifying Party contests indemnification;

(vi)      subject to the Indemnifying Party's giving of reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP000968

-18-

(vii)   the Indemnifying Party shall not settle any such claim without the prior written consent of the Indemnified Party, which consent (x) shall not be unreasonably withheld or delayed in the case of a settlement for monetary damages only and (y) may be withheld in the Indemnified Party's sole discretion if the Indemnified Party must perform any act or make any admission in connection with such settlement.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 4.5 is held to be unavailable or insufficient to hold harmless any Indemnified Party, although applicable in accordance with the terms of this Section 4.5, the Company, the Zohar Subsidiary or the Collateral Manager (as applicable) shall contribute to the aggregate costs incurred by the Indemnified Party in connection with any claim covered by this Section 4.5 in the proportion of the respective economic interests of the Company, the Zohar Subsidiary or the Collateral Manager. The respective economic interests shall be calculated by reference to the aggregate amounts (other than the proceeds from the issuance of the Notes) received by Company and the Zohar Subsidiary from the interest, fees, gains or other amounts received in connection with the Collateral and the aggregate Senior Collateral Management Fees and Subordinated Collateral Management Fees paid to the Collateral Manager hereunder.

## ARTICLE V

## TERM AND TERMINATION;
## REMOVAL OF THE COLLATERAL MANAGER

Section 5.1. <u>Term</u>. This Agreement shall become effective on the date hereof and shall continue in force and effect until the first of the following occurs (the "CMA Termination Date"): (i) the payment in full of the Notes and redemption of the Preference Shares and the termination of the Indenture and the Preference Share Paying Agency Agreement in accordance with their respective terms, (ii) the liquidation of the Collateral and the final distribution of the proceeds in accordance with the Priority of Payments and (iii) the termination of this Agreement in accordance with this Article V.

Section 5.2. <u>Automatic Termination</u>. This Agreement shall automatically terminate upon the Company's good-faith determination that the Company, the Co-Issuer, the Zohar Subsidiary, or the pool of Collateral has become required to be registered as an "investment company" under the Investment Company Act, and the Company notifies the Collateral Manager thereof.

Section 5.3. <u>Termination For Cause</u>. (a) The Collateral Manager may be removed for Cause upon 10 Business Days' prior written notice by the Company to the Collateral Manager (which notice may be waived by the Collateral Manager) at the direction of the Controlling Party.

(b)     If any event constituting Cause occurs, the Collateral Manager shall give prompt written notice thereof to the Company, the Zohar Subsidiary, the Trustee, the Preference Share Paying Agent and the Credit Enhancer promptly upon the Collateral Manager's becoming aware of the occurrence of such event.

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP000969

-19-

Section 5.4.  Post-Termination Approvals.

In the event that the Collateral Manager has received notification of its removal pursuant to this Article V, until a successor collateral manager has been appointed and has accepted such appointment in accordance with the terms hereof, all purchases and sales of any item included in the Collateral (other than Eligible Investments) must be approved by the Controlling Party (except for the settlement of purchases and/or sales committed to prior to the Collateral Manager's receipt of such notification).

Section 5.5.  Appointment of Successor.  Upon the removal of the Collateral Manager pursuant to this Article V, the Controlling Party shall appoint a successor collateral manager. Notwithstanding any other provision herein to the contrary, Patriarch XIV shall not be liable for any acts, omissions or obligations of any successor collateral manager.  Any termination of this Agreement and the termination of Patriarch XIV as the Collateral Manager hereunder shall become effective as provided herein once a successor collateral manager shall have been appointed.

(b)    No removal of the Collateral Manager shall be effective unless (i) a successor collateral manager has agreed in writing to assume all of the Collateral Manager's duties and obligations pursuant to this Agreement, (ii) the successor collateral manager has been approved in writing by the Controlling Party  and (iii) the outgoing Collateral Manager has received written notice (a) from the Controlling Party or, if applicable, a Majority of the Preference Shares that it has approved of such successor collateral manager and (b) from such successor collateral manager that it has agreed to assume the outgoing collateral manager's duties.

(c)    No removal of the Collateral Manager shall be effective until the appointment by the Controlling Party of, and acceptance of such appointment in writing by, a successor collateral manager that in the opinion of the Controlling Party or a Majority of the Preference Shares (as applicable) (i) is an established institution that has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Collateral Manager under this Agreement and the other Transaction Documents and with a substantially similar (or better) level of expertise, (ii) is legally qualified and has the capacity to act as collateral manager under this Agreement and the other Transaction Documents and as successor to the Collateral Manager hereunder in the assumption of all the responsibilities, duties and obligations of the Collateral Manager hereunder and the other Transaction Documents, (iii) will not cause any Zohar Obligor or the pool of Collateral to become required to register under the provisions of the Investment Company Act and (iv) so long as any Notes are rated, each Rating Agency has confirmed in writing that the appointment of such successor collateral manager will not cause its then current rating (without giving effect to the Credit Enhancement, if applicable) of any Note to be reduced or withdrawn.

(d)    If no successor collateral manager is in place within ninety (90) days after the giving of such notice of termination, the Collateral Manager or the Trustee (or, after the Notes are paid in full, the Preferences Share Paying Agent acting at the direction of a majority of the Preference Shares) may petition any court of competent jurisdiction for the appointment of a successor collateral manager.

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP000970

-20-

Section 5.6. <u>Survival</u>. Upon any termination or assignment of this Agreement, the provisions of Sections 3.1, 3.2, 4.1, 4.2, 4.4, 4.5, 5.7, 6.3, 6.4 and 6.5 shall survive such termination or assignment and remain operative and in full force and effect.

Section 5.7. <u>Action Upon Termination</u>. From and after the effective date of the termination of the Collateral Manager's duties and obligations pursuant to this Agreement or removal of the Collateral Manager hereunder, the Collateral Manager shall not be entitled to compensation for services hereunder after the effective date of such termination or removal but shall be paid all compensation accrued through the date of termination (subject to the Priority of Payments), as provided in Section 4.1 hereof, and shall be entitled to receive any amounts owing under Sections 4.2 and 4.5 hereof. Upon such termination or removal, the Collateral Manager shall as soon as practicable:

(i)     deliver to the Company or (at the direction of the Company) any successor collateral manager that is appointed all property and documents of the Trustee, the Company, the Co-Issuer, or the Zohar Subsidiary, as the case may be, relating to the Collateral then in the custody of the Collateral Manager, including, without limitation, files in electronic form; and

(ii)    deliver to the Trustee an accounting with respect to the books and records delivered to the Company or the successor collateral manager, as applicable.

(b)    Notwithstanding such termination or removal, the Collateral Manager shall remain liable to the extent set forth herein (but subject to Section 4.4 hereof) for its acts or omissions hereunder arising prior to termination or removal and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Collateral Manager in Section 3.2 hereof or from any failure of the Collateral Manager to comply with the provisions of this Section 5.7 or as otherwise provided in Section 4.5(c) hereof.

(c)    The Collateral Manager agrees that, notwithstanding such termination or removal it shall cooperate with the Company in any proceeding arising in connection with this Agreement, the Indenture, the Collateral Administration Agreement or any of the Collateral (excluding any such proceeding in which claims are asserted against the Collateral Manager or any Related Party of the Collateral Manager) upon receipt of appropriate indemnification and expense reimbursement. Notwithstanding anything else to the contrary contained in this Agreement or any other Transaction Documents, if Patriarch XIV ceases to be the Collateral Manager hereunder, the rights of Patriarch XIV and/or its Affiliates as a holder of any Securities shall not be affected.

Section 5.8. <u>Trustee Termination Rights</u>. The Company, the Zohar Subsidiary and the Collateral Manager acknowledge the right of the Trustee to terminate this Agreement under certain circumstances set forth in Section 14.1 of the Indenture.

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP000971

-21-

## ARTICLE VI

## ADDITIONAL AGREEMENTS OF THE COLLATERAL MANAGER

Section 6.1. <u>Non-Exclusivity</u>. The services of the Collateral Manager to the Company and the Zohar Subsidiary are not to be deemed exclusive and the Collateral Manager shall be free to render collateral management or other services of any kind to others (including without limitation Affiliates, other investment companies and clients having objectives substantially identical to those of the Company). It is understood and agreed that the members, directors, stockholders, partners, employees, officers and managers of the Collateral Manager may engage in any other business activity or render services to any other Person or serve as partners, owners, officers, directors, consultants and advisers or managers of any other firm or company.

Section 6.2. <u>Conflicts of Interest; Acknowledgment of the Company</u>.

(a)     Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of the Collateral Manager, and its Affiliates, managers, directors, officers, stockholders, members, agents, advisors, partners and employees (collectively, "Related Parties") and their respective clients, including but not limited to the matters described in Section 2.2(l) and this Section 6.2. The Collateral Manager and its Related Parties may invest for their own accounts or on behalf of other clients (including clients with business objectives and structures and loans identical to the Company and/or the Zohar Subsidiary) in securities, obligations, loans or other assets that would be appropriate as investments for the Company and/or the Zohar Subsidiary. Such investments may be different (including with respect to issuer, price or terms) from those made on behalf of the Company and/or the Zohar Subsidiary. The Collateral Manager and its Related Parties may have, or advise clients with, ongoing relationships with companies whose securities, obligations or loans are pledged to support the Company's repayment obligations under the Indenture and such Persons may own equity or debt securities issued by issuers of, and other obligors on, Collateral Debt Obligations. Subject to Section 2.2(l)(ii), the Collateral Manager and its Related Parties may serve as collateral manager or advisor for, invest in, or be affiliated with, the Persons from which the Company and/or the Zohar Subsidiary may acquire Collateral, Affiliates of such Persons and other entities organized to issue collateralized debt obligations, including those identical to the Securities and those secured by high yield securities, distressed loans, or emerging market bonds and loans, including those issued by companies that are issuers of, and other obligors on, the Collateral. The Collateral Manager and its Related Parties may at certain times be simultaneously seeking to purchase and/or sell investments for the Company, the Zohar Subsidiary and/or other entities (or for some but not all of such Persons) for which it serves as collateral manager or advisor now or in the future, or for its other clients and its managers, directors, officers, stockholders, members, agents, advisors, partners, employees and Affiliates or for its own account. Due to the illiquid nature of the market for certain investments, the Collateral Manager and its Related Parties and clients may be unable to obtain identical execution of similar buy or sell decisions. The Collateral Manager, and its Related Parties may at certain times acquire, hold and dispose of Notes and Preference Shares. Notwithstanding any other provision herein to the contrary, the Collateral Manager and its Affiliates may act as a consultant to any issuer of or obligor on any Collateral or an agent for lenders under any loan facility (or hold any other similar role) in which the Company and/or the

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP000972

-22-

Zohar Subsidiary holds an interest that comprises part of the Collateral, subject to such consulting agreement or loan facility (or similar documents) containing customary and reasonable provisions for the indemnification and/or compensation of the Collateral Manager or its Affiliates, as the case may be.

(b)     The Company and the Zohar Subsidiary hereby acknowledge that the Collateral Manager and its Related Parties may actively manage their own accounts and the accounts of other clients with investments similar, and in some cases identical, to the Collateral, including those issued by companies that are issuers of, and other obligors on, the Collateral, and consent to and waive the various potential and actual conflicts of interest that may exist from time to time with respect to the Collateral Manager and its Related Parties as generally described in Section 6.2(a) above; provided, however, that nothing in this Section 6.2 shall be construed as altering the duties of the Collateral Manager as set forth in this Agreement or the Indenture nor the requirements of any law, rule, or regulation applicable to the Collateral Manager.

(c)     If the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the holders of the Notes and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment advisor that relates to any action to be taken with respect to any Collateral Debt Obligation, then the Collateral Manager will perform its obligations with respect to any such conflict in accordance with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict (provided that, to the extent that any provision of this Agreement specifically addresses the treatment of any conflict referred to in this clause (c), such conflict shall not be subject to this clause (c)).

Section 6.3. Records.

(a)     The Collateral Manager, with the assistance of the Collateral Administrator, shall maintain appropriate books of account and records relating to services performed hereunder and relating to the Collateral including invoices for professional fees, and such books of account and records shall be accessible for inspection by a representative of the Company, the Zohar Subsidiary, the Trustee, the Credit Enhancer, the Preference Share Paying Agent, the Holders of the Notes and the independent accountants appointed by the Company pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior written notice; provided, however, that following the Collateral Manager's receipt of a notice of its removal pursuant to Section 5.3 hereof, the Collateral Manager shall at the request of the Controlling Party use its commercially reasonable efforts to promptly provide to the prospective successor collateral manager copies of the books and records of the Zohar Obligors and copies of Underlying Instruments (in each case in the possession of the Collateral Manager) (for the avoidance of doubt, such books and records and other information shall not include the credit templates or other proprietary information of the Collateral Manager); provided further that the Collateral Manager shall be required to provide the information described in the immediately preceding proviso if (i) the prospective successor collateral manager executes a confidentiality agreement reasonably acceptable to the Collateral Manager and (ii) the release of such information is permitted under the Transaction Documents and the Underlying Instruments. Upon the termination of its obligations hereunder in accordance with this Agreement and the Indenture, the Collateral Manager agrees to either (i) maintain or cause

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP000973

-23-

the Collateral Administrator to maintain, such books and records as provided above for a period of three years (or such longer period required by applicable law) from such termination or (ii) deliver, or cause the Collateral Administrator to deliver, all such books and records (or copies thereof) to the Trustee promptly following such termination.

(b)     Upon the reasonable request of the Credit Enhancer, the Collateral Manager shall provide the Credit Enhancer with any calculations, and copies of documents and other relevant data and information in the possession of the Collateral Manager that the Collateral Manager utilizes for purposes of preparing any report or performing any calculation hereunder, under the Indenture or under the Collateral Administration Agreement.

(c)     Following the acquisition by the Company or the Zohar Subsidiary of any Collateral Debt Obligation or any Unrestricted Collateral Debt Obligation, the Collateral Manager shall provide to the Credit Enhancer a copy of the credit template prepared by the Collateral Manager with respect to such Collateral Debt Obligation or such Unrestricted Collateral Debt Obligation, as the case may be.

Section 6.4. Confidentiality. The Collateral Manager shall, and shall endeavor to cause its Affiliates to, keep confidential information obtained in connection with this Agreement and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Company (or, with respect to confidential information of or pertaining to the Zohar Subsidiary or the activities of the Collateral Manager on behalf of the Zohar Subsidiary, the Zohar Subsidiary), (ii) such information as the Rating Agencies shall request, (iii) as required by law, regulation, court order or the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Collateral Manager (including securities offerings for additional collateralized debt obligation funds or investment vehicles for which the Collateral Manager or any of its Affiliates will serve as the collateral manager, advisor or replacement collateral manager), (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, (vi) to the extent required in connection with the acquisition, origination, restructuring, exchange or disposal of Collateral by the Company and/or the Zohar Subsidiary (e.g., disclosures to agent banks and borrowers to evidence the Company's and/or Zohar Subsidiary's ability to extend credit pursuant to the applicable Underlying Instruments) or (vii) such information that was or is obtained by the Collateral Manager (A) on a non-confidential basis or (B) for avoidance of doubt, other than in connection with the services rendered hereunder; provided that for the purposes of this clause (vii)(A) the Collateral Manager does not know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6.4, the Holders of Securities, the prospective Holders of Securities, the Credit Enhancer, all parties to the Transaction Documents, and any of their Related Parties or professional advisors or agents shall in no event be considered "non-affiliated third parties".

Section 6.5. Non-Petition. The Collateral Manager shall continue to serve as Collateral Manager under this Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under this Agreement because sufficient funds were not then available under the Indenture to pay such amounts in accordance with the Priority of Payments. The Collateral Manager covenants and agrees that it shall not institute against, or join any other Person in instituting against, any Zohar Obligor or any of their directors, officers, shareholders or

Collateral Management Agreement

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP000974

-24-

incorporators (in their capacity as such) for any reason whatsoever (including, without limitation, the non-payment to the Collateral Manager of any amount payable by the Company hereunder) any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this sentence shall preclude, or be deemed to stop, the Collateral Manager (A) from taking any action prior to the expiration of the aforementioned one year and one day period (or such longer applicable preference period then in effect) in (x) any case or proceeding voluntarily filed or commenced by the Company, the Zohar Subsidiary or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Company, the Zohar Subsidiary or the Co-Issuer, as the case may be, by a Person other than the Collateral Manager or its respective Affiliates, or (B) from commencing against the Company, the Zohar Subsidiary or the Co-Issuer or any properties of the Company, the Zohar Subsidiary or the Co-Issuer any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1. No Partnership or Joint Venture. The Company, the Zohar Subsidiary and the Collateral Manager are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Collateral Manager's relationship to the Company and the Zohar Subsidiary shall be deemed to be that of an independent contractor.

Section 7.2. Notices. Any notice under this Agreement shall be in writing and sent by facsimile or addressed and delivered or mailed postage paid to the other parties at such address as such other parties may designate for the receipt of such notice. Notice shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of facsimile notice, when received in legible form, addressed as set forth below. Until further notice to the other party, it is agreed that the address of the Company for this purpose shall be Zohar II 2005-1, Limited, c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Directors, telephone (345) 945-7099, facsimile (345) 945-7100; the address of the Zohar Subsidiary for this purpose shall be Zohar II 2005-1, LLC, c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopier number: (302) 738-7210; the address of the Collateral Manager for this purpose shall be Patriarch Partners XIV, LLC, c/o Patriarch Partners, LLC, 112 South Tryon Street, Suite 700, Charlotte, North Carolina 28284, Attention: Greg Murphy, telephone: (704) 227-1204, telecopier: (704) 375-0358; the address of the Trustee for this purpose shall be LaSalle Bank National Association, 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603, Attention: CDO Trust Services Group – Zohar II 2005-1, Limited, telephone: (312) 904-0283, telecopier: (503) 258-5859; the address of Standard & Poor's for this purpose shall be Standard & Poor's Ratings Group, 55 Water Street, New York, New York, 10041, telephone: (212) 438-2000, facsimile (212) 438-2664, Attention: Structured

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000975

-25-

Finance Ratings, Asset Backed Securities CBO/CLO Surveillance and that of Moody's for this purpose shall be Moody's Investors Service, Inc., 99 Church St., New York, New York 10007, telephone: (212) 553-0300, telecopier: (212) 553-0355, Attention: CBO/CLO Monitoring; and the address of the Credit Enhancer for this purpose shall be MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504, telephone: (914) 765-3068, telecopier: (914) 765-3555, Attention: Insured Portfolio Management – Attention: CDO Group.

Section 7.3. <u>Succession; No Assignment, Submission to Jurisdiction, Etc</u>. This Agreement shall inure to the benefit of and be binding upon the successors to the parties hereto. This Agreement may not be assigned by any party hereto, except (i) in the case of the assignment by the Company to the Trustee as contemplated by the Granting Clause of the Indenture, (ii) in the case of any assignment to a successor collateral manager pursuant to Section 5.5 hereof and (iii) in the case of any assignment by Patriarch XIV to a Controlled Entity with the prior written consent of the Controlling Party.

(b)    Each of the Company, the Zohar Subsidiary and the Collateral Manager irrevocably (i) submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in the City of New York in any action or proceeding arising out of or relating to this Agreement or the Indenture, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or federal court, (iii) waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, (iv) consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the address specified for it in Section 7.2 and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 7.4. <u>Third-Party Beneficiary</u>. The Credit Enhancer is an express third-party beneficiary of this Agreement with the full power to enforce this Agreement as if the Credit Enhancer were a party hereto.

Section 7.5. <u>Governing Law; Waiver Of Jury Trial</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 7.6. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP000976

-26-

Section 7.7. <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 7.8. <u>Severability</u>. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 7.9. <u>Entire Agreement</u>. This Agreement and other documents referred to herein or delivered pursuant hereto, collectively contain the entire understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior agreements and understandings, oral and written, with respect thereto.

Section 7.10. <u>Amendments</u>. This Agreement may not be amended or modified or any provision hereof waived except (i) by an instrument in writing signed by the parties hereto, (ii) in accordance with Section 14.4(d) of the Indenture and (iii) with the written consent of the Controlling Party. For the avoidance of doubt, prior to entering any agreement amending, modifying, terminating or waiving its rights under this Agreement, the Collateral Manager shall comply with the applicable requirements of Section 14.4(d) of the Indenture; provided however, that notwithstanding anything else contained herein, any amendment that (i) is necessary in order for this Agreement to comply with any applicable law or regulation, including without limitation the Investment Advisers Act of 1940, and (ii) does not materially and adversely affect the holders of the Notes shall not require the consent of any Person (other than the Controlling Party (so long as the Class A Notes are Outstanding, the Class A-1 Commitments and the Class A-3 Commitments have not expired, terminated or been reduced to zero, or there remain any accrued and unpaid Credit Enhancement Liabilities) which consent shall not be unreasonably withheld or delayed) and may be evidenced by a supplement prepared by the Collateral Manager.

Section 7.11. <u>Indulgences Not Waivers</u>. Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

Section 7.12. <u>Collateral Manager Obligations Under the Indenture</u>. The Collateral Manager (i) consents to the assignment of this Agreement to the Trustee for the benefit of the Secured Parties pursuant to the terms of the Indenture, (ii) acknowledges that each of the Company and the Zohar Subsidiary has collaterally assigned all of its right, title and interest in, to and under this Agreement to the Trustee for the benefit of such Secured Parties, (iii) makes each of the agreements and covenants set forth in Section 14.4 of the Indenture and (iv) acknowledges that, under the terms of the Indenture, the Credit Enhancer will act as the Controlling Party under certain circumstances described therein.

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP000977

-27-

Section 7.13.  <u>Limitations on Recourse</u>.  The Collateral Manager shall have recourse solely to the Collateral described in the Indenture for the payment and performance of all of the obligations of the Company under this Agreement.  Upon final realization of such Collateral, any outstanding obligations of the Company hereunder shall be extinguished and shall not thereafter revive, and the Collateral Manager shall not be entitled to take any further steps against the Company or any of its directors, officers, shareholders or incorporators, to recover any sums due from the Company but still unpaid.

(b)    The Collateral Manager shall have no recourse to any shareholder, manager, member, director or officer of the Company or the Zohar Subsidiary, or to any of the respective assets of such shareholder, manager, member, director or officer of the Company or the Zohar Subsidiary.

(c)    Neither the Company nor the Zohar Subsidiary shall have any recourse to any shareholder, manager, member, director or officer of the Collateral Manager, or to any of the respective assets of such shareholder, manager, member, director or officer of the Collateral Manager.

Section 7.14.  <u>Conflict with Indenture</u>.  Subject to Article II, in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

<u>Collateral Management Agreement</u>

NY281027.5/2047-00003

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                     PP000978

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR II 2005-1, LIMITED

By: _____

      Name:  **Chris Watler**
      Title:   **Director**

ZOHAR II 2005-1, LLC

By:    ZOHAR II 2005-1, LIMITED,
       as Managing Member

By: _____

      Name:  **Chris Watler**
      Title:   Director

PATRIARCH PARTNERS XIV, LLC

By: _____

      Name:  Lynn Tilton
      Title:   Manager

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000979

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR II 2005-1, LIMITED

By: _____
　　　　Name:
　　　　Title:

ZOHAR II 2005-1, LLC

By:　ZOHAR II 2005-1, LIMITED,
　　　as Managing Member

By: _____
　　　　Name:
　　　　Title:

PATRIARCH PARTNERS XIV, LLC

By: _____
　　　　Name: Lynn Tilton
　　　　Title:  Manager

Collateral Management Agreement

INDEX

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP000980

# **EXHIBIT 6**

## **Zohar III CMA**

26135740.1

COLLATERAL MANAGEMENT AGREEMENT

among

ZOHAR III, LIMITED,

ZOHAR III, LLC,

and

PATRIARCH PARTNERS XV, LLC,

as Collateral Manager

Dated as of April 6, 2007

ND: 4814-7998-2849, Ver 2

**RESPONDENTS'
EXHIBIT
16
AP No. 16462**

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

PP001994

## TABLE OF CONTENTS

<b>Page</b>

ARTICLE I      DEFINITIONS ................................................................... 1
   Section 1.1.   Definitions ................................................................. 1

ARTICLE II     GENERAL DUTIES OF THE COLLATERAL MANAGER ........... 4
   Section 2.1.   Appointment of the Collateral Manager ......................................... 4
   Section 2.2.   Management Services ......................................... 4
   Section 2.3.   Delivery of Collateral ......................................... 8
   Section 2.4.   Standard of Care ......................................... 8
   Section 2.5.   Action on Behalf of the Company and the Zohar Subsidiary ........ 9
   Section 2.6.   Obligations of the Collateral Manager ......................................... 9
   Section 2.7.   Brokerage ......................................... 9
   Section 2.8.   Allocation of Aggregate Executions ......................................... 10
   Section 2.9.   The Collateral Manager's Practices ......................................... 10

ARTICLE III    REPRESENTATIONS AND WARRANTIES ................................... 10
   Section 3.1.   Representations and Warranties of the Company and the Zohar Subsidiary ......................................... 10
   Section 3.2.   Representations and Warranties of the Collateral Manager ........ 12

ARTICLE IV     COMPENSATION; EXPENSE; DELEGATION; LIABILITY AND INDEMNIFICATION ................................... 14
   Section 4.1.   Compensation ......................................... 14
   Section 4.2.   Expenses ......................................... 15
   Section 4.3.   Delegation ......................................... 15
   Section 4.4.   Liability of the Collateral Manager ......................................... 16
   Section 4.5.   Indemnification ......................................... 16

ARTICLE V      TERM AND TERMINATION; REMOVAL OF THE COLLATERAL MANAGER ......................................... 19
   Section 5.1.   Term ......................................... 19
   Section 5.2.   Automatic Termination ......................................... 19
   Section 5.3.   Termination For Cause ......................................... 19
   Section 5.4.   Post Termination Approvals ......................................... 20
   Section 5.5.   Appointment of Successor ......................................... 20
   Section 5.6.   Survival ......................................... 21
   Section 5.7.   Action Upon Termination ......................................... 21
   Section 5.8.   Trustee Termination Rights ......................................... 22

ARTICLE VI     ADDITIONAL AGREEMENTS OF THE COLLATERAL MANAGER ......................................... 22
   Section 6.1.   Non Exclusivity ......................................... 22
   Section 6.2.   Conflicts of Interest; Acknowledgment of the Company ........... 22

ND: 4814-7998-2849, Ver 2

i

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001995

**TABLE OF CONTENTS**
(continued)

Page

Section 6.3.   Records ................................................................................ 23
Section 6.4.   Confidentiality ...................................................................... 24
Section 6.5.   Non Petition .......................................................................... 25
ARTICLE VII      MISCELLANEOUS ............................................................... 25
Section 7.1.   No Partnership or Joint Venture ......................................... 25
Section 7.2.   Notices ................................................................................... 25
Section 7.3.   Succession; No Assignment, Submission to Jurisdiction,
               Etc .......................................................................................... 26
Section 7.5.   Governing Law; Waiver Of Jury Trial ................................. 27
Section 7.6.   Counterparts .......................................................................... 27
Section 7.7.   Headings Descriptive ............................................................ 27
Section 7.8.   Severability ............................................................................ 27
Section 7.9.   Entire Agreement .................................................................. 27
Section 7.10.  Amendments .......................................................................... 27
Section 7.11.  Indulgences Not Waivers ..................................................... 28
Section 7.12.  Collateral Manager Obligations Under the Indenture ................. 28
Section 7.13.  Limitations on Recourse ...................................................... 28
Section 7.14.  Conflict with Indenture ........................................................ 28

ND: 4814-7998-2849, Ver 2

ii

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001996

## COLLATERAL MANAGEMENT AGREEMENT

COLLATERAL MANAGEMENT AGREEMENT, dated as of April 6, 2007 (as the same may be amended or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), among ZOHAR III, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Company"), ZOHAR III, LLC, a limited liability company organized under the laws of the State of Delaware (the "Zohar Subsidiary"), and PATRIARCH PARTNERS XV, LLC, a limited liability company organized under the laws of the State of Delaware ("Patriarch XV" or the "Collateral Manager").

RECITAL

The Company and the Zohar Subsidiary desire to engage the Collateral Manager to provide the services described herein and the Collateral Manager desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1.  Definitions.  Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings ascribed thereto in the Indenture (defined below).  In addition, as used herein, the following terms shall have the following respective meanings:

"Approved Percentage" shall mean 50% or such lesser percentage (greater than 25%) as shall have been approved in writing by the Controlling Class (such approval not to be unreasonably withheld).

"Approved Replacement" shall mean any replacement for an individual who is (a) a manager, director or management level employee of the Collateral Manager and (b) actively involved in the management of the Collateral Investments.

"Cause" shall mean:

(i)     the Collateral Manager willfully breaches, in any material respect, or takes any action that it knows violates, in any material respect, any provision of this Agreement or any term of the Indenture applicable to it;

(ii)     except as provided in (i) above, the Collateral Manager breaches in any material respect any provision of this Agreement or any term of the Indenture applicable to it, which breach materially and adversely affects the Company or the Noteholders, and fails to cure such breach within thirty (30) days of becoming

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                         PP001997

aware of, or receiving notice from the Trustee or the Controlling Class of, such breach; provided however, that such thirty (30) day period shall be increased to ninety (90) days if the Collateral Manager is using commercially reasonable good faith efforts to cure such breach;

(iii)     the failure of any representation, warranty, certification or statement made or delivered by the Collateral Manager in or pursuant to this Agreement or the Indenture to be correct in any material respect when made and such failure (i) materially and adversely affects the Company or the Noteholders and (ii) no correction is made for a period of forty-five (45) days after the Collateral Manager becomes aware of or receives notice from the Trustee of such failure; provided however, that such forty-five (45) day period shall be increased to ninety (90) days if the Collateral Manager is using commercially reasonable good faith efforts to cure such failure;

(iv)     an Event of Bankruptcy occurs;

(v)     the occurrence of an act by (i) the Collateral Manager, (ii) any company that controls, is controlled by or is under common control with the Collateral Manager (a "Controlled Entity"), (iv) any holder of equity interests in the Collateral Manager, or any Controlled Entity that is also a senior officer of such entity or (v) (without duplication) Lynn Tilton (or any Approved Replacement therefor) that constitutes fraud (as determined in an adjudication) in the performance of its obligations under this Agreement or in the performance of investment advisory services comparable to those provided under this Agreement, or any such person or entity being indicted for a criminal offense materially related to the performance of its obligations under this Agreement or in the performance of investment advisory services comparable to those provided under this Agreement (it being understood that, for the purposes of the definition of "Controlled Entity", control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise);

(vi)     (a) Lynn Tilton (or any Approved Replacement therefor) shall fail, for any reason, to be a principal, managing director or management level employee of Patriarch XV who is actively involved in the management of the Collateral Investments or (b) Lynn Tilton shall fail directly or indirectly to own at least the Approved Percentage of the equity interests in Patriarch XV, unless in the case of the foregoing clause (a) an Approved Replacement shall (x) have been proposed within forty five (45) days of such failure and (y) shall not have been objected to in writing within thirty (30) days after notice is sent of such proposed replacement by 66 2/3% or more of the Aggregate Outstanding Amount of the Controlling Class; or

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP001998

(vii)    the occurrence of any Event of Default under the Indenture that consists of a default in the payment of principal of or interest on the Notes when due and payable or results from any breach by the Collateral Manager of its duties under the Indenture or this Agreement.

"CMA Termination Date" shall have the meaning specified in Section 5.1.

"Collateral Manager Information" shall have the meaning specified in Section 3.2(f).

"Debt Issuer" shall mean the issuer of any Collateral Investment.

"Event of Bankruptcy" shall mean:

(A)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Collateral Manager or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Collateral Manager or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days; or an order or decree approving or ordering any of the foregoing shall be entered; or

(B)    the Collateral Manager shall (i) be wound up or dissolved, (ii) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (iii) apply for or consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (A) of this definition, (iv) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Collateral Manager or for a substantial part of its assets, (v) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (vi) cease to be able to, or admit in writing its inability to, pay its debts as they become due and payable, or make a general assignment for the benefit of creditors or (vii) take any action for the purpose of effecting any of the foregoing.

"Indemnified Party" shall have the meanings specified in Section 4.5(a).

"Indemnifying Party" shall have the meanings specified in Section 4.5(a).

"Indenture" shall mean the Indenture, dated as of April 6, 2007, among the Company, Zohar III, Corp., the Zohar Subsidiary, the Class A-1R Note Agent, the Class A-1D Note Agent and the Trustee, as modified and supplemented and in effect from time to time in accordance with the terms thereof.

ND: 4814-7998-2849, Ver 2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001999

"Purchase Documents" shall mean the assignment agreements, purchase and sale agreements, participation agreements and/or other agreements by which the Company and/or the Zohar Subsidiary acquires any interest, direct or indirect, in the Collateral.

"Related Parties" shall have the meaning specified in Section 6.2.

"Securities" shall mean, for the purposes of this Agreement only, the Notes and the Preference Shares.

"Senior Collateral Management Fee" shall have the meaning specified in Section 4.1(b).

"Subordinated Collateral Management Fee" shall have the meaning specified in Section 4.1(c).

## ARTICLE II

## GENERAL DUTIES OF THE COLLATERAL MANAGER

Section 2.1.    Appointment of the Collateral Manager. The Collateral Manager is hereby appointed as collateral manager of each of the Company and the Zohar Subsidiary for the purpose of performing certain investment management functions as specified herein, and the Collateral Manager hereby accepts such appointment.

Section 2.2.    Management Services. The Collateral Manager will provide each of the Company and the Zohar Subsidiary with the following services, in each case subject to and in accordance with the terms of the Indenture and this Agreement:

(a)    Collateral. The Collateral Manager shall determine, in accordance with the criteria set forth in the Indenture relating to the acquisition, origination, restructuring, exchange, holding and disposition of the Collateral, the specific Collateral to be acquired, originated, restructured, exchanged, held or disposed of by the Company and/or the Zohar Subsidiary (including without limitation (x) the entry into, and the reduction in the notional amount or termination of, Hedge Agreements (if any) and (y) whether or not to acquire (by extending credit or otherwise) additional Collateral Investments pursuant to Section 12.1 of the Indenture, or to apply amounts on deposit in the Rollover Proceeds Account, and shall effect acquisitions, originations, restructurings, exchanges and dispositions of Collateral on behalf of the Company and/or the Zohar Subsidiary from time to time as it shall determine, taking into consideration the payment obligations of and financing available to the Company under the Indenture and the other Transaction Documents and the Principal Proceeds and other amounts held by the Company; provided, however, that notwithstanding anything to the contrary contained in this Agreement, no duty or obligation of the Collateral Manager described hereunder shall be deemed to imply a guaranty of, and the Collateral Manager does not hereby guarantee, the performance of or economic returns to be realized by such Collateral or whether the

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

4

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                              PP002000

economic returns on such Collateral will be sufficient to repay the amounts owed by the Company under the Indenture or otherwise.

(b)    Effectuation of Trades.  Subject to any restrictions in the Indenture, the Collateral Manager shall effectuate the acquisition, origination, restructuring, exchange or disposition of Collateral on behalf of the Company and/or the Zohar Subsidiary, as applicable.

(c)    Exercise of the Rights by the Company and the Zohar Subsidiary.  The Collateral Manager shall make determinations with respect to the exercise or enforcement of any and all rights by the Company and/or the Zohar Subsidiary (including but not limited to any such rights under the Hedge Agreements (if any) and voting rights and rights arising in connection with the bankruptcy or insolvency of a Debt Issuer or the consensual or non judicial restructuring of the debt or equity of a Debt Issuer) or rights or remedies in connection with the Collateral and participating in the committees (official or otherwise) or other groups formed by creditors of a Debt Issuer; provided, however, that the Collateral Manager shall not cause the Company or the Zohar Subsidiary to exercise any such rights or remedies in a manner prohibited by the Indenture.  Without limiting the foregoing, the Collateral Manager may, on behalf of the Company and/or the Zohar Subsidiary and without the consent of the holders of any Notes or any other Person, enter into any amendment, modification or waiver of, or supplement to, any term or condition of any Collateral, Collateral Investment, and/or Equity Security (including, without limitation and subject to the terms of the Indenture, exchanges thereof for other loans, equity or other securities), so long as such amendment, modification, waiver or supplement does not contravene the provisions of the Indenture or this Agreement or contravene any applicable law or regulation.  The Collateral Manager shall make determinations with respect to the exercise or enforcement of any rights and remedies of the Company and the Zohar Subsidiary, as applicable, under the Purchase Documents on behalf of the Company and the Zohar Subsidiary, subject to the terms and conditions thereof.

(d)    Negotiations.  The Collateral Manager shall negotiate on behalf of the Company and the Zohar Subsidiary with prospective purchasers of the Collateral, with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor (or any of its Affiliates) thereon (or such obligor's (or any of its Affiliates') line(s) of business) or exchange of Collateral and/or with prospective sellers or issuers of Collateral as to the terms relating to the issuance, purchase, sale, exchange and/or disposition of such Collateral, subject in each case to any restrictions contained in the Indenture.

(e)    Rating Agencies and Trustee.  (i) The Collateral Manager shall on behalf of the Company and/or the Zohar Subsidiary consult with each Rating Agency and the Trustee at such times as may be reasonably requested by such Rating Agency or the Trustee and provide the Rating Agencies and the Trustee with any information reasonably requested by such Person in connection with each Rating Agency's or the Trustee's monitoring of the acquisition, management and disposition of Collateral.  (ii)

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP002001

The Collateral Manager shall be, and hereby is, authorized to execute on behalf of any Zohar Obligor(s) any and all agreements to be entered into between such Zohar Obligor(s) and a Rating Agency.

(f)    Monitoring of Collateral.  The Collateral Manager shall (i) monitor the Collateral on an ongoing basis, (ii) prepare and deliver such information, reports, schedules and other data that is required to be prepared and/or delivered by the Collateral Manager under the Indenture and Section 2 of the Collateral Administration Agreement, as applicable, (iii) notify the Trustee, and the Company in writing of the occurrence of an Event of Default under the Indenture to the extent the Collateral Manager has actual knowledge of the occurrence thereof, (iv) monitor from time to time the cash flows generated by the portfolio of Collateral Investments and notify the Trustee when such cash flows materially deviate from the expected cash flows in respect of such portfolio and (v) determine whether any Collateral Investment is (A) a Revolving Collateral Investment, Delayed Funding Collateral Investment or term loan; or (B) a Defaulted Investments.

(g)    Supervision of the Collateral.  The Collateral Manager shall manage the Company's and the Zohar Subsidiary's investments within the parameters set forth in the Indenture.

(h)    Hiring of Specialists.  The Collateral Manager shall, to the extent required or desirable in connection with the performance of its duties under this Agreement, hire and manage specialists and pay the fees and expenses with respect thereto (with reimbursement from the Company to the extent provided in Section 4.2 hereof and as provided in the Priority of Payments), provided that no delegation by the Collateral Manager of any of its duties hereunder to any third party shall relieve the Collateral Manager of any of its duties hereunder or relieve the Collateral Manager of any liability with respect to the performance of such duties.

(i)    Optional Redemption.  The Collateral Manager shall take commercially reasonable action on behalf of the Company in connection with effectuating any optional redemption of the Notes in accordance with Section 9.1 of the Indenture or any optional redemption of the Preference Shares in accordance with the Preference Share Paying Agency Agreement.

(j)    Other Matters.  The Collateral Manager shall comply with such other duties and responsibilities as may be expressly required of the Collateral Manager by the provisions of the Indenture and Section 2 of the Collateral Administration Agreement and shall use commercially reasonable efforts to assist the Company in complying with its duties and responsibilities under the Indenture, the Note Purchase Agreements and the Purchase Documents.

(k)    The Collateral Manager shall cause the Company and/or the Zohar Subsidiary to acquire each Collateral Investment pursuant to a purchase, assignment or participation agreement containing terms and conditions not materially less favorable to

Collateral Management Agreement

6

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                   PP002002

the Company and/or the Zohar Subsidiary than the terms and conditions of the comparable standard form document of the Loan Syndications and Trading Association ("LSTA") (which in the case of any Collateral Investment acquired by way of assignment for a price of less than 80% of par shall be deemed to be the applicable LSTA "Distressed Trade" form document) (for the avoidance of doubt, such documentation described in this clause (m) shall not be required in the case of any Collateral Investment that consists of a direct extension of credit by the Company and/or the Zohar Subsidiary to the obligor under such Collateral Investment).

(l)     The Collateral Manager shall not, on behalf of the Company and/or the Zohar Subsidiary, direct or effect the acquisition or disposition of the Collateral Investments or any other item included in the Collateral except in accordance with the requirements of the Indenture.

(m)     Workouts and Restructurings. For the avoidance of doubt and notwithstanding anything else contained herein, the Company, the Zohar Subsidiary and the Collateral Manager acknowledge and agree that the Collateral Investments will consist of stressed and distressed loans that may be the subject of extensive amendment, workout, restructuring and/or other negotiations and, as of consequence thereof, the Company and/or the Zohar Subsidiary may receive by way of amendments, modifications, exchanges and/or supplements to such Collateral Investments, Equity Kickers, Exchanged Securities, and/or the relevant Underlying Instruments (A) interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of "Collateral Investment" and/or the Eligibility Criteria and/or (B) Equity Workout Securities.

(n)     Borrowings. The Collateral Manager shall (subject to the terms of the Indenture) take such action on behalf of the Company and the Zohar Subsidiary as the Collateral Manager determines appropriate to cause the Company to make Borrowings under the Class A-1R Notes, and/or the Class A-1D Notes at such times and in such amounts (subject to Section 9.6 of the Indenture) as may be required to meet the obligations of the Company and the Zohar Subsidiary.

(o)     Eligible Investments. The Collateral Manager shall manage, in accordance with the terms of the Indenture, the Eligible Investments, including, without limitation, determining the Stated Maturity (after giving effect to any applicable grace period) of each Eligible Investment purchased or held by the Company, which Stated Maturity shall be no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the investment was made, taking into consideration the scheduled and expected funding and payment obligations of the Company and/or the Zohar Subsidiary.

Section 2.3.     Delivery of Collateral. The Collateral Manager shall cause the Company and/or the Zohar Subsidiary (as applicable to) deliver the Collateral as provided in Section 3.3 of the Indenture. Should any part of the Collateral come into the possession or otherwise be acquired by the Collateral Manager, the Collateral Manager

ND: 4814-7998-2849, Ver 2
Collateral Management Agreement

7

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                    PP002003

shall promptly cause such property to be delivered to the Trustee (or to the Custodian for the benefit of the Trustee), as provided in Section 3.3 of the Indenture.

Section 2.4.    Standard of Care.  The Collateral Manager shall, in rendering its services as Collateral Manager, use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions, in each case except as otherwise expressly provided in the Indenture.  Subject to the immediately preceding sentence, the Collateral Manager shall follow its customary standards, policies and procedures in performing its duties under the Indenture and Section 2 of the Collateral Administration Agreement and its duties hereunder.  The Collateral Manager shall comply with all the terms and conditions of the Indenture and Section 2 of the Collateral Administration Agreement affecting the duties and functions that have been delegated to it thereunder.  The Collateral Manager will be bound to follow any supplement or other modification to the Indenture and any other applicable Transaction Document of which it has received written notice from the time it has received a copy of such supplement or other modification from the Company or the Trustee, so long as such supplement or other modification is in effect and has been entered into in accordance with the terms of Article 8 of the Indenture.  The Collateral Manager shall not be bound by any amendment, supplement or other modification to the Indenture, any Transaction Document and/or any other agreement that reduces the rights or increases the obligations of the Collateral Manager unless the Collateral Manager shall have consented thereto in writing.

Section 2.5.    Action on Behalf of the Company and the Zohar Subsidiary.  To the extent necessary or appropriate to perform all of the duties to be performed by it hereunder and under the provisions of the Indenture applicable to it, each of the Company and the Zohar Subsidiary hereby confers upon the Collateral Manager the power to execute and deliver all necessary, desirable and appropriate documents and/or instruments in the name and on behalf of the Company or the Zohar Subsidiary, as the case may be, as its attorney in fact with respect thereto.

Section 2.6.    Obligations of the Collateral Manager.  Unless otherwise required by any provision of the Indenture or this Agreement or by applicable law, the Collateral Manager shall not take any action which it knows or should be reasonably expected to know in accordance with prevailing market practices would (i) cause the Company or the Zohar Subsidiary to violate the terms of the Indenture, (ii) materially adversely affect the interests of the Holders of the Securities in any material respect (other than as contemplated hereunder or under the Indenture, it being understood and acknowledged that the Collateral Manager does not guarantee the performance of the Collateral or any payment obligation under the Indenture), (iii) not be permitted under the governing instruments of the Company, the Co Issuer or the Zohar Subsidiary, (iv) violate any

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP002004

United States federal or state law (including Delaware corporate and limited liability company law), Cayman Islands law or any other law (including, without limitation, any related rule or regulation of any governmental body or agency having jurisdiction over the Company, the Co Issuer or the Zohar Subsidiary) known to the Collateral Manager, or as advised by the Administrator, counsel to the Administrator or counsel to the Collateral Manager, to be applicable to the Company, the Zohar Subsidiary or the Co Issuer, the violation of which would have a material adverse effect on the Company, the Zohar Subsidiary, the Co Issuer, any of the Collateral or on the ability of the Collateral Manager to perform its obligations hereunder or (v) require registration of the Company, the Co Issuer, the Zohar Subsidiary, or the pool of Collateral as an "investment company" under the Investment Company Act; it being understood that in connection with the foregoing the Collateral Manager will not be required to make any independent investigation of any facts or laws not otherwise known to it in connection with its obligations under this Agreement and the Indenture or the conduct of its business generally.  The Collateral Manager covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture.  Notwithstanding anything in this Agreement or the Indenture, the Collateral Manager shall not intentionally take any action that it knows would cause an Event of Default under the Indenture. For purposes of this Agreement, the Collateral Manager shall be entitled to consult with and rely in reasonable good faith on the written advice of counsel and public accountants experienced in the matter at issue with respect to legal and accounting matters, respectively, and any advice from such counsel or public accountants shall be full and complete authorization and protection for the Collateral Manager in respect of any action taken or omitted by it in reasonable good faith reliance thereon.

Section 2.7.    Brokerage.  The Collateral Manager shall use commercially reasonable efforts to obtain, in accordance with applicable laws, the best execution for all orders placed with respect to purchases and sales of the Collateral, but will not necessarily obtain the best available price with respect to any particular purchase, and will consider all circumstances it believes to be relevant including, without limitation, the price and size of the transaction, the nature of the market for such asset, the time constraints on the transaction, general market trends, research and other brokerage services furnished to the Collateral Manager or its Affiliates.  Such services may be used by the Collateral Manager in connection with its other advisory activities or investment operations.  Subject to Section 6.2, the Collateral Manager may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts managed by the Collateral Manager and the Affiliates of the Collateral Manager, provided that the Collateral Manager and its Affiliates may only so aggregate purchases and sales if at the time of such purchases and sales the agreements governing the management of such other accounts contain a provision permitting such aggregation substantially similar to the provision contained herein.  In accounting for such aggregated order price, commissions and other expenses shall be apportioned on an equitable basis (in the sole judgment of the Collateral Manager).

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

9

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                              PP002005

Section 2.8.    Allocation of Aggregate Executions.  When any aggregate sales or purchase orders occur, the objective of the Collateral Manager shall be to allocate the executions among the accounts in an equitable manner over time, consistent with its practices with respect to other accounts it manages, the status of the portfolio of investments and the requirements in the Indenture.

Section 2.9.    The Collateral Manager's Practices.  Without limiting the obligations of the Collateral Manager set forth herein and in the Indenture, all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company and/or the Zohar Subsidiary shall be in accordance with reasonable and customary business practices of the relevant market and in compliance with applicable laws and all purchases and sales of the Collateral will be effected on arm's length terms (including without limitation any sales or purchases of Collateral Investments to or from Natixis Financial Products Inc. and/or its Affiliates).  Each of the Company and the Zohar Subsidiary acknowledges that all or a significant portion of the Collateral Investments, if sold, will likely be sold in the distressed debt market and that the Collateral Manager will be required to cause the Company and the Zohar Subsidiary, as applicable, to make extensive representations and warranties regarding such Collateral and the management of such Collateral by the Company, the Zohar Subsidiary and the Collateral Manager.  In connection with the foregoing, to the extent that the seller of such Collateral Investments (and/or such seller's predecessors in title) did not make customary representations and warranties at the time of the applicable transfer of such Collateral, the Company and/or the Zohar Subsidiary may each make such representations and warranties on its own account.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1.    Representations and Warranties of the Company and the Zohar Subsidiary.  Each of the Company and the Zohar Subsidiary (each, a "Representing Entity") represents and warrants (as to itself only) to the Collateral Manager that:

(a)    Organization, Power and Authority, Etc.  Such Representing Entity has been duly organized and is validly existing under the laws of the Cayman Islands (in the case of the Company) or the State of Delaware (in the case of the Zohar Subsidiary) and has the full power and authority (i) to execute, deliver and perform each of the Transaction Documents to which it is a party and all obligations required thereunder and (ii) to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under the Transaction Documents to which it is a party would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of such Representing Entity.

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

10

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP002006

(b)    <u>This Agreement</u>. This Agreement has been duly authorized, executed and delivered by such Representing Entity and constitutes its valid and binding obligation, enforceable against it in accordance with its terms except that the enforceability thereof may be subject to (i) bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(c)    <u>Consents, Approvals, Etc</u>. No consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person is required for the performance by such Representing Entity of its duties hereunder, except such as have been duly made or obtained.

(d)    <u>No Conflicts</u>. Neither the execution and delivery of this Agreement nor the performance of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of or constitutes a default under (i) the organizational documents of such Representing Entity, (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which such Representing Entity is a party or such Representing Entity or its property is bound, (iii) any statute applicable to such Representing Entity, or (iv) any law, decree, order, rule or regulation applicable to such Representing Entity of any court or regulatory, administrative or governmental agency, body or authority or arbitrator having or asserting jurisdiction over such Representing Entity or its properties, and, in the case of each preceding clause, which would have a material adverse effect upon the performance by it of its duties under this Agreement or any other Transaction Document.

(e)    <u>No Violations</u>. Such Representing Entity is not in violation of any U.S. federal or state securities law or regulation promulgated thereunder and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best of its knowledge, threatened that would have a material adverse effect upon the performance by it of its duties under or the validity or enforceability of this Agreement.

(f)    <u>True and Complete Documentation</u>. True and complete copies of the Transaction Documents to which it is a party and all other documents contemplated therein, and the organizational documents of such Representing Entity, as in effect as of the date of this Agreement, have been delivered to the Collateral Manager and such Representing Entity agrees to deliver a true and complete copy of each amendment to the documents referred to in this paragraph (f) to the Collateral Manager, as promptly as practicable after its adoption or execution.

(g)    <u>Investment Company Act</u>. Such Representing Entity is not an "investment company" that is required to be registered under the Investment Company Act.

ND: 4814-7998-2849, Ver 2

<u>Collateral Management Agreement</u>

11

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP002007

Section 3.2.    <u>Representations and Warranties of the Collateral Manager</u>. The Collateral Manager represents and warrants to the Company, the Zohar Subsidiary and the Noteholders that:

(a)    <u>Organization, Power and Authority, Etc</u>. The Collateral Manager is duly organized, is validly existing and in good standing under the laws of the State of Delaware and has full power and authority (i) to execute and deliver this Agreement and to perform all of its obligations hereunder and under the provisions of the Indenture and Collateral Administration Agreement applicable to it, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the Indenture and Collateral Administration Agreement applicable to it and (ii) to transact the business in which it is presently engaged and is duly qualified and in good standing under the laws of each jurisdiction where the performance of its obligations under this Agreement and the provisions of the Indenture and Collateral Administration Agreement applicable to it would require such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the financial condition or the ability of the Collateral Manager to perform its obligations under, or on the validity or enforceability of, this Agreement and the applicable provisions of the Indenture and Collateral Administration Agreement.

(b)    <u>This Agreement</u>. This Agreement and each instrument or document of the Collateral Manager required hereunder or under the terms of the Indenture and Collateral Administration Agreement has been duly authorized, executed and delivered by the Collateral Manager and constitutes a valid and binding agreement of the Collateral Manager, enforceable against it in accordance with its terms, except that the enforceability thereof may be subject to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(c)    <u>No Securities Laws Violations, No Proceedings</u>. The Collateral Manager is not in violation of any federal or state securities law or regulation promulgated thereunder related to the conduct of its asset management business, and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best knowledge of the Collateral Manager, threatened, that in either case would have a material adverse effect upon the performance by the Collateral Manager of its duties under this Agreement and the Collateral Administration Agreement or on the validity or enforceability of this Agreement and the Collateral Administration Agreement or the provisions of the Indenture and the Collateral Administration Agreement applicable to the Collateral Manager.

(d)    <u>No Conflicts</u>. Neither the execution and delivery of this Agreement or the Collateral Administration Agreement, nor the performance of the terms hereof or the provisions of the Indenture and the Collateral Administration Agreement applicable to the Collateral Manager, conflicts with or results in a breach or violation of the

ND: 4814-7998-2849, Ver 2

<u>Collateral Management Agreement</u>

12

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP002008

organizational documents of the Collateral Manager or conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) the terms of any indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other agreement, obligation, condition, covenant or instrument to which the Collateral Manager is a party or the Collateral Manager or its property is bound, (ii) any statute applicable to the Collateral Manager or (iii) any law, decree, order, rule or regulation applicable to the Collateral Manager of any court or regulatory, administrative or governmental agency, body or authority or arbitrator having or asserting jurisdiction over the Collateral Manager or its properties, and which would, in the case of the foregoing clauses (i), (ii) and (iii), have a material adverse effect upon the performance by the Collateral Manager of its duties under this Agreement or the provisions of the Indenture and the Collateral Administration Agreement applicable to it.

(e)    No Consents, Approvals, Etc. No consent, approval, registration, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other Person is required for the performance by the Collateral Manager of its duties hereunder and under the terms of the Indenture and the Collateral Administration Agreement applicable to it, except such as have been duly made or obtained.

(f)    The statements set forth in the final offering memorandum dated April 4, 2007 (as supplemented, the "Offering Memorandum"), under the caption "The Collateral Manager" and "Risk Factors – Certain Conflicts of Interest Involving the Collateral Manager" (collectively, the "Collateral Manager Information") do not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

## ARTICLE IV

## COMPENSATION; EXPENSE; DELEGATION; LIABILITY AND INDEMNIFICATION

Section 4.1.    Compensation.

(a)    Generally. In consideration of the performance of the obligations of the Collateral Manager hereunder and under the Indenture, the Collateral Manager shall be entitled to receive, at the times set forth in the Indenture and subject to the conditions set forth in the Indenture and in accordance with the Priority of Payments, to the extent funds are available therefor, the fees set forth in clauses (b) and (c) below. The Senior Collateral Management Fee and the Subordinated Collateral Management Fee shall be computed on the basis of a year of 360 days and the actual number of days elapsed.

(b)    Senior Collateral Management Fee. The Collateral Manager shall be entitled to receive a fee (the "Senior Collateral Management Fee") which will accrue from the Closing Date at a rate of 1.0% per annum on the Quarterly Asset Amount on

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002009

each Payment Date (adjusted in the case of the first Payment Date on which such fees are paid to reflect the different number of days in such period), payable in arrears on each Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments. The Senior Collateral Management Fee will accrue if unpaid and shall be payable on the next Payment Date on which funds are available therefor in accordance with the Priority of Payments and so long as such payment will not cause an Event of Default under the Indenture. Notwithstanding the foregoing, the Collateral Manager, in its sole and absolute discretion, shall be entitled to defer to a later Payment Date and/or have paid at a less senior or other applicable position in the Priority of Payments all or any portion of the Senior Collateral Management Fee payable on any Payment Date upon written direction by the Collateral Manager to the Trustee. Any such deferred Senior Collateral Management Fee shall be payable, at the Collateral Manager's sole and absolute discretion, at such less senior or other applicable position in the Priority of Payments on such Payment Date and/or on the subsequent Payment Date (including for the avoidance of doubt at a less senior or other applicable position in the Priority of Payments) in each case to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments.

(c)    Subordinated Collateral Management Fee. The Collateral Manager shall be entitled to receive a fee (the "Subordinated Collateral Management Fee") which will accrue from the Closing Date at a rate equal to the sum of (x) 1.0% per annum on the Quarterly Asset Amount and (y) the excess of (i) $1,500,000 over (ii) the amount of the Senior Collateral Management Fee of such Payment Date on each Payment Date (adjusted in the case of the first Payment Date on which such fees are paid to reflect the different number of days in such period), payable in arrears on each Payment Date to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments. The Subordinated Collateral Management Fee will accrue if unpaid and shall be payable on the next Payment Date on which funds are available therefor in accordance with the Priority of Payments and so long as such payment will not cause an Event of Default under the Indenture. Notwithstanding the foregoing, the Collateral Manager, in its sole and absolute discretion, shall be entitled to defer to a later Payment Date and/or have paid at a less senior or other applicable position in the Priority of Payments all or any portion of the Subordinated Collateral Management Fee payable on any Payment Date upon written direction by the Collateral Manager to the Trustee. Any such deferred Subordinated Collateral Management Fee shall be payable, at the Collateral Manager's sole and absolute discretion, at such less senior or other applicable position in the Priority of Payments on such Payment Date and/or on the subsequent Payment Date (including for the avoidance of doubt at a less senior or other applicable position in the Priority of Payments) in each case to the extent there are sufficient funds available therefor on such Payment Date in accordance with the Priority of Payments.

(d)    Post Termination Payments. If this Agreement is terminated for any reason or Patriarch XV is removed, then (i) the fees calculated as provided in this Section 4.1 and payable to Patriarch XV shall be prorated for any partial period to, but excluding, the effective date of such termination or removal, and (ii) the fees calculated as provided

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002010

in this Section 4.1 and payable to the successor collateral manager shall be prorated for any partial period beginning on the effective date of such appointment. The prorated fees, together with any accrued and unpaid fees and any unpaid expense reimbursements, due to Patriarch XV hereunder shall rank pari passu to the fees and any unpaid expense reimbursements due to the successor collateral manager, and such fees and expense reimbursements due to Patriarch XV and the successor collateral manager shall be paid pro rata to the extent funds are available therefor in accordance with the Priority of Payments.

(e)    Subordination of Payments. The Collateral Manager agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be subordinated to the extent set forth in, and limited to the amounts available under, the Priority of Payments, described in the Indenture and the Collateral Manager agrees to be bound by the Priority of Payments as if the Collateral Manager were a party to the Indenture.

(f)    Collateral Manager as Holder of Notes and Preference Shares. The Company and the Zohar Subsidiary acknowledge and agree that the Collateral Manager may from time to time acquire, hold and dispose of Notes and Preference Shares, subject in each case to the terms and conditions of the Indenture.

Section 4.2.    Expenses. The Collateral Manager shall pay all expenses and costs incurred by it in connection with its services under this Agreement; provided, however, that the Company shall reimburse the Collateral Manager, at the times set forth in the Indenture and subject to the conditions set forth therein and the Priority of Payments, to the extent funds are available therefor, for (i) extraordinary costs and expenses incurred in the performance of the Collateral Manager's obligations under this Agreement and the Indenture, (ii) reasonable fees and expenses (not otherwise paid with funds from the Professional Fee Account) incurred by the Collateral Manager to employ outside lawyers, accountants, consultants or other outside specialists or professionals, asset pricing and asset rating services, and accounting, programming and data entry services that are retained by the Company, the Zohar Subsidiary or by the Collateral Manager on behalf of the Company or the Zohar Subsidiary and (iii) brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Company's or the Zohar Subsidiary's account. Expenses and costs payable to the Collateral Manager under this Section 4.2 shall constitute either Administrative Expenses or professional fees and shall be payable by application of amounts on deposit in the Professional Fee Account or the Expense Account, as applicable, subject to the terms of the Indenture and in accordance with the Priority of Payments (in each case to the extent funds are available therefor).

Section 4.3.    Delegation. The Collateral Manager may delegate to any agent any or all of the duties and obligations assigned to the Collateral Manager hereunder; provided that no delegation by the Collateral Manager of any of its duties hereunder shall relieve the Collateral Manager of any of its duties hereunder nor relieve the Collateral Manager of any liability with respect to the performance of such duties.

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

15

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002011

Section 4.4.    Liability of the Collateral Manager.  The Collateral Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it in good faith and, subject to the standard of conduct described in the next succeeding sentence, shall not be responsible for any action or omission of the Company, the Co Issuer, the Zohar Subsidiary or the Controlling Class or any other Person(s) in following or declining to follow any advice, recommendation or direction of the Collateral Manager or for any action of the Company, the Co Issuer, the Trustee or the Zohar Subsidiary in following any direction of the Controlling Class, the Trustee or any Holder of the Notes or of the Securities.  The Collateral Manager, its members, managers, directors, officers, stockholders, partners, employees, advisors and agents, shall not be liable to (a) the Company, the Co Issuer, the Zohar Subsidiary, the Trustee, the Holders of the Securities, or any other Person for any losses, claims, damages, judgments, assessments, interests, judgments, costs, fines, amounts paid in settlement, attorneys' fees and expenses or other liabilities of any nature whatsoever incurred by the Company, the Co Issuer, the Zohar Subsidiary, the Trustee, the Holders of the Securities, or any other Person that arise out of or in connection with the performance by the Collateral Manager (or such other Persons) of the Collateral Manager's duties under this Agreement and/or the other Transaction Documents, or (b)  the Holders of the Securities, the Co Issuers, the Zohar Subsidiary, the Trustee, the creditors of  the Co Issuers, the Zohar Subsidiary or any other Person for any error of judgment, mistake of law, or for any loss arising out of any investment, for any other act or omission in the performance of its obligations to the Zohar Obligors except, in the case of both clauses (a) and (b), by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party and with respect to the Collateral Manager Information, such information containing any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

Section 4.5.    Indemnification.

(a)      The Company and the Zohar Subsidiary (in such case, the "Indemnifying Party") shall reimburse, indemnify, defend and hold harmless the Collateral Manager and its managers, directors (whether supervisors or managers), officers, stockholders, members, agents, advisors, partners and employees and any Affiliate of the Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees (in such case, an "Indemnified Party") from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees and expenses), as are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Transaction Documents and/or any acts or omissions of the Collateral Manager, or its managers, directors, officers, stockholders, members, agents,

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

16

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                    PP002012

advisors, partners and employees made in good faith and in the performance of the duties of the Collateral Manager under the Transaction Documents except to the extent resulting from the Indemnified Party's acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party.

(b)     The Collateral Manager and its managers, directors, officers, stockholders, members, agents, advisors, partners and employees may consult with counsel and accountants with respect to the Collateral or the affairs of the Zohar Obligors and shall be fully protected and justified, to the extent allowed by law, in acting, or failing to act, if such action or failure to act is taken or made in good faith and is in accordance with the advice or opinion of such counsel or accountants. Notwithstanding anything contained herein to the contrary, the obligations of the Company under this Section 4.5 constitute Administrative Expenses and shall be payable in accordance with the Priority of Payments described in the Indenture.

(c)     The Collateral Manager (in such case, the "Indemnifying Party") shall reimburse, indemnify, defend and hold harmless the Company and the Zohar Subsidiary from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including reasonable attorneys' fees and expenses) in respect of or arising out of (A) any acts or omissions of the Collateral Manager, its directors, stockholders, managers, officers, members, agents, partners and employees constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party (except to the extent resulting from the Indemnified Party's bad faith, willful misconduct or gross negligence in the performance, or reckless disregard, of its duties hereunder or under any other Transaction Document to which it is a party) and (B) with respect to the Collateral Manager Information, such information containing any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

(d)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 4.5, such Indemnified Party shall (or with respect to Indemnified Parties that are Affiliates, managers, directors, officers, stockholders, members, agents, advisors, partners or employees of the Collateral Manager, the Company or the Zohar Subsidiary (as applicable), the Collateral Manager, the Company or the Zohar Subsidiary (as applicable) shall cause such Indemnified Party to):

(i)     give written notice to the Collateral Manager of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

17

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002013

Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 4.5 unless the Indemnifying Party is materially prejudiced or otherwise forfeits substantial rights or defenses by reason of such failure;

      (ii)     at the Indemnifying Party's expense, provide the Indemnifying Party with such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

      (iii)    at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

      (iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

      (v)     neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case, without the prior written consent of the Indemnifying Party, unless the Indemnifying Party contests indemnification;

      (vi)    subject to the Indemnifying Party's giving of reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest, such Indemnifying Party shall pay the reasonable fees and disbursements of one

ND: 4814-7998-2849, Ver 2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC        PP002014

counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

(vii)    the Indemnifying Party shall not settle any such claim without the prior written consent of the Indemnified Party, which consent (x) shall not be unreasonably withheld or delayed in the case of a settlement for monetary damages only and (y) may be withheld in the Indemnified Party's sole discretion if the Indemnified Party must perform any act or make any admission in connection with such settlement.

(e)    In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 4.5 is held to be unavailable or insufficient to hold harmless any Indemnified Party, although applicable in accordance with the terms of this Section 4.5, the Company, the Zohar Subsidiary or the Collateral Manager (as applicable) shall contribute to the aggregate costs incurred by the Indemnified Party in connection with any claim covered by this Section 4.5 in the proportion of the respective economic interests of the Company, the Zohar Subsidiary or the Collateral Manager. The respective economic interests shall be calculated by reference to the aggregate amounts (other than the proceeds from the issuance of the Notes) received by Company and the Zohar Subsidiary from the interest, fees, gains or other amounts received in connection with the Collateral and the aggregate Senior Collateral Management Fees and Subordinated Collateral Management Fees paid to the Collateral Manager hereunder.

## ARTICLE V

## TERM AND TERMINATION;
## REMOVAL OF THE COLLATERAL MANAGER

Section 5.1.    Term. This Agreement shall become effective on the date hereof and shall continue in force and effect until the first of the following occurs (the "CMA Termination Date"): (i) the payment in full of the Notes and redemption of the Preference Shares and the termination of the Indenture and the Preference Share Paying Agency Agreement in accordance with their respective terms, (ii) the liquidation of the Collateral and the final distribution of the proceeds in accordance with the Priority of Payments and (iii) the termination of this Agreement in accordance with this Article V.

Section 5.2.    Automatic Termination. This Agreement shall automatically terminate upon the Company's good faith determination that the Company, the Co Issuer, the Zohar Subsidiary, or the pool of Collateral has become required to be registered as an "investment company" under the Investment Company Act, and the Company notifies the Collateral Manager thereof.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002015

Section 5.3.    Termination For Cause.  (a)  The Collateral Manager may be removed for Cause upon 10 Business Days' prior written notice by the Company to the Collateral Manager (which notice may be waived by the Collateral Manager) at the direction of the Controlling Class.

(b)    If any event constituting Cause occurs, the Collateral Manager shall give prompt written notice thereof to the Company, the Zohar Subsidiary, the Trustee, S&P and the Preference Share Paying Agent promptly upon the Collateral Manager's becoming aware of the occurrence of such event.

Section 5.4.    Appointment of Successor.  Upon the removal of the Collateral Manager pursuant to this Article V, Patriarch XV shall appoint a successor collateral manager (subject to the consent of the Controlling Class).  Notwithstanding any other provision herein to the contrary, Patriarch XV shall not be liable for any acts, omissions or obligations of any successor collateral manager.  Any termination of this Agreement and the termination of Patriarch XV as the Collateral Manager hereunder shall become effective as provided herein once a successor collateral manager shall have been appointed.

(a)    No removal or resignation of the Collateral Manager under this Agreement shall be effective unless (i) a successor collateral manager has assumed in writing all of the Collateral Manager's duties and obligations pursuant to this Agreement, (ii) the successor collateral manager has been approved in writing by the Controlling Class  and (iii) the outgoing Collateral Manager has received written notice (a) from the Controlling Class or, if applicable, a Majority of the Preference Shares that it has approved of such successor collateral manager and (b) from such successor collateral manager that it has agreed to assume the outgoing collateral manager's duties.

(b)    No removal or resignation of the Collateral Manager shall be effective until the appointment by the Controlling Class of, and acceptance of such appointment in writing by, a successor collateral manager that in the opinion of the Controlling Class or a Majority of the Preference Shares (as applicable) (i) is an established institution that has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Collateral Manager under this Agreement and the other Transaction Documents and with a substantially similar (or better) level of expertise, (ii) is legally qualified and has the capacity to act as collateral manager under this Agreement and the other Transaction Documents and as successor to the Collateral Manager hereunder in the assumption of all the responsibilities, duties and obligations of the Collateral Manager hereunder and the other Transaction Documents, (iii) will not cause any Zohar Obligor or the pool of Collateral to become required to register under the provisions of the Investment Company Act and (iv) so long as any Notes are rated, each Rating Agency has confirmed in writing that the appointment of such successor collateral manager will not cause its then current rating of any Note to be reduced or withdrawn.

(c)    If no successor collateral manager is in place within ninety (90) days after the giving of such notice of termination, the Collateral Manager or the Trustee (or, after

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

20

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP002016

the Notes are paid in full, the Preferences Share Paying Agent acting at the direction of a majority of the Preference Shares) may petition any court of competent jurisdiction for the appointment of a successor collateral manager.

Section 5.5.    Survival.  Upon any termination or assignment of this Agreement, the provisions of Sections 3.1, 3.2, 4.1, 4.2, 4.4, 4.5, 5.6, 6.3, 6.4 and 6.5 shall survive such termination or assignment and remain operative and in full force and effect.

Section 5.6.    Action Upon Termination.  From and after the effective date of the termination of the Collateral Manager's duties and obligations pursuant to this Agreement or removal of the Collateral Manager hereunder, the Collateral Manager shall not be entitled to compensation for services hereunder after the effective date of such termination or removal but shall be paid all compensation accrued through the date of termination (subject to the Priority of Payments), as provided in Section 4.1 hereof, and shall be entitled to receive any amounts owing under Sections 4.2 and 4.5 hereof.  Upon such termination or removal, the Collateral Manager shall as soon as practicable:

(i)    deliver to the Company or (at the direction of the Company) any successor collateral manager that is appointed all property and documents of the Trustee, the Company, the Co Issuer, or the Zohar Subsidiary, as the case may be, relating to the Collateral then in the custody of the Collateral Manager, including, without limitation, files in electronic form; and

(ii)    deliver to the Trustee an accounting with respect to the books and records delivered to the Company or the successor collateral manager, as applicable.

(b)    Notwithstanding such termination or removal, the Collateral Manager shall remain liable to the extent set forth herein (but subject to Section 4.4 hereof) for its acts or omissions hereunder arising prior to termination or removal and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Collateral Manager in Section 3.2 hereof or from any failure of the Collateral Manager to comply with the provisions of this Section 5.6.

(c)    The Collateral Manager agrees that, notwithstanding such termination or removal it shall cooperate with the Company in any proceeding arising in connection with this Agreement, the Indenture, the Collateral Administration Agreement or any of the Collateral (excluding any such proceeding in which claims are asserted against the Collateral Manager or any Related Party of the Collateral Manager) upon receipt of appropriate indemnification and expense reimbursement.  Notwithstanding anything else to the contrary contained in this Agreement or any other Transaction Documents, if Patriarch XV ceases to be the Collateral Manager hereunder, the rights of Patriarch XV and/or its Affiliates as a holder of any Securities shall not be affected.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002017

Section 5.7.    Trustee Termination Rights.  The Company, the Zohar Subsidiary and the Collateral Manager acknowledge the right of the Trustee to terminate this Agreement under certain circumstances set forth in Section 14.1 of the Indenture.

## ARTICLE VI

## ADDITIONAL AGREEMENTS OF THE COLLATERAL MANAGER

Section 6.1.    Non Exclusivity.  The services of the Collateral Manager to the Company and the Zohar Subsidiary are not to be deemed exclusive and the Collateral Manager shall be free to render collateral management or other services of any kind to others (including without limitation Affiliates, other investment companies and clients having objectives substantially identical to those of the Company).  It is understood and agreed that the members, directors, stockholders, partners, employees, officers and managers of the Collateral Manager may engage in any other business activity or render services to any other Person or serve as partners, owners, officers, directors, consultants and advisers or managers of any other firm or company.

Section 6.2.    Conflicts of Interest; Acknowledgment of the Company.  (a) Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of the Collateral Manager, and its Affiliates, managers, directors, officers, stockholders, members, agents, advisors, partners and employees (collectively, "Related Parties") and their respective clients, including but not limited to the matters described in Section 2.2(l) and this Section 6.2.  The Collateral Manager and its Related Parties may invest for their own accounts or on behalf of other clients (including clients with business objectives and structures and assets identical to the Company and/or the Zohar Subsidiary) in securities, obligations, loans or other assets that would be appropriate as investments for the Company and/or the Zohar Subsidiary.  Such investments may be different (including with respect to issuer, price or terms) from those made on behalf of the Company and/or the Zohar Subsidiary.  The Collateral Manager and its Related Parties may have, or advise clients with, ongoing relationships with companies whose securities, obligations or loans are pledged to support the Company's repayment obligations under the Indenture and such Persons may own equity or debt securities issued by issuers of, and other obligors on, Collateral Investments.  Subject to Section 2.2(k)(i), the Collateral Manager and its Related Parties may serve as collateral manager or advisor for, invest in, or be affiliated with, the Persons from which the Company and/or the Zohar Subsidiary may acquire Collateral, Affiliates of such Persons and other entities organized to issue collateralized debt obligations, including those identical to the Securities and those secured by high yield securities, distressed loans, or emerging market bonds and loans, including those issued by companies that are issuers of, and other obligors on, the Collateral.  The Collateral Manager and its Related Parties may at certain times be simultaneously seeking to purchase and/or sell investments for the Company, the Zohar Subsidiary and/or other entities (or for some but not all of such Persons) for which it serves as collateral manager or advisor now or in the future, or for its other clients and its managers, directors, officers, stockholders, members, agents,

ND: 4814-7998-2849, Ver 2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP002018

advisors, partners, employees and Affiliates or for its own account. Due to the illiquid nature of the market for certain investments, the Collateral Manager and its Related Parties and clients may be unable to obtain identical execution of similar buy or sell decisions. The Collateral Manager, and its Related Parties may at certain times acquire, hold and dispose of Notes and Preference Shares. Notwithstanding any other provision herein to the contrary, the Collateral Manager and its Affiliates may act as a consultant to any issuer of or obligor on any Collateral or an agent for lenders under any loan facility (or hold any other similar role) in which the Company and/or the Zohar Subsidiary holds an interest that comprises part of the Collateral, subject to such consulting agreement or loan facility (or similar documents) containing customary and reasonable provisions for the indemnification and/or compensation of the Collateral Manager or its Affiliates, as the case may be.

(b)    The Company and the Zohar Subsidiary hereby acknowledge that the Collateral Manager and its Related Parties may actively manage their own accounts and the accounts of other clients with investments similar, and in some cases identical, to the Collateral, including those issued by companies that are issuers of, and other obligors on, the Collateral, and consent to and waive the various potential and actual conflicts of interest that may exist from time to time with respect to the Collateral Manager and its Related Parties as generally described in Section 6.2(a) above; provided, however, that nothing in this Section 6.2 shall be construed as altering the duties of the Collateral Manager as set forth in this Agreement or the Indenture nor the requirements of any law, rule, or regulation applicable to the Collateral Manager.

(c)    If the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the holders of the Notes and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as investment advisor that relates to any action to be taken with respect to any Collateral Investment, then the Collateral Manager will perform its obligations with respect to any such conflict in accordance with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and familiar with such matters would use in the resolution of such conflict (provided that, to the extent that any provision of this Agreement specifically addresses the treatment of any conflict referred to in this clause (c), such conflict shall not be subject to this clause (c)).

(d)    The Collateral Manager may, on behalf of the Company, direct the Company to sell or acquire Collateral Investments to or from the Collateral Manager or any of its Affiliates, to or from entities for which the Collateral Manager acts as investment advisor or in a similar capacity or to or from any other Person, in each case subject to the terms of this Agreement and the Indenture. All sales and acquisitions of Collateral Investments by the Collateral Manager on behalf of the Company shall be in accordance with its reasonable and customary business practices, at arms' length, for fair market value and in compliance with applicable law. Prior to each sale or acquisition of a Collateral Investment by the Company of a Collateral Investment to or from the Collateral Manager or one of its Affiliates, the Collateral Manager will submit all

ND: 4814-7998-2849, Ver 2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP002019

relevant information, including information relating to pricing, to the board of directors of the Company and obtain the written consent of a majority of such board of directors to such sale to or purchase by the Company.

(e)     Any Notes or Preference Shares held by the Collateral Manager or any Affiliate of the Collateral Manager ("Collateral Manager Securities"), in each case will have no voting rights with respect to any vote in connection with the removal of the Collateral Manager, and will be deemed not to be Outstanding in connection with any such vote; *provided* that any such Collateral Manager Securities will have voting rights and will be deemed Outstanding with respect to all other matters as to which Holders of Securities are entitled to vote.

(f)     The Collateral Manager, in connection with its other business activities, may acquire material non-public confidential information that may restrict the Collateral Manager from purchasing Collateral Investments or selling Collateral Investments for itself or its clients (including the Company) or otherwise using such information for the benefit of its clients or itself.

(g)     There is no limitation or restriction on the Collateral Manager or any of its Affiliates with regard to acting as collateral manager (or in a similar role) to other parties or persons.  This and future activities of the Collateral Manager and/or its Affiliates may give rise to additional conflicts of interest.

(h)     The Collateral Manager may also effect client cross-transactions where the Collateral Manager causes a transaction to be effected between the Company and another account advised by it or any of its Affiliates, including CDOs or entities warehousing assets similar to the Collateral Investments.  By purchasing a Note or Preference Share of the Company, a Holder is deemed to have consented to the Collateral Manager effecting client cross-transactions under the circumstances described herein and the procedures described herein relating to principal transactions with the Collateral Manager or its Affiliates.

Section 6.3.    Records.

(a)     The Collateral Manager, with the assistance of the Collateral Administrator, shall maintain appropriate books of account and records relating to services performed hereunder and relating to the Collateral including invoices for professional fees, and such books of account and records shall be accessible for inspection by a representative of the Company, the Zohar Subsidiary, the Trustee and the independent accountants appointed by the Company pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior written notice; provided, however, that following the Collateral Manager's receipt of a notice of its removal pursuant to Section 5.3 hereof, the Collateral Manager shall at the request of the Controlling Class use its commercially reasonable efforts to promptly provide to the prospective successor collateral manager copies of the books and records of the Zohar Obligors and copies of Underlying Instruments (in each case in the possession of the Collateral Manager) (for the avoidance of doubt, such books and

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002020

records and other information shall not include the credit templates or other proprietary information of the Collateral Manager); provided further that the Collateral Manager shall be required to provide the information described in the immediately preceding proviso if (i) the prospective successor collateral manager executes a confidentiality agreement reasonably acceptable to the Collateral Manager and (ii) the release of such information is permitted under the Transaction Documents and the Underlying Instruments. Upon the termination of its obligations hereunder in accordance with this Agreement and the Indenture, the Collateral Manager agrees to either (i) maintain or cause the Collateral Administrator to maintain, such books and records as provided above for a period of three years (or such longer period required by applicable law) from such termination or (ii) deliver, or cause the Collateral Administrator to deliver, all such books and records (or copies thereof) to the Trustee promptly following such termination.

Section 6.4.    Confidentiality. The Collateral Manager shall, and shall endeavor to cause its Affiliates to, keep confidential information obtained in connection with this Agreement and shall not disclose any such information to non affiliated third parties except (i) with the prior written consent of the Company (or, with respect to confidential information of or pertaining to the Zohar Subsidiary or the activities of the Collateral Manager on behalf of the Zohar Subsidiary, the Zohar Subsidiary), (ii) such information as the Rating Agencies shall request, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Collateral Manager (including securities offerings for additional collateralized debt obligation funds or investment vehicles for which the Collateral Manager or any of its Affiliates will serve as the collateral manager, advisor or replacement collateral manager), (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, (vi) to the extent required in connection with the acquisition, origination, restructuring, exchange or disposal of Collateral by the Company and/or the Zohar Subsidiary (e.g., disclosures to agent banks and borrowers to evidence the Company's and/or Zohar Subsidiary's ability to extend credit pursuant to the applicable Underlying Instruments) or (vii) such information that was or is obtained by the Collateral Manager (A) on a non confidential basis or (B) for avoidance of doubt, other than in connection with the services rendered hereunder; provided that for the purposes of this clause (vii)(A) the Collateral Manager does not know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6.4, the Holders of Securities, the prospective Holders of Securities, all parties to the Transaction Documents, and any of their Related Parties or professional advisors or agents shall in no event be considered "non affiliated third parties".

Section 6.5.    Non Petition. The Collateral Manager shall continue to serve as Collateral Manager under this Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under this Agreement because sufficient funds were not then available under the Indenture to pay such amounts in accordance with the Priority of Payments. The Collateral Manager covenants and agrees that it shall not institute against, or join any other Person in instituting against, any Zohar Obligor or any

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

25

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                                PP002021

of their directors, officers, shareholders or incorporators (in their capacity as such) for any reason whatsoever (including, without limitation, the non payment to the Collateral Manager of any amount payable by the Company hereunder) any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this sentence shall preclude, or be deemed to stop, the Collateral Manager (A) from taking any action prior to the expiration of the aforementioned one year and one day period (or such longer applicable preference period then in effect) in (x) any case or proceeding voluntarily filed or commenced by the Company, the Zohar Subsidiary or the Co Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Company, the Zohar Subsidiary or the Co Issuer, as the case may be, by a Person other than the Collateral Manager or its respective Affiliates, or (B) from commencing against the Company, the Zohar Subsidiary or the Co Issuer or any properties of the Company, the Zohar Subsidiary or the Co Issuer any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

### ARTICLE VII

### MISCELLANEOUS

Section 7.1.   <u>No Partnership or Joint Venture</u>.  The Company, the Zohar Subsidiary and the Collateral Manager are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them.  The Collateral Manager's relationship to the Company and the Zohar Subsidiary shall be deemed to be that of an independent contractor.

Section 7.2.   <u>Notices</u>.  Any notice under this Agreement shall be in writing and sent by facsimile or addressed and delivered or mailed postage paid to the other parties at such address as such other parties may designate for the receipt of such notice.  Notice shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of facsimile notice, when received in legible form, addressed as set forth below.  Until further notice to the other party, it is agreed that the address of the Company for this purpose shall be Zohar III, Limited, c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Directors, telephone (345) 945 7099, facsimile (345) 945 7100; the address of the Zohar Subsidiary for this purpose shall be Zohar III, LLC, c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald Puglisi, Esq., telecopier number: (302) 738 7210; the address of the Collateral Manager for this purpose shall be Patriarch Partners XV, LLC, c/o Patriarch Partners, LLC, 227 W. Trade St., Suite 1400, Charlotte, North Carolina

ND: 4814-7998-2849, Ver 2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP002022

28202, Attention: Lynn Tilton, telephone: (704) 227 1204, telecopier: (704) 375 0358; the address of the Trustee for this purpose shall be LaSalle Bank National Association, 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603, Attention: CDO Trust Services Group – Zohar III, Limited, telephone: (312) 904 0283, telecopier: (503) 258 5859; the address of Standard & Poor's for this purpose shall be Standard & Poor's Ratings Group, 55 Water Street, New York, New York, 10041, telephone: (212) 438 2000, facsimile (212) 438 2664, Attention: Structured Finance Ratings, Asset Backed Securities CBO/CLO Surveillance and that of Moody's for this purpose shall be Moody's Investors Service, Inc., 99 Church St., New York, New York 10007, telephone: (212) 553-0300, telecopier: (212) 553 0355, Attention: CBO/CLO Monitoring.

    Section 7.3.    Succession; No Assignment, Submission to Jurisdiction, Etc. This Agreement shall inure to the benefit of and be binding upon the successors to the parties hereto. This Agreement may not be assigned by any party hereto, except (i) in the case of the assignment by the Company to the Trustee as contemplated by the Granting Clause of the Indenture, (ii) in the case of any assignment to a successor collateral manager pursuant to Section 5.4 hereof and (iii) in the case of any assignment by Patriarch XV to a Controlled Entity with prior written notice to S&P.

    (a)    Each of the Company, the Zohar Subsidiary and the Collateral Manager irrevocably (i) submits to the non exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in the City of New York in any action or proceeding arising out of or relating to this Agreement or the Indenture, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or federal court, (iii) waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, (iv) consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the address specified for it in Section 7.2 and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

    Section 7.4.    Governing Law; Waiver Of Jury Trial. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES (OTHER THAN SECTION 5 1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

    Section 7.5.    Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which

ND: 4814-7998-2849, Ver 2

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP002023

when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Section 7.6.    <u>Headings Descriptive</u>.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 7.7.    <u>Severability</u>.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 7.8.    <u>Entire Agreement</u>.  This Agreement and other documents referred to herein or delivered pursuant hereto, collectively contain the entire understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior agreements and understandings, oral and written, with respect thereto.

Section 7.9.    <u>Amendments</u>.  This Agreement may not be amended or modified or any provision hereof waived except (i) by an instrument in writing signed by the parties hereto, (ii) in accordance with Section 14.4(d) of the Indenture.  For the avoidance of doubt, prior to entering any agreement amending, modifying, terminating or waiving its rights under this Agreement, the Collateral Manager shall comply with the applicable requirements of Section 14.4(d) of the Indenture; <u>provided</u> <u>however</u>, that notwithstanding anything else contained herein, any amendment that (i) is necessary in order for this Agreement to comply with any applicable law or regulation, including without limitation the Investment Advisers Act of 1940, and (ii) does not materially and adversely affect the holders of the Notes shall not require the consent of any Person and may be evidenced by a supplement prepared by the Collateral Manager.

Section 7.10.    <u>Indulgences Not Waivers</u>.  Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

Section 7.11.    <u>Collateral Manager Obligations Under the Indenture</u>.  The Collateral Manager (i) consents to the assignment of this Agreement to the Trustee for the benefit of the Secured Parties pursuant to the terms of the Indenture, (ii) acknowledges that each of the Company and the Zohar Subsidiary has collaterally assigned all of its right, title and interest in, to and under this Agreement to the Trustee for the benefit of

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP002024

such Secured Parties and (iii) makes each of the agreements and covenants set forth in Section 14.4 of the Indenture.

Section 7.12.  Limitations on Recourse.  Notwithstanding any other provision to the contrary, the Collateral Manager shall have recourse solely to the Collateral as applied pursuant to the Priority of Payments as described in the Indenture for the payment and performance of all of the obligations of the Company under this Agreement.  Upon final realization of such Collateral, any outstanding obligations of the Company hereunder shall be extinguished and shall not thereafter revive, and the Collateral Manager shall not be entitled to take any further steps against the Company or any of its directors, officers, shareholders or incorporators, to recover any sums due from the Company but still unpaid.  This provision shall survive the termination of this Agreement.

(a)    The Collateral Manager shall have no recourse to any shareholder, manager, member, director or officer of the Company or the Zohar Subsidiary, or to any of the respective assets of such shareholder, manager, member, director or officer of the Company or the Zohar Subsidiary.

(b)    Neither the Company nor the Zohar Subsidiary shall have any recourse to any shareholder, manager, member, director or officer of the Collateral Manager, or to any of the respective assets of such shareholder, manager, member, director or officer of the Collateral Manager.

Section 7.13.  Conflict with Indenture.  Subject to Article II, in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

ND: 4814-7998-2849, Ver 2

Collateral Management Agreement

29

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                PP002025

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR III, LIMITED

By:_____

      Name:  Chris Watler
      Title:  Director

ZOHAR III, LLC

By:    ZOHAR III, LIMITED,
       as Managing Member


By:_____

      Name:
      Title:

PATRIARCH PARTNERS XV, LLC


By:_____

      Name:  Lynn Tilton
      Title:   Manager

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP002026

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR III, LIMITED

By:_____
      Name:
      Title:

ZOHAR III, LLC

By:    ZOHAR III, LIMITED,
       as Managing Member

By:_____
      Name:   Chris Watler
      Title:    Director

PATRIARCH PARTNERS XV, LLC

By:_____
      Name:   Lynn Tilton
      Title:    Manager

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP002027

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

ZOHAR III, LIMITED

By:_____
        Name:
        Title:

ZOHAR III, LLC

By:    ZOHAR III, LIMITED,
       as Managing Member

By:_____
        Name:
        Title:

PATRIARCH PARTNERS XV, LLC

By:_____
        Name:   Lynn Tilton
        Title:    Manager

Collateral Management Agreement

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP002028