# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ZOHAR III, CORP., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| ZOHAR CDO 2003-1, LIMITED; ZOHAR II 2005-1, LIMITED; and ZOHAR III, LIMITED;  ZOHAR II 2005-1, CORP.; | Adv. Pro. No. 20-50534 (KBO) |
| Plaintiffs, | |
| v. | |
| PATRIARCH PARTNERS, LLC; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC; PHOENIX VIII, LLC; OCTALUNA LLC; OCTALUNA II LLC; OCTALUNA III LLC; ARK II CLO 2001-1, LIMITED; ARK INVESTMENT PARTNERS II, LP; ARK ANGELS VIII, LLC; PATRIARCH PARTNERS MANAGEMENT GROUP, LLC; PATRIARCH PARTNERS AGENCY SERVICES, LLC; and LYNN TILTON, | |
| Defendants, and | |
| 180S, INC.; BLACK MOUNTAIN DOORS, LLC; CROSCILL HOME, LLC; DURO TEXTILES, LLC; GLOBAL AUTOMOTIVE SYSTEMS, LLC; HERITAGE AVIATION, LTD.; INTREPID U.S.A., INC.; IMG HOLDINGS, INC.; JEWEL OF JANE, LLC; MOBILE ARMORED VEHICLES, LLC; SCAN-OPTICS, LLC; SILVERACK, LLC; STILA STYLES, LLC; SNELLING | |

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is c/o Province, LLC 70 Canal Street, Suite 12E, Stamford, CT 06902.

29646500

STAFFING, LLC; VULCAN
ENGINEERING, INC; and XPIENT
SOLUTIONS, LLC,

          Nominal Defendants.

---

PATRIARCH PARTNERS VIII, LLC;
PATRIARCH PARTNERS XIV, LLC;
PATRIARCH PARTNERS XV, LLC;
OCTALUNA LLC; OCTALUNA II LLC;
OCTALUNA III LLC; PATRIARCH
PARTNERS AGENCY SERVICES, LLC; and
PATRIARCH PARTNERS, LLC,

          Counterclaim and Third-Party
          Claimants,

          -against-

ZOHAR CDO 2003-1, LIMITED; ZOHAR
CDO 2003-1, CORP., ZOHAR II 2005-1,
LIMITED; ZOHAR II 2005-1, CORP.;
ZOHAR III, LIMITED; and ZOHAR III
CORP.

          Counterclaim and Third-Party
          Defendants.

**Re: Adv. D.I. 188**

## DECLARATION OF BRIAN R. CAMPBELL IN SUPPORT OF THE LITIGATION TRUSTEE'S BRIEF IN SUPPORT OF ZOHAR LITIGATION TRUST-A'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS AND THIRD PARTY CLAIMS

    I, Brian R. Campbell, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as

follows:

    1.      I am an associate at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel

for David Dunn, as Trustee (the "<u>Litigation Trustee</u>") for the Zohar Litigation Trust-A. I

respectfully submit this declaration in support of the Litigation Trust's *Motion to Dismiss*

*Defendants' Counterclaims and Third Party Claims*.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Zohar CDO 2003-1, Limited Class B Zero Coupon Second Priority Secured Note Due 2018 in the principal amount of $150,000,000.

3.      Attached hereto as **Exhibit 2** is a copy of the form of Zohar II 2005-1, Ltd. Class B Note, which was previously filed on behalf of Octaluna, LLC, Octaluna II, LLC, Octaluna III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC, in support of *Patriarch's Objection to the Debtors' Motion for Entry of an Order Authorizing the Use of Cash Collateral*.  Exhibit 7 to the Declaration of Carolyn Schiff, *In re Zohar III, Corp., et al.*, 18-10512-CSS, D.I. 504 (Oct. 30, 2018).

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the Zohar III, Limited Class B Zero Coupon Fourth Priority Secured Note Due 2019 in the principal amount of $186,000,000.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the Amended and Restated Credit Agreement dated February 28, 2003, among (i) eMag Solutions, LLC, (ii) Patriarch Partners Agency Services, LLC, (iii) Ark CLO 2000-1, Ltd. and (iv) Ark Investment Partners II, L.P.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the Third Amended and Restated Loan and Security Agreement dated January 15, 2009, among (i) Inter-Marketing Group, Inc., (ii) Dana Classic Fragrances, Inc., (iii) Dana S.A.U., (iv) IMG Holdings Inc., (v) Dana Fragrance Brands, LLC, (vi) IMG Fragrance Brands, LLC, (vii) International Watch Corp., (viii) St. Honore Holdings, Inc., (ix) Felagastrying EHF, (x) Vorumerkjastyring EHF, (xi) Finaz St. Honore B.V., (xii) Patriarch Partners Agency Services, LLC, (xiii) Zohar CDO 2003-1 Ltd., (xiv) Zohar II 2005-1, Ltd., and (xv) Zohar III, Ltd.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the Summons and Verified Complaint filed in the matter styled *Gref v. Am. Int'l Indus.*, No. 1:20-cv-05589-GBD, Dkt. 117-1 (S.D.N.Y. June 29, 2021).

8.      Attached hereto as **Exhibit 7** is a true and correct copy of Second Amended Complaint filed in the matter styled *Levine v. Kolmar Labs.*, Index No. 190251/2020, NYSCEF No. 37 (Sup. Ct., N.Y. Cnty. March 10, 2021).

9.      Attached hereto as **Exhibit 8** is a true and correct copy of Summons and Verified Complaint filed in the matter styled *Peltz v. Avon Prods.*, Index. No. 193142/2021, NYSCEF No. 1 (Sup. Ct. , N.Y. Cnty. July 19, 2021)

10.     Attached hereto as **Exhibit 9** is a true and correct copy of Complaint and Demand for Jury Trial filed in the matter styled *Schaeffer v. Barretts Minerals, Inc*., No. MID-L-007018-21, Dkt. 1 (N.J. Super. Ct., Middlesex Cnty. Dec. 8, 2021)

11.     Attached hereto as **Exhibit 10** is a true and correct copy of Supplemental Summons & Complaint filed in the matter styled *Rohe v. Chanel Inc.*, Index No. 190202/2019, NYSCEF No. 11 (Sup. Ct., N.Y. Cnty. Aug. 27, 2019).

12.     Attached hereto as **Exhibit 11** is a true and correct copy of Complaint for Personal Injury and Loss of Consortium -- Asbestos filed in the matter styled *Valega v. Albertson's Cos.*, No. 21STCV46564, Dkt. 1 (Super. Ct. of Cal., LA Cnty. Dec. 21, 2021).

Dated:  August 9, 2022
      New York, New York

                         */s/ Brian R. Campbell*
                         Brian R. Campbell

# **EXHIBIT 1**

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE ). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR CDO 2003-1, LIMITED

## CLASS B ZERO COUPON SECOND PRIORITY SECURED NOTE DUE 2018

CUSIP # 98976W AB 9                                           November 13, 2003
Certificate No. B-1                                          U.S.$150,000,000

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer") for value received, hereby promise to pay to OCTALUNA, LLC or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of ONE HUNDRED FIFTY MILLION United States Dollars (U.S.$150,000,000) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class B Note on the Payment Date in November, 2018 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class B Zero Coupon Second Priority Secured Notes due 2018 (the "Class B Notes") issued and to be issued under an Indenture dated as of November 13, 2003, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar CDO 2003-1, Corp. (the "Co-Issuer"), Zohar CDO 2003-1, LLC, MBIA Insurance Company (the "Credit Enhancer"), CDC Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent"), and U.S. Bank National Association, as trustee (together with any successor trustee as permitted under the Indenture, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein (including, without limitation, the Note Purchase Agreement related hereto) for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Credit Enhancer, the Class A-1 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class B Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

A portion of the principal amount of this Class B Note may be reduced in the circumstances and to the extent provided in the Indenture.

The principal of this Class B Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to

the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The payments of principal of this Class B Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class B Note (or one or more predecessor Class B Notes) effected pursuant to Section 7.13 of the Indenture by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class B Note issued upon the registration of transfer of this Class B Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class B Note.

This Class B Note is a registered Note pursuant to Section 2.4 of the Indenture and neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR CDO 2003-1, LIMITED

By: _____

Name: Donald J. Puglisi

Title: Attorney-in-Fact

## CERTIFICATE OF AUTHENTICATION

This is one of the Class B Zero Coupon Second Priority Secured Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Authorized Signatory

# **EXHIBIT 2**

# Exhibit 7

[FORM OF CLASS B NOTE]

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR II 2005-1, LIMITED

CLASS B ZERO COUPON SECOND PRIORITY SECURED NOTE DUE 2020

CUSIP # 989772 AA 6 [Date]
ISIN # US989772AA65 Certificate No. B/[____]
U.S.$[_____]

ZOHAR II 2005-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promise to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$_____) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class B Note on the Payment Date in January, 2020 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class B zero coupon second priority secured notes due 2020 (the "Class B Notes") issued and to be issued under an Indenture dated as of January 12, 2005, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar II 2005-1, Corp. (the "Co-Issuer"), Zohar II 2005-1, LLC, MBIA Insurance Company (the "Credit Enhancer"), IXIS Financial Products Inc., as agent for the Holders of the Class A-1 Notes (the "Class A-1 Note Agent") and as agent for the Holders of the Class A-3 Notes (the "Class A-3 Note Agent"), and LaSalle Bank National Association, as trustee (in such capacity, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Credit Enhancer, the Class A-1 Note Agent, the Class A-3 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class B Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

A portion of the principal amount of this Class B Note may be reduced in the circumstances and to the extent provided in the Indenture

The principal of this Class B Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to

PP-DEL2-000629776

the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture.  The payments of principal of this Class B Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture.  It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class B Note (or one or more predecessor Class B Notes) effected pursuant to Section 7.13 of the Indenture or by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class B Note issued upon the registration of transfer of this Class B Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class B Note.

This Class B Note is a registered Note pursuant to Section 2.4 of the Indenture and neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge.  Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Issuer or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restrictions or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof).  Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

Exhibit A-5 – Form of Class B Note

PP-DEL2-000629777

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

PP-DEL2-000629778

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR II 2005-1, LIMITED.

By:_____
    Name:
    Title:

INDEX

CERTIFICATE OF AUTHENTICATION

This is one of the Class B zero coupon second priority secured notes referred to in the within-mentioned Indenture.

LASALLE BANK NATIONAL ASSOCIATION, as Trustee

By:_____
        Authorized Signatory

PP-DEL2-000629780

# **<u>EXHIBIT 3</u>**

## CLASS B NOTE

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR III, LIMITED

### CLASS B ZERO COUPON FOURTH PRIORITY SECURED NOTE DUE 2019

CUSIP No.: 989767AA6

ISIN No.: US989767AA62

April 11, 2007

Certificate No. B/1

U.S.$186,000,000

ZOHAR III, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promise to pay to OCTALUNA III, LLC or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of ONE HUNDRED EIGHTY SIX MILLION United States Dollars (U.S.$186,000,000) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class B Note on the Payment Date in April 2019 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class B zero coupon fourth priority secured notes due 2019 (the "Class B Notes") issued and to be issued under an Indenture dated as of April 6, 2007, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar III, Corp. (the "Co-Issuer"), Zohar III, LLC, Natixis Financial Products Inc., as agent for the Holders of the Class A-1R Notes (the "Class A-1R Note Agent") and as agent for the Holders of the Class A-1D Notes (the "Class A-1D Note Agent"), and LaSalle Bank National Association, as trustee (in such capacity, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Class A-1R Note Agent, the Class A-1D Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class B Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

A portion of the principal amount of this Class B Note may be reduced in the circumstances and to the extent provided in the Indenture

The principal of this Class B Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at the close

of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The payments of principal of this Class B Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class B Note (or one or more predecessor Class B Notes) effected pursuant to Section 7.13 of the Indenture or by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class B Note issued upon the registration of transfer of this Class B Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class B Note.

This Class B Note is a registered Note pursuant to Section 2.4 of the Indenture and neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Issuer or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restrictions or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.



IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR III, LIMITED



By:

Name:

Title:         Gregory F. Lavelle
               Attorney-In-Fact

CERTIFICATE OF AUTHENTICATION

This is one of the Class B zero coupon fourth priority secured notes referred to in the within-mentioned Indenture.



LASALLE BANK NATIONAL ASSOCIATION, as Trustee

By: ⟨signature⟩
Authorized Signatory

# **EXHIBIT 4**

**[EXECUTION COPY]**

AMENDED AND RESTATED CREDIT AGREEMENT

dated as of February 28, 2003

among

EMAG SOLUTIONS, L.L.C.,

as BORROWER,

PATRIARCH PARTNERS AGENCY SERVICES, LLC,

as AGENT,

and

THE LENDERS PARTY HERETO

NY186031.4/1639-12505

# TABLE OF CONTENTS

ARTICLE 1 Defined Terms.................................................................................................2

    SECTION 1.01. Definitions...........................................................................................2

ARTICLE 2 Loans...........................................................................................................19

    SECTION 2.01. Loans. 19

    SECTION 2.02. Pro Rata Shares. ...............................................................................21

    SECTION 2.03. Use of Proceeds.................................................................................21

    SECTION 2.04. Evidence of Debt; Register; Notes....................................................21

    SECTION 2.05. Interest on Loans...............................................................................22

    SECTION 2.06. Fees. ..................................................................................................22

    SECTION 2.07. Repayment; Scheduled Payments. ....................................................23

    SECTION 2.08. Optional Prepayments.......................................................................24

    SECTION 2.09. Mandatory Prepayments; Mandatory Commitment Reductions.......25

    SECTION 2.10. Application of Prepayments...............................................................26

    SECTION 2.11. General Provisions Regarding Payments...........................................26

    SECTION 2.12. Ratable Sharing.................................................................................27

ARTICLE 3 Conditions Precedent ..................................................................................28

    SECTION 3.01. Closing Date......................................................................................28

    SECTION 3.02. Conditions to Each Borrowing..........................................................30

ARTICLE 4 Representations and Warranties...................................................................30

    SECTION 4.01. Existence and Power..........................................................................30

    SECTION 4.02. Authorization; Binding Effect...........................................................31

    SECTION 4.03. Contravention....................................................................................31

    SECTION 4.04. Consents............................................................................................31

    SECTION 4.05. Capitalization of the Borrower..........................................................31

    SECTION 4.06. Subsidiaries and Other Securities. ...................................................31

    SECTION 4.07. Projections.........................................................................................32

i

SECTION 4.08. Taxes. 32

SECTION 4.09. Litigation...................................................................................................32

SECTION 4.10. Permits; Compliance With Laws. ...............................................................33

SECTION 4.11. Absence of Certain Changes or Events.......................................................33

SECTION 4.12. Assets. 33

SECTION 4.13. Environmental Matters.................................................................................33

SECTION 4.14. Material Contracts.......................................................................................34

SECTION 4.15. Indebtedness and Liens. .............................................................................34

SECTION 4.16. Insurance. ...................................................................................................34

SECTION 4.17. Governmental Regulation. .........................................................................35

SECTION 4.18. Margin Stock..............................................................................................35

SECTION 4.19. Employee Matters. .....................................................................................35

SECTION 4.20. Employee Benefit Plans..............................................................................35

SECTION 4.21. Certain Fees. ..............................................................................................36

SECTION 4.22. Solvency.....................................................................................................36

SECTION 4.23. No Misstatements or Omissions. ................................................................36

SECTION 4.24. Full Disclosure. ..........................................................................................36


ARTICLE 5 Affirmative Covenants............................................................................................37

SECTION 5.01. Financial Statements and Other Reports.....................................................37

SECTION 5.02. Maintenance of Existence. .........................................................................40

SECTION 5.03. Maintenance of Records. ...........................................................................40

SECTION 5.04. Maintenance of Properties. ........................................................................40

SECTION 5.05. Conduct of Business. .................................................................................40

SECTION 5.06. Inspections; Lenders Meetings. ..................................................................40

SECTION 5.07. Payment of Taxes.......................................................................................40

SECTION 5.08. Use of Proceeds..........................................................................................40

SECTION 5.09. Insurance. ..................................................................................................41

SECTION 5.10. Compliance With Laws...............................................................................41

SECTION 5.11. Compliance with Credit Documents...........................................................41

SECTION 5.12. Blocked Account Agreement......................................................................41

SECTION 5.13. Subsidiaries. 41

NY186031.4/1639-12505

SECTION 5.14. Further Assurances..................................................................................41

ARTICLE 6 Negative Covenants ...................................................................................42
SECTION 6.01. Indebtedness........................................................................................42
SECTION 6.02. Liens.  42
SECTION 6.03. Equitable Lien; No Further Negative Pledges. .........................................43
SECTION 6.04. Restricted Payments; Restrictions on Subsidiary Distributions................43
SECTION 6.05. Investments. ........................................................................................43
SECTION 6.06. Financial Covenants..............................................................................44
SECTION 6.07. Fundamental Changes; Disposition of Assets; Acquisitions. ....................45
SECTION 6.08. Disposal of Subsidiary Interests.............................................................45
SECTION 6.09. Sales and Lease-Backs..........................................................................46
SECTION 6.10. Transactions with Shareholders and Affiliates. .......................................46
SECTION 6.11. Conduct of Business. ............................................................................46
SECTION 6.12. Fiscal Year. .........................................................................................46

ARTICLE 7 Increased Costs; Taxes; Indemnifications; Set-Off; Etc. ...........................46
SECTION 7.01. Increased Costs; Capital Adequacy. .......................................................46
SECTION 7.02. Taxes; Withholding, etc. .......................................................................47
SECTION 7.03. Indemnification. ...................................................................................48
SECTION 7.04. Right of Set-Off ...................................................................................48

ARTICLE 8 Events of Default ......................................................................................49
SECTION 8.01. Events of Default. .................................................................................49
SECTION 8.02. Remedies.............................................................................................51

ARTICLE 9 The Agent..................................................................................................52
SECTION 9.01. Appointment of Agent. .........................................................................52
SECTION 9.02. Powers and Duties................................................................................52
SECTION 9.03. General Immunity. ................................................................................53
SECTION 9.04. Agent Entitled to Act with Borrower.......................................................53
SECTION 9.05. Lenders' Representations, Warranties and Acknowledgment...............54

SECTION 9.06. Right to Indemnity. ................................................................54

SECTION 9.07. Successor Agent. ...................................................................54

SECTION 9.08. Collateral Documents. .............................................................55

SECTION 9.09. Notice of Default. ...................................................................56

SECTION 9.10. Delivery of Documents, Notices , Etc. .....................................56


ARTICLE 10 Release ........................................................................................56

SECTION 10.01.        Release by Borrower. ........................................................56


ARTICLE 11 Miscellaneous. ..............................................................................57

SECTION 11.01.        Amendments and Waivers. .................................................57

SECTION 11.02.        Notices. ...........................................................................57

SECTION 11.03.        Expenses. .........................................................................59

SECTION 11.04.        Enforceability; Successors and Assigns. .............................59

SECTION 11.05.        Lenders' Obligations Several;

                      Independent Nature of Lenders' Rights. .............................60

SECTION 11.06.        Integration. ......................................................................61

SECTION 11.07.        No Waiver; Remedies. ......................................................61

SECTION 11.08.        Submission to Jurisdiction. ...............................................61

SECTION 11.09.        Execution in Counterparts. ................................................61

SECTION 11.10.        Governing Law. ................................................................61

SECTION 11.11.        Waiver of Jury. .................................................................61

SECTION 11.12.        Severability. .....................................................................62

SECTION 11.13.        Survival. ...........................................................................62

SECTION 11.14.        Lawful Interest. ................................................................62

SECTION 11.15.        Interpretation. ..................................................................62

SECTION 11.16.        Ambiguities. .....................................................................62

iv

NY186031.4/1639-12505

**EXHIBITS**

| | |
|---|---|
| Exhibit 2.01(a) | Term Loans |
| Exhibit 2.01(b) | Revolving Credit Commitments |
| Exhibit 2.04(c)(i) | Form of Revolving Loan Note |
| Exhibit 2.04(c)(ii) | Form of Term Loan Note |
| Exhibit 3.01(a) | Form of Secretary's Certificate |
| Exhibit 3.01(g) | Form of Closing Date Certificate |
| Exhibit 3.01(i) | Form of Security Agreement |
| Exhibit 3.02(a) | Form of Funding Notice |
| Exhibit 4.07 | Projections |
| Exhibit 5.01(d) | Form of Compliance Certificate |
| Exhibit 5.01(f) | Form of Cash and Collateral Forecast |
| Exhibit 11.04(b) | Form of Assignment and Acceptance Agreement |

**SCHEDULES**

| | |
|---|---|
| Schedule 4.04 | Required Consents |
| Schedule 4.05 | Organizational Structure and Capital Structure |
| Schedule 4.06(a) | Subsidiaries |
| Schedule 4.06(c) | Securities |
| Schedule 4.08 | Taxes |
| Schedule 4.09 | Litigation |
| Schedule 4.12(b) | Real Property and Leaseholds |
| Schedule 4.13 | Environmental Matters |
| Schedule 4.14 | Material Contracts and Agreements |
| Schedule 4.15(a) | Indebtedness |
| Schedule 4.15(b) | Liens |

AMENDED AND RESTATED CREDIT AGREEMENT dated as of February 28, 2003 (the "Agreement"), by and among EMAG SOLUTIONS, L.L.C., a Delaware limited liability company (the "Borrower"), the several financial institutions and other investors from time to time parties to this Agreement (collectively, the "Lenders" and individually, a "Lender") and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company, as agent for Lenders (the "Agent").

## RECITALS

A.    Capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof.

B.    The Lenders have extended certain loans to Borrower under that certain Loan and Security Agreement, dated as of June 10, 1999 (as amended from time to time up to, but not including, the date hereof, the "Prior Agreement"), by and among Borrower, Lenders and Fleet Capital Corporation, as agent ("Fleet").

C.    Ark, one of the Lenders herein, made certain additional loans to Borrower in the amount of $336,949.00 (the "Overadvance") under the Prior Agreement pursuant to the terms and conditions of that certain Second Forbearance Agreement, dated as of January 24, 2003 by an among Borrower, Ark and AIP.

D.    As of the date hereof and immediately prior to giving effect to this Agreement, the outstanding principal amount of the loans owing by Borrower to Lenders under the Prior Agreement is equal to (i) $19,162,899.03 in the case of Term Loans (as defined in the Prior Agreement), (ii) $63,000 in the case of contingent Revolving Credit Loans (as defined in the Prior Agreement) in connection with an irrevocable standby letter of credit no. ASL-9920514-110EMA issued by Fleet National Bank on June 22, 1999 for the benefit of The Travelers Indemnity Company (as such amount may be reduced from time to time) and (iii) $336,949.00 in the case of the Overadvance (collectively, the "Prior Loan Amount") plus accrued interest, fees and other charges thereon.

E.    Borrower has requested that the Prior Agreement be amended and restated to restructure the loans and other obligations owed to Lenders under the Prior Agreement in order to assist Borrower in restructuring its debt obligations.

F.    The parties wish to modify the obligations of Borrower owing to the Lenders under the Prior Agreement and the Prior Security Documents by entering into this Agreement and the other Credit Documents. Accordingly, (i) in consideration of the contribution in the aggregate amount of $12,162,899.03 of the Term Loan (as defined in the Prior Agreement) by the Lenders ($8,687,788.50 by Ark and $3,475,110.53 by AIP-ES, Inc.) to Borrower and (ii) in consideration of additional financing in the form of the Revolving Loan being extended to Borrower and other financial accommodations being made in respect of the Borrower, (a) Borrower is entering into this Agreement pursuant to which Borrower's obligations to Lenders under the Prior Agreement will be fixed at the amounts provided herein and (b) Borrower will

-1-

continue to secure all of its obligations hereunder by continuing the grant to the Agent, for the benefit of Lenders and the Agent, and the Lenders a First Priority Lien on all of its assets, including a pledge of shares of the Capital Stock of each of its Subsidiaries.

## AGREEMENT

In consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1

### Defined Terms

Section 1.01.  Definitions.  As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"Account Debtor" means any Person who is or may become obligated under or on account of an Account.

"Accounts" mean all accounts, contract rights, chattel paper, instruments and documents, whether now owned or hereafter created or acquired by Borrower or in which Borrower now has or hereafter acquired any interest.

"Action" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding threatened or pending against or affecting the Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

"Affiliate" of a Person means any other Person (a) that directly or indirectly controls, is controlled by or is under common control with, the Person or any of its Subsidiaries, (b) that directly or indirectly beneficially owns or holds 5% or more of any class of equity Security or other similar interests of the Person or any of its Subsidiaries or (c) 5% or more of the equity Securities of which is directly or indirectly beneficially owned or held by the Person or any of its Subsidiaries.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, agreement or otherwise.

"Agent" means Patriarch Partners Agency Services, LLC, together with any successor Administrative Agent appointed pursuant to Section 9.07.

"Aggregate Amounts Due" has the meaning stated in Section 2.12.

"Agreement" means this Amended and Restated Credit Agreement, as it may be further amended, supplemented or otherwise modified from time to time.

-2-

"AIP" means Ark Investment Partners II, L.P.

"Ark" means Ark CLO 2000-1, Limited.

"Asset Sale" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than the Borrower), in one transaction or a series of transactions, of all or any part of Borrower's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Capital Stock of any of Borrower's Subsidiaries, other than (i) inventory (or other assets) sold or leased in the ordinary course of business.

"Assignment Agreement" has the meaning stated in Section 11.04(b).

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Borrower" has the meaning stated in the Heading of this Agreement.

"Borrowing" means the making of a Loan.

"Borrowing Date" means the date of a Borrowing.

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in New York, NY or Atlanta, Georgia are authorized or required by law or other governmental action to close.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Cash" means money, currency or a credit balance in any demand or Deposit Account.

"Change of Control" means any one or more of the following events:

(i)     Any individual, corporation (other than the Lenders, Borrower or any Subsidiary), partnership, trust, association, pool, syndicate, or any other entity or any group of

persons acting in concert becomes the beneficial owner, as that concept is defined in Rule 13d-3 promulgated by the Securities and Exchange Commission under the Exchange Act of securities of any Borrower possessing either (A) thirty percent (30%) or more of the voting power for the election of directors of such Borrower or (B) thirty percent (30%) or more in value of the outstanding equity securities (or the right to acquire thirty (30%) percent or more) of such Borrower;

(ii)     There shall be consummated any consolidation, merger, or other business combination involving any Borrower or the securities of such Borrower in which (A) holders of voting securities of the Borrower immediately prior to such consummation own, as a group, immediately after such consummation, voting securities of the Borrower (or, if the Borrower does not survive such transaction, voting securities of the corporation surviving such transaction) having less than fifty percent (50%) of the total voting power in an election of directors of the Borrower (or such other surviving corporation) or (B) holders of equity securities of such Borrower immediately prior to such consummation own, as a group, immediately after such consummation, equity securities of the Borrower (or, if the Borrower does not survive such transaction, voting securities of the corporation surviving such transaction) having less than fifty percent (50%) of the equity securities of the Borrower (or such other surviving corporation);

(iii)    During any period of two (2) consecutive years, individuals who at the beginning of such period constitute the directors of any Borrower cease for any reason other than voluntary resignation, death, disability, retirement or as otherwise provided in the Credit Documents to constitute at least a majority thereof unless the election, or the nomination for election by such Borrower's shareholders, of each new director of such Borrower was approved by a vote of at least two-thirds (2/3) of the directors of the Borrower then still in office who were directors of the Borrower at the beginning of any such period; or

(iv)     There shall be consummated any sale, lease, exchange, or other transfer (in one transaction or a series of related transactions) of assets representing all or substantially all of the assets of any Borrower to a party which is not controlled by or under common control with such Borrower either before or after such transaction or series of related transactions.

"Closing Date" means the date on which all of the conditions set forth in Section 3.01 are satisfied or otherwise waived by the Lenders.

"Closing Date Certificate" has the meaning stated in Section 3.01(g).

"Collateral" has the meaning stated in the Security Agreement.

"Collateral Documents" means the Security Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to the Agent, for the benefit of Lenders, a Lien on

-4-

any real, personal or mixed property of that Credit Party as security for the Obligations.

"Compliance Certificate" has the meaning stated in Section 5.01(d).

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"Consolidated Adjusted EBITDA" means, for any period, an amount determined for the Borrower and its Subsidiaries on a consolidated basis equal to (a) the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, (ii) Consolidated Interest Expense, (iii) provisions for taxes based on income, if any, (iv) total depreciation expense, (v) total amortization expense, and (vi) non-cash items reducing Consolidated Net Income (excluding any such non-cash item to the extent that it represents an accrual or reserve for potential cash items in any future period or amortization of a prepaid cash item that was paid in a prior period), minus (b) non-cash items increasing Consolidated Net Income for such period (excluding any such non-cash item to the extent it represents the reversal of an accrual or reserve for potential cash item in any prior period).

"Consolidated Capital Expenditures" means, for any period, the aggregate of all expenditures of each of the Borrower and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the consolidated statement of cash flows of the Borrower and its Subsidiaries.

"Consolidated Cash Interest Expense" means, for any period, Consolidated Interest Expense for such period, excluding any amount not payable in cash.

"Consolidated Current Assets" means, as at any date of determination, the total assets of the Borrower and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and cash equivalents.

"Consolidated Current Liabilities" means, as at any date of determination, the total liabilities of the Borrower and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"Consolidated Excess Cash Flow" means, for any period, an amount (if positive) equal to (a) Consolidated Adjusted EBITDA for such period, minus (b) the amount of Taxes actually paid by the Borrower and its Subsidiaries during such period, minus (c) the Consolidated Working Capital Adjustment, minus (d) Consolidated Capital Expenditures for such period, minus (e) the sum, without duplication, of the amounts for such period of (i) voluntary and scheduled repayments of Consolidated Total Debt (excluding repayments of Revolving Loans), plus (ii) Consolidated Cash Interest Expense.

"Consolidated Fixed Charges" means, for any period, the sum, without duplication, of the amounts determined for Borrower and its Subsidiaries on a consolidated basis equal to (a)

Consolidated Cash Interest Expense for such period; (b) Scheduled Principal Payments for such period; and (c) Taxes required to be paid during such period in respect of income and profits, as determined in accordance with GAAP.

"Consolidated Interest Expense" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of the Borrower and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of the Borrower and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers acceptance financing.

"Consolidated Net Income" means, for any period, (a) the net Income (or loss) of the Borrower and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (b) (i) the income of any Person (other than a Subsidiary the Borrower) in which any other Person (other than any of the Borrower or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or any of its Subsidiaries by such Person during such period, (ii) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or that Person's assets are acquired by the Borrower or any of its Subsidiaries, (iii) the income of any Subsidiary the Borrower to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (iv) any after-tax gains or losses attributable to returned surplus assets of any Pension Plan, and (v) (to the extent not included in clauses (i) through (iv) above) any net extraordinary gains or net non-cash extraordinary losses.

"Consolidated Total Debt" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP.

"Consolidated Working Capital" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"Consolidated Working Capital Adjustment" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the end of such period exceeds (or is less than) Consolidated Working Capital as of the beginning of such period.

"Credit Document" means any of this Agreement, the Notes, if any, the Collateral Documents, a guaranty, if any, any agreement in effect from time to time between the Borrower and the Agent with respect to fees payable to the Agent for its services hereunder, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of Agent or any Lender in connection herewith.

"Credit Party" means each Person (other than the Agent or any Lender or any

representative thereof) from time to time party to a Credit Document.

"Currency Agreement" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with each of the Borrower's and each of its Subsidiaries' operations.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender having a Revolving Credit Commitment that (a) fails to fund any portion of the Revolving Loans, (b) otherwise fails to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless such amount is the subject of a good faith dispute, or (c) has been determined insolvent by a court of competent jurisdiction or becomes the subject of a bankruptcy or insolvency proceeding.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Eligible Accounts" means, as of any date of determination thereof, an Account arising in the ordinary course of Borrower's business from the sale of goods or rendition of services which Agent, in its reasonable credit judgment, deems to be an Eligible Account. Without limiting the generality of the foregoing, no Account of Borrower shall be an Eligible Account if:

(i)     it arises out of a sale made by Borrower to a Subsidiary or an Affiliate of Borrower or to a Person controlled by an Affiliate of Borrower; or

(ii)    it is unpaid for more than 90 days after the original due date; or

(iii)   50% or more of the Accounts from the Account Debtor are not deemed Eligible Accounts hereunder; or

(iv)    any covenant, representation or warranty contained in the Agreement with respect to such Account has been breached; or

(v)     the Account Debtor is also a creditor or supplier of Borrower, or the Account Debtor has disputed liability with respect to such Account, or the Account Debtor has made any claim with respect to any other Account, or the Account otherwise is or may become subject to any right of setoff by the Account Debtor, such Account to be ineligible in any case, without duplication, to the extent of any such dispute, claim or setoff, or

(vi)    the Account Debtor has commenced a voluntary case under the federal

-7-

bankruptcy laws, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or a decree or order for relief has been entered by a court having jurisdiction in the premises in respect of the Account Debtor in an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other petition or other application for relief under the federal bankruptcy laws has been filed against the Account Debtor, or if the Account Debtor has failed, suspended business, ceased to be Solvent, or consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs; or

(vii)    it arises from a sale to the Account Debtor on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment or any other repurchase or return basis; or

(viii)    the Account Debtor is the United States of America or any department, agency or instrumentality thereof, unless Borrower assigns its right to payment of such Account to Agent, in, a manner satisfactory to Agent, so as to comply with the Assignment of Claims Act of 1940 (31 U.S.C. § 3727 and 41 U.S.C. § 15, as amended); or

(ix)    the Account is subject to a Lien other than a Permitted Lien; or

(x)    the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by Borrower and accepted by the Account Debtor or the Account otherwise does not represent a final sale; or

(xi)    the Account is evidenced by chattel paper or an instrument of any kind, or has been reduced to judgment; or

(xii)    Borrower has made any agreement with the Account Debtor for any deduction therefrom (but only to the extent of such deduction), except for discounts or allowances which are made in the ordinary course of business for prompt payment and which discounts or allowances are reflected in the calculation of the face value of each invoice related to such Account; or

(xiii)    Borrower has made an agreement with the Account Debtor to extend the time of payment thereof, or

(xiv)    it arises from a sale to an Account Debtor outside the United States or Canada, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion or is otherwise acceptable to Agent.

"Eligible Assignee" means (a) any Lender or any Affiliate of any Lender, and (b) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends

-8-

credit or buys loans as one of its businesses; provided, neither any Borrower nor any Affiliate of any Borrower shall be an Eligible Assignee.

"Eligible European Accounts" shall have the same meaning as Eligible Accounts (exclusive of subclause (xiv) thereof) but only with respect to such Accounts which arise in the ordinary course of eMag UK's business from the sale of goods or rendition of services, which the Agent in its credit judgment deems to be an Eligible European Accounts.

"eMag UK" means eMag Solutions Limited, a wholly owned subsidiary of Borrower and a company which is registered in England and Wales with number 03663649.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, any Borrower, any of its Subsidiaries or any of its ERISA Affiliates.

"Environmental Laws" means all federal, state, local and foreign Regulations relating to pollution, human health, safety, industrial hygiene or protection of the environment, including, without limitation, laws relating to releases or threatened releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, disposal, cleanup, transport or handling of Hazardous Materials and all Regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and all similar federal and state Regulations.

"Environmental Liability" has the meaning stated in Section 4.13(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member. Any former ERISA Affiliate of the Borrower or any of its Subsidiaries shall continue to be considered an ERISA Affiliate the Borrower or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate the Borrower or any such Subsidiary and with respect to liabilities arising after such period for which the Borrower or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation), (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with

respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan, (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA, (d) the withdrawal by any Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA, (e) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of liability on any Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA, (g) the withdrawal of any Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, (h) the occurrence of an act or omission which could give rise to the imposition on any Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan, (i) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against any Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan, (j) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code, or (k) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"Event of Default" means each of the conditions or events set forth in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of the Borrower that such financial statements fairly present, in all material respects, the financial condition of the applicable Borrower and each of its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes

resulting from audit and normal year-end adjustments.

"Financial Plan" has the meaning stated in Section 5.01(j).

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than Permitted Liens.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"Fixed Charge Coverage Ratio" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Adjusted EBITDA for the four Fiscal Quarter period then ending, to (b) Consolidated Fixed Charges for such four Fiscal Quarter period.

"Funding Default" means the occurrence of any of the following by a Lender having a Revolving Credit Commitment: (a) such Lender fails to fund any portion of the Revolving Loans, (b) such Lender fails to otherwise pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the such amount is the subject of a good faith dispute, or (c) such Lender is determined insolvent by a court of competent jurisdiction or becomes the subject of a bankruptcy or insolvency proceeding.

"Funding Notice" has the meaning stated in Section 3.02(a).

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Body" means any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign.

"Guarantor" means each of the domestic Subsidiaries of the Borrower identified as a "Guarantor" on the signature pages hereto, if any, and any domestic Subsidiary acquired or formed subsequent to the Closing Date.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (a) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (b) regulated in any way under the Regulations of any state where the Borrower or its Subsidiaries conduct their business or own any real property or have any

-11-

leasehold or in which any Relevant Property is located.

"Hedge Agreement" means an Interest Rate Agreement or a Currency Agreement entered into in order to satisfy the requirements of this Agreement or otherwise in the ordinary course of Borrower's or any of its Subsidiaries' businesses.

"Indebtedness" of a Person at any date means, without duplication, the sum of (a) all obligations of the Person (i) for borrowed money, (ii) evidenced by bonds, debentures, notes or other similar instruments, (iii) to pay the deferred purchase price of property or services, (iv) as lessee under Capital Leases, (v) under letters of credit or guarantees issued for the account of the Person, (vi) arising under acceptance facilities, plus (b) all Indebtedness of others guaranteed by the Person, plus (c) all Indebtedness of others secured by a Lien on any asset of the Person whether or not such Indebtedness is assumed by the Person, plus (d) the aggregate unfunded vested liabilities under each Pension Plan.

"Interest Coverage Ratio" means the ratio as of the last day of any Fiscal Quarter of (a) Consolidated Adjusted EBITDA for the four Fiscal Quarter period then ended, to (b) Consolidated Cash Interest Expense for such four Fiscal Quarter period.

"Interest Payment Date" means the last Business Day of each month, commencing on March 31, 2003 and ending on the final maturity date of such Loan.

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with the Borrower's and its Subsidiaries' operations.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (a) any direct or indirect purchase or other acquisition by Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person, (b) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Borrower from any Person (other than Borrower), of any Capital Stock of such Person, and (c) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by Borrower or any of its Subsidiaries to any other Person (other than Borrower), including all indebtedness and Accounts from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Issuing Bank" has the meaning stated in Section 2.01(c).

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether

in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"Knowledge of the Borrower" means the knowledge, after reasonable inquiry, of any of the Borrower's Authorized Officers.

"Leasehold Property" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Required Lenders in their sole discretion as not being required to be included in the Collateral.

"Lender" means each financial institution listed on the signature pages hereto as a Lender, together with each such institution's successors and permitted assigns.

"Letter of Credit" means that certain irrevocable standby letter of credit no. ASL-9920514-110EMA issued by Fleet National Bank on June 22, 1999 for the benefit of The Travelers Indemnity Company (as amended from time to time).

"Lien" means (a) any security interest, lien, claim, pledge, mortgage, deed of trust, hypothecation, charge, deposit arrangement, preference, priority, license, lease, conveyance of any right, or encumbrance of any kind, including, without limitation, any conditional sale agreement or other title retention agreement, any Capital Lease or financing lease having substantially the same economic effect as the foregoing and the filing of or agreement to give any financing statement under the uniform commercial code or comparable law of any jurisdiction to evidence any of the foregoing, and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"Loan" means a Term Loan or a Revolving Loan.

"Margin Stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means a material adverse effect upon any of (a) the business, results, operations, assets, properties, liabilities, condition (financial or otherwise), or prospects of the Borrower and any of its Subsidiaries, (b) the ability of any Credit Party to fully and timely perform the Obligations, (c) the legality, validity or enforceability of any of the Credit Documents or any material contract, (d) the rights, remedies and benefits available to, or conferred upon, the Agent and any Lender under any Credit Document, or (e) the Collateral or the Agent's Liens, on behalf of Agent and Lenders on the Collateral or the priority of such Liens.

"Multiemployer Plan" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Narrative Report" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of the Borrower and any of its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then

-13-

current Fiscal Year to the end of such period to which such financial statements relate.

"Net Asset Sale Proceeds" means, with respect to any Asset Sale, an amount equal to: (a) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower or any of its Subsidiaries from such Asset Sale, minus (b) any bona fide direct costs incurred in connection with such Asset Sale, including (i) income or gains taxes actually payable by the seller as a result of any gain recognized in connection with such Asset Sale, (ii) payment of the outstanding principal amount of, and premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (iii) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by the Borrower or any of its Subsidiaries in connection with such Asset Sale.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (a) any Cash payments or proceeds received by the Borrower or any of its Subsidiaries (i) under any casualty insurance policy in respect of a covered loss thereunder or (ii) as a result of the taking of any assets of the Borrower or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (b) (i) any actual and reasonable documented costs incurred by the Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of the Borrower or such Subsidiary in respect thereof, and (ii) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (a)(ii) of this definition, including income taxes actually payable as a result of any gain recognized in connection therewith.

"Note" means a Term Note or a Revolving Note.

"Obligations" means all obligations of every nature of each Credit Party from time to time owed to the Agent, the Lenders or any of them or their respective Affiliates under any Credit Document or Hedge Agreement, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"Participant" has the meaning stated in Section 11.04(c).

"Participation" has the meaning stated in Section 11.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

-14-

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"Permitted Indebtedness" means the following:

(i)     Indebtedness arising or existing under this Agreement and the other Credit Documents;

(ii)    Indebtedness existing as of the Closing Date as set forth in Schedule 4.15 and renewals, refinancings or extensions thereof in a principal amount not in excess of that outstanding as of the date of such renewal, refinancing or extension;

(iii)   Capital Leases and purchase money indebtedness for the financing of equipment which, in the aggregate principal amount at any time, do not exceed $250,000; and

(iv)    other Indebtedness which does not exceed $100,000 in the aggregate at any time outstanding.

"Permitted Liens" means each of the Liens permitted pursuant to Section 6.02.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Bodies.

"Pledge Agreement" means that certain Pledge Agreement dated as of the date hereof among Borrower and Agent (as it may be amended, supplemented, or otherwise modified from time to time).

"Principal Office" means, for the Agent, its office located at Patriarch Partners Agency Services, LLC, 112 South Tryon Street, Suite 700, Charlotte, North Carolina 28284, Attention: Roger Cleveland, or such other office as the Agent may from time to time designate in writing to the Borrower and each Lender.

"Prior Agreement" has the meaning stated in the Recitals of this Agreement.

"Prior Security Documents" means the Prior Agreement and all other instruments, documents and agreements delivered by Borrower or any of its Subsidiaries pursuant to the Prior Agreement in order to grant to Fleet, for the benefit of Lenders, a Lien on any real, personal or mixed property of Borrower or such Subsidiary as security for the Prior Loan Amount and obligations under the Prior Agreement and related documents.

"Pro Rata Share" means (a) with respect to all payments, computations and other matters relating to the Term Loans of any Lender, the percentage obtained by dividing (i) the Term Loan

-15-

Exposure of that Lender, by (ii) the aggregate Term Loan Exposure of all Lenders; and (b) with respect to all payments, computations and other matters relating to the Revolving Credit Commitment or Revolving Loans of any Lender, the percentage obtained by dividing (i) the Revolving Credit Exposure of that Lender, by (ii) the aggregate Revolving Credit Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (x) an amount equal to the sum of the Term Loan Exposure and the Revolving Credit Exposure of that Lender, by (y) an amount equal to the sum of the aggregate Term Loan Exposure and the aggregate Revolving Credit Exposure of all Lenders.

"Projections" has the meaning stated in Section 4.07.

"Register" has the meaning stated in Section 2.04(b).

"Regulation" means each applicable law, rule, regulation, order, guidance or recommendation (or any change in its interpretation or administration) by any Governmental Body, central bank or comparable agency and any request or directive (whether or not having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"Relevant Property" means all sites, facilities, locations, real property and leaseholds (a) presently or formerly owned, leased, used or operated by the Borrower or any of its Subsidiaries (whether or not such properties are currently owned, leased, used or operated by the Borrower or any of its Subsidiaries), (b) at which any Hazardous Material has been transported, disposed, treated, stored or released by the Borrower or any of its Subsidiaries, or (c) that are directly adjacent to any sites, facilities, locations, real property or leaseholds presently or formerly owned, leased, used or operated by the Borrower or any of its Subsidiaries.

"Required Lenders" means one or more Lenders having or holding any or all of Term Loan Exposure or Revolving Credit Exposure or Letter of Credit Obligations representing 100% of the sum of (a) the aggregate Term Loan Exposure of all Lenders, (b) the aggregate Revolving Credit Exposure of all Lenders and (c) the aggregate Letter of Credit Obligation set forth in Section 2.01(c).

"Restricted Junior Payment" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of any Borrower now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of any Borrower now or hereafter outstanding, and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of any Borrower now or hereafter outstanding.

"Restructuring Fee" has the meaning stated in Section 2.06(b).

"Revolving Credit Commitment" means the commitment of a Lender to make or otherwise fund any Revolving Loan. The amount of each Lender's Revolving Credit

-16-

Commitment, if any, is set forth on Exhibit 2.01(b) or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Credit Commitments as of the Closing Date is $300,000.

"Revolving Credit Commitment Period" means the period from the Closing Date to but excluding June 30, 2004; provided, however, Lenders may, in their sole discretion, elect to extend such period.

"Revolving Credit Commitment Termination Date" means the earliest to occur of (a) the last day of the Revolving Credit Commitment Period or (b) the date of termination of the Revolving Credit Commitments pursuant to Section 8.01.

"Revolving Credit Exposure" means, with respect to any Lender as of any date of determination, (a) prior to the termination of the Revolving Credit Commitments, that Lender's Revolving Credit Commitment, and (b) after the termination of the Revolving Credit Commitments, the sum of the aggregate outstanding principal amount of the Revolving Loans of that Lender.

"Revolving Loan" means a Loan made by a Lender to the Borrower pursuant to Section 2.01(b).

"Revolving Note" has the meaning stated in Section 2.04(c).

"Scheduled Principal Payments" means, for any fiscal period, the aggregate amount of all principal required to be paid by the Borrower during such period under Section 2.07(b) herein in respect of the Term Loans.

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreement" has the meaning stated in Section 3.01(i).

"Solvent" means, with respect to any Person, that as of the date of determination both (a)(i) the sum of such Person's debt (including contingent liabilities) does not exceed all of its property, at a fair valuation, (ii) the present fair saleable value of the property of such Person is not less than the amount that will be required to pay the probable liabilities on such Person's then existing, debts as they become absolute, and matured, (iii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and

-17-

(iv) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due, and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending, office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"Term Loan" means any of Term Loan A or Term Loan B made by a Lender to the Borrower pursuant to Section 2.01(a).

"Term Loan Amount" means the amount of each Lender's Term Loan, as set forth on Exhibit 2.01(a) or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Term Loan Amount as of the Closing Date is $7,336,949.00.

"Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender.

"Term Loan Maturity Date" means the earlier to occur of (a) June 30, 2006, and (b) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"Term Note" has the meaning stated in Section 2.04(c).

"Total Utilization of Revolving Credit Commitments" means, as at any date of determination the aggregate principal amount of all outstanding Revolving Loans.

"Transfer" means a direct or indirect offer, transfer, sale, assignment, pledge, hypothecation or other disposition of all or any interest.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"Unused Commitment Fees" has the meaning stated in Section 2.06(a).

## ARTICLE 2

### Loans

Section 2.01. Loans.

(a)     Term Loans. Subject to the terms and conditions hereof, as of the Closing Date, Borrower agrees to assume and continue a portion of the Loans (as defined under the Prior Agreement) as a "Term Loan A" (in the outstanding principal amount of \$336,949.00) and a "Term Loan B" (in the outstanding principal amount of \$7,000,000). The Term Loans shall (1) bear interest as provided in Section 2.05(a)(i) hereof and (2) be entitled to the security interests, collateral and other rights and benefits provided pursuant to the other Credit Documents. Any amount of Term Loans subsequently repaid or prepaid may not be re-borrowed. Subject to Sections 2.08(a) and 2.09, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Term Loan Maturity Date.

(b)     Revolving Loans

   (i)     Revolving Credit Commitments

      (A)     During the Revolving Credit Commitment Period, subject to and upon the terms and conditions hereof, each Lender listed in Exhibit 2.01(b), severally, and not jointly and severally, agrees to make Revolving Loans to Borrower in the aggregate amount up to but not exceeding such Lender's Revolving Credit Commitment; provided, that after giving effect to the making of any Revolving Loans in no event shall the aggregate outstanding amount of the Total Utilization of Revolving Credit Commitments exceed the Revolving Credit Commitments then in effect. Amounts borrowed pursuant to this Section 2.01(b) may be repaid and re-borrowed during the Revolving Credit Commitment Period.

-19-

(B)     Each Lender's Revolving Credit Commitment shall expire on the Revolving Credit Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Credit Commitments shall be paid in full no later than such date.

(ii)     Borrowing Mechanics

(A)     Revolving Loans shall be made in an aggregate minimum amount of $25,000 and integral multiples of $10,000 in excess of that amount.

(B)     Whenever Borrower desires that Lenders make Revolving Loans, Borrower shall deliver to Agent a fully executed and delivered Funding Notice no later than 10:00 a.m. (New York City time) at least two Business Days in advance of the proposed Borrowing Date.

(C)     Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Agent to each applicable Lender by facsimile with reasonable promptness, but (provided, Agent shall have received such notice by 10:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Agent's receipt of such Notice from Borrower.

(D)     Each Lender shall make the amount of its Revolving Loan available to Agent no later than 12:00 p.m. (New York City time) on the applicable Borrowing Date by wire transfer of same day funds in Dollars, at the Agent's Principal Office.     Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Agent shall make the proceeds of such Revolving Loans available to Borrower on the applicable Borrowing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Agent from Lenders to be credited to the account of the Borrower designated in writing to Agent by Borrower.

(c)     Letter of Credit Obligation.  Subject to the terms and conditions hereof, as of the Closing Date, Borrower acknowledges that it is liable in the amount of $63,000 in contingent Revolving Credit Loans (as defined in the Prior Agreement) on account of the Letter of Credit. In the event of any drawing under the Letter of Credit, Borrower agrees to reimburse Fleet National Bank, as issuing bank thereunder, or its permitted successors and assigns in such capacity (the "Issuing Bank") the amount of such honored drawing; provided, Borrower shall be permitted to make borrowings under Section 2.01(b) in order to reimburse the Issuing Bank the amount of such honored drawing.  In the event Revolving Loans are not available under Section 2.01(b) and Borrower is not otherwise able to reimburse the Issuing Bank the amount of such honored drawing, or any portion thereof, the Lenders, in their sole discretion and without prior notice to Borrower, may, but shall not be obligated to, reimburse the Issuing Bank for the

-20-

amount of such honored drawing, or any portion thereof. Any such amounts paid by the Lenders to the Issuing Bank shall constitute an Obligation under this Agreement and any such payments shall not constitute an agreement by the Lenders to make similar payments in the future or a waiver by the Lenders of any Event of Default under this Agreement. The Lenders need not inquire as to, or contest the validity of, any such honored drawing and the receipt of any notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

Section 2.02.   Pro Rata Shares.   All Loans shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall the Revolving Credit Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder.

Section 2.03.   Use of Proceeds.   The proceeds of the Revolving Loans made or issued after the Closing Date shall be used by Borrower and its Subsidiaries solely for working capital and general corporate purposes of the Borrower and its Subsidiaries. No portion of the proceeds of any Borrowing shall be used by Borrower or any of its Subsidiaries in any manner that might cause such Borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act, in each case as in effect on the date or dates of such Borrowing and such use of proceeds.

Section 2.04.   Evidence of Debt; Register; Notes.

(a)      Lenders' Evidence of Debt. Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Credit Commitments or any of Borrower's Obligations in respect of any applicable Loans; and provided, further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)      Register. Agent shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Revolving Credit Commitments and Loans of each Lender from time to time (the "Register"). The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall record in the Register the Revolving Credit Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Credit Commitments or any Borrower's Obligations in respect of any Loan.

(c)      Notes. If so requested by any Lender by written notice to Borrower (with a copy

-21-

to Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 11.04) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after such Borrower's receipt of such notice) (i) a promissory note, in the form of Exhibit 2.04(c)(i) (each, a "Revolving Note"), to evidence such Lender's Revolving Loan and (ii) a promissory note, in the form of Exhibit 2.04(c)(ii) (each, a "Term Note"), to evidence such Lender's Term Loan.

Section 2.05.   Interest on Loans.

(a)      Applicable Rates.   Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) as follows:

(i)      Term Loans.   In the case of Term Loans, at a rate of 8.5% per annum.

(ii)      Revolving Loans.   In the case of Revolving Loans, at a rate of 8.5% per annum.

(b)      Calculation of Interest Rates.   Interest payable pursuant to Section 2.05(a) shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an interest period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an interest period applicable to such Loan shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(c)      Payment of Interest.   Interest on each Loan shall be payable in arrears on (i) each Interest Payment Date, (ii) any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) at maturity, including final maturity.

(d)      Default Interest.   Upon the occurrence and during the continuance of an Event of Default described in Section 8.01(a), the principal amount of all Loans and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans, fees and other amounts. Payment or acceptance of the increased rates of interest provided for in this Section 2.05 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Agent or any Lender.

Section 2.06.   Fees.

(a)      Unused Commitment Fees.   Borrower agrees to pay to Lenders having Revolving

Credit Exposure an unused commitment fees (the "Unused Commitment Fees") equal to (i) the average of the daily difference between (A) the Revolving Credit Commitments, and (B) the aggregate principal amount of outstanding Revolving Loans, times (ii) one percent (1.0%) per annum. The Unused Commitment Fees shall be (i) calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year during the Revolving Credit Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Revolving Credit Commitment Termination Date and (ii) paid to the Agent at its Principal Office and upon receipt, Agent shall promptly distribute to each Lender its Pro Rata Share thereof.

(b) Restructuring Fee. Borrower shall pay to Agent for the ratable benefit of Lenders a restructuring fee equal to $100,000 (the "Restructuring Fee"), which fee is earned as of the date hereof, but which fee shall be due and payable in full on the Term Loan Maturity Date; provided however, the Restructuring Fee may or shall be prepaid, in whole or in part, pursuant to Sections 2.08 or 2.09.

(c) Agency Fee; Other Fees. Until payment in full of all Obligations, Borrower shall pay to Agent an agency fee equal to $25,000 per annum, which fee shall be payable in advance in quarterly installments of $6,250 on March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Closing Date. In addition to any of the foregoing fees, Borrower agrees to pay to the Agent such other fees in the amounts and at the times separately agreed upon by all of the parties..

Section 2.07. Repayment; Scheduled Payments.

(a) Repayment. All of the Term Loans shall be due and payable, and Borrower shall be required to repay all of the unpaid Term Loans, plus all accrued and unpaid interest on the principal amounts of the Term Loans, on the Term Loan Maturity Date. All of the Revolving Loans shall be due and payable, the Revolving Credit Commitments shall be reduced to zero and Borrower shall be required to repay all of the Revolving Loans, plus all accrued and unpaid interest on the principal amounts of the Revolving Loans, on the Revolving Credit Commitment Termination Date.

(b) Scheduled Payments. The principal amounts of the Term Loans shall be repaid in the amounts set forth below on each of dates set forth below:

| Payment No. | Date | Term Loan Installments |
|---|---|---|
| 1 | March 31, 2004 | $75,000.00 |
| 2 | June 30, 2004 | $175,000.00 |
| 3 | September 30, 2004 | $175,000.00 |
| 4 | December 31, 2004 | $175,000.00 |
| 5 | March 31, 2005 | $175,000.00 |
| 6 | June 30, 2005 | $175,000.00 |
| 7 | September 30, 2005 | $175,000.00 |

-23-

| 8  | December 31, 2005 | $175,000.00 |
| 9  | March 31, 2006    | $175,000.00 |
| 10 | June 30, 2006     | $5,861,949.00 plus all accrued interest and fees |

Each payment set forth above shall be allocated among the Lenders proportionately to their respective Pro Rata Shares, provided that (i) the full amount of the first installment payment shall be applied to the repayment of Term Loan A, (ii) for the second, third and fourth installment payments, the first $75,000 of each such payment shall be applied to the repayment of Term Loan A and the remaining $100,000 of each such payment shall then be applied to the repayment of Term Loan B, (iii) for the fifth installment payment, the first $36,949.00 of such payment shall be applied to the repayment of Term Loan A and the remaining $138,051.00 of such payment shall then be applied to the repayment of Term Loan B, and (iv) the full amount of all installment payments thereafter shall be applied to the repayment of Term Loan B.

(c)     Payment of All Amounts.  Upon the final payment of all remaining principal amount of the Loans at the stated maturity thereof, whether by acceleration or otherwise, Borrower shall also pay all other Obligations which are due and owing under this Agreement or other Credit Documents, including, but not limited to, all accrued and unpaid interest and fees.

Section 2.08.  Optional Prepayments.

(a)     Optional Prepayments.  Any time and from time to time, and subject to Section 2.10(a) below, (i) with respect to Restructuring Fee, the Borrower may prepay, without premium or penalty, the Restructuring Fee to the full extent thereof on any Business Day in whole or in part, in an aggregate minimum amount of $5,000 and integral multiples of $5,000 in excess of that amount, (ii) with respect to Term Loans, the Borrower may prepay, without premium or penalty, any Term Loans on any Business Day in whole or in part, in an aggregate minimum amount of $5,000 and integral multiples of $5,000 in excess of that amount, provided that such prepayments shall be applied (A) first, to the prepayment of Term Loan A and (B) second (after Term Loan A has been paid in full), to the prepayment of Term Loan B, and (iii) with respect to Revolving Loans, the Borrower may (A) prepay, without premium or penalty, any Revolving Loans on any Business Day in whole or in part in an aggregate minimum amount of $5,000 and integral multiples of $5,000 in excess of that amount or (B) reduce the Revolving Credit Commitment by prepaying, without premium or penalty, any Revolving Loans on any Business Day in whole or in part in an aggregate minimum amount of $5,000 and integral multiples of $5,000 in excess of that amount, and the aggregate Revolving Credit Commitment shall be permanently be reduced by the amount of any such prepayment.

(b)     Notice of Optional Prepayment.  All such prepayments shall be made upon not less than one Business Day's prior written or telephonic notice, in each case given to Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Agent (and Agent will promptly transmit such telephonic or original notice for Term Loans or Revolving Loans, as the case may be, by facsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. In the case of optional prepayment of Revolving Loans, Borrower shall specify whether such prepayment shall

-24-

be applied to permanently reduce the Revolving Credit Commitment or to reduce the outstanding amount of Revolving Loans without reducing the amount of the Revolving Credit Commitment; provided in the event Borrower fails to specify how the prepayment of Revolving Loans shall be applied, such prepayment shall be applied to reduce the outstanding amount of Revolving Loans without reducing the amount of the Revolving Credit Commitment.

Section 2.09.  Mandatory Prepayments; Mandatory Commitment Reductions.

(a)  Consolidated Excess Cash Flow.  In the event that there shall be Consolidated Excess Cash Flow at any time for the period beginning on the Closing Date through the date on which the Loans shall have been repaid in full, Borrower shall prepay, subject to the provisions of 2.10(b), the Restructuring Fee and the Term Loan by paying by the 45th day following the end of the fourth Fiscal Quarter of each Fiscal Year an amount equal to (i) 35% of the consolidated Excess Cash Flow for the four Fiscal Quarter period ending on December 31, 2003 and (ii) 25% of the consolidated Excess Cash Flow for each of the four Fiscal Quarter periods ending on December 31 of each year thereafter.

(b)  Asset Sales.  No later than the fifth Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any Net Asset Sale Proceeds, Borrower shall prepay the Restructuring Fee and the Loans and/or the Revolving Credit Commitments shall be permanently reduced as set forth in Section 2.10(b) in an aggregate amount equal to such Net Asset Sale Proceeds; provided (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, Borrower shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Borrower and its Subsidiaries; provided further, pending any such investment all such Net Asset Sale Proceeds shall be applied to prepay outstanding Revolving Loans (without a reduction in Revolving Credit Commitments).

(c)  Insurance/Condemnation Proceeds.  No later than the fifth Business Day following the date of receipt by the Borrower or any of its Subsidiaries, or Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Restructuring Fee and the Loans and/or the Revolving Credit Commitments shall be permanently reduced as set forth in Section 2.10(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, Borrower shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Borrower and its Subsidiaries, which investment may include the repair, restoration or replacement of the applicable assets thereof, provided further, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be applied to prepay outstanding Revolving Loans (without a reduction in Revolving Credit Commitments).

-25-

(d)     Revolving Loans.  Borrower shall from time to time prepay the Revolving Loans to the extent necessary so that the aggregate outstanding amount of Revolving Loans does not at any time exceed the aggregate amount of the Revolving Credit Commitments then in effect.

(e)     Prepayment Certificate.  Concurrently with any prepayment of the Loans and/or reduction of the Revolving Credit Commitments pursuant to Section 2.09(a) through 2.09(d), Borrower shall deliver to Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Consolidated Excess Cash Flow, as the case may be.  In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Borrower shall concurrently therewith deliver to Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

Section 2.10.  Application of Prepayments.

(a)     Application of Optional Prepayments.  Any prepayment made by Borrower pursuant to Section 2.08(a) shall first be applied to the prepayment of the Restructuring Fee to the full extent thereof.  Thereafter, absent a Default or Event of Default, any prepayment of any Loan pursuant to Section 2.08(a) shall be applied as specified by Borrower in the applicable notice of prepayment; provided that if such prepayment is a prepayment of Term Loans, it shall be applied (i) first, to the prepayment of Term Loan A and (ii) second (after Term Loan A has been paid in full), to the prepayment of Term Loan B; provided further, in the event Borrower fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied to Loans at the discretion of the Required Lenders.

(b)     Application of Mandatory Prepayments.  Any amount required to be paid pursuant to Section 2.09 shall be applied to prepay (i) first, the Restructuring Fee to the full extent thereof, (ii) second (after the Restructuring Fee has been paid in full), Term Loan A, (iii) third (after Term Loan A has been paid in full), each scheduled installment of principal on the Term Loan B in inverse order of due date to the full extent thereof, and (iv) fourth (after Term Loan B has been paid in full), to prepay the Revolving Loans to the full extent thereof and to permanently reduce the Revolving Credit Commitments by the amount of such prepayment.

Section 2.11.  General Provisions Regarding Payments.

(a)     Payments.  All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Agent not later than 12:00 p.m. (New York City time) on the date due at the Agent's Principal Office for the account of Lenders.  All funds received by Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b)     Non-Conforming Payments.  The Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been

-26-

received by Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Agent shall give prompt telephonic notice to Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.01(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.05 from the date such amount was due and payable until the date such amount is paid in full.

(c)     Payments to Include Accrued Interest. All payments in respect of the principal amount of any Loan (whether Mandatory or Optional) shall include payment of accrued interest on the principal amount being, repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(d)     Distributions by Agent. Agent shall promptly distribute to each Lender via facsimile, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Agent.

(e)     Business Days. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.12. Ratable Sharing. Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counter-claim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "Aggregate Amounts Due" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of the Borrower or otherwise, those purchases shall be rescinded and the purchase

-27-

prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. The Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counter-claim with respect to any and all monies owing by the Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

## ARTICLE 3

### Conditions Precedent

Section 3.01. Closing Date. The obligation of any Lender to make any Loan on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 11.01, of the following conditions on or before the Closing Date:

(a)     Secretary's Certificate. The Lenders shall have received a certificate of the secretary or assistant secretary, the manager or the general partner, as the case may be, of each Credit Party, each substantially in the form of Exhibit 3.01(a), with respect to (i) the articles of incorporation, certificate of formation or certificate of limited partnership, as the case may be, of such Credit Party, (ii) the bylaws, operating agreement or limited partnership agreement, as the case may be, of such Credit Party, (iii) the resolutions of the board of directors, manager or general partner, as the case may be, of such Credit Party approving each Credit Document to which such Credit Party is a party and the other documents to be delivered by such Credit Party under the Credit Documents and the performance of the obligations of such Credit Party thereunder, and (iv) the names and true signatures of the officers of such Credit Party or such other persons authorized to sign each Credit Document to which such Credit Party is a party and the other documents to be delivered by it under the Credit Documents.

(b)     Organizational and Capital Structure. The organizational structure and the capital structure of the Borrower and its Subsidiaries, shall be as set forth on Schedule 4.05.

(c)     Good Standing Certificates. The Lenders shall have received a good standing certificate from the applicable Governmental Body of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date.

(d)     Consents. The Lenders shall have received copies of all Consents set forth on Schedule 4.04, and each such Consent shall be in full force and effect and in form and substance reasonably satisfactory to Lenders.

(e)     Projections. The Lenders shall have received the Projections.

(f)     Evidence of Insurance. Lenders shall have received a certificate from the Borrower's insurance broker or other evidence satisfactory to it that (i) all insurance required to

-28-

be maintained pursuant to Section 5.09 is in full force and effect and that Agent, for the benefit of Lenders and Agent, has been named as additional insured and loss payee thereunder to the extent required under Section 5.09 and (ii) the Borrower has obtained and paid the premium for an endorsement to Borrower's directors and officers liability insurance policy that will extend the discovery period for claims covered by such policy through the last day of 2004.

(g)    Closing Date Certificate.  Lenders shall have received an originally executed Closing Date Certificate, in the form of Exhibit 3.01(g) (the "Closing Date Certificate"), from the Borrower, together with all attachments thereto.

(h)    UCC Financing Statements.  Lenders shall have received UCC Financing Statements duly executed by each applicable Credit Party with respect to all personal and mixed property Collateral of such Credit Party, for filing in all jurisdictions as may be necessary or, in the opinion of the Lenders, desirable, to perfect the security interests created in such Collateral pursuant to the Collateral Documents.

(i)    Security Agreement.  The Lenders shall have received the Amended and Restated Security Agreement, in the form of Exhibit 3.01(i) (the "Security Agreement"), duly executed and delivered by the Borrower.

(j)    Security Collateral.  The Lenders shall have received certificates, instruments and promissory notes (which certificates, instruments and promissory notes shall be accompanied by instruments of transfer or assignment duly endorsed in blank and otherwise in form and substance satisfactory to Agent and Lenders) representing or evidencing all Security Collateral pledged pursuant to the Security Agreement.

(k)    Other Actions to Perfect Security Interests.  The Lenders shall have received evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Lenders.

(l)    Other Information.  The Agent and Lenders shall have received any other financial or non- financial information regarding the Borrower and its Subsidiaries as the Agent or any Lender may reasonably request.

(m)    Proceedings.  All proceedings taken or to be taken in connection with the transactions contemplated by this Agreement shall be satisfactory to the Agent and Lenders and their counsel.

(n)    Fees and Costs.  The Borrower shall have paid (i) $6,250 to the Agent representing the first of four quarterly installment payments of the agency fee for the first twelve month period following the Closing Date and (ii) all fees and expenses (including attorneys' fees) and out-of-pocket expenses of the Lenders and Agent incurred in connection with this Agreement and the other Credit Documents.

Section 3.02. <u>Conditions to Each Borrowing</u>. The obligation of each Lender to make any Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 11.01, of the following conditions precedent:

(a)     <u>Funding Notice</u>. The Agent and Lenders shall have received a fully executed and delivered Funding Notice in the form of <u>Exhibit 3.02(a)</u> (each, a "<u>Funding Notice</u>"), as provided in Section 2.01.

(b)     <u>Representations and Warranties</u>. As of such Borrowing Date, the representations, warranties and covenants of the Credit Parties contained in the Credit Documents shall be true, correct and complied with on and as of that Borrowing Date.

(c)     <u>No Default or Event of Default</u>. As of such Borrowing Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Borrowing that would constitute an Event of Default or a Default.

(d)     <u>Consents</u>. The Lenders shall have received such Consents and other information, approvals, opinions or documents reasonably requested by the Agent or the Lenders in connection with such Borrowing;

(e)     <u>Available Commitment</u>. After making the Loans requested on such Borrowing Date, the Total Utilization of Revolving Credit Commitments shall not exceed the aggregate amount of Revolving Credit Commitments then in effect;

(f)     <u>Use of Proceeds</u>. The Borrower shall have confirmed that the proceeds of such Borrowing shall be used only in accordance with the provisions of Section 2.03; and

(g)     <u>No Material Adverse Effect</u>. No Material Adverse Effect shall have occurred.

## ARTICLE 4

### Representations and Warranties

In order to induce the Lenders to enter into this Agreement and to make each Borrowing to be made thereby, each Credit Party hereby represents and warrants to each Lender, on the Closing Date and on each Borrowing Date as follows.

Section 4.01. <u>Existence and Power</u>. Each of the Credit Parties (a) is a corporation, limited liability company or limited partnership, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified under the laws of each jurisdiction in which qualification is required to own, lease or license its assets and properties and to carry on its business, and (c) has all necessary corporate, limited liability company or partnership, as the case may be, power and authority required to own, lease or license its assets and properties, to carry on its business and to execute and deliver each of the Credit Documents and to consummate the transactions contemplated thereby, except

-30-

in the case of clauses (b) and (c) where the failure to have such status, license, qualification or authority could not reasonably be expected to have a Material Adverse Effect.

Section 4.02.  Authorization; Binding Effect.  The execution and delivery by the Credit Parties of each of the Credit Documents to which such Credit Parties are a party, the performance by the Credit Parties of their obligations under such Credit Documents and the consummation of the transactions contemplated thereby has been duly authorized by all necessary corporate, limited liability company or partnership, as the case may be, action on the part of the Credit Parties.  No other proceedings on the part of any Credit Party are necessary to approve and adopt the Credit Documents or to approve the consummation of the transactions contemplated thereby.  Each of the Credit Documents is, or, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of the Credit Parties enforceable against the Credit Parties in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 4.03.  Contravention.  Neither the execution, delivery and performance of the Credit Documents by the Credit Parties nor the consummation of the transactions contemplated thereby will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of any Credit Party's certificate of incorporation or bylaws, certificate of formation or operating agreement or certificate of limited partnership or partnership agreement, as the case may be, (b) conflict with, violate or breach any Regulation by which the Credit Parties or any of their assets or properties may be bound or affected, (c) conflict with, breach or result in a default under, result in the acceleration of, or give rise to a right of termination, cancellation, modification or acceleration or require any notice under, any material contract or agreement to which any Credit Party or any of their assets or properties may be bound or affected, (d) result in or require the creation or imposition of any Lien on any of the Credit Parties' assets or properties, or (e) result in a Material Adverse Effect.

Section 4.04.  Consents.  As of (a) the date of this Agreement, except for the Consents set forth on Schedule 4.04, and (b) the Closing Date, all Consents have been obtained which are required or advisable in connection with (i) the due execution and delivery by the Credit Parties of the Credit Documents and the performance of the Credit Parties' obligations thereunder, (ii) the consummation of the transactions contemplated by the Credit Documents, and (iii) the exercise by the Agent or the Lenders of their rights and remedies under the Credit Documents.

Section 4.05.  Capitalization of the Borrower.  Schedule 4.05 sets forth the authorized, issued and outstanding membership units of Borrower and the authorized and issued Capital Stock of eMag UK.  All of the issued and outstanding membership units, shares of common stock and preferred stock have been duly authorized, validly issued and are fully paid and nonassessable.  Except for such membership units and shares of common stock and preferred stock, there are no membership units or shares of Capital Stock of the Borrower issued and outstanding.

Section 4.06.  Subsidiaries and Other Securities.

-31-

(a)    Subsidiaries.  Schedule 4.06(a) sets forth a true, correct and complete list of each Subsidiary of the Borrower, showing (i) the jurisdiction of its organization and jurisdictions in which it is qualified to do business, (ii) the number of shares of Capital Stock of each class (A) authorized and (B) issued and outstanding, (iii) the percentage of the outstanding shares of Capital Stock of each Subsidiary owned directly or indirectly by the Borrower, (iv) the names of the record holders of each class of outstanding shares of Capital Stock of the Subsidiaries and the number of such shares held by each such holder, (v) the number of shares of Capital Stock of each Subsidiary covered by all outstanding options, warrants, rights of conversion or purchase, and similar rights, (vi) the percentage of those options, warrants or rights owned directly or indirectly by the Borrower, and (vii) the names of the record holders of such options, warrants and rights and the number of such options, warrants and rights held by each such holder.

(b)    Subsidiary Capital Stock.  All outstanding shares of Capital Stock of each Subsidiary are duly authorized, validly issued, fully paid and nonassessable and are free of any preemptive rights and, except as set forth on Schedule 4.06(a), are owned, directly or indirectly, beneficially and of record by the Borrower free and clear of all Liens and any options, warrants and other rights.

(c)    Securities.  Schedule 4.06(c) sets forth a true, correct and complete list and description of all Securities in which the Borrower or its Subsidiaries share an interest.  Each of the Securities listed on Schedule 4.06(c) that is an equity Security is duly authorized, validly issued, fully paid and non-assessable.  Each of the Securities listed on Schedule 4.06(c) that is a debt Security is duly authorized and validly issued and constitutes the legal, valid and binding obligation of the issuer thereof and each guarantor thereof.  All of the Securities listed on Schedule 4.06(c) are owned, beneficially and of record, by the Borrower or one of its Subsidiaries.

Section 4.07.  Projections.  On and as of the Closing Date, the projections of the Borrower and its Subsidiaries for the current (as of the Closing Date) Fiscal Year (the "Projections"), a copy of which is attached hereto as Exhibit 4.07, are based on good faith estimates and assumptions made by the management of the Borrower; provided, the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material; provided further, as of the Closing Date, the Borrower believes that the Projections are reasonable and attainable.

Section 4.08.  Taxes.  Except as set forth in Schedule 4.08, Borrower and its Subsidiaries have timely filed all Tax Returns that are required to be filed by them and have timely paid all Taxes due and owing by them (whether or not such Taxes are required to be shown on a Tax Return). All such Tax returns were correct and complete in all material respects when filed.  The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of Taxes are accurate and adequate and were calculated in the ordinary course of business consistent with past practice.

Section 4.09.  Litigation.  Except as set forth on Schedule 4.09, there is no Action (a) against the Borrower or its Subsidiaries, or (b) that questions the validity of any of the Credit

-32-

Documents or that involves or relates to any of the transactions contemplated thereby, or (c) affecting any of the Credit Parties' assets or properties. Except as specifically indicated on Schedule 4.09, none of the matters disclosed on Schedule 4.09 has had or could reasonably be expected to have a Material Adverse Effect.

Section 4.10. Permits; Compliance With Laws. Borrower and its Subsidiaries, as the case may be, own, hold or possess all material Permits necessary or advisable to entitle them to own, lease, operate and use their properties and assets and to carry on and conduct their business at full capacity, and all such Permits are validly held and in full force and effect, except for those Permits, the failure of which to have could not reasonably be expected to have a Material Adverse Effect. The Borrower and its Subsidiaries are in compliance with each Regulation and Permit applicable to the Borrower, its Subsidiaries, their operations or their assets or properties, except with respect to each of the foregoing when such noncompliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.11. Absence of Certain Changes or Events. Since May 1, 2002, (a) there has not occurred a Material Adverse Effect or any event or circumstance which could reasonably be expected to have, a Material Adverse Effect, (b) the Borrower and its Subsidiaries have conducted their business only in the ordinary course consistent with past practice, and (c) none of the Borrower or any of its Subsidiaries has (i) transferred any material portion of its properties or assets or permitted any of its properties or assets to become subject to any Liens (except pursuant to the Collateral Documents) or suffered to exist any Lien (except pursuant to the Collateral Documents) on any of their properties or assets, or (ii) directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any Restricted Junior Payment or agreed to do so.

Section 4.12. Assets.

(a) The Assets. The Borrower or one of its Subsidiaries (i) owns or leases, (ii) has the legal and valid right to use and (iii) has good and marketable title to or leasehold interest in, free and clear of all Liens (except for Permitted Liens or Liens created pursuant to the Collateral Documents), all of the properties and assets, tangible or intangible, including, without limitation, all real property, leaseholds, equipment, fixtures, inventory, contract rights, intellectual property and personal property used in or necessary for the conduct of their businesses (except as sold or otherwise disposed of in the ordinary course of business or as permitted by Section 6.07).

(b) Real Property and Leaseholds. Schedule 4.12(b) sets forth a true, correct and complete list, legal description and location of all real property and leaseholds, as of the Closing Date, in which each of the Borrower or its Subsidiaries have an interest. Except as set forth on Schedule 4.12(b), none of such real property is subject to any lease, sublease or other similar arrangement.

Section 4.13. Environmental Matters.

(a) No Environmental Liability. Except as set forth on Schedule 4.13, none of the Borrower or any of its Subsidiaries has any actual, alleged or contingent liability or obligation

-33-

(A) relating to the violation, or alleged violation of any Environmental Law or Permit, (B) with respect to, or relating to, the generation, presence, disposal, release, threatened release, handling, transportation, treatment, storage, cleanup or contamination of or by any Hazardous Material at any Relevant Property, or (C) with respect to, or relating to, the cleanup of any Relevant Property (any such liability or obligation referred to in clauses (A), (B) and (C) being an "Environmental Liability").

(b)    Basis for Environmental Claims.    None of the Borrower or any of its Subsidiaries has been identified or listed as a potentially responsible party or a responsible party under the federal Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Law, nor have any of the Borrower or any of its Subsidiaries received any information request from a Governmental Body under any Environmental Law. There are no underground storage tanks, storing or previously storing Hazardous Materials at any property, site or facility currently or previously owned, leased or operated by any of the Borrower or any of its Subsidiaries. There are no conditions, occurrences or activities which could reasonably be expected to form the basis of an Environmental Liability against Borrower or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 4.14.    Material Contracts.    Schedule 4.14 sets forth a true, correct and complete list and description of all the contracts and agreements, as of the Closing Date, to which the Borrower or its Subsidiaries  are a party or by which they or any of their properties, assets or rights are or may be bound or subject and which require the payment or incurrence of liabilities, or the rendering of services, by the Borrower or its Subsidiaries , subsequent to the date of this Agreement of more than $100,000 (the "Material Contracts"). None of the Borrower or any of its Subsidiaries is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of the Material Contracts, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

Section 4.15.    Indebtedness and Liens.

(a)    Schedule of Indebtedness.    Schedule 4.15(a) sets forth a correct and complete list of (i) all Indebtedness in respect of which any Credit Party is in any manner directly or contingently obligated, (ii) the maximum principal or face amounts of the Indebtedness outstanding or which may be outstanding under each of those agreements and other arrangements, and (iii) the maturity date of such Indebtedness.

(b)    Lien Schedule.    Schedule 4.15(b) sets forth a correct and complete description and list of all Liens on assets or property owned, leased, licensed or used by any of the Credit Parties. Borrower has delivered to the Agent and each of the Lenders a correct and complete copy of each instrument, agreement, judgment or other evidence giving rise to a Lien.

Section 4.16.    Insurance.    The Borrower, its Subsidiaries, all of their assets and properties and their businesses are covered by valid and currently effective insurance policies or

-34-

binders of insurance, including, without limitation, general liability insurance, property insurance, workers' compensation insurance and business interruption insurance, issued in favor of the Borrower or its Subsidiaries , in each case, with financially sound and reputable insurance companies and in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations substantially similar to those of the Borrower and its Subsidiaries.

Section 4.17. Governmental Regulation.   None of the Borrower or any of its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  None of the Borrower or any of its Subsidiaries is a "registered mezzanine company" or company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

Section 4.18.   Margin Stock.  None of the Borrower or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

Section 4.19.   Employee Matters.  None of the Borrower or any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.   There is (a) no unfair labor practice complaint pending against any of the Borrower or any of its Subsidiaries, or to the Knowledge the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any of the Borrower or any of its Subsidiaries or to the Knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving any Borrower or its Subsidiaries  that could reasonably be expected to have a Material Adverse Effect, and (c) to the Knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Subsidiaries and, to the Knowledge of the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

Section 4.20.   Employee Benefit Plans.  The Borrower and each of its Subsidiaries and each of their ERISA Affiliates are in substantial compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, except where the failure to perform such obligations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code is so qualified.  No material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any Trust established under Title IV of ERISA has been or is expected to be incurred by the Borrower or its Subsidiaries  or any of their ERISA Affiliates.  No ERISA Event has occurred or

-35-

is reasonably expected to occur. Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of the Borrower, its Subsidiaries or any of their respective ERISA Affiliates. As of the most recent valuation date for any Pension Plan, the amount of unfunded benefit liabilities (as defined in Section 4001(a)(18) of ERISA), individually or in the aggregate for all Pension Plans (excluding for purposes of such computation any Pension Plans with respect to which assets exceed benefit liabilities), does not exceed $50,000. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of the Borrower, its Subsidiaries and their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA, does not exceed $50,000. The Borrower, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

Section 4.21. Certain Fees. No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby.

Section 4.22. Solvency. Each Credit Party is and, upon the incurrence of any Obligation by such Credit Party on any date on which this representation and warranty is made, will be, Solvent.

Section 4.23. No Misstatements or Omissions. No information, certificate, schedule or report furnished or to be furnished by the Borrower or any of its Subsidiaries (or by their employees, representatives, counsel, accountants or other professionals) to the Agent or the Lenders or any of their representatives in connection with (a) the transactions contemplated by the Credit Documents, (b) the preparation or negotiation of any Credit Document or (c) the satisfaction of any conditions set forth in any Credit Documents and no representation or warranty contained in the Credit Documents (when made and on the Closing Date), contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

Section 4.24. Full Disclosure. There are no facts pertaining to the Borrower, its Subsidiaries, their assets or properties or their businesses which could reasonably be expected to have a Material Adverse Effect and which have not been disclosed in this Agreement. None of the representations or warranties the Borrower or any of its Subsidiaries contained in the Credit Documents is untrue or incorrect. There is no information which would contradict or is inconsistent with any representation or warranty of any of the Borrower or its Subsidiaries contained in the Credit Documents.

ARTICLE 5

Affirmative Covenants

Each Credit Party covenants and agrees that so long as any Revolving Credit Commitment is in effect and until payment in full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, in all material respects all covenants in this Article V.

Section 5.01. <u>Financial Statements and Other Reports</u>. The Borrower will deliver to Agent and Lenders:

(a)    <u>Monthly Reports</u>. As soon as available, and in any event within 30 days after the end of each month ending after the Closing Date, the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, to the extent prepared on a monthly basis, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(b)    <u>Quarterly Financial Statements</u>. As soon as available, and in any event within 45 days after the end of each of the Fiscal Quarters, the consolidated and consolidating balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)    <u>Annual Financial Statements</u>. As soon as available, and in any event within 90 days after the end of each Fiscal Year, (i) the consolidated and consolidating balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto, and (ii) with respect to such consolidated financial statements for Fiscal Years 2003 and thereafter, a report thereon by independent certified public accountants of recognized national or regional standing selected by the Borrower, and reasonably satisfactory to Required Lenders (which report shall be unqualified as to going concern and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the

-37-

consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating (x) that their audit examination has included a review of the terms of the Credit Documents, (y) whether, in connection therewith, any condition or event that constitutes a Default or an Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof, and (z) that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof;

(d)     Compliance Certificate.  Together with each delivery of financial statements pursuant to Sections 5.01(b) and 5.01(c), a duly executed and completed Compliance Certificate, in the form of Exhibit 5.01(d) (each, a "Compliance Certificate");

(e)     Sales Forecast.  As soon as available, and in any event within 7 days after the end of each month ending after the Closing Date, 60-day sales forecasts, in a form that is satisfactory to the Lenders, for the 60-day period beginning from the end of such month;

(f)     Cash and Collateral Forecast.  Borrower has previously provided a cash and collateral forecast for the eight week period ending on April 4, 2003, a copy of which is attached hereto as Exhibit 5.01(f), and agrees to submit (i) additional eight week cash and collateral forecasts no later than the end of the sixth week of the preceding eight week forecast period, (ii) no later than the Thursday of each week, reconciliation reports of actual cash receipts and disbursements, in a form that is satisfactory to the Lenders, for the preceding week, and (iii) no later than the Thursday of each week, consolidated collateral reports, in a form that is satisfactory to the Lenders, as of the last day of the preceding week;

(g)     Notice of Default.  Promptly upon any officer of the Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Borrower with respect thereto, (ii) any Person has given any notice to Borrower or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.01(b), (iii) of any condition or event of a type required to be disclosed in a current report on Form 8-K of the Securities and Exchange Commission; or (iv) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto;

(h)     Notice of Litigation.  Promptly upon any officer of the Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Action not previously disclosed in writing by any Borrower to Lenders, or (ii) any material development in any Action

-38-

that, in the case of either (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Borrower to enable Lenders and their counsel to evaluate such matters;

(i)     ERISA. (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying, the nature thereof, what action the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (ii) with reasonable promptness, copies of (A) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan, (B) all notices received by Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event, and (C) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Agent or any Lender shall reasonably request;

(j)     Financial Plan. As soon as practicable and in any event no later than 30 days prior to the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and the next three succeeding Fiscal Years (a "Financial Plan"), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, together with pro forma Compliance Certificates for each such Fiscal Year and an explanation of the assumptions on which such forecasts are based and (ii) forecasted consolidated statements of income and cash flows of the Borrower and its Subsidiaries for each month of each such Fiscal Year, together with an explanation of the assumptions on which such forecasts are based;

(k)     Insurance Report. As soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by Borrower and its Subsidiaries and all material insurance coverage planned to be maintained by the Borrower and its Subsidiaries in the immediately succeeding Fiscal Year;

(l)     Environmental Reports and Audits. As soon as practicable following receipt thereof copies of all environmental audits and reports with respect to environmental matters at any Relevant Property or which relate to any Environmental Liabilities;

(m)     Other Information. Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by the Borrower or its Subsidiaries to their security holders acting in such capacity, (ii) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by the Borrower or its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, (iii) all press releases and other statements made available generally by the Borrower

-39-

or its Subsidiaries to the public concerning material developments in the business of the Borrower or its Subsidiaries , and (iv) such other information and data with respect to any of the Borrower or its Subsidiaries as from time to time may be reasonably requested by Agent or any Lender.

Section 5.02. Maintenance of Existence. The Borrower and each of its Subsidiaries shall preserve and maintain its corporate existence and good standing in the jurisdiction of its incorporation, and qualify and remain qualified as a foreign corporation in each jurisdiction in which both such qualification is required and the failure to so qualify could have a Material Adverse Effect on its business, properties, operations, prospects or condition (financial or otherwise).

Section 5.03. Maintenance of Records. The Borrower and each of its Subsidiaries shall keep adequate records and books of account reflecting all its financial transactions, keep minute books containing accurate records of all meetings and accurately reflecting all action of its shareholders, members and its board of directors (including committees), as the case may be, and keep stock books and ledgers correctly recording all transfers and issuances of all capital stock, as the case may be.

Section 5.04. Maintenance of Properties. The Borrower and each of its Subsidiaries shall maintain, keep and preserve all its tangible and intangible assets and properties necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 5.05. Conduct of Business. The Borrower and each of its Subsidiaries shall continue to engage in an efficient and economical manner solely in the business and activities engaged in by the Borrower and its Subsidiaries on the Closing Date.

Section 5.06. Inspections; Lenders Meetings. Each Credit Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by any Lender to visit and inspect any of the properties of any Credit Party and any of its Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. Borrower will, upon the request of Agent or Required Lenders, participate in a meeting of Agent and Lenders once during each Fiscal Year to be held at Borrower's corporate offices (or at such other location as may be agreed to by the Borrower and Agent) at such time as may be agreed to by the Borrower and Agent.

Section 5.07. Payment of Taxes. The Borrower and each of its Subsidiaries shall promptly pay its Tax liabilities before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) Borrower and its Subsidiaries, as the case may be, have set aside on their books adequate reserves with respect thereto in accordance with GAAP.

Section 5.08. Use of Proceeds. The Borrower and each of its Subsidiaries shall use the

NY186031.4/1639-12505

proceeds of the Loans solely as provided in Section 2.03.

Section 5.09. Insurance. The Borrower and each of its Subsidiaries shall maintain insurance as provided in Section 4.16.

Section 5.10. Compliance With Laws. The Borrower and each of its Subsidiaries shall comply in all material respects with all Regulations, writs, judgments, injunctions, orders, decrees and awards of any Governmental Body applicable to it or its business, properties or operations, if a failure to comply with any of the foregoing, individually or in the aggregate, could result in Material Adverse Effect.

Section 5.11. Compliance with Credit Documents. The Borrower and each of its Subsidiaries shall perform and observe all of the terms and provisions of each Credit Document to be performed or observed by it and maintain each Credit Document in full force and effect.

Section 5.12. Account Control Agreement. As soon as practicable, and in any event within 30 days after the Closing Date or within such other time as the Lenders in their sole discretion may agree, the Borrower shall enter into, and use its best efforts to cause the respective bank or financial institution to enter into, an account control agreement in form and substance acceptable to the Agent.

Section 5.13. Subsidiaries. In the event any Borrower shall acquire, form or otherwise obtain any Subsidiary on or after the Closing Date, such Borrower shall promptly notify the Agent and Lenders of the existence of such Subsidiary, shall provide the Agent with the information required by Section 4.06 with respect thereto and shall enter into and deliver or cause such Subsidiary to enter into and deliver, as the case may be, to the Agent on behalf of the Lenders (a) an amendment to the Pledge Agreement pledging the stock of such Subsidiary pursuant to the terms of the Pledge Agreement, (b) if the Subsidiary is a domestic Subsidiary, (i) a Subsidiary guarantee guaranteeing the Obligations and (ii) an amendment to the Security Agreement granting a continuing security interest in, and a right of set off against any and all right, title and interest of such Subsidiary in and to the Collateral of such Subsidiary, and (c) such other instruments, documents, agreements, certificates or resolutions as Agent or Lenders may reasonably request.

Section 5.14. Further Assurances. The Borrower and each of its Subsidiaries shall promptly upon request by any Lender, correct, and cause each of the other parties to the Credit Document to promptly correct, any defect or error that may be discovered in any Credit Document or in the execution, acknowledgment or recordation of the Credit Document. Promptly upon request by any Lender, the Borrower and any of its Subsidiaries shall execute, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the Agent or any Lender may require from time to time in order to carry out more effectively the purposes of each Credit Document.

-41-

ARTICLE 6

Negative Covenants

Each Credit Party covenants and agrees that, so long as any Revolving Credit Commitment is in effect and until payment in full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, in all material respects all covenants in this Article VI.

Section 6.01.  Indebtedness.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except for the Obligations hereunder and the Permitted Indebtedness.

Section 6.02.  Liens.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or Accounts) of the Borrower or its Subsidiaries , whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, except:

(a)      Liens in favor of Agent, for the benefit of Lenders and the Agent, granted pursuant to any Credit Document;

(b)      [reserved];

(c)      statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of 5 days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(d)      Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)      easements, rights-of-way, restrictions, encroachments, and other minor defects or

irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries ; and

(f)     Liens in favor of the holders of Permitted Indebtedness and securing such Permitted Indebtedness.

Section 6.03.  Equitable Lien; No Further Negative Pledges.  If any Credit Party or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provision whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by Required Lenders to the creation or assumption of any such Lien not otherwise permitted hereby.  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided, that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

Section 6.04.  Restricted Payments; Restrictions on Subsidiary Distributions.

(a)     No Restricted Payments.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Junior Payment.

(b)     No Restrictions on Subsidiary Distributions.  Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Borrower to (i) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Borrower or any other Subsidiary of any Borrower, (ii) repay or prepay any Indebtedness owed by such Subsidiary to any Borrower or any other Subsidiary of any Borrower, (iii) make loans or advances to any Borrower or any other Subsidiary of any Borrower, or (iv) transfer any of its property or assets to any Borrower or any other Subsidiary of any Borrower.

Section 6.05.  Investments.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a)     cash equivalents;

(b)     equity Investments owned as of the Closing Date in any Subsidiary and

-43-

Investments made after the Closing Date in wholly-owned Subsidiaries of Borrower;

(c)     Investments (i) in Accounts arising and trade credit granted in the ordinary course of business and in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Borrower and its Subsidiaries; and

(d)     Consolidated Capital Expenditures permitted by Section 6.06(d).

Section 6.06.   Financial Covenants.

(a)     Interest Coverage Ratio.   The Borrower shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending June 30, 2003 to be less than 1.5 to 1.0.

(b)     Fixed Charge Coverage Ratio.   The Borrower shall not permit the Fixed Charge Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending June 30, 2003, to be less than 1.0 to 1.0.

(c)     Minimum Consolidated Adjusted EBITDA Covenant.   Beginning with the Fiscal Quarter ending June 30, 2003 through the Fiscal Quarter ending December 31, 2003, the Borrower shall maintain the following minimum cumulative Consolidated Adjusted EBITDA:

| Period Ending | Minimum Cumulative Consolidated Adjusted EBITDA |
|---|---|
| Two Fiscal Quarter Period Ending June 30, 2003 | $350,000 |
| Three Fiscal Quarter Period Ending September 30, 2003 | $625,000 |
| Four Fiscal Quarter Period Ending December 31, 2003 | $1,000,000 |

On or prior to December 31, 2003, the Borrower and Lenders will negotiate and agree upon the minimum cumulative Consolidated EBITDA amounts for the Fiscal Quarter periods from January 1, 2004 to December 31, 2004.   On or prior to December 31, 2004, the Borrower and Lenders will negotiate and agree upon the minimum cumulative Consolidated EBITDA amounts for the Fiscal Quarter periods from January 1, 2005 to December 31, 2005.   On or prior to December 31, 2004, the Borrower and Lenders will negotiate and agree upon the minimum cumulative Consolidated EBITDA amounts for the Fiscal Quarter periods from January 1, 2006 to the Term Loan Maturity Date.   For the avoidance of doubt, the failure by the Borrower to agree to additional minimum cumulative Consolidated Adjusted EBITDA amounts as provided in this Section 6.06(c) shall constitute an Event of Default under the Agreement.

(d)    Maximum Consolidated Capital Expenditures.  Borrower shall not, and shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures in an aggregate amount for each of the Borrower and its Subsidiaries in excess of $320,000 for the 2003 Fiscal Year.  On or prior to December 31, 2003, the Borrower and Lenders will negotiate and agree upon the Maximum Consolidated Capital Expenditure amount for the 2004 Fiscal Year.  On or prior to December 31, 2004, the Borrower and Lenders will negotiate and agree upon the Maximum Consolidated Capital Expenditure amount for the 2005 Fiscal Year.  On or prior to December 31, 2005, the Borrower and Lenders will negotiate and agree upon the Maximum Consolidated Capital Expenditure amount for the 2006 Fiscal Year.  For the avoidance of doubt, the failure by the Borrower to agree to additional minimum cumulative Capital Expenditure amounts as provided in this Section 6.06(d) shall constitute an Event of Default under the Agreement.

(e)    Minimum Accounts.  Borrower agrees to maintain:

(i)    with respect to the Borrower, during the term of this Agreement, a minimum level of Eligible Accounts in the aggregate amount of $1,000,000 and

(ii)    with respect to eMag UK, cause eMag UK to maintain, during the term of the Agreement, a minimum level of Eligible European Accounts in the aggregate amount of $1,000,000.

Section 6.07.  Fundamental Changes; Disposition of Assets; Acquisitions.  No Credit Party shall, nor shall it permit, any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)    any Subsidiary of any Borrower may be merged with or into such Borrower, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to such Borrower; provided, in the case of such a merger, such Borrower shall be the continuing or surviving Person;

(b)    disposals of obsolete, worn-out or surplus property; and

(c)    Investments made in accordance with Section 6.05.

Section 6.08.  Disposal of Subsidiary Interests.  Except for any sale of 100% of the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.07, no

Credit Party shall (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law, or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed herein under), or to qualify directors if required by applicable law.

Section 6.09.    Sales and Lease-Backs.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Borrower or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than the Borrower or its Subsidiaries ) in connection with such lease.

Section 6.10.    Transactions with Shareholders and Affiliates.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of any class of Capital Stock of the Borrower or its Subsidiaries or with any Affiliate of the Borrower or of any such holder, on terms that are less favorable to the Borrower or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate.

Section 6.11.    Conduct of Business.  From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (a) the businesses engaged in by such Credit Party on the Closing Date and similar or related businesses, and (b) such other lines of business as may be consented to by Required Lenders.

Section 6.12.    Fiscal Year.  No Credit Party shall, nor shall it permit any of its subsidiaries to, change its Fiscal Year-end from December 31 without the prior consent of the Agent or Required Lenders, which consent shall not be unreasonably withheld.

## ARTICLE 7

### Increased Costs; Taxes; Indemnifications; Set-Off; Etc.

Section 7.01.    Increased Costs; Capital Adequacy.  In the event that any Lender shall have determined that the adoption, effectiveness, phase-in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Body, central bank or comparable agency, has or would have the effect of

-46-

reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Revolving Credit Commitments or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within 5 Business Days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling, corporation on an after-tax basis for such reduction. Such Lender shall deliver to Borrower (with a copy to Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section, which statement shall be conclusive and binding, upon all parties hereto absent manifest error.

Section 7.02.   Taxes; Withholding, etc.

(a)   Payments to Be Free and Clear. All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)   Withholding of Taxes. If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Credit Party to Agent or any Lender under any of the Credit Documents: (i) Borrower shall notify Agent of any such requirement or any change in any such requirement promptly following Borrower becoming aware of it, (ii) Borrower shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Agent or such Lender, as the case may be) on behalf of and in the name of Agent or such Lender, (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, Borrower shall deliver to Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority; provided, no such additional amount shall be required to be paid to any Lender under clause (iii) above except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment Agreement pursuant to

-47-

which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such Assignment Agreement, as the case may be, in respect of payments to such Lender.

Section 7.03. Indemnification.

(a)    Indemnification by the Borrower.  Each of the Borrower and its Subsidiaries will indemnify and defend the Agent, the Lenders and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents and Affiliates (collectively, the "Indemnified Persons") against and hold each Indemnified Person harmless from any and all liabilities, obligations, losses, damages, costs, expenses, claims, penalties, Actions, judgments, disbursements of any kind or nature whatsoever, interest, fines, cleanup costs, settlements, costs of preparation and investigation, costs incurred in enforcing this indemnity and reasonable attorneys' fees and expenses (collectively, "Losses"), that the Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, or due to (i) any inaccuracy or breach of any of the representations and warranties of any Credit Party contained in any Credit Document or in any certificate delivered thereunder, (ii) the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of any Credit Party contained in any Credit Document or in any certificate delivered thereunder, (iii) any Environmental Liability, or (iv) any use of proceeds of any Loans.  Upon request of an Indemnified Person, Borrower shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person in connection with any Losses or threatened Losses and shall pay the fees and disbursements of such counsel.  The Indemnified Person shall have the right to employ its own counsel at the expense of Borrower if (i) the employment of counsel by the Indemnified Person at the Borrower's expense has been authorized in writing by Borrower, (ii) the Borrower has not in fact employed counsel to represent the Indemnified Person within a reasonable time after receiving notice of a request for the retention of counsel or (iii) both the Indemnified Person and Borrower are implicated with respect to the Losses or the threatened Losses, and representation of both parties by the same counsel would be inappropriate (as determined by the Lenders in their sole discretion) due to actual or potential differing interests between them, in each of which cases the reasonable fees and expenses of counsel (including local counsel) will be at the expense of the Borrower, and all such fees and expenses will be reimbursed promptly as they are incurred.

(b)    Contribution.    If the indemnification provided for in this Section 7.03 is prohibited under applicable Regulations to an Indemnified Person, then the Borrower, in lieu of indemnifying the Indemnified Person, will contribute to the amount paid or payable by the Indemnified Person as a result of the Losses in such proportion as is appropriate to reflect the relative fault of any Borrower, on the one hand, and of the Indemnified Person, on the other, in connection with the events or circumstances which resulted in the Losses as well as any other relevant equitable considerations.

Section 7.04.  Right of Set-Off.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender and Agent are hereby authorized by each Credit Party at any time or from time to time, without notice to any Credit Party or to any other Person, any such notice being

-48-

hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender or Agent to or for the credit or the account of any Credit Party against and on account of the Obligations of any Credit Party to such Lender or Agent hereunder, irrespective of whether or not (a) such Lender or Agent shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Article II and although such obligations and liabilities, or any of them, may be contingent or unmatured.

## ARTICLE 8

### Events of Default

Section 8.01. Events of Default. Any one or more of the following events which shall occur and be continuing shall constitute an "Event of Default":

(a) Failure to Make Payments When Due. Failure by the Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, (ii) any interest on any Loan or any fee or any other amount due hereunder within 5 days after the date due, or (iii) any Obligations relating to the Letter of Credit;

(b) Breach of Certain Covenants. Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.03, Section 5.02 or Article VI;

(c) Breach of Representations, etc. Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(d) Other Defaults Under Credit Documents. Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other section of this Section 8.01, and such default shall not have been remedied or waived within 30 days after the earlier of (i) an officer of such Credit Party becoming aware of such default or (ii) receipt by the Borrower of notice from Agent or any Lender of such default;

(e) Default in Other Agreements. (i) Failure of any Credit Party to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness in an individual principal amount of $50,000 or more or with an aggregate principal amount of $100,000 or more, in each case beyond the grace period, if any, provided therefore, or (ii) breach or default by any Credit Party with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred

-49-

to in clause (i) above or (B) any loan agreement, mortgage, indenture or other agreement relating to such item of Indebtedness, in each case beyond the grace period, if any, provided therefore, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be;

(f)     Involuntary Bankruptcy, Appointment of Receiver, etc.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Borrower or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed, or any other similar relief shall be granted under any applicable federal or state law, or (ii) an involuntary case shall be commenced against Borrower or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over such Borrower or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of such Borrower or any of its Subsidiaries for all or a substantial part of its property or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any of the Borrower or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for 60 days without having been dismissed, bonded or discharged;

(g)     Voluntary Bankruptcy, Appointment of Receiver, etc.  (i) Borrower or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or any of the Borrower or any of its Subsidiaries shall make any assignment for the benefit of creditors, or (ii) Borrower or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Borrower or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.01(f);

(h)     Judgments and Attachments.  Any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $100,000 or (ii) in the aggregate at any time an amount in excess of $250,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Borrower or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days (or in any event later than 5 days prior to the date of any proposed sale

thereunder);

(i)     Dissolution. Any order, judgment or decree shall be entered against any Credit Party decreeing, the dissolution or split up of the Borrower or any of its Subsidiaries and such order shall remain undischarged or unstayed for a period in excess of thirty 30 days;

(j)     Change of Control. A Change of Control shall occur; or

(k)     Collateral Documents and other Credit Documents. At any time after the execution and delivery thereof, (i) this Agreement or any Credit Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Agent or any Lender to take any action within its control, or (ii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party.

Section 8.02.   Remedies. Upon and after the occurrence of an Event of Default:

(a)     Non-Bankruptcy Related Defaults. In the case of any Event of Default specified in any Section other than Section 8.01(f) or 8.01(g), the Agent at the request of or with the consent of the Required Lenders, may by notice to the Borrower (i) terminate the Revolving Credit Commitments and they shall thereupon terminate, and (ii) declare each of the following to be immediately due and payable, which shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, the unpaid principal amount of and interest on the Loans and all other Obligations.

(b)     Bankruptcy Events of Default. In the case of any of the Events of Default speci-fied in Section 8.01(f) or 8.01(g), without any notice to the Borrower or any other act by the Agent or any Lender, automatically, (i) the Revolving Credit Commitments shall thereupon immediately terminate, and (ii) each of the following shall immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, the unpaid principal amount of and interest on the Loans and all other Obligations.

(c)     Remedies in All Events of Default. The Agent shall, at the request of or with the consent of the Required Lenders (i) exercise all rights and remedies provided in the Credit Documents, (ii) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Borrower, (iii) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any Credit Document and may exercise any power granted under or to recover judg-ment under any Credit Document, (iv) enforce any and all Liens and security interests created pursuant to Collateral Documents, and (v) exercise any other right or remedy permitted by

-51-

applicable Regulations.

(d) Lenders' Remedies. In case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the Lenders shall have accelerated the maturity of the Loans pursuant to this Section 8.02, each Lender, if owed any amount with respect to the Loans, may proceed to protect and enforce its rights by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Credit Agreement and the other Credit Documents or any instrument pursuant to which the Obligations to such Lender are evidenced, including as permitted by applicable law the obtaining of the ex parte appointment of a receiver, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of such Lender. No remedy herein conferred upon any Lender or the Agent or the holder of any Note is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

## ARTICLE 9

### The Agent

Section 9.01. Appointment of Agent. Patriarch Partners Agency Services, LLC is hereby appointed Agent hereunder, and each Lender hereby authorizes Agent to act as its agent in accordance with the terms hereof and the other Credit Documents. The Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable. The provisions of this Article IX are solely for the benefit of Agent and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, the Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries. The Agent without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates.

Section 9.02. Powers and Duties. Each Lender irrevocably authorizes the Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to the Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. The Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. The Agent may execute any of its duties under this Agreement and the other Credit Documents by or through third parties, agents or attorneys-in-fact, or may assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any third parties, agents, attorneys-in-fact or nominees selected by it with reasonable care. The Agent shall not have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender and nothing herein or any of the other Credit Documents, expressed or implied, is

-52-

intended to or shall be so construed as to impose upon the Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

Section 9.03. General Immunity.

(a) No Responsibility for Certain Matters. The Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the Agent to Lenders or by or on behalf of any Credit Party to the Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall the Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default. Anything contained herein to the contrary notwithstanding, Agent shall not have any liability arising from confirmations of the amount of outstanding Loans.

(b) Exculpatory Provisions. Neither the Agent nor any of its officers, trustees, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by the Agent under or in connection with any of the Credit Documents except to the extent caused by the Agent's gross negligence or willful misconduct. The Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Agent shall have received instructions in respect thereof from Required Lenders and, upon receipt of such instructions from Required Lenders, the Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) the Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for any of the Borrower and its Subsidiaries), accountants, experts and other professional advisors selected by it, and (ii) no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Required Lenders. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document which involves discretionary decision-making absent express written instructions from the Required Lenders with respect thereto.

Section 9.04. Agent Entitled to Act with Borrower. The Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with any of the Borrower or any of its Affiliates as if it were not

-53-

performing the duties specified herein, and may accept fees and other consideration from the Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

Section 9.05. Lenders' Representations, Warranties and Acknowledgment.

(a)     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Borrower and each of its Subsidiaries in connection with Borrowings hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Borrower and each of its Subsidiaries. The Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and the Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)     Each Lender, by delivering its signature page to this Agreement and funding any of its Term Loan Amount or a Revolving Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by the Agent, Required Lenders or Lenders, as applicable on the Closing Date.

Section 9.06. Right to Indemnity. Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify the Agent and its stockholders, directors, officers, employees, agents and Affiliates (each an "Indemnified Agent Person"), to the extent that the Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnified Agent Person in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as the Agent in any way relating to or arising out hereof or the other Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct. If any indemnity furnished to the Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, the Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof, and provided further, this sentence shall not be deemed to require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

Section 9.07. Successor Agent.

-54-

(a)     The Agent may resign at any time by giving not less than thirty (30) days prior written notice thereof to the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Agent.

(b)     If no successor Agent shall have been so appointed by the Required Lenders within thirty (30) days after the resigning Agent's giving of notice of resignation, then the resigning Agent may appoint, on behalf of the Borrower and the Lenders, a successor Agent, which shall be a commercial bank organized under the laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $500,000,000. In the event that the Agent is unable to appoint a replacement successor within such thirty day period after using reasonable efforts, the Agent may nonetheless resign by delivering a written resignation to the Lenders and the Borrower, provided that in such circumstances, and unless and until a successor Agent is appointed, the Agent shall remain Agent solely for the purpose of serving as secured party of record with respect to the Collateral, its sole duty in that capacity shall be to take such ministerial actions as it shall be directed to take by the Required Lenders (including, without limitation, the execution and delivery of documents or instruments relating to the Collateral), and the Agent shall be entitled to reimbursement from the Borrower for its out-of-pocket costs and expenses and reasonable compensation from the Borrower for its services. If the Agent has resigned and no successor Agent has been appointed, subject to the preceding sentence, the Lenders shall perform the duties of the Agent hereunder, and the Borrower shall make all payments in respect of the Obligations to the applicable Lender and shall deal directly with the Lenders.

(c)     No successor Agent shall be deemed to be appointed hereunder until such successor Agent has accepted the appointment in writing. Upon the acceptance of any appointment as Agent hereunder by a successor Agent and upon the execution and filing of such financing statements, or amendments thereto, and such other instruments and notices, as may be necessary or desirable or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted under the Security Agreement, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the resigning Agent, and the resignation of the Agent shall then be effective for all purposes. Upon the effectiveness of the resignation of the Agent, the resigning Agent shall be discharged from its duties and obligations under the Credit Documents. After the effectiveness of the resignation of an Agent, the provisions of Section 7.03, Section 11.03 and this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as the Agent under this Agreement.

(d)     The Required Lenders may replace the Agent with a successor Agent, with or without cause, at any time by giving not less than 30 days prior written notice thereof to the Agent and the Borrower.

Section 9.08.   Collateral Documents.

(a)     Agent as Agent under Collateral Documents.   Each Lender hereby further authorizes Agent, on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Collateral and the Collateral Documents. Subject to

-55-

Section 11.01, without further written consent or authorization from Lenders, Agent may execute any documents or instruments necessary to release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Required Lenders have otherwise consented.

(b)    Agent's Right to Realize on Collateral. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, Agent and each Lender hereby agree that (i) if the Agent fails or refuses to exercise any remedies against Borrower after receiving the direction of the Lenders, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose, and (ii) in the event of a foreclosure by Agent or any Lender on any of the Collateral pursuant to a public or private sale, Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Agent, as agent for and representative of Lenders, and any Lender, in its individual capacity, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations, in the case of the Agent, or to use and apply its pro rata share of the Obligations, in the case of a Lender, as a credit on account of the purchase price for any collateral payable by Agent or any Lender at such sale

Section 9.09.  Notice of Default.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 9.10.  Delivery of Documents, Notices , Etc.  In addition to, and in furtherance of any requirement placed upon the Agent herein to deliver, provide, distribute, notify or otherwise convey items received from the Borrower to the Lenders, the Agent shall promptly notify Lenders of any notices, documents, requests, demands or other items Agent received from Borrower and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders.

## ARTICLE 10

### Release

Section 10.01. Release by Borrower.  In consideration of the premises hereto, and the covenants and agreements contained in this Agreement, the Borrower, its Affiliates, members, partners, managers, officers, shareholders, directors, officers, employees and agents of each of

-56-

them, and each of the heirs, executors, administrators successors and assigns of any of those persons (collectively, the "Releasors"), hereby release and discharge the Agent, the Lenders, their Affiliates, members, partners, managers, shareholders, directors, officers, employees, attorneys and agents of each of them, and each of the heirs, executors, administrators successors and assigns of any of those persons (collectively, the "Releasees"), from any and all actions, causes of action, suits, debts, obligations, liabilities, contracts, controversies, agreements, promises, damages, judgments, claims or demands whatsoever, of whatever kind and based on whatever legal theory that the Releasors ever had, now has or hereafter can, shall or may have against the Releasees, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Agreement.

## ARTICLE 11

### Miscellaneous

Section 11.01. Amendments and Waivers.

(a)     General.   Subject to Section 11.01(b) below, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall be effective without the written consent of the Required Lenders.

(b)     Other Consent.   Notwithstanding the provisions of Section 11.01(a) above, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall amend, modify, terminate or waive any provision of Article IX as the same applies to the Agent, or any other provision hereof as the same applies to the rights or obligations of the Agent, in each case without the consent of the Agent.

(c)     Effect of Notices, Waivers or Consents.   Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 11.01 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

Section 11.02. Notices.  All notices, requests, demands and other communications to any party or given under any Credit Document (collectively, "Notices") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by telecopier, with confirmation received, to the telecopy number specified below (or at such other address or telecopy number as will be specified by a party by like notice given at least five calendar days prior thereto):

(a)     If to the Borrower, at:

-57-

eMag Solutions, L.L.C.
3495 Piedmont Road
Eleven Piedmont Center, Suite 500
Atlanta, Georgia 30305
Attention: Brendan Sullivan, CEO
Phone: (404) 995-6025
Facsimile: (404) 872-8247

With a copy to:

King & Spalding LLP
191 Peachtree Street, N.E.
Atlanta, Georgia  30303
Attention: Philip A. Theodore
Phone: (404) 572-4676
Facsimile:  (404) 572-5100

(b)    If to the Agent, at:

Patriarch Partners Agency Services, LLC
112 South Tryon Street, Suite 700
Charlotte, North Carolina 28284
Attention: Greg Murphy
Phone:  (704) 227-1204
Facsimile:  (704) 375-0358

With copies to:

Patriarch Partners Agency Services, LLC
40 Wall Street, 25th Floor
New York, New York 10005
Attention: Lynn Tilton
Phone:  (212) 825-0550
Facsimile:  (212) 825-2038

and

Richards Spears Kibbe & Orbe
One World Financial Center
New York, NY  10281
Attention:  Larry G. Halperin, Esq.
Phone: (212) 530-1800
Facsimile:  (212) 530-1801

(c)    If to the Lenders, to the address for such Lender set forth on the signature pages hereto.

-58-

All Notices will be deemed delivered when actually received. Each of the parties will hereafter notify the other in accordance with this Section of any change of address or telecopy number to which notice is required to be mailed.

Section 11.03. Expenses. Whether or not the transactions contemplated hereby shall be consummated or any Loans shall be made, Borrower agrees to pay promptly:

(a)     all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto;

(b)     the reasonable fees, expenses and disbursements of counsel to Lenders and Agent (in each case including, allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, supplements, waivers or other modifications thereto and any other documents or matters requested by Borrower;

(c)     all the actual costs and reasonable expenses of creating and perfecting Liens in favor of Agent, for the benefit of Lenders and Agent, pursuant hereto, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to Agent and Lenders;

(d)     all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers;

(e)     all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Agent and its counsel) in connection with the inspection, verification, custody or preservation of any of the Collateral; and

(f)     after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent or Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

The foregoing shall not be construed to limit any other provisions of the Credit Documents regarding costs and expenses to be paid by the Borrower.

Section 11.04. Enforceability; Successors and Assigns.

(a)     Enforceability; Successors and Assigns. This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto. This Agreement may not be assigned by the Borrower hereto without the

-59-

prior written consent of the Agent and each Lender. Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement.

(b)    Assignments. Each Lender may assign (each, an "Assignment") to one or more Eligible Assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of such Lender's Loans, Revolving Credit Commitment and Notes, as the case may be), without the consent the Borrower. In connection with any such assignment, the assigning Lender and the Assignee shall execute and deliver to the Agent an Assignment Agreement, in the form of Exhibit 11.04(b) (each, an "Assignment Agreement"), and $3,500.00 Assignment Fee payable to Agent. Upon its receipt of a duly executed and completed Assignment Agreement, Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to the Borrower and shall maintain a copy of such Assignment Agreement. From and after the effective date of an Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of a lender under this Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement. The Borrower hereby consents to the disclosure of any information obtained by Lender in connection with this Agreement to any Person to which Lender sells, or proposes to sell, its Loans, Revolving Credit Commitment or Notes.

(c)    Participations. Each Lender may sell participations (each, a "Participation") to one or more Persons (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of such Lender's Loans, Revolving Credit Commitment and Notes, as the case may be); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the Borrower for the performance of such obligations, and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce the Credit Documents and to approve any amendment, modification or waiver of any provision of the Credit Documents. Borrower hereby consents to the disclosure of any information obtained by a Lender in connection with this Agreement to any Person to which such Lender participates, or proposes to participate, its Loans, Revolving Credit Commitment or the Note.

Section 11.05. Lenders' Obligations Several; Independent Nature of Lenders' Rights. The obligation of each Lender hereunder is several and not joint and neither Agent nor any Lender shall be responsible for the obligation of any other Lender hereunder. In the event that any Lender at any time should fail to continue a Loan as herein provided, the Lenders, or any of them, at their sole option, may continue the Loan that was to have been continued by the Lender so failing to continue such Loan. Nothing contained in any Credit Document and no action taken by Agent or any Lender pursuant hereto or thereto shall be deemed to constitute Lenders to be a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and, provided the Agent fails or refuses to exercise any remedies against Borrower after receiving the direction of

-60-

the Lenders, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 11.06. Integration. This Agreement and the other Credit Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 11.07. No Waiver; Remedies. No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other Credit Documents will operate as a waiver of the right, power or privilege. A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege. The rights and remedies provided in the Credit Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 11.08. Submission to Jurisdiction. The Borrower, the Agent and the Lenders hereby (a) agrees that any Action with respect to any Credit Document may be brought only in the courts of the State of New York or of the United States of America for the Southern District of New York, (b) accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of such courts, (c) irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any Action in those jurisdictions, and (d) irrevocably consents to the service of process of any of the courts referred to above in any Action by the mailing of copies of the process to the parties hereto as provided in Section 11.01. Service effected as provided in this manner will become effective ten calendar days after the mailing of the process.

Section 11.09. Execution in Counterparts. This Agreement may be executed simultaneously in one or more counterparts, and by different parties hereto in separate counterparts, each of which when executed will be deemed an original, but all of which taken together will constitute one and the same instrument.

Section 11.10. Governing Law. This Agreement and the other Credit Documents will be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed in and to be performed entirely within that state, without reference to conflicts of laws provisions.

Section 11.11. Waiver of Jury. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE OTHER PARTY HAS

-61-

REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 11.12. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 11.13. Survival. All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other Credit Documents shall survive (a) the making of any Loans and the payment of the Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all Credit Documents, until the due and punctual (i) indefeasible payment of the Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other Credit Documents; provided, however, that the provisions of Article VII, Section 9.06 and Section 11.03 shall survive (i) indefeasible payment of the Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other Credit Documents.

Section 11.14. Lawful Interest. The Borrower shall not be obligated to pay any interest in excess of the maximum rate provided by law and interest under any Credit Document otherwise in excess of that rate shall be reduced to that rate.

Section 11.15. Interpretation. As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate. Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, schedule and exhibit references are references with respect to this Agreement unless otherwise specified. Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 11.16. Ambiguities. This Agreement and the other Credit Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other Credit Documents shall not be construed against the party who drafted this Agreement or such other Credit Documents.

NY186031.4/1639-12505

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

BORROWER:                          EMAG SOLUTIONS, L.L.C.

                                   By: _____
                                   Name:  BRENDAN  SULLIVAN
                                   Title:  PRESIDENT  &  CEO

NYJ86031.4/1639-12505                      S 1

AGENT:                              PATRIARCH PARTNERS AGENCY SERVICES, LLC

By: _____
    Name: Lynn Tilton
    Title: Manager

LENDERS:

Address for Notices:
c/o Patriarch Partners, LLC
40 Wall Street                      ARK CLO 2000-1, LIMITED
New York, New York 10005
Facsimile No.:212-825-2038          By:    Patriarch Partners, LLC,
                                           its Collateral Manager

        and

                                    By: _____
Patriarch Partners, LLC                 Name: Lynn Tilton
112 South Tryon Street, Suite 700       Title: Manager
Charlotte, NC  28284
Facsimile:  704-375-0358


Address for Notices:

c/o Patriarch Partners III, LLC
40 Wall Street                      ARK INVESTMENT PARTNERS II, L.P.
New York, New York 10005
Facsimile No.:212-825-2038          By:    Patriarch Partners III, LLC,
                                           its Investment Advisor

        and

                                    By: _____
Patriarch Partners III, LLC             Name: Lynn Tilton
112 South Tryon Street, Suite 700       Title: Manager
Charlotte, NC  28284
Facsimile:  704-375-0358

S 2

# EXHIBIT 5

# THIRD AMENDED AND RESTATED

# LOAN AND SECURITY AGREEMENT

### by and among

INTER-MARKETING GROUP, INC.
DANA CLASSIC FRAGRANCES, INC.
DANA S.A.U.
as Borrowers

and

IMG HOLDINGS INC.
DANA FRAGRANCE BRANDS, LLC
IMG FRAGRANCE BRANDS, LLC
INTERNATIONAL WATCH CORP.
ST. HONORE HOLDING, INC.
FELAGASTYRING EHF
VORUMERKJASTYRING EHF
FINANZ ST. HONORE B.V.
as Guarantors

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Agent

and

## THE LENDERS THAT ARE SIGNATORIES HERETO

### as the Lenders,

### Dated as of January 15, 2009

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **1.** | **DEFINITIONS AND CONSTRUCTION** | **2** |
| | 1.1 Definitions | 2 |
| | 1.2 Accounting Terms | 2 |
| | 1.3 Code | 2 |
| | 1.4 Construction | 2 |
| | 1.5 Schedules and Exhibits | 2 |
| **2.** | **LOAN AND TERMS OF PAYMENT** | **2** |
| | 2.1 Revolver Advances | 2 |
| | 2.2 Term Loan | 3 |
| | 2.3 Borrowing Procedures | 3 |
| | 2.4 Payments | 6 |
| | 2.5 Reserved | 9 |
| | 2.6 Interest Rate, Payments, and Calculations | 10 |
| | 2.7 Cash Management | 11 |
| | 2.8 Crediting Payments | 12 |
| | 2.9 Designated Account | 12 |
| | 2.10 Maintenance of Loan Account; Statements of Obligations | 12 |
| | 2.11 Reserved | 12 |
| | 2.12 Reserved | 12 |
| | 2.13 Reserved | 12 |
| | 2.14 Reserved | 13 |
| | 2.15 Joint and Several Liability of Borrowers | 13 |
| | 2.16 Securitizations | 15 |
| **3.** | **CONDITIONS; TERM OF AGREEMENT** | **16** |
| | 3.1 Conditions Precedent to the Effectiveness of Agreement | 16 |
| | 3.2 Conditions Precedent to all Extensions of Credit | 16 |
| | 3.3 Term | 16 |
| | 3.4 Effect of Termination | 16 |
| | 3.5 Early Termination by Borrowers | 17 |

# TABLE OF CONTENTS
(continued)

**Page**

**4.    REPRESENTATIONS AND WARRANTIES** ........................................................ 17

4.1    No Encumbrances ........................................................................................ 17

4.2    Reserved ...................................................................................................... 17

4.3    Reserved ...................................................................................................... 17

4.4    Equipment .................................................................................................... 17

4.5    Location of Inventory and Equipment ........................................................ 17

4.6    Inventory Records ........................................................................................ 17

4.7    Jurisdiction of Organization; Location of Chief Executive Office;
       Organizational Identification Number; Commercial Tort Claims ............... 17

4.8    Due Organization and Qualification; Subsidiaries ...................................... 18

4.9    Due Authorization; No Conflict ................................................................... 19

4.10   Litigation ..................................................................................................... 20

4.11   No Material Adverse Change ....................................................................... 20

4.12   Fraudulent Transfer ..................................................................................... 20

4.13   Employee Benefits ....................................................................................... 20

4.14   Environmental Condition ............................................................................. 21

4.15   Intellectual Property .................................................................................... 21

4.16   Leases .......................................................................................................... 21

4.17   Deposit Accounts and Securities Accounts ................................................ 21

4.18   Complete Disclosure ................................................................................... 21

4.19   Indebtedness ................................................................................................ 22

4.20   Material Contracts ....................................................................................... 22

**5.    AFFIRMATIVE COVENANTS** ........................................................................... 22

5.1    Accounting System ...................................................................................... 22

5.2    Collateral Reporting .................................................................................... 22

5.3    Financial Statements, Reports, Certificates ............................................... 23

5.4    [Intentionally Omitted] ............................................................................... 23

5.5    Inspection .................................................................................................... 23

5.6    Maintenance of Properties ........................................................................... 23

5.7    Taxes ............................................................................................................ 23

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 5.8 | Insurance | 23 |
| 5.9 | Location of Inventory and Equipment | 24 |
| 5.10 | Compliance with Laws | 24 |
| 5.11 | Leases | 24 |
| 5.12 | Existence | 24 |
| 5.13 | Environmental | 24 |
| 5.14 | Disclosure Updates | 25 |
| 5.15 | Control Agreements | 25 |
| 5.16 | Formation of Subsidiaries | 25 |
| 5.17 | Further Assurances | 25 |
| 5.18 | Material Contracts | 26 |
| 5.19 | License Agreements | 26 |
| **6.** | **NEGATIVE COVENANTS** | **27** |
| 6.1 | Indebtedness | 27 |
| 6.2 | Liens | 27 |
| 6.3 | Restrictions on Fundamental Changes | 27 |
| 6.4 | Disposal of Assets | 28 |
| 6.5 | Change Name | 28 |
| 6.6 | Nature of Business | 28 |
| 6.7 | Prepayments and Amendments | 28 |
| 6.8 | Change of Control | 29 |
| 6.9 | Consignments | 29 |
| 6.10 | Distributions | 29 |
| 6.11 | Accounting Methods | 29 |
| 6.12 | Investments | 29 |
| 6.13 | Transactions with Affiliates | 29 |
| 6.14 | Use of Proceeds | 30 |
| 6.15 | Inventory and Equipment with Bailees | 30 |
| 6.16 | Financial Covenants | 30 |
| 6.17 | Immaterial Subsidiaries | 32 |

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 7. | **EVENTS OF DEFAULT** | | **32** |
| 8. | **THE LENDER GROUP'S RIGHTS AND REMEDIES** | | **34** |
| | 8.1 | Rights and Remedies | 34 |
| | 8.2 | Remedies Cumulative | 34 |
| 9. | **TAXES AND EXPENSES** | | **35** |
| 10. | **GRANT AND PERFECTION OF SECURITY INTEREST** | | **35** |
| | 10.1 | Grant of Security Interest | 35 |
| | 10.2 | Perfection of Security Interests | 36 |
| | 10.3 | Power of Attorney | 40 |
| | 10.4 | Right to Cure | 41 |
| | 10.5 | Access to Premises | 42 |
| | 10.6 | Conflict with Intercreditor Agreement | 42 |
| 11. | **WAIVERS; INDEMNIFICATION** | | **43** |
| | 11.1 | Demand; Protest; etc | 43 |
| | 11.2 | The Lender Group's Liability for Collateral | 43 |
| | 11.3 | Indemnification | 43 |
| 12. | **NOTICES** | | **44** |
| 13. | **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER** | | **44** |
| 14. | **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS** | | **45** |
| | 14.1 | Assignments and Participations | 45 |
| | 14.2 | Successors | 48 |
| 15. | **AMENDMENTS; WAIVERS** | | **48** |
| | 15.1 | Amendments and Waivers | 48 |
| | 15.2 | Reserved | 49 |
| | 15.3 | No Waivers; Cumulative Remedies | 49 |
| 16. | **AGENT; THE LENDER GROUP** | | **49** |
| | 16.1 | Appointment and Authorization of Agent | 49 |
| | 16.2 | Delegation of Duties | 50 |
| | 16.3 | Liability of Agent | 50 |
| | 16.4 | Reliance by Agent | 51 |

# TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| | 16.5 | Notice of Default or Event of Default | 51 |
| | 16.6 | Credit Decision | 51 |
| | 16.7 | Costs and Expenses; Indemnification | 52 |
| | 16.8 | Agent in Individual Capacity | 53 |
| | 16.9 | Successor Agent | 53 |
| | 16.10 | Lender in Individual Capacity | 53 |
| | 16.11 | Collateral Matters | 54 |
| | 16.12 | Restrictions on Actions by Lenders; Sharing of Payments | 54 |
| | 16.13 | Agency for Perfection | 55 |
| | 16.14 | Payments by Agent to the Lenders | 55 |
| | 16.15 | Concerning the Collateral and Related Loan Documents | 55 |
| | 16.16 | Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 55 |
| | 16.17 | Several Obligations; No Liability | 56 |
| **17.** | | **WITHHOLDING TAXES** | **57** |
| **18.** | | **GENERAL PROVISIONS** | **59** |
| | 18.1 | Effectiveness | 59 |
| | 18.2 | Section Headings | 59 |
| | 18.3 | Interpretation | 59 |
| | 18.4 | Severability of Provisions | 59 |
| | 18.5 | [Reserved.] | 59 |
| | 18.6 | Lender-Creditor Relationship | 59 |
| | 18.7 | Counterparts; Electronic Execution | 59 |
| | 18.8 | Revival and Reinstatement of Obligations | 60 |
| | 18.9 | Confidentiality | 60 |
| | 18.10 | Lender Group Expenses | 61 |
| | 18.11 | USA PATRIOT Act | 61 |
| | 18.12 | Integration | 61 |
| | 18.13 | Parent as Agent for Borrowers | 61 |
| | 18.14 | Amendment and Restatement | 61 |

# TABLE OF CONTENTS
(continued)

**Page**

18.15   Existing Defaults.................................................................................................... 62

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit C-1 | Form of Compliance Certificate |
| Schedule A-1 | Agent's Account |
| Schedule A-2 | Authorized Persons |
| Schedule C-1 | Commitments and Loan Amounts |
| Schedule D-1 | Designated Account |
| Schedule I-1 | Immaterial Subsidiaries |
| Schedule P-2 | Permitted Liens |
| Schedule 1.1 | Definitions |
| Schedule 2.7(a) | Cash Management Accounts |
| Schedule 3.1 | Conditions Precedent |
| Schedule 4.5 | Locations of Inventory and Equipment |
| Schedule 4.7(a) | States of Organization |
| Schedule 4.7(b) | Chief Executive Offices |
| Schedule 4.7(c) | Organizational Identification Numbers |
| Schedule 4.7(d) | Commercial Tort Claims |
| Schedule 4.8(b) | Capitalization of Borrowers |
| Schedule 4.8(c) | Capitalization of Borrowers' Subsidiaries |
| Schedule 4.10 | Litigation |
| Schedule 4.14 | Environmental Matters |
| Schedule 4.15 | Intellectual Property |
| Schedule 4.17 | Deposit Accounts and Securities Accounts |
| Schedule 4.19 | Permitted Indebtedness |
| Schedule 4.20 | Material Contracts |
| Schedule 5.2 | Collateral Reporting |
| Schedule 5.3 | Financial Statements, Reports, Certificates |
| Schedule 6.6 | Nature of Business |
| Schedule 6.13 | Intercompany License Agreements |
| Schedule 8.15 | Existing Defaults |

DLI-6231627v7

## THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This Third Amended and Restated Loan and Security Agreement, is entered into on January 31, 2009, to be effective and dated as of January 15, 2008, by and among Inter-Marketing Group, Inc., a Florida corporation ("Inter-Marketing"), Dana Classic Fragrances, Inc., a Delaware corporation ("Dana US", and together with Inter-Marketing, each individually a "US Borrower" and collectively, "US Borrowers"), Dana S.A.U., a corporation organized under the laws of Spain ("Spanish Borrower", and together with US Borrowers, each individually a "Borrower" and collectively, "Borrowers"), IMG Holdings Inc., a Delaware corporation ("Parent"), Dana Fragrance Brands, LLC, a Delaware limited liability company ("Dana Fragrance"), IMG Fragrance Brands, LLC, a Delaware limited liability company ("IMG Fragrance"), International Watch Corp., a Florida corporation ("IWC"), St. Honore Holding, Inc., a Delaware corporation ("St. Honore Holding", and together with Parent, Dana Fragrance, IMG Fragrance and IWC, each individually a "US Guarantor" and collectively, "US Guarantors"), Felagastyring ehf, a corporation organized under the laws of Iceland ("Felagastvring"), Vorumerkjastyring ehf, a corporation organized under the laws of Iceland ("Vorumerkjastyring"), Finanz St. Honore WV., a corporation organized under the laws of The Netherlands ("Finanz St. Honore" and together with Felagastyring and Vorumerkjastyring, each individually a "Foreign Guarantor" and collectively, "Foreign Guarantors" and together with US Guarantors, each individually a "Guarantor" and collectively, "Guarantors"), the parties hereto from time to time as lenders, whether by execution of this Agreement or an Assignment and Acceptance (each individually, a "Lender" and collectively, "Lenders") and Patriarch Partners Agency Services, LLC, a Delaware limited liability company ("Patriarch"), in its capacity as agent for Lenders (in such capacity, "Agent").

## WITNESSETH:

WHEREAS, Borrowers, Guarantors, Agent and Lenders are parties to that certain Second Amended and Restated Loan and Security Agreement dated as of June 28, 2007, as amended by that certain First Amendment to Second Amended and Restated Loan and Security Agreement, dated as of July 7, 2008, that certain Second Amendment to Second Amended and Restated Loan and Security Agreement, dated as of October 17, 2008, that certain Third Amendment to Second Amended and Restated Loan and Security Agreement, dated as of December 24, 2008, and that certain Fourth Amendment to Second Amended and Restated Loan and Security Agreement, dated as of December 30, 2008 (as so amended,  the "Existing Loan Agreement") pursuant to which Lenders have made loans and other financial accommodations to Borrowers;

WHEREAS, the Borrowers have requested that the Lenders provide revolving loans in an aggregate amount not to exceed $2,566, 597; and

WHEREAS, in connection with the new revolving loans, the parties wish to amend and restate the Existing Loan Agreement in its entirety on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION.**

1.1     **Definitions**. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

1.2     **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto.

1.3     **Code**. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4     **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein or in any other Loan Document to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations that are not required by the provisions of this Agreement to be repaid or cash collateralized and the termination or expiration of all Revolver Commitments. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record and any Record so transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

1.5     **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.      **LOAN AND TERMS OF PAYMENT.**

2.1     **Revolver Advances**.

(a)     Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Advance Lender agrees (severally, not jointly or jointly and severally) to

- 2 -

make advances ("Advances") to Borrowers in an amount at any one time outstanding not to exceed such Advance Lender's Pro Rata Share of an amount equal to the Maximum Revolver Amount.

(b)    Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.  The outstanding principal amount of the Advances, together with interest accrued thereon, shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

2.2    **Term Loan**.

(a)    Borrowers hereby acknowledge, confirm and agree that as of the date of this Agreement and immediately before giving effect to this Agreement, Borrowers are indebted to Lenders for the Loans made to the Borrowers under the Existing Loan Agreement in the amounts and to the Lenders set forth in Exhibit C-1.

(b)    The entire unpaid principal amount of the Term Loans and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date or, if earlier, upon the acceleration of the Obligations pursuant to Section 8.1.  Borrowers shall have no right to request, and Lenders shall have no obligation to make, any additional loans or advances to Borrowers under this Section 2.2, and any repayments of the Term Loans shall not be subject to any re-advance to or re-borrowing by Borrowers.  Except as expressly provided in Section 2.4 hereof, no Term Loans shall be prepaid without the prior written consent of the Required Revolving Loan Lenders; provided, that, no prepayment of the Term Loans (excluding any prepayment pursuant to Section 2.4 hereof) shall be made (i) upon less than ten (10) days prior written notice to Agent and Revolving Loan Agent and (ii) unless such prepayment is accompanied by the applicable Prepayment Premium.

2.3    **Borrowing Procedures**.

(a)    **Procedure for Borrowing**.  Each Borrowing shall be made by an irrevocable written request by an Authorized Person delivered to Agent.  Such notice must be received by Agent no later than 1:00 p.m. (Georgia time) on the Business Day that is the requested Funding Date specifying (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day.  At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time.  In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b)    **Making of Advances**.

(i)    Promptly after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Advance Lenders, not later than 4:00 p.m. (Georgia time) on the Business Day immediately preceding the Funding Date applicable thereto, by telecopy, telephone, or other similar form of transmission, of the requested Borrowing.  Each Advance

Lender shall make the amount of such Advance Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 1:00 p.m. (Georgia time) on the Funding Date applicable thereto.  After Agent's receipt of the proceeds of such Advances, Agent shall make the proceeds thereof available to Administrative Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to Administrative Borrower's Designated Account; provided, however, that, subject to the provisions of Section 2.3(d)(ii), Agent shall not request any Advance Lender to make, and no Advance Lender shall have the obligation to make, any Advance if Agent shall have actual knowledge that (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.  Notwithstanding the foregoing, to the extent an Advance Lender waives the conditions precedent set forth in Section 3.2 and makes the Advance requested, the making of such Advance by such Advance Lender by itself shall not constitute a Default or Event of Default.

(ii)     Unless Agent receives notice from an Advance Lender prior to 12:00 p.m. (Georgia time) on the date of a Borrowing, that such Advance Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Advance Lender's Pro Rata Share of the Borrowing, Agent may assume that each Advance Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount.  If and to the extent any Advance Lender shall not have made its full amount available to Agent in immediately available funds and Agent in such circumstances has made available to Borrowers such amount, that Advance Lender shall on the Business Day following such Funding Date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period.  A notice submitted by Agent to any Advance Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error.  If such amount is so made available, such payment to Agent shall constitute such Advance Lender's Advance on the date of Borrowing for all purposes of this Agreement.  If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Borrower of such failure to fund and, upon demand by Agent, Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Advances composing such Borrowing.  The failure of any Advance Lender to make any Advance on any Funding Date shall not relieve any other Advance Lender of any obligation hereunder to make an Advance on such Funding Date, but no Advance Lender shall be responsible for the failure of any other Advance Lender to make the Advance to be made by such other Advance Lender on any Funding Date.

(iii)     Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments to each other non-Defaulting Lender member of the Advance Lender Group ratably in accordance with their Revolver Commitments (but only to the extent that such Defaulting Lender's Advance was funded by the other members of the Advance Lender Group) or, if so directed by Administrative

Borrower and if no Default or Event of Default had occurred and is continuing (and to the extent such Defaulting Lender's Advance was not funded by the Advance Lender Group), retain same to be re-advanced to Borrowers as if such Defaulting Lender had made Advances to Borrowers. Subject to the foregoing, Agent may hold and, in its Permitted Discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Revolver Commitment shall be deemed to be zero. This Section shall remain effective with respect to such Advance Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Agent, and Administrative Borrower shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Pro Rata Share of the applicable Advance and pays to Agent all amounts owing by Defaulting Lender in respect thereof. The operation of this Section shall not be construed to increase or otherwise affect the Revolver Commitment of any Advance Lender, to relieve or excuse the performance by such Defaulting Lender or any other Advance Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent or to the Advance Lenders other than such Defaulting Lender. Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Administrative Borrower at its option, upon written notice to Agent, to arrange for a substitute Advance Lender to assume the Revolver Commitment of such Defaulting Lender, such substitute Advance Lender to be acceptable to Agent. In connection with the arrangement of such a substitute Advance Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Advance Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever; provided however, that any such assumption of the Revolver Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Advance Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

(c)    **Notation**. Agent shall record on its books the principal amount of the Loans owing to each Lender, and the interests therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate.

(d)    **Lenders' Failure to Perform**. All Advances shall be made by the Advance Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that (i) no Advance Lender shall be responsible for any failure by any other Advance Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Revolver Commitment of any Advance Lender be increased or decreased as a result of any failure by any other Advance Lender to perform its obligations hereunder, and (ii) no failure by any Advance Lender to perform its obligations hereunder shall excuse any other Advance Lender from its obligations hereunder.

2.4    **Payments**.

(a)    **Payments by Borrowers.**

(i)    Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full on the Maturity Date or, if earlier, on the date on which the Obligations are declared due and payable pursuant to the terms of this Agreement.  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 2:00 p.m. (Georgia time) on the date specified herein.  Any payment received by Agent later than 2:00 p.m. (Georgia time), shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from Administrative Borrower prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender. Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application.**

(i)    So long as no Event of Default has occurred and is continuing and except as otherwise provided with respect to Defaulting Lenders, all principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses (other than fees or expenses that are for Agent's separate account) shall be apportioned ratably among the Lenders having a Pro Rata Share of the Revolver Commitment or Obligation to which a particular fee or expense relates.  All payments to be made hereunder by Borrowers shall be remitted to Agent and all (subject to Section 2.4(b)(iv) hereof) such payments, and all proceeds of Collateral received by Agent, shall be applied, so long as no Event of Default has occurred and is continuing, to reduce the balance of the Loans outstanding and, thereafter, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(ii)    Subject to the terms of the Intercreditor Agreement, at any time that an Event of Default has occurred and is continuing and except as otherwise provided with respect to Defaulting Lenders, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows:

(A)    <u>first</u>, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

(B)    <u>second</u>, to pay any fees or premiums then due to Agent under the Loan Documents until paid in full,

(C)    <u>third</u>, ratably to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(D)    <u>fourth</u>, ratably to pay any fees or premiums then due to any of the Lenders under the Loan Documents until paid in full,

(E)    <u>fifth</u>, ratably to pay interest due in respect of the Loans until paid in full,

(F)    <u>sixth</u>, ratably to pay the outstanding principal balance of the Loans until the Loans are paid in full,

(G)    <u>seventh</u>, to pay any other Obligations, and

(H)    <u>eighth</u>, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under the Intercreditor Agreement or applicable law.

Notwithstanding the foregoing, to the extent such payments or proceeds are from proceeds of Revolving Loan Priority Collateral, such payments and proceeds shall not be applied to Obligations.

(iii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive.

(iv)    In each instance, so long as no Event of Default has occurred and is continuing, <u>Section 2.4(b)(i)</u> shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.

(v)    For purposes of <u>Section 2.4(b)(ii)</u>, "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vi)    In the event of a direct conflict between the priority provisions of this <u>Section 2.4</u> and any other provision contained in any other Loan Document, it is the

intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of the Intercreditor Agreement shall in all instances control and govern and this <u>Section 2.4</u> shall in all other instances control and govern.

(c)  **Mandatory Prepayments.**  In each case, subject to the terms and conditions set forth in the Intercreditor Agreement,

(i)  immediately upon the receipt by Loan Parties of the proceeds of any voluntary or involuntary sale or disposition by Loan Parties of property or assets (including casualty losses or condemnations but excluding sales or dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), or (d) of the definition of Permitted Dispositions and excluding sales and dispositions of Revolving Loan Priority Collateral), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(d)</u>  in an amount equal to 100% of the Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by such Person in connection with such sales or dispositions; <u>provided that</u>, so long as (A) no Default or Event of Default shall have occurred and shall be continuing, (B) Administrative Borrower shall have given Agent prior written notice of Borrowers' intention to apply such monies to the costs of replacement of the properties or assets that are the subject of such sale or disposition or the cost of purchase or construction of other assets useful in the business of Loan Parties, (C) the monies are held in a cash collateral account in which Agent has a perfected first-priority security interest, and (D) Loan Parties, as applicable, complete such replacement, purchase, or construction within 180 days after the initial receipt of such monies, Loan Parties shall have the option to apply such monies to the costs of replacement of the property or assets that are the subject of such sale or disposition or the costs of purchase or construction of other assets useful in the business of Loan Parties unless and to the extent that such applicable period shall have expired without such replacement, purchase or construction being made or completed, in which case, any amounts remaining in the cash collateral account shall be paid to Agent and applied in accordance with <u>Section 2.4(d)</u>.  Nothing contained in this <u>Section 2.4(c)(i)</u> shall permit Borrowers or any of their Subsidiaries (other than the Excluded Subsidiaries) to sell or otherwise dispose of any property or assets other than in accordance with <u>Section 6.4</u>.

(ii)  immediately upon the receipt by Loan Parties of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(d)</u> in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iii)  immediately upon the issuance or incurrence by any Loan Party of any Indebtedness (other than Indebtedness permitted under <u>Section 6.1</u>) or the issuance by any Loan Party of any shares of such Loan Party's Stock (other than in the event that Borrowers or any of Subsidiary of a Borrower forms a Subsidiary in accordance with the terms hereof, the issuance by such Subsidiary of Stock to a Borrower or such Subsidiary, as applicable, or the making by the Borrowers of a capital contribution to a Loan Party), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(d)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such

- 8 -

issuance or incurrence. The provisions of this <u>Section 2.4(c)(iii)</u> shall not be deemed to be implied consent to any such issuance or incurrence otherwise prohibited by the terms and conditions of this Agreement.

(iv)      immediately upon the receipt by Borrowers or any of their Subsidiaries of the proceeds of any voluntary or involuntary sale or disposition by Borrowers or any of their Subsidiaries of Revolving Loan Priority Collateral (including casualty losses or condemnations but excluding sales or dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), or (d) of the definition of Permitted Dispositions), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.4(d)</u> in an amount equal to 100% of the Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by such Person in connection with such sales or dispositions; provided that, so long as (A) no Default or Event of Default shall have occurred and is continuing, (B) Administrative Borrower shall have given Agent prior written notice of Borrowers' intention to apply such monies to the costs of replacement of the properties or assets that are the subject of such sale or disposition, (C) the monies are held in a cash collateral account in which Agent (or Revolving Loan Agent) has a perfected first-priority security interest, and (D) Borrowers or their Subsidiaries, as applicable, complete such replacement, purchase, or construction within 180 days after the initial receipt of such monies, Borrowers and their Subsidiaries shall have the option to apply such monies to the costs of replacement of the property or assets that are the subject of such sale or disposition unless and to the extent that such applicable period shall have expired without such replacement, purchase or construction being made or completed, in which case, any amounts remaining in the cash collateral account shall be paid to Revolving Loan Agent or Agent, as applicable, and applied in accordance with <u>Section 2.4(d)</u>. Nothing contained in this <u>Section 2.4(c)(iv)</u> shall permit Borrowers or any of their Subsidiaries to sell or otherwise dispose of any property or assets other than in accordance with <u>Section 6.4</u>.

Provided, however, that amounts otherwise payable under this <u>Section 2.3(c)</u> shall not be payable to the extent such amounts are required to be applied against the Revolving Loan Debt in accordance with the terms of the Revolving Loan Agreement as such terms exist on the date hereof or are amended in accordance with the Intercreditor Agreement.

(d)      **Application of Payments.**  Subject to the Intercreditor Agreement, each prepayment pursuant to <u>Section 2.4(c)</u> above shall (A) so long as no Event of Default shall have occurred and be continuing, be applied, *first* to the outstanding principal amount of the Term Loans until paid in full, and *second* to the outstanding principal amount of the Advances (with a corresponding permanent reduction in the Maximum Revolver Amount) until paid in full, and (B) if an Event of Default shall have occurred and be continuing, be applied in the manner set forth in <u>Section 2.4(b)(ii)</u>.

2.5      **<u>Reserved</u>**.

2.6    **Interest Rate, Payments, and Calculations**.

   (a)    **Interest Rate.**

   (i)    Subject to clause (a)(ii) below, (y) in the case of the Existing Term Loan, the Term C Loan, the Term D Loan, the Term E Loan and the Advances, a rate equal to eight percent (8%) per annum in excess of (A) LIBOR or (B) in the event that LIBOR cannot be determined, 2%; and (z) in the case of the Term B Loan, a rate equal to seven and one-half percent (7.5%) per annum in excess of (A) LIBOR or (B) in the event that LIBOR cannot be determined, 2% (the "Interest Rate").

   (ii)    Notwithstanding anything to the contrary contained in clause (a)(i), the Interest Rate shall mean the rate of two percent (2%) per annum in excess of the rate otherwise set forth in clause (a)(i) above, at Agent's option or at the direction of the Required Lenders, without notice, either (A) for the period on and after the date of termination hereof until such time as all Obligations are indefeasibly paid and satisfied in full in immediately available funds, or (B) for the period from and after the date of the occurrence of any Event of Default, and for so long as such Event of Default is continuing as determined by Agent, in its reasonable discretion.

   (b)    **Payment.** Borrowers shall pay to Agent, for the benefit of the Lenders, interest on the outstanding principal amount of the Loans at the Interest Rate applicable thereto. Interest shall be payable monthly in arrears on the first day of each calendar month. All interest accruing hereunder on and after the date of any Event of Default or termination hereof shall be payable on demand. With respect to any Loan, upon the request of Agent or any Lender, the Borrowers shall execute and deliver promissory notes, in form and substance satisfactory to Agent, evidencing the outstanding principal amount of such Loan at such time.

   (c)    **Computation.** Interest shall be payable by Borrowers to Agent, for the account of Lenders, monthly in arrears not later than the first day of each calendar month and shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed. The interest rate on non contingent Obligations shall increase or decrease by an amount equal to each increase or decrease in LIBOR effective on the day such change is announced.

   (d)    **Intent to Limit Charges to Maximum Lawful Rate.** In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.7     **Cash Management**.

**At any time after the Revolving Loan Debt has been repaid in full and all commitments to lend under the Revolving Loan Documents have expired or been terminated:**

(a)     US Borrowers shall and shall cause each US Guarantor to (i) establish and maintain cash management services of a type and on terms satisfactory to Agent at one or more of the banks set forth on Schedule 2.7(a) (each a "Cash Management Bank"), and shall request in writing and otherwise take such reasonable steps to ensure that all of their and US Guarantors' Account Debtors forward payment of the amounts owed by them directly to such Cash Management Bank, and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to US Borrowers or the US Guarantors) into a bank account in Agent's name (a "Cash Management Account") at one of the Cash Management Banks.

(b)     Each Cash Management Bank shall establish and maintain Cash Management Agreements with Agent and US Borrowers.  Each such Cash Management Agreement shall provide, among other things, that (i) the Cash Management Bank will comply with any instructions originated by Agent directing the disposition of the funds in such Cash Management Account without further consent by US Borrowers or the US Guarantors, as applicable, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account, other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) the Cash Management Bank will forward, by daily sweep, all amounts in the applicable Cash Management Account to the Agent's Account.

(c)     So long as no Default or Event of Default has occurred and is continuing, Administrative Borrower may amend Schedule 2.7(a) to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to Agent, and (ii) prior to the time of the opening of such Cash Management Account, a US Borrower (or a US Guarantor, as applicable) and such prospective Cash Management Bank shall have executed and delivered to Agent a Cash Management Agreement.  Borrowers (or a US Guarantor, as applicable) shall close any of their Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Agent's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Agent's reasonable judgment.

(d)     Each Cash Management Account shall be a cash collateral account subject to a Control Agreement.

Notwithstanding the foregoing, this <u>Section 2.7</u> shall not apply to any US Guarantor, so long as all of such US Guarantors' Collections do not exceed $10,000 during any twelve month period.

2.8    **Crediting Payments**.  Subject to the Intercreditor Agreement, the receipt of any payment item by Agent (whether from transfers to Agent by the Cash Management Banks pursuant to the Cash Management Agreements or otherwise) shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Agent's Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 2:00 p.m. (Georgia time).  If any payment item is received into the Agent's Account on a non-Business Day or after 2:00 p.m. (Georgia time) on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.9    **Designated Account**.  Agent is authorized to make the Advances under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to <u>Section 2.6(b)</u>.  Administrative Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Advances requested by Borrowers and made by Agent or the Advance Lenders hereunder.  Unless otherwise agreed by Agent and Administrative Borrower, any Advance requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.10    **Maintenance of Loan Account; Statements of Obligations**.  Agent shall maintain an account on its books in the name of Borrowers (the "<u>Loan Account</u>") on which Borrowers will be charged with the Loans made by the Lenders to Borrowers or for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with <u>Section 2.8</u>, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account, including all amounts received in the Agent's Account from any Cash Management Bank.  Agent shall render statements regarding the Loan Account to Administrative Borrower, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after receipt thereof by Administrative Borrower, Administrative Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

2.11    **Reserved.**

2.12    **Reserved.**

2.13    **Reserved.**

DLI-6231627v7

2.14    **Reserved.**

2.15    **Joint and Several Liability of Borrowers.**

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents to which it is a party in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)    The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly

or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this <u>Section 2.15</u> afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this <u>Section 2.15</u>, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this <u>Section 2.15</u> shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this <u>Section 2.15</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or any Agent or Lender.

      (f)     Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

      (g)     The provisions of this <u>Section 2.15</u> are made for the benefit of Agent, Lenders and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this <u>Section 2.15</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this <u>Section 2.15</u> will forthwith be reinstated in effect, as though such payment had not been made.

      (h)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or

distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)       Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with <u>Section 2.4(b)</u>.

2.16    **Securitizations**.  Borrowers and Guarantors each hereby acknowledge that the Lenders and their Affiliates may seek to sell or securitize the Loans (a "<u>Securitization</u>") through the pledge of the Loans as collateral security for loans to the Lenders or their Affiliates or through the sale of the Loans or the issuance of direct or indirect interests in the Loans, which loans to the Lenders or their Affiliates or direct or indirect interests will be rated by Moody's, Standard & Poor's or one or more other rating agencies (the "<u>Rating Agencies</u>").  Borrowers and Guarantors shall provide reasonable cooperation to the Lenders and their Affiliates to effect the Securitization including, without limitation, by (a) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by the Lenders in connection with the Securitization, provided that (i) any such amendment or additional documentation does not impose additional costs (other than de minimus out-of-pocket expenses) on Borrowers and Guarantors and (ii) any such amendment or additional documentation does not adversely affect the rights, or increase the obligations, of Borrowers and Guarantors under the Loan Documents or change or affect in a manner adverse to Borrowers and Guarantors the financial terms of the Loans, (b) providing such information as may be reasonably requested by the Lenders in connection with the rating of the Loans or the Securitization, and (c) hereby agreeing (i) to indemnify Lenders and their Affiliates, any of the Rating Agencies, or any party providing credit support or otherwise participating in the Securitization (collectively, the "<u>Securitization Parties</u>") for any losses, claims, damages or liabilities (the "<u>Liabilities</u>") to which the Lenders, their Affiliates or such Securitization Parties may become subject insofar as the Obligations arise out of or are based upon any untrue statement of any material fact contained in any writing delivered by or on behalf of any Borrower or Guarantor to Agent or Lenders pursuant to clause (b) above or arise out of or are based upon the omission to state therein a material fact required to be stated therein, or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading as of the date made, and such indemnity shall survive any transfer by the Lenders or their successors or assigns of the Loans and (ii) to reimburse Lenders and their Affiliates for any legal or other expenses reasonably incurred by such Persons in connection with defending the Liabilities.

3.      **CONDITIONS; TERM OF AGREEMENT.**

3.1      <u>**Conditions Precedent to the Effectiveness of Agreement**</u>.  The effectiveness of this Agreement is subject to the fulfillment to the satisfaction of Agent and each Lender of each of the conditions precedent set forth on <u>Schedule 3.1</u>.

3.2      <u>**Conditions Precedent to all Extensions of Credit**</u>.  The obligation of the Advance Lender Group (or any member thereof) to make any Advances hereunder (or to extend any other credit hereunder) at any time shall be subject to the following conditions precedent:

(a)      the representations and warranties of the Loan Parties, as applicable, contained in this Agreement or in the other Loan Documents to which they are a party shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date);

(b)      no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)      no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower, Agent, or any Lender; and

(d)      no Material Adverse Change shall have occurred since March 31, 2006.

3.3      <u>**Term**</u>.  This Agreement shall continue in full force and effect for a term ending on May 26, 2009 (the "<u>Maturity Date</u>").  The foregoing notwithstanding, the Lender Group, upon the election of the Required Lenders, shall have the right to terminate its obligations under this Agreement pursuant to, and as provided for in, <u>Section 8.1</u>, subject to the Intercreditor Agreement.

3.4      <u>**Effect of Termination**</u>.  On the date of termination of this Agreement, all Obligations immediately shall become due and payable without notice or demand.  No termination of this Agreement, however, shall relieve or discharge Borrowers or Guarantors of their duties, Obligations, or covenants hereunder or under any other Loan Document and the Agent's Liens in the Collateral shall remain in effect until all Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated.  When this Agreement has been terminated and all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, mortgage releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Agent's Liens and all notices of security interests and liens previously filed by Agent with respect to the Obligations.

- 16 -

3.5    **Early Termination by Borrowers**.  Borrowers have the option, at any time upon 30 days prior written notice to Agent, to terminate this Agreement and terminate the Revolver Commitments hereunder by paying to Agent, in cash, the Obligations, in full.  If Borrowers have sent a notice of termination pursuant to the provisions of this Section, then the Revolver Commitments shall terminate and Borrowers shall be obligated to repay the Obligations, in full, on the date set forth as the date of termination of this Agreement in such notice.

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Borrower makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects, as of the date hereof, and shall be true, correct, and complete, in all material respects, as of the Closing Date, and at and as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1    **No Encumbrances**.  Each Loan Party has good and indefeasible title to, or a valid leasehold interest in, their personal property assets and good and marketable title to, or a valid leasehold interest in, their Real Property, if any, in each case, free and clear of Liens except for Permitted Liens.

4.2    **Reserved**.

4.3    **Reserved**.

4.4    **Equipment**.  Each material item of Equipment of Loan Parties is used or held for use in their business and is in good working order, ordinary wear and tear and damage by casualty excepted.

4.5    **Location of Inventory and Equipment**.  The Inventory and Equipment (other than vehicles or Equipment out for repair) of Loan Parties are located only at, or in-transit between, the locations identified on Schedule 4.5 (as such Schedule may be updated pursuant to Section 5.9).

4.6    **Inventory Records**.  Each Borrower keeps correct and accurate records itemizing and describing the type, quality, and quantity of its Inventory and the book value thereof.

4.7    **Jurisdiction of Organization; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims**.

(a)    The name of (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of Parent, each Borrower and each of its Subsidiaries is set forth on Schedule 4.7(a) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 6.5).

- 17 -

(b)     The chief executive office of each Loan Party is located at the address indicated on Schedule 4.7(b) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 5.9).

(c)     Each Loan Party's tax identification numbers and organizational identification numbers, if any, are identified on Schedule 4.7(c) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 6.5).

(d)     As of the Closing Date, Loan Parties do not hold any commercial tort claims, except as set forth on Schedule 4.7(d).

4.8     **Due Organization and Qualification; Subsidiaries**.

(a)     Each Borrower is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and qualified to do business in any state where the failure to be so qualified reasonably could be expected to result in a Material Adverse Change.

(b)     Set forth on Schedule 4.8(b) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 5.16), is a complete and accurate description of the authorized capital Stock of each Borrower, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding. Other than as described on Schedule 4.8(b), there are no subscriptions, options, warrants, or calls relating to any shares of each Borrower's capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. No Borrower is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or any security convertible into or exchangeable for any of its capital Stock. Schedule 4.8(b) also sets forth the pledge, if applicable, of such shares of stock which secure either the Revolving Loan Debt and/or the Obligations.

(c)     Set forth on Schedule 4.8(c) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 5.16), is a complete and accurate list of each Borrower's direct and indirect Subsidiaries, showing:  (i) the jurisdiction of their organization, (ii) the number of shares of each class of common and preferred Stock authorized for each of such Subsidiaries, and (iii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by the applicable Borrower.  All of the outstanding capital Stock of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)     Except as set forth on Schedule 4.8(c), there are no subscriptions, options, warrants, or calls relating to any shares of any Borrower's Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument.  No Borrower or any of its respective Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of any Borrower's Subsidiaries' capital Stock or any security convertible into or exchangeable for any such capital Stock.

DLI-6231627v7

4.9    **Due Authorization; No Conflict**.

(a)    As to each Borrower, the execution, delivery, and performance by such Borrower of this Agreement and the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Borrower.

(b)    As to each Borrower, the execution, delivery, and performance by such Borrower of this Agreement and the other Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to any Borrower, the Governing Documents of any Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on any Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Borrower, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of Borrower, other than Permitted Liens, except as contemplated by this Agreement or the Revolving Loan Agreement in accordance with the terms set forth in the Intercreditor Agreement or (iv) require any approval of any Borrower's interest holders or any approval or consent of any Person under any Material Contract of any Borrower, other than consents or approvals that have been obtained and that are still in force and effect.

(c)    Other than the filing of financing statements and other filings or actions necessary to perfect Liens granted to Agent in the Collateral, the execution, delivery, and performance by each Borrower of this Agreement and the other Loan Documents to which such Borrower is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than consents or approvals that have been obtained and that are still in force and effect.

(d)    As to each Borrower, this Agreement and the other Loan Documents to which such Borrower is a party, and all other documents contemplated hereby and thereby, when executed and delivered by such Borrower will be the legally valid and binding obligations of such Borrower, enforceable against such Borrower in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e)    The Agent's Liens are validly created, perfected (other than (i) in respect of motor vehicles and (ii) any Deposit Accounts and Securities Accounts not subject to a Control Agreement as permitted by Section 6.12, and subject only to the filing of financing statements), and first priority Liens, subject only to Permitted Liens.

(f)    The execution, delivery, and performance by each Guarantor of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Guarantor.

(g)    The execution, delivery, and performance by each Guarantor of the Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to such Guarantor, the Governing Documents of such Guarantor, or any order, judgment, or decree of any court or other Governmental Authority

- 19 -

binding on such Guarantor, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of such Guarantor, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of such Guarantor, other than Permitted Liens, or (iv) require any approval of such Guarantor's interest holders or any approval or consent of any Person under any Material Contract of such Guarantor, other than consents or approvals that have been obtained and that are still in force and effect.

(h)     Other than the filing of financing statements and other filings or actions necessary to perfect Liens granted to Agent in the Collateral, the execution, delivery, and performance by each Guarantor of the Loan Documents to which such Guarantor is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than consents or approvals that have been obtained and that are still in force and effect.

(i)     The Loan Documents to which each Guarantor is a party, and all other documents contemplated hereby and thereby, when executed and delivered by such Guarantor will be the legally valid and binding obligations of such Guarantor, enforceable against such Guarantor in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

4.10    **Litigation**.  Other than those matters disclosed on <u>Schedule 4.10</u> and other than matters arising after the Closing Date that reasonably could not be expected to result in a Material Adverse Change, there are no actions, suits, or proceedings pending or, to the knowledge of each Borrower, threatened against any Loan Party.

4.11    **No Material Adverse Change**.  All financial statements relating to Loan Parties that have been delivered by Borrowers to the Lender Group have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments and in the case of Foreign Subsidiaries of Borrowers, which financial statements shall have been prepared in accordance with international accounting standards) and present fairly in all material respects, Loan Parties' respective financial conditions as of the respective date thereof and results of operations for the period then ended.  There has not been a Material Adverse Change with respect to Loan Parties since March 31, 2006.

4.12    **Fraudulent Transfer**.

(a)     Each Loan Party is Solvent.

(b)     No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of Loan Parties.

4.13    **Employee Benefits**.  None of Loan Parties, or any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

4.14    **Environmental Condition**.  Except as set forth on Schedule 4.14, (a) to Borrowers' knowledge, none of Loan Parties' properties or assets has ever been used by Loan Parties, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such use, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to Borrowers' knowledge, none of Loan Parties' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) none of Loan Parties have received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by Loan Parties, and (d) none of Loan Parties have received a summons, citation, notice, or directive from the United States Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by any Loan Parties resulting in the releasing or disposing of Hazardous Materials into the environment.

4.15    **Intellectual Property**.  Each Loan Party owns, or holds licenses in, all trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of its business as currently conducted, and attached hereto as Schedule 4.15 (as updated from time to time) is a true, correct, and complete listing of all material patents, patent applications, trademarks, trademark applications, copyrights, and copyright registrations as to which each Loan Party is the owner or is an exclusive licensee; provided, however, that Borrowers may amend Schedule 4.15 to add additional property so long as such amendment occurs by written notice to Agent not less than 10 days before the date on which a Loan Party acquires any such property after the Closing Date.

4.16    **Leases**.  Loan Parties enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating and all of such material leases are valid and subsisting and no material default by Loan Parties exists under any of them.

4.17    **Deposit Accounts and Securities Accounts**.  Set forth on Schedule 4.17 is a listing of all of Loan Parties' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

4.18    **Complete Disclosure**.  All factual information (taken as a whole) furnished by or on behalf of Borrowers or their Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of Borrowers or their Subsidiaries in writing to Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.  On the Closing Date, the Closing Date Projections represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections represent Borrowers' good faith estimate of their future performance for the periods covered thereby based upon assumptions believed by Borrowers to

- 21 -

be reasonable at the time of the delivery thereof to Agent (it being understood that such projections and forecasts are subject to uncertainties and contingencies, many of which are beyond the control of Borrowers and no assurances can be given that such projections or forecasts will be realized).

4.19   **Indebtedness**.  Set forth on Schedule 4.19 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the Closing Date that is to remain outstanding after the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness and the principal terms thereof.  The Revolving Loan Debt may only be increased after the Closing Date in accordance with the terms of the Intercreditor Agreement and the Revolving Loan Agreement (as in effect on the date hereof or as amended in accordance with the terms of the Intercreditor Agreement).

4.20   **Material Contracts**.  Set forth on Schedule 4.20 is a description of all Material Contracts of Loan Parties, showing the parties and principal subject matter thereof and amendments and modifications thereto; provided, however, that Borrowers may amend Schedule 4.20 to add additional Material Contracts so long as such amendment occurs by written notice to Agent not less than 10 days after the date on which a Loan Party enters into such Material Contract after the Closing Date.  Except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against a Loan Party and, to the best of Loan Parties' knowledge, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified (other than amendments or modifications permitted by Section 6.7(c) and Section 6.7(d)), and (c) is not in default due to the action or inaction of any Loan Party.

5.   **AFFIRMATIVE COVENANTS.**

Each Borrower covenants and agrees that, until termination of all of the Revolver Commitments and payment in full of the Obligations, Borrowers shall and, to the extent applicable, shall cause each other Loan Party to do all of the following:

5.1   **Accounting System**.  Maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP and maintain records pertaining to the Collateral that contain information as from time to time reasonably may be requested by Agent. Borrowers also shall keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their sales and Borrowers shall continue to maintain the Return and Promotion Reserve.

5.2   **Collateral Reporting**.  Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the reports set forth on Schedule 5.2 at the times specified therein. In addition, each Borrower agrees to cooperate fully with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth above.

5.3    **Financial Statements, Reports, Certificates**.  Deliver to Agent, with copies to each Lender, each of the financial statements, reports, or other items set forth on Schedule 5.3 at the times specified therein.

5.4    **[Intentionally Omitted]**

5.5    **Inspection**.  Permit Agent, each Lender, and each of their duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Agent or any such Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Administrative Borrower.

5.6    **Maintenance of Properties**.  Maintain and preserve all of their properties which are necessary or useful in the proper conduct of their business in good working order and condition, ordinary wear, tear, and casualty excepted (and except where the failure to do so could not reasonably be expected to result in a Material Adverse Change), and comply at all times with the provisions of all material leases to which it is a party as lessee, so as to prevent any loss or forfeiture thereof or thereunder.

5.7    **Taxes**.  Cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Loan Parties, or any of their respective assets to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest.  Borrowers will and will cause the other Loan Parties to make timely payment or deposit of all tax payments and withholding taxes required of them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Agent with proof satisfactory to Agent indicating that the applicable Loan Party has made such payments or deposits.

5.8    **Insurance**.

(a)    At Borrowers' expense, maintain insurance respecting their and their Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses.  Borrowers also shall maintain public liability, and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. Within 60 days of the Closing Date, Borrowers shall obtain, and thereafter maintain, business interruption insurance, to the extent such insurance is available to the Borrowers on commercially reasonable terms, unless waived by Agent in its Permitted Discretion.  All such policies of insurance shall be in such amounts and with such insurance companies as are customary for companies of similar size and business to the Borrowers and reasonably satisfactory to Agent.  Borrowers shall deliver copies of all such policies to Agent with an endorsement naming Agent as loss payee (under a satisfactory lender's loss payable endorsement) or additional insured, as appropriate.  Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days prior written notice to Agent in the event of cancellation of the policy for any reason whatsoever, other than

cancellation due to nonpayment of premium in which case the policy shall provide for not less than 10 days prior written notice to Agent.

(b)    Administrative Borrower shall give Agent prompt notice of any loss exceeding $100,000 covered by such insurance.  So long as no Event of Default has occurred and is continuing, Borrowers shall have the exclusive right to adjust any losses payable under any such insurance policies which are less than $250,000.  Following the occurrence and during the continuation of an Event of Default, or in the case of any losses payable under such insurance exceeding $250,000, Agent shall have the exclusive right, subject to the terms and conditions of the Intercreditor Agreement to adjust any losses payable under any such insurance policies, without any liability to Borrowers whatsoever in respect of such adjustments; provided, that, if the loss exceeds $250,000 but is less than $500,000 and no Event of Default has occurred and is continuing, Borrower may agree to the adjustment of any such loss with the consent of the Agent, which consent shall not be unreasonably withheld.

5.9    **Location of Inventory and Equipment**.  Keep Loan Parties' Inventory and Equipment (other than vehicles and Equipment out for repair) only at the locations identified on Schedule 4.5 and their chief executive offices only at the locations identified on Schedule 4.7(b); provided, however, that Administrative Borrower may amend Schedule 4.5 or Schedule 4.7 so long as such amendment occurs by written notice to Agent not less than 20 days prior to the date on which such Inventory or Equipment is moved to such new location or such chief executive office is relocated, so long as such new location is within the continental United States, and so long as, at the time of such written notification, the applicable Borrower provides Agent (or Revolving Loan Agent) a Collateral Access Agreement with respect thereto.

5.10    **Compliance with Laws**.  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.11    **Leases**.  Pay when due all rents and other amounts payable under any material leases to which any Loan Party is a party or by which any Loan Party's properties and assets are bound, unless such payments are the subject of a Permitted Protest.

5.12    **Existence**.  At all times preserve and keep in full force and effect each Loan Party's, valid existence and good standing and, except as could not reasonably be expected to result in a Material Adverse Change, any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

5.13    **Environmental**.  (a) Keep any property either owned or operated by any Loan Party free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens, (b) comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests, (c) promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party and take any Remedial Actions required to abate said release or otherwise to come into compliance with applicable Environmental Law, and (d) promptly, but in any event within 5

- 24 -

days of its receipt thereof, provide Agent with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party, (ii) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party, and (iii) notice of a violation, citation, or other administrative order which reasonably could be expected to result in a Material Adverse Change.

5.14    **Disclosure Updates**.  Promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to the Lender Group contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.15    **Control Agreements**.  Subject to the Intercreditor Agreement, take all reasonable steps in order for Agent to obtain control in accordance with Sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the Code with respect to (subject to the proviso contained in <u>Section 6.12</u>) all of its Securities Accounts, Deposit Accounts, electronic chattel paper, investment property, and letter-of-credit rights.  At any time prior to the payment in full of the Revolving Loan Debt and the termination or expiration of all commitments to lend under the Revolving Loan Documents, as long as the Revolving Loan Agent is a party to such control agreements, this covenant shall be satisfied for each US Borrower and US Guarantor.

5.16    **Formation of Subsidiaries**.  At the time that any Borrower or any Guarantor forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date, such Borrower or such Guarantor shall (a) cause such new Subsidiary to provide to Agent a joinder to this Agreement and the Guaranty, together with such other security documents (including Mortgages with respect to any Real Property of such new Subsidiary), as well as appropriate financing statements (and with respect to all property subject to a Mortgage, fixture filings), all in form and substance satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Agent a pledge agreement and appropriate certificates and powers or financing statements, hypothecating all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Agent, and (c) provide to Agent all other documentation, including one or more opinions of counsel satisfactory to Agent, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all property subject to a Mortgage).  Any document, agreement, or instrument executed or issued pursuant to this <u>Section 5.16</u> shall be a Loan Document.

5.17    **Further Assurances**.  At any time upon the request of Agent, Borrowers shall execute or deliver to Agent, and shall cause Guarantors to execute or deliver to Agent, any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "<u>Additional Documents</u>") that Agent may request in form and substance

reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect the Agent's Liens in all of the properties and assets of Borrowers and Guarantors (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent in any Real Property acquired by Borrowers or Guarantors ,after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents.

5.18    **Material Contracts**.  Contemporaneously with the delivery of each Compliance Certificate pursuant hereto, provide Agent with copies of (a) each Material Contract entered into since the delivery of the previous Compliance Certificate, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previous Compliance Certificate.

5.19    **License Agreements**.

(a)    Each Borrower and Guarantor shall (i) promptly and faithfully observe and perform all of the material terms, covenants, conditions and provisions of the material License Agreements to which it is a party to be observed and performed by it, at the times set forth therein, if any, (ii) not do, permit, suffer or refrain from doing anything that could reasonably be expected to result in a default under or breach of any of the terms of any material License Agreement, (iii) not cancel, surrender, modify, amend, waive or release any material License Agreement in any material respect or any term, provision or right of the licensee thereunder in any material respect, or consent to or permit to occur any of the foregoing; except, that, subject to Section 5.19(b) hereof, such Borrower or Guarantor may cancel, surrender or release any material License Agreement in the ordinary course of the business of such Borrower or Guarantor; provided, that, such Borrower or Guarantor (as the case may be) shall give Agent not less than thirty (30) days prior written notice of its intention to so cancel, surrender and release any such material License Agreement, (iv) give Agent prompt written notice of any material License Agreement entered into by such Borrower or Guarantor after the date hereof, together with a true, correct and complete copy thereof and such other information with respect thereto as Agent may request, (v) give Agent prompt written notice of any material breach of any obligation, or any default, by any party under any material License Agreement, and deliver to Agent (promptly upon the receipt thereof by such Borrower or Guarantor in the case of a notice to such Borrower or Guarantor and concurrently with the sending thereof in the case of a notice from such Borrower or Guarantor) a copy of each notice of default and every other notice and other communication received or delivered by such Borrower or Guarantor in connection with any material License Agreement which relates to the right of such Borrower or Guarantor to continue to use the property subject to such License Agreement, and (vi) furnish to Agent, promptly upon the request of Agent, such information and evidence as Agent may reasonably require from time to time concerning the observance, performance and compliance by such Borrower or Guarantor or the other party or parties thereto with the material terms, covenants or provisions of any material License Agreement.

(b)    Each Borrower and Guarantor will either exercise any option to renew or extend the term of each material License Agreement to which it is a party in such manner as will cause the term of such material License Agreement to be effectively renewed or extended for the period provided by such option and give prompt written notice thereof to Agent or give Agent

prior written notice that such Borrower or Guarantor does not intend to renew or extend the term of any such material License Agreement or that the term thereof shall otherwise be expiring, not less than sixty (60) days prior to the date of any such non renewal or expiration.  In the event of the failure of such Borrower or Guarantor to extend or renew any material License Agreement to which it is a party, Agent shall have, and is hereby granted, the irrevocable right and authority, at its option, to renew or extend the term of such material License Agreement, whether in its own name and behalf, or in the name and behalf of a designee or nominee of Agent or in the name and behalf of such Borrower or Guarantor, as Agent shall determine at any time that an Event of Default shall exist or have occurred and be continuing.  Agent may, but shall not be required to, perform any or all of such obligations of such Borrower or Guarantor under any of the License Agreements, including, but not limited to, the payment of any or all sums due from such Borrower or Guarantor thereunder.  Any sums so paid by Agent shall constitute part of the Obligations.

6.    **NEGATIVE COVENANTS.**

Each Borrower covenants and agrees that, until termination of all of the Revolver Commitments and payment in full of the Obligations, Borrowers will not and will not permit any other Loan Party to do any of the following:

6.1    **Indebtedness**.  Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a)    Indebtedness evidenced by this Agreement and the other Loan Documents,

(b)    Indebtedness set forth on Schedule 4.19 and any Refinancing Indebtedness in respect of such Indebtedness,

(c)    Permitted Purchase Money Indebtedness and any Refinancing Indebtedness in respect of such Indebtedness,

(d)    endorsement of instruments or other payment items for deposit,

(e)    Revolving Loan Debt;

(f)    rental obligations with respect to leased Real Property; and

(g)    Indebtedness composing Permitted Investments.

6.2    **Liens**.  Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes**.

(a)    Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify their Stock, except for mergers of (i) a Borrower into a Borrower or (ii) a Guarantor into a Borrower or a Guarantor,

- 27 -

(b)    Liquidate, wind up, or dissolve themselves (or suffer any liquidation or dissolution),

(c)    (i) With respect to any Borrower, suspend or go out of a substantial portion of its or their business or (ii) with respect to all Loan Parties, suspend or go out of a substantial portion of the Business of the Loan Parties taken as a whole.

6.4    **Disposal of Assets**.  Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of the assets of any Loan Party.

6.5    **Change Name**.  Change any Loan Party's name, organizational identification number, state of organization or organizational identity; provided, however, that a Borrower or Guarantor may change its name upon at least 30 days prior written notice by Administrative Borrower to Agent of such change and so long as, at the time of such written notification, such Borrower or such Guarantor provides any financing statements necessary to perfect and continue perfected the Agent's Liens.

6.6    **Nature of Business**.  Make any material change in the nature of their business as described in Schedule 6.6 or acquire any material properties or assets that are not reasonably related to the conduct of such business activities.

6.7    **Prepayments and Amendments**.  Except in connection with Refinancing Indebtedness permitted by *Section 6.1*,

(a)    optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party, other than (i) the Obligations in accordance with this Agreement and the Revolving Loan Debt in accordance with the Revolving Loan Agreement or (ii) intercompany loans among the Loan Parties to the extent permitted under the Intercompany Subordination Agreement,

(b)    make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions,

(c)    directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of (i) any agreement, instrument, document, indenture, or other writing evidencing or concerning Indebtedness permitted under Section 6.1(b) or (c), or (ii) any other Material Contract except to the extent that such amendment, modification, alteration, increase, or change could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change; or

(d)    directly or indirectly, amend, modify, alter, or change any of the terms or conditions of the Revolving Loan Documents to the extent that the Intercreditor Agreement prohibits the holders of the Revolving Loan Debt from so amending, modifying or supplementing the same.

- 28 -

6.8    **Change of Control**.  Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9    **Consignments**.  (a) Consign any of their Inventory, or (b) sell any of their Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale, other than with respect to sales of Inventory on bill and hold in an aggregate amount not to exceed $500,000 in any fiscal year and so long as such sales are pursuant to written agreements provided to Agent.

6.10    **Distributions**.  Other than distributions or declaration and payment of dividends by a Loan Party to a Borrower or by a Loan Party that is not a Borrower to another Loan Party that is not a Borrower, make any distribution or declare or pay any dividends (in cash or other property, other than common Stock) on, or purchase, acquire, redeem, or retire any of any Borrower's Stock, of any class, whether now or hereafter outstanding.

6.11    **Accounting Methods**.  Modify or change their fiscal year or their method of accounting (other than as may be required to conform to GAAP, and with respect to Foreign Subsidiaries, other than as may be required to comply with applicable international accounting standards).

6.12    **Investments**.  Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment; provided, however, that U.S. Borrowers and U.S. Guarantors shall not have Permitted Investments (other than in the Cash Management Accounts) in Deposit Accounts or Securities Accounts in an aggregate amount in excess of $10,000 at any one time unless such Borrower or such Guarantor, as applicable, and the applicable securities intermediary or bank have entered into Control Agreements governing such Permitted Investments in order to perfect (and further establish) the Agent's, or, at any time prior to the payment in full of the Revolving Loan Debt and the termination or expiration of all commitments to lend under the Revolving Loan Documents, Revolving Loan Agent's Liens in such Permitted Investments. Subject to the foregoing proviso, Borrowers shall not and shall not permit the Guarantors to establish or maintain any Deposit Account or Securities Account unless Agent or, at any time prior to the payment in full of the Revolving Loan Debt and the termination or expiration of all commitments to lend under the Revolving Loan Documents, Revolving Loan Agent shall have received a Control Agreement in respect of such Deposit Account or Securities Account.

6.13    **Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party except for:

(a)    transactions (other the payment of management, consulting, monitoring, or advisory fees) between Loan Parties, on the one hand, and any Affiliate of Loan Parties, on the other hand, so long as such transactions (i) are upon fair and reasonable terms, (ii) are fully disclosed to Agent if they involve one or more payments by any Loan Party in excess of $100,000 for any single transaction or in excess of $250,000 for any series of transactions, and (iii) are no less favorable to Loan Parties, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate;

(i)　　　Dana US may sell goods to Dana Classic Fragrances Canada, Inc. ("Dana Canada") in the ordinary course of business; provided, that, (a) no Event of Default shall exist or would result therefrom, (b) the sales price for such goods shall be no less than Dana US' cost of such goods, (c) the payment terms of any such sale shall be no less favorable to Dana US than payment within sixty (60) days of the original invoice date, (d) no payables owing by Dana Canada to Dana US shall be more than one hundred twenty (120) days past the original invoice date or more than sixty (60) days past the due date, (e) the aggregate outstanding amount of the payables in respect of such goods owing by Dana Canada to Dana US shall not exceed $400,000 at any time, and (f) the aggregate sales of goods sold by Dana US to Dana Canada shall not exceed $1,200,000 in any fiscal year;

(ii)　　　Borrowers may sell goods to Jan Bell de Mexico ("Dana Mexico") in the ordinary course of business; provided, that, (a) no Event of Default shall exist or would result therefrom, (b) the sales price for such goods shall be no less than the applicable Borrower's cost of such goods, (c) the payment terms of any such sale shall be no less favorable to Borrowers than payment within ninety (90) days of the original invoice date, (d) no payables owing by Dana Mexico to either Borrower shall be more than one hundred fifty (150) days past the original invoice date or more than sixty (60) days past the due date, (e) the aggregate outstanding amount of the payables in respect of such goods owing by Dana Mexico to Borrowers shall not exceed $1,000,000 at any time, and the aggregate sales of goods sold by Borrowers to Dana Mexico shall not exceed $2,500,000 in any fiscal year;

(iii)　　　the license agreements listed on Schedule 6.13 hereto and renewals and extensions of such license agreements;

(b)　　　the transactions expressly permitted by Sections 6.1 and 6.12 hereof;

(c)　　　reasonable compensation to officers, employees and directors for services rendered to such Borrower or Loan Party in the ordinary course of business; and

(d)　　　the payment of reasonable fees, compensation, or employee benefit arrangements to, and any indemnity provided for the benefit of, outside directors of Parent in the ordinary course of business and consistent with industry practice.

6.14　　**Use of Proceeds**.  Use the proceeds of the Loan for any purpose other than, consistent with the terms and conditions hereof, lawful and permitted purposes.

6.15　　**Inventory and Equipment with Bailees**.  Store the Inventory or Equipment of Borrowers at any time now or hereafter with a bailee, warehouseman, or similar party, unless the applicable Borrower has provided Agent (or Revolving Loan Agent) with a Collateral Access Agreement with respect thereto; provided, however, that the Borrowers shall use their best efforts to obtain executed Collateral Access Agreements with each bailee, warehouseman or similar party prior to the Closing Date, but, in the event that such agreements cannot be obtained without unreasonable effort or expense, the Borrowers shall deliver such agreements within 30 days following the Closing Date.

6.16　　**Financial Covenants**.  With respect to the Borrowers only, the Borrowers shall not:

(a)    **Minimum EBITDA.**  Fail to achieve EBITDA, measured on a month-end basis, of at least the amount set forth in the following table for the applicable period set forth opposite thereto:

| Applicable Amount | Applicable Period |
|---|---|
| $199,000 | For the three month period ending June 30, 2008 |
| $444,000 | For the four month period ending July 31, 2008 |
| $1,165,000 | For the five month period ending August 31, 2008 |
| $2,041,000 | For the six month period ending September 30, 2008 |
| $3,701,000 | For the seven month period ending October 31, 2008 |
| $4,716,000 | For the eight month period ending November 30, 2008 |
| $5,028,000 | For the nine month period ending December 31, 2008 |
| $5,178,000 | For the ten month period ending January 31, 2009 |
| $5,338,000 | For the eleven month period ending February 28, 2009 |
| $5,618,000 | For the twelve month period ending March 31, 2009 |

(b)    **Fixed Charge Coverage Ratio.**  Have a Fixed Charge Coverage Ratio, measured on a month-end basis, less than the required amount set forth in the following table for the applicable period set forth opposite thereto:

| Applicable Ratio | Applicable Period |
|---|---|
| 0.21:1.0 | For the three month period ending June 30, 2008 |
| 0.36:1.0 | For the four month period ending July 31, 2008 |
| 0.78:1.0 | For the five month period ending August 31, 2008 |
| 1.15:1.0 | For the six month period ending September 30, 2008 |
| 1.80:1.0 | For the seven month period ending October 31, 2008 |
| 2.02:1.0 | For the eight month period ending November 30, 2008 |
| 1.93:1.0 | For the nine month period ending December 31, 2008 |
| 1.81:1.0 | For the ten month period ending January 31, 2009 |
| 1.72:1.0 | For the eleven month period ending February 28, 2009 |
| 1.67:1.0 | For the twelve month period ending March 31, 2009 |

(c)    **Capital Expenditures.**  Make Capital Expenditures in any fiscal year in excess of $500,000.

- 31 -

6.17    **Immaterial Subsidiaries**.  Permit any Immaterial Subsidiary to (i) engage in any type of business activity or (ii) own assets with a fair market value in excess of $250,000, in either case other than (x) Investments in Persons that are not Borrowers or Guarantors and (y) the ownership and license of Intellectual Property not used in, or necessary for, the Borrowers' business.

## 7.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

7.1    If Borrowers fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, or (b) all or any portion of the principal of the Obligations;

7.2    If, to the extent applicable, any Loan Party

(a)    fails to perform or observe any covenant or other agreement contained in any of Sections 2.7, 5.2, 5.3, 5.5., 5.8, 5.12, 5.14, 6.1 through 6.17 and Article X of this Agreement;

(b)    fails to perform or observe any covenant or other agreement contained in any of Sections 5.6, 5.7, 5.9, 5.10, 5.11, 5.15, 5.16, 5.17 and 5.19 of this Agreement and such failure continues for a period of 15 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) written notice thereof is given to Administrative Borrower by Agent; or

(c)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 7 (in which event such other provision of this Section 7 shall govern), and such failure continues for a period of 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) written notice thereof is given to Administrative Borrower by Agent;

7.3    If any material portion of any Loan Party's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by such Loan Party;

7.4    If an Insolvency Proceeding is commenced by any Loan Party;

7.5    If an Insolvency Proceeding is commenced against any Loan Party, and any of the following events occur:  (a) the applicable Loan Party consents to the institution of such

Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, any Loan Party, or (e) an order for relief shall have been issued or entered therein;

7.6     If any Loan Party is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

7.7     If one or more judgments, orders, or awards involving an aggregate amount of $250,000, or more (except to the extent covered by insurance pursuant to which the insurer has accepted liability therefor in writing) shall be entered or filed against any Loan Party or with respect to any of their respective assets, and the same is not released, discharged, bonded against, or stayed pending appeal before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such asset is subject to being forfeited by the applicable Loan Party;

7.8     If there is (a) a default in one or more agreements to which any Loan Party is a party with one or more third Persons relative to Indebtedness of any Loan Party involving an aggregate amount of $250,000 or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person(s), irrespective of whether exercised, to accelerate the maturity of the applicable Loan Party's obligations thereunder or (b) an "Event of Default" arising under and as defined in any Revolving Loan Document;

7.9     If any warranty, representation or statement made in this Agreement or in any other Loan Document or delivered to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date made or deemed to be made;

7.10    If the obligation of any Guarantor under the Guaranty is limited (except as expressly set forth in such Guaranty) or terminated by operation of law or by such Guarantor, or any such Guarantor becomes the subject of an Insolvency Proceeding;

7.11    If Article 10 of this Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in the Collateral covered hereby or thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

7.12    Any material provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Borrower or any Subsidiary of a Borrower, or a proceeding shall be commenced by any Borrower or any Subsidiary of a Borrower, or by any Governmental Authority having jurisdiction over any Borrower or any Subsidiary of a Borrower, seeking to establish the

DLI-6231627v7

invalidity or unenforceability thereof, or any Borrower or any Subsidiary of a Borrower shall deny that it has any liability or obligation purported to be created under any Loan Document; or

7.13    Parent engages in any type of business activity other than the ownership of the Stock of its Subsidiaries and other activities reasonably incidental to its Investment therein, the performance of ministerial activities, and performance of its obligations under the Loan Documents and Revolving Loan Documents to which it is a party.

## 8.    THE LENDER GROUP'S RIGHTS AND REMEDIES.

8.1    **Rights and Remedies**.  Subject to the terms and conditions set forth in the Intercreditor Agreement, upon the occurrence, and during the continuation, of an Event of Default, the Required Lenders (at their election but without notice of their election and without demand) may authorize and instruct Agent to do any one or more of the following on behalf of the Lender Group (and Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of the Lender Group), all of which are authorized by Borrowers:

(a)    Declare all or any portion of the Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

(b)    Terminate the Revolver Commitments or cease advancing money or extending credit to or for the benefit of Borrowers under this Agreement, under any of the Loan Documents, or under any other agreement between Borrowers and the Lender Group;

(c)    Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender Group, but without affecting any of the Agent's Liens in the Collateral and without affecting the Obligations; and

(d)    The Lender Group shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in Section 7.4 or Section 7.5, in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lender Group, the Revolver Commitments shall automatically terminate and the Obligations then outstanding, together with all accrued and unpaid interest thereon and all fees and all other amounts due under this Agreement and the other Loan Documents, shall automatically and immediately become due and payable, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrowers, subject to the Intercreditor Agreement.

8.2    **Remedies Cumulative**.  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver.  No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

- 34 -

9. **TAXES AND EXPENSES.**

If any Loan Party fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement (subject to any Permitted Protest), then, Agent, in its sole discretion and without prior notice to any Borrower, may do any or all of the following:  (a) make payment of the same or any part thereof or (b) in the case of the failure to comply with <u>Section 5.8</u> hereof, obtain and maintain insurance policies of the type described in <u>Section 5.8</u> and take any action with respect to such policies as Agent deems prudent in its Permitted Discretion.  Any such amounts paid by Agent shall constitute Lender Group Expenses and any such payments shall not constitute an agreement by the Lender Group to make similar payments in the future or a waiver by the Lender Group of any Event of Default under this Agreement.  Agent need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

10. **GRANT AND PERFECTION OF SECURITY INTEREST**

10.1    **Grant of Security Interest**.  To secure payment and performance of all Obligations, each US Borrower and US Guarantor has granted to Agent, for itself and the benefit of Lenders pursuant to the Existing Loan Agreement and other Loan Documents and hereby confirms and reaffirms to Agent, for itself and for the benefit of Lenders, a continuing security interest in, a lien upon, and a right of set off against, and hereby collaterally assigns to Agent, for itself and the benefit of Lenders, a security interest in, all personal and real property and fixtures, and interests in property and fixtures, of each US Borrower and US Guarantor, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by Agent or any Lender from any Person, collectively, the "<u>Collateral</u>"), including:

(a)    all Accounts;

(b)    all general intangibles, including, without limitation, all Intellectual Property;

(c)    all goods, including, without limitation, Inventory and Equipment;

(d)    all Real Property and fixtures;

(e)    all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(f)    all instruments, including, without limitation, all promissory notes;

(g)    all documents;

(h)    all deposit accounts;

(i)     all letters of credit, banker's acceptances and similar instruments and including all letter of credit rights;

(j)     all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Accounts and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Accounts or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(k)     all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of any US Borrower or US Guarantor now or hereafter held or received by or in transit to Agent, any Lender or its Affiliates or at any other depository or other institution from or for the account of any US Borrower or US Guarantor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(l)     all commercial tort claims, including, without limitation, those identified in the Information Certificate;

(m)     to the extent not otherwise described above, all Accounts;

(n)     all Records; and

(o)     all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

Notwithstanding anything to the contrary contained in this <u>Section 10.1</u>, (i) the payment and performance of all Obligations are further secured by the grant of a security interest in the Spanish Collateral pursuant to certain other Loan Documents; and (ii) the payment and performance of all Obligations are further secured by the grant of a security interest in certain Collateral by Foreign Guarantors in favor of Agent under the laws of The Netherlands and Iceland pursuant to certain other Loan Documents.

10.2     **Perfection of Security Interests**.  Subject to the terms and conditions of the Intercreditor Agreement,

(a)     Each Borrower and Guarantor irrevocably and unconditionally authorizes Agent (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming Agent or its designee as the secured party and such Borrower or Guarantor as debtor, as Agent may require, and including any other information with respect to such Borrower or Guarantor or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction as Agent may determine, together with any amendment

DLI-6231627v7

and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof.  Each Borrower and Guarantor hereby ratifies and approves all financing statements naming Agent or its designee as secured party and such Borrower or Guarantor, as the case may be, as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of Agent prior to the date hereof and ratifies and confirms the authorization of Agent to file such financing statements (and amendments, if any).  Each Borrower and Guarantor hereby authorizes Agent to adopt on behalf of such Borrower and Guarantor any symbol required for authenticating any electronic filing.  In the event that the description of the collateral in any financing statement naming Agent or its designee as the secured party and any Borrower or Guarantor as debtor includes assets and properties of such Borrower or Guarantor that do not at any time constitute Collateral, whether hereunder, under any of the other Loan Documents or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by such Borrower or Guarantor to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral.  In no event shall any Borrower or Guarantor at any time file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming Agent or its designee as secured party and such Borrower or Guarantor as debtor.

(b)     Each US Borrower and US Guarantor does not have any chattel paper (whether tangible or electronic) or instruments as of the date hereof, except as set forth in the Information Certificate.  In the event that any US Borrower or US Guarantor shall be entitled to or shall receive any chattel paper or instrument after the date hereof, US Borrowers and US Guarantors shall promptly notify Agent thereof in writing.  Promptly upon the receipt thereof by or on behalf of any US Borrower or US Guarantor (including by any agent or representative), such US Borrower or US Guarantor shall deliver, or cause to be delivered to Agent, all tangible chattel paper and instruments that such US Borrower or US Guarantor has or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify, in each case except as Agent may otherwise agree.  At Agent's option, each US Borrower and US Guarantor shall, or Agent may at any time on behalf of any US Borrower or US Guarantor, cause the original of any such instrument or chattel paper to be conspicuously marked in a form and manner acceptable to Agent with the following legend referring to chattel paper or instruments as applicable:  "This [chattel paper][instrument] is subject to the security interest of Patriarch Partners Agency Services, LLC, as Agent, and any sale, transfer, assignment or encumbrance of this [chattel paper][instrument] violates the rights of such secured party."

(c)     In the event that any US Borrower or US Guarantor shall at any time hold or acquire an interest in any electronic chattel paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), such US Borrower or US Guarantor shall promptly notify Agent thereof in writing.  Promptly upon Agent's request, such US Borrower or US Guarantor shall take, or cause to be taken, such actions as Agent may request to give Agent control of such electronic chattel paper under Section 9 105 of the Code and control of such transferable record under Section 201 of the

Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

(d)    (i)    Each US Borrower and US Guarantor does not have any deposit accounts as of the date hereof, except as set forth in the Information Certificate.

(ii)    At any time after the Revolving Loan Debt has been repaid in full and all commitments to lend under the Revolving Loan Documents have expired or been terminated, US Borrowers and US Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any deposit account unless each of the following conditions is satisfied:  (i) Agent shall have received not less than five (5) Business Days prior written notice of the intention of any US Borrower or US Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Agent the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom such US Borrower or US Guarantor is dealing and the purpose of the account, (ii) the bank where such account is opened or maintained shall be acceptable to Agent, and (iii) on or before the opening of such deposit account by any US Borrower or US Guarantor, such US Borrower or US Guarantor shall as Agent may specify either (A) deliver to Agent a Deposit Account Control Agreement with respect to such deposit account duly authorized, executed and delivered by such US Borrower or US Guarantor and the bank at which such deposit account is opened and maintained or (B) arrange for Agent to become the customer of the bank with respect to the deposit account on terms and conditions acceptable to Agent.  The terms of this subsection (d) shall not apply to deposit accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any US Borrower's or US Guarantor's salaried employees.

(e)    No US Borrower or US Guarantor owns or holds, directly or indirectly, beneficially or as record owner or both, any investment property, as of the date hereof, or have any investment account, securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the date hereof, in each case except as set forth in the Information Certificate.

(i)    In the event that any US Borrower or US Guarantor shall be entitled to or shall at any time after the date hereof hold or acquire any certificated securities (excluding certificated securities representing equity interests in either of the Excluded Subsidiaries), such US Borrower or US Guarantor shall promptly endorse, assign and deliver the same to Agent, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify.  If any securities (excluding securities representing equity interests in either of the Excluded Subsidiaries), now or hereafter acquired by any US Borrower or US Guarantor are uncertificated and are issued to such US Borrower or US Guarantor or its nominee directly by the issuer thereof, such US Borrower or US Guarantor shall immediately notify Agent thereof and shall as Agent may specify, either (A) cause the issuer to agree to comply with instructions from Agent as to such securities, without further consent of any Borrower or Guarantor or such nominee, or (B) arrange for Agent to become the registered owner of the securities.

(ii)    At any time after the Revolving Loan Debt has been repaid in full and all commitments to lend under the Revolving Loan Documents have expired or been terminated, US Borrowers and US Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any investment account, securities account, commodity account or any other similar account (other than a deposit account) with any securities intermediary or commodity intermediary unless each of the following conditions is satisfied: (A) Agent shall have received not less than five (5) Business Days prior written notice of the intention of such US Borrower or US Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Agent the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom such US Borrower or US Guarantor is dealing and the purpose of the account, (B) the securities intermediary or commodity intermediary (as the case may be) where such account is opened or maintained shall be acceptable to Agent, and (C) on or before the opening of such investment account, securities account or other similar account by any US Borrower or US Guarantor with a securities intermediary or commodity intermediary, such US Borrower or US Guarantor shall as Agent may specify either (1) execute and deliver, and cause to be executed and delivered to Agent, an Investment Property Control Agreement with respect thereto duly authorized, executed and delivered by such US Borrower or US Guarantor and such securities intermediary or commodity intermediary or (2) arrange for Agent to become the entitlement holder with respect to such investment property on terms and conditions acceptable to Agent.

(f)    US Borrowers and US Guarantors are not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the date hereof, except as set forth in the Information Certificate.  In the event that any US Borrower or US Guarantor shall be entitled to or shall receive any right to payment under any letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise after the date hereof, such US Borrower or US Guarantor shall promptly notify Agent thereof in writing.  Such US Borrower or US Guarantor shall immediately, as Agent may specify, either (i) deliver, or cause to be delivered to Agent, with respect to any such letter of credit, banker's acceptance or similar instrument, the written agreement of the issuer and any other nominated person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance satisfactory to Agent, consenting to the assignment of the proceeds of the letter of credit to Agent by such US Borrower or US Guarantor and agreeing to make all payments thereon directly to Agent or as Agent may otherwise direct or (ii) cause Agent to become, at Borrowers' expense, the transferee beneficiary of the letter of credit, banker's acceptance or similar instrument (as the case may be).

(g)    US Borrowers and US Guarantors do not have any commercial tort claims as of the date hereof, except as set forth in the Information Certificate.  In the event that any US Borrower or US Guarantor shall at any time after the date hereof have any commercial tort claims, such US Borrower or US Guarantor shall promptly notify Agent thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by such US Borrower or US Guarantor to Agent of a security interest in such commercial tort claim (and the proceeds thereof).  In the event that such notice does not include such grant of a security interest, the sending thereof by such US

- 39 -

Borrower or US Guarantor to Agent shall be deemed to constitute such grant to Agent. Upon the sending of such notice, any commercial tort claim described therein shall constitute part of the Collateral and shall be deemed included therein. Without limiting the authorization of Agent provided in <u>Section 5.2(a)</u> hereof or otherwise arising by the execution by such Borrower or Guarantor of this Agreement or any of the other Loan Documents, Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming Agent or its designee as secured party and such Borrower or Guarantor as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral. In addition, each Borrower and Guarantor shall promptly upon Agent's request, execute and deliver, or cause to be executed and delivered, to Agent such other agreements, documents and instruments as Agent may require in connection with such commercial tort claim.

(h)     US Borrowers and US Guarantors do not have any goods, documents of title or other Collateral in the custody, control or possession of a third party as of the date hereof, except as set forth in the Information Certificate and except for goods in transit to a location of a Borrower or Guarantor permitted herein in the ordinary course of business of such Borrower or Guarantor in the possession of the carrier transporting such goods. In the event that any goods, documents of title or other Collateral of any US Borrower or US Guarantor are at any time after the date hereof in the custody, control or possession of any other person not referred to in the Information Certificate or such carriers, US Borrowers and US Guarantors shall promptly notify Agent thereof in writing. Promptly upon Agent's request, US Borrowers and US Guarantors shall use reasonable efforts to deliver to Agent a Collateral Access Agreement duly authorized, executed and delivered by such person and the US Borrower or US Guarantor that is the owner of such Collateral.

(i)     Borrowers and Guarantors shall take any other actions reasonably requested by Agent from time to time to cause the attachment, perfection and first priority of, and the ability of Agent to enforce, the security interest of Agent in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Code or other applicable law, to the extent, if any, that any Borrower's or Guarantor's signature thereon is required therefore, (ii) causing Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, and (iv) use its reasonable efforts to obtain the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the Code or by other law, as applicable in any relevant jurisdiction

10.3     **Power of Attorney**. Each Borrower and Guarantor hereby irrevocably designates and appoints Agent (and all persons designated by Agent) as such Borrower's and Guarantor's true and lawful attorney in fact, and authorizes Agent, in such Borrower's, Guarantor's or Agent's name, to: (a) at any time an Event of Default exists or has occurred and is continuing (i) demand payment on Accounts or other Collateral, (ii) enforce payment of Accounts by legal

- 40 -

proceedings or otherwise, (iii) exercise all of such Borrower's or Guarantor's rights and remedies to collect any Receivable or other Collateral, (iv) sell or assign any Receivable upon such terms, for such amount and at such time or times as Agent deems advisable, (v) settle, adjust, compromise, extend or renew an Account, (vi) discharge and release any Receivable, (vii) prepare, file and sign such Borrower's or Guarantor's name on any proof of claim in bankruptcy or other similar document against an account debtor or other obligor in respect of any Accounts or other Collateral, (viii) notify the post office authorities to change the address for delivery of remittances from account debtors or other obligors in respect of Accounts or other proceeds of Collateral to an address designated by Agent, and open and dispose of all mail addressed to such Borrower or Guarantor and handle and store all mail relating to the Collateral; and (ix) do all acts and things which are necessary, in Agent's determination, to fulfill such Borrower's or Guarantor's obligations under this Agreement and the other Loan Documents and (b) at any time to (i) take control in any manner of any item of payment in respect of Accounts or constituting Collateral or otherwise received in or for deposit in the Blocked Accounts or otherwise received by Agent or any Lender, (ii) have access to any lockbox or postal box into which remittances from account debtors or other obligors in respect of Accounts or other proceeds of Collateral are sent or received, (iii) endorse such Borrower's or Guarantor's name upon any items of payment in respect of Accounts or constituting Collateral or otherwise received by Agent and any Lender and deposit the same in Agent's account for application to the Obligations, (iv) endorse such Borrower's or Guarantor's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Receivable or any goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non negotiable documents, (v) clear Inventory through U.S. Customs or foreign export control authorities in such Borrower's or Guarantor's name, Agent's name or the name of Agent's designee, and to sign and deliver to customs officials powers of attorney in such Borrower's or Guarantor's name for such purpose, and to complete in such Borrower's or Guarantor's or Agent's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, and (vi) sign such Borrower's or Guarantor's name on any verification of Accounts and notices thereof to account debtors or any secondary obligors or other obligors in respect thereof.  Each Borrower and Guarantor hereby releases Agent and Lenders and their respective officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Agent's or any Lender' s own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

10.4    **Right to Cure**.  Agent may, at its option, upon notice to Administrative Borrower, (a) cure any default by any Borrower or Guarantor under any material agreement with a third party that affects the Collateral, its value or the ability of Agent to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Agent or any Lender therein or the ability of any Borrower or Guarantor to perform its obligations hereunder or under any of the other Loan Documents, (b) pay or bond on appeal any judgment entered against any Borrower or Guarantor, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and pay any amount, incur any expense or perform any act which, in Agent's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Agent and Lenders with respect thereto.  Agent may add any amounts so expended to the Obligations and charge any Borrower's account therefor, such

amounts to be repayable by Borrowers on demand.  Agent and Lenders shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of any Borrower or Guarantor.  Any payment made or other action taken by Agent or any Lender under this Section 10.4 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

10.5    **Access to Premises**.  From time to time as reasonably requested by Agent, at the cost and expense of Borrowers, (a) Agent and Lenders or their respective designees shall have complete access to all of each Borrower's and Guarantor's premises during normal business hours and after notice to Administrative Borrower, or at any time and without notice to Administrative Borrower if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of each Borrower's and Guarantor's books and records, including the Records, and (b) each Borrower and Guarantor shall promptly furnish to Agent such copies of such books and records or extracts therefrom as Agent may request, and Agent or any Lender or Agent's or any Lender's designee may use during normal business hours such of any Borrower's and Guarantor's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Accounts and realization of other Collateral.

10.6    **Conflict with Intercreditor Agreement**.  In the event of, and only to the extent of, a conflict between any provision set forth in this Article 10 and any provision set forth in the Intercreditor Agreement, the provision set forth in the Intercreditor Agreement shall govern.  So long as Revolving Loan Agent is acting as bailee and as agent for perfection on behalf of the Agent pursuant to the terms of the Intercreditor Agreement, any obligation of any Borrower or any Guaranty in this Agreement or any other Loan Document that requires (or any representation or warranty hereunder to the extent that it would have the effect of requiring) delivery of Collateral (other than Priority Collateral) to, or the possession or control of Collateral (other than Priority Collateral) with, the Agent shall be deemed complied with and satisfied (or, in the case of any representation or warranty hereunder, shall be deemed to be true) if such delivery of Collateral is made to, or such possession or control of Collateral is with, the Revolving Loan Agent.

Notwithstanding anything herein to the contrary, in the event of a direct conflict between the terms and provisions of this Agreement and the other Loan Documents and the terms and provisions of the Security Agreement, dated as of June 28, 2007, among the U.S. Borrowers, Parent, IMG Fragrance, Dana Fragrance, and the Revolving Loan Agent (as amended, modified, supplemented, restated or replaced, the "WFF Security Agreement"), it is the intention of the Borrowers, Guarantors, the Agent and the Lenders that such provisions shall be read together and construed, to the fullest extent possible, to be in concert with each other, and to the extent applicable, the Intercreditor Agreement; however, in the event of any actual conflict, first, the Intercreditor Agreement shall control and second, the terms and provisions of the WFF Security Agreement shall control and, in such case, the Borrowers and Guarantors shall not be in breach of its obligations under this Agreement or the other Loan Documents as a result of complying with the terms and provisions of the Intercreditor Agreement or the WFF Security Agreement and not complying with the terms of this Agreement or the other Loan Documents.

## 11. WAIVERS; INDEMNIFICATION.

11.1    **Demand; Protest; etc**.  Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any such Borrower may in any way be liable.

11.2    **The Lender Group's Liability for Collateral**.  Each Borrower hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

11.3    **Indemnification**.  Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' and other Loan Parties' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by Parent or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities and Costs or Remedial Actions related in any way to any such assets or properties of Parent or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrowers shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto.  **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY**

**OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON EXCEPT TO THE EXTENT A COURT OF COMPETENT JURISDICTION FINALLY DETERMINES THAT SUCH INDEMNIFIED LIABILITIES RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON.**

12.    **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by Borrowers or Agent to the other relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as Administrative Borrower or Agent, as applicable, may designate to each other in accordance herewith), or telefacsimile to Borrowers in care of Administrative Borrower or to Agent, as the case may be, at its address set forth below:

<div style="margin-left:2em">

If to Administrative Borrower:    **DANA CLASSIC FRAGRANCES, INC.**
720 South Powerline Road, Suite D
Deerfield Beach, Florida  33442
Attn:  Chief Financial Officer
Fax No.:  (954) 725-6808

If to Agent:    **PATRIARCH PARTNERS AGENCY SERVICES, LLC**
227 West Trade Street, Suite 1400
Charlotte; North Carolina  28202
Attn:  Loan Administration/IMG
Fax No.:  (704) 375-0358

</div>

Agent and Borrowers may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this <u>Section 12</u>, other than notices by Agent in connection with enforcement rights against the Collateral under the provisions of the Code, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail.  Each Borrower acknowledges and agrees that notices sent by the Lender Group in connection with the exercise of enforcement rights against Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

13.    **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)    **THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND**

DLI-6231627v7

**THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

**(b)      THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  BORROWERS AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 13(b).**

**(c)      BORROWERS AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  BORROWERS AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

14.     **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

14.1     **Assignments and Participations.**

(a)      Any Lender may assign and delegate to one or more assignees (each an "Assignee") that are Eligible Transferees all or any portion, of the Obligations, the Revolver Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents, in a minimum amount (unless waived by the Agent) of $5,000,000 (except such minimum amount shall not apply to (x) an assignment or delegation by any Lender to any other Lender or an Affiliate of any Lender or (y) a group of new Lenders, each of whom is an Affiliate of each other or a fund or account managed by any such new Lender or an Affiliate of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000); provided, however, that Borrowers and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses, and related

- 45 -

information with respect to the Assignee, have been given to Administrative Borrower and Agent by such Lender and the Assignee, (ii) such Lender and its Assignee have delivered to Administrative Borrower and Agent an Assignment and Acceptance and Agent has notified the assigning Lender of its receipt thereof in accordance with **Section 14.1(b)**, and (iii) unless waived by the Agent, the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $3,500.  Anything contained herein to the contrary notwithstanding, the payment of any fees shall not be required and the Assignee need not be an Eligible Transferee if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of the assigning Lender.

(b)     From and after the date that Agent notifies the assigning Lender (with a copy to Administrative Borrower) that it has received an executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3 hereof) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation among Borrowers, the assigning Lender, and the Assignee; provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 16 and Section 18.9(a) of this Agreement.

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder .and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement as are delegated to Agent, by the terms hereof, together with such powers as are

reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 14.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Revolver Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, its Revolver Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Revolver Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender, or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, and (v) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement.  The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collections of Borrowers or Guarantors, the Collateral, or otherwise in respect of the Obligations.  No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

- 47 -

(f)      In connection with any such assignment or participation or proposed assignment or participation, a Lender may, subject to the provisions of <u>Section 18.9</u>, disclose all documents and information which it now or hereafter may have relating to Borrowers and their Subsidiaries and their respective businesses.

(g)      Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR § 203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

14.2   **Successors**.  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; <u>provided</u>, <u>however</u>, that Borrowers may not assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*.  No consent to assignment by the Lenders shall release any Borrower from its Obligations.  A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to <u>Section 14.1</u> hereof and, except as expressly required pursuant to <u>Section 14.1</u> hereof, no consent or approval by any Borrower is required in connection with any such assignment.

## 15.   AMENDMENTS; WAIVERS.

15.1   **Amendments and Waivers**.  No amendment or waiver of any provision of this Agreement or any other Loan Document (including, but not limited to, the Patriarch Warrants), and no consent with respect to any departure by Borrowers therefrom, shall be effective unless the same shall comply with the applicable terms and conditions, if any, set forth Intercreditor Agreement and shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and Administrative Borrower (on behalf of all Borrowers) and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and Administrative Borrower (on behalf of all Borrowers), do any of the following:

(a)      increase or extend any Revolver Commitment of any Lender,

(b)      postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(c)      reduce the principal of, or the rate of interest on, any Loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document,

(d)      change the Pro Rata Share that is required to take any action hereunder,

(e)      amend or modify this Section or any provision of this Agreement providing for consent or other action by all Lenders,

- 48 -

(f)    other than as permitted by <u>Section 16.11</u>, release Agent's Lien in and to any of the Collateral,

(g)    change the definition of "<u>Required Lenders</u>" or "<u>Pro Rata Share</u>",

(h)    contractually subordinate any of the Agent's Liens,

(i)    other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release any Borrower or any Guarantor from any obligation for the payment of money,

(j)    amend any of the provisions of <u>Section 2.4(b)(i)</u> or <u>(ii)</u>,

(k)    change the definition of Maximum Revolver Amount or the aggregate principal amount of any Term Loan, or

(l)    amend any of the provisions of <u>Section 16</u>.

and, <u>provided</u> <u>further</u>, <u>however</u>, that no amendment, waiver or consent shall, unless in writing and signed by Agent, affect the rights or duties of Agent under this Agreement or any other Loan Document.  The foregoing notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Borrowers, shall not require consent by or the agreement of Borrowers.

15.2    **Reserved.**

15.3    **No Waivers; Cumulative Remedies**.  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

16.    **AGENT; THE LENDER GROUP.**

16.1    **Appointment and Authorization of Agent**.  Each Lender hereby designates and appoints Patriarch as its representative under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as such on the express conditions contained in this <u>Section 16</u>.  The provisions of this <u>Section 16</u> are solely

- 49 -

for the benefit of Agent and the Lenders, and Borrowers and their Subsidiaries shall have no rights as a third party beneficiary of any of the provisions contained herein.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent; it being expressly understood and agreed that the use of the word "Agent" is for convenience only, that Patriarch is merely the representative of the Lenders, and only has the contractual duties set forth herein. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise, subject to the terms and conditions set forth in the Intercreditor Agreement, the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Borrowers and Guarantors, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Advances, for itself or on behalf of Advance Lenders as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the Collections of Borrowers and Guarantors as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of Borrowers and Guarantors, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Borrowers or the other Loan Parties, the Obligations, the Collateral, the Collections of Borrowers and Guarantors, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

　　　16.2　　**Delegation of Duties**.  Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

　　　16.3　　**Liability of Agent**.  None of the Agent Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Borrower or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any

other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Borrower or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of Borrowers or their Subsidiaries.

16.4   **Reliance by Agent**.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent.  Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable.  If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

16.5   **Notice of Default or Event of Default**.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Administrative Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default.  Each Lender shall be solely responsible for giving any notices to its Participants, if any.  Subject to Section 16.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 8; provided, however, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

16.6   **Credit Decision**.  Each Lender acknowledges that none of the Agent Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrowers and their Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender.  Each Lender represents to Agent that it has, independently and without reliance upon any Agent-

Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers or any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrowers or any other Person party to a Loan Document that may come into the possession of any of the Agent Related Persons.

16.7    **Costs and Expenses; Indemnification**.  Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise.  Agent is authorized and directed to deduct and retain sufficient amounts from the Collections of Borrowers and Guarantors received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders.  In the event Agent is not reimbursed for such costs and expenses by Borrowers or Guarantors, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's Pro Rata Share thereof.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), according to their Pro Rata Shares, from and against any and all Indemnified Liabilities; provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

16.8    **Agent in Individual Capacity**.  Patriarch and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though Patriarch were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, Patriarch or its Affiliates may receive information regarding Borrowers or their Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them.

16.9    **Successor Agent**.  Agent may resign as Agent upon 45 days notice to the Lenders (unless such notice is waived by the Required Lenders).  If Agent resigns under this Agreement, the Required Lenders shall appoint a successor Agent for the Lenders.  If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders, a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders.  In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 16 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  If no successor Agent has accepted appointment as Agent by the date which is 45 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

16.10    **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Borrowers or their Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

16.11  **Collateral Matters**.

(a)      The Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion, to release any Lien on any Collateral (i) upon the termination of the Revolver Commitments and payment and satisfaction in full of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Administrative Borrower certifies to Agent that the sale or disposition is permitted under Section 6.4 of this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Borrower or its Subsidiaries owned any interest at the time the Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to a Borrower or its Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement.  Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders.  Upon request by Agent or Administrative Borrower at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 16.11; provided, however, that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Borrowers in respect of) all interests retained by Borrowers, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)      Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by Borrowers or their Subsidiaries or is cared for, protected, or insured or has been encumbered, or that the Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

16.12  **Restrictions on Actions by Lenders; Sharing of Payments**.

(a)      Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or its Subsidiaries or any deposit accounts of any Borrower or its Subsidiaries now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan

Document against the Borrowers or Guarantors or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

16.13   **Agency for Perfection**.  Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Agent's Liens in assets which, in accordance with <u>Section 8</u> or <u>Section 9</u>, as applicable, of the Code can be perfected only by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

16.14   **Payments by Agent to the Lenders**.  All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

16.15   **Concerning the Collateral and Related Loan Documents**.  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

16.16   **Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**.  By becoming a party to this Agreement, each Lender:

(a)     is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report respecting Borrowers

or their Subsidiaries (each a "<u>Report</u>" and collectively, "<u>Reports</u>") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

       (b)    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

       (c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Borrowers or their Subsidiaries and will rely significantly upon Borrowers' and their Subsidiaries' books and records, as well as on representations of Borrowers' personnel,

       (d)    agrees to keep all Reports and other material, non-public information regarding Borrowers and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with <u>Section 17.9</u>, and

       (e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers; and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing:  (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Borrowers or their Subsidiaries to Agent that has not been contemporaneously provided by Borrowers or their Subsidiaries to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Borrowers or their Subsidiaries, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Administrative Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Administrative Borrower, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Administrative Borrower a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

      16.17   **<u>Several Obligations; No Liability</u>**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint)

obligations of the respective Lenders on a ratable basis, according to their respective Revolver Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Revolver Commitments. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in Section 16.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for it or on its behalf in connection with its Revolver Commitment, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

17.    **WITHHOLDING TAXES.**

(a)    All payments made by any Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes, and in the event any deduction or withholding of Taxes is required, each Borrower shall comply with the penultimate sentence of this Section 17(a). "Taxes" shall mean, any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of any Lender) and all interest, penalties or similar liabilities with respect thereto. If any Taxes are so levied or imposed, each Borrower agrees to pay the full amount of such Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 17(a) after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; provided, however, that Borrowers shall not be required to increase any such amounts if the increase in such amount payable results from Agent's or such Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). Each Borrower will furnish to Agent as promptly as possible after the date the payment of any Tax is due pursuant to applicable law certified copies of tax receipts evidencing such payment by any Borrower.

(b)    If a Lender claims an exemption from United States withholding tax, Lender agrees with and in favor of Agent and any Borrower, to deliver to Agent:

(i)    if such Lender claims an exemption from United States withholding tax pursuant to its portfolio interest exception, (A) a statement of the Lender, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of any Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to any Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN,

- 57 -

before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower;

(ii)     if such Lender claims an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower;

(iii)     if such Lender claims that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, two properly completed and executed copies of IRS Form W-8ECI before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower; or

(iv)     such other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower.

Lender agrees promptly to notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)     If a Lender claims an exemption from withholding tax in a jurisdiction other than the United States, Lender agrees with and in favor of Agent and Borrowers, to deliver to Agent any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or Administrative Borrower.

Lender agrees promptly to notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)     If any Lender claims exemption from, or reduction of, withholding tax and such Lender sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender, such Lender agrees to notify Agent and Administrative Borrower of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender. To the extent of such percentage amount, Agent and Borrowers will treat such Lender's documentation provided pursuant to Sections 17(b) or 17(c) as no longer valid. With respect to such percentage amount, Lender may provide new documentation, pursuant to Sections 17(b) or 17(c), if applicable.

(e)     If any Lender is entitled to a reduction in the applicable withholding tax, Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by subsection (b) or (c) of this Section 17 are not delivered to Agent, then Agent may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(f)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of the Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent under this <u>Section 17</u>, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

18.    **GENERAL PROVISIONS.**

18.1    **Effectiveness**.  This Agreement shall be binding and deemed effective when executed by Borrowers, Agent, and each Lender whose signature is provided for on the signature pages hereof.

18.2    **Section Headings**.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

18.3    **Interpretation**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Borrowers, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

18.4    **Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

18.5    **[Reserved.]**

18.6    **Lender-Creditor Relationship**.  The relationship between the Lenders and Agent, on the one hand, and Borrowers, on the other hand, is solely that of creditor and debtor.  No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to Borrowers arising out of or in connection with, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and Borrowers, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

18.7    **Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of

transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

18.8    **Revival and Reinstatement of Obligations**.  If the incurrence or payment of the Obligations by any Borrower or Guarantor or the transfer to the Lender Group of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "<u>Voidable Transfer</u>"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of the Lender Group related thereto, the liability of Borrowers or Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

18.9    **Confidentiality**.

(a)    Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Borrowers and their Subsidiaries, their operations, assets, and existing and contemplated business plans shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except:  (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group, (ii) to Subsidiaries and Affiliates of any member of the Lender Group, provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this <u>Section 18.9</u>, (iii) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, (iv) as may be agreed to in advance by Administrative Borrower or its Subsidiaries or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (v) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders), (vi) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement, provided that any such assignee, participant, or pledgee shall have agreed in writing to receive such information hereunder subject to the terms of this Section, and (vii) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents.  The provisions of this <u>Section 17.8(a)</u> shall survive for 2 years after the payment in full of the Obligations.

(b)    Anything in this Agreement to the contrary notwithstanding, Agent may provide information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services.

- 60 -

18.10   **Lender Group Expenses**.  Borrowers agree to pay any and all Lender Group Expenses promptly after demand therefor by Agent and agrees that their obligations contained in this Section 18.10 shall survive payment or satisfaction in full of all other Obligations.

18.11   **USA PATRIOT Act**.  Each Lender that is subject to the requirements of the USA Patriot Act (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrowers, which information includes the name and address of Borrowers and other information that will allow such Lender to identify Borrowers in accordance with the Act.

18.12   **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

18.13   **Parent as Agent for Borrowers**.  Each Borrower hereby irrevocably appoints Dana US as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide Agent with all notices with respect to Advances and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Advances to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.  To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and Collateral of Borrowers as herein provided, (b) the Lender Group's relying on any instructions of the Administrative Borrower, or (c) any other action taken by the Lender Group hereunder or under the other Loan Documents, except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this Section 18.13 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

18.14   **Amendment and Restatement**.  This Agreement is given in amendment, consolidation, restatement, renewal and extension (but not in novation, extinguishment or

DLI-6231627v7

satisfaction) of the Existing Loan Agreement.  All Liens securing payment of the obligations under the Existing Loan Agreement are hereby collectively renewed, extended, rearranged, ratified and brought forward as security for the payment and performance of the Obligations. This Agreement shall not constitute a waiver by Agent and Lenders of any Default or Event of Default (each such term as defined in the Existing Loan Agreement) under the Existing Loan Agreement and the Loan Documents (as defined therein) that existed on or prior to the Closing Date (and not otherwise expressly waived in writing by the Lenders (as defined in the Existing Loan Agreement)) immediately prior to the effectiveness hereof.

18.15  **Existing Defaults**.  Each Borrower acknowledges that (a) the Existing Defaults have occurred and are continuing; (b) such Borrower has received adequate and sufficient notice of the Existing Defaults; (c) such Existing Defaults and any other Default or Event of Default, whether known or unknown, has not been, is not hereby and shall not be deemed, waived by the Agent or the Lenders, expressly, impliedly, by this Agreement, through course of conduct or otherwise; (d) as a result of the Existing Defaults, the Agent and the Lenders (x) have no obligation to make any advances, loans or other financial accommodations to the Borrowers under any of the Loan Documents, (y) have no obligation to forbear against pursuing any rights or remedies under the Loan Documents, and (z) have the right to pursue their rights, powers and remedies under the Loan Documents, including, without limitation, the right to accelerate the Obligations and foreclose against the Collateral, all pursuant and subject to the terms, requirements and limitations of this Agreement, other Loan Documents and applicable law.

[Signature pages to follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

BORROWERS

INTER-MARKETING GROUP, INC.

By: _____
    Name: Emil B. Giliotti
    Title:  President


DANA CLASSIC FRAGRANCES, INC.

By: _____
    Name: Emil B. Giliotti
    Title:  President


DANA S.A.U.

By: _____
    Name: Emil B. Giliotti
    Title:  President


[SIGNATURES CONTINUED ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

GUARANTORS

IMG HOLDINGS, INC.

By: _____

Name: Emil B. Giliotti
Title: President

DANA FRAGRANCE BRANDS, LLC

By: _____

Name: Emil B. Giliotti
Title: President

IMG FRAGRANCE BRANDS, LLC

By: _____

Name: Emil B. Giliotti
Title: President

INTERNATIONAL WATCH CORP.

By: _____

Name: Emil B. Giliotti
Title: President

[SIGNATURES CONTINUED ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

ST. HONORE HOLDING, INC.

By: _____

Name: Emil B. Giliotti
Title: President

FELAGASTYRING EHF

By: _____

Name: Emil B. Giliotti
Title: President

VORUMERKJASTYRING EHF

By: _____

Name: Emil B. Giliotti
Title: President

FINANZ ST. HONORE B.V.

By: _____

Name: Emil B. Giliotti
Title: President

[SIGNATURES CONTINUED ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

AGENT

PATRIARCH PARTNERS AGENCY
SERVICES, LLC

By: _____
Name: Lynn Tilton
Title: Manager

LENDERS

ZOHAR II 2005-1, LIMITED

By: Patriarch Partners VIII, LLC, its collateral manager

By: _____
Name: Lynn Tilton
Title: Manager

ZOHAR CDO 2003-1 LIMITED

By: Patriarch Partners XIV, LLC, its collateral manager

By: _____
Name: Lynn Tilton
Title: Manager

ZOHAR III, LIMITED

By: Patriarch Partners XV, LLC, its collateral manager

By: _____
Name: Lynn Tilton
Title: Manager

## <u>Exhibit A-1</u>

**Form of Assignment and Acceptance Agreement**

This **ASSIGNMENT AND ACCEPTANCE AGREEMENT** ("<u>Assignment Agreement</u>") is entered into as of _____ between _____ ("<u>Assignor</u>") and _____ ("<u>Assignee</u>"). Reference is made to the Agreement described in <u>Annex I</u> hereto (the "<u>Loan Agreement</u>"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

        1.     In accordance with the terms and conditions of <u>Section 14</u> of the Loan Agreement, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Loan Documents as of the date hereof with respect to the Obligations owing to the Assignor, and Assignor's portion of the Revolver Commitments, all to the extent specified on <u>Annex I</u>.

        2.     The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statements, representations or warranties made in or in connection with the Loan Documents, or (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or any Guarantor or the performance or observance by any Borrower or any Guarantor of any of their respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto, and (d) represents and warrants that the amount set forth as the Purchase Price on <u>Annex I</u> represents the amount owed by Borrowers to Assignor with respect to Assignor's share of the Loans assigned hereunder, as reflected on Assignor's books and records.

        3.     The Assignee (a) confirms that it has received copies of the Loan Agreement and the other Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon Agent, Assignor, or any other Lender, based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents; (c) confirms that it is an Eligible Transferee; (d) appoints and authorizes the Agent to take such action as Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (e) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender**[; and (I) attaches the forms prescribed by the Internal Revenue Service of the United States**

**certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Loan Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty]**.

4.      Following the execution of this Assignment Agreement by the Assignor and Assignee, the Assignor will deliver this Assignment Agreement to the Agent for recording by the Agent.  The effective date of this Assignment (the "Settlement Date") shall be the latest to occur of (a) the date of the execution and delivery hereof by the Assignor and the Assignee, (b) the receipt by Agent for its sole and separate account a processing fee in the amount of $3,500 (if required by the Loan Agreement), (c) the receipt of any required consent of the Agent, and (d) the date specified in Annex I.

5.      As of the Settlement Date (a) the Assignee shall be a party to the Loan Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other Loan Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Loan Agreement and the other Loan Documents, provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Article 16 and Section 17.7 of the Loan Agreement.

6.      On the Settlement Date, Assignee shall pay to Assignor the Purchase Price (as set forth in Annex I).  From and after the Settlement Date, Agent shall make all payments that are due and payable to the holder of the interest assigned hereunder (including payments of principal, interest, fees and other amounts) to Assignor for amounts which have accrued up to but excluding the Settlement Date and to Assignee for amounts which have accrued from and after the Settlement Date.  On the Settlement Date, Assignor shall pay to Assignee an amount equal to the portion of any interest, fee, or any other charge that was paid to Assignor prior to the Settlement Date on account of the interest assigned hereunder and that are due and payable to Assignee with respect thereto, to the extent that such interest, fee or other charge relates to the period of time from and after the Settlement Date.

7.      This Assignment Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  This Assignment Agreement may be executed and delivered by telecopier or other facsimile transmission all with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

8.      THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement and Annex I hereto to be executed by their respective officers, as of the first date written above.

[NAME OF ASSIGNOR]
as Assignor

By _____
  Name:
  Title:

[NAME OF ASSIGNEE]
as Assignee

By _____
  Name:
  Title:

ACCEPTED THIS ____ DAY OF _____

**PATRIARCH PARTNERS AGENCY SERVICES, LLC,**
a Delaware limited liability company, as Agent

By _____
Name: Lynn Tilton
Title:  Manager

## Annex for Assignment and Acceptance

## Annex I

1.    Borrowers: Dana Classic Fragrances, Inc. and Inter-Marketing Group, Inc.

2.    Name and Date of Loan Agreement:

> Third Amended and Restated Loan and Security Agreement, dated as of January 15, 2009, by and among Dana Classic Fragrances, Inc., Inter-Marketing Group, Inc., Dana S.A.U., the Guarantors from time to time party thereto (the "Guarantors"), the Lenders from time to time a party thereto (the "Lenders"), Patriarch Partners Agency Services, LLC, a Delaware limited liability company, as the administrative agent for the Lenders

3.    Date of Assignment Agreement:                                   _____

4.    Amounts:

    a.    Assigned Amount of Revolver Commitment          $_____

    b.    Assigned Amount of Advances                             $_____

    c.    Assigned Amount of Existing Term Loan              $_____

    d.    Assigned Amount of Term B Loan                        $_____

    e.    Assigned Amount of Term C Loan                        $_____

    f.    Assigned Amount of Term D Loan                        $_____

    g.    Assigned Amount of Term E Loan                        $_____

5.    Settlement Date:                                                           _____

6.    Purchase Price                                                    $_____

7.    Notice and Payment Instructions, etc.

    Assignee:                              Assignor:


_____          _____

_____          _____

_____          _____

8.    Agreed and Accepted:

    [ASSIGNOR]            [ASSIGNEE]

    By:_____      By:_____
    Title:_____    Title:_____


ACCEPTED THIS \_\_\_\_ DAY OF
_____

**PATRIARCH PARTNERS AGENCY SERVICES, LLC**,
a Delaware limited liability company, as Agent

By   _____
Name: Lynn Tilton
Title:   Manager

<u>**Exhibit C-1**</u>

**Form of Compliance Certificate**

[on Borrowers' letterhead]

To:    Patriarch Partners Agency Services, LLC
       227 West Trade Street, Suite 1400
       Charlotte, North Carolina 28202
       Attn: **[Loan Administrator/IMG]**

       Re:    Compliance Certificate dated **[_____]**

Ladies and Gentlemen:

Reference is made to that certain **THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (the "<u>Loan Agreement</u>") dated as of January 15, 2009, by and among the Lenders identified on the signature pages thereof (such Lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "<u>Lender</u>" and collectively as the "<u>Lenders</u>"); **PATRIARCH PARTNERS AGENCY SERVICES, LLC**, a Delaware limited liability company, as the administrative agent for the Lenders ("<u>Agent</u>"), **DANA CLASSIC FRAGRANCES, INC.**, a Delaware corporation ("<u>Administrative Borrower</u>"), **INTERMARKETING GROUP, INC.**, a Florida corporation ("<u>IMG</u>"), and **DANA S.A.U.**, a corporation organized under the laws of Spain ("<u>Spanish Borrower</u>"; together with Administrative Borrower and IMG, collectively, "<u>Borrowers</u>"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to <u>Schedule 5.3</u> of the Loan Agreement, the undersigned officer of Administrative Borrower hereby certifies that:

1.    The financial information of **[Borrowers][parent and its Subsidiaries]** furnished in <u>Schedule 1</u> attached hereto, has been prepared in accordance with GAAP **[(other than with respect to the Foreign Subsidiaries)]** (except for year-end adjustments and the lack of footnotes), and fairly presents in all material respects the financial condition of Borrowers.

2.    Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Borrowers during the accounting period covered by the financial statements delivered pursuant to <u>Schedule 5.3</u> of the Credit Agreement.

3.    Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on <u>Schedule 2</u> attached hereto, specifying the nature and period of existence thereof and what action Parent and its Subsidiaries have taken, are taking, or propose to take with respect thereto.

Exhibit C-1 – Page 1

4.     The representations and warranties of Parent and its Subsidiaries set forth in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date hereof (except to the extent they relate to a specified date), except as set forth on Schedule 3 attached hereto.

5.     Borrowers are in compliance with the applicable covenants contained in Section 6.16 of the Loan Agreement as demonstrated on Schedule 4 hereof.

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this ___ day of _____, 20__.

DANA CLASSIC FRAGRANCES, INC.,
as Administrative Borrower


By: _____
     Name: _____
     Title:_____

**<u>Schedule 1 to Exhibit C-1</u>**

**Financial Information**

**<u>Schedule 2 to Exhibit C-1</u>**

**Default or Event of Default**

**<u>Schedule 3 to Exhibit C-1</u>**

**Representations and Warranties**

<u>**Schedule 4 to Exhibit C-1**</u>

**Financial Covenants**

1.      <u>**Minimum EBITDA.**</u>

      Borrowers' EBITDA, measured on a month-end basis, for the \_\_\_\_\_ month period ending _____, _____ is $_____, which amount **[is/is not]** greater than or equal to the amount set forth in Section 6.l6(a) of the Loan Agreement for the corresponding period.

2.      <u>**Fixed Charge Coverage Ratio.**</u>

      Borrowers' Fixed Charge Coverage Ratio, measured on a month-end basis, for the 12 month period ending _____, _____ is \_\_\_\_:1.0, which **[is/is not]** greater than or equal to the amount set forth in Section 6.l6(b) of the Loan Agreement for the corresponding period.

3.      <u>**Capital Expenditures.**</u>

      Borrowers' Capital Expenditures from the beginning of Parent's most recent Fiscal Year to the date hereof is _____, which **[is/is not]** greater than or equal to the amount set forth in Section 6.l6(c) of the Loan Agreement for the corresponding period.

## Schedule A-1

### Agent's Account

An account at a bank designated by Agent from time to time as the account into which Borrowers shall make all payments to Agent for the benefit of the Lender Group and into which the Lender Group shall make all payments to Agent under this Agreement and the other Loan Documents.

## **Schedule A-2**

### **Authorized Persons**

Emil B. Giliotti, President and Myron Derman, Secretary

**Schedule C-1**

**Commitments and Loan Amounts**

| Lenders | Revolver Commitment | Existing Term Loan Amount | Term B Loan Amount | Term C Loan Amount | Term D Loan Amount | Term E Loan Amount |
|---|---|---|---|---|---|---|
| Zohar CDO 2003-1, Limited | $2,566,597 | $16,911,269.84 | $0 | $2,000,000 | $300,000 | $144,640 |
| Zohar II 2005-1, Limited | $0 | $4,227,817.46 | $0 | $0 | $0 | $0 |
| Zohar III, Limited | $0 | $0 | $3,684,210.53 | $0 | $0 | $0 |

## Schedule D-l

## Designated Account

| Name of Institution | Company | Account Number | Branch Address | Description of Account |
|---|---|---|---|---|
| Wachovia Bank, N.A. | Parent | 2000025633997 | 350 E. Las Olas Blvd., Suite 1800, Ft. Lauderdale, FL 33301 | ZBA Disbursement - Funding Account |

## **Schedule I-1**

**Immaterial Subsidiaries**

None

## **Schedule P-2**

**Permitted Liens**

None

## Schedule 1.1

### Definitions

As used in the Agreement, the following terms shall have the following definitions:

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Act" has the meaning specified therefor in Section 18.11.

"Additional Documents" has the meaning specified therefor in Section 5.17.

"Administrative Borrower" has the meaning specified therefor in Section 18.13.

"Advance Lender" means any Lender having a Revolver Commitment (or, after the Revolver Commitments have terminated, any Lender holding outstanding Advances).

"Advance Lender Group" means, individually and collectively, each of the Advance Lenders and Agent.

"Advances" has the meaning specified therefor in Section 2.1(a).

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of the definition of Eligible Accounts and Section 6.13 of the Agreement:  (a) any Person which owns directly or indirectly 10% or more of the Stock having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to the Agreement.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Account" means the Deposit Account of Agent identified on Schedule A-1.

"Agent's Liens" means the Liens granted by Borrowers or their Subsidiaries to Agent under the Loan Documents.

DLI-6231627v7

"Agreement" means the Credit Agreement to which this Schedule 1.1 is attached, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Assignee" has the meaning specified therefor in Section 14.1(a).

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1.

"Authorized Person" means any one of the individuals identified on Schedule A-2.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Loan Party or ERISA Affiliate of any Borrower has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means the board of directors (or comparable managers) of Parent or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble to the Agreement.

"Borrowing" means a borrowing hereunder consisting of Advances made on the same day by the Advance Lenders (or Agent on behalf thereof) to Administrative Borrower.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York or Georgia.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors

Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the amount maintained with any such other bank is less than or equal to $100,000 and is insured by the Federal Deposit Insurance Corporation, and (f) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (e) above.

"Cash Management Account" has the meaning specified therefor in Section 2.7(a).

"Cash Management Agreements" means those certain cash management agreements, in form and substance satisfactory to Agent, each of which is among any Loan Party, Agent, and one of the Cash Management Banks.

"Cash Management Bank" has the meaning specified therefor in Section 2.7(a).

"Change of Control" means that (a) Permitted Holders fail to own and control directly or indirectly, 66 2/3%, or more, of the Stock of Parent having the right to vote for the election of members of the Board of Directors, (b) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20%, or more, of the Stock of Parent having the right to vote for the election of members of the Board of Directors, (c) a majority of the members of the Board of Directors do not constitute Continuing Directors, or (d) Parent fails to own and control directly or indirectly 100% of the Stock of its Subsidiaries (other than Excluded Subsidiaries).

"Chantilly License" means that certain License Agreement dated as of December 19, 2003 among Houbiant Inc., Etablissement Houbigant and IMG Fragrance Brands LLC.

"Chantilly Name" means the Intellectual Property licensed pursuant to the Chantilly License.

"Closing Date" means January _____, 2009.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by Administrative Borrower or its Subsidiaries in or upon which a Lien is granted under any of the Loan Documents.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's books and records, Equipment, or Inventory, in each case, in form and substance satisfactory to Agent.

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 delivered by the chief financial officer of Parent to Agent.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Parent on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was appointed or nominated for election to the Board of Directors by a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of Parent and whose initial assumption of office resulted from such contest, or the settlement thereof.

"Control Agreement" means a control agreement, in form and substance satisfactory to Agent, executed and delivered by the Administrative Borrower or one of its Subsidiaries, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"Copyright Security Agreement" means the Copyright Collateral Assignment and Security Interest (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 30, 2004, assigned to the Agent pursuant to that certain Second Amendment and Assignment of Patent Collateral Assignment and Security Agreement among the Agent, Finanz St. Honore and the lenders thereto dated as of April 25, 2007 and recorded on May 18, 2007 with the U.S. Copyright Office as file number 188291.

"Dana Fragrance" has the meaning specified therefor in the preamble to this Agreement.

"Dana US" has the meaning specified therefor in the preamble to this Agreement.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender Rate" means the interest rate then applicable to Advances.

"Defaulting Lender" means any Advance Lender that fails to make any Advance (or other extension of credit) that it is required to make hereunder on the date that it is required to do so.

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Administrative Borrower identified on Schedule D-1.

"Designated Account Bank" has the meaning specified therefor in Schedule D-1.

"Dollars" or "$" means United States dollars.

"EBITDA" means, with respect to any fiscal period, U.S. Borrowers' consolidated net earnings (or loss), minus extraordinary gains and interest income, plus interest expense, income taxes, and depreciation and amortization for such period, in each case, determined on a consolidated basis in accordance with GAAP.

"Eligible Transferee" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, provided that such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, financial institution, or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets in excess of $250,000,000, (d) any Affiliate (other than individuals) of a Lender, (e) so long as no Event of Default has occurred and is continuing, any other Person approved by Agent and Administrative Borrower (which approval of Administrative Borrower shall not be unreasonably withheld, delayed, or conditioned), and (f) during the continuation of an Event of Default, any other Person approved by Agent.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials from (a) any assets, properties, or businesses of any Loan Party, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Loan Party, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Loan Party, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of a Loan Party under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of a Loan Party under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which a Loan Party is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with a Loan Party and whose employees are aggregated with the employees of a Loan Party under IRC Section 414(o).

"Existing Defaults" means the Events of Default existing under the Existing Loan Agreement on the Closing Date listed on Schedule 8.15.

"Existing Loan Agreement" has the meaning specified in the recitals.

"Existing Term Loan" means the Loan made to the Borrowers under the Existing Loan Agreement in the aggregate principal amount and by the Lenders set forth under the applicable heading on Schedule C-1.

"Event of Default" has the meaning specified therefor in Section 7.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Subsidiaries" means, collectively, (a) Jan Bell de Mexico, a company organized under the laws of Mexico, and (b) Dana Classic Fragrances Canada, Inc., a Quebec corporation.

"Extraordinary Receipts" means any cash received by any Loan Party not in the ordinary course of business, including (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (including key man life insurance and business interruption insurance, but excluding any casualty insurance), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) indemnity payments, and (f) any purchase price adjustment received in connection with any purchase agreement; provided, however, that Extraordinary Receipts shall not include cash received in connection with Permitted Dispositions.

"Felagastyring" has the meaning specified therefore in the preamble to this Agreement.

"Finanz St. Honore" has the meaning specified therefore in the preamble to this Agreement.

"Finanz St. Honore" has the meaning specified therefore in the preamble to this Agreement.

"Fixed Charges" means, with respect to any fiscal period and with respect to U.S. Borrowers determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) cash Interest Expense paid or payable during such period, (b) principal payments in respect of Indebtedness that are required to be paid during such period, and (c) all federal, state, and local income taxes paid or payable during such period.

"Fixed Charge Coverage Ratio" means, with respect to Parent for any period, the ratio of (i) EBITDA for such period minus Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, to (ii) Fixed Charges for such period.

"Foreign Guarantor" has the meaning specified therefore in the preamble to this Agreement.

"Foreign Subsidiaries" means Subsidiaries created or organized under the laws of any jurisdiction other than the United States or any state thereof or the District of Columbia, and "Foreign Subsidiary" means any one of them.

"Funding Date" means the date on which a Borrowing occurs.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantors" means each Loan Party other than Borrowers, and "Guarantor" means any one of them.

"Guaranty" means that certain general continuing guaranty executed and delivered by each Guarantor in favor of Agent, for the benefit of the Lender Group, in form and substance satisfactory to Agent.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas; drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means any and all agreements, or documents now existing or hereafter entered into by Administrative Borrower or any of its Subsidiaries that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging Administrative Borrower's or any of its Subsidiaries' exposure to fluctuations in interest or exchange rates, loan, credit exchange, security, or currency valuations or commodity prices.

"IMG Fragrance" has the meaning specified therefore in the preamble to this Agreement.

"Immaterial Subsidiaries" means those Subsidiaries listed on Schedule I-1.

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all obligations owing under Hedge Agreements, (g) any inter-company debt among the Loan Parties or among the Borrowers and any Subsidiary, and (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (f) above.

"Indemnified Liabilities" has the meaning specified therefor in Section 11.3.

"Indemnified Person" has the meaning specified therefor in Section 11.3.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intercompany Subordination Agreement" means a subordination agreement executed and delivered by Borrowers, each of Borrowers' Subsidiaries, and Agent, the form and substance of which is satisfactory to Agent.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of June 28, 2007, among Agent, Revolving Loan Agent, Borrowers and Guarantors, as amended, supplemented, restated or otherwise modified from time to time.

"Interest Expense" means, for any period, the aggregate of the interest expense of Borrowers for such period, determined on a consolidated basis in accordance with GAAP.

"Inventory" means inventory (as that term is defined in the Code).

"Inventory Components" means, as to each Borrower, all of such Borrower's now owned or hereafter existing or acquired labels, empty bottles, caps, boxes and packaging, wherever located, in each case which are not part of finished goods or work-in-process.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) bona fide Accounts arising in the ordinary course of business consistent with past practice), or acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"IWC" has the meaning specified therefore in the preamble to this Agreement.

"Lender" and "Lenders" have the respective meanings set forth in the preamble to the Agreement, and shall include any other Person made a party to the Agreement in accordance with the provisions of Section 13.1.

"Lender Group" means, individually and collectively, each of the Lenders (including the Issuing Lender) and Agent.

"Lender Group Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by a Borrower or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Borrowers or their Subsidiaries, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and uniform commercial code searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) costs and expenses incurred by Agent in the disbursement of funds to Borrowers or other members of the Lender Group (by wire transfer or otherwise), (d) charges paid or incurred by Agent resulting from the dishonor of checks, (e) reasonable costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) audit fees and expenses (including travel, meals, and lodging) of Agent related to any inspections or audits to the extent of the fees and charges, (g) reasonable costs and expenses of third party claims or any other suit paid or incurred by the Lender Group in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Lender Group's relationship with any Borrower or any Subsidiary of a Borrower, (h) Agent's and each Lender's reasonable costs and expenses (including attorneys fees) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals,

and lodging), syndicating or amending the Loan Documents, and (i) Agent's and each Lender's reasonable costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Borrower or any Subsidiary of a Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Leverage Ratio" shall mean, as of any date, the ratio of (a) the aggregate principal amount of the Loans outstanding on such date plus the aggregate principal amount of all other Indebtedness of any Person on such date; to (b) EBITDA of such Person for the period of four (4) consecutive fiscal quarters ended on such date.

"LIBOR" shall mean, a fluctuating rate of interest determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the one month London inter-bank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day. If for any reason such rate is not available, "LIBOR" shall mean the fluctuating rate of interest calculated on a daily basis equal to the one month rate of interest appearing on Reuters Screen page LIBO Page as the one-month London inter-bank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates. "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"License Agreements" means all of the agreements or other arrangements of each Borrower and Guarantor pursuant to which such Borrower or Guarantor has a license or other right to use any trademarks, logos, designs, representations or other intellectual property owned by another person (other than Microsoft Windows and other "shrinkwrap" software), and "License Agreement" means any one of them.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan" means any of the Term Loans or Advances and "Loans" means the Term Loans and Advances, collectively.

"Loan Account" has the meaning specified therefor in Section 2.10.

"Loan Documents" means the Agreement, the Notes, the Cash Management Agreements, the Control Agreements, the Copyright Security Agreement, the Guaranty, the Intercompany Subordination Agreement, the Patent Security Agreement, the Trademark Security Agreements, the Intercreditor Agreement, any note or notes executed by a Borrower in connection with the Agreement and payable to a member of the Lender Group, and any other agreement entered into, now or in the future, by any Borrower, any of their Subsidiaries, and the Lender Group in connection with the Agreement, including but not limited to the Patriarch Warrants.

"Loan Parties" means Parent and its Subsidiaries (other than the Excluded Subsidiaries and the Immaterial Subsidiaries) and "Loan Party" means any one of them

"Material Adverse Change" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Loan Parties, taken as a whole, (b) a material impairment of a Loan Party's ability to perform its obligations under the Loan Documents to which it is a party or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the enforceability or priority of the Agent's Liens with respect to the Collateral as a result of an action or failure to act on the part of a Loan Party.

"Material Contract" means, with respect to any Loan Party, each contract or agreement to which such Loan Party is a party involving aggregate consideration payable to or by such Loan Party of $350,000 or more (other than purchase orders in the ordinary course of the business of such Loan Party and other than contracts that by their terms may be terminated by such Loan Party in the ordinary course of its business upon less than 60 days notice without penalty or premium).

"Maturity Date" has the meaning specified therefor in Section 3.3.

"Maximum Revolver Amount" means $2,566,597.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Mortgages" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by a Loan Party in favor of Agent, in form and substance satisfactory to Agent, that encumber Real Property.

"Net Cash Proceeds" means:

(a)     with respect to any sale or disposition by a Borrower or a Subsidiary of a Borrower of property or assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of a Borrower or a Subsidiary of a Borrower, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under the Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such sale or disposition,

(ii) reasonable fees, commissions, and expenses related thereto and required to be paid by a Borrower or such Subsidiary of a Borrower in connection with such sale or disposition and (iii) taxes paid or payable to any taxing authorities by a Borrower or such Subsidiary of a Borrower in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of a Borrower or a Subsidiary of a Borrower, and are properly attributable to such transaction; and

(b)     with respect to the issuance or incurrence of any Indebtedness by a Borrower or a Subsidiary of a Borrower, or the issuance by a Borrower or a Subsidiary of a Borrower of any shares of its Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of a Borrower or such Subsidiary in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by a Borrower or such Subsidiary in connection with such issuance or incurrence, (ii) taxes paid or payable to any taxing authorities by a Borrower or such Subsidiary in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of a Borrower or Subsidiary of a Borrower, and are properly attributable to such transaction.

"Net Liquidation Percentage" means the percentage of the book value of Borrowers' Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be as determined from time to time by an appraisal company selected by Agent.

"Notes" means, collectively, each promissory note of the Borrowers payable to the order of a Lender evidencing Indebtedness of the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the (i) Amended and Restated Term Note, dated as of January 16, 2009, made by the Borrowers payable to the order of Zohar II 2005-1, Limited, in the amount of $4,227,817.46, (ii) Amended and Restated Term Note, dated as of January 16, 2009, made by the Borrowers payable to the order of Zohar CDO 2003-1, Limited, in the amount of $16,911.269.84, (iii) Term B Note, dated as of July 7, 2008, made by the Borrowers payable to the order of Zohar III, Limited, in the amount of $3,684,210.53, (iii) Term C Note, dated as of October 17, 2008, made by the Borrowers payable to the order of Zohar CDO 2003-1, Limited, in the amount of $2,000,000, (iv) Term D Note, dated as of December 24, 2008, made by the Borrowers payable to the order of Zohar CDO 2003-1, Limited, in the amount of $300,000.00, (v) the Term E Note, made by the Borrowers payable to the order of Zohar CDO 2003-1, Limited, in the amount of $144,640.00, and (vi) the Revolver Note, dated as of the Closing Date, made by the Borrowers payable to the order of Zohar CDO 2003-1, Limited, in the amount of $1,500,000.00.

"Obligations" means all Loans (including Advances), advances, debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities (including all amounts charged to Borrowers' Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees, charges,

costs, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), lease payments, guaranties, covenants, and duties of any kind and description owing by Borrowers to the Lender Group pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.  Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"Originating Lender" has the meaning specified therefor in Section 14.1(e).

"Parent" means IMG Holdings, Inc., a Delaware corporation.

"Participant" has the meaning specified therefor in Section 14.1(e).

"Patent Security Agreement" means the Patent Collateral Assignment and Security Interest (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 30, 2004, assigned to the Agent pursuant to that certain Second Amendment and Assignment of Patent Collateral Assignment and Security Agreement among the Agent, Finanz St. Honore and the lenders thereto dated as of April 25, 2007 and recorded on May 8, 2007 with the United States Patent and Trademark Office at Reel 019260 and Frame 0033.

"Patriarch Warrants" shall mean, collectively (a) the Warrant, dated on or about May 26, 2005, by Parent to Zohar CDO 2003-1, Limited with respect to the purchase of shares of common stock of Parent and (b) the Warrant, dated on or about the date of Amendment No. 1, by Parent to Zohar II 2005-1, Limited with respect to the purchase of shares of common stock of Parent, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced; each sometimes being individually referred to as a "Patriarch Warrant".

"PDDB" shall mean Perfumes Dana do Brasil Ltda., a company existing under the laws of Brazil.

"Permitted Discretion" means a determination made in good faith in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Dispositions" means (a) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents, (d) (i) the exclusive license of any intellectual property with respect to any goods in the ordinary course of business in territories outside the United States of America, (ii) the exclusive license of any intellectual property with respect to any goods (other than Specified Goods) in the ordinary course of business in territories within the United States of America and

to Persons that are not Affiliates of any Borrower or Guarantor, (iii) the non-exclusive license of intellectual property with respect to any goods in the ordinary course of business in any territories, and (iv) the license of intellectual property pursuant to the license agreements listed on Schedule P-1 hereto (as in effect on the date hereof) and renewals and extensions of such license agreements, (e) the sale, transfer or other disposition of the capital stock of each Excluded Subsidiary, (f) the sale, transfer or other disposition of the capital stock of Spanish Subsidiary upon the full payment of the Loans, and (g) the sale or other transfer of Accounts and related general intangibles of Spanish Subsidiary to a Person that is not an Affiliate of any Borrower or Guarantor pursuant to a factoring (or similar) arrangement in the ordinary course of business and consistent with past practice.

"Permitted Holders" means, collectively, Zohar CDO 2003-1, Limited, Zohar II 2005-1, Limited, Zohar III, Limited, Patriarch Partners, LLC and any Affiliates of Patriarch Partners, LLC.

"Permitted Investments" means (a) Investments in cash and Cash Equivalents, (b) Investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, (d) Investments received in settlement of amounts due to a Borrower or any Subsidiary of a Borrower effected in the ordinary course of business or owing to a Borrower or any Subsidiary of a Borrower as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Borrower or any Subsidiary of a Borrower, and (e) Investments consisting of (i) intercompany loans among the Borrowers, (ii) intercompany loans among Guarantors and (iii) intercompany loans by a Borrower to a Guarantor or by a Guarantor to a Borrower in an aggregate amount not to exceed $200,000 outstanding at any time.

"Permitted Liens" means (a) Liens held by Agent to secure the Obligations, (b) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over the Agent's Liens and the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests, (c) judgment Liens that do not constitute an Event of Default under Section 7.7 of the Agreement, (d) Liens set forth on Schedule P-2, provided that any such Lien only secures the Indebtedness that it secures on the Closing Date and any Refinancing Indebtedness in respect thereof, (e) the interests of lessors under operating leases, (f) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) such Lien attaches only to the asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire the asset purchased or acquired or any Refinancing Indebtedness in respect thereof, (g) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests, (h) Liens on amounts deposited in connection with obtaining worker's compensation or other unemployment insurance, (i) Liens on amounts deposited in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money, (j) Liens on amounts deposited as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business, (k) with respect to any Real Property, easements, rights of way, and zoning restrictions

that do not materially interfere with or impair the use or operation thereof, and (l) Liens securing the Revolving Loan Debt.

"<u>Permitted Protest</u>" means the right of Administrative Borrower or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on a Borrower's or any of its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by Administrative Borrower or any of its Subsidiaries, as applicable, in good faith, and (c) Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Agent's Liens.

"<u>Permitted Purchase Money Indebtedness</u>" means, as of any date of determination, Purchase Money Indebtedness incurred after the Closing Date in an aggregate principal amount outstanding at any one time not in excess of $250,000.

"<u>Person</u>" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"<u>Prepayment Premium</u>" shall mean, with respect to any prepayment of the Loans (excluding any payments pursuant to <u>Section 2.4(a)</u> hereof and any prepayment pursuant to <u>Section 2.4(c)</u> hereof), the product of (a) the principal amount of such prepayment, and (b) the percentage listed below:

| <u>Percentage</u> | <u>Period</u> |
|---|---|
| (ii)  5% | From and after May 26, 2007 to and excluding May 26, 2008 |
| (iii)  None | From and after May 26, 2008 |

"<u>Priority Collateral</u>" means (a) the Real Property subject to an outstanding mortgage and other assets of the Spanish Subsidiary; (b) the Stock of Finanz St. Honore B.V., a corporation organized under the laws of The Netherlands, owned by St. Honore Holding, Inc., a Delaware corporation; (c) the Stock of the Spanish Subsidiary, owned by Felagastyring ehf, a corporation organized under the laws of Iceland; (d) the Stock of Felagastyring ehf, a corporation organized under the laws of Iceland, and Vorumerkjastyring ehf, a corporation organized under the laws of Iceland, owned by Isaac Florens Cohen; (e) all intellectual property (excluding the Chantilly Name) of each Borrower and Guarantor; and (f) all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Priority Collateral.

"<u>Projections</u>" means Borrowers' forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Borrowers'

historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Share" means, as of any date of determination:

(a)    with respect to a Lender's obligation to make the Existing Term Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) the principal amount of such Lender's portion of the Existing Term Loan by (ii) the aggregate principal amount of the Existing Term Loan,

(b)    with respect to a Lender's obligation to make the Term B Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) the principal amount of such Lender's portion of the Term B Loan by (ii) the aggregate principal amount of the Term B Loan,

(c)    with respect to a Lender's obligation to make the Term C Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) the principal amount of such Lender's portion of the Term C Loan by (ii) the aggregate principal amount of the Term C Loan,

(d)    with respect to a Lender's obligation to make the Term D Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) the principal amount of such Lender's portion of the Term D Loan by (ii) the aggregate principal amount of the Term D Loan,

(e)    with respect to a Lender's obligation to make the Term E Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) the principal amount of such Lender's portion of the Term E Loan by (ii) the aggregate principal amount of the Term E Loan, and

(f)    with respect to an Advance Lender's obligation to make Advances and right to receive payments of interest, fees, and principal with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Advance Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Advance Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtains by dividing (y) the principal amount of such Advance Lender's Advances by (z) the aggregate principal amount of all Advances.

"Purchase Money Indebtedness" means Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of Borrowers and their Subsidiaries that is in Deposit Accounts or in Securities Accounts, or any combination thereof, and which such Deposit Account or Securities Account is the subject of a Control Agreement and is maintained by a branch office of the bank or securities intermediary located within the United States.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Loan Party and the improvements thereto.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Refinancing Indebtedness" means refinancings, renewals, or extensions of Indebtedness so long as: (a) the terms and conditions of such refinancings, renewals, or extensions do not, in Agent's reasonable judgment, materially impair the prospects of repayment of the Obligations by Borrowers or materially impair Borrowers' creditworthiness, (b) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, (c) such refinancings, renewals, or extensions do not result in an increase in the interest rate with respect to the Indebtedness so refinanced, renewed, or extended, (d) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are materially more burdensome or restrictive to Borrowers, (e) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness, and (f) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials authorized by Environmental Laws.

"Report" has the meaning specified therefor in Section 16.16.

"Required Lenders" means, at any time, Lenders whose aggregate Pro Rata Shares (calculated under clause (d) of the definition of Pro Rata Shares) exceed 50%.

"Required Revolving Loan Lenders" means "Required Lenders" as such term is defined in the Revolving Loan Agreement.

"Revolving Loan Agent" means Patriarch, as agent for the lenders under the Revolving Loan Documents (and its successors and assigns).

"Revolving Loan Agreement" means that certain Credit Agreement, dated as of June 28, 2007, among the U.S. Borrowers, Revolving Loan Agent and the Revolving Loan Lenders, as the same maybe amended, modified, supplemented, restated or replaced in accordance with the terms of the Intercreditor Agreement.

"Revolving Loan Debt" means the Indebtedness of Borrowers and other obligations of the Loan Parties incurred pursuant to the terms of the Revolving Loan Agreement and the other Revolving Loan Documents and any refinancings, renewals or extensions thereof permitted in accordance with the terms of the Intercreditor Agreement.

"Revolving Loan Documents" has the meaning specified therefore in the Revolving Loan Agreement.

"Revolving Loan Lenders" means the lenders from time to time party to the Revolving Loan Agreement.

"Return and Promotion Reserve" means the reserve established by the Borrowers in the ordinary course consistent with past practice with respect to Accounts.

"Revolver Commitment" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code).

"Solvent" means, with respect to any Person on a particular date, that, at fair valuations, the sum of such Person's assets is greater than all of such Person's debts.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"Spanish Collateral" shall mean (a) the shares of stock in Spanish Subsidiary and (b) the Real Property, if any, and other assets of Spanish Subsidiary.

"Spanish Subsidiary" means Dana S.A.U., a corporation organized under the laws of Spain.

"Specified Goods" means, with respect to any intellectual property, perfume, cologne, eau de cologne, eau de toilette, body splash, aftershave, body lotion, body powder, talc, soap and any other goods now or hereafter sold by any Borrower.

"St. Honore Holding" has the meaning specified therefore in the preamble to this Agreement.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in

Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Taxes" has the meaning specified therefor in Section 17(a).

"Term B Loan" means the loan made to the Borrowers under the Existing Term Loan Agreement in the aggregate principal amount and by the Lenders set forth under the applicable heading on Schedule C-1.

"Term C Loan" means the loan made to the Borrowers under the Existing Term Loan Agreement in the aggregate principal amount and by the Lenders set forth under the applicable heading on Schedule C-1.

"Term D Loan" means the loan made to the Borrowers under the Existing Term Loan Agreement in the aggregate principal amount and by the Lenders set forth under the applicable heading on Schedule C-1.

"Term E Loan" means the loan made to the Borrowers under the Existing Term Loan Agreement in the aggregate principal amount and by the Lenders set forth under the applicable heading on Schedule C-1.

"Term Loan" means any of the Existing Term Loan, the Term B Loan, the Term C Loan, the Term D Loan or the Term E Loan and "Term Loans" means the Existing Term Loan, the Term B Loan, the Term C Loan, the Term D Loan and the Term E Loan, collectively.

"Trademark Security Agreements" means each of (i) the Trademark Collateral Assignment and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 30, 2004, assigned to the Agent pursuant to that certain Second Amendment and Assignment of Trademark Collateral Assignment and Security Interest among the Agent, Finanz St. Honore and the lenders thereto dated as of April 25, 2007 and recorded on May 18, 2007 with the United States Patent and Trademark Office at Reel 003545 and Frame 0001 and (ii) the Trademark Collateral Assignment and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 30, 2004, assigned to the Agent pursuant to that certain Second Amendment and Assignment of Trademark Collateral Assignment and Security Interest among the Agent, Vorumerkjastyring and the lenders thereto dated as of April 25, 2007 and recorded on May 8, 2007 with the United States Patent and Trademark Office at Reel 003537 and Frame 0360.

"United States" means the United States of America.

"US Borrower" has the meaning specified therefore in the preamble to this Agreement.

"US Guarantor" has the meaning specified therefore in the preamble to this Agreement.

"<u>Voidable Transfer</u>" has the meaning specified therefor in <u>Section 18.8</u>.

"<u>Vorumerkjastyring</u>" has the meaning specified therefore in the preamble to this Agreement.

"<u>WFF</u>" has the meaning specified in the recitals.

"<u>WFF Security Agreement</u>" has the meaning specified therefore in <u>Section 10.6</u>.

## Schedule 2.7(a)

## Cash Management Accounts

| Name of Institutions | Company | Account Number | Branch Address |
|---|---|---|---|
| Wachovia Bank, N.A. | Parent (Blocked Account) | 2000025634006 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 |
| Wachovia Bank, N.A. | IMG (Lockbox) | 2000021127232 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 |
| Wachovia Bank, N.A. | Dana (Lockbox) | 2000021127229 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 |

## **Schedule 3.1**

### **Conditions Precedent**

The obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the fulfillment, to the satisfaction of Agent and each Lender (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

(a)     the Closing Date shall occur on or before January 31, 2009;

(b)     all applicable conditions precedent set forth in Section 3.2 of the Agreement shall have been satisfied (other than the conditions set forth in Section 3.2(b));

(c)     Agent shall have received a copy of an amendment and consent to the Revolving Loan Agreement permitting the Advances, duly executed by all of the parties thereto;

(c)     Agent shall have received an original Revolving Promissory Note duly executed and delivered by each Borrower;

(d)     Agent shall have received a copy of the Master Reaffirmation and Amendment to Loan Documents executed by each of the Loan Parties;

(e)     no Default or Event of Default shall have occurred and be continuing on the Closing Date (other than the Existing Defaults); and

(f)     all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Agent.

**Schedule 4.5**

**Locations of Inventory and Equipment**

IMG keeps all, and Dana keeps some, of its inventory and equipment at:

> 720 South Powerline Road, Suite D
> Deerfield Beach, Florida 33442

Dana maintains inventory and a manufacturing operation at:

> 325 East Nugget Avenue, Suite l0lA
> Sparks, Nevada 89431

and keeps some of its inventory at:

> 3333 Crestwood Avenue
> Mountain Top, PA 18707

and stores other inventory with the following bailees:

> Aerosol and Liquid Packing, Inc.
> 715 S. Haven Street
> Baltimore, MD 21224

> Contract Filling, Inc.
> 10 Cliffside Drive
> Cedar Grove, NJ 07009

Dana S.A.U.:  Poligono Ind. San Many, Aptdo. Correos 244, 08400 Granollers, Barcelona, Spain. This is a manufacturing facility owned outright by Dana S.A.U.

**Schedule 4.7(a)**

**States of Organization**

Incorporation type, year and location and exact legal names.

Dana Classic Fragrances, Inc. ("DCF"), Inter-Marketing Group, Inc.("IMG"), IMG Holdings Inc. ("IMGH"), International Watch Corp. ("IWC") and St. Honore Holding, Inc. ("SHH") are each C Corporations. Dana Fragrance Brands, LLC ("DFBLLC") and IMG Fragrance Brands, LLC ("IMGFB") are each limited liability companies. Dana S.A.U. ("DSA") is a "sociedad anonima", abbreviated as "S.A.", the equivalent of a corporation in Spain. Finanz St. Honore B.V. ("FSH") is a "besloten vennootschap", abbreviated as "B.V.", which is translated as a "private limited company". Felagastyring ehf ("Fela") and Vorumerkjastyring ehf ("Vorum") are each "einkahlutafélag", abbreviated as "ehf.", which is translated as a "limited private company."

DCF was organized on November 13, 2003 under the laws of the State of Delaware.
IMG was organized on September 7, 1995 under the laws of the State of Florida.
IMGH was organized on November 13, 2003 under the laws of the State of Delaware.
DFBLLC was organized on November 13, 2003 under the laws of the State of Delaware.
IMGFB was organized on November 13, 2003 under the laws of the State of Delaware.
SHH was organized on July 27, 1999 under the laws of the State of Delaware.
IWC was organized on August 6, 1999 under the laws of the State of Florida.
FSH was organized on December 2, 1985 under the laws of The Netherlands.
DSA was organized on August 22, 1932 under the laws of Spain.
Fela was organized on April 7, 2003 under the laws of Iceland.
Vorum was organized on April 7, 2003 under the laws of Iceland.

## Schedule 4.7(b)

### Chief Executive Offices

Chief executive office of each Loan Party (other than Finanz St. Honore B.V.):

> 720 South Powerline Road, Suite D
> Deerfield Beach, Florida 33442

Finanz St. Honore B.V.'s Director's office is located at:

> Rokin 55
> 1012 KK
> Amsterdam, The Netherlands

## <u>Schedule 4.7 (c)</u>

### Organizational Identification Numbers

Organizational Identification Numbers:

> Dana Classic Fragrances, Inc.:  3727584
> Inter-Marketing Group, Inc.:  P95000069095
> IMG Holdings Inc.:  3727557
> Dana Fragrance Brands, LLC:  3727886
> IMG Fragrance Brands, LLC:  3729270
> St. Honoré Holding, Inc.:  3074714
> International Watch Corp.:  P99000077287
> Finanz St. Honoré, B.V.:  285748
> Dana S.A.:  A-08-027047
> Félagastýring ehf:  630503-3530
> Vorumerkjastyring ehf:  630503-3290

Employee Identification Numbers:

> Dana Classic Fragrances, Inc.:  20-0441439
> Inter-Marketing Group, Inc.:  65-0606628
> IMG Holdings Inc.:  20-0441398
> Dana Fragrance Brands, LLC:  20-0690198
> IMG Fragrance Brands, LLC:  20-0290026
> St. Honoré Holding, Inc.:  23-3009698
> International Watch Corp.:  65-0947334

**<u>Schedule 4.7 (d)</u>**

**Commercial Tort Claims**

None

### Schedule 4.8 (b)

**Capitalization of Borrowers**

Dana is authorized and has issued 1,500 shares of common stock, no par value, to Parent, which represents all issued and outstanding stock of Dana.

IMG is authorized and has issued 500 shares of common stock, $1.00 par value, to Parent, which represents all issued and outstanding stock of IMG.

Félagastýring ehf owns 100% of Dana S.A.U.

## <u>Schedule 4.8 (c)</u>

### Capitalization of Borrowers' Subsidiaries

IMG Holdings, Inc. is the 100% owner of Intermarketing Group, Inc., Dana Classic Fragrances, Inc., Dana Fragrance Brands, LLC, IMG Fragrance Brands, LLC, Félagastýring ehf, and Vorumerkjastyring Ehf.

Intermarketing Group, Inc. is the 100% owner of International Watch Corp. and Jan Bell De Mexico.

Félagastýring ehf is the 100% owner of Dana S.A.U.

Dana Fragrance Brands, LLC is the 100% owner of St. Honoré Holding, Inc.

Finanz St. Honoré, B.V. is the 100% owner of Financiera De Perfumeria, S.A., Dana Classic Fragrances Canada, Inc. and Marcafin, S.A.

## Schedule 4.10

### Litigation

None for Parent.

Jane Roush was a passenger in a vehicle involved in an accident with an employee of Dana. This suit is being handled by Geico, the insurance carrier for the vehicle. The plaintiff sued Isaac Cohen in his individual capacity, and added IMG as a defendant as well.

On or about February 8, 2007, Icebox Scoop, Inc., a former licensee, filed suit in the United States District Court, Eastern District of New York, against Finanz St. Honore B.V. and Dana for, among other things, wrongful termination of contract/license. The suit was filed and never served, and, as of this representation, has not been served. We believe that their claim has no merit and termination of the license was for cause, and not in violation of the terms therein.

Farber & Partners, Inc., in its capacity as Receiver for Teo Corp., sued Dana for, among other things, breach of contract. The suit alleges that Dana did not pay for goods delivered in the amount of $63,217.50. Dana has filed its answer, affirmative defenses and cross claims and has started settlement negotiations.

Finanz St. Honore B.V. filed a Notice of Objection to the filing by Johnson & Johnson Industries ("J&J") of the alleged trademark "Kissably Baby Soft" in International Class 3 with the U.S. Patent & Trademark Office ("USPTO"). J&J responded with a counterclaim seeking to cancel the trademark "Love's Baby Soft" owned by Finanz St. Honore B.V. on the grounds it is generic. The litigation is before the USPTO, being Finanz St. Honore B.V. v. Johnson & Johnson, Opposition No. 91161028 and Cancellation No. 92044444. A concurrent action has been filed with the Canada Trademark Office. Finanz St. Honore B.V. believes the J&J counterclaim has no merit, and has filed a Motion to Dismiss. After initial written discovery was completed, but before depositions could be scheduled, the parties agreed to consolidate these various actions into one action by filing an Amended Complaint. Finanz St. Honore B.V. re-filed their 12(b) Motion to Dismiss (with amendments), thus suspending all further litigation of this matter, pending a ruling by the TTAB. Currently a settlement proposal is being reviewed by J&J, whereby they would cease seeking to use the contested mark as a trademark, but they could use it in "puffery" on the back of their products or in ad copy. In turn, they will voluntarily dismiss their U.S. and Canadian actions. The attorney for J&J is awaiting their reply.

Finanz St. Honore B.V. filed a Notice of Objection to the filing by T.A. Music which sought to file a trademark application for "TATU", Opposition No. 91165019, based on the Russian female rock duet by that name. After the filing of the Opposition, the attorney for the applicant sought to suspend proceedings pending a resolution of this matter. A settlement agreement is pending whereby applicant would agree to use the trademark in the form "T.A.T.U", which is actually how the duet displays its name (in Cyrillic). We are awaiting a response, but the matter is still suspended.

**<u>Schedule 4.14</u>**

**Environmental Matters**

None

## Schedule 4.15

## Intellectual Property

**(a)    SEE ATTACHED FOR A LIST OF PATENTS, TRADEMARKS AND COPYRIGHTS**

**(b)    OTHER**

Dana or its affiliates own certain molds, trade dress and model rights related to its products and sales materials.  The molds are in the possession of the manufacturers of Dana's bottles.  Note that some of these mold designs are subject to trademark protection in favor of Finanz St. Honore B.V., as stated in Exhibit 4.l5(A).

In regard to oil formulas, Finanz St. Honore B.V. owns formulas for many of the fragrance oils that are used in Dana products worldwide.  Most of these oil formulas are the property of Finanz St. Honore B.V.  For oil formulas that are not the property of Finanz St. Honore B.V., Finanz St. Honore B.V. has the exclusive right (pursuant to written or unwritten agreements) to the use of the oil formulas, whether by Finanz St. Honore B.V. or an authorized licensee of Finanz St. Honore B.V.

In regard to formulations of products, Finanz St. Honore B.V. is the owner of all product formulations manufactured by its affiliates, and has the right under license agreements (written or unwritten) in which it is licensor to approve the formulations of all its licensees.

Dana also owns certain molds used for its artificial nails.  These are in the possession of Dana, and located at the Sparks, NV facility.

**(c)    LICENSES**

CHANTILLY, WHITE CHANTILLY, DEMI-JOUR, ENGLISH WATERLILLIES, MONSIEUR MUSK, BISTRO DE CHANTILLY, PARFUMS PARQUET and FRENCH VANILLA

License Agreement with Houbigant Inc. and Etablissement Houbigant, as Licensors, and IMG Fragrance Brands, LLC, as Licensee, dated December 19,2003.  Worldwide basis.

Royalties are $175,000 per month for 60 months (starting 1/1/04), after which time the trademarks and all other rights related thereto may be purchased by Licensee for $1,000.  These rights are in turn sub-licensed by IMG Fragrance Brands, LLC to Dana per a certain Sub-License Agreement Related to Houbigant Trademarks dated January 10, 2004.


HEAVEN SENT

Alleghany Pharmacal Corporation, via licenses with DCF:

Agreement between Helena Rubinstein, Inc., as Licensor, and Alliance Trading Company Incorporated, as Licensee, and dated January 1, 1981. Assigned to Dana on December 31, 2003 by New Dana Perfumes Corporation pursuant to the Asset Purchase Agreement. All of the countries in the Western Hemisphere, including Puerto Rico, the United States Virgin Islands and the Mexican Free Trading Zone, but excluding Canada, the continental United States, Alaska, Hawaii, Mexico other than the Free Trading Zone, Chile, Columbia, Uruguay, Guatemala, Costa Rica, Nicaragua, El Salvador and Honduras. Royalties are 5%.

Agreement between Alleghany Pharmacal Corporation, as Licensor, and MEM Company, Inc., as Licensee, and dated March 12, 1982. Assigned to Dana on December 31, 2003 by New Dana Perfumes Corporation pursuant to the Asset Purchase Agreement. Covers U.S. and its territories, except Puerto Rico. No royalty owed.

Agreement between Helena Rubinstein, Inc., as Licensor, and MEM Company, Inc., as Licensee, and dated April 25, 1983. Assigned to Dana on December 31, 2003 by New Dana Perfumes Corporation pursuant to the Asset Purchase Agreement. Covers Canada. No royalty owed.

License Agreement between Coscelebre, Inc. (as successor to Helena Rubenstein, Inc.), as Licensor, and MEM Company, Inc., as Licensee, and dated July 14, 1987. Assigned to Dana on December 31, 2003 by New Dana Perfumes Corporation pursuant to the Asset Purchase Agreement. Covers Chile, Columbia, Costa Rica, El Salvador, Guatemala, Honduras, Indonesia, Japan, Mexico, Nicaragua, Trinidad and Tobago, the former USSR, Uruguay, Ireland, France, New Zealand, Australia and India. Royalties are 7½%.

## **Exhibit 4.15, Parts I and II, to Schedule 4.15**

See attached.

## <u>Schedule 4.17</u>

## Deposit Accounts and Securities Accounts

| Name of Institutions | Company | Account Number | Branch Address | Description of Account |
|---|---|---|---|---|
| Wachovia Bank, N.A. | Parent | 2000025634006 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 | ZBA Collections – Blocked Account |
| Wachovia Bank, N.A. | IMG | 2000021127232 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 | IMG Lock Box |
| Wachovia Bank, N.A. | Dana | 2000021127229 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 | Dana Lock Box |
| Wachovia Bank, N.A. | Parent | 2000025633997 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 | ZBA Disbursement – Funding Account |
| Wachovia Bank, N.A. | IMG | 2079940016620 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 | IMG Controlled Disbursement |
| Wachovia Bank, N.A. | Dana | 2079940016633 | 350 E. Las Olas Blvd. Suite 1800 Ft. Lauderdale, FL 33301 | Dana Controlled Disbursement |
| Mercantile Bank | Dana | 7600437581 | 4697 N. State Road 7 Coral Springs, FL 33067 | Petty Cash for Dana |

## **Schedule 4.19**

### **Permitted Indebtedness**

1.    Pursuant to a severance agreement assumed by Dana, Dana is obligated to provide additional severance to Anthony Wesley in the amount of $447,912.93, which is included in accrued expenses and with a maturity date of November 5, 2007.

2.    The Revolver Loan Debt.

## <u>Schedule 4.20</u>

## **Material Contracts**

License Agreement with Houbigant Inc. and Etablissement Houbigant, as Licensors, and IMG Fragrance Brands, LLC, as Licensee, dated December 19,2003.  Worldwide basis.  Royalties are $175,000 per month for 60 months (starting 1/1/04), after which time the trademarks and all other rights related thereto may be purchased by Licensee for $1,000.  These rights are in turn sub-licensed by IMG Fragrance Brands, LLC to Dana per a certain Sub-License Agreement Related to Houbigant Trademarks dated January 10, 2004.

## Schedule 5.2

## Collateral Reporting

Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the documents to be provided to the Revolving Loan Agent and/or any Revolving Loan Lender pursuant to Schedule 5.2 of the Revolving Loan Agreement at the substantially the same times and in the same in form as such documents are provided to the Revolving Loan Agent and/or any Revolving Loan Lender, including, but not limited to:

| Weekly | (a) an Account roll-forward with supporting details supplied from sales journals, collection journals, credit registers and any other records together with a report specifying the Borrowers' Return and Promotional Reserve, in a format acceptable to Agent in its discretion, |
| --- | --- |
| | (b) notice of all claims, offsets, or disputes asserted by Account Debtors with respect to Borrowers' Accounts, and |
| | (c) Inventory system/perpetual reports specifying the cost and the wholesale market value of Borrowers' Inventory, by category, with additional detail showing additions to and deletions therefrom (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting). |
| Monthly (no later than the 10th day of each month | (d) a Borrowing Base Certificate, |
| | (e) a detailed aging, by total, of Borrowers' Accounts, together with a reconciliation and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), |
| | (f) a detailed calculation of those Accounts that are not eligible for the Borrowing Base, if Borrowers have not implemented electronic reporting, |
| | (g) a detailed Inventory system/perpetual report together with a reconciliation to Borrowers' general ledger accounts (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), |
| | (h) a detailed calculation of Inventory categories that are not eligible for the Borrowing Base, if Borrowers have not implemented electronic reporting, |
| | (i) a summary aging, by vendor, of Borrowers' accounts payable and any book overdrafts (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting) and an aging, by vendor, of any held checks, |
| | (j) a detailed report regarding Loan Parties' cash and Cash Equivalents, including an indication of which amounts constitute Qualified Cash, and |

| | |
|---|---|
| | (k)    a monthly Account roll-forward, in a format acceptable to Agent in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledgers. |
| Monthly (no later than the 30th day of each month) | (l)    a reconciliation of Accounts, trade accounts payable, and Inventory of Borrowers' general ledger accounts to their monthly financial statements including any book reserves related to each category; and<br><br>(m)    confirmation of the making of all royalty payments under the Chantilly License. |
| Quarterly | (n)    a report regarding Loan Parties' accrued, but unpaid, ad valorem taxes. |
| Annually | (o)    a detailed list of Borrowers' customers, with address and contact information. |
| Upon request by Agent | (p)    copies of purchase orders and invoices for Inventory and Equipment acquired by Loan Parties,<br><br>(q)    copies of invoices together with corresponding shipping and delivery documents, and credit memos together with corresponding supporting documentation, with respect to invoices and credit memos in excess of an amount determined in the sole discretion of Agent, from time to time, and<br><br>(r)    such other reports as to the Collateral or the financial condition of Loan Parties, as Agent may reasonably request. |

## Schedule 5.3

### Financial Statements, Reports, Certificates

Deliver to Agent, with copies to each Lender, each of the financial statements, reports, or other items to be provided to the Revolving Loan Agent and/or any Revolving Loan Lender pursuant to Schedule 5.3 of the Revolving Loan Agreement at the substantially the same times and in the same in form as such documents are provided to the Revolving Loan Agent and/or any Revolving Loan Lender, including, but not limited to:

| | |
|---|---|
| as soon as available, but in any event within 30 days after the end of each month during each of Parent's fiscal years | (a)  an unaudited consolidated and consolidating balance sheet, income statement, and statement of cash flow covering Borrowers' operations during such period, and <br><br> (b)  a Compliance Certificate. <br><br> (c)  a thirteen-week rolling cash flow forecast of Borrowers in reasonable detail acceptable to Agent in its discretion. |
| as soon as available, but in any event within 120 days after the end of each of Parent's fiscal years | (d)  consolidated and consolidating financial statements of Parent and its Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Agent and certified, without any qualifications (including any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Section 6.18), by such accountants to have been prepared in accordance with GAAP (other than with respect to the Foreign Subsidiaries) (such audited financial statements to include a balance sheet, income statement, and statement of cash flow and, if prepared, such accountants' letter to management, and such consolidating financial statements prepared in a manner consistent with the fiscal year 2006 audit shall be acceptable), and <br><br> (e) a Compliance Certificate. |
| as soon as available, but in any event within 30 days after the end of each of Parent's fiscal years | (f)  copies of Borrowers' Projections, in form and substance (including as to scope and underlying assumptions) satisfactory to Agent, in its Permitted Discretion, for the forthcoming 3 years, year by year, and for the forthcoming fiscal year, month by month, certified by the chief financial officer of Administrative Borrower as being such officer's good faith estimate of the financial performance of Borrowers during the period covered thereby. |
| If and when file by any Borrower, | (g)  Form 10-Q quarterly reports, Form 10-K annual reports, and any Borrower, Form 8-K current reports, <br><br> (h)  any other filings made by any Borrower with the SEC, and |

| | |
|---|---|
| | (i)    any other information that is provided by any Borrower to its shareholders generally. |
| promptly, but in any event within 5 days after a Borrower has knowledge of any event or condition that constitutes a Default or an Event of Default, | (j)    notice of such event or condition and a statement of the curative action that Borrowers propose to take with respect thereto. |
| promptly upon, but in any event within 5 days after, the occurrence thereof, | (k)    notice of the termination of any Material Contract. |
| promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Borrower or any Subsidiary of a Borrower, | (l)    notice of all actions, suits, or proceedings brought by or against any Borrower or any Subsidiary of a Borrower before any Governmental Authority which reasonably could be expected to result in a Material Adverse Change. |
| upon the request of Agent, | (m)    any other information reasonably requested relating to the Agent, financial condition of Borrowers or their Subsidiaries. |

**Schedule 6.6**

**Nature of Business**

Dana sells and markets fragrances, cosmetic products and personal care products bearing or otherwise using various trademarks, as well as sales and marketing in general of fragrance products, cosmetic products and personal care products.  IMG sells and markets jewelry, glasses and writing instruments.

**Schedule 6.13**

**Intercompany License Agreements**

The Sub-License Agreement Related to Houbigant Trademarks dated January 10, 2004, between IMG Fragrance Brands, LLC and Dana.

License Agreement between Finanz St. Honore B.V. and New Dana Perfumes (Canada) Corp. (n.k.a. Dana Classic Fragrances Canada, Inc.), dated June 1, 2000 (assigned to Dana by New Dana Perfumes Corporation and DPC Acquisition Corporation on December 31, 2003).

License Agreement between Finanz St. Honore B.V., Marcafin S.A. and Vorumerkjastyring ehf, dated May 28, 2003, as amended April 1, 2005.

License Agreement between Finanz St. Honore B.V. and Dana, dated December 29, 2003.

Distribution Agreement between Dana, Finanz St. Honore B.V. and Madona, S.A., dated December 15, 2005.

Amendment to License Agreement between Finanz St. Honore B.V. and Dana, dated October 1, 2004.

License Agreement between Finanz St. Honore B.V. and Dana S.A.U., dated April 1, 2005.

## Schedule 8.15

### Existing Defaults

1.     The failure of Borrowers to maintain the minimum required EBITDA for the twelve month period ending October 31, 2008, constituting a breach of Section 6.16(a) of the Credit Agreement and an Event of Default under Section 7.2(a) of the Credit Agreement.

2.     The failure of Borrowers to maintain the minimum required Fixed Charge Coverage Ratio for the twelve month period ending October 31, 2008, constituting a breach of Section 6.16(b) of the Credit Agreement and an Event of Default under Section 7.2(a) of the Credit Agreement.

3.     Borrowers selling goods to Dana Classic Fragrances Canada, Inc. at various times prior to the date hereof while one or more Events of Default were in existence, constituting a breach of Section 6.13(a)(i) of the Credit Agreement and an Event of Default under Section 7.2(a) of the Credit Agreement.

4.     Jan Bell de Mexico owing payables to Borrowers which are more than 150 days past original invoice date, constituting a breach of Section 6.13(a)(ii) of the Credit Agreement and an Event of Default under Section 7.2(a) of the Credit Agreement.

5.     Borrowers shipping goods to Dana Outlet Inc. at various times prior to the date hereof for which Borrowers have not been paid, constituting a breach of Section 6.13(a) of the Credit Agreement and an Event of Default under Section 7.2(a).

# **EXHIBIT 6**

# Exhibit 1

FILED: NEW YORK COUNTY CLERK 07/08/2020 04:08 PM
NYSCEF DOC. NO. 1
INDEX NO. 190178/2020
RECEIVED NYSCEF: 07/08/2020
Case 1:24-cv-05554-GBD-DCP Document Filed 08/12/21 Page 233 of 465
1 of 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------X

BRIAN JOSEPH GREF,                                    :     Index No.:
                                                      :     Date Filed:
                                                      :
                             Plaintiff,               :     Plaintiff designates
                                                      :     New York County
          -against-                                   :     as the place of trial
                                                      :
                                                      :     The basis of the venue is
AMERICAN INTERNATIONAL INDUSTRIES,                    :     **Defendant's Place of Business**
*individually and as successor-in-interest for the*   :
CLUBMAN BRAND, and to THE NESLEMUR                    :     SUMMONS
COMPANY and PINAUD COMPANY, et al.                    :
                                                      :
                             Defendants.              :
                                                      :
See Attached Rider – FULL CAPTION                     :
---------------------------------------------------------------------X

## TO THE ABOVE NAMED DEFENDANTS:

      **You are hereby summoned** to answer the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on the Plaintiffs' Attorney within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York). In the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Date:  New York, New York
       July 8, 2020

                          **SIMMONS HANLY CONROY**
                          Attorneys for Plaintiffs
                          112 Madison Avenue
                          New York, NY 10016
                          Tel.: (212)784-6400

                          James M. Kramer, Esq

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X
                                                :

BRIAN JOSEPH GREF,                         :

                               :

                      Plaintiff,     :

      -against-                     :

                               :           **FULL CAPTION RIDER**

AMERICAN INTERNATIONAL INDUSTRIES,  :
  *individually and as successor-in-interest for the*  :
  CLUBMAN BRAND, and to THE NESLEMUR  :
  COMPANY and PINAUD COMPANY,  :
BRENNTAG NORTH AMERICA,  :
BRENNTAG SPECIALTIES, INC*., as successor-in-*  *:*
  *interest to* MINERAL PIGMENT SOLUTIONS, INC.,  :
  *as successor-in-interest to* WHITAKER CLARK  :
  & DANIELS, INC.,  :
CYPRUS AMAX MINERALS COMPANY, sued  :
  individually, doing business as, and as successor to  :
  AMERICAN TALC COMPANY, METROPOLITAN  :
  TALC CO. INC., and CHARLES MATHIEU, INC and  :
  SIERRA TALC COMPANY and UNITED TALC  :
  COMPANY,  :
CYPRUS MINES CORPORATION *individually,*  :
  *doing business as, and as successor-in-interest to*  :
  AMERICAN TALC COMPANY,  :
  METROPOLITAN TALC CO. INC., CHARLES  :
  MATHIEU INC., CYPRUS INDUSTRIAL  :
  MINERALS COMPANY, WINDSOR  :
  MINERALS INC., and VERMONT TALC  :
DANA CLASSIC FRAGRANCES, INC.,  :
IMG HOLDINGS INC.,  :
JOHNSON & JOHNSON,  :
JOHNSON & JOHNSON CONSUMER,  :
  COMPANIES, INC.,  :
KOLMAR LABORATORIES, INC.,  :
LUZENAC AMERICA INC.,  :
PATRIARCH PARTNERS, LLC  :
JOHN DOE 1 through JOHN DOE 75 (fictitious),  :

                               :

                     Defendants.   :
-----------------------------------------------------------------------X

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
                                                  :

BRIAN JOSEPH GREF,                        :       Index No.:
                                                  :

                               Plaintiff,      :       COMPLAINT FILED:
                -against-                  :
                                                  :       **VERIFIED COMPLAINT**

AMERICAN INTERNATIONAL INDUSTRIES,    :
  *individually and as successor-in-interest for the*  :
  CLUBMAN BRAND, and to THE NESLEMUR   :
  COMPANY and PINAUD COMPANY,       :
BRENNTAG NORTH AMERICA,           :
BRENNTAG SPECIALTIES, INC*., as successor-in-*  :
  *interest to* MINERAL PIGMENT SOLUTIONS, INC.,  :
  *as successor-in-interest to* WHITAKER CLARK  :
  & DANIELS, INC.,                     :
CYPRUS AMAX MINERALS COMPANY, sued   :
  individually, doing business as, and as successor to  :
  AMERICAN TALC COMPANY, METROPOLITAN  :
  TALC CO. INC., and CHARLES MATHIEU, INC and  :
  SIERRA TALC COMPANY and UNITED TALC   :
  COMPANY,                        :
CYPRUS MINES CORPORATION *individually,*   :
  *doing business as, and as successor-in-interest to*  :
  AMERICAN TALC COMPANY,           :
  METROPOLITAN TALC CO. INC., CHARLES   :
  MATHIEU INC., CYPRUS INDUSTRIAL     :
  MINERALS COMPANY, WINDSOR        :
  MINERALS INC., and VERMONT TALC     :
DANA CLASSIC FRAGRANCES, INC.,       :
IMG HOLDINGS INC.,                 :
JOHNSON & JOHNSON,              :
JOHNSON & JOHNSON CONSUMER,       :
  COMPANIES, INC.,                 :
KOLMAR LABORATORIES, INC.,         :
LUZENAC AMERICA INC.,             :
PATRIARCH PARTNERS, LLC          :
JOHN DOE 1 through JOHN DOE 75 (fictitious),  :
                                                  :

                                 Defendants.   :
------------------------------------------------------------------------X

3

Plaintiff's complaint of the Defendants, by SIMMONS HANLY CONROY, his attorneys, respectfully alleges, upon information and belief, at all times hereinafter mentioned, as follows:

## PARTIES – PLAINTIFF

1.    Plaintiff Brian Joseph Gref resides at 10263 Whispering Forest Drive, Apartment 716, Jacksonville, FL 32257. Plaintiff Brian Gref was previously employed as, *inter alia,* a security guard, desk clerk, service technician, call center operator, medical combat technician, and presently employed as a blood technician. During his personal use of talc products, Plaintiff Brian Gref was exposed to and came in contact with Defendants' asbestos products and was also exposed to dust from Defendants' asbestos, asbestos-containing, and asbestos-contaminated products. As a direct and proximate result of his inhalation and ingestion of asbestos dust particles and fibers from Defendants' asbestos and asbestos-contaminated products, Plaintiff Brian Gref developed mesothelioma on or about November 27, 2019. Said injury meets the criteria for placement on the New York City Asbestos Litigation ("NYCAL") active docket as set forth in the NYCAL Case management order.

2.    Plaintiff respectfully repeats, realleges, and incorporates as set forth more fully herein all allegations contained in Simmons Hanly Conroy Standard Complaint for New York City Asbestos Litigation filed with the Court under Index No. 40,000 on June 16, 2015 as it pertains to the Defendants in the aforementioned caption.

3.    Reference herein to plaintiff and/or plaintiff's decedents is reference to all the persons set forth above as is syntactically and contextually correct.

4

## **PARTIES - DEFENDANTS**.

4.      Defendant AMERICAN INTERNATIONAL INDUSTRIES, individually and as successor-in-interest for the CLUBMAN BRAND, and to THE NESLEMUR COMPANY and PINAUD COMPANY is a corporation and was doing business in the State of New York.

5.      Defendant BRENNTAG NORTH AMERICA is a corporation and was doing business in the State of New York.

6.      Defendant BRENNTAG SPECIALTIES, INC., as successor-in-interest to MINERAL PIGMENT SOLUTIONS, INC., as successor-in-interest to WHITAKER CLARK & DANIELS, INC., is a corporation and was doing business in the State of New York.

7.      Defendant CYPRUS AMAX MINERALS COMPANY, sued individually, doing business as, and as successor to AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC and CHARLES MATHIEU, INC and SIERRA TALC COMPANY and UNITED TALC COMPANY is a corporation and was doing business in the State of New York.

8.      Defendant CYPRUS MINES CORPORATION individually, doing business as, and as successor-in-interest to AMERICAN TALC COMPANY, METROPOLITAN TALC CO. INC., CHARLES MATHIEU INC., CYPRUS INDUSTRIAL MINERALS COMPANY, WINDSOR MINERALS INC., and VERMONT TALC is a corporation and was doing business in the State of New York.

9.      Defendant DANA CLASSIC FRAGRANCES, INC. is a corporation and was doing business in the State of New York.

10.      Defendant IMG HOLDINGS INC. is a corporation and was doing business in the State of New York.

5

Case 1:25-cv-05534-GHJ-DCF Document 1 Filed 08/12/21 Page 238 of 465

11.     Defendant JOHNSON & JOHNSON is a corporation and was doing business in the State of New York.

12.     Defendant JOHNSON & JOHNSON CONSUMER COMPANIES, INC. is a corporation and was doing business in the State of New York.

13.     Defendant KOLMAR LABORATORIES, INC. is a corporation and was doing business in the State of New York.

14.     Defendant LUZENAC AMERICA INC. is a corporation and was doing business in the State of New York.

15.     Defendant PATRIARCH PARTNERS, LLC is a corporation and was doing business in the State of New York.

16.     John Doe 1 through John Doe 50 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known and who mined, manufactured, sold, marketed, installed, or removed asbestos or asbestos containing products which plaintiff used or to which plaintiff was exposed.

17.     John Doe 51 through John Doe 75 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known and who are the alter ego of or are otherwise responsible for the conduct or liability of those who mined, milled, manufactured, sold, marketed, installed, or removed asbestos or asbestos containing products which plaintiff used or to which plaintiff was exposed.

18.     The term "Defendant" is used hereafter to refer to all of the entities named above.

19.     At all relevant times the Defendants have done business in this state, have transacted business in this state, have committed one or more tortuous acts within this state, and

6

Case 1:20-cv-05534-KBD-DCF Document 1-1 Filed 08/12/20 Page 239 of 465

otherwise have performed acts within or without the state which have given rise to the injuries and losses hereafter described, and which subjects them to jurisdiction of the courts of this state.

20.     Plaintiff hereby incorporates by reference all allegations set forth in the Standard Verified Complaint filed with the Court under Index No. 40,000 on June 16, 2015 in accordance with the Case Management Order entered by Justice Freedman respecting asbestos litigation. Copies of the Standard Complaint are available upon written request.

## PUNITIVE DAMAGES

21.     Defendants and each of them had a duty to refrain from willful, reckless and wanton acts, omissions and/or misconduct which would foreseeably harm Plaintiff Brian Gref and/or expose Plaintiff Brian Gref to harm.

22.     Defendants and each of them breached said duties in that one or more of the above-described acts and/or omissions constitute willful, reckless, and wanton misconduct and manifests an intentionally and reckless disregard for the health, safety, and well-being of Plaintiff Brian Gref and others similarly situated.

23.     As a direct and proximate result of such willful, reckless, and wanton acts and/or omissions on the part of the Defendants and each of them, Plaintiff Brian Gref was exposed to asbestos as described, causing Plaintiff Brian Gref to develop mesothelioma and thereby sustain damages as outlined above as against each Defendant.

24.     In addition to compensatory damages, an award of punitive damages is necessary and appropriate to punish Defendants and each of them for their willful, wanton and intentional misconduct and reckless disregard for the health, safety and well-being of Plaintiff Brian Gref, and to deter Defendants and others from engaging in like misconduct in the future.

25.     WHEREFORE, Plaintiff demands and prays judgment against Defendants and each of them, jointly, severally or in the alternative, as follows:

a. Compensatory damages on each cause of action in an amount to be determined at trial, but exceeding the jurisdictional limits of any and all lower courts;

b. Punitive damages in amounts to be determined at trial, but exceeding the jurisdictional limits of any and all lower courts;

c. An award of interest (pre- and post- judgment), costs and disbursements incurred in this action; and,

d. Such other and further relief as this Court deems appropriate.

26.    In accordance with the Case Management Order entered on June 20, 2017, a copy of Plaintiff's Social Security records were ordered on January 8, 2020 and will be made available to Defendants.

Dated: New York, New York                          **SIMMONS HANLY CONROY**
      July 8, 2020

James Kramer, Esq.
112 Madison Avenue, 7th Floor
New York, New York 10016-7416
Attorneys for Plaintiff

**OF COUNSEL**
SIMMONS HANLY CONROY
Drew Sealey (IL Id. No. 6294584)
One Court Street
Alton, Illinois 62002
Tele: (618) 259-2222
Fax: (618) 259-2251

8

Case 1:21-cv-20558-BB Document 1 Filed 08/12/21 Page 241 of 465

STATE OF NEW YORK          )

                           )

COUNTY OF NEW YORK    )

     The undersigned, an attorney admitted to practice in the Courts of New York State, shows:

     Deponent is a member of the firm SIMMONS HANLY CONROY, Trial Counsel for the Plaintiff in the within action; deponent has read the foregoing Summons and Verified Complaint and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true. This Verification is made by deponent and not by Plaintiff because Plaintiff resides outside of the County of New York where the deponent maintains his office.

Dated: <u>July 8, 2020</u>

James M. Kramer, Esq.

9

# EXHIBIT 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x          Index No. 190251/2020

JOANNA LEVINE and TIMOTHY SPAHR,                              **SECOND AMENDED**
**COMPLAINT**
                    Plaintiffs,
Plaintiffs demand a trial
    -against-                                       by jury.

KOLMAR LABORATORIES, INC.; BRENNTAG
NORTH AMERICA, INC., individually and as
successor-in-interest to MINERAL PIGMENT
SOLUTIONS, INC. as successor-in-interest to
WHITTAKER, CLARK & DANIELS, INC.;
BRENNTAG SPECIALTIES, INC. f/k/a
MINERAL PIGMENT SOLUTIONS, INC. as
successor-in-interest to WHITTAKER, CLARK &
DANIELS, INC.;
CHATTEM, INC.;
CYPRUS MINES CORPORATION;
CYPRUS AMAX MINERALS CORPORATION;
DANA CLASSIC FRAGRANCES, as Successor in
Interest to English Leather and Tinkerbell;
JOHNSON & JOHNSON;
JOHNSON & JOHNSON CONSUMER INC.;
WHITTAKER CLARK & DANIELS, INC.;
**PATRIARCH PARTNERS LLC, Individually**
**and as successor- in-interest to DANA**
**FRAGRANCES**.

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - x

**TO THE ABOVE NAMED DEFENDANTS:**

      Plaintiffs, by their attorneys, LEVY KONIGSBERG LLP and MAUNE RAICHLE

HARTLEY FRENCH & MUDD, for their Complaint, respectfully allege as follows:

      1)    Plaintiffs repeat and re-allege Levy Konigsberg LLP's Standard Asbestos

Complaint for Personal Injury filed on May 11, 2018 ("Levy Konigsberg LLP's Standard

Complaint"), bearing caption: In Re New York City Asbestos Litigation relating to All Asbestos

cases under Index No. 782000/2017 as if fully incorporated herein.

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 244 of 465

2)    Plaintiffs amend their Complaint to add **PATRIARCH PARTNERS LLC, Individually and as successor- in-interest to DANA FRAGRANCES** as an additional defendant to the within action pursuant to the Case Management Order governing these actions.

3)    Plaintiffs seek punitive damages against all Defendants because, among other things, Defendants' tortious conduct was willful, wanton, and reckless. Defendants' tortious conduct demonstrated a conscious indifference to the health, safety, and rights of others, including Plaintiffs. Defendants' tortious conduct further demonstrated that it puts profits before public health and safety.

Dated:  New York, New York
       March 10, 2021

                          **LEVY KONIGSBERG LLP**

                          _____

                          Robert Ellis, Esq.
                          *Attorneys for Plaintiff*
                          605 Third Avenue, 33rd Floor
                          New York, New York 10158
                          Rellis@levylaw.com

                          **MAUNE RAICHLE HARTLEY FRENCH & MUDD**
                          *Attorneys for Plaintiff*
                          Suzanne M. Ratcliffe, Esq.

# **EXHIBIT 8**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| IN RE: NEW YORK CITY ASBESTOS LITIGATION | |
| THIS DOCUMENT RELATES TO: | Index No.: |
| JUDITH PELTZ and BENJAMIN PELTZ, | |
| Plaintiffs, | **SUMMONS** |
| -against- | Plaintiffs designate NEW YORK County as the Place of Trial |
| AVON PRODUCTS, INC., *et al.*, | |
| Defendants. | The Basis of Venue is Defendants' Place of Business |
| *See Attached Full Caption Rider* | |

**TO THE ABOVE NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your Answer—or, if the Complaint is not served with this Summons, to serve a Notice of Appearance—on the plaintiffs' attorney within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York). In the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated:  July 19, 2021
        New York, New York

                                THE LANIER LAW FIRM PLLC
                                *Attorneys for Plaintiffs*
                                126 E. 56th Street, 6th Floor
                                New York, New York 10022
                                Tel.: (212) 421-2800

                        By: _Darron Berquist_ _____
                                Darron E. Berquist, Esq.

2107757_6

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 247 of 465

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN RE:  NEW YORK CITY
         ASBESTOS LITIGATION

THIS DOCUMENT RELATES TO:

JUDITH PELTZ and BENJAMIN PELTZ,

                                    Plaintiffs,

         -against-

AVON PRODUCTS, INC.;
BOBBI BROWN PROFESSIONAL COSMETICS, INC.;
BRENNTAG NORTH AMERICA, INC. (individually and as
   successor to Mineral and Pigment Solutions, Inc.,
   successor to Whittaker, Clark & Daniels, Inc.);
BRENNTAG SPECIALTIES, LLC (individually and as
   successor to Mineral and Pigment Solutions, Inc.,
   successor to Whittaker, Clark & Daniels, Inc.);
BRISTOL-MYERS SQUIBB CO. (individually and as
   successor to Charles of the Ritz Inc. and Lavin-Charles
   of the Ritz);
BULGARI CORPORATION OF AMERICA;
CARGO COSMETICS, LLC;
CHANEL, INC.;
CLARINS GROUP NORTH AMERICA, INC.;
COTY, INC. (individually and as successor to CoverGirl
   Cosmetics, Inc.);
DILLARD'S, INC.;
ESTE LAUDER, INC. (individually and as successor to Bobbi
   Brown Professional Cosmetics, Inc., Clinique, Tom Ford,
   and Make-Up Art Cosmetics, Inc.);
ESTÉE LAUDER INTERNATIONAL, INC (individually and as
   successor to Bobbi Brown Professional Cosmetics, Inc.,
   Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc.).;
EVE PEARL, LLC;
GURWITCH PRODUCTS, LLC;
HERMÈS OF PARIS, INC.;
HOUBIGANT, INC. (individually, doing business as, and as
   successor to Dana Fragrances);
JEROME ALEXANDER COSMETICS, INC.;
LANCÔME;
LORAC COSMETICS, LLC;
L'OREAL USA, INC. (individually and as successor to Yves
   Saint Laurent America, Inc., and Lancôme);

2107757_6

L'ORÉAL USA PRODUCTS, INC. (individually and as successor to Yves Saint Laurent America, Inc., and Lancôme);

MAKE-UP ART COSMETICS, INC.;

MAKE-UP ART COSMETICS (NEW YORK), INC.;

MAKE-UP ART COSMETICS (U.S.), INC.;

MARKWINS BEAUTY BRANDS, INC. (individually and as successor to Yves Saint Laurent America, Inc., and Lorac Cosmetics, LLC);

NINA RICCI USA, INC.;

PATRIARCH PARTNERS, LLC (d/b/a and as successor to Dana Fragrances);

PENHALIGON'S (1870), INC.;

PENHALIGON'S, INC.;

PENHALIGON'S U.S.A., INC.;

PUBLIX SUPERMARKETS, INC.;

PUIG NORTH AMERICA, INC. (individually and as successor to Myrurgia, S.A. , Nina Ricci, and Penhaligon's, Inc.);

PUIG USA, INC. (individually and as successor to Myrurgia, S.A. , Nina Ricci, and Penhaligon's, Inc.);

REVLON, INC. (individually and as successor to Charles of the Ritz Inc., Lavin-Charles of the Ritz, E. R. Squibb, Squibb Corp,. and Yves Saint Laurent);

REVLON CONSUMER PRODUCTS CORP. (individually and as successor to Revlon Research Laboratories, Inc., Charles of the Ritz Inc., Lavin-Charles of the Ritz, E.R. Squibb, Squibb Corp., and Yves Saint Laurent);

SAKS FIFTH AVENUE, LLC (f/k/a Saks Fifth Avenue, Inc.);

SEPHORA USA, INC.;

SHISEIDO AMERICA, INC.;

SHISEIDO AMERICAS CORP.;

THE ESTÉE LAUDER COMPANIES, LLC (individually and as successor to Bobbi Brown Professional Cosmetics, Inc., Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc.);

THE NEIMAN MARCUS GROUP, LLC (f/k/a The Nieman-Marcus Group, Inc.);

THE THYMES, LLC;

TPR HOLDINGS, LLC (individually and as successor to Cargo Cosmetics, LLC);

WHITTAKER, CLARK & DANIELS, INC. (individually, doing business as, and successor to Charles Mathieu Inc. (d/b/a Charles Mathieu & Co. and Chas. Mathieu Inc.), American Talc Company Inc., Metropolitan Talc Company Inc., Imperial Products Co. Inc., and Resource Processors Inc.),

Defendants.

2107757_6

Case 20-50534-KBO   Doc 218   Filed 08/12/22   Page 249 of 465

**Defendants' Addresses:**

| DEFENDANT | SERVICE ADDRESS |
|---|---|
| **Avon Products, Inc.**<br>One Liberty Plaza<br>165 Broadway<br>New York, NY 10006 | c/o New York Secretary of State (B.C.L. § 306) |
| **Bobbi Brown Professional Cosmetics, Inc.**<br>575 Broadway, 4th Fl.<br>New York, NY 10012 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207 |
| **Brenntag North America, Inc.**<br>5083 Pottsville Pke.<br>Reading, PA 19605 | c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>The Corporation Trust Co.<br>Corporation Trust Center<br>1209 Orange St.<br>Wilmington, DE 19801 |
| **Brenntag Specialties, LLC**<br>5083 Pottsville Pke.<br>Reading, PA 19605 | c/o CT Corporation System<br>28 Liberty St.<br>New York, NY 10005 |
| **Bristol-Myers Squibb Co.**<br>345 Park Ave.<br>New York, NY 10154 | c/o CT Corporation System<br>28 Liberty St.<br>New York, NY 10005 |
| **Bulgari Corporation of America**<br>555 Madison Ave., 9th Fl.<br>New York, NY 10022 | c/o New York Secretary of State (B.C.L. § 306) |
| **Cargo Cosmetics, LLC**<br>c/o TPR Holdings, LLC<br>875 Third Ave., 7th Fl.<br>New York, NY 10022 | c/o New York Secretary of State (L.L.C.L. § 303) |
| **Chanel, Inc.**<br>9 West 57th St., 44th Fl.<br>New York, NY 10019 | c/o CT Corporation System<br>28 Liberty St.<br>New York, NY 10005 |
| **Clarins Group North America, Inc.**<br>15 Olympic Dr.<br>Orangeburg, NY 10962 | c/o CT Corporation Service Co.<br>80 State St.<br>Albany, NY 12207 |
| **Coty, Inc.**<br>350 5th Ave., 17th Fl.<br>New York, NY 10118 | c/o CT Corporation Service Co.<br>80 State St.<br>Albany, NY 12207 |
| **Dillard's, Inc.**<br>1600 Cantrell Rd.<br>Little Rock, AK 72201 | c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>The Corporation Trust Co.<br>1209 Orange St.<br>Wilmington, DE 19801 |
| **Estée Lauder, Inc.**<br>767 Fifth Ave. | c/o Corporation Service Co.<br>80 State St. |

| | |
|---|---|
| New York, NY 10153 | Albany, NY 12207-2543<br><br>*and*<br><br>767 Fifth Ave.<br>New York, NY 10153 |
| **Estée Lauder International, Inc.**<br>767 Fifth Ave.<br>New York, NY 10153 | c/o New York Secretary of State (B.C.L. § 306) |
| **Eve Pearl, LLC**<br>208 E. 51st St., Ste. 140<br>New York, NY 10022 | c/o New York Secretary of State (L.L.C.L. § 303) |
| **Gurwitch Products, LLC**<br>135 E. 57th St., Ste. U106<br>New York, NY, 10022-2050 | c/o CT Corporation System<br>28 Liberty St.<br>New York, NY 10005<br><br>*and*<br><br>c/o New York Secretary of State (L.L.C.L. § 304)<br>*With Further Registered Mail Service Upon*<br>The Corporation Trust Co.<br>1209 Orange St.<br>Wilmington, DE 19801 |
| **Hermès of Paris, Inc.**<br>55 E. 59th St., 2nd Fl.<br>New York, NY 10022 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207-2543<br><br>*and*<br><br>55 E. 59th St., 2nd Fl.<br>New York, NY 10022 |
| **Houbigant, Inc.**<br>40 Richards Ave., 4th Fl.<br>Norwalk, CT 06854 | c/o New York Secretary of State (B.C.L. § 306) |
| **Jerome Alexander Cosmetics, Inc.** | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 395733)<br><br>*and*<br><br>c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>15820 Euclid Ave.<br>Chino, CA 91708 |
| **Lancôme**<br>c/o L'Oreal USA, Inc. | c/o New York Secretary of State (B.C.L. § 306) |

2107757_6

| | |
|---|---|
| 10 Hudson Yards<br>New York, NY 10001 | *and*<br><br>c/o L'Oréal USA, Inc.<br>10 Hudson Yards<br>New York, NY 10001 |
| **Lorac Cosmetics, LLC**<br>29025 Avenue Penn<br>Valencia, CA 91355-5426 | c/o New York Secretary of State (L.L.C.L. § 303)<br>(DOS ID: 4862021)<br><br>*and*<br><br>c/o New York Secretary of State (L.L.C.L. § 304)<br>*With Further Registered Mail Service Upon*<br>29025 Avenue Penn<br>Valencia, CA 91355 |
| **L'Oréal USA, Inc.**<br>10 Hudson Yards<br>New York, NY 10001 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207 |
| **L'Oréal USA Products, Inc.**<br>10 Hudson Yards, 30th Floor<br>New York, NY 10001 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207-2543 |
| **Make-up Art Cosmetics, Inc.**<br>767 Fifth Ave.<br>New York, NY 10153 | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 2239105) |
| **Make-up Art Cosmetics (New York), Inc.**<br>767 Fifth Ave.<br>New York, NY 10153 | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 1834609) |
| **Make-up Art Cosmetics (U.S.), Inc.**<br>767 Fifth Ave.<br>New York, NY 10153 | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 1730072) |
| **Markwins Beauty Brands, Inc.**<br>22067 Ferro Pkwy.<br>City of Industry, CA 91789 | c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>Lina Chen<br>22067 Ferro Pkwy.<br>City of Industry, CA 91789 |
| **Nina Ricci USA, Inc.**<br>c/o Puig USA, Inc.<br>183 Madison Ave., 19th Fl<br>New York, NY 10016 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207<br><br>*and*<br><br>c/o Puig USA, Inc.<br>183 Madison Ave., 19th Fl.<br>New York, NY 10016 |
| **Patriarch Partners, LLC**<br>71 Broadway | c/o New York Secretary of State (L.L.C.L. § 304)<br>*With Further Registered Mail Service Upon* |

2107757_6

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 252 of 465

| | |
|---|---|
| #249 Lobby 2B<br>New York, NY 10006 | Corporation Service Co.<br>251 Little Falls Dr.<br>Wilmington, DE 19808 |
| **Penhaligon's (1870), Inc.** | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 2260352) |
| **Penhaligon's, Inc.**<br>1 Rockefeller Plaza, Ste. 1144-1146<br>New York, NY 10020 | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 4698938) |
| **Penhaligon's U.S.A., Inc.**<br>c/o Alfin Fragrances, Inc.<br>5 E. 57th St.<br>New York, NY 10022 | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 728849) |
| **Publix Supermarkets, Inc.**<br>3300 Publix Corporate Pkwy.<br>Lakeland, FL 33811 | c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>Corporate Creations Network, Inc.<br>801 US Hwy. 1<br>North Palm Beach, FL 33408 |
| **Puig North America, Inc.**<br>183 Madison Ave., 19th Fl.<br>New York, NY 10016 | c/o New York Secretary of State (B.C.L. § 306) |
| **Puig USA, Inc.**<br>183 Madison Ave., 19th Fl.<br>New York, NY 10016 | c/o New York Secretary of State (B.C.L. § 306) |
| **Revlon, Inc.**<br>1 New York Plaza<br>New York, NY 10004 | c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>Corporate Creations Network, Inc.<br>3411 Silverside Rd.<br>Tatnall Bldg., Ste. 104<br>Wilmington, DE 19801 |
| **Revlon Consumer Products Corp.**<br>1 New York Plaza<br>New York, NY 10004 | c/o New York Secretary of State (B.C.L. § 306) |
| **Saks Fifth Avenue, LLC**<br>12 E. 49th St.<br>New York, NY 10017 | c/o New York Secretary of State (L.L.C.L. § 303)<br><br>*and*<br><br>Attn: Corporate Tax Dept.<br>12 E. 49th St.<br>New York, NY 10017 |
| **Sephora USA, Inc.**<br>525 Market St., 32nd Fl.<br>San Francisco, CA 94105 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207 |
| **Shiseido America, Inc.**<br>390 Madison Ave.<br>New York, NY 10017 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207 |

2107757_6

| | |
|---|---|
| **Shiseido Americas Corp.**<br>390 Madison Ave.<br>New York, NY 10017 | 390 Madison Ave.<br>New York, NY 10017 |
| **The Estée Lauder Companies, Inc.**<br>767 Fifth Ave.<br>New York, NY 10153 | c/o Corporation Service Co.<br>80 State St.<br>Albany, NY 12207<br><br>*and*<br><br>767 Fifth Ave.<br>New York, NY 10153 |
| **The Neiman Marcus Group, LLC**<br>1618 Main St.<br>One Marcus Square<br>Dallas, TX 75201 | c/o CT Corporation Systems<br>28 Liberty St.<br>New York, N Y 10005 |
| **The Thymes, LLC**<br>629 Ninth St. SE<br>Minneapolis, MN 55414-1308 | c/o New York Secretary of State (L.L.C.L. § 304)<br>*With Further Registered Mail Service Upon*<br>National Registered Agents, Inc.<br>1209 Orange St.<br>Wilmington, DE 19801 |
| **TPR Holdings, LLC**<br>875 Third Ave., 7th Fl.<br>New York, NY 10022 | c/o New York Secretary of State (L.L.C.L. § 303) |
| **Whittaker, Clark & Daniels Inc.** | c/o New York Secretary of State (B.C.L. § 306)<br>(DOS ID: 3024090)<br><br>*and*<br><br>c/o New York Secretary of State (B.C.L. § 307)<br>*With Further Registered Mail Service Upon*<br>Joseph K. Cobuzio, Esq.<br>Tompkins McGuire Wachenfeld & Barry LLP<br>3 Becker Farm Rd., 4th Fl.<br>Roseland, NJ 07068 |

2107757_6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| IN RE:  NEW YORK CITY | |
| ASBESTOS LITIGATION | |

THIS DOCUMENT RELATES TO:

JUDITH PELTZ and BENJAMIN PELTZ,                    Index No.:

                              Plaintiffs,

          -against-

                                                     **VERIFIED COMPLAINT**

AVON PRODUCTS, INC.;
BOBBI BROWN PROFESSIONAL COSMETICS, INC.;
BRENNTAG NORTH AMERICA, INC. (individually and as
    successor to Mineral and Pigment Solutions, Inc.,
    successor to Whittaker, Clark & Daniels, Inc.);
BRENNTAG SPECIALTIES, LLC (individually and as
    successor to Mineral and Pigment Solutions, Inc.,
    successor to Whittaker, Clark & Daniels, Inc.);
BRISTOL-MYERS SQUIBB CO. (individually and as
    successor to Charles of the Ritz Inc. and Lavin-Charles
    of the Ritz);
BULGARI CORPORATION OF AMERICA;
CARGO COSMETICS, LLC;
CHANEL, INC.;
CLARINS GROUP NORTH AMERICA, INC.;
COTY, INC. (individually and as successor to CoverGirl
    Cosmetics, Inc.);
DILLARD'S, INC.;
ESTE LAUDER, INC. (individually and as successor to Bobbi
    Brown Professional Cosmetics, Inc., Clinique, Tom Ford,
    and Make-Up Art Cosmetics, Inc.);
ESTÉE LAUDER INTERNATIONAL, INC (individually and as
    successor to Bobbi Brown Professional Cosmetics, Inc.,
    Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc.).;
EVE PEARL, LLC;
GURWITCH PRODUCTS, LLC;
HERMÈS OF PARIS, INC.;
HOUBIGANT, INC. (individually, doing business as, and as
    successor to Dana Fragrances);
JEROME ALEXANDER COSMETICS, INC.;
LANCÔME;
LORAC COSMETICS, LLC;
L'OREAL USA, INC. (individually and as successor to Yves
    Saint Laurent America, Inc., and Lancôme);

2107757_6

L'ORÉAL USA PRODUCTS, INC. (individually and as successor to Yves Saint Laurent America, Inc., and Lancôme);

MAKE-UP ART COSMETICS, INC.;

MAKE-UP ART COSMETICS (NEW YORK), INC.;

MAKE-UP ART COSMETICS (U.S.), INC.;

MARKWINS BEAUTY BRANDS, INC. (individually and as successor to Yves Saint Laurent America, Inc., and Lorac Cosmetics, LLC);

NINA RICCI USA, INC.;

PATRIARCH PARTNERS, LLC (d/b/a and as successor to Dana Fragrances);

PENHALIGON'S (1870), INC.;

PENHALIGON'S, INC.;

PENHALIGON'S U.S.A., INC.;

PUBLIX SUPERMARKETS, INC.;

PUIG NORTH AMERICA, INC. (individually and as successor to Myrurgia, S.A. , Nina Ricci, and Penhaligon's, Inc.);

PUIG USA, INC. (individually and as successor to Myrurgia, S.A. , Nina Ricci, and Penhaligon's, Inc.);

REVLON, INC. (individually and as successor to Charles of the Ritz Inc., Lavin-Charles of the Ritz, E. R. Squibb, Squibb Corp,. and Yves Saint Laurent);

REVLON CONSUMER PRODUCTS CORP. (individually and as successor to Revlon Research Laboratories, Inc., Charles of the Ritz Inc., Lavin-Charles of the Ritz, E.R. Squibb, Squibb Corp., and Yves Saint Laurent);

SAKS FIFTH AVENUE, LLC (f/k/a Saks Fifth Avenue, Inc.);

SEPHORA USA, INC.;

SHISEIDO AMERICA, INC.;

SHISEIDO AMERICAS CORP.;

THE ESTÉE LAUDER COMPANIES, LLC (individually and as successor to Bobbi Brown Professional Cosmetics, Inc., Clinique, Tom Ford, and Make-Up Art Cosmetics, Inc.);

THE NEIMAN MARCUS GROUP, LLC (f/k/a The Nieman-Marcus Group, Inc.);

THE THYMES, LLC;

TPR HOLDINGS, LLC (individually and as successor to Cargo Cosmetics, LLC);

WHITTAKER, CLARK & DANIELS, INC. (individually, doing business as, and successor to Charles Mathieu Inc. (d/b/a Charles Mathieu & Co. and Chas. Mathieu Inc.), American Talc Company Inc., Metropolitan Talc Company Inc., Imperial Products Co. Inc., and Resource Processors Inc.),

Defendants.

2107757_6

Plaintiffs, JUDITH PELTZ AND BENJAMIN PELTZ, by their attorneys, The Lanier Law Firm PLLC, upon information and belief, at all times hereinafter mentioned, alleges as follows:

## THE PARTIES

1.      Plaintiffs, JUDITH PELTZ and BENJAMIN PELTZ, are residents of Florida, residing at 2575 Rue du Jardin, Naples, Florida.

2.      JUDITH PELTZ was diagnosed with malignant pleural mesothelioma in February 8, 2021. *See* **Exhibit A**. As such, and pursuant to § XIV(B) of the Case Management Order, this case qualifies for the Accelerated Docket.

3.      BENJAMIN PELTZ has been the lawful spouse of JUDITH PELTZ since May 28, 1961.

4.      Pursuant to § VII(A) of the Case Management Order, counsel requested JUDITH PELTZ's social security earnings statement on April 30, 2021.

5.      AVON PRODUCTS, INC. is a domestic corporation with a principal place of business in New York. AVON PRODUCTS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos[1]-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

6.      BOBBI BROWN PROFESSIONAL COSMETICS, INC. is a foreign corporation with a principal place of business in New York. BOBBI BROWN PROFESSIONAL COSMETICS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold

---

[1] Unless indicated otherwise, "asbestos" is used, not in a limited regulatory sense, but broadly and includes non-regulated and non-commercial forms of asbestos, all forms of elongate mineral particles, fibrous minerals, fibrous talc, cleavage fragments of amphiboles, individual fibers, bundles, fibrils and transition/transitional fibers. "Asbestiform" shall also be interpreted broadly and without any single definitional limitation regarding fiber size, length, dimension, ratio, presence of multiple fibers, or geologic origin or "habit." *See, e.g.,* Egilman, et al., Health Effects of Censored Elongated Mineral Particles: A Critical Review, *Detection Limits in Air Quality and Environmental Measurements* (STP 1618, 2019; doi: 10.1520/STP161820180080); January 6, 2020, Executive Summary of Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc (available at https://www.fda.gov/media/134005/download).

2107757_6

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 257 of 465

and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

7.      BRENNTAG NORTH AMERICA, INC. is a foreign corporation with a principal place of business in Pennsylvania. BRENNTAG NORTH AMERICA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

8.      BRENNTAG SPECIALTIES, LLC is a foreign corporation with a principle place of business in Pennsylvania. BRENNTAG SPECIALTIES, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

9.      BRISTOL-MYERS SQUIBB CO. is a foreign corporation with a principal place of business in New York. BRISTOL-MYERS SQUIBB CO. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

10.     BULGARI CORPORATION OF AMERICA is a domestic corporation with a principal place of business in New York. BULGARI CORPORATION OF AMERICA mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

11.     CARGO COSMETICS, LLC is a foreign corporation with a principal place of business in New York. CARGO COSMETICS, LLC mined, milled, processed, imported, designed, manufactured,

2107757_6

assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

12.    CHANEL, INC. is a domestic corporation with a principal place of business in New York. CHANEL, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

13.    CLARINS GROUP NORTH AMERICA, INC. is a foreign corporation with a principal place of business in New York. CLARINS GROUP NORTH AMERICA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

14.    COTY, INC. is a foreign corporation with a principal place of business in New York. COTY, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

15.    DILLARD'S, INC. is a foreign corporation with a principal place of business in Arkansas. DILLARD'S, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed.

16.    ESTÉE LAUDER, INC. is a foreign corporation with a principal place of business in New York. ESTÉE LAUDER, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

2107757_6

Case 20-50534-KBO   Doc 218   Filed 08/12/22   Page 259 of 465

17.     ESTÉE LAUDER INTERNATIONAL, INC. is a foreign corporation with a principal place of business in New York. ESTÉE LAUDER INTERNATIONAL, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

18.     EVE PEARL, LLC is a domestic corporation with a principal place of business in New Jersey. EVE PEARL, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

19.     GURWITCH PRODUCTS, LLC is a foreign corporation with a principal place of business in New York. GURWITCH PRODUCTS, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

20.     HERMÈS OF PARIS, INC. is a domestic corporation with a principal place of business in New York. HERMÈS OF PARIS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

21.     HOUBIGANT, INC. is a foreign corporation with a principal place of business in Connecticut. HOUBIGANT, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

22.     JEROME ALEXANDER COSMETICS, INC. is a domestic corporation with a principal place of business in New York. JEROME ALEXANDER COSMETICS, INC. mined, milled, processed,

2107757_6

imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

23.     LANCÔME is a domestic corporation with a principal place of business in New York. LANCÔME mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

24.     LORAC COSMETICS, LLC is a foreign corporation with a principal place of business in California. LORAC COSMETICS, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

25.     L'ORÉAL USA, INC. is a foreign corporation with a principal place of business in New York. L'ORÉAL USA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

26.     L'ORÉAL USA PRODUCTS, INC. is a foreign corporation with a principal place of business in New York. L'ORÉAL USA PRODUCTS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

27.     MAKE-UP ART COSMETICS, INC. is a foreign corporation with a principal place of business in New York. MAKE-UP ART COSMETICS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream

2107757_6

of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere

28.    MAKE-UP ART COSMETICS (NEW YORK), INC. is a foreign corporation with a principal place of business in New York. MAKE-UP ART COMETICS (NEW YORK), INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere

29.    MAKE-UP ART COSMETICS (U.S.), INC. is a foreign corporation with a principal place of business in New York. MAKE-UP ART COSMETICS (U.S.), INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

30.    MARKWINS BEAUTY BRANDS, INC. is a foreign corporation with a principal place of business in California. MARKWINS BEAUTY BRANDS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

31.    NINA RICCI USA, INC. is a domestic corporation with a principal place of business in New York. NINA RICCI USA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

32.    PATRIARCH PARTNERS, LLC is a foreign corporation with a principal place of business in New York. PATRIARCH PARTNERS, LLC mined, milled, processed, imported, designed, manufactured,

assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere

33.     PENHALIGON'S (1870), INC. is a domestic corporation with a principal place of business in New York. PENHALIGON'S (1870), INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

34.     PENHALIGON'S, INC. is a domestic corporation with a principal place of business in New York. PENHALIGON'S, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

35.     PENHALIGON'S U.S.A., INC. is a domestic corporation with a principal place of business in New York. PENHALIGON'S U.S.A., INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

36.     PUBLIX SUPERMARKETS, INC. is a foreign corporation with a principal place of business in Florida. PUBLIX SUPERMARKETS, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed.

37.     PUIG NORTH AMERICA, INC. is a domestic corporation with a principal place of business in New York. PUIG NORTH AMERICA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream

2107757_6

of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

38.     PUIG USA, INC. is a domestic corporation with a principal place of business in New York. PUIG USA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

39.     REVLON, INC. is a foreign corporation with a principal place of business in New York. REVLON, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

40.     REVLON CONSUMER PRODUCTS CORP. is a foreign corporation with a principal place of business in New York. REVLON CONSUMER PRODUCTS CORP. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

41.     SAKS FIFTH AVENUE, LLC is a foreign corporation with a principal place of business in New York. SAKS FIFTH AVENUE, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

42.     SEPHORA USA, INC. is a foreign corporation with a principal place of business in California. SEPHORA USA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

2107757_6

43.    SHISEIDO AMERICA, INC. is a domestic corporation with a principal place of business in New Jersey. SHISEIDO AMERICA, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

44.    SHISEIDO AMERICAS CORP. is a foriegn corporation with a principal place of business in New York. SHISEIDO AMERICAS CORP. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere

45.    THE ESTÉE LAUDER COMPANIES, INC. is a foreign corporation with a principal place of business in New York. THE ESTÉE LAUDER COMPANIES, INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

46.    THE NEIMAN MARCUS GROUP, LLC is a foreign corporation with a principal place of business in Texas. THE NEIMAN MARCUS GROUP, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

47.    THE THYMES, LLC is a foreign corporation with a principal place of business in Minnesota. THE THYMES, LLC mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

48.    TPR HOLDINGS, LLC is a foreign corporation with a principal place of business in New York. TPR HOLDINGS, LLC mined, milled, processed, imported, designed, manufactured, assembled,

marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

49.     WHITTAKER, CLARK & DANIELS INC. is a foreign corporation with principal places of business in New York and New Jersey. WHITTAKER, CLARK & DANIELS INC. mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce asbestos-containing products to which JUDITH PELTZ was exposed in New York and elsewhere.

50.     This Court has general jurisdiction over each defendant that (i) is, or during any portion of the period of JUDITH PELTZ's exposure was, a New York corporation, (ii) has, or during any portion of the period of JUDITH PELTZ's exposure had, a principal place of business in New York, (iii) presently, or during any portion of the period of JUDITH PELTZ's exposure had, such continuations and systematic affiliations with New York as to render it at home in this state; or (iv) is presently, or during any portion of the period of JUDITH PELTZ's exposure was, registered to do business in New York.

51.     This Court has specific jurisdiction over all defendants because they (i) transact (and/or during the relevant time periods transacted) business within New York, including business directly related to plaintiffs' allegations herein; (ii) caused JUDITH PELTZ to be exposed to asbestos in New York and/or otherwise committed a tortious act within the state; and/or (iii) committed a tortious act outside New York that caused or contributed to JUDITH PELTZ's exposure to asbestos in New York or otherwise caused plaintiffs to suffer injuries in New York, and said acts were directed in whole or in part toward the state. Furthermore, each of the non-resident defendants: (A) (i) regularly does or solicits (and/or during the relevant time period did or solicited) business; (ii) engages (and/or during the relevant time period engaged) in one or more other persistent courses of conduct, including conduct related to plaintiffs' allegations herein; and/or (iii) derives (and/or

2107757_6

during the relevant time period derived) substantial revenue from goods used or consumed or services rendered in the state, including from products and/or services at issue herein; or (B) expected or should reasonably have expected (and/or during the relevant time period expected or should have reasonably expected) its acts to have consequence in New York and derives (and/or during the relevant time period derived) substantial revenue from interstate or international commerce.

52.     Defendants are corporations or other business entities organized under the laws of the various states of the United States, that were and/or are doing business in the State of New York and/or were and/or are participating in a conspiracy and/or concert-of-action that was or is located or conducted in or through New York and/or had effects in New York, including, but not limited to, the violation within the state of its laws and regulations.

53.     For any entity referenced in the caption or elsewhere in this Complaint, where the terms "successor" or "successor in interest" are used, Plaintiffs allege as follows: (i) the successor entity expressly or impliedly assumed the predecessor's tort liability or liabilities for the allegations herein; (ii) there was a consolidation or a *de jure/de facto* merger of the seller and purchaser; (iii) the acquiring entity was a mere continuation of the selling entity; or (4) the transaction was entered into fraudulently to escape such liabilities or obligations, including, but not limited to, for those alleged herein.

54.     Defendants, including, but not limited to, those with predecessors specifically identified in the caption, are in a superior position—and have knowledge and information not available to plaintiffs—to determine whether they have, or may have, liability, whether directly or by operation of law, for the asbestos-containing products identified in the course of discovery. Therefore, if evidence that JUDITH PELTZ was exposed to an asbestos-containing product for which a defendant has liability, may have liability, or by operation of law may have liability, plaintiffs assert all of the allegations herein against said defendant in relation to said asbestos-containing

2107757_6

Case 20-50534-KBO   Doc 218   Filed 08/12/22   Page 267 of 465

product.

55.     For any defendant named as a "successor," a "successor in interest," or "doing business as," plaintiffs further allege that the named defendant is or was during the relevant time period the alter ego of the entity or entities that caused plaintiffs' injuries such that its corporate "veil" is or should be deemed pierced by virtue of any or several of the following factors: (i) absence of corporate formalities; (ii) inadequate capitalization, (iii) the defendant's siphoning of funds from the entity, (iv) lack of significant business discretion on the part of the entity, and/or (v) the creation of the entity to fraudulently avoid liabilities to creditors, including, but not limited to, plaintiffs herein.

56.     If it is deemed that Article 16 of the C.P.L.R. applies to this action, plaintiffs assert that this action falls within one or more of the exceptions set forth in C.P.L.R. § 1602, including, but not limited to, the exception for public employees (C.P.L.R. § 1602(1)(b)); the exception based upon defendants' non-delegable duty to warn of the health hazards of asbestos (C.P.L.R. § 1602(2)(iv)); the exception for cases in which a claimant suffers a "grave injury" (C.P.L.R. § 1602(4)); the exception for actions requiring proof of intent (C.P.L.R. § 1602(5)); the exception for cases in which a person is held liable for causing a claimant's injury by having acted with reckless disregard for the safety of others (C.P.L.R. § 1602(7)); the exception for cases in which a defendant is held liable by reason of the applicability of Article 10 of the Labor Law (C.P.L.R. § 1602(8)); the exception for cases involving any person held liable for causing a claimant's injury by having unlawfully released into the environment a substance hazardous to public health, safety or the environment (C.P.L.R. § 1602(9)); the exception for any parties found to have acted knowingly or intentionally and in concert to cause the acts or failure upon which liability is based (C.P.L.R. § 1602(11)); and the exception for persons held liable in a product liability action in which the manufacturer of the product is not a party to the action and jurisdiction over the manufacturer could not with due diligence be obtained (C.P.L.R. § 1601(10)).

2107757_6

57. The amount of damages sought exceeds the jurisdiction of all lower courts that might otherwise have jurisdiction.

### FIRST CAUSE OF ACTION: NEGLIGENCE

58. Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

59. Defendants mined, milled, processed, imported, designed, manufactured, assembled, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce (hereinafter "manufactured") products that contained asbestos.

60. Defendants had a duty to manufacture products that were not unreasonably dangerous or defective when used as intended or in a reasonably foreseeable manner.

61. Defendants had a duty to warn plaintiffs of the hazards and defects that defendants created, knew of and, within the exercise of reasonable care, should have known about.

62. During the time that defendants manufactured the products at issue, they knew, and in the exercise of reasonable care should have known, that said products were defective, ultrahazardous, dangerous and otherwise highly harmful to the public, including JUDITH PELTZ.

63. Defendants knew, and in the exercise of reasonable care should have known, that their products would be used, manipulated, consumed or otherwise handled, resulting in the release of asbestos and thereby creating a dangerous and unreasonable risk of injury to users and others coming into contact with said products, including JUDITH PELTZ, either directly or indirectly.

64. Plaintiffs did not know the nature and extent of the injuries that would result from contact with and exposure to asbestos from use of or exposure to defendants' products.

65. Defendants knew, and in the exercise of reasonable care should have known, that JUDITH PELTZ would come into contact with and be exposed to asbestos from use of or exposure to

2107757_6

their products and would inhale and/or otherwise ingest asbestos as a result of the ordinary and

foreseeable use of said products.

66.     Despite the facts as set forth above, defendants negligently, recklessly, intentionally

and with wanton disregard for plaintiffs' rights, safety or health:

(a)     manufactured products that defendants knew, and in the exercise of reasonable care should have known, were defective, dangerous, ultrahazardous and otherwise unreasonably harmful to JUDITH PELTZ as a result of exposure to asbestos;

(b)     failed to take reasonable precautions or exercise reasonable care to adequately warn individuals, including plaintiffs, of the risks, dangers and harms to which they would be subjected by exposure to asbestos from the use of or other exposure to defendants' products;

(c)     failed to provide information or reasonably safe and sufficient safeguards necessary to protect plaintiffs from being injured as a result of exposure to asbestos from the ordinary and foreseeable use of or other exposure to defendants' products;

(d)     failed to place, post or otherwise convey any warnings (or sufficient warnings) regarding the health hazards associated with exposure to asbestos from the use of or other exposure to their products;

(e)     failed to test or analyze (or adequately test or analyze) their products in order to ascertain the extent of potential asbestos hazards related therewith;

(f)     failed to recommend methods, procedures, practices and protocols to prevent or minimize exposure to asbestos from the use of or other exposure to their products;

(g)     misrepresented or failed to disclose that their products contained asbestos or otherwise caused, permitted or exacerbated exposure to asbestos, thus denying plaintiffs and the public of the knowledge required to take necessary safety precautions while using or otherwise being exposed to defendants' products;

(h)     continued to manufacture products despite knowing of the asbestos-related health hazards associated therewith;

(i)     failed to conduct research that should have been conducted in the exercise of reasonable care in order to ascertain the presence of asbestos in their products and the health hazards associated with asbestos exposure;

(j)     failed to package their products in a manner that would ensure that individuals, including JUDITH PELTZ, would not inhale and/or otherwise ingest asbestos from the ordinary and foreseeable use of their products;

2107757_6

(k)     failed to advise individuals, including plaintiffs, to adopt and enforce a safe, sufficient and proper methods and plans of using, handling, coming into contact with or otherwise being exposed to asbestos from the use of or other exposure to defendants' products so that JUDITH PELTZ would not inhale and/or otherwise ingest asbestos through the ordinary and foreseeable the use of or other exposure to defendants' products;

(l)     ignored and suppressed medical and scientific information, studies, tests, data and literature concerning the health risks associated with exposure to asbestos, including from the use of or other exposure to their products;

(m)     ignored and suppressed medical and scientific information, studies, tests, data and literature concerning the causal relationship between the inhalation and ingestion of asbestos and disease, including, but not limited to, mesothelioma;

(n)     subjected JUDITH PELTZ and other persons similarly situated to the risk of developing disease, which risk defendant knew, and in the exercise of reasonable care should have known, were consequences of exposure to asbestos;

(o)     failed to seek substitute materials in lieu of the use of talc, asbestos and/or asbestos-containing materials;

(p)     failed to advise JUDITH PELTZ, who defendants knew, and in the exercise of reasonable care should have known, had been exposed to asbestos from the ordinary and foreseeable the use of or other exposure to their products: (i) to cease further uncontrolled or unprotected exposure to said products and the inhalation and/or ingestion of asbestos therefrom; (ii) to be examined by medical professionals to determine the nature and extent of any diseases caused by inhalation and/or ingestion of asbestos; and (iii) to receive medical care and treatment for such diseases;

(q)     failed, upon discovery of the dangers, hazards and potentialities of exposure to asbestos, to adequately warn plaintiffs of same;

(r)     generally engaged in unreasonable, careless, negligent and reckless conduct in manufacturing products that substantially contributed to JUDITH PELTZ's asbestos exposure and plaintiffs' resulting injuries; and

(s)     otherwise disregarded the health, safety and welfare of plaintiffs in manufacturing products that caused JUDITH PELTZ to be exposed to asbestos.

67.     Reasonable alternative designs for defendants' products were available that would have avoided or reduced the risk of harm, and the failure to adopt any of the alternative designs rendered defendants' product unreasonably dangerous.

2107757_6

68. The designs of defendants' product were manifestly unreasonable in that the risk of harm so clearly exceeded the products' utility that reasonable consumers, such as plaintiffs, informed of the risk and utility, would not have purchased the product or otherwise been exposed to it.

69. Defendants failed to disclose and intentionally and negligently misrepresented to the public, including plaintiffs, the asbestos-related health risks created by the ordinary use of or other exposure to defendants' products. Plaintiffs reasonably and foreseeably relied upon said misrepresentations.

70. During, before and after JUDITH PELTZ's exposure to asbestos from the use of or other exposure to defendants' products, defendants falsely represented facts, including the dangers of asbestos exposure, to plaintiffs and the public, while defendants each had actual or constructive knowledge of said dangers. Defendants made the representations regarding the safety of their products in reckless and wanton disregard of the falsity thereof and the plaintiffs' rights. Said representations were material conditions precedent to JUDITH PELTZ's continued exposure to asbestos resulting from the use of or other exposure to defendants' products, and defendants each intended that JUDITH PELTZ and the public act upon the representations by continuing their consumption, use or other exposure to defendants' products. Plaintiffs, through no fault of their own, were ignorant of the falsity of defendants' representations and rightfully relied upon same.

71. Defendants acted in concert with each other and with other members of their industry—through express agreement, implicit agreement, imitative behavior and conscious parallel behavior—in pursuit of a common plan or design to commit a tortious act, actively take part in it, further it by cooperation or request, lend aid or encouragement to the wrongdoers, and/or ratify and adopt the wrongdoer's acts done for their benefit:

2107757_6

(a)     to withhold from users of their products—and from persons who defendants knew
        or should have known would be exposed to their products—information regarding
        the health risks of inhaling and ingesting asbestos;

(b)     to eliminate or prevent development of adequate procedures and tests relating to
        the health hazards of exposure to asbestos; and

(c)     to ensure that their products became widely used in the cosmetics industry.

72.     Defendants knew that their acts and omissions violated common law and statutory

standards of care and that their withholding and suppression of information, failure to develop

adequate tests and procedures, and promotion of widespread use of products that caused users to

be exposed to asbestos subjected plaintiffs to an unreasonable risk of injury.

73.     Defendants nevertheless gave substantial assistance and encouragement to each

other and to other members of their respective industries in engaging in the acts and omissions

outlined above.

74.     As a direct and proximate consequence of the foregoing acts and omissions, JUDITH

PELTZ used or was otherwise exposed to defendants' products and inhaled and/or ingested

asbestos resulting from the ordinary and foreseeable use thereof.

**SECOND CAUSE OF ACTION: NEGLIGENCE *PER SE***

75.     Plaintiffs repeat, reiterate and incorporate herein by reference the prior and

subsequent allegations of this complaint with the same force and effect as if hereinafter set forth

at length.

76.     The federal Food, Drug, and Cosmetic Act ("FDCA"), codified as 21 U.S.C. §§ 301-

399, governs the manufacture, sale, supply, distribution and marketing of cosmetic products in the

United States. 21 U.S.C. § 321(i) defines cosmetics by their intended use as "(1) articles intended to

be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human

body or any party thereof for cleansing, beautifying, promoting attractiveness, or altering the

2107757_6

appearance, and (2) articles intended for use as a component of any such articles…" Defendants'

products and the ingredients therein are cosmetic products as defined by 21 U.S.C. § 321(i).

77.       The FDCA was designed to protect consumers from hazardous cosmetic products.

Plaintiffs were and are members of the class of persons the FDCA was intended to protect. The

FDCA prohibits the manufacture, sale, supply, distribution and marketing of adulterated cosmetics

in interstate commerce. 21 U.S.C. § 331. "Adulterations" refer to violations involving product

composition, whether they result from ingredients, contaminants, processing, packaging, or

shipping and handling. A cosmetic product is adulterated if it "bears or contains any poisonous or

deleterious substance which may render it injurious to users under the conditions of use

prescribed in the labeling thereof, or under conditions of use as are customary and usual…" 21

U.S.C. § 361. The FDCA governs all persons and companies involved in cosmetics in interstate

commerce—including manufacturers, packers, distributors and retailers—who are accordingly

responsible for ensuring that they are not dealing in products that are adulterated or misbranded.

Under the FDCA, defendants owed plaintiffs a duty no to sell to or otherwise expose JUDITH PELTZ

to adulterated, hazardous cosmetic products.

78.       Defendants manufactured talc and talc-containing cosmetic products throughout

the United States and the internationally. In violation of the FDCA, and their duty to plaintiffs

thereunder, said products were contaminated with various carcinogens, including asbestos, a

poisonous and deleterious disease-causing mineral known by defendants since the early to mid-

1900s to cause death and disease. Under normal and customary use and application, defendants'

talc-containing products released respirable and ingestible asbestos, and end users, including

JUDITH PELTZ, were exposed to and consequently inhaled and/or ingested carcinogens, including

asbestos. Defendants manufactured adulterated cosmetic products that were contaminated with

asbestos and other carcinogens in clear violation of the FDCA. Defendants' violation of the FDCA,

2107757_6

which governs the sale of cosmetic products, including talcum powder and the ingredients therein, and JUDITH PELTZ's subsequent inhalation and/or ingestion of asbestos from said products were substantial factors in bringing about JUDITH PELTZ's mesothelioma and plaintiffs' consequential damages. In violating the FDCA, which was enacted, among other things, to prevent the sale of carcinogen-containing products, defendants were and are negligent *per se*.

79.     Defendants—and their employees, officers, directors and managing agents— participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of each of the acts set forth herein. Defendants are liable for the oppressive and malicious acts of their predecessors and divisions, and each defendant's employees, officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of the acts of each of their predecessors and divisions.

80.     Additionally, defendants were and are negligent *per se* for the aforementioned reasons pursuant to various state laws and regulations, including, but not limited to, N.Y. EDUC. L. § 6811, *et seq.*, MASS GEN. LAWS ch. 94 § 198, *et seq.*, and § 499.005, FLA. STAT. (2020).

81.     Defendants' violation of the FDCA (and the other laws and regulations cited above) was a proximate cause of the injuries and damages alleged in this complaint.

### THIRD CAUSE OF ACTION: STRICT LIABILITY – FAILURE TO WARN

82.     Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

83.     Defendants manufactured products that contained asbestos or that otherwise resulted in exposure to asbestos from the intended or reasonably foreseeable uses of said products.

2107757_6

84.    Defendants knew and had reason to know that JUDITH PELTZ and other persons similarly situated would be users or consumers of their products or would otherwise be exposed to asbestos therefrom.

85.    Defendants manufactured their products in a defective condition that were unreasonably dangerous to JUDITH PELTZ and other persons similarly situated.

86.    Throughout the many years that JUDITH PELTZ and other similarly situated persons were exposed to asbestos from the use of or other exposure to defendants' products, said products reached the users and consumers, including JUDITH PELTZ, without substantial change in the condition in which they were manufactured.

87.    The ordinary and foreseeable use of defendants' products constituted a dangerous and ultrahazardous activity and created an unreasonable risk of injury to users and bystanders.

88.    Defendants' products were defective in that they were incapable of being made safe for their ordinary and intended use and purpose without adequate warnings, and defendants failed to give any warnings or instructions (or failed to give adequate or sufficient warnings or instructions) about the risks, dangers and harms associated with exposure to asbestos from use of or other exposure to their products.

89.    It was technically and economically feasible for defendants to provide adequate warnings regarding the asbestos hazards associated with the use of or other exposure to their products.

90.    As a direct and proximate consequence of defendants' failure to warn or adequately warn, JUDITH PELTZ used or was otherwise exposed to defendants' products and inhaled and/or ingested asbestos resulting from the ordinary and foreseeable use thereof.

91.    As a consequence of the defective condition of defendants' products, JUDITH PELTZ inhaled and/or ingested asbestos during ordinary and foreseeable use of said products, and

2107757_6

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 276 of 465

plaintiffs were caused to suffer the injuries and damages alleged in this complaint.

**FOURTH CAUSE OF ACTION: STRICT LIABILITY – MANUFACTURING DEFECT**

92.     Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

93.     Defendants manufactured products from which JUDITH PELTZ was exposed to asbestos through the intended and/or reasonably foreseeable uses thereof.

94.     The design specifications, formulae and/or performance standards applicable to defendants' products did not incorporate, include or otherwise involve asbestos.

95.     Because they contained asbestos, said products deviated from the design specifications, formulae, performance standards and/or from otherwise identical units manufactured to the same manufacturing specifications or formulae.

96.     Said manufacturing defect existed before the products left defendants' control.

97.     As a result of said manufacturing defect, defendants' products contained asbestos and, therefore, were hazardous and not reasonably safe for their intended and reasonably foreseeable uses.

98.     As a direct and proximate consequence of the foregoing acts and omissions by defendants, JUDITH PELTZ used or was otherwise exposed to defendants' products and inhaled and/or ingested asbestos resulting from the ordinary and foreseeable use thereof.

99.     As a direct and proximate result of the manufacturing defect of defendants' products, JUDITH PELTZ inhaled and/or otherwise ingested asbestos through or by the intended, ordinary and/or foreseeable use of said products, which caused her mesothelioma and plaintiffs' consequential injuries and damages alleged in this complaint.

2107757_6

**FIFTH CAUSE OF ACTION: STRICT LIABILITY – DESIGN DEFECT**

100.    Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

101.    Defendants manufactured products from which JUDITH PELTZ was exposed to asbestos through their intended and/or reasonably foreseeable uses.

102.    Defendants' products were not reasonably fit, suitable or safe for their intended purpose because they were designed in a defective manner by incorporating as ingredients talc that contained or could contain carcinogens, including asbestos, and defendants did not employ reasonable safer designs or alternatives, such as substitutes for asbestos and/or talc (e.g., corn starch).

103.    The risks and dangers associated with defendants' products outweighed their usefulness and were not reduced to the greatest extent possible consistent with the continued utility of the products.

104.    The defects in defendants' products existed before they left their control, and the products had not thereafter been substantially altered in a way that was not reasonably foreseeable.

105.    JUDITH PELTZ was a foreseeable user and the kind of person who was reasonably expected to come into contact with defendants' products.

106.    As a direct and proximate consequence of the design defects of defendants' products, JUDITH PELTZ used or was otherwise exposed to defendants' products and inhaled and/or ingested asbestos resulting from the ordinary and foreseeable use thereof.

107.    As a direct and proximate result of the design defects of defendants' products, JUDITH PELTZ inhaled and/or otherwise ingested asbestos through or by the intended, ordinary

2107757_6

and/or foreseeable use of said products, which caused her mesothelioma and plaintiffs'

consequential injuries and damages alleged in this complaint.

### SIXTH CAUSE OF ACTION: MARKET SHARE LIABILITY[2]

108.    Plaintiffs repeat, reiterate and incorporate herein by reference the prior and

subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at

length.

109.    Talc Supplier Defendants, as defined herein, collectively or individually,

manufactured asbestos-containing talc products which were generically similar and fungible in

nature.

110.    JUDITH PELTZ was exposed to asbestos from Talc Supplier Defendants' products

through use of or other exposure to other entities' products that incorporated Talc Supplier

Defendants' products as components thereof.

111.    Talc Supplier Defendants constitute all known suppliers of the asbestos-containing

talc used in the talc-containing products to which JUDITH PELTZ was exposed and over which this

Court can presently exercise jurisdiction.

112.    Talc Supplier Defendants engaged, individually or collectively, in identical, uniform

and/or similar marketing activities to promote their products.

113.    Talc Supplier Defendants' conduct in manufacturing generic products with identical

and/or similar qualities created an identical hazard and risk, namely cancer, including

mesothelioma.

114.    Talc Supplier Defendants had exclusive control over the hazards and risks posed by

their products.

---

[2] Against Brenntag North America, Inc.; Brenntag Specialties, LLC; and Whittaker, Clark & Daniels Inc. (collectively "Talc Supplier Defendants").

2107757_6

115.    Talc Supplier Defendants had exclusive control over the knowledge of the presence of carcinogens, including asbestos, in their products that caused injuries to plaintiffs.

116.    JUDITH PELTZ used Talc Supplier Defendants' products in an intended and foreseeable manner.

117.    Conventional proof of product identification is impracticable and/or impossible due to the identical, concealed and/or undisclosed nature and/or identity of Talc Supplier Defendants' products.

118.    Talc Supplier Defendants' products did not contain a warning or other information about the health hazards associated therewith.

119.    Talc Supplier Defendants' products caused injuries to plaintiffs many years after JUDITH PELTZ was exposed to asbestos from said products.

120.    Talc Supplier Defendants' products represent a substantial share of the relevant market.

121.    Talc Supplier Defendants' products were dangerous when they left the Talc Supplier Defendants' control, and the Talc Supplier Defendants knew and should have known that said products would cause injuries to users, including JUDITH PELTZ.

122.    Defendants collectively, through explicit agreement, tacit agreement and conscious parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of their products and controlled the level of knowledge on the part of the public regarding the hazards of exposure to asbestos from same.

123.    Independent of the foregoing, Talc Supplier Defendants are also jointly and severally liable to plaintiffs, as the limitation of liability articulated in C.P.L.R. § 1601 does not apply to plaintiffs' cause of action by operation of the exceptions in C.P.L.R. § 1602, which state, *inter alia*, that the limitation of liability shall:

2107757_6

i.   (7)   Not apply to any person held liable for causing claimant's injury by having acted with reckless disregard for the safety of others.

ii.   (8)   Not apply to any person held liable by reason of the applicability of article ten of the Labor Law.

iii.   (10)   Not apply to any person held liable in a product liability action where the manufacturer of the product is not a party to the action and the claimant establishes by a preponderance of the evidence that jurisdiction over the manufacturer could not with due diligence be obtained and that if the manufacturer were a party to the action, liability for claimant's injury would have been imposed upon said manufacturer by reason of the doctrine of strict liability, to the extent of the equitable share of such manufacturer.

iv.   (11)   Not apply to any parties found to have acted knowingly or intentionally, and in concert, to cause the acts or failures upon which liability is based; provided, however, that nothing in this subdivision shall be construed to create, impair, alter, limit, modify, enlarge, abrogate, or restrict any theory of liability upon which said parties may be held liable to the claimant.

124.   By reason of the foregoing, Talc Supplier Defendants are liable, based upon their *pro rata* market share, to plaintiffs, as they represent the entire known market of asbestos-containing talc utilized in the talc-containing products to which JUDITH PELTZ was exposed.

125.   As a direct and proximate result of Talc Supplier Defendants' actions, JUDITH PELTZ was exposed to asbestos and sustained severe injuries and damages as alleged in this complaint.

2107757_6

**SEVENTH CAUSE OF ACTION: ALTERNATIVE/COLLECTIVE LIABLITY[3]**

126.    Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

127.    The Talc Supplier Defendants constitute all known manufacturers of the asbestos-containing talc that could have caused plaintiffs' injuries and over which this Court can presently exercise jurisdiction.

128.    Plaintiffs are unable to identify which of the Talc Supplier Defendants' asbestos-containing talc was in each of the talc-containing products to which JUDITH PELTZ was exposed.

129.    Each of the Talc Supplier Defendants, whether acting individually or in concert with others, violated a duty of care owed to plaintiffs to manufacture products that are reasonably safe when used as intended or in a reasonably foreseeable manner.

130.    Talc Supplier Defendants are in a better position to offer evidence of causation that plaintiffs are, and plaintiffs in no respect should be left without recourse should they be unable to establish which of the Talc Supplier Defendants' products caused the injuries complained of herein.

131.    The acts and omissions of at least one of the Talc Supplier Defendants caused plaintiffs to sustain the injuries, losses and expenses alleged herein.

132.    Consequently, the burden of proof should shift to the Talc Supplier Defendants to demonstrate that their respective conduct and products could not have caused Plaintiffs' injuries.

**EIGHTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION AND CONSPIRACY/CONCERT ACTION**

133.    Plaintiffs repeat, reiterate and incorporate herein the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

---

[3] Against all Talc Supplier Defendants.

2107757_6

134.     For decades, defendants manufactured products composed of talc that were sold and marketed as safe for daily use by consumers on their person to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Defendants' products were advertised as healthful for babies, children and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

135.     Defendants and the Cosmetic, Toiletry & Fragrance Association (n/k/a Personal Care Products Council) ("CTFA") made false statements to plaintiffs, the general public, news media and government agencies that exercise regulatory authority over the cosmetic industry, including, but not limited to, the U.S. Food & Drug Administration ("FDA"), the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused plaintiffs' harm through intentional efforts to deceive the general public as to the safety of and presence of carcinogens, including asbestos, in talc-containing products.

136.     Defendants and CTFA, for decades before JUDITH PELTZ was born, possessed medical and scientific data that raised concerns regarding the presence of carcinogens, including asbestos, in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

137.     Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in defendants' products, talc is known as "talcum powder."

138.     Geologists, Defendants and CTFA—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are associated with talc are also

2107757_6

associated with the formation of asbestos. "Asbestos" is a commercial and legal term, rather than a geologic or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and amphibole minerals such as actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

139.     Defendants, some of which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos, in talc and talc deposits.

140.     Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

141.     Defendants and their affiliates, employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the

2107757_6

effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of *National Safety News*, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

142.    In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" that found "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material, offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

143.    In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association *Journal* concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350-354 (1968). Defendants were aware of these findings.

2107757_6

144.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association. Defendants were aware of this study. The study revealed that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite and chrysotile. The study explained that such fibrous content was not unexpected because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

145.     A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the *New York Times* and the *Washington Post*, and Defendants were aware of same.

146.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on talc-containing products. Defendants and CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers

2107757_6

(including asbestos hazards) associated with cosmetic talcum powder products, such as Defendants' products.

147.    In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction ("XRD") analysis, and found them to contain 5-25% tremolite and anthophyllite asbestos.

148.    Soon thereafter, a symposium was held in August of 1971 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital, which was then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through TEM and electron diffraction. Defendants and CTFA, aware of the foregoing and citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos and other carcinogens.

149.    After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

2107757_6

INDEX NO. 193142/2021
RECEIVED NYSCEF: 07/19/2021

Case 20-50534-KBO   Doc 218   Filed 08/12/22   Page 287 of 465

150.     Dr. Lewin of New York University disclosed twice in 1972 that asbestos had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both. XRD had been used as the first step in analysis and the presence of asbestos and was verified by the use of optical microscopy to disclose the presence of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark & Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that "1615" talc contained 1% chrysotile and that "4615" talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that nine of fourteen samples contained chrysotile. Only five samples did not have detectable levels of chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

151.     A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile in

many of the talc samples sent by the CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

152.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including many of the Defendants herein, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Defendants' products. On September 3, 1973, the FDA sent CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing X-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed rule. Minutes of CTFA's Talc Subcommittee meeting on March 15, 1976, indicate that the FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of CTFA responded that "the subcommittee would give serious consideration to this suggestion."

153.     Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be completely free of asbestos. These were some of the same "grades" of talc used by Defendants.

2107757_6

154. The talc industry's response, including that of the defendants, was swift and well-coordinated through CTFA, with which the defendants conspired and worked in concert to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn consumers regarding the dangers associated with the talc products, including defendants' products.

155. Regarding the FDA's proposed 1972 rule-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. CTFA's president, Dr. Merritt, strongly objected to the FDA alerting the general public and publishing the brand names of the talcum powders, as it would cause the manufactures "economic hardship." Dr. Merritt also threatened to sue the FDA to prevent the disclosure of the brand names. As a result, the FDA, defendants and CTFA never revealed or publicized the brand names of the talcum powders that contained asbestos, much to the detriment of the plaintiffs and the general public.

156. In 1973, CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best

2107757_6

and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite defendants then owning or having unfettered access to same.

157.    From there, the difference between what defendants and CTFA knew diverged from what they were representing to the FDA. Defendants, CTFA and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

158.    Defendants and the CTFA also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and even if they were testing, it was done so superficially: only four or so grams per 20 tons of pre-shipment and pre-processed talc, as an example. Defendants and CTFA also failed to the inform the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFA sent letters to the FDA in March of 1976 fraudulently claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

159.    Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFA, defendants and the cosmetic industries were slow to address the issue of asbestos in talc and talcum powders.

2107757_6

Defendants had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

160.     Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of defendants' talcum powders contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were known to the defendants and published the same year by the *New York Times* and the *Washington Post*.

161.     Defendants and CTFA responded to these developments by falsely claiming that the industry was doing "everything" it could to solve the problem; issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

162.     CTFA subsequently began in earnest to produce a voluntary protocol and methodology that would provide defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, defendants and CTFA falsely represented that talcum powders have never contained asbestos.

163.     Defendants and third parties collectively met with and corresponded with CTFA, as well as collectively met with the FDA and other government agencies, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed

2107757_6

collectively by defendants and CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of the testing methods. Defendants and CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which JUDITH PELTZ was exposed.

164.    In support of its voluntary XRD methodology, which was finally published in 1977, CTFA produced letters to the FDA written by its members, including defendants, identifying tests conducted showing talcum powder products did not contain asbestos. CTFA, defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.

165.    CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." CTFA met with and corresponded with defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA and defendants, and was advocated to the FDA by CTFA and defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though CTFA and defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to

2107757_6

contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that CTFA or defendants ever shared this remarkable failure with the FDA or the public.

166.    Minutes of CTFA's Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators…" When referring to the challenge of chrysotile detection, an article entitled "Talc" in the January/March 1976 CTFA *Cosmetic Journal*, states that "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos…it was asked, 'Why should we test for chrysotile if there isn't any?'" CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after 1976, CTFA and defendants continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CFTA and defendants continued to represent that no asbestos was detected in cosmetic talc. These material representations adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFA represented that its "ultra sensitivity could be a problem" and that it was too expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater concentrations than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as "asbestos-free."

167.    Defendants and CTFA made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to

2107757_6

the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including plaintiff, that talc-containing products contained asbestos.

168.    CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFA's methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

169.    CTFA and defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" does not mean the product does not contain asbestos, but due to defendants' repeated conflation of the terms, the public has been lead to erroneously believe talc products are safe. Furthermore, since defendants and CTFA did not have sufficient testing protocols in place to support the claims that talc products were safe or asbestos-free, such statements were recklessly made, as they had no reason to believe them.

170.    Between 1970 and the 1990s, tests conducted by and on behalf of defendants and the talc industry continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.

171.    Defendants and CTFA's failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when

2107757_6

various government agencies raised concerns about the safety of talc, including the issue of asbestos content.

172.     To this day, many talc-containing products presently on the market contain asbestos. Instead of publicizing this fact, defendants and CTFA continue to deny all the above to protect their pecuniary interests, to the severe detriment of the public, including plaintiff.

173.     Since at least 1979, defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are, therefore, safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos-containing talc in cosmetics has not been banned or otherwise regulated by CTFA or the FDA.

174.     Defendants (and other entities in the talc industry and cosmetic industries, including the CTFA), individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in both their finished products as well as talc shipments from Talc Supplier Defendants and other sources that were used to produce finished products.

175.     Defendants, and even the outside laboratories, including McCrone Associates, sent letters to CTFA, to be and which were forwarded to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary when such false representations were made.

2107757_6

176. After 1976, defendants and CTFA continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in talc.

177. Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained carcinogens, including asbestos, at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain such carcinogens.

178. Defendants and CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including plaintiff, regarding the hazards of exposure to carcinogens, including asbestos, from talc and talc-containing products.

179. Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including plaintiff, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos in their talc and talc-containing products.

180. Defendants and CTFA, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which JUDITH PELTZ was exposed.

181. Defendants and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including plaintiff, of alarming medical and

2107757_6

scientific findings, many of which remained in their exclusive possession and under their exclusive

control.

182.    Defendants and CTFA conspired and/or acted in concert with each other and/or

with other entities through agreement and consciously parallel behavior:

(a)    to withhold from users of their products—and from persons who they knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products;

(b)    to eliminate, suppress or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

(c)    to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

(d)    to falsely represent that talc and talcum powder products, including those of defendants, were safe and healthful for use by consumers.

183.    Plaintiffs reasonably and in good faith relied upon the false and fraudulent

representations made by defendants and CTFA regarding the hazards of talc and talcum powder

products that contained asbestos and other carcinogens, and he was, therefore, deprived of an

opportunity to make informed decisions concerning use of, exposure to and contact with said

products.

184.    CTFA, as well as defendants and other entities in the talc industry and cosmetic

industries, individually and collectively, failed to report to the FDA tests performed both internally

and by outside laboratories confirming the presence of asbestos in defendants' and other CTFA

members' finished products as well as talc shipments from talc suppliers and other sources that

were used to produce finished products. Instead, CTFA sent letters to the FDA stating that results of

testing of talc used by the industry after 1972 had not revealed the presence of amphiboles or

chrysotile, when in fact all of these entities had received or performed tests indicating the contrary

2107757_6

by 1976, when such intentionally false misrepresentations were made. CTFA and defendants made and published such representations claiming that their collective testing method was adequate, they were ensuring that talcum powder products were safe, and that their testing of talc reaching consumers was "safe," despite knowing the contrary.

185.    The FDA, and ultimately plaintiffs, directly and/or indirectly relied upon CTFA's and defendants' false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states: "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding CTFA's and defendants' misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, on July 11, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole..." CTFA's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry, including defendants, continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

186.    CTFA and defendants, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public regarding the hazards of exposure to asbestos and other carcinogens from talc and talc-containing products.

2107757_6

187.    CTFA and defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including plaintiffs and their family members, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos from their talc and talc-containing products.

188.    CTFA and defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which JUDITH PELTZ was exposed.

189.    CTFA and defendants, through agreement and consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including defendants' products to which JUDITH PELTZ was exposed.

190.    As recently as 2016, Defendants made material misrepresentations to the FDA regarding asbestos in its talcum powder products.

191.    For additional details regarding and supporting plaintiffs' claim, see Bird T., *et al.*, "A Review of the Talc Industry's Influence on Federal Regulation and Scientific Standards for Asbestos In Talc," New Solut., 2021 Aug; 31(2): 152-169 (annexed hereto as **Exhibit B**), which plaintiffs incorporate herein.

192.    Defendants, both acting individually and in concert with others, including the CTFA, violated the common law duty of care owed to plaintiffs or otherwise engaged in intentionally culpable activity that caused plaintiffs to suffer severe injuries and damages.

2107757_6

193.    The actions and omissions of defendants, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to plaintiffs as described in this complaint.

194.    As a direct and proximate consequence of the foregoing acts and omissions by the defendants, JUDITH PELTZ used or was otherwise exposed to defendants' products and inhaled and/or ingested asbestos resulting from the ordinary and foreseeable use thereof.

### NINTH CAUSE OF ACTION: SPOUSAL LOSS OF CONSORTIUM

195.    Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

196.    As a consequence of the foregoing, including the injuries to their spouse, BENJAMIN PELTZ suffered loss of consortium, companionship, services, society, support, love, companionship, affection, advice, physical relations and solace.

### TENTH CAUSE OF ACTION: PUNITIVE DAMAGES[4]

197.    Plaintiffs repeat, reiterate and incorporate herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

198.    Defendants acted maliciously, wantonly and recklessly, and demonstrated a conscious indifference and utter disregard of the health, safety and rights of others, including plaintiffs, by acting with an improper motive or vindictiveness and with outrageous or oppressively

---

[4] Against Avon Products, Inc.; Brenntag North America, Inc.; Brenntag Specialties, LLC; Bristol-Myers Squibb Co.; Bulgari Corporation of America; Chanel, Inc.; Coty, Inc.; Estée Lauder, Inc.; Estée Lauder International, Inc.; Houbigant, Inc.; L'Oréal USA, Inc.; L'Oréal USA Products, Inc.; Patriarch Partners, LLC; Puig North America, Inc.; Puig USA, Inc.; Revlon, Inc.; Revlon Consumer Products Corp.; The Estée Lauder Companies, LLC; and Whittaker, Clark & Daniels, Inc.; As discovery proceeds, and including during trial, plaintiffs reserve the right to amend the Complaint to include other defendants in their count for punitive damages.

2107757_6

intentional misconduct, and such actions represented a high degree of immorality and showed a wanton dishonesty as to imply a criminal indifference to civil obligations, thereby warranting an award of punitive damages.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally, on each cause of action, with interest together with costs and disbursements in this action.

Dated:    July 19, 2021
          New York, New York

**THE LANIER LAW FIRM PLLC**
*Attorneys for Plaintiffs*
126 E. 56th Street, 6th Floor
New York, New York 10022
Tel.: (212) 421-2800

By: _____
    Darron E. Berquist, Esq.

2107757_6

# EXHIBIT A

Patient Name: PELTZ, JUDITH I
MRN: █████████
FIN: n/a
DOB: █████████

---

### *Pathology Review Consultation Report*

---

| | | | |
|---|---|---|---|
| ACCESSION: | RV-21-0002906 | COLLECTED DATE/TIME: | 3/8/2021 08:00 EST |
| PATHOLOGIST: | ALTIOK MD,SONER | RECEIVED DATE/TIME: | 3/8/2021 08:17 EST |

### Pathology/Review Consultation Report

**Clinical History**
NONE PROVIDED

**Contributor Information**
**NAPLES COMMUNITY HEALTHCARE**
350 SEVENTH STREET NORTH
NAPLES, FL 34102
T 239-624-3570    F 239-624-3571

**Material Submitted**
A. SP-21-0001960, 21 SLIDES, DATED FEB 6, 2021

**Final Diagnosis**
The above referenced slides, accompanying pathology reports and patient history have been reviewed in order to confirm the diagnosis.

SP-21-0001960, 21 SLIDES, DATED FEB 6, 2021
A. RIGHT PLEURA, BIOPSY:
Malignant epithelioid neoplasm, (see comment).

B. MASS, RIGHT LOWER LOBE, WEDGE RESECTION:
Detached fragment of malignant epithelioid neoplasm, (see comment).
Separate portion of lung parenchyma with emphysematous changes and no malignancy.
One lymph node examined, negative for malignancy (0/1).

C. PLEURAL FLUID, RIGHT (THINPREP AND CELL BLOCK CYTOLOGY):
Scattered atypical mesothelial cells (see comment).

Heather Gridley, MD. Surgical Pathology Fellow
HG

*I, SONER ALTIOK MD ,the attending pathologist, personally reviewed all slides and/or materials and rendered  or confirmed the final diagnosis Electronically Signed Out by SONER ALTIOK MD  03.11.21 16:08 PM*

*HG*

---

## CONFIDENTIAL PATIENT INFORMATION

Patient Name: PELTZ, JUDITH I
Printed: 5/14/2021 16:51 EDT
Report ID: 176314310

Patient Name: PELTZ, JUDITH I
MRN: ▮▮▮▮▮▮
FIN: n/a
DOB: ▮▮▮▮▮▮

---

### *Pathology Review Consultation Report*

ACCESSION:        RV-21-0002906        COLLECTED DATE/TIME:    3/8/2021 08:00 EST
PATHOLOGIST:      ALTIOK MD,SONER      RECEIVED DATE/TIME:     3/8/2021 08:17 EST

**Comment**
Sections from parts A and B show sheets and small vaguely papillary appearing clusters of epithelioid cells invasive into adipose tissue. There are rare foci of cell necrosis and rare mitotic figures.

Immunohistochemical stains received for review with reactive controls on part A show tumor cells to be positive for CK5/6, CK7, calretinin (cytoplasmic and nuclear) and WT1. IHC stains on part B also show tumor cells to be positive for calretinin (cytoplasmic and nuclear), WT-1, AE1/3, but negative for S100. Acid fast stain and GMS stain on part B are negative for mycobacterial and fungal organisms. IHC on part C shows individual mesothelial cells staining positive for calretinin (cytoplasmic and nuclear) and WT-1. The immunophenotypic findings of the tumor are compatible with malignant mesothelioma, epithelioid type, however, a poorly differentiated carcinoma of ovarian origin cannot be entirely excluded. Clinical and radiologic correlation recommended.

**Performing Location**
The physician professional service reflected in this report was performed at Moffitt Cancer Center: MCC 12902 Magnolia Dr, Tampa, FL 33612 CLIA # 10D0290540
 The facility technical service reflected in this report was performed at Moffitt Cancer Center: MCC 12902 Magnolia Dr, Tampa, FL 33612. CLIA # 10D0290540

---

## CONFIDENTIAL PATIENT INFORMATION

Patient Name: PELTZ, JUDITH I
Printed:       5/14/2021 16:51 EDT
Report ID:     176314310



# Naples Community Hospital
## Naples, Florida

| SURGICAL PATHOLOGY |
|---|

| ACCESSION: | SP-21-0001960 | COLLECTED DATE/TIME: | 2/6/2021 11:53 EST |
|---|---|---|---|
| RESPONSIBLE PATHOLOGIST: | Larkin,MD,Jeffrey T | RECEIVED DATE/TIME: | 2/8/2021 10:41 EST |

### Surg Path Add Discussion Report – 3/12/2021 13:55 EST – Final

**Addendum:**

A consultation report  is received from Moffitt Cancer Center   (their accession# RV-21-2906) and interpreted by Altiok Soner, MD, as follows:


**Note:**  The outside consultation report concurs with the original diagnosis.


*****Please see full consultation scanned in PowerChart*****

Jeffrey T. Larkin, M.D.
3/12/2021 1:16:35 PM EST

*Jeffrey T  Larkin, MD*
*(electronic signature)*
*Verified: 03.12.21*
*JTL/JP*

### Surg Path Add Discussion Report – 2/23/2021 14:38 EST – Final

**Addendum:**

Addendum #2:

The histologic type of this well-differentiated mesothelioma is EPITHELIOID TYPE.  No sarcomatous areas are identified.

Discussed with Dr. Kosloff by telephone on 02/23/2021.

*Jeffrey T  Larkin, MD*
*(electronic signature)*
*Verified: 02.23.21*
*JTL/JTL*

### Surg Path Add Discussion Report – 2/16/2021 13:54 EST – Final

**Addendum:**

Immunohistochemical stains performed on specimen "A" (right pleura) show the atypical cells to be positive for cytokeratin 5/6, cytokeratin 7, calretinin and WT1 consistent with mesothelial origin.

Given the infiltrative nature of the cells, **the findings are consistent with well-differentiated mesothelioma.**

| Unit Ref: | 014098202 | Patient Name: | PELTZ, JUDITH I | |
|---|---|---|---|---|
| Print Date/Time: | 5/25/2021 17:03 EDT | Med Rec #: | ███████ | DOB: ████████ |
| Report Request ID: | 39357194 | Financial #: | 10002286699 | |
| Page 223 of 1,255 | | | | |



# Naples Community Hospital
## Naples, Florida

### *SURGICAL PATHOLOGY*

| | | | |
|---|---|---|---|
| ACCESSION: | SP-21-0001960 | COLLECTED DATE/TIME: | 2/6/2021 11:53 EST |
| RESPONSIBLE PATHOLOGIST: | Larkin,MD,Jeffrey T | RECEIVED DATE/TIME: | 2/8/2021 10:41 EST |

**Addendum:**

The atypical cells in specimen "B" (right lower lobe mass) and "C" (pleural fluid) are also positive for calretinin and WT1, also supporting a diagnosis of mesothelioma.

*Jeffrey T Larkin, MD*
*(electronic signature)*
*Verified: 02.16.21*
*JTL/JTL*

### Surg Path Report – 2/12/2021 17:11 EST – Modified

**Clinical History & Pre-Op Diagnosis:**

Right pleural effusions.
Post-op Diagnosis:  Pending.

_____

**DIAGNOSIS:**

**A. RIGHT PLEURA, BIOPSY:**
  - ATYPICAL MESOTHELIAL PROLIFERATION SUSPICIOUS FOR MESOTHELIOMA, SEE COMMENT.

**B. MASS, RIGHT LOWER LOBE, WEDGE RESECTION:**
  - WEDGE RESECTION OF LUNG SHOWING EMPHYSEMATOUS CHANGES.
  - SEPARATE DETACHED FRAGMENT OF ATYPICAL MESOTHELIAL PROLIFERATION SUSPICIOUS FOR MESOTHELIOMA, SEE COMMENT.
  - 1 ANTHRACOTIC LYMPH NODE, NEGATIVE FOR MALIGNANCY (0/1).

**C. PLEURAL FLUID, RIGHT (THINPREP AND CELL BLOCK CYTOLOGY):**
  - SUSPICIOUS FOR MALIGNANCY, SEE COMMENT.

*Jeffrey T Larkin, MD*
*(electronic signature)*
*Verified: 02.12.21*
*JTL/JTL*

_____

**Comment:**

Initial immunostains performed on the atypical proliferation in block "B3" demonstrates the presence of an atypical epithelioid proliferation staining positively for pankeratin AE1/3 and negative for S100.  CD168 immunostain highlights interspersed histiocytes. acid fast and GMS histochemical stains are negative for mycobacterial and fungal organisms, respectively.  All control stains worked appropriately.

_____

| | | | |
|---|---|---|---|
| Unit Ref: | 014098202 | Patient Name: | PELTZ, JUDITH I |
| Print Date/Time: | 5/25/2021 17:03 EDT | Med Rec #: | ███████  DOB: ███████ |
| Report Request ID: | 39357194 | Financial #: | 10002286699 |
| Page 224 of 1,255 | | | |



# Naples Community Hospital
# Naples, Florida

## *SURGICAL PATHOLOGY*

| | | | |
|---|---|---|---|
| ACCESSION: | SP-21-0001960 | COLLECTED DATE/TIME: | 2/6/2021 11:53 EST |
| RESPONSIBLE PATHOLOGIST: | Larkin,MD,Jeffrey T | RECEIVED DATE/TIME: | 2/8/2021 10:41 EST |

**Comment:**
Additional immunostains are pending on "B3" and specimen "A" to confirm the mesothelial nature of this process.  An addendum report will follow with these results.

The relationship of the detached fragment of atypical mesothelial proliferation in specimen "B" to the received lung wedge resection is unclear. There is no definitive malignancy in the wedge resection, which is serially sectioned and submitted entirely. Clinical correlation is warranted.

C). The ThinPrep slide is acellular. The cellblock specimen demonstrates atypical mesothelial cells suspicious for mesothelioma. Immunostains are pending and will be issued as an addendum report.

Seen in intradepartmental consensus with agreement in the diagnosis.

**Tissue Submitted:**
A. Right Pleural Biopsy.
B. Right Lower Lobe Mass.
C. Right Pleural Fluid.

**Operative Procedure:**
Right VATS.

**Microscopic Description:**
Slides examined.

---

| | | | | |
|---|---|---|---|---|
| Unit Ref: | 014098202 | Patient Name: | PELTZ, JUDITH I | |
| Print Date/Time: | 5/25/2021 17:03 EDT | Med Rec #: | | DOB: |
| Report Request ID: | 39357194 | Financial #: | 10002286699 | |
| Page 225 of 1,255 | | | | |



# Naples Community Hospital
## Naples, Florida

### *SURGICAL PATHOLOGY*

| | | | |
|---|---|---|---|
| ACCESSION: | SP-21-0001960 | COLLECTED DATE/TIME: | 2/6/2021 11:53 EST |
| RESPONSIBLE PATHOLOGIST: | Larkin,MD,Jeffrey T | RECEIVED DATE/TIME: | 2/8/2021 10:41 EST |

**Gross Description:**

A. Received in formalin labeled with the patients name, number and "right pleural biopsy", are 2 tan soft tissue fragments measuring 0.8 cm in greatest dimension. Submitted: Entirely submitted in one block labeled A1.

B. Received in formalin labeled with the patients name, number and "right lower lobe mass", is a wedge of lung tissue measuring 6 x 1.1 x 1 cm in greatest dimension. The pleural surface is tan to deep red and appears intact. A line of staples is noted at the long axis. The staples are removed and the resulting parenchymal margin inked blue. Sectioning reveals spongy red/tan parenchyma, without well-defined mass lesions or nodularity. Also submitted is a separate black/tan soft tissue fragment measuring 0.8 x 0.7 x 0.3 cm in greatest dimensions. Submitted: Entirely submitted in 3 blocks as follows:
  B1-B2 - Lung wedge serially sectioned and entirely submitted
  B3 - Separate tissue fragment

C. Received 1 tub with patient name label. Approximately 1000 mL of a tan/yellow, turbid fluid. This material is submitted in 1 Thin Prep and 1 Cell Block.

RH 02/08/2021 13:22

*RH*

---

| | | | |
|---|---|---|---|
| Unit Ref: | 014098202 | Patient Name: | PELTZ, JUDITH I |
| Print Date/Time: | 5/25/2021 17:03 EDT | Med Rec #: | ▮▮▮▮ | DOB: ▮▮▮▮ |
| Report Request ID: | 39357194 | Financial #: | 10002286699 |
| Page 226 of 1,255 | | | |

63 of 84

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM    INDEX NO. 193142/2021
NYSCEF DOC. NO. 1    Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 310 of 465    RECEIVED NYSCEF: 07/19/2021

# A Review of the Talc Industry's Influence on Federal Regulation and Scientific Standards for Asbestos in Talc

NEW SOLUTIONS: A Journal of
Environmental and Occupational
Health Policy
2021, Vol. 31(2) 152–169
© The Author(s) 2021

Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/1048291121996645
journals.sagepub.com/home/new

$SAGE

Tess Bird[1] ⬤, Joan E. Steffen[2,3], Triet H. Tran[2], and David S. Egilman[2,4] ⬤

## Abstract

The talc industry and Food and Drug Administration (FDA) have asserted that talc has been asbestos-free since 1976 when the industry created a voluntary specification for the asbestos content of cosmetic talc. However, recent evidence reveals that cosmetic talc is not and never was asbestos-free. This narrative review examines the talc industry's role in delaying and ultimately blocking federal regulation of cosmetic talc from the 1970s to today. We review primary source material, including corporate documents released in recent litigation and FDA documents released in response to Freedom of Information Act requests. Our results indicate that the talc industry exerted considerable influence over three key areas: regulatory proceedings at the FDA; testing methods and the manipulation of test results (including undisclosed results); and press coverage and the medical literature. The talc companies' actions and FDA indifference have had a lasting effect on consumer health, including the regulation of talc by other government agencies.

## Keywords

regulation, deregulation, asbestos, talc, cosmetics industry, FDA

## Introduction

Numerous authors have sought to categorize the various methods corporations use to influence scientific research, government regulation, and public discourse in an effort to avoid regulation.[1][8] These methods rely on industry connections to and influence on regulatory agencies. They often include the production, interpretation, and dissemination of industry-approved science, the manipulation of safety standards, and the creation of strategic public relations campaigns that promote uncertainty about product safety. In the United States, instances of conflicts of interest in the Food and Drug Administration (FDA) and other regulatory bodies are well documented, including a "revolving door" of employment between government organizations and industry.[9,10] However, few have published accounts of the behind-the-scenes negotiations between federal agencies, industry executives, and industry scientists. Here, we provide a case study on cosmetic talc that relies on industry documents, released through litigation, and FDA documents, acquired through Freedom of Information Act (FOIA) requests. This case study examines a nearly fifty-year industry campaign to avoid

government regulation of cosmetic talc. It provides insights regarding the lasting impact on public health policy in the United States of decisions made in the 1970s, a contentious decade for government regulation.

Concerns about the health effects of cosmetic talc have recently come into the public sphere due to allegations that Johnson and Johnson (J&J) baby powder contains asbestos, causing both mesothelioma and ovarian cancer.[11] J&J has since stopped sales of talc-based baby powders in North America,[12] but there is still no

[1]Institute for Social and Cultural Anthropology, University of Oxford, Oxford, UK
[2]Never Again Consulting, Attleboro, MA, USA
[3]Harvard Law School, Cambridge, MA, USA
[4]Warren Alpert Medical School, Brown University, Providence, MA, USA

**Corresponding Authors:**
Tess Bird, Institute for Social and Cultural Anthropology, University of Oxford, Oxford, UK.
Email: tessbbird@gmail.com
David Egilman, Warren Alpert Medical School, Brown University, Providence, MA, USA.
Email: degilman@egilman.com

**FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM** INDEX NO. 193142/2021
NYSCEF DOC. NO. 1     Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 311 of 465    RECEIVED NYSCEF: 07/19/2021

*Bird et al.* 153

regulatory oversight. Representatives from several talc mining and manufacturing companies (TM&MCs) have maintained that talc has been asbestos-free since 1976. In that year, the Cosmetic, Toiletry and Fragrance Association (CTFA), which represents the personal care products industry, claimed they implemented "stringent safety and quality control measures designed to ensure the absence of asbestos fibers from consumer talc products" (p. 218).[13] As part of these measures, the CTFA developed a test method for the determination of the asbestos content of talc, known as the J4-1 method.[14] CTFA is now known as the Personal Care Products Council.

As we show, the TM&MCs have long been aware that historical and current tests for asbestos in talc reveal that talc is not and never was asbestos-free. Moreover, the claim that talc is asbestos-free has had a lasting effect on the regulation of cosmetic talc by the FDA and the National Toxicology Program (NTP), as well as on the characterization of the risks associated with the use of talc in the medical literature.[15]

The 1976 J4-1 method was part of a voluntary, unenforced industry self-regulation plan, implemented after the industry pressured the FDA to renounce regulatory control. We reviewed correspondence among the FDA, TM&MCs, and research institutions around key regulatory events prior to 1976. The TM&MCs, particularly J&J (which held the majority of the talc powder market share in 1976[16]), exerted considerable influence over:

1. Regulatory proceedings at the FDA;
2. Testing methods and the manipulation of test results (including undisclosed results); and
3. Press coverage and the medical literature.

These efforts led to the continued sale of cosmetic talcum powders containing asbestos and fibrous talc (which the Occupational Safety and Health Administration has regulated as asbestos[17]). There were significant downstream consequences well into the twenty-first century for scientific practice, regulation at agencies other than FDA, and public health. While concerted action on the part of industry to hide the asbestos content of talc over the course of fifty years is apparent, our review also questions the FDA's role in sustaining scientific uncertainty around an important public health concern.

## Methods

We reviewed primary source material consisting of corporate documents uncovered in litigation and government documents released through FOIA requests. Talc-related documents were deposited in a searchable database that was accessible to researchers during *Gail Ingham, et al. v.*

*Johnson & Johnson, et al.,* a St. Louis lawsuit regarding the use of commercial talcum powder. This document database included records produced by numerous TM&MCs.[a] In addition, we reviewed talc-related laboratory records.[b] We initially searched for asbestos-related terms, such as the names of asbestos minerals, "fiber(s)," "fibrous," "acicular," and "needle(s)." We then conducted additional searches based on themes that emerged within this initial data set, focusing on terms associated with testing protocols, quality control measures, test results, and specific talc mines and mills. The authors reviewed depositions of individuals connected to talc litigation. In addition, we conducted a review of the published literature on the asbestos and talc relationship, and the relationship of talc to ovarian cancer.

We provide a narrative review of meetings, events, newspaper reports, tests, research, and decisions by FDA and industry. The review is organized chronologically, with some exceptions to facilitate understanding of context. Unless otherwise specified, the word "talc" should be read as "talc used in cosmetics" and not "cosmetic talc" which, as we show, is a marketing construct. Because there is too much to cover in a single article, we have prepared a supplementary file with thirteen sections which include additional references and details on particular events and issues. Where relevant in this text, we refer to the supplementary file and section. So that readers can easily find cited statements from source documents, we have also included page numbers in parentheses to indicate where the information can be found in the source document.

In recent litigation, the CTFA, J&J, and Luzenac have claimed that many of the documents we cite were "confidential trade secrets." The complete set of cited documents and other public documents are available at https://repository.library.brown.edu/ under "David Egilman Papers." Our review of documents is limited to the documents made available to us, as well as those released to the public domain.

## Results

### Historical Background

An association between talc and asbestos was established as early as 1898.[18] Subsequent studies noted the presence of asbestos in talc deposits and the health effects of talc exposure.[18 26] However, it was not until the late 1960s that scientists reported "fibrous talc" and probably asbestos in cosmetic talc products.[27,28] Around that time, the research and advocacy efforts of Dr. Irving Selikoff at the Mt. Sinai School of Medicine in New York City were calling widespread public attention to the link between asbestos and cancer. Selikoff had organized a 1964 meeting of the New York Academy

of Sciences which publicized the fact that there was no known safe level of asbestos exposure.[29] In 1971, *The New York Post* publicized the fact that researchers at Mt. Sinai had found asbestos in talcum powder.[30]

According to Rosner et al.,[31] authors of *The Politics of Measurement of Asbestos in Talc*, in the 1970s,

> Skepticism of large institutions was burgeoning, with activist ire aimed at everything from major research uni versities to the military to large corporations. Advocacy for the interests of the everyday consumer, particularly around health and safety concerns, was exemplified by the attorney Ralph Nader, who became the public face of a revived consumer movement that thrived from the early 1960s into the 1980s.

The advocacy efforts of Ralph Nader, Irving Selikoff, and others as well as the establishment of government institutions such as Occupational Safety and Health Administration and the National Institutes of Occupational Safety and Health helped advance public, worker, and consumer health through regulatory action. This was met by a neoliberal backlash promoting industry self-regulation, privatization, and market liberalism. Scholars of this period have explained the long-term degradation of public health in the United States as a result of neoliberal structural adjustments and desta-bilization of the public sector.[32,33]

Rosner et al.[31] provide a summary of the testing methodology debate that followed Mt. Sinai's disclosure of asbestos in talc products. They focus on exchanges between the CTFA and FDA, relying on many of the same sources as we do. We build on their narrative, drawing attention to the integral role that J&J played in blocking regulation.

## Evidence of Asbestos in Talc: Early Public and FDA Knowledge (1970–1973)

After learning of Mt. Sinai's findings, Jerome Kretchmer of New York City Environmental Protection Agency urged the FDA to take three actions with respect to talcum powder:

1. Sampling all available brands;
2. Recommend that manufacturers revise their formula-tions or take asbestos-containing product off the market; and
3. Perform a follow-up epidemiologic study.[34]

On 3 August 1971, the FDA held a meeting with city and federal officials, the cosmetic companies, and researchers.[35] At the meeting, tensions between the reg-ulatory agencies and the TM&MCs were evident. Participants debated about methods for identifying

asbestos in talc and about " … the medical significance of asbestos and other fibers, and the mineralogy of asbestos and talc ore deposits" (p. 2).[35] After the meet-ing, the FDA and the CTFA began to conduct a series of tests that would form the basis for a proposed specifica-tion for talc.[36]

On 16 June 1972, *The New York Times* (NYT) reported on asbestos found in textured ceiling paint and talcum powder in the Mt. Sinai studies, revealing that two brands tested showed from 5 to 25 percent asbestos fibers and that "after repeated inquiries from newsmen, the [EPA] released a letter [ … ] naming Landers and Johnson & Johnson as the brands."[37] The article reported that the FDA "was still awaiting results of tests on other brands, and that the agency suspected that 'virtually every talcum powder contains some asbestos.'"[37] The article also reported Kretchmer's advice that the public should "stop using talcum powder until suspicions about its asbestos content were cleared up."[37]

After J&J was named in the 1972 NYT article, Dr. Wilson Nashed, J&J's Associate Director of Research, called the FDA, the New York City Environmental Protection Agency, and Mt. Sinai to request a correction to the story.[38] Dr. Arthur M. Langer, the researcher at Mt. Sinai who had tested the talc products, expressed to Nashed that he was not consulted about his "very, very preliminary findings" but maintained that J&J products contained traces of asbestos.[38] Nashed succeeded in con-vincing the FDA to assure the NYT that talc was safe to use.[38] The next day, the NYT published a correction, *Talc Warning is Labeled False*, quoting Langer as stating that the talc samples contained only "trace" amounts of asbestos and that J&J's is the "most pure" of the ones they had examined.[39] The article also reported that the FDA spokesman did not believe a warning was required on talc.

By 3 August 1972, the FDA received a report from Dr. Seymour Lewin, a Professor of Chemistry at New York University, whom they had hired to test various commercial talc products purchased at retail outlets in the Northeast for asbestos.[40] Lewin reported that 43 out of 102 commercial talc product samples contained trem-olite and/or chrysotile asbestos. The report found 5 per-cent chrysotile asbestos by weight in J&J's Shower to Shower (see Table 1).[40] Several days later, the Associate Director of Technology for the FDA, Dr. Robert Schaffner, told Nashed of J&J that "the Naderites have been pressuring him to release Dr. Lewin's report" as public information (p. 1).[44] Nashed was adamant that J&J's private tests showed no asbestos in their products, which was incorrect, and contended "that Dr. Lewin's technique may be inaccurate" (p. 2)[44] (see Table 3).

Representatives of the CTFA and its member compa-nies disputed Lewin's results during a meeting with the

*Bird et al.*    155

**Table 1.** FDA Knowledge: Studies Conducted by the FDA Regarding J&J Products.

| Year | Consultant | Tested | Method | Results |
|---|---|---|---|---|
| 1972 | Lewin, New York University[40,47] | J&J Shower to Shower; Baby Powder; Medicated Powder; 102 total products (not all J&J) | XRD; supplemented with optical microscopy | "The analyses show that 59 of the products have no detectable amounts of any of the asbestiform minerals (by the technique employed, proportions by weight of 1–2% or less could escape detection), 20 had small but definite percentages of tremolite, 7 had small percentages of chrysotile, 9 had small percentages of both tremolite and chrysotile, and 7 had substantial percentages of one or both of these asbestiform minerals."[47] Shower to Shower—5% chrysotile. Lewin repeat tests on J&J products found 2 5 percent chrysotile in Baby Powder and Shower to Shower, and 4 percent tremolite in Medicated Powder. |
| 1972 | Sperry Rand[41] | J&J Shower to Shower (Lewin sample) | Polarized light microscopy (PLM) | Fibers with length to width ratios of 10 to 1 to 50 to 1; diameter less than .05 micron; "characteristic of chrysotile and not tremolite" |
| 1973 | Lewin, New York University; FDA; Pfizer[42] | J&J Shower to Shower; Baby Powder; Medicated Powder; 195 total products (not all J&J) | XRD; supplemented by optical microscopy | 195 products tested; 13 had both tremolite and chrysotile, 6 had chrysotile only, and 24 had tremolite only (43 positives in total). Trace tremolite in J&J Medicated Powder. |
| 1974 | FDA—Dr. Stuart[43] | J&J Shower to Shower | Optical microscopy | No chrysotile; found tremolite/actinolite fibers. |

*Note.* XRD    X-ray diffraction; FDA    Food and Drug Administration.

FDA on 11 August 1972. They argued that other tests had failed to detect chrysotile, and they pressured Lewin to "confirm" his results using a different method.[45,46] Lewin ultimately agreed to retest the samples. He said that if no asbestos was found, "the sample will be declared 'no detectable asbestos' notwithstanding the [original] X-ray finding" (p. 5).[45] However, the attendees at the meeting understood that this new method, light microscopy, was "not capable of detecting fine chrysotile fibers" (p. 5). Despite these concerns, Dr. Alfred Weissler, the Acting Director of Cosmetics at the FDA, acquiesced: "I understand that some samples will be passed even though they contain such fibers, but we are willing to live with it" (p. 5).[45] J&J did not inform the FDA that other consultants had already found chrysotile in their products (see Table 3). The FDA ultimately agreed that Lewin should "confirm" the results using light microscopy[45] (Supplement Section 1).

Lewin found 2–5 percent chrysotile in his repeat analysis of Johnson's Baby Powder and Shower to Shower,

and 4 percent tremolite asbestos in J&J Medicated Powder; J&J received a copy of Lewin's report a little over a month later.[47] By this point, another FDA test confirmed the presence of chrysotile (see Table 1). At a September 21st meeting with the FDA, Lewin, and J&J's consultants, Nashed again challenged Lewin's chrysotile findings, presenting evidence of the absence of chrysotile in their Italian mine and talc products.[48] As the meeting began to "deteriorate into a non-fruitful pathway," Nashed suggested a "compromise:" that Lewin work with J&J's consultant laboratory, McCrone Associates Inc., to "establish the best microscopy technique to be followed" (p. 4).[48] After working with McCrone labs, Lewin admitted an error in his analysis of another company's product but did not change his opinion on J&J products.[49]

J&J personnel continued to pressure the FDA to not release Lewin's "erroneous findings."[49] Nashed insisted that Mt. Sinai had not found chrysotile in J&J's Shower to Shower and continued to find reasons for possible

**Table 2.** FDA Knowledge: J&J Disclosed Tests on Shower to Shower as Presented to FDA and Discussed September 21st, 1972.[56]

| Year | Consultant | Tested | Method | Results |
|---|---|---|---|---|
| 1972 | Fred Pooley, J&J consultant, a professor in the Department of Mineral Exploitation at the University College Cardiff[56] | Val Chisone Talc (source for Shower to Shower) | Various | Reported no evidence of chrysotile; Pooley found tremolite fibers, but J&J did not report this to FDA |
| 1972 | Dr. W. T. Caneer, The Colorado School of Mines[56] | Shower to Shower | Step scanning XRD | No chrysotile; LOD 1% |
| 1972 | Professor Gordon Brown, Department of Geology of Princeton University[56] | Shower to Shower | Step scanning XRD | No chrysotile; LOD 1% |
| 1972 | Walter McCrone[56] | Shower to Shower | "Optical staining" techniques | None detected: LOD 1% The report found 0.2 0.5% tremolite, but this report was replaced by another version that reported finding "only a few isolated crystals" (see Figure 1 and 2).[57] |
| 1972 | Jack Sheltz[56] | Shower to Shower | Differential thermal analysis | None detected: LOD 1% |

*Note.* LOD   Level of Detection; FDA   Food and Drug Administration; XRD   X-ray diffraction.

errors in Dr. Lewin's tests.[49] In a "frank, friendly talk" with Schaffner of the FDA on 1 November 1972, Fuller of J&J "concluded that unless [Dr. Schaffner] could assure me that the [Lewin] report would not be published I was instructed to make an appointment with FDA Commissioner Edwards and make our viewpoint known to him" (p. 2).[50] Schaffner replied that he was not happy with Lewin's report, which "would be issued only over my dead body" (p. 3) but also noted his fear of "favoritism" toward J&J were their products to be cleared.[50] However, on 22 November 1972, Schaffner told J&J that he believed Shower to Shower was "off the hook" and the report "will not be issued 'unless I drop dead.'"[51] The FDA stood by its word to J&J. The FDA has not produced Lewin's original "report" in response to FOIA requests; we reviewed copies present in industry files.

However, pursuant to a FOIA request, the FDA produced a second version of Lewin's results dated 7 December 1972.[52] Results for J&J products that had previously tested positive for chrysotile were reclassified as "n.d." or "none detected" except for a trace of tremolite in Johnson's Medicated Powder (which Lewin had previously reported contained 4% tremolite). These findings were based on a new analysis using acid treatment,[51] which can dissolve chrysotile.[53] On 8 December, the FDA relayed these findings to J&J.[54] Apparently

satisfied, J&J "no longer considered it necessary" to meet with the FDA commissioner.[54]

The FDA provided a report on 31 July 1973 that included the final tabulation of Lewin's results, results from different laboratories on the same products Lewin used (see Table 1), and tests on an additional ninety-three products.[42] The FDA reported that of the 195 samples tested, 17 were positive for chrysotile and 36 were positive for tremolite asbestos.[42] Lewin's tremolite findings in J&J products were left out.[42] The FDA assured the Environmental Defense Fund that this final information was accurate[55] (see Supplement Section 1).

## CTFA and TM&MC Private Testing (1970 1974)

In the same time frame, the TM&MCs conducted numerous tests on their own products. They appear to have cherry-picked which tests they delivered to the FDA. On the basis of the reports summarized in Table 2, which were given to the FDA, Nashed argued to the FDA that the Lewin samples did not contain chrysotile.[58] However, the companies did not provide their own test results finding tremolite and chrysotile in numerous products, including baby powder, Shower to Shower, talc ore, and ovarian tissue, as we detail in Table 3. There is evidence that J&J and at least one of its

*Bird et al.* 157

**Table 3.** J&J Tests Not Presented to the FDA.

| Year | Consultant | Tested | Method | Results |
|---|---|---|---|---|
| 1958 | Battelle[59] | Italian Talc No. 1 for Baby Powder | Microscopic examination | Fibrous tremolite |
| 1966 | J&J internal test[60] | Historic baby powder | Microscopic examination | Tremolite in domestic talc, Italian talc and fibrous talc. |
| 1971 | Langer at Mt. Sinai[61–63] | Ovarian tissue samples from the Tenovus Institute for Cancer Research.[64] | Electron diffraction | Talc and chrysotile |
| 1971 | Langer at Mt. Sinai[61–63] | Johnson & Johnson Baby Powder. | Electron diffraction | Talc and chrysotile |
| 1971 | J&J internal test[65] | Baby Powder | Microscope and XRD | Tremolite needles, actinolite |
| 1971 | McCrone[66] | Grantham Ore; Shower to Shower; and Medicated Powder (344 L baby powder) | Electron diffraction; electron microprobe | Tremolite and chrysotile in Grantham Ore; chrysotile fibers in Medicated Powder and Shower to Shower (no asbestos in 344 L baby powder) |
| 1972 | Fred Pooley, a professor in the Department of Mineral Exploitation at the University College Cardiff[67] | Val Chisone Talc (source for all J&J cosmetic talc powders 1946–1968 and 1981–1982) | Various | Tremolite fibers |
| 1972 | Dr. Thomas Hutchinson, professor at the University of Minnesota[68] | Lewin's sample of Shower to Shower | TEM | 5 "unmistakably chrysotile asbestos" fibers and 3 serpentine material in "perfect chrysotile patterns" |
| 1972 | McCrone[69] | 108T and 109 T baby powder talc lots (Lewin samples 133 and 134) | XRD, light microscopy, TEM, electron diffraction | 0.2%–0.5% tremolite "rods" |
| 1972 | J&J/Sperry Rand internal test[41] | Shower to Shower | SEM | Chrysotile fibers |
| 1972–1973 | Lewin, unfinished study, funds withdrawn[70] | Unfinished | Unfinished | J&J privately funded Lewin to study asbestos content of talc in baby powder, including funding a stipend for a graduate student, Avriam Elkies, to work on the project. Elkies testified that midway through 1973, J&J withdrew the scholarship and took all his research results. These results have never been produced. |
| 1973 | Fred Pooley, a professor in the Department of Mineral Exploitation at the University College Cardiff[71] | Vermont talc (source for J&J cosmetic talc powders from 1968 to 2003 and 2010) | Preconcentration of asbestos with XRD | Tremolite .05% in Vermont talc |

*Note.* XRD    X-ray diffraction; TEM    transmission electron microscopy; SEM    scanning electron microscopy.



Dr. A. J. Goudie
Johnson and Johnson
Research Center
501 George Street
New Brunswick, New Jersey 08901

EXAMINATION

OF

JOHNSON AND JOHNSON'S BABY POWDER

Do NOT USE
This REPORT.
REPLACED by
ANOTHER VERSION

Date: 27 October 1972

MA Number: 2546

Copy 1 of 4

walter c. mccrone associates, inc.
2820 SOUTH MICHIGAN AVENUE · CHICAGO, ILLINOIS 60616

**Figure 1.** Writing on McCrone Associates original report to J&J.

consultant laboratories also manipulated the findings of tests delivered to the FDA, as evidenced by Figures 1 and 2 (see Supplement Section 2 for full details).[57]

J&J further promoted the myth that their own talc was from a "good source" that they " … subject to refining with multiple washing before we obtain the baby powder grade; this together with extensive studies by world experts assures its freedom from asbestos" (p. 3).[72] However, J&J knew that "asbestos-form particles" could not be completely removed from talc ore, a fact which they told the hearing clerk at the U.S. Department of Health, Education, and Welfare,[73] and that they could not rely on the "clean mine" (asbestos-free) approach to assure the absence of asbestos in talc.[74]

## A Debate Over Test Methodology (1973–1976)

The Center for Science in the Public Interest and the Environmental Defense Fund petitioned the FDA on 27

June 1973 for the "promulgation of regulations [ … ] to prohibit the adulteration of food and drugs with asbestos."[75] On 28 September 1973, the FDA published a proposed regulation for asbestos in talc in the Federal Register, which called for a 99.9 percent purity for amphibole asbestos fiber and 99.99 percent for chrysotile and proposed the use of a polarized microscope.[75] The CTFA responded to the proposed regulation by completing a "critical review" of the FDA method through round robin testing of five different samples of cosmetic talc and one talc sample spiked with asbestos.[76] They informed the FDA that their proposed method was unreliable and should not be implemented, stating: "It results in both false-positive and false-negative findings. It is also tedious and may consume as much as one half day per sample" (p. 2).[76] They proposed that the TM&MCs work with the FDA to develop a "more reliable and more practical" method (p. 3) and summarized seven alternative test methods.[76] The CTFA determined that of the

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM INDEX NO. 193142/2021
NYSCEF DOC. NO. 1    Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 317 of 465    RECEIVED NYSCEF: 07/19/2021

*Bird et al.* 159

**Figure 2.** A copy of McCrone Associates initial report to J&J with handwritten edits.

seven methods, transmission electron microscopy with electron diffraction "appears to offer the best, most reliable method and is probably capable of detecting chrysotile and tremolite (fibrous), both at a level of 0.1%" (p. 9).[76] However, some CTFA members expressed "grave concern" (p. 3) over the inclusion of transmission electron microscopy, which they said was too sensitive and cost prohibitive for small manufacturers.[77] J&J's consultant had found chrysotile in Lewin's J&J product samples using transmission electron microscopy (see Table 3). In a memo to file about a January 1974 meeting with the FDA, Nashed states that "Our very preliminary calculation indicates that substantial asbestos can be allowed safely in a baby powder" (p. 2).[78]

Rosner et al.[31] offer some historical context for the CTFA's confidence in pressuring the FDA:

The industry was willing to challenge the FDA since some privately believed that the "FDA is reluctant to take any legal action in any problems with industry." The CTFA had been told that the FDA had "neither the money nor the manpower to pursue matters so that they will have airtight cases in scientific matters."

In December 1974, J&J wrote to the CTFA concerned that they needed to preempt FDA's adoption of more sensitive asbestos detection methods: "We believe it is critical for the CTFA to now recommend these methods to the FDA before the art advances to more sophisticated techniques with higher levels of sensitization [sic]" (p. 1).[79] J&J's consultants had already developed a centrifugation method that would concentrate asbestos in talc so that it could be detected microscopically.[80] They

deemed this method "too sensitive"[71] and noted in a memo: "we deliberately have not included a concentration technique as we felt it would not be in worldwide company interests to do this" (Supplement Section 3a).[81] There is no evidence that they shared the consultant recommendations on the concentration test method with the FDA or the CTFA. However, the FDA explored a similar method themselves in 1975, which one J&J representative described as "more disturbing" than other proposed methods[82] (Supplement Section 3b).

The CTFA ultimately recommended X-ray diffraction as the primary screening method for amphibole asbestos, to be used in the CTFA J4-1.[14] At best, this method could detect levels of asbestos above 0.5 percent.[14] The CTFA also convinced the FDA that the method did not need to test for chrysotile, the only non-amphibole form of asbestos, as they falsely claimed it had never been detected in talc (p. 3).[83] By this time, there was ample evidence of chrysotile in various companies' products and talc mines (see Table 3). (See Supplement Section 4 on X-ray diffraction and Supplement Section 5 on chrysotile.)

In 1975[84] and 1976,[85] the CTFA sent the FDA updates on the latest approved CTFA Cosmetic Talc Specification as well as their internal analyses of talcs that were meant to illustrate the "responsibility of industry in monitoring its talc" and to "give [the FDA] assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products" (p. 1).[85] Unfortunately, the letters contained multiple misrepresentations, notably the exclusion of positive results for chrysotile and tremolite (see Supplement Section 6a for details). After 1976, the FDA requested that the companies periodically report results of their own analyses on talc, but the companies resisted (Supplement Section 6b for exchange).[86] No subsequent test reports from industry were found in FDA records. J&J admitted they did not provide any test results to the FDA performed after 1973.[87]

In March of 1975, the FDA announced that the proposed regulations for asbestos content in talc would be delayed, in part because the proposed method was "difficult to use, laborious, and not practical for its intended purpose."[88] In 1976, Dr. Heinz Eiermann, the FDA commissioner in charge of cosmetics from 1973 to 1991, privately criticized the adequacy of the industry testing, particularly noting that their "analytical effort" was very small considering the "business volume" of the top cosmetic talc producers.[89] However, Eiermann publicly defended J&J, stating that their talc "has been found to be virtually free of asbestos" (p. 4) and that there is "no evidence" baby powder is hazardous, citing J&J's own testing of

talc (p. 3)[90] (see Supplement Section 7 for details on Eiermann).

The agency never issued a final regulation for asbestos in talc.

### Final CTFA Specifications (1976–1977)

In July of 1976, the CTFA discussed a definition of "cosmetic talc" which did not require that talc be "asbestos-free"[91]:

> Talc is an essentially white, odorless, fine powder which is ground from naturally occurring rock ore. It consists of a minimum of 90% hydrated magnesium aluminum silicate, having the ideal formula $Mg_6(Si_8O_{20}) \cdot (OH)_4$, with the remainder consisting of naturally associated minerals such as calcite, chlorite, dolomite, kaolin, and magnesite, and **containing no detectable asbestos minerals.** [Emphasis added; p. 2]

The CTFA's method, known as CTFA Method J4-1, was issued on 7 October 1976 for "the detection of amphibole minerals in cosmetic talc."[14] This framing, "no *detectable* asbestos" essentially allowed for asbestos to be present in levels that were *undetectable* based on the test method; this meant that any amount of chrysotile— which was not included in J4-1— was permitted. CTFA Method J4-1 was an unenforced specification that the CTFA never formally codified; the organization omitted any, even voluntary, compliance requirements[13,92] (see Supplement Section 8 for details).

In 1977, the CTFA coordinated a round robin and determined that the J4-1 method was not "accurate, reliable and practical" [emphasis in original, p. 1].[93] Three of the open market products tested positive for more than 0.5 percent asbestos by two to three labs.[93] Those products with "inconsistent results" would be retested.[93] We could not locate the results of the second round robin, but four of the seven samples tested contained tremolite and/or anthophyllite at levels over 0.5 percent[94] (see Supplement Section 9 for details on round robin testing).

Mt. Sinai continued to find asbestos in various cosmetic talc products, ten of which were reported in a 1976 article in the NYT.[95] In 2019, the FDA detected chrysotile asbestos in J&J baby powder; this asbestos-containing J&J baby powder lot passed both the CTFA J4-1 method and J&J's transmission electron microscopy method TM7024.[96]

There is a safe and effective alternative to cosmetic talc. Cornstarch powders have been on the market since at least the 1890s (p. 37).[97] In 1977, J&J compared the qualities of corn starch and talc powders and found that cornstarch "overall is rated significantly higher by

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM   INDEX NO. 193142/2021
NYSCEF DOC. NO. 1        Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 319 of 465   RECEIVED NYSCEF: 07/19/2021

*Bird et al.*                                                                                          161

mothers" (p. 5).[98] There is no evidence that corn starch is a carcinogen of any kind.

## Downstream Implications of the 1976 Specification (1977 Present)

### Continued industry self-regulation of talc despite citizen petitions to the FDA.

The FDA received four citizen petitions filed in 1978,[99] 1983,[100] 1994,[101] and 2008,[101] which each asked the FDA regulate talc due to its possible carcinogenicity. They also received a FOIA request in 1977 (see Supplement Section 10a–e for details on each).[102] The FDA continued to rely on information provided by the industry, including contacting J&J or the CTFA for information on the industry products.[102,103] The FDA denied the 1978 and 1986 petitions in 1979[99] and 1986,[104] respectively, citing inconclusive evidence and relying on tests provided by the industry. The FDA did not deny the 1994 and 2008 petitions, both from the Cancer Prevention Coalition, until 2014, a few months after a South Dakota jury found that J&J talc caused a plaintiff's ovarian cancer.[105,106] J&J used the 2014 FDA decision as part of its defense in an ongoing ovarian cancer trial in 2014 soon after the FDA released it.[107] In their reasons for denying the petitions, the FDA concluded that the epidemiologic data were insufficient to merit a cancer warning because the petition did not cite any evidence of "current" (post-1976) talc containing asbestos and that current talc comes from "asbestos-free" mines and can be purified.[105]

The companies continued to provide the FDA with industry-influenced "scientific" support. For instance, in 1994, the FDA and industry cofunded a workshop, *Talc: Consumer Uses and Health Perspectives,* with the International Society of Regulatory Toxicology and Pharmacology.[108] International Society of Regulatory Toxicology and Pharmacology is financed in part by the tobacco, pharmaceutical, and chemical industries and had a direct influence on those in attendance at the workshop (see Supplement Section 11a for details on influence).[109] The TM&MCs used the workshop as a platform to attempt to discredit a recently-completed NTP animal study demonstrating talc lung carcinogenicity (see Supplement Section 11b for details on study and TM&MC influence).[110] In response to the 2008 petition, the CTFA offered the FDA[111] a recently published narrative review and meta-analysis of talc and ovarian cancer, compiled by Drs. Michael S. Huncharek and Joshua E. Muscat,[112] which J&J and Luzenac had jointly funded via a law firm, Crowell & Moring, "so as to preserve the benefit of the attorney work product privilege, which is helpful in protecting confidentiality" (p. 2).[113] Huncharek and Muscat agreed that the funders could review the report and suggest changes before

submission to the NTP and publication (see Supplement Section 10e).[114]

### Use of the 1976 specification to prevent talc from being labeled a carcinogen.

The TM&MCs also influenced other regulatory agencies and standards-setting organizations, including influencing the NTP's decision to not include talc as a carcinogen in their *10th Report on Carcinogens* in the early 2000s. In October 2000, the NTP released a Draft Background Document citing evidence regarding the relationship between talc and cancer and recommending that both talc containing and not containing asbestiform fibers were "reasonably anticipated to be a human carcinogen."[115] The *Report on Carcinogens* Subcommittee would meet in December 2000 to make a final determination on the carcinogenic status of talc.

Ahead of the meeting, Luzenac began to craft a campaign to "create a reasonable doubt" in the mind of the NTP's Board of Scientific Counselors that "they may not be acting on the best advice from their consultants" (p. 2).[116] Luzenac had now taken the lead from J&J in defending the safety of talc (Luzenac was owned by Rio Tinto until 2011, when it was sold to Imerys). Luzenac retained the services of Dr. Alfred Wehner, who had served as a consultant to J&J, and sought the help of the Center for Regulatory Effectiveness (CRE), a private consulting firm and lobbyist group that helped clients oppose government regulation.[117] CRE claims they offer "independent analyses of agency regulations" on their website, but Luzenac retained their services to lobby against regulation of talc[118] (see Supplement Section 12a for details on CRE). Luzenac then "discovered" what they claimed was a "fatal flaw" in the NTP report: the report "assumed" that talc without specification of minerology or morphology may contain asbestos fibers due to the widespread contamination of talc with asbestiform minerals.[119,120] CRE advanced the "fatal flaw" argument as their primary critique of the Draft Background Document: CRE argued that because the industry took steps to ensure that talc was "virtually free of asbestiform fibers" after 1976, and the available epidemiologic evidence did not differentiate between asbestiform and non-asbestiform talc before and after this date, there was not enough "scientific support" for the NTP's "assumption" that there was a "widespread contamination" of talc.[120] As a second point, CRE attacked the adequacy of the NTP animal study, citing the International Society of Regulatory Toxicology and Pharmacology 1994 workshop.[120] The CTFA adopted a more polished version of the "fatal flaw" argument in their 2002 comments on the 10th Report on Carcinogens and used it again in their 2004 comments on the 12th Report on Carcinogens.[121] Their comments hinged on the distinction between "pure" cosmetic talc and talc containing asbestos, stating that while there was



**Figure 3.** Comparison of regulation to monopology game.

epidemiological evidence for a relationship between asbestos and ovarian cancer, "pure" or "asbestos-free" talc was "accepted in the medical community for decades" (p. 2). They then argued:

> A review of the epidemiologic studies on ovarian cancer and talc exposure shows that a **large portion of the exposures in all of the studies must have occurred prior to 1976.** In addition, none of those studies were able to characterize the composition of the powders or identify brands. Thus, in addition to the analytical weaknesses discussed previously**, the exposures might have involved exposure to asbestos**, making the studies essentially lacking in utility and data quality for the purpose of evaluating the safety of present day cosmetic talc. [ ... ] **Present-day cosmetic talc must be assumed to be free of asbestos**, consistent with the CTFA specification and absent evidence to the contrary. (p. 4) [Emphasis Added]

Of course, as we have illustrated, the 1976 specification *did not* assure that talc was asbestos-free.

The NTP ultimately deferred voting on both asbestiform and non-asbestiform talc.[119] Rich Zazenski of Luzenac took credit for finding the "flaw," asserting that this argument "would be our winning hand; if not during the NTP review process, certainly it would prevail in the courts ... " (p. 2).[119] He also attributed this early success with the NTP to the companies' creation of "confusion" around the "fatal flaw" but suggested that the NTP might remove the "fatal flaw assumptions" (pp. 2–3) in a subsequent draft.[122] In response to this potential problem, his colleague Robert Bernstein noted: "Time to come up with more confusion!"[122] David Michaels further details these events as classic examples of the corporate production of scientific doubt.[8] However, he notes that the industry also relied on political clout and their connections to the Bush Administration to make this strategy work (see Michaels[8] and Supplement Section 12c). Luzenac would retrospectively, in a 2011 presentation, reflect on this experience with the NTP as a "regulatory challenge" that they "could not afford to lose," (p. 2) and use the image shown in Figure 3 to compare the response to regulation to a monopoly game.[123]

Industry legal consultants also promoted the "fatal flaw" argument to the International Agency for Research on Cancer (IARC) in 2005 and the Cosmetic Ingredient Review—an "independent" review body supported by the FDA, the Consumer Federation of America, and the Personal Care Products Council—in 2012.[124 126] Both organizations accepted the representation that the CTFA's voluntary standards ensured the purity of talc sold after 1976 (see Supplement Section 13a/b for details).

The 1976 talc specification has continued to mislead epidemiologists studying talc carcinogenicity. Of thirty-two epidemiologic studies of talc and ovarian cancer, twelve accepted the claim that cosmetic talc products have been asbestos-free since 1976.[15] Without an alternative mechanistic explanation, some researchers rejected causal associations between talc use and ovarian cancer.[15]

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM    INDEX NO. 193142/2021
NYSCEF DOC. NO. 1    Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 321 of 465    RECEIVED NYSCEF: 07/19/2021

*Bird et al.*    163

## Discussion

The documents reviewed indicate that the CTFA, J&J, and other industry representatives exerted considerable influence in three key areas in the 1970s: (1) regulatory proceedings at the FDA; (2) testing methods and the manipulation of test results (including undisclosed results); and (3) press coverage and the medical literature. After 1976, when the industry succeeded in preventing government regulation of cosmetic talc products, their influence continued. The actions undertaken by the CTFA and J&J reflect what David Michaels and others have called manufacturing uncertainty or doubt about the harmful effects of a product.[5,8]

Our review also indicates that the industry successfully pressured the FDA to ignore evidence that talc contained asbestos and be "willing to live" with inadequacies of the J4-1 method which would not assure the absence of asbestos in talc.[42] We shed light on the insidious nature of corporate influence over regulatory bodies, and public health policy in particular. For this reason, it is worth noting the several cases of revolving-door employment in this case study. The FDA commissioner in charge of cosmetics from 1973 to 1991, Dr. Heinz Eiermann, worked for J&J and Shulman, two talc manufacturers, before coming to the FDA, and both Dr. John Wenninger, deputy director of the FDA Division of Cosmetics and Technology in the 1970s and 1980s, and Dr. John Bailey, the director of the FDA Office of Cosmetics and Color from 1992 to 2002, went on to work for CTFA.[127 130] Bailey spent nine years with the CTFA eventually serving as the Executive Vice-President of Science; he currently works for EAS, a consulting company focused on lobbying the FDA and testifies as an expert witness for J&J and Colgate in talc litigation.[128,131] Wenninger coauthored the updated 1992 and 2002 CTFA Cosmetic Ingredient Handbooks (he had also served on the editorial advisory board of the 1977 Handbook).[132,133] The industry also understood who to target in the FDA. For instance, the Senior Vice President of Science for the CTFA, Dr. Norman Estrin, once noted that Weissler was " … a weak member of the FDA group and he will probably bury the [asbestos test] methodology in a lot of paper."[134]

As Historians Rosner et al. describe, the 1970s witnessed a political and economic battle surrounding public health and regulation. While significant traction was made in the early 1970s in terms of establishing government organizations to protect worker, consumer, and public health, by 1980, a conservative backlash ushered in what David Harvey calls an "emphatic turn towards neoliberalism:" "Deregulation, privatization, and withdrawal of the state from many areas of social provision have been all too common" (pp. 2–3).[32] While

historically we can situate this case study within this contentious period, the downstream effects of deregulation (i.e. industry self-regulation) of talc on public health are apparent. Further, as neoliberalism has become the dominant political-economic rationale of the current era, scholars have called into question the influence of neoliberalism on numerous public health concerns.[33]

In a similar review of corporate and government documents, Hessari et al.'s[9] analysis of conversations between the CDC and Coca-Cola similarly points out the inappropriateness of "allowing conflicted corporate actors to engage in well-established tactics to further commercial goals" for "an organization established to protect public health." Corporate interests must be prevented from wielding power over regulatory proceedings and decision-making. Otherwise, regulatory bodies become complicit in protecting industry profits rather than public health. By its own definition, the FDA is first and foremost "responsible for protecting the public health by ensuring the safety, efficacy, and security of human and veterinary drugs, biological products, and medical devices; and by ensuring the safety of our nation's food supply, cosmetics, and products that emit radiation."[12] As criminologists Lynch et al.[135] state, the agency should be recognized as central to policing corporate crime in addition to protecting the public's health. Our review indicates that a number of government and public interest groups including the New York City Environmental Protection Agency, the Cancer Prevention Coalition, and private citizens regularly petitioned the FDA (from 1971 to 2008) to address concerns around talc carcinogenicity. In each instance, the FDA adopted industry's profit-driven position over that of public health.

The FDA's 2014 rejection of the 2008 citizen's petition and J&J's subsequent use of this rejection in a trial is also concerning. Industries often use the FDA's product approval as a defense against lawsuits.[136] In the case of pharmaceuticals, Kesselheim and Avorn[136] warn that if this defense is accepted in the majority of courts, "FDA approval of a drug would absolve companies of responsibility for failing to adequately evaluate or report the risks associated with their products." In this case, the FDA chose to leave talc unregulated and J&J used this account of FDA inaction to support its defense of talc to the public and to juries in court.

Large industries continue to influence scientific research, specifications, standards, and other forms of safety regulation with the motivation of protecting sales and preventing lawsuits, often when other, safer substitutes are available. Industry wealth and networks of power can undermine adequate government oversight.

## Conclusion

The FDA and TM&MC assertion that cosmetic talc has been "asbestos-free" since 1976 relies on the publication of the 1976 CTFA J4-1 method not on actual test results. This test method replaced a proposed FDA regulation on talc, was voluntary, and was never formally codified.[14] In addition to being unenforceable, the 1976 CTFA J4-1 specification was also defective: it permitted the presence of the carcinogens (including chrysotile and fibrous talc) and only detected amphiboles at levels over 0.5 percent.[14,94] The TM&MCs suppressed evidence of asbestos in talc products and withheld information on superior testing methods from the FDA and the scientific community. As a result, epidemiological and other studies that seek to define the relationship between talc and various cancers also repeat the misleading notion that talc has been asbestos-free since 1976.[15]

Representatives from several TM&MCs have maintained—and still maintain—that in 1976 the industry implemented "stringent safety and quality control measures designed to ensure the absence of asbestos fibers from consumer talc products."[13] J&J's website, for instance, as of December 2020, falsely states that: "JOHNSON's talc products do not contain asbestos. A frequent misperception is that JOHNSON's baby powder contains talc made with asbestos, a substance classified as cancer-causing. Since the 1970s, talc used in consumer products has been required to be asbestos-free."[137] However, "no detectable asbestos" is not the same as "asbestos-free." As Rosner et al.[31] state on this issue: "The difference in these methodologies meant that potentially billions of asbestos fibers could be released into the air when babies were powdered or adults powdered themselves" (p. 1). In 1974, J&J told the FDA that they would follow a precautionary principle,

> Dr. Fuller stressed Johnson & Johnson's policy of full cooperation with FDA and that if the results of any scientific studies show any question of safety of talc, Johnson & Johnson will not hesitate to take it off the market. (p. 3)[78]

However, in practice, at every crossroad, J&J and the FDA interpreted "doubt" as a basis for inaction rather than a basis for protection of the public's health. The FDA has still not initiated any regulatory process for talc. J&J discontinued sales of talc-based baby powder in North America in April 2020, shortly after the FDA found asbestos in J&J baby powder.[12] They did not issue a recall and continued to sell products that were on store shelves.

Since the 1960s, doctors had advised against the use of cosmetic talc for the undisputed harms they cause, asphyxiation and talcosis, and the increase risk of cancer and support legislation that bans the use of talc

in cosmetic powders.[138] It is crucial that researchers continue to investigate and publish ongoing examples of regulatory oversight and internal conversations so that methods to improve government agencies become more apparent. Physicians, policy makers, and regulatory body themselves must become adept at identifying industry influence over issues that may cause harm to human and environmental health. We must work to curb instances of corporate influence on the FDA and other regulatory bodies. In the very least, we need independent, democratic watchdogs with science boards of researchers who do not collaborate in any way with the related industries, keeping industry and the government in check.

### Limitations

Due to the elaborate nature of these events, this review is not exhaustive and much detail is omitted. Our review of documents is further limited to the documents made available to us, as well as those released to the public domain.

### Declaration of Conflicting Interests

The author(s) declared the following potential conflicts of interest with respect to the research, authorship, and/or publication of this article: David S. Egilman serves as an expert witness in litigation at the request of people who claim injuries resulting from the use of talcum powders. Triet H. Tran works for David S. Egilman. Joan E. Steffen and Tess Bird worked for David S. Egilman during the initial phases of research and writing. Dr. Egilman was not compensated for work on this article. Triet H. Tran, Joan E. Steffen, and Tess Bird were not compensated by law firms for work on this article. No party to these litigations reviewed this commentary or had input into its content. A copy of the article was sent to lawyers representing Johnson & Johnson for comments prior to publication.

### Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

### ORCID iDs

Tess Bird 🔘 https://orcid.org/0000 0003 2997 6798
David S. Egilman 🔘 https://orcid.org/0000 0003 0280 163X

### Supplemental material

Supplemental material for this article is available online.

### Notes

a. TM&MCs include: Avon, BASF, Chanel, Colgate Palmolive, CTFA, Cyprus, Imerys/Rio Tinto Materials/ Luzenac, J&J, Johns Manville, Pfizer, R.T. Vanderbilt, Shulton, and Whittaker, Clark & Daniels.

*Bird et al.*

b. Laboratories include: ES Laboratories, RJ Lee, National Institutes of Occupational Safety and Health, the Colorado School of Mines, McCrone Associates Inc., Dartmouth, Bain Environmental, Mount Sinai Hospital, and the Mine Safety and Health Administration.

## References

1. Egilman D and Bohme S. Over a barrel: corporate corruption of science and its effects on workers and the environment. *Int J Occup Environ Health* 2005; 11: 331 337.

2. Ong EK and Glantz SA. Constructing 'sound science' and 'good epidemiology': tobacco, lawyers, and public relations firms. *Am J Public Health* 2001; 91: 1749 1757.

3. Moodie R. Profits and pandemics: prevention of harmful effects of tobacco, alcohol, and ultra processed food and drink industries. *Lancet* 2013; 381: 670 679.

4. Michaels D. *Doubt is in their product: how industry's assult on science threatens your health.* Oxford: Oxford University Press, 2008.

5. Michaels D and Monforton C. Manufacturing uncertainty: contested science and the protection of the public's health and environment. *Am J Public Health* 2005; 95: S39 S48.

6. Stuckler D, McKee M, Ebrahim S, et al. Manufacturing epidemics: the role of global producers in increased consumption of unhealthy commodities including processed foods, alcohol, and tobacco. *PLoS Med* 2012; 9: 1 8.

7. Shulman S, Abend K, Meyer A, et al. *Smoke, mirrors, and hot air: how exxonmobil uses big tobacco's tactics to manufacture uncertainty on climate science.* Cambridge, *MA: Union of Concerned Scientists,* 2007.

8. Michaels D. *The triumph of doubt: dark money and the science of deception.* Oxford: Oxford University Press, 2020.

9. Hessari N, Ruskin G., McKee M, et al. Public meets private: conversations between Coca Cola and the CDC. *Milbank Q* 2019; 97: 74 90.

10. Piller C. FDA's revolving door: companies often hire agency staffers who managed their successful drug reviews. *Science Magazine,* 5 July 2018, https://www.sciencemag.org/news/2018/07/fda s revolving door companies often hire agency staffers who managed their successful (accessed 9 February 2021).

11. Shoot B. Jury awards $29 million in latest Johnson & Johnson cancer causing baby powder lawsuit. *Fortune Magazine,* 15 March 2019, http://www.fortune.com/2019/03/15/cancer asbestos johnson jnj baby talcum powder trial/ (accessed 9 February 2021).

12. Hsu T and Rabin R. Johnson & Johnson to end talc based baby powder sales in North America. *The New York Times,* 19 May 2020, http://www.nytimes.com/2020/05/19/business/johnson baby powder sales stopped.html (accessed 9 February 2021).

13. Zazenski R, Ashton W, Briggs D, et al. Talc: occurrence, characterization, and consumer applications. *Regul Toxicol Pharmacol* 1995; 21: 218 229.

14. CTFA Method J4 1: asbestiform amphibole minerals in cosmetic talc. Washington, DC: CTFA, https://repository.library.brown.edu/studio/item/bdr:841542/ (1976, accessed 9 February 2021).

15. Tran T, Steffen J, Clancy K, et al. Talc, asbestos, and epidemiology: corporate influence and scientific incognizance. *Epidemiology* 2019; 30: 783 788.

16. Lee G. Letter to Dr. Norman Estrin (CTFA). Raritan, N.J.: J&J, 5 October 1976, https://repository.library.brown.edu/studio/item/bdr:858421/ (accessed 9 February 2021).

17. Appendix A to § 1926.55 1970 American Conference of Governmental Industrial Hygienists' threshold limit values of airborne contaminants threshold limit values of airborne contaminants for construction OSHA, https://http://www.osha.gov/laws regs/regulations/standardnumber/1926/1926.55AppA (accessed 9 February 2021).

18. Dana E. *A textbook of mineralogy.* New York: John Wiley & Sons, 1898.

19. Schulz R and Williams C. Commercial talc: animal and mineralogical studies. *J Ind Hyg Toxicol* 1942; 24: 75 79.

20. Siegal W, Amith A and Greenburg L. The dust hazard in tremolite talc mining, including roentgenological findings in talc workers. *AJR Am J Roentgenol* 1943; 49: 11 29.

21. Pask J and Warner P. Fundamentatl studies of talc: I, constitution of talcs. *J Am Ceram Soc* 1954; 37: 118 128.

22. Gillson J. *Industrial minerals and rocks.* New York: The American Institute of Mining, Metallurgical, and Petroleum Engineers, 1960.

23. Fyfe W. On the relative stability of talc, anthophyllite, and ensteatite. *Am J Sci* 1962; 260: 460 466.

24. Hunt AC. Massive pulmonary fibrosis from the inhalation of talc. *Thorax* 1956; 11: 287 294.

25. Porro F and Patton J. Pneumoconiosis in the talc industry. *AJR Am J Roentgenol* 1942; 518: 47.

26. Waldermar D. Effects of certain silicate dusts on the lungs. *J Ind Hyg* 1933; 15: 66 78.

27. Gross P, deTreville RTP, Cralley LJ, et al. Pulmonary ferruginous bodies: development in response to filamentous dusts and a method of isolation and concentration. *Arch Path* 1968; 85: 539 546.

28. Cralley L, Key M, Groth D, et al. Fibrous and mineral content of cosmetic talcum products. *Am Ind Hyg Assoc J* 1968; 29: 350 354.

29. Selikoff IJ. *Biological effects of asbestos.* New York: New York Academy of Sciences Section of Biological and Medical Sciences, 1964.

30. Lawrence S. Asbestos in talcum? FDA to test. *The New York Post,* 13 August 1971, https://repository.library.brown.edu/studio/item/bdr:841666/ (accessed 9 February 2021).

31. Rosner D, Markowitz G and Chowkwanyun M. Nondetected": the politics of measurement of asbestos in talc, 1971 1976. *Am J Public Health* 2019; 109: 969 974.

32. Harvey D. *A brief history of neoliberalism.* Oxford: Oxford University Press, 2005.

33. Schrecker T and Bambra C. *How politics make us sick: neoliberal epidemics.* London: Palgrave Macmillan, 2015.

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM INDEX NO. 193142/2021
NYSCEF DOC. NO. 1          Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 324 of 465          RECEIVED NYSCEF: 07/19/2021

166                                            *NEW SOLUTIONS: A Journal of Environmental and Occupational Health Policy 31(2)*

34. Kretchmer J. *Letter to E. Richardson (Department of Health, Education, and Welfare)*. Washington, DC: Environmental Protection Agency, 28 June 1971, https://repository.library.brown.edu/studio/item/bdr:858524/ (accessed 9 February 2021).

35. Weissler A. *Discussion session on "asbestos and talc"*. Washington, DC: FDA, 3 August 1971, https://repository.library.brown.edu/studio/item/bdr:1104405/ (accessed 9 February 2021).

36. Sandland G. Report of CTFA talc subcommittee on method to detect chrysotile and tremolite in talc. Washington, DC: CTFA, 10 December 1973, https://repository.library.brown.edu/studio/item/bdr:925786/ (accessed 9 February 2021).

37. Lichtenstein G. High levels of asbestos found in 3 paints and 2 talcums here. *The New York Times*, 16 June 1972, https://www.nytimes.com/1972/06/16/archives/high levels of asbestos found in 3 paints and 2 talcums here.html (accessed 9 February 2021).

38. Nashed W. Memo to file, talc/asbestos. New Brunswick, N.J.: J&J, 17 June 1972, https://repository.library.brown.edu/studio/item/bdr:858453/ (accessed 9 February 2021).

39. Lichtenstein G. Doctor admits he may have been mistaken. *The New York Times*, 17 June 1972, https://repository.library.brown.edu/studio/item/bdr:858557/ (accessed 9 February 2021).

40. Lewin S. L T. Alfred Weissler (FDA), with attached tabulation of X ray diffraction analyses of commercial products containing talc. Department of Chemistry, New York University, 3 August 1972, https://repository.library.brown.edu/studio/item/bdr:858455/ (accessed 9 February 2021).

41. Nashed W. Memo to Fuller (J&J), talc/asbestos, Shower to Shower talc. New Brunswick, N.J.: J&J, 24 August 1972, https://repository.library.brown.edu/studio/item/bdr:858458/ (accessed 9 February 2021).

42. Weissler A. *Memo to Schaffner, summary and comments on Prof. Lewin's analytical results for asbestos in talc*. Washington, DC: FDA, 31 July 1973, https://repository.library.brown.edu/studio/item/bdr:858452/ (accessed 9 February 2021).

43. Stuart JW. Analyst work sheets (Lewin samples). Washington, DC: FDA, 23 April 1974, https://repository.library.brown.edu/studio/item/bdr:1104409/ (accessed 9 February 2021).

44. Nashed W. Memo to Fuller (J&J), confidential, talc/asbestos. New Brunswick, N.J.: J&J, 8 August 1972, https://repository.library.brown.edu/studio/item/bdr:858457/ (accessed 9 February 2021).

45. Nashed W. Memo to file, talc/asbestos FDA meeting August 11, 1972. New Brunswick, N.J.: J&J, 14 August 1972, https://repository.library.brown.edu/studio/item/bdr:841504/ (accessed 9 February 2021).

46. Wenniger J. Memorandum of meeting. Washington, D. C.: FDA, August 11, 1972, https://repository.library.brown.edu/studio/item/bdr:858459/ (accessed 9 February 2021).

47. Nashed W. Memo to fuller (J&J), talc/asbestos, with attached findings on Johnson & Johnson products from

a report by Dr. S. Lewin (consultant to the FDA). New Brunswick, N.J.:, 26 September 1972, https://repository.library.brown.edu/studio/item/bdr:858464/ (accessed 9 February 2021).

48. Nashed W. Memo to file, Shower to Shower/asbestos, FDA meeting, September 21, 1972. New Brunswick, N. J.: J&J, 25 September 1972, https://repository.library.brown.edu/studio/item/bdr:1078410/ (accessed 9 February 2021).

49. Nashed W. Memo to fuller (J&J), talc/asbestos, FDA meeting, October 19, 1972. New Brunswick, N.J.: J&J, 20 October 1972, https://repository.library.brown.edu/studio/item/bdr:858467/ (accessed 9 February 2021).

50. Fuller R. Talc file, meeting November 1, 1972 with Dr. Schaffner F.D.A. New Brunswick, N.J.: J&J, 13 December 1972, https://repository.library.brown.edu/studio/item/bdr:858470/ (accessed 9 February 2021).

51. Fuller R. Talc file, phone call Dr. Schaffner (on November 22, 1972). New Brunswick, N.J.: J&J, 13 December 1972, https://repository.library.brown.edu/studio/item/bdr:858472/ (accessed 9 February 2021).

52. Weissler A. *Handwitten note, Lewin results on J&J products*. Washington, DC: FDA, 7 December 1972, https://repository.library.brown.edu/studio/item/bdr:1104408/ (accessed 9 February 2021).

53. Addison J and Davies LS. Analysis of amphibole asbestos in chrysotile and other minerals. *Ann Occup Hyg* 1990; 34: 159 175. AprPubMed PMID: 2169219.

54. Fuller R. Memo to Nashed (J&J), Dr. Schaffner F.D. A. New Brunswick, N.J.: J&J, 8 December 1972, https://repository.library.brown.edu/studio/item/bdr:858474/ (accessed 9 February 2021).

55. Weissler A. L T. *Adamson and Lang (Environmental Defense Fund)*. Washington, DC: FDA, 2 March 1973, https://repository.library.brown.edu/studio/item/bdr:858475/ (accessed 9 February 2021).

56. Buerger M. The Washington meeting of September 21, 1972 of Johnson and Johnson with the Food and Drug Administration and conclusions to be drawn from the meeting. New Brunswick, NJ: J&J, 7 October 1972, https://repository.library.brown.edu/studio/item/bdr:858478/ (accessed 9 February 2021).

57. Stewart I. *Letter to Goudie (J&J)*. Chicago, IL: McCrone Associates, 15 November 1972, https://repository.library.brown.edu/studio/item/bdr:841514/ (accessed 9 February 2021).

58. Nashed W. L T. Robert Schaffer (FDA). New Brunswick, NJ: J&J, 29 November 1972, https://repository.library.brown.edu/studio/item/bdr:841522/ (accessed 9 February 2021).

59. Smith WL. *Progress report on further studies on the measurement and correlation of the physical properties of talc*. Columbus, OH: Battelle Memorial Institute, 9 May 1958, https://repository.library.brown.edu/studio/item/bdr:841507/ (accessed 9 February 2021).

60. Ashton WH. Microscopic examination museum baby powder samples. New Brunswick, NJ: J&J, 13 July 1966, https://repository.library.brown.edu/studio/item/bdr:841508/ (accessed 9 February 2021).

**FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM**
INDEX NO. 193142/2021
NYSCEF DOC. NO. 1
Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 325 of 465
RECEIVED NYSCEF: 07/19/2021

*Bird et al.*
167

61. Langer AM. *Letter to Henderson (Tenovus Institute)*. New York, NY: Mount Sinai School of Medicine, 22 August 1971, https://repository.library.brown.edu/studio/item/bdr:858491/ (accessed 9 February 2021).

62. Hildick Smith GL. Letter to Dr. Selikoff (Mt. Sinai School of Medicine). New Brunswick, NJ: J&J , 9 August 1971, https://repository.library.brown.edu/studio/item/bdr:858526/ (accessed 9 February 2021).

63. Langer A. Letter to Hildick Smith (J&J). New York, NY: Mt. Sinai School of Medicine, 10 November 1971, https://repository.library.brown.edu/studio/item/bdr:858480/ (accessed 9 February 2021).

64. Henderson WJ, Joslin CA, Turnbull AC, et al. Talc and carcinoma of the ovary and cervix. *J Obstet Gynaecol Br Commonw* 1971; 78: 266 272. March 1PubMed PMID: 5558843. Epub 1971/03/01. eng.

65. Ashton WH. Letter to Hildick Smith (J&J), assay of talc in baby powder (p.16). New Brunswick, NJ: J&J, 14 May 1971, https://repository.library.brown.edu/studio/item/bdr:858469/ (accessed 9 February 2021).

66. Grieger G. *Preliminary report on examination of Grantham ore, medicated talcum powder, and shower to shower talcum powder*. Chicago, IL: McCrone Associates, 3 September 1971, https://repository.library.brown.edu/studio/item/bdr:841528/ (accessed 9 February 2021).

67. Pooley FD, Kingston GA and Lightfoot J. *An examina tion of Italian mine samples and relevant powders*. Cardiff, Wales: Department of Mineral Exploitation, University of Cardiff, 8 September 1972, https://repository.library.brown.edu/studio/item/bdr:1161225/ (accessed 9 February 2021).

68. Hutchinson T. *Investigation of possible asbestos contami nations in talc samples*. Minneapolis, MN: University of Minnesota Space Science Center, 1972, https://repository.library.brown.edu/studio/item/bdr:1104412/ (accessed 9 February 2021).

69. Stewart I. *Examination of Johnson and Johnson's baby powder (labeled "Do Not Use This Report")*. Chicago, IL: McCrone Associates, 27 October 1972, https://repository.library.brown.edu/studio/item/bdr:1104411/ (accessed 9 February 2021).

70. Elkies A. Deposition in Swann vs. J&J in the circuit court of the city of St. Louis state of Missouri case no. 1422 cc 09326 (15 December 2016), https://repository.library.brown.edu/studio/item/bdr:858414/ (accessed 9 February 2021).

71. Rolle R. Memo to Shelley (J&J), proposed specs for ana lyzing talc for asbestos (p. 3). New Brunswick, NJ: J&J, 16 May 1973, https://repository.library.brown.edu/studio/item/bdr:858501/ (accessed 9 February 2021).

72. Nashed W. Memo to Fuller (J&J), talc/asbestos. New Brunswick, NJ: J&J, 31 January 1973, https://repository.library.brown.edu/studio/item/bdr:858434/ (accessed 9 February 2021).

73. Nashed WL. Letter to the Hearing Clerk, Department of Health, Education, and Welfare. New Brunswick, NJ: J&J, 11 October 1972, https://repository.library.brown.edu/studio/item/bdr:858466/ (accessed 9 February 2021).

74. Petterson D. Memo to DD Johnston (J&J), subject: Windsor Minerals and Talc. New Brunswick, NJ: J&J, 26 April 1973, https://repository.library.brown.edu/studio/item/bdr:841512/ (accessed 9 February 2021).

75. Asbestos Particles in Food and Drugs. Notice of pro posed rulemaking. *Fed Regist* 1973; 38: 27976 27981.

76. Sandland G. Letter to FDA Hearing Clerk, proposed order method for asbestos in talc published in the federal register. Washington, DC: CTFA, 26 December 1973, https://repository.library.brown.edu/studio/item/bdr:858497/ (accessed 9 February 2021).

77. Sandland G. Meeting notes of CTFA talc subcommittee. Washington, DC: CTFA, 4 December 1974, https://repository.library.brown.edu/studio/item/bdr:858498/ (accessed 9 February 2021).

78. Nashed W and Hildick Smith G. Memo to file, meeting with Commissioner Schmidt (FDA) January 16, 1974. J&J, 18 January 1974, https://repository.library.brown.edu/studio/item/bdr:1151835/ (accessed 9 February 2021).

79. Steinberg W. Letter to Estrin (CTFA) et al., Talc. New Brunswick, NJ: J&J, 17 December 1974, https://repository.library.brown.edu/studio/item/bdr:858495/ (accessed 9 February 2021).

80. Scheltz J. Memo to R. Rolle, review of experimental tech niques for the concentration of asbestos minerals in talc Project #0503 00. New Brunswick, NJ: J&J, 27 November 1974, https://repository.library.brown.edu/studio/item/bdr:1082590/ (accessed 9 February 2021).

81. Sloan IW. Memo to R. Rolle. New Brunswick, NJ: J&J, 18 February 1975, https://repository.library.brown.edu/studio/item/bdr:858547/ (accessed 9 February 2021).

82. Ashton WH. Memo to G. Lee. New Brunswick, NJ: J&J, 24 November 1976, https://repository.library.brown.edu/studio/item/bdr:858439/ (accessed 9 February 2021).

83. Estrin NC. Talc taskforce minutes. Washington, DC: CTFA, 7 February 1975, https://repository.library.brown.edu/studio/item/bdr:841518/ (accessed 9 February 2021).

84. Estrin N. L T. Schaffner (FDA). Re: summary of analyses of talcs from the United States and other parts of the world. CTFA, 23 September 1975, https://repository.library.brown.edu/studio/item/bdr:1104416/ (accessed 9 February 2021).

85. Estrin N. L T. Eiermann (FDA). Washington, DC: CTFA, 15 March 1976, https://repository.library.brown.edu/studio/item/bdr:841459/ (accessed 9 February 2021).

86. Estrin N. CTFA talc subcommittee minutes. Washington, DC: CTFA, 31 March 1976, https://repository.library.brown.edu/studio/item/bdr:841677/ (accessed 9 February 2021).

87. Videotable Deposition of Susan Nicholson, MD. Superior Court of New Jersey, Law Division: Middlesex County. Brody Deposition Services (6 March 2019), https://repository.library.brown.edu/studio/item/bdr:925795/ (accessed 9 February 2021).

88. Rules and regulations. *Fed Regist* 1975; 40: 11865 11869.

89. Eiermann H. *Memo to Schaffner, asbestos in talc sum mary company tests*. Washington, DC: FDA, 18 March

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM INDEX NO. 193142/2021
NYSCEF DOC. NO. 1 Case 20-50534-KBO Doc 218 Filed 08/12/22 Page 326 of 465 RECEIVED NYSCEF: 07/19/2021

168 *NEW SOLUTIONS: A Journal of Environmental and Occupational Health Policy 31(2)*

1976, https://repository.library.brown.edu/studio/item/bdr:858441/ (accessed 9 February 2021).

90. Walcott J. Talc tests wanting, FDA experts admit. Record Bergen County, N.J., 11 March 1976, https://repository.library.brown.edu/studio/item/bdr:1082643/ (accessed 9 February 2021).

91. Estrin N. Minutes: CTFA talc subcommittee. CTFA, 8 July 1976, https://repository.library.brown.edu/studio/item/bdr:1078416/ (accessed 9 February 2021).

92. Brenard C. Email to T McCarthy, K Wylie, et al. (J&J), URGENT: talc in cosmetic products. Rio Tinto Minerals, 25 April 2009, https://repository.library.brown.edu/studio/item/bdr:841519/ (accessed 9 February 2021).

93. Minutes: CTFA Task Force on Round Robin Testing of consumer talcim [sic] products for asbestiform amphibole minerals. Washington, DC: CTFA, 17 May 1977, https://repository.library.brown.edu/studio/item/bdr:841544/ (accessed 9 February 2021).

94. Scheltz J. Memo to George Lee (J&J), NF Estrin (CTFA) and G. Sandland (Bristol Myers Products) Re: CTFA Task Force On Round Robin Testing of Consumer Talcum Products. New Brunswick, NJ: J&J, 29 September 1977, https://repository.library.brown.edu/studio/item/bdr:841520/ (accessed 9 February 2021).

95. Asbestos found in ten powders. *The New York Times*, 10 March 1976, http://www.nytimes.com/1976/03/10/archives/asbestos found in ten powders.html (accessed 9 February 2021).

96. Steffen J, Tran T, Yiman M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cos metic talc powders a case series. *J Occup Environ Med* 2020; 62: ê e77.

97. J&J powder management (presentation). New Brunswick, NJ: J&J, 12 January 2000, https://repository.library.brown.edu/studio/item/bdr:925812/ (accessed 9 February 2021).

98. Hielle Tucker L. Memo to C.E. LaRosa (J&J), JOHNSON'S baby powder with corn starch U/A analy sis. New Brunswick, NJ: J&J, 18 July 1977, https://repository.library.brown.edu/studio/item/bdr:925704/ (accessed 9 February 2021).

99. Kennedy D. *Letter to Dr. SM Wolfe and Dr. B Gordon (public citizen)*. Washington, DC: FDA, 11 January 1979, https://repository.library.brown.edu/studio/item/bdr:1104345/ (accessed 9 February 2021).

100. Douilett P. Petition for labeling of warning of the hazard ous effects produced by asbestos in cosmetic talc. 8 November 1983, https://repository.library.brown.edu/studio/item/bdr:858510/ (accessed 9 February 2021).

101. Cashen J and Epstein SS. FDA citizen petitions from cancer prevention coalition, 1994 and 2008. 17 November 1994; 13 May 2008, https://repository.library.brown.edu/studio/item/bdr:1161226/ (accessed 9 February 2021).

102. Waggoner W. FDA call file, subject: FOI and Johnson's baby powder. New Brunswick, NJ: J&J, 20 June 1977, https://repository.library.brown.edu/studio/item/bdr:936011/ (accessed 9 February 2021).

103. Kavanaugh E. Letter to the FDA, Re: FDA Docket No. 94P 0420/CP 1. Washington, DC: CTFA, 16 June 1995, https://repository.library.brown.edu/studio/item/bdr:841681/ (accessed 9 February 2021).

104. Swanson J. *Letter to Phillippe Douilett (citizen petition)*. Washington, DC: FDA, 11 July 1986, https://repository.library.brown.edu/studio/item/bdr:841680/ (accessed 9 February 2021).

105. Musser SM. *Letter to Samuel Epstein (cancer prevention coalition). Re: RE: Docket Numbers 94P 0420 and FDA 2008 P 0309 000IICP*. Silver Spring, MD: FDA, 1 April 2014, https://repository.library.brown.edu/studio/item/bdr:841690/ (accessed 9 February 2021).

106. Leader A. South Dakota jury ties talc powder to cancer risk. *Rapid City Journal*, 5 October 2013, https://rapidcitytyjournal.com/news/south dakota jury ties talc powder to cancer risk/article_78bd7792 b78c 5adb b684 e6b2c2db10ed.html (accessed 9 February 2021).

107. Hegarty M. Defendants Johnson & Johnson and Johnson & Johnson Consumers Inc.'s first amended responses to plaintiff's first request for production. In: Ingham et al. v. Johnson & Johnson, et al. Circuit Court of the City of St. Louis, State of Missouri, 27 May 2016, https://repository.library.brown.edu/studio/item/bdr:927172/ (accessed 9 February 2021).

108. Kavanaugh E. CTFA response statement: talc. Washington, DC: CTFA, 17 November 1994, https://repository.library.brown.edu/studio/item/bdr:925809/ (accessed 9 February 2021).

109. Velicer C. Tobacco papers and tobacco industry ties in regulatory toxicology and pharmacology. *J Public Health Pol* 2018; 39: 34 48.

110. Baker RD and Ducasse B. Workshop on talc: consumer uses and health perspectives. Imerys, 11 February 1994, https://repository.library.brown.edu/studio/item/bdr:841684/ (accessed 9 February 2021).

111. Memorandum of meeting at FDA. Imerys, 8 May 2009, https://repository.library.brown.edu/studio/item/bdr:858443/ (accessed 9 February 2021).

112. Muscat JE and Huncharek MS. Perineal talc use and ovarian cancer: a critical review. *Eur J Cancer Prev* 2008; 17: 139 146.

113. Hall R. Email to S. Mann (J&J). NTP proposal to list talc (SFXE30.pdf). Crowell & Moring LLP, 1 February 2005, https://repository.library.brown.edu/studio/item/bdr:858515/ (accessed 9 February 2021).

114. Huncharek M. Fax to Robert Glenn (Crowell & Morning). Talc projects letter of agreement. Meta Analysis Research Group, 6 October 2004, https://repository.library.brown.edu/studio/item/bdr:858517/ (accessed 9 February 2021).

115. Technology Planning and Management Corporation. *Draft report on carcinogens background document for talc asbestiform and non asbestiform. Meeting of the NTP Board of Scientific Counselors Report on Carcinogens Subcommittee*. U.S. Department of Health and Human Services, 13 14 December 2000, https://repository.library.brown.edu/studio/item/bdr:841468/ (accessed 9 February 2021).

FILED: NEW YORK COUNTY CLERK 07/19/2021 11:50 AM    INDEX NO. 193142/2021
NYSCEF DOC. NO. 1    Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 327 of 465    RECEIVED NYSCEF: 07/19/2021

*Bird et al.*    169

116. Turner E. Email to Rich Zazenski, drafting of EUROTALC submission to NTP. Luzenac, 13 November 2000, http://www.toxicdocs.org/d/3JmOnNyr5wqdb683EMBV4yagE (accessed 9 February 2021).

117. Zazenski R. Email to Kent Cutler, Jerry Gauntt (Luzenac), Fwd: Talc/NTP Update. Luzenac, 1 November 2001, https://repository.library.brown.edu/studio/item/bdr:858552/ (accessed 9 February 2021).

118. CRE Invoices. Multinational Business Services, Inc., 2001 2015, https://repository.library.brown.edu/studio/item/bdr:1153278/ (accessed 9 February 2021).

119. Zazenski R, Memo to D. Harris, et al., 2001 major objectives or goals. Luzenac, 17 May 2001, https://repository.library.brown.edu/studio/item/bdr:1153282/ (accessed 9 February 2021).

120. Comments by CRE on the listing proposed for talc not containing asbestiform fibers in the report on carcinogens, tenth edition. Washington, DC: CRE, 29 November 2000, https://repository.library.brown.edu/studio/item/bdr:1153283/ (accessed 9 February 2021).

121. McEwen G. Letter to K. Olden (NTP), review of cosmetic talc for listing in the report on carcinogens, twelfth edition (69 Federal Register 28940). Washington, DC: CTFA, 18 March 2004, https://repository.library.brown.edu/studio/item/bdr:841466/ (accessed 9 February 2021).

122. Zazenski R. Email to Eric Turner, Robert Bernstein (Luzenac), summary of CRE meeting, time to come up with more confusion. Luzenac, 2 January 2001, https://repository.library.brown.edu/studio/item/bdr:841483/ (accessed 9 February 2021).

123. Identifying/managing product stewardship issues: "license to market." Presentation slides. Luzenac, 2011, https://repository.library.brown.edu/studio/item/bdr:1161056/ (accessed 9 February 2021).

124. Kelly W. Draft of Letter to Dr. Baan (IARC). Imerys, 20 December 2005, https://repository.library.brown.edu/studio/item/bdr:858446/ (accessed 9 February 2021).

125. Deposition of William Kelly. Leavitt and McElroy v. Johnson & Johnson, et al. Superior Court of California, County of Alameda (5 November 2018), https://repository.library.brown.edu/studio/item/bdr:938039/ (accessed 9 February 2021).

126. Kelly W. Letter to Alan Andersen (CIR). Initial comments on CIR draft scientific literature review for "talc as used in cosmetics". Washington, DC: CRE, 19 October 2012, https://repository.library.brown.edu/studio/item/bdr:858536/ (accessed 9 February 2021).

127. Draft minutes talc interested party task. Washington, DC: CTFA, 21 July 1993, https://repository.library.brown.edu/studio/item/bdr:858433/ (accessed 9 February 2021).

128. John B. Ph.D. Colors and cosmetics: EAS Consulting Group, https://easconsultinggroup.com/about us/professionals/independent advisors/john bailey/ (2018, accessed 14 Jan 2021).

129. Obituary For Heinz Josef Eiermann, Louden Funeral Home, http://www.loudounfuneralchapel.com/obituaries/Heinz Eiermann/ (2012, accessed 14 Jan 2021).

130. Gettings S. Scientific Advisory Executive Committee Minutes. Personal Care Products Council, 11 April 1995, https://repository.library.brown.edu/studio/item/bdr:925804/ (accessed 9 February 2021).

131. Bailey J, Expert Report of Dr. John E. Bailey, Jr. for Colgate Palmolive Company in Hayes v. Colgate Palmolive, et al. (29 July 2018), https://repository.library.brown.edu/studio/item/bdr:1104316/ (accessed 9 February 2021).

132. Estrin N, editor. *CTFA cosmetic ingredient dictionary*. Washington, DC: CTFA, 1977.

133. Wenniger J and McEwan G. *CTFA cosmetic ingredient handbook*. Washington, DC: CTFA, 1992.

134. Nashed W. Memo to JC Walcott (J&J), Special talc project No. 503, CTFA phone call. New Brunswick, NJ: J&J, 17 July 1971, https://repository.library.brown.edu/studio/item/bdr:936887/ (accessed 9 February 2021).

135. Lynch M, Burns R., Holcomb J. Food for thought: an investigation of food and drug administration reporting practices, 1995 1999. *Crim Justice Rev* 2005; 30: 293 311.

136. Kesselheim AS and Avorn J. The role of litigation in defining drug risk. *JAMA* 2007; 297: 308 311.

137. The facts about talc safety, http://www.jnj.com/our products/the facts about talc safety (2016, accessed 23 December 2020).

138. Hughes W and Kalmer T. Massive talc aspiration: successful treatment with dexamethasone. *Am J Dis Child* 1966; 111: 653 654.

**Author Biographies**

**Tess Bird** is an interdisciplinary social science researcher and medical anthropologist. She is a current research affiliate at the Institute of Social and Cultural Anthropology, University of Oxford and a former Mellon Fellow in Writing in the Social Sciences at Wesleyan University.

**Joan E. Steffen** is a second-year student at Harvard Law School. She is a policy director for the Harvard Prison Legal Assistance Project and a copresident of Harvard's chapter of the National Lawyers Guild. Prior to attending law school, Joan worked at Never Again Consulting.

**Triet H. Tran** is a graduate of Brown University in Statistics and Economics. He works at Never Again Consulting.

**David S. Egilman** is a clinical professor of Family Medicine at Brown University and owner of Never Again Consulting. He also runs a non-profit that funds community-oriented primary care training programs in developing countries.

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 328 of 465

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF NEW YORK )

The undersigned, an attorney admitted to practice in the Courts of the State of New York, shows:

Deponent is an associate with The Lanier Law Firm PLLC, counsel for plaintiffs in the within action; deponent has read the foregoing Summons and Verified Complaint and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes same to be true. This verification is made by deponent and not by plaintiffs because plaintiffs reside outside of the County of New York where deponent maintains his office.

Dated: July 19, 2021
       New York, New York

_____
Darron E. Berquist, Esq.

2107757_5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN RE:  NEW YORK CITY
        ASBESTOS LITIGATION

THIS DOCUMENT RELATES TO:                          Index No.:

JUDITH PELTZ and BENJAMIN PELTZ,

                          Plaintiffs,              **VERIFICATION**

        -against-

AVON PRODUCTS, INC., *et al.*,

                          Defendants.

Darron E. Berquist, Esq., an attorney duly admitted to practice before the Courts of the

State of New York, hereby certifies in accordance with 22 NYCRR Part 130-1.1-a of the Rules of the

Chief Administrator that to the best of my knowledge, information and belief, which was formed

after a reasonable inquiry under the circumstances, the presentation of the foregoing Summons

and Verified Complaint and their contents are not frivolous, as the term is defined in Part 130.

Dated:  July 19, 2021
        New York, New York               THE LANIER LAW FIRM PLLC
                                         *Attorneys for Plaintiffs*
                                         126 E. 56th Street, 6th Floor
                                         New York, New York 10022
                                         Tel.: (212) 421-2800


                                         By: _Darron Berquist_____
                                             Darron E. Berquist, Esq.


2107757_5

# EXHIBIT 9

WEITZ & LUXENBERG, PC
*A New York Professional Corporation*
BY:   Mark S.Weinstein
ID #:   141012015
Erin M. Boyle, Esq.
ID#: 312672020
Joseph J. Mandia, Esq.
ID#: 016652008
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
(856) 755-1115
Attorneys for Plaintiff

| | |
|---|---|
| **NANCY SCHAEFER,**                    **Plaintiff**<br><br>    **vs.**<br><br>**BARRETTS MINERALS, INC.;**<br><br>**BRENNTAG NORTH AMERICA, as a successor-in-interest to Mineral Pigment Solutions, Inc., as a successor-in interest to Whittaker, Clark & Daniels, Inc.;**<br><br>**BRENNTAG SPECIALTIES, INC., f/k/a Mineral Pigment Solutions, Inc., as a successor-in-interest to Whittaker, Clark & Daniels, Inc.;**<br><br>**BRISTOL-MYERS SQUIBB;**<br><br>**IDELLE LABS, LTD.;**<br><br>**PFIZER, INC.;**<br><br>**SPECIALTY MINERALS, INC.;**<br><br>**WHITTAKER, CLARK, & DANIELS, INC.;**<br><br>**REVLON, INC.;**<br><br>**REVLON CONSUMER PRODUCTS CORPORATION;**<br><br>**SHULTON, INC., Individually and as Successor to the Shulton Group and/or Shulton, Inc.;** | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION MIDDLESEX COUNTY**<br><br>**DOCKET NO. L-            - AS**<br><br>**CIVIL ACTION (ASBESTOS LITIGATION)**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

1

**THE PROCTER & GAMBLE COMPANY,**
**Individually and Successor to the Shulton Group**
**and/or Shulton, Inc.;**

**WYETH HOLDINGS LLC f/k/a Wyeth Holdings**
**Corporation f/k/a American Cyanamid Company**
**as successor-in-interest to The Shulton Group**
**and/or Shulton, Inc.;**

**L'OREAL USA Inc., for its L'Oréal, Maybelline**
**and products;**

**MAYBELLINE, LLC, as a subsidiary of L'Oréal**
**USA Inc. for its Maybelline brand of products;**

**NOXELL CORPORATION, f/k/a as Noxzema**
**Chemical Company;**

**COTY, INC., individually and for its subsidiary,**
**Noxell Corporation;**

**DANA CLASSIC FRAGRANCES, INC.,**
**individually and as successor-in-interest to Dana**
**Perfume Company, successor-in-interest to Les**
**Parfums De Dana, Inc.;**

**PATRIARCH PARTNERS, LLC**

**and JOHN DOE CORPORATIONS, 1-50**

                   **Defendants.**

Plaintiff NANCY SCHAEFER by way of Complaint against the Defendants named herein,

allege as follows:

## PARTIES - PLAINTIFF

1.     Plaintiff NANCY SCHAEFER resides at 33 Aqua View Lane, Barnegat,

County of Ocean, State of New Jersey.

2.   From approximately 1962-2006, Plaintiff NANCY SCHAEFER was exposed to asbestos

from her personal usage of Revlon, Almay, L'Oreal, and Cover Girl products in the New Jersey. From

approximately 1956-1965, Plaintiff NANCY SCHAEFER was exposed to asbestos from her personal

usage of Chantilly Body Dusting Powder in New Jersey. From approximately 1954-2004, Plaintiff

NANCY SCHAEFER was exposed to asbestos from her personal usage of Johnson's Baby Powder and

Shower to Shower talc products, as well as Plaintiff's usage of Johnson's Baby Powder on her two

children during diaper changes from approximately 1968-1973 in New Jersey. In addition, from

approximately 1952-1963, Plaintiff NANCY SCHAEFER was exposed to asbestos from her father's

usage of Old Spice talc powder in New Jersey. From approximately 1995-2007, Plaintiff NANCY

SCHAEFER was exposed to asbestos from her late husband's usage of Ammens Medicated powder in

New Jersey.

3.   As a direct and proximate result of the above exposures, Plaintiff contracted

mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and

attendant complications.

4.   Plaintiff was caused to suffer severe, permanent and disabling personal injury, has

expended and will be caused to expend sums of money for medical care and treatment, therefore,

has been prevented and will be prevented from pursuing her normal activities and employment,

has experienced and will continue to experience severe pain and suffering and mental anguish, and

has been deprived and will continue to be deprived of her ordinary pursuits and enjoyments of life.

5.   Reference herein to "Plaintiff" or "Plaintiffs" is a reference to all the persons set forth

above as is syntactically and contextually correct.

## **PARTIES – DEFENDANTS**

6.   Defendants are corporations organized under the laws of New Jersey and/or various

states of the United States of America that were and are doing business in the State of New Jersey.

The aforementioned Defendants mined, milled, designed, manufactured, sold, supplied, purchased

and/or marketed asbestos-containing products, and/or asbestos-containing talc and/or other

3

finished and unfinished asbestos-containing talc powder products, and/or asbestos fiber of various kinds and grades which Plaintiff was exposed.

7.   Defendants BARRETTS MINERALS, INC.; BRENNTAG NORTH AMERICA, as a successor-in-interest to Mineral Pigment Solutions, Inc., as a successor-in interest to Whittaker, Clark & Daniels, Inc.;BRENNTAG SPECIALTIES, INC., f/k/a Mineral Pigment Solutions, Inc., as a successor-in-interest to Whittaker, Clark & Daniels, Inc.; BRISTOL-MYERS SQUIBB; IDELLE LABS, LTD; PFIZER, INC.; SPECIALTY MINERALS, INC.; WHITTAKER, CLARK, & DANIELS, INC.; REVLON, INC.; REVLON CONSUMER PRODUCTS CORPORATION; SHULTON, INC., Individually and as Successor to the Shulton Group and/or Shulton, Inc.; THE PROCTER & GAMBLE COMPANY, Individually and Successor to the Shulton Group and/or Shulton, Inc.; WYETH HOLDINGS LLC f/k/a Wyeth Holdings Corporation f/k/a American Cyanamid Company as successor-in-interest to The Shulton Group and/or Shulton, Inc.; L'OREAL USA Inc., for its L'Oréal, Maybelline and products; MAYBELLINE, LLC, as a subsidiary of L'Oréal USA Inc. for its Maybelline brand of products; NOXELL CORPORATION, f/k/a as Noxzema Chemical Company;  COTY, INC., individually and for its subsidiary, Noxell Corporation; DANA CLASSIC FRAGRANCES, INC., individually and as successor-in-interest to Dana Perfume Company, successor-in-interest to Les Parfums De Dana, Inc.; PATRIARCH PARTNERS, LLC are corporations or other business entities organized under the laws of one or more states of the United States of America and doing business in New Jersey.

8.   Defendants, JOHN DOE CORPORATIONS, 1-50, are the fictitious names or corporations, Partnerships, and/or other business entities whose identities are not presently known, and who are the alter egos of or are otherwise responsible for the conduct of liability of those who

4

mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products, and/or asbestos-containing talc and/or other finished and unfinished asbestos-containing talc powder products, and/or raw asbestos fiber of various kinds and grades to which Plaintiff was exposed.

9.    Defendants conduct business in the State of New Jersey, and certain Defendants reside or maintain their principal offices and/or principle places of business in the State of New Jersey.

## **FIRST COUNT**

10.    Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

11.    Defendants, at all times material hereto, acted through their respective officers, employees and agents, who in turn were acting within the scope of their authority and employment in furtherance of the business of Defendants.

12.    Defendants were engaged, directly, or indirectly, in the mining, milling, designing, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, or distributing of asbestos-containing products, and/or asbestos containing talc and/or other finished and unfinished asbestos-containing talc powder products, and/or raw asbestos fiber of various kinds and grades which Defendants knew or should have foreseen would be used with asbestos-containing products (hereinafter collectively referred to as "Defendants' Products").

13.    Defendants, directly or indirectly, caused Defendants' Products to be sold to or used by Plaintiff and/or in close proximity to Plaintiff.

14. Plaintiff was exposed to and came in contact with Defendants' Products. Plaintiff inhaled and/or ingested the asbestos dust and fibers emanating from Defendants' Products.

15. As a direct and proximate result of Plaintiff's inhalation and ingestion of dust particles and fibers from Defendants' Products, Plaintiff developed permanent and disabling personal injuries.

16. During the time that Defendants mined, milled, designed, manufactured, produced processed, compounded, converted, sold, merchandised, distributed, and supplied Defendant's Products, Defendants knew or in the exercise of reasonable care should have known that Defendants' Products were defective, ultra-hazardous, dangerous, and otherwise highly harmful to Plaintiff.

17. Defendants knew or in the exercise of reasonable care should have known that the use of Defendants' Products, would cause asbestos dust and fibers to be released into the air and would create dangerous and unreasonable risk of injury to the lungs, respiratory systems, larynx, stomach and other bodily organs of users of Defendants' Products, and to others breathing that air and coming into contact with that dust.

18. Plaintiff did not know the nature and extent of the injury that would result from contact with and exposure to Defendants' Products, or from the inhalation or ingestion of the asbestos dust and fibers.

19. Defendants knew or in the exercise of reasonable care should have known that Plaintiff would come into contact with and be exposed to Defendants' Products and would inhale or ingest asbestos dust and fibers as a result of the ordinary and foreseeable use of Defendants' Products by Plaintiff.

20.    Despite the facts as set forth above, Defendants negligently, grossly negligently, maliciously, with willful and wanton disregard, recklessly and intentionally:

(a) Mined, milled, designed, manufactured, produced, processed, compounded, converted, sold, supplied, merchandised, distributed or otherwise placed in the stream of commerce Defendant's Products which Defendants knew, or in the exercise of reasonable care should have known, were defective, dangerous, ultra-hazardous and otherwise unreasonably harmful to Plaintiff;

(b) Failed to take reasonable precautions or exercise reasonable care to warn Plaintiff adequately of the risks, dangers and harm to which Plaintiff would be exposed by exposure to, contact with, use and handling of Defendants' Products, or by inhalation or ingestion of the asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products;

(c) Failed to provide information or reasonably safe and sufficient safeguards, wearing apparel, proper equipment and appliances necessary to protect Plaintiff from being injured, poisoned, disabled, killed or otherwise harmed by using, handling, coming into contact with and being exposed to Defendants' Products, or by inhalation or ingestion of the asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products;

(d) Failed to package their products in a manner that would assure that Plaintiff would not come into contact with or be exposed to the asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products;

(e) Failed to advise Plaintiff of the necessity to adopt and enforce a safe, sufficient and proper method and plan of using, handling, coming into contact with and being exposed

to Defendants' Products so that Plaintiff would not inhale or ingest the asbestos dust
and fibers resulting from the ordinary and foreseeable use of Defendants' Products;

(f) Ignored and/or suppressed medical and scientific information, studies, tests, data and
literature which Defendants acquired during the course of their normal business
activities concerning the risk of asbestosis, scarred lungs, cancer, mesothelioma,
respiratory disorders and other illnesses and diseases to individuals such as Plaintiff
and other persons similarly situated who were exposed to Defendants' Products;

(g) Disregarded medical and scientific information, studies, tests, data and literature
concerning the causal relationship between the inhalation or ingestion of asbestos dust
and fibers, and such diseases as asbestosis, mesothelioma, scarred lungs, cancer,
respiratory disorders and other illnesses and diseases;

(h) Failed to investigate, impose and comply with policies, procedures, standards and
regulations as to exposure to asbestos, asbestos fibers, and asbestos dust;

(i) Wrongfully processed, manufactured, packaged, distributed, used, delivered, and sold
Defendants' Products for use by Plaintiff, others like her and the general public;

(j) Exposed and continued to expose Plaintiff and other persons similarly situated to the
risk of developing asbestosis, mesothelioma, scarred lungs, cancer and other illnesses,
all of which risks Defendants knew, or in the exercise of reasonable care should have
known, were consequences of exposure to asbestos dust and fibers;

(k) Failed to seek substitute materials in lieu of the use of asbestos;

(l) Failed to provide proper, adequate, correct and appropriate warnings, labels, advice,
cautions, instructions, and information as to the use of and consequences of exposure

to Defendants' Products, asbestos, asbestos fibers and dusts and failed to use reasonable care as to same;

(m) Failed to provide proper and appropriate warnings and cautions to all users of Defendants' Products, including Plaintiff, of the dangers of asbestos-containing products, fibers and dusts, both known and foreseeable; and

(n) Failed to advise Plaintiff, who Defendants knew, or in the exercise of reasonable care, should have known, had been exposed to, inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products, to cease further uncontrolled or unprotected exposure to Defendants' Products and the inhalation or ingestion of asbestos dust and fibers; to be examined by competent medical doctors to determine the nature and extent of any and all diseases caused by inhalation or ingestion of asbestos dust and fibers; and to receive medical care and treatment for such diseases.

21.     Defendants otherwise acted negligently, grossly negligently, maliciously, with willful and wanton disregard, recklessly and with intentional disregard for the welfare of Plaintiff in the mining, milling, designating, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing, or otherwise placing in the stream of commerce Defendants' Products.

22.     Defendants acted in a negligent, grossly negligent, malicious, willful and wanton manner, with reckless disregard for the health and welfare of Plaintiff and others similarly situated, and failed to use reasonable care under all of the circumstances.

23.     As a direct and proximate result of the aforementioned acts and omissions of Defendants, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled

or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff developed mesothelioma as a direct and proximate result of said exposure to Defendants' Products. Plaintiff has and continues to endure severe pain and suffering and mental anguish, has been required to expend great sums of money for medical care and treatment related thereto, has been prevented from pursuing normal activities and has been deprived of ordinary pursuits and enjoyments of life. Plaintiff has suffered lost earnings and other pecuniary loss.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

<u>**SECOND COUNT**</u>

24.     Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

25.     Defendants expressly and impliedly warranted that Defendants' Products, which they mined, milled, designed, manufactured, produced, processed, compounded, converted, sold, supplied, merchandised, distributed or otherwise placed in the stream of commerce were merchantable, reasonably fit for use and safe for their intended purposes.

26.     Defendants breached said warranties in that Defendants' Products were defective, ultra-hazardous, dangerous, unfit for use, not merchantable and not safe for their intended, ordinary and foreseeable use and purposes.

27.     As a direct and proximate result of Defendants' breach of warranties, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff has

suffered the injuries, expenses and losses, including severe pain and suffering and mental anguish, as alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

## THIRD COUNT

28.     Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

29.     Defendants failed to disclose and intentionally and negligently misrepresented to Plaintiff the health risks created by ordinary use of Defendants' Products.

30.     Plaintiff relied upon said representations, and Plaintiff's reliance was foreseeable to Defendants.

31.     As a result of Defendants' conduct, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff has suffered the injuries, expenses and losses, including severe pain and suffering and mental anguish, as alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

## FOURTH COUNT

32.     Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

33.     Defendants are <u>strictly liable</u> to Plaintiff by reason of the following:

(a) Defendants were engaged in the business of being miners, millers, designers, manufacturers, producers, processors, sellers, suppliers, and distributors of Defendants' Products;

(b) Defendants knew or had reason to know that Plaintiff and other persons similarly situated would be ultimate users or consumers of Defendants' Products or would be exposed to Defendants' Products;

(c) Defendants sold or otherwise placed Defendants' Products into the stream of commerce in a defective condition, unreasonably dangerous to Plaintiff and other persons similarly situated;

(d) Throughout the many years that Plaintiff and other similarly situated persons were exposed to and used Defendants' Products, Defendants' Products reached the users and consumers without substantial change in the condition in which they were sold;

(e) The ordinary and foreseeable use of Defendants' asbestos-containing products constituted a dangerous and ultra-hazardous activity and created an unreasonable risk of injury to users, bystanders and household members;

(f) Defendants' Products were defective in that they deviated from the design specifications and/or standards set forth by the manufacturer, were incapable of being made safe for their ordinary and intended use and purpose due to their defective design, were defective because they failed to contain adequate warnings, were defectively manufactured as they failed to comply with their own specifications, were defectively

designed because Defendants' Products outweighed their benefits, and Defendants failed to give any warnings or instructions, or failed to give adequate or sufficient warnings or instructions about the risks, dangers and harm associated with the use of Defendants' Products.

(g) Defendants' Products were defectively designed because Defendants' Products are more dangerous than would be contemplated by ordinary users, consumers, workers, bystanders and household members, and also because the risks of Defendants' Products outweighed their benefits;

(h) Defendants' Products were defectively manufactured as they failed to comply with their own specifications.

34.    As a consequence of the defective condition of Defendants' Products, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff has suffered the injuries, expenses and losses, including severe pain and suffering and mental anguish, as alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

### FIFTH COUNT
### NEW JERSEY PRODUCTS LIABILITY ACT CLAIM
### (NJSA 2A:58C-1 *et seq.*)

35.    Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

36.     Defendants are <u>strictly liable</u> to Plaintiff by reason of the following:

(a) Defendants were engaged in the business of being miners, millers, designers, manufacturers, producers, processors, sellers, suppliers, and distributors of Defendants' Products;

(b) Defendants knew or had reason to know that Plaintiff and other persons similarly situated would be ultimate users or consumers of Defendants' Products or would be exposed to Defendants' Products;

(c) Defendants sold or otherwise placed Defendants' Products into the stream of commerce in a defective condition, unreasonably dangerous to Plaintiff and other persons similarly situated, which were not fit, suitable or safe for their intended purposes and/or reasonably foreseeable uses;

(d) Throughout the many years that Plaintiff and other similarly situated persons were exposed to and used Defendants' Products, Defendants' Products reached the users and consumers, and their household members, without substantial change in the condition in which they were sold;

(e) The ordinary and foreseeable use of Defendants' asbestos-containing products constituted a dangerous and ultra-hazardous activity and created an unreasonable risk of injury to users, bystanders and household members;

(f) Defendants' Products were defective in that they deviated from the design specifications and/or standards set forth by the manufacturer, were incapable of being made safe for their ordinary and intended use and purpose due to their defective design, were defective because they failed to contain adequate warnings, were defectively manufactured as they failed to comply with their own specifications, were defectively

designed because Defendants' Products were more dangerous than would be contemplated by an ordinary user, the risks of Defendants' Products outweighed their benefits, and Defendants failed to give any warnings or instructions, or failed to give adequate or sufficient warnings or instructions about the risks, dangers and harm associated with the use of Defendants' Products, and/or failed to give adequate post-sale warnings or instructions.

(g) Defendants' Products were defectively designed because Defendants' Products are more dangerous than would be contemplated by ordinary users, consumers, workers, bystanders and household members, and also because the risks of Defendants' Products outweighed their benefits;

(h) Defendants' Products were defectively manufactured as they failed to comply with their own specifications.

37.    As a consequence of the defective condition of Defendants' Products, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff has suffered the injuries, expenses and losses, including severe pain and suffering and mental anguish, as alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

## SIXTH COUNT

38.     Plaintiff reiterates the facts and contentions as set forth above, and repeats them herein.

39.     Defendants acted in concert with each other and with other members of the industry through express agreement, implicit agreement, imitative behavior and conscious parallel behavior:

(a) To withhold from users of Defendants' Products, and from persons who Defendants knew or should have known would be exposed to Defendants' Products, information regarding the health risks of breathing or ingesting asbestos dust and fibers;

(b) To eliminate or prevent development of adequate procedures and tests relating to the health hazards of exposure to asbestos fibers and dust; and

(c) To assure that Defendants' Products became widely used in industries such as personal hygiene, beauty, infant care, and similar industries.

40.     Defendants knew that their activities were violative of common law standards of care and that their withholding of information, failure to develop tests and procedures and promotion of widespread use of asbestos-containing products would expose persons such as Plaintiff to unreasonable risk of bodily injury.

41.     Defendants nevertheless gave substantial assistance and encouragement to each other and to other members of the industry and assisted each other and other members of the industry in: withholding information regarding the dangers of asbestos; failing to develop tests and procedures to assure that users of asbestos would not subjected to risk of injury; and promoting widespread use of Defendants' Products which Defendants knew would expose Plaintiff to unreasonably risk of bodily injury.

42. As a direct and proximate consequence of the concerted actions of Defendants and other members of the industry, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff was caused to suffer the injuries, expenses and losses, including severed pain and suffering and mental anguish, as alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

## SEVENTH COUNT

43. Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

44. The Defendants constitute all known, non-remote producers, designers, manufacturers, suppliers, distributors of the asbestos-containing products which could have caused Plaintiff's injuries.

45. Each of the Defendants, whether acting individually or in concert with others, violated a duty of care owed to Plaintiff, or otherwise engaged in culpable activity against Plaintiff. The acts and omissions of at least one of the Defendants caused Plaintiff to suffer the injuries, losses and expenses alleged in prior counts of this Complaint.

46. Plaintiff in no respect can be blamed should Plaintiff be unable to establish which of the asbestos-containing products caused the injuries complained of herein.

47.     The burden of proof in this matter thus should shift to Defendants to demonstrate that their respective conduct and their respective asbestos-containing products could not have caused Plaintiff's injuries, and failing such proof, Defendants should be held jointly, severally, or alternatively liable for Plaintiff's injuries.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

## EIGHTH COUNT

48.     Plaintiff reiterates the facts and contentions as set forth above and repeats them herein.

49.     At all times relevant hereto, the Defendants, as a part of their businesses, were engaged, directly, or indirectly, in the mining, milling, designing, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, or distributing of asbestos-containing products, and/or asbestos containing talc and/or other finished and unfinished asbestos-containing talc powder products, which Defendants placed into the stream of commerce in a defective, unsafe and inherently dangerous condition in that, among other things, adequate warnings, instructions and precautions were not given to known and foreseeable users and handlers, including Plaintiff, and the products and materials were expected to and did reach such persons, including Plaintiff, without substantial change in the condition in which they were sold.

50.     At all times relevant hereto, the asbestos containing products and materials were used and employed for the purposes for which they were mined, processed and manufactured,

designed, fashioned, packaged, inspected, tested, sold and intended to be used, and in a manner foreseeable to the Defendants.

51.     The injuries and resulting damages to Plaintiff were caused by the defective, unsafe and dangerous condition of the asbestos products and materials which Defendants distributed, supplied, sold, and otherwise placed in the stream of commerce.

52.     As a consequence of the Defendants' conduct and/or the defective condition of Defendants' Products, Plaintiff was exposed to and came in contact with Defendants' Products and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' Products. Plaintiff has suffered the injuries, expenses and losses, including severe pain and suffering and mental anguish, as alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally and/or in the alternative for such damages as may be permitted pursuant to the laws of the State of New Jersey, including but not limited to compensatory damages, pecuniary damages, punitive damages, pre- and post-judgement interest, and costs of suit, and attorney fees as provided by law.

Plaintiff hereby incorporates by reference all allegations set forth in the Standard Complaint, as amended, previously served upon all parties and filed with Middlesex County Clerk. Additional copies of the Standard Complaint are available upon written request to Plaintiff's counsel and a pdf version can be downloaded from the judiciary's website: https://www.njcourts.gov.attorneys/mcl/middlesex/asbestos.html.

In addition, copies of the Mass Tort Asbestos Manual, General Orders and Standing Orders pertaining to Middlesex County asbestos litigation are available from the judiciary's website, or from Special Master Agatha N. Dzikiewicz, Esq., Middlesex County Courthouse, 56 Paterson

Street, Chambers 204, New Brunswick, New Jersey 08903, Tel: 732-645-4300 ext. 88211, e-mail

– Agatha.Dzikiewicz@njcourts.gov.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues.

## **DEMAND FOR ANSWERS TO INTERROGATORIES**

Plaintiff demands answers to the Standard Interrogatories pursuant to the Asbestos General

Order. Said Standard Interrogatory forms may be obtained online at www.njcourtsonline.com.

## **DESIGNATION OF TRIAL COUNSEL**

Pursuant to Rule 4:25-4, Erin M. Boyle, Esq. and Joseph J. Mandia, Esq. are hereby

designated as trial counsel in this matter.

## **CERTIFICATION PURSUANT TO RULE 4:5-1**

I hereby certify that to my knowledge the within matter in controversy is not the subject of

any other action currently pending in any court or of a pending arbitration proceeding, and that no

other action or arbitration proceeding is contemplated.  I have no knowledge at the time of any

non-party who should be joined in the action.

> **WEITZ & LUXENBERG, PC**
> *A New York Professional Corporation*
>
> /s*Mark S. Weinstein*
> Mark S. Weinstein
> Attorney ID #  141012015
> 220 Lake Drive East, Suite 210
> Cherry Hill, NJ 08002
> (856) 755-1115
> Attorneys for Plaintiff

Dated: December  8, 2021

| | |
|---|---|
| **WEITZ & LUXENBERG**<br>*A New York Professional Corporation*<br>Mark S. Weinstein, Esq.<br>ID#: 141012015<br>220 Lake Drive East, Suite 210<br>Cherry Hill, NJ, 08002<br>(856) 755-1115<br>Attorneys for Plaintiff(s) | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MIDDLESEX COUNTY<br>DOCKET NO. MID-L -      - 21  AS |
| **NANCY SCHAEFER**<br><br>                    **Plaintiff,**<br>     vs.<br><br>**BARRETTS MINERALS, INC., et al.**<br><br>                    **Defendants.** | Civil Action<br><br>PLAINTIFF'S INITIAL FACT SHEET |

1.　　Full Name:  **Nancy Schaefer.**

2.　　Date of Birth:  **10/18/1944.**

3.　　Address:  **33 Aqua View Lane, Barnegat, NJ  08005.**

4.　　Union/Local/Years of Membership: **To be supplied if applicable.**

5.　　Date of first claimed asbestos exposure:  **1954**

6.　　Date of last claimed asbestos exposure:  **2017**

7.　　Smoking History:  **Plaintiff is a former smoker.**

8.　　State the inclusive dates of smoking history, the products smoked and the amount of product consumed per day:　 **To be supplied.**

9.　　Provide as much of the following information as is presently available: work sites, inclusive dates and trade or occupation for each site.

| WORK SITES | DATES | TRADE / OCCUPATION |
|---|---|---|
| Residence(s) in New Jersey | Approx. 1952-1963 | Application of Talc Powder by Father |
| Residence(s in New Jersey | Approx. 1954-2004 | Application of Talc Powder on Body |

| Residence(s) in New Jersey | Approx. 1956-1965 | Application of Talc Powder on Body |
| Residence(s) in New Jersey | Approx. 1962-2006 | Application of Talc Powders on Face |
| Residence(s) in New Jersey | Approx. 1968-1973 | Application of Talc Powder on Children During Diaper Changes |
| Residence(s) in New Jersey | Approx. 1995-2007 | Application of Talc Powder by Husband |

10.   State the claimed asbestos related diseases; including the date of diagnosis and the name of the diagnosing physician or institution (if available attach a copy of the medical report).

    a.   Disease: **Mesothelioma.**

    b.   Date of diagnosis:  **On or around October 1, 2021**

    c.   Doctor/Institution: **Penn Presbyterian Medical Center, Philadelphia, PA.**

**WEITZ & LUXENBERG**
*A New York Professional Corporation*
Attorneys for Plaintiffs

Dated:  December 8, 2021          By: *Mark S. Weinstein*
                                       Mark S. Weinstein, Esq.

myPeniiMedicine - Test Details    https://sectire.mypermmedicine.org/MyPennMedicine/inside.asp?mode=...

Name: Nancy Schaefer I MRN: 470236837 1 PCP: Harry Leo Larkin, MD

# SURGICAL PATHOLOGY REPORT - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| Case Information | Your Value<br>ACCESSION: PC-21-0000027 COLLECTION DATE/TIME: 9/30/2021 10:37 EDT RECEIVED DATE/TIME: 9/30/2021 10:50 EDT PATHOLOGIST: Moran, Anna M MD | |

| | | |
|---|---|---|
| Addendum<br>Discussion | Your Value<br>Case reviewed in consultation with Dr. H. Min.<br><br>The case material was reviewed and the report verified by: Anna M Moran, MD<br><br>(Electronic signature)<br>Report Date/Time: 10/20/2021<br>13:39 PM EDT<br>AMM<br><br>Penn Presbyterian Medical Cent 51<br>N.39th Street<br>Philadelphia PA 19104<br><br>Histopathology and Cytopathology processing performed at the Department of<br>Pathology and<br>Laboratory<br>Medicine, The Hospital of the University of Pennsylvania, 3020 Market Street,<br>Philadelphia PA<br>19104. | |

myPerinMedicirie - Test Details

| Component | Your Value | Standard Range |
|---|---|---|
| | **ATTENTION PATIENTS** <br> **The findings in this report have been made available for review potentially <br> before your <br> provider has had a chance to review and discuss the results with you. Please <br> allow time for <br> your provider to review your results. If you have any questions or concerns <br> about these results, <br> please contact the healthcare provider who ordered the test.** | |
| Case Information | Your Value <br> ACCESSION: PC-21-0000027 COLLECTION DATE/TIME: 9/30/2021 10:37 EDT RECEIVED DATE/TIME: 9/30/2021 10:50 EDT PATHOLOGIST: Moran, Anna M MD | |
| Final Diagnosis | Your Value <br> A.  Right pleural biopsy: <br> Malignant mesothelioma, epithelioid type, see note. <br><br> B.  Chest, right, diaphragm, biopsy: | |
| Case Information | Your Value <br> ACCESSION: PC-21-0000027 COLLECTION DATE/TIME: 9/30/2021 10:37 EDT RECEIVED DATE/TIME: 9/30/2021 10:50 EDT PATHOLOGIST: Moran, Anna M MD <br><br> .Final Diagnosis: | |
| Final Diagnosis | Your Value <br> Malignant mesothelioma, epithelioid type, see note. <br><br> The case material was reviewed and the report verified by: Anna M Moran, MD <br><br> (Electronic signature) <br> Report Date/Time: 10/01/2021 <br> 14:52 PM EDT | |

10/20/202 I, 2:37 PM

myPennMedicine - Test Details                              hups://secure.mypennmedicine.org/MyPennMedicine/inside.asp?mode=...

| Component | Your Value | Standard Range |
|---|---|---|
| | AMM | |

Penn Presbyterian Medical Cent
51 N.39th Street
Philadelphia PA 19104

Histopathology and Cytopathology processing performed at the
Department of
Pathology and
Laboratory
Medicine, The Hospital of the University of Pennsylvania, 3020
Market Street,
Philadelphia PA
19104.

**ATTENTION PATIENTS**
**The findings in this report have been made available for review
potentially
before your
provider has had a chance to review and discuss the results with
you. Please
allow time for
your provider to review your results. If you have any questions or
concerns
about these results,
please contact the healthcare provider who ordered the test.**

| Note | Your Value |  |
|---|---|---|
| | Immunohistochemical stains were performed at outside | |

institution and these were
available for
review.
The tumor cells are positive for CK7, calretinin, WT1, while staining
negative
for CK20, P 40,

Pax 8, TTF 1, MOC31 and ER. The histologic findings and
immunohistochemical
workup support the

myPennMedicine - Test Details          https://secure.mypennmedicine.org/MyPennMedicine/insicle.asp'?mode....

|              |                                                                 | Standard |
|--------------|-----------------------------------------------------------------|----------|
| Component    | Your Value                                                      | Range    |

above diagnosis. _


Disclaimer:

The above in-vitro IHC tests may have used reagents labeled for IVD (In Vitro

Diagnostic Use),

IUO (Investigational Use Only) and/or RUO (Research Use Only) and have not been

cleared or

approved by the U.S Food and Drug Administration. However, the FDA has

determined that such

clearance or approval is not necessary for ASR class I tests intended to provide

pathologists

with adjunctive information to assist their morphologic evaluation. The tests

using IUO or RUO

reagents were developed and their performance characteristics were validated for

diagnostic use

by the Laboratory of Immunohistochemistry, Anatomic Pathology at the Hosp

ital of

the University

of Pennsylvania. This laboratory is regulated under the Clinical Laboratory

Improvement

Amendments of 1988 (CLIA) as qualified to perform high complexity clinical

tests. These Class

I ASR tests are not intended to provide diagnostic, prognostic, predictive or

therapeutic

information that is not directly confirmed by routine histopathologic internal

or external

control specimens.


Case reviewed in consultation with Dr. H Min agrees with the above diagnosis of

10/20/2021, 2:37 PM

MID-L-007018-21    12/08/2021 10:22:10 AM  Pg 5 of 6 Trans ID: LCV20212864767
Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 358 of 465

myPennMedicine - Test Details                                    https://secure.mypenitmedicine.org/MyPennMedicine/inside.asp?mocle....

| Component | Your Value | Standard Range |
|---|---|---|
| | malignancy. | |
| Pathologist(s) | Your Value | |
| | Anna M Moran, MD | |
| Gross Description | Your Value | |
| | Received 12 outside surgical slides and 2 outside blocks labeled SMS21-3257 with | |
| | a corresponding | |
| | pathology report from Southern Ocean Medical Center 1140 Rt 72 West, West | |
| | Manahawkin, NJ 08050 | |
| | (Phone: 609-978-3176) . | |
| | Dictated by: Anna M Moran, MD | |
| | HS | |
| Case Information | Your Value | |
| | ACCESSION: PC-21-0000027 COLLECTION DATE/TIME: 9/30/2021 10:37 EDT RECEIVED DATE/TIME: 9/30/2021 10:50 EDT PATHOLOGIST: Moran, Anna M MD | |
| | .Clinical Information: | |
| Clinical Information | Your Value | |
| | Pre-Operative Diagnosis: | |
| | Post-Operative Diagnosis: | |
| | Operation: Outside slides | |
| | Specific questions to be answered by Consultation(if any) | |
| | Specimen: | |
| | 1 Slides (12) labeled SMS21-3257 from Southern Ocean Medical Center (obtained | |
| | on: 08/26/2021) | |

# General Information

Ordered by Suzanne L. Walker, CRNP, MSN

Collected on 09/30/2021 10:37 AM

Resulted on 10/20/2021 1:39 PM

myPennMedicine - Test Details                                   hups://secure.mypennmedicine.org/MyPennMedicine/inside.asp?mode=...

Result Status: Edited Result- FINAL

This test result has been released by an automatic process.

MyCharC licensed from Epic Systems Corporation © 1999 - 2020

10/20/2021, 2:37 PM

# Civil Case Information Statement

## Case Details: MIDDLESEX | Civil Part Docket# L-007018-21

**Case Caption:** SCHAEFER NANCY  VS BARRETTS MINERALS, I NC.

**Case Initiation Date:** 12/08/2021

**Attorney Name:** JOSEPH J MANDIA

**Firm Name:** WEITZ & LUXENBERG PC

**Address:** 220 LAKE DR EAST  STE 210
CHERRY HILL NJ 080020000

**Phone:** 8567551115

**Name of Party:** PLAINTIFF : SCHAEFER, NANCY

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** ASBESTOS

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** YES

**Are sexual abuse claims alleged by: NANCY SCHAEFER?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
#### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

12/08/2021
Dated

/s/ JOSEPH J MANDIA
Signed

# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PATRICIA A. ROHE and WILLIAM ROHE,

Plaintiff

.

CHANEL, INC., et al.,

Defendants                    .

Index No: 190202/19

Date Filed:

Plaintiff's designate
**NEW YORK COUNTY**
as the place of trial

**The basis of the venue is Plaintiff is a New
York domiciliary; Defendants, AVON
PRODUCTS, INC., CHANEL, INC.,
COLGATE-PALMOLIVE COMPANY,
ESTEE LAUDER, INC., KOLMAR
LABORATORIES, INC., L'OREAL USA,
INC., LOT LESS NYC., INC., LOT LESS
OF FULTON STREET, INC., PFIZER,
INC., REVLON CONSUMER
PRODUCTS, CORP., REVLON, INC.,
RITE AID OF NEW YORK, INC., RITE
AID OF NEW YORK CITY, INC.,
SHISEIDO AMERICA, INC., and
WALGREEN EASTERN CO., INC. are
citizens of New York/Headquartered in
New York; and a substantial part of the
events or omission giving rise to the claim
occurred in New York City (CPLR 503(a)) .**

**SUPPLEMENTAL SUMMONS &
COMPLAINT**

**TO THE ABOVE NAMED DEFENDANTS:**

　　**YOU ARE HEREBY SUMMONED to** answer the Complaint in this action and to serve a copy of your
Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on the
Plaintiff's Attorney within 20 days after the service of this Summons, exclusive of the day of service (or
within 30 days after the service is complete if this Summons is not personally delivered to you within the State
of New York). In the case of your failure to appear or answer, judgment will be taken against you by default
for the relief demanded in the complaint.

Dated: New York, New York
　　　　August 23, 2019

Yours etc.,

**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff's*
700 Broadway
New York, New York 10003
(212) 558-5500

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PATRICIA A. ROHE and WILLIAM ROHE,

Index No.:

Plaintiff,

**FULL CAPTION RIDER**

-against-

**AVON PRODUCTS, INC.,**
**BARRETTS MINERALS, INC.,**
**BRENNTAG NORTH AMERICA,**
    **as a successor-in-interest to MINERAL PIGMENT**
    **SOLUTIONS, INC., as successor-in-interest to**
    **WHITTAKER, CLARK & DANIELS, INC.,**
**BRENNTAG SPECIALTIES, INC., f/k/a MINERAL**
    **PIGMENT SOLUTIONS, INC., as successor-in-**
    **interest to WHITTAKER, CLARK & DANIELS, INC.,**
CHANEL, INC.,
**COLGATE-PALMOLIVE COMPANY,**
**CVS PHARMACY, INC.,**
**CYPRUS AMAX MINERALS COMPANY,**
**DRI I, INC.,**
**DUANE READE, INC.,**
**ESTEE LAUDER, INC.,**
**HOUBIGANT, INC., Individually and as successor-in-interest**
    **to DANA FRAGRANCES,**
**JOHNSON & JOHNSON,**
**JOHNSON & JOHNSON CONSUMER COMPANIES, INC.,**
**JOHNSON & JOHNSON HEALTH AND WELLNESS**
    **SOLUTIONS, INC.,**
**KOLMAR LABORATORIES, INC.,**
**L'OREAL USA, INC.,**
LOT LESS OF FULTON STREET, INC.,
LOT LESS NYC, INC.,
**MACY'S, INC.,**
**PATRIARCH PARTNERS LLC, Individually and as successor-**
    **in-interest to DANA FRAGRANCES,**
**PFIZER, INC.,**
**REVLON CONSUMER PRODUCTS CORPORATION,**
**REVLON, INC.,**
RITE AID OF NEW YORK, INC.,
RITE AID OF NEW YORK CITY, INC.,
SHISEIDO AMERICA, INC.,
WALGREEN EASTERN CO., INC., Individually and as successor-in-
    interest to Rite-Aid,
**WALGREEN, INC.,**
**WHITTAKER, CLARK & DANIELS, INC.,**

Defendants.

<u>DEFENDANTS' ADDRESSES:</u>
**PATRICIA ROHE AND WILLIAM ROHE DEFENDANTS**
**ADDRESS LIST:**

| **DEFEDANTS:** | **SERVICE:** |
|---|---|
| **AVON PRODUCTS, INC.** | **AVON PRODUCTS, INC.**<br>**1 AVON PLACE**<br>**SUFFERN, NEW YORK 10901** |
| **BARRETTS MINERALS, INC.** | **CT CORPORATION SYSTEM**<br>**28 LIBERTY STREET**<br>**NEW YORK, NEW YORK 10005** |
| **BRENNTAG NORTH AMERICA**<br>**5083 POTTSVILLE PLACE**<br>**READING , PA 19605** | **5083 POTTSVILLE PLACE**<br>**READING, PA 19605** |
| **BRENNTAG SPECIALTIES, INC.** | **CT CORPORATION SYSTEM**<br>**111 EIGHTH AVENUE**<br>**NEW YORK, NEW YORK 10011** |
| CHANEL, INC. | CT CORPORATION SYSTEM<br>28 LIBERTY STREET<br>NEW YORK, NEW YORK 10005 |
| **COLGATE-PALMOLIVE COMPANY** | **CT CORPORATION**<br>**28 LIBERTY STREET**<br>**NEW YORK, NEW YORK 10005** |
| **CVS PHARMACY, INC.** | **CT CORPORATION SYSTEM**<br>**28 LIBERTY STREET**<br>**NEW YORK, NEW YORK 10005** |
| **CYPRUS AMAX MINERALS COMPANY** | **C/O REGISTERED AGENT SOLUTIONS, INC.**<br>**9 E. LOCKERMAN STREET, SUITE 311**<br>**DOVER, DE 19901** |
| **DUANE READE, INC.** | **CORPORATION SERVICE COMPANY**<br>**80 STATE STREET**<br>**ALBANY, NEW YORK 12207** |
| **DRI I, INC.** | **CORPORATION SERVICE COMPANY**<br>**80 STATE STREET**<br>**ALBANY, NEW YORK 12207** |
| **ESTEE LAUDER, INC.** | **CORPORATION SERVICE COMPANY**<br>**80 STATE STREET**<br>**ALBANY, NEW YORK 12207** |
| **HOUBIGANT, INC.** | **SPITZER & FELDMAN**<br>**595 MADISON AVENUE**<br>**NEW YORK, NEW YORK 10022** |
| **JOHNSON & JOHNSON** | **ONE JOHNSON & JOHNSON PLAZA**<br>**NEW BRUNSWICK, NEW JERSEY 08933** |
| **JOHNSON & JOHNSON CONSUMER**<br>**COMPANIES, INC.** | **ONE JOHNSON & JOHNSON PLAZA**<br>**NEW BRUNSWICK, NEW JERSEY 08933** |
| **JOHNSON & JOHNSON HEALTH AND**<br>**WELLNESS SOLUTIONS, INC.** | **CT CORPORATION SYSTEM**<br>**111 EIGHTH AVENUE**<br>**NEW YORK, NEW YORK 10011** |
| **KOLMAR LABORATORIES, INC.** | **20 WEST KING STREET**<br>**PORT JERVIS, NEW YORK 12771** |

| | |
|---|---|
| **L'OREAL USA, INC.** | **CORPORATION SERVICE COMPANY**<br>**80 STATE STREET**<br>**ALBANY, NEW YORK 12207** |
| LOT LESS OF FULTON STREET, INC. | 305 BROADWAY<br>SUITE 303<br>NEW YORK, NEW YORK 10007 |
| LOT LESS NYC, INC. | 305 BROADWAY<br>SUITE 303<br>NEW YORK, NEW YORK 10007 |
| **MACY'S INC.** | **CORPORATE CREATIONS NETWORK, INC.**<br>**15 NORTH MILL STREET**<br>**NYACK, NEW YORK 10960** |
| **PATRIARCH PARTNERS LLC** | **CORPORATION SERVICES COMPANY**<br>**80 STATE STREET**<br>**ALBANY, NEW YORK 12207** |
| **PFIZER, INC.** | **CT CORPORATION SYSTEM**<br>**111 EIGHTH AVENUE**<br>**NEW YORK, NEW YORK 10011** |
| **REVLON CONSUMER PRODUCTS CORP.** | **CORPORATE CREATIONS NETWORK, INC.**<br>**15 NORTH MILL STREET**<br>**NYACK, NEW YORK 10960** |
| **REVLON, INC.** | **CORPORATE CREATIONS NETWORK, INC.**<br>**15 NORTH MILL STREET**<br>**NYACK, NEW YORK 10960** |
| RITE AID OF NEW YORK, INC. | CT CORPORATION SYSTEM<br>111 EIGHTH AVENUE<br>NEW YORK, NEW YORK 10011 |
| RITE AID OF NEW YORK CITY, INC. | CT CORPORATION SYSTEM<br>111 EIGHTH AVENUE<br>NEW YORK, NEW YORK 10011 |
| SHISEIDO AMERICA, INC. | 366 PRINCETON HIGHTSTOWN ROAD<br>EAST WINDSOR, NEW JERSEY 08520 |
| WALGREEN EASTERN CO., INC. | THE PRENTICE-HALL CORPORATION SYSTEM<br>80 STATE STREET<br>ALBANY, NEW YORK 12207 |
| **WALGREEN, INC.** | **CORPORATION SERVICE COMPANY**<br>**80 STATE STREET**<br>**ALBANY, NEW YORK 12207** |
| **WHITTAKER, CLARK & DANIELS, INC.** | **C/O SMITH MAZURE DIRECTOR WILKINS.**<br>**YOUNG & YAGERMAN**<br>**111 JOHN STREET, 20TH FLOOR**<br>**NEW YORK, NY 10038**<br>**ATTN: ANN ECCHER, ESQ** |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PATRICIA A. ROHE and WILLIAM ROHE,

Index No.:

Plaintiff,

**VERIFIED COMPLAINT**

-against-

**AVON PRODUCTS, INC.,**
**BARRETTS MINERALS, INC.,**
**BRENNTAG NORTH AMERICA,**
    **as a successor-in-interest to MINERAL PIGMENT**
    **SOLUTIONS, INC., as successor-in-interest to**
    **WHITTAKER, CLARK & DANIELS, INC.,**
**BRENNTAG SPECIALTIES, INC., f/k/a MINERAL**
    **PIGMENT SOLUTIONS, INC., as successor-in-**
    **interest to WHITTAKER, CLARK & DANIELS, INC.,**
CHANEL, INC.,
**COLGATE-PALMOLIVE COMPANY,**
**CVS PHARMACY, INC.**
**CYPRUS AMAX MINERALS COMPANY,**
**DRI I, INC.,**
**DUANE READE, INC.,**
**ESTEE LAUDER, INC.,**
**HOUBIGANT, INC., Individually and as successor-in-interest**
    **to DANA FRAGRANCES,**
**JOHNSON & JOHNSON,**
**JOHNSON & JOHNSON CONSUMER COMPANIES, INC.,**
**JOHNSON & JOHNSON HEALTH AND WELLNESS SOLUTIONS, INC.,**
**KOLMAR LABORATORIES, INC.,**
**L'OREAL USA, INC.,**
LOT LESS OF FULTON STREET, INC.,
LOT LESS NYC, INC.,
**MACY'S, INC.,**
**PATRIARCH PARTNERS LLC, Individually and as successor-**
    **in-interest to DANA FRAGRANCES,**
**PFIZER, INC.,**
**REVLON CONSUMER PRODUCTS CORPORATION,**
**REVLON, INC.,**
RITE AID OF NEW YORK, INC.,
RITE AID OF NEW YORK CITY, INC.,
SHISEIDO AMERICA, INC.,
**WALGREEN, INC.,**
WALGREEN EASTERN CO., INC., Individually and as successor-in-
    interest to Rite-Aid,
**WHITTAKER, CLARK & DANIELS, INC.,**

Defendants.

Plaintiff, by her attorneys, WEITZ & LUXENBERG, P.C., upon information and belief,

at all times hereinafter mentioned alleges as follows:

## THE PARTIES

1.    Plaintiff **PATRICIA ROHE and WILLIAM ROHE** are residents of the State of New York and reside at 612 Marina Pointe Drive in East Rockaway, New York 11518.

2.    PATRICIA ROHE was diagnosed with Mesothelioma and Ovarian Cancer on August 25, 2016.

3.    Plaintiff PATRICIA ROHE, ("Plaintiff"), by and through undersigned counsel bring this action for personal injuries suffered as a proximate result of PATRICIA ROHE'S regular and prolonged use of, inhalation, ingestion, absorption, and exposure to asbestos laden talcum powder products known as Avon Night Magic and Skin So Soft, Chanel face powder, Miss Dior dusting powder, Chantilly dusting powder, Coty Air-Spun Face Powder, Estee Lauder face powder, blush and eye shadow, Johnson & Johnson Baby Powder, Lancome face powder and eye shadow, Revlon eye shadow and face powder, and Shiseido blush and eye shadow ("PRODUCTS"), which at all times relevant hereto, were advertised, applied, brokered, converted, compounded, delivered, designed, distributed, fabricated, fashioned, imported, installed, labelled, leased, licensed, lobbied, manufactured, marketed, mined, mixed, packaged, processed, produced, promoted, purchased, relabeled, removed, sold, specified, supplied, tested, and/or used on behalf of by Defendants, **AVON PRODUCTS, INC., BARRETTS MINERALS, INC., BRENNTAG NORTH AMERICAN AS SUCCESSOR-IN-INTEREST TO MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR-IN-INTEREST TO WHITTAKER, CLARK & DANIELS, INC., BRENNTAG SPECIALTIES, FORMALLY KNOWN AS MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR- IN- INTEREST TO WHITTAKER, CHANEL, INC., COLGATE-PALMOLIVE COMPANY, CVS PHARMACY, INC., CYPRUS AMAX MINERALS COMPANY, DRI I, INC., DUANE READE, INC., ESTEE LAUDER, INC., HOUBIGANT, INC., Individually and as successor-in-interest to DANA**

FRAGRANCES, JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER

COMPANIES, INC., JOHNSON & JOHNSON HEALTH AND WELLNESS

SOLUTIONS, INC., KOLMAR LABORATORIES, INC., L'OREAL USA, INC., LOT

LESS OF FULTON STREET, INC., LOT LESS NYC, INC., MACY'S, INC.,

PATRIARCH PARTNERS LLC, INDIVIDUALLY AND AS SUCCESSOR-IN-

INTEREST TO DANA FRAGRANCES, PFIZER, INC., REVLON CONSUMER

PRODUCTS CORPORATION, REVLON, INC., RITE AID OF NEW YORK, INC.,

RITE AID OF NEW YORK CITY, INC., SHISEIDO AMERICA, INC., WALGREEN

EASTERN CO., INC., WALGREEN, INC., AND WHITAKER, CLARK & DANIELS,

INC.

4.    Plaintiff, PATRICIA ROHE was diagnosed with Mesothelioma and Ovarian Cancer

on August 25, 2016 as a result of her exposure to talcum powder contaminated with asbestos.

5.    The terms "Defendant" or "Defendants" shall include all present and former

employees, officers, executives, principals, owner, managers, contractors, and servants with

authority (either apparent, actual or imputed by law) to have acted on Defendant(s)'s behalf

during the relevant time period.

6.    At all relevant times, Defendants actions and conduct, as more fully described

below, were carried out by or through their duly authorized agents, servants, and employees, who

were then and there acting in the course and scope of their employment, and in furtherance of

Defendants' business.

7.    For any entity referenced in the caption or elsewhere in the pleading of this

Complaint, or in any complaint incorporating this Complaint by reference, where the term

"successor" or "successor in interest" is used, Plaintiff alleges as follows: (1) the successor entity

or corporation expressly or impliedly assumed the predecessor's tort liability or liabilities

described herein; (2) there was a consolidation or a de jure or de facto merger of the seller and

purchaser; (3) the purchasing entity or corporation was a mere continuation of the selling entity

or corporation; or (4) the transaction was entered into fraudulently to escape such liabilities or

obligations.

8.      For any such named "successor" entity, Plaintiff further alleges that the named predecessor entity was the named successor's mere alter ego such that its corporate veil was or should be deemed pierced by virtue of any or several of the following factors: (1) absence of corporate formalities; (2) inadequate capitalization, (3) the successor's siphoning of funds from the predecessor, (4) lack of significant business discretion on the part of the predecessor entity, and/or (5) the creation of the successor entity to fraudulently avoid liabilities to creditors, such as the Plaintiff herein.

9.      Defendant, **AVON PRODUCTS, INC.** is a duly organized domestic corporation doing business and/or transacting business in the State of New York. At all pertinent times, AVON PRODUCTS, INC., has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

10.     AVON PRODUCTS, INC., has continually advertised and marketed talc as safe for human use.

11.     AVON PRODUCTS, INC., supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information.

12.     Defendant, **BARRETTS MINERALS, INC.,** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times, BARRETTS MINERALS, INC. has been in the business of mining, milling, processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum powder, for use in talcum powder based products, including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

13.     Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic

mineral. The Defendant BARETTS MINERALS, INC., mined the talc, contaminated with

asbestos, [1] contained in the PRODUCTS.

14.     BARRETTS MINERALS, INC., has continually advertised and marketed talc as safe

for human use.

15.     BARRETTS MINERALS, INC., supplies customers with material safety data sheets

for talc. These material safety data sheets are supposed to convey adequate health and warning

information to its customers.

16.     Defendant, **BRENNTAG NORTH AMERICA, Individually as a successor in

interest to, MINERAL PIGMENT SOLUTIONS, INC., as a successor in interest to

WHITTAKER, CLARK & DANIELS, INC.,** is a duly organized foreign corporation doing

business and/or transacting business in the State of New York. At all pertinent times,

BRENNTAG NORTH AMERICA, as a successor in interest to Mineral Pigment Solutions, Inc.,

as a successor in interest to Whittaker, Clark & Daniels, Inc. has been in the business of

mining, milling, processing, importing, converting, compounding, designing, manufacturing,

marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the

stream of commerce asbestos-containing talcum powder, for use in talcum powder based

products, including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

BRENNTAG NORTH AMERICA is the successor or continuation of Mineral Pigment

solutions, Inc. which is the successor or continuation of Whittaker, Clark & Daniels, Inc. and

BRENNTAG NORTH AMERICA is legally responsible for all liabilities incurred when

it was known as Mineral Pigment Solutions, Inc. and Whittaker, Clark & Daniels, Inc.

---

[1] As used throughout this complaint, the term "asbestos" shall be interpreted in the broadest sense and includes, without limitation, non- regulated and non-commercial forms of asbestos (including non-fibrous asbestos), cleavage fragments, and transition/transitional fibers, without limitation as to fiber size, dimension, or ratio.

17.     Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral. The Defendant BRENNTAG NORTH AMERICA, mined the talc, contaminated with asbestos,[2] contained in the PRODUCTS.

18.     BRENNTAG NORTH AMERICA, has continually advertised and marketed talc as safe for human use.

19.     BRENNTAG NORTH AMERICA, supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to its customers.

20.     Defendant, **BRENNTAG SPECIALTIES, INC., Individually as a successor in interest to Mineral Pigment Solutions, Inc., as a successor in interest to Whittaker, Clark & Daniels, Inc.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times, BRENNTAG SPECIALTIES, INC., as a successor in interest to Mineral Pigment Solutions, Inc., as a successor in interest to Whittaker, Clark & Daniels, Inc. has been in the business of mining, milling, processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum powder, for use in talcum powder based products, including the PRODUCTS to which PATRICIA ROHE was exposed in New York. BRENNTAG SPECIALTIES, INC. is the successor or continuation of Mineral Pigment solutions, Inc. which is the successor or continuation of Whittaker, Clark & Daniels, Inc. and BRENNTAG SPECIALTIES, INC. is legally responsible for all liabilities incurred when it was known as Mineral Pigment Solutions, Inc. and Whittaker, Clark & Daniels, Inc

---

[2] As used throughout this complaint, the term "asbestos" shall be interpreted in the broadest sense and includes, without limitation, non- regulated and non-commercial forms of asbestos (including non-fibrous asbestos), cleavage fragments, and transition/transitional fibers, without limitation as to fiber size, dimension, or ratio.

21.    Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral. The Defendant BRENNTAG SPECIALTIES, INC., mined the talc, contaminated with asbestos, contained in the PRODUCTS.

22.    BRENNTAG SPECIALTIES, INC., has continually advertised and marketed talc as safe for human use.

23.    BRENNTAG SPECIALTIES, INC., supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to its customers.

24.    Defendant, **CHANEL, INC.** is a duly organized domestic corporation. At all pertinent times, CHANEL, INC., has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

25.    CHANEL, INC., has continually advertised and marketed talc as safe for human use.

26.    CHANEL, INC., supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information.

27.    Defendant, **COLGATE-PALMOLIVE COMPANY** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. COLGATE-PALMOLIVE COMPANY'S headquarters/principal executive offices are located at 300 Park Avenue, New York, New York 10022. At all pertinent times, COLGATE-PALMOLIVE COMPANY, has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

28.    COLGATE-PALMOLIVE COMPANY, has continually advertised and marketed

talc as safe for human use.

29.   COLGATE-PALMOLIVE COMPANY, supplies customers with material safety data sheets for talc.  These material safety data sheets are supposed to convey adequate health and warning information.

30.   Defendant, **CVS PHARMACY, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York.  At all pertinent times, CVS PHARMACY, INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

31.   Patricia Rohe purchased asbestos laden talcum products to which she was exposed, from the CVS Store, CVS PHARMACY, INC., from CVS stores in downtown Manhattan New York City.

32.   Defendant, **CYPRUS AMAX MINERALS COMPANY** is a duly organized foreign corporation doing business and/or transacting business in the State of New York.  At all pertinent times, CYPRUS AMAX MINERALS COMPANY has been in the business of mining, milling, processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum powder, for use in talcum powder based products, including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

33. CYPRUS AMAX MINERALS COMPANY has continually advertised and marketed talc as safe for human use.

34.   CYPRUS AMAX MINERALS COMPANY supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to its customers.

35.    Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral. The Defendant CYPRUS AMAX MINERALS COMPANY., mined the talc, contaminated with asbestos, contained in the PRODUCTS.

36.    CYPRUS AMAX MINERALS COMPANY., has continually advertised and marketed talc as safe for human use.

37.    Defendant, **DRI I, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. Patricia Rohe purchased asbestos laden talcum products to which she as exposed from the Duane Reade in downtown Manhattan in New York City. At all pertinent times, DRI I, INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

38.    DRI I, INC., has continually advertised and marketed talc as safe for human use. Patricia Rohe purchased purchased asbestos laden talcum products to which she as exposed from the Duane Reade in Downtown Manhattan in New York City.

39.    Defendant, **DUANE READE, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. Patricia Rohe purchased asbestos laden talcum products to which she as exposed from the Duane Reade in downtown Manhattan in New York City. At all pertinent times, DUANE READE, INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

40.    DUANE READE, INC., has continually advertised and marketed talc products as safe for human use. Patricia Rohe purchased asbestos laden talcum products to which she as exposed from the Duane Reade in downtown Manhattan in New York City.

41.    Hereinafter, unless otherwise delineated, **DRI I, INC., & DUANE READE, INC.** shall be collectively referred to as the "THE DUANE READE DEFENDANTS."

42.    Defendant, **ESTEE LAUDER, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times, ESTEE LAUDER, INC., has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

43.    ESTEE LAUDER, INC., has continually advertised and marketed talc as safe for human use.

44.    ESTEE LAUDER, INC., supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information.

45.    Defendant, **HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES,** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times, HOUBIGANT, has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

46.    HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES has continually advertised and marketed talc as safe for human use.

47.    HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information.

48.    Defendant, **JOHNSON & JOHNSON,** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times,

JOHNSON & JOHNSON was engaged in the business of mining, milling, processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum powder, for use in talcum powder based products, including the PRODUCTS to which PATRICIA ROHE was exposed in New York. At all pertinent times, JOHNSON & JOHNSON regularly transacted, solicited, and conducted business in the State of New York, including the marketing, promoting, selling, and/or distribution either directly or indirectly through third parties or related entities, the PRODUCTS at issue in this Complaint.

49.    Defendant, **JOHNSON & JOHNSON CONSUMER COMPANIES, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York. At all pertinent times, JOHNSON & JOHNSON CONSUMER COMPANIES, INC. was engaged in the business of mining, milling, processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum powder, for use in talcum powder based products, including the PRODUCTS to which PATRICIA ROHE was exposed in New York. At all pertinent times, JOHNSON & JOHNSON CONSUMER COMPANIES, INC. regularly transacted, solicited, and conducted business in the State of New York, including the marketing, promoting selling, and/or distribution either directly or indirectly through third parties or related entities, the PRODUCTS at issue in this Complaint.

50.    Defendant, **JOHNSON & JOHNSON HEALTH AND WELLNESS SOLUTIONS, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York. At all pertinent times, JOHNSON & JOHNSON HEALTH AND WELLNESS SOLUTIONS, INC. was engaged in the business of mining, milling, processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of

commerce asbestos-containing    talcum powder, for use in talcum powder based products,
including the PRODUCTS to which PATRICIA ROHE was exposed in New York. At all
pertinent times, JOHNSON & JOHNSON HEALTH AND WELLNESS SOLUTIONS,
INC. regularly transacted, solicited, and conducted business in the State of New York, including
the marketing, promoting selling, and/or distribution either directly or indirectly through third
parties or related entities, the PRODUCTS at issue in this Complaint.

51.      At all pertinent times, Defendant JOHNSON & JOHNSON CONSUMER
COMPANIES, INC. and Defendant JOHNSON & JOHNSON HEALTH AND WELLNESS
SOLUTIONS,  INC. have been wholly owned subsidiaries of Defendant JOHNSON &
JOHNSON, under the complete dominion of and control of Defendant JOHNSON &
JOHNSON. Hereinafter, unless otherwise delineated, these three entities shall be collectively
referred to as the "Johnson & Johnson Defendants."

52.      Talc, laden with asbestos is the main substance in talcum powders. The Johnson
& Johnson Defendants mined, milled, manufactured, marketed, promoted, sold, and
distributed the PRODUCTS. The PRODUCTS are composed almost entirely of talc,
contaminated with asbestos.

53.   Defendant **KOLMAR LABORATORIES, INC.** is a duly organized foreign
corporation doing business and/or transacting business in the State of New York. KOLMAR
LABORATORIES INC.'S headquarters/principal executive offices are located at 20 West King
Street, Port Jervis New York 12771. At all pertinent times, KOLMAR LABORATORES, INC.
has been in the business of processing, importing, converting, compounding, designing,
manufacturing, marketing, promoting, testing, supplying, distributing, and otherwise placing in
the stream of commerce asbestos-containing talcum powder, for use in talcum powder based
products, including the PRODUCTS to which ELIZABETH MILAN was exposed in New York.

54.   Defendant, **L'OREAL USA, INC.** is a duly organized foreign corporation doing
business and/or transacting business in the State of New York. At all pertinent times,
L'OREAL USA, INC., has been in the business of  processing, importing, converting,

compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

55. L'OREAL USA, INC., has continually advertised and marketed talc as safe for human use.

56. L'OREAL USA, INC., supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information.

57. Defendant, **LOT LESS OF FULTON STREET, INC.** is a duly organized domestic corporation doing business and/or transacting business in the State of New York. Patricia Rohe purchased asbestos laden talcum products to which she as exposed from the Lot Less of Fulton Street, Inc. located at 95 Fulton Street, New York, NY. At all pertinent times, LOT LESS OF FULTON STREET, INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

58. LOT LESS OF FULTON STREET INC., has continually advertised and marketed talc as safe for human use. Patricia Rohe purchased asbestos laden talcum products to which she was exposed, from the Lot Less Store, LOT LESS OF FULTON STREET, INC., located in downtown Manhattan in New York City.

59. Defendant, **LOT LESS OF NYC, INC.** is a duly organized domestic corporation doing business and/or transacting business in the State of New York. Patricia Rohe purchased asbestos laden talcum products to which she was exposed from the Lot Less of NYC, Inc., store located at 95 Fulton Street, New York, NY. At all pertinent times, LOT LESS OF FULTON STREET, INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic,

hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA

ROHE was exposed in New York.

60.    LOT LESS OF NYC, INC., has continually advertised and marketed talc products

as safe for human use.  Patricia Rohe purchased asbestos laden talcum products to which she was

exposed, from the Lot Less Store, LOT LESS OF NYC, INC., located in downtown Manhattan

in New York City.

61.    Hereinafter, unless otherwise delineated, **LOT LESS OF FULTON STREET,**

**INC., & LOT LESS OF NYC, INC.** shall be collectively referred to as the "THE LOT LESS

DEFENDANTS."

62.    Defendant, **MACY'S, INC.** is a duly organized domestic corporation doing

business and/or transacting business in the State of New York.  At all pertinent times,

MACY'S, INC., has been in the business of supplying, distributing, selling, and otherwise

placing in the stream of commerce asbestos-containing, talcum based, cosmetic,  hygienic,

medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE

was exposed in New York.

63.    Patricia Rohe purchased asbestos laden talcum products to which she was

exposed, from the Macy's Store, MACY'S, INC., from, among other locations, the Macy's

Herald Square location in Manhattan in New York City.

64.    Defendant, **PATRIARCH PARTNERS LLC, Individually and as successor-in-**

**interest to DANA FRAGRANCES,** is a duly organized foreign corporation doing business

and/or transacting business in the State of New York. At all pertinent times, PATRIARCH

PARTNERS LLC, has been in the business of  processing, importing, converting, compounding,

designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and

otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic,

hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA

ROHE was exposed in New York.

65.  PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA

FRAGRANCES, has continually advertised and marketed talc as safe for human use.

66.    PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES, Individually and as successor-in-interest to DANA FRAGRANCES supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information.

67.    Defendant, **PFIZER, INC.** is a duly organized foreign corporation doing business and/or headquartered in the State of New York.   PFIZER, INC.'S headquarters/principle executive offices are located at 235 East 42nd Street New York New York 10017.  At all pertinent times, PFIZER, INC. has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

68.    PFIZER, INC., has continually advertised and marketed talc as safe for human use.

69.    PFIZER, INC., supplies customers with material safety data sheets for talc.  These material safety data

70.    Defendant, **REVLON CONSUMER PRODUCTS CORPORATION** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times, REVLON CONSUMER PRODUCTS CORPORATION, has been in the business of processing, importing, converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

71.    REVLON CONSUMER PRODCUTS CORPORATION, has continually advertised and marketed talc as safe for human use.

72.    REVLON CONSUMER PRODUCTS CORPORATION, supplies customers with

material safety data sheets for talc. These material safety data sheets are supposed to convey

adequate health and warning information.

73.    Defendant, **REVLON, INC.** is a duly organized foreign corporation doing

business and/or transacting business in the State of New York. At all pertinent times,

REVLON, INC., has been in the business of processing, importing, converting, compounding,

designing, manufacturing, marketing, promoting, testing, supplying, distributing, selling, and

otherwise placing in the stream of commerce asbestos-containing talcum based, cosmetic,

hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA

ROHE was exposed in New York.

74.    REVLON, INC., has continually advertised and marketed talc as safe for human

use.

75.    REVLON, INC., supplies customers with material safety data sheets for talc. These

material safety data sheets are supposed to convey adequate health and warning information.

76.    Hereinafter, unless otherwise delineated, **REVLON CONSUMER PRODUCTS**

**CORPORATION and REVLON, INC.** shall be collectively referred to as the "THE

REVLON DEFENDANTS."

77.    Defendant, **RITE AID OF NEW YORK, INC.** is a duly organized domestic

corporation doing business and/or transacting business in the State of New York. At all

pertinent times, RITE AID OF NEW YORK, INC., has been in the business of supplying,

distributing, selling, and otherwise placing in the stream of commerce asbestos-containing,

talcum based, cosmetic, hygienic, medicated, and/or powdered products including the

PRODUCTS to which PATRICIA ROHE was exposed in New York.

78.    Patricia Rohe purchased asbestos laden talcum products to which she was

exposed, from the Rite Aid Store, RITE AID OF NEW YORK, INC., from various Rite Aid

Stores in Midtown and Downtown Manhattan in New York City.

79.    Defendant, **RITE AID OF NEW YORK CITY, INC.** is a duly organized

domestic corporation doing business and/or transacting business in the State of New York.

At all pertinent times, RITE AID OF NEW YORK CITY, INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygienic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

80.     Patricia Rohe purchased asbestos laden talcum products, to which she was exposed from the Rite Aid store, RITE AID OF NEW YORK CITY, INC., from various Rite Aid Stores in Midtown and Downtown Manhattan in New York City.

81.     Hereinafter, unless otherwise delineated, RITE AID OF NEW YORK INC. and RITE AID OF NEW YORK CITY shall be collectively referred to as the "THE RITE AID DEFENDANTS."

82.     Defendant, **WALGREEN EASTERN CO., INC, Individually and as successor in interest to Rite- Aid** is a duly organized domestic corporation doing business and/or transacting business in the State of New York. At all pertinent times, WALGREEN EASTERN CO., INC, has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygenic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE was exposed in New York.

83.     WALGREEN EASTERN CO., INC., has continually advertised and marketed talc as safe for human use.

84.     Patricia Rohe purchased asbestos laden talcum products, to which she was exposed from the Walgreen store, WALGREEN EASTERN CO, INC. from various Walgreen Stores in Midtown and Downtown Manhattan in New York City.

85.     Defendant, **WALGREEN, INC.** is a duly organized foreign corporation doing business and/or transacting business in the State of New York. At all pertinent times, WALGREEN INC., has been in the business of supplying, distributing, selling, and otherwise placing in the stream of commerce asbestos-containing, talcum based, cosmetic, hygenic, medicated, and/or powdered products including the PRODUCTS to which PATRICIA ROHE

was exposed in New York.

86.    WALGREEN INC.., has continually advertised and marketed talc as safe for human

use.

87.    Patricia Rohe purchased asbestos laden talcum products, to which she was exposed

from the Walgreen store, WALGREEN, INC. from various Walgreen Stores in Midtown and

Downtown Manhattan in New York City.

88.    Hereinafter, unless otherwise delineated, WALGREEN EASTERN CO., INC. and

WALGREEN, INC. shall be collectively referred to as the "THE WALGREEN

DEFENDANTS."

89.    Defendant, **SHISEIDO AMERICA, INC.** is a duly organized domestic

corporation doing business and/or transacting business in the State of New York. At all

pertinent times, SHISEIDO AMERICA, INC. has been in the business of processing, importing,

converting, compounding, designing, manufacturing, marketing, promoting, testing, supplying,

distributing, selling, and otherwise placing in the stream of commerce asbestos-containing talcum

poder, for use in talcum powder based products, including the PRODUCTS to which PATRICIA

ROHE was exposed in New York.

90.    SHISEIDO AMERICAN, INC.., has continually advertised and marketed talc as safe

for human use.

91.    SHISEIDO AMERICA, INC. supplies customers with material safety data sheets for

talc.  These material safety data sheets are supposed to convey adequate health and warning

information to its customers.

92.    Defendant, **WHITTAKER, CLARK & DANIELS, INC.** is a duly organized

foreign corporation doing business. At all pertinent times, WHITTAKER, CLARK &

DANIELS, INC. has been in the business of mining, milling, processing, importing, converting,

compounding, designing, manufacturing, marketing, promoting, testing, supplying, distributing,

selling, and otherwise placing in the stream of commerce asbestos-containing

talcum powder, for use in talcum powder based products, including the PRODUCTS to which

PATRICIA ROHE was exposed in New York

93. Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral. WHITTAKER, CLARK & DANIELS, INC. mined the talc, contaminated with asbestos, contained in the PRODUCTS.

94. WHITTAKER, CLARK & DANIELS, INC. has continually advertised and marketed talc as safe for human use.

95. WHITTAKER, CLARK & DANIELS, INC. supplies customers with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to its customers.

96. Defendants Unknown Businesses and/or Corporations A-Z are unknown entities whose conduct as described herein caused or contributed to the damages of the Plaintiff's, all of whose names and legal identities are unknown to the Plaintiff's at this time, but will be substituted by amendment when ascertained, individually and jointly.

97. Defendants have done business in New York State and/or have conducted and/or transacted business in New York State, have committed one or more tortious acts within New York and/or have otherwise performed relevant acts within and/or without this State giving rise to Plaintiff's asbestos-related injury and losses within New York, which acts subject each Defendant to the jurisdiction of New York Courts.

98. Defendants regularly did and/or solicited business in New York; engaged in a persistent course of conduct in New York; and/or derived substantial revenue from goods used or consumed or services rendered in New York.

99. Defendants, which derive substantial revenue from interstate and/or international commerce, expected and should reasonably have expected their acts to have consequences in New York.

100. Defendants are corporations or other business entities organized under the laws of the various states of the United States that were and/or are doing business in the State of

New York and/or were and/or are participating in a conspiracy and/or concert-of-action that was or is located or conducted in New York and/or had effects in New York, including, but not limited to, the violation within the state of its laws and regulations. Defendants, mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce asbestos-containing products to which PATRICIA ROHE was exposed.

101.    If it is deemed that Article 16 of the CPLR applies to this action, Plaintiff asserts that this action falls within one or more of the exceptions set forth in CPLR 1602, including, but not limited to, the exception for public employees (CPLR 1602(1)(b)); the exception based upon defendants' non-delegable duty to warn of the health hazards of asbestos (CPLR 1602(2)(iv)); the exception for cases in which a claimant suffers a "grave injury" (CPLR 1602(4)); the exception for actions requiring proof of intent (CPLR 1602(5)); the exception for cases in which a person is held liable for causing a claimant's injury by having acted with reckless disregard for the safety of others (CPLR 1602(7)); the exception for cases in which a defendant is held liable by reason of the applicability of Article 10 of the Labor Law (CPLR 1602(8)); the exception for cases involving any person held liable for causing a claimant's injury by having unlawfully released into the environment a substance hazardous to public health, safety or the environment (CPLR 1602(9)); the exception for any parties found to have acted knowingly or intentionally and in concert to cause the acts or failure upon which liability is based (CPLR 1602(11)); and the exception for persons held liable in a product liability action in which the manufacturer of the product is not a party to the action and jurisdiction over the manufacturer could not with due diligence be obtained (CPLR 1601(10)).

102.    Plaintiff has been damaged as against each Defendant and is entitled to compensatory and punitive damages in an amount to be determined by a trier of fact. The amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

103. The actions and conduct of the Defendants as more fully described below were carried out through their respective offices, by authorized agents, servants and employees, who were acting in the course and scope of their employment and authority, and in furtherance of the business and profit of the Defendants.

104. Each Defendant, has been engaged in the mining, production, processing, design, manufacture, marketing, supply, delivery, distribution, sale, promotion, and/or lobby on behalf of talc contaminated with asbestos and/or the PRODUCTS.

105. At all times herein mentioned, each of the Defendants, inclusive of the Doe Defendants, was the agent, servant, partner, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty.

106. There exists, and at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendant, and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

107. The injuries and damages to Plaintiff was caused by the wrongful acts, omissions, and fraudulent representations of Defendants.

108. At all times herein mentioned, Defendants were each engaged in the business of, or were successors in interest to, entities engaged in the business of research, designing, formulating, compounding, testing, mining, milling, manufacturing, producing, processing, assembling, inspecting, selling, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling, and/or or lobbying on behalf of, the PRODUCTS, including in the

State of New York.

109.    At all times herein mentioned Defendants were each authorized to do, or otherwise engaged in, business within the State of New York, and did in fact supply the aforementioned product within the State of New York, and nationwide.

110.    At all times herein mentioned, the officers and directors of Defendants authorized and directed the production and promotion of the PRODUCTS when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the PRODUCTS, and thereby actively participated in the tortious conduct which resulted in the physical injuries described herein.

111.    The Plaintiff, PATRICIA ROHE used the PRODUCTS as part of her regular cosmetic, beauty, and hygiene routine from approximately 1973 continuously until approximately 2019. She regularly dusted the PRODUCTS on various parts of her body which may have included at times: face, neck, shoulders, arms, armpits, legs, feet, collarbones, décolletage, breasts, vagina, and perineum. During this time she repeatedly inhaled, ingested, absorbed, and was regularly exposed to Asbestos dust emanating from the Asbestos laden talc within the PRODUCTS. This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

112.    Plaintiff was exposed on numerous and frequent occasions to the PRODUCTS which were mined, milled, produced, processed, designed, manufactured, marketed, tested, compounded, mixed,  supplied, delivered, distributed, sold and/ or lobbied for  by the Defendants.

113.    As a direct and proximate result of the Defendants' reckless, callous, calculated, and reprehensible conduct, Plaintiff was injured and suffered damages, namely Mesothelioma and Ovarian Cancer, which required or will require surgeries and treatments. At the time of her diagnosis the Plaintiff was fifty-six (56) years old.

114.    Plaintiff alleges that the cumulative effect of each exposure to Defendants PRODUCTS caused or contributed to her injuries, such that the Defendants are jointly and severely to the Plaintiff's

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 388 of 465

for the resultant asbestos related illness/disease and/or risk of death alleged herein.

## AS AND FOR A FIRST CAUSE OF ACTION SOUNDING IN NEGLIGENCE

115.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

116.    Defendants knew, or with reasonable diligence should have known and/or ascertained, that their PRODUCTS were inherently dangerous and hazardous to the health and well-being of those using, exposed to or coming in contact with Defendants' PRODUCTS.

117.    Defendants knew, or with reasonable diligence should have known and/or ascertained, that the Plaintiff would use or come into contact with Defendants' PRODUCTS and in so doing, would become exposed to asbestos from the Defendants' products in the course of ordinary and foreseeable contact, application, and use of those products.

118.    Defendants knew, or with reasonable diligence should have known and/or ascertained that the Plaintiff used, came into contact with, and was exposed to Defendants' PRODUCTS  and the asbestos laden talc contained in their PRODUCTS without any knowledge of the dangers and potential risk of harm to which he/she was being exposed.

119.    At all pertinent times, Defendants knew or should have known that the use of talcum powder based products, contaminated with asbestos, significantly increases the risk of Mesothelioma and Ovarian Cancer.

120.    At all relevant times, the Defendants knew or should have known that their asbestos and asbestos-containing products were inherently dangerous to those who used, handled, or came in contact with them, and that such hazards were beyond the expectations of the ordinary user or handler who would come into contact with these products.

121. Defendants knew, or with reasonable diligence should have known and/or ascertained, that the reasonable and foreseeable use of, or contact with, their asbestos-containing

products would cause the release of asbestos into the air, creating danger and unreasonable risk of injury and harm to those breathing the air contaminated with such asbestos, and to those breathing in asbestos brought home on work clothing.

122.    Defendants were and are miners, millers, processors, importers, converters, compounders, designers, manufacturers, assemblers, marketers, suppliers, distributors, sellers, and/or users of products that contained asbestos to which PATRICIA ROHE was exposed

123.    PATRICIA ROHE inhaled, ingested, absorbed, and was otherwise exposed to asbestos from Defendants' products.

124.    As a direct and proximate result of her inhalation and/or ingestion of asbestos from Defendants' products, PATRICIA ROHE developed permanent and disabling personal injuries, including Mesothelioma and Ovarian Cancer.

125.    Defendants had a duty to mine, mill, process, import, convert, compound, design, manufacture, assemble, market, supply, distribute, sell, use and/or otherwise place in the stream of commerce products that were not unreasonably dangerous or defective when used as intended or in a reasonably foreseeable manner.

126.    Defendants had a duty to warn PATRICIA ROHE, her family members and foreseeable users of their products of the hazards and defects that Defendants created, knew of and, within the exercise of reasonable care, should have known.

127.    During the time that Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce asbestos products, they knew, and in the exercise of reasonable care should have known, that said products were defective, ultra-hazardous, dangerous, and/or otherwise highly harmful to the public, including PATRICIA ROHE.

128.    Defendants knew, and in the exercise of reasonable care should have known, that the use of their products would release asbestos, thereby creating a dangerous and unreasonable risk of injury to users and others coming into contact said asbestos.

129.     PATRICIA ROHE did not know the nature and extent of the injury that would result from contact with and exposure to asbestos from Defendants' products.

130.     Defendants knew, and in the exercise of reasonable care should have known, that PATRICIA ROHE would come into contact with and be exposed to asbestos from THE PRODUCTS and would inhale and/or otherwise ingest asbestos as a result of the ordinary and foreseeable use of said products.

131.     At all pertinent times, BARRETTS MINERALS, INC., BRENNTAG NORTH AMERICA, BRENNTAG SPECIALTIES, CYPRUS AMAX MINERALS COMPANY, THE JOHNSON & JOHNSON DEFENDANTS, AND WHITTAKER CLARK AND DANIELS, mined, milled, sold and distributed Asbestos laden talc to AVON PRODUCTS, INC., CHANEL, INC., COLGATE-PALMOLIVE COMPANY, ESTEE LAUDER, INC., HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES, THE JOHNSON & JOHNSON DEFENDANTS, L'OREAL USA, INC., PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES, PFIZER, INC., THE REVLON DEFENDANTS, and SHISEIDO AMERICA, INC., which each knew or should have known was then being packaged and/or sold to consumers as the PRODUCTS.  At all pertinent times KOLMAR labs processed, compounded, tested, and distributed Asbestos contaminated talc for use in the JOHNSON & JOHNSON products, which KOLMAR knew or should have known was then being packaged and sold to consumers as the PRODUCTS.  At all pertinent times, AVON PRODUCTS, INC., CVS PHARMCY, INC., THE DUANE READE DEFENDANTS, THE LOT LESS DEFENDANTS, MACY'S, INC., THE RITE AID DEFENDANTS, AND WALGREEN EASTERN CO., INC., negligently sold and distributed AVON PRODUCTS, INC.'S, CHANEL INC.'S, COLGATE-PALMOLIVE COMPANY'S, ESTEE LAUDER, INC.'S, HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES', THE JOHNSON & JOHNSON DEFENDANTS', L'OREAL USA, INC., PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES, PFIZER, INC.'S, THE REVLON DEFENDANT'S and SHISEIDO

AMERICA, INC.'S asbestos contaminated products to the end user. At all pertinent times The Defendants facilitated and enabled the Defendant's tortious conduct by lobbying for and conspiring with the Defendants who mined, milled, processed, tested, designed, sold, packaged and distributed the PRODUCTS to keep the public ignorant of the harmful and deleterious effects of the PRODUCTS. Each Defendant knew or should have known that consumers of the PRODUCTS were using it to powder their faces and bodies, would thereby inhale, ingest, absorb, and be otherwise exposed to asbestos.

132. The Defendants, knew or should have known that the talc, contaminated with asbestos, would be used in the PRODUCTS, without adequately taking steps to ensure that ultimate consumers of the PRODUCTS, including Plaintiff, received the information that The Defendants possessed on the carcinogenic properties of talc laden asbestos, including its risk of causing Mesothelioma and Ovarian Cancer.

133. Despite knowledge of the unsafe and dangerous nature and properties of their asbestos laden talc products, the Defendants willfully, recklessly and negligently:

a. failed to warn the public at large, and more particularly this Plaintiff, of the dangers and hazards associated with or caused by the use of, exposure to or contact with Defendants' PRODUCTS resulting from the ordinary, anticipated and foreseeable use of Defendants' PRODUCTS;

b. failed to study, investigate and/or properly test their PRODUCTS for both potential and actual hazards associated with the use of, exposure to and contact with Defendants' PRODUCTS, when such products were used in a reasonably foreseeable and anticipated manner;

c. failed to communicate or convey their suspicions and knowledge with respect to potential or actual dangers and health hazards associated with the use of, exposure to or contact with Defendants' PRODUCTS resulting in exposure to talc, contaminated at times with asbestos, to the users and consumers of the Defendants' PRODUCTS;

d.  failed to properly design and manufacture Defendants' PRODUCTS to insure safe use and handling by users and consumers under conditions that were reasonably anticipated and foreseeable;

e.  failed to advise the public at large, and more particularly this Plaintiff's, of the necessity for protective garments, safety equipment and appliances to protect the user/consumer from harm caused by exposure to talc, contaminated with asbestos, and associated with the ordinary and foreseeable use of,  and contact with, Defendants' PRODUCTS;

f.  failed to institute, adopt or enforce appropriate safety protocols for handling and use of PRODUCTS to individuals working with, utilizing, handling or otherwise coming into contact with Defendants' PRODUCTS;

g.  failed to adequately package their PRODUCTS in a manner which would insure safe handling and use by those individuals, including this Plaintiff's, who the Defendants' knew or should have reasonably anticipated would be exposed to talc contaminated with asbestos in the ordinary and foreseeable use of Defendants' PRODUCTS;

h.  failed to remove their PRODUCTS from the stream of commerce despite knowledge of the unsafe and dangerous nature of those PRODUCTS;

i.  continued to mine, produce, process, design, manufacture, market, supply, deliver, distribute, install, use, purchase, remove and sell the PRODUCTS for general application and purposes without any alteration or change, despite the potential and known health  hazards and dangers posed to the foreseeable and anticipated user and consumer of those PRODUCTS;

j.  failed to timely develop and utilize substitute materials for talc in their PRODUCTs

k.  failed to design or redesign talc-containing products contaminated with asbestos to prevent, impede or  minimize the exposure to talc contaminated with asbestos;

and,

l.   failed to recall and/or issue a post-sale warning for their PRODUCTS

m.  misrepresented or failed to disclose that asbestos was in their products, thus

denying PATRICIA ROHE and the public of the knowledge required to

take necessary safety precautions while using or otherwise being exposed to

their PRODUCTS

n.   ignored and suppressed medical and scientific information, studies, tests,

data and literature that Defendants acquired concerning the health risks

associated with exposure to asbestos contained in their products;

(o)  failed to advise PATRICIA ROHE, who Defendants knew, and in the

exercise of reasonable care should have known, had been exposed to

asbestos from the ordinary and foreseeable use of their products: (i) to cease

further uncontrolled or unprotected exposure to said products and the

inhalation and/or ingestion of asbestos therefrom; (ii) to be examined by

competent medical doctors to determine the nature and extent of all diseases

caused by inhalation and/or ingestion of asbestos; and (iii) to receive

medical care and treatment for such diseases; and

(p)  otherwise disregarded the welfare of PATRICIA ROHE in mining, milling,

processing, importing, converting, compounding, designing, manufacturing,

assembling, marketing, supplying, distributing, selling, using, promoting,

lobbying on behalf of, and/or otherwise placing the stream of commerce

products containing asbestos to which she was exposed.

134.   The continued mining, milling, production, processing, design, manufacture,

marketing, distribution, supply, use, purchase, delivery, sale, and lobbying on behalf of, by the

Defendants of their PRODUCTS under the circumstances and conditions enumerated above,

demonstrates the callous, reckless, willful, depraved, and wanton indifference to and disregard

of the health, safety and welfare of the public at large, and more particularly, this Plaintiff.

135.    The PRODUCTS were defective and unreasonably dangerous when they left the possession of the Defendants in that it contained warnings insufficient to alert consumers, including Plaintiff herein, of the dangerous risks and reactions associated with the subject product, including but not limited to its propensity to permanent physical injuries including, but not limited to, developing Mesothelioma, Ovarian Cancer, and other serious injuries and side effects, notwithstanding the Defendants' knowledge of an increased risk of these injuries and side effects over other products.

136.    The subject product manufactured and supplied by Defendant was defective due to inadequate post-marketing warning or instruction because, after Defendant knew or should have known of the risk of serious bodily harm from the use of the subject product, Defendant failed to provide an adequate warning to consumers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings, instructions, and/or recall, while knowing that the product could cause serious injury.

137.    At all pertinent times, a safer feasible alternative to the PRODUCTS has existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects. Cornstarch powders have been sold and marketed for the same uses as talc with nearly the same effectiveness.

138.    Defendants knew, or with reasonable diligence should have known and/or ascertained, that the reasonable and anticipated use of, exposure to or contact with their Asbestos contaminated talc PRODUCTS would cause the release of asbestos fibers, creating danger and unreasonable risk of injury and harm.

139.    Defendants knew, or with reasonable diligence should have known and/or ascertained, that the Plaintiff would use or come into contact with Defendants' talc products, contaminated with asbestos, and in so doing would inhale, become exposed to, and absorb the talc particles and asbestos fibers as they were discharged and released from the Defendants' products in the course of ordinary and foreseeable contact, application and use of those products.

140.    Defendants knew, or with reasonable diligence should have known and/or ascertained that the Plaintiff used, came into contact with, and was exposed to Defendants' talc products, contaminated with asbestos, and the particles emanating from and released by those products without any knowledge of the dangers and potential risk of harm to which she was being exposed.

141.    Plaintiff used the subject product for its intended purpose.

142. The Defendants, as miners, millers, blenders, manufacturers and/or Sellers/ distributors of the PRODUCTS are held to the level of knowledge of an expert in the field.

143.    If any warnings were given by Defendants, they were either not accurate, clear, ambiguous, and/or otherwise inadequate.

144.    Plaintiff reasonably relied upon Defendants' skill, superior knowledge, and judgment.

145.     Defendants had a continuing duty to warn Plaintiff of the dangers associated with the PRODUCTS.

146.    If Plaintiff had received adequate warnings regarding the risks of the subject product, she would not have used it.

147.    As a result of the Defendants' negligence and recklessness, the Plaintiff's unwittingly and unavoidably inhaled, ingested and/or absorbed talc particles contaminated with asbestos, resulting in the development of her Mesothelioma and Ovarian Cancer; Plaintiff has been caused to endure severe physical pain and suffering and mental anguish; has been placed at increased risk for developing other serious bodily injuries; has expended sums of money for medical care, treatment and monitoring related to her exposure to the PRODUCTS, will be required to expend additional monies for medical care, treatment and monitoring in the future; has been prevented from pursuing her normal activities and employment; has been deprived of her ordinary pursuits and enjoyment of life; has suffered pecuniary losses; and has otherwise been damaged.

148.     The illnesses and disabilities of the Plaintiff are a direct and proximate result of the Defendants' negligence and carelessness, and their demonstrated reckless, immoral,

malicious, and/or wanton disregard for her safety and well-being.

## SECOND CAUSE OF ACTION
## NEGLIGENCE PER SE

149.    Plaintiff repeats, reiterates, and incorporates herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

150.    The Federal Food, Drug, and Cosmetic Act (FDCA), codified as 21 U.S.C. §§ 301-399, governs the manufacture, sale, supply, distribution and marketing of cosmetic products in the United States. 21 U.S.C. § 321(i) defines cosmetics by their intended use as (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any party thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles. Talc Defendants' products and the ingredients therein are cosmetic products as defined by 21 U.S.C. § 321(i).

151.    The FDCA was designed to protect consumers from hazardous cosmetic products. Plaintiff was and are members of the class of persons the FDCA was intended to protect. The FDCA prohibits the manufacture, sale, supply, distribution and marketing of adulterated cosmetics in interstate commerce. 21 U.S.C. § 331. Adulterations refer to violations involving product composition, whether they result from ingredients, contaminants, processing, packaging, or shipping and handling. A cosmetic product is adulterated if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual. 21 U.S.C. § 361. The FDCA governs all persons and companies involved in cosmetics in interstate commerce—including manufacturers, packers, distributors and retailers—who are accordingly responsible for ensuring that they are not dealing in products that are adulterated or misbranded. Under the FDCA, Talc Defendants owed Plaintiff a duty not to sell to or otherwise expose PATRICIA ROHE to

adulterated, hazardous cosmetic products.

152.    Talc Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce talc and talc-containing cosmetic products throughout the United States and the internationally. In violation of the FDCA, and their duty to Plaintiff, said products were contaminated with various carcinogens, including asbestos, a poisonous and deleterious disease-causing mineral known by Talc Defendants since the early to mid-1900s to cause death and disease. Under normal and customary use and application, Talc Defendants' talc-containing products released respirable and ingestible asbestos, and end users, including PATRICIA ROHE, were exposed to and consequently inhaled and/or ingested carcinogens, including asbestos. Talc Defendants manufactured, sold, supplied, distributed and marketed adulterated cosmetic products that were contaminated with asbestos and other carcinogens in clear violation of the FDCA. Talc Defendants' violation of the FDCA, which governs the sale of cosmetic products, including talcum powder and the ingredients therein, and PATRICIA ROHE'S subsequent inhalation and/or ingestion of asbestos from said products were substantial factors in bringing about PATRICIA ROHE'S Mesothelioma and Ovarian Cancer as well as Plaintiff's consequential damages. In violating the FDCA, which was enacted, among other things, to prevent the sale of carcinogen-containing products, Talc Defendants were and are negligent per se.

153.    Talc Defendants-and their employees, officers, directors, and/or managing agents— participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of each of the acts set forth herein. Talc Defendants are liable for the oppressive and malicious acts of their predecessors and divisions, and each Talc Defendant's employees, officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of the acts of each of their predecessors and divisions.

154.    Additionally, Talc Defendants were and are negligent per se for the aforementioned reasons pursuant to various state laws and regulations, including, but not limited to, NY Education Law § 6811, et seq., and NJ Stat. § 24:5-1, et seq.

155.     Talc Defendants' violation of the FDCA (and the other laws and regulations cited

above) was a proximate cause of the injuries and damages alleged in this complaint.

## AS AND FOR A THIRD CAUSE OF ACTION SOUNDING IN BREACH OF WARRANTY

156.     Plaintiff repeats and reiterates the prior allegations of this complaint as if alleged

more fully below.

157.     Defendants expressly and impliedly warranted that their PRODUCTS were of good

and merchantable quality and fit for their intended uses and purposes.

158.     Defendants expressly and impliedly warranted through direct-to-consumer

marketing, advertisements, and/or labels, that the PRODUCTS were safe and effective for

reasonably anticipated uses, including use by women to their bodies.

159.     At the time the Defendants manufactured, marketed, labeled, promoted,

distributed and/or sold the PRODUCTS, the Johnson & Johnson Defendants knew or should have

known of the uses for which the PRODUCTS were intended, including use by women for dusting

their bodies, and as a part of a feminine hygiene routine, and impliedly warranted the PRODUCTS

to be of merchantable quality and safe for such use.

160.     The express and implied warranties made by these Defendants were false,

misleading, and/or otherwise contained misrepresentations rendering these products unreasonably

dangerous, defective, hazardous, and/or harmful when used and/or applied the manner, and for

the purposes, intended and/or foreseeable.

161.     Plaintiff relied on Defendants' express and/or implied representations as to the good

and merchantability quality, and as to the safety and fitness of such products, in choosing to use

those products and/or to be in areas in which those products were being used.

162.     As a direct, foreseeable and proximate result of the Defendants' breaches of

implied warranties, Plaintiff purchased and used, as aforesaid, the PRODUCTS that directly and

proximately caused her to develop Mesothelioma and Ovarian Cancer; Plaintiff was caused to

incur, among other damages, medical bills, lost wages, and conscious pain and suffering.

163.     Defendants designed, manufactured, assembled, fabricated and/or distributed the products in question in a defective condition and therefore breached an implied warranty of fitness and an implied warranty of merchantability, in addition to various express warranties. The Defendants, as sellers, were merchants with respect to the products which they sold. In addition, these products were not fit for the ordinary purposes for which such goods are used. Defendants also had reason to know of the particular purpose for which these products would be used, as well as the knowledge that persons such as Plaintiff's would rely on the seller's skill to furnish suitable products.

164.     Therefore, Defendants have breached the implied warranty of merchantability as well as the implied warranty of fitness for a particular purpose, in addition to various express warranties. Such breach or breaches of implied and express warranties by the Defendants was a proximate cause of the injuries and damages sustained by Plaintiff's.

## AS AND FOR A FOURTH CAUSE OF ACTION SOUNDING IN STRICT LIABILITY

165.     Plaintiff repeats and reiterates the prior allegations of this complaint as if alleged more fully below.

166.     At all pertinent times, BARRETTS MINERALS, INC., BRENNTAG NORTH AMERICAN AS SUCCESSOR-IN-INTEREST TO MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR-IN-INTEREST TO WHITTAKER, CLARK & DANIELS, INC., BRENNTAG SPECIALTIES, FORMALLY KNOWN AS MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR- IN- INTEREST TO WHITTAKER, CLARK & DANIELS, INC., CYPRUS AMAX MINERALS COMPANY, KOLMAR LABORATORIES, INC., THE JOHNSON & JOHNSON DEFENDANTS and WHITTAKER, CLARK & DANEILS, INC., mined, processed, and/or sold and/or distributed talc contaminated with asbestos to AVON PRODUCTS, INC., CHANEL, INC., ESTEE LAUDER, INC., HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES, COLGATE-PALMOLIVE COMPANY, THE JOHNSON &

JOHNSON DEFENDANTS, L'OREAL USA, INC., PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES, PFIZER, INC., THE REVLON DEFENDANTS, and SHISEIDO AMERICA, INC., which they knew they packaged and sold to consumers as the PRODUCTS. They knew or should have known that customers used the PRODUCTS to powder their faces and bodies. At all pertinent times, AVON PRODUCTS, INC., CVS PHARMACY, INC., THE DUANE READE DEFENDANTS, THE LOT LESS DEFENDANTS, MACY'S, INC., THE RITE AID DEFENDANTS, and THE WALGREEN DEFENDANTS, sold and distributed AVON PRODUCTS, INC.'S, CHANEL, INC.'S, COLGATE-PALMOLOLIVE COMPANY'S, HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES', ESTEE LAUDER, INC.'S, THE JOHNSON & JOHNSON DEFENDANT'S, L'OREAL USA, INC., PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES', PFIZER, INC.'S, THE REVLON DEFENDANTS', and SHISEIDO AMERICA, INC.'S, asbestos contaminated products to the end users, including to the Plaintiff, to powder their faces and bodies.

167.    At all pertinent times, BARRETTS MINERALS, INC., BRENNTAG NORTH AMERICAN AS SUCCESSOR-IN-INTEREST TO MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR-IN-INTEREST TO WHITTAKER, CLARK & DANIELS, INC., BRENNTAG SPECIALTIES, FORMALLY KNOWN AS MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR- IN- INTEREST TO WHITTAKER, CLARK & DANIELS, INC., CYPRUS AMAX MINERALS COMPANY, KOLMAR LABORATORIES, INC., THE JOHNSON & JOHNSON DEFENDANTS, and WHITTAKER, CLARK & DANIELS, INC., knew and/or should have known of the unreasonably dangerous and carcinogenic nature of the asbestos contaminated talc it was mining, processing, and/or selling and distributing to defendants AVON PRODUCTS, INC., CHANEL, INC., COLGATE-PALMOLIVE COMPANY, ESTEE LAUDER, INC., HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES, THE JOHNSON & JOHNSON DEFENDANTS, L'OREAL USA, INC., PATRIARCH

PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES', PFIZER, INC., THE REVLON DEFENDANTS, and SHISEIDO AMERICA INC. Further, these Defendants knew or should have known that the Defendants AVON PRODUCTS, INC., CVS PHARMACY, INC., THE DUANE READE DEFENDANTS, THE LOT LESS DEFENDANTS, MACY'S, INC., THE RITE AID DEFENDANTS, and THE WALGREEN DEFENDANTS were not warning consumers of this danger.

168.    At all pertinent times, The Defendants, AVON PRODUCTS, INC., BARRETTS MINERALS, INC., BRENNTAG NORTH AMERICA AS SUCCESSOR-IN-INTEREST TO MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR-IN-INTEREST TO WHITTAKER, CLARK & DANIELS, INC., BRENNTAG SPECIALTIES, FORMALLY KNOWN AS MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR- IN- INTEREST TO WHITTAKER, CLARK & DANIELS, INC., CHANEL, INC., COLGATE-PALMOLIVE COMPANY, CYPRUS AMAX MINERALS COMPANY, CVS PHARMACY, INC., THE DUANE READE DEFENDANTS, ESTEE LAUDER, INC., HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES, KOLMAR LABORATORIES, INC., L'OREAL USA, INC., THE LOT LESS DEFENDANTS, MACY'S, INC., PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES, PFIZER, INC., THE REVLON DEFENDANTS, THE RITE AID DEFENDANTS, SHISEIDO AMERICA, INC., THE WALGREEN DEFENDANTS, AND WHITTAKER, CLARK & DANIELS, INC., were mining, milling, manufacturing, marketing, testing, promoting, selling and/or distributing the PRODUCTS in the regular course of business.

169.    At all pertinent times, The Defendants sold or otherwise placed their talc products, contaminated with asbestos, into the stream of commerce in a defective, unsafe and unreasonably dangerous condition.

170.    The Defendants knew or otherwise expected that their talc products, contaminated with asbestos, would reach the ultimate user/consumer of their talc products, including this

Plaintiff's, without substantial change from, or alteration of, the condition in which these products were originally manufactured and sold.

171.    The Defendants knew, or in the exercise of reasonable diligence, should have ascertained that the Plaintiff and others similarly situated would be the ultimate users/consumers of Defendants' talc products, contaminated with asbestos, or would be exposed to their talc products, contaminated with asbestos.

172.    The Defendants knew that their PRODUCTS would be used without inspection for defects and, by placing them in the marketplace, represented to the public at large and more particularly this Plaintiff that these products could be utilized safely, in the manner, and for the purpose for which they were intended.

173.    The Defendants knew that their PRODUCTS were defective and were incapable of being made safe for their ordinary and intended uses and purposes and that these defects were not discoverable by the Plaintiff, or others similarly situated, in the exercise of reasonable care nor were the dangers and hazards of these products perceivable to the Plaintiff and others similarly situated such that she might otherwise have averted her injury by the exercise of reasonable care.

174.    At pertinent times, Plaintiff PATRICIA ROHE used the PRODUCTS to powder her body which is a reasonably foreseeable use.

175.    At all pertinent times, all Defendants in this action knew or should have known that the use, inhalation, ingestion, and exposure to talcum powder based products, contaminated with asbestos, significantly increases the risk of Mesothelioma and Ovarian Cancer.

176.    At all pertinent times, including the time of sale and consumption, the PRODUCTS, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of Mesothelioma and Ovarian Cancer associated with the use of the PRODUCTS by women to powder their bodies. Defendants themselves failed to properly and adequately warn and instruct the Plaintiff as to the risks and benefits of the PRODUCTS given the Plaintiff's need for this information.

177.     Had the Plaintiff received a warning that the use of the PRODUCTS would have significantly increased her risk of Mesothelioma and Ovarian Cancer, she would not have used the same. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the

PRODUCTS, Plaintiff has suffered personal injuries, economic and non-economic damages, including pain and suffering.

178.     The development of Mesothelioma and Ovarian Cancer by the Plaintiff was the direct and proximate result of the unreasonably dangerous and defective condition of the PRODUCTS at the time of sale and consumption, including their lack of warnings; Plaintiff was caused to incur, among other damages, medical bills, lost wages, and conscious pain and suffering.

179.     The Defendants' PRODUCTS were defective because they failed to contain warnings and/or instructions, and breached express warranties and/or failed to conform to other express factual representation upon which the Plaintiff justifiably relied in electing to use the products.  The defect or defects made the products unreasonably dangerous to those persons, such as Plaintiff, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of the Plaintiff injuries and damages.

180.     The Defendants' PRODUCTS failed to contain, and continue to this day not to contain, adequate warnings and/or instructions regarding the increased risk of Mesothelioma and Ovarian Cancer with the use of their products by women. The Defendants continue to market advertise, and expressly represent to the general public that it is safe for women to use their PRODUCT regardless of application. These Defendants continue with these marketing and advertising campaigns despite having scientific knowledge that their PRODUCTS increase the risk of Mesothelioma and Ovarian Cancer.

181.     Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiff and the public.

182.     As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff was exposed to asbestos in the PRODUCTS and suffered the injuries

and damages set forth hereinabove.

183.    Defendants sold or otherwise placed their talc products, contaminated with asbestos, into the stream of commerce in a defective, unsafe and unreasonably dangerous condition.

184.    Defendants knew or otherwise expected that their PRODUCTS would reach the ultimate user/consumer of their PRODUCTS, including this Plaintiff, without substantial change from, or alteration of, the condition in which these PRODUCTS were originally manufactured and sold.

185.    Defendants knew, or in the exercise of reasonable diligence, should have ascertained that the Plaintiff and others similarly situated would be the ultimate users/consumers of Defendants' PRODUCTS or would be exposed to their talc products, contaminated with asbestos.

186.    Defendants knew, or reasonably should have known, that their PRODUCTS would be used without inspection for defects and, by placing them in the marketplace, represented to the public at large and more particularly this Plaintiff that these products could be utilized safely, in the manner, and for the purpose for which they were intended.

187.    Defendants knew that their PRODUCTS were defective and were incapable of being made safe for their ordinary and intended uses and purposes and that these defects were not discoverable by the Plaintiff, or others similarly situated, in the exercise of reasonable care nor were the dangers and hazards of these products perceivable to the Plaintiff and others similarly situated such that she might otherwise have averted her injury by the exercise of reasonable care.

188.    In light of the above, the ordinary and foreseeable use of Defendants' PRODUCTS constituted a dangerous and hazardous activity and placed the ultimate user/consumer, and this Plaintiff more particularly, at an unreasonable risk of harm and injury.

189.    The risks and dangers created by the use of Defendants' products outweighed the utility of these products.

190.    As a consequence of the defects of Defendants' products and the Plaintiff's

resultant inhalation, ingestion, absorption and exposure to asbestos fibers resulting from the ordinary and foreseeable use of those talc products, contaminated with asbestos, Plaintiff has sustained serious and permanent injuries as more fully described herein.

191.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

192.    The PRODUCTS are defective in their design or formulation in that they are not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

193.    At all times material to this action, the PRODUCTS was expected to reach, and did reach, consumers in the State of New York and throughout the United States, including Plaintiff's herein, without substantial change in the condition in which it was sold.

194.    Defendants are strictly liable to Plaintiff by reason of the following:

(a) Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce products containing asbestos;

(b) Defendants knew and had reason to know that PATRICIA ROHE and other persons similarly situated would be users or consumers of their asbestos products or would otherwise be exposed to asbestos therefrom;

(c) Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce products in a defective condition and that were unreasonably dangerous to PATRICIA ROHE and other persons similarly situated;

(d) Throughout the many years that PATRICIA ROHE and other similarly situated persons were exposed to asbestos from Defendants products, said products reached the users and consumers without substantial change in the condition in which they were mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the

stream of commerce;

(e) The ordinary and foreseeable use of Defendants products constituted a dangerous and ultra hazardous activity and created an unreasonable risk of injury to users and bystanders; and

(f) Defendants products were defective in that they were incapable of being made safe for their ordinary and intended use and purpose, and Defendants failed to give any warnings or instructions (or failed to give adequate or sufficient warnings or instructions) about the risks, dangers and harms associated with exposure to asbestos from their products.

195.    As a consequence of the defective conditions of Defendants' products, PATRICIA ROHE inhaled, absorbed, and/or ingested asbestos during the intended, ordinary, and foreseeable use of said products, and Plaintiff were caused to suffer the injuries and damages alleged in this complaint.

196.    At all times material to this action, the PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce.

197.    In addition, at the time the subject product left the control of the Defendants, there were s a f e r, practical, and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

198.    Defendants, by virtue of the foregoing, are strictly liable to the Plaintiff for injuries and illnesses resulting from the defects and dangerous propensities of their talc products contaminated with asbestos alleged herein.

**FIFTH CAUSE OF ACTION**
**STRICT LIABILITY – MANUFACTURING DEFECT**

199.     Plaintiff repeats, reiterate sand incorporates herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

200.     Talc Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce products to which PATRICIA ROHE was exposed through the intended and/or reasonably foreseeable uses thereof.

201.     The design specifications, formulae, and/or performance standards applicable to Talc Defendants̓ products did not incorporate, include or otherwise involve asbestos.

202.     Because they contained asbestos, said products deviated from the design specifications, formulae, performance standards, and/or from otherwise identical units manufactured to the same manufacturing specifications or formulae.

203.     Said manufacturing defect existed before the products left the Talc Defendants control.

204.     As a result of said manufacturing defect, Defendants products contained asbestos and, therefore, were hazardous and not reasonably safe for their intended or reasonably foreseeable uses.

205.     As a direct and proximate result of the manufacturing defect of Talc Defendant's products, PATRICIA ROHE inhaled and/or otherwise ingested asbestos through or by the intended, ordinary and/or foreseeable use of said products, which caused her Mesothelioma and Ovarian Cancer Plaintiffs̓ consequential injuries and damages alleged in this complaint.

## SIXTH CAUSE OF ACTION
## STRICT LIABILITY – DESIGN DEFECTS

206.     Plaintiff repeats, reiterates, and incorporates herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth.

207.     Talc Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise

placed in the stream of commerce products to which PATRICIA ROHE was exposed through their intended and/or reasonably foreseeable uses

208.    Talc Defendants' products were not reasonably fit, suitable or safe for their intended purpose because they were designed in a defective manner by incorporating as an ingredient talc that contained or could contain carcinogens, including asbestos, and Talc Defendants did not employ a reasonable safer design or alternative, such as corn starch or other talc substitutes.

209.    The risks and dangers associated with Talc Defendants' products outweighed their utility and were not reduced to the greatest extent possible consistent with the continued

210.    The defects in Talc Defendants' products existed before they left Talc Defendants' control, and the products had not thereafter been substantially altered in a way that was not 61. PATRICIA ROHE was a foreseeable user and the kind of person who was reasonably expected to come into contact with Talc Defendants' products.

211.    As a direct and proximate result of the design defects of Talc Defendants' products, PATRICIA ROHE inhaled and/or otherwise ingested asbestos through or by the intended, ordinary and/or foreseeable use of said products, which caused her Mesothelioma and Ovarian Cancer and Plaintiffs consequential injuries and damages alleged in this complaint.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

212.    Plaintiff repeats and reiterates the prior allegations of this complaint as if alleged more fully below.

213.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, end users, and the public, that the PRODUCTS had been tested and found to be safe and effective for use to the body. The representations made by Defendants, in fact, were false.

214.    Defendants failed to exercise ordinary care in the representations concerning the PRODUCTS while they were involved in their manufacture, sale, testing, quality assurance,

quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the PRODUCTS' high risk of unreasonable, dangerous, adverse side effects.

215.    Defendants breached their duty in representing that the PRODUCTS have no serious side effects.

216.    As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the PRODUCTS had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects.

217.    As a proximate result of Defendants' conduct, Plaintiff developed Mesothelioma and Ovarian Cancer, was caused to incur medical bills, lost wages, and conscious pain and suffering.

## AS AND FOR A EIGHTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

218.    Plaintiff repeats and reiterates the prior allegations of this complaint as if alleged more fully below.

219.    At all times mentioned in this Complaint, Defendants had the duty and obligation to disclose to Plaintiff, the true facts concerning the PRODUCTS, that is, that the PRODUCTS was dangerous and defective, and likely to cause serious health consequences to users, including the injuries as described in this Complaint.

220.    Defendants concealed important facts from Plaintiff which facts include, but are not limited to, the fact that Defendants:

    a.    Failed to disclose any connection between use of the PRODUCTS and the development of Mesothelioma and Ovarian Cancer;

    b.    Did not inform users of studies related to use of the PRODUCTS and the development of Mesothelioma and Ovarian Cancer, and/or

    c.    Concealed from users that numerous adverse events have been reported linking

use of the PRODUCTS to Mesothelioma and Ovarian Cancer.

221.    At all times mentioned in this Complaint, Defendants made affirmative representations to Plaintiff prior to the day the PRODUCTS was first purchased by Plaintiff that the PRODUCTS were safe as set forth above while concealing the material facts set forth herein.

222.    At all times mentioned in this Complaint, Defendants had the duty and obligation to disclose to Plaintiff the true facts concerning the PRODUCTS, which facts include, but are not limited to, the fact that the PRODUCTS was dangerous and likely to cause serious health consequences to users, including Mesothelioma and Ovarian Cancer.

223.    At all times mentioned in this Complaint, Defendants intentionally, willfully, and maliciously concealed and/or suppressed the facts set forth above from Plaintiff, with the intent to defraud as alleged herein.

224.    At all times mentioned in this Complaint, Plaintiff was not aware of the concealed facts set forth herein. Had she been aware of those facts, she would not have acted as she did, that is, the PRODUCTS would not have been purchased and used by Plaintiff and Plaintiff would not have been injured as a result.

225.    Had Plaintiff been informed of the deaths and serious injuries associated with the PRODUCTS usage, Plaintiff would have immediately discontinued use of the PRODUCTS.

226.    As a proximate result of the concealment or suppression of the facts set forth above, Plaintiff reasonably relied on Defendants' deception and, Plaintiff purchased the PRODUCTS and subsequently sustained injuries and damages as set forth in this Complaint. Defendants' concealment was a substantial factor in causing the injuries described herein.

227.    As a result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Plaintiff, for the sake of example and by way of punishing Defendants, seeks punitive damages according to proof.

228.    As a result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Plaintiff was caused to suffer the herein described injuries and damages.

**AS AND FOR AN NINTH CAUSE OF ACTION**

## CIVIL CONSPIRACY/CONCERT OF ACTION

229.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

230.    Upon information and belief, Personal Care Products Council f/k/a Cosmetic, Toiletries, and Fragrance Council, knowingly and willfully aided and abetted the fraudulent marketing and sales described herein.    PCPC aided and abetted this fraudulent scheme by providing substantial assistance to Defendants AVON PRODUCTS, INC., BARRETTS MINERALS, INC., BRENNTAG NORTH AMERICAN AS SUCCESSOR-IN-INTEREST TO MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR-IN-INTEREST TO WHITTAKER, CLARK & DANIELS, INC., BRENNTAG SPECIALTIES, FORMALLY KNOWN AS MINERAL PIGMENT SOLUTIONS, INC., AS SUCCESSOR- IN- INTEREST TO WHITTAKER, CLARK & DANIELS, INC, CHANEL, INC., COLGATE-PALMOLIVE COMPANY, CVS PHARMACY, INC., CYPRUS AMAX MINERALS COMPANY, THE DUANE READE DEFENDANTS, ESTEE LAUDER, INC., HOUBIGANT, INC., Individually and as successor-in-interest to DANA FRAGRANCES, THE JOHNSON & JOHNSON DEFENDANTS, KOLMAR LABORATORIES, INC., L'OREAL USA, INC., THE LOT LESS DEFENDANTS, MACY'S, INC., PATRIARCH PARTNERS LLC, Individually and as successor-in-interest to DANA FRAGRANCES, PFIZER, INC., THE REVLON DEFENDANTS, THE RITE AID DEFENDANTS, SHISEIDO AMERICA, INC., THE WALGREEN DEFENDANTS, AND WHITTAKER, CLARK & DANIELS, INC. This scheme to engage in a fraudulent marketing scheme included, among other things, that Defendant and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, and/or conspired among themselves to cause Plaintiff's injuries, disease, and/or illnesses by exposing the Plaintiff's to harmful and dangerous PRODUCTS. Cosmetic, Toiletries and Fragrance Council and the Defendants further knowingly agreed, contrived, confederated, and/or conspired to deprive Plaintiff of the opportunity of informed free choice as to whether to use the PRODUCTS or to expose her to said dangers. Defendant committed the above described wrongs by willfully

misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to the PRODUCTS.

231.    Plaintiff suffered serious injuries and pecuniary losses as a proximate result of the conspiracy described herein.

232.    For decades, the Talc Defendants and Talc Supplier Defendants mined, milled, processed, imported, converted, compounded, designed, manufactured, assembled, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce products composed of talc that were sold and marketed as safe for daily use by consumers on their person to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. The Talc Defendants' and Talc Supplier Defendants' products were advertised as healthful for babies, children and adults to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

233.    The Talc Defendants and Talc Supplier Defendants and CTFC made false statements to the Plaintiff, the general public, news media and government agencies that exercise regulatory authority over The Talc Defendants and Talc Supplier Defendants, including the U.S. Food & Drug Administration (FDA), the National Institute of Occupational Health and Safety (OSHA), and Personal Care Products Council (PCPC).

234.    The Talc Defendants, Talc Supplier Defendants and CTFC, since at least the early 1900s, possessed medical and scientific data that raised concerns regarding the presence of carcinogens, including asbestos, in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

235.    Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in Talc Defendants' and Talco Supplier Defendants' products, talc is known as talcum powder.

236.    Geologists, Talc Defendants, Talc Supplier Defendants and CTFC—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are

associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

237.    The Talc Defendants and Talc Supplier Defendants, some of which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos, in talc and talc deposits.

238.    Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons health in that it could cause lung disease, cancer and death.

239.    Talc Defendants, Talc Supplier Defendants and their affiliates, employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers. As early as 1934, the National Safety Council was publishing information stating that a cause of severe

pulmonary injury is asbestos, a silicate of magnesium. In the September 1935 issue of National

Safety News, an article entitled No Halfway Measures in Dust Control by Arthur S. Johnson

reported lowered lung capacity resulting from asbestosis and similar conditions that developed

from exposure to excess of many mineral dusts relatively low in free silica content. The article

further noted that claims for disabilities from workers who alleged exposure to clay, talc, emery,

and carborundum dusts had claims prosecuted successfully. The article concluded that in the

absence of adequate diagnoses, occupational histories and a more satisfactory method of

adjudicating claims than prosecution at common law, we must conclude that it is necessary to find

a practical method for controlling all mineral dusts.198. In 1936, the National Safety Council

published an article entitled Lesser Known Facts About Occupational Diseases stating that

exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material offers

another type of dust which may cause fatalities among workers.In1958, The New York

Department of Labor published Industrial Code Rule No. 12 establishing regulations applying to

all employees and employers relating to dangerous air contaminants and listing both asbestos and

talc as such substances.

240.    In 1968, a study presented at the American Industrial Hygiene Conference &

Exposition and published in the American Industrial Hygiene Association Journal concluded

that [a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous

material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and

chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant

amounts of such materials in products that may be used without precautions may create an

unsuspected problem._L. J. Cralley, et al., Fibrous and Mineral Content of Cosmetic Talcum

Products, 29 AM. IND. HYG. ASSOC.J. 350-354 (1968).

241.    A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New

York concluded that [t]he presence in these products of asbestiform anthophyllite and tremolite,

chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also

recommend that evaluation be made to determine the possible health hazards associated with the

use of these products. Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post.

242.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. The Talc Defendants, Talc Supplier Defendants and CTFC, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as The Defendants products.

243.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

244.    In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two leading brands of talcum powder using transmission electron microscopy (TEM) and X-ray diffraction analysis (XRD)and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

245.    Soon thereafter, a symposium was held in August of 1971 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and

doctors and scientists from Mt. Sinai Hospital—then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through TEM and electron diffraction. Talc Defendants, Talc Supplier Defendants and CTFC, citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos and other carcinogens.

246.    After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

247.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be asbestos-free. These were some of the same grades of talc used by Talc Defendants and Talc Supplier Defendants.

248.    The talc industry's response, including that of the Talc Defendants and Talc Supplier Defendants, was swift and well-coordinated through CTFC, an exclusive lobbying and advocacy group representing the cosmetics industry that conspired and worked in concert with the Talc Defendants and Talc Supplier Defendants to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn

consumers regarding the dangers associated with the talc products, including Talc Defendants and

Talc Supplier Defendants' products.

249.    Regarding the FDAs proposed 1972 ruling-making, the FDA Director of Product

Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a

meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the

FDA was preparing to release a Proposed Statement of Policy On Asbestos in Cosmetics

Containing Talc Dr. Schaffner explained that he was duty-bound and must publicize the brand

names of the talcum powders that contained asbestos. CTFCs president, Dr. Merritt, strongly

objected to the FDA alerting the general public and publishing the brand names of the talcum

powders, as it would cause the manufactures economic hardship. Dr. Merritt also threatened to

sue the FDA to prevent the disclosure of the brand names. Unsurprisingly, the FDA, Talc

Defendants, Talc Supplier Defendants and CTFC never revealed or publicized the brand names

of the talcum powders that contained asbestos, much to the detriment of the Plaintiff's and the

general public.

250.    In 1973, CTFC created a talc subcommittee and the Scientific Advisory Committee

to develop a testing methodology for detecting asbestos in talc. Initially, CTFC designated a group

of its members to tests talc grades used in talcum powder utilizing the methodology proposed by

the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum

powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated

among the members, including representatives of Talc Defendants and Talc Supplier Defendants.

Of the eight participating members, four found asbestos in every sample, three did not find

asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked

sample. In conclusion, all members agreed that the best and most reliable method of detecting

asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same

members, however, dispensed with this analytical method, claiming TEM and electron diffraction

equipment was too expensive, despite Talc Defendants and Talc Supplier Defendants then owning

or having unfettered access to same.

251.    From there, the difference between what Talc Defendants, Talc Supplier Defendants and CTFC knew diverged from what they were representing to the FDA. Talc Defendants, Talc Supplier Defendants and CTFC and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

252.    The Talc Defendants, Talc Supplier Defendants and CTFC also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and even if they were testing, it was done so superficially: only four or so grams per 20 tons of pre-shipment and pre-processed talc. Talc Defendants, Talc Supplier Defendants and CTFC also failed to the inform the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent Talc Defendants and Talc Supplier Defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFC sent letters to the FDA in March of 1976 fraudulently claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

253.    Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFC, Talc Defendants and Talc Supplier Defendants were slow to address the issue of asbestos in talc and talcum powders. Talc Defendants and Talc Supplier Defendants had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

254.    Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of the Talc Defendants'

and Talc Supplier Defendants' talcum powders that were tested contained over 20% asbestos. The researchers concluded that [t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc. We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products. The results of the Mount Sinai study were published the same year by the New York Times and the Washington Post.

255.    Talc Defendants and Talc Supplier Defendants responded to these developments by falsely claiming that the industry was doing everything it could to solve the problem; issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

256.    CTFC finally began in earnest to produce a voluntary protocol and methodology that would provide Talc Defendants and Talc Supplier Defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, Talc Defendants, Talc Supplier Defendants and CTFC falsely represented that talcum powders have never contained asbestos.

257.    Talc Defendants, Talc Supplier Defendants and third parties collectively met with and corresponded with CTFC, as well as collectively met with the FDA, to individually and collectively advocate for the use of voluntary XRD testing of miniscule portions of the tons of talc to be used in consumer products. Talc Defendants and Talc Supplier Defendants voluntary method—that was developed collectively by the Talc Defendants, Talc Supplier Defendants and CTFC and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of XRD. Talc Defendants, Talc Supplier Defendants and the CTFC also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such

as those to which PATRICIA ROHE was exposed.

258.     In support of their voluntary XRD methodology, which was finally published in 1977, CTFC produced letters to the FDA written by its members, including Talc Defendants and Talc Supplier Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. CTFC, Talc Defendants, Talc Supplier Defendants, and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.

259.     Talc Defendants, Talc Supplier Defendants and CTFC made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was safe, despite having substantial knowledge and evidence to the contrary. Talc Defendants and Talc Supplier Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff's, that talc-containing products contained asbestos.

260.     CTFC then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFCs methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

261.     CTFC, Talc Defendants and Talc Supplier Defendants have represented to various news media outlets and the public at large that their products are asbestos-free, when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. No asbestos detected means something much different than no asbestos, but due to Talc Defendants and Talc Supplier Defendants' repeated conflation of the terms, the public has been lead to erroneously believe talc products are safe. Furthermore, since

Talc Defendants, Talc Supplier Defendants and CTFC did not have sufficient testing protocols in place to support the claims that talc products were safe or asbestos-free, such statements were recklessly made, as they had no reason to believe them.

262.    Between 1970 and the 1990s, tests conducted by and on behalf of Talc Defendants, Talc Supplier Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.

263.    Talc Defendants, Talc Supplier Defendants and CTFCs failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when various government agencies raised concerns about the safety of talc, including the issue of asbestos content.

264.    To this day, many talc-containing products presently on the market contain asbestos. Instead of publicizing this fact, Talc Defendants, Talc Supplier Defendants and CTFC continue to deny all the above to protect their pecuniary interests, to the severe detriment of the public in the United States and worldwide, including Plaintiff.

265.    Since at least 1979, Talc Defendants and Talc Supplier Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are therefore safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Talc Defendants' and Talc Supplier Defendants' concerns for the safety of their products have always been voluntary and under the auspices of CTFC, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos-containing talc in cosmetics has not been banned or otherwise regulated by CTFC or the FDA.

266.    Talc Defendants and Talc Supplier Defendants (and other entities in the talc

industry and cosmetic industries, including the CTFC), individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in both their finished products as well as talc shipments from Talc Supplier Defendants and other sources that were used to produce finished products.

267.    Talc Defendants and Talc Supplier Defendants, and even the outside laboratory McCrone Associates, sent letters to CTFC, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made. Talc Defendants and Talc Supplier Defendants made and published such representations claiming that their testing method was adequate, they were ensuring that talcum powder products were safe, and that their testing of talc reaching consumers was safe, despite knowing the contrary. The Defendants intentionally and knowingly did so to avoid FDA regulations that may have required the Talc Defendants and Talc Supplier Defendants to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talcum powder products contained carcinogens, including asbestos, and were therefore dangerous.

268.    After 1976, Talc Defendants, Talc Supplier Defendants and the CTFC continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in talc.

269.    The Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained carcinogens, including asbestos, at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain such carcinogens.

270.    The Defendants and CTFC, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to

carcinogens, including asbestos, from talc and talc-containing products.

271.    Talc Defendants and Talc Supplier Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including PATRICIA ROHE, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos in their talc and talc-containing products.

272.    Talc Defendants, Talc Supplier Defendants and CTFC, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which PATRICIA ROHE was exposed.

273.    Talc Defendants, Talc Supplier Defendants and CTFC, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiff's, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

274.    Talc Defendants, Talc Supplier Defendants and CTFC conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior: (a) to withhold from users of their products—and from persons who Talc Defendants and Talc Supplier Defendants knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products;

(b) to eliminate or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

(c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

(d) to falsely represent that talc and talcum powder products, including those of Talc

Defendants and Talc Supplier Defendants, were safe for use by consumers.

275.    PATRICIA ROHE reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Talc Defendants, Talc Supplier Defendants and CTFC regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

276.    CTFC was founded in 1894 as the Manufacturing Perfumers Association (MPA). MPA was established to coordinate industry opposition to legislation that would increase the tariff on imported raw materials, affecting the cost of producing toilet goods. In 1922, MPA changed its name to American Manufacturers of Toilet Articles (AMTA) extending its membership eligibility to companies beyond perfumers. By 1924, AMTA membership included 115 active members and 105 associate members, including many of The Defendants. In 1970, AMTA changed its name to CTFC. In 2007, CTFC changed its name to PCPC. Many of The Defendants were members of or otherwise contributed resources and/or financial support to the AMTA, CTFC and/or PCPC. PCPC's more than 600 member companies manufacture, distribute, and supply the vast majority of personal care products marketed in the United States.

277.    As indicated above, asbestos has become a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite. XRD determines the crystalline structure of minerals by measuring the diffraction angles of an X-ray beam that has passed through the mineral. While XRD can identify amphibole minerals, it cannot determine if the mineral identified is fibrous or not, and thus it alone is not reliable for asbestos identification. TEM is the most sensitive and reliable instrument for detection and identification of all asbestos types in all size ranges. Finally, an energy-dispersive X-ray detector (EDX) interfaced with a TEM yields elemental composition, confirming the asbestos fiber's identity. Only TEM can detect and identify the very thin asbestos fibers that are the greatest health

hazard. As such, it is the necessary final step to confirm an absence of asbestos contamination.

By the 1970's, TEM was already established as a reliable method for asbestos identification.

McCrone Associates, the laboratory selected by several talc producers—including many of The

Defendants—to analyze their products, was already using TEM for asbestos analysis.

278.    An article by McCrone and Stewart from 1974 describes the advantages of TEM

for asbestos analysis and states that the TEM only recently installed in our laboratory will

undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers.

279.    Dr. Lewin of New York University disclosed twice in 1972 that asbestos had

been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of

195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7

had substantial percentages of one of both. XRD had been used as the first step in analysis and

the presence of asbestos and was verified by the use of optical microscopy to disclose the presence

of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark &

Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5%

chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of

Dr. Lewin's testing of 195 talc samples, the FDA found good semi-quantitative agreement for

tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD

by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical

microscopy could completely miss the presence of chrysotile if the fibers are submicroscopic,

which may well be the case in finely-milled talc In 1972, ES Laboratories reported that talc

contained 1% chrysotile and that talc contained 3% chrysotile and 3% anthophyllite. An August

23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that nine of

fourteen samples contained chrysotile. Only five samples did not have detectable levels of

chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese

from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New

Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for

tremolite.

280.    A December 10, 1973, report of the CTFCs Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDAs method because of elevated chrysotile concentrations. This December 10, 1973, CTFC report also showed that several laboratories had reported chrysotile in many of the talc samples sent by the CTFC for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

281.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFC, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including many of the Talc Defendants and Talc Supplier Defendants herein, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc Defendants' and Talc Supplier Defendants' products. On September 3, 1973, the FDA sent CTFC a letter regarding various means of measuring asbestos in talc, stating that convention methods employing X-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision. The FDA further advised CTFC that it has been exploring refractory optical microscopy as a means of measuring asbestos in talc. CFTC responded to the FDAs public notice on its proposed optical microscopy method on December 26, 1973. CTFC contended that the proposed method was not reliable for the detection of asbestos in talc, recommended a collaborative effort between FDA and industry to develop such a method, and urged deferment of the proposed rule. Minutes of CTFCs Talc Subcommittee meeting on March 15, 1976, indicate that the FDAs Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA. Dr. Estrin of CTFC responded that the subcommittee would give serious consideration to this suggestion.

282.    CTFC Method J4-1, published on October 7, 1976, states that TEM-SAED offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications. The published method, rather, relies on XRD with the level of detection of

amphibole by this method [being] 0.5% and above. CTFC met with and corresponded with Talc Defendants and Talc Supplier Defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer periodic tests by TEM. This voluntary method was developed by CTFC, Talc Defendants and Talc Supplier Defendants, and was advocated to the FDA by CTFC, Talc Defendants and Talc Supplier Defendants, in lieu of regulations requiring labeling and warnings on talcum powder products, even though CTFC, Talc Defendants and Talc Supplier Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first round robin tests, which analyzed a CTFC Tremolite-Spiked Talc, resulted in 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFCs own J4-1 method. There is no evidence that CTFC, Talc Defendants and Talc Supplier Defendants ever shared this remarkable failure with the FDA or the public.

283.    CTFC, as well as the Talc Defendants and Talc Supplier Defendants and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in Talc Defendants' and Talc Supplier Defendants' and other CTFC members finished products as well as talc shipments from talc suppliers and other sources that were used to produce finished products. Instead, CTFC sent letters to the FDA stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such intentionally false misrepresentations were made. CTFC, Talc Defendants and Talc Suppliers Defendants made and published such representations claiming that their testing method was adequate, they were ensuring that talcum powder products were safe, and that their testing of talc reaching consumers was safe, despite knowing the contrary. CTFC intentionally and knowingly did so to avoid FDA regulations that may have required Talc Defendants and Talc Supplier

Defendants and others to place warnings regarding the presence of asbestos and other carcinogens in talc products, and thereby inform the public, including Plaintiff's, that talcum powder products contained asbestos and were, therefore, dangerous.

284.    Minutes of CTFCs Talc Subcommittee from February 24, 1975, stated it was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators…When referring to the challenge of chrysotile detection, an article entitled Talc in the January/March 1976 CTFC Cosmetic Journal, states that "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction. However, despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos…it was asked, why should we test for chrysotile if there isn't any." CTFC's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after 1976, CTFC, Talc Defendants and Talc Supplier Defendants continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CTFC continued to represent that no asbestos was detected in cosmetic talc. This material representation adversely and directly impacted the FDAs attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFC represented that its ultra-sensitivity could be a problem and that it was too expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as asbestos-free.

285.    The FDA, and ultimately PATRICIA ROHE, directly and/or indirectly relied upon CTFC's false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states in cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods. The continuing lack of FDA awareness regarding the CTFC, Talc Defendants and Talc Supplier Defendants

misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, a July 11, 1986, the FDA states that an analytical methodology was sufficiently developed to ensure that such talc [is] free of fibrous amphibole CTFCs J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for ensuring asbestos-free talc. The use of TEM, recognized by the CTFC as offering greater sensitivity for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

286.    CTFC, Talc Defendants and Talc Supplier Defendants, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public regarding the hazards of exposure to asbestos and other carcinogens from talc and talc-containing products.

287.    CTFC, Talc Defendants and Talc Supplier Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including PATRICIA ROHE and her family members, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos from their talc and talc-containing products.

288.    CTFC, Talc Defendants and Talc Supplier Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which PATRICIA ROHE was exposed.

289.    CTFC, Talc Defendants and Talc Supplier Defendants, through agreement and consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports,

Case 20-50534-KBO    Doc 218    Filed 08/12/22    Page 430 of 465

data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including Talc Defendants and Talc Supplier Defendants' products to which PATRICIA ROHE was exposed.

290.    Talc Defendants and Talc Supplier Defendants, both acting individually and in concert with others, including the CTFC, violated the common law duty of care owed to Plaintiff's or otherwise engaged in intentionally culpable activity that caused Plaintiff to suffer severe injuries and damages.

291.    The actions and inactions of Talc Defendants, Talc Supplier Defendants and CTFC, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff as described in this complaint.

292.    By reason of the foregoing, Talc Defendants and Talc Supplier Defendants and the CTFC are jointly and severally liable to Plaintiff for the injuries and damages sustained by virtue of their fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

## AS AND FOR A TENTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

293. Plaintiff(s) repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "——", inclusive with the same force and effect as if hereinafter set forth at length.

294. Plaintiff husband is a resident of the state of New York. Plaintiff husband was married to Plaintiff wife during pertinent periods of exposure to the PRODUCTS, and still is the lawful husband of plaintiff.

295. By reason of the foregoing, plaintiff husband has been deprived of the services and consortium of his wife including but not limited to her support, services, love, companionship, affection, society, physical relations and solace, and consequently he suffered a loss of enjoyment of life.

## JOINT AND SEVERAL LIABILITY

296. Plaintiff repeats and reiterates the prior allegations of this complaint as if alleged more fully below.

297.   The limitations on liability set forth in CPLR 1601 do not apply because certain exceptions/exemptions apply.

298.   Plaintiff sustained a "grave injury" as defined by NY Workers Compensation Law section 11.  CPLR 1602(4).

299.   Plaintiff alleges a cause of action requiring proof of intent. CPLR 1602(5).

300.   Defendant acted with reckless disregard for the safety of others.   CPLR §1602(7).

301.   Defendant unlawfully released into the environment a substance hazardous to public health, safety or the environment, a substance acutely hazardous to public health, safety or the environment or a hazardous waste, as defined in articles 37 and 27 of NY Environmental Conservation Law and in violation of Article 71 of such law.  CPLR 1602(9).

302.   Plaintiff brings a products liability claim, the manufacturer of the product is not a party to the action and jurisdiction over the manufacturer could not with due diligence be obtained and that if the manufacturer were a party to the action, liability for claimant's injury would have been imposed upon said manufacturer by reason of the doctrine of strict liability, to the extent of the equitable share of such manufacturer.  CPLR 1602(10).

303.   Defendants acted knowingly or intentionally, and in concert, to cause the acts or failures upon which liability is based.  CPLR 1602(11).

304.   Defendants have construed the article to create or enlarge actions for contribution or indemnity barred because of the applicability of the workers' compensation law of this state, any other state or the federal government, or NY General Obligations Law section 18-201.

## PUNITIVE DAMAGES

305.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

306.   Plaintiff is entitled to punitive damages because Defendants' wrongful acts

and/or omissions were wanton or in conscious disregard of the rights of others. Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety and utility of the PRODUCTS and by failing to provide adequate instructions concerning their use.

307.    Defendants acted maliciously, wantonly and recklessly, and demonstrated a conscious indifference and utter disregard of the health, safety and rights of others, by acting with an improper motive or vindictiveness and with outrageous or oppressively intentional misconduct, such actions representing a high degree of immorality and showing wanton dishonesty as to imply a criminal indifference to civil obligations, thereby warranting an award of punitive damages.

308.    The Defendants have acted willfully, wantonly, with an evil motive, and recklessly in one or more of the following ways:

   a.   Defendants knew of the unreasonably high risk of Mesothelioma and Ovarian Cancer posed by the PRODUCTS before manufacturing, marketing, distributing and/or selling the PRODUCTS, yet purposefully proceeded with such action;

   b.   Despite their knowledge of the high risk of Mesothelioma and Ovarian Cancer associated with the PRODUCTS, Defendants affirmatively minimized this risk through marketing and promotional efforts and product labeling;

   c.   Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of the PRODUCTS and the Plaintiff's. Defendants' conduct, as described herein, knowing the dangers and risks of the PRODUCTS, yet concealing and/or omitting this information, in furtherance of their conspiracy and concerted action was outrageous because of Defendants' evil motive or a reckless indifference to the safety of users of the PRODUCTS.

309.    All of the Defendants have been aware for nearly forty (40) years of independent scientific studies linking the use of their PRODUCTS to the increased risk of cancer in women

and to the deleterious effects of Asbestos since the early 1900's. Despite this overwhelming body of evidence all of the Defendants have failed to inform their consumers of this known hazard. As such, all of the Defendants should be liable for punitive damages to the Plaintiff.

310.    As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of the Defendants, the Plaintiff has sustained damages as set forth above.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief on the entire Complaint as follows:

1.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.    Awarding Plaintiff reasonable attorneys' fees;

4.    Awarding Plaintiff the costs of these proceedings; and

5.    Such other and further relief as this Court deems just and proper.


Dated: August 23, 2019

By:    _s/s Erik Jacobs_
ERIK JACOBS, Esq.
WEITZ & LUXENBERG, P.C.
*Attorney for Plaintiff*
700 Broadway
New York, New York 10003
(212) 558-5500

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN RE:  NEW YORK CITY
       ASBESTOS LITIGATION

THIS DOCUMENT RELATES TO:

PATRICIA A. ROHE and WILLIAM ROHE,

                    Plaintiffs,

    -against-

CHANEL, INC., *et al.*,

                  Defendants.

Index No.: 190202/19

**VERIFICATION**

Erik Jacobs, Esq., an attorney duly admitted to practice before the Courts of the State of New York, hereby certifies in accordance with 22 NYCRR Part 130-1.1-a of the Rules of the Chief Administrator that to the best of my knowledge, information and belief, which was formed after a reasonable inquiry under the circumstances, the presentation of the foregoing Summons and Verified Complaint and their contents are not frivolous, as the term is defined in Part 130.

Dated: August 23, 2019
       New York, New York

**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiffs*
700 Broadway
New York, New York 10003
Tel.: (212) 558-5500

By: _____ *Erik Jacobs* _____
      Erik Jacobs, Esq.

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF NEW YORK         )

The undersigned, an attorney admitted to practice in the Courts of the State of New York, shows:

Deponent is an associate of Weitz & Luxenberg, P.C., counsel for Plaintiffs in the within action; deponent has read the foregoing Amended Complaint and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes same to be true. This verification is made by deponent and not by Plaintiffs because Plaintiffs reside outside of the County of New York where deponent maintains his office.

Dated: August 23, 2019
      New York, New York

*Erik Jacobs*

Erik Jacobs, Esq.

# **<u>EXHIBIT 11</u>**

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Stuart Rice

Electronically FILED by Superior Court of California, County of Los Angeles on 12/21/2021 04:43 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Lozano,Deputy Clerk

1 | **MAUNE.RAICHLE.HARTLEY.FRENCH & MUDD, LLC**
David L. Amell, Esq. (State Bar No. 227207)
2 | Marissa C. Langhoff, Esq. (State Bar No. 272692)
6101 W. Centinela Ave., Suite 340
3 | Culver City, California 90230
Telephone: (800) 358-5922
4 | Facsimile: (314) 241-4838
damell@mrhfmlaw.com
5 | mlanghoff@mrhfmlaw.com

6 | Attorneys for Plaintiffs

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF LOS ANGELES - COURT OF UNLIMITED JURISDICTION

10

11 | WALTER E. VALEGA and RITA M. VALEGA,

Case No.: 21STCV46564

12 | Plaintiffs,

**COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM --**
13 | **ASBESTOS**

vs.

14

ALBERTSONS COMPANIES, INC.;
15 | AMERICAN INTERNATIONAL
INDUSTRIES (individually and as
16 | successor to PINAUD, INC., BARBARA
ALICE, INC., ED. PINAUD, INC. d/b/a
17 | ED. PINAUD, and NESTLE-LE MUR
COMPANY);
18 | AVON PRODUCTS, INC.;
BARRETTS MINERALS INC.;
19 | BLOCK DRUG COMPANY, INC.;
BRENNTAG NORTH AMERICA, INC.,
20 | Individually and as Successor-in-Interest to
MINERAL PIGMENT SOLUTIONS, INC.
21 | and as Successor-in-Interest to
WHITTAKER CLARK & DANIELS,
22 | INC.;
BRENNTAG SPECIALTIES, INC. f/k/a
23 | MINERAL & PIGMENT SOLUTIONS,
INC., Individually and as Successor-in-
24 | Interest to WHITTAKER CLARK &
DANIELS, INC.;
25 | CHARLES B. CHRYSTAL COMPANY,
INC.;
26 | CHATTEM INC.;
COLGATE-PALMOLIVE COMPANY, as
27 | successor-in-interest to THE MENNEN
COMPANY;

28

1

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

DANA CLASSIC FRAGRANCES, as
   successor-in-interest to ENGLISH
   LEATHER, INC.;
DRUG FAIR, INC.;
LONGS DRUG STORES CALIFORNIA,
   L.L.C., on behalf of LONGS DRUG
   STORES CALIFORNIA, INC.;
LUCKY STORES INC.;
PATRIARCH PARTNERS LLC, Individually
   and as successor- in-interest to DANA
   FRAGRANCES;
PFIZER, INC.;
RITE AID CORPORATION;
SANOFI-AVENTIS U.S. LLC;
SHULTON, INC.;
SPECIALTY MINERALS INC.;
WHITTAKER CLARK & DANIELS, INC.;
and DOES 1-100,

   Defendants.

## GENERAL ALLEGATIONS

COME NOW, Plaintiffs Walter E. Valega and Rita M. Valega (hereinafter "Plaintiffs"),
and complain and allege as follows:

1.    Plaintiff Walter E. Valega has been diagnosed with mesothelioma.

2.    Plaintiffs were married on November 16, 1984.

3.    As used herein, the term "asbestos" collectively refers to the mineral asbestos in
any type or form, including but not limited to chrysotile, amosite, tremolite, actinolite,
anthophyllite and/or crocidolite, as well as the asbestiform varieties thereof.

4.    As used herein, the term "asbestos-containing products" collectively means
asbestos and products incorporating any amount of asbestos, whether added as a component
and/or present as a contaminant in any manner, including asbestos-contaminated talc.

5.    Prior to his diagnosis, Plaintiff and his family members were exposed to asbestos
fibers by using and handling asbestos fibers and products incorporating asbestos as a component,
and being in the presence of others using and handling asbestos fibers and products incorporating
asbestos as a component, as alleged herein.

///

6.     Plaintiff's cumulative exposure to asbestos, as a result of acts and omissions of defendants, their alternate entities, and each of them, and the defective products of defendants, their alternate entities, and each of them as hereinafter alleged, individually and together, were a substantial factor in increasing Plaintiff's risk of mesothelioma and other related injuries, and therefore a legal cause of Plaintiff's injuries and damages as set forth herein.

7.     Plaintiff was not aware at the time of exposure that asbestos presented any risk of injury and/or disease in human beings, and particularly was not aware that exposure to asbestos presented a risk of incurable, fatal cancer in human beings.

8.     Plaintiffs' claims are timely filed and are not barred by any applicable statute of limitations or statute of repose.

9.     Each of the herein named defendants is liable for its own tortious conduct and/or the tortious conduct of each and every "alternate entity", whether or not said entity is specifically named herein. Defendants, and each of them, including but not limited to the following defendants, are liable for the acts of their "alternate entity," and each of them, including that there has been a corporate name change, defendant is the successor by merger or successor by other acquisition resulting in a virtual destruction of Plaintiffs' remedy against each such "alternate entity"; Defendants, and each of them, have acquired the liabilities, assets, product line, and/or a portion thereof, of each such "alternate entity"; such "alternate entity"; Defendants, and each of them, caused the destruction of Plaintiffs' remedies against each such "alternate entity"; each such Defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity." Plaintiffs are aware of the following specific named "alternate entities" as to certain Defendants, but do not contend this is a fully inclusive or exhaustive list of all "alternate entities" of Defendants herein:

| **DEFENDANT** | **ALTERNATE ENTITIES** |
|---|---|
| AMERICAN INTERNATIONAL INDUSTRIES | PINAUD, INC. |
|  | BARBARA ALICE, INC. |

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

| | ED. PINAUD, INC. |
| | ED. PINAUD |
| | NESTLE-LE MUR COMPANY |
| BRENNTAG NORTH AMERICA, INC. | MINERAL PIGMENT SOLUTIONS, INC. |
| | WHITTAKER CLARK & DANIELS, INC. |
| BRENNTAG SPECIALTIES, INC. | MINERAL & PIGMENT SOLUTIONS, INC. |
| | WHITTAKER CLARK & DANIELS, INC. |
| COLGATE-PALMOLIVE COMPANY | THE MENNEN COMPANY |
| DANA CLASSIC FRAGRANCES | ENGLISH LEATHER, INC. |
| LONGS DRUG STORES CALIFORNIA, L.L.C. | LONGS DRUG STORES CALIFORNIA, INC. |
| PATRIARCH PARTNERS LLC | DANA FRAGRANCES |

10.     Each Defendant, whether explicitly named herein or a DOE Defendant, and each Defendant's alternate entities, are referred to collectively henceforth as "Defendants".

11.     Plaintiffs are informed and believe, and therefore allege, that at all times herein mentioned, Defendants were and are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction; that at all relevant times, Defendants were and are authorized to do business in the State of California; that Defendants have minimum contacts with the State of California, including through placing their products in the stream of commerce in the State of California, and regularly conducting business in the State of California, such that Defendants are subject to the jurisdiction of the State of California.

12.     Plaintiffs are informed and believe, and therefore allege, that at least some of the exposure to asbestos giving rise to Plaintiffs' claims occurred in Los Angeles County in the State of California, such that venue is proper in Los Angeles County.

13.     Plaintiffs are informed and believe, and thereon allege, that progressive lung disease, asbestosis, pleural plaques, lung cancer, mesothelioma and other serious diseases are

4

1  caused by inhalation of asbestos fibers, without perceptible trauma on exposure, and that said

2  diseases result from exposure to asbestos over a period of time.

3     14.    Plaintiffs are informed and believe, and therefore allege, that Defendants exposed

4  Plaintiff to the same hazardous product, namely asbestos.

5     15.    As a direct and proximate result of Defendants' conduct, Plaintiff was exposed to

6  respirable asbestos, which he inhaled and which thereby entered his body, and which caused him

7  to suffer the severe and permanent harm set forth herein.

8     16.    As a direct and proximate result of the conduct as hereinafter alleged, Plaintiff

9  suffered permanent injuries, including, but not limited to mesothelioma, and the mental, physical

10  and emotional distress attendant thereto, all to Plaintiffs' incurred general damages in a sum in

11  excess of $75,000.00.

12     17.    As a direct and proximate result of Defendants' conduct as set forth herein,

13  Plaintiffs have paid and/or incurred liability for medical costs, including, but not limited to, the

14  costs of physicians, surgeons, nurses, hospital care, medicine, hospices, medical imaging,

15  palliative care and other medical treatment, the true and exact amount thereof being unknown to

16  Plaintiffs at this time.

17     18.    As a further direct and proximate result of Defendants' conduct as hereinafter

18  alleged, Plaintiff has incurred, and will incur, loss of the ability to perform household services,

19  loss of income, a diminishment of earning potential, and other pecuniary losses, the full nature

20  and extent of which are not yet known to Plaintiffs.

21                            **FIRST CAUSE OF ACTION**
                                  **(Negligence)**
22

23  **PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50,
   AND EACH OF THEM, FOR A CAUSE OF ACTION FOR NEGLIGENCE, AND
   ALLEGE AS FOLLOWS:**
24

25     19.    Plaintiffs incorporate herein by reference each and every paragraph of the General

26  Allegations above and each cause of action set forth herein.

27  ///

28
                                        5
   COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

20.     At all relevant times, Defendants were engaged in the business of placing asbestos-containing products into the stream of commerce, including by mining, milling, refining, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging, and/or advertising said products.

21.     At all relevant times, Defendants negligently and carelessly placed asbestos-containing products into the stream of commerce as set forth above, which caused personal injuries and damages to users and consumers of said products, and persons in proximity to users and consumers of said asbestos-containing products, including Plaintiff and his family members (collectively, "exposed persons") when said asbestos-containing products were used and/or misused in a manner that was reasonably foreseeable, thereby rendering said products unsafe and dangerous for use.

22.     At all relevant times, Defendants negligently and carelessly researched, designed, modified, tested and/or failed to test asbestos-containing products, which caused personal injuries and damages to exposed persons when used and/or misused in a manner that was reasonably foreseeable, such that said products were unsafe and dangerous for use by exposed persons.

23.     At all relevant times, Defendants and their employees, contractors, subcontractors and/or agents, in the performance of their work, negligently and carelessly used asbestos-containing products in proximity to exposed persons, including Plaintiff, such that these persons were exposed to respirable asbestos.

24.     At all relevant times, Defendants negligently and carelessly failed to warn and/or inadequately warned of the health hazards of these asbestos-containing products, and failed to provide adequate use instructions or other information for eliminating the health risks inherent in their use, in that asbestos-containing products caused personal injuries to exposed persons while

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

being used and/or misused in a manner that was reasonably foreseeable and/or actually foreseen by Defendants, such that said products were unsafe and dangerous for use by exposed persons.

25.    At all relevant times, Defendants owed a duty to Plaintiff and other foreseeably affected persons to exercise due care in the pursuance of the activities mentioned above, and Defendants breached this duty of due care.

26.    Defendants knew, or should have known, and intended, that asbestos-containing products would be transported by truck, rail, ship and other common carriers, and knew, or should have known, that in the shipping process the products would break, crumble, crack, shed or be otherwise damaged, resulting in the release of airborne asbestos fibers in the proximity of Plaintiff and other exposed persons, who would then be exposed to, and inhale, said respirable fibers.

27.    Defendants knew, or should have known, and intended, that asbestos shipped in bags made of permeable materials such as jute or burlap, or breakable materials such as paper or plastic, would be transported by truck, rail, ship and other common carriers, and that as a result of such transportation, the bags would leak, tear, rip, split open, break, and otherwise cause asbestos to be released from the bags into the compartment in which they were transported and the surrounding air, thereby exposing exposed persons to these respirable fibers.

28.    Defendants knew, or should have known, and intended that the process of normal, intended, and/or foreseeable use and/or misuse of these asbestos-containing products would result in the release of airborne asbestos fibers in the proximity of exposed persons, who would then be exposed to and inhale said asbestos fibers.

29.    At all times herein relevant, Defendants were aware that asbestos-containing products were defective and dangerous, but nonetheless failed to take reasonable precautions, such as providing adequate warnings and/or other information regarding the hazards of said products to known or foreseeable exposed persons, including Plaintiff and his family members.

30.    At all times herein, Defendants failed to recall asbestos-containing products that had been placed in the stream of commerce, and/or to retrofit asbestos-containing products so as

to eliminate the risk of exposure to asbestos from said products. A reasonable manufacturer, distributor, marketer, supplier and/or seller of asbestos-containing products would, under the same or similar circumstances, have warned and/or adequately warned of the hazards associated with their use, so that persons in possession of, or exposed to, said asbestos fibers could cease their use, abate any asbestos-containing materials present, and otherwise act to protect themselves from harm. A reasonable manufacturer, distributor, supplier, marketer and/or seller of asbestos fibers would also, under the same or similar circumstances, have recalled these products from the market, and/or retrofitted said products in order to make them safe.

31.    Plaintiff suffers from injury and disease, including malignant mesothelioma, as a result of said exposure to asbestos-containing products as set forth herein. Plaintiff was not aware at the time of this exposure that Defendants' asbestos-containing products presented any risk of injury and/or disease to Plaintiff from his work and his family members' with and around these products.

32.    Defendants' conduct and Defendants' placing of defective products into the stream of commerce, as set forth herein, were a direct and proximate cause of Plaintiff's injuries and damages.

33.    Furthermore, the conduct of Defendants in continuing to market and sell products which they knew were dangerous to human health, without adequate warnings or proper use instructions, was done with reckless and conscious disregard for, and indifference to, the safety and health of Plaintiff and other exposed persons.

34.    Defendants acted with reckless disregard for the safety of Plaintiff and other exposed persons who came in contact with Defendants' asbestos-containing products, in that Defendants knew or should have known that there was a substantial risk of injury and death resulting from exposure to asbestos, as set forth above, and that these risks included asbestosis, pleural plaques, lung cancer and mesothelioma.

35.    On or before 1930, and thereafter, Defendants, who as a matter of law are held to the knowledge of an expert, knew or should have known of the hazards of exposure to asbestos,

8

by way of medical, scientific and industrial literature, including but not limited to literature available to organizations of which Defendants and their agents, officers, directors, managing agents and/or employees were members.

36.    Defendants were aware that members of the general public and other exposed persons, including Plaintiff and his family members, would assume, and in fact did assume, that exposure to asbestos-containing products was safe, when in fact said exposure was and is extremely hazardous.

37.    Defendants' conduct was motivated by Defendants' financial interests and was conducted for Defendants' own benefit and profit. In continuing to place asbestos-containing products in the stream of commerce in furtherance of their financial interest and for their own benefit, Defendants consciously disregarded the safety of exposed persons, including Plaintiff, and in fact were consciously willing and intended to permit asbestos to cause injury to exposed persons, including Plaintiff.

38.    In furtherance of their financial interests and for their own benefit, Defendants induced exposed persons to purchase, select and work with, and in proximity to, their asbestos-containing products, causing these persons to become exposed to asbestos.

39.    Defendants are liable for the fraudulent, oppressive, and malicious acts of their alternate entities, and each of them, and each Defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, and/or should have known of, the acts and omissions of Defendants, as set forth herein.

40.    Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and done in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

///

///

9

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

**SECOND CAUSE OF ACTION**
**(Strict Liability)**

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50, AND EACH OF THEM, FOR A SECOND CAUSE OF ACTION FOR STRICT LIABILITY, AND ALLEGE AS FOLLOWS:**

41.     Plaintiffs incorporate herein by reference each and every paragraph of the General Allegations and each cause of action set forth herein.

42.     Defendants marketed, manufactured, sold, supplied, distributed, rebranded, relabeled, and otherwise placed asbestos-containing products into the stream of commerce.

43.     These asbestos-containing products were defective and unsafe for their intended purpose, in that they did not perform as safely as expected by an ordinary consumer when used or misused in a reasonably foreseeable or intended manner, as asbestos-containing products were capable of causing and in fact did cause serious bodily injury and harm to exposed persons, including Plaintiff.

44.     These defects in Defendants' asbestos-containing products existed and were present at the time the products left Defendants' possession. These asbestos-containing products were intended to reach the ultimate consumer in the same condition as they left Defendants' possession, custody and/or control. These asbestos-containing products did, in fact, cause severe injury and bodily harm to exposed persons, including Plaintiff, while and as a result of being used and/or misused in a reasonably foreseeable manner, thereby rendering them defective, unsafe and dangerous for use.

45.     The defects in the asbestos-containing products placed in the stream of commerce by Defendants were a substantial factor in increasing Plaintiff's risk of developing an asbestos-related disease, including mesothelioma, which he did in fact develop, and thus in causing the injuries and damages sustained by Plaintiffs.

46.     Plaintiff's use and/or misuse, and the use and/or misuse by others, of said asbestos-containing products occurred in a manner that was reasonably foreseeable to Defendants.

///

10

47. Asbestos-containing products posed risks to human health that were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific and medical communities at the time Defendants placed said products into the stream of commerce.

48. The potential risks of asbestos-containing products presented a substantial danger to human health when used and/or misused in a way intended by, and/or reasonably foreseeable to, Defendants.

49. Defendants knew and intended that asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts, and without knowledge of the hazards involved in such use.

50. Defendants whose asbestos-containing products reached exposed persons by way of an intermediary, such as a supplier or manufacturer of a finished product, did not reasonably rely on such intermediaries to convey adequate warnings to others regarding the hazards of asbestos generally or of Defendants' asbestos-containing products specifically.

51. Exposed persons, including Plaintiff, did not know of the substantial danger of using asbestos-containing products, and did not have the same or similar access to medical, industrial and scientific sources of such knowledge as were actually and/or constructively available to Defendants.

52. Said dangers were not readily recognizable by Plaintiff or other exposed persons. Defendants failed to warn, adequately warn, or instruct of the potential hazards of said asbestos-containing products, and these acts and/or omissions were a substantial factor in causing harm to Plaintiff as set forth herein.

53. Neither Plaintiff nor his family members were negligent in any manner, including in their use or alleged modification or misuse of asbestos-containing products, and negligence by Plaintiff and/or his family members was not a substantial factor in causing or contributing to Plaintiffs' injuries or damages.

///

54.    Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and done in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50 AND EACH OF THEM, FOR A THIRD CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION, AND ALLEGE AS FOLLOWS:**

55.    Plaintiffs hereby incorporate by reference each and every allegation contained in the General Allegations and each cause of action set forth herein.

56.    Defendants, through words and conduct, represented that asbestos generally and asbestos-containing products marketed, sold, supplied, distributed, disturbed, installed removed, and/or placed in the stream of commerce by Defendants were of merchantable quality and safe for their intended and foreseeable use.

57.    Defendants' representations were made to members of the general public, the purchasers and users of said products, and other exposed persons including Plaintiff, intending or reasonably expecting that it would heard by Plaintiff and others similarly situated.

58.    Defendants' representations were not true, because asbestos-containing products were not safe for their intended use, nor were they of merchantable quality as represented by Defendants, in that asbestos has very dangerous properties and defects because it causes harm and disease in human beings, including but not limited to asbestosis, lung cancer, pleural plaques, and mesothelioma.

59.    Defendants had no reasonable grounds for believing these representations were true when Defendants made them.

///

///

12

60.     Defendants intended that members of the general public, the purchasers and users of said products, and other exposed persons including Plaintiff and his family members, would rely on these representations.

61.     As intended by Defendants, Plaintiff and other similarly situated exposed persons reasonably relied on Defendants' representations of Defendants, as such representations substantially influenced Plaintiff and others to purchase, use, recommend, supply, specify and/or work in the presence of said products, such that Plaintiff and others similarly situated were injured and damaged as a proximate result.

62.     As a direct and proximate result of his reliance on Defendants' representations, which were a substantial factor in causing harm, Plaintiff sustained injuries and damages as set forth herein.

63.     Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

## FOURTH CAUSE OF ACTION
### (Fraud by Nondisclosure)

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50 AND EACH OF THEM, FOR A FOURTH CAUSE OF ACTION FOR FRAUD BY NONDISCLOSURE, AND ALLEGE AS FOLLOWS:**

64.     Plaintiffs hereby incorporate by reference each and every paragraph of the General Allegations and each cause of action set forth herein.

65.     Defendants sold their products directly to Plaintiff thereby creating a direct transactional relationship between Defendants and Plaintiff giving rise to a duty to disclose. Defendants directly profited from the sale of their products to Plaintiff.

///

///

66.    Furthermore, Defendants directly advertised their products to Plaintiff and others similarly situated. Plaintiff therefore belonged to a class of persons to whom Defendants owed a duty to disclose.

67.    Defendants intentionally failed to disclose to Plaintiff and others similarly situated the fact that asbestos generally and asbestos-containing products marketed, sold, supplied, distributed, disturbed, installed removed, and/or placed in the stream of commerce by Defendants were not safe for their intended use, nor were they of merchantable quality, in that asbestos, and thus any product containing asbestos, has very dangerous properties and defects because asbestos fibers cause serious harm and disease in human beings, including but not limited to asbestosis, lung cancer, pleural plaques, and mesothelioma.

68.    Defendants intentionally failed to disclose certain facts which were known exclusively to them, and which Plaintiff could not have discovered, as Defendants had knowledge of the composition and hazardous nature of their asbestos-containing products, including the existence of and amount of asbestos present in said products and the propensity of those products to release asbestos fibers into the air during their ordinary and intended use.

69.    Plaintiff and others similarly situated did not know that that asbestos, and thus any product containing asbestos, has very dangerous properties and defects because it causes serious harm and disease in human beings, including but not limited to asbestosis, lung cancer, pleural plaques, and mesothelioma.

70.    Defendants intended to deceive Plaintiff and others similarly situated by concealing these facts as set forth herein.

71.    Plaintiff relied upon Defendants' intentional nondisclosure to his detriment. Had Defendants not concealed information about the hazards associated with asbestos and Defendants' asbestos-containing products, Plaintiff reasonably would have behaved differently, which may have included behavior such as using different safety and industrial hygiene measures, or purchasing products with less or no asbestos content.

///

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

72.     Defendants' fraudulent nondisclosure was a substantial factor in causing harm to Plaintiff, and as a result of Defendants' concealment of facts known to them, Plaintiff sustained injuries and damages as set forth herein.

73.     Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

### FIFTH CAUSE OF ACTION
#### (Vicarious Liability Based on Respondeat Superior)

**PLAINTIFFS COMPLAIN OF AGAINST DEFENDANTS ON EXHIBIT "C" AND DOES 51-100, AND EACH OF THEM, FOR A FIFTH CAUSE OF ACTION FOR VICARIOUS LIABILITY BASED ON RESPONDEAT SUPERIOR, AND ALLEGE AS FOLLOWS:**

74.     Plaintiffs incorporate by reference each and every paragraph of the General Allegations and each cause of action set forth herein.

75.     At all relevant times, Defendants retained, employed and/or hired workers, contractors and/or other personnel (hereinafter collectively "employees") in areas where Defendants owned, maintained, controlled, managed and/or conducted business activities where Plaintiff and/or his family members worked and/or were otherwise present.

76.     At all relevant times, Defendants' employees encountered asbestos-containing products during the course and scope of their employment, and during their regular work activities negligently disturbed said products, causing the release of respirable asbestos fibers, to which Plaintiff and/or his family members were exposed.

77.     These employees handling and disturbing asbestos-containing products in Plaintiff and/or his family members' vicinity were Defendants' agents, and at all times herein relevant, were subject to Defendants' control with respect to their acts, labor, and work involving (a) the abatement, removal, transport, installation, cleaning, handling, and maintenance of asbestos-containing products and materials, including debris and dust generated from work with

15

1  asbestos-containing products, and (b) the implementation of safety policies and procedures

2  regarding their work with and asbestos-containing products.

3       78.    Defendants controlled both the means and manner of performance of the work of

4  their employees as described herein.

5       79.    Defendants' employees received monetary compensation from Defendants in

6  exchange for the work performed as described herein, and these employees performed the work

7  as described herein in the transaction and furtherance of Defendants' business.

8       80.    Respirable asbestos fibers were released during Defendants' employees'

9  abatement, removal, use, handling, breaking, and/or otherwise disturbing asbestos-containing

10  products and materials.

11       81.    Defendants' employees' abatement, removal, use, handling, manipulation and/or

12  disturbing of asbestos-containing products and materials, occurring during the course and scope

13  of their employment, did, in fact, cause personal injuries, including mesothelioma and other lung

14  damage to exposed persons, including Plaintiff.

15       82.    Defendants' employees were negligent in that they failed to isolate their work

16  with asbestos-containing products and materials and/or to suppress asbestos fibers from being

17  released into the air and surrounding areas; failed to take appropriate steps to learn how to

18  prevent exposure to asbestos-containing products and materials; failed to warn and/or adequately

19  warn Plaintiff and/or his family members that they were being exposed to asbestos-containing

20  products; and failed to adequately warn Plaintiff or his family members of the harm associated

21  with their exposure to asbestos-containing products and materials and/or provide them with

22  protection to prevent their inhalation of asbestos.

23       83.    At all relevant times, Defendants had extensive knowledge and experience in the

24  field of work to be performed, and therefore knew or should have known of the risks created by

25  the work of its employees as set forth herein.

26  ///

27  ///

28

16

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

84.     Defendants' employees knew or should have known that failure to take such steps would result in exposure to bystanders, including Plaintiff, his family members, and others similarly situated.

85.     Defendants' employees owed Plaintiff, and other similarly situated persons, a duty to exercise due care and diligence in their activities, so as to avoid causing harm to Plaintiff and others similarly situated.

86.     Defendants' employees breached this duty of care as herein described.

87.     At all times herein mentioned, Plaintiff and his family members were unaware of the dangerous conditions and unreasonable risk of personal injury created by Defendants' employees' use of and work with and around asbestos-containing products.

88.     As a direct result of Defendants' conduct, Plaintiff was exposed to asbestos, causing severe and permanent injury and the damages and injuries to Plaintiff as complained of herein.

89.     Based on the foregoing, Defendants, as the employers of said employees, are vicariously liable under the doctrine of respondeat superior for all negligent acts and omissions committed by their employees in the course and scope of their work that caused harm to Plaintiff.

90.     Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

///

///

///

///

///

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

**SIXTH CAUSE OF ACTION**
**(Premise Owner/Contractor Liability)**

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "C", AND DOES 51-100, AND EACH OF THEM, FOR A SIXTH CAUSE OF ACTION FOR PREMISES OWNER/CONTRACTOR LIABILITY, AND ALLEGE AS FOLLOWS:**

91.   Plaintiffs incorporate herein by reference each and every paragraph of the General Allegations and each cause of action set forth herein.

92.   Plaintiff was exposed to asbestos-containing products in a manner that was reasonably foreseeable to Defendants.

93.   At all times herein mentioned, Defendants caused asbestos-containing products to be abated, removed, disturbed, constructed, installed, maintained, used, replaced, and/or repaired on the respective premises owned, leased, maintained, managed and/or controlled by Defendants.

94.   At all times mentioned herein, Defendants owned, leased, maintained, managed, and/or otherwise controlled the premises where Plaintiff and/or his family members were present.

95.   At all relevant times and places, Defendants caused asbestos-containing products, to be abated, removed, disturbed, installed, maintained, used, supplied, replaced, and/or repaired, on each of the aforesaid respective premises, by their own workers and/or by various contractors and/or subcontractors, causing the release of dangerous quantities of respirable asbestos fibers, thereby creating hazardous and unsafe conditions such that Plaintiff, his family members, and similarly situated persons were exposed to respirable asbestos fibers while present at said premises.

96.   At all times mentioned herein, Defendants knew or, in the exercise of ordinary and reasonable care, should have known, that the foregoing conditions and activities created hazardous and unsafe conditions which posed an unreasonable risk of harm to Plaintiff and persons present on each of the aforesaid respective premises.

97.   At all times relevant herein, Plaintiff and/or his family members entered and/or occupied these premises as intended and for the benefit and advantage of Defendants and at their request and invitation. In so doing, Plaintiff and/or his family members was exposed to

18

1  dangerous quantities of respirable asbestos fibers released through activities managed,

2  maintained, initiated, created, controlled and/or caused by Defendants.

3      98.    Plaintiff and his family members were at all relevant times unaware of the

4  hazardous conditions or the risk of personal injury created by the aforesaid presence and use of

5  asbestos-containing products on said premises.

6      99.    At all relevant times, Defendants remained in control of the premises where

7  Plaintiff and/or his family members worked.

8      100.   At all relevant times, Defendants owed to Plaintiff and others similarly situated a

9  duty to exercise ordinary care in the management of such premises in order to avoid creating an

10 unreasonable risk of harm, and to avoid causing injury, to Plaintiff and others similarly situated.

11     101.   At all relevant times, Defendants knew, or in the exercise of ordinary and

12 reasonable care should have known, that the premises in their control would be used without

13 knowledge of, or inspection for, defects or dangerous conditions, and that the persons present

14 and using said premises such as Plaintiff and/or his family members would not be aware of the

15 aforesaid hazardous conditions to which they were exposed on the premises.

16     102.   At all relevant times, Defendants negligently failed to correct or to warn Plaintiff

17 or his family members of the existence of these dangerous conditions and hazards on the

18 premises.

19     103.   Defendants caused asbestos-containing products to be abated, removed, disturbed,

20 installed, maintained, used, replaced, and/or repaired on these premises, by their own workers

21 and/or by employing various contractors, and caused the release of dangerous quantities of

22 respirable asbestos fibers on the premises, to which Plaintiff was exposed, thereby causing

23 Plaintiff's injury.

24     104.   At all relevant times, Defendants should have recognized that the work of said

25 contractors with asbestos-containing products would result in the release of asbestos fibers into

26 the air, creating dangerous conditions which posed a substantial risk of harm to Plaintiff and

27 others similarly situated unless appropriate precautions were taken.

28

19

105. Defendants knew or should have known that the work performed on their premises required appropriate industrial hygiene controls to be implemented to avoid creating a risk of harm from asbestos-containing products, and were aware or should have been aware that such procedures were not taken.

106. The negligent conduct of the contractors employed by Defendants includes, but is not limited to:

a) Failure to warn of the presence and hazardous nature of asbestos-containing products;

b) Failure to use appropriate industrial hygiene controls to remove, reduce and/or eliminate the release of asbestos fiber from asbestos-containing products and materials;

c) Failure to provide adequate personal protection from exposure and inhalation of respirable asbestos fibers, including but not limited to the use of breathing protection, work clothing, disposable coveralls, change rooms, and/or showers;

d) Failure to inspect, monitor and/or test the air on the premises for the presence of asbestos and to determine the quantity of asbestos present;

e) Failure to provide appropriate medical monitoring for contractors, employees and others present on the premises, including Plaintiff and others similarly situated, to detect the presence of asbestos-related disease and injury.

107. At all relevant times, Defendants were subject to certain rules, ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code section 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, sections 4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders.

108.    At all relevant times, Defendants were required to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances as prescribed by Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants and under the regulations promulgated by California regional Air Quality Management Districts as empowered by California Health and Safety Code section 40.200, *et seq.*

109.    Defendants violated these rules, ordinances, statutes, and other government regulations by:

a)    Failing to comply with statutes, and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

b)    Failing to segregate work involving the release of asbestos;

c)    Failing to suppress asbestos using prescribed ventilation techniques;

d)    Failing to suppress asbestos using prescribed "wet down" techniques;

e)    Failing to warn or educate Plaintiff, his family members and others similarly situated regarding the presence and risks of asbestos-containing products on the premises;

f)    Failing to provide appropriate respiratory protection devices;

g)    Failing to ensure appropriate respiratory protection devices were used properly, including administering 'fit tests';

h)    Failing to provide for an ongoing health screening program for those exposed to asbestos-containing products on the premises;

i)    Failing to provide adequate housekeeping and clean-up of the work place;

j)    Failing to properly warn of the hazards associated with asbestos-containing products as required by these statutes;

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

k) Failing to properly report renovation and disturbance of asbestos-containing products, as required by statutes and regulations, including but not limited to BAAQMD Regulation 11-2-401 and/or SCQAMD Rule 1403 D(1);

l) Failing to have an asbestos removal supervisor present, as required by regulation;

m) Failing to obtain approval for renovation as required by statutes; and

n) Failing to maintain records as required by statute.

110. Plaintiff and his family members were at all times unaware of the hazardous condition or the risk of personal injury created by the violation of said regulations, ordinances or statutes by Defendants.

111. At all times relevant times, Plaintiff was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

112. At all relevant times, Defendants knew, or in the exercise of ordinary and reasonable care should have known, that Plaintiff, his family members, and similarly situated persons would be lawfully present on premises under Defendants' control, without knowledge of dangerous conditions on said premises; that the persons present on said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises; and that such persons were unaware of the aforesaid violations of codes, regulations and statutes by Defendants.

113. As a direct and proximate result of the foregoing, Plaintiff developed an asbestos-related illness and injury, including mesothelioma, and Plaintiff has suffered damages as herein alleged.

114. At all relevant times relevant herein, Defendants negligently selected, supplied, distributed, and provided asbestos-containing products to Plaintiff and/or his family members for use during their regular work activities, causing Plaintiff to be exposed to respirable asbestos fibers.

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

115. At all relevant times, Defendants selected, supplied, and distributed asbestos-containing products to their employees for use during their regular work activities, such that said employees caused the release of respirable asbestos fibers to which Plaintiff and others similarly situated were then exposed as set forth herein.

116. At all relevant times, Defendants knew or should have known that their employees, contractors, and other persons lawfully on said premises, including Plaintiff and his family members, encountered asbestos-containing products during the course and scope of their work activities.

117. At all relevant times, Defendants, knew or should have known that the asbestos-containing products encountered on its premises by persons including Plaintiff and his family members were unsafe, in that respirable asbestos fibers were released during abatement, removal, disturbance, use, handling, breaking, or other manipulation of those asbestos-containing products, and that once released, asbestos fibers can be inhaled, causing severe risk of disease and death in human beings.

118. At all relevant times, Defendants knew, or in the exercise of reasonable diligence, should have known, that employees and other persons lawfully present, including Plaintiff and his family members, who were exposed to asbestos-containing products as set forth herein would have asbestos fibers released from these products accumulating on their clothing, shoes, hair and persons, such that absent appropriate industrial hygiene controls to prevent such contamination, Plaintiff, his family members, and other similarly situated persons would unknowingly carry these asbestos fibers home from the workplace, and contaminate their homes and vehicles, such that family members and others exposed to these asbestos fibers were at risk of severe and permanent harm.

119. At all relevant times, Defendants had a duty to use due care in the abatement, removal, selection, supply, distribution and disturbance of asbestos-containing products; to adequately instruct, train, and supervise their employees; and to implement adequate industrial hygiene controls, safety policies and procedures to protect workers, and persons encountering

23

1 those workers, including Plaintiff, from suffering injury or death as a result of exposure to

2 respirable asbestos.

3     120.    The duties of Defendants as alleged herein exist and existed independently of

4 their duties to maintain their premises in reasonably safe condition, free from concealed hazards.

5     121.    Defendants negligently abated, removed, selected, supplied, and distributed

6 asbestos-containing products; failed to adequately train or supervise their employees to identify

7 asbestos-containing products; failed to ensure the safe handling of asbestos-containing products

8 encountered during the course of their work activities; and failed to guard against inhalation of

9 asbestos fibers by those who would come into close contact with them after they had used,

10 disturbed, or handled, said asbestos-containing products during the course and scope of their

11 employment.

12     122.    As a direct and proximate result of Defendants' conduct, and each of them as set

13 forth herein, Plaintiff became exposed to and inhaled respirable asbestos fibers, which were a

14 substantial factor contributing to his risk of developing an asbestos-related disease, which he in

15 fact developed, leading to Plaintiff's injuries and damages.

16     123.    Defendants' herein-described conduct was and is willful, malicious, fraudulent,

17 outrageous and in reckless and conscious disregard and indifference to the safety and health of

18 exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing

19 said Defendants, seek punitive damages according to proof.

20     WHEREFORE, Plaintiffs pray judgment against Defendants.

21                          **SEVENTH CAUSE OF ACTION**
                              **(Loss of Consortium)**
22

23 **AS AND FOR A FURTHER SEVENTH CAUSE OF ACTION FOR LOSS OF
   CONSORTIUM, PLAINTIFF RITA M. VALEGA COMPLAINS OF DEFENDANTS,
   AND DOES 1-100, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:**
24

25     124.    Plaintiffs incorporate herein by reference each and every paragraph of the General

26 Allegations and each cause of action set forth herein.

27 ///

28                                      24
   COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

125.   Plaintiffs were married on November 16, 1984, and at all relevant times were husband and wife.

126.   Prior to his injuries as alleged, Plaintiff Walter E. Valega was able to, and did, fully perform the duties of a spouse. As a result of his injuries, Walter E. Valega has been and is unable to fully perform the necessary duties of a spouse and the work and service usually performed in the care, maintenance and management of the family home. As a proximate result thereof, Plaintiff Rita M. Valega was and is deprived of the full consortium of her spouse, including the performance of duties, all to Plaintiffs' damages, in an amount presently unknown to Plaintiffs but which will be proved at time of trial.

127.   As a direct and proximate result of the Defendants' acts and omissions as set forth herein, and the severe injuries caused thereby to Plaintiff Walter E. Valega as set forth in the complaint, Plaintiff Rita M. Valega has suffered, and continues to suffer, loss of consortium, including but not by way of limitation, loss of love, comfort, care, assistance, protection, society, moral support services, marital relations, companionship and affection of her spouse, and has suffered severe mental and emotional distress and other damages as a result thereof. Plaintiff Rita M. Valega seeks compensation only for such harm that has occurred and will occur during the period between Plaintiff Walter E. Valega's mesothelioma diagnosis and untimely death.

128.   Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and done in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff Walter E. Valega, and resulted in Plaintiff Rita M. Valega's loss of consortium. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

## PRAYER FOR JUDGMENT

WHEREFORE, Plaintiffs pray judgment against defendants, their alternate entities, and each of them, in an amount to be proved at trial, as follows:

1.   For Plaintiffs' general damages according to proof;

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

1    2.    For medical and related expenses according to proof;

2    3.    For loss of earnings according to proof;

3    4.    For exemplary or punitive damages according to proof;

4    5.    For Plaintiffs' cost of suit herein;

5    6.    For damages for fraud according to proof; and

6    7.    For such other and further relief as the Court may deem just and proper, including

7  costs and prejudgment interest as provided in California Code of Civil Procedure section 998,

8  California Code of Civil Procedure section 1032 and related provisions of law.

9  DATED: December 21, 2021        Maune Raichle Hartley French & Mudd LLC

10

11                    By: _____

                         David L. Amell

12                       Attorneys for Plaintiffs

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

1

## **EXHIBIT A**

2

3

4

5

6

Plaintiff Walter E. Valega ("Plaintiff" or "Mr. Valega") used commercial talcum powder products on a daily basis throughout the entirety of his adult life – beginning in approximately 1960. Mr. Valega also had talcum powder products applied to him by others, on a monthly basis, beginning in approximately the late 1940's. From approximately 1983 through 1997, Mr. Valega resided in the State of California, including in Los Angeles County. Throughout this time period, Mr. Valega used commercial talcum powder products sold into and purchased in the State of California on a daily basis. Plaintiffs allege that those commercial talcum powder products contained asbestos.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

## EXHIBIT "B"

ALBERTSONS COMPANIES, INC.;
AMERICAN INTERNATIONAL INDUSTRIES (individually and as successor to PINAUD, INC., BARBARA ALICE, INC., ED. PINAUD, INC. d/b/a ED. PINAUD, and NESTLE-LE MUR COMPANY);
AVON PRODUCTS, INC.;
BARRETTS MINERALS INC.;
BLOCK DRUG COMPANY, INC.;
BRENNTAG NORTH AMERICA, INC., Individually and as Successor-in-Interest to MINERAL PIGMENT SOLUTIONS, INC. and as Successor-in-Interest to WHITTAKER CLARK & DANIELS, INC.;
BRENNTAG SPECIALTIES, INC. f/k/a MINERAL & PIGMENT SOLUTIONS, INC., Individually and as Successor-in-Interest to WHITTAKER CLARK & DANIELS, INC.;
CHARLES B. CHRYSTAL COMPANY, INC.;
CHATTEM INC.;
COLGATE-PALMOLIVE COMPANY, as successor-in-interest to THE MENNEN COMPANY;
DANA CLASSIC FRAGRANCES, as successor-in-interest to ENGLISH LEATHER, INC.;
DRUG FAIR, INC.;
LONGS DRUG STORES CALIFORNIA, L.L.C., on behalf of LONGS DRUG STORES CALIFORNIA, INC.;
LUCKY STORES INC.;
PATRIARCH PARTNERS LLC, Individually and as successor- in-interest to DANA FRAGRANCES;
PFIZER, INC.;
RITE AID CORPORATION;
SANOFI-AVENTIS U.S. LLC;
SHULTON, INC.;
SPECIALTY MINERALS INC.;
WHITTAKER CLARK & DANIELS, INC.;
and DOES 1-50.

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS

1

**EXHIBIT "C"**

2  DOES 51-100.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERSONAL INJURY AND LOSS FOR CONSORTIUM – ASBESTOS