**REDACTED VERSION
OF DOCKET NO. 462**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ZOHAR III, CORP.,[1] | Case No. 18-10512 (KBO) |
| Debtor. | Jointly Administered |
| DAVID DUNN, as Litigation Trustee for Zohar Litigation Trust-A; | |
| Plaintiff, | Adv. Pro. No. 20-50534 (KBO) |
| -against- | |
| PATRIARCH PARTNERS, LLC; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC; PHOENIX VIII, LLC; OCTALUNA LLC; OCTALUNA II LLC; OCTALUNA III LLC; ARK II CLO 2001-1, LIMITED; ARK INVESTMENT PARTNERS II, LP; ARK ANGELS VIII, LLC; PATRIARCH PARTNERS MANAGEMENT GROUP, LLC; PATRIARCH PARTNERS AGENCY SERVICES, LLC; and LYNN TILTON, | |
| Defendants, and | |
| 180S, INC.; GLOBAL AUTOMOTIVE SYSTEMS, LLC; INTREPID U.S.A., INC.; IMG HOLDINGS, INC.; SCAN-OPTICS, LLC; STILA STYLES, LLC; SNELLING | |

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Zohar III, Corp., (9612). The Debtor's address is c/o Province, LLC 70 Canal Street, Suite 12E, Stamford, CT 06902. In addition to Zohar III, Corp., the Debtor's affiliates include the following debtors whose bankruptcy cases have been closed prior to the date hereof, along with the last four digits of their respective federal tax identification numbers and chapter 11 case numbers: Zohar II 2005-1, Corp. (4059) (Case No. 18-10513); Zohar CDO 2003-1, Corp. (3724) (Case No. 18-10514); Zohar III, Limited (9261) (Case No. 18-10515); Zohar II 2005-1, Limited (8297) (Case No. 18-10516); Zohar CDO 2003-1, Limited (5119) and (Case No. 18-10517). All motions, contested matters, and adversary proceedings that remained open as of the closing of such cases, or that are opened after the date thereof, with respect to such Closed-Case debtors, are administered in this remaining chapter 11 case.

STAFFING, LLC; and VULCAN
ENGINEERING, CO.,

Nominal Defendants.

## FOURTH AMENDED COMPLAINT

The above-captioned plaintiffs, by their undersigned attorneys, for their Fourth Amended

Complaint[2] against the above-captioned defendants, hereby allege as follows:

## Introduction[3]

1.    In the mid-2000s, Lynn Tilton created Zohar CDO 2003-1, Limited, Zohar II 2005-

1, Limited, and Zohar III, Limited (collectively, the "Zohar Funds"), a series of collateralized loan

obligation ("CLO") funds.  The Zohar Funds were unique among CLO funds in several ways, but

the most striking was that the Zohar Funds and the companies in which the Zohar Funds invested

were all entirely controlled, managed and selected by Tilton and her affiliated entities.  Tilton

raised billions of dollars through the Zohar Funds and, through the Patriarch Managers (the

collateral managers for the Zohar Funds that she controlled), used those funds to make debt and

equity investments in various Portfolio Companies, at her sole discretion.  And acting through the

Patriarch Managers, Tilton caused the Zohar Funds, as equity holders of these Portfolio

Companies, to install her as a director or manager of the Portfolio Companies (often times the sole

director or manager), which allowed her to exercise complete control over a portfolio of companies

---

[2] This Fourth Amended Complaint is filed in conformity with the Court's *Memorandum Opinion* (Dkt. 121) and *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Complaint* (Dkt. 122).  In order to preserve, without waiver, claims made in the original Complaint, Plaintiffs have included certain Counts (and supporting allegations) that were dismissed with prejudice by Order of the Court.  The continued inclusion of these allegations in the Complaint does not represent an intention to reargue them now, but instead to preserve them for appeal without waiver.

[3] Capitalized terms used but not defined in this Introduction shall have the meaning ascribed to them in the balance of this Complaint.

across a broad swath of industries.  She has exploited that control to siphon money from the Zohar Funds, and from the Portfolio Companies, ever since.

2.      After years of operating the Zohar Funds free from accountability, in 2015, Tilton's management came under scrutiny.  The SEC brought a fraud proceeding against Tilton in March of that year, and Zohar I looked set to default when its notes matured in November.  Tilton concluded that MBIA, as the Controlling Party for Zohar I and Zohar II, and the Zohar III Controlling Class had grave concerns about her management and would likely exercise their rights to replace her affiliated entities as collateral manager for the Zohar Funds.  Accordingly, Tilton took a series of steps designed to keep control over the Portfolio Companies, even after she was no longer the Zohar Funds' collateral manager, and ensure that cash was flowing in to her Patriarch enterprise for as long as possible.

3.      First, in August and September of 2015, Tilton upped—by a factor of four to seven times—the management-services fees that the Portfolio Companies were required to pay to her affiliate, PPMG.  At the same time, in September 2015, the Tilton-controlled Patriarch Managers executed a series of documents on behalf of the Zohar Funds purportedly transferring the right to govern and control the Portfolio Companies from the Zohar Funds to other entities owned and controlled by Tilton.  As a result of these transfers, the Zohar Funds could not exercise their contractual and equity holder rights to remove Tilton from her management roles with the Portfolio Companies or terminate the management-services agreements between the Portfolio Companies and PPMG.  Neither Tilton nor her entities provided the Zohar Funds or the Portfolio Companies any consideration for these transfers.

4.      In the months leading up to the Patriarch Managers' resignation as the Zohar Funds' collateral managers in March of 2016, Tilton, acting through PPAS and the Patriarch Managers, orchestrated illegitimate borrowings of more than $50 million.  PPAS then improperly held these

funds in its own bank accounts, refusing to give the Portfolio Companies the ostensibly loaned funds except at its own discretion, effectively creating a set of shadow loans, using the Zohar Funds' money, that PPAS controlled.

5.      Then, also in 2016, Tilton, as sole preference shareholder of the Zohar Funds, made an election for the Zohar Funds to be taxed as corporations, in contravention of the terms of the Zohar Funds' constituent documents and their Indentures.  Previously, the Zohar Funds were disregarded entities for tax purposes and, therefore, not subject to entity-level taxes and their tax attributes (including their net operating losses) would flow up to Tilton's own tax return.  Indeed, Tilton used her taxpaying responsibility to demand payments from both the Zohar Funds *and* the Portfolio Companies to cover any possible tax liability, even though the Portfolio Companies overwhelmingly generated losses that were tax advantageous.  At Tilton's election, however, the Zohar Funds became the relevant taxable entities—at the precise moment that there might finally be tax liability resulting from monetization of the Portfolio Companies and after Tilton harvested for her own account (to the exclusion of the Zohar Funds) years of favorable tax attributes generated from losses generated by the Portfolio Companies that she used for years to shield income from her vast enterprise from cash tax liability.  Tilton provided the Zohar Funds with no consideration for this change.

6.      Next, in November 2017, Tilton acted to maximize her personal financial stake in the Portfolio Companies most likely to be sold at substantial value.  More specifically, on November 13, 2017, Tilton brought actions seeking declaratory judgments that she, and not the Zohar Funds, was the beneficial owner of what she has acknowledged are three of the most valuable Portfolio Companies.  That same day, Tilton, in her capacity as manager of these three Portfolio Companies, executed written consents purporting to create new preference interests for the benefit of her affiliated entities.  The holders of these new preference interests—again, Tilton's

affiliates—would have the "sole right" to remove Tilton as manager of the Portfolio Companies and would, moreover, be entitled to receive a preference payout of *five times* their initial investments. Once again, Tilton's affiliated entities provided no consideration to the Zohar Funds for this change.

7.      Finally, on March 10 and 11, 2018, concurrently with the filing of these bankruptcy cases, Tilton caused the four Portfolio Companies that she identified as the most valuable and, accordingly, the most likely to be sold, to enter into "phantom equity" agreements under which Tilton would receive cash payments upon a change in control of the Portfolio Company. Tilton gave neither the Zohar Funds nor the Portfolio Companies any consideration for these agreements.

8.      Because Tilton and her affiliates, particularly the Patriarch Managers, controlled the flow of information about their activities, this self-dealing was concealed from all parties associated with the Zohar Funds other than Patriarch and its affiliates. Further, according to the SEC, since 2009, Tilton's manipulation of a financial test required under the Indentures had allowed Tilton to receive tens, if not hundreds, of millions of dollars in management fees and preference-share distributions that would not have been paid if the tests had been properly calculated, siphoning off value that should have gone to the Zohar Funds' investors. It was not until the Patriarch Managers were out of their role as the Zohar Funds' agent and attorney-in-fact that the Zohar Funds' third-party noteholders finally had a party unaffiliated with Tilton to hold her accountable for these actions.

9.      As further described below, Tilton and her affiliates have repeatedly breached their contractual and fiduciary duties to the Zohar Funds. They have used the Zohar Funds and the Portfolio Companies for their own personal gain and have wrongfully taken valuable rights and assets from the Zohar Funds without giving any consideration in exchange.

10. This rent-taking has not changed since these bankruptcy cases were filed. To the contrary, Tilton has brazenly withheld both information and cash from the Zohar Funds, taken advantage of her insider status to shift every possible recovery from the Zohar Funds to herself in the Portfolio Company sales process, and all the while continued to insist that Portfolio Companies pay her enormous sums in accordance with the improper and self-dealing agreements described above.

11. For all of the foregoing reasons, the Court should order Tilton and her affiliates to pay the Litigation Trust and the Portfolio Company Litigants the damages to which they are entitled, and the Court should avoid the improper transfers and obligations of the Zohar Funds incurred or made for the benefit of Tilton and her affiliates.

### Parties

### I. The Zohar Funds

12. Plaintiff Zohar Litigation Trust-A (the "Litigation Trust") is a trust organized under the laws of Delaware.

13. Zohar CDO 2003-1, Limited, Zohar II 2005-1, Limited, and Zohar III, Limited are referred to herein as the Zohar Funds collectively and each as a "Zohar Fund." As described in paragraph 18 hereof, the Zohar Funds were the predecessor plaintiffs to the Litigation Trust prior to the effectiveness of the Chapter 11 Plan (as defined below).

14. As described in more detail below, each Zohar Fund was created to raise capital, primarily for the purpose of making investments in companies to be identified by Defendant Tilton, acting through her affiliates as the Zohar Funds' collateral manager.

15. Zohar CDO 2003-1, Limited ("Zohar I") is an exempted company organized under the laws of the Cayman Islands.

16.     Zohar II 2005-1, Limited ("Zohar II") is an exempted company organized under the laws of the Cayman Islands.

17.     Zohar III, Limited ("Zohar III") is an exempted company organized under the laws of the Cayman Islands.

18.     The Zohar Funds are debtors and debtors in possession in the above-captioned chapter 11 cases.[4]

19.     In accordance with the *Order Confirming Third Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp., and its Affiliated Debtors*, *see* Case No. 18-10512, D.I. 3400, the *Order (i) Approving Certain Modifications to the Third Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliate Debtors Pursuant to Section 1127(b) of the Bankruptcy Code;(ii) Finding that (a) such Modifications are Not Material and Adverse or (b) the Debtors Have Satisfied the Requirements of Sections 1127(b) and (c) of the Bankruptcy Code with Respect to Such Modifications; (iii) Confirming the Modified Plan; and (iv) Granting Related Relief, see* Case No. 18-10512, D.I. 3467, and the *Fourth Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliated Debtors*, *see* Case No. 18-10512, D.I. 3474 (collectively, the "Chapter 11 Plan"), the Zohar Funds' claims in this Action were transferred to the Litigation Trust, which now stands as Plaintiff in this Action.  References herein to any or all of the Zohar Funds as Plaintiff asserting the claims stated herein refer to the Litigation Trust as successor thereto under the Chapter 11 Plan.

20.     In addition, pursuant to sections 6.1, 6.6 and 6.8 of the Chapter 11 Plan, the Litigation Assets (as defined in the Chapter 11 Plan) of the Debtors were transferred to the Zohar

---

[4] "Debtors" is defined as Zohar III, Corp., Zohar II 2005-1, Corp., Zohar CDO 2003-1, Corp., Zohar III, Limited, Zohar II 2005-1, Limited, and Zohar CDO 2003-1, Limited.

Litigation Trust-A and Zohar Litigation Trust-B, as specified in the supplement to the Chapter 11

Plan.  *See* Case No. 18-10512, D.I. 3391, Exs. H-1 and H-2.

## II.   Defendant Lynn Tilton

21.   Defendant Lynn Tilton ("Tilton") is a resident of Florida.

22.   Tilton formed and raised the outside investment in the Plaintiff Zohar Funds.

23.   Tilton is the principal and, upon information and belief, sole member of many of

the other defendants in this case, including, each as defined below, Patriarch Partners, the Patriarch

Managers, the Octaluna Entities, PPMG, PPAS, and the Ark Entities.  Tilton wields control over

the entire Patriarch investment enterprise.

## III.   The Patriarch Managers

24.   Defendants Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and

Patriarch Partners XV, LLC are referred to herein collectively as the "Patriarch Managers" or

individually as a "Patriarch Manager."

25.   As described in more detail herein, each Patriarch Manager was created to serve as

a collateral manager for one of the Zohar Funds.  Upon information and belief, all of the Patriarch

Managers are managed and controlled by Defendant Tilton.  Upon information and belief, non-

party Zohar Holding LLC ("Zohar Holdings") indirectly or directly owns each of the Patriarch

Managers.  Tilton owns 99% of the membership interests in Zohar Holdings.  The remaining 1%

membership interest in Zohar Holdings is held by the C.J. Tilton Irrevocable Trust.

26.   Defendant Patriarch Partners VIII, LLC ("Patriarch VIII") is a Delaware limited

liability company with its principal place of business in New York, New York.  Until March 2,

2016, Patriarch VIII was the collateral manager for Plaintiff Zohar I.

27.     Defendant Patriarch Partners XIV, LLC ("Patriarch XIV") is a Delaware limited liability company with its principal place of business in New York, New York.  Until March 2, 2016, Patriarch XIV was the collateral manager for Plaintiff Zohar II.

28.     Defendant Patriarch Partners XV, LLC ("Patriarch XV") is a Delaware limited liability company with its principal place of business in New York, New York.  Until March 2, 2016, Patriarch XV was the collateral manager for Plaintiff Zohar III.

## IV.     The Octaluna Entities

29.     Defendants Octaluna LLC, Octaluna II LLC, and Octaluna III LLC are referred to herein collectively as the "Octaluna Entities" and individually as an "Octaluna Entity."

30.     Each Octaluna Entity was created to own the preferred stock of a single corresponding Zohar Fund.  Upon information and belief, each Octaluna Entity is managed and controlled by Defendant Tilton, and Tilton has represented that she directly or indirectly owns each of the Octaluna Entities.

31.     Defendant Octaluna LLC ("Octaluna I") is a Delaware limited liability company with its principal place of business in New York, New York.  Octaluna I holds 100% of the preference shares of Zohar I, certain Class A-3 Notes issued by Zohar I, and the Class B Notes issued by Zohar I.

32.     Defendant Octaluna II LLC ("Octaluna II") is a Delaware limited liability company with its principal place of business in New York, New York.  All of the preference shares of Zohar II and Class B notes issued by Zohar II are owned and held by Octaluna II.

33.     Defendant Octaluna III LLC ("Octaluna III" and, together with Octaluna I and Octaluna II, the "Octaluna Entities") is a Delaware limited liability company with its principal place of business in New York, New York.  All of the preference shares of Zohar III and Class B notes issued by Zohar III are owned and held by Octaluna III.

## V.    Other Tilton Entity Defendants

34.    In addition to the Patriarch Managers and the Octaluna Entities, Defendant Tilton formed and employed multiple other entities to carry out the misconduct complained of herein. These entities, many of which are mere alter egos for Tilton herself, have also been named as defendants in this action.

35.    Defendant Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability company, with its principal place of business in New York, New York.  Upon information and belief, Patriarch Partners is wholly owned (directly or indirectly), managed and controlled by Defendant Tilton.

36.    Defendant Ark II CLO 2001-1, Limited ("Ark II") is a Cayman Islands company with its principal place of business in New York, New York.  Upon information and belief, Ark II is wholly owned (directly or indirectly), managed and controlled by Defendant Tilton.

37.    Defendant Ark Investment Partners II, L.P. ("AIP"), is a Delaware limited partnership with its principal place of business in New York, New York.  Upon information and belief, Defendant Tilton is (either directly or indirectly) the ultimate sole partner of AIP.

38.    Defendant Ark Angels VIII, LLC ("Ark VIII" and with Ark II and AIP, the "Ark Entities") is a Delaware limited liability company with its principal place of business in New York, New York.  Upon information and belief, Ark VIII is wholly owned (directly or indirectly), managed and controlled by Defendant Tilton.

39.    Defendant Phoenix VIII, LLC ("Phoenix VIII") is a Delaware limited liability company with its principal place of business in New York, New York.  Upon information and belief, Phoenix VIII is wholly owned (directly or indirectly), managed and controlled by Defendant Tilton.

40.    Defendant Patriarch Partners Management Group, LLC ("PPMG") is a Delaware limited liability company with its principal place of business in New York, New York.  Upon information and belief, PPMG is a wholly owned subsidiary of Zohar Holdings, and Tilton manages and controls PPMG.

41.    Defendant Patriarch Partners Agency Services, LLC ("PPAS") is a Delaware limited liability company with its principal place of business in New York, New York.  Upon information and belief, PPAS is wholly owned (directly or indirectly), managed and controlled by Defendant Tilton.

### VI.    The Assignor Portfolio Companies

42.    FSAR Holdings, Inc. is a Delaware corporation with its principal place of business in California.  FSAR Holdings, Inc. was 100% owned by Zohar II until its sale to a third party in or about April 2021.  FSAR Holdings, Inc. was the sole member of Performance Designed Products, LLC ("PDP"), a California limited liability company with its principal place of business in California.  Tilton was a manager of PDP.  Pursuant to the Court's order authorizing the sale of Zohar II's equity interests in FSAR Holdings, Inc., Zohar II was assigned specified "Retained Claims" from FSAR Holdings, Inc. and its subsidiaries (including PDP), which include claims against Tilton, as a former director of FSAR Holdings, Inc. and controlling person of its subsidiaries, and her affiliates, including the Defendants in this action.  *See* Case No. 18-10512, D.I. 2480.

43.    RM Acquisition, LLC ("RM Acquisition") is a Delaware limited liability company with its principal place of business in Illinois.  RM Acquisition was 100% owned by the Zohar Funds until its sale to a third party in or about October 2020.  Pursuant to the Court's order authorizing the sale of the Zohar Funds' equity interests in RM Acquisition, Zohar II 2005-1, Corp. was assigned specified "Retained Claims," which include claims against Tilton, as the former

manager of RM Acquisition, and her affiliates, including the Defendants in this action.  *See* Case No. 18-10512, D.I. 2050.

44.     Heritage Aviation Ltd. ("Heritage Aviation") is a Texas Limited Partnership with its principal place of business in Texas.  Zohar HA, LLC was Heritage Aviation's general partner and owned 1% of the partnership interests in Heritage Aviation up until November 23, 2021.  Zohar II was a limited partner of Heritage Aviation and owned the other 99% partnership interest until November 23, 2021.  On November 23, 2021, a third-party acquired 100% of the partnership interests in Heritage Aviation.  Pursuant to the Court's order authorizing that sale, Zohar II 2005-1, Corp. in its capacity as Seller Representative for the benefit of the Sellers (as defined in the applicable purchase agreement), was assigned, specified "Retained Claims," which include claims against Tilton, as the former manager of Heritage Aviation and her affiliates, including the Defendants in this action.  *See* Case No. 18-10512, D.I. 2926.

45.     UI Acquisition Holding Co. ("UI Acquisition") is a Delaware corporation.  UI Acquisition was 49.3% owned by the Zohar Funds until its sale to a third party on July 18, 2022.  Pursuant to the Court's order authorizing the sale of the Zohar Funds' equity interests in UI Acquisition, Zohar II 2005-1, Corp., in its capacity as Seller Representative for the benefit of the Participating Sellers (as defined in the applicable purchase agreement), was assigned specified "Retained Claims," which include claims against Tilton, as the former director of UI Acquisition and her affiliates, including the Defendants in this action.  *See* Case No. 18-10512, D.I. 2988.

46.     By virtue of the Chapter 11 Plan, on the Effective Date thereof (the "Effective Date"), the Debtors' interest in any "Retained Claims" seeking damages against Tilton or her affiliated entities (including the Defendants herein) were transferred to Zohar Litigation Trust-A.  As a result, any right or standing of a Debtor, either as a Seller Representative, Seller or

Participating Seller (as defined in the applicable purchase agreement), to assert or bring Retained Claims against the Defendants vested in the Litigation Trust-A and its trustee.

### VII.    The Portfolio Company Litigants[5]

47.    Nominal Defendant 180s, Inc. is a Delaware corporation with its principal place of business in New York.  Prior to the Effective Date, the Zohar Funds were stockholders and creditors of 180s, Inc.

48.    Nominal Defendant Intrepid U.S.A., Inc. is a Minnesota corporation with its principal place of business in Texas.  The sole stockholder of Intrepid U.S.A., Inc. is Zohar Healthcare, LLC, a Delaware limited liability company.  The sole member of Zohar Healthcare, LLC is Snelling Holdings, LLC, a Delaware limited liability company.  Prior to the Effective Date, the Zohar Funds were the sole members of Snelling Holdings, LLC.  Prior to the Effective Date, the Zohar Funds were creditors of Intrepid U.S.A., Inc.

49.    Nominal Defendant IMG Holdings, Inc. is a Delaware corporation with its principal place of business in Texas.  Prior to the Effective Date, IMG Holdings, Inc. was 100% owned by the Zohar Funds.  Prior to the Effective Date, the Zohar Funds were creditors of IMG Holdings, Inc.

50.    Nominal Defendant Snelling Staffing, LLC is a Delaware limited liability company with its principal place of business in Texas.  Snelling Holdings, LLC, is a member of Snelling Staffing, LLC.  Prior to the Effective Date, the Zohar Funds were the sole members of Snelling Holdings, LLC.

---

[5] Certain additional Portfolio Companies have claims similar to those asserted in this Complaint on behalf of other Portfolio Companies.  Those claims are not asserted in the Complaint at this time because of concerns over the impact of such litigation on the sale processes for those Portfolio Companies.  Plaintiffs reserve the right to add these additional Portfolio Companies at a later time.

51.     Nominal Defendant Scan-Optics, LLC is a Delaware limited liability company with its principal place of business in Connecticut.  Prior to the Effective Date, the Zohar Funds were the sole members of Scan-Optics, LLC.

52.     Nominal Defendant Vulcan Engineering Co. ("Vulcan") is an Alabama corporation with its principal place of business in Alabama.  Prior to the Effective Date, Zohar II was a stockholder and creditor of Vulcan.

53.     Nominal Defendant Zohar HA, LLC is a Delaware limited liability company with its principal place of business in New York.  Prior to the Effective Date, Zohar II was the sole member of Zohar HA, LLC.

54.     Nominal Defendant Snelling Holdings, LLC is a Delaware limited liability company with its principal place of business in Texas.  Prior to the Effective Date, the Zohar Funds were the sole member of Snelling Holdings, LLC.

55.     Nominal Defendant Zohar Healthcare, LLC, is a Delaware limited liability company with its principal place of business in Texas.  The sole member of Zohar Healthcare, LLC is Snelling Holdings, LLC.  Prior to the Effective Date, the Zohar Funds were the sole members of Snelling Holdings, LLC.

56.     Nominal Defendant Global Automotive Systems, LLC ("GAS") was a Delaware limited liability company with its principal place of business in Michigan.  Prior to the Effective Date, GAS was wholly owned by Zohar I, Zohar II, and Zohar III.  Tilton was the original manager of GAS.  Tilton has resigned and been removed as manager of GAS on multiple occasions but disputes the effectiveness of those resignations and removals.

57.     Nominal Defendant Stila Styles, LLC ("Stila") is a Delaware limited liability company, formed on April 15, 2009, with its principal place of business in California.  Stila is wholly owned by Zohar III.  Tilton was the original manager of Stila.  Tilton resigned and was

14

removed as manager of Stila on multiple occasions but disputed the effectiveness of those resignations and removals.

58.     On May 1, 2021, Zohar III filed suit in Delaware Court of Chancery to resolve the dispute over who is Stila's manager.  A Status Quo Order was entered by the Court of Chancery to govern control of Stila during the pendency of that case.  Under the Status Quo Order, Tilton had the authority to act, and hold herself out, as manager of Stila in the ordinary course of business.  The Status Quo Order prevented the manager appointed by Zohar III from directing the actions of Stila in his capacity as Manager, pending a resolution of the case.

59.     On May 31, 2022, following a two-day trial, the Court of Chancery issued a Post-Trial Memorandum Opinion in favor of Zohar III.  On July 11, 2022, the Court of Chancery issued a Letter Opinion clarifying the prior ruling, and holding that Zohar III had validly removed Tilton and appointed Kevin Carey as manager of Stila.  Kevin Carey became acting manager of Stila on August 9, 2022.

60.     180s, Inc., Intrepid U.S.A., Inc., IMG Holdings, Inc., and Vulcan Engineering Co., are the "Corporation Portfolio Company Litigants."

61.     GAS, Scan-Optics, LLC, Snelling Holdings, LLC, Snelling Staffing, LLC, Stila, Zohar HA, LLC, and Zohar Healthcare, LLC are the "LLC Portfolio Company Litigants," and, together with the Corporation Portfolio Company Litigants and Heritage Aviation[6], the "Portfolio Company Litigants."

---

[6] Reference to an LLC Agreement applied to Heritage Aviation shall refer to that certain Second Amended and Restated Partnership Agreement for Heritage Aviation, Ltd.

## VIII.   Allegations Related To Derivative Claims

62.     One or more of the Zohar Funds was an equity holder of each of the Portfolio Company Litigants during the entire relevant time period.

63.     The Zohar Funds have no obligation to make a demand upon either Stila or GAS before asserting claims derivatively on behalf of those companies, both of which were under Tilton's control until after the claims were validly in litigation.

64.     Tilton holds herself out as the sole manager of GAS, and held herself out as the sole manager of Stila until August 9, 2022.

65.     Tilton is conflicted and interested in the self-dealing transactions at issue in this Complaint regarding Stila and GAS.  For example, Tilton, as manager of Stila and GAS, caused those companies to issue the Class A interests to one or more Octaluna Entities, which she owns and controls.  Tilton also caused Stila and GAS to issue the Phantom Equity awards to herself. Tilton also caused Stila and GAS to enter into agreements with PPMG, another affiliate entity she owns and controls, and to pay PPMG millions of dollars pursuant to those agreements.  Tilton has directly reaped substantial financial benefits from these transactions, each of which breached the respective LLC Agreements.

66.     On August 24 and 25, 2021, one or more of the Zohar Funds served letters on the managers or boards of directors, as applicable, of 180s, Inc., Intrepid U.S.A., Inc., IMG Holdings, Inc., Snelling Staffing, LLC, Scan-Optics, LLC, Vulcan Engineering Co., and Zohar HA, LLC (on its own behalf and as general partner of Heritage Aviation), demanding that each manager or board of directors pursue the Portfolio Company claims pled herein as Counts XXV, XXVI, XXVII, XXIX, and XXX, against Tilton and her affiliates or, in the alternative, demanding that that each manager or board of directors allow the Zohar Funds to pursue such claims.

67. On August 31, 2021, the Managers of each of Snelling Staffing, LLC, Snelling Holdings, LLC (on its own behalf and as direct or indirect owner of Snelling Staffing, LLC, Zohar Healthcare, LLC, and Intrepid U.S.A., Inc.), Zohar Healthcare, LLC (on its own behalf and as owner of Intrepid U.S.A., Inc.), Scan-Optics, LLC, and Zohar HA, LLC (on its own behalf and as general partner of Heritage Aviation) determined at a meeting, as later memorialized by written consents that it was in the best interest of the respective company that the claims be litigated. Rather than pursue the litigation directly, however, the managers each determined to permit the Zohar Funds (and subsequently acknowledged the authority of the Litigation Trust in accordance with the Plan) to proceed with litigation of these claims derivatively on behalf of these companies.

68. On August 31 and September 1, 2021, the board of directors of each of 180s, Inc., Intrepid U.S.A., Inc., IMG Holdings, Inc., and Vulcan Engineering Co., determined by written consent that it was in the best interests of each company that the claims be litigated. Rather than pursue the litigation directly, however, the board of each of these companies resolved to permit the Zohar Funds (and subsequently acknowledged the authority of the Litigation Trust in accordance with the Plan) to proceed with derivative litigation of these claims on behalf of these companies.

## Jurisdiction and Venue

69. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.

70. Venue is proper in this District pursuant to 28 U.S.C. § 1409 because this adversary proceeding arises in cases commenced under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code").

71.     This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (H), and (O).  Accordingly, the Court may enter a final order or judgment consistent with Article III of the United States Constitution.  Plaintiff Litigation Trust, as successor to the Zohar Funds, consents to the entry of final orders or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### I.     Tilton launched the Zohar Funds with grand promises.

72.     The Zohar Funds are collateralized loan obligation (CLO) funds.  A CLO fund is a securitization vehicle in which a special purpose entity, the issuer, raises capital through the issuance of secured notes and uses the proceeds to purchase or make loans and other investments that serve as the collateral for the repayment of principal and interest on the notes.  A collateral manager determines what loans to purchase or originate, or what other investments to make, on behalf of the CLO fund.

73.     The Zohar Funds were unusual among CLO funds, which typically limited their investments to ownership of investment grade debt instruments.  The Zohar Funds, however, targeted investing in the debt of distressed Portfolio Companies (as defined below), oftentimes below par.  The investment thesis for the Zohar Funds was that the underlying Portfolio Companies could be rehabilitated through the active management of the Patriarch Managers, who were serving as the Zohar Funds' collateral managers.  The understanding was that not all of the Portfolio Companies would be successfully rehabilitated, but the value generated from those that were successful would be more than sufficient to repay the Zohar Funds' notes.

74.     Consistent with this investment thesis, the Zohar Funds would receive equity as part of their initial loan investment, subsequent work-outs, or both.  A successful rehabilitation of

30863291.1

18

a Portfolio Company would provide value to the Zohar Funds through repayment of their loans to that Portfolio Company (including loans acquired below par), and with truly great successes, returns on the equity held by the Zohar Funds in that Portfolio Company.  These enhanced recoveries on the debt and the equity proceeds would offset losses when a Portfolio Company was not rehabilitated and the loan did not yield a return (or, at times, resulted in losses) on the investment made by the Zohar Funds.

75.    Zohar I launched in November 2003, raising approximately $530 million from the sale of notes.  Zohar II and Zohar III followed in January 2005 and April 2007, respectively, each raising approximately $1 billion from the sale of notes.

76.    Investors invested in the Zohar Funds in return for the promise of regular interest payments and the repayment of their principal on a specified maturity date.  Every quarter, investors in a Zohar Fund receive an interest payment, generated from the collective payments made by the Portfolio Companies in the Zohar Funds' portfolio.

77.    Each Zohar Fund was governed by a set of documents that includes an indenture (each an "Indenture" and, collectively, the "Indentures", Exs. 1-3 hereto), collateral management agreement (each a "CMA" and, collectively, the "CMAs", Exs. 4-6 hereto), and collateral administration agreement (each a "CAA").

78.    The rights of the Zohar Funds' noteholders and the obligations of the Zohar Funds are set forth in the Indentures.  The Indentures also governed the rights and obligations of the Zohar Funds *vis-à-vis* their noteholders, the Credit Enhancer, and the Controlling Party (each as defined below) and describe the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments, as well as the rights of the parties and responsibilities of the Patriarch Manager designated the collateral manager for that Zohar Fund.

79.     While the Indentures directed that the Zohar Funds would primarily invest in debt, the Indentures contemplated that the Zohar Funds could receive equity in connection with the acquisition of a company, the extension of a new loan, or the restructuring of an existing loan. *See e.g.* Ex. 1 at § 1.1 (definition of "Equity Security"); § 7.12 (providing that Zohar I may "acquir[e], manag[e], dispos[e] of, and invest[] in … Equity Securities"); § 10.13 (requiring reporting of Equity Securities in reports to noteholders); § 12.1(a) (directing how to account for Equity Securities in determining "Collateral"); Ex. 2 (same); Ex. 3 (same).

80.     All loans, equity, and any other property acquired by the Zohar Funds, regardless of how or when acquired, were deemed "Collateral" of the Zohar Funds under the Indentures. *See e.g.* Ex. 1 at "Granting Clause" and § 1.1 (definition of "Collateral"); Ex. 2 (same); Ex. 3 (same). "Collateral" under the Indentures effectively includes "all . . . property of any type or nature owned" by the Zohar Funds. Ex. 1 at § 1.1 (definition of "Collateral"); Ex. 2 (same); Ex. 3 (same).

81.     Each CMA was a contract between a Zohar Fund and its collateral manager. *See* Exs. 4-6.  Each CMA engaged a collateral manager for a Zohar Fund and described their obligations and compensation, among other things. *See e.g.* Ex. 4 at §§ 2.1 (appointment), 2.2 (services), 2.4 (standard of care), 2.6 (obligations of collateral manager), 2.9 (collateral manager's practice), 4.1 (compensation), 4.2 (expenses); Ex. 5 (same); Ex. 6 (same).  The CMAs empowered the collateral managers to select and manage the collateral to be held by the Zohar Funds. *See e.g.* Ex. 4 at § 2.2(a); Ex. 5 at § 2.2(a); Ex. 6 at § 2.2(a).

82.     Prior to March 3, 2016, each Zohar Fund had a separate Patriarch Manager serving as its collateral manager.  Patriarch VIII was Zohar I's collateral manager.  Patriarch XIV was Zohar II's collateral manager, and Patriarch XV was Zohar III's collateral manager.

83.     Upon information and belief, each Patriarch Manager contracted with its affiliate, Patriarch Partners, for all of its employees, office space, and other operating services.

84.     Through her control of the Patriarch Managers, the initial collateral managers for the Zohar Funds, Tilton used the monies raised from investors to buy or make loans primarily to private, mid-sized distressed companies (the "Portfolio Companies").[7]  In connection with making certain of the loans or as a result of restructuring the loans, the Zohar Funds also received equity in the Portfolio Companies.  Tilton also held or received equity in certain of the Portfolio Companies indirectly through other entities she owned, and at times made loans to the Portfolio Companies through other investment funds that she owned or managed.

85.     The relationships between the Zohar Funds, as lenders, and the Portfolio Companies, as borrowers, were governed by credit agreements and other related lending documents (the "Credit Agreements").  The Credit Agreements set forth the terms and basic features of the loan facilities extended to the Portfolio Companies, including the borrowing mechanics, conditions precedent to drawing on a loan, the principal amount of the loan, the interest rate owed by the borrower, and the maturity date when the loan has to be repaid.

86.     Tilton's stated management strategy for the Zohar Funds included investing in the distressed Portfolio Companies, obtaining control over the Portfolio Companies through controlling equity positions, improving the operations of the distressed Portfolio Companies, increasing their value, and then paying off their debt and selling them.

---

[7] A list of the Portfolio Companies are included as Annex A.  The Portfolio Companies are divided into "Groups A" and "Group B" in Annex A, consistent with the nomenclature used in the "Settlement Agreement" approved in these chapter 11 cases. *See* D.I. 266, Ex. 1.  The Zohar Funds are still performing diligence on the Portfolio Companies and the list included on Annex A is subject to revision, both in form and substance, including to add or correct the identity of Portfolio Companies.

Additionally, in January 2017, MBIA purchased certain assets of Zohar I in an auction.  Those equity interests are reflected on Annex A as being held for Zohar I.

87.     Tilton actively managed the business affairs of the Portfolio Companies.  Tilton was CEO of some of the Portfolio Companies.  In other instances, Tilton was the sole manager of the Portfolio Companies that are LLCs.  For various Portfolio Companies, she hired and fired their senior employees and provided input on their major operating decisions.  She required that each of the Portfolio Companies report regularly to her regarding their financial condition and business prospects.

88.     Tilton caused the Portfolio Companies to contract with other entities that she owned and controlled.

89.     Tilton owns and controls PPAS, which is in the business of providing agency services to lenders.  Tilton caused the Zohar Funds to each retain PPAS as their agent under the Zohar Funds' loan agreements with the Portfolio Companies.  As agent, and as governed by the Credit Agreements, PPAS was responsible for invoicing, collecting, and disbursing payments, and receiving Portfolio Company financial information on behalf of the Zohar Funds and other entities affiliated with Tilton that were co-lenders in the various credit facilities with the Zohar Funds.

90.     Tilton indirectly owns and controls PPMG.  PPMG is in the business of financial and management consulting.  At least as early as 2006, Tilton began to cause the Portfolio Companies to contract with PPMG for "management and consulting services" under management-services agreements (the "PPMG Agreements").

91.     In addition to their contracts with Tilton's entities, Zohar I and Zohar II also contracted with an independent, third-party, "Credit Enhancer," MBIA Insurance Corporation ("MBIA") at the time of their formation.  As the Credit Enhancer, MBIA insured certain of the noteholders in case of a default by Zohar I or Zohar II.

92.     Under the applicable insurance agreements with MBIA, upon the occurrence of certain interruptions to the flow of payments to the insured noteholders, the Credit Enhancer would

become responsible for paying off the insured notes in full.  The Credit Enhancer was also the "Controlling Party" for Zohar I and Zohar II under the terms of their Indentures.  As the Controlling Party, MBIA had the ability to direct certain actions on behalf of Zohar I and Zohar II, particularly following an "Event of Default" under the Indentures.  Following the default in payment of the insured Class A notes of Zohar I and Zohar II at their respective maturity dates in 2015 and 2017, MBIA satisfied the outstanding notes and became the holder of such notes.

93.     MBIA did not insure Zohar III. Instead, Zohar III had a "Controlling Class" consisting of various private investors who hold more than 50% of the aggregate outstanding amount of the Class A-1 Notes issued by Zohar III.  As with the Controlling Party for Zohar I and Zohar II, MBIA, the Zohar III Controlling Class, was entitled to exercise various rights under the Zohar III Indenture, including directing a liquidation of the Collateral upon a default.

## II.     The Patriarch Managers owed fiduciary duties and contractual obligations to the Zohar Funds.

94.     As noted above, the Zohar Funds were each governed by a set of documents that include an Indenture, a CMA,[8] and a CAA for each Fund.[9]

95.     In addition to the responsibilities of the collateral managers set forth in the Indentures, the roles and obligations of the collateral managers were set out in the CMAs, which

---

[8] Unless stated otherwise, the term "CMA," as used herein, refers to the collateral management agreements between the Zohar Funds and the Patriarch Managers, rather than the subsequent collateral management agreements between the Zohar Funds and AMZM.

[9] The Indentures, CMAs, and CAAs are substantially identical, and will be cited in the singular herein, except where there are relevant differences between the documents.

granted the collateral managers—initially the Patriarch Managers—the power to act for and on behalf of the Zohar Funds in managing the loans and other assets of the Zohar Funds.[10]

96.     For example, the CMAs included language tasking the Patriarch Managers with:

- "determin[ing] . . . the specific Collateral to be acquired, originated, restructured, exchanged, held or disposed of by the [Zohar Funds]";

- "effectuat[ing] the acquisition, origination, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]";

- "monitor[ing] the Collateral on an ongoing basis";

- "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] . . . or rights or remedies in connection with the Collateral . . ."; and

- "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor . . . thereon . . . ."

Zohar II and Zohar III CMAs, § 2.2 (a), (b), (c), (d), and (f).[11]

97.     The Zohar Funds, through the CMAs, authorized the Patriarch Managers to "execute and deliver all necessary, desirable and appropriate documents and/or instruments in the name and on behalf of the [Zohar Funds] as [their] attorney-in-fact with respect thereto."  CMAs, § 2.5.

---

[10] The CMAs are expressly made subject to the terms of the Indenture, with provisions of the Indenture controlling over conflicting provisions in the CMAs.  *See* Zohar I and Zohar II CMAs, §7.14; Zohar III CMA, § 7.13.

[11] The Zohar I CMA similarly provides that the Collateral Manager is tasked with "determin[ing] . . . the specific Collateral to be purchased, restructured, exchanged, held, or disposed of by the [Zohar Funds]"; "effectuat[ing] the purchase, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]"; "monitor[ing] the Collateral on an ongoing basis"; "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] . . . or remedies in connection with the Collateral . . ."; and "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor . . . thereon . . . ."  Zohar I CMA, § 2.2 (a), (b), (c), (d), and (f).

98.     As a practical matter, until 2016, Tilton herself, made all investment decisions on behalf of the Zohar Funds and controlled the Zohar Funds' investment- and collateral-management activities through her control of the Patriarch Managers.

99.     The Patriarch Managers' actions for and on behalf of the Zohar Funds were subject to express fiduciary standards.  Under the CMAs, the Patriarch Managers agreed that, "in rendering [their] services as Collateral Manager," they would "use reasonable care and the same degree of skill and attention (a) that the Collateral Manager (i) exercises with respect to comparable assets that it manages for itself and its Affiliates and (ii) exercises with respect to comparable assets that it manages for others, and (b) exercised by institutional investment managers of national standing generally in respect of assets of the nature and character of the Collateral and for clients having similar investment objectives and restrictions . . . ."  CMA § 2.4.

100.    The Patriarch Managers further covenanted to the Zohar Funds "not [to] take any action which [they] know[] or should be reasonably expected to know in accordance with prevailing market practices would . . . adversely affect the interests of the Holders of the Securities [i.e., the Notes and Preference Shares issued by the Zohar Funds] in any material respect." Zohar I and II CMAs, § 2.6.[12]

101.    The Zohar I and Zohar II CMAs provided that "all purchases, exchanges and sales of Collateral by the Collateral Manager on behalf of the Company and/or the Zohar Subsidiary . . . will be effected on arm's-length terms."  Zohar I and Zohar II CMAs, § 2.9.  Any transactions between Zohar III and affiliates of the Patriarch Managers were to be "at arms' length, for fair market value and in compliance with applicable law." Zohar III CMA, §6.2(d).

---

[12] The Zohar III CMA provided that it will not take any action that would "materially adversely affect" these interests.  Zohar III CMA, § 2.6.

102.    Finally, like all investment advisers, the Patriarch Managers owed implied general fiduciary duties of care and loyalty to the Zohar Funds in providing advisory services and acting as the Zohar Funds' agent and attorney-in-fact in administering the Zohar Funds' investment activities.  These common-law and statutory fiduciary duties are in addition to the specific duties of care set forth in the CMAs.  None of the CMAs waived or narrowed these common law fiduciary duties.

103.    The CMAs acknowledged that the Zohar Funds would often acquire distressed assets and thus that the Patriarch Managers would require some flexibility in managing those assets.  The CMAs also acknowledged the potential for conflicts of interest to arise from the "overall advisory, investment and other activities of the Collateral Manager" and all of its affiliates, and provided that the Patriarch Managers and their affiliates may hold several roles related to the Zohar Funds' investments, such as consultant or manager.  CMA § 6.2.

104.    Even so, the CMAs explicitly stated the Patriarch Managers had obligations to the Zohar Funds to, among other things, ensure compliance with the Indentures and applicable laws, avoid actions that would adversely affect the Zohar Funds' noteholders, avoid intentional actions that they knew would cause an Event of Default, ensure that their actions were in accordance with customary and reasonable business practices, ensure that all purchases and sales be effected on arm's-length terms, and to act with skill, attention, and reasonable care.  Zohar I and II CMA, §§ 2.2(n), 2.4, 2.6, 2.9; Zohar III CMA, §§ 2.2(l), 2.4, 2.6, 2.9.

105.    The CMAs also provided that the Patriarch Managers would be liable to the Zohar Funds for any conduct "constituting fraud, bad faith, willful misconduct, gross negligence, or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Document to which it

is a party." Zohar I and II CMA, §§ 4.4, 4.5(a); Zohar III CMA, §§ 4.4, 4.5(a).[13]   The Zohar Funds and their non-Tilton affiliated noteholders therefore had every expectation that the Patriarch Managers would act in accordance with these requirements on their behalf.

### III.   The Patriarch Managers invested the Zohar Funds' capital in Portfolio Companies to be run by Tilton.

106.   Zohar I raised approximately $550 million through the issuance of notes to third-party investors and Zohar II and Zohar III each raised approximately $1 billion.   A portion of the initial amounts raised were used to acquire loans from existing funds managed by Tilton (including from Zohar I by Zohar II and from Zohar I and Zohar II by Zohar III), and other amounts were used to acquire existing distressed loans or to originate loans to distressed borrowers.   The Zohar Funds held and originated primarily senior secured loans, either through term loans or making commitments to revolving credit facilities, and received equity interests in the obligors, either as part of the initial investment, as part of subsequent loan work-outs, or through both avenues.

107.   The Zohar Funds focused on iconic, but distressed, brands.

108.   MD Helicopters, Inc. ("MD Helicopters") was the flagship Portfolio Company in the Zohar Funds' portfolio.   It is a manufacturer and distributor of helicopters for defense, military, law enforcement, and medical applications, and provides parts, logistics, and related training to its customers.   The Zohar Funds' initial investments in MD Helicopters were made in July 2005, and resulted in the Zohar Funds obtaining an approximately 39% ownership interest in MD Helicopters

---

[13]  The Zohar III CMA further provided that Patriarch XV would be liable, with respect to "Collateral Manager Information," for "any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading." Zohar III CMA, § 4.4.   The Collateral Manager Information was defined as "[t]he statements set forth in the final offering memorandum dated April 4, 2007 . . . under the caption 'The Collateral Manager' and 'Risk Factors - Certain Conflicts of Interest Involving the Collateral Manager' . . . ."   Zohar III CMA, § 3.2(f).

(approximately 10.1% to Zohar I and approximately 28.6% to Zohar II) in connection with a substantial term loan and revolving loan commitment. Tilton, through her Ark Entities, purportedly invested alongside the Zohar Funds by making loans to and receiving equity interests in MD Helicopters.

109.    The Zohar Funds continued to lend to MD Helicopters, including under subordinated, convertible notes. Ultimately, the Zohar Funds increased their equity holding in MD Helicopters to more than 49% (approximately 21.0% to Zohar I and approximately 28.6% to Zohar II), as a result of the conversion of the principal amount of their subordinated note holdings. Zohar I, Zohar II, and (ultimately after its formation) Zohar III became substantial lenders to MD Helicopters, holding loans in the approximate amount of $334 million, all of which became due and owing.

110.    Contemporaneous with their investment, the Zohar Funds entered into the MD Helicopters, Inc. Stockholders Agreement (the "MD Stockholders Agreement") with MD Helicopters, Ark II, AIP, and others. The MD Stockholders Agreement provides, among other things that the Zohar Funds are stockholders of MD Helicopters and that the Zohar Funds have various rights to restrict any transfers of equity by other MD Helicopters stockholders. In 2006, the MD Stockholders Agreement was amended to, among other things, prohibit MD Helicopters from paying any consulting or management fees to any affiliate of any of its stockholders or directors in excess of $500,000 in any calendar year.

111.    Tilton was the CEO and sole director of MD Helicopters as of the filing of the original Complaint, and held that position for a number of years. Tilton has since stepped down as director and CEO of MD Helicopters.

112.    The Rand McNally business was another prominent asset in the Zohar Funds' portfolio. It is a leading mobility technology provider to the transportation and travel industries,

30863291.1

28

focused on solutions that drive efficiency, safety, and connectivity.  In October 2007, Patriarch Partners, acting on the Zohar Funds' behalf, made an offer to acquire substantially all of the assets of Rand McNally & Company.  On or about November 2, 2007, RM Acquisition was formed and one month later, on December 2, 2007, all three Zohar Funds entered into an operating agreement for RM Acquisition as the initial LLC common members, and Tilton was appointed as manager of RM Acquisition.  The only signatures on this operating agreement are Tilton's.  On or about December 6, 2007, the acquisition of the Rand McNally business by RM Acquisition closed, with the purchase price financed by the proceeds of term loans made by the three Zohar Funds to RM Acquisition, and those same parties made revolving loan commitment to RM Acquisition.  On or about April 28, 2008, the Zohar Funds entered into a work-out of RM Acquisition's credit facility resulting in the issuance of $50 million of Series A Preferred equity to the Zohar Funds (with a preferred dividend equal to the greater of LIBOR or 2.0%) and a reduction in the borrowing costs under the credit facility and other covenant relief.  The Zohar Funds remained the sole common and preferred interest holders in RM Acquisition until it was sold to a third party in September, 2020.

113.    Tilton was the sole manager of RM Acquisition from its formation until she stepped down in March 2020.

114.    Yet another prominent Portfolio Company is Stila, which develops, markets, and distributes prestige cosmetics under the Stila brand.  Stila became a Portfolio Company when its business was acquired through an asset purchase financed entirely by term loans issued by Zohar III in April 2009.  As part of the transaction, Stila was formed on April 15, 2009, with Zohar III as its sole common member and sole holder of "Series A Preferred Interests" in the amount of $3.5 million.  The only signatures on this operating agreement are Tilton's.  In addition, Zohar III made a term loan, used to finance the purchase price, and a revolving loan commitment of $5 million.

By January 2016, Stila had fully repaid its term loan, redeemed its Series A Preferred Interests, and terminated its revolving credit commitment from the Zohar Funds; however, full realization has yet to occur on the Zohar Funds' interests in Stila.

115. Tilton acted as the sole manager of Stila since 2009 and as its CEO since 2013. After a series of disputed resignations and removals, the Zohar Funds brought suit in Delaware Chancery Court to adjudicate Tilton's claim to be Stila's sole manager. As further described *supra*, the Zohar Funds prevailed in that litigation and Tilton was replaced as acting manager and CEO of Stila on or about August 9, 2022.

116. From the Zohar Funds' investments in the Portfolio Companies, which included, among others, interest paying loans and dividend paying preferred investments, the Zohar Funds received cash used to pay their administrative expenses, collateral management fees to the Patriarch Mangers, interest on the notes issued by the Zohar Funds, other borrowing and financing costs, and, when permitted under the indentures, distributions on the preference shares held by the Octaluna Entities.

117. Tilton caused the Zohar Funds, through the Patriarch Managers, to appoint her as an LLC manager or director (usually the sole manager or director) of the Portfolio Companies. As the person controlling the Portfolio Companies (as LLC manager) or their boards (often times as the board's sole member), Tilton was also in a position to control the corporate activities and business strategies of the Portfolio Companies. This even included appointing herself as the CEO of the Portfolio Companies, which she did at MD Helicopters, Stila, Dura Automotive Systems,

LLC ("Dura Automotive")[14], and GAS, and entering into agreements with her affiliates, which she did with PPMG.

118.    As the investment thesis for the Zohar Funds was to invest in distressed companies, with the goal of rehabilitating them, the Portfolio Companies often generated substantial operating losses.  Many of the Portfolio Companies were structured as LLCs and elected to be treated as partnerships or disregard entities for tax purposes.  As a result of these elections, the income and losses of the Portfolio Companies flowed up to their record owners, the Zohar Funds.  And because the Zohar Funds were intended to be, and originally were, structured as disregarded entities for tax purposes, these tax attributes passed through the Zohar Funds, as well, and ended up with the Octaluna Entities, as the owner of the Zohar Funds.  Upon information and belief, these tax attributes ultimately made their way to Tilton as the ultimate owner of the Zohar Funds, Patriarch Managers, Octaluna Entities, PPMG, PPAS, and Patriarch Partners.  The losses generated by the Portfolio Companies were valuable to Tilton as they could be used to offset income Tilton and her affiliates earned in connection with their management of the Zohar Funds' investment activities.

119.    Notwithstanding that the equity in the Portfolio Companies is clearly reflected as having been issued to the Zohar Funds in various documents, including stock certificates issued by the Corporation Portfolio Companies and in the operating agreements of the LLC Portfolio Companies, Tilton asserted for years that the Octaluna Entities, and not the Zohar Funds, were the beneficial owners of the equity in the Portfolio Companies for which the Zohar Funds are listed as the record holder.  Tilton asserted this, notwithstanding the fact that the equity was issued to the

---

[14]   Dura Automotive is majority owned and, until December 15, 2020, was managed by Dura Buyer, LLC ("Dura Buyer").  On December 15, 2020, Dura Automotive's chapter 11 case was converted to a case under chapter 7 and, thereafter, a chapter 7 trustee was appointed to manage its affairs.

Zohar Funds as part of substantial investments made by the Zohar Funds in the Portfolio Companies, and the Octaluna Entities appear not to have provided any consideration for their putative equity ownership. Further, when the Zohar Funds acquired certain of the Portfolio Companies, generally financed through loans made by the Zohar Funds, the Ark Entities purported to co-invest with the Zohar Funds and received valuable loan and equity interests in the Portfolio Companies in their own names. Since the filing of the original Complaint in this action, Tilton has abandoned the argument that the Octaluna Entities are the current beneficial owners of the equity in the Portfolio Companies.

120.     Tilton and the other Defendants have received and retained substantial value arising out of equity interests in the Portfolio Companies held in the name of the Zohar Funds. And in at least one instance, with respect to HVEASI Holdings BV, it has been alleged by the Zohar Funds' prior collateral manager (Alvarez & Marsal Zohar Management, LLC) that Tilton or one of her non-Zohar Funds affiliates claimed complete ownership (record and beneficial) over a Portfolio Company that had previously been represented to be an asset of the Zohar Funds, and Tilton and/or her affiliates were able to realize substantial gain by exercising control over the equity in HVEASI Holdings BV.

**IV.    Tilton managed the Zohar Funds and Portfolio Companies for her personal benefit.**

121.     Tilton's compensation for managing the Zohar Funds' collateral depended upon the collateral's performance. Specifically, the Indentures required the Patriarch Managers to classify loans into categories based on their demonstrated or reasonably ascertained likelihood to perform (or not), and those categorizations were used to calculate a quarterly Overcollateralization Test (the "OC Test"). The OC Test affected the collateral-management fees received by the Patriarch Managers and the preference-share distributions to the Octaluna Entities. Essentially, the OC Test measured whether the noteholders were "over collateralized" (or "under collateralized") by

comparing the nominal principal amounts of higher quality loans to outstanding principal amounts of the notes issued by the Zohar Funds.  If the notes were sufficiently over collateralized, extra payments could be made to the Zohar Funds' collateral managers (in the form of subordinate management fees) and distributions could be made to the Zohar Funds' preference shareholders.

122.    Failing to achieve a defined threshold under the OC Test (ranging from 105% at Zohar I to 112.7% at Zohar III) cut in half the fees payable to the collateral managers (*i.e.*, the Patriarch Managers) and cut off payments to the Zohar Funds' preference shareholders (*i.e.*, the Octaluna Entities).  Further, if there was significant under collateralization, an event of default would have occurred under the Indentures, which would have allowed, among other things, the Controlling Parties to remove the Patriarch Managers as collateral managers under the Indentures.

123.    While some of the Portfolio Companies were stabilized and remain operating today (including those described above), during Tilton's tenure, not all of the Portfolio Companies were so successful.  A number of them ended up in chapter 7 or chapter 11 bankruptcy proceedings, such as, Dura Automotive (Bankr. D. Del. 2019), Netversant Solutions, LLC (Bankr. D. Mass. 2016), and Transcare Corporation (Bankr. S.D.N.Y. 2016), and a number of other companies have simply shuttered.

124.    Tilton frequently managed the cash of the Portfolio Companies, who were selected for investment based on their already stressed condition, to ensure that interest payments were made, thereby concealing (and maybe even exacerbating) the true stress impacting these companies.  In fact, Tilton was required to disclose to the Trustee information impacting the creditworthiness of the Portfolio Companies and to assess the likelihood that the loans held by the Zohar Funds would continue to perform, but simply failed to do so based on any objective standards.  *See* Ex. 1 at § 1.1 (definition of "Category 4" requires that a Category 4 investment not be an investment that "has, in the reasonable judgement of the Collateral Manager, a significant

risk of declining in credit quality or, with the passage of time, becoming Category 1, Category 2 or Category 3"); Ex. 2 at § 1.1 (same). Tilton, however, did not resort to objective or reasonable standards to make that determination. Instead, Tilton substituted her subjective view as to whether she felt a Portfolio Company was worthy of continued support: if it was, she awarded that company the highest credit-worthiness categorization under the Indentures, regardless of its actual performance or financial condition. In doing that, the OC Test couldn't fail. This approach, however, resulted in a significant disconnect between the actual quality and creditworthiness of the Portfolio Companies and what was reported to the Zohar Funds' noteholders to be the health of the overall portfolio of companies (indicated by high scores under the OC Test).

125.    As an example, in the January 29, 2016 noteholder reports for Zohar I and Zohar III, loans due from obligor Transcare Corporation (borrower 171, "Transcare") were listed as Category 4 (the highest quality for Zohar I and II) and a "Current Asset" (the equivalent of Category 4 at Zohar III). But just one month later, on the February 29, 2016 noteholder report for Zohar II, Transcare had been downgraded to Category 1 (the lowest quality for Zohar I and II). Notwithstanding the top-level categorization rating one-month earlier, this should not have been at all surprising to parties actually familiar with Transcare's business, such as Tilton, because Transcare collapsed into chapter 7 in the 4-week period since the Patriarch Managers had last declared the Transcare loans Category 4. A trial in Transcare's chapter 7 proceedings demonstrated that Tilton was well aware of the precarious financial condition that Transcare was in, and the substantial impairment that the Zohar Funds' loans were facing. But that reality was not reflected in the categorizations made by the Patriarch Managers until after the Zohar Funds' investments were tanked by Transcare's liquidation.

126.    Netversant Solutions, LLC (borrower 841, "Netversant"), which owed the Zohar Funds approximately $140 million, was no different. In those same January and February 2016

reports, Netversant's loans were categorized as "Category 4" and "Current Asset," but by June 30, 2016 (just 4 months after the last report), Netversant had shuttered its business and its creditors had commenced an involuntary chapter 7 proceeding against it. Tilton could not *reasonably* have believed in the run-up to Transcare's and Netversant's bankruptcy proceedings that the loans owed by them were free from the significant risk of decline in credit quality or falling into Category 3, 2 or 1 (where they ultimately ended up), that warranted the "Category 4" and "Current Asset" rating that they carried.

127.    In addition, many of the Portfolio Companies paid less than their stated interest amounts owed and were subject to repeated "oral amendments" to reduce or forbear interest, some of which were ultimately memorialized into new "interest tranche" loans under the applicable Credit Agreements. To Tilton, so long as the Portfolio Companies paid their ever-shifting interest obligation, these Portfolio Companies could retain the highest categorization for purposes of the OC Test. And Tilton was able to ensure that the interest owed was always paid by orally amending the amount of the interest payable to match the interest amounts "due" with whatever amounts she determined the Portfolio Companies could actually pay. However, the Indentures required the Patriarch Managers, as collateral manager, to objectively assess the creditworthiness of the Portfolio Companies by determining if they could, in fact, meet their loan obligations. They did not permit the collateral managers to constantly move the goal posts to engineer passing OC Test scores. Nonetheless, Tilton was able to ensure that the OC Test always passed by doing just that.

128.    On March 30, 2015, the SEC instituted an administrative proceeding against Tilton. The SEC alleged that Tilton had violated the antifraud provisions of the Investment Advisers Act of 1940 by, among other things, "reporting misleading values for the assets held by the [Zohar]

Funds and thus collecting unearned management fees and other payments . . . ."[15]  According to

the SEC, the Zohar Funds would have failed the OC Test under the Indentures, had it been properly

calculated, since 2009: "Zohar II and III paid Respondents a total of $208,415,871 in Subordinated

Collateral Management Fees and Preference Share Distributions during a period starting in 2009

when the Division alleges that those Funds failed one of the tests, the Overcollateralization Ratio

Test."[16]

129.     Under the Indentures, a severe failure of the OC Test was an Event of Default.  The

values alleged by the SEC would constitute a severe failure of the OC Test.  Such a failure would

have given MBIA, as Controlling Party for Zohar I and II, or the Zohar III Controlling Class, for

Zohar III, cause to terminate the Patriarch Managers as the collateral managers for the Zohar

Funds.  The replacement collateral manager for the Zohar Funds would then have had the authority

to exercise the Zohar Funds' rights to remove Tilton and her affiliates from their roles with the

Portfolio Companies.

130.     Upon information and belief, Tilton overstated the categorization of the Zohar

Funds' collateral for at least three reasons.  First, overstating the value of the collateral permitted

Tilton's wholly owned Patriarch Managers to reap higher collateral management fees from the

Zohar Funds and permitted the Octaluna Entities to receive preferred stock distributions.  Second,

overstating the value of the collateral prevented the Controlling Parties from removing the

---

[15] *In re Tilton*, Exchange Act Release No. 1182 (ALJ Sept. 27, 2017), 2017 WL 4297256, at *2 (the "SEC Decision").

[16] *Id.* at *13. In 2017, the Administrative Law Judge ("ALJ") ultimately concluded that the SEC had failed to prove its case under the Investment Advisers Act because "assuming *arguendo* that asset categorizations and consequent OC Ratio computations were not in accord with the provisions of the indentures, this disparity was disclosed to the investors." *Id.* at *45.  In another words, the ALJ found that the Zohar Funds' noteholders were on notice that Tilton may calculate values in breach of the CMAs and Indentures to ensure a passing OC Test.

Patriarch Managers as collateral managers for the Zohar Funds.  Third, overstating the value of the collateral prevented the Zohar Funds from removing Tilton and her various entities from their lucrative positions at the Portfolio Companies.

131.    While the Patriarch Managers were in place, upon information and belief, they received approximately $600 million in collateral management fees, of which $286 million was on account of subordinated management fees that would not be payable if the OC Test did not pass, and the Octaluna Entities received approximately $118 million in preference share distributions, the payment of which was contingent upon passing the OC Test.  Further, upon information and belief, Tilton's affiliated entities received at least $50 million in fees and other payments directly from the Group A Portfolio Companies (listed in <u>Annex A</u>) from 2015 through September 2018, and upon information and belief, similar payments were made prior to 2015 and continued after September 2018.

**V.    Tilton purported to cause the Zohar Funds to contract away the ability to remove her and her entities.**

132.    Leading up to the fall of 2015, Tilton expected that Zohar I would default when its notes matured in November 2015 and that MBIA would likely exercise its rights to replace her Patriarch Managers as collateral managers for the Zohar Funds, and as a result, new collateral managers would be able to remove her other entities as service providers to the Portfolio Companies.

133.    Accordingly, facing Zohar I's impending default, Tilton took a series of actions designed to maintain her control over the Zohar Funds' collateral and the Portfolio Companies.  First, Tilton, through the Patriarch Managers, caused the Zohar Funds to transfer their voting rights in the Portfolio Companies to other entities owned and controlled by Tilton.

134.    Second, Tilton caused the Zohar Funds to restructure their loans to the Portfolio Companies to, among other things, (i) curtail the Zohar Funds' ability to declare an event of default, (ii) grant PPAS (Tilton's affiliate) sole discretion to waive certain events of default, and (iii) require PPAS's consent for modification or waiver of any provision of the Credit Agreement.

135.    Thus, in the event that the Patriarch Managers were forced out as collateral managers, Tilton would still be able to wield ultimate authority through PPAS, whose appointment as agent was purportedly "irrevocable" under the applicable Credit Agreements.

**A.  Tilton caused the Zohar Funds to transfer their voting rights in the Portfolio Companies to Tilton's affiliates.**

136.    In September 2015, the Tilton-controlled Patriarch Managers executed a series of documents on behalf of the Zohar Funds purportedly transferring voting and other rights in equity holdings in various Portfolio Companies to entities owned and controlled by Tilton, as discussed in more detail below. These documents, irrevocable proxies and amendments to LLC agreements, purported to transfer equity voting rights, including the rights to remove and replace directors or managers, to amend LLC agreements, or to effect a sale of the company, from the Zohar Funds to Tilton-controlled entities that are unaffiliated with the Zohar Funds.

**(i)  Limited Liability Companies**

137.    The Zohar Funds' equity ownership of Portfolio Companies that are limited liability companies (collectively, the "LLC Portfolio Companies", each an "LLC Portfolio Company") was memorialized, among other places, in the LLC agreements setting forth the corporate governance of the relevant LLCs (collectively the "LLC Agreements", each an "LLC Agreement"). The LLC Agreement for each LLC Portfolio Company provides for the process for removing and replacing the manager of each LLC Portfolio Company.

138.   Some of the LLC Agreements, including Dura Buyer (where Zohar II held 52.49% of the common interests) and RM Acquisition (where Zohar II held 56.96% of the common interests), initially required only a majority-in-interest vote of the common members to remove and replace the manager and to amend the LLC Agreement.  In May 2011, Tilton caused the Zohar Funds to execute amendments to certain of the LLC Agreements of the LLC Portfolio Companies (the "May 2011 Amendments") that replaced the majority voting requirement for removal and replacement of the manager with a unanimous voting requirement.

139.   The May 2011 Amendments deprived the Zohar Funds of control rights in two ways.  First, at LLC Portfolio Companies where Tilton's personal investment vehicles owned a minority interest, the amendment gave them veto power over the Zohar Funds' ability to act.  These include Dura Buyer (Ark II), Libertas Copper, LLC (Ark II), American Doors, LLC (Ark II and AIP), eMag Solutions, LLC (AIP-ES, Inc., which is, upon information and belief, a subsidiary of AIP), Galey & Lord, LLC (Ark I, Ark II).  Second, Tilton included provisions in some LLC Agreements that purported to give the manager (i.e., Tilton) the authority to issue additional membership interests at her discretion.

140.   As a result, even at certain LLC Portfolio Companies owned 100% by the Zohar Funds, the May 2011 Amendments gave Tilton the ability to create for herself veto power over the Zohar Funds by simply issuing membership interests to herself (as she did years later at Stila, GAS, and Dura Buyer).  These include LVD Acquisition, LLC, Stila, GAS, Jewel of Jane, LLC, Silverack, LLC, Patriarch Partners Media Holdings, LLC, and Xpient Solutions, LLC.  None of the Zohar Funds received any consideration for giving up its ability to unilaterally exercise majority control.

141.   On September 22, 2015, Tilton purported to cause the Zohar Funds to execute amendments (the "September 2015 Amendments") to the LLC Agreements. The September 2015

Amendments purported to transfer certain of the Zohar Funds' membership rights to the "Class B Members" of the holders of the preference shares of the common members of each LLC Portfolio Company—that is, to the Class B Members of the Octaluna Entities (the "Class B Parties"),[17] which are all affiliates of Tilton. These transferred rights included the right to remove Tilton as manager of the LLC Portfolio Companies. By transferring that right, and insulating herself in the LLC manager role, Tilton effectively eliminated the Zohar Funds' ability to terminate her entities as service providers to the LLC Portfolio Companies.

142.    Each of the September 2015 Amendments includes a recital asserting that:

> the original intent of the Parties was to protect the interests of the Company, the Members, and the Holders of the Preference Shares of the Common Members of the Company by giving the Class B Members . . . of the Holders of the Preference Shares of the Common Members of the Company control over changes in the Manager, directions to the Manager, dissolution of the Company and other actions[.][18]

The assertion made in this recital was not true.

143.    The September 2015 Amendments further amend the LLC agreements to provide that:

> no Member may take any of the following actions without the consent of all the Class B [Parties]: . . . (a) remove or replace an existing Manager or appoint any additional manager; (b) give any directions to a Manager to take or refrain from taking any action or make any decisions on behalf of the Company . . . (c) amend this Agreement; (d) dissolve or wind-up the affairs of the Company . . . .

---

[17] Octaluna I's Class B Member is Patriarch VIII. Octaluna II's Class B Member is Patriarch XIV. And Octaluna III's Class B Members are Ark II, Patriarch XV, and Phoenix VIII.

[18] All of the September 2015 Amendments included language substantially identical to this language. The LLC Agreements of Portfolio Companies that are owned in part by any of Tilton's "Ark" entities grant the members of the Ark entities similar consent rights.

30863291.1

144.     In other words, neither the Zohar Funds nor a successor collateral manager appointed by the Zohar Funds could remove Tilton as manager of the LLC Portfolio Companies or amend the Portfolio Companies' LLC Agreements without the consent of the Class B Parties affiliated with Tilton.

145.     Tilton signed each of the September 2015 Amendments on behalf of all of the common members of the LLC Portfolio Companies – including the Zohar Funds.  The Zohar Funds received no consideration for the transfer of their membership rights in the LLC Portfolio Companies to these Tilton-controlled entities.

**(ii) Corporations**

146.     Contemporaneously with the September 2015 Amendments, Tilton caused the Zohar Funds to exercise their rights as shareholders of the corporate Portfolio Companies (the "Corporation Portfolio Companies", each a "Corporation Portfolio Company") to grant irrevocable proxies (the "September 2015 Proxies") to other entities controlled by Tilton. The September 2015 Proxies purported to have the same effect as the September 2015 Amendments: transferring the Zohar Funds' ability to remove management of the Corporation Portfolio Companies or otherwise control the Corporation Portfolio Companies from the Zohar Funds to one or more of Patriarch VIII, Patriarch XIV, or Ark II (collectively, the "Proxy Grantees")— entities that Tilton owned and controlled.  The Zohar Funds received no consideration in return for their purported transfer of stockholder voting rights in the Corporation Portfolio Companies to Tilton's Proxy Grantees.

147.     The September 2015 Proxies included a similar "original intent" recital as is found in the September 2015 Amendments. That recital states, with some immaterial variations in the language used in the various September 2015 Proxies:

> the original intent of the Grantor and the Grantee was to protect the interests of the Company, the Grantor, and the Grantee, in its capacity as the Class B Member of the Holder of the Preference Shares of the Grantor, by giving the Grantee the right to vote and act for the Grantor[.]

This recital was not true.

148.    The September 2015 Proxies purport to transfer all of the Zohar Funds' voting rights to the Proxy Grantees:

> The Grantor, being the holder and owner of the Shares, hereby authorizes the Grantee to vote for the Grantor, as the Grantor's proxy, at any and all meetings of the stockholders of the Company, and, as the Grantor's proxy, to consent or dissent without a meeting, and further makes, constitutes, and irrevocably appoints Grantee to act as true and lawful proxy and attorney-in-fact in the name and on behalf of the Grantor, with full power to appoint a substitute or substitutes, to vote and execute and deliver written voting consents with respect to the Shares . . . .

**B.    Tilton caused the Zohar Funds to give PPAS ultimate authority over the Zohar Funds' loans to Portfolio Companies.**

149.    In November 2015, when the notes issued by Zohar I were maturing and Zohar I was set to default on its payment obligations to Zohar I's investors, Tilton, purportedly on behalf of the Zohar Funds, executed a series of amendments, most of which were entered into in or about November 2015, but some of which pre-dated or followed that time period, to the Credit Agreements under which the Zohar Funds loaned to the Portfolio Companies (the "Credit Agreement Amendments") that served to substantially impair the Zohar Funds' loans to the Portfolio Companies.

150.    The Credit Agreement Amendments purported to restructure outstanding loans to: (i) waive or restructure unpaid interest or commitment fees; (ii) waive the Zohar Funds' ability to declare an event of default in most cases; (iii) waive other existing events of default; (iv) grant sole discretion to waive certain events of default under the Credit Agreements to PPAS; and (v) require

consent from PPAS for any amendment, modification, termination or waiver of any provision of the Credit Agreements, among other changes. In addition, certain of the Credit Agreement Amendments purported to subordinate the Zohar Funds' loans, and the security interests securing those loans, to loans made by the Ark Entities and the liens securing the Ark Entities' loans.

151. The Credit Agreement Amendments largely took the same form at each Portfolio Company. Each such amendment added an additional section to the relevant Credit Agreement, entitled "Right to Waive Events of Default," stating:

> Right to Waive Events of Default. Notwithstanding anything herein to the contrary, including, without limitation, the provisions of [the Section of the Credit Agreement discussing remedies] . . . or the provisions of [the Article of the Credit Agreement discussing miscellaneous provisions, including amendments to the Credit Agreement] . . . , (i) the Agent, in its sole discretion, despite any direction, request or objection of any Lender or the Required Lenders, may waive the occurrence of an Event of Default, other than an Event of Default [arising from the borrower's failure to pay obligations when due or the filing of voluntary or involuntary bankruptcy proceedings against any Credit Party], and shall not be required to exercise any rights or remedies related to any Event of Default waived pursuant to this Section . . . and (ii) neither the Lender nor the Required Lenders shall be entitled to exercise any rights or remedies with respect to any Events of Default waived by the Agent. Any waiver effected in accordance with this Section . . . shall be binding upon each Lender and Credit Party at the time of the waiver and each future Lender and Credit Party.

152. Thus, even if directed otherwise by the Required Lenders,[19] PPAS was given the power to waive events of default and exercise (or decline to exercise) remedies in the event of a default under the Credit Agreement, and the Zohar Funds[20] were expressly divested of the right to

---

[19] "Required Lenders" is a defined term under the Credit Agreements, and it generally refers to the lenders holding a majority of the outstanding debt. In most cases, the Required Lenders would be one or more of the Zohar Funds.

[20] The lenders vary by Credit Agreement but generally included one or more Zohar Funds and any Tilton affiliates (such as an Ark entity) that lend to the Portfolio Company alongside the Zohar Fund(s).

exercise remedies for those events of default waived by PPAS.  Prior to the Credit Agreement Amendments, the power to call an event of default and exercise associated remedies rested with the Required Lenders, a group controlled in each case by one or more of the Zohar Funds, who would then direct PPAS to exercise remedies.

153.    In addition to vesting PPAS with the ability to unilaterally waive events of default under each applicable Credit Agreement, the Credit Agreement Amendments also provided that no amendments could be made to the Credit Agreements without approval from PPAS: "Notwithstanding any other provision of this Agreement to the contrary, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall be effective without the written consent of the Agent."  Again, like the September 2015 Amendments and the September 2015 Proxies, the Credit Agreement Amendments purported to transfer authority previously held by the Zohar Funds to an entity owned and controlled by Tilton (this time, PPAS).[21]

154.    PPAS was given the ultimate authority to call or waive certain events of default and exercise remedies, and it also had final consent rights related to amendments to the Credit Agreements.  In addition, various Portfolio Company Credit Agreements included language that "irrevocably" appointed PPAS as agent.

155.    Upon information and belief, from 2015 through September 2018, PPAS received approximately $4.6 million in agency fees from the Portfolio Companies.

**VI.    Tilton double-dipped by charging fees to the Portfolio Companies directly for, what was in effect, managing the Zohar Funds' collateral and then ensured that she**

---

[21] Furthermore, in certain of the Credit Agreement Amendments, all of the borrower Portfolio Company's financial covenants were removed.  Much like the amendments to the LLC Agreements and the proxies involving the Corporation Portfolio Companies, there was no consideration paid to the Zohar Funds in exchange for the Credit Agreement Amendments that divested them of certain rights or removed the covenants that protected them as lenders.

**would continue to profit from the Zohar Funds' investments in the Portfolio Companies after removal as collateral manager.**

156.    In addition to blocking her removal from the Portfolio Companies as a manager or director and purporting to grant herself, through PPAS, irrevocable control over the Zohar Funds' loan collateral, Tilton ensured that, in the event that the Patriarch Managers were forced out as collateral managers, which appeared to be fast approaching with the looming maturity default at Zohar I, she would still be able to extract a similar level of fees from the Portfolio Companies, through PPMG.

157.    Upon a Zohar Fund's investment in a Portfolio Company, the collateral manager would generally install Tilton on the board, as an officer, or as the manager of such Portfolio Company.  At least as early as 2006, Tilton began to cause the Portfolio Companies to enter into agreements with PPMG for management services.  Under the PPMG Agreements, PPMG was to provide "general executive, professional, and management consulting services," "finance functions," and "human resource functions," as well as other services.  The services PPMG was purportedly providing were, in effect, the active management of the Portfolio Companies—the very services that the Zohar Funds were paying Tilton (through the Patriarch Managers) millions of dollars a quarter to provide.

158.    From 2010 to August 2015, the PPMG Agreements required the Portfolio Companies to pay between $15,000 and $25,000 per month (depending on annualized EBITDA and revenue levels) to PPMG through these various PPMG Agreements.  These prices were unilaterally set by Tilton and not disclosed, at any point prior to 2015, to Zohar Fund investors with the power to terminate or dispute the PPMG Agreements or the fairness of their terms, other than Tilton or a Tilton-controlled entity.  Moreover, the PPMG Agreements were virtually identical across the Portfolio Companies reflecting the fact that they were not the result of arm's length

negotiations between PPMG (controlled by Tilton) and the management of the applicable Portfolio Company (who ultimately reported to Tilton). Instead, they were simply provided to the Portfolio Companies' management team as a form to be filled in and executed.

159. In August and September of 2015, when the Patriarch Managers' removal as collateral managers was imminent, Tilton drastically changed the economics of the PPMG Agreements.

160. Tilton caused at least all of the Group A Portfolio Companies to consent to amend their PPMG Agreements and, upon information and belief, several of the Group B Portfolio Companies (listed in <u>Annex A</u>). These amendments increased the management fees that PPMG received from the respective Portfolio Company several times over. For 7 of the Group A Portfolio Companies,[22] the fee was increased to a flat $100,000 per month, reflecting a minimum four times, and potentially an almost seven times, increase in the monthly fees. At the other companies, she replaced the tiered EBITDA and revenue-based fee structure with a two-tiered monthly fee of $50,000 or $100,000, replacing the previous three-tiered monthly fees of $15,000, $20,000, or $25,000. In most instances, she directed an employee under her control to sign for the Portfolio Company. In at least one instance, Tilton personally executed the amendment to the PPMG Agreement on behalf of both PPMG and the Portfolio Company. In no instance were these amendments approved by an independent party.

161. In many of these instances, and where the fee increases were most dramatic, these amendments changed PPMG's fee structure from a tiered, performance-based fee driven by the

---

[22] Denali, Incorporated; GAS; MD Helicopters; PDP; RM Acquisition; Stila; and UI Acquisition Holding Co.

Portfolio Companies' EBITDA and revenue to a fixed monthly fee—at the same time that the *Patriarch Managers'* fixed collateral-management fees looked as though they would be cut off.

162.    As noted above, Tilton's concurrent transfer of the Zohar Funds' governance and control rights blocked the Zohar Funds from exercising their rights as the Portfolio Company's equity holders to remove Tilton from her management roles and terminate the PPMG Agreements (or enforce their existing termination provisions) due to Tilton's usurpation of the Zohar Funds' equity holdings.

163.    Upon information and belief, from 2015 through September 2018, PPMG received approximately $44.2 million in management fees, and several millions of dollars of other payments, directly from the Group A Portfolio Companies.

## VII.    Tilton orchestrated illegitimate borrowings on the eve of the Patriarch Mangers' resignation as collateral managers to be improperly held and loaned out by PPAS, creating a set of shadow loans over which Tilton maintained control.

164.    In another maneuver to retain control over the Zohar Funds and their loan collateral, immediately prior to the Patriarch Managers' resignation as collateral managers to the Zohar Funds, PPAS and the Patriarch Managers caused various Portfolio Companies to draw down the entire remaining balances of any revolving credit facilities ("RCFs") or delayed draw term loans ("DDTLs") that those Portfolio Companies had with the Zohar Funds, amounting to $50 million in draw downs.  Tilton orchestrated these draw downs even though they were in direct violation of the Credit Agreements—failing to comply with the mandatory Borrowing Mechanics set forth therein and paid out without satisfying the conditions precedent—and were a breach of the Patriarch Managers' contractual and fiduciary duties.

165.    Specifically, PPAS and the Patriarch Managers facilitated dozens of borrowings, totaling approximately $50 million in the aggregate, knowing that the borrowers had not delivered the mandatory Borrowing Certificates, which are an express condition precedent under the Credit

Agreement to any lending obligations on the part of the Zohar Funds. The Borrowing Certificates were to include certain required certifications by the Portfolio Companies in regard to the requested borrowings to demonstrate the *bona fides* of the borrowings.  It had been a routine practice of PPAS and the Patriarch Managers to obtain such Borrowing Certificates in regard to borrowings under the Credit Agreements.  In blatant disregard of the contractual requirements under the Credit Agreements and those prior practices, in February and March 2016, the Patriarch Managers and PPAS sent Issuer Orders to the Zohar Funds' trustee directing the transfer of funds to PPAS which they had no legitimate basis under the terms of the Credit Agreements to request.  Indeed, it appears that many Portfolio Companies' executives were entirely unaware that these purported borrowings had occurred.

166.    Further, rather than allowing those proceeds to be held by the borrowing Portfolio Companies, PPAS then held those funds in its own accounts, purportedly for the benefit of the borrowers, providing funds to the Portfolio Companies whenever PPAS preferred or deemed it necessary—even going so far as to require Borrowing Certificates for the funds that Patriarch had *already borrowed*.  The Portfolio Companies nonetheless were accruing interest payments as though they had borrowed the full amount.  In this way, PPAS effectively appointed itself the shadow collateral manager for a shadow revolving credit facility.

## VIII.    Tilton received extensive tax benefits before shifting tax liability from herself to the Zohar Funds.

167.    The Indentures and articles of association of each of the Zohar Funds required that each fund be treated as a disregarded entity or partnership for United States federal income tax purposes.  The relevant subscription agreements by which parties acquired the preference shares in the Zohar Funds likewise required that each preference shareholder maintain the funds' status as a disregarded entity or partnership for United States federal income tax purposes.  In accordance

with those express contractual requirements, an election was made at the formation of the Zohar Funds to treat them as disregarded entities and, prior to tax year 2016, all income of the Zohar funds, including income generated by the debt and equity investments in the various Portfolio Companies, flowed up through the Zohar Funds and, ultimately, to Tilton by way of a series of pass-through and other disregarded entities owned and believed to be directed by Tilton. Ms. Tilton testified at length, under oath, to the Delaware Chancery Court regarding the exact reasons why the Zohar Funds were treated as disregarded entities, and the importance of that status to the Zohar Funds' structure and deal terms.

168.    For tax years 2003 through 2015, Tilton filed tax returns for the Zohar Funds consistent with the Zohar Funds being treated as disregarded entities. As a result of this structure, Tilton was able to harvest net operating losses generated by the Portfolio Companies, most of which were heavily distressed when acquired, and was able to use various losses from the Zohar Funds to offset or defer her own personal tax liabilities from income generated operating the Zohar Funds' enterprise. The consequence to the Zohar Funds of their status as a disregarded entity as that they were not taxed on any interest, dividends, or distributions they received from their various Portfolio Company investments and upon the sale of any Portfolio Company, any resulting gain or loss would not have been taxable to the applicable Zohar Fund.

169.    This tax structure—the Zohar Funds' status as disregarded entities—was a central aspect of the Zohar Funds as a structured finance vehicle and a prerequisite for the Zohar Funds receiving the credit ratings that they required to entice investors in their notes at the Funds' formation.

## A.    Tilton "double-dipped" by taking Tax Dividends from Portfolio Companies

170.    The Zohar Funds were structured to be pass-through entities for tax purposes, whose tax attributes would be passed through to their preference shareholders, the Octaluna

Entities.  Upon information and belief, prior to the CTB Election (defined below) in 2016, these tax attributes were passed through the Octaluna Entities and ultimately made their way to Tilton as the ultimate owner of the Zohar Funds, Patriarch Managers, Octaluna Entities, PPMG, PPAS, and Patriarch Partners.

171.    The tax attributes of the Zohar Funds included attributes (such as taxable income or losses) resulting from their beneficial ownership of Portfolio Company equity.  Many of the LLC Portfolio Companies are themselves pass-through entities for tax purposes, and pass their tax attributes to their owners, including the Zohar Funds.

172.    The Zohar Funds were intentionally structured to be able to own equity in the Portfolio Companies without incurring tax liabilities associated with their investments or operations.  By design, any tax attributes resulting from the Zohar Funds' ownership of Portfolio Company equity were to be passed through to the Octaluna Entities as preference shareholders and ultimately to Tilton.

173.    The Delaware Court of Chancery issued factual findings regarding "the Zohar Funds' organization structure" following a trial on the merits of a dispute under D.G.C.L. § 225 between the Zohar Funds and Tilton over beneficial ownership of three Portfolio Companies (the "Chancery 225 Action"):

> [T]he Zohar Funds do not bear the tax burdens associated with their beneficial ownership of equity securities.  Insofar as the Zohar Funds earn ***income on account of their beneficial ownership of equity securities***, that income ***is taxable to the Funds' preference shareholders*** . . . .  That being so, Section 7.8(a)(iv)(y) of the Indentures does not prohibit the Zohar Funds from acquiring and owning equity.  This construction is entirely consistent with the ***design of the Zohar Funds*** . . . .

*Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. CV 12946-VCS, 2017 WL 5956877, at *30 (Del. Ch. Nov. 30, 2017) (emphasis added).

174.    Tilton agreed at the formation of each of the Zohar Funds to this structure, whereby tax attributes of the Zohar Funds, including any tax attributes on account of their beneficial ownership of Portfolio Company equity, would be passed through to the Octaluna Entities as preference shareholders and ultimately to Tilton.

175.    For example, Tilton testified under oath in the Chancery 225 Action regarding the formation of Ark CLO 2000-1 Ltd. ("Ark I"), which she characterized as the "template" for each of the Zohar Funds.  Tilton testified that when she agreed to act as the taxpayer for Ark I, the Ark I structure was changed to provide for the accelerated payment to Tilton of preference share dividends in order to compensate her for the tax liabilities that could arise from Ark I.

176.    The Zohar Funds were structured so that if they passed certain financial covenants (which would presumptively suggest that they were generating net taxable income), Tilton would receive substantial preference share distributions.  It was uncommon in CLO transactions such as the Zohar Funds for the holders of preference shares—which are generally treated like equity—to be entitled to such large payments in the early stages of the transaction when the holders of the notes—which are senior to preference shares in the capital structure—remained unpaid.  However, patterned after the Ark I transaction, these preference share distributions were intended to provide Tilton with payments that could be used to cover tax liabilities for "phantom income" that might arise from her taking on the tax attributes of the Zohar Funds (including any tax attributes resulting from the Zohar Funds' beneficial ownership of Portfolio Company equity).

177.    Tilton, through the Octaluna Entities, received $118 million in preference share distributions across the three Zohar Funds.

178.    In addition to these preference share distributions, Tilton's status as "taxpayer" for the Zohar Funds from their inception until 2016 provided her with additional valuable tax benefits.

Losses from the Zohar Funds have allowed Tilton to substantially offset or defer her own cash tax liabilities despite receiving hundreds of millions of dollars of income from the Zohar Funds.

179.    Notwithstanding these massive tax benefits that fully compensated Tilton for her role as "taxpayer" for the Zohar Funds, she also used her position as the Zohar Funds' collateral manager to place provisions in the LLC Agreements or partnership agreements of Portfolio Companies to compel them to separately make tax distributions to her, bypassing the Zohar Funds (as members or partners of each of those Portfolio Companies) entirely, notwithstanding that Tilton had already agreed, and was already compensated, to take on the tax attributes of the Zohar Funds, including tax attributes resulting from their ownership of Portfolio Company equity, and notwithstanding that those tax attributes appear to have frequently consisted of valuable tax losses that Tilton could use to offset her own income.

180.    Tilton accomplished this by adding provisos to "Tax Distributions" clauses in LLC Agreements of numerous LLC Portfolio Companies[23] to provide for distributions "***directly***" to her affiliated entities:

> . . . any amount that would be distributed to a Member that is a disregarded entity for United States Federal income tax purposes will instead be paid directly to the owner of such Member that is considered the Member for United States Federal income tax purposes.

181.    These provisos essentially allowed Tilton to extract compensation from the Zohar Funds ***twice*** for her role as "taxpayer" for the Zohar Funds.  But for these provisos, the tax

---

[23] Such provisos are present in the LLC Agreements of at least Dura Buyer, GAS, Heritage Aviation, Snelling Holdings, LLC, Snelling Staffing, LLC, Libertas Copper, LLC, LVD Acquisition, LLC, Stila, Jewel of Jane, LLC, Scan-Optics, LLC, Amweld International, LLC, Best Textiles Acquisition, LLC, Galey & Lord, LLC, Iconic American Trucks, LLC, Mobile Armored Vehicles, LLC, Patriarch Partners Media Holdings, LLC, and Silverack, LLC.  Upon information and belief, similar provisos are present in the LLC Agreements of other LLC Portfolio Companies.

distributions clauses would have provided for dividends to the Zohar Funds as Members, not Tilton's affiliates.  If tax dividends had been properly made by Portfolio Companies to the Zohar Funds, the priority of payments provisions within the Zohar Funds' Indentures would not have permitted these funds to be diverted to Tilton.

182.    Upon information and belief, certain Portfolio Companies have made tax dividends (the "Tax Dividends") of at least $50 million to Tilton's affiliated entities since the Zohar Funds ceased to be disregarded entities for United States Federal income tax purposes in 2016, and issued additional tax dividends prior to 2016.  Tilton and her affiliates received these Tax Dividends in addition to the approximately $118 million that the Octaluna Entities received in preference share distributions ostensibly intended to cover the same tax burden.  The Tax Dividends known to date were made by Croscill Home, LLC, GAS, Heritage Aviation, Zohar HA, LLC, Mobile Armored Vehicles, LLC, RM Acquisition, Scan-Optics, LLC, Snelling Staffing, LLC, Snelling Holding, LLC, Stila, and Xpient Holdings, LLC (the "Tax Dividend Payors").

**B.    After realizing substantial benefits, Tilton shifted tax liabilities to the Zohar Funds.**

183.    In 2016, Tilton, as sole preference shareholder of the Zohar Funds, made an election for the Zohar Funds to be taxed as corporations, commonly known as a "check the box" election (the "CTB Election").  As a result, for United States federal income tax purposes, all items of income, gain, and loss no longer flow through to entities controlled by Tilton.  Instead, each of the Zohar Funds became a taxable entity.

184.    The effect of the CTB Election is significant.  First, the Zohar Funds became responsible for tax on the income generated in the ordinary course, primarily the collection of interest receipts on their loans.  However, more significant was the impact from a sale of a Portfolio Company or loan repayments:  any resulting gain on the basis in the Zohar Funds' investment in

the equity of the Portfolio Company (which was carried at zero) or loan (which were often acquired below par) would be taxable to the applicable Zohar Fund.  This tax structure is in stark contrast to the pre-"check the box" structure where the tax consequences of any gains or losses resulting from the sale of a Portfolio Company or repayment of a loan—including beneficial net operating losses generated from the investments the Zohar Funds' have in the Portfolio Companies—would flow to Tilton.

185.    In effect, this change in tax structure decoupled the potential gains that the Zohar Funds would see upon a sale of the Portfolio Companies from the offsetting losses the Portfolio Companies suffered in earlier years—these latter, beneficial tax attributes, passed through the Zohar Funds to Tilton and her entities for several years.  Upon information and belief, Tilton personally benefited from the losses recognized for tax purposes in early years then sought to leave the Zohar Funds responsible for any gains upon the eventual sales of the Portfolio Companies.

## IX.    Tilton usurped equity value of the Portfolio Companies from the Zohar Funds.

186.    Shortly before the filing of these cases, Tilton began to formulate strategies to finally monetize the Portfolio Companies, ultimately electing to do so through chapter 11 bankruptcy proceedings for the Zohar Funds. In the run up to that period, Tilton sought to further maximize the value she could personally extract from the Portfolio Companies, focusing on those most likely to be sold at substantial value.

### A.    Tilton issues herself preference shares with a 5x payout and further entrenches herself as LLC manager.

187.    On November 13, 2017, Tilton brought lawsuits seeking declaratory judgments that she was the beneficial owner of three of the then most valuable Portfolio Companies: Dura Buyer, GAS, and Stila.  Upon information and belief, Tilton viewed Dura Buyer, GAS, and Stila as three

of the Portfolio Companies most likely to be sold at substantial value in connection with the chapter 11 cases.

188.    At the same time, Tilton, in her capacity as LLC manager, executed written consents (the "November 2017 Written Consents") for Dura Buyer, GAS, and Stila. The November 2017 Written Consents purported to unilaterally create new preference interests (the "Class A Interests") and grant the holders of such preference interests (*i.e.*, the Octaluna Entities) the "sole right" to remove or replace Tilton as LLC manager of Dura Buyer, GAS, and Stila or to amend their respective LLC Agreements:

> RESOLVED FURTHER, that, notwithstanding anything to the contrary contained in the LLC Agreement, the Class A Interests shall have the sole right to:
>
> A. Remove or replace an existing Manager or appoint any additional manager; provided that, any Manager may resign at any time, effective immediately upon notice to any Class A Member;
>
> B. Direct the Manager on all matters in which the approval of the Members is required by the Certificate (as defined in the LLC Agreement), the LLC Agreement, or nonwaivable provisions of applicable law;
>
> C. Amend the LLC Agreement; or
>
> D. Dissolve or wind-up the affairs of the Company (it being understood that any dissolution or wind-up of the Company that would not otherwise require the consent of any Member shall not require such consent solely by virtue of this clause);

189.    In addition to the November 2017 Written Consents, each respective Tilton-owned Octaluna Entity executed a subscription agreement, also dated November 13, 2017, setting forth an investment that it was making in exchange for the Class A Interest.

190.    With regard to Dura Buyer, Octaluna II and Octaluna III purportedly made investments totaling $10 million and were each granted a Class A Interest with a preference payout of five times their initial investment.

191.    With regard to GAS, the Octaluna Entities purportedly made investments totaling $3 million in and were each granted a Class A Interest with a preference payout of five times their initial investment.

192.    And, with regard to Stila, Octaluna III purportedly made an investment totaling $10 million and was granted a Class A Interest with a preference payout of five times its initial investment.

193.    As a result of the execution of the September 2015 Amendments and the November 2017 Written Consents, Tilton purportedly transferred the Zohar Funds' rights to remove her as manager of Dura Buyer, GAS, and Stila to entities that she owned and controlled. Other than subscription agreements whereby the Octaluna Entities acquired preference shares with a 5x payment, there was no documented consideration associated with these transfers.

194.    None of these transfers were negotiated or approved by anyone independent of Tilton.  None of these transfers were contemporaneously disclosed to anyone independent of Tilton.

**B.    Tilton arranges to receive cash payments upon a change in control of the most valuable Portfolio Companies.**

195.    On March 10 and 11, 2018, concurrently with filing these bankruptcy cases, Tilton caused four Portfolio Companies, Dura Automotive, GAS, Stila, and MD Helicopters (collectively, the "Phantom Equity Portfolio Companies")—to enter into "phantom equity" agreements with her in her capacity as CEO of these companies. Upon information and belief, Tilton viewed the Phantom Equity Portfolio Companies as the four Portfolio Companies most likely to be sold at substantial value in connection with the chapter 11 cases.

196.    Under these agreements (the "Phantom Equity Agreements"), Tilton would, upon a change of control of a Phantom Equity Company, receive cash payments from the Phantom

Equity Portfolio Company, equal to up to 4% of any equity appreciation that had occurred since she began serving as CEO or manager of the Phantom Equity Portfolio Company.

197.    Upon information and belief, the Phantom Equity Portfolio Companies in which Tilton arranged to receive a phantom-equity payment were four of the most valuable Portfolio Companies and four of the Portfolio Companies most likely to be monetized in the chapter 11 cases.

198.    The Phantom Equity Agreements diluted the equity value that the Zohar Funds held in the Portfolio Companies, to the direct detriment of the estates and all estate stakeholders other than Tilton.

199.    The phantom-equity interests and agreements were not negotiated or approved by anyone independent of Tilton.  Tilton did not contemporaneously disclose the phantom-equity interests or agreements to anyone related to the Zohar Funds independent of Tilton.  Tilton did not even disclose the existence of these phantom-equity interests to Debtors' counsel in connection with the filing of these chapter 11 cases.  In fact, it was not until the eve of trial on the Zohar Funds' secured creditors' motions to dismiss these chapter 11 cases that the existence of the Phantom Equity Agreements were disclosed to parties unaffiliated with Tilton.

X.    **The Zohar Funds finally obtain records of Tilton's misconduct in late-2016—over Tilton's opposition.**

200.    The Zohar Funds were unable to meaningfully evaluate Tilton and her affiliates' compliance with their duties and obligations as long as Tilton and her affiliates, particularly the Patriarch Managers, continued to control the flow of information about their activities.

201.    Finally, on March 3, 2016, the Zohar Funds entered into an agreement with Alvarez & Marsal Zohar Management, LLC ("AMZM") to replace the Patriarch Managers as the Zohar Funds' collateral managers.  In breach of the CMAs, Tilton's Patriarch Managers and Patriarch

Partners refused to deliver any of the Zohar Funds' or the collateral managers' books and records to AMZM.

202.   On May 9, 2016, AMZM brought suit against Patriarch Partners and the Patriarch Managers in the Delaware Court of Chancery, seeking access to the Zohar Funds' books, records, and other documents that the Patriarch Managers had refused to produce to AMZM.

203.   On October 26, 2016, after a full trial on the merits, the Chancery Court ruled that the Patriarch Managers had breached the CMAs by failing to turn over the books and records to the Zohar Funds and ordered immediate production of those documents. The Patriarch Managers appealed, and on June 19, 2017, the Delaware Supreme Court affirmed.

204.   Finally privy to information about Tilton's actions, on January 1, 2017, the Zohar Funds, acting through AMZM, brought an action in the U.S. District Court for the Southern District of New York (the "SDNY Action"), asserting state-law claims for breach of fiduciary duty, breach of contract, conversion, and unjust enrichment, as well as a federal RICO claim, against Tilton and her affiliated entities.  That action was dismissed in December 2017, without prejudice with respect to all but the federal RICO claim, and the counts in this action include the remaining affirmative damages claims that were asserted in the SDNY Action.

205.   It was not until the Patriarch Managers were ousted from their role as the Zohar Funds' agent and attorney-in-fact in March of 2016 that the Zohar Funds finally had a party unaffiliated with Tilton to protect their interests.

**XI.    Tilton forces the Portfolio Companies to bear the costs of the Zohar Funds' action to recover their equity interests.**

206.   On November 29, 2016, the Zohar Funds initiated the Chancery 225 Action seeking declarations that the September 2015 Proxies Tilton executed for FSAR Holdings, Inc. (parent of PDP), Glenoit Universal, Ltd. ("Glenoit"), and UI Acquisition were invalid and that the Zohar

Funds, as stockholders of these Portfolio Companies, had the right to remove Tilton from each company's board of directors.

207.    The core of the Chancery 225 Action was Tilton's refusal to recognize the Zohar Funds' beneficial ownership of the Portfolio Companies.  In the Chancery 225 Action, Tilton advocated for her own personal interests—her now-abandoned claim of "beneficial ownership" of these companies.

208.    The Zohar Funds prevailed entirely in the Chancery 225 Action, and Tilton has since abandoned her appeal.  In a 95-page opinion issued after a trial on the merits, the Chancery Court found that "Tilton's hindsight observations regarding what the parties intended, and her revisionist view of what the contemporaneous documents say, cannot compete with the clear and ambiguous terms of the agreements . . . ."  *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. CV 12946-VCS, 2017 WL 5956877, at *34 (Del. Ch. Nov. 30, 2017).  The Chancery Court also found that "numerous [] documents, including [ones] signed by Tilton, [] show the Zohar Funds to own the disputed equity," and that "Tilton's attempts to explain this evidence away are not credible." *Id*. at *34 n.317.

209.    Despite asserting purely personal interests in the Chancery 225 Action, Tilton sought to coerce the three Portfolio Companies that were the subject of the action to pay her legal fees in connection with her misguided claim of ownership.  Once the Chancery Court issued its well-reasoned opinion unequivocally rejecting her claim of ownership, Tilton demanded reimbursement for approximately $16 million in her legal fees.  However, Tilton is not entitled to indemnification from these Portfolio Companies for her legal fees incurred in asserting her own personal interests, and her claims to entitlement are invalid under each company's organizational documents.

210.    Moreover, Tilton's assertion of this indemnification claim against these companies is blatant retaliation against the Zohar Funds (through their ownership of the Portfolio Companies) for enforcing their rights under the status quo order then in effect in the Chancery 225 Action.  On May 27, 2020, the Zohar Funds moved for an order of contempt from the Chancery Court for Tilton's violation of the status quo order.  The Chancery Court ultimately found that Tilton had violated the status quo order[24] and issued a contempt order against Tilton.  Tilton, in direct response to the Zohar Funds' petition for protection of their rights, which the Chancery Court ultimately vindicated, immediately retaliated by asserting millions of dollars of additional indemnification claims against these Portfolio Companies, purportedly reflecting the remainder of her legal costs. As Tilton's lieutenant, Carolyn Schiff explained to PDP and Glenoit on May 29, 2020:

> Ms. Tilton did not anticipate making any further demand for indemnification from Glenoit or PDP.  On Wednesday, however, we learned that the Zohar Funds sought an order of contempt in the long-stayed Action, contending that Ms. Tilton violated the status quo orders . . . under such circumstances, Ms. Tilton now demands full indemnification of the legal fees and expenses she incurred in the Action.

## XII.    Tilton's misconduct continued unabated during these bankruptcy cases.

211.    Since initiating these bankruptcy cases with sworn statements in her first day declaration that the Zohar Funds' collateral was more than adequate to pay all creditors in full, Tilton has continually found new ways to extract value from the Debtors estates, further diminishing the Zohar Funds' assets, while secured creditors' claims have been substantially impaired.  In some cases, Tilton has abused the Court's ordered process set forth in Paragraph 18

---

[24] Tilton violated the status quo order by entering into a settlement with an insurer of PDP and Glenoit, by which she would receive a portion of her personal litigation expenses and the insurance rights of PDP and Glenoit would be extinguished, without providing the Zohar Funds notice of a transaction outside the ordinary course of business.

of the Settlement Agreement to facilitate her misconduct; in others, she has circumvented the Court entirely to enrich herself at the expense of the Debtors' estates.

**A.  Tilton hid substantial recoveries at Galey & Lord from the Zohar Funds while diverting millions of dollars to affiliates.**

212.    Galey & Lord, LLC ("Galey & Lord") is a long-defunct textile company to which the Zohar Funds extended more than one hundred million dollars in secured loans that were never repaid.  In 2015, Tilton and the Patriarch Managers executed a series of amendments to Galey & Lord's ABL and term loan Credit Agreements on the eve of surrendering her role as collateral manager.  These amendments, which are among the Credit Agreement Amendments and the Voting/Control Actions (defined below), purported to subordinate all of the Zohar Funds' debt to that of Tilton's affiliates, Ark II and AIP, despite the fact that the vast majority of loans extended to Galey & Lord, including the latest-in-time loans, were extended by the Zohar Funds.

213.    In 2018, in response to requests by the Debtors for information regarding Galey & Lord's assets, Patriarch told the Debtors that Galey & Lord had been foreclosed upon in 2016, was "winding down in the ordinary course," and that the Debtors had no right to information regarding the company.  As part of Tilton's concerted concealment efforts, PPAS also kept Ankura Trust Company, LLC ("Ankura")—the agent appointed by the Court for the Zohar Funds' loans at Galey & Lord—in the dark about Galey & Lord's assets.  Patriarch told the Court that the cost of installing a replacement agent for Galey & Lord was "not justified" because Galey & Lord "[had] been foreclosed upon and no longer operates," suggesting that it had no assets available for recovery to the Debtors' estates.[25]

---

[25] *Patriarch's Objection to Debtors' Motion, Pursuant to Sections 105(a), 363 and 503(b) of the Bankruptcy Code, for Entry of an Order (I) Authorizing the Appointment of Ankura Trust Company, LLC as New Agent Under the Court-Approved Settlement Agreement by and Between*

214.    It has since become clear that these representations were nothing more than a smokescreen to avoid the Zohar Funds' scrutiny into Tilton's post-petition diversion of Galey & Lord's assets.  In 2016, the Zohar Funds, Ark II, and AIP accepted certain assets of Galey & Lord, collateral under the ABL and term loan Credit Agreements, in partial satisfaction of the obligations to the lenders.  The assets accepted by the lenders included the proceeds of two arbitrations then pending in Singapore (the "Lucky Arbitration") and nearly all real property owned by Galey & Lord.  The assets accepted by the lenders were "Term Loan Priority Collateral" pursuant to the lenders' Amended and Restated Intercreditor Agreement (as amended, the "Galey Intercreditor Agreement").  To the extent the amendment to the Galey Intercreditor Agreement dated September 1, 2015,[26] was effective, proceeds of the assets accepted by the lenders were to be allocated in accordance with Section 2.3(b).  In particular, assets were to be distributed to the term loan creditors until the term loan debt was paid in full before any distribution was to be made to satisfy the revolving loan debt.

215.    Unbeknownst to the Zohar Funds, between 2018 and 2020, PPAS collected $38.7 million in proceeds from assets Galey & Lord's secured lenders had accepted in partial satisfaction of Galey & Lord's obligations.  $31.2 million of this sum represents proceeds of the settlement of the Lucky Arbitration (the "Lucky Settlement").  The remainder represented liquidation proceeds of certain real properties that had been foreclosed upon.  And though (i) PPAS foreclosed on Galey & Lord's assets for the benefit of the Galey & Lord's secured lenders, including the Zohar Funds,

---

the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class and (II) Granting Related Relief (D.I. 623).

[26] The September 1, 2015 amendment to the Galey Intercreditor Agreement was executed simultaneously with the 53rd amendment to the Galey & Lord term loan Credit Agreement and the 9th Amendment to the ABL Credit Agreement, and is among the Credit Agreement Amendments and Voting/Control Actions complained of herein.

(ii) the collected cash belonged to the lenders, and (iii) the Zohar Funds held the overwhelming majority of Galey & Lord's secured indebtedness, PPAS has used these proceeds to satisfy secured **_and unsecured_** debts to Tilton's affiliates in full while disbursing only a fraction to the Zohar Funds, violating the priority of payments set forth in the Galey Intercreditor Agreement between the Zohar Funds, Ark II, AIP, and PPAS.

216.    According to Tilton, $12.6 million of these proceeds have gone to Ark II and AIP, and $1.9 million has gone to PPMG to pay accrued management fees.  Upon information and belief, PPAS currently holds approximately $2.5 million of the Zohar Funds' foreclosed cash and—astonishingly—Tilton allowed approximately $16.2 million to be funded back to one of Galey & Lord's foreign affiliates to an account that had no deposit account control agreement in place when the money was transferred.  Only $4.2 million has been paid to the Zohar Funds to date.  Why the Zohar Funds' purported loan and collateral agent—PPAS—would allow a defaulted borrower subsidiary to hold over $16 million of cash owned by PPAS's principals (the Zohar Funds) has never been explained.

217.    While the Zohar Funds have been paid $4.2 million of ███████████████, they should have received much more.  For example, the Zohar Funds should have received payment ahead of Ark II and AIP, which could only claim entitlement to payment ahead of the Zohar Funds on account of the improper Credit Agreement Amendments (which were likely executed with knowledge that Galey & Lord was expected to receive ████████████ in the future).  Even if the wrongfully executed amendments to the Galey & Lord Credit Agreements and intercreditor agreement were effective, PPAS still violated the Galey & Lord Intercreditor Agreement by paying her affiliated entities, Ark II and AIP, **_in full_** before paying a single dollar to the Zohar Funds.  As described *supra*, the payments to Ark II and AIP were made with the proceeds of assets that were Term Loan Priority Collateral under the Galey & Lord Intercreditor

Agreement (and which the lenders had accepted in partial satisfaction of Galey & Lord's obligations), and therefore should have been paid to the term loan lenders before any payments were made to satisfy the revolving loan debt.

218.    The Zohar Funds, as secured creditors, also should have received payment ahead of PPMG, contractors hired by PPAS, and various professional advisors, which are, at most, unsecured creditors of Galey & Lord.  And, Galey & Lord should not have been permitted to continue holding $16.2 million ███████████, without notice to the Debtors or the Court (despite numerous requests from the Debtors and refusals by PPAS), while its secured loans to the Zohar Funds remain outstanding and in default.  Thus, the Zohar Funds should have received tens of millions of additional dollars from the Galey & Lord assets they accepted in partial satisfaction of Galey & Lord's obligations than it has received to date, despite the fact that such cash represented and represents property of the Debtors and their estates

219.    In light of PPAS stonewalling the Debtors and Ankura regarding the Court-approved installation of Ankura as the new lending agent at Galey & Lord, the Debtors moved for this Court to order PPAS to fully transition all agent functions with respect to the loans to Galey & Lord to Ankura (see "Galey Agency Motion") (D.I. 2611 [sealed]; D.I. 2637 [redacted]).  Once further facts were developed after the filing of the Galey Agency Motion, the Debtors amended the Galey Agency Motion to seek sanctions against PPAS and others (see "Galey Supplemental Motion") (D.I. 3022 [sealed]; D.I. 3064 [redacted]).

220.    Neither the Galey Agency Motion nor Galey Supplemental Motion seek relief pertaining to PPAS's wrongful collection and distribution of funds other than the proceeds currently being held by PPAS and Galey & Lord, including those proceeds distributed between 2016 and 2018 in violation of the Galey Intercreditor Agreement and amounts wrongfully paid to subordinate and junior creditors.

**B.**     **Tilton asserted invalid claims under Paragraph 18, depriving the Zohar Funds of substantial sale proceeds.**

221.     On May 21, 2018, the Court ordered the entry of the Settlement Agreement between the Debtors, Lynn Tilton, certain of Tilton's affiliated Patriarch entities, MBIA, and the Zohar III Controlling Class.  Pursuant to the Settlement Agreement, Tilton was to remain in her positions of control at the Portfolio Companies and cooperate in the Monetization Process.

222.     Paragraph 18 of the Settlement Agreement established a "pay now, fight later" procedure whereby, to the extent a claim asserted by Patriarch is "supported by written documentation showing the claim . . . [is] owed to a Patriarch Stakeholder," it is "deemed due and payable through the closing of any monetization event on a *pari passu* basis with other similarly situated claims and equity," without prejudice to the Debtors' "rights to challenge the propriety of any of the foregoing claims or equity interests" after the Settlement Agreement is terminated.  The Zohar Funds' ability to assert these objections to Tilton's claims are therefore preserved.

223.     Tilton's affiliates have been paid substantial amounts upon the sales of Portfolio Companies under this framework and have claimed entitlement to additional amounts upon the monetization of the remaining Portfolio Companies.

224.     Substantial portions of the amounts paid to Tilton's affiliates are invalid and must be disgorged pursuant to Paragraph 18 of the Settlement Agreement, based on the wrongdoing detailed above.

225.     In particular, Tilton, the Octaluna Entities, and PPMG have made improper claims against the proceeds from Portfolio Company monetization events for (1) indemnification of Tilton's legal fees and costs she incurred in advancing her own interests in the Chancery 225 Action; (2) indemnification of her costs incurred in these bankruptcy proceedings; (3) tax dividends; (4) management fees; (5) returns on Class A Interests; and (6) phantom equity.

226.    For example, Tilton received approximately $2.2 million upon the sale of FSAR Holdings Inc., based on her invalid claim for indemnification of her legal fees and costs for the Chancery 225 Action.

227.    In the months leading up to her resignation, Tilton also claimed that more than $4 million, divided among eleven Portfolio Companies, was payable as indemnifiable costs owed to PPMG that were "incurred in connection with protecting the compan[ies]' rights in [the bankruptcy] proceeding, including with respect to the monetization process and the protection of the company's confidential information, as well as in connection with disputes over the [Management Services Agreement] itself." However, the underlying invoices presented were from law firms representing Ms. Tilton and the Patriarch Stakeholders and the services underlying these invoices were actually incurred to advance Ms. Tilton and the Patriarch Stakeholders' interests in these cases—not the interests of the Portfolio Companies.

228.    For the first 18 months of these cases, these professionals had, in fact, been paid by the Zohar Funds under the Cash Collateral Order (as defined below). The basis for the Zohar Funds making payments to Ms. Tilton's professionals under the Cash Collateral Order was as a compromise of Ms. Tilton's claim that, as secured creditors of the Zohar Funds, the Patriarch Stakeholders were entitled to have their professional fees paid by the estates. But once the Cash Collateral Order was no longer a source of payment for her own professionals, Ms. Tilton had to find a new source. The Portfolio Companies that she controlled were an easy target, and she promptly shifted the costs and responsibility for payment of *her own* professionals to the Portfolio Companies.

229.    In any event, though, the PPMG Agreements for ten of the eleven Portfolio Companies terminated before the bankruptcy proceeding was filed, so Tilton's claim to indemnification from the Portfolio Companies for PPMG costs post-filing are baseless.

230.    Nonetheless, PPMG received approximately $5.0 million upon the sales of FSAR Holdings, Inc., RM Acquisition, UI Acquisition, and Libertas Copper, LLC, based upon these invalid claims of indemnification for bankruptcy costs.  Upon information and belief, other companies paid these amounts to PPMG upon their presentment.

231.    PPMG also received approximately $13 million at the closings for sales of RM Acquisition, Libertas Copper, Denali Inc., UI Acquisition, and FSAR Holdings, Inc. based on similarly invalid claims for accrued management fees and transaction fees.

232.    The Octaluna Entities also received approximately $2.6 million at the closings for sales of RM Acquisition and Libertas Copper based on invalid claims for Tax Dividends from these Portfolio Companies.

233.    The Zohar Funds are entitled to recoupment of all of these amounts, as well as similar amounts asserted against other Portfolio Companies that may be paid from the proceeds of subsequent sales.

**C.    Patriarch's fees have been improperly borne by the estate.**

234.    On December 10, 2018, the Court entered the *Final Order (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Providing Superpriority Administrative Expense Status; (IV) Modifying Automatic Stay; and (V) Granting Related Relief* (the "Cash Collateral Order") (D.I. 588).

235.    Paragraph 12 of the Cash Collateral Order provides that the Debtors will pay the fees, including professional advisors' fees, of Patriarch Partners XV, LLC, Octaluna, LLC, Octaluna II, LLC and Octaluna III, LLC (the "Patriarch Secured Parties").  Specifically, paragraph 12(c) provides that the Debtors will pay "the reasonable and documented fees, costs, expenses, and disbursements incurred or accrued by . . . the Patriarch Secured Parties, . . . arising before or after the Petition Date, . . . including the reasonable fees and disbursements of their professional

advisors (collectively, the 'Secured Party Professionals'), in connection with (i) the Cases or any successor case; (ii) the Settlement Agreement; (iii) the Transaction Documents; or (iv) enforcement of any rights or remedies under the Transaction Documents, in each case whether or not the transactions contemplated hereby are fully consummated." *Id.* ¶ 12(c).

236.    Paragraph 12 further provides that "the Debtors are authorized under sections 363 and 503(b) of the Bankruptcy Code to pay the reasonable fees, costs and expenses of the Patriarch Secured Parties provided however, that the Patriarch Secured Parties' rights to later assert that such payments are adequate protection is expressly reserved." *Id.* ¶ 12(g).

237.    However, the Cash Collateral Order also contains an express reservation of rights, which states that "[n]othing contained herein shall prejudice any rights, claims, objections, or remedies of the Debtors . . . with respect to . . . (i) . . . the payment of fees, costs and expenses of the Patriarch Secured Parties pursuant to paragraph 12(g) of this Order, or (ii) the recovery, allocation or surcharge of any fees, expenses or reserves in these Cases, in both cases under the Bankruptcy Code, contract, agreement, or any other applicable law . . . ." *Id.* ¶ 21.

238.    Since the Cash Collateral Order was approved, Tilton and her affiliates have sought and obtained the reimbursement of approximately $15 million in fees and expenses by the Debtors pursuant to section 503(b) if the Bankruptcy Code despite the fact that these fees and expenses were not "actual and necessary costs and expenses of preserving the estate" nor were they incurred in making a "substantial contribution" to the estate as required by 11 U.S.C. § 503(b).

239.    Instead, Tilton's post-petition efforts, like her pre-petition efforts, have been entirely self-interested schemes to enrich herself to the detriment of the Debtors and to the administration of the estates.  As described herein, Tilton and her affiliates have been engaging in conflicted and harmful conduct towards the Debtors and their estates throughout these cases, and were being compensated by the estates to do so.

30863291.1

## CLAIMS FOR RELIEF

## COUNTS SEEKING INVALIDATION OF TILTON'S ENTRENCHMENT EFFORTS.

### COUNT I :    DECLARATORY JUDGMENT OF EQUITY OWNERSHIP
### (By the Zohar Funds Against the Octaluna Entities and Lynn Tilton)

240.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

241.    As of the filing of these bankruptcy cases, the Zohar Funds were record holders and owners of equity interests in at least the following Portfolio Companies:  180s, Inc.; Acme International Enterprises, Inc.; American LaFrance, LLC; Amweld International, LLC; Best Textiles Acquisition, LLC; Croscill Home; Denali Acquisition, LLC; Dura Buyer; Duro Textiles, LLC; eMag Solutions LLC; Fetco Home Décor, Inc.; FSAR Holdings, Inc.; Galey & Lord; Glenoit; GAS, Gorham Paper and Tissue, LLC; Hartwell Industries, Inc.; Heritage Aviation; Iconic American Trucks, LLC; IMG Holdings, Inc.; Jewel of Jane LLC; Libertas Copper LLC; LVD Acquisition, LLC; MD Helicopters; Mobile Armored Vehicles, LLC; Netversant; Patriarch Partners Media Holdings, LLC; Petry Media Corporation; Rapid Rack Industries, Inc.; Remco Maintenance, LLC; RM Acquisition; Scan-Optics, LLC; Silverack, LLC; Snelling Holdings; Spiegel, LLC; Stila; UI Acquisition; Vulcan ; and Xpient Solutions, LLC.[27]

242.    The Zohar Funds' equity interests were memorialized in the form of, among other documents, stock certificates and LLC agreements.   These equity interests were included in the collateral securing the notes issued pursuant to the Indenture by the Zohar Funds.

243.    The Zohar Funds received these interests for good and valuable consideration, generally in connection with providing financing for the acquisition of Portfolio Companies,

---

[27] The Delaware Chancery Court has already determined that the Zohar Funds were the beneficial owners of the record equity issued to them by FSAR Holdings, Inc., Glenoit, and UI Acquisition. Accordingly, these three Portfolio Companies are not the subject of Counts I and II.

extending loans to Portfolio Companies, or in exchange for agreeing to restructure loans to Portfolio Companies.

244.    The stock certificates were valid securities issued in the names of the Zohar Funds and declare the Zohar Funds "owners" of shares of stock.

245.    The LLC Agreements list the Zohar Funds as parties, include the Zohar Funds as signatories, and list the Zohar Funds as members entitled to membership interests.

246.    On November 29, 2016, the Debtors filed suit in the Delaware Chancery Court seeking a declaration that the Debtors, as owners of three Portfolio Companies, had the authority to replace Tilton on each company's board of directors.

247.    Following a trial on the merits, the Chancery Court found that the Debtors were the beneficial owners of the disputed Portfolio Companies and that the written consents Tilton executed while acting as the Debtors' collateral manager to strip the Debtors of their control rights were invalid and ineffective.  In particular, the Chancery Court found that "Tilton's attempts to explain away" evidence of the Debtors' ownership of the disputed Portfolio Companies, including "[h]er argument regarding her alleged 'gift' of equity upside to the Zohar Funds," were "not credible."  Nonetheless, Tilton repeatedly asserted, including in the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* (D.I. 5) filed in these cases, that the Zohar Funds did not own equity in the Portfolio Companies, but rather were gifted "upside" in the equity, which, Tilton asserts, was actually owned by Tilton and the Octaluna Entities.

248.    On March 21, 2020, Tilton conceded by letter to the Debtors that she would cease contesting the Debtors' beneficial ownership of the Portfolio Companies.  Tilton affirmed her concession in a sworn declaration filed in this Court five days later.  D.I. 1525.

249.     On March 26, 2020, this Court issued a declaration that the Debtors were "the legal and beneficial owners of the equity or membership interests issued or otherwise recorded in the Debtors' names."  D.I. 1524.

250.     Notwithstanding her unequivocal concession and the Court's clear order, no adjudication or clear concession have yet acknowledged that Debtors were always the legal and beneficial owners of the equity or membership interests issued or otherwise recorded in their names.  Such ownership undergirds Counts III, VIII, IX, X, XI, XII, and XIII of this Amended Complaint.

251.     Accordingly, a justiciable controversy exists among the parties with regard to the ownership over and rights in equity interests in Portfolio Companies.

252.     The Zohar Funds therefore seek a declaration that they were always the legal and beneficial owners of the equity interests issued or otherwise created in their names, with the relevant equity rights and interests to be established at trial and, further, that no other party, including the Octaluna Entities, Tilton, or her affiliates, had any ownership interest in the equity interests held by the Zohar Funds, until such equity interests were sold or abandoned under the Plan.

**COUNT II :   DECLARATORY JUDGMENT THAT VOTING/CONTROL ACTIONS WERE INEFFECTIVE**
**(By the Zohar Funds Against Patriarch Managers, Class B Parties, Proxy Grantees, Ark Entities, Octaluna Entities, PPAS, and Tilton)**

253.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

254.     The Zohar Funds were record holders and owners of valuable equity and loan interests that are memorialized in the form of, among other documents, stock certificates, LLC agreements, and loan agreements.  The Zohar Funds received these interests for good and valuable consideration.

255.    The relevant agreements are valid and enforceable.

256.    Nonetheless, the Defendants have purported to execute proxies, other documents, or amendments to existing documents, to transfer value from the Zohar Funds to one or more of the Defendants, including by granting voting rights, transfer-restriction rights, payment priorities, or the right to veto an event of default under the applicable loan agreements, as set out in more detail above in the discussion of the May 2011 Amendments, the September 2015 Amendments, the September 2015 Proxies, Credit Agreement Amendments, and the November 2017 Written Consents (collectively, the "Voting/Control Actions"). The Voting/Control Actions were undertaken without providing any consideration to the Zohar Funds for relinquishing or diminishing their rights.

257.    All of the Voting/Control Actions exceeded the scope and authority of the Patriarch Managers to act on behalf of the Zohar Funds. The Patriarch Managers were empowered to act on behalf of the Zohar Funds only "[t]o the extent necessary or appropriate to perform all of the duties to be performed by it [under the CMA] and under the provisions of the Indenture applicable to it". *See* Exs. 4 through 6 at § 2.5.

258.    Under the CMAs, the Patriarch Managers' actions were required to comply with the Indentures, be taken in good faith, at arm's length, done according to a standard of care, and comport with applicable laws and prevailing market standards. The Patriarch Managers were not permitted to take any action that would violate or cause a violation of the Indentures. The Voting/Control Actions were not taken in good faith, at arm's length, according to a standard of care, and in compliance with applicable laws and prevailing market standard. The Voting/Control Actions were not consistent with the Zohar Funds' obligations under their Indentures.

259.    Because the Voting/Control Actions were not necessary or appropriate in connection with the collateral manager's role nor consistent with the provisions of the Indenture, they exceeded the authority conferred upon the Patriarch Managers to act for the Zohar Funds.

260.    Tilton, directly or indirectly controlled each party to each of the Voting/Control Actions.  She was aware or should have been aware that the Voting Control Actions exceeded the scope of the Patriarch Managers' authority to act for the Zohar Funds.  Tilton's actual or imputed knowledge that the Patriarch Managers were not authorized to take the Voting/Control Actions can be imputed to all other participants in the Voting/Control Actions based on Tilton's control of those entities.

261.    In addition, the November 2017 Written Consents were executed by Tilton as LLC manager in contravention of applicable state law, which permits amendment of the LLC Agreements only by action of the members.  Tilton purported to sign each such document on behalf of every party thereto.

262.    Tilton has repeatedly asserted that the Zohar Funds' actions to remove her and entities associated with her from positions of authority, such as director, manager, and officer at the Portfolio Companies, were invalid by reason of the Voting/Control Actions.  Tilton has also repeatedly asserted that the Zohar Funds' actions to terminate contracts between the Portfolio Companies and entities associated with Tilton were invalid by reason of the Voting/Control Actions.

263.    Accordingly, a justiciable controversy exists as to (a) the enforceability of the amendments, proxies, and other documents or provisions encompassed by the Voting/Control Actions and (b) the validity of the actions taken to remove Tilton and her entities from their positions of power at or with the Portfolio Companies, which actions Tilton caused the Portfolio Companies to disregard based on Tilton's contention that the Voting/Control Actions nullified the

Zohar Funds power to remove Tilton or her entities or to cancel contracts between Tilton or her entities and the Portfolio Companies.

264.    The Zohar Funds therefore seek, at a minimum, a declaration that the Voting/Control Actions were void *ab initio* and are deemed unenforceable.

### COUNT III : DECLARATORY JUDGMENT (PPMG AGREEMENTS)
### (By the Zohar Funds Against PPMG)

265.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

266.    The PPMG Agreements expressly state that they would terminate when PPMG, Patriarch Partners, LLC, investment funds managed by the foregoing and affiliates of the foregoing (collectively, the "Patriarch Entities"), together with any co-investors, own or control, in the aggregate, less than both (x) 30% of the voting power of the Company and (y) 30% of the fair market value of the issued and outstanding equity securities of the Company.

267.    Following the replacement of the Patriarch Managers with AMZM as collateral manager, the Patriarch Entities did not own or control more than 30% of the equity in any of the Portfolio Companies, except MD Helicopters (where Ark Entities assert approximately 41% of the ownership of the equity).

268.    Nonetheless, PPMG has repeatedly acted as if the PPMG Agreements have not terminated.

269.    Accordingly, a justiciable controversy exists among the parties with regard to the termination of the PPMG Agreements.

270.    The Zohar Funds therefore seek a declaration that the PPMG Agreements terminated upon the Patriarch Managers' replacement as collateral manager at all Portfolio Companies other than MD Helicopters.

**COUNTS SEEKING REMEDIES FOR MISCONDUCT IN
COLLATERAL MANAGEMENT**

**COUNT IV :  BREACHES OF CMAS AND INDENTURES**
**(By the Zohar Funds Against Patriarch Managers)**

271.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

272.    As set forth above, each of the Patriarch Managers entered into a CMA by which it agreed to act as collateral manager for one of the Zohar Funds. Patriarch Partners VIII entered into a CMA with Zohar I, Patriarch Partners XIV entered into a CMA with Zohar II, and Patriarch Partners XV entered into a CMA with Zohar III.

273.    The CMAs charged the Patriarch Managers with:

- "determin[ing] . . . the specific Collateral to be acquired, originated, restructured, exchanged, held or disposed of by the [Zohar Funds]";

- "effectuat[ing] the acquisition, origination, restructuring, exchange or disposition of Collateral on behalf of the [Zohar Funds]";

- "monitor[ing] the Collateral on an ongoing basis";

- "mak[ing] determinations with respect to the exercise or enforcement of any and all rights by the [Zohar Funds] . . . or rights or remedies in connection with the Collateral . . ."; and

- "negotiat[ing] on behalf of the [Zohar Funds] with prospective purchasers of the Collateral [and] with any Person in connection with the possible workout, amendment or restructuring of the Collateral or any obligor . . . thereon . . . ."

- "us[ing] reasonable care and the same degree of skill and attention . . . that the Collateral Manager exercises with respect to comparable assets that it manages for itself . . . and exercised by institutional investment managers of national standing generally . . ."

- "follow[ing] its customary standards, policies, and procedures in performing its duties . . ."

- "[refraining] from tak[ing] any action which . . . would cause the [Zohar Fund] to violate the terms of the Indenture," "materially adversely affect the interests of the [Zohar Funds' investors]," or that would "not be permitted under the governing instruments of the [Zohar Funds.]"

Zohar I and II CMA, §§ 2.2(n), 2.4, 2.6, 2.9; Zohar III CMA, §§ 2.2(l), 2.4, 2.6, 2.9.

274.    The CMAs provided that, in carrying out these duties, "The Collateral Manager shall comply with such other duties and responsibilities as may be expressly required of the Collateral Manager by the provisions of the Indenture . . . and shall use commercially reasonable efforts to assist the Company in complying with its duties and responsibilities under the Indenture. . . ." CMA, § 2.2(k).  Section 2.4 of the CMAs further provided:  "The Collateral Manager shall comply with all the terms and conditions of the Indenture . . . affecting the duties and functions that have been delegated to it thereunder."

275.    Section 2.2(c) of the CMA specified that the collateral manager may only modify, waive, or supplement the Zohar Funds' rights, including its voting rights, "so long as such amendment, modification, waiver or supplement does not contravene the provisions of the Indenture or this Agreement or contravene any applicable law or regulation."  And, Section 2.2(l) further stated that "The Collateral Manager shall not, on behalf of the Company and/or the Zohar Subsidiary, direct or effect the acquisition or disposition of the Collateral Investments or any other item included in the Collateral except in accordance with the requirements of the Indenture."

276.    Separately, under the Indentures, "the Collateral Manager … agrees to perform any provisions of this Indenture applicable to the Collateral Manager." Indentures, § 14.4. Among other things, the Indentures prohibited encumbrances on the Collateral, which the Voting/Control Actions undoubtedly were.  *See* Indentures § 7.8(a)(i).

277.    The CMAs state that the Patriarch Managers will be liable "by reason of acts or omissions constituting fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the other Transaction Documents to which it is a party." CMAs, § 4.4.

278.     At all times relevant, the CMAs were valid and enforceable contracts, and the Zohar Funds complied with all material terms of the CMAs.

279.     At all times relevant, the Indentures were valid and enforceable contracts, and the Zohar Funds complied with all material terms of the Indentures.

280.     The Patriarch Managers have knowingly and intentionally breached the CMAs or have breached the CMAs through fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty through the actions described herein.

281.     Moreover, under New York law, the covenant of good faith and fair dealing is an implied term of every contract.

282.     In the event that the actions alleged herein, somehow, did not breach the express terms of the CMAs, the actions breached the implied covenant of good faith and fair dealing.

**A.     The Voting/Control Actions and other debt and equity actions breached the CMAs and Indentures.**

283.     Among other things, the Patriarch Managers have knowingly and intentionally breached the CMAs or have breached the CMAs through fraud, bad faith, willful misconduct, gross negligence or breach of fiduciary duty in taking or purporting to take the Voting/Control Actions outside of the scope of the authority conferred upon the Patriarch Managers, and in violation of the standard of conduct governing the Patriarch Managers, under the CMA.

284.     The Patriarch Managers permitted valuable debt rights to be impaired or otherwise transferred to the Portfolio Companies or the Defendants, through various amendments, and transferred the Zohar Funds' valuable rights, interests or proceeds of equity in the Portfolio Companies that rightly belonged to the Zohar Funds, including dividends and sale proceeds, to the Defendants, through, among other things, the various Voting/Control Actions described herein, if effective.  These actions breached the CMAs in two separate ways.

285.   First, if effective, these actions caused the Zohar Funds to breach the Indentures, which the CMAs forbid the collateral manager from doing in multiple provisions, including Sections 2.2 and 2.4.

286.   Second, the actions transferred value from the Zohar Funds to Tilton and her various affiliates in a manner that was not entirely fair to the Zohar Funds and was not consistent with arms-length business practices.  This breached numerous provisions of the CMA, including Sections 2.2 and 2.4, and the implied covenant of good faith and fair dealing.

**B.     The Patriarch Managers breached the CMAs and Indentures by manipulating the OC Tests.**

287.   The Zohar I and II Indentures provided that:

> Upon the acquisition of each Collateral Debt Obligation by the Issuer, the Collateral Manager shall designate (in a writing delivered to the Trustee and the Credit Enhancer) each such Collateral Debt Obligation as falling within Category 1, Category 2, Category 3 or Category 4. After the acquisition of each Collateral Debt Obligation by the Issuer and/or the Zohar Subsidiary, to the extent that the characterization of such Collateral Debt Obligation shall change, the Collateral Manager shall redesignate (in a writing delivered to the Trustee and the Credit Enhancer) each such Collateral Debt Obligation as falling within Category 1, Category 2, Category 3 or Category 4 or as a Workout Obligation.

Zohar I and II Indentures, § 12.1(b).

288.   Section 1.1 of the Zohar I and II Indentures set out definitions for each of these categories, which include objective criteria for determining a particular asset's classification, most of which are tied to the likelihood of repayment on that asset.  To be a Category 4 asset, the loan must, among other things, be a "Current Collateral Debt Obligation" (*i.e.*, it must not be in (or near) default related to payment of interest or principal or subject to other adverse conditions) and must not have a "significant risk of declining in credit quality."  In general, Category 1 assets consisted of loans that were not "Current Collateral Debt Obligations" (*i.e.*, "Non-Current

Obligations"), which were "Defaulted Obligations" (*i.e.*, loans in (or near) default related to payment of interest or principal, among other conditions) where the interest payable had been deferred or capitalized and had not been paid.[28]

289.    Likewise, the Zohar III Indenture provided that a "Defaulted Investment" is an Investment

> as to which the Collateral Manager believes, that (A) a default has occurred and is continuing with respect to such Collateral Investment that in the sole judgment of the Collateral Manager will likely result in a default as to the payment of principal and/or interest on such Collateral Investment or (B) a default as to the payment of principal and/or interest (beyond any applicable grace period) has occurred and is continuing on another obligation of the same issuer that is senior or *pari passu* in right of payment … .

Zohar III Indenture, § 1.1.  By contrast, at Zohar III, a "Collateral Investment" is an "outstanding loan or obligation" that is not a "Defaulted Investment". *Id.*

290.    Under the Indentures, to calculate the "Class A Overcollateralization Ratio Test", Category 4 or "Collateral Investment" assets were typically valued at their principal amounts, while Category 1 or "Defaulted Investment" assets were valued at a lower amount, generally either the market value of that asset, or a substantially impaired value dictated by the asset's Moody's rating.

291.    Section 2.4(f) of the CMAs required the Patriarch Managers to determine the appropriate categorization of the Zohar Funds' loans into Categories 1 through 4 or whether it is a "Defaulted Investment," as applicable.  The Patriarch Managers knowingly and intentionally breached the CMAs by incorrectly categorizing the Zohar Funds' assets using higher quality categorizations than were warranted, resulting in inflated principal balances being used as part of

---

[28] In practice, Categories 2 and 3 generally were not utilized.

the OC Test in violation of the Indentures.  By managing the categorization of the various loan assets to allow reporting the OC Tests as passed when they were actually failing and by allowing the OC Tests to be calculated based on an inflated valuation of the Zohar Funds' assets, the Patriarch Managers obtained collateral management fees, and the Octaluna Entities obtained preference-share payments, to which the Patriarch Managers and the Octaluna Entities were not entitled.  Moreover, the Patriarch Managers were able to retain control over the Zohar Funds for longer than they would have otherwise.

292.    In addition to violating express provisions of the CMAs and Indentures, the foregoing actions were taken in violation of the covenant of good faith and fair dealing implied in those contracts.

### C.    The Patriarch Managers breached the CMAs by failing to report to the Trustee the deterioration of the Portfolio Companies.

293.    The CMAs required the Patriarch Managers to provide specified information to the Trustee of the Zohar Funds.

294.    Among other things, Section 2.2(f)(iv) specifically required the Patriarch Managers to "monitor from time to time the cash flows generated by the portfolio of Collateral Investments and notify the Trustee when such cash flows materially deviate from the expected cash flows in respect of such portfolio[.]"  Upon information and belief, the cash flows generated by many of the Portfolio Companies deviated from the expected cash flows for a substantial period of time without the Patriarch Managers alerting the Trustee.

295.    The Patriarch Managers breached these obligations and the implied covenant of good faith and fair dealing to conceal the state of the Portfolio Companies and to prolong their and Tilton's control over the collateral.

**D.      The Patriarch Managers breached the CMAs by directing the distribution of funds for borrowings for which the conditions precedent had not been satisfied.**

296.    The CMAS require the Collateral Manager to "use reasonable care and the same degree of skill and attention . . . that the Collateral Manager exercises with respect to comparable assets that it manages for itself . . . and exercised by institutional investment managers of national standing generally . . ." including by "follow[ing] its customary standards, policies, and procedures in performing its duties . . ." Zohar III CMA, § 2.4.  The Collateral Manager also must refrain "from tak[ing] any action which . . . would cause the [Zohar Fund] to violate the terms of the Indenture," "materially adversely affect the interests of the [Zohar Funds' investors]," or that would "not be permitted under the governing instruments of the [Zohar Funds.]" *Id.* § 2.6.

297.    The Patriarch Managers violated these obligations under the CMAs when, in February and March 2016, they directed by Issuer Order that the Zohar Funds' trustee disburse funds to PPAS for borrowings under Credit Agreements for which the conditions precedent had not been satisfied, including because no Borrowing Certificate had been received from the Portfolio Company requesting such borrowings, nor in many cases was the Portfolio Company even aware the borrowing was occurring.

**E.      The Zohar Funds are Entitled to Relief.**

298.    As a result of the Patriarch Managers' breaches of the CMAs, the Zohar Funds have suffered economic loss and damages in an amount to be proven at trial, and are entitled to be placed in the same situation as if the CMAs had not been violated. The Zohar Funds have also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect their rights under the CMAs and the Indentures.

299.     The Zohar Funds seek rescission of the transactions executed by the Patriarch Managers in breach of the CMAs and damages in the amount of losses caused by the Patriarch Managers' breaches of the CMAs.

## COUNT V :   TORTIOUS INTERFERENCE WITH CMAS AND INDENTURES
### (By the Zohar Funds Against Lynn Tilton)

300.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

301.     As set forth above, each of the Patriarch Managers entered into a CMA by which it agreed to act as collateral manager for the Zohar Funds. Patriarch Partners VIII entered into a CMA with Zohar I, Patriarch Partners XIV entered into a CMA with Zohar II, and Patriarch Partners XV entered into a CMA with Zohar III.

302.     At all times relevant, the CMAs were valid and enforceable contracts, and the Zohar Funds complied with all material terms of the CMAs.

303.     At all times relevant, the Indentures were valid and enforceable contracts, and the Zohar Funds complied with all material terms of the Indentures.

304.     Tilton, as the manager and ultimate owner of the Patriarch Managers, had and has knowledge of the CMAs and Indentures and the respective rights and obligations of the Zohar Funds and the Patriarch Managers under the CMAs and Indentures.

305.     Tilton wrongfully and intentionally interfered with the contractual relationships between the Zohar Funds and the Patriarch Managers by directing or otherwise causing the Patriarch Managers—closely held companies that she controls and dominates—to breach the CMAs and Indentures, or by causing the Patriarch Managers to cause the Zohar funds to breach the Indentures, as set forth in Count IV hereof.

306.     Among other things, Tilton caused the Patriarch Managers to: (a) purport to transfer the Zohar Funds' voting and equity control rights over the Portfolio Companies from the Zohar

Funds to entities controlled by Tilton, including through the Voting/Control Actions, (b) manipulate the OC Test by incorrectly categorizing the Zohar Funds' assets resulting in inflated principal balances being used in the OC Test in violation of the Indentures, and (c) fail to report deterioration in the Portfolio Companies' financial condition and cash flow to the Trustee.

307.    Tilton did not take the actions complained of in her capacity as an agent, representative or employee of the Patriarch Managers.  Rather, Tilton manipulated the Patriarch Managers' actions to benefit herself personally, directly and through other entities that she owns and controls.

308.    As a result of Tilton's tortious interference with the contractual relationships between the Zohar Funds, their noteholders, and the Patriarch Managers, the Zohar Funds suffered damages in an amount to be determined by the Court.

### COUNT VI :  BREACH OF FIDUCIARY DUTIES OWED IN COLLATERAL MANAGEMENT
**(By the Zohar Funds Against Patriarch Managers and Lynn Tilton)**

309.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

310.    Tilton, through the Patriarch Managers, provided investment and advisory services to the Zohar Funds.  Tilton and her Patriarch Managers were tasked with managing the Zohar Funds' investments, and were designated power to act on behalf of the Zohar Funds, including to execute all "necessary, desirable and appropriate documents and/or instruments in the name and on behalf of" the Zohar Funds. CMAs, § 2.5.

311.    As collateral managers, the Patriarch Managers and their controller Tilton held a position of confidence and trust with respect to the Zohar Funds, which the Patriarch Managers knew of and accepted, and were obligated to act as agents on behalf of the Zohar Funds in good faith and with due regard to the Zohar Funds' interests.

312.    Tilton and the Patriarch Managers owed fiduciary duties of loyalty, which obligated them to put the interests of the Zohar Funds ahead of their own self-interest, to disclose material facts, and to refrain from exploiting the relationship for the benefit of themselves and other entities owned by Tilton.

313.    Tilton and the Patriarch Managers breached their fiduciary duties by, among other things, wrongfully consenting on behalf of the Zohar Funds to the Voting/Control Actions that purportedly transferred valuable interests, including debt and equity interests and rights owned and held by the Zohar Funds, to Patriarch Managers and the other Defendants, as well as permitting or authorizing the distribution or transfer of valuable rights and interests in, and the proceeds of, debt and equity held or owned by the Zohar Funds to be transferred or distributed to the Defendants and their affiliates.  The Tax Dividends, which should have been paid to the Zohar Funds as the partners or members of these Portfolio Companies, are among these equity proceeds.  Tilton and the Patriarch Managers abused their role as the Zohar Funds' fiduciary by including provisos for payment of the Tax Dividends directly to Tilton's affiliates within LLC Agreements, and then allowing such payments to occur.  These actions were self-dealing exploitations of Tilton and the Patriarch Managers' position of power and control over the Zohar Funds.  Through this conduct, Tilton and the Patriarch Managers placed the Defendants' own interests above those of the Zohar Funds and caused economic damages to the Zohar Funds.

314.    Tilton and the Patriarch Managers also violated their fiduciary duties by, among other things, manipulating the OC Test and incorrectly categorizing the Zohar Funds' assets (resulting in inflated principal balances being used in the OC Test) in violation of the Indentures, in acts of self-dealing and exploitation of their position of power and control with respect to the Zohar Funds.  Through this conduct, Tilton and the Patriarch Managers placed the Defendants' own interests above those of the Zohar Funds and caused economic damages to the Zohar Funds.

315.    Since their inception, the Zohar Funds paid the Patriarch Managers hundreds of millions of dollars in collateral management fees in exchange for the Patriarch Managers' services as the Zohar Funds' fiduciaries and agents.

316.    Each of Tilton and the Patriarch Managers aided and abetted the others' breaches of fiduciary duty by knowingly participating in the breaches of duty.

317.    As a direct and proximate result of the conduct of Tilton and the Patriarch Managers, the Zohar Funds have suffered damages in an amount to be proven at trial.

318.    By reason of their breaches of their fiduciary duties owed to the Zohar Funds, the Patriarch Managers are faithless servants and are required to forfeit all money that they received from the Zohar Funds as of the first day that they breached their duties.

### COUNT VII :  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (By the Zohar Funds Against Tilton)

319.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

320.    Plaintiffs plead this Count solely in the alternative to their claim in Count VI that Tilton breached the fiduciary duties that Tilton herself owed to the Zohar Funds.  If Tilton did not herself owe fiduciary duties to the Zohar Funds, she aided and abetted the Patriarch Managers breaches of the fiduciary duties that they owed to the Zohar Funds.

321.    The Patriarch Managers owed the Zohar Funds fiduciary duties as collateral managers to the Zohar Funds.

322.    The Patriarch Managers breached their fiduciary duties to the Zohar Funds, as set forth in Count VI herein.

323.    Tilton knowingly participated in the Patriarch Managers' breaches of their fiduciary duties owed to the Zohar Funds.  Among other things, Tilton controlled all of the actions taken by the Patriarch Managers, as alleged herein.  Tilton knowingly caused the Patriarch Managers to take

many of the actions by which the Patriarch Managers breached their fiduciary duties for the purpose of enriching Tilton either personally or through other entities she directly or indirectly owned and controlled.

324.    As a direct and proximate result of the conduct of Tilton and the Patriarch Managers, the Zohar Funds have suffered damages in an amount to be proven at trial.

## COUNT VIII : CONVERSION OF ZOHAR FUNDS' PROPERTY
### (By the Zohar Funds Against the Patriarch Managers, Class B Parties, Proxy Grantees, Octaluna Entities, Ark Entities, PPAS, and Tilton)

325.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

326.    As set forth more fully above, the Zohar Funds were the owners of equity interests issued or otherwise created in their names (with the relevant equity interests to be established at trial), and of debt memorialized by a series of loan agreements between the Zohar Funds and Portfolio Companies.

327.    Tilton and the other Defendants, including the Patriarch Managers, the Octaluna Entities and the Ark Entities, intentionally interfered with the property rights of the Zohar Funds by diverting and exercising dominion and control over the equity interests owned by the Zohar Funds, or acquired with capital extended by the Zohar Funds, including sale proceeds, dividends and other distributions on account of these equity interests, thereby depriving the Zohar Funds of the use of that property.  Based on allegations made by the Zohar Funds' prior collateral manager, AMZM, in prior litigation, this included, among other things, the proceeds of the sale of HVEASI Holding BV, which was at various times represented to have been owned 100% by Zohar II. Additionally, Tilton intentionally interfered with the property rights of the Zohar Funds by taking the Voting/Control Actions designed to strip the Zohar Funds of their valuable rights in the Portfolio Companies property and transferring them to Tilton and her affiliated entities, including

Ark II, the Class B Parties, the Proxy Grantees, and the Octaluna Entities, thereby unlawfully exercising dominion and control over the Zohar Funds' property and depriving the Zohar Funds of the use of that property.   The May 2011 Amendments, September 2015 Amendments, September 2015 Proxies, and November 2017 Written Consents each purported to convey, in whole or in part, the Zohar Funds' inherent right to vote their equity interests in the applicable Portfolio Companies to Tilton or her affiliated entities, including the Octaluna Entities, the Class B Parties, and the Proxy Grantees.   Through these actions, Tilton, the Octaluna Entities, the Class B Parties, and the Proxy Grantees intentionally exercised dominion and control over the Zohar Funds' equity interests in the Portfolio Companies.

328.    In addition, the Credit Agreement Amendments purported to restructure outstanding loans to waive or restructure unpaid interest or commitment fees; to waive the Zohar Funds' ability to declare an Event of Default in most cases; to waive other existing Events of Default; to grant sole discretion to waive certain Events of Default under the Credit Agreements to PPAS; and to require consent from PPAS for any amendment, modification, termination or waiver of any provision of the Credit Agreements, among other changes.   Thus, the November 2015 Credit Amendment expressly divested the Zohar Funds of their rights to control their loans to the Portfolio Companies.

329.    The Credit Agreement Amendments served to transfer the authority and rights previously held by the Zohar Funds under the Credit Agreements to PPAS, an entity owned and controlled by Tilton, thereby unlawfully exercising dominion and control over the Zohar Funds' property and depriving the Zohar Funds of the use of that property.   Further, the Patriarch Managers, PPAS, or both, purporting to act on behalf of the Zohar Funds, as lenders, consented to the subordination of the Zohar Funds' loans to new loans made by the Ark Entities (which were affiliates of the Patriarch Managers and PPAS), and the subordination of the liens securing the

Zohar Funds' loans to the liens securing the new loans made by the Ark Entities.  Finally, PPAS improperly retained amounts loaned by the Zohar Funds to the Portfolio Companies, amounts paid by the Portfolio Companies to PPAS on account of loans made by the Zohar Funds, and amounts otherwise collected and received by PPAS on account of loans made by the Zohar Funds, and withheld such amounts from the Zohar Funds.

330.    As a direct and proximate result of the conduct of the Patriarch Managers, the Octaluna Entities, PPAS, and Tilton, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

### COUNT IX :  ACTUAL FRAUDULENT TRANSFER
### (By the Zohar Funds Against Patriarch Managers, Class B Parties, Octaluna Entities, PPAS, Ark I, AIP, and Ark II)

331.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

332.    The May 2011 Amendments resulted in the transfer of interests in the Zohar Funds' property (namely, critical governance and control rights in the equity of the Portfolio Companies) and the incurrence of governance and control obligations (the "May 2011 Transfers").

333.    The September 2015 Amendments and the September 2015 Proxies resulted in the transfer of interests in the Zohar Funds' property (namely, critical governance and control rights in the equity of the Portfolio Companies) to the Class B Parties and the Proxy Grantees, respectively, and the incurrence of governance and control obligations (namely, the obligation to obtain the consent of the Class B Parties and the Proxy Grantees, as applicable) (collectively, the "September 2015 Transfers").

334.    The Credit Agreement Amendments resulted in the transfer of interests in the Zohar Funds' property (namely, critical control rights in the Zohar Funds' loans to the Portfolio Companies, including the ability to declare or waive certain events of default) to PPAS and the

incurrence of control obligations (including the obligation to obtain PPAS's consent to amend, modify, terminate, or waive any provision of the Credit Agreements) (the "November 2015 Transfers").

335.    The November 2017 Written Consents resulted in the transfer of interests in the Zohar Funds' property (namely, critical governance and control rights in the equity of the Portfolio Companies) to the Octaluna Entities and the incurrence of governance and control obligations (namely, the obligation to obtain the consent of the Octaluna Entities) (the "November 2017 Transfers" and, together with the May 2011 Transfers, the September 2015 Transfers, and the November 2015 Transfers, the "Voting/Control Transfers").

336.    The Patriarch Managers made the Voting/Control Transfers to and for the benefit of Tilton and her affiliated entities, including Ark II, the Class B Parties, the Proxy Grantees, the Octaluna Entities, and PPAS.

337.    The Voting/Control Transfers were steps in a single, integrated effort to entrench Tilton at the Portfolio Companies.

338.    The Voting/Control Transfers were made with an actual intent to hinder, delay, and/or defraud the Zohar Funds' creditors, to the detriment and harm of such creditors. Such intent can be inferred from, among other things, the Voting/Control Transfers were made to and for the benefit of insiders of the Zohar Funds (Tilton and her affiliates), the transfers were made without consideration to the Zohar Funds, the transfers were made in violation of affirmative obligations of the Zohar Funds not to engage in such transactions, the nature and extent of these had been concealed from the Zohar Funds' non-Tilton affiliated investors actions (in fact much of the Zohar Funds' ownership of the equity itself had been concealed), and the Zohar Funds were insolvent at the time of the Voting/Control Transfers.  Further, the bulk of the Voting/Control Transfers occurred immediately before the maturity default at Zohar I in November 2015, which Tilton knew

would likely lead to the collapse of the entire Zohar Funds' structure and the exercise of remedies against the very equity that Tilton purported to transfer control of to herself.  At the time of the Voting/Control Transfers, Tilton completely dominated and controlled the Zohar Funds, and she was uniquely positioned to cause the Zohar Funds to make the subject transfers.  Accordingly, her intent should be imputed to the Zohar Funds.

339.    As a result of the Voting/Control Transfers, the Zohar Funds and their creditors have been harmed.

340.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, the Zohar Funds may avoid any transfer of an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of the Zohar Funds exist who could avoid the Voting/Control Transfers under applicable non-bankruptcy law.

341.    The Voting/Control Transfers are avoidable as actual fraudulent transfers under Section 544 of the Bankruptcy Code and applicable state law, including NY DCL § 276 and 6 *Del. C.* § 1304.

342.    Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover the property fraudulently transferred in the Voting/Control Transfers, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

## COUNT X :   CONSTRUCTIVE FRAUDULENT TRANSFER
### (By the Zohar Funds Against Patriarch Managers, Class B Parties, Octaluna Entities, PPAS, and Ark II)

343.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

344.     The Voting/Control Transfers were transfers of interests in the property of the Zohar Funds to and for the benefit of Tilton and her affiliated entities, including Ark II, the Class B Parties, the Proxy Grantees, the Octaluna Entities, and PPAS.

345.     The Voting/Control Transfers were steps in a single, integrated effort to entrench Tilton at the Portfolio Companies.

346.     The Voting/Control Transfers were made for no consideration, without fair consideration, or for less than reasonably equivalent value.

347.     The Voting/Control Transfers were made (a) when the Zohar Funds were insolvent, (b) when the Zohar Funds had unreasonably small capital for the conduct of their business, or (c) when the Zohar Funds had incurred, and in the future would incur, debts beyond their ability to pay.

348.     Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, the Zohar Funds may avoid any transfer for an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of the Zohar Funds exist who could avoid the Voting/Control Transfers (other than the May 2011 Amendments) under applicable non-bankruptcy law.

349.     The Voting/Control Transfers (other than the May 2011 Amendments) are avoidable as constructively fraudulent transfers under Section 544 of the Bankruptcy Code and applicable state law, including NY DCL §§ 273 through 275 and 6 *Del. C.* §§ 1304 and 1305.

350.     Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover the property fraudulently transferred in the Voting/Control Transfers (other than the May 2011 Amendments) , or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

**COUNT XI :  ACTUAL FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(A)(1)(A)**
**(By the Zohar Funds Against the Octaluna Entities)**

351.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

352.    The November 2017 Transfers were transfers of interests in the property of, and obligations incurred by, the Zohar Funds to and for the benefit of Tilton and her affiliates, the Octaluna Entities.

353.    The November 2017 Transfers were made with an actual intent to hinder, delay, and/or defraud the Zohar Funds' creditors, to the detriment and harm of such creditors. Such intent can be inferred from, among other things, the November 2017 Transfer were made to and for the benefit of insiders of the Zohar Funds (Tilton and her affiliates), the transfers were made without consideration to the Zohar Funds, the transfers were made in violation of affirmative obligations of the Zohar Funds not to engage in such transactions, the nature and extent of these actions were concealed from the Zohar Funds' independent, third-party collateral manager AMZM, and the Zohar Funds were insolvent at the time of the Voting/Control Transfers.  Further, the November 2017 Transfer was made in the midst of heated litigation between the Zohar Funds and Tilton and her affiliates over the ownership and control of the Portfolio Companies, and in fact was made on the very day that Tilton filed three lawsuits contesting the Zohar Funds' ownership of the three subject Portfolio Companies.  Moreover, the Zohar Funds' collapse was well underway, with Zohar I and Zohar II having defaulted, and Zohar III with no apparent prospects to repay its notes, which were maturing just a year and a half after the November 2017 Transfers.  At the time of the November 2017 Transfers, Tilton had placed herself in a position to exercise complete domination and control of the Zohar Funds' interest in the three subject Portfolio Companies and she was uniquely positioned to control the terms and occurrence of the subject transfers.  Accordingly, her intent should be imputed to the Zohar Funds.

354.    As a result of the November 2017 Transfers, the Zohar Funds and their creditors have been harmed.

355.    Pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, the November 2017 Written Consents should be avoided by Order of the Court.

356.    Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover the property fraudulently transferred in the November 2017 Transfers, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

## COUNT XII : CONSTRUCTIVE FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(A)(1)(B)
### (By the Zohar Funds Against the Octaluna Entities)

357.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

358.    The November 2017 Transfers were transfers of interests in the property of, and were obligations incurred by, the Zohar Funds to and for the benefit of Tilton and her affiliates, the Octaluna Entities.

359.    The November 2017 Transfers were made for no consideration, without fair consideration, or for less than reasonably equivalent value.

360.    The November 2017 Transfers were made (a) when the Zohar Funds were insolvent, (b) when the Zohar Funds had unreasonably small capital for the conduct of their business, or (c) when the Zohar Funds had incurred, and in the future would incur, debts beyond their ability to pay.

361.    Pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the November 2017 Written Consents should be avoided by Order of the Court.

362.     Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover the property fraudulently transferred in the November 2017 Transfers, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

## COUNT XIII : UNJUST ENRICHMENT (DEBT AND EQUITY ACTIONS)
### (By the Zohar Funds Against Ark Entities, Octaluna Entities, PPAS, PPMG, and Tilton)

363.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

364.     The Patriarch Managers caused the Zohar Funds, as their attorney-in-fact, to take the Voting/Control Actions in violation of the CMAs.   One purpose and effect of the Voting/Control Actions was to personally enrich Tilton, including through her various affiliated entities, at the Zohar Funds' expense.

365.     As a result of the Voting/Control Actions, Tilton was able to remain in her roles as officer and director of the various Portfolio Companies. PPMG was able to remain in place under its various management agreements with the Portfolio Companies; PPAS was able to remain in place as the administrative agent for the Portfolio Companies; and the Ark Entities were able to extend loans to the Portfolio Companies on terms favorable to the Ark Entities and prejudicial to the now-subordinated Zohar Funds.

366.     Tilton and her affiliated entities, PPMG and PPAS, have been substantially enriched by their entrenched roles with the Portfolio Companies, having received tens of millions of dollars of payments from the Portfolio Companies.[29]   But for the Patriarch Managers' wrongful acts, the amounts received by Tilton, PPMG, and PPAS would have been available for loan

---

[29] These include amounts PPMG received pursuant to Paragraph 18 upon the sales of FSAR Holdings, Inc., RM Acquisition, and Libertas Copper, LLC, based upon invalid claims of indemnification.

payments to the Zohar Funds or dividends and distributions on the equity interest owned by Zohar Funds.

367.     Tilton, as well as the Ark Entities and the Octaluna Entities, acting through Tilton, knew of and played an active role in the Patriarch Mangers' transfer, or consent and acquiescence to the transfer, of valuable rights in the Portfolio Companies and valuable equity distributions away from the Zohar Funds.  The Octaluna Entities and Ark Entities as the alleged holders of the equity in the Portfolio Companies, and Tilton as their indirect owner, were the recipients of these valuable transfers and distributions.

368.     The circumstances are such that it would be against equity and good conscience to permit Tilton, the Ark Entities, the Octaluna Entities, PPMG, and PPAS to retain their ill-gotten gains from the Zohar Funds.  Tilton, the Ark Entities, the Octaluna Entities, PPMG, and PPAS have an obligation to the Zohar Funds to make restitution for their ill-gotten gains. Tilton, the Ark Entities, the Octaluna Entities, PPMG, and PPAS have failed to make restitution to the Zohar Funds for their ill-gotten gains.

369.     Restitution should therefore be made by Tilton, the Ark Entities, the Octaluna Entities, PPMG, and PPAS to the Zohar Funds in an amount to be proven at trial.

**COUNT XIV :     UNJUST ENRICHMENT (OC TEST MANIPULATION)**
**(By the Zohar Funds Against the Octaluna Entities and Tilton)**

370.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

371.     Tilton and the Patriarch Managers manipulated the OC Test by incorrectly categorizing the Zohar Funds' assets and inflating the principal balances used in the OC Test in violation of the Indentures.

372.     By virtue of the OC Tests being reported as passed when they were actually failing and by virtue of the OC Tests being calculated based on an inflated valuation of the Zohar Funds'

assets, the Patriarch Managers obtained collateral management fees, and the Octaluna Entities obtained preference share payments, to which the Patriarch Managers and the Octaluna Entities were not entitled, and Patriarch retained control over the Zohar Funds for longer than they would have otherwise.

373.    Tilton and her affiliated entities, the Patriarch Managers and the Octaluna Entities, have been substantially enriched by the manipulations of the OC Test at the expense of the Zohar Funds. Due to the Patriarch Managers' wrongful acts, the Zohar Funds have paid substantial Subordinated Collateral Management Fees to the Patriarch Managers and substantial Preference Share Distributions to the Octaluna Entities, which the Patriarch Managers and the Octaluna Entities, respectively, were not entitled to receive.

374.    Tilton, and the Patriarch Managers and the Octaluna Entities, through Tilton, knew of and played an active role in the Patriarch Mangers' manipulations of the OC Test.

375.    The circumstances are such that it would be against equity and good conscience to permit Tilton and the Octaluna Entities to retain their ill-gotten gains from the Zohar Funds. Tilton and the Octaluna Entities have an obligation to the Zohar Funds to make restitution for their ill-gotten gains. Tilton and the Octaluna Entities have failed to make restitution to the Zohar Funds for their ill-gotten gains.

376.    Restitution should therefore be made by Tilton and the Octaluna Entities to the Zohar Funds in an amount to be proven at trial.

### COUNTS SEEKING REMEDIES FOR TAX ELECTION ISSUES

### COUNT XV : BREACH OF SUBSCRIPTION AGREEMENTS (CHECK-THE-BOX ELECTION)
#### (By the Zohar Funds Against the Octaluna Entities)

377.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

378.    Zohar I and Octaluna I were parties to a subscription agreement whereby Octaluna I acquired the preference shares in Zohar I.

379.    Zohar II and Octaluna II were parties to a subscription agreement whereby Octaluna II acquired the preference shares in Zohar II.

380.    Zohar III and Octaluna III were parties to a subscription agreement whereby Octaluna III acquired the preference shares in Zohar III.

381.    The aforementioned "Subscription Agreements," each a "Subscription Agreement" were valid and enforceable contracts at all relevant times under which the Zohar Funds have fully performed.

382.    Each Subscription Agreement attached an investor questionnaire on behalf of the applicable Octaluna Entity.  Paragraph 9 of each Subscription Agreement provides: "The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein."

383.    Under each investor questionnaire, the Octaluna Entities agreed that the Zohar Funds would be treated as a disregarded entity for tax purposes:

The Investor understands and agrees that:

> (1) Solely for United States Federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Preference Shares and other equity interests in the Issuer, the Issuer will be treated as a disregarded entity . . . .

384.    The Octaluna Entities further agreed to indemnify the Zohar Funds for any breaches of the agreements set forth in the Subscription Agreement and the other documents provided to the Zohar Funds in connection with the investment, such as the investor questionnaire:

> The Investor agrees to indemnify and hold harmless the Issuer, the Preference Share Paying Agent and each of their respective Affiliates from and against any loss, damage or liability due to or

> arising out of a breach of any representation, warranty or agreement
> of the Investor contained in this Subscription Agreement or in any
> other document provided by the Investor to the Issuer in connection
> with the Investor's investment in Preference Shares . . . .

385.    Beginning in 2016, the Octaluna Entities elected for the Zohar Funds to be taxed as corporations (*i.e.*, they each made a CTB Election), in contravention of the terms of the Subscription Agreements.  As a result of the CTB Election, for United States federal income tax purposes, all items of income, gain, and loss would no longer flow through to entities controlled by Tilton. Instead, each of the Zohar Funds became a taxable entity.

386.    As such, the Octaluna Entities breached the Subscription Agreements with the Zohar Funds.

387.    As a result of the Octaluna Entities' breaches of the Subscription Agreements, the Zohar Funds have suffered economic loss and damages in an amount to be proven at trial, and are entitled to be placed in the same situation as if the Subscription Agreements had not been violated. The Zohar Funds seek rescission of the transactions executed by the Octaluna Entities in breach of the Subscription Agreements, damages in the amount of losses caused by the Octaluna Entities' breaches of the Subscription Agreements, and indemnification for any loss, damage or liability due to or arising out of the Octaluna Entities' breaches.

388.    Moreover, under applicable law, the covenant of good faith and fair dealing is an implied term of every contract.

389.    In the event that the actions alleged herein, somehow, did not breach the express terms of the Subscription Agreements, the actions breached the implied covenant of good faith and fair dealing.

**COUNT XVI :  TORTIOUS INTERFERENCE WITH SUBSCRIPTION AGREEMENTS (CHECK-THE-BOX ELECTION)**
**(By the Zohar Funds Against Lynn Tilton)**

390.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

391.     The Subscription Agreements were valid and enforceable contracts at all relevant times. The Zohar Funds have complied with all material terms of the Subscription Agreements.

392.     Tilton, as signatory to the Subscription Agreements on behalf of the Octaluna Entities, had and has knowledge of the Subscription Agreements and the respective rights and obligations of the Zohar Funds and the Octaluna Entities under the Subscription Agreements.

393.     Under the Subscription Agreements, the Octaluna Entities agreed that the Zohar Funds would be treated as a disregarded entity for tax purposes.

394.     Tilton wrongfully and intentionally interfered with the contractual relationships set forth in the Subscription Agreements by electing, through the Octaluna Entities, for the Zohar Funds to be taxed as corporations. As a result of the CTB Election, for United States federal income tax purposes, all items of income, gain, and loss ceased flowing through to entities controlled by Tilton. Instead, each of the Zohar Funds became a taxable entity.

395.     As a result of Tilton's tortious interference with the contractual relationships set forth in the Subscription Agreements, Tilton has caused the Zohar Funds to suffer damages in an amount to be determined by the Court to sufficiently and fully compensate the Zohar Funds for the damages and losses suffered as result of Tilton's actions.

**COUNT XVII :  TORTIOUS INTERFERENCE WITH INDENTURE (CHECK-THE-BOX ELECTION)**
**(By the Zohar Funds Against the Octaluna Entities and Lynn Tilton)**

396.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

397.    The Indentures were valid and enforceable contracts at all relevant times. The Zohar Funds have complied with all material terms of the Indentures.

398.    Tilton and the Octaluna Entities, through Tilton, had and have knowledge of the Indentures and the Zohar Funds' rights and obligations under the Indentures.

399.    The Indentures contemplated and required that each of the Zohar Funds shall, for United States federal income tax purposes, be treated as a disregarded entity.

400.    Tilton and the Octaluna Entities wrongfully and intentionally interfered with the contractual relationships set forth in the Indentures by electing, on behalf of the Zohar Funds, for the Zohar Funds to be taxed as corporations. As a result of the CTB Election, for United States federal income tax purposes, all items of income, gain, and loss ceased flowing through to entities controlled by Tilton. Instead, each of the Zohar Funds became a taxable entity.

401.    As a result of Tilton's and the Octaluna Entities' tortious interference with the contractual relationships set forth in the Indentures, Tilton and the Octaluna Entities, through Tilton, have caused the Zohar Funds to suffer damages in an amount to be determined by the Court to sufficiently and fully compensate the Zohar Funds for the damages and losses suffered as result of Tilton's and the Octaluna Entities' actions.

### COUNT XVIII :    CONVERSION OF TAX DIVIDENDS
### (By the Zohar Funds Against the Octaluna Entities and Lynn Tilton)

402.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

403.    The Octaluna Entities and Tilton, as the ultimate taxpayers for the Octaluna Entities, received Tax Dividends from the Portfolio Companies, which are property of the Zohar Funds.

404.    For example, the audited 2018 financial statements for Stila disclose tax dividends paid to the Octaluna Entities in excess of $7 million dollars in 2017 and in excess of $5.9 million

in 2018.  Upon information and belief, other tax dividends were paid to other Octaluna Entities, which should have been paid to the Zohar Funds.

405.   Tilton and the Octaluna Entities have intentionally interfered with the property rights of the Zohar Funds by diverting and exercising dominion and control over the Tax Dividends owned by the Zohar Funds, thereby depriving the Zohar Funds of the use of that property.

406.   As a direct and proximate result of the conduct of Tilton and the Octaluna Entities, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

**COUNT XIX :**  **ACTUAL FRAUDULENT TRANSFER (CHECK-THE-BOX ELECTION)**
**(By the Zohar Funds Against the Octaluna Entities)**

407.   The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

408.   The CTB Election resulted in the Zohar Funds' incurrence of tax obligations that had previously been the tax obligation of Tilton and the Octaluna Entities.

409.   The CTB Election resulted in an obligation being incurred by the Zohar Funds solely for the benefit of Tilton and her affiliated entities, including the Octaluna Entities.

410.   The CTB Election was made with an actual intent to hinder, delay, and/or defraud the Zohar Funds' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, that the obligations were incurred for the benefit of insiders of the Zohar Funds (Tilton and her affiliates), the obligations were incurred without consideration to the Zohar Funds, the obligations were incurred in violation of affirmative obligations of the Zohar Funds not to engage in such transactions, and the Zohar Funds were insolvent at the time of the CTB Election. Further, the CTB Election was made to gain an advantage in looming litigation between the Zohar Funds and Tilton and her affiliates over the ownership and control of the Portfolio Companies. Since making the CTB Election, Tilton has repeatedly relied on the fact that the Zohar Funds are

subject to entity-level taxation to dissuade the Zohar Funds from asserting their ownership interest in the Portfolio Companies' equity.  Moreover, the Zohar Funds' collapse was well underway when she made the CTB Election, with Zohar I having defaulted, and Zohar II and Zohar III having no apparent prospects for repaying their notes, and Ms. Tilton (the Zohar Funds' shareholder) shifted her own tax liability onto the Zohar Funds at the time when she knew the Zohar Funds could not pay their third-party noteholders. Finally, Tilton was uniquely positioned to control the CTB Election and was the sole person who could have caused the Zohar Funds to incur entity-level tax obligations—notwithstanding that her signature appears on multiple documents containing covenants that the Zohar Funds not be subject to entity-level taxation.  Accordingly, her intent should be imputed to the Zohar Funds.

411.    As a result of the CTB Election, the Zohar Funds and their creditors have been harmed.

412.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, the Zohar Funds may avoid an obligation that has been incurred that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of the Zohar Funds exist who could avoid the CTB Election under applicable non-bankruptcy law.

413.    The CTB Election is avoidable as an actual fraudulent transfer under Section 544 of the Bankruptcy Code and applicable state law, including NY DCL § 276 and 6 *Del. C.* § 1304.

414.    Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover compensatory damages in an amount to be determined at trial from the direct and indirect transferees.

## COUNT XX : CONSTRUCTIVE FRAUDULENT TRANSFER (CHECK-THE-BOX ELECTION)
### (By the Zohar Funds Against the Octaluna Entities)

415.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

416.    The CTB Election resulted in the Zohar Funds' incurrence of tax obligations that had previously been the tax obligation of Tilton and the Octaluna Entities.

417.    The CTB Election resulted in an obligation being incurred by the Zohar Funds solely for the benefit of Tilton and her affiliated entities, including the Octaluna Entities.

418.    The CTB Election was made for no consideration, without fair consideration, or for less than reasonably equivalent value.

419.    The CTB Election was made (a) when the Zohar Funds were insolvent, (b) so as to render the Zohar Funds insolvent, (c) so as to leave the Zohar Funds with unreasonably small capital, or (d) when the Zohar Funds had incurred debts beyond their ability to pay.

420.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, the Zohar Funds may avoid an obligation that has been incurred that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of the Zohar Funds exist who could avoid the CTB Election under applicable non-bankruptcy law.

421.    The CTB Election is avoidable as a constructively fraudulent transfer under Section 544 of the Bankruptcy Code and applicable state law, including NY DCL §§ 273 and 275 and 6 *Del. C.* §§ 1304 and 1305.

422.    Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover compensatory damages in an amount to be determined at trial from the direct and indirect transferees.

**COUNT XXI :       ACTUAL FRAUDULENT TRANSFER UNDER 11 U.S.C.**
**§ 548(A)(1)(A) (CHECK-THE-BOX ELECTION)**
**(By the Zohar Funds Against the Octaluna Entities)**

423.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

424.    The CTB Election resulted in the Zohar Funds' incurrence of tax obligations that had previously been the tax obligation of Tilton and the Octaluna Entities.

425.    The CTB Election resulted in an obligation being incurred by the Zohar Funds solely for the benefit of Tilton and her affiliated entities, including the Octaluna Entities.

426.    The CTB Election was made with an actual intent to hinder, delay, and/or defraud the Zohar Funds' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, that the obligations were incurred for the benefit of insiders of the Zohar Funds (Tilton and her affiliates), the obligations were incurred without consideration to the Zohar Funds, the obligations were incurred in violation of affirmative obligations of the Zohar Funds not to engage in such transactions, and the Zohar Funds were insolvent at the time of the CTB Election. Further, the CTB Election was made to gain an advantage in looming litigation between the Zohar Funds and Tilton and her affiliates over the ownership and control of the Portfolio Companies. Since making the CTB Election, Tilton has repeatedly relied on the fact that the Zohar Funds are subject to entity-level taxation to dissuade the Zohar Funds from asserting their ownership interest in the Portfolio Companies' equity.  Moreover, the Zohar Funds' collapse was well underway when she made the CTB Election, with Zohar I having defaulted, and Zohar II and Zohar III having no apparent prospects for repaying their notes, and Ms. Tilton (the Zohar Funds' shareholder) shifted her own tax liability onto the Zohar Funds at the time when she knew the Zohar Funds could not pay their third-party noteholders. Finally, Tilton was uniquely positioned to control the CTB Election and was the sole person who could have caused the Zohar Funds to incur entity-level tax obligations—notwithstanding that her signature appears on multiple documents

containing covenants that the Zohar Funds not be subject to entity-level taxation.  Accordingly, her intent should be imputed to the Zohar Funds.

427.    As a result of the CTB Election, the Zohar Funds and their creditors have been harmed.

428.    Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, the CTB Election should be avoided by Order of the Court.

429.    Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover compensatory damages in an amount to be determined at trial from the direct and indirect transferees.

**COUNT XXII :        CONSTRUCTIVE FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(A)(1)(B) (CHECK-THE-BOX ELECTION) (By the Zohar Funds Against the Octaluna Entities)**

430.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

431.    The CTB Election resulted in the Zohar Funds' incurrence of tax obligations that had previously been the tax obligation of Tilton and the Octaluna Entities.

432.    The CTB Election resulted in an obligation being incurred by the Zohar Funds solely for the benefit of Tilton and her affiliated entities, including the Octaluna Entities.

433.    The CTB Election was made for no consideration, without fair consideration, or for less than reasonably equivalent value.

434.    The CTB Election was made (a) when the Zohar Funds were insolvent, (b) so as to render the Zohar Funds insolvent, (c) so as to leave the Zohar Funds with unreasonably small capital, or (d) when the Zohar Funds had incurred debts beyond their ability to pay.

435.    Pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the CTB Election should be avoided by Order of the Court.

436.    Under Section 550 of the Bankruptcy Code, the Zohar Funds are entitled to recover compensatory damages in an amount to be determined at trial from the direct and indirect transferees.

**COUNT XXIII :      [RESERVED]**

437.    [Reserved.]

438.    [Reserved.]

439.    [Reserved.]

**COUNT XXIV :      UNJUST ENRICHMENT (TAX DIVIDENDS)**
**(By the Zohar Funds Against the Octaluna Entities and Lynn Tilton)**

440.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

441.    The Octaluna Entities and Tilton, as the ultimate tax payers for the Octaluna Entities, were unjustly enriched by receipt of Tax Dividends from the Portfolio Companies, at the expense of the Zohar Funds, that were paid in addition to Preference Share Distributions intended to cover the same purported tax attributes.

442.    For example, the audited 2018 financial statements for Stila disclose tax dividends paid to the Octaluna Entities in excess of $7 million in 2017 and in excess of $5.9 million in 2018. Upon information and belief, other Tax Dividends were paid to other Octaluna Entities, which should have been paid to the Zohar Funds.

443.    Tilton and the Octaluna Entities have been substantially enriched by receipt of Tax Dividends from the Portfolio Companies, at the expense of the Zohar Funds.

444.    The circumstances are such that it would be against equity and good conscience to permit Tilton and the Octaluna Entities to retain their ill-gotten gains from the Zohar Funds. Tilton and the Octaluna Entities have an obligation to the Zohar Funds to make restitution for her ill-

gotten gains. Tilton and the Octaluna Entities have failed to make restitution to the Zohar Funds for their ill-gotten gains.

445.    Restitution should therefore be made by Tilton and the Octaluna Entities to the Zohar Funds in an amount to be proven at trial.

## COUNTS SEEKING REMEDIES FOR MISCONDUCT IN PORTFOLIO COMPANY MANAGEMENT

### COUNT XXV :    BREACHES OF LLC AGREEMENTS
**(By Zohar II 2005-1, Corp. individually and the Zohar Funds on behalf of the LLC Portfolio Company Litigants Against Lynn Tilton)**

446.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

447.    The Zohar Funds have standing to assert this claim directly with respect to the Class A Interests.

448.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp., has standing to assert this claim in respect of Tilton's breach of the RM Acquisition LLC Agreement because, (i) pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in RM Acquisition, this claim is a "Retained Claim" that was assigned to Zohar II 2005-1, Corp. in its capacity as Seller Representative for the benefit of the Sellers (each as defined in the equity purchase agreement), and (ii) this "Retained Claim" was a Litigation Asset (as defined in the Plan) conveyed to the Litigation Trust pursuant to the transactions set forth in the Plan.

449.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp., has standing to assert this claim in respect of Tilton's breach of the Second Amended and Restated Partnership Agreement for Heritage Aviation because, (i) pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in Heritage Aviation, this claim is a "Retained Claim" that was assigned to Zohar II 2005-1, Corp., in its capacity as Seller Representative for the benefit of the Sellers (each as defined in the equity purchase agreement) and (ii) this "Retained Claim" was a

Litigation Asset (as defined in the Plan) conveyed to the Litigation Trust pursuant to the transactions set forth in the Plan.

450.     Plaintiff Litigation Trust, as successor to the Zohar Funds, have standing to assert this claim on behalf of Stila and GAS because one or more of the Zohar Funds are members of Stila and GAS, and demand upon Tilton to investigate and bring the claim was futile at all relevant times due to Tilton's self-interested and conflicted relationship to the claim.

451.     The Zohar Funds have standing to assert this claim on behalf of Snelling Staffing, LLC, Snelling Holdings, LLC, Scan-Optics, LLC, Zohar HA, LLC, and Zohar Healthcare, LLC because the manager of each has determined that bringing this claim was in the best interest of each company and that, rather than pursue the litigation, determined to permit the Zohar Funds (and subsequently acknowledged the authority of the Litigation Trust in accordance with the Plan) to proceed with litigation of this claim on behalf of each company.

452.     The Portfolio Companies' LLC Agreements are valid and enforceable contracts.

453.     Tilton was, at all times relevant, the manager of the LLC Portfolio Companies Litigants.

454.     One or more of the Zohar Funds is a party to each LLC Agreement.

455.     The Zohar Funds have each complied with all material terms of each of the LLC Agreements to which that Zohar Fund is party.

456.     Tilton has breached the LLC Agreements serially, including through the issuance of the Class A Interests, through the Phantom Equity awards, and the PPMG Agreements, as described herein.

457.     Moreover, under applicable law, the covenant of good faith and fair dealing is an implied term of every contract.

458.    In the event that the actions alleged herein, somehow, did not breach the express terms of the LLC Agreements, the actions breached the implied covenant of good faith and fair dealing.

459.    The Zohar Funds have suffered damages in an amount to be proven at trial from these breaches.

### A.    Tilton breached the LLC Agreements for Dura Buyer, GAS, and Stila by issuing the Class A Interests to benefit herself.

460.    Paragraph 3.4 of LLC Agreements for Dura Buyer, GAS, and Stila provides: "The Manager may from time to time in her sole discretion authorize and direct the creation and issuance of other classes of Membership Interests having such terms as she determines to be appropriate, which terms will be reflected in a written consent of the Manager and will be deemed to be contained in this Agreement for all purposes hereof."

461.    Under applicable law, LLC managers must exercise their discretion in good faith.

462.    On November 13, 2017, Tilton, as LLC manager for Dura Buyer, GAS, and Stila, executed the November 2017 Written Consents.  The November 2017 Written Consents created new Class A Interests for Dura Buyer, GAS, and Stila and granted those interests to one or more of the Octaluna Entities, which are affiliates of Tilton.  The Class A Interests granted the Octaluna Entities the "sole right" to amend their respective LLC Agreements for Dura Buyer, GAS, or Stila or to remove or replace Tilton as LLC manager of Dura Buyer, GAS, and Stila.

463.    Tilton, as LLC Manager for Dura Buyer, GAS, and Stila, did not exercise her discretion to create and issue to her controlled-affiliates the Class A Interests in good faith and thus breached the LLC Agreements for Dura Buyer, GAS, and Stila.

464.    In addition, paragraph 5.13 of Dura Buyer's LLC Agreement and paragraph 5.14 of GAS's and Stila's LLC Agreements provide: "The Company may transact business with the

Manager, any Member or any officer or Affiliate of the foregoing, provided that the terms of those transactions are no less favorable than those the Company could reasonably be expected to obtain from unrelated third parties." (emphasis in originals).

465.    Under applicable law, an LLC's transactions with an affiliate of the LLC manager require entire fairness.

466.    The November 2017 Written Consents created new Class A Interests for Dura Buyer, GAS, and Stila and granted those interests to one or more of the Octaluna Entities, which are affiliates of Tilton. The Octaluna Entities executed subscription agreements setting forth the investments that they were making in exchange for the Class A Interests.

467.    With regard to Dura Buyer, Octaluna II and Octaluna III purportedly made investments totaling $10 million and were each granted a Class A Interest with a preference payout of five times their initial investment. With regard to GAS, the Octaluna Entities purportedly made investments totaling $3 million in and were each granted a Class A Interest with a preference payout of five times their initial investment. And, with regard to Stila, Octaluna III purportedly made an investment totaling $10 million and was granted a Class A Interest with a preference payout of five times its initial investment.

468.    Tilton, as LLC Manager for Dura Buyer, GAS, and Stila, caused those companies to transact business with the Octaluna Entities, which are affiliates of Tilton, on terms that were not entirely fair. The investments that the Octaluna Entities made did not represent a fair price, and the transactions did not reflect a fair process.

469.    The investments that the Octaluna Entities made in Dura Buyer, GAS, and Stila in exchange for the Class A Interests were less favorable than the investments that Dura Buyer, GAS, and Stila could reasonably expect to obtain from unrelated third parties.

470.    As such, Tilton, as LLC Manager for Dura Buyer, GAS, and Stila, breached the LLC Agreements for Dura Buyer, GAS, and Stila.

**B.    Tilton breached the LLC Agreements for GAS and Stila through the Phantom Equity Agreements.**

471.    Tilton also breached the LLC Agreements for GAS and Stila through the Phantom Equity awards. Tilton, as the sole manager of GAS and Stila, caused each company to enter into a Phantom Equity Agreement that granted Tilton, personally, an entitlement equal to 4% of the equity appreciation in each company since the applicable "Commencement Date," as more specifically described in section 1 of the respective Phantom Equity Agreement.

472.    The respective agreements do not recite what consideration, if any, was provided for the awards. Upon information and belief, no consideration was provided.

473.    Tilton, as LLC Manager, caused GAS, and Stila to transact business with her on terms that were not entirely fair with respect to the Phantom Equity Agreements. The consideration for the Phantom Equity Agreements provided by Tilton, if any, did not represent a fair price, and the transactions did not reflect a fair process.

**C.    Tilton breached the LLC Agreements for all of the LLC Portfolio Companies through the PPMG Agreements.**

474.    The LLC Agreement for each LLC Portfolio Company Litigant requires that transactions with related parties be on terms that are no less favorable than would be obtained from unrelated third parties.

475.    PPMG is owned and controlled by Tilton. Each of the LLC Portfolio Company Litigants contracted with PPMG on terms that were less favorable than would be obtained from an unrelated third-party.  Applicable law requires that such a transaction be entirely fair.  The PPMG Agreements were not entirely fair:  their terms were not fair and the process by which they were entered was not fair (because no process existed).

476.    First, the LLC Portfolio Company Litigants would never have contracted with an unrelated third party for the services supposedly provided by PPMG in the first instance.  The Patriarch Managers, separate entities also owned and controlled by Tilton, were highly compensated by the Zohar Funds for providing the same services to the LLC Portfolio Company Litigants as the LLC Portfolio Companies contracted with PPMG to provide.  The Portfolio Companies would not have paid an unrelated third-party a second time for services they were already receiving at the expense of their members (the Zohar Funds), but that is what Tilton caused the LLC Portfolio Company Litigants to do when she caused the LLC Portfolio Companies to contract with PPMG.

477.    Further, upon information and belief, to the extent that PPMG did, in fact, provide services beyond those already being provided by the Patriarch Managers, Tilton simply referred those matters to her own controlled affiliate and did not test the market to ensure that the services and fees provided under the PPMG Agreements were consistent with arm's-length terms for such services.

478.    Second, the amounts charged by PPMG were not reasonable for the services that were rendered by PPMG. The amounts charged by PPMG were designed to extract value rather than to compensate PPMG for services rendered.  This fact became particularly apparent when the amounts payable to PPMG increased precipitously in late 2015 (from four to seven times), at the same time that PPMG's affiliates, the Patriarch Managers, were facing an imminent termination of their income stream from the Zohar Funds.

479.    The LLC Portfolio Company Litigants would never have accepted PPMG's late-2015 price if PPMG were an unrelated third party.  Upon information and belief, there was no market-based reason, nor separate consideration, for the amendments resulting in this price increase.  Instead, Tilton caused PPMG to dramatically increase (at times quadrupling) the rates

30863291.1

112

that it charged to the LLC Portfolio Companies when she began to suspect that the Zohar Funds were about to terminate the Patriarch Managers. Indeed, all of the amendments to the PPMG Agreements were dated either August 25, 2015, or September 21, 2015.

480.     Finally, and most egregiously, the PPMG Agreements provide for an award of 5% of the transaction value upon a sale of an LLC Portfolio Company or its assets. This was a blatant attempt for Tilton to capture a portion of the value of the LLC Portfolio Company Litigants for herself for no, or unreasonably small, consideration.

481.     As such, Tilton breached the LLC Portfolio Companies' LLC Agreements in causing the LLC Portfolio Company Litigants to contract with PPMG on a non-arms' length basis.

**D.     Tilton breached the LLC Agreements by causing certain LLC Portfolio Companies and Heritage Aviation to pay her affiliates Tax Dividends owed to the Zohar Funds.**

482.     The Litigation Trust, as successor to (i) Zohar II 2005-1, Corp, as assignee of RM Acquisition and Heritage Aviation, and (ii) the Zohar Funds on behalf of the LLC Portfolio Company Litigants, bring this claim for relief in the alternative to the Zohar Funds' claims in Counts VI, VII, XVIII, and XXIV for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, and unjust enrichment with respect to Tax Dividends paid by the LLC Portfolio Companies and Heritage Aviation, to the Octaluna Entities.

483.     Each of the Tax Dividend Payors was a disregarded entity for tax purposes while operational.

484.     The LLC Agreements for each of the Tax Dividend Payors included provisions requiring that the company make distributions to its members in accordance with a formula based on the company's Net Income less its Net Losses accumulated over prior years.

485.     The LLC Agreements further included a proviso that "any amount that would be distributed to a Member that is a disregarded entity for federal income tax purposes shall instead

be paid directly to the owner of such Member that is considered the Member for Federal income tax purposes."

486.    Following the CTB Elections, the Zohar Funds were members of these portfolio companies and were not disregarded entities for federal income tax purposes.  Accordingly, from the moment that Tilton executed the CTB Elections (or before, if the Court determines that these provisos were void *ab initio*), the LLC Agreements required these portfolio companies to disburse any applicable Tax Dividends to the Zohar Funds.

487.    Tilton caused each of the Tax Dividend Payors to violate its LLC Agreement by causing them to pay her affiliates, the Octaluna Entities, even after the CTB Election (or before, if the Court determines that these provisos were void *ab initio*), and not pay the Zohar Funds.

488.    Tilton further caused each of the Tax Dividend Payors to violate its LLC Agreement by causing them to make payments in contravention of the applicable formulas.  Upon information and belief, upon the CTB Elections, Tilton caused each Tax Dividend Payor to disregard accumulated historical Net Losses or otherwise failed to apply the formula required by the LLC Agreements in its calculation of Tax Dividends, thereby increasing the amount that the company would pay to Tilton's affiliates, the Octaluna Entities.

489.    As a result of Tilton's actions, each Tax Dividend Payor (a) failed to satisfy its obligations to the Zohar Funds as members (to the extent a monetary obligation existed based on a proper application of the formula set forth in the LLC Agreements), and (b) transferred substantial sums to Tilton's affiliates, the Octaluna Entities.

490.    Upon information and belief, Tilton caused the Tax Dividend Payors to issue more than $45 million in Tax Dividends to her affiliates, the Octaluna Entities, in contravention of their LLC Agreements.[30]


### E.    Tilton breached the covenant of good faith and fair dealing implied in the LLC Agreements.

491.    Through the LLC Agreements, the Zohar Funds and other members reasonably expected to receive the profits of the operation of the LLC Portfolio Company Litigants—whether by cash distributions to members or proceeds on sale of the businesses.

492.    By their nature, the LLC Portfolio Companies' LLC Agreements necessarily vested Tilton with discretion in executing her duties as manager of the LLC Portfolio Company Litigants.

493.    The implied covenant of good faith and fair dealing required Tilton to exercise that discretion in good faith.

494.    Tilton used her discretion to cause the LLC Portfolio Company Litigants to enter needless, arbitrary transactions with herself and her affiliates on terms that bore no resemblance to market rates, in breach of her express obligations under the LLC Agreements.  But in the alternative, even if Tilton's self-dealing transactions were executed on market terms, they were unnecessary, unreasonable, entered into arbitrarily, and resulted in Tilton diverting the benefit of the bargain the Zohar Funds and other members expected to receive through the LLC Agreements to herself.

---

[30] These amounts include the payments at issue in *Debtors' Motion Pursuant to Paragraphs 18 and 20 of the Settlement Agreement to Compel Refund of Amounts Paid to Patriarch Stakeholders and for Related Relief* (D.I. 2168).

495.    Tilton caused three LLC Portfolio Companies—companies that she would tout as "extremely successful" in her First Day Declaration a mere four months later—to issue the Class A Interests, despite identifying no business purpose for raising funds in this manner at this time. The striking similarity of the terms of these "financings" and the decision to extend this "financing" to only companies she characterized as the most successful in the Zohar Funds' portfolio are indicia that the issuance of the Class A Interests was not driven by business needs of these individual companies.  Instead, on information and belief, Tilton exercised her discretion under the Stila, GAS, and Dura Buyer LLC Agreements in bad faith to deprive the Zohar Funds of the fruits of their bargain as members of these companies by inserting herself into these companies' capital structure ahead of the Zohar Funds' equity shortly before they were to begin a marketing process.

496.    Tilton caused two of these same "extremely successful" LLC Portfolio Companies to grant the Phantom Equity awards to Tilton contemporaneously with her causing the Debtors to file their voluntary petitions, without providing notice to this Court.  The issuance of these awards was similarly unnecessary and resulted in the dilution of the fruits of the Zohar Funds' bargain— proceeds upon the eventual sale of these companies.

497.    Tilton caused the LLC Portfolio Company Litigants to enter into, and not terminate, the PPMG Agreements, despite the fact that the Zohar Funds were already paying Tilton and her affiliates millions of dollars per quarter to provide the same active management services.  The LLC Portfolio Company Litigants had no need of these redundant services, and Tilton's discretionary choice to cause the LLC Portfolio Company Litigants to contract with and pay her affiliate for services that the Zohar Funds, their owners, were already paying for, was made in bad faith.

498.    By exercising discretion under the LLC Agreements to cause the LLC Portfolio Company Litigants and Heritage Aviation, to enter into numerous transactions that served no

purpose other than to line her own pockets, Tilton diverted funds that would otherwise ultimately be paid out to the Zohar Funds and other members of the LLC Portfolio Companies to herself.

499.    As a result of Tilton's breaches of the LLC Agreements in connection with (a) the Class A Interests, (b) the Phantom Equity Agreements, (c) the PPMG Agreements, and (d) Tax Dividends, the Zohar Funds have suffered economic loss and damages in an amount to be proven at trial, and are entitled to be placed in the same situation as if Tilton had not breached the LLC Agreements.

500.    The Zohar Funds seek rescission of the transactions executed by Tilton in breach of the LLC Agreements and damages in the amount of losses caused by Tilton's breaches of the LLC Agreements.

## COUNT XXVI :    TORTIOUS INTERFERENCE WITH THE LLC AGREEMENTS
**(By Zohar II 2005-1, Corp. individually and the Zohar Funds individually and on behalf of the Tax Dividend Payors Against the Octaluna Entities)**

501.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

502.    The Zohar Funds have standing to assert this claim directly with respect to the Class A Interests.

503.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp., has standing to assert this claim in respect of Tilton's breach of the RM Acquisition LLC Agreement because, (i) pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in RM Acquisition, this claim is a "Retained Claim" that was assigned to Zohar II 2005-1, Corp. in its capacity as Seller Representative for the benefit of the Sellers (each as defined in the equity purchase agreement), and (ii) this "Retained Claim" was a Litigation Asset (as defined in the Plan) conveyed to the Litigation Trust pursuant to the transactions set forth in the Plan.

504.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp., has standing to assert this claim in respect of Tilton's breach of the Second Amended and Restated Partnership Agreement for Heritage Aviation because, (i) pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in Heritage Aviation, this claim is a "Retained Claim" that was assigned to Zohar II 2005-1, Corp., in its capacity as Seller Representative for the benefit of the Sellers (each as defined in the equity purchase agreement) and (ii) this "Retained Claim" was a Litigation Asset (as defined in the Plan) conveyed to the Litigation Trust pursuant to the transactions set forth in the Plan.

505.    The Zohar Funds have standing to assert this claim on behalf of Stila and GAS because one or more of the Zohar Funds are members of Stila and GAS, and demand upon Tilton to investigate and bring the claim was futile at all relevant times due to Tilton's self-interested and conflicted relationship to the claim.

506.    The Zohar Funds have standing to assert this claim on behalf of Snelling Staffing, LLC, Snelling Holding, LLC, Scan-Optics, LLC, and Zohar HA, LLC, because the manager of each has determined that bringing this claim was in the best interest of each company and that, rather than pursue the litigation, determined to permit the Zohar Funds to proceed with litigation of this claim on behalf of each company.

507.    The LLC Agreements are valid and enforceable contracts.

508.    One or more of the Zohar Funds was at all relevant times a party to each LLC Agreement.

509.    The Zohar Funds have each complied with all material terms of each of the LLC Agreements to which that Zohar Fund is party.

510.    Tilton has breached the LLC Agreements serially, including through the issuance of the Class A Interests and the payment of Tax Dividends, as described herein.

A.    **Octaluna Entities Tortiously Interfered with the Dura Buyer, GAS, and Stila LLC Agreements Through the Class A Interests.**

511.    The LLC Agreements each preclude the LLC Portfolio Company from transactions with related companies on terms more favorable than arm's length transactions with third parties.

512.    The Octaluna Entities, as affiliates of Tilton, had and have knowledge of the LLC Agreements for Dura Buyer, GAS, and Stila and the respective rights and obligations of Tilton and the applicable Zohar Funds under the LLC Agreements.

513.    The Octaluna Entities knowingly and intentionally provided substantial assistance to Tilton's breaches of the LLC Agreements by, among other things, accepting the Class A Interests and executing the subscription agreements setting forth the investments that the Octaluna Entities were making in exchange for the Class A Interests.

514.    The Octaluna Entities' assistance was a substantial factor in causing Tilton's breaches of the LLC Agreements because the Octaluna Entities accepted the Class A Interests and executed the subscription agreements setting forth the investments that the Octaluna Entities were making in exchange for the Class A Interests.

515.    As a result of the Octaluna Entities' misconduct, the Octaluna Entities have caused the Zohar Funds to suffer damages in an amount to be determined by the Court to sufficiently and fully compensate the Zohar Funds for the damages and losses suffered as result of the Octaluna Entities' actions.

B.    **The Octaluna Entities Tortiously Interfered with the LLC Agreements of the Tax Dividend Payors by Taking Tax Dividends.**

516.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp., has standing to bring this claim for relief in the alternative to the Zohar Funds' claims in Counts VI, VII, XVIII, and XXIV for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, and unjust enrichment with respect to Tax Dividends paid by the Tax Dividend Payors to the

Octaluna Entities because, (i) pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in RM Acquisition, this claim is a "Retained Claim" that was assigned to Zohar II 2005-1, Corp. in its capacity as Seller Representative for the benefit of the Sellers (each as defined in the equity purchase agreement), and (ii) this "Retained Claim" was a Litigation Asset (as defined in the Plan) conveyed to the Litigation Trust pursuant to the transactions set forth in the Plan.

517.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp., has standing to bring this claim for relief in the alternative to the Zohar Funds' claims in Counts VI, VII, XVIII, and XXIV for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, and unjust enrichment with respect to Tax Dividends paid by the Tax Dividend Payors to the Octaluna Entities because, (i) pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in Heritage Aviation, this claim is a "Retained Claim" that was assigned to Zohar II 2005-1, Corp., in its capacity as Seller Representative for the benefit of the Sellers (each as defined in the equity purchase agreement) and (ii) this "Retained Claim" was a Litigation Asset (as defined in the Plan) conveyed to the Litigation Trust pursuant to the transactions set forth in the Plan.

518.    The Zohar Funds on behalf of the LLC Portfolio Company Litigants bring this claim for relief in the alternative to the Zohar Funds' claims in Counts VI, VII, XVIII, and XXIV for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, and unjust enrichment with respect to Tax Dividends paid by the Tax Dividend Payors to the Octaluna Entities.

519.    The LLC Agreements of the Tax Dividend Payors each provides for Tax Distributions to members that are not disregarded entities for federal income tax purposes, and do not permit Tax Distributions to members of members who are not disregarded entities.  The LLC

Agreements also provide for Tax Distributions to be calculated in accordance with a formula, which accounts for accumulated historical Net Losses.

520.    The Octaluna Entities, as affiliates of Tilton, had and have knowledge of the LLC Agreements and the respective rights and obligations of Tilton and the applicable Tax Dividend Payors under the LLC Agreements.

521.    The Octaluna Entities knowingly and intentionally provided substantial assistance to Tilton's breaches of the LLC Agreements by, among other things, demanding and accepting Tax Dividends made in violation of the LLC Agreements.

522.    The Octaluna Entities' assistance was a substantial factor in causing Tilton's breaches of the LLC Agreements because the Octaluna Entities are a necessary conduit for Tilton's profit from the Tax Dividends.

523.    As a result of the Octaluna Entities misconduct, the Octaluna Entities have caused the Tax Dividend Payors to suffer damages in an amount to be determined by the Court to sufficiently and fully compensate the Tax Dividend Payors for the damages and losses suffered as result of the Octaluna Entities' actions.

## COUNT XXVII :    TORTIOUS INTERFERENCE WITH THE LLC AGREEMENTS
### (By Zohar II 2005-1, Corp. individually and the Zohar Funds on behalf of the LLC Portfolio Company Litigants Against PPMG)

524.    The LLC Portfolio Company Litigants incorporate the foregoing allegations as if fully set forth here.

525.    Zohar II 2005-1, Corp. has standing to assert this claim in respect of Tilton's breach of the RM Acquisition LLC Agreement because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in RM Acquisition, the claim was assigned to Zohar II 2005-1, Corp.

526.    The Zohar Funds have standing to assert this claim on behalf of Stila and GAS because one or more of the Zohar Funds are members of Stila and GAS, and demand upon Tilton to investigate and bring the claim was futile at all relevant times due to Tilton's self-interested and conflicted relationship to the claim.

527.    The Zohar Funds have standing to assert this claim on behalf of Snelling Staffing, LLC, Snelling Holdings, LLC, Scan-Optics, LLC, Zohar HA, LLC and Zohar Healthcare, LLC, because the manager of each has determined that bringing this claim was in the best interest of each company and that, rather than pursue the litigation, determined to permit the Zohar Funds to proceed with litigation of this claim on behalf of each company.

528.    The Portfolio Companies' LLC Agreements are valid and enforceable contracts.

529.    One or more of the Zohar Funds was at all relevant times a party to each LLC Agreement.

530.    The Zohar Funds have each complied with all material terms of each of the LLC Agreements to which that Zohar Fund was party.

531.    Tilton has breached the LLC Agreements serially, including through the PPMG Agreements, as described herein.

532.    The LLC Agreements each preclude the LLC Portfolio Company Litigant from transactions with related companies on terms more favorable than arm's length transactions with third parties.

533.    PPMG, as an affiliate of Tilton, had and has knowledge of the LLC Agreements and the respective rights and obligations of Tilton and the applicable Zohar Funds and Portfolio Companies under the LLC Agreements.

534.    PPMG knowingly and intentionally provided substantial assistance to Tilton's breaches of the LLC Agreements by, among other things, entering into and amending the PPMG Agreements with the LLC Portfolio Company Litigants.

535.    PPMG's assistance was a substantial factor in causing Tilton's breaches of the LLC Agreements because PPMG is a necessary conduit for Tilton's profit from the PPMG Agreements.

536.    As a result of PPMG's misconduct, PPMG has caused LLC Portfolio Company Litigants to suffer damages in an amount to be determined by the Court to sufficiently and fully compensate LLC Portfolio Company Litigants for the damages and losses suffered as result of PPMG's actions.

## COUNT XXVIII :    TORTIOUS INTERFERENCE WITH THE MD HELICOPTERS, INC. STOCKHOLDERS AGREEMENT
### (By the Zohar Funds Against Lynn Tilton and PPMG)

537.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

538.    The MD Stockholders Agreement is a valid and enforceable contract.

539.    Zohar I and Zohar II were parties to the MD Stockholder Agreement at all relevant times.

540.    Zohar I and Zohar II each complied with all material terms of the MD Stockholder Agreement.

541.    Tilton and PPMG caused MD Helicopters to breach the MD Stockholder Agreement, including through the Phantom Equity Agreement and the PPMG Agreements as described herein.

542.    Upon information and belief, Tilton was an employee of MD Helicopters at the time of MD Helicopters' entry into the Phantom Equity Agreement. The Phantom Equity Agreement serves as non-voting stock in MD Helicopters.

543. The MD Stockholders Agreement required the vote of all shareholders of MD Helicopters to authorize the award under the Phantom Equity Agreement to insiders like Tilton.

544. In issuing the Phantom Equity award, Tilton did not comply with the MD Stockholders Agreement. Among other things, the Zohar Funds, who owned more than 49% of the shares in MD Helicopters, never validly approved the Phantom Equity award.

545. At relevant times, Tilton was a director of MD Helicopters, as that term is defined within the MD Stockholders Agreement. PPMG was and remains an affiliate of Tilton.

546. Upon information and belief, Tilton cause MD Helicopters to pay PPMG more than $500,000 in management or consulting fees in multiple calendar years. The putative 5% transaction fee under the PPMG Agreement to be paid upon a sale of MD Helicopters will exceed $500,000 if earned in accordance with the applicable PPMG Agreement. These payments breached Section 2.01(d) of the MD Stockholders Agreement, as amended in 2006.

547. PPMG, as an affiliate of Tilton, had and has knowledge of the MD Stockholder Agreement and the respective rights and obligations of MD Helicopters and the Zohar Funds thereunder.

548. PPMG knowingly and intentionally provided substantial assistance to MD Helicopters' breaches of the MD Stockholders Agreement by, among other things, entering into and amending the PPMG Agreement with MD Helicopters.

549. PPMG's assistance was a substantial factor in causing MD Helicopters' breaches of the MD Stockholders Agreement because PPMG is a necessary conduit for Tilton's profit from MD Helicopters' breaches of the MD Stockholders Agreement.

550. As a result of PPMG's misconduct, PPMG has caused the Zohar Funds to suffer damages in an amount to be determined by the Court to sufficiently and fully compensate the Zohar Funds for the damages and losses suffered as result of PPMG's actions.

551.    The Zohar Funds also seek rescission of the transactions that Tilton caused MD Helicopters to execute in breach of the Stockholders Agreement.

552.    Moreover, under applicable law, the covenant of good faith and fair dealing is an implied term of every contract.

553.    In the event that the actions alleged herein, somehow, did not breach the express terms of the MD Stockholders Agreement, the actions breached the implied covenant of good faith and fair dealing.

### COUNT XXIX :    BREACH OF FIDUCIARY DUTIES OWED TO THE CORPORATION PORTFOLIO COMPANY LITIGANTS, HERITAGE AVIATION, PDP, AND UI ACQUISITION
### (By Zohar II individually and the Zohar Funds on behalf of the Corporation Portfolio Company Litigants Against Lynn Tilton)

554.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

555.    Plaintiff Litigation Trust, as successor to Zohar II under the Chapter 11 Plan, has standing to assert this claim in respect of Tilton's breach of fiduciary duties owed to FSAR Holdings, Inc. and PDP, because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in FSAR Holdings, Inc., the claims were assigned to Zohar II.

556.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp. under the Chapter 11 Plan, has standing to assert this claim in respect of Tilton's breach of fiduciary duties owed to UI Acquisition because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in UI Acquisition, the claims were assigned to Zohar II 2005-1, Corp., in its capacity as Seller Representative (as defined in the equity purchase agreement) for the benefit of the participating sellers.

557.    Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp. under the Chapter 11 Plan, has standing to assert this claim in respect of Tilton's breach of fiduciary duties owed to

Heritage Aviation because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in Heritage Aviation, the claims were assigned to Zohar II 2005-1, Corp., in its capacity as Seller Representative (as defined in the equity purchase agreement) for the benefit of the Sellers.

558.    The Litigation Trust has standing to assert this claim on behalf of 180s, Inc., Intrepid U.S.A., Inc., IMG Holdings, Inc., and Vulcan Engineering, Co. because the board of directors of each determined that bringing this claim was in the best interest of each company and that, rather than pursue the litigation, voted to permit the Zohar Funds (and subsequently acknowledged the authority of the Litigation Trust in accordance with the Plan) to proceed with litigation of this claim.  In addition, with respect to Intrepid U.S.A., Inc., each of Snelling Holdings, LLC and Zohar Healthcare, LLC, delegated to the Litigation Trust any rights that each of them had to prosecute claims on behalf of Intrepid U.S.A., Inc. on a derivative basis.

559.    Tilton caused the Zohar Funds to elect her to the boards of directors of each of the Corporation Portfolio Company Litigants, UI Acquisition, and PDP, contemporaneously with the Zohar Funds' investments in each such company.  Tilton also caused Zohar HA, LLC to be appointed as general partner of Heritage Aviation, through her control over the partnership interests in Heritage Aviation.  Tilton also caused herself to be appointed as the sole manager of Zohar HA, LLC, through her control over its sole member, Zohar I.

560.    Tilton exercised actual control over the board of each of the Corporation Portfolio Company Litigants, UI Acquisition, and PDP, either because she was the sole director of the Corporation Portfolio Company or because the other directors (or members, in the case of PDP) of each such company lacked independence from her, at the time of the conduct complained of in this count.  Tilton exercised actual control over Heritage Aviation because she was the sole

manager of its general partner, Zohar HA, LLC, and in its capacity as general partner, Zohar HA, LLC had sole authority over the conduct of Heritage Aviation's business.

561.    As a director of the Corporation Portfolio Company Litigants, UI Acquisition, and PDP, Tilton owed each such company and their stockholders, which were or included the Zohar Funds, fiduciary duties of care and loyalty.  As the person ultimately in control of Heritage Aviation, Tilton owed similar fiduciary duties to Heritage Aviation.

562.    Under applicable law, a corporation's related-party transactions with an affiliate of a director require entire fairness.

563.    Under applicable law, Tilton owed PDP, a duty of loyalty, including a duty to refrain from self-dealing.

564.    Under applicable law, Tilton owed Heritage Aviation a duty of loyalty and was required to act in Heritage Aviation's, and not her and her affiliates', best interest.

565.    PPMG is owned and controlled by Tilton.

566.    The boards of the Corporation Portfolio Company Litigants were required to approve adoption of the PPMG Agreements. No Director other than Tilton voted to approve the PPMG Agreements.  Upon information and belief, no shareholder who was not under the control of Tilton voted in favor of the PPMG Agreements.

567.    Tilton was the sole Board Member of 180s, Inc., IMG Holdings, Inc., Intrepid, Vulcan, and UI Acquisition, at the time each entered into PPMG Agreements. Tilton, acting on behalf of each of those Portfolio Companies, caused them to enter into PPMG Agreements.

568.    Tilton was a manager of PDP, at the time it entered into its PPMG Agreement. Tilton dominated and controlled the decision making of the board and management of PDP, and caused management of PDP, to execute a PPMG Agreement and amendments thereto.

569.    Tilton was the manager of Zohar HA, LLC, which was the general partner of Heritage Aviation.  As the person controlling Zohar HA, LLC, Tilton was the sole person with authority to approve Heritage Aviation entering into a PPMG Agreement and amendments thereto.

570.    Entering into the PPMG Agreements was a breach of the duty of loyalty under Delaware, Texas, and California law and was a director's conflicting-interest transaction under Alabama and Minnesota law.

571.    Upon information and belief, entry into the PPMG Agreements was not entirely fair to, nor in the best interests of, the Corporation Portfolio Company Litigants, PDP, UI Acquisition, and Heritage Aviation. First, the terms agreed to and the amounts actually paid under the PPMG Agreements were not fair to the Corporation Portfolio Companies PDP, UI Acquisition, or Heritage Aviation.  The Patriarch Managers, which are separate entities also owned and controlled by Tilton, were already obligated to provide the same services to the Corporation Portfolio Company Litigants, PDP, UI Acquisition, and Heritage Aviation that PPMG purportedly provided, and were highly compensated by the Zohar Funds for providing those services. Accordingly, the Corporation Portfolio Company Litigants, PDP, UI Acquisition, and Heritage Aviation should not have been obligated to pay a second time for these services.

572.    Further, the amounts charged by PPMG were not reasonable for the services that were actually rendered by PPMG.  The amounts charged by PPMG were designed to extract value rather than to compensate PPMG for services rendered, particularly when the amounts payable to PPMG increased precipitously in late 2015 (increasing from four to seven times) for some Portfolio Companies.

573.    The price increase came at the same time that Tilton was concerned that the Patriarch Managers would be removed as collateral manager, which would result in the loss of the collateral-management fees received by the Patriarch Managers, which totaled at least $4.5 million

per quarter and were a valuable revenue stream for Tilton's overall enterprise. Indeed, all of the amendments to the PPMG Agreements were dated either August 25, 2015, or September 21, 2015. Tilton's concerns proved well founded because the Patriarch Managers were replaced by AMZM about six months later.

574.    Finally, and most egregiously, the PPMG Agreements provide for an award of 5% of the transaction value upon a sale of each Corporation Portfolio Company, PDP, UI Acquisition, or Heritage Aviation (or its assets). This was a blatant attempt for Tilton to capture a portion of the value of the Portfolio Companies for herself for no, or unreasonably small, consideration.

575.    Further, upon information and belief, to the extent that PPMG did, in fact, provide services beyond those already being provided by the Patriarch Managers, Tilton simply referred those matters to her own controlled affiliate and did not test the market to ensure that the services and fees provided under the PPMG Agreements were consistent with arm's-length terms for such services.

576.    By using her control over Corporation Portfolio Company Litigants, PDP, UI Acquisition, and Heritage Aviation to cause them to enter into the PPMG Agreements, Tilton breached the fiduciary duties that she owed the Corporation Portfolio Company Litigants, PDP, UI Acquisition, and Heritage Aviation and their direct and indirect equity holders, the Zohar Funds.

577.    As a direct and proximate result of Tilton's conduct, the Litigation Trust has suffered damages in an amount to be proven at trial.

**COUNT XXX :     AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(By Zohar II individually and the Zohar Funds on behalf of the Corporation Portfolio Company Litigants Against PPMG)**

578.    Plaintiffs incorporate the foregoing allegations as if fully set forth here.

579.   Zohar II has standing to assert this claim in respect of Tilton's breach of fiduciary duties owed to FSAR Holdings, Inc. and PDP, because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in FSAR Holdings, Inc., the claims were assigned to Zohar II.

580.   Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp. under the Chapter 11 Plan, has standing to assert this claim in respect of Tilton's breach of fiduciary duties owed to UI Acquisition because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in UI Acquisition, the claims were assigned to Zohar II 2005-1, Corp., in its capacity as Seller Representative (as defined in the equity purchase agreement) for the benefit of the participating sellers.

581.   Plaintiff Litigation Trust, as successor to Zohar II 2005-1, Corp. under the Chapter 11 Plan, has standing to assert this claim in respect of Tilton's breach of fiduciary duties owed to Heritage Aviation because, pursuant to the Court's order authorizing the Zohar Funds' sale of equity interests in Heritage Aviation, the claims were assigned to Zohar II 2005-1, Corp.

582.   The Litigation Trust has standing to assert this claim on behalf of 180s, Inc., Intrepid U.S.A., Inc., IMG Holdings, Inc., and Vulcan Engineering, Co. because the board of directors of each determined that bringing this claim was in the best interest of each company and that, rather than pursue the litigation, voted to permit the Litigation Trust to proceed with litigation of this claim.

583.   PPMG is owned and controlled by Tilton. Tilton served as the director of each of the Corporation Portfolio Company Litigants that entered into PPMG Agreements.

584.   As an entity owned and controlled by Tilton, PPMG had knowledge of the fiduciary relationships between Tilton and (1) the Corporation Portfolio Company Litigants, (2) PDP, (3) UI Acquisition, and (4) Heritage Aviation.

30863291.1

130

585.    PPMG aided and abetted Tilton's breaches of her fiduciary duties to the Corporation Portfolio Company Litigants, Heritage Aviation, UI Acquisition, and PDP, by inducing these companies to enter into the PPMG Agreements and subsequently agree to amendments of the PPMG Agreements on terms that were not entirely fair to the companies. By entering into the PPMG Agreements, PPMG aided and abetted Tilton's breach of her duty of loyalty to the various Corporation Portfolio Company Litigants, Heritage Aviation, UI Acquisition, and PDP.

586.    As a direct and proximate result of PPMG's conduct, the Corporation Portfolio Company Litigants, Heritage Aviation, UI Acquisition, and PDP, have suffered damages in an amount to be proven at trial.

**COUNT XXXI :    ACTUAL FRAUDULENT TRANSFER (PPMG AGREEMENTS)**
**(By the Zohar Funds Against PPMG)**

587.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

588.    At the time the original Complaint was filed, the Zohar Funds were lenders to the following Portfolio Companies or subsidiaries of the Portfolio Companies:  Dura Automotive, GAS, Heritage Aviation, Ltd., Intrepid U.S.A., Inc., Libertas Copper, LLC, LVD Acquisition, LLC, MD Helicopters, RM Acquisition, Snelling Staffing, LLC, and Vulcan, as well as various Group B Portfolio Companies or their subsidiaries.  The loans owed to the Zohar Funds matured in 2019, and each of the applicable borrowers was unable to repay the Zohar Funds in full.

589.    Upon information and belief, Tilton, acting as controlling director or manager, caused each company to enter into a PPMG Agreement with PPMG, an entity that is owned and controlled by Tilton.  Tilton, acting as collateral manager through the Patriarch Managers, was already being highly compensated for, among other things, managing and turning around each of the Portfolio Companies, and overseeing the restructuring and ultimate disposition of the Portfolio

Companies.  The services provided by PPMG under the PPMG Agreements were duplicative of the services that Tilton should have been providing through the Patriarch Managers in their capacity as collateral managers of the Zohar Funds.  As a result, there was no basis to provide additional compensation to Tilton, through PPMG, to provide the same services she agreed to provide through the Patriarch Managers, who were engaged in an "active management" strategy.

590.    Instead, the fees to be paid to PPMG under the PPMG Agreements were intended only to enhance the Defendants' recoveries from the Portfolio Companies in excess of the fees the Defendants contractually committed to receive as collateral manager, to the detriment of the Zohar Funds.  The PPMG Agreements were nothing more than an opportunity for the Defendants to double-dip—charging the Zohar Funds a very handsome fee to actively manage the Portfolio Companies (the collateral for the notes) and also charging the Portfolio Companies for the privilege of the active management that the Patriarch Managers had already contracted with the Zohar Funds to provide.  This was most egregious with respect to the 5% transaction fee under the PPMG Agreements—a fee that Tilton contends is payable from the Zohar Funds' collateral even when the sale of the Zohar Funds' collateral is insufficient to satisfy in full the amounts owed to the Zohar Funds.

591.    The entry into the PPMG Agreements and the amendments to the PPMG Agreements, and the fees paid to PPMG under the PPMG Agreements (collectively, the "PPMG Transfers")[31] were transfers of interests in the property of, or obligations incurred by, the Portfolio Companies to and for the benefit of PPMG and, through PPMG, Tilton.

---

[31] The PPMG Transfers consist of transfers made by at least the following Portfolio Companies to which the Zohar Funds were lenders:  Acme International Enterprises, Inc.; Croscill Home, LLC; Dura Automotive; EMAG Solutions, LLC; GAS and its subsidiaries; Gorham Paper and Tissue, LLC; IMG Holdings, Inc.; Heritage Aviation; Intrepid U.S.A., Inc.; Jewel of Jane LLC; Libertas

592.     The PPMG Transfers were steps in a single, integrated effort to extract value from the Portfolio Companies.

593.     The PPMG Transfers were made with an actual intent to hinder, delay, and/or defraud the Portfolio Companies' creditors, including the Zohar Funds, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, that the obligations were incurred for the benefit of PPMG, an affiliate of the Portfolio Companies' controlling manager or director, the consideration, if any, provided for the PPMG Transfers was inadequate, the PPMG Transfers were purportedly on account of the same services that PPMG's affiliates (the Patriarch Managers) had separately contracted to provide and for which the Patriarch Managers were being separately (and substantially) compensated by the Zohar Funds, and the PPMG Transfers were made at a time when the Portfolio Companies were inadequately capitalized and at, or near, insolvency (a point that the subject Portfolio Companies ultimately reached, if they were not already there at the time of the applicable PPMG Transfer).   Finally, Tilton was uniquely positioned to cause the PPMG Transfers to be made because she was the sole person with authority at the Portfolio Companies to permit the PPMG Transfers to occur.  Accordingly, her intent should be imputed to the applicable Portfolio Companies.

---

Copper, LLC; LVD Acquisition, LLC; MD Helicopters; Mobile Armored Vehicles, LLC (f/k/a PVI Acquisition, LLC); Natura Water, Inc.; RM Acquisition; Snelling Staffing, LLC; S.O. Acquisition, LLC; Vulcan Engineering Co.; and Xpient Solutions, LLC. For purposes of Counts 31 and 32, PPMG Transfers do not include transfers made by or obligations incurred by Stila.

The management fees actually paid to PPMG by the Portfolio Companies that are known to the Zohar Funds are identified in Annex B.  Upon information and belief, however, additional payments have been made prior to and following the period identified in Annex B by the Portfolio Companies identified therein, as well as by additional Portfolio Companies that are not listed on Annex B, within and without the period identified on Annex B. The Zohar Funds reserve the right to add additional payments made to PPMG in the applicable periods once identified.

594.    As a result of the PPMG Transfers, the Portfolio Companies and their creditors, including the Zohar Funds, have been harmed.

595.    The PPMG Transfers are avoidable as actual fraudulent transfers under applicable state law, including NY DCL § 276 and 6 *Del. C.* § 1304.

596.    Under applicable state law, including NY DCL §§ 278 and 279 and 6 *Del. C.* § 1308, the Zohar Funds are entitled to recover the property fraudulently transferred in the PPMG Transfers, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

**COUNT XXXII :    CONSTRUCTIVE FRAUDULENT TRANSFER (PPMG AGREEMENTS)**
**(By the Zohar Funds Against PPMG)**

597.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

598.    At the time the original Complaint was filed, the Zohar Funds were lenders to the following Portfolio Companies or subsidiaries of the Portfolio Companies:  Dura Automotive, GAS (and its subsidiaries), Heritage Aviation, Intrepid U.S.A., Inc., Libertas Copper, LLC, LVD Acquisition, LLC, MD Helicopters, RM Acquisition, Snelling Staffing, LLC, and Vulcan , as well as various Group B Portfolio Companies. The loans owed to the Zohar Funds matured in 2019, and each of the applicable borrowers was unable to repay the Zohar Funds in full.

599.    The PPMG Transfers were steps in a single, integrated effort to extract value from the Portfolio Companies.

600.    The PPMG Agreements were constructed to provide Tilton, through PPMG, with additional value from the Zohar Funds investment vehicles by extracting fees at the Portfolio Companies for the very services that she should have been providing in her capacity as the collateral manager of the Zohar Funds, a position for which she was already being highly

compensated.  Accordingly, Tilton has not provided any un-compensated services or other value to the Portfolio Companies in exchange for payment of the management fees and transaction fees. Moreover, the purported services that PPMG actually provided to the Portfolio Companies, if any, were less than the monthly fee amounts under the PPMG Agreements.

601.    Upon information and belief, Tilton, an insider of the Portfolio Companies, caused the Portfolio Companies to favor payment of the fees payable to PPMG (and, indirectly, to her as the owner of PPMG) when the Zohar Funds have not been paid in full at each Portfolio Company. As a result, the amounts paid to PPMG were not received in good faith by PPMG or in exchange for fair consideration or reasonably equivalent value.

602.    Finally, each of the Portfolio Companies has been in precarious financial condition at all relevant times.  At the time that the PPMG Agreements were executed in 2010 and 2011 and at the time of the amendments in 2015, the Portfolio Companies had incurred debts beyond their ability to pay, as evidenced by the ultimate defaults to the Zohar Funds in 2019, were insolvent at the time of entry into the PPMG Agreements, and had unreasonably small capital for the businesses that they were engaged in.

603.    The PPMG Transfers (other than original entry into the PPMG Agreements) are avoidable as constructively fraudulent transfers under applicable state law, including NY DCL §§ 273 through 275 and 6 *Del. C.* §§ 1304 and 1305.

604.    Under applicable state law, including NY DCL §§ 278 and 279 and 6 *Del. C.* § 1308, the Zohar Funds are entitled to recover the property fraudulently transferred in the PPMG Transfers (other than original entry into the PPMG Agreement), or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

## COUNT XXXIII :    UNJUST ENRICHMENT
### (By the Zohar Funds Against the Octaluna Entities and PPMG)

605.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

606.    In the event that the Zohar Funds are not made whole for the classes of misconduct alleged in Counts XXV through XXXII, the Zohar Funds have claims for unjust enrichment against the beneficiaries of these breaches of the LLC Agreements, Stockholders Agreement, and fiduciary duties owed to both the LLC Portfolio Companies and the Corporation Portfolio Companies.

607.    The Octaluna Entities and PPMG were enriched by Tilton's breaches of the LLC Agreements, breaches of the Stockholders Agreement, and breaches of fiduciary duties owed to the Zohar Funds and the Portfolio Companies, and the Patriarch Managers' breaches of the CMAs and Indentures.

608.    The Portfolio Companies were impoverished by these breaches.  As the sole equity holders of most of the Portfolio Companies (other than Tilton and her affiliates), the entire brunt of the Portfolio Companies' impoverishment was and is born by the Zohar Funds.  The Zohar Funds were and are also directly and indirectly impoverished by these breaches.

609.    There is no justification for this enrichment or this impoverishment.

610.    Absent a full remedy for this impoverishment provided by the forgoing Counts XXV through XXXII, the Zohar Funds will have no remedy at law to address this unjust enrichment.

611.    Thus, absent a full remedy based upon other Counts herein, restitution should therefore be made by PPMG and the Octaluna Entities to the Zohar Funds in an amount to be proven at trial to remedy this unjust enrichment.

## COUNT XXXIV :    FAITHLESS SERVANT
### (By the Zohar Funds Against the Patriarch Managers)

612.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

613.    Since their inception, the Zohar Funds paid the Patriarch Managers hundreds of millions of dollars in collateral management fees in exchange for the Patriarch Managers' services as fiduciaries and agents pursuant to the CMAs and the Indentures.

614.    As detailed above, the Patriarch Managers breached their duty of loyalty to the Zohar Funds and violated the terms of the CMAs and the Indentures in their most material and substantial part.

615.    Tilton's own self-interest, not fidelity to fiduciary and contractual obligations, guided the Patriarch Managers' service as the Zohar Funds' collateral manager.  As the Zohar Funds' performance gradually deteriorated, Tilton's interests increasingly diverged from those of the Zohar Funds.  Time and again, Tilton, acting in her fiduciary capacity as the Zohar Funds' collateral manager, made decisions for the Zohar Funds that served Tilton's interests, not the Zohar Funds'.

616.    As the performance of Tilton's hand-selected Portfolio Companies faltered, Tilton obscured the degrading quality of the collateral that secured the Zohar Funds' own obligations.  In hundreds, if not thousands of instances, Tilton misreported the quality of the Zohar Funds' collateral, resulting in a manipulated and meaningless Overcollateralization Ratio that violated the express terms of the Indentures.  But for Tilton's manipulation of the Overcollateralization Ratio, her collateral management fees (amounting to approximately $600 million in a little more than a decade) would have been slashed in half and the Zohar Funds' creditors could have removed her.[32]

617.    Tilton took further steps to obscure the deteriorating quality of the Zohar Funds' collateral.  On multiple occasions, Tilton purported to forgive outstanding and past due interest

---

[32] *See* Counts IV, V, VI, VII, XIV.

owed to the Zohar Funds or to accrue unpaid amounts by Portfolio Companies who defaulted on

their payment obligations to the Zohar Funds. Eventually, Tilton reduced the interest obligations

of nearly all Portfolio Companies to nothing (or a nominal amount), making it almost impossible

for them to default. And yet, after Tilton exercised the Zohar Funds' authority to install herself as

the manager or director of dozens of Portfolio Companies, Portfolio Companies under her control

continued to default on their nominal payment obligations to the Zohar Funds. All while the

Patriarch Managers reported them as performing for purposes of the Overcollateralization Ratio.

618.    As the severity of the deterioration in the Zohar Funds' collateral began to dawn on

the Zohar Funds' investors, Tilton took steps to further entrench herself into positions of authority.

Through the Voting/Control Actions,[33] Tilton, still acting through the Patriarch Managers in a

fiduciary role, stripped the Zohar Funds' control rights and gave them to her affiliates so that the

Zohar Funds were prevented from putting a stop to her rent-seeking conduct.[34] Simultaneously,

she used her entrenched roles at Portfolio Companies owned by the Zohar Funds to dramatically

increase the amount that these Portfolio Companies would pay her directly for, among other things,

---

[33] *See* Counts II, IV-XIII.

[34] For example, after Tilton's resignation as collateral manager, the Zohar Funds had to win a trial judgment in Delaware Chancery just to obtain business records they were entitled to—business records that demonstrated their ownership of equity in numerous Portfolio Companies. After prevailing in that action, the Zohar Funds had to sue Tilton *again*, and prevail at trial *again*, just to obtain the right to vote the shares they owned (which Tilton had attempted to transfer to the Octaluna Entities) to remove Tilton from management of three Portfolio Companies. After the Zohar Funds prevailed in this action too, Tilton put the Zohar Funds into bankruptcy while the Zohar Funds' relief was stayed pending appeal (an appeal that Tilton later abandoned). Later, Tilton asserted indemnification claims for her costs in this litigation against the three Portfolio Companies, which the Zohar Funds own, shifting the cost of Tilton's proven misconduct onto the Zohar Funds. This illustrates how Tilton, by wrongfully entrenching herself to such a degree, has used the threat of a death by a thousand cuts to inhibit the Zohar Funds from even seeking to unwind her wrongful actions.

"management services."[35]  She also facilitated illegitimate drawdowns on the eve of the Patriarch

Managers' resignation, to create a shadow lending system in which PPAS could usurp the role of

the collateral manager and maintain control of funds that rightfully belonged to the Zohar Funds.

619.    The Patriarch Managers' breaches served to prolong the period during which Tilton

dominated and controlled the Zohar Funds, all the while causing the Zohar Funds to improperly

pay subordinated collateral management fees that were intended to align the interests of the Zohar

Funds' stakeholders and incentivize the Patriarch Managers' performance.  By retaining control

of the Zohar Funds, their Portfolio Companies, and their loans for as long as possible, Tilton also

maximized the value she could siphon from the Portfolio Companies that the Zohar Funds own.

Tilton also extracted value through payments directly from Portfolio Companies to PPMG

(monthly "management" fees and clauses that would provide hefty fees upon an eventual sale of

the company), PPAS (annual "administrative agent" fees and preferential distribution of

liquidation proceeds from defunct borrowers), and the Octaluna Entities (regular Tax Dividends,

despite already receiving separate consideration through the Indenture, on top of being massively

enriched by her tax ownership of the Zohar Funds).

620.    By substantially violating their fiduciary and contractual duties, and then going to

lengths to obscure Tilton's conduct and entrench her in other positions, the Patriarch Managers

defanged the safeguards that all other stakeholders in the Zohar Funds depended on to protect their

interests.

621.    By reason of their breaches of their fiduciary duties owed to the Zohar Funds and

their pervasive and substantial breaches of their contractual obligations to the Zohar Funds, the

---

[35] *See* Counts XXV-XXIII.

Patriarch Managers are faithless servants, and are required to forfeit all money that they received from the Zohar Funds since the first day that they breached their duties.

**COUNT XXXV :    CONVERSION OF ZOHAR FUNDS' PROPERTY**
**(By the Zohar Funds Against Tilton, PPAS, PPMG, Ark II, and AIP)**

622.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

623.    In 2016 PPAS, in its capacity as agent for Galey & Lord's secured lenders, foreclosed on certain of Galey & Lord's assets in partial satisfaction of the Zohar Funds' indebtedness.  Thus, the secured lenders under the ABL and term loan Credit Agreements became the owners of those Galey & Lord assets.

624.    The Zohar Funds were the largest secured creditors under the ABL and term loan Credit Agreements.

625.    Between 2018 and 2020, PPAS received in excess of $31 million █████████ ████████ .

626.    Additionally, on June 6, 2017 PPAS received approximately $5.5 million from the Boland Plant Sale and approximately $2 million from the Darlington Plant Demolition.

627.    These payments belonged to the secured lenders, including the Zohar Funds.

628.    Tilton, PPAS, PPMG, Ark II, and AIP intentionally interfered with the Zohar Funds' property rights in the proceeds of ████████████ , the Boland Plant Sale, and the Darlington Plant Demolition by diverting and exercising dominion and control over the proceeds owned by the Zohar Funds, thereby depriving the Zohar Funds of the use of that property.  Specifically, instead of transferring to the Zohar Funds the proceeds that it owned, PPAS caused Galey & Lord to give $12.6 million of the proceeds to Tilton-controlled Ark II and AIP, $1.9 to

PPMG, certain amounts to other unsecured, subordinate creditors such as contractors and legal advisors and possibly amounts to PPAS.[36]

629.    As a direct and proximate result of the conduct of Tilton, PPAS, PPMG, Ark II, and AIP, the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

### COUNT XXXVI :    AVOIDANCE OF POSTPETITION TRANSFER OF PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. § 549
### (By the Zohar Funds Against Tilton, PPAS, PPMG, Ark, and AIP)

630.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

631.    As set forth above, the secured lenders under the ABL and term loan Credit Agreements, including the Zohar Funds, were the owners of Galey & Lord's assets.

632.    On March 11, 2018, the Zohar Funds filed for bankruptcy protection.

633.    Between 2018 and 2020, PPAS, on behalf of the Lenders, received in excess of $31 million as part of the ████████████ .

634.    Additionally, on June 6, 2017 PPAS, on behalf of the Lenders, received approximately $5.5 million from the Boland Plant Sale and approximately $2 million from the Darlington Plant Demolition.

635.    These proceeds were property of the estate.

636.    After the Zohar Funds filed for bankruptcy, PPAS transferred $12.6 million of the proceeds from the ████████████ , the Boland Plant Sale and the demolition of the Galey & Lord's Darlington Plant (the "Darlington Plant Demolition") to Ark II and AIP.  PPAS also

---

[36] Count XXXV does not address the amounts at issue in the Galey Agency Motion, which will be determined pursuant to the relief requested in that motion.

transferred $1.9 million of the proceeds to PPMG and paid certain amounts to other unsecured, subordinate creditors such as contractors and legal advisors and possibly amounts to PPAS.[37]

637.    These post-petition transfers were never authorized by the Court or under the Bankruptcy Code and, thus, are avoidable pursuant to section 549 of the Bankruptcy Code and are recoverable pursuant to section 550 of the Bankruptcy Code.

638.    By reason of the foregoing, these transfers of proceeds of the ████████, the Boland Plant Sale, and the Darlington Plant Demolitions should be avoided and set aside as unauthorized post-petition transfers under section 549 of the Bankruptcy Code and are recoverable by the Zohar Funds pursuant to Bankruptcy Code section 550.

### COUNT XXXVII :   CONSTRUCTIVE FRAUDULENT TRANSFER
### (By the Zohar Funds Against Tilton, PPAS, PPMG, and the Ark Entities)

639.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

640.    Plaintiffs plead this Count solely in the alternative to their claims in Count XXXV and XXXVI for conversion and violations of Section 550 of the Bankruptcy Code.  If PPAS did not properly foreclose on Galey & Lord's assets for the benefit of the secured lenders, and/or that the Galey & Lord assets, including the proceeds of the ████████, the Boland Plant Sale, and the Darlington Plant Demolition were not property of the secured lenders, the transactions described herein were constructive fraudulent transfers.

641.    The Zohar Funds were secured lenders of Galey & Lord.  As of June 1, 2017, Ark II and AIP were also secured lenders of Galey & Lord.  The loans owed to the Zohar Funds have matured, and Galey & Lord is unable to repay the Zohar Funds in full.

---

[37] Count XXXVI does not address the amounts at issue in the Galey Agency Motion, which will be determined pursuant to the relief requested in that motion.

642.    Until her resignation on March 21, 2020, Tilton was Galey & Lord's manager.

643.    In 2016, PPAS, in its capacity as agent for Galey & Lord's secured lenders, foreclosed on certain of Galey & Lord's assets in partial satisfaction of the Zohar Funds' indebtedness.  On October 26, 2018, counsel to PPAS informed the Debtors that "Galey was foreclosed upon by PPAS in 2016.  The Company is winding down in the ordinary course."

644.    Between 2018 and 2020, Galey & Lord received in excess of $31 million as part of the ███████████.

645.    Additionally, on June 6, 2017 Galey & Lord received approximately $5.5 million from the Boland Plant Sale and approximately $2 million from the Darlington Plant Demolition.

646.    Upon information and belief, Tilton, an insider of Galey & Lord both through her status as manager of Galey & Lord and owner, manager, and controller of PPAS, caused Galey & Lord or its affiliates to transfer proceeds of the ███████████, the Boland Plant Sale, and the Darlington Plant Demolition to insider-creditors PPMG, AIP and Ark II at a time when each insider-creditor had reason to believe that Galey & Lord was insolvent.  Specifically, Galey & Lord used the proceeds to pay the outstanding principal on the term loans owed to insider-creditors AIP and Ark II ($12.6 million, together) in a manner inconsistent with the applicable loan and intercreditor documents and $1.9 to PPMG in outstanding unsecured management fees.  Galey & Lord also transferred approximately $16.2 million to certain Tilton affiliates, which then transferred the cash back to an affiliate of Galey & Lord over which Tilton maintained control.[38] This transfer was made for no apparent reason at all other than to perhaps secret the cash from the Zohar Funds.

---

[38] Count XXXVII does not address the amounts at issue in the Galey Agency Motion, which will be determined pursuant to the relief requested in that motion.

647.     These transfers are avoidable as constructively fraudulent transfers under applicable state law, including NY DCL §§ 274(b) and 6 *Del. C.* § 1305(b).

648.     Under applicable state law, including NY DCL §§ 278 and 279 and 6 *Del. C.* § 1308, the Zohar Funds are entitled to recover the property fraudulently transferred in the Transfers, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees.

### COUNT XXXVIII :  ACTUAL FRAUDULENT TRANSFER
### (By the Zohar Funds Against PPAS & PPMG)

649.     The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

650.     Plaintiffs plead this Count solely in the alternative to their claims in Count XXXV and XXXVI for conversion and violations of Section 550 of the Bankruptcy Code.  If PPAS did not properly foreclose on Galey & Lord's assets for the benefit of the secured lenders, and/or that the Galey & Lord assets, including the proceeds of the ███████████, the Boland Plant Sale, and the Darlington Plant Demolition are not property of the secured lenders, the transactions described herein were actual fraudulent transfers.

651.     The Zohar Funds were secured lenders of Galey & Lord.  The loans owed to the Zohar Funds have matured.

652.     Between 2018 and 2020, Galey & Lord received in excess of $31 million as part of the ███████████.

653.     Additionally, on June 6, 2017 Galey & Lord received approximately $5.5 million from the Boland Plant Sale and approximately $2 million from the Darlington Plant Demolition.

654.     PPAS surreptitiously transferred $1.9 million of the proceeds of the ██████ ███████, the Boland Plant Sale, and the Darlington Plant Demolition to an insider, unsecured creditor PPMG.

655.    These payments to PPMG were made with actual intent to hinder, delay or defraud the Zohar Funds, who were secured creditors of Galey & Lord at the time of the transfer.  Such intent can be inferred from, among other things, that the transfers were made to and for the benefit of an insider of PPAS (PPMG), the transfers were made without consideration to the Zohar Funds, the transfers were made in violation of affirmative obligations of PPAS not to engage in such transactions, the transfers had been affirmatively and knowingly concealed from the Zohar Funds.

656.    PPAS also transferred approximately $8.7 million to AIP and approximately $1.3 million of the proceeds of the ███████████ and the Boland Plant Sale to an insider creditor in contravention of the priority of payments set forth in the Galey & Lord Intercreditor Agreement.[39] Even if the September 1, 2015 amendment to the Galey & Lord Intercreditor Agreement were valid, PPAS transferred approximately $350,000 to AIP and $1.3 million to Ark II in contravention of the Galey & Lord Intercreditor Agreement.

657.    These payments to Ark II and AIP were made with actual intent to hinder, delay or defraud the Zohar Funds, who were secured creditors of Galey & Lord at the time of the transfers and were entitled to priority with respect to the transferred money.  Such intent can be inferred from, among other things, that the transfers were made to and for the benefit of insiders of PPAS (Ark II and AIP), the transfers were made without consideration to the Zohar Funds, the transfers were made in violation of affirmative obligations of PPAS not to engage in such transactions, the transfers had been affirmatively and knowingly concealed from the Zohar Funds.[40]

658.    As a result of the transfers, the Zohar Funds have been harmed.

---

[39] The September 1, 2015 amendment to the Galey & Lord Intercreditor Agreement was invalid as it was among the Credit Agreement Amendments and Voting/Control Actions.

[40] Count XXXVIII does not address the amounts at issue in the Galey Agency Motion, which will be determined pursuant to the relief requested in that motion.

659.    The transfers to PPMG, Ark II, and AIP are avoidable as actual fraudulent transfers under applicable state law, including NY DCL § 276 and 6 *Del. C.* § 1304.

### COUNT XXXIX :    DISGORGEMENT OF FEES AND EXPENSES
### (By the Zohar Funds Against Tilton and the Patriarch Secured Parties)

660.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

661.    Paragraph 12(g) of the Cash Collateral Order provides that "the Debtors are authorized under sections 363 and 503(b) of the Bankruptcy Code to pay the reasonable fees, costs and expenses of the Patriarch Secured Parties . . . ."  Cash Collateral Order ¶ 12(g).

662.    Paragraph 21 of the Cash Collateral Order reserves the Debtors' rights with respect to "the recovery, allocation or surcharge of any fees, expenses or reserves in these Cases, in both cases under the Bankruptcy Code, contract, agreement, or any other applicable law . . . ." *Id.* ¶ 21.

663.    Under the guise of paragraphs 12(c) and 12(g) of the Cash Collateral Order, Tilton and her affiliates have sought and obtained the reimbursement of fees and expenses by the Debtors pursuant to section 503(b) of the Bankruptcy Code despite the fact that these fees and expenses were not "actual and necessary" and did not serve to "preserv[e] the estate" nor were they incurred in making a "substantial contribution" to the estate as required by 11 U.S.C. § 503(b).

664.    Instead, these fees and expenses relate to numerous post-petition schemes in which Tilton has engaged that were detrimental to the Debtors and to the administration of the estates.

665.    For services rendered in the months of August and September 2019—the last two months for which Ms. Tilton's fees were paid under the Cash Collateral Order— the Zohar Funds paid her professionals more than $3 million.  The month of September ended with the Court denying Ms. Tilton's opposition to the Debtors' motion, filed at the beginning of August, to affirm a principal element of the Settlement Agreement—the continuation of the Monetization Process— and the very next day, on October 1, 2019, Ms. Tilton filed an 80-page complaint seeking to elevate

her own deeply-subordinated claims above those of the Debtors other pre-petition (and senior) creditors.  These efforts, and other self-serving ventures, were funded by the Zohar Funds.

666.    For instance, Tilton through her control of PPAS and Galey & Lord, has siphoned value away from the Debtors' estates by causing Galey & Lord to transfer certain proceeds to the Tilton-affiliated Ark II, AIP, and PPMG and by causing PPAS to refuse to release approximately $18.7 million in cash sitting at Galey & Lord's subsidiary and at PPAS, which should rightfully have been paid to the Zohar Funds long ago in partial satisfaction of Galey & Lord's secured indebtedness to the Debtors.

667.    Indeed, Tilton and her cohorts have been engaging in conflicted and harmful conduct throughout these Cases, and are getting paid by the estate to do so.

668.    Pursuant to Paragraph 21 of the Cash Collateral Order, the Debtors are entitled to disgorgement of the fees and expenses paid to Tilton and her affiliated entities.

## COUNT XL :    BREACH OF THE GALEY & LORD CREDIT AGREEMENT, ABL CREDIT AGREEMENT, AND INTERCREDITOR AGREEMENT
### (By the Zohar Funds Against PPAS, Ark II, and AIP)

669.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

670.    Plaintiffs plead this Count solely in the alternative to their claim in Count IV for rescission of the Credit Agreement Amendments and the Voting/Control Actions, including the Galey & Lord Term Loan Credit Agreement, the Galey & Lord ABL Credit Agreement, and the Galey & Lord Intercreditor Agreement.  If the amendments are effective, then PPAS, Ark II, and AIP breached the Galey & Lord Term Loan Credit Agreement, the Galey & Lord ABL Credit Agreement, and the Galey & Lord Intercreditor Agreement.

671.    Section 2.3 of the Galey & Lord Intercreditor Agreement sets forth distinct priorities of payment for proceeds of Revolving Loan Priority Collateral and Term Loan Priority

Collateral.  Section 2.3(b) provides that proceeds of Term Loan Priority Collateral must be paid to satisfy the Term Loan Debt in full before any amounts are paid to satisfy the Revolving Loan Debt.

672.    The proceeds distributed by PPAS were realized from assets that were Term Loan Priority Collateral, as set forth in Exhibit A to the Galey & Lord Intercreditor Agreement.  The proceeds should therefore have been paid to satisfy the Term Loan Debt of **all** Term Loan Lenders, not just Tilton's personal investment vehicles, Ark II and AIP.

673.    Instead, PPAS distributed, and Ark II and AIP accepted, payment in full of all of Ark II and AIP's debt—term loan debt and revolving loan debt—before a single dollar was paid to the Zohar Funds' term loan debt.

674.    PPAS also transferred $1.9 million of the proceeds of the ██████████, the Boland Plant Sale, and the Darlington Plant Demolition to insider-creditor PPMG, ostensibly to satisfy outstanding unsecured management fees.

675.    This payment was made at a time where over $100 million was outstanding on the Zohar Funds' secured Term Loans.

676.    Neither the Galey & Lord ABL Credit Agreement nor the Term Loan Credit Agreement allows PPAS to use proceeds of collateral owned by the secured lenders to pay outstanding unsecured management fees ahead of the secured lenders.

677.    Accordingly, the $1.9 million payment made to PPMG was a breach of the Galey & Lord ABL Credit Agreement and the Galey & Lord Term Loan Credit Agreement.

678.    The Zohar Funds seek rescission of the payments made in breach of the Galey & Lord ABL Credit Agreement, the Galey & Lord Term Loan Credit Agreement, and the Galey &

Lord Intercreditor Agreement and damages in the amount of losses caused by the breaches of these agreements.[41]

### COUNT XLI :       UNJUST ENRICHMENT (INVALID PARAGRAPH 18 CLAIMS)
### (By the Zohar Funds Against the Octaluna Entities, Tilton, PPMG, PPAS, and Patriarch Partners)

679.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

680.    Paragraph 18 of the Settlement Agreement creates a framework whereby the Zohar Funds were barred from asserting certain objections to claims by Tilton and her affiliates for proceeds from monetization events.

681.    Paragraph 18 preserves the Zohar Funds' right to challenge the propriety of any of Tilton's or her affiliates' claims and equity interests in respect of any monetization event.  The Zohar Funds therefore have standing to challenge these improper payments.

682.    As a result of improper claims paid pursuant to Paragraph 18, Tilton and PPMG have been substantially enriched.  But for Tilton's and PPMG's improper claims, the amounts received upon a monetization event by Tilton and PPMG would have been available to the Zohar Funds.

683.    Tilton received substantial proceeds from the monetization of FSAR Holdings, Inc. and UI Acquisition, based on her invalid claim for indemnification of her legal fees and costs for the Chancery 225 Action.

684.    Tilton's claim for indemnification by FSAR Holdings Inc. (or its subsidiary, PDP) is invalid.  Among other reasons, Tilton is not entitled to indemnification under the LLC agreement of Performance Designed Products, as PDP was not a party to the Chancery 225 Action.  Tilton is

---

[41] Count XL does not address the amounts at issue in the Galey Agency Motion, which will be determined pursuant to the relief requested in that motion.

not entitled to indemnification under the articles of incorporation of FSAR Holdings, Inc., because her indemnification request was not approved in accordance with FSAR Holdings' governing documents.  Tilton was not entitled to indemnification from either company because she was advancing her own interests in the Chancery 225 Action, and because she sought indemnification from FSAR Holdings in bad faith to retaliate against the Zohar Funds' asserting their rights under the status quo order in place in the Chancery 225 Action.

685.    PPMG received substantial proceeds upon the sales of FSAR Holdings, Inc., RM Acquisition, Libertas Copper, LLC, and UI Acquisition based upon invalid claims of indemnification for bankruptcy costs incurred by Tilton and her affiliates.  PPMG has also made invalid assertions of entitlement to indemnification for bankruptcy costs to be paid upon the sales of IMG Holdings, Inc., Intrepid U.S.A., Inc., Scan-Optics, LLC, and Vulcan.   These indemnification claims were and are invalid because the PPMG Agreements were no longer in effect and, even if they were still in effect, the claimed amounts were not indemnifiable expenses under the terms of the PPMG Agreements.

686.    PPMG also received substantial proceeds upon the sales of RM Acquisition, Libertas Copper, LLC, Denali, Inc., and FSAR Holdings, based on invalid claims for accrued management fees and transaction fees.  PPMG has also made invalid assertions of entitlement to additional management fees and transaction fees to be paid upon the sales of Intrepid U.S.A., Inc., Stila, IMG Holdings, Inc., 180s, Inc., Scan-Optics, LLC, and Vulcan.  These claims were and are invalid because the PPMG Agreements were no longer in effect and as set forth in Counts XXV-XXXIII.

687.    The Octaluna Entities received approximately $2.6 million upon the sales of RM Acquisition and Libertas Copper based on invalid claims for Tax Dividends from these Portfolio Companies.  The Octaluna Entities have also made invalid assertions of entitlement to additional

Tax Dividends to be paid upon the sale of Stila. These claims were and are invalid because the Octaluna Entities were not entitled to Tax Dividends as set forth in Counts XI, XII, XVIII, XXIV, XXV, and XLII.

688.    PPAS has made invalid assertions of entitlement to indemnification for legal expenses incurred by Patriarch Partners, LLC, in connection with asbestos lawsuits brought against Patriarch Partners, LLC, owing to its relationship with IMG Holdings, Inc. These claims are invalid because PPAS is not entitled to indemnification under the IMG Holdings, Inc. Credit Agreement for expenses incurred by Patriarch Partners, LLC, in connection with these suits.

689.    The circumstances are such that it would be against equity and good conscience to permit Tilton or PPMG to retain their ill-gotten gains from the Zohar Funds. Tilton and PPMG have an obligation to the Zohar Funds to make restitution for their ill-gotten gains. Tilton and PPMG have failed to make restitution to the Zohar Funds for their ill-gotten gains.

690.    Restitution should therefore be made by Tilton and PPMG to the Zohar Funds in an amount to be proven at trial.

### COUNT XLII :     BREACH OF SETTLEMENT AGREEMENT (TAX DIVIDENDS)
### (By the Zohar Funds Against Tilton, the Ark Entities and the Octaluna Entities)

691.    The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

692.    The Zohar Funds, Tilton, the Ark Entities and the Octaluna Entities are parties to the Settlement Agreement.

693.    The Settlement Agreement is a valid and enforceable contract under which the Zohar Funds have fully performed.

694.    The Settlement Agreement defined a "15 Month Window" during which, pursuant to Paragraph 20, Tilton was required to operate the Group A and Group B Portfolio Companies in the ordinary course of business. Paragraph 20 prohibited Tilton from executing significant

transactions during the 15 Month Window, like financing transactions with affiliates, without first consulting with the CRO. The Portfolio Companies were permitted to make payments as designated by the "Designated Tax Director" "for the payment of their state and federal income taxes." Tilton was prohibited from causing the Portfolio Companies to "declare dividends" during the 15 Month Window.

695. Notwithstanding the prohibition on declaring dividends, Tilton caused multiple LLC Portfolio Companies to declare dividends—to be made directly to her affiliated Octaluna Entities and Ark Entities—during the 15 Month Window. These dividends amounted to more than $10 million. These dividends were not permitted as payments "for the payment of *their* [i.e., any Portfolio Company's] state and federal income taxes" (emphasis added) because the LLC Portfolio Companies, as disregarded entities, had no federal income taxes. This is in contrast to the Corporation Portfolio Companies, who would have owed "state and federal taxes" (to the extent they had net taxable income), and were permitted to make payments to taxing authorities "for the payment of their state and federal income taxes" pursuant to Paragraph 20.

696. In further violation of her obligations to operate the Portfolio Companies in the ordinary course, Tilton caused some LLC Portfolio Companies to make payments during the 15 Month Window on promissory notes that she had wrongfully forced them to execute years earlier. These promissory notes purported to reflect amounts owed by the applicable Portfolio Company to Tilton's affiliated Ark Entities and Octaluna Entities for prior years' "tax distribution amounts." These affiliate payments were made outside the ordinary course, without the consent of the CRO, and in violation of the Settlement Agreement.

### COUNT XLIII :    BREACH OF THE CREDIT AGREEMENTS
#### (By the Zohar Funds Against PPAS)

697. The Zohar Funds incorporate the foregoing allegations as if fully set forth here.

698.    As set forth above, the Zohar Funds and PPAS are parties to the Credit Agreements.

699.    The Credit Agreements are valid and enforceable contracts under which the Zohar Funds have fully performed.

700.    The Credit Agreements state precise "Borrowing Mechanics" applicable to all borrowings from the Zohar Funds. Before asking the Zohar Funds as lenders to fund their pro rata share of any borrowing, PPAS was required to receive a fully executed Borrowing Certificate from the applicable borrower. Ex. 7 at § 2.3(b), (c).

701.    Receipt of a Borrowing Certificate by PPAS was an express condition precedent to each borrowing—the Zohar Funds would have no obligation to fund any borrowing if PPAS had not received a fully executed Borrowing Certificate. *Id.* § 3.2(a).

702.    Many of the Credit Agreements included an additional express condition precedent that borrowings under any DDTL be supported by a resolution of the Portfolio Company's board of directors. *Id.* § 3.2(h).

703.    Moreover, PPAS was to disburse the funding to the borrowers only upon satisfaction of the conditions precedent, including the receipt of an executed Borrowing Certificate and board resolution (for any DDTL drawdown). *Id.* § 2.3(d).

704.    In February and March 2016 leading up to the Patriarch Managers' resignation, PPAS breached the Credit Agreements by requesting over approximately $50 million in funding on Revolving Credit Facilities and Delayed Draw Term Loans for which the conditions precedent had not been satisfied including because no Borrowing Certificate or board resolution had been provided.

705.    PPAS further breached the Credit Agreements by disbursing funds to the borrowers without satisfaction or waiver of the conditions precedent.  PPAS then held those funds, loaned them out at its sole discretion or the discretion of the Portfolio Managers, and received repayments

back from the Portfolio Companies that it refused to return to the Zohar Funds, as had been its routine practice.  It continued to hold these funds even after some of the Portfolio Companies were declared in default and the Zohar Funds had expressly demanded the funds back.

706.    As a result of this breach, the Zohar Funds have incurred economic loss and damages in an amount to be proven at trial.  The Zohar Funds have also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect their rights under the Credit Agreements.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, the Zohar Funds respectfully request that this Court enter judgment in favor of the Zohar Funds and against the Defendants and grant the following relief:

A.    a judgment against the Octaluna Entities and Tilton finding and declaring that the Zohar Funds at all relevant times have been the legal and beneficial owners of the equity interests issued or otherwise created in their names, with the relevant equity interests to be established at trial;

B.    a judgment against the Patriarch Managers, the Class B Parties, the Proxy Grantees, the Octaluna Entities, and Tilton finding and declaring that the amendments, proxies, and other documents concerning the assets and interests of the Zohar Funds entered into by these Defendants outside the scope of their authority were void *ab initio* and are deemed unenforceable;

C.    a determination against the Patriarch Managers, the Class B Parties, the Octaluna Entities, and Ark II finding and declaring that the Voting/Control Transfers constitute actual and constructive fraudulent transfers;

D.    a determination against the Octaluna Entities finding and declaring that the November 2017 Transfers and the CTB Election constitute actual and constructive fraudulent transfers;

E.    a determination against the Octaluna Entities finding and declaring that the Zohar Funds are entitled to indemnification for any loss, damage or liability due to or arising out of the CTB Election;

F.    a determination against PPMG finding and declaring that the PPMG Transfers constitute actual and constructive fraudulent transfers;

G.    avoidance of the fraudulent transfers;

H.    recovery of the property fraudulently transferred, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees;

I.    [Reserved];

J.    rescission of the transactions executed by Tilton in breach of the LLC Agreements and damages in the amount of the losses caused by Tilton's breaches of the LLC Agreements;

K.    damages in the amount of the losses caused by the Octaluna Entities' aiding and abetting of Tilton's breaches of the LLC Agreements;

L.    rescission of the transactions executed by the Patriarch Managers in breach of the CMAs and damages in the amount of the losses caused by the Patriarch Managers' breaches of the CMAs;

M.    damages in the amount of the losses caused by Tilton's tortious interference with the contractual relationships between the Zohar Funds and the Patriarch Managers and between the Zohar Funds and the Octaluna Entities;

N.    damages in the amount of the losses caused by the Patriarch Managers' and Tilton's breaches of their fiduciary duties, including Tilton's fees and expenses paid by the Debtors pursuant to paragraph 12(c) of the Cash Collateral Order;

O.    a determination finding and declaring that PPAS, PPMG, the Patriarch Managers, the Ark Entities, the Octaluna Entities, and Tilton have been unjustly enriched and damages in the amount of the unjust enrichments;

P.    a determination finding and declaring that the Patriarch Managers are faithless servants and forfeiture of all money that they received from the Zohar Funds as of the first day that they breached their duties;

Q.    damages in the amount of the losses caused by the Patriarch Managers', the Octaluna Entities', the Ark Entities', PPAS's, and Tilton's conversions of the Zohar Funds' property;

R.    rescission of the transactions executed by the Octaluna Entities in breach of the Subscription Agreements and damages in the amount of the losses caused by the Octaluna Entities' breaches of the Subscription Agreements;

S.    damages in the amount of the losses caused by the Octaluna Entities' and Tilton's tortious interference with the Indentures;

T.    rescission of the transactions executed by Tilton in breach of the MD Stockholders Agreement and damages in the amount of the losses caused by Tilton's breaches of the MD Stockholders Agreements;

U.    a judgment against PPMG finding and declaring that the PPMG Agreements have terminated;

V.      damages in the amount of the losses caused by PPMG's aiding and abetting of Tilton's breaches of her fiduciary duties and the LLC Agreements;

W.      disgorgement of all compensation received by the Patriarch Managers since the date of their first disloyal act;

X.      disgorgement of all amounts improperly paid to Tilton, the Octaluna Entities, and PPMG pursuant to Paragraph 18 of the Settlement Agreement;

Y.      disgorgement of all fees and expenses paid to Tilton, the Patriarch Secured Parties, and their professional advisors, pursuant to 11 U.S.C. § 503(b) and paragraph 12(c) of the Cash Collateral Order;

Z.      a judgment that Tilton, the Ark Entities and the Octaluna Entities  violated the Settlement Agreement and damages in the amount of dividends made in violation of the Settlement Agreement.

AA.      damages in the amount of the losses caused by PPAS's breaches of the Credit Agreements;

BB.      prejudgment interest;

CC.      reasonable attorneys' fees, costs, and expenses incurred in this action; and

DD.      any other and further relief as the Court deems just, proper, or equitable under the circumstances.

Dated:  October 13, 2023          YOUNG CONAWAY STARGATT & TAYLOR,
        Wilmington, Delaware      LLP

                                  */s/ Ryan M. Bartley*
                                  James L. Patton, Jr. (No. 2202)
                                  Robert S. Brady (No. 2847)
                                  Michael R. Nestor (No. 3526)
                                  Joseph M. Barry (No. 4221)
                                  Ryan M. Bartley (No. 4985)
                                  Rodney Square
                                  1000 North King Street
                                  Wilmington, Delaware 19801
                                  Telephone:    (302) 571-6600
                                  Facsimile:    (302) 571-1256

                                  *Counsel to the Debtors, the Debtors in Possession and
                                  the Litigation Trust*

                                          -and-

                                  QUINN EMANUEL URQUHART & SULLIVAN,
                                  LLP

                                  Jonathan E. Pickhardt, Esq. (admitted *pro hac vice*)
                                  Ellison Ward Merkel, Esq. (admitted *pro hac vice*)
                                  Blair A. Adams, Esq. (admitted *pro hac vice*)
                                  Brian R. Campbell, Esq. (admitted *pro hac vice*)
                                  Brenna D. Nelinson, Esq. (admitted *pro hac vice*)
                                  51 Madison Avenue, 22nd Floor
                                  New York, NY 10010
                                  Telephone: (212) 849-7000
                                  Facsimile: (212) 849-7100

                                  *Counsel to David Dunn, as Trustee for the Zohar
                                  Litigation Trust-A*

30863291.1

28510112.3

## ANNEX A – PORTFOLIO COMPANIES

### *Group A Portfolio Companies*

| Portfolio Company | Ownership Interest Held By | | | | Business Description |
|---|---|---|---|---|---|
| | Zohar I | Zohar II | Zohar III | Total | |
| **Denali Acquisition, LLC** | - | - | 100% | 100.00% | Holding company that formerly owned 60.5 % of Denali, Incorporated, which designs, manufactures, sells and installs fiberglass reinforced plastic products for corrosive environments. |
| **Dura Buyer, LLC** | - | 52.49% | 25.29% | 77.78% | Holding company that owns 73% of Dura Automotive Systems, LLC, which designs and manufactures parts and systems for the global automotive industry. |
| **FSAR Holdings, Inc.** | - | 100.0% | - | 100.00% | Sole member of Performance Designed Products, LLC which develops, markets, and distributes video game accessories. |
| **Global Automotive Systems, LLC** | 18.8% | 49.1% | 32.2% | 100.10% | Manufactures stamped, roll formed, stretch bent, welded and rotary cold formed products. |
| **Heritage Aviation, Ltd.** | 1.0% | 99.0% | - | 100.00% | Provides maintenance, avionics, and fixed base operations. |
| **Snelling Holdings, LLC** | 22.3% | 63.8% | 13.9% | 100.00% | Holding company that owns:<br>• 100% of Intrepid U.S.A., Inc., which provides home health care and hospice services, and<br>• 94.75% of Snelling Staffing, LLC, which provides career and flexible staffing services through company-owned and franchised offices. |
| **Libertas Copper, LLC** | - | - | 82.8% | 82.80% | Manufactures coppers and copper-nickel alloys. |
| **LVD Acquisition, LLC**[42] | 18.9% | 58.3% | 22.8% | 100.00% | Manufactures and distributes a wide range of water dispensing equipment. |
| **MD Helicopters, Inc.** | 21.0% | 28.6% | - | 49.60% | Manufactures and distributes helicopters for defense/military applications. |

---

[42] The membership units of LVD Acquisition, LLC were sold to a third party in September 2019.

| Portfolio Company | Ownership Interest Held By | | | | Business Description |
|---|---|---|---|---|---|
| | Zohar I | Zohar II | Zohar III | Total | |
| **RM Acquisition, LLC** | 17.1% | 57.0% | 25.9% | 100.00% | Provides mapping, software, and hardware for the consumer electronics, commercial transportation, and education markets. |
| **Stila Styles, LLC** | - | - | 100.0% | 100.00% | Develops, markets, and distributes cosmetics and other personal care products. |
| **UI Acquisition Holding Co.** | 15.5% | 17.3% | 16.5% | 49.30% | Supplies pick and place equipment used to assemble components onto printed circuit boards. |
| **Vulcan Engineering Co.** | - | 80.0% | - | 80.00% | Provides systems and equipment for a wide range of metal-casting industries. |

### *Group B Portfolio Companies*

| Portfolio Company | Ownership Interest Held By | | | | Business Description |
|---|---|---|---|---|---|
| | Zohar I | Zohar II | Zohar III | Total | |
| **Operating Companies** | | | | | |
| **180s, Inc.** | - | 68.4% | - | 68.40% | Produces performance apparel and accessories. |
| **Acme International Enterprises, Inc.** | - | 72.5% | - | 72.50% | Offers kitchen and household items. |
| **Croscill Home, LLC** | | | 100.0% | 100% | Produces furniture and home goods |
| **eMag Solutions, LLC** | - | 70.6% | - | 70.60% | Provides tape restorations, legacy data migrations, and information governance support. |
| **Glenoit Universal, Ltd.** | 1.7% | 27.7% | - | 29.40% | Manufactures and markets curtains, rugs, towels, and other home accessories. |
| **Gorham Paper and Tissue, LLC** | - | - | 100.0% | 100.00% | Manufactures niche paper products. |
| **IMG Holdings, Inc.** | 16.9% | 68.2% | 14.8% | 99.90% | Manufactures fragrances for men and women. |
| **Jewel of Jane, LLC** | - | 100.0% | - | 100.00% | Produces beauty and cosmetic products. |
| **Scan-Optics, LLC** | 18.0% | 82.0% | - | 100.00% | Provides custom data solutions for commercial users. |

| Portfolio Company | Ownership Interest Held By | | | | Business Description |
| --- | --- | --- | --- | --- | --- |
| | Zohar I | Zohar II | Zohar III | Total | |
| Companies that are not operating | | | | | |
| American Doors, LLC | 21.1% | 34.1% | 40.5% | 95.70% | Was a manufacturer of hollow metal doors and frames for private, commercial, and government use. |
| American LaFrance, LLC | 16.3% | 16.3% | 16.3% | 48.90% | Was a designer and manufacturer of fire, rescue, and emergency vehicles. |
| Amweld International, LLC | 23.1% | 33.3% | 39.3% | 95.70% | Was a manufacturer of steel doors, frames, and architectural hardware. |
| Best Textiles Acquisition, LLC | - | - | 100.0% | 100.00% | Was a manufacturer and distributor of medical, hospitality, butcher, and food processing garments. |
| Duro Textiles, LLC | - | 29.0% | - | 29.00% | Was a manufacturer and distributor of textile products. |
| Fetco Home Decor, Inc. | 44.9% | 19.8% | - | 64.70% | Was a provider of photograph frames, albums, and related home décor items. |
| Galey & Lord, LLC | 46.4% | 33.9% | - | 80.30% | Was a designer, manufacturer and supplier of fabric for causal fashion, uniform, and work wear markets. |
| Hartwell Industries, Inc. | 61.1% | 4.7% | - | 65.80% | Was a designer and distributor of shirts, jackets, and athletic wear. |
| Iconic American Trucks, LLC | 21.2% | 22.5% | 44.1% | 87.80% | Holds certain assets formerly owned by American LaFrance, LLC. |
| Mobile Armored Vehicles, LLC (f/k/a PVI Acquisition, LLC) | | | 100.0% | 100.00% | Was a developer and manufacturer of armored vehicles. |
| Netversant Solutions, LLC | 42.37% | 37.76% | 19.87% | 100.00% | Was a provider of comprehensive and integrated network infrastructure solutions. |
| Patriarch Partners Media Holdings, LLC | 53.6% | 46.7% | - | 100.30% | Holds certain media related assets. |
| Petry Holding Inc. | - | 37.2% | - | 37.20% | Was a representative that sold advertising time and space for newspapers, magazines, and television. |
| Red Shield Acquisition, LLC | | | 100% | 100% | Was an operator of a pulp mill |

| Portfolio Company | Ownership Interest Held By | | | | Business Description |
|---|---|---|---|---|---|
| | Zohar I | Zohar II | Zohar III | Total | |
| Remco Maintenance, LLC | 72.7% | - | - | 72.70% | Was a provider of restoration, preservation, and maintenance services. |
| Silverack, LLC | 44.7% | - | 55.3% | 55.30% | Was a manufacturer of racks, shelves and desks. |
| Spectrum International Holdings, Inc. | 53.6% | - | 25.6% | 79.2% | Holding company for Rapid Rack Industries, Inc., which was a manufacturer and seller of industrial rack and metal works. |
| Spiegel, LLC | - | 25.5% | 74.5% | 100.00% | Was a designer and marketer of women's apparel, accessories, and footwear. |

28510112.3

## <u>ANNEX B – IDENTIFIED PPMG PAYMENTS</u>

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| **CBA/ Universal Instruments** | | |
| | 01/05/2015 | 25,000.00 |
| | 02/06/2015 | 25,000.00 |
| | 03/06/2015 | 25,000.00 |
| | 04/03/2015 | 25,000.00 |
| | 05/08/2015 | 25,000.00 |
| | 06/05/2015 | 25,000.00 |
| | 07/03/2015 | 25,000.00 |
| | 08/07/2015 | 25,000.00 |
| | 09/04/2015 | 25,000.00 |
| | 10/09/2015 | 100,000.00 |
| | 11/06/2015 | 100,000.00 |
| | 12/04/2015 | 100,000.00 |
| | 01/08/2016 | 100,000.00 |
| | 02/05/2016 | 100,000.00 |
| | 03/04/2016 | 100,000.00 |
| | 04/04/2016 | 100,000.00 |
| | 05/09/2016 | 100,000.00 |
| | 06/06/2016 | 100,000.00 |
| | 07/08/2016 | 100,000.00 |
| | 08/05/2016 | 100,000.00 |

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 08/12/2016 | 100,000.00 |
| | 11/04/2016 | 200,000.00 |
| | 12/05/2016 | 100,000.00 |
| | 01/06/2017 | 100,000.00 |
| | 02/03/2017 | 100,000.00 |
| | 03/03/2017 | 100,000.00 |
| | 03/10/2017 | 100,000.00 |
| | 04/07/2017 | 100,000.00 |
| | 05/05/2017 | 100,000.00 |
| | 07/06/2017 | 100,000.00 |
| | 07/31/2017 | 100,000.00 |
| | 09/06/2017 | 100,000.00 |
| | 10/10/2017 | 100,000.00 |
| | 11/06/2017 | 100,000.00 |
| | 12/11/2017 | 100,000.00 |
| | 01/08/2018 | 100,000.00 |
| | 02/05/2018 | 100,000.00 |
| | 02/12/2018 | 100,000.00 |
| | 04/16/2018 | 100,000.00 |
| | 04/20/2018 | 100,000.00 |
| | 06/11/2018 | 100,000.00 |
| | 06/18/2018 | 100,000.00 |
| | 07/30/2018 | 100,00.00 |
| | 08/13/2018 | 100,000.00 |

2

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 09/25/2018 | 100,000.00 |
| **Total CBA/ Universal Instruments** | | **3,925,000.00** |
| **Denali** | | |
| | 01/21/2015 | 25,000.00 |
| | 02/17/2015 | 25,000.00 |
| | 03/24/2015 | 25,000.00 |
| | 04/21/2015 | 25,000.00 |
| | 05/19/2015 | 25,000.00 |
| | 06/23/2015 | 25,000.00 |
| | 07/14/2015 | 25,000.00 |
| | 08/21/2015 | 25,000.00 |
| | 09/29/2015 | 100,000.00 |
| | 10/22/2015 | 100,000.00 |
| | 11/16/2015 | 100,000.00 |
| | 01/12/2016 | 100,000.00 |
| | 02/09/2016 | 100,000.00 |
| | 03/08/2016 | 200,000.00 |
| | 05/05/2016 | 100,000.00 |
| | 06/01/2016 | 100,000.00 |
| | 01/25/2017 | 100,000.00 |
| | 03/29/2017 | 100,000.00 |
| | 04/27/2017 | 100,000.00 |
| | 05/30/2017 | 100,000.00 |
| | 06/12/2017 | 100,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 01/22/2018 | 100,000.00 |
| | 02/26/2018 | 100,000.00 |
| | 03/26/2018 | 100,000.00 |
| | 05/01/2018 | 100,000.00 |
| | 05/29/2018 | 100,000.00 |
| **Total Denali** | | **2,100,000.00** |
| **Dura Automotive Systems, LLC** | | |
| | 02/04/2015 | 100,000.00 |
| | 03/03/2015 | 100,000.00 |
| | 04/03/2015 | 100,000.00 |
| | 05/08/2015 | 100,000.00 |
| | 05/29/2015 | 100,000.00 |
| | 07/09/2015 | 100,000.00 |
| | 08/10/2015 | 100,000.00 |
| | 09/30/2015 | 200,000.00 |
| | 11/04/2015 | 100,000.00 |
| | 12/01/2015 | 100,000.00 |
| | 01/05/2016 | 100,000.00 |
| | 02/03/2016 | 100,000.00 |
| | 02/26/2016 | 100,000.00 |
| | 04/04/2016 | 100,000.00 |
| | 04/29/2016 | 100,000.00 |
| | 06/01/2016 | 100,000.00 |
| | 06/28/2016 | 100,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 08/05/2016 | 100,000.00 |
| | 09/02/2016 | 100,000.00 |
| | 10/04/2016 | 100,000.00 |
| | 11/02/2016 | 100,000.00 |
| | 11/30/2016 | 100,000.00 |
| | 12/29/2016 | 100,000.00 |
| | 02/01/2017 | 100,000.00 |
| | 03/06/2017 | 100,000.00 |
| | 04/11/2017 | 100,000.00 |
| | 05/17/2017 | 100,000.00 |
| | 06/27/2017 | 100,000.00 |
| | 07/25/2017 | 100,000.00 |
| | 03/09/2018 | 100,000.00 |
| | 03/19/2018 | 100,000.00 |
| | 03/26/2018 | 100,000.00 |
| | 07/02/2018 | 300,000.00 |
| | 08/27/2018 | 500,000.00 |
| **Total Dura Automotive Systems, LLC** | | **4,100,000.00** |
| **Electrosource (PDP)** | | |
| | 02/06/2015 | 25,000.00 |
| | 03/10/2015 | 25,000.00 |
| | 04/02/2015 | 25,000.00 |
| | 05/06/2015 | 25,000.00 |
| | 06/05/2015 | 25,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 07/01/2015 | 25,000.00 |
| | 08/04/2015 | 25,000.00 |
| | 09/02/2015 | 25,000.00 |
| | 09/29/2015 | 100,000.00 |
| | 11/02/2015 | 100,000.00 |
| | 11/30/2015 | 100,000.00 |
| | 01/04/2016 | 100,000.00 |
| | 02/03/2016 | 100,000.00 |
| | 03/01/2016 | 100,000.00 |
| | 04/05/2016 | 100,000.00 |
| | 05/02/2016 | 100,000.00 |
| | 05/31/2016 | 100,000.00 |
| | 07/01/2016 | 100,000.00 |
| | 08/01/2016 | 100,000.00 |
| | 08/29/2016 | 100,000.00 |
| | 10/01/2016 | 100,000.00 |
| | 10/31/2016 | 100,000.00 |
| | 12/05/2016 | 100,000.00 |
| | 12/28/2016 | 100,000.00 |
| | 03/03/2017 | 100,000.00 |
| | 03/27/2017 | 100,000.00 |
| | 04/21/2017 | 100,000.00 |
| | 04/21/2017 | 100,000.00 |
| | 06/07/2017 | 100,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 06/12/2017 | 100,000.00 |
| | 07/12/2017 | 100,000.00 |
| | 08/14/2017 | 100,000.00 |
| | 10/12/2017 | 100,000.00 |
| | 11/01/2017 | 100,000.00 |
| | 11/14/2017 | 100,000.00 |
| | 12/15/2017 | 100,000.00 |
| | 01/22/2018 | 100,000.00 |
| | 02/13/2018 | 100,000.00 |
| | 03/26/2018 | 100,000.00 |
| | 05/01/2018 | 100,000.00 |
| | 05/29/2018 | 100,000.00 |
| | 07/02/2018 | 100,000.00 |
| | 07/30/2018 | 100,000.00 |
| | 09/04/2018 | 100,000.00 |
| **Total Electrosource (PDP)** | | **3,800,000.00** |
| **Global Automotive Systems** | | |
| | 06/08/2015 | 25,000.00 |
| | 06/15/2015 | 25,000.00 |
| | 06/22/2015 | 25,000.00 |
| | 07/01/2015 | 25,000.00 |
| | 07/08/2015 | 25,000.00 |
| | 07/15/2015 | 25,000.00 |
| | 07/21/2015 | 25,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 08/24/2015 | 25,000.00 |
| | 08/25/2015 | 25,000.00 |
| | 09/16/2015 | 25,000.00 |
| | 11/23/2015 | 100,000.00 |
| | 12/07/2015 | 100,000.00 |
| | 01/20/2016 | 100,000.00 |
| | 02/09/2016 | 100,000.00 |
| | 03/01/2016 | 100,000.00 |
| | 04/11/2016 | 100,000.00 |
| | 04/26/2016 | 100,000.00 |
| | 05/25/2016 | 100,000.00 |
| | 06/22/2016 | 100,000.00 |
| | 08/03/2016 | 100,000.00 |
| | 08/22/2016 | 100,000.00 |
| | 09/19/2016 | 100,000.00 |
| | 11/02/2016 | 100,000.00 |
| | 12/06/2016 | 100,000.00 |
| | 01/03/2017 | 100,000.00 |
| | 02/16/2017 | 100,000.00 |
| | 02/27/2017 | 100,000.00 |
| | 03/29/2017 | 100,000.00 |
| | 04/24/2017 | 100,000.00 |
| | 05/22/2017 | 100,000.00 |
| | 06/28/2017 | 100,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 07/31/2017 | 100,000.00 |
| | 09/01/2017 | 100,000.00 |
| | 09/29/2017 | 100,000.00 |
| | 11/27/2017 | 100,000.00 |
| | 01/24/2018 | 100,000.00 |
| | 02/12/2018 | 100,000.00 |
| | 02/26/2018 | 100,000.00 |
| | 04/19/2018 | 100,000.00 |
| | 05/01/2018 | 100,000.00 |
| | 07/06/2018 | 100,000.00 |
| | 09/10/2018 | 200,000.00 |
| | 09/18/2018 | 200,000.00 |
| **Total Global Automotive Systems** | | **3,750,000.00** |
| **Heritage Aviation** | | |
| | 09/17/2016 | 25,000.00 |
| | 10/12/2016 | 25,000.00 |
| | 11/23/2016 | 30,000.00 |
| | 12/20/2016 | 250,000.00 |
| | 02/13/2017 | 90,000.00 |
| | 03/13/2017 | 110,000.00 |
| | 05/01/2017 | 100,000.00 |
| | 06/15/2017 | 150,000.00 |
| | 08/15/2017 | 100,000.00 |
| | 09/19/2017 | 150,000.00 |

9

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 11/15/2017 | 82.00 |
| | 05/21/2018 | 200,000.00 |
| | 06/21/2018 | 500,000.00 |
| | 07/25/2018 | 450,000.00 |
| | 08/13/2018 | 49,918.00 |
| | 09/18/2018 | 50,000.00 |
| **Total Heritage Aviation** | | **2,280,000.00** |
| **Intrepid USA** | | |
| | 07/07/2015 | 25,000.00 |
| | 07/16/2015 | 25,000.00 |
| | 12/13/2016 | 184,207.51 |
| | 01/25/2017 | 25,000.00 |
| | 02/15/2017 | 25,000.00 |
| | 04/25/2017 | 25,000.00 |
| | 05/12/2017 | 15,792.48 |
| | 05/23/2017 | 25,000.00 |
| | 07/19/2017 | 25,000.00 |
| | 08/03/2017 | 25,000.00 |
| | 08/03/2017 | 6,250.00 |
| | 10/16/2017 | 25,000.00 |
| | 01/23/2018 | 25,000.00 |
| | 02/26/2018 | 25,000.00 |
| | 03/23/2018 | 25,000.00 |
| | 04/13/2018 | 25,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 05/22/2018 | 25,000.00 |
| | 06/22/2018 | 25,000.00 |
| | 06/25/2018 | 1,000,000.00 |
| | 07/19/2018 | 25,000.00 |
| | 08/16/2018 | 25,000.00 |
| **Total Intrepid USA** | | **1,631,249.99** |
| **Libertas Copper** | | |
| | 01/07/2015 | 100,000.00 |
| | 02/02/2015 | 100,000.00 |
| | 03/02/2015 | 100,000.00 |
| | 04/01/2015 | 100,000.00 |
| | 05/01/2015 | 100,000.00 |
| | 06/01/2015 | 100,000.00 |
| | 07/01/2015 | 100,000.00 |
| | 08/03/2015 | 100,000.00 |
| | 09/01/2015 | 100,000.00 |
| | 10/01/2015 | 100,000.00 |
| | 11/02/2015 | 100,000.00 |
| | 12/01/2015 | 100,000.00 |
| | 01/04/2016 | 100,000.00 |
| | 02/01/2016 | 100,000.00 |
| | 03/01/2016 | 100,000.00 |
| | 04/01/2016 | 100,000.00 |
| | 05/02/2016 | 100,000.00 |

11

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 06/01/2016 | 100,000.00 |
| | 07/01/2016 | 100,000.00 |
| | 08/01/2016 | 100,000.00 |
| | 09/01/2016 | 100,000.00 |
| | 10/03/2016 | 100,000.00 |
| | 11/01/2016 | 100,000.00 |
| | 12/01/2016 | 100,000.00 |
| | 01/03/2017 | 100,000.00 |
| | 02/01/2017 | 100,000.00 |
| | 03/01/2017 | 100,000.00 |
| | 04/03/2017 | 100,000.00 |
| | 05/01/2017 | 100,000.00 |
| | 06/01/2017 | 100,000.00 |
| | 07/03/2017 | 100,000.00 |
| | 08/01/2017 | 100,000.00 |
| | 09/01/2017 | 100,000.00 |
| | 10/02/2017 | 100,000.00 |
| | 11/01/2017 | 100,000.00 |
| | 12/01/2017 | 100,000.00 |
| | 01/08/2018 | 100,000.00 |
| | 02/01/2018 | 100,000.00 |
| | 03/01/2018 | 100,000.00 |
| | 04/02/2018 | 100,000.00 |
| | 05/02/2018 | 100,000.00 |

12

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 06/01/2018 | 100,000.00 |
| | 07/02/2018 | 100,000.00 |
| | 08/01/2018 | 100,000.00 |
| | 09/04/2018 | 100,000.00 |
| **Total Libertas Copper** | | **4,500,000.00** |
| **LVD Acquisition, LLC** | | |
| | 01/25/2017 | 60,000.00 |
| | 02/01/2017 | 40,000.00 |
| | 04/04/2017 | 60,000.00 |
| | 04/21/2017 | 40,000.00 |
| | 05/15/2017 | 60,000.00 |
| | 06/19/2017 | 40,000.00 |
| | 07/13/2017 | 160,000.00 |
| | 07/26/2017 | 60,000.00 |
| | 08/10/2017 | 40,000.00 |
| | 09/11/2017 | 60,000.00 |
| | 10/10/2017 | 1,550,000.00 |
| | 10/24/2017 | 124,853.00 |
| | 11/29/2017 | 60,000.00 |
| | 12/11/2017 | 40,000.00 |
| | 01/18/2018 | 60,000.00 |
| | 03/29/2018 | 40,000.00 |
| | 05/01/2018 | 40,000.00 |
| | 05/02/2018 | 60,000.00 |

13

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 05/16/2018 | 25,000.00 |
| | 05/30/2018 | 50,000.00 |
| | 06/21/2018 | 500,000.00 |
| | 07/02/2018 | 50,000.00 |
| | 07/25/2018 | 50,000.00 |
| | 08/03/2018 | 25,000.00 |
| | 08/13/2018 | 25,000.00 |
| | 08/29/2018 | 50,000.00 |
| | 09/10/2018 | 100,000.00 |
| | 09/25/2018 | 50,000.00 |
| | 09/25/2018 | 50,000.00 |
| **Total LVD Acquisition, LLC** | | **2,059,853.00** |
| **MD Helicopters** | | |
| | 09/29/2015 | 598,510.71 |
| | 10/05/2015 | 84,674.37 |
| | 10/13/2015 | 15,325.63 |
| | 11/16/2015 | 100,000.00 |
| | 12/01/2015 | 70,983.81 |
| | 12/08/2015 | 29,016.19 |
| | 01/13/2016 | 100,000.00 |
| | 02/03/2016 | 100,000.00 |
| | 03/15/2016 | 100,000.00 |
| | 05/10/2016 | 100,000.00 |
| | 06/06/2016 | 100,000.00 |

14

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 06/20/2016 | 100,000.00 |
| | 07/06/2016 | 100,000.00 |
| | 08/08/2016 | 100,000.00 |
| | 09/05/2016 | 100,000.00 |
| | 10/10/2016 | 100,000.00 |
| | 11/11/2016 | 100,000.00 |
| | 12/05/2016 | 100,000.00 |
| | 03/29/2017 | 100,000.00 |
| | 04/11/2017 | 100,000.00 |
| | 04/11/2017 | 100,000.00 |
| | 05/09/2017 | 100,000.00 |
| | 06/05/2017 | 100,000.00 |
| | 09/25/2017 | 100,000.00 |
| | 09/25/2017 | 100,000.00 |
| | 09/25/2017 | 100,000.00 |
| | 11/20/2017 | 100,000.00 |
| | 12/21/2017 | 135,704.00 |
| | 01/16/2018 | 100,000.00 |
| | 02/06/2018 | 100,000.00 |
| | 03/19/2018 | 100,000.00 |
| | 04/06/2018 | 100,000.00 |
| | 04/30/2018 | 100,000.00 |
| | 05/29/2018 | 100,000.00 |
| | 06/22/2018 | 100,000.00 |

15

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 07/25/2018 | 100,000.00 |
| | 09/04/2018 | 100,000.00 |
| **Total MD Helicopters** | | **4,134,214.71** |
| **RM Acquisition, LLC** | | |
| | 01/06/2015 | 20,000.00 |
| | 02/06/2015 | 20,000.00 |
| | 03/04/2015 | 20,000.00 |
| | 04/08/2015 | 20,000.00 |
| | 05/06/2015 | 20,000.00 |
| | 06/03/2015 | 20,000.00 |
| | 07/08/2015 | 20,000.00 |
| | 07/08/2015 | 220,000.00 |
| | 09/09/2015 | 20,000.00 |
| | 10/06/2015 | 100,000.00 |
| | 11/02/2015 | 100,000.00 |
| | 12/08/2015 | 100,000.00 |
| | 01/05/2016 | 100,000.00 |
| | 02/03/2016 | 100,000.00 |
| | 03/08/2016 | 100,000.00 |
| | 04/05/2016 | 100,000.00 |
| | 05/01/2016 | 100,000.00 |
| | 05/31/2016 | 100,000.00 |
| | 07/06/2016 | 100,000.00 |
| | 08/02/2016 | 100,000.00 |

16

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 09/07/2016 | 100,000.00 |
| | 10/06/2016 | 100,000.00 |
| | 11/08/2016 | 100,000.00 |
| | 12/06/2016 | 100,000.00 |
| | 01/10/2017 | 100,000.00 |
| | 02/17/2017 | 100,000.00 |
| | 03/06/2017 | 100,000.00 |
| | 04/06/2017 | 100,000.00 |
| | 05/04/2017 | 100,000.00 |
| | 06/06/2017 | 100,000.00 |
| | 07/05/2017 | 100,000.00 |
| | 08/10/2017 | 100,000.00 |
| | 09/06/2017 | 100,000.00 |
| | 10/05/2017 | 100,000.00 |
| | 11/06/2017 | 100,000.00 |
| | 12/07/2017 | 100,000.00 |
| | 01/08/2018 | 100,000.00 |
| | 02/06/2018 | 100,000.00 |
| | 03/07/2018 | 100,000.00 |
| | 04/05/2018 | 100,000.00 |
| | 05/07/2018 | 100,000.00 |
| | 06/11/2018 | 100,000.00 |
| | 07/06/2018 | 100,000.00 |
| | 08/06/2018 | 100,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 09/10/2018 | 100,000.00 |
| **Total RM Acquisition, LLC** | | **3,980,000.00** |
| **Snelling Staffing** | | |
| | 01/02/2015 | 25,000.00 |
| | 02/03/2015 | 25,000.00 |
| | 03/02/2015 | 25,000.00 |
| | 04/02/2015 | 25,000.00 |
| | 05/04/2015 | 25,000.00 |
| | 06/02/2015 | 25,000.00 |
| | 07/02/2015 | 25,000.00 |
| | 08/04/2015 | 25,000.00 |
| | 09/02/2015 | 25,000.00 |
| | 10/02/2015 | 25,000.00 |
| | 11/03/2015 | 41,666.67 |
| | 11/11/2015 | 76.00 |
| | 12/01/2015 | 41,666.67 |
| | 12/30/2015 | 41,666.67 |
| | 01/03/2016 | 41,666.67 |
| | 03/01/2016 | 83,333.34 |
| | 03/31/2016 | 41,666.67 |
| | 05/02/2016 | 41,666.67 |
| | 05/31/2016 | 41,666.67 |
| | 07/01/2016 | 83,333.34 |
| | 09/01/2016 | 41,666.67 |

18

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 09/30/2016 | 41,666.67 |
| | 11/01/2016 | 41,666.67 |
| | 12/01/2016 | 41,666.67 |
| | 02/01/2017 | 41,666.67 |
| | 03/01/2017 | 41,666.67 |
| | 04/04/2017 | 41,666.67 |
| | 05/02/2017 | 41,666.67 |
| | 06/06/2017 | 41,666.67 |
| | 07/10/2017 | 41,666.67 |
| | 08/04/2017 | 41,666.67 |
| | 09/01/2017 | 41,666.67 |
| | 10/04/2017 | 41,666.67 |
| | 11/02/2017 | 41,666.67 |
| | 11/15/2017 | 19,575.00 |
| | 12/01/2017 | 41,666.67 |
| | 12/31/2017 | 397,015.57 |
| | 01/04/2018 | 41,666.67 |
| | 02/07/2018 | 41,666.67 |
| | 03/01/2018 | 41,666.67 |
| | 04/03/2018 | 41,666.67 |
| | 05/02/2018 | 41,666.67 |
| | 05/31/2018 | 41,666.67 |
| | 07/13/2018 | 41,666.67 |
| | 08/01/2018 | 41,666.67 |

19

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 09/04/2018 | 41,666.67 |
| **Total Snelling Staffing** | | **2,125,000.02** |
| **Stila Styles LLC** | | |
| | 01/28/2015 | 20,000.00 |
| | 03/06/2015 | 20,000.00 |
| | 03/18/2015 | 20,000.00 |
| | 04/23/2015 | 20,000.00 |
| | 05/21/2015 | 20,000.00 |
| | 06/16/2015 | 20,000.00 |
| | 07/16/2015 | 20,000.00 |
| | 08/25/2015 | 13,987.19 |
| | 08/31/2015 | 20,000.00 |
| | 08/31/2015 | 25,970.43 |
| | 08/31/2015 | 5,573.28 |
| | 09/22/2015 | 100,000.00 |
| | 09/30/2015 | 5,885.63 |
| | 09/30/2015 | 13,987.19 |
| | 10/01/2015 | 61,631.76 |
| | 10/31/2015 | 13,987.19 |
| | 11/02/2015 | 100,000.00 |
| | 11/30/2015 | 100,000.00 |
| | 11/30/2015 | 13,987.19 |
| | 12/23/2015 | 100,000.00 |
| | 12/30/2015 | 13,987.19 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 01/31/2016 | 13,987.19 |
| | 02/29/2016 | 13,987.19 |
| | 03/09/2016 | 17,015.76 |
| | 03/23/2016 | 86,012.81 |
| | 03/31/2016 | 13,987.19 |
| | 04/26/2016 | 86,012.81 |
| | 04/30/2016 | 13,987.19 |
| | 05/31/2016 | 13,987.19 |
| | 06/06/2016 | 86,012.81 |
| | 06/30/2016 | 13,987.19 |
| | 07/06/2016 | 86,012.81 |
| | 07/31/2016 | 13,987.19 |
| | 08/03/2016 | 86,012.81 |
| | 08/31/2016 | 13,987.19 |
| | 09/08/2016 | 86,012.81 |
| | 09/30/2016 | 13,987.19 |
| | 10/05/2016 | 86,012.81 |
| | 10/31/2016 | 13,987.19 |
| | 11/02/2016 | 86,012.81 |
| | 11/30/2016 | 13,987.19 |
| | 12/07/2016 | 86,012.81 |
| | 12/08/2016 | 4,200.00 |
| | 12/27/2016 | 81,812.81 |
| | 12/31/2016 | 13,987.19 |

21

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 01/31/2017 | 13,987.19 |
| | 02/01/2017 | 3,602.79 |
| | 02/06/2017 | 86,012.81 |
| | 03/01/2017 | 3,602.79 |
| | 03/02/2017 | 86,012.81 |
| | 03/27/2017 | 86,012.81 |
| | 04/01/2017 | 3,602.79 |
| | 04/25/2017 | 30,698.96 |
| | 05/01/2017 | 32,425.14 |
| | 05/05/2017 | 140,054.72 |
| | 06/01/2017 | 32,425.14 |
| | 07/01/2017 | 32,425.14 |
| | 07/12/2017 | 67,574.86 |
| | 07/31/2017 | 67,574.86 |
| | 08/01/2017 | 32,425.14 |
| | 08/30/2017 | 67,574.86 |
| | 09/01/2017 | 32,425.14 |
| | 09/28/2017 | 67,574.86 |
| | 10/01/2017 | 32,425.14 |
| | 11/01/2017 | 32,425.14 |
| | 11/01/2017 | 67,574.86 |
| | 12/01/2017 | 67,574.86 |
| | 12/01/2017 | 32,425.14 |
| | 12/31/2017 | 67,574.86 |

22

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 01/31/2018 | 32,425.14 |
| | 01/31/2018 | 67,574.86 |
| | 02/28/2018 | 32,425.14 |
| | 03/05/2018 | 67,574.86 |
| | 03/29/2018 | 67,574.86 |
| | 03/29/2018 | 32,425.14 |
| | 04/04/2018 | 67,574.86 |
| | 04/04/2018 | 32,425.14 |
| | 05/31/2018 | 32,425.14 |
| | 06/04/2018 | 67,574.86 |
| | 06/08/2018 | 67,574.86 |
| | 06/08/2018 | 32,425.14 |
| | 07/09/2018 | 32,425.14 |
| | 08/02/2018 | 67,574.86 |
| | 08/24/2018 | 32,425.14 |
| | 08/29/2018 | 67,574.86 |
| | 09/24/2018 | 32,425.14 |
| | 09/26/2018 | 67,574.86 |
| **Total Stila Styles LLC** | | **3,860,000.00** |
| **Vulcan Engineering** | | |
| | 01/22/2015 | 20,000.00 |
| | 02/19/2015 | 20,000.00 |
| | 03/18/2015 | 20,000.00 |
| | 04/21/2015 | 20,000.00 |

23

| Portfolio Company | Date | Payment Amount |
|---|---|---|
| | 05/19/2015 | 20,000.00 |
| | 06/16/2015 | 20,000.00 |
| | 07/20/2015 | 20,000.00 |
| | 08/17/2015 | 20,000.00 |
| | 09/15/2015 | 20,000.00 |
| | 10/19/2015 | 50,000.00 |
| | 11/16/2015 | 50,000.00 |
| | 01/04/2016 | 50,000.00 |
| | 02/02/2016 | 50,000.00 |
| | 02/17/2016 | 50,000.00 |
| | 03/29/2016 | 50,000.00 |
| | 05/06/2016 | 50,000.00 |
| | 06/01/2016 | 50,000.00 |
| | 07/19/2016 | 50,000.00 |
| | 08/02/2016 | 50,000.00 |
| | 09/05/2016 | 50,000.00 |
| | 10/04/2016 | 50,000.00 |
| | 11/07/2016 | 50,000.00 |
| | 12/06/2016 | 50,000.00 |
| | 01/04/2017 | 50,000.00 |
| | 02/03/2017 | 50,000.00 |
| | 03/06/2017 | 50,000.00 |
| | 04/10/2017 | 50,000.00 |
| | 05/04/2017 | 50,000.00 |

30863291.1

| Portfolio Company | Date | Payment Amount |
|---|---|---|
|  | 06/06/2017 | 50,000.00 |
|  | 07/12/2017 | 50,000.00 |
|  | 08/10/2017 | 50,000.00 |
|  | 09/06/2017 | 50,000.00 |
|  | 09/29/2017 | 50,000.00 |
|  | 11/06/2017 | 50,000.00 |
|  | 12/04/2017 | 50,000.00 |
|  | 12/31/2017 | 50,000.00 |
|  | 02/09/2018 | 50,000.00 |
|  | 03/20/2018 | 50,000.00 |
|  | 04/04/2018 | 50,000.00 |
|  | 05/07/2018 | 50,000.00 |
|  | 06/04/2018 | 50,000.00 |
|  | 07/02/2018 | 50,000.00 |
|  | 07/30/2018 | 50,000.00 |
|  | 09/04/2018 | 50,000.00 |
| **Total Vulcan Engineering** |  | **1,930,000.00** |
| **TOTAL** |  | **44,175,317.72** |