## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ZOHAR III, CORP.,[1]<br><br>             Debtor. | Chapter 11<br><br>Case No. 18-10512 (KBO) |
| DAVID DUNN, as Litigation Trustee for Zohar Litigation Trust-A,<br><br>             Plaintiff,<br><br>         -against-<br><br>PATRIARCH PARTNERS, LLC; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC; PHOENIX VIII, LLC; OCTALUNA LLC; OCTALUNA II LLC; OCTALUNA III LLC; ARK II CLO 2001-1, LIMITED; ARK INVESTMENT PARTNERS II, LP; ARK ANGELS VIII, LLC; PATRIARCH PARTNERS MANAGEMENT GROUP, LLC; PATRIARCH PARTNERS AGENCY SERVICES, LLC; and LYNN TILTON,<br><br>         Defendants, and<br><br>180S, INC.; GLOBAL AUTOMOTIVE SYSTEMS, LLC; INTREPID U.S.A., INC.; IMG HOLDINGS, INC.; SCAN-OPTICS, LLC; STILA STYLES, LLC; SNELLING STAFFING, LLC; and VULCAN ENGINEERING, CO.,<br><br>         Nominal Defendants. | Adv. Pro. No. 20-50534 (KBO) |
| PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; | |

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Zohar III, Corp. (9612). The Debtor's address is c/o Province, LLC 70 Canal Street, Suite 12E, Stamford, CT 06902. In addition to Zohar III, Corp., the Debtor's affiliates include the following debtors whose bankruptcy cases have been closed prior to the date hereof, along with the last four digits of their respective federal tax identification numbers and chapter 11 case numbers: Zohar II 2005-1, Corp. (4059) (Case No. 18-10513); Zohar CDO 2003-1, Corp. (3724) (Case No. 18-10514); Zohar III, Limited (9261) (Case No. 18-10515); Zohar II 2005-1, Limited (8297) (Case No. 18-10516); Zohar CDO 2003-1, Limited (5119) and (Case No. 18-10517). All motions, contested matters, and adversary proceedings that remained open as of the closing of such cases, or that are opened after the date thereof, with respect to such Closed-Case debtors, are administered in this remaining chapter 11 case.

PATRIARCH PARTNERS XV, LLC;
OCTALUNA LLC; OCTALUNA II LLC;
OCTALUNA III LLC; PATRIARCH
AGENCY SERVICES, LLC; and
PATRIARCH PARTNERS, LLC,

     Counterclaim and
     Third-Party
     Claimants,

   -against-

ZOHAR CDO 2003-1, LIMITED; ZOHAR
CDO 2003-1, CORP.; ZOHAR II 2005-1,
LIMITED; ZOHAR II 2005-1, CORP.;
ZOHAR III, LIMITED; and ZOHAR III,
CORP.,

     Counterclaim and
     Third-Party
     Defendants.

DAVID DUNN, as Litigation Trustee for
Zohar Litigation Trust-A,

     Plaintiff,

   -against-

LYNN TILTON; PATRIARCH
PARTNERS, LLC; PATRIARCH
PARTNERS VIII, LLC; PATRIARCH
PARTNERS XIV, LLC; PATRIARCH
PARTNERS XV, LLC; PATRIARCH
PARTNERS AGENCY SERVICES, LLC;

PATRIARCH PARTNERS
MANAGEMENT GROUP, LLC;
OCTALUNA LLC; OCTALUNA II LLC;
ARK II CLO 2001-1, LIMITED; ARK
INVESTMENT PARTNERS II, L.P.; LD
INVESTMENTS, LLC; ZOHAR HOLDING,
LLC; and ZOHAR HOLDINGS, LLC,

     Defendants.

Adv. Pro. No. 20-50776 (KBO)

**PATRIARCH STAKEHOLDERS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO COMPEL DISCOVERY FROM FTI CONSULTING, INC.**

Dated: August 29, 2024
Wilmington, Delaware

**LEWIS BRISBOIS BISGAARD &
SMITH LLP**
Scott D. Cousins (No. 3079)
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
Telephone: (302) 958-6000
scott.cousins@lewisbrisbois.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Monica Loseman (admitted *pro hac vice*)
1801 California Street, Suite 4200
Denver, CO 80202
Telephone: (303) 298-5700
Facsimile: (303) 298-5907
mloseman@gibsondunn.com

Mary Beth Maloney (admitted *pro hac vice*)
Akiva Shapiro (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
mmaloney@gibsondunn.com
ashapiro@gibsondunn.com

*Counsel to Lynn Tilton, Patriarch Partners,
LLC, Patriarch Partners VIII, LLC,
Patriarch Partners XIV, LLC, Patriarch
Partners XV, LLC, Phoenix VIII, LLC,
Patriarch Partners Agency Services, LLC,
Patriarch Partners Management Group,
LLC, Zohar Holdings, LLC, Octaluna LLC,
Octaluna II LLC, Octaluna III LLC, Ark II
CLO 2001-1, Limited, Ark Investment
Partners II, L.P., LD Investments, LLC and
Ark Angels VIII, LLC*

# **TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

    I.       Patriarch Serves a Subpoena on FTI. ..................................................................3

    II.      The Parties Have Promising and Productive Initial Search Parameters
              Negotiations. .......................................................................................................5

    III.     Patriarch Works with FTI to Substantially Reduce the Review Population
              Via a Privilege-Only Review, But FTI Forces the Parties to Return to
              Square One After Weeks of Negotiation. ...........................................................6

    IV.     Patriarch Makes Another Proposal That, Again, Substantially Reduces the
              Review Population. ..............................................................................................7

    V.       Following the Parties' Miscommunication, Patriarch Continues to Work to
              Reduce Hit Counts and the Associated Burden on FTI, But FTI Refuses to
              Review Documents Absent Cost-Shifting. ..........................................................9

ARGUMENT ..............................................................................................................................12

    I.       The Documents Patriarch Seeks Are Relevant and FTI Does Not Assert
              Otherwise. ..........................................................................................................12

    II.      FTI Has Not Shown That Reviewing 110,000 Documents Represents an
              Undue Burden. ...................................................................................................13

    III.     FTI Must Bear the Costs of Its Own Review, or Seek Reimbursement
              from the Trust—Not Patriarch. .........................................................................14

CONCLUSION...........................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*E.E.O.C. v. Kronos, Inc.*,
694 F.3d 351 (3d Cir. 2012)................................................................13, 14

*Finjan, Inc. v. Rapid7, Inc.*,
2020 WL 5045186 (D. Del. Aug. 7, 2020) ...............................................12

*Gould v. O'Neal*,
2019 WL 4686991 (D.N.J. Sept. 26, 2019) ........................................15, 17

*Invensas Corp. v. Renesas Elecs. Corp.*,
2013 WL 12146531 (D. Del. May 8, 2013)................................................12

*Josephs v. Harris Corp.*,
677 F.2d 985 (3d Cir. 1982)................................................................13, 14

*Kaiser v. Stewart*,
1996 WL 730533 (E.D. Pa. Dec. 10, 1996) ........................................12, 13

*Mallinckrodt LLC v. Actavis Laboratories FL, Inc.*,
2017 WL 5476801 (D.N.J. Feb. 10, 2017) ................................. 2, 15-17

*Momah v. Albert Einstein Med. Ctr.*,
164 F.R.D. 412 (E.D. Pa. 1996).................................................................13

*R.J. Reynolds Tobacco v. Philip Morris, Inc.*,
29 Fed. Appx. 880 (3d. Cir. 2002).............................................................15

*United States v. Connections Cmty. Support Programs*,
2022 WL 2237200 (D. Del. June 22, 2022)..........................................15, 17

**Rules**

Fed. R. Civ. P. 26(b)(1)...............................................................................12

Defendants Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Phoenix VIII, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners Management Group, LLC, Zohar Holdings, LLC, Octaluna, LLC, Octaluna II, LLC, Octaluna III, LLC, Ark II CLO 2001-1, Ltd., Ark Investment Partners II, L.P., LD Investments, LLC and Ark Angels VIII, LLC (collectively, the "Patriarch Stakeholders" or "Patriarch") hereby submit this memorandum of law in support of the *Patriarch Stakeholders' Motion to Compel Discovery from FTI Consulting, Inc.* (the "Motion").

## PRELIMINARY STATEMENT[2]

FTI Consulting, Inc. ("FTI") managed the Zohar II and Zohar III Estates for over four years during the Zohar Funds' Bankruptcy, a period during which the Zohar Litigation Trust-A (the "Trust") did not yet exist. *See* DI 3823 at 12. Indeed, FTI is still listed as the address for the Zohar Funds at the very top of the Bankruptcy docket. For its labors, FTI collected **over $42 million** ($42,173,545 to be exact). *Id.* Now, after over a year spent whittling away at an initial review population of over 300,000 documents, the parties have reached an impasse regarding the review—at the direction of the Trust—of 110,000 documents consisting almost exclusively of documents that the Trust has informed FTI it believes are potentially subject to common interest privilege. To be clear, FTI has never so much as questioned the relevance of these documents, nor has it ever asserted that their review and production is overbroad in relation to their importance to the issues raised in the case. Nevertheless, and despite spurning all of Patriarch's suggestions to reduce its costs, FTI refuses to conduct this Trust-involved and Trust-directed review unless *Patriarch* agrees

---

[2] Citations to "Ex. __" refer to the exhibits attached to the *Declaration of Diane Chan in Support of Patriarch's Motion to Compel Discovery from FTI Consulting, Inc.*, filed contemporaneously herewith.

to foot the bill.  *See* Ex. 4 at 2.  In these circumstances, cost-shifting is plainly not warranted under the applicable case law.

*First*, FTI is not a true "third party."  At the time that the Complaint was filed, the Trust did not exist, but FTI did.  The Complaint, including its first two amended versions, were filed by the Zohar Funds, at which time they were managed and controlled by their Chief Restructuring Officer, Michael Katzenstein of FTI, with the support of FTI personnel, along with their independent director Joseph Farnan, Jr.  FTI could not possibly or fairly have expected to avoid involvement in these Adversary Proceedings.  There is no doubt that a portion of FTI's compensation was earned in connection with conjuring up this very litigation, and FTI, accordingly, can have no expectation that it can now wash its hands of the business without producing documents related to its management of the Funds, and without paying its own costs.

*Second*, even if FTI is treated as a third party, FTI has been and remains "interested" in this litigation as a result of its role in managing Zohar Estates during their Bankruptcy and in bringing this Action.  Moreover, FTI cannot articulate why it—one of the world's leading consulting firms already richly compensated for its work in connection with the facts underlying this Action—is less able to bear the costs of this review than Patriarch, which is itself orders of magnitude smaller than FTI and is bearing extraordinary defense costs as a result of the plethora of claims asserted in this Action by the Trust.  *See, e.g.*, *Mallinckrodt LLC v. Actavis Laboratories FL, Inc.*, 2017 WL 5476801 (D.N.J. Feb. 10, 2017) (non-party was interested in the litigation, and was required to bear its own costs, where it had previously received "million[s] of dollars" from one of the parties and "should have anticipated subsequent . . . litigation").  FTI reports that this review is likely to cost at least $160,000, a fraction of the over $42 million it was paid in connection with the creation

of these documents, and a rounding error for a company that generates an annual income of over $3 billion.

Moreover, if FTI believes it should not bear these costs, it should look to the *Trust*—not Patriarch—for reimbursement, as the Trust's unwillingness to collect and produce documents from the entity that was essentially its predecessor-in-interest and subsequent assertion of an expansive common interest privilege and associated common interest review is the wellspring of the costs associated with FTI's review. Indeed, at the parties' most recent meet and confer approximately one week ago, FTI confirmed that the Trust would provide direction to FTI regarding the documents to be withheld on common interest privilege grounds—but that the Trust refused to conduct the review itself. If the Trust insists on asserting a blanket common interest privilege,[3] and bullying third parties into conducting document reviews accordingly, then to the extent FTI wishes to push the costs of that review onto someone else, in fairness it should look to the Trust, not to Patriarch. Indeed, the only reason Patriarch has been forced to seek broad discovery from third parties in this Action is because of the Trust's inability or unwillingness to collect and produce documents from its former agents, including FTI. *See generally* Adv. D.I. 534.

For all of these reasons, Patriarch's motion to compel production from FTI of these indisputably relevant documents for its defense, without cost-shifting, should be granted.

## FACTUAL BACKGROUND

### I.    Patriarch Serves a Subpoena on FTI.

As a result of FTI's provision and support of the Zohar Estates' Chief Restructuring Officer, *see,* D.I. 297, and management of the Estates in connection therewith, FTI is a critical

---

[3] Patriarch remains largely in the dark as to the contours and breadth of the Trust's common interest privilege and reserves all rights to challenge the privilege at such time as the Trust deigns to explain it.

source of evidence in this Action.  Indeed, during the course of its engagement, FTI essentially

stepped into the shoes of the Zohar Estates.  Nevertheless, the Trust failed to retain documents

created during the course of FTI's management of the Zohar Estates and refused to rectify this

failure by collecting them from its former agent FTI after the fact—even though FTI documents

are, for all intents and purposes, Zohar Estates documents.

Upon the Trust's refusal to collect and produce documents from FTI, Patriarch was forced

to serve its Subpoena to Produce Documents on FTI on February 1, 2023 (the "<u>Subpoena</u>").  *See*

Adv. D.I. 534 at 6.  On February 17, 2023, FTI served its Objections and Responses to the Patriarch

Parties' Subpoena to Produce Documents (the "Responses & Objections").  Therein, FTI agreed

to produce documents in response to each request, stating in relevant part:

> Subject to and without waiving the foregoing objections, FTI will produce
> documents responsive to this request following a meet-and-confer with the
> Patriarch Parties' counsel.

*See generally* Ex. 2.

In August 2023, the parties began negotiations in earnest regarding FTI's compliance with

the Subpoena.  The parties met and conferred on August 16, 2023, at which point FTI requested

that Patriarch provide an initial search parameters proposal.  FTI further explained that Patriarch's

willingness to propose custodians was particularly important, and counsel for FTI expressed the

understanding that 40 or 50 FTI employees worked on the Zohar matter, roughly half of whom

billed over 700 hours to the matter.  Patriarch agreed and acknowledged that it would seek to

devise terms and date ranges to work around materials potentially covered by mediation

confidentiality until the then-forthcoming ruling on the Zohar Litigation Trust-A's (the "Trust")

Motion for a Protective Order, Adv. D.I. 346, concerning the mediation confidentiality issue had

been announced.  At no point during these early negotiations did FTI suggest that it would seek cost-shifting as a condition of compliance.

## II.    The Parties Have Promising and Productive Initial Search Parameters Negotiations.

Following the Court's ruling on the mediation confidentiality issue, on October 13, 2023, Patriarch wrote to update FTI on the ruling and to provide an initial search parameters proposal containing five key FTI custodians, each among the highest billers to the Zohar matter.  *See* Ex. 3 at 2.  A few days later, FTI raised concerns regarding eight terms purportedly "generating mishits." *Id.* at 1-2.  The same day, Patriarch agreed to remove the eight terms entirely.  *Id.* at 1.  The parties then briefly met and conferred on November 7, 2023, at which point FTI explained that Patriarch's initial search parameters proposal was still generating approximately 268,000 hits.  FTI nevertheless expressed a willingness to conduct a large review (with no mention of cost shifting), which Patriarch appreciated and understood as reasonable given FTI's substantial role in the Zohar Bankruptcy, and Patriarch agreed to consider how best to limit the number of documents FTI would ultimately review in an effort to minimize any potential burden on FTI.

The parties discussed various clarifying questions and proposed tweaks to reduce the potential review population in late November 2023.  Ex. 4 at 13-14.  Patriarch then proposed further substantive revisions to the search parameters, revising terms to exclude false positives and inquiring as to FTI's ability to exclude non-responsive documents with "AND NOT" limiters, particularly as applied to other Zohar Estate advisors with whom FTI works on other matters, including Houlihan Lokey, KPMG, and Jefferies (collectively, the "Zohar Advisors").  *Id.* at 13. FTI responded in early December, explaining that there was no "easy way to identify limiting terms for FTI's work with Houlihan, KPMG, and Jefferies."  *Id*.  FTI also confirmed that it had revised the terms as Patriarch proposed in its November 28 email, which worked to reduce the potential review population by a further 17,000 documents.  *Id.*

5

III.    **Patriarch Works with FTI to Substantially Reduce the Review Population Via a Privilege-Only Review, But FTI Forces the Parties to Return to Square One After Weeks of Negotiation.**

Despite the progress the parties had made toward narrowing FTI's potential review population, Patriarch remained committed to further reducing the burden imposed by the Subpoena.  Accordingly—and given what Patriarch explained were "the challenges that we are facing with trying to reduce those hit counts"—Patriarch in mid-December 2023 proposed a streamlined procedure pursuant to which FTI would run "search terms designed to capture potentially privileged documents," conduct a privilege review of those documents, and produce the balance of remaining documents "without the need to conduct a further review for responsiveness."  Ex. 4 at 13.  To ameliorate any potential concerns with this privilege-only review, Patriarch offered "to enter into a clawback agreement that is accommodating of FTI's concerns regarding the inadvertent production of privileged information."  *Id.*

The parties met and conferred to discuss Patriarch's proposal on December 19, 2023.  FTI expressed its concern that Patriarch's proposal would result in the production of documents related to FTI's non-Zohar engagements, which, in its view, could amount to a breach of client confidentiality, and explained that, even removing terms likely to generate non-responsive hits— namely, terms associated with the Zohar Advisors—the potential privilege review population yielded approximately 100,000 documents.  To further narrow this population, Patriarch proposed running certain domains of interest to generate a privilege review population and agreed to the exclusion of emails exclusively between FTI and its counsel.  FTI also conveyed its concerns regarding potential common interest privilege with the Trust and former Zohar Estate professionals and indicated that it would reach out to counsel for the Trust for additional clarity regarding the scope of the asserted common interest privilege.

On December 21, 2023, FTI provided a revised hit report reflecting its search of key domains and other privilege terms and confirmed that it had reached out to counsel for the Trust "but ha[d] not heard back." *Id.* at 12. Patriarch responded on January 2, 2024, acknowledging that the Trust's expansive view of common interest privilege would likely increase the review population, and expressing its view that a 100,000-document review population was appropriate in view of "FTI's central role in managing the Zohar Funds, the size of the team at FTI that worked on this engagement, and the highly relevant nature of the information we believe to be in FTI's possession." *Id.* Patriarch followed up on January 11, 2024, and FTI responded later that day, stating that, as Patriarch predicted, "[a]fter discussions with counsel for other parties, there may be privilege issues that we would need to account for in any review." *Id.* at 11-12. Indeed, FTI explained that counsel for other parties "provided additional terms which resulted in a hit count of over 176,000 documents." *Id.* At this point, FTI also expressed its "reluctan[ce]" to conduct a privilege-only review, and its view that, as a result, the parties were back to square one: a "300,000+ hits" review population. *Id.* FTI did make a counterproposal by "try[ing] to devise search terms using the original list you provided us . . . includ[ing] qualifiers," but stated its view that "if you insist on us running each term individually separated by the 'or' connector, then I do not think we will be able to get the hit count any lower than the 300,000+ hits, which we view as unduly burdensome for a third party to review." *Id.* Once again, FTI did not raise cost-shifting.

## IV.    Patriarch Makes Another Proposal That, Again, Substantially Reduces the Review Population.

Acknowledging that the parties were "back to conducting a review for responsiveness rather than privilege," Patriarch made what it intended to be "one final proposal" to lower the hit counts on January 11, 2024. Ex. 4 at 11. Patriarch's proposal entailed the following:

"[1] FTI would exclude from the searchable population emails that are <u>exclusively</u> between FTI and @sidley.com; [2] FTI would also exclude from the searchable

population emails with a 'patriarchpartners.com' email domain, where that email domain appears in the top header email field; [3] FTI would then apply the following searches string: ('patriarch' or 'octaluna' or 'tilton' or 'lynn' or 'Zohar'); [4] FTI would then exclude the document hits for the above search string from the searchable population.  Then for the remainder of the searchable population, FTI would apply the portfolio company names in the December 8 hit report without limiters."

*Id.* (emphasis in original).

Patriarch made clear that its "intent for structuring the search in this manner is to remove potential duplicates" between the broad search strings in [3] and the portfolio companies reflected in [4], and explained that, "based on recent experience in negotiating search parameters with other third-parties," it "should lower the hit count even further."  *Id.*  That evening, FTI responded with a clarifying question, to which Patriarch promptly responded less than an hour later.  *Id.*

Patriarch followed up on January 26, 2024.  *Id.*  FTI responded later that day noting that Patriarch's final proposal reduced hit counts from the "300,000+" discussed earlier in the month to 122,000 documents.  *Id.* at 10-11.  Nevertheless, FTI stated its position that the potential review population remained "unduly burdensome for a non-party," apparently unmoved by Patriarch's explanation of FTI's central role in the Zohar bankruptcy and the substantial compensation it extracted from the Zohar Estates from that role.  *Id.* at 10.  FTI did, however, propose a path forward at this time, asking Patriarch if it would be amenable to the addition of limiters as well as the exclusion of unique hits associated with the Zohar Advisors and other key Zohar Estate players.  *Id.*  FTI also first raised the possibility of "discuss[ing] cost-shifting."  *Id.*  Patriarch promptly agreed to the removal of unique hits for terms associated with the Zohar Advisors, Zohar III noteholders and their counsel, and the Litigation Trustee, as well as the generic term "portfolio comp*."  *Id.*  With respect to limiters, Patriarch explained that it was reluctant to adopt limiters (or qualifiers) "unless absolutely necessary based on our experiences negotiating search terms with

8

other parties," and the "number of issues . . . with such qualifiers" tending to be both over- and under-inclusive from term to term. *Id.*

The parties' continued negotiations moved the ball in the right direction as, with these modifications, Patriarch's latest proposal generated a review population of 67,000 documents. *See Id.* at 9-10. FTI expressed the view that this was *still* too burdensome, and, complicating things further, Patriarch realized thereafter that there had been a miscommunication between the parties and that FTI had omitted from its hit report certain key terms that, when run correctly, resulted in a "true" review population of 244,000 documents. *Id.* at 8-10.

**V.     Following the Parties' Miscommunication, Patriarch Continues to Work to Reduce Hit Counts and the Associated Burden on FTI, But FTI Refuses to Review Documents Absent Cost-Shifting.**

Undeterred by yet another setback in negotiations, Patriarch continued to work toward a resolution of the Subpoena acceptable to both Patriarch and FTI. Once FTI revealed that it had not applied the search parameters as Patriarch intended, Patriarch sought to further reduce the hit counts by "further narrow[ing] our proposed search parameters by reducing the number of custodians [from five to three], and applying search term limiters." Ex. 4 at 6. Patriarch's proposed revisions, as well as some further minor tinkering, *see id.* at 4-5, worked to reduce the review population to the 110,102 documents—the documents at issue in this Motion. Patriarch viewed and continues to view this population as reasonable because of FTI's substantial role in managing the Zohar Estates (as well as its compensation for that role), but, nevertheless, continued to attempt to minimize the number of documents FTI would ultimately need to review.

On June 27, 2024, Patriarch proposed a procedure by which FTI would review approximately 32,000 potentially common interest privileged documents,[4] and produce without review the remaining approximately 78,000 documents to Patriarch subject to "a clawback provision" that "would apply to any inadvertently produced materials in the population of 78,000 documents." *Id.* at 4-5.  Patriarch followed up on July 9, 2024 and shared its expectation based on experience with similarly situated third parties such as Teneo that "we would expect the Trust, and not FTI, would also handle reviewing the roughly 32,000 documents mentioned below for privilege." *Id.* at 4.  FTI responded on July 24, 2024 and reported that, as a result of "FTI's . . . duties to its clients to maintain confidences with respect to its engagements," it would not produce documents without first conducting a responsiveness review.  *Id.*  FTI proposed two options: (1) FTI would review the 110,000 documents at Patriarch's expense; or (2) FTI would work with the Trust to "de-duplicat[e]" the review population against FTI documents already produced in this Action.  *Id.*  Patriarch responded that day to seek clarification as to whether the Trust would review any FTI documents for common interest privilege and whether the de-duping process FTI proposed was feasible.  *Id.*

FTI and the Trust conferred regarding these issues during the ensuing weeks, and on August 14, 2024, FTI let Patriarch know that de-duplication "efforts will only eliminate about 2,300 documents" from the review population and that, importantly, the Trust "would want to review for privilege anything we deem responsive, not just the 32,000 that you have identified." FTI further conveyed that they had "not received confirmation that [the Trust is] willing to review

---

[4] As a point of comparison, Ankura, a third party similarly involved in the management of the Estates as replacement Collateral Manager and Administrative Agent, agreed to review over 40,000 documents.  On information and belief, Ankura was compensated substantially less than FTI for its work in connection with the Estates. *See, e.g.*, D.I. 491.

a population that large." *Id.* at 3. FTI followed up that week to further explain that "*[f]ollowing discussions with the Trust's counsel*, FTI would review all 110,000 documents for both responsiveness and privilege." *Id.* at 2 (emphasis added). At the Trust's behest, FTI rejected Patriarch's suggestion that *just* 32,000 of the 110,000 documents could possibly implicate a common interest privilege, stating that "*the Trust's counsel believes that there is likely a far greater population that may contain privileged information*." *Id.* (emphasis added). FTI concluded by saying that "the Trust's counsel believe that it would be most efficient for FTI to review documents for both responsiveness and privilege at one time." *Id.* At Patriarch's urging, later that day, FTI further confirmed that, unlike as to the other third parties over whose documents the Trust is asserting its common interest privilege, the Trust did not "intend[] to review" FTI documents "with the caveat that *FTI may consult the Trust on certain privilege calls*." *Compare id.*, *with* Ex. 5 at 3 ("I'm told by the Trust's counsel at Quinn Emanuel that they have been reviewing the documents but that it has not been completed yet").

On August 16, 2024, the parties again met and conferred, at which point FTI confirmed that FTI would not review the 110,000 documents absent cost-shifting—that is, unless Patriarch agreed to foot the bill—that the Trust informed FTI that it believes substantially all of the documents that would be reviewed for privilege were potentially subject to common interest privilege (and as the parties had previously agreed to exclude from review potentially attorney-client privileged documents), and that the Trust would provide direction to FTI regarding the documents to be withheld on common interest privilege grounds but would not conduct a review itself. These points confirmed, Patriarch in turn confirmed that it would not agree to pay the cost of FTI's review, that the parties were therefore at an impasse on the issue of cost-shifting, and that Patriarch would seek relief from the Court accordingly. On August 23, 2024, FTI reported that

11

the review was estimated to cost "$160,000 based solely on document count, so recognize the cost could be more or less once the review is underway." Ex. 4 at 1.

## ARGUMENT

### I.    The Documents Patriarch Seeks Are Relevant and FTI Does Not Assert Otherwise.

The *sine qua non* of discovery is that documents sought must be relevant.  *See* Fed. R. Civ. P. 26(b)(1).  When a party objects to discovery request, it is the burden of the party seeking the discovery to "show the relevance of the information requested."  *See, e.g.*, *Kaiser v. Stewart*, 1996 WL 730533, at *2 (E.D. Pa. Dec. 10, 1996).  "Relevance is liberally construed to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case."  *Finjan, Inc. v. Rapid7, Inc.*, 2020 WL 5045186, at *2 (D. Del. Aug. 7, 2020).  Once relevance is established, however, the burden shifts to the objecting party to "show why discovery, even if relevant, should not be permitted."  *Id.*; *see Invensas Corp. v. Renesas Elecs. Corp.*, 2013 WL 12146531, at *2 (D. Del. May 8, 2013) (same).

Following and aside from boilerplate reservations of right, in over a year of meet and confer negotiations FTI has not objected to the relevance of the documents Patriarch seeks.  *See generally* Exs. 2-4.  Nor can it.  The documents Patriarch seeks concern, *inter alia*, the Zohar Funds' performance and FTI's evaluation thereof, payments made by and received from the Estates, the Portfolio Companies, Zohar noteholders, the monetization process, and the Patriarch Parties themselves.  *See generally* Ex. 1.  As Patriarch has explained on multiple occasions, *see* Adv. D.I. 534, 566, the requested documents are relevant to a range of the Trust's many claims and allegations.  Indeed, though the Trust has refused to make any new document collections from former agents like FTI, it has produced approximately 20,000 documents with "FTI" listed as custodian—mystifyingly in its possession—further underscoring FTI's significance to this Action and the relevance of the documents Patriarch seeks.

## II.     FTI Has Not Shown That Reviewing 110,000 Documents Represents an Undue Burden.

The relevance of the documents and communications sought established (and unquestioned), it is FTI's burden to demonstrate why discovery should not be permitted.  *See Kaiser*, 1996 WL 730533, at *2.  A party resisting discovery of relevant documents "must show *specifically*" how the information requested is "overly broad, burdensome, or oppressive." *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982) (emphasis added).  The "[m]ere recitation of the familiar litany that . . . a document production request is 'overly broad, burdensome, oppressive and irrelevant' will not suffice."  *Momah v. Albert Einstein Med. Ctr.*, 164 F.R.D. 412, 417 (E.D. Pa. 1996) (citing *Josephs*, 677 F.2d at 992).  To the contrary, a finding of undue burden "requires at least some evidence to support a party's assertion about what the actual costs of compliance will be."  *E.E.O.C. v. Kronos, Inc.*, 694 F.3d 351, 372 (3d Cir. 2012).[5] FTI's conclusory assertion that, absent cost-shifting, conducting the document review contemplated by the parties' negotiations to date—including coordinating the Trust's requested involvement—will be unduly burdensome, is insufficient to establish burden.

The core of FTI's objection to the Subpoena is not that the requests themselves are irrelevant, overbroad, or unduly burdensome, nor is it that the review population itself is too large *per se*.  Because FTI apparently agrees that the documents generated by the parties' exhaustively negotiated search parameters are relevant, this distinction is important: it exposes that FTI's real issue is with the cost associated with the number of documents it possesses that are relevant to this action and, thanks to the Trust's position, obtainable from no other source.  That FTI possesses a

---

[5] The Third Circuit also "adopt[ed] the general proposition that a non-party should not be expected to bear as great an expense as a party when complying with a subpoena" in *Kronos Inc.*, 694 F.3d at 372.  There is certainly no risk of that here (at least as to Patriarch).

large number of documents responsive to the Subpoena should be no surprise to anyone familiar with the Zohar Funds Bankruptcy—indeed, FTI admits that 40-50 professionals billed to the Zohar matter, many billing over 700 hours, over the course of the four years it managed the Zohar Estates. FTI was richly compensated for that engagement, *see* D.I. 3823 at 12, and cannot, in fairness, now hold for ransom the critically important documents that were created during the course of its work with the Estates. Merely complaining about the cost of reviewing the documents is insufficient to establish undue burden, especially, where, as here, FTI has done nothing to show specifically how the information requested is "overly broad, burdensome, or oppressive." *See Josephs*, 677 F.2d at 992; *see also Kronos Inc.*, 694 F.3d at 372.

## III. FTI Must Bear the Costs of Its Own Review, or Seek Reimbursement from the Trust—Not Patriarch.

Moreover, FTI is no true third party. While FTI may or may not have continuing involvement with the Trust today, it is indisputable that FTI was involved in the conjuring and bringing of at least this Adversary Proceeding. Indeed, the Trust *did not exist* until well after the Zohar Adversary Complaint was first filed and subsequently amended *twice*. *See* Adv. D.I. 2 (the "Complaint") (listing the Debtors' address as "3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036); 129 (the "First Amended Complaint") (same); 179 (the "Second Amended Complaint") (same). When the Complaint and its first two amended versions were filed, Independent Director Joseph Farnan, Jr. and Chief Restructuring Officer Michael Katzenstein— employed and supported by FTI—ran the show. In view of Judge Farnan's role in managing the Estates, Farnan LLP has agreed to bear the costs associated with reviewing and producing costs in response to Patriarch's subpoena. Now it's FTI's turn to do the same.

Even if the Court does view FTI as a third party, FTI cannot carry its burden with respect to cost-shifting and should be compelled to conduct the contemplated document review at its own

expense—or to seek reimbursement from the Trust, if it is so inclined.  Though case law regarding cost-shifting is limited, courts in this jurisdiction have applied a three-factor test in determining whether costs should be shifted from a non-party: (1) whether the non-party has an interest in the outcome of the case; (2) whether the non-party can more readily bear the costs than the requesting party; and (3) whether the litigation is of public importance.  *See Gould v. O'Neal*, 2019 WL 4686991, at *5 (D.N.J. Sept. 26, 2019); *United States v. Connections Cmty. Support Programs*, 2022 WL 2237200, at *2 (D. Del. June 22, 2022) (citing *Gould*, 2019 WL 4686991).[6]  These factors as applied to FTI make clear that cost-shifting is not warranted and that FTI should bear its own costs of compliance with the Subpoena—or should look to the Trust to cover its costs.

*First*, FTI has an interest in the outcome of this Action.  Even if "not altogether obvious," a non-party may be interested in the outcome of a litigation where its involvement in the facts underlying the litigation, including compensation in connection that involvement, renders the non-party susceptible to subsequent litigation and other negative consequences.  *Gould*, 2019 WL 4686991, at *5.  For example, the *Gould* court found that non-party Chase Bank had "some interest in the outcome" of a case related to an underlying investigation with which Chase was interested because "a ruling in favor of Plaintiff may result in a lawsuit against Chase, public backlash and/or some form of other negative consequences for their role in the investigation."  *Gould*, 2019 WL 4686991, at *5.  So too here.

---

[6]    Specifically, the Third Circuit has instructed that cost-shifting is mandatory under Federal Rule of Civil Procedure 45 to protect non-parties from "*significant* expense resulting from" a document subpoena, after a determination by the district court of significance under the circumstances.  *R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed. Appx. 880, 882-83 (3d. Cir. 2002).  The three-factor test set forth above is the test for determining whether the expenses are "significant" under FRCP 45.  As the factors make clear, this is not a simple inquiry as to the *amount* of the expenses at issue.  *See, e.g.*, *Mallinckrodt LLC v. Actavis Laboratories FL, Inc.*, 2017 WL 5476801 (D.N.J. Feb. 10, 2017) (document review estimated to cost approximately $400,000 deemed not significant, and non-party ordered to bear its own costs).

As discussed *supra*, FTI managed the Zohar Estates during the Zohar Funds' Bankruptcy, a period which Patriarch maintains (and FTI appears to agree) is critically important to the adjudication of the Trust's claims.  Indeed, Patriarch has consistently shared its view that the Debtors and their agents, including FTI, bear responsibility for the substantial deterioration of the value of the Zohar Funds' collateral during the Bankruptcy.  Thus, if during the course, or as a result, of the outcome of this litigation, Patriarch's position is vindicated, FTI may well find itself on the receiving end of "negative consequences."  *Id.*  There can be no question that the Estates' Chief Restructuring Officer and his firm were consulted in connection with the drafting and filing of one or both of the Complaints that initiated these Adversary Proceedings—particularly given FTI received "million[s] of dollars" from the Estates for its work, including during that very period.  *Mallinckrodt*, 2017 WL 5476801, at *5 (D.N.J. Feb. 10, 2017).  FTI "should have anticipated subsequent . . . litigation."  *Id.*  FTI is, therefore, interested in the outcome of this litigation.

*Second*, FTI can plainly more readily bear the costs than Patriarch, and, in any case, can make no showing to the contrary.  As the Court is well aware, Patriarch has incurred and continues to incur extraordinary costs in connection with its own discovery obligations in this Action as well as in connection with the current campaign of third-party discovery made necessary by the Trust's avoidance of its own obligations.[7]  *See* Adv. DI 534.  Ms. Tilton testified to as much at the

---

[7] As the Court is aware, the Trust and MBIA have asserted a collective 47 claims spanning a period of 23 years.  In responding to extensive discovery requests covering that vast scope, Patriarch has reviewed and produced approximately one million documents in this Action, and reviewed and logged as privileged a further approximately 80,000 documents, in addition to deeming produced hundreds of thousands of documents from other actions to which the Zohar Funds were party.  Patriarch has also devoted substantial resources to responding to virtually endless questions, demands, and informal written discovery requests from the Trust.  It has also had to seek discovery from approximately 20 third parties—including FTI—to obtain the documents it needs to mount its defense in the vacuum left by the Trust's positioning of itself as a shell entity without control over the documents of its agents and advisors. The costs incurred by Patriarch to date in these efforts have been nothing short of extraordinary, and Patriarch is concerned that the Trust's actions suggest it has been the Trust's strategy to engage in scorched-earth discovery and to take the

confirmation hearing, stating that Patriarch suffered substantial net losses related to the Zohar

Funds between 2004 through 2022, a period which does not include any of the extraordinary

discovery expenses incurred in connection with this Action.  D.I. 3397 (June 21, 2022 Hr'g Tr.) at

23:20-24:4; Ex. 10.  FTI, on the other hand, bills itself as a "market-leading global consulting firm"

and advisor to nearly all of the world's leading private equity funds, banks, corporations, and law

firms in addition to touting its over 8,000 employees worldwide and $8.1 billion equity market

capitalization.  *See* Ex. 6 at 2-3.  In 2023 alone, FTI reported income of $3.489 billion.  Ex. 7 at 1.

And on July 25, 2024, FTI reported "record" results for the second quarter of 2024.  Ex. 8 at 1.

With all this financial might—not to mention the $42 million dollars it received as a result of the

work that generated the very documents at issue, *see* D.I. 3823 at 12—it is clear that FTI can more

readily bear the costs of conducting the contemplated review than Patriarch.  *See Gould*, 2019 WL

4686991, at *5 (finding that Chase Bank was "unquestionably in a better position to bear any such

costs" due to its position as "one of the largest companies in the world" and annual income in the

billions of dollars).[8]

    *Third*, while the Court need not find that the litigation is of public importance to grant

Patriarch's Motion given the first two factors, *see, e.g.*, *Mallinckrodt*, 2017 WL 5476801, at *5

(holding that the non-party "shall bear its costs" despite finding that "there is no discernible public

importance" to the litigation); *Gould*, 2019 WL 4686991, at *5 (same), this Action is of public

importance.  That this litigation is of public importance is evidenced by the extensive media

---

aforementioned positions with respect to its agents and advisors primarily for the purpose of driving up
costs for Patriarch and making it impossible for Patriarch to adequately defend itself.

[8] And if, in spite of the vast disparity in the parties' resources, FTI seeks to argue that Patriarch has not
adequately established its *inability* to pay, that argument is inapposite.  The inquiry is whether the non-
party can **more readily** bear the costs than the requesting party, not whether the requesting party can bear
them as well or at all.  *See Connections Cmty. Support Programs*, 2022 WL 2237200, at *2; *see also Gould*,
2019 WL 4686991, at *5 ("the operative inquiry is whether the nonparty can 'more readily' bear the cost,
not whether the requesting party is able to do so").

coverage of Ms. Tilton and this Action specifically.  *See, e.g.*, Ex. 9.  Likewise, the consequences

of the outcome of this litigation may be far-reaching.  The Zohar Funds were novel collateralized

loan obligations premised on Ms. Tilton's business-patented model.  *See* D.I. 5 ¶ 19.  Each of the

Zohar Funds' Noteholders understood that the Funds' strategy hinged on Ms. Tilton's active

management of all facets of the Funds and their Portfolio Company.  *Id.* ¶¶ 21, 32-36.  That strategy

emphasized the rehabilitation of "undervalued, iconic American brands" in order to "create[e] and

preserv[e] jobs in America and across the globe."  *Id.* ¶ 16.  Accordingly, this litigation concerning

the rise and fall of the Zohar Funds, and Ms. Tilton's role in the former and absolution of the latter,

are of public importance because they implicate novel financial structures and the disposition of

companies employing thousands of individuals at home and abroad.

      Each of the three factors considered in evaluating whether the expenses associated with a

non-party subpoena are "significant" weighs against cost-shifting and favors granting this Motion

seeking to compel FTI to produce relevant documents while bearing its own costs of review and

production.  Important policy considerations do too.  FTI managed the Zohar Estates and was

compensated accordingly.  *See* DI 3823 at 12.  As a result, FTI possesses a large quantity of

documents relevant to this Action.  Given its role, FTI was involved in drafting and filing of at

least the Zohar Adversary Complaint and cannot be at all surprised that it is being asked to produce

document in this action.  Patriarch—already forced to bear the significant costs of its third-party

efforts seeking critical documents as a result of the Trust's unwillingness or inability to collect and

produce these clearly relevant documents—should not be forced to pay twice to obtain documents

necessary to its defense.  To force Patriarch to do so would be to set the precedent that a plaintiff

may push its discovery obligations off to a deeply involved non-party in order to force its adversary

into an impossible dilemma: deplete resources necessary to defend itself or forego documents necessary to defend itself.  Something has to give.

These concerns are further amplified by the Trust's recent interference with FTI's review process.  Not only is the Trust seeking to force Patriarch to pay the costs of obtaining clearly relevant FTI documents that were, in all material respects, the Trust's own documents, but it has also abandoned its prior practice of patrolling its own vast purported common interest borders by conducting the common interest privilege review itself and bearing the costs in connection therewith.  Now, in connection with the FTI production, it has changed course and is trying to coerce a third party, FTI, to bear those costs itself while preserving its role in shaping the review process.  *See, e.g.*, Ex. 5.  There can be no explanation for this other than that the Trust seeks to shift the cost of its own discovery obligations, including now the cost of its own document review, onto Patriarch.  To reward this conduct would be to do mischief on the document discovery process in this jurisdiction.

If FTI and the Trust are allowed to proceed as they have contrived at Patriarch's expense, there will be nothing stopping a plaintiff from asserting a staggeringly broad common interest privilege without explanation, and then using that privilege to collude with a critical (and intimately involved) non-party to drive up the defendant's costs or impede their access to potentially exculpatory evidence altogether—as the Trust now seeks to do here.  If the Trust persists in maintaining an extraordinarily broad common interest privilege—and Patriarch reserves all rights as to the propriety of such assertions—fairness requires that either it, or FTI, bear the costs associated therewith.  For that reason, FTI should be compelled to conduct the review it has agreed with Patriarch at its own expense.  If FTI is not willing to devote a tiny portion of its vast resources towards complying with the Subpoena, it should take that issue up with the Trust, who,

in fairness, should have collected, reviewed, and produced these documents well over a year ago and certainly should foot the bill for the common interest review it is now insisting on.

## **CONCLUSION**

For the reasons set forth herein, the Patriarch Stakeholders respectfully request that the Court grant the Motion.

[*The remainder of the page is intentionally left blank.*]

Dated: August 29, 2024
Wilmington, Delaware

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

*/s/ Scott D. Cousins*
Scott D. Cousins (No. 3079)
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
Telephone: (302) 958-6000
scott.cousins@lewisbrisbois.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Monica Loseman (admitted *pro hac vice*)
1801 California Street, Suite 4200
Denver, CO 80202
Telephone: (303) 298-5700
Facsimile: (303) 298-5907
mloseman@gibsondunn.com

Mary Beth Maloney (admitted *pro hac vice*)
Akiva Shapiro (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
mmaloney@gibsondunn.com
ashapiro@gibsondunn.com

*Counsel to Lynn Tilton, Patriarch Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Phoenix VIII, LLC, Patriarch Partners Agency Services, LLC, Patriarch Partners Management Group, LLC, Zohar Holdings, LLC, Octaluna LLC, Octaluna II LLC, Octaluna III LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC and Ark Angels VIII, LLC*